**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

ANTHONY JAKES,

                     Plaintiff,

        v.

KENNETH BOUDREAU, ESTATE OF
MICHAEL KILL, LOUIS CAESAR,
THOMAS PACK, MICHAEL DELACY,
KEN BURKE, FRED BONKE, CITY OF
CHICAGO, and UNKNOWN EMPLOYEES
OF THE CITY OF CHICAGO,

                    Defendants.

Case No._____

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff ANTHONY JAKES, by his attorneys LOEVY & LOEVY, complains of

Defendants CITY OF CHICAGO, MICHAEL KILL, KENNETH BOUDREAU, LOUIS

CAESAR, THOMAS PACK, MICHAEL DELACY, KEN BURKE, FRED BONKE, and

UNKNOWN EMPLOYEES OF THE CITY OF CHICAGO, and states as follows:

### INTRODUCTION

1.      In September 1991, fifteen-year-old Anthony Jakes falsely confessed to being an

accessory to murder, a crime for which he is wholly innocent. That fabricated confession led to

Mr. Jakes being wrongfully convicted and spending twenty years in prison before he was

exonerated.

2.      The confession was the product of abuse: Defendant Chicago Police detectives

Michael Kill and Kenneth Boudreau held Mr. Jakes for more than sixteen hours without food,

water, or access to his guardian, and eventually beat him into falsely claiming he was a lookout

while another man committed murder.

3.      Unbeknownst to the interrogators at the time, the narrative they fabricated and coerced Mr. Jakes to repeat as a confession was not only false but impossible: Mr. Jakes could not have seen the victim from his home, as the confession claimed, because his house was behind another building that completely blocked his view of the crime scene.

4.      Tragically, Mr. Jakes is but one of dozens of young men of color who have accused these Defendants of the exact same misconduct during interrogations. To date, sixteen men who were convicted after falsely confessing to Defendants Boudreau and Kill have had their convictions overturned. Indeed, Mr. Jakes is but one of more than a hundred people who have accused Chicago Police Department officers of misconduct during custodial interrogations; because doing so was part and parcel of the City of Chicago's custom, policies, and practices.

5.      Mr. Jakes was exonerated only after he was wrongfully incarcerated from age fifteen through thirty-five. He will never recover that time. But he brings this suit to redress the harm Defendants inflicted upon him and to expose the systemic abuses that allowed his wrongful conviction to happen with the hope that no other innocent people will suffer the nightmare of being wrongfully convicted of murder.

## JURISDICTION AND VENUE

6.      Mr. Jakes brings this action pursuant to 42 U.S.C. § 1983 and Illinois law to redress Defendants' tortious conduct and the deprivation under color of law of his rights secured by the United States Constitution.

7.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1367.

8.      Venue is proper under 28 U.S.C. § 1391(b). Mr. Jakes resides in this judicial district and the events and omissions giving rise to Mr. Jakes's claims occurred in this judicial district.

## PARTIES

9.      Plaintiff Anthony Jakes is a forty-two-year-old resident of Chicago, Illinois. He spent twenty years—almost half his life—in prison for a murder he did not commit. Apart from his wrongful murder conviction, Mr. Jakes has never been convicted of any crime.

10.     Defendants Detectives Michael Kill (#4123), Kenneth Boudreau (#17998), Louis Caesar (#7208); Officers Thomas Pack (#2877) and Michael DeLacy (#14120); Youth Officer Ken Burke (#3037); and Sergeant Fred Bonke (#2108) are current or former officers and employees of the City of Chicago Police Department and the City of Chicago. These officers participated in the investigation of Rafael Garcia's homicide, which resulted in Mr. Jakes's wrongful conviction.

11.     Defendant Unknown Employees of the City of Chicago also participated in the misconduct alleged in this complaint.

12.     The City of Chicago is a municipal corporation that is or was the employer of the above-named defendants.

13.     Each of the individually-named defendant police officers (hereafter the "Defendant Officers") acted under color of law and within the scope of his employment at all times relevant to this lawsuit.

## FACTS

### The Crime

14.     In the late hours of September 15, 1991, an unknown person shot Rafael Garcia just after he left Queen Submarine, a restaurant at 1206 West 51st Street in Chicago. Garcia was in the driver's seat of his car when the shooter fired through the passenger window, striking him four times. The shooter fled the scene.

15.     After he was shot, Garcia got out of his car and fell to the ground in front of 1208 West 51st Street, where he was discovered by responding Chicago police officers.

16.     Garcia was transported to Cook County Hospital, where he died from the gunshot wounds.

### The Investigation

17.     At 11:55 p.m. on September 15, 1991, the Chicago Police Department received an anonymous call reporting the shots that killed Garcia were intended for the person sitting in the passenger seat, a man known as Snake.

18.     About four hours later, two Chicago police officers interviewed an employee of a liquor store just east of Queen Submarine. The liquor store employee also told police the shots were intended for Snake, a passenger in Garcia's car. The witness added that the shooter was a six-foot tall, skinny, black male with the last name Thomas. He reported that Thomas carried out the shooting at the direction of a man named Troy who drove a Camaro and lived on the 5000 block of Elizabeth Street.

### Anthony Jakes

19.     Plaintiff Anthony Jakes had turned fifteen years old less than two months before Garcia was killed. He was five feet eight inches tall and weighed only 125 pounds.

20.     Mr. Jakes was an eighth-grade student at an alternative school who struggled with reading.

21.     In September 1991, Mr. Jakes lived with his aunt and guardian, Jessie Mae Jones, in the rear house on the lot at 1212 West 51st Street, three doors west of Queen Submarine.

22.     Mr. Jakes had no involvement whatsoever in Garcia's killing.

23.     On the night of murder, at about 11:30 p.m., Mr. Jakes was on 51st Street in front

of his aunt's house when a car drove by. One of the people in the car threw a bottle that broke a second-floor window of the house at 1210 West 51st Street, next door to Mr. Jakes's home. Mr. Jakes helped clean up the broken glass.

24.     Afterward, Mr. Jakes and his cousin went to the alley behind his aunt's house to throw away the glass. There, they encountered a group of boys they had been arguing with earlier. Mr. Jakes ran away toward a friend's house, and then circled back to 51st Street.

