# Exhibit 1

Page 1

1        IN THE UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF ILLINOIS

3                 EASTERN DIVISION

4    ANTHONY JAKES,              )

5              Plaintiff,        )

6       -vs-                     ) No. 19-cv-2204

7    THE CITY OF CHICAGO, et     )

8    al,                         )

9              Defendants.  )

10        The videotaped deposition of ANTHONY

11   JAKES, called for examination, taken pursuant to

12   the Federal Rules of Civil Procedure of the United

13   States District Courts pertaining to the taking of

14   depositions, taken before GAIL LIVIGNI, CSR No.

15   84-1965, a Notary Public within and for the County

16   of Will, State of Illinois, and a Certified

17   Shorthand Reporter of said state, at Suite 2200,

18   321 North Clark Street, Chicago, Illinois, on the

19   29th day of September, A.D. 2021, commencing at

20   10:00 o'clock a.m.

21

22

23

24

Page 2

1    PRESENT:

2        LOEVY & LOEVY,

3        (311 North Aberdeen Street,

4        Chicago, Illinois 60607,

5        (312) 243-5900), by:

6        MR. RUSSELL AINSWORTH,

7        MS. RENEE SPENCE (Via Zoom),

8            appeared on behalf of the Plaintiff;

9

10       ROCK, FUSCO & CONNELLY, LLC,

11       (321 North Clark Street, Suite 2200,

12       Chicago, Illinois 60654,

13       (312) 494-1000), by:

14       MR. ANDREW J. GRILL,

15       MS. JESSICA L. ZEHNER,

16           appeared on behalf of the Defendants,

17           Kenneth Boudreau, Louis Caesar, Michael

18           Delacy, Ken Burke and Fred Bonke;

19

20

21

22

23

24

Page 3

1    PRESENT:

2        THE SOTOS LAW FIRM, P.C. (Via Zoom),

3        (141 West Jackson Boulevard, Suite 1240A,

4        Chicago, Illinois 60604,

5        (630) 735-3300), by:

6        MR. GEORGE J. YAMIN, JR.,

7            appeared on behalf of the Defendant,

8            City of Chicago.

9

10   ALSO PRESENT:

11       MR. MASON DOUGLASS, Videographer.

12

13

14

15

16

17

18

19   REPORTED BY:    GAIL LIVIGNI, CSR

20                   CSR No. 84-1965.

21

22

23

24

Page 4

1        THE VIDEOGRAPHER:  This is the video
2    deposition of Anthony Jakes in the matter of Jakes
3    versus Boudreau, et al being heard before the
4    United States District Court for the Northern
5    District of Illinois, Eastern Division, case number
6    19-CV-02204.
7        This deposition is being held at Rock,
8    Fusco & Connelly in Chicago, Illinois,
9    September 29, 2021.  The time on the clock is 10:07
10   A.M.  My name is Mason Douglass, I'm the
11   Videographer.  The Court Reporter is Gail Livigni.
12       Counsel, will you please introduce
13   yourselves and state your affiliations?
14       MR. YAMIN:  Can I interrupt for a second?  I
15   can't hear you.
16       MR. AINSWORTH:  He's on the other end of the
17   table, that's the Videographer.  He just did the
18   read on.  Can you hear me, George?
19       MR. YAMIN:  Yes.
20       MR. GRILL:  George, can you hear me?
21       MR. YAMIN:  Yes.
22       MR. AINSWORTH:  We're at the other end of a
23   long conference table.
24       MR. YAMIN:  Okay, as long as I could hear the



Page 5

1 parties, the attorneys and the party.
2 THE VIDEOGRAPHER: Counsel, can you go ahead
3 and introduce yourselves and state your
4 affiliations?
5 MR. AINSWORTH: This is Russell Ainsworth
6 appearing on behalf of the Plaintiff.
7 MR. GRILL: This is Andrew Grill appearing on
8 behalf of the individual officer defendants.
9 MR. YAMIN: And Georgia Yamin. I'm appearing
10 on behalf of Defendant, City of Chicago.
11 MS. ZEHNER: And this is Jessica Zehner also
12 on behalf of the individual officers.
13 MS. SPENCE: My name is Renee Spence appearing
14 on behalf of Plaintiff.
15 (WHEREUPON, the witness was duly
16 sworn.)
17 ANTHONY JAKES,
18 called as a witness herein, having been first duly
19 sworn, was examined and testified as follows:
20 DIRECT EXAMINATION
21 BY MR. GRILL:
22 Q. All right. Mr. Jakes, I introduced
23 myself to you earlier today, but again just so
24 we're clear, my name is Andrew Grill, and I'm one

Page 6

1 of the attorneys that represents the police
2 officers in this case, and I'm going to be the one
3 primarily asking you questions today.
4 I just want to go over a few of the
5 ground rules. I Trust your attorney has done this
6 already, but just so we're clear, the basic format
7 today is going to be that I'm going to ask you
8 questions. Your job is simply to answer those
9 questions, okay?
10 When you give your answers, we need at a
11 minimum a yes or a no. Uh-hums, nods of the head,
12 uh-huh, things like that are not going to be
13 sufficient, so at a minimum can you please just
14 give a yes or no? Is that okay?
15 A. Yes.
16 Q. All right. And as I'm asking you
17 questions today, I would ask you kindly to please
18 hold off on answering any of my questions or any
19 questions later on posed by any of the other
20 attorneys here until the person asking the question
21 is done asking it. That at a minimum will
22 hopefully have us avoid speaking over each other so
23 that way the Court Reporter here who is writing
24 everything down that everybody is saying today

Page 7

1 makes a clean record, okay?
2 A. Okay.
3 Q. And if at any point today I ask you a
4 question that you don't understand, that you didn't
5 hear, what have you, please speak up and let me
6 know that you didn't hear it, you don't understand
7 it or what have you. I'll just simply reask the
8 question or have it read back. The point being is
9 you don't have to sit here and guess about what it
10 is that me or anybody else asks you today. Does
11 that make sense?
12 A. Absolutely.
13 Q. Okay. And if you need a break at any
14 point today, just let me know, and we can take a
15 break for however long you need, and that's it,
16 okay?
17 A. Okay.
18 Q. All right. Sir, how old are you today?
19 A. 45.
20 Q. All right. And where do you currently
21 live?
22 A. 4942 West Rice, Chicago, Illinois.
23 Q. 42 West what?
24 A. 4942 West Rice, Chicago, Illinois.

Page 8

1 Q. Rice like R-i-c-e?
2 A. Yes.
3 Q. Okay. Is that a house, an apartment,
4 what is that?
5 A. House.
6 Q. Who do you live there with?
7 A. My Auntie Emma Mitts and my Auntie
8 Jessie May Jones.
9 Q. Emma Mitts?
10 A. Emma Mitts, M-i-t-t-s, and Jesse May
11 Jones.
12 Q. Okay. And Jesse May, that's Aunt Bee,
13 right? That's her like I guess nickname, I guess?
14 A. Yes.
15 Q. And is it B like B-e-a, or is it just
16 Aunt Bee, the letter B?
17 A. B-e-e.
18 Q. B-e-e, okay, got you. And your Aunt
19 Bee, is she your mom or your dads sister?
20 A. My mom's sister.
21 Q. Okay. And what's your mom's name?
22 A. Jeanette Jakes.
23 Q. Okay. Where does your mom live now?
24 A. My mom passed away.



Page 9

1    Q.    When did she pass away?
2    A.    February something.  I can't remember
3  the exact date.
4    Q.    What year?
5    A.    I want to say, what, 2018, 2017,
6  something like that.  I'm not for sure.
7    Q.    I'm sorry to hear that your mom passed
8  away.  Were you able to attend her funeral?
9    A.    Yes.
10    Q.    All right.  The house at 4242 West Rice
11  that you live in with your Aunt Bee and your Aunt
12  Emma Mitts, do you own that house, or do one of
13  them own the house?
14    MR. AINSWORTH:  Object to the form.  Go ahead.
15  BY MR. GRILL:
16    Q.    If you know.
17    A.    The address is 4942.
18    Q.    I thought you said 4242.  Thanks for
19  correcting me.  Who owns the house?
20    A.    Emma Mitts owns the house.
21    Q.    Do you pay rent to live there?
22    A.    Partially.
23    Q.    What do you pay per month?
24    A.    I help out with the bills, cable.  She

Page 10

1  may say she needs some help on something else, and
2  I might just give some money on it.
3    Q.    Okay.  So it's just kind of on as you
4  can basis basically?
5    A.    Pretty much.
6    Q.    Is there like a typical amount per month
7  you're giving your Aunt Emma Mitts to pay for
8  bills, cable, things like that?
9    A.    No.
10    Q.    Some months you don't pay anything?
11    A.    No.
12    Q.    No, some months you don't?
13    A.    Right.
14    Q.    Got it.  How long have you been living
15  with Aunt Bee and Emma Mitts?
16    A.    I believe since I was paroled 2012.
17    Q.    Okay.  And Emma Mitts is an alderwoman,
18  right?
19    A.    Yes.
20    Q.    Do you know what ward or district she's
21  in?
22    A.    37.
23    Q.    Where did your Aunt Emma Mitts, if you
24  remember, live in 1991?

Page 11

1    A.    Probably the same address.
2    Q.    4945 West Rice?
3    A.    4942 West Rice.
4    Q.    42.  I keep getting it wrong, I'm sorry,
5  4942, okay.  You believe that's where she was
6  living in 1991?
7    A.    Yes.
8    Q.    All right.  Do you think she could have
9  been living anywhere else?
10    A.    Not for sure.
11    Q.    And how far away is 4942 West Rice from
12  1212 West 51st Street?
13    A.    I don't know.
14    Q.    Is it like more than a mile?
15    A.    I don't know.
16    Q.    Is it -- could you walk there from your
17  house?  Did you ever do that back in 1991?
18    A.    No.
19    Q.    No.
20    A.    No.
21    Q.    Okay.  Where did your mom Jeanette live
22  in 1991?
23    A.    In Milwaukee.
24    Q.    Well, let's be more specific, in

Page 12

1  September of 1991.
2    A.    In Milwaukee.
3    Q.    When did she move to Milwaukee?
4    A.    I don't know.
5    Q.    Do you know where she lived in
6  Milwaukee?
7    A.    It's been so long ago, I don't know.
8    Q.    Did she ever live on West 51st Street?
9    A.    Yes.
10    Q.    What was her address on West 51st Street
11  when she lived there?
12    A.    1212 West 51st Street.
13    Q.    Okay.  So it's my understanding that
14  there is two houses that have that address on West
15  51st Street, is that right?
16    A.    Right.
17    Q.    Okay.  So let's just for purposes of
18  this deposition differentiate between the two by
19  saying the front house, which is the one on 51st
20  Street, and then the back house, is that fair?
21    A.    That's fair.
22    Q.    So if I say the front house, that would
23  be the 1212 West 51st Street house that is actually
24  on 51st Street?



Page 13

1    A.   Yes.
2    Q.   And the back house would be the 1212
3  house that's behind that one?
4    A.   Yes.
5    Q.   That's on the alley side, fair enough?
6    A.   Fair enough.
7    Q.   Okay.  And you agree that how I
8  described the houses that's generally how they were
9  lined up relative to each other?
10   A.   Yes.
11   Q.   Back in 1991, right?
12   A.   Yes.
13   Q.   You all right?
14   A.   Uh-huh.
15   Q.   Now, which of those houses, the front
16 house or the back house, when your mom lived on
17 West 51st Street, which of those two houses did she
18 live in?
19   A.   She lived in the front.
20   Q.   Okay.  What floor?
21   A.   The first floor.
22   Q.   Okay.  And your testimony is you don't
23 remember what year it was that she moved to
24 Milwaukee, right?

Page 14

1    A.   Correct.
2    Q.   Okay.  You had -- well, let me ask you
3  this then.  When you got -- when the police came to
4  your house -- and we'll talk about this in detail
5  later.  When the police came to your house on
6  September 16th or I should say came to your Aunt
7  Bee's house on September 16th, 1991, how long, if
8  you remember, had your mom been living in
9  Milwaukee?
10        MR. AINSWORTH:  Object to the form of the
11   question.  Go ahead.
12   BY THE WITNESS:
13   A.   I don't know.  I'd be guessing
14   BY MR. GRILL:
15   Q.   All right.  Well, guess for me.
16        MR. AINSWORTH:  Object to the form of the
17   question, calls for speculation.
18   BY THE WITNESS:
19   A.   I don't know.
20   BY MR. GRILL:
21   Q.   Was it more than a month?
22   A.   I don't know.
23   Q.   Who was she living with in Milwaukee in
24 1991?

Page 15

1    A.   My sister and brother.
2    Q.   What are their names?
3    A.   One deceased.  My brother's name is
4  Dennis Anderson, he's deceased, and the other is
5  Doris Anderson.
6    Q.   Dennis Anderson, Doris Anderson.
7    A.   Correction, Dennis Jakes.
8    Q.   Dennis Jakes, okay.  It wasn't like
9  Dennis Harris, right?
10   A.   No.
11   Q.   Do you know Dennis Harris?
12   A.   No.
13   Q.   Never know anybody by that name, right?
14   A.   I don't know who that is.
15   Q.   You know a Denise Harris, though, right?
16   A.   Yes, I now Denise Harris.
17        MR. AINSWORTH:  So, Mr. Jakes, just give it a
18   pause, and maybe both sides can give it a pause
19   before you talk and that way we'll have a clear
20   record.  Go ahead.
21   BY MR. GRILL:
22   Q.   Yes.  Are you related to Denise Harris?
23   A.   Well, when we was little, we used to
24 call ourselves cousins but not blood related.

Page 16

1    Q.   Okay.  So you're not blood relatives
2  with Denise?
3    A.   No.
4    Q.   That was just a term of endearment, I
5  guess --
6    A.   Right.
7    Q.   -- between you and Denise?
8    A.   Yes.
9    Q.   Did you guys refer to yourselves as
10 cousins when you were little because you were close
11 with Denise?
12        MR. AINSWORTH:  Object to the form of the
13   question.
14   BY THE WITNESS:
15   A.   I would say no.
16   BY MR. GRILL:
17   Q.   Okay.  Did you refer to her as cousin
18 when you were little because you felt that she was
19 part of your family?
20   A.   Yes.
21   Q.   Okay.  And I presume back in 1991
22 you -- well, let me ask you this.  What other
23 family members lived of yours, blood relatives
24 let's stick with that, lived on West 51st Street in



Page 17

1  1991?

2      MR. AINSWORTH:  Object to the form of the

3  question.

4  BY MR. GRILL:

5      Q.    So you had your aunts?

6      A.    You had my Aunt, you had her kids.

7      Q.    Okay.  Which Aunt are you talking about?

8      A.    My Aunt Bee.

9      Q.    Okay.  Any other aunts?

10     A.    My Aunt Ruthella she stayed in the front

11  building.

12     Q.    Aunt who?

13     A.    Ruthella.

14     Q.    How do you spell that?

15     A.    Got me.

16     Q.    Rudella?

17     A.    Ruthella.

18     Q.    Like R-u-d --

19     A.    Like R-u-t-h-e-l-l-a or something like

20  that.

21     Q.    Ruthella.

22     A.    Yes.

23     Q.    Any other aunts?

24     A.    Not that I can remember at the time.

Page 18

1      Q.    What house or what address did Aunt

2  Ruthella live in in 1991?

3      A.    1210 West 51st Street second floor.

4      Q.    Second floor, all right.  And you

5  said -- any other aunts other than Aunt Bee and

6  Aunt Ruthella on 51st Street?

7      A.    That's all I can remember.

8      Q.    And you said there was some cousins?

9      A.    Yes.

10     Q.    What were their names?

11     A.    There was Rosey, Veronica, Everett,

12  Victor, and my Aunt Ruthella's kids, the twins,

13  Quarter Pound and Tweetie.

14     Q.    Do you remember Quarter Pounder's real

15  name?  I gather that's a nickname.

16     MR. AINSWORTH:  Object to the form of the

17  question.

18  BY THE WITNESS:

19     A.    No.

20  BY MR. GRILL:

21     Q.    Okay.  Quarter Pounder --

22     MR. AINSWORTH:  It's Quarter Pound.

23  BY MR. GRILL:

24     Q.    Quarter Pound.  So I believe -- maybe

Page 19

1  I'm misremembering, but I believe you were present

2  on the zoom deposition of Cleotha Chairse recently,

3  is that right?

4      A.    I believe so.

5      Q.    Okay.  Cleotha said that he was your

6  cousin Quarter Pound.  Do you remember him saying

7  that during that deposition?

8      A.    Do I remember him saying that?

9      Q.    Yes, yes.

10     A.    No.

11     Q.    All right.  Well, that guy Quarter Pound

12  who was deposed that you sat and watched the

13  deposition of recently, was that your cousin?

14     A.    I don't think I watched the deposition

15  of Quarter Pound.

16     Q.    Okay, all right.  Well, does the name

17  Cleotha Chairse ring a bell to you?

18     A.    It sounds familiar.

19     Q.    Is that your cousin Quarter Pound?

20     A.    Maybe.  You want me to assume?  I don't

21  know.

22     Q.    Who is Quarter Pound's mom?

23     A.    Aunt Ruthella.

24     Q.    Okay.  Tweetie, is that another nickname

Page 20

1  for one of your cousins?

2      A.    Yes.

3      Q.    Do you remember Tweetie's real name?

4      A.    It might be the same as his name.  I

5  know they're twins.  I don't know.

6      Q.    Claudette Chairse, does that ring a bell

7  about?

8      A.    Yes, that sounds familiar.

9      Q.    So Ruthella is her mom, too, right?

10     A.    Yes.

11     Q.    What about Victor, what's his last name?

12     A.    I think it's Clemson or Clemmons or

13  something like that.  I'm not for sure.

14     Q.    And who is Victor's mom?

15     A.    I don't know.

16     Q.    Do you know where Victor lived?

17     MR. AINSWORTH:  Objection, foundation.

18  BY MR. GRILL:

19     Q.    Back in 1991.

20     A.    He lived with us.

21     Q.    When you say with us, can you be more

22  specific?

23     A.    1212 West 51st Street rear house.

24     Q.    Okay.  All right.  And where did Quarter



Page 21

1  Pound and Tweetie live?
2      A.    1210 West 51st Street second floor.
3      Q.    Okay.  So basically right next door?
4      A.    Yes.
5      Q.    Same side of the street of 51st Street?
6      A.    Yes.
7      Q.    Do you know if anybody else lived with
8  your Aunt Ruthella at 1210 second floor other than
9  Quarter Pound and Tweetie back in 1991?
10     A.    There might have been somebody else
11 living up there, but I don't know, I'm not for
12 sure.  It's been 30 years ago, I don't know.
13     Q.    Do you know Fred?
14     A.    Yes, I know a Fred.
15     Q.    Back in 1991?
16     A.    Yes.
17     Q.    What was Fred's last name?
18     A.    I don't -- I don't know.
19     Q.    Frederick Gunn, does that ring a bell?
20     A.    I think I read that somewhere before.
21 It rings a bell.
22     Q.    And where did Frederick Gunn live in
23 1991.
24     MR. AINSWORTH:  Object to the foundation.

Page 22

1  BY THE WITNESS:
2      A.    I don't know no Frederick Gunn.  I know
3  Fred stayed at 1214.
4  BY MR. GRILL:
5      Q.    Well, the Fred that you believe stayed
6  at 1214 in 1901, is that the Frederick Gunn that
7  you're thinking of?
8      A.    I don't know.
9      MR. AINSWORTH:  Objection, foundation.
10 BY MR. GRILL:
11     Q.    Did Frederick that stayed at 1214 have a
12 brother that lived on the block too?
13     A.    Well, you said his name is Frederick.  I
14 said Fred.  I don't know no Frederick.
15     Q.    Okay, Fred, let's just stick with that.
16 Fred Gunn, does that ring a bell?
17     A.    Yes, Fed rings a bell.
18     Q.    Fred Gunn?
19     A.    No, Fred Gunn don't ring no bell, just
20 Fred.
21     Q.    Just Fred.  And Fred lived at 1214?
22     A.    Yes.
23     Q.    All right.  And was he a relative of
24 yours?

Page 23

1      A.    No, friend, grew up together.
2      Q.    Okay.  What about with your cousin
3  Quarter Pound?
4      A.    No.
5      MR. AINSWORTH:  Object to the form of the
6  question.
7  BY MR. GRILL:
8      Q.    Did Fred have a brother that lived at
9  1214?
10     A.    He had two brothers.  I think one of
11 them's name was Ra Ra and the other one's name was
12 Day Day or something like that.
13     Q.    Ra Ra, R-a-R-a?
14     A.    Yeah.
15     Q.    And what was other one?
16     A.    Day Day.
17     Q.    Day Day?
18     A.    Yes, like D-a-y, D-a-y.
19     Q.    Do you know what -- those sound like
20 nicknames, right?
21     A.    Right.
22     Q.    Do you know what their real names were?
23     A.    No.
24     Q.    Did they live at 1214 with Fred?

Page 24

1      A.    Yes.
2      Q.    How old is Fred back -- well, let me
3  rephrase the question.  Was Fred older or younger
4  than you?
5      A.    I believe we're about the same age.
6      Q.    Okay.  And Quarter Pound was he older or
7  younger than you?
8      A.    That's a good question.  I don't know.
9  Might be older.  I don't know.
10     Q.    Did you hang out back in 1991 with
11 Quarter Pound, your cousin?
12     MR. AINSWORTH:  Object to the form of the
13 question.
14 BY THE WITNESS:
15     A.    Not that much.
16 BY MR. GRILL:
17     Q.    Okay.  What types of things would you do
18 with him when you did hang out with him?
19     A.    Normal things, you know.  Bad things.
20     Q.    Bad things.  Like what kind of bad
21 things?
22     A.    We always -- when we was growing up, me
23 and him always had a thing for throwing bottles at
24 cars and stuff.



Page 25

1    Q.   That's something that you and Quarter
2   Pound did?
3    A.   Yeah.
4    Q.   Did you do that a lot?
5    MR. AINSWORTH:  Object to the form of the
6   question.
7   BY THE WITNESS:
8    A.   No.
9   BY MR. GRILL:
10   Q.   Okay.  Like how often would you and
11  Quarter Pound throw rocks and bottles at cars?
12   A.   I don't know.
13   Q.   Did you ever get arrested together for
14  doing that?
15   A.   No.
16   Q.   All right.  Why would you and Quarter
17  Pound throw rocks and bottles at cars before you
18  got arrested on this case?
19   A.   Can you repeat that?
20   Q.   Why would you and Quarter Pound -- think
21  back to when you and Quarter Pound were throwing
22  rocks and bottles at cars, was there a reason why
23  you two were doing that?
24   MR. AINSWORTH:  Object to foundation.

Page 26

1   BY MR. GRILL:
2    Q.   Let me rephrase it.  Was there a reason
3   why you were doing it?
4    MR. AINSWORTH:  Object to foundation.
5   BY THE WITNESS:
6    A.   No, there wasn't no reason.
7   BY MR. GRILL:
8    Q.   Were these cars that would drive by, or
9   were throwing them at cars that were parked?
10   A.   Are you speaking from that night, or are
11  you just talking about in general?
12   Q.   In general because it -- well, let me
13  clarify.
14   A.   Okay.
15   Q.   You said that you and Quarter Pound
16  would do bad things, right?
17   A.   Right.
18   Q.   And those bad things you described as
19  being throwing rocks and bottles at cars, right?
20   A.   Right.
21   Q.   Did you -- and we'll talk about this.  I
22  know that you're saying that the night that this
23  murder happened, you and Quarter Pound were
24  throwing stuff at cars.  Did you guys throw --

Page 27

1   other than that night, September 15th, 1991, before
2   then, did you and Quarter Pound throw rocks and
3   bottles at cars?
4    A.   Yes.
5    Q.   Okay.  So my question was how often were
6   you guys doing that?
7    MR. AINSWORTH:  Objection, foundation.
8   BY THE WITNESS:
9    A.   I don't want to assume, so I'm just
10  going to say I don't know.
11  BY MR. GRILL:
12   Q.   All right.  Was there a reason why you,
13  other than the night on September 15th, so before
14  that night in 1991, was there a reason why you were
15  throwing rocks and bottles at cars?
16   MR. AINSWORTH:  Objection, foundation.
17  BY THE WITNESS:
18   A.   No.
19  BY MR. GRILL:
20   Q.   All.  Right anybody else ever throw
21  rocks and bottles at cars with you other than
22  Quarter Pound?
23   A.   I don't want to assume, so I'm going to
24  say I don't know.  It's been 30 years ago.  I don't

Page 28

1   know.
2    Q.   Well, think back to before your arrest
3   in this case.  Was there a particular place where
4   you and Quarter Pound were typically throwing rocks
5   and bottles at cars from?
6    MR. AINSWORTH:  Objection, form.
7   BY THE WITNESS:
8    A.   No.
9   BY MR. GRILL:
10   Q.   Okay.  Did you do it on West 51st
11  Street?
12   A.   Probably that night.
13   Q.   Okay.  What about other nights before
14  that?
15   A.   No, not that I could think of.
16   Q.   What other streets do you remember
17  throwing rocks and bottles that you were on when
18  you were throwing rocks and bottles at cars?
19   A.   Maybe once on Elizabeth.
20   Q.   Okay.  Do you have a specific memory of
21  throwing rocks and bottles at cars on Elizabeth
22  Street?
23   A.   Not really.
24   Q.   Everett, your cousin, what was his last



Page 29

1  name?
2     A.   Jones.
3     Q.   Okay.  Where did he live in 1991?
4     A.   1212 West 51st Street rear house.
5     Q.   Rear house.  So we've got Victor in the
6  rear house, Everett in the rear house.  You said
7  Veronica, right, that was one of your other
8  cousins?
9     A.   Yes.
10    Q.   What's Veronica's last name?
11    A.   Jones.
12    Q.   Where did she live in 1991?
13    A.   1212 West 51st Street rear house.
14    Q.   Rear house, okay.  Rosey, what was her
15  last name?
16    A.   Jones.
17    Q.   Okay.  Did she live in the rear house
18  too?
19    A.   Yes.
20    Q.   Okay.  And are all of these your Aunt
21  Bee's children?
22    A.   Yes, except Victor.
23    Q.   Who is Victor's mom or dad.
24    A.   I answered that already.  I don't know.

Page 30

1     Q.   Okay.  How do you know he was a cousin?
2     A.   Because he grew up with us, and my Aunt
3  Bee said he was our cousin.
4     Q.   Okay.  And you cared about these people,
5  right, back in 1991?
6     A.   Yes.
7     Q.   Loved them like family?
8     A.   They was my family.
9     Q.   Right.  And you used that same term
10  cousin to describe your relationship with Denise
11  Harris back in 1991, right, the word cousin?
12    A.   Yeah.
13    Q.   Okay.  Now, Denise -- it's my
14  understanding there is an Annette Harris out there
15  too in 1991?
16    A.   Excuse me, say who?
17    Q.   Annette Harris, do you recognize that
18  name?
19    A.   Yes.
20    Q.   Who is she?
21    A.   That's Denise's sister.
22    Q.   Okay.  Did she live in the second floor
23  of 1212 front house?
24    A.   Yes.

Page 31

1     Q.   Who else lived with Denise and Annette
2  up in the second floor of the front house at 1212?
3     A.   I probably could just tell you her
4  momma.  I don't remember who all was living up
5  there.  Her momma and she had her kids up there.
6     Q.   Do you know what her mother's name was?
7     A.   I think it was Adella, Adella, Adelia,
8  something like that.
9     Q.   Okay.  Harris, if you know?
10    A.   I'm assuming.
11    Q.   Okay.  Anybody else live up in that
12  second floor of the front house at 1212?
13    A.   I don't know, man.  Her kids was
14  probably up there with her, I don't know.
15    Q.   When your mom lived on the first floor
16  of the front house of 1212, who did she live there
17  with?
18    A.   I believe it was her kids.
19    Q.   So your brothers and sisters?
20    A.   Yes.
21    Q.   All right.  What are your brothers and
22  sisters names?
23    MR. AINSWORTH:  Objection, asked and answered
24  BY THE WITNESS:

Page 32

1     A.   I gave them to you already, Doris and
2  Dennis.
3  BY MR. GRILL:
4     Q.   Doris, and what was the other one, Doris
5  and who?
6     A.   Dennis Jakes.
7     Q.   Anybody else live up there?
8     MR. AINSWORTH:  Object to the form of the
9  question.
10  BY MR. GRILL:
11    Q.   Live in the first floor at 1212 front
12  house?
13    A.   Just her kids.
14    Q.   Is Dennis older or younger than you?
15    A.   Younger.
16    Q.   How much younger?
17    A.   Probably -- I don't want to assume.
18  Probably -- man, I don't -- man, shit, I was born
19  in '76.  He was born in -- probably a year, I
20  think.  He was born in '77, I was born in '76.
21    Q.   Okay.  Doris, is she older or young than
22  you?
23    A.   She's older.
24    Q.   How much older?



Page 33

1    A.    I'll say two years.

2    Q.    Okay.  Other than your mom, Dennis and

3    Doris, do you remember anybody else that lived in

4    the front house?

5    A.    Me, her kids.

6    MR. AINSWORTH:  Object to the foundation.

7    BY MR. GRILL:

8    Q.    Anybody else?

9    A.    Her kids.

10    Q.    Just those two.  Anybody else?

11    A.    I answered the question already.

12    Q.    I'm asking you again.  So did anybody

13    else other than your mom, Doris --

14    A.    I just answered it already.

15    Q.    It's a yes or no question.  Did anybody

16    else live up in that house with your mother when

17    she was living on the first floor of 1212 front

18    house?

19    MR. AINSWORTH:  Object to the form of the

20    question.

21    BY MR. GRILL:

22    Q.    Go ahead.  We can take a break if you

23    want to tell him that he needs to answer the

24    question.

Page 34

1    A.    I answered the question already.  I'm

2    not finnin to answer the same question.  Her kids.

3    Q.    My question is did anybody else --

4    A.    I don't care what your question is.

5    Q.    Okay.  We're going to take a break.

6    THE VIDEOGRAPHER:  We're going off the record,

7    the time is 10:35 a.m.

8    (WHEREUPON, a short break was had.)

9    THE VIDEOGRAPHER:  We are back on the record,

10    the time is 10:45 a.m.

11    BY MR. GRILL:

12    Q.    All right.  Sir, did you have an

13    opportunity to speak with your attorney on the

14    break that we just took?

15    A.    Yes.

16    Q.    Okay.  Are you going to answer my

17    question?

18    A.    What is your question?

19    MR. AINSWORTH:  Why don't you pose your

20    question.

21    BY MR. GRILL:

22    Q.    Sure.  My question is do you have any

23    recollection of anybody other than your mom, your

24    brother Dennis, and your sister Doris living on the

Page 35

1    first floor of the 1212 front house building?

2    MR. AINSWORTH:  Objection, foundation.  You

3    can answer.

4    BY THE WITNESS:

5    A.    It was my mother, Jeanette Jakes, her

6    son Dennis Jakes, her daughter Doris Anderson, and

7    her son Anthony Jakes.  Those are my mother's kids.

8    BY MR. GRILL:

9    Q.    And you're Anthony Jakes, right?  Right?

10    A.    Yes.

11    Q.    So when did you live in the front house

12    of -- the front of 1212 house on the first floor

13    with your mom?

14    A.    I don't know.

15    Q.    Okay.  What year, if you remember, did

16    you, your mom and your siblings move to the first

17    floor of the front house in the 1212 building?

18    A.    I don't know.

19    Q.    Prior to -- what year -- okay.  Where

20    were Dennis and Doris living in September 1991?

21    A.    Milwaukee with my momma.

22    Q.    Okay.  And when is the last time that

23    you talked to Doris before today?

24    A.    Probably yesterday.

Page 36

1    Q.    Yesterday?

2    A.    Day before.  I try to talk to my sister

3    every other day.

4    Q.    Okay.  I apologize if I forgot this.

5    Your brother Dennis is still alive, right?

6    A.    My brother Dennis is deceased.

7    Q.    What year did he die?

8    A.    Last year -- no, this year, I believe.

9    This year.

10    Q.    Okay.  Sorry about that.

11    MR. YAMIN:  Excuse me, I'm sorry to interrupt

12    again.  I can't hear a thing.

13    MR. GRILL:  I'll try to speak up.

14    MR. AINSWORTH:  We got a cord issue, George.

15    We'll try and move you closer.

16    MR. YAMIN:  Okay, thanks, and I don't mean to

17    interrupt, but I need to hear.

18    MR. GRILL:  Should we go off the record and

19    move it?

20    THE VIDEOGRAPHER:  Do you want to go off the

21    record?

22    MR. GRILL:  I mean if we got to fix this, yes.

23    I don't want to obviously spend my deposition time

24    fixing the phone.



Page 37

1    MR. YAMIN:  Andrew, I can't hear you very well
2  either.  I don't know what the logistics are.
3    MR. GRILL:  Let's just go off the record and
4  try and fix this.
5    THE VIDEOGRAPHER:  We're going off the record,
6  the time is 10:48 a.m.
7       (WHEREUPON, a short break was had.)
8    THE VIDEOGRAPHER:  We're back on the record,
9  the time is 10:59 a.m.
10  BY MR. GRILL:
11    Q.  All right.  Mr. Jakes, I think my last
12  question was at what years, if you recall, were you
13  living with your mom on the first floor of the
14  front 1212 West 51st Street house?
15    A.  I don't know.
16    Q.  And who was living on the first floor of
17  the 1212 West 51st Street house on September 15th,
18  1991?
19    A.  I don't know.
20    Q.  Was somebody living there?
21    A.  I'll be assuming.  I don't know.
22    Q.  Okay.  How many floors were on the 1212
23  rear house?
24    A.  Two.

Page 38

1    Q.  All right.  What floor -- who lived on
2  the second floor?
3    A.  Excuse me?
4    Q.  Who lived on the second floor of the
5  1212 rear house?
6    A.  It's a cottage.  It's not a house.  It's
7  a cottage.  It's just one big house.
8    Q.  Okay.  Well, you said there was two
9  floors, right?
10    A.  Okay, you got a downstairs and you got
11  an upstairs.  It's just one big cottage.
12    Q.  Okay.  Where were the bedrooms located
13  in the rear house?
14    A.  The bedrooms was located on the second
15  floor.
16    Q.  How many bedrooms?
17    A.  There is three.
18    Q.  Three bedrooms, okay.  Was there a
19  basement?
20    A.  Yes.
21    Q.  And which bedroom did your Aunt Bee stay
22  in?
23    A.  First bedroom second floor.
24    Q.  What about Rosey Jones?

Page 39

1    A.  Rosey stayed in the second bedroom.
2    Q.  Okay.  Veronica?
3    A.  Second bedroom.
4    Q.  Everett?
5    A.  Third bedroom.
6    Q.  Okay.  Anybody else stay in the third
7  bedroom?
8    A.  Me.
9    Q.  Okay.  Where was your father living in
10  September 1991?
11    A.  I don't know.
12    Q.  When is the last time that you saw your
13  father prior to September 1991 if you can remember?
14    A.  I don't know.
15    Q.  Was it more than a year since you had
16  seen him?
17    A.  Are you talking about recently or --
18    Q.  No, no, no.  Prior to September 1991,
19  when was the last time -- so that's like the day
20  that the shooting happened.  My understanding is
21  the police came and picked you up at your Aunt
22  Bee's on September 16th, the next day.  So before
23  then, when was the last time --
24    A.  So before the 16th when is the last time

Page 40

1  I saw him?
2    Q.  Saw your dad.
3    A.  I don't know.
4    Q.  Was it more than a year before that?
5    A.  I don't know.
6    Q.  Okay.  Was it more than two years?
7    A.  He ain't never been in my life, so I
8  don't know.
9    Q.  Is there a reason why he's never been in
10  your life that you know of?
11    A.  I don't know.
12    Q.  Okay.  Do you have any idea in 1991 one
13  where your dad lived?
14    A.  I don't know.
15    Q.  Is that a no or you don't know?
16    A.  I don't know.
17    Q.  Is there a reason, if you know, why you
18  did not go with your mom and your siblings to
19  Milwaukee?
20    MR. AINSWORTH:  Object to the form of the
21  question.
22  BY MR. GRILL:
23    Q.  Why you didn't move there with them.
24    A.  I did move there with them.



Page 41

1    Q.    Okay.  What year did you move to
2  Milwaukee with your mom and your siblings?
3    A.    I don't know.
4    Q.    Okay.  Well, you would agree it would
5  happen at some point prior to September 16th, 1991,
6  right?
7    A.    Yes.
8    Q.    All right.  So I want you to think when
9  was it that you lived in Milwaukee with your mom
10  and your siblings?
11    A.    Again, I don't know.
12    Q.    Okay.  When did you come back to Chicago
13  after you moved to Milwaukee?
14    A.    Probably September 13th or
15  September -- I would assume I was back in Chicago
16  that week.
17    Q.    So it's your testimony that you moved
18  back to Chicago the week preceding your arrest in
19  this case?
20    A.    I came back to Chicago within that week
21  span.  Now the day I don't know.
22    Q.    Okay.  But I just want to be clear, your
23  testimony is that you moved back to Chicago from
24  Milwaukee the week -- roughly in the week before

Page 42

1  your arrest in this case, is that right?
2    A.    Yes.
3    Q.    You're sure?
4    A.    Yes.
5    Q.    100 percent?
6    A.    100 percent.
7    MR. AINSWORTH:  Object to the form of the
8  question.
9  BY MR. GRILL:
10    Q.    Okay.  Where in Milwaukee -- how long do
11  you think -- before the week you moved back, how
12  long do you think you were living in Milwaukee?
13  Was it like for more than a year?
14    A.    I don't want to assume, so I don't know.
15    Q.    That's fine.  I guess what I'm trying to
16  figure out is, at a minimum, were you in Milwaukee
17  for a long time, or were you in Milwaukee for like
18  a month?
19    MR. AINSWORTH:  Object to the form of the
20  question.
21  BY THE WITNESS:
22    A.    I know it was more than a month, but
23  like I said I don't want to assume because I don't
24  know.

Page 43

1  BY MR. GRILL:
2    Q.    Did you go to school in Milwaukee?
3    A.    I don't recall going to school there.
4    Q.    I know you were only 15 when you -- in
5  September of 1991, but do you have a recollection
6  of like working in Milwaukee?
7    A.    No.
8    Q.    What were you doing in Milwaukee?
9    A.    Living with my mother.
10    Q.    Was there a reason why your mom moved to
11  Milwaukee, if you know?
12    A.    You got to ask her.
13    Q.    Well, did she ever tell you?
14    A.    No.
15    Q.    All right.  And do you remember what
16  part of Milwaukee, like what neighborhood you were
17  living in?
18    A.    I don't know.  That was 30 some years
19  ago.  I don't remember.
20    Q.    Was it in the city, or was it outside
21  the city?  Because sometimes people say like I live
22  in Chicago but really they live out in the suburbs,
23  so same kind of idea here, do you remember whether
24  you were living in Milwaukee, or were you living --

Page 44

1    A.    We was living in Milwaukee.
2    Q.    All right.  In the city?
3    A.    I guess.
4    Q.    Are you familiar with Milwaukee today?
5  Have you been there, for example, since you got out
6  of jail?
7    A.    Since I got out of jail, no.
8    Q.    Do you know like do you recall living
9  like near where the basketball stadium was?
10    A.    No.
11    Q.    Or like where -- there is a university
12  in downtown Milwaukee called Marquette University.
13  Do you think you lived near that school?
14    A.    No.
15    Q.    No, you didn't?
16    A.    I don't know.
17    Q.    Okay.  What about there is a casino
18  there, too.  Do you remember living near the
19  casino?
20    A.    I was 15.  I don't know.
21    Q.    Okay.  So what brought you back to
22  Milwaukee -- or back to Chicago the week before you
23  were arrested on this case?
24    A.    What brought me back?



Page 45

1    Q.    Yes, why did you come back?
2    A.    There was probably two reasons.
3    Q.    Why, what are they?
4    A.    I believe I had got arrested and they
5    held me in their little juvenile camp till they
6    sent me back to Chicago.
7    Q.    You got arrested in Milwaukee?
8    A.    Yes.  I was never charged with nothing.
9    I was just detained.
10    Q.    Okay.  What was the other reason?
11    A.    That's it right there, both the same
12    reasons.
13    Q.    So it's really just one reason because
14    you got arrested?
15    A.    Yeah.
16    Q.    All right.  What were you arrested for?
17    A.    I wasn't arrest for nothing.  I was
18    detained.
19    Q.    What were you detained for?
20    A.    I don't recall.
21    Q.    Well, do you remember the police
22    department that detained you?
23    A.    No.
24    Q.    Were you detained near your home

Page 46

1    wherever it was that you were living in Milwaukee
2    at the time?
3    A.    30 years ago, I don't know.
4    Q.    All right.  So you're sure there is no
5    record of this, though; is that what you're saying?
6    A.    I'm positive.  I wasn't arrested.  I was
7    just detained.
8    Q.    Well, how do you know there is no
9    record?
10    A.    Look it up then.
11    Q.    Well, you said it, so I'm asking you.
12    MR. AINSWORTH:  Object to the form of the
13    question.
14    BY THE WITNESS:
15    A.    Look it up then.
16    BY MR. GRILL:
17    Q.    Were you with anybody when you were
18    detained?
19    A.    No.
20    Q.    Okay.  So what was it about you being
21    detained that made you come back to Chicago?
22    A.    Got to ask them.  They sent me back.
23    Q.    Who sent you back?
24    A.    The police and the State's Attorney.

Page 47

1    Q.    The police and the State's Attorney,
2    okay.  So you talked to a State's Attorney in
3    Milwaukee -- or, yeah, I guess Milwaukee somewhere.
4    A.    I don't recall.
5    Q.    All right.  Well, you said that, so is
6    that something that -- are you making that up, or
7    is that something you remember?
8    MR. AINSWORTH:  Whoa, object to the form of
9    the question.  He didn't say --
10    BY MR. GRILL:
11    Q.    Well, he said -- okay.  Did you speak
12    with the State's Attorney?  I'll withdraw the
13    question.
14    A.    No.
15    Q.    Okay.  So who sent you back to Chicago?
16    A.    I don't know.  Let me put it like that,
17    I don't know.
18    Q.    You don't know.  All right.  Did your
19    mom send you back to Chicago?
20    A.    No.
21    Q.    Do you believe it was law enforcement,
22    whether the police or the State's Attorney that
23    sent you back to Chicago?
24    A.    Law enforcement.

Page 48

1    Q.    All right.  And they never arrested you,
2    though, right?
3    A.    Correct.
4    Q.    How do you know they didn't arrest you?
5    A.    Look it up.
6    Q.    I'm asking you how do you know?  How do
7    you know that they didn't arrest you?  Why do you
8    say that?
9    A.    I just answered your question.  You can
10    move to the next question.
11    Q.    Are you refusing to answer my question?
12    A.    I said -- man.
13    Q.    Are you refusing to answer my question?
14    A.    Yes, I'm refusing.
15    Q.    Okay.  Can we please mark that?
16    Is there a reason why you're refusing to
17    answer my question?
18    A.    Because I answered your question.
19    Q.    My question -- and I'll ask it one more
20    time, how do you know the police did not arrest
21    you?
22    MR. AINSWORTH:  You can answer the question.
23    BY THE WITNESS:
24    A.    I answered the question already.



Page 49

1    MR. AINSWORTH:  You can answer it again.
2  BY THE WITNESS:
3    A.  What was the question again?
4  BY MR. GRILL:
5    Q.  How do you know the police did not
6  arrest you?
7    A.  Because they didn't.  They detained me.
8    Q.  Did they put you in handcuffs?
9    A.  Yes.
10   Q.  Okay.  And did they -- and how is it
11 that you believe they sent you back to Chicago?
12   A.  They didn't let me go back to my mother
13 in Milwaukee.
14   Q.  Did they take you into the police
15 station?
16   A.  I was in one of their little Audy homes
17 or group homes, whatever that shit was up there.
18   Q.  In Milwaukee?
19   A.  Yes.
20   Q.  How long were you in like -- so the Audy
21 home, let me just back up.  You understand the Audy
22 home is like the juvenile detention facility here
23 in Chicago, right?
24   A.  Yes.

Page 50

1    Q.  So is it your testimony that you spent
2  some time in the juvenile detention facility in
3  Milwaukee sometime prior to September 1991?
4    A.  Yes.
5    Q.  For how long were you in the juvenile
6  detention center?
7    A.  I don't know.
8    Q.  Do you think that the juvenile detention
9  center then would have a record of you being there?
10   MR. AINSWORTH:  Objection, foundation.
11 BY THE WITNESS:
12   A.  I don't know.  You got to call them and
13 ask them.  I don't know.
14 BY MR. GRILL:
15   Q.  And do you know -- do you have any
16 understanding about the mechanism or procedure that
17 they used to send you back to Chicago?
18   A.  All I know is I woke up one morning,
19 they came to the door, told me get my stuff, walked
20 outside, there was a police car, they drove me past
21 Great America, put me on the bus, and I got off the
22 bus at the Greyhound in Chicago.
23   Q.  Okay.  Did you talk to your mother
24 before you were sent back to Chicago?

Page 51

1    A.  No.
2    Q.  Do you know if you had a warrant for
3  your arrest here in Chicago that they were sending
4  you back here to deal with?
5    A.  No, not that -- I don't know.
6    Q.  You know what a warrant is, right, an
7  arrest warrant?
8    A.  Yes.
9    Q.  All right.  So where were you
10 brought -- so it's your testimony -- actually,
11 strike that.
12        Is it your testimony that the police or
13 law enforcement personnel transported you from
14 Milwaukee to Chicago?
15   A.  No.
16   Q.  How did you get back to Chicago?
17   A.  I got back as I stated before.
18   Q.  On a Greyhound bus?
19   A.  They put me on a Greyhound bus.
20   Q.  And who paid for the bus ticket?
21   A.  They paid for it.  I didn't pay for it.
22   Q.  All right.  So law enforcement it's your
23 understanding paid for your bus ticket to come back
24 to Chicago?

Page 52

1    A.  Yes.
2    Q.  All right.  And when you got back to
3  Chicago, where did you go?
4    A.  To my Auntie's house.
5    Q.  Aunt Bee's?
6    A.  Yes.
7    Q.  Yes?
8    A.  Yes.
9    Q.  All right.  So before -- let me ask you
10 this.  You were living then in the first floor of
11 the front house, the front 1212 building with your
12 mother and your siblings until you guys moved to
13 Milwaukee, is that fair?
14   MR. AINSWORTH:  Object to the form of the
15 question.  Go ahead and answer.
16 BY THE WITNESS:
17   A.  I'm not for sure how that happened, so
18 I'll say I don't know.  I just know we wound up
19 moving to Milwaukee.
20 BY MR. GRILL:
21   Q.  Right.  So before you moved to
22 Milwaukee, I thought you -- I understood you to be
23 saying -- telling me that you, your brother Dennis,
24 your sister Doris, and your mom all lived in the



Page 53

1  first floor of the front house at 1212, is that
2  right?
3      A.   That's correct.
4      Q.   Okay.  So it's your testimony that at
5  the time the police came and picked you up on
6  September 16th, 1991 for this murder, you had only
7  been living with your Aunt Bee for about a week in
8  the rear house, is that right?
9      A.   Yeah, that's about right.
10     Q.   Do you know the difference between the
11 truth and a lie?
12     A.   Sure.
13     Q.   Can you tell me what you understand the
14 difference between those two things are?
15     A.   You got a dictionary on you?  I can read
16 it to you.
17     Q.   No, I want to know what you in your
18 mind -- I want your own definition of what the
19 difference between a truth and a lie is.
20     MR. AINSWORTH:  Object to the form of the
21 question, it's argumentative.
22 BY THE WITNESS:
23     A.   The truth is you're getting on my God
24 Damn nerves, I'd be lying if I said you didn't.

Page 54

1  BY MR. GRILL:
2      Q.   So what is the difference between, in
3  your mind, between the truth and a lie?
4      MR. AINSWORTH:  Objection, asked and answered.
5  It's harassing.  Don't answer that question.
6      MR. GRILL:  Okay.  You're instructing this
7  witness to not tell me what the difference is
8  between a truth and a lie?
9      MR. AINSWORTH:  He just did.
10     MR. GRILL:  No, that was not -- that is
11 hilarious.  That is so not an answer to my question
12 what he said.  That's okay, I mean if you're
13 instructing him not to answer, that's fine.  I
14 just want to make clear that that's what you're
15 doing.
16     MR. AINSWORTH:  I think you're doing it in a
17 harassing fashion, and I think that there is
18 no --
19     MR. GRILL:  Well, harassment is not a
20 basis -- well, strike that question.  I'll withdraw
21 that.
22 BY MR. GRILL:
23     Q.   My question is what is your
24 understanding of the difference between telling the

Page 55

1  truth and telling a lie?  That's my question to
2  you.  Go ahead.
3      A.   I answered it already.
4      Q.   You did not.  So if that's the answer
5  you're sticking with, that's fine.  I'm giving you
6  one more opportunity -- I mean if that's what you
7  want in the record --
8      A.   Put it in the record then.
9      Q.   Okay.  Why am I getting on your nerves?
10     A.   All the attorneys for the police get on
11 my nerves.
12     Q.   Okay.  Do you not like being asked
13 questions about what happened in September of 1991?
14     A.   I don't like being asked questions
15 period.
16     Q.   Okay.  Any other reason that I'm getting
17 on your nerves other than that I'm an attorney
18 that's representing police officers in this case?
19     A.   No.
20     Q.   Okay.  Oh, sorry, there is another
21 reason, and that you don't like being asked
22 questions.  Any other reasons?
23     A.   Nah.
24     Q.   Okay.

Page 56

1      A.   Or no rather.
2      Q.   What was your understanding about what
3  we were supposed to be doing here today?
4      MR. AINSWORTH:  Don't answer the question.  It
5  calls for attorney/client privileged
6  communications.
7  BY MR. GRILL:
8      Q.   Okay, I want your own understanding.
9  Separate and apart from anything you've ever
10 discussed with your attorney, I don't want to hear
11 anything about what you and Mr. Ainsworth any other
12 attorneys --
13     A.   I'm going to follow the instructions of
14 my lawyer.
15     Q.   I want to know what your personal
16 understanding is today about --
17     A.   I'm going to follow the advice of my
18 lawyer.
19     MR. AINSWORTH:  Hang on.  And I'm going to
20 object.  He can't answer that question without
21 revealing privileged communications because we've
22 talked extensively about this deposition, and so
23 I'm going to tell you don't answer that question.
24 It calls for attorney/client privileged



Page 57

1   communication.
2   BY MR. GRILL:
3       Q.   Okay.  What is --
4       MR. AINSWORTH:  Let me finish.
5       MR GRILL:  Oh, sorry, I thought you were done.
6       MR. AINSWORTH:  It calls for attorney/client
7   privileged communication.
8   BY MR. GRILL:
9       Q.   What is your -- so you're going to take
10  your attorney's advice and not tell me what you
11  personally understand is the purpose of today's
12  deposition, is that right?
13      A.   Yes.
14      Q.   Okay.  What is your personal
15  understanding of the nature of your lawsuit?
16      MR. AINSWORTH:  If you can answer the question
17  without revealing attorney/client privileged
18  communications, then do so.
19  BY THE WITNESS:
20      A.   I'm going to refuse to answer that
21  question.
22  BY MR. GRILL:
23      Q.   Do you know what you're suing the police
24  for?

Page 58

1       A.   I'm going to refuse to answer that too.
2       Q.   On what basis?
3       MR. AINSWORTH:  Because it would -- well, it
4   pertains to a privilege, so let's take a break so I
5   can talk about the privilege with my client.
6       MR. GRILL:  Okay, let's go off the record.
7       THE VIDEOGRAPHER:  We're going off the record,
8   the time is 11:19 a.m.
9           (WHEREUPON, a short break was had.)
10      THE VIDEOGRAPHER:  We are back on the record,
11  the time is 11:24 a.m.
12      MR. GRILL:  Can you read back my question?
13          (WHEREUPON, the record was read
14           as requested.)
15  BY THE WITNESS:
16      A.   That's your question?
17  BY MR. GRILL:
18      Q.   Yes.
19      A.   For wrongful conviction, police
20  brutality.
21      Q.   Anything else?
22      A.   Nothing else.
23      Q.   Did you believe that people were going
24  to -- attorneys in particular -- were going to ask

Page 59

1   you questions about those claims?
2       A.   I'd be assuming.  I don't know.
3       Q.   Do you think that people should be able
4   to ask you questions, attorneys, ask you questions
5   about those claims?
6       MR. AINSWORTH:  Object to the form of the
7   question, calls for speculation.
8   BY MR. GRILL:
9       Q.   Do you believe that attorneys should be
10  able to ask you questions about those claims?
11      A.   Yes.
12      Q.   Okay.  Do questions about your claims
13  annoy you, bother you, frustrate you?
14      A.   Excuse me, can you repeat that?
15      Q.   Do questions, do people asking you,
16  attorneys asking you questions about your claims
17  and your lawsuit, does it bother you?
18      MR. AINSWORTH:  Objection, foundation.
19  BY THE WITNESS:
20      A.   Does it bother me?
21  BY MR. GRILL:
22      Q.   Yes.
23      A.   No.
24      Q.   Okay.  So I just want to see if we're --

Page 60

1   the fact that I'm asking you questions right now,
2   it doesn't bother you?
3       A.   Yeah, you're bothering me, but they
4   don't bother -- you're the only one ever asking me
5   questions.
6       Q.   Well, yeah, I'm the only one -- this is
7   the first time you've been deposed in this lawsuit,
8   right?
9       A.   Yes.
10      Q.   But you were asked questions during the
11  criminal proceedings by attorneys, right?
12      A.   Right.
13      Q.   And you were asked questions by
14  attorneys during your post-conviction proceedings,
15  right?
16      A.   Right.
17      Q.   Did it frustrate you that people were
18  asking you questions in those situations?
19      A.   Not as much as now.
20      Q.   Okay.  Why is it worse now?
21      A.   Because I don't want to be here.
22      Q.   Why don't you want to be here?
23      A.   Because I don't want you asking me
24  questions.



Page 61

1    Q.    You don't want me asking you questions;
2  is that what you said?
3    A.    Yes.
4    Q.    Why don't you want me asking you
5  questions about your lawsuit?
6    A.    Oh, that was a question to me?
7    Q.    Yeah, why don't you want me asking you
8  questions about your lawsuit?
9    A.    No particular reason.
10   Q.    Okay.  At all, none?
11   A.    Not at all.
12   Q.    Are you concerned that you might say
13  something that might damage your lawsuit?
14   A.    Not in particular.
15   Q.    Okay.  The events that you experienced
16  that surround your arrest and prosecution for the
17  murder of Rafael Garcia are all super important
18  events in your life; you'd agree with that, right?
19   MR. AINSWORTH:  Objection, foundation, form.
20  BY THE WITNESS:
21   A.    You said --
22  BY MR. GRILL:
23   Q.    Those are important events; your arrest
24  and prosecution for Mr. Garcia's murder --

Page 62

1    A.    Yes.
2    Q.    -- what happened to you, it's an
3  important thing that happened to you in your life,
4  right?
5    A.    Getting arrested supposed to be
6  important to me?  That's what you're asking me?
7    Q.    Yes, specifically getting arrested for
8  Mr. Garcia's murder and getting criminally
9  prosecuted and sent to prison, that was, I guess, a
10  life changing event in your life, right?
11   MR. AINSWORTH:  Object to the form of the
12  question.
13  BY THE WITNESS:
14   A.    Yes.
15  BY MR. GRILL:
16   Q.    You would agree that those events that I
17  just described are events that changed the course
18  of your life forever, right?
19   A.    Yes.
20   Q.    Do you still have a good memory of those
21  events?
22   MR. AINSWORTH:  Objection, foundation.
23  BY THE WITNESS:
24   A.    Somewhat.

Page 63

1    MR. AINSWORTH:  And form, compound.
2  BY MR. GRILL:
3    Q.    Do you remember when the police came to
4  your Aunt Bee's house to pick you up?  Do you have
5  a good memory of those events?
6    MR. AINSWORTH:  Objection, form.
7  BY THE WITNESS:
8    A.    What do you mean by pick me up?
9  BY MR. GRILL:
10   Q.    They came to pick you up on
11  September 16th at your Aunt Bee's house, right?
12   A.    No, they busted in the house and
13  arrested me.  They didn't come to pick me up.
14   Q.    Okay.  Regardless of how you want to
15  characterize it --
16   A.    That's how you characterized it.
17   Q.    Do you remember when the police came to
18  your Aunt Bee's house on September 16th?
19   A.    Yes, I remember.
20   Q.    Do you have a good memory of those
21  events?
22   MR. AINSWORTH:  Object to the form of the
23  question.
24  BY THE WITNESS:

Page 64

1    A.    What is your question?
2  BY MR. GRILL:
3    Q.    Do you have a good memory of those
4  events?
5    A.    I would say somewhat.
6    MR. AINSWORTH:  Same objection.
7  BY MR. GRILL:
8    Q.    You would say so what?
9    A.    Yes.
10   MR. AINSWORTH:  Somewhat.
11  BY MR. GRILL:
12   Q.    Somewhat, got it.  Do you have a good
13  memory of being at the police station after they
14  came to your Aunt Bee's house when they searched
15  you and found a foil packet in your pants pocket,
16  do you have a good memory of those events?
17   A.    Yes.
18   MR. AINSWORTH:  Objection to the form of the
19  question.
20  BY MR. GRILL:
21   Q.    Do you have a good memory of being
22  interrogated and questioned at the police station
23  about Mr. Garcia's murder, do you have a good
24  memory of those events?



Page 65

1    MR. AINSWORTH:  Objection to the form of the
2    question.
3    BY THE WITNESS:
4       A.    Somewhat.
5    BY MR. GRILL:
6       Q.    Okay.  Do you have a good memory of the
7    criminal proceedings, in particular the
8    times -- the two times you testified during the
9    motion to suppress and then later at the criminal
10   trial, do you have a good memory of those events?
11      A.    Somewhat.
12      MR. AINSWORTH:  Object to the form of the
13   question.
14   BY MR. GRILL:
15      Q.    Okay.  What materials did you review
16   today to get ready for your deposition?
17      A.    I believe it was some letters, my
18   statement, and I believe when I took the stand for
19   the squash arrest, something like that.
20      Q.    Okay.  So some of your testimony from
21   your criminal proceedings?
22      A.    Yes.
23      Q.    Okay.  Anything else?
24      A.    That's it.

Page 66

1       Q.    Did you review your criminal trial
2    testimony?
3       A.    I believe it was in there.
4       Q.    You believe?
5       A.    I believe it was in there.  There was
6    like -- it was all bundled up in one package.
7       Q.    Okay.  What about any of your testimony
8    during the post-conviction proceedings, did you
9    review any of that?
10      A.    I can't say offhand.  I just remember
11   reading the squash and probably the trial and some
12   letters and stuff.
13      Q.    Okay.  What letters?
14      A.    You got to ask my attorney.  Some
15   letters that I wrote while I was in jail, I guess.
16      Q.    So they were letters that you wrote that
17   you reviewed?
18      A.    Yes.
19      Q.    Okay.  How many letters were there, if
20   you remember?
21      A.    Probably two or three.  I'm not for
22   sure.
23      Q.    And the statement that you reviewed,
24   that was the handwritten statement that you did

Page 67

1    with the Assistant State's Attorney, right?
2       A.    Yes.
3       Q.    Okay.  Anything else?  Well, did you
4    review any photographs?
5       A.    Photographs?
6       Q.    Yes.
7       A.    I believe he had me look at a couple of
8    crime scene photos.  I'm not for sure how many of
9    them.
10      Q.    Do you remember what was in those
11   photographs?
12      A.    Pictures of the neighborhood, pictures
13   of the sub shop, stuff like that.
14      Q.    Okay.  Were they pictures -- when you
15   say they were crime scene photographs, why do you
16   describe it that way?
17      A.    There was yellow tape around it.
18      Q.    Do you have any like mental health
19   diagnoses or disorders that would prevent you from
20   testifying truthfully and honestly today?
21      A.    Not that I can recall.
22      Q.    Okay.  Have you ever to your knowledge
23   been diagnosed with any mental health or emotional
24   or behavioral disorder to your knowledge?

Page 68

1       MR. AINSWORTH:  Objection to the form of the
2    question.
3    BY THE WITNESS:
4       A.    Only thing I can ever remember being
5    diagnosed with was lead poisoning, that's about it.
6    BY MR. GRILL:
7       Q.    Okay.  Do you see that book in front of
8    you?
9       A.    Yes.
10      Q.    We're going to refer to this a few
11   times.  There is tabs that have numbers on them.
12   In those tabs, the numbers kind of refer to an
13   Exhibit number, okay?
14      A.    Okay.
15      Q.    I'm going to jump around a bit, but I
16   know this is the first Exhibit I'm showing you, but
17   the tab I want you to flip to is tab No. 16, okay,
18   and I want you to flip to the second to last page
19   of that Exhibit, okay.  On the bottom right-hand
20   corner, there is Bates stamped numbers, so this
21   would be -- so you see on the bottom right-hand
22   corner, it says CPS Subpoena Response followed by a
23   number?
24      A.    Yeah, five zeroes and a 1?



Page 69

1    Q.   Yes.  I want you to go to CPS Subpoena
2  Response 15.
3    A.   15?
4    MR. AINSWORTH:  It's the third from the end.
5  BY MR. GRILL:
6    Q.   Oh, yes, third from the end.
7    A.   Did you say 15?
8    Q.   Uh-huh.
9    A.   All right.
10    Q.   So you see there at the top of this
11  Exhibit, it says, "Historical Student Information
12  Access."  These are records we got from the Chicago
13  Public Schools, and these appear to be from
14  October 1st, 1993, so I'm gathering you were
15  incarcerated on this case at the time these records
16  were generated.
17        And you'll see that down on kind of the
18  right side -- I know the writing is small, but kind
19  of halfway down, it says date of evaluation
20  requested, it says September 29th, 1992.
21        So first question is do you remember
22  getting evaluated for any reason whatsoever while
23  you were incarcerated or awaiting trial for the
24  Garcia homicide?

Page 70

1    A.   Do I remember being evaluated?
2    Q.   Yes, for any reason, any type of
3  evaluation.
4    A.   No.
5    Q.   I'll be a little more specific.  Do you
6  remember receiving any like mental health
7  evaluations, speaking with like a social worker,
8  anything like that while you were awaiting trial?
9    A.   I could say I can, but I can't remember.
10    Q.   Do you remember anybody ever telling you
11  that they concluded, according to this record, that
12  you had a behavioral or emotional disorder because
13  you see that on primary disability category on the
14  left?
15    A.   Uh-huh.
16    Q.   Okay.  Do you remember anybody telling
17  you anything like that that's what this evaluator
18  or this record concluded?
19    A.   I don't want to assume, so I don't know.
20  I can't remember.
21    Q.   Have you ever received to date any type
22  of psychological or mental health treatment for any
23  type of behavioral or emotional disorder that you
24  can think of?

Page 71

1    A.   Not that I could think of.
2    Q.   Since your release have you been
3  evaluated by a mental health professional, a
4  psychologist, psychiatrist, or anything since you
5  got out of jail?
6    A.   I believe I was for my -- what was that?
7  I was trying to get my disability started back up.
8    Q.   After you got out of prison?
9    A.   Yes.
10    Q.   Okay.  And what were you doing to do
11  that?
12    A.   What was I doing?
13    Q.   Yeah, like how did you go about doing
14  that?
15    A.   The regular steps just going down to the
16  office.
17    Q.   What office?
18    A.   I believe it was the aid office or
19  social security office, one of them.
20    Q.   Were you evaluated by some type of
21  doctor, social worker?
22    A.   Man, that was --
23    Q.   If you know.
24    A.   I don't know.  I'll say I don't know.  I

Page 72

1  probably was, but I can't remember.
2    Q.   Did they render any type of diagnosis
3  for you that you're aware of?
4    A.   No.
5    Q.   No, they didn't, or, no, you don't know?
6    A.   No, they didn't.
7    Q.   Okay.  Other than that, have you sought
8  treatment or counseling for any reason from anybody
9  since your release from prison?
10    A.   No.
11    Q.   Is there any reason why you haven't?
12    A.   None in particular.
13    Q.   Okay.  Do you feel like you need
14  treatment?
15    A.   No.
16    Q.   Why not?
17    A.   I feel I'm okay.
18    Q.   Okay.  Do you think you have adequately
19  prepared to testify today?
20    A.   No.
21    Q.   Why not?
22    A.   Because the truth is the truth.  It's
23  going to come out one way or the other.
24    Q.   No, no, no, hang on, let me make sure



Page 73

1  you heard my question.
2    A.   I heard your question.
3    Q.   Okay.  Let me ask you this.  Do you
4  think you did everything you could to prepare for
5  your deposition today?
6    A.   No.
7    Q.   Why is that?
8    A.   No particular reason.
9    Q.   Do you feel that your testimony today is
10  important for your lawsuit?
11    MR. AINSWORTH:  Object to the form of the
12  question.
13    THE WITNESS:  I could answer?
14    MR. AINSWORTH:  Yeah, you can answer.
15  BY THE WITNESS:
16    A.   Repeat that again now.
17  BY MR. GRILL:
18    Q.   Do you feel that your testimony and your
19  deposition today is important for your lawsuit?
20    MR. AINSWORTH:  Same objection.
21  BY THE WITNESS:
22    A.   No.
23  BY MR. GRILL:
24    Q.   Why not?

Page 74

1    A.   Because the truth is the truth.  It's
2  going to come out eventually.
3    Q.   How are people in your mind supposed to
4  know the truth without your testimony today?
5    MR. AINSWORTH:  Object to the form of the
6  question, argumentative.
7  BY THE WITNESS:
8    A.   I'm giving you my testimony today.
9  BY MR. GRILL:
10    Q.   Did somebody else other than the police
11  witness any of the things that you claim happened
12  to you in your lawsuit?
13    MR. AINSWORTH:  Object to the form of the
14  question.
15  BY MR. GRILL:
16    Q.   At the police station in particular.
17    A.   No.
18    Q.   Okay.  So the only witnesses to any of
19  the abuse that you claim that you suffered were
20  other police personnel, right, at the police
21  station?
22    A.   Yes.
23    Q.   Okay.  And it's what happened to you at
24  the police station that you claim resulted in you

Page 75

1  being wrongfully convicted, right?
2    A.   Yes.
3    Q.   When you testified at the criminal
4  trial -- so let's start with the motion to quash,
5  okay, the motion to suppress.  So this was the
6  motion when you were trying to get your confession
7  thrown out.  Do you remember testifying about that
8  in the criminal procedure?
9    A.   Somewhat.
10    Q.   Okay.  And then you also testified at
11  the criminal trial, right, in your own defense,
12  right?
13    A.   Yes.
14    Q.   Okay.  Did you understand at the time
15  you gave those testimonies that your testimony was
16  important?
17    MR. AINSWORTH:  Object to the form of the
18  question.
19  BY MR. GRILL:
20    Q.   Let me be more specific.  That it was
21  important as it related to your defense against the
22  charge of murder?
23    A.   Yes.
24    Q.   Okay.  And when you testified in either

Page 76

1  of those cases, do you believe that you told the
2  truth when you were testifying?
3    A.   Yes.
4    Q.   And you've had an opportunity to review
5  those transcripts before you came in here today,
6  right?
7    A.   I reviewed some transcripts, not all of
8  them.
9    Q.   Did you review the transcript from your
10  motion to quash, did you review that transcript?
11    A.   Yes.
12    Q.   When you reviewed that -- when did you
13  last review that transcript?
14    A.   I believe that was yesterday sometime.
15    Q.   Okay.  And when you read that
16  transcript, do you remember thinking to yourself
17  that any of the things that you testified to were
18  untrue?
19    A.   Yes.
20    Q.   Okay.  So is it your testimony that you
21  believe that you did not tell the truth at your
22  motion to quash during that testimony?
23    A.   That I did not tell the truth?
24    Q.   Yes.  I'm just talking about what you



Page 77

1  said, not what anybody else said, just what you
2  said under oath during the motion to quash.
3      A.   I believe I told the truth to the best
4  of my ability.
5      Q.   So when you reviewed that transcript,
6  did you still believe that, yep, this is the truth?
7      A.   Yes.
8      Q.   Okay.  Same with your criminal trial
9  testimony, when you reviewed that did you believe
10  that everything you were saying in that
11  transcript -- everything that was recorded that you
12  said in that transcript that it was all the truth?
13      A.   Yes.
14      Q.   Did you find yourself sitting there
15  disagreeing with anything that you said?
16      A.   I disagreed with a whole lot of stuff.
17      Q.   No, I'm just talking about what you
18  said.
19      A.   Right, I disagreed with what I said.
20      Q.   Okay.  What do you recall disagreeing
21  with about what you said in that transcript from
22  your criminal trial?
23      A.   What do I recall disagreeing with?
24      Q.   Yes, with your own testimony.

Page 78

1      A.   The statement, the statement -- the
2  statement.
3      Q.   What statement are you talking about?
4      A.   The statement that I signed.
5      Q.   Okay.  So let's make sure that you're
6  following me here, okay.  So my question is when
7  you read the transcript of your testimony from your
8  criminal trial, so when you got on the stand in
9  your own defense, okay, when you read that
10  transcript, was everything that you read in that
11  transcript -- do you remember it being the truth,
12  that everything you said there that was recorded in
13  that transcript was truthful that came out of your
14  mouth?
15      MR. AINSWORTH:  Objection, foundation.
16  BY THE WITNESS:
17      A.   No.
18  BY MR. GRILL:
19      Q.   Okay.  Were there things that you read
20  about your own testimony from the criminal trial
21  that you felt, when you read it the other day
22  again, were untruthful?
23      A.   Yes.
24      Q.   What things did you say at the criminal

Page 79

1  trial --
2      A.   You got the transcript in front of you,
3  we'll go through it.
4      Q.   I'm just wondering if you can tell me
5  now.
6      A.   I need to see it.
7      Q.   Okay.  Can you tell me generally what
8  pops into your mind right now as something that you
9  read just the other day in that transcript that you
10  believe you said that was not the truth?
11      A.   Well, I would believe at that time I was
12  just a 17-year-old on trial not knowing nothing.
13  And when I re-looked at the transcripts as I
14  continued to evolve in life, stuff just started
15  coming back to me sticking out like this didn't
16  happen like that; this, that, whatever it is.
17      Q.   Okay.  Has your memory of those events
18  that happened on September 15th and 16th, 1991,
19  were they better then at the time of your criminal
20  trial, or are they better today?
21      MR. AINSWORTH:  Object to the form of the
22  question.
23  BY THE WITNESS:
24      A.   Better today.

Page 80

1  BY MR. GRILL:
2      Q.   How did your memory get better about
3  those events as more time went by?
4      A.   When you sit in jail 20 years, you ain't
5  got nothing to do but read transcripts.
6      Q.   And you wanted to get out of jail,
7  right?
8      A.   Exactly.
9      Q.   All right.  Do you have a computer right
10  now?
11      A.   Do I have a computer?
12      Q.   Yes.
13      A.   I think I got one at the house.
14      Q.   Okay.  When did you get it -- well, let
15  me ask you this.  Is it your computer?
16      A.   Yes, it's mine.
17      Q.   Like you bought it?
18      A.   Yes, bought it from Walmart.
19      Q.   All right.  Where did you get the money
20  to buy it from?
21      A.   I was working at the time.
22      Q.   Okay.  Where were you working?
23      A.   Freedman Seating Company.
24      MR. AINSWORTH:  Seating.



Page 81

1 BY MR. GRILL:
2    Q.   Seating.
3    A.   It's right down on Augusta, 4500 Augusta
4 Avenue, somewhere right there.
5    Q.   Got it.  When did you start working
6 there?
7    A.   I'm not for sure.
8    Q.   Okay.  So let's try to peg it.  What
9 year did you get out of jail?
10   A.   I got out I want to say 2012.
11   Q.   Okay.  So how many jobs since 2012 have
12 you had?
13   A.   Let me see.  Probably two.
14   Q.   Okay.  So other than the Freedman
15 Seating Company, what was the other job?
16   A.   Joy Construction Company.
17   Q.   Spell that.
18   A.   Joy like J-o-y.
19   Q.   Joy Construction Company.
20   A.   With an S, you got to add an apostrophe
21 S on the construction company.
22   Q.   Okay.  Joy's Construction Company, all
23 right.  Is that in Chicago?
24   A.   Yes.

Page 82

1    Q.   And obviously Freedman Seating Company
2 is as well because it's on Augusta?
3    A.   Yes.
4    Q.   Any other jobs you've had since then?
5    A.   Not that I can -- just volunteer work
6 and all that other stuff.
7    Q.   Where have you been volunteering?
8    A.   For my Auntie.
9    Q.   Mitts?
10   A.   Yes.
11   Q.   Okay.  Where do you volunteer for her?
12   A.   Either in the office or out campaigning
13 or participating in 5K walks, you know, stuff like
14 that.
15   Q.   Are you currently employed now?
16   A.   No.
17   Q.   When did you stop working?
18   A.   I would say around 20 -- had to be like
19 2018, 2019.  I'm not for sure.  I don't want to
20 assume.  I don't know.
21   Q.   Was it more than a year ago?
22   A.   I ain't worked in almost two or
23 three years.  I just can't be specific, so I don't
24 know.

Page 83

1    Q.   That's fine.  Was there any reason why
2 you stopped working?
3    A.   Was there any reason why?
4    Q.   That you haven't worked in two or
5 three years?
6    A.   I got fired.
7    Q.   From which one, Freedman or Joy's?
8    A.   Freedman.
9    Q.   So you had Joy's first and then
10 Freedman?
11   A.   Right.
12   Q.   Okay.  Why did you get fired from
13 Freedman Seating Company?
14   A.   I got fired because I chased somebody
15 through the warehouse with a lead pipe.
16   Q.   Okay.  Why did that happen?
17   A.   No particular reason why it happened.
18   Q.   Is that out of character for you to
19 chase somebody for no reason with a lead pipe
20 through a warehouse?
21   A.   Yeah, you could say that.
22   Q.   All right.  When you think back to why
23 you did that that day, can you think of any reason
24 why you were doing that?

Page 84

1    A.   I know why I did it, but I just choose
2 not to tell you.
3    Q.   Okay.  Well, unfortunately, you need to,
4 and if you want to take a break and talk it out
5 with your attorney, you can, but you do have to
6 answer my question.
7    A.   Answer it?
8    MR. AINSWORTH:  Go ahead.
9 BY THE WITNESS:
10   A.   A gambling debt.
11 BY MR. GRILL:
12   Q.   Okay.  That you owed or somebody owed
13 you?
14   A.   He owed me and refused to pay.
15   Q.   How much money did this person owe you?
16   A.   A dollar.
17   Q.   Really, one dollar?
18   A.   I answered his question.
19   Q.   Okay.  Just so I'm clear, you chased a
20 guy with a lead pipe through a warehouse because he
21 owed you one dollar?
22   A.   Yes.
23   Q.   Okay.  Did you catch him?
24   A.   No.



Page 85

1    Q.   Okay.  What were you going to do with
2  that lead pipe if you caught him?
3    A.   I don't know.
4    Q.   Well, do you think you were going to hit
5  him with that lead pipe?
6    MR. AINSWORTH:  Objection, calls for
7  speculation.
8  BY THE WITNESS:
9    A.   I would have to say that I don't know.
10  BY MR. GRILL:
11    Q.   What kind of gambling were you doing
12  with this guy where he ended up owing you a buck?
13    A.   ESPN fantasy football.
14    Q.   Okay.  And how long after this incident
15  that you're describing was it that you got fired?
16  Did you get fired on the spot, or was it sometime
17  later?
18    A.   They had to do their little
19  investigation, so I don't want to assume again, so
20  I don't know.
21    Q.   Did the person -- do you know if your
22  employer at the Freedman Seating Company talked to
23  the person that you were chasing through the
24  warehouse with the lead pipe?

Page 86

1    A.   I don't know.  They did their
2  investigation.  I would be assuming if I told you.
3  I don't know.
4    Q.   Were you given any type of severance pay
5  when they fired you?
6    A.   No.
7    Q.   Okay.  And it's your testimony you were
8  fired; you didn't quit, right?
9    A.   I was fired.
10    Q.   And they told you you were fired, right?
11    A.   Yes.
12    Q.   So since then is there any reason why
13  you haven't worked since then?
14    A.   No particular reason.
15    Q.   Why is that out of character for you to
16  do something like you just described?
17    MR. AINSWORTH:  Object to the form of the
18  question.
19  BY THE WITNESS:
20    A.   Because normally I don't let people get
21  under my skin like that.
22  BY MR. GRILL:
23    Q.   What was this man doing to get under
24  your skin?

Page 87

1    A.   What you're doing now, talking crazy.
2    Q.   Okay.  Was he asking you questions?
3    A.   Just talking crazy.
4    Q.   Okay.  Was he an attorney representing
5  the police?
6    A.   No.
7    Q.   All right.  Was he asking you questions
8  about why you went to jail?
9    A.   No.
10    Q.   Was he asking you questions about your
11  lawsuit?
12    A.   No.
13    Q.   Okay.  So what was it about this guy
14  that got under your skin?
15    A.   Again, he was talking crazy.
16    Q.   Did you get arrested because of this?
17    A.   No.
18    Q.   All right.  Well, I guess, in light of
19  what you just said, I got to ask, if you could,
20  would you want to come after me physically with
21  like a pipe because I'm asking you questions?
22    A.   Nah.
23    Q.   Are you sure?
24    A.   It's a different form of your questions

Page 88

1  than his questions, him talking crazy.
2    Q.   Because you just told me that you chased
3  a guy with a lead pipe through a warehouse for
4  doing the same thing that I'm doing to you right
5  now, so I need to know right now if you're
6  threatening me?
7    A.   Absolutely not.
8    MR. AINSWORTH:  Wow, and that's totally not
9  what happened, Andrew, and you know it.
10  BY MR. GRILL:
11    Q.   Well, then explain to me how I'm
12  misunderstanding you.
13    A.   You misunderstood.  I ain't
14  misunderstood.
15    Q.   Well, you said that you chased a guy
16  that was -- through a warehouse with a lead pipe
17  because he was getting under your skin.
18    A.   I said he was talking crazy.
19    Q.   I asked you why and said because of the
20  same thing that you're doing to me.
21    MR. AINSWORTH:  That's not what he said.
22  Objection, argumentative.  Shawn, go ahead, you can
23  set him straight.
24  BY MR. GRILL:



Page 89

1    Q.    What was the guy doing to get under your
2  skin?
3    A.    First of all, there is a difference
4  between you asking me questions and a guy that owed
5  me money that's calling me out my name telling me
6  that he's not going to pay me, B this, H that, you
7  know, and all this other stuff.  I don't want to
8  say the whole word but you know -- you want me to,
9  bitch this, whore that, I ain't paying you, okay.
10    Q.    So he was disrespecting you?
11    A.    Yes.
12    Q.    Okay.  So were you chasing him -- did
13  you have any source of income other than this job
14  at the Freedman Seating Company?
15    MR. AINSWORTH:  Objection, foundation.
16  BY THE WITNESS:
17    A.    No.
18  BY MR. GRILL:
19    Q.    Specifically to address Mr. Ainsworth's
20  objection, my question should have been at the time
21  you were employed at the Freedman Seating Company,
22  was that your only source of income at that time?
23    A.    Yes.
24    Q.    Did you get any like public aid or

Page 90

1  anything to supplement your income at that time?
2    A.    No.
3    Q.    Okay.  How much were you getting paid at
4  the Freedman Seating Company when you worked there?
5    A.    I don't remember.
6    Q.    How long did you work there for?
7    A.    Probably -- I don't want to assume, man,
8  so I'm just going to say less than four years.  I
9  hate assuming.
10    Q.    But for a couple years at least?
11    A.    Yes.
12    Q.    How did you get the job?
13    A.    Went up there and applied for it.
14    Q.    Did any of your attorneys help you get
15  either of these jobs, Freedman Seating Company or
16  Joy's Construction Company?
17    A.    No.
18    Q.    These were jobs you went out and found
19  on your own?
20    A.    Yes.
21    Q.    All right.  And it's your testimony that
22  you have no idea how much you were getting paid at
23  the Freedman Seating Company for the years that you
24  worked there?

Page 91

1    A.    If I go back and look at some pay stubs,
2  I can give you an actual answer.  I got them in my
3  dresser.
4    Q.    Were you paid hourly or were you salary?
5    A.    Shit, I think it was hourly.
6    Q.    You think it was hourly?
7    A.    Yes.
8    Q.    What about at Joy's Construction
9  Company?
10    A.    Weekly.
11    Q.    You were paid every week?
12    A.    Yes.
13    Q.    Like a salary?
14    A.    Yes.
15    Q.    What was your salary at Joy's
16  Construction?
17    A.    Probably about -- I don't know.
18    Q.    How long did you work at Joy's
19  Construction Company?
20    A.    I did that for like probably three to
21  five months.
22    Q.    Why did you stop working there?
23    A.    Most of our projects was over with and
24  then the owner just couldn't get no work at that

Page 92

1  time.
2    Q.    What have you been doing to keep
3  yourself busy between -- in the last like three
4  years, I guess, when you haven't worked?
5    A.    What have I been doing to keep myself
6  busy?
7    Q.    Yes.
8    A.    Just volunteering for my Auntie.
9    Q.    What do you do for money?
10    A.    Nothing.
11    Q.    Do you have any income from any source
12  since you've stopped -- since you got fired from
13  Freedman Seating?
14    A.    Do I have any income?
15    Q.    Uh-huh.
16    A.    No.
17    Q.    Do you have any debts?
18    A.    No.
19    Q.    None?
20    A.    Not that I'm aware of.
21    Q.    How do you pay for the cable bill and
22  what other bills you contribute since you've been
23  living with your Aunt Emma Mitts over the last
24  three years if you have no income?



Page 93

1    A.    Is that a question I should answer?
2    MR. AINSWORTH:  Go ahead.
3  BY THE WITNESS:
4    A.    From my actual innocence claim.
5  BY MR. GRILL:
6    Q.    Okay.  So from your certificate of
7  innocence?
8    A.    Yes.
9    Q.    You got how much money for that?
10    A.    Enough.
11    Q.    Well, I know the range, so do you know
12  how much money you got?
13    A.    I don't recall what the exact number
14  was, but it was enough.
15    Q.    All right.  So you've been living off
16  that for the last three years?
17    A.    Yes.
18    Q.    Okay.  Did you buy a car?
19    A.    Yes.
20    Q.    What kind of car did you buy?
21    A.    I believe it's a 2004 Volvo.
22    Q.    How much did you pay for it?
23    A.    Probably 35 or 3,500, something like
24  that.  I don't know the exact price.

Page 94

1    Q.    So you got a driver's license?
2    A.    Do I have a license?
3    Q.    Yes.
4    A.    No.
5    Q.    Okay.  Why did you buy a car if you
6  don't have a driver's license?
7    A.    Because I have somebody drive plea
8  around when I need to go somewhere.
9    Q.    Who drives you around?
10    A.    I'd rather not say.
11    Q.    Well, you got to, I'm sorry.
12    A.    Well, I'm not going to say.
13    Q.    Are you referring to answer my question?
14    A.    Yes.
15    Q.    Okay, mark that, please.
16        Is there a reason -- without telling me
17  the name of the person, is there a reason why you
18  will not tell me who drives you around?
19    A.    Ain't no particular reason.
20    Q.    Is it somebody else that has gotten
21  their conviction reversed?
22    A.    No.
23    Q.    Is it somebody that -- are you afraid
24  for some reason to let me know who this person is?

Page 95

1    A.    No, I just don't want to tell you.
2    Q.    Okay.  Well, see, there is this thing
3  that can happen like if we need to know information
4  and we believe it's relevant, we can
5  actually -- and Mr. Ainsworth can explain this to
6  you -- we can have you come back and get a court to
7  order you to tell me --
8    A.    I ain't got nothing but time.
9    Q.    Huh?
10    A.    I don't have nothing but time.  I ain't
11  got nothing to do.
12    MR. GRILL:  Russell, I believe he can answer
13  my question.
14    MR. AINSWORTH:  Do you want to take a break?
15    MR. GRILL:  Yes.
16    THE VIDEOGRAPHER:  We're going off the record,
17  the time is 11:58 a.m.
18        (WHEREUPON, a short break was had.)
19    THE VIDEOGRAPHER:  We are back on the record,
20  the time is 12:05 p.m.
21  BY MR. GRILL:
22    Q.    All right.  Mr. Jakes, you've had an
23  opportunity to talk to your attorney.  My question
24  is will you answer my question about who is your

Page 96

1  driver?
2    A.    Monique Davis.
3    Q.    Who is Monique Davis?
4    A.    My girlfriend.
5    Q.    And why did you not want to tell me who
6  your driver was?
7    A.    Because that ain't none of your
8  business.
9    Q.    Okay.  How long have you been dating
10  Monique Davis?
11    A.    That ain't none of your business.
12    Q.    Okay.  Are you referring to answer my
13  question again?
14    MR. AINSWORTH:  Just answer the question.
15  BY THE WITNESS:
16    A.    I don't know.
17  BY MR. GRILL:
18    Q.    Where did you meet her?
19    A.    I don't know.
20    Q.    Do you live with her?
21    A.    Do I live with her?
22    Q.    Yes.
23    A.    No.
24    Q.    Or does she live with you?



Page 97

1    A.   No.
2    Q.   Okay.  Where does she live?  Do you know
3   where she lives?
4    A.   Do I know where she lives?
5    Q.   Yes, where she lives.
6    A.   Yes, I know where she lives.
7    Q.   Okay.  Where does she live?
8    A.   Why do you need to know that?
9    Q.   That's not my question.
10    A.   But that's my question to you.
11    Q.    Well, so the format here -- I thought
12   maybe Mr. Ainsworth had explained this to you, but
13   I'll explain it.  The format is I ask the
14   questions, you answer them.  It's actually kind of
15   a one-way street unless there is something I'm
16   asking you don't know or don't understand what I'm
17   asking you.
18         Outside of that, I ask the questions,
19   you answer them, not the other way around.
20    A.   Well, I don't want to answer that one.
21    Q.   Okay.
22    MR. AINSWORTH:  Just answer the question.
23   BY THE WITNESS:
24    A.   You got to understand something.  These

Page 98

1   particular things ain't got nothing to do with this
2   case.  You can sit here and waste time.  I ain't
3   got nothing to do but go home and do some volunteer
4   work.  I could sit here all day.
5   BY MR. GRILL:
6    Q.   So we've got seven hours to do this
7   deposition.
8    A.   I don't care.
9    Q.   And like what I'm going to do here at
10   the end, if I need more time, I'm going to back and
11   add up all this delay and tack it out.
12    A.   You're the one delaying.
13    Q.   I've asked you a question.  It's a very
14   specific and direct question, it's very clear, and
15   it has an answer.  All I need you to do is answer
16   the question.  Where does she live?
17    A.   Okay, I'll get back to you with that.
18    Q.   Do you not know?
19    A.   I'll get back -- I know how to get to
20   her house, but I'll get the address for you.
21    Q.   Okay.  What street does she live on?
22    A.   I don't know.  I'll get it.
23    Q.   Does she live in Chicago?
24    A.   No.

Page 99

1    Q.   What's her phone number?
2    A.   I'd have to look in my phone and get it.
3    Q.   Why don't you look in your phone?  We'll
4   go off the record and you can give it to me.
5    MR. AINSWORTH:  We're not doing that.
6    MR. GRILL:  Why?  It's not privileged.
7    MR. AINSWORTH:  If you need information --
8    MR. GRILL:  Are you representing her?
9    MR. AINSWORTH:  I'm representing Mr. Jakes.
10    MR. GRILL:  Are you representing Monique?  If
11   you don't want to respond, it's up to you.
12    MR. AINSWORTH:  Let me respond.
13    MR. GRILL:  Go ahead.
14    MR. AINSWORTH:  If you have a request for a
15   phone number or something that we need to look in a
16   phone or look up, then I'm happy to provide that
17   information.  And so if you're going to make a
18   request for the information, then we'll respond.
19    MR. GRILL:  Okay.  So I don't hear any
20   privilege or anything that would -- that is being
21   asserted that would otherwise provide a basis for
22   this witness to not answer my question, so I want
23   an answer to my question.
24    MR. AINSWORTH:  He did answer.  He just said

Page 100

1   that --
2    MR. GRILL:  So look in your phone and give
3   me -- no, he says he has the information on him and
4   it's readily accessible, so I will wait, and we can
5   go off the record.  I want the phone number.
6    MR. AINSWORTH:  Then make a request for
7   production.  He doesn't know the number.  That's
8   the answer.
9    MR. GRILL:  No, he does, he says it's on his
10   phone that he has with him.
11    MR. AINSWORTH:  Right, he would have to look
12   into his phone.  That's not a requirement that he
13   do during a deposition.
14   BY MR. GRILL:
15    Q.   Okay.  So you're refusing to answer my
16   question?
17    A.   Yes.
18    MR. AINSWORTH:  He's not refusing to answer
19   your question.  He answered the question.  He says
20   he doesn't know what the phone number is.  He has
21   to look in the phone to get it.
22   BY MR. GRILL:
23    Q.   Okay.  Do you try to be a role model to
24   your siblings?  Think back to 1991.  Did you try to

Page 101

1  be a role model to your siblings?
2      A.   I was a kid man, no.
3      Q.   No?
4      A.   I don't know.
5      Q.   Okay.  What about today?
6      A.   Yes.
7      Q.   Well, at least for your sister.
8      A.   Yes.
9      Q.   What do you do to try to be a role model
10 for your sister today?
11     A.   I thank God everyday for waking me up
12 and live life.
13     Q.   How is that being a role model for her?
14     A.   That's my way of being a role model.
15     Q.   Do you remember like back in 1991 trying
16 to teach your siblings about the difference between
17 wrong and right?
18     A.   No.
19     Q.   Did they teach you the difference
20 between wrong and right?  Do you remember them
21 trying to teach you that back then?
22     A.   Everybody tried to teach you something
23 once upon a time.
24     Q.   Did you use drugs or drink alcohol

Page 102

1  before your arrest for this murder?
2      A.   Excuse me?
3      Q.   Did you drink alcohol or use drugs of
4  any sort prior to your arrest for the Garcia
5  homicide?
6      A.   Yes.
7      Q.   Okay.  How much alcohol did you drink on
8  a weekly basis back then in 1991?
9      A.   I don't want to assume, but I would say
10 I probably had a 40-ounce everyday.
11     Q.   Where would you get it from?
12     A.   Liquor store.
13     Q.   Which liquor store?  Would that be the
14 liquor store on the corner of 51st and Racine.
15     A.   We had a liquor store on May Street,
16 too, so whichever one was open.
17     Q.   Did you go to that store, the corner
18 store at 51st and Racine?
19     A.   Yes.
20     Q.   And they sold liquor there, right?
21     A.   Yes.
22     Q.   And there was some Arab fellows that ran
23 that place, right?
24     A.   Who?

Page 103

1      Q.   Some Arabic fellows that ran that place,
2  right?
3      A.   I'm not for sure.
4      Q.   Okay.  Do you recall any of the corner
5  stores near you being operated by an Arabic man or
6  a man and his son?
7      A.   I don't know.
8      Q.   Okay.
9      A.   That's too long ago.  I don't know.
10     Q.   Did you work at any of those stores back
11 in 1991?
12     A.   Might have moved some boxes or something
13 at the store on Racine.  I wouldn't call it working
14 there.
15     Q.   Okay.  How often?
16     A.   You know, he would come in probably have
17 us move some boxes around, take the garbage out.
18 He'd give us some pop and chips and we'd go on
19 about our business.
20     Q.   Did they pay you to do that stuff?
21     A.   He gave us pop and chips.
22     Q.   Yeah, I got that part.  What I was
23 trying to ask is did you ever get money for doing
24 those things?

Page 104

1      A.   He gave us pops and chips.
2      Q.   Did he ever give you money, yes or no?
3      A.   No.
4      Q.   Okay.  How did you come to be doing that
5  like how -- yeah, how did you end up doing work
6  like that?
7      A.   37 years ago, I don't know.
8      Q.   Did you do that with anybody?
9      A.   Do what with anybody?
10     Q.   Like move boxes, take garbage out, was
11 it just you, or were you doing it along with
12 somebody else?
13     A.   I don't remember.
14     Q.   Do you remember who the store owner was
15 that hired you to do that?
16     A.   And I just told you five seconds ago I
17 don't remember.
18     Q.   Okay.
19     A.   You're asking the same questions.
20     Q.   Do you remember if there was a younger
21 guy that maybe worked at the store there?
22     A.   I don't know.
23     Q.   Other than the two jobs that you've had
24 since you got out of prison, were there any other



Page 105

1  jobs that you applied for?
2      A.   Now that I think about it, I did used to
3  work for -- oh, man.
4      Q.   Who else?
5      A.   I don't know if I'm pronouncing the name
6  right, but it's like Gallups or Galley.  It's
7  something like that.
8      Q.   Gallions?
9      A.   Probably.
10     Q.   Where was that at?
11     A.   It's like right there on Cicero Avenue.
12  I believe it's between Cicero and Wright street.
13     Q.   What type of store was it?
14     A.   It wasn't a store.  It was a building.
15  I was in there just cleaning up doing maintenance
16  work in there.
17     Q.   How long did you do that for?
18     A.   About probably six months.
19     Q.   Six months.  Like how long ago was this?
20     A.   It was after Freedman, so I don't want
21  to assume.
22     Q.   So after you got fired from Freedman --
23     A.   Right.
24     Q.   -- then you went and worked at this

Page 106

1  store for like six months?
2      A.   Yes.
3      Q.   Why did you stop working there?
4      A.   Because my momma passed away and I had
5  to travel to Arkansas for her funeral and I just
6  didn't go back to work.
7      Q.   How did you get to Arkansas for her
8  funeral?
9      A.   I drove.
10     Q.   Yourself, or did --
11     A.   With the family.
12     Q.   All right.  Did anybody help you with
13  your job search at any point since you got out of
14  prison?
15     A.   Auntie might have helped out.  I can't
16  be for sure.  I don't want to assume.
17     Q.   Your Aunt Mitts?
18     A.   Yes.
19     Q.   Anybody else in your family you think
20  might have helped you find a job?
21     A.   I probably did a little side work with
22  my cousins and them.
23     Q.   Which ones, which cousins are you
24  talking about?

Page 107

1      A.   Her daughter Tanya Mitts.
2      Q.   Anybody else?
3      A.   No.
4      Q.   When you say side work, what was the
5  side work?
6      A.   Just whatever she was doing, volunteer
7  work or having to do some decorating, whatever the
8  case was.
9      Q.   Did you tell any of these employers, any
10  of these three employers that you had since you got
11  out of prison, did you tell them about your arrest
12  for this murder?
13     A.   No.
14     Q.   Did they ever ask you about it?
15     A.   No.
16     Q.   Did your arrest for this murder impact
17  your ability to get any of these jobs?
18     A.   You say what now?
19     Q.   Did your arrest and prosecution for the
20  Garcia homicide and the time that you spent in
21  prison, did any of that impact your ability to get
22  any of these three jobs that you told me about
23  today that you got since you got out of jail?
24     A.   I'm not understanding what you're

Page 108

1  saying.
2      MR. AINSWORTH:  Objection.
3  BY MR. GRILL:
4      Q.   Did your arrest and prosecution for
5  killing Mr. Garcia in your mind impact your ability
6  to get any of these jobs, these three jobs?
7      A.   Okay, what are you meaning ability?
8      Q.   Did it affect your --
9      MR. AINSWORTH:  He's not understanding impact
10  is the problem.
11  BY MR. GRILL.
12     Q.   Got it, yeah.  Do you know what an
13  obstacle is?
14     A.   Yes.
15     Q.   Like something that's in your way?
16     A.   Right.
17     Q.   Okay.  So did your arrest and
18  prosecution for the Garcia homicide in your mind,
19  was it an obstacle for you to getting any of these
20  jobs?
21     MR. AINSWORTH:  Objection, foundation.
22  BY THE WITNESS:
23     A.   I don't know.  I don't recall.
24  BY MR. GRILL:



Page 109
1    Q.    You got hired for all of them, right?
2    A.    Right.
3    Q.    Has your arrest and time in prison for
4  killing Mr. Garcia posed an obstacle to you to
5  getting a job at any point over the last three
6  years since you've been unemployed?
7    A.    First of all, I ain't killed Mr. Garcia,
8  and second of all, no.
9    Q.    Okay, right.  So my question wasn't
10  accusing you of killing him.
11    A.    You said killing him.
12    Q.    Right.  So you were arrested and
13  prosecuted for killing him, correct?
14    A.    You didn't say that.
15    Q.    All right.  Do you have any aspirations
16  of getting your own place and moving out of your
17  Aunt Emma Mitts' house?
18    A.    Yep.
19    Q.    What's the obstacle, if there is one, to
20  you doing that?
21    A.    There is not no obstacle.  I can move
22  when I want to.  I just choose not to.
23    Q.    Why do you choose not to move out?
24    A.    Because I'm perfectly happy there.

Page 110
1    Q.    Okay.  You have a girlfriend, right?
2    A.    Yes.
3    Q.    And you don't live with her, right?
4    A.    Right.
5    Q.    And you care about her, right?
6    A.    Right.
7    Q.    And you told me that you want to move
8  out, right?
9    A.    Right.
10    Q.    Okay.  So what's the hold up about?
11    A.    No particular reason.
12    Q.    Okay.  Do you have enough money to
13  afford a place of your own?
14    A.    Yes.
15    Q.    And do you want more space for yourself?
16    A.    I'm perfectly fine there.
17    Q.    Okay.  So it sounds to me like you're
18  totally content with where you're living right now,
19  is that fair?
20    A.    No.
21    Q.    All right.  What are you not content
22  about?
23    A.    I'm content with being there now, but in
24  the future I'll probably move back to my momma's

Page 111
1  house in Arkansas and take over that.
2    Q.    All right.  Is there something that
3  you're waiting to happen first before you can do
4  that?
5    A.    Nothing in particular.
6    Q.    All right.  When in the future do you
7  see yourself moving back to Arkansas?
8    MR. AINSWORTH:  Objection to the form of the
9  question.
10  BY THE WITNESS:
11    A.    I don't want to assume, so I'm just
12  going to say I don't know.
13  BY MR. GRILL:
14    Q.    Are you waiting for this lawsuit to be
15  over?
16    A.    It's a possibility.
17    Q.    What do you think you're going to get
18  out of this lawsuit if you're successful?
19    A.    Whatever the jury feels I should get for
20  spending 20 years in jail.
21    Q.    Do you think you're going to get money?
22    A.    Whatever the jury thinks I should get.
23    Q.    Right, but I'm asking you.
24    A.    I'd be assuming that they going to give

Page 112
1  me some money, so, again, whatever the jury feels.
2    Q.    Well, how much money do you think you're
3  entitled to?
4    A.    Whatever the jury feels.
5    Q.    I know, that's not my question.
6    MR. AINSWORTH:  No, no, no.  That's the answer
7  BY MR. GRILL:
8    Q.    How much money -- well, let me ask you
9  this.  Tell me what you believe the dollar amount
10  is personally, not what you think the jury is doing
11  to do.  What do you think a jury should award you?
12    A.    Whatever the jury thinks.
13    Q.    Okay.  Do you feel like you should get a
14  lot or a little money for this?
15    MR. AINSWORTH:  Object to the form of the
16  question, and I'm going to direct him not to answer
17  because there has been --
18    MR. GRILL:  And I'm not asking for your
19  conversations with your lawyers.
20    MR. AINSWORTH:  But whatever he says is
21  influenced by our discussions, and it's going to
22  reveal attorney/client privileged information, and
23  it steps on like, you know, settlement stuff that's
24  inappropriate, you know.  I think you have your



Page 113

1  answer.
2  BY MR. GRILL:
3      Q.    Are you refusing to answer my question?
4      A.    I answered your question.
5      Q.    No, your attorney objected and you
6  didn't answer my question.
7      MR. AINSWORTH:  What is your question?
8  BY MR. GRILL:
9      Q.    Do you want her to read it back?
10     A.    What is the dollar amount?
11     Q.    Uh-huh.
12     A.    Whatever the jury feels I should get.
13     Q.    And I'm going to ask you do you think
14  you're going to get a lot or a little --
15     A.    Again, whatever the jury feels I should
16  get.
17     Q.    If the jury awarded you one dollar,
18  would you be okay with that?
19     A.    I'd be perfectly fine.
20     Q.    If the jury awarded you no money, would
21  you be okay with that?
22     A.    I'd be perfectly fine.
23     Q.    So after spending all this time in jail
24  for a crime you say you didn't commit, you'd be

Page 114

1  okay with the jury awarding you no money?
2      A.    I wouldn't be okay --
3      MR. AINSWORTH:  Objection.
4  BY THE WITNESS:
5      A.    I got it, Russell.  I wouldn't be okay
6  personally, but I would be all right.  I made it 20
7  years in there.  I can make it going forward out
8  here.
9      MR. AINSWORTH:  And I object to the form of
10  the question, argumentative.
11  BY MR. GRILL:
12     Q.    Did you have a girlfriend or anybody,
13  date anybody while you were in prison?
14     A.    No.
15     Q.    Did you ever try to?
16     A.    Nope.
17     Q.    Let's look at in the book Exhibit 14, so
18  tab 14.
19     A.    What page?
20     Q.    14, tab No. 14.  Do you recognize this?
21     A.    Yes.
22     Q.    Okay.  What is it?
23     A.    A prison pen pal thing.
24     Q.    So what was the point of this?

Page 115

1      A.    Just to get mail.
2      Q.    Okay.
3      A.    Mail and dating is two different things.
4      Q.    Okay.  So is there any particular
5  reason -- so on the left, it says seeking, and it
6  says dash women, friends.  What was the reason that
7  you were seeking women in this ad?
8      A.    Excuse me?
9      Q.    Why did you put women down specifically?
10     A.    Because I'm a man that's in jail that
11  don't like men, so why would I put women on
12  there -- why wouldn't I put women on there.
13     Q.    Anybody respond to this?
14     A.    There may have been a few.
15     Q.    How did they -- how did you correspond
16  with people that -- women in particular that
17  responded to this PrisonPenPals.com ad that you put
18  up?
19     A.    You say what?
20     Q.    Did they like write you letters, did you
21  get letters?
22     A.    Yeah, just basically pen pal, writing.
23     Q.    Did you write them letters?
24     A.    Yes.

Page 116

1      Q.    Do you have those letters?
2      A.    No.
3      Q.    Okay.  Do you know who does?
4      A.    I don't know, the garbage.
5      Q.    What are your aspirations for your
6  future?  What do you want to do?
7      A.    In hopes that God continues to wake me
8  up everyday and live a long, healthy, lasting life.
9      Q.    Okay.  Anything else?
10     A.    Nope.
11     Q.    Have you ever made any complaints to any
12  doctors since your release about the effects,
13  whether they're physical or mental, that you might
14  still be dealing with as a result of having been in
15  prison for this murder?
16     A.    Not that I can recall.
17     Q.    Do you feel like you need to make any
18  complaints to any doctors about the effects of your
19  incarceration on you?
20     A.    No.
21     Q.    Do you feel like you have any residual
22  effects or complaints that you would like to make
23  to a doctor arising out of your time in jail?
24     A.    No.



Page 117

1    MR. AINSWORTH:  Object to the form of the
2  question.
3  BY MR. GRILL:
4    Q.   No?
5    A.   No.
6    Q.   Do you feel like mentally you're totally
7  okay despite having been in prison for all this
8  time for this crime?
9    A.   I feel like I'm somewhat okay.  I ain't
10  perfect.
11    Q.   Okay.  Do you feel like you have trouble
12  making -- meeting people or maintaining
13  relationships with people since you've been out of
14  prison?
15    A.   No.
16    Q.   Okay.  Do you feel like you
17  are -- strike that.
18       Does the fact that you were in prison
19  for the Garcia homicide and according to you in
20  prison wrongfully, does it impact or interfere, I
21  should say, in any way that you could think of with
22  your day-to-day activities?
23    MR. AINSWORTH:  Object to the form of the
24  question.

Page 118

1  BY THE WITNESS:
2    A.   No
3  BY MR. GRILL:
4    Q.   Not at all?
5    A.   No.
6    Q.   Okay.  Is there any reason why you
7  haven't gone to see any doctor, psychologist,
8  psychiatrist, anybody since you've been out of
9  prison at least to talk about what your experiences
10  in jail might have been like?
11    A.   I probably just did an anger management
12  course.  Other than that, no, nobody.
13    Q.   An anger management course.  When did
14  you take that?
15    A.   I can't remember.
16    Q.   Was there a reason that you took that?
17    A.   Well, I had got an anger management
18  certificate while I was incarcerated, but part of
19  my parole condition was I had to go to one of their
20  little whatever.
21    Q.   Okay.  So that was a parole condition
22  that you had to satisfy?
23    A.   Yes.
24    Q.   Do you remember what year it was that

Page 119

1  you took that anger management course?
2    A.   No.
3    Q.   Otherwise you haven't seen any
4  professionals?
5    A.   No.
6    Q.   Have you not seen any medical or mental
7  health professional since you've been out because
8  you're afraid that somebody like me might be able
9  to access those records?
10    A.   No.
11    Q.   All right.
12    A.   I don't have nothing to hide.
13    Q.   Do you have any plans to see a provider,
14  medical or mental health provider at all?
15    A.   If I feel like something is wrong with
16  me.
17    Q.   But you don't feel like anything is
18  wrong with you, right?
19    A.   No.
20    Q.   Okay.  What prisons were you at after
21  you got convicted for killing Mr. Garcia?
22    A.   Man, I'm quite sure you got that in
23  front of you, man.  I ain't finnin to say the names
24  all these years, man.

Page 120

1    Q.   Well, do the best you can.
2    A.   I'm just going to stick to the top
3  three; Joliet, Pontiac and Menard.
4    Q.   And do you remember the names of any of
5  your cellmates while you were at any of those
6  places?
7    A.   No.
8    Q.   How long were you at Joliet for?
9    A.   I don't know.
10    Q.   How about Pontiac?
11    A.   I don't know.
12    Q.   Menard?
13    A.   I don't know.
14    Q.   All right.  And you don't remember the
15  names of any of your cellmates; is that your
16  testimony?
17    A.   My testimony would be -- let me see
18  here.  Probably one name I remember, that's Boogie.
19    Q.   How do you spell that?
20    A.   I think it's B-o-o-g-i-e, something like
21  that.
22    Q.   What facility were you a cellmate with
23  Boogie?
24    A.   Joliet.



Page 121

1    Q.    The whole time you were at Joliet that
2 was your cellmate, or did you have other ones?
3    A.    I had other cellmates, but I don't
4 remember them people's names.
5    Q.    Why do you remember Boogie?
6    A.    Because Boogie was somebody I knew from
7 my neighborhood.
8    Q.    Do you remember his real name?
9    A.    I believe it's Watson or Ralph or
10 something like that. I don't want to assume, but I
11 think that's his name.
12    Q.    So you were incarcerated at Joliet and
13 cellmates with a person named Ralph Watson whose
14 nickname is Boogie, is that right?
15    A.    Yes.
16    Q.    Do you know -- you know who Arnold Day
17 is, right?
18    A.    Yes.
19    Q.    You know his nickname Little A, right?
20    A.    Yes.
21    Q.    Do you know if Arnold Day knows Ralph
22 Watson?
23    MR. AINSWORTH: Objection, foundation.
24 BY MR. GRILL:

Page 122

1    Q.    Do you know for any reason if Arnold Day
2 knows who Ralph Watson is?
3    A.    He should know who he is.
4    Q.    Why do you say that?
5    A.    Because they grew up together in the
6 same neighborhood.
7    Q.    Where did Ralph live in 1991?
8    A.    Man, I don't know.
9    Q.    Okay. How do you know that Ralph and
10 Little A grew up in the same neighborhood in 1991?
11    A.    Because I always used to see Ralph.
12    Q.    Where would you see Ralph?
13    A.    Probably around the neighborhood.
14    Q.    Okay. So think about the neighborhood
15 and particular places in the neighborhood and tell
16 me what some of those places are that you would see
17 Ralph in the neighborhood?
18    MR. AINSWORTH: Objection to the form of the
19 question.
20 BY THE WITNESS:
21    A.    I probably seen him at the Queen
22 Submarine or Sherman Park. Queen Submarine, that's
23 the restaurant.
24 BY MR. GRILL:

Page 123

1    Q.    The one that's like right at the corner
2 where this shooting happened?
3    A.    Right.
4    Q.    Outside?
5    A.    Right.
6    Q.    And then at Sherman Park?
7    A.    Sherman Park.
8    Q.    And you would see Ralph and Little A
9 together?
10    A.    I ain't never seen them together.
11    Q.    Then how do you know that Little A would
12 know Ralph?
13    A.    Again because we're in the same
14 neighborhood.
15    Q.    Okay. Were you ever a member of a gang
16 while you were in prison?
17    A.    Was I a member of a gang while I was in
18 prison?
19    Q.    Were you a gang member when you were in
20 prison?
21    A.    Yes.
22    Q.    What gang were you a member of when you
23 were in prison?
24    A.    Black P Stone.

Page 124

1    Q.    And in 1991, what gang was around the
2 neighborhood where you lived on 51st and Racine?
3    A.    Shit, you had Latin Kings, Vice Lord,
4 Stones, MCs, GDs, you had all types of stuff
5 around. BDs, you had all type of stuff around
6 there.
7    Q.    When you say the Stones, that's Black P
8 Stones, right?
9    A.    Yes.
10    Q.    Okay. Were you ever a member of the
11 Black P Stones?
12    A.    In '91?
13    Q.    Yes?
14    A.    No.
15    Q.    Were you a member of the Black Stones?
16    A.    Do I remember them?
17    Q.    Let me ask this. To your knowledge,
18 were the Black P Stones and the Black Stones the
19 same gang?
20    A.    I believe so.
21    Q.    Okay. I'm asking because I don't want
22 to use those terms interchangeably if to you they
23 mean different things.
24    A.    Right.



Page 125

1    Q.    So in 1991, were you a member of the
2  Black Stones?
3    A.    No.
4    Q.    Have you ever been a member of the Black
5  Stones before you got to prison?
6    A.    No.
7    Q.    Okay.  Have you ever told the police at
8  any point prior to 1991 that you were a member of
9  the Black Stones?
10    A.    Not that I can remember or recall.  I
11  don't know.
12    Q.    Okay.  And the Black Stones -- do you
13  know whether Sherman Park held any significance for
14  the Black Stones back in 1991?
15    A.    Shit, that's where everybody used to go
16  up there.
17    Q.    Okay.  Was that a place where the Black
18  Stones as a gang would generally like hang out to
19  your knowledge?
20    A.    Well, everybody used to hang out in
21  Sherman Park.  You know, you got the track, the
22  football field, the baseball field, swimming pool.
23  It's just where everybody went.
24    Q.    Do you know if Arnold Day was a Black

Page 126

1  Stone member in 1991?
2    A.    Do I know if he was a Black Stone
3  member?
4    Q.    Yes, in 1991.
5    A.    I would be assuming, but I would have to
6  say yeah because I used to see him with them all
7  the time.
8    Q.    Did Arnold Day ever tell you that he was
9  a Black Stone?
10    A.    No.
11    Q.    And did you ever -- how often did you
12  see Arnold Day back in 1991 let's say -- just stick
13  with the year 1991, so January '91 up to
14  September 1991, how often do you think you'd see
15  him?
16    A.    Not often, I could tell you that.
17    Q.    You knew who he was, though, right?
18    A.    Yes.
19    Q.    You knew what he looked like?
20    A.    Yes.
21    Q.    What did he look like?
22    A.    If my memory serves me right, tall, bald
23  head, brown skin or dark skin.
24    Q.    Do you know if he's older than you or

Page 127

1  younger than you?
2    A.    I think he older than me.
3    Q.    Do you know how much older than you he
4  is?
5    A.    I'm not for sure.
6    Q.    Okay.  And you said you assume that
7  Arnold Day was a Black Stone because you would see
8  him with other Black Stones.  Any other reason why
9  you thought or would assume that Arnold Day was a
10  Black Stone back in 1991?
11    A.    No.
12    Q.    Do you know if Arnold Day like held any
13  rank in the Black Stones?
14    A.    No.
15    Q.    Do you understand that the Black Stones
16  had a hierarchy --
17    A.    Yeah.
18    Q.    There is guys that are on top and then
19  there is guys at the bottom?
20    A.    No, in '91, no, I wouldn't know nothing
21  about that.
22    Q.    Did you ever come to learn that?  Did
23  you ever come to learn that there was a hierarchy
24  within the Black Stones?

Page 128

1    A.    Yes, while I was in jail.
2    Q.    Why did you join the Black Stones when
3  you were in prison?
4    A.    You got to join somebody.
5    Q.    Why?
6    A.    Man, it's a long story.
7    Q.    Okay.  Was it for protection generally?
8    A.    Yeah, pretty much.
9    Q.    From what?
10    A.    From other rival gangs in jail.
11    Q.    Okay.  In 1991 if you were seen in your
12  experience talking to the police about a crime that
13  was committed by let's say Black Stones, would you
14  be in any danger if the Black Stones found out that
15  you were talking about it to the police?
16    MR. AINSWORTH:  Objection to foundation and
17  form.
18  BY THE WITNESS:
19    A.    You asking me that?
20  BY MR. GRILL:
21    Q.    Yes, based on your experience.
22    A.    So based on my experience, you want me
23  to assume because I don't know?
24    Q.    Okay.



Page 129

1    A.    You know what I'm saying.  The situation
2  ain't never happened to me, but I can assume if you
3  want me to.
4    Q.    Yes, go ahead.
5    MR. AINSWORTH:  Objection, foundation and
6  form.
7  BY THE WITNESS:
8    A.    I would say telling on somebody in the
9  neighborhood from what I learned, you know, it's
10  just not a good thing to do.
11  BY MR. GRILL:
12    Q.    Why is it not a good thing to do?
13    A.    It's just not a good thing to do.
14    Q.    Why is it not a good thing to do?
15    A.    I don't know then, how about that?
16    Q.    Well, you said --
17    A.    I don't want to assume no more, so I
18  don't know.
19    Q.    Well, you sat in on some depositions and
20  listened in on, for example, Denise Harris'
21  deposition, right?
22    A.    Yes.
23    Q.    Do you remember her telling me that she
24  could -- if she talked to the police, people would

Page 130

1  think she's a snitch and the Black Stones in
2  particular would hurt her if they thought that she
3  was snitching on Black Stone gang members to the
4  police?  Do you remember her talking about that?
5    A.    Yes.
6    Q.    And she actually said that one of the
7  things that could happen to her she could get
8  killed for talking to the police about the Black
9  Stones committing crimes in the neighborhood.  Do
10  you remember her talking about that?
11    A.    Yes.
12    Q.    Okay.  So do you think she was wrong
13  about that?
14    MR. AINSWORTH:  Object to the form of the
15  question, calls for speculation.  Objection,
16  foundation.
17  BY THE WITNESS:
18    A.    I don't want to assume.  That's her
19  opinion.
20  BY MR. GRILL:
21    Q.    Okay.  Did you have the same opinion
22  back in 1991?
23    MR. AINSWORTH:  Objection to the form of the
24  question.

Page 131

1  BY THE WITNESS:
2    A.    I have no opinion now.
3  BY MR. GRILL:
4    Q.    Do you know if it was against prison
5  rules in any of the facilities you were in to be a
6  member of a gang while you're in prison?
7    A.    Say that again.
8    Q.    Do you know was it against prison rules
9  to be a member of a gang in prison?  Like if the
10  prison found out you were a gang member, that would
11  be a problem?
12    MR. AINSWORTH:  Object to the form of the
13  question.
14  BY THE WITNESS:
15    A.    I don't know.  You got to ask them that.
16  BY MR. GRILL:
17    Q.    I'm asking if you understood that.
18    A.    I don't know.  I don't know.
19    Q.    Okay, the answer is I don't know.
20    Okay.  How long -- when you lived on the
21  first floor of the front house at 1212 with your
22  mom and your siblings, did you see -- Denise and
23  Annette lived above you at that time then, right?
24    A.    To be honest with you, I don't remember

Page 132

1  nothing about living on the first floor at 1212.
2    Q.    Okay.  Let's back up then.  Because
3  today you told me that you --
4    A.    I lived on there with my mother, but as
5  far as -- I don't remember.
6    Q.    What don't you remember?
7    A.    The question you just asked me.
8    Q.    So I understood your testimony earlier
9  today to be that before you moved to Milwaukee with
10  your mom and your siblings, you lived in the front
11  house at 1212 West 51st Street on the first floor
12  correct?
13    A.    And can I -- correction.
14    Q.    Okay.
15    A.    I said that I don't know where we was
16  living at when my mother moved to Milwaukee because
17  we stayed on 53rd and Racine, we stayed on 51st and
18  Laflin, we stayed on 51st and Carpenter.  I don't
19  know where we was living at when she moved.
20    Q.    Okay.  Did you move with your mom and
21  your siblings to Milwaukee?
22    A.    Yes, I did.
23    Q.    Okay.  Did your mom and you and your
24  siblings all move to Milwaukee at the same time?



Page 133

1  A.  Yes, we did.
2  Q.  Okay.  And I understood you to be saying
3 that --
4  A.  You assumed.
5  Q.  No, I'm going to tell you what I
6 understood.  You tell me if I'm wrong, okay?  I
7 understood you to be saying earlier that before you
8 came back to -- the week, you know, of the 16th
9 when the shooting happened, okay, that you were
10 living in Milwaukee before then, right?  You came
11 back from Milwaukee, right, correct?
12  A.  I'm listening to you.
13  Q.  You have to tell me am I right that
14 that's true?
15  A.  Correct.
16  Q.  Okay.  And before then, before you moved
17 to Milwaukee, that you were living on the first
18 floor of the 1212 building in the front house, is
19 that correct?
20  A.  No, it would be incorrect.
21  MR. AINSWORTH:  Object to foundation.
22 BY MR. GRILL:
23  Q.  Where were you living?
24  A.  I don't know where my mother was living

Page 134

1 at, but she wasn't living at 1212 when we moved to
2 Milwaukee.
3  Q.  Okay.  And you have no idea where you
4 were living at the time?
5  A.  We was probably living on 53rd, 52nd,
6 51st, 50th.  I don't know where she was living at
7 when we moved.
8  Q.  When you were living at those other
9 addresses or those other places that you were just
10 rattling off there, were those places that like
11 your mom was renting or had owned, or were you
12 living with other people at those addresses?
13  A.  I believe she was renting, but I don't
14 know, it's been so long ago.
15  Q.  Do you have a recollection of living
16 with other people at any of those addresses?
17  A.  The only address that I can safely that
18 I know for a fact that my momma lived with was her
19 sister.
20  Q.  Which sister?
21  A.  Jesse May Jones in the rear cottage.
22  Q.  So at some point, your mom lived in the
23 rear cottage, too?
24  A.  Yes.

Page 135

1  Q.  When was that?
2  A.  At some point.  I don't remember.
3  Q.  How long before this shooting?
4  A.  I don't know.
5  Q.  Okay.  Do you recall what Denise's
6 testimony was about where you lived in 1991?
7  A.  Not offhand.
8  Q.  Okay.  When you think about -- you
9 watched all of Denise's deposition, right?
10  A.  I chimed in and out.
11  Q.  Was there a reason why you were wanting
12 to listen to what she was -- or why you tuned in to
13 her deposition?
14  A.  I tuned in to a lot of depositions.
15  Q.  Okay.  Well, that's where I was going to
16 go next, so we'll just go there.  What other
17 depositions, other than Denise's, do you remember
18 sitting in on and listening to?
19  A.  A couple of the police officers.  I
20 can't recall their names.
21  Q.  Okay.  Is there any reason why you were
22 wanting to listen to these depositions?
23  A.  Because I was paying attention to my
24 case.

Page 136

1  Q.  Okay.  And what are you specifically
2 paying attention to?
3  A.  The case.
4  MR. AINSWORTH:  And don't answer the question
5 to the extent it reveals communication with your
6 attorneys, okay.
7 BY MR. GRILL:
8  Q.  Go ahead.
9  A.  The case just in general.
10  Q.  Okay.  When you were listening to Denise
11 testify, do you remember thinking to yourself that
12 she was saying anything that was not true?
13  A.  Yes.
14  Q.  Okay.  What do you remember her saying,
15 what comes to mind?
16  A.  She got her addresses wrong.
17  Q.  What addresses were those?
18  A.  1210, 1212, and 1214.
19  Q.  What did she get wrong about those
20 addresses?
21  A.  The people who lived in those buildings.
22  Q.  Okay.  Tell me what you remember.
23  A.  Because I remember Fred living in 1214,
24 and I remember my cousin and them living in 1210



Page 137

1  and Denise and them staying in 1212.
2      Q.   Okay. Anything else that you remember
3  that she said that you thought was not correct or
4  not truthful?
5      A.   And the fact that she said that -- I
6  believe she said -- no, I'm just going to
7  stick -- no, I can't remember.
8      Q.   Nothing else comes to mind?
9      A.   I can't remember verbatim.
10     Q.   And Fred -- was it your recollection
11  also that Fred or Fred's brother would associate
12  with Arnold Day which is one of the things she
13  said?
14     MR. AINSWORTH:  Object to the form of the
15  question.
16  BY THE WITNESS:
17     A.   Which brother are you talking about?
18  BY MR. GRILL:
19     Q.   So Fred -- she said that Fred or Fred's
20  brother, she'd see Arnold Day over with Fred or
21  Fred's brother with Arnold Day from time to time.
22  Do you have a similar recollection?
23     MR. AINSWORTH:  Objection to the form of the
24  question, foundation.

Page 138

1  BY THE WITNESS:
2      A.   Fred had two brothers, so I don't want
3  to assume. I don't know.
4  BY MR. GRILL:
5      Q.   Any of his brothers, did you ever see
6  Arnold Day over at Fred's house?
7      A.   Fred's house?
8      Q.   Yes.
9      A.   Not that I can recall.
10     Q.   Okay. Do you know if Fred or any of his
11  brothers for any other reason knew or associated
12  with Arnold Day?
13     A.   I'd be assuming, so I don't know.
14     Q.   You don't know?
15     A.   I don't know.
16     Q.   Okay. So Denise said that -- and I
17  wrote this down -- that you never lived in the back
18  house with your Aunt in 1991. So do you remember
19  her saying that during her deposition?
20     A.   No, but I just heard you say it.
21     Q.   Okay. Do you agree with what Denise is
22  saying or not?
23     A.   I don't agree with what she's saying.
24  She's probably just lost in the head. I don't

Page 139

1  know.
2      Q.   Well, I asked her if she was sure, and
3  she said she was sure. So do you think that
4  Denise --
5      A.   Well, we both know she wasn't sure.
6      Q.   Well, I don't know anything. I wasn't
7  there.
8      A.   Well, I know where I stayed at in '91.
9      MR. AINSWORTH:  Wait for a question, and ask a
10  question that he can answer.
11  BY MR. GRILL:
12     Q.   Do you think that Denise was lying?
13     MR. AINSWORTH:  Object to the form.
14  BY THE WITNESS:
15     A.   I'm not inside her mind.
16  BY MR. GRILL:
17     Q.   Pardon me?
18     A.   I can't speculate that. I'm not inside
19  her mind.
20     Q.   Do you think that's not the truth what
21  Denise is saying?
22     A.   Only thing I would say -- I don't want
23  to assume, but I know I stayed in the rear house.
24  Now where she thought I stayed at, that's her

Page 140

1  opinion. I can't answer that.
2      Q.   Let me add some more to this.
3      A.   Okay.
4      Q.   Because this is also things that she
5  testified to.
6      A.   Okay.
7      Q.   She said that you lived on the first
8  floor of the front house of the 1212 West 51st
9  Street house, and she knew this because she lived
10  above you and saw you everyday. This is in 1991
11  before your arrest specifically.
12     A.   That's a lie.
13     Q.   Is that true?
14     A.   That's not true.
15     Q.   That's a lie?
16     A.   Yes.
17     Q.   Okay. Do you know why -- do you have
18  any idea why Denise, a person that you called your
19  cousin back then, would lie about that?
20     MR. AINSWORTH:  Object to the form of the
21  question. Objection, foundation.
22  BY THE WITNESS:
23     A.   I don't know. Call her and ask her. I
24  don't know.



Page 141

1  BY MR. GRILL:
2      Q.   Okay.  Did Denise ever stay upstairs
3  from you at any point?
4      A.   She probably did.  I can't be for sure.
5  Like I say, I don't recall living there.  I was
6  probably 12 or 13.  I don't know.
7      Q.   You reviewed your criminal trial
8  testimony, right?
9      A.   My criminal trial testimony?
10     Q.   Before coming in today, you reviewed
11 your testimony that you gave in your own defense in
12 your criminal trial, right?
13     A.   Yeah, I believe we looked over it.
14     Q.   Do you remember reading that you
15 testified that Denise Harris stayed upstairs from
16 us, do you remember giving that testimony?
17     A.   Yes, I remember that.
18     MR. AINSWORTH:  Objection to the -- and the
19 proper way to do it is to read him the testimony.
20     MR. GRILL:  Well, I'm asking him --
21     MR. AINSWORTH:  Because he didn't say upstairs
22 from us.  He said upstairs.
23 BY MR. GRILL:
24     Q.   Now I've been dared, so let's look and

Page 142

1  make sure that I wrote it down right.
2          So let's look at tab 5, okay.  So tab 5
3  is like a Group Exhibit meaning there is several
4  other tabs in it.  I want you to turn to the tab
5  that says 1993 9-10 trial TR.  09-10 trial TR.
6      A.   All right.
7      Q.   And I want you -- you see at the bottom
8  there is these letters, it says like G and then
9  like a number with a dash.
10     A.   Like G-36?
11     Q.   Yes, I want you to go to page G-73.  I'm
12 going to tell you -- I'm going to represent to you
13 that this is a transcript of your criminal trial
14 testimony.  You see G-73 at the bottom?
15     A.   Yes, I see it.
16     Q.   And so on the left-hand margin, there is
17 numbers that go 1 through 25.
18     A.   Uh-huh.
19     Q.   Specifically I'm going to draw your
20 attention to lines 11 and 12.  So earlier today I
21 had asked you if you ever knew a Dennis Harris, you
22 said no, so you don't know anything by that name,
23 but you know a Denise Harris.  So in lines 11 and
24 12, you were asked who is Dennis Harris, Denise

Page 143

1  Harris, your answer was "He stay upstairs from us."
2          So I presume you're talking about Denise
3  Harris here, right?
4      A.   At that time, could be talking about
5  anybody.  Shit, I just said Dennis Harris.  I don't
6  want to assume.
7      Q.   Well, you said today that you did not
8  know anybody by that name, Dennis Harris, right?
9      A.   No, I don't know know Dennis Harris.
10     Q.   Okay.  So do you think you were talking
11 about Denise Harris here?
12     A.   I would be assuming.
13     Q.   Okay.  And then I guess the answer would
14 be -- should be "she said upstairs from us" is your
15 answer.  So when did Denise Harris -- does this
16 refresh your recollection that Denise Harris lived
17 upstairs from you?
18     MR. AINSWORTH:  Object to the form of the
19 question, foundation.
20 BY MR. GRILL:
21     Q.   Okay.
22     A.   You say does this refresh my
23 recollection?
24     Q.   Yes.

Page 144

1      A.   No.
2      Q.   Did Denise Harris ever stay upstairs
3  from you?
4      A.   If my mother stayed on the first floor,
5  she had to stay upstairs, they had to stay up
6  there.
7      Q.   But you say from us, so were you living
8  on the first floor of 1212 in the front building
9  when Denise lived upstairs from you?
10     MR. AINSWORTH:  Objection, foundation.
11 BY MR. GRILL:
12     Q.   In 1991.
13     MR. AINSWORTH:  Objection, foundation.  Which
14 part of 1991?
15 BY MR. GRILL:
16     Q.   I can rephrase if it will help you.
17     A.   I don't know.  I mentioned it.  I don't
18 know.
19     Q.   When was Denise Harris staying upstairs
20 from you?
21     A.   I don't know.
22     Q.   Do you know how long before this
23 shooting it was that Denise Harris was staying
24 upstairs from you?



Page 145

1     A.   I don't know.  I was in Milwaukee.
2     Q.   Well, you weren't in Milwaukee at the
3  time of the shooting.
4     A.   I wasn't in Milwaukee at the time of the
5  shooting, but I was in Milwaukee.
6     Q.   Do you remember at any time when Denise
7  Harris --
8     A.   I don't know.
9     Q.   Hang on, let me finish my question.  Do
10  you remember any time when it was that Denise
11  Harris lived upstairs from you?
12     A.   I don't know.
13     Q.   Okay.  So I guess we'll just have to go
14  with whatever Denise says on that, right?
15     MR. AINSWORTH:  Objection to the form of the
16  question.
17  BY THE WITNESS:
18     A.   I don't know.
19  BY MR. GRILL:
20     Q.   Nakeia Little, do you know somebody by
21  that name?
22     A.   Yes, she's decreased.
23     Q.   Do you know how to spell the first name?
24  I've heard a couple different spellings.

Page 146

1     A.   I believe it's N-a-k-k-i-a, something
2  like that.  I'm not sure, I don't know.
3     Q.   Do you remember where she lived back in
4  1991?
5     A.   I believe -- I want to say on the first
6  floor of 1212 with her sister Michelle Little.  I
7  don't know.
8     Q.   Okay.  So when did Nakeia and Michelle
9  Little live, if you remember, relative to when the
10  shooting happened on the first floor of the 1212
11  West 51st Street house?  I'm assuming you're taking
12  about the front house, right?
13     A.   Yes.
14     Q.   So when did they live on the first floor
15  of that house?
16     A.   I'd be assuming, so I don't know.  I
17  just know I used to see Nee Nee (phonetic), they
18  used to always be right there on that front porch
19  when I come through the gangway.
20     Q.   Specifically the 1212 building?
21     A.   Yes.
22     Q.   Were they living there at the time the
23  shooting happened on the first floor of the front
24  house of 1212?

Page 147

1     A.   I believe so.  I don't want to assume,
2  but I believe so.
3     Q.   Why would you believe so?
4     A.   Okay, I don't know then.
5     Q.   Did Quarter Pound, your cousin, did he
6  ever go by the name Walter Pound?
7     A.   I don't know.
8     Q.   Did you ever call him by that name?
9     A.   No, I used to always just call him
10  Quarter Pound.
11     Q.   Okay.  He didn't have a sister Wheaty,
12  right?  It was Tweetie, right?
13     A.   Yes.
14     Q.   He didn't have enough sister with the
15  nickname Wheaty, right, like Wheaty, W-h-e-a-t-y?
16     A.   Not that I know of.
17     Q.   Gus Robinson, you know him?
18     A.   Yes.
19     Q.   You knew him in 1991, right?
20     A.   Yes.
21     Q.   What was his nickname in 1991?
22     A.   I think we called him Snake.
23     Q.   All right.  Why did you call him Snake
24  if you know?

Page 148

1     A.   That's the way he got introduced in the
2  hood when he came around, my name is Snake.
3     Q.   Was he older than you or younger than
4  you?
5     A.   I believe he was older.
6     Q.   Do you know by like how much?
7     A.   I don't know.
8     Q.   Was he like a lot older than you?
9     A.   I don't know.
10     Q.   Do you know where he lived?
11     A.   I know he stayed once upon a time on
12  Throop.  After that I don't know where he lived.
13     Q.   How did you know he lived once upon a
14  time on Throop?
15     A.   Because we used to always be in front of
16  his house.
17     Q.   Who is "we?"
18     A.   Me and some of my friends.
19     Q.   What friends?
20     A.   Ronnie Sloan.
21     Q.   S-l-o-a-n, maybe n-e.
22     A.   It's R-o-n-n-i-e.
23     Q.   And who else?
24     A.   Lamont Brown.



Page 149

1    Q.   Who Lamont Brown?
2    A.   Yeah.
3    Q.   L-a-m-o-n-t?
4    A.   Yes, something like that. I don't know.
5    Q.   Okay. Who else?
6    A.   That's been over the years. He's been
7  out there 100 times with different people, man.
8    Q.   Andre Green?
9    A.   Yes, I've been out there with him
10 before.
11   Q.   Okay. What about Tyrone Pitts?
12   MR. AINSWORTH: And what's the question?
13 BY MR. GRILL:
14   Q.   Who are the people that he hung out in
15 front of Gus Robinson's house over on Throop. So
16 we've got Ronnie Sloan, Lamont Brown, Andre Green.
17 Who else? I had mentioned Tyrone Pitts. Was he
18 one of them?
19   A.   I'm not for sure, but -- I'm not for
20 sure about him.
21   Q.   Do you know a person named Troy Walker?
22   A.   Who?
23   Q.   Troy Walker, did you know somebody by
24 that name back in --

Page 150

1    A.   Did you say Troy Lockert?
2    Q.   Walker, like walking.
3    A.   Oh, No.
4    Q.   Did you know anybody by the name Troy
5  back in 1991?
6    A.   Yes, I knew two Troys.
7    Q.   Who were the two Troys that you knew?
8    A.   One stayed on 50th and Throop and the
9  other one stayed on Elizabeth.
10   Q.   Do you know the last name of either of
11 these Troys?
12   A.   No.
13   Q.   Do you know what kind of cars either of
14 these Troys drove?
15   A.   No.
16   Q.   Do you know if they had cars?
17   A.   Man, I was 15, I didn't know nothing
18 about no cars. I still don't know the name of cars
19 today.
20   Q.   Well, I was thinking maybe because you
21 throw rocks and bottles at cars, so maybe you'd
22 remember some of these cars. So you don't know,
23 fair enough. Do you know if either of these Troys
24 were older or younger than you?

Page 151

1    A.   I would say they were older.
2    Q.   Okay. Both of them?
3    A.   I believe the one that stayed on Throop
4  was probably older, he ain't never hung out with
5  us.
6    Q.   Okay.
7    A.   And the other Troy, shit, he probably in
8  between. He's probably our age or a little younger
9  or a little older, I don't know.
10   Q.   The Troy that was on Elizabeth that was
11 about the same age, did you hang out with him?
12   A.   No, we just used to see him in the
13 neighborhood.
14   Q.   All right.
15   A.   Or he'd come walking down 51st going to
16 the Queen Submarine.
17   Q.   It seems like everybody went to Queen
18 Submarine.
19   A.   Man, they had the best food ever. Then
20 Harold's Chicken was behind it.
21   Q.   Thomas, did you know anybody with that
22 name?
23   A.   Yes.
24   Q.   Who is the Thomas that you knew? Well,

Page 152

1  let me ask you this first. Was Thomas one of the
2  people you'd hang out with in front of Gus' house?
3    A.   Yeah.
4    Q.   Do you remember Thomas' last name?
5    A.   But, shit, if you talk to -- I know he
6  is deceased, but if you talk to his brother, he
7  might be able to give you that information.
8    Q.   Who is his brother?
9    A.   Ronnie Sloan.
10   Q.   So it was Thomas Sloan?
11   A.   I don't know.
12   Q.   Are you sure his brother is Ronnie
13 Sloan?
14   A.   I'm positive.
15   Q.   Was Thomas older or younger?
16   A.   Thomas was older than us.
17   Q.   Was Ronnie like your age?
18   A.   Yes, Ronnie around our age.
19   Q.   You hung out with Ronnie a lot, didn't
20 you?
21   A.   That was one of my best friends growing
22 up.
23   Q.   You guys got arrested before a few times
24 together?



Page 153

1    A.    Probably did.  It's been so long ago.
2  Probably did.
3    Q.    Okay.  Darren, who's that?
4    A.    Darren?
5    Q.    Yes, did you know Darren?
6    A.    I know a few Darrens now.
7    Q.    Then.  Sorry, we're sticking to 1991 in
8  the year or so leading up to your arrest in this
9  case.
10    A.    Okay.
11    Q.    So did you know Darren during that time
12  period?
13    A.    Yes, I knew a Darren.
14    Q.    What's Darren last name, if you know?
15    A.    I have no idea.
16    Q.    Did you hang out with Darren in front of
17  Gus' house?
18    A.    No.
19    Q.    Darren Triplett, does that ring a bell?
20    A.    Yeah, it rings a bell.
21    Q.    Is that Darren's last name?
22    A.    I don't know.
23    Q.    Why does Darren Triplett ring a bell?
24    A.    Because I heard that Triplett name

Page 154

1  before.
2    Q.    Where did you hear that name before?
3    A.    Probably from people from the
4  neighborhood.  I just always knew him as Darren.  I
5  didn't know him as Darren Triplett until like
6  probably, what, some years ago, something like
7  that.
8    Q.    Was he a friend of yours?
9    A.    We ain't never had coffee together.
10    Q.    Was he a friend of yours?
11    A.    No.
12    Q.    Did you ever tell anybody that he was a
13  friend of yours?
14    A.    No.
15    Q.    Maybe a friend in the neighborhood?
16    A.    No.
17    Q.    What are you looking at now?  Did you
18  ever testify to that during your criminal trial?
19    A.    What, that we was friends?
20    Q.    Yeah, like Darren was a friend in the
21  neighborhood.
22    A.    I probably said he was a friend in the
23  neighborhood, not meaning that me and him friends.
24  I would say you were a friend in the neighborhood

Page 155

1  if you stayed in the neighborhood.
2    Q.    You would say I was a friend in your
3  neighborhood?
4    A.    Yes.
5    Q.    I have a hard time believing that today.
6    A.    I would say Russell, too.
7    Q.    Well, I believe that about Russell, but
8  I don't know if I believe that about me.  That's
9  suspicous.
10    A.    I would say you were a friend from the
11  neighborhood if you grew up with me and I knew you.
12  You know, you all be trying to misconstrue the
13  words because our culture, you know what I'm
14  saying, is when we say, man, he's a friend, that's
15  what he is.  But it ain't like we sat down and had
16  coffee or did this together or hung out or nothing.
17  He's just a friend from the neighborhood.
18    Q.    Right.  So those are the types of things
19  I need you to explain, okay?
20    A.    He's a friend from the neighborhood.
21    Q.    So he's not somebody you went and sat
22  down and had coffee with, but he's somebody that
23  you knew?
24    A.    Right.

Page 156

1    Q.    All right.  And you knew -- he wasn't an
2  enemy of yours?
3    A.    No.
4    Q.    You didn't have any problems with
5  Darren, right?
6    A.    No, I ain't got no problems with nobody.
7    Q.    Do you know how long you had known
8  Darren before the shooting happened?
9    A.    I would say probably about anywhere from
10  six months to a year, probably less, probably a
11  little longer.
12    Q.    What about Gus, how long did you know
13  him before the shooting happened?
14    A.    Let me see, Gus moved in the
15  neighborhood when Snake moved in from Cabrini
16  Greens.  I don't know, probably about I would say
17  less than seven, maybe six months, something like
18  that.  I don't know.
19    Q.    Okay.  Do you know if Gus was a Black
20  Stone?
21    A.    No, Gus was a -- he was a -- I think he
22  was an MC or something.
23    Q.    Like a Mickey Cobras?
24    A.    Yeah, something like that.



Page 157

1    Q.    Why do you say that?
2    A.    Because that's where he came from,
3  that's what he said out his mouth.
4    Q.    Okay.  What about Thomas, Ronnie's
5  brother, was he a gang member?
6    A.    He might have been a -- I'm not for
7  sure.  He might have been a Stone, I don't know.
8    Q.    Might have been a Stone?
9    A.    I don't know.
10   Q.    Were the Mickey Cobras and the Black P
11 Stones, the Black Stones back in 1991, were they
12 enemies to your knowledge?
13   A.    I don't know.
14   MR. AINSWORTH:  Objection, foundation.
15 BY MR. GRILL:
16   Q.    Like I guess what I'm asking is like
17 would you expect, if Gus Robinson was a Mickey
18 Cobras living in a neighborhood with Black Stones,
19 if that would caused, in your experience living
20 there, a problem?
21   A.    You talking in '91 or now?
22   Q.    '91.
23   A.    Man, I was 15, I don't know.
24   Q.    What about now?

Page 158

1    A.    Probably wouldn't be no problem.
2    Q.    All right.  Ronnie Sloan was he in 1991
3  a member of any gang?
4    A.    No.
5    Q.    Lamont Brown was he a gang member?
6    A.    I don't know.
7    Q.    What about Andre Green?
8    A.    I don't know.
9    Q.    Tyrone Pitts?
10   A.    I'd be assuming, so I'll say I don't
11 know.
12   Q.    Assume for me.
13   A.    I don't want to assume.
14   Q.    All right.  Do you see Arnold Day
15 hanging out with any of these folks, so Thomas,
16 Ronnie, Lamont, Andre, Tyrone, Gus, do you have any
17 recollection back in 1991 of seeing Arnold Day
18 associating with any of these folks?
19   A.    No.
20   MR. AINSWORTH:  Object to the form of the
21 question.
22 BY MR. GRILL:
23   Q.    Did you know from any source whether
24 Arnold Day associated with any of these people?

Page 159

1    A.    No.
2    Q.    Do you know if they knew Arnold Day?
3    A.    They probably did.  I don't know.
4    Q.    Why would you say they probably did?
5    A.    I don't know, everybody know everybody
6  in the neighborhood.
7    Q.    Okay.
8    A.    Well, I can't speak for them, so I'm
9  going to say I don't know.
10   Q.    All right.  How long had you known
11 Arnold Day prior to the shooting?
12   A.    I don't know him personally.  I knew of
13 him.  I'd probably say about probably a year, year
14 and a half.  You know, could be off, could be a
15 little bit more, you know.
16   Q.    Do you know where Arnold Day lived in
17 September 1991?
18   A.    No.
19   Q.    Would you consider him a friend in the
20 neighborhood?
21   A.    In '91?
22   MR. AINSWORTH:  Object to the form of the
23 question.
24 BY MR. GRILL:

Page 160

1    Q.    Yes.
2    A.    No.
3    Q.    So were you enemies with Arnold Day in
4  1991?
5    A.    No.
6    Q.    So Arnold Day is not somebody you went,
7  as you said earlier, that you would sit down and
8  have coffee with, right?
9    A.    There is a lot of people in the
10 neighborhood I wouldn't sit down and have coffee
11 with.
12   Q.    So guess what I'm trying to figure out
13 is like what category Arnold Day falls into because
14 you're telling me that friends in the neighborhood
15 are people that you know in the neighborhood, but
16 it's not somebody that you'd go off and like have
17 coffee with, so I want to know if Arnold Day falls
18 into that category?
19   A.    Arnold Day falls in the category --
20   Q.    In 1991.
21   A.    In 1991, Arnold Day falls in the
22 category of he's not my friend, he's just someone I
23 knew, period.
24   Q.    Somebody you knew.



Page 161

1    A.    We ain't never hung out, we ain't never
2  did nothing together.
3    Q.    How did you learn his name?
4    A.    Huh?
5    Q.    If you never hung out with him and you
6  never did anything with him, how did you figure out
7  what his name was?
8    A.    Who?
9    A.    Arnold Day.
10    A.    Everybody knew Little A in the
11  neighborhood.
12    Q.    We did everybody in the neighborhood
13  know Little A?
14    A.    Because we used to always see him.
15    Q.    It sounds to me if everybody knew him in
16  the neighborhood -- let me ask it this way.  Is
17  there something about Little A that in your mind
18  would cause you to say everybody in the
19  neighborhood knew him in 1991?
20    MR. AINSWORTH:  Object to the form of the
21  question.
22  BY THE WITNESS:
23    A.    No.
24  BY MR. GRILL:

Page 162

1    Q.    Was Little A a ranking member of the
2  Black Stones by any chance?
3    MR. AINSWORTH:  Objection, asked and answered.
4  BY MR. GRILL:
5    Q.    Is that why everybody in the
6  neighborhood knew him?
7    A.    I answered that question already.  I
8  don't know.
9    Q.    Was Little A -- did he have a reputation
10  to your knowledge of committing crimes on behalf of
11  the Black Stones in your neighborhood?
12    A.    I don't know.
13    Q.    Was he somebody that people were afraid
14  of in your experience back in 1991?
15    MR. AINSWORTH:  Object to foundation.
16  BY THE WITNESS:
17    A.    I don't know.
18  BY MR. GRILL:
19    Q.    Okay.  Do you know if Arnold Day back in
20  1991 was fighting with anybody in the Black Stones?
21    A.    I don't know.
22    Q.    Did you know that Arnold Day got
23  arrested for another murder separate from the
24  Garcia homicide close in time to when the Garcia

Page 163

1  homicide occurred?
2    A.    I believe so.
3    Q.    Okay.  Do you know if Ralph Watson knew
4  anything about that murder?
5    A.    I don't want to assume.  I don't know.
6  I don't know.
7    Q.    Did you ever talk to Ralph while you
8  were in prison?
9    A.    Did I talk to him?
10    Q.    Yeah.  When you guys were cellmates, did
11  you ever talk about the murder that Little A got
12  convicted for?
13    A.    No, we ain't never talked about it.
14    Q.    Do you know the name of the victim
15  Arnold Day -- the murder that Arnold Day was
16  convicted of, did you know the name of the victim
17  in that case?
18    A.    I believe I seen the paper, Ruin or
19  something like that.
20    Q.    Jerrod Irving, does that ring a bell?
21    A.    Yeah, there you go.
22    Q.    Did you and Ronnie ever talk -- not
23  Ronnie -- Ralph, did you guys ever talk about it
24  when you were cellmates?

Page 164

1    A.    No.
2    Q.    What are Fred's brother's names?
3    MR. AINSWORTH:  Objection, asked and answered.
4  Tell him again.
5  BY MR. GRILL:
6    Q.    I don't remember.
7    A.    Ra Ra Arnold Day Day.
8    Q.    I do remember now, sorry about that.
9  Thanks.
10    A.    No problem.
11    Q.    Do you know Nate Anderson, do you know
12  who that is?
13    A.    I know G Nate.  I know G Nate.
14    Q.    What did you know about G Nate back in
15  1991?
16    A.    Nothing.
17    Q.    Do you know if G Nate was a gang member?
18    A.    Yeah, he was a gang member.
19    Q.    Do you know what gang?
20    A.    He was a Black Stone.
21    Q.    Do you know if he held any rank in the
22  Black Stones?
23    A.    They called him G, G Nate, so he got to
24  hold something, I don't know.



Page 165

1    Q.   G like general maybe?
2    A.   I guess.
3    Q.   Okay.  Did you know that?
4    A.   Did I know that?
5    Q.   Yes.
6    A.   Back in '91?
7    Q.   Uh-huh.
8    A.   No.
9    Q.   Do you know about it now?
10   A.   Yes.
11   Q.   Do you know if Arnold Day and G Nate had
12  any problems between each other back in 1991?
13   A.   I don't know.  I ain't never hung out
14  with them like that, so I don't know.
15   Q.   Did you know from any source whatsoever?
16   A.   No.
17   Q.   Did you ever hear anything like that, a
18  rumor?
19   A.   No.
20   MR. GRILL:  It's 1:00.  Do you want to take
21  lunch?  I'm going to move on to a different
22  section.
23   MR. AINSWORTH:  Whenever you'd like.
24   MR. GRILL:  I'm asking the witness.  I'll keep

Page 166

1  going.
2    THE WITNESS:  You keep going.  I'm trying to
3  get this over with.
4    MR. GRILL:  Okay.  Well, let's take five
5  because Ive got to go to the bathroom.  I'm just
6  telling you we're going to be here for a bit, so if
7  you want to eat, you can.
8    THE VIDEOGRAPHER:  We're going off the record,
9  the time is 1:05 p.m.
10   (WHEREUPON, a short break was had.)
11   THE VIDEOGRAPHER:  We're back on the record,
12  the time is 1:24 p.m.
13  BY MR. GRILL:
14   Q.   Mr. Jakes, earlier today I asked you
15  some questions about your detainment in Milwaukee
16  when they sent you back, okay.  It seemed to me
17  that you were -- well, let me ask you this.  In
18  your mind, is there a difference between being
19  detained and being arrested?
20   A.   There is a difference.
21   Q.   Okay.  Can you flesh out for me, help me
22  understand how you distinguish between those two?
23   A.   As far as Milwaukee or just in general?
24   Q.   In general.  When you think back to

Page 167

1  like -- because you said that when you were in
2  Milwaukee that the police I guess detained you,
3  that they didn't arrest you up there, so that's
4  what I'm trying to understand like why you're
5  saying that you weren't arrested, so if you could
6  explain to me what the difference in your mind is
7  between those two things.
8    A.   Well, to give you a clarification on
9  that, I probably was arrested.
10   Q.   Okay.
11   A.   I know they had me in a little juvenile
12  detention center for some days.
13   Q.   Yeah, that's what it sounded like to me.
14   A.   So I probably was arrested.  I don't
15  know.
16   Q.   Okay.  Are you still drawing some type
17  of distinction, though, between those would things?
18   A.   What, detained?
19   Q.   Detained and arrested, yes.
20   A.   Well, detained it's just simple, the
21  police may take me in for a couple hours, detain
22  you and just let you go.  Arrested that means you
23  got to go through all the proper channels, send you
24  to the county jail, you go up in front of the judge

Page 168

1  and all that other stuff.
2    Q.   If you're arrested?
3    A.   If you're arrested.
4    Q.   And that's not what happened in
5  Milwaukee?
6    A.   In Milwaukee I didn't see no judge or
7  nothing.  All I know I was in their juvenile
8  facility for some days, and the police came and got
9  me and they sent me back to Chicago.  That's all I
10  know.
11   Q.   Had you like run away from wherever it
12  was that you were living?
13   A.   No.
14   Q.   In Milwaukee?
15   A.   No.
16   Q.   And you don't recall what it was that
17  they detained you for, that you were detained for?
18   A.   Do I recall what they --
19   Q.   Yes.
20   A.   They never told me.  All I know is they
21  just sent me back to Chicago.
22   Q.   Thinking back to that experience, do you
23  have any understanding or belief now sitting here
24  today about why it was that you were detained in



Page 169

1 Milwaukee before they sent you back?

2    A.   I don't want to assume.  But if you care
3 to share, please do, maybe it will jog my memory.

4    Q.   I don't know.  I'm asking you if there
5 is any reason.

6    A.   I don't know.

7    Q.   That you've become aware of since then?

8    A.   Not to my knowledge.

9    Q.   All right.  Since your release from
10 prison, do you believe or do you have any feeling
11 that your experience of being arrested and
12 prosecuted and sent to prison for killing
13 Mr. Garcia, has that given you any fear of law
14 enforcement that you didn't have before?

15    A.   First, again, I ain't killed Mr. Garcia
16 as you just stated.  Second, yes, I don't like the
17 police.

18    Q.   Right.  So did you like the police
19 before you were arrested for Mr. Garcia's murder?

20    A.   I can't be for sure.  I'm just saying I
21 don't like the police.

22    Q.   Did you trust the police before
23 Mr. Garcia's murder?

24    A.   I don't know about all that.

Page 170

1    Q.   When you think back to 1991 -- and let
2 me just put it this way.  It's my understanding,
3 based on your testimony from the criminal trial,
4 that you recognized that, before you were arrested
5 in this case, you were arrested maybe as many as 13
6 times before you got arrested for Mr. Garcia's
7 murder.  Do you remember giving testimony like
8 that?

9    A.   Somewhat.

10    Q.   In light of those experiences, did
11 you -- when you think back to 1991 and before you
12 were arrested in this case, do you believe that you
13 mistrusted the police back during that time period?

14    MR. AINSWORTH:  Objection to foundation.

15 BY THE WITNESS:

16    A.   Can you repeat that again?

17 BY MR. GRILL:

18    Q.   Did you trust the police prior to 1991
19 when you were arrested for shooting and killing or
20 participating in the murder of Mr. Garcia?

21    A.   Did I trust the police in '91?

22    Q.   Yes.

23    MR. AINSWORTH:  Objection, foundation.

24 BY THE WITNESS:

Page 171

1    A.   Probably not.

2 BY MR. GRILL:

3    Q.   Okay.  Is there a reason why you didn't
4 trust the police in?

5    A.   No reason.

6    Q.   Okay.  Did you believe that the police
7 had ever before your arrest for Mr. Garcia's
8 homicide had put false charges -- arrested you for
9 false reason before then, or was this the first
10 time that you were arrested and charged with a
11 crime that you didn't commit?

12    A.   I'm not understanding what you're
13 saying.

14    Q.   Was this case the first time in your
15 mind that you were arrested for a crime that you
16 didn't commit?

17    A.   Well, they arrested me for a zip gun
18 that I felt like I shouldn't have been arrested
19 for.

20    Q.   Okay.  Any other arrests that you had or
21 any other times that you were arrested where you
22 believe that the arrest was made up, that you
23 didn't do or participate in anything that the
24 police were arresting you for?

Page 172

1    A.   You asking me?

2    Q.   Yes, I'm asking you your opinion.

3    A.   In my opinion, I would say all of them.
4 I ain't did nothing.

5    Q.   Okay.  So you think every
6 time -- seriously, no, this is serious.  Like do
7 you believe that every time the police arrested you
8 before this case, all them were made up; is that
9 your testimony?

10    A.   I ain't going to say all of them was
11 made up, but I would say probably -- whatever I
12 could remember probably.

13    Q.   What other ones do you remember that
14 were made up?

15    A.   I know the zip gun, I believe, I didn't
16 have nothing to do with that, and I think it was a
17 criminal sexual assault somewhere, I believe, I
18 ain't had nothing to do with that.  And I know I
19 kicked the Show Biz door in, I did that, so I admit
20 to that.  And whatever else -- whatever other
21 charges I don't remember, it's been so long ago.

22    Q.   How many times were you arrested for
23 criminal sexual assault?

24    A.   I was only arrested for that once.



Page 173

1    Q.   Are you sure?
2    A.   Positive.
3    Q.   Any other crimes that you believe you
4  didn't commit that you were arrested for that you
5  could think of?
6    A.   Not unless you got my criminal wrap
7  sheet in front of you.
8    Q.   I do, we'll go through it, but I'm
9  asking you right now --
10   A.   Not that I could think of right now.
11   Q.   After you got out of prison in this
12 case, did you basically have the same feelings
13 about the police as far as like you didn't trust
14 them, or was it worse than it was before if you
15 remember?
16   A.   It's worse.
17   MR. AINSWORTH:  Object to the form of the
18 question.
19 BY MR. GRILL:
20   Q.   It was worse?
21   A.   Yes.
22   Q.   Why was it worse?
23   A.   I just don't like -- the police don't
24 like me and I don't like them.

Page 174

1    Q.   Do you have any fear of like, after
2  having gotten out of prison, like any trouble
3  sleeping?
4    A.   Occasional nightmares, you know.
5    Q.   About what?
6    A.   Just being in jail overall just like
7  wake up in hot sweats and shit.
8    Q.   Do those nightmares like interfere with
9  your ability to function on a daily basis?
10   MR. AINSWORTH:  Object to the form of the
11 question, object to the foundation.
12 BY THE WITNESS:
13   A.   No.
14 BY MR. GRILL:
15   Q.   Like do you find yourself like not being
16 able to leave the house because you're thinking
17 about those nightmares?
18   MR. AINSWORTH:  Objection, foundation.
19 BY THE WITNESS:
20   A.   I would say yeah.
21 BY MR. GRILL:
22   Q.   Yeah.  Tell me about it.
23   A.   Just like when you wake up in a cold or
24 hot sweats, you just don't want to go outside.  I

Page 175

1  just had a edge for just like I don't want to go
2  outside.
3    Q.   Do you have any fear about confined
4  spaces?
5    A.   Somewhat.
6    Q.   Or being in public?
7    A.   I don't like being in small spaces.
8    Q.   Okay.
9    A.   I don't nothing that leave the ground.
10   Q.   I'm sorry, I didn't understand that.
11   A.   I don't like nothing that leaves the
12 ground, and I don't like being in small spaces.
13   Q.   Okay.  How does it impact you being in
14 small spaces?
15   A.   I just don't like being in small spaces.
16   Q.   Did you mind being in small spaces back
17 in 1991?
18   A.   Excuse me?
19   Q.   Did you have a problem with being in
20 small spaces before this?
21   A.   I don't know.
22   MR. AINSWORTH:  Can I just -- when you said
23 lead the ground, is that what you're --
24 BY MR. GRILL:

Page 176

1    Q.   Leave the ground.
2    A.   I don't like nothing that leaves the
3  ground.  I don't like airplanes, roller coasters,
4  boats, anything that leaves the ground I don't
5  lake.
6    MR. AINSWORTH:  Thank you, I'm sorry.  Go
7  ahead.
8  BY MR. GRILL:
9    Q.   Have you ever been on a boat?
10   A.   Huh?
11   Q.   Have you ever been on a boat in your
12 life?
13   A.   Have I ever been on a boat?
14   Q.   In your life.
15   A.   I can't recall.  I don't know.
16   Q.   What about an airplane, have you ever
17 been on an airplane?
18   A.   I've been on an airplane probably twice.
19   Q.   When was the last time you were on an
20 airplane?
21   A.   I would believe it was to go bury my
22 nephew in Arkansas.
23   Q.   So after you were released?
24   A.   Yes, that was, shit, about two years ago



ANTHONY JAKES
ANTHONY JAKES vs CITY OF CHICAGO

Page 177

1  or a year ago -- two years ago my nephew passed
2  away.
3      Q.   Did you have any trouble flying?
4      A.   I would have preferred to drove, but,
5  you know, I had to get to my sister immediately, so
6  we wound up flying.
7      Q.   Did you go with anybody on the airplane?
8      A.   Yes, me and my Aunt Bee.
9      Q.   You and your Aunt Bee?
10     A.   Aunt Bee, yes.
11     Q.   And whatever your fear of airplanes was,
12  it didn't prevent you from getting on the airplane?
13     A.   Right, I had to put it to the back of my
14  head.
15     Q.   So it sounds like a fear that you got
16  control over it sounds like?
17     A.   I ain't got control over it. I do what
18  I got to do, but I don't like nothing that leaves
19  the ground.
20     Q.   All right. What other time were you on
21  an airplane, when was that?
22     A.   I think I went to Vegas or something. I
23  believe it was Vegas or something. I don't know, I
24  can't remember.

Page 178

1      Q.   When did you go to Vegas?
2      A.   I don't remember.
3      Q.   After you got out of prison, right?
4      A.   Yes.
5      Q.   Okay. How long after you got out of
6  prison?
7      A.   I can't remember. I don't even want to
8  assume.
9      Q.   Why did you go to Vegas?
10     A.   Just went to Vegas with a friend.
11     Q.   What friend?
12     A.   Monique.
13     Q.   Anybody else?
14     A.   I believe it was her brother and his
15  girlfriend. I don't know their names, so don't
16  even ask, and I believe one their cousins. I don't
17  know, it was a little group thing, and I just
18  happened to just go with them.
19     Q.   Was it to celebrate you getting out of
20  prison?
21     A.   No, this was way after I got out of
22  prison.
23     Q.   All right. How long did you go to Vegas
24  for?

Page 179

1      A.   I want to say three or four days or two
2  or three days, something like that. I don't know.
3      Q.   And did you have any problem being in
4  Vegas like in the casinos with all the people
5  around, is that troubling to you?
6      A.   Somewhat, you know, just wasn't used to
7  a large crowd like that in casinos.
8      Q.   But you got along fine?
9      MR. AINSWORTH: Object to the form of the
10  question.
11  BY THE WITNESS:
12     A.   I would say I did okay.
13  BY MR. GRILL:
14     Q.   Is that a gold nugget in your hand, is
15  that what that is?
16     A.   Yes.
17     Q.   That you're twisting around. Does it
18  mean something to you?
19     A.   No.
20     Q.   Why do you have it?
21     A.   It's a stress reliever.
22     Q.   Okay. So you twirl a gold nugget in
23  your hand to relieve stress?
24     A.   Yep, or shake my leg.

Page 180

1      Q.   Back in 1991, did you understand your
2  Miranda Rights back then?
3      A.   Somewhat.
4      Q.   Okay. What do you mean by that?
5      A.   That's what I mean, somewhat.
6      Q.   Were there parts of them in 1991 at the
7  time of your arrest that you didn't understand?
8      A.   Somewhat.
9      Q.   Okay. What parts of your Miranda Rights
10  did you not understand?
11     A.   Somewhat.
12     Q.   Okay. Did you understand in 1991 at the
13  time of your arrest that you had a right to remain
14  silent?
15     A.   Excuse me?
16     Q.   At the time of your arrest for this case
17  for this murder, did you understand that you had a
18  right to remain silent?
19     A.   That I had the right to remain silent?
20     Q.   Yes, did you understand that?
21     A.   Yes.
22     Q.   Okay. And did you understand that you
23  had a right to an attorney?
24     A.   Yes.



Page 181

1    Q.    At the time of your arrest, right?  You
2  understood that, right?
3    A.    I said yes.
4    Q.    And did you also understand that, if you
5  didn't have an attorney, that you would get one
6  appointed to you?  You understood that, right?
7    A.    Somewhat.
8    Q.    Well, did you or didn't you?
9    A.    That's my answer, somewhat.
10    Q.    Did you testify during the motion to
11  suppress hearing that you understood that right?
12    A.    I don't remember that.
13    Q.    Okay.  Well, let's look.  So why don't
14  you get that binder out, and I want you to
15  go -- still on Exhibit 5, but I want you to go to
16  the 1992 12-02 tab, okay?
17    MR. AINSWORTH:  So in that binder.
18    BY THE WITNESS:  He can read it off to me.
19  BY MR. GRILL:
20    Q.    Do you got it?  Do you want to look at
21  it?
22    A.    I don't need to look at it.
23    Q.    Okay.  I'm just going to read it to you
24  then.  Your attorney can follow along.

Page 182

1      Do you remember being asked these
2  questions?
3    MR. AINSWORTH:  You need to tell me what page?
4    MR. GRILL:  Oh, sorry, 75, B-75 starting at
5  line 22.
6    MR. AINSWORTH:  Thank you.
7    MR. GRILL:  Tell me when you're there.
8    MR. AINSWORTH:  I'm here.
9  BY MR. GRILL:
10    Q.    Okay.  So starting on line 22, do you
11  remember being asked these questions and giving
12  these answers:  Question:  "Did you understand that
13  you had a right to remain silent?"  Answer:  "Yes."
14      On the next page, B-76 at the top,
15  question:  "You understood?"  Answer:  "Yes."
16  Question:  "Did you understand that you had a right
17  to an attorney?"  Answer:  "Uh-huh."  Question:
18  "You have to answer."  Answer:  "Yeah."  Question:
19  "Do you understand that if you didn't have an
20  attorney one would be appointed for you?"  Answer:
21  "Yes."
22    MR. AINSWORTH:  You're not reading down to
23  line 21 on page 76?
24    MR. GRILL:  As you always say to me --

Page 183

1    MR. AINSWORTH:  Okay.
2  BY MR. GRILL:
3    Q.    Did you give those answers?  Were you
4  asked those questions and did you give those
5  answers during that motion to suppress hearing?
6    A.    Yes.
7    Q.    So when I asked you that if you
8  understood back in 1991 that, if you didn't have an
9  attorney, you would have one appointed for you, you
10  understood that then, right?
11    A.    And my answer again is somewhat.
12    Q.    In 1991 or '92, I should say, you said
13  yeah.
14    A.    All right.
15    Q.    So is it different now?  Is the
16  testimony that you gave then not correct?
17    A.    Okay, my answer is still going to be so
18  what -- somewhat.
19    Q.    So what or somewhat?
20    A.    Somewhat.
21    Q.    What part about that do you not fully
22  understand?  I'm asking you tell me like what part
23  that you didn't fully understand about, if you
24  didn't have an attorney, you would get one

Page 184

1  appointed for you?
2    A.    I didn't say I didn't fully understand.
3  You said it.
4    Q.    You said somewhat.
5    A.    I just said somewhat.
6    Q.    Okay.  All right.  So prior to your
7  arrest in this case, do you remember any other
8  occasions where the police read you your Miranda
9  Rights?
10    A.    You're talking about 30 some years.  I
11  don't know, man.
12    Q.    Okay.  I want you to go to Exhibit 1
13  which is in that binder.  You're going to want to
14  probably look at these because these are your
15  arrests, okay?
16      I'm going to represent to you, and we'll
17  go through these, that these arrests -- there is 11
18  of them here, actually.
19    A.    11?
20    Q.    Yep.
21    A.    Where did you all get 13 from then?
22    Q.    Well, these are the 11 that I want to
23  talk to you about.  Yeah, there could be two more,
24  but we have reports on these 11.



Page 185

1     A.    Okay.

2     Q.    So these reports -- these arrests start

3   in this Exhibit here, Exhibit 1, and it's subparts

4   A through K, show that your first arrest here was

5   on June 11, 1989.

6     A.    On June 11, 1989.

7     Q.    Yeah.  And all of these arrests list

8   your home address as 1212 West 51st Street, okay?

9   Not one of these arrests indicates that you live in

10  the back house.  Do you -- when you think back to

11  these arrests, do you remember giving the police

12  your home address?

13    A.    I don't remember none of this.

14    Q.    Okay.  So, No. 1, June 11, 1989, this

15  was the criminal damage to property at Show Biz

16  Pizza when you kicked out a wood panel in the front

17  door, and that's the one you said that you did do.

18  That's not made up, right?

19    A.    Right.

20    Q.    So then let's go to Exhibit 1-B, so flip

21  to the next tab, okay?  So this is an arrest for a

22  battery that occurred on -- at least the date of

23  arrest is October 6, 1989.  Did you ever go to

24  Libby Public School?

Page 186

1     A.    Yes.

2     Q.    And do you think you were going there in

3   October of 1989?

4     A.    That's what it say right here.

5     Q.    Do you have any recollection of maybe a

6   school employee, possibly a teacher, trying to keep

7   you out of a class that you were not supposed to be

8   in and then you threw or were accused of throwing a

9   plastic milk crate at that person?

10    A.    I don't remember this.

11    Q.    And this says that you were arrested and

12  taken to the 9th District Youth for processing.  So

13  it's your testimony that you don't remember this

14  arrest at all?

15    A.    I don't remember this arrest.

16    Q.    Do you think that this is made up?  Is

17  this one of the things that you think --

18    A.    I don't want to assume, but I don't

19  remember it.

20    Q.    You don't remember it, okay.  I want you

21  to look at what the home address is on this one,

22  okay.  So you'll see it's on that page that's

23  marked CCSAO Subpoena Exhibit 6650.  Do you see

24  that, are you on that page?

Page 187

1     A.    Yep.

2     Q.    So you see your name -- so you got on

3   top Jerry Christmas.  Do you see that name?

4     A.    Yes.

5     Q.    Do you know a person named -- does that

6   name ring a bell, Jerry Christmas?

7     A.    No.

8     Q.    And then underneath it says Jakes,

9   Anthony.  Do you see that?

10    A.    Yep.

11    Q.    That's your name, right?

12    A.    Yes.

13    Q.    So next to that, it says home address at

14  the box that says home address, and it says 1212

15  West 51st Street, it says first floor.  Do you see

16  that?

17    A.    Yeah, I see it.

18    Q.    So on October 6, 1989, do you think you

19  were living on the first floor of the front

20  building at 1212?

21    A.    That's what this say.  I don't remember,

22  so that's my answer I don't remember.

23    Q.    Do you think it's possible that's where

24  you were living on that date?

Page 188

1     A.    I don't remember.

2     MR. AINSWORTH:  Object to the form of the

3   question, calls for speculation.

4   BY MR. GRILL:

5     Q.    Okay.  So the next one, Exhibit C, so

6   this is CCSAO Subpoena Exhibit 6652 through 6660.

7     A.    Did you say C?

8     Q.    Yes, it's at tab C, next tab.  So this

9   date of arrest is December 6, 1989, and this is for

10  a criminal sexual assault that allegedly occurred

11  in an abandoned building at 1400 West 51st Street

12  on the second floor of that building.

13         Do you have any recollection of being

14  arrested for criminal sexual assault in December of

15  1989, so you would have been I think about 13 or 14

16  -- 13?

17    A.    13.  I remember this.

18    Q.    Okay.  So was this made up like that the

19  police falsely charged you?

20    A.    The girl and the police made it up as

21  far as I'm concerned.

22    Q.    Okay.  So this is something maybe the

23  victim you're saying made up, but it's not

24  something that the police made up; is that fair?



Page 189

1    A.    Yes, you could say that.

2    Q.    Do you remember the girl's name?

3    A.    No.

4    Q.    Did you know this girl before this

5    incident?  Did you know -- was she somebody you

6    knew from the neighborhood at least?

7    A.    I believe at that time the girl was

8    staying in 1210 on the first floor, I believe.  I

9    don't want to assume, but I believe that's where

10   she was staying at.

11   Q.    Do you remember her name?

12   A.    I just said I don't remember her name.

13   Q.    Why do you think that she was living on

14   the first floor at 1210?

15   A.    Because I remember this case.

16   Q.    Why do you remember this case?

17   A.    Because it was something that I didn't

18   do?

19   Q.    All right.  It says that you were

20   arrested with Lamont Brown and Ronnie Sloan and

21   Abdoul Giles and Raymond Alexander.  Do you see

22   that?  It's on the first page?

23   A.    It's on the first page?

24   Q.    Well, it's actually not on the first

Page 190

1    page.  It's on the page that is numbered 6655.

2    A.    6655.  Yeah, I see it.

3    Q.    So it lists the offender's names, it's

4    got you at the top, and then Lamont Brown.  Then if

5    you go down, Ronnie Sloan and Abdoul Giles, and

6    Raymond Alexander.  Do you see that?

7    A.    Yeah, I see it.

8    Q.    Do you remember the five of you around

9    December 6, 1989 getting in any type of altercation

10   with a girl named either Lathasha Lenoir,

11   L-e-n-o-i-r, or Juanita Lencik, L-e-n-c-i-k -- oh,

12   no, it is Juanita Lenoir, L-e-n-o-i-r.  Do you have

13   any recollection of like getting into any type of

14   conflict around December 6, 1989 with either of

15   these two women?

16   A.    No, I ain't got no memory of any of them

17   two.

18   Q.    Do you know who those two women are, or

19   do their names ring a bell?

20   A.    They don't ring no bell to me?

21   Q.    So this report documents that the

22   victim -- if you go to the next page, 6656, that

23   the victim came to the police station with her

24   mother to report this sexual assault, and it's your

Page 191

1    testimony that she's making this up, is that right?

2    A.    Yes.

3    Q.    Do you have any recollection of being on

4    the street at 5018 South Ada with Ronnie, Lamont,

5    Abdoul and Raymond and running into one of these

6    women that's listed that I mentioned before and you

7    and Lemont grabbing the victim and kissing her

8    against her will?

9    A.    No recollection.

10   Q.    Do you remember her slapping either of

11   you?

12   A.    (Witness nodding no.)

13   Q.    Do you remember this girl running away

14   from you guys?

15   A.    No.

16   Q.    Pushing you guys away and running away?

17   No?

18   A.    No.

19   Q.    You're saying none of this happened.  Do

20   you remember her running up a porch?

21   A.    I don't remember none of that.

22   Q.    Okay.  And then grabbing her and

23   carrying her away into a building and the five of

24   you raping her.  None of this rings a bell?

Page 192

1    A.    None of it rings a bell to me.

2    Q.    And it's all made up?

3    A.    Yep.

4    Q.    So it's your testimony this girl went

5    into the police station and made that story up

6    about you?

7    A.    Yes.

8    Q.    And her mother?

9    A.    Yes.

10   Q.    This police report indicates that you

11   are an admitted Black Stone member from 51st and

12   Racine.  Do you remember making any admissions like

13   that to the police in December of 1989?

14   A.    No.

15   Q.    No?

16   A.    No, absolutely not.

17   Q.    So that's something that the police

18   would have made up about you?

19   A.    Yeah, pretty much.

20   Q.    All right.  So that one, according to

21   your testimony, is made up by the victim but not

22   made up by the police, right?

23   A.    Right.

24   Q.    Okay.  So tab 4, do you know what -- in



Page 193

1  1991, you knew what a gun sounded like, right?  You
2  had heard gun shots before?
3      A.   Who, me?
4      Q.   Yes.
5      A.   Yes.
6      Q.   All right.  How many times do you think
7  you had heard gun shots prior to your arrest in
8  this case in 1991?
9      A.   I don't know.
10     Q.   Bunch of times?
11     A.   I don't know.
12     Q.   More than once?
13     A.   I don't know.
14     Q.   You heard them, though?  You know what a
15  gun shot sounded like, right, correct?
16     A.   Correct.
17     Q.   So in Exhibit 4 -- or, excuse me,
18  Exhibit 1, subparagraph D, this is an arrest --
19     A.   D?
20     Q.   Yes, D.  So this is an arrest on
21  February 2nd, 1990, okay?
22     A.   February 2nd, 1990.
23     Q.   So do you remember getting arrested with
24  a gun that the police saw in your right hand around

Page 194

1  5100 South Throop Street?
2      MR. AINSWORTH:  Objection to form, compound.
3  BY THE WITNESS:
4      A.   Yes.
5  BY MR. GRILL:
6      Q.   Yes?
7      A.   Yes, I remember this.
8      Q.   So this one the police are also not
9  making up, right, this happened?
10     A.   The police made this one up.  They put
11  that gun on me.
12     Q.   Oh, so you didn't have a gun in your
13  right hand?
14     A.   No.
15     Q.   This indicates that you were read your
16  Miranda Rights.  Do you remember the police reading
17  your Miranda Rights to you on this arrest?
18     A.   No.
19     Q.   What happened to this case?  Were you
20  prosecuted, was it dropped?
21     A.   I want to say -- I don't even remember.
22  I might have did 30 days in the Audy.  I don't
23  know.  I don't remember.
24     Q.   So there was some type of disposition

Page 195

1  with this, though?
2      A.   Right.
3      Q.   You were prosecuted even as a juvenile
4  for a gun?
5      A.   Yes.
6      Q.   And did you have an attorney for this
7  one?
8      A.   Man, I don't remember.  I don't know.
9      Q.   Do you remember if your mom or your aunt
10  got you a lawyer to defend you in this case that
11  you say the police made up against you?
12     A.   I don't know.  I don't remember.
13     Q.   Did you have a trial if you remember?
14     A.   No.
15     Q.   You pled guilty to this?
16     A.   Yes.
17     Q.   Why did you plead guilty to this if you
18  didn't do it?
19     A.   Because my mother and may auntie told me
20  to.
21     Q.   Which auntie?
22     A.   Jesse May.
23     Q.   So did you believe that being caught
24  with a gun at the age of, I guess, 14, and possibly

Page 196

1  even 13, whether that was serious?
2      A.   It wasn't a real gun.  It was a zip gun.
3      MR. AINSWORTH:  Object to the form of the
4  question.
5  BY MR. GRILL:
6      Q.   All right.  Well, what's a zip gun?
7      A.   A zip gun is -- I don't know how to
8  explain it to you, but it wasn't a real gun.
9      Q.   Well, what's the difference in your mind
10  between a zip gun and a real gun?
11     A.   I don't know.
12     Q.   Well, you're saying it's not a real gun,
13  so like tell me why this is not a real gun?
14     A.   I don't know.
15     Q.   Where did you get it -- well, did the
16  police plant the gun on you.  Is that what you're
17  saying?
18     A.   No, they ain't plant it on me, but they
19  put it on me.
20     Q.   Did somebody in your group that you were
21  with that day have a gun?
22     A.   Yes, somebody had that.
23     Q.   Had that zip gun?
24     A.   Yes.



Page 197

1    Q.   Okay.  So there was a gun.  It's just
2    that you're saying the police are lying about
3    seeing you with it?
4    A.   Yes.
5    Q.   Do you remember who in your group had
6    the gun?
7    A.   I can't be for sure.
8    Q.   Was it possible --
9    A.   30 years ago.  I don't know.
10   Q.   Do you remember ever having that zip gun
11   in your hand on that day?
12   A.   I never had it in my hand.
13   Q.   Did your mom or your aunt ever tell you
14   why they wanted you to plead guilty to a crime that
15   you are saying you did not commit?
16   A.   Because they believed, if I would have
17   took it to trial, I probably would have lost, so
18   they just said go on and take the 30 days and be
19   done with it.
20   Q.   Okay.  The criminal sexual assault from
21   the previous one, the one that happened on
22   December 6, 1989, were you prosecuted for that?
23   A.   Yes.
24   Q.   Do you remember what the result of that

Page 198

1    case was?
2    A.   Once again, my mother and all the other
3    mothers they got together, and we took a plea deal.
4    I believe it was, what, 30 days and a year,
5    something like that, I don't know.
6    Q.   So you pled guilty to that one, too,
7    right?
8    A.   Yes.
9    Q.   And that was another one that you didn't
10   commit but you pled guilty to?
11   A.   Yes.
12   Q.   And it's your testimony that your mother
13   and your aunt -- well, let me ask you this.  With
14   the criminal sexual assault case, did you tell them
15   that you didn't commit it?
16   A.   Yes, I did.
17   Q.   And was it your understanding that they
18   knew what the charge was that you were facing being
19   criminal sexual assault?
20   MR. AINSWORTH:  Object to foundation.
21   BY MR. GRILL:
22   Q.   Let me ask you this.  Did you ever tell
23   them that was the charge you were facing?
24   MR. AINSWORTH:  Objection, foundation.

Page 199

1    BY THE WITNESS:
2    A.   The police told them the charges when
3    they came down there to get me.
4    BY MR. GRILL:
5    Q.   All right.  And it's your testimony that
6    your mom and your aunt told you to plead guilty to
7    a charge for raping -- gang raping a girl in an
8    abandoned building at 1400 West 51st Street?
9    A.   First of all, I ain't rape nobody.
10   Q.   I understand that.  I'm saying they told
11   you to plead guilty to that?
12   A.   Yes.
13   Q.   The battery at the Libby Public School,
14   you didn't remember that one?
15   A.   I don't recall that.
16   Q.   The criminal damage to property at Show
17   Biz Pizza, do you remember being read your Miranda
18   Rights for that one?
19   A.   No.
20   Q.   Okay.  The police reports indicate that
21   you were read your Miranda Rights and taken to the
22   8th District Youth Office.  Is that not true or do
23   you not remember?
24   A.   I don't remember.

Page 200

1    Q.   Were you read your Miranda Rights when
2    you were arrested for the criminal sexual assault?
3    A.   I don't remember.
4    Q.   Were you read your Miranda Rights when
5    you were arrested for the zip gun?
6    A.   I don't remember.
7    Q.   Let's go to tab E.  So E is another
8    criminal damage to property, it happened on
9    February 11th, 1990, and it happened at 5033 South
10   Throop, and it has you for breaking street lights
11   with rocks.  Do you remember doing that or getting
12   arrested for that?
13   A.   I don't remember being arrested for it,
14   but it sounds like something I'd do when I was a
15   kid throw rocks up at the street lights.
16   Q.   Do you remember what happened with this
17   one, if you pled guilty to this one?
18   A.   I don't even know.  I don't even think I
19   went to court for this, though.
20   Q.   Why do you say that?
21   A.   Because I don't remember it.  I just
22   don't think I went to court for this.  I don't
23   know.
24   Q.   So let's go to tab F.  This is CCSAO



1  Subpoena Exhibit 669 through 6672. Do you remember
2  getting arrested this time with eight other people
3  including Ronnie Sloan again for sexually
4  assaulting I think her name Vanessa Brown? Do you
5  remember that?
6      MR. AINSWORTH: Object to the form of the
7  question, mischaracterizes the evidence.
8  BY THE WITNESS:
9      A.    I ain't never been arrested for no
10 Vanessa Brown.
11 BY MR. GRILL:
12     Q.    How about a Vera Moore or a Janie Moore?
13     A.    No.
14     Q.    Okay.
15     A.    I don't know why they got my name on
16 this.
17     Q.    If you go to the next page 6671 it lists
18 out eight or nine people that are in custody for
19 this criminal sexual assault.
20     MR. AINSWORTH: Objection, mischaracterizes
21 the evidence.
22 BY MR. GRILL:
23     Q.    It says in custody at the top left on
24 6671. Do you see that?

1      MR. AINSWORTH: But not for criminal sexual
2  assault.
3  BY THE WITNESS:
4      A.    They probably brought me down to the
5  station.
6  BY MR. GRILL:
7      Q.    6670, the first page top, very top of
8  it, criminal sexual assault.
9      MR. AINSWORTH: Look at what it says where it
10 says offender's 1 through 5 criminal sexual
11 assault; offender's 6 through 9, disorderly
12 conduct.
13 BY MR. GRILL:
14     Q.    The charge they arrested you for is
15 criminal sexual report.
16     A.    I never got charged for that.
17     Q.    Do you remember being arrested with
18 eight other people where some of them were charged
19 with criminal sexual assault?
20     A.    No, I don't remember this.
21     Q.    This is another one where you were with
22 Ronnie Sloan, so this is the second criminal sexual
23 assault --
24     A.    I wasn't charged with it.

1      Q.    Although you weren't charged with the
2  criminal sexual assault, you were with people that
3  were, and Ronnie Sloan is one of them again. Do
4  you remember this?
5      MR. AINSWORTH: Objection, foundation.
6  BY THE WITNESS:
7      A.    I don't remember this. I'll say I dont'
8  know.
9  BY MR. GRILL:
10     Q.    Is this one made up by the police, or
11 you don't know?
12     A.    I don't even know how my name got on
13 this report, so I'm going to say it was made up by
14 the police.
15     Q.    Okay. What basis --
16     A.    I don't remember it.
17     Q.    Did you ever -- you and Ronnie and it
18 looks like Shonte Frazier, do you know who that is?
19     A.    Who?
20     Q.    Shonte, S-h-o-n-t-e, Frazier,
21 F-r-a-z-i-e-r. Do you know a person by that name
22 that was a 15 year old?
23     A.    Probably by nickname because that ain't
24 ringing no bell to me.

1      Q.    What nickname do you think Shonte --
2      A.    I don't even know who that is.
3      Q.    What about Newman Washington?
4      A.    Newman sounds familiar.
5      Q.    Andrea Batsby, B-a-t-s-b-y?
6      A.    No.
7      Q.    Raymond Alexander?
8      A.    He sounds familiar.
9      Q.    Curtis Robinson?
10     A.    No.
11     Q.    Sam Brown?
12     A.    No.
13     Q.    Michael Brown?
14     A.    No.
15     Q.    All right. So do you ever remember
16 referring -- calling you and a group of your
17 friends referring to yourselves as the 51st Street
18 rapists, does that ever --
19     A.    No, I ain't never heard that.
20     Q.    Because this report says that the victim
21 said that that's what you guys called yourselves.
22 That doesn't ring a bell?
23     A.    One thing in life I ain't never called
24 myself no rapist.



Page 205

1    Q.    Did any of your friends ever call
2  themselves like a member of a group called the 51st
3  Street Rapists?
4    A.    The first time I heard that is when you
5  just said it.  I ain't never heard that.
6    Q.    All right.  Do you remember -- and you
7  have no recollection of being arrested for
8  disorderly conduct on March 4th, 1990?
9    A.    March -- is this the same one?
10   Q.    Yep.
11   A.    No.
12   Q.    This has your address as 1212 West 51st
13  Street.  So in March of 1990, do you think you were
14  still living at least in one of the buildings at
15  1212 51st Street?
16   A.    If it's on the arrest report, the police
17  said.  I don't remember.
18   Q.    If you were living in Milwaukee --
19   A.    No.
20   Q.    So you were probably living in Chicago
21  at this time, right?
22   A.    Right.
23   Q.    So let's go to number G, okay.
24   A.    G?

Page 206

1    Q.    Yes, which is the next one.  So this is
2  CCSAO Subpoena Exhibit 6673 to 6675.  So this is an
3  arrest at Libby School for exchanging gang signs
4  and threatening people.  Do you remember --
5    A.    No.
6    Q.    -- getting arrested for doing anything
7  like that?
8    A.    Uh-uh.
9    Q.    Okay.  Do you think this one is made up,
10  or you don't know?
11   A.    It might be made up, but I ain't going
12  to guess.
13   Q.    You don't know?
14   A.    I don't know.
15   Q.    All right.  Do you remember ever getting
16  in any trouble at Libby for exchanging gang signs
17  with anybody?
18   A.    No.
19   Q.    No.  All right.  Exhibit H, this is
20  CCSAO Subpoena Exhibit 6676 through 78.  This is
21  for criminal damage to property.  Here generally
22  you were accused or arrested for -- according to
23  the police report -- striking a fire hydrant with a
24  wrench and damaging it.  Do you remember doing

Page 207

1  anything like that in June of 1990?
2    A.    Nope.
3    Q.    Is this made up, or do you not know?
4    A.    I don't know.
5    Q.    This one also lists your address here
6  as -- well, on 6677, are you on that page?
7    A.    6677?
8    Q.    Yes.
9    A.    Yes.
10   Q.    So it says on the left under the
11  offender's name, it says Vashawn Jakes.  You went
12  by Vashawn?
13   A.    I ain't never went by Vashawn.
14   Q.    You went by Shawn, right?
15   A.    My name always been Shawn.
16   Q.    S-h-a-w-n?
17   A.    Yep.
18   Q.    And this lists at 1212 West 51st Street
19  first floor on this one, too.  Do you see that next
20  to the name Vashawn?
21   A.    Yes.
22   Q.    Did you know a Vashawn Jakes that lived
23  on the first floor of 1212 West 51st Street?
24   A.    No.

Page 208

1    Q.    It would seem to me that the first floor
2  of 1212 West 51st Street has to be the front house
3  because there is no bedrooms on the first floor of
4  the rear coach house of 1212, right?
5    MR. AINSWORTH:  Object to the form of the
6  question, compound.
7  BY MR. GRILL:
8    Q.    There are no bedrooms on the first floor
9  of the coach house, the cottage house at 1212,
10  right?
11   A.    No.
12   Q.    You already told me that, correct?
13   A.    Correct.
14   Q.    Okay.  So did you know a Vashawn that
15  lived on the first floor of 1212 West 51st Street
16  in the front house in June of 1990?
17   A.    Nope.
18   Q.    And you would agree, though, that you
19  were still living in Chicago in June of 1990?
20   A.    I don't know.
21   Q.    Well, let's look at I then, the next
22  one.  So this is another criminal damage to
23  property on July 9, 1990, but this one the police
24  came because -- at least the way I read this -- was



Page 209

1  that you were running around naked outside and your
2  mom was throwing a beer bottle at you and then you
3  threw a rock threw the rear window.  Do you
4  remember anything like that?
5      A.   Man, I don't remember nothing like this,
6  man.  It sounds like some made up stuff.
7      Q.   Well, do you ever getting arrested for
8  throwing a rock through your mom's window?
9      A.   No.
10     Q.   Is that something that never happened?
11     A.   I can't say that because I don't know.
12     Q.   You don't know, okay.  This one says you
13 were read your Miranda Rights and taken to the 9th
14 District Youth Office.  Does that help refresh your
15 memory about this happening?
16     A.   Not at all.
17     Q.   Okay.  The address here has you at 1212
18 West 51st Street.  Do you think you were living in
19 Chicago on July 9, 1990?
20     A.   I'm not for sure.  I don't know.
21     Q.   You think it's likely?
22     A.   Huh.
23     Q.   Do you think it's likely?
24     MR. AINSWORTH:  Object to the form of the

Page 210

1  question.
2  BY THE WITNESS:
3      A.   I don't know.
4  BY MR. GRILL:
5      Q.   Do you have any tattoos on your hands?
6      A.   Yes.
7      Q.   Where?
8      A.   Right here, right here, and right here.
9      Q.   What are they of?
10     A.   It's an A for my name, an R for my
11 momma's name, and love.  It's all initials.  It's
12 an A, R, L.
13     Q.   A, R, L, got it.  When did you get those
14 tattoos?
15     A.   I don't know, man, shit.  I was 12 or
16 13.  I don't know.
17     Q.   So if you'll notice here on 6680, if you
18 start at your name and then just kind of follow the
19 line to the right, you'll end up on the far right
20 side to a box that says marks, scars, et cetera.
21 Underneath it, it says tattoos - hand.  Do you see
22 that?
23     A.   Yes.
24     Q.   Okay.  And you have tattoos on your

Page 211

1  hands, or you had them you said when you were 12 at
2  the time of --
3      A.   I said I don't know, probably 12 or 13.
4      Q.   Right.  So in 1990, you would have had
5  those tattoos on your hands because you would have
6  been like 14?
7      A.   I don't know, man.
8      Q.   All right.  Do you remember your mother
9  ever throwing beer bottles at you?
10     A.   Nope.
11     Q.   So that's something that's never
12 happened in your life?
13     A.   Nope.
14     Q.   Is that something you think you'd
15 remember if it happened?
16     A.   I don't remember that.
17     Q.   I mean to me that sounds like kind of a
18 traumatic and awful thing that would have happened
19 to a kid, and I'm wondering again like do you have
20 any memory of that?
21     A.   I don't remember.  That's my answer.
22     Q.   Let's go to J.  So this is CCSAO
23 Subpoena Exhibit 66882 to 6687.  So this one is an
24 attempted burglary.  Again you were arrested with

Page 212

1  three other people including Ronnie Sloan, and you
2  guys were accused on November 24th of 1990 of
3  breaking a rear window of Ruben Robles' home and
4  trying to enter the house.  Do you remember getting
5  arrested for this?
6      A.   No.
7      Q.   It didn't happen, or, no, you don't
8  remember?
9      A.   I don't remember nothing about this.
10     Q.   Well, you're chuckling about it?
11     A.   I just don't remember.  It's funny
12 because you keep on saying Ronnie Sloan.
13     Q.   Yeah, he pops up here quite a bit, and
14 you keep getting arrested with him, at least
15 according to the police, but you're not remembering
16 this other than you do remember the December 1989
17 criminal sexual assault when you got arrested with
18 him for that one?  You just said that the victim
19 made it up, that's all.  You remember that, though,
20 right?
21     A.   Right.
22     Q.   So do you remember in November of
23 1990 --
24     A.   November of 1990.



Page 213

1    Q.    Yes.

2    A.    Is this on this page?

3    Q.    Yes.

4    A.    The burglary I don't remember this.

5    Q.    So do you think the cops made this one
6  up, or you just don't recall?

7    A.    I don't remember it.

8    Q.    Okay.  This one, if you go on the page
9  that's 6684, I think you're on it, at the top, it
10  says subjects arrested.  It has your name and
11  you're 14 years old and your home address is 1212
12  51st Street.  So were you still living in Chicago
13  on November 24th, 1990?

14    A.    Man, I don't know.  If it say, I don't
15  know.

16    Q.    If it says it, you probably were, right?

17    A.    Right.

18    Q.    All right.  Let's go to K.  So this is
19  Subpoena Exhibit 6687 through 6689.  This is an
20  arrest for battery?

21    A.    Did you say what, K?

22    Q.    Yes, tab K, tab K.  There should be a K.
23  This is February 28, 1991.  So it has the victim
24  name is Willie Carter.  Do you remember getting

Page 214

1  arrested for battering Willie Carter who was about
2  52 years old?

3    A.    No.

4    Q.    At least in 1991 he was.  Okay.  Do you
5  know a guy named Ronald Milon?

6    A.    No.

7    Q.    So it has a name here for the arrestees
8  as a Berry -- or Veshun Berry.  Did you ever use
9  that nickname?

10    A.    No.

11    Q.    And it has a home address of 1212 West
12  51st Street.  Did you know a Veshun Berry?

13    A.    No.

14    Q.    But you used the name Shawn, we already
15  talked about that, right?

16    A.    Right.

17    Q.    Here it has the age of 15, that's Veshun
18  Berry's age according to this police report.  You
19  would have been 15 in February 28, 1991, right?

20    MR. AINSWORTH:  Objection, no.

21  BY THE WITNESS:

22    A.    In '91?

23  BY MR. GRILL:

24    Q.    On February 28, 1991.

Page 215

1    MR. AINSWORTH:  He would have been 14.

2  BY MR. GRILL:

3    Q.    You didn't know nobody then that lived
4  at 1212 West 51st Street named Veshun Berry, right?

5    A.    No.  My name ain't even on this report.
6  I don't even see my name on here.

7    Q.    Okay.  And do you remember anybody
8  positively identifying you as the person who
9  battered Willie Carter in February of '91?

10    A.    I have no idea what they talking about.
11  It wasn't me.

12    Q.    Okay.  So I think right here is a good
13  time to break for lunch, so at least the Court
14  Reporter and Videographer can eat, and then we will
15  resume.  So how much -- do you want to eat?

16    THE VIDEOGRAPHER:  Going off the record, the
17  time is 2:13 p.m.

18        (WHEREUPON, a short break was had.)

19    THE VIDEOGRAPHER:  We're back on the record,
20  the time is 3:01 p.m.

21  BY MR. GRILL:

22    Q.    All right.  Mr. Jakes, did you get
23  something to eat over lunch?

24    A.    Yeah.

Page 216

1    Q.    Ready to keep going here?

2    A.    Let's go.

3    Q.    Okay.  When you -- I want to circle back
4  briefly to that December 6, 1989 criminal sexual
5  assault.

6    A.    December 6?

7    Q.    Yes, 1989, that one that you pled guilty
8  to.  If you want to look, it's at tab C.  I wasn't
9  going to ask you specifically about the report.

10        So this one you pled guilty to, but you
11  say that the victim was the one that was lying.  Do
12  you recall whether, when you were arrested for that
13  particular crime, that the police interviewed you
14  or interrogated you in regards to what the victim
15  was saying occurred?

16    A.    I don't remember.

17    Q.    You don't have any recollection of being
18  in a police station or the police asking you
19  anything about your version of what occurred
20  was?

21    A.    I don't remember.

22    Q.    No?  You got to speak up.

23    A.    I said I don't remember.

24    Q.    On any of these arrests, at least the



1  ones that you can remember that we went through, do
2  you have any recollection of the police
3  interrogating you for any of these crimes that we
4  talked about?
5      A.   That we talked about?
6      Q.   Yes, the ones that you can remember.  If
7  you want, it would be criminal damage to property
8  at Show Biz Pizza, the battery at Libby Public
9  School, the criminal sexual assault, the UUW, those
10  ones you said you pled guilty to.  The rest you
11  said you didn't recall.  So at least for those
12  ones, those four, did --
13      A.   Which one in particular?
14      Q.   Any of them.
15      A.   Start with the first one.
16      Q.   Okay, so criminal damage to property at
17  Show Biz.  Do you have a recollection of the police
18  interrogating you?
19      A.   Yes.  Wait, I don't have a recollection
20  of them interrogating me, but I remember it.
21      Q.   Yeah, no, so my question is specifically
22  only about now whether you remember the police
23  interrogating you about those crimes.
24      A.   Okay.

1      Q.   So the criminal damage to property at
2  Show Biz, do you remember the police interrogating
3  you?
4      A.   No.
5      Q.   Okay.  What about the battery with the
6  plastic milk crate that you threw at, I guess,
7  somebody at Libby School, do you remember the
8  police interrogating you about that one?
9      A.   No.
10      Q.   Criminal sexual assault, I think
11  you -- that occurred on December 6, 1989, you don't
12  remember the police interrogating you about that
13  either?
14      A.   No.
15      Q.   And the UUW, the zip gun, do you
16  remember the police interrogating you about that?
17      A.   No.
18      Q.   Prior to your arrest in this case, do
19  you have any recollection of the police ever
20  interrogating you beforehand?
21      A.   Not that I can remember.
22      Q.   All right.  Did you have any experience
23  yourself -- let me strike that.  Let me rephrase.
24          In 1991, in September 1991 before you

1  got arrested for this murder for Mr. Garcia's
2  homicide, did you have a belief that the
3  police -- a personal belief that the police would
4  make things up about people, make things up, make
5  crimes up to charge people with?
6      A.   Yes.
7      Q.   What was that belief based on?
8      A.   What I just used to see in the
9  neighborhood.
10      Q.   What did you see in the neighborhood?
11      A.   Police was framing people.
12      Q.   That the police were framing people?
13      A.   Yes.
14      Q.   What did you see the police do in your
15  neighborhood to frame people?
16      A.   They was putting drugs on people, guns.
17      Q.   This was something you saw?
18      A.   Yes.
19      Q.   With your own eyes?  Yes?
20      A.   Yes.
21      Q.   Do you remember the names of some people
22  that you saw the police plant drugs on?
23      A.   Man, that was so long ago.  It was so
24  long ago, man.

1      Q.   Were some of these people your friends?
2      A.   I wouldn't say --
3      Q.   Friends in the neighborhood at least?
4      A.   Yeah, friends in the neighborhood.
5      Q.   People you knew?
6      A.   Right.
7      Q.   Okay.  And you saw the police plant
8  drugs or plant guns on these people?
9      A.   Yes.
10      Q.   In order to frame them for crimes they
11  didn't commit?
12      A.   Yes.
13      Q.   Did you believe that the police -- and
14  this is prior to your arrest for the Garcia
15  homicide.  Did you believe that the police would
16  make promises to people in order to get them to
17  falsely confess to crimes that they didn't commit?
18      MR. AINSWORTH:  Object to the form of the
19  question.
20  BY THE WITNESS:
21      A.   You say -- repeat that one more time.
22  BY MR. GRILL:
23      Q.   Did you believe, when you think back to
24  1991, did you believe before your arrest in the



Page 221

1 Garcia homicide case that the police would make
2 promises to people in order to make them falsely
3 confess to crimes?
4     A.   Yes.
5     Q.   Okay.  Why did you believe that?
6     A.   Well, I would say I knew of a couple of
7 people, you know, that the police was holding them,
8 and, you know, we had a few conversations with
9 them, and that was about it.
10    Q.   This was something you knew before your
11 arrest for Mr. Garcia's homicide?
12    A.   Yes.
13    Q.   Tell me as much as you can remember
14 about what those people told you.
15    A.   Well, I can't tell you what they told
16 me, but I can tell you what I witnessed.
17    Q.   Okay.
18    A.   I remember one incident that the police
19 was detaining one of our friends, and prior to him
20 being detained I remember somebody -- I ain't going
21 to say no names -- somebody stole the police
22 scanner out of the car, and the police told, if we
23 give them the scanner back, they'll let our friend
24 go.  We gave him the scanner, they let him go.

Page 222

1     Q.   So they did what they said they were
2 going to do?
3     A.   Yes.
4     Q.   Right.  So my question was do you
5 remember thinking, before your arrest for the
6 Garcia homicide, that the police would lie, make
7 promises to people in order to get them to confess
8 to a crime they didn't actually do?
9     MR. AINSWORTH:  Object to the form of the
10 question, foundation.
11 BY THE WITNESS:
12    A.   I believe that.
13 BY MR. GRILL:
14    Q.   Why do you believe that?
15    A.   Because just word on the street.
16    Q.   What word on the street did you hear?
17    A.   That police was framing people.
18    Q.   So when you were arrested for Mr.
19 Garcia's homicide, would it be fair to say that
20 you -- at that point, you didn't trust the police
21 when you were in that police station, right?
22    A.   I ain't never trusted the police.
23    Q.   And, in fact, according to you, they had
24 already framed you for a drug charge --

Page 223

1     A.   Right.
2     Q.   -- earlier that day, correct?
3     A.   Right, correct.
4     Q.   And you knew when you were in the police
5 station being interrogated that, because of your
6 experiences that you've just described and what you
7 knew happening to other people in your
8 neighborhood, that the police may lie to you in
9 order to get you to say something that wasn't true,
10 right?
11    MR. AINSWORTH:  Object to the form of the
12 question.
13 BY THE WITNESS:
14    A.   I'm not going to necessarily say that,
15 but I guess.
16 BY MR. GRILL:
17    Q.   How would you put it?
18    MR. AINSWORTH:  Object to the form of the
19 question.  Don't answer the question.
20    MR. GRILL:  On what basis, Counsel?
21    MR. AINSWORTH:  It's not a question, how would
22 you put it.  How would you put what?
23 BY MR. GRILL:
24    Q.   You're saying you guess.  You're saying

Page 224

1 I guess -- if you say so, I guess.
2     MR. AINSWORTH:  Objection, that's not what he
3 said.
4     MR. GRILL:  Read my question and then read his
5 answer back.
6        (WHEREUPON, the record was read
7         as requested.)
8 BY MR. GRILL:
9     Q.   So you said that is not necessarily what
10 I would say but I guess, so how would you say it?
11    A.   I guess.
12    Q.   So when you were in the police station
13 being interrogated for the Garcia homicide, you
14 believed that it was possible that the police would
15 say something to you that was not true in order to
16 get you to confess to killing him, right?
17    MR. AINSWORTH:  Object to the form of the
18 question.
19 BY THE WITNESS:
20    A.   I didn't believe nothing.
21 BY MR. GRILL:
22    Q.   What do you mean you didn't believe
23 nothing?
24    A.   That's what I said, I believe nothing.



Page 225

1  I'd be assuming. I don't know what the police was
2  going to say to me.
3     Q.   You didn't trust the police, right?
4     MR. AINSWORTH: Object to the form of the
5  question, foundation.
6  BY MR. GRILL:
7     Q.   Let me ask you this. When you were
8  sitting there being interrogated for Mr. Garcia's
9  murder, did you trust the police when you were in
10 that room?
11    MR. AINSWORTH: Object to the form of the
12 question and foundation.
13 BY MR. GRILL:
14    Q.   Did you trust the police?
15    A.   Me?
16    Q.   Yes. When you were being interrogated
17 for Mr. Garcia -- being asked questions --
18    A.   I ain't never trusted the police. I
19 answered that already.
20    Q.   Okay. And you didn't trust them on
21 September 16th, 1991 either, right?
22    A.   I don't trust the police now.
23    Q.   Okay. Do you know a person by the name
24 of Jerome Craft? Does that name ring a bell?

Page 226

1     A.   Jerome Craft?
2     Q.   Jerome, J-e-r-o-m-e, Craft, C-r-a-f-t,
3  do you know who that is?
4     A.   Ain't ringing no bells.
5     Q.   At all?
6     A.   Unless you got a nickname or something.
7  Real name I don't know who that is.
8     Q.   You never heard that name before right
9  now?
10    A.   I'm not for sure. I'm just now hearing
11 that name. Jerome Craft?
12    Q.   Do you remember if the police made you
13 any promises when they were interrogating you?
14    MR. AINSWORTH: Objection, foundation.
15 BY MR. GRILL:
16    Q.   When you were being interrogated for the
17 Garcia homicide, do you remember the police making
18 any promises to you?
19    A.   Do I remember them making any promises
20 to me?
21    Q.   Yes.
22    A.   I can't be for sure. All I wanted to do
23 was get up out of there, so you know.
24    Q.   Do you remember if they promised to let

Page 227

1  you go home if you just confessed or something like
2  that happening?
3     A.   It was sort of like that, you know. I
4  was just trying to get up out of there.
5     Q.   Right. Well, do you remember if they
6  made a promise like that to you?
7     A.   I believe he said that if I cooperate
8  with them and all this other stuff that I could
9  possibly -- my Auntie could come get me, I could
10 probably go home tonight. That's about it.
11    Q.   Okay. Did you believe them?
12    MR. AINSWORTH: Objection to the form of the
13 question.
14 BY THE WITNESS:
15    A.   I didn't know what to believe at the
16 time.
17 BY MR. GRILL:
18    Q.   Well, when the police told you that they
19 wanted you to cooperate and then you could go home,
20 at least that's what I heard you to be saying, did
21 you believe them when they told you that?
22    A.   I just answered that question, didn't I?
23    Q.   Well, I'm asking a slightly different
24 question. Did you believe them when they told you

Page 228

1  that?
2     A.   Say that again.
3     Q.   When they told you that if you cooperate
4  you could go home, did you believe the police when
5  they told you that?
6     A.   Somewhat.
7     Q.   Why did you believe them somewhat?
8     A.   Because at that time I was ready to go
9  home, I was ready to get up out of there.
10    Q.   Okay. So in light of your I guess it
11 sounds like lifelong distrust of the police, what
12 was it about what was going on that night during
13 September 16th and September 17th, 1991 when you
14 were being interrogated about this murder that made
15 you somewhat believe that the police were being
16 honest with you if you cooperated that you could go
17 home?
18    A.   I don't know.
19    MR. AINSWORTH: Objection, form, compound.
20 BY MR. GRILL:
21    Q.   You don't know?
22    A.   I don't know.
23    Q.   Okay. Have you thought about -- you
24 already told me today that this whole series of



Page 229

1  events, your interrogation in particular at Area
2  3 that night, was a life-changing moment.  So have
3  you given any thought between September 16th, 1991
4  and today about why it is that you might have
5  trusted the police somewhat when they made that
6  promise to you?
7      MR. AINSWORTH:  Objection to the form of the
8  of question, compound.
9  BY THE WITNESS:
10     A.  I don't know.
11  BY MR. GRILL:
12     Q.  Okay.  During your criminal trial, did
13  you participate in your own defense?
14     MR. AINSWORTH:  Objection to the form of the
15  question.
16  BY THE WITNESS:
17     A.  No.
18  BY MR. GRILL:
19     Q.  Do you remember the name of your
20  attorney from your criminal trial?
21     A.  Do I remember the name?
22     Q.  Yes.
23     A.  I know it was a lady and a man.  If you
24  say the name, I'd be able to tell you.

Page 230

1      Q.  Frank Medea, does that ring a bell?
2      A.  Yes.
3      Q.  Was that him?
4      A.  I think he was my first public defender.
5      Q.  Do you remember the name of the second
6  one?  Do you remember the name of any other ones?
7      A.  It was a lady, Bowen, Bowes or
8  something.
9      Q.  Okay.  Do you remember -- you don't have
10  to tell me necessarily what was said, but did you
11  talk to your lawyers about what happened?
12     MR. AINSWORTH:  Objection.  Don't answer the
13  question, attorney/client privilege.
14  BY MR. GRILL:
15     Q.  Are you going to take your lawyer's
16  advice?
17     A.  Yes.
18     Q.  Did you provide any ideas to your
19  attorneys about how to defend against the criminal
20  charges?
21     MR. AINSWORTH:  Don't answer the question,
22  attorney/client privilege.
23  BY MR. GRILL:
24     Q.  Okay.  Do you think your attorney that

Page 231

1  represented you during your criminal trial was
2  effective in representing you?
3      MR. AINSWORTH:  Objection to the form of the
4  question and foundation.  I don't know who you're
5  talking about.
6  BY MR. GRILL:
7      Q.  Do you think the attorney that
8  represented you at your criminal trial was
9  effective in representing you?
10     MR. AINSWORTH:  Same objections.
11  BY MR. GRILL:
12     Q.  You can answer the question.
13     A.  If my attorney tell me I can't answer, I
14  ain't answering.
15     Q.  He didn't tell you that you can't
16  answer.  He's just objecting to the question.
17     A.  What was the question again?
18     Q.  Do you think that the attorney that
19  represented you at your criminal trial, Frank Medea
20  in particular, was effective in representing you?
21     MR. AINSWORTH:  Objection.  He didn't
22  represent him in his criminal trial, so object to
23  the form of the question, mischaracterizes the
24  evidence.

Page 232

1  BY MR. GRILL:
2      Q.  Do you think Frank Medea was effective
3  at representing you?
4      A.  Effective how?
5      Q.  I'm asking you sitting here today, do
6  you think that he did a good job or a bad job
7  representing you?
8      A.  Bad job.
9      Q.  Okay.  Let's go to Exhibit 6 in the
10  binder, okay?
11     A.  Exhibit 6?
12     Q.  So tab 6, okay.  Do you see that?
13     A.  Yes.
14     Q.  Do you remember signing this affidavit
15  in 2004, February 2nd?
16     A.  Yes.
17     Q.  Okay.  Have you seen this affidavit as
18  part of the documents you reviewed to prepare for
19  today's deposition?
20     A.  I believe so.
21     Q.  Okay.  When did you last see this
22  document?
23     A.  I think I might have seen it yesterday.
24     Q.  Okay.  If you go down to the bottom



Page 233

1  there, you can see it's like signed, and it says
2  Anthony Jakes, February 2, 2004.  Is that your
3  signature?
4      A.   Yes.
5      Q.   Like you actually physically personally
6  signed it, right?
7      A.   Yes.
8      Q.   Okay.  Did you review this affidavit
9  before you signed it?
10     A.   I might have skimmed through it.  I
11  don't remember.
12     Q.   Did you understand that -- do you
13  understand what an affidavit is?
14     A.   Yes.
15     Q.   What is it?
16     A.   It's a sworn affidavit.
17     Q.   What does it mean to be sworn?
18     A.   Like she just swore me in.
19     Q.   Right, like you got to make sure that
20  it's the truth, right?
21     A.   Yes.
22     Q.   By signing it, you're representing that
23  everything in here is the truth, right?
24     A.   Yes.

Page 234

1      Q.   Like 100 percent, no lies whatsoever,
2  right?
3      A.   I guess.
4      Q.   Well, yes or no?
5      A.   Yes.
6      Q.   Okay.  And when you signed this
7  affidavit, you knew -- you were swearing that
8  everything in here was the truth, right?
9      A.   Yes.
10     Q.   Okay.  So I want to ask you a few
11  questions then about this, okay.  First of all, do
12  you know what the purpose -- why it was that you
13  were signing this affidavit, like what it was going
14  to be used for?
15     A.   I can't remember.
16     Q.   Okay.  And generally speaking since you
17  reviewed this affidavit before you came in here,
18  the substance of this affidavit is listing out some
19  of the reasons, I gather, that you thought Frank
20  Medea was ineffective in representing you according
21  to paragraph 2 at trial, right?
22     MR. AINSWORTH:  Objection to the form of the
23  question.  Objection, mischaracterizes the
24  evidence.

Page 235

1  BY MR. GRILL:
2      Q.   Right?
3      A.   Yes.
4      Q.   Yes, okay.  And in line No. 2, it says
5  that Assistant Public Defender Frank Medea was the
6  attorney who represented me at trial.  Did
7  Mr. Medea you at trial?
8      A.   I don't remember who represented me at
9  trial.
10     Q.   Okay.  Well, is No. 2 -- do you think
11  it's wrong, like that's not true?
12     A.   Again, I don't know who represented me
13  at trial.  If you call some names out, I might
14  remember the names, but I don't necessarily
15  remember who represented me.
16     Q.   So is your answer I don't know?
17     A.   I don't know then.
18     Q.   Okay.  So why did you want to tell
19  people in 2004 that Mr. Medea was ineffective in
20  representing you at trial?
21     A.   You said why did I tell people?
22     Q.   Yeah, why was that important to you to
23  sign an affidavit explaining the reasons why
24  Mr. Medea in your mind was ineffective at

Page 236

1  representing you at trial?
2      MR. AINSWORTH:  Objection to the form of the
3  question.
4  BY THE WITNESS:
5      A.   Frankly, I don't know.  You got to ask
6  the person who wrote the affidavit.
7  BY MR. GRILL:
8      Q.   Well, who wrote it for you?
9      A.   A jailhouse clerk.
10     Q.   And what did you discuss with that
11  clerk?  Why did you have this clerk write this
12  affidavit for you?
13     MR. AINSWORTH:  Hold on, object to the form of
14  the question.
15  BY MR. GRILL:
16     Q.   Let me back up.  Did you ask this clerk
17  to write this affidavit for you?
18     A.   No.
19     Q.   Okay.  Who is this jailhouse clerk that
20  put this affidavit together for you?
21     A.   I don't know.
22     Q.   Do you know why this jailhouse clerk
23  asked you to fill -- why this jailhouse clerk
24  drafted an affidavit for you to sign that you did



Page 237

1  sign about Mr. Medea being ineffective at
2  representing you at trial?
3      A.   You have to ask him.  I gave him my
4  legal work and this is what he drew up.
5      Q.   Okay.  You were in jail in 2004 as you
6  just indicated, right?
7      A.   Yes.
8      Q.   Did you think that this affidavit was
9  going to help you get out of jail?
10     A.   Yes.
11     Q.   Why did you think it was going to help
12  you get out of jail?
13     A.   Again, because it's the truth.
14     Q.   That Mr. Medea was ineffective?
15     A.   He was ineffective, but I don't know if
16  he was my trial lawyer.
17     Q.   Okay.  Well, he represented you for part
18  of your -- at least part of the criminal case,
19  right?
20     A.   Right.
21     Q.   So did you talk to Mr. Medea about what
22  happened at the police station?
23     A.   I don't remember.
24     Q.   Did you tell Mr. Medea what you say the

Page 238

1  police did to you to get you to confess?
2      MR. AINSWORTH:  Objection, don't answer the
3  question.
4      MR. GRILL:  On what basis?
5      MR. AINSWORTH:  Attorney/client privilege.
6      MR. GRILL:  It's a waiver.
7      MR. AINSWORTH:  It's not a waiver.
8      MR. GRILL:  Ineffective claims waive
9  privilege.
10     MR. AINSWORTH:  No, that's not true.
11     MR. GRILL:  Yes, they do.  Okay, that's fine.
12  If you're asserting it, that's fine.  I'm just
13  making the record, okay?
14     MR. AINSWORTH:  Fine.
15     MR. GRILL:  Is it your position that, because
16  he's saying that Mr. Medea was ineffective in
17  signing the affidavit, that that does not
18  constitute a waiver; is that your position?
19     MR. AINSWORTH:  There has been no waiver of
20  attorney/client privilege.
21     MR. GRILL:  Why do you think there has been no
22  waiver?
23     MR. AINSWORTH:  Because he is asserting the
24  privilege.  It has not been waived.

Page 239

1      MR. GRILL:  No, no, you can't assert a
2  privilege if you don't have one.  Your question is
3  do you believe that there is -- that his
4  ineffective assistance claim -- ineffective
5  assistance of counsel claim that's set forth in
6  Exhibit 6 does not constitute a waiver of the
7  attorney/client privilege; is that your position?
8      MR. AINSWORTH:  What ineffective assistance of
9  counsel claim are you referring to?
10     MR. GRILL:  He's already testified and the
11  document speaks for itself, but the point of this
12  is to explain the reasons why Mr. Medea was
13  ineffective at representing him at trial.  My
14  position is that constitutes a waiver of the
15  attorney/client privilege to the subject matter
16  that's contained -- at least to the subject matter
17  that's contained in this affidavit.
18         That's my position, you make yours, and
19  then we'll go from there.
20     MR. AINSWORTH:  So you're pointing me to
21  Exhibit 6.  Exhibit 6 is an affidavit, and it's not
22  a claim, it's not a post-conviction petition, it's
23  not a -- and even if there was, there was no
24  hearing on it, he didn't testify to it.  There has

Page 240

1  been no waiver of the attorney/client privilege and
2  we're standing on the privilege.
3      MR. GRILL:  All right.  So it's your position
4  that even though he is claiming in this affidavit
5  that Mr. Medea -- that he's using to get his
6  conviction reversed where he's claiming that
7  Mr. Medea did a bad job in representing him, an
8  ineffective job in representing him at trial, and
9  I'm not allowed to inquire about whether that is
10  indeed the case; is that your position?
11     MR. AINSWORTH:  Well, first, you
12  mischaracterized it.  This is not -- this was not
13  used to pursue an ineffective assistance of counsel
14  claim.
15     MR. GRILL:  I'm saying he is arguing that
16  Mr. Medea was ineffective, so is it your position
17  I'm not allowed to inquire about why it is that he
18  thinks Mr. Medea was ineffective.
19     MR. AINSWORTH:  Arguing with who?
20     MR. GRILL:  Inquire of this witness.
21     MR. AINSWORTH:  No, you said that Mr. Jakes
22  was arguing that he was ineffective.  Who was he
23  arguing with?
24     MR. GRILL:  It's set forth, Russell, in this



Page 241

1 affidavit that he said was used to help him get out
2 of jail. So he's explaining in this affidavit --
3      MR. AINSWORTH: He didn't say it was used to
4 help him get out of jail. That's not the testimony
5 here today. It wasn't used to help him get out of
6 jail.
7      MR. GRILL: He said he filled it out and
8 signed it because he thought it was going to help
9 him get out of jail.
10      MR. AINSWORTH: Do you see the distinction
11 there? Like if you keep mischaracterizing what the
12 testimony is, I'm going to keep calling you on it
13 each and every time.
14      MR. GRILL: I don't think I am, but that's
15 fine. I think that I've made myself clear about
16 that I think there is a waiver, certainly under
17 Patrick vs. Chicago, which is 154 F.Supp 3D 705.
18 I'm going to lay my record, and if we have to bring
19 the witness back to talk about this, we'll do it,
20 okay? So you can -- I'm going to ask the
21 questions, and if you're going to direct him not to
22 answer, we'll do that, okay?
23      MR. AINSWORTH: I did, and I know Patrick, I
24 know the case, and there has been no waiver.

Page 242

1      MR. GRILL: Okay. I disagree, but that's
2 fine. I'm going to make my record, you make your
3 objections as you want, and we're going to move on
4 from there, okay? That's how it goes. We don't
5 have to agree. We don't have to agree on it.
6      MR. AINSWORTH: Right. I'm not asking you to
7 agree. I'm just saying that, based on what you
8 presented here today, Exhibit 6 being the affidavit
9 that was apparently written by somebody who
10 referred to Denise Harris as Dennis Harris, you
11 know, obviously reading the trial transcripts, you
12 know, I mean like -- okay, if that's your record.
13      Like is there anything else that you
14 believe entitles you to a waiver apart from what
15 you've said?
16      MR. GRILL: I'm not really following your
17 question. But what I want to do is I'm going to
18 ask this witness the questions I want to ask. I
19 believe there is a waiver. And if you want to
20 assert privilege or direct him not to answer, you
21 can. So I'm not going to waste anymore time going
22 back and forth between us here. We can hash this
23 out at another time, fair enough?
24      MR. AINSWORTH: Of course, but I already made

Page 243

1 my objection, then you wanted me to state the basis
2 for -- you know, you wanted to engage in this back
3 and forth. So just so we're clear, this back and
4 forth --
5      MR. GRILL: I think we both wanted to engage
6 in the back and forth because we're both engaging
7 each other here. Let's just move on, okay? I'm
8 going to ask the questions and you can make
9 whatever objections you want to make.
10      MR. AINSWORTH: Sure, you invited me to, and
11 so, please, by all means go forward, but don't
12 suggest that I was either wasting time or trying to
13 inject anything into this, but please go ahead.
14 BY MR. GRILL:
15      Q.   All right, here we go. So do you have
16 any understanding as to why this jailhouse clerk,
17 as you've describe it, was drafting this -- or
18 drafted this affidavit for you?
19      A.   He was trying to assist me in gaining my
20 freedom.
21      Q.   Did you have a lawyer at this time?
22      A.   If you want to call one of these public
23 defenders my lawyer, I guess.
24      Q.   Okay. And those public defenders would

Page 244

1 include Frank Medea?
2      A.   Yes.
3      MR. AINSWORTH: Objection to foundation and
4 the form.
5 BY MR. GRILL:
6      Q.   So what I'm specifically asking you,
7 though, is in 2004 when you signed this affidavit,
8 did you have a lawyer at that point?
9      A.   I don't know.
10      Q.   Do you think you did?
11      A.   I had a public defender somewhere
12 around. I don't know.
13      Q.   Do you recall around this time being in
14 communication with any lawyer on the outside of
15 your prison that you were talking with to help you,
16 as you put it earlier, get out of jail?
17      A.   I can't be for sure. I don't know.
18      Q.   Did you talk to -- how did the clerk
19 know -- well, let me ask you this. Did you tell
20 the clerk the information that was in this
21 affidavit?
22      A.   I gave the clerk my transcripts, and he
23 did what he did.
24      Q.   What transcripts did you give the clerk?



Page 245

1    A.    My trial transcripts.

2    Q.    Did you have any conversations with this

3  clerk about any of the information that's contained

4  in this affidavit, if you know?

5    A.    I can't remember.

6    Q.    Is it possible that you did?

7    MR. AINSWORTH:  Object to the form of the

8  question.

9  BY THE WITNESS:

10    A.    I'd be assuming then.

11    MR. AINSWORTH:  Object to the form of the

12  question, calls for speculation, and give it a

13  pause before you answer.

14  BY MR. GRILL:

15    Q.    All right.  Did you review this

16  affidavit line by line before you signed it to make

17  sure that it was accurate?

18    A.    No.

19    Q.    Why did you sign it then if you knew

20  that this was sworn?

21    A.    Because I took it upon myself to trust

22  what he's doing.

23    Q.    Well, did you know this person?

24    A.    He's a law library clerk.

Page 246

1    Q.    Were you familiar with this clerk's

2  work?

3    A.    A few people around the jail recommended

4  him.

5    Q.    So you just trusted him?

6    A.    Basically.

7    Q.    So they could be total just lies and

8  stuff made up in here but you didn't want to know?

9    MR. AINSWORTH:  Object to the form of the

10  question.

11  BY THE WITNESS:

12    A.    Could be, could not be.  I don't know.

13  BY MR. GRILL:

14    Q.    How did -- so in paragraph 3, let's look

15  at that one, it says that in the course of trial

16  preparation, Frank Medea never visited the location

17  where the crime was alleged to have occurred, nor

18  did he photograph the view looking into the

19  sandwich shop at 1206 West 51st Street, Chicago.

20        Do you know how the clerk or what pieces

21  of information that you gave the clerk would have

22  caused the clerk to write that?

23    MR. AINSWORTH:  Objection, foundation and to

24  the form of the question.  Go ahead.

Page 247

1  BY THE WITNESS:

2    A.    I believe in talking I might have told

3  him that he never viewed the crime scene.  I don't

4  know if it was in the trial transcripts that I gave

5  him and all that because I rarely seen him.

6  BY MR. GRILL:

7    Q.    So you believe you told the clerk this

8  information; is that what you're saying?

9    A.    I believe so.  I can't be for sure.  He

10  might read it in the transcripts.

11    Q.    All right.  What about the next

12  sentence, did you also tell the clerk -- it goes

13  on, "through a side window which Gus Robinson

14  testified that he and I viewed a white man," did

15  you tell the clerk that?

16    A.    He probably got that out of the

17  transcripts.  I don't know.

18    Q.    Do you think Gus Robinson said white man

19  in the transcripts?

20    A.    I don't know.

21    Q.    It goes on to say that side window view

22  would have been impossible from that location as

23  there was a newsstand located in front of the side

24  window that prevented an interior view of the

Page 248

1  counter area of the sandwich shop.  Did you tell

2  him that?

3    A.    I can't remember.

4    Q.    Do you remember there being anything in

5  the transcripts that said that it was impossible to

6  see inside?

7    A.    I can't remember.

8    Q.    Do you remember if like Frank Medea

9  testified at your criminal trial?

10    A.    Do I remember if he testified?

11    Q.    Yeah, did he testify?

12    A.    I don't remember.  I don't know.

13    Q.    I'm going to represent to you that he

14  did not, okay?  Would you accept my representation?

15    A.    Say that again.

16    Q.    He did not testify at any part of your

17  criminal trial, okay?

18    A.    Okay.

19    Q.    So where, if you know, did the clerk get

20  that the side window view would have been

21  impossible from that location as there was a

22  newsstand located in front of the side window

23  preventing an interior view of the counter area of

24  the sandwich shop, where would the clerk have



Page 249

1 gotten that information?

2    A.   I don't know.

3        MR. AINSWORTH:  Hold on.  Objection, asked and

4 answered, foundation.

5 BY MR. GRILL:

6    Q.   Okay.  So paragraph 4 says that in the

7 course of trial preparation, okay, Frank Medea

8 never had an investigator visit or take pictures of

9 the location where the crime was alleged to have

10 occurred, nor photograph the view looking into the

11 sandwich shop at 51st and Racine through the side

12 window which Gus Robinson testified that he and I

13 viewed a white man.

14        Now, how did this jailhouse clerk learn

15 about what it was that Frank Medea did to prepare

16 for trial?

17    A.   I don't know.

18    Q.   Do you think it's something that you

19 told him?

20        MR. AINSWORTH:  Objection -- well, go ahead.

21 BY THE WITNESS:

22    A.   I don't know.

23 BY MR. GRILL:

24    Q.   Do you recall there being anything in

Page 250

1 the trial transcripts --

2    A.   I don't know.  I don't recall.

3    Q.   -- about what Frank Medea did to prepare

4 for trial?

5    A.   I don't know.  I don't recall.

6    Q.   And you don't remember if this is

7 something you told the clerk?

8        MR. AINSWORTH:  Objection, asked and answered.

9 BY THE WITNESS:

10    A.   I don't remember.

11 BY MR. GRILL:

12    Q.   All right.  Let's see, No. 5, also says

13 that in the course of trial preparation, Frank

14 Medea never visited, had an investigator visit or

15 take pictures of the location where, according to a

16 statement that I gave after being coerced by

17 Chicago police detectives, I was alleged to have

18 viewed the victim around midnight in the street at

19 1210 West 51st Street.

20        So again here it starts out that in the

21 course of trial preparation.  Again, where

22 did -- what documents did you give the jailhouse

23 clerk that explained to the clerk what it was that

24 Frank Medea did to prepare for trial?

Page 251

1    A.   I don't know.

2    Q.   Did you give the jailhouse -- did you

3 have Frank Medea's notes from his file that he

4 created while representing you?

5    A.   No.

6    Q.   All right.  So is this something that

7 you would have told the clerk?

8        MR. AINSWORTH:  Objection to the form of the

9 question.

10 BY THE WITNESS:

11    A.   I don't know.

12 BY MR. GRILL:

13    Q.   Did you tell this to the clerk?

14    A.   I don't know.

15    Q.   No. 6, it says, "That in the course of

16 trial preparation, Frank Medea never contacted two

17 witnesses which could have testified that I was

18 with them at the time of the shooting, Dennis

19 Harris and Nakeia Little.  He was made aware of

20 these witnesses and he never subpoenaed them to

21 testify."

22        MR. AINSWORTH:  It says Nikka Little.

23 BY MR. GRILL:

24    Q.   Nikka Little.  Okay.  So did you give

Page 252

1 the jailhouse clerk any documents that related to

2 what Frank Medea did to prepare for trial regarding

3 these two witnesses?

4    A.   Again I don't know.

5    Q.   Do you remember having any documents

6 like that in your possession at any point from

7 Mr. Medea?

8    A.   If it was in all the transcripts for my

9 motion suppress or evidentiary hearing, he had all

10 of that.

11    Q.   Right, no, but this says about in the

12 course of trial preparation.

13    A.   I don't know.

14    Q.   Do you remember or did you believe that

15 Frank Medea never visited the location where the

16 crime was alleged to have occurred or photographed

17 it?  Did you believe -- not what he said -- did you

18 believe that that was something that Frank Medea

19 did not do?

20        MR. AINSWORTH:  Hang on.

21        MR. GRILL:  Definitely it doesn't cross into a

22 privilege.

23        MR. AINSWORTH:  It may.

24        MR. GRILL:  No, it doesn't.



Page 253

1    MR. AINSWORTH:  It does.  It does because,
2  based on how he answers, that could reveal
3  attorney/client communications.
4    MR. GRILL:  He doesn't even remember saying
5  these things, so I don't know how it would, so I'm
6  asking him what does he believe.
7    MR. AINSWORTH:  No.  When you say he doesn't
8  remember these things, that was in response to
9  questions about conversations he had with this
10  particular jailhouse clerk.  But in terms of
11  conversations with his counsel, I think the
12  attorney/client privilege is implicated by that the
13  way that question is phrased.  If you can rephrase
14  it, I'll let him answer it.
15  BY MR. GRILL:
16    Q.   Are you going to follow your attorney's
17  advice and not answer the question as I posed it to
18  you?
19    A.   Yes.
20    Q.   Do you believe that Frank Medea never
21  visited the location where the crime was alleged to
22  have occurred?
23    MR. AINSWORTH:  And hang on.  I mean you see
24  my problem?

Page 254

1    MR. GRILL:  No, it's literally written on a
2  page.  I can't even imagine -- I don't even
3  understand why you're even asserting a privilege on
4  this.  This is on an affidavit that he signed.
5  BY MR. GRILL:
6    Q.   Do you believe that Frank Medea didn't
7  visit the scene where the crime was alleged to have
8  occurred and photograph it?
9    MR. AINSWORTH:  You can answer that yes or no.
10  BY THE WITNESS:
11    A.   Do I believe he visited?
12  BY MR. GRILL:
13    Q.   That he did not visit it.
14    A.   Oh, I don't want to assume.  I don't
15  know.
16    Q.   You don't know, okay.  Do you believe
17  that Frank Medea never had an investigator visit or
18  take pictures of the location where the crime was
19  alleged to have occurred?
20    A.   Again, I don't want to assume.  I don't
21  know.
22    Q.   Did you ever believe that Frank Medea
23  never visited, had an investigator visit or take
24  pictures of the location where, according to a

Page 255

1  statement that you gave after being coerced by
2  Chicago police detectives, you were alleged to have
3  viewed the victim around midnight in the street?
4    A.   Again, I don't want to assume.  I don't
5  know.
6    Q.   Do you think that those are things that
7  Frank Medea should have done regardless -- all
8  things setting aside, do you think those are things
9  that you would have wanted to have done?
10    MR. AINSWORTH:  Object to the form of the
11  question.
12  BY MR. GRILL:
13    Q.   Think back to when you were facing
14  prosecution for these crimes, are those things that
15  you would have wanted to have done?
16    A.   That I wanted to have done?
17    Q.   Yes.
18    A.   Yes.
19    Q.   Okay.  All these things that I've listed
20  off here, these are all things that you would have
21  had wanted to have done to defend you at trial?
22    A.   I can't say all of them because, again,
23  I'd be assuming.  I don't know.
24    Q.   I'm not asking if they were done or not

Page 256

1  done.  I'm just saying are these things sitting
2  here today that you would have wanted to have done
3  to defend you in the criminal case?
4    A.   Yes.
5    Q.   We already talked about you don't know a
6  Dennis Harris.  We're speaking of Denise Harris,
7  right?
8    A.   Right.
9    Q.   And you also know Nakeia Little, right?
10    A.   Right.
11    Q.   So when you look at this affidavit that
12  you signed as truth, are those the two people that
13  you were talking about, Denise Harris and Nakeia
14  Little, Dennis Harris and Nikka Little?
15    A.   Yes.
16    Q.   So this should be Denise Harris Nakeia
17  Little, right?
18    A.   Yes.
19    Q.   So what did you think they -- let me
20  rephrase.
21    What value did you think that they had
22  for purposes of your criminal case, defending the
23  criminal charges that the state brought against
24  you?



Page 257

1    A.    What value did the have?

2    Q.    Yes, why were they important to you?

3    A.    Because they was outside.

4    Q.    Well, it says something different, okay?

5    A.    It says what?

6    Q.    This says something different.  This

7  says that in the course of trial preparation, Frank

8  Medea never contacted two witnesses -- and this is

9  the part that I want you to pay attention

10  to -- which could have testified I was with them at

11  the time of the shooting.

12    MR. AINSWORTH:  What's the question?

13  BY THE WITNESS:

14    A.    What's the question?

15  BY MR. GRILL:

16    Q.    Were you with them at the time of the

17  shooting?

18    A.    No, I was not with them.

19    Q.    So this is something that's in here

20  that's not true, right?  I mean am I incorrect, or

21  is this true that you were with them at the time of

22  the shooting?

23    A.    I was not with them.

24    Q.    So why did you sign an affidavit

Page 258

1  swearing that you were with them at the time of the

2  shooting?

3    MR. AINSWORTH:  Object to the form of the

4  question, mischaracterizes the evidence.  You can

5  testify -- you can answer.

6    THE WITNESS:  I can answer?

7    MR. AINSWORTH:  You can answer.

8  BY THE WITNESS:

9    A.    What was the question again?

10  BY MR. GRILL:

11    Q.    Why did you sign an affidavit on

12  February 2nd, 2004 swearing that you were with

13  Denise Harris and Nakeia Little at the time of the

14  shooting?

15    MR. AINSWORTH:  Objection, form of the

16  question, mischaracterizes the evidence.  You can

17  answer the question.

18  BY THE WITNESS:

19    A.    I guess that's on me, my

20  irresponsibility for not reading it.

21  BY MR. GRILL:

22    Q.    Okay.  So what should it say?

23    MR. AINSWORTH:  Objection to the form.

24  BY MR. GRILL:

Page 259

1    Q.    Like if you were going to redo paragraph

2  6 today, what would be -- what should it say?

3    MR. AINSWORTH:  Objection to the form of the

4  question, it calls for speculation.  Answer the

5  question if you can.

6  BY THE WITNESS:

7    A.    I don't want to assume.

8  BY MR. GRILL:

9    Q.    Okay.  So your testimony here today is

10  that at the time of the shooting you were not with

11  Denise Harris or Nakeia Little, is that right?

12    A.    Yes.

13    Q.    Do they have any value for you -- let me

14  strike that.

15        Do you believe that they have anything

16  to say about your whereabouts on that night of the

17  shooting?

18    A.    I'd be assuming if I say yes.  I don't

19  know.

20    MR. AINSWORTH:  Object to the form of the

21  question.

22  BY MR. GRILL:

23    Q.    Do you know how this jailhouse clerk got

24  the names -- well, they got them wrong but Denise

Page 260

1  Harris and Nakeia Little, do you know?

2    MR. AINSWORTH:  Object to the form of the

3  question.

4  BY MR. GRILL:

5    Q.    Did you give them those names?

6    MR. AINSWORTH:  Which names?

7    MR. GRILL:  Denise Harris and Nakeia Little.

8    MR. AINSWORTH:  You mean Dennis Harris and

9  Nikka Little?

10    MR. GRILL:  We already cleared that up,

11  Russell, so please stop talking.

12  BY MR. GRILL:

13    Q.    Did you give those names to the

14  jailhouse clerk?

15    A.    No.

16    Q.    Did you give the name Dennis Harris to

17  the jailhouse clerk?

18    A.    No.

19    Q.    Did you give the name Nikka Little to

20  the jailhouse clerk?

21    A.    No.

22    Q.    Did you give the jailhouse clerk the

23  name Denise Harris?

24    A.    No.



Page 261

1    Q.    Did you give the jailhouse clerk the
2    name Nakeia Little?
3    A.    No.
4    Q.    You have no idea where the jailhouse
5    clerk would have gotten these two names from,
6    right?
7    A.    Probably got it from my paperwork.
8    Q.    Do you know what paperwork that you gave
9    the jailhouse that would have had their names as
10   people that, according to this affidavit, could
11   have testified you were with him at the time of the
12   shooting?
13   A.    Say it again.
14   Q.    Do you know what paperwork you gave the
15   jailhouse clerk that would have indicated that you
16   were with these two people at the time of the
17   shooting?
18   A.    He probably got it out of the paperwork
19   I gave him.  I don't know.
20   Q.    Okay.  See paragraph 7, the next one?
21   A.    Yeah.
22   Q.    It says, "That my appellate attorney,
23   Assistant Public Defender Ira Churgin, never raised
24   the issue of ineffective assistance of trial

Page 262

1    counsel, even though I made him aware of the issue
2    and asked him to raise it," do you see that?
3    A.    I see it.
4    Q.    Okay.  So here you're making it clear
5    that you believe that Frank Medea was ineffective
6    as a trial counsel for you in representing you,
7    right?
8    A.    Yes.
9    Q.    Okay.
10   MR. AINSWORTH:  Object to the form of the
11   question, mischaracterizes the evidence.
12   BY MR. GRILL:
13   Q.    If you saw something happening in your
14   criminal trial that you wanted to have changed,
15   like, for example, like a witness is
16   testifying -- or strike that -- that a witness is
17   testifying to something that isn't true, is that
18   something that you think you would have made known
19   to your attorney?
20   MR. AINSWORTH:  Objection to the form of the
21   question, calls for speculation, incomplete
22   hypothetical.  You can answer the question if you
23   can.
24   BY THE WITNESS:

Page 263

1    A.    Well, I'm going to say I don't know.
2    BY MR. GRILL:
3    Q.    So if you heard -- during your
4    criminal -- think back.  I want you to put yourself
5    back in the state of mind when you were at the
6    criminal trial sitting there.  You were there,
7    right?  You were at the table listening to all the
8    witnesses testify, right?
9    A.    Yes.
10   Q.    Okay.  And do you have a recollection of
11   hearing witnesses, any witness that you can think
12   of, say something on the stand that you knew for
13   sure was not true?
14   A.    Yes.
15   Q.    What kind of things did you hear them
16   say?
17   A.    Man, you're talking about over 30 years
18   ago.  I don't remember.
19   Q.    Well, are those -- when you heard those
20   witnesses say things that weren't true, did you
21   tell your attorney those things aren't true?
22   MR. AINSWORTH:  Objections, don't answer the
23   question.
24   BY MR. GRILL:

Page 264

1    Q.    Is that something you think you would
2    have brought up?
3    MR. AINSWORTH:  Hang on.  Don't answer the
4    question.  Are you withdrawing the question?
5    MR. GRILL:  No, you can assert the privilege.
6    MR. AINSWORTH:  I don't know what the question
7    is.
8    BY MR. GRILL:
9    Q.    Is that something that you think you
10   would have brought up?
11   MR. AINSWORTH:  Objection, calls for
12   speculation.
13   BY MR. GRILL:
14   Q.    You can answer the question.
15   MR. AINSWORTH:  If you can.
16   BY THE WITNESS:
17   A.    Is that something I would have brought
18   up to my attorney about somebody lying?
19   BY MR. GRILL:
20   Q.    Yes.
21   A.    I did.  They just didn't listen.
22   MR. AINSWORTH:  I don't want you to talk about
23   anything you said to your attorney, okay.
24   BY MR. GRILL:



Page 265

1    Q.    Did you pay attention to the witnesses
2  who testified during your criminal trial?
3    A.    Somewhat.
4    Q.    What do you mean somewhat?
5    A.    Somewhat.
6    Q.    Did you consider your trial to be a very
7  important part of your life at the time it was
8  happening?
9    MR. AINSWORTH:  Object to the form of the
10  question.
11  BY THE WITNESS:
12    A.    The question again?
13  BY MR. GRILL:
14    Q.    Did you consider your trial to be a very
15  important part of your life at the time it was
16  happening?
17    A.    To be honest with you, I don't know what
18  was going on at the time.
19    Q.    Did you understand that you were facing
20  a -- you were being prosecuted now at trial for
21  having participated in killing Rafael Garcia?  Did
22  you understand that?
23    A.    At that time, no.
24    Q.    You didn't understand that that's --

Page 266

1    A.    No.
2    Q.    -- that that's what you were facing
3  during the trial that you testified in your own
4  defense in?
5    A.    Yeah.
6    Q.    You didn't understand that that's what
7  you were being tried for?
8    A.    I think that's what I just said.
9    Q.    I need to be clear because I'm shocked,
10  okay?
11    A.    You can be shocked.
12    Q.    Just so we're clear, you did not
13  understand -- this is the last time I'll ask this.
14  So we're perfectly clear on this, you did not
15  understand -- your testimony is you did not
16  understand during your criminal trial that you were
17  being prosecuted for murder; is that your
18  testimony?
19    A.    Yep.
20    Q.    Okay.  Did you understand that during
21  the criminal trial that, if you were convicted,
22  that you'd be going to prison for a very long time?
23    A.    No.
24    Q.    Did you believe or understand that --

Page 267

1  did you understand what a murder charge was then?
2    A.    No.
3    Q.    Did you believe like a murder charge was
4  a serious type of crime that you could be charged
5  with, maybe the most serious?
6    A.    I don't remember.
7    Q.    Did you believe that criminal sexual
8  assault was a serious crime?
9    A.    No.
10    Q.    Is that why you pled guilty, you just
11  didn't think it was a big deal?
12    MR. AINSWORTH:  Object to the form of the
13  question.
14  BY THE WITNESS:
15    A.    I pled guilty because it's what my
16  mother said, not because of the charges.
17  BY MR. GRILL:
18    Q.    That's different, that's not what I'm
19  saying.
20    A.    That's your problem.
21    Q.    Did you plead guilty because you
22  thought -- to criminal sexual assault because you
23  didn't think it was a serious crime?
24    A.    I answered your question already.

Page 268

1    Q.    Okay.  What is it about a murder charge
2  in your mind that makes it not a serious crime?
3    MR. AINSWORTH:  Object to the form of the
4  question, mischaracterizes the evidence.  Go ahead.
5  BY THE WITNESS:
6    A.    At 15 I didn't know nothing about no
7  murder charge or none of that.
8  BY MR. GRILL:
9    Q.    You weren't 15 when you went to trial.
10  I believe you were 19.
11    A.    I was 17.
12    MR. AINSWORTH:  17.
13  BY MR. GRILL:
14    Q.    And you had been incarcerated
15  for -- well, since September 16th, 1991, right?
16    A.    Yes.
17    Q.    You never got out, right?
18    A.    Yes.
19    Q.    Okay.  Did the fact that you sat in jail
20  for two years before you went to trial, do you
21  remember thinking back -- when you think back to
22  that time, do you remember thinking like this is
23  serious, I'm still in jail?
24    A.    I was in the Audy home waiting to go to



Page 269

1   trial.
2       Q.   Did you have an understanding that you
3   were waiting to go to trial to face a murder
4   charge?
5       A.   Yep.
6       Q.   Did you think that -- hang on.
7          Do you know what an alibi is?
8       A.   An alibi?
9       Q.   Yes.  Do you know what that is?
10      A.   I believe so.
11      Q.   What do you think it is, why don't you
12  tell me?
13      A.   I guess when somebody committed a crime
14  and he says he was doing something else, that's his
15  alibi.
16      Q.   Right.  So it's like somebody who can
17  provide an account about your whereabouts at the
18  time Mr. Garcia was shot that would take you out of
19  consideration for being responsible for it, right?
20      A.   Right.
21      Q.   All right.  Do you remember if your
22  attorney at trial, at the criminal trial, put on an
23  alibi defense?
24      A.   I don't remember.  That was too long

Page 270

1   ago, man.
2       Q.   When you think back to the trial, is
3   there somebody that you believe could have provided
4   an alibi for you?
5       A.   I don't know.
6       Q.   Well, you've had a lot of time to think
7   about this, so is there anybody that you can think
8   of that would be able to be an alibi witness for
9   you?
10      A.   And, again, I don't know.
11      Q.   Okay.  Why did you identify Dennis
12  Harris and Nikka Little as people that you were
13  with at the time of the shooting then in this
14  affidavit?
15      MR. AINSWORTH:  Objection, asked and answered,
16  mischaracterizes the evidence.  You can answer
17  again.  You can answer again.
18  BY THE WITNESS:
19      A.   What was the question?
20  BY MR. GRILL:
21      Q.   Why did you swear that -- why did you
22  sign an affidavit then that said Nikka Little and
23  Denise Harris -- Nakeia Little and Denise Harris
24  could testify that you were with them at the time

Page 271

1   of the shooting?
2       A.   And, again, I did not write this out.
3   The jailhouse lawyer wrote this out.
4       Q.   So we're clear you don't have an alibi,
5   is that fair?
6       MR. AINSWORTH:  Object to the form of the
7   question.
8   BY MR. GRILL:
9       Q.   Right?
10      A.   If that's what you want to say.
11      Q.   No, I'm asking you do you believe that
12  you have a alibi witness out there?
13      A.   If that's what you want to say.
14      Q.   So I need you to listen to my question
15  because what you can't do is dodge me here and then
16  come at trial and say, oh, I do have an alibi
17  witness.
18         So I want to know from you if sitting
19  here today if you believe that there is a witness
20  out there that was not called at your criminal
21  trial that could provide an alibi for you, meaning
22  somebody that could get on the stand and testify
23  Anthony Jakes was with me at the time of the murder
24  and therefore could not have committed this crime?

Page 272

1       A.   I don't know.
2       Q.   You don't know nobody, you can't think
3   of a single person that could provide an alibi?
4       A.   I don't know.
5       Q.   And this was -- over all these years
6   you've never been able to come up with somebody?
7       MR. AINSWORTH:  Objection.  Is that a
8   question?
9   BY MR. GRILL:
10      Q.   I'll rephrase.  In 30 some odd years
11  since this happened, have you ever been able to
12  determine for yourself that there is somebody out
13  there that could provide an alibi for me on the
14  night of this murder?
15      A.   And, again, I don't know.
16      Q.   Okay.  Have you ever tried to contact
17  anybody to see if they could provide an alibi for
18  you?
19      A.   What do you mean contact?
20      Q.   Did you ever call anybody, anybody in
21  your family, anybody that you saw out there that
22  night, did you ever try to talk to anybody and say,
23  hey, can you provide an alibi for me, can you back
24  me up?



Page 273

1    A.    No.
2    Q.    Because my understanding, according to
3  you about what you said at the criminal trial, is
4  when you got back to your aunt's house, there was a
5  lot of people out there, right?
6    A.    Yes.
7    Q.    Who was out there?
8    A.    A lot of people.
9    Q.    Like who, name them, who do you
10  remember?
11    A.    Man, I'm not finnin to try to figure out
12  who was all out there.
13    Q.    Okay.  Well, you've testified to some of
14  them in the past.  But like sitting here
15  today -- and I'll refresh your recollection if we
16  need to -- but I'm asking you now is there anybody
17  that comes to mind now -- well, let me ask this.
18  Strike what I just said.
19        When you came back up 51st Street after
20  you ran through the alley, which house porch did
21  you go onto when you saw the ambulance?
22    A.    I don't know.
23    Q.    Did you go onto a porch when you saw the
24  ambulance?

Page 274

1    A.    Again, I don't know.
2    Q.    Do you remember what happened that
3  night?
4    A.    Alls I remember is what I've been saying
5  for years now.
6    Q.    So why don't you just tell me then right
7  now what happened that night?  So tell me this.
8  We'll start here.  I think this could be a good
9  place to start.
10        Were you throwing rocks and bottles at a
11  car that night?
12    A.    Yes.
13    Q.    What time was it when you were throwing
14  rocks and bottles at a car that night?
15    A.    That was 37 years ago, I don't know.
16    Q.    Were you with anybody?
17    A.    As far as what, throwing rocks and
18  bottles?
19    Q.    Throwing rocks and bottles at the cars.
20    A.    I believe me and Quarter Pound was
21  together.
22    Q.    Do you remember where you were when you
23  were throwing those rocks and bottles?
24    A.    Probably on 51st.

Page 275

1    Q.    Why do you say probably on 51st?
2    A.    Because I remember being out there, and
3  I remember the car coming past with -- I don't know
4  if it was a Puerto Rican or Mexican flag, whatever
5  it was, through a bottle, and ran through my
6  gangway.
7    Q.    So like you reviewed just yesterday your
8  criminal trial testimony, right?
9    A.    Did I review it?
10    Q.    Yeah, did you read it?
11    A.    I looked over some of it.  I didn't read
12  all this stuff.
13    Q.    Well, how about your criminal trial
14  testimony, did you review that?
15    A.    Again, I didn't read all that stuff.  I
16  looked over it.
17    Q.    How many times did you meet with your
18  attorney to prepare for today's deposition?
19    A.    Probably once.
20    Q.    And when was that?
21    A.    Yesterday.
22    Q.    Have you met with him at any other
23  times?
24    A.    No.

Page 276

1    Q.    And you've sat in on I think almost all
2  the depositions in this case, right?
3    MR. AINSWORTH:  Objection.
4  BY THE WITNESS:
5    A.    That's incorrect.
6  BY MR. GRILL:
7    Q.    Okay.  You sat in on a number of them?
8    A.    I sat in about three of them, so if you
9  want to say a number of them, I guess.
10    Q.    You sat in on Denise's, right?
11    A.    I sat in, yes.
12    Q.    Who else do you remember sitting in on?
13    A.    Boudreau, I think, Grossman.  I don't
14  remember.
15    Q.    Thinking back about any of those
16  testimonies that you watched as recently as last
17  week, do you -- did that help refresh your memory
18  about maybe what you were doing that night?
19    A.    I already knew what I was doing that
20  night.
21    Q.    Well, you just told me you didn't know.
22    MR. AINSWORTH:  Objection to the form of the
23  question.
24  BY MR. GRILL:



Page 277

1    Q.    Okay.  So where were you before or were
2  you anywhere before you were throwing rocks with
3  Quarter Pound?
4    A.    Man, I don't know, that's 30 years ago.
5    Q.    I'm asking you.  So your answer is you
6  don't know?
7    A.    I don't know.  I don't know.
8    Q.    Okay.  And do you remember where on 51st
9  Street specifically you and Quarter Pound were when
10  you were throwing rocks at cars?
11    A.    Probably in front of 1210.
12    Q.    Okay.  In front of 1210?
13    A.    Yes, West 51st Street.
14    Q.    How many cars did you throw rocks at?
15    A.    I would say one.
16    Q.    Okay.  Why would you say one?
17    A.    That's all I remember.
18    Q.    All right.  And what happened?
19    A.    Like I said before, the car came down
20  the street, we threw a bottle at it, ran through
21  the gangway, they came back, threw a bottle through
22  the second floor window.  That was it.
23    Q.    So let's unpack that, all right.  So I
24  want you to get your binder out, okay, and I want

Page 278

1  you to turn to Exhibit 5, and I want you to go to
2  the trial testimony which is 1993 09-10 Trial.
3    Are you there?
4    A.    What number did you say again?
5    Q.    Tab 5.  Okay.  So you got those numbers,
6  those G numbers on the bottom.  I want you to go to
7  page 37-B.
8    A.    37-B?
9    Q.    Well, it's actually just 37, sorry, not
10  37-B.
11    A.    I don't see it.
12    Q.    G-37.  It's at the bottom of the page.
13    A.    All right.
14    Q.    You got it, okay.  So this is your trial
15  testimony, okay?
16    A.    Okay.
17    Q.    I want you to look at lines 12 through
18  20, do you see that, or 11 through 20.  So 11
19  starts, "Now, on September 15th, 1991, do you
20  remember the evening -- do you remember where you
21  were at?  You said at your auntie's house, and then
22  it goes on on line 18, "And around 10:00 o'clock or
23  so, did something unusual happen?"  It says,
24  "Police came to my house."  And the question goes,

Page 279

1  "No, on the 15th?"  Answer:  "Okay, the 15th?"
2  Question:  "Yes."  Answer:  "Uh-huh."
3    Next page, G-38, question:  "Did you
4  have an altercation with some individuals or fight
5  with some people?"  There is an objection.  Then if
6  you skip down to line 7, question:  "Did anything
7  happen?"  Answer:  "I got into an argument with
8  some people."  Question:  "Can you tell the ladies
9  and gentlemen what happened?"  Answer:  "I believe
10  it was Mexicans, Indians, and one of them drove
11  past and threw a bottle through my auntie's window,
12  so me and my cousin went upstairs and cleared the
13  glass up and took the glass out to the garbage.  We
14  seen them in the alley and we had a few words and
15  that was it."  Do you see that testimony?
16    A.    I see it.
17    Q.    And that was the testimony that you gave
18  in response to those questions back in 1993, right?
19    A.    Right.
20    Q.    So does this refresh your recollection
21  that this rock throwing incident happened
22  around -- at the car happened around at 10:00
23  o'clock at night?
24    MR. AINSWORTH:  Objection to the form of the

Page 280

1  question.
2  BY THE WITNESS:
3    A.    I guess.
4  BY MR. GRILL:
5    Q.    All right.  So you and Quarter Pound
6  throw rocks or bottles at a car, right, correct?
7    A.    Right.
8    Q.    So tell me exactly what happens after
9  that.  You throw rocks and bottles at the car.
10  What happens next?
11    A.    Like I said before for the third time,
12  ran through the gangway.
13    Q.    Why did you run through the gangway?
14    A.    Because that was the normal thing to do.
15    Q.    Did the car stop?
16    A.    Yes, the car stopped.
17    Q.    Did anybody get out?
18    A.    I don't remember.  I was running with my
19  back to them.
20    Q.    Do you know what direction down 51st
21  Street the car was driving?
22    A.    I don't know.  It was going towards
23  Racine or May or something, I don't know.
24    Q.    So it was heading east?



1    A.   I don't know.  I don't know.

2    Q.   And did you see the car like back up

3  after you hit it, after you threw things at it?

4    A.   Again, I don't know.

5    Q.   And the gangway was in between which

6  houses?

7    A.   1210 and 1212.

8    Q.   1210 and 1212, okay.  Did you see

9  anybody out on the stoop of 1210?

10   A.   Man, there was some people out there,

11  but I can't recall who was out there.

12   Q.   Do you remember who was out there?

13   A.   I just said I can't recall who was out

14  there.

15   Q.   Was it guys or girls, men or women?

16   A.   I don't know.

17   Q.   Do you remember how many people were out

18  there?

19   A.   I don't know.

20   Q.   Do you remember which stoop they were

21  on, 1210 or 1212?

22   A.   I don't know.

23   MR. AINSWORTH:  Wait, hang on.  Object to the

24  form of the question.  You're asking him about

1  1210.

2  BY MR. GRILL:

3    Q.   I was asking him if he knows which stoop

4  they were on.

5    A.   I said I don't know.

6    Q.   But they were on -- were they on at

7  least one of those stoops, 1210 or 1212?

8    A.   I don't know.

9    Q.   Well, when you're thinking about that

10  there was people out there, where do you recall

11  that they were where?

12   A.   Where do I what?

13   Q.   You're saying that you know there were

14  people out there other than you and Quarter Pound.

15  Where were they?

16   A.   They was out there.

17   Q.   Like on the sidewalk, were they standing

18  in the street, where?  How do you know they were

19  out there?

20   A.   They was out there.

21   Q.   So you guys run through the gangway

22  between 1212 and 1210.  Where do you run to?

23   A.   I believe we ran through the gangway.

24   Q.   To where?

1    A.   Wasn't no particular where.  We just ran

2  through the gangway.

3    Q.   Okay.  Where did you run to?  Did you

4  stop running, did you go somewhere, what happened?

5    A.   Probably ran around the block and came

6  back.

7    Q.   I'm asking what you remember.

8    A.   Probably ran around the block and came

9  back.

10   Q.   You and Quarter Pound both ran around

11  the block?

12   A.   I'm not for sure, but I know I took off

13  running.

14   Q.   Okay.  So where did you run to?

15   A.   I don't know.  Around the block.

16   Q.   Did you run through the alley, did you

17  run back out on 51st Street?

18   A.   I don't know.

19   Q.   What direction did you run?

20   A.   I don't know.

21   Q.   And how long were you running for?

22   A.   I don't want to assume, so I don't know.

23   Q.   Where did Quarter Pound run to?

24   A.   I don't know.

1    Q.   Was he with you?

2    A.   I don't know.

3    Q.   Did he run with you?

4    MR. AINSWORTH:  Can I just get some

5  foundation?

6    MR. GRILL:  Down the alley where he's saying

7  he was at running.

8    MR. AINSWORTH:  But like where in the story?

9    MR. GRILL:  We're trying to find out because

10  it does not make a lot of sense.

11  BY MR. GRILL:

12   Q.   So you guys run through the gangway,

13  let's start there.  Let's back it up.  You throw

14  the rock and bottle at the car, you and Quarter

15  Pound run through the gangway.  What did you do

16  after you get through the gangway?

17   A.   Again, I was running.

18   Q.   Right, I got that.  Where did you run

19  to?

20   A.   Wasn't no particular to.  I was running.

21   Q.   Okay.  What direction --

22   A.   I don't know.

23   Q.   After you get to the gangway --

24   A.   I don't know.



Page 285

1    Q.    Do you run down the alley?
2    A.    I don't know.
3    Q.    Do you run inside a house?
4    A.    I didn't go in no house.
5    Q.    And Quarter Pound is with you in the
6    gangway, so when you -- and there is an alley back
7    at the end of the gangway, right?  It goes to the
8    alley, correct?  Mr. Jakes?
9    A.    What's up?
10   Q.    Do you need a break?
11   A.    I'm good.  I'm going to let you keep on
12   asking the same damn question.
13   Q.    You're not answering --
14   A.    Because I answered them already.
15   Q.    Well, I asked you a question and you are
16   just staring out the window.
17   MR. AINSWORTH:  Can we take a break?
18   MR. GRILL:  Yes.
19   THE VIDEOGRAPHER:  We're going off the record,
20   the time is 4:05 p.m.
21        (WHEREUPON, a short break was had.)
22   THE VIDEOGRAPHER:  We're back on the record,
23   the time is 4:14 p.m.
24   BY MR. GRILL:

Page 286

1    Q.    All right.  Mr. Jakes, so after you and
2    Quarter Pound ran through the gangway between 1210
3    and 1212, where did you run to after you got to the
4    gangway?
5    A.    I ran through the alley towards
6    Elizabeth.
7    Q.    Where did Quarter Pound go?
8    A.    I don't know.
9    Q.    Was he with you or not?
10   A.    I don't know.
11   Q.    Okay.  Were you being chased by anybody?
12   A.    No.
13   Q.    Okay.  So you ran westbound through the
14   alley, right?
15   A.    If westbound is Elizabeth, I guess so.
16   Q.    Okay.  And then after Elizabeth is
17   Throop Street, right?
18   A.    Yes.
19   Q.    All right.  What happened when
20   you -- and how fast do you think you were running
21   down the alley?
22   A.    I don't want to assume, so I don't know.
23   Q.    Well, you said running.  Were you
24   sprinting, were you jogging, do you know?

Page 287

1    A.    I don't know.
2    Q.    You weren't walking, though, right?  You
3    were running?
4    A.    Exactly.
5    Q.    And where were you running to?
6    A.    No particular place.
7    Q.    Were you running to try to get away from
8    whoever might have been in that car?
9    A.    No particular place.
10   Q.    You were just running?
11   A.    Just running.
12   Q.    All right.  So when you got to
13   Elizabeth -- that would have been at the end of the
14   alley, that's the first street you're going to hit,
15   right?
16   A.    Right.
17   Q.    So where did you go after you ran to the
18   end of the alley?
19   A.    51st.
20   Q.    So you took a left?
21   A.    If it's going left, I guess.
22   Q.    All right.  And then did you run between
23   the end of the alley to 51st Street, or did you
24   start walking at that point?

Page 288

1    A.    I don't recall.
2    Q.    Okay.  And when you got on 51st -- got
3    to 51st, did you stop, did you keep running, did
4    you go somewhere else?  What happened there?
5    A.    Came down 51st Street.
6    Q.    Which direction?
7    A.    Whichever way going towards Racine.
8    Q.    So back towards your house or at least
9    back towards 1210?
10   A.    Yes.
11   Q.    Did you see that car?
12   A.    What car?
13   Q.    The one that you were throwing the
14   bottles and rocks at.
15   A.    No.
16   Q.    And did you see any cars that you
17   remember stopped -- well, let me ask you this.  Do
18   you remember what type of car it was that you threw
19   rocks and bottles at?
20   A.    No.
21   Q.    Do you think that car was still there?
22   A.    I don't know.  I didn't see it.
23   Q.    Would you have gone back towards 1210
24   West 51st Street if that car was still there?



Page 289

1   A.  Probably not.

2   Q.  Right.  And did you see any group of

3 Hispanic guys, Mexican guys, or Indian guys, or a

4 mix thereof on the sidewalk maybe outside 1210 or

5 1212 as you turned to walk back east down 51st

6 Street?

7   A.  No.

8   Q.  Okay.  And did you see Quarter Pound

9 anywhere?

10   A.  He might have been in the front of 1210.

11   Q.  Why do you say that?

12   A.  Because I remember when I walked up, my

13 Auntie said a few words to me about them busting

14 the window on the second floor, and me and him went

15 to go upstairs to go clean up the glass.

16   Q.  Okay.  So you come up West 51st Street

17 from the corner of Elizabeth.  Do you run or walk

18 up 51st Street?

19   A.  I don't recall.

20   Q.  You don't remember?

21   A.  I don't remember.

22   Q.  All right.  And what house do you go to,

23 or do you go to a house?

24   MR. AINSWORTH:  Objection to the form of the

Page 290

1 question.

2 BY THE WITNESS:

3   A.  I said I went in front of 1210.

4 BY MR. GRILL:

5   Q.  And did you talk to anybody in front of

6 1210?

7   A.  I was talking to my Auntie.

8   Q.  Which aunt?

9   A.  Jessie May Jones.

10   Q.  Aunt Bee, right?

11   A.  Right.

12   Q.  Where is she at 1210?

13   A.  I don't know, she's somewhere right

14 there.

15   Q.  Well, think if you can like where was

16 she?

17   A.  I don't know.

18   Q.  Was she on the sidewalk?

19   A.  I don't know.

20   Q.  Was she on the porch?

21   A.  I don't know.

22   Q.  Was she on the street?

23   A.  I don't know.

24   Q.  Was she standing in the gangway?

Page 291

1   A.  I don't know.

2   Q.  Was she outside when you were throwing

3 rocks and bottles at the car?

4   A.  I don't know.

5   Q.  Was she with anybody?

6   A.  I don't know.

7   Q.  Is it possible that she was with

8 somebody?

9   MR. AINSWORTH:  Object to the form of the

10 question, calls for speculation.

11 BY MR. GRILL:

12   Q.  I'll withdraw it.

13      Did you see -- when you were out there

14 at this point, did you see Denise?

15   A.  Did I see who?

16   Q.  Denise.

17   A.  I don't know.

18   Q.  Did you see Annette?

19   A.  I don't know.

20   Q.  You listened in on Denise's deposition,

21 right?

22   A.  Right.

23   Q.  Yes.  Do you remember what she said

24 about this?

Page 292

1   A.  I don't know.

2   Q.  Do you remember that she testified that

3 she had been outside on I think it was 1210, it

4 could been 1212, but I think it was 1210, but that

5 she had been out there with Annette and some others

6 for over an hour at this point.  Do you remember

7 her testifying about that?

8   A.  I don't know.

9   Q.  You don't remember hearing that?

10   A.  Again, I don't know.

11   Q.  I'm going to represent to you that

12 that's what she said in her deposition.

13   A.  Okay.  Well, then if that's what she

14 said, that's what she said.

15   Q.  Do you think she was lying --

16   A.  I don't know.  I'm not inside her mind.

17   Q.  All right.  So Aunt Bee -- you come up

18 West 51st Street and Aunt Bee is at 1210 somewhere,

19 you don't know exactly where, but she's at 1210.

20 What happens when you get to 1210?

21   A.  Like I said before, we had a few words.

22   Q.  You and Aunt Bee?

23   A.  Had a few words.

24   Q.  About what?



Page 293

1    A.    About the window being busted on the
2 second floor of 1210.
3    Q.    Okay.  So when did the window get busted
4 on the second floor?
5    A.    I guess they threw the bottle through
6 the window while I was running away.  I don't want
7 to assume, so I guess.
8    Q.    Okay.  Did you see them throw the
9 bottle?
10    A.    I was running.  How could I see them?
11    Q.    Did you hear window or glass breaking?
12    A.    I was running.  How could I do any of
13 that?
14    Q.    Okay.  So what does Aunt Bee say to you?
15    A.    Man, that was 30 years ago.  I don't
16 know.
17    All right.  Well, you said you had
18 words, you know you talked to her, but you don't
19 remember anything she said to you?
20    A.    No.
21    Q.    What happened after you talked to her?
22    A.    Went upstairs to clean the glass up.
23    Q.    Well, it sounds like then you remember
24 that she said something to you about the window?

Page 294

1    A.    And, again, like I said, we went
2 upstairs to clean the glass up.
3    Q.    Did Aunt Bee tell you how she knew that
4 the window got broken?
5    A.    I don't know.
6    Q.    At 1210?
7    A.    I don't know.
8    Q.    And Aunt Bee lived in the back of 1212,
9 right?
10    A.    Yes.
11    Q.    Did you ask Aunt Bee what she was doing
12 out in front of 1210 at that time?
13    A.    My Auntie grown, what am I going to ask
14 her a question like that before?
15    Q.    I'm just asking you if you know.
16    A.    I don't know then.
17    Q.    And you don't remember if she was with
18 anybody, right?  Right?
19    A.    I answered that already.
20    Q.    So I guess the answer was you don't
21 remember, okay.  All right.  So she told you to go
22 up to 1210 on the second floor and clean the glass,
23 right?
24    A.    She didn't tell us nothing.  We just

Page 295

1 went up there and cleaned it up.
2    Q.    Who is we, who is the we you're talking
3 about?
4    A.    Me and Quarter Pound.
5    Q.    Okay.  When did he show up again?
6    MR. AINSWORTH:  Object to the form of the
7 question.
8 BY MR. GRILL:
9    Q.    Well, let me back up.  He wasn't with
10 you running through the alley, right?
11    A.    Right.
12    Q.    And he wasn't with you when you turned
13 from the alley to go towards Elizabeth, right?
14    A.    Right.
15    Q.    And he wasn't with you when you hit the
16 corner of Elizabeth and 51st Street when you
17 started heading back east on 51st Street, right?
18    A.    Right.
19    Q.    So when did Quarter Pound show back up?
20    A.    Probably standing out there in front of
21 the house.
22    MR. AINSWORTH:  Object to the form of the
23 question.
24 BY MR. GRILL:

Page 296

1    Q.    Probably standing out in front of what
2 house?
3    A.    1210.
4    Q.    Okay.  So a moment ago you told me you
5 didn't remember if anybody was standing with Aunt
6 Bee, so if you want to -- are you changing your
7 testimony?
8    MR. AINSWORTH:  Object to the form of the
9 question.  He didn't say he --
10 BY THE WITNESS:
11    A.    I wasn't trying to pay attention to
12 people.
13 BY MR. GRILL:
14    Q.    Was Quarter Pound standing with Aunt Bee
15 when you got there?
16    A.    I don't know who was standing with my
17 Aunt Bee.
18    MR. AINSWORTH:  Counsel, you can't argue with
19 the witness in that way.
20    MR. GRILL:  I'm not arguing with him.
21    THE WITNESS:  He's not arguing with me.
22 BY MR. GRILL:
23    Q.    We're just going to move on.  So where
24 was Quarter Pound when you were standing talking to



Page 297

1  Aunt Bee?
2      A.   I don't than.
3      Q.   Was he outside?
4      A.   He was outside, but I don't know where
5  he was at.
6      Q.   So you talked to Aunt Bee and she sends
7  you inside to go clean up the mess?
8      A.   Again, she didn't send me to do nothing.
9      Q.   How did you find out that -- well, how
10 was it that you came to decide that you were going
11 to go inside and clean up the glass?
12     A.   Because the window was broke, simple.
13     Q.   And you found that out from?
14     A.   When I walked up, they was talking about
15 the bottle that I had threw at the car, the car
16 took the same bottle and threw it through the
17 second floor window.
18     Q.   So you said they was talking.  Who is
19 the "they" that was talking?
20     A.   Man, I don't know, man.  Will you stop
21 asking me the same damn questions, man.
22     Q.   Well, you're the one that said they.  So
23 first you started out -- I'll tell you why I'm
24 asking.  Because first you said it was just Aunt

Page 298

1  Bee, and now it's Quarter Pound is out there too,
2  and now you're saying they were talking, so who is
3  the "they" that were talking?
4      A.   Man, I don't remember who was out there
5  that night.
6      MR. AINSWORTH:  Object to the form, it
7  mischaracterizes the witness' testimony in a gross
8  and misleading fashion.
9      MR. GRILL:  Okay.  Well, that's a lawyer just
10 doing his job.
11 BY THE WITNESS:
12     A.   Last answer, I don't know.
13 BY MR. GRILL:
14     Q.   Who is the "they?"
15     A.   I don't know.  So find another question
16 to ask, I don't know.
17     Q.   Let me ask you this.  Do you have a
18 recollection now that Aunt Bee was talking to
19 somebody when you walked up?
20     A.   I don't know.
21     Q.   Up 51st Street?
22     A.   I don't know.
23     Q.   Okay.  Do you remember somebody
24 specifically telling you --

Page 299

1      A.   I don't know.
2      Q.   Let me finish my question.
3      A.   I don't care about your question.  I
4  don't know.
5      MR. AINSWORTH:  Well, hang on.  Mr. Jakes,
6  let's take a break.
7      THE WITNESS:  No, I'm good.
8      THE VIDEOGRAPHER:  We're going off the record,
9  the time is 4:24 p.m.
10         (WHEREUPON, a short break was had.)
11     THE VIDEOGRAPHER:  We're back on the record,
12 the time is 4:27 p.m.
13 BY MR. GRILL:
14     Q.   Okay.  I think I remember where we were
15 at.  Do you remember somebody specifically telling
16 you that a bottle had been thrown through the
17 second floor window of the 1212 building?
18     A.   Can't remember.
19     Q.   All right.  Well, did you go inside the
20 1212 building -- or the 1210 building, excuse me?
21     A.   Did I go inside?
22     Q.   Yes.
23     A.   Yes.
24     Q.   Who did you go inside with?

Page 300

1      A.   I went inside to clean up the glass.
2      Q.   With who, anybody?
3      A.   Quarter Pound.
4      Q.   Okay.  And did you -- was Quarter Pound
5  already inside, or did you walk inside with him?
6      A.   I don't know where he came from.
7      Q.   All right.  And do you remember how it
8  was that -- like what door you went through at 1210
9  to get inside to go up to the second floor?
10     A.   I don't remember.  I would think we went
11 through the back door.  I don't remember.
12     Q.   Why do you think you would have gone
13 through the back door?
14     A.   I don't know.
15     Q.   Are you just guessing?
16     A.   I don't know.
17     Q.   I'm just asking if you're guessing or if
18 there is something you're thinking of that makes
19 you say it might have been the back door.
20     A.   I don't know.
21     Q.   You don't know?  Mr. Jakes?
22     A.   I said I don't know.
23     Q.   Okay.  So my question was, though, when
24 you say it might have been the back door, is that



Page 301

1 just a guess?
2    A.   I don't know.
3    Q.   How many doors were there to get into
4 1210? There was a back door, obviously.  Is there
5 a front door?
6    A.   Yeah, there's a front door.
7    Q.   Is there a side door?
8    A.   There is a front door and a back door.
9    Q.   What about the 1212 building, are you
10 familiar with the entrances and exits of that
11 building, the front one?
12    A.   I believe there is a front door and a
13 back door.  I don't know.
14    Q.   Well, you lived on the first floor for a
15 while, so think back to that time period.
16    A.   A front door and a back door.
17    MR. AINSWORTH:  Wait.  Are you talking about
18 1210?
19    MR. GRILL:  No, I shifted to 1212, the first
20 floor unit when he lived there.
21    MR. AINSWORTH:  I'm so sorry.
22    MR. GRILL:  That's okay.  I move fast, I know.
23 BY MR. GRILL:
24    Q.   So there is a front door and a back door

Page 302

1 of the 1212 building as well, right?
2    A.   I would believe so.
3    Q.   Were there like gates on the doors like
4 bars on the front or back door of the 1212
5 building?
6    A.   It's 37 years ago.  I don't know.
7    Q.   How about when you were living there?
8    A.   I don't know.
9    Q.   What about the 1210 building, were there
10 gates or bars on the front or back door of that
11 building?
12    A.   I don't know.
13    Q.   Do you know whether there -- how many
14 entrances were there or exits -- entrances and
15 exits to the rear house of the 1212 building?
16    A.   One.
17    Q.   Just the front door or side door, I
18 guess?
19    A.   Side, whatever you want to call it.
20    Q.   Okay.  And was that door -- did you have
21 a key to the rear house, 1212?
22    A.   Did I have a key to it?
23    Q.   Yes.
24    A.   No.

Page 303

1    Q.   When you ran down the gangway between
2 1210 and 1212, why not just run into your house,
3 the rear house?
4    A.   I don't know.
5    Q.   Okay.  Why not run into 1212, the front
6 house?
7    A.   I didn't live there, so I don't know.  I
8 never run in somebody house if I don't know who
9 lives there.
10    Q.   Well, you knew who lived on the second
11 floor.  You knew that Denise and Annette lived up
12 there.
13    A.   Okay, so what am I going to run up in
14 their house for?
15    Q.   Well, if she's at the time your cousin.
16    A.   Right, but okay.
17    Q.   All right.  What about 1210, you could
18 gone there, that's where Quarter Pound lives?
19    A.   No, I ran through the gangway.
20    Q.   I'm asking if there was a reason why you
21 didn't run into one of those houses?
22    A.   There is no reason.
23    Q.   All right.  So how long do you think it
24 took you to run through the gangway, down the

Page 304

1 alley, down the end of the block and back up 51st
2 Street?  How long do you think it took you to run
3 basically around the block?
4    A.   I don't want to assume, so I don't know.
5    Q.   Less than a couple minutes?
6    A.   Again, I don't want to assume, so I
7 don't know.
8    Q.   Did it take like more than five minutes?
9    A.   Again, I don't want to assume.  I don't
10 know.
11    Q.   Okay.  Do you know what Google Maps is?
12    A.   Do I know what Google Maps is, yes.
13    Q.   And you know how on Google Maps like you
14 can put in like -- you can set it to tell you how
15 long it will take you to walk between two points?
16    A.   I ain't ever used it like that.  I don't
17 know.
18    Q.   But are you aware that it can do that?
19    A.   I don't know.  The first time I probably
20 heard of that.
21    Q.   If it says that it would take about a
22 minute to walk from the alley around the corner
23 back up 51st Street, the route that you ran, would
24 you disagree with that?



Page 305

1    MR. AINSWORTH:  Object to the form of the
2  question, it calls for speculation.
3  BY MR. GRILL:
4    Q.    I'm just asking if you disagree with it?
5    A.    And, again, I would say I don't want to
6  assume, so I don't know.
7    Q.    You don't know, all right.  So you and
8  Quarter Pound go back inside, and -- well, hang
9  hinge on.  While you're standing outside, did you
10  see a group of Hispanic guys, Indian guys or a mix
11  of those two ethnicities anywhere in your proximity
12  on 51st Street while you were talking to Aunt Bee
13  and I guess Quarter Pound is standing somewhere
14  nearby?
15    A.    30 years ago, I don't know.
16    Q.    All right.  Like maybe a group of people
17  that you thought might be the people from the car
18  that you through a rock and bottle at?
19    A.    I don't know, 30 years ago.
20    Q.    Do you know if the rock or the bottle,
21  whatever you threw at the car, actually hit the
22  car?
23    A.    I don't know.
24    Q.    Do you know -- like did you see anybody

Page 306

1  like stop and get out of the car and throw a bottle
2  up on the second floor window?
3    A.    I was running through the gangway at
4  that time.
5    Q.    Do you remember ever seeing this car
6  before in the neighborhood?
7    A.    I don't want to assume, so I don't know.
8    Q.    Did you see it that night?
9    A.    I don't want to assume.  I don't know.
10    Q.    I guess you're all right with not facing
11  the camera.
12    A.    Oh, wow, my bad.  I didn't know I was
13  supposed to be facing it, I'm sorry.
14    Q.    It's up to you.
15    A.    Just trying to get comfortable.
16    Q.    Okay.  So how long do you think you were
17  outside talking to Aunt Bee before you go inside
18  with Quarter Pound?
19    A.    I don't know.
20    Q.    Not long?
21    A.    I don't know.
22    Q.    Do you remember having like a long
23  conversation?  Were you talking about a lot of
24  stuff, or was it just --

Page 307

1    A.    I don't want to assume, so I don't know.
2    Q.    Do you believe Aunt Bee mentioned the
3  broken window at all?
4    A.    I can't recall, so I don't know.
5    Q.    Do you remember what her demeanor was
6  like when you were outside?
7    A.    30 years ago, I don't want to assume.  I
8  don't know.
9    Q.    Well, you remember she was out there, so
10  is there something about what happened that night
11  that causes you to remember, yep, it was definitely
12  Aunt Bee that was out there?
13    MR. AINSWORTH:  Object to the form of the
14  question.
15  BY THE WITNESS:
16    A.    No.
17  BY MR. GRILL:
18    Q.    It's just something you remember, right?
19  Is that right?
20    A.    Is what right?
21    Q.    That it's just something that you
22  remember?
23    A.    Yes, I remember her being out there.
24    Q.    Okay.  Did you testify at trial -- well,

Page 308

1  I'm going to actually strike that.
2        Did you and Quarter Pound go directly up
3  to the second floor at 1210, or did you go
4  somewhere else before you went upstairs to clean
5  the glass up?
6    A.    I believe we went up to clean the glass
7  up.
8    Q.    Who did Quarter Pound -- well, when you
9  got up to the second floor, did you see anybody
10  else up there?
11    A.    I can't recall.
12    Q.    And you're sure that you were with
13  Quarter Pound upstairs cleaning the glass up, like
14  100 percent positive about that?
15    A.    I'm positive about it.
16    Q.    Like you can sit here and you're
17  thinking in your head like I definitely remember
18  that?
19    MR. AINSWORTH:  Objection.
20  BY THE WITNESS:
21    A.    I definitely remember cleaning the glass
22  up.
23    MR. AINSWORTH:  I'll object to the form of the
24  question.



Page 309

1    MR. GRILL:  Sorry, are you done?
2    MR. AINSWORTH:  Yes.
3  BY MR. GRILL:
4    Q.    And you definitely remember that you
5  were with Quarter Pound?
6    A.    Again, I went upstairs with Quarter
7  Pound, we cleaned the glass up.
8    Q.    Did you see Tweetie anywhere up there?
9    A.    I don't recall.
10   Q.    Did you see anybody else in Quarter
11  Pound's family up there?
12   A.    Again, I don't recall.
13   Q.    How long -- tell me what the situation
14  looked like when you got up to the second floor
15  with the broken window?
16   A.    Again, we cleaned the glass up.
17   Q.    Was there like -- could you figure out
18  like what it was that they threw through the
19  window, like did you find anything out of place
20  like that?
21   A.    I don't want to assume, so I don't know.
22   Q.    How long did it take you to clean the
23  glass up?
24   A.    I don't want to assume.  I don't know.

Page 310

1    Q.    At any point did you look out the window
2  and see like a group of Hispanics or Indians or a
3  mix of the two standing outside 1210 looking for
4  you guys?
5    A.    I don't know.
6    Q.    All right.  Did you ever look out the
7  window and see if there was anybody out there
8  looking for you two?
9    A.    I don't recall looking out the window.
10   Q.    Do you remember Quarter Pound doing
11  anything like that?
12   A.    You got to ask him that.  I don't want
13  to assume, so I don't know.
14   Q.    I just want to be clear about something.
15  You're absolutely sure that after you ran down the
16  alley and circled back around to clean the glass
17  up, that you actually did that; that you actually
18  came back and you cleaned the glass up?  You're
19  sure about that?
20   A.    I'm positive.
21   Q.    You didn't like just run off never to be
22  seen again, right?
23   A.    If I did that, I wouldn't be sitting
24  here talking to you today.

Page 311

1    Q.    Well, assuming, I guess, that you ran
2  west, not east, right, because east would have been
3  back towards the sub shop, right?
4    MR. AINSWORTH:  Object to the form of the
5  question.
6  BY THE WITNESS:
7    A.    I don't know.
8  BY MR. GRILL:
9    Q.    So did you and Quarter Pound do anything
10  else up on the second floor at 1210 other than
11  clean the glass you?
12   A.    Just cleaned the glass up.
13   Q.    And then after you got -- where did you
14  put the glass?  Did you put it in a bag, or how did
15  you clean it up?
16   A.    I don't remember.  I don't remember.
17   Q.    Okay.  After you got the glass picked
18  up, what did you do?
19   A.    I believe we took it out to the alley
20  and put it in the garbage can.
21   Q.    Okay.  All right, so Denise in her
22  deposition --
23   A.    Who?
24   Q.    Denise in her deposition that you sat in

Page 312

1  on and listened to, do you remember what she said
2  about the bottle being thrown?
3    A.    Not in particular.  I don't want to
4  assume.
5    Q.    Denise said, your cousin or at least the
6  person that you called your cousin, said during her
7  deposition that -- and I already said this
8  before -- that she was outside of 1210 for an hour
9  or more with Annette and some other people and that
10  she was out there when you threw a bottle at a car
11  or a rock and that you then ran -- she saw you run
12  through a gangway, and then she never saw you
13  again, and that she was out there until the
14  shooting happened.
15      In fact, she testified that she actually
16  saw the two guys -- two guys walk up from the
17  direction of 51st and Racine that she believes
18  actually shot Mr. Garcia.  But what she said was at
19  no time when she was out there did anybody ever
20  throw anything through the second floor window at
21  1210.  Do you remember her talking about that
22  during her deposition?
23   MR. AINSWORTH:  I'll object to the form of the
24  question, it's improper stating your recollection



Page 313

1  of what happened at a deposition when there is a
2  transcript.
3  BY MR. GRILL:
4      Q.    Do you recall her testifying generally
5  to those facts?
6      A.    I can't recall because, again, I was
7  listening in and out.
8      Q.    Okay.  Well, I'm going to represent to
9  you that she said those things.
10     A.    Okay.
11     Q.    So do you believe that Denise is lying
12  about those things?
13     MR. AINSWORTH:  Object to the form of the
14  question, it's argumentative.
15  BY THE WITNESS:
16     A.    I wouldn't necessarily say she's lying
17  because it's a strong word, but I would say that
18  she got the facts confused.
19  BY MR. GRILL:
20     Q.    I mean I asked her if she was absolutely
21  certain about those things, and she said she was.
22     A.    Okay.
23     Q.    Okay.  Did you listen in on Quarter
24  Pound's deposition?

Page 314

1      A.    No.
2      Q.    So Quarter Pound was really specific
3  about what he remembered about cleaning the glass
4  up, specifically about -- what he was specific
5  about was that you were not with him when he
6  cleaned the glass up; that he and his sister
7  Claudette, Tweetie, were the ones that cleaned the
8  glass up.
9      MR. AINSWORTH:  Is there a question, or are
10  you just going to --
11     MR. GRILL:  I'm not done.  I'm still --
12     MR. AINSWORTH:  You're still what?
13     MR. GRILL:  I'm still asking my question.
14     MR. AINSWORTH:  This is an improper question.
15  BY MR. GRILL:
16     Q.    If Quarter Pound testified to that, do
17  you think he was lying?
18     MR. AINSWORTH:  Object to the form of the
19  question.
20  BY THE WITNESS:
21     A.    That would be assuming, so I don't know.
22  BY MR. GRILL:
23     Q.    Well, if Quarter Pound testified to
24  that, you agree that he's telling a different story

Page 315

1  than you're telling right now, right?
2      MR. AINSWORTH:  Object to the form of the
3  question.  That's an improper question.
4  BY MR. GRILL:
5      Q.    Quarter Pound also said that after you
6  guys threw the rocks or bottles or what have you at
7  the car, that you ran down the gangway also never
8  to be seen again, but that's not true, you came
9  back, right?
10     A.    Yep.
11     Q.    All right.  So you guys get to the
12  alley, you and Quarter Pound, I guess, get to the
13  alley.  You're out there to throw the glass out,
14  right?
15     A.    Yes.
16     Q.    All right.  And you go out there
17  together?
18     A.    Yes.
19     Q.    What happens when you get to the alley?
20     A.    We was approached by some other people.
21     Q.    How many people were you approached by?
22     A.    Shit, I think it was about three.
23     Q.    Do you remember what their race was?
24     A.    I believe they was black.

Page 316

1      Q.    Do you remember testifying at trial that
2  they were white?
3      A.    Yeah, I remember that.
4      Q.    Okay.  So today what do you believe
5  their race was, the three guys in the alley?
6      A.    Probably black and white mixed.
7      Q.    Maybe a bit of both?
8      A.    Yes.
9      Q.    Did you recognize these guys?
10     A.    No, I don't know those guys.
11     Q.    Had you ever seen them before?
12     A.    No.
13     Q.    Did you see these guys earlier in the
14  day maybe playing basketball at Sherman Park?
15     A.    Maybe.  I can't be for sure, but maybe.
16     Q.    Did you recognize any of these three
17  guys?
18     A.    From the neighborhood?
19     Q.    Yes.
20     A.    No, I can't say.
21     Q.    So these three guys that you saw, as far
22  as you were aware, you had never seen any of these
23  guys before?
24     MR. AINSWORTH:  Object to the form of the



Page 317

1  question.
2  BY THE WITNESS:
3      A.  Can't remember.
4  BY MR. GRILL:
5      Q.  And they were all guys, right, all men?
6      A.  Yes.
7      Q.  Do you remember what any of them were
8  wearing?
9      A.  No.
10     Q.  Do you remember how old they looked?
11     A.  No.
12     Q.  Do you remember what kind of hair style
13  they had?
14     A.  No.
15     Q.  Do you remember if they had like any
16  types of particular coats on?  I mean we're in
17  September in Chicago.  I'm thinking it was probably
18  not exactly warm out.
19     A.  I don't know.
20     Q.  Do you remember how tall any of them
21  were?
22     A.  Don't know.
23     Q.  Do you remember what their hair styles
24  were like?

Page 318

1      A.  Don't know.
2      Q.  Did any of them have any facial hair?
3      A.  Don't know.
4      Q.  Wearing jewelry?
5      A.  Don't know.
6      Q.  What type of pants they had on?
7      A.  Don't know.
8      Q.  What color shirts they had on?
9      A.  Don't know.
10     Q.  What type of shoes?
11     A.  No, I don't know.
12     Q.  Do you remember like what direction in
13  the alley they were coming at you from?
14     A.  Can't be for sure.
15     Q.  So what did you -- what happened between
16  you and Quarter Pound and these three guys?
17     A.  We were putting the glass in the garbage
18  can, and I turned around, they just appeared, we
19  exchanged a few words, and I took off running.
20     Q.  Okay.  What were the words that were
21  exchanged?
22     A.  I don't know.  It was 30 years ago.
23     Q.  Why did you take off running?
24     A.  Because they looked like they wanted to

Page 319

1  get aggressive and violent.
2      Q.  Okay.  Tell me what they were doing to
3  make you think that?
4      A.  It's hard to explain.
5      Q.  Well, do your best if you can.
6      A.  I don't want to.
7      Q.  Okay.  I need you to, though.
8      A.  That would be assuming then.
9      Q.  Well, you described them as aggressive.
10     A.  Okay.
11     Q.  So I need to know why you're saying
12  that?
13     A.  Hey, I just said it.
14     Q.  Are you guessing?
15     A.  Okay, I'll take that one, I'm guessing.
16     Q.  Okay.  So they might not have been
17  aggressive?
18     A.  I don't know.
19     Q.  Well, why did you run from them?
20     A.  I ran because I ran.  I don't know why I
21  ran because I ran.
22     Q.  So now it's you just ran for -- you have
23  no idea now why you ran?
24     A.  I ran.

Page 320

1      MR. AINSWORTH:  Object to the form of the
2  question.
3  BY MR. GRILL:
4      Q.  Do you have any idea sitting here today
5  why it was that you ran away from these three guys?
6      A.  I ran.
7      Q.  Is there a reason why you ran?
8      A.  I just gave you the reason, I ran.
9      Q.  Do you know a reason today why you ran?
10     A.  I ran.
11     Q.  Okay.  Would you agree with me that you
12  don't know --
13     A.  I don't want to agree with you.
14     Q.  Okay.  Well, I need a yes or no to the
15  question.  Do you know sitting here today why it
16  was that you ran from those three guys in the alley
17  after you threw the glass out?
18     A.  So you say you need an answer.  I don't
19  know.
20     Q.  Okay.  What about Quarter Pound, did he
21  run with you?
22     A.  I don't know.
23     Q.  How fast down the alley -- well, what
24  direction did you run, east or west, like towards



1  Elizabeth or towards Racine?

2     A.   I already told you towards Elizabeth.

3     Q.   Okay.  So you went back down towards

4  Elizabeth.  Were you running somewhere in

5  particular?

6     A.   At that particular time, I ran to

7  Throop.

8     Q.   Any reason why you went all the way down

9  to Throop this time?

10    A.   Because I had friends on Throop.

11    Q.   What friends were over there?

12    A.   All of my friends that I normally hang

13  with.

14    Q.   Like?

15    A.   The guys you just named.

16    Q.   Which ones, it's been awhile since I

17  named any names?  Why don't you tell me which guys?

18    A.   I don't know.

19    Q.   I need you to tell me which guys?

20    A.   I don't know who was -- I can't remember

21  who was out there.

22    Q.   All right.  Well, which friends lived

23  over there?

24    A.   My friend Jug lived over there.

1     Q.   Jug, I definitely didn't mention that

2  name unless that's a nickname for somebody else.

3  Do you know Jug's real name?

4     A.   He's deceased, but I think it's Edward

5  something, I don't know.

6     Q.   By the way, was Tweetie out in the alley

7  with you and Quarter Pound when these three guys

8  came up?

9     A.   No.

10    Q.   You're sure?

11    A.   No.

12    Q.   Jug, do you know Jug's real name?

13    A.   I just said it was Edward something.  I

14  don't know.

15    Q.   You don't know.  Who else lives over by

16  Throop that you might have been running to?

17    A.   I'm not for sure if Snake still stayed

18  over there.

19    Q.   Okay.  Anybody else?

20    A.   Not offhand that I can remember.

21    Q.   All right.  So do you know -- okay, go

22  ahead.

23    A.   Maybe Ronnie and Abdul was out there.  I

24  don't know.

1     Q.   Ronnie Sloan?

2     A.   Yes.

3     Q.   Is that Abdul Giles?

4     A.   Excuse me.

5     Q.   When you say Abdul, is that Abdul Giles;

6  is that who you're talking about, the guy that you

7  were arrested with for criminal sexual assault?

8     A.   I'm not for sure that's his last name,

9  but it sounds like it.

10    Q.   Did you know any other Abduls?

11    A.   Just him.

12    Q.   All right.  Anybody else that lived over

13  down by Throop?

14    A.   It's so long ago, I don't know.

15    Q.   So when you were running down the alley,

16  did you ever look behind you and see if Quarter

17  Pound was still with you?

18    A.   No, I never looked back.

19    Q.   Okay.  Any reason why you didn't look

20  back?

21    A.   I was too busy focusing on running

22  forward.

23    Q.   Okay.  Why were you so focused on

24  running forward and not looking back?

1     A.   Because I'm trying to get away.

2     Q.   Okay.  What are you trying to get away

3  from?

4     A.   From these three other guys.

5     Q.   Okay.  I thought you said you didn't

6  know why you were running?

7     A.   Okay, that's what you said.

8     MR. AINSWORTH:  Object to the form of the

9  question, argumentative.

10  BY MR. GRILL:

11    Q.   All right.  What did these guys do that

12  made you want to get away from them?

13    A.   I don't remember.

14    Q.   These three guys that you had never seen

15  before?

16    A.   I don't remember.

17    MR. AINSWORTH:  Object to the form of the

18  question.

19  BY MR. GRILL:

20    Q.   All right.  Before you started running,

21  did anybody throw any punches at each other?

22    A.   No.

23    Q.   Anybody show each other -- like produce

24  a weapon like a gun or knife, anything like that?



Page 325

1    A.   No.

2    Q.   Anybody make any threats that you
3  remember?

4    A.   Not that I -- I don't know.

5    Q.   Any reason why you just didn't run into
6  your house that was right there, the rear 1212
7  coach house?

8    A.   I don't want to assume why I didn't run
9  in my house, so I don't know.

10    Q.   I'm just asking like you've had time to
11  think about this, like is there any reason you can
12  think of as to why you didn't go back into your
13  home?

14    A.   I don't know.

15    Q.   And your mom was -- or, excuse me, your
16  Aunt Bee was like right -- well, did you know where
17  Aunt Bee was at this point?

18    A.   No, I did not.

19    Q.   All right.  And did you maybe think
20  running back out through the gangway to see if she
21  was in front to get help?

22    A.   No.

23    Q.   All right.  So you run down to Throop
24  this time, right?

Page 326

1    A.   Right.

2    Q.   And then when you get to Throop, what do
3  you do?

4    A.   I stopped and started talking.

5    Q.   Oh, so who did you stop and start
6  talking to?

7    A.   I don't remember.

8    Q.   Okay.  You realize you never said that
9  in any of your testimony before?

10    A.   Yes, I do.

11    Q.   Okay.  Is there any reason why you left
12  that fact out after all these decades that you
13  haven't bothered to mention that before?

14    A.   I don't know.

15    Q.   Just you don't know.  You just never
16  bothered to say it?

17    A.   Never got asked to me like that.

18    Q.   Well, no, the police asked you what you
19  were doing, where you went that night.  You didn't
20  tell them that?

21    MR. AINSWORTH:  Object to the form of the
22  question.

23  BY MR. GRILL:

24    Q.   Correct?

Page 327

1    A.   Excuse me?

2    Q.   When you were interrogated by the
3  police, you didn't tell them that you ran down to
4  Throop and stopped and talked to somebody?  You
5  didn't tell them that, did you?

6    A.   I don't recall.  I don't remember.

7    Q.   But you certainly didn't testify to that
8  at your criminal trial, right?

9    A.   I don't remember.

10    Q.   Okay.  And you didn't testify to that at
11  your motion to suppress either?

12    A.   And, again, I don't remember.

13    Q.   And you also didn't testify to that fact
14  and include that fact in your post-conviction
15  testimony either, correct?

16    A.   I don't remember.

17    MR. AINSWORTH:  Let me interpose an objection
18  to the improper impeachment on the motion to
19  suppress testimony question.

20  BY MR. GRILL:

21    Q.   And you don't know who this person was
22  that you stopped to talked to?

23    A.   No.

24    Q.   Was it somebody that you knew?

Page 328

1    A.   I don't remember.

2    Q.   Total stranger, you just stopped and
3  talked to a stranger somewhere down on Throop after
4  you ran from these other strangers that --

5    A.   If that's what you want to call it,
6  okay.

7    Q.   I'm asking you.

8    A.   I just told you I don't remember.

9    Q.   Well, you do remember some things.  You
10  remember these three guys in the alley, right?
11  Right?  Right?

12    A.   Man, you already answered the question.
13  Tell the Court Reporter to read the answer back.
14  I'm not going to keep on sitting here answering the
15  same questions.

16    Q.   Well, I'm trying to get this --

17    A.   Well, tell her to read my answer back.
18  I answered it already.

19    Q.   Okay.  So I'll just tell you then.  You
20  testified that you knew about these three guys in
21  the alley.  You also remember cleaning the glass
22  up.  You remember the window getting broken, and
23  you remember running down the alley now for the
24  second time all the way down to Throop.  And now



Page 329

1  you remember, for the first time, it sounds like,
2  stopping to talk to somebody down on Throop Street
3  who you also don't remember who it is?
4      MR. AINSWORTH:  Object to the form of the
5  question.
6  BY MR. GRILL:
7      Q.   Well, that's why I'm asking him to
8  correct me.  So if you would like to explain to me
9  who this person was, I would appreciate it.
10     A.   I don't know.
11     Q.   Was it a stranger?
12     A.   I don't know.
13     Q.   Okay.  Was there anybody else other than
14  this person now that you're talking to down on
15  Throop Street?
16     A.   I don't know.  I don't remember.
17     Q.   Okay.  Did you talk to this person in
18  the alley?  Because let me make it clear, the alley
19  goes actually all the way down to Throop, right?
20     A.   Yes.
21     Q.   You can run that alley all the way west
22  down to Throop Street, right?
23     A.   Yes.
24     Q.   Okay.  So did you talk to this person in

Page 330

1  the alley?
2      A.   I don't recall.
3      Q.   And did you talk to this person on the
4  sidewalk on Throop somewhere?
5      A.   I don't recall.
6      Q.   Okay.  Was this person a man or a woman?
7      A.   I don't recall.
8      Q.   Do you remember what this person was
9  wearing?
10     A.   Don't know.
11     Q.   Do you remember what you talked about?
12     A.   Don't know.
13     Q.   Do you remember if this person was
14  somebody that you asked for help from?
15     A.   It's a mistery.
16     Q.   Do you know if these three guys in the
17  alley were chasing you?
18     A.   Do I know if they were chasing me?
19     Q.   Yeah, did you ever like -- by the time
20  you got to Throop, did you look back down the alley
21  and see if these guys were still coming after you?
22     A.   When I looked back down the alley, they
23  be going the other way.
24     Q.   Which way is the other way?

Page 331

1      A.   Back towards Racine or somewhere, I
2  don't know.
3      Q.   Okay.  So at what point in the alley did
4  you turn around and look and see these three guys
5  going back towards Racine?
6      A.   When I got to Throop.
7      Q.   Okay.  So now you're looking back about
8  a block and a half, right?
9      MR. AINSWORTH:  Object to the form of the
10  question.
11  BY THE WITNESS:
12     A.   I wouldn't say it's a block and a half,
13  but they wasn't back there no more, I know that.
14  BY MR. GRILL:
15     Q.   And you agree this is sometime
16  after -- it's dark out?  It's after 10:00 o'clock
17  at night, right?
18     A.   I don't know what time it was.
19     Q.   Was there any lights in the alley?
20     A.   I don't know.
21     Q.   Do you remember there being street
22  lights in the alley?  There weren't any, were
23  there?
24     A.   We're talking about 30 years ago.  I

Page 332

1  don't know.
2      Q.   How do you know these guys -- like did
3  you see these guys like running off, walking off,
4  the three guys?
5      A.   Again, when I looked back, I didn't see
6  them no more.  They was going the other way.  I
7  didn't see them.
8      Q.   Okay.  And they were going back towards
9  Racine you're sure?
10     A.   I'd be assuming.  They weren't chasing
11  me no more, I know that.
12     Q.   How old was this guy that you were
13  talking to at the corner of the alley, I guess, or
14  around that on Throop Street?
15     MR. AINSWORTH:  Object to the form of the
16  question.
17  BY THE WITNESS:
18     A.   I don't know.
19  BY MR. GRILL:
20     Q.   All right.  How long did you talk to
21  this person for?
22     A.   I don't know.
23     Q.   Was it a long time?
24     A.   I don't know.



Page 333

1    Q.   Was it a little bit of time?

2    A.   I don't know.

3    Q.   Was it five minutes?

4    A.   I don't know.

5    Q.   All right.  So after you got done

6  talking -- well, while you're talking to this

7  person, did anybody walk up, like did Jug come up?

8    A.   I don't recall.

9    Q.   Did Gus come up?

10   A.   I don't know.

11   Q.   Did Ronnie show up?

12   A.   I don't know.

13   Q.   What about Abdul, did he show up?

14   A.   I don't know.

15   Q.   But the guy you were talking to wasn't

16  any of those four guys, right?

17   A.   No.

18   Q.   All right.  So after you're done talking

19  to this guy, what do you do next?

20   A.   I walked towards 51st.

21   Q.   Okay.  And then when you got to 51st,

22  what did you do when you got to 51st?

23   A.   I started walking towards my house.

24   Q.   Okay.  Did you walk all the way back up

Page 334

1  there?

2    A.   Yes.

3    Q.   All right.  So what are you seeing when

4  you're your walking back up towards 51st?

5    A.   As soon as I turned the corner, I saw

6  police cars.

7    Q.   Turned what corner?

8    A.   51st and Throop.

9    Q.   You see police cars where?

10   A.   Down by 51st and Racine.

11   Q.   What else do you see?

12   A.   I just see police cars.

13   Q.   Tell me what happens next.

14   A.   As I got to 1210, I believe --

15   Q.   Okay, keep going, tell me what happened.

16   A.   I believe me and my Auntie had a few

17  words, and I was told -- I believe she gave me a

18  light slap across the face and told me to go in the

19  house.  I walked through the gangway and went in

20  the house.

21   Q.   Okay.  So what aunt is out there that

22  slapped you?

23   A.   Aunt Bee.

24   Q.   Aunt Bee again, okay.  So was Aunt Bee

Page 335

1  basically in the same spot?

2    MR. AINSWORTH:  Object to the foundation.

3  BY THE WITNESS:

4    A.   I don't know.

5  BY MR. GRILL:

6    Q.   Was she in the same spot that she was

7  when --

8    A.   I don't know.

9    Q.   -- when you talked to her before you

10  went and cleaned the glass?

11   A.   There was too much going on, I don't

12  know.

13   Q.   Was there anybody else out there with

14  Aunt Bee?

15   A.   Again, I'm going to tell you I don't

16  know, there was too much going on.

17   MR. AINSWORTH:  Give it a pause.  Objection,

18  foundation.

19  BY MR. GRILL:

20   Q.   When you testified in your

21  post-conviction proceeding, you were -- well, let

22  me ask you this.  How long did it take you to get,

23  if you remember, from where you threw the glass

24  out, down to Throop, back up to 51st Street, and

Page 336

1  back out I guess in front of 1210, how long do you

2  think that took you?

3    A.   I would be assuming, so I don't know.

4    Q.   Do you think it took like a long time?

5    A.   Again, I'd be assuming.  I don't know.

6    MR. AINSWORTH:  And I'll object to the form of

7  the question.

8  BY MR. GRILL:

9    Q.   If you were going to take your best

10  guess today, how long do you think it took?

11   A.   I'm not going to take a guess.  I'd be

12  assuming, so I don't know.

13   Q.   When you testified in your

14  post-conviction proceeding, you remember doing

15  that, right?

16   A.   Somewhat.

17   Q.   When you were running from these three

18  guys, did you hear any gunshots?

19   A.   Man, I don't know, it was 30 years ago.

20  I can't remember.

21   Q.   Well, you know somebody now that was

22  shot basically out in front of -- between the Queen

23  Submarine shop and 1210, right?

24   A.   Right.



Page 337

1   Q.   And you know they were like shot more

2 than once, right?

3   A.   I don't want to assume.  I just told you

4 I don't know.

5   Q.   Do you know today?  I mean like,

6 seriously, you looked at --

7   A.   From reading paperwork, yes, I know

8 today, but then I'd be assuming.

9   Q.   Okay.  So when you're reading all that

10 paperwork, you know this guy got shot basically in

11 front of your family's homes to an extent on 51st

12 Street, shot more than once.  When you think back

13 to like running from these guys, hey, yeah, I heard

14 some gunshots, do you have any recollection of

15 hearing any gunshots as you were running?

16   A.   I have no recollection.

17   MR. AINSWORTH:  Objection, asked and answered.

18 BY MR. GRILL:

19   Q.   And it's your testimony I gather that

20 Mr. Garcia see was shot at some point when you were

21 probably running from these guys, right?

22   A.   Probably.  I don't assume, but probably.

23   Q.   And when you -- if you were going

24 to -- how long do you think it would take you to

Page 338

1 walk, not run, walk from wherever it was you threw

2 the glass out in the alley down to Throop, back up

3 to 51st Street and back to 1210, how long do you

4 think it would take you to walk that distance?

5   A.   I don't want to assume, so I don't know.

6   Q.   Not very long, though, right?

7   A.   I don't want to assume, so I don't know.

8   Q.   So is there any particular reason why

9 now today you remember stopping and talking to this

10 person on Throop Street?

11   MR. AINSWORTH:  Objection, asked and answered.

12 BY MR. GRILL:

13   Q.   No, I have not asked that.  Do you know

14 is there any reason today why now you remember

15 that?

16   MR. AINSWORTH:  You can answer it.

17 BY THE WITNESS:

18   A.   I don't know.

19 BY MR. GRILL:

20   Q.   When you testified at the

21 post-conviction hearing, did you also tell the

22 truth during that hearing?

23   A.   I believe I told the truth to the best

24 of my ability.

Page 339

1   Q.   Okay.  Is your memory better today than

2 it was back in 2015?

3   MR. AINSWORTH:  Objection, form of the

4 question.

5 BY THE WITNESS:

6   A.   My memory is so so.

7 BY MR. GRILL:

8   Q.   Okay.  But you understood that you were

9 under oath and obligated to tell the truth there

10 just like you are here today?

11   A.   Right.

12   Q.   Okay.  So I want you to look at

13 something.  I want you to look at the testimony,

14 okay, that you gave under oath back in 2015.  Look

15 in your binder and go to the 2015 08-18 PC TR tab,

16 okay.  And I want you to turn to page -- it's Bates

17 stamped Day11757, but it's easier to probably spot

18 by the page number which is 39, so look over to 39.

19   So I want you to read and follow along

20 with me, we're going to start on page 39 at the

21 very bottom, line 24, okay?

22   MR. AINSWORTH:  Of 39.

23 BY THE WITNESS:

24   A.   39.

Page 340

1 BY MR. GRILL:

2   Q.   And you were sworn to tell the

3 truth -- you remember being sworn to tell the truth

4 back at the post-conviction proceeding, right?

5 Correct?

6   A.   Correct.

7   Q.   And this was a proceeding where you knew

8 that whatever it was that you said this was all

9 about trying to actually getting you out of jail,

10 right, trying to reverse your conviction, correct?

11   MR. AINSWORTH:  Object to the form of the

12 question, compound.

13 BY MR. GRILL:

14   Q.   Did you understand that you were

15 testifying in a hearing in 2015 that was

16 potentially going to lead to you getting released

17 from jail; you understood that, right?

18   MR. AINSWORTH:  Object to the form of the

19 question.

20 BY MR. GRILL:

21   Q.   Did you understand that?

22   A.   I can answer it?

23   MR. AINSWORTH:  Answer it, go ahead.

24 BY THE WITNESS:



Page 341

1   A.  Yes.
2   BY MR. GRILL:
3       Q.   Okay.  So you knew at that hearing that
4   it was super important that you be -- that you tell
5   the truth because whether --
6       MR. AINSWORTH:  Why are you wagging your pen
7   at him?
8       MR. GRILL:  I'm shaking it.  I'm not wagging
9   it.
10      MR. AINSWORTH:  Why are you wagging it at him?
11      MR. GRILL:  I'm just wagging it in the air.
12      MR. AINSWORTH:  Well, why don't you wag it at
13  somebody else?
14      MR. GRILL:  I'm not wagging it at him, so
15  knock it off.
16      MR. AINSWORTH:  You can wag it at me, I got no
17  problem with that, just don't do it at the witness.
18      MR. GRILL:  Yes, and I'm not wagging it at the
19  witness, so stop.
20  BY MR. GRILL:
21      Q.   So, Mr. Jakes, you understood that when
22  you testified in 2015 at your post-conviction
23  hearing that telling the truth was very important
24  because, whatever it was that you were going to

Page 342

1   say, would impact whether you actually get out of
2   jail?
3       MR. AINSWORTH:  He was already out of jail.
4   BY THE WITNESS:
5       A.   I was out of jail already.
6   BY MR. GRILL:
7       Q.   Excuse me, sorry, that is a great point.
8   But I'm going to point something else out to you
9   anyway.  Let's look at the bottom of page 39, and
10  the question reads:  "And then, when you ran down
11  the alley towards Throop, you hooked around, and
12  came back on to 51st Street, is that correct?"
13  Your answer:  "Correct."  Question:  "Okay.  But
14  you had alluded these guys by that point, right?"
15  Answer:  "Correct."  Question:  "Okay."  And we're
16  on 40 here.  Question:  "Okay.  And you just ran a
17  block and a half down that alley, is that right?"
18  Answer:  "Right."  Question:  "And you were running
19  from these guys as fast as you could, right?"
20  "Right."  Question:  "Because you wanted to get
21  away from them?"  Answer:  "Did I want to get away
22  from them?"  Question:  "You wanted to get away
23  from these guys.  You didn't want to get in a fight
24  with them, did you?"  Answer:  "Yes."  Question:

Page 343

1   "You wanted to get away from them, is that
2   correct?"  Answer:  "Correct."  Question:  "Okay.
3   You didn't make any stops along the way as you were
4   running this block and a half down the alley?"
5   Answer:  "Not that I can remember."
6       Next page, question:  "Okay.  Well, do
7   you think you would have?  Answer:  "Don't know."
8       MR. AINSWORTH:  Wait, wait.  Objection, not
9   impeaching in any respect whatsoever.
10  BY MR. GRILL:
11      Q.   I disagree.  So did you -- why didn't
12  you say back in 2015 that you stopped and made a
13  stop along the way?
14      MR. AINSWORTH:  Objection, that's not what the
15  testimony here is today and that's not impeaching.
16  It's not impeaching.  It doesn't contradict his
17  testimony in any respect whatsoever.
18      MR. GRILL:  Stop with the speaking objection.
19  BY MR. GRILL:
20      Q.   Why didn't you say in 2015 that you
21  stopped and talked to this guy?
22      A.   I don't know.
23      MR. AINSWORTH:  If you have a question and
24  answer that that would be responsive to, then

Page 344

1   please direct us to it.
2       MR. GRILL:  Form, foundation.  You do the same
3   thing to me all the time.  Stick to it.
4   BY MR. GRILL:
5       Q.   You are sure today that Quarter Pound
6   was not running down the alley with you, right?
7       A.   Again, I don't know.
8       Q.   Look at page 38, see if this refreshes
9   your recollection, lines 10 through 20.  Question:
10  "Okay.  Now, you ran down the alley towards Throop,
11  isn't that correct?"  Answer:  "Correct."
12  Question:  "So it's about a block and a half?"
13  Answer:  "Yeah, about -- yeah, that's about right."
14  Question:  "Okay.  And you were being chased by
15  these guys, right?"  Answer:  "Right."  Question:
16  "And you were with your cousin Quarter Pounder,
17  right?"  Answer:  "Right."
18      So was Quarter Pound with you or not?
19      A.   I don't know which way Quarter Pound ran
20  just like I told you.  I don't know.  I don't
21  remember.
22      Q.   Here you testified that you were with
23  Quarter Pounder when you were being chased?
24      A.   Okay.  Now I'm testifying right here I



Page 345

1 don't know. I don't know which way he ran.
2    Q.   Well, it's not which way he ran.
3    A.   I don't care.
4    Q.   Well, you really don't care?
5    A.   I don't care which way he ran.
6    Q.   Why did you say in 2015 that Quarter
7 Pounder was running with you down the alley?
8    A.   I don't remember.
9    Q.   So is your testimony today that he was
10 not with you running down the alley?
11    A.   It ain't my testimony today. My
12 testimony today is I don't remember.
13    Q.   Quarter Pounder testified in his
14 deposition that he went out to throw the glass out
15 with his sister Tweetie, right?
16    A.   I don't know, that's what you're saying.
17    Q.   Do you believe that Quarter Pounder, if
18 that's what his testimony was, that that testimony
19 is not truthful?
20    MR. AINSWORTH:  Object to the form of the
21 question.  His name is not Quarter Pounder.
22 BY MR. GRILL:
23    Q.   Quarter Pound?
24    A.   What was the question?

Page 346

1    Q.   Do you believe that that testimony is
2 not truthful that Quarter Pound gave his
3 deposition --
4    A.   I don't know if it's not truthful, but I
5 would say he probably got some details mixed up.  I
6 don't know.
7    Q.   Quarter Pound testified that it was him
8 and his sister Tweetie that confronted these three
9 guys in the alley when they were throwing the glass
10 out.  Is that testimony not truthful?
11    A.   You got to ask him.  I don't know.
12    Q.   In your opinion?
13    A.   Ask him.  I don't want to assume.
14    Q.   So you testified in that piece that I
15 just read back to you from your post-conviction
16 testimony that you were being chased down the alley
17 by these three guys.  When did you -- how do you
18 know you were being chased, or why did you testify,
19 sorry, in 2015 that you were being chased down the
20 alley?
21    A.   Because I was being chased.
22    Q.   Okay.  At what point did you look back
23 to see that you were being chased?
24    MR. AINSWORTH:  Object to the form of the

Page 347

1 question.
2 BY MR. GRILL:
3    Q.   Did you look back?  Because before I
4 thought you told me that you didn't look back.
5    A.   I didn't.  I ain't looked back till I
6 got to Throop.
7    Q.   So how did you know you were being
8 chased?
9    A.   I don't know then, how about that?
10    Q.   Okay.  So I want you to look at your
11 criminal trial testimony, so that's going to be the
12 1992 12-- no, 1993 09-10 Trial tab.  I want you to
13 go to G-38.  Tell me when you're there.
14    Are you at G-38?
15    A.   Yes.
16    Q.   So this is testimony from your criminal
17 trial.  By the way, do you know why it was that you
18 decided to take your -- take the stand in your own
19 defense during the criminal trial?
20    MR. AINSWORTH:  Don't talk about the
21 conversation.
22 BY MR. GRILL:
23    Q.   Not anything with your attorney, like
24 why you decided to do it?

Page 348

1    MR. AINSWORTH:  Hang on.  If your answer would
2 reveal communications with your attorney that
3 influenced your decision, then please do not answer
4 it.  Only answer if you cannot reveal any
5 communications with your attorney.
6 BY MR. GRILL:
7    Q.   And I agree with your lawyer, but to
8 build on it, the decision whether to take the stand
9 in your own defense is yours, it's not your
10 attorneys, and so that's what I am wanting to know,
11 why it was that you decided to take the stand in
12 your own defense.
13    MR. AINSWORTH:  But if your decision was
14 influenced by your counsel's statements, then don't
15 reveal those counsel's statements.
16 BY MR. GRILL:
17    Q.   Fair enough.  Go ahead.
18    A.   I'm going to take my lawyer's advice.  I
19 ain't going to answer.
20    Q.   Okay, I guess I need to clarify then.
21 Was your decision to take the stand in your own
22 defense, was there any part of it that was your
23 own?
24    MR. AINSWORTH:  Object.



Page 349

1  BY MR. GRILL:
2      Q.   The decision that you made because you
3  wanted to take the stand in your own defense?
4      MR. AINSWORTH:  Object to the form of the
5  question.
6  BY THE WITNESS:
7      A.   Same answer as before, I'm going to take
8  my lawyer's advice and not answer it.
9  BY MR. GRILL:
10      Q.   He didn't actually tell you to not
11  answer the question.
12      A.   Well, I'm not going to answer it.
13      Q.   But that's where we run into a problem.
14  Unless your attorney is asserting a privilege,
15  which he's not over this question, you've got to
16  answer it, so you've got to give me an answer.
17      A.   I don't know.
18      Q.   You got to give me something.  You don't
19  know?
20      A.   I don't know.
21      Q.   You don't know why in your own mind why
22  it was that you decided to take the stand in your
23  own defense?
24      A.   I just answered it.  I said I don't

Page 350

1  know.
2      Q.   All right.  So when you look at this
3  G-38, and we're going to start on line 17, here's
4  the question and answer.  Question -- from your
5  criminal trial -- "When you had a few words with
6  them, what occurred after that?  What was after
7  that?"  Answer:  "They kind of chased us cause it
8  was like some more of them was coming," okay.
9          So there you said they chased us.  Who
10  is the "us" that you're referring to?
11      A.   Could have been Quarter Pound, that's
12  the only person I remember really being with that
13  night.
14      Q.   Okay.
15      A.   I don't want to assume, but I guess
16  that's who it is.
17      Q.   Okay.  Are you saying that you both were
18  chased down the alley here; is that what you meant?
19      A.   Again, I ran towards Throop.  I don't
20  know which way Quarter Pound ran.  I don't know
21  where he went to.
22      Q.   Have you ever talked to him since that
23  day?
24      A.   Have I talked to him?

Page 351

1      Q.   Yes.
2      A.   I can't even remember the last time I
3  talked to him.  It's been a while.
4      Q.   Did Quarter Pound, to your recollection,
5  like back when you were growing up, like did you
6  think that he was a liar, he had a reputation for
7  not telling the truth?
8      A.   Did I think that?
9      Q.   Yes.
10      A.   I don't want to assume so.  I don't
11  know.
12      Q.   I'm saying did you ever think that?
13      A.   I don't know.  I was 15, man.
14      Q.   When was the last time you talked to
15  Quarter Pound?
16      A.   That's a hard question there.  I would
17  say within the last year.
18      Q.   Okay.  How many times have you talked to
19  him in the last year?
20      A.   I don't know.
21      Q.   More than once?
22      A.   Again, I don't know.  I don't want to
23  assume.
24      Q.   Did you talk to him on like social

Page 352

1  media?  You've got like a Facebook account, right?
2      A.   Yes.
3      Q.   Do you have any other social media
4  accounts?
5      A.   I got a Facebook account.
6      Q.   Anything else?
7      A.   Go look it up yourself.
8      Q.   I have, so I'm asking if there is any
9  others?
10      A.   You know what I got then.
11      Q.   Well, I know about that one.  I want to
12  know if there is any other ones?
13      A.   I don't know.
14      Q.   And you talk to Quarter Pound on there?
15      A.   I don't recall talking to him on there.
16      Q.   What about Arnold Day, you've talked to
17  him on Facebook?
18      A.   Yes, I talked to him.
19      Q.   You talk to him a lot on Facebook?
20      A.   No.
21      MR. AINSWORTH:  Object to the form of the
22  question.
23  BY MR. GRILL:
24      Q.   How many times do you like message him



Page 353

1  on Facebook, would you say, since you've been out
2  of jail?
3      A.   We normally don't message each other on
4  Facebook.  But if I had to guess, I don't want to
5  assume, so I'm going to say I don't know.
6      Q.   Do you know when it was that you set up
7  a Facebook account?
8      A.   When I set a Facebook account up?
9      Q.   Uh-huh?
10     A.   Oh, man, I think my cousin set that
11  account up for me when I first came home.  I'm not
12  for sure, so I don't want to assume.
13     Q.   Which cousin?
14     A.   I believe Tanya Mitts or -- I don't
15  know.  It was one of my female cousins.  I can't be
16  for sure.
17     Q.   All right.  When did you first get
18  contacted by Arnold Day on Facebook, or when did
19  you first contact him?
20     A.   The first time we probably made contact
21  was, shit, I think the day he got -- it was
22  probably -- I can't say.  I'm not for sure, but I
23  believe it was a function that Loevy & Loevy was
24  throwing that we ran into each other.

Page 354

1      Q.   Okay.  Do you know what year that was?
2      A.   About a few years back.  I don't want to
3  assume.
4      Q.   Did you ever talk to Gus Robinson since
5  you've been out?
6      A.   Have I talked to Gus Robinson?
7      Q.   Uh-huh.
8      A.   I seen him a few times.  We ain't never
9  had too many words to exchange.
10     Q.   When have you seen him?
11     A.   I think I seen him once at a picnic.  I
12  think I probably seen him at a block club party.  I
13  don't want to assume, so I don't know.
14     Q.   Do you know what year it was when you
15  saw him?
16     A.   I don't want to assume.  I don't know.
17     Q.   Do you know where he is now?
18     A.   Do I know where he is now?  No,
19  absolutely not.
20     Q.   Did you ever communicate with him while
21  you were in prison?
22     A.   Have I communicated with him while I was
23  in prison?
24     Q.   Yes.

Page 355

1      A.   I believe we crossed each other paths
2  once, he was getting ready to go home, so there
3  really was no communication.  Then I believe I got
4  transferred to another joint -- jail that he was
5  in, and I believe he claimed me as an enemy or
6  something like that and they wound up sending me
7  somewhere else.
8      Q.   How did you find out that he claimed you
9  as an enemy?
10     A.   When they came and got me, they told me,
11  they said I got an enemy down here, somebody
12  claiming me as an enemy.
13     Q.   Did you ever find out why he was
14  claiming you as an enemy?
15     A.   Nope, not at all.
16     Q.   Do you have any idea yourself why he
17  might be doing that?
18     A.   No, not at all.  I don't want to assume,
19  so I don't know.
20     Q.   Well, do you know now that he talked to
21  the police about you about this murder?
22     A.   I knew he talked to the police back from
23  day one about this murder.
24     Q.   So do you think that made him angry?

Page 356

1      A.   I don't know.  You got to ask him.
2      Q.   Did you ever get any letters from him?
3      A.   Did I ever get any letters from him?  I
4  didn't get no letters from him.  I got a letter
5  from one of my public defenders that he had wrote.
6      Q.   What do you mean, tell me about that?
7      A.   Again, I got a letter from my public
8  defender that he had wrote.
9      Q.   Did you ever want to be angry at Gus?
10     A.   I ain't got no reason to be angry at
11  him.
12     Q.   Do you remember the name of the public
13  defender you got the letter from Gus from?
14     A.   I don't want to assume, but I'm quite
15  sure you got it in one of these tabs somewhere.
16     Q.   Did you read the letter that the public
17  defender gave you?
18     A.   Yes, I read it.
19     Q.   Do you remember what it said?
20     A.   Not verbatim.
21     Q.   Do you remember that -- well, here, why
22  don't you just look at it.  It's tab 3 in your
23  binder.
24     A.   Tab 3.



Page 357

1    Q.   Just flip through it and tell me if this
2  is the letter that you got from the public
3  defender.
4    A.   Yes, that's the letter.  I guess this
5  was the letter that he sent to my public defender
6  at the time.
7    Q.   Did you ever want to hurt Gus or take
8  any type of revenge on him for what he said to the
9  police about you?
10    A.   No.
11    Q.   Why not?
12    A.   Ain't no why not, just no.
13    Q.   Well, I would imagine it's your position
14  that whatever Gus said to the police couldn't have
15  been true because you didn't commit this murder,
16  right?
17    A.   Correct.
18    Q.   So that didn't upset you?
19    A.   I wouldn't say it wouldn't upset me,
20  just I didn't have no ill will to do any harm to
21  the man.
22    Q.   Okay.  Do you know why it was that your
23  public defender, his name is Tom Herres, why he
24  gave you this letter from Gus?

Page 358

1    A.   No.
2    Q.   Or did he tell you why?
3    A.   I don't know.
4    Q.   Did you ask him?
5    MR. AINSWORTH:  Don't answer that question.
6    MR. GRILL:  Well, it's not legal advice, did
7  he tell you why he gave you the letter.
8    MR. AINSWORTH:  It doesn't have to be legal
9  advice.  It goes to the case.  Why he would give
10  him the letter?  Don't Answer that question.
11  BY MR. GRILL:
12    Q.   Are you taking your lawyer's advice and
13  not telling me why?
14    A.   Yes, I'm taking his advice.
15    MR. AINSWORTH:  I'm saying if he had that
16  conversation, I'm saying don't answer the question.
17  BY MR. GRILL:
18    Q.   Gus in this letter that you got from
19  your public defender --
20    A.   Yes.
21    Q.   -- talks about a reliable source on the
22  inside at prison with you that told Gus that you
23  know about him being in prison and that he wishes
24  that you could bump into Gus and that we both can

Page 359

1  imagine what would occur if that was to happen.
2    Q.   Do you know, after reading that letter,
3  who this reliable source might have been that Gus
4  was referring to that was incarcerated, I guess,
5  with you?
6    A.   I have no idea.
7    Q.   Did you ever tell anybody that you
8  wanted to hurt Gus or harm him in any way?
9    A.   No.
10    Q.   Never once?
11    A.   Not that I can remember.
12    Q.   Do you think Gus' testimony had anything
13  to do with you getting arrested for this murder?
14    MR. AINSWORTH:  Object to the form of the
15  question.
16  BY MR. GRILL:
17    Q.   Strike that.  Do you think what Gus told
18  the police had anything to do with you getting
19  arrested for this murder?
20    A.   Maybe.
21    Q.   Okay.  Why do you say maybe, what do you
22  think?
23    A.   Because he said I came up to him and
24  asked him did I want to act as a lookout with me,

Page 360

1  which is not true, but I don't know why he would
2  tell the police that.
3    Q.   Do you think what Gus said had anything
4  to do or helped at all or contributed to you
5  getting convicted for that murder?
6    A.   Well, it was his word against mine.  I
7  guess they believed his.
8    Q.   And none of that upset you?
9    MR. AINSWORTH:  Object to the form of the
10  question.
11  BY THE WITNESS:
12    A.   I'm not upset.  I don't have time to be
13  angry.
14  BY MR. GRILL:
15    Q.   All right.  So you walk up 51st Street,
16  you get slapped by Aunt Bee.  Why did Aunt Bee slap
17  you, if you know?
18    A.   I would have to say -- I don't want to
19  assume, but I would have to say it's about the
20  window being busted on the second floor of 1210.
21    Q.   Okay.  Did she say why she slapped you?
22    A.   Again, I don't want to assume.
23    Q.   Okay.  She didn't slap you the first
24  time you walked up, right?



Page 361

1    A.    No.
2    Q.    When you saw her the first time and you
3  went to clean the glass up, she didn't slap you
4  then, right?
5    A.    No.
6    Q.    All right.  But she slapped you the
7  second time, so why do you think that --
8    A.    Again, I don't know.
9    Q.    Why do you assume it was for the window
10  the second time?
11    A.    I don't want to assume.  It may be for
12  the window.  It could have been for something else.
13  I don't know.
14    Q.    Okay.  Well, were you in trouble, if you
15  remember back then, for anything else?
16    A.    I don't remember.
17    Q.    All right.  As you're walking up 51st
18  Street before you get to Aunt Bee and she slaps
19  you, how many police cars did you see at the scene?
20    A.    Man, that was 30 years ago.  I don't
21  know.
22    Q.    More than one?
23    A.    I don't know.
24    Q.    Was there crime tape up?

Page 362

1    A.    I don't know.
2    Q.    Well, do you know what crime tape is?
3    A.    I don't want to assume.  I don't know.
4    Q.    Like you understand it's like that
5  yellow tape that police put up?
6    A.    It could be red tape.  I don't know.
7    Q.    Did you see anything like that up when
8  you were walking up?
9    A.    I don't know.
10    Q.    Did you see an ambulance?
11    A.    I don't know.
12    Q.    Did you see any dead bodies in the
13  street?
14    A.    I don't know.
15    Q.    Did you see anybody that had been shot?
16    A.    I don't know.
17    Q.    Did you see a station wagon that was
18  kind of cockeyed right out in front of 1210 pretty
19  much?
20    A.    I wasn't paying attention to it.
21    Q.    Really?
22    A.    I wasn't.
23    Q.    All right.  Well, you were paying
24  attention to -- you saw the police cars, right?

Page 363

1    A.    Yeah, I seen the police cars.
2    Q.    And you saw an ambulance, right?
3    MR. AINSWORTH:  Object to the form of the
4  question.
5  BY THE WITNESS:
6    A.    I don't recall seeing an ambulance.
7  BY MR. GRILL:
8    Q.    Okay.  You don't recall seeing an
9  ambulance in front of your house, in front of 1212?
10    A.    I can't recall.
11    Q.    Okay.  Do you recall testifying at the
12  criminal trial that you saw an ambulance in front
13  of your house?
14    A.    Maybe, but I don't recall now.
15    Q.    And so seeing all that, at least some
16  police activity, did you remember thinking that you
17  wanted to know what was going on out in front of
18  your house or in front of 1210 or 1212?
19    A.    Not in particular.
20    Q.    Any reason why you didn't -- weren't
21  interested?
22    A.    Didn't have nothing to do with me.
23    Q.    Did you see any broken glass on the
24  sidewalk in front of 1210 or 1212?

Page 364

1    A.    I answered that already.
2    Q.    No, I didn't ask you about broken glass.
3    A.    Yes, you did, but the answer again is
4  no.
5    Q.    All right.
6    A.    And I wasn't looking for no broken
7  glass.
8    Q.    Did you see any bullet casings like
9  shells on the ground?
10    A.    I didn't see none of that.
11    Q.    Did your Aunt Bee tell you, hey, there
12  is a guy that's shot in the street in front us?
13  Did she say anything like that?
14    A.    No, she didn't say nothing like that to
15  me.
16    Q.    Look at 72 -- G-72 in your trial
17  transcript.
18    A.    G-72?
19    Q.    Yes.
20    A.    What year?
21    Q.    The same stuff, the trial transcript,
22  '93 09-10, but just go to G-72.
23    MR. AINSWORTH:  You sent him to Exhibit 3.
24  BY MR. GRILL:



Page 365

1    Q.   Oh, did I?  Sorry, I did.  Yeah, tab 5.
2  Yes, I forgot that I did that.
3    A.   You say what page?
4    Q.   72.  So I want you to look at lines 12
5  through 15.  So it reads question:  "You say that
6  you also had an altercation with somebody on your
7  porch that night, is that correct?"  Answer:
8  "Yeah, some females."  Question:  "Did they strike
9  you?"  Answer:  "Nope, my auntie struck me."
10  Question:  "Where did she hit you?"  Answer:  "In
11  the face."
12       So who are these females that you're
13  talking about at that criminal trial?
14    A.   The same females that I've been talking
15  about since day one.
16    Q.   Which are those?
17    A.   Denise Harris, Annette Harris, and
18  Nakeia Little.
19    Q.   So were they out there with Aunt Bee
20  when she struck you?
21    A.   Man, listen, man.
22    Q.   I'm just trying to figure out what
23  happened.
24    A.   No, you're not.  No, you're not.

Page 366

1    Q.   Okay.  So tell me again then who are
2  these -- was Aunt Bee out on her porch, out on the
3  pour at 1210 --
4    A.   Okay, I'm going to say this one time.
5  This will be the last time I say this.  I'm going
6  to go and say that I'm going to assume that they
7  was all like there.  I don't like to assume, but
8  I'm going to assume they was all out there.
9    Q.   Were you assuming back then at your
10  criminal trial?
11    A.   I just answered your question, so come
12  on with the next one.
13    Q.   No, this is a totally different
14  question.  Were you assuming in 1993 at your
15  criminal trial --
16    A.   Yep, I was assuming they was out there.
17    Q.   So you were testifying under oath in
18  1993 to things that happened, but really they're
19  just guesses?
20    A.   I've been telling the dumb ass police
21  for the longest to go talk to them, but they never
22  did.
23    Q.   To Denise and Annette?
24    A.   To Denise, Annette and Nakeia Little.

Page 367

1    Q.   Okay, great.  So what do you think that
2  they have to offer to this case?
3    A.   Man, I don't know.
4    Q.   Why do you want the police to talk to
5  them?
6    A.   Because they was out there.
7    Q.   Well, you knew where they lived, right?
8    A.   Okay, they was out there.  They should
9  have went and talked to them.
10    Q.   How do you know they were out there?
11    A.   Okay, again, I assume they was out
12  there.
13    Q.   Well, where do you assume that they were
14  out there and when?
15       Let's start over.  You go and throw
16  rocks and bottles at a car, right?  Right?
17    A.   Can you read my answer back to that
18  question he just asked me because I answered that
19  already?
20    MR. AINSWORTH:  I don't think she can, it's
21  too far.
22  BY THE WITNESS:
23    A.   I answered it already.  I'm not finnin
24  to answer it again.  I answered it already.

Page 368

1  BY MR. GRILL:
2    Q.   I'll tell you exactly what I'm trying to
3  figure out here is when it was that you began
4  assuming that Denise and Annette were outside?
5    A.   Because I began assuming because you
6  ain't common sense or you're not listening, and you
7  started asking me the same question.
8    Q.   Okay.  Because Denise said that she was
9  out there the whole time.
10    A.   Okay, well, if she says she was out
11  there, then she was out there.
12    Q.   I know.  But she is saying that none of
13  the things that you said happened with that bottle
14  happened, okay?  So I'm trying to figure out -- and
15  what your assumption now is based on about her
16  being -- her and Annette being outside, that's the
17  first question, so what is that assumption based
18  on?
19    A.   And my answer to that question is I've
20  been saying the same thing from day one to the
21  police, so you do your job and dig out what
22  Denise's truth is.  I've been telling the police
23  from day one that I threw a bottle through
24  somebody's car -- at somebody's car that night.



Page 369

1  It's all right there back in '91, so you either
2  going to believe Denise or you're going to believe
3  the police, so do your job.
4      Q.   When did you find out that Denise was
5  outside?
6      A.   I don't know.  I don't know.  Okay, I
7  don't know then, how about that?  I don't know.
8      Q.   It would matter if you thought --
9      A.   It don't matter what you matter.  I
10  don't know.
11      Q.   Prior to your trial, when did you find
12  out that Denise was outside?
13      A.   I don't know.
14      Q.   Did you talk to Denise?
15      A.   I don't know.
16      Q.   Did somebody in your family tell you
17  that, hey, Denise told me that she can help you out
18  in defending against your criminal case?
19      A.   I don't know.
20      Q.   So why did you want the police to talk
21  to Denise?
22      A.   I don't know.
23      Q.   What about Annette, why did you want the
24  police to talk to Annette?

Page 370

1      A.   I don't know.
2      Q.   Well, you already told me that what was
3  in that affidavit --
4      A.   I don't give a fuck.
5      MR. AINSWORTH:  Let's take a break.
6      MR. GRILL:  Looks like we need another break.
7  BY THE WITNESS:
8      A.   I don't need no break, man.  Let's just
9  get this over with, man.
10      MR. AINSWORTH:  I need a break.
11      THE VIDEOGRAPHER:  We're going off the record,
12  the time is 5:32 p.m.
13          (WHEREUPON, a short break was had.)
14      THE VIDEOGRAPHER:  We're back on the record,
15  the time is 5:39 p.m.
16  BY MR. GRILL:
17      Q.   Okay.  So I'm trying to pick up back
18  where we left off.  So we're talking about why you
19  wanted the police to talk to Denise and Annette.
20  So what did you believe they had to tell the
21  police?
22      A.   I assumed that they was out there and
23  they can tell the police whatever need to be told.
24      Q.   Okay.  So earlier today you told me you

Page 371

1  didn't know who was out there other than your Aunt
2  Bee.  So why -- what is that assumption based on?
3      MR. AINSWORTH:  Object to the form of the
4  question.
5  BY THE WITNESS:
6      A.   Again, I assume that they was out there
7  and they would be able to help the police with
8  their investigation.
9  BY MR. GRILL:
10      Q.   Why do you assume?
11      A.   Ain't no why.  I just said I assume.
12      Q.   All right.  So do you remember if like
13  somebody told you that like, hey, Denise and
14  Annette are outside or saw something that could
15  help you?
16      A.   I don't remember that.
17      Q.   Did you ever hear prior to your trial
18  Denise and Annette had information -- from anybody
19  that Denise and Annette had information that could
20  help you defend against the murder charge that you
21  were facing?
22      A.   Only what I read in my police report.
23      Q.   Okay.  Well, what did you read in the
24  police reports?

Page 372

1      A.   The same thing you read.
2      Q.   Well, the police reports say that Denise
3  and Annette weren't there.
4      MR. AINSWORTH:  Object to the form of the
5  question.  That's not what they say.
6  BY MR. GRILL:
7      Q.   They say that Denise came home and then
8  went over, I believe, over to May Street, for
9  example, at the time of the shooting.  So with that
10  in mind, what else did you read in the police
11  reports that told you that they had something to
12  say that could help you defend against a murder
13  charge?
14      A.   You want to go to the police report, we
15  can go over it together.
16      Q.   I'm just asking you what you recall.
17      A.   I'm not going to assume unless you put
18  it in front of me.
19      Q.   Okay.  Did you -- Denise and Annette
20  lived in the second floor of the 1212 building,
21  right?
22      A.   Right.
23      Q.   The front building, right?
24      A.   (Witness nodding).



Page 373

1    Q.    Did you ever -- do you recall whether
2   they testified at the criminal trial?
3    A.    No.
4    Q.    Do you remember if a subpoena was ever
5   issued by your attorney for their testimony at your
6   criminal trial?
7    A.    I don't know.
8    Q.    Do you remember if the state's attorneys
9   ever called them to testify?
10    A.    I don't know.
11    Q.    Did you want them to testify at your
12   criminal trial?
13    A.    Yes, I wanted them.
14    Q.    Okay.  What did you want them to say?
15    A.    Whatever they saw.
16    Q.    What did you think they saw?
17    A.    Whatever they saw.  It ain't what I
18   think they saw.  It's what they saw.
19    Q.    See, that's what I'm trying to figure
20   out because you feel that they have some
21   information that will help you, and I'm trying to
22   figure out what you think in your head --
23    A.    I don't know what information they have
24   to help me.

Page 374

1    Q.    So you're just guessing that they might
2   have something to say that would help you?
3    A.    I'm guessing that they probably would
4   know more than what I know about it.
5    Q.    That's what I'm wondering about like
6   what are you basing that on, like why do you think
7   they know something more?
8    A.    There ain't no why I'm basing it on
9   something.
10    Q.    Did you ever ask anybody in your family
11   if they could find out -- well, let me ask you
12   this.  After you got arrested on the 17th, I guess,
13   of September 1991 -- for the murder that is -- up
14   until when your trial started in -- was it '93?
15    A.    '93.
16    Q.    Did anybody in your family -- let's
17   start with Aunt Bee, did she come visit you when
18   you were in jail awaiting trial when you were at
19   the Audy home?
20    A.    Yes, my Aunt Bee came up there.
21    Q.    What about anybody else in your family,
22   anybody come visit you?
23    A.    My momma.
24    Q.    Okay.

Page 375

1    A.    And a couple of -- man, that's been so
2   long now.  Man, I don't know.  I know my mom and
3   Aunt Bee came.  That's all I'm going to say.  I
4   can't assume about nobody else.
5    Q.    How many times place did Aunt Bee come
6   visit you?
7    A.    Aunt Bee came to visit me probably -- I
8   don't want to assume.  I don't know.
9    Q.    More than once?
10    A.    Yes, it was more than once, but I still
11   don't want to assume.
12    Q.    Do you think she came and visited you
13   once a month?
14    A.    I don't want to assume, so I don't know.
15    Q.    What about your mom?
16    A.    Same answer, I don't want to assume.
17    Q.    Do you remember talking to your Aunt
18   Bee, for example, on any of these visits when she
19   came to see you at the Audy home while you were
20   awaiting trial talking to her about what happened
21   with the police that night when you got arrested?
22    A.    I can't remember.
23    Q.    Did you talk to her about the police
24   making you confess to a crime you didn't commit?

Page 376

1    A.    I can't remember.
2    Q.    What about your mom, did you tell her,
3   mom, I didn't do this and this is why the police
4   made me admit it by beating me up?
5    A.    Did I tell my mom that?
6    Q.    Yeah, yes.
7    A.    I can't remember.  I don't want to
8   assume.
9    Q.    In any of these conversations, do you
10   remember talking to your mom, for example, about
11   what it was that you thought Denise or Annette
12   might have to say about what happened that night?
13    A.    I can't recall.
14    Q.    Do you remember asking your mom can you
15   go talk to Denise or Annette and see what they know
16   and let me know?
17    A.    I can't remember.
18    Q.    What about your Aunt Bee, did you ever
19   ask her to go find out what it was that Denise and
20   Annette knew?
21    A.    No.
22    Q.    Why are you sure that you've never asked
23   your Aunt Bee that?
24    A.    Because I don't want to assume, so I



Page 377

1  don't know.
2     Q.   Oh, you don't know?  It's not a no.
3  It's you don't know, is that right?
4     A.   However you want to put it.
5     Q.   Well, I want you to put it.  I'm not
6  testifying for you.  It's your deposition, so you
7  need to tell me.
8     A.   I just told you.
9     Q.   You don't know, is that the answer?
10    A.   If that's what you want to put down.
11    Q.   Well, I don't want to put down anything
12  other than what you say happened.
13    A.   Go to your next question then.
14    Q.   Okay.  Well, I'll just ask the same
15  question again because it sounds like you're just
16  adopting what I'm saying, and I want you to tell me
17  is the answer to my question which was did you talk
18  to Aunt Bee or ask Aunt Bee to find out from Denise
19  and Annette what they knew.
20    A.   I don't know.
21    Q.   Okay.  So I was asking you before we
22  took a break on G-72 which you got opened up there
23  on those lines about the females, plural, on your
24  porch that night.  Why did you say females?

Page 378

1     A.   Because that was the last place I seen
2  the females on my porch before I ran through the
3  gangway.
4     Q.   Okay.  Ran through the gangway the first
5  time after throwing the rocks or the --
6     A.   The first time.
7     Q.   Okay.  What females were out there?
8     A.   I don't know, man.
9     Q.   You don't know?
10    A.   I don't know.  You want me to assume?
11    Q.   Well, was it Annette?
12    A.   Do you want me to assume?  Because I'll
13  assume for you.  I'm telling you I don't know, but
14  if you want me to assume, I would have to say
15  Annette, Denise, and the kids, if you want to
16  assume that.
17    Q.   So based on your assumption, you'd agree
18  with what Denise said that she was outside on the
19  porch?
20    A.   If that's what she said, that's what she
21  said.  I can't speak for her.  I can only speak for
22  what I know and see.
23    Q.   My point is that you realize that, as I
24  pointed out here, that Denise is -- if she was out

Page 379

1  there, like I guess you're assuming now that she
2  was, that she's saying that nobody through a bottle
3  through the second floor window, and I want to know
4  if you agree with that?
5     MR. AINSWORTH:  Object to the form of the
6  question, argumentative.  You can answer.  Are you
7  asking him if he agrees --
8     MR. GRILL:  With Denise.
9     MR. AINSWORTH:  -- that Denise said --
10  BY MR. GRILL:
11    Q.   That was her testimony.
12    A.   Do I agree with her testimony?
13    Q.   Yes.
14    A.   No.
15    Q.   That she said nobody threw a bottle
16  through the second floor window that night.
17    A.   No, I don't an agree with that.
18    MR. AINSWORTH:  I'll object to foundation as
19  well.
20  BY MR. GRILL:
21    Q.   You also don't agree with Quarter
22  Pound's testimony that you were not with him when
23  he cleaned the glass up?
24    A.   Yes.

Page 380

1     Q.   Yes, you don't agree with his testimony?
2     A.   I don't agree with it.
3     Q.   Okay.  Do you have a recollection of
4  seeing like Fred?
5     A.   Have I --
6     Q.   That night like on the 15th, did you see
7  him that night?
8     A.   I can't recall.
9     Q.   Where -- after your Aunt Bee slapped
10  you, your testimony I thought was that she didn't
11  say why she was slapping you; you just assumed it
12  was for the window, is that right?
13    A.   Correct.
14    Q.   And why did you assume it was for the
15  window since now this is the second time that
16  you're back with Aunt Bee about the window?
17    A.   Why do I assume what now?
18    Q.   Yeah, why would you assume that she was
19  slapping you because of the window?
20    A.   No reason, I just assumed.
21    Q.   Because, again, she didn't hit you the
22  first time about the window when she told you to
23  clean the glass up.  It was just the second time
24  when you came back --



Page 381

1    A.    When I came back around, I assumed it
2    was about the window.
3        Q.    Okay.  Do you remember if Aunt Bee said
4    anything about her seeing Mr. Garcia get shot to
5    death in his car out in front of 1210 where she was
6    standing?
7        A.    No.
8        Q.    Did she tell you that ever in any of
9    your visits with her at the Audy Home, Anthony, I
10   saw Mr. Garcia get shot to death and I know it
11   wasn't you?
12       A.    No.
13       Q.    Okay.  Do you know if Aunt Bee went back
14   to 1212 rear house when you were inside the second
15   floor at 1210 cleaning the glass up?
16       A.    I don't know.
17       Q.    Did you see her in the alley?
18       A.    No.
19       Q.    Did you see her in the gangway?
20       A.    No.
21       Q.    Did you see her walk off from the porch
22   of 1210 when she told you to go clean the glass up?
23       A.    No.
24       Q.    Okay.  In any of your visits with Aunt

Page 382

1    Bee at the Audy Home while you were awaiting trial,
2    did she tell you that she heard gunshots?
3        A.    No.
4        Q.    Did she ever talk to you about anything
5    that she may have seen about Mr. Garcia getting
6    killed in front of the house that she was standing
7    on the porch of?
8        A.    No.
9        Q.    Nothing?
10       A.    Nothing that I can remember.
11       Q.    Did your mom tell you where she was when
12   the shooting happened?
13       A.    My momma was living in Milwaukee.
14       Q.    Okay, that's right.  Do you know how
15   word got to your mom that you were in jail for this
16   murder, that you got arrested for it?
17       A.    I don't want to assume, so I don't know.
18       Q.    Did she ever tell you how she found out?
19       A.    No.
20       Q.    Did you call her?
21       A.    Did I call her?
22       Q.    Yes.
23       A.    No.
24       Q.    So she just showed up one day at the

Page 383

1    Audy Home to meet with you, is that accurate?
2        A.    Put it like that, yes.
3        Q.    Was she with anybody when she came and
4    visited you?
5        A.    She was by herself.
6        Q.    Did your father ever come and visit you
7    in the Audy Home?
8        A.    No.
9        Q.    Other than your Aunt Bee and your mom,
10   it's your testimony that you don't recall anybody
11   else coming to visit you during that time period?
12       A.    I recall people coming to visit me, but
13   I just don't know who it was.
14       Q.    Denise never came to visit you?
15       A.    No.
16       Q.    And Annette never came to visit you?
17       A.    No.
18       Q.    What about Nakeia Little, did she ever
19   come and visit you?
20       A.    No.
21       Q.    Do you who Taneal Jones is?
22       A.    Who?
23       Q.    Taneal Jones?
24       A.    Taneal Jones, Taneal, it sounds

Page 384

1    familiar.  You got a nickname for her?
2        Q.    No.
3        A.    Just Taneal Jones?  I don't want to
4    assume, but I don't know.
5        Q.    Did Arnold Day ever come visit you while
6    you were in the Audy Home?
7        A.    No.
8        Q.    Did Gus ever come visit with you when
9    you were in the Audy Home?
10       A.    No.
11       Q.    Just had to ask, get it crossed off the
12   list to make sure.
13             After your Aunt Bee slapped you, where
14   did you go?
15       A.    She told me to go in the house.
16       Q.    Okay.  I want you to tell me where you
17   went?
18       A.    I went in the house.
19       Q.    Where did you go in the house?
20       A.    1212 rear.
21       Q.    Where in the house did you go?
22       A.    Upstairs to my room.
23       Q.    What did you do?
24       A.    Man, I can't remember.  I probably laid



Page 385

1 down. I was probably watching TV, I don't know.
2    Q.   Anybody in the house at that time when
3 you went in?
4    A.   I don't know.
5    Q.   Do you remember what you watched?
6    A.   I don't -- that's 30 years ago, man, I
7 don't know.
8    Q.   Well, I don't know, you remembered a few
9 things about what happened. I'm wondering if you
10 remember --
11    A.   I ain't going to remember no TV program.
12    Q.   Could you see like flashing lights out
13 in the street?
14    A.   Flashing lights?
15    Q.   Yes, from the police car, all the police
16 cars out there.
17    A.   No.
18    Q.   Did you ever tell the police that your
19 aunt sent you specifically to the rear house of
20 1212?
21    A.   Did I ever tell the police that?
22    Q.   Yes.
23    A.   I don't want to assume, so I don't know.
24 I just know I went to the rear house.

Page 386

1    Q.   Okay. Well, I'm going to tell you that
2 you going to the rear house after your aunt slapped
3 you is not in the police reports, so I'm wondering
4 if you recall ever telling the police that?
5    A.   I don't want to assume, so I don't know.
6    Q.   Do you think that would have been an
7 important thing to let them know since there are
8 two 1212 houses, a front one and a back one, that
9 you went specifically to the rear house?
10    MR. AINSWORTH: Object to the form of the
11 question and foundation.
12 BY THE WITNESS:
13    A.   I went to the rear house because that's
14 where I lived at.
15 BY MR. GRILL:
16    Q.   Right. And that's the house where you
17 later said that it would have been impossible for
18 you to see a body moving around on the street
19 because it's the rear house, right?
20    A.   Exactly.
21    Q.   But you would have been able to see the
22 body if you were with folks in 1212 front house,
23 right, if you looked out the front window?
24    A.   Are you asking me to assume?

Page 387

1    Q.   No, I'm ask you like that one faces the
2 street. There isn't nothing block your vision,
3 right?
4    A.   You're asking me to assume then.
5    Q.   Okay, assume.
6    A.   Yeah, you probably could.
7    Q.   Same if you're in 1210, the one that had
8 the broken window, if you were looking out at that
9 window, you could have seen the body?
10    A.   I don't know.
11    Q.   Okay. You remember when you did that
12 handwritten statement with the Assistant State's
13 Attorney, right?
14    A.   The handwritten statement?
15    Q.   Yes.
16    A.   What about it?
17    Q.   You remember doing it, right?
18    A.   Right.
19    Q.   And in that statement -- we're going to
20 talk some more about it in detail, but do you
21 recall telling -- the Assistant State's Attorney's
22 name was A.S.A. Grossman. Do you remember telling
23 him that you specifically went to the rear house
24 1212?

Page 388

1    A.   I don't remember.
2    Q.   Okay. Because that's not what your
3 statement says. Your statement just says 1212.
4    A.   Okay, well, hey.
5    Q.   At any point, do you remember seeing an
6 ambulance pull up?
7    A.   Do I remember seeing an ambulance pull
8 up?
9    Q.   Yes.
10    A.   I don't remember.
11    Q.   Did you see Quarter Pound in the front
12 of 1210 when your Aunt Bee slapped you?
13    A.   I don't remember. I don't want to
14 assume, I don't remember.
15    Q.   Did Quarter Pound ever come visit you at
16 the Audy Home after you got arrested?
17    A.   No.
18    Q.   Did you ever try to call him?
19    A.   No.
20    Q.   Did you ever try to call Denise?
21    A.   No.
22    Q.   Did you ever try to call Annette?
23    A.   No.
24    Q.   You knew how to get ahold of them,



Page 389

1  right?

2      A.    Did I know how to get ahold of them?

3      Q.    Yeah, back when you were sitting in the

4  Audy Home, you knew how --

5      A.    When I was in the Audy Home?

6      Q.    Yeah, you knew how to reach them if you

7  needed to.

8      A.    I don't want to assume.  They were

9  probably still staying there, I don't know.

10     Q.    Well, they were.  I mean you heard

11  Denise in her deposition testify that she was still

12  living at 1212 on the second floor in the front

13  house even when you went to trial in 1993.

14           So while you were sitting in the Audy

15  Home, you knew how to reach Denise, for example, if

16  you wanted to get ahold of her.  You knew how to do

17  that, right?

18     A.    You're assuming that I knew how to do

19  that.

20     Q.    You knew where he she lived, right?

21     A.    I didn't know they were still staying

22  there.

23     Q.    You knew where she lived, right?

24     A.    I didn't know they were still staying

Page 390

1  there.  I'm locked in a cage.  I don't know where

2  people stayed at.

3      Q.    Did you think that Denise moved out of

4  the second floor of 1212 --

5      A.    I'd be assuming then.

6      MR. AINSWORTH:  Just wait for the question.

7  BY MR. GRILL:

8      Q.    Did you think that she had moved?

9      A.    I'd be assuming.

10     Q.    Did you think that Annette had moved?

11     A.    I'd be assuming.

12     Q.    Well, was there any reason why you would

13  assume that they moved?

14     A.    No particular reason.

15     Q.    Okay.  So assuming that they were still

16  living on the second floor of 1212 at the time you

17  were sitting in the Audy Home waiting to go to

18  trial for killing Mr. Garcia, did you know -- you

19  knew how to reach them if you needed to, right,

20  assuming they still lived on the second floor at

21  1212?

22     A.    I don't want to assume.

23     MR. AINSWORTH:  I'll object to the form of the

24  question, it calls for speculation.

Page 391

1      BY MR. GRILL:

2      Q.    Well, assume.  If you had to assume, do

3  you think you would assume you could have reached

4  them?

5      A.    I don't want to.

6      Q.    You don't want to?

7      A.    Nah.

8      Q.    Are you just refusing to answer my

9  question?

10     A.    I ain't refused.  I answered.  I said I

11  don't want to assume.

12     Q.    Oh, I taught you just said you didn't

13  want to answer.  Okay, well, what about Quarter

14  Pound, did you know how to get ahold of him while

15  you were sitting in the Audy Home?

16     A.    Nope.

17     Q.    Did you ever -- was there any reason why

18  you didn't try, if you thought Denise or Annette

19  had this information that could help you, that you

20  didn't try to contact them yourself while you were

21  sitting at the Audy Home?

22     A.    Excuse me?

23     Q.    Is there any reason -- if you

24  thought -- strike that.

Page 392

1           If you thought, as you said, while you

2  were sitting at the Audy Home that Denise and

3  Annette had information that could help you defend

4  against the murder charge that you're sitting in

5  the Audy Home for waiting to go to trial, is there

6  any reason why you didn't reach out and for example

7  try to contact Denise and talk to her?

8      A.    I don't know.

9      Q.    What about Annette, any reason why you

10  didn't try to get ahold of her?

11     A.    I don't know.

12     Q.    Did you not care?

13     A.    I did care, but I don't know.

14     Q.    I mean or does this go back to what you

15  told me earlier today about the murder charge, I

16  think the phrase you used was -- I wrote it

17  down -- not serious.  Is that because you didn't

18  think a murder charge was a serious crime --

19     MR. AINSWORTH:  Object to the form.

20  BY MR. GRILL:

21     Q.    -- when you were sitting in the Audy

22  Home?

23     MR. AINSWORTH:  Object to the form of that

24  question.



Page 393

1  BY THE WITNESS:
2      A.  I don't know what a serious crime was
3  back then.
4  BY MR. GRILL:
5      Q.  Okay.  You didn't know if a murder
6  charge was a serious crime?
7      A.  I didn't know what a serious crime was
8  back then.
9      Q.  All right.  Any reason why you didn't
10  try to get ahold of Quarter Pound while you were at
11  the Audy Home?
12      A.  I don't know.
13      Q.  Did you ever get upset at your trial
14  attorney for not calling Denise at trial?
15      MR. AINSWORTH:  Don't reveal any
16  communications you had, so nothing you said and
17  nothing your attorney said to you, okay?
18  BY THE WITNESS:
19      A.  Well, to answer, I don't know.
20  BY MR. GRILL:
21      Q.  Do you remember feeling upset that your
22  attorney didn't call Denise at trial?
23      A.  I don't know how I felt.
24      Q.  What about Annette, did you feel upset

Page 394

1  that your attorney didn't call Annette?
2      A.  I don't know how I felt.
3      Q.  All right.  These were people you
4  believed might be able to provide an alibi for you,
5  right?
6      A.  Not for me.  They was probably out
7  there, they seen whatever, they could have helped
8  the police with their investigation.
9      Q.  Do you know if either of them ever told
10  the police that they could help with their
11  investigation?
12      A.  I don't know.
13      Q.  Because you saw police reports, and
14  those police reports show that the police did talk
15  to both of them, but both of them said they weren't
16  around when the shooting happened.
17      A.  Well, we both know that was a lie,
18  right?
19      Q.  My question is like do you know of any
20  other information that should have made the police
21  think something different?
22      A.  You got to ask them.
23      Q.  Well, I did.
24      A.  Okay, so you know the answer then.

Page 395

1      Q.  Right.  So all they knew about was that
2  they both said that they couldn't help.
3      MR. AINSWORTH:  Objection, but go ahead.
4  BY MR. GRILL:
5      Q.  So I'm wondering if you were aware, in
6  possession of any other information while you were
7  sitting at the Audy Home that should have caused
8  the police, in your opinion, to follow up more with
9  Denise and Annette?
10      MR. AINSWORTH:  Objection, mischaracterizes
11  the evidence.
12  BY MR. GRILL:
13      Q.  Go ahead?
14      A.  Did I know about the evidence?
15      Q.  Yeah, were you aware of anything else
16  that the police knew about because you had the
17  reports, you know?
18      A.  I didn't have the reports in the Audy
19  Home.
20      Q.  Well, you've looked at them since.
21  Let's say generally -- so now today, sitting here
22  today, you've looked at the police reports, you
23  have the benefit of all these transcripts, you've
24  looked at all of this evidence, is there anything

Page 396

1  in that evidence that tells you that, in your
2  opinion, this is something that the
3  police -- should have caused the police to follow
4  up more with Denise and Annette?
5      A.  Not at the moment.
6      Q.  Okay.  Do you need to get the phone?
7      A.  No, it's my Auntie.  I'll talk to her in
8  a minute.
9      Q.  What about Nakeia Little, same answer
10  with her?
11      A.  Yes.
12      MR. AINSWORTH:  Object to the form of the
13  question.
14  BY MR. GRILL:
15      Q.  You got to the police station
16  around -- well, after the police came to your Aunt
17  Bee's house to pick you up, your testimony was that
18  you got -- at least at the criminal trial -- you
19  got to the police station between 12:00 and
20  12:40 in the afternoon.  Does that still comfort
21  with what you remember?
22      A.  I don't want to assume, but it may fall
23  in that time range somewhere.
24      Q.  So what time on September 16th did the



Page 397

1  police show up at your Aunt Bee's house?
2      A.   I'm not for sure, but I know it was
3  probably midmorning or afternoon.  I'm not for
4  sure.
5      Q.   Okay.  Well, if you got to the police
6  station between 12:00 and 12:40, do you
7  think -- well, strike that question.
8          Tell me what you were doing when the
9  police showed up at your Aunt Bee's house on the
10  16th?
11     A.   I believe I was upstairs ironing some
12  clothes.
13     Q.   All right.  And what were you ironing
14  clothes for?
15     A.   I believe I had a juvenile court date.
16     Q.   Okay.  What time was court at?
17     A.   I believe it was -- shit, probably 1:30,
18  1:45, something like that.
19     Q.   Okay.  What was the court date for, what
20  type of charge were you dealing with?
21     A.   I didn't have no charges.  Just my
22  probation officer ordered me to come to court.
23     Q.   That's what I'm asking, what were you on
24  probation for?

Page 398

1      A.   For the criminal sexual assault.
2      Q.   So you were still on probation from
3  that?
4      A.   Right.
5      Q.   How long was your probation still to go
6  at that point, if you know?
7      A.   I don't remember.  I just know that I
8  was given a year of probation, that's all I know.
9      Q.   And what happened -- well, what time did
10  you go to bed the night before on the 15th if you
11  know?
12     A.   You're talking about 30 years ago.  I
13  don't know.
14     Q.   So the 16th was a Monday, okay, so we're
15  talking on Sunday night and you've got juvenile
16  probation, meaning the next day, so what time, if
17  you can think, would it have been that you would
18  have gone to bed?
19     A.   I don't want to assume, so I don't know.
20     MR. AINSWORTH:  Objection, asked and answered.
21  BY MR. GRILL:
22     Q.   Well, you said you stayed up and watched
23  television after your Aunt Bee sent you -- after
24  slapping you.

Page 399

1      A.   I didn't say I stayed up and watched
2  television.  I said I might have watched
3  television, turned the TV on.  I said I don't know
4  what I did.
5      Q.   Okay.  Well, TV is kind of a specific
6  thing, so do you think you did something else other
7  than watch TV?
8      A.   I don't recall.  I don't know.
9      Q.   All right.  So you're getting ready to
10  go to court, you're ironing your clothes.  What
11  happens next?
12     A.   I just -- I heard a bunch of commotion
13  downstairs and I heard my Auntie calling my name.
14     Q.   All right.  And what did you hear
15  downstairs?
16     A.   A bunch of commotion.
17     Q.   What did it sound like?
18     A.   Like furniture moving, just a bunch of
19  commotion.
20     Q.   And then what happened?
21     A.   By the time I got to the top of the
22  stairs to get ready to come down the stairs, the
23  police was coming up the stairs.
24     Q.   How many police officers were coming up

Page 400

1  the stairs?
2      A.   I don't want to assume.  I'll just say
3  probably two.  I don't remember.
4      Q.   All right.  And what happened?
5      A.   They had their guns drawn.  I was in the
6  middle of the stairs.  They slammed me up against
7  the wall and put their handcuffs on me.
8      Q.   Did they have their guns drawn?
9      A.   Yes.
10     Q.   Did you ever testify to that before?
11     MR. AINSWORTH:  Objection to the form of the
12  question, improper impeachment.
13  BY MR. GRILL:
14     Q.   I'm asking you do you recall ever saying
15  that in any of your prior testimony?
16     A.   Not for sure.  I probably did probably.
17  I'm not for sure.
18     Q.   Okay.  So both of them had their guns
19  drawn?
20     A.   I'm not for sure.
21     Q.   Were they white officers, black
22  officers?
23     A.   Man, they was all white to me.  I didn't
24  see no black folks the color of my skin in there.



Page 401

1   Q.   All right.  Were they pointing their
2   guns at anybody?
3   A.   They just had their guns drawn.
4   Q.   What were they saying?
5   A.   They was asking me was my name Shawn,
6   I'm like yeah.
7   Q.   All right.  And what happened next?
8   A.   Again, they slammed me against the wall
9   and put some handcuffs on me.
10   Q.   Okay.  What wall did they slam you
11   against?
12   A.   My hallway wall going upstairs.
13   Q.   Were you on the stairs when they did
14   this?
15   A.   Yes.
16   Q.   Who was home when this happened?
17   Who was home?
18   Q.   Yes, at the rear house 1212.
19   A.   I believe my Auntie was there, and I
20   think my cousin's boyfriend was there because they
21   grabbed him first.
22   Q.   So your Aunt Bee?
23   A.   Yep.
24   Q.   And your cousin's boyfriend?

Page 402

1   A.   I think his name was Joe Joe or
2   something like that.
3   Q.   Where is Joe Joe today?
4   A.   I believe he is deceased.
5   Q.   Okay.  Did you see your Aunt Bee
6   anywhere while the police were slamming you against
7   the wall?
8   A.   There was too much going on.  I just
9   hear her talking and all this other stuff.
10   Q.   What did you hear her saying?
11   A.   What's the problem, what's going on.
12   Q.   What did the police say?
13   A.   They ain't saying nothing.
14   Q.   Did they tell you why they were?
15   A.   Nope.
16   Q.   Nothing?
17   A.   They didn't say nothing.
18   Q.   So after they got you in handcuffs, what
19   did they do?
20   A.   They asked me where my clothes was at.
21   I told them it was upstairs, so they walked me
22   upstairs.  They grabbed the pants that was on the
23   ironing board, they put them on me, put a shirt on
24   me.  My Auntie threw some shoes out when they

Page 403

1   walked me out to the car.  I sat in the car.  They
2   went back in the house.  My Auntie told me later on
3   while I was in the Audy Home they came back in the
4   house said they was looking for a gun, they said
5   something about gang stuff and if everything panned
6   out, I'd be home later tonight.
7   Q.   Okay.  So when did they come back and a
8   look for a gun?
9   A.   They went and looked for a gun while I
10   was sitting in the police car.
11   Q.   All right.  How long were you in the
12   house before they brought you out to the police
13   car?
14   A.   I don't want to assume, so I don't know.
15   Q.   And then was it a marked squad like a
16   police car with obvious police markings, or was it
17   like a car that was just one color that they put
18   you in?
19   A.   Man, you're talking about 30 some years
20   ago.  I don't know what color the car was.
21   Q.   Did you see any police officers that
22   were dressed in like suits instead of police
23   uniforms?
24   A.   I do remember one of them was one of

Page 404

1   them tactical officers, me and him had a run-in a
2   few times.
3   Q.   Do you remember his name?
4   A.   I think Packs or Pack or something like
5   that.
6   Q.   And this is an officer or detective that
7   you recognized?
8   A.   Right.
9   Q.   And when did you have a run-in with him
10   before?
11   A.   I can't remember.  Probably one of them
12   arrests you was talking about.
13   Q.   Okay.  Was it one of the arrests that
14   you remembered and pled guilty to?
15   A.   No.
16   Q.   Okay.  Well, the other arrests were ones
17   that you said you didn't remember any of them.
18   A.   I just said I was familiar with him.  I
19   don't recall him arresting me, but I was familiar
20   with him.  He done stopped me a few times.
21   Q.   And was he one of the two officers that
22   slammed you against the wall?
23   A.   I'm not for sure.
24   Q.   Did he put handcuffs on you?



Page 405

1   A.   I'm not for sure.
2   Q.   Where do you remember first seeing him
3  at your aunt's house, was it inside or outside?
4   A.   Inside.
5   Q.   Where was he inside when you saw him?
6   A.   I'm not for sure.
7   Q.   Did he say anything to you?  Yes or no?
8   A.   No.
9   Q.   And where were the police going to take
10 you, if you know?
11  A.   I don't know.  I just know they just put
12 me in a police car and I sat out there in the
13 police car.
14  Q.   Well, you're sitting in a police car,
15 and then it's your testimony that the police go
16 back in and look for a gun?
17  A.   Right.
18  Q.   Did you ever testify to that during your
19 criminal trial?
20  A.   I don't remember.  I don't even remember
21 being asked that question, but I don't know.
22  Q.   I'm going to tell you that that's not in
23 your testimony.
24  MR. AINSWORTH:  Objection, he didn't say he

Page 406

1  saw it.
2  BY MR. GRILL:
3   Q.   Did you ever testify to that in any
4  motion to suppress that the police went back into
5  your house and looked for a gun?
6   MR. AINSWORTH:  Objection, form.
7  BY THE WITNESS:
8   A.   I don't know.
9  BY MR. GRILL:
10  Q.   Did they ever show you a warrant for the
11 gun?
12  A.   I asked them for a warrant.  They didn't
13 show me no warrant for my arrest.
14  Q.   Who did you ask to see a search warrant?
15  A.   The police when they slammed me against
16 the wall and put the handcuffs on me.
17  Q.   Why were you saying that you want a
18 warrant -- well, hang on.  Were you asking to see
19 an arrest warrant or a search warrant?
20  A.   I was asking to see both.
21  Q.   Okay.  Why did you want to see a search
22 warrant when they slammed you against the wall?
23  A.   Because you're in my house, we didn't
24 let you in, you're just in my house.

Page 407

1   Q.   Did you think they were looking for
2  something?
3   A.   I don't know what they was looking for.
4  You got to ask them.
5   Q.   So why did you ask if they had a search
6  warrant?
7   A.   I asked them why they in my house.
8   Q.   Okay, but that's different.  I'm asking
9  you like why did you --
10  A.   I answered it.
11  MR. AINSWORTH:  Objection, argumentative.
12 He's not a lawyer.
13 BY MR. GRILL:
14  Q.   Did you think that the police were
15 searching for something in your house?
16  A.   Did I think?
17  Q.   Yes.
18  MR. AINSWORTH:  Objection, foundation.
19 BY THE WITNESS:
20  A.   I'm telling you what my Auntie told me.
21 BY MR. GRILL:
22  Q.   No, no, no.  I'm talking about when they
23 slammed you against the wall and you asked them to
24 see a search warrant, did you think at that point

Page 408

1  that they were looking for something in your house?
2   A.   Did I think they was looking for
3  something?  I don't know what they was looking for.
4   Q.   Okay.
5   A.   I want to know why they in my house in
6  the first place.
7   MR. AINSWORTH:  I'll object to the compound
8  nature of your question.
9  BY MR. GRILL:
10  Q.   Did they tell you why they were in your
11 house?
12  A.   No.
13  MR. AINSWORTH:  And Mr. Jakes and Mr. Grill,
14 may I ask you each to just give it a pause.
15 BY MR. GRILL:
16  Q.   When they put you in handcuffs in your
17 house, did they read you your Miranda Rights at
18 that point?
19  A.   I don't know.  I don't remember.
20  Q.   Did the police that slammed you against
21 the wall and put handcuffs on you say anything to
22 you at that point?
23  A.   I don't recall.  I don't remember.
24  Q.   Did they tell you you were under arrest?



Page 409

1    A.   I don't remember them telling me I was
2  under arrest.
3    Q.   Did they tell you that we think you were
4  involved in a murder that happened?
5    A.   They didn't say none of that.  They
6  slammed me against the wall and put handcuffs on
7  me.
8    Q.   Okay.  Did you see your Aunt Bee asking
9  the police anything like what is going on?
10    A.   Yes, she told me later on that they come
11  to get me talking about some gang-banging stuff and
12  said they was looking for a gun, and that was it.
13  She never said nothing about no murder or none of
14  that.
15    Q.   So your Aunt Bee told you later that
16  before the police took you away --
17    A.   When I was in the Audy Home.
18    Q.   Okay, hang on, let me finish my
19  question.  So your Aunt Bee later told you, during
20  a conversation you had with her at the Audy Home,
21  that, before they took you away but after you were
22  put in the car, that she knew that the police -- or
23  the police were telling her that they were there
24  because you were involved in some gang-banging?

Page 410

1    A.   I guess they must have told her that
2  while I was sitting out in the police car, you
3  know.  I'm just relaying what she told me.
4    Q.   Okay.  All right.  And did she tell you
5  that they knew where they were taking you?
6    A.   Repeat that.
7    Q.   Did she tell you that she knew where
8  they were taking you?
9    A.   No.
10    Q.   Did you hear her ask them if she knew
11  like where they were going to take you?
12    A.   No.
13    Q.   Did you see the police search your
14  house?
15    A.   I was sitting in the car so --
16    Q.   Did you see the police search your
17  house?
18    A.   No, no.
19    Q.   How long were you sitting in the car
20  before you guys drove off?
21    A.   I don't want to assume, so I don't know.
22    Q.   Do you remember feeling like you were
23  there a long time?
24    A.   I don't know.

Page 411

1    Q.   You don't know?  Do you have any memory?
2    A.   I don't know.
3    Q.   When they drove you to the police
4  station, were you driven by Officer Pack, or was it
5  somebody else?
6    A.   I don't know.
7    Q.   What happened on the way to the police
8  station?
9    A.   Nothing.  They took me to the police
10  station.
11    Q.   How many police officers were in the car
12  with you that drove you?
13    A.   I don't know.  Probably two.  I don't
14  know.
15    Q.   All right.  Did anybody sit in the back
16  seat with you?
17    A.   Man, I don't know.  I don't want to
18  assume.
19    Q.   Did you have any conversations with
20  either of the police officers that were in the car
21  driving you to the police station?
22    A.   I don't recall.
23    Q.   Did you make any stops on the way to the
24  police station?

Page 412

1    A.   I don't recall.
2    Q.   Did anybody make any threats to you in
3  the car on the way to the police station?
4    A.   I don't recall.
5    Q.   Anybody beat you up?
6    A.   No, I don't recall.
7    Q.   Hit you, punch you?  Nothing?
8    A.   Nothing.
9    Q.   All right.  So when you got to the
10  police station, what happened when you got there?
11    A.   I believe they took me up to the third
12  floor.
13    Q.   Okay.  Go ahead, I thought you were
14  done.
15    A.   I believe they took me up to the third
16  floor.
17    Q.   Had you ever been up to the third floor
18  at the police station?
19    A.   At 39th and California?
20    Q.   Yeah.
21    A.   No.  I don't even think I ever been to
22  that police station.
23    Q.   How do you know it was 39th and
24  California?



Page 413

1   A.   Because that's where it was at.

2   Q.   Okay.  Was this your first time that you

3  were there?

4   A.   Yes.

5   Q.   And do you remember how you got up to

6  the third floor?

7   A.   I don't know.  We probably walked up the

8  stairs.  I don't know.

9   Q.   Can you describe --

10   A.   Elevator, I don't know, shit.

11   Q.   Had any of the officers that came to

12  your house other than Pack, did you ever see any of

13  those officers again?  Do you remember seeing them?

14   A.   No, I ain't never seen them again.

15   Q.   Did you see any of them testify at your

16  criminal trial?

17   A.   Shit.  I don't want to assume.  They

18  probably did, but I don't know.

19   Q.   Well, I don't want you to assume.  Do

20  you remember seeing any of the officers that were

21  in your house when they came to get you --

22   A.   Testify at my criminal trial?

23   Q.   Yeah.

24   A.   I'm not sure.

Page 414

1   Q.   When did your Aunt Bee throw shoes at

2  you?

3   A.   I guess when the police was coming back

4  out the house, she brought the shoes to the car

5  walking with the police.

6   Q.   Do you know why she threw shoes to you?

7   A.   I didn't have no shoes on.

8   Q.   All right.  Well, I guess if you thought

9  you were coming back inside, you probably wouldn't

10  need shoes on, right?

11   A.   I don't know.

12   Q.   All right.  So you get to Area 3, that's

13  the place you were at, so I'll probably call it

14  that.  So where did they take you when you get to

15  Area 3?

16   A.   Upstairs to the third floor.

17   Q.   And where did they put you up there?

18   A.   I believe they said they got to perform

19  a search or something they said, and they walked me

20  to a cage, and I guess when the officer he was

21  patting me down and all this stuff, he went in my

22  pocket and came out with a tinfoil pack talking

23  about what's this, and I told him I don't know.

24   Q.   Do you know who the officer was that

Page 415

1  went into your pocket?

2   A.   I don't know.

3   Q.   Was it one of the officers that was at

4  your house?

5   A.   I can't -- I don't know.

6   Q.   Did you ever see this officer before?

7   A.   No.  I don't remember.

8   Q.   Did you see this officer testify at your

9  criminal trial?

10   A.   I don't know.

11   Q.   At your motion to suppress?

12   A.   I don't know.

13   Q.   What pocket did this officer go into?

14   A.   It was 30 something years ago.  I don't

15  know.

16   Q.   Right pocket or left pocket?

17   A.   I don't know.

18  MR. AINSWORTH:  Like all his pockets or where

19  was the tinfoil found?  Objection to form.

20  BY MR. GRILL:

21   Q.   Well, I mean I'm assuming -- what pocket

22  was the tinfoil found in?

23   A.   I don't know.

24   Q.   All right.  At any point up until this

Page 416

1  point, had you asked the police or anybody that was

2  in law enforcement that came to your house or

3  anywhere why it was that they had come to your

4  house?

5   A.   Can you repeat that?

6   Q.   Did anybody tell you why the police --

7  up until this point -- why the police had come to

8  your house looking for you?

9   A.   In '91?

10   Q.   Yes.

11   A.   Did anybody tell them why did they come

12  to my house?

13   Q.   Yeah.  Like at that point, did you

14  ask -- were you asking the police why did you come

15  and get me, why am I here?  Did you ask anybody

16  that?

17   A.   No.

18   Q.   Did anybody tell you?

19   A.   No.

20   Q.   So they just came in your house, throw

21  you against the wall, handcuff you and take you

22  away, and you have no idea why at this point?

23   A.   Well, I found out later that -- I don't

24  know how true it is, but they claimed -- the police



Page 417

1  claimed they got an anonymous phone call talking
2  about I may have some -- I may have been a witness
3  to the murder or knew something, something like
4  that.
5      Q.   Okay.  So my question, though, has to do
6  with when you were being searched and they pulled
7  the foil packet out of your pocket, up until that
8  point had anybody told you why the police had taken
9  you out of your house in handcuffs?
10     A.   No.
11     Q.   You had no idea?
12     A.   No idea.
13     Q.   All right.  So they're searching you,
14  they pull a tinfoil packet out of your pocket.  How
15  many officers are around when the packet comes out
16  of your pocket?
17     A.   I don't know.
18     Q.   Like one?
19     A.   I don't know.
20     Q.   You said you were in a cage.  Were you
21  in some type of holding cell when they searched
22  you?
23     A.   It was just a cage to my recollection.
24     Q.   What did it look like?

Page 418

1      A.   I don't know.  I'm quite sure you got a
2  picture somewhere in here.  Pull it up and I can
3  identify you.
4      Q.   I don't, so I'm asking you what do you
5  remember it looked like?
6      A.   Regular cage.
7      Q.   Yeah, so I'm telling you I don't.  You
8  can tell me whatever you want?  Like what did it
9  look like?
10     A.   It was a holding cage, that's all I can
11  tell you.
12     Q.   Was it like jail bars, like metal bars?
13     A.   Like a gate.
14     Q.   What kind of gate, describe it a little
15  bit?
16     A.   Man, I can't describe it.  It's been too
17  long ago.
18     Q.   Okay.  All right.  So are there any
19  other people in this cage when you're getting
20  searched?
21     A.   I don't know.  I wasn't looking behind
22  me.
23     Q.   Okay.  What about in front of you?
24     A.   The police was in front of me.

Page 419

1      Q.   How many police were in front of you?
2      A.   I don't know.
3      Q.   What did they look like?
4      A.   White.
5      Q.   All right.  Was there more than one?
6      A.   Again, I don't know.
7      Q.   Were they talking to you?
8      A.   Again, I don't know.
9      Q.   How far away from you were they?
10     A.   I don't know.
11     Q.   Were they in uniform, or were they in
12  plain clothes like a suit?
13     A.   I don't remember.
14     Q.   All right.  Did you recognize any of
15  these officers that were in front of you?
16     A.   Again, you asked that already, I don't
17  know.
18     Q.   Did you see any other people that looked
19  like maybe they were under arrest or arrestees in
20  this cage in front of you other than these
21  officers?
22     A.   I don't know.
23     Q.   And after they pulled this foil packet
24  out of your pocket, what happened next?

Page 420

1      A.   He said I was under arrest for
2  controlled substance or something he said.
3      Q.   And what happened after that?
4      A.   I think he said I had to talk to a youth
5  officer or something.
6      Q.   Okay.
7      A.   And while I was in the holding room, I
8  believe one of them officers came in there with a
9  piece of paper and said this is my court date for
10  the cocaine package.
11     Q.   Okay.  And did you make any statements
12  about that to the police about that cocaine
13  package?
14     A.   I'm not for sure.
15     Q.   Did you tell like it's not mine,
16  anything like that?
17     A.   I can't remember what I said.
18     MR. AINSWORTH:  Object to the characterization
19  of it as being a cocaine packet.  We know it's not
20  cocaine.
21  BY MR. GRILL:
22     Q.   Yeah, I know.  I'm just using his words.
23  I don't disagree.  It tested positive later for no
24  cocaine, I guess, is probably an inartful way of



Page 421

1  saying it, but it wasn't cocaine.
2      Either way at the time they pulled it
3  out of your pocket, the police are telling you that
4  they thought it was cocaine?
5      A.  Right.
6      Q.  When they were telling you this, did you
7  tell the police anything along the lines of that is
8  not mine?
9      A.  I can't recall.
10     Q.  After they pulled the cocaine out of
11 your -- the fake cocaine, I guess, out of your
12 pocket, the tinfoil packet, whatever you want to
13 call it, what happened next?
14     A.  Like I said, I believe I was sitting in
15 the interview room.
16     Q.  Okay.  Well, did they -- so you were in
17 this cage and they searched you and found a foil
18 packet.  Did they move you somewhere else?
19     A.  Yes.
20     Q.  Where did they take you?
21     A.  To an interview room.
22     Q.  How long after they pulled the foil
23 packet out of your pocket was it that they moved
24 you to an interview room?

Page 422

1      A.  I don't want to assume, so I'm not for
2  sure.
3      Q.  Do you think they took you right away
4  over there, or did they leave you in the cage for a
5  while?
6      A.  I don't know.
7      Q.  All right.  And when you got to
8  the -- who took you over to the interview room?
9      A.  I'm not for sure, so I don't know.
10     Q.  Why do you call it an interview room?
11     A.  Because it had chairs and tables in
12 there and lockers.
13     Q.  All right.  And how big of a room was
14 it?
15     A.  I don't know.
16     Q.  Okay.  So the officer that pulled the
17 tinfoil packet out of your pocket, you had never
18 seen that officer before, right?
19     A.  I can't say that without certain, but I
20 would say I don't want to assume, so I don't know
21 /STPHR.
22     Q.  Well, look at your post-conviction
23 testimony, okay, which is the 2015 08-18 testimony.
24     A.  2015?

Page 423

1      Q.  Go to page 51 and look at lines 1
2  through 11.
3      A.  1 through 11.
4      Q.  Okay.  So it says -- well, there is a
5  question on 50, but the answer -- that goes on to
6  the top of 51.
7      A.  Did you say 51?
8      Q.  Yeah, the top of 51.
9      A.  Okay.
10     Q.  The question is your testimony is --
11     MR. AINSWORTH:  Slow down, Andrew.
12 BY MR. GRILL:
13     Q.  "Your testimony is that the officer who
14 patted you down planted these drugs on you, is that
15 correct?"  Answer: "Correct."  Question: "Okay.
16 And had you had any prior interactions with the
17 officer who was patting you down as far as you
18 know?"  Answer: "No."  Question: "Okay.  So as
19 far as you know, that's the first time that you had
20 seen this officer, is that correct?"  Answer:
21 "After one officer patted, yeah."
22     Do you remember being asked those
23 questions and giving those answers during your
24 post-conviction trial?

Page 424

1      A.  Somewhat, somewhat.
2      Q.  Is this testimony accurate like that
3  about you didn't know who this officer was, you
4  never seen him before?
5      A.  It would be accurate.
6      Q.  So you're in this interview room.  Is
7  anybody in this interview room when you get in
8  there?
9      A.  No.
10     Q.  All right.  And you said there was some
11 lockers in it?
12     A.  Yes.
13     Q.  What did these lockers look like?
14     A.  I don't know.
15     Q.  What wall were they on?  Like, okay, so
16 you walk in the door, were they on the left, were
17 they straight in front of you, were they on the
18 right?  Where are they?
19     A.  I don't want to assume because it's not
20 ringing no bells to me.  I don't know.
21     Q.  Well, you're saying that you got thrown
22 into those lockers at some point by Detective Kill,
23 right?
24     A.  Right.



1    Q.   Okay.  And you're saying that you got
2  injured because of that, right?
3    A.   Right.
4    Q.   Yes.  So do you remember, in light of
5  that happening, where those lockers were in that
6  room?
7    A.   Your guess is as good as mine.  I don't
8  remember.
9    Q.   All right.  And I would think that you
10  would agree that whatever happened -- whatever you
11  say happened to you in that room, in particular
12  with Detective Kill, it's pretty traumatic, right?
13    A.   I would say so.
14    Q.   This guy beat you up according to you in
15  order to get you to confess to a crime of murder no
16  less that you did not commit, right?
17    A.   Right.
18    Q.   All right.  And you don't remember where
19  those lockers were in that room in light of all
20  that, right?
21    MR. AINSWORTH:  Object to the form of the
22  question, argumentative.
23  BY MR. GRILL:
24    Q.   All right.  So you get in that room.  Do

1  you remember who the officer was that walked you
2  into the room?  I know I asked you this.
3    A.   I don't know.
4    Q.   How many officers walked you in front of
5  the cage area where you got searched to the room,
6  the interview room?
7    A.   I don't know.
8    Q.   Do you remember what time it was when
9  you got to the interview room?
10    A.   I don't know.
11    Q.   Do you remember what time it was when
12  you were told that you were being charged with
13  possession of, I guess, cocaine?
14    A.   I'm not for sure.
15    Q.   Did you see any clocks at any point
16  during any of your time at Area 3 if you know?
17    A.   I don't want to assume, but I don't
18  recall seeing no clocks.
19    Q.   All right.  You didn't have a watch on?
20    A.   No.
21    Q.   And when you were brought over to the
22  interview room, were you still in handcuffs?
23    A.   I don't recall.
24    Q.   Do you remember if, once you were in the

1  interview room, if you were in handcuffs?
2    A.   When I was in the interview room, was I
3  in handcuffs, no.
4    Q.   All right.  At any point when you were
5  being -- you know, when they searched you and found
6  the foil packet, they told you that you were being
7  charged with a crime, right?
8    A.   Right.
9    Q.   Cocaine possession?
10    A.   Right.
11    Q.   Even though it turned out not to be
12  cocaine, but they were telling you that, right?
13    A.   Right.
14    Q.   Did you ask to call a lawyer?
15    A.   No.
16    Q.   Did you ask to call your parents?
17    A.   No.
18    Q.   Did you ask to call your Aunt Bee?
19    A.   No.
20    Q.   Did you ask to call any family member?
21    A.   No.
22    Q.   Why not?
23    A.   I was 15, naive, I didn't think about
24  asking them that.

1    Q.   Well, you already told me today that you
2  knew that you had a right to remain silent.
3    A.   That ain't got nothing to do with the
4  question you asked me.
5    Q.   One of those rights is you have a right
6  to an attorney?
7    A.   That don't have nothing to do with the
8  question you just asked me.
9    Q.   Okay.  Well, if you understood those
10  rights then, which you already told me today that
11  you do, why didn't you want to call or ask to call
12  a lawyer?
13    MR. AINSWORTH:  Objection, argumentative.
14  BY THE WITNESS:
15    A.   I answered that already.
16  BY MR. GRILL:
17    Q.   Tell me again.
18    A.   I said I was young, 15, naive, I didn't
19  think about that.
20    Q.   But even though you were young, 15, and
21  naive, you told me today that you understood your
22  Miranda Rights?
23    MR. AINSWORTH:  Wait for him to get a question
24  out, and it will be argumentative, so I'm going to



Page 429

1   object, so go ahead.
2   BY THE WITNESS:
3      A.   So what's the question again?
4   BY MR. GRILL:
5      Q.   So you told me today that at the time
6   that you were interrogated for killing Mr. Garcia,
7   which happened, you know, shortly after this foil
8   packet being pulled out of your pocket, that you
9   knew what your Miranda Rights were.  And so in
10  light of that, although you say you're naive and
11  15 years old, is there any other reason why you
12  didn't want to ask for an attorney?
13     A.   No other reason.
14     Q.   Did you feel like you were in trouble
15  when they found that foil packet in your pocket?
16  Even though I get that you say it wasn't yours, did
17  you feel like, oh, man, this is some trouble?
18     A.   No.
19     Q.   I mean you had been arrested maybe 13
20  times prior to this, right?
21     A.   If you're going to assume 13, I guess.
22     Q.   Well, you said 13.  I said 11 that I
23  had.
24     A.   Some of those arrests in there ain't

Page 430

1   mine.
2      Q.   Well, that's what you say.  But even so
3   you do agree that you were arrested a number of
4   times before this?
5      A.   Okay, so what's your question?
6      Q.   So were you scared?  Did you think I'm
7   in trouble, that I need help?
8      A.   I didn't think to call no lawyer if
9   that's what you're trying to ask me.
10     Q.   What about your Aunt Bee?
11     A.   I didn't think to call nobody.
12     Q.   What about your mom?
13     A.   What part of nobody don't you
14  understand?
15     Q.   Why didn't you think you needed to call
16  a parent?
17     A.   I wasn't thinking.
18     Q.   Why not?
19     A.   I wasn't thinking, that's my answer.
20     Q.   All right.  Was it that you didn't want
21  to get in more trouble from your Aunt Bee if she
22  found out that you were at the police station and
23  they -- did you think that your Aunt Bee was going
24  to be mad?

Page 431

1      A.   Why would my Aunt Bee be mad if she was
2   fussing with them cause they took me out of her
3   care?
4      Q.   Well, your Aunt Bee, you told me today
5   before, told you to plead guilty to a criminal
6   sexual assault and some other crimes that you say
7   you didn't want to commit -- that you didn't do, so
8   did you think then that this would be another one
9   of those situations if you tell Aunt Bee, she's
10  going to just tell you you're sunk, they found it,
11  you better plead guilty?
12     A.   If that's what you want to believe, go
13  ahead, man.
14     Q.   Well, I'm asking you did you think that?
15     A.   I answered the question.  If that's what
16  you want to believe, go ahead.
17     MR. AINSWORTH:  Just wait for a question.
18  BY MR. GRILL:
19     Q.   Well, you knew, though, at that time
20  that you could have made one of those phone calls,
21  right?
22     A.   I didn't know nothing.
23     Q.   Well, you understood your Miranda
24  Rights, you told me that?

Page 432

1      A.   If that's what you want to say, go
2   ahead.
3      Q.   No, that's what you said.
4      A.   All right, next question.  Come on,
5   speed it up, man.
6      Q.   All right.  So you are now in an
7   interview room.  How does the officer or officers
8   that walked you over there, did they put you into
9   the same room again?
10     A.   I was in there by myself.
11     Q.   For how long?
12     A.   I don't know.
13     Q.   Were you handcuffed?
14     A.   No.
15     Q.   When did they take the handcuffs off of
16  you?
17     A.   When they put me in the room.
18     Q.   Okay.  So it sounds like then when they
19  walked you over to the room, you were still in
20  handcuffs, is that right?
21     A.   When they walked -- I don't remember.
22  You got to ask them.  I don't know.
23     Q.   Well, did they take the handcuffs off
24  you at any point before you got into that room?



Page 433

1   A.   They took the handcuffs off me to search
2   me when I was in the cage.
3   Q.   Okay.  Did they put them back on after
4   that then?
5   A.   I can't remember.
6   Q.   All right.  And you don't know how long
7   you were in the cage for, right?
8   A.   Right.
9   Q.   Okay.  So once you're sitting in the
10  interview room, does some officer or detective or
11  anybody come in and talk to you?
12  A.   I'm not sure how the order went, but a
13  bunch of detectives came in there to talk to me.
14  I'm not sure how the order went.
15  Q.   Okay.  So the first time a detective or
16  detectives came in to talk to you, how many were
17  there the first time they came in, if you remember?
18  A.   I believe it was two that came.  I'm not
19  for sure.
20  Q.   Do you know who they were?
21  A.   Man, if you go back through these
22  transcripts, I'm quite sure you'll find their
23  names.
24  Q.   Well, do you know sitting here today?

Page 434

1   A.   Give me some paperwork, I can tell you
2   who it was.
3   Q.   Well, I'm asking you right now do you
4   remember?
5   A.   Not offhand.
6   Q.   You reviewed the transcripts yesterday.
7   A.   Not offhand.
8   Q.   How many detectives came in the first
9   time?
10  A.   I just told you two.
11  MR. AINSWORTH:  Objection, asked and answered.
12  BY MR. GRILL:
13  Q.   And how were they dressed?
14  A.   I don't know.
15  Q.   Did you ever see these detectives
16  before?
17  A.   I don't want to assume, so I'm going to
18  say I don't know.
19  Q.   Do you recall if either of these
20  detectives testified at your criminal trial?
21  A.   I answered that already.
22  Q.   Well, did they?  The two that came into
23  the room this first time, did you ever see them?
24  A.   I answered it already.

Page 435

1   Q.   You got to answer it again.
2   A.   I answered it.
3   Q.   Did they testify at --
4   A.   I answered it.
5   MR. AINSWORTH:  Just answer the question.
6   THE WITNESS:  I answered it already.
7   MR. AINSWORTH:  I know, I know.  Just answer
8   it again, please, for me.
9   BY THE WITNESS:
10  A.   What's the question?
11  BY MR. GRILL:
12  Q.   Did the two detectives that came in the
13  first time, do you recall whether either of them
14  testified against you at your trial?
15  A.   I don't know.
16  MR. AINSWORTH:  Wait for the question.  What's
17  the elapsed time?
18  THE VIDEOGRAPHER:  6 hours 26 minutes.
19  BY MR. GRILL:
20  Q.   I'm going to have to speed it up.  So
21  when Detective Kill came in -- or not Detective
22  Kill -- when the two detectives came in the first
23  time, what happened?
24  A.   I believe we had a conversation, but I'm

Page 436

1   not -- again, I don't know the exact order of how
2   it went, but I believe we had a conversation.
3   Q.   Okay.  What was the conversation?
4   A.   I can't remember.
5   Q.   Okay.  What happened, anything strange
6   happen?
7   A.   They just kept asking me a bunch of
8   questions, that's all I remember.
9   Q.   What did they ask you?  And this is the
10  first time, these two detectives roll in, and did
11  they just sit down and start asking you questions?
12  A.   I'm trying to think of their names, but
13  I don't know, shit.  They just started asking me
14  questions.
15  Q.   And did they sit down at the table and
16  start asking you questions?
17  A.   You said did they sit at the table?
18  Q.   Uh-huh.
19  A.   I'm not for sure, but I believe so.
20  Q.   Okay.  And where were you sitting?
21  A.   I probably was sitting in the chair at
22  the table.
23  Q.   And when you were sitting at the chair
24  at the table, you're not handcuffed, right?



Page 437

1   A.   Right.
2   Q.   All right.  And so how long do you talk
3  to them?
4   A.   I don't want to assume, so I'm not for
5  sure.
6   Q.   They're asking you questions about what?
7   A.   They was asking me what I was doing that
8  day.  I believe they was just asking me general
9  questions like what I was doing that day and all
10 that type of stuff.
11  Q.   What did you tell them?
12  A.   Told them the same thing I told them
13 from day one.
14  Q.   Which is that you didn't do it, right?
15  A.   Which is what?
16  Q.   That you didn't do it.
17   MR. AINSWORTH:  Object to the form of the
18 question.
19 BY THE WITNESS:
20  A.   Do what?
21 BY MR. GRILL:
22  Q.   Let me ask you this.  During this first
23 conversation with these two detectives, did you
24 tell them -- did they accuse you of being involved

Page 438

1  in the murder?
2   A.   I can't recall.
3   Q.   Did they accuse you of being a trigger
4  man?
5   A.   I don't recall.
6   Q.   Did they accuse you -- did you
7  understand that they were asking you questions
8  about your potential involvement or what they
9  thought was your involvement in killing Mr. Garcia?
10  A.   I'm not for sure.
11  Q.   All right.  And did any of the
12 detectives show you any pictures?
13   MR. AINSWORTH:  Objection, foundation.  In
14 this first interview?
15 BY MR. GRILL:
16  Q.   When they walked in, yep, did they show
17 you any pictures?
18  A.   In the first interview?
19  Q.   Yes.
20  A.   Detectives?
21  Q.   Yes.
22  A.   I don't recall.
23  Q.   Okay.  At any point, did these
24 detectives leave the room?

Page 439

1   A.   Yes.
2   Q.   Did any other detectives come in during
3  this conversation that we were talking about with
4  the two detectives, or was it only these two?
5   A.   Shit, to my recollection, I don't know
6  what was going on.  They just said some detectives
7  was out on the street and they have some more
8  questions for me when they come in.  That's all I
9  remember.
10  Q.   Okay.  So how long do you think you
11 talked to these first two detectives?
12  A.   I don't know.
13  Q.   All right.  And then what happened?  It
14 sounds like they left?
15  A.   Who, the first two detectives?
16  Q.   Yes.
17  A.   Yes.
18  Q.   And during that first interview with
19 these two detectives, they didn't show you any
20 pictures in that interview, right?
21  A.   Not that I can remember.
22  Q.   All right.  So at some point -- how long
23 do you think they were gone for?
24  A.   I don't know.

Page 440

1   Q.   Did some detectives come back?
2   A.   Yes.
3   Q.   Was it the same two detectives?
4   A.   No.
5   Q.   What did these next two detectives look
6  like?
7   A.   Shit, they was regular detectives.
8   Q.   Did you recognize --
9   A.   What they supposed to look like?
10  Q.   Did you recognize either of them?
11  A.   Did I recognize any of them, like have I
12 ever seen them before that day?
13  Q.   Yes.
14  A.   Not that I can recall.
15  Q.   All right.  Did either of these two
16 detectives testify, if you recall, at your criminal
17 trial?
18  A.   I think Kill and Boudreau testified at
19 my trial.  I'm not for sure.  I believe they did,
20 but I'm not for sure.
21  Q.   Well, how do you know their names?
22  A.   Because I'm sitting here looking at it
23 in your book.
24  Q.   Well, the second time that they came in,



Page 441

1  who were the two detectives that came back the
2  second time?
3      A.   Kill and Boudreau.
4      Q.   You only know that because you're
5  looking at the transcript.  I'm ask you do you
6  remember --
7      A.   I remember them.  I don't remember the
8  first set of detectives, but I remember Kill and
9  Boudreau, and if you put the paperwork in front of
10  me, maybe it will jog my memory who the first
11  detectives was.
12      Q.   So the second time that the detectives
13  come back, you're saying it was Kill and Boudreau?
14      A.   Kill and Boudreau.
15      Q.   But they were not the first two
16  detectives?
17      A.   No.
18      Q.   So Kill and Boudreau come in this time.
19  What happens when they come in?
20      A.   I can't recall, like I say, the order of
21  events of how it went, but I remember Detective
22  Kill taking some pictures and I believe Boudreau
23  asked a few questions and they said they was going
24  on -- they left and went on the street, and I sat

Page 442

1  there for a long, long time.
2      Q.   Okay.  How long do you think you sat
3  there for?
4      A.   I don't know, your guess is as good as
5  mine.
6      Q.   Okay.  So who took the photos of you?
7      A.   I believe it was Detective Kill.
8      Q.   Okay.  And had you ever seen Detective
9  Kill before this incident?
10      A.   No.
11      Q.   Okay.  And after Detective Kill -- how
12  many pictures of you do you think he took?
13      A.   I'm not for sure, but I think -- I don't
14  want to assume.  I want to say probably one or two.
15      Q.   All right.  What kind of camera was he
16  using?
17      A.   It was -- I think it was one of them
18  little square Polaroid where you snap it and the
19  picture comes right out.
20      Q.   Okay.  So up until this point, had any
21  of these detectives told you anything about the
22  murder, about what happened?
23      A.   Not that I can recall.
24      Q.   So after Detective Kill and Detective

Page 443

1  Boudreau or Detective Kill took these Polaroids of
2  you, is that all they did?
3      A.   Yes.
4      Q.   Did they ask you any questions?
5      A.   Detective Boudreau probably asked a few
6  questions.  Like I said, they left.
7      Q.   Did you tell them about Denise and
8  Annette?
9      A.   Denise, did I tell -- I think I probably
10  mentioned it to them during our interview when they
11  came back.
12      Q.   Oh, okay.  So during like the third
13  interview when they came back?
14      MR. AINSWORTH:  Objection to the form of the
15  question.
16  BY MR. GRILL:
17      Q.   The third.  So they left and then they
18  came back --
19      A.   It might have been the second interview.
20      Q.   So at the time -- I'm talking about the
21  interview when Kill is taking Polaroids of you, did
22  either him or Boudreau ask you any questions -- did
23  you tell them anything about Denise or Annette
24  during that interview?

Page 444

1      A.   I can't recall.  I don't know.
2      Q.   And when they left, how long were they
3  gone for?
4      A.   I can't be specific.  I don't want to
5  assume, but they was gone a long time.
6      Q.   Okay.  And what were you doing that
7  whole time?
8      A.   Siting in that room.
9      Q.   And did you have an understanding that
10  they were asking you questions -- or that you were
11  in this room so they could talk to you about the
12  Garcia homicide?
13      A.   I don't know why they had me in that
14  room.
15      Q.   You didn't know why you were there at
16  that point?
17      A.   Right.
18      Q.   Okay.  And so why wouldn't you have told
19  them about Denise and Annette?
20      A.   Excuse me?
21      Q.   Why didn't you tell them about Denise
22  and Annette?
23      A.   I didn't say I told them anything about
24  Denise and Annette.



Page 445

1    Q.   So after they come back the second time
2  or the third time I guess -- the second time for
3  them but the third the police have now come and
4  talked to you in that room, was it Kill and
5  Boudreau that came back?
6    A.   Yes.
7    Q.   After they took the pictures, they
8  leave, and they come back?
9    A.   Yes.
10   Q.   Were they with anybody else?
11   A.   Like I say, I don't necessarily remember
12  the order or how the events took place, but I do
13  know that it's possible somewhere in there that
14  they questioned me, and I may have told them about
15  Denise Harris, Nakeia Little and Annette Harris,
16  but, like I say, I don't remember the order events.
17   Q.   Okay.  So when they came back, do you
18  think it was -- when they came back like after they
19  took the pictures, left and came back again, do you
20  recall them asking you questions about the Garcia
21  homicide at that point?
22   A.   Can you repeat that?
23   Q.   After they took pictures of you, they
24  left -- they take pictures of you and they come

Page 446

1  back, Kill and Boudreau come back a second time for
2  them.  In that interview, the second time Kill and
3  Boudreau are back, is it in that interview that
4  they start asking you questions about the Garcia
5  homicide?
6    A.   Yes.
7    Q.   Okay.  What are they asking you?
8    A.   Detective Kill came in, he was
9  like -- he had the Polaroid picture, he said the
10  guy in this picture know who committed this murder
11  and all this other stuff, and I told him to go talk
12  to the guy in the picture.
13   Q.   A girl in the picture?
14   A.   No, it was me in the picture.
15   Q.   I thought you said a gal.
16   A.   I didn't say gal.
17   Q.   Okay.  What did you say, guy?
18   A.   I said he said this guy in this picture
19  know what happened with this murder.
20   Q.   And it's a picture of you?
21   A.   It's a picture of me.  I told him before
22  he turned the picture around, I told him, well, you
23  need to go talk to him then.  And when he turned
24  the picture around and showed me the picture, it

Page 447

1  was the same Polaroid picture he took of me
2  earlier.
3    Q.   Got it.  Did he show you any other
4  pictures?
5    MR. AINSWORTH:  Objection, foundation.
6  BY THE WITNESS:
7    A.   I think he may have showed me a picture
8  of Arnold Day.
9  BY MR. GRILL:
10   Q.   Okay.  When did he show you that?
11   A.   Probably right -- probably a little bit
12  after the time he was talking to me and he said
13  this guy right here and all this other stuff.  Like
14  I say, I can't remember the order of events how it
15  happened.
16   Q.   Did he show you any other pictures
17  besides Arnold Day?
18   A.   I don't think so.
19   Q.   So you think he only showed you two
20  pictures, one of you and one of Arnold Day?
21   A.   Yes.
22   Q.   Did he say anything about the picture of
23  Arnold Day?
24   A.   No.

Page 448

1    Q.   In 2005, you signed an affidavit and
2  that affidavit is at tab 7.
3    A.   Tab 7.  I think somebody is knocking on
4  your door out there.
5    Q.   And in this affidavit -- so this is a
6  handwritten one.
7    A.   Did you say 7?
8    Q.   Tab 7.  This is Plaintiff Jakes 11289 to
9  11291.  During this affidavit, you say that
10  Jakes -- or that Kill only showed you a picture of
11  Little A.  So is that not accurate?
12   MR. AINSWORTH:  Wait, objection.
13  BY THE WITNESS:
14   A.   Where it say that at?  Let me read it.
15       It says right here in the affidavit that
16  Detective Kill turned the picture around --
17   MR. AINSWORTH:  And read the whole thing so
18  you can answer his question.
19  BY MR. GRILL:
20   Q.   I only got a few minutes left, so I'm
21  going to ask you is that accurate?
22   MR. AINSWORTH:  Is what accurate?
23  BY THE WITNESS:
24   A.   Is this affidavit accurate?



Page 449

1    MR. AINSWORTH:  Which question?
2  BY MR. GRILL:
3    Q.  Hang on, let me start again.  Do you
4  remember signing this affidavit or making this
5  affidavit?
6    A.  I can't remember offhand.
7    Q.  Is this your handwriting?
8    A.  It looks like my handwriting, yes.
9    Q.  Do you know why you did this?
10   A.  I can't recall.
11   Q.  Do you know what it was for?
12   A.  I can't recall.
13   Q.  Did you give this to somebody?
14   A.  '05?  I can't recall.  Probably sent it
15  to a law firm or something, I don't know.
16   Q.  All right.  So then what happens after
17  they show you these pictures, what happens next?
18   A.  You say after they showed me the
19  pictures what happened next?
20   Q.  What happened next?
21   A.  Once Kill turned the picture
22  around -- well, he said the guy on this picture he
23  knows something, he know what happened and all
24  this, I told him to go talk to him.

Page 450

1    Q.  Okay.
2    A.  And when he turned the picture around,
3  it was a picture of me.
4    Q.  Okay.
5    A.  I told him I don't know what you're
6  talking about.
7    Q.  Okay.  So what happened next?
8    A.  I believe he slapped me.
9    Q.  Who did?
10   A.  Detective Kill.
11   Q.  And is Boudreau in the room too?
12   A.  I believe so.
13   Q.  Is he or isn't he?
14   A.  I believe so.
15   Q.  Why do you believe so?
16   A.  That's his partner.
17   Q.  Well, how do you know that he's his
18  partner?
19   A.  Because he told me when he introduced
20  himself to me, he said that was his partner.
21   Q.  Well, do you have a specific
22  recollection of Detective Boudreau being in that
23  room when you say he slapped you?
24   A.  I believe so.

Page 451

1    Q.  Are you guessing or do you know?
2    A.  I believe so.
3    Q.  Well, why do you believe that?
4    A.  Because that's his partner.
5    Q.  Okay.  Any other reason why you believe
6  that?
7    A.  No, no other reason.
8    Q.  Is it possible that Boudreau was not in
9  the room?
10   A.  I ain't going to say is it possible, but
11  he was there.
12   Q.  Well, if it's not the possible, then
13  what is it?
14   MR. AINSWORTH:  Object to the form of the
15  question.
16  BY MR. GRILL:
17   Q.  So Detective Kill hits you, slaps you in
18  the face.  What happens next?
19   A.  I think he threatened to push me out of
20  the window.  Like I say, I don't know the order of
21  events, but I believe he threatened to push me out
22  of the window, talking about he'll burn me with a
23  cigarette, talking about how the Latin Kings will
24  give me and my family up.

Page 452

1    Q.  And what happens next?
2    A.  I believe he -- like I said, I don't
3  know the order of events, but I believe he knocked
4  me to the floor, kicked me, stomped on my back.
5    Q.  Okay.
6    A.  Then he may have told me to get back in
7  the chair and said this is how this is going to go,
8  and he just started telling me stuff.
9    Q.  Did you tell him about Denise or Annette
10  at this point?
11   MR. AINSWORTH:  Object to the form of the
12  question, foundation.
13  BY THE WITNESS:
14   A.  I believe -- like I say, I can't
15  remember the exact order of events, but I think I
16  may have mentioned Denise and Annette in our first
17  interview.  I'm not for sure.
18  BY MR. GRILL:
19   Q.  Okay.
20   A.  But I believe I mentioned them because
21  they said they was going out on the streets, so I'm
22  not for sure.
23   Q.  Okay.  And why did you mention Denise
24  and Annette to them?



Page 453

1    A.    Because, once again, I felt like they
2  may have had information that would help them solve
3  their case.
4    Q.    And you knew that how?
5    A.    I didn't know nothing.  I was assuming.
6    Q.    You just guessed?
7    A.    Absolutely.
8    Q.    Do you know if they went and followed up
9  with them?
10   A.    Huh?
11   Q.    Do you know if they went and followed up
12  with them?
13   A.    I can't be 100 percent sure, but I know
14  my police record said that somebody talked to them.
15  I don't know if it was Kill or Boudreau.
16   Q.    Do you remember testifying at the motion
17  to suppress that you found out that Denise and
18  Annette might know who the killers were because
19  your Auntie Bee told you that while you were at the
20  Audy Home?
21   MR. AINSWORTH:  Objection.  If you want to
22  impeach him or --
23  BY MR. GRILL:
24   Q.    Do you remember testifying to that at

Page 454

1  the motion to suppress?
2    A.    Do I remember --
3    MR. AINSWORTH:  What page and line?
4    MR. GRILL:  B70 to B71.
5    MR. AINSWORTH:  Take a look at your testimony.
6  BY MR. GRILL:
7    Q.    No, I'm not wasting time.  I'm asking
8  him simply do you remember testifying to that?
9    A.    I don't remember then.
10   Q.    All right.  So after Detective Kill
11  stomped on your back, did he ever hit you in your
12  chest?
13   A.    Did he ever hit me in my chest?
14   Q.    Uh-huh.
15   A.    I don't know.
16   Q.    And do you remember if they showed -- at
17  any point before you did the handwritten statement
18  with A.S.A. Grossman, do you remember at any point
19  whether any other photographs of anybody were shown
20  to you?
21   A.    Any other photographs?
22   Q.    At any point during your interactions
23  with Kill and Boudreau.
24   A.    That was 30 years ago.  I just remember

Page 455

1  two pictures, me and Arnold Day.
2    Q.    Okay.  All right.  So how long did this
3  interview go on with Detective Kill stomping on
4  you?
5    A.    I don't know.  I don't want to assume,
6  so I don't know.  I didn't have no clock or time on
7  me.
8    MR. AINSWORTH:  Objection, foundation.
9  BY MR. GRILL:
10   Q.    Were there any other police officers in
11  the room when you were with Detective Kill and
12  Detective Boudreau?
13   A.    Like I said before, I believe Detective
14  Boudreau was in there.
15   Q.    Anybody else?
16   A.    I don't know about nobody else.
17   Q.    What about youth officer, was there a
18  youth officer in the room?
19   A.    No.
20   Q.    Okay.  Are you sure?
21   A.    I don't remember seeing a youth officer
22  till -- well, actually, correction, I seen the
23  youth officer for the fake cocaine, and I believe
24  there was one in there when they was taking a

Page 456

1  statement.
2    Q.    And do you remember that youth officer's
3  name when they were taking a statement?
4    A.    I want to say Bark or Burke or Berkley
5  or something of that nature.
6    Q.    Did you ever tell the youth officer
7  anything about what Detective Kill had done to you?
8    A.    No.
9    Q.    Did you ever tell -- you got to talk to
10  the State's Attorney, too, right?
11   A.    Yes.
12   Q.    And you were talking to the State's
13  Attorney at a point when it was just you and A.S.A.
14  Grossman, right?
15   MR. AINSWORTH:  Objection, foundation and form
16  and mischaracterizes the evidence.
17  BY THE WITNESS:
18   A.    I remember talking to him, but I don't
19  know if nobody else was in the room or not.  It's
20  kind of fuzzy.
21  BY MR. GRILL:
22   Q.    You told A.S.A. Grossman that you were
23  treated good by the police, right?
24   A.    Yes.



Page 457

1    Q.   Why wouldn't you tell A.S.A. Grossman
2  that Detective Kill had stomped on you?
3    A.   Because he was working with them.
4    Q.   How do you know that?
5    A.   He told me he was.
6    Q.   Okay.  What about Dr. Lujan when you
7  went to the Audy Home?
8    A.   Who?
9    Q.   Dr. Lujan, the doctor that examined you
10 at the Audy Home, did you tell Dr. Lujan what
11 Detective Kill had done?
12   A.   No.
13   Q.   Why not?
14   A.   Color of their skin, they all work
15 together as far as I'm concerned.
16   Q.   Because they're white?
17   A.   Yeah.  Told you I was naive at the time.
18   Q.   Okay.  Any other reason?
19   A.   Nope.
20   Q.   Were you bleeding from any part of your
21 body after Detective Kill had slapped you or kicked
22 you?
23   A.   Not that I can recall.
24   Q.   At some point, an A.S.A. showed up,

Page 458

1  right?
2    A.   Yes.
3    Q.   And I believe it's tab 8 in your binder
4  if you want to open that up.
5    A.   What page is it?
6    Q.   Tab 8.
7    A.   Tab 8?
8    Q.   Uh-huh.  So when you gave a statement to
9  A.S.A. Grossman, had Detective Kill given you any
10 details that he wanted you to include in your
11 statement to the State's Attorney?
12   A.   Besides me lying about being a freshman
13 at Tilden, he said all this stuff.
14   Q.   Okay.  So it's your testimony
15 today -- and you've had an opportunity to review
16 this statement before you came in here today,
17 right?
18   A.   Yes.
19   Q.   You read it yesterday?
20   A.   Did I read this yesterday?  I may have
21 looked over it.  I'm not for sure I read the whole
22 thing.
23   Q.   Okay.  And when you -- have you ever
24 read this whole thing?

Page 459

1    A.   Yes, I read it.
2    Q.   Yesterday?
3    A.   Many a times.  I didn't read the whole
4  thing yesterday, but I've read it many a times.
5    Q.   You're very familiar with what's in this
6  handwritten statement?
7    A.   Yes.
8    Q.   As you testified before, it's your
9  signature at the end, right?
10   A.   Yes.
11   Q.   But this is somebody -- A.S.A. Grossman
12 wrote this, right?
13   A.   I believe so.
14   Q.   And it's your testimony -- I thought I
15 just heard you say, that other than the Tilden High
16 School thing, Detective Kill told you everything
17 else to put in here?
18   A.   Somewhat.  I would say that.
19   Q.   Okay.  Well, are there parts in here
20 that he did not tell you to put in here?
21   A.   There is probably parts that when the
22 State's Attorney was going -- when he was asking me
23 what happened and we was going detail by detail
24 that he was saying little stuff that led me to

Page 460

1  finish the statement for him but he just led me to
2  finish it.
3    Q.   Like was A.S.A. Grossman telling you
4  what to say?
5    MR. AINSWORTH:  Object to the form of the
6  question.  Go ahead.
7  BY THE WITNESS:
8    A.   I'm just going to say he would lead me
9  to like certain points.
10 BY MR. GRILL:
11   Q.   So I'm just going to walk you through
12 this, and I want you to tell me line by line which
13 things are things that you said on your own or in
14 particular -- let's do it the other way.  I want
15 you to tell me which of these things were things
16 that either Detective Kill or A.S.A. Grossman told
17 you to say, okay?
18   A.   Okay.
19   Q.   We're just going to start from the top.
20 "After being advised of his constitutional rights
21 and stating he understood each of these rights and
22 stating that he understood that Brian Grossman is
23 an Assistant State's Attorney, a lawyer working
24 with the police and not his lawyer, Anthony Jakes



Page 461

1 agreed to give the following statement in summary
2 and not verbatim." I'm sure that's not something
3 you said but something A.S.A. Grossman said, right?
4 Correct?
5 A. Yeah.
6 Q. "Anthony Jakes stated that he is
7 15 years old." Did you tell A.S.A. Grossman that
8 yourself?
9 A. Yes.
10 Q. Did Detective Kill tell you to say that?
11 A. I said that myself.
12 Q. Okay. Anthony -- so you said that
13 yourself, okay. "Anthony is a freshman at Tilden
14 High School in Chicago, Illinois." Is that
15 something that you said yourself?
16 A. I said that myself.
17 Q. "Anthony reads, writes and understands
18 English," is that true?
19 A. True.
20 Q. And did Detective Kill tell you to say
21 that?
22 A. No.
23 Q. Did A.S.A. Grossman tell you to say
24 that?

Page 462

1 A. No.
2 Q. "Anthony Jakes stated that on
3 September 15, 1991, he was standing just outside
4 Queen's Submarine Shop at 1206 West 51st Street at
5 about 11:35 p.m. or 11:40 p.m." Is that something
6 that Detective Kill told you to say?
7 A. That was something, yeah, Detective
8 Kill.
9 Q. Told you to say?
10 A. Yeah.
11 Q. "Anthony was standing -- going on to the
12 next page -- with his friend Little A and Darren."
13 Did Detective Kill tell you to say those things?
14 A. Yes.
15 Q. "Anthony has known Little A for about a
16 year and one half." Did Detective Kill tell you to
17 say that?
18 A. That probably came from me and Grossman.
19 Q. Okay. How did Grossman -- how did that
20 come from him?
21 A. Because when he was talking to me about
22 them, he was like so you've been knowing them,
23 what, six months to a year, and I just went along
24 with it.

Page 463

1 Q. Okay. So it's not that Grossman was
2 telling you those details. He was just prodding
3 you to provide more detail?
4 A. Leading me on and I was just following
5 his direction.
6 Q. Okay. But that sentence that is
7 something that you said; not something that
8 Detective Kill told you to say, right?
9 A. Right.
10 Q. "Anthony has known Darren for about one
11 year." Did Detective Kill tell you to say that?
12 A. I don't recall.
13 Q. Do you think that's something that came
14 from you or Detective Kill?
15 A. I don't recall.
16 Q. "Little A came out of the sub shop and
17 said "the Mexican dude has got a lot of money,
18 we're going to stick him up." Is that something
19 that you said or Detective Kill told you to say?
20 A. I believe that probably came from Kill.
21 I don't know nothing about that.
22 Q. "Little A then showed Anthony the gun
23 which was sticking out of his waistband." Is that
24 something that Detective told you to say?

Page 464

1 A. That was Detective Kill.
2 Q. Anthony recognized the gun to be Little
3 A's .380 caliber handgun which Little A usually
4 carries on him at night." Is that something that
5 Detective Kill told you to day?
6 A. Can you repeat that again?
7 Q. "Anthony recognized the gun to be Little
8 A's .380 caliber handgun which Little A usually
9 carries on him at night." Is that something that
10 Detective Kill told you to say?
11 A. That's Detective Kill.
12 Q. "Anthony knew that Little A's .380 held
13 between 7 and 8 shells." Is that something that
14 Detective Kill told you to say?
15 A. I believe I was led to say that by
16 Grossman.
17 Q. So he was prodding you and that's
18 something that you came up with on your own?
19 A. That is something that he threw out
20 there and I just followed his suit.
21 Q. What did he throw out there?
22 A. .380 between 7 and 8 shells fully
23 loaded.
24 Q. So Grossman told you to say that?



Page 465

1    A.   Once again, he was leading me to say
2  that.
3    Q.   Right.  I'm trying to figure out how he
4  was leading you to say it?
5    A.   "So you've been knowing Arnold or Little
6  A this amount of time."
7    Q.   Okay.  It goes on, "Anthony knew Little
8  A sometimes kept the clip of the gun fully loaded
9  with bullets and at other times the gun was half
10  loaded with bullets."  Is that something Detective
11  Kill told you to say?
12    A.   That was probably Kill or Grossman.  It
13  wasn't me.
14    Q.   Okay.  "Little A told Anthony to get the
15  corner."  Did Kill tell you to say that?
16    A.   I'm not for sure about that one.
17    Q.   So that could have come from you?
18    A.   Get the corner?
19    Q.   Uh-huh.
20    A.   That sounds like something Grossman
21  probably told me -- led me to say.
22    Q.   Why do you think he led you to say that?
23    A.   Because in the beginning they lied to me
24  already talking about, if I just cooperate, I

Page 466

1  probably can be going home and be charged as a
2  lookout.  They didn't say nothing about I'd be
3  charged with first degree murder and all this other
4  stuff.
5    Q.   Right.  So did you add get the corner
6  yourself?
7    A.   Who me?
8    Q.   Yes.
9    A.   Like I said, I was probably led to say
10  that.
11    Q.   I guess what I'm asking, though, is that
12  something that you said on your own, or did
13  somebody put those words in your mouth?
14    MR. AINSWORTH:  Object to the form of the
15  question.
16  BY MR. GRILL:
17    Q.   Do you know if that's words somebody put
18  in your mouth and told you to say, or is that
19  something --
20    A.   I would say put in my mouth.
21    Q.   By who?
22    A.   Again probably the State's Attorney.
23    Q.   Okay.  "Anthony understood this to mean
24  that he would be the lookout."  Is that something

Page 467

1  that Kill told you to say?
2    A.   I was always told by them to say I was
3  the lookout.
4    Q.   "Anthony's job was to watch for any
5  police that were coming and to let Little A and
6  Darren know that the police were coming."  Is that
7  something that Kill told you to say?
8    A.   I was probably led to say that.
9    Q.   By?
10    A.   State's Attorney.
11    Q.   "After Little A told Anthony to get the
12  corner, Anthony said "all right."  Anthony then
13  walked toward the corner of 51st and Racine."  Kill
14  tell you to say that?
15    A.   Probably was led.
16    Q.   By Grossman?
17    A.   Yes.
18    Q.   Okay.  "As Anthony walk towards the
19  corner of 51st and Racine, he ran into his friend
20  Snake in Harold's Chicken, now known as Oliver's
21  Chicken."  Is that something that Kill told you to
22  say?
23    A.   Yes.
24    Q.   In Oliver's Chicken parking lot.  Did

Page 468

1  Kill tell you to say that?
2    A.   Yeah, that would be him.
3    Q.   Anthony went up to Snake and said that
4  they was fittin to rob this man."  Did Kill tell
5  you to say that?
6    A.   I was probably led that by Grossman on
7  that one.
8    Q.   Why do you think Grossman led you on
9  that one?
10    A.   Because they wanted me and Snake to have
11  some type of interaction, I don't know.
12    Q.   Now, the next line, "Anthony asked Snake
13  if he was fittin to help but Snake said no."  Is
14  that something that -- you want to take a break for
15  a second?
16    A.   I thought you said you were almost done.
17    MR. AINSWORTH:  You got four minutes left.
18  BY MR. GRILL:
19    Q.   "Anthony asked Snake if he was fittin to
20  help but Snake said no."  Is that something that
21  Kill told you to say?
22    A.   Probably led by Grossman.
23    Q.   "Snake then said -- Snake then drove
24  away from the parking lot."  Is that something that



Page 469

1  Kill told you to say?
2     A.   Probably led by Grossman.
3     Q.   "When Anthony got to the corner of 51st
4  and Racine, Anthony stood there for a little bit
5  and look both ways."  Kill or Grossman?
6     MR. AINSWORTH:  Go ahead and answer.
7  BY THE WITNESS:
8     A.   What was the question again?
9  BY MR. GRILL:
10    Q.   "When Anthony got to the corner -- top
11  of page 3.  "When Anthony got to the corner of 51st
12  and Racine, Anthony stood there for a little bit
13  and looked both ways."  Kill or Grossman tell you
14  to say that?
15    A.   That was probably Kill because they
16  wanted me to make myself a lookout.
17    Q.   "Anthony didn't see any police coming
18  from any direction," Kill or Grossman?
19    MR. AINSWORTH:  Object to the form of the
20  question.
21  BY MR. GRILL:
22    Q.   Did Kill or Grossman tell you to say
23  that, or is that something that you said?
24    A.   Probably something that I was misled to

Page 470

1  say.
2     Q.   By Grossman?
3     A.   Yes.
4     Q.   "Anthony then stood by the newspaper
5  stand which was on the side of Queen's Submarine
6  Shop."  Is that something that Kill or Grossman
7  told you to say?
8     A.   Something I was led to say.
9     Q.   By Grossman?
10    A.   Yes.
11    Q.   Okay.  "Anthony told Little A and Darren
12  "it's all right."  Anthony meant that he didn't see
13  any police around."  Did Kill or Grossman tell you
14  to say that?
15    MR. AINSWORTH:  Object to the form of the
16  question.
17  BY THE WITNESS:
18    A.   What was the question again?
19    Q.   Anthony told Little A and Darren, "it's
20  all right."  Anthony meant that he didn't see any
21  police around."  Are those facts that Kill or
22  Grossman told you to put in the statement?
23    A.   Probably led by Grossman.
24    MR. AINSWORTH:  Object to the form of the

Page 471

1  question.
2  BY MR. GRILL:
3     Q.   Grossman led you to say that?  Yes?
4     A.   That's what I said.
5     Q.   Okay.  "Anthony then kept looking both
6  ways."  Is that something that you said on your
7  own, or is that something that Grossman led you to
8  say, or is that something that Kill told you to put
9  in?
10    A.   I probably said that on my own.  I ain't
11  for sure.
12    Q.   "The Mexican dude then came out of
13  Queen's Submarine Shop."  Is that something that
14  you were led to say by Grossman or did Kill tell
15  you to say that?
16    A.   Led by Grossman.
17    Q.   "Little A went up to the Mexican dude
18  and pointed his .380 caliber gun at the Mexican
19  dude.  Little A said, "This is a stickup."
20  Grossman lead you to say that, or did Kill tell you
21  to put that detail?
22    MR. AINSWORTH:  Object to the form of the
23  question.
24  BY MR. GRILL:

Page 472

1     Q.   Or did Kill give you that detail before
2  you talked to Grossman?
3     A.   I believe that Grossman led me to that
4  one.
5     Q.   Okay.  "Darren was standing right next
6  to Little A.  The Mexican dude mumbled something
7  that Anthony couldn't hear.  The Mexican dude ran
8  to his car parked in front of Queen's Submarine
9  Shop on the street."  Are those facts that Grossman
10  led you to say, or are those lines that Kill fed
11  you to put in the statement?
12    A.   I probably would say that -- I'm not for
13  sure about that one.
14    Q.   Do you think that's something you could
15  have added in on your own?
16    A.   If I added anything, I was being misled.
17    Q.   By Grossman?
18    A.   Yes.
19    Q.   "The Mexican dude started his car and
20  backed up his car.  The Mexican dude's car then hit
21  another car."  Did Grossman lead you to say that,
22  or did Kill feed you those details to put in there?
23    A.   I'm not for sure.
24    Q.   Do you think it's something that you



Page 473

1  could have said?

2     A.   It's something I could have been led to.

3     Q.   By Grossman?

4     A.   Yes.

5     Q.   "Little A then went right up to --

6     MR. AINSWORTH:  We're at time.

7     MR. GRILL:  Well, I'm going to finish this up.

8     MR. AINSWORTH:  Well, no, you're not going to

9  finish the statement.

10    MR. GRILL:  Yeah, I am going to finish this.

11    MR. AINSWORTH:  The amount of time you wasted

12  in this deposition --

13    MR. GRILL:  No, no, no, no, no, no.  Okay, if

14  you want to play it that way, that's fine, but I

15  have got about three minutes left to finish this

16  statement and you know the line of questioning and

17  how I'm doing this.

18    MR. AINSWORTH:  Then let's take a break, let

19  me talk to my client because I don't know if I'm

20  going to allow him to do this.

21    MR. GRILL:  We are going to finish this up,

22  Russell.  Are you serious?

23    MR. AINSWORTH:  I am serious.

24    MR. GRILL:  We provide you the same courtesy

Page 474

1  with our clients all the time.  I've got a couple

2  minutes left.  I'm going to finish this up.  And if

3  you figure out like with the delay and the

4  arguments that have gone on with your client today,

5  I think I get another three or four minutes to

6  finish this up, okay?

7     MR. AINSWORTH:  Let's go off the record.

8     THE VIDEOGRAPHER:  We're going off the record,

9  the time is 7:04 p.m.

10    (WHEREUPON, a short break was had.)

11    THE VIDEOGRAPHER:  We're back on the record,

12  the time is 7:05 p.m.

13  BY MR. GRILL:

14    Q.   All right, and I will keep going as fast

15  as I was.  Pick it up.  "Little A then went right

16  up to the passenger window of the Mexican dude's

17  car."  Is that something that Kill told you to say,

18  or is that something that Grossman led you to say?

19    A.   Detective Kill.

20    Q.   Okay.  "Little A pointed the gun at the

21  Mexican dude and Little A started shooting at the

22  Mexican dude."  Did Grossman lead you to say that,

23  or did Kill tell you to say that?

24    A.   I'm not sure where that one came from.

Page 475

1     Q.   Do you think it could have come from

2  you?

3     MR. AINSWORTH:  Object to the form of the

4  question.

5  BY THE WITNESS:

6     A.   I don't want to assume.  I'm not sure.

7  BY MR. GRILL:

8     Q.   Why are you not sure, is there a reason

9  why?

10    A.   No reason.

11    Q.   Okay.  "Anthony was next to the

12  newsstand about 10 feet away from Little A."  Is

13  that something that Kill told you to say, or is

14  that something that Grossman led you to say?

15    A.   I probably said it on my own.

16    Q.   "Darren was a couple feet away from

17  Little A."  Is that something that --

18    A.   I'm trying to read down to find out

19  where you're at.

20    Q.   "Darren was a couple feet away from

21  Little A."  Is that something that Kill told you to

22  say or said to you, or is that something that

23  Grossman led you to say?

24    A.   I'm not for sure.

Page 476

1     Q.   Is that something you believe that you

2  could have put in there on your own?

3     A.   Could have.

4     Q.   Okay.  "Anthony didn't want to stand in

5  front of the sub shop because Anthony lived only a

6  few houses away from the sub shop and he didn't

7  want anybody in the sub shop to recognize him."  Is

8  that something that Kill told you to say, or is

9  that something --

10    A.   That probably was me there.

11    Q.   That was you, okay.  Why did you put

12  that in there?

13    A.   I guess to make the statement look good

14  so I could go home.

15    Q.   "Anthony saw Little A fire four shots at

16  the Mexican dude."  Is that something that --

17    A.   That's Kill.

18    Q.   That's Kill.  "Anthony then turned and

19  started to run.  Anthony heard about three more

20  shots after he turned and started to run."  Kill

21  tell you to say that, or did Grossman lead you to

22  say that?

23    A.   I'm not for sure on that one.

24    Q.   Is that something that you think you



Page 477

1 could have added in here on your own to make it
2 sound better?
3    MR. AINSWORTH:  Object to the form of the
4 question.
5 BY THE WITNESS:
6    A.   It's possible.
7 BY MR. GRILL:
8    Q.   All right.  "Anthony ran because he
9 didn't want anybody to see him and he got scared."
10 Is that something that you also said, or is that
11 something Kill told you to say or that Grossman led
12 you to say?
13    A.   That's probably something I said.
14    Q.   "Anthony ran home to 1212 West 51st
15 Street."  Is that something you said, or is that
16 something that Kill told you to say or Grossman led
17 you to say?
18    A.   I'm not for sure.
19    Q.   Okay.  "Anthony figured that him, Little
20 A and Darren would split the money they were going
21 to take from the Mexican dude."  Is that something
22 that Kill told you to say, or is that something
23 that Grossman led you to say?
24    A.   That's something I probably said trying

Page 478

1 to make it look good.
2    Q.   Why did you want to make it look good?
3    A.   Because I was trying to go home.  He
4 told me if I make myself a lookout, I can possibly
5 go home.
6    Q.   And you believed him?
7    A.   And that's what I believed.
8    Q.   "Anthony didn't stick around to get his
9 share because he didn't want anybody to see him and
10 he got scared."  Is that something that you added
11 on your own to make this look good, or is that
12 something Kill told you to say, or did Grossman
13 lead you to say that?
14    A.   I'm not for sure.  I'd probably say me.
15 I don't know, I ain't for sure about that one.
16    Q.   You think it was you?
17    A.   I'm not for sure.
18    Q.   It could have been you?
19    A.   It could have, but I don't want to
20 assume.
21    Q.   "After Anthony had been home for a few
22 minutes, he looked out onto 51st Street towards the
23 sub shop and saw the Mexican dude moving around on
24 the ground for a minute."  Is that something that

Page 479

1 Kill told you to say?
2    A.   That was Kill.
3    Q.   Okay.  "Anthony Jakes states that he has
4 been treated well by the police and the Assistant
5 State's Attorney."  Is that something that Kill
6 told you to say or that Grossman led you to say?
7    A.   That's something I said.
8    Q.   Was that true?
9    A.   Was I treated good by the police?  Hell,
10 no, that wasn't true.
11    Q.   Why did you add that in there?
12    A.   Because, again, I was trying to make it
13 look good so I could go home.
14    Q.   Do you think that if you put in here
15 that the police beat you up, it wouldn't look good?
16    A.   I think I probably would have got beat
17 up some more.  They probably would have killed me.
18    Q.   Okay.  "Anthony has been allowed to use
19 the washroom when he needed to."  Is that true?
20    A.   Yes.
21    Q.   Did Kill tell you to put that in there,
22 or did you put that in there on your own?
23    A.   I believe that was me.
24    Q.   Okay.  "Anthony states he is not hungry

Page 480

1 or thirsty at the present time and told the police
2 that when he was asked if he wanted anything."  Is
3 that something that Kill told you to say?
4    A.   No, I don't where that -- no.
5    Q.   You don't know where that came from?
6 Did that come from you?
7    A.   I'm not for sure.
8    Q.   Do you think it came from you?
9    A.   I'm not sure.
10    Q.   "Anthony states that he was not promised
11 anything in return for his statement, nor was he
12 threatened in any way."  Did Kill tell you to say
13 that, or did Grossman lead you to say that?
14    A.   I probably said that on my own to get up
15 out of there.
16    Q.   Okay.  "Anthony is not, nor does he
17 appear to be, under the influence of drugs or
18 alcohol."  Did you add that in, too?
19    A.   Did I add that in?
20    Q.   Yes, on your own.
21    A.   I don't know where that came from.
22    Q.   Is that something that Grossman added in
23 there?
24    MR. AINSWORTH:  Object to the form of the



1 question.

2 BY MR. GRILL:

3    Q.   If you know, did he lead you to say

4 that?

5    A.   I don't know.

6    Q.   You don't know where that came from?

7    A.   Uh-uh.

8    Q.   And that's your signature at the bottom,

9 right?

10    A.   Yep.

11    Q.   Okay. True to my word, I am done. I

12 appreciate your time here today.

13    MR. AINSWORTH: We'll reserve signature.

14    THE VIDEOGRAPHER: We are going off the record

15 at 7:11 p.m.

16       FURTHER DEPONENT SAITH NOT.

17

18

19

20

21

22

23

24

1 STATE OF ILLINOIS   )

2                ) SS:

3 COUNTY OF W I L L   )

4       I, GAIL LIVIGNI, CSR No. 84-1965, a

5 Notary Public within and for the County of Will,

6 State of Illinois, and a Certified Shorthand

7 Reporter of said state, do hereby certify:

8       That previous to the commencement of the

9 examination of the witness, the witness was duly

10 sworn to testify the whole truth concerning the

11 matters herein;

12       That the foregoing deposition transcript

13 was reported stenographically by me, was thereafter

14 reduced to typewriting under my personal direction

15 and constitutes a true record of the testimony

16 given and the proceedings had;

17       That the said deposition was taken

18 before me at the time and place specified;

19       That I am not a relative or employee or

20 attorney or counsel, nor a relative or employee of

21 such attorney or counsel for any of the parties

22 hereto, nor interested directly or indirectly in

23 the outcome of this action.

24

1       IN WITNESS WHEREOF, I do hereunto set my

2 hand of office at Chicago, Illinois, this 4th day

3 of October, 2021.

4

5

6

7

8       Notary Public, Will County, Illinois.

9       My commission expires 06/25/24

10

11 GAIL LIVIGNI, CSR No. 84-1965

12

13

14

15

16

17

18

19

20

21

22

23

24

1        I N D E X

2 WITNESS                  EXAMINATION

3 ANTHONY JAKES

4 Direct by Mr. Grill          5-481

5

6       E X H I B I T S

7 NUMBER                    PAGE

8 Exhibit No. 1           185

9 Exhibit No. 3           356

10 Exhibit No. 5       142/278

11 Exhibit No. 7           448

12 Exhibit No. 8           458

13 Exhibit No. 14         114

14 Exhibit No. 16          68

15

16

17

18

19

20

21

22

23

24



Page 485

```
 1   DEPOSITION ERRATA SHEET
 2   Our Assignment No. J7476473
 3        IN THE UNITED STATES DISTRICT COURT
 4            NORTHERN DISTRICT OF ILLINOIS
 5                 EASTERN DIVISION
 6   ANTHONY JAKES,                )
 7              Plaintiff,          )
 8        -vs-                      ) No. 19-cv-2204
 9   THE CITY OF CHICAGO, et        )
10   al,                           )
11              Defendants.        )
12        DECLARATION UNDER PENALTY OF PERJURY
13        I declare under penalty of perjury that I
14   have read the entire transcript of my deposition
15   taken in the above-captioned matter or the same has
16   been read to me and the same is true and accurate,
17   save and except for changes and/or corrections, if
18   any, as indicated by me on the DEPOSITION ERRATA
19   SHEET hereof, with the understanding that I offer
20   these changes as if still under oath.  Signed on
21   the _____ day of _____, 20___.
22
23   _____
24   ANTHONY JAKES
```

Page 486

```
 1   DEPOSITION ERRATA SHEET
 2   Page No._____Line No._____Change to:_____
 3   _____
 4   Reason for change:_____
 5   page No._____Line No._____Change to:_____
 6   _____
 7   Reason for change:_____
 8   page No._____Line No._____Change to:_____
 9   _____
10   Reason for change:_____
11   page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20   SIGNATURE:_____DATE:_____
21            ANTHONY JAKES
22
23
24
```

Page 487

```
 1   DEPOSITION ERRATA SHEET
 2   Page No._____Line No._____Change to:_____
 3   _____
 4   Reason for change:_____
 5   page No._____Line No._____Change to:_____
 6   _____
 7   Reason for change:_____
 8   page No._____Line No._____Change to:_____
 9   _____
10   Reason for change:_____
11   page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20   SIGNATURE:_____DATE:_____
21            ANTHONY JAKES
22
23
24
```



Exhibit 2

```
1                           ANTHONY JAKES,

2      the Petitioner-Defendant, herein, called as a witness

3      on his own behalf, on the motion, having been first

4      duly sworn, was examined and testified as follows:

5                         DIRECT EXAMINATION

6                         BY MR. MADIA:

7          Q    Mr. Jakes, back in September of 1991, how old

8      were you?

9          A    16 -- I mean, 15.

10         Q    Okay.

11              And where were you living at?

12         A    1212 West 51st Street.

13         Q    And who were you living there with?

14         A    My auntie.

15         Q    And what is her name?

16         A    Jessie May Jones.

17         Q    And bringing your attention to September

18     16th, 1991, in the morning, what, if anything, unusual

19     occurred?

20         A    Police came in my house with their guns

21     drawn.

22         Q    Where were you in your home?

23         A    Upstairs.

24         Q    Is that your bedroom there?
```

A-7

Plaintiff Jakes 005370

1    A    Yes.

2    Q    Okay.

3                  And when the police came, with their

4    guns drawn, what, if anything, did they do?

5    A    They slammed me against the wall and put

6    handcuffs on me.

7    Q    Okay.

8                  Did they have occasion to take you

9    anywhere?

10    A    They took me to 39th and California.

11    Q    All right.

12                  At that time, did they show you a

13    warrant for your arrest?

14    A    No.

15    THE COURT:  State, you stipulate to lack of

16    judicial process?

17    MR. GOODFRIEND:  Yes, Judge.

18    THE COURT:  Are you asserting consent here?

19    MR. GOODFRIEND:  Yes, Judge.

20    THE COURT:  Proceed.

21    MR. MADIA:  Q   Were you violating any State,

22    Municipal or Federal law?

23    A    No.

24    Q    All right.

A-8

Plaintiff Jakes 005371

```
 1                    Do you expect the State to use evidence
 2     gained from your illegal arrest against you in a Court
 3     of law?
 4         A    Yeah.
 5         MR. MADIA:   I don't have anything further at time.
 6         THE COURT:   Cross examination.
 7                         CROSS EXAMINATION
 8                       BY MR. O'CONNOR:
 9         Q    Mr. Jakes, was your aunt the only other
10     person that was living at that particular location?
11         A    My cousin's boy friend, Joe Joe was there.
12         Q    Was Joe Joe there at the time that the police
13     arrived?
14         A    Yeah.
15         Q    Oh, all right.
16                    What time was it that the police
17     arrived?
18         A    I don't know the exact time.
19         Q    Well, was it morning or afternoon or night?
20         A    Morning.
21         Q    Can you approximate what time?
22         A    No.
23         Q    The officers that spoke with you, did they
24     identify themselves?
```

A-9

Plaintiff Jakes 005372

| | | |
|---|---|---|
| 1 | A | Nope. |
| 2 | Q | Were they in uniform or out of uniform? |
| 3 | A | Out of uniform. |
| 4 | Q | Plain clothes? |
| 5 | A | Yes, street clothes. |
| 6 | Q | You say that they came into your house with |
| 7 | | guns drawn, is that correct? |
| 8 | A | Yeah. |
| 9 | Q | Where is the first place that you saw those |
| 10 | | officers? |
| 11 | A | Coming up the stairs. |
| 12 | Q | And how many officers were there? |
| 13 | A | About 4 or 5, 6. |
| 14 | Q | 4 or 5 officers? |
| 15 | A | Yeah. |
| 16 | Q | And what did those officers look like? |
| 17 | A | All of them was white, Caucasian. |
| 18 | Q | They were all Caucasian? |
| 19 | A | Yeah. |
| 20 | Q | Specifically, did each of those 4 or 5 |
| 21 | | officers, did they all have their guns drawn? |
| 22 | A | Yeah. |
| 23 | Q | And can you describe any of those 4 or 5 |
| 24 | | officers, other than the fact that you say that they |

A-10

Plaintiff Jakes 005373

1    are white?

2       A   No.

3       Q   You saw them come up the stairs, were you

4    inside the premises or outside the premises, when you

5    saw this?

6       A   Inside.

7       Q   Okay.

8       Q   You looked down the stairs, what were you

9    looking down for?

10      A   I was coming down, my auntie called my name.

11      Q   Did they -- when they first came up, did they

12    say anything to you?

13      A   No, they just threw me against the wall and

14    put handcuffs on me.

15      Q   They didn't ask what your name was?

16      A   No.

17      Q   And after they put those handcuffs on you,

18    did they tell you what they wanted to talk to you

19    about?

20      A   Nope.

21      Q   They took you straight to 39th and

22    California?

23      A   Yep.

24      Q   Did they question you at all?

A-11

Plaintiff Jakes 005374

1    A    Yeah, they questioned me there.

2    Q    No, did those officers who, you say, put you

3    up against the wall, and handcuffed you, did they

4    arrest you at all -- I'm sorry, did they question you

5    at all?

6    A    Uhn-uhn, not at 39th.

7    Q    When you got to 39th and California is it

8    true that they asked to empty your pockets or did they

9    conduct any type of pat down search of you?

10   A    They went in my pockets, searched me, yeah.

11   Q    Okay.

12        Did they find what they believed to be

13   cocaine?

14   MR. MADIA:   Objection.

15   THE COURT:   Grounds?

16   MR. MADIA:   Judge, how does he know what they

17   believe?

18   THE COURT:   Sustained, form of the question.

19   MR. O'CONNOR:   Q   Did they find a small packet,

20   which they said was cocaine?

21   A    Yeah.

22   Q    Okay.

23        Did they find that on your body?

24   A    Yeah, in my pocket.  I don't know where it

A-12

Plaintiff Jakes 005375

1    came from.

2         Q    You have no idea where that came from?

3         A    Nope.

4         Q    And after they found that, they told you that

5    you were under arrest for the packet of cocaine, and

6    had to be transferred over to the Youth Division, is

7    that right?

8         A    Nope.

9         Q    Did they ever bring you over to the Youth

10   Division at 39th and California, a separate room where

11   you were processed?

12        A    Nope.

13        Q    You never left -- strike that.

14             When you got to 39th and California, did

15   you go up to the third floor?

16        A    Yeah.

17        Q    Okay.

18             And when you got up to that third floor,

19   is that where that search that you described took

20   place?

21        A    Yeah, in the little cage.

22        Q    In the cage?

23        A    Yeah.

24        Q    They put you into a cage, as soon as they

A-13

Plaintiff Jakes 005376

1    brought up there?

2         A    Yeah.

3         Q    And they conducted a search of you in that

4    cage?

5         A    Yeah.

6         Q    And that's when they found this packet, which

7    you have described?

8         A    Yeah.

9         Q    Did they ever send you over or bring you over

10   to a separate room, where you spoke with another

11   police officer about that cocaine?

12        A    Nope.

13        Q    You don't recall ever speaking with a youth

14   officer by the name of Danaher, is that right?

15        A    Nope.

16        Q    You don't remember him ever telling you a

17   particular Court date, which you had to go to, to

18   answer for that cocaine possession?

19        A    Go to the other question, is whether the

20   other police was questioning me.  He came in the room

21   with a little sheet of paper.  He said, this is for my

22   drug case.

23        Q    So, you did -- you did speak with somebody

24   about a particular Court date about the drug case, is

A-14

Plaintiff Jakes 005377

```
 1    that right?

 2         A    Yeah.

 3         Q    Okay.

 4              And isn't it true that that particular

 5    officer called your aunt Jessie May Jones to tell her

 6    where you were again?

 7         A    I can't remember that.

 8         Q    You don't remember that during the time that

 9    you were at 39th and California.

10              Did you remain in that cage you

11    described, the entire time?

12         A    Nope, they took me into a little room.

13         Q    Okay.

14              And did they speak with you in that room?

15         A    Yeah, they started questioning me.

16         Q    Okay.

17              Did they tell you what your Miranda

18    Rights were.

19         MR. MADIA:  Objection, Judge.

20         THE COURT:  Sustained.

21         MR. GOODFRIEND:  I'm sorry?

22         THE COURT:  Pursuant to the agreement of counsel,

23    this would be handled separately.

24         MR. O'CONNOR:  Yes, Judge.
```

A-15

Plaintiff Jakes 005378

1    THE COURT:  Is your aunt's place on 51st Street, a

2    single family home or an apartment?

3       THE WITNESS:  Apartment.

4       THE COURT:  Is her apartment on first floor or

5    second floor?

6       THE WITNESS:  It's like a -- 2 floors, then in

7    the back is her apartment.  She staying in the back.

8       THE COURT:  You said, your aunt had called you

9    down.  Where was your aunt when she called you down?

10      THE WITNESS:  In the house.

11      THE COURT:  And where is her apartment located?

12      THE WITNESS:  In the back, in the rear.

13      THE COURT:  And where were you when she called you

14   down?

15      THE WITNESS:  Upstairs.

16      THE COURT:  What is upstairs?

17      THE WITNESS:  Upstairs, it's like a -- it's

18   like -- it's a house but it got an upstairs to it.

19      THE COURT:  Which part of the house is her

20   apartment?

21      THE WITNESS:  Huh, in the rear.

22      THE COURT:  On what floor?

23      THE WITNESS:  On -- it's like a whole house.  It

24   is an upstairs and downstairs.

Plaintiff Jakes 005379

```
 1        THE COURT:  So, her apartment, that's what I asked
 2   you originally.  Her apartment has both an upstairs
 3   and downstairs?
 4        THE WITNESS:  Yeah.
 5        THE COURT:  Upstairs, I assume is where the
 6   bedrooms are?
 7        THE WITNESS:  Yeah.
 8        THE COURT:  Is that where you were when you got
 9   called?
10        THE WITNESS:  Yeah.
11        THE COURT:  How were you dressed?
12        THE WITNESS:  I had my -- I had some stonewash
13   pants on and a shirt.
14        THE COURT:  Did you have any shoes on?
15        THE WITNESS:  Yeah.
16        THE COURT:  Continue.
17        MR. O'CONNOR:  Q    What type of shirt did you have
18   on?
19        A    The same one right here.
20        Q    That's the same shirt that you are wearing
21   right now?
22        A    Yeah.
23        MR. O'CONNOR:  May the record reflect, a red
24   Chicago Bulls sweatshirt.
```

Plaintiff Jakes 005380

1      Q    You indicate there was a person by the name

2    of Joe Joe that was home at the time, is that right?

3      A    Yeah.

4      Q    What was Joe Joe's last name?

5      A    I don't know.

6      Q    You don't know his last name?

7      A    I don't know nothing about him.  All I know,

8    he goes with my cousin.  He got a baby by her.

9      Q    How long was he living there at that time?

10     A    He don't stay there, no.  Every once in a

11    while, he spend the night and then he go home.

12     Q    Did you say earlier that he was living at

13    that location?

14     A    Uhn-uhn, I just said, he stayed there -- he

15    stayed there one night and go home the next night.

16     Q    Did you -- when the police were at your

17    address, they had a conversation with your aunt, is

18    that right?

19     A    Yeah, after they had made a police call.

20     Q    Well, were you present for a conversation

21    they had with your aunt, telling your aunt, where you

22    were going?

23     A    Nope.

24     Q    Okay.

A-18

Plaintiff Jakes 005381

1     They never told your aunt where you were
2   going to go?
3     A   I don't know.
4     Q   You said that you were out in the police car
5   at one point in time?
6     A   Yeah.
7     Q   And there is police officers still speaking
8   with your aunt?
9     A   Uh-huh.  And one standing out there watching
10  me.
11    Q   Okay.
12        And you couldn't hear what's said
13  between the police officers and your aunt?
14    A   They was in the back.
15    Q   Just answer my question.
16  THE COURT:  You could not.
17  MR. O'CONNOR:  Q   You could not hear the
18  conversation between the police officers and your
19  aunt, is that correct?
20    A   Nope.
21    Q   After that police officer gave you the piece
22  of paper, telling you what your Court date was
23  regarding your drug case, didn't they also tell you
24  that the detectives who wanted to talk to you were not

Plaintiff Jakes 005382

1    in the station at the time?

2        A    I can't rereemember.

3        Q    They could have said that, but you don't

4    remember?

5        A    I can't remember.

6        Q    Do you remember having to wait for a while

7    before some police officers came and spoke with you,

8    detectives?

9        A    Not that long.  It was like 5 or 10 minutes.

10       Q    Okay.

11              5 or 10 minutes, you had to wait for

12   some detectives to arrive?

13       A    Yeah.

14       Q    All right.

15              Didn't they also tell you that after you

16   were done being processed with respect to the drug

17   case, that there were police officers that were out on

18   the street, and that you can wait there or you can go

19   home, and they can talk to you later?

20       A    Nope.

21       Q    That room that you said that you were brought

22   to -- well, strike that.  Rephrase the question.

23              At the time that they found that cocaine

24   in your pocket, that's when you --

Plaintiff Jakes 005383

1    MR. MADIA:  Objection, your Honor, assumes a fact
2    not in evidence.
3        THE COURT:  Oh, he said that he found it in his
4    pocket.  He didn't know how it got there.  He said it
5    was in his pocket.
6        MR. MADIA:  It assumes that it is cocaine.
7        THE COURT:  He said it was cocaine.
8        MR. MADIA:  The State said.
9        THE COURT:  No, he also said -- he said, they
10   found a packet of cocaine in my pocket.  I don't know
11   how it got there.  He's not an expert witness.  I
12   would not find beyond a reasonable doubt that it was
13   cocaine, at this point, but that's not the situation
14   here any way.
15       MR. MADIA:  Okay.
16       THE COURT:  Continue.
17       MR. O'CONNOR:  Thank you, Judge.
18       Q    After they found that cocaine in your pocket,
19   you said that you were placed in that cage, is that
20   correct?
21       A    After they found it, a detective took me in
22   this questioning room.
23       Q    Okay.
24                And was that the same officer that gave

Plaintiff Jakes 005384

1    you the piece of paper as to what your Court date was

2    going to be on the drug case?

3        A    It was a heavy set guy.  White heavy set guy.

4        Q    Was it the same officer that gave the piece

5    of paper on your drug case?

6        A    Nope.

7        Q    Okay.

8            Were you moved out of that cage area

9    into an interview room, is that right?

10       A    Yeah.

11       Q    And that interview room was a larger room

12   with desks and phones and a window, right?

13       A    Wasn't no phones in there.  It is a table and

14   some chairs.

15       Q    Okay.

16           And at some point in time, did you speak

17   with -- I'm sorry, Judge, I have to go to the other

18   one.

19           Nothing further, Judge.

20       THE COURT:  Any redirect.

21       MR. MADIA:  Just briefly.

22

23

24

Plaintiff Jakes 005385

REDIRECT EXAMINATION

2                                     BY MR. MADIA:

3          Q     Anthony, you remember when the police found a

4     small packet?

5          A     Uh-huh.

6          Q     Can you -- is that a yes?

7          A     Yeah.

8          Q     Okay.

9                Can you describe that packet?

10         A     Well, when they took it out my pocket, it was

11    in aluminum foil and --

12    THE COURT:  About the size of a dime bag?

13    THE WITNESS:  Yeah.  And looked like some jiffy

14    mix or something.

15    MR. MADIA: Q    Did you go to Court for that?

16         A     Yeah.

17         Q     What happened with that case?

18         A     They dropped it in Juvenile Court.

19    MR. GOODFRIEND:  Objection.

20    MR. O'CONNOR:  Irrelevant.

21    THE COURT:  Sustained.

22    MR. MADIA:  Nothing further, your Honor.

23    THE COURT:  You may step down.

24                               (Witness excused.)

A-23

Plaintiff Jakes 005386

Exhibit 3

1    of the statement and we ask that the burden

2    shift at this time period.

3        THE COURT:  Any witnesses you wish to call?

4        MR. MEDEA:  We call Mr. Jakes.

5                    (Witness Sworn)

6

7                 ANTHONY JAKES,

8    the Petitioner-Defendant herein, having been

9    first duly sworn, testified as follows:

10

11       THE COURT:  Be seated.  Make yourself

12   comfortable.  Once you are state your full name.

13       THE WITNESS:  Anthony Jakes, J-a-k-e-s.

14       THE COURT:  What is your date of birth?

15       THE WITNESS:  July 30, 1976.

16       THE COURT:  Proceed.

17

18                 DIRECT EXAMINATION

19                      BY

20                  MR. MEDEA:

21       Q    Now, bringing your attention to late in

22   the afternoon on September 16th of 1991 do you

23   recall where you were, Anthony?

24       A    Yeah, 39th and California.

B  39

Plaintiff Jakes 002542

```
1       Q       And did you have occasion to see anyone
2   there or talk to anyone?
3       A       Yeah, a detective.
4       Q       What was his name; do you recall?
5       A       Detective Kill and his partner.
6       Q       Was that the gentleman that testified
7   today, Boudreau?
8       A       Yes.
9       Q       Now, where were you at when you saw
10  these two detectives?
11      A       In a conference room.
12      Q       Can you describe it to the Judge?
13      A       It's a table like.  There are four or
14  five chairs around and there is a bunch of
15  lockers.
16      Q       Were you handcuffed at all?
17      A       Not at the time that Kill came.
18      Q       When Detective Kill came tell the
19  Court what, if anything, happened?
20      A       He started asking me questions and
21  showing me pictures.  I kept telling him I don't
22  know what he was talking about.  Then he held a
23  picture up saying this person right here is the
24  person that did the murder, stuff like that.
```

B 40

Plaintiff Jakes 002543

```
 1    When he turned the picture around I was on the
 2    picture and I said I don't know what you are
 3    talking about and he hit me.
 4         Q    Where did he hit you at?
 5         A    In the face.
 6         Q    Did he hit you with an open hand or his
 7    fist?  How did he hit you?
 8         A    Open hand.
 9         THE COURT:  This is Kill who hit you?
10         THE WITNESS:  Yes.
11         MR. MEDEA:  Q  After that happened, what
12    happened next?
13         A    Then he just started talking,
14    threatening me and then he said he will push me
15    out that window if I reach for his partner's gun
16    and stuff like that and how my family would be
17    jumped on by the Latin Kings.  He said that he
18    was close with them and stuff like that.
19         Q    Was anyone present in the room when
20    this happened?
21         A    His partner was there.
22         Q    And after he said that what, if
23    anything, happened next?
24         A    And I -- when I said I don't know what
```

Plaintiff Jakes 002544

```
1   you are talking about he knocked me on the floor
2   and just started kicking me and stuff.
3       Q    Did you cry out or make any noise?
4       A    No, I just balled up.
5       Q    After he was kicking you what did you
6   do next?  What happened next?
7       A    And then he told me to sit back in the
8   chair.  Then he started asking me do I know
9   these certain people that he had went out and got
10  and got their pictures on.  I told him yeah, I
11  know them.  Then he said was you with any of
12  them?  No, I said but the girl I had named they
13  can help you find your killer.
14      MR. O'CONNOR:  Judge --
15      THE COURT:  The girl I named to them he said
16  they can help you --
17      THE WITNESS:  Find the killer.
18      MR. MEDEA:  Q  Who is that girl?
19      A    Denise Harris.
20      Q    Now, did anything else happen during
21  the conversation?
22      A    It was before Kill came there.  Another
23  detective came in.  I don't remember his name.
24      Q    Has he testified?
```

B 42

Plaintiff Jakes 002545

```
 1        A      I can't remember.

 2        Q      Now, after this conversation with

 3   Detective Kill did he have occasion to leave?

 4        A      Yes, he left and then -- that is when

 5   he just said he was going to my neighborhood and

 6   came back with a bunch of people.

 7        Q      Now, when he returned, did he talk with

 8   you again?

 9        A      Yeah, he said that the State's Attorney

10   was coming and I better tell him what he wants to

11   hear or he was going to give me some more of what

12   I just had.  In other words, beat me and stuff.

13        Q      And what did you take that to mean?

14        A      That the State's Attorney would hear

15   what he wanted to hear.

16        Q      Now, I'm going to show you what I

17   have previously marked as Defendant's Group

18   Exhibit 1A thru G and ask you to take a look at

19   that.

20               What does 1A depict?

21        A      When he was kicking me on my side.

22        Q      Is that a picture of you?

23        A      Yeah.

24        Q      And can you tell the Court where that
```

B 43

Plaintiff Jakes 002546

1    injury is located?

2        A    On the side.

3        MR. O'CONNOR:  Judge, I did not see where

4    the defendant --

5        THE COURT:  He might need them in case he

6    loses the motion.  I don't want to have them

7    marked.

8            Take a pen, don't mark it with a pen,

9    but point to the spot where you say the marks

10   were.

11       THE WITNESS:  Right here.  (Indicating)

12       THE COURT:  What part of the body?

13       THE WITNESS:  (Indicating.)

14       THE COURT:  The stomach area, right around

15   the belly button is where he is pointing to, the

16   stomach area on the side, the left side.

17       MR. O'CONNOR:  Before that when he pointed

18   to his own body he pointed on the right side.

19   He had his left hand --

20       THE COURT:  His body is not what is going in

21   evidence.  The pictures are.

22       MR. MEDEA:  Q  Bringing your attention to B.

23    What does that indicate?

24       A    My back.

B  44

Plaintiff Jakes 002547

```
 1      Q      Could you show the Court and the State
 2   where the injury is?
 3      A      Right here.  (Indicating)
 4      Q      All right.  And showing you C.  What
 5   does that show?
 6      A      My back, closer view.
 7      Q      What does that show, an injury?
 8      A      Right here.
 9      Q      Now, showing D --
10      THE COURT:  How did you get that injury in
11   C?  How did you get that injury?
12      THE WITNESS:  From Detective Kill.
13      THE COURT:  Did it go away or do you still
14   have that right now?
15      THE WITNESS:  I don't remember, I don't
16   know.
17      THE COURT:  Let's find out.  Looks like a
18   scar.
19      MR. MEDEA:  Indicating a scar on his back.
20      THE COURT:  That appears on his body still,
21   but in the picture it looks like scar tissue.  It
22   looks like scar tissue as I look at it in court.
23      MR. MEDEA:  Do you want to take a look,
24   Judge?
```

B 45

Plaintiff Jakes 002548

1      THE COURT: Yes. Okay. This is on a leg.
2   This is not the back.
3      MR. MEDEA: That is his back, Judge.
4          Could the record indicate that the
5   defendant is lifting his shirt and has shown
6   the same injury?
7      THE COURT: Yes. It is not the same
8   injury. It appears to be slightly different to
9   be honest.
10     MR. MEDEA: It shows an injury roughly in
11  the location --
12     THE COURT: There is a mark in the location
13  that is also depicted on the picture.
14         In D, what is that a photograph of?
15  A    My back again.
16  Q    And where is that injury?
17  A    Up here on the top, a bruise.
18  Q    And F -- E, what does that show?
19  A    Better view of my side.
20  Q    That is a photograph of your upper
21  chest portion?
22  A    Down here.
23     MR. O'CONNOR: Indicating for the record
24  once again the witness is pointing to his left

Plaintiff Jakes 002549

```
 1   rib area, stomach area.

 2        MR. MEDEA:  Q  Now, F, what does that show?

 3        A     My arm when I fell on the floor.

 4        Q     Could you show the Court and the State

 5   where the injuries are?

 6        A     (Indicating)

 7        Q     Indicating the elbow area.

 8              And G, what is that?

 9        A     My leg -- my knee.

10        Q     Your left or right?

11        A     My right.

12        Q     Could you show the Court and State the

13   injury there?

14        A     Right here (indicating).

15        Q     Now, Anthony, do those photographs

16   truly and accurately portray the way you

17   looked on September 17, 1991?

18        A     Um-um.

19        THE COURT:  Is that when these were taken?

20        THE WITNESS:  As soon as I came to court.

21   When I --

22        THE COURT:  How many days had you been in

23   custody before those pictures were taken?

24        THE WITNESS:  I can't remember.
```

B  47

Plaintiff Jakes 002550

```
 1    rib area, stomach area.
 2         MR. MEDEA:  Q  Now, F, what does that show?
 3         A    My arm when I fell on the floor.
 4         Q    Could you show the Court and the State
 5    where the injuries are?
 6         A    (Indicating)
 7         Q    Indicating the elbow area.
 8              And G, what is that?
 9         A    My leg -- my knee.
10         Q    Your left or right?
11         A    My right.
12         Q    Could you show the Court and State the
13    injury there?
14         A    Right here (indicating).
15         Q    Now, Anthony, do those photographs
16    truly and accurately portray the way you
17    looked on September 17, 1991?
18         A    Um-um.
19         THE COURT:  Is that when these were taken?
20         THE WITNESS:  As soon as I came to court.
21    When I --
22         THE COURT:  How many days had you been in
23    custody before those pictures were taken?
24         THE WITNESS:  I can't remember.
```

Plaintiff Jakes 002551

1    MR. MEDEA: There will be a stipulation
2    between the parties that the photographs were
3    taken by Investigator Art Sterrazas,
4    S-t-e-r-r-a-z-a-s. on September 18, 1991 pursuant
5    to an order in Branch #66. So stipulated?
6        MR. O'CONNOR: So stipulated.
7        MR. MEDEA: Q   Now, Anthony, you later spoke
8    to State's Attorney Grossman, right?
9        A    Yeah.
10       Q    And he advised you of your Miranda
11   Rights?
12       A    Uh-huh.
13       Q    And you cooperated with State's
14   Attorney Grossman?
15       A    Yeah.
16       Q    And would you tell the Court the
17   reason you cooperated?
18       A    Because Detective Kill said he was
19   going to get me some more of what happened to
20   me, beating me and stuff if I didn't tell him
21   what he wanted to hear.
22       Q    Now, you saw a doctor in the Juvenile
23   Detention Center some days after this, right?
24       A    Yeah.

B 48

Plaintiff Jakes 002552

```
 1        Q     And did you tell that doctor or
 2   complain to that doctor about any injuries at
 3   that time?
 4        A     I just told him that I had a scar on
 5   my back and stuff like that.
 6        Q     Did you show him -- that doctor your
 7   back?
 8        A     Yeah.
 9        MR. MEDEA:   I don't have anything further
10   at this time.
11        THE COURT:   Cross.
12
13                CROSS EXAMINATION
14                       BY
15                MR. O'CONNOR:
16        Q     Mr. Jakes, at the time you were with
17   the Chicago police officers you were 15 years
18   old; is that right?
19        A     Yes.
20        Q     And you have attributed the alleged
21   injuries that are depicted in these photographs
22   as coming from primarily Detective Kill; is that
23   right?
24        A     Right.
```

B   49

Plaintiff Jakes 002553

```
 1       Q     He is the one who caused each one of
 2   these injuries?
 3       A     Yes.
 4       Q     Well, did you tell the police
 5   detectives that you were fighting with people
 6   earlier that day?
 7       A     No.
 8       Q     Did you tell the Chicago police
 9   officers on the date of the murder that you got
10   in a couple of different fights?
11       A     No.
12       Q     Did you get in any fights that week?
13       A     No.
14       Q     When you spoke with the Chicago police
15   officers did they provide you with Miranda
16   Warnings?
17       A     No.
18       Q     Are you indicating to the Court the
19   first person that provided you with any form of
20   Miranda Warnings was the Assistant State's
21   Attorney?
22       A     Yes.
23       Q     Did you understand those warnings?
24       A     Uh-hum.
```

B 50

Plaintiff Jakes 002554

```
 1      Q    Did you agree to talk to the State's
 2  Attorney?
 3      A    Yeah.
 4      Q    You heard those warnings before?
 5      A    Yeah.
 6      Q    I'm sorry?
 7      A    I heard them before.
 8      Q    When Detective Kill and Detective
 9  Boudreau were talking with you you were aware of
10  what your rights were at that time?
11      A    No.
12      Q    I am sorry?
13      A    No.
14      Q    You were not aware what your rights
15  were?
16      A    No.
17      Q    Prior to that date had you ever heard
18  of your rights before?
19      A    Yeah.
20      Q    Did you understand those rights on a
21  prior date?
22      A    Yeah.
23      Q    On that date when you talked to
24  Detective Kill and Detective Boudreau you
```

Plaintiff Jakes 002555

```
 1    understood your rights on that day?
 2         A    No, because they ain't read them to
 3    me.
 4         Q    That is not the question.  My question
 5    is did you understand what your rights were?
 6         A    No.
 7         Q    And you are saying that you didn't
 8    understand because they didn't read them to you?
 9         A    No.
10         Q    Prior to that date did you understand
11    what your rights were?
12         A    Yeah.
13         Q    Fine.  That scar on your back, that is
14    still on your body today, correct?
15         A    Yeah.
16         Q    And you maintain that it was Detective
17    Kill who caused that scar?
18         A    Yeah.
19         Q    What type of sharp object did he use to
20    cause that scar?
21         A    I can't recall because he knocked me on
22    the floor.
23         Q    Did that scar -- did that injury to
24    your back, was that caused by someone kicking
```

B 52

Plaintiff Jakes 002556

```
1     you?
2           MR. MEDEA:  Objection, your Honor.
3           THE COURT:  One moment.  Remain in place.
4                       (Whereupon a recess was taken,
5                       after which the following
6                       proceedings were had, to wit:)
7           THE COURT:  Court is back in session.
8           MR. MEDEA:  I had an objection to the
9     question.
10          THE COURT:  You objected to the question;
11    was it a sharp object?
12          MR. MEDEA:  Right.
13          THE COURT:  Why did you object?
14          MR. MEDEA:  How would he know.  He testified
15    that he was balled up.
16          THE COURT:  Sustained.
17          MR. O'CONNOR:  Q  That scar that Detective
18    Kill allegedly caused, do you know how he caused
19    it?
20          A    I don't.  I was balled up on the
21    floor.
22          MR. MEDEA:  Objection.
23          THE COURT:  Overruled.
24          THE WITNESS:  I was balled up on the floor.
```

B 53

Plaintiff Jakes 002557

```
 1        MR. O'CONNOR:  Q  I am sorry?

 2        A    I was curled up on the floor.

 3        Q    Did you ever feel any type of sharp

 4   object have contact with your back?

 5        A    Yes, I felt his foot and stuff kicking

 6   me.

 7        Q    Was that the only contact that you

 8   recall, from his foot?

 9        A    When he -- Then he started stomping on

10   my back.

11        Q    He started stomping on your back as

12   well?

13        A    Yeah.

14        Q    Do you ever recall any type of sharp

15   object striking your back?

16        A    How would I know?

17        Q    You were there, sir.  I am asking you

18   the question.

19        A    How would I know?

20        Q    Do you recall any type of sharp object

21   cutting your back?

22        A    How would I know?

23        THE COURT:  Do you understand the question?

24        THE WITNESS:  Yeah, I understand.
```

Plaintiff Jakes 002558

```
 1        THE COURT: You don't recall anything or you

 2   don't know?

 3        THE WITNESS:  I don't know.

 4        THE COURT:  All right.  Next question.

 5        MR. O'CONNOR:  Q  How many times did

 6   Detective Kill kick you in the back?

 7        A     I can't remember.

 8        Q     Was it more than five?

 9        A     It was several times.

10        Q     Can you say if it was more than five

11   or less than five?

12        A     I can't remember.

13        Q     Did he kick you hard?

14        A     Yes, he kicked me hard.

15        Q     You said that he also slapped you?

16        A     Yeah.

17        Q     Where did he slap you?

18        A     On my face.

19        Q     Did he ever hit you or punch you in the

20   chest?

21        A     No.

22        Q     Did he ever hit you or punch you in the

23   ribs?

24        A     Yes, he hit me.
```

B 55

Plaintiff Jakes 002559

| | | |
|---|---|---|
| 1 | Q | How did he hit you? |
| 2 | A | With his fist. |
| 3 | Q | Did he hit you hard? |
| 4 | A | Yes. |
| 5 | Q | Where did he hit you in your ribs? |
| 6 | A | (No response). |
| 7 | Q | Do you understand the question? |
| 8 | A | I understand. |
| 9 | Q | Do you want to answser it? |
| 10 | A | I don't remember. |
| 11 | Q | You don't remember? |
| 12 | A | No. |
| 13 | Q | That was quite a beating? |
| 14 | A | Yes. |
| 15 | Q | It is a beating that you will never |
| 16 | forget? | |
| 17 | A | I will never forget nobody who beat |
| 18 | me. | |
| 19 | Q | And you never told that to the State's |
| 20 | Attorney, correct? | |
| 21 | A | No. |
| 22 | Q | You never told that to the youth |
| 23 | officer when you had a chance to speak with him, | |
| 24 | correct? | |

B 56

Plaintiff Jakes 002560

```
 1        A      I don't even remember speaking with a
 2   youth officer.
 3        Q      You don't remember him coming into the
 4   room, introducing himself, and asking you how
 5   has it been going?
 6        A      No.
 7        Q      You never told that to the State's
 8   Attorney that you were beaten or mistreated in
 9   any way?
10        A      I ain't tell the State's Attorney
11   nothing.  I told him what he wanted to hear; that
12   was it.
13        Q      Did the State's Attorney ever tell you
14   this is what I wanted to hear?
15        A      No.
16        Q      He asked you questions and you answered
17   those questions?
18        A      Yeah.
19        Q      And at the conclusion of that statement
20   you signed that statement, correct?
21        A      Yeah.
22        Q      You read that statement, correct?
23        A      Yeah.
24        Q      You read the part that says there was
```

Plaintiff Jakes 002561

```
1    no threat or promises made against you?

2         A    I don't remember getting that far.

3         Q    You don't remember getting that far?

4         A    Uh-uh.

5    MR. O'CONNOR:  May I approach?

6    THE COURT:  Yes.

7    MR. O'CONNOR:  Q  I show you what I have

8    marked as People's Exhibit #2 for

9    Identification.  I direct your attention to the

10   last paragraph where it says that Anthony Jakes

11   states that he has been treated well by the

12   police and the Assistant State's Attorney.  Do

13   you remember that particular sentence?

14        A    No.

15        Q    Do you remember the State's Attorney

16   asking you how you were treated?

17        A    Yes, he asked me.

18        Q    What did you say?

19        A    I told him that I have been treated

20   good.

21        Q    Do you remember the next sentence that

22   you were allowed to use the washroom when you

23   needed to and you told the police that you were

24   not hungry or thirsty at the present time of even
```

Plaintiff Jakes 002562

```
 1    when they asked you?
 2         A    Yes.
 3         Q    Do you remember that sentence?
 4         A    Yes.
 5         Q    Do you remember the sentence that you
 6    were not promised anything in return for the
 7    statement nor were you threatened in any way?
 8         A    Yeah, I remember.
 9         Q    Do you remember that all?
10         A    Uh-hum.
11         Q    Whose signature is that directly below
12    that paragraph?
13         A    That is my name.
14         Q    So it is clear for the record, Mr.
15    Jakes, you do remember these sentences that we
16    just went over?
17         A    Uh-hum.
18         Q    You have to answer yes or no.
19         A    Yeah, I remember.
20         Q    Now, you live at 51st and Loomis, don't
21    you?
22         A    Yeah.
23         Q    You have a lot of Latin Kings around
24    there?
```

B 59

Plaintiff Jakes 002563

```
 1        A     Yeah, 51st and Ada.

 2        Q     What?

 3        A     Ada.

 4        Q     51st and Ada that is primarily Black P

 5   Stone Nation?

 6        A     No.

 7        Q     What gangs are affiliated there?

 8        MR. MEDEA:  Objection, irrelevant to

 9   anything in the motion.

10        THE COURT:  Well, only because of that

11   rather unusual statement that he made it would

12   not be relevant; that is why I asked the

13   question.  He said that among the parade of

14   horribles that were going to be inflicted upon

15   him was the fact that his family was going to be

16   taken care of by the Latin Kings.  I was

17   surprised because of the location where he lives,

18   but now he explains there are Latin Kings in the

19   area.  It is a matter of inquiry.  You may

20   proceed.

21        MR. O'CONNOR:  Q   What gangs are affiliated

22   at 51st and Ada?

23        A     On 51st and Ada is Latin Kings.

24        Q     That is Latin Kings territory on 51st
```

B 60

Plaintiff Jakes 002564

```
 1   Street?

 2        A      Just that street.  And on 51st and

 3   Throop Blackstones and on Bishop it is Vice

 4   Lords.  It is all different types of gangs.

 5        Q      Specifically directly where your

 6   house is, what gang is there?

 7        A      Blackstones.

 8        MR. MEDEA:  Objection.

 9        THE COURT:  Overruled.  The answer may

10   stand.

11        MR. O'CONNOR:  Q  I'm sorry --

12        THE COURT:  Blackstones he said.

13        MR. O'CONNOR:  Q  Blackstones.  Thank you.

14             Now, this beating, you indicated that

15   you would never forget?

16        A      Right.

17        Q      The next morning you were brought over

18   to the Audy Home?

19        A      Yeah.

20        Q      And you were sat down and a worker

21   interviewed you about your health, correct?

22        A      No.

23        Q      You don't remember that at all?

24        A      No.
```

B  61

Plaintiff Jakes 002565

```
 1       Q     You don't remember at all a worker
 2    sitting down with you and telling you what the
 3    rules of the Audy Home were?
 4       A     No.
 5       Q     You don't remember that worker asking
 6    you if you had any kind of illness, any
 7    injuries, required any hospitalization?
 8       A     No.
 9       Q     Well, let me ask you this, sir; is that
10    your signature?
11             I have marked this as People's Exhibit
12    #3 for Identification.
13       MR. MEDEA:   Could I see that?
14       MR. O'CONNOR:   I apologize, Judge.   Let the
15    record reflect that I am showing Counsel what I
16    have marked as People's Exhibit #3 for
17    Identification.
18       Q     Showing you again what I have marked as
19    People's Exhibit #3 for Identification, I ask you
20    if you recognize the signature on this particular
21    exhibit?
22       A     That is my signature.
23       Q     You signed that, correct?
24       A     Yes.
```

B 62

Plaintiff Jakes 002566

```
1       Q    For the purpose of the record, what is
2  the date indicated on this particular exhibit?
3       A    9-18.
4       Q    That would have been the following day,
5  wouldn't it?
6       A    Yeah.
7       Q    Did you make any complaints at the time
8  that you signed this signature about your
9  treatment?
10      A    Told you I don't remember.  I don't
11 even remember that paper.
12      Q    You don't remember this?
13      A    No.
14      Q    Even though your signature is on there?
15      A    Yeah.
16      Q    Incidentally, your name is Anthony
17 Jakes, correct?
18      A    Yeah.
19      Q    And your date of birth is July 30,
20 1976?
21      A    Yes.
22      Q    Do you remember speaking to a doctor
23 two days later?
24      A    Yeah, after I came from court.
```

B 63

Plaintiff Jakes 002567

```
 1       Q    And that doctor also asked about your
 2  treatment; isn't that correct?
 3       A    No, he didn't ask me did I have no
 4  injuries.
 5       Q    Did you point to the left side of your
 6  body where you were kicked repeatedly?
 7       A    It wasn't there no more.
 8       Q    What?
 9       A    It was not there.  I was not hurt as
10  bad as I was.
11       Q    Those injuries were gone?
12       A    Yeah.
13       Q    Did you forget that you were beaten
14  that way?
15       A    No, I ain't forget.  You going to
16  forget?
17       Q    You did not tell him that?
18       A    No.
19       THE COURT:  You've got a negative with a
20  positive question.  The answer is meaningless.
21       MR. O'CONNOR:  Q  Did you ever tell the
22  doctor that you were beaten by the police?
23       A    No.
24       Q    Did you ever point to any injuries on
```

B 64

Plaintiff Jakes 002568

```
  1    your body that were caused by Chicago police

  2    officers?

  3         A     Yeah, my back.

  4         Q     You pointed to your back?

  5         A     Yeah.

  6         Q     And did that doctor ask you about the

  7    injuries?

  8         A     Yeah.

  9         Q     And your response was that you were hit

 10    in the back about one week ago?

 11         A     No, I told him that I was hit.

 12         Q     Did you not say that you were hit in

 13    the back one week ago?

 14         MR. MEDEA:  Objection.

 15         THE COURT:  Grounds?

 16         MR. MEDEA:  It does not indicate that the

 17    defendant said anything.

 18         MR. O'CONNOR:  It does.

 19         THE COURT:  The question was asked of the

 20    defendant, not of the form.  The question is did

 21    he tell him that.

 22              Did you tell the doctor that you had

 23    received an injury about one week before?

 24         THE WITNESS:  To tell the truth, I can't
```

B  65

Plaintiff Jakes 002569

```
 1   remember.

 2        THE COURT:  That is his answer.

 3        MR. O'CONNOR:  Q  At any point in time in

 4   your conversation with that doctor did you ever

 5   claim that you were struck by Chicago police

 6   officers?

 7        A    No.

 8        Q    You say that the injuries on your left

 9   side they were gone at the time the doctor saw

10   you, correct?

11        A    Yes.

12        Q    What about the injuries to your elbow

13   on Defense #1?  Was that gone as well?

14        A    I can't remember.

15        Q    Let me show you what has been marked

16   as Defense Exhibit No. 1G, the alleged injury to

17   your knee.  Was that gone at that time?

18        A    Can't remember.

19        Q    Did you ever complain to that doctor

20   about any injury to the front of your body?

21        A    No.

22        Q    You agree at the time the Chicago

23   police officer spoke with you that you were in

24   the interview room, correct?
```

B 66

Plaintiff Jakes 002570

```
1        A    I can't hear you.
2        Q    Do you agree at the time Detective Kill
3   and Detective Boudreau spoke with you you were in
4   the interview room, correct?
5        A    Yeah.
6        Q    You were not handcuffed, correct?
7        A    No.
8        THE COURT:  You have done it again.  You
9   were not handcuffed, correct?  They are both
10  applicable.  No point in asking a question like
11  that.
12       MR. O'CONNOR:  I apologize.
13            Were you handcuffed at the time that
14  you had the conversation with Detective Kill or
15  Detective Boudreau?
16       A    No.
17       Q    You saw a youth officer come in here
18  and testify today, did you not?
19       A    Yeah.
20       Q    Did you speak with the youth officer on
21  that day?
22       A    I don't remember.
23       Q    Did you have a conversation with
24  Detective Kill and Detective Boudreau somewhere
```

B 67

Plaintiff Jakes 002571

```
 1   around 4:15 or 4:30 on that date?

 2        A    I don't remember the time.

 3        Q    Did you have a conversation with

 4   Detective Kill or Detective Boudreau about 10:45

 5   p.m. that evening?

 6        A    Told you I can't remember.

 7        Q    Can you estimate at all what time this

 8   conversation took place where you were beaten?

 9        A    No, all I know Detective Boudreau kept

10   running in and out, running in and out and I

11   couldn't keep up with the time.

12        Q    What time was it that the witnesses

13   came back into Area 3; do you know that?

14        A    No.

15        Q    Did you say that Detective Kill showed

16   you a picture?

17        A    Yes.

18        Q    What was the picture of?

19        A    Picture of me.

20        Q    Picture of you?

21        A    Yeah.

22        Q    What type of picture was it?

23        A    One of them -- mug shot pictures.

24        Q    Was it like a polaroid?
```

Plaintiff Jakes 002572

```
 1        A     Yeah.
 2        Q     Like the one that is marked as a
 3   Defense Exhibit?
 4        A     Yeah.
 5        Q     Did the police take a picture of you
 6   that day?
 7        A     Yeah.
 8        THE COURT:  Before that or after that?
 9        THE WITNESS:  They took a picture right
10   when I came in.
11        THE COURT:  Do you know if the picture that
12   was shown to you was the picture that was taken
13   that day?
14        THE WITNESS:  Yeah.
15        MR. O'CONNOR:  Q   And he showed you that
16   picture of yourself?
17        A     Yeah.
18        Q     And after that is when this alleged
19   beating took place?
20        A     Right.
21        Q     What other pictures were shown to
22   you that day?
23        A     He showed pictures of my friends.
24        Q     Who is that?
```

Plaintiff Jakes 002573

```
 1        A      Tyrone Pitts, Ronnie Shalone (phonetic
 2   spelling) and Andre Grenier.  The rest of it.
 3        Q      Were those fellows gang members?
 4        MR. MEDEA:  Objection.  Relevance.
 5        THE COURT:  Sustained. It may be relevant,
 6   but not significant in this hearing to go into it
 7   any further.
 8        MR. O'CONNOR:  Q  You indicated that you did
 9   tell the police about a Denise Harris?
10        A      Huh?
11        Q      You did tell the police about Denise
12   Harris?
13        A      Yes.
14        Q      You told the police about some other
15   girls you were with?
16        A      I didn't say that I was with.  That can
17   help them find the killer.
18        Q      You said that you were with Denise
19   Harris at the time of the murder?
20        A      No, I said she knows who did the
21   murder.
22        THE COURT:  How do you know Denise knew who
23   did the murder?
24        THE WITNESS:  When they let me talk to my
```

Plaintiff Jakes 002574

```
 1    auntie at the Audy Home she told me.

 2         THE COURT:  This was after the interview,

 3    wasn't it?  You didn't talk to your aunt at the

 4    Audy Home until the next day?

 5         THE WITNESS:  She said -- She told me Denise

 6    and Arna (phonetic spelling) were on the front

 7    porch.  They were standing out there during the

 8    shooting so they should know who did it.

 9         THE COURT:  How do you know they were

10    standing out there during the shooting?

11         THE WITNESS:  Because later on that night

12    my auntie said they were standing out there.

13         THE COURT:  Continue.

14         MR. O'CONNOR:  Q  When was that that you

15    learned that Denise Harris might have

16    information regarding the murder?

17         A    I can't remember.

18         Q    Well, you learned that from your aunt?

19         A    Yeah.

20         Q    When was the first time that you had

21    spoken with our aunt?

22         A    Like, I don't know.

23         Q    I'm trying to understand this, sir.

24    You spoke with your aunt at the Audy Home?
```

Plaintiff Jakes 002575

```
 1      A      Yeah.  That is when they gave me my
 2  phone call.
 3      Q      At the Audy Home?
 4      A      Yeah.
 5      Q      You had provided the statement to the
 6  State's Attorney and signed your name; is that
 7  right?
 8      A      Yeah.
 9      Q      And then you spoke with your aunt at
10  the Audy Home the next day?
11      A      Yeah.
12      Q      You then learned about Denise Harris
13  at that time; is that right?
14      A      I learned about her before that, too.
15      Q      Didn't you say that the first person
16  that you learned about Denise Harris was from
17  your aunt?
18      A      And then when they started calling her
19  names to me, like they was asking me like was
20  they my cousins or just relatives or friends.  I
21  told my cousin.  That is when they were just
22  mentioning names.
23      Q      Did you tell the police that night that
24  Denise Harris could tell you about the murder?
```

Plaintiff Jakes 002576

```
 1      A    Yeah, I told them.
 2      Q    You told them?
 3      A    Yeah, I said she can tell you that I
 4  didn't do it.
 5      Q    Did the police say they were going to
 6  go out and try to find her and talk to her and
 7  find out who did do it?
 8      A    They told me they were going to find
 9  somebody else.  Relative gang member; that is
10  what they said.
11      THE COURT:  Any more questions?
12      MR. O'CONNOR:  Q  So it is clear, you
13  indicated that prior to that date you were aware
14  of what your Miranda Warnings were?
15      A    Yeah.
16      Q    And you understood those Miranda
17  Warnings?
18      A    Uh-huh.
19      Q    You had those Miranda Warnings
20  provided to you on at least thirteen other
21  occasions.  Would that be fair to say?
22      MR. MEDEA:  Objection.
23      THE WITNESS:  Not really.
24      MR. MEDEA:  Objection to relevancy.
```

B 73

Plaintiff Jakes 002577

```
 1        THE COURT:  Overruled.  It is relevant to
 2   the motion.
 3        MR. O'CONNOR:  Q  I'm sorry.  Your answer?
 4        A    Not really.
 5        Q    On any of those -- You had contact
 6   with the police prior to this day at least
 7   thirteen times, right?
 8        MR. MEDEA:  Objection to that question.
 9        THE COURT:  Overruled.  Apparently, it is
10   his position, his testimony is that he only
11   understands Miranda when it was read to him.  It
12   was read to him thirteen times.
13        MR. MEDEA:  It assumes a fact not in
14   evidence if he was read his Miranda Warnings on
15   each and every occasion.
16        THE COURT:  Then that is a matter that can
17   be explored.  You may proceed.
18        MR. O'CONNOR:  Q  Would it be fair to say
19   that you had contact with Chicago police
20   officers prior to this day approximately
21   thirteen times?
22        A    Yeah.
23        Q    During those thirteen times that you
24   had contact with police officers did they provide
```

Plaintiff Jakes 002578

```
 1   Miranda Warnings?

 2        A    Not every time.

 3        Q    How many times would you estimate?

 4        A    About three times.

 5        Q    You understood those warnings each and

 6   every time?

 7        A    Yeah.

 8        Q    Was there anything that you didn't

 9   understand about those warnings?

10        A    I don't even remember the Miranda

11   Warnings to tell you the truth.

12        Q    You understood them?

13        A    Could you say that again?

14        Q    You understood your Miranda Warnings

15   prior to that day?

16        A    Yeah, most of it.

17        Q    Which one didn't you understand?

18        A    I told you that is for you to know.

19        Q    I'm sorry?

20        A    I don't know the Miranda Warnings.

21   You all know that.  I don't know that.

22        Q    Did you understand that you had a

23   right to remain silent?

24        A    Yes.
```

B 75

Plaintiff Jakes 002579

```
 1       Q    You understood that?

 2       A    Yes.

 3       Q    Did you understand that you had a

 4  right to an attorney?

 5       A    Uh-huh.

 6       Q    You have to answer.

 7       A    Yeah.

 8       Q    Do you understand that if you didn't

 9  have an attorney one would be appointed for

10  you?

11       A    Yeah.

12       Q    You understood each of those?

13       A    Yeah.

14       Q    Did you understand that you didn't

15  have to say anything to the police?

16       A    Ain't tell me that.

17       Q    Did you understand that you didn't

18  have to say anything to the police?

19       A    No.

20       Q    You didn't understand that?

21       A    No.

22       Q    Were you confused over that Miranda

23  Right each of those other occasions when the

24  police read it to you?
```

B 76

Plaintiff Jakes 002580

1      MR. MEDEA: Objection. Irrelevant.

2      THE COURT: Sustained.

3      MR. O'CONNOR: Q  Mr. Jakes, which side of

4   the face were you struck on?

5      A    Left side.

6      Q    Indicating for the record the witness

7   has pointed to the left side of his face.

8           Is that where Detective Kill hit you?

9      A    Yes.

10     Q    And that is when he hit you with an

11  open hand?

12     A    Yes.

13     Q    Did you ever make any complaint with

14  respect to that injury to the doctor or anybody

15  over at the Audy Home?

16     A    No.

17     Q    When you spoke with the Assistant

18  State's Attorney Detective Kill was not in the

19  room the entire time, was he?

20     A    He was in a part of the time standing

21  there.

22     Q    He was there initially when he

23  introduced everybody?

24     A    Sat in like after the statement and

B  77

Plaintiff Jakes 002581

```
 1   then he left.
 2        Q    Did he leave at some point in time?
 3        A    Yeah.
 4        Q    Did you ever tell the State's Attorney
 5   that hey, that is the guy who beat me?
 6        A    No.
 7        Q    Mr. Jakes, did you also indicate to the
 8   police that Denise Harris, Arna Kellitle
 9   (phonetic spelling), and Annette Harris might
10   have information regarding the murder?
11        A    Yes.
12        Q    You indicated all three of those names?
13        A    Uh-huh.
14        Q    You were with them at the time the
15   murder happened?
16        A    I ain't say that I was with them.
17        Q    With respect to the statement which was
18   marked as People's Exhibit #2, the State's
19   Attorney sat in your presence and wrote out each
20   one of those lines, right?
21        A    Which statement?
22        Q    Showing you what has been marked as
23   People's Exhibit #2.
24        A    Yeah.
```

B   78

Plaintiff Jakes 002582

```
 1      Q      He sat with you and wrote each one
 2   of the lines on the exhibit?
 3      A      Yeah.
 4      Q      And at the conclusion of the statement
 5   he had you read part of it, correct?
 6      A      Yeah.
 7      Q      He read it out loud?
 8      A      Yeah.
 9      Q      And he read each one of the lines
10   and he had you follow along with him as he read
11   it out loud; is that correct?
12      A      No, he just was telling me to read a
13   part.  That is it.
14      Q      He read it out loud to you, each and
15   every line on that statement?
16      A      No.
17      Q      You also signed below on the printed
18   form about your Miranda Warnings?
19      A      Yeah, I signed it.
20      Q      In the statement there were particular
21   mistakes that were made, correct?
22      A      Yeah.
23      Q      That was scratched out and initialed;
24   is that right?
```

B  79

Plaintiff Jakes 002583

```
 1      A      Yeah.

 2      Q      You initialed those, correct?

 3      A      Yeah.

 4      Q      Is there some on page two of the

 5   statement?

 6      A      Yeah.

 7      Q      Page three of the statement?

 8      A      Yeah.

 9      Q      You made those corrections because you

10   saw that something was wrong?

11      A      No, he made those corrections.

12      Q      You did not make any of them?

13      A      No.

14      Q      How was it that your initials got

15   there?

16      A      He told me to sign there after he

17   signed there.

18      Q      The State's Attorney told you to put

19   your initials at that particular area?

20      A      Yeah.

21      Q      Did Detective Kill tell you what to say

22   and you said it to the State's Attorney, correct?

23      A      He just told me to tell them what they

24   wanted to hear.
```

Plaintiff Jakes 002584

```
 1        Q      Did he tell you what to say?

 2        A      No.

 3        MR. O'CONNOR:  Northing further, your Honor.

 4        THE COURT:  Redirect.

 5

 6                  REDIRECT EXAMINATION

 7                         BY

 8                    MR. MEDEA:

 9        Q      Anthony, did Detective Kill tell you

10   what Snake said -- Who is Snake?

11        A      Gus Rubinson.

12        Q      Now, you said well, this shooting that

13   occurred happened on September 15th almost right

14   in front of your house, right?

15        A      Yeah.

16        Q      And you were home the evening of

17   September 15th and the morning of September 16th

18   at some point?

19        A      Yeah.

20        Q      You live with your aunt Jessie Mae

21   Jones?

22        A      Yeah.

23        Q      You would have spoken to her sometime

24   on the 16th?
```

Plaintiff Jakes 002585

```
 1        A     Yeah.

 2        Q     And now when you talked to the doctor

 3    on September 20th you did tell the doctor about

 4    certain injuries on your back?

 5        A     Yeah.

 6        Q     Did you roll up your shirt and show

 7    that to the doctor?

 8        A     Yeah.

 9        MR. MEDEA:  I don't have anything further,

10    Judge.

11

12                   RECROSS EXAMINATION

13                          BY

14                   MR. O'CONNOR:

15        Q     Did you say that you spoke with your

16    aunt while you were at Area #3?

17        A     No.

18        Q     When was it that you spoke with your

19    aunt?  Before the police came to your house?

20        A     Yeah, before they came because I was

21    upstairs.

22        Q     Just so we are clear.  The scar that

23    you showed the doctor, did you ever tell them

24    that you obtained that scar from being hit in
```

B  82

Plaintiff Jakes 002586

```
 1   the back about one week ago?

 2        A    No.

 3        Q    He just wrote that down?

 4   MR. MEDEA:  Objection.

 5   THE COURT:  Sustained.

 6   MR. O'CONNOR:  Nothing further.

 7   THE COURT:  You my step down.

 8                   (Witness Excused)

 9   THE COURT:  Call your next witness.

10   MR. MEDEA:  Petitioner rests.

11   THE COURT:  Does the Respondent -- Movant

12   have any additional rebuttal?

13   MR. O'CONNOR:  Could I have a moment,

14   please?

15   MR. MEDEA:  I move my exhibits be placed in

16   evidence.

17   THE COURT:  Any objection to photographs

18   numbers 1A thru 1F I believe?

19   MR. O'CONNOR:  Not at all.

20   MR. MEDEA:  Would you like to take a look at

21   them?

22   THE COURT:  Sure.  They have been examined

23   by the Court.

24   MR. O'CONNOR:  Could we have a recess to see
```

B   83

Plaintiff Jakes 002587

Exhibit 4

```
 1        IN THE UNITED STATES DISTRICT COURT
 2           NORTHERN DISTRICT OF ILLINOIS
 3                 EASTERN DIVISION
 4
 5  ANTHONY JAKES,                    )
 6               Plaintiff,           )
 7      vs.                           )
 8  KENNETH BOUDREAU, ESTATE OF       )   19-cv-02204
 9  MICHAEL KILL, LOUIS CAESAR,       )
10  THOMAS PACK, MICHAEL DELACY,      )
11  KEN BURKE, FRED BONKE, CITY OF    )
12  CHICAGO, and UNKNOWN EMPLOYEES    )
13  OF THE CITY OF CHICAGO,           )
14               Defendants.          )
15                                    )
16
17       The teleconference deposition of JESSIE MAE
    JAKES, called for examination, taken pursuant to the
18  Federal Rules of Civil Procedure for the United
    States District Courts, taken before KAREN L.
19  PILEGGI, CSR No. 84-3404, a Notary Public, within
    and for the County of DuPage, State of Illinois,
20  Certified Shorthand Reporter within and for the
    State of Illinois, Registered Merit Reporter, at
21  Chicago, Illinois, November 12, 2021, at the
    approximate hour of 10:00 a.m.
22
23
24
```

```
 1  PRESENT:
        LOEVY & LOEVY,
 2      311 North Aberdeen Street, 3rd Floor,
        Chicago, Illinois  60607,
 3      312-243-5900, by:
    MS. RENEE SPENCE,
 4      spence@loevy.com,
            appeared on behalf of the Plaintiff;
 5
    THE SOTOS LAW FIRM,
 6      141 West Jackson Boulevard, Unit 1240A,
        Chicago, Illinois  60604,
 7      630-735-3300, by:
    MR. GEORGE J. YAMIN, JR.,
 8          appeared on behalf of the Defendants
            City of Chicago and Unknown Employees of
 9          the City of Chicago.
    SPECIAL ASSISTANT CORPORATION COUNSEL,
10      321 North Clark Street, Suite 2200,
        Chicago, Illinois  60654,
11      312-494-1000, by:
    MS. BRITTANY JOHNSON,
12      bjohnson@rfclaw.com,
            appeared on behalf of the Defendants
13          Kenneth Boudreau, Estate of Michael Kill,
            Louis Caesar, Thomas Pack,
14          Michael Delacy, Ken Burke, Fred Bonke;
15
    VIDROGRAPHERS:  Jackie Uribe and Matthew Miller
16
17
18
19
20
21
22
23
    REPORTED BY:  Karen Pileggi, CSR, RPR, RMR, CRR,
24               CSR License No. 84-3404
```

1 THE VIDEOGRAPHER: This is Media No. 1 to the
2 video recorded deposition of Jessie Mae Jakes in the
3 matter of Anthony Jakes versus Kenneth Boudreau, et
4 al., being heard before the United States District
5 Court for the Northern District of Illinois, Eastern
6 Division, Case No. 19-cv-02204.
7      This deposition is being held remotely
8 using Esquire virtual remote technology and the
9 witness is located in Chicago, Illinois on
10 November 12th, 2021 at 10:03 a.m.
11      My name is Jacqueline Uribe and I'm the
12 videographer. The court reporter is Karen Pileggi.
13      Counsel, will you introduce yourselves
14 and your affiliations and the witness will be sworn.
15      MS. SPENCE: Counsel for plaintiff
16 Anthony Jakes, as well counsel for Ms Jessie Mae
17 Jakes for the purposes of this deposition,
18 Renee Spence.
19      MS. JOHNSON: Brittany Jones. I represent the
20 individual defendants in this matter.
21      MR. YAMIN: George Yamin. I represent the
22 defendant, City of Chicago.
23      THE VIDEOGRAPHER: Will the court reporter
24 please swear in the witness.

1           (WHEREUPON, the witness was
2           duly sworn.)
3           JESSIE MAE JAKES,
4 called as the witness herein, having been first duly
5 sworn, was examined and testified as follows:
6           EXAMINATION
7 BY MS. JOHNSON:
8   Q.   Good morning.
9   A.   Good morning.
10   Q.   My name is Brittany Johnson. As I
11 explained to you earlier, I represent the individual
12 defendants in this case. I know it's rough since
13 we're taking it over Zoom. Have you ever had your
14 deposition taken before?
15   A.   Yes.
16   Q.   So you know the basic background rules,
17 correct?
18   A.   Yes.
19   Q.   So just to go over it really quickly
20 since we're here on Zoom, there might be some lag in
21 the internet time and so if there's anything like
22 that that happens, just try and click back on if we
23 get cut off. Okay?
24   A.   Okay.



1   Q.   There might also be some lag in my
2  questions and they may come through not as I'm
3  asking.  Just give me a chance to try to finish my
4  question before you give me an answer so that way we
5  can make sure that the court reporter can take
6  everything down.  Okay?
7   A.   Okay.
8   Q.   In addition, make sure that you give
9  verbal answers, yeses and nos.  No uh-huh or head
10 shakes like that because the court reporter can't
11 take that down even though it is getting recorded.
12 Okay?
13  A.   Yes.
14  Q.   Can you tell me, where are you taking
15 your deposition from today?
16  A.   4942 West Rice.
17  Q.   Is that your home address?
18  A.   Emma Mitt's home.
19  Q.   Do you live there with her?
20  A.   Yes.
21  Q.   Is there anybody else present with you
22 right now in the room for your deposition?
23  A.   No.
24  Q.   All right.  Then let's go ahead and get

1  started.  State your name and spell your last name
2  for the record for me.
3   A.   Jessie Mae Jakes, J-a-k-e-s, Jakes.
4   Q.   Have you ever gone by any other names?
5   A.   Jessie Mae Jones.
6   Q.   What's your date of birth?
7   A.   ████
8   Q.   And that makes you 72 years old now?
9   A.   Seventy-two?  I thought 71.
10  Q.   My math is off.
11  A.   Okay.  I don't want to say I'm -- I would
12 love to say I'm younger, but I was born in '49,
13 so...
14  Q.   That's all right.  You're 71.  I
15 apologize.  My math is off.
16  A.   Okay.
17  Q.   So back in September of -- actually,
18 September 15th of 1991 you would have just turned,
19 what, is that 41 or 42?
20  A.   Yeah.
21  Q.   Are you married?
22  A.   Not now, no.
23  Q.   Have you ever been married?
24  A.   Yes.

1   Q.   When was the end of your marriage, ma'am?
2   A.   It's been about 20 years ago.  I don't
3  have the exact date, but it's been a while.
4   Q.   Who were you married to previously?
5   A.   Izear Jones, J-o-n-e-s.
6   Q.   Did you get divorced?
7   A.   Yes.
8   Q.   How many children do you have?
9   A.   Four I birthed and I adopted one.  Five
10 in all.  Three boys and two girls.
11  Q.   A full house.  Can you tell me what their
12 names and ages are.
13  A.   Derrick Jones.  He was the first one.  I
14 don't know his exact age, but he was born February
15 the 26th.  Veronica Jones, January 3rd.  Rosie
16 Jones, March 3rd.  Everett Jones, May 12.  And I
17 adopted Antonio Jones April 1st.  His birthday, I
18 mean, is April 1st.
19  Q.   Are they all adults?
20  A.   Yes.
21  Q.   Do any of your children that you just
22 named live with you currently?
23  A.   No.
24  Q.   Do you have any siblings?

1   A.   Yes.
2   Q.   How many siblings do you have?
3   A.   Started out to be 16.  Well, there was 24
4  in all but not by the same mother.  Three mothers.
5  Nine boys and 13 girls.
6   Q.   Wow.  Are any of your siblings still
7  alive?
8   A.   Yes.
9   Q.   How many of your siblings are still alive
10 now, ma'am?
11  A.   I've got to go thinking of the names now.
12 I think there's seven, eight of us left.
13  Q.   Can you tell me the names of the ones
14 that are alive?
15  A.   Xcell Brown.  Ernie Sticks.  The two
16 brothers.  Sisters, Betty Ruth Puffis is the oldest
17 sister.  Myself.  Then Mary Lee Jackson.  Minnie Mae
18 Williams.  Cheryl Johnson.  Jeanette Jakes,
19 deceased.
20  Q.   Jeanette Jakes, is that --
21  A.   Anthony's mother.
22  Q.   When you talk about Anthony, do you call
23 him Anthony or do you call him Shawn?
24  A.   I call him Shawn.



Page 9

1    Q.   For the purposes of this deposition, if I
2  say Shawn, will you know who I'm talking about?
3    A.   Yes.
4    Q.   We stopped with Jeanette.  Who are your
5  other siblings?
6    A.   I didn't understand you.
7    Q.   We have six.  So you said there are about
8  seven or eight are alive.
9    A.   Fannie Lee passed away.  Jeanette and
10  Donny Yvonne.  That's nine.  Rosa Mae Sweezly, she
11  was, you know, on the other side.  She's not the
12  mother's child.  I was naming off the mother's and
13  the others I was kind of back to get them.
14    Q.   Do any of your siblings still live in
15  Chicago?
16    A.   Yes.
17    Q.   Who still lives in Chicago?
18    A.   Emma Mitts, Betty Puffis and myself, in
19  Chicago.  Luella, I forgot her the first time.
20  Luella was in California.
21    Q.   What year did Jeanette pass away?
22    A.   I don't have that handy right away, but
23  it's been since Shawn got out, maybe four or
24  five years ago.

Page 10

1    Q.   So she passed away after Shawn got out of
2  prison?
3    A.   Yes.
4    Q.   Don't be offended.  We ask this of
5  everybody at every dep.  Have you ever been
6  convicted of a felony or a misdemeanor involving
7  dishonesty like fraud?
8    A.   I've been arrested, but it was for
9  driving my friend's car and I didn't know where his
10  insurance papers or license or nothing and they said
11  that I was supposed to accept it before I got the
12  car and went to the grocery store.
13         They said the license plates that was on
14  the car didn't match the car.  I had no idea.  I
15  just borrowed my friend's car and went to the
16  grocery store.
17         They got me -- stopped me when I was on
18  my way back home.  I made it to the house, but
19  that's when they said I'm responsible for the car.
20    Q.   Did you actually get convicted of those
21  or was that charge dismissed?
22    A.   They threw it out, but they took me to
23  jail.  That was the only time.  I've never been
24  arrested or anything.  They had to take me for

Page 11

1  driving this man's car with no license plate --
2  registration of the car and I didn't know anything
3  about it.  I just asked him for the keys.
4    Q.   So that was the only time, right?
5    A.   Yes, the only time.
6    Q.   How long have you been living at your
7  current address, the 4945 West Rice?
8    A.   I've been over here almost eight or
9  nine years, maybe.  My address is 6629 South Wood
10  Street.
11    Q.   That's where you lived before?
12    A.   Yes.  I just moved over here with my
13  sister so we wouldn't have to be separate.
14    Q.   When did you live at 6629 South Wood
15  Street?
16    A.   I lived there before I came here.  And
17  the house is still there.  My granddaughter is in
18  the house.
19    Q.   What's your granddaughter's name?
20    A.   Delica Jones.  D-e-l-i-c-a.  Jones,
21  J-o-n-e-s.
22    Q.   6629 South Wood Street, you said you
23  lived there before you moved here.  Do you remember
24  about what years you lived at 6629 South Wood

Page 12

1  Street?
2    A.   It was after 1212 West 51st.  I moved
3  from there to 66th and Wood and from there over
4  here.  I can't remember exactly when I moved.  I
5  mean, what year.
6    Q.   In 1991 did you still live at 1212 West
7  51st Street?
8    A.   Yes.
9    Q.   You don't remember exactly when you moved
10  over to the Wood Street address?
11    A.   It was in '91, but I'm saying what month,
12  I don't remember.
13    Q.   So you lived at 1212 West 51st Street at
14  some point in '91 and then you also moved to the
15  Wood Street address also in '91?
16    A.   Yes.  But I had lived at 1212 for,
17  maybe -- I raised my kids over there so I moved to
18  66th and Wood and left my son at 1212.
19    Q.   Who did you leave at 1212 when you left?
20    A.   Everett and Vincent Clemens (phonetic).
21    THE REPORTER:  Can we spell these.
22  BY THE WITNESS:
23    A.   C-l-e-m -- I don't know the correct
24  spelling of his name.



Page 13

1 BY MS. JOHNSON:
2     Q.   What's his first name?
3     A.   Vincent.
4     THE REPORTER:  What was the first name?
5 Everett?
6 BY THE WITNESS:
7     A.   Everett, E-v-e-r-e-t-t.  Everett Jones.
8 BY MS. JOHNSON:
9     Q.   So you left two of your sons at the 1212
10 51st Street address when you moved, right?
11    A.   A son and a cousin.
12    Q.   Your son is Everett Jones and then the
13 cousin is -- is it Vincent or Vincen?
14    A.   Vincent.
15    Q.   Clemens.  Okay.  Do they still live
16 there?
17    A.   No.
18    Q.   So we talked about currently.  Let's talk
19 about currently at the 4945 West Rice address.  I
20 know you said you live with Emma Mitts.  Who else do
21 you live with?
22    A.   Just Emma Mitts right now.
23    Q.   Did Shawn ever live there with you guys?
24    A.   Shawn lives here now.

Page 14

1     Q.   About how long has Shawn lived there, if
2 you know?
3     A.   Since he got out.
4     Q.   Did you move in with your sister around
5 the time that Shawn got out?
6     A.   Not -- well, it might have been close to
7 the same time because my mom was here and I came
8 over with them and I just -- every time I go home,
9 she would pick me back up so I decided I'd stay with
10 her.
11    Q.   Have you ever been in the military?
12    A.   No, I wasn't in the military.  My son is
13 in the military.
14    Q.   Which son?
15    A.   The oldest one, Derrick Jones.  He's
16 still in the military.
17    Q.   What branch is he in?
18    A.   I don't know exactly what branch.
19    Q.   What's your highest level of education,
20 ma'am?
21    A.   Tenth grade.
22    Q.   Did you attend school in Chicago?
23    A.   No.  Arkansas.  Borden High School in
24 Arkansas.

Page 15

1     Q.   Do you remember what year you left high
2 school?
3     A.   I don't remember the year.  Now, that's
4 been a long time.
5     Q.   Are you currently employed?
6     A.   No.  Retired.
7     Q.   When did you retire?
8     A.   Oh, my God.  I knew that was next.  I
9 stayed on the job 20 years.  I don't have the date
10 and the time that I retired, but I've been retired
11 about, maybe, five years, six.
12    Q.   Where did you retire from?
13    A.   The University of Illinois at Chicago.
14    Q.   What did you do at the University of
15 Illinois at Chicago?
16    A.   I was a building service worker.  They
17 called us BSW workers.  I cleaned the building or
18 took care of plants.  Did maintenance stuff around
19 the building.
20    Q.   Is that the same position that you had
21 for all 20 years you worked there?
22    A.   Well, I started out making beds in the
23 dormitory doing housekeeping.
24    Q.   Okay.

Page 16

1     A.   And from that to building service, just
2 serving the building.
3     Q.   Were you at the University of Chicago for
4 20 years?
5     A.   Yes.
6     Q.   Before you worked at the University of
7 Chicago, where did you work?
8     A.   I wasn't working.  That was my first job
9 here in Chicago.  I worked in Arkansas.
10    Q.   When did you leave Arkansas?  Do you
11 remember what year?
12    A.   I think I left Arkansas in '89 -- it
13 might have been '80.  I really -- I don't want to
14 speculate.  I don't know the year or nothing like
15 that.  I don't know.  I got here and raised the
16 kids.  Got me a job and worked 20 years and retired.
17    Q.   You would have left Arkansas some time in
18 the '80s?
19    A.   Yes, sometime in the '80s.
20    Q.   Do you own any property?
21    A.   I was at 1212, but I let that go and I
22 still own 6629 South Wood Street.
23    Q.   Let's start with 1212 West 51st Street.
24 When did -- did you buy that or how did you come to



Page 17

1  acquire that property?
2     A.   I bought it.
3     Q.   When did you buy 1212 West 51st Street?
4     A.   It was back in the '80s, I believe.  '84,
5  '85, somewhere in that.
6     Q.   Who did you buy it from, if you remember?
7     A.   I don't remember.
8     Q.   When did you sell 1212 West 51st Street?
9     A.   I didn't sell it.
10    Q.   So do you still own it?
11    A.   No, I don't own it.  I just filed
12 bankruptcy and left it.
13    Q.   Okay.  So that was part of the
14 bankruptcy?
15    A.   Correct.
16    Q.   When did your bankruptcy close and
17 conclude?
18    A.   I don't have the year, but it's over and
19 done.
20    Q.   Was it sometime in the '90s or sometime
21 in the 2000s, if you remember?
22    A.   Probably in the 2000s.  It might have
23 been in the '90s.  I don't want to say because I
24 don't have any paperwork on it and I can't remember

Page 18

1  dates and times like that.  I'm so sorry.  I don't
2  remember.
3     Q.   That's okay.  Just to the best of your
4  knowledge.  That property, you no longer own that
5  property after it went through bankruptcy, correct?
6     A.   Correct.
7     Q.   Back in 1991 did you still own it,
8  though?
9     A.   Yes.  I owned it in 1991.  I was living
10 over there at the time.  I moved from there to 66th
11 and Wood.
12    Q.   When did you buy the 66th and Wood
13 property?
14    A.   I bought that -- I was renting from the
15 lady downstairs and she said that she was going to
16 sell the building, if I wanted to buy it, she'd give
17 me first choice of what they were going to give her
18 and I bought it.  That's when I bought it.  Now what
19 year, I don't know.  But she said they wanted to
20 take her house.
21    Q.   You still own that one, right?
22    A.   Yes, I own that.  That was also in
23 bankruptcy.  My granddaughter is over there.
24    Q.   So that one didn't get discharged in the

Page 19

1  bankruptcy.  You still own that one?
2     A.   Yes.  I could have kept the other one if
3  I paid the bill on it, but I couldn't pay two
4  houses.
5     Q.   How is your health, as you sit here
6  today?
7     A.   I'm not at the best, but I'm glad to be
8  here.  I have aches and pains, bruises, high blood
9  pressure.
10    Q.   Is there anything like medications or
11 anything that you're on that would affect your
12 memory?
13    A.   No.
14    Q.   Do you have any concerns with regards to
15 like your health status where you may not be able to
16 recall anything clearly about the events that
17 happened back in 1991?
18    A.   No, I don't have no problem with that.
19    Q.   So do you know why you're here to give a
20 deposition today?
21    A.   Yes.  Regarding my nephew Shawn, Anthony.
22    Q.   What about your nephew Shawn are you here
23 to testify about today?
24    MS. SPENCE:  Objection to the extent the

Page 20

1  question calls for privileged conversations with
2  counsel.  Can you rephrase the question.
3     MS. JOHNSON:  I am having a hard time picking
4  you up.  There's a ton of echo.
5     MS. SPENCE:  Objection to the extent that the
6  question calls for privileged conversations with
7  counsel.  If you could rephrase that question to
8  exclude conversations that she's had with Shawn's
9  counsel.
10    MS. JOHNSON:  Are you getting the same feedback
11 I am?
12    THE VIDEOGRAPHER:  Yes.  I'm getting an echo.
13    THE REPORTER:  Yes.  Me too.
14    THE VIDEOGRAPHER:  Would you l ke to go off the
15 record?
16    MS. JOHNSON:  Yeah.
17    THE VIDEOGRAPHER:  This marks the end of Media
18 No. 1.  The time is 10:25 a.m.  We are off the
19 record.
20        (WHEREUPON, a recess was had.)
21    THE VIDEOGRAPHER:  This marks the beginning of
22 Media No. 2.  The time is 10:34 a.m.  We are on the
23 record.
24    MS. SPENCE:  Before we got off the record, I



Page 21

1 was objecting to counsel's question about
2 Ms. Jake's understanding about her testimony today
3 to the extent that it called for her to disclose
4 conversations with counsel so I was asking for
5 counsel to specify that her question was not
6 requesting that information or conversations that
7 Ms. Jakes had with Shawn's counsel.
8      MS. JOHNSON:  I can rephrase the question.
9 BY MS. JOHNSON:
10     Q.   Without going into anything that your
11 attorney told you or any conversations that you may
12 have had with your attorney, what is your
13 understanding of why you're here to give a
14 deposition today?
15     MS. SPENCE:  You can go ahead and answer.
16 BY THE WITNESS:
17     A.   Repeat the question.
18 BY MS. JOHNSON:
19     Q.   Without going into anything your attorney
20 may have told you or any conversations that you may
21 have had with your attorney, what is your
22 understanding of why you're here to give a
23 deposition today?
24     A.   For Shawn.  I'm here for him to let you

Page 22

1 all know what I knew about him.  I was raised up
2 with him.
3      Q.   So let's go and then we'll start with
4 that.  Let's start with some background information.
5      A.   Okay.
6      Q.   I already asked you where you lived in
7 September of 1991.  You told me you lived at 1212
8 West 55th Street.
9      A.   The house in the rear.
10     Q.   So you lived in the house in the rear?
11     A.   Yes.
12     Q.   Kind of paint the picture for me about
13 that property.  If you're coming off of 51st Street,
14 how do you get to the rear house?
15     A.   There's a gangway to go straight down
16 from 1212, the front house, and 1210, the two houses
17 look alike, and then you go around the gangway to
18 mine in the back.  I was in the rear.
19     Q.   Does the gangway take you from 51st in
20 between the properties at 1210 and 1212 to the rear
21 house?
22     A.   Yes.
23     Q.   Is there anything like a fence or
24 anything else that separates the property at 1212

Page 23

1 from the property at 1210?
2      MS. SPENCE:  Objection form.
3      Go ahead.
4 BY THE WITNESS:
5      A.   There was a --
6      MS. SPENCE:  So, Ms. Jakes.  I will object to
7 questions every once in a while and so I will object
8 and then -- if you should answer -- you can answer
9 unless I tell you not to answer after I make the
10 objection.  Okay?
11     THE WITNESS:  Okay.
12     MS. SPENCE:  You want to give me a second to
13 object after she -- after Ms. Johnson asks a
14 question.  Just pause a beat, allow me to object and
15 then you can answer.  Okay?
16     THE WITNESS:  Okay.
17     MS. SPENCE:  So go ahead.
18 BY THE WITNESS:
19     A.   About the fence between the house?  There
20 was a fence and when I purchased the property, I put
21 a wrought iron across the front so they wouldn't be
22 coming through that gangway.
23 BY MS. JOHNSON:
24     Q.   There was a wrought iron, I guess, you

Page 24

1 called it a gate?
2      A.   Yes.  A gate.  A wrought iron gate across
3 the front so they couldn't walk through there like
4 that.
5      Q.   Did the wrought iron gate, did it lock?
6      A.   It locked.  I had a key for it.
7      Q.   So in order to get through that gangway
8 to the rear house, would you have to go through that
9 locked wrought iron gate that was facing 51st?
10     A.   Yes.  My property to the property next to
11 me.
12     Q.   So if you had a key to that wrought iron
13 gate and, say, you opened the gate and you're coming
14 from 51st and walking towards the rear house, could
15 you also get to the property at 1212?
16     A.   Yes.
17     Q.   What about 1210.  If you went through
18 that wrought iron gate, could you also get to the
19 property at 1210?
20     A.   No.  They had a fence -- my gate hooked
21 to their fence.  So I would have to go back to the
22 front of 1210 to get to that house.
23     Q.   I understand.  How many bedrooms were in
24 the rear house at 1212?



Page 25

1   A.   Three.
2   Q.   Were all of the bedrooms -- where were
3 the bedrooms in the house?
4   A.   Upstairs.
5   Q.   So all three bedrooms were upstairs?
6   A.   Yes.
7   Q.   And then what about, how many floors was
8 the rear house at 1212?
9   A.   There was a basement, first floor and the
10 bedrooms upstairs.
11   Q.   What rooms were on the first floor?
12   A.   Living room, bathroom, kitchen, pantry.
13   Q.   Other than those three bedrooms, were
14 there any other rooms on the top floor?
15   A.   No.  Just three bedrooms upstairs.
16 Living room, kitchen, pantry, bathroom, first floor
17 and the basement just was the basement.
18   Q.   Was the basement finished?
19   A.   No.
20   Q.   Did you have -- strike that.  Let me try
21 again.
22        How would you access the basement to the
23 house?
24   A.   Go out through the kitchen.  I had the

Page 26

1 back porch.  Go off that back porch down the stairs
2 and then come around and go in the basement.
3   Q.   Did anybody live in that basement
4 downstairs?
5   A.   Years after I purchased it my son fixed
6 up one bedroom for him, the oldest one.  He was
7 there before he left.  He graduated and he put him
8 in the basement, but it was something he did on his
9 own.
10   Q.   The oldest one, that's Derrick, right?
11   A.   Yes.
12   Q.   He finished out the basement and made a
13 little room for himself there?
14   A.   Right.
15   Q.   When did he do that, if you remember?
16   A.   He did that before he left high school.
17 I don't know what year, what time, but he had his
18 bedroom and it was nice for him at the time he was
19 there.
20   Q.   What about in 1991, had he finished the
21 basement in 1991?
22   A.   Derrick had -- let me see when he moved
23 out.  I don't remember Derrick being there when
24 Shawn went to jail.  I think Derrick was already --

Page 27

1 he was doing his training in boot camp.  He was
2 someplace.  I can't remember him being there at that
3 particular time.
4   Q.   So back in 1991, let's talk about that
5 wrought iron gate that was in the front.  Who had,
6 besides yourself, a key to that gate?
7   A.   I had the key and who else had the key to
8 that front gate?  Just me and all the kids whoever
9 wanted to get out had the key to unlock it and lock
10 it back.
11   Q.   Did you give them each their own key or
12 did you just have one key that anybody could come
13 and take?
14   A.   No.  I gave them a key so I could keep
15 mine.
16   Q.   Let's talk about this again.  How -- if
17 you're coming off 51st, you walk through the gangway
18 and how do you enter the rear house at 1212?
19   A.   I say you go through the gangway, but I
20 put a fence there.  That's the wrought iron gate.
21   Q.   So once you get up to 1212, is there a
22 porch in the front that you have to walk up?
23   A.   Yes.
24   Q.   What does the front door or what did the

Page 28

1 front door in 1991 look like?
2   A.   It was a door to the kitchen and if you
3 come up on the stairs to the enclosed back porch,
4 you was on the back porch until I open the door and
5 then you come in the kitchen.
6   Q.   Was it just a single door or did you have
7 another like screen door or something else in front
8 of it?
9   A.   No.  Just the door.  That's to come into
10 the kitchen.  When you come up on the porch, there
11 was a door that had to be opened.
12   Q.   So you said if you're coming through the
13 kitchen.  Let's back up.
14        How many entrances from the outside were
15 there to get into that rear house?
16   A.   Two entrances.  On the enclosed back
17 porch and then the kitchen.
18   Q.   What direction did the enclosed back
19 porch face?
20   A.   Like right as you walk up the stairs.
21 Walk up the stairs and then you enter the enclosed
22 back porch.  Once you get in there, the door, and
23 then you come into the kitchen.
24   Q.   So if you're walking up to the entrance



Page 29

1 from the enclosed back porch and you open the front
2 door, does that let you into the kitchen?
3    A.    Yes.
4    Q.    What about the other entrance, where was
5 that?
6    A.    Same place. One door was outside.
7 Another door was inside. You had to be at the porch
8 around that. You come upstairs and you're on the
9 porch, but they enclosed the porch.
10    Q.    I understand now. Was the porch enclosed
11 in 1991 as well?
12    A.    Yes.
13    Q.    Did the door at the enclosed porch, did
14 that lock?
15    A.    Yes.
16    Q.    I'm assuming the front door that actually
17 lets you into the kitchen also locked?
18    A.    Yes.
19    Q.    Did you have to have a key for both of
20 those doors to get into the house?
21    A.    Yes.
22    Q.    Were they two separate keys or were they
23 both one key?
24    A.    Two separate keys.

Page 30

1    Q.    So all in all let's talk about doors that
2 you have to enter. If you're coming through back to
3 the house from 51st Street, you needed a key to open
4 the wrought iron gate, correct?
5    A.    Yes. Correct.
6    Q.    Then you needed a different key to open
7 the door with the enclosed porch?
8    A.    Yes.
9    Q.    And then the last key, the third key,
10 would let you actually into the house and open the
11 front door?
12    A.    Yes.
13    Q.    Okay. I got it.
14          So the enclosed porch, was the door a
15 solid door or was it some other type of door?
16    A.    It's a door, a regular door.
17    Q.    Other than the entrance, so other than
18 the door at the enclosed porch and the front door
19 that lets you into the kitchen, was there any other
20 door that would let you into the house from the
21 outside?
22    A.    No. There was just one way in there.
23 You had to have the ladder -- if we was trapped in
24 there sometimes to get out other than go outside and

Page 31

1 go in the basement. There was no attachment from
2 going through the house to the basement.
3    Q.    Could you get up to the first floor from
4 the basement from the inside of the basement?
5    A.    No.
6    Q.    So in order to enter -- there was no
7 connection or doorway or stairway that led from
8 inside the basement up to the first floor?
9    A.    No.
10    Q.    Okay. I understand.
11          Back in 1991, who lived in that rear
12 house with you?
13    A.    Myself and I had just got Antonio Jones
14 as a baby, Edward Jones and Shawn and Vincent.
15 Vincent Clemens and Everett Jones and Antonio was a
16 baby and myself.
17    Q.    What about Veronica, did she live with
18 you then?
19    A.    No. Veronica had her own place.
20    Q.    What about, who is Rosie Jones?
21    A.    Who is who?
22    Q.    Who was Rosie?
23    A.    Rosie Jones is my daughter.
24    Q.    Did she live with you in 1991?

Page 32

1    A.    I don't think she was there either. She
2 probably had her own place too. I'm not sure.
3    Q.    To the best of your recollection, you,
4 Antonio, who was a baby at the time, Everett, Shawn
5 and Vincent all lived together in that back house?
6    A.    In the back house, in the rear, yeah.
7    Q.    Where did everybody sleep?
8    A.    Vincent, Everett and -- Derrick and
9 Vincent shared a room and Everett had the back -- it
10 was a small room, but it was in the back. My room
11 was off from theirs. There was just three bedrooms.
12 My door, their door -- there was one door to go to
13 the two bedrooms together.
14    Q.    So did you -- you had your own room?
15    A.    Yes. And two of the boys shared a room
16 and Everett had the back bedroom.
17    Q.    So did Shawn and Vincent share a room?
18    A.    Shawn and Vincent shared a room.
19    Q.    Everett had his own room in the back,
20 that was the third bedroom?
21    A.    Uh-huh. That you have to go through
22 their room to get to Everett's room.
23    Q.    I understand. So when did Shawn come to
24 live with you?



Page 33

1    A.   Shawn came to live with me about two or
2   three months before there was -- that happened in
3   September.  About two or three months before then
4   because he was in Milwaukee.
5    Q.   Do you know how long they lived in
6   Milwaukee?
7    MS. SPENCE:  Objection.  Lack of foundation.
8       Go ahead.  Sorry.  And to form as to
9   "they."  Go ahead.
10  BY MS. JOHNSON:
11   Q.   You can answer, if you understand.
12   A.   Okay.  They lived in Milwaukee not long
13  because she had moved the kids over because Shawn's
14  school started calling her and she said she couldn't
15  deal with that, him being put in Montreal.  There
16  was some sort of little problem there.
17       I never did get a chance to work with
18  that problem because they came shortly after that
19  and took him away from me so we never had a chance
20  to go through any psychiatric help or whatever we
21  thought was wrong with him.  It could have been just
22  wanting to be with his mom and dad.
23   Q.   So let me break that up.  I'm going to
24  try and get a good time line from you.

Page 34

1       About two or three months before
2   September 1991 is when Shawn came to live with you,
3   correct?
4    A.   Correct.
5    Q.   You said prior to him coming to live with
6   you he lived in Milwaukee; is that right?
7    A.   Right.  With his mother.
8    Q.   He lived in Milwaukee with his mom.  Who
9   else did he live in Milwaukee with?
10   A.   They had their own place with his sister,
11  Doris Anderson and Dennis James Anderson was his
12  brother.  It was the three of them.  Shawn, Dennis
13  and Doris.
14   Q.   Prior to Shawn moving to Milwaukee with
15  his mom, his sister and his brother, did he live in
16  Chicago?
17   A.   Yes, he lived in Chicago.
18   Q.   Where in Chicago did Shawn live before
19  they left for Milwaukee?
20   A.   Before they left for Milwaukee -- let's
21  see, where did she live?  I can't remember.  She had
22  two or three addresses before, but she was off and
23  on back to 1212 because sometimes when she didn't
24  pay the rent or got kicked out or something, she

Page 35

1   always wind up her furniture and stuff -- if one of
2   the floors was vacant, I let her put her stuff on
3   the floor, but she have never lived there.  She
4   wasn't living there at the time.
5    Q.   She wasn't living where?
6    A.   At 1212 at the time.  She have lived
7   there, at 1212, but she wasn't living there during
8   the time Shawn got arrested.
9    Q.   When she lived at 1212, did she live on
10  the first or the second floor?
11   A.   I can remember her being on the first
12  floor and when the second floor got available, I
13  think she moved upstairs, the second floor.  There
14  was nobody in the building.  She didn't stay up
15  there that long.  Like about a month or two, maybe.
16       I can't remember her being there that
17  long.  When she was there, I think she was on the
18  first floor, but I'm not sure.
19   Q.   Do you know prior to the -- prior to
20  September 1991, do you know when she moved from
21  Chicago to Milwaukee?
22   A.   No.
23   Q.   Back in 1991 as the owner of the property
24  at 1212 West 51st Street, did you also rent it out

Page 36

1   to people, the front house?
2    A.   The front house was always rented out,
3   the first and the second floor.
4    Q.   Was it a two flat?  Were there only two
5   units in the front house?
6    A.   Two units.  First and second floor and
7   there was a basement up front, too, but it wasn't
8   rented out.
9    Q.   So people only lived on the first or the
10  second floor?
11   A.   Yes.  When I first got it, there was a
12  couple in the basement, but they moved out and I
13  never did rent the basement again.
14   Q.   Did that couple still live in the
15  basement in 1991?
16   A.   No.  There was nobody in the basement in
17  1991.
18   Q.   Do you remember was there somebody that
19  lived on the first floor in 1991?
20   A.   I think that person had moved out.  I did
21  have one tenant on the second floor.
22   Q.   Who lived on the second floor?
23   A.   An older lady.
24   Q.   Do you remember her name?



Page 37

1     A.   No, I don't remember her name.

2     Q.   Did you make your tenants sign lease

3 agreements?

4     A.   No.  It was like a friend or a distant

5 relative, something.  I never had a lease.

6     Q.   How would they pay rent to you?

7     A.   Once a month.

8     Q.   Would they write you a check or would

9 they pay you some other way?

10    A.   Sometimes -- most of the times they gave

11 me cash.  I can't remember them giving me a check.

12    Q.   So if you didn't have a lease agreement,

13 how would you guys agree for how long the tenant was

14 supposed to stay?

15    A.   Well, back then, they -- at first she

16 wanted to rent the apartment.  It would be a family

17 member or distant relative, somebody close, somebody

18 that I knew.  They would rent it from month to

19 month.

20    Q.   Okay.

21    A.   They would pay you rent and security.

22    Q.   Did they pay utilities as well on their

23 own or did you take care of those?

24    A.   Well, they would pay their own cooking

Page 38

1 and lights, I think.  I furnished the gas for the

2 building.  I think cooking and lights were on them.

3 I heated the building and the water.

4     Q.   You paid for the water, as well, water

5 and heat?

6     A.   The water and heat, I provided that.

7     Q.   Do you recognize the name Denise Harris?

8     A.   Denise Harris, yes.

9     Q.   At any point in time was she one of your

10 tenants at 1212 West 51st Street?

11    A.   Yes.

12    MS. SPENCE:  Objection.

13 BY THE WITNESS:

14    A.   On the second floor.

15    MS. SPENCE:  Sorry.  One second.  Objection.

16 Lack of foundation.  Form.

17    Go ahead.

18 BY MS. JOHNSON:

19    Q.   You owned that building, right?

20    A.   Right.

21    Q.   If somebody were to rent one of the

22 apartments from you, they would have to talk to you

23 about renting it; is that right?

24    A.   Right.

Page 39

1     Q.   So you would know who was living in that

2 front building, right, because it was your building?

3     A.   Right.

4     Q.   So at any point in time was Denise Harris

5 one of your tenants?

6     A.   I rent --

7     MS. SPENCE:  Objection.  Form.

8 BY MS. JOHNSON:

9     Q.   Go ahead.

10    A.   Denise Harris was Idea's daughter and I

11 rent the building to Idea.  She was paying me the

12 rent.

13        You asked me about Denise Harris, I knew

14 the Harris name from her mother being named Idea,

15 but they were called Mimi and Net and I don't know

16 them apart.

17    Q.   Mimi and Net?

18    A.   One of the girls was called Mimi and one

19 was called Net.  I don't know who Denise was.  I

20 can't tell you.  I can't give you particulars on

21 Denise, but I know she was a Harris.

22 BY MS. JOHNSON:

23    Q.   Was Denise Harris one of your tenants in

24 1991?

Page 40

1     MS. SPENCE:  Objection.  Form.  Also the use of

2 the term tenant for the child who is not paying

3 rent.

4        Continue.  Go ahead.

5 BY THE WITNESS:

6     A.   She was living up there with her mother

7 at the time.  I didn't rent to Denise Harris.  I'm

8 saying I'm not familiar with her name.  I rented to

9 her mother Idea Harris.

10 BY MS. JOHNSON:

11    Q.   You rented to the mother Idea Harris and

12 the mother had two daughters, right?

13    A.   And she has other kids up there.  She had

14 more than just the two daughters.

15    Q.   Do you know if any of her kids lived with

16 her back in 1991?

17    A.   I think Mimi and Net and somebody else

18 was up there, was Idea's kids, but they had like

19 other names.  I don't know them as their real name.

20    Q.   Do you recognize when I say the name

21 Annette Harris, do you recognize that name?

22    A.   No.  I just know she was one of Idea's

23 daughters.

24    Q.   So back in 1991 when they lived at 1212



Page 41

1 West 51st Street, did they live on the first or the
2 second floor?
3    A.    The second floor.
4    Q.    To the best of your recollection, Idea
5 and her two daughters, Mimi and Net lived there on
6 the second floor back in 1991; is that right?
7    A.    Yes.  Correct.
8    Q.    Do you recognize the name Nikia Little?
9    A.    No.
10   Q.    What about the property next door at 1210
11 West 51st Street, do you know who owned that
12 property?
13   A.    Joyce Jakes.  It was my brother's place.
14 Nathaniel Jakes and his wife.
15   Q.    Joyce is -- does she also go by
16 Georgia Jakes?
17   A.    Yes.
18   Q.    Do you know do Joyce and Nathaniel still
19 own that property?
20   A.    I think Joyce still own the property, but
21 Nathaniel is deceased.
22   Q.    Is there a Nathaniel, Jr. and a
23 Nathaniel, Sr.?
24   A.    Yes.

Page 42

1    Q.    Nathaniel, Sr. is the one that's
2 deceased, correct?
3    A.    Correct.
4    Q.    Nathaniel, Jr. is his son; is that right?
5    A.    Correct.
6    Q.    Back in 1991 would you ever visit the
7 property at 1210 West 51st Street?
8    A.    Did I visit that property?
9    Q.    Right.
10   A.    Yes.
11   Q.    Did that also have a rear house or was
12 that a single front building?
13   A.    It had a single front building and a back
14 door.  I could go out my house and go up the back
15 stairs and go over to their house over there.  But
16 Joyce didn't live in the building at the time.
17   Q.    How many units were in the front building
18 at 1210, if you know?
19   A.    The first, second floor and a basement.
20 The same as 1212.
21   Q.    Back in 1991, did anybody live at the
22 basement?
23   A.    No.
24   MS. SPENCE:  Objection.  Lack of foundation.

Page 43

1 BY THE WITNESS:
2    A.    Not that I know of.
3 BY MS. JOHNSON:
4    Q.    Back in 1991, did anybody live on the
5 first floor at 1210 West 51st Street?
6    A.    No.
7    MS. SPENCE:  Sorry.  Ms. Jakes, when you hear
8 me say "objection," just pause.  It's okay.  This is
9 such a unique experience.
10   Objection.  Lack of foundation.  Calls
11 for speculation.
12   Go ahead, Ms. Jakes.
13 BY THE WITNESS:
14   A.    I knew Ruthetta lived on the second
15 floor.  That's Joyce Jake's sister.
16 BY MS. JOHNSON:
17   Q.    Did Ruthetta go by a nickname?
18   A.    Cheers.
19   Q.    Cheers is her last name?
20   A.    Yes.
21   Q.    Who did Ruthetta live with back in 1991
22 when they were living on the second floor of 1210?
23   MS. SPENCE:  Objection.  Calls for speculation.
24   Go ahead.

Page 44

1 BY THE WITNESS:
2    A.    All I know, Ruthetta and her children.
3 BY MS. JOHNSON:
4    Q.    Is Ruthetta related to you?
5    A.    Just a distant relative.  My brother
6 married her sister and they had kids.
7    Q.    What were their kids's names?
8    A.    Cleotha and Claudette.  They were twins.
9 She had other kids, too, but there was a baby,
10 twins, and they called them Tweety and Quarter
11 Pound.  That's what they was calling them, but I
12 learned after that the name was Cleotha and the girl
13 was named Claudette.
14 BY MS. JOHNSON:
15   Q.    Whose nickname was Quarter Pound?  Was
16 that Cleotha?
17   A.    That's Cleotha.
18   Q.    And Claudette's nickname was Tweety?
19   A.    Yes.
20   Q.    Back in 1991 when Ruthetta lived on the
21 second floor of 1210 West 51st Street, did Cleotha
22 and Claudette or, as you called them, Quarter Pound
23 and Tweety also live with her?
24   A.    Yes.

Page 45

1    Q.    Would you ever go and visit them
2  sometimes back in 1991 at their apartment on the
3  second floor at 1210 51st Street?
4    A.    Yes.
5    Q.    How often would you visit them back in
6  1991?
7    A.    I just visit on a regular basis.
8  Sometimes every other day or so.  Maybe I see them
9  on the front.  We meet out on the front.
10    Q.    Do you remember -- so back in 1991, what
11  did that second floor apartment look like?  How many
12  rooms were in there?
13    A.    She probably had the same amount of
14  rooms, but I don't know what she had over there.  I
15  think it was like three bedrooms too.
16    Q.    Was there a kitchen and a living room as
17  well?
18    A.    Yes.
19    Q.    Was there a window in that second floor
20  apartment that faced 51st Street?
21    A.    Yes.
22    Q.    Where was that window located?  Was it in
23  the living room, the bedroom, the kitchen?
24    A.    Living room.

Page 46

1    Q.    Other than the window in the living room
2  that faced 51st Street, were there any other windows
3  in that apartment that would face 51st Street?
4    A.    Not that I know of.  Maybe the living
5  room.  When you walk in the house, you can look
6  out -- it was like a picture window on the first
7  floor that you could look out and see 51st.
8    Q.    Give me a second.  Let me show you a
9  photo real quick.  We'll mark this as Exhibit 1.
10  This is City_Jakes 507.
11            (WHEREUPON, a certain document was
12            marked Exhibit No. 1, for
13            identification, as of 11/12/2021.)
14  BY MS. JOHNSON:
15    Q.    Can you see that?
16    A.    Yes.  I see a car.
17    Q.    Do you recognize the area in this
18  picture?
19    A.    Yes.  That was the house next to me.
20    Q.    Do you know who lived in this gray house
21  in this picture?
22    A.    I didn't know the people, but I know
23  there was a lady there and his son and he was sort
24  of like handicapped.  I don't know their name

Page 47

1  either.
2    Q.    Did they live there back in 1991?
3    A.    Yes.
4    Q.    You never really -- you didn't associate
5  with them?
6    A.    No.  I didn't know them.
7    Q.    Right to the left of the gray house, is
8  that 1210 51st Street?
9    A.    Yes.
10    Q.    We were talking about the windows.
11  Looking up at this it looks like, is there a porch?
12    A.    It was a balcony like up there.
13    Q.    There was a balcony up here on the second
14  floor.  Was there any way to, like, walk out onto
15  this balcony or would you have gone through a window
16  to stand on this balcony here?
17    A.    You go through the window.
18    Q.    It looks like there's three windows in
19  the front.  Were all three of these windows
20  considered in one unit, that second floor unit at
21  1210?
22    A.    Yes.
23    MS. SPENCE:  Objection.  Form.
24

Page 48

1  BY MS. JOHNSON:
2    Q.    Were all of these windows that you see
3  here facing out onto 51st Street, were they in the
4  living room?
5    A.    I don't -- that's upstairs.
6    Q.    Let's talk about the first window on the
7  left.  Was this window in the living room?
8    A.    That faces the front.
9    Q.    Right.  Right here (indicating), is this
10  the living room window you were talking about?
11    A.    Yes.
12    Q.    What about this middle window
13  (indicating), was this also in the living room?
14    A.    That may have been the part to the side.
15  It still faced the front.
16    Q.    This window over here to the right with
17  the air conditioner hanging out of it, was that also
18  in the living room?
19    A.    That was a bedroom, I think.
20    Q.    What about downstairs.  Do you know who
21  lived downstairs?
22    A.    At that time I don't know if anybody was
23  on that first floor.  If there was, I don't know.
24    Q.    Over here if we go all the way to the



Page 49

1 left, I know it's a little bit dark, but it looks
2 like it has white and green stripes. Do you see
3 that right there, that awning?
4    A.   Right. That's going into the basement.
5    Q.   And then above, this whole building right
6 here, all the way on the left, that's 1212 West 51st
7 Street, right?
8    A.   Yes.
9    Q.   That's the building that you owned,
10 correct?
11    A.   Correct.
12    Q.   If we look up here and we look -- we'll
13 go from right to left at this time. If you look up
14 here, this window to the very right on the second
15 floor, where was that window? Was it in the living
16 room or somewhere else?
17    A.   That room was a bedroom, I believe.
18    Q.   What about this middle window here
19 (indicating), do you know what room that window was
20 in?
21    A.   That may have been -- I don't know just
22 right offhand looking at the window like that. When
23 you go upstairs, there was a living room and then
24 off to that was a bedroom.

Page 50

1    Q.   On the left right here it looks like
2 there's a final window. Do you know what room that
3 window would have been in?
4    A.   No. Probably connecting to the living
5 room because there were two, like a picture window
6 and something on the side.
7    Q.   Back in 1991 we see that there's a first
8 floor as well. Do you remember did anybody live
9 there in 1991?
10    A.   On the second floor, I know somebody was
11 on the second floor, but I'm not sure about the
12 first floor.
13    Q.   What about in September 1991 right before
14 Anthony was arrested, do you know if anybody was
15 living in this first floor of 1212?
16    A.   I can't remember. I don't know if nobody
17 was on that first floor. I don't think so.
18        The lady stayed on the second floor. She
19 rented for, like, some years, but she moved and I
20 never had another tenant. For just a little while,
21 maybe. Two or three months, something like that.
22 They wouldn't come and stay a long time where I can
23 put their names down.
24    Q.   To the best of your recollection, back in

Page 51

1 September of 1991 this bottom floor unit at 1212
2 West 51st Street was vacant?
3    A.   Vacant, as far as I know.
4    Q.   We'll mark this as Exhibit 2. For the
5 record, City_Jakes 506.
6        (WHEREUPON, a certain document was
7        marked Exhibit No. 2, for
8        identification, as of 11/12/2021.)
9 BY MS. JOHNSON:
10    Q.   Do you see this?
11    A.   Yes, I see it fine.
12    Q.   Do you recognize the area in this
13 picture?
14    A.   Yes. That little restaurant right on the
15 corner there.
16    Q.   We'll get to that in a minute. I'm going
17 to focus here on, do you see there's like three
18 people sitting on the porch?
19    A.   Yeah.
20    Q.   Would they be sitting on the porch at
21 1210 West 51st Street?
22    A.   1210.
23    Q.   Do you recognize the woman that's wearing
24 a white dress and red shoes?

Page 52

1    A.   I can't recognize her right there.
2    Q.   Let me zoom in. Does this help you?
3    A.   It looks like I'm sitting there, but I
4 don't know.
5    Q.   Do you think that might be you right
6 here?
7    A.   That look like me. And the other one
8 look like me too so I don't know.
9        The reason why the white look like me is
10 because the earrings. I have, like, a lot of
11 earrings. I do see some earrings, but I can't see
12 the face right there. And the other one is turned.
13    Q.   So the one that's sitting up looks
14 like -- sitting up on the brick, that person's face
15 is turned. You don't recognize that person here?
16    A.   No.
17    Q.   What about the person that's sitting down
18 in the middle, do you see it looks like he or she is
19 covering their mouth. Do you recognize that person?
20    A.   No.
21    Q.   I'll get as close as I can.
22    A.   It look like Ruthetta, myself and maybe
23 Ruthetta's daughter, but I don't remember that
24 picture, at all. I tried to look at the clothes and



Page 53

1 see if they were my clothes, but I don't remember
2 nothing about that.
3     Q.    That's okay if you don't know.  Let's
4 ta k about -- I know I showed you your street right
5 there and those two properties.  Let's talk about
6 that neighborhood back in 1991.  What was that
7 neighborhood like back in 1991 where you lived?
8     A.    Just like an average neighborhood.  Kids
9 would be around and they painted some as gangbangers
10 and some as their momma not taking care of them.
11 Painted kids I ke anything.  But that wasn't my
12 concern.
13     Q.    What was your concern about living in
14 that neighborhood back in 1991?
15     A.    Trying to keep my kids focused, not to
16 follow nobody to the wrong place.  Wherever you're
17 going, know where you're going.  Get permission.
18 Don't just be out there.
19     Q.    Was that -- based upon your memory of
20 that neighborhood back in 1991, was it a safe place
21 to live?
22     A.    It was safer than any other place if you
23 did what you're supposed to do.  You couldn't hang
24 out and do other things.  Going and coming.

Page 54

1     Q.    Do you remember back in 1991 whether
2 there was a lot of crime in that area?
3     A.    There was a lot of crime.  There's a lot
4 of crime in all these areas now, still.  But there
5 was crime, but it wasn't a part of us.  I didn't
6 have anything to do with it.
7           The only thing that was concerning me was
8 Shawn when they said he killed a man out there on
9 51st Street when he didn't.
10    Q.    Who told you that?
11    A.    Well, later on they said they charged him
12 with the murder of a man out there on 51st Street
13 and I was out there.  He didn't kill anybody out
14 there on 51st Street.  There was no way Shawn could
15 have killed nobody that night because there was
16 another incident going on.
17    Q.    What incident was going on that night, do
18 you remember?
19    A.    Yeah, I remember.  It was the Latin
20 Kings.  They were passing by -- constantly passing
21 by with bags hanging off the car and things.
22          They were into it about because when they
23 called me, I went out there and they said they threw
24 some pop or water or something at the car, but the

Page 55

1 car came around and all through the back.  They were
2 throwing some things.  I know some gangbanger
3 sticks, chains and they threw up and broke the
4 window next door.
5     Q.    Next door where?  What building did they
6 throw --
7     A.    1210.  1210.  I don't know if it's
8 Quarter Pound or Shawn, somebody broke a window.
9 Somebody -- because they thought they ran in the
10 house.  They were trying to get the two that threw
11 at them.
12    Q.    Let's talk about that.  Let's talk
13 about -- I'll go over that with you.  I just want to
14 understand.  You said that somebody -- you thought
15 there was some Latin Kings, they were doing
16 something in the area.  Do you remember about what
17 time that would have happened?  Strike that.  Let me
18 go back.
19          You're talking about that night.  Are we
20 talking about September 15th, 1991, the same night
21 as the shooting?
22    A.    Yes.
23    Q.    You said that there were Latin Kings
24 around in that area.  What were they doing?

Page 56

1     A.    Just riding by on 51st Street.  Just
2 driving by.  That was 51st Street.  They were just
3 riding by, but they had signs swinging out their
4 windows and they were saying things.  It wasn't
5 nothing that they had to do anything with.
6           But I guess they got tired of seeing them
7 all.  They may have knew some of the boys.  I don't
8 know.  I don't know what went on with that.  Shawn
9 told me that they threw some water, pop or
10 something, whatever they was drinking, they threw it
11 and they came back for retaliation.
12    Q.    Were you outside when they were throwing
13 things at the building?
14    A.    No.  I went out there after that part was
15 over.  When I got out there, I just saw the car
16 coming.  They were running and went in the house
17 next door.  Just all kind of little things was
18 happening that I didn't know anything about.
19          So later on that night is when the man
20 got shot out there.  I know Shawn was supposed to
21 have been in the house at that time.  I had told him
22 to go in the back.
23    Q.    So let me go back.  What time was it when
24 you finally went outside to see what was going on



Page 57

1 out there?

2    A.    I don't know exact time.  I just walked

3 out there.  But I know it was in the evening.  It

4 was late kind of like in the evening.  I can't tell

5 you if it was 4:00, 3:00 or what, but the man didn't

6 get shot until it was later on that night.

7    Q.    How do you know that the man got shot

8 later on that night?

9    A.    In the back and out in the front, going

10 in and out.

11    Q.    Were you there when the man was shot?

12    A.    But I didn't see anything.  A lot of

13 people was out there walking, talking.  We was

14 talking.  I wasn't looking at what was going on.

15         The next thing we knew we heard a shot.

16 I didn't know where it was coming from.  Then I saw

17 a man run across the street and around the currency

18 exchange, but it wasn't nobody that I knew.

19    Q.    When you heard a shot, where were you?

20    A.    Coming through the gangway getting ready

21 to go up on the porch at 1210.  I don't know which

22 one of the porch they was on, 1210 or 1212.

23         When I come out back, I usually go in the

24 front.  Me and friends sit there talk or whatever

Page 58

1 we're doing.  We're sitting on the front.  But I

2 didn't make it to the front that night.  I was

3 coming through the gangway when I heard all the

4 commotion.

5    Q.    I'll ask you about -- to go through that

6 day with me really quickly.  Let's just focus on

7 when the people -- I guess you said there were Latin

8 Kings driving around the area.  Do you remember what

9 kind of signs they had or were holding?

10    A.    Flags mostly hanging out the car.

11 Whatever they doing on independence day, riding

12 around with the flags.

13    Q.    So the day of September 15th, 1991, that

14 was some kind of independence day?

15    A.    Something for them.  They were still

16 riding with the flags.

17    Q.    Do you know whether or not the people

18 that were riding around with the flags were actually

19 members of the Latin Kings?

20    A.    I don't know that.  I didn't even know

21 the people.

22    Q.    Do you know whether or not it was Mexican

23 Independence Day?

24    A.    It may have been.  I just saw the car.

Page 59

1 They told me there's another car there.  It's coming

2 back through the gangway.  I just went in the house.

3    Q.    Were you outside when something was

4 thrown through the window of 1210?

5    A.    No.  I wasn't outside then because that

6 was later on they said they had broke -- the people

7 broke the window.

8    Q.    So let me back up.  So at some point that

9 night somebody had broken a window and then you came

10 outside and who told you that somebody had broken a

11 window?

12    A.    I don't know who told me that.  It was a

13 child saying -- them people broke a window on the --

14 the first or the second floor of Ruthetta's house.

15         By the time I got out there, the window

16 was broke and she wasn't home.  Meanwhile, I was

17 checking because whoever is respons ble for it,

18 somebody need to pay for her window.

19         So I was out there to see if I need to

20 call the police or who saw what.  All I could get is

21 the Latin Kings threw something up to that window

22 and broke it.

23    Q.    You don't remember who told you that it

24 was the Latin Kings that threw something up there

Page 60

1 and broke the window?

2    A.    No.

3    Q.    Do you remember calling the police that

4 night about the broken window?

5    A.    No, I didn't call them, at all.

6    Q.    After you came outside and one of the

7 kids told you that somebody had broken the window,

8 what happened?

9    A.    I went up there to see because she wasn't

10 home and, like I said, we look after each other.  I

11 went to put something up until she got there.

12    Q.    Did Anthony go upstairs with you?

13    A.    Anthony supposed to have been in the back

14 house.  He didn't go upstairs with me.

15    Q.    So when you went up there to check about

16 the window at 1210, who was actually in the

17 apartment at that time?

18    A.    Quarter Pound.  He was up there.

19    Q.    What about Tweety, was she up there?

20    A.    I can't remember if Tweety was up there

21 that time or not.  I saw Quarter Pound.

22    Q.    Do you remember seeing Quarter Pound

23 upstairs after you went to go check and see about

24 the broken window?



Page 61

1    A.   I didn't see it no more.  I told him to
2  go -- I told him to go to his house and I told Shawn
3  to go in the back.
4    Q.   So that's my question.  Right when you
5  get outside, right when you get outside and you come
6  and check on this broken window, are Shawn and
7  Quarter Pound together?
8    A.   No.
9    Q.   So why would you have told Shawn to go
10  back into the back house?
11    A.   That was when they were saying about the
12  flags and what had happened.  Just go in the house.
13  Nothing was going on then.  You go in the back and
14  you go where you live.  He went to the front to go
15  to 1210.  Shawn went in the back and I proceeded
16  going through the gangway towards the front.
17    Q.   Earlier -- as you're walking out of the
18  rear house, you see Shawn and you tell him to go
19  inside, right?
20    A.   Right.
21    Q.   And then you keep walking back from the
22  rear house down the gangway to go check out the
23  front of 51st Street and you see Quarter Pound,
24  right?

Page 62

1    A.   Yes.
2    Q.   And you tell Quarter Pound to go
3  upstairs?
4    A.   To go in his house, upstairs.
5    Q.   And at that point when you see both of
6  them, had the window already been broken?
7    A.   The window broke after that.  They just
8  broke a window.  Someone said they saw him running
9  in that building, but nobody came out so they said
10  he threw a bottle or something and broke that
11  window.  I wasn't out there for that either.
12    Q.   So that's what I'm trying to understand.
13  At some point before the window was broken, you saw
14  Shawn?
15    A.   Right.
16    Q.   Who was Shawn with when you told him to
17  go home?
18    MS. SPENCE:  Objection.  Lack of foundation.
19      Go ahead.
20  BY THE WITNESS:
21    A.   When I saw Shawn, he was in the gangway
22  and I told him to go to the house, go on in the
23  house in the back because of what I heard going on
24  in the front.

Page 63

1  BY MS. JOHNSON:
2    Q.   Was Shawn by himself when you saw him or
3  was he with somebody else?
4    A.   Shawn was by himself when I saw him.
5    Q.   I understand that.  And then where was --
6  you saw Shawn in the gangway.  Where was Quarter
7  Pound?
8    A.   I didn't see Quarter Pound until I got
9  directly in the front of the house.
10    Q.   Directly in front of 1210?
11    A.   1210.  That's where he was, on the porch
12  and I told him to go in.
13    Q.   Was anybody else on the porch with
14  Quarter Pound when you saw him and told him to go
15  inside?
16    A.   I don't know if they were with him or
17  not, but there was other people out there on the
18  porch, but I don't know who it was.
19    Q.   You don't remember who it was?
20    A.   That was on the porch at that time, no.
21    Q.   Do you know whether or not Shawn had been
22  sitting on that porch before you saw him in the
23  gangway?
24    MS. SPENCE:  Objection.  Calls for speculation.

Page 64

1      Go ahead.
2  BY THE WITNESS:
3    A.   I don't know if he was on the porch or
4  not.  I told you where I saw him at.
5  BY MS. JOHNSON:
6    Q.   You just said you don't know where you
7  saw him at.  Who do you mean by "him"?
8    MS. SPENCE:  Objection.  Mischaracterizes the
9  testimony.
10    MS. JOHNSON:  Let's read back the answer.  Can
11  you go ahead and read back the answer for me, then.
12      (WHEREUPON, the record was read by
13      the reporter as requested.)
14  BY MS. JOHNSON:
15    Q.   You said I don't know if he was on the
16  porch or not.  I told you where I saw him at.  Were
17  you talking about Shawn?
18    A.   Yes.  You asked me about Shawn.  No.
19  Quarter Pound.  You asked me where did I see him at.
20  I saw him on the front.  Shawn was coming through
21  the gangway.
22    Q.   And then I asked you, do you know whether
23  or not before you got outside and you saw Shawn if
24  Shawn was also on that porch --



Page 65

1    MS. SPENCE: Objection --
2 BY MS. JOHNSON:
3    Q.   Right?
4    THE REPORTER: I'm sorry. We have to do that
5 over.
6    MS. JOHNSON: Strike that. Let's try again.
7 BY MS. JOHNSON:
8    Q.   I'm talking about now you said you saw
9 Quarter Pound on the porch and you saw Shawn in the
10 gangway, right?
11    A.   Right.
12    Q.   Do you know before you saw Shawn in the
13 gangway whether or not he was also hanging out on
14 the porch with Quarter Pound?
15    A.   I didn't have no answer to that.
16    Q.   Why don't you have an answer for that?
17    A.   I wasn't out there then. I was coming
18 through the gangway coming to the front when I saw
19 Shawn.
20    Q.   Understand.
21    A.   I was on my way to the front and I told
22 him to go in the back.
23    Q.   When you told him to go in the back,
24 where did he go?

Page 66

1    A.   I assume he went in the house.
2    Q.   Do you actually know whether or not he
3 did go into the house?
4    A.   I don't know for sure if he went into the
5 house or not, no. I can't testify to that.
6    Q.   So let's talk about what you did that day
7 on September 15th, right?
8    MS. SPENCE: Can we take a break? Since you're
9 changing topics, can we take a break?
10    MS. JOHNSON: Yeah, sure.
11    MS. SPENCE: Can we do five minutes?
12    MS. JOHNSON: Yeah, that's fine.
13    MS. SPENCE: Thanks.
14    THE VIDEOGRAPHER: This marks the end of Media
15 No. 2. The time is 11:30 a.m. We are off the
16 record.
17    (WHEREUPON, a recess was had.)
18    THE VIDEOGRAPHER: This marks the beginning of
19 Media No. 3. The time is 11:40 a.m. We are on the
20 record.
21 BY MS. JOHNSON:
22    Q.   We're back. Remember we were ta king
23 about you telling Shawn to go into the house?
24    A.   Yes.

Page 67

1    Q.   So after you told Shawn to go into the
2 house, was that the last time you saw him that
3 night?
4    A.   Yes.
5    Q.   So after that night when's the next time
6 you saw Shawn?
7    A.   The next morning before the police all
8 got there.
9    Q.   About how long before the police officer
10 showed up did you see Shawn?
11    A.   Maybe about an hour, hour and a half. He
12 came down to take a bath, go back upstairs and get
13 dressed. I think he was in the process of doing
14 that. When the police came, he was upstairs.
15    Q.   So you said -- the next time you saw
16 Shawn was the next morning about an hour or an hour
17 and a half before the police showed up; is that
18 right?
19    A.   Right. Correct.
20    Q.   When you saw him about an hour or an hour
21 and a half before the police showed up on
22 September 16th, 1991, what was he doing?
23    A.   Getting ready to get dressed so he can go
24 out, step out, I guess. He said he was coming

Page 68

1 downstairs to take a shower and then going to go get
2 dressed.
3    Q.   In order for him to take a shower, would
4 he have had to come downstairs?
5    A.   Yes. He had to come downstairs and take
6 a shower. That's when I saw him with the shorts on
7 and went back upstairs.
8    When the police came, they called him
9 downstairs or went up to get him or something. He
10 had the same thing on when I saw him.
11    Q.   So let's try and go in order that day.
12 What time -- so on September 16th, the next day
13 after the shooting, what time did you wake up?
14    A.   I got up about -- I don't know what time.
15 I just get up a regular time. Usually I'm up early.
16 I'm a morning person. I don't know what time it
17 was. I never looked at the time.
18    Q.   Let's go back, then, and talk about
19 September 16th, 1991, you'll have to take my word
20 for it, that that would have been a Monday. Back in
21 1991 were you employed?
22    A.   At that particular time I don't -- was I
23 employed then or not? I think I got the job after I
24 got Antonio. I don't remember that part either.



Page 69

1 But 1991 is, I think, when -- I'm not sure if I was
2 working then or not.
3    Q.   All right.  Let's talk about a typical
4 day, then.  You said you're a morning person.  Talk
5 about Monday, on Monday, a typical Monday in 1991.
6 You would get up in the morning because you're a
7 morning person?
8    A.   Yes.  Correct.
9    Q.   And then what would you do?
10    A.   Well, I had my baby and my daughter
11 dropped her baby off.  She had to be at work at
12 seven, 7:00, so she was there early around 5:30,
13 6:00 in the morning that particular morning.  So I
14 was just getting breakfast and getting the babies
15 together.
16    Q.   The next morning by the time that you saw
17 Shawn, was the baby already there?
18    A.   Yes.  I had both babies downstairs.
19    Q.   That included your daughter's baby,
20 right?
21    A.   Right.  Correct.
22    Q.   Does that mean to you that you would have
23 seen Shawn sometime after 5:30 or 6:00 in the
24 morning?

Page 70

1    A.   Yes, I would have saw him.
2    Q.   After your daughter would drop off the
3 baby, then what would you do?
4    A.   Start seeing from one to the other one
5 and fixing breakfast.  Just doing what you're doing
6 in the morning time.
7    Q.   How long would it take for you to make
8 breakfast and get dressed for the day?
9    A.   About an hour or two.
10    Q.   Do you remember on September 16, 1991 the
11 first time you saw Shawn, had you already finished
12 making breakfast and getting dressed for the day?
13    A.   Yes.
14    Q.   After you would make breakfast and get
15 dressed for the day, then what would you do?
16    A.   If the baby was asleep, I'm doing
17 something.  Maybe watching television or doing a
18 crossword puzzle or something.  I don't remember
19 exactly what I was doing, but that day I was in
20 there with the babies.
21    Q.   You remember that day when you first saw
22 Shawn the next day, you were in where with the
23 babies?
24    A.   In the living room.  That's where I was,

Page 71

1 in the living room.  I was hollering upstairs to
2 answer his question.  He wanted to know if anybody
3 was in the bathroom.  He was going to come down to
4 take a shower.
5    Q.   Did you, in fact, see him come down the
6 stairs and take a shower?
7    A.   He came down the stairs.  That's what I
8 told him.  That's what he said to me.  He asked me
9 if anybody was in the bathroom.  He was going to
10 come down and take a shower and get dressed.  I said
11 to him there was nobody in the bathroom.
12    Q.   So did you see him go to the bathroom?
13    A.   I wasn't paying attention to see if he
14 went in and took a shower or what he did.  I don't
15 know anything about that part.
16        I know when the police came in, he was
17 upstairs.  Joe Joe was in the kitchen.
18        MS. SPENCE:  Just to save some time, how would
19 we spell Joe Joe?  Ms. Jakes, how do you spell Joe
20 Joe?
21        THE WITNESS:  His name was Daryl Lewis.  We
22 call him Joe Joe.  J-o-e, J-o-e.  Joe Joe.
23        MS. SPENCE:  Got it.
24

Page 72

1 BY MS. JOHNSON:
2    Q.   Back in September 1991 did Joe Joe live
3 with you?
4    A.   No.  He was my daughter's boyfriend at
5 the time.  I guess he wasn't working.  He was there
6 to help out with his daughter, seeing if his
7 daughter was being all right.
8    Q.   What time did Joe Joe get to your house
9 on September 16th, 1991?
10    A.   I don't know if he came with her that
11 morning when she dropped the baby off or he came in
12 later.  When I knew then, he was in the kitchen.  I
13 couldn't say what time he came.
14    Q.   Which daughter are we talking about?
15    A.   Veronica.
16    Q.   Joe Joe was Veronica's boyfriend?
17    A.   Yes.
18    Q.   If Joe Joe was over at the house, did he
19 have a key or would somebody have to let him in?
20    A.   That's what I'm thinking.  I think he
21 came in with her when she dropped the baby off
22 because they didn't live there.  They lived
23 someplace else and he probably came with her then.
24 Once he got in the house, he was already in the



1  house.

2      Q.   So you didn't actually see Joe Joe come

3  in the house?

4      MS. SPENCE:  Objection.  Mischaracterizes the

5  testimony.

6      Go ahead.

7  BY MS. JOHNSON:

8      Q.   Go ahead.

9      A.   I can't remember now saying whether I saw

10 him when he came in the house or not because I would

11 have knew what time he came or if he came with her.

12     Q.   I understand.  From what you remember,

13 when you saw Joe Joe, he was in the kitchen?

14     A.   He was in the kitchen when I saw him.  He

15 was in the kitchen.

16     Q.   What was Joe Joe doing in the kitchen?

17     A.   When I saw him, he was standing in the

18 kitchen and let the police see him.  He was the one

19 that opened the door for the police and let them in

20 the kitchen.

21     Q.   Let's back up.  Do you know -- strike

22 that.

23          From what I understand, you don't know

24 how long Joe Joe was at the house before the police

1  got there; is that right?

2      A.   That's correct.

3      Q.   When you first saw Joe Joe that day, he

4  was in the kitchen and he had let the police in; is

5  that right?

6      A.   Correct.

7      Q.   Let's talk about him letting the police

8  in.  Where were you when Joe Joe let the police in?

9      A.   In the living room.

10     Q.   Did you hear the police knock on the

11 door?

12     MS. SPENCE:  Objection.  Lack of foundation.

13          Go ahead.

14 BY THE WITNESS:

15     A.   I heard a loud knock, but I didn't know

16 it was the police at the time.

17 BY MS. JOHNSON:

18     Q.   So you heard a loud knock and then what

19 did you hear after that?

20     A.   The police talking, asking him was his

21 name Anthony Jakes.

22     Q.   What did you hear Joe Joe, if anything,

23 say to the police?

24     A.   No.  His name was Joe Joe.  They was

1  asking him if his name was Anthony Jakes.  He said

2  his name was Joe Joe.  That's what I heard and then

3  I started coming into the kitchen to see what was

4  the problem.

5      Q.   When you came into the kitchen, where

6  were the police?

7      A.   They were all coming in the door standing

8  by the door out on the front on the enclosed porch

9  before they come into the house.

10     Q.   So when you saw them, were any of the

11 police officers already in the house?

12     A.   They was coming in.  One was already in

13 there.  I think there was maybe two.  I know one was

14 in there.  It happened so fast, I don't know.  They

15 just came in.

16     Q.   You said some were -- so when you went to

17 go into the kitchen to see what was going on, one

18 police officer was inside and there were still more

19 on the porch; is that right?

20     A.   Standing in the door getting ready to

21 come on in the house too trying to see if Joe Joe

22 was Shawn.

23     Q.   How many total police officers showed up

24 at your house?

1      A.   I remember seeing two or three.  I

2  remember seeing more than three.

3      Q.   Tell me about how many you remember being

4  there.  You said more than three.  Was it four?

5      A.   It may have been.  I'm saying I didn't

6  see them.  It could have been the same one moving

7  around.  It happened so fast.  They were moving.  I

8  know two went upstairs and one was standing at the

9  door.

10     Q.   So for sure you know that there were at

11 least three?

12     A.   There were three for sure, but I think

13 there was four.

14     Q.   So let's talk about these police

15 officers.  Did any of them tell you their names?

16     A.   No.  They didn't address me as no name or

17 nothing.  They came in asking me about Shawn and

18 they were looking for a weapon and they had to

19 search my house.

20          By that time Shawn come to the top of the

21 stairs wanting to know if they had a search warrant.

22     Q.   Let's back up.  I understand that.  Give

23 me a second.

24          Out of the officers that you remember



Page 77

1 seeing, were any of -- were they white or black or
2 some other race?
3     A.   I saw one black man, I'll put it like
4 that.  I think there was one black man that I
5 remember seeing.
6     Q.   Let's start with the black officer.  Do
7 you remember about how tall he was?
8     A.   Not really.
9     Q.   Do you remember about, like, what his
10 body type was?  Was he thin?  Was he medium sized or
11 was he overweight?
12     A.   I didn't know I had to describe him like
13 that.  I just saw police officers.  I saw billy
14 sticks, their gun, their badges and stuff, but I
15 never knew what size and how tall.
16     Q.   I'm running through that.  If you don't
17 know, that's okay.  I'm just trying to ask you what
18 you remember about what they looked like.
19     A.   I can't describe them then and I can't
20 describe them now.
21     Q.   Let me back up.  Let me go through it one
22 by one.
23         Let's start with the black officer.  Do
24 you know whether or not he had glasses on?

Page 78

1     A.   I can't remember that.
2     Q.   Do you remember whether or not he had any
3 facial hair?
4     A.   They asked me that before and I don't
5 remember then and I don't remember now.  I just
6 remember people coming into the house.  That's what
7 I remember.
8     Q.   Were any of the officers that you saw
9 wearing a uniform?
10     A.   They were all wearing a uniform, I think.
11     Q.   What color was the uniform, if you
12 remember?
13     A.   I don't remember, but I think it was
14 blue.  I just said blue, but I don't remember.
15     Q.   Did you recognize the uniform to be the
16 uniform of a police officer?
17     A.   Yes.
18     Q.   You also said you saw badges.  Were all
19 four of them wearing a badge with their uniform?
20     A.   I can't say that all four had badges on.
21 I don't remember.  Maybe I saw one badge or
22 something, but I never did pay no attention to know
23 what was on the badge.
24     Q.   You said you remember that they may have

Page 79

1 had billy sticks.  Did all four of them have them?
2     MS. SPENCE:  Objection.  Mischaracterizes the
3 testimony.
4         Go ahead.
5 BY THE WITNESS:
6     A.   I'm saying that I don't remember looking
7 at all of them individually to see what they had on.
8 It was happening so fast and everybody was talking.
9 I'm trying to catch up to what they are saying.  I
10 know there was no gun in the house and Shawn hadn't
11 killed nobody.
12 BY MS. JOHNSON:
13     Q.   If you remember, were any of the officers
14 caring a gun?
15     A.   Were they carrying a gun?
16     Q.   Yeah.
17     A.   They had on -- they was in their uniform.
18     Q.   When they entered the house, did any of
19 the officers have their guns drawn?
20     A.   I didn't testify about having no gun
21 drawn.  I never saw them draw the gun.  They didn't
22 have no reason to draw a gun.  We wasn't violent.  I
23 let them in.  They didn't have a search warrant, but
24 I let them in.  They didn't have a search warrant

Page 80

1 and they didn't get real loud until Shawn asked them
2 about a search warrant.
3         Like he was a child and I wouldn't think
4 to ask about no search warrant.  I was getting them
5 to go out of the house.  What you come in here for?
6 After they explained what they were there for, I
7 told them there was no gun there.  Shawn hadn't
8 killed nobody.  But they still proceeded to do what
9 they were coming to do, search the house and take
10 him out of there.
11 BY MS. JOHNSON:
12     Q.   So let's back up.  Now that you got
13 that -- you said you let them in.  When you let them
14 in, where did they go?
15     A.   Upstairs.  When they heard him talking
16 upstairs.  There was no way he could get out.  He
17 had to come back down with them or back then to the
18 front to come out.  He could have gotten out the
19 window if he would have ran from them, but there was
20 no reason to run.
21     Q.   So let's back up.  So when the police
22 first knocked on your door and they were looking for
23 Shawn, did you know whether or not he was home?
24     A.   Well, he said he was going to get dressed



Page 81

1 and go out. I didn't know if he was still up the
2 stairs because I called for him two or three times
3 and he didn't answer me.
4      By that time he started coming down
5 stairs wanting to know did he hear me calling him.
6 If he's up there, he's going to answer. Sometimes
7 he don't answer and just come and say, what do you
8 want.
9      Q. Once the police got there and they said
10 they were looking for Shawn, you called up to him,
11 correct?
12      A. Upstairs.
13      Q. You said you called him about two or
14 three times but he didn't answer you?
15      A. No, he didn't answer me then. I thought
16 maybe he wasn't there. I was getting ready to tell
17 them that he wasn't there and then he came to the
18 top of the stairs, Auntie, do you want me? Did you
19 call for me?
20      By this time they knew he was up there
21 and they proceeded to go upstairs. That's when the
22 conversation started about no warrant.
23      Q. So let's back that up. Let's break that
24 down.

Page 82

1      Shawn comes to the top of the stairs.
2 When he comes to the top of the stairs, do the
3 police go upstairs to meet him?
4      A. Yes, they went on upstairs, up where he
5 was, asking was he Shawn. He said yes and I know
6 two of them went on upstairs then.
7      I went on up behind them to see what --
8 they said they were looking for a gun. I knew they
9 wasn't going to find no gun. Nobody in my family
10 have no gun like that. We have no reason to have a
11 gun. But they wouldn't listen to me at that time.
12 They wanted to search.
13      Q. So when you saw Shawn at the top of the
14 stairs, what was he wearing?
15      MS. SPENCE: Objection. Mischaracterizes the
16 testimony.
17      Go ahead.
18 BY MS. JOHNSON:
19      Q. After you called down to Shawn and Shawn
20 came down, what was he wearing?
21      A. Shorts. I remember seeing shorts and
22 that's it. I don't know if he had on socks. I know
23 he didn't have no shoes on.
24      Q. Was he wearing a shirt?

Page 83

1      A. He may have had on a T-shirt or
2 something. I don't remember that. I remember the
3 shorts and I know if they were going to take him
4 somewhere, he needed a top.
5      Q. What kind of shorts? Were they like
6 basketball shorts or boxer shorts?
7      A. Something like a Bulls set or something
8 like that. A little thin or something.
9      Q. Something like basketball shorts?
10      A. Yes, a pair of shorts like that. Maybe
11 with the Bulls, a little thin top or something. I
12 wanted him to have a shirt on and some shoes or
13 socks or he may have been cold where he was going.
14 I just wanted him to have something else on. He
15 wasn't finished dressing.
16      Q. After they go up the stairs and -- do you
17 follow them up the stairs?
18      A. Yes.
19      Q. Once you guys got up the stairs, what
20 happened?
21      A. It wasn't too much that I could see, but
22 they said they were going to search the house. They
23 started searching. I remember I had two babies
24 downstairs. I had to go back down stairs. I

Page 84

1 couldn't be up there that long.
2      Q. Did you see, did they let Shawn get
3 dressed?
4      A. That's what I'm telling you now. I
5 didn't see if they let him get dressed because I got
6 him to grab a shirt and a pair of shoes. I mean,
7 long pants and the shoes.
8      Q. So when you grabbed a long pair of pants
9 and his shoes, did you give those to Shawn while he
10 was still upstairs?
11      A. They had him handcuffed. I thought maybe
12 they would help him -- let him put the clothes on up
13 there, but the pants, long pants to go on, he could
14 put them on top of the shoes. Upstairs they didn't
15 let him do none of that. He didn't do any of that
16 upstairs.
17      Q. So they did not allow him to get dressed
18 upstairs?
19      A. No. They put him in the police car. I
20 took that to the police car and threw it in to him
21 so he could have them, to put some shoes on.
22      Q. After you get upstairs and then -- when
23 did you go back down stairs?
24      A. It wasn't long because one of the babies



Page 85

1 started crying. I had two.

2    Q.    About how long were the police and Shawn
3 still there when you had to go back down stairs?

4    A.    It wasn't too long. The whole thing
5 wasn't that long, but it seemed like forever. I
6 wasn't timing it. I can't just give you a time or
7 what all happened. That's what they did. They
8 searched and they took him out of there.

9    Q.    Let me ask you this, then. When the
10 police went upstairs to get Shawn, did they also
11 handcuff him at that time?

12    A.    They handcuffed him upstairs. When he
13 came down stairs, he was handcuffed.

14    Q.    Did you see the police actually put Shawn
15 in the handcuffs?

16    A.    No. He was handcuffed when they brought
17 him downstairs, though.

18    Q.    When they brought Shawn down the stairs,
19 what was he wearing then?

20    A.    The shorts, like I said. The same thing
21 he had on at first, shorts and maybe a little --
22 like it was summertime, like a little thin Bulls top
23 or something to match the little short set he had
24 on.

Page 86

1    Q.    So they took him down the stairs and then
2 where did they take him?

3    A.    Out to the police car and put him in the
4 car and then they come back and finished doing
5 whatever they were doing upstairs.

6    Q.    How many officers was it that took Shawn
7 to the police car?

8    A.    I don't know if it was two or the three.
9 I just saw them take him out the door on each side
10 of him. They were putting him in the car and they
11 put him in the car.

12    Q.    Was one of the black officers one of the
13 ones that put Shawn in the car?

14    A.    I can't tell you whether he's black or
15 not when they took him out of the house. I didn't
16 follow them all the way to the car because the car
17 was sitting in the alley back there. I went out
18 there to try to see the car, but I didn't see him.

19    Q.    Let me talk to you about that. What door
20 did they take Shawn out of?

21    A.    The door from the enclosed porch from the
22 kitchen. He was on the porch and then they went off
23 the porch, down the porch.

24    Q.    When they went off the porch, did they go

Page 87

1 through the gangway back towards 51st or did they go
2 around to the alley in the back?

3    A.    Went through the alley to the back.

4    Q.    Did you see them put Shawn in the car?

5    A.    I don't know if I saw them put Shawn in
6 the car now, but I know I did throw the shoes out
7 there so he get the shoes and long shirt.

8    Q.    When you took the shoes and the shirt out
9 there, did you hand the shoes and the shirt to one
10 of the police officers or were you able to give
11 those directly to Shawn?

12    A.    I was trying to give them to the officer.
13 He didn't take it. I had to just throw them through
14 the window. The window was down some and I put them
15 through the window. He would have had the shoes and
16 shirt to put on had they unhandcuffed him and let
17 him put his arms in the shirt.

18    Q.    Do you remember what the police car
19 looked like that they put him into?

20    A.    In the back seat of the car.

21    Q.    Do you remember what the car looked like?

22    A.    A red and white -- the police car. The
23 Chicago Police car.

24    Q.    Did it have like the red and the blue

Page 88

1 lights on the top?

2    A.    Yes.

3    Q.    So that's what we call -- we call them
4 marked police cars. You saw them take him out the
5 back, around to the alley and put him in a marked
6 police car; is that what I understand?

7    A.    Yes.

8    Q.    What direction did they drive off?

9    A.    Did they drive up?

10    Q.    No. Did they drive off? Once they put
11 him in the car, how many officers got into the car
12 with him?

13    A.    He was in the car by himself. They came
14 back and finished searching the house and then they
15 left. They went back out there and got in the car
16 and left.

17    Q.    Here is my question. Did all four
18 officers or all three or four officers leave at the
19 same time?

20    A.    When it all boiled down, they left around
21 about the same time. When two come from upstairs,
22 they went out the house, got in the car and left.

23        They stopped and gave me a card saying
24 where they were going to take him to and call me if



Page 89

1 they found -- if I had a gun or had any more
2 question concerning that. They left a card for me
3 to call them, but I didn't find -- there was no gun
4 I could find. It wasn't there. So I never did call
5 them.
6     Q.   Let me get back to before they did that.
7 You said that there were two of them that walked --
8 or two or three of them that walked Shawn out to the
9 car and then they all came back in to search your
10 house; is that right?
11     A.   To finish searching upstairs, yes.
12     Q.   Did they only search upstairs or did they
13 search the whole entire house?
14     A.   They searched the upstairs in the bedroom
15 part. When they left, the mattress was off the bed,
16 the drawers were pulled out, everything was dumped
17 out the drawers onto the floor, that sort of check.
18     Q.   Do you remember was it all four officers
19 that had come back into your house to search, all
20 three or four?
21     A.   I don't remember that part.
22     Q.   So once they leave your house and they
23 put Shawn in the car and they are getting ready to
24 take Shawn, how many officers get into the car with

Page 90

1 Shawn?
2     A.   I didn't see them getting in the car
3 pulling off with him because there may have been
4 other cars back there in the back. The house, you
5 can't see outside of your house and all around in
6 the back. I just saw that they put him in the car.
7     Q.   When you saw the car that they put him
8 in, were you still inside your house?
9     A.   Yes. Looking out the living room part
10 window but that faced the other garage to 1210. I
11 had to look on the side to see the front part of the
12 car still there.
13     I couldn't see who got in or out the car.
14 I ran out there to give him those shoes and shirt
15 and he was already in the car.
16     Q.   When you ran out there to give him the
17 shoes and shirt, did you have a conversation with
18 any of the police officers at that time?
19     A.   No. I, didn't have no conversation but
20 for one in the kitchen that I told that he didn't
21 have no gun and there was no way he killed nobody
22 and they said they was taking him for questioning.
23     Q.   Let me back up here. The officer that
24 you talked to in the kitchen, do you remember what

Page 91

1 he looked like?
2     A.   Just a police officer, to me, at that
3 time and right now too because when I explained what
4 I had said to him, he told me he was taking a
5 gangbanger off the street. How does he label my
6 nephew as a gangbanger. I never knew Shawn was a
7 gangbanger.
8     I said, I'm trying to tell you he's not a
9 gangbanger and he said, tell it to the judge. And I
10 never got a chance to tell no judge nothing because
11 they didn't ask me nothing.
12     Q.   Let's talk about this conversation that
13 you had with that police officer.
14     Where were you in the house when you had
15 a conversation with this police officer that you're
16 talking about right now that said something about a
17 gangbanger?
18     A.   He was coming down stairs. I guess they
19 were about ready to leave. I told him that he's not
20 a gangbanger and -- I said he hasn't killed nobody.
21 He doesn't have a gun in this house, at all.
22     He said for me to tell that to the judge.
23 I said, I will. He said that they are going to
24 thank them for getting a gangbanger off the street.

Page 92

1 He never was a gangbanger.
2     Q.   Do you know -- let me back up. Was the
3 officer that you were talking to about -- that told
4 you that Shawn was a gangbanger, was he white or
5 black?
6     A.   He was white.
7     Q.   Do you remember, was he taller or was he
8 shorter?
9     MS. SPENCE: Objection. Taller or shorter than
10 what? I don't know the comparison. Taller or
11 shorter than what?
12     MS. JOHNSON: Let me rephrase the question,
13 then.
14 BY MS. JOHNSON:
15     Q.   Do you know how tall the officer was that
16 was talking to you about Shawn being a gangbanger?
17     A.   No, I don't know how tall he was.
18     Q.   Was he taller or shorter than you?
19     A.   He's a little taller than me and I'm
20 about five-six or seven. He was somewhere between
21 that, maybe. I don't know.
22     Because I was standing next to him. They
23 were just being smart. If they're going to frame a
24 child, they going to frame --



Page 93

1    THE REPORTER: I'm sorry. I need that last
2  sentence.
3  BY THE WITNESS:
4    A.    They wasn't looking for nothing I was
5  saying. They already had made up what they were
6  going to do, take him away. I thought that they
7  would bring him back that night, but they didn't.
8  BY MS. JOHNSON:
9    Q.    Let me go back again. Where were the
10  other officers when you were having that
11  conversation with the officer who called Shawn a
12  gangbanger?
13    A.    They was probably on the enclosed back
14  porch or getting ready to go down the stairs. They
15  wasn't in there with us at that time.
16    Q.    So the officer that talked to you about
17  Shawn being a gangbanger, is that the same officer
18  that gave you his card?
19    A.    He was the last one that went out the
20  house. Whether he's the one giving me the card or
21  somebody else. As I walked to the door to really
22  lock the porch, that's when the one gave me the card
23  and said if I found anything or knew anything about
24  this case, call that number.

Page 94

1    Q.    I'm not sure that I understand your
2  answer. Do you know whether or not the person --
3  the officer that you were talking to that called
4  Shawn a gangbanger was the same officer that gave
5  you his business card?
6    MS. SPENCE: Objection. Lack of foundation.
7    Go ahead.
8  BY THE WITNESS:
9    A.    I testified that one of the officers gave
10  me a card. I don't know which one it was. I'm not
11  saying he was the one, but out of the three, one of
12  them gave me a card saying to call him.
13  BY MS. JOHNSON:
14    Q.    I just wanted to see if you could
15  identify the one that gave you the card. That's all
16  right. If you don't know, that's okay.
17    A.    No, I don't know.
18    Q.    After the officers leave, what do you do?
19    A.    Start calling my family one by one.
20    Q.    Who was the first person that you called?
21    A.    I called, I think it was Betty. Betty
22  Puffis.
23    Q.    What did you tell Betty?
24    A.    What happened so far. The whole family

Page 95

1  know Shawn couldn't have killed nobody. They told
2  me, be careful, just sit there. They will probably
3  bring him on back to me.
4    Then I called my mother. I talked to her
5  for a little while. She said to keep her posted.
6  Then I called Xcell. I had called Emma.
7    THE REPORTER: I'm sorry?
8  BY THE WITNESS:
9    A.    Xcell, that's his name. X-c-e-l-l Brown.
10  He said that all he could tell me to do was wait
11  until he come back or tell me something. I didn't
12  have nobody to call except that number I had if I
13  found a gun.
14  BY MS. JOHNSON:
15    Q.    Did you ever try and call that number
16  that the police officers had given you?
17    A.    No, I never did call the number. He told
18  me to call that number if I found a gun. I never
19  did find no gun and he didn't kill nobody so they
20  took him away. I'll wait until Shawn call me. And
21  that's what I did.
22    Q.    After you called -- after you called
23  Xcell Brown -- and that's your brother, right?
24    A.    Yes.

Page 96

1    Q.    Who did you call then?
2    A.    Who else did I call? And my uncle, I
3  think I called him and Jessa. They lived on the
4  west side at that time. It was just family members.
5  Somebody to ta k to.
6    They had him. I didn't know what to do
7  and I had these two babies. I couldn't go out
8  looking for him. I really had no idea where they
9  were going to take him. I thought they were taking
10  him to 35th and Lowe. They may have taken him to
11  26th and California because everybody asked me where
12  did he go. I have no idea.
13    Q.    Give me a second. Did you ever try and
14  call Shawn's mom?
15    A.    No, I didn't call Shawn's mother at that
16  time because she didn't have no phone. She had no
17  way of me calling her. If she had a phone, it was
18  off at that particular time. I don't remember
19  talking to her that day, at all.
20    Q.    Did any of you have mobile phones back in
21  1991?
22    A.    I had a pager then, but I didn't have no
23  mobile phone. I had a house phone at that time.
24    Q.    Do you know, did Shawn's mom have a pager



Page 97

1  then, if you know?
2      A.   I don't think she had no pager.  I had a
3  pager.
4      Q.   Let's go back really quick.  Originally
5  you said that the police officers told you that they
6  were going to take him and where they were going to
7  take him.
8           Did they ever -- I'm confused a little by
9  what you just said.  For the record, so it's clear,
10 did any police officer ever tell you where they were
11 going to take Shawn?
12     A.   No, because I thought they were taking
13 him outside to talk to him, ask him a few more
14 questions and send him back in the house.  I had no
15 idea they were going to take him away and keep him
16 that long questioning him.  He was 15 years old.
17 That's why he should have had an adult with him.
18     Q.   Did they ever -- so let's back up.  Did
19 they -- when they took Shawn, did they tell you they
20 were going to take him down -- take him somewhere,
21 at all?
22     A.   They was questioning him.  They said they
23 wanted to finish questioning him.
24     Q.   So when they first -- when they first

Page 98

1  took Shawn out of your house, were they actually
2  questioning him then?
3      A.   Not before me because they should have
4  questioned him before they took him out the house.
5      Q.   But did they ever question him before
6  they took him out of the house?
7      A.   Not to my knowledge.
8      Q.   When the police officer showed up, did
9  they ever tell you why they were there?
10     A.   They was investigating somebody had said
11 he's supposed to have been a lookout man or watchman
12 or something.  Something really silly.
13          That's what they said somebody had signed
14 a complaint saying that he was into whatever
15 happened in that front out there, killing a man.  He
16 supposed to have been a lookout man for him.  I
17 didn't know anything about a lookout man.  I thought
18 he was in the house.  I'm telling you what I thought
19 now.
20     Q.   That's what the police officer told you?
21 They told you they wanted to take him out and ask
22 him some questions about being a lookout for the
23 murder that had happened the night before; is that
24 right?

Page 99

1      A.   Yes.  I said that he wasn't no lookout
2  and he wasn't out there.
3      Q.   Did you tell the police officers that he
4  wasn't a lookout?
5      A.   Yes, I told them that.  They said for me
6  to move and let them do what they came there to do.
7  They had to still do their investigation and
8  somebody had identified him.  I mean, Shawn.  They
9  said it was Shawn.  That's why they had to take him
10 to finish their investigation.  When that was over,
11 they'd bring him back.  They did never bring him
12 back.
13     Q.   While the police were at your house, did
14 you ever see any of them strike Shawn?
15     A.   No, I didn't see them strike him.  I
16 didn't see them do no hitting or nothing.  I didn't
17 see them pull the billy stick or none of that, but
18 they took him out to the car.  He had to go with
19 them because he was handcuffed.  They did handcuff
20 him.
21     Q.   But you didn't see them hit him, kick
22 him, strike him in any way?
23     A.   No.  If they did anything, they had to do
24 it upstairs because I was downstairs.

Page 100

1      Q.   From the time they entered the house to
2  the time they left, about how long were they there?
3  The police officers, I mean.
4      A.   They wasn't there that long, but the
5  time -- I don't know what time it was because as
6  things was happening, it seemed like forever.  They
7  soon left.  How many times they stayed there, ten
8  minutes or 15 minutes, something like that, or 20, I
9  don't know.  I can't testify to that.
10     Q.   Okay.
11     A.   They were there until they finished
12 searching and doing what they had to do.  I couldn't
13 make them leave.
14     Q.   To the best of your recollection, you
15 said they weren't there that long.  It could have
16 been anywhere from ten to 20 minutes; is that right?
17     A.   That's what I would testify to.  It
18 wasn't long, but it could have been less than that
19 or maybe longer than that, but it wasn't like, oh,
20 they stayed out.  It wasn't like that.  But they
21 were there.
22     Q.   When the police officers showed up at
23 your house and they told you that they were
24 investigating this murder, did they also tell you



1 that Shawn was not under arrest at that time?

2     A.   We didn't talk about no arrest. They

3 said they was taking him for questioning.

4     Q.   Right. That's what I'm saying. Did

5 they, specifically, tell you they are going to take

6 him in for questioning and he's not under arrest or

7 they never said anything about an arrest?

8     A.   They didn't say nothing about no arrest

9 because I thought they were -- they said they were

10 investigating something somebody had told them or

11 somebody had identified him and they were going to

12 need to talk to him and set the record straight.

13     Q.   When they told you that that they were

14 going to need to talk to him because somebody had

15 identified him, what did you say?

16     A.   I called for him to come down stairs and

17 talk to these people. Come on down the stairs.

18         When he came down the stairs, they went

19 up and you got the story to that. That's all I

20 know. They didn't want to question in front of me.

21 They just said we're getting ready to bring him to

22 the police station and finish this investigation.

23         They said they were taking him to finish

24 up what they had to do. They didn't tell me nothing

1 about they were going to arrest him or they were

2 going to keep him. They didn't tell me anything

3 about it. I didn't know anything.

4         When Shawn got to the Audy Home, that's

5 when he called me. That was way the next day or so.

6 Probably the next evening or something. I had

7 almost -- it was enough to have lost everything you

8 had trying to find our way -- where did they take

9 him to. They never did call to tell me that he was

10 in the Audy Home. Shawn called me.

11     Q.   Let me back up.

12     A.   He was a teenager.

13     Q.   So let me back up really quick. Did you

14 ever tell the police that they had permission to

15 take Shawn to the police station?

16     A.   They didn't have permission from me to do

17 nothing with Shawn. They did what they did on their

18 own.

19     Q.   Did you ever tell the police that you did

20 not want to come with Shawn to the station because

21 you were tired of Shawn getting in trouble and that

22 he was on his own?

23     A.   No. Shawn have never been on his own,

24 ever.

1     Q.   That's my question. Did you ever tell

2 the police that you didn't want to come down to the

3 station with Shawn?

4     A.   No. If they said that, they put that in

5 on whatever else they made up for him going to jail.

6     Q.   Did the police ever tell you that you

7 could be present while Shawn was questioned at the

8 police station?

9     A.   No.

10     Q.   Other than the officers telling you that

11 somebody had said that Shawn was involved in this

12 murder, the shooting that happened the night before,

13 what else did they tell you about the actual

14 shooting?

15     A.   That's all they told me, that this person

16 had painted Shawn for the lookout man. That's what

17 they identified him or testified to that Shawn was

18 supposed to have been the lookout man. That's the

19 only thing I know.

20     Q.   Did they ever tell you who said that

21 about Shawn, that Shawn was supposed to have been a

22 lookout man?

23     A.   Somebody by the name of Snake. That's

24 all I know.

1     Q.   So that's my question. When the police

2 were at your house that day, did they actually tell

3 you that somebody named Snake had accused Shawn of

4 being a lookout man for the murder that had happened

5 the night before?

6     A.   None say he was involved. The police

7 didn't tell me somebody told them he was involved.

8 They said that -- they had testified that Shawn was

9 a lookout man or something and I was trying to tell

10 them Shawn couldn't have been out there. He was

11 looking out for nobody because he was in the house.

12     Q.   Let me back up, then. You said that they

13 testified. I'm not talking about anything that the

14 police officers would have said at court or in a

15 deposition. Nothing like that.

16         I'm just talking about what they told you

17 when they were at your house that day in September

18 of 1991. Okay?

19     A.   That they had to question him to finish

20 their investigation.

21     Q.   And other than the police officers

22 telling you that they had to question Shawn to

23 finish their investigation, did they give you any

24 other information about the actual shooting itself?

1    A.   No.  Nothing that I know of.  Nothing
2  that I can think of now that they told me except
3  that they had to take him for questioning.
4    Q.   I understand now.  If you remember,
5  actually, was Shawn still handcuffed when the police
6  officers put him in the car?
7    A.   Yes.  They never take the handcuffs off
8  him once they put them on upstairs.  I never did see
9  him out of the handcuffs.
10   Q.   Earlier you said you didn't actually see
11  the police officers put the handcuffs on Shawn but
12  you assume -- are you assuming that they did it
13  upstairs?
14   A.   They had to do it upstairs because I
15  would have saw him downstairs.  I was downstairs in
16  the living room.  There's no way to go in and out.
17  There's no way to close the door.  I was in the
18  living room.  When he came down the stairs, he was
19  still in the handcuffs.
20   Q.   After they put Shawn in the car, you said
21  that that car was parked in the alley.  Which way
22  did they take -- which way did they drive off?
23   A.   Which way did they drive off the car?
24  They just kept straight on through the alley.  The

1  car was parked right behind the garbage can facing
2  the street on the Elizabeth side.  That's the way
3  they went out.
4    Q.   The car when it was parked back in the
5  alley was facing towards Elizabeth?
6    A.   Yes.
7    Q.   And Elizabeth is actually -- correct me
8  if I'm wrong, Elizabeth is -- would be -- my gosh,
9  my directions.  Elizabeth would be, if you're in the
10  front of your house staring back towards the alley,
11  Elizabeth would be to your left?
12   A.   To my left?
13   Q.   Right.  So if you're facing the alley,
14  you're standing from --
15   A.   Right.
16   Q.   So if your back is towards 51st Street
17  and you're facing the alley, the back alley,
18  Elizabeth would be on your left-hand side; is that
19  right?
20   A.   Yes.
21   Q.   I understand now.  And then if you're the
22  same direction, Racine is the cross street towards
23  the right, right?
24   A.   Yes.  Racine.

1    Q.   I understand.  I understand now.
2        You said the cop car drove off towards
3  Elizabeth and then after it drove off towards
4  Elizabeth, did you see it again?
5    A.   No.
6    Q.   So you said after that you made several
7  phone calls.  We talked about all the people that
8  you called.  You said you didn't try and call
9  Shawn's mom because she didn't have a phone; is that
10  right?
11   A.   She didn't have a phone at that
12  particular time.  She didn't have a phone.  But she
13  got word of it.  She was back with the family once
14  she heard about it, but she wasn't there when they
15  arrested him.
16   Q.   Do you know -- strike that.
17       About how long after Shawn was arrested
18  did his mom hear about it?
19   MS. SPENCE:  Objection.  Calls for speculation.
20       Go ahead.
21  BY THE WITNESS:
22   A.   I'm saying, I don't know what time or how
23  long, but I think she --
24

1  BY MS. JOHNSON:
2    Q.   Let's talk about this.  After Shawn was
3  arrested, did his mom ever contact you?
4    A.   Yes.  Later on.
5    Q.   When she contacted you, was it later on
6  that same day after he was arrested or sometime
7  later?
8    A.   Sometime later.
9    Q.   Do you know whether or not it was a
10  couple of days later or about a week later?
11   A.   No.  Just about a day or so because it
12  was there before I knew where he was.
13   Q.   When she contacted you a day or so later,
14  what did you tell her?
15   A.   That he was in the Audy Home and maybe
16  they were just going to keep him a minute or
17  something.  I didn't know what.  I've got to go out
18  there.
19       When I made it to the Audy Home, it was
20  the same thing.  He didn't know.  He was just there
21  too until I got a chance to talk to somebody on the
22  staff there.  Nobody called me from the Audy Home
23  either.
24   Q.   Let me go back.  When she called you to



Page 109

1 talk to you about that, about Shawn being arrested,
2 what did she say to you?
3    A.   Did I know what happened.  Yeah, I know
4 what happened.  Shawn had did nothing.
5    Q.   Did you tell her why he had been
6 arrested?
7    A.   Yeah.  I told her everybody say he had
8 killed a man on the front.  They didn't say he was
9 the one that killed him.  They was saying he was the
10 lookout man for whoever the other people were.
11        But Shawn said he wasn't in no gang.  He
12 wasn't no lookout man.  I don't know where that came
13 from, but that's what they say.
14    Q.   Let's back up.  After the police, that
15 same day after the police left your house with
16 Shawn, did you go and talk to anybody in person?
17    A.   I just talked to them on the telephone.
18 When I found out something, I will call you back.
19 If somebody picked me up, I wasn't driving at the
20 time and I had to have a baby-sitter too.  I was at
21 the house.  If they want to know anything, they
22 called me.  I didn't know anything to tell them
23 except he was going to jail.
24    Q.   I understand, but here is my question.

Page 110

1 So the same day after the police left your house
2 with Shawn, did you go and try and talk to anybody
3 about it in person?
4    A.   No.
5    Q.   Everybody that you talked to after the
6 police took Shawn was over the phone?
7    A.   Yes.  Remember, I had no other number but
8 the number that the police gave me to call them if I
9 found a gun.  I ain't found no gun.  So I had to
10 wait until Shawn called me to tell me where he was.
11    Q.   So when you were making all those phone
12 calls right after the police had taken Shawn, did
13 you ask anybody that you talked to if they knew
14 anything about the shooting that had happened?
15    A.   Yes.  I asked if they heard anything or
16 had they called them.
17    Q.   What did they say to you?
18    A.   They were waiting on me to get back with
19 them.
20    Q.   Did they tell -- did anybody that you
21 talked to that day after the police took Shawn, did
22 they have any information to give to you about the
23 shooting?
24    A.   No.  They didn't know anything about any

Page 111

1 shooting.
2    Q.   That same day, we're talking about the
3 day that Shawn was arrested, at some point did the
4 police call you?
5    A.   No.
6    Q.   They never called you that day?
7    A.   Never called me that day.  No other day.
8 No time ever.
9    Q.   Let me show you this, then.  Do you
10 remember testifying --
11    A.   Yeah, I testified to it on -- this
12 happened in September.  In November is the first
13 time I testified.
14        They hadn't called me then, but I was
15 thinking maybe they went through some paperwork.  My
16 man told me that the city had called because that's
17 what a person would do that's 15 years old.  I
18 didn't want to say no and something else go wrong.
19        I was thinking they were going to let him
20 come to me.  Had I known it was going to be 20 years
21 or more for a mistake that he did this or he did
22 that, I wanted some adult to speak up for a
23 15-year-old.  I said yeah, they called me.
24        I'm telling you now -- the first time I

Page 112

1 testified they did, but they didn't call me never.
2 I'm saying now that they never called me.
3    Q.   Give me a second.
4        Do you remember testifying, and it would
5 actually be November 18th of 1993, you testified in
6 court about what happened that day when Shawn was
7 arrested.  Do you remember that?
8    A.   Yes.
9    Q.   You're telling me now that when you
10 testified that the police called you that day, that
11 was a lie?
12    A.   I told them and I straightened it out to
13 Russell why I said that they called because I was
14 thinking they would call me later, but they never
15 did call me no time, ever.  I never got a call from
16 them in any kind of way.
17    Q.   So that's what I'm saying.  What you're
18 saying is, your testimony back in 1993 was that the
19 police had called you, that was not true.  That was
20 a lie?
21    A.   Yes, that was not true.
22    Q.   That day on September 16, 1991, did you
23 ever try and go down to the police station to see
24 Shawn?



Page 113

1   A.   No.
2   Q.   Why didn't you try and go down to the
3 police station to see him?
4   A.   I had two babies in the house.  No
5 transportation.  I had to wait for my daughter to
6 get off work to get her baby and I also had Antonio.
7       I wasn't taking him to the police station
8 and I didn't know where I was going.  I'm testifying
9 that I didn't know where he was.
10   Q.   So back up.  Back in 1991 you didn't have
11 a car?
12   A.   No.  I had my friend's car, maybe.  I
13 didn't have a car of my own.
14   Q.   In September 1991 if you needed to go
15 somewhere, would you have had access to a car?
16   A.   Not all the time.  I would call for
17 somebody in the family to pick me up.  If this one
18 can't go, call that one until you get somebody to
19 come and get you.
20   Q.   So after Shawn was arrested, did you ever
21 call anybody and ask them to take you down to the
22 police station to try and find out what happened to
23 Shawn?
24   A.   No.

Page 114

1   Q.   Did you ever -- after Shawn had been
2 taken by the police from your home, did you ever
3 receive a phone call from him that day?
4   A.   Not that day, no.
5   Q.   When was the next time after Shawn had
6 been taken from your home on September 16th, 1991
7 that you talked to Shawn?
8   A.   I think it was that Tuesday evening.  He
9 called me -- if they come to the house that Monday,
10 it was the next day in the evening.
11   Q.   He called you the next day, so that would
12 be September 17th, 1991?
13   A.   Yes.  The next day in the afternoon.
14   Q.   He called you in the afternoon.  What did
15 he say to you when he called you?
16   A.   That he was at the Audy Home.  I could
17 visit him at the Audy Home.  I want to know what
18 happened.  He said he will tell me when I got there.
19       When I got there, then he told me so much
20 other stuff.  You know, how they beat him and
21 threatened to throw him out the window.  A whole
22 bunch of stuff.  I could never know if that was true
23 or not because they say they lost the pictures and
24 stuff that they had on that.  I'm still lost at

Page 115

1 that.
2   Q.   Hold on.  Let me back up really quick.
3 We'll get to the pictures in a second.  Give me a
4 second.  You're jumping ahead of me.
5       So when Shawn called you on September 17,
6 1991, he told you that you could come pick him up,
7 right?
8   A.   No.  I could come and visit him.  He had
9 to stay in the Audy Home for a minute.  I said, how
10 long.  He said he would tell me when I got there.
11   Q.   Did you go visit him that day?
12   A.   I couldn't visit him that day, no.  I
13 don't think I went that day.  I had to make
14 arrangements to go.
15   Q.   When he told you that you could come and
16 visit him, when was the next time that you actually
17 saw him in person?
18   A.   From that time until -- it's been so long
19 because I know I visit him as soon as I could.  It
20 wasn't that Monday or Tuesday.  I think it was
21 like -- it might have been Tuesday night.  I don't
22 know for sure, but I saw him whenever I could see
23 him.
24   Q.   Let's walk back there.  So you said that

Page 116

1 he called you from the Audy Home on September 17th
2 in the afternoon, right?
3   A.   Yeah.  He said they took him to the Audy
4 Home.
5   Q.   And then September 17th, that would have
6 been a Tuesday?
7   A.   Uh-huh.
8   Q.   You said you couldn't go visit him on
9 Tuesday but you went sometime later, right?
10   A.   I may have went that Tuesday, but when I
11 went, whatever time and what all he said they had
12 did to him, I didn't see very many bruises I ke
13 you're really messed up because he had time maybe to
14 heal or maybe on his clothes I didn't see.  I didn't
15 see no bruises at that particular time.  I'm not
16 saying that nothing that he told me happened.  I'm
17 saying I didn't see them.
18   Q.   All right.  If you can tell me, was it
19 within that same week that you went to visit him?
20   A.   Yes, it was that same week.
21   Q.   You're not sure whether or not it was the
22 night of the 17th or sometime later?
23   A.   It may have been the night -- whenever he
24 got to the Audy Home, I went that night to see him



1 because I want to see what he looked like. He's
2 gone from me this long now, I need to see him.
3     Q.   Fair enough. So then when you got to the
4 Audy Home, how did you get there?
5     A.   Somebody came and picked us up and took
6 us over there. I think it was Louis, a friend of
7 mine. I think it was him that took me out there.
8     Q.   About how far away from your -- when
9 Louis took you out there, were you at home when he
10 came to pick you up to take you to the Audy Home?
11     A.   Yes.
12     Q.   About how far away from your home is the
13 Audy Home?
14     A.   1212 West 51st Street and the Audy Home
15 is over on Roosevelt. 12th Street and Roosevelt, I
16 think.
17     Q.   How long did it take you -- I'm assuming
18 he came and picked you up in a car, right?
19     A.   Yes.
20     Q.   When I say "he," I mean your friend Louis
21 picked you up in a car. How long did it take you
22 from the car -- in the car to get from your home to
23 the Audy Home?
24     A.   Not long.

1     Q.   Was it more or less than ten minutes?
2     A.   More than ten minutes. Maybe about 15 or
3 20. Maybe 30. I don't know.
4     Q.   When you got to the Audy Home, then what
5 happened?
6     A.   You sign in and you go and visit him. I
7 sat there and talked with him.
8     Q.   When you sat there and talked with him,
9 was it -- were you able to talk with him face to
10 face or did you have to talk with him through like
11 some type of glass or --
12     A.   I talked to him face to face.
13     Q.   When you talked to him at the Audy Home,
14 was he handcuffed at that time?
15     A.   No.
16     Q.   Do you remember when you spoke with him
17 at the Audy Home, what was he wearing?
18     A.   I can't remember what he was wearing, but
19 it was something that he had on from when he was
20 arrested because he didn't have no other clothes up
21 there.
22          That's why I had to get there, to take
23 him some different stuff. I had to bring him more
24 clothes or something. They may have Audy Home

1 clothes for him, but they didn't tell me. He asked
2 me to bring him some.
3     Q.   Let me back up. When you saw him at the
4 Audy Home that first time, was he in the same
5 clothes as he had been in the day that he was taken
6 from your home?
7     A.   Now that, I don't know.
8     Q.   So then you said that you were able to
9 talk to him face to face. You didn't have to talk
10 to him through glass or anything?
11     A.   No. It was a visit. You go sit down and
12 talk to him at a table. If you had something,
13 snacks or something you want to eat with him, you
14 could do that. We played card games like we had
15 been doing. It was just like he was waiting for
16 them to let him go home.
17     Q.   Did you actually give him some snacks?
18     A.   And it was like -- I don't know if we had
19 snacks that night or not. It was like he thought he
20 was coming home too soon.
21     Q.   Let's back up. Once you got to the Audy
22 Home, you signed -- you had to sign in, right?
23     A.   To visit, yes. It's like a visit.
24     Q.   And then where did you go to go actually

1 have your visit with Shawn?
2     A.   Upstairs in the Audy Home. There's a big
3 lounging room that the family go in. You sit at
4 this table. So you could see other people visiting.
5 They're visiting your children.
6     Q.   I'm sorry. You may have said this and I
7 don't remember. Where was -- do you remember the
8 location of the Audy Home back in 1991?
9     A.   The location I know was upstairs. You
10 went in the Audy Home, you go upstairs. They had
11 like a big room that you visit in. I don't know
12 what floor it was on, but I know I can remember
13 going upstairs. When I got up there -- I did have
14 to wait until they seat me and then they got and
15 brought him over there.
16     Q.   Let me back up. I'm talking about the
17 actual physical location. Do you know like was it
18 at -- the cross streets of where the Audy Home was
19 located in 1991?
20     A.   I thought it was on Roosevelt.
21     Q.   Roosevelt and what's the cross street?
22     A.   Oh, my God. Let me see.
23 MS. SPENCE: Objection. Calls for speculation.
24

Page 121

1 BY THE WITNESS:

2     A.    I know Audy Home.  It's still the same
3 Audy Home.

4 BY MS. JOHNSON:

5     Q.    Where it is today it was back then?

6     A.    I think so.

7     Q.    Once you sat down to talk to Shawn, what
8 did he tell you?

9     A.    About what they did to him.  How they
10 told him he could go home.  Let him stay outside on
11 a bench there.  The first officer that took him away
12 from me said that he could go home but he had to
13 wait.  While he was sitting there and they had him
14 not fed, he said he was tired and half speaking.
15 Some more officers come and picked him up and
16 carried him someplace else and that's when the one
17 said he had drugs on him.  He had to stay there for
18 a while.  That's when they said he better say he did
19 this, he did that or they will throw him out the
20 window.  A whole bunch of stuff.

21     Q.    That's what I'm trying to understand.  I
22 don't mean to cut you off.  I'm trying to get
23 specific with what you remember that Shawn told you
24 about how he was treated by the police.

Page 122

1     A.    Yes.

2     Q.    So let's back up.  So first you said some
3 police officers told him that he could go home?

4     A.    He said the first one that he left there
5 with, from my house with, told him that he was free
6 to go.  He didn't have nowhere to go to.  He had
7 nowhere to go so they set him on a bench to wait for
8 somebody to pick him up.  Well, he hadn't called me.
9 He said he sat there a few minutes and somebody else
10 come and grabbed him up and took him someplace else.

11     Q.    Did he tell you where they took him?

12     A.    He told me someplace else, but I don't
13 know where that place was.  But he still wind up
14 back at the Audy Home when he could have came home
15 if somebody had picked him up when they first let
16 him sit on this bench.

17     Q.    Let me back up, then.  The first one that
18 he left the house with told him that he was free to
19 go, but he didn't have -- if -- well -- strike that.
20 Let me try it again.  Sorry.  There's a lot you said
21 there so I'm trying to follow up.

22           He said that he was waiting for somebody
23 to pick him up and somebody else came and took him
24 somewhere else.  What happened after that someone

Page 123

1 came and took him somewhere else?

2     A.    Said they searched him and found drugs on
3 him and they were charging him with being in
4 possession of some sort of drugs.  I don't know if
5 it's marijuana or what, but he said some drugs.

6           I know they searched him.  They searched
7 him when they took him from my house.  He couldn't
8 have had no drugs.

9     Q.    Let me back up, then.  How do you know
10 that they searched him when they took him from your
11 house?

12     A.    They searched him up the stairs.  He told
13 me that they searched him and he had on some shorts
14 with no pockets so where did he have to put any
15 drugs.  I had thrown him some shoes.

16           If he had socks on or something, maybe.
17 I don't know about that.  He said they said they
18 found drugs on him, but he didn't have no drugs on
19 him.  How many times you going to search a young
20 guy.

21     Q.    Let me back up, though.  Were you present
22 and you personally saw the police search Shawn at
23 your home?

24     A.    I couldn't see if they searched him or

Page 124

1 not at the house.  He didn't have nothing to search.
2 He had a pair of short pants with no pockets to
3 them.

4     Q.    When you got to the Audy Home, Shawn told
5 you that they had searched him and found drugs on
6 him?

7     A.    He said that's what they told him.  When
8 they got him off that bench and took him somewhere
9 else, they said they searched him and found drugs on
10 him.  Shawn said they didn't search him.  That's
11 what they told him, that he had to stay there.

12     Q.    And then -- so after Shawn told -- after
13 Shawn told you that they had searched him and found
14 drugs on him, what did he say next?

15     A.    That he had to stay and wrestle with them
16 guys he said for a minute.

17     THE REPORTER:  I'm sorry.  Say it again.

18 BY THE WITNESS:

19     A.    He said he had to stay there with them
20 until they finished doing what they were doing
21 before they took him to the Audy Home.  The first
22 set said he could go and then another set got him.

23           That's when he told me they were
24 threatening to throw him out the window and he had



1 to sign this and sign the other before they took him

2 to the Audy Home.

3          When they took him to the Audy Home, I

4 think they had everything they wanted to read up on

5 him.

6 BY MS. JOHNSON:

7     Q.    Let me back up.  You said that Shawn told

8 you that he had to stay and wrestle with them guys

9 for a minute.

10    A.    Another set of officers.

11    Q.    You told -- you said that Shawn told you

12 that a different set of officers than the ones that

13 had found the drugs --

14    A.    No.  A different set of officers that

15 took him from the house said that he could go and

16 they was getting off work, but he didn't have

17 nowhere to go but sit on the bench and another set

18 came and got him and took him someplace else and

19 those officers were the ones that said he had drugs

20 on him.

21    Q.    And then --

22    A.    Shawn said he never had no drugs.  He

23 said, you know they said I had some drugs.  I know

24 he had been searched and there were no drugs when

1 you left my house.  Where were you going to get some

2 drugs from at the police?

3     Q.    I understand.  Did Shawn tell you

4 anything else about the way that he was treated at

5 the police station by any of the police officers

6 besides what you just told me?

7     A.    Just said that they would feed him if he

8 cooperate and sign some papers and they would soon

9 let him go.  He said he was terrorized saying what

10 they are going to do, hitting him and threatening

11 him until maybe he signed the papers.  Signed

12 whatever they told him to sign or recopied what they

13 wrote down for him to rewrite or something.  His

14 confession.

15    Q.    Did he --

16    A.    It was supposed to be his confession.

17    Q.    Did he tell you where they hit him?

18    A.    He said they choked him too.

19    Q.    All right.  So --

20    MS. SPENCE:  What was the answer?  He said

21 they...?

22    MS. JOHNSON:  Choked him too.

23 BY THE WITNESS:

24    A.    Hit him and choked him and said they are

1 going to throw him out of a window.

2 BY MS. JOHNSON:

3     Q.    Did he tell you the name of the police

4 officer that hit him or -- excuse me.  Let me try

5 that again.

6          Did he tell you the name of the officer

7 or officers who hit him, choked him and threatened

8 to throw him out of a window?

9     A.    If he told me the officer's name, I'm

10 saying I don't remember no officer's name.  I don't

11 remember if he told me the name.  He said they.

12    MS. SPENCE:  Brittany, can we take a break at

13 any point maybe for some food, just for a little

14 bit?

15    THE WITNESS:  My computer --

16    MS. SPENCE:  Your computer is going to die?

17    THE WITNESS:  Yes.  It's got 13 percent.

18    MS. SPENCE:  Can we go off the record?

19    MS. JOHNSON:  Let's go off the record and take

20 a break for lunch.

21    THE VIDEOGRAPHER:  This marks the end of Media

22 No. 3.  The time is 12:58 p.m.  We are off the

23 record.

24          (Recess was had for lunch.)

1     A F T E R N O O N   S E S S I O N

2     THE VIDEOGRAPHER:  I'm Matthew Miller and I'm

3 the videographer.  This marks the beginning of Media

4 Unit No. 4.  The time is 2:07 p.m.  We are on the

5 record.

6 BY MS. JOHNSON:

7     Q.    Ms. Jakes, can you hear me?

8     A.    Yes.

9     Q.    I think when we left off, we were talking

10 about your visit with Shawn when he was at the Audy

11 Home.  I want to finish with that and ask you a

12 couple questions.

13          During your visit with Shawn at the Audy

14 Home, did he ever talk to you about the shooting

15 itself?

16    A.    No.

17    Q.    Did you tell Shawn the name of anyone

18 that may have information about the shooting when

19 you talked to him at the Audy Home?

20    MS. SPENCE:  Objection.  Lack of foundation.

21          Go ahead.

22 BY THE WITNESS:

23    A.    No.

24



Page 129

1 BY MS. JOHNSON:
2    Q.   Did you ever tell Shawn at any time that
3 Denise Harris may know who the killers were?
4    MS. SPENCE:  Objection.  Lack of foundation.
5    Go ahead.
6 BY THE WITNESS:
7    A.   I didn't know if she had information, no.
8 BY MS. JOHNSON:
9    Q.   While you were at the Audy Home, what
10 else did he tell you about the way that the officers
11 had treated him when he was at the police station?
12    A.   Not giving him no food.  No water.
13 Threatening him to sign and they would get him out
14 of there as soon as he signed and rewrites what they
15 told him to write.  He was tired and he just wanted
16 to go so he told them he would sign.
17      That's where he got from there to the
18 Audy Home is when he signed some papers or something
19 they wanted him to sign.
20    Q.   Let me back up.  Did he tell you that he
21 signed the papers that the police officers wanted
22 him to sign at the Audy Home?
23    A.   No.  Before he went to the Audy Home.  He
24 signed whatever they asked him to do and then they

Page 130

1 took him to the Audy Home.
2    Q.   Do you know what papers it was that he
3 signed?
4    A.   No.  It just said he may have been the
5 lookout man.  All I can remember is something about
6 the lookout man.
7    Q.   Did Shawn ever tell you during your visit
8 with him at the Audy Home that the police officers
9 forced him to sign a confession?
10    A.   He told me they forced him to sign and he
11 did sign something saying he was the lookout man.
12    Q.   Did you ask him whether or not he was
13 actually a lookout man?
14    A.   I asked him.  Of course I did.  He said
15 he didn't have nothing to do with that.  But he said
16 he signed what they asked him to sign.  It had to be
17 that he signed that he did say he was the lookout
18 man.
19    Q.   Did he tell you why he signed that even
20 though it wasn't true?
21    A.   I guess he's 15 years old.  You'd have to
22 ask him.  He explained to me that he was hungry, he
23 was tired and they were talking about pushing him
24 out the window and they were choking him.  A lot of

Page 131

1 stuff that he told me like abusing him to make him
2 sign those papers.
3      If they said they were going to give him
4 something to eat, he hadn't had anything to eat that
5 day until later in the evening.  Maybe he thought if
6 he signed, he was going to get something to eat.  I
7 don't know why he did, but that's what he told me he
8 did.  He signed whatever they asked him to sign or
9 he said whatever they wanted him to say and they got
10 him out of there until they do the investigation.
11    Q.   Did he tell you what the officers told
12 him to say?
13    A.   They wrote down what they wanted him to
14 say and wanted him to repeat what they wrote down
15 and that's what he repeated and copied over what
16 they had wrote down including the wrong name.
17    Q.   When you say that he told you he wrote
18 down the wrong name, which wrong name are you
19 talking about?
20    A.   He didn't write his name.  They had
21 signed his name as something -- whatever he signed,
22 they told him to copy it down and sign at the
23 bottom.
24      So he signed his name at the bottom, but

Page 132

1 whatever they had wrote up in the middle wasn't his
2 name.  But I never did see that because they said
3 they had misplaced all that.
4    Q.   Wait.  Your video cut off.
5    A.   It says 5 percent.  It's going to close.
6 It said battery low and close.  It's 5 percent now.
7 It say it's charging, but it's not charging.
8    MS. SPENCE:  Let's go off the record, then.
9    THE VIDEOGRAPHER:  That's the end of Media No.
10 4.  The time is 2:12 p.m.  We are off the record.
11      (WHEREUPON, a recess was had.)
12    THE VIDEOGRAPHER:  This marks the beginning of
13 Media No. 5.  The time is 2:40 p.m.  We are on the
14 record.
15    MS. JOHNSON:  Just for the record, we can no
16 longer see the video but we do have audio for
17 Ms. Jakes.
18      Ms. Jakes, I just ask that since we can't
19 see you, make sure you're in the room by yourself.
20 We'll put you on your own recognizance that you're
21 still in the room by yourself and you're not looking
22 at anything you're not supposed to look at; is that
23 fair?
24    THE WITNESS:  Okay.



1 BY MS. JOHNSON:

2    Q.   Going back to your visit with Shawn at

3 the Audy Home, do you remember about how long that

4 was?

5    A.   The visiting hours, I think, was maybe an

6 hour.

7    Q.   While you were there did you ever discuss

8 getting an attorney with Shawn?

9    A.   We talked about it just a little bit

10 because at that particular time I didn't have money

11 to afford an attorney so they gave us a public

12 defender.

13    Q.   Did you know at the time when you went to

14 go visit Shawn at the Audy Home who the public

15 defender would be?

16    A.   No.  Would you give me just five minutes

17 to let the dog out?

18    Q.   Okay.

19    A.   Maybe less than that.  I'm opening the

20 door.

21       THE VIDEOGRAPHER:  Go off the record or wait?

22       MS. JOHNSON:  I think we can wait.

23 BY THE WITNESS:

24    A.   I'm back.  You wanted to ask me what?

1 BY MS. JOHNSON:

2    Q.   I just wanted to ask you, I think we were

3 talking about -- and I can't remember.  We've had so

4 many breaks so I apologize if I'm repeating myself.

5    A.   I'm sorry about that.  You were talking

6 about at the Audy Home something about a lawyer or

7 public defender.

8    Q.   Right.  So then -- what else did you talk

9 about with Shawn while you were at the Audy Home?

10    A.   We was talking about everything that

11 happened to him.  He couldn't show me a lot of

12 bruises and things from the time I saw him from when

13 they took him from my house, but he did tell me

14 there were bruises.  I guess they were gone.  I

15 didn't see them.

16    Q.   And then -- so after he told you about

17 how the police treated him, what else did he tell

18 you?

19    A.   That everything was laid up and somebody

20 named Snake said a lie and they are goin on what

21 Snake said and Snake supposed to have been the one

22 that shot him.

23       He was telling me a lot of different

24 stuff like that, but I don't know who Snake was and

1 if Snake lied like that.  Why would you --

2    Q.   Let's back up really quick.  Let's talk

3 about what Shawn told you that Snake had said.

4       What exactly did Shawn tell you that

5 Snake had told the police officer about Shawn?

6    A.   That he was supposed to have been the

7 lookout man.

8    Q.   What did Shawn tell you about Snake?

9    A.   He told me Snake was lying and Snake was

10 the one supposed to have been -- did the shooting

11 because he didn't know anything about the shooting.

12    Q.   Why did Shawn tell you that Snake was

13 supposed to have been the one that did the shooting?

14    MS. SPENCE:  Objection.  Calls for speculation.

15       Go ahead.

16 BY MS. JOHNSON:

17    Q.   If you know.

18    A.   I don't know.  I guess he had people that

19 he was talking to now, but I don't know who it was.

20 He didn't tell me who told him.  It was like

21 hearsay.

22    Q.   When you say he had people who were

23 talking to him, are you talking about Shawn?

24    A.   Shawn probably talked to somebody.  I

1 don't know because nobody told me anything.  I got

2 my information from Shawn.  He said that Snake

3 started it, saying that he was a lookout man.  He

4 ain't looked out for nothing.

5    Q.   When you say that Shawn told you that

6 Snake had started it saying that he was the lookout

7 man, you mean that Snake started it by saying that

8 Shawn was the lookout man?

9    A.   That's the understanding, yes, that Shawn

10 told me that Snake told him that he was supposed to

11 have been the lookout man.  That's what Snake had

12 told the police, the reason why they came and got

13 him.

14       I want to know why they would pull up to

15 my house to get him or a gun and not question me.

16 They questioned Shawn.

17    Q.   So did Shawn also tell you that Snake was

18 the one who was supposed to have been the shooter?

19    A.   That's what he told me at that time when

20 I visited him, that Snake was the one that was

21 supposed to have did everything.

22       Later on somebody else did the shooting.

23 They had a record of who did the shooting.  I never

24 knew who that was.  I don't know anything, but Snake



1 supposed to have been the one saying that Shawn was
2 supposed to have been the lookout man.
3      That's the only thing I know they would
4 have had him for, that he's supposed to have been
5 the lookout man for somebody.  But I found out all
6 that was just lies.
7    Q.   You said that later on you found out that
8 there was somebody else that was supposed to have
9 done the shooting.  Who did you find out later on
10 that was the other person that was supposed to have
11 done the shooting?
12   A.   But I don't know his name.  I don't know
13 nobody else's name but Snake.  I didn't know any of
14 them.
15   Q.   So then other than what you just told me,
16 did Shawn tell you anything else about the way that
17 the police treated him or anything about the
18 shooting itself?
19   MS. SPENCE:  Objection.  Form.
20      Go ahead.
21 BY THE WITNESS:
22   A.   No.
23 BY MS. JOHNSON:
24   Q.   You've told me everything that you know

1 with regards to what Shawn told you at the Audy Home
2 about the shooting or about the way that the police
3 had treated him, correct?
4   A.   Yes.  Correct.
5   MS. SPENCE:  Objection.  Form.
6 BY MS. JOHNSON:
7   Q.   After you guys talked about that at the
8 Audy Home, what else did you do?
9   A.   When I left Shawn, I went back home.
10   Q.   After you left Shawn to go back home, did
11 you call anyone and talk to them about the things
12 that Shawn had told you?
13   A.   Yes.  I told the family what Shawn had
14 told me and there still wasn't anything we could do
15 until we talked to somebody and ain't nobody ever
16 gave me a number that said I could talk to them.
17 Nobody answered the number.  I never did talk to
18 nobody but my family.
19   Q.   Did you ever try and contact the police
20 and tell them about what you had learned with
21 respect to Snake being the actual shooter?
22   A.   No.
23   Q.   Did you ever talk to Shawn's criminal
24 defense attorney and tell him what you knew with

1 respect to Snake being the shooter?
2   A.   No.
3   Q.   Other than family, did you tell anyone
4 else what Shawn had told you about Snake being the
5 shooter?
6   A.   No.  Just the family.
7   Q.   When you say "just the family," I know
8 you have a lot of family, but can you remember who
9 you told from your family about that information
10 with respect to Snake being the shooter?
11   A.   All of my sisters and my mother and I
12 think I had two brothers I talked to, the two that's
13 living in this area, Xcell.  The rest of them, they
14 wouldn't know but just y'all take care.
15   Q.   Did you tell -- I'm sorry.  I didn't mean
16 to cut you off.  Did you tell -- I'm sorry.  I can't
17 see you so I can't tell when you're about to start
18 talking.  I apologize.  Go ahead and finish your
19 answer.
20   A.   But I didn't hear the question.
21   Q.   All right.  Did you tell Shawn's mom
22 about what Shawn had told you with respect to Snake
23 being the actual shooter?
24   A.   Yes.  Everybody around in that

1 neighborhood was known the same thing, yes.  I told
2 her what Shawn had told me.  We waited and we waited
3 and I kept visiting thinking he was going to get out
4 and then he went from one thing to another.  They
5 just kept building the case up on Shawn.
6   Q.   After that first visit you had with Shawn
7 at the Audy Home, when was the next time that you
8 saw Shawn in person?
9   A.   Back at the Audy Home.  I visited him at
10 the Audy Home for about three or four years.  When
11 he left the Audy Home, they put him in 26th and
12 California and I visited him there.
13   Q.   Is it your understanding that Shawn was
14 held at the Audy Home for three or four years after
15 he was arrested?
16   A.   Yes.  He had to stay at the Audy Home.
17 They kept him at the Audy Home.  He wasn't but 15
18 and they kept him there until he got 17 or 18.  They
19 was going to put him in the Audy Home.  I mean, they
20 were going to put him in 26th and California with --
21 you know you're going to prison and you're not a
22 teenager.  You're an adult now.  I think when he got
23 18.
24   Q.   Just so I understand you correctly, he



Page 141

1 was at the Audy Home for three to four years until
2 he turned about -- until he became an adult and then
3 they transferred him to the prison at 26th and
4 California in Chicago?
5     MS. SPENCE: Objection. Mischaracterizes the
6 testimony.
7 BY THE WITNESS:
8     A. Yes.
9 BY MS. JOHNSON:
10    Q. I'm sorry. I didn't hear your answer.
11 Did you say yes?
12    A. Yes.
13    Q. After he was transferred from the Audy
14 Home to 26th and California, did you continue to
15 visit him?
16    A. Yes. And when I visited him there, there
17 was a partition. I couldn't touch him. I had to
18 pick up a phone and talk to him through the phone.
19        I wasn't able to sit. We couldn't play
20 cards at 26th and California. We talked until our
21 time was up and then they took him back.
22    Q. In the three or four years that Shawn was
23 at the Audy Home, about how many times per week
24 would you go and visit him, if you know?

Page 142

1     A. Sometimes once a week. Starting out once
2 a week. Or if I could visit him more, something
3 happened, sometimes he wouldn't be just right and
4 they would call me for something, I guess. He
5 wouldn't participate or mad about something and I
6 couldn't see why he was so mad, but he was mad
7 because he was in there and nobody wanted to try to
8 help him get out. He wanted to get out.
9     Q. Let's talk about that really quickly.
10 You said that people from the Audy Home would call
11 you and talk to you about how Shawn wasn't
12 participating?
13    A. No.
14    MS. SPENCE: Objection. Mischaracterizes her
15 testimony.
16        Go ahead.
17 BY MS. JOHNSON:
18    Q. That's what I'm not understanding. When
19 you got a call from the Audy Home about Shawn, what
20 were they saying to you?
21    A. No. When I would go up to visit him,
22 there was a guy I had met up there that knew him.
23 He lived on our block. He worked at the Audy Home.
24 And I knew at the time when he was arrested.

Page 143

1        So when he found out that he was up
2 there, he would check in on him. He was reporting
3 to me what was going on. Nothing really bad. Just
4 different behavior that he was doing before he went
5 in there.
6     Q. Let me stop you. Talk to me about what
7 this person would report to you about Shawn while
8 Shawn was in the Audy Home.
9     A. He said that he was a good guy. He
10 didn't see no bad movement that he was doing. He
11 wasn't hanging with the rowdy ones and he didn't
12 know why he was in there.
13        In fact, he say he start, you know, f-ing
14 around the Audy Home a little bit. He would always
15 tell me good stuff about him, that he wasn't doing
16 anything.
17        But when I visit him, Shawn would tell me
18 a different one who did something to him.
19    Q. When you would go and visit him and Shawn
20 would tell you that somebody did something to him,
21 what exactly would he tell you about what that
22 person did to him?
23    A. More like somebody took his tray or
24 something to that effect. Not no beating or nothing

Page 144

1 in the Audy Home, but you had to go to your room or
2 you couldn't pee at a certain time. If you wasn't
3 participating in this, you couldn't do that. If you
4 don't shovel the snow, then you couldn't do nothing.
5 He was pretty much to himself.
6     Q. When you say he was pretty much to
7 himself, are you talking about Shawn?
8     A. Shawn, yes. Shawn was pretty much to
9 himself. He stayed in at the time that they
10 wouldn't let him out. When he did work that off,
11 another time do he know what to do, sit down or go
12 to reading. Do whatever it takes to get through
13 that day.
14        But he said the reason why -- I said,
15 Shawn why won't you shovel the snow. Do what they
16 ask you to do. He said because they got him in
17 there and he ain't did nothing, why should he shovel
18 the snow. He didn't shovel snow when he was out.
19        And I know that for the true fact. He
20 didn't want to shovel it. My other two boys would
21 go out there and shovel. Shawn would go out there and
22 do a little bit, but he never was too much on
23 shoveling no snow. I don't know what about him and
24 the snow, he don't want to do that.



Page 145

1    Q.   He said that he was upset because they
2  were making him shovel snow in the Audy Home?
3    A.   He didn't tell me they made him shovel
4  snow in the Audy Home.  He told me about they were
5  wanting him to shovel the snow when he got -- start
6  doing 26th and California a certain time of the
7  year.  The snow, they want the inmates to go and
8  shovel snow.
9        I guess everybody who wants to shovel
10  will shovel.  Shawn would not.  Whatever he had to
11  do, if he had to miss a meal, he'd miss it because
12  he wasn't going to shovel the snow.
13    Q.   Did Shawn ever tell you about him getting
14  in trouble when he wouldn't shovel snow or do what
15  they told him to do?
16    A.   Yes, he would tell me.
17    Q.   What did he say about him getting in
18  trouble for that?
19    A.   He said he knew that he wasn't going to
20  do it and if it took him a meal or he couldn't go on
21  the playground or he couldn't go out when everybody
22  go out to play ball or whatever little time you have
23  to do, he said he got sent back.  No sense in
24  arguing.  He ain't going to shovel no snow.

Page 146

1        So the whole time he was there, I think
2  he didn't never shovel the snow.  If he did, he did
3  it when he wanted to do it.
4    Q.   Let me go back really quick here.  It
5  looks like we're jumping around, but that's all
6  right.
7        I want to go back to the night of
8  September 15th, 1991.  We talked about that earlier.
9  You said you had come outside and seen Shawn in the
10  gangway and told him to go inside.  Before you saw
11  Shawn in that gangway, where were you just prior to
12  that?
13    A.   I was in the back house coming out the
14  house.  I told him to come in.  It's dark.  It's
15  time to come in.  Whatever you're doing make sure
16  you come home and in the house.  I ain't got to look
17  for you.
18        I thought he was in the house.  I never
19  knew he was out the house.  I came out of the house
20  meeting him in the gangway like he was coming back
21  to the house.  So I asked him what was he doing out.
22    Q.   You asked him what he was doing out.
23  What did he tell you?
24    A.   He said, I'm on my way back in.  I just

Page 147

1  went to the store.  I went to do something.
2    Q.   After you sent Shawn into the house,
3  where did you go?
4    A.   Straight on to the front.
5    Q.   About how long were you out in the front?
6    A.   Before the man got shot?
7    Q.   Yes.
8    A.   It was all happening at the same time.
9  That's why I'm trying to tell the police and
10  everybody that asked me, Shawn couldn't have shot
11  nobody in the front because I was talking to him and
12  sending him in the house.
13        When I got to the front, I didn't even
14  know what was going on, but there was hollering,
15  crowd, people was out there.  I did hear a shot, but
16  I don't know who made the shot.  But when I saw the
17  man, the door was open on the other side and the man
18  was in the car.  The boy just shot through the door.
19  Open the window.  The window was open, down.  He
20  shot him and start running across the street to the
21  laundromat.  He went down the street and around the
22  currency exchange.
23        Now, he had a hoodie on, but there was no
24  way that that was Shawn and I told the police that

Page 148

1  and they told me to tell it to the judge.  So they
2  had their mind made up that they were going to take
3  him regardless.
4    Q.   When you said you told the police that,
5  are you talking about the police that came to your
6  house --
7    A.   Came to the house --
8    Q.   Let me finish my question.  I'm trying to
9  get it out for the record.  Give me a second.
10        When you're talking about you told the
11  police that, are you talking about you told the
12  police that came to your house that day that
13  information?
14    A.   Yes.
15    Q.   So let's go back because I'm confused
16  about the timeline.  Originally you said that you
17  had come outside and sent Shawn in the house before
18  the bottle was thrown through the window?
19    A.   No.  That had happened.  It was just like
20  a few minutes all that had happened.  I didn't see
21  somebody threw no bottle.  When I got in front, the
22  window was broken.  They told me the window was
23  broken.
24    Q.   So let me back up there.  Give me a



Page 149

1  second.  Let me back up.
2       MS. SPENCE:  Ms. Jakes, give Ms. Johnson an
3  opportunity to ask the question and then just answer
4  the question that she's asking you.  Focus on the
5  question that's being asked and answer the question
6  that's being asked only.
7       THE WITNESS:  Yes.
8  BY MS. JOHNSON:
9       Q.   Let me back up really quick.  I'm just
10  trying to understand that I follow.
11       When you went outside and you saw Shawn
12  in the gangway and you continued out to the front of
13  the building, at that point had the glass already
14  been thrown through the window?
15       A.   Yes.
16       MS. SPENCE:  Objection.  Lack of foundation.
17  I'm going to object to lack of foundation.
18       Ms. Jakes, you can go ahead and answer
19  Ms. Johnson's question.
20  BY THE WITNESS:
21       A.   When I got out there, the glass was
22  there.  I saw where the glass was broke.  Those
23  guys, whoever, the Latin Kings, had threw a bottle
24  up there and broke her window.  I asked to put

Page 150

1  something over the window because Ruthetta wasn't
2  home.
3  BY MS. JOHNSON:
4       Q.   Wait.  Give me a second.  Who told you
5  that the Latin Kings had thrown a bottle through the
6  window?
7       A.   The same car that had been chasing Shawn
8  in town around.  They said they went upstairs on
9  1210.  I wasn't out there then.  I don't know if he
10  went upstairs, but they broke the window over there
11  at 1210, not 1212.  And they said they went in the
12  house, but they come out the back door.  That's
13  where I met Shawn when I was coming out the house.
14  What are you doing out here.  I told him to come in
15  the house.  He said, I'm on my way.  I went to the
16  store.
17       Q.   So --
18       A.   That was before the man got shot now.
19       MS. SPENCE:  Ms. Jakes, hold on.  Just answer
20  the question that Ms. Johnson is asking.
21  BY MS. JOHNSON:
22       Q.   So that's -- I'm trying to understand a
23  timeline of how these events happened and I'm trying
24  to follow your testimony.  Give me a second and let

Page 151

1  me try to ask some follow-up questions.
2       You are sure that when you went outside
3  and met Shawn in the gangway and continued to the
4  front that that was before the man had gotten shot?
5       A.   Yes.
6       Q.   And then about how long before or --
7  strike that.  Let me try again.
8       About how long after you went upstairs to
9  help clean up the glass did you hear gunshots?
10       A.   No.  I never did go upstairs.  I didn't
11  tell you I went upstairs.  When I sent Shawn in the
12  house, I was on my way to the front.  This other
13  incident was happening then.  I'm thinking -- I'm
14  still trying to find out about the previous -- that
15  little incident just before I went to the front.
16  But when I went to the front, that case going on
17  then.
18       Q.   So let me ask you this.  When you went
19  outside and you met Shawn in the gangway, did you
20  stay outside until you heard gunshots?
21       A.   I stayed outside.  I was on my way still
22  towards the front when I heard the shot, but it
23  sounded like it was just one shot.  But when I got
24  to the front, that's when I saw the commotion,

Page 152

1  running.  They said he just shot in this man's car.
2  You hear things.  I'm telling you what I saw.
3       I saw the boy run across the street, the
4  one with the hood on, was the one that had the gun.
5  Well, that's all I saw was a black hoodie and he was
6  running and went down by the currency exchange and
7  it wasn't Shawn.
8       Q.   Where were you outside when you heard
9  gunshots?
10       A.   I had made it to the front.  I was on my
11  way from the back to the front.  When Shawn went in
12  the house, I kept on to the front.
13       Q.   Do you know for sure when you told Shawn
14  to go into -- to go back into the house, do you know
15  for sure that's where he went?
16       A.   Uh-huh.
17       Q.   How do you know?
18       A.   Because I was standing there with him and
19  told him to go on in the house.  I told him before
20  to go in and I didn't know he was out at that time.
21  He said he went to the store.  He went on in the
22  house and I proceeded to come to the front.
23       Q.   And then when you got to the front, what
24  happened?



1    A.    Before I got to the front I heard a noise
2  like a shot and people talking.  But when I got to
3  the front, that's all I was able to see.  I saw a
4  station wagon.  They said the man was in the station
5  wagon and the boy opened the door, shot in the car
6  and ran.
7        They said he was going -- attempted to
8  rob the man.  But when I saw the man laying out
9  there, I saw the money hanging out his pocket.
10  Didn't nobody get the money.
11    Q.    You're saying that they said that
12  somebody shot through the window or opened the door
13  and shot through.  Who told you that?
14    A.    On my way to the front that's when it was
15  happening.  It was happening --
16    Q.    Here is my question.  You didn't actually
17  see the shooting yourself, correct?
18    A.    Correct.
19    Q.    But when you got to the front, you're
20  telling me that people were telling you about how
21  the shooting happened, right?
22    A.    No.  They were just saying they going --
23  they were pointing at this car and I looked.  That
24  man was laying on out.

1    Q.    Right.  So when you got outside and you
2  were on the porch, did anybody tell you about
3  something they had seen with respect to the
4  shooting?
5    A.    Nothing but they all said it was Snake.
6  I don't know who Snake was.  And that went on for
7  years.  They just said Snake did it.  They said
8  whoever shot him, the man's father had -- the boy
9  had passed away and the man's father told them that
10  it wasn't Shawn, but they didn't let him out.  He
11  stayed ten more years in there.
12    Q.    Let me be clear.  I'm talking about what
13  you learned the night of the shooting.  I don't want
14  you to tell me what anybody told you about it later.
15        I'm talking about when you got out to the
16  front porch and you saw those people standing
17  around, what did they say to you about the shooting?
18    A.    They didn't say anything at that time.
19  They was looking and hollering and this one -- just
20  looking until the police all came up and later on I
21  heard the rest of it.
22        What I saw was not Shawn and I told them
23  enough to know that that was not Shawn, but nobody
24  listened to me.

1    Q.    You said you saw a person in a hoodie
2  running away.  Did you see that person's face?
3    A.    No, I didn't see his face.  I saw a
4  hoodie and I didn't see no gun.  They said he's the
5  one that did shoot, the one that was doing the
6  running.
7    Q.    Who told you that he was the one that was
8  doing the shooting?  Who said that to you?
9    A.    As long as it's been, it was somebody
10  that was on the front.  I don't know if it was -- I
11  don't know who told me that.  I want to say Helen.
12  That was the daughter.  She was out there.
13        I don't know for sure if she said -- she
14  said it happened so fast she don't know what
15  happened.
16    Q.    Let me be clear.  When you got to the
17  front porch and -- are you talking about the front
18  porch at 1210 or the front porch at 1212?
19    A.    I went to 1210.
20    Q.    So when you went to the front porch at
21  1210, at that point had the glass from the window
22  already been broken?
23    A.    Yes.
24    MS. SPENCE:  Objection.  Asked and answered.

1  BY MS. JOHNSON:
2    Q.    I'm sorry.  What did you say?
3    A.    Yes, the glass was broken already.
4    Q.    I want to make this extremely clear.
5  When you went outside that night, was that the only
6  time that you had gone outside?
7    MS. SPENCE:  Objection.  Form.
8        Go ahead.
9  BY THE WITNESS:
10    A.    I don't know what the question is.
11  That's the only time I went outside.
12  BY MS. JOHNSON:
13    Q.    Let me try it again.  I thought
14  originally -- and I'm probably misunderstanding you.
15  I thought originally you had gone outside different
16  times based upon what I understood you to say
17  earlier.  So now I'm trying to understand if what
18  you're telling me is -- if I'm understanding you
19  correctly.
20        If I understand you, you walked outside,
21  you saw Shawn in the gangway, you told him to go
22  inside, then you heard gunshots on your way up to
23  the front porch at 1210 51st Street and by the time
24  you had gotten out there the glass had already been



Page 157

1 broken; is that correct?
2     A.   Correct.
3         MS. SPENCE:  Objection.  Mischaracterizes the
4 testimony.  I believe she already testified that she
5 heard one shot.
6 BY MS. JOHNSON:
7     Q.   I understand what you're saying now.
8         Did you stay outside on the porch and
9 watch the police arrive?
10     A.   Yes.
11     Q.   Do you remember about how long after you
12 heard gunshots that the police arrived on the scene?
13         MS. SPENCE:  Objection.  Mischaracterizes the
14 testimony.  She testified she only heard one shot.
15 BY MS. JOHNSON:
16     Q.   Or a shot.  A gunshot.  Let me try it
17 again, then.
18         Do you remember about how long it was
19 until after you heard a gunshot that the police
20 arrived on the scene?
21     A.   It all happened when I left Shawn
22 proceeding to go on to the front I heard shots then.
23 When I got on the front, that's when I saw the man
24 running.  That's all.  I saw the man ran across the

Page 158

1 street and went around the currency exchange.  Who
2 that man was --
3     Q.   About how long after you saw the man run
4 across the street did the police arrive?
5     A.   Not long.
6     Q.   Is it more or less than five minutes?
7     A.   It might have been more than five
8 minutes.  I don't know how long it took them, but
9 after that they came, the police came.  I guess
10 somebody had called them.  You know how fast they
11 come to a scene.
12         But I wasn't -- I don't know what time
13 they arrived.  When I looked, I saw police cars and
14 ambulance and everything coming up as though they
15 were coming up to see if they could save somebody.
16 I didn't know what had happened.
17     Q.   When the police --
18     A.   At that particular time Shawn was in the
19 house and I do know that.
20     Q.   You know that because that's where you
21 told him to go; is that right?
22     A.   Right.  And when I went back in the
23 house, he was still in there.
24     Q.   Well, I'm confused now because earlier

Page 159

1 when I asked you if you had seen -- you told me that
2 you hadn't seen Shawn again that night after you saw
3 him in the gangway.
4     A.   Shawn -- no.  He went in the house.  He
5 was in the house when I got back in the house.
6     Q.   How do you know that he was in the house
7 when you got back in the house?
8     A.   Well, he was upstairs.  He was supposed
9 to have been upstairs.
10     Q.   Did you go upstairs to see if Shawn was
11 actually at home?
12     A.   No, I did not go upstairs.
13     Q.   When the police arrived, were you still
14 on -- sitting or near the front porch at 1210 West
15 51st Street?
16     A.   Yes.  I was on the front.
17     Q.   Who else was out there on the front porch
18 with you, if you remember?
19     A.   I remember there were a lot of them out
20 there.  I want to say it was Helen or Angelique, the
21 other one that was sitting out there.  That's
22 another one of Ruthella's daughters.  I was out
23 there talking with them.  They was trying to fill me
24 in on what else happened.  Like I said, there was

Page 160

1 too much going on that night.
2     Q.   So let me stop you.  You said you were
3 out there talking to -- did you say Pam with a P?
4     A.   No.  I said Angeline, Angelique.  And
5 Helen.  They were Ruthella's older kids.
6     Q.   So you were out there.  You were talking
7 to Helen and Angeline?
8     A.   Yes.
9     Q.   What did Helen or Angeline tell you?
10     A.   That the man came up to like -- he went
11 over to the restaurant there on the corner.  I guess
12 he went there to get him some food or something.
13         However, somebody was in there and must
14 have saw him pull out -- pull out his money like he
15 had gotten his income tax check or something like
16 that, just a lot of money to pay for one thing and
17 I guess they decide they are going to rob him.
18         I don't know what happened, but they said
19 the man came out of the restaurant to make it to his
20 car and that's when somebody on the other side just
21 shot him.
22     Q.   I understand.
23     A.   Because I --
24     Q.   So after that conversation and the police



1 arriving, did you see Shawn again that night?
2    A.   I was on the front.  Shawn was supposed
3 to have been in the back.  That's why I told you I
4 didn't see Shawn no more that night that I can
5 remember, or talking to him, until the next morning.
6    Q.   Okay.  I understand.
7       Did you ever when you were sitting out on
8 the porch after the police had arrived, did you ever
9 speak to the police, at all?
10    A.   No.
11    Q.   When did you go back into your home after
12 that?
13    A.   I think it was an hour -- maybe less than
14 that.  I don't know.
15    Q.   So --
16    A.   I wasn't out there.  I wasn't out
17 there -- I don't know if -- what time they left
18 because we were still sitting out there.  We didn't
19 just go straight in because I wanted to find out
20 what all went down that I had missed in the first
21 place.
22    Q.   So after the police showed up, you stayed
23 out there but you didn't talk to them?
24    A.   I didn't talk to the police, at all.

1 They did what they had to do and they left.  They
2 didn't ask me nothing that night.
3    Q.   Were you still outside on the porch when
4 the police left the scene that night?
5    A.   No.
6    Q.   So did you ever see the police actually
7 leave the scene?
8    A.   No.
9    Q.   Where did you go after you left the front
10 porch?
11    A.   Back to my house in the back.  I lived in
12 the back.  I went back to the house.  We usually
13 come out in the front steps, talk, catch up with
14 what's going on, talk about things, whatever, and
15 then go back in the house.
16       But all this other stuff was happening,
17 you know we was trying to see what we could see.
18 When you hear gunshots, you get out of the way.  I
19 got back to the house.  I didn't try to stay out
20 there and talk at that particular time.
21       Later on I went back out there to see
22 what was going on and there was still a lot of he
23 said, she said.  Nothing made no sense, but I didn't
24 think Shawn had anything to do with that that night,

1 that day, the next day and not ever.  He didn't have
2 anything to do with it.
3    Q.   When you went back to your house, were
4 the police still out in front?
5    A.   No.  I think they may have been out
6 there.  I don't know.  I'm saying I don't know if
7 they was still out there because there was a lot
8 going on.  They had to get the body from out there.
9 They had to talk and try to find out what was going
10 on.  They stayed a while.  They didn't just come and
11 leave.
12       But the reason why I went on back in the
13 house so that they wouldn't ask me nothing that I
14 didn't know.
15    Q.   When you went back into your house that
16 night, what did you do next?
17    A.   Nothing but got ready to go to bed.  You
18 put things away and you go to bed.
19    Q.   You went back to the house and then you
20 went to sleep.  Did you go directly to your bedroom?
21    A.   Not really.  I stayed downstairs a
22 minute.
23    Q.   When you stayed downstairs, what were you
24 doing?

1    A.   Watching television.
2    Q.   Do you remember about how long you
3 watched television before you went to bed?
4    A.   No, not really.  I didn't have no certain
5 time or I'm watching this or I'm watching that.
6 When the news go, I go to bed.  I don't think the
7 news had came on at that particular time.
8    Q.   Do you know about what time you went to
9 sleep that night, then?
10    A.   No, I don't know what time I went to
11 sleep.  I usually try to go early because I'm a
12 morning person.  I get up early.  I've got to go to
13 bed to get up early.
14    Q.   But that night did you also go to bed
15 early?
16    A.   Yes.
17    Q.   What do you consider to be going to bed
18 early?
19    A.   Well, during the week my kids had to be
20 ready and in bed about 8:00.  School night.
21    Q.   Let me cut you off really quick.
22 September 15th, 1991 I'll represent to you that that
23 was a Sunday.
24    A.   May have had a little longer time on the



Page 165

1 weekend when there's no school. They could go
2 upstairs about 9:00 on the weekend.
3    Q.   I'll also represent to you that the
4 police reports indicate that the shooting happened
5 closer to midnight on September 15th, 1991.
6        What I'm trying to understand is -- if I
7 understand you correctly, then, you wouldn't have
8 gone to bed by midnight that night; is that correct?
9    A.   Correct. Probably about midnight. Maybe
10 a little bit later.
11    Q.   Regardless, you went in the house after a
12 little while and then watched a little bit of TV and
13 then you went upstairs to your room to go to bed?
14    A.   Right. Correct.
15    Q.   You didn't see Shawn again until the next
16 morning about an hour or an hour and a half before
17 the police arrived, correct?
18    A.   Correct.
19    Q.   Let me ask you quickly. When Shawn was
20 living with you, did he also have keys to the front
21 gate and to the two -- the enclosed porch and the
22 front door of the rear house?
23    A.   I don't remember him having a key.
24    Q.   How would he get in and out of your home

Page 166

1 when he lived with you if he didn't have a key?
2    A.   Just come through the door. The door to
3 the porch to come on the porch, it wasn't never just
4 locked all the way.
5        If he got on the porch, he could knock
6 and let me know he was out there and I would let him
7 in.
8        Now the gate, I would unlock the gate
9 until they are all in after eight. I would lock the
10 gate, but that don't mean they couldn't go around to
11 the back and come in.
12        There was nothing but a gate up there at
13 the back, too, but I would never lock it all the
14 time. If I had the front locked, there was no
15 walking straight through that all the time. I
16 really wanted that front gate locked.
17    Q.   Let me ask you this, then. When you left
18 the front porch the night of the murder and you were
19 walking back to your house, did you go through the
20 gangway in between 1210 and 1212 to get back to your
21 house?
22    A.   Yes.
23    Q.   Did you lock the gate behind you after
24 you went through the gangway?

Page 167

1    A.   The gate -- I don't think that gate was
2 up there at that time. I put the gate up there
3 after that because of the way they walk through
4 there and you'd be sitting on the front and you
5 couldn't ask nobody to leave and they said they
6 could sit there if they wanted to and all negative
7 that you get from kids. If you don't live here,
8 don't sit here and they still would sit.
9    Q.   Let me back up now. I'm a little
10 confused now so give me a second.
11        Back in September 1991 did you have the
12 wrought iron gate that we talked about that
13 separated the gangway from 51st Street in place?
14    A.   In '91 I don't think that was up there.
15 I got the gate after all this because of the traffic
16 that was coming through there. People would be
17 walking all the time.
18        If you had that gate locked, that would
19 mean they have to get over a fence and that would
20 stop them coming straight through there and shortcut
21 to the front instead of going around the corner to
22 the bar instead of coming through there.
23    Q.   Was the front porch -- in order -- strike
24 that. Let me try again.

Page 168

1        In order to get into your house back in
2 September of 1991, did you have to go through the
3 door of the enclosed porch?
4    A.   Yes.
5    Q.   Did you have to unlock that door?
6    A.   When I went back in the house, I didn't
7 have to unlock it. I locked it when I got back in.
8 I locked that door and then -- I'm not expecting
9 nobody else and I unlocked the door to go into the
10 house. That was going into the kitchen. So I
11 locked that and I locked the outside too.
12    Q.   That's what I was trying to understand.
13 So on the night of September 15th when you left the
14 porch and you went back into your house, you locked
15 both doors to the enclosed porch and the front door
16 to the kitchen behind you, correct?
17    A.   Correct.
18    Q.   That's what I needed.
19        I want to ask you a little bit about that
20 neighborhood. I'm going to jump around a little bit
21 because I'm going to go back through a couple of
22 things that I think I missed.
23        At the time of the shooting in
24 September 1991, do you remember what that little



Page 169

1  restaurant on the corner was called?

2      A.    No.  The neighborhood would call it the
3  last chance to get something.  Everybody would run
4  there at the last minute before they close and I
5  don't know what the closing time, but they were open
6  around midnight or after that because that's when it
7  was all going down.

8      Q.    Back in 1991 do you know anybody who
9  worked at what you called The Last Chance?

10     A.    The restaurant, I didn't know anybody
11  that worked there.

12     Q.    Did you ever eat there yourself?

13     A.    Did I do what?

14     Q.    Did you ever eat at The Last Chance
15  yourself?

16     A.    There were a few things they had I liked
17  I would get on occasion there, but it was nothing I
18  really wanted.

19     Q.    Do you know whether or not they sold
20  chicken?

21     A.    I really don't know what they sold.  I
22  know they had sandwiches and fast-food like.

23     Q.    Was that a popular place that people in
24  the neighborhood would go to eat?

Page 170

1      A.    They would go and buy sandwiches, yeah.
2  It was a carry out.  Just go and order and get your
3  stuff and leave.  You couldn't just sit around and
4  eat like a big restaurant.  It was a storefront
5  like.

6      Q.    Have you ever heard of the neighborhood
7  called Motown?

8      A.    They was calling that Motown where I
9  lived, but I didn't know anything about no Motown.
10  When you give them your address, they say, oh, you
11  live in Motown.  I don't know nothing about a
12  Motown.

13     Q.    You don't know what Motown means?

14     A.    No.  I just live 1212 West 51st Street,
15  the house in the rear.  That's all I knew at that
16  time.

17     Q.    You had heard other people refer to it in
18  1991 as Motown, but you didn't know what that meant
19  yourself; is that right?

20     A.    Right.  Correct.  I found out later they
21  were talking about gang members and they called
22  themselves Mos or something.  Something like a
23  gangbanger area.

24     Q.    Do you know what gang called themselves

Page 171

1  Mos?

2      A.    No.  That's why I'm saying I don't know
3  why they just labeled him as a gangbanger.  I don't
4  know anything about a gangbanger.  We were teaching
5  our kids not to affiliate with that.  We've got --

6      MS. SPENCE:  Just -- Ms. Jakes, you want to
7  answer the question that Ms. Johnson is asking you.

8      THE WITNESS:  Okay.

9      MS. SPENCE:  I know you can't see her so you
10  can't see where the pauses are happening, but just
11  wait for her question.  Answer the question and just
12  pause even if it's a long pause, we're all here on
13  the Zoom together so we are -- Ms. Johnson will ask
14  you another question.  Be comfortable in the pause.

15  BY MS. JOHNSON:

16     Q.    I'm sorry.  I apologize.  I can't see you
17  so I don't know when you're going to start so I'm
18  going to try my best to wait for you too.  Okay?

19     A.    Okay.

20     Q.    Let's just go generally.  I want to jump
21  back.  I want you to talk to me really quickly and
22  tell me what your familial relationship is to Shawn.

23     A.    I am Shawn's aunt.  He's my sister's,
24  under me, son.

Page 172

1      Q.    And your sister, that would be
2  Jeanette Jakes?

3      A.    Yes.

4      Q.    Shawn is her son, Jeanette's son,
5  correct?

6      A.    Correct.

7      Q.    In September 1991 were you Shawn's legal
8  guardian?

9      A.    At that time, yes.  I had just -- they
10  just gave Shawn to me about two or three --

11     Q.    I'm sorry.  I couldn't hear that last
12  part.

13     A.    I had custody of Shawn for about two
14  months, maybe, before that happened.  I was just
15  trying to get him in line so that I could take him
16  to school, bring him back, make sure he went to
17  school.

18          But it had to be like when you -- let him
19  go on his own, there were things at school or
20  something that he wasn't going or he was playing
21  hooky, just walking out the classroom.  Just doing
22  crazy stuff as a child at that time.

23          He had to be doing something to be wrong.
24  When I got him, I had to take him to Martha Fiori



1 (phonetic). I know that's a school for behavior
2 kids. I didn't see no problem he had.
3    Q.   Let me back you up. Let me stop you
4 really quick. You said you had to take Shawn to a
5 school for kids with behavior problems and I
6 couldn't understand the name that you called it.
7    A.   The school was Martha Fiori School and I
8 knew from living around here in Chicago -- I'm from
9 Arkansas. I found out the school is for kids with
10 behavior, bad behavior.
11        They've got to go to school so they just
12 put them in there, I guess, and that's when he
13 really started acting out because he didn't want to
14 be there.
15    Q.   Do you remember when Shawn started
16 attending the Martha Fiori school?
17    A.   I took him one day. When I got him and
18 got the paperwork to put him in the school, I took
19 him that day and when I got back home, they had him
20 back there too waiting for me to get in and let him
21 in and I'm wondering what happened.
22    Q.   Let me stop you real quick. What I'm
23 asking you is, when did you enroll Shawn in that
24 school? Was that when you became his legal guardian

1 in 1991?
2    A.   Yes. I enrolled him in that school and
3 when I got back home, he was there too. They had
4 brought him back to my house.
5        So why would I go out to take him to the
6 school and they bring him back? What happened,
7 Shawn? He said, they told me I had to go home.
8        From that point on, if he went to school,
9 I didn't know if he stayed there or came home. If
10 he come back the first day, I don't think he went no
11 more. I don't know for sure because he never would
12 say anything about school.
13    Q.   Let me ask you this real quick, then.
14 When you -- after you enrolled Shawn in school in
15 1991, how would he get to school?
16    A.   I gave him carfare so he can get to
17 school, the first day I took him, but they brought
18 him back to the house before I could get there.
19 That's what I'm saying.
20        And he said he was not going back no
21 more. But I know if he live in my house he's going
22 to. He's got to go somewhere. They put him in this
23 school until his behavior changed. That's what they
24 told me when I enrolled him. He would have to stay

1 there as long as he went by their rules and they see
2 where he was going by the rules, he wouldn't have to
3 be at the school. I tried to explain that to him
4 but it didn't do no good.
5    Q.   So --
6    A.   That was --
7    Q.   Do you know about how long he attended
8 the behavioral school?
9    A.   It wasn't long. That was the last school
10 I tried to get him in and he did not attend it. As
11 far as I know, from that point until now he did not
12 attend Martha Fiori.
13    Q.   Let me backtrack a little bit.
14        Did you ever have to go to court or sign
15 legal documents to become Shawn's legal guardian?
16    A.   Yes. His mother was there with me. They
17 wanted to know was he coming just him. I told her I
18 believe I could do better. You don't know nothing.
19 She said you don't either, but when they put me in
20 front of the judge, he gave me custody of Shawn.
21    Q.   What were the circumstances between you
22 and Shawn's mom that led to you becoming Shawn's
23 legal guardian?
24    A.   She said he had got -- he wouldn't obey

1 her and she wanted -- she would get mad and go off
2 on him like she's going to whoop him and that ain't
3 helping nothing. If he's doing this, we've got to
4 get him to see some kind of counseling or something.
5        That's what my intention of trying to do,
6 I thought I could do better. I didn't hear talking
7 about no counseling and no seeing nobody. I'm not
8 saying you've got to be crazy to see a psychiatrist,
9 but I wanted him to go there and see if we can work
10 out something from that point on. But then this
11 happened and I didn't get that chance.
12    Q.   Let me back up really quick. Did you and
13 your sister Jeanette attend court in Chicago to
14 start the guardianship proceedings?
15    A.   Yes, here in Chicago.
16    Q.   Do you remember if the courthouse that
17 you went to was at 26th and California?
18        MS. SPENCE: Objection. Form. Lack of
19 foundation.
20        Go ahead.
21 BY THE WITNESS:
22    A.   I don't know if we was at 26th and
23 California. I thought we was downtown. I really
24 don't know what court, but I know I stood before the



1 judge and they read all the rights off and asked
2 her -- they asked her because I didn't know about no
3 other thing coming or no package, nothing there. I
4 was taking Shawn under my care.
5       She said she would prepare school clothes
6 and all that, which we didn't come into all that.
7 This is the arrangement she and I made. I would
8 take him because I can make sure he's in school. I
9 can't see some of this when they saying he's doing
10 this and he's doing that. I didn't see that
11 behavior with Shawn, at all. Maybe he's different
12 for me for some reason.
13      Q.   Do you know -- in September 1991, do you
14 know if Jeanette your sister still lived in
15 Milwaukee?
16      A.   1991?
17      Q.   September of 1991.
18      A.   September 1991 where did Jeanette live?
19 I think she lived in Milwaukee then because I didn't
20 have Shawn that long. They brought him to me from
21 Milwaukee.
22      Q.   Do you know when -- actually, strike
23 that.
24      Did Jeanette live in Chicago before she

1 moved to Milwaukee?
2      A.   Yes.
3      Q.   Do you know what year she left Chicago to
4 move to Milwaukee?
5      A.   No, but it was -- like three or
6 four months that she was trying to get him out of
7 Chicago because she got tired of Mos and this kind
8 of stuff. She get him away and she wouldn't have to
9 go through that. After he had to come back, she
10 asked me if I'd take him, and I did.
11      Q.   I want you to -- I want to unpack that
12 answer that you gave me. You said your sister told
13 you that he's in with Mos? I didn't understand what
14 you said.
15      A.   No. She said she was tired of him --
16 people saying he had joined some Mos or some gang or
17 something, which I didn't believe and I never saw
18 him with them, but I can't follow him around all the
19 time. From my understanding he was never a member,
20 he never joined no gang.
21      Q.   But that's just -- that's just what
22 Jeanette told you; is that right?
23      A.   Right. That she had heard. I wasn't
24 hearing that. That I can't be bothered. I can be

1 bothered.
2      Q.   After -- actually, strike that. Let me
3 try again.
4      When Jeanette moved to Milwaukee, did she
5 originally take Shawn with her?
6      A.   Yes. I didn't get custody of him until
7 he came back.
8      Q.   Do you know why she sent him back to
9 Chicago?
10      A.   Yes, I know why. She didn't send him
11 back. The police brought him back to me. They had
12 said that he had killed a man in Milwaukee, but I
13 know he ain't killed nobody nowhere.
14      Q.   You're telling me that the police brought
15 him from Milwaukee to you and told you that it was
16 alleged that he had killed someone?
17      A.   Yeah. Yes. And they found out he was
18 not the one. They only got him for that murder
19 because he said he looked over and the man -- leaned
20 down to see if he knew who the man was.
21      You ain't been in Milwaukee that long,
22 why would you do that. All the other kids went on
23 in the house. He said he wanted to see if he knew
24 the man or see if he was dead.

1      Well, a woman saw him leaning over the
2 man and that's when they come to her house and got
3 him from her house.
4      Q.   And then let me back up. Did the
5 police -- did the Milwaukee police actually escort
6 Shawn from Milwaukee back to your house in Chicago?
7      A.   Somebody brought him there because when
8 he got to my house, I didn't see no police bring
9 him, but they said they was going to bring him to my
10 house and we could start the procedure that I was
11 going to be his legal guardian and we started making
12 plans where, Shawn, you got to obey. You've got to.
13 You can't be running out here doing this or doing
14 that or you're on the corner. You have to be in
15 this house. That was my rule. He said he could do
16 that. I never saw the side that she was telling me
17 what they were telling her.
18      Q.   I'm asking about when he came to live
19 with you. You said he came to live with you about
20 two or three months before the shooting that we're
21 talking about that happened on the corner, right?
22      A.   Right. He wasn't in my house that long.
23      Q.   I'm talking about when he first came to
24 live with you that day, who brought him to your



Page 181

1 house?

2   A.   He said someone brought him from

3 Milwaukee to my house.

4   Q.   Did he tell you who brought him from

5 Milwaukee to your house?

6   A.   If he told me, I wouldn't have known how

7 he got there.

8   Q.   Let me just go over.  I want to ask you

9 some general questions about Shawn and what he was

10 like back in 1991.  Can you tell me what his

11 personality was like back then in 1991.

12   A.   Just like my other son.  I didn't see no

13 difference.  I didn't see the side that they were

14 trying to paint that he was doing other stuff and

15 talking back, smart talking.  He never did that to

16 me.

17   Q.   I'm not asking you about what he did or

18 didn't do.  I'm generally asking you about what kind

19 of kid was he?  Was he outgoing?  Was he shy?  Was

20 he loud?  Was he quiet?

21   A.   He was a little -- Shawn has always been

22 a little quiet.  He's happy and joyful when he's

23 playing balls or doing what he want to do.  When

24 he's not doing what he want to do, he's quiet.

Page 182

1   Q.   What did he like to do back in 1991?

2   A.   He liked a lot of things.  I know he

3 liked football and all kinds of sports.  He was

4 learning how to cook.  He know how to care for

5 babies because I trust him with mine and my daughter

6 trust him with hers.

7       This other side, it's like, I don't know

8 that person.  I know Shawn as he is now and that's

9 what was depressing for him to go and spend that

10 long in jail and not be with his family.  I know

11 that was distressing.  I told him, it's not going to

12 be long.  When I told him that, I didn't think it

13 was going to be years long as it was, but he was in

14 there.  We worked it through.

15   Q.   Back in 1991, do you remember about how

16 tall he was?

17   A.   No, I can't say how tall he was.  An

18 average teenager.

19   Q.   Back in 1991, was he taller or shorter

20 than you?

21   A.   He probably got about my size.  He came

22 up a little bit.  Maybe he was as tall to me or a

23 little bit taller than me because Shawn has always

24 been big.  But he was big and tall.

Page 183

1   Q.   When you say "big," what do you mean?

2   A.   A little on the heavy side.

3   Q.   Back in 1991, was he still a little on

4 the heavy side?

5   A.   Yes.  He was big for his age.  He didn't

6 look like he was no 15.

7   Q.   Back in 1991, how did he wear his hair?

8   A.   He wore short cut hair or cut it all off

9 because he didn't want to comb his hair and if he

10 come around me, I was going to comb it for him so he

11 kept it short and low cut so that I wouldn't say

12 nothing.  He never liked hair.

13   Q.   In 1991, did Shawn wear glasses?

14   A.   He didn't wear prescription glasses.  He

15 wanted to look cool so he would get him a pair of

16 reading glasses or something you could see through.

17 Or he wore the glasses with no lenses in them back

18 in 1991.  I think they thought that was the style,

19 but it was ugly to me.

20       He always had something over his eyes

21 whether it shades or no lens or some type of glass

22 was on his eyes.  No, he don't have to wear

23 prescription glasses.

24   Q.   Back in September of 1991, if you

Page 184

1 remember, did Shawn have any facial hair?

2   A.   Yeah, he had facial hair.

3   Q.   What type of facial hair did he have?

4   A.   Just a little bit coming out on his chin.

5 I don't know if he cut it off or my older son did

6 it, but they learned how to get it off their face.

7       Shawn had more hair than my boys because

8 they never had -- they don't have much facial hair

9 now.

10   Q.   Let me back up.  From what I understand,

11 he had a little bit of facial hair but he always

12 kept it short.  He never grew a beard or anything?

13   A.   No, not at 15.  He had a little enough to

14 rub and say he's getting to be a man.  He want to

15 show me, I'm getting to be a man now.  Yeah, I know.

16 There wasn't really nothing to even look at.

17   Q.   Back in September or, actually, back in

18 1991 in those couple of months when he came to live

19 with you, did he have any friends that he would hang

20 out with regularly?

21   A.   Not regular.  Just maybe going to play

22 basketball.  I'm going over here to the park or

23 going over here to the lagoon.  Whatever he told me,

24 I don't know if he did that or not, but he wasn't



1 saying I'm going to meet my friends and we're going
2 to do some terrible stuff. He would never tell me
3 nothing like that.
4    Q.    Did he tell you who any of his friends
5 were? Do you know any of his friends by name?
6    A.    I know the regular ones he hung with.
7 Quarter Pound. Cleto, so that's Quarter Pound. And
8 Everett and Derrick. He would be out there with
9 them, I thought. If anything, I don't know.
10        I never knew any of his friends. He
11 didn't bring anybody around saying, this is my
12 friend and we're going to do this or we're going to
13 do that, no.
14    Q.    So other than -- Everett was your son,
15 though, right?
16    A.    Right.
17    Q.    Quarter Pound was Ruthetta's son, right?
18    A.    Yes, Ruthetta's son.
19    Q.    Those two, were they related to Shawn or
20 were they just friends of his?
21    A.    Just friends. My brother married his
22 auntie, that was Ruthetta's sister, and so we was
23 just like family together.
24    Q.    Those were Shawn's cousins, right?

1 Everett and Quarter Pound were cousins?
2    A.    Yes. Everett was his biological cousin.
3 Quarter Pound came in with the family and they just
4 said they were cousins.
5    Q.    Other than Everett and Quarter Pound, do
6 you remember any of Shawn's friends that he may have
7 had back in 1991?
8    A.    I don't remember no outside other than
9 those two.
10    Q.    Let's talk about his grades. Do you
11 remember what his grades were like when he was going
12 to school in 1991?
13    A.    When he was going to school he had good
14 grades. He never was one -- you never knew what
15 Shawn know because if he was mad, he wasn't going to
16 tell you nothing. He knew he wasn't going to
17 answer.
18        By his grades, he was passing, but he had
19 behavior problem. I guess when the teacher, she
20 want him to answer her and if he made up his mind
21 he's not going to talk this day, he's not going to
22 do nothing. What's school if you're not going to
23 say anything.
24    Q.    You said when he was going to school, he

1 was passing so he didn't even have any problem
2 learning the material, it was a behavior problem; is
3 that what I'm understanding?
4    A.    Yes, that's the problem.
5    Q.    I know we talked a little bit earlier
6 about some of the trouble that he was getting into
7 in school. Did he often get in trouble at school?
8    A.    I didn't have him that long, but his mom
9 complained about she have to go up to the school,
10 Shawn did this or he did that or something to the
11 fact that he wasn't doing what he was supposed to do
12 at school.
13        That's the reason why they took him out
14 of the regular school and that was his last
15 alternative was to go to Martha Fiori but he said he
16 wasn't going.
17    Q.    As far as you know, after you enrolled
18 him in Martha Fiori, he didn't actually go back to
19 school?
20    A.    He came home that same day. I enrolled
21 him to go to class. I enrolled him and they was
22 going to take him on to his class and I was to come
23 home. By the time I got home, they had him back
24 there. I don't know -- it's been so long I don't

1 know what they say he did that day, but I was too
2 mad.
3    Q.    So back in 1991, was Shawn able to read
4 in English?
5    A.    Yeah, he could read and could write. He
6 could spell, but he couldn't spell too good. If he
7 had to write down something, it looked like chicken
8 scratch. If he wanted to write it where you could
9 read it, he could do that too.
10    Q.    So back when he was a kid back in 1991,
11 did he have any chronic or serious illnesses?
12    A.    Shawn was diagnosed with lead poisoning
13 when he was a baby. But he was here in Chicago,
14 they took him to Arkansas with my mother. He stayed
15 down there for the summer working. When school was
16 out so he could spend the summer down there. That's
17 where he spent the summer at.
18        My mother said she didn't see no
19 difference. But the other baby that was in the
20 house with him, he may have ate some of the paint or
21 something. He had a problem from the lead. He
22 still have problems now. Shawn, I never saw any of
23 that on Shawn.
24    Q.    As far as you know, Shawn never had any



Page 189

1 problems from the lead poisoning?

2    A.    Not from the lead poisoning that I knew

3 of.

4    Q.    Did you ever see Shawn drink alcohol or

5 use any drugs?

6    A.    Not at 15. Nothing like that at 15.

7    Q.    Prior to his arrest in September of 1991,

8 do you remember if he had any -- if he had to have

9 any major surgeries?

10    A.    I can't think right now of no surgery

11 Shawn had.

12    Q.    By the time that Shawn was arrested in

13 September of 1991, what grade was he in?

14    A.    Shawn was probably in 7th grade, I

15 believe. Seventh or 8th. He got his 8th grade

16 diploma from 26th and California. They mailed it to

17 me.

18        I don't know if he got it from when he

19 was in the Audy Home and they mailed his package and

20 whatever else he had there when he got to 26th and

21 California, but that's when I got the diploma from

22 his 8th grade.

23    Q.    Do you know if Shawn ever attended high

24 school?

Page 190

1    A.    If he did -- I enrolled him, but he said

2 he wasn't going. From that point he went to school

3 in the Audy Home and finished up the 8th grade. I

4 don't know if he went no further. He said he took

5 the GED and he passed that.

6        Out of 20 years you should do something

7 with your life besides just sit there so I figured

8 he did do all that.

9    Q.    Let me back up and talk to you about the

10 GED. You said he took the GED and passed. Was that

11 while he was in prison?

12    A.    Yes.

13    Q.    What did you say?

14    A.    He did that when he was in prison. From

15 the Audy Home his 8th grade diploma and everything

16 he got from mastering the 8th grade, they sent that

17 to me, his diploma for the 8th grade.

18    Q.    I'm talking about the high school GED.

19 We're talking about 9th through 12th grade.

20    A.    He was in jail then so he say he got his

21 GED, but he didn't show it to me. I believe he got

22 it.

23    Q.    Did Shawn tell you that he got it?

24    A.    He told me he had it. He's like, I got

Page 191

1 my GED, I passed the GED test. And I was so proud

2 of him. I know I had the 8th grade. You only have

3 four more. Just do something while you're in there.

4        So he applied himself and got his GED.

5 And then he started doing a little work. I think he

6 started working in the kitchen or doing something

7 there.

8        He managed to live there. He stopped

9 being -- whatever he was doing at first. I think

10 he's still a little quiet. But Shawn is a good

11 person. He was never out there like you're out

12 there and nobody wants you. No. We all want him

13 and love him. If you're out there and got a

14 problem, we're going to help you with it.

15    Q.    Back in 1991, did you ever have any

16 concerns about Shawn's behavior or concerns that he

17 was getting into trouble?

18    A.    No, I didn't have that. If I had any

19 feeling that he was not going to cooperate and treat

20 me right, I've been with him since he was a baby.

21 If he can't go to school and do like I want him to

22 do, then we're going to get some help for him.

23        Like I say, I never got the chance to

24 give him the help I wanted to give him. I wanted to

Page 192

1 see if -- why you labeling him as a gangbanger and

2 Mos and this and that. That side of him never

3 appeared to me then and now. I've always been

4 around him since he was a baby and I've had him into

5 my care.

6        As of now, he's still the same person, to

7 me. He's still a little quiet. He get in his mood,

8 but Shawn is a beautiful person to be around.

9 Everybody I talk to loves him. You can't be gang

10 banging and treating folks wrong if you're like

11 that. Nobody want to be around nobody like that.

12    Q.    Let me ask you this real quick. I'm

13 going to represent to you that Denise Harris had a

14 deposition in this case anyway and she told us that

15 Shawn was constantly getting into trouble, throwing

16 rocks and bottles at cars. Was she lying about

17 that?

18    MS. SPENCE:  Objection. Form. I believe the

19 question is improper. The premise of the question

20 is improper to have another witness opine on the

21 credibility of a separate witness.

22        Go ahead.

23    MS. JOHNSON:  She can tell us what she knows

24 based upon her observations of Shawn. I'm asking --



1    MS. SPENCE:  You're asking if -- I think it's a
2 different question, whether she's lying or whether
3 or not what she's saying is accurate, right?
4    MS. JOHNSON:  We can rephrase the question,
5 then.
6 BY MS. JOHNSON:
7    Q.   I'll just represent to you that
8 Denise Harris said that Shawn was a bad guy in the
9 neighborhood and that he was constantly getting into
10 trouble and throwing rocks and bottles at cars all
11 the time.  Did you ever see Shawn do any of those
12 things?
13    MS. SPENCE:  Objection.  Mischaracterizes the
14 testimony of Ms. Harris.
15        Go ahead.
16 BY MS. JOHNSON:
17    Q.   Go ahead.
18    THE WITNESS:  Do you want me to answer the
19 question?
20    MS. SPENCE:  Yeah.
21 BY MS. JOHNSON:
22    Q.   Did you ever see Shawn do any of those
23 things?  That's the question I want you to answer.
24    A.   I never saw Shawn do any of those things

1 and I was surprised to hear of it today that I heard
2 about it, that he and someone threw something at a
3 car.
4        If that's what they had been doing out
5 there, I had never heard about it until this
6 particular night, the night the man died.
7    Q.   Let me ask you this, though.  Did you
8 hear that Shawn and Quarter Pound were throwing
9 something at cars the night that that man died?
10    A.   That's what I was out there for, to see
11 what was going on with that and the Latin Kings
12 breaking a window.  What was all this about.
13    Q.   Who told you that Shawn and Quarter Pound
14 were out there throwing things at cars?
15    A.   I don't know who told me, but they said
16 they was out there and that's the purpose for me
17 going out there, to see what was going on.  That's
18 the first time I told him to go in.
19        But I went back to the house and when I
20 come back out, he was out there.  I'm wondering why
21 you aren't in the house.  I never saw that side of
22 behavior from Shawn.
23    Q.   Prior to Shawn being arrested in
24 September of 1991, had he ever been arrested before,

1 that you knew about?
2    A.   Had what?
3    Q.   Had Shawn ever been arrested before
4 September 1991 that you were aware of?
5    A.   Not that I'm aware of.
6    Q.   Let me run through this.  I'm going to
7 ask you a couple of questions.
8        Do you have any information about Shawn
9 getting arrested on June 11th of 1989 for kicking
10 out a wood panel of a door at a Show Biz pizza?
11    A.   Oh, I never -- this is my first time
12 hearing that.
13    Q.   In June of 1989 did he live with you?
14    A.   1989?
15    Q.   Yeah.  Was he living with you in June
16 of 1989?
17    A.   No.
18    Q.   Do you know where Shawn lived in June
19 of 1989?
20    A.   No.
21    Q.   Do you know who he lived with in June
22 of 1989?
23    A.   He had to be with his mother, but I'm
24 saying I don't know exactly where they live in

1 nineteen -- I'm saying I don't know anything about
2 no arrest.  I don't know anything about that.
3        When he lived at that time, he only had
4 one or two house places that he stayed.  Somewhere
5 on Drexler, I think, but I don't know the address to
6 that.  And another house he stayed in other than
7 mine.
8    Q.   If a police report that documents the
9 arrest in June -- on June 11th of 1999 said his home
10 address was 1212 West 51st Street, first floor, do
11 you believe that that information is inaccurate?
12    MS. SPENCE:  Objection.  Calls for speculation.
13        Go ahead.
14 BY THE WITNESS:
15    A.   It may have said that because that may
16 have been on the address.  His mother did live
17 over -- I mean, in the front house, but I don't
18 think it was back then at that time, but I'm not for
19 sure.  It's been so long.  But she stayed there.
20 When she wanted to move, she moved.
21 BY MS. JOHNSON:
22    Q.   What about October 6th of 1989.  Did you
23 know that Shawn was arrested for cursing at school
24 and throwing a plastic milk case at someone who



Page 197

1 tried to keep him out of a class he wasn't supposed
2 to be in?

3    A.   Oh.  I'm saying I didn't know.

4    Q.   You said you didn't know about that?

5    A.   No.  This is my first time hearing of any
6 behavior except for when he got into this last that
7 they accused him of that he didn't do.

8         The trouble he got into that they are
9 saying about him killing somebody there and in
10 Milwaukee.  That's the only two things that I know
11 he was accused of, but he didn't do it, either one.
12 And that's all I do know about.

13        That other stuff, I know his mother told
14 me, Jeanette said he was acting bad at school, and I
15 don't know when he started acting up because he was
16 going just like everybody else.

17    Q.   What about December 6th of 1989.  Did you
18 hear about Anthony and a group of boys being
19 arrested after being accused of sexually assaulting
20 a 13-year-old girl named Latasha Lenore?

21    A.   No, I never heard about any of that.

22    Q.   Do you know a girl named Latasha Lenore?

23    A.   I don't even know that name.  This is the
24 first time I'm hearing it.

Page 198

1    Q.   In December of 1989, did Shawn live with
2 you?

3    A.   In December?  I didn't get Shawn in
4 December.  I only had Shawn about two months or
5 maybe three before the incident.

6    Q.   Do you know who he lived with back in
7 December of 1989?

8    A.   I thought he was with his mother.  If he
9 stayed somewhere else, I don't know.  I can't
10 testify to nothing I don't know about.

11    Q.   That's fair.

12    A.   And I should have known.  We -- I should
13 have known, but I don't.

14    Q.   If there is a police report from
15 December 6th, 1989 that documents Anthony's address
16 as 1212 West 51st Street, do you have any reason to
17 agree or disagree with that?

18    A.   I'm not going to agree or disagree
19 because I don't know anything about that.  It could
20 have happened, but I don't know about it.

21    Q.   Back --

22    A.   I have --

23    Q.   You can tell me you don't know.

24    A.   The mother didn't tell me anything about

Page 199

1 that.

2    Q.   What about on February 2nd, 1990.  Do you
3 know anything about Shawn getting arrested when
4 police saw him carrying around a zip gun?

5    A.   I never heard anything about a zip gun
6 neither.  This is all news to me.

7    Q.   By February 2nd of 1990 was Shawn living
8 with you at that point?

9    MS. SPENCE:  Objection.  Asked and answered.

10        Go ahead.

11 BY MS. JOHNSON:

12    Q.   February 6th of 1990 was Shawn living
13 with you?

14    A.   No.  I didn't get Shawn until I think '91
15 about two or three months before he got into the
16 trouble right there.

17    Q.   Do you know who he lived with in February
18 of 1990?

19    A.   I don't know.  If he wasn't with me, he
20 was probably with my mother, but I'm saying I can't
21 testify to saying he was with my mother and I don't
22 know.

23    Q.   What about on February 11th of 1990.  Did
24 you know that Shawn was arrested after he was seen

Page 200

1 throwing rocks at a streetlight?

2    A.   All this is new.  I never heard of
3 anything he did.

4    Q.   What about March 4th of 1990.  Did you
5 hear anything about Shawn and a group of boys being
6 arrested after being accused of sexually assaulting
7 a 14-year-old girl named Jeanie Moore?

8    A.   No.  How many times was he assaulting
9 girls?  I never heard of that or saw any signs of
10 him acting like that.  No.  My answer is no.

11    Q.   You don't know who he lived with in March
12 of 1990; is that correct?

13    A.   I thought he was living with his mother.
14 If he wasn't with the mother, he was with my mother
15 or with me because I never know him to be with
16 nobody else.

17    Q.   What about April 1990.  Did you know that
18 Shawn was arrested after the principal of a school
19 observed him and another boy throwing up gang signs
20 and threatening each other with gang retaliation?

21    A.   No.  This is all new.  I haven't heard,
22 at all.

23    Q.   Back in April of 1990 he didn't live with
24 you; is that right?



Page 201

1    A.    In April of 1990?  No.  Shawn didn't come
2 until '91.  About two or three months, like I said,
3 before he got into this trouble.  I was just trying
4 to get him back in school and put him on the right
5 track.
6         If he was doing all this you say he was
7 doing, there was something going on because his
8 mother told me it was too much for her to deal with
9 and her heart was bad and Shawn was going to kill
10 her so I told her I was going to take him.
11    Q.    What about June 15th of 1990.  Did you
12 know that Shawn was arrested after he was observed
13 striking a fire hydrant with a wrench?
14    A.    No.  I haven't heard of that bad
15 behavior, at all.
16    Q.    Back in June of 1990 Shawn still didn't
17 live with you at that point, right?
18    A.    No.
19    Q.    What about July 9th of 1990.  Did you
20 know that Shawn was arrested after Jeanette caught
21 him running around outside naked and he threw a rock
22 breaking the rear window?
23    A.    Never heard of that either.  No.  I don't
24 have any knowledge of that.

Page 202

1    Q.    Let me show you this.  I'm going to ask
2 you questions about this one because here -- I'm
3 going to share my screen with you.  We can mark this
4 as Exhibit 3.
5         (WHEREUPON, a certain document was
6          marked Exhibit No. 3, for
7          identification, as of 11/12/2021.)
8 BY MS. JOHNSON:
9    Q.    Can you see this here, what's on my
10 screen, or can you not see any video?
11    MS. SPENCE:  She's on the phone.  There is no
12 video.
13    MS. JOHNSON:  That's right.
14    MS. SPENCE:  There's no video, at all.  Can you
15 say the Bates-stamp number?
16    MS. JOHNSON:  Absolutely.  It's CCSAO subpoena
17 Exhibit 6680 through 6681.  Actually, it starts at
18 6679 through 6681.
19    MS. SPENCE:  Okay.
20 BY MS. JOHNSON:
21    Q.    We have a police report that says an
22 incident occurred on July 9th of 1990 at 1212 West
23 51st Street and the witness or the complainant here
24 is listed as Jeanette Jakes and that's Shawn's mom,

Page 203

1 right?
2    A.    Right.
3    Q.    It lists her home address as 1212 West
4 51st Street?
5    A.    Who called the police on who?
6    Q.    On Shawn.
7    A.    I'm saying I don't know anything about
8 that.
9    Q.    Do you ever remember Jeanette telling you
10 about an incident where Shawn threw a rock breaking
11 the rear window of 1212 West 51st Street?
12    A.    No.
13    Q.    Back in July -- on July 9th of 1990 you
14 owned 1212 West 51st Street, right?
15    A.    Yes.
16    Q.    You don't remember having to repair a
17 broken window?
18    A.    No.  This is all new to me now.
19    Q.    That's all right.  What about
20 November 24th, 1990.  Did you know that Shawn and
21 several other boys were arrested after they were
22 accused of trying to break into a man's house and
23 after the man chased them away, they picked up
24 wooden weapons and threatened to batter him if they

Page 204

1 continued to follow him?
2    A.    I don't know.  I never heard of that, any
3 of that.
4    Q.    Back on November 24th of 1990, Shawn did
5 not live with you, right?
6    A.    No.
7    Q.    What about February 28th of 1990.  Did
8 you know that Shawn and another boy were arrested
9 for pushing down a 52-year-old man and hitting him
10 several times on the head and face?
11    A.    No.
12    Q.    Back on February 28th of 1990, just so
13 we're clear, Shawn did not live with you?
14    A.    What now?  No part of the '90s did he
15 stay with me.  He probably had been to my house and
16 spent some nights or something.  I wasn't aware of
17 any of this bad behavior that he was doing and
18 didn't know how he wind himself up at Marksville
19 (phonetic).  That's where I come in at.  I never did
20 -- none of it.  Any of that.
21    Q.    I gave you the wrong date.  It's
22 February 28th, 1991.  I apologize.  I misspoke.
23    A.    I don't know of no time he was arrested.
24    Q.    Back in February of 28th, 1991, he did



Page 205

1  not live with you; is that correct?
2      A.    February the 28th?
3      Q.    Yes.
4      A.    No.  That was too many months -- well,
5  I'm not going to say no.  I got him in '91, but I
6  don't know what month.  I didn't have him long.  I
7  know I didn't have him long because I never saw any
8  of this behavior.
9      Q.    You talked about a time that Shawn was
10  arrested in Milwaukee and something about killing
11  somebody.
12      MS. SPENCE:  Objection.  Mischaracterizes the
13  testimony.
14          Go ahead.
15  BY MS. JOHNSON:
16      Q.    Do you know about a time when Shawn was
17  arrested in Milwaukee on August -- in August
18  of 1991?
19      A.    Yes, I remember that time that they say
20  he was supposed to have killed a man over there in
21  Milwaukee, but the next thing I heard he didn't do
22  it.
23      Q.    So by August 21st of 1991, even though he
24  had been arrested in Milwaukee, was he living with

Page 206

1  you at that point?
2      A.    He came from Milwaukee to my house and I
3  took him in.
4      Q.    If he was arrested in August -- on
5  August 21st, 1991 in Milwaukee, he didn't live with
6  you yet at that point; is that correct?
7      A.    Correct.
8      Q.    I just want to go over -- I'm going to
9  try and move through this as fast as we can.
10          I just want to talk to you about what you
11  did today to prepare for your deposition.  Did you
12  review any materials prior to your deposition today?
13      A.    Nothing more than looking at what I said
14  the first time when I know I had to correct -- that
15  was the same -- for one deposition --
16      MS. SPENCE:  Ms. Jakes, are you referring to
17  your motion to suppress testimony where you're using
18  the term deposition?
19      THE WITNESS:  When I first did the deposition
20  for the first -- very first one.
21      MS. SPENCE:  Right.  So I'm just referring when
22  you say "the deposition," are you talking about in
23  court?
24

Page 207

1      THE WITNESS:  In court, that deposition from --
2  it was in September.  September, I think, is the
3  only one I did.  Somewhere in September back in '90
4  or '91.  I think it was '90, '91.  '90 or '91.  I
5  don't remember all this other stuff that you're
6  running past me.  I don't know nothing about it.
7  BY MS. JOHNSON:
8      Q.    Do you believe that you also testified in
9  court sometime in September of 1991?
10      A.    Do I remember?
11      Q.    Right.  That's what I thought I just
12  understood you to say.
13      A.    I remember, yes.  That's the only time I
14  remember anything about Shawn that I went to court
15  for.
16      Q.    I will represent to you that I have a
17  transcript from testimony that you gave in
18  November -- on November 18th of 1993.  I think
19  that's actually the wrong year.  I think that's
20  1992.  Excuse me.  It is '92.  November 18th of
21  1992.  Did you testify at any time before that?
22      A.    I testified, I think, after -- I remember
23  because I had a deposition.  So there was a court,
24  but I don't know what day it was.

Page 208

1      Q.    Let me ask you this.  A deposition is a
2  little different than you giving testimony in court.
3          For example, right now you're in a
4  deposition.  There's a court reporter present.  The
5  videographer was present.  The attorneys for the
6  parties are present, but there is no judge present.
7          When you are talking about your testimony
8  in September of 1991, did you do that before a judge
9  or was there no judge present?
10      A.    A judge.
11      Q.    So did you testify again in November --
12  on November 18th of 1992 before a judge?
13      A.    Yes.
14      Q.    To the best of your recollection, you
15  testified twice before a judge.  One was in
16  September of 1991 and then the second was
17  November 18th of 1992; is that right?
18      A.    Correct.
19      Q.    Now I'm asking you, what materials or if
20  you -- I think you were talking about giving a
21  deposition or something.  Did you review your
22  testimony from September of 1991 to prepare for your
23  deposition today?
24      A.    No.  I reviewed the one that I had when I



Page 209

1  said that they called me.  They never called me.
2  And I changed that at the second one.  That's the
3  only thing I wanted to change.
4      Q.    What you're telling me, then -- I'll
5  represent to you that the testimony where you
6  testified that the police called you, that was
7  November 18th of 1992?
8      A.    Okay.  That was the time.
9      Q.    Did you testify again after November 18th
10  of 1992?
11     A.    Yes, I testified again.  That's when I
12  corrected that statement and everything else I let
13  it stay like it was because that was the only thing
14  that I lied about on the stand.
15     Q.    Let me ask you this.  Do you remember the
16  date that you testified the next time after your
17  testimony in November of 1992?
18     A.    Of '92?  Do I remember what day it was?
19  No.
20     Q.    Do you have a transcript in front of you
21  that has a date that was -- that details your
22  testimony that was sometime after November of 1992?
23     A.    Hold on one second.  I got it.  The 18th
24  day of November 1992, that would be the date.

Page 210

1      Q.    Let me reask it.  Is that the only time
2  you testified in front of a judge with respect to
3  Shawn?
4      A.    No.  There was another time I testified,
5  but I don't have that.
6      Q.    When was the other time that you
7  testified?  Was it before or after the testimony you
8  gave on November 18th of 1992?
9      A.    It was after.
10     Q.    Do you remember what year it was that you
11  testified after 1992?
12     A.    No.
13     Q.    Do you remember whether or not you gave
14  testimony again with respect to Shawn in front of a
15  judge sometime in the 2000s?
16     A.    Yes.  That's the one I remember.  That's
17  the time that I testified when they brought this up
18  that I said they called me and they didn't.  They
19  never called me.  I wanted to correct that and
20  that's what I corrected.
21        But the only reason I did that was
22  because somebody was supposed to be looking out.  I
23  thought they had overlooked that and they would be
24  proud of me or something.  I don't know why I said

Page 211

1  they called me, but they didn't call me, ever.
2      MS. SPENCE:  I know that we are trying to be
3  efficient here.  The postconviction hearing happened
4  over a number of years in the 2000s, but she is
5  referring to testifying at the postconviction stage.
6      MS. JOHNSON:  Right.
7  BY MS. JOHNSON:
8      Q.    I guess my correct question is, then, did
9  you ever actually end up testifying because you just
10  told me they were supposed to call you, but they
11  didn't call you.  Did you ever end up actually
12  testifying?
13     MS. SPENCE:  Sorry.
14  BY THE WITNESS:
15     A.    I testified twice on Shawn's behalf, this
16  time and another time.  It was at the office where I
17  straightened up this.
18     MS. SPENCE:  Brittany, just to clarify because
19  there may be some confusion.
20     MR. YAMIN:  If you want to clarify, you should
21  do it on questioning after Brittany is done.  This
22  is ridiculous that you're interjecting.  You're
23  testifying for the witness.  That's not proper.
24  Save it for cross, please.

Page 212

1      MS. SPENCE:  I'm not testifying for Ms. Jakes.
2  I think there is some obvious confusion that I am
3  trying to clear up in the interest of time.  I know
4  we've had a lot of delays.
5         I know that we've had a lot of delays in
6  this deposition, none of which have been your fault
7  or defense counsel's fault.  There were some
8  technological delays.  I'm totally fine to let it go
9  over as long as it needs to go to clear it up, but
10  I'm just trying to help it be more efficient.  I
11  noted what you're saying.
12  BY MS. JOHNSON:
13     Q.    Let's go through the testimony.  You said
14  you testified two other times or just the one other
15  time?
16     A.    The one other time that I recall.
17     Q.    I understand now.  All right.
18        Do you have a copy of that testimony in
19  front of you?
20     A.    No.
21     Q.    Other than the transcript that we talked
22  about, the one from November 18th of 1992, did you
23  review any other materials to prepare for your
24  deposition today?



Page 213

1    A.    No.
2    Q.    Do you have a computer?
3    A.    Yes.
4    Q.    Did you do any Internet research
5    regarding the claims being made by Anthony in this
6    case?
7    A.    No.
8    Q.    Have you ever seen any news coverage
9    about Shawn's release from prison?
10    A.    Yes, I saw something.
11    Q.    Do you remember where you saw it?
12    A.    They cleared him.  Once they cleared him,
13    that was on the news.
14    Q.    Did you see it on like the TV news or did
15    you read it in, like, a newspaper or some other
16    online article or something like that?
17    A.    It was in the newspaper too.  They had a
18    couple articles we cut out to keep, but I don't
19    remember where it come from, the Sun-Times or
20    whatever the other -- Tribune.  Somebody had put it
21    on.
22    Q.    Do you still have those articles that you
23    cut out to keep?
24    A.    Yes.  Just cut them out to keep them.  I

Page 214

1    don't have them with me now.  They are at my house
2    in the fire cabinet.
3    Q.    You do -- you know that they still exist
4    so you have a copy of those articles that you
5    clipped?
6    A.    I think they still over there.  I haven't
7    been back over in a minute, but there's no one in
8    the house.  They should be in the fire cabinet where
9    I put them.  I don't have them with me now.
10    Q.    Why did you keep those materials?
11    A.    Because I knew he wasn't guilty in the
12    first place and I cut it out to keep it to have to
13    show if anybody asked me.  He spent 20 years --
14    that's why I kept it -- for nothing.  I'm always sad
15    about it, but I'm glad to have him with me.  That
16    was 20 years.
17    Q.    Other than your attorneys, did you talk
18    to anyone about your deposition today?
19    A.    No.
20    Q.    Have you ever given an interview or
21    spoken to any media outlet about Shawn's release
22    from prison?
23    A.    No.  A few friends said I know he's going
24    to be innocent.  Just a few friends.  It wasn't

Page 215

1    nothing that we're trying to get to -- no.
2    Q.    You never talked to like a news reporter
3    about Shawn's release?
4    A.    No, I can't remember talking to no news
5    reporter.  If I did, it was Russell the same day all
6    this happened.  We had a few words to say.  I don't
7    even remember what I said then or if I said
8    anything.  I think my sister did the talking.
9    Q.    When you say your sister, do you mean
10    Emma Mitts?
11    A.    Emma Mitts, yes.
12    Q.    Do you know anyone else that has
13    testified in this lawsuit?
14    A.    I don't know if anybody else testified or
15    not, no.
16    Q.    Have you read any deposition transcripts
17    from this case?
18    A.    No.
19    Q.    Have you watched any videos of any
20    depositions in this case?
21    A.    No.
22    Q.    Without going into the substance of what
23    you talked about with your attorneys, did you ever
24    meet in person with your attorneys with respect to

Page 216

1    your deposition in this case?
2    A.    No.
3    Q.    Without going into what may or may not
4    have been said to your attorneys, that's privileged,
5    did you ever have any conversations over the phone
6    with your attorneys about your deposition in this
7    case?
8    A.    No, nothing that I can think of now.
9    Q.    How did you find out about your
10    deposition to this case -- in this case?
11    A.    Someone called me.  I think -- what was
12    her name?  Helen.
13    Q.    Would that have been Heather?
14    A.    Heather.  Heather, what was her last
15    name.  I don't know her last name.  She wrote her
16    name down for me on paper.
17    Q.    I don't want you to tell me what Heather
18    talked to you about.  All I want to know is, do you
19    remember when Heather called you?
20    A.    I think it was last Monday.  I want to
21    say Monday because she said she would come by to
22    bring me the tablet.  This was going to be done on
23    the tablet.  She'd bring the tablet Tuesday.
24    Q.    I don't want to know what you guys talked



1  about.  When you talked to Heather on Monday, about
2  how long did you guys talk?
3      A.   We didn't talk that long.  She said she
4  would --
5      MS. SPENCE:  Wait, Ms. Jakes.  Don't say
6  whatever -- whatever Heather said or whatever you
7  said to Heather, don't talk about that.
8          What Ms. Johnson is asking is about when
9  and for how long, right?  So you're only talking
10  about time and date, not about content.  Okay?
11  BY THE WITNESS:
12      A.   Monday.
13  BY MS. JOHNSON:
14      Q.   All I want is know is about how long did
15  you talk to Heather when you talked to her on Monday
16  in terms of minutes, hours.  That's the only thing I
17  want to know.
18      A.   It was like minutes.  I would say about
19  ten or 15 minutes.
20      Q.   Other than the time that you talked to
21  Heather on Monday, did you ever speak with your
22  attorneys before or after that?
23      A.   No.
24      Q.   So was the only time you talked to one of

1  your attorneys about your deposition today last
2  Monday?
3      A.   Yes.
4      Q.   Now, I want to talk to you a little bit
5  more about Anthony.
6      MS. JOHNSON:  Just for the record, we're going
7  to take a break at 4:45 so we can switch court
8  reporters.
9      MS. SPENCE:  Okay.
10      MS. JOHNSON:  Just so you're aware so we're not
11  pressed for time.
12      MS. SPENCE:  Sure.
13  BY MS. JOHNSON:
14      Q.   I want to talk to you a little bit more
15  about Anthony.  Can you tell me is Shawn currently
16  employed?
17      A.   Not now, no.
18      Q.   When was the last time that Shawn had a
19  job since he's been out of prison?
20      A.   It's been a while, but I don't know
21  exactly how long.
22      Q.   Do you remember the name of his last
23  employer?
24      A.   No.

1      Q.   Do you recognize the name
2  Friedman Seeding?
3      A.   I think that's where he worked at.  I
4  think that's the name.  It was something like that.
5      Q.   Do you know whether or not his job with
6  Friedman Seeding was the last job he has had since
7  he's been out of prison?
8      A.   Yes.  I think that's the last job he's
9  had, that I remember.
10      Q.   Do you know why he no longer works at
11  Friedman Seeding?
12      A.   I know a little bit.  I don't know if
13  it's true or not.  Speculation.  I wasn't there.
14      Q.   Do you know why Shawn no longer works at
15  Friedman Seeding?
16      MS. SPENCE:  Objection.  Calls for speculation.
17  BY THE WITNESS:
18      A.   I would have to say what I heard.
19  BY MS. JOHNSON:
20      Q.   What did you hear?  Tell me what you
21  heard.
22      A.   I heard he was fired.
23      Q.   Did you hear why he was fired?
24      A.   Something about a misunderstanding on the

1  job.  A fight or something.
2      Q.   Who told you that?
3      A.   Shawn told me.  We want to know why you
4  ain't going to work.  You didn't go to work today.
5  You didn't go yesterday.  What's the problem.  They
6  called him and won't let him come back there.  An
7  incident happened at work.
8      Q.   Did he tell you what exactly the incident
9  was that happened at work?
10      A.   Not exactly going into the details.
11      Q.   I'm sorry.  I don't understand your
12  answer.  Did you say he did or did not go into
13  detail?
14      A.   He told me they told him to go home and
15  they would contact him later about what they going
16  to do about investigating.  And he kept sitting
17  around.  We want to know what happened.  And then he
18  said he was fired.  That's it.
19      Q.   Did he tell you that he was fired because
20  of a fight?
21      A.   He told me about a fight that he had with
22  somebody that worked there.
23      Q.   Did he tell you what the fight was about?
24      A.   I'm not sure what the fight was about.



Page 221

1 It was a fight or argument or something. Confusion.

2    Q.   When he was employed with Friedman
3 Seeding, do you know was that job part-time or
4 full-time?

5    A.   Full-time. Full-time and he was a
6 supervisor there. They had made him -- pushed him
7 up to a supervisor.

8    Q.   Do you remember about how long he had
9 worked for Friedman Seeding before he was fired?

10    A.   I don't know that.

11    Q.   Since his job at Friedman Seeding has
12 Shawn had any other jobs?

13    A.   Not that I know of. He didn't tell me
14 about nothing that he had. He was doing a little
15 work like with the alderman with my sister. He was
16 doing little stuff for her that I know about.

17       I don't know of any other job that he had
18 to do a nine to five, no. The alderman with
19 Emma Mitts. He worked up there with her for a
20 minute or so. I don't know if he's still doing that
21 or not.

22    Q.   You're talking about Emma Mitts, your
23 sister. She's an alderman; is that right?

24    A.   That's correct.

Page 222

1    Q.   When you said that Shawn would do some
2 work for her, was he helping her out with her
3 campaign?

4    A.   Sometimes he was campaigning for her and
5 he did some -- what is it? Something else. What
6 was it that he was doing for her? Besides
7 campaigning, something -- I can't tell you exactly
8 what his job was, but he was doing something for
9 her.

10    Q.   When he was working with Emma Mitts, was
11 that full-time employment?

12    A.   It was full-time what he was doing at
13 that time. Once the job ran out, it was over. He
14 got a chance to do something, I guess, like some
15 jobs they have up there.

16    Q.   If I'm understanding you correctly,
17 you're saying the employment that he had with
18 Emma Mitts would be seasonal so he would work until
19 the job was done and then there would be no work
20 anymore; is that right?

21    A.   Correct.

22    Q.   Did he get paid to do the work that he
23 was doing with your sister Emma?

24    A.   Yes. He was on the payroll. If it was

Page 223

1 campaigning, no. He had something else he was
2 doing. I can't think of the name. He did that
3 for -- I don't know how long. It was just like
4 seasonal, you campaigning or during the election
5 you're working for that.

6    Q.   Other than the job that you're talking
7 about with Alderman Emma Mitts campaigning and the
8 job at Friedman Seeding, has Shawn had any other
9 jobs since he's been released from prison?

10    A.   Nothing that I know of.

11    MS. JOHNSON: Let's take a break now so we can
12 switch court reporters.

13       (Discussion had off the record.)

14    THE VIDEOGRAPHER: That's the end of Media
15 No. 5. The time is 4:45 p.m. We are off the
16 record.

17    THE REPORTER: Before I hang up, are you
18 ordering this section of the transcript?

19    MS. JOHNSON: Yes, I'll order.

20    THE REPORTER: Copies?

21    MS. SPENCE: Yes, we'll order a copy.

22    MR. YAMIN: Not for the City. Thanks.

23       (WHEREUPON, a recess was had to
24       switch court reporters.)

Page 224

1 STATE OF ILLINOIS )

2            ) SS:

3 COUNTY OF DUPAGE )

4       I, KAREN PILEGGI, a Notary Public
5 within and for the County of DuPage, State of
6 Illinois, and a Certified Shorthand Reporter of said
7 state, do hereby certify:

8       That previous to the commencement of
9 the examination of the witness, the witness was duly
10 sworn to testify the whole truth concerning the
11 matters herein;

12       That the foregoing deposition
13 transcript was reported stenographically by me, was
14 thereafter reduced to typewriting under my personal
15 direction, and constitutes a true record of the
16 testimony given and the proceedings had;

17       That the said deposition was taken
18 before me at the time and place specified;

19       That I am not a relative or employee
20 or attorney or counsel, nor a relative or employee
21 of such attorney or counsel for any of the parties
22 hereto, nor interested directly or indirectly in the
23 outcome of this action.

24       IN WITNESS WHEREOF, I do hereunto



## Page 225

1  set my hand and affix my seal of office at Chicago,
2  Illinois, this 1st day of December, 2021.
3
4
5            Notary Public,
6            DuPage County, Illinois.
7            My commission expires 1/2/24.
8
9  CSR Certificate No. 84-3404
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

## Page 226

1            DEPOSITION ERRATA SHEET
2
3  Our Assignment No. J7638039
4  Anthony Jakes v Kenneth Boudreau
5
6        DECLARATION UNDER PENALTY OF PERJURY
7
8        I declare under penalty of perjury that I
9  have read the entire transcript of my Deposition
10  taken in the captioned matter or the same has been
11  read to me, and the same is true and accurate, save
12  and except for changes and/or corrections, if any,
13  as indicated by me on the DEPOSITION ERRATA SHEET
14  hereof, with the understanding that I offer these
15  changes as if still under oath.
16
17            Signed on the _____ day of
18  _____, 20___.
19            _____
20            JESSIE MAE JAKES
21
22
23
24

## Page 227

1            DEPOSITION ERRATA SHEET
2  Page No._____Line No._____Change to:_____
3  _____
4  Reason for change:_____
5  Page No._____Line No._____Change to:_____
6  _____
7  Reason for change:_____
8  Page No._____Line No._____Change to:_____
9  _____
10  Reason for change:_____
11  Page No._____Line No._____Change to:_____
12  _____
13  Reason for change:_____
14  Page No._____Line No._____Change to:_____
15  _____
16  Reason for change:_____
17  Page No._____Line No._____Change to:_____
18  _____
19  Reason for change:_____
20  Page No._____Line No._____Change to:_____
21  _____
22  Reason for change:_____
23  SIGNATURE:_____DATE:_____
24            JESSIE MAE JAKES

## Page 228

1            DEPOSITION ERRATA SHEET
2  Page No._____Line No._____Change to:_____
3  _____
4  Reason for change:_____
5  Page No._____Line No._____Change to:_____
6  _____
7  Reason for change:_____
8  Page No._____Line No._____Change to:_____
9  _____
10  Reason for change:_____
11  Page No._____Line No._____Change to:_____
12  _____
13  Reason for change:_____
14  Page No._____Line No._____Change to:_____
15  _____
16  Reason for change:_____
17  Page No._____Line No._____Change to:_____
18  _____
19  Reason for change:_____
20  Page No._____Line No._____Change to:_____
21  _____
22  Reason for change:_____
23  SIGNATURE:_____DATE:_____
24            JESSIE MAE JAKES



Page 229

```
 1              EXAMINATION

 2                          Page Line

 3  JESSIE MAE JAKES

 4  Examination by Ms. Johnson        4      6

 5

 6

 7            E X H I B I T S

 8  Deposition Exhibit              Page Line

 9  Exhibit No. 1........................  46    12

10  Exhibit No. 2........................  51     7

11  Exhibit No. 3........................ 202     6

12

13      ***ORIGINAL EXHIBITS RETAINED BY COUNSEL***

14

15

16

17

18

19

20

21

22

23

24
```



Exhibit 5

**1**

1   IN THE UNITED STATES DISTRICT COURT FOR THE

2   NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

3   ---------------------------x

4   ANTHONY JAKES,

5           Plaintiff,

6   v.              CASE NO. 19-cv-02204

7   KENNETH BOUDREAU, et al.,

8           Defendants.

9   ---------------------------x

10

11          Continuation of the

12      Videotaped Deposition of JESSIE MAE JONES

13          Conducted Virtually

14          Friday, November 12, 2021

15              4:53 a.m.

16

17

18

19

20

21

22  Job No.:  413488

23  Pages:  1 - 115

24  Transcribed by:  Bobbi J. Fisher, RPR

**2**

1   Continuation of the Deposition of JESSIE MAE

2   JONES, conducted virtually:

3

4

5   Pursuant to Notice, before Gabriel Martin, Digital

6   Court Reporter and Notary Public in and for the

7   State of Illinois.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**3**

1           A P P E A R A N C E S

2   ON BEHALF OF THE PLAINTIFF:

3       RENEE SPENCE, ESQ.

4       LOEVY & LOEVY

5       311 North Aberdeen Street, Suite 3

6       Chicago, Illinois 60607

7       (312) 243-5900

8

9   ON BEHALF OF THE DEFENDANT:

10      BRITTANY D. JOHNSON, ESQ.

11      ROCK FUSCO & CONNELLY, LLC

12      321 North Clark Street, Suite 2200

13      Chicago, Illinois 60654

14      (312) 494-1000

15

16      GEORGE YAMIN, ESQ.

17      THE SOTOS LAW FIRM

18      141 West Jackson Boulevard, Suite 1240A

19      Chicago, Illinois 60604

20      (630) 735-3322

21

22  ALSO PRESENT:

23      Matthew Miller, Videographer

24

**4**

1               I N D E X

2   WITNESS/DESCRIPTION                    PAGE

3   JESSIE MAE JAKES (Continuation)

4       Continuing Examination by Ms. Johnson   5

5       Examination by Ms. Spence             86

6       Further Examination by Ms. Johnson   110

7

8               E X H I B I T S

9           (Attached to the transcript.)

10  EXHIBIT          DESCRIPTION          PAGE

11  Exhibit 4    Note                      111

12

13

14

15

16

17

18

19

20

21

22

23

24

**5**

1    P R O C E E D I N G S
2        VIDEOGRAPHER:  This marks the beginning
3    of Media No. 6.  The time is 4:53 p.m.  We are on
4    the record.
5    CONTINUING EXAMINATION ON BEHALF OF THE DEFENDANTS
6    BY MS. JOHNSON:
7        Q.    Hello, Ms. Jakes.  I have a couple more
8    questions for you, so...
9            And really briefly, we were talking about
10    Sean's jobs and everything that he had, and I
11    wanted to ask you, has Sean ever discussed any
12    career goals that he has with you?
13        A.    Yes, something he discussed with me about
14    something he wanted to do.  I can't think of it
15    right now what is it.
16        Q.    You don't remember what it was that he
17    had discussed with you that he wanted to do?
18        A.    No, I can't think of it right now.
19        Q.    Do you remember when you had this
20    conversation with him about his career goals?
21        A.    I remember us talking about it, but
22    it's -- he is not doing it.
23        Q.    Okay.  Have you helped him in any way
24    since he's been released from prison to try and

**6**

1    get a job?
2        A.    All I can.  If you find a job for him, he
3    is not taking it.
4        Q.    So have you -- have you looked for jobs
5    for Sean?
6        A.    Well, Emma had found him a few, but he
7    would always have a reason why he wasn't going.
8        Q.    And when you say "a few," are you talking
9    about more or less than two or -- than two?
10        A.    More.
11        Q.    When you say "a few," are you talking
12    about more or less than three?
13        A.    I'm talking about jobs that she had
14    him -- people said that he could come to it, and
15    Sean wouldn't show up or something happen or he
16    say he showed up and he didn't like the -- he
17    didn't like it or something -- something that he's
18    not working.  It would always be something, since
19    he had the first -- the job that he had.
20        Q.    Is --
21        A.    He's not had another.
22        Q.    Oops, sorry.
23            When you're talking about the jobs that
24    Emma tried to show him, were those before or after

**7**

1    he -- he got his job at Freedman Seating?
2        A.    I think she put him up on that one too.
3        Q.    And then after he was -- after he was let
4    go from Freedman Seating, has Emma tried to show
5    him or get him other jobs?
6        A.    Yes.
7        Q.    Okay.  And what happened with those jobs?
8        A.    She would have him set up for one.  If he
9    went to it, he went to it or he didn't go or I
10    don't know.  He had tell him he was on work.  I
11    think he worked maybe a day or so or didn't work
12    at all.  I don't know the outcome, but the only
13    job I knew him to have was the Freedman job.
14        Q.    Okay.
15        A.    Since he's been out.
16        Q.    All right.  Do you know if Sean -- I know
17    he was young, but do you know if Sean had any jobs
18    before we went to prison in 1991?
19        A.    I don't know of any.
20        Q.    Did you -- did you ever know Sean to work
21    at the corner store near 51th and Racine before
22    September 1991?
23        A.    No.
24        Q.    What about a paper route?  Did Sean ever

**8**

1    have a paper route when he was younger?
2        MS. SPENCE:  Ms. Met -- sorry; Ms. Jakes,
3    can you hear us?  Ms. Jakes?  Okay.  All right.
4    Can we go off the record?
5        VIDEOGRAPHER:  This marks the end of
6    Media No. 6.  The time is 4:58 p.m.  We are off
7    the record.
8        (A brief recess was taken from 4:58 p.m.
9    to 5:08 p.m.)
10        VIDEOGRAPHER:  This marks the beginning
11    of Media No. 7.  The time is 5:08 p.m.  We are on
12    the record.
13    BY MS. JOHNSON:
14        Q.    Okay.  I'm not -- I think I left off when
15    I asked you if Sean, when he was younger, if he
16    ever had a paper route.  And you said no, you
17    don't remember that?
18        A.    I said I don't know.  I don't know of him
19    having a paper route.
20        Q.    Do you remember whether or not there was
21    a corner store back in 1991 located at 51st and
22    Racine?
23        A.    Yes, I remember a corner store.
24        Q.    Do you remember the name of the corner

**9**

1 store?
2    **A. No, I don't remember the name of the**
3 **store.**
4    Q. Do you know anybody who worked at that
5 corner store?
6    **A. Nobody that I know of.**
7    Q. If you know, did Sean have a bike back in
8 1991?
9    **A. A bike?**
10    Q. Mm-hmm. Did he have a bike that he could
11 ride, a bicycle?
12    **A. I don't know.**
13    Q. Okay. Do you know, does Sean have a
14 driver's license now?
15    **A. I don't know that either. He say he**
16 **have, but he never showed it to me.**
17    Q. Does Sean have a car now?
18    **A. Yes.**
19    Q. Is that Sean's car or somebody else's
20 that he borrows?
21    **A. It's Sean's car. He said his car.**
22    Q. What kind of car is it?
23    **A. I don't know, but he says it's his.**
24    Q. Is it -- do you know is a two-door or a

**10**

1 four-door?
2    **A. It's a four-door. I know it's a**
3 **four-door.**
4    Q. Do you know what color it is?
5    **A. Maroon with a little black stripe across**
6 **the front.**
7    Q. Is it an actual car or is it more like a
8 truck or an SUV?
9    **A. Truck.**
10    Q. Okay. Do you know about how long he's
11 had that car since he's been out of prison?
12    **A. I don't know how long he's had it.**
13    Q. Do you know right now -- I know you told
14 me that Sean doesn't have a job right now, but
15 does he have any source of income other than a job
16 right now?
17    **A. Not that I know of.**
18    Q. Do you know, does Sean contribute to
19 household expenses where you guys live or does he
20 pay any rent?
21    **A. Well, he would pay that to my sister, I**
22 **guess, but I don't know of him paying anything to**
23 **her.**
24    Q. Do you know if he helps -- if he helps

**11**

1 pay for, like, the lights or anything else?
2    **A. I don't know of him having bills or**
3 **anything.**
4    Q. Right now -- okay. So you don't know
5 whether or not he's ever paid a bill at the house?
6    **A. He probably -- he may have paid a bill**
7 **from when he was working or something, but I don't**
8 **know -- I don't know what bills that he paid.**
9    Q. Right now where you guys live, does Sean
10 have his own room?
11    **A. Yes.**
12    Q. And where is Sean's room in the house?
13    **A. In the basement.**
14    Q. Does Sean have the whole basement to
15 himself?
16    **A. No.**
17    Q. Who else shares the basement?
18    **A. (Inaudible). Two bedrooms in the**
19 **basement. My bedroom is in the basement next to**
20 **Sean's bedroom. And I don't see nobody else in**
21 **there but he and I.**
22    Q. Okay. But you each have your own
23 bedrooms?
24    **A. Yes.**

**12**

1    Q. Okay. And what about -- what about Emma?
2 Does she have her own bedroom too?
3    **A. Yes, she's upstairs.**
4    Q. How many bedrooms are upstairs in Emma's
5 house?
6    **A. Emma has three bedrooms. Two downstairs**
7 **and one upstairs.**
8    Q. And the two downstairs are both --
9    **A. Two bedrooms upstairs and two downstairs.**
10 **Just one bedroom is nothing in there but, you**
11 **know, she had changed it from a bedroom to putting**
12 **clothes in there.**
13    Q. Okay.
14    **A. But take the clothes out there, it's**
15 **still a bedroom.**
16    Q. Okay. So if I understand correctly,
17 there's four total bedrooms in the house.
18    **A. Correct.**
19    Q. Okay. Do you know, is Sean dating anyone
20 now?
21    **A. Yes. He has a girlfriend. Her name is**
22 **Monique, but I don't know the last name.**
23    Q. How long has Sean been dating Monique?
24    MS. SPENCE: Objection. Calls for

13

1 speculation.
2      Go ahead.
3      **A.  I don't know how long he been dating her,**
4 **but he told me it was his girlfriend, and that's**
5 **who I see him with.**
6      Q.  Do you know, was Sean dating anyone while
7 he was in prison?
8          MS. SPENCE:  Objection.  Calls for
9 speculation.
10     **A.  (Inaudible).**
11     Q.  I'm sorry; what did you say?
12     **A.  I don't know if he had -- was dating**
13 **anyone when he was in there.**
14     Q.  Did Sean ever tell you how he and Monique
15 met?
16     **A.  Not really.**
17     Q.  If you know did they start dating after
18 Sean got out of prison?
19     **A.  Yes.**
20     Q.  And, if you know, has Sean been dating
21 her for more than a year?
22     **A.  Yes.  I mean, she is the only one that I**
23 **saw him dating.  If he's dating anybody else, he**
24 **didn't bring her around here.  I only know of one**

14

1 **and that's Monique.**
2      Q.  Okay.  Let me ask you --
3      **A.  To my knowledge.**
4      Q.  -- what year did Sean get out of prison?
5      **A.  Mmm, lord.  I'm trying to think of**
6 **something.  Ain't nothing coming to my head.  I**
7 **just don't know.  He's been out about ten years, I**
8 **believe, so -- or come back.**
9      Q.  If I were to tell you -- if I were to
10 tell you that Sean got out of prison in 2012, does
11 that sound about right to you?
12     **A.  It's nothing ringing a bell of when he**
13 **got out.  Just (inaudible), I never thought about**
14 **it.  And I'm serious.  I know he's out.  I think**
15 **he's been out that long, and I don't know for sure**
16 **of that.**
17     Q.  Okay.  So since Sean's been out of
18 prison, what does he like to do to relax?
19     **A.  I think he like to watch football games**
20 **and some on television, some shows.  And he**
21 **like -- what is it?  Martin Lawrence.  And he like**
22 **dancing.  Wrestling.  All the sports things.**
23     Q.  Are you talking about those are the
24 things he likes to watch on TV?

15

1      **A.  Yes, all the sports.  Any sports you can**
2 **name, he's on the television.  He don't like -- he**
3 **call our shows nothing.  No Lifetime, nothing like**
4 **that.  He like old stuff.  Something funny like**
5 **Martin Lawrence or we watching Jeopardy.  Oh, he**
6 **loves Jeopardy.  And Wheel of Fortune, Price is**
7 **Right.  Start to whoop and holler and laugh and**
8 **try to say we done won something.  We ain't won**
9 **nothing.**
10     Q.  Does Sean have a TV in his bedroom?
11     **A.  Yes.**
12     Q.  What else does Sean like to do for fun?
13     **A.  For fun?  I like Sean like to -- he like**
14 **to be the center of attention of whatever he's**
15 **doing, laughing or lying, I don't know.  But he**
16 **have fun.**
17     Q.  And if you were to tell me -- if I were
18 to ask you what Sean's favorite thing to do was,
19 what is that?
20     **A.  His favorite thing to do?  He likes to**
21 **sit around and eat and joke.**
22     Q.  Do you see Sean sitting around and eating
23 and joking often?
24     **A.  Well, when he did hang around me.  I**

16

1 **guess I'm not doing as much -- as he would do**
2 **outside, so he'd mostly spend his time out**
3 **someplace else.  But when he's here and we're**
4 **talking about cooking or watching something, he'll**
5 **come in on one of his favorite shows.  Since the**
6 **Price is Right done changed its schedule, I don't**
7 **know what he's doing from 9:00 to 10:00 because he**
8 **used to watch --**
9      Q.  Does Sean go out often?
10     **A.  I don't know about often, but he -- he**
11 **gets around.  I mean, I don't -- I wouldn't know**
12 **if he's in the basement -- he's in the basement --**
13 **he's been home now for about two weeks.  That's**
14 **because he's been sick.  He wasn't feeling well.**
15     Q.  So you're saying that he's been at the
16 house for about two weeks now because he was sick?
17     **A.  Yeah.  I mean, I have been seeing him**
18 **often this -- for two weeks, but he told me he was**
19 **sick.  He said he had a boil and he had some type**
20 **of cold or -- he wasn't feeling like doing much,**
21 **and he had -- coming down with a sweat.  And he**
22 **stays in the basement because he -- he went to the**
23 **doctor yesterday, and it's nothing but just a**
24 **common cold, they said.**

17

1    Q.  And when he's not sick -- well, so when
2  he's not sick, does he like to go out?
3    **A.  Yes.**
4    Q.  Now, since Sean's been out of prison,
5  does he drink alcohol?
6    **A.  I'm pretty sure he drinks alcohol, but --**
7    Q.  Have you ever actually seen --
8    **A.  -- (inaudible).**
9    Q.  -- him drink any alcohol?
10   **A.  Yes.**
11   Q.  Do you think Sean has a problem with
12 alcohol?
13   **A.  I don't know if it's a problem or not,**
14 **but I know he drinks.**
15   Q.  Do you know -- does Sean drink a lot now?
16   **A.  Well, I think he drinks more than what he**
17 **was drinking.  To me, he drinks more.**
18   Q.  Well, let me back that up.  So what do
19 you mean by "more than when he" --
20   **A.  If you're having a party, we're setting**
21 **up -- it's your party and we're going to have a**
22 **party and we're going to get together and**
23 **everybody toast, we take a drink.  But I think**
24 **he's drinking more than if we're going to a party.**

18

1  **I think maybe he get him a bottle where there's**
2  **nothing going on.**
3    Q.  Okay.  I understand.
4    **A.  That sort of drinking.  That sort of**
5  **drinking.  Drinking just to be drinking, I guess.**
6    Q.  But did you ever see him drink before he
7  was in prison?
8    **A.  I never saw him drink before he went to**
9  **prison, not even beer.**
10   Q.  Okay.  So --
11   **A.  I never --**
12   Q.  So we're talking about now.  And you
13 said --
14   **A.  We're talking about now?**
15   Q.  Right.  I'm talking about -- I want you
16 to focus on now, since Sean's been released from
17 prison.  I asked you if he drank alcohol, and you
18 said he does.  And I was --
19   **A.  Yes.**
20   Q.  And then I asked you if you thought that
21 Sean has a problem with alcohol now.
22       MS. SPENCE:  Objection.
23   **A.  Without me being (inaudible) and what I**
24 **have seen and heard, I think he has sort of a**

19

1  **problem.  I don't know if it's -- if he drinks**
2  **nearly every day.  He would have to tell you that.**
3  **But I see him drinking occasionally.  But drinking**
4  **when there is no party or nothing that we're**
5  **toasting to.  It's not to no happy new year,**
6  **nothing like that.  He drinks other than that.**
7  **From when I see him tasting, we tasting altogether**
8  **where it just be a little taste like, not no**
9  **drinking the whole bottle or you'll sit down and**
10 **drink this whole bottle.  We take a shot.  But I**
11 **myself drink beer.**
12   Q.  Okay.  When you see Sean drink, is he
13 ever drinking by himself?
14       MS. SPENCE:  Objection to form.
15       Go ahead.
16   **A.  When I see him drinking, he has to be**
17 **drinking by his self.  I'm not drinking with him.**
18   Q.  Well, let me rephrase that.
19   **A.  But I'm saying he -- he can have a drink**
20 **when there's nothing going on.  So if that's a**
21 **problem with drinking or it couldn't -- might not**
22 **be a problem.  It's just something maybe he does.**
23 **But it's something new to me, I'm saying with**
24 **(inaudible) drink.**

20

1    Q.  Let me ask you a different way then.
2  Does the amount that Sean drinks cause you
3  concern?
4    **A.  Sometimes.**
5    Q.  Do you believe that the amount that Sean
6  drinks now has any relation to his time that he
7  spent in prison?
8    **A.  I believe there's something going on**
9  **there, but I can't just say because he's not**
10 **talking to me.  Like I told him, if he would go**
11 **and sign himself up and talk with a person or**
12 **see if -- he may be missing something.  But he**
13 **told me that he's not crazy.  You don't have to be**
14 **crazy to see a psychiatrist.  So I wanted him just**
15 **to be checked out.  That's what my intentions**
16 **were, when I heard of anything that he was doing.**
17   Q.  Okay.  Well, let me stop you really quick
18 and let me ask you a question.  Since Sean has
19 been out of prison, do you know if he's ever gone
20 to see a mental health professional?
21   **A.  I don't think so, but we're all pushing**
22 **that on him, so he might be going and he might**
23 **not.  I don't know.**
24   Q.  So you yourself have asked or have talked

21

1  to Sean and told him that he may need to go see a
2  mental health professional; correct?
3  **A. Correct.**
4  Q. And when you told Sean that, what did he
5  tell you?
6  **A. He's not crazy. Those are his exact**
7  **words.**
8  Q. So he said he wasn't crazy. And did he
9  refuse to go?
10  **A. He never made an appointment, I'm saying.**
11  **I never know of no facility that he went to. And**
12  **this was when he was released to go to different**
13  **places to see -- just to check, you know, if**
14  **there's an alcohol problem. I'm saying now his**
15  **alcohol problem runs on his father's side, but I**
16  **don't know if it's an alcohol problem. I'm**
17  **telling you I don't know.**
18  Q. Okay. So you don't know whether or not
19  Sean has a problem with alcohol.
20  **A. No.**
21  Q. Okay. Have you Sean, since his release
22  from prison, use any other drugs like, for
23  example, marijuana or anything else?
24  MS. SPENCE: Objection to form.

22

1  **A. Well, I saw him with a little marijuana**
2  **maybe but -- smoking a little marijuana maybe but**
3  **nothing else. I never saw him with any other**
4  **drugs at all.**
5  Q. Okay. And do you think he has a problem
6  with regards to marijuana?
7  MS. SPENCE: Objection. Form. Calls for
8  speculation.
9  Go ahead.
10  **A. Yeah, that would be speculation, but I --**
11  **I would have to speculate because I don't know for**
12  **sure if he has a problem or he just smoke -- I saw**
13  **him smoking one time. And I said, "Oh, lord, you**
14  **can smoke now!" He say, "I stay in jail for 20**
15  **years. I should be able to do something I want to**
16  **do." So we laughed about it, but I don't think**
17  **it's no big thing. Like he's just smoking or**
18  **getting drunk and falling all out and coming in**
19  **drunk or clowning. He treat me the same, so I**
20  **don't know.**
21  Q. Okay. All right. What about any
22  other -- any other drugs? Have you ever seen Sean
23  use any other drugs besides marijuana?
24  **A. No.**

23

1  MS. SPENCE: Objection.
2  BY MS. JOHNSON:
3  Q. Do you know, does Sean smoke cigarettes?
4  **A. No, I don't think he can handle the**
5  cigarettes. That's why I'm (indiscernible)
6  smoking. He had a pack or two, but I don't see
7  him with in cigarettes, no pack or nothing. So I
8  think that was just something...
9  Q. Oh, I'm sorry. What did you say?
10  **A. I said I don't think he smokes cigarettes**
11  **but he did, when he first got out, he tried to**
12  **smoke cigarettes, trying to be like the boys, I**
13  **guess, but he couldn't handle the cigarettes more**
14  **because they cost too much.**
15  Q. Okay. Fair enough. Okay. So --
16  **A. (Inaudible) smoke.**
17  Q. Has Sean ever -- other than his career
18  aspirations, has Sean ever talked to you about any
19  goals or things that he wants for the future with
20  you?
21  **A. Yeah, he say he would love to have a wife**
22  **and some kids or maybe -- or find out if he can**
23  **have kids. He said he would have had one if he**
24  **hadn't went to jail, but I don't know. He's been**

24

1  **out long enough to have had one if he wanted one.**
2  **So he might want no kids like he told me he did.**
3  **But that was his first goal. He said he wanted**
4  **kids. He wanted a nice place and a wife. He**
5  **wanted to do things. He always talk about good**
6  **things that he can do, but you have got to start**
7  **somewhere. Show me something. Start out at least**
8  **showing where he's working every day.**
9  Q. Right. And you said right now he's not
10  working every day; right?
11  **A. Not going to no job like 9:00 to 5:00,**
12  **you have got to be here and you have got to be**
13  **there, no. I don't think he got a job.**
14  Q. Okay.
15  **A. If he got a job, he didn't tell me**
16  **nothing about it.**
17  Q. Okay. And as far as you know, Sean does
18  not have any kids right now?
19  **A. As far as I know, ain't nobody saying he**
20  **is a father. He said he don't have no kids**
21  **nowhere.**
22  Q. Okay. I want to talk to you about --
23  about DJ. Who is DJ?
24  **A. DJ is a Sean's brother, baby brother.**

25

1    Q.   And what's DJ's government name?
2    A.   DJ's government name?
3    Q.   Right.  What's his actual real name?
4    A.   Dennis James Anderson.
5    Q.   Okay.  But do you guys call him DJ?
6    A.   We just call him DJ.
7    Q.   And when did DJ pass away?
8    A.   DJ just recently passed away.  About four
9 or five months ago, maybe six.
10   Q.   Okay.
11   A.   Or maybe -- maybe that time.  I don't
12 know.  We just -- it just happened suddenly.
13 Automobile accident.
14   Q.   How does Sean handle the passing of his
15 brother?
16   A.   Oh, it was terrible at first, but I guess
17 after you get over he's gone and you never see him
18 again, you start trying to live and
19 (indiscernible).  He's telling me since then
20 he's -- he's been the same.  He took it hard
21 because he only had that one brother, that I know
22 of.  The other brother he had on the father's side
23 after he left my sister, that brother is dead too.
24 He died before DJ.

26

1    Q.   Actually, we haven't talked a lot about
2 Sean's dad.  What was Sean's father's name?
3    A.   Same thing.  Dennis James Anderson.  DJ
4 was named after him, Jr.
5    Q.   Okay.
6    A.   Dennis James, Sr.
7    Q.   Okay.  And was Dennis the senior -- we'll
8 call him Dennis Sr. -- was Dennis Sr. a big part
9 of Sean's life when he was little?
10   A.   No part of his life.  I think that's when
11 he start acting up -- acting out, when he couldn't
12 get a chance to meet with him or -- I don't know
13 what he had in his head, but he always talked
14 about him.  I'm so glad they get in a relationship
15 going after the first time since I knew he was in
16 the world the first time.  And he wanted to spend
17 Thanksgiving with him this year.  And they talked
18 on the phone.  I can hear him talking all the time
19 with his father now, but I never did hear nothing
20 of him and his father being together at all.
21   Q.   And what about -- so I'm talking about
22 before Sean -- Sean went to prison.  You're saying
23 that he didn't really have a relationship with his
24 father?

27

1    A.   No.  It was like that (indiscernible) --
2 that (indiscernible).  You know?  It was just
3 negative.  But I couldn't see nothing he was
4 doing.  He didn't ever stop by and see the kids or
5 I know you can give this to him, give this to my
6 boy, give this to my daughter.  Never.  We was
7 real good friends, but he went on, got somebody
8 else, and then he didn't even call me no more for
9 a long time.  But now we're talking again.  I
10 asked him why did he do that.  He thought he would
11 leave one thing and just go on to another one, but
12 you don't leave family.  We was all like family.
13 You have children over here.
14   Q.   Did -- actually, let's strike that.
15        Do you know where does Dennis Sr. live
16 now?
17   A.   He's back in Arkansas.  He did live up
18 here, but now he's back in Arkansas.  He's living
19 in Arkansas.
20   Q.   When Sean was younger and lived in
21 Chicago, did Dennis Sr. also live in Chicago?
22   A.   Yes.  He lived up here before Sean ever
23 came to Chicago.
24   Q.   Okay.  So let's go back.  I just want to

28

1 touch on DJ again.  You said that he took it hard
2 because that's the -- he only had the one brother.
3 How is Sean doing now?
4    A.   It's hard to tell how he is doing now
5 when he's not communicating.  He started
6 communicating (indiscernible).  He was not talking
7 with me like he used to and we're not planning and
8 doing things like we used to.  If I have a doctor
9 appointment and need him to take me somewhere, he
10 would do that.  He used to do that by making sure
11 I get where I'm getting and back home
12 (indiscernible) say he get lost.  So I don't know
13 if he's getting lost or what you're doing.
14   Q.   Did you notice a change in your
15 relationship with Sean after DJ passed?
16   A.   Yes.  It's a little different.
17   Q.   How is your relationship different with
18 Sean after DJ passed?
19   A.   Well, it's no relationship.  We're not
20 doing -- like I said, we're here in this house
21 together, and if he wasn't sick, I wouldn't see
22 him.
23   Q.   Okay.
24   A.   Like he would come around, you know,

29

1 (indiscernible) he know what I'm going to cook,
2 he'll come back for that, if he know what I'm
3 going to cook. He eats out -- he'll eat out. He
4 don't come back -- we don't have those certain
5 time since he's (indiscernible).
6     Q.  Okay.  So I know that when you talked
7 about when Sean was sick, but for the most part,
8 when Sean's not sick, is he not at home?
9     A.  For the most part.
10     Q.  Okay.  All right.  I want to talk to you
11 a little bit about medical treatment, about
12 anything that you may know.  And if you don't
13 know, you can tell me that you don't know.  Okay?
14     A.  Okay.
15     Q.  Okay.  Do you know if Sean ever received
16 any medical treatment for injuries he sustained
17 during his arrest in September of 1991?
18     A.  I don't know of anything.
19     Q.  Do you know --
20     A.  Except for (inaudible).
21     Q.  I'm sorry.  Go ahead.
22     A.  Except what Sean told me, I don't know of
23 anything.  Slapping around or choking or
24 hitting -- see, I never saw the bruises.

30

1     Q.  I know.
2     A.  When I got (inaudible) --
3     Q.  I know.  I'm just talking about -- I'm
4 talking about if you know if Sean ever received
5 any medical treatment for the injuries that he
6 said he sustained when the police were --
7     A.  No, I don't --
8     Q.  -- were slapping him around, like you
9 said.
10     A.  I never saw any record and never heard
11 anything except for what Sean told me.
12     Q.  And what did Sean tell you about the
13 medical treatment that he received?
14     A.  He didn't tell me he had no medical
15 treatment.  If he had a medical treatment, we have
16 never discussed it.  He only told me that --
17 different things that they told me they did to
18 him.  But Sean showed me where your bruise is at.
19 Oh, that's done healed now.  And that was it.
20 (Indiscernible) at home.  I didn't see no bruises.
21 You know, where can you just pat somebody, hit
22 them upside the head or nothing that I could see.
23 And I asked him if he had something he wanted to
24 show me.  He said they got pictures of it.

31

1     But when we went to court, they said he
2 had lost all that.  I never -- I'm telling you, I
3 never saw any of it.
4     Q.  Okay.  And did you -- and so let me ask
5 you this:  When you were at the Audy Home and you
6 asked Sean to see the bruises, did Sean tell you
7 that they were healed?
8     A.  Sean told me he -- I couldn't see the
9 bruises because there wasn't any bruises now.  He
10 said they done healed up and guess he ain't got
11 nothing to show me.  He didn't show me anything.
12     Q.  Okay.  And let me ask you this now.
13 Let's move on.  Do you know if Sean ever received
14 any medical treatment for any injuries he got
15 while he was in prison?
16     A.  I just answered that.  I never -- if he
17 got anything, I didn't see it.  No bruises, I
18 never saw any report, and I told you no one called
19 me or contacted me (indiscernible) at all.  So I
20 had to go on what he told me.
21     Q.  No, no, no.  I know.  What I'm asking you
22 is -- well, let me back up then.  When Sean was in
23 prison, did he ever talk to you about being
24 injured?

32

1     A.  And had to get a medical record or
2 something to see a doctor or something?  No, he
3 never told me that he saw no doctor or nobody --
4 nothing like that while he was in there.  He just
5 told me they pushed him around and choked him and
6 threatened to push him out the window.  You know,
7 you can threaten a person and not hit them, but
8 I'm not --
9     Q.  What about -- so what about after that?
10 Let me -- we're going a little bit forward.  So
11 once Sean -- once Sean was in prison, right --
12     A.  Right.
13     Q.  -- I'm talking about while he was in
14 prison, did he ever talk to you about -- about any
15 injuries that he had gotten while he was in
16 prison?
17     A.  The answer was no.
18     Q.  Okay.  I understand.  Okay.
19     What about any medical treatment for
20 injuries that Sean has had since he's been
21 released from prison?  Did Sean ever talk to you
22 about that?
23     A.  Yeah, he's had some injuries since he's
24 been out, but I don't know --

33

1    Q.   So what injuries has Sean had since he's
2  been out of prison?
3    **A.   I don't know of nothing.  I'm trying to**
4  **think of just one.  I know he had been off for his**
5  **tonsils.  I think he had to go to get his tonsils**
6  **removed.  And he had to go for something else.**
7  **Oh, my God.  I'm trying to think.  A rash or**
8  **something that he had gotten.  Some kind of rash.**
9  **I think he went for a rash that he had.  But I'm**
10 **not for sure.  But he had to go to the doctor a**
11 **few times while he was out.**
12   Q.   Okay.  Other than the tonsils and the
13 rash you were talking about, do you remember any
14 other injuries or illnesses that Sean has had
15 since he's been out of prison?
16   **A.   No.**
17   Q.   Okay.  All right.  Now, let me talk to
18 you about -- about this.  Do you know if Sean -- I
19 think I may have asked you, but I'm sorry.  It's
20 getting late and I'm blanking.
21       Did Sean ever receive any mental health
22 treatment or counseling while he was in prison?
23   **A.   Now, that, he didn't talk to me about**
24 **because if he did, why wouldn't he want to see**

34

1  **somebody while you're out here?  I mean, you can**
2  **just go see somebody else.  I think he said he had**
3  **classes and talked to this person or that person.**
4  **It's not what I was thinking of.  I'll put it like**
5  **that.  So I don't know of no other help he had.**
6    Q.   I mean, what about -- what about before
7  he went to prison?  Do you know if Sean received
8  any mental health treatment or counseling
9  before --
10   **A.   Before he went?**
11   Q.   -- he was incarcerated?
12   **A.   I don't think so.**
13   Q.   I'm sorry; I didn't hear you.  What did
14 you say?  You don't what?
15   **A.   If -- if he has seen -- saw a doctor or**
16 **anything, I think I would know, but I -- I'm**
17 **telling you I have no knowledge of even hearing**
18 **that we went to see anybody.**
19   Q.   Okay.
20   **A.   Because --**
21   Q.   That's fair.
22   **A.   -- he didn't -- he didn't want to go.**
23   Q.   Okay.  Do you know if Sean has ever
24 received any substance abuse treatment or

35

1  counseling prior to his incarceration?
2        MS. SPENCE:  Objection.  Lack of
3  foundation.
4        Go ahead.
5    **A.   No, I don't know of any -- the answer**
6  **would be no.**
7    Q.   All right.  Do you know if Sean ever
8  received any substance abuse treatment or
9  counseling while he was in prison?
10       MS. SPENCE:  Objection.  Lack of
11 foundation.
12       Go ahead.
13   **A.   No.**
14   Q.   What did you say?  Your answer is no?
15   **A.   No.**
16   Q.   Okay.  Do you know if Sean ever received
17 any substance abuse treatment or counseling since
18 he's been released from prison?
19       MS. SPENCE:  Objection.  Lacks
20 foundation.
21       Go ahead.
22   **A.   No.  No.  No.**
23   Q.   Okay.  All right.  So I know that we
24 previously talked about visits, but I want to ask

36

1  you:  While Sean was in prison, how many times did
2  you go and visit him?
3    **A.   I didn't count the times.  I just visit**
4  **him.  I don't know how many times.  I visit him a**
5  **lot.  That's all I know.  But I didn't count no**
6  **times.  I can't say 10, 20 or however many times.**
7  **I visit him.  On a regular basis, I put it like**
8  **that.**
9    Q.   So --
10   **A.   As much as I can.**
11   Q.   So we talked earlier, and we talked
12 about, you know, Sean had been in prison for about
13 20 years once he was released.
14   **A.   Yes.**
15   Q.   And so he did his 20 years, and what I
16 want to know is how often would you go and visit
17 him in prison?
18   **A.   Oh, maybe two -- three or four times a**
19 **year.**
20   Q.   Okay.  During any of those times that you
21 went to go visit Sean in prison, did you guys ever
22 discuss the shooting that happened back in
23 September of 1991?
24   **A.   Yes, we discussed it.  He -- he don't**

37

1  much as I know about that.  He said he was -- he
2  don't know what happened.  All he know is Snake
3  lied.  That's all he would tell me.  So I don't
4  know anything else.
5     Q.  Okay.  So during those times where you
6  would go and visit Sean in prison, did you guys
7  ever discuss his criminal trial?
8     A.  No.  I can't remember discussing, no --
9  no criminal trial with him.
10    Q.  Okay.
11    A.  Because he was in there.  Just whenever
12 he said release, they'd let me know.
13    Q.  Okay.  During those times when you would
14 go and visit Sean in prison, would he talk to you
15 about how he was doing?
16    A.  Sometimes he would tell me.  It ain't no
17 different, the same.
18    Q.  And when he would talk to you about how
19 he was doing, what would he tell you?
20    A.  He would tell me that -- I had bought him
21 a television.  He told me he was watching it and
22 somebody was going home and he bought that
23 television.  So, I mean, he could watch two things
24 at one time and said it's fun.  But stuff like

38

1  that.
2     Q.  When you would go -- during those times
3  when you would go and visit Sean in prison, what
4  was his mood like?
5     A.  Same as he got now.
6     Q.  Okay.  All right.
7     A.  I mean, he was playful and he never sit
8  around and said, like, make you think that he had
9  a problem with it.  He learned to deal with it, I
10 would say.  He learned to cope.
11    Q.  Other than the times that you would go
12 and visit Sean in person in prison, did you ever
13 talk to him over the phone while he was in prison?
14    A.  If he called me, I talked to him.  And
15 every time I visit him in the prison, I had to
16 talk to him -- well, at 26 and California.  The
17 other prison had a room that you could go and sit.
18 And you could see other folks visiting too around
19 in there.  You didn't have to go to the glass and
20 talk over the phone.  We could touch or something
21 like that.
22    Q.  Okay.  Well, so, other than those times
23 that you actually got to see him in person, right,
24 when you would drive down to the prison or however

39

1  you would get there and go see him, did you and
2  Sean have phone calls?
3     A.  After I left?
4     Q.  No.  Any time.  So while Sean was in
5  prison, did you ever talk to Sean over the phone?
6     A.  A few times he had phone calls.  He would
7  call me and maybe he use his phone call to call
8  somebody else.  He didn't have but one phone call
9  that he had to make, but he couldn't call me all
10 the time.  But I did talk to him a lot.
11    Q.  How often -- while Sean was in prison,
12 how often would you talk to him on the phone?
13    A.  I'm trying to think.  I would talk to
14 him -- I'm not going to say every day, but I
15 talked to him.  I can't say how many times I
16 really talked to him, because he would call me
17 when he got a chance to call.
18    Q.  When you would talk to Sean on the phone
19 while he was in prison, what would you two talk
20 about?
21    A.  Something that was going on.  He wanted
22 to know what this one doing, somebody he basically
23 want to ask me about, and I wouldn't know nothing
24 about him because I don't deal with people like

40

1  that.
2     Q.  When you talked to Sean -- oh, I'm sorry.
3  Go ahead.
4     A.  We had -- we had good conversations
5  whenever -- because he would know things that he
6  would tell me that I didn't know or somebody had
7  wrote him or he said I got a letter from somebody
8  and tell somebody to write and they say they
9  didn't have no stamp.  Put their letter in there
10 with yours and mail it to me.  Something like
11 that.  But we had conversations.
12    Q.  And so when Sean was in prison and he was
13 talking to you about letters that he had gotten,
14 did he tell you who they were from?
15    A.  He'd say letters, pictures.  Yes, he
16 would tell me about -- some things he told me, I
17 didn't even know who he was talking about but I
18 listened.
19    Q.  Well, did he tell you -- did he tell you
20 who sent him any letters or pictures?
21    A.  Yeah, he would say Sheronda (ph) or
22 Shanika send me pictures of her kids or I got a
23 letter from Dominique or do you ever see whoever
24 he would ask about.  And we had conversation, like

41

1  a normal conversation.  I mean, I don't know no
2  other way you can (indiscernible).
3      Q.  Okay.
4      A.  He was in there and we just talked every
5  chance that we could.  And like now, anything you
6  want to talk about, he know he can come to me with
7  it, whatever it is.  Just tell me and then we'll
8  decide.  But he want to be writing and some of
9  that stuff he wasn't writing and I'll tell
10 (indiscernible) he wasn't writing and you know,
11 see it like this, listen to me like this.  And he
12 want me to see his side, but he wasn't right all
13 the time.  But he is not a bad person.
14     Q.  Well, what --
15     A.  (Inaudible) real bad person.
16     Q.  Let me go back.  When you said, "Sean
17 wasn't right all the time," what was he not right
18 about?
19     A.  Sean (inaudible), I can't think -- I
20 can't think of everything but some things don't be
21 right.
22     Q.  Give me an example of a time where you
23 thought that Sean wasn't right.
24     A.  That sometimes -- I'm trying think of one

42

1  now, a good example, but I can't -- I can't think
2  right now what it is.
3      Q.  Okay.  That's all right.  Okay.
4          When you would talk to Sean when he was
5  in prison, did you guys ever discuss this -- well,
6  strike that.  Let me try again.
7          When you would talk to Sean when he was
8  in prison, did you guys ever discuss his
9  post-conviction proceedings?
10     A.  No.
11     Q.  When you would talk to Sean when he was
12 in prison, did he ever mention a person named Tom
13 Harris?
14     A.  (Indiscernible).
15     Q.  Did he ever mention that person to you?
16     A.  No.  This is my first time hearing the
17 name Tom Harris.  No.
18     Q.  Okay.  When you would talk to Sean in
19 prison, did he ever talk to you about a person
20 named Frank Madea?
21     A.  No.
22     Q.  Were you ever -- let me strike that.
23 We'll get there in a minute.
24         Prior to Sean's criminal trial -- so back

43

1  in, was it 1993, did you ever meet with Sean's
2  criminal defense attorney?
3      A.  Yes.
4      Q.  When you met with Sean's criminal defense
5  attorney, what did you tell him?
6          MS. SPENCE:  Objection.  Wait, sorry.
7  Objection.  Sorry.  Objection to -- objection.
8  This calls for privileged communications.  It
9  would be work product.  We're not waiving the work
10 product privilege for the criminal defense
11 attorney.
12         MS. JOHNSON:  Wait, so what I'm going to
13 ask -- so what I'm going to ask here is -- okay.
14 How are the criminal defense attorney's
15 communications with a third-party witness
16 considered privileged in terms of work product?
17     A.  In terms of what?
18         MS. SPENCE:  So this is a question to me,
19 Ms. Jakes.
20         MS. JOHNSON:  Right.  Yeah, give me a
21 second.
22         MS. SPENCE:  So if you're doing an
23 investigation and you're speaking to -- so there
24 are two ways that this can be work product.  One

44

1  way is that, as the attorney when you're
2  investigating with a witness and you have asked
3  the witness questions and their answer will
4  reflect that attorney's mental impressions, those
5  conversations can be work product.
6          The second way is, if she's acting as an
7  advocate for a client and she's providing
8  information to the -- the criminal defense
9  attorney to help the client, not necessarily in a
10 witness capacity but an active work capacity, that
11 can always be work product.
12         MS. JOHNSON:  Okay.  So I'll take your
13 objections, Spence.  So are you directing her not
14 to answer those questions?
15         MS. SPENCE:  The question as posed, I
16 instruct her not to answer that question.  Even if
17 it's a more specific question as -- the question
18 is really broad:  What did you tell the defense
19 attorney?
20         MS. JOHNSON:  Right.
21         MS. SPENCE:  So I think if it's a little
22 bit more narrow, we may not have an issue.
23         MS. JOHNSON:  Well, all right.
24         MR. YAMIN:  Excuse me a second.

45

1  MS. JOHNSON:  Here's what I'll tell you.
2  MR. YAMIN:  Excuse me.
3  MS. JOHNSON:  It's my understanding that
4 attorney communications in the capacity as
5 investigating or a theory of defense of a witness
6 would not be considered privileged.
7  Go ahead, George.  Sorry.
8  MR. YAMIN:  I got lost a little bit.  Are
9 these with regard to conversations with Mr. Madea?
10  MS. JOHNSON:  Correct.
11  MR. YAMIN:  This issue came up at Madea's
12 deposition where Andrew pointed out, after Russell
13 was making multiple objections to communications
14 between Mr. Jakes and Mr. Madea, that
15 attorney-client privilege was waived because of
16 Mr. Jakes' allegations that Mr. Madea was
17 ineffective as his counsel.
18  So is the question a privilege question?
19 I'm sorry; is the objection a privilege objection
20 or no?
21  MS. SPENCE:  So it is a privilege
22 objection.  I'm not -- I'm not arguing that's
23 attorney-client privilege.  So -- and I have not
24 talked to Russell about Mr. Madea's deposition

46

1 specifically, but I do know -- my issue is the
2 breadth of that question.  I think it does capture
3 things that would be protected under work product,
4 which is not waived simply because there are
5 issues that are waived for attorney-client
6 privilege and there are boundaries as to what is
7 waived in attorney-client privilege based on there
8 can be a subject matter issue there.
9  So what I was saying, I'm going to direct
10 the witness not to answer this flawed question of
11 what did you tell the criminal defense attorney,
12 but I'm saying that I don't -- there may not be an
13 objection if the question is more narrow.
14  MR. YAMIN:  Is it a work product
15 objection?
16  MS. SPENCE:  Yes.
17  MR. YAMIN:  Okay.
18  MS. SPENCE:  Yes.
19  MR. YAMIN:  That helps me understand.
20  MS. SPENCE:  But we have lost the witness
21 in this time.  It just happened.
22  MS. JOHNSON:  I heard something go off.
23  MS. SPENCE:  Can we go off the record,
24 please?  I'm sorry, unless counsel wants to

47

1 respond some more about this argument.
2  MR. YAMIN:  I don't, no.
3  MS. JOHNSON:  No, we don't need to
4 respond to it.  I understand -- I understand your
5 objection.  You're going to go ahead and direct
6 her not to answer that one.  I'll ask another one
7 and then you can, you know, keep at it.
8  MS. SPENCE:  Okay.  Can we go off the
9 record, please?
10  VIDEOGRAPHER:  This marks the end of
11 Media No. 7.  The time is 5:55 p.m.  We are off
12 the record.
13  (A brief recess was taken from 5:55 p.m.
14 to 6:01 p.m.)
15  VIDEOGRAPHER:  This marks the beginning
16 of Media No. 8.  The time is 6:01 p.m.  We are on
17 the record.
18 BY MS. JOHNSON:
19  Q.  Okay.  Ms. Jakes, I was asking you about
20 conversations that you had had with Sean's
21 criminal defense attorney, Frank Madea.  Do you
22 remember, prior to Sean's criminal trial, about
23 how many times had you met with Frank Madea?
24  A.  One time.  And I don't know who Frank

48

1 Madea was, but I met with a lawyer one time before
2 I got with Russell and them.
3  Q.  When you met with the attorney the one
4 time, was that in the '90s?
5  A.  It was back before he ever went to court.
6 Before they charged him with it, maybe.  Because
7 he was getting -- I went to -- he asked me to come
8 in (inaudible) whatever I thought.
9  Q.  I'm sorry; I actually didn't hear that
10 last part.  I'm sorry.  Can you repeat that?
11  A.  Before I would call in -- if it was just
12 me with him about what the --
13  MS. SPENCE:  All right.  So Ms. Jakes,
14 I'm going to stop you from getting into the
15 conversation -- the content of the conversations
16 that you had with the attorney that represented --
17 who represented Sean before -- any attorney who
18 represented Sean, I'm going to advise you not to
19 disclose the content of those conversations.
20  THE WITNESS:  Okay.
21 BY MS. JOHNSON:
22  Q.  When you met with Sean's criminal defense
23 attorney, about how long did you meet with him the
24 one time that you met with him?

49

1    A.   Not long.
2    Q.   Was it more or less than an hour?
3    A.   Less than an hour.
4    Q.   Was it more or less than 30 minutes?
5    A.   Well, no, it was around 20 or 30 minutes
6  maybe.  I don't know.  We talked, and he wanted to
7  know if I could --
8        MS. SPENCE:  Wait, wait.  Again,
9  Ms. Jakes, don't get into what you guys talked
10  about.  Ms. Johnson is asking a very specific
11  question about the length of the meeting.
12    A.   The length of the meeting wasn't long.
13  And I can't say what time because I wasn't timing
14  it.  We just talked a few minutes, and I left.
15    Q.   Okay.  When you talked to Sean's criminal
16  defense attorney, did you tell him anything that
17  you had seen the night that the person was shot on
18  September 15th, 1991?
19    A.   Same thing I told him then and now, what
20  I saw, and that's it.
21    Q.   When you talked to Sean's criminal
22  defense attorney, did you tell him about what you
23  saw the police officers do when they took Sean
24  from your house the next day on September 16th,

50

1  1991?
2    A.   Yes, I told him.
3    Q.   When you talked to Sean's criminal
4  defense attorney, did you tell him that Sean had
5  told you about his treatment by police officers?
6    A.   I don't think we discussed that.
7    Q.   Okay.  And my question to you is:  Why
8  did you not tell Sean's criminal defense attorney
9  about what he had told you about the way that the
10  police officers treated him during the
11  investigation of that shooting?
12    A.   He wanted to see me about testifying.
13  We --
14        MS. SPENCE:  Wait, wait.  Again, stop.
15  Wait, wait.  Ms. Jakes, you're getting into
16  statements -- you're getting into the substance of
17  the conversation so -- hold on one second.
18        (Indiscernible).  Ms. Johnson is asking
19  you about your decision -- about the reason why
20  you did not disclose what Sean said to you about
21  his injuries.  Can you answer that question
22  without getting into what the criminal defense
23  attorney told you?
24    A.   I can't answer the question if I don't

51

1  know.  I don't know anything of that.  Only I know
2  what he called me in for, and I was there to do
3  that, and that was it.  And we didn't talk -- we
4  didn't discuss nothing else.
5    Q.   Okay.  So my question is --
6    A.   That I (inaudible).
7    Q.   -- is that you told me earlier that you
8  had information that Sean had given you that he
9  was mistreated by the police officers during the
10  investigation of the shooting; right?
11    A.   Right.
12    Q.   Why did you not say anything about that
13  to Sean's criminal defense attorney?
14    A.   They didn't ask me anything of that
15  nature.  They didn't ask me.  I answered what they
16  asked me.
17    Q.   Okay.
18    A.   That's what I'm telling you now and
19  that's what I said then.  I can't answer a
20  question that I don't know.
21    Q.   Okay.
22    A.   I don't know of (indiscernible) that we
23  discussed and why I didn't say nothing.  Anything
24  I tried to say, nobody'd listen to me.  So that's

52

1  where I am now.
2    Q.   Did you feel that way about Sean's
3  criminal defense attorney, that he didn't listen
4  to you?
5    A.   Yes.  Nobody listened to me except for
6  Russell.
7    Q.   Okay.
8    A.   Russell listened to what I had to say.
9  And then we went from there.
10    Q.   Okay.  Well, what I'm asking --
11    A.   (Inaudible).
12    Q.   I'm sorry, I'm sorry.  I'm sorry.  I
13  can't tell -- I didn't know you were still
14  talking.  Please go.
15    A.   No.  If anybody would have asked me or
16  tried to see my point of view, I would have told
17  them.  There was nothing.  They act like Sean was
18  alone.  I visit him because he was family and I
19  loved him.  That's why I visit him.  I wasn't
20  visiting him trying to tell him this and tell him
21  that.  Because I was auntie, they're thinking I'm
22  lying for him.
23    Q.   I understand.
24    A.   Because he already told them that was --

53

1  that was it.  That was enough for me.
2      Q.  So based upon -- so based upon the
3  conversation that you had with Sean's criminal
4  defense attorney, did you feel like he appreciated
5  what you had to say or listened to you when you
6  tried to talk to him?
7          MS. SPENCE:  Objection.  Form.
8          Go ahead.
9      A.  Well, he never talked to me about it.
10 I'm saying nobody talked to me about anything.
11 They tell me what they want me to do and I did
12 that and left.
13     Q.  Okay.  So --
14     A.  And this is (inaudible).
15     Q.  I'm asking you just for your impression
16 of Sean's criminal defense attorney when you went
17 to meet with him.  That's what I'm asking about.
18 What did you think -- or what was your impression
19 of Sean's criminal defense attorney that one time
20 that you met with him?
21         MS. SPENCE:  Objection.  Form.  Calls for
22 speculation.
23         Go ahead.
24     A.  That I had no impression of him except

54

1  for he was a public defender, and he would handle
2  the case like I would handle it:  Doing nothing.
3  That he did was nothing.
4      Q.  Okay.
5      A.  He didn't ask me or try to come out.  He
6  didn't try to check up on him to see whether he
7  lived -- did he live here?  Take pictures or what
8  I said, none of that.  We didn't talk about it.
9      Q.  How do you know he didn't do any of those
10 things?
11     A.  I was there.
12     Q.  Okay.
13     A.  I was there that particular time.  He
14 didn't do anything to nobody out front except for
15 maybe he did throw it over to Latin Kings.  That's
16 where that particular thing started.  Now, he said
17 he throwed I'll call it lord or whatever ball he
18 had, but he (inaudible).  He threw it at them.
19     Q.  Okay.  Well, let me ask you this:  I'm
20 talking about the things that you said.  You said
21 the criminal defense attorney didn't do anything.
22 And I'm -- that's what I'm asking you about.  When
23 you said he didn't do anything, what do you mean?
24     A.  As far as that you're handling a case,

55

1  you're supposed to tell me where you're at on the
2  case.  What did you observe?  What did you find?
3  You said you was investigating.  There was
4  nothing.
5      Q.  Okay.
6      A.  Everything was the same.  And they never
7  showed me anything.  I don't know what the same
8  was.  I got my information, like I said, from
9  Sean.
10     Q.  So based upon your -- well, based upon
11 your conversations with Sean and your impression
12 of Sean's criminal defense attorney, did you feel
13 like he was doing a good job defending Sean?
14     A.  I don't feel -- I don't see nothing that
15 he did do.  He still stayed in there, so the next
16 thing I know, he -- Sean got him -- was able to
17 get with Russell and talk with him on his case,
18 and I think Russell started and listened to what
19 he had to say and follow-up and then build the
20 case.  That's when we went to asking, questioning,
21 then on the case.
22     Q.  Okay.  But -- so what I'm asking you
23 specifically is about Sean's criminal defense
24 attorney.  Do you feel -- is it your opinion --

56

1  I'm asking for your opinions.  Do you feel like
2  Sean's criminal defense attorney did a good job
3  defending him at the trial?
4      A.  No.
5      Q.  Okay.  Why do you feel like Sean's
6  criminal defense attorney didn't do a good job
7  defending him?
8      A.  He still was in jail and he wasn't -- he
9  still would have been in there if he still would
10 have had the same lawyer.  You're asking me my
11 opinion.  That's my opinion.  I didn't see nothing
12 that he was doing.  It was nothing on file.  They
13 never sent me out anything.  I never signed
14 anything.
15     Q.  So let me ask you this really quickly.
16 Other than that one time that you talked to Sean's
17 criminal defense attorney, did his criminal
18 defense attorney ever reach out to you again?
19     A.  No.
20     Q.  Do you know if Sean's criminal defense
21 attorney ever reached out to anybody else in your
22 family?
23     A.  It's -- all this is new to me.  If there
24 was, then we would have talked about it.

57

1    Q.   So you said, so if he had done that,
2  somebody in the family would have told you that he
3  had done it.
4    A.   Yes, that he helped, that he served, that
5  he did what he was supposed to do.
6    Q.   But nobody in the family told you that he
7  had done what he was supposed to do.  Is that what
8  I'm understanding?
9    A.   That's what I'm saying and that's all I
10  understand too.
11    Q.   Okay.
12    A.   If he wasn't (inaudible).
13    Q.   So let me jump back then.  So, based upon
14  that, it was your impression that Sean's criminal
15  defense attorney didn't do what he should have
16  done; is that right?
17    A.   Yes.
18    Q.   Okay.
19    A.   It's been a year and you ain't did
20  nothing.  He was 15 years old when he went in.  He
21  should have did something.
22    Q.   Okay.  That's what I wanted to know.
23    A.   Why would you do 20 years if you're going
24  to anything to help him?  Looks like you put him

58

1  on in there, I guess.  Maybe what he had -- I
2  the stuff that he told me, I would have put him in
3  there too if he did all this.  But you don't
4  (indiscernible) on what nobody said or if he was
5  arrested.  He might have been arrested with them
6  boys.  I just can't see Sean doing any of that.
7  That's not (indiscernible) of Sean to me.  Not the
8  Sean that I know.
9    Q.   Okay.
10    A.   And that's all that happened --
11    Q.   Let me ask you --
12    A.   (Inaudible).
13    Q.   Sorry; I don't mean to cut you off.  Let
14  me ask you really quickly about -- about some
15  people in the neighborhood that you may know.  I
16  know we already talked about -- about Snake.  Did
17  you personally know Snake?
18    A.   Yes.
19    Q.   How did you meet Snake?
20    A.   Just out of (indiscernible).  I had two
21  daughters.  He was trying to talk to one of them,
22  and they wouldn't give him the time of day.  But
23  they said that's Snake.  But, now, he had to have
24  another name.  I know nobody was just going to

59

1  name your child Snake.  So I figured it was a
2  gang-banging name or something.  And
3  (indiscernible) need to find somebody that you
4  know.  I didn't know him.
5    Q.   Do you --
6    A.   I would see (inaudible) -- I would
7  sometimes times -- well, they say he lived over on
8  Elizabeth.  I think the street next to us
9  somewhere over there.  But who he lived with or
10  his parents, family, brothers or sister or
11  anybody, I didn't know nothing of Snake but Snake.
12    Q.   Okay.  Do you know whether or not Snake
13  was actually a member of a gang?
14    A.   I don't know that either.
15    Q.   If I told you the name Gus Robinson, do
16  you recognize that?
17    A.   No, not Gus Robinson.  I don't know who
18  that would be.
19    Q.   Okay.  Back in -- so let me ask you this:
20  About how long had you known Snake as of -- as of
21  September 1991?
22    A.   I knew him for a few years maybe.  He was
23  a young boy.  I would see him out there, and
24  they'd say that, "That's Snake, there's goes

60

1  Snake, Mama."  So I looked at him so I would have
2  known him.
3    Q.   What did Snake look like?  Was there
4  anything about any of his physical features that
5  stood out to you?
6    A.   He was sort of small, slim trim, and he
7  was just another child to me.  He wasn't -- he was
8  just -- I can't describe nobody too much, but
9  Snake was small, dark, and tall.  He was a little
10  tall.  And that's all I can tell you about Snake.
11    Q.   Was he taller than you?
12    A.   I don't think -- I don't know.
13    Q.   When you saw Snake or -- actually, strike
14  that.  Let me try again.
15      Back in 1991, would you ever see Sean and
16  Snake hanging out together?
17    A.   No.  I never did see them hanging out
18  together now.
19    Q.   So back in 1991, do you know whether or
20  not Sean also knew Snake?
21    A.   Sean and (inaudible) Snake?  I didn't
22  understand that question.
23    Q.   Let me try again.  So back in 1991,
24  before Sean went to prison, do you know whether or

61

1  not Sean knew Snake?
2  **A.  I -- I wouldn't know that, but I'm pretty**
3  **sure he did.**
4  Q.  And when you say you're pretty sure he
5  did, why are you pretty sure that he knew Snake
6  too?
7  **A.  Because he would be out there with -- I**
8  **mean, Snake and Quarter-Pound, I would see them**
9  **out there sometimes, but see them doing things, I**
10 **didn't ever see them going nowhere or doing**
11 **things, but I saw him out there.  He would be**
12 **across the street or he would be down at the**
13 **newspaper stand when I would see him, but...**
14 Q.  So there are times -- there are times
15 back in 1991 that you would see Sean, Snake, and
16 Quarter-Pound together; correct?
17 **A.  No, I --**
18     MS. SPENCE:  Objection.  Mischaracterizes
19 testimony.
20     Go ahead.
21 **A.  I never say I saw them, Sean and Snake**
22 **hanging out together.  I say I would see him out**
23 **there, and I'd see that Sean might would know**
24 Snake (indiscernible) asked him, because I don't

62

1  know his real name.
2  Q.  Okay.
3  **A.  But he would be talking.  I have saw him**
4  **talking to Quarter-Pound.  And I saw him talking**
5  **to Everett.  But that was my son, but I know**
6  **nothing about Snake.**
7  Q.  Did you ever see Sean talking to Snake?
8  **A.  No, I never saw Sean even talking to**
9  **Snake.**
10 Q.  Okay.
11 **A.  But if you sound like a friend and you --**
12 **you have got a friend, you're going to bring that**
13 **friend around to the house and visit your family,**
14 **even if you are hanging with him.  I just don't**
15 **know.**
16 Q.  Did Sean ever bring any of his friends
17 around the house to meet you?
18 **A.  No, that's why I said he had no friends.**
19 **He was family.  He had family.**
20 Q.  Okay.
21 **A.  And if he had couple friends, I'm quite**
22 **sure he had somebody that went to school or**
23 **something.**
24 Q.  Did Sean ever bring any friends from

63

1  school around the house to meet you?
2  **A.  No.**
3  Q.  Do you know someone named Gurjit or
4  Gurgid?
5  **A.  No.**
6  Q.  Do you know someone named Abdul Giles?
7  **A.  Yes.**
8  Q.  How do you know Abdul?
9  **A.  Abdul was -- his mother lived right**
10 **across the street from me, so I know Abdul and his**
11 **sisters from there.**
12 Q.  And when you say that they lived across
13 the street from you, what street are you referring
14 to?
15 **A.  Across 51st Street.**
16 Q.  So Abdul and his mom and you said his
17 sister lived across 51st Street from you back in
18 1991; is that right?
19 **A.  Correct.**
20 Q.  Okay.  Was Abdul a friend of Sean's?
21     MS. SPENCE:  Objection.  Calls for
22 speculation.
23     Go ahead.
24 **A.  Abdul was a friend of -- just like family**

64

1  **friend.  I would see him often, and when Sean came**
2  **out, Abdul came over here once to visit him.  And**
3  I think he could have been (inaudible) or
4  something like that.  So that would be a friend, I
5  would think.  He was okay (indiscernible) for him.
6  Q.  Okay.  So --
7  **A.  (Inaudible).**
8  Q.  -- are there occasions -- are there
9  occasions back in 1991 when you would see Abdul
10 and Sean hang out?
11 **A.  I never saw them hang out, but I know**
12 **they was -- they knew each other.**
13 Q.  Do you know, does Abdul go by any other
14 name, like a nickname?
15 **A.  All I knew was Abdul.  I don't know no**
16 **last name either.**
17 Q.  So prior -- prior to Sean's arrest in
18 1991, about how long had you known Abdul?
19 **A.  I knew him -- like he grew up with my**
20 **kids, so I just know him.**
21 Q.  Okay.  Okay.  So, back in 1991, can you
22 tell me what Abdul looked like?
23 **A.  No.**
24 Q.  Prior to this lawsuit, did you know

65

1 someone named Rafael Garcia?
2 **A. Rafael Garcia? I have never even heard**
3 **of that name affiliated with Sean, no.**
4 Q. Okay.
5 **A. I don't know him.**
6 Q. Do you know someone named Ronnie Sloan?
7 **A. No.**
8 Q. Do you know a person named Andre Green?
9 **A. No.**
10 Q. Do you know someone named Tyrone Pitts?
11 **A. No.**
12 Q. Do you know a man named Michael Sampson?
13 **A. No.**
14 Q. Do you know someone named Troy Walker?
15 **A. No.**
16 Q. Do you know someone named Thomas Sloan?
17 MS. SPENCE: Are you there?
18 THE WITNESS: Yes, I'm here.
19 MS. SPENCE: Oh, sorry.
20 BY MS. JOHNSON:
21 Q. I'm sorry. I didn't hear your answer.
22 Do you know someone named Thomas Sloan?
23 **A. No.**
24 Q. Back in 1991, did you know someone that

66

1 they would call Little A?
2 **A. Now, I have heard the name Little A. I**
3 **have heard the name, but I can't get a picture of**
4 **him. He was around 51st, Little A. I have heard**
5 **that name, but I can't get a picture of him, and I**
6 **don't know where I know him from. It has to be**
7 after (indiscernible).
8 Q. Okay. So you don't know the person named
9 Little A personally; is that right?
10 **A. No.**
11 Q. You had just heard his name around the
12 neighborhood; is that correct?
13 **A. Correct. Something like Little A, but I**
14 **know he's got to have another name, but that**
15 **name -- I have heard that name before, but...**
16 Q. When you would hear Little A's name
17 around the neighborhood, what would they tell you
18 about Little A?
19 MS. SPENCE: Objection. Lack of
20 foundation.
21 Go ahead.
22 **A. All I heard was that he was gang-banging**
23 **or something. Something to that effect, but I**
24 **don't know.**

67

1 Q. Okay. And when you heard that he was
2 gang-banging, did they tell you which gang he
3 belonged to?
4 MS. SPENCE: Objection. Lack of
5 foundation.
6 **A. It's -- the answer is still no.**
7 Q. Okay. Do you recognize the name Arnold
8 Day?
9 **A. Arnold Day? I have heard the name, but I**
10 **don't know -- I don't know of Arnold Day.**
11 Q. Where have you heard the name Arnold Day?
12 **A. It seems like I have heard the name**
13 **before. I'm saying I don't know anything about**
14 **him or his family.**
15 Q. I'm just asking you -- I'm just asking if
16 you can remember where you heard the name.
17 **A. Oh, Arnold Day. Seems like I have heard**
18 **the name. I can't -- can't say where I know him**
19 **from.**
20 Q. Have you heard the name Arnold Day prior
21 to this lawsuit?
22 **A. The answer is no.**
23 Q. Okay. Do you know somebody by the name
24 Tennille Jones?

68

1 **A. Tennille?**
2 Q. Jones.
3 **A. No. Never heard of the name.**
4 Q. Do you know someone by the name Ralph
5 Watson?
6 **A. No.**
7 Q. Do you know someone by the name Frederick
8 Gunn or David Gunn?
9 **A. Do I know what now?**
10 Q. Somebody by the name Frederick Gunn or
11 David Gunn?
12 **A. No.**
13 Q. Do you know someone by the name Denardo
14 Triplett?
15 **A. No.**
16 Q. Do you know someone by the name Darren
17 Triplett?
18 **A. No.**
19 Q. Okay. I know we have talked about this
20 quite a bit, but I want to ask you just directly:
21 Do you believe that Sean is innocent for his
22 alleged involvement in the shooting that happened
23 on September 15th, 1991?
24 **A. Yes. I know he's innocent of that. He**

69

1 has absolutely nothing to do with that.
2    Q.   How do you know that he is innocent?
3    A.   He's absolutely innocent in that.  And
4 they have dropped all the charges so I have always
5 felt his innocence because I never knew anything
6 of all this that I'm hearing now.  These names is
7 nothing -- mean nothing to me.  Just a few, maybe
8 two or three of them, but nothing else.
9    Q.   So I know -- and I understand that.  I
10 know that you said you have always thought he was
11 innocent, but can you tell me why you have always
12 thought that?
13    A.   Some of the things you was telling me
14 now, I never (inaudible).  I know he went there
15 for the things he wouldn't do at all.
16    Q.   And you're saying -- so you said you know
17 that there are some things that he wouldn't do at
18 all.
19    A.   At all.  And some of the things that you
20 done mentioned to me, I'm not saying he didn't do
21 that, but I have no knowledge of it.
22    Q.   So I understand -- I know that.  We
23 talked to you about if you knew about any of that.
24 What I'm asking you specifically is about why you

70

1 believe Sean is innocent for being a lookout for
2 the shooting that happened in September of 1991.
3    A.   Because he -- he's supposed to have been
4 in the house.  He wasn't looking out for nothing.
5 He was in the house.
6    Q.   Okay.  Since Sean has been released from
7 prison, has he been arrested since?
8    A.   Now, I know of one arrest that I think
9 he's been arrested since.  (Inaudible) said
10 nothing, but I do know of one.  He was staying on
11 the corner and they told him to go and told all
12 the other boys or whoever he was standing out
13 there with to go, and everybody left but Sean.  He
14 said he didn't have to go nowhere.  He can stand
15 wherever he want to because he wasn't doing
16 anything.
17    Q.   And is that -- is that -- what you're
18 talking about right now, has that arrest been
19 since he was released from prison?
20    A.   Yes.
21    Q.   Okay.  And you said he was standing on
22 the corner.  They told all of them to go, and then
23 what happened?
24    A.   Everybody proceeded to walk away but

71

1 Sean.  Sean stood there and said he didn't have to
2 go nowhere because he wasn't bothering nobody.  He
3 was just standing there.
4    Q.   And then did that happen in Chicago?
5    A.   Yes.
6    Q.   Do you remember what year that that had
7 happened in?
8    A.   I don't remember what year or what date
9 but it happened.  You asked me since he's been
10 out?
11    Q.   Yes.
12    A.   He's been in jail since he's been out.
13 Yes, he was in jail.
14    Q.   So since he's been -- so since he was
15 released from prison back -- back ten years ago,
16 he had got -- he's been arrested again?
17    A.   I think he was arrested one time, but I
18 don't know if they threw it out or there was a no
19 case.  He went to court or nothing.  But they took
20 him off that corner.
21    Q.   And do you know, when they took him off
22 the corner, did they actually put him in jail?
23    A.   Yes, they put him in jail.
24    Q.   And how do you know that they put him in

72

1 jail?
2    A.   Different ones on the corner come by here
3 and told us.  The lady named Stefan (ph) said Sean
4 was gone to jail.
5    Q.   And when you were -- what did you do when
6 she told you that Sean had gone to jail?
7    A.   Same thing I do all the other times.  I
8 ask him, well, what do you think?  She said, Well,
9 let me make a few phone calls.  And she made a few
10 phone calls and found out he was in jail.  And,
11 after that, he came home.  So I guess they let him
12 go.  I don't know no --
13    Q.   Did you try -- oh, I'm sorry.  Go ahead.
14    A.   I don't know of no charges he got for
15 that.
16    Q.   Okay.
17    A.   But he was arrested.
18    Q.   Okay.  Did you try and go and get him
19 from the jail?
20    A.   No.
21    Q.   Did he come home that same day after he
22 was arrested?
23    A.   Now, that, I can't testify to.  I think
24 he came home later on that night or maybe the next

73

1 day. I don't know if he spent the whole night
2 there. But you asked me was he arrested since
3 he's been out, and I know of one time.
4    Q.  Okay.  Really quickly before I forget,
5 you said Sean's girlfriend Monique, do you know
6 whether or not her last name is Davis?
7    A.  I don't know her last name. I just know
8 Monique.
9    Q.  Okay.  All right.  I just wanted to clear
10 that up before I forget.
11      When Sean got home after he had been
12 arrested since he had been out, did he talk to you
13 about what happened?
14    A.  What happened while he was in jail?
15    Q.  Yeah.  Did he talk to you about that?
16    A.  We never discussed that part. The more
17 we talked all of that -- that call why
18 (indiscernible).  We never discussed that anymore.
19    Q.  Okay.  So the only thing that you know
20 about -- about Sean getting arrested since he's
21 been out of prison was what that one lady told
22 you; right?
23    A.  I can't hear you right now. Hold on one
24 second. I need to take the dog out, I think.

74

1 Just one second. Let me get to the door. Go to
2 the door. Okay. I'm back. I'm back and I'm
3 sorry about that.
4    Q.  That's okay.
5      I was just asking you about -- about
6 your -- the information that you got about Sean's
7 arrest, the one that he's had since he's been out
8 of prison.  If you didn't talk to Sean about it,
9 is the only information you have about it what
10 that lady told you?
11    A.  Yes, the lady's son said that they asked
12 him to move, and everybody moved off the corner
13 but Sean. He stood there and said he could stand
14 where he wanted to stand, he wasn't doing anything
15 and --
16    Q.  Do you know --
17    A.  -- (inaudible).
18    Q.  When they say they were standing on the
19 corner, do you know what corner they were on?
20    A.  I believe it's the corner to -- if you're
21 going out, standing on the front, it's going to be
22 to the right. That corner.
23    Q.  Are you talking about standing in the
24 front of where you live now at the West Rice

75

1 location?
2    A.  Yes, (indiscernible) of that.
3    Q.  My understanding, then, you're saying
4 that Sean was arrested near the corner of where
5 you guys live now when the cops had asked
6 everybody to leave and he didn't want to go.
7    A.  Right. Correct.
8    Q.  I understand. Okay.
9      Did you attend Sean's criminal trial?
10    A.  Yes.
11    Q.  Were you there both days?
12    A.  I was there both days, but I only got a
13 chance to see just the end of it. I was probably
14 the last witness or something. I was in the
15 witness protection. What I saw, nothing of the
16 trial. But I was there so I could see or hear
17 something. By me being a witness, they said I had
18 to go into -- they would come and get me when they
19 got ready. So everything was said and done, and
20 then they come and got me.
21    Q.  Okay. Did you -- so when you were
22 watching the criminal trial, did you see actually
23 any part of it, or did they have you back in a
24 room waiting to be called?

76

1      MS. SPENCE: Objection. Mischaracterizes
2 the testimony.
3      Go ahead.
4    A.  In -- I was in a witness room or some --
5 some -- I wasn't out in there where the trial was
6 going on. I was in a room that they came and got
7 me when it was time for me to testify.
8    Q.  Okay. Other than the room that you were
9 in when -- other than the room that you were in,
10 when you came out, when it was time for you to
11 testify, did you get to watch any part of the
12 criminal trial?
13    A.  A little bit. Just my part and whatever
14 they were saying after. When I finished
15 testifying, they took me back where I came from,
16 and I didn't see nothing else.
17    Q.  Okay.
18    A.  Are you still there?
19    Q.  I am. Give me a second. Give me a
20 second. I'm looking over my notes.
21    A.  I just wanted to know if I was cut off
22 again. My phone went dark.
23    Q.  No, no. You're okay.
24      So after -- and I don't want you to tell

77

1 me any of the substance of these conversations,
2 but after Sean had been convicted, did you
3 participate in his post-conviction hearing?
4    A.  No.
5    Q.  Did you talk to Sean's attorney at his
6 post-conviction proceedings about what happened
7 the night of the shooting on September 15th, 1991?
8         MS. SPENCE:  Objection.  Form.  Vague as
9 to who the attorney was in the proceedings.  And
10 clarified (inaudible) attorney.  There was
11 multiple post-conviction proceedings.
12        MS. JOHNSON:  I'm asking if she talked to
13 any of them.
14 BY MS. JOHNSON:
15    Q.  Any post-conviction attorney that Sean
16 may have had, did you talk to them about what had
17 happened the night of the shooting on September
18 15th, 1991?
19    A.  No.
20    Q.  Were you present at any of the
21 post-conviction proceedings that occurred in 2011
22 and thereafter?
23    A.  Now, I went -- I'm not sure of your
24 question because I went everywhere I was supposed

78

1 to go.
2    Q.  Let's talk about -- so I'm not talking
3 about the criminal trial.  That was over in -- by
4 '93.  I'm talking about after Sean had been
5 convicted and he was in prison and we had to go --
6 they had to go back to court around
7 two-thousand -- it would have been 2011, sometime
8 around then, did you ever -- were you ever present
9 at any of those proceedings?
10    A.  Yes.
11    Q.  Do you remember about how many times were
12 you present at those proceedings?
13    A.  I went to every trial he had except for
14 the last -- the last -- I think it was the last
15 one.  The last -- the last one or two.  I
16 missed -- out of all the trials he had, I may have
17 missed two -- two of them.
18    Q.  Were you present when any of the -- when
19 any other witness -- not yourself -- when any
20 other witness testified during the post-conviction
21 proceedings about the events that led up to Sean's
22 arrest?
23    A.  No.
24    Q.  Okay.  So let's -- I'm going to jump back

79

1 around because I'm just going back through.  I'm
2 covering stuff so I'm almost done.
3         The night of the shooting on September
4 15th, 1991, did you see Sean get in an altercation
5 with quote/unquote females?
6    A.  No.  I didn't see no -- getting into it
7 with no females.
8    Q.  The night of September 15th, 1991, the
9 night of the shootings, did you ever slap Sean in
10 the face?
11    A.  I don't know if it was the night of
12 the -- yeah, I hit him one time but he did
13 something.  But I hit him.  I don't know if I
14 slapped him in the face.  I think I just hit him
15 on the head or something.  I can't remember
16 slapping him in the face, but I think I hit him.
17    Q.  Do you remember, like, hitting him on the
18 night of September 15th of 1991, the night of the
19 shooting?
20    A.  I think that's the night I hit him.
21    Q.  Why did you hit him that night?
22    A.  Because why would I be seeing him coming
23 into the house when he's supposed to be already in
24 the house.  When I came out of the house, I'm

80

1 thinking I'm out the house and everybody that's
2 supposed to be in there is in there already.  I
3 met him and I asked him -- he was saying, I went
4 to the -- that ain't what he supposed to have did,
5 and I think I lost it.  That's when I told him
6 just go in the house, do like I asked you to do.
7    Q.  Where -- so when you slapped Sean --
8    A.  (Inaudible).
9    Q.  So, hold on.  When you slapped Sean,
10 where were you guys standing?
11    A.  In the -- in the gangway going -- he was
12 coming to the house and I was going out the house.
13 Right as you come down the stairs.  And we was
14 ready to go to the gangway.  That's where I met
15 him at.  "Where you supposed to be coming from?"
16    Q.  Okay.
17    A.  "I just went to the store" or something
18 he told me.  But, to me, you do like I ask you to
19 do if you're going to stay here.  And I just had
20 hit him before I know it.
21    Q.  Okay.  So you said that, when you slapped
22 Sean, you were in the gangway in between 1210 and
23 1212; correct?
24        MS. SPENCE:  Objection.  Mischaracterizes

81

1 testimony.
2      Go ahead.
3      **A.  Correct.**
4      Q.  Did you ever see anybody else slap Sean
5 that night besides yourself?
6      MS. SPENCE:  Objection.  Mischaracterizes
7 the testimony.  She specifically said she didn't
8 remember slapping him.
9      MS. JOHNSON:  I think she said she did
10 slap him that night.
11      MS. SPENCE:  I think she said she hit him
12 on the head.
13      **A.  Like he's coming back (inaudible).**
14      Q.  Well, other than --
15      **A.  (Inaudible).**
16      Q.  -- did you see anybody else hit or slap
17 Sean that night other than yourself?
18      **A.  No.**
19      Q.  Okay.  The night of September 15th, 1991,
20 did Sean ever tell you that he got into an
21 argument with some people that he believes it was
22 Mexicans and Indians?
23      **A.  I thought that was the Latin Kings that**
24 **he was talking about.  Or maybe --**

82

1      Q.  So (inaudible) Sean told you that the
2 night of September 15th, 1991, he had gotten into
3 an argument with Latin Kings?
4      **A.  And that's -- that's what I thought was**
5 **going on.  And I told him go in the house.**
6      Q.  Did -- and with respect to that -- with
7 respect to the Latin Kings, did Sean tell you that
8 he had gotten into a fight with Latin Kings?
9      **A.  No.**
10      Q.  Okay.  So the next day, on September
11 16th, 1991, you said that Sean was getting
12 dressed.  Do you know where he was getting dressed
13 and ready to go?
14      **A.  No.  I don't know of a special place he**
15 **had to go, but he was getting ready to go some**
16 **place.**
17      Q.  Okay.  Well, earlier, you testified that
18 Sean had told you that they took photos of
19 injuries; is that correct?
20      **A.  That's what he told me, that they had --**
21 **they had pictures and they had the bruise**
22 **picture -- where they had bruised him, that they**
23 **had pictures of that too.  So when I got to court,**
24 **they said that they -- the pictures and things was**

83

1 **misplaced, so I never saw any pictures.  I only**
2 **heard what Sean told me.**
3      Q.  Okay.  So did Sean tell you who took
4 those pictures?
5      **A.  No, he didn't tell me who took the**
6 **pictures or where the pictures came from, but he**
7 **said that he had photos of it and I could see them**
8 **later.**
9      Q.  And when you say when you went to court
10 and they told you that the pictures were
11 misplaced, who told you that?
12      **A.  It was whoever -- when I asked about the**
13 **pictures, they said that they couldn't find them.**
14      Q.  So -- and let me -- let me be clear.
15 When did you ask about those pictures?  Was that
16 sometime in 1991?
17      **A.  The first trial we had when we got ready**
18 to go (inaudible) -- when I saw the attorney,
19 that's when I asked, because he said that they had
20 lost it, the pictures and lost his whole file.
21      Q.  Okay.  Okay.  So you're talking about --
22 and that was -- that was when you were getting
23 ready for the criminal trial, correct, back in the
24 '90s?

84

1      **A.  Back in the '90s, yes.  That was the**
2 **first time.**
3      MS. JOHNSON:  Okay.  All right.  I think
4 I am done.  Let me look over my notes to see if
5 there's any other questions I have.  We'll take,
6 like, five minutes and I'll be back.
7      MS. SPENCE:  All right.  Ms. Jakes, we'll
8 be back at 7:53.  Okay?  I'm sorry.  6:53.  6:53.
9 Okay?
10      THE WITNESS:  6:53.
11      MS. SPENCE:  Six five three.  Yep.
12      THE WITNESS:  Okay.  Thank you.  I need
13 to go to the bathroom.
14      MS. SPENCE:  Yes, let's go off the
15 record.
16      VIDEOGRAPHER:  This marks the end of
17 Media No. 8.  The time is 6:48 p.m.  We are off
18 the record.
19      (A brief recess was taken from 6:48 p.m.
20 to 7:00 p.m.)
21      VIDEOGRAPHER:  This marks the beginning
22 of Media No. 9.  The time is 7 p.m.  We are on the
23 record.
24 BY MS. JOHNSON:

85

1    Q.   Okay, Ms. Jakes.  You talked earlier
2  about your testimony on November of 1992, and I'll
3  just represent to you that that was prior to the
4  actual criminal trial itself, and it was at
5  something that we call a motion to suppress
6  hearing.  Okay?
7    **A.   Okay.**
8    Q.   Okay.  Did you want to testify at Sean's
9  criminal trial?
10   **A.   Did I want to?**
11   Q.   Yes.
12   **A.   I thought I did.**
13   Q.   Well, no, so that's what I was telling
14 you.  So prior -- so when you testified in
15 November of 1992, that wasn't actually at Sean's
16 criminal trial itself.  That was actually a
17 pre-trial proceeding.  I'm talking about during
18 the actual criminal trial, did you want to testify
19 in Sean's defense?
20   **A.   Yes.**
21   Q.   Do you know why you were not called by
22 the defense to testify on Sean's behalf?
23   **A.   No.**
24   Q.   Why did you want to testify at Sean's

86

1  criminal trial?
2    **A.   Because I wanted to tell them the same**
3  **thing I had been telling them all the time.  He**
4  **had -- he didn't do it.**
5    Q.   Okay.  All right.  And then one more
6  question:  Without going into the substance of any
7  conversation that you may have had with your
8  attorneys, including Spence, did you have an
9  opportunity to talk to Spence during the lunch
10 break of this deposition?  And, again, don't go
11 into any conversations or substance.
12   **A.   Of which deposition?**
13   Q.   This one.  Did you -- and let me -- let
14 me ask the question so it's really clear, because
15 I want you to be careful.  Without going into the
16 substance and without telling me what your
17 conversations were about -- that's not what I'm
18 asking -- all I want you to tell me is did you
19 have an opportunity to talk to Spence during the
20 lunch break of this deposition?
21   **A.   No.**
22     MS. JOHNSON:  I'm done.
23     EXAMINATION ON BEHALF OF THE PLAINTIFF
24 BY MS. SPENCE:

87

1    Q.   All right.  So Ms. Jakes, I want to ask
2  you a few questions about some of the topics
3  Ms. Johnson talked to you about.  So this is
4  Spence, because I know you can't see me.  All
5  right?
6    **A.   All right.**
7    Q.   Okay.  So I want to start with your time
8  with Sean.  In the 1990s, you were living at 1212
9  West 51st Street; right?
10   **A.   Yes.**
11   Q.   Okay.  And while you were living there,
12 did any of your family members come to visit you?
13   **A.   Yes.**
14   Q.   And while you were there, did any of your
15 nieces and nephews come to visit you?
16   **A.   Yes.**
17   Q.   In that time in the 1990s, did you have
18 an opportunity to observe Sean interacting with
19 his cousins?
20   **A.   Yes.**
21   Q.   And how would you describe his -- so what
22 kind of activities would Sean do with his cousins?
23   **A.   They'd play sports.  I know they played**
24 **sports.**

88

1    Q.   Mm-hmm.  Outside of playing sports, did
2  you observe Sean doing anything else with his
3  cousins?
4    **A.   Yes.**
5    Q.   What other type of activities did you see
6  Sean engage in with his cousins?
7    **A.   They would go out together.**
8    Q.   And how would you describe Sean's
9  demeanor when he was hanging out with his cousins?
10   **A.   Same.  He would just joyful.  Fun person**
11 **to be with.**
12   Q.   While -- before Sean was arrested, you
13 previously testified that Sean had -- Sean was --
14 Sean lived with you for a little bit of time.  Is
15 that right?
16   **A.   Yes.**
17     MS. JOHNSON:  Let me make my objection.
18 Objection.  Misstates prior testimony.
19     Go ahead.
20 BY MS. SPENCE:
21   Q.   And before he was living with you in
22 1991, was there an occasion where Sean would ever
23 sleep over your house or stay with you for a few
24 days?

89

1     A.  I can't remember just coming and spending
2  some time, but he always went home.
3     Q.  Were there times before Sean's arrest
4  that you were able to hang out with Sean by
5  himself?
6     A.  Yes.
7     Q.  And what kind of relationship did you
8  guys have, the two of you?
9     A.  Just the two of us?  We played cards and
10 we cooked.  We -- we did things together.
11 Everything we did was together.
12    Q.  What kind of food would you guys cook?
13    A.  Well, we would make -- I would always try
14 and cook something that he likes.  We made --
15 little dishes, little things, I guess.  Just
16 cooking.
17    Q.  Were there ever any occasions where Sean
18 cooked for you?
19        MS. JOHNSON:  Objection to form.  Are you
20 talking about --
21    A.  The whole meal --
22        MS. JOHNSON:  I'm not clear when you're
23 talking about.  Are you talking about now or back
24 in --

90

1         MS. SPENCE:  No, I said -- this is before
2  the arrest in the 1990s.
3         MS. JOHNSON:  Okay.
4     A.  Before he was --
5     Q.  So before he was arrested -- so focusing
6  on the time before he was arrested, when you
7  would -- you and Sean would spend time together as
8  a twosome, just the two of you, were there ever
9  times that Sean ever cooked food for you?
10    A.  No, not the whole meal, no.
11    Q.  Not the whole meal?
12    Were there any times when Sean cooked
13 part of a meal?
14    A.  Well, he'd cook a whole meal now, but he
15 wasn't cooking a whole meal when he was in -- I
16 think he was learning how to live his own and cook
17 by being in prison, because when he came out, he
18 cooks now.  He cooks whole meals now.
19    Q.  You previously testified that -- or
20 earlier, you testified that Sean would help take
21 care of the babies?
22    A.  Yes.
23    Q.  And this was before -- this is before he
24 was arrested for the murder; right?  The Garcia

91

1  murder.
2     A.  Yes.
3     Q.  And which babies was Sean taking care of?
4     A.  I know he took care of Antonio or he took
5  care of Shelanda and Shanika.
6     Q.  Okay.  And how often --
7     A.  (Inaudible).
8     Q.  Go ahead.
9     A.  Shanika was Rose's daughter.  Rose's
10 oldest daughter.  And that's the one he said he --
11 the baby never fell out the bed in his care.  He
12 was so mad when he came in and saw a knot on the
13 baby's head.  He wanted to know what happened
14 here.  And they told her she fell out the bed.
15 And that's when we went off (inaudible) "She never
16 fell in my care.  Now, who wasn't watching her?"
17        So that's when I know he -- he can take
18 care of babies and he's concerned about other
19 children and stuff.  He don't want nobody to get
20 hurt in his care.
21    Q.  Okay.  So how old were the babies that
22 Sean would watch?
23    A.  They were between two and three months.
24    Q.  And how many -- how many babies would

92

1  Sean help to take care of?
2     A.  He helped with all three of them:
3  Antonio, Shalenda Lewis, and Shanika Jones, Rose's
4  daughter.
5     Q.  When you left --
6     A.  He'd watch the kids.
7     Q.  Okay.  When you -- when you left the
8  babies in Sean's care, were you ever worried about
9  their safety?
10    A.  Never.
11    Q.  And how did you feel when you knew that
12 Sean was going to be watching the babies?
13    A.  I felt all right.  I could go into the
14 grocery store, laundromat.  Wherever I was going,
15 I could go and come back and not worry about is my
16 child hurt.  No.  That's why he was so upset that
17 the baby fell out the bed.  He was wondering who
18 was watching the baby.  The baby was supposed to
19 have been in Shalenda's care and Shanika.
20    Q.  Were babies ever -- when Sean was in
21 charge of taking care of the babies, were the
22 babies ever injured?
23    A.  Never injured.  They would always be dry,
24 playful, or they would be sleeping when you got

93
1 back or he would be playing with them.
2    Q.   You also mentioned that, for fun, you
3 used to play cards with Sean?
4    A.   Yes.
5    Q.   What kind of card games would you play?
6    A.   We played Spades, Gin Rummy, Slap Jack.
7 And there was another one we played. Can't think
8 of that one right offhand, though. We had
9 something to do.
10    Q.   When you played Spades, was Sean on your
11 team? Were you guys a pair?
12    A.   Sometimes we were partners. Sometimes we
13 wasn't partners. Because Sean wanted to win.
14 Every game, he wanted to win. And he'd want to
15 play my hand and his hand, so I couldn't be
16 partners with him too long.
17    Q.   I see.
18    A.   He'd say, "I know you wouldn't have
19 played that spade. Didn't you see I laid it with
20 you (inaudible)?" "I'm playing my hand, you play
21 yours."
22    Q.   Mm-hmm.
23    A.   So he's very -- if he going to play, he
24 want to win. And he 's going to do all he can to

94
1 win. If he lose, you (inaudible) because he going
2 to call the cards before you even play it.
3    Q.   And when he -- you said that Sean would
4 also participate in sports?
5    A.   Yes. He loves sports today.
6    Q.   What kind of sports would he play before
7 he was arrested for the Garcia murder?
8    A.   Basketball and football, I can remember.
9    Q.   Did you ever have an opportunity to watch
10 Sean play basketball or football?
11    A.   No.
12    Q.   Who would he play these basketball and
13 football games with?
14        MS. JOHNSON:  Objection.
15    A.   He would play with Eric or Quarter-pound,
16 Derrick. A few of them would play, and that's
17 where I knew about Abdul. Abdul would play with
18 them sometimes. The ones that I know would come
19 over, and they would be like, you know, this. All
20 those other names -- I think it's about two names
21 or one name I heard of, but that one is the only
22 one that came to the house, Abdul.
23    Q.   When you --
24    A.   And he --

95
1    Q.   Go ahead.
2    A.   When he would -- Abdul would call me from
3 time to time when he was in jail to tell me what
4 to tell him or if he want, you know, something.
5 So I saw him doing -- I kept in touch with him
6 too.
7    Q.   All right.
8    A.   The last time I saw Abdul was when Sean
9 got out of jail. He came over here, and I think
10 he took him shopping, and they bought him a few
11 outfits or two or three pair of something.
12 Anyway, he did what he could.
13    Q.   I see.
14    A.   And I haven't seen him no more.
15    Q.   All right. Earlier, you had also
16 mentioned that you used to watch TV shows with
17 Sean?
18    A.   Yes.
19    Q.   And was this before he was arrested for
20 the Garcia murder?
21    A.   Yes. And he still love those games.
22    Q.   What kind of shows would you watch?
23    A.   Jeopardy. That's his number one show
24 there. He'd be hollering them out, calling

96
1 answers real quick. And Wheel of Fortune, they
2 could get the answer real quick. Before they get
3 two or three letters, they got the whole word --
4 the whole puzzle. Now, they was good at that.
5    Q.   When you --
6    A.   All the kids loved that. They would be
7 racing, trying to see how many were they going to
8 get. If I got one, I was happy.
9    Q.   So you were watching the show with the
10 kids and Sean?
11    A.   Yes. Sean would be getting them fast.
12    Q.   All right.
13    A.   "Oh, that's Dr. Drake." And they'd say
14 "Dr. Drake." You're right. And I would be,
15 "Sean, let somebody else get some." But then he
16 started wanting to make a bet on it. I bet you
17 I'm going get this one. I bet you. He was into
18 Wheel of Fortune and The Price is Right.
19    Q.   When -- go ahead.
20    A.   (Inaudible) television. Telling the
21 folks what door it's behind, then they'd tell you
22 to get this or that.
23    Q.   All right. And so when -- when Sean was
24 convicted -- so I want to move the timeline a bit

97

1 to when Sean -- after Sean had gone to trial and
2 he was convicted and sent to prison, you said that
3 you would visit him at the prison; right?
4 　A.　Yes.
5 　Q.　When you went to visit him at the prison,
6 did anyone ever go with you to visit him?
7 　A.　Sometimes somebody would go with me.  My
8 friend would go sometimes and some of the kids,
9 when they got of age to go, they went.
10 　Q.　And what -- when you say "of age," how
11 old did the kids need to be to go visit Sean?
12 　A.　All of them visit him at the Audy Home.
13 Well, Rosa finally did it too.  He told her she
14 looked like a kid, but she had a baby at the time
15 and she got so mad but didn't want her to see him.
16 But the officer came and told her that she could
17 still go to see him.  So he did.  She was able to
18 see him, but at first, they was giving her the run
19 around.  Like you ain't nobody's auntie, and
20 you're nobody -- you have to be related to him to
21 go in there.  You have to be a distant relative
22 like an auntie, grandma, dad or something like
23 that.  So I told him just say that's your auntie.
24 And he -- that man told her she didn't look like

98

1 she was nobody's auntie.  You ain't got no kids.
2 He said I might not be his uncle, but I have a
3 baby.  And then he made her go sit down and, later
4 on, they let her up.
5 　Q.　And so, if I'm understanding correctly,
6 at the Audy Home, there were restrictions on who
7 would see Sean?
8 　A.　They have restrictions.
9 　Q.　Is that what you were saying?  I'm trying
10 to understand what you were saying about the
11 rules -- where they had rules that prevented
12 certain people from seeing Sean?
13 　A.　Right.  You had to have rules.  You had
14 to be an uncle or aunt or a mother, father,
15 sister, brother, something like that.  His sisters
16 and brothers couldn't visit him.  But my kids
17 wanted to see him.  After so long, they wanted to
18 see him, this one wants "let me go, let me go."
19 　　　So I would tell (inaudible) that's your
20 uncle.
21 　Q.　Oh, I see.
22 　A.　And so Rosa just didn't look like she
23 could be nobody's auntie.  And he turned her
24 around like we was doing something real bad.

99

1 After he saw how bad she was and crying, he went
2 on and let her up.  But he told her that, next
3 time, just put her name on there and go on and see
4 him.
5 　Q.　And you said that Sean's sisters -- his
6 siblings couldn't see him?
7 　A.　They was what?
8 　Q.　Did you say that Sean's siblings couldn't
9 see him?  Is that what you said earlier?
10 　A.　Oh, yeah.  His siblings could see him
11 but, like, my kids, Rosa and them, they was
12 cousins.
13 　Q.　I see.  The cousins could not see him.
14 　A.　A certain age to visit him too.  I think
15 you had to be around 8 or -- or you -- where you
16 can visit without a parent.  And if he's your
17 uncle, you can literally walk in.  But you're 17
18 or you're 18, what uncle you got.  That was the
19 (indiscernible).  He just thought maybe something
20 was going on, but he let her on anyway because he
21 wasn't having that many visitors that I know of.
22 　Q.　And you said that you --
23 　A.　All these people (inaudible).
24 　Q.　You said that Sean didn't have -- you

100

1 didn't know of Sean having a lot of visitors.  Was
2 this true when Sean was in prison?  Did he have a
3 lot of visitors in prison, do you know?
4 　　　MS. JOHNSON:  Object to foundation.
5 　　　Go ahead.
6 　A.　Oh, I can't testify to what he had coming
7 up there because I didn't know, but I'm saying I
8 thought that there was -- he didn't have many
9 visitors.  If they wanted to see him, they would
10 ask me and I would tell them.  And then they said,
11 Just let me go; I'll say he's my uncle.
12 　　　And the oldest first two, Veronica and
13 Derrick had got in, and Rosa was (indiscernible),
14 and that's when he turned her around.  And I don't
15 know she ever went back again.  But she did -- but
16 she was able to see him that time.
17 　Q.　So focusing on the time that Sean was in
18 prison -- so this is after he was convicted -- you
19 said that you went to go to the prison and you
20 would visit Sean in the prison; is that right?
21 　A.　Correct.
22 　Q.　Okay.  And did any other family members
23 that you know of -- sorry.  Did -- your mother,
24 Sean's grandmother, did she ever go to the prison

101
1  to visit Sean?
2        MS. JOHNSON:  Object to the foundation.
3    A.  Yes.  She would.
4        MS. JOHNSON:  Go ahead.
5    Q.  And how did you know that his grandma
6  would go visit with him?
7    A.  Because she would make a trip
8  (indiscernible) up here, and she would stop --
9  whatever prison he was in, she would try to see
10  him before.  When they moved to close to her, she
11  would just visit him and then go home.  But,
12  usually, she would visit and come up on here and
13  visit him on the way back.
14        So when he was in John (indiscernible)
15  and 26 and California, they just took that out
16  there.  I think he was in Pontiac too somewhere.
17  He was in a lot of them, but we found him.
18    Q.  When Sean was -- it sounds -- when Sean
19  was moved to different prisons, how did you find
20  out where Sean was going?
21    A.  He'd write me a letter and give me an
22  address to the prison, saying where he was.  And
23  when I got there, I gave him my information and ID
24  and I could see him.  I could visit him -- every

102
1  time I went to visit him, I visit him except for
2  one time over letting him --
3    Q.  (Inaudible) that one time.
4    A.  He couldn't tell them how old I was.  I
5  think there was something like that.  And he say I
6  might have been 70.  And I was, like, 50 something
7  then maybe.  60, I guess.  He said -- like he
8  didn't know me or something.  Anyway, his mom got
9  a chance to visit him, but I didn't.  I waited
10  outside.  They wouldn't let me see him.  And I had
11  been the one there a couple of times.
12    Q.  When Sean was moved to different prisons,
13  did that ever have an impact on how frequently you
14  could visit Sean?
15    A.  No.
16    Q.  Do you -- earlier you testified that,
17  when you would visit Sean in prison, that he --
18  that he talked about having -- sorry; that he
19  seemed happy and joking.  Do you remember saying
20  that?
21    A.  Not too many times.  Every time he was
22  there to see some of us.  And out of the whole
23  time in there, my mom went there one time to visit
24  him, and they didn't let her see him.  I don't

103
1  know if he had gotten into some trouble inside
2  that he wasn't having no visitors, because
3  usually, we called before we come.  After that
4  time, we started calling before we go to see if he
5  was able to have visitors.  If so, then we went.
6  We just never stopped by and just said we would go
7  see Sean and we went.  We went there that time,
8  and they said he couldn't have no visitors or
9  something.  He was in a -- in -- consolidated or
10  something -- something that he couldn't come out
11  to see us and we couldn't see him.  And one
12  time -- one time, they let him up because my mom
13  had came all the way from Arkansas, and they let
14  her saw him, not us.
15    Q.  So you said that he was happy and joking
16  when he saw you, but --
17    A.  Yeah, he was happy --
18    Q.  Where there times -- when you talked to
19  him on the phone, did Sean ever talk about times
20  that were difficult for him in prison?
21        MS. JOHNSON:  Object to form.
22    A.  When -- he would talk about it real bad
23  when he was not at home, but I think he stayed at
24  Audy Home, those two or three years led him to, if

104
1  they're not going to let you out, you have just
2  got to do the best you can, do your time inside
3  here.  I think something snapped and changed
4  because they stopped saying he went in -- they got
5  him off so he can't have no visitors, can't come
6  out, and he knows what to do and what not to do so
7  he wouldn't have to go in solitary.
8    Q.  And since Sean has been out -- go ahead.
9    A.  When he first went, there was a lot of
10  times that he was -- he was in there for
11  something.  But it says no visitor for Anthony
12  Jakes.  And we knew then that he was in -- he had
13  done something.  I don't know what it was.  Threw
14  a tray or something in there that made him have to
15  go to confinement.  He couldn't have no visitors.
16    Q.  After Sean was released from prison, how
17  would you compare his personality and his moods
18  since he's been out of prison as compared to
19  before he was put in prison?
20        MS. JOHNSON:  Object to form.
21    A.  He sort of -- well, he seemed to be as
22  happy as he possibly can around me.  He -- he may
23  show a difference to someone else, but to me, it's
24  always -- well, he called me his Ray.  Ray, how

105

1 you doing? How you feel? What's up? You know,
2 just average Sean.
3     I love being around him. I can't see him
4 being anything other than a nice person. If there
5 were some negatives about it, I would want to know
6 why and what reasons for this.
7   Q.  I want to talk about the -- your
8 testimony regarding the police calling you from
9 the station. You previously testified that
10 that -- when you testified to that in court, that
11 that was a lie, that that was not a truthful
12 statement; right?
13   A.  Right, correct.
14   Q.  All right. And did there ever come a
15 time when you testified in court about that --
16 sorry; let me -- I withdraw that question.
17     Did you ever tell a judge -- was there
18 ever a time that you told a judge that that
19 testimony that the police called you after Sean
20 had been taken to the police station that night,
21 was untrue?
22   A.  Yes.
23     MS. JOHNSON:  Object to the form.
24 BY MS. SPENCE:

106

1   Q.  When did you testify that that statement
2 was untrue?
3   A.  When I was on the stand. The next time I
4 was on the stand, they came up with the paper
5 saying did you say this? And I know I said yes.
6 And they wanted to know why did I say yes to it
7 and then, no, they didn't call. But my mind back
8 at the time, saying this has been a long time, me
9 saying that somebody should have been there with
10 him. He shouldn't been out here, 15 years old,
11 testifying to doing nothing for himself without an
12 adult. So I said that they called me, but they
13 never called me. I communicated with Sean the
14 whole time.
15   Q.  All right. So can you explain to me now
16 why you said that the police called you when they
17 had not, in fact, called you that night?
18   A.  Because I thought they may have forgotten
19 it -- said -- told me they would call me, but they
20 never called me. I'm saying he had enough going
21 on without them not calling me, so I thought maybe
22 they had forgot and they'd be letting him out
23 soon. When I find out he was still in, I just
24 lied for them for nothing. And I wanted to

107

1 correct that.
2   Q.  When you say you lied for them, who is
3 the "them"? Who is "them"?
4   A.  The -- when I was on the witness stand.
5 Lied to the fact that the police called me about
6 Sean when they didn't. They just took him away
7 from me like I wasn't nothing. Just took him away
8 and said that they would call me and left me a
9 card to call them if I found his aunt.
10   Q.  And so when you said that you were lying
11 for them, were you saying that you were lying for
12 the police?
13     MS. JOHNSON:  Object to the form.
14   A.  When I was on the witness stand. I
15 raised my hand to tell the truth, the whole truth,
16 nothing but the truth, and I lied. And I know I
17 lied and I told them afterwards.
18   Q.  You told who afterwards?
19   A.  That it was a lie, they never called me.
20 That they never called me, that I lied on the
21 stand. (Indiscernible) that couldn't take it
22 back, but if I wanted to take it, I could change
23 it when I testified the second time. They gave me
24 the privilege to change it --

108

1   Q.  So without --
2   A.  And that's what I did. I changed it. I
3 changed it and I'm sticking to it now because they
4 didn't call me ever.
5   Q.  Okay.
6   A.  They treated me like Sean had
7 (indiscernible).
8   Q.  So, Ms. Jakes, when you corrected your
9 testimony in court and admitted that you had lied,
10 who was Sean's attorney at that time?
11   A.  Russell.
12   Q.  Before you became Sean's legal guardian,
13 did you ever attend any parent-teacher conferences
14 at Sean's school?
15   A.  No.
16   Q.  Before you became Sean's legal guardian,
17 did you ever receive Sean's report cards?
18   A.  No.
19   Q.  Before you became Sean's legal guardian,
20 did you ever -- did you ever have access to his --
21 did you ever have access to his educational
22 records?
23   A.  No. I had -- I never saw nothing except
24 for his diploma that they sent me from 26 and

109

1 California. I got the 8th grade diploma, that he
2 had completed the 8th grade.
3    Q. All right.
4    A. And that's when he told me he was
5 going -- he was going back to school and he was
6 going to get his GED. I mean, get his diploma.
7    Q. Okay.
8    A. But something happened.
9    Q. Got it.
10    MS. SPENCE: I just want to just take a
11 five-minute break to just make sure I don't have
12 anymore questions, but I think I'm almost done.
13    THE WITNESS: Oh, thank you.
14    MS. SPENCE: So can we go off the record
15 for five minutes?
16    So, Ms. Jakes, we'll be back at 7:35.
17 Okay?
18    THE WITNESS: 7:35.
19    VIDEOGRAPHER: This marks the end of
20 Media No. 9. The time is 7:30 p.m. We are off
21 the record.
22    (A brief recess was taken from 7:30 p.m.
23 to 7:42 p.m.)
24    VIDEOGRAPHER: This marks the beginning

110

1 of Media No. 10. The time is 7:42 p.m. We are on
2 the record.
3    MS. SPENCE: I do not have any additional
4 questions.
5    MS. JOHNSON: I just have a couple of
6 follow-ups on the stuff that you asked.
7    EXAMINATION ON BEHALF OF THE DEFENDANT
8 BY MS. JOHNSON:
9    Q. Ms. Jakes, did you ever give the police
10 officers that came to your house and took Sean,
11 your phone number?
12    A. My phone number?
13    Q. Did you ever give the police officers
14 that came to your house and took Sean down to the
15 station your phone number?
16    A. No.
17    Q. At any point in time, did you ever call
18 the police officers and try to give them your
19 phone number?
20    A. No.
21    Q. All right. Well, I'm going to show you
22 really quickly --
23    MS. JOHNSON: Just for the record,
24 Spence, this will be 4. It's City Jakes 824.

111

1    Actually, I cannot show you. I keep forgetting
2 you're not on the video. Okay. I'll show -- I'll
3 show you, Spence. This is what it's supposed to
4 be.
5    MS. SPENCE: Yep.
6    (Exhibit 4, Note, was marked for
7 identification.)
8 BY MS. JOHNSON:
9    Q. Okay. I'll represent to you, Ms. Jakes,
10 that we have handwritten note in the actual police
11 file with respect to this case, and it's just a
12 blank page and it says -- at the top, it says,
13 "Jessie Mae Jones, aunt," and then it has a dash
14 and it says, "924-2258." Was that your phone
15 number back in 1991?
16    A. Yes.
17    Q. How would the police officers have gotten
18 your phone number if you didn't give it to them?
19    MS. SPENCE: Objection -- I'm sorry.
20 Objection. Calls for speculation.
21    Go ahead.
22    A. Sean may have gave it to them. I didn't
23 give it to them. Nobody asked me for the phone
24 number. They act like he was just in the street,

112

1 he didn't live with nobody.
2    Q. Okay. But if they had the phone number
3 924-2258, that was your correct phone number;
4 right?
5    A. Correct house number, yes.
6    Q. Okay. That's all I have got. I'm done.
7    MS. SPENCE: Okay. We can go off the
8 record.
9    MS. JOHNSON: George, do you have
10 anything?
11    MS. SPENCE: George, anything from the
12 City? Hearing no response...
13    I think we can go off the record.
14    MS. JOHNSON: I think we're okay.
15    MS. SPENCE: Okay.
16    VIDEOGRAPHER: We're going off the record
17 at 7:45 p.m., and this concludes today's testimony
18 given by Jessie Mae Jakes. The total number of
19 media units used was ten and will be retained by
20 Esquire.
21    MS. SPENCE: So, Ms. Jakes, you have an
22 opportunity to read a transcript of today's
23 deposition and review it for any errors and make
24 corrections to any mistakes that are made in the

113

1  transcript, or you can say I don't want to read
2  through the transcript.
3          THE WITNESS:  Yes, I want to.
4          MS. SPENCE:  You want to read through the
5  transcript.  Okay.
6          All right.  So she's going to reserve
7  signature.
8          (At 7:45 p.m., the reading and signing
9  having not been waived, the deposition concluded.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

115

1              CERTIFICATE OF TRANSCRIBER
2
3          I, Bobbi J. Fisher, do hereby certify that
4  the foregoing transcript is a true and correct
5  record of the recorded proceedings; that said
6  proceedings were transcribed to the best of my
7  ability from the audio recording and supporting
8  information; and that I am neither counsel for,
9  related to, nor employed by any of the parties to
10 this case, and I have no interest, financial or
11 otherwise, in its outcome.
12
13 _Bobbi Fisher_
14
15 Bobbi J. Fisher, RPR
16 NCRA Registered Professional Reporter (RPR)
17 November 26, 2021
18
19
20
21
22
23
24

114

1      CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC
2
3          I, Gabriel Martin, the officer before whom
4  the foregoing deposition was taken, do hereby
5  certify that said proceedings were electronically
6  recorded by me; and that I am neither counsel for,
7  related to, nor employed by any of the parties to
8  this case and have no interest, financial or
9  otherwise, in its outcome.
10         IN WITNESS WHEREOF, I have hereunto set my
11 hand and affixed my notarial seal this 12th day of
12 November, 2021.
13
14 _Glen_
15 _____
16 Gabriel Martin, Notary Public
17 for the State of Illinois
18
19
20
21
22
23
24

Exhibit 6

91074645

9 1 0 7 4 6 4 5   491-17469/mal

**LIS PENDENS NOTICE**

**IN THE CIRCUIT COURT OF COOK COUNTY ILLINOIS**

**NOTICE OF FORECLOSURE**
To be filed in the office of the Recorder of Deeds

| | |
|---|---|
| TALMAN HOME FEDERAL SAVINGS AND LOAN ASSOCIATION OF ILLINOIS )<br>                            Plaintiff )<br>vs )<br>GEORGIA JAKES, GERALD E. SIKORA AS)<br>TRUSTEE UNDER TRUST DEED RECORDED )<br>AS DOCUMENT 86630807, "JOHN DOE" )<br>TENANT, NONRECORD CLAIMANTS AND )<br>UNKNOWN OWNERS )<br>                         Defendants ) | No. 91 CH 1464<br><br>. DEPT-01 RECORDING      $13.00<br>. T#1111 TRAN 8030 02/15/91 15:27:00<br>. #6720 # A *-91-074645<br>. COOK COUNTY RECORDER |

I, the undersigned, do hereby certify that the above entitled cause was filed in the above Court on <u>FEB 15 1991</u>, 1991 for foreclosure of a certain mortgage made by GEORGIA JAKES to TALMAN FEDERAL SAVINGS AND LOAN ASSOCIATION dated October 2, 1979 and recorded on October 24, 1979 as document number 25207238. Said action is now pending in the above Court. The record title holder of the affected real estate is GEORGIA JAKES, and it is legally described as follows:

Lot 23 in Block 1 in Young and Clarkson's Subdivision of the South East 1/4 of the South East 1/4 of the North West 1/4 of Section 8, Township 38 North, Range 14 East of the Third Principal Meridian, in Cook County, Illinois.

PTN#20-08-131-042-0000

Commonly known as 1210 West 51st Street, Chicago, Illinois 60609

_____
(Signature of Affiant)

JAROS, TITTLE & O'TOOLE, LIMITED

I.D #90410
Attorney of Record

33 N. Dearborn Street, Chicago, IL 60602
               (Address)

Deposit in Box no. 346
of the Recorder's Office

This instrument prepared by:
JAROS, TITTLE & O'TOOLE, LIMITED
33 N. Dearborn Street, Suite 1515
Chicago, IL 60602
(312) 750-1000

13⁰⁰

91074645

I CERTIFY THAT THIS
IS A TRUE AND CORRECT COPY
OF DOCUMENT # 91674645

DEC 0 2 2021

COOK COUNTY CLERK

95682757

. DEPT-01 RECORDING          $31.50
. T#0001 TRAN 0127 19/06/95 13:54:00
. #7472 # JM *-95-682757
.   COOK COUNTY RECORDER

Account No  117 1171000306

This instrument was prepared by:

FIRST UNION HOME EQUITY BANK, N. A.

131 I W. 22ND STREET
(Name)

SUITE 108
OAK BROOK  IL 60521
(Address)

# MORTGAGE

THIS MORTGAGE is made this __29th__ day of __September__ __1995__ , between the Mortgagor,
__JESSIE MAE JAKES , a single person__ (herein "Borrower"),
whose address is __1212 W 51ST CHICAGO IL 60609__
and the Mortgagee, __FIRST UNION HOME EQUITY BANK, N. A.__
a national banking association organized and existing under the laws of the United States of America, whose address
is __CONS-14 0361 CHARLOTTE, NC 28288__ (herein "Lender").

WHEREAS, Borrower is indebted to Lender in the principal sum of U.S. $ __41,600.00__ , which indebtedness is
evidenced by Borrower's note dated __September__ __29__ __1995__ and extensions, renewals and modifications
thereof (herein "Note"), providing for monthly installments of principal and interest, with the balance of indebtedness,
if not sooner paid, due and payable on __October__ __4__ __2010__ :

TO SECURE to Lender the repayment of the indebtedness evidenced by the Note, with interest thereon; the payment
of all other sums, with interest thereon, advanced in accordance herewith to protect the security of this Mortgage; and
the performance of the covenants and agreements of Borrower herein contained, Borrower does hereby mortgage, grant
and convey to Lender the following described property located in the County of __COOK__ , State of
Illinois:

LOT 24 IN BLOCK 1 IN YOUNG AND CLARKSON'S SUBDIVISION IN SECTION 8, TOWNSHIP 38
NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

31.50

which has the address of _1212 W 51ST_ _____ **CHICAGO** **IL** **60609**

(Street)        (City)    (State)   (Zip Code)

(herein "Property Address") and Permanent Parcel Number   20-08-131-041 AND 20-08-131-042

TOGETHER with all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances and rents all of which shall be deemed to be and remain a part of the property covered by this Mortgage; and all of the foregoing, together with said property (or the leasehold estate if this Mortgage is on a leasehold) are hereinafter referred to as the "Property."

**Any Rider ("Rider") attached hereto and executed of even date is incorporated herein and the covenant and agreements of the Rider shall amend and supplement the covenants and agreements of this Mortgage, as if the Rider were a part hereof.**

Borrower covenants that Borrower is lawfully seized of the estate hereby conveyed and has the right to mortgage, grant and convey the Property, and that the Property is unencumbered, except for encumbrances of record. Borrower covenants that Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to encumbrances of record.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal and Interest.** Borrower shall promptly pay when due the principal and interest indebtedness evidenced by the Note and late charges as provided in the Note. This Mortgage secures payment of said Note according to its terms, which are incorporated herein by reference.

2. **Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender under the Note and paragraph 1 hereof shall be applied by Lender first to interest due on the Note, second to the principal due on the Note, and then to other charges, if any, due on the Note.

3. **Prior Mortgages and Deeds of Trust; Charges; Liens.** Borrower shall perform all of Borrower's obligations, under any mortgage, deed of trust or other security agreement with a lien which has priority over this Mortgage, including Borrower's covenants to make payments when due. Borrower shall pay or cause to be paid all taxes, assessments and other charges, fines and impositions attributable to the Property which may attain a priority over this Mortgage, and leasehold payments or ground rents, if any.

4. **Hazard Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage", and such other hazards as Lender may require and in such amounts and for such periods as Lender may require.

The insurance carrier providing the insurance shall be chosen by Borrower subject to approval by Lender; provided, that such approval shall not be unreasonably withheld. All insurance policies and renewals thereof shall be in a form acceptable to Lender and shall include a standard mortgage clause in favor of and in a form acceptable to Lender. Lender shall have the right to hold the policies and renewals thereof, subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has priority over this Mortgage.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

If the Property is abandoned by Borrower, or if Borrower fails to respond to Lender within 30 days from the date notice is mailed by Lender to Borrower that the insurance carrier offers to settle a claim for insurance benefits, Lender is authorized to collect and apply the insurance proceeds at Lender's option either to restoration or repair of the Property or to the sums secured by this Mortgage.

**5. Preservation and Maintenance of Property; Leaseholds; Condominiums; Planned Unit Developments.** Borrower shall keep the Property in good repair and shall not commit waste or permit impairment or deterioration of the Property and shall comply with the provisions of any lease if this Mortgage is on a leasehold. If this Mortgage is on a unit in a condominium or a planned unit development, Borrower shall perform all of Borrower's obligations under the declaration or covenants creating or governing the condominium or planned unit development, the by-laws and regulations of the condominium or planned unit development, and constituent documents.

**6. Protection of Lender's Security.** If Borrower fails to perform the covenants and agreements contained in this Mortgage, or if any action or proceeding is commenced which materially affects Lender's interest in the Property, then Lender, at Lender's option, upon notice to Borrower, may make such appearances, disburse such sums, including reasonable attorneys' fees, and take such actions as is necessary to protect Lender's interest.

Any amounts disbursed by Lender pursuant to this paragraph 6, with interest thereon, at the Note rate, shall become additional indebtedness of Borrower secured by this Mortgage. Unless Borrower and Lender agree to other terms of payment, such amounts shall be payable upon notice from Lender to Borrower requesting payment thereof. Nothing contained in this paragraph 6 shall require Lender to incur any expense or take any action hereunder.

**7. Inspection.** Lender may make or cause to be made reasonable entries upon and inspections of the Property, provided that Lender shall give Borrower notice prior to any such inspection specifying reasonable cause therefor related to Lender's interest in the Property.

**8. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of the Property, or part thereof, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has priority over this Mortgage.

**9. Borrower Not Released; Forbearance By Lender Not a Waiver.** The Borrower shall remain liable for full payment of the principal and interest on the Note (or any advancement or obligation) secured hereby, notwithstanding any of the following: (a) The sale of all or a part of the premises, (b) the assumption by another party of the Borrower's obligations hereunder, (c) the forbearance or extension of time for payment or performance of any obligation hereunder, whether granted to Borrower or a subsequent owner of the property, and (d) the release of all or any part of the premises securing said obligations or the release of any party who assumes payment of the same. None of the foregoing shall in any way affect the full force and effect of the lien of this Mortgage or impair Lender's right to a deficiency judgment (in the event of foreclosure) against Borrower or any party assuming the obligations hereunder.

Any forbearance by Lender in exercising any right or remedy hereunder, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any such right or remedy.

**10. Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements herein contained shall bind, and the rights hereunder shall inure to, the respective successors and assigns of Lender and Borrower, subject to the provisions of paragraph 15 hereof. All covenants and agreements of Borrower shall be joint and several. Any Borrower who co-signs this Mortgage, but does not execute the Note: (a) is co-signing this Mortgage only to mortgage, grant and convey that Borrower's interest in the Property to Lender under the terms of this Mortgage, (b) is not personally liable on the Note or under this Mortgage, and (c) agrees that Lender and any other Borrower hereunder may agree to extend, modify, forbear, or make any other accommodations with regard to the terms of this Mortgage or the Note without that Borrower's consent and without releasing that Borrower or modifying this Mortgage as to that Borrower's interest in the Property.

**11. Notice.** Except for any notice required under applicable law to be given in another manner, (a) any notice to Borrower provided for in this Mortgage shall be given by delivering it or by mailing such notice by first class mail addressed to Borrower or the current owner at the Property Address or at such other address as Borrower may designate by notice to Lender as provided herein, and any other person personally liable on this Note as these person's names and addresses appear in the Lender's records at the time of giving notice and (b) any notice to Lender shall be given by first class mail to Lender's address stated herein or to such other address as Lender may designate by notice to Borrower as provided herein. Any notice provided for in this Mortgage shall be deemed to have been given to Borrower or Lender when given in the manner designated herein.

**12. Governing Law; Severability.** The state and local laws applicable to this Mortgage shall be the laws of the jurisdiction in which the Property is located. The foregoing sentence shall not limit the applicability of Federal law to this Mortgage. In the event that any provision or clause of this Mortgage or the Note conflicts with applicable law, such conflicts shall not affect other provisions of this Mortgage or the Note which can be given effect without the conflicting provision, and to this end the provisions of this Mortgage and the Note are declared to be severable. As used herein "costs", "expenses" and "attorneys' fees" include all sums to the extent not prohibited by applicable law or limited herein.

**13. Borrower's Copy.** Borrower shall be furnished a conformed copy of the Note, this Mortgage and Rider(s) at the time of execution or after recordation hereof.

**14. Rehabilitation Loan Agreement.** Borrower shall fulfill all of Borrower's obligations under any home rehabilitation, improvement, repair or other loan agreement which Borrower enters into with Lender. Lender, at Lender's option, may require Borrower to execute and deliver to Lender, in a form acceptable to Lender, an assignment of any rights, claims or defenses which Borrower may have against parties who supply labor, materials or services in connection with improvements made to the Property.

**15. Transfer of the Property or a Beneficial Interest in Borrower, Assumption.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at Lender's option, for any reason, declare all the sums secured by this Mortgage to be immediately due and payable. However, this option shall not be exercised by Lender if exercise is prohibited by Federal law as of the date of this Mortgage.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

This Mortgage may not be assumed by a purchaser without the Lender's consent. If an assumption is allowed, the Lender may charge an assumption fee and require the person(s) assuming the loan to pay additional charges as authorized by law.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**16. Acceleration; Remedies.** Upon Borrower's breach of any covenant or agreement of Borrower in this Mortgage, including the covenants to pay when due any sums under the Note secured by this Mortgage, Lender, at Lender's option may declare all sums secured by this Mortgage, to be immediately due and payable without demand or notice and may foreclose this Mortgage by judicial proceeding. Lender shall be entitled to collect in such proceeding all expenses of foreclosure, including, but not limited to, reasonable attorneys' fees and costs of documentary evidence, abstracts and title reports.

**17. Assignment of Rents; Appointment of Receiver, Lender in Possession.** As additional security hereunder, Borrower hereby assigns to Lender the rents of the Property, provided that Borrower shall, prior to acceleration under paragraph 16 hereof or abandonment of the Property, have the right to collect and retain such rents as they become due and payable.

Upon acceleration under paragraph 16 hereof or abandonment of the Property and at any time prior to judicial sale, Lender (in person, by agent or by judicially appointed receiver) shall be entitled to enter upon, take possession of and manage the Property and to collect the rents of the Property including those past due. All rents collected by Lender shall be applied first to payment of the costs of management of the Property and collection of rents, including, but not limited to received fees, premiums on receiver's bonds and reasonable attorneys' fees, and then to the sums secured by this Mortgage.

**18. Loan Charges.** If the loan secured by this Mortgage is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed permitted limits, then: (1) any such loan charges shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (2) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by mailing a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment under the Note.

**19. Legislation.** If, after the date hereof, enactment or expiration of applicable laws have the effect either of rendering the provisions of the Note, the Mortgage or any Rider, unenforceable according to their terms, or all or any part of the sums secured hereby uncollectible, as otherwise provided in this Mortgage or the Note, or of diminishing the value of Lender's security, then Lender, at Lender's option, may declare all sums secured by the Mortgage to be immediately due and payable.

**20. Release.** Upon payment of all sums secured by this Mortgage, this Mortgage shall become null and void and Lender or Trustee shall release this Mortgage without charge to Borrower. Lender, at Lender's option, may allow a partial release of the Property on terms acceptable to Lender and Lender may charge a release fee. Borrower shall pay all costs of recordation, if any.

**21. Waiver of Homestead.** Borrower hereby waives all rights of homestead exemption in the Property.

**22. Hazardous Substances.** Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit, or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal, or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this paragraph 22, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 22, "Environmental law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety, or environmental protection.

## REQUEST FOR NOTICE OF DEFAULT AND FORECLOSURE
## UNDER SUPERIOR MORTGAGES OR DEEDS OF TRUST

Borrower and Lender request the holder of any mortgage, deed of trust or other encumbrance with a lien which has priority over this Mortgage to give Notice to Lender, at Lender's address set forth on page one of this Mortgage, of any default under the superior encumbrance and of any sale or other foreclosure action.

IN WITNESS WHEREOF, Borrower has executed this Mortgage.

_____ (SEAL)
Borrower

**JESSIE MAE JAKES**

_____ (SEAL)
Borrower

STATE OF Illinois _____DuPage_____ County ss

I, __THE UNDERSIGNED_____ , a Notary Public in and for said County and State, do hereby certify that __JESSIE MAE JAKES_____ , personally known to me to be the same person(s) whose name(s) _____IS_____ subscribed to the foregoing instrument, appeared before me this day in person, and acknowledged that __She signed and delivered the said instrument _____AS HER_____ free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and official seal, this 29TH day of __SEPTEMBER_____ , 19 95 .

_____
Notary Public

My Commission Expires: 8-19-98

"OFFICIAL SEAL"
TIMOTHY J. O'DONOGHUE
Notary Public, State of Illinois
My Commission Expires 8/19/98

I CERTIFY THAT THIS
IS A TRUE AND CORRECT COPY
OF DOCUMENT # 95682757

DEC 0 2 2021

COOK COUNTY CLERK

# ILLINOIS

COUNTY OF **COOK**
LOAN NO 1: **8816830**
LOAN NO 2:
INVESTOR: .
POOL NO: **LR31**

WHEN RECORDED MAIL TO:

Principal Portfolio Services, Inc.
3631 S. Harbor Blvd., Suite 200
PO BOX 25079
Santa Ana, CA 92704-6951

Prepared By: Evelin Barba

## Assignment of Mortgage

Original Mortgage Amount: 41,600.00

FOR VALUE RECEIVED, the undersigned as Beneficiary ("ASSIGNOR"), hereby grants, conveys, assigns and transfers to
**FIRST UNION NATIONAL BANK SUCCESSOR BY CONSOLIDATION TO FIRST UNION NATIONAL BANK OF NORTH CAROLINA
301 S. COLLEGE STREET, CHARLOTTE, NC 28288**

("Assignee") all beneficial interest under that certain mortgage dated        **September 29, 1995**    executed by
**JESSIE MAE JAKES**

                                                                         Mortgagor, to

                        **FIRST UNION HOME EQUITY BANK, N.A.
                        CONS-14 0361 CHARLOTTE,  NC 28288**                Mortgagee, and

recorded as   Instrument No.         **95-682757**      on   **10/6/95**   in   Book
Page                              , of Official Records in the office of the County Recorder of          **COOK**

County, Illinois    , covering the following described property:
**LOT 24 IN BLOCK 1 IN YOUNG AND CLARKSON'S SUBDIVISION IN SECTION 8, TOWNSHIP 38 NORTH, RANGE 14, EAST OF THE
THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.**

Together with the note or notes therein described or referred to, the money due and to become due thereon
with interest, and all rights accrued or to accrue under said deed of trust.

**PIN: 20-08-131-041 AND 20-08-131-042**

86        81     1          97272111091          



Dated: _____10/6/95_____

FIRST UNION HOME EQUITY BANK, N.A.

1000 LOUIS ROSE PLACE, CHARLOTTE, NC 28288-8546

By _Lynn E Brown_
LYNN R. BROWN
VICE PRESIDENT

By _Kathy Adair_
KATHY ADAIR
ASSISTANT SECRETARY

STATE OF    NORTH CAROLINA          )
                                    )  SS
COUNTY OF    MECKLENBURG            )

On _____6/5/98_____ . before me,          SHENITA CURRIE          personally appeared

**LYNN R. BROWN, VICE PRESIDENT    AND    KATHY ADAIR, ASSISTANT SECRETARY**

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s)
is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/ her/their signature(s) on the instrument the person(s) or the
entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal

_Shenita Currie_
NOTARY PUBLIC            SHENITA CURRIE
My commission expires    5/18/2002

**Prepared By:**    Evelin Barba, Principal PSI
3631 S. Harbor Blvd., Suite 200, Santa Ana, CA 92704


86    91    2        97272111091    16011110g1


I CERTIFY THAT THIS
IS A TRUE AND CORRECT COPY
OF DOCUMENT # 2867642

DEC 0 2 2021

COOK COUNTY CLERK

QUIT CLAIM DEED
Statutory (ILLINOIS)
(Individual to Individual)

86 3 4 6 1 5 6

CAUTION: Consult a lawyer before using or acting under this form.
All warranties, including merchantability and fitness, are excluded.

86846156

THE GRANTOR   EDDIE JAKES and JESSIE LEE JAKES,
his wife

of the City       of  Chicago     County of  Cook
State of   Illinois                     for the consideration of
Ten and no/100----------------------- DOLLARS,
and other good and valuable consideration in hand paid,
CONVEY    and QUIT CLAIM   to

JESSE MAE JAKES, divorced and not since re-married,
1212 W. 51st Street, Chicago, Illinois 60609

(The Above Space For Recorder's Use Only)

(NAME AND ADDRESS OF GRANTEE)
all interest in the following described Real Estate situated in the County of    Cook                       in the
State of Illinois  to wit:

Lot 24 in Block 1 in Young and Clarkson's Subdivision in Section 8,
Township 38 North, Range 14, East of the Third Principal Meridian, in
Cook County, Illinois.

I hereby declare that the attached Deed represents a transaction exempt
from taxation under the Chicago Transaction Tax Ordinance by paragraph
"e" of Section 200.1.2B6 of said Ordinance.

86346156

Permanent Tax Number: 20-08-131-041

Exempt Under Real Estate Transfer Tax Act Sec. 4
Par.          & Cook County Ord. 95104 Par. E
Date     8/11/86          Sign.

hereby releasing and waiving all rights under and by virtue of the Homestead Exemption Laws of the State of
Illinois.

DATED this    7th    day of  August  1986

Eddie Jakes          (SEAL)   Jessie Lee Jakes    (SEAL)
EDDIE JAKES                   JESSIE LEE JAKES

PLEASE
PRINT OR
TYPE NAME(S)
BELOW                  (SEAL)                            (SEAL)
SIGNATURE(S)

State of Illinois, County of   Cook                   ss.   I, the undersigned, a Notary Public in and for
said County, in the State aforesaid, DO HEREBY CERTIFY that

EDDIE JAKES and JESSIE LEE JAKES

IMPRESS        are    personally known to me to be the same person s   whose name s  are  subscribed
SEAL                  to the foregoing instrument, appeared before me this day in person, and acknowl-
HERE                  edged that   they signed, sealed and delivered the said instrument as  their
                      free and voluntary act, for the uses and purposes therein set forth, including the
                      release and waiver of the right of homestead.

Given under my hand and official seal, this    7th    day of  August  19 86

Commission expires   2-11   1987

NOTARY PUBLIC

This instrument was prepared by   Samuel G. Jaffe, 105 W. Madison, 3rd Floor, Chicago, Il 60
(NAME AND ADDRESS)

ADDRESS OF PROPERTY
Samuel G. Jaffe                          1212 W. 51st Street
(Name)                                   Chicago, IL 60609
MAIL TO   105 W. Madison, 3rd Floor      THE ABOVE ADDRESS IS FOR STATISTICAL PURPOSES
(Address)                                ONLY AND IS NOT A PART OF THIS DEED

SEND SUBSEQUENT TAX BILLS TO
Chicago, IL 60602
(City, State and Zip)                    (Name)

RECORDER'S OFFICE BOX NO.                (Address)

I CERTIFY THAT THIS
IS A TRUE AND CORRECT COPY
OF DOCUMENT # 2634615

DEC 0 2 2021

COOK COUNTY CLERK

# Quit Claim Deed

INDIVIDUAL TO INDIVIDUAL

TO

Glenn G. Jones
ATTORNEY AT LAW
Tenth Floor
100 WEST MONROE STREET
CHICAGO, ILL. 60603
Tel.: 236-1441

GEORGE E. COLE®
LEGAL FORMS

I CERTIFY THAT THIS
IS A TRUE AND CORRECT COPY
OF DOCUMENT # 86346156

DEC 0 2 2021

COOK COUNTY CLERK

GEORGE E. COLE*
LEGAL FORMS

RELEASE OF MORTGAGE OR TRUST
BY CORPORATION (ILLINOIS)

FORM NO. 805
April, 1980

8 7 3 7 4 5 5 5

CAUTION: Consult a lawyer before using or acting under this form.
All warranties, including merchantability and fitness, are excluded.

# FOR THE PROTECTION OF THE OWNER, THIS RELEASE SHALL BE FILED WITH THE RECORDER OF DEEDS OR THE REGISTRAR OF TITLES IN WHOSE OFFICE THE MORTGAGE OR DEED OF TRUST WAS FILED.

87371883

Above Space For Recorder's Use Only

**KNOW ALL MEN BY THESE PRESENTS,** That the

Madison National Bank

a corporation of the State of __Illinois__, for and in consideration of the payment of the indebtedness

secured by the __Trust Deed__ hereinafter mentioned, and the cancellation of all the notes thereby secured,

and of the sum of one dollar, the receipt whereof is hereby acknowledged, does hereby REMISE, RELEASE,

CONVEY and QUIT CLAIM unto __Nathanial Jakes and Georgia Jakes__
(NAME AND ADDRESS)

__1210 W. 51st Street__ Chicago, Illinois 60609

heirs, legal representatives and assigns, all the right, title, interest, claim or demand whatsoever it may have

acquired in, through or by a certain __Trust Deed__, bearing date the __30th__ day of __June__

19 __83__, and recorded in the Recorder's Office of __Cook__ County, in the State of Illinois, in book

__""__ of records, on page ____, as document No. __27112811__, to the premises therein described,

situated in the County of __Cook__, State of Illinois, as follows, to wit:

Lot Twenty-three (23) in Block One (1) in Young and Clarkson's
Subdivision of the South East quarter of the South East quarter of
the North West quarter of Section Eight (8), Township Thirty-eight
(38) North, Range Fourteen (14), East of the Third Principal Meridian
in Cook County, Illinois.

PIN. 20-08-131-042
DFO

together with all the appurtenances and privileges thereunto belonging or appertaining.

IN TESTIMONY WHEREOF, the said __Madison National Bank__

has caused these presents to be signed by its __Sr. Vice-__ President, and attested by its __Vice-__

Secretary, and its corporate seal to be hereto affixed, this __16th__ day of __January__, 19 87
President

Madison National Bank

By _____
Ted J. Francis, XXXXXXX Sr. Vice-President
Attest: _____
Evelyn L. Denny, XXXXXXX Vice-President

This instrument was prepared by __Mary Lesnau 9190 W. Golf Rd. Des Plaines, Il. 60016__
(NAME AND ADDRESS)

# RELEASE DEED
## By Corporation

TO

ADDRESS OF PROPERTY:

Mail To:
Georgia A. Jakes
1034 So. 22nd Ave
Bellwood, IL 60104

$12.00

GEORGE E. COLE®
LEGAL FORMS

87374883

DEPT-01                        $12.25
T#0003   TRAN 2902 07/08/87 10:51:00
#8164 # C  *-87-374883
COOK COUNTY RECORDER

STATE OF Illinois
COUNTY OF Cook } SS.

I, Monica A. Camacho, a notary public
in and for said County, in the State aforesaid, DO HEREBY CERTIFY that Ted J. Francesa
personally known to me to be the Sr. Vice-President of the Madison National Bank
Illinois, a corporation, and Evelyn L. Denny personally
known to me to be the Vice-President of said corporation, and personally known to me to be the
same persons whose names are subscribed to the foregoing instrument, appeared before me this day in person
and severally acknowledged that as such Sr. Vice-President and Vice-President they
signed and delivered the said instrument and caused the corporate seal of said corporation to be affixed thereto,
pursuant to authority given by the Board of Directors of said corporation, as their free and voluntary
act, and as the free and voluntary act of said corporation, for the uses and purposes therein set forth.

GIVEN under my hand and Notarial seal this 16th day of January 19 87.

Monica A. Camacho
NOTARY PUBLIC

"OFFICIAL SEAL"
MONICA A. CAMACHO
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 9/17/90

I CERTIFY THAT THIS
IS A TRUE AND CORRECT COPY
OF DOCUMENT # _8731483_

DEC 0 2 2021

COOK COUNTY CLERK

Exhibit 7



CITY_JAKES 00504

RD NO. P454289

OFFENSE/INCIDENT AggBatt

DATE & TIME PHOTOS TAKEN 16/9/91

STAR NO.   UNIT

PHOTOGRAPHER'S NAME TSC

CITY_LAKES-00505



CITY_JAKES 00506



CITY_JAKES 00507



CITY_JAKES 00508


CITY_JAKES 00509



CITY JAKES 60510




CITY_JAKES 00512



CITY_JAKES 00513


CITY_JAKES 00514



CITY_JAKES 00515



CITY_JAMES_0051?





CITY_JAKES 00518


CITY_JAKE3 00519



CITY_JAKES 00520



CITY_JAKES 00521



CITY_JAKES 00522



CITY_JAKES 00523

Exhibit 8

1           IN THE UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF ILLINOIS

3                  EASTERN DIVISION

4              CASE NO.  19-CV-02204

5

6                  ANTHONY JAKES,

7                    Plaintiff

8

9                       V.

10

11            KENNETH BOUDREAU, ET AL.

12                   Defendants

13

14

15

16

17

18

19

20

21

22

23   DEPONENT:  CLEOTHA CHAIRSE

24   DATE:      SEPTEMBER 20, 2021

25   REPORTER:  VICTORIA JADICK



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1                    APPEARANCES
2
3    ON BEHALF OF THE PLAINTIFF, ANTHONY JAKES:
4    Russell Ainsworth
5    Loevy & Loevy
6    311 North Aberdeen Street
7    Chicago, Illinois 60607
8    Telephone No.: (312) 243-5900
9    E-mail: russell@loevy.com
10   (Appeared via videoconference)
11
12   ON BEHALF OF THE DEFENDANTS, KENNETH BOUDREAU, LOUIS
13   CAESAR, MICHAEL DELACY, KEN BURKE, AND FRED BONKE:
14   Andrew Grill
15   Rock Fusco & Connelly, LLC
16   321 North Clark Street
17   Suite 2200
18   Chicago, Illinois 60654
19   Telephone No.: (312) 494-ten00
20   E-mail: agrill@rfclaw.com
21   (Appeared via teleconference)
22
23
24
25
```

```
1                      INDEX
2                                                   Page
3    PROCEEDINGS                                      6
4    DIRECT EXAMINATION BY MR. AINSWORTH              8
5    CROSS EXAMINATION BY MR. GRILL                  31
6    EXAMINATION BY MR. GIVEN                        196
7    RECROSS EXAMINATION BY MR. GRILL               212
8
9                    EXHIBITS
10   Exhibit                                         Page
11   1 - Photo*                                       10
12   2 - Photo*                                       14
13   3 - Handwritten note*                            14
14   4 - Photo                                       161
15   5 - Photos                                      218
16
17   * Will forward upon receipt
18
19
20
21
22
23
24
25
```

```
1              APPEARANCES(CONTINUED)
2
3    ON BEHALF OF THE DEFENDANT, THE CITY OF CHICAGO:
4    Jeffrey Given
5    The Sotos Law Firm
6    141 West Jackson Boulevard
7    #1240A
8    Chicago, Illinois 60604
9    Telephone No.: (630) 773-0980
10   E-mail: jgiven@jsotoslaw.com
11   (Appeared via videoconference)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1                    STIPULATION
2
3    The VIDEO deposition of CLEOTHA CHAIRSE was taken at
4    KENTUCKIANA COURT REPORTERS, 30 SOUTH WACKER DRIVE, 22ND
5    FLOOR, CHICAGO, ILLINOIS 60606, via videoconference in
6    which all participants attended remotely, on MONDAY the
7    20th day of SEPTEMBER 2021 at 11:06 a.m.; said
8    deposition was taken pursuant to the FEDERAL Rules of
9    Civil Procedure.
10
11   It is agreed that VICTORIA JADICK, being a Notary Public
12   and Court Reporter, may swear the witness.
13
14
15
16
17
18
19
20
21
22
23
24
25
```



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 PROCEEDINGS

2

3 COURT REPORTER: We are now on the record. My
4 name is Victoria Jadick. I'm the video technician
5 and court reporter today. Today is the 20th day
6 of September 2021. The time is 11:01 -- or
7 ten:00 A.M. Eastern -- Central Standard Time.
8 You're convened by video conference to take the
9 deposition of Cleotha Chairse in the matter of
10 Anthony Jakes versus Kenneth Boudreau et al pending
11 in the United States District Court for the Northern
12 District of Illinois Eastern division. Case number
13 19-CV-02204. Will counsel please state your
14 appearance, how you are attending, and the location
15 you are attending from, starting with Plaintiff's
16 counsel.
17 MR. AINSWORTH: This is Russell Ainsworth
18 appearing on behalf of the plaintiff, Anthony Jakes,
19 and I'm appearing remotely from Illinois. You're
20 muted, Andrew.
21 MR. GRILL: Yes, I am. Thanks, Russell. My
22 name's Andrew Grill I'm counsel for the individual
23 officer defendants and I am appearing for --
24 appearing in Illinois.
25 MR. GIVEN: Jeff Given, G-I-V-E-N appearing on

1 behalf of the City of Chicago. Also, I'm in
2 Chicago, Illinois.
3 COURT REPORTER: Okay. And Mr. Chairse, will
4 you please state your name for the record?
5 THE WITNESS: I'm Cleotha Chairse --
6 COURT REPORTER: And we just need --
7 THE WITNESS: -- and I'm in -- I'm in Iowa.
8 COURT REPORTER: Would you please -- and would
9 you please take your ID, sir, and hold it up to the
10 camera like so? Pull it back a little bit, please,
11 sir. Down a little bit. Perfect. Thank you, sir.
12 You may put that away.
13 COURT REPORTER: Do all parties present agree
14 that the witness is in fact Mr. Cleotha Chairse?
15 MR. AINSWORTH: Yes.
16 MR. GRILL.: Yes.
17 MR. GIVEN: I guess so. I wouldn't know
18 otherwise.
19 COURT REPORTER: Yes, Mr. Given. Thank you.
20 Mr. Chairse, would you please raise your right hand?
21 COURT REPORTER: Do you solemnly swear or
22 affirm that the testimony you're about to give will
23 be the truth, the whole truth, and nothing but the
24 truth?
25 THE WITNESS: Yes.

1 COURT REPORTER: Thank you, sir. Counsel, you
2 may proceed.
3 DIRECT EXAMINATION
4 BY MR. AINSWORTH:
5 Q Thank you. Sir, would you please state and
6 spell your name for the record?
7 A Cleotha Chairse. C-L-E-O-T-H-A C-H-A-I-R-S-E.
8 Q And what's your date of birth?
9 A
10 Q And where were you born?
11 A Where?
12 Q Yes, sir.
13 A New Orleans. Jefferson Parish.
14 Q And at some point, did you come to Chicago?
15 A Yes.
16 Q And how old were you when you came to Chicago?
17 A I'll say -- I believe around three years old.
18 Q And when you were growing up, what -- did you
19 grow up in Chicago?
20 A Yes.
21 Q In which neighborhood of Chicago did you grow
22 up in?
23 A Started off in the Robert Taylor neighborhood
24 -- I mean the Robert Taylor projects, and then moved to
25 12ten West 51st Street.

1 Q Do you know how old you were when you moved to
2 12ten 51st -- West 51st Street?
3 A I want to say 12, 13, maybe.
4 Q When you were growing up, did you have a
5 nickname?
6 A Yes.
7 Q What was your nickname?
8 A Quarter Pound.
9 Q And do you know Anthony Jakes?
10 A Yes.
11 Q What name do you call Anthony?
12 A Shawn.
13 Q Is that his middle name?
14 A I'm figuring. That's what we called him.
15 Everyone called him Shawn.
16 Q Okay. How do you know Shawn?
17 A Cousin through marriage.
18 Q All right. So back in September of 1991,
19 all right, if you were born in '75, would that make you
20 16 then?
21 A Yes.
22 Q And so where were you living in September of
23 1991 when you were 16?
24 A 12ten West 51st Street, Chicago, Illinois.
25 Q And at that time, where did Anthony Jakes



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  live?
2      A    1212 West 51st Street, Chicago, Illinois.
3      Q    And which portion of 1212 West 51st Street
4  did --
5      A    In the back house.
6      Q    Can you describe that?  What do you mean by
7  the back house?
8      A    It was -- it was two twin apartment buildings,
9  which was 12ten and 1212, and there was a house that was
10 behind the 1212 address.
11     Q    All right.  I'm going to show you a
12 photograph.  Let's mark this as Exhibit number 1.  I'm
13 showing you what's been labeled as -- Bates labeled
14 Plaintiff Jakes 005089.  So there's a building in the
15 right hand of the photograph and there's a building
16 where my cursor is with the basketball hoop on it.  And
17 then on the left side of the photo, there's another
18 building, right?  Can you identify what these buildings
19 are?
20          (EXHIBIT 1 MARKED FOR IDENTIFICATION)
21     A    The one on my screen to the left with the gray
22 -- with the gray painting is 12ten.  That's where I
23 lived.  1212 --
24     Q    Okay.  When you say the gray painting, you
25 mean the gray on the stairs going down?

1      A    Yeah.  The gray stairs.
2      Q    Okay, so the building all the way to the left
3  was your building at 12ten West 51st Street, correct?
4      A    Correct.
5      Q    Okay.  Go ahead.  What other buildings do you
6  recognize?
7      A    And the building to the right was a twin
8  apartment building, which is 1212 with the basketball
9  hoop on it.  And the house behind is the 1212 address in
10 the back.
11     Q    Okay.  So the building to the right on the
12 photograph is the rear house at 1212 West 51st Street,
13 is that correct?
14     A    That's correct.
15     Q    And in September of 1991, who lived in this
16 rear house?
17     A    That's where my Aunt Bee lived, and Shawn
18 lived with Aunt Bee.
19     Q    And do you know the real name of your Aunt
20 Bee?
21     A    Oh, Jessie.  Jessie Jakes.
22     Q    All right.  But you called her Aunt Bee?
23     A    Yes.
24     Q    Thank you.  I'm going to stop sharing my
25 screen.  And so, do you recall the night of September

1  15, 1991?
2      A    Yes.
3      Q    What do you recall happening the night of
4  September 15, 1991?
5      A    Well, pertaining to -- with Shawn getting
6  locked up?  We were hanging out -- we was on the front
7  of the buildings and it was the Mexican parade day.  We
8  wasn't sure though.  We didn't know.  We just figured
9  that they was riding through making noise and decided to
10 throw bottles at the cars going by and when we threw
11 bottles that the cars going by, the cars stopped and we
12 took off and ran, and maybe ten minutes after -- five
13 minutes to ten minutes after -- after being in the
14 house, a bottle came through the window -- through my
15 apartment window.
16     Q    Okay.  Let me stop you there.  I want to show
17 you a photograph.  All right.  So I got to pull it up.
18 Hang on.  Okay.  I'm showing you a photograph that has
19 been Bates numbered Plaintiff Jakes 005079.  Do you see
20 -- can you tell us what buildings are depicted in this
21 photograph?
22     A    Far to the left, starting with 1212 West 51st.
23     Q    Okay.
24     A    The next building to the right is 12ten, --
25     Q    Okay.

1      A    -- and then that's -- be 1208 and 1206 of the
2  restaurant.
3      Q    Okay.  And so when you say the restaurant,
4  which restaurant are you referring to?
5      A    The fast-food restaurant that's right here
6  with the Polish sign on it.  Maxwell Street.
7      Q    Is that Queen Submarine?
8      A    Yes.
9      Q    All right.  And then this building you said
10 was 1208, is that correct?
11     A    Yes.
12     Q    And then?
13     A    12ten.
14     Q    And 12ten is where you lived?
15     A    That's where I lived.  Yes
16     Q    Okay.  Where did you live at 12ten?
17     A    On the second floor.
18     Q    All right.  Can you see in this photograph,
19 the window where the -- let me zoom in a little bit.
20 Can you see in this photograph of 12ten where the window
21 where the bottle went through?
22     A    Yes.
23     Q    Which window did the bottle go through?
24     A    That'll be the middle -- the middle window --
25 the middle picture window.  There was another window on

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1 the right-hand side also of that building.
2    Q    Okay.  When you say the middle, do you mean --
3    A    The first window.  Yes.
4    Q    This one here?
5    A    Yes.
6    Q    So it's the -- oh, I see.  It's the middle
7 facing the Street but in the photograph on the second
8 floor, it appears to be the first of three photos that
9 we can see.
10   A    Right.
11   Q    Counting from the left.  Is that accurate?
12   A    Yes.  That's right.
13   Q    Okay.  All right.  Let me show you-
14        COURT REPORTER:  I'm sorry, Mr. Ainsworth, did
15   you want to mark that as Exhibit 2?
16        MR. AINSWORTH:  Thank you.  We should.  Let's
17   do that.  I appreciate it.
18        (EXHIBIT 2 MARKED FOR IDENTIFICATION)
19 BY MR. AINSWORTH:
20   Q    And then I want to show you this document.
21 Let's mark this as Exhibit number 3 and it's Bates
22 numbered Plaintiff Jakes 005304.  All right.  So this is
23 a handwritten document that says, "September 16, 1991,
24 Anthony Jakes."  It says, "23:30 hours in front of home
25 with Denise Harris, Nikia Little, Annette Harris, Cousin

1 Tweety, and Quarter Pound.  Car drives by westbound on
2 51st Street, waving Mexican flag and threw a bottle,
3 which broke second-floor window.  Jakes and the other
4 people clean up glass.  Three male blacks Jakes had been
5 fighting with earlier came back.  Jakes and his cousin
6 run to Throop.  Jakes came home.  An ambulance out in
7 front.  Jakes got in an argument with another boy and
8 his aunt slapped him and sent him in house."  Do you see
9 that?
10        (EXHIBIT 3 MARKED FOR IDENTIFICATION)
11   A    Yes.
12   Q    All right.  I'm going to stop showing because
13 I want to ask -- well, did it happen that there were
14 cars driving by on West 51st Street waving Mexican
15 flags?
16   A    Yes.
17   Q    Do you know what time of night that happened?
18   A    Actually, no, I really don't remember the time
19 of day.
20   Q    And that's just fine.  There may be questions
21 in the -- today that you don't know the answer to and
22 that's perfectly fine.  We understand that it's been 28
23 years.  And so did one of the people from -- and so you
24 -- do you recall whether Denise Harris and Annette
25 Harris and Nikia little were out front that night?

1    A    I vaguely do but I don't really remember.
2    Q    Okay.  Do you remember Shawn being out there
3 with you that night?
4    A    Yeah, he was with me.  I remember him, yes.
5    Q    And when you were throwing bottles at cars
6 going by, what was Shawn doing?
7    A    Well, he was right there with me.  He was --
8    Q    Was he -- and he was throwing bottles --
9    A    We both threw bottles at the car.
10   Q    Okay.  And then did one of the cars that had a
11 Mexican flag on it -- was waving a Mexican flag, did it
12 stop and throw a bottle through a window?
13   A    Well, it stopped and came back and we took off
14 and ran.  And that's when they threw the bottles.  Yes.
15   Q    Okay.  And did you have to clean up the glass?
16   A    Yes.
17   Q    Did you kind of get in trouble when -- well,
18 what happened when the -- did you get in trouble when
19 the bottle got thrown through the window?
20   A    Yes.
21   Q    And so what'd you have to do?
22   A    Well, I had to clean it up.
23   Q    And was there a -- were you present for a
24 confrontation where some guys came up to Shawn and he
25 ran?

1    A    Well, yeah.  That's -- he took off and ran.
2    Q    Okay.
3    A    He ran.  Yeah.  He took off and ran and then
4 left me and my sisters having a confrontation with the
5 guys.
6    Q    And where was the confrontation?  Where did it
7 occur?
8    A    It started -- we was on the back by the back
9 house and when we made it to the front, we got into it
10 again with them.
11   Q    And who were the people that you're talking
12 about that you got into it with?
13   A    With the Mexican guys.
14   Q    Okay.  And when you say, "by the back house,"
15 what are you referring to?
16   A    In the back by Aunt Jesse house -- in the back
17 -- in the alleyway.
18   Q    All right.
19   A    That's where Shawn took off and ran.
20   Q    Which way did Shawn run when he ran?
21   A    Westbound towards Throop.
22   Q    All right.  What did you do when Shawn ran
23 westbound?
24   A    Well, I defended myself and then went in the
25 house.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    Q    All right.  And why'd you go in the house?
2    A    Because I was scared.
3    Q    Yeah.  And so did you calmly walk in the house
4 or did you run in the house?
5    A    I ran in.
6    Q    And where did your sister go?
7    A    That's when she came -- we went to the window
8 and we looked out the window and that's when I believe
9 she went back downstairs.  It kind of confused me but I
10 do remember we looked out the window also and we fixed -
11 -
12    Q    And when you --
13    A    We set everything.  We patched the -- put the
14 little patches of whatever up there in the window.
15    Q    Okay.  So when you -- you mentioned you looked
16 out the window.  What did you see when you looked out
17 the window?
18    A    Well, we really wasn't paying attention.
19 There still was people out there but we really wasn't
20 too concerned.  We was worried about trying to patch the
21 window up.
22    Q    And so did you put something in the window to
23 -- the broken window to patch it up?
24    A    Yeah.  Yes.
25    Q    What's your sister's name?

1    A    Claudette Chairse.  We call her Tweety.
2    Q    And in -- so in September 1991, who else lived
3 with you on the second floor at 12ten West 51st Street?
4    A    My mom.  My dad.
5    Q    And which side of the family are you related
6 to Shawn?
7    A    Through -- my aunt married his uncle.
8    Q    Back in September of 1991, did you know Denise
9 and Annette Harris?
10    A    Yes.
11    Q    Where did they stay in September 1991?
12    A    They stayed 1212 in the apartment building on
13 the second floor.
14    Q    So in the front building?
15    A    Yes.
16    Q    Did you know Nikia Little?
17    A    Yes.
18    Q    Did you know where she lived back in
19 September 1991?
20    A    I believe she stayed down on Justine.
21    Q    Do you know if she was friends with Denise and
22 Annette Harris?
23    A    That's their cousin.
24    Q    All right.  After you dealt with the glass --
25 or sorry, after you dealt with putting something in the

1 window, sorry.  Let me strike that and start over.
2 After you dealt with putting something in the window
3 that was broken, what did you do?
4    A    I think I talked to my sister about when my
5 mom get home because my mom was gone out of town at the
6 time, of how much more trouble I may be in.  And I'm not
7 sure about how long it was but I walked to the store.  I
8 went to the corner store.  I left out the back door and
9 went to the corner store.  And once I noticed there was
10 no one on the front of the -- in the front of the
11 restaurant, I came back to my house through the front
12 down 51st Street.
13    Q    When you say the corner store, where was the
14 corner store located?
15    A    51st and Racine.
16    Q    On which corner was it at 51st and Racine?
17    A    The northeast corner.
18    Q    Okay.  So you had to cross over Racine to get
19 to it.  Is that right?
20    A    Yes.
21    Q    And then -- and did you go down the alley to
22 get there?
23    A    Yes.
24    Q    And then you walked back on the sidewalk, is
25 that correct?

1    A    Yes.  Yes.
2         MR. GRILL:  Objection.  Leading.
3    Q    Well, when you -- how'd you get back from the
4 corner store at 51st and Racine?
5    A    I walked up 51st Street, westbound coming back
6 towards my house.  On the Street.  I didn't go back -- I
7 didn't go back to home through the alley.
8    Q    Okay.  And when you went back to your home,
9 did you -- were you walking on the Street or on the
10 sidewalk?
11    A    I was walking on the sidewalk.
12    Q    Okay.  And when you walked to the corner store
13 and then back to your house at 12ten West 51st Street,
14 did you see Shawn outside anywhere?
15    A    No.
16    Q    And then after you got home, did you hear
17 anything?
18    A    Well, before I made it home, I was confronted
19 by two guys that approached me and said that they was
20 about to get this guy when he come out of the store --
21 out of the restaurant because he had a bag full of
22 money.  And once -- when he stated that to me, I looked
23 at him.  It was like, "Oh, okay."  And I took off
24 proceeding and I went -- I got to the gangway between
25 12ten and 1212, and I took off and ran to get back to my



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 apartment. And when I made it up the stairs to my
2 apartment, when I made it through the middle of my house
3 I heard the gunshots, and that's when I told my sister.
4 I'm like, "Oh my, God, these guys must have just shot."
5 And I explained to her what had just had happened to me
6 -- with me with the two gentlemen that was out front of
7 the restaurant.
8  Q  All right. So the two guys, they told you
9 that the -- that they -- that there was a guy who had a
10 bag full of money. Is that right?
11  A  Yes.
12  Q  And did you know the two guys?
13  A  No.
14  Q  Had you seen them before?
15  A  I had seen the -- one of the guys I had seen
16 him before and I explained to my sister the detail of
17 the guys and she told me who the one guy was -- who the
18 one of the guys were.
19  Q  All right. And so -- but -- so you've seen
20 one of the guys around. And had you seen the other guy
21 around?
22  A  No.
23  Q  Did you know either of their names?
24  A  No, I didn't.
25  Q  Can you recall what they looked like?

1  A  One of the guys was a short, dark-skinned guy
2 and one of the guys was taller, but I'm -- I kind of
3 figured he was a little bit brown-skinned. He wasn't as
4 dark as the short guy was.
5  Q  And 28 years later, do you remember anything
6 else about their descriptions?
7  A  No.
8  Q  And so how old was Tweety at the time?
9  A  That's my twin sister. We're the same age.
10  Q  All right. Right, right. I forgot that. So
11 she was also 16, right?
12  A  Yes.
13  Q  And so -- and then when you described one of
14 the guys to Tweety, who did she say you thought it
15 sounded like, or she thought it was?
16  A  A guy named Little A.
17  Q  Okay. Do you know if that's how the rumor
18 that Little A was involved in the shooting got started?
19  MR. GIVEN: Objection. Competence.
20  Speculation. Lack of foundation.
21  MR. GRILL: Join.
22 BY MR. AINSWORTH:
23  Q  You can answer, sir.
24  A  Oh. Repeat your question again.
25  Q  Yeah. Do you know if that's how the rumor

1 that Little A was involved in the shooting got started?
2  MR. GRILL: Same objections.
3  A  I'm not sure.
4  Q  Okay. Did -- and do you know, did Tweety see
5 these people?
6  A  Well-
7  MR. GIVEN: Objection. Objection. Form.
8  Competence. Speculation.
9  MR. AINSWORTH: Let me withdraw the question.
10  All right.
11 BY MR. AINSWORTH:
12  Q  Did Tweety tell you that she'd seen these two
13 guys that you ran into that night when they were around
14 the sub shop?
15  A  I'm not sure. I'm not sure because the night
16 -- the way the night went so fast, I can't really recall
17 but I know by me describing the guy -- who it was, that
18 she said who it was.
19  Q  Okay.
20  A  From the description.
21  Q  And so she didn't -- it wasn't until you gave
22 a description that she said anything about these two
23 guys, is that fair to say?
24  A  Yes.
25  Q  All right. So it wasn't like she was telling

1 you about something that she had witnessed or she had
2 seen; is that right?
3  A  Right.
4  MR. GIVEN: Objection. Competence.
5  Foundation.
6  Q  All right. Did you actually see the shots be
7 fired?
8  A  No.
9  Q  Did you see any altercation between anybody
10 with a gun and the victim?
11  A  No.
12  Q  Did you see the victim out on the Street or
13 inside the sub shop when you were walking by?
14  A  I saw him actually at the gate on the inside
15 of the restaurant like if he was coming out of the back.
16  Q  Where -- and when -- where were you when you
17 saw that?
18  A  I was in front of the restaurant. I was
19 walking past the restaurant in front of the front door.
20  Q  And do you recall what the victim looked like?
21  A  No, I couldn't really tell.
22  Q  What made you he was the victim?
23  A  Because he was coming out and the guy said
24 that he was about to come out.
25  Q  Okay.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Kentuckiana
COURT REPORTERS

1    A    It's froze on my side too.  The screen.

2    Q    Is it still frozen?

3    A    Yes.

4    Q    All right.

5    A    I can hear you, but it's --

6    Q    Does it have me in a good  -- do I look good?

7    A    Yeah.

8    Q    All right.  When you heard the shots fired,

9 what did you do?

10    A    I screamed at my sister and said to her, "Oh

11 my, God.  These guys just shot this man."  And that's

12 when I explained to her what had happened that fast.

13 And we went and looked out the front of the window.

14    Q    And what'd you see when you looked out the

15 front?

16    A    The guy hanging out -- hanging out of that

17 station wagon.  His body was hanging out of the car and

18 the door was closed on him.  So he was partially in the

19 car and partially his body was hanging out of the car.

20    Q    And did you see the shooter or anybody else

21 around the victim?

22    A    No.  No one was there at the time.

23    Q    All right.  Did you see Shawn running

24 westbound or anywhere around?

25    A    No.  Shawn never came back from when he ran

1 the first time.

2    Q    All right.  And then what did you do when you

3 saw the victim hanging out of the station wagon?

4    A    Nothing.  I just stayed in the house and

5 talked to my sister about it -- what was going on.

6    Q    Did you later learn that Shawn was arrested?

7    A    Yeah.  The next day.

8    Q    And did you tell people that -- well, strike

9 that.  Did you tell his family members, you know, what

10 you had seen and what you'd observed?

11    A    Yes.

12    Q    After this incident in September of 1991, did

13 you get locked up?

14    A    Yes.

15    Q    When was that?

16    A    I want to say maybe a couple months after that

17 incident happened.

18    Q    And --

19    A    I was working -- I was working and I got

20 locked up.  I was walking towards 55th Street and I got

21 locked up -- walking to go to work and I was smoking

22 marijuana.

23    Q    And when you were locked up, for how long were

24 you locked up?  For that one?

25    A    It was -- well, it wasn't too long.  I got out

1 maybe a day or so.

2    Q    Was there a time in, you know, the 1991 to

3 1992 period where you spent some time in county jail?

4    A    Yes.

5    Q    When was that?

6    A    It was actually that time.  Well, it's kind of

7 so long ago.

8    Q    It's all right.

9    A    I was in -- I wasn't in there too long, but I

10 got out, and actually, I was on probation.  That's what

11 happened.  I got on probation, but I can't really

12 remember how long I was in there.

13    Q    So you spent some time in county jail in '91

14 to '92 time period, is that right or is that wrong?

15    A    I believe it was -- it was a little while.  It

16 wasn't too long though.

17    Q    What's your sense of a little while?  More

18 than a month or less than a month?

19    A    Less than a month.

20    Q    Did any police officer question you about what

21 you may have witnessed the night that the murder

22 occurred?

23    A    No.  They're completely gone off the screen

24 now.

25    Q    So if you moved to 12ten when you were 12 or

1 13 years old, had you been living there three or four

2 years?

3    A    Yes.

4    Q    Were you known in the neighborhood as

5 Quarter Pound?

6    A    Yes.

7    Q    To your knowledge, did people know that you

8 lived on the second floor at 12ten West 51st Street?

9    A    Yes.

10    Q    Were you active in the area?  Would you play

11 basketball?  Hang out with other people?

12    A    I didn't hang out with nobody around there,

13 but I did go to the park and shoot ball.

14    Q    Were you a member of a gang back then in 1991?

15    A    No.

16    Q    Was Shawn a member of a gang back in 1991?

17    A    No.  Not that I know of.  I'm not sure.

18    Q    Was your sister a member of a gang back then?

19    A    No.

20    Q    Do you know if Denise or Annette Harris were

21 members of a gang back in 1991?

22    A    No.

23    MR. GIVEN:  Objection.  Leading.  Speculation,

24 sorry.  Competence.

25    Q    And when you say no, you mean no they were



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  not?
2     A    No, they were not.
3     Q    Okay.  Were you ever asked to testify at Mr.
4  Jakes' trial?
5     A    No.
6     Q    Did you ever talk to Mr. Jakes' lawyer?
7     A    No.
8     Q    Did anyone ask you to talk to Mr. Jakes'
9  lawyer?
10    A    No.
11    Q    Did you know who his lawyer was when you were
12 a 16-year-old kid?
13    A    No.
14    Q    Did you ever see the guys who, you know,
15 talked to you about robbing the guy with the bag of
16 money after that night?
17    A    No, I didn't.
18    Q    When you'd seen -- you'd seen one of them
19 before, right?
20    A    Yes.
21    Q    Can you tell us where you'd seen him, like
22 which area?
23    A    By the park -- by Sherman Park, 52nd by
24 Racine.
25    Q    And what was he doing there if you know?

1     A    I'm not sure.  I was walking, coming from the
2  basketball court.
3          MR. AINSWORTH:  All right Mr. Chairse, I don't
4  have any other questions for you.  I appreciate your
5  time, but some of the other lawyers might have
6  questions for you.
7          MR. GRILL:  Yeah, I've got questions, but just
8  give me a minute.  So can we take five minutes and
9  then I'm going to do my questions.
10         COURT REPORTER:  We'll go off the record.  The
11 time is ten:37 A.M.
12              (OFF THE RECORD)
13         COURT REPORTER:  We're back on the record.  The
14 time is ten:44 A.M.
15              CROSS EXAMINATION
16 BY MR. GRILL:
17    Q    Sir.  My name's Andrew Grill.  I'm one of the
18 attorneys that represents the individual police officers
19 that Mr. Jakes has sued in this lawsuit.  Can you hear
20 me all right?
21    A    Yes.
22    Q    Tell me again, how exactly do you pronounce
23 your last name?
24    A    Chairse.
25    Q    Chairse, okay.  Now you're incarcerated right

1  now, sir, correct?
2     A    Yes.
3     Q    What facility are you at specifically where
4  you're giving -- from where you're doing this
5  deposition?
6     A    Newton Correctional Release Center.
7     Q    Okay.  When do you get out?
8     A    I get read out for parole next month.
9     Q    Okay.  What are you serving time for right
10 now?
11    A    Driving while barred.  Driving while barred.
12    Q    While barred?  Oh you had, like, a suspended
13 or revoked license or something?
14    A    Yes.
15    Q    Got it.  All right.  Where are you going to be
16 living after you get out?
17    A    With my significant other I've been with since
18 1992.
19    Q    Okay.
20    A    In Ames, Iowa.
21    Q    In Ames, Iowa?
22    A    Yes.
23    Q    Do you have an address where you're going to
24 be?
25    A    Yes.

1     Q    What's that address going to be?
2     A    232 --
3     Q    Uh-huh.
4     A    South Walnut.  Ames, Iowa.  5ten.  Apartment
5  1.
6     Q    Okay.  You got a job you're working otherwise
7  when you get out?
8     A    Yes.
9     Q    Where are you going to be working at?
10    A    Cook at Village Inn.
11    Q    Okay.  When did you start serving this
12 sentence that you are getting out for, I guess, next
13 month?
14    A    December.
15    Q    Okay.
16    A    December of '20 that just passed.
17    Q    Okay.  All right.  When did you first find out
18 about Mr. Jakes' lawsuit that you're giving a deposition
19 in here today?
20    A    Oh, I think it was a couple months ago, maybe.
21    Q    Oh yeah?  Okay.  How'd you find out about it?
22    A    My cousin, Shawn, he contacted me.
23    Q    Okay.  So Mr. Jakes contacted you?
24    A    Yeah.
25    Q    Okay.  And he contacted you while you were at



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  the prison that you're at right now?
2     A   No, no, no.  I was out.
3         MR. GRILL:  You were out then, okay.
4         THE WITNESS:  It cut off.  I don't see nobody.
5  Okay, now it's back.
6     Q   You back?
7     A   Yeah.
8     Q   Sorry.
9     A   Ah.  Okay.  Now it's back.
10    Q   You're back?
11    A   Yeah.
12    Q   Okay.  So Shawn contacted you at a time a
13  couple months ago when you were not in prison?
14    A   Yeah, I wasn't in prison.  It's got me kind of
15  confused.
16    Q   Okay, yeah, because a couple of months ago is
17  not December, right?
18    A   Yeah.  Right.  It was sometime, like, last
19  year, but the crazy part about it was he didn't even say
20  as if it was like a lawsuit, he just was saying to speak
21  to the lawyer about the case, about what I knew about
22  what happened.
23    Q   Okay.  So let's just -- we'll get to that.
24  Just before we get there, I need to kind of get a
25  timeline here.  So I'm trying to peg down based on your

1  memory when it was that Mr. Jakes contacted you, I guess
2  about talking to some lawyers.
3     A   I think if it was -- maybe -- I'll have to say
4  from now, it had to be a year ago, maybe.
5    Q   Okay.  Did something else happen a couple
6  months ago that you're thinking about?
7    A   No, I'm just figuring -- I've never really
8  considered it being a lawsuit against the police.  I
9  didn't think about that part.
10    Q   Okay.  So the first time -- so was this -- a
11  year ago, this time that you're thinking about, was that
12  the first time that Mr. Jakes ever --
13    A   Yeah.
14    Q   -- talked to you about talking to lawyers?
15    A   Right, right, right, right.
16    Q   How did Mr. Jakes contact you?  Was it in
17  person?  Was it over the phone?  Did you get a text
18  message, an email?
19    A   Talked to me on the phone.  He got ahold of my
20  twin sister and then I got in contact with him.
21    Q   Got it.  Okay.  And do you know where Mr.
22  Jakes was when he -- where he was when he was calling
23  you?
24    A   Chicago.
25    Q   He was in Chicago?  Okay.  When was the last

1  time before then that you'd spoken with Mr. Jakes?
2     A   I think right when he got out, maybe, but he
3  didn't say any -- he didn't talk about no -- talking to
4  no lawyer or anything.
5    Q   Okay.  When he --
6    A   It was more about his wellbeing and how he was
7  doing and everything.
8    Q   He call him or you call him then, when he got
9  out?
10    A   He called my mom.
11    Q   So between the time that you talked to him,
12  when he got out and this call about a year ago, when he
13  told me to talk to the lawyers, how many times in
14  between those two periods do you think you talked to Mr.
15  Jakes in any way?
16    A   I hadn't talked to him at all.
17    Q   Okay.  So since he's been out, you've talked
18  to him two times?
19    A   Two times, yeah.
20    Q   Okay.  And you haven't talked to him since
21  last year when he told you to talk to the lawyers?  Not
22  at all?
23    A   Correct.
24    Q   All right.  Did you ever -- you know like
25  social media, stuff like that?  Do you know what that

1  is, like Facebook --
2     A   Nope, I don't -- I don't have none of that.
3    Q   No, no, no.  I'm just asking you to know what
4  it is, right?
5    A   Oh, yeah.
6    Q   And Twitter and Instagram, you know what those
7  things are, right?
8    A   Correct.
9    Q   Okay.  And it's your testimony that you've
10  never exchanged any posts or instant messages through
11  any of those social media sites with Mr. Jakes?
12    A   No, sir.
13    Q   What about with any of his family members?
14    A   No, sir.
15    Q   Okay.  When you talked to -- when Mr. Jakes
16  called you a year ago to tell you to talk to some
17  lawyers, how long do you think this conversation lasted
18  on the phone?
19    A   Probably ten to 15 minutes, maybe.
20    Q   Okay.  And who was with you -- or let me ask
21  you this.  Do you remember where you were when you got
22  this phone call from Mr. Jakes?
23    A   I was at home.
24    Q   And you said he was in Chicago when he was
25  calling you, right?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    Yeah.

2    Q    How do you know that that's where he was?

3    A    Well, I'm figuring that's where he could have
4    been.  I was all the way in Ames, Iowa, so --

5    Q    Right.  So did he tell you he was in Chicago
6    or are you just guessing that's where he was?

7    A    I'm just guessing that's where he was.

8    Q    All right.  Do me a favor, if you're
9    guessing about something, best you can and I'll try to
10   clarify it if I think you are guessing, but if you are
11   guessing, tell me if you're guessing.

12   A    Okay.

13   Q    All right.  So you talked to him about a year
14   ago, ten to 15 minutes.  You hadn't talked to him before
15   then since he got out of jail, right?  That's where
16   we're at?

17   A    Right.

18   Q    Okay.  And he tells you in this call that he
19   wants you to talk to some lawyers, right?

20   A    Right.

21   Q    Okay.  Did he tell you that he had filed a
22   lawsuit a year ago when you had this conversation?

23   A    No.

24   Q    Do you know what a lawsuit is?

25   A    Yes.

1    Q    Okay.  Well, tell me what you understand a
2    lawsuit is.

3    A    A lawsuit is against someone that you feel
4    they've done wrong -- done you wrong.

5    Q    Okay.  Do you know if, like -- if you are
6    successful in your lawsuit, like, if you can get, you
7    know, money at the end of it, if you're successful?

8    A    Yes.

9    Q    Do you have any sense of where an idea from
10   any source whatsoever, what it is that Mr. Jakes hopes
11   to get out of this lawsuit?

12   A    No.

13   Q    Have you ever talked to him about it?

14   A    No.

15   Q    Well, tell me what you think then, Mr. Jakes
16   is trying to get out of this lawsuit.  I mean, he's your
17   cousin, right?

18   A    For his name to be cleared for the murder that
19   he didn't commit.

20   Q    Okay.  Anything else?

21   A    No.

22   Q    Do you know if Mr. Jakes is trying to get any
23   money from this lawsuit?

24   A    No, not that I know of.

25   Q    Okay.  What do you think?  Do you expect that

1    he is trying to get money?

2    A    No.  I don't know.

3    Q    Okay.  Do you think Mr. Jake [sic] deserves
4    money for -- if he's successful in this lawsuit for
5    going to jail?  You know, for killing Mr. Garcia?

6    A    I just feel that if he's cleared, he should be
7    cleared.  It's bad he lost his life, all that time gone.

8    Q    Uh-huh.

9    A    You're not doing anything.  So I just feel
10   that his name should be cleared.

11   Q    You think if Mr. J -- if it turns out that Mr.
12   Jakes was involved in killing Mr. Garcia, that he should
13   have his name cleared?

14   A    I don't believe that he was there.  So, no.

15   Q    No, I'm asking hypothetically.  If it turns
16   out that he was involved in killing Mr. Garcia, do you
17   think he deserves still to have his name cleared?

18   A    Not if he was involved.

19   Q    When Mr. Jakes talked to you a year ago and
20   called you, were you surprised to hear from him?

21   A    Yeah.

22   Q    Why were you surprised to hear from him?

23   A    Because I didn't know he was released.

24   Q    I'm sorry.  Can you say that again?  You broke
25   up a little bit.

1    A    I didn't know that he was released.  They
2    faded away again, too.

3    Q    Well, I thought you talked to him a year --
4    sometime before then, after he got out?  Didn't you know
5    then that he was out?

6    A    Well, when he got out, I didn't know that he
7    had even got out.  And the second time when I talked to
8    him, yes, I was surprised that he called me.

9    Q    Okay, so now I got to back up.  We've talked
10   about two phone calls that you had with Mr. Jakes,
11   right?

12   A    Right.

13   Q    And these are the only two phone calls that
14   you've ever had with him since he got out of jail,
15   right?

16   A    Right.

17   Q    I understood you to be saying that the first
18   time you talked to him, that he was -- it was after he
19   got out, that you knew that he was out when you talked
20   to him.  Did I misunderstand you?  Is that -- was that
21   not the case at the time when you talked to him the
22   first time that he's out of jail?

23   A    Right.  I didn't know that he was out when he
24   got out and I spoke with him.  And the second time when
25   he called me, I was surprised that he called me.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Okay.  And then tell me again then why were
2  you surprised that he called you the second time?
3    A    Because I thought he was just free.  I didn't
4  know that he had any lawsuit going on or anything.
5    Q    Okay.  So did you know that there was a
6  lawsuit going on the second time that he called you?
7    A    No, I did not.
8    Q    Okay.  So then why are you mentioning the
9  lawsuit?  What is that?
10   A    That's what I said the second time.  You asked
11 me, did I know anything about a lawsuit?  I said, no.
12   Q    Uh-huh.
13   A    And when he called me and told me to speak to
14 the lawyers, I was just thinking that he was just
15 speaking to clear his name for the case.  I wasn't sure
16 if he was out because of doing good time or however he
17 was released.  I didn't know nothing about that at the
18 time.
19   Q    Okay.  At the time that you had the second
20 call with him?
21   A    Yes.
22   Q    Well, when did you find out that things were
23 not as you are describing them or saw it?
24   A    Just now with you, speaking it to me actually.
25   Q    Okay.  So what is your understanding now about

1  what's going on?
2    A    That it's a lawsuit going against the police -
3  -
4    Q    Okay.
5    A    -- department.
6    Q    And so when was the first time that you found
7  out about a lawsuit -- that Mr. Jakes had a lawsuit
8  against the police department?
9    A    Actually, when I spoke with the lawyers.
10   Q    A year ago?
11   A    No, just recently when I talked to them since
12 I've been here.
13   Q    Got it.  Well, let's back up still to that
14 call a year ago with -- when Jakes -- Mr. Jakes told you
15 that you needed to talk to the lawyers.  Did you talk to
16 the lawyers after that call?
17   A    No, not right away.  It was a couple months.
18   Q    Couple months?
19   A    Yeah.
20   Q    Okay.  When you talked to Mr. Jakes a year
21 ago in this ten-to-15-minute call, when he told you to
22 talk to the lawyers, did you ask him -- was this
23 confusing to you?  Let me ask you that.  Let me back the
24 question up.  Did you, when Mr. Jakes called you a year
25 ago, told you to talk to the lawyers, did you ask him

1  anything along the lines of, "About what?  What do you
2  want me to talk to lawyers for?"  Anything like that?
3    A    No.  I just knew that -- I knew about the
4  case.  I knew what happened that day.  So I was figuring
5  that he wanted me to talk to them to explain it and what
6  I knew what happened.
7    Q    Okay.  So this would have been in 2020, right,
8  that you're having this call about a year ago with Mr.
9  Jakes?
10   A    I believe so.
11   Q    Okay.  And you say that you knew about the
12 case.  What case are you talking about?
13   A    The case he was incarcerated for.
14   Q    Okay, but you understood that Mr. Jakes at the
15 time, in 2020, was not in jail anymore, right?
16   A    Yes.  When I spoke to him, yes.
17   Q    Okay.  So what case are you talking about?
18 Are you talking about a lawsuit or something else?
19        MR. AINSWORTH:  Object to the form of the
20        question.
21   A    I'm talking about the case from when he was
22 locked up.
23   Q    Okay.
24   A    That's the case I was talking about.
25   Q    So what did Mr. Jakes tell you, if anything,

1  about why he wanted you to talk to the lawyers?
2    A    He didn't--He didn't implicate nothing about -
3  - nothing, but he wanted me to talk to the lawyers to
4  explain to them what happened with the case.
5    Q    Did he say --
6    A    That's all it was.
7    Q    Okay.
8    A    That's all he was talking about.  He didn't
9  say nothing about, "Oh, I got a lawsuit.  I need you to
10 help me testify to help win the case."  None of that.
11 He didn't stipulate none of that.
12   Q    Okay.  Do you think your testimony can help
13 him win the case or do you something to say or add that
14 can help him with the case?
15        MR. AINSWORTH:  Object to the form of the
16        question.
17   Q    I'm using your words, sir.
18        MR. AINSWORTH:  Object to the form of the
19        question.
20   Q    You can answer the question.  You've still got
21 to answer it, yeah.  We just make objections as lawyers
22 and we'll deal with it--
23   A    You're saying with my testimony?
24   Q    Yeah.  You said -- you used the phrase, "To
25 help them win the case," I think is what you said, or



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 exactly maybe what you just said.
2       MR. AINSWORTH:  Object to form of the question.
3    Q    So do you think that you have something to say
4 in this lawsuit today that can help Mr. Jakes win his
5 case?
6    A    Well, basically the only thing I could think
7 of, is that by me speaking and telling you guys that he
8 wasn't there -- that I know he wasn't there, if that's
9 going to help him, yes.
10   Q    How do you think --
11   A    With --
12   Q    Go ahead, I thought you were done -- finished.
13   A    With him beating the case, the whole case,
14 period of him not even convicting for the murder.
15   Q    So you -- if I'm understanding you right, you
16 think that if you can convince people that Mr. Jakes
17 wasn't there that, that will help him win this lawsuit?
18 Is that fair?
19       MR. AINSWORTH:  Object to the form of the
20    question.
21   A    I'm not -- you're confusing me now with what
22 you're saying.
23   Q    Okay.  When you said --
24   A    I didn't know that -- first of all, if I could
25 explain this to you --

1    Q    Yes, go ahead.
2    A    That I'm not -- I was not thinking about me
3 coming here to defend him for the win of a lawsuit case.
4 I was thinking of me just coming to represent for him
5 not being part of the murder.
6    Q    Uh-huh.
7    A    So if that's going to help him by not being a
8 part of the murder, yes.
9    Q    And that's information that you had back in
10 September of 1991, you knew then that he wasn't part of
11 the murder?
12   A    Yes.
13   Q    Okay.  And that was something that you told
14 your family, too, right?  That he wasn't part of the
15 murder, right?
16   A    Yes.
17   Q    What family members did you tell that to back
18 in September of 1991 after you found out the next day or
19 so that Mr. Jakes had been arrested?
20   A    My mom, Aunt Bee, I think I spoke to his mom
21 maybe one time, but I never was questioned about it.  It
22 never was -- it never was brought up back to me anymore.
23 We never really discussed it over and over or anything.
24   Q    So what is your mother's name again?
25   A    Ruth.

1    Q    Yeah.
2    Q    Chairse?
3    A    Chairse, yes.
4    Q    And then when you say Aunt Bee, you're talking
5 about Jessie Mae, right?
6    A    Jessie, yes.
7    Q    Jakes' grandmother, is that right?
8    A    Jakes - that's his aunt.
9    Q    Or his aunt.  Excuse me.  Sorry.  Messed that
10 up.
11   A    And Jessie Mae is who Mr. Jakes, you say,
12 lived with in the rear house at 1212, right?
13   A    Yes.
14   Q    What exactly did you tell her, Jessie Mae?
15   A    I explained to her what happened earlier that
16 day and who I saw, I explained to her everything that
17 happened.  And she was -- and after, when I told her,
18 and she was like, "Okay."  And pretty much it went to
19 the grown folk's conversation because I didn't stay
20 around.  You know?
21   Q    You didn't stay -- why didn't you stay around?
22   A    Well, because my mom and his mom or whoever
23 they all was talking about it, so they never questioned
24 me any more about it.
25   Q    Okay.  And this was like, how many days --

1 when you talked to Jessie Mae, how many days after
2 hearing those gunshots that you talked about -- that you
3 they told Jessie Mae about?
4    A    The next --
5    Q    The next day.
6    A    The day when they locked up Shawn.  The day
7 when they got him.
8    Q    Okay.  And you knew that the police -- well,
9 let me ask you this.  What did you understand -- did you
10 have any understanding about what type of crime the
11 police were arresting Mr. Jakes for or had arrested him
12 for?
13   A    For the murder of the guy that was coming out
14 of the restaurant.
15   Q    Okay.  So at the time you were talking to
16 Jessie Mae, it was your belief that the police had
17 arrested your cousin who lived right next to you for
18 murder, right?
19   A    Yes.
20   Q    That was your understanding?
21   A    Yeah.
22   Q    Okay.  And you had information that in your
23 mind would prove that Mr. Jakes was absolutely innocent
24 of that murder, that he couldn't have been involved in
25 it that, right?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       MR. AINSWORTH: Object to the form of the
2 question. Go ahead.
3     A    Yeah.
4     Q    Okay. And you told that information to his
5 aunt, Jessie Mae, who he lived with, right?
6     A    Yes.
7     Q    And to your mom, Ruth Chairse, right?
8     A    You're right.
9     Q    Who else did you tell this information to,
10 anybody else?
11     A    Not that I can remember. Whoever -- only
12 thing I could think of whoever we was around. I can't
13 really think of no kids or nobody like that.
14     Q    And you had said earlier today that you went,
15 you got locked up for just a little while for some
16 marijuana or something, right, afterwards?
17     A    Yeah.
18     Q    A couple months later? You weren't in jail --
19 well, did you know when Mr. Jakes went to trial? Like
20 you were aware of that?
21     A    No, I did not.
22     Q    Do you know if you in jail at the time he went
23 to trial?
24     A    No, I don't.
25     Q    Today, like, do you know?

1     A    No.
2     Q    Okay. You know, today though, that there was
3 a criminal trial that found him -- a jury initially back
4 then and found him guilty of --
5     A    Yes, now I do.
6     Q    -- participating in the murder of Mr. Garcia?
7 You understand that, right?
8     A    Yes.
9     Q    Okay. All right. When you got this call from
10 Mr. Jakes a year ago, when he told you to talk to the
11 lawyers, did he tell you how to get ahold of him -- how
12 to reach the lawyers?
13     A    No. He told -- he asked for my number and
14 told me that they would be calling me.
15     Q    Got it. Okay. And did he tell you when they
16 were going to call you?
17     A    No. Yeah. He said maybe in a couple of days
18 or sometime.
19     Q    Okay.
20     A    He really didn't say specifically.
21     Q    Yeah. So did you believe that Mr. Jakes
22 thought that you had something valuable to tell these
23 lawyers about his case as you put it?
24     A    Yes.
25     Q    Okay. What did you think that -- why would

1 you -- why do you think that Mr. Jakes thought that you
2 had something valuable to tell his lawyers about his
3 case?
4       MR. AINSWORTH: Object to the form of the
5 question.
6     A    Because he know that I know that he was not
7 there and that he ran off.
8     Q    Okay. And you believe that Mr. Jakes knew
9 that back in 1991, in September --
10     A    Yes.
11     Q    -- when the shooting happened, right?
12     A    Yes.
13     Q    Okay. Do you know a person by the name of
14 Walter Pound? Does that name ring a bell?
15     A    No.
16     Q    Okay. Did you ever go by that name?
17     A    Walter?
18     Q    Walter Pound, Walter Pound, W-A-L-T-E-R,
19 Pound. P-O-U-N-D. Kind of like Quarter Pounder, but
20 Walter instead.
21     A    No.
22     Q    Okay. You know, you've never heard that --
23 did Mr. Jakes ever hear him mention that name before?
24     A    No.
25     Q    Okay. How close were you with Mr. Jakes when

1 -- let's say in the year leading up to his arrest for
2 this murder in September of 1991. How close were you
3 with Mr. Jakes then?
4       MR. AINSWORTH: Object to the form of the
5 question.
6     Q    Do you understand what I mean by close? Like
7 you guys are cousins. I'm just trying to have you
8 explain, like what your relationship with him was like.
9     A    We weren't really that close. We wouldn't --
10 we didn't run around and hang out together, none of that
11 -- like that, but just happened to be that day
12     Q    Uh-huh. He's family though, right? He's your
13 cousin?
14       MR. AINSWORTH: Object to the form of the
15 question.
16     A    Yeah, through marriage.
17     Q    You love him, you care about him?
18     A    Yes.
19     Q    And how long did you guys live in such close
20 proximity to each other on 51st Street?
21     A    I believe we moved there in '89, 80 -- let me
22 see. '89. I believe '89 we moved there to 12ten.
23     Q    Okay. So couple of years?
24     A    Yeah.
25     Q    All right. Did you see him every day living

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1 so close to him?
2     A    No.
3     Q    How much did you see him on a weekly basis?
4     A    Probably twice -- once or twice. Because I
5 went to Catholic school and I played ball, so I wasn't
6 around. When I came home, I went in the house pretty
7 much after school.
8     Q    And so what days did you see him on? Did you
9 say a couple of days a week? Were there regular days
10 that you saw him?
11    A    Possibly, maybe the weekend more.
12    Q    Why do you say that?
13    A    Because that's when I would most likely be
14 around.
15    Q    Why do you say that was when you'd most likely
16 be around?
17    A    Because I played basketball. So I went to
18 practice every day.
19    Q    Do you know who Mr. Jakes -- sorry, go ahead.
20 I thought you were done, continue.
21    A    No, that's it.
22    Q    Did you know who Mr. Jakes' friends were in
23 those two years you guys lived basically next to each
24 other?
25    A    No, I didn't socialize with him.

1    Q    Did you ever see him hanging out with anybody?
2    A    No.
3    Q    Okay. You guys -- you didn't socialize with
4 him, but the night that the shooting happened, you and
5 Mr. Jakes were, according to you throwing bottles
6 together at cars with, I guess, Hispanic people in them
7 as they were driving by your residences at 51st Street.
8 Is that right?
9    A    Yes.
10    Q    What time of day was that when you and Mr.
11 Jakes were throwing bottles at cars together that day?
12    A    I'm not sure.
13    Q    Was it dark out?
14    A    I'm not sure. I believe it was getting dark,
15 but I'm not sure. I couldn't -- I couldn't really tell
16 you.
17    Q    Okay. Do you know how long you and Mr. Jakes
18 were out there throwing bottles at cars?
19    A    It wasn't long. We -- once we threw the first
20 bottles, it was over with.
21    Q    So the first car that you threw --
22    A    Yep.
23    Q    -- bottles at, what happened after that --
24 that car? Why, why did you only -- let me, let me start
25 over. That wasn't a good question. You threw cars --

1 you threw bottles only at one car, is that your
2 testimony?
3    A    Pretty much, yes.
4    Q    Okay. Why did you throw a bottle at all at
5 that car?
6    A    Because they was riding around, they was
7 hollering out of the car, and they was waving the
8 Mexican flag, which we didn't know nothing about.
9    Q    Okay. So did you throw bottles at them
10 because they were Mexicans? Is that what you're saying?
11    A    Because they was making a lot of noise, pretty
12 much.
13    Q    Okay. What kind of car was it, that you threw
14 the bottles at?
15    A    I'm not -- I don't know.
16    Q    How many people were in that car?
17    A    Probably three or four, maybe.
18    Q    Could you see what they looked like?
19    A    No.
20    Q    Were they ac -- do you know if they were
21 actually Mexicans that were in that car?
22    A    No.
23    Q    Did the car stop after you threw the bottles
24 at it?
25    A    Yes.

1    Q    Did the bottles hit the car or did they just
2 kind of crash near the car?
3    A    I'm not sure. Okay.
4    Q    Okay. Whose idea was it to throw bottles at
5 the car?
6        MR. AINSWORTH: Object to the form of the
7 question.
8    A    Mine.
9    Q    Okay. How long were you and Mr. Jakes out in
10 front of your house on 51st Street when you two started
11 -- before you and Mr. Jakes started throwing bottles at
12 the car?
13    A    Probably 30 to 45 minutes.
14    Q    What were you doing out there for that 30 and
15 45 minutes?
16    A    Oh, we was out there talking pretty much. One
17 of the girls was playing or something.
18    Q    I'm sorry you broke up.
19    A    We was out in front of -- in the gangway
20 between 12ten and 1212. We were right there talking.
21    Q    About what were you talking about?
22    A    I'm not sure.
23    Q    Who else was out there?
24    A    It was some people on the porch, but I can't
25 pinpoint who they were.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 Q   Which porch?
2 A   1212.
3 Q   I didn't hear you.
4 A   1212.
5 Q   1212.  Okay.
6 Q   And you said he didn't know who those people
7 were that were on the porch?
8 A   I'm not exactly sure who it were that was out
9 there.
10 Q   Okay.  Could you hear -- do you remember being
11 able to hear people like -- let me ask you this.  How'd
12 you know there were people on the porch at 1212 if you
13 and Mr. Jakes are in the gangway between --
14 A   Oh, because they -- they was laughing and
15 talking.
16 Q   Oh, okay.  You could hear them laughing and
17 talking?
18 A   Yeah.
19 Q   Female voices, male voices, or mixed?
20 A   Female.
21 Q   Okay.  How many?
22 A   I'm not sure.
23 Q   Okay.  Do you remember recognizing these
24 voices?  I mean, you had family in that building, right?
25 A   No.  I didn't have family in that building.

1 Q   Okay.  Who lived in 1212 again then?
2 A   Nini, Annette.
3 Q   When you say Nini, is that Nikki?
4 A   Yeah.
5 Q   Nikki?
6 A   No.  Nikia Little stayed on Justine --
7 Q   That's what I thought.
8 A   -- with my cousins -- my cousins Annette and
9 the other family stayed in 1212.
10 Q   Do you remember thinking that's -- do you
11 remember thinking that you thought you heard Annette's
12 voice, for example, out there?
13 A   Wait say it again.
14 Q   Remember thinking you heard -- may have heard
15 Annette's voice on the porch?
16 A   Yes.
17 Q   Okay.  Whose other voices do you think you
18 heard on the porch laughing and talking while you and
19 Mr. Jakes were in the gangway?
20 A   I don't remember.
21 Q   When you had this call a year ago with Mr.
22 Jakes, did -- and you gave him your phone number to, I
23 guess, have the lawyers call you -- remind me again, how
24 long was it until you heard from Mr. Jakes' lawyers?
25 A   I'm not sure.  I think I was missing their

1 call because I was at work at the time.  So I was
2 missing their calls when they did call.  I'm not sure
3 actually how long it took before I spoke with them.
4 Q   Where they leaving messages?  I mean, how do
5 you know?
6 A   No, my message on my phone doesn't work.  So
7 they call back again.
8 Q   Okay.  Were you like seeing the same number
9 come up?
10 A   Yes.
11 Q   All right.  And eventually they -- you picked
12 up and you had a conversation with them, right?
13 A   Right.
14 Q   You had this conversation how long after this
15 call that you got a year ago from Mr. Jakes was it that
16 you actually now are on the phone with these folks?
17 A   I don't remember.
18 Q   Okay.  Do you remember what the name of the
19 person or persons you spoke to on that call?
20 A   No.
21 Q   How many people did you speak with was -- let
22 me ask you this.  Was it a man or a woman that you
23 talked with?
24 A   It was a man and a woman on the phone when I
25 spoke with them.

1 Q   Okay.  Do you know if they were actually
2 lawyers?
3 A   Yes.
4 Q   How do you know?
5 A   Well, they -- once when they told me they out
6 -- once when they told me their names, I remember from
7 Shawn telling me who it would be, but I didn't write
8 nothing down or anything like that.
9 Q   Like, did they tell you, "We're Mr. Jakes' --
10 two of Mr. Jakes' lawyers"?
11 A   Yes.
12 Q   Okay.  Did they tell you if they were like
13 recording the conversation or anything like that?
14 A   Yes, I do believe.
15 Q   What did they tell you?
16 A   That the conversation will be recorded.
17 Q   Okay.  And you agreed to that?
18 A   Yes.
19 Q   Was it -- was one of the lawyers that you're
20 speaking with, was it Mr. Ainsworth who's on the
21 deposition here today that's asking questions?  Was he
22 one of them?
23 A   Yes.
24 Q   Okay.  And then it was Mr. Ainsworth and a
25 woman, you said with them as well?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    Yes, I do believe.
2    Q    Okay.  Was this call that you had, was it a
3  video call or was it a phone call, just like a regular
4  phone call without-
5    A    Regular phone call.
6    Q    And you said this -- how long was this call
7  that you had Mr. Ainsworth and this other female
8  attorney?
9    A    I believe long -- I don't know the time limit,
10 but long enough for me to explain to them what happened.
11   Q    Okay.  Was it more than 30 minutes?
12   A    I'm not sure.  I can't -- I can't recall.
13   Q    Okay.  And it was long enough for you to
14 explain why you believe Mr. Jakes could not have
15 committed this murder, is that what you're generally
16 saying?
17   A    Yes.
18   Q    Okay.  Did you guys talk about anything else
19 other than that?
20   A    No.
21   Q    Did they tell you about his lawsuit?
22   A    No.
23   Q    They tell you why they wanted you to tell your
24 story?
25   A    No, pretty much they just wanted to know what

1  happened.  That's the only thing I can remember, but I
2  don't remember them telling me nothing about no lawsuit.
3    Q    Did they ask you questions about what it was
4  that you were telling them?
5    A    What do you mean?
6    Q    Did they ask you questions about what it was
7  that they were -- what you were talking about?
8    A    Yeah, yeah.
9    Q    Do you remember what types of questions they
10 were asking you?
11   A    Just what happened that day, where was I,
12 where was Mr. Jakes, and that's pretty much it.
13   Q    Okay.  So they were asking you questions and
14 you were giving answers kind of like what we're doing
15 here today?
16   A    Pretty much, yes.
17   Q    On the same topics?
18   A    Yes.
19   Q    Got it.  Would it be -- were the things that
20 Mr. Ainsworth, that he was asking you about today, were
21 any of those topics surprising to you?  Like things --
22 questions that he had never asked you before?
23   A    No.
24   Q    Okay.  So you had heard all of those questions
25 from Mr. Ains -- that Mr. Ainsworth asked that you

1  generally heard all those questions from him being put
2  to before today, right?
3    A    The same questions, yes.
4    Q    So you kind of got to practice in a way, like
5  what you were going to say today with him?
6         MR. AINSWORTH:  Objection to the question.
7    A    No.  No.  I didn't have to practice because
8  I'm going to tell you the same thing.  If you asked me
9  20 years from now, I would explain to you the same way.
10 My story can't change.
11   Q    Yeah.
12   A    It's been the same way since the beginning.
13   Q    Was the female attorney, was her name Heather
14 by any chance that was with Mr. Ainsworth?  Does that
15 ring a bell?
16   A    I'm not sure.
17   Q    What about Spence or Renee, could that have
18 been the name of the female attorney?
19   A    No, I'm not sure.  I can't remember the name.
20 I don't remember.  I'm not good with names.
21   Q    That's okay.  But you're sure it was Mr.
22 Ainsworth was one of the attorneys that you were
23 speaking to.
24   A    I remember him by being Russell because I got
25 an uncle named Russell.

1    Q    Got it.  Okay.  Before you had this call with
2  Mr. Ainsworth and this female attorney, did their law
3  firm or either of them ever send you any letters or
4  anything like that before they spoke with you that day,
5  a year ago-ish?
6    A    No.
7    Q    Okay.  You ever got any letters from any
8  lawyers about this case other than to tell you about the
9  deposition today?
10   A    No.
11   Q    All right.  When you -- when Mr. Jakes was
12 arrested -- after he was arrested for this murder, so
13 we're going back to 1991 now, and you told his aunt and
14 your mom everything that you knew that in your mind
15 would demonstrate that he didn't kill Mr. Garcia or was
16 not involved with killing Mr. Garcia, did you ever go
17 visit Mr. Jakes at Cook County Jail?
18   A    No.
19   Q    Okay.  Any reason why you didn't go visit your
20 cousin in jail, if you knew that he was innocent?
21   A    Well, I was a kid, and I don't know nothing
22 about going to visit nobody locked up.
23   Q    Okay.  Well, did you ask your mom or your
24 aunt?  No?
25   A    No.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Did you know if either of them ever went and
2  visited Mr. Jakes in Cook County Jail while he was
3  awaiting trial?
4    A    Not that I know of.
5    Q    Okay.  Did you know whether Mr. Jakes' aunt
6  ever got a lawyer for him before, you know, his criminal
7  trial started?
8    A    No, I don't know.
9    Q    Okay.  Do you know if anybody in Mr. Jakes'
10 family got Mr. Jakes a lawyer before his criminal trial?
11   A    No, I do not.
12   Q    Did you ever hear that he had a lawyer?
13   A    No.
14   Q    Okay.  When did you first find out that Mr.
15 Jakes actually got convicted for participating in the
16 robbery and murder of Mr. Garcia?  He's the guy that was
17 in the sub shop that I guess you saw.
18   A    I don't actually remember.  I just know that
19 they said that he had got 45 years or something like
20 that.  I don't really remember.
21   Q    Right.  Do you remember finding this out at
22 some point, I guess is the--
23   A    Yeah.
24   Q    Do you remember when you found that out, if
25 you had a sense of finding that out close in time to

1  when Mr. Jakes got convicted?
2         MR. AINSWORTH:  Object to the form of a
3     question.
4    Q    So let me just kind of round it out.  Really
5  what I'm trying to ask is, sometimes when we think back
6  to stuff that happened a long time ago, we might not be
7  able to peg it, you know, as far as like, oh, it was on
8  this day or this month, but we can get a sense of, well,
9  I do know that I found this out shortly after or a long
10 time after a particular event happened.  And in this
11 case, do you remember finding that out and thinking when
12 at the time you found it out that Mr. Jakes or knowing
13 or feeling that Mr. Jakes had just gotten convicted and
14 sentenced to 45 years?
15        MR. AINSWORTH:  Object to the form a question.
16        MR. GRILL:  Not surprised that you had an
17     objection on that question.
18 BY MR. GRILL:
19   Q    All right.  So at some point though, you found
20 out that Mr. Jakes got sentenced to -- go to jail and go
21 to prison for quite a long time, did you ever go visit
22 him while he was in prison?
23   A    No.
24   Q    Did you ever send him a letter?
25   A    No.

1    Q    Did he ever send you a letter?
2    A    No.
3    Q    You ever call him?
4    A    No.
5    Q    And I'm talking about while he was in prison,
6  do you ever call him while he was in prison?
7    A    No.
8    Q    Did he ever call you while he was in prison?
9    A    No.
10   Q    Did he ever get a message of any sort to you
11 through anybody else?  Like you get a message to him and
12 I say, "Hey, I talked to Anthony and he says, hi,"
13 anything like that?
14   A    No.  No.
15   Q    No communication whatsoever?
16   A    None at all.
17   Q    Okay.  What did you do with this information
18 that you had about Mr. Jakes' innocence all these years,
19 other than telling his aunt and your mom about it?  What
20 did you do with that information?
21   A    Explained it to people when I heard about
22 somebody else being wrongfully incarcerated because it
23 was so much similar to the situation.  That was all I
24 could do.
25   Q    Similar to what?

1    A    Anything else that happens in the world of
2  anyone else that I seen got incarcerated for wrongful
3  convictions or anything like that.
4    Q    So this was something that was on your mind
5  over all these decades that you-
6    A    Oh, yeah.  I always thought about it.
7    Q    Okay.  And how many people did you talk to
8  about this -- about this information that you had that
9  would prove in your mind that Mr. Jakes was wrongfully
10 convicted?
11   A    I'm not sure.
12   Q    Lots?
13   A    It could have been, I'm not sure.
14   Q    Okay.  But you never got it -- did you ever
15 try to find out who Mr. Jakes' lawyers might have been?
16   A    No.
17   Q    Okay.  Did you ever go talk -- tell the
18 police?
19   A    No.
20   Q    Did you ever -- you know what a state's
21 attorney is, right?  Do you know what a criminal
22 prosecutor is?
23   A    Oh, yeah.  Yeah, yeah.
24   Q    Okay.  And you know that they have that
25 criminal courthouse down at 26th and Cal, right?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    Yes.
2    Q    Okay.  Did you ever go and want to tell
3  anybody there about what the information was that you
4  had about Mr. Jakes' innocence?
5    A    No.  I never knew anything about that I could.
6    Q    Okay.  What do you mean that you didn't know
7  that you could?
8    A    I never knew what I could do.  I never knew
9  that I could go and complain to anyone about it.
10    Q    Okay.  Well, this was something that was on
11  your mind for decades, that was important enough for you
12  to continually raise with people, right?
13        MR. AINSWORTH:  Object to the form of the
14    question.
15    A    Yeah.  At any time, if anything happened
16  similar to the situation that happened, that's when I
17  would bring it up.  I never just went to someone and
18  said, "Hey, guess what happened," and explained to them
19  what happened, no.
20    Q    Okay.
21    A    But if something was to happen in the
22  neighborhood while I was there, or I heard about
23  anything of someone being locked up for wrongful
24  conviction or anything, that's when I would say
25  something about it.

1    Q    Mm-hmm.  And these were just people that you
2  were telling this information to your story to that were
3  just people you were encountering in your neighborhood,
4  is that right?
5    A    Yes.
6        MR. AINSWORTH:  Object to the form of the
7    question.
8    Q    Okay.  You also understood though that a
9  lawyer, for example, would be the type of a person that
10  actually might be able to do something with that
11  information in a way that could impact Mr. Jakes' case,
12  right?  You understood that?
13    A    Well, I never know-
14        MR. AINSWORTH:  Object to the form of the
15    question.
16    A    I never knew who to go talk to.
17    Q    Right.  No, I'm talking -- I'm not talking
18  about specifics, I'm just talking about that type of a
19  person.  A lawyer is a type of a person you could tell
20  that information to that in your mind would be the sort
21  of person that it might be able to use that information
22  to do something with it, right?
23    A    No, I didn't know, actually.
24    Q    No?
25    A    I mean, I was dumbfounded to the fact of

1  knowing to try to help.  I didn't know that if I was
2  able to go and talk to someone, that's what I'm saying.
3    Q    All right.
4    A    I didn't know.  I didn't understand the law.
5  I didn't know who to speak with or anything.
6    Q    Okay.  All right.  Well then, and why did you
7  think Mr. Jakes wanted you to talk to his lawyers?
8        MR. AINSWORTH:  Objection.  Asked and answered.
9    Q    In light of what you just said.
10    A    Just to get the point across for him to beat
11  the -- to be proven, not guilty.
12    Q    Well, did you think Mr. Jakes was just asking
13  you to talk to lawyers for no reason?
14        MR. AINSWORTH:  Object to the form the
15    question.  Argumentative.
16    Q    You can answer the question.
17    A    Wait, what was that you said?
18    Q    Did you think that Mr. Jakes was asking you to
19  talk to lawyers -- his lawyers for no reason -- that
20  he's -- yeah.
21    A    No.  I knew he wanted me to tell my side of
22  the story.  I understood that part.
23    Q    Yeah.  Did you think that the lawyers were the
24  type of people -- Mr. Jakes' lawyers that were trying to
25    A    Help him?

1    Q    -- help Mr. Jakes with his case?
2    A    Yeah.
3    Q    Okay.  So you did understand that that lawyers
4  could -- were a type of a person that could take the
5  information that you had about Mr. Jakes' innocence and
6  use it to help his case.  You understood that right?
7        MR. AINSWORTH:  Object to the form of the
8    question.
9    A    What I was saying to you is that I didn't know
10  who to go and talk to.
11    Q    Well, did you -- you know what a lawyer is,
12  right?
13    A    Yeah.  But how do I supposed to know who's his
14  lawyer?  Or if it's a lawyer or who to go talk to?  I
15  was too young.  I didn't know no better.
16    Q    Well you -- this was something that was on
17  your mind for decades.  I mean, you got older and wiser
18  over those years, right?
19        MR. AINSWORTH:  Object the form of the
20    question.
21    Q    And you never went and tried to talk to
22  anybody until somebody reached out to you, right?
23    A    Right.
24    Q    Okay.  After you talked to Mr. Ainsworth and
25  this female attorney about a year ago or so, little less



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 74

1 I guess maybe, how many other conversations did you have
2 with Mr. Jakes' attorneys after that one?
3    A    None.
4    Q    What about in preparation for this deposition
5 today, did you not talk to anybody from any of Mr.
6 Jakes' attorneys?
7    A    Yes, I did.
8    Q    Okay.  When was the last time that you -- how
9 many times did you talk to Mr. Jakes' attorneys to get
10 ready for today's deposition?
11   A    One time, I spoke with him Friday.
12   Q    And that was Mr. Ainsworth?
13   A    Yes.
14   Q    And you told him your story again about all
15 the information that you had about Mr. Jakes being
16 innocent, you told him that again?
17   A    Yeah.
18   Q    Okay.  You went through it another time like
19 you did the last time you talked to Mr. Ainsworth,
20 right?
21   A    The same words.
22   Q    Okay.  So you had your -- you had a chance to
23 practice what you're going to say again today with Mr.
24 Ainsworth a week ago.
25        MR. AINSWORTH:  Object to the form of the

Page 75

1 question.
2    A    There's no practice.
3    Q    Okay.  Well, how would you phrase it?  What
4 word would you use?
5    A    It's facts what I'm talking about.  It's
6 exactly what happened.
7    Q    Okay.  Well, why did you feel the need to tell
8 it to him again before coming in today?  Why didn't you
9 just come in here and tell it to us?
10        MR. AINSWORTH:  Object to the form of the
11 question?  Assumes facts not evidence.
12   Q    Go ahead.
13   A    Yeah.  How was I supposed to -- I didn't know
14 nothing about today until speaking with them.
15   Q    Okay.  Well, you told him your story.  I
16 thought you just told me that when you talked to him on
17 Friday, I guess, that you told him your story again,
18 about all the evi --
19   A    It wasn't --
20        MR. AINSWORTH:  Andrew, this is getting to be
21 harassing in the arguing with the witness.  Just ask
22 questions and find out what happened.
23        MR. GRILL:  Okay.  Well, we had a big back and
24 forth about speaking objections.  So I want you take
25 your own advice from the last deposition we had,

Page 76

1    Russell, and not speak.
2 BY MR. GRILL:
3    Q    So Mr. Chairse, when you talked to Russell on
4 Friday about today's deposition, in order to get ready
5 for it, why did you need to tell him the story about all
6 of the information that you have that shows Mr. Jakes is
7 innocent?  Why did you need to run through it again with
8 him before today?
9        MR. AINSWORTH:  Object to the form of the
10       question.
11   A    It was the question that was asked.  I'm not
12 understanding, but what -- it's not a setup, it's not
13 nothing that I'm making up.  It's not nothing that I
14 have to practice for.
15   Q    Right.  I know, but why did you -- was Mr.
16 Ainsworth -- let me ask you this.  Was he asking you to
17 tell him the story again?
18   A    No, he just asked me what happened.
19   Q    Okay.
20   A    He asked me what happened.  He didn't put
21 nothing in my mouth to say -- this way or anything.
22   Q    I'm not saying that Mr. Ainsworth put anything
23 in your mouth.  I'm asking, why, if it wasn't practice
24 that you were doing, what's the point of you telling him
25 again a week ago about what happened in order to get

Page 77

1 ready for this deposition if you know?
2    A    Well, I'm figuring that he needed it for his
3 notes, that's why he would ask me what -- what happened
4 or what's going on?
5    Q    I thought the last time you talked to him it
6 was recorded?
7        MR. AINSWORTH:  Object to the form of the
8       question.
9    Q    Isn't that not what you said?
10   A    Well, if it was recorded, I'm figuring he
11 still need to know if I was telling the truth, if I was
12 going to say the same thing as the recording said,
13 maybe.
14   Q    Okay.
15   A    See if I'm going to say the same thing or what
16 was which.
17   Q    This call, we could go on -- or we could go on
18 Friday with Mr. Ainsworth, was it in person?  Was it a
19 video call?  What kind of call was it?
20   A    It was a regular call.
21   Q    Okay.  Did Mr. Ainsworth send you any
22 documents to review to get ready for today's deposition?
23   A    No.
24   Q    He showed you some exhibits during his
25 questioning.  You remember seeing those?


1    A   Yes.

2    Q   Have you ever seen any of those materials at

3 any time before today?

4    A   No.  Not no materials.  That's where I used to

5 live, that's how I know the area.

6    Q   Okay.  The first exhibit that he showed you

7 about the back of the houses.  So it was, I guess, the

8 picture was taken, I guess, closer to the alley.  And on

9 the right-hand side, it was the back house of 1212.  And

10 then you had the backs of 12ten and 1212 in the front.

11 You ever seen that picture before today?

12    A   No, I have not saw any pictures.

13    Q   Okay.  What about the crime scene?  The older

14 looking picture that looked like maybe had a front at

15 your house that busted that window on the second floor.

16 Do you ever see that picture before today?

17    A   No, sir.

18    Q   Okay.  So you ever been inside the Queen

19 Submarine shop where --

20    A   Yes.

21    Q   -- you saw Mr. Garcia?

22    A   Yes, I have.

23    Q   Where he was shot.  Okay.  How many times

24 prior to that night in September do you think you've

25 been inside that store?

1    A   You say how many times before?

2    Q   Uh-huh.

3    A   Multiple times before I've been in there.  I

4 stayed right next door to it.

5    Q   Okay.  So 51st Street runs which directions?

6 North, south, east and west?

7    A   East and west.

8    Q   Right.  And so Racine runs north and south?

9    A   North and south, yes.

10    Q   And you lived just west of that restaurant,

11 right?

12    A   Yes.

13    Q   Okay.  So did Mr. Jakes.  So you testified

14 today that -- here, I wrote this down, so let me just be

15 accurate about what you said.  You said that you, after

16 these guys, I guess, asked you maybe to help them rob

17 this guy, you said that you saw -- you good?  I presume

18 that's somebody that works at the jail there -- the

19 prison, that's with you?

20    A   Walk past, yeah.

21    Q   Okay.  Just making sure.  Okay, you

22 said that you saw the victim inside the restaurant and

23 this is you from the front by the gate as if he was

24 coming out of the back.  Can you explain -- can you

25 unpack that for me?  I was not understanding what that

1 meant.

2    A   The back where the workers work at, it's a

3 gate.  Once you get into the restaurant, it's a gate

4 where the workers be in the back of the restaurant.

5    Q   Okay.  So you were outside the restaurant?

6    A   Yes.

7    Q   You could see -- what window are you looking

8 through when you're seeing this?

9    A   The front picture window of the restaurant.

10    Q   Okay.  Are you on the sidewalk?  You in the

11 Street?  You across the Street?  How far away are you?

12    A   We're right there in front of the door.

13    Q   You and this guy that asked you to--

14    A   On the sidewalk, yeah.

15    Q   Okay.  And it's you and this guy who --

16 anybody else?  You had said there were two guys.

17    A   There was two guys.

18    Q   Okay.  And so you could see all the way in and

19 the guy that they wanted to rob was all the way, I

20 guess, near the back of the restaurant.  Fair enough?

21    A   No.  Not in the back, he was in the middle.

22 He was about to come out of the gate.

23    Q   Okay.  Now you said that your, I guess, your

24 sister, Tweety, told you that one of the guys looked

25 like Little A, is that right?

1    A   Yeah.  Yes.

2    Q   Where's your sister, Claudette, today?

3    A   She's in Ames, Iowa.

4    Q   Okay.  Do you know what her address is?

5    A   Yes.

6    Q   What is it?

7    A   919 South 16th Street, Ames, Iowa.  Apartment

8 314.

9    Q   You talk to her about this case?

10    A   No.

11    Q   Does she know you're given a deposition in

12 this case here today?

13    A   No, she doesn't.

14    Q   Okay.  Is your understanding that she

15 witnessed this shooting?

16    A   No.

17    Q   Okay.  No, she didn't or no, that's not your

18 understanding?

19    A   No, she didn't witness it.

20    Q   How do you know that?

21    A   Because she was in the house.

22    Q   Which house?

23    A   My house, 12ten West 51st Street.

24    Q   Do you know where she was in the house when

25 the shooting happened?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    In the living room.

2    Q    How do you know that?

3    A    Because when I made it upstairs and I was
4  running through the hallway, the gunshots went off and
5  that's when I hollered and told her what had just
6  happened.

7    Q    Okay.  So how is it -- explain to me then
8  that, from your understanding, why she's telling you
9  that one of the guys looked like Little A?

10    A    From the description I gave her.

11    Q    Okay.  And that was -- tell me what that
12  description was again?

13    A    Short dark-skinned guy.

14    Q    That's it?

15    A    Yeah, but I mean, I explained to her what he
16  would -- I don't remember what all I said, but I just
17  remember me telling her and explaining to her what he
18  looked like at the time.

19    Q    But you agree that like a short dark-skinned
20  guy is a pretty general description.  It could be a lot
21  of people, right?

22    A    Yeah.

23         MR. AINSWORTH:  Object to the form of the
24    question.

25    Q    Okay.  Was there -- do you know who Little A

1  is?

2    A    I don't know him.  I didn't hang out with the
3  guys around there, so I didn't know him by person.

4    Q    Yeah, I know.  But did you know what he looked
5  like?  You got to think back to 1991.  Did you know what
6  he looked like?

7    A    When she told me who it was, I still wouldn't
8  have knew.  I didn't know them.  I didn't hang out with
9  the guy, so I didn't know.  Once I explained to her who
10  it was, then that's when she said who it was.

11    Q    Right.  That's not my question though.  My
12  question is, back in 1991 in September, did you know who
13  Little A was?  I'm not asking were you best friends with
14  the guy.  Did you know who he was?

15    A    No.  No.

16    Q    Did you know what he looked like?

17    A    Yes, at the time.

18    Q    Okay.  And did you know what his real name
19  was?

20    A    No.

21    Q    Does the name Arnold Day mean anything to you?

22    A    No.

23    Q    Okay.  Who did you know -- okay, so you knew
24  what he looked like.  You knew what Little A looked like
25  back in 1991.  Did you know if Little A was a gang

1  member by reputation in the neighborhood?

2    A    I don't know.

3    Q    Okay.  Did you not -- if you knew, did you
4  ever hear that?

5    A    No.

6    Q    Not from anybody?

7    A    No.

8    Q    Okay.  And what were the main gangs, if you
9  know, and right around the area of Sherman Park by 51st
10  and Racine?

11    A    I think they were black -- some stones, Black
12  Stone, they call themselves.

13    Q    Okay.  And you said you were not a member of
14  the Black Stones, right?

15    A    No.

16    Q    Okay.  And had you ever been arrested before
17  September 1991?

18    A    No.

19    Q    For anything?

20    A    No.

21    Q    Okay.  So what else, if you think, I want you
22  to think as hard as you can here.  What else did you
23  tell your sister about the short dark-skinned guy other
24  than to give her a description of this person that she
25  then turned around and told you sounded like a

1  description of Little A?

2         MR. AINSWORTH:  Object to the form of the
3    question.

4    A    I can't remember because she was outside too
5  for a brief -- she was outside too before she came
6  upstairs also.  So I don't know, maybe from me
7  describing him at the time that she remembered seeing
8  him that that's why she came up with his name or not,
9  I'm not sure.

10    Q    Well, you know what Little A looked like,
11  right?

12    A    Yeah.  At that time.

13    Q    At the time.  Yeah.  So after she told you
14  this, what did you tell her?

15    A    I just said, "Wow, they just shot that guy.
16  They just--"  Actually I had to explain to her that they
17  had just asked me or said, told me that the guy was
18  coming out with a bag of money out of the restaurant.
19  And if they was about to rob him.

20    Q    Okay.  Did you see the guy with the bag in his
21  hand?

22    A    Yes.

23    Q    Okay.  Did you know what was in the bag?

24    A    No.

25    Q    Okay.  Do you know what bag looked like?  Can



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  you describe it?
2      A   No, I cannot, not now.
3      Q   Okay.  Was it like a duffel bag or something,
4  or?
5      A   I don't know.  It was a small bag.  He had a
6  bag in his hand.  He hadn't made it out of the black
7  gate yet, but he was coming out.
8      Q   What's the black gate?
9      A   The gate to the back of the restaurant on the
10 inside where they work at, where they take our orders
11 at, it's a black gate right there where they asked to
12 take out orders at the window.
13     Q   Okay.
14     A   The entrance of the employees.
15     Q   Got it.  Yes.  Was it like a backpack or
16 something like that that he had with him?
17     A   I'm not sure he had a bag in his hand, I'm not
18 sure what kind of bag it was.
19     Q   Okay.  I guess, was it -- the bag that he had
20 in his hand, I guess I'm trying to at least get a
21 category of what type of bag.  I mean, I know that
22 you're saying you can't remember exactly what it looked
23 like, but was this a bag that you would've thought, this
24 is something that he brought in with him?
25         MR. AINSWORTH:  Objection to the form of the

1  question.
2      A   I'm not sure.
3      Q   Like a plastic bag?
4      A   No.
5      Q   Was it a paper bag?
6      A   No.  It was black bag.  It was a bag.
7      Q   Got it.
8      A   I'm not sure, actually, but it was like a
9  carry bag.  He had it in his hand.
10     Q   Got it.  Okay.  So this was not -- you're sure
11 that it wasn't like a plastic bag or a paper bag.  This
12 is like something that was maybe even closer like a
13 duffle bag of some sort, but--
14     A   Yeah, pretty much.  Yeah.
15     Q   And this is something you specifically
16 remember seeing in his hand as you're looking in the
17 window with these two guys, right?
18     A   Yeah.
19     Q   You're sure?  You're sure?
20     A   Yes.
21     Q   Okay.  And that was the bag that you
22 understood these guys were telling you that they thought
23 had the money in it, right?
24     A   Right.
25     Q   Okay.  Had you ever seen this guy with the bag

1  in the store in the restaurant before?
2      A   No.
3      Q   Okay.  And these two guys that came up to you,
4  you said today before that you don't recall.  I think
5  you said you don't recall ever seeing these two guys
6  before that came up to you, is that right?
7      A   I didn't see him that day.  I remember seeing
8  Little A at the park before, but I hadn't seen him all
9  that day until then.
10     Q   That's right.  Yeah.  You saw one of them as
11 you were coming back from playing basketball, right?
12     A   Right.
13     Q   How long ago was that before this shooting?
14     A   I'm not sure.
15     Q   Okay.  Was it like months or longer than that?
16     A   I couldn't tell you.  I just remember seeing
17 them before.
18     Q   Why do you re -- which one, the taller one or
19 the shorter one did you see?
20     A   The short one.  The short one.
21     Q   The one that your sister described as Little
22 A.
23     A   As Little A, yes.
24     Q   All right.  Do you remember what side of
25 Sherman Park you were on when you saw this guy that your

1  sister thought was Little A?
2      A   I was coming out of the park on 52nd Street.
3      Q   So that would be on the south side of the
4  park, I guess?
5      A   That would be the north side.
6      Q   The north side, okay.
7      A   The north gate -- 52nd is the north part of
8  the park.
9      Q   Tell me why you remember -- why is it that you
10 remember seeing this guy that your sister thought was
11 Little A on that day coming back from playing
12 basketball?
13         MR. AINSWORTH:  Object to the form of the
14 question.
15     A   I can't remember.
16     Q   It's just something that you remember?
17         MR. AINSWORTH:  Object to the form of question.
18 It's not what he said.
19     A   I just remember him and I remember that day.
20 I remember him from when I saw him in front of the
21 restaurant.  I can't remember what he was doing or
22 anything like that.
23     Q   Okay.  On that day coming out of Sherman Park
24 playing basketball, did you talk to this guy that your
25 sister later thought was Little A?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Kentuckiana
COURT REPORTERS

1    A    No.

2    Q    How far away from him was he when you saw him

3  in the park?

4    A    A couple -- he walked past me.  A couple feet.

5    Q    Oh, like going the opposite way?

6    A    Opposite way, yes.

7    Q    Was he with anybody?

8    A    Yeah, he was with a couple of guys.

9    Q    Was one of them the taller guy that you saw

10  outside the submarine shop?

11    A    I'm not sure.

12    Q    Okay.  You ever seen this guy that your sister

13  described as Little A on any other occasions?

14    A    Not that I can recall.

15    Q    Okay.  So the guy that you know is Little A

16  though is not this guy, right?

17        MR. AINSWORTH:  Object to the form of the

18  question.

19    A    The short guy who she said was Little A that's

20  the guy that I saw by the park.

21    Q    Right.  But earlier today you testified that -

22  - putting that aside, that the real Little A you

23  actually do know what that person looks like.  Although

24  you don't know him personally, you know what that person

25  looks like back in 1991?

1    A    Not today, I couldn't tell you what he looked

2  like.

3    Q    Talking about back then in 1991, you knew what

4  he looked like then, right?

5    A    I didn't know his name, but I knew when she

6  said that's the only way I knew who it was.

7        MR. AINSWORTH:  Objection.  Foundation.

8    Q    Okay.  So listen to my question.  I want you

9  to listen to my question and I'll try to be as clear as

10  possible.  The person, the real Little A, okay, back in

11  1991, I understood you to have testified earlier today

12  that you actually did know what Little A looked like.

13  Although you didn't -- you weren't friends with him, you

14  did know what he looked like, is that correct?

15        MR. AINSWORTH:  Objection.

16    A    I don't know.  I didn't know who Little A was

17  that day.  I just know that I had seen him previously.

18  And once when I explained it to my sister, that's who

19  she said it was.

20    Q    Okay.  Had you ever heard of a -- let me try

21  it this way.  Had you ever heard of a person -- before

22  your sister mentioned this name, Little A, had you ever

23  heard that name before?

24    A    Yes.

25    Q    Okay.  And --

1    A    Can I put the name with the face?  No.

2    Q    Okay.  Back in 1991, could you put the name

3  with the face?

4    A    No.

5    Q    Okay.

6    A    Unless she was to tell me who it is, that's

7  the only way.  I didn't know.

8    Q    Okay.  So you did not know, in 1991, whether

9  the person she was telling you was actually Little A, is

10  that fair?

11    A    Only person I knew who it was, was from what

12  she said.  So I went with that.  That's the only person

13  I knew.

14    Q    Got it.  Okay.  Did you ever run into Little A

15  in the neighborhood or somebody by that name after you

16  had this conversation with your sister?

17    A    No.

18    Q    All right.  You know a guy named Gus Robinson

19  back in 1991?

20    A    No.

21    Q    What about a guy that went by the nickname

22  Snake, do you know who that is?

23    A    Yes.

24    Q    Okay.  Who is he?  Well, let me ask you, what

25  does he look like?

1    A    He got a patch on his face, a light patch on

2  his face.

3    Q    Okay.  And how do you know him?  Or how do you

4  know?

5    A    He used to be on the next block west of us on

6  Elizabeth, he used to hang out over there.  And I

7  believe he used to talk to Shawn's sister, I believe.

8  But I remember him by his name then, Snake, and a patch

9  being on his face.

10    Q    You know why he got -- why his nickname was

11  Snake?

12    A    I figured because of the patch on his face, I

13  don't know.

14    Q    Okay.  Do you know if Snake was a gang for any

15  reason, if he was a gang member?

16    A    If he was, he was a Black Stone.  No, I do

17  not, I do not know.

18    Q    When you say, if he was, he was a Black Stone,

19  why would you say that?

20    A    That was the gang that was around there.

21    Q    Okay.  Were there any other gangs around

22  there?  Around --

23    A    Not that I know of.

24    Q    Okay.

25        COURT REPORTER:  Sorry, Mr. Ainsworth, did you



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   object earlier?
2      MR. AINSWORTH:  Not to that question.
3      COURT REPORTER:  Okay.  Just making sure.
4   Thank you.
5      MR. AINSWORTH:  I know it's a surprise.  I like
6   to keep Andrew on his toes.
7      MR. GRILL:  Yeah.  You're doing good today.
8   You haven't objected very much, I don't think.  At
9   least I don't feel you have.  Maybe I'm just, like,
10  tuning it out which is possible.
11  BY MR. GRILL:
12     Q   All right, Mr. Chairse.  So is it -- would it
13  be accurate or do I have this right that basically the
14  two guys that walked up to you, you understood that they
15  were asking you to help them rob this guy with the black
16  bag -- duffle bag of sorts that was inside the sub shop,
17  is that right?
18     A   I'm figuring that could have been the reason
19  why they was telling me.  I didn't know why, but I just
20  knew I need to get the hell away from them, so I took
21  off.
22     Q   Yeah.  And why did you --
23     A   I just told him okay and I just walked on off.
24  And instead of me going up the front of my stairs, I ran
25  through the gangway.

1      Q   Right.  So why did you feel the need to run
2   away from these guys?
3      A   Because they were going to rob somebody I
4   don't want to be part of it.
5      Q   Right.  Okay.  That's what I was -- that was
6   my point.  Okay.  So, and these two guys that came up to
7   you were two guys, basically, you didn't know from
8   anybody.  They were total strangers to you at the time,
9   correct?  Correct?
10     A   Yes.
11     Q   Had anything like that ever happened to you
12  before in your neighborhood where total strangers come
13  up to you and ask you to help them commit an armed
14  robbery?
15     A   No.
16     Q   Has that ever happened to you since?
17     A   No.
18     Q   How old did these two guys look to be to you?
19     A   I couldn't tell you -- teenagers.  I'm not
20  sure.  They looked around my age, maybe.
21     Q   Okay.  Remember what kind of clothes they were
22  wearing?
23     A   No.
24     Q   Did they have baseball hats on either of them
25  or hats -- anything on their heads?

1      A   Not that I remember.
2      Q   Okay.  Did they have jackets on, I mean, it
3   was September right in Chicago?
4      A   Not that I remember.
5      Q   They had shirts on, right?  They were wearing
6   clothes.
7      A   Yeah.  Yeah.  They had on clothes, but I can't
8   remember if they had on jackets, shorts, jogging pants,
9   I can't under -- I don't remember none of that.
10     Q   Okay.  You can't remember any of that today?
11     A   Right.
12     Q   Do you think you gave your sister, Claudette,
13  a more detailed description back in September of 1991
14  about at least the short dark-skinned guy?
15     MR. AINSWORTH:  Object to the form of the
16  question.
17     A   I don't remember.
18     Q   You haven't talked to your sister since then
19  about this shooting?
20     A   No.
21     Q   Never?
22     A   No.
23     Q   Okay.  Was there any reason why you have not,
24  in all of these conversations that you've had over the
25  years with people about miss -- the information that you

1   have about Mr. Jakes' innocence, is there any reason why
2   you haven't talked to your sister about it?
3      A   No.  It never comes up.
4      Q   Is there any reason why you have never brought
5   it up with her?
6      A   No, I don't.  I -- it's not nothing that I
7   really think about anymore, so we just never discuss it.
8      Q   Well, you think about it.  I understood you'd
9   be saying, you think about this a lot.
10     MR. AINSWORTH:  Object to the form the
11  question.
12     A   Only if someone was to bring up something that
13  pertaining to some subject of it -- of something that
14  happened, particularly like it or something.  That's the
15  only time, if I would think about it --
16     Q   Okay.
17     A   -- but I didn't talk about it like that within
18  the last couple years to nobody about it or anything
19  like that.
20     Q   Have you ever been so close to a shooting that
21  resulted in somebody being killed, other than this
22  incident before?
23     A   No.
24     Q   What about -- and I'm talking about before
25  September 1991, is that the first time that happened to

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  you?

2      A    Yes.

3      Q    What about after?

4      A    No.

5      Q    So, this is the only time that you were around

6  or near somebody that got killed?

7      A    Yes.

8      Q    All right.  And in fact, you were close enough

9  to this where the people that you believe actually

10 committed this murder, asked you to help them rob this

11 guy that they ended up killing.  That's right, right?

12          MR. AINSWORTH:  Object to the form of the

13     question.

14     A    I was running through the house when the shots

15 was fired.

16     Q    Yeah.  No, but the people that you believe

17 fired those shots, or were the two guys, or one of the

18 two guys presumably, that asked you to help them rob the

19 guy, right?

20     A    Yes.

21     Q    And then your sister also heard these shots,

22 correct?  Because you guys talked about it.

23     A    Yes.  Yes, she did.

24     Q    So she's, in your mind, it's got to be one of

25 these folks that really is pretty close - as close to

1  this incident as you are, right?

2          MR. AINSWORTH:  Object, object to the form of

3     the question.

4     A    We were in the house --

5     Q    Yes.

6     A    We were in the house when the shots was fired.

7     Q    Do you know if your sister has ever been

8  around or near -- as you were to this shooting.  Is

9  anything like that ever, to your knowledge, ever

10 happened to her before this incident in September 1991?

11     A    No.

12     Q    What about after?

13     A    No.

14     Q    And it's your testimony that you've never

15 talked to her about this?

16     A    I talked to her about it when it happened.

17 Yes.

18     Q    Other than that?

19     A    No.

20     Q    And you never thought to share with her the

21 information that you had that would show, in your mind,

22 that Mr. Jakes could not have participated in the

23 shooting, correct?

24     A    Yes.  That's what we talked about.

25     Q    You did talk to Tweety about it?

1      A    When I told what -- after, when it happened, I

2  told her that's who did it.  That's when we talked about

3  it.  Right then and there when the shooting occurred.

4      Q    Okay.

5      A    When I explained to her who was out there,

6  that's when we talked about it wasn't Shawn.

7      Q    It's never come up since?

8      A    No.

9      Q    Okay.  Where were -- you said earlier today

10 that you remembered Nikia Little and Denise Harris being

11 outside that night of the shooting.  Where did you --

12 where do you remember they were exactly?

13     A    Well, I believe before we threw the bottles,

14 they were on the porch, but I don't believe -- I don't

15 know who were out there when the shooting occurred.

16     Q    Yeah.  Okay.  Which porch were they on?

17     A    1212.

18     Q    1212.  All right.  Do you know if they -- so

19 were they some of the voices that you heard when you

20 were in the gangway between 12ten and 1212?

21     A    Yes.

22     Q    Okay.  So we got Nikia, Denise, and Lynnette

23 as being potentially three people that were on that

24 porch when you were in the gangway with Mr. Jakes, is

25 that right?

1      A    Right.

2      Q    Okay.  Anybody else that I'm missing right

3  now?

4          MR. AINSWORTH:  Object to the form of the

5     question.

6      A    I don't remember no one.

7      Q    Okay.  So, you guys are in the -- you guys are

8  in the gangway between 12ten and 1212.  Where'd you get

9  the bottles from to throw at the car?

10     A    Out the garbage -- out the garbage can right

11 there.

12     Q    Where?  Where is right there?

13     A    In the gate.  In the gate of 1212.

14     Q    There's a garbage can there?

15     A    I believe it were.

16     Q    All right.

17     A    If it wasn't, there was bottles in that yard

18 right there where we got them from.

19     Q    Okay.  And how many -- had this car that you

20 ended up throwing bottles at, had it come by before?  Or

21 was this the first time that you're seeing it?

22     A    It came by before multiple times.  I'm not

23 sure how many times, but it was more than once.

24     Q    Okay.  And so this time it comes around, you

25 and Mr. Jakes are ready for it, right?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   A   Right.
2   Q   And you get the bottles and do you guys throw
3   the bo -- where -- tell me exactly how it goes down when
4   you guys throw the bottles at the car.
5   A   When the car is going by, I told him if the
6   car's come back hooting and hollering again, I'm going
7   to throw this bottle at them.
8   Q   Okay.
9   A   He started laughing and he got a bottle, and
10  then we threw the bottles at the car when it went
11  passed.
12  Q   Okay.  And what happens after these guys throw
13  the bottle?
14  A   The car stopped.  We take off running and the
15  car came around.  No, the car stopped.  We took off and
16  run, and a few minutes later Shawn took off -- they came
17  around the back, Shawn took off and ran west towards
18  Throop.  They -- wait first, they threw the bottle
19  through the window.  Then we had confrontation with him,
20  and Shawn had took off and ran west.  It's -- my mind is
21  so thrown back from that far.  But I do know that Shawn
22  took off and ran west, and me and my sister went -- we
23  had confrontations with the guys, diffusing that I was
24  the one that threw the bottle at them, and then that's
25  when they left.  The cars -- the guys in the car left.

1   Q   Okay.  So, let me get this straight.  You guys
2   -- so after you guys -- after you throw the bottle, the
3   car stopped, right?
4   A   Right.
5   Q   Okay.  And how -- was the car heading east or
6   west down Racine?
7   A   I believe it was heading west down Racine,
8   west down 51st.  It was going down 51st Street.
9   Q   Oh, excuse me.  Down 50, sorry.  Yeah.  Wrong
10  street, down 51st.
11  A   Yeah, it was going down 51st Street and I just
12  know we threw the bottles at the car.
13  Q   Okay.
14  A   It took off -- the car stopped and we took off
15  and ran through the gangway.
16  Q   Through the -- okay.  You both went through
17  the gangway?
18  A   Yes.
19  Q   Together?
20  A   Yes.
21  Q   So Jakes didn't take off going west.  You and
22  he went -
23  A   Well, he came through the gangway and made it
24  to the alley.  That's when he ran west.
25  Q   Got it.  Towards like Throop and --

1   A   Towards Elizabeth and Throop.
2   Q   Yeah.  Which are only like -- they're the next
3   two blocks over.
4   A   Exactly.
5   Q   Right?  First you hit Elizabeth then you hit
6   Throop, right?
7   A   Yeah, yeah, Throop.
8   Q   Right, yeah.  So not very far, correct?
9       MR. AINSWORTH:  Object to the form of the
10  question.
11  Q   If you're running westbound through the alley,
12  all the way to Throop, you can do that, what?  Probably
13  in like under a minute, right?
14  A   No.  Hey, man.  Close to a minute.  I'm not
15  sure.  It's two blocks.
16  Q   Not far?
17      MR. AINSWORTH:  Object to the form of the
18  question.
19  Q   It's two blocks and you guys are teenagers,
20  right?
21  A   Yeah.
22  Q   Yeah.  Did you play sports?  You were an
23  athlete, right?  And you were playing basketball and
24  stuff, right?
25      MR. AINSWORTH:  Object to the form of the

1   question.
2   A   Yeah.
3   Q   Mr. Jakes played sports then?  Back at that
4   time.
5   A   No, I never saw him play anything really.
6   Q   Did he look like?
7   A   If he did, he didn't play with me.  He didn't.
8   I was too good, so he couldn't be on my team.
9   Q   Fair enough.  Okay.  Mr. Jakes didn't have any
10  like physical disabilities, right?  Like didn't have --
11  he could run and walk just like anybody else, right?
12  A   Right.
13      MR. AINSWORTH:  Objection.  Foundation.
14  Q   Okay.  He wasn't like morbidly obese,
15  overweight, or obese, right at the time?
16  A   No.
17  Q   Okay.  All right.  So you guys throw the
18  bottles, the car stops.  You guys go through the gangway
19  and Jakes goes west down the alley through -- towards
20  Elizabeth and Throop and you go where?
21  A   In the house.
22  Q   Okay.  In the -- in your house at 12ten,
23  right?
24  A   Yes.
25  Q   And you go to the second floor?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    Yes.
2    Q    12ten is the house that ultimately gets a
3 bottle through the window, right?
4    A    Right.
5    Q    And that's in the picture that Mr. Ainsworth
6 showed you earlier today, right?
7    A    Right.
8    Q    Okay.  Now, do you know if Mr. Jakes has a
9 cousin named Walter Pound?  Does that name ring a bell
10 to you?
11    A    No, I do not.
12    Q    Okay.  Does he have -- were you guys with any
13 of his other cousins, other than you, that night, when
14 you guys were throwing bottles at the car?
15    A    It was just me and him.
16    Q    Okay.  Now, was the window broken upstairs, on
17 the second floor at 1212, by the time you got up there
18 after running from this car?
19    A    No.  No.
20    Q    When did it get broken?
21    A    It get broke when I was in the house.
22    Q    Okay.  Where were you in the house when it got
23 broken?
24    A    In the living room.
25    Q    First floor?

1    A    We had a dining room and the living room, so I
2 wasn't -- I wasn't right by the window.  I was in the
3 middle part of the house.
4    Q    Okay.  Were you on the first floor or the
5 second floor?
6    A    Second floor where we lived -- where I lived.
7    Q    Okay.  And what did you hear?  Did you hear
8 like something come through the window?
9    A    Yeah, it broke.  We heard the bottle; it came
10 through the window.
11    Q    And when we say we, it's you and who?  Who's
12 the we there?
13    A    Me and my sister.
14    Q    You and Tweety?
15    A    Yep.
16    Q    All right.  Anybody else at home at this time?
17    A    No.
18    Q    So, it's just you two, right?
19    A    Yeah.
20    Q    All right.  So, you hear a window break.  What
21 do you do?
22    A    Well, I said to her, "oh, sh--."  I cursed.  I
23 was like, "They broke the window again."  We went
24 downstairs to argue with the guys for breaking the
25 window.

1    Q    Okay.  Did you see the guys in the car that
2 stopped to actually throw whatever it was through your
3 window?
4    A    No, I didn't.  We didn't see who threw through
5 nothing through the window.  We wasn't by the window
6 when it got broke.
7    Q    Yeah, but I mean, it's safe assumption that's
8 who it was, considering you were just throwing bottles
9 of their car?
10    A    Right.
11    Q    Okay.  All right.  And when Mr. -- when you
12 and Mr. Jakes, I guess, according to you, parted company
13 after you went to the gangway and he went west down, I
14 guess, towards Elizabeth and Throop or in that
15 direction, did Mr. Jakes tell you where he was going to
16 run to?
17    A    No, we didn't say nothing.  No.
18    Q    Okay.  Do you know if he went back to his
19 house, which was next door at 1212, I guess?
20    A    No.
21    Q    Back?
22    A    No, he did not.  No, he did not.  He ran
23 through the alley.  He never came back.
24    Q    No, no.  I know.  I know you said that
25 earlier, but I want to -- we got to take it in pieces.

1 Okay.  So, I got to get the detail from you because
2 that's where the devil always lies in this stuff, right?
3 It's in the details.
4        MR. AINSWORTH:  Object to the commentary.
5        MR. GRILL:  Oh, just letting him know where
6    I'm going.
7 BY MR. GRILL:
8    Q    So Mr. Chairse, Mr. Jakes, you said, ran west
9 down the alley.  Did you see him -- did you see how far
10 down the alley he got?
11    A    No, I did not.
12    Q    Okay.  Did he say anything to you as he headed
13 westbound down the alley?
14    A    No, he -- no.
15    Q    How do you know that he actually went west
16 down the alley?
17    A    Because I was standing there when he ran west.
18    Q    Okay.
19    A    He was in front of me.
20    Q    And how --
21    A    And he turned left.  He turned left.
22    Q    Was he like sprinting because you guys are
23 just throwing a bottle at the car.  I mean, was he
24 running basically, as far as you were concerned at a
25 pretty full clip, going down the alley?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  MR. AINSWORTH:  Object to the form of the
2  question.
3  A    He was running.
4  Q    Sprinting?
5  A    He was running.
6  MR. AINSWORTH:  Object to the form of the
7  question.
8  Q    Okay.  Did he look scared?
9  A    Yeah.
10  MR. AINSWORTH:  Object to form of the --
11  objection.  Foundation.
12  Q    And as he's running west down the alley, he
13  has to pass his house, the rear house, 1212, right?
14  A    Yep.
15  Q    Okay.  But -- and you didn't see him go in
16  there, right?  He went past it.
17  A    No, he didn't.  No, he did not.  He ran past
18  it.
19  Q    Okay.  But you went and hid in your own home,
20  right?  At 12ten?
21  A    Yep.
22  Q    Okay.  Did you ever ask Mr. Jakes why he just
23  didn't go inside of his house?
24  A    I never got a chance to talk to him again.
25  Q    Well, you've talked to him at least twice

1  since he's been out.  Did you ask him on any of those
2  occasions?
3  A    I never asked.  Nope.  Never asked him.  Never
4  -- never even thought about it.
5  Q    Okay.  It would've been pretty easy for him to
6  just go in his house.  Don't you think?
7  MR. AINSWORTH:  Object to the form question.
8  A    His gate's up there.
9  Q    How do you mean?
10  A    It's a gate to the door.
11  Q    Please explain that.  I'm not at all
12  following.
13  A    It's a gate to the house where he lived.
14  Q    So, like, he couldn't get in?
15  A    Well, if he would've been trying to run in, he
16  ain't had no key to open the lock that fast.
17  Q    You've got to explain what you're talking
18  about.  What key, what lock?
19  A    It's a gate -- it's a gate to his house where
20  he lived in the back, at the back house.  It's a gate
21  right there that you would have to open to go in.
22  Q    Did you even know if you were being chased by
23  anybody at that point?
24  A    Yeah.  Because the car stopped and they came -
25  - they backed up.  They came back.

1  Q    Right.  But did you -- they -- did you see
2  anybody get out of the car?
3  A    We didn't give them a chance.  No, we didn't.
4  Q    Okay.  So, you didn't know if anybody had
5  gotten out of the car?  That's probably fair.
6  A    No, we -- no.  We -- no, we don't.  No, we
7  didn't know.
8  Q    Okay.  And so this -- so from the alley, let's
9  talk about this.  What -- you're saying there's a fence
10  around the rear house at 1212 of some sort?
11  A    Yes.
12  Q    With a gate?
13  A    Which?  No, it's a gate to the door.
14  Q    The door of the actual house?
15  A    Yes.
16  Q    Got it.  Okay.  And you said that Mr. Jakes
17  would need a key to open that up.  Is that right?
18  A    Yeah.
19  Q    Okay.  How do you know that?
20  A    Because it always been one there.
21  Q    Okay.  And it's usually locked in your
22  experience, is that what you're saying?
23  A    Yeah.  Yeah.
24  Q    Do you know if it was locked that night?
25  A    No, I don't know.

1  Q    Do you know if Mr. Jakes had a key?
2  A    No, I don't.
3  Q    Did -- do you know if Mr. Jakes normally has a
4  key to that?
5  A    I don't.  I don't know.
6  Q    Okay.  All right.  Do you know if his aunt,
7  Jessie Mae, was home that night?
8  A    No, I do not.
9  Q    Okay.  Did you ever -- did you see her at any
10  point that evening?
11  A    No.
12  Q    All right.  Who else live with Mr. Jakes and
13  his aunt in the rear house?
14  A    Her kids.
15  Q    What are their names?
16  A    Rosie, Everett, and I believe it was another
17  cousin or two stayed there.  Victor or Vincent.
18  Q    Anybody else?
19  A    I'm not sure who else.
20  Q    Did you?
21  A    I think Veronica.  Veronica, maybe.  I'm not
22  sure who all was staying there at the time.  Veronica,
23  Rosie, Everett.  Yeah.
24  Q    What type of person was Jessie Mae?  Well, let
25  me ask you this.  Did you know Jessie Mae -- your Aunt

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 Bee, did you know her pretty well then?
2     A    Yeah.
3         Q    What ki -- what type of person -- how would
4 you describe her as a person?  Back in 1991, what type
5 of person was she?
6         MR. AINSWORTH:  Object to form of the question.
7     A    She's nice.
8     Q    Uh-huh.
9     A    She was an auntie.  She treats you like a
10 nephew.  She was --
11     Q    Uh-huh.
12     A    She was okay.  She was no trouble.
13     Q    Do you know if she had expectations for --
14 what her expectations for Anthony were at the time?
15 Like, was she strict with him?  Did she want him to stay
16 out of trouble, keep his nose clean, that type of thing?
17 Was she that type of person?
18     A    Oh yeah, for sure.
19     Q    Would she -- how do you think she would react
20 if she was home, --
21     A    She would.
22     Q    -- Mr. Jakes comes in, running from a car full
23 of people who you guys just threw a bottle at on 51st
24 Street.  How do you think she would react to that?
25     A    She would've got on him.

1         MR. AINSWORTH:  Objection.  Foundation.  Go
2     ahead.
3     Q    She would not, in your experience, your
4 expectation would be she would not have been happy about
5 that, right?
6     A    Exactly.  Exactly.
7     Q    Do you know if Mr. Jakes, prior this night,
8 had ever been arrested for anything, to your knowledge?
9     A    No.
10     Q    No he hadn't or no you don't know?
11     A    No, I don't know.
12     Q    Okay.  Do you have any idea from Mr. Jakes,
13 for example, about what his relationship with Jessie Mae
14 was like prior to his arrest in this case?
15     A    No.  I just knew that he lived there with her,
16 so it had to be good.
17     Q    Did she ever complain to you about Mr. Jakes,
18 in any way, about anything?
19     A    No.
20     Q    Okay.  Did Mr. Jakes ever complain to you
21 about his relat -- about his aunt?
22     A    No.
23     Q    His Aunt Jessie Mae?
24     A    No.
25     Q    Do you know why Mr. Jakes is living with

1 Jessie Mae and not his own parents?
2     A    I believe his mom had moved -- she moved to
3 Wisconsin.
4     Q    Okay.
5     A    So, I believe he stayed for schooling and
6 everything.
7     Q    Well, there's schools in Wisconsin.  Do you
8 know why they're --
9     A    I don't know.
10     Q    -- why Mr. Jakes didn't go with her?
11     A    No, I do not.
12     Q    Okay.  Do you know where Mr. Jakes' dad was at
13 the time?
14     A    No.
15     Q    Do you think Mr. Jakes had ever been arrested
16 prior to this night?
17         MR. AINSWORTH:  Objection.
18     A    I don't know.
19         MR. AINSWORTH:  Speculation.
20     Q    Did Mr. Jakes ever talked to you about his
21 parents, his biological parents?
22     A    No.
23     Q    Ever, not once in your life?
24     A    No.
25     Q    Did you think that was strange?

1     A    No.
2     Q    Okay.  Why not?
3     A    I mean, what was he going to tell me about
4 them?
5     Q    Maybe why he doesn't live with him, for
6 starters?
7     A    No.  Never asked.  Well, I'm a kid.  What I'm
8 going to go say?  What am I going to explain?  Explain
9 me, what could I do?  I couldn't tell him to come stay
10 with me.
11     Q    Well, your cousins and you love him, so.
12     A    Yeah, but no, we don't discuss -- we never
13 discussed it.
14     Q    Okay.  You know where in Wisconsin his mom is?
15     A    No.
16     Q    Okay.  So Mr. Jakes goes west down the alley,
17 you go inside.  Bottle gets busted, comes over --
18 something comes through the front window.  Is it your
19 testimony then that basically after, well, let me ask
20 you this.  Did you ever see Mr. Jakes again that night,
21 after he --
22     A    No.
23     Q    -- took off running down -- westbound down the
24 alley?
25     A    No, I did not.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    All right.  Do you know if he ever came back
2 to either 12ten or 1212 at any point that night?
3    A    What?  The next day?  No, I don't.  No, no,
4 no, no, no.
5    Q    You did not see him at all that night again,
6 correct?
7    A    I didn't see him all the rest of that day.  I
8 believe, in.
9    Q    You ever asked Mr. Jakes where he went --
10    A    No.
11    Q    -- after you guys parted ways in the alley?
12    A    No.
13    Q    All right.  Did you see Mr. Jakes the next
14 day?
15    A    No.
16    Q    Okay.  So, I guess effectively that when you
17 guys parted ways in the alley, that was the last time
18 that you saw him?
19    A    True.
20    Q    Until he got out of prison, right?
21    A    I still haven't saw him.  I only talked to
22 him.
23    Q    Fair.  I haven't asked you that.  So, let's
24 just cross that off the list.  You've never -- have you
25 ever seen Mr. Jakes since --

1    A    No, I still haven't.
2    Q    -- his release?
3    A    I still haven't saw him.
4    Q    Okay.  So you, since that -- you guys part
5 ways in the alley, and he headed off westbound, that was
6 the -- literally the last time in your life you've
7 actually physically seen him with your own eyes in front
8 of you, right?
9    A    Correct.
10    Q    Okay.  All right.  Do you need to take a
11 break?
12    A    Yes, if possible.
13    MR. GRILL:  Take a couple minutes.  Yeah.  You
14 look like you're bouncing, maybe.  So let's take
15 five-
16    THE WITNESS:  Yeah, I've got to, you know.
17    MR. GRILL:  Maybe you did, so that's fine.
18 Let's just take.  I will pick it up when you come
19 back in five minutes.  Okay?  Or whatever, whenever.
20 Take -
21    THE WITNESS:  All right.
22    MR. GRILL:  -- as much time as you need.  We'll
23 be here.  Okay?
24    THE WITNESS:  Okay.
25    MR. GRILL:  All right, thanks.

1    COURT REPORTER:  We will turn off the record.
2 The time is 12:16.
3    (OFF THE RECORD)
4    COURT REPORTER:  We are back on the record.
5 The time is 12:25 P.M.
6 BY MR. GRILL:
7    Q    Okay.  All right.  Mr. Chairse, picking up.
8 So you -- you're now back -- you're in your house with
9 Tweety, nobody else, and window breaks.  What do you
10 guys do after the window breaks?
11    A    We go downstairs to confront the guys that
12 broke the window.  Because we wonder why the window was
13 broke, and we get into a little argument with the guys.
14 They were saying that you threw bottles.  I was like,
15 "No, I didn't."  Whatever, whatever.  They leave and I
16 go back upstairs to clean the glass up.
17    Q    Okay.  Let's just put a pin in it right there.
18 Okay.  So we can pick up there.  It's a good spot to --
19 we'll kind of break this out.  So how -- when the window
20 broke, did you go up to the front of your apartment and
21 look out the window to see that -- if the people that
22 had broken the window were actually still outside?
23    A    Yeah.
24    Q    Okay.
25    A    Actually, yeah, that's what we did.  We went

1 and looked out the window and then that's when we went
2 downstairs.
3    Q    Okay.  And when you looked out the window,
4 what did you see outside?
5    A    Guys.  There was some guys that were standing
6 outside looking up.  There was people that was out there
7 looking up towards the window.
8    Q    Okay.  And did you see the car anywhere that
9 you guys had thrown the bottle at?
10    A    I don't really remember.  My main object was
11 to argue about why they broke the window.
12    Q    Okay.  And you said you saw some guys, right?
13    A    Yeah.
14    Q    How many guys?
15    A    I'm not sure how many it was.
16    Q    Where were they?
17    A    Standing in front of my building.
18    Q    On the street?  On the sidewalk?  Where?
19    A    The street, on the sidewalk.  On the sidewalk,
20 standing in front.  In front of the building.
21    Q    Okay.  And you're in 12ten, right?
22    A    Exactly.
23    Q    And we testified earlier that the girls,
24 Nikia, Annette, Denise, whose voices you believe you
25 heard, they were at on the porch to 1212, right?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    Right.

2    Q    Okay. And the guys that you saw on the
3 sidewalk in front of your place, 12ten, could you tell
4 whether they were black guys, white guys, Asian guys,
5 Hispanic guys?

6    A    Latino. They was Latino guys.

7    Q    Okay. How could you tell?

8    A    Because they looked -- they looked Mexican.

9    Q    Okay. And did you recognize any of these
10 guys? You ever seen them before?

11    A    No.

12    Q    All right. Could you -- were they saying
13 anything? Could you hear anything?

14    A    They were --

15    Q    The second floor of your place, he's looking
16 out the window.

17    A    I didn't hear none of that. I didn't -- I
18 didn't pay attention to it. Me and my sister just tried
19 to get downstairs to diffuse -- to ask why did they
20 break the window?

21    Q    Okay. What had changed in your mind now that
22 made you want to actually go physically confront these
23 guys?

24      MR. AINSWORTH: Object to the form of the
25    question.

---

1    A    It was about the broken window.

2    Q    Just let me drop the physically, that you want
3 to go down and confront these guys about breaking the
4 window. What had changed in your mind?

5      MR. AINSWORTH: Object to the form of the
6    question.

7    Q    From the time that you threw the bottle until
8 now?

9    A    That, what was the reason for them breaking
10 the window.

11    Q    Okay.

12    A    And they said that I was supposed to threw the
13 bottle at their car. I'm like, "No, I didn't." We
14 argued back and forth about that, and then they left and
15 that was the end.

16    Q    All right. So listen to my question. Okay?

17    A    Uh-huh.

18    Q    You're up in your second floor of your
19 building, right, with your sister.

20    A    Right.

21    Q    How big are you at this time? Like how tall
22 are you? How much do you weigh?

23    A    Pretty much about the same. I've been the
24 same since like sixth grade. No lie.

25    Q    Oh, so how big are you?

---

1    A    5'8", 5'9". I'm 5'9" now, but I'll say 5'7".

2    Q    Okay. How much do you weigh?

3    A    About 180.

4    Q    Okay. And there's more than one of these guys
5 outside, right?

6    A    Right.

7    Q    Maybe three or four?

8    A    Yeah.

9    Q    Okay.

10    A    Or probably was a couple more.

11    Q    Okay. There's a bunch of them, right?

12      MR. AINSWORTH: Object to the form of question.

13    Q    Right?

14    A    Yeah. There's guys out there.

15    Q    You call anybody to come help you?

16    A    No.

17    Q    And you're pretty sure these guys are mad
18 enough at you that they threw something through your
19 front window?

20    A    Well, first of all, I don't believe that they
21 even knew that it was me that did it for sure. They was
22 going off the hearsay --

23    Q    Okay.

24    A    -- of someone else telling them that I threw
25 the bottle with them.

---

1    Q    Okay. So, you were going to go down there and
2 make sure that they knew it was you?

3    A    To let them know that I didn't do it. That's
4 what me and my sister went down there for. "Why did you
5 break the window?" That's when they were saying that I
6 threw the bottle, or someone in that apartment threw the
7 bottle at their car.

8    Q    Okay.

9    A    They didn't even say specifically me.

10    Q    Got it. So, you were going to go down with
11 this ruse -- this lie that you're going to tell him to
12 try to diffuse the situation. Is that right?

13    A    True.

14    Q    Okay. You call for backup in case something
15 didn't go the way you'd planned? Make sure you had
16 somebody there to back you up?

17      MR. AINSWORTH: Objection --

18    A    No.

19      MR. AINSWORTH: -- to the form of the question.

20    Q    So what happened when you went downstairs?

21    A    We argued back and forth, and then they left
22 and I went back upstairs.

23    Q    Okay. And this argument took place where?

24    A    In front of the building. I stood on the
25 porch, and they stayed on the sidewalk.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   Q   Okay.  And those girls, Annette, Nikia and
2  whatnot, Denise, are they still on the porch at 1212?
3       A   I blacked out.  I wasn't -- I ain't -- I
4  wasn't even paying attention to them no more.  I was
5  just focused on the guys.  I didn't -- I don't even
6  remember anybody else, actually.
7       Q   Blacked out.  What do you mean?
8       A   I'm saying I zoned out.  I was only paying
9  attention to the guys who broke the window.  I wasn't
10  paying attention to no surrounding.
11      Q   Okay.  Tell me, what was the conversation or
12  argument?  Tell me most, everything you can remember
13  about what was said between you and this group of guys
14  that threw a bottle at the front window.
15      A   They said that I threw bottles at them, or
16  someone up there threw the bottles at them.  And I was
17  like, "No one up here threw no bottles at them." And
18  then my sister got in, "Why did y'all break my window?"
19  And then that's when they got back, "Somebody up there
20  was somebody, whatever, whatever." And after that they
21  left.  They just got in the car, whatever, they walked
22  off -- I'm not sure.  But they just left and we went in
23  and it was over with at that point.
24      Q   What did you say to them to convince them that
25  it wasn't you?

1       MR. AINSWORTH:  Object to the form of the
2    question.
3       A   I don't remember.
4       Q   How long of this conversation or argument, I
5  guess, you're describing that occurred on the sidewalk
6  in front of 12ten?
7       A   Three to five minutes.
8       Q   Three to five minutes.  Okay.  Did you
9  recognize anybody in this group of Mexicans that, I
10  guess, got out of this car, to be the victim that you
11  saw -- the eventual victim that you saw with the bag
12  inside of the sub shop?
13      A   No.  I never saw him either.  I never saw -- I
14  don't know.  I never saw nobody, no.
15      Q   I'm saying was he, to your recollection, was
16  he one of the group -- in the group of guys that was
17  confronting you and your sister out in front of your
18  house?
19      A   No.  I never saw him before in my life.  I
20  didn't know none of them.
21      Q   Why didn't you and your sister just, really,
22  why didn't you, just stay inside of 12ten rather than
23  risk going outside and coming face to face with a group
24  of, as you describe, angry Hispanic guys that are
25  standing outside your house?

1       A   Well, I wasn't scared, so I wasn't going let
2  my sister go down there by herself.
3       Q   Well, you were scared enough to run.
4       A   Yeah.
5       Q   Okay.  So why didn't you just stay inside?
6       A   Because I wasn't thinking at the time.
7       Q   How do you know that?  Like all these years
8  later, how do you know you weren't thinking?
9       MR. AINSWORTH:  Object to the form of the
10   question.
11      A   Because I went down there.
12      Q   Right, so I'm asking you, well, what changed
13  then?  Like you -- you throw the bottle, you run,
14  because you guys are, you and Jakes are scared.  Jakes
15  goes west down the alley, you go inside your house, they
16  throw something.
17      A   They didn't know that I actually done it.
18  That's why I went down.
19      Q   Right.  But if you never go down, you have no
20  risk of them figuring out, or thinking you were lying to
21  them, and you avoid the potential of getting beat up by
22  a bunch of guys who --
23      A   I wasn't worried about that.  I just wanted to
24  diffuse the point right then, and the that's what we
25  did.

1       Q   Well, if you weren't --
2       MR. AINSWORTH:  Hold on, hold on.  Let me get
3    my objection on it.  Objection is argumentative.
4    And at a certain point, it's harassing.
5  BY MR. GRILL:
6       Q   Well, I'm trying, okay.  I'm -- to me,
7  something's not lining up, so I'm trying to figure out
8  what changed in your mind because you throw the bottle
9  and after you throw the bottle, you're scared enough
10  after these, and these guys stop.  You're scared enough
11  to run.  Jakes runs, according to you, off to a degree
12  where you literally never see him again for decades, and
13  you go hide in your house.  But then once these group of
14  people now is in front of your actual home and angry,
15  you decide that you're going to go out with your sister
16  and try to tell them a lie to get them to leave.
17      Q   At that point it's my word against theirs,
18  because they don't really know it's me or not.
19      MR. AINSWORTH:  And I'll object to the
20   argumentative nature of this question.
21      Q   Why didn't you call the police?
22      A   For what?  And I was in the wrong for throwing
23  the bottles at them.  That wouldn't make sense.
24      Q   Well, you could lie.  You could lie to the
25  police too and tell them, "I didn't throw anything to

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  them.  These guys whipped a bottle through my front
2  window."
3       MR. AINSWORTH:  Object to the form of the
4  question.
5       Q   Why not call the police?
6       A   We didn't think to call the police.
7       Q   All right.  So these guys leave after you tell
8  them that you're not the guy they're looking for.  What
9  happens next?
10      A   Go back in the house.
11      Q   Who's we?  Do you -- you and your sister both
12 go back in?
13      A   Me and my sister go back in the house --
14      Q   Uh-huh.
15      A   -- clean up the glass, we put some stuff in
16 the window.  We sit there.  I explained to her, well
17 with me, with me and Jakes done.  I'm not sure how long
18 it was, but I looked out, I don't see nobody.  So I
19 leave and go to the store, but I go out the back door,
20 go through the alley east, cross Racine, go to the store
21 or 51st and Racine.  And when I come back, going to my
22 house, I came back up the street, the regular street,
23 because I didn't see no one out there -- no cars or
24 nothing.  When I came walking across, and I made it
25 across the front of the restaurant, that's when the two

1  guys came out of the restaurant and approached me about
2  the guy with the money in the bag that's about to come
3  out the store.
4       Q   Got it.  Okay.  Let's put a little pin --
5  we're going to talk about that.  Okay.  You ever -- when
6  you were preparing for today's deposition and meeting
7  with Mr. -- speaking with, I should say Mr. Ainsworth,
8  did he ever provide you a copy of Mr. Jakes' testimony
9  from his criminal trial?
10      A   No.  I have none of that.
11      Q   Have you ever seen it in your life?
12      A   No.
13      Q   Have you ever seen any of the affidavits that
14 Mr. Jakes executed after he was convicted for -- meaning
15 affidavit -- you know, let me ask this.  Do you know
16 what an affidavit is?
17      A   Yes.
18      Q   What is it?
19      A   It's the statements or whatever going on in
20 the case.
21      Q   Okay.  You ever seen any affidavits by Mr.
22 Jakes related to this case?
23      A   No, sir.
24      Q   Anybody ever tell you what Mr. Jakes --
25 anything about what Mr. Jakes ever testified about

1  during his criminal proceedings?
2       A   No.
3       Q   Okay.  Did anybody in his family ever tell you
4  anything about what he testified about?
5       A   No.
6       Q   You think Mr. Jakes is a liar in your
7  experience with him?
8       A   No.
9       Q   Think that he -- the truth matters to him,
10 that if somebody asks a question, he's going to be -- in
11 your experience, you expect him to tell the truth?
12      A   Yep.
13      Q   Okay.
14          (Sound effect)
15      MR. GRILL:  Sorry.  Did I hear something?  No?
16      Q   Okay.  When you spoke with Mr. Ainsworth, I
17 don't know, less than a year ago, but -- should put that
18 on silent.  When you spoke with Mr. Ainsworth and you
19 said that it was recorded, how do you know that it was
20 being recorded?
21      MR. AINSWORTH:  Object to the form of the
22 question.  Go ahead.
23      A   Just from him saying -- telling me.
24      Q   Okay.  Were you in custody at the time you had
25 this, this recorded conversation with Mr. Ainsworth?

1       A   No.
2       Q   Okay.  So this wasn't like a situation where
3  you're on like a phone in a jail and it's a recorded
4  line.  It wasn't that, right?
5       A   Right.  Right.
6       Q   Okay.  What about the call you had with him on
7  Friday, is that recorded?
8       A   No, not that I know of.  I'm not sure.
9       MR. AINSWORTH:  Objection.  Foundation.
10      Q   Did you -- that call you had with Mr.
11 Ainsworth on Friday?  I mean, you were in custody at the
12 same place you are right now when you spoke with him,
13 right?
14      A   Yes.
15      Q   And was that a face-to-face conversation or --
16 this was -- my understanding was, this was a phone call
17 you had with Mr. Ainsworth?  That's right?
18      A   Right.  Right.
19      Q   Okay.  And how did this phone call gets set
20 up, if you know, like, how did you know that Mr.
21 Ainsworth was going to talk to you on Friday?
22      A   Through a counselor.
23      Q   What do you mean?
24      A   Through one of the counselors here at CRC.
25      Q   Got it.  Okay.  What did that counselor tell



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1 you?
2      A   I will be having a legal call.
3      Q   Legal call.  Okay.  And what, what does it
4 mean if it's a legal call, in your understanding?
5      MR. AINSWORTH:  Objection.  Foundation.
6      A   That I'm going to speak with a lawyer.
7      Q   Pardon me?
8      A   That I'm going to speak with a lawyer.
9      Q   Yeah.  And, and so do you have an
10 understanding whether legal calls are recorded by the
11 facility that you're incarcerated at?  Do you know if
12 they are or if they are not?
13     A   No, I do not know.
14     Q   Okay.  And when did you retain Mr. Ainsworth
15 to be your lawyer?
16     MR. AINSWORTH:  Objection.  Foundation.
17     A   Never.  Never been my lawyer.
18     Q   Uh-huh.  Okay.  So he's not your lawyer here
19 today, right?
20     A   No.
21     Q   Okay.  And he's never represented you for
22 anything ever in your life, right?
23     A   No.
24     Q   No, no, he has not, correct?
25     A   No, he has not.

1      Q   Okay.  And so why was this a legal call, if in
2 your, to your knowledge, why was this a legal call that
3 you had with Mr. Ainsworth on Friday as opposed to a
4 call with anybody else?
5      A   Because he --
6      MR. AINSWORTH:  Objection.  Foundation.
7      A   Because he's an attorney.
8      Q   But he doesn't represent you.
9      MR. AINSWORTH:  Objection.  Argumentative.
10 Andrew, like, I mean, at a certain point it's got to
11 stop.
12     MR. GRILL:  Okay.  Yeah.  You know what?  It's
13 got to stop.  This -- the type of interaction with
14 witnesses that I'm -- you know what I'm asking about
15 right now.
16     MR. AINSWORTH:  What?  Andrew, there's nothing
17 wrong.  There's nothing inappropriate with talking
18 to a witness in a case.  You can leave the call.
19     MR. GRILL:  I'm not the one that needs to
20 decide that, so --
21     MR. AINSWORTH:  Well, hang on, I want to make
22 sure.  Are you making some kind of allegation that
23 there's something improper done?  Because if so, I'd
24 like to know about it.
25     MR. GRILL:  Yeah.  And we can talk about it

1 later.  And this isn't the first time.
2      MR. AINSWORTH:  No, no, no, I'd like to,
3 because if you're saying it, in front of the witness
4 --
5      MR. GRILL:  No I'm not going to -- stop.  Stop.
6 Stop.
7      MR. AINSWORTH:  No, Andrew, you raised it in
8 front of the witness.  You can't do that.  If you're
9 going to raise it in front of the witness, then you
10 know, let's, let's hear it.  What do you think was
11 done improper?
12     MR. GRILL:  No, I'm going to move on.  We can
13 hash it out another time.
14     MR. AINSWORTH:  Then don't --
15     MR. GRILL:  Stop.  Stop.
16     MR. AINSWORTH:  No, I'm going to make my
17 record.  I object to you insinuating that there was
18 something improper done, okay?
19     MR. GRILL:  I'm not insinuating.  I'm telling
20 you that I think it's improper, and that we can move
21 on.  So let me remove any ambiguity about it,
22 Russell.
23     MR. AINSWORTH:  Andrew, there is nothing
24 improper about talking to a witness over a legal
25 call.  There is -- that's always permitted.

1 BY MR. GRILL:
2      Q   Great.  Okay.  So Mr. Chairse, did you have
3 any other legal calls at any point while you've been
4 incarcerated with any other lawyers that report to --
5 work for Mr. Jakes?  None?
6      A   No.
7      Q   Ever?
8      A   No.
9      Q   All right.  All right.  So when -- how long
10 did it take you and your sister to clean the glass up
11 upstairs?
12     A   I'm not sure.
13     Q   Do you think it took a long time, or --
14     A   No, it didn't take too long.  I don't, I'm not
15 sure.  We just cleaned it up.  I didn't -- I don't
16 remember.  And I just cleaned it up and I was worried
17 about my mom when she come home because she wasn't at
18 home.
19     Q   Right.  So that's what I was just about to
20 ask, like, where is your mom?
21     A   Yeah, that's what I was worried about, more
22 than anything else, anybody else.  I was worried about
23 me getting in trouble when my mom would get back.
24     Q   Yeah, because she's going to come home and her
25 front window's broken.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    Exactly.

2    Q    Yeah.  Where is your mom that night?

3    A    She's in Ames, Iowa.

4    Q    Back in 1991?

5    A    Oh, then?  No, she's -- she's been there.  She
6    was going out of town.

7    Q    Okay.  So, so let's just, that was a little
8    confusing.  So the night that the bottle or whatever,
9    whatever they throw through your fr -- what did they throw
10   through your front window?  Do you know?

11   A    I don't -- I'm not sure.

12   Q    All right.  So whatever it was, is they threw
13   it through your front window.  At the time, you and your
14   sister, Tweety, are cleaning that glass up, it's my
15   understanding your mom is not there.  Right?

16   A    Right.

17   Q    Where, if you remember, where was she that
18   night?  Why wasn't she home?

19   A    She -- I don't remember what -- where she was
20   at, but she was gone out of town.

21        MR. AINSWORTH:  Objection.  Asked and answered.

22   Q    She, you're saying that she was out of town
23   that night.  Is that what you're saying?

24   A    Yes.

25   Q    Okay.  Now do you know when she came back?

1    A    Couple of days later.

2    Q    Did you get the window fixed by then?

3    A    No, I was a kid.  How am I going to get the
4    window fixed?

5    Q    I don't know.  Just asking if it got fixed.
6    So the answer is no?

7    A    No.

8    Q    Okay.  Did you talk to your mom about the
9    window and how it got broken when she got home?

10   A    Yes, I did.

11   Q    What'd you tell her?

12   A    I told her what happened, that I threw bottles
13   and then the guys came back and threw something through
14   the window and broke it.

15   Q    Did you tell her who you were with when you
16   threw the bottle?

17   A    Yeah.

18   Q    Okay.  Was this -- and by the time you're
19   talking to your mom, had Mr. Jakes -- had he already
20   been, if you recall, had he already been arrested by
21   this point?

22   A    Yep, he was locked up already.

23   Q    Okay.  So when you say he was locked up, what
24   do you mean?

25   A    When they got him, they never let him go.

1    Q    Okay.  And this conversation that you had with
2    your mom, after she came back, was this when you told
3    her the information that you told me about earlier, that
4    you believe proves Mr. Jakes is innocent?

5    A    Right.

6    Q    Okay.  Who else was present when you told your
7    mom, if anybody, when you told your mom this information
8    after she came home?

9    A    I don't -- I don't remember.

10   Q    Did you have a way of reaching your mom on the
11   phone when she was out of town?  If you wanted to call
12   her and tell her what had happened instead of waiting
13   for her to get back?

14   A    Yeah, yeah, I could have.

15   Q    Okay.  Okay, so where was she, then?

16        MR. AINSWORTH:  Objection.  Asked and answered.

17   A    She was at her aunt -- she was at her aunt's
18   house.  I don't remember what aunt, but I got family
19   members' number.  We always was left with that, but I
20   don't remember exactly if she was in St. Louis, if she
21   was in New Orleans.  I don't remember.

22   Q    Okay.  So, now what you're telling me -- what
23   you remembering now is that you believe that she was at
24   a -- another relative's home?

25   A    She was, she was, that's the only place we go.

1    We don't do no vacation and all that.

2    Q    Got it.  Okay.  Was she -- did she travel, if
3    you know, did she travel alone, wherever she went there
4    that day, or wherever she was at?

5    A    I'm not -- I don't remember.

6    Q    Okay.  Okay.  Who was responsible for you and
7    your sister, what -- for watching you guys while your
8    mom was out of town in 1991 when this happens?

9    A    We were 16 and my other sisters was there too.
10   They wasn't there at the present time, but I got older
11   siblings also.  It's just not me and my twin sister, we
12   got older brothers there.  So we were the babies.  So we
13   got older sisters and brothers and plus my dad, too.  My
14   dad was there at the time.  My dad was there.  He stayed
15   there.  He just wasn't present.

16   Q    Right.  Right.  So where did your dad stay at
17   the time?

18   A    Our place.

19        MR. AINSWORTH:  Object to the form of the
20   question.

21   Q    I thought you said he wasn't there at the
22   time, like that he wasn't living there?

23   A    He stayed there but he wasn't home.  Just me
24   and my sister was home at the time.

25   Q    So did you -- when did your dad -- when did



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  you next see your dad after the, whatever came through
2  the window broke the winter after --
3      A    After we -- after -- he came home a little bit
4  later.
5      Q    Okay.  Did you talk to your dad about what
6  happened?
7      A    Yeah.
8      Q    Okay.  What'd you tell him?
9      A    The same thing what I just explained.  The
10 same thing.  The same story.  I didn't -- I didn't lie
11 about it.
12     Q    Okay.  So, so now we got another person.  So
13 you, you actually told the information about Mr. Jakes'
14 innocence, essentially -- the information that you had,
15 not only to your mom and to his aunt, but also to your
16 dad.  Is that right?
17     A    Yeah.
18          MR. AINSWORTH:  Objection.  Foundation.
19     Q    Okay.  Is there anybody else other than these
20 three that you've told this information to?
21     A    I don't really remember.
22     Q    All right.  So you and your sister
23 cleaned the glass up.  Where were -- you said you had
24 older siblings that were in the house.  What were their
25 names, that would have been living there at the time?

1      A    Angeline and Helen.
2      Q    Helen?
3      A    Yeah, she's deceased.
4      Q    Okay.  And the first y -- I'm sorry, you broke
5  up a little bit.  The first name you said was what?
6      A    Angeline.
7      Q    Angeline?
8      A    Yep.
9      Q    Can you spell that?
10     A    A-N-G-E-L-I-N-E.
11     Q    Okay.  What's her last name?  Chairse, I
12 guess?
13     A    Yep.  Yep.
14     Q    How old is Angeli -- how much older is
15 Angeline than you?
16     A    Six years -- five years older.  She's five
17 years older than me.
18     Q    Okay.  So she would've been like 21, 22 years
19 old at the time.
20     A    Yeah.
21     Q    Do you remember where she was that night?
22     A    She wasn't home, she was out.
23     Q    Okay.  How do you know?
24     A    Because it was just me and my sister was
25 there.

1      Q    Okay.  Did you ever talk to Angeline about
2  what happened?
3      A    Not that I recall.
4      Q    Okay.  Do you know, so do you know what time
5  it was roughly, when the window got broken?
6      A    Well, I don't remember, I don't remember.
7          MR. AINSWORTH:  Objection.  Asked and answered.
8      Q    Now after you cleaned the glass up, you said
9  you go out into the alley, right?  Throw out the broken
10 glass?
11     A    Yep.
12     Q    Okay.  Does anybody go with you when you go
13 out?  Does Tweety come with you when you go to the
14 alley?
15     A    No.
16     Q    Okay.  Where does -- do you leave Tweety
17 inside or does she go somewhere else, or what happened
18 with her?
19     A    She stayed home.  She never left.  She was
20 there all the time.
21     Q    She stayed up on the second floor at 12ten,
22 after you swept the mess?
23     A    Yep.
24     Q    Okay.  So you go out to the alley by yourself
25 to take the glass out, what happens then?

1      A    I believe I went back in the house.
2      Q    Okay.  And what'd you do when you went back in
3  the house?
4      A    I don't -- I believe probably talked to her
5  about what happened and then, I don't know.  I just know
6  after that, I can't really recall how many minutes or
7  whatever.  I waited a while, we talked, I don't know.
8  And then I left that's when I left and went to the
9  store.  I don't even really remember.  I just remember
10 going to the store and coming back.  And then the
11 morning incident happened.  All that other, all the
12 other incidents that happened between that, it's really
13 mind boggling, and I don't really remember it.
14     Q    What does your dad do for a living back in
15 September 1991?
16     A    Worked in construction, H and H, on Kansas.
17     Q    What did he do for them?  Like what type of
18 construction?
19     A    Steel mill.
20     Q    What were his hours?
21          MR. AINSWORTH:  Objection.  Foundation.
22     A    He worked in the morning.  Six to two, maybe,
23 six to three, he worked.
24     Q    6:00 A.M. to 3:00 P.M.?
25     A    Yeah.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   Q   You know what day of the week this was that
2   the shooting happened?
3   A   No, I don't remember.
4   Q   Know if it's a weekday or weekend?
5   A   I don't remember.
6   Q   All right.  Did you ever have a confrontation
7   with anybody in the alley?
8   A   Not that I can remember.
9       MR. AINSWORTH:  Objection.  Foundation.
10  A   No.
11  Q   That night at any point, did you ever have a
12  confrontation of any sort with anybody in the alley
13  behind your house?
14  A   I don't remember.  No.
15  Q   Is that something, if it did happen, you think
16  you would remember?
17      MR. AINSWORTH:  Objection.  Calls for
18  speculation.
19  A   I believe if it would, I would have remembered
20  it.  I don't remember.  No.
21  Q   All right.  So you go back in the house, I
22  guess you talk to your sister a little bit, and then
23  what happens after that?
24  A   I leave and I go to the store.
25  Q   Okay.  And why did you want to go down to the

1   store?
2   A   I don't remember what I went to go get.  I
3   just went -- I don't remember what I went to go get.
4   Q   Great.  What was the name of the store that
5   you went to?
6   A   I don't know, it was the corner store.  The
7   only store right there.  The only store we went to on
8   the corner of 51st and Racine, northeast corner.  There
9   was no other store around.  Whatever -- the closest
10  store.
11  Q   They sell liquor --
12  A   Yep.
13  Q   -- at that store?  Okay.  Was it, do you
14  remember like what the ethnicity, were, was of the
15  fellows that -- the employees that worked there?
16  A   Arab or Indian maybe?
17  Q   Okay.  Do you know their names?
18  A   No.
19  Q   Do you know if Mr. Jakes ever worked at that
20  store?
21  A   No.
22  Q   No, he didn't, or no, you don't know?
23  A   No, I don't know.
24  Q   All right.  Do you remember what you bought?
25  A   No, I do not.

1   Q   If you bought anything?  Okay.
2   A   Yeah.  That's why I went to the store to get
3   something, but I don't remember what I went to go get.
4   Q   Okay.  You ever seen Gus Robinson at any point
5   that night?
6   A   I don't know no Gus Robinson.
7   Q   Snake.  Do you remember seeing him that night
8   at any point?
9   A   I don't remember.
10  Q   Do you know what kind of car he drives or
11  drove, I should say, then?
12  A   No.
13  Q   Okay.  Did you have a car back in 1991 --
14  September of '91?
15  A   No.
16  Q   All right.  Did your parents have a car?
17  A   Yeah, my dad.
18  Q   What kind of car did he have?
19  A   A Chevy Caprice.
20  Q   What color was it?
21  A   Blue.
22  Q   All right.  Did he drive it to work?
23  A   Yep.
24  Q   All right.  So you go to the corner store.
25  What happens after you get done at the corner store?

1   A   I come walking back to the house and got
2   approached by the two guys to tell me about the guy in
3   the store with the money.
4   Q   Did you see anybody that you knew inside the
5   corner store while you were in there?
6   A   No, I don't remember.
7   Q   Okay.  And these two guys that approached you
8   when you were outside, where exactly, if you can
9   remember, was it or were you at when they approached
10  you?
11  A   In front of the restaurant.
12  Q   Directly in front of it?
13  A   Directly.
14  Q   Okay.  Do you remember there being like a
15  newspaper stand just to the east of the restaurant?
16  A   Yes, I do.
17  Q   Okay.  Do you remember if that newspaper stand
18  was open or closed when you were standing out in front?
19  A   It was closed.  Nighttime -- or leaving, it
20  wasn't morning.  They're only open in the morning.  They
21  was closed.
22  Q   So these two guys that you don't know, come up
23  and ask you to help them rob the guy inside, right?
24  A   Well, they didn't so much ask.  They made a
25  statement of what they was about to do.  So I figured



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  that they was trying to get me to help them. I don't
2  know what their point was. I just knew I had to get
3  away from them.
4      Q  Because you thought that they were about to
5  commit a crime by robbing someone?
6      A  Exactly.
7      Q  All right. Any of them show you a gun or
8  anything like that? Did you see anything like that?
9      A  I don't remember.
10     Q  Okay. And so what, did you tell them like,
11  "No, I'm not going to help you" or did you -- what did
12  you say to them?
13     A  I just said, "Oh, okay." And I took off
14  walking.
15     Q  Westbound down 51st Street, back to your
16  place, right?
17     A  Yep.
18     Q  Okay. And then, you go inside?
19     A  I went through the gangway, when I got to the
20  gateway, the front of the building, I took off running.
21  Ran through the back, ran up the stairs and ran through
22  the -- ran through the gangway. And when I got in my
23  apartment, as I'm coming back towards the front, I hear
24  the gunshots being fired. So I'll say I was in the
25  middle of my apartment coming toward the front of my

1  house. And that's when I said to my sister, "Hey, oh
2  man, they must've just shot this guy." And I explained
3  to her what happened on my way coming in.
4      Q  How many gunshots did you hear?
5      A  I'm not sure.
6      Q  And were they loud?
7      A  Yeah.
8      MR. AINSWORTH: Object to the form of the
9  question.
10     Q  Had you heard gunshots before?
11     A  Yep.
12     Q  Okay. And so this is a sound that you were
13  familiar enough with to be able to identify as those
14  were definitely gunshots that you heard.
15     A  Yep.
16     Q  Okay. Did you hear more than one shot?
17     A  I'm not sure. I heard gunshots. I'm not sure
18  if it was one. If it, if it was one, and it echoed
19  between the buildings from the other -- 1212. I just
20  heard more than one shot.
21     Q  You heard, you heard more than one shot is the
22  bottom line. Fair enough?
23     A  Yeah, yeah.
24     Q  Okay. Did you call the police?
25     A  No.

1      Q  Why not?
2      A  Because I was frantic and by the time we
3  looked out the window, we hear sirens coming and they
4  was there before we knew it.
5      Q  Did you see any emergency -- so you said to
6  Mr. Ainsworth, that you actually looked out and saw the
7  guy kind of half in and half out of his car, right? The
8  victim?
9      A  Right. Yeah.
10     Q  You know what kind of car it was that he was
11  hanging out of?
12     A  A station wagon.
13     Q  And did you stay in that window long enough to
14  see emergency personnel, police, or an ambulance, or
15  anything like that pull up?
16     A  No, I don't remember standing in the window
17  that long. I just remember explaining it to my sister
18  what happened after that, and then it's kind of -- after
19  that, it just really is -- I don't really remember.
20     Q  Did you go back outside at any point after?
21     A  No.
22     Q  You stayed up inside the entire time?
23     A  Yep.
24     Q  Did you ever feel like you should go down and
25  -- well, let me ask you this. Did you know -- I mean,

1  although you left the window, did you have, do you
2  remember thinking that you knew that there were police
3  and what have you outside your house on 51st Street
4  handling this shooting?
5      A  Did I fee -- did I -- did I do what?
6      Q  Were you aware that police eventually did show
7  up on --
8      A  Oh, yeah.
9      Q  -- the scene and that there were police
10  personnel and whatnot outside your house investigating
11  this murder. Right?
12     A  Yep.
13     Q  Okay. Did you ever think to go down and tell
14  them any of the information that you had?
15     A  No.
16     Q  Why?
17     A  Because I didn't know. I didn't know no
18  better for to do that.
19     Q  I don't understand what you mean by that.
20     A  I didn't know. I didn't, I wasn't thinking to
21  go down and say anything to nobody.
22     Q  Were you afraid of something happening to you
23  if you went and talked to the police about what it was
24  that you had see?
25     A  That actually didn't even cross my mind. I



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 just didn't think to go down. I don't know. I just
2 stayed upstairs.
3     Q   I mean, you saw that -- you believed that you
4 talked to the two guys that were involved with shooting
5 the dude who you are seeing from your window, basically
6 dead, hanging out of his car in front of your house.
7 You didn't, you're telling me you didn't think that you
8 should go tell the police what it was that you saw?
9     MR. AINSWORTH: Object to the form of the
10 question.
11     A  No, I did not.
12     Q  And you were able to, and, and you saw them
13 well enough where you were able to give a description of
14 one of those people to your sister that was good enough
15 for her to tell you that it sounded like the person you
16 were describing was Little A, and you didn't think that
17 you should tell the police that?
18     A  No, I did not.
19     MR. AINSWORTH: Object to the form of the
20 question.
21     Q  But after Mr. Jakes gets arrested, and for the
22 next several decades, you will tell -- you -- this is on
23 your mind a ton, and you tell people on a regular basis,
24 this information that you believe. Same information you
25 could have told the police that night, this information

Page 155

1 that you believe proves that he's innocent. I have that
2 right, right?
3     MR. AINSWORTH: Object to the
4 mischaracterization of the witness' statement.
5     Q  Do I have that right?
6     MR. AINSWORTH: And compound. Object to the
7 form.
8     A  I don't know to tell, who to tell.
9     Q  The police that are out in front of your
10 house. How about them?
11     A  Well, no. No, I don't know, I'm a kid. How
12 do I supposed to know to go out there? No, I don't.
13     Q  You're like 16, right?
14     A  Yeah.
15     Q  Okay. Do you have a driver's license?
16     A  I'm not thinking, I'm not, no I'm not, I'm not
17 thinking to go out there and say a word. I don't know.
18     Q  Okay. So I'm what I'm asking is like, were
19 you afraid of something happening to you if people saw
20 you talking to the cops about, "Hey, I saw who shot
21 these guys"?
22     A  I didn't know, I didn't, I didn't think about
23 it, no I didn't.
24     MR. AINSWORTH: So Andrew --
25     A  I didn't go out there, I didn't think to go

Page 156

1 nothing. I just thought I stay my butt in the house.
2 That's the only thing I thought about.
3     Q  Okay.
4     MR. AINSWORTH: And I'll object to asking the
5 same question, but louder. So it's an objection,
6 asked and answered, and you can't raise your voice
7 to the witness in an attempt to get him to say
8 something different.
9     MR. GRILL: We have a lot of witnesses here and
10 I don't think I'm doing anything inappropriate, so
11 -- and I'm not yelling.
12     MR. GIVEN: I disagree with that. I disagree
13 with that characterization, Russell.
14     MR. GRILL: Yeah.
15     MR. AINSWORTH: No, I heard it.
16     MR. GRILL: Okay.
17     MR. GIVEN: I didn't.
18 BY MR. GRILL:
19     Q  All right. How long, if you know, were the
20 police out in front of your house set that morning or
21 that night?
22     A  I don't know.
23     Q  Did you ever see them like set up like the
24 yellow crime scene tape?
25     A  No, I did not. I didn't go back out. I

Page 157

1 didn't go nowhere.
2     Q  Just give me one second here. Let's take a --
3 I'm trying to find this photograph. I want to show you
4 and I lost it. So I don't want to waste -- let's take a
5 two minute break so I can find it and we're not just
6 like burning time here for no reason. So let's go off
7 the record for one minute.
8     COURT REPORTER: Going off the record. The
9 time is 1:05 P.M.
10     (OFF THE RECORD)
11     COURT REPORTER: We are back on the record, the
12 time is 1:ten P.M.
13 BY MR. GRILL:
14     Q  Mr. Chairse, you can hear me and see me,
15 right? Just to be sure.
16     A  Yeah.
17     Q  Okay. Yeah, all right. I'm going to show you
18 a picture and just going to ask you a couple of
19 questions about this picture.
20     MR. GIVEN: And can I, Andrew, before he -- can
21 I just tell you that this is a technical thing and
22 I'm a dinosaur, so I apologize, but just FYI, right
23 as we started, I got a window that came up that said
24 something or another, and one of them said, "Got
25 it." One of the choices was to click on "Got it."

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 Like, oh, this is, this is being recorded.
2     MR. AINSWORTH: Oh, that's, that's me.
3     MR. GRILL: It does that every time we record.
4     MR. GIVEN: And do I -- should I just leave
5 that alone? Or because I clicked "Got it" and then
6 everything froze up again.
7     MR. GRILL: Oh, is it frozen now?
8     COURT REPORTER: Mr. Given, this is the court
9 reporter. Is it--
10     MR. GIVEN: No. Now, now I'm seeing it froze
11 for a while, but now whoever's talking comes up on
12 my screen in live. Like, I can see Victoria nodding
13 slowly at this point.
14     MR. GRILL: Can you see the picture that I'm
15 sharing?
16     MR. GIVEN: I can. I think everything's good
17 again, but do I, when it comes up, when it says,
18 "Got it," do I click it or ignore it?
19     MR. GRILL: Click it.
20     MR. AINSWORTH: That only happens the first
21 time you get into the, just to alert you that you're
22 being recorded.
23     MR. GIVEN: Got it.
24     MR. AINSWORTH: And you can hit "Got it", and
25 then you're done, you're good.

1     MR. GRILL: Got it. No pun intended. Okay.
2 Are we still on the record here?
3     COURT REPORTER: Yes, we are.
4 BY MR. GRILL:
5     Q   Okay. All right, Mr. Chairse, can you see
6 this photograph that I've put on the screen here?
7     A   Yes.
8     Q   Okay. So I'm going to represent to you this
9 is an exhibit actually, that was used, as you can see in
10 the bottom right hand corner during Mr. Jakes' criminal
11 trial. This was a photograph that the police took at
12 the scene once they were there. Okay?
13     A   Okay.
14     Q   I'm going to kind of zoom in here, because I
15 want to know really, if you recog -- see my cursor,
16 these people on the front stoop on the left-hand side?
17     A   Yeah.
18     Q   You recognize any of these people?
19     A   I can't really tell who it is though.
20     Q   Here, let me see if I can get it over a little
21 better. See that? Do you know who any of those people
22 are?
23     A   I can't tell who it is because they heads are
24 turned.
25     Q   Uh-huh. Yeah, no, I know, I was just thinking

1 maybe by you just knowing folks.
2     A   Yeah, I can't tell who it is.
3     Q   Think you might know who it might be?
4     MR. AINSWORTH: Object to the foundation, to
5 the form of the question.
6     A   No.
7     Q   Is this like Annette or Nikki or--
8     A   I can't see the face. The face is blurred.
9 Like she got a hand over her face or something.
10     Q   Do you know any of your neighbors, anything to
11 wear blue slippers like this? These fuzzy ones?
12     A   I don't remember that. I couldn't tell you.
13     Q   Looks like maybe like Sesame Street slippers
14 or something. I don't know. Okay.
15     MR. GIVEN: Hey, Andrew, can you identify that
16 photo for the record or maybe --
17     MR. GRILL: Yeah, this, for whatever reason I
18 grabbed a un-Bates stamped one, but it's regardless
19 if this was absolutely disclosed in this case, it's
20 a Exhibit Number 13 -- People's Exhibit Number 13
21 from the criminal trial. That's the best I can do
22 right now. And I apologize for using an un-Bates
23 stamped one. If it's important, I absolutely can
24 circulate the Bates stamped version of this later.
25     MR. AINSWORTH: I think I have a Bates stamp

1 number.
2     COURT REPORTER: Do you want to -- I'm sorry.
3     MR. GRILL: Oh, you do Russell? Great. If you
4 got it--
5     MR. AINSWORTH: I'll find it, no.
6     MR. GRILL: Okay.
7     COURT REPORTER: Did you want to mark that one
8 as an exhibit, Mr. Grill?
9     MR. GRILL: Sure. We can mark that as an
10 exhibit.
11     (EXHIBIT 4 MARKED FOR IDENTIFICATION)
12     MR. GIVEN: Andrew, sorry, could you put that
13 photo up one more time? And would you mind if I
14 just asked one question while it's up there and
15 we're on it and then I'll shut up later.
16     MR. GRILL: Yep. I'm trying to --
17     THE WITNESS: Yeah, that's back on.
18     MR. GRILL: Hang on a second. There you go.
19 Jeff, can you see it?
20     MR. GIVEN: I can.
21     MR. GRILL: Okay. What was your question?
22     MR. GIVEN: Yeah. Mr. Chairse, can you tell
23 what address that stoop is -- belongs to?
24     THE WITNESS: Where they're sitting at?
25     MR. GIVEN: Correct.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  THE WITNESS:  Yeah.  That's where I live.
2  12ten.
3  MR. AINSWORTH:  And I think that photograph
4  appears at Plaintiff Jakes 5083.  Although that
5  photo is slightly cropped.
6  COURT REPORTER:  I'm sorry, this is the court
7  reporter.  Was that you Mr. Ainsworth or Mr. Grill?
8  MR. AINSWORTH:  It was Russell.
9  BY MR. GRILL:
10  Q   Okay.  So Mr. Given has wisely predicted, in a
11  way, what my next question is going to be.
12  MR. GIVEN:  Sorry, Andrew.
13  Q   That's okay.  I'm going to share another
14  photograph.  This is People's Exhibit 14.  And again, I
15  apologize.  Russell, if you have the Bates stamp on this
16  one too, go ahead and rattle it off.  But here's my
17  question.  Sir, so this is the -- right here on the
18  right, you can see this right, Mr. Chairse?
19  A   Right, yep.
20  Q   On the right, this is the Queen Submarine Shop
21  that, you know, inside of this building is where you saw
22  the victim, right?
23  A   Right.
24  Q   Okay.  And then, there's this gray house here,
25  and then this house right next to it, this two-flat with

1  the three people on the front.  That's your place?
2  That's 12ten, right?
3  A   Right.
4  Q   And then --
5  A   That's 1212.
6  Q   1212.  Right.  Okay.  You see the same three
7  people sitting here?  Unfortunately --
8  A   Right.
9  Q   -- this isn't any better.  But again, you
10  don't recognize these three people right here that are
11  sitting on the stoop of your house, right?
12  A   No.
13  Q   And it looks -- from the last photograph, it
14  looked to me -- well, here.  Let me just bring it up.
15  Last photograph.  I guess we'll go back to Exhibit 1.
16  This -- does this look like -- can you tell the gender
17  of these three people here?
18  A   Female.
19  Q   Uh-huh.  Any of them --
20  A   I can't-
21  Q   -- consistent with --
22  A   I guess those are female house shoes she got
23  on.
24  Q   Uh-huh.  Any of them look like Denise,
25  Annette, or Nikki?

1  A   I can't tell.  I can't really see them.
2  Q   Yeah, no, I know.  But like -- let's say like
3  body type.
4  MR. AINSWORTH:  Object to the form of the
5  question.  Foundation.
6  A   I couldn't tell you.
7  Q   All right.  So, did you know anybody in the
8  neighborhood back in 1991 named Darren?
9  A   I knew -- yeah.  I knew a guy named Darren.
10  Q   Do you know what his last name was?
11  A   No.
12  Q   Okay.  Did he have a nickname?
13  A   Not that I know of.
14  Q   What Darren did you know?  Tell me about him.
15  Back in 1991.
16  A   The Darren I knew stayed on Elizabeth.  He was
17  married to -- I can't think of his lady -- his lady
18  friend name, but he had dogs.  I knew about them.  I
19  didn't -- he moved from -- I think he moved around there
20  from around off 74th and Racine.
21  Q   Okay.
22  A   If I believe.
23  Q   Do you know what he looked like?  I mean,
24  could -- back in 1991?
25  A   Brown skinned guy, a brown-skinned, tall --

1  kind of tall-ish.
2  Q   Okay.  How old was he back then, relative to
3  your age?
4  A   He was older than me.
5  Q   A lot older, like a lot?  Was he like an
6  adult?  Like 30-something, or --
7  A   No, I don't believe he was that old.  He had
8  to be in his twenties, maybe.
9  Q   Okay.  Do you know who he hung out with?
10  A   No, I didn't know his buddies.  His buddies,
11  his friends, who they were, they came from another
12  neighborhood.  They didn't stick around.
13  Q   How do you know that?
14  A   Because when I used to talk to them and I had
15  a dog too, we used to talk about the dogs, but all his
16  friends used to pull up.  They didn't used to stay in
17  the neighborhood, I don't believe.
18  Q   So at any rate, he didn't live far away to
19  your knowledge from where this murder happened, is that
20  fair?
21  A   He stayed on Elizabeth -- the Darren that I
22  know.
23  Q   Yeah.  So then like a block away.
24  A   Yeah.  Yeah.
25  Q   Do you know if Mr. Jakes knew him -- knew the



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  Darren that you're talking about?
2     A   No, not that I know of.
3     Q   Did you know anybody with the last name of
4  Triplet?  Does that name ring a bell?
5     A   No.
6     Q   Did you know anybody nicknamed Troy back in
7  the neighborhood back in 1991?
8     A   No.
9     Q   Okay.
10    A   No.
11    Q   Is there anybody -- know a guy named Ronnie
12 Sloan?  Does that name ring a bell?
13    A   No.
14    Q   All right.  Did you ever see the guy that your
15 sister told you sounded like Little A?  Did you ever see
16 that guy again, maybe over by Sherman Park after this
17 incident?
18    A   No.
19        MR. AINSWORTH:  Objection.  Asked and answered.
20    Q   Did you ever see him anywhere in the
21 neighborhood anywhere?
22        MR. AINSWORTH:  Objection.  Asked and answered.
23    A   No.
24    Q   In any of your conversations -- I guess the
25 two conversations that you've had with Mr. Jakes since

1  he's been out of jail or thereabouts, have you ever
2  talked to him about what it is that you know might be
3  able to help him in his case?
4     A   No.
5     Q   Okay.  And you never talked to him while he
6  was in jail at all in any way?
7     A   No.
8     Q   Okay.
9     A   No.
10    Q   Did Mr. Jakes ever tell you why it is that he
11 thought you had something valuable or something at all,
12 really, to tell his attorneys when he called you a year
13 ago and said, "My attorneys are going to give you a
14 call"?
15        MR. AINSWORTH:  Objection.  Asked and answered.
16    A   Basically, it just was the same thing about
17 what happened about us throwing the bottles and I never
18 saw him again.  So, that was it.
19    Q   Well, if you never saw him again, that's my
20 point.  I mean, how does he know that you have something
21 to say about his innocence if you never saw him after
22 that point?
23        MR. AINSWORTH:  Objection.  Foundation.
24    A   Because he took off and ran.  I know that he
25 took off and ran.

1        MR. GRILL:  Right.  But that was like --
2  awhile before the shooting happened, right?  I mean,
3  it didn't happen --
4        MR. AINSWORTH:  Objection.
5     Q   Well, let me ask you this.  Let's start here
6  since now, you know where I'm going and maybe you can
7  fill in the blanks for me here.
8     Q   How long after that bottle -- well, after you
9  threw the bottle at the car, was it until the gunshot,
10 until you heard the gunshots?
11    A   I don't know how long that was.
12    Q   More than a few minutes, right?
13    A   Yeah, it was more than a few minutes.
14    Q   Because you ran to the out -- well, you ran
15 inside.  He ran west.  You went inside, right?  Then,
16 whatever it was, they threw something in your window.
17 Cleaned up that glass --
18    A   Right.
19    Q   swept it up --
20    A   Right.
21    Q   -- went out to the alley, threw it out, came
22 back in, talked to your sister for a bit, then left out
23 the back, went down the alley to the store.
24    A   Right.
25    Q   Walked all the way down there, did whatever he

1  did in the store, crossed the Street.  Talked to the
2  guys out in front of the sub shop.
3     A   That's when the shooting happened, right after
4  that.
5     Q   Then went -- yeah.  And then went home, and
6  then as you're booking it back through the same alleyway
7  from earlier, that's when you hear the gunshots, right?
8     A   Exactly.
9     Q   So how long do you think it took for all that
10 to happen between the bottle -- kind of listed
11 everything out for you.
12    A   There's no way I could tell you.  I could --
13 that's so long ago, I can't put all of them -- all that
14 timeframe together.
15    Q   Yeah.
16    A   I just --
17        MR. AINSWORTH:  Objection.  Asked and answered.
18    A   I just went to the store.  So I don't know.
19    Q   Yeah.  Because the reason why I'm asking you,
20 and I'm not trying to hide anything from you here, is
21 you have said several times in this deposition that you
22 have information that proves Mr. Jakes couldn't have
23 been involved.  And the story that you've explained to
24 me suggests that -- or doesn't even suggest, you said
25 that after he left you in the alley, you never saw him



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  again, ever. To this day, you've never seen him. So
2  I'm wondering why it is that Mr. -- if you know why, if
3  he's ever told you, why is it -- he thinks that you have
4  information that proves that he wasn't involved.
5          MR. AINSWORTH: Objection. Foundation.
6      Objection. Form. Mischaracterizes the testimony
7      thus far.
8  BY MR. GRILL:
9      Q    Go ahead.
10     A    Well, yeah, he know -- he didn't see me. He
11 know he didn't come back. So of course, I'm going to
12 have some answers for it.
13     Q    Well, how do you know he didn't come back?
14     A    Me and him ran off, and he ran through the
15 alley the same time when I ran in the house. I'm the
16 only witness -- I'm the last person who saw him leave.
17 That's why.
18     Q    Well, you never went back outside, right?
19     A    No.
20     Q    After you heard the gunshots?
21     A    After the shooting? No, I did not go back out
22 after the shooting.
23     Q    Uh-huh
24         THE WITNESS: You clicked me off.
25         MR. AINSWORTH: I did?

1          THE WITNESS: Yeah. Oh, it's back up now.
2          MR. AINSWORTH: Oh. Holy mackerel.
3          MR. GRILL: Tell me when you're back on.
4          THE WITNESS: Yeah, I'm on. I'm on.
5          MR. GRILL: Oh, okay. Good. Okay.
6  BY MR. GRILL:
7      Q    Has Mr. Jakes ever told you in any of your
8  conversations that you've ever had with him since his
9  arrest in this case about anything that happened to him
10 or that he says happened to him while he was at the
11 police station after they picked him up for this murder?
12     A    No, he did not.
13     Q    Do you have any idea of what it is that Mr.
14 Jakes is claiming occurred to him at the police station?
15     A    No.
16     Q    Do you know that from any source whatsoever?
17     A    No.
18     Q    Did Mr. Ainsworth or any of his attorneys ever
19 tell you anything about the allegations Mr. Jakes is
20 making as it pertains to how the police treated him
21 after taking him into custody for this murder?
22     A    No.
23     Q    All right. Did -- do you have any
24 understanding from any source at all about whether Mr.
25 Jakes is even claiming that the police mistreated him?

1      A    No, I do not.
2      Q    Do you have any understanding as to whether
3  Mr. Jakes ever confessed to this murder, to having
4  participated in killing Mr. Garcia, who was the guy you
5  saw with the bag inside the restaurant?
6      A    No, I do not.
7      Q    Okay. What was the streetlights like on 51st
8  Street on this night? Like where were they located?
9          MR. AINSWORTH: Object to the form.
10     Q    Huh?
11     A    Where were who?
12     Q    Where -- were there streetlights on 51st
13 Street on that night in September 1991?
14     A    Yeah, they came on every night around 6:00 or
15 7:00.
16     Q    Were they working that night? If you
17 remember?
18     A    I'd say they were running, yeah.
19     Q    Did you ever see Mr. Jakes just -- I just want
20 to make sure I want to close this off. Did you ever see
21 Mr. Jakes in the alley after you guys threw the bottle
22 and he went west? Did you ever see him again in the
23 alley?
24     A    No.
25     Q    Do you have any idea of -- any belief, I

1  guess, of your own as to where Mr. Jakes might've run to
2  when he headed westbound?
3      A    No, I do not.
4      Q    How much time passed, if you can recall,
5  between you hearing the gunshots and you hearing sirens
6  headed to --
7      A    I don't remember. I don't remember.
8      Q    Was it quick, or was it like a lot of time?
9          MR. AINSWORTH: Object to the form of the
10     question.
11     Q    Did this group of, I guess, Mexican guys that
12 were in the car that you threw a bottle at, did they
13 ever chase you and Mr. Jakes anywhere?
14     A    I just remember the -- from the time when we
15 ran, that's all that I remember.
16     Q    Did they ever chase you all around?
17     A    When their car stopped, that's -- we just took
18 off running.
19     Q    Did they ever chase you like through the
20 alley?
21     A    I would say --
22         MR. AINSWORTH: Object. I'll object.
23     Q    Did they ever chase you all the way down to
24 the street?
25     A    I never went that way.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Did they ever chase --

2    A    I never went nowhere, but in the house.

3    Q    Did they would chase you all the way into

4 Thrift Street?

5    A    Nope, not me.

6    MR. GRILL:  Okay.

7    Q    Did they chase Mr. Jakes to your knowledge

8 that way?

9    A    Not that I know of.

10    Q    Okay.  How long after you got inside was it

11 that you heard the window break?

12    A    I don't remember.

13    Q    Was it quick?

14    A    Not that I remember.  I can't -- I can't

15 remember how long it was.

16    Q    Do you have a recollection of being inside for

17 like a while before the window broke?  Or was it

18 something that you remember kind of happening pretty

19 quickly after you got inside?

20    MR. AINSWORTH:  Objection.  Asked and answered.

21    A    It wasn't too long.  It wasn't -- I don't

22 remember, but I know it wasn't no 30 minutes or so.

23    Q    Yeah.  How many times had Mr. Jakes been

24 inside your the house on the second floor at 1212 --

25 12ten, excuse me, before this incident with the bottle?

1    A    I don't remember.

2    Q    Had he been inside your house before?

3    A    Yeah, he'd been in my house before.

4    Q    Okay.  What about 1212?  Does he ever go over

5 there?  The front house, the one on 51st Street.  Do you

6 know if he ever goes inside that house prior to the this

7 incident?

8    A    I don't -- I'm not sure.  They used to live

9 there, I know that, so of course he'd been over there

10 before.

11    Q    Since Mr. Jakes has been out of prison -- has

12 the family -- if you're aware, have there been

13 discussions in the family about his case?

14    A    No.

15    Q    Okay.  Do you know anything about the efforts

16 that Mr. Jakes went through in order to get his

17 conviction overturned and get out of jail?

18    A    No.

19    Q    Did anybody ever contact you to assist in

20 those efforts to get Mr. Jakes out of jail?

21    A    Not that I remember.

22    Q    So it's fair to say the first time any lawyer

23 ever got ahold of you about this was basically about a

24 year ago.  Is that right?

25    A    I believe so.

1    Q    Okay.  Is it your understanding that Mr.

2 Jakes has known this entire time since his arrest that

3 you had this information that would show that he

4 couldn't have done -- that you've described and talked

5 about to them and showed that he's innocent?

6    MR. AINSWORTH:  Objection.  Foundation.

7    A    I'm not understanding what you're saying.

8    Q    Well, no one's ever contacted you about this

9 case until about a year ago.  Right?

10    A    Right.

11    Q    And it's your -- I understood your testimony

12 today to be that Mr. Jakes knows -- which is why he had

13 his lawyers call you a year ago, that he knows that you

14 have something to offer to this case, that can show that

15 --

16    A    Right.

17    Q    he didn't do this murder, that wasn't --

18 didn't participate in it.  Right?

19    A    Yeah, yeah.

20    Q    And he acknowledged that's information that he

21 had back in 1991 when he was arrested, right?

22    A    Figuring, yeah.

23    Q    Yeah, okay.

24    MR. AINSWORTH:  Objection.  Foundation.

25    Q    And no one's ever contacted you until a year

1 ago to get your story, is that right?

2    A    Right, right.

3    Q    No one ever contacted you as part of this

4 criminal trial to have you testify, right?

5    A    No.

6    Q    And no one contacted you while Mr. Jakes was

7 in prison to even tell you that he was trying to get out

8 of jail, right?

9    A    No.

10    Q    You ever hear the name Detective Ken

11 Boudreaux?  Does that name ring a bell to you for any

12 reason whatsoever?

13    A    Never had no altercations with no police, so

14 no, I never talked to any of them.

15    Q    Yeah, no, I'm not talking about altercations.

16    A    Oh, no.

17    Q    Does that name ring a bell?  You ever hear the

18 name?

19    A    No.

20    Q    Did you ever hear the name Detective Michael

21 Kill?  Does that name ring a bell to you?

22    A    No.

23    Q    Okay.  Do you know a guy named Gerad Irving?

24    A    No.

25    Q    Okay.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   A    Cut off again, but I guess we could keep
2  going.  They blacked out.  They be blacking out on me.
3  And then they freeze on me, too.  Yeah, I know.  This is
4  the second time today.
5       Q    Do you know where the Latin Kings were or were
6  they nearby -- in your neighborhood?
7       A    I'm not sure.
8       Q    I'm talking about back in 1991.  Is that like
9  a gang that was near where you were living on 51st and
10  Racine, essentially?
11      A    I don't know, sir.
12      Q    You know if -- did any of Mr. Jakes' family
13  members that you spoke to, I guess, in the 24 hours
14  following the incident with the bottle and the shooting,
15  did your mom, did Mr. Jakes' -- did your mom, for
16  example, or Jakes' aunt, Jessie Mae, ever tell you that
17  they saw Mr. Jakes at any point prior to the police
18  coming to get him?
19      A    No, I don't remember.
20      Q    Did anybody tell you -- or did you ever talk
21  to Nikia, Denise, or Annette after the bottle incident
22  happened?  Did you ever talk to them that night?
23      A    No.
24      Q    The next 24 hours?
25      A    No.

1       Q    Okay.  Do you have any understanding as to how
2  the police -- and this would be from any source
3  whatsoever, as to how the police came to want to talk to
4  Mr. Jakes about this murder in the day following the
5  shooting?
6       A    No, I do not.
7            MR. GRILL:  All right.  I think we might be
8       almost done.  Let's take a quick break here and then
9       I'll circle back and tell you if that's indeed the
10      case.  So just sit tight for a minute, okay?
11           THE WITNESS:  All right.
12           COURT REPORTER:  We're going off the record.
13      The time is 1:37 P.M.
14           (OFF THE RECORD)
15           COURT REPORTER:  We're back on the record.  The
16      time is 1:43 P.M.
17  BY MR. GRILL:
18      Q    You can hear me, right?
19      A    Yeah.
20      Q    Okay.  All right.  Just a few more topics, or
21  not even topics, questions and then we'll see if we're
22  done.  While this -- back in the 90 -- between, you
23  know, I guess 1991 and thereafter, before Mr. Jakes was
24  tried, I guess years later, did you ever hear at the
25  time of the shooting or afterwards, I should say, that

1  the police were looking for you to speak with you about
2  what it is that you might know about the shooting?
3       A    No.
4       Q    You didn't hear that from anybody?
5       A    No.
6       Q    Okay.  If you had heard that the police were
7  looking for you, would you have spoken with them?
8       A    Well, sure.
9            MR. AINSWORTH:  Objection.  Calls for
10      speculation.
11      Q    Yeah?  Why do you say sure?
12      A    Because why wouldn't I talk to them if they
13  wanted to talk to me?
14      Q    Okay.  Well, because I'm asking because when
15  they were out in front of your house, you didn't talk to
16  him then.  So I'm wondering --
17      A    Yeah.  I mean, I would've talked to them if
18  they want -- if they would've came to talk to me, I
19  would have talked to them.
20      Q    Do you think that they would not have wanted
21  to talk to you the night that the shooting happened when
22  they were out in front of your house investigating it?
23           MR. AINSWORTH:  Object to the form of the
24      question.
25      A    I didn't know no better.  I was young, so I

1  didn't understand.
2       Q    How did you get the nickname quarter pounder?
3  Where did that?  Or a quarter pounder?
4       A    It's a --
5       Q    Is it Quarter Pound or quarter pounder.
6       A    Quarter Pound and Tweety, my twin sister.  I
7  was bigger than her.  She was small.  So my uncle named
8  me Quarter Pound and named her Tweety because she was
9  smaller than me.
10      Q    Right.  Okay.  But -- okay.  I guess I kind of
11  get it, but where does this Quarter Pound come from
12  anything --
13      A    My uncle named me that.  My twin sister is
14  Tweety.  She was smaller than me.  So when we was born,
15  I was bigger than her.  So he was like, "That's Quarter
16  Pound and a little Tweety bird."  That's how we got the
17  names.
18      Q    Okay.
19      A    And that's how we got the name Cleotha and
20  Claudette.  I'm named after my father.  He named both of
21  us.
22      Q    Got it, okay.  Over the years after that night
23  when you last saw Mr. Jakes running west through the
24  alley, did -- between then and now, have you ever seen
25  any media stories about Mr. Jakes' case?


Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    No.

2    Q    Nothing on the television?

3    A    No.

4    Q    Nothing in the newspapers or anything like

5 that?

6    A    No.

7    Q    You ever know if he like -- are you even aware

8 that the media has reported on Mr. Jakes' case?

9    A    No, I did not know.

10    Q    Okay.  You've never done a Google search to

11 look it up or anything like that?

12    A    No, no.

13    Q    Did you ever do any Googling about anything

14 related to this case to get ready for today's

15 deposition?

16    A    No, I did not.

17    Q    You talk to any of Mr. Jakes' friends or

18 family on social media?

19    A    No, I do not.

20    MR. AINSWORTH:  Objection.  Asked and answered.

21    Q    Are you friends with any of them on social

22 media?

23    A    I don't have no social media.

24    Q    At all?

25    A    At all.  I have nothing.

1    Q    Is there a reason why?

2    A    There's -- because of me and my old lady has a

3 feuding problem, so if I ain't got it, I ain't got to

4 worry about fighting with her.

5    Q    Okay.  How long has that been the case, that

6 you haven't had social media?

7    A    Ever since they came out with the first

8 whatever before -- what was it before Facebook?

9 Whatever it was, I had a cousin, they used to meet girls

10 and I said I'll never get it, because it'll be a reason

11 for me to be fighting with my girl, so I never got it.

12    Q    Okay.  Do you have Mr. Jakes' phone number

13 like in your phone?  Like if you need to get ahold of

14 them, you can call him?

15    A    No, I don't have it now.

16    Q    You can get it though.  I imagine.

17    A    Most likely, yeah.

18    Q    I want to list off just a couple of names of

19 some people here.  I'm just going to run through a list.

20 I want you to just kind of answer a couple of questions.

21 Okay?

22    A    That's fine.

23    Q    All right.  Do you know a person named Emma

24 Mitts?

25    A    Yeah.

1    Q    Who do you know Emma Mitts to be?

2    A    Shawn's uncle.  Auntie, I mean.

3    Q    Have you ever met her?

4    A    Yeah, I've met her before.

5    Q    Okay.  When's the last time you think you saw

6 her

7    A    I was a kid.

8    Q    Okay.

9    Q    Do you know what she does for a living now?

10    A    Yeah, she's -- well, she used to be, I don't

11 know if she still is now.

12    Q    Okay.  Do you ever talk to her about Mr.

13 Jakes' case?

14    A    No.

15    Q    Has she ever talked to anybody to your

16 knowledge in your family about Mr. Jakes' case?

17    A    Not that I know of.

18    MR. GRILL:  Okay.

19    Q    Do you know if she was -- where -- did you

20 know where she lived in 1991?

21    A    I always just knew she lived on the west side

22 of Chicago.

23    Q    So not in the same neighborhood where you guys

24 were.

25    A    No.

1    Q    Okay.  Did you see her around at all, around

2 the area of 51st and Racine, you know, in the days

3 following Mr. Jakes' -- in the days following the

4 shooting, specifically?

5    A    No.

6    Q    Okay.  Did you know -- do you know whether she

7 was present when Mr. Jakes was taken into custody in his

8 house?

9    A    No.  I do not know.

10    Q    Do you know a person named Tenille Jones?

11    A    No.

12    Q    Do you know Mindy Gibson?  Do you know who

13 that is?  Actually, I withdraw that one, nevermind.

14 Let's see.

15    Q    Do you know a person named Kurgan Singh?

16    A    No.

17    Q    Andre Green?  Do you know who that is?

18    A    No.

19    Q    Okay.  Tyrone Pitts?  Do you know who that is?

20    A    No.

21    Q    Michael Samson.  Do you know who that is?

22    A    No.

23    Q    So, you testified earlier to me that, you

24 know, after you saw Mr. Jakes run west down the alley,

25 you never saw him again.  So would you agree that it's



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  possible, or it would be fair to say that as far as you
2  know, the two guys that you saw outside the Queen
3  Submarine shop that asked you to help them rob Mr.
4  Garcia, as far as you know, they could have asked Mr.
5  Jakes the same thing?
6       MR. AINSWORTH:  Objection.  Form and
7    foundation.
8    A   No.
9    Q   I mean, you don't know where he went, so how
10 can you say that?
11      MR. AINSWORTH:  Objection.
12   A   Because the seconds for me to run from them to
13 the -- to my house, no one could have not have made it
14 there that fast.
15   Q   That's not what I'm talking about.  Like, you
16 didn't see Mr. Garcia pull up, did you?  To the Queen
17 Sub shop?
18   A   Who was -- Mr. Garcia is the guy that was
19 coming out of the restaurant, right?
20   Q   Yeah, yeah.  The guy that was shot.  You don't
21 know when he got there, right?
22   A   He was coming out of the restaurant.
23   Q   Right.  You don't know when he got to the
24 restaurant, do you?
25   A   No.

1    Q   Okay.  You don't know how long those two guys
2  in front of the restaurant were out there watching him,
3  do you?
4    A   No.
5    Q   Because you went through the alley, right?
6    A   Right.
7    Q   And as far as you -- and you don't know where
8  Mr. Jakes ran off to, other than that he went west down
9  the alley.  Right?
10   A   Right.
11   Q   And it'd be a pretty easy thing to take a left
12 and another left, and then all of a sudden he's running
13 eastbound down 51st Street, back towards the sub shop.
14 It's totally possible, right?
15      MR. AINSWORTH:  Objection.  Calls for
16   speculation.
17   A   I doubt he'd run back that way.  That's where
18 the cars were.
19   Q   But you don't know?
20   A   No.  No.
21      MR. AINSWORTH:  Is there a question -- doesn't
22   know what?  Object to the form of the question.
23   Q   You don't know where he went other than that
24 he went west down the alley, right?
25   A   Right.

1    Q   Okay.  Did you ever know if Mr. Jakes
2  associated with -- in any way with Arnold Day back in
3  1991?
4    A   No.  I don't know who that is.
5    Q   Do you know -- did Mr. Jakes ever tell you
6  that he knew somebody by the name of Arnold Day?
7    A   No.
8    Q   Okay.  Do you know a person named Betty
9  Pulsus?
10   A   Yes.
11   Q   Who's that?
12   A   Jakes' auntie.
13   Q   Did you ever talk to her about this case?
14   A   No.
15   Q   She ever talk to you about this case?
16   A   No.
17   Q   And when's the last time you saw Betty?
18   A   I think two years ago when my cousin passed
19 away.
20   Q   Okay.  And when you saw her, did -- was Mr.
21 Jakes and his case, did it come up in conversation at
22 all?
23   A   No.
24   Q   Okay.  Do you know who Betty works for?
25   A   No.

1    Q   Okay.  Do you know if she works with Emma
2  Mitts?
3    A   No.  I don't know where she works or who she
4  works for.
5    Q   Do you know Rufus Pulsus?
6    A   Yes, that's her husband.
7    Q   Okay.  When is the last time you saw him?
8    A   The same time when I saw Betty.
9    Q   You talked to -- do you know if Rufus was
10 talking about Mr. Jakes' case then?
11   A   No, I never talked to him about it.
12   Q   Do you ever hear him talk about it at all?
13   A   No.
14   Q   Okay.  What about Lueathel Seawood?  Do you
15 know who that is?
16   A   No.
17   Q   Sheryl Johnson, you know who that is?
18   A   No.
19      MR. GRILL:  And for the court reporter,
20   Lueathel is L-U-E-A-T-H-E-L, Seawood S-E-A-W-O-O-D.
21   Sheryl is S-H-E-R-Y-L Johnson.  That's just for the
22   court reporter.
23 BY MR. GRILL:
24   Q   Do you know Antwan Jakes?  Tony Jakes, do you
25 know who that is?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    No.  No.
2    Q    How about Douglas Brown.  Do you know Douglas
3  Brown is?
4    A    Yeah.
5    Q    Who's that?
6    A    That's Rufus' and Betty's son.
7    Q    Okay.  So that'd be one of Mr. Jakes' cousins.
8    A    Yeah.
9    Q    You didn't see him that night in September
10  1991, did you?
11   A    No.
12   Q    Okay.  Nathaniel Jakes Jr.  Do you know who
13  that is?
14   A    Yep.
15   Q    Who's that?
16   A    That's my cousin and his cousin.
17   Q    All right.  Did you see him that night?
18   A    No.
19   Q    Did you ever talk to Nathaniel Jakes Jr. about
20  this case?
21   A    No.
22   Q    Does Nathaniel have a nickname?
23   A    Boom.
24   Q    What's that?  What was -- do you know where he
25  got that nickname from?

1    A    I guess he was bad.  I don't know.  I don't
2  know.
3    Q    Why does it mean that he's that bad?
4    A    He was a baby, so, we called him Boom Boom.
5    Q    Oh, from the time he was a kid you called him
6  Boom Boom.
7    A    Yeah, yeah.
8    Q    Got it.  Okay.  Kind of like Bam Bam, I guess.
9    A    Yeah.
10   Q    All right.  And then Lakeisha Jakes, you know
11  who that is?
12   A    No.
13   Q    Georgia Jakes or Georgia Jakes-Gibbs.  Do you
14  know who that is?
15   A    Yeah.
16   Q    Who's that?
17   A    That's my mom's sister.
18   Q    Your mom's sister?
19   A    That's my mom's sister.
20   Q    Okay.  You ever talk to her about this case?
21   A    No.
22   Q    All right.  Willy Howard.  You know who that
23  is?
24   A    No.
25   Q    Mr. Jakes, when he talked to the police,

1  talked a lot about a guy named Walter Pound.  And he
2  said that he lived at 12ten West 51st Street and he was
3  his cousin.
4    A    12ten?
5         MR. AINSWORTH:  Object to the form of the
6  question.
7    Q    So do you know --
8    A    I don't know --
9         MR. AINSWORTH:  Mischaracterizes the evidence.
10   Q    Okay.  So do you know -- are you sure you
11  don't know anybody by that name?  Walter Pound?
12   A    Walter Pound?
13   Q    Walter Pound.  W-A-L-T-E-R P-O-U-N-D.
14   A    No.
15   Q    Okay.
16   A    He said that's his cousin?
17   Q    Yeah, his cousin that lived at 12ten West 51st
18  Street.  Does that sound right?
19   A    Where they -- yep.  Y'all had to get it
20  misconstrued with Quart Pound.
21   Q    Yeah.  That's what I was thinking.
22   A    I'm the only Pound that's there.
23   Q    Yeah.
24   A    There's no other Pound.
25   Q    That's always kind of been my assumption that

1  he's talking about you.
2    A    Especially I'm wondering why you said Walter.
3  I'm like, "What's Walter?"  No, not no Walter.
4    Q    Yeah, I was kind of thinking he was probably
5  meaning you, right?
6    A    Yeah.  That was that country accent came out
7  when you said Quarter Pound, that's what probably
8  happened.
9    Q    Okay.  That sub shop or whatever, the store
10  that you saw victim in with the black bag, before he got
11  shot?
12   A    Uh-huh.
13   Q    So there's like -- if the signs say it's like
14  chicken and then it's also Queen Submarine.  Is it --
15  When you think back to that place that you've been into
16  a bunch of times, is it like the same shop inside?  Or
17  it two different restaurants?
18   A    No, there's only one.  There's only one
19  restaurant.
20   Q    Right.  Here.  Let me --
21   A    The Queen Submarine place?  Yeah.
22   Q    Yeah.
23   A    Yeah.
24   Q    And it also sells chicken?
25   A    What you mean like chicken?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Chicken, fried chicken?

2    A    Maybe you're thinking about the Harold's that

3 was next door?

4    Q    Was there a Harold's -- was there a Harold's

5 next door?

6    A    Yeah that used to be Harold's, that chicken

7 shack right there, but I'm figuring the Queen Submarine

8 place sold chicken.  I'm not sure what kind of chicken.

9 They sold chicken wings, yeah.

10    Q    Okay.  Or Oliver's Chicken?  I think that's

11 what it changed the name to, is that?

12    A    Yeah.

13    Q    Yeah.  Is it -- was it the Harold's that

14 became an Oliver's?  Was that what it was?

15    A    Yeah, yeah.

16    Q    And was that a different shop?

17    A    Yeah, that was different.  That was not the

18 same place.

19    Q    Where was it relative to the Queen Submarine?

20    A    Where was it?

21    Q    Yeah.

22    A    Is that on the east side to the back.  Closer

23 to the back alley.

24    Q    Is it still on that I guess northwest corner

25 of 51st and Racine?

1    A    Yes.

2    Q    Is it behind the Queen's Submarine?  Is that

3 what you're saying?

4    A    Yeah, it'll be right next door to it but

5 behind it.

6    Q    Okay.  Is it like a separate building or can

7 you go into Queens and also Oliver's?

8    A    Separate building.

9    Q    Separate building?

10    A    Separate building.

11    Q    So let me -- hang on a second.  That's a

12 crumby picture, hang on a minute.  Sorry I lost my place

13 and that's a problem right now, I apologize.

14    Q    Do you know who Lashundra Seals is?

15    A    No.

16    Q    L-A-S-H-U-N-D-R-A?

17    A    No.

18    Q    Vince Smooth, you know who that -- uses that

19 nickname?  I'm guessing that's a nickname.

20    A    No.

21    Q    Tracey Sanders, T-R-A-C-E-Y Sanders.  Do you

22 know that is?

23    A    No.

24    Q    Okay.  Hurrisa Datsun?  H-U-R-R-I-S-A.

25    A    No.

1    MR. GRILL.:  Okay.  I've got no further

2 questions.  Maybe Mr. Ainsworth has got some follow-

3 up for you?

4    MR. GIVEN:  Well --

5    MR. GRILL.:  Or actually -- sorry, Jeff.

6 Maybe Mr. Given has some additional questions for

7 you.

8    MR. GIVEN:  I do.

9        EXAMINATION

10 BY MR. GIVEN:

11    Q    Good aft -- it's now good afternoon, Mr.

12 Chairse.  How are you?

13    A    All right.

14    Q    You need a -- do you need a break.  I

15 shouldn't be very --

16    A    No.  I'm fine.

17    Q    Okay.  I've got a series of questions to ask

18 you.  And I do not mean any disrespect by them at all.

19 I just want to run through with you your history of

20 arrests in your life, starting with your first and going

21 towards your last.  So do you recall when your first --

22 the first time you were arrested?

23    A    Yeah, I was arrested for some marijuana.

24    Q    And when was that?

25    A    I believe it was, I want to say '91, '92 if I

1 can actually remember.

2    Q    Okay.  And was that in Chicago?

3    A    Yes, that was in Chicago.

4    Q    And did you have a lawyer represent you in

5 that arrest?

6    A    A public defender.  Pretty much all my cases I

7 had public defenders.

8    Q    Okay.  And what was the result of that case?

9    A    Probation.

10    Q    So you were -- did you -- were you convicted

11 or did you take a plea?  What happened?

12    A    I took a plea.

13    Q    And how much time did you get?

14    A    I think it was an 18-month probation period.

15    Q    And did you violate probation at all or were

16 you clean on that?

17    A    I wound up making it through the probation.

18    Q    Okay good.  When was the next time you were

19 arrested?

20    A    I had -- in '95 I got locked up for a robbery.

21    Q    And was that in Chicago?

22    A    Yes.

23    Q    CPD arrested you?

24    A    Yes.

25    Q    And you had a public defender?



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    Yes.

2    Q    And what was the result of that case?

3    A    I pleaded out to a six-year sentence.

4    Q    And how much time did you serve?

5    A    A two and a half years. Done three years on
6    parole, completed it.

7    Q    Okay. When was the next time you were
8    arrested?

9    A    Okay that was '95 to '98. And then I think
10   2001, 2002, I had a possession charge. I got sentenced
11   to a year.

12   Q    Was that in Chicago?

13   A    In Chicago.

14   Q    And you had a lawyer for that?

15   A    No.

16   Q    Not even a public defender?

17   A    Well yeah, a public defender.

18   Q    Believe it or not, public defenders are
19   lawyers. And you -- did you plead or did you get --

20   A    Yeah, I pleaded out to that.

21   Q    And how much time did you serve?

22   A    61 days.

23   Q    And then parole or probation?

24   A    Yeah, parole.

25   Q    And you made it through on that one okay?

1    A    Yes.

2    Q    Okay. What was your next arrest?

3    A    OWI, I was -- then all my other cases was here
4    in Iowa, which was OWI and a driving while barred.

5    Q    Were those the same incident or were those two
6    different arrests?

7    A    There's two different arrests.

8    Q    All right. So let's -- let's take them one at
9    a time.

10   A    Okay.

11   Q    OWI --

12   A    This is driving while influenced. Operating
13   while intoxicated.

14   Q    Got it. When was that?

15   A    2007.

16   Q    Did you have a lawyer?

17   A    Um yes.

18   Q    Public defender or private?

19   A    Yeah, public defender.

20   Q    What was the result?

21   A    I wound up getting probation.

22   Q    So did you plead guilty? You're found guilty
23   in some way?

24   A    Pleaded guilty.

25   Q    How long was the probation?

1    A    It was two years.

2    Q    And you made that -- made it through that two
3    years okay?

4    A    No, I wound up catching -- they gave me a
5    possession charge. Well, there was a delivery charge in
6    2000 -- the same year 2007. And I wind up taking it to
7    trial in 2008. I took it to trial, I lost, they charged
8    me with aiding and abetting a delivery sale and gave me
9    ten years.

10   Q    Did you -- I take it you had a lawyer for
11   that?

12   A    Yup.

13   Q    Public defender or private?

14   A    Public defender.

15   Q    And is that what you're currently serving time
16   on?

17   A    No, I'm here for a driving while barred now.

18   Q    Got it, you told me that, I'm sorry. So
19   convicted for ten years, how long did you serve on the
20   delivery charge?

21   A    Ten months and I was out and I was on parole.

22   Q    And then you're driving without, while barred
23   or whatever?

24   A    Yeah.

25   Q    When did that happen?

1    A    I got -- I actually had wind up getting three
2    driving while barreds.

3    Q    Three different arrests?

4    A    Yes.

5    Q    When were those?

6    A    20ten. 20ten, 2013. Actually, it was four,
7    20ten, 2013, 2015, and 2018.

8    Q    Okay. On the 20ten arrests, these are all in
9    Iowa by the way right?

10   A    Yes.

11   Q    And all in Ames or anywhere else?

12   A    Yeah all in Ames. All in Ames.

13   Q    Okay. On the 20ten arrest did you have a
14   lawyer for that?

15   A    Yes.

16   Q    And that was a public defender?

17   A    Public defender. Yeah.

18   Q    And what was--

19   A    All the cases -- all the cases I have public
20   defenders for.

21   Q    Got it. And what was the result of the 20ten
22   arrest?

23   A    I got two years.

24   Q    And how much did -- how much time did you
25   serve?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     A     I believe, I'm not sure.  It's so crazy like
2   ten months.  I believe ten months, each one of them was
3   six months.
4     Q     Got you.  So that probably answers my series
5   of questions, but let me just ask them anyway, in the
6   2013 arrest for driving while barred I assume you had a
7   public defender for that one, right?
8     A     Yeah.
9     Q     And what was the result of that arrest?
10    A     A two-year sentence.
11    Q     And in terms of time served was that the six
12  to ten-month kind of stretch that you were talking
13  about?
14    A     Yeah.
15    Q     Okay.  And then the 2015 arrest for driving
16  while barred, you had a public defender I take it?
17    A     Yes.
18    Q     And what was the result of that arrest?
19    A     A two-year sentence.
20    Q     And time served was six to ten months again?
21    A     Yeah.
22    Q     Okay.  And then the 2018 arrest for driving
23  while barred?
24    A     And the OWI --
25    Q     And --

1     A     And the OWI.
2     Q     Got you.
3     A     And with that I got five years for that.
4     Q     And you had a lawyer for that case?
5     A     Yeah public defender.
6     Q     Right.  And did you plead, or were you
7   convicted?
8     A     No, I pleaded.
9     Q     And I should've asked that for all four of the
10  arrests that you just were telling you about, 2010,
11  2013, 2015 and 2018, you pleaded on all of those?
12    A     Yes.
13    Q     Okay.  And on the driving while barred and OWI
14  in 2018 you got five years?
15    A     Yup.
16    Q     And that's what you're serving time for now as
17  we sit here today?
18    A     No, I'm serving time for just the driving
19  while barred, which I caught.
20    Q     Right.  Okay.
21    A     Which I caught last year.
22    Q     Ah, got it.  So you have a 2020 arrest as
23  well?
24    A     Right.
25    Q     For driving while barred?

1     A     Right.
2     Q     And you had a lawyer for that case?
3     A     Same thing, public defender yep.
4     Q     And you pleaded to that one as well?
5     A     Yes.
6     Q     And how much time did you get on that?
7     A     Two years.
8     Q     I've asked this before, but I think I now have
9   to, that's what you're serving time for currently now?
10    A     Yeah.
11    Q     And when do you get out on that?  It sounds
12  like soon?
13    A     Yeah.  I get ran up for parole next month.
14  God's willing I'll be out in November.
15    Q     Well here's my advice.  You haven't asked for
16  it, don't drive while you're barred.
17    Q     Oh yeah, I got it together.  I know what I
18  owe.  I thought it was a lot more than what it is.
19    Q     Wait, what do you mean?  How much do you owe?
20    A     $1,500.
21    Q     Is that the first time you got hit with a
22  fine?
23    A     No, I always get hit with fines.  That's the
24  increments of everything adding up, which I thought was
25  more.

1     Q     Got it.  So fair to say in all the -- and any
2   other arrests --
3     A     No.
4     Q     -- besides the ones you've told me about?  And
5   fair to say that in all these cases when you had a
6   lawyer representing you, you understood that the lawyer
7   was there to help you in your case right?
8     A     Right.
9     Q     And you knew that telling your lawyer whatever
10  you could to help your case was a good thing right?
11    A     Right.
12    Q     Okay.  Let me ask about your educational
13  history.  You sound like a very -- you're a very well-
14  spoken man.  And you sound very intelligent to me.
15  What's your educational history?
16    A     I graduated from Leo High School on 79th and
17  Morgan.  Off of Morgan rather.
18    Q     Right.  What year?
19    A     '92.
20    Q     Leo, if I remember right, that's a private
21  Catholic school, right?
22    A     Yes.
23    Q     And did you play varsity basketball for Leo?
24  They're a pretty good program.
25    A     Yeah, I played ball.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q    Did you play varsity?

2     A    Yup.

3     Q    All four years?

4     A    Yeah.

5     Q    I'm trying to remember who their star was back

6 then.  They had a guy who went to Northwestern a few

7 years ago.  Who was the star of the team, other than

8 you?  Who was the star?

9     A    There was a guy named Roy.  There was a guy

10 named Roy.  They -- we went all our separate ways.  I

11 wound up going to Tallahassee for junior college for a

12 semester -- for two semesters.  Then I came back.

13     Q    So you went to Tallahassee, is it a community

14 college -- junior college?

15     A    Yes.  Junior college.  Tallahassee Junior

16 College.

17     Q    Did you play ball there?

18     A    No.

19     Q    And you went there, you said for two

20 semesters?

21     A    Yeah.

22     Q    And that I shouldn't assume this.  Is that in

23 Florida?

24     A    Yup.

25     Q    How'd you make it down to Tallahassee junior

1 college?

2     A    Well it was me and one of my cousins -- a good

3 friend.  And we just decided to try to get away, and we

4 took off and went there, and some confusion kicked off

5 and we had to get back because a stray bullet -- a

6 bullet from a party bounced it hit my friend in his leg.

7 So we came back to Chicago.

8     Q    Oh, wow that's unfortunate.  So while you were

9 in Tallahassee Junior College, you -- is it your friend

10 did you say, or your cousin?  I'm sorry.

11     A    It was a friend of mine.

12     Q    Friend of yours.  So while you're in

13 Tallahassee Junior College, your friend caught a stray

14 bullet?

15     A    Yeah.

16     Q    And did they ever figure out what happened

17 with that incident?

18     A    Nope, we don't -- we don't know.  We just, we

19 left.  We never stayed, we didn't stay to try to figure

20 out, because it was something that was going on at

21 another party.  It wasn't with us.  It was something

22 that happened across the way.  And a bullet came across

23 and actually hit him.

24     Q    Got it.  Were you with him when he got hit?

25     A    No.

1     Q    Got you.  So he was at a party, you weren't

2 there.  He gets hit with a stray bullet and then you

3 guys decide to leave Tallahassee right away?  Right

4 after that?

5     A    Well not right after, but when the summer came

6 up we came back and didn't go back.

7     Q    I got you.  What -- to your knowledge was

8 there ever an investigation about what happened?

9     A    No, not that I know of.  I don't know.

10     Q    I got you.  What was your cousin never

11 questioned about what happened to your knowledge?

12     A    No.

13     Q    And I take it --

14     A    Nothing pertaining to the shooting or

15 whatever.

16     Q    And I take it you didn't have any information

17 about your cousin getting shot in Tallahassee, is that

18 right?

19     A    Right.

20     Q    Would it be fair to me to think that if you

21 had any information about your cousin getting shot in

22 Tallahassee, that's the kind of information you would

23 have told the police or somebody about right?

24     MR. AINSWORTH:  Object to the form of the

25 question.

1     A    Possibly.  If they would have came and asked.

2     Q    Well how old were you when you were in

3 Tallahassee?  That's sort of like 18, 19 years old at

4 that point?

5     A    Yeah, we was 18.

6     Q    Yeah.  And you believed at that point that you

7 would only answer questions that might help an

8 investigation about a shooting if somebody came to ask

9 you?  You wouldn't just voluntarily go to someone if you

10 had information?

11     MR. AINSWORTH:  Object to the form of the

12 question.

13     A    Well I couldn't answer that one, because I

14 wasn't there.

15     Q    I understand.  But my question is slightly

16 different, if you had any information, not being there,

17 but if you had information that could help catch whoever

18 shot your cousin, is that the kind of thing you would

19 have gone to someone to tell them about?

20     MR. AINSWORTH:  Object to the form of the

21 question.

22     A    If asked about it.

23     Q    So that's what I'm trying to get to.  So your

24 approach is if somebody asks you, you'll tell them about

25 the information that you have?  But if no one asks you,



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  you'll just keep it to yourself?
2          MR. AINSWORTH:  Object to the form of the
3     question.
4      Q    I'm sorry I didn't hear your answer.
5      A    No, I will not say nothing if it's not nothing
6  pertaining to me.
7      Q    Okay.  After Tallahassee Junior College, any
8  more education?
9      A    No.
10     Q    Take any college classes while you've been in
11 prison?
12     A    No, they don't have any here.  They don't
13 offer any college classes here.
14     Q    Got you.  Are you, when you're not in prison,
15 do you have -- I don't want to run through your entire
16 employment history.  Do you have an occupation or a
17 profession when you're -- I think you said you were a
18 cook?
19     A    Cook at Village Inn.  Yes.
20     Q    Right.  And how long have you been a cook at
21 Village Inn?
22     A    For two years.
23     Q    And prior to that did you have any experience
24 in cooking?
25     A    Yeah, I worked for the Iowa State University,

1  which is in Ames.  I worked at --  I did done multiple
2  things, but I liked the cooking part.
3      Q    Got you.  How long did you work for the
4  Cyclones?
5      A    For a year and a half.
6      Q    From -- do you remember what year?  What time
7  period that was?
8      A    That was the 2013 to '15.
9      Q    And when did you -- how did that employment
10 end?  Was that because you went --
11     A    I caught the OWI, I caught, got the charge.
12     Q    Got you.  Other than the Inn and ISU, any
13 other cooking experience?
14     A    Well different little restaurants.
15     Q    Professional.  Professional experience.  I
16 don't mean cooking at home.
17     A    Right, no, I know what you mean, but I done
18 worked in other little restaurants that's around.
19     Q    I got you.  All right if you can give me about
20 five minutes, I'm probably done with my questions, but
21 if you can give me five minutes, I'd appreciate it.
22     A    Uh-huh.
23     Q    Thank you.
24          COURT REPORTER:  Okay so we're going off the
25     record.  The time is 2:21 P.M.

1          (OFF THE RECORD)
2          MR. GIVEN:  Mr. Chairse, thank you for your
3     time and patience with me I appreciate it.  I have
4     no more questions today.
5          THE WITNESS:  All right thank you.
6               RECROSS EXAMINATION
7  BY MR. GRILL:
8      Q    Mr. Chairse, I just have one last question.
9  The two guys that you saw, you know at the submarine
10 shop who told you about the intended robbery, was one of
11 them Darren?
12          MR. AINSWORTH:  Objection, foundation.
13     A    No.
14     Q    So it wasn't Darren that you saw right?
15     A    Right.
16          MR. GRILL:  I don't have any further questions.
17     Q    What did Darren look like then?
18          MR. AINSWORTH:  Objection.  Asked and answered.
19     A    The Darren that I knew he was brown skinned,
20 wore like a flat top head hairdo, medium built.
21     Q    I want to show you something real quick.  I
22 showed you -- I'm going to show you two pictures real
23 fast, and then I'm done.  I showed you one of these
24 earlier and it was this one.  So can you see this?
25     A    Yeah.

1      Q    Okay.  So this is you know, the night of, okay
2  you see the police tape.  This is State's -- Peoples
3  Exhibit 13.  I forget what the Bates stamp was that
4  Russell read in earlier.  But in any event, right here
5  at the top you see two signs.  You see the Queens
6  Submarine shop sign, you see that?
7      A    Yeah.
8      Q    And then you see this other sign, Oliver's and
9  I think it says Chicken King.  You see that?
10     A    Yep.
11     Q    Okay.  So you were telling me I think earlier
12 that this Oliver's Chicken is a separate business.  It's
13 not part of the Queen Submarine shop, right?
14     A    Correct.
15     Q    Okay.  And this Oliver's, it's around the
16 backside, so I guess around the east side of the
17 building heading north, is that right?
18     A    That's right.
19     Q    Okay.  I'm going to show you another picture
20 here.  And you said this Oliver's Chicken had like it's
21 its own separate entrance and whatnot?
22     A    Yup.
23     Q    Did it have like a window to that you could?
24     A    It's a whole big picture window across the
25 whole front of it.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Is it these windows right here that I'm
2 circling in the front by the Queen's?
3    A    That's a whole -- that's an apartment building
4 with a restaurant on the bottom.  That goes back as far,
5 I don't think they go back as far as my apartment
6 building was, and the other building is -- that's a
7 parking lot next to the paper stand right there.
8    Q    Okay.  So let me show you another picture
9 maybe this will make it a little bit more clear.  Okay.
10 There we go.  So this one is -- Mr. Jakes' attorneys
11 gave us this photograph -- well it's one of a bunch of
12 photographs.  This is the one I want to show you.  Okay,
13 can you see this?
14    A    Right, yeah.
15    Q    Okay.  So this is Plaintiff's Jakes' 8167.  So
16 this is after the fact.  I mean you can see here on the
17 bottom right that there's no newspaper stand, and then
18 the sign for the sub shop's different.  But you agree
19 it's like generally speaking, it's the same building,
20 right?
21    A    The Chicken King is not connected to that
22 building, the chicken place, the chicken -- what's the
23 name?  Oliver's.  It's not connected to this building
24 right here.
25    Q    Okay.

1    A    See that garage?  That garage is right behind
2 the -- if you go back there Queen Submarine, that's
3 behind this building right here with the Submarine shop
4 on it.
5    Q    Yeah, there's an alley between this garage and
6 the back of this building right?  That's the alley?
7    A    Exactly.
8    Q    That's the alley you walk down to go to the
9 store?
10    A    Exactly.
11    Q    Right.  So where was the Oliver's in this
12 picture?  Would it be --
13    A    Further to your right.  Going back that way
14 towards, if you could scroll back, you don't have the
15 picture of the Oliver's, but the Olives is in the same
16 parking lot where this truck is parked at.
17    Q    Okay.  The window that you looked through when
18 you saw the victim, was it these two windows right here?
19    A    Yes, sir.
20    Q    Okay.  So he was inside -- Mr. Garcia, the
21 victim was inside this building right here that's
22 pictured in this exhibit Plaintiff Jakes' 8167, right?
23    A    Yes.
24    Q    Okay.  What was here?
25    A    It used to be a paper stand.

1    Q    Right.  But see this icon it says pizza by the
2 slice and it's got this like frame around it?  What was
3 there?
4    A    That was nothing, that had always been a brick
5 wall.
6    Q    You sure about that?
7    A    That's all I remember.  I just remember a
8 piece of -- a newspaper stand sitting right there.
9    Q    Uh-huh.
10    A    But there never was no entrance or anything
11 right there.
12    Q    Yeah no, I know, was there a there window
13 there?
14    A    No.
15    Q    You sure?
16    A    Not that I can remember.
17    Q    So you don't know or you don't recall for
18 sure?
19    A    I don't recall.
20         MR. AINSWORTH:  Object to the form of the
21 question.
22    Q    Okay.  Just so I'm clear, because you don't
23 have a picture of it.  The chicken, Oliver's Chicken
24 you're saying it was a separate building from what's
25 pictured in this photograph?

1         MR. AINSWORTH:  Question asked and answered.
2    Q    Okay.  Let's see.  Is this a be -- does this
3 help you?  This is Plaintiff Jakes 8168.  Can you tell
4 me where Oliver's Chicken would have been in this
5 photograph?
6    A    It used to sit at the back like right next
7 door, next to this garage right here used to sit right
8 back there.
9    Q    This garage?
10    A    Yep.  It used to sit right here to the right
11 of it.  Where those cars are parked.
12    Q    So it was like right here?
13    A    Yes.
14    Q    Ah, okay.  So it was in this lot.  It's not --
15 it's been torn down I guess basically --
16    A    It's nothing.
17    Q    But it -- in between it would have been in
18 between this garage and I don't know if this house is
19 right on the lot, but basically in this space, in this
20 photograph between these two buildings?
21    A    Exactly.
22    Q    Got it.  Okay.  And you never saw the victim
23 inside Oliver's Chicken, right?
24    A    No.
25    Q    He was always inside Queen Submarine shop.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  And you saw him in between, in Plaintiff Jakes' 8167,
2  you saw him in between, through these windows, right?
3      MR. AINSWORTH:  Objection.  Asked and answered.
4   Q    And this is the sidewalk that at the bottom
5  here, that you were on where these two guys approached
6  you right?
7   A    Yep.  They approached me in the front door
8  right here under the Submarine side.
9   Q    Underneath the submarine shop.  Okay.
10     COURT REPORTER:  Do you want to mark that as,
11  both those two photos as an exhibit?
12     MR. GRILL.:  Yeah, we'll mark them.  So
13  Plaintiff Jakes' 8167 and 8168.
14     (EXHIBIT 5 MARKED FOR IDENTIFICTION)
15     COURT REPORTER:  And the one previously, the
16  one that was more, it wasn't from the side of those
17  women it was like facing them more directly.  Did
18  you want to -- not that one, there was another one
19  where you could see them visually from a different
20  angle.
21     MR. GRILL.:  Yeah no, I'm not going to bother
22  marking it.
23     COURT REPORTER:  Okay, just this one here,
24  which was formerly known as Exhibit 13 and the two
25  other photos, which I will mark as exhibit five?

1      MR. GRILL.:  That's right.
2      COURT REPORTER:  Perfect, thank you sir.
3  BY MR. GRILL:
4   Q    Okay.  All the people -- of all the people
5  that you talked to that night about, or the day after,
6  about this shooting is that I guess, you know the
7  minimum includes your dad, your mom, and Jessie Mae.  Do
8  you know if any of them ever talked to the police?
9   A    No, I don't know.
10  Q    Did you ever ask them at any point if they
11  did?
12  A    No, I did not.
13  Q    Do you know if any of them today, if any of
14  them went to Mr. Jakes' criminal trial or attended it?
15  A    No, I don't know.
16  Q    Okay.  Did Jessie Mae ever encourage you to go
17  tell the police what it was or what it is that you knew
18  from that night?
19  A    No.  I'm pretty sure if she would have, I
20  would have had to go.  But she never talked to me about
21  it.
22     MR. GRILL.:  Okay.  I've got nothing else.
23     MR. AINSWORTH:  I have nothing.
24     MR. GIVEN:  Cleotha, we've finished your
25  deposition.  We just have one last question for you.

1  The court reporter has been recording all the
2  questions that have been asked to you and all the
3  answers that you've given.  And so you have a choice
4  now, you can trust that the court reporter has taken
5  down your testimony accurately and you can choose to
6  waive reading your testimony -- or your deposition
7  transcript.  Or you can reserve the right to read
8  it.  It doesn't matter to us what you choose.  You
9  just have to let us know what you want to do.
10     THE WITNESS:  Wait say that -- I have to read
11  it?
12     MR. GIVEN:  So before your transcript becomes
13  final you have a right to read it for accuracy to --
14  before it's final, or you can trust that the court
15  reporter has recorded your testimony accurately, and
16  then you can waive that right.  It doesn't matter to
17  us what you choose.  You just have to let us know
18  what you'd like to do.
19     THE WITNESS:  I think I'm good.  I'm all right.
20     MR. GIVEN:  All right.  We'll show signature
21  waived.
22     MR. GRILL.:  All right.  Thanks everybody.
23  Thank you, Mr. Chairse.  Good luck after you get
24  paroled, so good luck with you going forward.
25     THE WITNESS:  Thank you.

1      COURT REPORTER:  This concludes the deposition
2  we are going off the record.  The time is 2:37 P.M.
3  Central Standard Time.
4      (DEPOSITION CONCLUDED AT 2:37 P.M.)

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1            CERTIFICATE OF REPORTER

2

3   I do hereby certify that the witness in the foregoing

4   transcript was taken on the date, and at the time and

5   place set out on the stipulation page hereof by me after

6   first being duly sworn to testify the truth, the whole

7   truth, and nothing but the truth; and that the said

8   matter was recorded by me and then reduced to

9   typewritten form under my direction, and constitutes a

10  true record of the transcript as taken, all to the best

11  of my skills and ability. I certify that I am not a

12  relative or employee of either counsel, and that I am in

13  no way interested financially, directly or indirectly,

14  in this action.

15

16

17

18  

19

20

21

22  VICTORIA JADICK,

23  COURT REPORTER / NOTARY

24  COMMISSION EXPIRES ON: 01/28/2023

25  SUBMITTED ON:  09/30/2021

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit 9

```
 1        IN THE UNITED STATES DISTRICT COURT

 2        FOR THE NORTHERN DISTRICT OF ILLINOIS

 3              EASTERN DIVISION

 4            CASE NO. 19-CV-02204

 5

 6           ANTHONY JAKES,

 7              Plaintiff

 8

 9              V.

10

11        KENNETH BOUDREAU, ET AL.

12             Defendants

13

14

15

16

17

18

19

20

21

22

23   DEPONENT:  CLAUDETTE CHAIRSE

24   DATE:     OCTOBER 28, 2021

25   REPORTER:  VICTORIA JADICK
```

Page 2

```
 1          APPEARANCES
 2
 3  ON BEHALF OF THE PLAINTIFF, ANTHONY JAKES:
 4    Heather Lewis Donnell
 5    Loevy & Loevy
 6    311 North Aberdeen Street
 7    Third Floor
 8    Chicago, Illinois 60607
 9    Telephone Nos.: (312) 243-5900
10    E-mail: heather@loevy.com
11    (Appeared via videoconference)
12
13  ON BEHALF OF THE DEFENDANTS, KENNETH BOUDREAU, LOUIS
14  CAESAR, MICHAEL DELACY, KEN BURKE, AND FRED BONKE:
15    Andrew Grill
16    Rock Fusco & Connelly, LLC
17    321 North Clark Street
18    Suite 2200
19    Chicago, Illinois 60654
20    Telephone Nos.: (312) 494-1000
21    E-mail: agrill@rfclaw.com
22    (Appeared via videoconference)
23
24
25
```

Page 3

```
 1        APPEARANCES (CONTINUED)
 2
 3  ON BEHALF OF THE DEFENDANT, THE CITY OF CHICAGO:
 4    Jeffrey Given
 5    The Sotos Law Firm
 6    141 West Jackson Boulevard
 7    Suite 1240A
 8    Chicago, Illinois 60604
 9    Telephone Nos.: (630) 735-3315
10    E-mail: jgiven@jsotoslaw.com
11    (Appeared via videoconference)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              INDEX
 2                        Page
 3  PROCEEDINGS              6
 4  DIRECT EXAMINATION BY MS. DONNELL      8
 5  CROSS EXAMINATION BY MR. GRILL        93
 6
 7            EXHIBITS
 8  Exhibit              Page
 9    1    Photo of the scene        65
10    2    Photo of apartment gangway    73
11    3    Photo of rear building      74
12    4    Photo of the scene facing cars  75
13    5    Photo of rear of apartment 1212  76
14    6    Photo of rear house bates stamped  77
15         005090
16    7    Photo of apartment gangway    65
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1            STIPULATION
 2
 3  The VIDEO deposition of CLAUDETTE CHAIRSE was taken at
 4  KENTUCKIANA COURT REPORTERS, 30 SOUTH WACKER DRIVE, 22ND
 5  FLOOR, CHICAGO, ILLINOIS 60606, via videoconference in
 6  which all participants attended remotely, on THURSDAY
 7  the 28th day of OCTOBER, 2021 at 10:04 a.m. CST; said
 8  deposition was taken pursuant to the FEDERAL Rules of
 9  Civil Procedure.  The oath in this matter was sworn
10  remotely pursuant to FRCP 30.
11
12
13  It is agreed that VICTORIA JADICK, being a Notary Public
14  and Court Reporter for the State of KENTUCKY, may swear
15  the witness and that the reading and signing of the
16  completed transcript by the witness is not waived.
17
18
19
20
21
22
23
24
25
```

Page 6

1          PROCEEDINGS
2
3        COURT REPORTER: We are now on the record. My
4   name is Victoria Jadick. I'm the video technician
5   and court reporter today. Today is the 28th day of
6   October 2021, and the time is 10:05 a.m. Central
7   Standard Time. We're convened by videoconference to
8   take the deposition of Claudette Chairse, in the
9   matter of Anthony Jakes v. Kenneth Boudreau, et.
10  al., pending in the United States District Court for
11  the Northern District of Illinois, Eastern Division,
12  case number 19-CV-02204. Will counsel please state
13  your appearance, how you're attending, and the
14  location you're attending from, starting with
15  plaintiff's counsel?
16       MS. DONNELL: Certainly. Good morning. My
17  name is Heather Lewis Donnell. I represent the
18  plaintiff Anthony Jakes. I am appearing from my
19  home in Chicago, Illinois.
20       MR. GRILL: Okay. I'll go. Andrew Grill. I'm
21  one of the attorneys that represents the individual
22  police officers in this matter. And I'm appearing
23  in Cook County, Illinois.
24       MR. GIVEN: Jeff Given, G-I-V-E-N. I'm
25  appearing by Zoom. I'm in Chicago. I represent the

Page 7

1   City of Chicago.
2        COURT REPORTER: And Ms. Chairse, would you
3   please state your full name for the record?
4        THE WITNESS: My full name is Claudette
5   Chairse, C-H-A-I-R-S-E.
6        COURT REPORTER: Thank you, ma'am. And would
7   you please take your driver's license and hold it up
8   to the camera like so? Pull it back a little bit
9   more, please. Perfect. Thank you, ma'am. You may
10  put that away. Do all parties present agree that
11  the witness is, in fact, Ms. Claudette Chairse?
12       MS. DONNELL: Plaintiff agrees.
13       MR. GRILL: The officers agree.
14       COURT REPORTER: All right. Ms. Chairse, would
15  you please raise your right hand?
16       MS. DONNELL: Hold on just one second. I don't
17  know if Mr. Given had an opportunity to respond on
18  the record.
19       MR. GIVEN: I'm sorry, what?
20       MS. DONNELL: Victoria asked if all parties
21  agreed that the witness is who the witness is after
22  she showed her driver's license. And so Andrew
23  agreed on behalf of his clients and I'm just making
24  sure you do.
25       MR. GIVEN: I have no idea if she is who she

Page 8

1   says, but if she says she is who she is, I fully --
2   I've no reason not to agree to that.
3        COURT REPORTER: Perfect. Right. Ms. Chairse,
4   would you please raise your right hand? Do you
5   solemnly swear or affirm that the testimony you're
6   about to give will be the truth, the whole truth,
7   and nothing but the truth?
8        THE WITNESS: I swear.
9        COURT REPORTER: Thank you, ma'am. Counsel,
10  you may proceed.
11       MS. DONNELL: Thank you. And then Victoria,
12  are you pinning the witness for the video?
13       COURT REPORTER: Got it.
14       MS. DONNELL: Okay. Great. Thank you.
15          DIRECT EXAMINATION
16  BY MS. DONNELL:
17      Q   Okay. Ms. Chairse, can you again please state
18  and spell your name for the record?
19      A   Claudette Chairse. C-L-A-U-D-E-T-T-E.
20  Chairse, C-H-A-I-R-S-E.
21      Q   Thank you, Ms. Chairse. Can you also state
22  your date of birth for the record?
23      A   January the 9th, 1975.
24      Q   And because we're proceeding in the Zoom
25  format, can you identify for us -- you don't have to

Page 9

1   give your actual physical address, but what city and
2   state you are appearing from.
3       A   Ames, Iowa.
4       Q   Thank you. Also, I want to go over just a few
5   housekeeping matters before we get started because like
6   we talked about before, we're doing this on the Zoom
7   format. And so if at any point there is a technological
8   glitch -- sometimes my computer and maybe one of the
9   defendant's counsel's computer -- and you don't hear
10  something we say, please let us know. And I'm happy to
11  restate my question because I want to make sure you can
12  hear it, okay?
13      A   Yes, ma'am.
14      Q   Okay. The same thing is true if you don't
15  understand one of my questions. Please let me know and
16  I'm happy to restate it or state it a different way to
17  make it more clear, okay?
18      A   Okay.
19      Q   And I don't know how long this deposition will
20  go today, but we can take breaks, you know, for lunch or
21  if you need a bathroom break. Just let me know if you
22  need or would like a break and I'm happy to accommodate
23  that. I just ask that you answer any pending question
24  before we go off the record for a break, okay?
25      A   Okay.

Page 10

1    Q   And then can you first just identify -- you're
2  appearing -- we're seeing you on a laptop computer; is
3  that right?
4    A   Yes.
5    Q   And then you're using your phone's audio; is
6  that right?
7    A   Yes.
8    Q   Okay.  And then you do not have access to
9  other technology right now; is that right?  Other than
10  your phone that you're using and the computer you're
11  using?
12    A   Correct.
13    Q   Okay.  Great.  Okay.  We'll get started.  Are
14  you related to Anthony or Shawn Jakes?
15    A   Yes.
16    Q   How --
17    A   Through marriage.
18    Q   Explain how you and Shawn Jakes are related.
19    A   My aunt is married to his uncle.  My mom's
20  sister is married to his mom's brother.
21    Q   Got it.  And what is your mom's sister's name
22  that was married to Shawn Jakes' uncle?
23    A   Georgia Jakes.
24    Q   Okay.  So Georgia Jakes is your mom's sister;
25  is that right?

Page 11

1    A   Yes.
2    Q   And what's your mom's name?
3    A   My mom's name Ruth Chairse.
4    Q   Ruth Chairse.  Okay.  Thank you.  And who was
5  Georgia Jakes married to?
6    A   Nathaniel Jakes.
7    Q   And is Nathaniel Jakes -- is he deceased now?
8    A   Yes.
9    Q   Okay.  Okay.  We're going to get back into
10  that.  So you and -- we'll strike.  You and -- strike
11  that.  You and -- can I call him Shawn or how do you
12  refer to your cousin?
13    A   You could call him Shawn Anthony.
14    Q   Okay.  Shawn Anthony?
15    A   (Inaudible).
16    Q   Growing up, did you call him Shawn, or
17  Anthony, or both?
18    A   Shawn.
19    Q   Okay.  So you and Shawn are cousins; is that
20  right?
21    A   Yes.
22    Q   And are you close in age to Shawn?
23    A   Yes.
24    Q   How many years apart are you?
25    A   I believe I'm -- we either like the same --

Page 12

1  I'm probably a couple of months older or he's probably a
2  year younger.
3    Q   Got it.  And we're going to get more into that
4  later.  But is it fair to say that you knew Shawn before
5  he was arrested and incarcerated for this Garcia murder
6  that the deposition is about today?
7    A   Yes.
8    Q   Okay.  Okay.  Now, you -- right now, you live
9  in Ames, Iowa; is that right?
10    A   Yes.
11    Q   How long have you been living in Iowa?
12    A   I've been living in Iowa since November of
13  2016.
14    Q   Okay.  And are you currently employed,
15  Ms. Chairse?
16    A   Yes.
17    Q   Where are you presently employed?
18    A   At Menards.
19    Q   What position do you have at Menards?
20
21    A   Front end cashier.
22    Q   And I understand you're missing work today so
23  I appreciate that.  And where's that -- what -- let's
24  see.  How long have you been working at the -- as a
25  front end cashier for Menards?

Page 13

1    A   Two years.
2    Q   Did you have employment before that?
3    A   Yes.
4    Q   Where did you work before you worked at
5  Menards?
6    A   At Five Guys Burgers & Fries.
7    Q   And was that also in Iowa?
8    A   Yes.
9    Q   Was your employment in Five Guys in Ames,
10  Iowa?
11    A   Yes.
12    Q   And Menards is also in Ames, Iowa?
13    A   Yes.
14    Q   Okay.  And how long did you work at Five Guys?
15    A   A year-and-a-half.
16    Q   What position -- what was the highest position
17  you had at Five Guys before you moved over to Menards?
18    A   I was the shift manager.
19    Q   Ms. Chairse -- did you graduate from high
20  school?
21    A   No, ma'am.
22    Q   Okay.  Did you ever obtain your GED?
23    A   No, ma'am.
24    Q   Okay.  What's the highest level of grade that
25  you completed?

Page 14

1    A   11th.
2    Q   11th grade.  Okay.  And where did you attend
3  high school?
4    A   Proviso East in Maywood, Illinois.
5    Q   And so you completed the 11th grade at Proviso
6  East in Maywood, Illinois?
7    A   Yes.
8    Q   Okay.  Before your deposition today, did you
9  have an opportunity to meet me?
10   A   Yes.
11   Q   Okay.  And we talked earlier this week; is
12  that right?
13   A   Yes.
14   Q   Okay.  And other than talking to and meeting
15  with me earlier this week, have you talked to any
16  counsel for the defendants before your deposition today,
17  Mr. Grill or Mr. Given?
18   A   No.
19   Q   And did you see any photographs this
20  week before your deposition?
21   A   Yes.
22   Q   And do you remember what some of those
23  photographs were that I showed you?
24   A   It's a photograph of the gangway by our old
25  building on 1210 West 51st Street in Chicago, Illinois

Page 15

1  and the front part of our building with individuals
2  sitting on the porch.
3    Q   Okay.  And I'm going to show you some others
4  later today as well, okay?
5    A   Okay.
6    Q   And other than talking to me this week -- do
7  you remember how many times we talked this week?
8    A   Twice.
9    Q   Okay.  Did you --
10       MR. GRILL:  I did not -- wait Heather.  I did
11  not hear that answer.
12       MS. DONNELL:  Oh, sure.
13   Q   Can you repeat your answer?
14   A   Twice.
15   Q   Okay.  And how -- did we speak by Zoom on one
16  occasion?
17   A   Yes.
18   Q   And then we also spoke by telephone?
19   A   Yes.
20   Q   Okay.  And did you speak with anybody else
21  from our office other than me in preparing for your
22  deposition this week?
23   A   Mort.
24   Q   Okay.  Is that Mort Smith?
25   A   Yes.

Page 16

1    Q   Okay.  Did you see -- other than the
2  photographs I showed you and talking to me and Mort, did
3  you talk to anybody else to prepare for your deposition?
4    A   No.
5    Q   Did you talk to your cousin Shawn Jakes about
6  your deposition?
7    A   No.
8    Q   Okay.  Okay.  I want to go back to Shawn and
9  how you knew him before he was convicted of the Garcia
10  homicide.  So did -- were you -- how would you describe
11  your relationship with Shawn when you were in grade
12  school, before you were teenagers?
13   A   Before we became teenagers, we were close.  We
14  would be at my granny house -- both of my grannies.  My
15  granny on my mom's side, the granny on his mom's side.
16  We would be at our aunt's house, my mom's house --
17   Q   What aunt's house -- I'm sorry to interrupt
18  you.  What aunt's house would you be at when you were in
19  grade school and you and Shawn would be there together?
20   A   My aunt Betty Ruth, my aunt Georgia, my Aunt
21  B, which is Jesse, Georgia, and my aunt Betty Ruth.
22   Q   Are you saying Betty Ruth, R-U-T-H?
23   A   Yes.
24   Q   Betty Ruth.  So you would see -- when you were
25  kids, like, before you became teenagers, you would see

Page 17

1  Shawn and be hanging out at both of your grandmothers'
2  house, your grandma on your mom's side and your
3  grandmother on your dad's side?
4    A   No.  It was Shawn -- it was actually my aunt
5  Jesse's mom.
6    Q   Got it.  Okay.  And then you'd also be with
7  Shawn when you were kids at your aunt Georgia's house?
8    A   Yes.
9    Q   And your aunt Jesse's house?
10   A   Yes.
11   Q   And that she's also known as Aunt B; is that
12  right?
13   A   Yes.
14   Q   And then when you were kids, you also would be
15  together with your cousin Shawn at Betty Ruth's, your
16  aunt Betty Ruth's?
17   A   Yes.  Yes.
18   Q   Did you and Shawn ever attend the same grade
19  school together?
20   A   Yes.  We went to Libby together.
21   Q   Okay.  Were you guys in the -- you and Shawn
22  in the same grade if you remember?
23   A   I think I was a grade ahead of Shawn.
24   Q   Okay.  Oh, and can you remind me what's your
25  birthdate again?

Page 18

1    A   January the 9th, 1975.
2    Q   Got it.
3        COURT REPORTER:  Chairse, do you mind moving
4    the phone a little closer to you?  It's a little
5    difficult to hear you.
6        THE WITNESS:  Okay.
7        COURT REPORTER:  Perfect.  Thank you.
8   BY MS. DONNELL:
9    Q   Thank you.  Do you remember some of the things
10   that you and Shawn used to do as kids together when you
11   were growing up?
12   A   We used to play -- we used to play softball in
13   the -- you know, in the middle of the street by my aunt
14   Betty Ruth's house.  We used to play hide and seek, red
15   light green light, just different little games.  We used
16   to play -- being in the house, we had Atari so we had
17   hand games.  So we've been out playing the hand games.
18   It was just sit around, laugh, eat, go to the -- see who
19   could make it the store the first with all the quarters
20   and --
21   Q   And do you have -- I've got to ask you; do you
22   have any brothers and sisters?  You've got a brother,
23   right?
24   A   Yes.  I have seven -- seven siblings.
25   Q   Okay.  How about -- why don't you tell us who

Page 19

1   your seven siblings are?
2    A   My oldest sibling is Ellen (phonetic).  Then I
3   have a brother -- my oldest brother is Floyd.  Then it's
4   Denise.  Then it's Paula (phonetic), Ledal, Angeline,
5   then Cleotha.
6    Q   And Cleotha is your twin; is that right?
7    A   Yes.
8    Q   Okay.  And does Cleotha have a nickname that
9   he went by back in -- when he was a kid?
10   A   Quarter Pound.
11   Q   Do you know how he got that nickname?
12   A   My Uncle Matt (phonetic) gave him that
13   nickname because he was a chunky one when he was a baby,
14   my uncle say.
15   Q   Cute.  And did you have a nickname that you
16   went by or that people called you back when you were a
17   kid?
18   A   Tweety.
19   Q   Tweety?
20   A   Like Tweety Bird.
21   Q   I was going to ask is that like Tweety Bird?
22   Do you know how you got the nickname Tweety or
23   Tweety Bird?
24   A   My mom say because my hair would never lay
25   down at the top.  So it always stuck up.

Page 20

1    Q   Like a little Tweety Bird top.  Okay.  Got it.
2   What kind of kid was Shawn when he was back in grade
3   school if you remember?
4    A   Just jokefully [sic] --
5        MR. GRILL:  Objection to form.
6    A   Always joked around, played around.  Just real
7   silly.  Tripped over his own shoestrings type of kid.
8    Q   How about as teenagers?  Were you and Shawn --
9   did you still spend time together when you were
10   teenagers?
11   A   We spent time together but it was, like, we
12   wasn't -- because he had, like, his -- he started
13   roaming into his own little crowd.  So it was, like,
14   family functions we'll be more together than just being
15   out and about.  Only time we really hung out when we
16   became teenagers if we was, like, by the house because
17   we stayed right there together.
18   Q   Back in the nine -- early 1990s and 1991,
19   where were you living at that time?
20   A   1210 West 51st Street Chicago, Illinois 60609.
21   Q   Good memory.  Do you -- who did you live at
22   1210 West 51st Street back in September 1991?
23   A   My parents, my brother, and my sister.
24   Q   And so that was Cleotha and which sister?
25   A   Angeline.

Page 21

1    Q   Angeline.  Okay.  And where -- can you
2   describe the building at 1210 West 51st Street?  What
3   kind of -- was it apartment or a two-flat?
4    A   It was a two-flat brick building.
5    Q   And where did your family live?
6    A   The second floor.
7    Q   Did you know who lived on the first floor back
8   in September 1991?
9    A   I think during that time, I think the people
10   that was living down there had moved.  I don't
11   believe -- I can't recall if anyone was staying there at
12   that time.
13   Q   Understood.  And I think you could -- I know
14   that we're asking questions about something that was,
15   like, over 30 years ago -- but just about 30 years ago.
16   So again, it's always to the best of your ability.  And
17   if you don't remember, don't recall, you know, please
18   let us know.  We don't need you to speculate or guess so
19   - okay.  Do you know who owned the building at 1210 West
20   51st Street when you lived there in September 1991 with
21   your brother, and your parents, and your sister?
22   A   My aunt Georgia.
23   Q   Okay.  Do you remember when you moved to 1210
24   West 51st how old you were about?
25   A   We moved there in '87, 1987.

Page 22

1    Q   Okay.  How long did you live at 1210 West
2 51st?
3    A   I'm a say nine years -- ten years because when
4 we moved, I had a daughter.  My daughter is my third
5 child and she was born in '95 so we moved, like, '96.
6    Q   Okay.  And Ms. Chairse, how many children do
7 you have?
8    A   I have six.
9    Q   Six.  Okay.  Congratulations.  And it sounds
10 like your two oldest are boys; is that right?
11    A   Correct.
12    Q   And then you had a daughter in 1995?
13    A   Correct.
14    Q   And then what -- how about your other three
15 kids?  Do you have daughters, or sons, or both?
16    A   Yeah.  I have two more boys and one daughter
17 so I have two girls and four boys.
18    Q   All right.  And do you live with -- do any of
19 your kids live with you now?
20    A   Yes.  My 7 year -- I have a 7-year-old.
21    Q   That's your baby?
22    A   Yes.
23    Q   Okay.  And have you ever been married?
24    A   No.
25    Q   Okay.  So let's go back to -- we were talking

Page 23

1 about the -- living at 1210 West 51st Street.  Back in
2 September 1991, where did Shawn live, if you remember?
3    A   1212 West 51st Street in the back house with
4 my Aunt B.
5    Q   Okay.  And did you ever spend time with Shawn
6 when he was living at the back house at 1212 West 51st
7 Street and your Aunt B?  Did you ever spend time with
8 them there?
9    A   Yes.
10    Q   Okay.  And did Shawn have a bedroom in that
11 rear house?
12    A   Yes.  He was -- it -- he didn't have his own
13 bedroom, but he shared a bedroom.
14    Q   Do you remember who he shared with?
15    A   I think it had to be with my cousin Everett
16 and his brother and Shawn's brother, DJ.  We call him
17 DJ.
18    Q   Is it D as in dog, or B as in boy?  I'm sorry.
19 I couldn't quite hear.
20    A   D as in dog.
21    Q   DJ.  Yeah.  Got it.  Okay.  And other than
22 your house and your Aunt B's house, were there other
23 family members that lived on 51st back in September
24 1991?
25    A   Yeah.  It was, like, the family that we had on

Page 24

1 51st -- besides Shawn and them, it was Annette Little,
2 which is my other cousin -- which is my cousin
3 Sarah (phonetic).  Them is her cousins on her dad --
4 dad's side.  So and that --
5    Q   I'm sorry.  Just -- Annette Little was a
6 cousin you had on --
7    A   Through -- it was through my mom also.
8    Q   Okay.  Anybody else?
9    A   Nope.  That was -- that -- those were the --
10 all.
11    Q   Okay.  Okay.  And do you recall there being a
12 restaurant on the corner of 51st?
13    A   Yes.  It wasn't exactly on the corner because
14 it was, like, a lot that used to have a Harold's Chicken
15 and then it was the restaurant, a house, and then our
16 building.
17    Q   Got it.  Do you remember what the restaurant
18 was called?  Or what you guys referred to it?
19    A   I'm -- thinking back then, it was The
20 Submarine -- The Submarine place or something like that
21 or The Hoagie -- Hoagie.
22    Q   Hoagies?
23    A   Sandwich.
24    Q   Did you ever go into that restaurant to buy
25 anything?

Page 25

1    A   Yes.
2    Q   What'd you used to go there for?
3    A   Their Italian beef.
4    Q   They had good Italian beef?  And did they have
5 sit down or you just walked in and did take out?
6    A   No.  Just take out.  They didn't have the --
7    Q   Was there also a corner store on the corner of
8 51st?
9    A   Yes.
10    Q   And that was 51st and Racine?
11    A   Yes.
12    Q   And what was at the corner -- was that --
13 describe what the corner store was.
14    A   We called it Mom's and Pop's store.
15    Q   Okay.  Why'd you guys call it Mom's and Pop's
16 store?
17    A   Because they owned it so long and -- you know,
18 that's what we'd referred to them as.  Mom and Pop.
19    Q   Okay.  Now, I know you already described for
20 me the family that you had living on 51st.  Did you know
21 your neighbors back in September 1991 that lived on
22 51st?
23        MR. GRILL:  Objection.  Form.
24    A   I knew --
25    Q   You can go ahead.  Ms. Chairse, Mr. Grill or

Page 26

1 Mr. Given from time to time might object to make a
2 record, but you can go ahead after they've made their
3 objection. You can go ahead and answer the question.
4 So the question was: Today, do you remember
5 some of the neighbors and other individuals that were
6 living on 51st with you back in September 1991? Just to
7 be clear, back in September 1991.
8 MR. GRILL: Same objections.
9 Q. You can go ahead.
10 A. Yes. I know the people over the restaurant.
11 Her name was Monique. She was a little -- she was
12 younger than me. Her mom -- I couldn't -- can't
13 remember her mom though. But I remember her name
14 because she used to hang with my niece and my niece had
15 the same name. Then I knew the Gunns. They stayed next
16 door to my aunt because it was, like, my aunt Georgia
17 house, my aunt Jesse's building, and then it was the
18 Gunn's building, which is --
19 Q. And you're saying the Gunns building?
20 A. Yeah. That's was their last name, G-U-N-N.
21 They stayed in the third building. But I -- I can't
22 recall who stayed, like, over next because it started
23 getting tore down, like, right through there.
24 Q. Okay. Other than the Gunns' home, do you
25 remember, as you sit here today, any of the other

Page 27

1 neighbors that you had living on 51st other than your
2 family and the Gunns?
3 A. Like around 51st?
4 Q. No. On 51st. No. I'm saying just on 51st.
5 A. Yeah. I know the -- I knew a lot of people:
6 Browns, the Jacksons, Jug and his mom. Yeah. I knew a
7 lot of people.
8 Q. How would you describe that neighborhood where
9 the people hang out on their front porches, and people
10 knew their neighbors and hung around together?
11 MR. GIVEN: Objection.
12 MR. GRILL: Form.
13 MR. GIVEN: Joined.
14 BY MS. DONNELL:
15 Q. Well -- what was -- describe your neighborhood
16 back in September 1991. What was that area like?
17 A. It was, like -- it was a -- a nice
18 neighborhood because it was, like, you know, the
19 older -- the older crowd and, you know, they see you not
20 at school, they going to make sure you get -- go to
21 school. And -- you know, it was just, like, family-
22 oriented. So it was, like, you know, most of the older
23 people. They did treat us like we were their kids,
24 like, go to school, don't do this, don't do that. We
25 sat around, you know, after school, weekends. We do be

Page 28

1 at the neighborhood -- neighbor's next block -- block
2 down. Or people having parties, we at the parties. We
3 did have something like a -- it was like a -- a skating
4 rink or something like a round where we could go. You
5 know, we had little things -- what we could do without,
6 you know, having to get in any trouble.
7 Q. Was it a neighborhood back in this time frame,
8 in the early 1990s, where -- when the weather was nice,
9 people were hanging out in the front of their homes, and
10 you would have conversations with the people passing by,
11 and that kind of thing?
12 A. Yeah.
13 Q. And -- okay. And at this time, was it also a
14 neighborhood or in an area where there was also some
15 violence as well back in this time frame?
16 A. It was violence, but it wasn't violence where
17 you'd be, like, I ain't going outside, I ain't sitting
18 outside -- I ain't -- you know, every -- every
19 neighborhood had their ups and downs.
20 Q. Yep. So if --
21 A. The neighborhood would have a --
22 Q. -- the -- oh, sorry. Go ahead. I'm sorry, I
23 interrupted you.
24 A. Every neighborhood have a organization that
25 they would call a gang affiliation. So it was, like,

Page 29

1 every -- our neighborhood was like every other
2 neighborhood. We had some violence and we didn't have
3 violence. But it wasn't to the point where we didn't --
4 our parents wouldn't let us go out because it was that
5 bad. Like now, if I come to Illinois now, my baby and
6 grandbabies can't go outside.
7 Q. Uh-huh.
8 A. Like now. Back then, yeah, you could go
9 outside, now you not. So every neighborhood had their
10 ups and downs.
11 Q. Uh-huh. And it sounds like you describe a
12 neighborhood where the older generation shared a
13 mountain -- took responsibility for all the kids. So
14 you could get in trouble for doing wrong because if --
15 your neighbor caught you doing something you weren't
16 supposed to be doing?
17 MR. GRILL: Form. Ma'am --
18 A. Yeah. And your mom --
19 MR. GRILL: Ma'am, I --
20 A. -- and your parents find out.
21 MR. GRILL: Ma'am, just -- when you -- or
22 Heather, maybe you want to tell her just to pause
23 for a second when there's an objection. But the
24 question --
25 MS. DONNELL: Yeah. It's so hard -- I mean,

Page 30

1    the audio is hard.
2        Q   So Ms. Chairse, Mr. Grill's saying that
3    sometimes he's going to object so it's good just to let
4    me finish my question, take a pause, and see if he or
5    Mr. Given's going to object.
6            MS. DONNELL:  But I know it's a little hard
7    because even that one, I didn't -- I couldn't quite
8    hear you, Andrew, until after I was already agreeing
9    so I can read you the question if you want to make
10   sure you get your objection.  I'm happy to do that.
11           MR. GRILL:  Yeah.  My objection is just -- you
12   don't need to redo the question.  Just as a form
13   objection.  And I would just caution you there's
14   been a lot of leading that you're doing.
15           MS. DONNELL:  Fair.
16           MR. GRILL:  So it's all right.  There's nothing
17   major yet, but just try to keep it in mind as we
18   move forward.
19           MS. DONNELL:  Got it.  Thank you.  Okay.
20   BY MS. DONNELL:
21       Q   I'm going to move now.  So first of all, are
22   you okay if we keep going?  I'm going to move now to
23   September 15, 1991, okay?  Ms. Chairse, did you hear me?
24       A   Oh, yes.  I thought you was talking to
25   Mr. Grill.

Page 31

1        Q   Oh, sorry.  It wasn't clear.  Thanks for
2    letting me know.  I was going to ask if you needed a
3    break or if we could just keep going.
4        A   We could keep going.
5        Q   All right.  Great.  Okay.  I'm going to turn
6    your attention now to the night of September 15, 1991.
7    And I'll represent for the record this is the night of
8    the Rafael Garcia homicide.  Ms. Chairse, do you, as you
9    sit here today, have a memory of anything that happened
10   on September 15, 1991?
11       A   Yes.
12       Q   Okay.  And before we get to the evening of
13       September 15, 1991, I want to first ask: Do
14   you have any memory of earlier that day, like, what you
15   did during the morning on September 15th?
16       A   Yes.
17       Q   You do?
18       A   Yes.
19       Q   Okay.  What do you remember doing the morning
20   of September 15th?
21       A   That morning, I was at my sister house.  She
22   stayed on 51st and State Street.
23       Q   Okay.
24       A   So I was at my sister house and my dad picked
25   me up from my sister house at, like, 11:00 because I was

Page 32

1    down there for, like, two days.  So my dad picked me up
2    earlier that day.
3        Q   Okay.  And what do you recall -- you're saying
4    you got picked up around 11:00 in the morning or 11:00
5    in the evening?
6        A   In the morning.
7        Q   Okay.  And what did you do -- and how is it
8    that you have a memory of that morning?  Is there
9    something that stands out to you?
10       A   Yes.  Because it was -- my little -- it was me
11   and my cousin was at my sister house.  And my sister
12   actually moved out the next day from 51st and State
13   Street so that's why my dad came and got me because my
14   sister was moving out.
15       Q   I --
16       A   And I was actually over there helping her get
17   the little things that she had together.  She needed
18   help packing her things up.
19       Q   So because your sister was moving, you have a
20   memory of that -- earlier that day?
21       A   Yeah.
22       Q   Okay.  And do you remember anything else that
23   happened during the afternoon after your dad came to get
24   you around 11:00?
25       A   No.  I just went home and my mom had made us

Page 33

1    clean up because she was -- my mom was leaving -- going
2    to a -- a funeral later on that day.
3        Q   And I know it's been a long time.  So you have
4    an actual memory of your mom making you clean up?
5        A   Yeah.  Because that's the -- I -- that's the
6    day that she was -- she actually went to a funeral that
7    day.
8        Q   Your mom did?
9        A   Yeah.
10       Q   Whose funeral did she go to?
11       A   It was my -- her sister's brother-in-law.
12       Q   Okay.  Do you remember who that -- what's your
13   sister's brother-in-law's name?
14       A   It was my aunt Betty -- my mom oldest sister
15   Aunt Betty.  It was her brother-in-law.
16       Q   I see.  And did you go to that funeral or just
17   your mom?
18       A   No.  Just my mom.
19       Q   Okay.  Okay.  And so you remember being at
20   home.  Do you remember the evening hours -- what you
21   were doing in the evening on September 15, 1991?
22       A   Yeah.  We -- I was sitting on the porch.
23       Q   And when you're saying, "sitting on the
24   porch," where were you sitting -- where does that --
25   where's that located?

Page 34

1    A    1210 West 51st Street.
2    Q    Is that a front porch, like, a front stoop?
3    A    Yeah.  A front stoop.
4    Q    Okay.  And how long -- were you outside for a
5    long time that evening or a short time, or do you have
6    any recollection as you sit here today?  It's a long
7    time ago, so
8    A    I don't have a recollection of how long I was
9    out there.
10    Q    Okay.  Do you remember who you were on the
11    porch with on the evening of September 15, 1991?  And
12    let's go now to, you know, the evening hours before --
13    you know, shortly before the murder occurred.  Were you
14    outside on the front stoop of 51st Street at that time?
15    A    You said what?  I didn't -- I didn't
16    understand your question.
17        MR. GRILL:  Object to the form of the question.
18    Q    Sorry.  I'll restate it.  Before -- do you
19    remember about what time you and -- we'll strike that.
20    Who were you on the front stoop of 1210 West 51st Street
21    in the evening hours of September 15th?
22    A    Me, my twin Cleotha, and Shawn.
23    Q    Okay.  And do you remember what you guys were
24    doing -- you, and Cleotha, and Shawn on the front stoop
25    at 1210 West 51st Street?

Page 35

1    A    We was out there acting silly, being kids.  And
2    it was Hispanic Heritage Month if I'm not mistaken.  And
3    we was, like -- I don't know who stated it or however,
4    but it was, like, the next car come pass with a flag and
5    we'd go -- just go -- go throw a bottle at it or the
6    bottle, the brick -- whatever it was, we threw.  I don't
7    recall who threw it but when the -- they came, they
8    threw it.  We seen the car stop so we ran.
9    Q    And I'll just pause right there.  It sounds
10    like you -- in the evening hours, you were with Shawn
11    and Cleotha, your brother, on the front stoop at 1210
12    West 51st Street.  And you recall it being like a
13    Hispanic Heritage Month and so cars are driving by with
14    flags and -- is that right?
15    A    Yes.
16    Q    And then you don't know whose idea it was, but
17    somebody of the three of you had the idea of the next
18    car that came by with a flag to throw a bottle or -- a
19    brick or a bottle at it; is that right?
20        MR. GRILL:  Hey.  There's a -- this is --
21    there's a lot of leading so form.
22        MS. DONNELL:  Okay.  And I'm just making sure I
23    got it because it's a little hard to hear so -- and
24    then --
25        MR. GRILL:  Yeah.  But -- then ask her to

Page 36

1    restate it instead of you testifying for her.
2        MS. DONNELL:  Okay.  Well, let's see if we can
3    get it.
4    BY MS. DONNELL:
5    Q    So Ms. Chairse, did -- do you remember what
6    the car looked like that you guys ended up throwing a
7    bottle at?
8    A    No.  I can't recall what the car, the color,
9    or the make and model, or anything.
10    Q    And I believe you said -- but you could
11    clarify, do you recall who of the three of you threw
12    the object?
13    A    No.  I can't recall which one of us threw it.
14    Q    Okay.  But did the object -- whoever threw the
15    object of the three of you -- did it hit the vehicle?
16    A    No.  It landed, like, by the vehicle.  But
17    they knew that it was -- because it was, like, right by
18    the vehicle.
19    Q    And so you saw the car stop; is that right?
20    A    Yes.
21    Q    Did anybody get out of the car if you recall?
22    A    Not that I can recall because we had started
23    running.
24    Q    Okay.  Did all three of you start running?
25    A    Yes.

Page 37

1    Q    Do you remember where you ran?
2    A    Through the gangway up through the back to my
3    mom -- to our apartment.
4    Q    And when just state "through the gangway,"
5    what gangway are you referring to?  What was it in
6    between?
7    A    It was between 1210 West 51st Street and 1212
8    West 51st Street.
9    Q    Okay.  Do you recall what you were thinking or
10    feeling at that moment when your -- after the car
11    stopped, you started running through the gangway?
12    A    I recall -- it was, like, I was scared because
13    I'm a female.
14    Q    Okay.  Could you see where your brother
15    Cleotha ran?
16    A    He also ran upstairs.
17    Q    And you're saying he ran upstairs; is that
18    right?
19    A    Yes.  Because I was --
20    Q    And where did you -- I'm sorry.  Where did you
21    and Cleotha ran upstairs to?
22    A    Out to the apartment that we lived in at
23    1212 -- 1210 West 51st Street.
24    Q    So you ran from the front of the stoop at 1210
25    in front of your house -- at the front stoop at 1210?

Page 38

1  You ran around the building through the gangway between
2  1210 and 1212 and then up the stairs to your home?
3     A.  Yes.
4     Q.  And you saw your brother running with you; is
5  that right?
6     A.  Yes.
7     Q.  Okay.  Did you see where Shawn ran?
8     A.  Shawn ran through the alley westbound towards
9  Ashland.
10    Q.  Did Shawn run through the gangway with you and
11 Cleotha first?
12    A.  Yes.
13    Q.  Okay.  So all three of us ran through the
14 gangway between 1210 and 1212, right?
15    A.  Yeah.
16    Q.  Okay.  And then once you got to the back you
17 saw Shawn run down the alley; is that right?
18    A.  Yes.
19       MR. GRILL:  Hey.  Again.  Leading.  Form.
20    You're testifying for the witness still.  Please
21    stop.
22       MR. GIVEN:  I join that.
23    Q.  Go ahead, Ms. Chairse.
24    A.  Yes.  All three of us ran through the alley.
25 Of course, I was in the back because I'm the last one to

Page 39

1  get through.  Shawn kept going -- ran through the -- ran
2  right past Aunt B house because she had a house in
3  behind a building.  We didn't have anything behind our
4  building but an open park, like, you could park there.
5  Shawn ran past Aunt B house to the left and ran through
6  the alley towards -- westbound towards Ashland.  Me and
7  Cleotha ran up the back stairs to my mom apartment on
8  the second floor.
9     Q.  Okay.  And after you ran through the gangway,
10 you started running upstairs.  Did you -- you saw Shawn
11 start running westbound down the alley towards Ashland,
12 correct?
13    A.  Yes.  He was right -- he had been -- turned
14 the building -- turned behind Aunt B house.  By the time
15 I made it to the stairs, Shawn was at the end of the
16 house turning so --
17    Q.  Okay.  Did you see him after you observed him
18 turn past his Aunt B's house where he lived?  Did you
19 see him run down the alley, or you just saw the
20 direction he headed and then you went into your house,
21 or did you watch him run down the alley?
22    A.  No.  I did not watch him run down the alley.
23    Q.  Okay.  When you ran through the gangway to the
24 back of your house, did you see anybody in the back of
25 the house, in the back of the alley when you ran back

Page 40

1  there?
2     A.  No.
3     Q.  Okay.  Do you -- so is it fair to say that the
4  only people you recall seeing when you ran back there is
5  you, and Cleotha, and Shawn?
6     A.  Yes.
7     Q.  Okay.  Okay.  So you said that you ran
8  upstairs to your home and that was through the backdoor;
9  is that right?
10    A.  Yeah.
11    Q.  Okay.  And what room does that go into when
12 you enter from the back stairwell in the back of your
13 house at 1210?
14    A.  The kitchen.
15    Q.  Was anybody in the kitchen, if you recall,
16 when you and Cleotha ran in there?
17    A.  No.
18    Q.  Was anybody else at home that you recall as
19 you sit here today?
20    A.  No.  Wasn't no one there but me and Cleotha.
21    Q.  Okay.  Okay.  What do you recall next after
22 you and Cleotha got upstairs to your home?
23    A.  An object came through the window.  I can't
24 say if it was a brick or a bottle, but an object came
25 through the window and broke the -- our -- my mom front

Page 41

1  window.
2     Q.  Where -- did you hear a noise when it
3  happened?
4     A.  Yeah.  We heard it bust through because we --
5  it was, like, we came through the backdoor.  By the time
6  -- it was, like, when you come through backdoor, it's
7  the kitchen.  It has three bedroom, bathroom, another
8  bedroom.  By the time we made it, like, to the stove --
9  by the stove and the bedroom, you hear the glass break
10 and the object came through the front window.
11    Q.  Did you see the object come through?
12    A.  No.  So I don't recall.  I can't -- I didn't
13 see it come through and I can't recall it was a bottle
14 or a brick, but it came through the front window of the
15 apartment.
16    Q.  And when it came through and you heard --
17 well, strike that.  Did you hear the glass shatter if
18 you recall?
19    A.  Yes.
20    Q.  Okay.  Where were you standing when you heard
21 the glass shatter?
22    A.  By the -- the bedroom, the back -- the middle
23 bedroom.  So the middle bedroom is right off the
24 kitchen.
25    Q.  Okay.  So is it --

Page 42

1    A    Coming -- coming towards the front of the
2  house -- the front of the apartment.
3    Q    Thank you for clarifying.  And so the -- and
4  the front of the house faces 51st; is that right?
5    A    Yes.
6    Q    And so in your home at that time when you came
7  in the back entryway, there was the kitchen.  And then I
8  think you said a pantry and a bedroom; is that right?
9    A    Yes -- yes.
10   Q    And so is it -- you're saying you were
11 standing by that bedroom and the pantry just past the
12 kitchen at a --
13   A    No.  It was -- it's actually where you
14 passed -- where you -- it -- where you come through the
15 back door is the kitchen.  It's a pantry, it's a
16 bedroom.  When you come a little further towards the
17 front is the bathroom and the bedroom.  Cattycorner --
18 you know, across from each other.  So it was -- we -- I
19 was by that -- the bathroom and that second room --
20   Q    I see.  So --
21   A    -- coming towards the front room.
22   Q    And just so I make sure it's clear, you had,
23 like, a walkway through your apartment.  And so on one
24 side of that walkway where you were standing, there is a
25 bathroom and then the other side it was a bedroom?

Page 43

1    A    Yes.
2    Q    And that was the -- I'm coming from the back
3  of the house towards the front of the house.  That was
4  the second bedroom or what you called the middle
5  bedroom?
6    A    Yes.
7    Q    Okay.  And it's your testimony that you recall
8  being approximately across in that hallway between the
9  bathroom and the middle bedroom when you heard the
10 noise?
11   A    Yes.
12   Q    Okay.  What did you do when that happened?
13   A    Just was telling my brother, like, oh, we're
14 going to get our tails whooped.  We're getting a
15 whooping.
16   Q    Why did you say to Cleotha that you were
17 worried about getting your -- a whooping?
18   A    Because that window was broken.
19   Q    Did you and Cleotha go to see the window?
20   A    Yes.  We had to go over there because we had
21 to clean -- we cleaned up the glass.
22   Q    Okay.  And at that time -- well, again, can
23 you describe what window was broken?
24   A    It was the middle one.  We had -- it's
25 three -- it was three windows.  Well, you could say four

Page 44

1  but the -- the window that's all by itself was my mom in
2  my mom bedroom.  In the front room, it's the side
3  window, the middle window, side window.  It was the
4  middle window that got busted.
5    Q    And that middle window that got broke, you
6  said that was in your mom's bedroom?
7    A    That was the front room, the -- the living
8  room.
9    Q    Oh, the living room.  Okay.  So the living
10 room window was broken?
11   A    Yeah.
12   Q    Okay.  Okay.  And then -- when you saw that
13 the window was broken, did you look out into 51st Street
14 at that time?
15   A    Yes.  I mean -- because the -- the curtain
16 was, like, moving so we didn't -- I didn't just look out
17 the window but -- you know how'd you just be looking,
18 you know, just looking up -- looking out because we --
19 I -- we was getting the glass up.  But I didn't stand
20 there and just look out the window.
21   Q    How broken was the window if you recall?
22       MR. GRILL:  Objection.  Form.
23   Q    You can answer.
24   A    It was -- was -- it was, like, majority of
25 the -- the whole frame window.  Like -- like the hole

Page 45

1  through the window, like, a nice sized hole through the
2  window.
3    Q    Okay.  And then you said you and Cleotha
4  started to clean up the glass; is that right?
5    A    Yes.
6    Q    Okay.  How long were you upstairs cleaning up
7  the glass?
8    A    I can't recall how long it took us to clean
9  it.
10   Q    Okay.  Did you take the glass back out to the
11 alley or did you stay upstairs?
12       MR. GIVEN:  Objection.  Leading.
13   Q    Oh, you can answer.
14   A    I can't recall if Cleotha took it outside or
15 if he put it in the trash in the kitchen so I can't -- I
16 can't recall that.
17   Q    Okay.  What's the next thing you recall
18 happening?
19   A    We -- I recall me going downstairs, but I
20 wasn't down there very long.
21   Q    And when you say --
22   A    But I do recall --
23   Q    -- downstairs -- I'm sorry.  Did you go
24 downstairs to the other apartment downstairs or
25 downstairs meaning outside?

Page 46

1    A   Outside on the front porch, but I wasn't out
2  there very long.
3    Q   Do you recall, as you sit here today, who else
4  was outside on the front porch when you went back
5  outside?
6    A   No one was on our -- on the -- on our porch.
7    Q   Okay.  So sometime after the window broke, you
8  went back outside to the front porch on 51st; is that
9  right?
10   A   Yes.
11   Q   And do you remember anybody else who was out
12 at that time?
13   A   You referring as to who, like, my --
14   Q   Well, I'm saying, when you went back outside
15 on the front porch, do you remember seeing anybody?  Did
16 you -- was Shawn there, or your brother there, or any of
17 the neighbors there?
18   A   No -- no.  My brother was still upstairs and
19 Shawn then never reappeared back down towards that way.
20   Q   Okay.  Is it your testimony that after you saw
21 Shawn run past his Aunt B's house and turn westbound in
22 the alley, did you ever see him again that night on
23 September 15?
24   A   No.  I didn't see Shawn until the next morning
25 when they was bringing them out at my aunt B's house.

Page 47

1    Q   Okay.  All right.  So after you went back --
2  or you -- I believe I asked you this.  Let me just ask
3  you again.  Do you remember how long you were out on
4  your front porch on 51st Street after the window was
5  broken?
6    A   No.  I can't recall.
7    Q   Okay.  Do you remember what you did after you
8  went to the front porch?
9    A   I returned back upstairs.  And my -- Cleotha
10 was -- said he was going to walk to the store -- to the
11 corner store.
12   Q   And where was the corner store located?
13   A   Like, when you come out of our building --
14 when you come out of 1210, you would take a left and
15 it's, like, you have to cross the lights to get to the
16 corner store.  It was on 51st and Racine so --
17   Q   Okay.  So it's on the other side of Racine?
18   A   Yeah.  On the east side of it, east side of
19 51st.
20   Q   Got it.  Okay.  Did you observe your brother
21 leave the home where you were at?
22   A   Yes.
23   Q   Okay.  And so were you the only one in the
24 apartment still at that time after your brother left to
25 go to the corner store?

Page 48

1    A   Yes.
2    Q   Okay.  Do you remember what you were doing?
3    A   I can't recall.
4    Q   What's the next thing you recall that night of
5  September 15th?
6    A   I recall my brother running through the back
7  door breathing hard and I'm like -- I just, you know,
8  look at him because I'm -- you know, I'm just thinking
9  he just running.  But then he went to describe -- so he
10 wanted to say something and describe someone --
11 something -- you know, describe people to me because he
12 didn't know anyone there -- down there.
13   Q   So first off, do you remember any -- well,
14 first off, when you say your brother didn't know anyone
15 down there, did your brother live with you at 51st?
16   A   Yes.
17   Q   Did he go to school with you?
18   A   No.  He went to --
19   Q   Where did your brother go to school?
20   A   My brother went to St. Charles Lwanga, a
21 Catholic school.
22   Q   Okay.  Did your brother -- during the week,
23 did your brother live at 1210 West 51st Street?
24   A   Yeah.  But he -- at that time we was going to
25 have to so he was going to Leo High School, which is --

Page 49

1  Leo is located -- is Leo located on 79th?  Leo?
2    Q   I don't know.  Sorry.
3    A   Yeah.  He was going to Leo High School at
4  that -- at that present time.
5    Q   Okay.  So what do you recall -- your brother
6  comes in sort of breathing heavy.  Where were you in the
7  apartment when you saw him come in if you recall?
8    A   I had -- I had to be at the kitchen because
9  the conversation when he started -- when he first came
10 through the door, I just turn around because I didn't
11 know if it was him coming through the backdoor.
12   Q   Okay.  And you said your brother seemed like
13 he had been running.  Do you remember anything he
14 described to you?
15   A   He did -- he described -- he was, like,
16 what's -- what's the guy's name with the -- the -- the
17 spot on his face?  And I was, like, Snake?  And it was,
18 like, once he said Snake, by that time -- we walking
19 towards the front because we were, like, by the
20 bathroom.  So by the time I say Snake, we heard
21 gunshots.
22   Q   Okay.  Where were you in your home when you
23 first heard gunshots?
24   A   Like, by the bathroom.  You know, the bathroom
25 is located by the second bedroom so it was, like, in the

Page 50

1   middle. We might as well say in the middle of the
2   apartment.
3       Q   Do you recall how many -- if you heard --
4   well, strike that. How many gunshots did you hear?
5       A   I can't recall how many.
6       Q   Did you hear more than one?
7       A   Yes.
8       Q   So you know, you heard more than one got shot
9   but you don't know how many you heard?
10      A   Correct.
11      Q   Okay. Do you remember where your brother was
12  in the apartment when you heard the gunshots and you
13  were by that bathroom and middle bedroom?
14      A   He was right -- he was right there with me
15  because we were walking towards the front.
16      Q   Okay. Now, did -- when you said -- right
17  before the gunshots happened, you said your brother was
18  describing somebody. Do you remember -- and then did he
19  use the words -- did he identify the person as Snake or
20  is that something you said?
21      A   That's something I said --
22      MR. GIVEN: Objection. Leading.
23      MR. GRILL: Join.
24      Q   Okay. Well, what -- do you remember any of
25  this -- words your brother used?

Page 51

1       A   I didn't -- I didn't hear your question.
2       Q   Oh, thank you. Do you remember any of the
3   words your brother used to describe the individual?
4       A   Yes. He just -- he described them as the
5   person with the -- the birthmark on his face, like, the
6   spot on his face.
7       Q   Okay. And what did you say?
8       A   I was, like, you talking about Snake?
9       Q   And why did you say, "you talking about Snake"
10  after your brother gave you the description of somebody
11  with a birthmark on his face?
12      A   Because that's the only one that be, like, in
13  the area that has a birthmark on his face. That
14  everybody thinks that he actually got burned but it was
15  his birthmark.
16      Q   I see. But you didn't see any of the
17  individuals your brother was describing, right?
18      A   I had seen him earlier that day. I hadn't
19  seen him within a time period of my brother seeing him.
20  I didn't see him that time period of him seeing him, but
21  I've seen him prior to my brother seeing him before
22  then.
23      Q   Okay. I --
24      MR. GRILL: Sorry. Hang on. I was not able to
25  get off mute fast enough and I didn't want to

Page 52

1   interrupt the witness. I had a form.
2   Mischaracterizes her testimony. Objection to your
3   question, Heather, but I just want to put it on the
4   record.
5       MS. DONNELL: Sure. Thanks. I have to say I
6   don't even really remember the question, but okay, I
7   got it.
8       Q   Okay. Ms. Chairse, did your brother say
9   anything else to you that you recall other than what
10  you've already testified to before you heard the
11  gunshots?
12      A   He didn't -- he didn't -- didn't really get
13  out what he wanted to say because of the -- once the
14  gunshots started, it was, like, that's -- you know, we
15  kids so we froze. We just, like -- so he didn't get out
16  exactly how he was -- could have said or what he was
17  about to fully say. But it was -- like, it just end --
18  the conversation ended right there. So after, you
19  know --
20      Q   Do you recall what you were feeling after you
21  heard the gunshots?
22      A   Scared.
23      Q   What did you -- what, if anything, did you say
24  to your brother after you heard the gunshots?
25      A   I -- I can't recall, like, exactly what I

Page 53

1   said.
2       Q   Why were you scared?
3       A   Because I've never been that close to any
4   shots being fired -- that close in my facility.
5       Q   And when you say you've never been that close
6   with a gunshot, how loud were the shots that you could
7   hear from inside your house?
8       A   They was loud because the window was busted so
9   you could hear -- you heard it clearly.
10      Q   Okay. And so you were afraid because that was
11  the closest you had ever been in your life to hearing
12  live gunshots going off?
13      A   Yes.
14      Q   Okay. What do you recall doing when you heard
15  the gunshots and you were in that middle part of your
16  house between the bathroom and the middle bedroom? Did
17  you stay there or did you move?
18      A   We -- we moved. We -- actually we stopped but
19  then we started going after, you know, we started going
20  toward the window, like, I don't know why --
21      Q   When you -- I'm sorry.
22      A   -- I don't know why -- why I was scared but
23  still wanted to go towards the window because -- like,
24  be in the window when they're shooting, but it wasn't a
25  thought at the time. It's just, like, scared but wanted

Page 54

1  to see too.
2  Q   So did -- but you said you stopped first.  Did
3  you -- so you paused and waited for some amount of time
4  and then you went towards the window?
5  A   No.  We -- we didn't -- never stop walking.  We
6  kept going.  Once we heard the gunshot, it was, like, we
7  moved a little faster to get, you know, to the window.
8  Q   What window did you go to in your house?
9  A   The living room window, like, not the -- not
10  the broken window, but to the -- it was the smaller
11  window on the side that you -- you know, it's right
12  there by the balcony.  It was the one --
13  Q   Now --
14  A   -- right by the balcony --
15  Q   Okay.
16  A   -- but it was also connected -- it was also
17  connected to the front room.
18  Q   So you went to the front living room window,
19  but not the broken living room window; is that right?
20  A   Correct.
21  Q   Do you remember if the lights were on in your
22  house at that time in that front room?
23  A   I can't recall if they were on.
24  Q   And I think you said this was the evening
25  hours.  It was -- was it dark out?

Page 55

1  A   It was -- yeah, it had to be -- yeah, it was
2  dark.  It was night -- because it was night time so it
3  was dark.
4  Q   Okay.  And did -- were there streetlights on
5  your street back in September 1991, if you recall?
6  A   Yeah.  It was pretty bright right there
7  because we had the lights off the restaurant, the lights
8  off the laundromat across the street, the street lights,
9  the lights off the (Inaudible).  So we -- it was pretty
10  bright, like, right there on that -- that corner.
11  Period.
12  Q   Okay.  Did your brother walk with you to that
13  same window?  If you recall.
14  A   I can't recall if he went to the same window,
15  but he did come that way.
16  Q   Okay.
17  A   As I can recall he got in the window.
18  Q   Do you remember looking out the window?
19  A   Yes.
20  Q   Okay.  Can you describe what you saw when you
21  looked out the window?
22  A   Just two young Black fellows, like, they're
23  spurting, like, they running away from the vehicle --
24  Q   What --
25  A   -- running away from a vehicle.  It was a -- a

Page 56

1  brown-beige or beige.  I know it was a station wagon.
2  And I could recall two young Black guys, like,
3  dispersing from the vehicle.
4  Q   Are you able to describe either of those young
5  Black men as you sit here today?
6  A   No.
7  Q   Do you -- can you describe which way they ran
8  if you recall?
9  A   I can't really recall because it was, like,
10  you know, by we having that balcony, you can't see if
11  they run.  If they don't run across the street, you
12  don't know which way they run.
13  Q   Did you -- you're meaning, like, if they don't
14  run -- describe what you mean.
15  A   Towards the -- if -- if they don't run towards
16  the -- it was a laundry mat across the street.  If they
17  don't run southbound from our -- from our -- from by
18  the -- our building or the restaurant, you don't know
19  which way they going over -- they running if they
20  running where.  So once they just spurted from the car,
21  it was -- like, they just ran from the car.
22  Q   Do you recall any of the clothes they were
23  wearing as you -- today?
24  A   No.
25  Q   Do you recall heights of either of the

Page 57

1  individuals you saw?
2  A   I know -- I can't describe the exact height,
3  but I know they wasn't, like, the same height.  It was,
4  like, one was shorter than the other one, but I know it
5  was two, you know -- two young Black guys.  I don't --
6  can't say what they were wearing or who exactly -- who
7  they were.
8  Q   Okay.  And you said you saw that -- if you
9  recall, how long after you heard the shots did you get
10  to the window and look out and see what you've just
11  described?  Can you tell us how much time had elapsed or
12  got to the -- yes.  Let me try that again.  The -- kind
13  of a weird question but can you -- if you recall --
14  well, strike that.  Do you recall how much time elapsed
15  from when you first heard the gunshots to when you were
16  looking out that living room window?
17  A   I can't say exactly how many seconds or
18  whatever it was, but it wasn't too -- too much after
19  long, you know, because I'd -- I'd seen the people
20  dispersing.  You know, like, they wasn't in the car, but
21  it was, like, they was just coming off of the car.
22  Q   Okay.
23  A   Like, if you lean on someone's car, like --
24  and they was, like, they was dispersing from the car.
25  Q   But to be clear, you didn't see any shots get

Page 58

1  fired because when the shots were fired you were back --
2      A. No. I didn't -- I didn't see anyone shoot --
3      Q. Okay.
4      A. -- because I was, like, towards the back of
5  the house so I didn't see any shooting. I just heard
6  the shot -- shooting.
7      Q. Okay. How long did you -- what happened --
8  let's see. What else did you observe when you were
9  looking out the window after you saw two young Black men
10 and they ran but you couldn't see where -- the direction
11 they ran? Did you keep -- continue to look out the
12 window?
13     A. Yeah. Now, it was, like the -- the person
14 that had got shot in the vehicle, he -- it was, like,
15 he -- his car was, like, trying to move, but then it
16 just automatically -- it just stop. Like, it -- you
17 know, like, it turned over and just stop. And then it
18 was, like, after that --
19     Q. Did you see the vehicle -- I'm sorry. Go
20 ahead.
21     A. And it was like, after that, you know, it was
22 just, like, the -- the man -- the man -- then, you know,
23 you could hear, like, the horn, like, he had leaned
24 over. Like, you could -- he had leaned over, like --
25     Q. It sounds like you could hear a horn, but

Page 59

1  could you actually see inside the vehicle?
2      A. No. Not from upstairs.
3      Q. Okay. So you're saying you heard a -- did
4  you -- you heard a horn, but you're just -- you couldn't
5  actually see what was happening inside the car, correct?
6      A. Correct.
7      Q. Okay. Could you see -- well, what else do you
8  recall seeing?
9      A. Just the vehicle, like, it was trying to pull
10 out. Once it land -- once it stopped, it was, like, it
11 just stopped, like, in the side where you, like --
12 like --
13     Q. So you -- oh, go ahead.
14     A. -- he's lost control of the -- you know, lost
15 control of the steering wheel just, like --
16     Q. What else -- so you saw the car move and then
17 stop; is that right?
18     A. Correct. Like, he was trying to pull off, but
19 it didn't. You know, once he got shot at, it probably
20 just shocked him and he just stopped his vehicle. Like,
21 he couldn't brake --
22     Q. Yeah.
23     A. -- he couldn't hit the gas.
24     Q. And again, we don't want you to speculate
25 because you weren't inside the car and you can -- so

Page 60

1  again, just -- I wanted to know just the things you
2  could see and hear. So it sounds like you saw the car
3  move and then stop, right?
4      A. Correct.
5      Q. But you could not see anything that was going
6  on inside the car?
7      A. Correct.
8      Q. Okay. And that's because of the angle you
9  were looking out of the window. You couldn't see that
10 perspective?
11     A. Correct.
12     Q. Okay. What do you recall seeing next?
13     A. Just the -- all of the lights, the ambulance
14 lights, police lights, and -- because I don't recall
15 seeing anyone else, you know, walking up or -- you know,
16 coming to see what happened, if the man okay. I can't
17 recall seeing anyone doing that. And I -- I didn't come
18 back downstairs because remind you, I'm a minor. So I
19 didn't come back down.
20     Q. You mean you stayed in your apartment the rest
21 of the night?
22     A. The rest of the time that they was out there,
23 you know, in -- investigating the -- the scene and
24     Q. Did you ever talk to any Chicago police
25 officers that night of September 15th?

Page 61

1      A. Nope.
2      Q. Did you ever talk to any police officers
3  investigating that murder on September 16th?
4      A. Nope.
5      Q. Did any detectives from the Chicago Police
6  Department ever talk to you about the incident on
7  September 15th, that murder?
8      A. Nope.
9      Q. And you never went down to the station to give
10 that information?
11     A. No.
12     Q. And why was that? Did you have any
13 information you thought you could give?
14     A. It wasn't that I didn't feel like I didn't
15 have no information to give. It was just -- felt
16 like -- my parents felt like we was minors and we wasn't
17 going to no station. Either you-all -- if they're going
18 to question us, they're going to question us at -- at
19 the home while they're there or -- they couldn't take us
20 to the station to question us. We're minors.
21     Q. Okay. Okay. Did you ever see the victim that
22 night? The man who was shot?
23     A. I've seen him before --
24     Q. I mean, after he was shot. I'm sorry. After
25 he was shot.

Page 62

1    A   No.  No.
2    Q   Okay.  And could you --
3        MR. GRILL:  Was there an -- if she gave an
4    answer to that question, I did not hear it.
5    Q   Sure.  Ms. Chairse, did you see the -- you
6    know, I was talking about what you were seeing when you
7    were looking out the window.  And I think you said you
8    started to hear -- see the lights of either police cars
9    or ambulances; is that right?
10    A   Correct.
11    Q   And my question was: Did you ever see the
12    victim after -- at that time?  Did you ever see the
13    victim after you heard the gunshots?
14    A   No.
15    Q   Did you ever see anybody get out of the
16    vehicle?
17    A   No.  You mean, like, a passenger or anything?
18    Q   Yeah.  Or the victim or the passenger.
19    A   No.
20    Q   Did you ever see any person get out of the
21    car?
22    A   No.
23    Q   Okay.  Do you remember seeing an ambulance
24    arrive?  Were you looking when the ambulance arrived if
25    you recall?

Page 63

1    A   I was -- I just recall the lights.  I can't
2    pinpoint exactly when they came, but I remember seeing
3    the -- the lights of the ambulance, police lights, and
4    Q   But you never recall seeing an individual
5    being put in an ambulance; is that right?
6    A   No.  I can't -- I don't recall that.
7    Q   Okay.  Do you recall seeing any of the police
8    officers doing an investigation?  Did you ever look out
9    during that time?
10    A   No.  Because by then, my mom was home and we
11    was getting fussed at about the window.  So no because
12    we -- we wasn't able to come back towards the front.
13    Q   What's the last thing you remember seeing
14    before your mom got home and you got pulled away from
15    the window?
16    A   The last thing I remember seeing was --
17    because I'm not -- the police did come quickly.  And the
18    last thing I could recall seeing was the vehicle trying
19    to pull off and came to a stop.
20    Q   What --
21    A   That was the last thing I could recall seeing
22    before I seen I -- started seeing the police lights and
23    ambulance and stuff.
24    Q   Do you recall seeing any police on the scene
25    or just the lights?  The last thing you recall seeing is

Page 64

1    lights?
2    A   I don't recall seeing the police on the scene.
3    I can't really recall the scene.
4    Q   Okay.  You said then that you remember your
5    mom came home sometime around this time; is that right?
6    A   Actually, I believe my mom -- if I'm -- I
7    can't really pinpoint, but I -- I know my mom came home
8    and all you could hear is "my window."  She was fussing
9    about our window because that was the first thing she
10    looked at, but I can't recall if -- I think that the
11    incident had happened already after she -- she made it
12    home after the incident.
13    Q   Do you remember --
14    A   The only thing I could hear -- because the
15    window was broken so the only thing I could hear is my
16    mom fussing about our window from downstairs.  So I can
17    recall that because you -- you'll never forget your
18    mom's voice or -- you know, things that happen with your
19    parents.
20    Q   Did you and your brother get in trouble for
21    the window being broken?
22    A   Yes.
23        MS. DONNELL:  Okay.  Okay.  Now, I'm going to
24    shift gears and show you some photographs.  But
25    before I do that -- I mean, I might need a quick,

Page 65

1    like, just a quick five-minute break or three-minute
2    break.  So if it's okay with counsel, maybe we'll go
3    off the record and take just a quick five-minute
4    break.  And then we can come back and continue.
5        MR. GRILL:  It's fine.
6        COURT REPORTER:  We are going off the record.
7    The time is 12:20 -- I'm sorry, 11:20 Central
8    Standard Time.
9        (OFF THE RECORD)
10        COURT REPORTER:  We are back on the record.  The
11    time is 11:30 Central Standard Time.
12    BY MS. DONNELL:
13    Q   Okay.  Ms. Chairse, I'm going to show you some
14    photographs now and see if you recognize anything in the
15    photographs.  And I'm going to do it by sharing my
16    screen.  So you can just let me know if you can see the
17    picture or if you need me to zoom in or zoom out, okay?
18    A   Okay.
19    Q   Okay.  Let's see.  Okay.  I'm showing you
20    what's been previously designated as Exhibit 7.  I'm not
21    sure if that's the best place to -- let's see.  Actually,
22    let's start -- okay.  Let's start with Exhibit 1.  So
23    I'm showing you something what I previously marked as
24    Exhibit 1.  Ms. Chairse, do you recognize the buildings
25    that are depicted in Exhibit 1?

Page 66

1    (EXHIBIT 1 MARKED FOR IDENTIFICATION)
2    MS. DONNELL:  And I'm sorry.  For the record,
3  Exhibit 1 has the Bates stamp Plaintiff Jakes
4  005079.
5    Q   Okay.  Ms. Chairse, do you recognize any of
6  the buildings that are depicted in the photograph I've
7  identified as Exhibit 1 to your deposition?
8    A   Yes.
9    Q   Okay.  Let's start with the -- I don't know if
10  you can see my -- actually, I can find, like, a
11  highlighter, a pink highlighter.  Do you see the
12  building that I've just circled in pink highlighting?  It
13  says, "Maxwell Street Polish," and then there's a yellow
14  sign -- awning sign?
15    A   Yes.
16    Q   Okay.  What is the -- can you describe for me
17  the building that I've circled in pink highlighter right
18  now?
19    A   That's the restaurant with the apartment
20  upstairs.
21    Q   And is that -- you said Monique lived
22  upstairs?
23    A   Apartment.  It's one apartment upstairs --
24    Q   Okay.
25    A   -- on that restaurant.

Page 67

1    Q   And I'm sorry, can you remind me who used to
2  live up there at September 1991, if you recall?
3    A   I can't hear you.
4    Q   Oh, I'm sorry.  Do you recall who lived in the
5  upstairs apartment above this submarine shop in
6  September 1991?
7    A   Her daughter's name was Monique.  I can't
8  recall the mom or -- the mom or the grandmom that she
9  stayed with.  I can't remember her name, but I remember
10  the little girl's name.  Mon -- her name was Monique.
11    Q   Okay.  Thank you.  And are you able to read
12  the sign that gives the restaurant's name that's on the
13  sign?
14    A   I can't -- I can't really see the yellow sign.
15    Q   Okay.  If I said Queen Submarine --
16    A   Is it Queen Submarine?
17    Q   Yeah.  Does that ring a bell to you, Queen
18  Submarine?
19    A   Yeah.
20    Q   Did you guys have a name for that -- a
21  nickname or a name for that store?
22    A   We used to call it The Last Resort because it
23  used to be, like, that'll be the last -- if that's the
24  only restaurant open, that's where they're eating.
25    Q   Got it.  Okay.  I'm going to circle another

Page 68

1  building.  I'm circling this gray home just -- and in
2  which direction is this heading down 51st Street?
3    A   West.
4    Q   West?  Okay.  So the next house west to the
5  Queen Submarine shop.  Do you know what this building
6  was back in September 1991?
7    A   A single family home.
8    Q   Do you know who lived there back in September
9  1991?
10    A   No.  Can't recall.
11    Q   Do you know who owned that home if you knew?
12    A   No.
13    Q   Okay.  All right.  I'm going to circle the
14  next house, the two flats here in pink highlighting.  And
15  that would be the -- again, we're heading -- is it west?
16    A   Yes.  West.
17    Q   Okay.  And this down 51st Street, right?
18    A   Yes.
19    Q   Okay.  Do you recognize this home?
20    A   Yes.
21    Q   Okay.  Describe what is it.
22    A   A two-flat building.  That's 1210, that's
23  where we lived.
24    Q   And so the second story apartment at
25  1210 West 51st that I'm circling with a smaller circle,

Page 69

1  that was your home back in September 1991?
2    A   Yes.
3    Q   Okay.  Can you tell me those three windows up
4  top of the window furthest to the west that I'm circling
5  now with my pink highlighter -- what window was that in
6  your home?
7    A   That was the living room -- the living room
8  window.
9    Q   Okay.  Is that the window that was broken that
10  night?
11    A   Yes.
12    Q   Does it -- I'm going to zoom in here.  Does
13  it -- can you see the window being actually broken?
14    A   If I'm not mistaken, it's broken right there.
15  I'm not sure though.
16    Q   Okay.
17    A   But it's, like, right in the -- look like it's
18  right there by the corner --
19    Q   You see I drew a smaller circle here.  Does
20  that refresh your recollection of where the window was
21  broken?
22    A   Yeah.
23    Q   And that was the bottom pane of the --
24    A   The bottom pane --
25    Q   -- living room window to the furthest to the

Page 70

1 west?
2   A   Yes.
3   Q   How about this middle window?  Do you know
4 what room did that go to?
5   A   That also went to the living room.
6   Q   And is that the window that you looked out of
7 after you heard the gunshot?
8   A   Yes.
9   Q   Okay.  And then this third window, closest
10 to --
11   A   My mom --
12   Q   -- 1210, what room was that in?
13   A   My mom bedroom.
14   Q   Okay.  I'm going to -- do you see there's some
15 individuals here?  If I scroll up, can you see that
16 there's three -- it looks like three individuals sitting
17 on the front of 1210 West 51st Street?
18   A   Yes.
19   Q   And I'm going to just going to zoom a little
20 bit and ask you if you can identify any of them.  You
21 let me know if you can still see the individual.  Oops,
22 sorry.  I don't know if I can move -- sorry.  Can you
23 see any -- all right.  Can you identify any of the
24 individuals depicted here that I've zoomed in on?
25   A   No.  It's -- it's blurry so I can't see

Page 71

1 exactly who it is.
2   Q   Okay.  When you testified earlier today that
3 you were on your front porch or front stoop, is that
4 this area (indicating) where these three individuals are
5 sitting on in the picture depicted in Exhibit 1?
6   A   Yes.
7   Q   Okay.  I'm going to scroll back up.  How about
8 this house just to the west of your house at 1210?  I
9 mean the one to the west.  Do you recognize this home?
10   A   Yes.
11   Q   And was that a two-flat or a single family?
12   A   That was a two-flat.
13   Q   Was there also a basement or apartment down
14 here where there's the green and white awning or was
15 that a business?
16   A   It had became -- I'm not quite remembering if
17 it was an apartment then but it had became an apartment
18 so I'm not quite sure if it was an apartment then too.
19   Q   Got it.  Do you recall, as you sit here today,
20 who lived -- that would have -- would it have been 1208
21 West 51st?
22   A   That's 1212.
23   Q   1212.  Sorry.
24   A   I -- I believe Ann -- Annette and them stayed
25 on the second floor at that time, but I can't recall who

Page 72

1 was on the first floor.  But I believe Annette and them
2 stayed upstairs on the second floor.  And I'm not for
3 sure if Nikia was on the first floor.  But I know Ann --
4 the Littles stayed on the second floor.
5   Q   And you are saying Annette Little stayed on
6 the second floor?
7   A   Yes.
8   Q   And Nikia?
9   A   Little.
10   Q   Little.  Okay.  Also stayed on the second
11 floor and that was 1210?  I'm sorry.
12   A   No I -- that's -- that's 1212, but I'm -- if
13 I'm not mistaken, I believe at that time, Nikia, and her
14 mom, and sister stayed on the first floor.  And Annette,
15 and her siblings, and mom, then stayed on the second
16 floor.
17   Q   And do you know who owned that building back
18 in September 1991?
19   A   My Aunt B.
20   Q   Your Aunt B.  And that was the front building
21 and she lived in the back building with Shawn?
22   A   She lived -- she lived -- right, the back
23 house.  It's the house in the back.
24   Q   Got it.  Okay.  And then the gangway that you
25 ran through that evening of September 15th -- that was

Page 73

1 between your house at 1210 and your Aunt B's house at
2 1212 West 51st where I just circled that space
3 (indicating)?
4   A   Yes.
5   Q   Okay.  Okay.  There's two cars to -- here
6 parked in front.  Do you recognize either of those
7 vehicles?
8   A   Just the vehicle that I've seen proceeding,
9 like, it was trying to pull off -- the station wagon,
10 but it just -- that's why I ended up just stopping --
11   Q   I'm sorry.  When you --
12   A   -- after the -- after the --
13   Q   Oh, sorry.
14   A   -- the shooting.
15   Q   Okay.  Let me show you what I've marked as
16 Exhibit 2 to your deposition.  And it has the Bates
17 stamp Plaintiff's Jakes 005080.  Do you recognize what's
18 depicted in that photograph I have identified as Exhibit
19 2 in your deposition?
20       (EXHIBIT 2 MARKED FOR IDENTIFICATION)
21   A   Yes.  Looks like the -- the -- the -- the Aunt
22 B house.  No.  Or that's -- that's the back part -- the
23 back of the house -- the back of the building.
24   Q   Okay.  The back of the building that has
25 the -- that signals here that has the two.  Do you

Page 74

1 recognize this building?
2    A   Yes.  The two – the first and second floor.
3    Q   Yeah.  Do you know what building this is the
4 back of?
5    A   That's the back of our building, the –
6    Q   Okay.  And when you're saying your Aunt B's
7 house, you are referring to Aunt B's back house, this
8 one?
9    A   Yes.
10    Q   Got it.  So in this angle, do you know what
11 perspective, what direction the photographs are being
12 taken towards?
13    A   I'm assuming it's been taken in the alley.
14    Q   And when you go through that gangway, is
15 that – can you see the street out there?  Is that 51st
16 Street?
17    A   Right.  When you go out through the gangway,
18 that'll be 51st.
19    Q   Okay.  Ms. Chairse, I'm going to show you now
20 what I've designated as Exhibit 3 in your deposition. It
21 says Plaintiff's Jakes 005081.  Do you recognize the
22 buildings that are depicted in Exhibit 3?
23       (EXHIBIT 3 MARKED FOR IDENTIFICATION)
24    A   That's the back of – that's the back of our
25 building and that's the back of the restaurant.

Page 75

1    Q   Okay.  And do you recognize – do you know
2 what street would be depicted up here facing?
3    A   That'll be Racine.
4    Q   Yeah.  I'm going to show you what is
5 designated as Exhibit 4 to your deposition.  It has a
6 Bates stamp Plaintiff's Jakes 005083.  Do you recognize
7 what's depicted here and got designated as Exhibit 4 to
8 your deposition?
9       (EXHIBIT 4 MARKED FOR IDENTIFICATION)
10    A   That's the corner store that we all went to.
11    Q   When you're saying that's the corner store,
12 are you referring to the – it looks like Oliver's that
13 I have in a box.  What are you saying is the corner
14 store?  Are you saying – or are you just saying that?
15 I'm sorry.  Maybe just tell me again what you think is
16 depicted here.
17    A   The corner store and the restaurant is – that
18 side is the east side of the street.  Like – because
19 the way that is – the picture that I'm looking at, it
20 would be the house, the restaurant, the lot that had
21 Harold's in it.  It was a chicken – a chicken shack.
22 And then that's the light – once you cross over, that's
23 at the store.
24    Q   Got it.  Do you see this individual here over
25 on the – looks like it's on your stoop?

Page 76

1    A   Yeah.  I see him.
2    Q   Do you recognize who that is?
3    A   No.
4    Q   Okay.  I'm going to show you what I've
5 designated as Exhibit 5 of your deposition.  It's
6 Plaintiff Jakes 005089.  Do you recognize the buildings
7 that are depicted in Exhibit 5?
8       (EXHIBIT 5 MARKED FOR IDENTIFICATION)
9    A   Yes.
10    Q   What's – describe what's depicted in Exhibit
11 5.
12    A   That's 1212, Aunt B building, and her back –
13 and the house in the back.
14    Q   And the house in the back, that's where Aunt B
15 and Shawn resided back in September 1991?
16    A   Yes.
17    Q   And the front – this building I'm going to
18 mark and – this is the front building at 1212 West 51st
19 Street; is that right?
20    A   Yes.
21    Q   Okay.  And then the building here with the
22 gray stairs, that was your building?
23    A   Yes.
24    Q   At 1210 West 51st Street?
25    A   Yes.

Page 77

1    Q   Okay.  Do you – I'm going to show you now
2 what I designated previously as Exhibit 6 to your
3 deposition and has Plaintiff Jakes 005090.  Do you
4 recognize what's depicted here?
5       (EXHIBIT 6 MARKED FOR IDENTIFICATION)
6    A   Yeah.  That's Aunt B – Aunt B back house.
7    Q   Okay.  And do you know what angle this is
8 being taken from if you can tell?
9    A   That'll be taken between the two buildings,
10 1210 and 1212.  That's the front door.
11    Q   Do you know back in September 1991 where
12 Shawn's bedroom was in your aunt B's back house?  Was it
13 on the second floor or the first one?
14    A   The second floor.
15    Q   Okay.  I'm showing you what I designated as
16 Exhibit 7 and has Plaintiff Jakes 005091.  Do you
17 recognize what this photograph is – what is depicted in
18 the photograph I have designated as Exhibit 7 to your
19 deposition?
20       (EXHIBIT 7 MARKED FOR IDENTIFICATION)
21    A   Yes.  That's our gangway.
22    Q   And when you're saying our gangway, can you
23 tell us again what the gangway is between?
24    A   The gangway is to the back of 1212 and the
25 back of 1210 back porches, and also to the back of Aunt

Page 78

1 B to – to the house in the back of – belongs to Aunt
2 B.
3    Q   Okay.  I'm going to stop sharing my screen.
4 Okay.
5         COURT REPORTER:  Before we go on, I just wanted
6 to make sure I – the first photo you showed was –
7 you said was previously marked?
8         MS. DONNELL:  As Exhibit 1.
9         COURT REPORTER:  As Exhibit 1?
10        MS. DONNELL:  I mean, just before the
11 deposition.  I just – I'm just referring to how I
12 marked them –
13        COURT REPORTER:  But it will not be an actual
14 marked exhibit attached to the transcript?
15        MS. DONNELL:  No.  It will be.  I showed her
16 Exhibit 1.
17        COURT REPORTER:  Okay.  So all the photos, even
18 the ones that were previously marked, are marked as
19 actual exhibits?
20        MS. DONNELL:  Yes.  Correct.
21        COURT REPORTER:  Making sure.  Thank you.
22        MS. DONNELL:  Thank you.  Oh, thank you so
23 much.  Yes.  So I've have marked all of those as
24 Exhibit 1.  Thank you for clarifying your record,
25 Victoria.

Page 79

1 BY MS. DONNELL:
2    Q   Okay.  Ms. Chairse, did you go to Shawn's –
3 well, did you learn that Shawn had been arrested and
4 charged for the murder that happened that night?
5    A   Not that night.
6    Q   I'm sorry.  Not that night.  Do you have –
7 I'm sorry, that was not a clear question.  Do you
8 remember learning at some point in time after September
9 15th that your cousin had been charged with that murder?
10        MR. GRILL:  Form.
11    Q   You can answer.
12    A   I didn't learn that he was charged with it
13 until probably a week or two later.  All he – I learned
14 that they picked him up the next day.  When we got up,
15 like, the next morning – got up and I went – come out
16 the room because my – my bedroom was the kitchen
17 bedroom.  So when I came out, there – the kitchen
18 window right there.  So we didn't have blinds.  We had
19 kitchen curtains – as my granny would call them,
20 kitchen curtains.  So you could see, like, with the
21 opening to the back.  And then I seen all the activity
22 going on at Aunt B house, but I never opened the door or
23 ask questions because I'm a minor.  That's when I
24 learned that they had picked him up as a suspect as the
25 murder that happened the day before – the night before.

Page 80

1    Q   And when you're saying you recall seeing
2 activity at your Aunt B's house, did you actually see
3 your cousin Shawn coming out of Aunt B's house with the
4 police at that time?
5    A   No.  I don't – I didn't see him come out
6 because I think they had then already brought him out.
7 So I didn't see him come out but they were still there
8 after they brought him out.
9    Q   Do you recall what you saw when the police
10 were at that back house at your Aunt B's?
11    A   Just – they been there and saying what
12 they're saying to my auntie, and Aunt B just, you know,
13 he didn't do it, he wasn't there, what's going on?  You
14 know, she's just trying to figure out was going on
15 and – you know, why are you-all coming to get him?
16 What have he done because I don't believe that they had
17 told her that day either.
18    Q   Do you remember any – did you – were you
19 able to hear anything the officers or detectives were
20 saying to your aunt B?
21    A   No.
22    Q   To the best of your ability, do you recall
23 your aunt B saying he didn't have anything to do with
24 anything or words to that effect?
25    A   Right.  She – she was saying that she didn't -

Page 81

1 - she just was wondering why were they getting him
2 because they wouldn't – they just got him and wasn't
3 saying what they were getting him for.
4    Q   I see.
5    A   So you could hear her being louder because
6 it's, like, you – you-all surrounding my house and why
7 is you-all here to get him?  Like, she's trying to
8 figure out so we can – you can hear her louder but
9 you – you couldn't detect what the detectives was
10 saying.
11    Q   Got it.  And do you remember if these were
12 officers that were dressed up in uniforms or were they
13 in their street clothes, if you recall?
14    A   I can't recall.
15    Q   Okay.
16        MR. GRILL:  Please stop leading.  Thank you.
17        MS. DONNELL:  But that was not a leading
18 question.  I was asking if she recalled them being
19 in uniform or plain clothes.  It wasn't a leading
20 question.
21        MR. GRILL:  I disagree with that.  But let's
22 not argue in front of the witness.
23        MS. DONNELL:  Sounds good.
24        MR. GRILL:  Please stop leading though.
25        MS. DONNELL:  Well, I'm – thanks, but I do not

Page 82

1   think that was a leading question.  But let's go on.
2      Okay.  So
3   BY MS. DONNELL:
4      Q   Ms. Chairse, did you -- I think I asked you
5   this earlier, but anytime between the night of September
6   15th and your cousin's criminal trial, did you ever
7   have -- talk to any police officers from the Chicago
8   Police Department about the incident that you saw on
9   September
10  15, 1991?
11     A   No.
12     Q   And did you attend your cousin's criminal
13  trial?
14     A   No.
15     Q   And you -- did you testify -- you didn't
16  testify at it, correct?
17     A   Correct.
18     Q   Did you meet with any of the prosecutors who
19  were prosecuting your cousin prior to his criminal
20  trial?
21     A   No.
22     Q   Did you meet with any investigators?
23     A   No.
24     Q   Did you meet with your cousin's lawyers ever
25  before his --

Page 83

1      A   No.
2      Q   -- criminal trial?
3      A   No.
4      Q   Did you have any communication with your
5   cousin when he was incarcerated at that Cook County
6   Jail --
7      A   No.
8      Q   -- before his trial?  Okay.
9      A   No.
10     Q   Did you have any communications with your
11  cousin when he was in the Illinois Department of
12  Correction?
13     A   Not personally, like, writing him and calling
14  him but -- you know, I send messages, like, tell him I'm
15  thinking about him, I love him and -- you know, things
16  of that nature, but not phone calls and letters.
17     Q   Okay.
18     A   We didn't communicate, like --
19     Q   Have you seen your cousin Shawn since he was
20  released from prison?
21     A   Probably twice -- two, three times since he's
22  been released.
23     Q   And where have you seen your cousin Shawn
24  since he's been released?
25     A   Each time I've seen him it was in Illinois so

Page 84

1   it was like one time at -- it was -- we had
2   Gabe (phonetic), our other cousin, a get-together.  So
3   I've seen him.  It was at my aunt Betty Ruth house.  And
4   I also seen him -- oh, yeah at my -- in Betty Ruth
5   party.  We gave -- they gave her a birthday party.
6      Q   So it sounds like you've seen him at least two
7   family functions, a cousin get-together at your aunt
8   Betty Ruth's, and then Betty Ruth's party -- a party
9   thrown for Betty Ruth.
10     A   Yeah.
11     Q   Do you remember any other times you've seen
12  him since he's been released?
13     A   No.  I -- no.  Because I don't -- I don't -- I
14  don't come to Illinois like that.
15     Q   Got it.  Did you have any communications with
16  the prosecutors before your cousin was released during
17  his post-conviction proceeding or when he was
18  challenging his conviction?
19     A   No.
20     Q   Don't recall that?  Okay.  And let me see.  Did
21  you have any communications with any of Shawn's lawyers
22  back during his post-conviction proceeding that you
23  recall?
24     A   You said since he been released?  Or he -- or
25  he --

Page 85

1      Q   Not that he'd been released.  Before he got
2   released, do you remember -- did you communicate with
3   any of his lawyers back then?
4      A   No.
5      Q   Okay.  You know, I'm going to ask you about
6   some names to see if you remember some of these
7   individuals from back in September 1991.  I think you
8   said Nikia Little and Annette Little were two people you
9   knew who lived right next door; is that right?
10     A   Yes.  Those are actually -- my cousin Sarah --
11  those are her little cousins on her dad's side.
12     Q   Okay.  So it's your cousin Sarah's cousin on
13  the other side that you're not related?
14     A   Yes.
15     Q   Okay.  And how old -- is Nikia Little -- is
16  she older or younger than you back in
17     A   Younger than me.
18     Q   Okay.  How much younger if you remember?
19     A   Like, a year or two.
20     Q   And how about Annette Little?  Is she --
21     A   Me and Annette is -- I'm a month older than
22  Annette.
23     Q   Okay.  How about Denise Harris?  Did you know
24  Denise Harris back in September 1991?
25     A   Yes.

Page 86

1    Q   Who is she?
2    A   That's Annette Little – that's her sister.
3    Q   Denise Harris is Annette Little's little
4 sister?
5    A   Yeah.
6    Q   And is Annette – but was Annette Little or
7 Harris – did she go by either one?
8    A   Yeah.  Yeah.
9
10
11   Q   Okay.
12      THE WITNESS:  If I go – if I go mute, it's
13 because I got to cough if that's okay.
14      MS. DONNELL:  Okay.
15      THE WITNESS:  Okay.
16      MS. DONNELL:  Thank you.
17 BY MS. DONNELL:
18   Q   Okay.  You said earlier I think you knew
19 someone that you knew as Jug back in September 1991,
20 right?
21   A   Yes.
22   Q   Do you remember Jug's legal name or given
23 name?
24   A   No.
25   Q   Okay.  Did you know anybody by the name of Joe

Page 87

1 Joe back in – or the nickname Joe Joe back in September
2 1991?
3    A   If it's Joe Joe, I believe Joe Joe is Joe
4 Blow.  So I believe that's the same person.
5    Q   Okay.  Who is Joe Joe or Joe Blow, if that's
6 the same person?  Who are you thinking of?
7    A   Joe Blow.
8    Q   And who is Joe Blow or who did you know him to
9 be back in September 1991?
10   A   I don't know who his family was, but he was
11 just, like, somebody hung in the neighborhood.  So I
12 don't know exactly his family or his real name.  But –
13 you know, we called him Joe Blow.
14   Q   Okay.  Could you describe his physical
15 appearance back in September 1991, if you recall?
16   A   He was, like, more of a very aggressive guy.
17 He was – he was not the sweetest thing you would meet,
18 but he wasn't a fair neither.
19   Q   Do you know where Joe Joe or Joe Blow lived
20 back in September 1991?
21   A   I believe Joe Blow stayed on Laflin – Bishop
22 or Laflin, like, 52nd, 53rd.
23   Q   Were you ever at his house or you just sort of
24 thinking that's the area he lived in?
25   A   No.  I never lived at their house.

Page 88

1    Q   Okay.  So you don't actually have a
2 understanding of where he actually resided back in
3 September 1991?
4    A   Correct.
5    Q   Okay.  How about Ronnie Sloan?  Did you know
6 Ronnie Sloan back in September 1991?
7    A   You say who?
8    Q   Ronnie Sloan?
9    A   No.  If that's his real name, I don't – it is
10 not too many people down there that I know by real name
11 beside, like, the Browns and the Gunns.  Like, them
12 the – anyone else, like, I really didn't know their
13 real names.  I just knew them by their nicknames.
14   Q   Did you know you – the person you were –
15 earlier talked about is Snake.  Did you know Snake's
16 real name?
17   A   Nope.  I ain't know Snake real name.
18   Q   Okay.  Did you know somebody that goes –
19 Arnold Day or Little A back in September 1991?
20   A   Little – Little A?
21   Q   Yeah.
22   A   Yeah, I knew Little A.  You know, I heard of,
23 you know, them being – heard of Little A being around.
24 So I never was like a communicator too much to him.  You
25 know, it was hey, we at the party together, things of

Page 89

1 that nature but not, like, chat, chat or – or hang, no.
2    Q   Did you know Dorothea Robinson back in
3 September 1991?
4    A   The name sound familiar.  And I believe she's
5 Little A's sister or cousin.  She's a kin to Little A, I
6 believe.
7    Q   Did you know back in September 1991 anybody by
8 the name of Darren Triplett?
9    A   Yeah.
10   Q   How did you know Darren Triplett?
11   A   He got a baby by my best friend.
12   Q   And what's your best friend's name?
13   A   Monique Powell.
14   Q   And what's the – their baby together?  They
15 have just one baby together?
16   A   I believe they have two.
17   Q   Okay.  Are you and Monique still friends?
18   A   We talk but we don't hang much because she's
19 still in Illinois.  Like I said, I don't come to
20 Illinois as much, but when I do come, I try to call her,
21 let her know I'm there if she – you know, if she want
22 to hang out or –
23   Q   Do you see or do you communicate with Darren
24 Triplett?
25   A   Nope.  I haven't.  Oh, it's been a long time

Page 90

1 since I've seen or heard from Darren.
2 Q Okay. How about Denardo Triplett? Do you
3 know that person?
4 A Did they have a nickname?
5 Q I'm not sure.
6 A I'm not -- if that's -- if that's Darren's
7 brother, then I probably know him but -- but not by his
8 real name. So I'm not --
9 Q Okay.
10 A -- sure.
11 Q How about Andre Brown or Andre Green, do you
12 know who that is?
13 A Yes.
14 Q That's one of Browns that lived on 51st,
15 right?
16 A Yes.
17 Q And do you have any -- do you know his
18 brother?
19 A Lamont.
20 Q Okay. Tyrone Pitts, do you know somebody by
21 that name?
22 A Yeah.
23 Q Who's that?
24 A Tyrone is somebody from the neighborhood also.
25 He's been around the neighborhood a lot -- a while too.

Page 91

1 Q Did he live on 53rd Street or just nearby?
2 A Yes. He lived over there. He lived on --
3 Tyrone lived on Ada (phonetic). It was either Ada or
4 Throop.
5 COURT REPORTER: I'm sorry, Ms. Chairse. Could
6 you repeat that again?
7 THE WITNESS: You -- you say me? Oh, I said
8 Tyrone lived on 50th and Ada or Throop.
9 BY MS. DONNELL:
10 Q Ms. Chairse, I think I'm almost done. And
11 I -- Mr. Grill or Mr. Given are probably going to have
12 questions for you, but I just want to stay back in -- on
13 September 15, 1991, did you tell anybody what you saw?
14 Did you tell your mom, or your dad, or anybody?
15 A No.
16 Q And why is that?
17 A Because it was -- didn't no one ever come to
18 me to ask me about it. So it was -- like, it was
19 nothing that I was going to expand to -- bring up
20 a conversation if they ask me something else. I ain't
21 going to stop what they actually need to bring up what
22 happened.
23 Q And how old --
24 A And my mom -- my parents wasn't the type to
25 bring it up as we been minors. Like, did you-all see

Page 92

1 what happened or -- you know.
2 Q Did you -- how old were you in September 1991?
3 A 14, 15.
4 MS. DONNELL: Okay. Okay. I think I'm done
5 asking questions for now. Thank you so much for
6 your time. I'm sure the defendants -- Mr. Grill or
7 Mr. Given have questions for you. I don't know if
8 you want to go ahead and proceed or if you need a
9 break before you go ahead.
10 MR. GRILL: Yeah. I have questions, but let's
11 take five. I want to get a couple of things
12 together and then we'll do -- let's come back at,
13 like, 12:10.
14 MS. DONNELL: 12:10. Okay. Sure.
15 MR. GRILL: Thanks.
16 THE WITNESS: Oh, okay.
17 COURT REPORTER: We are going off the record,
18 the time is 12:05 p.m. in Central Standard Time.
19 (OFF THE RECORD)
20 COURT REPORTER: We are back on record. The
21 time is 12:14.
22 MR. GRILL: Right. Claudette, can you hear me
23 all right?
24 THE WITNESS: Yes.
25 MR. GRILL: Is it okay if I call you Claudette?

Page 93

1 THE WITNESS: Yes.
2 MR. GRILL: Okay. If any point you can't hear
3 me just -- of course, just let me know, all right?
4 THE WITNESS: Okay. Okay.
5 CROSS EXAMINATION
6 BY MR. GRILL:
7 Q Just to remind you, I am one of the attorneys
8 that represent the police officers that your cousin
9 Mr. Jakes has sued, okay?
10 A Okay.
11 Q All right. So who -- there's something I want
12 to clear up real quick. You had your best friend. You
13 said her name is Monique, right?
14 A Yes, that is --
15 MS. DONNELL: Andrew, I'm trying to hear you.
16 Can you talk towards the computer? Can you turn
17 your head? I can't hear what you're saying.
18 MR. GRILL: Yeah. Can you hear me? Is that
19 better-ish, maybe?
20 Q Can you hear me, Claudette?
21 A Yes, sir.
22 Q Okay. You said your best friend's name was
23 Monique, right?
24 A Yes.
25 Q And she was your best friend in 1991?

Page 94

1   A   Yes.
2   Q   And she's still your best friend today?
3   A   Yes.
4   Q   What's her last name?
5   A   Powell, P-O-W-E-L-L.
6   Q   Okay.  And where did she live in 1991?
7   A   On 50th and Elizabeth.
8   Q   Okay.  So just right around the corner?
9   A   Yes.
10  Q   Did she have any siblings?
11  A   Nope.  Monique's the only child.
12  Q   Right.  Did you know her parents?
13  A   I -- her mom.  I didn't know her dad.
14  Q   Okay.  And what was her mom's name?
15  A   I called her Ms. Powell so I didn't call her
16  by her first name.
17  Q   Yeah.  Did you know -- or do you know what her
18  first name is?
19  A   No.
20  Q   Okay.  I apologize if this sounds strange.  You
21  testified this about Monique at the very beginning of
22  Ms. Donnell's questions.  And I thought I heard you say
23  that Monique or her family owned either the sandwich
24  shop or the corner store, but maybe I misheard you.
25  A   No, Monique --

Page 95

1       MS. DONNELL:  I'm just going to object to --
2   that misstates her prior testimony, but you can
3   answer the question.
4       MR. GRILL:  I'm just asking her to clarify.
5   A   No.  Monique that stay over the restaurant was
6   very younger than me.  She was younger than me where she
7   hung with my niece.
8   Q   Got it.
9   A   With my oldest -- my oldest sister
10  Alice (phonetic).  She hang with that Monique.  The
11  Monique that stayed over the restaurant, she probably
12  was -- probably six years old when this happened -- five
13  or six when this occurred.
14  Q   Okay.  So there was a Monique that owned a --
15  owned the restaurant; is that correct?
16  A   There's -- no, she didn't own it.  She stayed
17  upstairs with her -- upstairs from the restaurant. Yeah.
18  Q   Got it.
19  A   She was a very little -- a very little girl at
20  that time.
21  Q   That's a different Monique then.
22  A   Yes.
23  Q   Got it.  That's where my confusion was because
24  we got two Moniques.  All right.  Thanks for clearing
25  that up.  The Gunns.  You said that they stayed -- and

Page 96

1   this is a quote -- "in the third building."  What
2   bill -- what's the third building?  If you know the
3   address, that would be best.
4   A   The -- I don't know if it was 1214.  But the
5   third building was, like, about my auntie B building. So
6   it was like my aunt Joy -- Georgia building, my Aunt B
7   building, and then the -- the other stayed in that other
8   building.
9   Q   Okay.  So the third building on 51st Street,
10  last stop --
11  A   Yes.
12  Q   -- sub shop, I guess.  Is that fair?
13  A   Yes.
14  Q   Got it.  And you said your aunt Georgia's
15  building, your aunt B's building.  So that's the 1210
16  building and the front 1212 building, right?
17  A   Correct.
18  Q   And then Aunt B also owns a rear building at
19  1212?
20  A   Yes.  It was a -- it actually is a house. This
21  wasn't a building in the back.
22  Q   Yeah.  Right.  Right.  And so Georgia and Aunt
23  B -- they are related; correct?  They're both aunts of
24  Mr. Jakes; right?
25  A   Correct.  They are sisters-in-laws.

Page 97

1   Q   Right.
2   A   And my Aunt Georgia is married to Aunt B's
3   brother.
4   Q   Right.  So you would agree then that the 1210
5   building, the 1212 building on 51st Street, and the rear
6   house at 1212, all three of those homes were owned by
7   aunts of Mr. Jakes, that's true; right?
8   A   True.
9   Q   Okay.  The Gunns -- can you tell me the names
10  of the Gunn family members that lived maybe in 1214 or
11  at least in the third building down from the sub shop on
12  51st Street?
13  A   One name Fred (phonetic).
14  Q   Fred.
15  A   The other two -- I can't tell you their real
16  name but we called them Dada and Rara.  So it was Fred,
17  Dada, Rara.
18  Q   Okay.
19  A   Again, they -- their mom.  Also her name Bob.
20  We called her Bob.
21  Q   Can you spell that?
22  A   B-O-B, but her name is Bobby (phonetic), but
23  we called her Bob.
24  Q   Okay.  And Rara, is that a guy or a girl?
25  A   A guy.

Page 98

1    Q   And Dada?

2    A   A guy.

3    Q   And is that D-A-Y-D-A-Y?

4    A   D-A-D-A.

5    Q   D-A -- like that, okay.  Dada, almost.  Okay.

6  Do you know who's the oldest?  Fred, Dada, or Rara?

7    A   Dada.

8    Q   And then who's after Dada?

9    A   Fred.

10   Q   Okay.  And after -- and then Rara?

11   A   Yes.

12   Q   Were Fred, Dada, or Rara friends with your

13  twin brother Quarter Pound?

14   A   No.  He -- he talked to them, but they wasn't

15  friends.  But he did socialize with them because my

16  brother socialized with them mom.  He still socialized

17  with they mom.  So they -- you know, they speak when

18  they see each other, things of that nature.

19   Q   So you have your brother Floyd and Ledal.  Is

20  that a guy, Ledal?

21   A   Yes.

22   Q   And then Cleotha.  Those are -- you have three

23  brothers.  Do I have that right?

24   A   Correct.

25   Q   Right.  And of your three brothers, were any

Page 99

1  of them friends with any of the Gunn -- like, you know,

2  (Inaudible).  What other Gunns were they friends with

3  or --

4    A   No.  Because my --

5        MS. DONNELL:  Objection, form.  But you can

6    answer.

7    A   No.  Because my Floyd -- my brother Floyd

8  stayed in New Orleans at the time.  And my brother Ledal

9  was incarcerated at the time.

10   Q   Right.

11   A   So the only brother I had home was Quarter

12  Pound.

13   Q   Got it.  What was -- if you mind asking what

14  was Ledal in jail for at the time?

15   A   A murder.

16   Q   Okay.  He's still in jail?

17   A   No.  He's deceased now.

18   Q   Okay.  Sorry.  I'm sorry to hear that.

19  That's -- okay.  So Floyd.  Is he still in jail -- or

20  excuse me, in New Orleans?  Sorry.

21   A   No.  Floyd is here in Ames, Iowa with me and

22  my mom.

23   Q   Okay.  Did anybody in the Gunn family -- so

24  the three Gunn brothers.  Did they ever come down and

25  hang out at your building on 1210?

Page 100

1        MS. DONNELL:  Objection.  Form.

2    A   Fred used to.

3    Q   In 1991 primarily.

4    A   I mean, Fred used to come down there because

5  it was, like, he was the -- the sweetest one out the

6  bunch.  Like, Fred was the nicest one out of all three

7  of them.  So he used to come sit down there chitchat

8  with me, you know, with me here even speaking, you

9  know., chitchat with my mom and she's sitting out there.

10  He used to even, you know, talk to her for a second or

11  so.  But Dada and Rara?  No, they never sat there

12  because we didn't -- we -- you know, they was just too

13  much for -- like, they did too much.  And Fred wasn't

14  that type.

15   Q   When you say, "they did too much," like, what

16  do you mean by that?

17   A   Like, they run around bullying -- they was

18  like bullies.

19   Q   Okay.  Weren't nice people, I guess, is what

20  you're saying?

21       MS. DONNELL:  Objection.  Form.

22   Q   Were they mean to you, Rara or Dada?

23   A   No.  But I just, like, kept my distance.  I

24  speak to them, you know, say little words to them, but

25  never, like, just hang out with them or have full

Page 101

1  conversations.

2    Q   Did you witness Rara or Dada ever, you know,

3  bully people?

4    A   Like Rara, yeah.  When we was -- because he

5  was -- he younger than me.  So in school he used to,

6  like, bully the -- the kids who is younger than him.

7  Things of that nature, like, coming from school.  And --

8  you know, you used to tell by his demeanor that he

9  always was -- like, he just felt like he couldn't be

10  touched, like, could nobody beat him up or something.

11   Q   Right.

12   A   So he always felt like he was a tough guy of

13  the neighborhood.

14   Q   How much older or younger?  I forget if you

15  said he was older or younger than you.  But what was the

16  age difference between you and Rara, for example?

17   A   Oh, probably about six, seven years.

18   Q   Him being older than you?

19   A   No.  He younger than me.

20   Q   Okay.

21   A   Rara younger than me.

22   Q   What about Dada?  Is he older or younger than

23  you?

24   A   Dada older than me.

25   Q   Okay.  Did you ever witness Dada bully people

Page 102

1 like you were saying?
2     A.  No.  He just had -- the way that he spoke to
3 people with this, you know, like he -- his -- his -- his
4 vocabulary just wasn't -- wouldn't sit well with me, the
5 way he spoke to people.
6     Q.  Okay.  But can you give me an example?
7     A.  Like -- yeah, you know, just try to downgrade
8 people, curse them out, or talk about how they dress, or
9 what they looked like, just, you know.
10     Q.  Yeah.  What about Fred?  Did he bully people
11 too?  Although --
12     A.  No.
13     Q.  -- he was sweetest of the bunch, I mean.
14     A.  Fred didn't, no.
15     Q.  Okay.
16     A.  You never would hear Fred, like, downgrade
17 people or say mean things to people.
18     Q.  Were Fred and Cleotha about the same age or
19 no?
20     A.  Yeah.  Fred -- Fred was like around our age.
21 If not our age, he probably a year younger.
22     Q.  Would you say -- if you think back in 1991
23 that your brother, Cleotha and Fred were friends?  Do
24 you think that?
25     A.  I wouldn't say friends but social --

Page 103

1 socialize.
2     Q.  All right.  And you guys were neighbors, you
3 know, lived in couple of houses apart from each other,
4 right?
5     A.  Yeah.
6     Q.  All right.  You know, you had said earlier
7 during Ms. Donnell's examination that there were -- the
8 neighborhood, you know, in your opinion was okay, but
9 there were gangs and violence, like, you know, in the
10 neighborhood.  What gangs to your knowledge were in the
11 neighborhood around where you lived on 51st West Street
12 in 1991?
13     A.  Blackstone, Latin King, MC.
14     Q.  And the MCs are the Mickey Cobras?
15     A.  Yes.
16     Q.  Okay.  Was Fred, or Dada, or Rara, to your
17 knowledge, a member of any of those gangs?
18     A.  Not to my knowledge.
19     Q.  Okay.  What about your cousin Mr. Jakes?  Was
20 he?
21     A.  No.  He wasn't in no -- was no -- well, back
22 then, he was be organization, but he wasn't in no gang
23 or not to my knowledge that he was.  But to my
24 knowledge, he wasn't.
25     Q.  Okay.

Page 104

1     A.  He would ran around throwing up hand signs and
2 things of that nature.
3     Q.  Is that -- those things of that nature that
4 you just described -- are those the types of things that
5 would tell you for sure whether somebody was in a gang?
6         MS. DONNELL:  Objection.  Form.
7     A.  Yes.
8     Q.  Yeah?
9         MS. DONNELL:  Make same objection.
10         MR. GRILL:  I didn't hear her answer.
11     Q.  What was your answer to my question?
12     A.  Yes.
13     Q.  All right.  And do you know if your brother
14 Cleotha was a member of any of those gangs?  The
15 Blackstones, Latin Kings, Mickey Cobras?
16     A.  No.  He wasn't.
17     Q.  All right.  You said that in high school or at
18 least -- not in high school.  But when you got to be
19 teenagers, you and Mr. Jakes --
20         COURT REPORTER:  I'm sorry, I can't hear you.
21     Q.  You testified earlier today -- before you
22 and Mr. Jakes became teenagers that you and Mr. Jakes
23 acted -- hung out with each other pretty often?
24     A.  Yes.
25     Q.  It sounded like though that that changed

Page 105

1 somewhat once you two became teenagers; is that right?
2     A.  Yes.  Because I started hanging with -- he not
3 going to hang with me if I'm hanging with six girls.  He
4 ain't going to be the only boy hanging with me.
5     Q.  Okay.
6     A.  It would be -- why would -- he come -- he
7 couldn't play jump rope with us.
8     Q.  Sure.  And what was the age difference between
9 you and Mr. Jakes?  Well, what is the age difference
10 between you two?
11     A.  We -- me and Shawn?  We are the same age.
12     Q.  Right.  Okay.
13     A.  Yeah.
14     Q.  All right.  So did you know who any of
15 Mr. Jakes' friends were in September 1991?
16     A.  All the -- only person that I knew that Shawn
17 hung with a lot was my cousin Boom, which his name is
18 Nathaniel, my brother Quarter Pound, my -- my little
19 cousin Little Ruphus.  And he was --
20     Q.  Can you spell it?
21     A.  Huh?
22     Q.  Spell that, the Ruphus for me?
23     A.  R-U-P-H-U-S, Ruphus.
24     Q.  Ruphus?
25     A.  Yes.

Page 106

1    Q   Got it.
2    A   And if he wasn't -- if he wasn't with his
3  family, he would just be in the neighborhood just, you
4  know, it wasn't a certain -- wasn't no -- wasn't no
5  certain individuals that Shawn really hung with, like,
6  they would come to the house to get him or he would go
7  to they house to get them and they hung the
8  neighborhood.  Wasn't no certain individual because
9  Shawn talked to everybody, like, Shawn actually talked
10  to everybody.  So it wasn't a certain individuals that
11  he actually hung with every day that you could say oh,
12  was Shawn going to over to so-and-so's house because he
13  didn't hang with certain people -- certain individuals
14  every day.
15    Q   Uh-huh.  Who do you think he hung out with the
16  most if you think back to 1991 to your knowledge?
17        MS. DONNELL:  Objection, form.  She already
18        answered but -- asked and answered but go ahead.
19    A   I would say more of his family.  Like his
20  cousin.  If he wasn't with them, he wouldn't be with
21  nobody.  He would just be going to see what they doing
22  on Elizabeth, what they doing on Throop, and he would be
23  in a position to spot for too long around nobody because
24  when he walked off -- or he by -- when he walked out, he
25  by himself.  When he come back, he'd be by himself.  So

Page 107

1  it wasn't no particular individuals that he hung with
2  every day or that you can be, like, he was close with in
3  the neighborhood anyway.
4    Q   How did you know this if you didn't see him
5  that much, I guess, or as much as you were saying?
6    A   I did see him because I didn't leave the
7  neighborhood.  Only place I was going to was Elizabeth,
8  Throop, and Bishop.  These the same blocks that Shawn
9  going to be on.  Elizabeth, Throop, or Bishop, or maybe
10  Laflin.
11    Q   Do you have any reason that you and Mr. Jakes
12  didn't really venture off of those few blocks that you
13  just described back in 1991?
14    A   No.  We didn't because I was -- actually, I
15  was around hanging on 51st before we even moved to 1210
16  West 51st.  Before we moved to 1210, my Aunt Georgia
17  stayed there.  So I was at her house even when we didn't
18  stay on 51st and Racine.
19    Q   Uh-huh.
20    A   So I had already know a couple of people
21  before we moved over there.
22    Q   Would there'd been danger -- sorry.  Go ahead.
23  I thought you were done.
24    A   So the -- when I did move over there, it was,
25  like, the same ones that I knew before I moved there.  I

Page 108

1  would still -- them the ones that I socialized with when
2  I moved around there.
3    Q   Would it have been dangerous for Mr. Jakes, to
4  your knowledge, to have ventured off of those blocks
5  that you just mentioned in September 1991 for any
6  reason -- to your knowledge?
7        MS. DONNELL:  Objection, form.  Calls for
8        speculation.
9    A   I didn't hear you Mr. Grill.
10    Q   Would it have been dangerous for any reason
11  for Mr. Jakes to have ventured off of those blocks that
12  you just mentioned that you and stuck to back in
13  1991?
14        MS. DONNELL:  Objection.  Form.  Calls for
15        speculation.
16    A   No.  I wouldn't know because everyone knew who
17  he was, like, they know he wasn't -- nobody to come and
18  harm him.  So they wouldn't have harmed him.
19    Q   When you say, "everybody knew who he was,"
20  what do you mean by that?
21    A   Like, everybody knew that was Shawn from right
22  there off 51st.  They say by the restaurant.  Like,
23  everybody knew that was Tweety -- stay right there on
24  51st.
25    Q   Uh-huh.

Page 109

1    A   So it was like -- oh, that's -- it could be
2  dark.  He could be walking down, they'd, oh, that's --
3  that's Tweety, you know?
4    Q   Uh-huh.
5    A   Oh, there's -- oh, there's Lamont.  You know,
6  it's just -- they would know who you with so it wasn't,
7  like, we felt danger going to another block.  We didn't
8  feel intimidated or anything going to somewhere else to
9  hang out.
10    Q   Uh-huh.
11    A   We'd go in and play softball in the middle of
12  the street, play jump rope, play It.  We're not going to
13  do the harm or nothing, or we going over here to --
14  somebody around the corner having a party.  We going to
15  the party.  We weren't going to hurt nobody or feel like
16  they was going to hurt us.
17    Q   Uh-huh.  And one of those places that you --
18  sounds like you hung out a lot in 1991 was the front
19  porch of 1210; is that right?
20    A   Yes.  I -- yeah.  It was, like -- yeah, I was
21  on my porch.
22    Q   Well, I --
23    A   But if my mom say I -- if my mom say I can't
24  go outside -- as far as I can go is to the porch, that's
25  where I got to go to.  To the porch.

Page 110

1    Q   In your experience when you think back to
2   1991, did people that were outside of your family, for
3   example, also, like, hang out, or post up on your front
4   porch, or was it just typically people you know?
5        MS. DONNELL:  Objection.  Form.
6    Q   You can answer.
7    A   Sometimes we'll -- it'll be somebody we don't
8   know that would be on the porch.  They probably be
9   sitting there waiting for the bus or they probably just
10  stopping right there to sit down and smoke their
11  marijuana or something.
12   Q   All right.
13   A   But sometimes, yeah.  It -- it had been people
14  on our porch that we didn't know.
15   Q   All right.  What would you do if somebody was
16  on your porch that you didn't know    A   We didn't do
17  anything.  We just -- we let the adults handle it.
18  Either my mom going to come out and say get off the
19  porch or my auntie's going to pull up and say get off
20  our porch.
21   Q   Right.
22   A   That was like the -- that was the adults.  The
23  child -- we -- we not going to be arguing.  We don't
24  know if they're wrong or not.  We ain't going to be
25  arguing with nobody about a porch.

Page 111

1    Q   Got it.  Okay.  Your parent -- your -- the
2   adults would.  They would shoo people away that they
3   didn't know if they was hanging on your front porch; is
4   that right?
5    A   Yeah.  My mom, yeah.  If my mom knew you was
6   on her porch, yeah, my mom will come down and tell you
7   to get off the porch.
8    Q   Okay.  You've mentioned Ruphus is one of the
9   people that you believed was friends with your cousin,
10  Mr. Jakes, back in 1991.  Do you know Ruphus' last name?
11  Or do you know --
12   A   That's his cousin.
13   Q   -- or his cousin?  Okay.  What's Ruphus' last
14  name?
15   A   Phusus [sic].
16   Q   I didn't hear you.
17   A   Phusus.  Like Phusus, P-H -- P-H-U-S-U-S
18  [sic].  I'm close to the spelling if I'm not poorly
19  spelling.
20   Q   Yeah.  Phusus, P-U-L-F [sic] -- yeah.  Okay.  I
21  know who you're talking about.  Did Ruphus have a
22  nickname?
23   A   We just called him Little Ruphus coming up.
24   Q   Where did he live in '91?
25   A   75th and Onnery.

Page 112

1    Q   All right.  So that's pretty far away from
2   where you guys lived.  Was Ruphus in -- did he come to
3   your neighborhood often in 1991 to see your cousin
4   Mr. Jakes?
5    A   No.  He didn't come often because we was over
6   there because -- we was over there more than he was over
7   by our house.  That's Aunt Betty Ruth son so we was more
8   over there than he was over on 51st.
9    Q   Got it.  All right.  And you would be with
10  Mr. Jakes at Ruphus' house?
11   A   Yes.
12   Q   All right.  If you could, you know, think back
13  to the few years before this shooting happened, how
14  would you, in your own words, based on your experience,
15  describe the type of person Mr. Jakes was in those
16  years, you know, leading up to the murder?
17   A   Like I said before, real goofy.  The type that
18  would trip over his own shoestrings.
19   Q   Okay.  Was he --
20   A   He was more like -- more like a nerd than...
21   Q   Okay.  Was he, like, a good kid?  Did he stay
22  out of trouble to your knowledge?
23   A   Yeah.  He stayed out of trouble.  He -- Shawn
24  barely got a whooping.  We would -- Shawn about --
25  probably was the only one out the little family bunch

Page 113

1   that didn't get a whooping.
2    Q   And you're sure about that?
3    A   Yeah.  Because it was, like, Shawn, my other
4   little cousin, she didn't get -- it was, like -- it was
5   probably, like, three of us -- three of -- like, three
6   out of probably the whole 15 that -- family members that
7   probably wouldn't get a spanking for doing something.
8    Q   Yeah.  So, like, would you say, like -- tell
9   me, like, how well you think you knew Mr. Jakes?  For
10  example --
11   A   I've been around --
12   Q   -- hang on, hang on.
13   A   -- I've been around when Jake --
14   Q   Hang on, hang on.  Hang on, hang on.  Let me
15  finish my question.  So I want you to think about the
16  time period, like, the three or four years before the
17  shooting here, okay?  So, like, not everything.  Just
18  think about those few years.  How well do you think you
19  knew Mr. Jakes during that time period?
20   A   I knew him well because we still was around
21  each other.  My aunt was been married to his uncle.
22  Before Shawn was born, before I was born, they was
23  married.  So our families always have been together.
24  So --
25   Q   So when you -- sorry, go ahead.  I'm sorry,

Page 114

1  you go ahead.
2      A   -- so at the time of us becoming -- well, we
3  moved to Illinois when me and Quarter Pound was 2, 3
4  years old from the time we was at my momma's side, going
5  to the city, going to the get-togethers.  We were 6, 7
6  years old so we had already -- we started being around
7  Shawn -- Shawn -- knew him at 6, 7 years old.  So we
8  would've been around Shawn then -- before we were even
9  born, we was around him so when we started being 6, 7,
10  we was around from that time.
11      Q   Is he the type of guy that you would think,
12  like, could break the law?  Like --
13      MS. DONNELL:  Objection.  Form.
14      Q   -- like it's -- when you think back to those
15  three or four years leading up to the shooting, like, do
16  you know if he ever been arrested?
17      A   No.
18      Q   No, he wasn't or no, you don't know?
19      A   No.  I don't know.
20      Q   Did you ever hear if, like, he got arrested
21  for --
22      A   Never, never heard he had --
23      Q   Ma'am, let me finish my question.  Did you
24  ever hear whether he was arrested for sexually
25  assaulting a woman?

Page 115

1      MS. DONNELL:  Objection.  Objection.  Form.  And
2  also she just had answered your question but go
3  ahead.  You can answer.
4      MR. GRILL:  No.  I certainly have not asked
5  this question.  Did you ever hear whether Mr. Jakes
6  had been arrested for criminal sexual assault?
7      A   No.  I haven't.
8      Q   Maybe getting arrested twice for that?
9      MS. DONNELL:  Objection.  Misstates the record.
10      Q   Did you ever hear that?
11      A   No.  That I haven't.
12      MS. DONNELL:  Objection.  Misstates the record.
13      Q   Did you ever hear that he got arrested for
14  robbery, or burglary, or anything like that before this
15  shooting happened?
16      A   No.  I haven't.
17      Q   Do you know whether he ever told the police
18  that he was a member of the Blackstone street gang prior
19  to his arrest for this murder?  Did you ever hear that
20  from anybody, from any source?
21      A   No.  I--
22      MS. DONNELL:  Objection.  Form.  Calls for
23  speculation.
24      Q   That -- you never heard that?
25      A   No.  I haven't.

Page 116

1      Q   Did you ever hear that Mr. Jakes was accused
2  of assaulting a girl and carrying her into an abandoned
3  building with a group of other people and raping her?
4  Did you ever hear that?  With a guy named Ronnie Sloan
5  specifically, did you ever hear that from anybody in
6  your family?
7      MS. DONNELL:  Objection.  Argumentative.
8  Objection since she's already said she haven't heard
9  this before.  And at this point, it's pretty
10  argumentative.  So I'm going to object to this line
11  of questioning, but you can go ahead and answer for
12  that.
13      MR. GRILL:  It is quite coaching speaking of
14  the objection, but that's fine.  It doesn't matter.
15  I want to know if this witness has ever heard that
16  from anybody ever.
17      MS. DONNELL:  That's fine, Mr. Grill.  Same
18  objections.
19  BY MR. GRILL:
20      Q   Go ahead, ma'am.
21      A   Now, we could go -- I could go to this story
22  but I didn't hear about it being as Shawn.  Now it's
23  somebody -- I don't know if that's his real name, but I
24  heard of that story before.  But I never heard Shawn
25  being into the -- in -- in that story, but I heard of

Page 117

1  that story.
2      Q   Okay.  What did you hear about that story and
3  from who?
4      A   I just heard that this -- the -- this guy,
5  Mike, that we call Black Mike -- we call him Black Mike.
6  And had took in a girl into a building or something on
7  Ada or Throop or something, but I never heard that Shawn
8  had anything to do with it.  But I did hear about that
9  story.
10      Q   Did anybody in your family ever tell you that
11  Mr. Jakes, before his arrest for this murder, had been
12  arrested by the police in the three or four years
13  leading up to this murder over a dozen times.  Did
14  anybody ever tell you that?
15      MS. DONNELL:  Objection.  Form.
16      A   No.  They haven't.
17      Q   All right.  Does that come as a surprise to
18  you --
19      MS. DONNELL:  Objection, form.
20      Q   -- that your cousin, Mr. Jakes, the plaintiff
21  in this lawsuit, before he was arrested for this murder,
22  was arrested by the police more than 12 times?
23      MS. DONNELL:  Again, asked and answered.  And
24  object to the form.  Go ahead and answer,
25  Ms. Chairse.

Page 118

1  A.  No.  I haven't.  Because if -- if he did get
2  arrested, it was, like, he wasn't arrested and gone to
3  do no time because we -- I -- we seen Shawn enough.  He
4  didn't miss no -- he wasn't missing at family
5  gatherings.  He wasn't missing as if he was gone long
6  enough where we could be, like, where is Shawn at?  So
7  no, it never was -- never came up that he had been
8  arrested or locked up or charged for any -- anything
9  within the four, five years of this incident.
10      Q.  And I presume that Mr. Jakes never told you
11  that he had been arrested those many times before his
12  arrest for this murder, right?  He never mentioned it to
13  you?
14      A.  No.  No.
15      Q.  All right.  I'm going to represent to you and
16  I believe Ms. Donnell would agree with this that Mr.
17  Jakes was arrested over 12 times before his arrest for
18  this murder.  And knowing that, I want to ask you if
19  that at all causes you to change your opinion that Mr.
20  Jakes was the type of kid that is a good kid, that kept
21  his nose clean.  The only one in your family that would
22  not get a whooping.  Would that change your opinion
23  about Mr. Jakes during that time period leading up to
24  the murder?
25          MS. DONNELL:  Objection.  Form.

Page 119

1      A.  No.  It doesn't because that the time, you
2  know, the time of me growing up with Shawn, I didn't see
3  the bad side of Shawn.  Just -- it's like if you let
4  your kids outside, you don't know what your kids doing
5  on the outside.  It's the same thing as with -- when we
6  was kids.  When you go outside, when would -- they let
7  us out, they don't know what we doing if don't nobody
8  come and tell them.  I didn't never known Shawn to be
9  locked up for nothing our whole life besides -- until
10  when he got arrested for this murder.
11      Q.  Does it make you --
12      A.  I never knew he'd been to the station or
13  nothing.
14      Q.  Does it make you think, hearing that he'd been
15  arrests so many times before this murder -- does it make
16  you think that maybe you didn't know him as well as you
17  think you did during those few years leading up to this
18  shooting?
19          MS. DONNELL:  Objection.  Form.  Argumentative,
20  but you can answer the question, Ms. Chairse.
21      A.  No.  It don't give me the diff -- no different
22  outlook of how I look at him.  I look at him different
23  than how other people look at him.
24      Q.  You --
25      A.  I don't read the book by its cover.  I knew

Page 120

1  Shawn -- whatever he went through I still knew him but I
2  didn't -- I didn't know him as he being a bad kid
3  because he never did anything bad around us.  So
4  whatever he did, I didn't know.
5      Q.  So he never did anything bad around you and he
6  never told you about any of the bad things that he might
7  have done; is that fair?
8      A.  No.  No.  Because he never got a whooping for
9  it.  If things go wrong and all the kids together, it
10  was, like, we know Shawn ain't going to get in trouble.
11  We know Shawn, the -- my other two cousins, they ain't
12  going to get in trouble because they -- they know it's
13  going to be out of these four right here.  They did it
14  and these three didn't.  So I -- that -- that's why I
15  was just like, no.  It's not going to change the opinion
16  of how we grew up or how it -- it was.
17      Q.  You said that you never --
18      A.  He still was the same kid that didn't get in
19  trouble in my sight.
20      Q.  Okay.  Though -- did you ever know whether
21  your -- that Mr. Jakes threw bottles at cars or rocks at
22  cars as they were driving by on any days other than the
23  night of the shooting?
24      A.  Nope.  Because that would -- if he did, he did
25  it not with us.  But that was the first time we ever did

Page 121

1  decide to do it.
2      Q.  To your knowledge, that was the first time
3  that he ever decided to do that?
4      A.  That was my know -- yes, that's my knowledge
5  that the first time that we decided to do it together.
6  If they -- if he ever did it before, or with anyone else
7  it -- it was with someone else.  But that was the first
8  time we ever did it together.
9      Q.  Did you ever hear from anybody prior to the
10  shooting whether -- or that Mr. Jakes had thrown rocks
11  or bottles at cars on other occasions?
12      A.  No.
13      Q.  Did your brother Cleotha ever tell you that he
14  did things like that with Mr. Jakes prior to the
15  shooting?
16      A.  No.
17      Q.  Okay.  You said a moment ago that you didn't
18  know about the bad side of Shawn.  At some point did you
19  hear that Mr. Jakes had a bad side?
20          MS. DONNELL:  Objection.  Form.  Objection.
21  That misstates her prior testimony but you can
22  answer, Ms. Chairse.
23      A.  I mean what would you consider a bad side?
24      Q.  Okay.
25      A.  To me, he don't have a bad side.

Page 122

1    Q   Okay.
2    A   He didn't have a bad side as coming up and it
3    was just, like, I never -- I never got told that Shawn
4    did this, Shawn did that, Shawn -- locked up Shawn. That
5    never came to me.  So I never knew if he do -- did get
6    locked up.  I never knew.  If he did, I -- I never --
7    no one ever told me in my family that Shawn had been
8    locked up for anything.  Never.
9    Q   So me telling you some of these things about
10   Mr. Jakes' criminal history before his arrest for the
11   shooting -- you're hearing them for the first time
12   today; is that correct?
13   A   Yes.  Yes.
14   Q   All right.  If Mr. Jakes was getting to get a
15   whooping as you said, who would be the person you would
16   expect -- would whoop him --
17       MS. DONNELL:  Jeff, do you mind going on mute
18   because when you're moving a paper, it's getting
19   hard to hear it.  It gets distracting.
20       MR. GIVEN:  Yeah.
21   Q   Is your mic muted Claudette?
22   A   Yes.  It -- it will be my aunt B or my mom.
23   Q   Why would your mom be the one to whip him?
24       MS. DONNELL:  Objection to extent it misstates
25   her prior testimony.

Page 123

1        MR. GRILL:  Well, I -- let me rephrase it.
2    Q   Why would your mom be one of the two people
3    you believe that would whip Mr. Jakes if he had done
4    something wrong?
5    A   Because he -- that's who he'll be around --
6    he'll be around -- that's usually the adults, you know,
7    these -- that's who he'll be around.  He'll be around me
8    or my aunt B.  My aunt Betty Ruth ain't -- she ain't
9    going to whoop us.  But yeah, my -- my mom -- I know my
10   mom and I know my aunt B will give him a spanking.
11   Q   Well, there was --
12       MR. GIVEN:  (phone rings.)
13       MR. GRILL:  What was that?
14       MS. DONNELL:  Jeff, do you mind going on mute?
15       MR. GIVEN:  You know what?  The phone rang.
16   I'll go on mute, but you're going to have to pause
17   because if I want to come back on, it takes me a
18   second or two to find the buttons.  So I will go on
19   mute.
20   BY MR. GRILL:
21   Q   Where in the few years leading up to the
22   shooting -- where was Mr. Jakes' mother if you know?
23   A   Irene was --
24   Q   Uh-huh.
25   A   I believe Irene was staying in Minnesota -- in

Page 124

1    Michigan or Minnesota --
2    Q   All right.
3    A   -- before she moved.  Because I believe she
4    moved back -- if she -- but I'm really not certain, but
5    I believe she was out there -- she had -- was staying
6    out of town at the time.
7    Q   Okay.  How long prior to this shooting was
8    Mr. Jakes to your knowledge -- well, hang on.  Where was
9    Mr. Jakes living?  You -- strike that as well.  You
10   testified earlier today that Mr. Jakes, at the time of
11   the shooting, was living in the rear house at 1212 with
12   your Aunt B; is that right?
13   A   Correct.
14   Q   How long had he been living there in the rear
15   house with your Aunt B?
16   A   I'm not quite sure how long he had been living
17   there.
18   Q   Okay.  Was it more than a month?
19   A   Yeah.  It was more than a month.
20   Q   Was it more than a year?
21   A   That's what I'm not quite sure of if it was
22   past a year or not, but I know it was more than a month.
23   Q   You know where he was living before he started
24   living with your aunt B?
25   A   He was staying with his mom because if I'm not

Page 125

1    mistaken, Irene was staying in the front building --
2    Q   Right.
3    A   -- if I'm not mistaken.  Irene was staying in
4    the front building before she moved -- before she moved
5    out of town.
6    Q   Right.
7    A   In the front building of 1212 West 51st if
8    I'm --
9    Q   And which --
10       MS. DONNELL:  I --
11   A   -- remembering correctly, she was staying
12   there before then.
13   Q   And which --
14       MS. DONNELL:  I'm just going to request
15   Mr. Grill you don't interrupt the witness or testify
16   yourself as she's giving answers to affirm whether
17   you think it's appropriate answer or not.  So I'll
18   just make that request.
19   Q   What floor of the front building was Mr.
20   Jakes' mother living in?  Go ahead.
21   A   The basement.  Yeah.
22   Q   The base --
23   A   It was the basement -- the basement apartment.
24   Q   Okay.  And is that the apartment in the
25   photograph with the green and white awning that Ms.

1  Donnell showed you earlier today?

2  A  Yes.

3  Q  Who lived down the first floor then when Mr.

4  Jakes and his mother were living in the basement

5  apartment of the 1212?

6  A  I can't recall – I can't recall who was

7  staying on the first floor –

8  Q  Uh-huh.

9  A  – at the time that Irene was staying there.

10  Q  Uh-huh.  Before you came in for today's

11  deposition, did you talk to your brother about whether

12  he had – well, let me strike that.  When was the last

13  time you talked to your brother, Cleotha, before today?

14  A  I haven't talked to my – to Cleotha in, like,

15  seven months.

16  Q  Okay.  Do you know whether he has given a

17  deposition like you're giving today in this case?

18  A  They gave me his deposition papers, but I

19  still hadn't talked to him because how can I contact

20  him?  He locked up.

21  Q  Got it.  Who gave you –

22  A  So I don't know if he had a deposition or not.

23  Q  What kind of deposition papers are you talking

24  about?

25  A  For a deposition, I think it was to talk to –

1  I can't even recall because I don't even know where the

2  paper at because I moved.  So when they brought the

3  paper, they actually brought the paper to my mom.  And I

4  was picking my mom up because we was going – getting

5  ready to go out of town.

6  Q  Uh-huh.

7  A  So all that I know is that they brought the

8  paper.  And my mom called me and I was on my way to her

9  house.

10  Q  Got it.

11  A  So I can't tell you, but I haven't talked to

12  Cleotha in, like, seven months.

13  Q  How about – well, let me see.  When did you

14  get these papers that you're talking about, his

15  deposition papers?

16  A  My dad passed in May.  So it had to be after

17  my dad passed because my dad passed in May.

18  Q  Okay.  During your meetings with Ms. Donnell

19  or Mr. Mort Smith to prepare for today's deposition, did

20  anybody show you the transcript, for example, of your

21  brother's – your twin brother's deposition testimony in

22  this case?

23  A  No, sir.

24  Q  Tell you anything about what it was that your

25  brother said in his deposition?

1  A  No, sir.  I didn't even know my brother had a

2  deposition until just now you're saying it.

3  Q  Okay.  What about –

4  A  I didn't even know if he had – if he had one,

5  but I knew he had one coming.  But I didn't know if –

6  if they was able to contact him to have a deposition.

7  Q  Okay.

8  A  So I don't know if he had one or not.

9  Q  Do you know – other than – when you prep –

10  met with Ms. Donnell and Mr. Smith to prepare for

11  today's deposition, other than photographs, did they

12  show you any other documents, materials, anything like

13  that?

14  A  No, sir.

15  Q  The only thing they showed you were pictures?

16  A  They showed me two pictures.  There was a

17  picture of the gangway, and the picture of the – the

18  picture that she just show with the restaurant and the

19  building with the people sitting on.  Them the only two

20  photos.

21  Q  Okay.  And you said that you met with Ms.

22  Donnell two times, right?

23  A  Yes.

24  Q  Where you spoke with her two times, once via

25  Zoom and one time on the telephone, right?

1  A  Yes.

2  Q  And then you also spoke with Mort Smith, their

3  investigator, right?

4  A  Yes.  And both times I spoke with Mort Smith,

5  it was me, Heather, and Mort all on the Zoom.  And then

6  we were also on the call.

7  Q  All right.  So you didn't ever meet with –

8  did you ever – let me ask you this way.  Did you ever

9  meet with Mr. Smith separately?

10  A  Yes.

11  Q  Okay.  So –

12  A  He came – he came to Iowa.

13  Q  Got it.  When did he come to Iowa?

14  A  It was in August.  I don't know the exact

15  date, but it was August because I had just came back

16  from Illinois because I was trying to move back to

17  Illinois.  But I changed my mind and came back to Iowa.

18  Q  Okay.  Why did –

19  A  And Mort called and I met him at the grocery

20  store.

21  Q  Okay.  Did you know Mr. Smith was going be

22  calling you that day?

23  A  No.  I didn't even – I – tell you honestly

24  true.  I don't answer my phone if I don't know calls,

25  but I just happened to just answer it because I do got

Page 130

1 two kids in Illinois. I got my kids there, Illinois.
2 That's what made me answer the phone.
3    Q    Got it.
4    A    Because it says Illinois called and I -- my
5 30 -- my 29-year-old and my 27-year-olds stays in
6 Illinois. And in -- and that's what made me answer.
7 Other than that, I wouldn't have never talked to Mort
8 because I would have never answered.
9    Q    Was this the first -- had anybody prior --
10 before Mr. Smith contacted you in August -- I guess it's
11 August of this year, right?
12    A    Yeah.
13    Q    It's just a couple months ago? Okay.
14    A    Yes.
15    Q    Prior to that call from Mr. Smith, had anybody
16 working on behalf of Mr. Jakes contacted you before that
17 call from Mr. Smith about this case?
18    A    Nope.
19    Q    All right.
20    A    I didn't even know anything about a case
21 proceeding until Mort -- when they brought the paper.
22 But I still didn't -- because I don't know what a
23 deposition is. I don't know far as what it was go -- I
24 didn't even know it was -- had something to do with
25 Shawn when they brought the paper for my brother. I'm

Page 131

1 thinking it's something that he have to go to court
2 for -- from him being incarcerated here. So I never
3 knew until Mort -- until I talked to Mort in August. So
4 I didn't even never knew because -- because I just was,
5 like, oh, this something he got to do here in Iowa so I
6 didn't never know because I didn't read the whole paper
7 because like I told you, I was on my way on the highway
8 when they brought the paper. I was getting ready to go
9 out of town.
10    Q    Uh-huh.
11    A    So I didn't know what the paper was and didn't
12 know anything about a deposition. I didn't even know
13 Shawn was still proceeding on with the case.
14    Q    Well, that -- the paper. You said you got it
15 in the -- about the deposition papers. You say you got
16 those in May of this year; is that right?
17        MS. DONNELL: Objection. Misstates her
18 testimony.
19    A    No.
20    Q    When did you get them?
21    A    I don't know the exact month. I say my dad
22 passed away in May. And I -- the papers came after my
23 dad passed because I had came back from Mississippi
24 [sic] after -- when they brought the paper. So it had
25 to be in June or something.

Page 132

1    Q    Okay. At any rate, the point I was going for
2 here is that you got the deposition papers before you
3 got this call from Mr. Smith, right?
4    A    Yes.
5    Q    All right. And those deposition papers --
6 they had Mr. Jakes' name on them, right?
7    A    I didn't -- like I told you before, I didn't
8 read the paper. He -- once he gave me -- once the man
9 came -- once I made it to my mom house to get the -- the
10 sign for the form, I didn't read it because I was on my
11 way to the highway.
12    Q    Uh-huh.
13    A    So I didn't read the form, he just said it was
14 a deposition. It was a subpoena for my brother. And
15 I'm, like, my brother already locked up. So he was,
16 like, it just -- he was, like, I don't know. It's just
17 a subpoena. I'm just delivering the papers for my
18 daughter because my daughter is in the hospital so I'm
19 delivering the paper.
20    Q    Uh-huh. So --
21    A    And it was a subpoena. So I didn't know -- I
22 didn't read it. I just fold it up. My mom put it in
23 her purse and we got on the highway. So I just was,
24 like, well, I don't know how they go send him a subpoena
25 if he already locked -- incarcerated.

Page 133

1    Q    Uh-huh.
2    A    I didn't think about to look at the paper.
3    Q    Did you get the --
4    A    Because they didn't have my name on them.
5    Q    Sure. Did you get the papers in June, or did
6 somebody else get the papers in June?
7        MS. DONNELL: Objection. Form.
8    A    I -- I --
9    Q    In your family. Like -- yeah. Like it -- was
10 it you or somebody else in your family got the paper?
11    A    I -- I signed for the papers.
12    Q    Okay. So you got the papers yourself in June,
13 right? The deposition papers?
14    A    You're right. Yes.
15    Q    Okay. Did you open them?
16    A    No.
17    Q    Who delivered -- how did you get them? Were
18 they mailed to? Did someone come and hand them to you?
19    A    Someone came and hand it to us.
20    Q    Who was it?
21    A    It -- I don't -- his -- however it go it was
22 his daughter that's supposed to deliver them. She the
23 one that the -- the court proceeding of the -- when
24 people get subpoenaed or whatever or they had to have a
25 paper brought to them, she was actually the one who does

Page 134

1  it. And he said she was in the hospital so he presented
2  the subpoena papers.
3      Q   Whose daughter are you talking about?
4      A   The guy -- the guy that brought the sub -- the
5  papers.
6      Q   Mort Smith's daughter?
7      MS. DONNELL: Objection. Form.
8      A   No.
9      MS. DONNELL: Totally misstates her testimony.
10     MR. GRILL: I'm trying to follow what she's
11  saying.
12     Q   So whose daughter are you talking about that
13  brought the deposition papers to you?
14     MS. DONNELL: Objection.
15     A   It's --
16     MS. DONNELL: Form. And you're misstating her
17  testimony.
18     A   Go ahead.
19     A   It's a company -- it's a company that works
20  here in Ames, Iowa. I don't know if they come from --
21  if they worked through the -- for role of probation
22  board or where their office is actually located. But
23  it's a female. So once the papers got submitted
24  through -- from Illinois through to Iowa -- knowing that
25  Cleotha was in Iowa, they presented the papers. They

Page 135

1  still presented them to the wrong address because if
2  they presented them to my momma address and he
3  incarcerated, that's not his address. His address is in
4  Newton.
5      Q   Got it. Okay. And the papers --
6      A   So once they got -- brought the papers, no. I
7  never read them so I don't know -- I didn't know what it
8  was. I'm thinking it was something for him because he
9  would already incarcerated here.
10     Q   Okay. And so the papers were just for your
11  brother, Cleotha, correct?
12     A   Yes.
13     Q   All right. And did you open them at all?
14     MS. DONNELL: Objection. Asked and answered.
15     A   No.
16     Q   And you gave them -- you said to your mother
17  and she held onto them?
18     A   My mom. Yeah. She just stuck them in her
19  purse.
20     Q   Okay. And the next time you heard about
21  anything related to these papers was when Mr. Smith
22  called you out of the blue when you were in the grocery
23  store, right?
24     MS. DONNELL: Objection. Form.
25     A   No. The next time I heard about this case is

Page 136

1  when I got a phone call on my way from St. Louis from
2  Mr. Mort. I don't even believe I'm -- let me take that
3  back. I don't know who it was. They was at my house --
4  subpoenaed me for a deposition.
5      Q   Okay.
6      A   And I wasn't even at home.
7      Q   What month was this when you were on your way
8  to St. Louis?
9      A   This was -- on my way -- I was on my way back
10  to Iowa.
11     Q   Okay.
12     A   So this was the -- the same, like, a week
13  after they brought my -- Cleotha.
14     Q   So, like, June or July? Somewhere in there?
15     A   Yeah. So this was, like, July -- yeah, like,
16  July.
17     Q   All right. What did this person tell you on
18  the phone?
19     A   He just -- he just said I was subpoenaed --
20  you getting a subpoena for a deposition.
21     Q   Okay.
22     A   I said a subpoena for a deposition. What is a
23  deposition? He was, like, well, I'm just go -- do you
24  want me to just leave the -- your subpoena here? So I
25  was, like, since you at my house, you might as well

Page 137

1  leave it there.
2      Q   All right. Did you ask this person -- what
3  did this person's -- did this person tell you what a
4  deposition was?
5      A   He just -- he just said it the deposition to
6  go to court. He didn't say for who, for what, or
7  anything.
8      Q   All right.
9      A   He just was, like, it's a subpoena -- a
10  deposition. So I was, like, a deposition. He said
11  deposition to go to court -- to go to court. That's
12  when I found out it was for Shawn. He said to go to
13  court for Anthony Jakes.
14     Q   Okay. So in this call -- so in June or July,
15  at that point, you knew that there was a deposition
16  subpoena for you that concerned something about Mr.
17  Jakes; is that right?
18     A   Correct.
19     Q   Did you ask this person anything else about --
20     A   Nope.
21     Q   -- what the subpoena had to do with?
22     A   Nope. Because I just decided I was going to
23  wait to read it so I could call whoever name was on
24  there to find out further what was going on.
25     Q   Got it. And you went -- when you got home,

Page 138

1  did you get the subpoena?  Was it there waiting for you?
2      A.  Yes.  It was.
3      Q.  And did you read it?
4      A.  Yes.  I read it.
5      Q.  And at that point, you realized also that the
6  subpoena had Mr. Jakes' name on it at the top, right?
7      A.  Yes.
8      Q.  What did you do after you opened that subpoena
9  and read it?
10     A.  I called the number at the --
11        MS. DONNELL:  Objection.  Form.  Go ahead.
12     A.  I called the number at the bottom and they
13  never -- still ain't got an answer right now today.
14     Q.  Do you know who you were calling or who that
15  number was supposed to go to?
16     A.  The name that was on there was
17  Brittany (phonetic).
18     Q.  Got it.  Okay.
19     A.  And I never got an answer, left a message,
20  never got a call back.  So I didn't call no more.
21     Q.  Okay.
22     A.  So the thing -- when I -- so I -- I left it at
23  that.  I'm -- I ain't got to do no deposition.  I ain't
24  got to do anything.  No one answered.  So I don't -- why
25  would I have to do a deposition if I can't get in touch

Page 139

1  with nobody?  When do I know I supposed to do a
2  deposition and how do I know how I am going to do it?
3      Q.  Got it.  When -- did you ever -- strike that
4  question.  Did you know in June or July of this year
5  when you got this subpoena to be deposed in this case
6  whether Mr. Jakes was out of jail?
7      A.  You say did I know he was out of jail?
8      Q.  Yeah.  Did you know if he was out of jail at
9  that time when you got the subpoena in July of this year
10  or June of this year?
11        MS. DONNELL:  Objection.  Misstates her prior
12     testimony, but you can answer.
13     A.  Yes.  Because my Aunt Betty's birthday party
14  was years -- a couple of years ago so I knew he had been
15  there.  I knew Shawn been out.
16     Q.  Did you know how to get a hold of Mr. Jakes in
17  June of this year?  Did you, like, have a phone number
18  or a way that you knew that you can reach him?
19     A.  Nope.  I ain't had no phone number or anything
20  on him.
21     Q.  What about your aunt Betty?
22     A.  Yeah.  I was able to get in touch with my aunt
23  Betty, and Aunt B, and them, but I -- I still wasn't
24  going to contact him because didn't I -- like I said
25  before, no one answered or responded to my call.  So all

Page 140

1  that I'm thinking is they subpoenaed me, but they really
2  don't want me to do a deposition so -- because no one
3  contacted me and I couldn't contact nobody once I
4  received that paper.
5      Q.  Did you call anybody after you were unable --
6      A.  I called --
7      Q.  Hang on, hang on, hang on.  After you weren't
8  able to reach Brittany, did you call anybody else to
9  find out what the subpoena was about?
10     A.  Nope.  Because that's whose name that was on
11  there written.
12     Q.  Well, you knew that this subpoena had to do
13  with Mr. Jakes or something to do with him, right?
14     A.  Yes.
15     Q.  Did you call anybody in your family?
16     A.  No.  No.
17     Q.  Any person?
18     A.  No.
19     Q.  At these parties -- the two times that you saw
20  Mr. Jakes after he was out at Aunt Betty's -- did you
21  know at that time whether Mr. Jakes had filed a lawsuit
22  regarding -- arising out of his incarceration for this
23  matter?
24     A.  No.  I ain't know nothing about no lawsuit
25  probably until Tuesday.

Page 141

1      Q.  This last week?
2      A.  Yeah.  I ain't know nothing about no lawsuit
3  until Tuesday this week.
4      Q.  Who told you about the lawsuit on Tuesday this
5  week?
6      A.  Ms. Heather And Mr. Morton [sic].
7      Q.  Okay.  What did they tell you about the
8  lawsuit?
9      A.  They just said -- I knew that he had got
10  exonerated, but I thought that was, like, the end of
11  the -- end of it.  So when I did get the subpoena, I'm
12  just -- once they didn't answer, I just thought it was,
13  like, something to do with the exoneration.  I'm, like,
14  he already exonerated.
15     Q.  When --
16     A.  So all these things they said was I'm going to
17  subpoena -- I'm going through a deposition to speak with
18  some detective's lawyer, but they still never really
19  expanded on it's a lawsuit.  Like, expand, like, it's a
20  lawsuit that Anthony is going through.  They didn't
21  expand on it like that, you know.
22     Q.  Uh-huh.  Do you have any understanding about
23  what Mr. Jakes' lawsuit is about?
24     A.  No.
25     Q.  Did you ask Mr. Smith or Ms. Donnell anything

Page 142

1  like –
2    A   No.  No.
3    Q   You care to know?
4    A   Yeah.  I do because I have to – it's a
5  process that I have to do and you know, yeah.  I care to
6  know because I'm the one got to be on records about his
7  case.
8    Q   All right.  Well, sitting here right now –
9    A   I just – I just don't want to be put in a
10  position of – I'm speaking to his lawyers without it
11  being on record without his not on records and the other
12  half lawyers don't, you know, not there to hear what I
13  have to say.
14    Q   Uh-huh.
15    A   So I would rather find out what the lawsuit
16  about with both lawyers on both ends.
17    Q   Okay.
18    A   That's all.
19    A   Go ahead.  Sorry.  I thought you were done.
20    A   I'm done.
21    Q   Okay.  So if you care to know, have you asked
22  anybody before right now what – prior to right now,
23  like, what this lawsuit's about?
24        MS. DONNELL:  Objection.  Form.  I think also
25    she's just answered that.  But go ahead,

Page 143

1  Ms. Chairse.
2    A   No.  I didn't.  I mean, that's what – that's
3  what I'm trying to tell you, Mister – Mr. Grill.  I
4  didn't talk to anyone about his case of him being in
5  there.  I haven't talked to his case of – prior to him
6  being exonerated.  I haven't talked to no one prior to
7  him having a lawsuit.  Like I told you, I just found out
8  about a lawsuit.
9    Q   Uh-huh.
10    A   So I don't know what his lawsuit is about.
11  Like – like, his lawsuit could be about anything.
12  People take stuff to court about bed bugs, anything.
13    Q   Uh-huh.
14    A   I don't – I just don't know, like –
15    Q   Well, you said a moment ago that you – when
16  the subpoena for you was at your house that you read it.
17  And that subpoena says that this pertains to a lawsuit.
18  Do you remember reading that?
19    A   It – it – it just says lawsuit.  It doesn't
20  says what the lawsuit is.  It just – it don't even say
21  lawsuit.  It says court case.
22    Q   Uh-huh.
23    A   It doesn't say lawsuit.  It says Anthony Jakes
24  v. so-and-so so-and-so.  You – I'm being subpoena on
25  so-and-so – I was subpoenaed to do a deposition on so-

Page 144

1  and-so date.  It doesn't say what is the lawsuit consist
2  of or if it's a lawsuit.
3    Q   Okay.
4    A   It just said I'm being subpoena to court for
5  Anthony Jakes.  It doesn't say a lawsuit.  It doesn't
6  say anything consists of what this case is.
7    Q   What –
8    A   And it just have a case number.  I can't look
9  up a case number to know what it is because I don't have
10  that type of technology or –
11    Q   Well, do you have a computer?
12    A   Yeah.  I do, but I don't know how to – you
13  see I don't even know how to work the microphone.
14        MS. DONNELL:  Hey, Andrew.  You don't have to
15    now, but at some point can we take a short bathroom
16    break?  And I also don't know if the witness needs
17    to take a lunch break at some point.  I don't know
18    how long your plan to go, but we haven't gotten so
19    far yet so I just want to make sure.
20        MR. GRILL:  Yeah.  I'm –
21        MS. DONNELL:  I need a short break, but she may
22    need a lunch break because it's almost 1:30.
23        MR. GRILL:  We can do a lunch break.  Let me
24    just finish this line of questioning and then we'll
25    just take a break for however long we want.

Page 145

1  BY MR. GRILL:
2    Q   Ma'am, when Mr. Smith called you in the
3  supermarket, how long did you talk to him for on the
4  phone?
5    A   No.  Actually, I went and met Mr. Mort face-
6  to-face and we talked probably about – I – it wasn't
7  even ten minutes.  Basically, I think Mr. Mort was just
8  there trying to actually see if I still resided in Iowa
9  because my intentions was to be moved out of Iowa
10  between June and August.  And I was in Illinois for a
11  month because that was where I was going to go.
12    Q   Right.
13    A   He didn't – once he called and he was just,
14  like, he wanted to meet with me, that's when I was,
15  like, well, we can meet up at ALDI's Grocery Store so
16  that's where we met at.  And he just introduced himself,
17  like, who he is, you know, he talked – you know, he
18  worked with Renee Spence.  Just introducing himself,
19  and – and letting me introduce myself to him and –
20    Q   Uh-huh.
21    A   – let me know that – he still never
22  mentioned a law – he didn't never mentioned a lawsuit
23  either.  So I feel it was, like, under the radar of
24  still not knowing what it is that I was going for.
25    Q   Uh-huh.  Right.  So my question was: You had

Page 146

1   earlier told me that you got a call. And you answered
2   it because it was an Illinois number and it was
3   Mr. Smith; is that right?
4       A   Correct.
5       Q   Right. And before that, you had never talked
6   to Mr. Smith, right?
7       A   Nope.
8       Q   You've never met Mr. Smith before that call,
9   right?
10      A   I never -- nope.
11      Q   Okay. No meaning you had never met Mr. Smith
12  before that call, correct?
13      A   No. I never met him before that call.
14      Q   Okay. So all I wanted to know was: That call
15  that you got from Mr. Smith -- how long was that call?
16  How long did you talk to him on the phone?
17      A   For, like, 30 seconds. He was, like, is it
18  okay if I come and stop and talk to you? I'm in Iowa.
19      Q   Okay.
20      A   You know, first he introduced himself my name
21  Mort Smith. I rep -- you know, I worked with Renee
22  Spence. Working with An -- Anthony Jakes' case. So I
23  was, like, okay. He was, like -- I just wanted to see
24  if I can meet with you because I'm in Iowa. I said yes.
25  I gave him the address and I was, like, you could pull

Page 147

1   up at the ALDI's on Fifth Street in Ames. And I just
2   meet -- let me know when you there.
3       Q   Got it.
4       A   And he was, like, okay.
5       Q   Uh-huh.
6       A   That was the end of that conversation.
7       Q   Right.
8       A   Then he called me and was, like, I'm here.
9       Q   Okay. And so when he said that he's working
10  on Anthony Jakes' case, did you ask him what case?
11      A   No. Because that's what I'm saying. I still
12  was in -- under the impression that it would still
13  the -- when him -- him being exonerated -- it still have
14  something to do with the exoneration. I don't -- as far
15  as -- I don't know anything about going -- proceeding
16  onto a next case after you get exonerated. I don't know
17  what else the procedures is after you exonerated. I
18  don't know if you -- what's the next steps. So I'm
19  thinking that's what it was for -- the exoneration.
20      Q   You thought that it had something to do with
21  Mr. Jakes being exonerated. That -- it was at least
22  what was something that was in your mind; is that right?
23      A   Right. Right.
24      Q   And then Mr. Smith came and met you where?
25      A   At ALDI's Grocery --

Page 148

1       MS. DONNELL: Objection. Asked and answered.
2       Q   Go ahead.
3       A   At ALDI's grocery store. It was in the
4   parking lot at -- in Ames, Iowa.
5       Q   How long did you talk to Mr. Smith that time?
6       MS. DONNELL: Objection. Asked and answered.
7       Q   In the --
8       A   It wasn't even --
9       MS. DONNELL: Yeah. Objection. Asked and
10  answered.
11      Q   Okay. Great. How long did you talk to
12  Mr. Smith in the parking lot for?
13      A   It wasn't even ten minutes.
14      Q   Okay. And he was alone, you said, right?
15      A   Yes.
16      Q   What did you guys talk about in the parking
17  lot?
18      MS. DONNELL: Objection. Asked and answered.
19  She's already gone over this.
20      A   He just was -- said he was at -- he was in
21  Iowa. He wanted to meet me because I had the -- I had
22  got the subpoena and, you know, introduce himself. He
23  still never -- we -- I still never asked him -- because
24  it never came up that it was something for a lawsuit,
25  like -- and I still don't know what the lawsuit -- what

Page 149

1   did -- you see what I'm saying? Like, until you just
2   said a lawsuit so
3       Q   So you guys talked for ten minutes. So far
4   he's -- you told me he introduced himself to you and you
5   guys talked about the subpoena, I guess. What else did
6   you talk about?
7       A   He basically --
8       MS. DONNELL: Objection. Asked and answered.
9       Q   Or is that it? Maybe that's --
10      A   He was just basically saying -- asking me,
11  like, how I know Shawn or -- you know, the same thing,
12  like, how we cousins, how -- how are we related, have I
13  talked to Shawn.
14      Q   Okay. Did he ask you anything about the night
15  of Mr. Jakes' -- of the shooting or related to his
16  arrest? Did he ask you questions about that?
17      A   No. No.
18      Q   Did he tell you why you had been -- or why he
19  thought you had been subpoenaed in this case?
20      A   No. Because I didn't ask him anything about
21  why I was subpoenaed, because I'm figuring he -- I'm
22  figuring he just -- he probably figured that I knew what
23  was going on or I be talking to Shawn, which I don't --
24  I didn't know what was going on, I don't talk to Shawn.
25  Shawn don't even know I had a subpoena unless he know

Page 150

1 through his lawyers.
2 MS. DONNELL: Andrew, I know you said you had
3 just one -- are you done with this line of
4 questioning? Can we take a short break?
5 MR. GRILL: Yeah. If you want to take bathroom
6 break, yeah. But I want to finish this line up
7 before we take a lunch break. So --
8 MS. DONNELL: Well, no that's fine. But if
9 you're going to -- if you've got more -- I
10 thought -- okay.
11 MR. GRILL: Yeah. So it's good if you want to
12 take a bathroom break. But in how much time --
13 MS. DONNELL: No -- no. If you're going to --
14 if you're almost done and we're going to take a
15 lunch break, let's just keep going. But if you're
16 going to go another half hour on this line of
17 questioning, then we'll take a bathroom break.
18 MR. GRILL: I'm going to finish this line of
19 questioning. Why don't we take a break? If you
20 want to take a bathroom break, we'll take a bathroom
21 break. But I'll --
22 MS. DONNELL: Okay. Let's go off the record.
23 Also Ms. Victoria, can you be keeping track of the
24 time, the elapsed time just for the record. I'm not
25 sure how long Mr. Grill is going to go today, but if

Page 151

1 you can keep track of that, that'd be great.
2 COURT REPORTER: Yes, ma'am. Shall we all
3 still go off the record now then?
4 MS. DONNELL: Yeah. That'd be great.
5 MR. GRILL: And we'll come back in five
6 minutes?
7 MS. DONNELL: Perfect.
8 COURT REPORTER: We're going off the record,
9 the time is 1:23 p.m.
10 (OFF THE RECORD)
11 COURT REPORTER: We're back on the record, the
12 time is 1:31.
13 BY MR. GRILL:
14 Q Okay. Claudette, just a little bit more and
15 we take a lunch break here. So after you and Mr. Smith
16 talked, I guess, for ten minutes in the ALDI parking
17 lot, when was the next time -- how long after that was
18 until you spoke with Ms. Donnell or Mr. Smith -- yeah?
19 A Tuesday just passed. Tuesday of this week.
20 Q Okay. And then was that the Zoom call or was
21 that the call that was just on the cell phone?
22 A The Zoom call.
23 Q Okay. And then when was the phone call that
24 you had with Ms. Donnell and Mr. Smith?
25 A Yesterday.

Page 152

1 Q Okay. All right. So the call -- the Zoom
2 call that was on Tuesday. So I guess that would have
3 been two days ago. That call -- how long was that Zoom
4 call? How long did it last?
5 A I give it less than an hour.
6 Q Was it more than a half hour?
7 A Yes.
8 Q All right. See anybody else on that Zoom call
9 other than you, Mr. Smith, and Ms. Donnell?
10 A No.
11 Q And where did you take that Zoom call? From
12 your house or were you somewhere else?
13 A I was home.
14 Q What did you guys talk about on that call for
15 a half hour more?
16 A Just how -- have I ever been in a deposition,
17 have I ever been in the court precinct, has been
18 questioned far as, you know, being, like, on -- on
19 trial, but just in a different setting as, like, being
20 on a computer, and how it's going to be set up, you
21 know, people being in different spots, home, office, you
22 know, just let me know how the layout was going to be.
23 And actually, you know, have I ever, you know, talk --
24 as far as representing, I never had to talk to represent
25 nobody but -- but on my -- on my own behalf.

Page 153

1 Q Uh-huh. Have you ever testified in court or
2 given a deposition before today?
3 A No.
4 Q Okay. And what did she tell you about
5 testifying in --
6 A She just --
7 Q -- Court or testifying in a deposition?
8 A She just was letting me know what -- like,
9 what the deposition == basically, a deposition is me
10 been subpoenaed to further on with Anthony -- has been,
11 like, a witness on his behalf and having to talk to
12 lawyers of the Chicago Police Department. And we going
13 to have a court reporter and -- you know, just let me
14 know how -- who I must be speaking with and the --
15 this -- the layout and things of that nature.
16 Q Well, who did she tell you you're going to be
17 speaking with?
18 A She did mention you-all's name but I didn't
19 remember right off hand.
20 Q Like my name and Jeffrey?
21 A She did mention -- she did mention Jeff. I
22 can't recall if she mentioned Andrew, but she did -- it
23 was two names that she did mention, but I can't just
24 recall. But I do recall the Jeff.
25 Q Okay. What did she tell you about us or Jeff,

Page 154

1 at least?
2   A   Just that you -- that -- the ones that I'm be
3 speaking with representing Chicago Police Department.
4   Q   Okay. Anything else?
5   A   No. And just, you know, a little bit about my
6 background -- me. Do I have children, you know, do I
7 have a -- a nice -- you know, do I have a place where I
8 could be with quiet and no interruptions, or if I need
9 to be somewhere, like, at a -- the closest station or
10 whatever in my town or -- you know, just trying to see
11 if I had complete set up where I could be on Zoom.
12   Q   Uh-huh. Okay. Anything else you guys talked
13 about?
14   A   No.
15   Q   Maybe as much as long as an hour?
16   A   My bad. I was get her more of what's going --
17 what was, like, my background and things of
18   Q   Okay. Anything else?
19   A   No.
20   Q   All right. Did you guys talk about what the
21 deposition was going to be about today?
22   A   She yeah, she -- she didn't -- I didn't expand
23 with her, like, far as what is -- what is the case is or
24 what it's about. But I did actually, like, it's a
25 deposition representing -- you know, I got to talk on

Page 155

1 Shawn behalf for all of that. But I feel they never
2 asked him because that -- that is my fault. I still
3 never asked what type of case that I'm being subpoenaed
4 to. So I didn't -- I didn't ask them and they didn't
5 expand on it either.
6   Q   Okay.
7   A   So I guess -- they was about thinking, like, I
8 was -- I would be on record so I could find out what it
9 is. So I won't know.
10   Q   Okay. So when you say you -- they told you're
11 going to talk on Shawn's behalf, what did you understand
12 that to mean?
13   A   As far as still thinking about the exoneration
14 the -- you know him being incarcerated.
15   Q   Okay. And that's something that Ms. Donnell
16 or Mr. Smith told you that you're going to talk on
17 Shawn's behalf today?
18       MS. DONNELL: Objection. Form. Misstates her
19       testimony and argumentative. But go ahead, Ms.
20       Chairse. You can answer the question.
21   A   It was -- basically, it was just, like,
22 speaking yes, like, you know, I'm getting questioned
23 about Shawn. It still didn't dawn on me, like, if I
24 knew it would have something to do with the incident --
25 the -- the charges he was charged with, but I still

Page 156

1 didn't know who have -- what the case was still
2 consisting of as far as a lawsuit.
3   Q   Right. So what did you discuss with Ms.
4 Donnell and Mr. Smith on Tuesday this week during the
5 Zoom call in regards to what the deposition was going to
6 be about today? That's what I'm trying to find out from
7 you.
8   A   It was -- it -- it was spoken about being part
9 of -- be in the case that he was convicted on. It
10 just -- it wasn't -- it just wasn't spoken as being
11 to -- as a lawsuit. So I still didn't have it as a
12 lawsuit. I still was -- had it as I'm speaking on his
13 behalf of the case that he was incarcerated of -- of
14 been exonerated, not a lawsuit.
15   Q   Okay. All right. So --
16       MS. DONNELL: I just think -- I think you're
17       maybe talking past each other but I mean --
18       MR. GRILL: Let me --
19       MS. DONNELL: Maybe you ask it a different way.
20       MR. GRILL: Stop. Stop. Stop. Stop. Stop.
21       Stop. Stop. Stop. Let me ask another question.
22       Now -
23       -
24       MS. DONNELL: Well, I'm just suggesting to ask
25       the question in another way.

Page 157

1       MR. GRILL: No. Just stop.
2 BY MR. GRILL:
3   Q   Claudette, during your call -- the Zoom call,
4 did you discuss with Ms. Donnell and Mr. Smith what it
5 was that you remember from the night of the shooting and
6 the following day regarding Mr. Jakes' arrest? Did you
7 discuss any of that with them during the Zoom call?
8   A   No. By the fact, only thing that we discussed
9 is the part about the window. And she just showed me
10 the pictures, just asked me do I see -- do I -- could I
11 see who this is sitting on the porch.
12   Q   Okay.
13   A   And that's it.
14   Q   Okay.
15   A   Far as part of the incident that happened and
16 all of that, no, we didn't expand to.
17   Q   Okay. So what did you discuss with Ms.
18 Donnell and Mr. Smith about the window on Tuesday during
19 the Zoom call?
20   A   About us just sitting on the porch, throwing
21 the bottle, and window get busted. And I was just,
22 like, I knew we was going to get a whooping time. And
23 then, like, I was telling my brother, like, we'd go get
24 our butt whooped.
25   Q   Uh-huh.

Page 158

1    A   And

2    Q   Anything else?

3    A   That's it because once she showed the picture

4   and was, like, do you see the -- the window busted?  And

5   we didn't ever discuss anything as far as the incident

6   with the shooting or anything.  It just was, like, the

7   window and do I -- could I recognize who was sitting on

8   the porch?

9    Q   Uh-huh.  Got it.  Okay.  So did Ms. Donnell

10   and/or Mr. Smith -- either of them ask you questions

11   during the Zoom call on Tuesday about how the window got

12   broken?

13    A   Yeah.  They asked me how did -- how did the

14   window get broken that day.

15    Q   Right.  Okay.  And kind of questions similar

16   to what Ms. Donnell asked you in her examination today

17   about the window; is that fair?

18    A   Yes.

19    Q   So those questions in that topic itself --

20   that was not a surprise to you today to hear those

21   questions from Ms. Donnell; is that fair?

22    A   Correct.

23    Q   All right.  Because you had gone over that

24   information with Ms. Donnell before your deposition

25   today, correct?

Page 159

1    A   Correct.

2    Q   And would the same apply to Ms. Donnell's

3   questions to you today about who is on the porch?

4    A   Correct.  In the picture -- in the photo.

5    Q   Right.  She went over that with you today --

6   or excuse me, during the Zoom call with you on Tuesday,

7   right?

8    A   Correct.

9    Q   So those questions that Ms. Donnell asked you

10   about who was on the porch and related to that topic --

11   none of that was a surprise to you today either,

12   correct?

13    A   Correct.

14    Q   Okay.  Were there any other topics that you

15   discussed with Ms. Donnell during the Zoom call other

16   than -- and I'm talking about topics related to the

17   events surrounding the shooting, Mr. Jakes' arrest the

18   following day -- or I shouldn't say arrest, but when the

19   police came and got him at his aunt B's house.  Are any

20   other topics that you discussed with Ms. Donnell and Mr.

21   Smith on Tuesday during Zoom call related to those

22   events?

23    A   No.

24    Q   So the only two things that you did -- only

25   two topics that you discussed with Ms. Donnell and

Page 160

1   Mr. Smith on Tuesday during the Zoom call related to

2   this incident concerned the window and how it got

3   broken, and who was on the porch.  Those are the only

4   two topics; is that right?

5    A   No.  Who -- who was on the porch, how do --

6   and do I see the window broken, and how it got broken.

7    Q   Okay.  Did you talk with Ms. Donnell about the

8   last time that you saw Mr. Jakes?  Did that come up at

9   all?  The last time you saw Mr. Jakes on September 15,

10   1991 where they stood -- night the shooting happened,

11   did that come up at all during the call?

12    A   No.  She didn't ask me when was the last time

13   I seen him September 15, 1991.  She --

14    Q   Okay.

15    A   -- didn't ask me that on the Zoom call or the

16   phone call.

17    Q   Okay.  And did Ms. Donnell and Mr. Smith tell

18   you anything about what any other witness in this case

19   has testified to in any deposition in this lawsuit so

20   far?  Did anything -- did they communicate anything like

21   that to you at all?

22    A   No.  I didn't even -- I didn't even know

23   nobody else was on this case.  I thought I was the bowel

24   joint after whole bundle or something.

25    Q   Uh-huh.  Did you ask Ms. Donnell or Mr. Smith

Page 161

1   during the Zoom call on Tuesday anything about why do

2   you want to know anything about how the window got

3   broken or who was on the porch?  Why they wanted to talk

4   to you about that before today?  Did you ask them any

5   questions like that?

6        MS. DONNELL:  Objection.  Form.

7    Q   Go ahead.

8    A   No.  I didn't ask them.  It's just that -- she

9   just say I'm going to show you a photo.  And when she

10   showed it, I just was, like, oh, that's the top window.

11   That's the window that got broke.

12    Q   Uh-huh.

13    A   And then that's when she just was, like, you

14   see the people on the porch?  Yeah.  But I can't -- I

15   don't know who it is because I can't clearly see who it

16   is that's sitting on the porch.

17    Q   Okay.  All right.  So just to recap.  During

18   your Zoom call on Tuesday that might've been as long as

19   an hour, the only things you talked about with Ms.

20   Donnell and Mr. Smith are as follows -- and you tell me

21   if I left anything off.  That you talked about whether

22   or not you'd ever been in a deposition before, whether

23   or not you've ever been in court and testified in court,

24   what the layout of the deposition was going to be like

25   today, they showed you photos, you talked about the

Page 162

1 window, and who was on the porch. That's it. Am I
2 missing anything?
3    A    Well --
4        MS. DONNELL: Objection. You misstated her
5    prior testimony.
6    Q    Am I missing anything?
7    A    And -- yeah. I also was telling her how I was
8 wrongfully convicted. So that was, like, a topic that
9 was off the conversation of what the whole deposition is
10 about, but I did expand and let her know that I was
11 wrongfully convicted by Chicago detectives also.
12    Q    Got it. That's new to me. Okay. So tell me
13 about that. What crime were you wrongfully convicted
14 for?
15        MS. DONNELL: Okay. I just want to pause for
16    just a second because I do think you're going into
17    new area now, and I just want to ask the witness if
18    she --
19        MR. GRILL: Hang on.
20        MS. DONNELL: -- something.
21        MR. GRILL: -- hang on, hang on, hang on. You
22    froze, I didn't hear.
23        MS. DONNELL: Oh, I was just saying it sounds
24    like you might be going into another topic, which is
25    fine. I just want to say, if so, maybe the

Page 163

1 witness -- if she wants to eat because we're going
2 on 2:00 now.
3        MR. GRILL: No.
4        MS. DONNELL: Just to inquire. It's your --
5        MR. GRILL: No, you're --
6        MS. DONNELL: I think it's -- I think it's
7    approach -- sorry. Before you interrupt me Andrew,
8    I think it's appropriate because you said you're
9    going to give her a lunch break since 1:00 and it's
10    now 1:40.
11        MR. GRILL: Okay. I'm not going to take a
12    break right now until I get the answers to this
13    topic because -- and then we will take a break.
14        MS. DONNELL: That's fine. That's fine. I
15    just would like to be respectful of the witness and
16    her needing -- need to eat or drink and --
17        MR. GRILL: We're going to do that. So
18    without --
19        MS. DONNELL: But I'm not sure when.
20        MR. GRILL: Let's not waste any more time.
21 BY MR. GRILL:
22    Q    Ma'am, tell me what crime you were wrongfully
23 convicted of?
24    A    I was wrongfully -- wrongfully convicted of --
25 of my baby being injured.

Page 164

1    Q    Okay. What was the charge?
2    A    Aggravated battery to a child.
3    Q    What year did this -- were you arrested for
4 this crime?
5    A    2003.
6    Q    Which child? What name?
7    A    My child, Destinee.
8    Q    Destinee. And you were arrested by Chicago
9 Police Department?
10    A    Yes. She got injured at her dad house and she
11 was seven-weeks-old. I was at work; I went to pick her
12 up. She was crying. I took her to the hospital. They
13 said she had colic so I took her to another hospital.
14 They asked me what was wrong with her. I said I believe
15 something wrong with her legs. She ended up with a cast
16 because she had a fractured ankle. Six months later,
17 they called me to the police station, had me at the
18 station for four days, nothing to eat, not restroom, or
19 anything. They had me to sign a paper saying I was free
20 to get out and I ain't going home until six years later.
21    Q    And you were -- did you take -- were you
22 charged with anything else other than aggravated
23 battery?
24    A    No.
25    Q    And --

Page 165

1    A    Yeah. Like in '90 -- in the '90s I had a drug
2 case, like, in '98.
3    Q    Okay. Yeah. And I just want to talk about
4 the aggravated battery. Did you take that case to
5 trial? Well, let me ask you. Did you have a lawyer
6 that represented you once you were charged?
7    A    Yeah. I had a lawyer, but I stayed in the
8 County for 20 -- over two years.
9    Q    Okay.
10    A    So my mom got sick. My mom had two heart
11 attacks and a stroke. I was just, like, I'm not
12 going to sit no longer. I need to get home to my kids
13 and my mom when my mom got sick and my mom had my kids.
14    Q    And --
15    A    Because other than that, I wouldn't have never
16 left the County because I know I didn't do anything
17 wrong and I'm not going to take no charge for nobody.
18    Q    Who was --
19    A    But I did end up taking the time because I
20 need to get home to be with my kids and my mom.
21    Q    Who was your lawyer? What was your lawyer's
22 name?
23    A    My lawyer's name was Trent -- Trent Jackson.
24 He came out of Bridgeview.
25    Q    Okay. Was he a public defender or was he a

Page 166

1 private attorney?

2    A   He was a public defender.

3    Q   Okay. And -- so it's -- I think what you were

4 saying is that you pled guilty to it; is that right?

5    A   Yeah -- I mean, yeah. I pled guilty after two

6 years.

7    Q   Yeah.

8    A   Fighting for two years.

9    Q   Were you -- what was the sentence that you

10 were given? Were you given, like, time served or did

11 you get something more than?

12    A   The State -- nope. I got six years and 85

13 percent. So I still end up going down state for three -

14 - three more years. Three years and some months.

15    Q   Okay. All right. Was there -- when did you

16 get out?

17    A   July of 2008.

18    Q   And why do you believe that you were

19 wrongfully convicted of that crime?

20    A   How you going to convict -- how you going to

21 charge someone that wasn't even there when the incident

22 happened if I was there at work at 9:00 in the morning.

23 I picked my baby up at 6:00 in the evening, and she

24 already -- her bone already broke. Where do I come in

25 possession of her with -- come into the time frame of

Page 167

1 being there when she got injured? So when I went to the

2 police station, it was me, my mom, and my baby. So they

3 questioned me and then they released me. Six months

4 later they asked me to come in for a polygraph test. I

5 never took a polygraph test. They never let me call

6 home. I was there for four days, nothing to eat. They

7 wouldn't let me use the bathroom so I was using it all

8 over the cell on 111th Street. And I didn't get --

9 didn't nobody know where I was at until I got to Cook

10 County Jail and was able to get that phone call to call

11 my mom. So yeah, I was -- I already -- that's the only

12 time that I had -- ever had to testify in court and it

13 was on my own behalf.

14    Q   What -- do you know what type of hearing you

15 were testifying in? Was it, like -- yeah --

16    A   I didn't -- I didn't take it to trial.

17    Q   No. I know.

18    A   I was going to take it to trial, but once my

19 mom got sick I just -- like, the State was trying to

20 give me 16 years. No. I'm not going to take 16 years.

21 I'm not going to take -- I wasn't going to take

22 anything. I was going to sit there until the walls cave

23 in if I had to. But once my mom got sick, yeah, I got

24 to get out of here. So I pleaded for the six years.

25 That's 85 percent to get home to my mom.

Page 168

1    Q   Did you have prior criminal convictions of any

2 sort before you were charged? You had mentioned the

3 drug charge, I guess, back in the '90s. But other than

4 that, were there any other criminal convictions that you

5 had?

6    A   No.

7    Q   Okay. Do you have any understanding of what

8 the State's -- the prosecutors theory of their case was

9 that, you know, would explain maybe in your mind why

10 they were asking for 16 years?

11       MS. DONNELL: Objection. Calls for

12 speculation.

13    Q   Because you -- let me put it into context for

14 you. The reason I'm asking that question is your

15 explanation to me just now about why you are innocent or

16 why you were wrongfully convicted of this crime was

17 because you weren't there at the time, I guess, your

18 seven-week-old baby girl was -- had her -- or baby had

19 her ankle broken. So do you know what the State's

20 evidence was against you or what you expected the

21 State's evidence to be --

22    A   He say, she say.

23    Q   -- to prove that --

24    A   I had -- I had evidence. I had clock in

25 sheets. I had -- my managers -- they have video showing

Page 169

1 what time I came in, what time I clocked out. They had

2 my clock in sheet, they had my clock out sheet. All

3 that -- the State had -- was the people on her dad's

4 side. I don't know what they -- whatever they were

5 saying, they -- I shook my baby up -- all that.

6    Q   Uh-huh.

7    A   But my thing was: How did I shake my baby if I

8 wasn't here? And when I got here and she was -- you-all

9 say she's been crying for, like, two hours. I went

10 straight back out the door with her. So when in the --

11 this time of period frame that you-all see me shake my

12 baby? And if she was shaken, how do her leg get broke

13 from being shaken? What exactly did you-all do to my

14 baby?

15    Q   So --

16    A   So they really -- the detectives really didn't

17 even have a case because if they did, they would've kept

18 me. They would've arrested me the day I went to the

19 police station. They arrest -- they call

20 theyself [sic] -- arrested me six months later without

21 any -- without me talking to them, having a polygraph

22 test, or anything. They just brought -- I went in there

23 from work, they put me in a room, came back, put me in

24 this holding room, and the next thing I know, I'm coming

25 out of -- they -- sign this so you could go home. Next

Page 170

1  thing I know, I'm on the bus on my way to the County.
2      Q   So it's your understanding that the State had
3  witnesses that were going to offer testimony that you
4  were there or that you did abuse your child.  Is that
5  generally --
6      A   But my lawyer -- I -- we had witnesses too.  We
7  had my -- we had my supervisor, my manager, and they
8  also had video that I was at work.  I just didn't want
9  to sit no longer because my mom got sick --
10     Q   Got it.
11     A   -- and she had all five of my kids.
12     Q   Do you --
13     A   So I didn't want to sit no longer.
14     Q   Yep.  I got that.  Do you remember the name or
15  the names of any of the detectives that investigated you
16  or arrested --
17     A   No.
18     Q   Okay.
19     A   No.  But I sure -- I was going to go through
20  the process of -- of trying to find their names when I
21  came home.  But I just was, like, I'm not even going to
22  even -- I'm just done with it.  I done did the time,
23  I'm -- I'm over it.  I just was over it.  I'm home with
24  my baby so that's it.
25     Q   Has your conviction ever been overturned for

Page 171

1  that offense?
2      A   No.  Because I didn't ever proceed to
3  process -- to get it overturned, but I was going to
4  press the issue of getting it overturned.  But I just --
5  I just let it be.
6      Q   Are you on parole right now?
7      A   No.
8      Q   All right.  When did it end?
9      A   A year after I got out because -- they ended
10  it on good behavior because I wasn't -- I was going to
11  school for my CDLs, the class they had me in.
12     Q   Yeah.
13     A   So they was just -- like, I reported every
14  month.  My parole ended probably -- it probably wasn't
15  even a year after.  It probably was -- it probably was a
16  year or something after.
17     Q   Do you believe that the Chicago Police
18  Department did anything improper when they investigated
19  you for the aggravated battery of your child?
20     A   Yes.  They did.
21     Q   What did you believe that they did wrong?
22     A   They didn't -- they didn't take the time to go
23  to my place of employment to talk to my supervisors, get
24  video.  We had to get all this -- my supervisor, video,
25  all that.  My lawyer end up getting all that along with

Page 172

1  my auntie.  My auntie ended up have -- you know, getting
2  them to get all this information for me to have to --
3  for them to present in court.  They didn't proceed to
4  try to do anything.  All that they know is they want --
5  they want -- oh, it's a child, you the mama.  You go get
6  convicted.  You -- we ain't got to ask you no questions,
7  we ain't got to do this, sign this paper.  Oh.  She said
8  this which -- I'm, like, when they presented the paper
9  at court I'm, like, yeah, that's my signature, but that
10  is not -- how -- how would you-all tell me they wrote
11  that out with me.  I supposed to wrote this letter
12  saying that I did this and my baby name ain't even
13  spelled right.  I'm not going to -- I'm going to spend
14  my whole -- my baby's name wrong?  Writing out a whole
15  statement that I supposed to wrote -- I supposed to
16  wrote out a whole statement, and I'm going to spell my
17  baby's name wrong, spell my name wrong?  And they was,
18  like, sign this so you could go home.  So I signed it
19  and end up on a bus on my way to Cook County.
20     Q   Are you --
21     A   It was a statement that they had wrote up
22  try -- saying that I made the statement.  That I wrote
23  the statement out.
24     Q   Who wrote the state -- was this a handwritten
25  statement or like, a typed up statement?

Page 173

1      A   It was a handwritten statement.
2      Q   And do you know who wrote the statement out?
3      A   No.  Because -- remind you, I'm telling you
4  they had me in this room -- holding room for four days.
5  So when they did decide to open the door, it was sign
6  this so you could go home.  So it never was, like,
7  presented to me as, like, a full paper like this with a
8  statement.  It just was, like, well, you can sign this,
9  like -- like they had -- it was something over it.  Like,
10  sign this and you -- you free to go.  So once I signed
11  it, and I'm getting my -- getting ready -- getting my
12  shoes to put on, the door closed, you can hear it lock.
13  Then all of a sudden, I'm on the bus on my way to
14  Cook County Jail.  And never seeing home again for
15  another three years later.
16     Q   So they put a -- so they wrote out -- so
17  somebody wrote out a handwritten statement for you to
18  sign and you never read it; is that right?
19     A   No.  I never read it.
20     Q   And --
21     A   I ain't never read it until I got to -- I was
22  in -- locked up for almost a year when it was first
23  presented but I was --
24     Q   But you signed --
25         MS. DONNELL:  I'm sorry.  Just a second, Mr.

Page 174

1  Grill. I know that you don't mean to, but I don't
2  think she finished what she was saying. So just let
3  her finish and then you can ask the question.
4     Q  Are you done?
5     A  Yeah, I'm done.
6     MS. DONNELL: Andrew, I –
7     MR. GRILL: Not you. I'm talking to the
8  witness, Heather.
9     MS. DONNELL: I'm sorry, Andrew. Calm down.
10  Calm down. I –
11     MR. GRILL: Heather, knock it off. Stop. Stop.
12     MS. DONNELL: Andrew, I'm being professional
13  with you. Please stop your attitude. I am not
14  doing anything inappropriate. I'm just asking you
15  not to interrupt the witness.
16     MR. GIVEN: You –
17     MS. DONNELL: I'm not even getting angry right
18  now. I'm just being –
19     MR. GRILL: You're talking way too much. Your
20  objections are speaking objections. I asked you to
21  stop. Just make your objection.
22  BY MR. GRILL:
23     Q  Ma'am, are you done with your answer?
24     A  Yes.
25     Q  Okay.

Page 175

1     MS. DONNELL: Andrew, I'm going to ask that you
2  just take your attitude down a notch so we can
3  finish this deposition in a professional manner.
4  I'm just going to put that out right now.
5     MR. GIVEN: And I will – for the record, I
6  don't hear an attitude. And I don't see anything
7  unprofessional so
8     MR. GRILL: Thank you, Jeff. I was going to
9  say the same and I will agree with – I'm unbiased.
10  I'll agree with Mr. Given.
11     MS. DONNELL: I'm outnumbered here today so
12  that's fine. But you can proceed. But I think that
13  it's clear from the tone you're using –
14     MR. GRILL: Can you not –
15     MR. GIVEN: You guys – I disagree Heather. So
16  why don't you just stop the finger pointing and let
17  Andrew ask his questions.
18     MR. GRILL: Yeah.
19  BY MR. GRILL:
20     Q  Ma'am, did you – so the paper that you signed
21  at the police station after being there, I guess, for
22  four days – you thought you were signing release papers
23  or something that would allow you to go home; is that
24  right?
25     A  Correct.

Page 176

1     Q  And why did you think that what you were
2  signing was something that was going to allow you to go
3  home?
4     MS. DONNELL: Object.
5     A  Because that's what they said. Sign this form
6  so you could go home.
7     Q  Okay. And then a year – over a year, I
8  guess, later then you saw what it was that you signed.
9  And at that point you realized that you had signed a
10  confession; is that right?
11     A  That's when I seen the handwritten letter over
12  a year later.
13     Q  Okay.
14     A  – or almost – it probably was close to a
15  year, if not over a year. That's the first time I had
16  seen – actually seen this written confession. And I'm,
17  like, how did I write this and my name not spelled
18  right? My baby name not spelled right? Like who go
19  write a confession and they own name not spelled right?
20     Q  Uh-huh. And when you saw this confession that
21  you signed a year-and-a-half later, how did you know –
22  then tell me how you knew that what that confession was?
23  That that was the same thing that you signed when you
24  were in the police station over a year before that since
25  you never saw what it was that you signed or read, but

Page 177

1  it was –
2     A  Because my signature was at the bottom. I
3  know my own signature.
4     MS. DONNELL: I'm just going to – if I may –
5     MR. GIVEN: Whoa, whoa, whoa, whoa. Let the
6  witness speak, Heather.
7     MS. DONNELL: I'm putting an objection – and
8  thank – Andrew I'm putting an objection on the
9  record. So just – Ms. Chairse, if you don't mind
10  just pausing after Mr. Grill asks his question in
11  case I can make an objection or want to make an
12  objection. So I'm going to object to the form of
13  the question. And it's argumentative and also to
14  the form being – well, form. Go ahead, Ms. Chairse.
15  BY MR. GRILL:
16     Q  Go ahead. So how did – do you need me to ask
17  the question again?
18     A  Yes.
19     Q  Okay. So how a – year-and-a-half later,
20  or – over a year later when you're, I guess, still
21  sitting in the county jail on this case and you see your
22  confession – this handwritten confession you signed for
23  the first time. How was it that you knew that that
24  confession was the same thing that you signed a year
25  plus before in the police station? Yeah. How do you

Page 178

1  know it was the same thing?
2      MS. DONNELL: Objection. Form. Go ahead and
3  answer.
4      A  Because I know my signature and my signature
5  was at the bottom of the papers. I know my handwriting.
6  So whatever paper that they had, they had a format over
7  it. Whereas where you write, it goes through, like, a
8  double standard, like you sign out a check and it -- the
9  ink through. It was the same. I know -- I know my
10  signature and my handwriting. Yes, that was my
11  signature on there. But no, that wasn't my handwriting.
12  And no, I'm not going to spell my own name wrong. I'm
13  not going to spell my baby name wrong. That's how I
14  knew it was the same paper.
15      Q  Uh-huh.
16      A  And the judge asked me that. Is that the same
17  form? Yeah. That's the same. That's -- that is my
18  signature, but that is not the paper that they
19  brought to me -- that's not how it was presented to me.
20  It was presented to me as something being on top. And
21  you sign right here and you could go home. And once I
22  signed it, I didn't go home so it had to be a cover and
23  paper, the form of a -- the top form of the paper wedge
24  right through. I'm not denying that it wasn't in my
25  signature. Yeah, it was my signature. But it wasn't in

Page 179

1  my handwriting on the top.
2      Q  How many pages was this handwritten confession
3  that you signed?
4      A  It was -- I don't know how many pages it was,
5  but the one that they presented to me was, like, the one
6  that I -- that the judge asked was this my signature.
7  That was, like, the back page so it probably was more
8  than two -- three pages.
9      Q  Did you sign just one page or did you sign
10  more than one page?
11      A  It was that one page. It was, like, the end
12  of whatever they had that was written up.
13      Q  And you said the judge asked you at some point
14  if that was your signature on the confession?
15      A  Yes.
16      Q  And --
17      A  He asked me was that my signature?
18      Q  Okay.
19      A  He also asked me was that my handwriting? No.
20  That's not my handwriting. And no, that's not how my
21  name is spelled. And no, that's not how my baby name is
22  spelled.
23      Q  Okay.
24      A  People spell their baby name different. I
25  don't spell my baby name like everybody else spell

Page 180

1  Destiny.
2      Q  Uh-huh.
3      A  Destinee not spelled like Destiny with a Y.
4      Q  Did you --
5      A  My baby name not spelled like that.
6      Q  Did you tell the judge that you were tricked
7  into signing that confession?
8      A  I told the judge. When I first went to court,
9  I told Judge Davy. That was my judge in Bridgeview.
10  Judge Davy.
11      Q  D-A-V-I-E-S?
12      A  D-A-V-E-Y [sic], I believe. I -- and I
13  believe he retired because it was Judge Davy in
14  Courtroom 109. Because this courtroom was my birthday.
15      Q  Okay.
16      A  And I told him when I first got there, I
17  signed the form. They told me to sign the form, that I
18  was on my -- getting ready -- going home and I ended up
19  on the bus in Cook County jail.
20      Q  Did your lawyer or -- did you ask your lawyer
21  to move to try to suppress or get that confession thrown
22  out since you were tricked into signing it?
23      A  Yeah. I -- it did end up getting thrown out,
24  but it still was, like, ever -- they ended up getting
25  thrown out. It was, like, he put in for it to get

Page 181

1  thrown out. It ended up getting thrown out. Then here
2  comes some more with them with some more. I don't know
3  what else -- what -- what else they -- they witnesses
4  they claim they had or but then nobody never come to
5  court. So I'm just wondering like where did you-all get
6  your-all witnesses from. Where the witnesses at? Why
7  they never at court? Because them -- nobody didn't ever
8  come to court but my -- my family.
9      Q  Okay. So is your --
10      A  My supervisor.
11      Q  Sorry, go ahead. Are you done?
12      A  Yes.
13      Q  So it's your testimony that your confession
14  and the signed confession that you were tricked into
15  signing was indeed thrown out. It was not something
16  that could be used against you if you decided to go to
17  trial; is that right?
18      A  Correct.
19      Q  Okay. And was it the police or was it the
20  state's attorney that told you if you signed these
21  papers, you could go home.
22      A  It was the detectives. They -- they came --
23  it was the detectives of 111th Street of Chicago,
24  Illinois.
25      Q  You remember the detective's name?

Page 182

1    A   No.  I don't.
2    Q   Okay.  Was he a White guy, a Black guy, or a
3  Hispanic guy, or an Asian guy?
4    A   They were White guys.
5    Q   Okay.
6    A   It was two of them.  It was a heavyset one and
7  there was a -- slim -- it was a -- a skinny one.
8    Q   You ever seen these guys?
9    A   I'll never forget -- I'd never forget how they
10  look because the heavyset one is the one that got to
11  screaming and hollering you did it -- you did it.  I
12  ain't did nothing.  And if you not going to give me no
13  polygraph test, then I need to go home.  That's when
14  they put me in that other room.  And I ain't hear that
15  door.
16    Q   Uh-huh.
17    A   Only thing -- only time you heard that door
18  was when they hit on it to say be quiet or -- because
19  I'd be hollering can I go to the bathroom.
20    Q   Was --
21    A   They beat on the door.  Be quiet.  Okay.  I'm
22  going to be quiet, but this going to be a pissy [sic]
23  cell until I leave out of here.
24    Q   Did you actually have -- like, do you remember
25  if you actually had, like, a hearing in court where your

Page 183

1  attorney made an argument to the judge and presented
2  testimony or evidence, you know, in favor over or about
3  the reasons why your confession -- your handwritten
4  confession should be suppressed or thrown out?  Do you
5  remember having a hearing like that at any point?
6    MS. DONNELL:  Objection.  Form.
7    A   Yeah.  We did have a hearing and the
8  confession did get thrown out.  But that was --
9    Q   Yeah.  And I'm just asking if you remember the
10  hearing.  Okay.  So do you remember what the argument
11  was that your attorney made to get the confession thrown
12  out?
13    A   It was just -- like, I can't remember the
14  exact how it was but it was like a -- like a confession
15  of being, like, how would she write a confession out and
16  spell her own -- her name and her child name wrong.
17    Q   Uh-huh.
18    A   Like, who go -- who go write a whole, like,
19  write a confession or -- that's like writing a letter or
20  writing a book and you spelling the names that you're
21  using incorrect.
22    Q   Okay.  Other than the names that were
23  misspelled in the confession, when you finally got a
24  chance to read it, you know, a year or more after you
25  signed it, do you remember if there were other things in

Page 184

1  the confession that you remember reading and thinking
2  that's absolutely not true, that's something that
3  somebody might have made up?
4    A   The date they had in there --
5    MS. DONNELL:  Objection to the form of the
6  question.  Sorry.  Objection to the form of the
7  question.  Argumentative, but you can answer.
8    A   It was -- it was the date that they had in
9  there that -- they said that they had me to come to the
10  station for the polygraph test.  They had -- it was a
11  whole different thing that they--
12    Q   Okay.  Other than some names and the date --
13    MS. DONNELL:  I'm sorry.  She hasn't finished
14  her answer, Mr. Grill.  She hasn't finished saying
15  her answer.
16    A   I got it.
17    Q   Go ahead and finish your answer.
18    A   It was the date --
19    Q   I know.
20    A   -- the date was wrong that I came to the
21  station.  The name was wrong.
22    Q   Okay.
23    A   And then you could see where is -- they tried
24  to have a date and -- the date that they was trying to
25  say that I was -- the date that they was trying to say

Page 185

1  the incident happen.  That date was wrong, but they
2  tried to write over it, like, so they won't have to
3  write the whole thing over so it was, like, the date
4  that the incident happened.  That was even wrong.
5    MS. DONNELL:  Andrew, before you ask the next
6  question.  I just want to say we've now gone -- it's
7  another hour.  It's two -- almost 2:15.  And I just
8  want put on the record that we've said she was going
9  to get a lunch break in the --
10    MR. GRILL:  Yes.  And I'm almost done with this
11  section.
12    Q   Did any of the police officers other than, I
13  guess, telling you that if you signed the papers, you
14  can go home -- did anybody else -- did she -- was there
15  anything else police did to get you to sign that
16  confession?
17    A   No.
18    MS. DONNELL:  Objection to the extent that
19  misstates your prior testimony.
20    MR. GRILL:  I don't know what I misstated.
21    Q   But other than the police putting the papers
22  in front of you in the police station saying, hey, sign
23  these and you can go home, was there anything else the
24  police did to get you to sign those papers?
25    A   No.

Page 186

1    Q   Okay.  Did anybody, like, any of the police
2  officers physically abuse you in any way while you were
3  in police station?
4    A   They mentally -- I feel like they mentally
5  abused me.  They wouldn't let me use the restroom.  They
6  wouldn't see me and I was there -- if I was there over
7  72 hours and you don't have anything that you -- you --
8  you don't have a charge on me and you have me here 72 --
9  72 hours, that's against the law, which I knew that at
10  the time.  But at the time, yeah, they -- they mentally
11  abused me.  They didn't physically put their hands on
12  me, but they mentally abused me.
13    Q   Okay.
14    A   You know, like, it was -- like, I went got
15  locked up.  My baby's six months old.  I come home my
16  baby's going on seven.
17    Q   Okay.  What is your opinion of the Chicago
18  Police Department, you know, whether for this or
19  anything else.  I mean, what's your opinion today's of
20  the Chicago Police Department?  Do you trust them, for
21  example?
22    A   No.
23    Q   Okay.  Is that because of your personal
24  experiences that you've described here?
25    A   Yes.

Page 187

1    Q   Are there any other reasons why you don't
2  trust the police?
3    A   No.  It's my own experience why I don't trust
4  the Chicago Police Department.
5    Q   Like the police at all?
6    A   I have -- if -- only time if I was to call the
7  police department of Chicago is when I'm in a car
8  accident.
9    Q   That's it?
10    A   If I -- or -- if they get the shooting by me.
11  But far as them coming to, like, no, I don't trust them
12  to come to my aid anymore like I used to would be
13  because if I call on you to come for my rescue, how am I
14  going to get locked up, and I'm the one they got hit, or
15  I'm the one they got stabbed or whatever, and I'm the
16  one getting in car -- getting locked up.  I've been
17  through it a couple of times, not within my -- my own
18  personal self and my children.  We wanted my son.  So
19  I've already been through it a couple of times.
20    Q   Uh-huh.
21    A   Once by myself and -- like, three times with
22  my son.  So my son called the police when somebody shot
23  him, they locked him up.  Why he go get locked up for
24  getting shot?
25    Q   I --

Page 188

1    A   And he didn't have a weapon on him or nothing.
2    Q   I don't know.
3    A   But he -- he get incarcerated.  He get locked
4  up for getting shot.  It's, like, now I know because of
5  my own experience, not because of anyone else's that I
6  don't trust Chicago Police Department.
7    Q   And that's an opinion you hold right now even
8  as we are speaking, correct?
9    A   I didn't hear you.
10    Q   It's the opinion about the police that you
11  hold right now.  As we're speaking here today, you hold
12  that opinion about the police in Chicago, right?
13    A   Yeah.
14    Q   Okay.  When you spoke with Heather and Mort
15  and told them -- you told them about this, right?  In
16  that conversation -- one of the conversations that you
17  had with them in this last week, right?
18    A   Yeah.  I told him about the experience I had
19  with the detectives of Chicago, but I never expanded to
20  them that I don't trust Chicago Police Department.
21    Q   No.
22    A   But Heather find -- Heather finding out today
23  that I don't trust them.  But she didn't know that
24  Tuesday.
25    Q   Yeah.  Right.  So what I'm really just asking

Page 189

1  -- and I didn't ask it very well is:  When you
2  talked to Heather and Mort, you made it clear to them in
3  those conversations you had with them earlier this week
4  that you believe that you were wrongfully convicted for
5  aggravated battery of a child, right?  You explained
6  that to them?
7    A   Yes.  Yes.
8    Q   Okay.  Did you ask them to help you in any way
9  with resolving or -- you know, getting some sort of
10  justice for yourself, you know, for being wrongfully
11  convicted, as you say, for the aggravated battery?
12    MS. DONNELL:  I'm just going to object right
13  now to this line of questioning.  Andrew, I think
14  it's improper --
15    MR. GRILL:  Well if it's --
16    MS. DONNELL:  -- and also you know that I --
17  you know that our office would be conflicted.  And
18  so I think this is improper, but --
19    MR. GRILL:  Wait.
20    MS. DONNELL:  I think it's a totally irrelevant
21  question, but you can go ahead Ms. Chairse.
22    MR. GRILL:  Heather, can you just --
23    MS. DONNELL:  And Andrew, are you throwing your
24  pen at me?
25    MR. GRILL:  That is ridiculous that you said

Page 190

1    that, please stop.
2   BY MR. GRILL:
3        Q   Ma'am --
4        MS. DONNELL:  Andrew, please stop.  Andrew.
5    Andrew.  Andrew, stop being disrespectful to me as a
6    professional attorney.
7        MR. GRILL:  Stop.
8        MS. DONNELL:  You do not need to yell, but do
9    not yell at me with that angry tone.  Please don't,
10   Andrew.  Please.
11       MR. GRILL:  Heather, stop.  No.
12       MS. DONNELL:  Let's just take a break after
13   this, because you are getting out of control.
14       MR. GRILL:  No.  We're not taking --
15       MS. DONNELL:  You're acting -- you want to go
16   off --
17       MR. GIVEN:  That is untrue, Heather.  Your
18   accusations are untrue.  And -- you know, you're
19   lecturing Andrew as much as you're claiming he's
20   acting improperly towards you.  I do think taking a
21   break makes some sense right now though.
22   BY MR. GRILL:
23       Q   This is my last question, ma'am.  Did you ask
24   Ms. Donnell or Mr. Mort Smith for any help resolving
25   this or getting justice for what you believe was a

Page 191

1    wrongful conviction in any of those conversations?
2        A   (No verbal response.)
3        MS. DONNELL:  Same objection.
4        Q   Ma'am, I didn't hear your answer.
5        A   No.  Because I don't -- look, I don't follow
6    behind my -- by my past.  It been -- it been 18, 19
7    years.  So no.  I'm not -- I'm not looking for justice.
8    I'm just going on about my business.  My way is my way,
9    they way is they way.  My -- I'm -- I'm ahead of it now.
10       Q   Do you intend on seeking any help from anybody
11   at any point in the future to get justice for this
12   wrongful conviction that we've talked about for the
13   last, you know, half hour or so?
14       A   No.
15       Q   Not at all?  So you've been -- you feel like
16   you've been wrongfully convicted, but you don't intend
17   on trying to get justice for that.  Is that what you're
18   saying?
19       MS. DONNELL:  Objection.  Objection, Andrew,
20   asked and answered.
21       Q   Ma'am?
22       MS. DONNELL:  You can answer again.
23       A   No.  Only thing that I'm be looking forward is
24   to get expunged off my background.  As far as me taking
25   it to court and all that, no, I'm -- I don't want to --

Page 192

1    I'm not going through all that no more.  It's all --
2        Q   How are you --
3        A   It's --
4        Q   Go ahead.
5        A   I've done the time.  It's -- it's -- it's over
6    with.  The time -- you can't -- I can't bring back six
7    years of my kid's life and can't nobody bring back six
8    years of my kid's life.
9        Q   How do you intend on seeking help or getting
10   it expunged?  Have you thought about that?
11       A   They have things that you can go through,
12   like, programs you could go through and -- at the time
13   or certain times of the year where you could get your
14   background expunged, but I just haven't been trying to
15   get it expunged because I got a -- a whole different
16   life as -- I got a seven-year-old I'm -- I'm raising
17   alone by myself.
18       Q   Did you ask --
19       A   I got my own bills, I got my own job, my own
20   place to live raising the seven-year-old so
21       Q   Did you ask Ms. Donnell or Mr. Smith any
22   questions about how you could -- whether they could help
23   you get it expunged from your record?
24       MS. DONNELL:  Objection.  Asked and answered.
25   But you can answer again.

Page 193

1        A   No.
2        Q   And when you were speaking with Mr. Smith and
3    Ms. Donnell, you understood that Ms. Donnell wasn't the
4    type of an attorney that helps people getting their
5    convictions reversed or records expunged?  You
6    understood the essence of where she was --
7        MS. DONNELL:  Objection.  Objection.  Objection.
8    Andrew, I'm going to just object to how you're
9    characterizing my legal practice since I don't
10   do --
11       MR. GRILL:  That's fine.
12       MS. DONNELL:  -- conviction work.  So you
13   know --
14       MR. GRILL:  Well --
15       MS. DONNELL:  -- it's just, you're
16   mischaracterizing and --
17       MR. GRILL:  No, there's --
18       MS. DONNELL:  -- all right.  Just real quick on
19   the record that you -- again, are not giving this
20   witness a break or the court reporter.
21   BY MR. GRILL:
22       Q   Ma'am, the speaking objections are pretty
23   amazing here.
24       MR. GRILL:  Heather.
25       MS. DONNELL:  It's your sarcasm.

Page 194

1    Q   Ma'am. Claudette, can you ask [sic] my
2  question, please?
3    A   No.  I'd -- I'd never knew that's what Heather
4  does.  I didn't -- I didn't get down to her background
5  of what she do because I don't feel like I need a lawyer
6  or I'm not in the process of trying to get my background
7  expunged -- any of that right now because it's not hard
8  for me to get a job.  I have -- it's not hard for me to
9  get a apartment.  They don't go off my background, you
10  know, I -- I don't hold my background on my shoulders.
11  It is what it is.  It's over with.  So I don't -- I'm
12  not in a quick rush.  If it take another nine years and
13  then I get it expunged, it is what it is.  I'm not in no
14  rush to get it off or none of that.
15    Q   So why did you then tell -- feel that it was
16  necessary or why did you tell Heather and Mr. Smith
17  about your wrongful conviction when they were there to
18  talk to you about Mr. Jakes and the subpoena arising out
19  of the events from September 15, 1991?
20    A   Because I knew he was wrongfully convicted.  I
21  knew he wasn't at the place -- the present place at that
22  present time when that incident happened.  And yeah, it
23  needs to be said, like, back in the late '80s, early
24  '90s, yeah, it was some corrupt detectives.  Used to
25  beat people into confessions and all type of stuff.  And

Page 195

1  I'm not -- it's just, like, yeah, I knew this and I knew
2  Shawn wasn't there when the incident happened.  And how
3  I knew he wasn't on Racine is because after the
4  window -- after the window got broke and we -- and
5  somebody walking past was, like, Shawn -- somebody asked
6  where Shawn was at and somebody was, like, Shawn down
7  there on Laflin or down there on Bishop or something.
8  Shawn wasn't even towards Racine.  So once I, you know,
9  it's like -- come on now, it -- it -- it takes a
10  coverage to -- it takes a village to raise a kid.  And
11  just because of what they did in they past doesn't make
12  them a bad person.  Shawn -- every -- it's -- it's -- we
13  not the only ones that got convicted of a wrong
14  conviction over the police department.  Or probably over
15  just because of somebody that don't work for the police
16  department.  It could be somebody from the street.  Come
17  with they -- with they wrongfully messages to the police
18  department or the judge.  So yeah, I -- I had to let
19  them know I was wrongfully convicted from Chicago
20  detectives also.
21    Q   Did you think that --
22    A   I brought it up.  They didn't bring it up.
23  They don't know nothing about me.  They don't know about
24  my background.  I brought it to their attention.
25    Q   Uh-huh.  And you brought it to her attention

Page 196

1  because you thought that was going to help or that's
2  something important for them to know because you
3  thinking it might help Mr. Jakes' case?
4    A   I brought it to their attention because when
5  they asked me do I know what a deposition is and have I
6  ever been presented in a court hearing, that's when I
7  brought it up as the only court hearing I've been in was
8  my owns when I was -- when I was convicted.
9    Q   Uh-huh.
10    A   And let them know, yeah, I was convicted in
11  2000 -- I was arrested, you know, locked up 2003,
12  convicted in 2005.  That's the only court settings that
13  I've been in as far as having to testify against or talk
14  to a lawyer, judge, or anything --
15    Q   Yeah.
16    A   -- as that proceeding.
17    Q   And you don't --
18    A   It didn't have anything to do with the part
19  with Shawn.  It was my own well-beings of just
20  conversating with Heather and Morton --
21    Q   Yeah.  And --
22    A   -- about my own experience.
23    Q   Did you bring that up to them because you
24  thought that they could help you get justice for --
25    A   No.

Page 197

1    Q   -- your own conviction?
2        MS. DONNELL:  Objection.  Objection.  Asked and
3  answered.  She just told you how it came up and
4  you're mischaracterizing her testimony.  She's
5  already answered that question too so I am objecting
6  to that question as argumentative.  It misstates her
7  prior testimony.
8        MR. GRILL:  Wow.  Okay.  Another speaking
9  objection.  Okay.  So --
10    A   No.  Because just like I told you before, I'm
11  not looking for justice --
12    Q   Do you remember --
13    A   -- because I'm not -- I'm going forward, but I
14  ain't going back.
15    Q   All right.  Do you remember telling me earlier
16  today when I asked you if you'd ever testified in any
17  context, whether in a deposition or a court, your
18  initial answer was no?
19    A   No.  I told you my own -- I never -- I said no
20  but in my own --
21    Q   Okay.
22    A   -- court hearing.  I -- I didn't say
23  completely, yeah.  No.  I haven't been in a deposition,
24  but I have been in a court settings of my own.
25        MR. GRILL:  Okay.  We can take a lunch break

Page 198

1  now. How long do you want? Half hour, hour? I
2  don't care.
3      THE WITNESS: Are you talking to me?
4      MR. GRILL: Yeah. Everybody really, how much
5  time do everybody want for lunch?
6      THE WITNESS: We could come back at 3:00. It's
7  2:25.
8      MR. GRILL: Great. See everybody at 3:00.
9  Thanks.
10     COURT REPORTER: Okay. We're going off the
11  record. The time is 2:25 p.m.
12     (OFF THE RECORD)
13     COURT REPORTER: We are --
14     MR. GRILL: You ready?
15     COURT REPORTER: -- sorry. We are back on the
16  record. The time is 3:04 p.m.
17  BY MR. GRILL:
18     Q  Okay. All right ma'am, just to kind of close
19  out a couple of little things that we were talking about
20  before we broke for lunch. What is your -- you'd
21  mentioned that your son, you know, had been arrested
22  and -- but you didn't think that that was fair or
23  legitimate because he was the one that had ended up
24  having been shot. What is your son's name that was shot
25  or was arrested, I guess, for the crime?

Page 199

1      A  Demetris.
2      Q  Can you spell that?
3      A  D-E-M-E-T-R-I-S.
4      Q  Chairse?
5      A  Yeah.
6      Q  And what's his date of birth?
7      A  Is that irrelevant?
8      Q  Yeah. I mean, it's not irrelevant. What's
9  his date of birth?
10     MS. DONNELL: I'm just going to object. But
11  you can answer the question.
12     THE WITNESS: It's hard to hear --
13     MS. DONNELL: I do object to the irrelevance of
14  this but go ahead, Ms. Chairse.
15     MR. GRILL: Too bad that's not a legit
16  objection in a dep [sic].
17  BY MR. GRILL:
18     Q  Just let me know what his date of birth is
19  when you're ready.
20     A  08-09-94.
21     Q  Okay. And that shooting happened in Chicago?
22     A  Yep.
23     Q  Okay. I -- he survived, right?
24     A  Yeah. He did.
25     Q  Okay. And was he the only one arrested?

Page 200

1      A  Yep.
2      Q  Okay. Had you ever been arrested before
3  September 15, 1991 for anything?
4      MS. DONNELL: Objection. Asked and answered.
5      MR. GRILL: No. It wasn't.
6      Q  But had you been arrested before September of
7  1991?
8      MS. DONNELL: Again, I think that's been asked
9  and answered. But go ahead.
10     A  No. Well, no. No.
11     Q  Okay.
12     A  Because my -- no because the first case I ever
13  caught was a drug case in '98.
14     Q  Yeah.
15     A  '97, '98.
16     Q  Right. And other than that drug case that you
17  caught in 1998 -- well, let me ask you this. Do you
18  remember what the exact charge was that you were charged
19  with for that drug case in, you know, around 1998?
20     A  I think it was trafficking --
21     Q  Okay. Do you remember --
22     A  -- or a conspiracy. It was a conspiracy, I
23  believe.
24     Q  Okay. Were you convicted of that?
25     A  I got two years of probation.

Page 201

1      Q  Two years of probation. Was it reduced to
2  something else?
3      A  No.
4      Q  Okay. And what type of drug was it that you
5  were convicted of, I guess, trafficking? To use your
6  words.
7      A  Cocaine.
8      Q  And were you -- do you claim now to be
9  innocent of that? Was that, like, one where you were
10  also wrongfully charged and convicted of it or not?
11     A  I didn't do -- I didn't do the transaction,
12  but I had the marked money that they presented.
13     Q  Okay. So you admit that you were involved in
14  that crime; is that correct?
15     MS. DONNELL: Objection --
16     A  Yeah.
17     MS. DONNELL: -- to the extent that misstates
18  her testimony, but you can answer.
19     Q  Your answer is yes, ma'am?
20     A  Yes.
21     Q  Okay. Are there any other arrests that you
22  had prior to 1991?
23     A  No. It was, like, June. Now I don't even
24  think I ever went -- I went to juvenile, but it was,
25  like, just sat there. I never was convicted or --

Page 202

1   Q   What –

2   A   – or nothing.

3   Q   Do you remember what year that was?

4   A   No.

5   Q   Okay.

6   A   I don't even think that was before '91.

7   Q   You think it was after?

8   A   If it was before '91 -- yeah, it had its -- if

9   it was before '91, it was definitely, like, just to the

10  station, but I doubt it.

11  Q   Got it.  And do you remember what the charge

12  was that you went to juvenile for that we're talking

13  about?

14  A   Like petty theft, things of that nature.

15  Q   What's –

16  A   Taking the little rings from the jewelry –

17  the beauty supply store, a little dumb stuff.

18  Q   Okay.

19  A   No.

20  Q   Any other arrests before 1991?

21  A   Nope.

22  Q   Any drug arrests, any thefts, anything like

23  that?

24  A   Nope.

25  Q   Okay.  When you got arrested in '97 or '98 for

Page 203

1   the trafficking charge, you -- who were -- what are the

2   names of any of the other people you were arrested with

3   in that case?

4   A   Didn't nobody get arrested in that case.

5   Q   Well, you said it was a conspiracy so -- of

6   some –

7   A   It was -- it was a -- it was a -- they had

8   arrested me because they did a transaction with the

9   marked money or whatever.  And I end up with the marked

10  money because I gave somebody change for the 20.  So

11  whatever they would consider that.

12  Q   Okay.  Did you know any of the other people

13  that were involved or if anybody else was charged, I

14  should say?

15  A   No.

16  Q   Or anybody else was arrested in relation to

17  that case?

18  A   No.

19  Q   Okay.  What about any other arrests or

20  convict -- let's just go with arrests.  Any other

21  arrests that you can think of other than the trafficking

22  charge and then the, I guess, thefts that you just

23  described.  Anything else?

24  A   No.

25  Q   Nothing that you knew -- no other arrests?

Page 204

1   Those are the only two?

2   A   Yep.

3   Q   Okay.  You sure?

4       MS. DONNELL:  Objection.  Asked and answered.

5   Argumentative.  If you have a document that you're

6   looking at that the witness needs to see that you

7   could show it.  Are you -- is there a document

8   you're referring to Andrew?

9       MR. GRILL:  I'm just asking her what she knows,

10  what she recalls if she's sure that's it.

11      MS. DONNELL:  Okay.  Objection. Argumentative.

12  I think she's answered your question.

13  BY MR. GRILL:

14  Q   Ma'am, do you got –

15      MS. DONNELL:  You can answer.

16  A   Not that I can recall of.

17  Q   Okay.  Other than the aggravated battery and

18  the two years of probation you got, did you -- were

19  there any other times that you can think of that you

20  spent time in jail for anything else?

21  A   No.

22  Q   What about out-of-state arrests?  Have you

23  ever been arrested in any other states other than

24  Illinois?

25  A   No.

Page 205

1   Q   Okay.  The -- you told Ms. Donnell during her

2   examination that you remembered what you were doing the

3   morning of September 15, 1991 because you had been

4   staying at your sister's house for a couple of days and

5   that your sister was moving that day.  Your dad picked

6   you up at your sister's house around 11:00 a.m. to bring

7   you home because your mom was going to a funeral that

8   day.  I wanted to know who was the person or the name of

9   the person who had died whose funeral your mother was

10  going to?

11  A   I don't know the name.  I -- I don't know the

12  name of the person whose funeral she went to.  I know –

13  all that I know is that they were, like, my aunt husband

14  sister.  It was her in-laws.  I -- I -- that's all I

15  know.  I don't know the name of the people –

16  Q   Okay.

17  A   -- name of the person.

18  Q   Which sister's house were you at that morning

19  that your dad picked you up from?

20  A   Angeline.

21  Q   Can you spell her name?

22  A   A-N-G-E-L-I-N-E.

23  Q   Got it.  Okay.  And where did she live?  You

24  said 51st and State; is that right?

25  A   Yeah.

Page 206

1    Q   Did she live there with anybody?
2    A   Nope.
3    Q   And where is Angeline now?
4    A   She stay at Illinois.
5    Q   In Chicago?
6    A   Yes.
7    Q   Do you know what her address is?
8        MS. DONNELL:  I'm sorry.  I didn't hear you.
9    Q   Do you know what her address is?
10   A   No.  I don't.
11   Q   Or what her phone number is?
12   A   She don't have a phone.
13   Q   Is her last name Chairse or does she have a
14  different last name than you?
15   A   The same last name.
16   Q   How old is she?
17   A   50, 51.
18   Q   So you got home around -- you said 11:00 a.m.
19      on the morning of September 15th; is that
20  right?
21   A   I -- yes.  It was -- it was after 11:00
22  because my dad made it there, like, something until
23  11:00 if it wasn't 11:00.
24   Q   How long -- did you guys, like, stop somewhere
25  after you left your sister's house or did you go

Page 207

1   straight back?
2    A   No.
3    Q   Okay.  So you guys drove right from 51st and
4   State to 51st and Racine, right?
5    A   Correct.
6    Q   Yeah.  So that's, you know, less than a mile,
7   correct?
8    A   Yeah.  Or a mile, whatever.
9    Q   Yeah.  All right.  And what did you do when
10  you got home?
11   A   Clean -- cleaned up because I know I hadn't --
12  didn't -- I hadn't cleaned my room so I knew I had to --
13  I cleaned up.
14   Q   Okay.  All right.  And what did you do after
15  that?
16   A   Just was around the house because I couldn't
17  go outside because actually -- actually, I believe I was
18  on a punishment.  That's why I ended up not going --
19  that's why I ended up on the porch because I believe I
20  was on the punishment.  Because if I wasn't, I wouldn't
21  have been on Racine at all so I had to been on a
22  punishment.
23   Q   On a punishment.  Is that what you're saying?
24  Like you were in trouble?
25   A   Yeah.  So I had to been on punishment.

Page 208

1    Q   What were you in trouble for?
2    A   Because I couldn't -- I couldn't leave off the
3   porch or whatever so I had to be on -- been on
4   punishment.  It had to be something to do with school or
5   something.
6    Q   Do you know what you were on punishment for?
7    A   No.  Can't recall.
8    Q   Okay.  And why do you think if you were on
9   punishment, it would have had to do with something with
10  school?
11   A   Because that's the only time that I really get
12  in trouble.  It's something to do with school that I'd
13  be on punishment for.
14   Q   Okay.  Did the arrest for stealing -- did that
15  have to do with school?
16   A   No.
17   Q   Did you get punished by your folks for that?
18   A   Yes.
19   Q   Okay.  All right.  So what time was it that
20  you started sitting down the front stoop of 1210 on
21  September 15, 1991?
22   A   I can't tell you exact time.
23   Q   Okay.  Can you recall whether the sun was up
24  or if the sun was down when you started sitting on your
25  front stoop?

Page 209

1    A   The sun probably that was going down because I
2   didn't go out the door until after my mom left.
3    Q   Okay.  Until your mom left to go to the
4   funeral?
5    A   Yes.
6    Q   Okay.  Do you know what time it was when your
7   mom left?
8    A   No.  I don't recall what time it was.
9    Q   You know about how long it was after you got
10  home with your dad how long it was until your mom left?
11   A   It was a couple of hours or later.
12   Q   All right.
13   A   It wasn't right after we got home because the
14  funeral wasn't at noon -- at noon, nothing of that
15  nature.
16   Q   Okay.  How long after your mom left was it
17  that you started sitting on the front stoop of 1210?
18   A   Probably about an hour, half an hour, two
19  hours later or something.
20   Q   Okay.  So you think you were on your front
21  stoop with your brother, Cleotha, you know, by about
22  5:00 in the evening?
23   A   Yeah.  By then we was -- by then we was
24  outside.  Yeah.  At 4:00 or 5:00 we was out there --
25   Q   Okay.

Page 210

1    A  – by then.  So they hadn't – that's when it
2  was probably sun going down.
3    Q  Okay.  And you testified to Ms. Donnell
4  earlier that you and Cleotha were basically on the stoop
5  in the evening – the stoop of 1210.  You said being
6  kids, kind of just playing out there; is that right?
7    A  Yeah, we were just sitting out there.  We
8  wasn't playing on the stoop.  Just sitting out there.
9    Q  Okay.  And how long – but at some point when
10  you and Cleotha were out there – well, let me ask you
11  this.  Other than Cleotha, who else was out there
12  with – if anybody, with you and him on the front stoop
13  that evening while you're sitting on the stoop of 1210?
14    A  Only one I can recall was that there was me,
15  him, and Shawn.
16    Q  Okay.  You recall whether there was anybody
17  out on the stoops of any of the other houses around you?
18  1208, 1212, 1214, anybody else?
19    A  I can't recall if anyone was on next door or
20  anything or any of the porch.
21    Q  Okay.  Is it possible that other people might
22  have been on those porches, you just don't remember?
23    A  It is possible, but I just don't remember.
24    Q  Uh-huh.  And it's your testimony that that
25  window at the second floor of 1210 – that window was

Page 211

1  not broken before the bottle was thrown through it,
2  right?
3    A  No.  It wasn't broken before the object was
4  thrown through.
5    Q  Okay.  Or whatever was thrown.  Right.  Had
6  that window ever been broken before?
7    A  No.  Not to my knowledge.  I can't recall.
8    Q  Had anybody ever thrown anything to that
9  window on any other nights or days before September 15,
10  1991?
11    A  No.  Not that I can recall there have –
12  somebody ever thrown anything through it.
13    Q  Was it broken for any reason by anything on
14  any other dates that you can recall prior to September
15  15, 1991?
16    A  No.
17    Q  Okay.  And as you are sitting out there, at
18  some point, a car came past and that's the car that the
19  group of you – you don't know who, but somebody in your
20  group threw a bottle, or a rock, or whatever at the car
21  as it went by, right?
22    A  Yes.
23    Q  How long had you been on the stoop with –
24  well, let me ask you this.  You and Cleotha – when you
25  went out to the stoop after your mom left to go to the

Page 212

1  funeral, did you go out there by yourself or did you go
2  out there with Cleotha initially?
3    A  I can recall if – I can't recall if we went
4  out there together, or if I was out there first, or I
5  can't recall who went out first, or if we went out
6  together.
7    Q  Was Mr. Jakes in your house at any point
8  prior – that day prior to you getting out on the stoop
9  at
10  1210?
11    A  I can't recall if he was upstairs at the house
12  earlier that day or prior to being on the front porch.
13    Q  Do you have any recollection of seeing
14  Mr. Jakes in your home after your dad brought you back
15  from your sister's house, but before your mom left to go
16  to the funeral?
17    A  No.  I don't have any recollections of that.
18    Q  All right.  So your mom leaves to go to
19  funeral.  Within an hour of her leaving, you're out on
20  the front stoop and Cleotha is with you, correct?
21    A  Yes.
22    Q  When – do you have a recollection of when Mr.
23  Jakes showed up?
24    A  No.  I don't recall was – when did he – when
25  did he come about.  So I can't – I don't recall.

Page 213

1    Q  Okay.  Do you remember, like, where he came
2  from?  Like, did he walk up –
3    A  When he –
4    Q  – did he come into the gangway?
5    A  He came from – he – no.  He walk – he
6  walked from – through the gangway.
7    Q  Okay.  How do you know that?  Tell me.
8    A  Because I could recall – I could recall him
9  coming from through that way.  I just can't recall
10  that – how long I was out there before he came.
11    Q  All right.  Which gangway did he come through?
12    A  The gangway between 1210 and 1212.
13    Q  All right.  So this would have just been
14  off – if you're sitting out in the stoop facing 51st
15  Street, he would have come from your right, correct?
16    A  It's – yes.
17    Q  Once Mr. Jakes show up, how much time passed
18  before that car drove by and you – and the rock, or
19  bottle, whatever was thrown at it?
20    A  It wasn't within the last five minutes, but I
21  can't recall.  But it – it wasn't, like, soon as he
22  came out or – like, we probably was out there a good
23  little while before anybody thought of something like
24  that.
25    Q  Okay.  Did you know –

Page 214

1    A   I don't know -- I can't say exactly when or
2   how long.
3    Q   All right.  So let's try it this way.  After
4   your mom left to go to funeral and you started sitting
5   on your front stoop -- but before -- and up until the
6   time the car drove by and the rock or bottle was thrown
7   at it, were you on your stoop basically during that
8   whole time period?
9    A   Yeah.
10   Q   All right.
11   A   I was out there for -- I was out there for a
12  while.
13   Q   For several hours; is that right?
14   A   Yeah.  Probably -- probably for several hours
15  I was going back in -- back and forth, in and out.
16   Q   Right.  And Mr. Jakes and Cleotha were there
17  with you generally that entire time too, correct?
18   A   Most of the time they was there.  Yeah.
19  Because then nobody go -- then nobody go -- like I said,
20  then nobody go nowhere.  Then my brother then go to the
21  store to -- after the window had broken.  That was the
22  only time he had left off the porch besides being inside
23  the house.
24   Q   Got it.  Now, do you recall anybody else
25  coming by to talk with you or anybody, Mr. Jakes, or

Page 215

1   Cleotha during these hours that the group of you were --
2    A   It was just probably people walking past, the
3   standard chitter chat, but I can't recall who they were
4   or anything but -- no, okay.  Tell how many people
5   walked past us, said something, spoke or -- what you-all
6   doing, what you-all on -- I ain't going to tell you how
7   many people walked past.
8    Q   Okay.  Do you remember seeing Denise while you
9   were out there, you know, up until the time the car
10  drove by?
11   A   I can't recall seeing her.  But I don't
12  quite --
13   Q   What about Annette?
14   A   I can't recall seeing her either.
15   Q   What about Nikia or Nika Little?
16   A   I can't recall seeing them that -- I can't
17  recall seeing them when -- before the window or even
18  after the window.  I can't recall -- like I said, it was
19  a lot of people walking up, walking past, stopping,
20  saying something so
21   Q   Are you done with your answer?
22   A   Yes.
23   Q   All right.  When did -- if you recall, when
24  was it that Mr. Jakes', to your knowledge, mom moved?  I
25  think you said to Minnesota.  Like, if you want us to

Page 216

1   just kind of --
2    A   It's not -- I can't -- I can't recall when did
3   she -- I can't recall when she moved.
4    Q   Okay.  Do you know roughly how long before the
5   shooting happened it was that she moved?
6    A   No.  I can't recall.
7    Q   And before --
8    A   Because -- it's like I said, it's probably --
9   I can't recall because at some point of time Irene did
10  stay in 1212 building so I can't recall if it was before
11  the shooting or after the shooting.  But it was at a
12  point of time that Irene did stay at 1212.  I just can't
13  recall the time frame.
14   Q   Okay.  Do you -- but once Mr. Jakes' mother
15  moved to Minnesota, it's your recollection that Mr.
16  Jakes stayed in the neighborhood, right?  He didn't go
17  with her.
18   A   Correct.
19   Q   You sure?
20   A   To --
21       MS. DONNELL:  Objection.  Just -- I'm sorry.
22  Objection.  Form and asked and answered.  Okay.  Go
23  ahead.
24   A   From how I'm thinking, like, I'm 100 percent
25  sure that he didn't but --

Page 217

1    Q   Okay.  Do you know why from any source it was
2   that Mr. Jakes did not move out of the front building of
3   1212 with his mother when she left to go to Minnesota?
4   Like, why he stayed and she left?
5    A   Say that again?
6    Q   You know why Mr. Jakes did not go with his mom
7   when she moved out of the front building of 1212?  Why
8   he stayed, and she left?
9    A   No.  I don't.
10   Q   Did you ever ask him?
11   A   No.
12   Q   Did anybody in your family ever tell you why
13  it was that Mr. Jakes was staying in the neighborhood
14  and not leaving town with his mother?
15   A   No.
16   Q   All right.  Do you --
17   A   Like I say, we -- I was a minor.  It's not --
18  that wasn't -- we wasn't raised to ask questions.  You
19  don't ask an adult questions about another kid being
20  where they are and who -- why -- why they are there with
21  another adult.
22   Q   Yeah.  Well, there's other people other than
23  adults you could've potentially heard a reason about
24  before, right?  You could have heard from one of your
25  cousins.

Page 218

1    A   They probably did not even know theyself.

2    Q   Well, my question --

3    A   So no need to asking them.

4    Q   I wanted -- my question --

5    A   They're younger than me so no need to asking

6    them.

7    Q   Okay.  My question was just simply if anybody

8    had told you any -- if you had heard from any source,

9    anything like that, but it sounds --

10   A   Oh, no.

11   Q   Right.  Okay.  Do you know why it was that Mr.

12   Jakes' mom left town?

13   A   No.  No.

14   Q   All right.  Do you know if Mr. Jakes lived in

15   any other city for any amount of time between the time

16   that his mom left to go to, according to you, to

17   Minnesota up until the -- September 15, 1991?

18   A   He probably was in Arkansas for a little

19   while.

20   Q   What's in Arkansas?

21   A   That's where his granny stays.  His granny,

22   and his aunt, and uncles, and them stayed there.  His

23   grannies had a house out there.  So he -- he probably

24   was in Arkansas, but I don't think he was down there,

25   like, to stay.  He probably was there to visit and was

Page 219

1    there.

2    Q   All right.  Do you have a memory of him going

3    to Arkansas between the time that his mom left to go to

4    Minnesota and the night that the shooting happened?

5    A   No.  I don't.  But if -- that's what I am

6    saying, like, if he -- if there is anywhere where he

7    would go outside of Chicago that I am figuring would be

8    Arkansas.

9    Q   Okay.  Did you ever hear about whether

10   Mr. Jakes had left town, went to another city, and got

11   arrested for anything between the time that his mom left

12   to go to Minnesota and the night that the shooting

13   happened?

14   A   No.

15   Q   Never heard that from anybody?

16       MS. DONNELL:  Objection.

17   A   No.

18       MS. DONNELL:  Asked and answered.

19   Q   When his mom left, do you know where

20   Mr. Jakes' dad was?

21   A   No.

22   Q   Do you know your uncle, I guess, his father?

23   A   No.

24   Q   Do you know his name?

25   A   No.

Page 220

1    Q   Do you know whether he even was living in

2    Chicago in September 1991?

3    A   No.

4    Q   Mr. Jakes never talked to you at any point

5    about his dad.  Do you have any memories like that?

6    A   No.

7    Q   Okay.  So after his mom left town, where did

8    Mr. Jakes stay?

9    A   From -- back house with Aunt B.

10   Q   And Aunt B, I think you said earlier, also

11   owned the front house of 1212, right?

12   A   But that would have been why his mom was there

13   in Illinois, not why his mom wasn't there in Illinois.

14   Aunt B wasn't going to let him stay in the front house

15   by himself.

16   Q   Yeah.  I know.  I got you.  And I know -- just

17   listen to the question that I'm asking.  So the question

18   was: When Mr. Jakes started living with his Aunt B, I'm

19   correct, right, that Aunt B also owns the front house of

20   1212 building on 51st Street, right?

21   A   Yes.

22   Q   Okay.

23   A   But that's not the question that you asked me.

24   You asked me if Shawn was living at the front house

25   also.  He was not living at the front house alone after

Page 221

1    his mom -- when his mom wasn't in Chicago, no.  He was

2    not living by himself in the front house.  That's what

3    you asking me.

4    Q   And Annette and Denise lived on the second

5    floor of the front house at 1212, right?

6    A   Correct.

7    Q   Do you know if Mr. Jakes is related in any way

8    to Annette, or Denise, or Nikia?

9    A   I wouldn't know.  I mean, they say that

10   they -- some type of however it goes is -- and that mom

11   supposed to got a baby by -- I don't know if it's Shawn

12   or Uncle or -- you have to do with somebody in somebody

13   else's hood.

14   Q   Okay.

15   A   So they -- they never really said, like, they

16   couldn't or -- you know, like, that -- that I could

17   recall.

18   Q   Do you know if Mr. Jakes had left town for any

19   reason in that week or two before the shooting?

20   A   No.

21   Q   Okay.  No, you don't know or no, he did not

22   leave town?

23   A   No.  I don't know.

24   Q   Okay.  You said that when you guys were all

25   out there on the front stoop at 1212 in the evening on

Page 222

1  September 15, 1991, that when you threw – when the
2  rock, or bottle, or whatever was thrown at the car, that
3  you described that as the three of you just being silly.
4  That is the phrase that you used.  Tell me why you think
5  it's silly to throw objects at cars as they drive by?
6      A   We were being kids – being kids is part of
7  being silly for me.
8      Q   Okay.  That is not my question.
9      A   We being a kid.  We being – we being a kid.
10     Q   Right.  So is it your test – are you saying
11 then that when you are being a kid in September 15,
12 1991, that being silly as a kid includes throwing
13 objects at moving cars in front of your house?
14     MS. DONNELL:  Objection.  Objection.  I'm going
15     to leave an objection.  Asked and answered.  You
16     can –
17     A   It was something that we could – that – that
18 we'd been goofy – silly about.  That – we think funny.
19     Q   What was funny about that?
20     A   Because all – we were sit – all – all that
21 we were thinking we was, like, just keep seeing these
22 flags – keep seeing these flags.  So we was just
23 thinking, like, it'd be funny – so we wasn't trying
24 to – when – the intention was not to bust the window
25 or anything.  It was just to throw something at the car.

Page 223

1  Not to damage the car or anything.
2      Q   Yeah.  At a car that you knew – that you saw
3  had, like, a Mexican flag hanging on it, right?
4      A   Correct.
5      Q   So you thought it was funny – I think you
6  testified earlier that you knew it was Hispanic Heritage
7  Month so you thought it was funny to throw objects at a
8  car that had a – his Mexican flag hanging out of it.  Is
9  you – is that what you're saying?  You think that that
10 was funny?
11     MS. DONNELL:  Objection.  Argumentative.  This
12     has been asked and answered.  Ms. Chairse, I –
13     you're going to have to answer that question again,
14     but hopefully this is the last time she has to
15     answer this particular question since you've asked
16     it three times.
17     A   If it was just something that came across
18 kids' minds, like, every kid had something to – that
19 they did that was stupid.
20     Q   Uh-huh.
21     A   And that just was a stupid moment that we had
22 at that time.
23     Q   Did you throw the – or what – do you know
24 if, like, the rock or bottle was thrown at the car
25 because it was Spanish or Hispanic Heritage Month and

Page 224

1  the car had Mexicans or Hispanic people in it?  Is that
2  why?
3      MS. DONNELL:  Objection.  This has been asked
4      and answered.  It's extremely argumentative, and she
5      has answered the question.
6      MR. GRILL:  (Inaudible) –
7      MR. DONNELL:  She has answered it three times,
8      Andrew.
9  BY MR. GRILL:
10     Q   Did you –
11     MS. DONNELL:  And you are asking it again for a
12     specific purpose.
13     MR. GRILL:  (sound effect).
14     MS. DONNELL:  Yes, you are.
15     MR. GRILL:  Stop.
16     MS. DONNELL:  And so she said –
17     MR. GRILL:  Stop.
18     MS. DONNELL:  I am going to say – no.  Let me
19     just finish.  She can answer it one more time.  If
20     you need to ask that question again, let's call the
21     Court.
22 BY MR. GRILL:
23     Q   Did you throw the – if you know, was the rock
24 or bottle thrown at the car because of the race of the
25 people that were in the car?  Is that what was funny?

Page 225

1      MS. DONNELL:  Objection.  Argumentative.
2      Objection.  Asked and answered.  Ms. Chairse, please
3      answer this question one more time.  And if
4      Mr. Grill wants to ask it again, we're going to call
5      the Court before you answer it.
6      A   No.  It could – it didn't have to be a
7  pacific [sic] nationality in the car.  We weren't even
8  thinking about who was in the car.  We was talking about
9  the flag on the car, not what's in the car.  We didn't
10 say when a – a car of Mexicans come past we go throw a
11 bottle at it.  We said the flag, not the humans.
12     Q   So you threw the bottle –
13     A   The flag.
14     Q   Are you saying you threw the – to your now
15 understanding, the rock or bottle was thrown at the car
16 because it had a Mexican flag on it, not because of the
17 race of the people in the car; is that right?  Is that
18 what you are saying?
19     MS. DONNELL:  Objection.  Asked and answered.
20     Andrew, please move on.  She has answered your
21     question four times.  And I think what – if you
22     need to have her answer this question again, I am
23     going to ask that we take a break – not a break.
24     We stay on the record and we call Judge Jantz
25     because you've gotten your answer four times.  This

Page 226

1  is now the fifth time. So let's do that. Do you
2  need -- do you want move on with the question or do
3  you want to call Judge Jantz?
4      MR. GRILL: Are you telling her not to answer
5  the question?
6      MS. DONNELL: I am. I said it if you were
7  going to ask it again after she answered it four
8  times that we would need to call the Court because
9  she's answered your question.
10     MR. GRILL: It's a different question, Heather,
11 please stop.
12     MS. DONNELL: What is the difference about it,
13 Andrew? What is the difference in the question that
14 you are asking right now? Can you just -- I mean,
15 maybe there is a difference. I just cannot seem to
16 see it.
17 BY MR. GRILL:
18     Q   Please answer the question, ma'am.
19     A   No. I haven't told her that. You have asked
20 the same question. And we can call the judge if you
21 need the answer again. So I would like to call the
22 judge because she has already answered your question.
23     MR. GRILL: You can move for protective order
24 if you want. I don't understand what the reason
25 here is -- why you're picking this point right now,

Page 227

1  but that's fine.
2      MS. DONNELL: I think you're harassing the
3  witness.
4      MR. GRILL: We can -- are you not going to
5  answer the question, ma'am? Is that basically what
6  you are telling me?
7      MS. DONNELL: I told you Andrew.
8      MR. GRILL: Okay. Because I think -- I will
9  lay it out there. I think the race of the victim has
10 something to do with this case, Heather, and --
11     MS. DONNELL: And she answered your question.
12     MR. GRILL: Hang on, let me finish. Let me --
13     MS. DONNELL: You're right. You're right. Go
14 ahead. I'm sorry, Andrew.
15     MR. GRILL: Let me finish. The race of the
16 victim has something to do with this. And there is
17 a crime of -- arguably a crime of violence that Mr.
18 Jakes is accused of having engaged in. And this
19 witness is suggesting to me that the nationality of
20 the occupants of that car had something to do with
21 it. And so I am trying to clear that up, okay?
22     MS. DONNELL: So the same answer --
23     MR. GRILL: But that's not what I --
24     A   They could have been occupants of African-
25 Americans. We didn't say the occupants of what's in the

Page 228

1  vehicle.
2      MR. GRILL: Guys.
3      MS. DONNELL: This is --
4      A   We saying the things that is hanging off the
5  vehicle, not the occupations of what's in the vehicle.
6  It could have been 12 dogs in the vehicle. A spotty
7  dog, a orange dog, a brown dog. We didn't say we
8  throwing anything at any human beings. We said a
9  vehicle with a flag on it.
10 BY MR. GRILL:
11     Q   And you --
12     MS. DONNELL: Just --
13     A   We didn't say -- it did -- it wasn't just only
14 Hispanics riding around with flags and with those types
15 of flags. You -- you can't say that it was Hispanics
16 got out -- it was Hispanics who got out and busted our
17 window. We can't say that either. It could have been
18 other Black people who got out and bust the window. They
19 wasn't the only ones riding around with the flag. So
20 it's not that we threw the flag of -- because of a race.
21 We said the flag. We weren't thinking about who's in
22 the car. They wasn't the only ones -- only ones who had
23 that on their vehicle.
24     Q   Did you guys throw rocks at --
25     A   So --

Page 229

1      Q   -- any cars that didn't have flags -- Mexican
2  flags hanging out that night?
3      MS. DONNELL: I'm sorry. I am sorry Andrew. I
4  didn't hear the question. I want to make sure that
5  I can object.
6      Q   Did you guys throw rocks or bottles at any
7  other vehicles that night that did not have Hispanic or
8  Mexican flags on them?
9      A   No.
10     Q   All right. How many other cars that night did
11 you throw rocks and bottles at?
12     MS. DONNELL: Objection. It -- I mean, she
13 already answered this question. But Ms. Chairse,
14 please answer it one more time.
15     A   No cars.
16     Q   That was the only one you guys threw something
17 at?
18     A   Yeah. Why would we throw something at another
19 vehicle when our window got busted.
20     Q   I'm talking about the --
21     A   That was the first car. That was the first
22 car and the only car.
23     Q   Okay. How long had you guys been on your
24 stoop before that car drove by?
25     A   I don't recall --

Page 230

1    Q   At least –
2    A   – how long we had been out there.
3    Q   At least a couple of hours, right?
4    A   Yeah.  It was a couple of hours, but I can't
5   recall.  You want me to say the exact hours and day and
6   then you – you reframing your questions by asking the
7   same questions and replaying them.  I don't know the
8   exact hours of how many we was out there, but we were
9   out there.
10   Q   And did you –
11   A   I can't say we was out there from noon until
12  10:00 that night because I can't recall how long – how
13  many hours we were out there, how many – if we was out
14  there 20 minutes or seven hours before the in – before
15  the – the – the object got thrown at the vehicle.
16   Q   That wasn't the only car that drove by on
17  Racine – drove by your – the house – the 1210 stoop
18  that evening before the car with the flag went by,
19  right?
20       MS. DONNELL:  Objection.  Form.
21   A   No.  It wasn't.
22   Q   Okay.  What's your date of birth?  If you – I
23  know you said it before, but I am trying to figure out
24  exactly what your age was in September of 1991.
25   A   I was 16.

Page 231

1    Q   Right.  And you consider being 16 a kid?
2    A   Yeah.  We wasn't grown.  We was – first of
3   all, I'm – I'm going to go back some because me coming
4   up – I come from the south.  You not – you not grown
5   until you pay bills.  I don't care if you 25 in your
6   momma's house.  You still not grown.  So if I'm 16 and I
7   consider myself as still being a kid, I'm a be a kid at
8   16 because I'm not going to overrun over my momma, like,
9   16-years-old – 16-year-olds do.  No.  I'm a be a kid
10  all while I'm a kid.  At 16, yes, I consider myself
11  still a kid.
12   Q   Where were you –
13   A   I was still in school, I wasn't paying bills,
14  I didn't own a vehicle, I didn't have a job so yes, I'm
15  still a kid.  I'm under my momma's roof, and I am going
16  by rules.  If I am still getting on – we getting – my
17  momma could still put me on a punishment, I'm a kid.  So
18  yes.  I consider myself being a kid and doing what kids
19  do.  Jump rope, throwing objects at vehicles, throwing
20  stuff at each other, whatever.  I was a kid, yeah.  I
21  considered myself as being a kid.
22   Q   You said that you had – by the time you moved
23  out of 1210, you were having your third child; is that
24  right?
25   A   I had three kids when I moved out of 1210.

Page 232

1    Q   What year was –
2    A   My oldest child is 29 years old right now
3   today.
4    Q   What year was your first child born?
5    A   '92.
6    Q   Okay.  And what year was your second child
7   born?
8    A   '94.
9    Q   And your third child?
10   A   '95.
11   Q   Okay.  Did you consider yourself a kid in 1992
12  when you had your first baby?
13   A   Yeah.  A kid having a kid, definitely did.  I
14  just – my parents didn't believe in abortions and I was
15  out there thinking I was grown doing what I was doing
16  and popped up pregnant.  And yes, I had a baby when I
17  was still a kid.  Yes.  I still considered myself a kid.
18  Yes.  My mom helped raise them and practically raised
19  them.  And I still was outside being a kid.
20   Q   What about in nine –
21   A   I left my babies in the house with my momma.
22   Q   What about 1994?  Did you consider yourself a
23  kid then too?
24   A   I considered myself as going into adulthood,
25  learning things, processing – processing better –

Page 233

1   getting better as becoming out of the kids stage.
2    Q   What about in '95 when you had your third
3   child?  Did you consider yourself a kid then too?
4    A   No.  I considered myself as a young adult.
5    Q   Okay.  What was different in 1995 as opposed
6   to '92 or '94?
7    A   Because I was paying bills.
8    Q   Okay.
9    A   But I still was a young adult.
10   Q   What job – how were you paying your bills?
11  Did you have a job in 1995?
12   A   Yeah.  I was working at – when – I mean at
13  White Castle.
14   Q   Okay.  And when you were arrested for the
15  trafficking charge, were you working at that point?  Did
16  you have a job then?
17   A   No.  I wasn't, no.
18   Q   Is that why you were, I guess, involved in
19  some way, shape, or form with that drug deal?
20       MS. DONNELL:  Objection.  Form.  Argumentative
21  and misstates her prior testimony.
22   Q   Was it to get money?  That's my question.
23       MS. DONNELL:  The same objections.
24   Q   You can answer the question.
25   A   It wasn't that I was involved.  It was that I

Page 234

1 walked up and someone asked for change. And I gave them
2 the change. That's how I end up being involved because
3 I end up with the marked $20 bill. I wasn't in those
4 transaction.
5     Q   Okay.
6     A   That's how I end up -- I had the marked money
7 so that end up being a case on me. I didn't do no
8 trans -- drug transaction.
9     Q   Yeah.
10     A   I walked up, going in the building on 50th and
11 Calumet. Somebody said can I -- you got two tens for
12 this 20? I gave them the two tens; they gave me the 20.
13 Met in the hallway -- the police come in the hallway.
14 And it was three of us in the hallway. And they got the
15 $20 off me. So there I go, I'm gone. I ain't going to
16 be, like, oh no, I got it from him. Is that -- what
17 they going to do? They still going to lock me up
18 because I got the marked money. It wasn't no
19 transaction -- I wasn't selling drugs to have no money.
20     Q   Okay. When did you first meet Little A? What
21 year if you can recall? If you want to start, like,
22 September 15, 1991 as, like, kind of a bookmark, when
23 before then did you first meet Little A?
24     A   I can't recall. It was before '91 though. But
25 I can't recall exactly what year.

Page 235

1     Q   All right. Was it more than a year before
2 this shooting happened or less than a year?
3     A   It was more than a year.
4     Q   Okay. And so you knew what he looked like,
5 right? In September of 1991, you knew what Little A
6 looked like. You could see him on the street and be,
7 like, that's him, right?
8     A   Yeah.
9     Q   You know where he lived?
10     A   I probably -- I probably -- yeah. I mean, did
11 I know where he lived?
12     Q   Yeah.
13     A   No.
14     Q   You know who his friends --
15     A   I didn't know where -- I didn't know where too
16 many or nobody on 51st lived because we didn't -- them
17 nobody go to people houses. When we go outside, we
18 outside. Ain't no going to -- to -- don't know -- we
19 going over there to sit on they porch, we going to knock
20 on they doors, no. I didn't -- I didn't even socialized
21 with Little A, Snake, none of them like that to be all
22 in they business of where they lived at.
23     Q   Did Little A and Snake, to your knowledge,
24 associate with each other in some way?
25     A   Yeah. They -- they -- yeah. I -- yeah. They

Page 236

1 spoke, and talked, or whatever.
2     Q   How do -- tell me what experiences you
3 remember, things that you saw that led you to believe
4 Little A and Snake associated with each other -- knew
5 each other.
6     A   They see each other, they give each other the
7 five, the handshake and say a couple of words. Probably
8 walk off and walk in the store together or one walk the
9 other way, one go the other way or --
10     Q   What stuff --
11     A   When you seen them -- when you seen them
12 bypassing each other, you'll know that they know each
13 other because they're stopping -- yeah each other.
14 What's up man, hey, what's going on, where you on your
15 way to, whatever -- whatever they'd be saying.
16     Q   And you knew Snake because he had a mark on
17 his face, right? That was something that was kind of
18 distinguishing about him, right?
19     A   Yes.
20     Q   Where would you -- when you saw Snake and
21 Little A, you know, interacting with each other the way
22 you just described, were there places where you would
23 see them run into each other more often than other
24 places or a place that you knew that they would be
25 together more likely at than others?

Page 237

1     A   Only place that you will see -- see them at is
2 around 51st.
3     Q   But you're talking both of them -- Little A
4 and Snake. That's where you'd see them around 51st
5 Street?
6     A   Yeah.
7     Q   Where on 51st? 51st goes quite a way?
8     A   Anywhere on 51st. Anywhere from probably
9 Morgan back down towards Ashland. You'll see them
10 through that ways.
11     Q   Okay. Little A ever been over to your house
12 ever before September 1991?
13     A   No.
14     Q   He ever come over to your stoop and hang out
15 on your stoop with you?
16     A   No. He probably sat there, and I probably
17 wasn't there because I didn't really socialize. I spoke
18 to him and we -- but we didn't hang out and drink, smoke
19 cigarettes, or hardly chitchatting and kick it together
20 like that, no.
21     Q   Okay.
22     A   If he -- if he sat on my stoop, he probably
23 was sitting on the stoop with some of the other guys
24 that are stopping, sit right there whatever.
25     Q   Like who?

Page 238

1   A   Like Snake and them.  They probably stopped
2   and sit right there or they ordered them some food and
3   come sit out on the porch until they -- until they food
4   get done at the restaurant or whatever.
5       Q   Did Cleotha hang out with them on your stoop?
6       A   No.  My brother didn't even know none of them
7   off the -- only one my brother know by name would be the
8   Gunn boys.  That's because he socialized with they mom.
9   For any of them other guys, my brother didn't socialize.
10  He didn't speak to them, none of that.
11      Q   To your knowledge, did your brother know
12  Snake, like, prior to September 15, 1991?  Did you think
13  that your brother knew who Snake was?
14      A   No.
15      Q   Why do you say that?
16      A   Because he -- if -- only thing he would be
17  able to say is the guy with the mark on his face.  He
18  didn't know what his name would be or anything.  He'd
19  just have to describe him.
20      Q   Why --
21      A   He'd be like --
22      MS. DONNELL:  I'm sorry.  Just let her answer.
23      MR. GRILL:  I thought she did.
24      A   He wouldn't come -- he wouldn't come in and
25  say oh, I was just talking to Snake or nothing like that

Page 239

1   because he didn't talk to them.
2       Q   Uh-huh.  How do you know -- like, what are you
3   basing that on is what I'm trying to find out.  It's,
4   like, why are you sure that your brother didn't know
5   Snake in 1991?
6       A   Because I know my brother.  And my brother
7   wasn't -- didn't hang out on 51st.
8       Q   Okay.  So Snake was how he's --
9       A   Only time my brother -- only -- only -- my
10  brother didn't hang out on 51st.  He didn't go on
11  Elizabeth, he didn't go on Throop, he didn't -- my
12  brother didn't hang out on 51st.  He ain't had no reason
13  to be on none of them other blocks and none of that
14  because he didn't hang -- he didn't hang out with none
15  of them.
16      Q   Why wouldn't your brother ever go onto
17  Elizabeth or on Throop Street?
18      A   Because he had his own friends that he grew up
19  in the projects that he still was friends with, and he'd
20  go over they house.  He had catch the bus to they house.
21      Q   Okay.
22      A   He then -- the ones we grew up with in the
23  projects is the ones that my brother still was hanging
24  with when we were staying on 51st.
25      Q   Did your brother know Little A; if you know?

Page 240

1       A   No.
2       Q   No, he didn't or no, you don't know?
3       A   No.  He didn't know him.
4       Q   How do you know that?
5       A   Because he didn't -- he asked me who they
6   were.  He would ask me if -- if you -- if he walk up or
7   he come outside, he'd be, like, who is that just walked
8   off or who is that -- who is that you sitting outside
9   with or something of that nature, or he wouldn't, you
10  know, he didn't know who they was.
11      Q   Do you know or do you have any recollection of
12  your brother asking you questions like that about Snake
13  or Little A, questions like hey, who was that, and you
14  telling him that that's Snake or that's Little A before
15  September 15, 1991?
16      A   Yeah.  He probably asked me who -- who was
17  that guy right there.
18      Q   Okay.  So --
19      A   He was, like, if they walking past or if we in
20  the store or something, he'd be, like, who is that?  You
21  know, if I -- I'm like, hey, how you-all doing or they'd
22  be like, what up Tweety or -- he'd be like, who was
23  that?  And I'd be like, oh, that's Snake.  Oh, that's so
24  and so.  Oh, that's --
25      Q   So back -- sorry, go ahead.

Page 241

1       A   I'm done.
2       MS. DONNELL:  Before you ask another question,
3   I didn't know if it's your chat ding that's on, but
4   there's a ding that keeps happening.  That
5   sometimes --
6       MR. GRILL:  Okay.
7       MS. DONNELL:  -- covers up with me.  And I
8   don't know if you can just turn it off.  There's a
9   setting that can turn it off.
10      MR. GRILL:  Yeah.  I've been not able to turn
11  that off, unfortunately, but hopefully it doesn't
12  keep going.  It's my -- yeah.  It's my e-mail.  And
13  I don't know how to turn that off so -- but I -- if
14  you need me to repeat something just because of the
15  ding, just let me know and I will.
16      MS. DONNELL:  Okay.  Thanks.
17  BY MR. GRILL:
18      Q   So it's your testimony then that although you
19  don't know when, you agree that at times prior to
20  September 15, 1991, you can recall pointing out Little A
21  or Snake to your brother?
22      A   It probably wasn't before September.  It
23  probably -- I doubt if it was.  The first time my
24  brother probably asked about Little A and Snake, it
25  probably would -- it -- it had to be before that, but it

Page 242

1  wasn't, like, he was trying to get to know who they
2  were.
3     Q    Yeah.
4     A    He probably just asking who that is.
5     Q    Yeah.
6        MS. DONNELL: Can I --
7     Q    Okay. So when you were living on 51st and
8  Racine in September of 1991?
9        MS. DONNELL: (piano playing). Sorry,
10  somebody's got kind of, like, a piano sound going.
11     Q    In September of 1991, in the -- I don't know,
12  year, let's say, before then, do you know if Mr. Jakes,
13  your cousin, knew who Little A was?
14     A    Yeah.
15     Q    How do you know that?
16     A    Shawn knew -- he knew the -- the guys that was
17  from over there because it's not like Shawn had just
18  appeared over there in August of '91. Shawn had
19  practically been over there his whole life. So Shawn
20  didn't just meet them. Shawn was out -- he -- he knew
21  them.
22     Q    You're saying, "over there." Where are you
23  talking about?
24     A    On 51st.
25     Q    All right. So why does that, in your mind,

Page 243

1  confirm for you that Mr. Jakes knew Little A prior to
2  September 15, 1991?
3     A    I'm -- I'm 100 percent sure Shawn knew who
4  Little A was before that day. I'm 100 percent sure
5  because there was, like, he hung around. The way he go
6  around the corner, go up the street , they'd be the ones
7  that'd be outside and all that. So I'm quite sure he
8  walked up and speak to them and knew who they were.
9     Q    Okay. Did you ever see Mr. Jakes socializing
10  in any way prior to September 15, 1991 with Little A?
11     A    I can't recall. I can't recall, like, if they
12  standing there talking with. I can't recall all that.
13     Q    Okay. Do you ever see Little A going over to
14  Mr. Jakes' house prior to September 15, 1991, like, go
15  and visit him, anything like that?
16     A    I can't recall -- can't recall then.
17     Q    Is it possible?
18        MS. DONNELL: Objection. Calls for
19  speculations. Again, he's only asking you about the
20  things you know, or have seen, or heard, not to
21  speculate or to guess. So if you know, go ahead.
22     A    I doubt it because it wasn't too many people
23  that go -- that go knock on my aunt B's door --
24     Q    Why's that?
25     A    -- for Shawn -- be like, you just wait for

Page 244

1  Shawn to come outside.
2     Q    Okay. Do you know if Little A was a member of
3  any gang in September 1991?
4     A    I don't recall. I -- I don't know who was
5  in the -- affiliated with gangs back then because I
6  didn't -- it would just, like, they just hung out. It
7  wasn't, like, they running around hollering anything
8  or -- so I can't recall them, you know, them running
9  around hollering a certain gang or --
10     Q    Okay. The -- you said a moment ago that you
11  would see Snake and Little A give each other the five.
12  You just talking about a high-five or is it --
13     A    You know, you go walk up and you'd be, like,
14  what up. You --
15     Q    Okay.
16     A    -- shaking hands and -- you know, just --
17  that's like you walk in an office. You shake somebody
18  hand, how you doing.
19     Q    Got it. Okay. All right. So after -- oh, do
20  you know Little A's real name? Like, you know, that's a
21  nickname. Do you know what his actual name is?
22        MS. DONNELL: I think that was already asked
23  and answered earlier but go ahead and answer again.
24     A    No. I -- that's what I was saying earlier.
25  Most -- most they people over there, I know nicknames. I

Page 245

1  don't know their real name. I only -- I don't know. I
2  mentioned that earlier, like, I just know nicknames.
3     Q    All right. So after you threw -- or the
4  bottle, I should say, was thrown -- well, hang on. Where
5  exactly were you, the three of you, when the bottle
6  thrown, were you still on stoop or were you guys
7  somewhere near 1210 when you guys threw the bottle at
8  the car, or the rock at the car, or whatever it was?
9     A    We was still on the stoop.
10     Q    All right. And you said the car stopped,
11  right?
12     A    We -- we wasn't for sure if it -- if it
13  stopped or what but -- because once it went, we went
14  running. So --
15     Q    Okay.
16     A    -- we wasn't -- I ain't for sure if it stopped
17  or not because I didn't run back to see if stopped or
18  look back to see if it stopped or anything.
19     Q    Got it. So basically, I guess, as soon as
20  you -- that whatever it was that was thrown, since you
21  guys threw it, the three of you hightailed it through
22  the gangway between 1210 and 1212, right?
23     A    Correct.
24     Q    And you and Cleotha went upstairs to your
25  apartment on 1210, and Mr. Jakes went westbound down the

Page 246

1 alley, right?
2    A  Correct.
3    Q  And when Mr. Jakes went westbound down the
4 alley, that was the last time you saw Mr. Jakes until
5 the next morning or the next day when the police were
6 taking him out of his aunt B's house in the back of
7 1212, right?
8    A  I didn't see them bringing him out, but that
9 was the next time that I heard about Shawn being down
10 that away.
11    Q  All right. Just before we took the break, you
12 told me that you knew Mr. Jakes (sound effect) is
13 innocent because after --
14    A  I didn't hear you because that beep.
15    Q  Sorry, yep. Fair enough. You told --
16    MS. DONNELL: I just think it is a little
17 distracting because it happens to you. Do you just
18 want to just close your e-mail because you're in a
19 dep -- because it does keep --
20    MR. GRILL: I need my e-mail. So just tell me
21 to -- ask me to repeat it.
22    Q  So you told me right before the break that we
23 took for lunch that you knew Mr. Jakes was innocent
24 because at some point after the shooting, you heard
25 people saying that he was down on Laflin or Bishop. Who

Page 247

1 did you hear that from?
2    A  They wasn't talking to me when they said it.
3    Q  Who is "they"?
4    A  It was by -- by -- whoever was walking past
5 but -- by the window being broke and -- I can hear,
6 like, my -- I can hear someone from the family asking
7 where's Shawn or somebody said -- asking for Shawn or
8 whatever. And somebody was saying he was down there on
9 Bishop and Laflin. I didn't -- I didn't ask no one
10 where he were. I could just hear them talking saying it
11 from upstairs that the window's broken and we sitting
12 right there in the front.
13    Q  Got it. Okay. So did you hear -- whoever it
14 was that said this, did you hear this the night of the
15 shooting or was this on some other night that you heard
16 this?
17    A  This the night of the shooting --
18    Q  Okay.
19    A  -- because we was wondering where is Shawn at
20 2:00 because we ran up the stairs and we was wondering
21 all day Shawn ain't came back this way yet.
22    Q  So -- sorry, go ahead.
23    A  So I -- so one -- we was wondering then it
24 was, like -- I'm sorry. That's when somebody -- I think
25 it was -- if I ain't mistaken, I can't recall exactly

Page 248

1 who, but it was a voice that -- from our family that
2 actually was, like, where is Shawn at. Like, a older
3 person. And that's when someone was like Shawn down
4 there Laflin and on Bishop. And this was like -- this
5 was, like, later on in the evening, like, this was
6 after -- this was, you know, like, we sitting upstairs
7 and I'm, like, Shawn ain't came back down -- Shawn ain't
8 came back yet.
9    Q  Is this after the --
10    A  So he out there.
11    Q  Is this after the shooting that you're
12 hearing this or is this before the shooting?
13    A  No. This was like -- this was before the
14 shooting and then, you know, after the shooting we
15 couldn't -- you can't hear nothing because all you could
16 hear is just, like, the police with radios outside, you
17 know, making this (sound effect). And that's when --
18 the next day I'm just, like, why all of these -- that's
19 when I'm, like, why are all these police is at Aunt B
20 house.
21    Q  So after the bottle or rock was thrown at the
22 car but before the shooting happened, you're telling me
23 that you were up in your apartment with your brother, I
24 guess, and you hear somebody outside from your family,
25 an older person say something that made you think that

Page 249

1 Mr. Jakes was down at -- either on Laflin or Bishop
2 Street? Do I have that right?
3    A  Yeah. Whoever was walking past, someone was
4 walking past that was, like, going to the store. So
5 either they -- either they were asking them, or they
6 just were saying it out, or talking to somebody else.
7 However it's when -- it was, like, Shawn on Laflin.
8 The -- I don't know they could have -- they could have
9 been talking about the other Shawn. All that I know is
10 that I was heard, like, Shawn on Laflin.
11    Q  What other Shawn?
12    A  It was another Shawn that they -- I -- I don't
13 even know his last name, but they called him -- his name
14 was Shawn too. So they could have be talking about him,
15 but I do recall that's being said, like, Shawn on
16 Laflin. It could have been --
17    Q  Well, you said that --
18    A  It could have been a conversation between the
19 people walking past or anything good. Something of that
20 nature, but we wasn't going, like, out down the street
21 looking for Shawn.
22    Q  So you said this was a voice of an older
23 person from your family, right? That you heard say
24 this?
25    A  That was, like, Shawn --

Page 250

1  Q  Did anything --
2  A  -- but they -- just --
3  Q  Go ahead.
4  A  -- just, like, with the other Shawn --
5  Q  Uh-huh.
6  A  -- could've been talking about that Shawn
7  because he -- the Shawn that's from 51st -- he also used
8  to be down there too.  But he used to hang with one of
9  my cousin -- but friends.  He used to be down there with
10 him.  And they don't -- people on 51st -- they don't
11 know him.  So he wasn't, like, from there but he used to
12 be down there on 51st and Laflin -- 52nd and Laflin.
13     Q  Was this -- did you know if other people in
14 your family knew who this other Shawn was that you don't
15 know what this person's name is or where they live
16 but -- you know, if other people in your family knew who
17 this other Shawn was?
18     A  Yeah.  They knew.
19     Q  Okay.  Was the voice that you heard outside
20 talking about Shawn being on Laflin or Bishop -- was
21 this voice you heard -- was it a male voice or a female
22 voice?  This older person?
23     A  A male.
24     Q  All right.  Did you recognize the voice?  I
25 mean, it's a family -- somebody in your family.  Do you

Page 251

1  recognize his voice?
2     A  I can't recall if it was -- if it was Derrick
3  or if it was -- I can't recall if it was Derrick or if
4  it was Vince.  I just can't recall which voice it was,
5  but it was one that they voices.
6     Q  And Derrick and Vince -- I'm sorry.  I
7  don't -- I can't keep everybody's name straight.  Who
8  are they in your family?  Just do it that way.
9     A  Derrick is Aunt B's son.  That's her -- her
10 oldest child.
11     Q  Okay.
12     A  And Vince is her nephew.
13     Q  Okay.  And what exactly, other than Mr. Jakes
14 or Shawn, I should say because you don't know what Shawn
15 you're talking about -- but the Shawn that was over on
16 that you heard them say was over on Laflin or Bishop.
17 Did you hear say anything else about Shawn being over at
18 Laflin and Bishop?
19     A  No.  Because it was like, whoever they was,
20 they was, like, gone in the -- in the house, or down the
21 street, or whatever.  It was, like, they were just by
22 passing or walking past.
23     Q  And did this make you think that Mr. Jakes --
24 once the shooting happened and you found out that he had
25 been arrested and charged with killing Mr. Garcia,

Page 252

1  that's the name of the person who you saw, I guess,
2  hanging out the car.
3     MS. DONNELL:  Objection (sneezes).  Sorry.
4     MR. GRILL:  Heather, stop.  Excuse me.
5     Q  Did you think after you found out that what
6  Mr. Jakes had been charged with, that Mr. Jakes was
7  innocent because he was down on Bishop or Laflin at the
8  time of the shooting?
9     MS. DONNELL:  Objection to the form of the
10 question.
11     Q  Did --
12     MS. DONNELL:  And to the extent you
13 mischaracterize her testimony, the initial part of
14 the question, but you can answer the question.
15     Q  In hearing that outside your window from, I
16 guess either Derrick or Vince maybe, did it make you
17 think that Mr. Jakes was innocent?
18     A  I had a -- I knew Shawn did never come back
19 towards Racine because if he would've came back, he
20 would've came upstairs.  I know he would've came
21 upstairs --
22     Q  Upstairs --
23     A  -- because he knows up to our apartment.
24     Q  Okay.
25     A  He would've came upstairs because he knew we

Page 253

1  were going to get -- we was in trouble about that
2  window.  So I know Shawn would've came upstairs.
3     Q  Did he --
4     A  I'm not saying -- I'm not saying that the --
5  they said, like, oh, he -- he better had -- he better
6  came, no.  I know he would've came upstairs.  I know he
7  would've came upstairs.  He would've tried to plead --
8  he -- he would've try to plead his part of the case of
9  the window being broken.
10    Q  Why -- he would've wanted to plead his case to
11 who about the window being broken?
12    A  My momma.  My mom.
13    Q  Your mom wasn't home.
14    A  My mom wasn't home.  My mom came home.
15    Q  Okay.
16    A  What'd you mean?  My mom came home the same
17 night.
18    Q  Okay.
19    A  My mom didn't -- didn't stay gone.  My mom
20 came home the same day.  She only went to a funeral.
21    Q  Okay.
22    A  When I was talking to Ms. Heather, did you
23 hear me say my mom -- we heard my mom say my -- got to
24 cursing about her window.  We heard her from -- in fact,
25 first in the bathroom window.

Page 254

1    Q   Okay.  Hang on one second.  Sorry.  All right.
2  So did you tell anybody -- well, what did you do with
3  that information about, you know, I guess that you
4  happened to overhear where the shooting happened that
5  somebody was wondering where Shawn was?  What did you do
6  with that information after you found out that Mr. Jakes
7  had been arrested for killing Mr. Garcia or being
8  involved with Mr. Garcia?
9        MS. DONNELL:  Objection.  Go ahead, Ms.
10   Chairse.
11   A   I didn't -- I haven't talked -- this is -- I
12  haven't talked to anyone about this case ever.  This the
13  first time I'm ever talking about this case.
14   Q   Do you believe -- go ahead.
15   A   And -- this -- this -- this case is coming
16  back around.  I haven't spoken to anyone about Shawn
17  being arrested and charged with that murder.  None.  He
18  was gone in the years.  We never spoken about it.  Me,
19  my brother, my cousin, aunts, momma.  We never spoken
20  about it.
21   Q   Do you believe that you have information
22  that -- to offer that in your mind proves that Mr. Jakes
23  could not have killed Mr. Garcia or been involved with
24  killing Mr. Garcia?
25   A   I have it in my mind that he -- yeah.  It's --

Page 255

1  it's -- my whole 100 percent body and soul that he
2  didn't have anything to do with the killing of
3  Mr. Garcia.
4    Q   Right.  I'm asking you something a little bit
5  different.  I'm asking you if you believe that you have
6  evidence, information, something to say to point to that
7  proves in your mind or mind Mr. Jakes could not have killed
8  Mr. Garcia or been involved with killing Mr. Garcia.  Do
9  you believe you have information like that to offer?
10   A   Yeah.  I do.
11   Q   And what is that information exactly that you
12  believe you have that proves Mr. Jakes is innocent?
13   A   My defense of that he is innocent is that once
14  Shawn went through the gangway, turned left west down
15  the alley to Ashland, Shawn never returned towards
16  Racine until after 11-something that night, going onto
17  midnight.
18   Q   How do you know -- okay.
19   A   So once Shawn left after the window got
20  busted, Shawn never returned to 51st and Racine until he
21  came straight in the house.
22   Q   Okay.  Did you see him again after he -- at
23  some point later that night or the next day after he
24  headed westbound down the alley after you guys threw the
25  rock bottle of the car?

Page 256

1    A   No.  I didn't see him, but he -- from my
2  understanding, Shawn was in the house at about 11:00
3  that night.
4    Q   So that's what I'm trying to get at.  What is
5  that understanding based on?  Where did you get that
6  from?
7    A   Because the person who we walked back down
8  towards Racine with.
9    Q   Who's that?
10   A   That was Annette's brother Rodney.
11   Q   Rodney what?
12   A   Harris.
13   Q   Okay.  And when were you walking down the --
14  down the scene with Rodney?  Was it that night, the
15  night of the shooting?
16   A   I wasn't walking down Racine with Rodney.
17   Q   Okay.
18   A   That's when -- Rodney said that's when him and
19  Shawn came back down.  That's Annette -- Annette's
20  brother.  Rodney.
21   Q   Yeah.  Yeah.  Okay.  I got that by the last
22  name, but where -- so you're telling me that Rodney
23  and Mr. Jakes were together at some point later that
24  night?
25   A   Rodney probably was coming from pass -- Rodney

Page 257

1  probably was coming home anyway, but just so happened
2  him and Shawn start walking that way.
3    Q   And how do you --
4    A   Rodney -- Shawn -- Rodney.  No.  They didn't
5  hang together.
6    Q   That's not what I'm asking.  How do you --
7    A   They didn't hang together -- they didn't hang
8  together at all period.
9    Q   How do you know that Rodney and Shawn -- Mr.
10  Jakes were walking together at some point that night
11  after you guys threw the rock or bottle at the car?  How
12  do you know that?
13   A   That's where Rodney said.  They walked back
14  down 50 -- when they made it back down there, it was,
15  like, 11-something that night.  Him and Shawn -- he was
16  walking down 51st coming home, and him and Shawn walk
17  down to 51st together.  Now, they --
18   Q   When did Rodney talk to -- is this something
19  that Rodney told you?
20   A   Yes.
21   Q   When did Rodney tell you this?
22   A   This was back then when he got arrested for
23  it.
24   Q   All right.  And when did Rodney -- did Rodney
25  tell you whether he ran into Mr. Jakes before or after

Page 258

1 the shooting?
2     A   11:00 that night.  That was after the shooting
3 am -- if I'm correct.
4     Q   It's your understanding that Rodney was
5 telling you that he ran into Mr. Jakes walking down the
6 street -- walking down the scene, I believe, after the
7 shooting --
8     A   Down 51st.
9     Q   -- is that what you're telling me?  Down 51st.
10 After the shooting?  Is that what you're telling me?
11     A   Yeah.  How many hours later?
12     Q   Well, you said it was around 11:00.  I'm just
13 going with -- but in any event --
14     A   Right.  Closer to exactly when they --
15     Q   -- it's your understanding -- okay.  Where on
16 51st Street did Rodney run into Mr. Jakes, if you know?
17     A   I don't know exactly where he ran into him at.
18     Q   Uh-huh.  And why is it that if Rodney ran into
19 Mr. Jakes after the shooting down 51st -- somewhere on
20 51st Street, that to you -- that tells you that
21 Mr. Jakes is innocent?  Explain your thought process on
22 that if you could.
23     A   Who -- who go kill somebody and then walk down
24 the street?
25     Q   Well, how far down 51st Street were they?  Do

Page 259

1 you know?
2     MS. DONNELL:  Objection.  I think that's asked
3 and answered.  And she said she didn't know.
4     Q   Okay.  So why does that to you tell --
5 convince you, I guess, that Mr. Jakes is innocent?
6     A   I'm just -- I'm -- I'm -- it's -- it's
7 convincing to me that he is innocent because he wasn't
8 in the facility of the -- when I seen the two young
9 Black men disbursing the car, it was not -- neither one
10 of them was Shawn.  I know that.  They -- but --
11     Q   I thought you said you couldn't remember what
12 they looked like or what they were wearing, right?
13     A   I can't remember what they looked like or what
14 they were wearing.
15     Q   Uh-huh.
16     A   But I'm -- I'm -- I know for sure that it
17 wasn't -- neither one them was Shawn because they wasn't
18 tall as Shawn were.
19     Q   And when you're looking at these guys that you
20 testified you saw, like, running away from the car --
21 these two guys you say are not Mr. Jakes.  Where you see
22 these two guys?  These two guys are somewhere west of
23 the Queen's sub shop and west of the intersection of
24 51st on the scene, right?  Because you're kind of
25 looking out of the side window of your apartment out on

Page 260

1 the 51st Street, right?
2     A   That's the east.  I be looking east.  Looking
3 towards at --
4     Q   You're looking east.  I'm saying they have
5 west.
6     A   So I'm looking out the window, looking east,
7 and they're at the -- dispersing the car -- disperse --
8 leaving by the vehicle on the driver side
9     Q   Uh-huh.
10     A   -- dispersing from -- by the vehicle.
11     Q   Could you see --
12     A   The -- the vehicle would be -- they would be
13 on the south side of the vehicle and the vehicle is
14 facing west.
15     Q   Yeah.  Right.  So could you see the corner of
16 51st and the scene from where you were looking at the
17 window watching these two guys that are not Mr. Jakes
18 run from the car?
19     A   No.  You can't see the corner from my -- our
20 window period.
21     Q   Right.  Right.  Do you know what Mr. Jakes --
22     A   -- because of that -- because of that balcony.
23     MS. DONNELL:  I'm sorry.  I'm sorry.  I
24 just -- it's getting a little bit hard, I think --
25     MR. GRILL:  Stop.  She's done with her answer.

Page 261

1 I'm going to ask the next question.
2     Q   Do you know --
3     MS. DONNELL:  I'm just asking -- it's for the
4 witness to just to remember to pause because I think
5 it's getting -- part of the record's getting unclear
6 and I'm not criticizing.
7     MR. GRILL:  Uh-huh.
8     MS. DONNELL:  I'm just saying maybe you could
9 not talk over each other.
10 BY MR. GRILL:
11     Q   Do you know what it is exactly that Mr. Jakes
12 was accused of having actually done or -- you know, what
13 was it -- he was said to have -- how was it he was said
14 to have participated in the time -- do you know what it
15 was or what it is?
16     MS. DONNELL:  Objection.  Form.
17     No.  But I --
18     Q   Do you know --
19     A   No.  But I knew he was charged with murder.
20     Q   Do you know that he was charged with being a
21 lookout on the corner of 51st to the scene?  That that's
22 what he was charged with having done and convicted for?
23     MS. DONNELL:  And is that a statement or is
24 that a question?
25     MR. GRILL:  I'm asking if she knows if that's

Page 262

1   what – if she knows that that's actually what he
2   was accused of having done when it – as it relates
3   to Mr. Garcia's –
4       A   No.
5       Q   And it's – okay.  So you can't tell me, since
6   you couldn't see the corner of 51st and Racine, from
7   where you saw these two guys run from the car that
8   weren't Mr. Jakes – you can't tell me at all if Mr.
9   Jakes was actually not at the corner of 51st and Racine
10  when that shooting happened, right?  You don't know.
11      MS. DONNELL:  Objection.
12      A   No.  I can't tell you.  No.  I can't tell you
13  if he was at the corner because you can't see from
14  the – you can't see to the corner from where we stayed.
15      Q   And so your belief that Mr. Jakes is innocent
16  is just that.  It's your belief.  But there's nothing
17  that you can actually tell me that actually proves that
18  Mr. Jakes could not have been the lookout, right?
19      A   I – I'm – I'm actually going to say this.
20  He – the shooting happened too – not too long after
21  our window got broken.  He probably hadn't even made it
22  to – to Laflin or Bishop or Laflin by the time the
23  shooting even happened.  Because the happened – the
24  shooting happened – it wasn't too long after our window
25  got broken.

Page 263

1       Q   Okay.
2       A   So how did he make it from back down there –
3   from down there – back down there to talk to somebody
4   about being a lookout?
5       Q   How long – it's a great point.  So how long
6   was it?  When you say, "it's not too long," what's not
7   too long?  How, you know, as far as –
8       A   I don't –
9       Q   – when the window got broken until you heard
10  gunshots, how much time passed?
11      A   I – I can't say exactly if it was 40 minutes,
12  30 minutes, a hour, two hours, but I know exactly –
13  it – the window got broke.  We in the house cleaning
14  the glass.  My brother takes the glass to the garbage.
15  Go to the store.  The shooting happened.
16      Q   Okay.
17      A   That wasn't even a full – that wasn't even
18  probably a full 40 minutes because we didn't – he
19  didn't even get a extended – extended of time to even
20  be, like, well, I'm going to see if the car pulls it off
21  before he even went to the store.
22      Q   What did you tell your mom about how the
23  window got broken?
24      A   Exactly what happened.
25      Q   Which was?

Page 264

1       A   Which was we decided to throw a car at – at a
2   car that was going to past with a flag.
3       Q   Uh-huh.
4       A   And they bust the window.
5       Q   Got it.
6       A   They got out of their car and the bust the
7   window.
8       Q   Got it.  And so when – from the time the
9   window got broke until you heard the shots, do you think
10  it was more than a half hour but something less than an
11  hour, or was it some other amount of time?
12      MS. DONNELL:  Objection.  Asked and answered.  I
13  think she just tried to answer that.
14      MR. GRILL:  Trying to pin it down.
15      Q   Was it at least a half hour later?
16      A   I'm fig – it was – it was less than a hour.
17  And I'm figuring it was – it – it – probably – it
18  was less than a hour.  I know that.
19      Q   Okay.  But more than a half hour?
20      A   I can't say if it was more than a half hour.
21      Q   Well, let's go through what you guys did.  So
22  you guys are – you and Cleotha are up in your
23  apartment.  This is before the window gets broken.  But
24  you guys now ran from the car and you two are in your
25  kitchen in your apartment on the second floor at 1210,

Page 265

1   right?
2       A   You said ran from a car.
3       Q   Yeah.  After you guys threw the rock or
4   bottle, you and Cleotha scooted up to your place, and
5   then Mr. Jakes took off westbound down the alley, right?
6       A   Correct.
7       Q   Okay.  And you and Cleotha are the only two in
8   your apartment.  Mr. Jakes is not there, right?
9       A   Correct.
10      Q   Okay.  And how long are you and Cleotha in the
11  apartment on the second floor of 1210 before the bottle
12  or whatever it is – before the window gets broken?  How
13  long are you inside?
14      MS. DONNELL:  Objection.  Asked and answered.
15  But you can answer again.
16      A   We probably had just made it in the door,
17  like, in the door.  The – just like I said, the
18  kitchen, the pantry, the bedroom, bathroom.
19      Q   Okay.  Okay.
20      A   Boom, the window's open.  The window open.
21      Q   Okay.  And so you're inside for a short amount
22  of time, very short amount of time.  You hear the window
23  get broken.  You guys go up to the front window and see
24  that it's been broken, right?
25      MS. DONNELL:  Objection.  Form.

Page 266

1    A   Yes.
2    Q   Okay.  And you said you looked outside, right?
3    A   Yes.
4    Q   Did you see anybody outside on the sidewalk?
5    A   Not that I --
6       MS. DONNELL:  Objection to the extent that
7    she's already --
8    A   Not that you --
9    A   Not that I recall.
10   Q   Okay.  Did you see, like, maybe the occupants
11   of the car outside angry wanting to --
12   A   Not that I recall.
13   Q   Okay.  Do you think that's something you'd
14   remember, like, if, the car stopped and the people that
15   were in it got outside and were, like, maybe shouting?
16      MS. DONNELL:  Objection.  I'm sorry.  Objection.
17      MR. GRILL:  That's fine.
18      MS. DONNELL:  I'm sorry.  Objection.  Form.
19   Argumentative.  Go ahead and answer.
20   A   We don't know if they were the ones that bust
21   the window.  I never said they got out the car and bust
22   the window.
23   BY MR. GRILL:
24   Q   All right.
25   A   All that we know is the window got busted.

Page 267

1    Q   Right.  Right.
2    A   It probably was.  And them got out the car and
3    bust the window.
4    Q   The question's a little different.  I'm asking
5    you:  If the occupants of the car had gotten out and
6    maybe were standing in front of the apartment building,
7    shouting at you guys to maybe come down and -- you know,
8    confront you guys about it, is that something that you
9    think you'd remember if that had happened?
10      MS. DONNELL:  Objection.  Form.  Argumentative.
11   But if you know the answer, you can answer.
12   A   It probably would, but I -- over 30 years ago.
13   But it probably would be something I could remember.
14   But --
15   Q   And you don't have a memory of that?
16      MS. DONNELL:  I'm sorry.  I don't think she's
17   finished.
18   A   No.  I don't have a -- a recollection of no
19   one standing out there whooping and hollering come out
20   or down or -- none of that.
21   Q   Do you remember if your brother went down and
22   confronted a group of people that -- you know, were the
23   occupants of the car that you guys had thrown something
24   at?
25   A   No.

Page 268

1    Q   All right.  And at any rate, it sounds to me
2    like once you and Cleotha were inside and the window had
3    gotten broken, the next time Cleotha left was to throw
4    the glass out that you guys cleaned up, right?
5    A   Right.
6    Q   Okay.  So how long did it take you and Cleotha
7    to clean the glass up?
8    A   It didn't take us no 30 minutes.  I know it
9    wouldn't have took -- it didn't take that long because
10   it wasn't, like, the whole window was busted out.
11   Q   Uh-huh.  Yeah.  And so what?  Maybe it took
12   you five, ten minutes to clean the glass up, make sure
13   you got everything, right?
14      MS. DONNELL:  Objection.  Form of the question
15   to the extent it misstates her testimony.  But if
16   you can answer, you can answer.
17   A   I can't say if it was two minutes, three
18   minutes, or ten.
19   Q   Okay.  And what did you guys put the glass
20   into -- the broken glass?
21   A   I don't recall what -- what we put it in.
22   Q   All right.  And Cleotha, at any rate, like,
23   took the broken glass outside to throw it out?
24      MS. DONNELL:  Objection to the extent I think
25   you're misstating her prior testimony, but maybe I'm

Page 269

1    wrong.
2    A   At some point between -- with -- yeah, he took
3    it out.
4    Q   And he took the glass to throw to throw it out
5    before he left to go to the store, right?
6    A   He -- I can't recall if he took it out and
7    then -- and just went to the store from that point or if
8    he just took it out and came back up.  I can't recall
9    exact steps of being down to the garbage --
10   Q   Uh-huh.
11   A   -- back up, back down, back around.  I can't
12   recall it being that -- call -- I can't recall if he
13   just went out to the store and back up.
14   Q   Uh-huh.  Okay.  Okay.  After you guys cleaned
15   the glass up -- well, what you said was that you at some
16   point went down to -- this is after the window was
17   broken -- went down to your front porch.  Remember
18   testifying to that?
19   A   Yeah.  I went down.
20   Q   Yeah.  How long did you stay on your front
21   porch that time?
22   A   Not long.  I think I just went down and
23   probably looked around and looked up or -- and came back
24   up.
25   Q   Why?

Page 270

1    A   I went down, looked up at the window.  It
2  wasn't that I went down there and sat on the stoop or
3  nothing.
4    Q   Okay.  Do you know how long you were out
5  there?
6    A   No.
7    Q   All right.  Did you see anybody outside, like,
8  any of your neighbors, anybody that you knew?
9    A   I can't recall.
10   Q   Did you see Annette, Denise, or Nikia outside
11  while you came down there that time?
12   A   Maybe.  I can't recall.
13   Q   All right.  Did you see anybody walking
14  westbound down 51st Street on the sidewalk coming from
15  the direction -- you know, of the intersection of
16  Racine?
17   A   I can't recall.
18   Q   All right.  And do you recall at all what the
19  reason was that you decided to go back down to your
20  porch at that point, your front porch?
21   A   To look up at the window.
22   Q   All right.  And --
23   A   I didn't go down to hang out.  I went to look
24  up at the window.
25   Q   All right.  What was -- why did you need to go

Page 271

1  and look up at the window from the outside?
2       MS. DONNELL:  Objection to the form of the
3    question.  You can answer.
4    Q   What were you here -- I'm asking a different
5  one.  What were you looking for?
6    A   To see -- it was -- to see how it was -- how
7  it was looking from the outer part of the window, like,
8  the outside.  How was it looking from the outside?
9    Q   Okay.
10   A   Like, once my momma pull up she go -- how bad
11  would she notice it.  Like, how bad did it look?
12   Q   You told Ms. Donnell that the reason why you
13  ran after the bottle or rock was thrown at the car, and
14  you and Cleotha ran into your apartment was because you
15  were scared.  You said also you were scared because you
16  were a woman or a girl.  Why did your gender make you
17  scared, or why were you scared?
18       MS. DONNELL:  Objection.
19   A   Because I'm a female.
20   Q   But what about being a female made you scared?
21  Separate apart from you guys threw something at a car
22  and maybe you guys thought they were going to come after
23  you, was there some other reason that you being a girl
24  made you scared?
25   A   Yeah.  I'm not tough as a guy.  I can't beat

Page 272

1  up a man.  If a guy jump out the car, I can't beat --
2  beat him.
3    Q   Okay.  And you never ran into anybody that
4  night from the car, right, that was looking for you, and
5  your brother, and Jakes, correct?
6    A   No.
7    Q   Never went out to the alley that night, right?
8    A   No.
9    Q   When you went back down after you guys
10  cleaned -- or were cleaning up the glass, and you went
11  back down to your front porch, were you no longer
12  scared?
13   A   Yeah.  I was still scared but I still went --
14  I still went down.
15   Q   Okay.  What were you still scared of?
16   A   I don't know.  Just of -- being a female,
17  being scared of little things, like, what if they
18  standing down your --
19   Q   Like what little things?  I'm not -- I need
20  you to explain that for me, please.
21   A   Like, what if they standing on the side of the
22  building?  They waiting for what -- somebody - one of
23  us to come out the building, or --
24   Q   Why didn't you ask Cleotha -- or did you ask
25  Cleotha to come down with you to look to make you feel

Page 273

1  more safe?
2    A   No.
3    Q   Why not?
4    A   Because I wasn't thinking like that at the
5  time.  I was just thinking to go look to see how it
6  looked from the outside.
7    Q   Okay.  So you were scared but you weren't
8  thinking about, like, how can I make myself more safe
9  when I go outside?
10   A   No.
11       MS. DONNELL:  Objection.  Asked and answered, I
12    think.
13   Q   All right.  When your mom came home and you
14  guys told her what had happened, did you get punished
15  for that?  For the window?
16   A   Yes.
17   Q   What was your punishment?
18   A   No outside and I -- I know it was no outside,
19  but I can't recall if we had got -- nope.  We didn't get
20  a spanking, but it was, like, no outside.  Go to school
21  and back in the house.
22   Q   Okay.  Did your mom, like, make you and your
23  brother, like, pay her for the window or do anything
24  like that?
25   A   No.

Page 274

1    Q   Okay.  You testified -- you told
2  Ms. Donnell -- well, let me ask you this.  Had Cleotha
3  gone to throw the glass out in the alley, you know, at
4  the time or right around the time that you went back
5  down to the front stoop?
6    A   I can't recall if he was in the house or if he
7  was at the store.  I -- I can't recall if he was in the
8  house.  I can't recall.
9    Q   Uh-huh.
10    A   I just wasn't -- I can't recall.  I just -- I
11  can't recall if he was in the house.
12    Q   All right.  You can't recall if he was in the
13  house at all, or do you mean something else?  I'm not --
14    A   You asked me were he in the house when I went
15  out.  Was he still in the alley throwing away glass when
16  I went and looked at the window?
17    Q   Okay.
18    A   I can't recall if he was in the house or if he
19  was still in the alley.  I can't recall at what pacific
20  time that I went out, if it was at the time of him
21  throwing the glass out or if it was at the time of --
22  before the glass got picked up.  I can't recall, but I
23  do recall looking up at the window.
24    Q   Uh-huh.  You told Ms. Donnell that when you
25  came back up from the porch, I guess after looking at

Page 275

1  the broken window from the outside of your house, and
2  you went back upstairs, Cleotha was there and told you
3  that he was going to the corner store at that point.  Do
4  you remember giving that testimony earlier today?
5    A   Yeah.  He did say -- yeah, he went to the
6  store.
7    Q   All right.  And what door did Cleotha leave
8  out of?
9    A   The front door.
10    Q   Okay.  You sure?
11    A   That I could -- I -- nope.  I ain't going to
12  say the front.  I ain't going to say the front or the
13  back because I don't recall.
14    Q   Okay.  So yeah.  So if you don't recall, you
15  don't recall.  I get you.  All right.  So Cleotha
16  leaves.  How long is he gone for before you see him next
17  time?
18    A   He wasn't gone -- he wasn't gone two minutes,
19  three minutes.  The store right there.  It ain't like he
20  was going grocery shopping.  He was just going to get a
21  snack.
22    Q   Okay.
23    A   If he was gone that long.  Go in there, grab
24  it, pay for it, get out.
25    Q   Okay.  And when he came back, what happened?

Page 276

1    A   He came running through the back door.
2    Q   Okay.  And what did he say?
3    A   He -- I just looked at him, and he was, like,
4  who was -- what's -- what's his name with the birthmark?
5  I was, like, Snake.  By the time I get Snake out -- and
6  he was, like, yeah and (sound effect).
7    Q   Uh-huh.
8    A   So he didn't get a chance to get out really
9  the full stuff --
10    Q   Uh-huh.
11    A   -- the full thing of what he was about to say
12  until after -- you know, he wasn't -- couldn't get out
13  the full thing of everything he was about to say.
14    Q   Okay.
15    A   But the shooting happened so quickly, like,
16  what's his name with the birthmark?  I'm, like, Snake?
17    Q   Uh-huh.  And it sounds like at some point you
18  got the full story from your brother, right?  Like, what
19  he was trying to tell you after the shooting; is that
20  right?
21    A   Yeah.
22    Q   Fine.  So what did he tell you?
23    A   That they were mentioning to him the --
24    Q   I'm sorry?
25    A   -- they killed -- somebody got a pocket full

Page 277

1  of money.  They go rob them.  And they mentioned to him
2  something about a robbery.  He was, like, wait, I be --
3  he was, like, wait a minute.  And that's when he came --
4  he probably walked off.  But when he went and they
5  visible -- veering, he just ran.  That's when he
6  probably ran because he was -- like, ran through the
7  back door so he had to run up the stairs.
8    Q   Who did he say said these things to him?
9    A   That's what I was saying.  That's the
10  beginning of his story, like, he was trying to describe.
11  So he described, like, the one who got the birthmark and
12  I'm, like, Snake?
13    Q   Uh-huh.  Okay.  So tell me what he told you
14  the guy with the birthmark said to him.
15    A   Something about the guy had a pocket full of
16  money.  A pocket full of money.  Something about --
17  check this out and he was just, like, oh, okay.  I be --
18  he was, like, wait a minute.
19    Q   Uh-huh.
20    A   And came home through the back and ran in the
21  house.
22    Q   Uh-huh.  And you're telling me that you
23  believe your brother was asking you -- you know, to tell
24  you who the guy with the birthmark was because he
25  couldn't -- he didn't know the guy's name; is that

Page 278

1 right?

2    A   He did know his name.

3    Q   Okay. Well, why --

4    A   I told you that two hours ago.

5    Q   Okay.

6    A   He did know his name.

7    Q   Okay. All right. So do you have any

8 understanding why he was asking you, you know, the guy

9 with the birthmark?

10    A   So he could -- so he could tell me who it was

11 and what they were saying -- what they was saying to

12 him.

13    Q   Okay. Did he say if anybody else was with

14 Snake, I guess?

15    A   Yeah. But he didn't -- he couldn't really

16 describe them because the other person, whoever was

17 that -- else that was there wasn't as close to him as --

18 he couldn't -- you know, he wasn't really thinking about

19 them because they wasn't, like, on the conversation far

20 as with him as he -- you know, he's just thinking about

21 the person that saying something to him and -- you know,

22 saying something to him why he going fast.

23    Q   Uh-huh.

24    A   Not who's -- who's around the person who was

25 talking to him, but the people that -- that ain't

Page 279

1 talking to him. He wasn't probably wasn't paying them

2 no attention. And plus once he -- Snake probably said

3 something about rob, that's all he -- my brother needs

4 to hear is something got to do with a crime and he's

5 not -- he don't want to hear it anyway.

6    Q   Uh-huh. Why is that?

7    A   He ain't -- he ain't no criminal. You think

8 because he incarcerated now, he a criminal. Everyone is

9 not a criminal. He's incarcerated because of the things

10 that he want to do, driving for instance.

11    Q   Uh-huh.

12    A   He's not a criminal. He ain't going to go

13 around hurting or harming people, robbing people.

14 That's --

15    Q   So what else did he say, if anything, that I

16 guess Snake and this other guy might have said to him?

17    A   That's all that he said. That's -- all he had

18 to say was something about a -- a pocket full of money

19 and rob and that's it. That's all he had to say because

20 he wanted -- basically hear no more. Okay. All right,

21 wait a minute. And he came running upstairs.

22    Q   Uh-huh. And did you see Snake running away

23 from -- after you heard the shots? When you looked out

24 the window, did you see Snake running away from the car?

25    A   I can't say who it was running away from the

Page 280

1 car. All I could know that it was two Black -- two

2 young Black guys.

3    Q   Uh-huh.

4    A   I can't said if it was Snake. I can't said if

5 it was nobody. I just -- I -- I don't know. I know it

6 was two Black guys running from the vehicle.

7    Q   And you agree that, like, that birthmark or

8 that -- yeah, that birthmark on Snake's face -- I mean,

9 that makes him pretty easy -- yeah.

10    A   That makes him unique and pretty easy to see.

11 Yeah.

12    Q   Yeah. Like, definitely not somebody you could

13 get confused with -- for example, with Little A, right?

14    A   Definitely -- definitely not. Definitely not.

15    Q   Yeah. That would be, like, no way. Nobody

16 could get Snake and Little A confused, right?

17    A   They definitely couldn't.

18       MS. DONNELL: Objection. I think that's and

19 asked and answered. But go ahead and ask.

20    Q   And your brother -- you told me -- knew what

21 both of them looked like. He knew what Snake looked

22 like on that day and he also knew what Little A looked

23 like on that day, right? You'd point out --

24    A   He didn't --

25    Q   -- to him because --

Page 281

1    A   No, you asked me what it -- what I know what

2 they look like on that day.

3    Q   I --

4    A   You didn't say what my brother know what they

5 would look like on that day.

6    Q   I -- no. You told me earlier today that you

7 had pointed out Little A to your brother. He'd asked

8 you who that was on prior occasions, right?

9    A   That wasn't -- that wasn't that day. You said

10 did I ever point any of them out to my brother. Have my

11 brother ever asked me who was them guys on 51st --

12    Q   Uh-huh.

13    A   -- before September the 15th of 1991.

14    Q   Uh-huh.

15    A   If my brother walked up any of them any time

16 before or after September the 5th [sic] of 1991, only

17 one he would know who it was to pick out but still

18 wouldn't know they name would be Snake.

19    Q   Yeah. Okay.

20    A   Now, you could walk up and ask him who -- you

21 could show him a picture ask who was this, who is this,

22 who is this, who is that, and he still wouldn't be able

23 to tell you. Now, if he say oh, who is that right

24 there -- oh, that's Jug. Who was there right there?

25 That's Dre. Oh, the next two days, or the next three

Page 282

1  days, or the next day, he ain't going to remember who
2  that was.
3    Q   Okay.  So --
4    A   Because he -- he didn't keep up with them like
5  that.  For what?  He don't need to know.  He ain't -- he
6  ain't want to know them.  He just wants to know who they
7  were that I was speaking to or speaking to me.
8    Q   Did --
9     MS. DONNELL:  Wait.  Can I just ask a quick
10  housekeeping question because there's a piano lesson
11  going in the background here.  And I just want to
12  know if I should mute myself if it's too
13  distracting.
14     MR. GRILL:  I can't, no.  I don't know about
15  anybody else, but I can't hear it one bit.
16     MS. DONNELL:  Okay.  Then I'm not going to mute
17  myself right now, but let -- will you let me know if
18  it gets distracting?
19     MR. GRILL:  I want to take piano lessons.  I
20  did when I was younger.  I should've kept them up.
21  That's what everybody says.
22  BY MR. GRILL:
23    Q   So did Cleotha tell you what the other guy
24  with Snake looked like?
25    A   He was describing -- he was describing him,

Page 283

1  but at the time it was, like, we -- I was back at the
2  window trying to look out the window.  So we didn't
3  finish the -- get to, like, to the end --
4    Q   Did the description --
5    A   -- that I could -- that I could recall of
6  me -- him describing someone else.  So I can't recall if
7  he had -- if I had told him about another description.
8    Q   Do you recall whether the description of the
9  other person that Cleotha said was with Snake matched up
10  to anybody --
11    A   That's what I -- that's what I can't recall.
12  Like, if he -- if we went into a conversation of him
13  describe -- he -- he was describing something, but I
14  can't recall, like, if we got through the whole
15  conversation of him describing somebody else, like --
16    Q   Because Cleotha gave a deposition just real
17  recently.  And we talked about this.  And he said that
18  one of the people that came up to him and asked him to
19  help rob -- turns out, I guess, (Inaudible) Mr. Garcia
20  die in the sub shop -- that the description that he gave
21  you caused you to tell him that it sounded like a
22  description of Little A.  Does that refresh --
23    A   I can't recall that.
24    Q   -- do you remember saying something like that
25  to him?

Page 284

1    A   I can't recall.  Because once he described who
2  the first -- the first person was -- the first person he
3  described -- it was, like, Snake.  So after that, it
4  was, like, the shooting.  So I can't recall if we
5  completed the conversation and he was -- you know, I
6  just knew it was something about a -- the man got a
7  pocket full of money and rob, but I can't recall
8  giving -- him giving me a description of a second
9  person.
10    Q   Got it.  Okay.  Sounds good.  So after you
11  heard these gunshots, did you and your brother talk
12  amongst yourselves about who was involved in that
13  shooting that you heard take place basically outside of
14  your house?
15     MS. DONNELL:  I'm going to object --
16    A   I can't recall ever talking -- I can't recall
17  us ever talking about it.  No more.  I can't -- I can't
18  have -- it was -- like, after -- after -- it was just,
19  like, a -- a unbelievable movie episode after -- like, I
20  only recall talking to my brother.  Nobody after that
21  day about the shooting.
22    Q   When Cleotha explained to you who -- or
23  described to you who was out there -- you know that he
24  ran into on his way back from the store to your
25  apartment right before the shooting happened.  Did you

Page 285

1  talk to him or did you and Cleotha talk at that point
2  about how it could not have been Mr. Jakes?
3     MS. DONNELL:  And -- I'm sorry.  I'm sorry.  I'm
4  sorry.  I'm going to object to the form, but I may
5  not have heard if you gave a temporal.  So could --
6  do you mind if you could just either -- I'm sorry I
7  didn't hear the first part.
8     MR. GRILL:  I'll just ask the question again.
9     MS. DONNELL:  Thanks.
10  BY MR. GRILL:
11    Q   When Cleotha got back and explained to you --
12  described to you who it was that he ran into that asked
13  him to help rob Mr. Garcia, I guess -- at that point,
14  did you and your brother have a discussion between you
15  two about it could not have been Mr. Jakes?
16     MS. DONNELL:  I'm going to object to the form
17  of the question.  I object to the extent it might
18  misstate her prior testimony but go ahead and answer
19  if you can.
20    Q   I'm asking you if you guys had a conversation,
21  like, between you two.
22    A   How would we have a conversation?  He wouldn't
23  know who Shawn is -- is -- if Shawn walked up on him and
24  said something to him like that.  He doesn't know who
25  Shawn is.

Page 286

1    Q   Well, I'll tell you why --
2    A   You -- you asked me did we have a conversation
3  about him -- about Shawn.
4    Q   Uh-huh.
5    A   So basically you saying did he -- well --
6  me -- did he describe Shawn to me?
7    Q   No. I'm asking you: Did you guys talk amongst
8  yourselves at that point that it could not have been
9  Shawn who was involved in the shooting that just
10  occurred outside of your apartment? Did you guys have a
11  conversation like that?
12    A   I can't recall us having a conversation about
13  that because -- no, I can't recall.
14    Q   Don't recall. Okay.
15        MS. DONNELL: I'm just going to ask again. Are
16  you sure you guys are not hearing piano in the
17  background?
18        MR. GRILL: No. I'm not at all.
19        MS. DONNELL: Okay. Great. Okay. Just let me
20  know because I can't imagine that you can't hear it
21  so -- okay.
22        MR. GRILL: Just that -- nobody else is because
23  nobody's saying anything, but I can't hear anything
24  so --
25        MS. DONNELL: Okay. I brought my volume down

Page 287

1  so just let me know if it gets loud.
2        MR. GRILL: Is it good piano?
3        MS. DONNELL: I mean it's simple. It's simple.
4  BY MR. GRILL:
5    Q   Okay. So how long after the shooting or after
6  hearing the gunshots was it that he -- until the police
7  showed up?
8    A   I can't recall, like, it -- I -- I can't
9  recall -- I can't recall 30 years ago how many minutes
10  it was before they showed up, but it wasn't too long
11  after the shooting.
12    Q   When --
13    A   But I can't recall if it was ten minutes, six
14  minutes, 20 minutes. I can't recall how long it was --
15    Q   It --
16    A   -- because once I heard the shooting, the next
17  thing I seen outside the window was light because I left
18  the window.
19    Q   Okay. In any event, you never -- once the
20  police were there and you saw the lights, you never went
21  down and talked to any of the police about what it was
22  that you saw.
23    A   Nope.
24    Q   Anything like that, right?
25    A   Nope.

Page 288

1    Q   Any reason why you didn't do that?
2    A   Because I --
3        MS. DONNELL: I think that is already asked and
4  answered but go ahead and answer again.
5    A   No. Because they didn't -- I didn't go down
6  and talk to the police. I'm a minor. I -- I ain't
7  going to talk to the police without a parent.
8    Q   Okay.
9    A   And then they didn't come knock on the door.
10  So -- and then if they would've, I still wouldn't have
11  talked to them because my parents not here.
12    Q   Okay. Could you see the body in the street
13  from your apartment?
14        MS. DONNELL: Objection. Asked and answered
15  but go ahead and answer again.
16    A   No. I couldn't see the body from my
17  apartment. It was -- it was just -- like, you just -- I
18  just seen the car, but I couldn't see in the car, like,
19  literally through the window in the car.
20    Q   Right. Yeah. So Mr. Garcia's --
21    A   I couldn't see --
22    Q   Mr. Garcia's --
23    A   -- in the car.
24    Q   Mr. Garcia's body was found outside of his car
25  in the street. So I'm wondering if you saw -- by the

Page 289

1  police. So I'm wondering if you saw that from your
2  apartment.
3    A   No. I couldn't.
4        MS. DONNELL: I'm just going to object to the
5  extent that misstates the record but go ahead and
6  answer.
7    Q   Well --
8    A   No. You couldn't see over the car in the
9  street because it -- remind you, are -- we looking over
10  a balcony so we just see part of the car but not over.
11  The -- the car is high enough. If he in the street, you
12  can't see him laying because the car's blocking his body
13  if he was laying in the street.
14    Q   Is it more accurate to say you don't remember
15  if you could or couldn't?
16        MS. DONNELL: Objection to the form of the
17  question, but you can answer.
18    A   No, I would -- I would remember if I see a
19  body laying -- a -- a body. That would traumatize me.
20  Believe me.
21    Q   Okay.
22    A   After I heard the shooting too, but I don't --
23  that's why I -- no, I don't recall because you can't
24  see.
25    Q   Yeah. I'm asking because I asked the same

Page 290

1  question to your brother. And he said that he could see
2  the body. So I'm wondering if -- you know, I'm trying
3  to figure out --
4     A  He probably went outside, but I didn't go
5  outside.
6     Q  Okay.
7     A  He probably did go outside. I didn't go
8  outside.
9     Q  And I said he could see it from your front
10  window looking over on the 51st Street. He could see
11  the body.
12     A  I couldn't.
13     Q  But you couldn't. Okay.
14     A  Well, remind you -- remind you, he probably
15  was in the middle window. And he was -- and he's taller
16  than me.
17     Q  Okay.
18     A  I'm in the side window by the balcony.
19     Q  That might explain it.
20     A  And only thing I could see is the car's
21  curved. I can't see what's on the other side of the
22  vehicle.
23     Q  Okay. I got you. That makes sense.
24     A  Even if I was in the middle window, I still
25  couldn't see because I wasn't that tall. I was only,

Page 291

1  like, four feet something when I was 6 -- 15 -- 16-
2  years-old. I've almost had to get on my tiptoes to look
3  out the window because it was a radiator right there.
4     Q  Okay. You -- the next day - well, strike
5  that. When your mom came home that night, did you --
6  were the police still outside the building by the time
7  your mom showed up?
8     A  I don't have a recalls.
9     Q  Okay. Did you talk to your mom about the
10  shooting? I mean, I presume she must have found out
11  about it that night, correct?
12     MS. DONNELL: Objection to the extent it calls
13    for speculation. But if you know, you can answer.
14     A  I don't recall ever talking to my mom on about
15  the shooting. Right now today, I don't recall us ever
16  talking about it.
17     Q  Okay. So you don't recall talking to your mom
18  about the shooting that night; is that right?
19     A  No. No.
20     Q  No, you don't remember?
21     MS. DONNELL: Objection. I think that
22    misstates her prior testimony.
23     A  No. I don't recall.
24     Q  Okay. When you woke up the next day, you said
25  that you recall the police, you know, at least being at

Page 292

1  your aunt B's house in the back house of 1212. It was
2  your understanding that they're there for your cousin,
3  Mr. Jakes, right?
4     A  No. I wasn't understanding that they was
5  there at this moment that I got up, but I was
6  understanding that they was there. I didn't know what
7  they was there for --
8     Q  Okay.
9     A  -- but they were there. I didn't know --
10  because I didn't see them bring Shawn out -- Shawn out
11  or anything so I don't know. All I know was that they
12  was there. I don't.
13     Q  Uh-huh. You told Ms. Donnell that when you
14  saw the police at your aunt B's house the next day that
15  you heard your aunt B saying he didn't do it. Do you
16  remember giving that test -- telling Ms. Donnell that
17  earlier today?
18     A  Yeah. I remember but this was, like -- this
19  was as soon as I got up. This was, like, after being up
20  a hour in the window. It was, like, they was searching
21  and all that. And then when they -- because of --
22  because my aunt B never went outside either.
23     Q  Yeah.
24     A  Because it was just, like, the police was
25  outside, like, they wouldn't let anybody out, they

Page 293

1  wouldn't let nobody in, whatever they was doing in the
2  inside, they was doing in the inside. Once they
3  finished in the inside, that's when they came out.
4  That's when Aunt B was whooping and hollering, like,
5  what he did, what he did, he didn't no -- what he did?
6  So you could -- I couldn't hear what the officers were
7  saying to her, but I could hear her because she's
8  aggressively loud because you -- you-all are surrounding
9  her house and in her house. And she want to know why
10  and what's going on.
11     Q  Yeah.
12     A  So that's why I've could hear her, like,
13  what's going on? What he did, he ain't did nothing
14  so --
15     Q  Okay. So you just said that you also heard
16  your aunt saying what did he do or what he did?
17     A  Right. Look --
18     Q  But did -- what -- but did --
19     A  She just --
20     Q  Hang on.
21     A  -- she's trying to --
22     Q  Let me finish my question.
23     A  -- she's trying to find --
24     Q  Let me finish my question real quick. So in
25  addition to that, did you hear your aunt B also say he

Page 294

1  didn't do it?  Did you hear her say that?
2      A   She just was, like, he didn't do nothing.  I
3  don't recall her saying, like, it was just, like, you --
4  like -- he -- what did he do?  He didn't do anything.  He
5  didn't do anything.  What did he do?  Because if the --
6  people know how you go -- the police come to your
7  house -- come to your house to get somebody, not going
8  to tell them what they coming to get them for.  So she
9  whooping and hollering, trying to see -- what are you
10  coming to get him for?  What happened?  What did he do?
11  He didn't do anything.  So she just tried to figure out,
12  like, what did he do?  He ain't do nothing.
13      Q   Okay.
14      A   But of course, there's going to be the words
15  that come out of people mouth.  He didn't do nothing.
16  What did he do?
17      Q   Yeah.  And you didn't --
18      A   They not going to tell you what they did when
19  they come into your house.  I -- I -- I done went
20  through that too.
21      Q   So what drew you -- did you ever see Mr. Jakes
22  the next day at any point?
23      A   No.
24      Q   Okay.  And what drew your attention, you know,
25  to the police activity by your aunt B's house the next

Page 295

1  day?
2      A   That's my bedroom.  My bedroom right there.  I
3  come out my bedroom.  That's the window.
4      Q   What did you --
5      A   That's the kitchen window.
6      Q   Did you hear something that got your
7  attention, that caused you to go investigate, like, what
8  was going on outside or --
9      A   If you -- if you come out -- if the way our
10  apartment was set up, you come out the bedroom, you
11  ain't -- you going to look straight at the window.  If
12  we look at -- we ain't even got to be by the window.  We
13  could look and see Aunt B's door.
14      Q   Uh-huh.
15      A   So once I looked and I'm, like, the -- then I
16  was -- went to the restroom and I -- and went back.  I
17  can't recall if I woke my mom up or whatever, but I
18  recall them being back there.  I can't recall if I woke
19  up -- woke my mom and them up or nothing -- anything.
20      Q   Yeah.
21      A   But I can recall seeing the police back there.
22  But I can't -- I didn't never see Shawn come -- them
23  bring Shawn out or anything.  I didn't even know if they
24  had Shawn.  I don't even know if I found out that day if
25  they had Shawn.

Page 296

1      Q   Okay.  When did you find out that the
2  police -- or first find out that the police had taken
3  Shawn out of your aunt B's house, I guess?  Did you find
4  out that day or was it sometime --
5      A   That's what I'm -- that's what I'm saying.  I
6  can't recall if it was that day that I -- that day,
7  exact day, a little bit later, or if I -- or the next
8  day, whatever.  I just can't recall exactly when did I
9  find out -- found out they had brought Shawn out.
10      Q   Did your Aunt B sound upset when she was
11  hollering?  You know, he didn't do it, or what did he
12  do, or --
13      A   Yeah.  She was upset because it was -- they
14  come up in her house.  Anyone would be upset you come --
15      Q   All right.
16      A   -- bust in my door.
17      Q   Get it.  So did you go over to your aunt B and
18  ask her what happened or what's going on?
19      A   No.
20      Q   Huh?
21      A   No.  That's just like -- I'm telling you.  I
22  tell you this five times.  When you a minor, you stay in
23  your place.  You don't go to the adults in my family and
24  ask them anything.
25      Q   Okay.

Page 297

1      A   If they don't bring it up to you, if you don't
2  hear them talking about it as adults, you don't go ask
3  no questions about the police, drugs, alcohol.  Nothing
4  consists of being an adult.  You don't ask because
5  you're a kid.  You stay in a kid place.
6      Q   Okay.
7      A   That's the fifth time I told you that about my
8  family.  You don't ask them questions that you don't
9  ask.
10      Q   No.  You --
11      A   If they come and they -- if they come and say,
12  Tweety, Pound, Ledal -- was you-all out there when Floyd
13  got jumped on, then you answer the questions.
14      Q   Okay.
15      A   You don't going to ask no adults in my family
16  what's going on as far as the police being present or
17  anything.
18      Q   All right.  Did you go ask any of your cousins
19  if they knew what was going on?
20      A   No.  Because if they --
21      Q   Are you not supposed to tell them or not?
22      A   -- they didn't -- they didn't -- they
23  didn't -- they didn't stay there so how they know?
24      Q   Well, what about Annette, or Denise, or Nikia?
25  I mean, they're, like, right there.  Did you ask any of

1 them, like, hey, do you know what's going on at Aunt B's
2 house out back?
3    A    That was out – I don't even know if they
4 was – I don't know who was out there looking because
5 I – we never – I never opened our back door.  I was
6 looking through the window.
7    Q    That's not my question.  The question is: Did
8 you ever ask them that day, maybe –
9    A    The – the answer is – I told you no.
10    Q    Well, hold on.  Okay.
11    A    I never asked no one that day – the next day
12 until I heard that Shawn was locked up.
13    Q    Right.  And you heard that –
14    A    He's the man on 51st.
15    Q    Yeah, and you – sorry.
16    A    I never asked nobody about it.
17    Q    You heard that Shawn was locked up for
18 shooting a man on 51st.  You found that out, like, a
19 week or two later, I think, is what he told Ms. Donnell,
20 right?
21    A    I – I know I didn't find it out that day.
22    Q    Yeah.  No.  I'm just saying you told Ms.
23 Donnell you found –
24    A    If it was a week later, a year later –
25 however, I didn't find out that day that they had

1 brought Shawn out of there for a shooting.
2    Q    Who did you find out a week or two later after
3 the shooting?
4    A    It was going through the neighborhood.  It was
5 just everywhere.
6    Q    Okay.  It was just –
7    A    It was floating around –
8    Q    At that –
9    A    – it's just floating around.  Everybody's
10 talking about it.
11    Q    At that point, did you at least talk to your
12 mom about what it was that you knew had happened that
13 night?
14    A    Nope.  Nope.
15    Q    So you didn't believe that Shawn had done that
16 shooting when you found out that that's what he had been
17 locked up for, right?
18    A    Yeah.
19    Q    And you saw things that you told me today
20 would help show that Shawn didn't do that shooting,
21 right?
22    A    Correct.  And if the police wanted to question
23 me, they was going to question me at 1210 West 51st
24 place, or Street, or don't question me at all.
25    Q    Did you tell your mom hey Ma, I know that

1 Shawn didn't do it because this is what we were doing
2 that night and I saw these things.  And this all to me
3 shows that Shawn couldn't have done this shooting.  Did
4 you have a conversation like that?
5    A    No.  No.  But I'm quite sure my mom knew.  I'm
6 quite sure my twin mentioned it it to my mom that we –
7 Shawn was out there with us throwing the bottles or
8 whatever.  I'm not sure what my mom knew or if she knew
9 Shawn – when she – if she knew Shawn was out there
10 when we threw the bottles because we told – she knew
11 who was there when the window got broke.  She knew how
12 the window got broke.  But far as me explaining it all
13 with my parents or – or with anybody about going on –
14 no, I didn't.  But I knew.
15    Q    Yeah.  But the window doesn't have anything to
16 do with the shooting, right?  They're separate events.
17    A    No.  It – no, it doesn't.  But I'm saying –
18    Q    Okay.  So why does that matter if your mom
19 knows –
20    A    – this – the is what –
21    Q    Okay.
22    A    – the – the time my momma knew about the
23 window, but far as me talking to her about the shooting
24 and anything, no.  I never – I'd never – I don't
25 recall me ever talk to my mom about the shooting.

1    Q    Why didn't you – well, let me ask you this.
2 In light of your answer right there, is it possible that
3 you talked to your mom about it?
4    A    No.
5    Q    No?  Okay.  So you held this information in
6 this whole time, that you think would help show that
7 your cousin is innocent of a murder.  You held it in
8 until you basically got a deposition subpoena to come
9 and testify in his civil lawsuit about it.  Do I have
10 that right?
11    A    No.  I probably talked to somebody.  I just
12 probably don't recall who I talked to.
13    Q    Okay.  What's –
14        MS. DONNELL:  I'm sorry.  I'm sorry.  I was
15 muted.  I meant to say an object.  Sorry.  I'm so
16 sorry.  I don't know how I muted myself.  I think
17 I've gotten my hand on my keyboard.  I'm just saying
18 objection, form, argumentative, but you can answer.
19    Q    Who do you think you talked to over the last
20 decade –
21    A    I don't – I don't – I don't recall who it
22 was, but it does – it – I mean, I didn't talk to
23 nobody back then when it happened.
24    Q    Did you not –
25    A    I know – I – I know that much because –

Page 302

1  I -- I know that much.

2  Q   Talk to your brother?

3  A   If it took for me to get -- if it took me to

4  get subpoenaed to do a deposition on his behalf, then

5  that's what it took.  But I didn't talk to nobody the

6  time he was locked up or the time he got locked up.  No.

7  I didn't.

8  Q   How would you feel if you were in Mr. Jakes'

9  shoes, and you knew family members had information that

10  would show in their minds that you were innocent of a

11  murder and they held onto it for decades until --

12  A   I was innocent of a child being -- of -- of

13  battery to a child.  And then nobody step to my

14  position --

15  Q   How did it make you feel --

16  A   -- so

17  Q   -- when nobody came up to help?

18  A   It -- I mean, I -- I don't hold no grudges

19  against nobody.  It is what it is.

20  Q   That's not my question.  How does it make you

21  feel if people --

22  A   I don't hold grudges.  I -- I don't hold

23  grudges.  So I'm not angry about it or anything.

24  Q   Do you know what --

25  A   I don't.

Page 303

1  Q   Do you have any understanding of what it is

2  that Mr. Jakes is hoping to get out of this -- out of

3  this lawsuit?

4  A   He can't get his life back; he can't get 22

5  years back.

6  Q   I know.  So do you know what he wants out of

7  it?  Do you have any understanding of what Mr. Jakes

8  hopes to get out of this lawsuit?

9  A   I know what he -- I know what he needs to get

10  out it.  Maybe to pay him for his 22 years he sat for

11  something he didn't do.

12  Q   Pay him what?

13  A   I -- they could pay him what they want to pay

14  him.  They -- he needs to be in a real stability of

15  where he could take care his own, buy his own, get his

16  own house.  He just needs to be tooken [sic] care of.

17  Q   And how much do you think he needs -- how much

18  you think he should be paid?

19      MS. DONNELL:  Objection to the form of the

20      question, but you can answer.

21  A   I -- I don't know.  I'm not a -- I'm not a

22  accountant so I don't know.

23  Q   You think that you're going to get some

24  benefit for that if you help him out now, finally, all

25  these decades later and help him get that money?  Do you

Page 304

1  think that you might see some benefit from that?

2      MS. DONNELL:  Objection to the form of the

3      question.  Extremely argumentative and harassing.

4      But Ms. Chairse, you can answer the question.

5  Q   You have an expectation at all that Mr. Jakes

6  will cut --

7  A   I don't have no expectations.  He ain't got to

8  give me nothing, buy me nothing.  That's why I get up

9  and get my own on my own so I don't have to ask nobody

10  for nothing.  I just want him to have -- just -- he just

11  needs to be -- justice has to be -- to be served on his

12  behalf because he didn't do it.

13  Q   When did you find out --

14  A   He needs --

15      MS. DONNELL:  She's not finished.  Go ahead.

16  A   He needs to have justice for his life.  That

17  was his life.  You took 22 years.  He even missed out on

18  his nephews growing up, his little cousins growing up.

19  He could have had babies himself.  He ain't got no kids

20  himself.

21  Q   Yeah.

22  A   That's some time -- that's -- that's some time

23  that they took away from him.

24  Q   When did --

25  A   And I -- I feel him because I went through the

Page 305

1  same thing though, but he just did a little longer.

2  Q   Uh-huh.

3  A   Yeah, he needs to be compensated for his --

4  his 22 years he been gone.

5  Q   Uh-huh.

6  A   If he wasn't -- if he wasn't innocent, I don't

7  think he even got exonerated.

8  Q   And you believe you should be compensated,

9  too, for your lawful conviction?

10  A   No.  No.  No.

11  Q   No?

12  A   No.

13  Q   Okay.

14  A   Why?

15  Q   All right.  Well, you said you were wrongfully

16  convict --

17  A   Why can't I be compensated?

18      MS. DONNELL:  Object --

19  Q   You said you were wrongfully convicted.  Do

20  you think you should be compensated if it was shown that

21  that was true.

22  A   I'm not taking my past -- bringing my past to

23  a -- to my present.

24  Q   Uh-huh.

25  A   No.  I don't need to be compensated.  It's --

Page 306

1  it's over and done.
2    Q   Okay. When did you --
3    A   Like I thought once he got it -- once -- once
4  he got out exonerated, I thought it was over and done. I
5  didn't never think that it was going to go then -- like,
6  on to this.
7    Q   Okay. Didn't --
8    A   I didn't know he was suing -- suing Chicago
9  Police Department, but he shouldn't have to sue. They
10  should've automatically just paid the boy because he
11  didn't -- he -- he wrongfully convicted.
12   Q   Okay.
13   A   They know he wrongfully convicted.
14   Q   Got it. Okay. So when did you run into
15  Rodney when he told you this story about seeing Mr.
16  Jakes on -- somewhere on 51st Street after the shooting?
17   A   I can't recall exactly when did I -- when did
18  we have that conversation.
19   Q   Okay. Who was -- do you remember where you
20  were when you had this conversation with Rodney?
21   A   I can't recall if we was on our porch or they
22  porch, but we were -- I can't recall exactly where we
23  were at.
24   Q   And where would Rodney's porch be?
25   A   Next door, 1212.

Page 307

1    Q   Okay. 1212. And do you remember if anybody
2  else was there when you had this conversation with
3  Rodney?
4    A   I can't recall.
5    Q   Do you remember how long after the shooting it
6  was that you had this conversation with Rodney?
7    A   I can't recall. I can't recall if it was six
8  months, two days, six -- a year. I can't recall when it
9  was. I didn't --
10   Q   Did --
11   A   -- remember the conversation.
12   Q   Do you remember if it was daytime or nighttime
13  when you had this conversation with Rodney?
14   A   I don't recall if it was day or night.
15   Q   Remember how it came up that you were
16  having -- that Rodney was telling you, oh, you know
17  what? I saw Shawn somewhere on 51st Street after the --
18   A   I don't -- I don't recall how the conversation
19  came up.
20   Q   Okay. Do you know what -- tell me everything
21  you can remember right now about what it was that Rodney
22  told you, other than that he told you that he was with
23  Mr. Jakes somewhere on 51st Street after the shooting
24  happened. Where does that --
25   A   He said he was coming. All that I -- I can

Page 308

1  recall is that Rodney saying something about -- he was
2  coming from his friend house and we was -- and it was,
3  like, a joking because Rodney liked men. So it was,
4  like, a joke, like, you just came from your boyfriend
5  house? We was joking about it.
6    Q   Uh-huh.
7    A   I actually went -- it was like a jokey [sic]
8  situation. And that's how the conversation came up,
9  laughing and he was, like, no, I walked down the street
10  and I ran into Shawn. Me and Shawn walked to the house
11  together.
12   Q   Wait a minute. You guys --
13   A   But it still did never -- it still did never
14  dawn on me -- we didn't -- we didn't continue on with no
15  conversation about the case because we still -- it's
16  still not something that we was talk about. It was,
17  like, it's still -- was just -- like, it just was a
18  conversation, like, Rodney coming from his friend house.
19   Q   Okay.
20   A   So we messing around, like, oh, your
21  girlfriend -- your boyfriend house?
22   Q   Yeah.
23   A   And it was, like, me and Shawn walked down the
24  street. We can -- we walked down here together. We
25  walked down here together.

Page 309

1    Q   So if it was --
2    A   We wasn't like -- oh, we -- we -- this what
3  happened. This was -- no. It was just like --
4    Q   So if this converse -- if you don't know when
5  this conversation with Rodney happened, as far as, you
6  know, when after the shooting it was, how do you know
7  that Rodney was describing to you a run-in with Mr.
8  Jakes after the shooting, like, the -- actually on the
9  night after the shooting happened? How do you know that
10  that's actually when the encounter --
11   A   We wasn't talking. We took --
12       MS. DONNELL: Object. I'm sorry. I'm sorry.
13  Objection to the form of the question. And
14  speculation. But if you can answer, answer.
15   A   Because we was talking -- laughing about the
16  window because they window had ended up broken. And we
17  was laughing about the window because they window --
18  they sister had end up busting out they window. So we
19  was laughing about the windows being busted.
20   Q   Uh-huh.
21   A   All the stuff that happened after the stuff
22  that happened, we wasn't thinking about that. We was
23  laughing about the windows being broke.
24   Q   And --
25   A   So when his sister broke they window, that's

Page 310

1  what made us get to talking and giggling about our
2  window and the – you know, that they – but we never
3  thought – we never brought up nothing about the
4  shooting or nothing. It was just, like, you was at your
5  boyfriend house and –
6  Q   How do you know that – or was there something
7  that Rodney told you that made you think that this run-
8  in that he had with Mr. Jakes actually happened before
9  the shooting or – excuse me, actually happened after
10 the shooting occurred?
11 A   Because the time frame that he said that they
12 have made it back to the – back to the house – back –
13 made it to the house.
14 Q   Well, explain that to me. I'm not following
15 you.
16 A   The time frame that he said they made it back
17 down by – to the house. They made it – he said they
18 made it back. I was coming from my friend house. I say
19 I – we – whoever was, like, oh, your boyfriend?
20 Uh-uh. No. But I walking down 51st and ran into Shawn.
21 It was just something. It was – and I don't – I can't
22 recall how long ago it was, but I just remember it was,
23 like, no, me and Shawn walked down to the house
24 together, like, about 11:00 that night. And that's when
25 I seen his bike. That's when I seen the window broken.

Page 311

1  Q   Right. So what about that makes you think
2  that run-in between Rodney and Mr. Jakes happened before
3  the shooting?
4      MS. DONNELL: Objection. Asked and answered.
5  Q   I'm not understanding. Maybe I'm just dense.
6  I – which is totally possible. I'm not understanding,
7  though, what about that makes you think that that
8  encounter with Rodney actually occurred before or –
9  excuse me, occurred after the shooting happened?
10 A   It happened at night.
11     MS. DONNELL: Just going to object. I'm going
12 to object that has been asked and answered, but –
13 Q   Let me ask it this way. Did Rodney tell you,
14 like, oh, when I talked with Mr. Jakes, there was police
15 activity in front of your house. Did he say anything
16 like that?
17 A   No. Because just like I told you before –
18 Q   It was (Inaudible) in front of your house?
19     MS. DONNELL: I'm sorry, you're talking over
20 each other. It's getting a little hard to
21 understand because you're both talking at the same
22 time.
23 Q   Did he say, you know what? When we came back,
24 there was a dead body in the street in front of your
25 house. Did he say anything like that?

Page 312

1      MS. DONNELL: Objection. Asked and answered.
2  Go ahead, Ms. Chairse.
3  A   How would he say that if this is 11:00 at
4  night? The shooting didn't happen at 10:00. And the
5  shooting didn't happen at 11:00 at night.
6  Q   Well, let's think about this, okay? If the
7  shooting – if he came back with Mr. Jakes after the
8  shooting – the shooting happened at, like, 11:30, okay?
9  So if he came back, that leaves a pretty small window
10 for them to have come back after the shooting that
11 night, which means the police probably were there. And
12 I'm telling you this because I'm just laying out the
13 cards here so you can explain to me why you believed
14 that this encounter with Rodney happened – that you're
15 sure that it happened after the shooting, okay? So for
16 example, did Rodney tell you, when we came back, there
17 was a dead body in the street. Did he say anything like
18 that?
19     MS. DONNELL: Objection. Asked and answered.
20 It has been asked and answered two times, that same
21 question.
22 Q   Did he – yes or no. Did he say anything –
23 did he say police cars – stop. Stop.
24 A   No. Because – listen to yourself. If you
25 said it happened at 11:30 and he said they walked up at

Page 313

1  11:00, how was it a body in the street at 11:00 if you
2  say it happened at 11:30?
3  Q   Okay. So I – do you want to change your
4  answer, then? Is it that he ran into Rodney before the
5  shooting? Is that what you're saying now?
6  A   I didn't know what time he –
7      MS. DONNELL: Objection. I'm just going to
8  object to the form of the question and the
9  argumentative nature. But Ms. Chairse, you can
10 answer the question.
11 A   I didn't have the – I'm – I'm – I'm a need
12 to take a break because I'm getting irritated. I don't
13 know what time the shooting was. Frankly, you – you-
14 all subpoenaed me to do this. I don't know what time
15 the shooting was. All that I know it was – was not in
16 the morning time. All that I know Shawn wasn't down
17 there. I don't know what time the shooting was. I
18 don't know what time the window got busted –
19 Q   Okay.
20     MS. DONNELL: Object –
21 A   – any of that. I do know one thing for sure.
22 I do know that the common place you came up that he
23 walked by – down the street with Shawn. I do know at
24 the time, Shawn wasn't present. If Shawn was present,
25 I'm quite sure my brother know what Shawn look like if

Page 314

1  he was standing on the corner.  If you say -- you said
2  if -- if my brother come from the store and somebody
3  said something to him about it -- if my brother
4  mentioned that to you -- if you say Shawn supposed to
5  been a witness on the corner, why my brother didn't see
6  Shawn on the corner?  You asking me the same question
7  repeatedly but in a different manner.  Now I'm getting a
8  little agitated and irritating because it been too many
9  hours with you asking the same questions in a different
10  manner.  My patience is getting a little --
11      MS. DONNELL:  All right.  You know what?
12  Ms. Chairse, I think it's a good time to take a
13  break.  You've been going straight -- you've been
14  questioning straight since 3:04.  And it's well over
15  trust.  Why don't we take a break and we'll see how
16  long the elapsed time is?  And why don't you just
17  take a break?  I think it's a good time to take a
18  break.  I do have to go to the bathroom anyway.  So
19  let's take a break and maybe, Victoria, could you
20  give us the elapsed time because I know we're
21  closing in at seven hours.
22      COURT REPORTER:  Does everyone agree to go off
23  the record, then?
24      MR. GRILL:  Yeah.  We can go off the record,
25  but if you want to tell us the elapsed time.

Page 315

1      COURT REPORTER:  Yes, sir.  We're going off the
2  record.  The time is 5:20 p.m. Central Standard
3  Time.
4      (OFF THE RECORD)
5      COURT REPORTER:  We are back on the record.  The
6  time is 5:31.
7  BY MR. GRILL:
8  Q  Do you know where Rodney Harris is today?
9  A  No.
10  Q  When was the last time you saw Rodney?
11  A  Last time I saw Rodney was in the '90s.
12  Q  Was it around the time of the shooting?
13  A  No.  It was before -- it was when we moved.  We
14  moved in '96, like, June of '96 from off of 51st.
15  Q  Do you know if Rodney is still alive?
16  A  Yes.  He -- yes.
17  Q  Do you know how --
18  A  I believe -- I believe so.
19  Q  Do you know how to reach him?
20  A  No.
21  Q  Okay.  And he's Denise and Annette's brother,
22  I guess?
23  A  Yes.
24  Q  Is he older or younger than you?
25  A  Rodney is older than me, like, a year or two,

Page 316

1  probably.  He older than me.
2  Q  You know where he lives generally.  Maybe not
3  his -- unless you know his address, but do you know
4  where in the city he lives or if he does live in the
5  city?
6  A  No.  He -- from my last understanding, Rodney
7  don't live in Illinois -- Illinois.
8  Q  Do you know --
9  A  The last place I knew where Rodney stay was
10  Atlanta.
11  Q  Atlanta?  When did you learn that he stayed in
12  Atlanta?
13  A  This was about eight years ago -- nine years
14  ago.
15  Q  Got you.  Rodney have any nicknames that
16  you're aware of?
17  A  No.  No.
18  Q  Okay.  Got it.  Okay.  So when you were having
19  this conversation sometime after the shooting with
20  Rodney, do you -- based on what Rodney was telling you,
21  do you believe that Rodney was telling you that he ran
22  into Mr. Jakes on 51st somewhere before or after the
23  shooting?
24  A  As I said before, I didn't -- I don't know
25  what time the shooting occurred.  But -- however it was

Page 317

1  said was that they walked down to the house together.
2  Q  Okay.  So earlier today you told me that you
3  didn't know what time the shooting happened.  That's
4  something that you said repeatedly today.  But you
5  talked about Rodney or brought him up.  You told me that
6  whatever it was that Rodney was telling you about
7  running into Mr. Jakes, that when he walked Mr. Jakes
8  back, that it was after the shooting.  So --
9  A  How am I going to tell you it was after the
10  shooting when I don't know what time the shooting was?
11  Q  Okay.  So was there any --
12  A  The time that -- the time that Rodney say they
13  made it back towards the house was around - to -- around
14  11:00 when they made it back down towards 51st and
15  Racine.
16  Q  Okay.
17  A  Now, I don't know what time the shooting
18  was -- I can't recall what time the shooting was.  I
19  can't even recall what time we -- what time my window
20  got busted.  I can't recall no time.  I can't say, oh,
21  it was 5:20.
22  Q  Okay.
23  A  I can't recall no times.  No -- no times for
24  that day.
25  Q  Did Rodney --

Page 318

1   A  I don't -- I don't even recall what time the
2  shooting happened, what time the window got busted, what
3  was the exact time.  I can't say, oh, it was 9:00 when
4  the window got busted.
5   Q  Did Rodney --
6   A  No because I don't recall that.
7   Q  Got it.  So did Rodney tell you where he
8  walked Mr. Jakes back to?
9   A  They stay in the same building, the -- the
10  front and the back.  So they walk to the same place
11  together.  If they walking -- if he walking home, that's
12  what he mean.  He walking home to 1212.  Rodney stay at
13  1212.
14   Q  Uh-huh.
15   A  Shawn stay at 1212.  Shawn stay in the back;
16  Rodney stay in the front.
17   Q  Got you.
18   A  And they walking to 1212.
19   Q  When you met with Ms. Donnell and Mr. Smith
20  this week, did you tell either of them in any of your
21  conversations what you told me here today during this
22  deposition about Rodney and Mr. Jakes?
23   A  No.
24   Q  Okay.  Have you ever told anybody about Rodney
25  and Mr. Jakes running into each other that night of the

Page 319

1  shooting?
2   A  How I'm going to tell someone when I never
3  spoken to anyone about this day of the shooting?
4   Q  Okay.  Do you think that --
5   A  We don't even talk about the window and -- the
6  window being busted.
7   Q  Do you believe that what it was that Rodney
8  told you about running into Mr. Jakes somewhere on 51st
9  Street and walking back to his house, I guess -- do you
10  believe that that information somehow proves that
11  Mr. Jakes is innocent of this murder?
12   A  Yeah.  That proves that he's innocent.
13   Q  How?
14   A  The part of -- because -- I will consider
15  if -- if he wasn't out there at the time of the
16  incident, how did he -- how was he the watch out?
17   Q  Right.  So I'm trying to figure how --
18   A  Now -- me -- now --  you say -- listen.  You
19  say the -- the shooting occurred around 11:30 p.m.; am I
20  correct?
21   Q  Uh-huh.
22   A  Am I correct?
23   Q  Yeah.
24   A  Now, I testified to you that my brother went
25  to the store right before the shooting; am I correct?

Page 320

1  Also --
2   Q  Well, that's what you said.  I'm not agreeing
3  that that's truthful but yes, that's what you testified.
4   A  I don't want -- I -- I ain't -- I ain't --
5  actually, I'm just letting you -- I'm saying -- so if my
6  brother call me in and describing someone to me --
7   Q  Uh-huh.
8   A  -- if he never seen Shawn on the corner -- if
9  that happened at 11:30 and my brother was at the store -
10  - and the shooting happened at 11:30 so evidently my
11  brother came in the door right before the shooting.  So
12  it had -- it hadn't been between -- if he didn't see
13  Shawn at the corner, why would make them think -- why
14  would he -- why would the detective really think that
15  Shawn was the lookout?  My brother would know who Shawn
16  is if he walked past him.  But you ask me why would I
17  think he innocent.  Because he -- I think he innocent
18  because he wasn't there.  And he not going to pull a
19  crime like that --
20   Q  Uh-huh.  All right.
21   A  -- with nobody -- a robbery.  Who would he
22  got -- why he had to rob nobody.  It wasn't anything
23  that we didn't -- ask for that we didn't get.
24   Q  Uh-huh.  Did --
25   A  If we act -- we did right in school, we got

Page 321

1  it.  If we didn't do right in school, we didn't get it.
2  So ain't no need to going around robbing and stealing,
3  robbing people.  Robbing for what?
4   Q  Uh-huh.  So did Rodney tell you where exactly
5  it was that he walked back with Mr. Jakes to or you're
6  just guessing that they went back to 1212?  If you
7  remember.  Maybe you don't.  I don't know.
8   A  I said this about seven times.  He said they
9  walked back towards the house together.
10   Q  Right.  Did they actually go there?  Did he
11  tell you that they actually went --
12   A  I didn't take a picture to see that they went
13  there so I don't know the -- I'm saying what he said.
14  They walked back to the house together.
15   Q  Okay.
16   A  So back to the house will be meaning 1212.
17   Q  Uh-huh.  Did he and Rodney say what happened
18  when they got back in the area of 1212?
19   A  They went in the house.  He went in the house;
20  Shawn went in the house.  Because wasn't nobody outside.
21  So my thing is if they made it there before the
22  shooting, if they made it there where my brother was
23  coming from the store -- however, my brother still
24  didn't see Shawn in the facility of the shooting
25  happening -- occurring.  So if my --

Page 322

1   Q  Okay.

2   A  -- brother was outside and I wasn't, and he

3  didn't see him, why would -- and we know -- I don't -- I

4  didn't even believe Rodney when he said Shawn walked

5  that away.  But it was just, like, Shawn walked this way

6  with me.

7   Q  Yeah.  Well, okay --

8   A  We walked to the house together.

9   Q  So now, it sounds like you're pretty sure that

10  Rodney --

11   A  No.  I believe Rodney, but I --

12   Q  Hang on.  Hang on.  Hang on.  I'm not done.  So

13  now, it sounds like what you're telling me is that

14  Rodney, whatever it was that he told you -- it means to

15  you that he walked Mr. Jakes back to 1212 before the

16  shooting.  Is that what you're saying now?

17   A  They --

18      MS. DONNELL:  Object -- I'm just going to

19  object to the form of the question.  It's been asked

20  and answered.  And I think you so covered this

21  ground but you can answer the question.

22      MR. GRILL:  We've definitely done in about face

23  on this ground, but I just want to know because

24  this --

25      MS. DONNELL:  I object to your characterization

Page 323

1  of -- this witness' testimony isn't about face.  I

2  am objecting to that and you are doing your best

3  to --

4      MR. GRILL:  That's why we have transcripts.  So

5  is it now that --

6   A  If they walked -- if they walked down pretty

7  fast to home, both of their homes were what?  1212.

8  BY MR. GRILL:

9   Q  Yeah.

10   A  If Rodney says they made it there by -- made

11  it there about 11:00.

12   Q  Uh-huh.  Did Rodney tell you that it was

13  11:00?  That's what he told you?  When they got back?

14   A  He didn't say and -- he said may -- around

15  11:00.

16   Q  Okay.

17   A  It could've been before, but he said around

18  11:00.

19   Q  Okay.  And did your brother tell you what he

20  did to look around the corner of 51st and Racine to take

21  an accounting of, like, who might have been out there to

22  make sure that Mr. Jakes wasn't there?

23      MS. DONNELL:  Objection to the form of the

24  question.

25   Q  Did you guys ever talked about anything like

Page 324

1  that?

2   A  Ain't nowhere for nobody to hide because if

3  you -- if you said -- they say he was at the corner

4  watching.  If he was at the corner, there's only one

5  corner that he -- to stand by.

6   Q  Uh-huh.

7   A  And that's the corner right there.  So --

8   Q  Did you ever have a conversation like that

9  with your brother?  That's my question.  Yes or no?

10   A  No.

11   Q  Okay.  So you don't know.

12      MS. DONNELL:  Objection to the form of the

13  question --

14   A  No.

15      MS. DONNELL:  -- argumentative.  And this has

16  really been covered a lot today already but go ahead

17  and ask your question, Andrew.

18   Q  Okay.  Did you see or did your brother tell

19  you that he saw, like, Annette, Denise, or Nikia on that

20  corner too at any point?

21   A  No.

22   Q  All right.  Did he tell you whether he saw

23  them outside of maybe 12 --

24   A  No.

25   Q  Okay.  Did he tell you whether he saw anybody

Page 325

1  on any of the porches of 1210 or 1212 as he was, I

2  guess, running back inside after being asked to help

3  some strangers rob a guy inside the submarine shop?

4      MS. DONNELL:  Objection to the --

5   A  No.

6      MS. DONNELL:  -- form of the question.

7  Argumentative, but you can answer.

8   Q  Okay.  So Rodney saw -- okay.  What did you do

9  with that information that Rodney gave you?  Did you

10  tell your brother, for example, about --

11      MS. DONNELL:  Objection to this -- oh, sorry.

12  Finish your question.

13   Q  That's it.  Did you ever tell your brother

14  what Rodney told you?

15      MS. DONNELL:  Objection.  This has been asked

16  and answered already today.  You can answer again,

17  Ms. Chairse.

18   A  No, they -- no because they -- I -- just like I

19  told you before, we -- it -- it wasn't nothing to talk

20  of.  To be walking around talking about because we was

21  laughing about they window being busted.

22   Q  Uh-huh.

23   A  So it was like we was reira -- reirating

24  [sic], like, both windows busted on -- both of the

25  windows got busted.  That's what we were reirating

Page 326

1  about. We weren't reirating about nothing.
2      Q   All right. So did you know when Mr. Jakes'
3  criminal trial was -- like, did you know that at some
4  point, he'd become aware that he was being prosecuted
5  for the murder he's going to --
6      A   No.
7      Q   All right. You didn't know about it?
8      A   I didn't know when his trial was or nothing.
9      Q   Okay. Did you know or find out from any of
10 your family whether he had a lawyer at any point?
11     A   Once again, I never spoken to anyone about
12 Shawn being incarcerated throughout my family. I -- if
13 I speak to them -- if I speak to someone, I'd be, like,
14 you -- if you talk -- you know, if you talk to Shawn,
15 tell Shawn I said hey. I never wrote him. He never
16 called me. It was just, like, tell Shawn I say what up.
17     Q   Uh-huh.
18     A   But as far as me knowing when he went to
19 trial, who his lawyer was, who the judge was, no. I
20 don't even know what courtroom -- what courthouse he
21 went to.
22     Q   Uh-huh.
23     A   So I never -- because I never went to court. I
24 never talked to anyone about the case. My family,
25 friends, nobody.

Page 327

1      Q   Uh-huh. Did your brother -- when he came back
2  then tell you where exactly it was that he was
3  approached by these two guys that him to help them in a
4  robbery?
5      A   No. He didn't tell me exactly where they
6  approached him at.
7      Q   Do you have any understanding of where that
8  might be now? Where that might have happened?
9      A   No.
10     Q   Okay.
11     A   I know it was between the rest -- between the
12 restaurant and our building. It couldn't have been
13 nowhere but right up in that part facility.
14     Q   Uh-huh. Are you sure that --
15     A   That's common sense.
16     Q   Are you sure that your brother was in the
17 apartment when you heard the gunshots?
18     A   I'm positive.
19     Q   100 percent, like, no doubt in your mind about
20 that?
21         MS. DONNELL: Objection. Argumentative. She's
22     been asked and answered that question. You can
23     answer again.
24     A   At the time of the shooting is -- that's when
25 I was telling him who the person was with the spot on

Page 328

1  they face. So of course he was in the apartment. We
2  wasn't out there.
3      Q   Uh-huh. Other than telling you about the spot
4  on the face, the description that he gave you of one of
5  the guys, did he give you any other descriptions? Other
6  than that --
7         MS. DONNELL: Objection. I'm sorry. If you
8     finish your question -- go ahead, Andrew.
9      Q   Quite specific. Did he describe the height of
10 either of these guys, like, how tall either of them
11 were?
12     A   I can't really recall if he described the
13 height or --
14     Q   Okay. Did he describe -- do you remember if
15 he told you what the -- yeah. Like, what their skin
16 complexion was whether they're light or darker skin?
17     A   I can't recall if he was -- say what the
18 complexion or
19     Q   Uh-huh. Did he tell you whether he had seen
20 either of these two guys before? I mean, obviously, we
21 know about Snake, but what about the other guy? Did he
22 tell you anything about having ever seen that guy
23 anywhere before?
24     A   I don't recall us talking, like, you seen him
25 before. I -- I don't recall us talking like that.

Page 329

1      Q   Okay. Did your brother ever tell you whether
2  he saw the victim where he was shot?
3         MS. DONNELL: Objection. I think you already
4     asked and answered -- she's already answered that
5     question.
6         MR. GRILL: Oh, I forget. So that's it.
7      A   I didn't hear the question.
8      Q   Did he ever tell you that he saw the victim at
9  any point prior to the shooting?
10     A   I don't recall.
11     Q   Do you know if your brother -- you know, you
12 got -- you and Cleotha are the same age or twins. And
13 you've told me quite a bit today about how it's -- you
14 know, to sum it up children in your family are typically
15 seen and not heard or they don't speak unless when
16 they're spoken to. Do you remember or do you have any
17 understanding or knowledge whether your brother talked
18 to either of your parents about what happened or what
19 you guys saw the night of the shooting?
20     A   Not to my knowledge.
21     Q   Okay. Would you -- would it be more
22 reasonable or possible based on, you know, your
23 experiences with your family for your brother to be able to
24 speak up relative to you then or was -- did the same
25 rules as far as you know apply to both of you?

Page 330

1      A   The same rules apply to all kids in our
2   family.
3      Q   Okay.
4      A   And I'm not sure if he spoken to them --
5   spoken to my parents ever about it anyway.
6      Q   Yeah.  I'm asking because he told me that he
7   did speak to your parents but wondering if you know --
8      A   Probably after he got older.  I'm not sure so
9   I don't -- I don't -- I don't know.
10     Q   No.  He told me that -- he testified in his
11  dep that he told your folks the very next day what had
12  happened.
13     A   Oh.
14     Q   So did your parents -- and your testimony is
15  your parents never came and asked you any questions
16  about it, right?
17     A   Not -- not to my recall or knowledge.
18         MR. GRILL:  All right.  I am done.  I'm just
19  going to hit pause for a couple of minutes and check
20  with my colleague.  Making sure I haven't forgotten
21  anything.  I probably haven't.  I think we've been
22  talking a while.  So just give me a couple minutes
23  and I'll be right back, okay?
24         COURT REPORTER:  Probably go off the record.
25         MR. GRILL:  Yeah.  We can go off the record.

Page 331

1          MS. DONNELL:  Yes.
2          COURT REPORTER:  Okay.  We're going off the
3   record.  The time is 5:50 p.m.
4          (OFF THE RECORD)
5          COURT REPORTER:  Back on the record.  The time
6   is 5:53.
7   BY MR. GRILL:
8      Q   Okay.  Just a couple of closing out questions
9   here and then I'll be done.  Claudette, is there
10  anything else that you can possibly think of that you
11  haven't told me today about you and -- about the rock
12  throwing incident at the car?  Have you told me
13  everything that you can recall about that?
14     A   Yes.
15     Q   All right.  You did not leave anything out.
16  You told me everything you know about it, right?
17         MS. DONNELL:  Objection.  Asked and answered.
18     A   Everything.
19     Q   Pardon me?
20     A   Everything that I could recall.
21     Q   Okay.  Have you told me everything that you
22  remember about what happened when the window got broken?
23     A   Everything that I could recall.
24     Q   Have you have told me everything that you --
25  you know, is there anything else that you possibly want

Page 332

1   to tell me about what happened when you and your brother
2   were cleaning the glass up?
3      A   Everything -- everything I said is all I could
4   recall.  Anything that I couldn't recall I
5      Q   Are you there?  Did you --
6      A   Yeah.
7      Q   I thought maybe you froze.  Is there anything
8   else that you want to tell me or is there anything that
9   you haven't told me about what happened when your
10  brother came back from the store and you guys heard the
11  gunshots.  You told me everything that you remember
12  about that?
13     A   Yes.
14     Q   You told me everything that you remember about
15  your conversations with Rodney?
16     A   Yes.
17     Q   Have you told me everything that you can
18  remember about what you saw the following day when the
19  police came to your aunt B's house?
20     A   Yes.
21         MR. GRILL:  Okay.  I've got nothing else to
22  this witness.  I turn it over to, I guess, Mr. Given
23  if he's got anything.
24         MR. GIVEN:  Ms. Chairse, I'm sure you'll be
25  very disappointed especially given that Ms. Donnell

Page 333

1   singled me out to tell you about me.  I would love
2   to find out what that was, but I really don't care
3   and I don't have any questions for you.
4          MS. DONNELL:  I don't have any questions for
5   you.  Thank you so much for your time.  We've sat
6   here for a very long time.  You have the right to
7   review a deposition transcript to see if Victoria
8   transcribed everything you said accurately.  You can
9   also waive your right and trust that she had got the
10  transcript right, but that's your choice.
11         THE WITNESS:  Yes.  I would like -- I would
12  like the transcript.
13         MS. DONNELL:  Okay.  She would like to reserve
14  to signature for this transcript.
15         MR. GRILL:  Okay.  All right.  Thank you,
16  everybody.
17         MS. DONNELL:  Thanks.  And thank you,
18  Ms. Chairse.  I know the long day for you -- I hope
19  you can go get your son.  So thank you so much for
20  your time.
21         COURT REPORTER:  And we are --
22         THE WITNESS:  So when will I get the
23  transcript?
24         MS. DONNELL:  When the transcript gets ordered,
25  it will be sent to you.  We can help facilitate it.

Page 334

1  I don't know -- are you guys ordering it, Andrew?

2      COURT REPORTER:  Before we do so, shall we go

3  off the record officially?

4      MS. DONNELL:  Sure.  Yeah.

5      MR. GRILL:  Yeah.  We can.

6      COURT REPORTER:  This concludes the deposition.

7  We're going off the record.  The time is 5:56 p.m.

8  Central Standard Time.

9      (DEPOSITION CONCLUDED AT 5:56 P.M.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 335

1          CERTIFICATE OF REPORTER

2          COMMONWEALTH OF KENTUCKY AT LARGE

3

4  I do hereby certify that the witness in the foregoing

5  transcript was taken on the date, and at the time and

6  place set out on the Title page hereof by me after

7  first being duly sworn to testify the truth, the whole

8  truth, and nothing but the truth; and that the said

9  matter was recorded stenographically and mechanically

10  by me and then reduced to typewritten form under my

11  direction, and constitutes a true record of the

12  transcript as taken, all to the best of my skill and

13  ability.  I certify that I am not a relative or

14  employee of either counsel, and that I am in no way

15  interested financially, directly or indirectly, in this

16  action.

17

18

19

20

21

22  VICTORIA JADICK

23  COURT REPORTER/NOTARY

24  MY COMMISSION EXPIRES ON: 01/28/2023

25  SUBMITTED ON:  11/11/2021

# Exhibit 10

# FILED UNDER SEAL