25.     When Mr. Jakes returned to 51st Street, he saw a Chicago Fire Department ambulance in front of Queen Submarine.

26.     Mr. Jakes went to the back lot and joined his aunt and neighbors who were gathered on the front porch. Ms. Jones sent Mr. Jakes into the house soon after.

**Defendants Arrest Mr. Jakes and Fabricate Evidence to Keep Him at Area 3**

27.     The day after the murder, September 16, 1991, at about 12:30 p.m., the police received another anonymous call. This caller reported that a boy named Anthony Jakes might have information about Garcia's death.

28.     Soon after, Defendants Pack, DeLacy, and at least two other plain-clothes Chicago Police officers barged into Mr. Jakes's home without permission. At the time, Anthony was in an upstairs bedroom.

29.     When these Defendants forced their way inside, Anthony's aunt began yelling. The commotion attracted Plaintiff's attention, and, as he came down the stairs, Defendants charged up, slammed him against the wall, and cuffed his hands behind his back.

30.     The officers ignored Anthony's and his aunt's questions about why they were handcuffing him, whether they had a warrant, and where they were taking the fifteen-year-old.

31.     Instead, with no explanation and without Anthony's or Ms. Jones's consent,

Defendants drove Plaintiff three-and-a-half miles away to the Chicago Police Department Area 3 detective headquarters at 39th Street and California Avenue.

32.     At Area 3, Defendants took Anthony to the Violent Crimes Unit on the third floor and locked him in a bullpen commonly referred to by Area 3 detectives as the "cage."

33.     Sometime later, one of the Defendant arresting officers reached inside Anthony's pants pocket and falsely claimed to have found a small foil packet containing cocaine.

34.     Defendants falsely arrested Anthony for drug possession as a pretense to keep him at the police station.

35.     A youth officer processed Anthony for the drug charge—which was later dismissed—around 3:30 p.m.

36.     Thereafter, Anthony was locked in a room at Area 3.

37.     At about 4:15 p.m., Detectives Duckhorn and O'Riley questioned Anthony about Garcia's murder. Anthony told the detectives he did not know anything about the murder, and he relayed the events of his night: cleaning up the broken glass and then returning to see the ambulance on 51st street.

38.     In an effort to help, Anthony told the detectives that his aunt had told him three women, Annette and Denise Harris and Nikia Little, might have information about the murder because they were on the front porch of the front building at 1212 West 51st Street when the shooting occurred.

### Defendants Fabricate Evidence Implicating Anthony Including Coercing Him Into Signing a False Confession

39.     Less than half an hour later, Defendants Kill and Boudreau questioned Anthony again. Anthony told them the same facts he shared with Duckhorn and O'Riley, including about the potential witnesses to the murder.

40.     Without Anthony's consent, Defendants Kill and Boudreau locked him in an interrogation room and left, ostensibly to investigate the murder.

41.     Anthony spent the next six hours, from sometime around 4:45 p.m. to about 10:45 p.m. sitting in a bare room. During that time, he had no contact with his guardian or any other family member, and was provided no access to a telephone, food, or water.

42.     In the meantime, Defendants Kill and Boudreau went to the crime scene and interviewed the Harrises and Little, who provided no information about the murder. Defendants also interviewed an unnamed neighbor, who reported that he went to the scene after the shooting and heard a woman asking if Snake was alright.

43.     Defendants Kill and Boudreau did not try to find Thomas, the alleged shooter, or Troy, the alleged mastermind behind the crime, who lived on the 5000 block of South Elizabeth and drove a Camaro. Rather, Defendants Kill and Boudreau set about trying to falsely implicate Anthony in the murder.

44.     Kill and Boudreau claimed they recognized Snake as a nickname for a drug dealer named Gus Robinson. They found Snake nearby and brought him to Area 3 for questioning.

45.     Back at Area 3, Kill and Boudreau interrogated Snake before returning to Anthony.

46.     At this point, fifteen-year-old Anthony had been in police custody for over ten hours.

47.     Defendants Kill and Boudreau falsely claimed that he voluntarily remained at the police station all that time locked in an interrogation room.

48.     Though Defendants had Anthony's aunt's phone number, Kill and Boudreau never attempted to contact her. Indeed, they never tried to contact any of Anthony's family

members or gave him access to a telephone to call his family himself.

49.     Around 10:45 p.m., Defendants Kill and Boudreau began Anthony's third interrogation. Although police regulations required a youth officer to be present while detectives interrogated a fifteen-year-old child without a parent or guardian, Defendants Kill and Boudreau intentionally chose not to summon anyone to witness Anthony's interrogation.

50.     Alone in the room with Anthony, Kill and Boudreau accused him of participating in the murder. Plaintiff repeated that he was innocent.

51.     In response, Kill slapped Anthony in the face and threatened to throw him out a window.

52.     When Anthony continued to maintain his innocence, Kill told him he would recruit members of the Latin Kings street gang to kill Anthony's family.

53.     Anthony continued to resist Defendants' efforts to get him to falsely confess. As a result, Kill tried to burn him with a cigarette. Kill also knocked Anthony from his chair to the ground, and Defendants Kill and Boudreau started punching and kicking him, causing Anthony to cut his back on a locker against the wall of the interrogation room.

54.     A fifteen-year-old child, Anthony feared for his life. When Defendants told Anthony he could go home if he confessed, he believed them. Anthony thought if he cooperated with Defendants and said what they wanted him to say—that he was a lookout while someone else shot Garcia—he would get to go home.

55.     Separately, Snake, a two-time convicted felon, spent the night at Area 3 and ultimately signed a statement at 3:50 a.m. after being interrogated by Defendant Kill.

56.     Snake's fabricated statement, which Defendants knew was false, does not mention Snake being the target of the shooting, a passenger in the victim's car, or being at the scene when

the shooting occurred. Rather, the concocted statement claims Snake was on 51st Street using a payphone just east of Queen Submarine at 11:50 p.m. on September 15 when Anthony approached. The statement says Anthony asked Snake to be a lookout while "Little A and his homie" robbed a white man on the man's way out of the sub shop. According to the statement, Snake turned Anthony down and left the area.

### The False Confession

57.     At about 4 a.m.—at which point Anthony had been at Area 3 for more than sixteen hours without food, water, or contact with an attorney or family member—Anthony agreed to falsely claim he was a lookout during the robbery.

58.     Anthony did not know the details of Garcia's murder when Kill and Boudreau interrogated him. To facilitate the false confession, Defendants fed Anthony information about the crime to include in the statement.

59.     After supplying that information, Kill and Boudreau told Anthony that a man was coming to see him and instructed Anthony to repeat the story he had heard from the detectives.

60.     Thereafter, Kill introduced Anthony to an Assistant State's Attorney ("ASA") and to Defendant Ken Burke, a Chicago Police Department youth officer. Detective Louis Caesar also entered the interrogation room.

61.     With Defendant Kill coming and going from the room, and Defendants Burke and Caesar observing at all times, Anthony made a statement to the ASA, which the ASA wrote out.

62.     Defendants Burke and Caesar knew the statement Anthony was giving was false, but had agreed with Defendants Kill, Boudreau, and others to participate in framing Plaintiff for Garcia's murder, including by fabricating evidence against him.

63.     The statement, which includes fabricated details Defendants relayed to Anthony,

says Anthony had been a lookout while his friends "Little A"—a reference to a man named Arnold Day, whom Plaintiff hardly knew—and Darren attempted to rob Garcia; and that Little A eventually shot Garcia.

64.     The statement is demonstrably false.

65.     Specifically, according to the statement, after the shooting, Anthony "ran home to 1212 W. 51st Street" and "looked out onto 51st Street toward the sub shop and saw the Mexican dude moving around on the ground for a minute."

66.     But Anthony lived in the *rear* house on the lot at 1212 West 51st Street.

67.     From the rear house, the buildings at the front of 1212, 1210, and 1208 West 51st Street obstruct the view to the street, making it possible to see only a sliver of 51st Street directly in front of 1212 West 51st Street.

68.     Accordingly, Anthony could not have looked out the window of the rear house at 1212 West 51st Street and seen the victim lying in the road in front of 1208 West 51st Street.

69.     Nevertheless, Anthony was charged with first degree murder and attempted armed robbery the same day, September 17, 1991.

70.     On February 4, 1992, Chicago Police officers arrested Arnold Day.

71.     Following an interrogation by Defendant Boudreau, Day signed a statement saying he attempted to rob Garcia and then shot him. Day's statement does not mention anything about Anthony acting as a lookout or suggesting that Plaintiff (or Darren for that matter) played any role in the murder whatsoever.

72.     As in myriad other cases, Defendants' misconduct was known, ratified, and thereby encouraged by supervisors.

73.     Here, for example, Defendant Bonke expressly signed off on the Defendant

Officers' work even though he knew the confession and other police reports included falsehoods fabricated by detectives under his supervision. Because he acted according to the Chicago Police Department's established policies, customs, and practices, Defendant Bonke knew his approval of Defendants' misconduct was never going to be questioned by other supervisors.

### Trial and Wrongful Conviction

74. Anthony and Arnold Day were tried together before separate juries.

75. The prosecution presented no physical evidence tying Anthony to the crime and Anthony testified he was innocent. Nevertheless, based on the false confession and Gus Robinson's fabricated testimony, the jury found Anthony guilty of murder and attempted armed robbery.

76. Day—who testified that he was innocent and did not implicate Mr. Jakes—was acquitted by his jury of all charges.

77. The trial court sentenced Anthony to concurrent sentences of forty years in prison for murder and fifteen years for attempted armed robbery.

### Exoneration

78. In the decades following his unsuccessful appeal, Mr. Jakes pursued his claim of innocence through a series of post-conviction petitions.

79. Mr. Jakes served his entire sentence—twenty years—and was released from prison on parole on June 21, 2012.

80. On July 25, 2013, the Torture Inquiry and Relief Commission issued a decision concluding Mr. Jakes's claim of abuse was credible.

81. Following an evidentiary hearing at which Mr. Jakes established his confession was both demonstrably false and coerced, the State agreed to vacate his wrongful conviction.

82. On April 30, 2018, more than twenty-five years after Defendants fabricated evidence against Mr. Jakes and coerced him into signing a false confession, the Cook County circuit court vacated his conviction.

### The City of Chicago's Policy and Practice of Prosecuting Innocent People and Coercing Involuntary Confessions in Violation of Due Process

83. The Chicago Police Department is responsible by virtue of its official policies for scores of miscarriages of justice like those its employees inflicted upon Plaintiff.

84. Since 1986, no fewer than 70 cases have come to light in which Chicago police officers fabricated false evidence or suppressed exculpatory evidence to convict innocent people for serious crimes they did not commit.

85. These cases include many in which Chicago police officers used the same tactics Defendants employed against Plaintiff in this case, including: (1) using physically and psychologically coercive tactics to obtain involuntary and false confessions; (2) fabricating witness statements; (3) concealing exculpatory evidence; (4) manipulating witnesses to influence their testimony; and (5) using other tactics to secure the arrest, prosecution, and conviction of a person without probable cause and without regard to the person's actual guilt or innocence.

86. At all times relevant hereto, members of the Chicago Police Department, including the Defendants in this action, routinely manufactured evidence against innocent people by coercing, manipulating, threatening, pressuring, and offering inducements to suspects and witnesses to obtain false statements implicating innocent people, knowing full well those statements were false. As a matter of widespread custom and practice, members of the Chicago Police Department, including the Defendants in this action, contrived false narratives that were fed to vulnerable suspects and witnesses, who then adopted those false narratives as their own so police could secure the wrongful conviction of an innocent person. Furthermore, Chicago Police

Department officers systematically suppressed exculpatory and/or impeaching material by concealing evidence that a witness was coerced, manipulated, threatened, pressured or offered inducements to make false statements.

87.     The municipal policy and practice set out in the paragraphs above was recently described in a Federal Bureau of Investigation FD-302 Report of an interview with Assistant State's Attorney Terence Johnson. The Report documents, among other things, that Chicago police detectives fed information to witnesses and coached them through court-reported and handwritten statements, coerced witnesses into sticking to a detective's theory of the case, physically abused witnesses, and worked together to develop and rehearse false narratives so there were no inconsistencies in the witnesses' stories.

88.     At all times relevant hereto, members of the Chicago Police Department, including the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos, and other information in files that were maintained solely at the police department and were not disclosed to other participants in the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of an investigation, rather than being maintained as part of the official file.

89.     Consistent with the municipal policy and practice described in the preceding paragraphs, employees of the City of Chicago, including Defendants, concealed exculpatory evidence from Plaintiff.

90.     The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established and corroborated in the cases of *Fields*

*v. City of Chicago*, 10 C 1168 (N.D. Ill.) and *Jones v. City of Chicago*, 87 C 2536 (N.D. Ill.), among others.

91.     The policy and practice of file suppression at issue in *Fields* was in place from the 1980s through the 2000s, including at the time of the Garcia murder and investigation at issue here.

92.     In addition, a set of clandestine street files was found in the case of *Rivera v. City of Chicago*, 12 C 4428 (N.D. Ill.). Those files, which emanated from a period in the 1980s and 1990s, contained exculpatory and impeaching evidence not turned over to criminal defendants.

93.     Put simply, the policy and practice of suppressing exculpatory and/or impeaching material evidence was in place and actively relied upon when Area 3 detectives investigated the Garcia murder.

94.     The City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago Police Detectives recommended charging an innocent person with a serious crime, and no Chicago Police Officer has ever been disciplined as a result of his misconduct in any of those cases.

95.     Before and during the period in which Plaintiff was falsely charged and convicted with the Garcia murder, the City of Chicago also operated a dysfunctional disciplinary system for Chicago Police Officers accused of serious misconduct. The City's Office of Professional Standards almost never imposed significant discipline against police officers accused of violating civilians' civil and constitutional rights. And the Chicago Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

96.     As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence with the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

97.     As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct and facilitating a code of silence within the Chicago Police Department, officers (including the Defendants here) have come to believe that they may, without fear of adverse consequences, violate the civil rights of members of the public and cause innocent to be charged with serious crimes without fear of adverse consequences. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

98.     This includes Defendants in this case. By way of example, Defendants Boudreau and Kill have a long history of engaging in the kind of investigative misconduct that occurred in this case, including coercing confessions, manipulating witnesses, fabricating evidence, and concealing evidence in the course of maliciously prosecuting innocent people. There are dozens of known cases in which these Defendants engaged in serious investigative misconduct, including many cases in which they manipulated and coerced suspects and witnesses and fabricated and concealed evidence, as they did in this case. Defendants engaged in such misconduct because they had no reason to fear that the City of Chicago and its Police Department would ever discipline them for doing so.

99.     The City of Chicago and its Police Department also failed in the years before

Plaintiff's wrongful charging and conviction to provide adequate training to Chicago Police

Detectives and other officers in the following areas, among others:

      a.     The need to refrain from physical and psychological abuse of, and

manipulative and coercive conduct toward, suspects and witnesses.

      b.     The constitutional requirement to disclose exculpatory evidence, including

how to identify such evidence and what steps to take when exculpatory evidence has been

identified to ensure the evidence is part of the criminal proceeding.

      c.     The risks of engaging in tunnel vision during investigation.

      d.     The need for full disclosure, candor, and openness on the part of all

officers who participate in the police disciplinary process, both as witnesses and as

accused officers, and the need to report misconduct committed by fellow officers.

100.     The need for police officers to be trained in these areas was and remains obvious.

The City's failure to train Chicago Police Officers as alleged in the preceding paragraph

proximately caused Plaintiff's wrongful conviction and his injuries.

101.     The City's failure to train, supervise, and discipline its officers, including

Defendants, condones, ratifies, and sanctions the kind of misconduct that Defendants committed

against Plaintiff in this case. Constitutional violations like those that occurred in this case are

encouraged and facilitated as a result of the City's practices and *de facto* polices, as alleged

above.

102.     The City of Chicago and final policymaking officials within the Chicago Police

Department failed to act to remedy the patterns of abuse described in the preceding paragraphs,

despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful

practices and ensured no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

103.    The City of Chicago's policymakers also approved the policies and practices described in the foregoing paragraphs and were deliberately indifferent to the violations of constitutional rights described herein.

### Kill's and Boudreau's Pattern of Misconduct that Extended to Mr. Jakes

104.    Before Mr. Jakes's interrogation, Kill and Boudreau coerced confessions from dozens of innocent people using the same methods they applied to him.

105.    Kill has testified that in about 90% of the murder cases he worked on in which the suspects confessed (about 1500 cases), the defendants filed motions to suppress alleging Kill coerced their confessions using physical force.

106.    Likewise, sixteen men have now been exonerated after falsely confessing in cases Boudreau worked.

107.    Kill and Boudreau have invoked their Fifth Amendment privilege against self-incrimination when asked to testify about their interrogations of suspects.

108.    In the now-notorious "Englewood Four" case, for example, Boudreau and his colleague coerced a false confession from several teenagers, four of whom—Harold Richardson, Michael Saunders, Terrill Swift, and Vincent Thames—were wrongfully convicted for a rape and murder they did not commit. The City of Chicago paid over $31 million to settle claims the detectives coerced the false confessions from the Englewood Four, all of whom were exonerated when DNA discovered at the crime scene excluded them and instead implicated a serial rapist and murderer.

109.    In an examination of hundreds of murder cases in Cook County from 1991

through 2000, the Chicago Tribune observed: "Boudreau stands out not only for the number of his cases that have fallen apart, but for the reasons. In those cases, Boudreau has been accused by defendants of punching, slapping or kicking them; interrogating a juvenile without a youth officer present; and of taking advantage of mentally retarded suspects and others with low IQs." Maurice Possley, Steve Mills, and Ken Armstrong, *Veteran Detective's Murder Cases Unravel*, CHI. TRIB., Dec. 17, 2001.

110. Other examples of Boudreau's abuses, which are corroborated by sworn testimony, include:

a. Defendant Boudreau and a partner obtained a murder confession in 1991 from Alfonzia Neal and testified that Neal waived his rights and signed a statement handwritten by a prosecutor. Experts established that Neal had an IQ in the forties and was incapable of intelligently waiving his *Miranda* rights. Neal was acquitted notwithstanding that he signed a confession.

b. Marcus Wiggins sued Boudreau alleging Boudreau handcuffed him to a wall and beat him in an interrogation room while questioning him and other youth in a 1991 murder case. Wiggins's mother had been denied access to her son, a thirteen-year-old eighth grader, while he was being interrogated. Six young suspects gave confessions. Two confessions were thrown out on the basis of the "periodic screaming [at the police station] throughout the night," which Boudreau testified he did not hear. The remaining defendants, including two Boudreau interrogated, were acquitted.

c. In 1991, Boudreau and others interrogated fifteen-year-old John Plummer for thirty-six hours. After being beaten, he falsely confessed to murder.

d. In 1991, Boudreau and others electroshocked Damari Clemon, beat him, and threatened him with a pistol.

e. In 1992, Boudreau and another detective interrogated Arnold Day in the Garcia case. Day was isolated in an interrogation room for hours while the detectives psychologically and physically tortured him until he gave a false confession. In November 1992, Boudreau and others coerced Harold Hill, Dan Young, and Peter Williams to provide interlocking confessions to raping and killing a woman. Williams was incarcerated at the time of the crime, and was therefore never charged. But Hill and Young were convicted based on confessions that implicated the undeniably innocent Williams. DNA evidence later exonerated them.

f. In 1992, Clayborn Smith was interrogated for thirty-seven hours in connection with a murder he knew nothing about. When Smith professed his innocence, a detective kicked and punched him, and Boudreau and others threatened to charge his pregnant girlfriend if he did not confess. At one point, the detectives believed they had successfully coerced Smith to confess; but when the ASA entered the room, Smith continued to assert his innocence, whereupon the ASA left and the beating resumed. The same thing happened a second time with another ASA. Again, Smith refused to confess. When that ASA left the room, Boudreau and others resumed the beating. Smith, deprived of both counsel and sleep for an inordinate amount of time, finally signed a false confession.

g. Boudreau featured prominently in the 1993 case against Tyrone Hood and Wayne Washington, having coerced a false confession from Washington. Both men's convictions were later overturned.

19

h.  In December 1993, Boudreau and others "solved" two separate murders with confessions from two intellectually impaired juveniles, Fred Ewing and Darnell Stokes, classmates in special-education courses. One expert concluded that Ewing "was unable to comprehend the substance of the confession which he allegedly made." Absent any evidence connecting them to the crime, both were acquitted.

i.  In 1993, Boudreau's partner beat Richard Anthony, and denied him food, sleep, and access to the bathroom to coerce him into falsely confessing to murder. Boudreau and his partner also beat Anthony's co-defendant, Jerry Gillespie. During his thirty-hour interrogation, the detectives prevented Gillespie from contacting an attorney or his family and refused him access to the bathroom. Gillespie eventually gave a false confession.

j.  In 1993, Boudreau and another detective interrogated Tyrone Reyna the day after his sixteenth birthday. They refused to let him contact his family and beat him into confessing to a murder he did not commit. Boudreau arrested Reyna's codefendants, Nicholas Escamilla and Miguel Morales, for the murder even though there was no physical evidence or eye witness linking Escamilla to the crime. Boudreau beat Escamilla and threatened to send his pregnant wife to jail if he did not confess. Escamilla falsely confessed after several hours. Morales refused to confess despite being beaten so Boudreau coerced Morales's friend into stating that Morales had confessed to the murder over the phone. The witness recanted his statement at trial, and testified he only gave the statement after he had been beaten for over twenty hours and threatened with prosecution until he falsely implicated Morales.

k. In 1993, Boudreau and others arrested Emmett White. In an interrogation room, they hit and punched White, threw him to the ground, stepped on his face, and dragged his head across the floor in an attempt to get him to falsely confess.

l. In 1994, Boudreau and others beat Anthony Williams into falsely confessing to murder and armed robbery.

m. In 1995, Boudreau was part of a team of detectives who physically abused John Wright until he agreed to implicate Malik Taylor and Michael Taylor in a murder.

n. In 1995, Boudreau and others interrogated and coerced confessions from Oscar Gomez, Eric Gomez, and Abel Quinones. The detectives held the men for thirty hours, beat them while they were shackled to the wall, and prevented them from communicating with an attorney or their families. All three defendants were acquitted based largely on evidence that the detectives coerced their confessions.

o. Boudreau placed Antoine Ward in an interrogation room cuffed to a bench for prolonged periods, beat him, and denied him access to a bathroom (he eventually urinated on the floor). Boudreau told Ward other witnesses had placed him at the scene of a murder, but he would let him go home if he signed a statement saying he gave another man a gun. After almost two days, Ward signed the statement Boudreau wrote out and was convicted of murder.

p. In 1998, Boudreau and others held Joseph Jackson in an interrogation room in connection with a murder investigation. When Jackson refused to confess, Boudreau and another detective placed a book on his chest and stomach and hit the book with a black jack to avoid leaving visible marks on Jackson's body. Boudreau and the detective also put a typewriter cover over Jackson's head and

cut off his air supply. Jackson eventually confessed to a murder he did not commit.

q. In 1998, Boudreau helped extract a murder confession from a thirteen-year-old boy with a verbal IQ of fifty-nine. The judge later ruled the boy did not have the mental capacity to waive his rights and threw out the confession, after which prosecutors dropped the charges.

r. After police officer Michael Ceriale was shot to death in 1998, Boudreau and other detectives arrested Jonathan Tolliver at 4:00 a.m. and interrogated him for twenty-four hours, resulting in allegedly incriminating (unwritten and unsigned) statements. The detectives failed to advise Tolliver of his rights and ignored his requests to speak with a lawyer and/or his mother. Boudreau claimed he did not use the protections for minors because sixteen-year-old Tolliver had claimed to be eighteen. After two trials, Tolliver was convicted of Ceriale's murder.

s. In connection with the Ceriale murder, Boudreau and others coerced witness statements to incriminate Tolliver. Among other means, Boudreau intentionally withheld insulin from a diabetic witness for more than a day. When the witnesses later refused to testify at trial consistent with the coerced false statements, the State charged five of them with perjury, and at least one went to jail.

t. Christopher Holly filed a federal civil rights lawsuit against Boudreau and other detectives alleging he was framed for a 1998 murder.

u. Boudreau and others coerced Derrick Flewellen to sign a false confession to a 1999 murder after interrogating him for more than thirty-six hours, during which the detectives slapped, kicked, punched, and slammed him into the wall before he

succumbed. After almost five years in jail, Flewellen was acquitted when DNA
tests proved someone else committed the crime.

v.  Fabian Pico was sixteen years old when he gave a self-incriminating statement to
Boudreau and another detective that was used to convict him of murder. When
Pico moved to suppress the statement on the grounds that police did not allow him
access to his mother, Boudreau claimed he had tried unsuccessfully to reach
Pico's mother by phone before Pico confessed; but Boudreau's supposed attempt
was not memorialized anywhere in his reports.

w.  Boudreau and other detectives beat Jesse Clemon until he signed a written
statement (with his left hand because his right hand was injured in the beating).
Witnesses in the station heard Clemon screaming and protesting "I didn't do it."
Boudreau testified the statement was not coerced; but the judge suppressed it due
to the "horrendously oppressive" atmosphere at the station. During the same
investigation, Boudreau and others also threatened, beat, and electroshocked
Clemon's brother and beat his other brother with a flashlight.

x.  Boudreau and another detective arrested Kilroy Watkins, handcuffed him to the
wall of an interrogation room, and choked and punched him to coerce him confess
to a six-month-old shooting. After more than thirty hours with minimal sleep and
food, Watkins signed a false incriminating statement.

y.  Richard Malek alleges that Boudreau and other detectives kept him in an
interrogation room for four days, depriving him of sleep, food, and access to
lawyers, and used violence and threats to coerce his confession. Boudreau
participated in this coercion as the "good cop," uncuffing Malek and providing

him a hamburger after he had been starved for an extended period. When detectives falsely claimed they obtained an oral confession, Malek filed a federal lawsuit against Boudreau and others.

**Mr. Jakes's Damages**

111.     Mr. Jakes suffered nothing short of a nightmare by being incarcerated as a fifteen-year-old boy to serve a forty-year sentence for a murder and armed robbery he did not commit.

112.     During his wrongful incarceration, Mr. Jakes was thrust into the brutality of prison, forced to endure the injustice of being detained for something he had not done. Mr. Jakes suffered numerous instances of physical abuse perpetrated by both guards and prisoners.

113.     Because of Defendants' misconduct, Mr. Jakes was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. Mr. Jakes was taken away from, and missed out on, the lives of his family and friends. He missed out on the ability to share holidays, births, funerals, and other life events with loved ones, and the fundamental freedom to live one's life as an autonomous human being. Mr. Jakes lost the opportunity to pursue an education or a career.

114.     He returned home to relationships changed or lost by decades away, and to a changed world and community. As a result of his wrongful incarceration, Mr. Jakes must now attempt to rebuild his life without the benefit of two decades of life experience that ordinarily equip adults for that task.

115.     Even after his release from prison, Mr. Jakes had to fight his wrongful conviction for years until finally proving his innocence in 2018.

116.     In addition to causing Mr. Jakes to suffer the severe trauma of wrongful imprisonment and loss of  liberty, Defendants' misconduct continues to cause Mr. Jakes extreme

suffering, humiliation, fear, nightmares, anxiety, depression, and despair. Mr. Jakes has also been branded a murderer and has suffered profound reputational harm as a result.

## COUNT I
### 42 U.S.C. § 1983 – Coerced and False Confession in Violation of the Fifth Amendment

117.    Mr. Jakes incorporates each paragraph of this pleading as if fully restated here.

118.    In the manner described more fully above, the Defendant Officers, individually, jointly, and in conspiracy with each other, as well as under color of law and within the scope of their employment, forced Mr. Jakes to incriminate himself falsely and against his will, in violation of his rights secured by the Fifth Amendment.

119.    As described more fully above, the Defendant Officers participated in, encouraged, advised, and ordered an unconstitutional and unlawful interrogation of Mr. Jakes that caused him to make involuntary and false statements implicating himself in the murder of Rafael Garcia.

120.    The coerced, involuntary, false statement the Defendant Officers fabricated and attributed to Mr. Jakes was used against him to his detriment in a criminal case.

121.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and reckless indifference to the rights of others, and with total disregard for the truth and Mr. Jakes's clear innocence.

122.    As a result of Defendants' misconduct described in this Count, Mr. Jakes suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

123.    Mr. Jakes's injuries were caused by the policies, practices, and customs of Defendant City of Chicago.

124.    At all relevant times and before the events giving rise to this lawsuit occurred, the

City of Chicago promulgated rules, regulations, policies, and procedures for the conduct of interrogation, testing, and questioning of criminal suspects by officers and agents of the Chicago Police Department. In addition, the City of Chicago promulgated rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Chicago Police Department with respect to the conduct of interrogations and the techniques to be used when questioning criminal suspects.

125.    These rules, regulations, policies, and procedures were implemented by officers and agents of the Chicago Police Department, including the Defendant Officers who were responsible for interrogating suspects and witnesses in connection with the Garcia homicide investigation.

126.    In addition, at all times relevant to the events described in this pleading and for a period of time before those events, Defendant City of Chicago had notice of a widespread practice by officers and agents of the Chicago Police Department under which individuals like Mr. Jakes who were suspected of criminal activity were routinely coerced against their will to implicate themselves in crimes of which they were innocent. It was common for suspects interrogated by the Chicago Police Department to falsely confess under extreme duress and after suffering abuse to committing crimes to which they had no connection and for which there was scant evidence to suggest they were involved.

127.    Specifically, at all relevant times and for a period of time before the events giving rise to this case, there existed a widespread practice among officers, employees, and agents of the Chicago Police Department under which criminal suspects were coerced to involuntarily implicate themselves by various means, including but not limited to the following: (a) individuals, including minors and individuals with mental disabilities and psychiatric conditions,

were subjected to unreasonably long and uninterrupted interrogations, often lasting for many hours and even days; (b) individuals were subjected to actual and threatened physical and psychological violence; (c) individuals were interrogated at length without proper protection of their constitutional right to have an attorney present or to remain silent; (d) individuals were forced to sign false statements fabricated by the police; (e) officers and employees were permitted to lead or participate in interrogations without proper training and without knowledge of the safeguards necessary to ensure that individuals were not subjected to abusive conditions and did not confess involuntarily or falsely; and (f) supervisors like Defendant Bonke, with knowledge of permissible and impermissible interrogation techniques, did not properly supervise or discipline police officers and employees such that the coercive interrogations continued unchecked.

128.    These widespread practices were allowed to flourish because the leaders, supervisors, and policymakers of the Chicago Police Department directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees as to proper interrogation techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses like those that affected Mr. Jakes.

129.    The above widespread practices were so well-settled as to constitute *de facto* policy of the Chicago Police Department and were able to exist and thrive because policymakers exhibited deliberate indifference to the problem, thereby effectively ratifying it.

130.    In addition, the misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that the constitutional violations committed against Mr. Jakes were committed either directly by, or with the knowledge or approval of,

people with final policymaking authority for the Chicago Police Department.

131.     The policies, practices, and customs set forth above have resulted in numerous well-publicized false confessions, including the false confession at issue here, where individuals were convicted of crimes they did not commit after being subjected to abusive interrogation techniques.

132.     Mr. Jakes's injuries were caused by officers, agents, and employees of the City of Chicago, including but not limited to the individually-named Defendants who acted pursuant to the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

### COUNT II
### 42 U.S.C. § 1983 – Coerced Confession in Violation of the Fourteenth Amendment

133.     Mr. Jakes incorporates each paragraph of this pleading as if fully restated here.

134.     In the manner described more fully above, the Defendant Officers, individually, jointly, and in conspiracy with each other, as well as under color of law and within the scope of their employment, forced Mr. Jakes to incriminate himself falsely and against his will, in violation of his right to due process secured by the Fourteenth Amendment.

135.     As described in detail above, the misconduct described in this Count was carried out using extreme techniques of physical and psychological coercion and torture against a fifteen-year-old boy. This misconduct was so severe as to shock the conscience. It was designed to injure Mr. Jakes, and it was not supported by any conceivable governmental interest.

136.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and with total disregard for the truth and Mr. Jakes's clear innocence.

137.     As a result of Defendants' misconduct described in this Count, Mr. Jakes suffered

loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

138.     Mr. Jakes's injuries were caused by the policies, practices, and customs of Defendant City of Chicago in the manner more fully described above.

**COUNT III**
**42 U.S.C. § 1983 – Violation of Due Process under the Fourteenth Amendment**

139.     Mr. Jakes incorporates each paragraph of this pleading as if restated fully herein.

140.     As described more fully above, the Defendant Officers, while acting individually, jointly, and in conspiracy with each other, as well as under color of law and within the scope of their employment, deprived Mr. Jakes of his constitutional right to due process and a fair trial.

141.     In the manner described more fully above, the Defendant Officers deliberately withheld exculpatory and impeachment evidence from Mr. Jakes, his attorneys, and prosecutors, among others, thereby misleading and misdirecting Mr. Jakes's criminal prosecution.

142.     In addition, as described more fully above, the Defendant Officers fabricated and solicited false evidence, including statements and testimony they knew to be false, fabricated police reports and other evidence falsely implicating Mr. Jakes, suborned perjury, obtained Mr. Jakes's conviction and continued prosecution using that false evidence, and failed to correct fabricated evidence they knew to be false when it was used against Mr. Jakes during his criminal trial.

143.     In addition, the Defendant Officers concealed and fabricated additional evidence that is not yet known to Mr. Jakes.

144.     Defendants' misconduct directly resulted in Mr. Jakes's unjust criminal prosecution and wrongful conviction, thereby denying him his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, Mr. Jakes's prosecution

29

would not and could not have been pursued.

145.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and with total disregard for the truth and Mr. Jakes's clear innocence.

146.    As a result of Defendants' misconduct described in this Count, Mr. Jakes suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

147.    Mr. Jakes's injuries were caused by the policies, practices, and customs of Defendant City of Chicago in that employees and agents of the City regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence implicating individuals in criminal conduct, elicited false and coerced witness testimony, pursued wrongful convictions through profoundly flawed investigations, and otherwise violated due process in a manner similar to that alleged here.

148.    The above-described widespread practices were so well-settled as to constitute *de facto* policy of the City of Chicago and were allowed to exist and flourish because municipal policymakers with authority over the City's policies exhibited deliberate indifference to the problem, thereby effectively ratifying the policy.

149.    The widespread practices described in the preceding paragraphs were allowed to flourish because the City of Chicago declined to implement sufficient training and any legitimate mechanism for oversight or punishment of officers and agents who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful convictions.

150.    Indeed, the Chicago Police Department's systems for investigating and disciplining police officers and other employees accused of the type of misconduct that affected

Plaintiff was and is, for all practical purposes, nonexistent. The Department maintained a "code of silence" that effectively eliminated any form of accountability, discipline, or oversight.

151.   Chicago police officers and other employees of the City of Chicago who manufactured criminal cases against individuals like Mr. Jakes had every reason to know not only that they enjoyed *de facto* immunity from criminal prosecution and departmental discipline, but also that they stood to be rewarded for closing cases no matter what the cost. In this way, the City proximately caused abuses like the Defendant Officers' misconduct at issue in this case.

152.   The misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that the constitutional violations committed against Plaintiff were committed either directly by, or with the knowledge or approval of, people with final policymaking authority for the Chicago Police Department.

153.   The policies, practices, and custom set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Mr. Jakes to suffer the grievous and permanent injuries and damages set forth above.

## COUNT IV
### 42 U.S.C. § 1983 – Liberty Deprivation in Violation of the Fourth Amendment

154.   Mr. Jakes incorporates each paragraph of this pleading as if restated fully herein.

155.   In the manner described more fully above, the Defendant Officers, individually, jointly, and in conspiracy with each other, as well as under color of law and within the scope of their employment, used fabricated evidence to accuse Mr. Jakes of criminal activity and detain him without probable cause.

156.   In so doing, the Defendant Officers caused Mr. Jakes to be deprived of his liberty and detained without probable cause in violation of his rights secured by the Fourth and Fourteenth Amendments. Specifically, Plaintiff was incarcerated from the date of his arrest

continuing for the next twenty years.

157.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and with total disregard for the truth and Mr. Jakes's clear innocence.

158.     As a result of Defendants' misconduct described in this Count, Mr. Jakes suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

159.     The Defendant Officers' misconduct described in this Count was undertaken pursuant to the City of Chicago's policies and practices in the manner more fully described above.

## COUNT V
## 42 U.S.C. § 1983 – Failure to Intervene

160.     Mr. Jakes incorporates each paragraph of this pleading as if restated fully herein.

161.     In the manner described above, during the constitutional violations described above, one or more of the Defendant Officers stood by without intervening to prevent the misconduct.

162.     These Defendants had a reasonable opportunity to prevent harm to Mr. Jakes, but failed to do so.

163.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Mr. Jakes's constitutional rights.

164.     As a direct and proximate result of the Defendant Officers' failure to intervene to prevent the violation of Mr. Jakes's constitutional rights, Mr. Jakes suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

165.     Defendants undertook the misconduct described in this Count pursuant to the City of Chicago's policies and practices in the manner more fully described above.

## COUNT VI
### 42 U.S.C. § 1983 – Conspiracy

166.     Plaintiff incorporates each paragraph of this pleading as if restated fully herein.

167.     All of the Defendant Officers reached an agreement among themselves to frame Plaintiff for Rafael Garcia's robbery and murder, and thereby to deprive Plaintiff of his constitutional rights, as described in above. This agreement was first reached before arresting Plaintiff and remained in place throughout all periods of his detention, prosecution, and incarceration.

168.     In addition, before Plaintiff's conviction the Defendant Officers conspired, and after his conviction they continued to conspire, to deprive Plaintiff of exculpatory materials to which he was entitled and that would have led to his earlier exoneration.

169.     In this manner, the Defendant Officers, acting in concert with each other and with other unknown co-conspirators, including people who are and are not members of the Chicago Police Department, have conspired by concerted action to accomplish an unlawful purpose or a lawful purpose by unlawful means.

170.     In furtherance of the conspiracy, each co-conspirator committed overt acts and was an otherwise willful participant in joint activity.

171.     As a direct and proximate result of this illicit prior agreement, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

172.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Plaintiff's constitutional rights.

173.     Defendants undertook the misconduct described in this Count pursuant to the City of Chicago's policies and practices in the manner more fully described above.

## COUNT VII
### State Law Claim – Malicious Prosecution

174.     Mr. Jakes incorporates each paragraph of this pleading as if restated fully herein.

175.     In the manner described above, the Defendant Officers, individually, jointly, and/or in conspiracy with each other, as well as within the scope of their employment, accused Mr. Jakes of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against Mr. Jakes without any probable cause for doing so.

176.     In so doing, the Defendant Officers caused Mr. Jakes to be subjected improperly to  judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

177.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and with total disregard for the truth and Mr. Jakes's clear innocence.

178.     As a result of the Defendant Officers' misconduct described in this Count, Mr. Jakes suffered damages as set forth above.

## COUNT VIII
### State Law Claim – Intentional Infliction of Emotional Distress

179.     Mr. Jakes incorporates each paragraph of this pleading as if restated fully herein.

180.     Defendants' actions, omissions, and conduct, as set forth above, were extreme and outrageous. These actions were rooted in an abuse of power and authority and were  undertaken with the intent to cause, or with reckless disregard for the probability that they would cause Mr. Jakes severe emotional distress, as more fully alleged above.

181.    As a direct and proximate result of the Defendant Officers' actions, Mr. Jakes

suffered and continues to suffer emotional distress and other grievous and continuing injuries

and damages as set forth above.

## COUNT IX
## State Law Claim – Civil Conspiracy

182.    Mr. Jakes incorporates each paragraph of this pleading as if restated fully herein.

183.    As described more fully above, the Defendant Officers, acting in concert with

other co-conspirators reached an agreement among themselves to frame Mr. Jakes for a crime he

did not commit and conspired by concerted action to accomplish an unlawful purpose and/or to

achieve a lawful purpose by unlawful means. In addition, these co-conspirators agreed among

themselves to protect each other from liability for depriving Mr. Jakes of these rights.

184.    In furtherance of their conspiracy, each co-conspirator committed overt acts and

was otherwise a willful participant in joint activity.

185.    In furtherance of this conspiracy, a tortious action was committed against Mr.

Jakes.

186.    As a result of the Defendant Officers' misconduct described in this Count, Mr.

Jakes suffered damages as set forth above.

## COUNT X
## State Law Claim – *Respondeat Superior*

187.    Mr. Jakes incorporates each paragraph of this pleading as if restated fully herein.

188.    While committing the misconduct alleged in the preceding paragraphs, the

Defendant Officers were employees, members, and agents of the City of Chicago, acting at all

relevant times within the scope of their employment.

189.    Defendant City of Chicago is liable as principal for all state law torts committed

by its agents.

### COUNT XI
### State Law Claim – Indemnification Pursuant to 745 ILCS 10/9-102

190.    Mr. Jakes incorporates each paragraph of this pleading as if restated fully herein.

191.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

192.    The Defendant Officers were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

193.    The City of Chicago is responsible for paying any judgment entered against the Defendant Officers. Mr. Jakes therefore demands judgment against Defendant City of Chicago in the amounts awarded to Mr. Jakes against the individual Defendants as damages, attorneys' fees, costs, and interest.

WHEREFORE, Plaintiff ANTHONY JAKES respectfully requests this Court enter a judgment in his favor and against Defendants  CITY OF CHICAGO, MICHAEL KILL, KENNETH BOUDREAU, LOUIS CAESAR, THOMAS PACK, MICHAEL DELACY, KEN BURKE, FRED BONKE, and UNKNOWN EMPLOYEES OF THE CITY OF CHICAGO, awarding compensatory damages, attorneys' fees, and costs against each Defendant and, because they acted willfully, wantonly, and/or maliciously, punitive damages against each of the individual Defendant Officers, and any other relief this Court deems just and proper.

### JURY DEMAND

Plaintiff ANTHONY JAKES hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

ATHONY JAKES

By: *s/ Alison Leff*
        *One of Plaintiff's Attorneys*

Arthur Loevy
Jon Loevy
Russell Ainsworth
Alison R. Leff
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Fl.
Chicago, IL 60607
(312) 243-5900 (phone)
(312) 243-5902 (fax)
alison@loevy.com