# Exhibit 11

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ANTHONY JAKES
vs.
KENNETH BOUDREA, et al

Cause No. 19-cv-02204

VIDEO DEPOSITION OF DENISE HARRIS

TAKEN ON BEHALF OF THE PLAINTIFF

SEPTEMBER 23, 2021

(Starting time of deposition:  10:06 a.m.)

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedale@kentuckianareporters.com
www.kentuckianareporters.com

Page 2

```
1                        INDEX
                                        PAGE
2
    Index                               2
3   Deposition Information              3
    Appearance Page                     4
4   Direct Examination Ms. Spence       7
    Cross-Examination Mr. Grill         56
5   Notarial Certificate                217
6
7
8               PLAINTIFF'S EXHIBITS
9   EXHIBIT    DESCRIPTION           PAGE MKD.
    NUMBER
10  1          Photographs Bates stamped    31
               City_Jakes 506 and 507
11  2          Google map                   39
    3          Plaintiff Jakes 5302         42
12             Photograph
13
14
15  (Original exhibits were retained by the Attorney
    Spence.)
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1            IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION
3   ANTHONY JAKES,                )
                                  )
4            Plaintiff,           )
                                  )
5        vs.                      ) Cause No. 19-cv-02204
                                  )
6   KENNETH BOUDREA, et al,       )
                                  )
7            Defendants.          )
8
9            IT IS STIPULATED AND AGREED by and between
10  counsel for plaintiff and counsel for defendant that
11  the video deposition of DENISE HARRIS, may be taken
12  pursuant to the Federal Rules of Civil Procedure, by
13  and on behalf of the plaintiff, on September 23, 2021,
14  at the offices of Alaris Litigation Services, 711
15  North 11th Street, St. Louis, Missouri, 63101, before
16  Amy A. Victoria, Certified Court Reporter in the State
17  of Missouri and a Certified Shorthand Reporter in the
18  State of Illinois; that the issuance of notice is
19  waived and that this deposition may be taken with the
20  same force and effect as if all Federal Rules had been
21  complied with.
22
23
24
25
```

Page 4

```
1            A P P E A R A N C E S
2
    For the Plaintiff:
3
       LOEVY & LOEVY
4      By:  Renee Spence
       311 N. Aberdeen Street
5      Chicago, IL  60607
       (312)243-5900
6      spence@loevy.com
       (Via Zoom)
7
8
    For the Defendants City of Chicago:
9
       SOTOS LAW FIRM
10     By:  George Yamin
       550 East Devon Avenue
11     Suite 150
       Itasca, IL  60143
12     (630)735-3300
       gyamin@jsotoslaw.com
13     (Via Zoom)
14
    For the Defendant Individual Officer:
15
       ROCK FUSCO & CONNELLY, LLC
16     By:  Andrew Grill
       321 North Clark Street
17     Suite 220
       Chicago, IL  60654
18     (312)494-1000
       agrill@rfclaw.com
19     (Via Zoom)
20
    Also present: Anthony Jakes
21                 (Via phone)
22
23
24
25
```

Page 5

```
1   Court Reporter:
2
       Amy A. Victoria, CCR MO #556
3      Alaris Litigation Services
       711 North Eleventh Street
4      St. Louis, MO  63101
       (314) 644-2191
5      1-800-280-3376
6
    Videographer:
7
       Natalia Basham
8      Kentuckiana Reporters
       730 West Main Street
9      Suite 101
       Louisville, KY  40202
10     (502)589-2273
       (Via Zoom)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 6

1    IT IS FURTHER STIPULATED AND AGREED, that
2 any and all objections to all or any part of this
3 deposition are hereby reserved and may be raised on
4 the trial of this cause, and that the signature of the
5 deponent is reserved.
6                *    *    *    *    *
7
8    THE VIDEOGRAPHER: We are now on record.
9 My name in Natalia Basham. I'm the video technician,
10 and Amy Victoria is the court reporter.
11    Today is the 23rd day of September 2021.
12 The time is 10:06 a.m. Central. We are convened via
13 video conference to take the deposition of Denise
14 Harris in the matter of Anthony Jakes versus Kenneth
15 Boudreau, et al pending in the United States District
16 Court for the Northern District of Illinois, Eastern
17 Division, Case Number 19-cv-02204.
18    Will counsel please state your appearances
19 for the record.
20    MS. SPENCE: Good morning. My name is
21 Renee Spence. I represent the plaintiff, Anthony
22 Jakes. I'm appearing remotely and Mr. Jakes is also
23 appearing remotely for this deposition.
24    MR. GRILL: My name is Andrew Grill,
25 G-R-I-L-L. I am appearing remotely from Illinois. I

Page 7

1 am one of the attorneys that represents the individual
2 officer defendants in this case.
3    MR. YAMIN: My name is George Yamin. I
4 represent the defendants City of Chicago, and I am
5 appearing remotely from Chicago.
6    THE VIDEOGRAPHER: Thank you, counsel.
7 Will the court reporter please swear in the witness.
8                *    *    *    *    *
9
10             DENISE HARRIS,
11 of lawful age, produced, sworn and examined on behalf
12 of the Plaintiff, deposes and says:
13
14           DIRECT EXAMINATION
15 QUESTIONS BY MS. SPENCE:
16    Q.  Good morning, Ms. Harris.
17    A.  Good morning.
18    Q.  Can you please state your first name and
19 your last name for the record, and can you spell your
20 last name, please.
21    A.  Denise Harris, H-A-R-R-I-S.
22    Q.  And I should have asked you to spell your
23 first name as well. Is it Denise, D-E-N-I-S-E?
24    A.  Yes.
25    Q.  And as I said before, my name is Renee

Page 8

1 Spence. I represent the plaintiff in this case,
2 Mr. Anthony Jakes.
3    And Ms. Harris, we've met before; is that
4 correct?
5    A.  Yes.
6    Q.  Okay. And have you ever sat for a
7 deposition before, Ms. Harris?
8    A.  No.
9    Q.  So I just want before we begin to go over
10 some of the rules of the deposition. One of the rules
11 is that we want to be careful to speak one at a time
12 because everything that's being said is being
13 transcribed, and if we speak over one another, the
14 transcription will not be accurate.
15    Because we are appearing remotely, there
16 may be a bit of a delay because of the video. And so
17 I ask that after you hear the question, that you pause
18 and then you answer the question, and I will try to do
19 the same for you as well.
20    Also the attorneys for the defendants may
21 object when I ask a question, and so you also want to
22 pause to give the attorneys an opportunity to object
23 and then you can answer the question. Okay?
24    A.  Yes.
25    Q.  You're doing a great job on this so far,

Page 9

1 and I just want to remind you because it's being
2 transcribed it's important for you to answer using
3 words. Normally in every day speech we use sounds or
4 gestures like uh-huh, un-huh, or the nodding of a
5 head, and that's not accurately transcribed in a
6 deposition transcript. And so if you do answer using
7 sounds or a gesture, I might say, is that a yes or is
8 that a no, and that's not to reprimand you in any way
9 it's just to remind you to use words. Okay?
10    A.  Yes.
11    Q.  At any point in time, you are allowed to
12 take breaks. You can just simply ask for us to take a
13 break and we will do so. I only ask that if there is
14 a question pending, that you answer the question
15 before we take the break. Do you agree to that?
16    A.  Yes.
17    Q.  Because we are appearing in different
18 rooms, I can't see if you have anything in front of
19 you and so I ask that if you are looking at a
20 document, or there's something in front of you, that
21 you let me know that you're looking at a document or
22 you have a document in front of you. Okay?
23    A.  Yes.
24    Q.  And do you have any documents in front of
25 you right now?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 10

1    A.  I'm just -- I'm writing down notes on who
2 all I'm talking with and who all that's appearing. So
3 I have the names, their e-mails, and that's it.
4    Q.  So other than your personal notes, do you
5 have any other documents in front of you?
6    A.  No.
7    Q.  Okay. Is there any reason why you can't
8 give a complete and accurate deposition today?
9    A.  No.
10    Q.  Do you have any medical conditions that
11 affect your memory?
12    A.  No.
13    Q.  Are you on any kind of medication that
14 would impact your memory?
15    A.  No.
16    Q.  Okay. So Ms. Harris, can you tell me your
17 date of birth?
18    A.  ███████████
19    Q.  And in which city do you live right now,
20 Ms. Harris?
21    A.  St. Louis, Missouri.
22    Q.  Ms. Harris, do you work?
23    A.  Yes.
24    Q.  What do you do for employment?
25    A.  I'm a housekeeper at Benard Care Center

Page 11

1 West Pine, 5343 West Pine, St. Louis, Missouri.
2    Q.  And Ms. Harris, I want to talk to you about
3 1991, specifically towards the end of 1991, in
4 September of 1991. Where were you living during that
5 time period?
6    A.  1212 West 51st Street, second floor
7 apartment.
8    Q.  Is that in Chicago, Illinois?
9    A.  Yes.
10    Q.  With whom did you live at 1212 West 51st
11 Street on the second floor?
12    A.  My mother, sister, brother.
13    Q.  And what was your sister's name?
14    A.  Annette Harris.
15    Q.  And is it A-N-N-E-T-T-E?
16    A.  Yes.
17    Q.  And what was your brother's name?
18    A.  Maurice.
19    Q.  And how do you spell his name?
20    A.  M-A-U-R-N-I-C-E Harris.
21    Q.  M-A-U-R-N-I-C-E?
22    A.  M-A-U-R-I-C-E.
23    Q.  And then Harris like your last name?
24    A.  Yes.
25    Q.  What was your mom's name?

Page 12

1    A.  Idella.
2    Q.  How do you spell her first name?
3    A.  I-D-E-L-L-A.
4    Q.  You said that you lived on the second floor
5 of 1212. Did anyone live on the first floor?
6    A.  Yes.
7    Q.  Who lived on the first floor?
8    A.  Shawn Jakes stayed on the first floor with
9 his mother, Jeanette Jakes.
10    Q.  Okay. And -- and we're focussing on the
11 time period of September 1991. In September of 1991,
12 was Mr. Jakes living on the first floor of 1212?
13    A.  Yes.
14    Q.  And how do you know that?
15    A.  I stayed upstairs from him. So, you know,
16 we both stayed in the same building so...
17    Q.  And did you ever go into the apartment
18 building on the first floor of 1212 West 51st Street?
19    A.  Yes. Just about every day because they --
20 it was like family. He was, like, my cousin. So, you
21 know, we -- we would see each other every day.
22    Q.  You mentioned your sister, Annette. In
23 1991, how -- well, let me back up.
24      In 1991, how old were you?
25    A.  I believe about 15 at the time.

Page 13

1    Q.  And how old was your sister in 1991?
2    A.  Well, she was a year older than me now. So
3 she was 16.
4    Q.  In September of 1991, was there a back
5 portion to 1212 West 51st Street where someone could
6 live?
7    A.  Yes.
8    Q.  Like a back residence?
9    A.  Yes.
10    Q.  Do you know who lived in the back
11 residence?
12    A.  Shawn's auntie.
13    Q.  And do you know her name or did you call
14 her by any particular name?
15    A.  We called her Aunt Bee, Auntie Bee, Aunt
16 Bee, like that.
17    Q.  Did you -- did anyone -- were you familiar
18 with a building that was number 1210 West 51st Street?
19    A.  Yeah. Yes.
20    Q.  And in relation to your building, 1212 West
21 51st Street, where was 1210 West 51st Street located?
22    A.  Okay. 1212, in the middle. 1210, I
23 believe it was on the right side of us.
24    Q.  On the right side. And what cross street
25 was closest to 1210?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 14

1       A.    Racine was at the corner, the left corner.
2   Elizabeth was at the right corner, if I'm sitting on
3   the porch like this.  So...
4       Q.    And so if Racine is to the left and
5   Elizabeth to the right, 1210 was closest to which
6   street, Elizabeth or Racine?
7       A.    Elizabeth.
8       Q.    Okay.  And do you know who -- did you know
9   anyone who lives in 1210?
10      A.    Yes.
11      Q.    Who lived in 1210 focussing on September
12  of 1991?
13      A.    Fred stayed in 1210 with his mother,
14  brother, sister.
15      Q.    And did you -- were you aware of a person
16  named Nikia Little?
17      A.    Yes.
18      Q.    And how did you know someone named Nikia
19  Little?
20      A.    She's my first cousin.
21      Q.    And I notice that you said she was your
22  first cousin, is Ms. Little still alive?
23      A.    No.  She's deceased.
24      Q.    In 1991, in September of 1991, do you know
25  where Ms. Little lived?

Page 15

1       A.    Next door.
2       Q.    What was the number for her building?
3       A.    Let me see, 1012, 1212, 1214.
4       Q.    1214?
5       A.    Yeah.  Yes.
6       Q.    And in September 1991, did you know anyone
7   who went by the name of Quarter Pound?
8       A.    Yes.
9       Q.    How did you know -- how did you know
10  Quarter Pound?
11      A.    He stayed next door.
12      Q.    Where did Quarter Pound -- in which
13  building next door did Quarter Pound stay?
14      A.    Twelve (12) -- 1214.
15      Q.    In the same building as Ms. Little?
16      A.    Yes.  Upstairs.  Second floor.
17      Q.    And so other than Fred living in 1210, do
18  you know anyone else who lived in 1210?
19      A.    No.
20      Q.    And Quarter Pound, did you know if he had
21  any siblings, like, a sister or a brother?
22      A.    Yeah.  He had a sister.
23      Q.    And do you know what her name was?
24      A.    Well, her name was, I believe, Claudette.
25      Q.    Did you call her Claudette?

Page 16

1       A.    No.  We actually called her Tweety.
2       Q.    And did Tweety live in the same building as
3   Quarter Pound?
4       A.    Yes.
5       Q.    Would it be fair to call Quarter Pound and
6   Tweety your next door neighbors?
7       A.    Yes.
8       Q.    And Ms. Little, would you also refer to
9   Ms. Little as a next door neighbor?
10      A.    Yes.
11      Q.    Now, did you ever, in September of 1991,
12  did you -- were you in school?
13      A.    Yes.
14      Q.    What school did you attend in September
15  of 1991?
16      A.    Libby Elementary.
17      Q.    And how do you spell -- and this is -- at
18  15, you were in an elementary school?
19      A.    Yes.
20      Q.    Okay.  And how do you spell the name of
21  that elementary school?
22      A.    Libby, Libby, L-I-B-B-Y, Elementary.
23      Q.    Now, I want to -- all right.  I want to
24  talk a little bit about Quarter Pound for a second.
25  You mentioned that your relationship with Shawn is

Page 17

1   that he was like a cousin.  What kind of relationship
2   did you have with Quarter Pound?
3       A.    Pretty -- pretty much just that he was our
4   neighbor, and it was pretty much so as by them, and
5   they parents know my parents.  It was -- we was -- we
6   all ran together like we was just kin to each other.
7       Q.    And did you have a similar relationship
8   with Tweety?
9       A.    Yeah, but not so much.  Like, more, like,
10  the regular of us that was all the same age, you know.
11  When we would -- we would see them if they outside or,
12  you know, but not as much, like, every day.
13      Q.    So you wouldn't see Tweety as much, every
14  day, and so you weren't as close to Tweety; is that
15  right?
16      A.    Right.  Correct.
17      Q.    And I want to go back to miss -- I believe
18  you said Ms. Jeanette Jakes, and that's Mr. Jakes'
19  mother?
20      A.    Yes.
21      Q.    All right.  Okay.  And Ms. Jakes, was
22  she -- based on your -- when you were living in 1212,
23  was she in -- did she live on the first floor all the
24  time, or did she travel?  Do you know if she was there
25  on a regular basis?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 18

1          MR. YAMIN: Objection. Form.
2     Q.   (Ms. Spence) Go ahead.
3     A.   She lived there.
4     Q.   Okay.  And were you aware of her travelling
5  anywhere in 1991?
6          MR. YAMIN: Objection. Form. Foundation.
7     Q.   (Ms. Spence) Go ahead.
8     A.   Not as much.
9     Q.   When you say not as much, what do you mean?
10    A.   Because -- what I mean is that we were
11 kids.  So we wasn't was always at home, but when we
12 were at home, our parents were there.
13    Q.   All right.  At any point, did you ever know
14 Shawn to live with his aunt, Aunt Bee in the back of
15 1212?
16    A.   Well, I would say, because that's his
17 auntie and she stays in the back, and they have the
18 downstairs apartment, and we stay upstairs.  So it's
19 quite likely he -- they go back and forth, back and
20 forth.  But I always known them to live downstairs,
21 and they auntie stay in the back.
22    Q.   Right.  So when you say that they go back
23 and forth, what do you mean --
24    A.   I mean back --
25    Q.   -- go back and forth?

Page 19

1     A.   It's -- it's their auntie.  So that -- I
2  mean, we kids.  We go back and forth to our auntie
3  house.  See how they doing.  Eat something, or, you
4  know, whatever the case might be or...
5          So back and forth is what I mean, like, he
6  probably be at his auntie house this day, or he at
7  home, or he at his auntie house.  Or if his mom is
8  probably going out of town, he's probably at his
9  auntie house most the time, or he at his own house.
10    Q.   Okay.
11    A.   That's what I mean by back and forth, you
12 know, so...
13    Q.   I understand.
14         So in September of 1991, do you know if
15 there was a time where Mr. Jakes was staying for a
16 while in the back with his aunt?
17         MR. GRILL: Objection. Foundation.
18    A.   No.
19    Q.   (Ms. Spence) Go ahead.  You don't know you
20 said?
21    A.   No.
22    Q.   I didn't hear your answer.  Sorry?
23    A.   No.
24         (Unintelligible speech.)
25         THE COURT REPORTER:  One more time,

Page 20

1  Mr. Grill.
2          MR. GRILL: My objection was Ms. Spence's
3  question, last question mischaracterized the witness's
4  testimony, but the witness has answered so we're fine.
5     Q.   (Ms. Spence) Ms. Harris, I want to focus
6  you on the night of September 15th, 1991.  Do you
7  remember that night?
8     A.   Not as much.
9     Q.   I want to -- I guess, I want to help
10 clarify a little bit about the day that I'm talking
11 about.
12         In September of 1991, were -- did you have
13 any occasion where you were outside and a shooting
14 occurred near your house?
15    A.   Yes.
16    Q.   Okay.  So -- and in just focussing on the
17 month of September 1991, was there an occasion where
18 there are multiple shootings out in front of -- near
19 your house or just one?
20    A.   Just one.
21         MR. YAMIN: Objection. Form.
22    Q.   (Ms. Spence) So focussing on that one
23 shooting that happened outside your house, or near
24 your house in September of 1991, I want to focus you
25 towards the end of that day around 10:00 p.m.  Do you

Page 21

1  know where you were around 10:00 p.m. that night?
2     A.   I was sitting on the front.
3     Q.   Sitting on the front of what?
4     A.   The front porch.
5     Q.   And which building were you sitting on the
6  front porch?
7     A.   It was -- it was -- we was sitting on, I
8  believe, Nikia Little's front porch.
9     Q.   You said Nikia's front porch?
10    A.   Yeah.
11    Q.   Sorry.  I didn't hear your answer.
12    A.   Yes.
13    Q.   And just to -- for the record, how do you
14 spell Nikia's name, her first name?
15    A.   N-I-K-I-A.
16    Q.   And you said you were sitting on the front
17 porch.  Was anyone sitting on the front porch with you
18 at 10:00 p.m.?
19    A.   Yes.  It was me, myself, Fred, Nikia,
20 Annette.  That's all I can think of right now.
21    Q.   And while you were sitting on the front
22 porch that night, did you ever see Quarter Pound?
23    A.   No.
24    Q.   While you were sitting on the porch, did
25 you see Tweety?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 22

1       A.   Well, at that time -- well, at that moment,
2  at that time, no.  She was not out there at that time.
3       Q.   All right.  You said at that time, Tweety
4  was not out there.  Did it -- did there come a time
5  that night when Tweety was outside while you were on
6  the porch?
7       A.   Well, I believe when the incident happened,
8  that's when, like, people start coming out.  So
9  therefore, it's -- it's -- in a sense, it comes to me
10 as she maybe were out there.  Also Quarter Pound, you
11 know, just from coming -- if they was in the house,
12 coming outside and hearing, you know, the commotion
13 going on.
14      Q.   So while you're sitting on the porch, you
15 said you were with Fred, Nikia and Annette; is that
16 correct?
17      A.   Yes, it was --
18      Q.   And what were you --
19      A.   Go ahead.  I'm sorry.
20      Q.   All right.  Go --
21      A.   No.  Go ahead.
22      Q.   What were you doing on the porch that night
23 with Fred, Nikia and Annette?
24      A.   We all was just sitting on the porch.  We
25 all just come from, you know, finishing up our day.

Page 23

1  Just sitting getting ready to go in the house after so
2  long.
3       Q.   All right.  And while you were on the
4  porch, at any point did you see Mr. Jakes?
5       A.   Yeah, I did.
6       Q.   When did you see Mr. Jakes?
7       A.   I seen him -- when I seen Mr. Jakes, okay,
8  I seen him run.  Okay.  And when I seen him run, he
9  came from off around by Elizabeth, and he ran through
10 the gangway, and into his auntie's house.
11      Q.   Okay.  So I just want to set the scene.
12 You -- at the time that you saw Mr. Jakes, were you on
13 the porch?
14      A.   Yeah.
15      Q.   Okay.  And was this the porch --
16      A.   Yes.  Yes.  Yes.
17      Q.   Okay.  This was the porch at 1214?
18      A.   Yes.
19      Q.   And when you saw Mr. Jakes, from which
20 direction was he coming?
21      A.   He was coming from the Elizabeth side.
22      Q.   And was anyone with him when you saw him
23 coming from the Elizabeth side?
24      A.   No.
25      Q.   And when you saw Mr. Jakes come down from

Page 24

1  the Elizabeth side, where did you see him go?
2       A.   He ran through the gangway.
3       Q.   All right.  Where is the gangway located?
4       A.   It's directly in between 1212 and 1214.
5       Q.   It's between 1212 and 1214?
6       A.   Yes.
7       Q.   And where does the gangway lead?  If
8  someone goes into the gangway, where -- where does the
9  gangway lead?
10      A.   It leads -- well, actually -- I really
11 wouldn't call it a gangway, but by -- it's the 1212
12 apartment that sits on the front, the house sits on
13 the back, and then 1214, that's the whole property
14 right there.  So we go through the -- yeah, I guess,
15 the side.  You can say a gangway to get to Auntie Bee
16 house, and the alley is behind her house.
17      Q.   So the -- if one were to go down the
18 gangway, would the gangway provide access to the back
19 of 1212, to the rear house 1212?
20      A.   Yes.
21      Q.   And you could use the gangway you said to
22 also get to the alley behind 1212; is that right?
23      A.   Yes.
24      Q.   You said when Shawn went into the gangway,
25 was anyone following him into the gangway?

Page 25

1       A.   No.
2       Q.   Okay.  Do you know why Shawn was -- ran
3  into the gangway?
4       A.   Well, that -- he suppose to have been
5  throwing rocks at someone.  And by us being so young
6  then and he was young, he was kind of scary.  So every
7  little bad thing he do, he would take off running.
8       Q.   Okay.  So you said that he was --
9       A.   Rocks, bottles.
10      Q.   -- throwing rocks at someone?
11      A.   Yeah.  Rocks, bottles.
12      Q.   And how do you know that he was -- and why
13 do you think he was throwing rocks at someone?
14      A.   Okay.  First of all, first of all, you
15 could hear it.  Because it's that time of night and
16 it's quiet, and Elizabeth is, like, maybe two houses,
17 three houses from the corner.  So we can very well
18 hear it.  If we sitting right there on the porch, and
19 it's quiet, and it's at night, and so we hear, you
20 know, bottle break, like, some rocks being thrown at a
21 car.
22      Q.   And that night, did you hear any bottles
23 breaking or rocks being thrown?
24      A.   Yes.
25      Q.   Okay.  Could you see any -- could you see

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 26

1 Shawn throwing any bottles or rocks that night?
2      A.   No.
3      Q.   You said that at that time, Shawn was
4 really scary. What did you mean by that phrase?
5      A.   Every little thing that he do, like, for
6 instance, like I said, like, if he was throwing rocks,
7 or -- at someone's car, he would take off running, you
8 know. Go run and hide. Probably run in the house,
9 you know, and don't come out for -- for a while. You
10 know, the little things that kids do at that age.
11      Q.   So when you say that Shawn is really scary,
12 would it be fair to say that he was, like, the kind of
13 person who was afraid easy? Like, he would run off if
14 he was afraid?
15            MR. GRILL: Objection. Form. Foundation.
16      Q.   (Ms. Spence) Okay. Go ahead.
17      A.   Can you rephrase that?
18      Q.   Sure. I'm just trying to get the sense of
19 the word scary. When you say that he's scary, does
20 that mean that he would run away or was afraid of
21 things?
22            MR. GRILL: Same objections.
23      Q.   (Ms. Spence) Go ahead.
24      A.   I'm not understanding. I mean, the form of
25 scary is -- what I'm saying is, like I say, again, if

Page 27

1 he was throwing rocks at someone, and someone say,
2 uh-oh, or they turn back around, or jump out their car
3 and, you know, going to react towards what he done,
4 yeah, he's going to take off running.
5      Q.   All right.
6      A.   And run in the house.
7      Q.   And were you afraid of Shawn?
8      A.   No.
9      Q.   I'm sorry. Mr. Jakes. We started using
10 the name Shawn. Do you understand Shawn to be
11 Mr. Jakes?
12      A.   Yes.
13      Q.   Is -- is -- is that the name you used to
14 call Mr. Jakes back in 1991, did you call him Shawn?
15      A.   No.
16      Q.   Were you afraid of Shawn in 1991?
17      A.   No.
18      Q.   At any point in your life, have you ever
19 been afraid of Shawn?
20      A.   No.
21      Q.   All right. So I want to -- I'm going to
22 show you a picture. Actually, one moment. I'm going
23 to continue asking questions first.
24            After you saw Shawn, did you stay -- run
25 into the gangway, did you stay outside?

Page 28

1      A.   Yes.
2      Q.   Did anything happen when you were outside
3 after Shawn ran into the back of the house?
4            MR. YAMIN: Objection to form.
5            MR. GRILL: Yeah. Hang on. That also
6 mischaracterizes her testimony.
7      Q.   (Ms. Spence) So Ms. Harris, when you saw
8 Shawn run into the gangway, where did you say he went?
9            MR. GRILL: Objection. Foundation.
10      Q.   (Ms. Spence) Okay. Go ahead.
11            MR. YAMIN: And mischaracterizes her
12 testimony.
13      Q.   (Ms. Spence) Go ahead.
14      A.   When I seen Shawn run through the gangway,
15 like I said, I believe he ran into his auntie's house.
16      Q.   And to be clear, his auntie's house was in
17 the back of 1212; is that right?
18      A.   Yes.
19            MR. GRILL: Foundation. Form.
20 Mischaracterizes her testimony.
21      Q.   (Ms. Spence) Okay. When -- after you saw
22 Shawn go into the gangway, did anything else happen
23 while you were outside?
24            MR. YAMIN: Objection. Form.
25      Q.   (Ms. Spence) Go ahead.

Page 29

1      A.   Yes.
2      Q.   What happened?
3      A.   After so many minutes later, you know, we
4 didn't really think nothing of it. Us ones that was
5 outside sitting on the front porch. And so we was
6 just sitting out there just talking, doing what we was
7 doing. And so many minutes later, that's when we
8 heard a shooting.
9      Q.   Before you heard the shooting, did you -- I
10 guess, where did you hear the sound of the shooting
11 come from?
12      A.   From the corner.
13      Q.   Which corner?
14      A.   It was right by the -- the restaurant.
15      Q.   When you say right by the restaurant, what
16 restaurant are you referring to?
17      A.   It was a restaurant. I guess it was the
18 sub shop. Because we were sitting that close. So it
19 was, like, real close to us, and it wasn't no one else
20 out on the streets. Like, no cars were coming by.
21 You know, just everybody -- a car every now and then,
22 and no one really was out.
23      Q.   You said there was a shop, sub shop that
24 was close to where you were sitting?
25      A.   Yeah. Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 30

1    Q.   Do you remember the name of the sub shop?
2    A.   No.
3    Q.   I'm going to show you a photograph.  It's
4  Bates stamped City_Jakes 506.  Ms. Harris, can you see
5  this photo?
6    A.   Yes.
7    Q.   And in the photo, there is a sign that says
8  Queen Submarine.  Do you see that yellow sign?
9    A.   Yes.
10   Q.   Do you recognize that yellow sign?
11   A.   Yes.
12   Q.   How do you recognize it?
13   A.   Because I went there to eat every day.
14   Q.   Earlier you -- go ahead.
15   A.   And we stayed right on the same street, you
16  know, couple houses from it.
17   Q.   And when you were talking about there was a
18  shooting by the sub shop, or the shots appeared to be
19  coming from near the sub shop.  Is the Queen Submarine
20  shop, the sub shop you're referring to?
21   A.   Yes.
22   Q.   And in this photograph, do you recognize
23  the -- do you see that there are people sitting on
24  what appear to be steps?
25   A.   Yeah.  Yes.

Page 31

1    Q.   All right.  And there's a house to the
2  right of those individuals.  Do you see that?
3    A.   Yes.
4    Q.   Do you know the number for that house?
5    A.   No.
6    Q.   I'm now showing you a photograph that is
7  marked City_Jakes 507.  Can you see this photograph?
8    A.   Yes.
9         MS. SPENCE:  And just for the record, why
10  don't you go ahead and mark these two photographs as
11  Exhibit 1.
12        (Plaintiff's Deposition Exhibit No. 1,
13  Photographs Bates stamped City_Jakes 506 and 507.)
14   Q.   (Ms. Spence) All right.  And in the
15  photographs, do you see the Queen Submarine shop sign?
16   A.   Yes.
17   Q.   In this photograph, do you see where you
18  live?  Do you see the building that you used to live
19  in?
20   A.   Yes.
21   Q.   Can you describe the building that you used
22  to live in?
23   A.   It's the building with the green and white,
24  like, shutter at the bottom, and we stayed upstairs.
25   Q.   Okay.  So that would be the building on the

Page 32

1  left-hand -- on the most left-hand side of the
2  photograph?
3    A.   Yes.
4    Q.   And you described there was a green and
5  white awning?
6    A.   Yes.  Yes.
7    Q.   And do you see the building in which Nikia
8  lived?
9    A.   Yes.
10   Q.   Where -- can you describe the building in
11  the photograph that Nikia lived in?
12   A.   The building she stayed in is the building
13  where the people are sitting on the steps at.
14   Q.   Okay.  And would it be fair to say that
15  that was a brown looking building or a dark colored
16  building?
17   A.   Yes.
18   Q.   And would it be fair, just for the record,
19  to describe it as a building that was the second house
20  to the left of the sub shop?
21   A.   Yes.
22   Q.   Second building?
23   A.   Yes.
24   Q.   When -- when you referred to a gangway, do
25  you see the gangway in this photograph?

Page 33

1    A.   Yes.
2    Q.   In City_Jakes 507?
3    A.   Yes.  I can see it.
4    Q.   Okay.  Can you tell us in the photograph
5  where the gangway is?
6    A.   Okay.  The gangway is right there where
7  the -- the building I stayed in 1212, that first
8  window, okay, that's where the gangway is at.  Okay.
9    Q.   Go ahead.
10   A.   Where the light is on that, right.  Down
11  the first floor, that's pretty much right there.
12  That's where the gangway is at, right there.
13   Q.   When you say right there, are you talking
14  about where the plus sign is?
15   A.   Yes.  Yes.
16   Q.   Okay.  So just for the record, I'm going to
17  describe the picture for the record.
18        The gangway you're describing, or where the
19  plus sign is is in between the 1212 building with the
20  green and white awning and the building in which you
21  said Nikia lived; is that correct?
22   A.   Yes.
23   Q.   All right.  So you said that you heard
24  shots coming from near the sub -- subway shop.  Did
25  you see anyone go into the subway shop before you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 34

1  heard the shots?
2      A.  Yes.
3      Q.  Who did you see go into the subway shop
4  before you heard the shots?
5      A.  First, I saw a guy go in there.
6      Q.  What did the guy look like?
7      A.  I want to say he's -- I want to say he's
8  Caucasian.  Yeah.  He's Caucasian.
9      Q.  And do you remember -- and -- and was
10  anyone with the man when he went into the sub shop?
11     A.  No.  He was by hisself.
12     Q.  Do you know how the man got to the sub shop
13  area?  Was he on foot?  Did he drive?  Do you know?
14     A.  He drove.
15     Q.  And how did you know he drove there?
16     A.  Because the car that was outside.
17     Q.  You know he was there because there was a
18  car outside?
19     A.  No.  I remember that car.  And I remember
20  seeing the guy get out of it and go into the sub shop.
21     Q.  Do you remember what his car looked like?
22     A.  It was the white station wagon car looking
23  that was on the photo.
24     Q.  So I'm going to -- I'm going to pull back
25  up Exhibit 1.  In looking at the second photo in

Page 35

1  Exhibit 1, City_ Jakes 507, in this photograph, do you
2  see the car that the man pulled up in in this
3  photograph?
4      A.  Yes.  That white and brown station wagon
5  looking car right there.  Yeah.
6      Q.  So after the man got out of his car and
7  went into the sub shop, what happened?
8      A.  I remember -- so we all just sitting there,
9  you know, ain't, you know, worried about it.  We just
10  see the guy go in there.  I guess order him something
11  to eat.  And I also remember seeing two guys come from
12  around the corner.
13     Q.  When you say that two guys came from around
14  the corner, which corner are you talking about?
15     A.  Okay.  I'm talking about the corner
16  that's -- it's across the street.  Well, yeah, it's
17  across the street.  It's on the same side the
18  restaurant is, but, you know, going that way.  Going
19  back that way.  Not towards us but going that way.  So
20  across the street it was a check cashing place on the
21  corner, and I seen them coming from around that
22  corner.  Go into the restaurant.  And, I guess, just
23  figuring they probably just going to get them
24  something to eat.  We just, you know, just sitting on
25  the porch.  We all just talking and just doing what we

Page 36

1  doing.
2      Q.  So I just want to get the location
3  clarified a bit.  The street that you're on, what's
4  the name of that street that you live?
5      A.  The street that we stay on is the 51st
6  Street.  It's 51st, that's the main avenue.
7      Q.  All right.  When you say the guys were
8  coming from the direction that was away from you, was
9  that still on 51st Street?
10     A.  Well, no.  I can say Racine.  Okay.  51st
11  and this is Racine.  So the check cashing place is
12  right here.  The restaurant is right here.  Just right
13  across the street from each other but on the same side
14  of the street like this.  So that's Racine.
15     Q.  Okay.  So it sounds like 51st -- let's say
16  51st is going from left to right.  Okay.  Is it fair
17  to say that Racine was going up and down, like, they
18  were perpendicular, like?
19         MR. GRILL:  Form.
20     Q.  (Ms. Spence) Go ahead, Ms. Harris.
21     A.  I'm confused.  You got me confused.
22     Q.  Okay.  All right.  One moment.  So
23  Ms. Harris, I'm showing you a Google map of -- that
24  shows 1212 West 51st Street.  Can you see that on your
25  screen?

Page 37

1      A.  Yes.
2      Q.  Okay.  Now, on -- on this map, the red --
3  there's a red symbol that says 1212 West 51st Street.
4  Do you see that?
5      A.  Yes.
6      Q.  Okay.  And then to the left of that,
7  there's 51st and Elizabeth Street.  Do you see that?
8      A.  Yes.
9      Q.  And to the right of that red dot, there's
10  South Racine Avenue and 51st Street.  Do you see that?
11     A.  Yes.
12     Q.  And then to the right of Racine, there's a
13  street that runs north to south, that says South Main
14  Street.  Do you see that?
15     A.  Yes.
16     Q.  Now, is that the way -- back in 1991, does
17  this map accurately show how the streets were set up
18  back in 1991 as it relates to Elizabeth, Racine, South
19  Main Street, and 51st Street?
20     A.  Yes.
21     Q.  So when you describe -- I'm going to zoom
22  in a little bit.  Yeah.  Okay.  When you describe the
23  two men that you saw coming while you were at 1212
24  West 51st Street, where on the map did you see those
25  men?  From which direction did you see those men?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 38

1  coming?
2      A.   I seen them coming from off Racine.
3      Q.   Off Racine?
4      A.   Yes.
5      Q.   And when you say off Racine, are you
6  talking about they came coming down south of Racine or
7  they were coming north up Racine?
8      A.   Look, I can't tell you that.
9      Q.   Okay.
10     A.   Only thing that I can say is that it's a
11 check cashing place, Currency Exchange, sitting on
12 that corner of Racine.
13     Q.   Which corner?  Is it the corner on the same
14 block as the sub shop or the corner across the street?
15     A.   The corner across the street.  Across the
16 street.
17     Q.   All right.  So where the -- can you see the
18 arrow in --
19     A.   Yeah.  Yes.
20     Q.   All right.  Is the arrow on the corner
21 where the check cashing place was?
22     A.   Yes.
23     Q.   Okay.  So for the record, the arrow is on
24 the northeast corner of 51st and Racine?
25     A.   Yes.

Page 39

1           MS. SPENCE:  Okay.  I'm going to mark that
2  as Exhibit 2.
3           (Plaintiff's Deposition Exhibit No. 2,
4  Google map.)
5      Q.   (Ms. Spence) Okay.  When you saw the men
6  coming from the northeast corner of 51st and Racine,
7  can you describe what the -- how the men appeared?
8      A.   They was two -- two dark guys.  Two black
9  males.  One was tall.  One was kind of short.
10     Q.   And did --
11     A.   I can't tell you what clothing they had on.
12     Q.   Did you recognize them as people you knew?
13     A.   Well, back then -- back then I knew who
14 they were, but I can't tell you that right now because
15 it's been so long so...
16     Q.   When you saw the two men coming from the
17 check -- from the direction of the check cashing
18 place, what did you see them do after you saw them
19 coming towards your direction?
20     A.   I just seen them go into the sub shop,
21 right.  And so I just, like I said, I figured they
22 probably was going to get them something to eat.  Now,
23 the guy was already in there at the time.
24     Q.   When you say the guy was already in there,
25 is this the white man that you're referring to before,

Page 40

1  or the Caucasian man you're referring to before?
2      A.   Yes.
3      Q.   And what happened next?
4      A.   That's when we all was just out on the
5  front and we heard shooting.  So once we heard the
6  shooting, we all just took off running.
7      Q.   When you took off running, you say we all
8  took off running.  Who took off running with you?
9      A.   Everyone that was on the front porch with
10 us.
11     Q.   When you heard the shooting, did you see
12 Shawn outside at the time that you heard the shooting?
13     A.   No.
14     Q.   When you saw the -- the men coming from the
15 check cashing place, did you see Shawn outside during
16 that time period?
17     A.   No.
18     Q.   When you took off running, where did you
19 go?
20     A.   I didn't hear you.
21     Q.   When you took off running, where did you
22 go?
23     A.   We all -- me and everyone else that was out
24 there with me, we all ran through the same gangway
25 that Shawn ran through, ran through the alley, came up

Page 41

1  the alley by the pay phone by the sub shop, and we
2  were standing at that pay phone.
3      Q.   Okay.  All right.  Ms. Harris, I'm going to
4  show you the same map that we were looking at before,
5  Exhibit 2.  The alleyway, do you see the alley that
6  you ran through on the map?
7      A.   Yes.
8      Q.   Okay.  Where -- can you describe where the
9  alley is?
10     A.   The alley would be right behind 1212.
11     Q.   Okay.  Is it -- was the alley between South
12 Elizabeth and South Racine?
13     A.   Yes.
14     Q.   Okay.  And on the map, there's a street
15 behind 1212 or a path behind 1212 that is not labelled
16 with a street name.  Do you see that?
17     A.   Yes.
18     Q.   Is that the alley you're describing?
19     A.   Yes.
20     Q.   Okay.  And you said that you ran through
21 the alley to a pay phone?
22     A.   Yes.
23     Q.   Where was the pay phone located?
24     A.   The pay phone is located right next door to
25 the sub shop.  Okay.  It's the sub shop, then it's the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 42

1 parking lot, then it's the pay phone.
2     Q.   Got it.  Ms. Harris, I'm showing you a
3 picture that's marked -- sorry -- the Bates stamp says
4 Plaintiff Jakes 5302.  Can you see this photograph?
5     A.   Yes.
6          MS. SPENCE:  All right.  Let's go ahead and
7 mark that as Exhibit 3.
8          (Plaintiff's Deposition Exhibit No. 3,
9 Plaintiff Jakes 5302 Photograph.)
10     Q.   (Ms. Spence) Do you recognize this --
11 sorry.  Do you recognize the location shown in this
12 picture?
13     A.   Yes.
14     Q.   How do you recognize this location?
15     A.   That's the pay phone at the corner because
16 it's also a bus stop there, the restaurant, my
17 building, the kids building.
18     Q.   Okay.  Let's take it one at a time.  The
19 pay phone that you're referring to, is that the -- the
20 area where there's a blue sign?
21     A.   Yes.
22     Q.   A blue and white sign.  Is that the pay
23 phone you're referring to?
24     A.   Yes.
25     Q.   I'm sorry.  Okay.  And your building, is

Page 43

1 that the one with the green and white awning in --
2 sorry -- and dark red building?
3     A.   Yes.
4     Q.   And Nikia's building is the one to the
5 right of that; is that correct?
6     A.   Yes.
7     Q.   And the sub shop, is that the one with the
8 yellow sign?
9     A.   Yes.
10     Q.   And earlier you referred to a parking lot.
11 Is the parking lot depicted in this photograph?
12     A.   Yes.  That's where you see the cars that's
13 parked right there.  Where the white van, red car, and
14 then, you know, two other cars.  That's the parking
15 lot.
16     Q.   Got it.  And so you said you ran -- you
17 guys ran through the alley and came back around to the
18 pay phone --
19     A.   Pay phone.
20     Q.   -- is that correct?
21     A.   Yes.
22     Q.   All right.  And when you ran through the
23 alley, did you see Shawn?
24     A.   No.
25     Q.   When you got to the pay phone, did you see

Page 44

1 Shawn?
2     A.   No.
3     Q.   When you got to the pay phone, what did you
4 do?  Sorry.
5          Who was with you when you got to the pay
6 phone?
7     A.   Me.  It was me, Fred, Nikia, and Annette,
8 it was a couple more people, I think.  I can't
9 remember.  But we were just actually just standing
10 there and we was looking.
11     Q.   And when you are at the pay phone, how did
12 you feel when you were standing there at the time at
13 the pay phone?
14     A.   I felt real scared because I didn't know
15 what -- that if -- if anything else was going to
16 happen.
17     Q.   Okay.  What happened after you guys got to
18 the pay phone?  Did anything else happen?
19     A.   I remember seeing two guys go into that
20 car.  They did something.  And then I just seen them
21 just take off running around the corner.  Around the
22 corner meaning the corner that's -- where the check
23 cashing place at.  The Currency Exchange is at.
24 Around that corner going back the other way.
25     Q.   Okay.  So you said you saw the two guys

Page 45

1 when you were at the pay phone?
2     A.   Uh-huh.
3     Q.   Is that a yes?
4     A.   Yes.  Yes.  I'm sorry.
5     Q.   No.  It's totally fine.  It's happens all
6 the time.  It's all good.
7          And when you saw the two guys, where did
8 you see them?
9     A.   I seen them -- okay -- I seen them standing
10 at that car.
11     Q.   Which car?
12     A.   That white car.
13     Q.   And the white car, where -- at what part of
14 the car were they standing?
15     A.   They was on the driver's side.
16     Q.   And could you see the man, the Caucasian
17 man?
18     A.   No.  I couldn't see him.
19          MR. GRILL:  Okay.  Time out.  That
20 mischaracterizes her testimony.  Lacks foundation.
21          MS. SPENCE:  What's -- what's
22 mischaracterized.
23          MR. GRILL:  You're inserting facts into
24 your question.  So --
25          THE COURT REPORTER:  Oh, Mr. Grill, hang

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 46

1 on. You said: You're inserting facts into the
2 question and then you went away.
3         MR. GRILL: She's inserting facts into her
4 question that this witness has not testified to. So
5 the question lacks a foundation, and it
6 mischaracterizes her testimony, and it's a form
7 problem because leading.
8     Q. (Ms. Spence) Okay. Ms. Harris, you said
9 you saw a Caucasian man go into the sub shop, right?
10     A. Yes.
11     Q. Okay. When you were at the pay phone, did
12 you see that Caucasian man again?
13     A. No. I didn't see him again.
14     Q. Okay. When you saw the two men at the car,
15 did you see the Caucasian man?
16     A. No. I didn't see him.
17     Q. Okay. You said you saw the two men at the
18 driver's side of the car. Could you see what they
19 were doing?
20     A. They was reaching over into the car.
21     Q. Okay. Do you know if anyone was inside the
22 car?
23     A. The man -- the Caucasian man was in the
24 car. Reason --
25     Q. And how --

Page 47

1     A. -- me saying --
2     Q. Go on.
3     A. -- that is because he had -- he was sitting
4 in the car. I didn't --
5     Q. From where you --
6     A. Go ahead. I'm sorry.
7     Q. Go ahead.
8     A. No. You go ahead.
9     Q. Did you see the Caucasian man get into --
10 get back into the vehicle?
11     MR. YAMIN: Objection. Form.
12 Mischaracterizes her foundation.
13     A. No.
14     Q. (Ms. Spence) Okay. You said that the
15 Caucasian man was in the car. From where you were
16 standing, could you see the Caucasian man in the car?
17     A. No. Because we too far to be able to see
18 him in the car. Because we at the corner, and we
19 can't quite see the man in the car but I can see the
20 two guys standing at the car.
21     Q. And from where you were standing, could you
22 see what they were doing at the car?
23     A. They was reaching over in the car.
24     Q. Okay. Could you see from where you were
25 standing what they were reaching -- what they -- what

Page 48

1 they -- what they were doing inside the car when they
2 were reaching in there?
3     A. No. No. No.
4     Q. After you saw them reaching in the car,
5 what happened next?
6     A. I seen them take off running around the
7 corner.
8     Q. All right. Did you ever see who -- did you
9 ever see a weapon that night?
10     A. No.
11     Q. Did you ever see a gun?
12     A. No.
13     Q. Did you see anyone shoot a gun that night?
14     A. No.
15     Q. Did you see -- did you see who -- did you
16 see if anyone was shot that night?
17     A. The man was shot, first of all. I didn't
18 see it, but I heard it.
19     Q. Did you see the man be -- did you see the
20 man after you heard the shot? Did you see the
21 man's -- the Caucasian man?
22     A. No. Because after hearing the shooting,
23 like I said, we all took off running. So therefore,
24 he had to have been done made it to his car.
25     Q. But you didn't see him go into the car; is

Page 49

1 that right?
2     A. No. Right. Right.
3     Q. So after the two men took off running, what
4 did you do?
5     A. I think we was just there at the pay phone
6 for a minute. I can't say who called the police or
7 not, but I know, like, that's when people started
8 coming outside.
9     Q. And so after people started coming outside,
10 what did you do?
11     A. I believe I was in the house at the time
12 because I was -- I was kinda shook up, you know.
13     Q. When you said that you were inside the
14 house, which house were you in?
15     A. 1212.
16     Q. And would this be your house on the second
17 floor?
18     A. Yes.
19     Q. When you got inside the house, what did you
20 do that night?
21     A. I can't remember.
22     Q. Okay. When you were inside the house, how
23 did you feel that night?
24     A. Scared. Not wanting to say anything to
25 nobody about it.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 50

1    Q.   Why didn't you want to say anything to
2  anyone about it?
3    A.   Because at that time, when we was coming
4  up, you know, if the guys or any of them did anything,
5  you say anything, consequences, you know.
6    Q.   When you say the guys, who are you
7  referring to?
8    A.   The gang that, you know, we lived around.
9  The Black P Stones.
10   THE COURT REPORTER:  The black what?
11   THE WITNESS:  Black P Stones.  That's what
12 they were called.
13   THE COURT REPORTER:  P?
14   THE WITNESS:  P Stones.
15   Q.   Are you saying Black, as in the color, and
16 P as the letter, then Stones?
17   A.   Yes.
18   Q.   And were you a part of the Black P Stones?
19   A.   No.
20   Q.   Were you part of any gang?
21   A.   No.
22   Q.   When you went into the house that night,
23 where was -- when you went into house that night, did
24 you ever talk to your sister about what you saw?
25   A.   I don't think she was in the house at the

Page 51

1  time.  I think she probably just stayed outside, or,
2  you know, I just -- I just don't remember where she
3  were at the time.
4    Q.   Did anything else happen that night after
5  you went inside the house?
6    MR. YAMIN:  Objection.  Form.
7    MR. GRILL:  Join.
8    A.   Well --
9    MR. YAMIN:  And foundation.
10   A.   -- after -- after so long, I heard -- well,
11 yeah.  I heard that the police had came and locked him
12 up, was saying that he did it, you know.
13   Q.   (Ms. Spence) When you say he, who are you
14 referring to?
15   A.   Meaning Shawn.  Shawn.
16   Q.   But just from looking at that night, did
17 you hear that night about Shawn getting locked up or
18 was that at a later time?
19   A.   It was -- it was that same night, I
20 believe.  Probably, like -- I'm guessing it was
21 just -- it was the same night probably -- probably
22 between the hours -- probably, like, maybe an hour or
23 so later.  Maybe two hours later, I guess.
24   Q.   At any point that night -- or at any point,
25 did you ever speak to the police?

Page 52

1    A.   I don't recall.
2    Q.   When you say that you heard that Shawn had
3  been locked up, how did you hear that?  Do you know
4  how you learned it?
5    A.   I think his sister, the family was talking
6  about it.  I heard through the family his sister, I
7  believe, auntie, you know, they say that --
8    Q.   When you --
9    A.   -- he was locked up.
10   Q.   When you heard that Shawn was locked up
11 from his sister, his aunt, did you say anything to
12 them about what you saw that night?
13   A.   If -- if I did, I probably -- no.  I don't
14 think I said anything.  I don't think I said anything.
15   Q.   All right.
16   MS. SPENCE:  Mr. Jakes, your phone is no
17 longer on mute.  Can you mute your phone.  Thank you.
18   Q.   (Ms. Spence) After -- sorry.  Ms. Harris,
19 do you know an individual back in 1991 who went by the
20 name of Snake?
21   A.   Yes.
22   Q.   All right.  How did you -- can you describe
23 what Snake looked like?
24   A.   Snake was tall.  He had a skin condition.
25   Q.   Okay.  And did you see him out that night?

Page 53

1    A.   I don't recall.
2    Q.   Back in 1991, did you know someone named
3  Tyrone Pitts?
4    A.   Yes.
5    Q.   Did you know anyone named Ronnie Sloan?
6    A.   Yes.
7    Q.   Did you see Tyrone Pitts out that night?
8    A.   No.
9    Q.   Sorry?
10   A.   No.
11   Q.   Did you see Ronnie Sloan out that night?
12   A.   No.
13   Q.   Back in 1991, did you know a guy by the
14 name of Thomas?
15   A.   Yes.
16   Q.   And do you know where Thomas lived back in
17 1991 or where he used to hang out?
18   A.   Well, they -- he used to hang out on True.
19 Him, Ronnie, Snake, all of them, you know, them, and,
20 you know, the other guys that they would hang with.
21 They would hang on the block True.
22   Q.   And can you describe Thomas?  Do you
23 remember what he looked like back in 1991?
24   A.   Thomas, he stood tall too, real tall, and
25 he was real, real dark.



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 54

1    Q.   When you say tall, about how tall would you
2 say he was?
3    A.   Like, he was every bit of six, 6', six
4 something.  He was -- he was very tall.  He was a tall
5 guy.
6    Q.   What kind of build would you say he had?
7    A.   He was slim.
8    Q.   After -- after you learned that Shawn had
9 been arrested for the shooting, did you ever talk to
10 Shawn?
11   A.   No.  I never heard from him again.
12   Q.   In recent times, in recent years, have you
13 had any contact with Shawn?
14   A.   I talked to him maybe once or twice
15 probably months ago.  Just seeing how he doing.
16   Q.   And -- okay.  Other than asking him how
17 he's doing, did you guys talk -- like, have you guys
18 had any conversation about what you saw that night?
19   A.   No.
20   Q.   Okay.
21   A.   It wasn't a conversation for us to have.
22   Q.   What do you mean?
23   A.   Because, I mean, he -- he wasn't -- he
24 didn't see anything.  I mean, I seen it.  So there
25 really wasn't a conversation to really have or him

Page 55

1 asking me anything, you know.  So we -- that
2 conversation never came up for us.  Just the fact that
3 he was locked up for it, and, you know, but we
4 really -- we really never even talked about
5 it.
6    Q.   And in the time that you talked to Shawn to
7 ask him how he's doing, did Shawn ever threaten you
8 about making statements about what you saw that night?
9    A.   No.
10   Q.   Did he ever pressure you to make statements
11 about what you saw that night?
12   A.   No.
13   Q.   Did anyone in -- did anyone in Shawn's
14 family reach out to you to pressure you to make
15 statements about what you saw that night?
16   A.   No.
17   Q.   Anyone in Shawn's family ever threatened
18 you?
19   A.   No.
20   Q.   Has anyone -- has Shawn ever offered to pay
21 you for any statements that you made about what you
22 saw that night?
23   A.   No.
24   Q.   Has anyone in Shawn's family ever offered
25 to pay you in exchange for making statements about

Page 56

1 what you saw that night?
2    A.   No.
3    Q.   Ms. Harris, did you, in 1991, know someone
4 who went by the name of Little A?
5    A.   Yes.
6    Q.   And on the night of the shooting, did you
7 see Little A that night?
8    A.   I can't remember.  I can't say.
9         MS. SPENCE:  Can we take a five minute
10 break, please?
11        MR. YAMIN:  Sure.
12        THE VIDEOGRAPHER:  We're now going off the
13 video record.  The time is 11:13 a.m.
14        (A short break was then taken.)
15        THE VIDEOGRAPHER:  We are back on the
16 record.  The time is 11:24.
17        Q.   (Ms. Spence) Ms. Harris, after you saw
18 Shawn run into the gangway, did you see Shawn at any
19 other point that -- did you see him again that night?
20   A.   No.
21        MS. SPENCE:  All right.  I don't have any
22 further questions.
23        MR. GRILL:  Give me one minute.
24             CROSS-EXAMINATION
25 QUESTIONS BY MR. GRILL:

Page 57

1    Q.   Okay.  Ma'am, my name is Andrew Grill.  I'm
2 one of the attorneys who represents the police
3 officers in this case.  Can you hear me okay?
4    A.   Yes.
5    Q.   So I'm going to ask you some questions.  If
6 at any point here, like, it becomes difficult to hear
7 me, or you don't understand something I said, just let
8 me know.  Okay.  Sometimes the video and audio
9 doesn't, you know, cooperate, I guess, for lack of a
10 better word.  Okay?  Got it?
11   A.   Yes.
12   Q.   Okay.  All right.  Now, before we get too
13 far into this.  I want to be clear about something.
14 Do you believe today that Shawn, you know, who's you
15 know, also known as Anthony Jakes, the plaintiff in
16 this case.  Do you believe that he is innocent of
17 killing the Caucasian man that you saw go into that
18 sub shop on the corner of 51st and Racine back in
19 September of 1991?
20   A.   Do I believe what?
21   Q.   Do you believe Shawn is innocent of killing
22 that man?
23   A.   Yes.
24   Q.   Okay.  And um, in light of your testimony
25 today, I -- I -- I understand that you believe that

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 58

1 he's innocent of that shooting.  The fact that you
2 believe that he couldn't have done that shooting
3 because you saw him run through the gangway in
4 between, I think, 1212 and 1214 towards the rear house
5 behind 1212 before the shooting happened, right?
6 That's why you believe that?
7     A.  Okay.  Can -- just say it -- say it again
8 without all the ofs and ahs.  I mean, make it clearer
9 to me where I can understand.
10    Q.  Okay.  Yeah.  You believe that Shawn could
11 not have done that shooting because you saw him go
12 into the alley be -- the gangway between 1212 and 1214
13 before the shooting happened, right?
14    A.  No.  I don't believe it, but I know he
15 didn't do it.
16    Q.  Okay.  So maybe you need to tell me then
17 why you believe specifically Shawn, Mr. Anthony Jakes,
18 did not or could not have shot the Caucasian man that
19 you saw go into the sub shop.
20    A.  Because that -- the two guys I saw was
21 neither one of them was not Shawn Jakes at all.
22    Q.  Okay.  So you knew for sure that those two
23 guys that you saw walk, or, I guess, turn the corner
24 off of Racine onto 51st Street, you saw them well
25 enough to know for sure that neither of them were

Page 59

1 Mr. Jakes; is that right?
2     A.  Correct.
3     Q.  And, in fact, you testified that back then
4 you actually knew who those two people were, you just
5 don't remember today who they were?
6     A.  Correct.
7     Q.  Okay.  Did you actually -- you were sitting
8 on your front porch when the shots were fired, right?
9     A.  Yes.
10    Q.  And -- and you were out there with Fred,
11 and Nikia, and Annette, right?
12    A.  Yeah.  And there was a few more of us so...
13    Q.  Yeah.  And -- and -- well, who else was out
14 there?
15    A.  I can't recall.
16    Q.  Okay.  I thought you said that's all I can
17 think of right now, but I -- I don't remember that you
18 testified that there were more people out there.
19        So are you saying that there are -- there
20 were more people than the four of you on the front
21 porch?
22        MS. SPENCE:  Objection.  Form.  Go ahead.
23    A.  It was several of us out there.
24    Q.  (Mr. Grill) Okay.  And the front porch that
25 you were sitting on -- here, actually this will be

Page 60

1 easier.
2        MR. GRILL:  Spence, if you could put that
3 photograph of the house, the exhibit you used up on
4 the screen again.  It's one of the two pictures from
5 Exhibit 1 that has the three people sitting on the
6 front porch.
7        MS. SPENCE:  One moment.  So I have 507 and
8 506, which one are you referring to?
9        MR. GRILL:  No, that's fine.
10       MS. SPENCE:  506?
11       MR. GRILL:  Yeah, the other one.
12       MS. SPENCE:  507.  This one?
13       MR. GRILL:  Yeah, that's the one.
14       MS. SPENCE:  Okay.
15    Q.  (Mr. Grill) All right.  So when you were
16 talking about the white car, is it this -- do you mean
17 this station wagon that's in this picture?
18    A.  Yes.
19    Q.  Okay.  Did you -- and your testimony was
20 that you were actually on your porch with all those
21 people at the time the shooting happened, right?
22    A.  I can't tell you who those people are
23 because I don't know, and I can't see faces.
24    Q.  No, that's not my question.  My question is
25 is you were on the porch, the front porch of one of

Page 61

1 these homes at the time the shooting happened, right?
2     A.  Yes.
3     Q.  Okay.  And which address, 1210 or 1212?
4     A.  Where the people is sitting at.
5     Q.  Hang on.  Hang on.  Which -- oh, so you
6 were on the porch in this photograph, the same porch
7 that the people -- the three people dressed in white
8 are sitting on, that's the porch you were on at the
9 time the shooting happened?
10    A.  Yes.
11    Q.  Okay.  So the shooting would have happened
12 directly in front of you; is that fair?
13       MS. SPENCE:  Objection.  Mischaracterizes
14 testimony.
15    A.  No, I can't -- No.  No.  No.
16    Q.  (Mr. Grill) Okay.  That station wagon --
17 well, after the shooting -- well, let me actually back
18 up here.
19       Did you ever see the person that went into
20 the sub shop, the Caucasian guy, actually exit the sub
21 shop?
22    A.  No.
23    Q.  Okay.  You saw the two guys that rounded
24 the corner.  And how close did they get to you?  Like,
25 what was the closest they ever got to you, those two

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 62

1  guys that you knew then but didn't -- but can't
2  remember who they are now?
3       A.   What you mean?  How close they...
4       Q.   Yeah.  How close -- yeah.  How close.  That
5  night when you think back to everything that happened
6  that night, what's the closest to you those two guys
7  ever got?
8       A.   Closest meaning?
9            MS. SPENCE:  Objection -- sorry.  Objection
10 to form.
11      Q.   (Mr. Grill) Yeah.  Did they get within five
12 feet of you?  Or did they -- did they -- did they
13 own -- did you -- or did they stop somewhere and the
14 closest they got to you is closer down to the sub
15 shop?  Did you only see them on the corner of 51st and
16 Racine?  You tell me how close they got to you that
17 night because --
18           MS. SPENCE:  Objection.  Form.
19      Q.   (Mr. Grill)  Because you told me --
20           MR. GRILL:  Hang on.
21           MS. SPENCE:  Let me -- let me object.
22           MR. GRILL:  I'm not done with my question.
23           MS. SPENCE:  You're talking over me.
24           MR. GRILL:  I'm not done with my question.
25 So don't talk over me.

Page 63

1            MS. SPENCE:  Okay.
2       Q.   (Mr. Grill) So did the -- did the two
3  people that you saw that you knew then, tell me now
4  how close to them -- the closest that night that they
5  ever got you to, how close was it?
6            MS. SPENCE:  Objection.  Form.  Go ahead.
7       A.   These two guys.  Me sitting on the porch
8  where I am, that's close enough to see who they are.
9       Q.   (Mr. Grill) Right.  That's not my question.
10 How close?  How many feet?
11      A.   I can't tell you no feet.
12      Q.   Huh?
13      A.   I can't tell you no feet.  I know they was
14 close enough -- if you look at the picture yourself,
15 and you see the people that's sitting on the porch and
16 the sub shop is right here, and you see these people
17 walk into there.  How close do you think that could be
18 for you?
19      Q.   Okay.  So did they ever get closer to you
20 than the sub shop?  Like you -- okay.  While you're
21 sitting on the porch.
22      A.   Why would they be coming to me?  Closer to
23 me closer for?  They not coming for me.  Or they just
24 coming to get them something to eat.
25      Q.   All right.  Just listen to my question.

Page 64

1       Q.   Okay.  So you're on the porch, right?  Right?
2       A.   Yes.  Yes.
3       Q.   And you don't leave the porch until the
4  shooting happens, right?
5       A.   Yes.
6       Q.   All right.  And you're on that porch that
7  was depicted in that --
8            MR. GRILL:  Let's put that picture back up,
9  if you wouldn't mind, Spence.  I didn't ask that it be
10 taken down.
11      Q.   (Mr. Grill) Okay.  So you're on that porch,
12 and that is 1210 West 51st Street, right, that porch
13 that those three people in white are on?
14      A.   Yes.
15      Q.   All right.  And then you see the sub shop
16 on the right-hand side of this picture, right?
17      A.   Yes.
18      Q.   Okay.  And you said you saw those two
19 people that you knew then that you believe shot the
20 Caucasian man that was in the sub shop, you saw those
21 two men by the submarine shop, right?
22      A.   Yes.
23      Q.   Where did you see them by the submarine
24 shop, was it by the door in that picture or was it
25 some other place?

Page 65

1       A.   I said I seen the two men walk up, go into
2  the submarine shop.  I never said I seen them standing
3  anywhere.  I seen them come -- come from where they
4  was coming from going to the submarine shop.
5       Q.   Got it.  Okay.  So you saw them go into
6  that door that's pictured, I guess, it's got a gate on
7  it in this photograph, but you saw them go in that
8  door before the shooting, right?
9       A.   Yes.
10      Q.   All right.  And did you ever see them come
11 back, those two guys come back out of that door that
12 night?
13      A.   I can't remember.
14      Q.   Okay.  And do you remember if those two
15 guys -- so -- okay.
16           So you see the people on the porch in this
17 photograph and you see the door.  And there's a house
18 in be -- that gray house.  I think that's 1208 West
19 51st Street, okay, pictured in Exhibit 1 here.
20           Those two guys that you saw go in the door.
21 Did you ever see them get closer to you than, you
22 know, you know, than the distance that is depicted in
23 this picture between the door and three people on the
24 porch?  Did they ever get closer to the porch?
25           MS. SPENCE:  Objection.  Form.  Asked and



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 66

1  answered. Go ahead.
2       A.   You asking the same question.
3       Q.   (Mr. Grill) Do you remember or did -- or
4  not?
5            MS. SPENCE: Objection. Asked and
6  answered. Go ahead.
7       A.   I said from me sitting on the porch where
8  I'm at, that's the closest I seen them get. I mean,
9  they have no reason to come up to us and say hi or any
10 of that. You asking the same question.
11      Q.   (Mr. Grill) Okay.
12      A.   But in a different form. So I can't tell
13 you how many feets, what you see from us -- from them
14 sitting on the porch and the sub shop, me seeing them
15 go in, that's the closest.
16      Q.   Okay. So -- all right. So that -- that
17 white -- the station wagon that you described earlier
18 as the white car, but you've now explained that that's
19 the station wagon that you were talking about that's
20 depicted in Exhibit 1 here. Do you recall whether
21 that car was parked on the sidewalk while you --
22 before the shooting while you were -- I shouldn't say
23 parked along side -- on the -- parked along the
24 sidewalk, parallel parked along the sidewalk before
25 the shooting happened?

Page 67

1       A.   Yes, that car was parked.
2            MS. SPENCE: Objection. Form.
3       Q.   (Mr. Grill) Right. That car would have
4  been parked, like, right in front of 1210, wouldn't
5  it?
6            MS. SPENCE: Objection. Form. And lack of
7  foundation.
8       A.   I can't tell you exactly where that car was
9  parked.
10           MR. GRILL: Okay. Let's put up the other
11 picture, Spence, if you would do that. The other
12 picture in Exhibit 1.
13           MS. SPENCE: 506?
14           MR. GRILL: Yes.
15      Q.   (Mr. Grill) Okay. So this -- you agree
16 this depicts the same area that was in the last
17 picture just from a different angle, right?
18      A.   No, that car was -- that station wagon was
19 alongside that red car. So...
20      Q.   Oh, okay. So it was, like, in the street,
21 like, directly next to the red car?
22      A.   Yes.
23      Q.   It wasn't in the space between the red car
24 and that other car behind it?
25      A.   I don't -- what other car?

Page 68

1            MS. SPENCE: Objection. Form.
2       A.   I only see two cars.
3            MR. GRILL: Okay. Let's go to the other
4  picture.
5            MS. SPENCE: 507.
6       Q.   (Mr. Grill) So you see this other little
7  red car?
8       A.   Okay. Yes.
9       Q.   So when you -- you had testified a moment
10 ago that this station wagon in this photograph was
11 parallel parked along the sidewalk before the
12 shooting, right?
13      A.   No. I did not.
14      Q.   Okay. Well, tell me where it was.
15      A.   The car was parked. I mean, it's basic
16 common sense. If this man is going into the shop to
17 get him something to eat, he will park his car.
18      Q.   So I'm just trying to get from your
19 recollection where before the shooting exactly this
20 station wagon was parked on 51st Street?
21      A.   I don't know. I'm not sure. I don't know
22 if it was in front of the sub shop, or it was parked
23 in front of that red car, or in between the other car
24 from the other picture that I seen.
25      Q.   Okay. And you don't recall the two guys

Page 69

1  exiting the store, right?
2       A.   Correct.
3       Q.   Do you remember where the -- did you see
4  the -- either of the two guys actually shoot the
5  Caucasian guy?
6       A.   Repeat that.
7       Q.   Did you see either of the two guys that you
8  saw actually shoot the Caucasian guy?
9       A.   No.
10      Q.   Okay. So after you -- when you heard the
11 gunshots, you didn't look over in the direction of
12 this -- this station wagon that's, you know, according
13 to this photograph, looks to be maybe a car length
14 away from that porch the three people were on that you
15 were sitting on?
16      A.   Repeat that.
17      Q.   When you heard the shots, are you telling
18 me that you did not look over -- well, let me rephrase
19 that.
20           When you heard the shots, did you look over
21 in the direction of the station wagon once you heard
22 the shots?
23      A.   No.
24      Q.   No, or, no, you don't remember?
25      A.   No, because we took off running. We didn't

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 70

1 know where it was coming from. So we just -- we right
2 there. So we just --
3     Q.   Right. See that's the part that's
4 confusing me because --
5     MS. SPENCE: Okay. Hold on. Andrew,
6 you're cutting her off. She said we are right there,
7 and then interrupted --
8     Q.   (Mr. Grill) Oh, you done? I thought you
9 were done with your answer. Continue, if you want.
10    A.   When we heard the shooting, sir.
11    Q.   Uh-huh.
12    A.   We didn't -- I didn't -- me, myself, I
13 didn't look back. I just took off running. We ran
14 through the gangway, and, you know, as I'm running,
15 I'm thinking in my mind, like, oh, what happened?
16 Where did that come from? Because it was so close to
17 us. So I'm kind of shook up. And then we end up
18 where we end up at the pay phone.
19    Q.   Uh-huh. Right. So -- so it's your
20 testimony that even though this shooting was so close
21 to you guys, you didn't -- well, let me ask you this.
22 When the shooting happened, where on this deck -- on
23 this porch were you sitting, if you can you tell me.
24 There's three people on there you can see. Maybe you
25 can use one of them to orient me and this record in a

Page 71

1 way that could explain where exactly you were on that
2 porch when the shooting -- when you heard the
3 gunshots.
4     A.   Sir, I can't tell you if I was sitting on
5 the porch or if I was standing up.
6     Q.   Okay.
7     A.   I know I was out there.
8     Q.   Okay. And do you remember what direction
9 you were facing when you heard the shots?
10    A.   No.
11    Q.   Okay. And did you talk to any -- after you
12 heard the -- after you guys got to the pay phone, for
13 example, did you talk to any of the people that ran to
14 the pay phone with you about --
15    MS. SPENCE: Objection.
16    Q.   -- whether any of them saw the shots
17 actually get fired?
18    A.   No --
19    Q.   Have you ever asked any of those people if
20 they saw who actually fired the gun?
21    A.   No.
22    Q.   The two people as you turn -- as they
23 turned off of Racine onto 51st Street, what drew your
24 attention to them?
25    MS. SPENCE: Objection. Form.

Page 72

1     Q.   (Mr. Grill) Well, you remember them. So
2 what drew your attention to them?
3     A.   Because we all sitting outside. We the
4 only kids that's out. We see this one car come up.
5 They come from around the corner. And like I said,
6 everybody -- they -- he come to get him something to
7 eat. They probably come getting something to eat.
8 They went in the restaurant. You couldn't help but to
9 see them.
10    Q.   Right. Was there something unusual about
11 them that makes you remember them? Like, remember
12 that, oh, there were these two guys that I saw walk
13 off 51st Street into the sub shop?
14    A.   No, not nothing unusual that -- that --
15 they from the neighborhood.
16    Q.   Okay. Did you say hi to them?
17    A.   No.
18    Q.   Well, you said you knew who they were. So
19 did you -- you didn't wave, or say, hi, how are you?
20    A.   No.
21    Q.   Anything like that?
22    A.   No.
23    Q.   All right. How old do you think these two
24 guys were?
25    A.   They were --

Page 73

1     MS. SPENCE: Objection. Form. Sorry.
2 Objection. Form. Calls for speculation.
3     Q.   (Mr. Grill) You knew them?
4     A.   No.
5     MS. SPENCE: Objection. Form. Lack of
6 foundation. Calls for speculation.
7     Q.   (Mr. Grill) Did you not know them? Did you
8 not know who these two people were then?
9     A.   Like I said, knowing them from the
10 neighborhood, them being around the neighborhood,
11 that's it. As far as knowing them, like, personally
12 and stuff like that, no, I didn't. No, I don't.
13    Q.   Did you know where either of these two
14 people lived in the neighborhood?
15    A.   No.
16    Q.   Where would you usually see these two
17 people in the neighborhood?
18    A.   They --
19    Q.   Either --
20    A.   They walked through the neighborhood period
21 and you -- you can't help but see them. I stay right
22 there on 51st Street. I -- we were all sitting out on
23 the front. So we see these different guys, and, you
24 know, and then they sit -- they be with our next door
25 neighbor. So, you know, just from knowing them

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 hanging out the places they hang out, and by me on my
2 front porch you can't help but to -- them saying each
3 other's names, and this, and that, and the other. But
4 I never personally conversated with none of them or
5 anything.
6     Q.  Do you know whether these two people -- or
7 did you believe that these two people were gang
8 members?
9     A.  They were, yes.
10     Q.  Black Stone gang members?
11     A.  Yes.
12     Q.  How do you know that?
13     A.  Because everyone was in a gang.
14     Q.  Well, is there any other reason that you
15 knew them to be Black Stone gang members?
16     A.  Any other reason, what you mean?
17     Q.  Any other reason other than that, according
18 to you, everybody was in a gang?
19     A.  I'm not -- I'm not getting it. They was in
20 a gang, that I know.
21     Q.  Right. So did you ever have a conversation
22 with either of these two people where one of them or
23 both of them told you, yes, I am indeed a Black Stone
24 gang member?
25     A.  No.

1     Q.  You testified that you're not a gang
2 member, right?
3     A.  Yes.
4     Q.  All right. So that means at least you in
5 the neighborhood were not a gang member. So -- so
6 clearly then everybody is not in the Black Stone gang.
7 So what other reasons do you have that you can tell me
8 about that lead you to say these people -- these two
9 people were actually in --
10     THE COURT REPORTER: Okay. These two
11 people --
12     MS. SPENCE: Objection. Form. Asked and
13 answered.
14     Q.  (Mr. Grill) Go ahead.
15     A.  I didn't even hear what you said, sir. You
16 have to speak up.
17     MR. GRILL: Please put the exhibit back up,
18 if you wouldn't mind.
19     MS. SPENCE: So here's the thing with me
20 sharing the -- I can't really see the screen when I'm
21 sharing. So are you still using the exhibit right now
22 because it's impeding my ability to follow.
23     MR. GRILL: I hear you. That's fine. You
24 can keep it down for now then.
25     MS. SPENCE: Okay.

1     Q.  (Mr. Grill) So again, is there any other
2 reason other than everybody in the neighborhood was in
3 a gang, was there any other reason other than that
4 that you believe these two people were Black Stone
5 gang members?
6     MS. SPENCE: Objection. Asked and
7 answered. Form. Go ahead.
8     A.  Answer that? I don't understand what he's
9 saying. I mean, what do you mean when you --
10     Q.  (Mr. Grill) Is there something about -- let
11 me ask it this way. Is there something about living
12 in that neighborhood around where this shooting
13 happened that causes everybody to be a gang member
14 according to you?
15     A.  I can't --
16     MS. SPENCE: Objection. Hold one second.
17 One second.
18     A.  I can't tell you that.
19     MS. SPENCE: Hold on. Objection. Lack of
20 foundation. Calls for speculation. Form. Go ahead.
21     Q.  (Mr. Grill) Go ahead.
22     A.  I can't tell you that. I mean, that
23 don't -- that don't even sound right.
24     Q.  Have you ever -- you said a minute ago that
25 you heard people say in the past -- you heard people

1 say these two guys names. Do you remember what those
2 names were?
3     A.  I never said that. I never said that.
4     Q.  Okay. Do you know what these guys -- when
5 you think back, do you know what these two guys' names
6 were?
7     A.  No.
8     Q.  All right. I guess we -- you would agree
9 that in 1991, after the shooting happened, because you
10 saw the two guys that were involved in the shooting,
11 you knew for sure that neither of them was Shawn,
12 right, Anthony Jakes?
13     A.  Correct.
14     Q.  That's fair?
15     MS. SPENCE: Objection. Form.
16     Q.  (Mr. Grill) Did you see anybody else with
17 these two guys?
18     A.  No.
19     Q.  All right. What was it about the Black
20 Stones that made you afraid to tell anybody about what
21 you saw that night?
22     MS. SPENCE: Objection. Mischaracterizes
23 the testimony. Lack of foundation. Go ahead.
24     A.  It was just the thing, you know. By me
25 being young, I'm not -- I just always stay to myself.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 78

1  And just from -- just hearing in the neighborhood, you
2  know, people don't snitch on each other.  So... And
3  then I wasn't being questioned or asked nothing about
4  it.  So I just put it to the back of my head and just
5  left it alone.  And once I found out Shawn went to
6  jail, I -- I just -- just didn't know what was going
7  on.
8       Q.   (Mr. Grill) But you knew -- okay.  You --
9  how long had you known Shawn as of September of 1991?
10      A.   I known Shawn for a while.
11      Q.   Well, what's a while?  Years or months?
12      A.   Years.  We grew up together.
13      Q.   Since you were little?
14      A.   Yeah.
15      Q.   How little?
16      A.   I can't remember.  Probably, like, I'd say
17 probably starting at the age of -- what I can
18 remember -- probably starting at the age of probably
19 being in maybe seventh grade, sixth grade.  Because we
20 all went to the same school together.  The same
21 elementary school, Libby, together.
22      Q.   Okay.
23      A.   And our parents knew each other.  So that
24 brought us around his family.
25      Q.   Okay.  You were neighbors.  You lived right

Page 79

1  next to each other basically, right?
2       A.   Yes.
3       Q.   Okay.  And would it be fair, did you care
4  about Mr. Jakes back in 1991?
5       A.   I consider him as my cousin.
6       Q.   You loved him?
7       A.   My cousin.
8       Q.   Yeah.  Not, like, romantically, but you
9  loved him like a family member?
10      A.   Yeah.  My cousin.  Yes.
11      Q.   And none of his -- his Aunt Bee, she wasn't
12 a gang member, right?
13      A.   No.
14      Q.   You loved her as well, right?
15      A.   Yes.
16      Q.   And Jakes' parents, Mr. Jakes'
17 parents, they weren't gang members, as far as you
18 knew, right?
19      A.   No.
20      MS. SPENCE:  Objection.  One second.
21 Objection.  Calls for speculation.  Go ahead.
22      Q.   (Mr. Grill) Right, they weren't?
23      A.   No.
24      MS. SPENCE:  Okay.  Same...
25      Q.   (Mr. Grill) Okay.  And what about any of

Page 80

1  his other cousins in the area, you knew all of them as
2  well too, right?
3       MS. SPENCE:  Objection.  Mischaracterizes
4  the testimony as to knowing all of his cousins.  Lack
5  of foundation.  Calls for --
6       Q.   (Mr. Grill) Cousins that lived in that home
7  around you on 51st Street, you knew them, right?
8       A.   Excuse me?
9       Q.   You know any other -- Mr. Jakes other
10 family members that lived --
11      A.   Who are you referring to?
12      Q.   Well, I'm asking you.  Did you know any of
13 his other family members other than his parents and
14 his grandma -- and his aunt, Aunt Bee, that lived in
15 the back house of 1212.  Did you know any other of
16 Mr. Jakes' family members?
17      A.   I knew his sister.  I knew his brother.
18      Q.   Uh-huh.  Who else?
19      A.   That stay with Aunt Bee, them his two
20 cousins, that's it.
21      Q.   Okay.  And you cared about all of them as
22 well the same way you cared about Mr. Jakes; is that
23 true?
24      A.   Yes.  Family.  Family.  Family.
25      Q.   And you don't want to see bad things happen

Page 81

1  to family, right?  Things that are unfair?
2       A.   Yes.
3       Q.   Right?
4       A.   Correct.
5       Q.   And it's your testimony today that you
6  never told any of these people what it was that you
7  knew about that night, right?
8       A.   I never told who?
9       Q.   Anybody in his family?
10      A.   I never got asked.
11      Q.   That's not my question.  You never told
12 anybody in --
13      A.   No.
14      Q.   -- Mr. Jakes' family that you saw who
15 actually shot Mr. Garcia is his name, the guy in the
16 white car.  You never told them that --
17      MS. SPENCE:  Objection.
18      Q.   -- did you?
19      MS. SPENCE:  Objection.  Mischaracterizes
20 testimony.  Form.  Go ahead.
21      Q.   (Mr. Spence) Right?
22      A.   I never -- his parents, auntie never asked
23 me anything about it.
24      Q.   Why would you need to be asked by one of
25 his family members who you loved as family to -- to

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 82

1  tell them that you knew or had information that proves
2  Mr. Jakes could not have killed Mr. Garcia?  Why would
3  you -- tell me now.  I'll give you the floor.  Why
4  would you need to be asked by one of them to tell them
5  that?
6       A.   First of all --
7            MS. SPENCE:  Objection.  Form.  Go ahead.
8       A.   First of all, I didn't even know that they
9  even got him for it.  What was the use of me even
10 telling his parents.  I didn't know that they had
11 Shawn Jakes for that.
12      Q.   (Mr. Grill) Okay.
13      A.   So what was...
14      Q.   Okay.  So when did you find out that
15 Mr. Jakes, as I -- I wrote down when you were
16 testifying, that you knew that he got locked up, is
17 the phrase you used, for this murder.  When did you
18 find out that the police had arrested Mr. Jakes?
19      A.   Probably, like, either later on that night
20 or maybe the next day.
21      Q.   And you knew that they had arrested him for
22 shooting the guy out in front of your house, right?
23           MS. SPENCE:  Objection.  Mischaracterizes
24 testimony.
25      A.   No, I did not know they arrested Shawn

Page 83

1  Jakes for shooting that guy at all.
2       Q.   (Mr. Grill) Okay.  When did you find out
3  that he had been arrested for being involved in
4  shooting the guy out in front of your house?
5       A.   Excuse me?
6            MS. SPENCE:  Objection.  Lack of
7  foundation.
8       Q.   (Mr. Grill) When did you find out that
9  Mr. Jakes had been arrested for being involved with
10 shooting the guy out in front of your house?
11      A.   I'm not sure.
12      Q.   Was it within a week after the shooting?
13      A.   I'm not sure.  I just know I knew.
14      Q.   Okay.  Well, that's what I want you to tell
15 me.  Is when did you find that out?
16      A.   I don't know.
17           MS. SPENCE:  Objection.  Asked and
18 answered.
19      A.   I don't remember.
20      Q.   (Mr. Grill) Do you know that Mr. Jakes was
21 tried in a criminal court for -- for that shooting,
22 you know that right?
23      A.   No.
24      Q.   Okay.  Well, you know that he went to jail,
25 right?

Page 84

1       A.   Yes.  But not for this.
2       Q.   Okay.  So when did you move out of 1212
3  West 51st Street?
4       A.   I don't remember.
5       Q.   Was it in 1991?
6       A.   I don't remember.
7       Q.   Okay.  Was it in 1992?
8       A.   I don't remember.
9       Q.   Did you move out right, like, do you have a
10 recollection of moving out of 1212 West 51st Street
11 shortly after the shooting happened?
12      A.   I don't remember.
13      Q.   Okay.  In any of the -- you said that --
14 strike that question.
15           This was the -- this was a very scary thing
16 that happened, this shooting, right?
17      A.   I say it what?
18      Q.   That this was a very scary thing that
19 happened to you, witnessing this, or being so close to
20 this shooting, right?  You testified to that earlier
21 today, right?
22      A.   I said that it's -- it was scary to me.
23      Q.   Yeah.
24      A.   Not saying that I seen it, but it was kind
25 of scary because it was so close, and I didn't know

Page 85

1  what was going on.
2       Q.   Uh-huh.  And did you discuss the shooting
3  afterwards, say, in the three months after the --
4  following the shooting, do you have a recollection of
5  discussing the shooting, or it -- or just it -- or
6  just it being talked about in your presence with any
7  of Mr. Jakes' family members that lived right around
8  you on 51st Street?
9       A.   No.
10           MS. SPENCE:  Objection.  Asked and
11 answered.
12      Q.   (Mr. Grill) Okay.  So after that -- prior
13 to September 15th, 1991, how often would you see
14 Mr. Jakes, was it, like, basically every day?
15      A.   Yes.
16      Q.   And then after September 16th really, you
17 never saw him again, right?
18      A.   No.
19      Q.   You ask anybody in Mr. Jakes
20 family, hey, where is Anthony?  Where's Shawn?
21      A.   I mean --
22      Q.   That I used to see every day?
23      A.   Just hearing that he was locked up.  You
24 know, that was -- that was an answer for itself.
25      Q.   Okay.  Right.  So Mr. Jakes, I'll represent



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 86

1  to you, was not tried for this homicide for a couple
2  of years after it happened.  He sat in jail until the
3  trial, and then he was found guilty and went to
4  prison.  Okay.
5          So after the shooting, he was arrested
6  basically the next day.  So you think back to that
7  time period.  The months following the shooting, did
8  you ask any of Mr. Jakes' family members where Shawn
9  is since before then you had seen him every day?
10         MS. SPENCE:  Objection.  Asked and
11 answered.  Go ahead.
12     A.   Knowing that he locked up, it was no reason
13 to ask where he at.
14     Q.   (Mr. Grill) Okay.  Okay.  So I guess
15 that's what I'm trying to figure out.  It would be --
16 sounds like, given the answer you just gave me, that
17 in the months following the shooting you knew that
18 Mr. Jakes had been locked up; is that fair?
19     A.   I knew that he got locked up.
20     Q.   In the months -- you mean --
21     A.   And --
22     Q.   -- in the months -- sorry.  Go ahead.
23     A.   And I never seen him again.
24     Q.   Right.  So I'm trying to pin down when
25 after the shooting it was that you knew Mr. Jakes had

Page 87

1  been locked up?
2      A.   I can't -- like I said --
3          MS. SPENCE:  Objection.
4      A.   I say and I will say again.
5          MS. SPENCE:  Hold on.  Hold on.  Let me
6  just object.
7          THE WITNESS:  Yes, ma'am.
8          MS. SPENCE:  And then you can answer.
9  Objection.  Asked and answered multiple times.  Go
10 ahead, Ms. Harris.
11     A.   I said -- repeat the question again.
12     Q.   (Mr. Grill) I'll ask it to you more
13 directly.  In light of the testimony that you gave
14 just a moment ago, would you agree that although you
15 don't know the date when you found out, but that you
16 knew the months following his arrest, so let's say the
17 three months -- within that three months following the
18 shooting, you knew that Mr. Jakes had been locked up.
19 Would you agree with that?
20         MS. SPENCE:  Objection.  Asked and
21 answered.
22     A.   When I knew that he was locked up, it was
23 some hours after or either that next day, that's the
24 answer to your question.
25     Q.   (Mr. Grill) Okay.  Great.  Now -- and you

Page 88

1  knew within the hours of the next day that Mr. Jakes
2  had been locked up specifically because of the
3  shooting that happened the night or night of
4  September 15th, 1991.  That's fair, right?
5      A.   No.
6          MS. SPENCE:  Objection.  Mischaracterizes
7  the testimony.
8      Q.   (Mr. Grill) Okay.
9          MS. SPENCE:  Form.  Go ahead.  Lack of
10 foundation.  Go ahead.
11     A.   No.
12     Q.   (Mr. Grill) Okay.  What did you understand
13 Mr. Jakes had been locked up for in the day or so,
14 hours or days after the shooting?
15     A.   Hours or day.  Okay.  First of all, let's
16 get this straight.  When he got locked up, I thought
17 he got locked up from throwing the rocks and bottles
18 at somebody's car.
19     Q.   Okay.
20     A.   That's what I thought it was for.  Not
21 knowing that he was picked up for this thing right
22 here.  This murder.
23     Q.   Okay.  All right.  So when months or years
24 started passing, still hadn't seen Mr. Jakes, do you
25 recall that your assumption about why Mr. Jakes had

Page 89

1  been locked up changed?
2          MS. SPENCE:  Can you re-ask that?  I'm
3  sorry.  I didn't -- I missed part of the question.
4      Q.   (Mr. Grill) After months or years went by
5  without seeing Mr. Jakes, do you recall if your
6  assumption that he'd been locked up for throwing rocks
7  and bottles changed?
8      A.   What do you mean by after months and years?
9      Q.   Well, do you think --
10     A.   I'm not assuming anything.  It's what I
11 know.
12     Q.   You think people get locked up -- in your
13 mind, do you think that people get locked up for
14 months and years for throwing rocks and bottles at
15 cars?
16     A.   Listen.
17         MS. SPENCE:  Objection.  Form.  Calls for
18 speculation.
19     A.   A lot.  Shawn was a bad kid.  Okay.
20     Q.   (Mr. Grill) Was a bad kid?
21     A.   Yeah.  He threw a lot of rocks and bottles
22 at folks.
23         Now, as far as me not knowing, I mean, why
24 would I think that he would be no -- if -- if he
25 locked up for this, for throwing rocks and bottles?  I

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 90

1  don't know his history.
2       Q.    Okay.
3       A.    From being and doing a lot of stuff that he
4  doing because I'm not his parent.  But I thought that
5  he got locked -- and then after so many years, it just
6  went away, you know.  I don't -- hell, I don't know
7  what the hell he did.
8       Q.    Uh-huh.
9       A.    You know, he probably could have got in
10 trouble, more trouble.
11      Q.    Okay.  What type of trouble -- when you say
12 that he's a bad kid back then in 1991 --
13      A.    Shawn threw a lot of rocks and bottles at
14 people's cars, that's one of the main things he did,
15 and he would take off running.
16      Q.    Okay.  What else do you know that he did
17 that would cause you to describe him as a bad kid?
18      MS. SPENCE:  Objection.  Lack of
19 foundation.  Mischaracterizes testimony.  Go ahead.
20      A.    That's it.  That's it.
21      Q.    (Mr. Grill) Okay.  Do you know if Mr. Jakes
22 had ever been arrested for anything prior to the day
23 after the shooting, I guess?
24      A.    Excuse me?
25      Q.    Did you know, prior to this shooting, did

Page 91

1  you know if Mr. Jakes had ever been arrested for
2  anything?
3       A.    No, I don't.  I know he stayed in trouble a
4  lot.
5       Q.    How do you know that?  That's what I'm
6  trying to figure out.
7       A.    Because, I mean, we hung around each other.
8  I -- I always, you know, I mean, we like family.
9       Q.    Yeah.
10      A.    So that was just something just to know
11 that he was a bad kid.  He stayed in trouble with his
12 mom a lot.
13      Q.    Okay.  What about with his Aunt Bee, did he
14 get in trouble with her?
15      A.    No, not that I know of.
16      Q.    Okay.  When you think back some of the --
17 other than rocks and bottles, that he threw those at
18 cars, I guess, all the time, are there any other
19 things that you can remember that Mr. Jakes did that
20 would cause him to get into trouble?
21      MS. SPENCE:  Objection.  Asked and
22 answered.
23      A.    No.  No.
24      Q.    (Mr. Grill) Do you know if Mr. Jakes was a
25 Black Stone in 1991?

Page 92

1       THE COURT REPORTER:  A black what?
2       MR. GRILL:  Black Stone gang member.
3       Q.    (Mr. Grill) Do you know if he was?
4       A.    No.
5       Q.    No, he wasn't, or, no, you don't know?
6       A.    No, he wasn't.
7       Q.    How do you know that?
8       A.    We hung together.  Wasn't none of us in a
9  gang.
10      Q.    Okay.
11      A.    We lived around it.  We was in the midst of
12 it.  You know, all around us.  We knew who the people
13 were when we seen them.  Wasn't none of us in a gang.
14      Q.    Okay.  Do you know if Mr. Jakes had any
15 tattoos?
16      A.    Huh?
17      MS. SPENCE:  I'm sorry?
18      Q.    (Mr. Grill) Do you know if he has any
19 tattoos?
20      A.    No, I don't know.
21      Q.    Do you know if he had any tattoos in 1991?
22      A.    No.
23      Q.    Know if he had any gang tattoos in 1991?
24      A.    No.
25      MS. SPENCE:  Objection.

Page 93

1       A.    No.
2       Q.    (Mr. Grill) Do you know who Mr. Jakes'
3  friends were in 1991, like, who he hung out with?
4       A.    Us.
5       Q.    Who else?
6       A.    Me, Nikia, Fred, Adora, Rashon, Rah Rah,
7  you know, just us.  We all was neighbors.  Kids, kids
8  kids.  We all hung together.
9       Q.    Anybody else other than that that you can
10 think of that he was friends with?
11      MS. SPENCE:  Objection.  Form.
12      A.    No.
13      Q.    (Mr. Grill) Okay.  You talked about Little
14 A earlier today.  Let me go -- because I've written
15 down what you said.  I have some questions about that.
16      You testified that -- or you were asked by
17 Spence if you knew someone by the nickname of Little
18 A.  And you said -- in 1991, if you, knew somebody that
19 went by that nickname, and you said that you did.
20      The next question that Spence asked you was
21 if you could remember if you saw him that night, the
22 night of the shooting, and you said that you could
23 not.  What I need to know is:  How do you know
24 somebody by the nickname Little A in 1991?  Who was
25 that and how did you know that person?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 94

1     A.   He was one of the Black Stone gang members,
2  that's how I know him.
3     Q.   Okay.  Did you know what he looked like?
4     A.   Yeah.  I know what he looked like.
5     Q.   Okay.  What did he look like?
6     A.   He was the average black guy, low haircut.
7     Q.   Okay.  Were you friends with him?
8     A.   Nope.
9     Q.   Was he older or younger than you?
10    A.   He was much older than me.
11    Q.   Know where he lives?
12    A.   No.
13    Q.   How do you know that he was a Black Stone
14 member?
15    A.   They all were.
16    Q.   Okay.  Well, we've identified a lot people
17 here today that you say are not Black Stones.
18    A.   Listen, he is -- he was affiliated with
19 them and he was one also too.
20    Q.   Okay.  You're talking about Little A?
21    A.   Yes.
22    Q.   You know what Little A's real name was?
23    A.   No.
24    Q.   All right.  Do you know where he lives?
25    A.   No.

Page 95

1     Q.   Do you know if he held any rank in the
2  Black Stone gang?
3     A.   How would I know that?
4     Q.   I'm asking you if you know.
5     A.   People only know that if they affiliated
6  with it.  If they in it.
7     Q.   Okay.
8     A.   And I was not.
9     Q.   All right.  Was there something about
10 Little A -- well, let me ask you this:  How often do
11 you think you'd see him in 1991 on a weekly basis?
12    A.   Who?
13    Q.   Little A.  How often do you think you'd see
14 him?
15    A.   I don't know, probably, maybe every day.
16    Q.   Uh-huh.  All right.  Where would you see
17 him?  Was there like a --
18    A.   Just around the neighborhood.  Because if
19 kids, we come outside, we walk around the
20 neighborhood, you know, we might see him.  We might
21 not see him.
22    Q.   Uh-huh.  How tall is he do you think back
23 in 1991?
24    A.   He probably was like about maybe 5'7".  He
25 was taller than me and I'm 5'6".  So he was, like,

Page 96

1  taller than me.
2     Q.   What was his, like, build like?  Was he,
3  like, a thin guy, little guy?
4     A.   Little guy.  Just slim and regular average
5  build, you know.
6     Q.   All right.  Do you know if he was a -- had
7  a reputation in the neighborhood of being a bad guy?
8         MS. SPENCE:  Objection.  Calls for
9  speculation.  Go ahead.
10    A.   I -- I -- I don't know.
11    Q.   (Mr. Grill) All right.  Do you know if
12 Shawn knew Little A back in 1991?
13        MS. SPENCE:  Objection.  Speculation.
14    Q.   (Mr. Grill) Go ahead.
15    A.   Answer that?
16    Q.   Yeah.
17        MS. SPENCE:  Yeah.  Go ahead.
18    A.   Yeah.  Yeah, I believe Shawn knew Little A.
19 Everybody knew him.  Every -- every -- like, all of us
20 knew Little A, you know, so...
21    Q.   (Mr. Grill) Okay.  So see, that's what I'm
22 trying to figure out because you keep making these
23 generalizations, like, everybody knew him, or
24 everybody is in a gang.  I'm trying to figure out from
25 you what that's based on.

Page 97

1         So when you say everybody knew Little A,
2  tell me in your own words why everybody knew Little A
3  back in 1991?
4     A.   Reason why I say that is because it's
5  basically just like the common person that you would
6  see on a daily basis, and they calling out his name,
7  and you just recognize that's who the person is.
8     Q.   Got it.  So people --
9     A.   So when you see him again, you be like, oh,
10 okay, that's such and -- that's Little A, or that's
11 Shawn, or...
12    Q.   Got it.  And so you would see -- So if I'm
13 following you right, you would see Little A almost
14 every day or every week in the neighborhood, and when
15 you'd see him, people would just be calling out his
16 name, hey, Little A, or something to that effect; is
17 that right?
18    A.   No.  No.  No.
19    Q.   Tell me what I got wrong.
20    A.   Whoever sees him.  Sees him.  How they
21 speak to him, that's how they speak to him.  When I
22 see him, I just say to myself, that's who he is.  I
23 just recognize who he is.  I don't call out his name
24 or none of that because to me they were bad people.
25 They gang bang.  They fight.  They did this.  They did

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 98

1  that. You know, I didn't involve myself in that.
2      Q.  So the people that you saw Little A talking
3  to most of the time were, as you said, bad people that
4  you didn't want to associate with?
5      A.  No, I didn't say that.
6      MS. SPENCE:  Objection. Mischaracterizes
7  the testimony.
8      Q.  (Mr. Grill) What did you -- what do you
9  mean then?  When you say bad people, what -- how are
10 you connecting that to Little A?
11     A.  Bad people meaning people that sell drugs,
12 that fight, jumps on people, that run around the
13 neighborhood gang banging, and, you know, just doing a
14 whole bunch of bad things to other people. You know,
15 that's what I mean by bad, I mean...
16     Q.  Got it.  And are you saying that in your
17 experience in 1991, these were the types of people
18 that Little A was associated with?
19     MS. SPENCE:  Objection. Mischaracterizes
20 testimony.
21     A.  These people, what you mean these people?
22     Q.  (Mr. Grill) These people that sell drugs,
23 and fight people, and jump on people, and that are
24 gang banging?
25     A.  Everybody sold drugs. Everybody did

Page 99

1  something bad.
2      Q.  Okay. Did Mr. Jakes sell drugs?
3      A.  No.
4      MS. SPENCE:  Objection. Calls for
5  speculation.
6      Q.  (Mr. Grill) Okay. So these bad people that
7  you described. In your experience, were those the
8  types of people that you believed or saw Little A
9  typically associating with back in 1991 and before?
10     MS. SPENCE:  Objection. Form. Lack of
11 foundation. Go ahead. Go ahead.
12     A.  I don't understand. What are you trying to
13 say to me?
14     Q.  (Mr. Grill) I'm trying to understand what
15 you're saying. So I'm just asking you to answer the
16 question. Are these the people -- the types of
17 people, bad people who sell drugs, fight and stomp on
18 people in the neighborhood, and gang bang, are these
19 the types of people that you, in your mind, or in
20 your -- I should say in your experience you saw Little
21 A interacting with in the neighborhood?
22     A.  When I would see Little A, I would see him
23 walking around, you know, with his friends, his
24 partners. They'll sit on the porch smoking bud. They
25 drink. They do this. They do that.

Page 100

1      Q.  Okay. His friends and partners, did you
2  know who Little A's friends were?
3      A.  Well, he was friends with the guys stay
4  next door.
5      Q.  Okay. Who's that?
6      A.  Fred, he was friends with Fred's brother,
7  Day Day. He would come over there and sit on the
8  porch with him from time to time.
9      Q.  Okay. And is Fred a relation of Shawn's?
10 Are they related?
11     A.  No. We all --
12     MS. SPENCE:  Objection. Calls for
13 speculation.
14     A.  No. No.
15     Q.  (Mr. Grill) And Fred lived at what house?
16     A.  Fred stayed next door to me and Shawn.
17     Q.  So in 1214 or 1210?
18     A.  1210.
19     Q.  What floor?
20     A.  Second.
21     Q.  Okay. Who else were friends of Little A's,
22 to your knowledge?
23     A.  Look, I don't know all of them. Okay.
24 Now, we talking about one particular person. I don't
25 know a lot about him.

Page 101

1      Q.  About Little A?
2      A.  Yes. I don't know a lot about him. I know
3  I can't tell you who all his friends was and who he
4  ran with every day. I can't tell you that because I
5  don't know that. I didn't affiliate myself with him.
6  Didn't want to get in none of their business and
7  really didn't even care.
8      Q.  Right. And I don't -- I've never thought
9  here that you were friends with Little A. It sounded
10 to me in light of things that you were saying before
11 that you didn't associate, or as you stated, run with
12 Little A because you had some misgivings, some
13 concerns about the type of people that Little A, in
14 your mind, hung out with?
15     A.  Not in my mind. Not -- this is not in my
16 mind. Okay. This is just what I said. This is not
17 what I'm thinking and what I'm knowing something that
18 I said. And who he runs with, that has nothing to do
19 with me.
20     Q.  Okay. The people that he -- Little A runs
21 with, are those the bad people in the neighborhood
22 that are on drugs, and fight people, and gang bang,
23 that's what -- all I want to know?
24     MS. SPENCE:  Objection. Asked and
25 answered. Lacks foundation. Calls for speculation.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.   (Mr. Grill) Go ahead, ma'am.

2    A.   I don't -- I don't -- I don't remember.  I

3 don't know.  I even know what you -- where you even

4 getting at.

5    Q.   Okay.  So other than --

6    A.   It's just circles.

7    Q.   **Other than Fred, who were other friends of**

8 **Little A's that you --**

9    A.   I do not know.

10    Q.   **Okay.  You also said partners, what do you**

11 **mean by partners, friends and partners?  What -- what**

12 **do you mean by partners of Little A?**

13    A.   Partners.  How would you phrase partners?

14 Partners is somebody -- not a partner, but somebody

15 that you go and see every day, a friend, or I just

16 phrase it, put it in that phrase, that's all.  But

17 he -- he came next door to me.  Sat on the porch.

18    Q.   **Literally?**

19    A.   Yeah.  With Fred's brother, you know, and

20 that's what I would see them do.

21    Q.   **Okay.**

22    A.   It ain't no partners and friends but if

23 that's how you want to phrase it hell...

24    Q.   **I'm -- no, I'm intentionally using your**

25 **words.  So Fred's brother, what's his name?**

1    A.   His name is Day Day.

2    Q.   **Day Day.  D-A-Y, D-A-Y?**

3    A.   I guess that's how you would spell it.

4    Q.   **What's Day Day's real name?**

5    MS. SPENCE:  Objection.

6    A.   That's what I know.

7    MS. SPENCE:  Calls for -- sorry.

8 Objection.  Calls for speculation.

9    Q.   **(Mr. Grill) What's Fred's last name?**

10    A.   That's -- that's what I know.

11    Q.   **What is Fred's last name?**

12    A.   I don't know none of their first names.

13 Don't know none of their last names.  Only thing I

14 know is street names and what I hear, you know, that's

15 it.

16    Q.   **What is Fred's last name?**

17    MS. SPENCE:  Objection.  Asked and

18 answered.

19    A.   Fred is Fred.

20    MS. SPENCE:  Go ahead.

21    A.   That's what I know.

22    Q.   **(Mr. Grill) You don't know his last name?**

23    A.   No.

24    MS. SPENCE:  Objection.  Asked and

25 answered.

1    Q.   **(Mr. Grill) Okay.**

2    MS. SPENCE:  Andrew, can we take a break?

3    THE WITNESS:  Please.

4    MR. GRILL:  Off the record.

5    THE VIDEOGRAPHER:  Okay.  The time is

6 12:17 p.m. We are now going off the record.

7    (A short break was then taken.)

8    THE VIDEOGRAPHER:  We're back on the

9 record.  Time is 12:29 p.m.

10    Q.   **(Mr. Grill) Okay.  Can you hear me, ma'am,**

11 **still?**

12    A.   Yes.

13    Q.   **Okay.  Get a chance --**

14    MR. GRILL:  I just heard that the recording

15 stopped.  Anybody else hear that?

16    THE COURT REPORTER:  I heard that.

17    THE VIDEOGRAPHER:  Sorry about that.  It's

18 back on.

19    MR. GRILL:  Okay.  We're good to go?

20    THE VIDEOGRAPHER:  Yes.

21    MR. GRILL:  All right.  Thanks.

22    Q.   **(Mr. Grill) Ma'am, you got to have a little**

23 **break.  You good to keep going with this deposition?**

24    A.   Yes.  I'm -- I'm -- I'm good to go.

25    Q.   **Okay.  During the break, did you have a**

1 chance to talk with Spence, Mr. Jakes' attorney?

2    A.   No.

3    MS. SPENCE:  Objection to the form.

4    Q.   **(Mr. Grill) Have you -- you're not**

5 **represented today by Spence, correct?  Ma'am?**

6    A.   Huh?  I'm sorry.

7    Q.   **You're not represented by Spence or any**

8 **other attorney today, right?**

9    A.   No.  Correct.

10    Q.   **And did you -- were you sent any documents**

11 **or materials by anybody to review to prepare for the**

12 **deposition here today?**

13    A.   Yes.  Spence, she -- I talked with her.

14    Q.   **What did she say to you?**

15    A.   She just base -- pretty much just going

16 over everything about what's going to happen today,

17 and, you know, getting me set up for a ride.  Asking

18 me about what happened.  You know, what my memories

19 are and...

20    Q.   **Okay.  When did you talk to her?**

21    A.   She came by my house yesterday.

22    Q.   **Okay.  Your house in St. Louis?**

23    A.   Yes.  Yes.

24    Q.   **You know how Spence got down there?  She**

25 **drive, or did she fly down there, take the train?**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          MS. SPENCE:  Objection.  Calls for
2  speculation.
3          A.   No.  I do not know, but when she pulled up
4  in front of my house, she was very well in a car.
5          Q.   **Was she with anybody?**
6          A.   Yes.  She was with a gentleman.
7          Q.   **Do you know what his name was?**
8          A.   I can't remember.
9          Q.   **Was his name Russell?**
10         A.   Excuse me?
11         Q.   **Was his name Russell?**
12         A.   I can't remember.  I don't -- I can't
13  remember what his name was.
14         Q.   **What did he look like?**
15         A.   He's a dark gentleman.
16         Q.   **Oh, is he an African American guy?**
17         A.   Yes.
18         Q.   **Okay.  Do you know if he was an attorney?**
19         A.   I know he worked with Spence.
20         Q.   **Okay.  Did Spence introduce you to this**
21  **person?**
22         A.   Yes.
23         Q.   **Do you know -- did you have an**
24  **understanding as to why that person was there with**
25  **Spence?**

1          A.   Yes.
2          Q.   **And what was your understanding?**
3          A.   That they were there representing Shawn
4  Jakes and pretty much, you know, they wanted to figure
5  out what all that's going on.  Wanted to hear my side,
6  and, you know, and also to let me know that you guys
7  are going to be talking with me now.
8          Q.   **Uh-huh.  What did they say about me?**
9          A.   You mean.
10         Q.   **They said that?**
11         A.   No.  I'm just kidding.
12         Q.   **I don't believe you.**
13         A.   They said nothing bad.  Nothing bad.
14  Nothing bad.  Nothing -- nothing at all.
15         Q.   **Okay.  Well, it definitely sounds like they**
16  **were definitely talking about me.  So -- so sad.**
17             **Okay.  Did you know Spence was coming down**
18  **yesterday to your house in St. Louis?**
19         A.   Yes.
20         Q.   **All right.  She didn't, like, surprise you**
21  **all of a sudden, right?**
22         A.   No, she didn't.  She had text me.
23         Q.   **Okay.**
24         A.   And --
25         Q.   **She texted you right before?**

1          A.   Yeah.
2          Q.   **Okay.  Do you know how she got your phone**
3  **number?**
4          A.   I believe she got it through whoever --
5              MS. SPENCE:  Objection.  Sorry.  One
6  second.  Objection.  Calls for speculation.  Go ahead.
7          A.   Whoever these victim crime people are that
8  helps people.  I can't -- I can't -- I can't recall
9  their name, but she got -- well, no.  I gave it to
10  Shawn and Shawn gave it to her, that's how.
11         Q.   **How do you know --**
12         A.   Huh?
13         Q.   **How do you know that?  How do you know**
14  **that?  How do you know Shawn -- how do you know**
15  **Mr. Jakes gave your phone -- your cell phone number to**
16  **Ms. Spence?**
17         A.   Because he called me on Facebook one day
18  and he said that she would like to talk to me, was it
19  okay?  And I told him, yes, it was okay.
20         Q.   **Okay.  When did Shawn call you?  Was this,**
21  **like, on video chat or something else that he called**
22  **you on?**
23         A.   Yeah.  It was pretty much a video chat
24  because I don't have his direct number so...
25         Q.   **Okay.  How long ago was this video chat**

1  with Shawn?
2          A.   How long?  Excuse me?
3          Q.   **Yeah.  How long ago was this video chat on**
4  **Facebook that you had with Shawn where you gave him**
5  **your phone number to give to Spence?**
6          A.   I'm not -- I'm not sure.
7          Q.   **Like, more than a month ago or was it less**
8  **than that?**
9          A.   I'm not sure.
10         Q.   **All right.  Well, I need you to ballpark it**
11  **for me.**
12             MS. SPENCE:  No.  Objection.  Asked and
13  answered.
14         A.   I can't --
15             MS. SPENCE:  Go head.
16         A.   I can't because when I talked to them -- I
17  can't because I just know that I got a call from him.
18  And when I did talk to him -- okay.  When I -- as a
19  matter of fact, when I talked to Shawn that day, he
20  asked me was it okay if he can give Spence my number
21  and that she was going call me right away.  So she
22  called me right away.
23         Q.   **(Mr. Grill) Okay.  So, yeah, when was that?**
24             MS. SPENCE:  Objection.  Asked and
25  answered.


Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 110

1    A.  I can't remember.
2        MS. SPENCE:  Go ahead.
3    Q.  (Mr. Grill) Okay.  Was this the first time
4    that you talked to Spence on this call?
5        MS. SPENCE:  Which call?  Objection.
6    Q.  (Mr. Grill) The one that you're talking
7    about right now.
8    A.  The first time me talking to her --
9    Q.  Did she call you --
10   A.  No.
11       THE COURT REPORTER:  What was that?
12   Q.  (Mr. Grill) You said that she called you
13   right away after Shawn called her?
14   A.  Yeah, that was my first time talking with
15   her, speaking with her.
16   Q.  Okay.  And Spence called your cell phone or
17   did she contact you on Facebook too?
18   A.  She called my cell phone.
19   Q.  Okay.  How many times other -- how many
20   times total before today do you think you've talked to
21   Spence or any of the -- that represents Shawn?
22   A.  I mainly been talking to Spence.  So I
23   talked to her maybe once, twice, three, maybe three,
24   four times.
25   Q.  Three or four times?

Page 111

1    A.  Yeah.  I'll say three at the most.
2    Q.  Okay.
3    A.  And -- and she came to see me, you know.
4    It was based on her coming to see me and wanted to
5    just talk with me.
6    Q.  Okay.  And when -- how did she get, you
7    know, whatever materials we'll talk about that you
8    reviewed that she gave you, but when did she provide
9    you materials to review for the deposition today?
10   A.  She came and sat and talked with me.
11   Q.  Okay.  So it was yesterday --
12   A.  Yes.
13   Q.  -- when she gave you materials?  Got it.
14   And before then had she provided you or any of
15   Mr. Jakes' attorneys provided you with any materials
16   to review?
17   A.  No.
18   Q.  All right.  And what materials did Spence
19   and this African American guy that was with her review
20   with you?
21   A.  She basically got my statement on my
22   recollection on what I know.
23   Q.  Okay.  Right.  So my question is:  What
24   materials did you review?
25   A.  She showed me a picture or two, and, you

Page 112

1    know, it was just basically the pictures that we all
2    looking at.  And asked me do I remember anything, and,
3    you know, but that's it.
4    Q.  Okay.  So other than those two pictures any
5    other materials, documents, what have you that she
6    showed you and reviewed with you?
7    A.  No.
8    Q.  All right.  So those two pictures that she
9    showed here today, those -- that wasn't the first time
10   you'd seen them, right?
11   A.  Correct.
12   Q.  It wasn't a surprise to you when you saw
13   those pictures, right?
14   A.  It wasn't a surprise.  I mean, why you
15   would phrase that as a surprise?  It's just pictures.
16   Q.  Right.  That you'd seen before as recently
17   as yesterday?
18   A.  I never seen them before.  I never seen
19   those pictures at all.
20   Q.  You saw them yesterday?
21   A.  Well, I seen them yesterday for the first
22   time.
23   Q.  Right.  So when you saw them today, it
24   wasn't a surprise to see them, correct?
25   A.  Correct.

Page 113

1    Q.  Correct.  And the questions that Spence
2    asked you today about those pictures, were those
3    generally the same questions that she went over with
4    you yesterday to prepare you for the deposition today?
5    A.  Yes.
6    Q.  So the questions Spence asked you today
7    also were not surprising to you, you had gone through
8    those questions with Spence yesterday, right?
9        MS. SPENCE:  Objection.  Objection.  Form.
10   A.  See, first of all --
11       MS. SPENCE:  Lacks foundation.
12   A.  First of all, what questions are you
13   referring to?  You have to be specific --
14   Q.  (Mr. Grill) Okay.  The questions --
15   A.  -- you know.  And -- and based -- and it
16   wasn't she asking me any questions.  It was just that
17   she was talking to me.  You know, wanted to get a
18   outlook of what I know.
19   Q.  Uh-huh.
20   A.  So the questions that she's asking me,
21   these are the first time she asking me these
22   questions.
23   Q.  Uh-huh.  The types of questions that she
24   was asking you today, did they concern the same
25   information that you and -- let's say about those

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 photographs, same information that you and Spence were
2 talking about yesterday when --
3      A.   Excuse me?
4           MS. SPENCE:  Objection.  Form.
5      Q.   (Mr. Grill) The questions that Spence was
6 asking today, did they concern the same information
7 that you and Spence were talking about yesterday as it
8 pertained to those photographs?
9      A.   The questions that she asking me today are
10 the questions that she's asking in the photo, what do
11 I remember, or those are the questions that she's
12 asking me.  Not something that we already reviewed or
13 went over.
14     Q.   Uh-huh.  Did Spence ask you about the two
15 people that rounded the corner on 51st Street?
16     A.   Asking me -- I mean, what -- what -- what
17 was it that she was asking me about?  I mean, what --
18 what is your question?
19     Q.   When you met with Spence yesterday, did she
20 ask you about the two people that rounded the corner
21 that you say committed the shooting?
22     A.   I -- I don't -- I don't remember.  I
23 don't -- I don't remember because it came up.
24     Q.   Okay.  How did it come up?
25     A.   I don't -- maybe just me talking about it

1 trying to remember what I seen.  Remembering -- trying
2 to remember what I, you know, could remember, or
3 just -- or maybe just her asking the question, did I
4 see anyone else?  And the two people came up.  So...
5      Q.   Uh-huh.  Anything else?
6      A.   No.
7      Q.   Was Mr. Jakes part of the conversation?
8 Was he, like, on the phone, or was he there at all
9 when you were talking to Spence yesterday?
10     A.   No.
11     Q.   All right.  When did you -- did you talk
12 about with Spence, whether yesterday or in any of the
13 other two conversations or three that you've had with
14 Spence before today, any of those conversations have
15 you talked to her, or have you discussed with her the
16 circumstances surrounding Mr. Jakes' release from
17 prison?
18          MS. SPENCE:  Sorry.  Can we -- can someone
19 just read back the question, or Andrew if you want to
20 repeat it.  I got a little lost in the question.
21          MR. GRILL:  Yeah.  I'll just repeat it.
22     Q.   (Mr. Grill) On any of the conversations
23 that you've had with Spence before today, have you
24 ever discussed with her how it was that Mr. Jakes got
25 released from prison?

1      A.   No.
2      Q.   When did you first find out that Mr. Jakes
3 was released from prison?
4      A.   I think I found out seeing, like, seeing
5 his pictures on Facebook.
6      Q.   Okay.
7      A.   Or probably, like, just going through my
8 friend requests and seeing his name.
9      Q.   Okay.
10     A.   And sending him an invite.
11     Q.   Okay.
12     A.   But I never knew how long he's been out.  I
13 never knew...
14     Q.   All right.  When was, you know, when was
15 the last time that you talked to Mr. Jakes before
16 today?
17          MS. SPENCE:  Objection.  Objection.  I
18 don't -- mischaracterizes the testimony.  Lack of
19 foundation.
20          MR. GRILL:  The question has nothing to
21 do --
22          MS. SPENCE:  About before today, when did
23 she talk to him today?
24          MR. GRILL:  Before today, so that's --
25          MS. SPENCE:  Is she talking to him now?

1          MR. GRILL:  Spence, stop.  Listen to the
2 question.
3      Q.   (Mr. Grill) Ma'am, before today, okay, when
4 was the last time that you spoke with Mr. Jakes?
5          MS. SPENCE:  Right.  And so that's what I'm
6 objecting to because the implication is that she is
7 talking to him today.  They're having some type of
8 conversation.
9      Q.   (Mr. Grill) When was the last time that you
10 spoke to Mr. Jakes?
11     A.   I can't remember.
12     Q.   Have you spoken to Mr. Jakes since you
13 found out that he got out of jail?
14     A.   I've talked with him.
15     Q.   Okay.  So we know about the one time when
16 he contacted you on Facebook to get your phone number.
17 How many time other times than that do you think you
18 spoke with Mr. Jakes?
19     A.   I probably talked with him maybe two times
20 at the most, you know.  Just probably just twice.
21     Q.   The first time that he contacted you on
22 Facebook to ask for your phone number, was that the
23 first time that you had spoken to him since 1991?
24     A.   Was it -- repeat that.
25     Q.   The time that he contacted you on Facebook



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 118

1  to ask for your phone number to give to Spence, was
2  that the first time that you had spoke with Mr. Jakes
3  since 1991?
4      A.   No.
5      Q.   Okay.  So other than that conversation on
6  Facebook when he asked for your phone number, how many
7  other times before then that you had spoken with
8  Mr. Jakes?
9      A.   Twice.
10     Q.   Okay.  How long before then?  How much --
11 how long before the conversation on Facebook when he
12 asked for your phone number was it that you had these
13 other two conversations?
14     A.   Like, maybe months, months, months ago
15 because I'm not really a Facebook person.
16     Q.   Uh-huh.  Okay.  How did you know then that
17 he was going to contact you on Facebook?
18     A.   I didn't know.
19          MS. SPENCE:  Objection.  Sorry.  Objection.
20 Lacks foundation.
21     Q.   (Mr. Grill) Okay.
22          MS. SPENCE:  Mischaracterizes testimony.
23     Q.   (Mr. Grill) Like when somebody calls you on
24 Facebook, does, like, your computer ring like a
25 telephone to tell you somebody is trying to contact

Page 119

1  you there?
2      A.   Excuse me?
3      Q.   When somebody is trying to call -- you said
4  Mr. Jakes called you on Facebook, right?  Like a
5  telephone call.  It wasn't a text message.  He called
6  you on Facebook, right?
7      A.   It could have been both.  It could have
8  been him texting me first, or he just ring the phone
9  because most people they would text you first before
10 they'll just ring your phone.
11     Q.   That's what I'm asking.  Did he text you --
12     A.   It could have been both, sir.
13     Q.   Okay.  Do you remember?
14     A.   No.
15     Q.   All right.  Do you think you still have
16 these messages from -- if there were messages -- from
17 Mr. Jakes on your Facebook?
18     A.   I'm not sure.
19     Q.   Okay.  I'd ask if you do, don't erase them.
20 Okay?
21     A.   I don't have them so...
22     Q.   Well, how do you know you don't have them?
23     A.   Because I -- my phone has been dropped in
24 water and I had to get a new phone.  So I don't have
25 any of that.

Page 120

1      Q.   Okay.  Those messages on Facebook aren't
2  stored on your phone.  They're stored on the Cloud for
3  lack of a better word.  So if they are on your
4  Facebook account, I'd ask that you do not erase them.
5  Okay?
6      A.   Sure.
7      Q.   Now, that begs another question though.
8  Has Mr. Jakes texted you on your cell phone ever?
9      A.   What you mean text?  Because it's several
10 ways that a person can text you.  They can message you
11 by text or text your actual phone number.  So which
12 one are you talking?
13     Q.   Yes.  Did he text your actual -- has he
14 ever texted your actual phone number?
15     A.   No.
16     Q.   All right.  What is your phone carrier?
17     A.   I'm with Metro PCS.
18     Q.   Do you only have one phone?
19     A.   Yeah.
20     Q.   And what is the phone number for your Metro
21 PCS?
22     A.   314-565-6330.
23     Q.   How long have you had that phone number,
24 how many years?
25     A.   I've probably had it about a year.

Page 121

1      Q.   What was the number that you had before?
2      A.   I don't remember.
3      Q.   What was your carrier before then?
4      A.   Same person.
5      Q.   Metro PCS?
6      A.   Yep.
7      Q.   Okay.  How long did you meet with Spence
8  yesterday for?
9      A.   I think -- how long?
10     Q.   Yeah.
11     A.   She probably was there for about an hour.
12     Q.   Okay.  And on these other conversations
13 that you had with Spence, the other three or four of
14 them, or two or three of them actually, how many --
15 how long generally were each of those conversations?
16     A.   Before yesterday, just probably a --
17 probably a minute or so.  She basically just reaching
18 out to me letting me know who she were and that's it.
19 And -- and she reached out to me the second time and
20 let me know that I was being subpoenaed and...
21     Q.   Okay.  Right, right?
22     A.   That I -- and I was telling her that I'm
23 probably gonna have to take a day off work.
24     Q.   Okay.  Do you have an understanding of who
25 issued the subpoena for your deposition?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 122

1    A.  Yes.
2    Q.  Who -- what's your understanding?
3    A.  That I'm being subpoenaed by the courts.
4    Q.  Un-huh.
5    A.  On behalf of you guys.
6    Q.  I'm going to represent to you that Spence
7  on behalf of Mr. Jakes is the -- is who issued the
8  subpoena for your deposition, not me or any of the
9  defendants.  Okay?
10    A.  Okay.  That's fine.
11       MS. SPENCE:  I'm also going to object.  I
12  think that's an incomplete explanation of how a
13  subpoena works, or where the power for -- the subpoena
14  power comes from.  I don't -- I object to the
15  mischaracterization of the subpoena.
16       MR. GRILL:  Cool.
17    Q.  (Mr. Grill) All right.  So during your
18  meetings with Spence or any of Mr. Jakes' attorneys,
19  did anybody ever share any police reports?
20    A.  No.
21    Q.  Did anybody talk to you about what was
22  written in any of the police reports regarding the
23  criminal investigation into the homicide of Rafael
24  Garcia that Mr. Jakes was sent to jail for?
25       THE COURT REPORTER:  That Mr. Jakes was

Page 123

1  what?
2       MR. GRILL:  Sent to jail for.
3    A.  What's the question again?
4    Q.  Has anybody that -- any attorneys, you
5  know, that represent Mr. Jakes, have any of them ever
6  talked to you about what is written in any of the
7  police reports concerning the criminal investigation
8  into the Rafael Garcia homicide, which is the guy,
9  Caucasian guy that you saw get killed?
10    A.  No.
11    Q.  All right.  To this day do you have any
12  idea what's written in those police reports?
13    A.  No.
14    Q.  Did anybody show you or talk to you about
15  any of the testimony that anybody gave at the criminal
16  trial for Mr. Jakes?
17    A.  No.
18    Q.  Did anybody ever talk to you about what it
19  is that Mr. Jakes has testified to during the criminal
20  proceedings about what happened and what he was doing
21  the night Mr. Garcia was killed?
22    A.  No.
23    Q.  Do you know from any source whatsoever what
24  it is that Mr. Jakes said happened that night that
25  Mr. Garcia was shot?

Page 124

1    A.  No.
2    Q.  When Mr. Garcia was shot, did you ever
3  see -- strike that.
4       Do you know where the shooters were
5  standing relative to Mr. Garcia -- actually strike
6  that.
7       Do you know where Mr. Garcia was, where the
8  Caucasian guy was when he was shot?
9    A.  No.
10    Q.  Did you ever see him inside, other than
11  when you were at the pay phone, did you ever see him
12  get into his station wagon?
13    A.  No.
14       MS. SPENCE:  Objection.  Mischaracterizes
15  testimony.
16    Q.  (Mr. Grill) That's a question.
17    A.  No.
18       MS. SPENCE:  Well, you said other than when
19  you were at the pay phone, and she never testified
20  that she saw him get into the car when she was at the
21  pay phone.  So that's -- you baked in the assumption
22  about the testimony and that's my objection.
23    Q.  (Mr. Grill) When you were at the pay phone,
24  ma'am, you saw two people standing on the driver's
25  side of Mr. Garcia's station wagon, right?

Page 125

1    A.  Yes.
2    Q.  Okay.  And you said you saw those people
3  reaching into the station wagon, right?
4    A.  Yes.
5    Q.  Both of them reaching into the station
6  wagon?
7    A.  I believe it was both of them because they
8  both was standing right close to each other.  So, you
9  know, like I said, one was tall, one was kind of
10  short, and I seen them reaching over into the car.
11    Q.  Uh-huh.  Great.  And did you see anybody --
12  were these two people that you saw, were they the same
13  two people that you saw turn the corner from Racine
14  onto 51st Street?
15    A.  Yes.
16    Q.  And you saw these two people go into the
17  sub shop, right?
18    A.  Yes.
19    Q.  And then -- but you don't remember ever
20  seeing them come back out, right?
21    A.  I said that I seen them running around the
22  corner.
23    Q.  Before the shooting?
24    A.  After the shooting.  After -- I seen them
25  running.  After I seen them reaching into the car, I

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 126

1 seen them take off running around the corner. Because
2 by then -- by then, at that time, we standing at the
3 pay phone. So we can't help but to see them.
4    Q.   Right. Yeah. And these -- these are the
5 same two guys, right?
6    A.   Yeah.
7    Q.   That you saw --
8    A.   Yes.
9    Q.   -- walk up to the sub shop? Okay. And did
10 you see them take anything out of the -- when they
11 reached in, did you see them take anything out or pull
12 anything out of the car after they reached into the
13 car?
14    A.   No, I didn't.
15    Q.   All right. After you all heard the shots
16 and ran into the gangway, and into the alley, and then
17 the pay phone, how long do you think it took you to
18 run from the porch through the gangway to the alley
19 and to the pay phone?
20    A.   I'm not sure.
21    Q.   Well, it's not very far, right?
22    A.   No. It's not that far.
23    Q.   Okay. And your testimony is once you got
24 to that pay phone, you were -- these two guys were
25 still there rifling through or reaching through the

Page 127

1 driver's side window of the station wagon, right?
2         MS. SPENCE: Objection. Form.
3    A.   By the time we got to the pay phone so I --
4    Q.   They were still there, right?
5    A.   They -- they -- they reaching over into the
6 man's car.
7    Q.   Right. They were still there, right?
8    A.   Yes. Yes.
9    Q.   And, of course, you testified as to that
10 you were, like, really scared because somebody had
11 just been shot, right?
12    A.   Yes.
13         MS. SPENCE: Objection. Mischaracterizes
14 testimony.
15    Q.   (Mr. Grill) Okay. And you were on the
16 porch of 1210 when the shooting happened, right?
17    A.   I said I don't know if I standing on the
18 porch or I was sitting down but we was out there.
19    Q.   Yeah. Out in front of 1210, right?
20    A.   Yeah. Yes.
21    Q.   Why not run into 1210? Why go through the
22 gangway?
23    A.   Why not run through the gangway?
24    Q.   I'm asking you why you didn't go into 1210?
25    A.   Why would I --

Page 128

1    Q.   And then my next question is going to be if
2 you didn't go into 1210, why you didn't go into 1212?
3 So just let you think about that and then you can tell
4 me first why you didn't go into 1210.
5         MS. SPENCE: Objection. Form.
6    A.   First of all, I would say if -- if these
7 guys -- if I just heard this shooting, I'm not going
8 to run in the house. I'm going to run somewhere else
9 and hide.
10    Q.   (Mr. Grill) Why?
11    A.   Because if they see me run in my house and
12 they not probably even paying attention to who I am,
13 why would I run in my house and then therefore they
14 know where I stay.
15    Q.   Well, they -- you knew these people so...
16    A.   It don't matter if I knew them --
17         MS. SPENCE: Objection.
18    A.   -- or not but they don't know who I -- oh,
19 Lord.
20         MS. SPENCE: Objection. Mischaracterizes
21 testimony.
22    Q.   (Mr. Grill) I mean, is it your testimony
23 that if you ran in your house, they would know then
24 how to find you because you were a witness to the
25 murder? Is that what -- is that what you're saying?

Page 129

1    A.   No. You asked me --
2         MS. SPENCE: Objection.
3    A.   -- why didn't I not run in my house. Why
4 would I run in my house?
5    Q.   (Mr. Grill) That's what I'm asking. Why
6 would you --
7    A.   That's why I wouldn't run into my house.
8 Why would I run in my house?
9    Q.   Right. So it sounds like given the
10 objection and what you're saying, that you think I was
11 mischaracterizing what you said.
12         So tell me again why not run into your
13 house? Why not run into 1210?
14    A.   Put it like this. I just didn't run in the
15 house, that's it. I just didn't run in the house.
16    Q.   Why?
17    A.   No reason why I should have ran in the
18 house. I didn't have a reason to run in the house. I
19 just didn't run in the house.
20    Q.   All right. So do you think that being on
21 the street where the shooters or shooter can see you
22 is a safer place than going into your home and locking
23 the door behind you, maybe calling the police?
24    A.   Maybe, yes.
25    Q.   Okay. So why not go into 1210, the house

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 130

1  you actually lived in?
2      A.  Because I just didn't go into --
3          MR. SPENCE:  Objection.
4      A.  -- 1210.
5          MS. SPENCE:  Objection.  Sorry.
6      A.  That's why.
7          MS. SPENCE:  Listen.  Objection.
8  Mischaracterizes testimony.
9      A.  What the hell.  Okay.
10     Q.  (Mr. Grill) All right.
11     A.  Okay.  Go ahead.
12     Q.  All right.  And, you know, everybody that
13  you were with ran to the pay phone, nobody went inside
14  a house, right?
15         MS. SPENCE:  Objection.  Mischaracterizes
16  testimony.  Calls for speculation.
17     Q.  (Mr. Grill) Did I mischaracterize something
18  there?  Did somebody go inside one of the homes that
19  you were with?
20     A.  I don't remember if everybody went in the
21  house or not.  I know where I end up at.
22     Q.  Okay.  So let's go back to what I wrote
23  down, and what I thought you said and you tell me if I
24  got this wrong.  And this is a quote.  After the
25  shooting you said:  Then we heard the shooting and we

Page 131

1  all took off running.  Everyone that was on the front
2  porch with us.  We all ran through the same gangway
3  that Shawn ran through.  And then we went through the
4  alley, went to the pay phone in the parking lot of the
5  sub shop, that's, I believe, word for word what you
6  testified to here today.
7          So in light of that, you were there, you
8  have no recollection of any of these people that were
9  on the front porch with you, which at least includes
10  Fred, Nikia, Annette, and yourself, do you have a
11  recollection of these other three people going into
12  1210, or 1212, or any other home other than going to
13  the pay phone with you?
14         MS. SPENCE:  Objection.  Mischaracterizes
15  testimony.  Form.  Go ahead.
16     A.  First of all, they would not run into
17  neither one of our parents' house.  Wouldn't none of
18  us do that.
19     Q.  (Mr. Grill) What about Fred, he lives next
20  door.  He lives at 1210.
21     A.  What about him?
22     Q.  Well, did he not go to the pay phone or did
23  he go into 1210?
24     A.  I said Fred was standing at the pay phone
25  with us.  I thought I said that.

Page 132

1      Q.  Okay.  Yeah, that's what I thought.  Yeah,
2  that's what I thought.  You were saying -- I thought
3  you were saying that people would not have gone into
4  the homes, either 1210 or 1212 because they didn't
5  live there.  And so I was pointing out that, that's
6  not right.  Fred is --
7      A.  See, that's your assumption.  That's what
8  you want it to be.  I said we knew as kids that we
9  wouldn't run into our house.  Our parents' doors are
10  locked.  Okay.  We all on the porch.
11     Q.  Got it.  So now, okay, so let me get this
12  straight.  So that night after everybody got back from
13  their day, their long day, I think, as you described
14  it, you guys were all locked out of the house.  Is
15  that why you were --
16         MS. SPENCE:  Objection.  Mischaracterizes
17  testimony.
18     Q.  (Mr. Grill) I'm asking because that's what
19  you -- I thought you just said it?
20     A.  No, that's what you thought I said, that's
21  what you saying.  That's not what I said.  That's not
22  what I said.  Why don't you ask me questions straight
23  out.  Stop trying to say what you want it to be and
24  just let it be what it is.
25     Q.  Were you locked out of the house?

Page 133

1      A.  No.  I was not locked out of the house.
2      Q.  Okay.  Was the door to 1210 locked, if you
3  know, the front door, or any of the doors that would
4  let you get inside?
5          MS. SPENCE:  Objection.  Mis -- objection.
6  Speculation.
7      Q.  (Mr. Grill) If you know.
8          MS. SPENCE:  Go ahead, Ms. Harris, you can
9  answer.
10     A.  How would I know the door's locked if I
11  haven't been in the house?  Huh?
12     Q.  (Mr. Grill) I'm asking you, did you -- do
13  you know if the door was locked for 1210?
14     A.  It seems to me that you know this.
15     Q.  I don't.  I can tell you.
16     A.  Well, how would I know if the door's locked
17  if I never went in the house?  I knew not to go -- I
18  knew we -- I knew -- just knew I didn't run in the
19  house.
20     Q.  Okay.  So I think the house is you don't
21  know if the door to 1012 is locked; is that fair?  Is
22  that right?
23     A.  I don't know.
24     Q.  Okay.  But you did know that -- well, let
25  me ask you again.  Let me ask so that we're perfectly

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 134

1 clear. Was the door to your house at 1212 locked?
2      A.   I don't know.
3      Q.   Okay.  Did you have a key --
4      A.   No.
5      Q.   -- to your house?  Didn't have key to your
6 own house?
7      A.   No.
8      Q.   After you all got to the pay phone, how
9 long after you got to the pay phone was it, how much
10 time passed until those two guys that you saw on the
11 driver's side of the station wagon ran off?
12      A.   Say that again.
13      Q.   How long after you got to the pay phone was
14 it until the guys ran off, the two guys you say shot
15 Mr. Garcia?
16      A.   When we got to the pay phone, like I said,
17 I seen two guys reaching over into the car.  They
18 reached over, did what they did, and they was gone.
19      Q.   Okay.  What direction did they run?
20      A.   They ran towards the direction where the
21 Currency Exchange sits on the corner.  The opposite
22 side of the street of the restaurant.
23      Q.   So -- and I think you said that that
24 Currency Exchange was on the same side of the street
25 though as the sub shop?

Page 135

1      A.   No.  I never said that because this is
2 something that I know.
3      Q.   Okay.  So the Currency Exchange is on 51st
4 and Racine, right?  It's on one of those corners?
5      A.   Yeah.
6      Q.   Okay.  So which corner -- so which side of
7 51st Street is the Currency Exchange on, the same side
8 of the sub shop or the other side?
9      A.   If it's on Racine, and Racine runs this
10 way.  The sub shop is right here.  The Currency
11 Exchange is right here.  So they would be on the same
12 street.  But if we sitting on 51st on my porch, the
13 sub shop is right here next door, the Currency
14 Exchange is across the street.
15      Q.   Right.  So I'll just lay it out there.  The
16 reason I'm asking you this is because you guys are all
17 standing at that pay phone when these guys then run
18 off, and you're on the corner of 51st and Racine,
19 which means that they ran towards you; is that right?
20      A.   They ran across the street and around that
21 corner.
22      Q.   Okay.
23      A.   They never came up the street past that
24 restaurant.  They have never did none of that.  They
25 left at an angle where couldn't no, you know, and --

Page 136

1 and they shot around the corner.
2      Q.   Okay.  Did you have any concern that any of
3 these two guys recognized you?
4      A.   No.
5      Q.   You didn't have any concern?
6      A.   No.
7      Q.   Okay.  Why not when you go through the
8 gangway then go through, like, the back door so they
9 don't see which house that you go into?
10      A.   In the neighborhood we live in, we don't
11 leave doors unlocked.
12      Q.   Okay.  So the doors are all locked then, is
13 that what you're saying?
14      A.   Pretty much they are.
15      Q.   And that's why everybody is sitting outside
16 because nobody can get in, right?
17      MS. SPENCE:  Objection.  Lack of
18 foundation.
19      A.   Sir --
20      MS. SPENCE:  Calls for speculation.
21      A.   -- we are --
22      MS. SPENCE:  Go ahead.
23      A.   -- sitting outside because we are outside.
24 We wasn't ready to go in the house yet.
25      Q.   (Mr. Grill) Okay.  Who were you waiting for

Page 137

1 that night, at least at your home, who would you have
2 to wait for to be let into the house?
3      MS. SPENCE:  Objection.  Lack of
4 foundation.
5      A.   Who am I waiting for?  What?  Why would I
6 be waiting on someone to let me in?  How -- how does
7 that sound?  That don't sound right.
8      Q.   (Mr. Grill) Okay.  Do you have -- do you
9 have any doubts that you could have gotten into your
10 home that night if you needed to, as you were -- after
11 the shooting, as you're running away, if you needed to
12 get into your house at 1212, do you think you could
13 have got inside?
14      A.   Yes, I could of.
15      Q.   Okay.  And that is because why?  How would
16 you get inside?
17      A.   Knock on the door.  You get an answer.  You
18 gets in.
19      Q.   Who was home at your house at 1212 that
20 night inside the house when you're sitting outside
21 after -- right after the shooting happened?
22      A.   I believe my mom was there and --
23      Q.   Okay.
24      A.   I believe my mom.
25      Q.   And you have a back --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 138

1    A.   Huh?
2         Q.   You have a back door too of that house,
3    right?  So to go through the gangway, you could have
4    used the back door to your unit, right?
5    A.   Yes.
6         Q.   Could have gone up there and knocked on the
7    door, and if you didn't have a key, your mom could
8    have let you in, right?
9    A.   No.
10        Q.   No.  Why?
11   A.   You mean, I could have gone -- why would I
12   want to go through the back when I can go through the
13   front?
14        Q.   So they didn't -- so these guys that did
15   the shooting didn't know which house you lived in,
16   that's why.
17             So why not just go up the back door where
18   they can't see you and have your mom let you in the
19   door and call the police.  Why didn't you do that?
20   A.   I didn't want to do that.  I mean, why
21   would I want to go in the house seeing what I seen
22   right when they could see me?
23        Q.   Well, that's the point.  If you're in the
24   back, they can't see you.
25   A.   I didn't -- I didn't go in the house.  I

Page 139

1    just didn't go in the house right then and there.
2         Q.   You didn't go in the house --
3    A.   No.
4         Q.   -- you ran around to the corner so you
5    could get another look at these two guys; is that
6    right?
7    A.   It was --
8         MS. SPENCE:  Objection.  Sorry.  Objection.
9    Mischaracterizes the testimony.  Go ahead.
10   A.   It was not to get a look.  I didn't know
11   what was going to happen once we popped out of that
12   alley and at that pay phone.
13        Q.   (Mr. Grill) Right.  So that's a great
14   point.  So why run to that corner right on the other
15   side of where the shooting happened instead of, like,
16   I don't know, run westbound down the alley and get
17   totally away from where this shooting happens?  Why
18   did you circle back around basically right to where
19   this shooting happened and close enough where these
20   two guys basically double back on a diagonal across
21   the street, but definitely in your direction.  Why go
22   there instead of running just totally away from this
23   shooting?
24        MS. SPENCE:  Objection.  Asked --
25        Q.   (Mr. Grill) This is what I can't figure

Page 140

1    out.
2         MS. SPENCE:  Listen.  Objection.  Asked and
3    answered multiple times.
4    A.   I swear.
5         MS. SPENCE:  You've asked this question
6    multiple times --
7         Q.   (Mr. Grill) Okay.  I'll -- I'll --
8         MS. SPENCE:  You get the same answer every
9    time.
10        Q.   (Mr. Grill) I'll simplify it.
11             Why not run westbound down the alley after
12   you go through the gangway and get out of there
13   entirely?
14   A.   I say again when we heard the shooting,
15   that's where we ran down the alley and we ended up at
16   the pay phone.  Ain't no reason why I should have did
17   this, or why didn't I do that or...
18        Q.   Uh-huh.  You don't know, do you?
19   A.   What you mean, I don't know?  I just didn't
20   do it, that's what I know.  I ran to where I ran,
21   that's where I know.
22        Q.   Okay.
23   A.   And I didn't go right in the house at that
24   time, that's what I know.
25        Q.   After these two guys run off, you walk back

Page 141

1    down 51st Street to your house, right?
2    A.   I'm only right there a couple of foot.
3         Q.   Yes or no.  Is that what you did or not?
4    A.   Yes.  I went home.
5         Q.   Okay.  And to walk home you had to walk
6    right past that station wagon, right?
7    A.   Yeah.
8         Q.   Where this guy -- did you look in the
9    station wagon?
10   A.   I looked.
11        Q.   What did you see?
12   A.   I can't remember.
13        Q.   See a guy that was shot?
14   A.   I know it was the guy.
15        MS. SPENCE:  Objection.  Sorry.  Objection.
16   Sorry.  Go ahead.  I withdraw the objection.
17        Q.   (Mr. Grill) Did you see a guy that was
18   shot?
19   A.   It's not -- well, I put it like this.  The
20   guy -- I knew that guy was in that car, and I know
21   that he had been shot just from seeing what I seen.
22   Them guys reaching over, and then, you know, and them
23   taking off running.  Wasn't no one in the sub shop,
24   and I seen him go in there.
25        Q.   Uh-huh.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 142

1    A.   He pulled up in that car.
2    Q.   Uh-huh.  Did you see the guy in his car
3 that had been shot as you walked by?
4    A.   I probably didn't even look over in the car
5 because I was just, like, just real nerve wrack -- it
6 was scary, you know, just to see something like that.
7    Q.   See anybody -- did you see the guy laying
8 in the street?
9    A.   No.  I didn't see no one laying in the
10 streets.
11   Q.   Do you believe the doors to his car were
12 open or closed?
13   A.   I believe the doors was closed.
14   Q.   Did you see if -- why do you say that?  Why
15 do you believe that they were closed?
16   A.   Because -- the reason why I say that is
17 because if they reaching over into the car, the car is
18 not -- that door couldn't be -- that door is not open
19 at all if they reaching over into the car.
20   Q.   Okay.  You did see a body in the street?
21   A.   No.  I didn't see a body.
22   Q.   Okay.  Did you see if any of the windows on
23 the car were broken?
24   A.   Excuse me?
25   Q.   Did you see if any of the windows on the

Page 143

1 station wagon were broken as you're walking by?
2    A.   Broken?  No.  I didn't see no windows
3 broken.  Wasn't no glass shattered out on the ground
4 or none of that.
5    Q.   You didn't see -- like, are you saying
6 that -- that -- that none of the windows were broken,
7 like, you saw and that none of them were broken, is
8 that what you're saying?
9    A.   I didn't see any windows broken.
10   Q.   Okay.  Did you call the police?
11   A.   No, I did not.
12   Q.   Why?
13   A.   Because I didn't.
14   Q.   I know that you didn't.  I'm asking why,
15 the reason why?
16   A.   I didn't call the police.
17        MS. SPENCE:  Objection.  Asked and
18 answered.
19   A.   I didn't call the police.
20   Q.   (Mr. Grill) Do you know if that pay phone
21 that you were all standing next to on the corner of
22 51st and st Racine, do you know if you could have
23 called the police on that phone?
24   A.   I don't even know if that pay phone was
25 working right now today.

Page 144

1    Q.   Okay.  Well, it's not there today, but I'm
2 saying then it was there.  Could you have called --
3    A.   I don't know if the pay phone was working.
4        MS. SPENCE:  Objection.  Asked and
5 answered.
6    Q.   (Mr. Grill) Did you try?  Did you pick it
7 up to see if it worked?
8        MS. SPENCE:  Objection.  Asked and
9 answered.
10       MR. GRILL:  That's a different question.
11   Q.   (Mr. Grill) Did you pick up --
12       MS. SPENCE:  It's the same question because
13 you're asking her if she called anyone, and then
14 you're asking her if she's picking it up.  She said
15 she doesn't know whether or not the phone was working.
16       MR. GRILL:  Thanks for testifying for her,
17 but it's still a different question.
18   Q.   (Mr. Grill) Ma'am, did you pick up the pay
19 phone on the corner of 51st and Racine to see if it
20 worked so you could call the police?
21   A.   If I didn't know if the pay phone worked or
22 not.  I would have known if it worked or not if I
23 would have picked it up.
24   Q.   Right.  That's what I'm asking.  Did you
25 pick it up?

Page 145

1    A.   I don't know if the pay phone was working.
2 So I didn't pick it up.
3    Q.   Okay.  So my question still is:  Did you
4 pick up the pay phone --
5    A.   No.
6    Q.   -- to see if it worked?
7    A.   No.
8        MS. SPENCE:  Asked and answered.
9 Objection.
10   Q.   (Mr. Grill) Good.  That's all I wanted to
11 know.
12        So you walked past the station wagon where
13 a man has just been shot and killed.  Where do you go?
14 Do you go into your own home now or do you go
15 somewhere else?
16   A.   I go in my own home.
17   Q.   Okay.  And how do you go into your house?
18   A.   Through the front door.
19   Q.   And did you have to ring the doorbell or
20 knock on the door to get inside?
21   A.   I knock on the door to get in the house.
22   Q.   Who let you in?
23   A.   My mother.
24   Q.   All right.  Where is your mother today?
25   A.   At home.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 146

1    Q.   Okay.  In St. Louis with you?
2    A.   No.  She's in Minnesota.
3    Q.   Okay.  Remind me of what is your mother's
4  name?
5    A.   Idella Harris.
6    Q.   What's her address?
7    A.   I don't remember.
8    Q.   What's her phone number?
9    A.   I don't know.
10   Q.   When is the last time you talked to your
11 mom?
12   A.   This morning.
13   Q.   Talk to your mom a lot?
14   A.   Not really.
15   Q.   Okay.  Why don't you look on your phone
16 that you have with you and give me her phone number,
17 please.
18   A.   Her phone number?
19   Q.   So we can call her and ask her about what
20 you're telling me.
21   A.   (651) 354-1992.
22   Q.   Do you have an address in your phone for
23 your mom?
24   A.   Excuse me?
25   Q.   Do you have an address for your mother in

Page 147

1  your phone, is that also saved?
2    A.   I don't have an address.  I just told you
3  that.
4    Q.   What town does she live in?
5    A.   She stay in St. Paul.
6    Q.   Okay.  Does she live, like, near the
7  University of St. Thomas or something similar in that
8  area?
9    A.   I don't -- I don't -- I can't -- it's been
10 so long since I've been there so...
11   Q.   So up until the -- up to the point that
12 you've now walked past the murder scene and into your
13 house through the front door, at that -- up and to
14 that point, you had not seen Shawn since he had run
15 through the gangway between 1212 and 1214, right?
16   A.   Uh-huh.  Correct.
17   Q.   And it would it be fair to say that after
18 he ran through that gangway, you didn't see him again,
19 right?
20   A.   Right.  Correct.
21   Q.   So you don't know where he went after he
22 went through that gangway; is that fair?
23   A.   He went into his auntie house.
24   Q.   How do you know that?  Or are you guessing?
25 If you're guessing, that's fine.  I just want to know

Page 148

1  if you're guessing or if you know that for sure.  And
2  if you know for sure, how you know that.
3    A.   Because we -- we never use our back doors
4  to go into our houses.  And the only reason -- and --
5  and that's the way he ran.  And I knew he ran in the
6  house, in his auntie house.
7    Q.   Okay.  So are you guessing that he ran into
8  his auntie's house, or do you know for sure from some
9  source somehow --
10   A.   That's where Shawn was at, in his auntie
11 house.
12   Q.   How do you know that?
13   A.   Because that's where he ran to, in his
14 auntie house.
15   Q.   How -- yeah, I know.  How do you know that?
16 That's not answering --
17   A.   Because that's where he were.  I mean,
18 that's where the police came and got him from.  That's
19 where he was at.  I don't think anyone was at the
20 downstairs apartment at that time.
21   Q.   Okay.  That's still not answering my
22 question so I'm going to keep asking it.
23        How do you know that night, after Shawn, of
24 the night of the shooting, after Shawn went through
25 the gangway between 1212 and 1214, how do you know

Page 149

1  that he went to his Aunt Bee's house?
2    A.   Because when Shawn would get in trouble and
3  run, he would run into her house.
4    Q.   How do you know that that's where he went
5  that night?  Did you see him go 12 -- into his Aunt
6  Bee's house?  Let me just -- let's do it that way.
7        Did you see him go in the house?  Into Aunt
8  Bee's house?
9    A.   No.
10   Q.   Did you watch -- after you saw him go
11 through the alley, or the gangway after throwing
12 rocks, and bottles, and whatnot at cars, did you
13 follow him to the gangway to see he if actually indeed
14 went to Aunt Bee's house?
15   A.   No.  We didn't follow him.  No.  I didn't
16 follow him to the gangway.
17   Q.   Did you go and talk to Aunt Bee and say,
18 hey, did you -- did Shawn, after he threw those rocks
19 and bottles at the cars, did he come to your house?
20 Did you ask her anything like that?
21   A.   No.
22   Q.   Okay.  Did she tell you anything like that
23 at any point?
24   A.   No.
25   Q.   Okay.  So did anybody else tell you that



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 150

1 Shawn, after he threw the rocks and bottles at the
2 house went into Aunt Bee's house after going through
3 the gangway?
4      A.   I'm trying to see.  I -- I can't -- I can't
5 remember because I don't -- I can't remember.
6      Q.   You don't know, fair?  Right?
7           MS. SPENCE:  Objection.  Mischaracterizes
8 testimony.
9      Q.   (Mr. Grill) You don't know, right?
10     A.   I don't know what?
11     Q.   If Shawn went into Aunt Bee's house.
12 You're guessing.  You think he did but you don't know
13 for sure, right?
14     A.   I know that he was in there.
15     Q.   How do you know that?
16     A.   Because -- because -- just -- just because
17 Shawn was not outside.  Wasn't no one else outside.
18 Where else could he run to?
19     Q.   I don't know.  Down the alley.
20     A.   But listen, he just come from the alley
21 throwing rocks.
22     Q.   Uh-huh.  You see anybody chase him after he
23 threw rocks?
24     A.   Them people -- I heard some people, you
25 know, like, say something to him, you know, that

Page 151

1 scared him.  So that made him run.  Come around the
2 front way and ran through the gangway and went into
3 his Aunt Bee house.
4      Q.   My question was --
5      A.   It's just something -- it's just something,
6 you know, by -- by us all knowing where we all would
7 probably run to especially if we around our places,
8 that's where he would run to.
9      Q.   Okay.  So I want you to listen to my
10 question.  Did you ever see anybody chasing Shawn that
11 night?
12     A.   No.  I didn't see no one chasing him.
13     Q.   Right.  And it's your testimony that --
14 okay.
15          Let me -- let me be clear on something.
16 Where exactly, if you know, was Shawn when he was
17 throwing the rocks or bottles at cars that night?
18 Where was he -- where was he at when he was throwing
19 those things?
20     A.   Shawn was on Elizabeth.
21     Q.   So west down 51st Street of where you were
22 sitting on the porch, right?
23     A.   Uh-huh.
24     Q.   Elizabeth is the next north south street
25 west of 1210 West 51st Street, right?

Page 152

1      A.   West, east, north south.  He was on
2 Elizabeth.
3      Q.   Okay.  How do you know he was on Elizabeth?
4      A.   We all just come from around there, and we
5 all had walked ahead of him and he was dragging
6 behind.
7      Q.   Okay.  So were you all -- you and Shawn,
8 and, I guess, Fred, and Nikia, and Annette, were you
9 all walking together from somewhere --
10     A.   Yes.
11     Q.   -- together that night?
12     A.   Yeah.  Coming from over there on the other
13 block hanging out.  And so all of us stayed on 51st.
14 So that puts all us together in a group.  So we all
15 coming home.  And we just on our front until we just
16 get ready to go in the house.
17     Q.   All right.  Where were you all together
18 before that you were walking from back over to 51st
19 Street?
20     A.   Probably walking around the neighborhood.
21 Ain't no telling where specifically we was just
22 actually at standing in a spot because we never stayed
23 in one spot.
24     Q.   Okay.  How long were the group of you
25 including Shawn walking around together?

Page 153

1      A.   I can't remember.
2      Q.   And how -- well, okay.  And so was Quarter
3 Pounder -- do you know Quarter Pounder's real name by
4 any chance?
5      A.   No.
6      Q.   Okay.  I'll just call him Quarter Pounder
7 then.  Is Quarter Pounder, was he in this group with
8 you guys?
9      A.   No, he didn't hang.  He didn't run around
10 with us.  He was more, like, a homebody.
11     Q.   Okay.  Did he hang around with Shawn,
12 Mr. Jakes?
13     A.   No.
14          MS. SPENCE:  Objection.  Calls for
15 speculation.
16     Q.   (Mr. Grill) If you know, based on your
17 experience, did he hang around with Jakes?
18     A.   You know what, if -- if they did anything
19 together, like I said, we mostly all was family.  So
20 we would come over to each other houses, like, if we
21 cooking or something like that, you know, or if our
22 mom sent us over there, or, to get something from
23 them, you know, or something like that.  But Quarter
24 Pounder was mostly at home, and we would see him from
25 time to time when he come out on the porch.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 154

1    Q.   Okay.  And you're sure that he was not in
2  your group with Mr. Jakes walking back to 51st
3  Street --
4    A.   Yes.
5    Q.   -- right?  And do you have any belief at
6  all whether Quarter Pounder was with Mr. Jakes as he
7  was throwing rocks and bottles at cars that were going
8  by?
9    A.   No.
10   Q.   No, he was not?
11   A.   No, he was not with Mr. Jakes.
12   Q.   And how do you know that Mr. -- Quarter
13 Pounder was not with Mr. Jakes?
14   A.   Because Shawn was running by hisself.
15   Q.   Okay.  And now, I was talking about when
16 Mr. Jakes was throwing the rocks and bottles before he
17 started running.
18   A.   Quarter Pound was in the house.
19   Q.   Okay.  Now, you know how many -- how long
20 Mr. Jakes was throwing rocks and bottles for on
21 Elizabeth Street before he started running from one of
22 those cars?
23   A.   No.  It wasn't -- it couldn't have been --
24 just it was -- it was -- it was, like, from the time
25 that we made it to the alley, right.

Page 155

1    Q.   Yeah.
2    A.   From Elizabeth and we are makin' -- and
3  Shawn's right behind us.  We done walked around the
4  corner and made it pretty much to our front porch.
5  That's when we hear -- we see a car drive past and
6  turn the corner.  That's when we hear some rocks or
7  bottles.  So we hear somebody say, hey, or some stuff
8  like that, and Shawn take off running.
9    Q.   Okay.  Was there anything -- do you
10 remember anything distinguishing or unique about the
11 car that Shawn was throwing rocks or bottles at?
12   A.   No.
13   Q.   Do you remember what type car it was?
14   A.   No.
15   Q.   Have any, like, flags or anything hanging
16 from it?
17   A.   No.
18   Q.   Playing loud music?
19   A.   No.
20   Q.   Know how many people were in the car?
21   A.   No.
22   Q.   Do you know if the car stopped after Shawn
23 threw rocks and bottles at it?
24   A.   I believe it stopped because -- I think it
25 stopped, and then, I guess, once they seen him take

Page 156

1  off running, they just went on about their business.
2    Q.   Okay.  And did you see anybody get out of
3  that car and chase Mr. Jakes?
4    A.   No.
5    Q.   Did any of those people ever get out of the
6  car and come near 1210, walk up to 1210 West 51st
7  Street at any point?
8    A.   Get out of what car?
9    Q.   The car that he was throwing rocks and
10 bottles at, did any of those people, or person,
11 whoever was in that car, did anybody get out of that
12 car and walk up to 1210 West 51st Street?
13   A.   Shawn was nowhere near us when he was
14 throwing rocks at the car.  So how would they get out
15 the car and come walk up to us?
16   Q.   Well, you know, you guys are sitting there.
17 Maybe they got -- I'm thinking maybe they got out to
18 look for whoever it was that threw rocks and bottles
19 at their car.  Did anything like that happen?
20   A.   No.
21   Q.   What about in front of 1210, did anybody
22 walk up to 1210 looking for Shawn that got out of that
23 car that he was throwing rocks and bottles at?
24   A.   No.
25   Q.   Okay.  Hundred percent sure, like, no doubt

Page 157

1  in your mind nothing like that happened?
2    A.   No one got out the car, walked up to
3  neither one of those addresses.
4    Q.   All right.
5    A.   At all.
6    Q.   In fact -- in fact, it sounds like nobody
7  got out of that car at all, right, as far as you're
8  aware?
9    A.   You say --
10        MS. SPENCE:  Objection.  Speculation.
11   A.   You say did anyone get out looking for him
12 in front of 1210, no.
13   Q.   Okay.  Did anybody get out of that car?
14   A.   Shawn is not nowhere by us when he threw
15 rocks and bottles.  So how can it be from where he at
16 to where I'm at?  Somebody getting out the car and
17 looking for him or walking up to us?  How...
18   Q.   I mean, he ran through the gangway, you
19 know, basically.
20   A.   They don't know where this boy ran to.
21 They don't know where he ran to.
22   Q.   How do you know that?
23   A.   If they did, exactly what you said, they
24 would have came up to us and probably would have asked
25 us something.  So that's how I know.  They didn't see

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 158

1 where he ran to.
2      Q.    Was Shawn ever in a gangway between 1210
3 and 1212 throwing rocks and bottles at the cars?
4      A.    I don't know what time it was at all.
5      Q.    No.  Was -- sorry.
6      A.    Oh, the addresses.
7      Q.    Yeah.  Exactly.
8      A.    No, Shawn was -- I'm sorry.  Shawn, like I
9 said, Shawn was at the end of the alley right there in
10 that area.
11     Q.    At the end of 51st Street towards
12 Elizabeth -- on the corner of --
13     A.    Elizabeth.
14     Q.    Right?
15     A.    Yes.
16     Q.    Did you see him down at the end of 51st
17 Street on the corner throwing rocks and bottles?
18     A.    He wasn't at the corner.  He was just
19 coming past, like, coming up the street, the alley,
20 and you could just hear -- we -- the -- we came --
21 came on around the corner.  And we see a car turn the
22 corner.  Then next thing you know, we hear some rocks
23 being thrown at a car.  Bam.  Bam.  Then hear glass
24 break.  Boom.  Then Shawn just took off running.  Then
25 that's when he, you know, made it to the front of the

Page 159

1 house.  And we seen him run past us and go through the
2 gangway and ran up in his auntie house.  Because we --
3 I mean, he would have came back out.  He would have
4 popped back out.  That's how I know he was in Bee
5 house, his auntie house, because he didn't go in the
6 house.
7      Q.    Okay.
8      A.    He wasn't hiding nowhere back there in the
9 back because there's nowhere to hide.
10     Q.    Right.  So you know that -- are you now
11 saying that you know that Mr. Jakes -- how do you know
12 -- what are you saying now about how you know
13 Mr. Jakes was in his aunt's house?
14     A.    He couldn't have been nowhere else but in
15 Bee house.  And how I know that he was in Bee house is
16 because that's where he got picked up at and this and
17 that.  And never Shawn never came back outside.  I
18 never seen him again.
19     Q.    Right.
20     A.    Then I heard then after that -- because he
21 went right in immediately after that.  And then that's
22 when we heard the shooting.  So Shawn ain't nowhere
23 around to be found.  Shawn done got scared and ran in
24 the house.
25     Q.    Was the car that he was throwing rocks at,

Page 160

1 was it on -- when he -- when Shawn was throwing rocks,
2 was the car on 51st Street or was the car on
3 Elizabeth?
4      A.    It was on Elizabeth.  The car had turned
5 off 51st Street onto the block.
6      Q.    Okay.  So the car was headed west on 51st
7 Street, and then turned on Elizabeth, and that's where
8 Shawn was throwing rocks at it?
9      A.    On his way home.  Just some -- one little
10 bad little thing to do.
11     Q.    And you could hear the sounds of those
12 rocks --
13     A.    Yeah, you heard it.
14     Q.    -- all the way around the corner?
15     A.    You heard it.  It was just as clear as day.
16     Q.    Okay.  While you were sitting -- how long
17 do you think you were sitting on the porch at 1210
18 before the shooting happened?
19          MS. SPENCE:  Objection.  Calls for
20 speculation.  Go ahead.
21     A.    How long do I think I was sitting on the
22 porch?
23     Q.    Yeah.
24     A.    I'm not sure.  It was just for some time.
25     Q.    For --

Page 161

1      A.    We was just out there.
2      Q.    -- like, an hour or less?
3      A.    Huh?  Huh?
4      Q.    For, like, an hour or less than that?
5      A.    Probably an hour, maybe more, longer.
6      Q.    During that hour or maybe more that you
7 were sitting on the front porch, did anybody drive by
8 and throw a bottle or rocks through the window of 1210
9 West 51st Street specifically the second floor window,
10 front window?  Did anybody do that?
11     A.    No.
12     Q.    Do you know if that window was broken at
13 all?  Like, you know, whether that night or another
14 night, do you know if that window was broken --
15     A.    No.
16     Q.    -- on that date?  No, it wasn't, or no, you
17 don't know?
18     A.    I don't know if it was broken or not.
19     Q.    But nobody drove by and threw anything
20 through that window, right?
21     A.    Didn't I just say I don't know.  I don't
22 know if any...
23     Q.    Well, I don't know is different than no.
24 So did somebody drive by while you're sitting on the
25 porch for an hour or more and throw anything through

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 162

1 the second floor window --
2    A.   No.
3    Q.   -- of 1210?  Okay.
4    A.   I'm not sure.
5    Q.   What did you say?
6    A.   Nothing.
7    Q.   If you need a break.
8    A.   I'm listening to you.
9    Q.   If any of you -- if you want to take a
10 break, I've got to take care of my --
11   A.   No.  Come on.  No.  I'm fine.  I'm fine.
12 I'm going be all right.  I'm okay.  I'm okay.
13   Q.   Okay.  All right.
14        MS. SPENCE:  How much longer do you think
15 you have, Andrew?
16        MR. GRILL:  A while.
17   Q.   (Mr. Grill) So ma'am, oh, how many times
18 do you think you saw -- prior to the shooting -- do
19 you think you saw Little A talking to Fred's brother
20 next door?
21   A.   That day?
22   Q.   No.  Like, how often would Little A come
23 and talk to Fred's brother prior to the shooting?
24   A.   I have no idea.  I seen that man every once
25 in a while every blue moon.  I can't give you no

Page 163

1 specific day, no specific time.  I just would see him
2 in the neighborhood whenever I would see him.
3    Q.   When you say you don't want to be a snitch
4 in the neighborhood, if people in the neighborhood
5 found out that you were snitching by talking to the
6 police about, in this case, a murder, do you think
7 something bad could happen to you?  Like, the Black
8 Stones, for example, would do something to you?
9    A.   Probably so, yes.
10   Q.   Like, what could happen to you?
11   A.   I don't know.  Anything.  Could be
12 anything.
13   Q.   Including getting killed, right?
14   A.   I'm not going to say that because I don't
15 know.
16   Q.   I know you don't know.  I'm asking you to
17 speculate.  Is that something in your mind --
18   A.   I -- I don't want to speculate on nothing
19 like that.
20        MS. SPENCE:  Objection.
21   Q.   (Mr. Grill) Do you think --
22   A.   Because I don't know if they would come up
23 and just kill us.  I don't know that.  I'm not going
24 to say that.
25   Q.   Do you think good things would happen to

Page 164

1 you if the Black Stones found out that you were
2 talking to the police about a murder that one of their
3 gang members was suspected of committing?
4        MS. SPENCE:  Sorry.  Can you repeat the
5 question, Andrew.
6    Q.   (Mr. Grill) Do you think good things would
7 happen to you if the Black Stones in 1991 found out
8 that you were talking to the police about a murder
9 that one of -- that the police thought one of their
10 Black Stone gang members committed?  Do you think good
11 things would happen to you if they found that out?
12        MS. SPENCE:  Objection.  Calls for
13 speculation.  Go ahead.
14   A.   No.
15   Q.   (Mr. Grill) No, you don't think good things
16 would happen to you?
17   A.   (Witness nods.)
18   Q.   Is that -- is that what you mean by no?
19   A.   Yes.  Yes.
20   Q.   Okay.  You knew Arnold Day was a Black
21 Stone back then, right?
22   A.   Who?
23   Q.   Arnold -- sorry.  That's his real name.
24 Little A.  You knew Little A was a Black Stone back
25 then, right?

Page 165

1    A.   Yeah.
2        THE COURT REPORTER:  What was his -- what
3 was the official name you had used?
4        MR. GRILL:  Arnold, A-R-N-O-L-D, Day,
5 D-A-Y.
6    Q.   (Mr. Grill) You knew and so that concern,
7 that fear that you just described, you would have that
8 fear if you were talking to the police about Arnold
9 Day having been involved in that murder, right?
10   A.   Why would I be talking to the police about
11 him being involved into a murder when I don't even
12 know if it was -- when -- when -- I can't say it was
13 him.  I never said it was him.
14   Q.   That's not my question.  If you thought
15 Arnold Day was involved, you wouldn't want to say
16 anything to the police that it was him because you
17 would be afraid that the Black Stones might do
18 something to you because Arnold you knew was a Black
19 Stone, right?
20   A.   No.
21        MS. SPENCE:  Objection.  Calls for
22 speculation.  Sorry.  Objection.  Calls for
23 speculation.  Lack of foundation.
24   Q.   (Mr. Grill) Right?
25   A.   No.



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 166

1    Q.   You wouldn't be scared?
2    A.   Because first of all, where he was, I have
3  no idea.  Why would I want to fear a man that I don't
4  even know -- why would I want to fear a man about him
5  finding out that I supposedly talked to the police
6  about what happened?  Why should I fear him?  Why
7  should I be scared?
8    Q.   That's not my question.  My question was if
9  you thought that Arnold Day was involved in this
10  murder, you wouldn't want to tell the police that
11  because you knew Arnold Day was a Black Stone and
12  something bad could happen to you if you did that,
13  right?
14    A.   No.
15    MS. SPENCE:  Objection.
16    A.   It's not in --
17    MS. SPENCE:  Objection.  Wait a second.
18  Objection.  Calls for speculation.  Lacks foundation.
19  Go ahead.
20    Q.   (Mr. Grill) Right?
21    A.   No.  It's not if I would have thought
22  because if I -- if it was him, it was him.  It
23  wouldn't have been pretty -- not too much that I --
24  that I -- that I wouldn't have been scared of because
25  of the simple fact because when something like that

Page 167

1  happen, the police not suppose to tell what happened,
2  the person.
3    Q.   Okay.  I think you -- I think you've kind
4  of pointed it out.  So let me rephrase it.
5        If it was Arnold Day, would you tell the
6  police?  One of those two guys that you saw was Arnold
7  Day that killed Mr. Garcia, and you knew Arnold Day
8  was a Black Stone, would you tell the police?  Would
9  you talk to the police and --
10    MS. SPENCE:  Objection.
11    Q.   -- tell them that it was Arnold Day?
12    A.   I don't know --
13    MS. SPENCE:  Objection.  Calls for
14  speculation.
15    A.   No.  No.  No. No.  I don't know if one of
16  them guys was Arnold Day at all.
17    Q.   (Mr. Grill) Not my question.  If one of
18  them was Arnold Day, would you tell the police?
19    A.   Well, back then I did not know --
20    MS. SPENCE:  Objection.  Calls for
21  speculation.
22    A.   I can't say.  No.  Yeah.  That's too much.
23  No.  That's too much.
24    Q.   (Mr. Grill) Did you see the man that was
25  shot die in front of you?

Page 168

1    A.   No.
2    MS. SPENCE:  Objection.  Asked and
3  answered.
4    Q.   (Mr. Grill) If the police asked you that
5  night or any night afterwards he needs to know who
6  shot Mr. Garcia, would you tell them who it was?
7    MS. SPENCE:  Objection.  Calls for
8  speculation.
9    A.   I never talked to the police.  They
10  never --
11    Q.   (Mr. Grill) I know --
12    A.   -- asked me any questions.
13    Q.   -- I'm asking -- Okay.  We're going to talk
14  about that in a minute.
15        But just listen to my hypothetical.  Okay.
16  If the police did ask you something along the lines of
17  Denise, we know you saw the shooting, can you tell us
18  who it was that shot Mr. Garcia, and would you tell
19  them?  Considering the fact that you've already told
20  me that then you did know who these people were but
21  you knew they were Black Stones.  Would you have told
22  the police if they asked you?
23    MS. SPENCE:  Objection.  Calls for
24  speculation.
25    A.   No.

Page 169

1    Q.   (Mr. Grill) Why would you have not told the
2  police who it was?
3    A.   Again, I say I wouldn't want to say nothing
4  due to living in that -- due to living in that
5  neighborhood.  Ain't no telling, you know, if they got
6  out, what --
7    Q.   That's all --
8    A.   -- could happen.
9    Q.   That's all I wanted to know.  That's what I
10  thought.  Thank you for being honest.
11        After the shooting happened, do you
12  remember an ambulance showing up on scene?
13    A.   I don't remember.  I don't know.  I don't
14  even know.
15    Q.   Okay.  Do you remember police coming on
16  scene to investigate the murder?  I mean, this is
17  basically right outside your house.  Do you remember
18  seeing police personnel on scene after the shooting?
19    MS. SPENCE:  Objection.  Form.  Go ahead.
20    A.   Yes.
21    Q.   (Mr. Grill) Okay.  What do you remember
22  about it?
23    A.   Just I was in the house.  So just seeing
24  the police just outside.
25    Q.   Okay.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 170

1    A.   I remember looking out the window.  I never
2  came back outside so...
3    Q.   I presume you were afraid to go out and
4  talk to the police about what you knew because you
5  were afraid somebody seeing you talking to the police
6  that might think you're snitching on them, right?
7         MS. SPENCE:  Objection.  Form.  Calls for
8  speculation.
9    A.   I didn't go out and talk to the police
10  because it was nothing I really could tell them.
11    Q.   (Mr. Grill) You don't think that they would
12  have wanted to know that you knew who you saw who shot
13  Mr. Garcia and you also in 1991 knew who they were?
14         MS. SPENCE:  Objection.  Mischaracterizes
15  testimony.
16    Q.   (Mr. Grill) You don't think the police
17  would want to know that?
18    A.   Well, obviously, they didn't come and knock
19  on my door and ask us any questions.
20    Q.   Why would they know to knock on your door?
21    A.   They just -- they just did what they did.
22    Q.   All right.  Okay.
23    A.   They didn't come knock on our doors and ask
24  us anything.
25    Q.   You would agree though that you had

Page 171

1  information that you would reasonably believe they
2  would want to know about, assuming you'd talk to them,
3  that they would want to know what you knew, right?
4         MS. SPENCE:  Objection.  Calls for
5  speculation.
6    A.   No, I don't agree.  Because they -- like I
7  said, they didn't come knock on the door and ask us
8  anything.
9    Q.   (Mr. Grill) Why do you think -- how do you
10  think the police would have known to come knock on
11  your door that night?
12         MS. SPENCE:  Objection.  Calls for
13  speculation as to what the police were thinking.
14    A.   If they wanted to know what happened, they
15  would have came and knocked door to door and asked
16  questions.  Simple as that.
17    Q.   (Mr. Grill) Okay.  Did you ever talk to the
18  police that night at all?
19    A.   No.
20    Q.   Did you talk to the police at any time that
21  night?
22    A.   No.  I don't -- no.
23    Q.   How about in any of the months following
24  the shooting, did you ever talk to the police?
25    A.   No.

Page 172

1    Q.   In 1991, in September, you were 15 years
2  old, right?
3    A.   Yes.
4    Q.   And you lived, as we said, at 1212 West
5  51st Street on the second floor, right?
6    A.   Yes.
7    Q.   And your phone number was 268-4156, right?
8    A.   I don't remember that.
9    Q.   Okay.  So here, I'm going to show you
10  something.  Can you see this?  See this right here?
11    A.   Uh-huh.
12    Q.   Do you see your name right here, Denise
13  Harris?
14    A.   Yeah.
15    Q.   Okay.  So I'm going to represent to you
16  this is a page of a police report that the detectives
17  who investigated Mr. Garcia's homicide wrote up to
18  document some of the investigation that they did when
19  they were trying to figure out who shot and killed
20  Mr. Garcia, and they say that you were one of the
21  people that they spoke with.
22         And you see here on this page this name,
23  there's your name, age, and where you live.  Does that
24  refresh your recollection at all?
25    A.   No, it do not.  They said I was one of the

Page 173

1  people that what?
2    Q.   That they -- that they interviewed when
3  they went door to door knocking on doors asking people
4  what happened.
5         So I'm showing you this because I'm
6  wondering if you -- if this helps refresh your memory
7  that maybe you did talk to the police somehow that
8  night or close in time thereafter?
9    A.   I don't remember that.  Because just myself
10  being on there and so I'm guessing they talked to all
11  them people that's on that list.  Because half of them
12  people -- them people -- some of them people don't
13  even stay nowhere around us.
14    Q.   Okay.  Well, did you see them talking to
15  Annette?
16    A.   No.  I don't even remember talking to them.
17    Q.   Well, I'm saying, did you see them talking
18  to --
19    A.   No.
20    Q.   Did Annette ever tell you she talked to the
21  police?
22    A.   No.
23    Q.   Ronnie Sloan.  They got him as Swan here,
24  but it's Sloan, I think.  Maybe it's Swan.  Lives at
25  1246 West 51st Street.  Did you ever see the police

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 174

1 talking to him that night?

2           MS. SPENCE: Objection. Lack of

3 foundation.

4     Q. (Mr. Grill) Did you see them talking to

5 Ronnie that night?

6     A. No.

7     Q. All right. Do you have any idea where it

8 was -- where -- how the police could have gotten your

9 name, and your age, and your address, and the floor

10 that you lived on, and maybe --

11           MS. SPENCE: Objection.

12     Q. -- your -- do you have any idea how they

13 could have got that information?

14     A. No, I do not.

15           MS. SPENCE: Objection. Calls for

16 speculation.

17     Q. (Mr. Grill) Okay. So what time did you go

18 to bed that night?

19     A. I don't recall. I don't remember.

20     Q. Okay. Do you know what time -- you know,

21 earlier today you testified that before this shooting,

22 you know, you, and Mr. Jakes, and Fred, and Annette,

23 and Nikia, people were walking around. You didn't

24 know for how long, but that you guys were walking

25 around before you wound up on the front porch of 1210.

Page 175

1 Do you know what time you left your house on

2 September 15th, 1991, to start walking around, I

3 guess, with that group of people that I just ticked

4 off?

5           MS. SPENCE: Objection. Form.

6     A. No.

7     Q. (Mr. Grill) Do you think it was like --

8     A. Because it's not that -- them the -- that's

9 the group of people I just -- I just end up with for

10 the whole day.

11     Q. Okay. Well, what time did you leave, if

12 you remember?

13     A. I don't remember.

14     Q. Do you remember where you started meeting?

15 Do you know if you left your house alone and then

16 started meeting those people somewhere else?

17     A. No.

18     Q. Okay. Do you remember whether you went to

19 anybody's home after you left your house but before

20 you got back and wound up on the porch at 1210?

21     A. No, not specifically going to someone home.

22 It's just the fact when I would come -- when I would

23 come outside and proceed onto one one (phonetic), we

24 would always go around the corner onto Elizabeth. See

25 who all outside. We never went into nobody -- really

Page 176

1 never went into anyone's house because everybody was

2 outside. So whoever we end up seeing or seeing

3 throughout the day, that's what we did. We just sit

4 and talk and chat with each other. Probably walk

5 around. Walk to the store. Maybe go to the park.

6 You know, different things like that. We only 15. So

7 it wasn't much that we was into.

8     Q. Right. How -- where is May Street in

9 relation to your house on 51st Street? Where is May?

10 How far away is it?

11     A. May is not that far. I don't know if

12 it's -- I don't know if it's -- I haven't been in

13 Chicago so long. I don't know if it's on --

14     Q. Well, let me -- this is what I want to

15 know. Was there somebody in 1991 that you knew that

16 lived over on May Street?

17     A. Maybe. It depends on who.

18     Q. Do you have any friends over there that you

19 would have, like, wanted to go and hang out with?

20     A. No, not -- not really. No.

21     Q. Would there be, like, a store, or a

22 favorite store or something that was over on May

23 Street near your house that you would hang out at?

24     A. No.

25     Q. Okay. Do you know who Everett Jones is?

Page 177

1     A. That's Shawn's cousin.

2     Q. All right. Do you talk to him, like, at

3 all in the last year?

4     A. No.

5     Q. Okay. Do you know -- have his phone

6 number?

7     A. No.

8     Q. You know if he has your phone number?

9     A. No.

10           MS. SPENCE: Objection. Calls for

11 speculation.

12     Q. (Mr. Grill) Is Mr. Jones older or younger

13 than you, if you know?

14           MS. SPENCE: Objection. Calls for

15 speculation.

16     Q. (Mr. Grill) If you know.

17     A. Mr. Jones would be older than me.

18     Q. You know by, like, how much older than you,

19 do you think?

20     A. No, I do not.

21           MS. SPENCE: Objection. Calls for

22 speculation.

23     Q. (Mr. Grill) Do you know where he lived in

24 1991?

25     A. Mr. Jones stayed in a house with Auntie

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 178

1  Bee.
2      Q.   Oh, in the rear house?
3      A.   Yes.
4      Q.   Do you know if he still lives there?
5      A.   I don't know if that place even still
6  standing.
7      Q.   Did he ever try to contact you in the last,
8  let's say, ten years?  Did he ever try to contact you
9  for any reason related to Mr. Jakes?
10     A.   No.
11     Q.   Okay.  Let me show you this.  You tell me
12 if this refreshes your recollection.  Do you see this?
13     A.   Yes.
14     Q.   This letter?
15     A.   I see it.
16     Q.   Okay.  So this is a letter that was sent to
17 Mr. Jones in 2004, and it was sent to the 1212 West
18 51st Street rear house, which is Aunt Bee's house.
19         MS. SPENCE:  Does this have Bates stamp
20 number, Andrew?
21         MR. GRILL:  Yeah, it does.  It's yours,
22 Plaintiff Jakes 1 -- 013237.
23     Q.   (Mr. Grill) So -- so Mr. Herres, who's an
24 assistant public defender.  I mean, he's, like, a
25 defense attorney and works for the government.  He

Page 179

1  sent Mr. Jones, Jakes' cousin, this letter, and he's
2  looking for you.  See this right here?  Says looking
3  for Annette, but you're not Annette.  So that's -- so
4  that's why I'm asking, like, does this refresh your
5  recollection?  Did Mr. Jones ever try to get a hold of
6  you about Mr. Jakes' case around 2004 or thereafter,
7  if you recall?
8      A.   Where this letter come from?
9      Q.   The public defender's office.
10     A.   I have no recollection of that.  No one
11 ever reached out to me.
12     Q.   To be even more specific, like, came from
13 Mr. Jakes' attorneys to me, but that's kind of neither
14 here nor there.
15         What I just want to know is, like, did
16 Mr. Jones -- do you have a recollection of Mr. Jones
17 ever trying to contact you after two-thousand and --
18 you know, from after December 23rd, 2004, about
19 Mr. Jakes' case, do you remember anything like that
20 happening?
21     A.   No.  I -- no.  I have not heard anything.
22 Nothing.
23     Q.   Where did you live in 2004?
24     A.   I stayed in St. Paul.  I mean, no.  I'm
25 sorry.  St. Louis.

Page 180

1      Q.   You were in St. Louis in 2004?
2      A.   Yeah.  Yes.
3      Q.   Did you know how to get a hold of
4  Mr. Jones, Mr. Everett Jones in 2004, if you needed to
5  reach him?
6      A.   No.  By that -- by that time, 2004, no, I'd
7  forgot all about them people.
8      Q.   Right.  No.  I mean, I'm just wondering if
9  you knew how to get a hold of him, I mean, he's Jakes'
10 cousin, right?
11     A.   No.
12     Q.   Family.  Okay.  So Mr. Jones, I guess,
13 testimony is you don't have any recollection of
14 Mr. Jones ever trying to contact you after
15 December 23rd, 2004; is that right?
16     A.   He never what?
17     Q.   You don't have any recollection of
18 Mr. Jones trying to contact you about Mr. Jakes or any
19 of his -- or his case or anything after December 23rd,
20 2004, through today?  You don't -- that never
21 happened, at least as far as you can remember, right?
22     A.   No.
23         MS. SPENCE:  All right.  Sorry.  Andrew,
24 really quick.  Can you give me the Bates stamp number
25 again.  I didn't catch it when you rattled it off.

Page 181

1          MR. GRILL:  Yeah.  Hang on.  It is
2  Plaintiff Jakes 013237.
3          MS. SPENCE:  237.
4          MR. GRILL:
5      Q.   (Mr. Grill) I've got another one too.  Do
6  you know who Rosie Jones is?
7      A.   I think that's their sister, Everett and
8  them's sister.
9      Q.   Okay.  You stay in contact with Rosie at
10 all?  Like, do you know how to get a hold of her?
11     A.   No.
12     Q.   Okay.  Do you know, has she ever called you
13 in the last, like, ten years?
14     A.   No.
15     Q.   Okay.  I bet you can tell where I'm going
16 with this because --
17         THE COURT REPORTER:  What is that?
18     Q.   I said I bet you can tell where I'm going
19 with this because I have another letter from the
20 public defender's office.  This one is Bates stamped
21 013231.
22         So this one also is getting to me by
23 Mr. Jakes' lawyers.  And it says:  To Mrs. Jones,
24 currently representing Anthony Jakes in a petition for
25 post conviction relief.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          So we'll talk about that too, but just to
2  orient you, that's, like, a legal thing that can be
3  filed by somebody who is in jail to make an argument
4  about why he or she should be let out of jail. Okay.
5  Or at least have their conviction maybe reversed.
6  Okay.
7          And you can see here that the letter goes
8  on and says: Wherein he is trying to obtain a new
9  trial in his murder conviction. And Tom Herres, the
10 public defender, in 2003. So this is basically
11 exactly before December 23rd, 2003, tells Ms. Jones,
12 Ms. Rosie Jones that he's also looking for you in that
13 because he thinks you are two -- to use his words --
14 key witnesses that he needs for Mr. Jakes' efforts to
15 try to get Mr. Jakes' conviction get him out of jail.
16         So all of that is set up. Do you have any
17 recollection of Ms. Jones ever trying to contact you
18 about Mr. Jakes?
19    A.   No.
20    Q.   When you met with Spence and the other
21 African American, I guess, attorney that was with her.
22         MS. SPENCE: Objection. There's no
23 statement that he was an attorney.
24         MR. GRILL: Oh, I don't know. I -- I said
25 if he was an attorney.

1          MS. SPENCE: Right. There's nothing in the
2  record to say that. So object to that
3  characterization.
4          MR. GRILL: Okay.
5     Q.   (Mr. Grill) So I guess he wasn't a lawyer.
6  Maybe he was an investigator.
7          MR. GRILL: Maybe Spence, you want to tell
8  us who it was?
9          MS. SPENCE: No.
10         MR. GRILL: Okay.
11    Q.   (Mr. Grill) So when you met with Spence and
12 this African American person, gentleman, that was with
13 her, did they explain to you that you were a key
14 witness in some sort of Mr. Jakes' lawsuit?
15    A.   No, they didn't. The gentleman that was
16 with Spence, he never talked at all.
17    Q.   Okay. Did Spence explain to you that she
18 thought you were an important witness to Mr. Jakes and
19 his lawsuit?
20         MS. SPENCE: Objection. Lack of
21 foundation. Go ahead.
22    A.   She basically just said that she wanted to
23 hear my side of the story. Not that I was a key
24 witness. Not that I was an important witness.
25    Q.   (Mr. Grill) Did you believe that you were

1  an important witness or are an important witness for
2  Mr. Jakes?
3     A.   Yes.
4     Q.   Why do you believe that?
5     A.   Because I was out there the day it
6  happened.
7     Q.   Yeah.
8          MR. GRILL: Okay. Let's go off the record
9  for a minute.
10         THE VIDEOGRAPHER: Okay. The time is
11 1:56 p.m. We are going off the record.
12         (A short break was then taken.)
13         THE VIDEOGRAPHER: We're back on the
14 record. The time is 2:01 p.m.
15    Q.   (Mr. Grill) Can you still hear me?
16    A.   Yes.
17    Q.   All right. Remind me what year -- I
18 think -- I think you testified you don't remember, but
19 maybe -- maybe I'm misremembering. What year was it
20 that you moved from 1212?
21    A.   I don't remember.
22    Q.   That's what I thought. Do you have a
23 recollection of you -- of moving though close in time
24 to the shooting, moving out of 1212?
25    A.   Excuse me?

1     Q.   Do you like -- do you remember, like, if it
2  was, like, not long after this shooting happened that
3  you moved from 1212?
4     A.   I can't remember.
5     Q.   Do you know where you moved to after you
6  have moved from 1212?
7     A.   I'm not sure.
8     Q.   Do you know if you stayed in Chicago?
9     A.   Yeah. I stayed over in Chicago.
10    Q.   Do you think when you moved from 1212, it
11 was a situation where, like, you were moving and
12 getting your own place, or was it you were moving with
13 your family?
14    A.   My mother was moving.
15         MS. SPENCE: Objection. Calls for
16 speculation. Go ahead.
17    A.   The family was moving. We all was just
18 moving period.
19    Q.   (Mr. Grill) Okay. How many times do you
20 think you moved before you moved to St. Louis?
21    A.   I'm not sure.
22    Q.   Okay. Since the shooting, have you kept in
23 contact with Aunt Bee?
24    A.   No.
25    Q.   Have you kept in contact with anybody in



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 186

1    Jakes, Mr. Jakes' family?
2        A.   No.
3        Q.   No?
4        A.   No.
5        Q.   When was the last time that you talked to
6    Aunt Bee before today?  I mean, not that you not spoke
7    with her today.
8        A.   I haven't talked to her.
9        Q.   Not since 1991?
10       A.   Not since then.
11       Q.   All right.  Are there any family members of
12   Mr. Jakes that you have kept in any contact, whatever
13   it might be, any contact since Mr. Jakes was arrested
14   in 1991?
15       A.   No.
16            MS. SPENCE:  Objection.  Form.
17       Q.   (Mr. Grill) Did you -- did I ask, were
18   you -- I know you were only 15 at the time, but by any
19   chance did you have a job in 1991?
20       A.   No.
21       Q.   Did you -- do you remember what your first
22   job was?
23       A.   My first job period?
24       Q.   Yeah.  What was the first job you ever had?
25       A.   I think I worked at Burger King.

Page 187

1        Q.   Burger King, and that was in Chicago?
2        A.   Or it could have been at Martinizing Dry
3    Cleaners.  It was one or the other.
4        Q.   Was that in Chicago?
5        A.   No.  It was in Minnesota.
6        Q.   Minnesota.  Okay.  How old were you when
7    you started working?
8        A.   I had my first child.  So I probably was --
9        Q.   How old were you when you -- sorry.  Go
10   ahead.
11       A.   Maybe 20.  Maybe 18.  No.  Probably -- I
12   probably was -- I probably was 20 at the most.  I
13   believe I was 20, around 20.
14       Q.   When you had your first child?
15       A.   I was 18 when I had my first child.
16       Q.   Okay.  Did you deliver your child in
17   Chicago or somewhere else?
18       A.   In Chicago.
19       Q.   Okay.  Do you know where you were living
20   when you had that baby -- when you had your baby?
21       A.   At 1212.
22       Q.   Okay.  So if you were 15 in 1991, it would
23   be reasonable to believe that you were still there
24   three years later at 18 when you had your baby; is
25   that fair?

Page 188

1        A.   Yes.  Yes.
2        Q.   Do you know, did you move to Minnesota
3    after you had your baby?
4        A.   Yeah, that was after I had the baby.  Well
5    after, he was up walking, running around.
6        Q.   Okay.  If you mind me asking, who's --
7    what's the name of your child's father?
8            MS. SPENCE:  Objection.  Relevance.
9        Q.   (Mr. Grill) Go ahead.  You can answer the
10   question.
11       A.   I'd rather not say.
12       Q.   Well, I need to know because I need to know
13   if it's somebody involved in this case.
14       A.   I don't -- I'm not sure.
15       Q.   Okay.
16       A.   I don't know.
17       Q.   Got it.  Okay.  So between 1991 and 1994
18   when you had your baby, did any -- do you recall
19   finding out from anybody during that three year time
20   period whether Mr. Jakes was going to stand trial for
21   shooting Rafael Garcia, who was the Caucasian guy that
22   you saw walk into the Queens Sub Shop the night of the
23   shooting?
24       A.   No.
25            MS. SPENCE:  Objection.  Form.

Page 189

1        Q.   (Mr. Grill) Okay.  Did -- do you recall if
2    Aunt Bee ever came and talked to you to ask you to
3    help out with -- or -- and ask you if you knew
4    anything about the shooting that might be able to help
5    Mr. Jakes?
6        A.   No.
7        Q.   And I presume no attorneys during that time
8    period ever -- representing Mr. Jakes in his criminal
9    case ever came and talked to you about what you knew
10   that night, right?
11       A.   Correct.
12       Q.   Did you and Nikia Little after the shooting
13   ever talk about what you guys saw that night?
14       A.   No.
15       Q.   Any reason why you two did not talk about
16   it?
17       A.   No reason why.  We just didn't.
18       Q.   I guess the way I'm thinking about it is,
19   is, like, it seems like it was pretty scary, maybe
20   even traumatic experience.  And so to me, I would
21   think, well, maybe it might be something you'd want to
22   talk about with maybe other people that were there
23   with you.  You're telling me that you've never done
24   that, right?
25       A.   I didn't understand what you were saying.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 190

1  I couldn't hear you.

2      Q.   The shooting, you've already told me today,

3  was very scary, if not traumatic experience, right,

4  for you?

5      A.   It wasn't traumatic, but it was scary just

6  being that close to something.

7      Q.   Right.  And you've never seen anything like

8  that so close in your life before then, right?

9  Correct?

10     A.   Well, I've seen other things before.

11     Q.   You saw other people get shot to death in

12  front of you?

13     A.   No, I never seen no one get shot.

14         MS. SPENCE:  Objection.  Mischaracterizes

15  the testimony.

16     Q.   (Mr. Grill) Okay.  Did it bother you

17  that -- in any way when you think back to

18  September 1991 on that night, did it bother you in any

19  way that somebody had been shot and killed in front of

20  you on September 15th, 1991?

21         MS. SPENCE:  Objection.  Mischaracterizes

22  the testimony.

23     A.   The man was not shot and killed in front of

24  me.

25     Q.   (Mr. Grill) Okay.  How would you describe

Page 191

1  it because the way -- go ahead.  I'll give you the

2  floor.  You tell me how.

3      A.   Like I said, I'll say it again.  Hearing it

4  and seeing it is two different things.

5      Q.   Okay.

6      A.   So I never seen the man got shot directly

7  in my face.  I didn't see that.

8      Q.   Right.  But you knew that he was shot and

9  killed, right?

10         MS. SPENCE:  Objection.  Mischaracterizes

11  testimony.  Go ahead.

12     Q.   (Mr. Grill) Did you believe that or did you

13  believe --

14     A.   Once the police got there and they had

15  everything taped off, the man was dead.

16     Q.   Okay.  And you knew that he -- when you

17  heard those gunshots that happened right in front of

18  your place, and at that point at least, you knew that

19  that's when that man was shot and killed, right?

20     A.   Yes.

21     Q.   And you knew that you were right there on

22  the front stoop, somewhere on the front stoop of 1210

23  when that happened, right?

24     A.   Yes.

25     Q.   And did that bother you in any way after?

Page 192

1  Did you think about it?

2      A.   No.

3      Q.   No.  Didn't bother you whatsoever?

4      A.   No.

5      Q.   Okay.  What bothered you was maybe talking

6  to the police about it; is that right, because --

7      A.   No.

8      Q.   -- you were afraid --

9      A.   No.  It was a lot of shooting going on

10  around there.  A lot of them.  The gangs --

11     Q.   Yeah.

12     A.   -- they back and forth rivalling with each

13  other.  That's all you hear is shooting.

14     Q.   Right.  Which -- which means that, I think,

15  I think then that would make it more -- did that --

16  did the -- let me ask it this way.  Did the amount of

17  shooting that you just described between the gangs

18  that was happening then, did that, in your mind, make

19  it more likely that something bad could happen to you

20  if you talked to the police about a gang shooting?

21     A.   No.

22         MS. SPENCE:  Objection.  Calls for

23  speculation.

24     Q.   (Mr. Grill) All right.  How long were

25  police on scene outside your house, if you remember,

Page 193

1  after you went inside?

2      A.   I'm not sure.  I don't remember.

3      Q.   Okay.  Are you sure that it was rocks that

4  Mr. Jakes was throwing at the car going by or was it

5  something else?

6      A.   It was rocks and glass.

7      Q.   Okay.  And how much longer were you on the

8  front stoop of 1210 after you saw Mr. Jakes run down

9  the gangway and before you heard the shots?  How long

10  were you out there?

11     A.   How long were I --

12         MS. SPENCE:  Objection.  Form.

13     Q.   (Mr. Grill) Huh?

14     A.   How long were I out there then afterwards?

15     Q.   Yeah.  Like, how much time went by between

16  seeing Mr. Jakes head down the alley after throwing

17  the rocks and then hearing the gunshots, like, how

18  much time we talking?

19     A.   I ain't understanding your question.

20     Q.   How much time went by, if you know, between

21  the time that you saw Mr. Jakes run down the gangway

22  between 1212 and 1214 after he threw the rocks, how

23  much time passed between that and then hearing the

24  gunshots?

25     A.   Like, maybe a minute or two.



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 194

1    Q.   Okay.  Why do you say it was, like, a
2  minute or two?
3    A.   Because it was, like, it was soon after,
4  you know.
5    Q.   And because it's a minute or two, that, in
6  your mind, makes it, like, less likely that Mr. Jakes
7  could have been involved in the shooting, right,
8  because he just, like, ran down the gangway?
9    A.   No.  No.
10   Q.   No?
11   A.   No.
12   Q.   That -- it makes it -- my question was, in
13 your mind, that makes it more likely that Mr. Jakes
14 was not involved in the shooting, right?
15   A.   Right.  Correct.
16        MS. SPENCE:  Objection.
17   Q.   (Mr. Grill) Okay.  Right.
18        MS. SPENCE:  Form.
19   Q.   (Mr. Grill) Did you ever see Mr. Jakes go
20 inside of 1210 and help clean up any broken glass or
21 anything like that that night?
22   A.   No.
23   Q.   Did you ever see Mr. Jakes go inside 1210
24 West 51st Street at any point that night after you saw
25 him, you know, throw the rocks --

Page 195

1    A.   No.
2    Q.   -- at the car?
3    A.   No.
4        MS. SPENCE:  That misstates testimony.
5    Q.   (Mr. Grill) Did you ever see -- and you
6  never saw Mr. Jakes out on the front stoop of either
7  1212 or 1210 talking to any of his aunts, right?
8    A.   No.  They were in the house.
9    Q.   Okay.  Did you ever see Mr. Jakes get,
10 like, slapped in the face by any of his aunts that
11 night?
12   A.   No.
13   Q.   You never saw him, right?  He never was out
14 in front on the stoop of either of those homes that
15 night.  He was just throwing rocks and -- well, let me
16 take that, it's a compound question.  You never saw
17 Mr. Jakes on the front stoop of 1210 or 1212 at any
18 point that night, right?
19        MS. SPENCE:  Objection.  Asked and
20 answered.
21   Q.   (Mr. Grill) Correct?
22   A.   Mr. Jakes -- we was outside.  He was not
23 outside with us.  Like I said, he ran through the
24 gangway and ran in the house.  So how is he outside?
25   Q.   Right.  I agree.  So has anybody ever shown

Page 196

1  you a transcript maybe of what Mr. Jakes testified
2  about as far as what happened that night?  You know,
3  what he testified about at the criminal trial about
4  what happened that night?  Has anybody ever shown you
5  that?
6        MS. SPENCE:  Objection.  Asked and
7  answered.
8    A.   No.
9        THE COURT REPORTER:  One second.
10        MR. GRILL:  Sure.
11        THE COURT REPORTER:  We have something --
12 we've lost you guys.  Oh, now you're back.
13        MR. GRILL:  Okay.  Can I keep going?
14        THE COURT REPORTER:  Yes.
15   Q.   (Mr. Grill) You described Mr. Jakes earlier
16 today as -- let's see what the phrase was -- a bad
17 kid, that's the phrase you used.  Did you -- do you
18 have a recollection or would you also describe
19 Mr. Jakes as a liar?  Was he somebody that you knew
20 that was not likely to tell the truth about things?
21   A.   No.
22   Q.   You thought he was otherwise a pretty
23 truthful guy?
24   A.   Yes.
25   Q.   So if, like, he testified in court under

Page 197

1  oath, would you think that he was telling the truth?
2        MS. SPENCE:  Objection.  Calls for
3  speculation.  It's asking -- it's improper to ask her
4  to talk about the credibility of another witness.
5        MR. GRILL:  Not in a deposition it's not.
6        MS. SPENCE:  It's absolutely improper.
7  Like, what her opinion it has no bearing.  It's
8  outside the scope of Rule 26.  It's not relevant
9  whether or not she thinks he was telling the truth at
10 a hearing.
11        MR. GRILL:  Okay.  Well, I'm going to keep
12 asking my questions.
13   Q.   (Mr. Grill) So ma'am, do you think
14 Mr. Jakes would, if he was testifying, would lie?
15        MS. SPENCE:  Objection.  Calls for
16 speculation.  Outside the scope of Rule 26.
17   A.   I have no idea.  I wouldn't -- I wouldn't
18 know if he would lie.  I mean, we was 15 back then.
19   Q.   (Mr. Grill) Yeah.
20   A.   And -- and talking about what happened now,
21 I don't know if he lying or not.
22   Q.   You never went and visited Mr. Jakes in
23 jail at any point ever?
24   A.   No.
25   Q.   Okay.  And do you have any understanding of

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 198

1  what it is that Mr. Jakes' lawsuit -- well, yeah. Do
2  you have -- let me ask you this. Strike that
3  question.
4           You understand that Mr. Jakes has filed a
5  lawsuit, and that's why you're here testifying today.
6  You understand, right?
7       A.  Yeah. Yes.
8       Q.  Do you have any understanding -- did
9  Spence, for example, explain to you at all when you
10 met with her or in any of your phone calls with her
11 what it is that Mr. Jakes is alleging in his lawsuit?
12 What he's claiming happened?
13      A.  Well, as far as I know, that he was
14 wrongfully convicted.
15      Q.  Okay. So that phrase, wrongfully
16 convicted, is that a phrase that Spence or one of
17 Mr. Jakes' attorneys used to explain to you what they
18 say happened to Mr. Jakes?
19      A.  That's something I know.
20      Q.  How do you know that?
21      A.  Because he didn't do it.
22      Q.  Right. And I'm asking you where you heard
23 that phrase from, wrongfully convicted. Is that a
24 phrase that Spence or one of Mr. Jakes' attorneys
25 used?

Page 199

1       A.  No. I used that myself.
2       Q.  Okay. And why do you believe Mr. Jakes is
3  wrongfully convicted?
4       A.  Because he didn't do it.
5       Q.  Okay.
6       A.  Shawn was nowhere around that scene. He --
7  I seen -- like I said, I seen the two guys come from
8  around a corner. How is Shawn coming from where he
9  coming from from all the way around the corner. You
10 would have to pass us. We would see you.
11      Q.  And do you have any understanding about
12 what it is that Mr. Jakes is hoping to get out of this
13 lawsuit?
14      A.  No. I never, like, looked into it or
15 nothing. It just after so many years, it just, you
16 know, went -- I just didn't think about it anymore.
17 You know, I just -- I just figured they would probably
18 just let him out after so many years.
19      Q.  Did you ever do any research on the
20 internet, for example, about Mr. Jakes' criminal case
21 or his efforts to get out of jail?
22      A.  No, not for real. I mean, I was looking at
23 some stuff the other day, but I didn't -- I didn't --
24 by me not having my glasses around, I couldn't really
25 see it. So I was just, you know, was just glancing at

Page 200

1  pictures and, you know...
2       Q.  Okay.
3       A.  I didn't really read up on anything.
4       Q.  Well, where were you looking? Were you
5  looking on the internet or were you looking at
6  something else?
7       A.  Huh?
8       Q.  Were you looking on the internet or were
9  you looking at something else?
10      A.  On the internet. I had just Googled the
11 case, and just looked --
12      Q.  What did you Google?
13      A.  I just said the Shawn case -- Shawn Jakes
14 case, and his picture popped up immediately, and I
15 just clicked on it and just was just looking. And
16 then they had a whole thing about what happened, what
17 was going on. It was just too much for me to read.
18 And I was just tired. So I really didn't even go any
19 further.
20      Q.  Did you look up anything else about
21 Mr. Jakes?
22      A.  No.
23      Q.  On any other occasion?
24      A.  No.
25      Q.  Do you have any understanding today from

Page 201

1  any source what it is that Mr. Jakes is claiming the
2  police did to him?
3       A.  No.
4       Q.  Okay. Do you know from any source whether
5  Mr. Jakes is claiming that the police mistreated him
6  in any way?
7       A.  Rephrase. Say that again.
8       Q.  Do you know through any source whatsoever
9  whether Mr. Jakes is claiming that the police
10 mistreated him?
11      A.  Do I know what?
12      Q.  Do you know from any source whether
13 Mr. Jakes is claiming that the police mistreated him?
14      A.  It's in the -- it was in -- in the paper
15 online saying that they -- how they kept him for
16 16 hours without food, and beat him, and -- and, you
17 know, made him say that he did it.
18      Q.  Okay. Well, tell me what you know about
19 that.
20      A.  What I just told you.
21      Q.  And you read that where?
22      A.  I just read that -- I just, like, kind of
23 browsed through it. I was just looking at it the day
24 that Ms. Spence came and seen me. And I really didn't
25 read the whole thing. I just browsed through it. And

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 202

1  I was like, wow, they -- just saying to myself --
2  they -- they did that to him?  And...
3       Q.   So you're looking at this Google -- this
4  information that you're describing to me while
5  Ms. Spence was meeting with you yesterday?
6       A.   No.
7            MS. SPENCE:  Objection. Mischaracterizes
8  testimony.
9       A.   No.
10           MS. SPENCE:  Lack of foundation.
11      Q.   (Mr. Grill) I thought that's what you said.
12  When -- when did you look at this?  I want to make
13  sure.
14      A.   I'll say again.
15      Q.   Uh-huh.
16      A.   I looked at it later on that day.  I was
17  too tired.  So I really didn't even read the stuff.  I
18  just looked -- read just as much as what I just said
19  that how long they kept him, what he was kept for,
20  what he's fighting against and that.
21      Q.   Okay.  Did Spence tell you something that
22  caused you to want to look up and find out more
23  about --
24      A.   Just wanted to know for myself.
25           MS. SPENCE:  Objection.  Form.

Page 203

1       A.   Just wanted to know for myself what
2  actually happened with the boy.  What actually --
3       Q.   (Mr. Grill) Okay.
4       A.   -- you know, went on.
5       Q.   Okay.  So did you find out something from
6  Ms. Spence that inspired you to want to find out more
7  about Mr. Jakes' case?
8       A.   Just wanting to know.
9            MS. SPENCE:  Objection.  Form.
10      A.   Just wanting to know.
11      Q.   (Mr. Grill) Right.  So like --
12      A.   It wasn't -- it really wasn't much.  I
13  mean, because what we was -- what she was trying --
14  asking me, it was just wanted to know what actually
15  did happen with him after so many years because I
16  never knew if he got out.  I never knew how long they
17  kept him.  I never knew none of that.  I mean, just
18  after so long after the incident happened, it just --
19  I just -- we moved on, and it was just never talked
20  about, thought about again.
21      Q.   Right.  So had you ever looked up on the
22  internet, for example, anything about Mr. Jakes before
23  you met with Ms. Spence yesterday?
24      A.   No.
25      Q.   Okay.  So that's why I'm wondering, like,

Page 204

1  did something happen during your -- or did you learn
2  something, or what have you from your conversations
3  with Spence yesterday that inspired you to get on the
4  internet for the first time and start looking up
5  information about --
6            MS. SPENCE:  Objection. Objection. Form.
7  Asked and answered.
8       Q.   (Mr. Grill) You can answer the question.
9       A.   No.
10      Q.   Okay.  Can you tell me why until -- why you
11  had never looked up or bothered to lookup anything
12  about Mr. Jakes before?
13      A.   Because I never thought about it again, you
14  know, until, you know, this came up.  When he asked me
15  can he give my number to her.  I never really thought
16  about it.  You know, I just left it alone.  It just
17  went away.
18      Q.   Right.  So but before you went with
19  Ms. Spence yesterday, you had talked to her and
20  Mr. Jakes, you know, a number of times.  So were you
21  not thinking about it on any of those prior -- prior
22  to those communications?
23      A.   No.
24      Q.   Did you ever ask Mr. Jakes anything about
25  well, along the lines of why it was that he wanted you

Page 205

1  to talk his lawyers?
2       A.   No.  I mean, it's -- it's basic for me
3  because him asking me, or rather telling me -- asking
4  me can he give Ms. Spence my number is, you know, he
5  wanted to know who can help him in some kind of way.
6       Q.   Right.  So, like, did you -- is that -- did
7  Mr. Jakes tell you that he thought you had information
8  that could help him in some way?
9       A.   No.  He didn't tell me anything.
10      Q.   Okay.  Was that a belief that you held
11  when -- at least at the time that he called you on
12  Facebook, that you had information that could help
13  him?
14      A.   We never talked about it.
15      Q.   That's not my question.  Did you believe
16  that you had information at that time that could help
17  Mr. Jakes?
18      A.   I believe I had information the whole time.
19  I just never talked about it.
20      Q.   I -- I know you've said that.  Okay.  You
21  said that you never talked about it before.  Okay.  So
22  why when Mr. Jakes called you, did you ask him any
23  follow-up questions about why he wanted you to talk to
24  his lawyers?
25           MS. SPENCE:  Objection.  Asked and

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 206

1  answered.
2         A.    No.
3         Q.    (Mr. Grill) Okay.  And -- and he didn't
4  tell you anything about why he wanted you to talk to
5  his lawyers, right?
6         MS. SPENCE:  Objection.  Asked and
7  answered.
8         Q.    (Mr. Grill) Right?
9         A.    He wanted me to talk to his people because
10 he figured I knew what I knew.  I knew something.
11        Q.    Uh-huh.  Did he know -- do you believe that
12 he knew that you knew that he was not one of the two
13 people that you saw --
14        MS. SPENCE:  Objection.
15        Q.    -- that --
16        MS. SPENCE:  Calls for speculation.
17        Q.    Hang on.  That you saw or that you believed
18 were responsible for shooting Mr. Garcia?
19        MS. SPENCE:  Objection.  Calls for
20 speculation.  Lacks foundation.
21        Q.    (Mr. Grill) Do you believe that he
22 understood that about you, that you had that
23 information?
24        MS. SPENCE:  Objection.  Lack of
25 foundation.  Calls for speculation.  Go ahead,

Page 207

1  Ms. Harris.
2         A.    Shawn knew it wasn't him.
3         Q.    (Mr. Grill) I know.  But my question is, is
4  why does he think, if you know, why does he think
5  you're -- why does he think that you might be able to
6  back him up on that?
7         A.    We were --
8         MS. SPENCE:  Objection.  Calls for
9  speculation.  Lack of foundation.
10        A.    Look, we were outside.
11        Q.    (Mr. Grill) Uh-Huh.
12        A.    Shawn knew we all was outside on the porch.
13 We was altogether.
14        Q.    Uh-huh.  Okay.  That's it?
15        A.    That's it.  He ran past.  He knew it was
16 us.
17        Q.    Okay.
18        A.    So that's why he probably would ask or...
19        Q.    Uh-huh.  And I think you would agree that
20 since you didn't move from -- for three years after
21 this shooting, that if Shawn needed to find you, you
22 were still sitting at the same address that you were
23 sitting at the night that the shooting happened,
24 right?
25        MS. SPENCE:  Objection.  Calls for

Page 208

1  speculation.
2         Q.    (Mr. Grill) Right?  You hadn't moved?
3         A.    No, I'm not saying I didn't move.  I was in
4  the house.
5         Q.    Yeah.
6         A.    I mean...
7         Q.    Okay.  You testified that two guys that
8  walked up, they were two black males.  One was tall,
9  one was, quote, kind of short.  You can't tell us what
10 kind of clothing they had on.  Back then you knew who
11 they were but I can't tell you right now because it's
12 been so long.  Were either of these two people that
13 you saw walk up people that you'd ever seen hanging
14 out with Little A prior to that night?
15        A.    I can't tell you that.  I don't know.
16        Q.    Okay.  But you knew them as two Black
17 Stones from the neighborhood, right?
18        A.    Uh-huh.  Yes.
19        Q.    All right.  And you're sure they went into
20 the sub shop, right?
21        A.    Yes.
22        Q.    Did you ever see either of these two guys
23 talking to other people before they went into the sub
24 shop?
25        A.    No.

Page 209

1         Q.    You didn't know what happened after that
2  because you never saw them exit the sub shop, right?
3         A.    No.
4         Q.    Right?  How could you see -- so, like, your
5  house at 1210 is set back further than 1208 and
6  further back off the sidewalk than the sub shop.  How
7  is it that you could see down the street all the way
8  to the corner of 51st and Racine?
9         MS. SPENCE:  Objection.  Mischaracterizes
10 testimony.
11        A.    From my house you could see all of that.
12 You come down on the porch, or even just being
13 upstairs in the window you could see all of that.
14        Q.    (Mr. Grill) You weren't upstairs in the
15 window, you were on the porch, right?
16        A.    Yeah.  But I was -- I was just, you know...
17 whether I was in the house or out the house, come down
18 on the porch you can see the house next door, the
19 house next door, the house next door, the Currency
20 Exchange, and the restaurant.
21        Q.    Okay.
22        A.    And if you come down off the porch, you can
23 see the pay phone.
24        Q.    Uh-huh.  After the -- you said that after
25 the incident, after the shooting happened, people

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 210

1  started coming out.  Who did you see coming out?
2       A.  I don't know who all was out there on that
3  porch.
4       Q.  All right.  That picture that Spence showed
5  you of the scene and the three people sitting on the
6  stoop of 1210, do you know who any of those three
7  people are that were in the picture?
8       A.  No.  I'm not sure.
9       Q.  Okay.  Were any of those people you?
10      A.  I'm not sure.  I don't know.
11      Q.  You thought one was you?
12      A.  No, I don't think so.
13      Q.  Okay.  Were you scared that if you told
14  somebody in Jakes' family what it was that you know,
15  that you could be retaliated against by the Black
16  Stones?
17      A.  No.
18      Q.  Okay.  Were there any other reasons that
19  you didn't tell Jakes, Mr. Jakes' family what it was
20  that you knew about that shooting, other than that
21  they had not asked you?
22         MS. SPENCE:  Objection.  Mischaracterizes
23  testimony.  Go ahead.
24      A.  Can you repeat that?
25      Q.  (Mr. Grill) Were there any other -- you

Page 211

1  know, we've been talking for a while here.  So I'm
2  just giving you a chance to, you know, say anything
3  else that you might have forgotten.
4       A.  Just speak clearly when you talking.
5       Q.  Is there anything -- any other reasons that
6  you didn't tell Mr. Jakes' family, anybody in, you
7  know, in his family that lived right around you,
8  whatever it was that you knew or saw that night other
9  than the fact that you said none of them had asked
10  you.  Is there any other reason you didn't tell them?
11      A.  No.
12         MS. SPENCE:  Objection.  Mischaracterizes
13  testimony.
14      A.  No.
15      Q.  (Mr. Grill) Okay.
16      A.  Just didn't talk about it.
17      Q.  Did you know anybody by the name of Troy
18  back in 1991?
19      A.  Troy?
20      Q.  Uh-huh.
21      A.  I can't remember.
22      Q.  You don't remember if you know anybody by
23  that name back then?
24      A.  No, I don't.
25      Q.  Were one of the guys that were walking up

Page 212

1  that you knew then, was one of them Troy?
2         MS. SPENCE:  Objection.  Form.  What guys
3  walking up?  Like, where are we?
4         MR. GRILL:  The two guys -- same two guys
5  we've been talking about all day.
6         MS. SPENCE:  Oh, the two guys.  I'm sorry.
7  I thought you said -- I'm sorry.  I didn't hear the
8  two guys part.
9       Q.  (Mr. Grill) One of them named Troy?
10      A.  I mean, are you asking is that his real
11  name or is that his street name?
12      Q.  I don't know.  Did you know either one of
13  those guys by the name of Troy?
14      A.  I can't tell you that.  Because I don't
15  know if it's his real name or his street name, but the
16  name sound familiar.
17      Q.  Okay.  Well, you think you could -- those
18  two guys that you saw walking up that shot Mr. Garcia,
19  do you think one of them was Troy?
20      A.  I don't know.
21         MS. SPENCE:  Objection.  Calls for
22  speculation.
23      Q.  (Mr. Grill) Okay.  Do you know a person
24  named Darren back in 1991?
25      A.  No.

Page 213

1       Q.  You don't know anybody by that name?
2       A.  No.
3       Q.  Back in 1991?  No?
4       A.  No.  Darren, no.
5         MR. GRILL:  All right.  I might be done.
6  Let's take a break, and I'll come back in a couple of
7  minutes and let you know if I am.  Okay.
8         MS. SPENCE:  Sure.
9         THE VIDEOGRAPHER:  Okay.  We're now going
10  off the record.  The time is 2:35 p.m.
11         (A short break was then taken.)
12         THE VIDEOGRAPHER:  We're back on the
13  record.  The time is 2:48 p.m.
14         MR. GRILL:  All right.  I'm done.
15         THE COURT REPORTER:  Hold on.  We're going
16  to close the door.  We kind of forgot to do that.
17         MR. GRILL:  Okay.  I'm done anyway.  So you
18  can actually run out the door.  No.
19         THE WITNESS:  Hey, you got to say nothing
20  but the word.
21         MR. GRILL:  I gave you the chance.  I gave
22  you the chance.  I'm done.  The -- some of the other
23  attorneys may have follow-up questions for you, but
24  thanks for sitting through this today and I'll turn it
25  over to the other lawyers.



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 214

1      THE WITNESS: All right. Okay.
2      MS. SPENCE: George?
3      MR. YAMIN: Nothing from the city.
4      MS. SPENCE: All right. I don't have
5 anything either.
6      So Ms. Harris, you have an opportunity to
7 read a transcript of the deposition today and review
8 that transcript for any errors. Like, if you -- any
9 words that were mistyped that you said, or there's
10 something got transcribed wrong, you have an
11 opportunity to review it, make corrections, and sign
12 off on those corrections, or you can choose not to
13 review the transcript. It's your choice. Which would
14 you prefer? Would you prefer to review and sign it or
15 do you want to waive it?
16      THE WITNESS: I prefer to review it and
17 sign.
18      MS. SPENCE: Okay. Okay. All right. So
19 Ms. Harris is reserving signature.
20      I think we can go off the record. And
21 Ms. Harris, you should give your address to the court
22 reporter and -- so that they can make arrangements to
23 get the transcript to you.
24      THE WITNESS: Okay.
25      MS. SPENCE: All right.

Page 215

1      THE VIDEOGRAPHER: We're now going off the
2 video record. The time is 2:50 p.m.
3      THE COURT REPORTER: And then I need to
4 know who needs a transcript and what kind of format.
5      MS. SPENCE: For the plaintiff's side,
6 plaintiff is not ordering a transcript today.
7      MR. GRILL: We'll take one.
8      MR. YAMIN: I don't need one. Thanks.
9      THE COURT REPORTER: And then so,
10 Mr. Grill, are you willing to pay for the original?
11      MR. GRILL: Yeah. We'll pay for it.
12      THE COURT REPORTER: Okay. And do you want
13 it e-mailed?
14      MR. GRILL: Yes, that's fine.
15      THE COURT REPORTER: E-mailed. And then do
16 you want a full copy, or do you want condensed or?
17      MR. GRILL: Do they -- can we get both for
18 the same price or are they different prices?
19      THE COURT REPORTER: I think with the
20 original you might get both.
21      MR. GRILL: I thought that --
22      THE VIDEOGRAPHER: Yeah, you get all
23 electronic files for the same cost.
24      MR. GRILL: Great. So just send both.
25      THE COURT REPORTER: Okay.

Page 216

1      MR. YAMIN: Andrew, do you want that
2 expedited or no?
3      MR. GRILL: No. I don't need it expedited.
4 I got notes.
5      THE COURT REPORTER: All right.
6      MS. SPENCE: Ms. Victoria, can you give me
7 your e-mail address so I can e-mail you the exhibits.
8      THE COURT REPORTER: Yeah. Natalia, do you
9 know, do you guys want to have the exhibits sent to
10 you?
11      THE VIDEOGRAPHER: Yeah. Spence, we've
12 been corresponding. I sat this deposition up for you
13 all. If you just want to send them over to me at
14 natalia@kentuckianareporters.com.
15      MS. SPENCE: Okay. I don't have anything
16 more.
17      MR. GRILL: Okay. We're done.
18      (Signature reserved.)
19      (WHEREIN, the deposition was concluded at
20 2:50.)
21
22
23
24
25

Page 217

1      CERTIFICATE OF REPORTER
2
3      I, Amy A. Victoria, MO CCR, within and for
4 the State of Missouri, do hereby certify that the
5 witness whose testimony appears in the foregoing
6 deposition was duly sworn by me; that the testimony of
7 said witness was taken by me to the best of my ability
8 and thereafter reduced to typewriting under my
9 direction; that I am neither counsel for, related to,
10 nor employed by any of the parties to the action in
11 which this deposition was taken, and further that I am
12 not a relative or employee of any attorney or counsel
13 employed by the parties thereto, nor financially or
14 otherwise interested in the outcome of the action.
15
16
17      _Amy A. Victoria_
18      MO CCR #556
19
20
21
22
23
24
25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

# Exhibit 12

1

```
 1        IN THE UNITED STATES DISTRICT COURT FOR THE
 2        NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION
 3
 4   -------------------------------------------
 5   ANTHONY JAKES,
 6        Plaintiff,
 7                              File No. 19-cv-2204
        vs.                     Hon. Manish S. Shah
 8                              Hon. Beth W. Jantz
 9   KENNETH BOUDREAU, et al.,
10        Defendants.
11   -------------------------------------------
12        The videotaped deposition of ANNETTE
13   HARRIS, taken pursuant to Notice of Taking
14   Deposition before Jolynn Graham, RPR, and a Notary
15   Public in and for the County of Hennepin, State of
16   Minnesota, commencing at approximately 10:12 a.m.
17   on December 16, 2021 in Minnesota.
18
19
20              AFFILIATED COURT REPORTERS
21                  6880 River Road
              Inver Grove Heights, MN 55076
22                  (612) 338-4348
              Info@AffiliatedReportersMN.com
23
24
25
```

2

1  APPEARANCES:

2  On Behalf of the Plaintiff:

3     Renee Spence, Esquire
      Loevy and Loevy
4     311 N. Aberdeen Street
      3rd Floor Chicago, Illinois
5     spence@loevy.com

6  On Behalf of the Defendant Kenneth Boudreau,
   et al:
7
      Brittany D. Johnson,
8     Rock Fusco & Connelly, LLC
      321 N. Clark Street
9     Suite 2200
      Chicago, Illinois 60654
10    bjohnson@rfclaw.com

11
   On Behalf of the Defendant City of Chicago:
12
      George Yamin, Esquire
13    Sotos Law Firm
      141 W. Jackson Boulevard
14    Suite 1240A
      Chicago, Illinois 60604
15
   Also Present: Robert Buckman, Videographer
16

17        DEPOSITION REFERENCE INDEX

18
   Examination by Ms. Johnson.............. 3
19

20              OBJECTIONS

21  By Ms. Spence: 11, 12, 13, 14, 15, 16, 18, 19,
    20, 22
22

23
                EXHIBITS
24               (None)
25

3

1          P R O C E E D I N G S

2     The videotaped deposition of ANNETTE HARRIS was

3  commenced at 10:12 a.m. as follows:

4                    * * *

5          VIDEO TECHNICIAN: This is the

6  videotaped deposition of Annette Harris, taken on

7  December 16, 2021. The time is now approximately

8  10:12 a.m.

9          The deposition is being taken in the

10:12 10  matter of Anthony Jakes versus Kenneth Boudreau,

11  et al, filed in the United States District Court

12  for the Northern District of Illinois, Eastern

13  Division, Case No. 19-cv-02204.

14          The deposition is taking place in

15  Woodbury, Minnesota. My name is Robert Buchman.

16  I am the videographer, representative of

17  Affiliated Reporters.

18          Will Counsel please identify

19  themselves for the record.

10:13 20          MS. JOHNSON: Brittany Johnson for

21  the Defendant officers.

22          MR. YAMIN: George Yamin on behalf

23  of the Defendant City of Chicago.

24          MS. SPENCE: Renee Spence on behalf

25  of Plaintiff Anthony Jakes.

4

1          THE VIDEOGRAPHER: Will the court

2  reporter please swear in the witness.

3          THE COURT REPORTER: Would you please

4  raise your right hand, ma'am?

5          ANNETTE HARRIS,

6  after having been first duly sworn,

7  deposes and says under oath as follows:

8          E X A M I N A T I O N

9  BY MS. JOHNSON:

10:14 10      Q.    Okay. Ms. Harris, can you go ahead

11  and state your name for the record for me?

12      A.    Annette Harris.

13      Q.    And where did you live back in

14  September 1991?

15      A.    Oh, my god, I plead the 5th.

16      Q.    Did you live at 1212 West 51st

17  Street on the second floor back in 1991?

18      A.    Yep.

19      Q.    Did you live with Denise Harris?

10:14 20      A.    Where's she at?

21      Q.    Is that your sister, is Denise your

22  sister?

23      A.    Yes, she is.

24      Q.    Did you live with her on the second

25  floor of 1212 West 51st Street back in 1991?

5

1    A.    Yes, yes, yes.  That's my sister.

2    Q.    Did you live with anyone else

3 besides you and your sister in that apartment back

4 in 1991?

5    A.    I was 14 years old.  Of course I was

6 with my mother and my sisters and brothers.

7    Q.    Who else lived with you besides your

8 sister Denise?

9    A.    You got everything on the computer

10:15 10 about me and my whole family life.  There's 15 of

11 us.

12    Q.    Do you know who Kia Little?

13    A.    Yes, that's my cousin.  She's

14 deceased.

15    Q.    Did she live with you back on the

16 second floor --

17    A.    No, no, no, no, no, no, no.

18    Q.    Who lived below you back on 1212

19 West 51st Street back in September --

20    A.    Sean and his mama.

21    THE COURT REPORTER:  I'm sorry, I'm

22 not getting the question because I'm not --

23    THE WITNESS:  Sean and his mom.  How

24 cannot understand what I'm saying.

25    MS. JOHNSON:  Just for the record,

6

1 she said, Sean and his mama.

2 BY MS. JOHNSON:

3    Q.    Is that what I heard?

4    A.    Yes.

5    Q.    Okay.  I know you're ready to go, so

6 I am going to skip really quickly, okay?

7    A.    Mm-hmm.

8    Q.    So correct me if I'm wrong, but you

9 were questioned by the police about what you knew

10:15 10 about the murder that happened --

11    A.    It wasn't by no police.  I wasn't

12 questioned by no police.  I wasn't questioned by

13 no police.

14    Q.    Did any detective ever talk to

15 you --

16    A.    I wasn't questioned by no police.

17    Q.    Okay.  So you never told the police

18 that you weren't home --

19    A.    I never talked to nobody.

10:16 20    Q.    Okay.  So if the -- if the police

21 records show that you talked to the police --

22    A.    I didn't talk to them.  My mom

23 didn't talk to no police.

24    Q.    So if the police records show that

25 you talked to police and told them that you were

7

1 not home September 15th that night, the night of

2 the murder --

3    A.    That was 30 years ago, okay?  How is

4 somebody going to remember that?  I just heard the

5 shooting and stuff happen, that was it.  That's

6 the only thing I can remember.

7    Q.    How did you hear about the shooting?

8    A.    I lived right there.

9    I'm ready to go home, I'm fixing to

10 go home.

11    I lived right there, I lived right

12 there.  I'm asking you all questions, where is

13 everybody else at?  Where is everybody else at?

14    Q.    What do you mean, Where is everybody

15 else?

16    A.    Where is everybody else at, all the

17 rest of the witnesses?  Three, one, five,

18 everybody.

19    Q.    I know --

10:16 20    A.    Rob, Bob, Red, where they at?

21    Q.    Okay, so let me help you out.  When

22 we depose a witness like this, the witness is

23 there by themselves.  We don't depose you all at

24 the same time.

25    A.    Well, sorry.

8

1    Q.    That's for -- that's for your

2 privacy.

3    A.    Well, I'm through.  I'm through, I'm

4 fixing to go.  In 30, I'm out of here.

5    Q.    Okay.  Well, let me finish my

6 questions, then.

7    So you said that you never talked to

8 police about the murder back in September of --

9    A.    I can't remember.

10:17 10    Q.    Well, is there anything that would

11 help you remember?

12    A.    Nope.

13    Q.    So if the police records show that

14 you told police that you weren't home the night of

15 the murder --

16    A.    Didn't I just say it was 30 years

17 ago?  I can't remember.

18    Q.    I understand that.  Let me ask it --

19    A.    Well, you asked me the same

10:17 20 question.

21    Q.    I'm going to -- you gave me

22 15 minutes, so I'm going to ask that you let me

23 ask my questions.

24    A.    You asking me the same question, I'm

25 going to give you the same answer.

9

1    **Q.**   Okay.  Well, that's okay, but you
2   have to let me finish my question.
3    **A.**   Then hurry up.
4    **Q.**   I understand.  What I'm telling you
5   is, is that if in fact police records show that
6   you told police you weren't home --
7    **A.**   I can't remember.
8    **Q.**   -- on the night -- so you can't
9   remember whether or not you were home on the night
10:18 10   of the murder, September 15, 1991?
11    **A.**   I was at home.  I was at home, I was
12   sitting on the front porch.
13    **Q.**   Okay.  Did you see the murder
14   happen?
15    **A.**   I don't know.
16    **Q.**   Did you see who -- did you see who
17   shot --
18    **A.**   I didn't see none of that.  The only
19   thing I heard was some shooting.  I didn't see
10:18 20   nothing.
21    **Q.**   How many shots did you hear?
22    **A.**   I don't -- I can't remember.
23    **Q.**   So if the police records show that
24   you said you weren't home, is that a lie?
25    **A.**   Didn't I just tell you that was

10

1   30 years ago?  I can't remember.  If you're sure
2   that I talked to the police, okay.  But that was
3   30 years.  Come on now.  Come on now.  Don't ask
4   me the same question.
5    **Q.**   When you heard gunshots the night of
6   the murder, were you in your apartment?
7    **A.**   I don't know where I was.  I just
8   heard some gunshots.  I probably was on the front
9   porch.  I probably was in the house, I don't know.
10:18 10    **Q.**   If you were on the front porch, then
11   that means to me that you would have seen the
12   murder.  Did you actually see it happen?
13    **A.**   No.
14    **Q.**   Okay.  In the days following the
15   murder, did you ever talk to anybody about what
16   happened the night of the shooting?
17    **A.**   I was at a funeral.
18    **Q.**   You're talking about the night of
19   the murder, you were at a funeral.
10:19 20    **A.**   I was at a funeral the next day.
21    **Q.**   Okay.  And at the funeral, did you
22   talk to anybody about the shooting?
23    **A.**   No, no, no, no.
24    **Q.**   Did you ever talk to Denise about
25   the shooting?

11

1    **A.**   Nope.
2    **Q.**   Prior to the shooting on
3   September 15, 1991, did you ever see Sean that
4   day?
5    MS. SPENCE:  Objection, form.
6   BY MS. JOHNSON:
7    **Q.**   Ms. Harris?
8    **A.**   What?
9    **Q.**   At any point on September 15, 1991,
10:19 10   prior to the shooting, did you see Sean?
11    **A.**   I seen him that night.  I seen him
12   that night when he threw something at me, he ran
13   through the gangway, and I ain't seen him no more.
14    **Q.**   What did he throw at you?
15    **A.**   I don't know, I can't remember.  We
16   was kids, we was playing.
17    **Q.**   And when he threw something at you,
18   was that before or after the shooting happened?
19    **A.**   That was before the shooting.
10:20 20    **Q.**   Did you see him again after he ran
21   through the gangway?
22    **A.**   No, I didn't see him no more.
23    **Q.**   Did you ever see Sean get into an
24   altercation with some girls on his porch that
25   night?

12

1    **A.**   The girls was us.
2    **Q.**   Okay.  So you were the one that he
3   was fighting with?
4    **A.**   Yeah.
5    **Q.**   Why were you -- why did you guys get
6   into a fight --
7    **A.**   I said we was kids, we was playing.
8    **Q.**   Did you ever see an aunt slap him
9   and send him inside?
10    THE COURT REPORTER:  Did you ever
11   see what?  I'm sorry.  Repeat that, please.
12    MS. JOHNSON:  I said, Did you ever
13   see his aunt slap him and send him inside.
14    MS. SPENCE:  Objection, form.
15   Foundation.
16   BY MS. JOHNSON:
17    **Q.**   Ms. Harris?
18    **A.**   What?
19    **Q.**   Did you ever see anybody slap Sean
20   or one of his aunts --
21    **A.**   No, no, no.
22    MS. SPENCE:  Objection, form.
23   Foundation.
24    THE WITNESS:  Come one, the time is
25   running out.  I'm going to go home.  I'm tired.

13

1    BY MS. JOHNSON:
2        Q.    So after the murder on September 15,
3    1991, when was the last time you saw Sean?
4        A.    I don't know.
5            MS. SPENCE: Objection.
6    BY MS. JOHNSON:
7        Q.    Did you ever go visit Sean in
8    prison?
9        A.    For what?
10:21 10     Q.    I'm just asking if you did.
11       A.    I said, for what?
12       Q.    Well, let me ask you this. What was
13   your relationship like with Sean back in 1991,
14   were you friends?
15       A.    Nothing. Nothing.
16       Q.    How did you know Sean back in
17   September --
18       A.    My momma had a baby by his uncle.
19       Q.    Were you guys cousins?
10:21 20     A.    No.
21       Q.    How often back in September of 1991
22   would you see Sean?
23       A.    I don't know.
24       Q.    Were you home on September 15, 1991,
25   when there was an incident where a bottle

14

1    was thrown through a second-floor window at
2    1210 West 51st?
3            MS. SPENCE: Objection, form.
4    Foundation.
5            THE WITNESS: I don't know what
6    you're talking about, woman.
7    BY MS. JOHNSON:
8        Q.    You never heard about --
9        A.    No, no, no, no.
10:22 10     Q.    -- somebody throwing a bottle
11   through the second-floor window of the house next
12   door?
13       A.    No, no, no.
14       Q.    Is that a no?
15       A.    No, I don't know nothing. I never
16   seen nothing like that. I don't know nothing.
17       Q.    Do you know what an alibi is?
18       A.    Nope. An alibi is when you try to
19   pick up -- I mean, you try to stick up with
10:22 20  somebody, to see if he's there at that place or
21   whatever, I don't know.
22       Q.    Right. So an alibi means that you
23   couldn't possibly have committed the crime that
24   you were accused of, correct?
25       A.    Who?

15

1        Q.    What?
2        A.    That who was accused of?
3        Q.    I'm asking you. Did you understand
4    what an alibi is?
5        A.    Yeah, I understand what that is.
6        Q.    Okay. Do you know if Sean had an
7    alibi for the murder that happened --
8        A.    I don't know.
9            MS. SPENCE: Objection --
10:22 10         THE WITNESS: I was 14 years old, I'm
11   5 months pregnant. I don't know. I buried my
12   uncle the next day. I don't know.
13           And actually, I don't even care.
14   This happened 30 years ago, I don't even care. My
15   life has gone on, so I don't care about none of
16   this.
17           MS. SPENCE: One second, there was
18   some crosstalk.
19           I objected to form to your question.
10:23 20         MS. JOHNSON: No, that's okay.
21   BY MS. JOHNSON:
22       Q.    Do you know who committed the murder
23   on the night of September 15, 1991?
24       A.    Nope.
25       Q.    Did you see Sean --

16

1        A.    No.
2        Q.    -- get arrested the next day on
3    September 16, 1991?
4        A.    No.
5        Q.    Did you ever talk to -- actually,
6    strike that.
7            Do you know who Jessie Mae Jakes is?
8        A.    Nope.
9        Q.    Do you know a woman by the name of
10:23 10  Aunt B?
11       A.    Yeah, I know them. That's his
12   Aunt B.
13       Q.    Did you ever talk to Aunt B --
14       A.    No, no, no.
15       Q.    -- after the murder?
16       A.    No.
17           Come on, you got seven more minutes,
18   eight. I mean, I'm sorry. This happened over
19   30 years ago and...
10:24 20     Q.    What was the neighborhood like near
21   1212 West 51st Street where you lived back in
22   1991?
23       A.    Just a neighborhood.
24           MS. SPENCE: Objection to form.
25   BY MS. JOHNSON:

17

1      Q.    Excuse me?

2      A.    Just a neighborhood.

3      Q.    Are you familiar with the

4  neighborhood called Motown?

5      A.    Oh, my God.

6      Q.    Can you give me an answer?  What

7  does Motown mean to you?

8      A.    Motown is a name and a town, that's

9  a town.  That's just a name.

10:24 10    Q.    Did you live in Motown back in 1991?

11     A.    That's where I stayed at, in Motown.

12     Q.    Okay.  Can you describe for me what

13  Anthony was like back in 1991?

14     A.    I don't know nothing about that

15  kid --

16         MS. SPENCE:  Form.

17         THE WITNESS:  I didn't know nothing

18  about that kid.  I don't know nothing about him.

19  I didn't like him, I don't know nothing about him.

10:25 20  And I can't describe nothing about nobody that I

21  don't know.

22  BY MS. JOHNSON:

23     Q.    Why didn't you like him?

24     A.    I don't -- why, what you mean by why

25  don't I like him?

18

1      Q.    You just told me that, I don't like

2  him.

3      A.    Because I don't like men.  I was

4  raped.  I don't like men.

5      Q.    I understand.

6         Do you think that Sean is innocent

7  for the murder of Mr. Garcia?

8      A.    I believe he is.

9         MS. SPENCE:  Objection to form.

10:25 10  BY MS. JOHNSON:

11     Q.    Why do you think that?

12     A.    Because for sure, I know he is.

13  Sean is not the type of person that's going to

14  kill a guy.  He ain't got enough heart in him to

15  do it.  Sean and I have a disability, okay?

16     Q.    What disability did you know that

17  Sean had?

18     A.    Sean was on Social Security.

19     Q.    Excuse me?  I'm sorry, I couldn't

10:25 20  hear you.

21     A.    Sean was on Social Security.

22     Q.    Okay.

23     A.    He was on Disability.  Sean wasn't

24  -- since Sean was a kid.  Sean was a kid that,

25  even though he was bad, you know what I'm saying,

19

1  and stuff, like, I mean, he was just a bad kid.

2  But Sean, Sean didn't have enough heart to pull no

3  trigger.

4      Q.    Well, did you ever hear about an

5  incident with Sean and some of his friends where

6  they raped a teen girl in the neighborhood?

7      A.    Yeah, they raped --

8         MS. SPENCE:  Objection.

9  BY MS. JOHNSON:

10:26 10    Q.    Did you hear about that?

11     A.    I heard about a lot of things.  I

12  got raped, too.

13     Q.    Did you hear about the incident I'm

14  specifically talking about?

15         MS. SPENCE:  Objection, form.

16         THE WITNESS:  They was always

17  together.

18  BY MS. JOHNSON:

19     Q.    Who was always together?

20     A.    They was always together.

21         Anyway, I plead the 5th.  I'm done.

22  I'm tired.  I'm not going to answer no more

23  questions.

24     Q.    All right.

25     A.    I'm not going to answer no more

20

1  questions.  I'm not going to answer no more

2  questions.

3      Q.    Okay.  Well, that's what I'm asking

4  you.  You said, you were always together.  Who was

5  we?

6      A.    I said they always together.  The

7  kids in the neighborhood, they always was

8  together.  And a lot of girls got raped.  I was

9  one of them.  A lot of them got raped.

10:27 10    Q.    Did you hear about a group of boys

11  that called themselves the 51st Street Rapists?

12         MS. SPENCE:  Objection.  Speculation.

13         THE WITNESS:  I don't know nothing

14  about that.

15  BY MS. JOHNSON:

16     Q.    Okay.  All right.  So --

17     A.    51st Street Rapists?  Where did you

18  get your information from?  I know you ain't going

19  to tell me, but where did you get this from?

10:27 20    Q.    So let me ask you this again now.

21  You said you know Sean didn't do it.  Did you

22  actually -- did you see him the night of the

23  murder at all?

24     A.    Didn't I just tell you Sean threw

25  something at me, he just went through the gangway,

21

1   and I didn't see him no more.
2        Q.   Right, but you said that was before
3   the shooting.  Did you ever see him again after --
4        A.   That was before the shooting, that's
5   what I mean.  I didn't see him no more.
6        Q.   So if you didn't see him, then why
7   do you know that Sean didn't do it?
8        A.   Sean didn't did it.  Sean didn't do
9   it.
10:27 10   Q.   I know.  Why do you think that?
11        A.   Sean did not do it.
12        Q.   Why do you think that?
13        A.   Sean -- it ain't why, Sean didn't do
14   it.  That's the only thing I'm going to say:  Sean
15   did not do it.
16        Q.   Then how do you know that?
17        A.   Sean didn't do that.
18        Q.   Did you ever tell the police that
19   Sean didn't do it?
10:28 20   A.   I don't recall talking to the
21   police.
22        Q.   Did you ever tell Sean's aunt that
23   Sean didn't do it?
24        A.   I don't believe I did.
25        Q.   Did you ever try and tell anybody --

22

1   did you ever try and tell anyone after the fact
2   that you knew that Sean didn't do it?
3        MS. SPENCE:  Objection, form.
4        THE WITNESS:  Everybody knows Sean
5   didn't do it.
6   BY MS. JOHNSON:
7        Q.   How do you -- why do you say that?
8   How do you know that everybody --
9        A.   Sean didn't do it, I know.  Sean is
10:28 10   ADHD, he is on Social Security.  Sean didn't
11   (inaudible.)
12        Q.   Okay.
13        A.   They're just taking an innocent kid
14   out of the neighborhood, that's all.
15        Q.   Did you ever talk to -- again, I'm
16   going to ask you this again.  Did Denise ever tell
17   you that she knew who committed the murder?
18        MS. SPENCE:  Objection, form.
19   Foundation.
10:28 20   THE WITNESS:  Girl, I don't even
21   know what you're talking about.  Now I know I'm
22   really going to go.  I'm tired, I'm going to go.
23   BY MS. JOHNSON:
24        Q.   So that's why I'm asking, so let
25   me -- I need an answer to my question.

23

1        Did Denise ever tell you at any point --
2        A.   No, no.
3        Q.   -- at any point --
4        A.   No, no, no.  No, no, no.
5        Q.   Let me finish my question.
6        A.   I just said no.  Me and my sister
7   didn't talk.  We was kids back then, we ain't got
8   time for that.  We didn't have time for that.
9        Q.   All right.  But let me finish my
10:29 10   question so that it's on the record.  I understand
11   you gave me your answer, but let me finish my
12   question.
13        The question was --
14        A.   I already answered.
15        Q.   -- did Denise ever talk to you and
16   tell you that she knew who had committed the
17   murder on September 15, 1991?
18        A.   Didn't I say no?
19        Q.   Excuse me?
10:29 20   A.   No.
21        Q.   Ms. Harris, did you review any
22   materials to prepare you for your deposition
23   today?
24        A.   What?
25        Q.   Did you review any materials to

24

1   prepare you for your deposition today?
2        A.   I think I did.  I thanked the Lord
3   that I woke up this morning.
4        Q.   Have you ever spoken to Sean about
5   this case at all?
6        A.   No.
7        Q.   When was the last time that you
8   spoke to Sean?
9        A.   I don't know, I ain't seen Sean.  I
10:30 10   ain't seen Sean ever since he was locked up.
11        I ain't seen Tony, I ain't talked to
12   him, and I don't know him.
13        Q.   Prior to your deposition today, how
14   many conversations have you had with Sean's
15   attorney?
16        A.   I never talked to him.
17        Q.   Okay.  Well, let me ask you this.
18   Like, you see Ms. Spence here on the camera.  Did
19   you ever talk to Ms. Spence?
10:31 20   A.   (Inaudible.)
21        Q.   Did you ever talk to her about your
22   deposition today?
23        A.   Did I talk to her?  Did I talk to
24   her, yeah.
25        Q.   How long was that conversation?

25

```
 1        A.    What I said, what me and her talked
 2   about?
 3        Q.    What did you say?
 4        A.    What I said was, What me and her
 5   talked about?
 6        Q.    So that's information that's
 7   discoverable in the deposition.
 8        A.    I didn't tell you that information.
 9   Did I tell you that information?
10:31 10      Q.    I didn't ask for information.  What
11   I am asking you for is conversations.  What did
12   you guys talk about when you spoke?
13        A.    Nothing.  Nothing.  Barely anything.
14   That's the only thing we talked about is us kids.
15        Q.    All right.  Ms. Harris, I'm going --
16   I'm going to say this on the record for you, okay?
17            We are entitled to ask these
18   questions, and I'm doing my best to make sure --
19        A.    And I'm giving you my best.
10:31 20      Q.    I understand.  I'm doing my best to
21   make sure that we hurry.  I need you to listen to
22   my questions and give me your answers.
23        A.    I did give you my answers.
24            I'm going to go.  It's 10:30 now, I'm
25   going to go.
```

26

```
 1        Q.    I understand.  But --
 2        A.    I'm going to go.  Do you understand
 3   what I'm saying?  I'm fixing to walk out.  I done
 4   showed up.  I got my subpoena.  I'm already.  So
 5   if you need one more question answered, you ask it
 6   and I'm going to go.
 7        Q.    Ms. Harris, I don't want to have to
 8   get a court order to bring you back.  That's why
 9   I'm saying --
10:32 10      A.    You can get a court order for me to
11   come back, and I will say the same damn thing.
12   Same thing.
13        Q.    All right.  So let me just --
14        A.    I keep saying it's 30 years ago.  My
15   life done changed.  Leave me alone.  Now do I have
16   to get me a lawyer to go up against you?  I ain't
17   got time for it.  I'm on disability.  I'm
18   schizophrenic and bipolar.  I ain't got time for
19   none of this.  I ain't got time for none of this.
10:32 20   I done answered my questions.
21        Q.    Okay.  So let me ask you again.
22   When was the last time you spoke with Sean?
23        A.    I'm out of here.
24            MS. SPENCE:  Ms. Harris, hold on.
25   Ms. Harris?  Ms. Harris?
```

27

```
 1            THE VIDEOGRAPHER:  She's left, she
 2   walked out.  Do you want me to try to get her
 3   back?
 4            MS. JOHNSON:  No.
 5            MS. SPENCE:  Can we go off the
 6   record for a moment?
 7            MS. JOHNSON:  Yeah.
 8            THE VIDEOGRAPHER:  Going off the
 9   record.  The time now is 10:32 a.m.
10:36 10          (Short break.)
11            THE VIDEOGRAPHER:  We are back on
12   the record, the time now is 10:36 a.m.
13            MS. SPENCE:  Ms. Harris just walked
14   out, and after she walked out I called her, and
15   she indicated that she would prefer to have the
16   deposition rescheduled.  She's on new medication
17   which impacts her moods.
18            I think earlier she testified that
19   she is bipolar and schizophrenic.  She says that
10:37 20   she has not slept.  Last night she did not get any
21   sleep and does not feel like she's in a place
22   where she can do this deposition at this time.
23   She is asking for Defense Counsel to reschedule so
24   that she can do it again.  She refused to come
25   back upstairs.
```

28

```
 1            Although we are remote while I was
 2   speaking to her, my video was not needed.  I did
 3   encourage Ms. -- and Defense Counsel was present
 4   on the phone via Zoom, I did encourage Ms. Harris
 5   to come back upstairs, but she said that she just
 6   could not manage the deposition at this time.
 7            MS. JOHNSON:  All right.  For the
 8   record, can you go ahead and read the total time
 9   we were on the record, please?
10:38 10          THE VIDEOGRAPHER:  Are you talking
11   about how many minutes?
12            MS. JOHNSON:  Yeah, I need to know
13   how many minutes, just so that we have the amount
14   of time that the witness left.  I just want to
15   make sure that we have it on the record the amount
16   of time that the witness talked.
17            THE VIDEOGRAPHER:  Okay.
18   Approximately 22, 21, 22 minutes.
19            MS. JOHNSON:  All right.  So at this
10:38 20   time, George, can you unmute so we can have this
21   discussion on the record?
22            At this time, given the witness's
23   unwillingness to participate in this deposition
24   for today, for all of the reasons that Plaintiff's
25   Counsel already stated on the record, I think that
```

29

1    it's appropriate now at this point to adjourn the

2    deposition, subject to obviously a reschedule or

3    reopen, and to allow for additional questioning,

4    since it looks like we were only on the record for

5    approximately 21, 22 minutes.  Let know if

6    everybody agrees.

7              MS. SPENCE:  No objection from

8    Plaintiff's Counsel.

9              MR. YAMIN:  No objection.

10             MS. JOHNSON:  All right.  That will

11   do it for today, guys.  Thank you.

12             MR. YAMIN:  All right.

13             THE VIDEOGRAPHER:  We are going off

14   the record at 10:39 a.m.

15        (The remote videotape deposition of

16   ANNETTE HARRIS was adjourned at 10:39 a.m.)

17

18

19

20

21

22

23

24

25

30

1    STATE OF MINNESOTA:
                      :         CERTIFICATE
2    COUNTY OF HENNEPIN:

3

4         BE IT KNOWN that I, Jolynn Graham, took the
     foregoing deposition of ANNETTE HARRIS:
5
          That the witness, before testifying, was by me
6    first duly sworn to testify the whole truth and
     nothing but the truth relative to said cause:
7
          That the testimony of said witness was recorded
8    in shorthand by me and was reduced to typewriting
     under my direction:
9
          That the foregoing deposition is a true record
10   of the testimony given by said witness:

11        That the reading and signing of the foregoing
     deposition by the said witness WAS WAIVED by the
12   witness and respective Counsel:

13        That I am not related to any of the parties
     hereto, nor an employee of them, nor interested in
14   the outcome of the action:

15        That the cost of the original has been charged
     to the party who noticed the deposition, and that
16   all parties who ordered copies have been charged
     at the same rate for such copies:
17
18        WITNESS MY HAND AND SEAL this 3rd DAY of
     JANUARY, 2022.
19

20

21             Jolynn Graham, RPR
               Notary Public
22

23

24

25

**10:12** [3] - 1:16, 3:3, 3:8
**10:30** [1] - 25:24
**10:32** [1] - 27:9
**10:36** [1] - 27:12
**10:39** [2] - 29:14, 29:16
**11** [1] - 2:21
**12** [1] - 2:21
**1210** [1] - 14:2
**1212** [4] - 4:16, 4:25, 5:18, 16:21
**1240A** [1] - 2:14
**13** [1] - 2:21
**14** [3] - 2:21, 5:5, 15:10
**141** [1] - 2:13
**15** [10] - 2:21, 5:10, 8:22, 9:10, 11:3, 11:9, 13:2, 13:24, 15:23, 23:17
**15th** [1] - 7:1
**16** [4] - 1:17, 2:21, 3:7, 16:3
**18** [1] - 2:21
**19** [1] - 2:21
**19-cv-02204** [1] - 3:13
**19-cv-2204** [1] - 1:7
**1991** [17] - 4:14, 4:17, 4:25, 5:4, 9:10, 11:3, 11:9, 13:3, 13:13, 13:21, 13:24, 15:23, 16:3, 16:22, 17:10, 17:13, 23:17
**20** [1] - 2:21
**2021** [2] - 1:17, 3:7
**2022** [1] - 30:18
**21** [2] - 28:18, 29:5
**22** [4] - 2:21, 28:18, 29:5
**2200** [1] - 2:9
**3** [1] - 2:18
**30** [8] - 7:3, 8:4, 8:16, 10:1, 10:3, 15:14, 16:19, 26:14
**311** [1] - 2:4
**321** [1] - 2:8
**338-4348** [1] - 1:21
**3rd** [2] - 2:4, 30:18
**5** [1] - 15:11
**51st** [7] - 4:16, 4:25, 5:19, 14:2, 16:21, 20:11, 20:17
**55076** [1] - 1:21
**5th** [2] - 4:15, 19:21
**60604** [1] - 2:14
**60654** [1] - 2:9
**612** [1] - 1:21
**6880** [1] - 1:20

**a.m** [7] - 1:16, 3:3, 3:8, 27:9, 27:12, 29:14, 29:16
**Aberdeen** [1] - 2:4
**accused** [2] - 14:24, 15:2
**action** [1] - 30:14
**additional** [1] - 29:3
**ADHD** [1] - 22:10
**adjourn** [1] - 29:1
**adjourned** [1] - 29:16
**AFFILIATED** [1] - 1:20
**Affiliated** [1] - 3:17
**ago** [6] - 7:3, 8:17, 10:1, 15:14, 16:19, 26:14
**agrees** [1] - 29:6
**ahead** [2] - 4:10, 28:8
**ain't** [12] - 11:13, 18:14, 20:18, 21:13, 23:7, 24:9, 24:10, 24:11, 26:16, 26:18, 26:19
**al** [3] - 1:9, 2:6, 3:11
**alibi** [5] - 14:17, 14:18, 14:22, 15:4, 15:7
**allow** [1] - 29:3
**alone** [1] - 26:15
**altercation** [1] - 11:24
**amount** [2] - 28:13, 28:15
**AND** [1] - 30:18
**and..** [1] - 16:19
**ANNETTE** [5] - 1:12, 3:2, 4:5, 29:16, 30:4
**Annette** [2] - 3:6, 4:12
**answer** [7] - 8:25, 17:6, 19:22, 19:25, 20:1, 22:25, 23:11
**answered** [3] - 23:14, 26:5, 26:20
**answers** [2] - 25:22, 25:23
**Anthony** [3] - 3:10, 3:25, 17:13
**ANTHONY** [1] - 1:5
**anyway** [1] - 19:21
**apartment** [2] - 5:3, 10:6
**APPEARANCES** [1] - 2:1
**appropriate** [1] - 29:1
**arrested** [1] - 16:2
**attorney** [1] - 24:15
**Aunt** [3] - 16:10, 16:12, 16:13
**aunt** [3] - 12:8, 12:13, 21:22
**aunts** [1] - 12:20
**baby** [1] - 13:18

**bad** [2] - 18:25, 19:1
**barely** [1] - 25:13
**BE** [1] - 30:4
**Behalf** [3] - 2:2, 2:6, 2:11
**behalf** [2] - 3:22, 3:24
**below** [1] - 5:18
**best** [3] - 25:18, 25:19, 25:20
**Beth** [1] - 1:8
**bipolar** [2] - 26:18, 27:19
**bjohnson@rfclaw.com** [1] - 2:10
**Bob** [1] - 7:20
**bottle** [2] - 13:25, 14:10
**BOUDREAU** [1] - 1:9
**Boudreau** [2] - 2:6, 3:10
**Boulevard** [1] - 2:13
**boys** [1] - 20:10
**break** [1] - 27:10
**bring** [1] - 26:8
**Brittany** [2] - 2:7, 3:20
**brothers** [1] - 5:6
**Buchman** [1] - 3:15
**Buckman** [1] - 2:15
**buried** [1] - 15:11
**BY** [15] - 4:9, 11:6, 12:16, 13:1, 13:6, 14:7, 15:21, 16:25, 17:22, 18:10, 19:9, 19:18, 20:15, 22:6, 22:23
**camera** [1] - 24:18
**cannot** [1] - 5:24
**care** [3] - 15:13, 15:14, 15:15
**Case** [1] - 3:13
**case** [1] - 24:5
**CERTIFICATE** [1] - 30:1
**changed** [1] - 26:15
**charged** [2] - 30:15, 30:16
**Chicago** [5] - 2:4, 2:9, 2:11, 2:14, 3:23
**City** [2] - 2:11, 3:23
**Clark** [1] - 2:8
**commenced** [1] - 3:3
**commencing** [1] - 1:16
**committed** [4] - 14:23, 15:22, 22:17, 23:16
**computer** [1] - 5:9
**Connelly** [1] - 2:8
**conversation** [1] - 24:25

**conversations** [2] - 24:14, 25:11
**copies** [2] - 30:16, 30:16
**correct** [2] - 6:8, 14:24
**cost** [1] - 30:15
**Counsel** [6] - 3:18, 27:23, 28:3, 28:25, 29:8, 30:12
**County** [1] - 1:15
**COUNTY** [1] - 30:2
**course** [1] - 5:5
**Court** [1] - 3:11
**COURT** [5] - 1:1, 1:20, 4:3, 5:21, 12:10
**court** [3] - 4:1, 26:8, 26:10
**cousin** [1] - 5:13
**cousins** [1] - 13:19
**crime** [1] - 14:23
**crosstalk** [1] - 15:18
**damn** [1] - 26:11
**DAY** [1] - 30:18
**days** [1] - 10:14
**deceased** [1] - 5:14
**December** [2] - 1:17, 3:7
**Defendant** [4] - 2:6, 2:11, 3:21, 3:23
**Defendants** [1] - 1:10
**Defense** [2] - 27:23, 28:3
**Denise** [7] - 4:19, 4:21, 5:8, 10:24, 22:16, 23:1, 23:15
**depose** [2] - 7:22, 7:23
**deposes** [1] - 4:7
**deposition** [20] - 1:12, 3:2, 3:6, 3:9, 3:14, 23:22, 24:1, 24:13, 24:22, 25:7, 27:16, 27:22, 28:6, 28:23, 29:2, 29:15, 30:4, 30:9, 30:11, 30:15
**DEPOSITION** [1] - 2:17
**Deposition** [1] - 1:14
**describe** [2] - 17:12, 17:20
**detective** [1] - 6:14
**direction** [1] - 30:8
**disability** [3] - 18:15, 18:16, 26:17
**Disability** [1] - 18:23
**discoverable** [1] - 25:7
**discussion** [1] - 28:21
**District** [2] - 3:11, 3:12
**DISTRICT** [2] - 1:1, 1:2

**Division** [1] - 3:13
**DIVISION** [1] - 1:2
**done** [4] - 19:21, 26:3, 26:15, 26:20
**door** [1] - 14:12
**duly** [2] - 4:6, 30:6
**EASTERN** [1] - 1:2
**Eastern** [1] - 3:12
**eight** [1] - 16:18
**employee** [1] - 30:13
**encourage** [2] - 28:3, 28:4
**entitled** [1] - 25:17
**Esquire** [2] - 2:3, 2:12
**et** [3] - 1:9, 2:6, 3:11
**examination** [1] - 2:18
**EXAMINATION** [1] - 4:8
**excuse** [3] - 17:1, 18:19, 23:19
**EXHIBITS** [1] - 2:23
**fact** [2] - 9:5, 22:1
**familiar** [1] - 17:3
**family** [1] - 5:10
**fight** [1] - 12:6
**fighting** [1] - 12:3
**File** [1] - 1:7
**filed** [1] - 3:11
**finish** [5] - 8:5, 9:2, 23:5, 23:9, 23:11
**Firm** [1] - 2:13
**first** [2] - 4:6, 30:6
**five** [1] - 7:17
**fixing** [3] - 7:9, 8:4, 26:3
**Floor** [1] - 2:4
**floor** [5] - 4:17, 4:25, 5:16, 14:1, 14:11
**following** [1] - 10:14
**follows** [2] - 3:3, 4:7
**FOR** [1] - 1:1
**foregoing** [3] - 30:4, 30:9, 30:11
**form** [11] - 11:5, 12:14, 12:22, 14:3, 15:19, 16:24, 17:16, 18:9, 19:15, 22:3, 22:18
**foundation** [4] - 12:15, 12:23, 14:4, 22:19
**friends** [2] - 13:14, 19:5
**front** [3] - 9:12, 10:8, 10:10
**funeral** [4] - 10:17, 10:19, 10:20, 10:21
**Fusco** [1] - 2:8
**gangway** [3] - 11:13, 11:21, 20:25

Garcia [1] - 18:7
George [2] - 2:12, 3:22, 28:20
Girl [1] - 22:20
girl [1] - 19:6
girls [3] - 11:24, 12:1, 20:8
given [2] - 28:22, 30:10
God [1] - 17:5
god [1] - 4:15
Graham [3] - 1:14, 30:4, 30:21
group [1] - 20:10
Grove [1] - 1:21
gunshots [2] - 10:5, 10:8
guy [1] - 18:14
guys [4] - 12:5, 13:19, 25:12, 29:11
HAND [1] - 30:18
hand [1] - 4:4
HARRIS [5] - 1:13, 3:2, 4:5, 29:16, 30:4
Harris [14] - 3:6, 4:10, 4:12, 4:19, 11:7, 12:17, 23:21, 25:15, 26:7, 26:24, 26:25, 27:13, 28:4
hear [7] - 7:7, 9:21, 18:20, 19:4, 19:10, 19:13, 20:10
heard [7] - 6:3, 7:4, 9:19, 10:5, 10:8, 14:8, 19:11
heart [2] - 18:14, 19:2
Heights [1] - 1:21
help [2] - 7:21, 8:11
HENNEPIN [1] - 30:2
Hennepin [1] - 1:15
hereto [1] - 30:13
hmm [1] - 6:7
hold [1] - 26:24
home [12] - 6:18, 7:1, 7:9, 7:10, 8:14, 9:6, 9:9, 9:11, 9:24, 12:25, 13:24
Hon [2] - 1:7, 1:8
house [2] - 10:9, 14:11
hurry [2] - 9:3, 25:21
identify [1] - 3:18
ILLINOIS [1] - 1:2
Illinois [4] - 2:4, 2:9, 2:14, 3:12
impacts [1] - 27:17
IN [1] - 1:1
inaudible [2] - 22:11, 24:20
incident [3] - 13:25,

19:5, 19:13
INDEX [1] - 2:17
indicated [1] - 27:15
Info@
  AffiliatedReportersMN
  .com [1] - 1:22
information [5] -
  20:18, 25:6, 25:8, 25:9, 25:10
innocent [2] - 18:6, 22:13
inside [2] - 12:9, 12:13
interested [1] - 30:13
Inver [1] - 1:21
IT [1] - 30:4
Jackson [1] - 2:13
Jakes [3] - 3:10, 3:25, 16:7
JAKES [1] - 1:5
Jantz [1] - 1:8
JANUARY [1] - 30:18
Jessie [1] - 16:7
Johnson [2] - 2:7, 3:20
JOHNSON [26] - 3:20, 4:9, 5:25, 6:2, 11:6, 12:12, 12:16, 13:1, 13:6, 14:7, 15:20, 15:21, 16:25, 17:22, 18:10, 19:9, 19:18, 20:15, 22:6, 22:23, 27:4, 27:7, 28:7, 28:12, 28:19, 29:10
Johnson............ [1] - 2:18
Jolynn [3] - 1:14, 30:4, 30:21
keep [1] - 26:14
Kenneth [2] - 2:6, 3:10
KENNETH [1] - 1:9
Kia [1] - 5:12
kid [6] - 17:15, 17:18, 18:24, 19:1, 22:13
kids [5] - 11:16, 12:7, 20:7, 23:7, 25:14
kill [1] - 18:14
KNOWN [1] - 30:4
knows [1] - 22:4
last [4] - 13:3, 24:7, 26:22, 27:20
Law [1] - 2:13
lawyer [1] - 26:16
leave [1] - 26:15
left [2] - 27:1, 28:14
lie [1] - 9:24
life [3] - 5:10, 15:15, 26:15
listen [1] - 15:21
live [7] - 4:13, 4:16, 4:19, 4:24, 5:2, 5:15,

17:10
lived [6] - 5:7, 5:18, 7:8, 7:11, 16:21
LLC [1] - 2:8
locked [1] - 24:10
Loevy [2] - 2:3
looks [1] - 29:4
Lord [1] - 24:2
ma'am [1] - 4:4
Mae [1] - 16:7
mama [2] - 5:20, 6:1
manage [1] - 28:6
Manish [1] - 1:7
materials [2] - 23:22, 23:25
matter [1] - 3:10
mean [7] - 7:14, 14:19, 16:18, 17:7, 17:24, 19:1, 21:5
means [2] - 10:11, 14:22
medication [1] - 27:16
men [2] - 18:3, 18:4
MINNESOTA [1] - 30:1
Minnesota [3] - 1:16, 1:17, 3:15
minutes [6] - 8:22, 16:17, 28:11, 28:13, 28:18, 29:5
MN [1] - 1:21
mom [2] - 5:23, 6:22
moment [1] - 27:6
momma [1] - 13:18
months [1] - 15:11
moods [1] - 27:17
morning [1] - 24:3
mother [1] - 5:6
Motown [4] - 17:4, 17:7, 17:10, 17:11
motown [1] - 17:8
MR [3] - 3:22, 29:9, 29:12
MS [45] - 3:20, 3:24, 4:9, 5:25, 6:2, 11:5, 11:6, 12:12, 12:14, 12:16, 12:22, 13:1, 13:5, 13:6, 14:3, 14:7, 15:9, 15:17, 15:20, 15:21, 16:25, 17:16, 17:22, 18:9, 18:10, 19:8, 19:9, 19:15, 19:18, 20:15, 20:15, 22:3, 22:6, 22:18, 22:23, 22:6, 22:18, 22:23, 26:24, 27:4, 27:5, 27:7, 27:13, 28:7, 28:12, 28:19, 29:7, 29:10
murder [14] - 6:10, 7:2, 8:8, 8:15, 9:10, 9:13, 10:6, 10:12,

10:15, 10:19, 13:2, 15:7, 15:22, 16:15, 18:7, 20:23, 22:17, 23:17
MY [1] - 30:18
name [5] - 3:15, 4:11, 16:9, 17:8, 17:9
near [1] - 16:20
need [4] - 22:25, 25:21, 26:5, 28:12
needed [1] - 28:2
neighborhood [7] - 16:20, 16:23, 17:2, 17:4, 19:6, 20:7, 22:14
never [6] - 6:17, 6:19, 8:7, 14:8, 14:15, 24:16
new [1] - 27:16
next [4] - 10:20, 14:11, 15:12, 16:2
night [14] - 7:1, 8:14, 9:8, 9:9, 10:5, 10:16, 10:18, 11:11, 11:12, 11:25, 15:23, 20:22, 27:20
nobody [2] - 6:19, 17:20
None [1] - 2:24
none [4] - 9:18, 15:15, 26:19
NORTHERN [1] - 1:2
Northern [1] - 3:12
Notary [2] - 1:14, 30:21
nothing [15] - 9:20, 13:15, 14:15, 14:16, 17:14, 17:17, 17:18, 17:19, 17:20, 20:13, 25:13, 30:6
Notice [1] - 1:13
noticed [1] - 30:15
oath [1] - 4:7
objected [1] - 15:19
objection [15] - 11:5, 12:14, 12:22, 13:5, 14:3, 15:9, 16:24, 18:9, 19:8, 19:15, 20:12, 22:3, 22:18, 29:7, 29:9
OBJECTIONS [1] - 2:20
obviously [1] - 29:2
OF [3] - 1:2, 30:1, 30:2
officers [1] - 3:21
often [1] - 13:21
old [2] - 5:5, 15:10
one [7] - 7:17, 12:2, 12:20, 12:24, 15:17, 20:9, 26:5

order [2] - 26:8, 26:10
ordered [1] - 30:16
original [1] - 30:15
outcome [1] - 30:14
participate [1] - 28:23
parties [2] - 30:13, 30:16
party [1] - 30:15
person [1] - 18:13
phone [1] - 28:4
pick [1] - 14:19
place [3] - 3:14, 14:20, 27:21
Plaintiff [3] - 1:6, 2:2, 3:25
Plaintiff's [2] - 28:24, 29:8
playing [2] - 11:16, 12:7
plead [2] - 4:15, 19:21
point [4] - 11:9, 23:1, 23:3, 29:1
police [20] - 6:9, 6:11, 6:12, 6:13, 6:16, 6:17, 6:20, 6:21, 6:23, 6:24, 6:25, 8:8, 8:13, 8:14, 9:5, 9:6, 9:23, 10:2, 21:18, 21:21
porch [4] - 9:12, 10:9, 10:10, 11:24
possibly [1] - 14:23
prefer [1] - 27:15
pregnant [1] - 15:11
prepare [2] - 23:22, 24:1
Present [1] - 2:15
present [1] - 28:3
prison [1] - 13:8
privacy [1] - 8:2
Public [2] - 1:15, 30:21
pull [1] - 19:2
pursuant [1] - 1:13
questioned [4] - 6:9, 6:12, 6:16
questioning [1] - 29:3
questions [9] - 7:12, 8:6, 8:23, 19:23, 20:1, 20:2, 25:18, 25:22, 26:20
quickly [1] - 6:6
raise [1] - 4:4
ran [2] - 11:12, 11:20
raped [6] - 18:4, 19:6, 19:7, 19:12, 20:8, 20:9
Rapists [2] - 20:11, 20:17
rate [1] - 30:16

**read** [1] - 28:8
**reading** [1] - 30:11
**ready** [2] - 6:5, 7:9
**really** [2] - 6:6, 22:22
**reasons** [1] - 28:24
**record** [16] - 3:19, 4:11, 5:25, 23:10, 25:16, 27:6, 27:9, 27:12, 28:8, 28:9, 28:15, 28:21, 28:25, 29:4, 29:14, 30:9
**recorded** [1] - 30:7
**records** [5] - 6:21, 6:24, 8:13, 9:5, 9:23
**Red** [1] - 7:20
**reduced** [1] - 30:8
**REFERENCE** [1] - 2:17
**refused** [1] - 27:24
**related** [1] - 30:13
**relationship** [1] - 13:13
**relative** [1] - 30:6
**remember** [10] - 7:4, 7:6, 8:9, 8:11, 8:17, 9:7, 9:9, 9:22, 10:1, 11:15
**remote** [2] - 28:1, 29:15
**Renee** [2] - 2:3, 3:24
**reopen** [1] - 29:3
**Repeat** [1] - 12:11
**reporter** [1] - 4:2
**REPORTER** [3] - 4:3, 5:21, 12:10
**REPORTERS** [1] - 1:20
**Reporters** [1] - 3:17
**representative** [1] - 3:16
**reschedule** [2] - 27:23, 29:2
**rescheduled** [1] - 27:16
**respective** [1] - 30:12
**rest** [1] - 7:17
**review** [2] - 23:21, 23:25
**River** [1] - 1:20
**Road** [1] - 1:20
**rob** [1] - 7:20
**Robert** [2] - 2:15, 3:15
**Rock** [1] - 2:8
**RPR** [2] - 1:14, 30:21
**running** [1] - 12:25
**saw** [1] - 13:3
**schizophrenic** [2] - 26:18, 27:19
**SEAL** [1] - 30:18

**Sean** [48] - 5:20, 5:23, 6:1, 11:3, 11:10, 11:23, 12:19, 13:3, 13:7, 13:13, 13:16, 13:22, 15:6, 15:25, 18:6, 18:13, 18:15, 18:17, 18:18, 18:21, 18:23, 18:24, 19:2, 19:5, 20:21, 20:24, 21:7, 21:8, 21:11, 21:13, 21:14, 21:17, 21:19, 21:23, 22:2, 22:4, 22:9, 22:10, 24:4, 24:8, 24:9, 24:10, 26:22
**Sean's** [2] - 21:22, 24:14
**second** [6] - 4:17, 4:24, 5:16, 14:1, 14:11, 15:17
**second-floor** [2] - 14:1, 14:11
**Security** [3] - 18:18, 18:21, 22:10
**see** [24] - 9:13, 9:16, 9:18, 9:19, 10:12, 11:3, 11:10, 11:20, 11:22, 11:23, 12:8, 12:11, 12:13, 12:19, 13:22, 14:20, 15:25, 20:22, 21:1, 21:3, 21:5, 21:6, 24:18
**send** [2] - 12:9, 12:13
**September** [14] - 4:14, 5:19, 7:1, 8:8, 9:10, 11:3, 11:9, 13:2, 13:17, 13:21, 13:24, 15:23, 16:3, 23:17
**seven** [1] - 16:17
**Shah** [1] - 1:7
**shooting** [12] - 7:5, 7:7, 9:19, 10:16, 10:22, 10:25, 11:2, 11:10, 11:18, 11:19, 21:3, 21:4
**Short** [1] - 27:10
**shorthand** [1] - 30:8
**shot** [1] - 9:17
**shots** [1] - 9:21
**show** [5] - 6:21, 6:24, 8:13, 9:5, 9:23
**showed** [1] - 26:4
**signing** [1] - 30:11
**sister** [6] - 4:21, 4:22, 5:1, 5:3, 5:8, 23:6
**sisters** [1] - 5:6
**sitting** [1] - 9:12
**skip** [1] - 6:6
**slap** [3] - 12:8, 12:13, 12:19

**sleep** [1] - 27:21
**slept** [1] - 27:20
**Social** [3] - 18:18, 18:21, 22:10
**sorry** [5] - 5:21, 7:25, 12:11, 16:18, 18:19
**Sotos** [1] - 2:13
**speaking** [1] - 28:2
**specifically** [1] - 19:14
**speculation** [1] - 20:12
**SPENCE** [20] - 3:24, 11:5, 12:14, 12:22, 13:5, 14:3, 15:9, 15:17, 16:24, 17:16, 18:9, 19:8, 19:15, 20:12, 22:3, 22:18, 26:24, 27:5, 27:13, 29:7
**spence** [1] - 24:18
**Spence** [4] - 2:3, 2:21, 3:24, 24:19
**spence@loevy.com** [1] - 2:5
**spoken** [1] - 24:4
**State** [1] - 1:15
**state** [1] - 4:11
**STATE** [1] - 30:1
**STATES** [1] - 1:1
**States** [1] - 3:11
**stayed** [1] - 17:11
**stick** [1] - 14:19
**Street** [8] - 2:4, 2:8, 4:17, 4:25, 5:19, 16:21, 20:11, 20:17
**strike** [1] - 16:6
**stuff** [2] - 7:5, 19:1
**subject** [1] - 29:2
**subpoena** [1] - 26:4
**Suite** [2] - 2:9, 2:14
**swear** [1] - 4:2
**sworn** [2] - 4:6, 30:6
**TECHNICIAN** [1] - 3:5
**teen** [1] - 19:6
**testified** [1] - 27:18
**testify** [1] - 30:6
**testifying** [1] - 30:5
**testimony** [2] - 30:7, 30:10
**thanked** [1] - 24:2
**THE** [20] - 1:1, 4:3, 5:21, 5:23, 12:10, 12:24, 14:5, 15:10, 17:17, 19:16, 20:13, 22:4, 22:20, 27:1, 27:8, 27:11, 28:10, 28:17, 29:13
**themselves** [3] - 3:19, 7:23, 20:11
**Three** [1] - 7:17

**threw** [3] - 11:12, 11:17, 20:24
**throw** [1] - 11:14
**throwing** [1] - 14:10
**thrown** [1] - 14:11
**tired** [3] - 12:25, 19:22, 22:22
**today** [6] - 23:23, 24:1, 24:13, 24:22, 28:24, 29:11
**together** [6] - 19:17, 19:19, 19:20, 20:4, 20:6, 20:8
**Tony** [1] - 24:11
**took** [1] - 30:4
**total** [1] - 28:8
**town** [2] - 17:8, 17:9
**trigger** [1] - 19:3
**true** [1] - 30:9
**truth** [2] - 30:6, 30:6
**try** [5] - 14:18, 14:19, 21:25, 22:1, 27:2
**type** [1] - 18:13
**typewriting** [1] - 30:8
**uncle** [2] - 13:18, 15:12
**under** [2] - 4:7, 30:8
**UNITED** [1] - 1:1
**United** [1] - 3:11
**unmute** [1] - 28:20
**unwillingness** [1] - 28:23
**up** [7] - 9:3, 14:19, 24:3, 24:10, 26:4, 26:16
**upstairs** [2] - 27:25, 28:5
**versus** [1] - 3:10
**via** [1] - 28:4
**VIDEO** [1] - 3:5
**video** [1] - 28:2
**Videographer** [1] - 2:15
**videographer** [1] - 3:16
**VIDEOGRAPHER** [7] - 4:1, 27:1, 27:8, 27:11, 28:10, 28:17, 29:13
**videotape** [1] - 29:15
**videotaped** [3] - 1:12, 3:2, 3:6
**visit** [1] - 13:7
**vs** [1] - 1:7
**WAIVED** [1] - 30:11
**walk** [1] - 26:3
**walked** [3] - 27:2, 27:13, 27:14
**WAS** [1] - 30:11

**West** [5] - 4:16, 4:25, 5:19, 14:2, 16:21
**whole** [2] - 5:10, 30:6
**window** [2] - 14:1, 14:11
**WITNESS** [10] - 5:23, 12:24, 14:5, 15:10, 17:17, 19:16, 20:13, 22:4, 22:20, 30:18
**witness** [10] - 4:2, 7:22, 28:14, 28:16, 30:5, 30:7, 30:10, 30:11, 30:12
**witness's** [1] - 28:22
**witnesses** [1] - 7:17
**woke** [1] - 24:3
**woman** [2] - 14:6, 16:9
**Woodbury** [1] - 3:15
**Yamin** [2] - 2:12, 3:22
**YAMIN** [3] - 3:22, 29:9, 29:12
**years** [9] - 5:5, 7:3, 8:16, 10:1, 10:3, 15:10, 15:14, 16:19, 26:14
**Zoom** [1] - 28:4

# Exhibit 13

1

1          IN THE UNITED STATES DISTRICT COURT FOR THE

2                 NORTHERN DISTRICT OF ILLINOIS

3                        EASTERN DIVISION

4     ---------------------------------------------

5     ANTHONY JAKES,

6              Plaintiff,

7                                  File No. 19-cv-02204
           vs.                     Hon. Manish S. Shah
8                                  Hon. Beth W. Jantz

9     KENNETH BOUDREAU, et al.,

10             Defendants.

11    ---------------------------------------------

12             The remote videotaped deposition of

13    ANNETTE HARRIS, taken pursuant to Notice of

14    Taking Deposition before Jolynn Graham, RPR, and a

15    Notary Public in and for the County of

16    Hennepin, State of Minnesota, commencing at

17    approximately 10:01 a.m. on March 9, 2022.

18

19
                   AFFILIATED COURT REPORTERS
20                      6880 River Road
                 Inver Grove Heights, MN 55076
21                      (612) 338-4348
                 Info@AffiliatedReportersMN.com
22

23

24

25

```
 1        APPEARANCES:

 2        On Behalf of the Plaintiff:

 3                 Heather Lewis Donnell, Esquire
                   Loevy and Loevy
 4                 311 N. Aberdeen Street
                   3rd Floor Chicago, Illinois
 5                 donnell@loevy.com

 6        On Behalf of the Defendant Kenneth Boudreau,
          et al:
 7
                   Andrew Grill, Esquire
 8                 Rock Fusco & Connelly, LLC
                   321 N. Clark Street
 9                 Suite 2200
                   Chicago, Illinois 60654
10                 agrill@rfclaw.com

11

12        On Behalf of the Defendant City of Chicago:

13                 George Yamin, Esquire
                   Sotos Law Firm
14                 141 W. Jackson Boulevard
                   Suite 1240A
15                 Chicago, Illinois 60604

16        Also Present:  Adam Wallin, Videographer

17                      DEPOSITION REFERENCE INDEX

18
          Examination by Mr. Grill............. 3, 125
19        Examination by Ms. Donnell..........   111

20

21                      EXHIBITS

22        No. 1 -  Photographs................   86

23

24

25
```

```
 1               P R O C E E D I N G S

 2          The videotaped deposition of ANNETTE

 3     HARRIS was commenced at 10:01 a.m. as

 4     follows:

 5                    *   *   *

 6               VIDEO TECHNICIAN:  We're now on the

 7     record.  This is the video-recorded

 8     deposition of Annette Harris taking place on

 9     March 9, 2022.  The time now is 10:01 a.m.

10     This deposition is being taken in the Anthony

11     Jakes versus Kenneth Boudreau, et al., in the

12     United States District Court in the Northern

13     District of Illinois, Eastern Division, Case

14     No.  19-CV-2204.

15               This deposition is taking place in

16     Woodbury.  My name is Adam Wallin.  I'm the

17     videographer with Affiliated Court Reporters.

18               Will Counsel please identify

19     themselves for the record.

20               MS. DONNELL:  Heather Lewis

21     Donnell, and I represent Anthony Jakes, the

22     Plaintiff, in this matter.

23               MR. GRILL:  Go ahead, George.

24               BY.  YAMIN:  George Yamin, I

25     represent the Defendants, the City of
```

 1    Chicago.

 2              MR. GRILL:  Andrew Grill.  And I

 3    represent the individual police officers.

 4              VIDEO TECHNICIAN:  Will the court

 5    reporter please swear in the witness.

 6                   **ANNETTE HARRIS,**

 7         after having been first duly sworn,

 8         deposes and says under oath as follows:

 9                        * * *

10                    **EXAMINATION**

11              THE WITNESS:  -- the police

12    officers?

13              MR. GRILL:  I didn't understand

14    what you said.

15              THE WITNESS:  Who represents the

16    police officers in Chicago.

17              MR. GRILL:  Are you asking -- say

18    that again?

19              THE WITNESS:  (Inaudible) I want to

20    keep that to myself.

21              MS. DONNELL:  I think she's asking

22    who you represent, Andrew.

23              MR. GRILL:  I can't -- all right.

24    That's fine.  But there's a bigger issue

25    here, and that is at least my audio is pretty

```
 1          muffled.  I don't know if it's because of her
 2          coat or if she's -- I don't know.  It's
 3          pretty difficult to understand you right now,
 4          so can we just --
 5                    THE WITNESS:  You guys said you
 6          don't hear me?
 7                    MR. GRILL:  Yeah, it's a little
 8          echoey and boomy.  I guess we'll do our best
 9          to understand you, but try to speak up the
10          best you can.  Okay, ma'am?
11                    THE WITNESS:  Yeah.
12                    MR. GRILL:  All right.  So to your
13          question, yes, I'm one of the attorneys that
14          represents the police officers.  Does that
15          answer your question?
16                    THE WITNESS:  Yeah.
17     BY MR. GRILL:
18     Q.   Okay.  All right.  Ms. Harris, you sat for a
19          deposition before and walked out; you
20          remember that, right?
21     A.   Yeah.
22     Q.   And I just want to make sure today that you
23          understand -- or do you understand why you're
24          here a second time?
25     A.   Yeah, for the same thing.
```

```
 1   Q.   Okay.  What's that same thing?
 2   A.   The same thing you asked me the first time.
 3        Yeah, I know why I'm here.
 4   Q.   Well, tell me in your own words why you're
 5        here.
 6   A.   I don't know.  I don't know.  You all wanted
 7        me to come back because I walked out.
 8   Q.   Okay.  Do you know what you're here to talk
 9        about today?
10   A.   The same thing.
11   Q.   What's that?
12   A.   The same thing that I was here the first time
13        for.
14   Q.   Well, I need you to tell me in your own
15        words --
16   A.   I don't know -- you all asked me to be here.
17        You tell me -- why I'm here.
18   Q.   Do you not know why you're here today?
19   A.   No, no, I don't.
20   Q.   All right.  Do you know Anthony Jakes is, he
21        also went by the name of Sean Jakes back in
22        1991?
23   A.   Yeah, I do.
24   Q.   How do you know him?
25   A.   Sean?
```

```
 1    Q.    Yes.

 2    A.    He was a friend of the family.

 3    Q.    And who -- what family are you talking about?

 4    A.    My family.

 5    Q.    Okay.  And who is in your family that he was

 6          friends with --

 7    A.    My momma had a baby by Sean's uncle, okay.

 8    Q.    Okay.  So it's you and who else in your

 9          family was Sean, to you knowledge, friends

10          with?

11                 MS. DONNELL:  Objection to form.

12                 THE WITNESS:  Sean -- Sean is

13          related to my brother, he ain't related to

14          me.  He related to my brother.  My momma got

15          a baby by his uncle.  That's the only thing I

16          could say, he ain't related to me.

17    BY MR. GRILL:

18    Q.    What's your brother's name?

19    A.    Eugene.  Eugene Harris.

20    Q.    E-U-G-E-N-E?

21    A.    I guess so.  I think so.

22    Q.    Did you live with Eugene in September of '91?

23    A.    No.

24    Q.    How is Sean related to Eugene?

25    A.    I just told you.  Sean and Eugene, they kin
```

```
 1          folk.  My momma got a baby by Sean's uncle.

 2          So we are not, which he's deceased now.

 3    Q.    So they're cousins?

 4    A.    Yeah, they first cousins.

 5    Q.    Where did Eugene live in September '91?

 6    A.    I don't know.

 7    Q.    Did you see Eugene at all on a regular basis

 8          back at that time period?

 9    A.    Eugene raped me when I was a kid so I

10          don't -- (inaudible) to Eugene.

11    Q.    I'm sorry, I misunderstood you.

12    A.    Eugene raped me when I was kid, I don't want

13          to talk about him.

14    Q.    You said Eugene raped you when you were a

15          kid?

16    A.    Yeah.

17    Q.    I'm sorry to hear that.

18                How old -- how old are you today?

19    A.    47.

20    Q.    How old is Eugene if you know?

21    A.    I don't know.

22    Q.    Was Jakes, Mr. Jakes, Sean, is he older or

23          younger than you, if you now?

24    A.    Who, Sean?

25    Q.    Yeah.
```

```
 1   A.   Sean is younger than me.

 2   Q.   Was Sean and Eugene friends?

 3   A.   They were cousins --

 4             MS. DONNELL:  Objection,

 5        foundation.

 6             THE WITNESS:  -- (inaudible)  Dang.

 7        That's what gets me.

 8        BY MR. GRILL:

 9   Q.   Well, there's a difference, I think you'd

10        agree --

11   A.   You asked me the same questions just like --

12        you trying to confuse me but you can't.

13        Eugene and Sean are first blood cousins.

14   Q.   Okay.  So my question was, were they also

15        friends?

16             MS. DONNELL:  Objection, asked and

17        answered.

18             MR. GRILL:  I didn't hear your

19        answer --

20             THE WITNESS:  I don't know.  I

21        don't know.  I do not know.

22             MR. GRILL:  Okay.

23             THE WITNESS:  I just know they

24        cousins.

25             MR. GRILL:  Okay.
```

```
 1         BY MR. GRILL:
 2    Q.   How much younger than you is Mr. Jakes?
 3    A.   I don't know.  I don't even know how old he
 4         is.
 5    Q.   Where did he live in 1991?
 6    A.   I don't know.  I know where I stayed in 1991,
 7         51st and Racine --
 8              MS. DONNELL:  I just need to make
 9         an objection, that's been asked and answered
10         in the prior deposition.
11              THE WITNESS:  They asked the same
12         things.
13              MR. GRILL:  Okay.  Well, you walked
14         out of the last deposition, so I might go
15         over some of the same questions for
16         foundation -- what the foundation is, so...
17              MS. DONNELL:  That's fine.  I'm
18         just making a record, Andrew.  Thank you.
19              MR. GRILL:  Yeah, whatever.
20         BY MR. GRILL:
21    Q.   Ms. Harris, in September 1991, do you
22         remember the address of the house or
23         apartment building that you lived in at that
24         time?
25    A.   1212 West 51st Street.
```

```
1   Q.   1212, or what was the address, it's very

2        echoey.

3   A.   1212 West 51st Street.

4   Q.   Is that a house --

5              THE COURT REPORTER:  Please wait

6        until --

7              MR. GRILL:  I'll talk to her about

8        it.

9              So, Ms. Harris, since there's a

10       court reporter here that's writing down

11       everything that everyone is saying, it's

12       really hard for her to make an accurate

13       record about what anyone says if people are

14       talking at the same time.

15             THE WITNESS:  It ain't fault --

16       (inaudible) microphones and stuff.

17             MR. GRILL:  So just there, you

18       spoke over me.  I wasn't done talking and you

19       started talking, and that's -- that's okay --

20             THE WITNESS:  But you're asking

21       me -- I know what you're going to ask me --

22       you're asking me the same questions.  Are you

23       trying to confuse me or something?  I mean

24       it's the same questions.

25             MR. GRILL:  Okay.  So, that's fine.
```

1    But that's not the point.  Your job here

2    today, ma'am, is to answer the questions --

3    hang on, so this is exactly what I'm talking

4    about here, okay.  Your job here today is to

5    answer questions whether you think they were

6    asked again or they're the same question.

7    That's not your concern.  That's the concern

8    for the lawyers, okay.

9              Your job is to simply answer the

10   questions to the best you can remember and

11   truthfully.  And in order for us to get an

12   accurate record we can't talk over each

13   other.  So the best way for us to do that is

14   simply don't start talking until I'm done

15   answer -- I'm done asking the question.  Is

16   that --

17              THE WITNESS:  I see, you asked me

18   what (inaudible) --

19              MR. GRILL:  I'm just telling you --

20              THE WITNESS:  And that's --

21              MR. GRILL:  And see right there

22   you're still talking over me.  So I'm going

23   to continue with the deposition, but I gather

24   you probably want to not be here today; is

25   that right?  Is that fair?

```
 1              THE WITNESS:  Yeah, I'm here to
 2      save an innocent person from going to jail,
 3      that's what I'm here for.
 4              MR. GRILL:  Okay.  Is it important
 5      to you to save an innocent person today?
 6              THE WITNESS:  Yes --
 7              MS. DONNELL:  Objection.  Andrew, I
 8      would just ask that you do the same thing,
 9      that you don't interrupt Ms. Harris when
10      she's answering was way, so that it goes both
11      ways.
12              MR. GRILL:  And I would ask you to
13      give me the same courtesy.
14              MS. DONNELL:  I -- I -- I'm doing
15      my best, Andrew, I'm doing my best.  But
16      again, I think both you and Ms. Harris need
17      to wait until the other is completed.  And
18      you should wait until Ms. Harris is completed
19      with the answer before you ask the next
20      question, and that will make a clear record.
21              MR. GRILL:  Well -- you don't need
22      to interrupt.
23      BY MR. GRILL:
24  Q.  So Ms. Harris, here's my question that I
25      still need an answer to, is it important to
```

```
 1          you to save this innocent person?
 2    A.    Yes, it is.
 3    Q.    Okay.  So, in order to do that, and to make a
 4          clear record, I just need you to follow these
 5          rules and answer the questions, okay?  Fair?
 6                    I need to know if you think that's
 7          fair?
 8    A.    Yeah, it's fair.  Ask me your next question.
 9    Q.    Okay, great.  This innocent person that
10          you're referring to, who is it?
11    A.    Sean.
12    Q.    Sean Jakes?
13    A.    Yeah.
14    Q.    How do you know he's innocent?
15    A.    (Inaudible) because he is.  Sean -- Sean was
16          in social security back in -- come on, Sean
17          was just a kid, you know what I'm saying,
18          Sean didn't do that.
19    Q.    Did you see the shooting?
20                    MS. DONNELL:  I'm sorry, again you
21          interrupted Ms. Harris.  So please follow
22          your own instructions.
23                    THE WITNESS:  Thank you.
24    BY MR. GRILL:
25    Q.    Did you see the shooting, Ms. Harris?
```

```
 1    A.    No.

 2    Q.    Did you ever talk to Sean about it?

 3    A.    No.

 4    Q.    Did you talk to anybody that witnessed it?

 5    A.    No.

 6    Q.    How do he know that he's innocent?

 7    A.    Because he's innocent.

 8    Q.    Based on what?

 9    A.    He's innocent.

10    Q.    Based on what?

11    A.    Sean is a kid, you know what I'm saying, I

12          mean Sean didn't like the knowledge to sit up

13          and kill someone.  You know what I'm saying?

14          And Sean had HDHD [sic] back then.  Sean was

15          getting a social security check.  Sean was

16          just as kid.  I was just 14, come on now.

17    Q.    Sean was 15 years old at the time?

18                MS. DONNELL:  Objection, form.

19          BY MR. GRILL:

20    Q.    Right?

21    A.    I don't know, I know how old I was.

22    Q.    Okay.

23    A.    Okay.

24    Q.    You sure you were 14 at the time in September

25          of 1991?  Well, let me ask you this, what's
```

1     your birthday?

2   A.   1/2.

3   Q.   Of what year?

4   A.   1975.

5   Q.   Okay.  Did you know as of September 15, 1991,

6        whether Mr. Jakes had ever been arrested for

7        any crime before that date?

8   A.   I don't remember.

9   Q.   Okay.  Did you know whether he had ever been

10       accused of robbing somebody?

11  A.   No, not that I know of.

12  Q.   Did you know if the police ever accused

13       him -- or not the police, let's start with

14       victims.  Do you know if any women ever

15       accused Mr. Jakes of raping them?

16  A.   No, not that I know of.

17  Q.   Did you know whether the police ever arrested

18       Mr. Jakes or questioned him about committing

19       a sexual assault on women?

20            MS. DONNELL:  Objection,

21       foundation.  And she's already said she had

22       no knowledge of any arrests, so this is --

23            MR. GRILL:  Please don't coach the

24       witness.

25            MS. DONNELL:  Objection,

```
 1        foundation.

 2        BY MR. GRILL:

 3   Q.   Okay.  Ms. Harris, did you know if the police

 4        ever questioned Mr. Jakes in regard to any --

 5   A.   Not that I know of.

 6   Q.   Do you know if he was ever arrested for

 7        anything like that?

 8               MS. DONNELL:  Objection,

 9        foundation.

10               MR. GRILL:  Yes or no, do you know?

11               THE WITNESS:  I said not that I

12        know of.

13        BY MR. GRILL:

14   Q.   Do you know if Mr. Jakes ever got arrested

15        for drug possession?

16               MS. DONNELL:  Objection,

17        foundation.

18               THE WITNESS:  Not that I know of.

19        BY MR. GRILL:

20   Q.   All right.  And what is it about Jakes' young

21        age that convinces you that he could not have

22        committed or participated, I should say, in

23        this murder?

24               MS. DONNELL:  Objection, asked and

25        answered.  You can answer.
```

```
 1                    THE WITNESS:  You said I can
 2        answer?
 3                    MR. GRILL:  Yeah.
 4                    MS. DONNELL:  Yeah, I'm making a
 5        record -- sometimes, Ms. Harris, I'm just
 6        making a record.  It's just me doing my job
 7        but you can still answer the question, I'm
 8        just making a record.
 9                    THE WITNESS:  I understand, I
10        understand.
11                    You have to ask me again, I got
12        loss of memories.
13                    MR. GRILL:  Ms. Court Reporter, can
14        you read that question back?
15                    (The requested portion was read by
16        the court reporter.)
17                    MS. DONNELL:  Same objection.
18                    THE WITNESS:  Sean was -- Sean had
19        like social security back then, and Sean's
20        mind wasn't -- the way I remember him, his
21        mind was able to do nothing like that.  Sean
22        was like hyper -- Sean was like
23        (inaudible) -- you know, messing up, but
24        actually he was a good kid.  He was a good
25        kid, to my knowledge he was.
```

```
 1          BY MR. GRILL:
 2     Q.   Do you know if Sean was a member of any
 3          street gang back in 1991?
 4     A.   Not that I know of.
 5                    MS. DONNELL:  Objection,
 6          foundation.
 7                    MR. GRILL:  I don't understand that
 8          objection.
 9          BY MR. GRILL:
10     Q.   Do you recall whether you were a member of
11          any street gang back in 1991?
12     A.   No.
13     Q.   Do you know or have a recollection as to what
14          street gangs were in the immediate vicinity
15          of 1212 West 51st Street?
16     A.   Not that I know of.
17     Q.   Were the Black Stones a gang that was in that
18          area?
19     A.   Not that I know of.
20     Q.   Okay.  Do you know any gangs that were in
21          that area?
22     A.   Nope.
23     Q.   Did you know whether Mr. Jakes went to school
24          back in September of 1991?
25     A.   Basically I don't know.
```

```
 1   Q.   Did you know who any of Mr. Jakes's friends
 2        were back in September of 1991?
 3   A.   Not that I know of.
 4   Q.   Did you know whether Mr. Jakes had a job in
 5        September of 1991?
 6   A.   Not that I know of.  Like I said, I was a kid
 7        myself.
 8   Q.   Well, you told me that you know that you're
 9        sure that he was --
10   A.   He used to play with us.  He used to play
11        with us.  He stayed behind us.  We all used
12        to play together.  Now, Sean sitting up here
13        pulling a trigger and killing somebody, no,
14        no, no.  I know that much, no.  No, he
15        didn't.
16   Q.   Right.  So I'm trying to figure out --
17   A.   He wasn't -- he wasn't raised like that, you
18        know, he's a kid had HDHD, just like --
19        (inaudible), you know, I mean we all was
20        family.  But as far as him pulling a trigger
21        trying to kill somebody, no.  No.
22   Q.   Did he used to pick on people?
23   A.   No, playing with us, no, he didn't run -- we
24        used to play games and stuff when we was
25        kids, you know.
```

```
 1   Q.   Who's we?

 2   A.   The family, his brothers -- his brother, my

 3        brother, my sisters.

 4   Q.   Right.  Some names would be helpful, can you

 5        give me some names?

 6             MS. DONNELL:  Objection, form.

 7             THE WITNESS:  (Inaudible) DJ, I

 8        didn't know.

 9   BY MR. GRILL:

10   Q.   I didn't catch any of that.  Can you say that

11        again.

12   A.   He got a sister named Bougi and a brother

13        named DJ.

14   Q.   Can you spell Bougi?

15   A.   No, I don't -- no, I don't.  No, I don't.

16   Q.   Is that a nickname, Bougi?

17   A.   I don't know.  It should be in your all

18        paperwork.

19   Q.   I'm asking you.  It doesn't matter what's in

20        the paperwork.  Is that a nickname?

21             MS. DONNELL:  Objection, form.

22        It's been asked and answered.

23             THE WITNESS:  I don't know.  I just

24        know her by Bougi.

25   BY MR. GRILL:
```

```
 1   Q.   DJ, his brother, is that a nickname or is
 2        that --
 3   A.   I guess that's his name, I don't know.
 4        That's what I know him by, DJ.
 5   Q.   So you don't know how to spell Bougi or Bougi
 6        at all?
 7   A.   No, no, no.
 8   Q.   Were you friends with Jakes's sister?
 9   A.   Yeah, we all was friends.
10   Q.   What about his brother DJ?
11   A.   Of course, we all stayed in the building
12        together.
13   Q.   What building are you talking about?
14   A.   1212 West 51st Street.
15   Q.   Where is -- again, I would asked you before
16        but I don't think you answered the question.
17        Is 1212 a single-family home or is it like
18        a --
19   A.   Like a two plex, it was a two plex.
20   Q.   And what floor did you live on?
21   A.   Second floor.
22   Q.   And that was in September of '91?
23   A.   I don't know.  I don't remember.  We
24        stayed -- we moved in, we moved out.  I don't
25        know how long we there.
```

```
 1   Q.   So I'm going to represent to you that the
 2        murder that you believe Mr. Jakes is innocent
 3        of committing or participating in, happened
 4        on September 15, 1991, okay.
 5                 So at the time that shooting
 6        happened, were you living on the second floor
 7        of 1212 West 51st Street at that time?
 8   A.   Yup.
 9                 MS. DONNELL:  Objection, asked and
10        answered.
11        BY MR. GRILL:
12   Q.   And you lived up there with you and your
13        sister and your mom?
14   A.   Yeah.
15   Q.   And your sister's name is?
16   A.   I got a lot of sisters.
17   Q.   Well, the ones that lived at 1212 West 51st
18        Street on the second floor, those are the
19        only ones I am talking about right now.
20   A.   All of them.
21   Q.   Okay.  So what are all their names?
22   A.   One sister is Denise, one sister named
23        Cynthia, another sister's name is Tawana,
24        she's deceased, another sister named
25        Clarinda, she's in a group room.  My baby
```

```
 1             sister wasn't born, and then it's me.

 2   Q.    Tawana, and the one after her, you said you

 3         have a sister that's in a group home, I

 4         missed the name of that --

 5   A.    That's Clarinda (inaudible.)

 6   Q.    Clarinda?

 7   A.    Yeah.

 8   Q.    And is the order that you just gave me of

 9         those names, is that oldest to youngest?

10   A.    And then there's Terese, she wasn't even in

11         the picture, she wasn't even born.  But she's

12         my little baby sister, she's the baby girl

13         out of all the others.  She wasn't even born.

14         She wasn't even thought of.

15   Q.    What is your mom's name?

16   A.    Della Harris.

17   Q.    Did your dad live at 1212 West 51st Street --

18   A.    No, my dad didn't.  No, my mom and my dad was

19         not together.

20   Q.    Okay.  So it's your mom, you, Denise,

21         Cynthia, Tawana and Clarinda?

22   A.    Darius, Maurice, Manny, (inaudible) Dennis,

23         all of us.

24   Q.    All of you lived on the second floor at 1212

25         West 51st Street --
```

```
 1   A.   Yeah, we had a big family.

 2   Q.   Okay.  How many bedrooms were in that

 3        apartment?

 4   A.   Three.

 5   Q.   Three, okay.  Are you the oldest then?

 6   A.   No, I'm not.

 7   Q.   Who is the oldest?

 8   A.   Clarinda is the oldest, she's in a group

 9        home.  She had a brain stroke so she does not

10        need to be bothered.

11   Q.   Not going to bother her, just trying to

12        figure --

13   A.   She can't even talk.  She can't even talk

14        so...

15   Q.   Okay.  And you said that -- you said that

16        Sean and his mom lived on the first floor at

17        1212?

18            MS. DONNELL:  Objection, form.

19        Misstates her testimony.

20            MR. GRILL:  Well, it's actually on

21        page 5, lines 18-24 of her first deposition,

22        but I just wanted to confirm that --

23            MS. DONNELL:  Okay.

24            MR. GRILL:  -- that was her

25        testimony.
```

```
 1          BY MR. GRILL:
 2     Q.   Ma'am, Sean and his mom lived on the first
 3          floor of 1212, right?
 4     A.   Yeah, they also stayed in the back apartment
 5          too with their auntie.
 6     Q.   Right.  And that aunt's name was?
 7     A.   Bea.
 8     Q.   Did you know her?
 9     A.   That's his Aunt Bea, she was our landlord.
10     Q.   Okay.  My question, though, is pretty simple
11          and different than what I think you are
12          answering.
13     A.   You're just trying to confuse me.
14     Q.   Well, it would probably be less confusing for
15          you if you would just listen to my questions.
16     A.   I did -- I do listen to your question.  And
17          you're going to talk to me with respect too.
18     Q.   Okay.  So my question is --
19     A.   Whoever the hell you think you are.  Like I
20          just told you, he stayed in the apartment
21          with his Auntie Bea.  He stayed back there
22          too.  She was our landlord.
23     Q.   Right.  So just give me like a straight
24          answer to the question, yes or no.  Did you
25          know Aunt Bea in September of 1991?
```

1          MS. DONNELL:  Andrew, I'm going to

2     object -- hold on one second, Ms. Harris.

3          I am going to object to the form of

4     the question and also the tone in which

5     you're asking them.  I do think it's getting

6     very argumentative, and so I'm going to just

7     ask that you refrain from that, and ask the

8     questions and Ms. Harris is sitting here

9     answering them.

10          So I would like to ask you to

11     please refrain from that tone, Andrew.

12          MR. GRILL:  I just don't think I'm

13     the one with the tone, but that's fine.

14     BY MR. GRILL:

15  Q.  So I have forgotten already because of all

16     the interruptions if you answered my question

17     so I am going to ask it again.

18          Did you know Aunt Bea in September

19     of 1991?

20          MS. DONNELL:  It's been asked and

21     answered.  Objection.

22          MR. GRILL:  Yeah, but --

23          THE WITNESS:  I'm not going to

24     answer it again, I already answered.

25          MS. DONNELL:  Ms. Harris, I am

```
 1            going to have to make those objection, but

 2            you do have to answer again.  But I will make

 3            those objections.  But I think you have

 4            answered, but please just answer it again.

 5                      THE WITNESS:  Okay.

 6                      MR. GRILL:  Yes or no?

 7                      THE WITNESS:  Yes, I knew her.

 8       BY MR. GRILL:

 9  Q.    Okay, great.  Who lives with Aunt Bea?  Well,

10            let me -- hang on, I am going to withdraw

11            that question.  Let's go back to the first

12            floor of the 1212 building.

13                      When did Sean and his momma live on

14            the first floor --

15  A.    I don't know.  I don't know.  I don't know.

16  Q.    When did Sean -- did Sean and his momma at

17            some point move -- to your knowledge, move in

18            with Aunt Bea in the back house?

19  A.    I don't know.

20  Q.    Okay.  Do you know where Sean lived in

21            September 15th of -- September 15th of 1991?

22  A.    I don't -- I can't remember.  I can't

23            remember.

24  Q.    Okay.  Is there anything that can help you

25            remember?
```

```
 1   A.   No.  That was 30 years ago, and I am not
 2        going to pressure my mind going 30 years
 3        back.
 4   Q.   Well, you're here to save --
 5   A.   I'm on medication and I'm on everything, and
 6        I can't remember.
 7   Q.   Okay.  So, you said -- you told me a minute
 8        ago that you're here to save an innocent
 9        person, so I want --
10   A.   But you --
11   Q.   Hang on.  I want to give you the opportunity
12        to think really hard, and about whether you
13        knew where Sean lived on September 15th of
14        1991?
15   A.   I do not know.
16   Q.   Okay.  You said you're on medication today.
17        Does the medication interfere with your
18        ability --
19   A.   This is not -- I am going to let you finish
20        talking.  Go ahead.
21   Q.   Thank you.  That's a good idea.  Does the
22        medication that you're on interfere with your
23        ability to recall you events, if you know?
24   A.   My medication ain't got nothing to do with
25        this.
```

```
 1    Q.   That's not my question.

 2    A.   Like I said, my medication ain't got nothing

 3         to do with this.  That's my -- that's my

 4         answer.

 5    Q.   So maybe I just don't understand what you

 6         mean by your answer.

 7    A.   I don't understand what you saying.

 8    Q.   So you know -- you understand what the

 9         concept about being able to remember is,

10         right?

11    A.   I understand right from wrong, I know that.

12    Q.   Do you know what I mean if I ask you the

13         question, do you remember something, do you

14         understand what I mean, what the word

15         remember means?

16              MS. DONNELL:  Objection, form.

17              THE WITNESS:  Yeah, I remember what

18         the word remember means.

19    BY MR. GRILL:

20    Q.   Okay.  And does the medication that you're on

21         impact, if you know, your ability to remember

22         anything?

23    A.   No.

24    Q.   Okay.  Great.  And is it -- does it make you

25         tired or anything that might interfere with
```

```
1          your ability today to complete this
2          deposition?
3    A.    Nope.
4    Q.    Okay.  All right.  And I'm only asking those
5          questions because you just raised on your own
6          the fact that you're on medication, and it
7          left me with the impression that you were
8          suggesting that it might affect you today.  I
9          just want to find out if that's the case.
10   A.    That's how you feel, not me.
11   Q.    Great.  Yeah, it doesn't matter how I feel.
12         I just need to make sure for the record that
13         whatever medication you're on is not going
14         impact your testimony today.  Okay?
15              MS. DONNELL:  Objection, asked and
16         answered.
17   BY MR. GRILL:
18   Q.    Does the medication that you're on, to your
19         knowledge --
20   A.    I said no.
21   Q.    Okay.  Hang on.  I got a new question here.
22         Does the medication that you're on right now,
23         to your knowledge, impact your ability to
24         tell the truth?
25   A.    It's my blood pressure.
```

1   Q.   Okay.

2   A.   That's the only medicine.

3   Q.   I didn't want to ask that question because

4        it's private, I just wanted to know --

5   A.   If it was meant to be private, you asking me?

6   Q.   Well, I wasn't asking you the type of

7        medication you're on, because that would tell

8        me something about whatever your medical

9        condition is.

10  A.   Can we get on with this.

11  Q.   Mm-hmm.  All right.  So when was the last

12       time you talked with Anthony Jakes?

13            MS. DONNELL:  Objection, asked and

14       answered.

15            You can answer again, Ms. Harris.

16            THE WITNESS:  I don't talk to him.

17       I don't know where he is.

18  BY MR. GRILL:

19  Q.   When was the last time you saw him?

20  A.   I don't know.  Last time I seen him was when

21       we was kids, you know how many years that

22       was.

23  Q.   Was it the night the shooting happened?

24  A.   Yeah, yeah, yeah.

25  Q.   Who did -- who else lived on the first floor

```
 1           at 1212 with Sean and his mom?

 2   A.    I don't know -- I don't know.  I don't know.

 3         I don't know.  I don't know.

 4   Q.    Did you know Sean's mother?

 5   A.    Yes, I did.

 6   Q.    Okay.  What was her name?

 7   A.    Reen.

 8   Q.    Say that again?

 9   A.    Reen.

10   Q.    Can you spell that?

11   A.    Nope.

12   Q.    What I'm hearing on my end is Reen, but I

13         don't think that's her name.

14   A.    Reen, that's her name.  Reen.

15   Q.    Reen, R-E-E-N?

16   A.    Reen, yeah.  But she's deceased now.

17   Q.    Yeah, I know that, I just don't remember that

18         name.

19               Okay.  You said that Jakes had -- I

20         think you meant to say ADHD; is that right?

21   A.    Yeah.

22   Q.    Okay.  How do you know that he had ADHD in

23         September of 1991?

24   A.    I just know his momma was getting a social

25         security check for him, that's all I know.
```

```
1    Q.    Okay.  So when you say he had ADHD and was on
2          social security, you mean that the social
3          security for you was some evidence that he
4          actually had ADHD?
5    A.    Sorry, what did you just say?
6    Q.    You tell me -- instead of me trying to say it
7          for you I'll ask you.
8    A.    (Inaudible) he got a social security check,
9          and so a social security check is for any
10         person that got a problem, he had HDHD,
11         that's the only thing that happened to him.
12         (Inaudible) was a bad ass kid, he was out
13         there playing.  He didn't -- he -- just like
14         I said, Sean wasn't the type that do nothing
15         like that.  Y'all just took an innocent
16         person for no reason.
17               Y'all didn't even stood up there to
18         stake the neighborhood and figure out who
19         did, or what happened and nothing.  Y'all
20         just going by people saying, yeah, who was
21         over there, who was out there, come on now.
22         Y'all just took a boy's life away from him,
23         okay, and that was so wrong.  That was so
24         wrong.  That was so wrong.
25   Q.    Mm-hmm.  So, right.  You keep saying that so
```

```
 1          I'm still trying to figure out like why you
 2          believe that.
 3                  So, you know, what -- have you ever
 4          spoken to anybody --
 5    A.    I don't talk to nobody.
 6    Q.    -- hang on, hang on, hang on.  Since
 7          September 15, 1991, have you ever spoken to
 8          anybody about the shooting that happened
 9          outside of the Queen Submarine there on 51st
10          and Racine?
11    A.    Nope, because I was going through my own
12          problems.
13    Q.    Mm-hmm.  So I want you to -- and I will give
14          you -- if you need to think about this for a
15          minute --
16    A.    Nothing I already told you.
17    Q.    Hang on, I haven't even asked my question.  I
18          will give you some time to think about this,
19          because I really want you to think as hard as
20          you can about what information you know from
21          any source that proves to you that Sean did
22          not participate in this shooting.
23                  What do you know, other than beyond
24          your own feelings, that, you know, he's not
25          that type of person, do you know anything
```

```
 1          from anybody that tells you, nope, Sean could
 2          definitely not have participated in the
 3          shooting?
 4    A.    You through talking?
 5    Q.    I'm giving you the floor.
 6    A.    The only thing I know is Sean didn't do it.
 7    Q.    Right.  So I'm trying to figure out --
 8    A.    I don't got --
 9    Q.    -- like how do you know that?
10    A.    He didn't do it.
11    Q.    Right.  But why do you --
12    A.    Because Sean was just out there with us, Sean
13          didn't do it.  Sean didn't do it.  I just
14          know that for sure, Sean didn't do it.
15    Q.    Sean was just out there with us, tell me what
16          you mean by that?
17    A.    He was juts outside on the front with us.
18    Q.    The front where?
19    A.    -- the front with us.
20    Q.    The --
21    A.    Sean ran in the house, Sean ran in the house.
22          That night Sean was picking me with me and I
23          was pregnant and I chased him through the
24          gateway.  But Sean -- Sean didn't do it.
25    Q.    Okay.
```

```
 1   A.   Sean didn't do it.  The only thing I know
 2        Sean didn't do it.
 3   Q.   Okay.  So let's back this up.  So when was
 4        Sean on the porch with you?
 5   A.   I don't know.  That night, we was just
 6        outside.  We was just kids, just outside.
 7        What time that shit happened, what time that
 8        happened, I don't know.  We was outside.  One
 9        thing I can say, Sean did not do.
10   Q.   Right.  I got it.  So your job here is to, in
11        part, tell me why that's the case.  Okay.
12             So, did you -- you already told me
13        that you did not actually see the shooting,
14        right?
15   A.   No, I didn't.  No, I didn't.
16   Q.   Okay.  And how did you find out, if you
17        didn't see it, that there was a shooting
18        outside the Queen Submarine shop?
19   A.   (Inaudible) how you going to ask me how can I
20        find out.  We stay two apartments down.  Only
21        thing we got to do is look out our window.
22   Q.   Right --
23   A.   Only two apartments down, the Submarine is
24        right there, just one, two, we the third.
25        How could you not see nothing out there if
```

```
 1        somebody getting shoot.  Who ain't going to
 2        run to their front window and look out the
 3        window, huh.
 4   Q.   Did you run to your front window and look
 5        out?
 6   A.   I don't know.  I don't know.  I was a kid.  I
 7        don't know.
 8   Q.   Okay.  So I only want you to tell me about --
 9   A.   I told you I don't know.
10   Q.   Okay.  Do you remember if you heard gunshots?
11   A.   I don't know.
12   Q.   Okay.
13   A.   I don't know.
14   Q.   Do you remember where you were at the time of
15        the shooting?
16   A.   I don't know.  I don't know.  I don't know.
17   Q.   Do you remember who you were with at the time
18        of the shooting?
19   A.   I know I was pregnant.  I was with my baby, I
20        know that.
21   Q.   So you were definitely with your unborn baby.
22   A.   Yeah.
23   Q.   Do you remember if you were with anybody
24        else?
25   A.   No.
```

```
 1   Q.   Do you remember if you saw Sean -- well, let
 2        me ask you this.  It sounds like something
 3        you just said a minute ago that at some point
 4        on the night of September 15, 1991, you were
 5        on the front porch at 1212; is that right?
 6   A.   You know what, I was just saying we was
 7        outside.  We was outside.  I don't know what
 8        day it happened.  I don't know what day it
 9        was.  We was outside.  And you trying to
10        confuse me and put something in my
11        mouth (inaudible) -- I ain't told you nothing
12        like that.
13             I just said we was outside when --
14        we was outside, and I don't know if I was in
15        the house or not when the shooting occurred.
16        But Sean didn't do it.  I just know we all
17        there playing.  But when the shooting
18        occurred, I don't know and I can't remember.
19        Because I know what happened that night.
20   Q.   If you were -- if you were -- I'm not saying,
21        since you don't remember that you did this,
22        but if you were to look out the front window
23        of 1212, could you see the scene, you know,
24        where this guy was shot?
25   A.   It was right there in front of the house.
```

1   Q.   So that's a yes?

2            MS. DONNELL:  Objection.  Well,

3        sorry, you're asking the hypothetical could

4        you see the Queen shop or did she see the

5        actual murder.  I'm just not clear what your

6        question was (inaudible).

7            MR. GRILL:  I said where this guy

8        was shot.

9            MS. DONNELL:  So could she see the

10       location he was shot or could she see him

11       being shot?

12       BY MR. GRILL:

13  Q.   My question, ma'am, is if you were to look

14       out the window of 1212, could you see where

15       this guy was shot?

16  A.   Yeah.

17  Q.   Okay.  Do you remember seeing a person lying

18       in the street?

19  A.   I don't -- I don't remember.  I don't

20       remember.

21           MS. DONNELL:  Objection.

22       Foundation.

23           THE WITNESS:  I don't remember.  I

24       don't remember.

25       BY MR. GRILL:

41

```
 1   Q.   Is there anything that would--
 2   A.   I could look out the window and see the scene
 3        right there, but I don't remember.  I don't.
 4   Q.   Is there anything that would help you
 5        remember what you saw?
 6   A.   Nope.  I don't want to remember (inaudible).
 7   Q.   Why don't you want to remember it?
 8   A.   Because it's not -- I mean, why would I worry
 9        about something that happened 30 years ago.
10   Q.   Well, because you're here trying to get an
11        innocent person --
12   A.   Just like I said, he didn't do it.
13   Q.   Right.  So I understand that you might not
14        want to remember a shooting, but --
15   A.   No, I don't want to remember that.  I don't
16        want to remember nobody's shooting.
17   Q.   Do you think if you could remember it would
18        help clear Mr. Jakes's name?
19   A.   Mr. Jakes's name is clear, he didn't do it.
20        He didn't do it.
21   Q.   Okay.  Do you have an understanding -- go
22        ahead.
23   A.   Yeah.
24   Q.   Was there something else you wanted to say?
25   A.   No, hu-huh.
```

```
 1   Q.   Do you have an understanding of what
 2        Mr. Jakes's lawsuit is about?
 3   A.   What his what is about?
 4   Q.   What his lawsuit is about, that you're here
 5        giving a deposition for.
 6   A.   (Inaudible) what his lawsuit is about.  Y'all
 7        locked an innocent man up.  That's what his
 8        lawsuit is about.  He lost half of his life,
 9        you know.
10   Q.   Has you ever seen his law -- a copy of the
11        Complaint that he filed, the lawsuit?
12   A.   I ain't -- I ain't seen nothing, it ain't my
13        business.
14   Q.   Did you ever talk to anybody about it?
15   A.   Nope.
16   Q.   Did you ever talk to any of Mr. Jakes's
17        attorneys?
18   A.   Nope.
19   Q.   Ever?
20   A.   Nope.
21   Q.   Never talked to Ms. Donnell before today?
22   A.   Nope.  Who is that, who is --
23   Q.   Ms. Donnell is here on this deposition, she's
24        the woman that is making objections.
25   A.   I ain't met nobody.
```

```
 1   Q.   Okay.  You have -- was there any -- you
 2        remember when Mr. Jakes -- well, let me ask
 3        this.  Let me start that over.
 4             At some point after the shooting,
 5        did you ever learn that Mr. Jakes had been
 6        arrested for having participated in the
 7        shooting that happened out in front of 1212
 8        basically?
 9   A.   I don't know nothing.  The only thing I know,
10        they said Sean was locked up for some
11        shooting.
12   Q.   Okay.  Do you know whether he ever went to a
13        criminal trial -- ever had a criminal trial?
14   A.   I don't -- I don't know nothing about that.
15        That's nothing for me to worry about.  The
16        only thing I'm just saying, y'all locked the
17        innocent man up for no reason.
18   Q.   Yeah, I know that.
19   A.   Then you trying to push the pressure down on
20        me.  What his family, where his family at,
21        they stayed (inaudible) why just me.  Because
22        I say he didn't do it, which he didn't, and
23        I'm going speak -- (inaudible) he didn't do
24        the murder.
25   Q.   So did --
```

1    A.    Where is everybody else?  Where is his

2          family, that's -- that's what I want to ask,

3          where is his family that he stayed with.

4    Q.    So did -- when Mr. Jakes was away or was --

5          let me start that over.

6                    After Mr. Jakes was arrested for

7          this, I will represent to you that he had an

8          attorney and he eventually went to trial

9          after which a jury convicted him of having

10         participated in this homicide.  Okay.  So,

11         and this it is a long time ago, but I want to

12         know whether any -- you have any memory of

13         any attorneys ever reaching out to you on

14         behalf of Mr. Jakes to talk to you about

15         whether you knew anything that could help him

16         in defending himself against the murder

17         charges that the State's Attorney Office

18         brought against him.

19   A.    No.  I have my own life, I went on with of my

20         life.

21   Q.    All right.  Sitting here today, is there

22         anything that you can think of that you know

23         about this murder that you could have -- you

24         think you could have told a jury in order to

25         prove or to help Mr. Jakes prove that he was

```
 1         not -- could not have been involved in the

 2         shooting?

 3    A.   I can't think of nothing.

 4    Q.   Why?

 5    A.   I could just say, y'all just locked an

 6         innocent man up.  That's the only thing I can

 7         say.

 8    Q.   Okay.  So there's no -- nothing that you

 9         remember seeing that would allow you to tell

10         a jury, Hey, Mr. Jakes could not have

11         participated in this murder, anything like

12         that?

13    A.   No.  When I left home, I left home when I was

14         16 years old, I wasn't even thinking about no

15         murder.  All that stuff that happened, you

16         know what I'm saying, I got a life, I got

17         nine kids, you know, life goes on.

18    Q.   Do you know what an alibi witness is?

19              MS. DONNELL:  Objection, it's been

20         asked and answered.

21              MR. GRILL:  I'm going to ask it

22         again.

23         BY MR. GRILL:

24    Q.   Do you know what an alibi is.

25              MS. DONNELL:  Objection, asked and
```

1    answered.

2              But you can answer, Ms. Harris,

3    again.

4              THE WITNESS:  No.  I'm not going to

5    answer again.  I already told him.

6              MR. GRILL:  Well, you have to,

7    so --

8              THE WITNESS:  Yeah, I know what an

9    alibi witness is.

10   BY MR. GRILL:

11   Q.   Tell me in your own words what you

12        understand --

13   A.   (Inaudible).

14              MS. DONNELL:  Objection, asked and

15        answered, but you can answer it again.

16   BY MR. GRILL:

17   Q.   An alibi witness -- you tell me if you agree

18        with this definition -- an alibi witness is

19        somebody that can say that a person charged

20        with a crime couldn't have done it because

21        they were somewhere else at the time the

22        crime happened; does that make sense?

23   A.   Well, it may make sense.  But like I said,

24        Sean didn't do it.

25   Q.   Right.  I know.  So...

```
1   A.   And my momma didn't allow us to talk to
2        nobody, you know what I'm saying.  You know
3        what I'm saying.
4                  I mean, y'all (inaudible) --
5        there's other peoples out there that know
6        something.  There's other peoples out there
7        that know something.  I don't know.  Like I
8        said, I had my own life.  You know, I was
9        pregnant at the age of 14.  My baby's daddy
10       went to jail for a murder.  I had -- I had
11       shit on my mind too.  Excuse my language.  I
12       had shit on my mind too.
13                 I know for sure Sean didn't do it.
14  Q.   Right.  So it sounds like --
15  A.   (Inaudible) you got these people locked up,
16       innocent people.  My brother even went to
17       jail at the same place for a robbery or
18       something he didn't do.  I mean, y'all know
19       it was just messed up back then, and now.
20  Q.   So the bottom line is --
21  A.   My life was moving on and I feel that, and
22       I'm not going to pressure my mind about
23       nothing that happened 30 years.  I do know
24       that 30 years ago that Sean didn't do it.  I
25       know that for sure.
```

48

```
 1   Q.   Got it.

 2   A.   (Inaudible) y'all locked that boy up and took

 3        that boy's life from him.

 4   Q.   So the bottom line is that you do not know

 5        where Sean was at the time of the shooting,

 6        right?

 7   A.   Yeah, that's true.

 8   Q.   Okay.

 9   A.   But Sean didn't do it.

10   Q.   Got that.

11   A.   (Inaudible).

12   Q.   Got it.  So to put that another way, you

13        cannot provide an alibi for Mr. Jakes?

14   A.   You're asking if I can provide an alibi for

15        Mr. Jakes?

16   Q.   What?

17   A.   Why can't I provide an alibi for him?

18   Q.   Because you don't know where he was at the

19        time of the shooting.

20   A.   But he didn't do it either, though.

21   Q.   I know.  That's a different -- that's

22        different though.  My only question is, you

23        don't know where he was --

24   A.   I don't know where he was, but he didn't do

25        it though.  I know that.
```

1   Q.   Okay.

2   A.   I know that much.

3   Q.   All right.  You mentioned that there's other

4       people out there that do know what happened,

5       right?

6   A.   His family, his sister, his sisters and

7       brothers, you know, y'all can talk to them,

8       they can tell you -- (inaudible.)

9   Q.   Why do you think that they -- these other

10      people would know something about the

11      shooting?

12   A.   Same thing why you asking me.  Why do

13      (inaudible) --

14   Q.   Have you ever talked to --

15   A.   (Inaudible) you think I should know about

16      this shooting.  Why do you think -- that's

17      his family.  That's his family.  So holler at

18      the family.

19   Q.   Well, do you know --

20   A.   I'm just an outsider.

21   Q.   Do you know if any of those people you --

22   A.   I don't know, I don't talk to them.

23   Q.   Let me finish my question.  Do you know if

24      any of those people, these other people,

25      witnessed the shooting?

```
 1   A.   I don't know.
 2   Q.   Do you know if any of these other people knew
 3        where Mr. Jakes was at the time of the
 4        shooting?
 5   A.   I don't know.
 6   Q.   Okay.  Have you ever talked to any of these
 7        people --
 8   A.   I don't talk to --
 9   Q.   Hang on -- about what they might know about
10        Mr. Jakes's involvement or lack of
11        involvement in this shooting?
12   A.   I don't know.
13   Q.   Do you know what role Mr. Jakes was accused
14        of having played in this murder?
15              MS. DONNELL:  Objection,
16        foundation.
17              THE WITNESS:  I don't know nothing
18        about that.  So I don't know.
19        BY MR. GRILL:
20   Q.   Do you know if Mr. Jakes was accused of being
21        the person who actually pulled the trigger
22        that shot the man?
23              MS. DONNELL:  Objection,
24        foundation.
25              THE WITNESS:  I don't know.
```

1      BY MR. GRILL:

2  Q.  Do you know what the name of the person was

3      that was shot and killed basically outside of

4      1212 West 51st Street?

5  A.  Nope.  Nope.

6  Q.  Okay.  Do you know a person, or did you, I

7      should say, back in September of '91, did you

8      know a person named Gus Robinson?

9  A.  No.

10  Q.  Did you know anyone with the nickname Snake

11      back then?

12  A.  Yeah, I knew Snake.

13  Q.  What did he look like?

14  A.  (Inaudible) Indian-like -- you know --

15  Q.  Do you know if Snake was in a gang?

16  A.  I don't know.  I don't know.  I don't know.

17  Q.  Well, did you ever think that Snake was in a

18      gang?

19          MS. DONNELL:  Objection,

20      foundation.

21          THE WITNESS:  I don't know and it's

22      not my problem.

23          MR. GRILL:  Okay.

24          THE WITNESS:  I'm not getting

25      smart, but I don't know and it's not my

```
 1          problem.  What gang do you mean?  I don't
 2          care about who -- what gang.
 3          BY MR. GRILL:
 4     Q.   When you think back to 1991, do you remember
 5          thinking to yourself ever or believing that
 6          Snake was in a gang?
 7                    MS. DONNELL:  Objection,
 8          foundation.  And asked and answered.
 9                    THE WITNESS:  I don't know.  I
10          don't know.
11          BY MR. GRILL:
12     Q.   All right.  Andre Green, do you know who that
13          is?
14     A.   Yup.
15     Q.   Who is that?
16     A.   A friend.
17     Q.   Of who?
18     A.   A friend that just got out of penitentiary,
19          didn't he just get out?
20     Q.   Did you know Andre Green back in 1991?
21     A.   Yup.
22     Q.   How did you know him?
23     A.   The neighborhood, we all went to the same
24          school, we was in the neighborhood.
25     Q.   Did you believe that Andre was in a gang?
```

```
 1   A.   That's not my business and I don't know.
 2   Q.   Was Andrea a friend of, in any way of
 3        Mr. Jakes at the time?
 4   A.   I don't know.  I don't know.
 5   Q.   Did you know the names of any of Mr. Jakes's
 6        friends back in September of 1991?
 7   A.   Nope.
 8   Q.   Did you -- do you believe that Mr. Jakes had
 9        friends back in September of 1991?
10   A.   I don't know.
11   Q.   Do you know what Mr. Jakes did like on a
12        day-to-day basis back in 1991?
13   A.   Nope.
14   Q.   Do you know any of the things that he liked
15        to do to have fun back at that time period?
16   A.   Nope.
17   Q.   Did you know any of the places that he would
18        typically hang out at or that he liked to go?
19   A.   Nope.
20   Q.   Huh?
21   A.   Nope.
22   Q.   Okay.  Do you know the Chairse family?
23   A.   Yes.
24             THE COURT REPORTER:  What was the
25        name?
```

```
 1                    MR. GRILL:  Chairse, C-H-A-I-R-S-E,
 2          is how you spell it.
 3                    THE WITNESS:  It's Quarter
 4          Pound and -- (inaudible) momma.
 5          BY MR. GRILL:
 6     Q.   Yup.  Where did they live?
 7     A.   I don't know.  Where did they live?
 8     Q.   Yeah, where did they live in '91?
 9     A.   I believe they staying in the next building
10          to us on the second floor.
11     Q.   1210, right?
12                    MS. DONNELL:  Objection, leading.
13                    THE WITNESS:  I don't know.  I
14          don't know.  I know my address is 1212.
15                    MR. GRILL:  It's called a
16          foundation question, ma'am.
17          BY MR. GRILL:
18     Q.   1210 it is the building next door to you,
19          right?
20     A.   I don't know.  I don't know.  I just know
21          they stayed in the next building.
22     Q.   Okay.  And the next building over would be
23          the next building in the direction of the
24          Queens Submarine Shop, right?
25     A.   Yup.
```

55

```
 1    Q.    So south of you, right?

 2    A.    Yup.

 3    Q.    Mm-hmm.  Who else lived over there, Cleotha,

 4          Claudette --  so Cleotha was Quarter Pound,

 5          Tweetie, Rosetta, who else lived there?

 6    A.    I don't know.  I just know Tweetie, Quarter

 7          Pound and their mom, that's it.

 8    Q.    Do you know if Mr. Jakes --

 9    A.    I don't know who stayed in those peoples'

10          houses.

11    Q.    Do you know if Mr. Jakes was --

12    A.    I don't know.

13    Q.    Hang on -- was related to the -- anybody in

14          the Chairse family?

15    A.    I don't know.

16    Q.    Do you know if Mr. Jakes was friends with

17          Tweetie back in '91?

18    A.    I don't know.

19    Q.    Do you know if Mr. Jakes was friends with

20          Quarter Pound back in '91?

21    A.    I don't know.

22    Q.    Do you remember seeing Tweetie on the -- at

23          any point on the day that the shooting

24          happened?

25    A.    No.
```

```
 1    Q.    Do you remember seeing her like the night of
 2          the shooting, like after it got dark out?
 3    A.    I don't remember, I can't remember.
 4    Q.    What about Quarter Pound, did you ever see
 5          him at any point --
 6    A.    I don't know.
 7    Q.    Hang on.  Let me finish my question.
 8                Do you have any recollection about
 9          seeing Quarter Pound on September 15, 1991,
10          the day that this shooting happened?
11    A.    No, I don't.
12    Q.    Is there anything that would help you
13          remember if you saw him?
14    A.    Nope.
15    Q.    Do you remember if anybody threw a -- did you
16          hear anything about like a bottle or rock
17          getting thrown through the window, a window
18          of any of the houses on 51st Street right --
19                MS. DONNELL:  Objection --
20                MR. GRILL:  Let me finish my
21          question.
22                MS. DONNELL:  I'm sorry, I keep
23          thinking you're done, you're just taking a
24          pause.  Go ahead.
25                MR. GRILL:  Yeah.
```

```
 1          BY MR. GRILL:
 2     Q.   I will just start my question over.
 3               Do you recall hearing that a bottle
 4          or rock had gotten thrown through the window
 5          of any of the homes on 51st Street, you know,
 6          shortly before the shooting happened in front
 7          of the Queens --
 8     A.   I don't remember --
 9               MS. DONNELL:  Objection.  I'm just
10          making an objection, asked and answered.
11               Go ahead, Ms. Harris.
12          BY MR. GRILL:
13     Q.   Ms. Harris, do you remember knowing or
14          hearing anything like that?
15     A.   No.
16               MS. DONNELL:  Objection.
17          BY MR. GRILL:
18     Q.   Is there anything that would help you
19          remember?
20     A.   I said no, I don't.  That -- that's a
21          question that -- that don't even sound right,
22          you're talking about somebody throwing
23          something through somebody's window.
24     Q.   Right.  Okay, so --
25     A.   That's a stupid question.
```

58

```
 1   Q.   So my question though, the second question

 2        that I didn't get an answer to yet was, is

 3        there anything that you can think of that

 4        would help you remember if you knew something

 5        like that at any point?

 6   A.   No.

 7   Q.   Okay.  Do you know if Mr. Jakes ever worked

 8        at any of the shops or restaurants kind of

 9        right around the area of 51st and Racine back

10        in September of 1991?

11   A.   Nope, not that I know of.

12   Q.   Do you know a person named Raphael Garcia;

13        does that name ring a bell?

14   A.   No.

15   Q.   What about Tyrone Pitts; does that name ring

16        a bell?

17   A.   No.

18   Q.   Huh?

19   A.   No.

20   Q.   Okay.  Ronnie Sloan, do you know who that is?

21   A.   No.

22   Q.   Andre Green, you said he just got out of

23        prison, is that what you said -- is that what

24        you were saying a minute ago?

25   A.   Mm-hmm.
```

```
 1    Q.    You have to say yes or no, you can't go --
 2    A.    Yes.  Yes.  Yes.  Yes.
 3    Q.    How do you know he got out of prison?
 4    A.    His mom is my God mom.  I went to school with
 5          his sister.
 6    Q.    What's his sister's name?
 7    A.    Vanessa, Vanessa Brown.
 8    Q.    Do you know what Ronnie was in prison for?
 9    A.    Who?
10                MS. DONNELL:  I'm sorry, objection,
11          form.
12                THE WITNESS:  He going to say --
13                MS. DONNELL:  He said Ronnie.
14                MR. GRILL:  I'm sorry, Andre.
15                THE WITNESS:  Yeah, he said Ronnie.
16                MR. GRILL:  I did say Ronnie, I
17          misspoke.  Andre.
18          BY MR. GRILL:
19    Q.    Do you know what Andre was in prison for?
20    A.    No, I don't.
21    Q.    Did you ever go visit him?
22    A.    No.  For what?  I don't visit jailbirds.
23    Q.    Okay.  Would that also apply to Jakes, did
24          you ever go visit him in prison?
25    A.    No.
```

```
 1                    MS. DONNELL:  Objection, asked and
 2          answered.
 3          BY MR. GRILL:
 4     Q.   Why didn't you ever go visit Mr. Jakes in
 5          prison?
 6     A.   For what?  For what?  For what?  For what?
 7     Q.   Well, you believed he was in
 8          there (inaudible), right?
 9     A.   I have my own life, just like I said, I'm a
10          mother of nine.  I have kids.  I ain't got
11          time to go and meet nobody else.  I'm trying
12          to raise my family; you understand what I'm
13          saying?
14     Q.   Sure.  Well, did you ever call him on the
15          phone?
16     A.   For what?
17     Q.   To see how he's doing.
18     A.   It's not any of my problem.
19     Q.   All right.  Did you ever write him a letter?
20     A.   Nope.
21     Q.   Did he ever call you?
22     A.   No.
23     Q.   I'm talking about when he was in prison.
24     A.   No.
25     Q.   Did you ever write him a letter?
```

```
 1   A.   No.
 2              MS. DONNELL:  Objection.  Asked and
 3        answered.
 4   BY MR. GRILL:
 5   Q.   Okay.  Did anybody on behalf of Mr. Jakes try
 6        to communicate with you at any point while he
 7        was in prison?
 8   A.   No.
 9   Q.   Okay.  Do you know a Thomas Sloan?
10   A.   Yeah, Thomas is dead.
11   Q.   Is Thomas related to Ronnie, if you know?
12   A.   Not that I know of.  I don't know.
13   Q.   Where did Thomas live in '91, if you know?
14   A.   I don't know.
15   Q.   When did Thomas die?
16   A.   I don't know.  I just heard that he was --
17        you know, Facebook, we got Facebook, it
18        popped up on Facebook, I don't know.
19   Q.   Did he have a nickname?
20   A.   I don't know.
21   Q.   How did he die?
22   A.   I don't know.  It was just a post up, rest in
23        peace, that's all.
24   Q.   Do you know who Thomas was friends with or
25        hung out with in September of '91?
```

```
 1   A.   No.

 2   Q.   Do you know who owned your building, 1212

 3        West 51st Street, in September of '91?

 4   A.   Aunt Bea.

 5             MS. DONNELL:  Objection, asked and

 6        answered.

 7        BY MR. GRILL:

 8   Q.   Do you know if Aunt Bea owned any other

 9        buildings?

10   A.   Not that I know of.

11   Q.   To your knowledge, did Mr. Jakes ever live

12        anywhere else other than, you know, around

13        the area of 51st and Racine back in 1991?

14   A.   Not that I know of.

15   Q.   Earl Day, do you know who that is?

16   A.   No.

17   Q.   Do you know a person with the nickname Little

18        A; does that ring a bell?

19   A.   Yeah, I know Little A.  Ain't he dead?  Ain't

20        he dead.  I thought -- (inaudible).

21   Q.   How do you know Little A, who that is?

22   A.   The internet.

23   Q.   Okay.  Do you know where Little A lived?

24   A.   No, I didn't.

25   Q.   Do you know if Mr. Jakes hung around with
```

```
 1          Little A at?
 2   A.     No, I don't.
 3   Q.     Do you know if Mr. Jakes knew who Little A
 4          was back in 1991?
 5   A.     I don't know.
 6   Q.     Is there anything that might help you
 7          remember?
 8   A.     No.
 9   Q.     When you say you knew Little A from the
10          neighborhood, explain that to me, what do you
11          mean by that?
12   A.     Walked to the store, we see people going to
13          the store, (inaudible) you know, went to the
14          store with each others, you know, that's all
15          it is.
16   Q.     Did you go to school with Little A?
17   A.     No, I didn't.
18   Q.     Okay.  So --
19   A.     He was -- I don't remember, you know it was a
20          long time ago.  I don't remember.  But
21          (inaudible) was in the neighborhood.
22   Q.     Do you know if Little A was in a gang in
23          1991?
24   A.     Not that I know of.
25   Q.     Did Little A ever come over to your house to
```

64

```
 1        hang out and play?
 2   A.   No.
 3   Q.   Had you ever been to Little A's house
 4        yourself?
 5   A.   No.
 6   Q.   How did you know or learn Little A's
 7        nickname?
 8   A.   I don't even know if that's his nickname.  I
 9        don't even know if that's his name.  I don't
10        know.  I just know about Little A, that's all
11        I know.
12   Q.   Okay.  Do you know who Emma Mitts is?
13   A.   No, I don't.
14   Q.   Tenille Jones?
15   A.   Who?
16   Q.   Tenille Jones, do you know who that is?
17   A.   No.
18   Q.   Do you know the Gunns, G-U-N-N?
19   A.   No.
20   Q.   Frederick Gunn or David Gunn?
21   A.   No.
22   Q.   Ralph Watson, do you know who that is?
23   A.   Nope.
24   Q.   What about Gene A, do you know somebody with
25        that nickname?
```

```
 1   A.    No.

 2   Q.    Nathanial Anderson?

 3   A.    No.

 4   Q.    The Triplets, Denaro or Darin Triplett, do

 5         you know who they are?

 6   A.    Hu-huh.

 7   Q.    Ever hear of those names before?

 8   A.    No.

 9   Q.    So earlier today you were saying that, at

10         least I understood you to be saying, that

11         because Mr. Jakes had ADHD and was receiving

12         social security that he couldn't have

13         participated in this murder.

14               Why do you believe ADHD would cause

15         or in your mind prevent Mr. Jakes from having

16         been able to participate in this shooting?

17               MS. DONNELL:  Objection to the

18         extent you misstated the witness's prior

19         testimony.

20               But you can answer, Ms. Harris.

21               THE WITNESS:  Sean -- Sean was a

22         kid, just like I said, he had HDHD.  Sean had

23         a good mom.  You know, she raised him good

24         that I know of.  And I don't know, Sean

25         basically like -- basically like stayed
```

```
 1        around the house, and he do stuff that HDHD
 2        kids do, they hyper, they want to tear up the
 3        house, they want to eat up all the food.  I
 4        mean, you know, he was just a kid, you know.
 5                 I just -- to my own (inaudible), I
 6        can't see it.  I can't see it.  And I know
 7        for sure he didn't do it.  I know for sure.
 8        I put my life on it he didn't do it.
 9        BY MR. GRILL:
10   Q.   Did you ever go and eat at the Queen
11        Submarine shop?
12   A.   Ate there all the time.
13   Q.   Do you know if Sean ever would eat there?
14   A.   I don't know.  I don't know.
15   Q.   Did you ever go there with --
16   A.   I don't know.
17   Q.   You mean you don't remember?
18   A.   I don't know.  He didn't live in my house.
19   Q.   Right.  But you guys lived in the same
20        building --
21   A.   I don't know.
22   Q.   Did you ever go to this Queen shop and see
23        Sean there?
24   A.   No.
25                 MS. DONNELL:  Objection to the form
```

```
 1          of the question.
 2                    THE WITNESS:  You asking some
 3          questions that you don't even understand.
 4          No.
 5                    MR. GRILL:  Sorry, what did you
 6          say?
 7                    THE WITNESS:  I said no.
 8          BY MR. GRILL:
 9     Q.   Okay.  So tell me in your own words, back in
10          September of 1991, what the neighborhood
11          around 51st and Racine was like?
12     A.   I don't know.  I didn't --
13                    MS. DONNELL:  Hold on one second,
14          Ms. Harris.  This has been asked and
15          answered.
16                    But go ahead, Ms. Harris.
17                    THE WITNESS:  I don't know and I
18          didn't hang out in the streets.
19          BY MR. GRILL:
20     Q.   Sure.  Okay.  But you lived there.
21     A.   So?  So what I lived there.  I couldn't go
22          out on my front porch and go back up in the
23          house?  I didn't have to walk the streets to
24          figure out what's going on in the streets.
25                    My momma had -- my momma raised us
```

```
 1            to be kids.  Not to be kids out there running
 2            the streets and tearing up -- I don't know
 3            nothing about what's going on in the
 4            neighborhood.  Do you know what's going on in
 5            your neighborhood?
 6   Q.   Well, I do actually, but that doesn't matter.
 7   A.   That's the same thing I'm trying to tell you,
 8            I don't know.
 9   Q.   Okay.  So was -- to your knowledge, was
10            your -- was it not safe for you to go out and
11            hang out in the streets, to use your words?
12   A.   Well, I didn't have no enemy, so I don't
13            know.
14   Q.   That's not my question.  Was -- in your
15            mind --
16   A.   I don't know.
17   Q.   Would it have been not safe for you to go
18            out --
19   A.   I always stayed in the house.  I always
20            stayed in the house.
21   Q.   So right, but why?
22   A.   Because I wanted to.
23   Q.   Was there a reason that --
24   A.   Because I wanted to.
25   Q.   So you had friends, right?
```

```
 1   A.   I wanted to be around my momma.  And I was

 2        pregnant, because I wanted to.  But I

 3        ain't -- is it something against the law that

 4        I can't stay in the house, I got to go

 5        outside?

 6   Q.   So I'll just cut to the chase --

 7   A.   I don't know nothing about no neighborhood.

 8        And I ain't trying to know nothing about the

 9        neighborhood.

10   Q.   I'm going to represent to you that other

11        witnesses in this case who have been deposed,

12        like you're being deposed right now, that

13        either lived at or hung around the area of

14        51st and Racine have generally all described

15        the neighborhood at that time period around

16        where you lived to be not safe.  Okay.

17             And I just want to know if you

18        agree with that.

19   A.   I don't remember --

20             MS. DONNELL:  Hold on one second.

21        I'm going to object to the extent that your

22        representation of the various witness

23        testimony is incomplete and --

24             But you can answer, Ms. Harris.

25        BY MR. GRILL:
```

70

```
 1    Q.    Do you believe that the neighborhood around

 2          51st and Racine in September in 1991 was

 3          safe?

 4    A.    Yeah.  I don't think -- I don't think at the

 5          time nowhere was safe.  I can't say.  I can't

 6          say.  Just like I said, I didn't have no

 7          enemies.  I can go in and come out as I

 8          please. (Inaudible) school maybe, hm-hmm, I

 9          don't know, I don't know what going on in the

10          neighborhood.

11    Q.    Right.  I'm not asking you about specifics.

12    A.    I just told you, no, I don't know.

13    Q.    Okay.  Did you have friends in 1991 that you

14          would hang out with?

15    A.    Nope.

16    Q.    No friends at all?

17    A.    Nope.

18    Q.    Was there a reason why you didn't have any

19          friends back in 1991?

20    A.    I'm a loner.

21    Q.    Is there a reason why you're a loner?

22    A.    I'm a loner.

23    Q.    Right, I know.  Is there a reason for it?

24                    MS. DONNELL:  Objection --

25                    THE WITNESS:  I'm not going to tell
```

1       you what's wrong with me as why I ain't got

2       no -- why -- I mean why I'm a loner, that's

3       not your business.  What's going on with my

4       life, that's not your business.

5       BY MR. GRILL:

6   Q.  All right.  Do you suffer from some type

7       of -- let me rephrase it.  Were you diagnosed

8       with something back in 1991 or before then

9       that caused you to be a loner, that is not my

10      business?

11  A.  Not your business.

12  Q.  Okay.

13  A.  It's not your business.

14  Q.  Back in 1991 would you feel safe leaving your

15      front door open at night?

16              MS. DONNELL:  Objection.  Asked and

17      answered --

18              THE WITNESS:  That's been asked --

19              MR. GRILL:  No, that's not been

20      answered.  But go ahead.

21              MS. DONNELL:  You were asking the

22      question (inaudible)  --

23              MR. GRILL:  This is a different

24      question.

25      BY MR. GRILL:

```
 1   Q.   Ms. Harris, would you feel safe leaving your
 2        front door open at night in 1991?
 3   A.   Can I ask you a question?  Why would my momma
 4        leave her door open with a house full of
 5        kids?  Would you leave your door open?
 6   Q.   It's kind of an unfortunate reality for some
 7        witnesses --
 8   A.   (Inaudible) my answer to that --
 9   Q.   Hang on -- in depositions, and that reality
10        is that you don't typically get to ask me
11        questions.  If you don't understand a
12        question, you can ask me to rephrase it or I
13        will clarify my question --
14   A.   I just --
15   Q.   Hang on, hang on.  This conversation is more
16        or less a one-way street, and the format as
17        you are experiencing is I ask you questions,
18        you answer them, and then the other attorneys
19        at the end, when I'm done --
20   A.   But I -- I have a right to say something too,
21        like I told you, no.
22   Q.   Okay.  So I'm not sure what question you're
23        answering, so let me just --
24   A.   Would you leave your door open at night?
25   Q.   Back in 1991 would you feel safe with your
```

```
 1          front door open in your neighborhood?
 2    A.    No --
 3                MS. DONNELL:  Objection, asked and
 4          answered.
 5    BY MR. GRILL:
 6    Q.    Okay.  Are you familiar with a neighborhood
 7          called Motown back in '91?
 8    A.    No.
 9                MS. DONNELL:  This has been asked
10          and answered.
11                MR. GRILL:  Ma'am?
12                MS. DONNELL:  Asked and answered.
13                But you can answer again, Ms.
14          Harris.
15                THE WITNESS:  I'm fine.
16    BY MR. GRILL:
17    Q.    Do you know, does that phrase ring a bell?
18                MS. DONNELL:  I think that's been
19          asked and answered as well.
20                You can answer again, Ms. Harris.
21                THE WITNESS:  Do I have to?
22                MS. DONNELL:  Yeah, you do, but --
23                THE WITNESS:  What was the question
24          again?
25    BY MR. GRILL:
```

```
 1   Q.   Are you familiar with a neighborhood called
 2        Motown?
 3                  MS. DONNELL:  Same objection.
 4                  THE WITNESS:  Nope.
 5                  MR. GRILL:  No?
 6                  THE WITNESS:  No.
 7        BY MR. GRILL:
 8   Q.   Okay.  Well, here, let me just show you this.
 9        Do you see that?
10   A.   What's that?  What's that.
11   Q.   The transcript I have on here?
12                  MS. DONNELL:  She's asking you what
13        it is.
14        BY MR. GRILL:
15   Q.   Yeah, I know.  I'm first asking if you can
16        see it.  Do you see it?
17   A.   I can see it.
18   Q.   Okay.  So this is a transcript of the
19        testimony you gave in your last deposition
20        that you walked out of, and this is on
21        page 17 and it's lines 3 through 11.
22                  And you were asked these questions
23        and gave these answers.  You were asked, Are
24        you familiar with a neighborhood called
25        Motown?
```

```
 1                    Answer:  Oh my God.
 2                    Question:  Can you give me an
 3          answer, what does Motown mean to you?
 4                    Answer:  Motown is a name and a
 5          town, that's a town that's just a name.
 6                    Question:  Did you live in Motown
 7          back in 1991?
 8                    Answer:  That's where I said stayed
 9          at in Motown.
10     A.   I stayed --
11     Q.   Hang on, hang on.  Do you remember being
12          asked those questions and giving those
13          answers back --
14     A.   Yeah, I do.  Yeah, I do.  But I mean it was
15          all type of names, because -- it was all type
16          of names.  That's how -- I'm all messed up, I
17          mean --
18     Q.   Well, right now --
19     A.   It's not like I was lying or anything, but,
20          you know what I'm saying, last time I was off
21          my medicine, but, yeah, I remember all this.
22     Q.   I thought you said your medicine doesn't
23          impact your ability --
24     A.   Listen to me.
25                    MS. DONNELL:  Objection,
```

```
 1              argumentative.
 2                      THE WITNESS:  It was other
 3              medicine.  I'm just on my blood pressure
 4              medicine.
 5              BY MR. GRILL:
 6         Q.   What medicine were you on last theme?
 7         A.   Medicine is for my arthritis, my bipolar,
 8              depression, high anxiety, you know what I'm
 9              saying, schizophrenia, bipolar, I got it all.
10         Q.   Well, then that begs a different question
11              that I haven't asked.
12                      Do you need to be on that
13              medication to fully participate in this
14              deposition today?
15         A.   No, I don't.
16         Q.   Okay.  Does you not being on that medication
17              impact your ability to recall events?
18         A.   Nope.
19         Q.   Does it impact your ability to answer
20              truthfully?
21         A.   Nope.
22         Q.   So when I asked you this question about
23              Motown the first time --
24         A.   You said --
25         Q.   Today, you said you didn't know what it was,
```

 1           but in your last deposition you went as far

 2           as --

 3      A.   Yeah, I see it now.  I see it now, but either

 4           way -- I mean Motown is Motown, Chi-Town, is

 5           all type of names, you know what I'm saying.

 6      Q.   So what's Motown?

 7      A.   That's just a name for the -- just a name for

 8           the neighborhood.  That's all it is, is a

 9           name for the neighborhood.

10      Q.   Okay.

11      A.   So when you put that up (inaudible) online, I

12           mean I remember, but it's just a name.  Yeah,

13           Motown, Chi-Town, it got all types of names.

14      Q.   Was Motown, to your knowledge, associated

15           with the -- any gang?

16      A.   I don't know.  See that's what I'm saying, I

17           don't know.  I don't know.

18      Q.   Does the phrase, What up, Mo, mean anything

19           to you?

20      A.   What?

21      Q.   If somebody walked up to you -- or you saw

22           two guys walk up to each other and greet each

23           other by saying, What's up, Mo, would that

24           mean anything to you back in 1991?

25      A.   If they walk up to each other and say, What's

```
 1            up, Mo, what's that supposed to mean?
 2     Q.     I am asking --
 3     A.     I don't know.  I don't know.
 4     Q.     Does that signify to you that those --
 5     A.     I don't know.
 6     Q.     -- people would be members of a gang?
 7     A.     I was never around the gang bangers.  I have
 8            heard people say it, but as I say I don't
 9            know.  I don't know that means.  They could
10            be saying (inaudible) -- brothers never say
11            What's up, Mo, what's up, Brother, What's up,
12            Daddy, What's up, Momma, I don't know.
13     Q.     Have you ever heard of a gang called the
14            Black Stones?
15     A.     Yeah, I heard of it.
16     Q.     Do you know if the word Mo is ever used to
17            refer to --
18     A.     I don't know.  I don't know.  I don't know.
19                   I mean, people got all type of
20            names for gangs, you know, I don't know.
21     Q.     Okay.  Did Anthony Jakes, to your knowledge,
22            before he got arrested for this murder,
23            did -- do you know whether he ever got in
24            trouble at school?
25     A.     Not that I know of.
```

```
 1   Q.   Did you think he was a smart kid or not a
 2        smart kid --
 3   A.   Not that I know of.  I just know -- I just
 4        know he wasn't a bad kid.
 5   Q.   Okay.  Did you ever see him or witness him
 6        throwing things at cars, like bottles, rocks,
 7        anything --
 8   A.   Not that I know of.
 9   Q.   Did you ever see him do anything like that,
10        the night that the shooting happened?
11   A.   I don't even know the night that the shooting
12        happened.  I don't remember the date.  I
13        don't even remember none of that.  I don't
14        remember that.
15   Q.   Do you have any recollection of seeing the
16        police on 51st Street around The Queen's
17        Submarine shop after the shooting happened?
18   A.   Not that I know of.
19   Q.   Did the police ever talk to you?
20             MS. DONNELL:  Objection, asked and
21        answered.
22             But you can answer again, Ms.
23        Harris.
24             THE WITNESS:  Did the police talk
25        to who, me?
```

```
 1                    MR. GRILL:  Um-hmm.

 2                    THE WITNESS:  Nope.

 3         BY MR. GRILL:

 4    Q.   Okay.

 5    A.   Not that I know of.  We not -- we ain't

 6         allowed to talk to the police.

 7    Q.   Okay.  I'm going to show you something else

 8         here.  All right.  Take a look at this.

 9    A.   Look at what?

10                    MS. DONNELL:  What he's showing

11         you.

12                    MR. GRILL:  Everybody chill out,

13         I'm putting it up.  There it is.

14         BY MR. GRILL:

15    Q.   Ma'am, can you see the transcript again?

16    A.   Yes.

17                    MS. DONNELL:  What page is this?

18                    MR. GRILL:  9.  Let me -- all of

19         your questions will be answered, let me just

20         lay the foundation.

21         BY MR. GRILL:

22    Q.   So, ma'am, this is what you testified to

23         again the last time where we tried to depose

24         you, and this is on page 9 and it starts on

25         line 8.
```

```
 1                   MS. DONNELL:  Objection.
 2                   MR. GRILL:  And it goes --
 3                   MS. DONNELL:  Just one second.  I'm
 4         just going to object to the form of the
 5         question.  I don't know if you're --
 6                   MR. GRILL:  I haven't asked one.  I
 7         was trying to --
 8                   MS. DONNELL:  If you're refreshing
 9         her recollection -- you are doing them
10         separately to impeach her testimony, you are
11         doing it improperly.  So go ahead.
12         BY MR. GRILL:
13    Q.   Okay.  Ma'am, earlier today you told me that
14         you did not remember where you were when the
15         shooting happened, correct?
16    A.   I don't know.
17    Q.   I know.  I know that's what you said today.
18         But last time you said, and this is on line 8
19         and it goes through line 12, you were asked
20         the question, on the night -- so you can't
21         remember whether or not you were home on the
22         night of the murder September 15, 1991.  And
23         on lines 11 and 12 you give this answer, I
24         was at home.  I was at home.  I was sitting
25         on the front porch.
```

```
 1    A.    And I don't --
 2                MS. DONNELL:  I am going to object
 3          to the extent that it improperly --
 4                THE WITNESS:  I ain't --
 5                MS. DONNELL:  Ms. Harris, I just
 6          need to make a record.  And rule of
 7          completion and would have you read the rest
 8          of line page 9, 10 and 11 because you just
 9          misrepresented the question that she was
10          asked was where was she was at the time of
11          the shooting and --
12                THE WITNESS:  (Inaudible).
13                MR. GRILL:  And I don't even know
14          where --
15    BY MR. GRILL:
16    Q.    Okay.  So ma'am, do you remember being asked
17          that question and giving that answer?
18    A.    Is this the first time they came and asked
19          me?  No, I don't remember.  But either way it
20          go, I don't know.
21    Q.    The question is really specific and it's
22          about --
23    A.    (Inaudible) run up and tell people lies and
24          come to their house and asking me questions
25          and, you know what I'm saying, it was just a
```

```
 1           rush job, but I didn't ask them about
 2           nothing.  Like I said, Sean didn't do it and
 3           I'm going to stick to it.
 4      Q.   I got it.  And you've made that --  you've
 5           made your belief perfectly clear here today.
 6                My question is totally different:
 7           I'm asking if you remember being asked this
 8           question that I just read to you from your
 9           deposition transcript and giving the answer
10           that you were at home, I was sitting on the
11           front porch on the night of the murder; do
12           you remember being asked that question and
13           giving that answer?
14      A.   No.  No.  No.
15      Q.   Okay.  Does seeing this transcript from your
16           last deposition in this case --
17      A.   I don't know, I got to read --
18      Q.   Hang on --
19      A.   I got to read it first.
20      Q.   Does it help refresh your memory at all about
21           what -- or about where you were sitting on
22           the night of the murder?
23      A.   Nope.
24                MS. DONNELL:  I'm going to object
25           to improper impeachment of her prior
```

```
1            testimony here today but continue.

2            BY MR. GRILL:

3     Q.     Do you -- I'll just ask you and I'll move on

4            from this.

5                       Were you sitting on your front

6            porch at the time or close in time to when

7            the shooting happened?

8     A.     Can't remember.

9     Q.     Okay.  Do you remember seeing your sister

10           Denise at any point --

11    A.     Don't remember.

12    Q.     -- hang on, on September 15, 1991?

13    A.     Don't remember.

14    Q.     Do you remember seeing anybody slap Anthony

15           Jakes in the face?

16    A.     I can't remember.

17    Q.     Okay.  Anything that might help you remember

18           any of those things?

19    A.     No.

20    Q.     You just erased it from your mind entirely,

21           right?

22                      MS. DONNELL:  Objection, form.

23                      THE WITNESS:  You know what, stay

24           in your lane, God help me with this.

25           BY MR. GRILL:
```

1    Q.    Okay.  Let's keep plugging along here.

2              Do you remember if the police

3          talked to you that night after the shooting

4          happened?

5              MS. DONNELL:  Objection, it's been

6          asked and answered.

7              THE WITNESS:  No.

8    BY MR. GRILL:

9    Q.    Okay.  Did you ever go and try to find the

10         police yourself --

11   A.    No.

12   Q.    -- to tell them anything that you might have

13         known about or seen related to the shooting?

14   A.    Nope.

15   Q.    Did you ever see -- hang on a second.

16   A.    (Inaudible.)

17   Q.    Actually I might as well just show this to

18         you now because I think -- bear with me for

19         one second, I'm going to get this up.  Okay.

20         I'm going to show this to you.  Do you see

21         this picture?  Do you see the picture?

22   A.    Yeah.

23   Q.    So this is -- there's two of them, it's Jakes

24         506 and 507.

25             MS. DONNELL:  Are you marking this

```
1        as an exhibit, Andrew, for the record?

2                 MR. GRILL:  Can you just --

3                 MS. DONNELL:  No, I am just trying

4        to make the record clear.

5                 MR. GRILL:  Well, that's a

6        different question.  So I was about to mark

7        and say this is going to be our Exhibit 1.

8                 So Ms. Court Reporter, we'll send

9        you a copy of this after the deposition, and

10       this will be Exhibit No. 1, and it's a group

11       exhibit because it has two photos in it.

12                MS. DONNELL:  And send it to us as

13       well, Andrew --

14                MR. GRILL:  Yup, I will.

15                (Deposition Exhibit No. 1

16                was marked for identification.)

17       BY MR. GRILL:

18  Q.   So, ma'am --

19                MS. DONNELL:  Wait, I just want to

20       make an improp -- or an objection because

21       this has happened repeatedly where you don't

22       send exhibits to the parties participating in

23       the deposition, and I'm just going to repeat

24       that objection which I've made before, but

25       please continue.
```

1           MR. GRILL:  Great.

2           So just while we're making our

3      record here, Heather, do you think that --

4      Heather, have you ever seen this photograph

5      before, Heather?

6           MS. DONNELL:  Yes, that's not the

7      point --

8           MR. GRILL:  No, no, no, because it

9      is -- because it goes -- (inaudible).

10          MS. DONNELL:  (Inaudible)  that's

11     fine, Andrew.  I don't think you need to

12     detract from it.  Let's not waste Ms.

13     Harris's time.  I'm just making the record

14     that this is something you and I have

15     discussed before, we don't have to go into it

16     so please continue.

17          MR. GRILL:  No.  I'm going to put a

18     pin in this and finish this out.

19          Do you believe, Heather, that by us

20     not having sent you these two photographs in

21     advance of Ms. Harris's deposition that you

22     have somehow been prejudiced here today?

23          MS. DONNELL:  Now, Andrew --

24          MR. GRILL:  Yes or no, I mean

25     because that's what it comes down to --

```
1              MS. DONNELL:  Andrew, let's not
2        waste the witness's time and let her -- let's
3        take this up after the deposition.
4              MR. GRILL:  (Inaudible).
5              MS. DONNELL:  So let's not waste
6        this witness's time.
7              Now, Andrew, on principle you have
8        done this before with other things where you
9        just haven't even produced documents and you
10       showed them.  And you would not -- I assure
11       you, if I did the same thing to you, you
12       would make the same objection.
13             So in principle I am maintaining
14       the objection that I think you should provide
15       counsel with the exhibits for depositions
16       you're taking, at least right before the
17       deposition.
18             But please continue now with Ms.
19       Harris.
20             MR. GRILL:  Right.  But you raised
21       it and it seems kind of nonsensical for you
22       to have made the objection in the manner that
23       you made it if you don't really believe that
24       you've been prejudiced.  So that's why I'm
25       asking, do you believe that you have suffered
```

1    some amount of prejudice here today because

2    you -- I didn't send you Plaintiff's, or what

3    is it, the city Jakes 506 and 507.

4         MS. DONNELL:  Andrew, I do not

5    believe that this particular example is an

6    example of us being prejudiced.  In other

7    cases -- in other depositions in this case I

8    believe it has been.

9         But please continue now that you

10   have put your pin in it and continue.

11        MR. GRILL:  I will take my pin out

12   because I got my answer.

13   BY MR. GRILL:

14   Q.  Okay.  Ma'am, so this first page, and this is

15   CityJakes 506, I'm going to tell you it's

16   orientated, we're facing southbound, we're

17   looking southbound toward the Queen's sub

18   marine shop.  Okay?

19        Do you recognize this photograph,

20   or what's depicted in this photograph?

21   A.  I -- I don't recognize the photograph but I

22   (inaudible)  --

23        MS. DONNELL:  Objection --

24   (inaudible) sorry, Ms. Harris.

25        To the extent that you are

```
 1            misstating the geographical orientation.
 2                   MR. GRILL:  Oh, yeah, it might be.
 3            So this would, what, east I think.
 4                   MS. DONNELL:  Correct.
 5                   MR. GRILL:  You're right.  Sorry,
 6            it's east.
 7            BY MR. GRILL:
 8       Q.   So anyway we're on 51st Street looking east,
 9            and that green light, you see -- like I will
10            just use my screen, it's right here, that is
11            Racine, okay.
12                   Do you recognize that Queen
13            Submarine shop that's pictured in this
14            photograph?
15       A.   Yeah, I do.
16       Q.   And that's the Queen Submarine shop you told
17            me earlier today that you would go eat at all
18            the time?
19       A.   Yup, and that's the second place we have
20            (inaudible).  Anyway, okay, what's
21            (inaudible)  --
22       Q.   I'm just wondering if -- I'm going to
23            represent to you that this station wagon here
24            that's kind of angled that has the police
25            tape around it, that that was the vehicle
```

```
1           that was driven by the fellow that got shot
2           that night, okay.
3                     Seeing this photograph, does this
4           help refresh your recollection of anything
5           that you saw, or saw on the night of
6           September 15, 1991?
7     A.    Nope.
8     Q.    Okay.  Do you see there's a gray house here
9           with two, like, there's a little awning over
10          the door, and then there's an awning over the
11          window; do you see this gray house here?
12    A.    Yeah, I know that's where Claudette stayed
13          there.
14    Q.    All right.  So that's the Chairse residence,
15          that's where Quarter Pound and --
16    A.    That's the Chairse residence.  But
17          they (inaudible) -- the Chairse residence
18          where (inaudible).
19    Q.    Got it.  Okay.  So, here this is probably a
20          better way to go about it --
21    A.    (Inaudible).
22    Q.    So this building right here, now I'm on 507,
23          okay.  So, do you see -- so this building,
24          the -- I guess the red brick building, that's
25          the Chairse residence?
```

```
 1   A.   Yeah.

 2   Q.   Do you rec --  I'm going go back up to 506.

 3        Do you recognize any of these three people

 4        sitting on the front step.

 5   A.   (Inaudible) I see Rosetta.

 6   Q.   Which one is Rosetta?

 7   A.   The one in the all white.

 8   Q.   This woman right her (indicating) with her

 9        back --

10   A.   Yeah.  Yeah.

11   Q.   Do you know who this person is right here?

12   A.   No, I don't.

13   Q.   Do you know who this person in between the

14        two are?

15   A.   I ain't even seeing nobody right there.

16   Q.   We'll zoom in.  Do you see that?

17   A.   Yeah.

18   Q.   Okay.  Does that help?  Do you recognize the

19        person sitting --

20   A.   That's my sister, she's deceased.

21   Q.   The girl in the middle -- the person in the

22        middle of these two, that's your sister?

23   A.   The one that's sitting on the stairs, that's

24        my sister, Tawana, and she's deceased.

25   Q.   Okay.  And this person with the blue slippers
```

```
 1            on, do you know who that is?
 2    A.    That's the one I'm talking about, the person
 3            with the blue slippers on, that's my sister,
 4            Tawana.
 5    Q.    Got it, got it.  Got it.
 6    A.    Now whoever that third person is, I don't
 7            know.
 8    Q.    And again the third person you're talking
 9            about is the one in between Rosetta and your
10            sister?
11    A.    Yeah.
12    Q.    You don't know who that is?
13    A.    Hm-hmm.
14    Q.    Okay.  I'm going to zoom in on 507, that
15            probably doesn't help, does it?
16    A.    No, that's worse.
17    Q.    Yeah, it's pretty blurry.  Okay.  You see the
18            person in the middle has also got like blue
19            slippers on too, do you recognize anybody
20            (inaudible) --
21    A.    That was 30 years ago.  That was 30 years
22            ago.
23                    MS. DONNELL:  Objection.  To the
24            extent that -- I don't see slippers, but
25            maybe you have better eyes than I do.  I have
```

```
 1        my readers on.

 2                  MR. GRILL:  Blue shoes.

 3        BY MR. GRILL:

 4   Q.   I'm going to go up to 506 again.  Do you see

 5        that, I guess it's a red Camaro, it has a

 6        blue license place that says I think Volvo of

 7        Lisle on the front; do you see this car here?

 8   A.   Yeah.

 9   Q.   Do you know whose car that is?

10   A.   Nope.

11   Q.   This -- I'm on 507 now here.  Next to the

12        station wagon there's like a red hatchback

13        car; do you see that?

14   A.   Yeah.

15   Q.   Do you know whose car that is?

16   A.   No.

17   Q.   All right.  And do you see the building that

18        you lived in in September of 1991 in this

19        photograph that's Bates stamped 507?

20   A.   I don't even know if that was '91 -- but,

21        yeah, that's right next door.

22   Q.   Is that the one with the green and white

23        awning here at street level?

24   A.   Yeah.  Yeah.  Like the basement part?

25   Q.   Yeah.
```

95

```
 1    A.    Yeah.   Jerry stayed down there.

 2    Q.    Who is Jerry?

 3    A.    Sean's uncle.

 4    Q.    And Sean and his mom at some point lived on

 5          the first floor, right?

 6    A.    Yup.  Yup.

 7    Q.    And you guys all lived up here --

 8    A.    Yeah, yeah.

 9    Q.    Do you see this window right here on the

10          second floor of 1210?

11    A.    I do.  I do.  That building -- I don't know

12          that building though.

13    Q.    Yeah.  Do you see this window right here --

14    A.    Yeah.

15    Q.    -- that I'm circling on the second floor?

16    A.    Yeah.

17    Q.    It looks like it's broken, do you see that?

18    A.    It do look like it's broken.

19    Q.    Yeah.  Do you know when that happened?

20    A.    I don't know.  I don't know.

21    Q.    Do you remember, like, knowing whether that,

22          you know, it had been broken for some time,

23          or anything like that?

24                MS. DONNELL:  Objection foundation.

25                THE WITNESS:  I don't know.  There
```

```
 1              was other people in the houses, you know, my
 2              momma took care of us, I'm fine.
 3              BY MR. GRILL:
 4     Q.       Were you ever on the porch at 1210 on the
 5              night of September 15, 1991?
 6     A.       I don't know.  I don't even know the night
 7              the murder happened.  I don't know.  If you
 8              don't see nobody on that porch -- if you
 9              don't see nobody on that porch, then there
10              wasn't nobody out there.
11                   You see the only people on that
12              porch is that other house, so I don't know.
13              If you don't see anybody on that porch,
14              wasn't nobody out there.
15     Q.       Okay.  Aunt Bea's house in the back, have you
16              ever been inside it?
17     A.       Yeah.
18     Q.       Okay.  What direction -- where was like the
19              front door for that house?  Like what side of
20              the house was it on?  And here, let's
21              describe it this way.  There's an alley in
22              the back, right?
23     A.       Yup.
24     Q.       And the alley runs what, east and west also,
25              right?
```

```
 1   A.   I guess.

 2   Q.   Okay.  So does the front door to Aunt Bea's

 3        house, does it face the alley, does it face

 4        east, does it face west, does it face a

 5        different direction?

 6   A.   Faces that way, more west.

 7   Q.   It faced towards 51st Street, not 51st

 8        Street, Racine?

 9   A.   Yeah, it faced (inaudible) (indicating).

10   Q.   Were there any other doors --

11   A.   That's only one way in and one way out.

12   Q.   Okay.  Did Aunt Bea have any like gate of any

13        sort that you remember being on that door?

14   A.   Yeah, she had a gate.

15   Q.   Okay.  What did it look like?

16   A.   She had a gate on the door, a gate.

17   Q.   What did it look like?

18   A.   A gate, a gate that you close your door and

19        put a lock on.

20   Q.   Do you know if Aunt Bea worked back in

21        September of 1991?

22   A.   I don't know.  All I just is she was a

23        landlord, and I had a baby by her cousin

24        (inaudible).  I had a baby by her cousin --

25        (inaudible) I don't know.
```

```
 1   Q.   Okay.  Do you remember seeing any ambulances
 2        out on 51st Street that night?
 3   A.   No.
 4   Q.   Do you remember seeing Sean at any point on
 5        the night of September 15, 1991, the day the
 6        murder happened?
 7   A.   I don't -- I don't -- I don't -- I don't
 8        remember that.  I keep telling you I don't
 9        know if the murder happened on the 15th, I
10        don't know.
11             But I know -- (inaudible) but Sean
12        hit me and I chased him through the gangway
13        and I ain't seen Sean no more that day.  But
14        that was during the daytime though.
15   Q.   And was that --
16   A.   That was during the daytime though, that
17        wasn't at nighttime.
18   Q.   And you're sure this happened on the same
19        day --
20   A.   I don't know was it the 15th.  I don't know.
21        You keep saying the 15th.  I don't know what
22        day that murder happened.
23   Q.   Just put the 15th out of your mind.  Just --
24   A.   I can't put that out of my mind if I don't
25        know if that's the date.  I'm not going to
```

1        put that on my mind if I don't know if that

2        was the date.

3    Q.   So we're talking just about the day that the

4        murder happened.

5    A.   Well, I don't know about that.  I don't know.

6    Q.   So when that happened, did -- was that the

7        same day that Jakes --

8    A.   I don't know.  I don't know.

9    Q.   -- (inaudible) the gangway?

10   A.   I don't know.  It could have been, I don't

11       know.  I don't know.

12   Q.   Do you know where Jakes was running --

13   A.   It could have been the day before that, I

14       don't even know.  I don't know.

15   Q.   Do you know where Jakes ran --

16   A.   Ran to his house in the back.

17   Q.   And the gangway was between which addresses

18       on 51st Street --

19   A.   Our address and both of the buildings, both

20       of the buildings.

21   Q.   So between the Chairse residence and your

22       residence?

23   A.   Yeah.

24   Q.   Okay.  But you do not know if that happened

25       the same day that the shooting happened,

```
 1         right?
 2   A.    Right.  Right.
 3   Q.    Okay.  You said that he hit you.  Can you
 4         tell me like what he did?
 5   A.    He hit me, he threw something at me.
 6   Q.    Okay.  What did he throw at you?
 7   A.    I don't know.  It's been so long I don't
 8         know.  I can't remember.
 9   Q.    Do you remember where it hit you?
10   A.    It hit -- he threw it at me.  He threw it at
11         me.
12   Q.    Did it hit you in the head?  Did it hit you
13         in the back?
14   A.    No, no, he just threw it at me.  He just
15         threw something at me.
16   Q.    Okay.  Is there any reason why you remember
17         that if it did not happen, or if you're not
18         sure that it --
19   A.    It happened to me.  It happened to me.
20   Q.    Okay.
21   A.    That's the last time I seen Sean.  And like I
22         said, the day of the murder, I don't know --
23         I just know what the dates are when I chased
24         Sean through the gangway, that's it.  I don't
25         know if it was that day or the next day or
```

```
 1           the day of the murder, I don't know, I don't
 2           know.
 3    Q.     Okay.  Did you ever slap Jakes as a result of
 4           that?
 5    A.     No.
 6    Q.     Do you have any recollection of slapping Sean
 7           at any point in your life for any reason?
 8    A.     No.
 9    Q.     That's a no?
10    A.     No, not that I know of.  He didn't touch me.
11           Maybe I couldn't catch him, I was pregnant.
12    Q.     Okay.  Do you remember if the police ever
13           came to talk to Anthony Jakes after the
14           shooting?
15    A.     I don't know --
16                   MS. DONNELL:  Objection,
17           foundation.
18                   I'm sorry, Ms. Harris, sometimes I
19           just have to get an objection, objection.
20                   THE WITNESS:  That's okay.
21    BY MR. GRILL:
22    Q.     So do you know if the police ever came to
23           talk to or look for Anthony Jakes following
24           the shooting?
25    A.     Nope.
```

```
 1    Q.   Do you have any knowledge as to how it was

 2         that Mr. Jakes ended up at the police station

 3         following the shooting?

 4    A.   I don't know nothing about it.

 5              MS. DONNELL:  Objection,

 6         foundation.

 7              THE WITNESS:  I don't know nothing

 8         about that.

 9    BY MR. GRILL:

10    Q.   Do you know if the police came to your

11         neighborhood looking for Mr. Jakes?

12    A.   I do not know.

13              MS. DONNELL:  Objection,

14         foundation.

15              I'm sorry.  Sometimes, Ms. Harris,

16         I just have to get an objection in --

17              THE WITNESS:  That's okay.  That's

18         okay.  That's okay.

19              MS. DONNELL:  Thanks.

20    BY MR. GRILL:

21    Q.   So do you know if the police ever came to

22         your neighborhood following the shooting

23         looking for Mr. Jakes for any reason?

24    A.   I don't know.  I don't know.

25    Q.   Did you ever see any police at Aunt Bea's
```

```
 1        house in the back?
 2   A.   I don't know.  They might -- I don't know.
 3        (Inaudible).
 4   Q.   Is there anything that might help refresh
 5        your recollection?
 6   A.   Nope.  It was 30 years ago, like I told you.
 7        I said it's over 30 years, too.
 8   Q.   Do you have any understanding or knowledge
 9        about whether the police located Mr. Jakes at
10        Aunt Bea's house following the shooting?
11   A.   I don't know.  I don't know.
12   Q.   Have you ever talked to anybody about whether
13        that happened?
14   A.   Nope.
15   Q.   Okay.  So it's fair to say you have no idea
16        at all whether the police ever went to Aunt
17        Bea's house looking for Mr. Jakes?
18   A.   Right.
19   Q.   Okay.  Did you ever find out that Mr. Jakes
20        was at the police station in regards to the
21        shooting that happened on 51st Street?
22   A.   I don't -- I don't know nothing about that.
23   Q.   Okay.  Did you ever go visit Mr. Jakes while
24        he was awaiting trial at the Cook County
25        Jail?
```

```
 1   A.   No.
 2   Q.   Did Aunt Bea ever talk to you about the
 3        police coming to her house looking for
 4        Mr. Jakes?
 5   A.   Nope.
 6   Q.   What about Mr. Jakes's mom?
 7   A.   No.
 8   Q.   What about any of his siblings?
 9   A.   No.
10   Q.   What about any of your cousins?
11   A.   Nope.
12   Q.   No?
13   A.   Nope.
14   Q.   Did you ever talk to Denise about what
15        happened on the night of the shooting?
16   A.   I guess we weren't interested, so nope.
17   Q.   Okay.  Do you have any recollection of your
18        sister Denise telling you that she could
19        provide an alibi of any sort for Mr. Jakes?
20   A.   No.
21   Q.   When was the last time you talked to your
22        sister Denise?
23   A.   I don't talk to her.
24   Q.   You don't talk to her?
25   A.   Nope.
```

```
 1    Q.    Why not?

 2    A.    Because I don't talk to her.  That's between

 3          me and my sister, we don't talk.

 4    Q.    Is the reason why you guys don't talk at all

 5          --

 6    A.    It ain't because of that, it's not because of

 7          that.

 8    Q.    Well, let me just ask the question so it's

 9          clear.

10                Is the reason why you and Denise

11          don't talk in any way related to what

12          happened with this shooting, to this

13          shooting?

14    A.    No.

15    Q.    Okay.  Do you recall whether on the night of

16          the shooting you made any calls to 911 or

17          anything like that to report that a shooting

18          had happened?

19    A.    No.

20    Q.    All right.  Is it fair to say that following

21          the shooting, the next time you ever heard

22          anything about this case was when people

23          started trying to contact you in regards to

24          your deposition?

25    A.    (Inaudible) I would say no, because I don't
```

```
 1            know what you're talking about.  No.
 2    Q.      So you're sitting for a deposition here today
 3            in this case, and then you sat a little bit
 4            ago but we didn't get to complete your
 5            deposition.  So those are the depositions I'm
 6            talking about.
 7                        So between September 1991 when the
 8            shooting happened and you then getting
 9            subpoenaed to appear for a deposition today,
10            or in relation to Mr. Jakes's lawsuit, in
11            between those two times, did you talk to
12            anybody about the shooting?
13    A.      No.
14    Q.      Okay.  Do you have any understanding about
15            whether Mr. Jakes -- what Mr. Jakes is trying
16            to get out of this lawsuit?
17    A.      That is --
18                        MS. DONNELL:  Foundation.
19                        THE WITNESS:  That's not my problem
20            and I don't care.  I do not care.  The only
21            thing I keep telling y'all, Sean didn't do
22            it.  I don't care about no money, I don't
23            care about no nothing.
24            BY MR. GRILL:
25    Q.      Mr. Jakes told the police, or at least
```

```
 1            according to the police, that your sister
 2            Denise knew who the killer or killers were
 3            that were responsible for the murder of
 4            Mr. Garcia out in front of the Queen Sub shop
 5            that night in September; do you know if
 6            Denise does know who committed the shooting?
 7    A.      If my sister knew anything, don't you think
 8            she would tell me?
 9    Q.      So that's a no?
10    A.      That's a no.  She would have told me and I
11            don't -- I don't know nothing, I don't know
12            nothing.  And I'm quite sure she don't know
13            nothing.
14    Q.      Why do you think Denise would tell you if --
15    A.      That's my sister.  Me and my sisters don't
16            hide nothing from nobody.  We don't hide
17            nothing from each other.  She called me and
18            told me that some people are trying to get in
19            touch with her about that, but she don't know
20            nothing.
21                    If she did, believe me, I would
22            have knew about it.
23                    Why aren't y'all questioning her, I
24            mean, what's the problem?
25    Q.      Do you know -- have you ever heard -- let me
```

1       start that over.

2               Have you ever heard from any source

3       whatsoever anything about what Mr. Jakes says

4       happened to him at the police station when

5       the police were talking to him about this

6       shooting?

7   A.  I don't know nothing.

8   Q.  You don't know anything at all?

9   A.  I don't know nothing.

10  Q.  Okay.

11  A.  I need to go eat.

12  Q.  Okay.  Let's take a couple-minute break.

13      Let's come back in five minutes, okay?  It's

14      1140 according to my time.

15              VIDEO TECHNICIAN:  Going off the

16      record at 11:40 a.m.

17              (Short break.)

18              VIDEO TECHNICIAN:  We are back on

19      the record at 11:45.

20              MR. GRILL:  I've just got a few

21      more questions for you.  Can you hear me

22      okay?

23              THE WITNESS:  Yeah.

24      BY MR. GRILL:

25  Q.  All right.  You described Mr. Jakes back in

```
 1          1991 as, in your opinion, a good kid, right?
 2   A.     Yeah.
 3   Q.     And would you feel like generally speaking he
 4          was like a respectful kid?
 5   A.     He was a respectful kid, he went to school.
 6          Like we would get off the bus and (inaudible)
 7          he wasn't a violent kid or nothing like that.
 8          I -- I -- I just can't see it in him, I
 9          can't.
10   Q.     Yeah.  And would you --
11   A.     Nobody can see it in him.
12   Q.     Would you describe him as like an --
13          outwardly people would say a pretty normal
14          guy?
15   A.     Yes, he is a normal guy.  Just a little
16          hyper, you know what I'm saying, just a
17          little hyper, like any other HDHD child
18          probably was.  You know --
19   Q.     So --
20   A.     I got it.
21              MS. DONNELL:  I'm sorry.  It's just
22          I think she hasn't quite finished.  I know
23          you're almost done and you want to get
24          through it, but maybe just wait until she's
25          done answering your question.
```

```
 1        BY MR. GRILL:
 2   Q.   Would you think if you were talking to him
 3        that -- did it appear that there was
 4        something, like, obviously wrong with him?
 5   A.   No.  No.  No.  No.
 6   Q.   Do you know what I mean?
 7   A.   He was like -- Sean was like a normal kid, he
 8        just had a little HDHD, he's a hyper kid,
 9        just was like a -- just say a hyper kid.
10   Q.   Mm-hmm.
11   A.   He went to school, you know, he did -- he had
12        a pretty good momma.  I mean, she did very
13        good for them, you know --
14   Q.   Did you --
15   A.   -- to my knowledge.
16   Q.   In your experiences and interactions with
17        Mr. Jakes, did he come off to you as like
18        mentally deficient in any way?
19   A.   No, he had -- you know, he had, like I say,
20        he's just off a little, that's all.
21   Q.   What did you mean by that?
22   A.   He was just like off a little, like -- I just
23        say he was just a little hyper, you know.  He
24        didn't fit to (inaudible)  -- he didn't fit
25        for pulling that trigger to kill nobody, you
```

```
 1        know.
 2   Q.   And when you say hyper, like he couldn't --
 3   A.   He would do hyper things, like the kids eat
 4        candy, they want to jump around and stuff
 5        like that, you know.
 6   Q.   Okay.
 7   A.   He was like a kid that likes sweets and
 8        stuff, that's all.  Basically he was a good
 9        kid.
10             MR. GRILL:  Okay.  I've got nothing
11        else, unless you have got any follow-up.
12             MS. DONNELL:  Sure.
13                       EXAMINATION
14   BY MS. DONNELL:
15   Q.   Ms. Harris, I have just a few questions for
16        you, just to clarify things from yesterday
17        and today.  I'm going to try and be real
18        quick about it, okay?
19             All right, Ms. Harris?
20   A.   Yes.
21   Q.   Okay.  And my questions are really just going
22        to focus on the -- your last time that you
23        remember seeing Sean.  And so earlier you
24        testified that you remember it being outside
25        with Sean and some other folks and he threw
```

1    something at you and then you chased him

2    through the gateway, but you couldn't quite

3    catch up to him; do you remember that

4    testimony?

5  A.  Yes.

6  Q.  Okay.  And could you -- could you just for

7    the record one me time, just tell us

8    everything that you remember about that, just

9    describe it in your own words for us what you

10    were --

11        MR. GRILL:  Well, that's asked and

12    answered.

13        But go ahead.

14        THE WITNESS:  It's just like one

15    day, it was like during the daytime, you

16    know, y'all just come outside and sit on the

17    porch and stuff.

18        And Sean came from the back, you

19    know, and Sean always picked with us and he

20    threw something at me and I chased him

21    through the gangway, I couldn't catch him,

22    Sean he was fast, and I cussed him out.  But

23    I didn't see Sean no more, I didn't see him

24    no more.

25  BY MS. DONNELL:

```
 1   Q.   Okay.  So just -- just to be quick, this is
 2        the last time you ever remember seeing Sean
 3        in person; is that right?
 4   A.   Yeah, yeah.
 5   Q.   And do you remember, other than you and Sean,
 6        anybody else that was out there at that time,
 7        as you sit here today?  I know it's been a
 8        really long time ago, but right now do you
 9        remember any other young people that were out
10        there with you?
11             MR. GRILL:  Asked and answered.
12             THE WITNESS:  If it was -- if it
13        was like during the daytime probably like --
14        (inaudible) like I'm saying probably some of
15        the kids from the neighborhood, you know.
16             They always would come and go, you
17        know, ain't nobody always stick around, you
18        know.  I always stayed in the house and
19        looked out the window, so...
20   BY MS. DONNELL:
21   Q.   And just to be real quick, instead of -- I
22        don't want you to guess or speculate, but
23        just as you sit here today, your memory
24        today, do you remember any of the other
25        people in the neighborhood who were with you
```

```
 1          when this happened?

 2                    MR. GRILL:  Asked and answered.

 3                    THE WITNESS:  Probably just us that

 4          stay in the building, you know, the kids in

 5          the neighborhood just walking past, you know.

 6          Because there was a lot of us, you know, kids

 7          in the neighborhood, there was a lot of us.

 8          I ain't going to lie, there was a lot of us.

 9          BY MR. GRILL:

10    Q.    And was that something typical like you kids

11          would hang out in front of your

12          neighborhood -- (inaudible).

13    A.    Yeah, we like -- you know, we all like meet

14          up in the morning, we all get up (inaudible)

15          and come and sit on the porch, you know.  Go

16          to the corner store, you know what I'm

17          saying, go to a friend's house, you know,

18          come back, and we wouldn't change our clothes

19          until nighttime, you know -- (inaudible)

20          that's just basically what we did, you know.

21    Q.    And sometimes you guys would hang out in the

22          dinnertime hours or evening hours out in the

23          front area stoop from time to time?

24    A.    Basically we just used to hang in the front

25          of the house.  We always used to, you know,
```

115

```
 1          hang on the blocks, you know what I'm saying.

 2          Going down laughing and laughing, and you

 3          know -- (inaudible) we hang around the

 4          neighborhood because, you know, we all went

 5          to school, you know, and we all got a lot of

 6          friends, you know.

 7                    We weren't the type that would sit

 8          right there in front of the house, cuz, you

 9          know, Bea didn't want no traffic on the

10          porch, you know what I'm saying?  My momma

11          didn't want that.  You know, we had the candy

12          store, we were good kids, you know.

13   Q.     Yeah, just normal kids.

14   A.     (Inaudible).

15   Q.     So I'm going to ask you, do you remember back

16          around just before Christmastime -- do you

17          remember like today you said you remember

18          this being in the daytime, is that what

19          you've been saying today, or right now you

20          remember the last time seeing Sean was in the

21          daytime?

22   A.     Yeah, it was in the daytime when Sean was

23          throwing something at me.

24   Q.     Okay.  So I'm going to -- so you remember you

25          gave a deposition back sometime before
```

1       Christmas in December of 2021, and I am going

2       to show you part of that testimony and read

3       the questions that you were asked and the

4       answers you gave then.  Okay.  So just hold

5       on one moment, I'm going to put up on my

6       screen.  But I'm reading from page 11, lines

7       9 to 22.

8               And so, Ms. Harris, can you see

9       that on your screen?  But I'll read it for

10      you.  And you were asked, At any point on

11      September 15, 1991, prior to the shooting,

12      did you see Sean?

13              Answer:  I seen him that night.  I

14      seen him that night when he threw something

15      at me.  He ran through the gangway and I

16      ain't seen him no more.

17              Question --

18  A.  (Inaudible) but like I said, that was during

19      the day or night, I can't remember.  But that

20      was the last time I seen Sean.

21  Q.  Okay.  So I'm just going to finish reading

22      these questions and the answers you gave back

23      in December, okay.

24  A.  Okay.

25  Q.  So then what did he throw at you?

```
 1                   Answer:  I don't know.  I can't
 2        remember.  We was kids and was playing.
 3                   Question:  And when he threw
 4        something at you, was that before or after
 5        the shooting happened.
 6                   Answer:  That was before the
 7        shooting.
 8                   Question:  Did you see him again
 9        after he ran through the gangway?
10                   Answer:  No, I didn't see him no
11        more.
12                   And do you remember being asked
13        those questions and giving those answers back
14        in December?
15   A.   Yes.  Yes.
16   Q.   Okay.
17   A.   Like I say, whether it was like during the
18        day or at night, I don't remember, you know.
19        But that was the last time that I seen Sean.
20   Q.   Okay.
21   A.   I don't know if it was nighttime, I don't
22        remember, like -- (inaudible) asked the
23        question did he hit you right then and
24        there -- but, yeah, basically, that's the
25        last time I seen Sean.
```

```
 1   Q.   But, Ms. Harris, to be clear, back in
 2        December you remembered it being nighttime
 3        and you said it was nighttime, and now today
 4        you're saying, as you sit here today, you're
 5        not sure, right?
 6   A.   It was -- it was just like I -- it was
 7        nighttime or daytime, I can't remember.  I
 8        can't remember.
 9   Q.   Okay.  Okay.  And that was --
10   A.   That was the last time that I seen Sean.
11   Q.   That's the last time you saw him.  Okay.
12   A.   If I said who did do the shooting, he dead
13        now so it wouldn't matter.  He dead, so...
14   Q.   So, Ms. Harris, you're saying the person who
15        people said did the shooting is dead now?
16   A.   Yeah.
17   Q.   Okay.  And who -- who were you told -- who
18        told you -- or who were you told did the
19        shooting?
20   A.   Well, I heard it was this boy named Duke.
21        They said his name was Duke.  Sean and Duke
22        was the same height, but Duke was -- Duke was
23        an older guy.  And Sean was a kid, and they
24        was just like the only two tall ones in the
25        neighborhood.
```

119

```
 1   Q.   You are saying Duke, D-U-K-E --
 2   A.   It was -- it was just something I heard, you
 3        know.
 4   Q.   Okay.  Who told you --
 5   A.   Nobody said --
 6   Q.   I'm sorry, just let me -- who told you that
 7        Duke did this murder?
 8   A.   Ain't nobody tell me nothing, I just heard
 9        it.
10   Q.   Okay.  You heard it in the neighborhood --
11   A.   Yeah, I did --
12   Q.   -- back in 1991?
13   A.   It wasn't back in 1991.  It was like probably
14        a couple more years after that, you know how
15        people keep talking and stuff, so...
16   Q.   Do you remember anybody who told you?
17   A.   Ain't nobody tell me nothing, I just heard
18        it.
19   Q.   Okay.  Do you remember who you heard it from?
20   A.   Hm-hmm, I don't.
21   Q.   Did you know who that person was, this person
22        named Duke?
23   A.   Yes, I do.
24   Q.   Who is that person?
25   A.   He was just a tall way, I think Duke
```

```
 1              (inaudible) I think it was like Carpenter or

 2              somewhere, Carpenter or May or Aberdeen,

 3              somewhere over there.

 4     Q.       How did you know him?

 5     A.       (Inaudible).

 6     Q.       How did you know him?

 7     A.       Duke used to be in the neighborhood.  He used

 8              to be in the neighborhood.

 9     Q.       Was he friends with any of your siblings?

10     A.       No, no, uh-huh.  He just be out there with

11              the boys and stuff, that's all.

12     Q.       Okay.  When's the -- can you tell us about --

13              how did you know him, just from the

14              neighborhood?

15     A.       As I said, just from the neighborhood, yeah,

16              yeah.  Everybody used to meet up there at

17              that restaurant.

18     Q.       Which restaurant?

19     A.       That was the last -- they used to call the

20              submarine place the last resort.

21     Q.       The last resort?

22     A.       Yeah.  So when we get home, that's the last

23              place we would go get something to eat.

24     Q.       Is that because it was open late?

25     A.       Yeah.  Yeah.  Yeah.  Stayed open until like 2
```

```
 1              or 3 o'clock in the morning.
 2     Q.       And did you see this person, Duke, around the
 3              sub --
 4     A.       I don't -- I don't remember, I don't remember
 5              that night, it was just something that I
 6              heard.  Okay.  I don't know if he did, but I
 7              know Sean didn't do it.  They just throw
 8              names on people, you know.  You never know,
 9              you know what I'm saying, but I know Sean
10              didn't do it (inaudible).
11     Q.       And just to be real clear, Ms. Harris, did
12              you see the shooting --
13     A.       No, I didn't --
14     Q.       -- outside the sub shop?
15     A.       No.  No.  No, I didn't see no shooting.  I
16              don't even know if I was there, you know what
17              I'm, you know what I'm saying.  But I mean
18              it's right there in front of my house but I
19              don't know if I was at home or not, you know.
20              I'm just not going to say nothing that I
21              don't know, you know.
22     Q.       No.  Nobody wants you to say something you
23              don't know, and nobody wants you to guess or
24              speculate.  We only want you to say what you
25              saw or you heard or you know.
```

122

```
 1   A.   I never seen no shooting.  I never seen it.
 2        Whoever was on them front steps, they're the
 3        ones that probably seen it (inaudible).  You
 4        can't question my sister, she's deceased now.
 5   Q.   Can you describe what you remember this -- do
 6        you know Duke's real name or last name?
 7   A.   No, no, no.  Everybody had different names,
 8        you know what I'm saying.  They didn't say
 9        the whole name.  They just gave us nicknames.
10        Like my nickname was cupcake.  Everybody just
11        gave us nicknames.
12   Q.   Okay.  Can you describe this Duke that you
13        recall?
14   A.   I recall he just tall, he just tall and
15        skinny.  He just tall and skinny.  Tall,
16        skinny and dark skinned with a short haircut.
17   Q.   Tall, skinny, dark skin --
18   A.   Dark skin, and a short haircut.
19   Q.   You said a short haircut?
20   A.   Yup.  Like a fade.
21   Q.   Like a fade.  Do you know anybody he used
22        to -- did you see him with other people when
23        you would see him, like people that he hung
24        with?
25   A.   Basically, no.  All of them basically would
```

```
 1        always drive a car, you know.  If they did
 2        hang with some guys, everybody met up in
 3        front of the restaurant, you know.
 4   Q.   Do you know if he --
 5   A.   And when the lights comes on, my momma knows,
 6        she always made us come in, so...
 7   Q.   Okay.  But do you have any actual
 8        information -- in other words, like did you
 9        see who shot Mr. Garcia?
10   A.   No, I didn't.  No, I didn't.  No.
11   Q.   Okay.  And so you have just heard a rumor
12        that it was this individual named Duke, is
13        that what your testimony is today?
14   A.   Yup.  Yup.  Yup.
15   Q.   Anybody else that you heard a rumor about?
16   A.   Nope.  That was the one name I just heard,
17        that was the one name I just heard.
18   Q.   And I know I asked you this already, but is
19        there anybody that you remember you heard
20        that from?
21   A.   No.
22   Q.   Is there anything that --
23   A.   I don't know if I heard it -- all those names
24        together, you know me and all the girls, so
25        they was talking or it was on a Facebook or
```

124

```
 1              whatever, I -- I can't remember where I heard
 2              it from.  But I know he dead.  But I heard --
 3    Q.        How do you know Duke is dead?
 4    A.        Duke deceased.
 5    Q.        How do you know?
 6    A.        Duke deceased, that's all I got to say.  He's
 7              deceased.
 8    Q.        I'm saying, how did you know that?
 9    A.        He -- he get killed.  He got changed, he got
10              changed in Chicago.  A lot -- a lot of those
11              got killed, lots of young ones, you know,
12              they all got killed, you know, just stupid
13              shit.  Stupid shit.
14    Q.        Okay.  I think earlier today you said that
15              back when Sean was living right there by you
16              guys on 51st and Racine, that he lived at one
17              point with his mom, and on the first floor of
18              the building that you were at, but also back
19              with his Aunt Bea in the back house, right?
20    A.        Yeah.
21    Q.        And is it your testimony that he lived at
22              both of those places?
23    A.        Yeah.  Yeah.
24    Q.        Okay.  But do you remember -- you had said
25              you had been at Aunt Bea's house before?
```

1   A.   Yeah, I got a baby by her nephew.

2   Q.   Okay.  And do you remember, did Sean have a

3        bedroom in Aunt Bea's house?

4   A.   Sean, basically was being like different, he

5        used to be back at his Auntie Bea's house,

6        you know, back in the day, (inaudible) his

7        Aunt Bea, always back and forth, you know,

8        always back and forth.

9   Q.   Okay.  And I think you said this, but on

10       September 15, 1991, do you know where he was

11       at that night, if he was back at Aunt Bea's

12       house?

13  A.   No.  But when I chased him, if that was at

14       nighttime, like I say -- that's the only

15       place -- when he ran through that gangway,

16       that's the only place he stayed, back there

17       with Aunt Bea.

18            MS. DONNELL:  Okay.  I think that's

19       all the questions I have for you, Ms. Harris.

20       I imagine Mr. Grill has a few questions for

21       you, so...

22            THE WITNESS:  I'm ready to go home.

23                 FURTHER EXAMINATION

24       BY MR. GRILL:

25  Q.   Ms. Harris, did you -- I guess when Mr. Jakes

126

1   threw whatever he threw at you and he ran off

2   through the gangway, did you see Mr. Jakes

3   throwing anything at vehicles that were going

4   by?

5 A. No.  He threw it at me, he threw it at me and

6   he ran through the gangway.

7 Q. Okay.

8 A. I'm getting aggravated now.

9 Q. Yeah.  Okay.

10    So -- and you never saw Mr. Jakes

11   throw anything at any car?

12 A. No.  No.

13    MS. DONNELL:  Objection, asked and

14   answered.

15    THE WITNESS:  After Sean threw

16   something at me, I didn't see him no more --

17   I (inaudible)  at somebody's car.  After he

18   threw something at me I chased him through

19   the gangway, I ain't seen him no more.

20   BY MR. GRILL:

21 Q. Did ever hear from anybody that Mr. Jakes

22   might have thrown anything at a car when it

23   was driving by?

24 A. No.

25 Q. Did you know Mr. Jakes --

```
 1   A.   Not that I know of, no.

 2   Q.   Did you know, you know, prior to this

 3        shooting, did you know if that was something

 4        Mr. Jakes would do, that is throwing things

 5        at cars as they drove by on 51st Street?

 6             MS. DONNELL:  Objection, asked and

 7        answered.  And foundation.

 8             MR. GRILL:  Ma'am?

 9             THE WITNESS:  I said no.  No, no,

10        no.

11        BY MR. GRILL:

12   Q.   So earlier today, you told me very

13        specifically that you had no friends?

14   A.   I don't.

15   Q.   No, I'm talking about back in 1991.

16   A.   I don't.

17   Q.   And that you stayed at home all the time.

18   A.   Yeah.

19   Q.   And never went out, right?

20   A.   Went out.  I went outside, but, you know, I

21        just didn't have no friends, no

22        social (inaudible) --

23   Q.   Just now you told Ms. Donnell that you had

24        lots of friends and you would all hang out on

25        the block?
```

```
 1   A.   I said -- (inaudible) hang out on the block.
 2        I said all the kids in the neighborhood, we
 3        all used to hang around.  I mean, I don't
 4        have friends.  I have associates, there's a
 5        difference between a friend and associates.
 6   Q.   So you didn't spend all of your time at home,
 7        you did have friends and you did go outside,
 8        right?
 9   A.   I spent all my time at home but I went
10        outside sometimes.
11   Q.   Okay.  So then I got to ask you again since
12        now you're telling me that did you have
13        friends --
14   A.   I didn't have --
15   Q.   -- and you did go outside --
16   A.   Friends, I had associates.
17   Q.   Okay.  Whatever you want to call them.
18   A.   Okay.  I mean, kids, when we come home from
19        school, what, we can't stand outside for a
20        minute (inaudible).
21   Q.   Well, it sounds like you would go up and down
22        the block, and there was a candy store --
23   A.   I didn't not say that.
24   Q.   -- and things for you all to do outside,
25        right?
```

```
 1   A.   I didn't say that.  I did not say that.  I
 2        did not say that.
 3   Q.   Did you not say that you would go to the
 4        candy store?
 5   A.   We had a candy store.  My mom had a candy
 6        store.  We had one.
 7   Q.   Okay.  So when you are talking about the
 8        candy store, you are talking about your
 9        mother's candy store?
10   A.   Yeah.  Our candy store in our house, we had a
11        candy store -- we had our own candy store.
12   Q.   Okay.  Did Duke look like Mr. Jakes --
13   A.   I don't know.  I don't remember how the boys
14        looked like now today.  I just remember his
15        name.
16   Q.   Let me finish my question.
17             My question is, is do you -- did
18        Duke look like Mr. Jakes in any respect other
19        than how tall he was, that they were similar
20        heights back in 1991?
21   A.   No.  No.
22   Q.   Okay.  How old was Duke, if you know, in
23        1991?
24   A.   I don't know.  I don't know.
25   Q.   Okay.  You have no idea if he was actually --
```

```
 1   A.   No, I don't have no idea how old he is.  How
 2        old he was back then or now, I don't know.
 3   Q.   Did you ever tell the police or try to tell
 4        the police about this rumor that you heard in
 5        the neighborhood about Duke?
 6   A.   No.  Nope.
 7   Q.   Why not?
 8   A.   For what?  It ain't my business.  I don't
 9        care.  I do not care about none of this.  The
10        only reason I'm here talking about Sean is
11        because Sean didn't do it, and he is part of
12        the family.
13   Q.   Right.
14   A.   (Inaudible).
15   Q.   So is it important to you today that people
16        know that Sean did not commit this shooting?
17   A.   They know.  They know.  A lot of people know
18        Sean didn't do it.
19   Q.   Who are those people?
20   A.   I don't know.
21   Q.   Well, then, why are you saying that?
22   A.   Like I said, a lot of people know.  All the
23        people that read the new and stuff, they
24        should know.  As far as his Aunt Bea and
25        them, they should know.
```

131

```
 1              I don't know why y'all just got me
 2         here, you know.  I'm only talking to you
 3         because he innocent.  I mean, where's his
 4         Aunt Bea's at, (inaudible) I know where they
 5         all live.
 6    Q.   How do you know where they're all at?
 7    A.   (Inaudible) I know where they stay at.  I
 8         talk to Tweetie on Facebook.
 9    Q.   Have you talked to Tweetie about this case?
10    A.   No.  No.  No.
11    Q.   Okay.  Have you ever talked to Quarter Pound
12         about this case?
13    A.   No.
14    Q.   Okay.  What's your Facebook handle?
15    A.   I don't have one no more.
16    Q.   You don't have Facebook at all?
17    A.   Nope.
18    Q.   When did you close your account?
19    A.   Why?
20    Q.   Frankly because I'll look, so...
21    A.   I mean, go look, it's Annette Harris, go look
22         (inaudible).
23    Q.   Well, if it's closed --
24    A.   The only thing (inaudible)  -- my page been
25         closed, at least, what, five or six months.
```

```
 1          Probably a whole year.

 2     Q.   Why did you close it?

 3     A.   Because I wanted to, ain't nothing but

 4          gossip.

 5     Q.   Do you have any other social media accounts?

 6     A.   I don't do none of that.

 7     Q.   Okay.  Do you have Mr. Jakes's phone

 8          number --

 9     A.   No.

10     Q.   -- currently?

11     A.   No.

12     Q.   Uh?

13     A.   No.

14     Q.   If you needed to get ahold of him --

15     A.   For what?

16     Q.   For any reason, would you be able to do that?

17     A.   Hm-hmm.

18     Q.   Do you know if he has your contact

19          information?

20               MS. DONNELL:  Objection,

21          foundation.

22               THE WITNESS:  He ain't got nothing

23          of me.

24     BY MR. GRILL:

25     Q.   Okay.  Do you know how to reach anybody else
```

```
 1          in Mr. Jakes's family?

 2   A.     Nope.

 3              MR. GRILL:  Okay.  All right.  I'm

 4          done.  I don't know if you have anything,

 5          Heather, on what I asked.

 6              MS. DONNELL:  I don't have any

 7          other questions for Ms. Harris.  I don't know

 8          if Mr. Yamin does.

 9              MR. YAMIN:  I do not.

10              MR. GRILL:  Okay.

11              Ms. Harris, we're done.  Thanks for

12          you time today.  This is only thing left for

13          you to decide.  As the deponent, meaning the

14          person answering the questions today, you

15          have the right if you want to review a

16          transcript of your testimony today.  The

17          point of you doing that, if you want to do

18          that, is to make sure for yourself that

19          everything that was said today, especially

20          what you said, was transcribed correctly.

21          You can't change your testimony on the

22          document.  But there's a sheet at the end

23          called an Errata sheet where you can make

24          some notes about where you think that the

25          transcription might have made a mistake.  You
```

1      can do that, or you can trust that the court

2      reporter got everything down accurately.  It

3      was also audio recorded, so that's how they

4      check it, but --

5              THE WITNESS:  I got everything.  I

6      ain't got nothing to identify.  I got

7      everything.

8              MR. GRILL:  So signature waived.

9      We are done.

10             Thanks for your time, Ms. Harris, I

11      hope you have a great day.

12              THE WITNESS:  Yup.

13             MS. DONNELL:  Thanks, Ms. Harris.

14             VIDEO TECHNICIAN:  Concluded at

15      12:12 p.m.

16            (The deposition of **ANNETTE HARRIS** was

17      concluded at 12:12 p.m.)

18

19

20

21

22

23

24

25

```
1        STATE OF MINNESOTA:
                        :                    CERTIFICATE
2        COUNTY OF HENNEPIN:

3
             BE IT KNOWN, that I, Jolynn Graham, took
4        the foregoing videotaped deposition of
         ANNETTE HARRIS;
5
             That the witness, before testifying, was
6        by me first duly sworn to testify the whole
         truth and nothing but the truth relative to
7        said cause;

8
             That the testimony of said witness was
9        recorded in shorthand by me and was reduced
         to typewriting under my direction;
10

11           That the foregoing deposition is a true
         record of the testimony given by said
12       witness, to the best of my ability;

13
             That the reading and signing of the
14       foregoing deposition by the said witness WAS
         WAIVED by the witness;
15

16           That I am not related to any of the
         parties hereto, nor an employee of them, nor
17       interested in the outcome of the action;

18
             That the cost of the original has been
19       charged to the party who noticed the
         deposition, and that all parties who ordered
20       copies have been charged at the same rate for
         such copies;

21

22           WITNESS MY HAND AND SEAL this 22nd DAY of
         MARCH, 2022.
23

24
                              Jolynn Graham, RPR
25                            Notary Public
```

Exhibit 14

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT - CRIMINAL DIVISION

**FILED**

PEOPLE OF THE STATE OF          )
ILLINOIS,                       )     MAR 22 1994
                                )     AURELIA PUCINSKI
                Plaintiff,      )     CLERK OF THE CIRCUIT COURT
                                )     CRIMINAL DIVISION
                                )
        vs.                     )     92 CR 5073
                                )
ANTHONY JAKES,                  )
                                )
                Defendant.      )

            REPORT OF PROCEEDINGS HAD at the hearing of the

above-entitled matter, before the Honorable THOMAS

DURKIN, Judge of the Circuit Court of Cook County, on the

9TH Day of SEPTEMBER, A.D., 1993.

        PRESENT:            HON. JACK O'MALLEY,
                            State's Attorney of Cook Co.
                            BY: MR. NEAL GOODFRIEND, and
                            MR. JOHN DILLON,
                            Asst. State's Attorneys,
                                on behalf of the State;

                            MS. RITA FRY,
                            Public Defender of Cook Co.
                            BY:  MR. STEWART KATZ,
                            Asst. Public Defender,
                                on behalf of Mr. Day;
                            MR. FRANK MADEA, and
                            MS. CHERYL T. BORMANN,
                                on behalf of Mr. Jakes.

Mary Catherine McGreal Redmon, CSR

Plaintiff Jakes 030869

I N D E X

CASE NAME: PEO VS. ANTHONY JAKES

CASE NUMBER: 92 CR 5073

DATE HEARD: 9/9/93

PAGES: F-1 TO F332

| OPENING STATEMENTS | STATE | DEFENSE |
|---|---|---|
| DEFT. DAY | 9 | 21 |
| DEFT. JAKES | 31 | 38 |

| WITNESSES | DX | CX | CX | RDX | RCX | RDX |
|---|---|---|---|---|---|---|
| MARCO GARCIA | 43 | 50 | | 51 | | |
| OFCR. DOSS | 52 | 60 | 65 | | | |
| OFCR. MC KEOUGH | 67 | 82 | 86 | | | |
| DET. CAESAR | 87 | 98 | 102 | 109 | 110 | |
| STIPULATIONS | 111 | | | | | |
| RICHARD FOURNIER | 122 | 138 | | | | |
| OFCR. PACK | 141 | 147 | | | | |
| GUS ROBINSON | 152 | 165 | | 175 | 179 | |
| DET. KILL | 183 | 211 | | 227 | 229 | |
| OFCR. EVANS | 233 | 240 | | | | |
| DET. BOUDREAU | 245 | 266 | | 279 | 283 | |
| ASA DONIELIAN | 284 | 302 | | 312 | 314 | |

Plaintiff Jakes 030870

1    MR. DILLON:  Judge, we will also have a motion to

2    exclude witnesses.

3        THE COURT:  We are on Mr. Day and Mr. Jakes, mutual

4    motions to exclude witnesses are sustained.

5            The State would be proceeding with their

6    opening statement individually so as soon as we have the

7    first jury we will go with whomever that happens to be.

8            And I think we now have a jury?

9        MR. DILLON:  The other thing, Judge, is we

10   anticipate there, that there would be 5 common witnesses

11   among the 2 juries.  One of the other witnesses I guess

12   would be the 6th witness, Judge.

13           We believe that, and I have spoken about this

14   with Mr. Katz and Mr. Madea, that the cross examination

15   of Detective Caesar would be more extensive by Mr. Madea

16   than Mr. Katz.

17           And we'd be asking that when Mr. Madea

18   cross-examines Detective Caesar that Mr. Day's jury be

19   removed.

20           And I think the parties are in agreement.

21       THE COURT:  All right.  Bring it up at the

22   appropriate time.  I will remove any jury.

23           Obviously Mr. Madea has some intention of

24   presenting some witnesses.  He can do that by way of a

Plaintiff Jakes 030871

1    defense witness or he can attempt to do so by way of

2    cross-examination at that time.  But I am not going to --

3         So just let me know.

4    MR. DILLON:  Thank you, Judge.

5    THE COURT:  State, we now have both juries.

6         Who do you want to go with?  You are going

7    first.

8    MR. GOODFRIEND:  Doesn't matter to us, Judge.

9    THE COURT:  Go in the order of the charges against

10   them, then.  All right.

11        Bring out Mr. Day.

12        (Defendant Day in Courtroom.)

13   THE COURT:  All right.  Mr. Day is present

14   personally and by counsel.  The sheriffs are present.

15        I want to tell the sheriffs that from after the

16   first opening statement, it is of critical, critical,

17   critical importance that the 2 juries never be together

18   again.  Never be together again.

19        It is a lot of work for me to pick 2 jurys and

20   very stressfull to hear a double jury at the same time.

21   I don't intend to see all my efforts of yesterday and the

22   rest of the week be fouled because of some improper

23   communication from the sheriffs to the jury or from one

24   jury to the other.

Plaintiff Jakes 030872

1    So I tell you now, it is of critical importance

2    that they be kept separately from this point forward.

3    Do not under any circumstances discuss the case

4    with them because it's quite possible that something will

5    be said that they shouldn't be hearing and I don't want

6    to see that happen.

7    If you have any questions, tell them to talk to

8    the Judge about it.  You all understand it?

9    Please bring out -- what's your name, sir?

10    A    Mr. Day.

11    THE COURT:  Mr. Day's jury out.

12    (Defendant Day's Jury out.)

13    THE COURT:  Morning again, ladies and gentlemen.

14    Unfortunately we have lost a few minutes this

15    morning but again I stress to you the importance of

16    punctuality because I was the least inconvenienced of

17    all.  I had plenty of other work I could do.

18    Again, any time that we lose because of jurors

19    being late we can never recover again.  At some point we

20    go beyond the abilities of recovering that portion of the

21    day and we wind up spending an extra day which I have to

22    do anyway, but it would be an inconvenience to your

23    fellow jurors.

24    I want to give you before you are sworn as a

5

Plaintiff Jakes 030873

1    jury --

2              You were sworn yesterday to tell the truth.  I

3    want to give you some idea of the chronology and the

4    first thing I want to do is take roll.  And I will

5    explain to you why I am doing that in just a moment.

6    Because it will explain the way the juries are going to

7    be treated.

8              Edwin Nasimoto?  I think you're giving me the

9    wrong cards.  This is about --

10             We will quickly understand why I am doing what

11   I am doing.  Jennifer Alexian?

12        A    Here.

13        THE COURT:  Brian Anton?

14        A    Here.

15        THE COURT:  Cheryl Princeton?

16        A    Here.

17        THE COURT:  Patricia Finnegan?

18        A    Here.

19        THE COURT:  Beatrice Kahn?

20        A    Here.

21        THE COURT:  Heidi McDowell?

22        A    Here.

23        THE COURT:  Carol Nickles?

24        A    Here.

Plaintiff Jakes 030874

1       THE COURT:   Joseph John Simon?

2       A    Yes.

3       THE COURT:   Deloris Cameron?

4       A    Here.

5       THE COURT:   Rudolph Campbell?

6       A    Here.

7       THE COURT:   Cynthia Fasco?

8       A    Yes.

9       THE COURT:   Darrell Lampkins?

10      A    Yes.

11      THE COURT:   Deloris Rice?

12      A    Yes.

13      THE COURT:   Jean Welcheck?

14      A    Yes.

15      THE COURT:   All right.   I was about to tell you that

16  from this point forward you will not have any contact

17  with the other jury.  That is to make sure, 2 things.

18          That is to make sure this the trials are as

19  fair as they can possibly be and even more importantly,

20  it's to make sure that I don't waste all the time of

21  having to pick the jury and trying the case.

22          And I will tell you a story that occurred to a

23  Judge in this building some years ago on a case that was

24  a double jury and took about a 2 week trial.

Plaintiff Jakes 030875

1    The case was over with and the Judge was doing

2    a jury poll and the one jury was out deliberating; the

3    other jury came back and he got out the jury cards and

4    exactly what just occurred to me occurred, except it was

5    one juror.

6    That during the course of the week they were

7    altogether and somehow one juror had switched and so they

8    had 2 jurys but they were mixed.  One juror from the

9    wrong jury was on.

10    That whole 2 weeks of work went out the window,

11    didn't make any difference from what the verdict was.

12    So the sheriffs are under instructions to keep

13    you completely separate from the other jury.  You won't

14    be eating with them.  One of the juries will have to be

15    transported to a different Courtroom because of course we

16    only have one jury room here.

17    For most of the trial there will be 2 jurys in

18    the Courtroom.  There may be some portions of the trial

19    for example that will not affect you and you will be out,

20    whereas some portions of the trial the other jury will be

21    out.

22    Exactly what we are doing right now.  You will

23    be hearing the opening statement separately.

24    So those things occur during the trial and

1   nothing unusual about it. That is what is required in

2   order to make sure that there is a fair trial.

3        So it's not a matter of speculation, but I do

4   want you to understand why you are going to be kept

5   separate because I can't take a chance on having that

6   mix-up occur and having all this work be for naught.

7        We will be working this morning until sometime

8   approximately 1:00 o'clock, when each of the jurys will

9   be transported.

10        Today you are going to get the rarest of

11   treats. You are going to get your own tax dollars back

12   by way of a free lunch compliments of the sheriff of Cook

13   County. So you will be taken as a group to the gourmet

14   dining facility next door. So one sheriff will be

15   assigned to each jury, they will be there to make sure

16   that you are comfortable and well treated.

17        If something occurs during the course of the

18   trial and you need a question repeated, you can't hear an

19   answer, let me know. I intend to make this as pleasant

20   and comfortable an experience for you as it can possibly

21   be.

22        All of you now stand and raise your right hands

23   to be sworn?

24                (Jury sworn.)

9

Plaintiff Jakes 030877

1       THE COURT: All right. Mr. Day is present

2    personally and by counsel.

3         Mr. Jakes is not present in the Courtroom nor

4    is his attorney. Do the people intend to make an opening

5    statement?

6       MR. DILLON: Yes, sir.

7       THE COURT: You may proceed.

8       MR. DILLON: Thank you.

9

10                    OPENING STATEMENT

11

12                        BY

13

14                    MR. DILLON:

15    Ladies and Gentlemen, what you are going to hear

16    during the course of this trial and what's going to be

17    very evident to you as you listen to the evidence is that

18    back on September 15 of 1991, an execution took place.

19         An execution that took place shortly before

20    midnight at 1206 West 51st Street, here on the South side

21    of the City of Chicago. An execution that resulted in 48

22    year old Rafael Garcia losing his life.

23         And I submit, ladies and gentlemen, that you

24    won't have to look any further than this person right

Plaintiff Jakes 030878

1    here, the defendant, Arnold Day, as the person who was

2    responsible for that vicious and violent execution.

3         Now, as Judge Durkin addressed you yesterday,

4    he told you that you were going to determine what the

5    evidence is in this case.

6         The evidence is going to come to you in a

7    variety of different ways.

8         Primarily the evidence is going to come to you

9    from witnesses who will get on the witness stand and tell

10   you what it is they know about what happened back on

11   September 15 of 1991. And I am going to ask that as each

12   witness gets on that witness stand to testify, that you

13   not only listen to what it is they have to stay but you

14   observe them while they are testifying.

15        Because the Judge is also going to tell you

16   that you are going to have to determine the believability

17   of the witnesses. So I would ask that not only that you

18   listen but that you observe each witness because that is

19   one of your functions.

20        And as each witness gets on that witness stand,

21   ask yourself if that witness has any motive or bias to

22   testify in the way that he or she testifies.

23        You are also going to receive the evidence in

24   the form of exhibits, photographs, physical evidence and

Plaintiff Jakes 030879

1   after all of that evidence, the testimony, the exhibits,

2   the photographs, are received by you, then you will be in

3   a position to determine what the evidence is.

4           And as Judge Durkin addressed you yesterday and

5   told you, he'll then instruct you as what the law is in

6   the State of Illinois.

7           And it's your duty as jurors to take the law

8   that he gives you, apply it to the evidence that you see

9   having occurred in order to reach a decision.

10          But you all bring one other thing with you as

11  jurors here today that is going to aid you and be of just

12  as much importance as the evidence and the law and that

13  is your common sense.

14          And it's our belief that when you look at the

15  evidence, you hear what the law is in the State of

16  Illinois, and just as importantly, you use your common

17  sense, that you too will find that Arnold Day is guilty

18  of the attempted Armed Robbery and First Degree Murder of

19  Rafael Garcia.

20          Now, you are going to hear from a Chicago

21  police officer by the name of Officer Doss.

22          Officer Doss is going to tell you that back on

23  September 15 of 1991, he was working the midnight shift

24  and was assigned to the 9th District.  He'll tell you

12

Plaintiff Jakes 030880

1    that shortly after midnight on what would now be

2    September 16th of 1991, he was driving on Racine

3    approaching the intersection of 51st and Racine.

4          He'll tell you that as he approached that

5    intersection, he was flagged down by a citizen and

6    proceeded to turn down onto 51st Street.

7          He will tell you that as he was going down 51st

8    Street he observed who he now knows to be Rafael Garcia

9    laying bleeding profusely about his body in the street on

10   51st Street at approximately 1208 West 51st Street.

11         He'll tell you that he got out of his car and

12   went to render whatever aid he could.  He'll tell you

13   that Rafael Garcia was unconscious, and bleeding

14   profusely.  He'll tell you that he contacted a Chicago

15   Fire Department ambulance in an attempt, what would turn

16   out to be an unsucessful attempt to save his life.

17         He'll tell you that at that location he also

18   observed a Chevrolet station wagon which he later learned

19   to belong to Rafael Garcia.

20         He will tell you that that car had struck an

21   another parked car at that location of approximately 1208

22   West 51st Street.

23         He'll tell you that when he got there the

24   driver's door of that station wagon was open, there was a

Plaintiff Jakes 030881

1   warm order of food on the front seat of that car, and the

2   right front passenger window was broken out.

3         He'll tell you that the car was running and it

4   was in gear, and when he looked inside the interior of

5   that car, on the front seat of Rafael Garcia's car, he

6   saw 2 shell casings from a gun.

7         He'll tell you that he made notifications to

8   people from the Chicago Police Department Crime Lab, and

9   also Detectives to come out to process that crime scene.

10        He'll tell you that Rafael Garcia was

11   subsequently taken to Cook County Hospital, and you will

12   learn that while at Cook County Hospital, Rafael Garcia

13   died.

14        You are also going to hear from an evidence

15   technician by the name of McKeough. He'll tell you that

16   he's been an evidence technician with the Chicago Police

17   Department in excess of 25 years.

18        He'll tell you that back on September 16th, he

19   was assigned to process that crime scene at that location

20   and he'll explain what he does when he processes a crime

21   scene.

22        But what he'll tell you is in addition to

23   photographing that area, he too examined the interior of

24   Rafael Garcia's car and he too will tell you that he

19

1   recovered those 2 shell casings from the front seat.

2           He'll tell you that he too observed the front

3   passenger window broken and observed glass both inside

4   and outside the car.

5           He'll tell you that he examined the area

6   immediately surrounding that car and found 2 additional

7   shell casings on the street as well as a fired bullet.

8           He'll explain to you how he collected that

9   evidence, sealed it and sent it off to the firearms

10   section of the Chicago Police Department so that that

11   evidence could be analyzed.

12           You are going to hear from a Detective by the

13   name of Caesar who will tell you that he was the first

14   Detective to arrive at that scene.

15           He'll tell you that when he arrived Rafael

16   Garcia had already been removed to the hospital. He'll

17   tell you that he went to Cook County Hospital in an

18   attempt to interview Mr. Garcia.

19           But you will learn that he was unable to do so

20   as Mr. Garcia never regained consciousness. He'll tell

21   you that when Rafael Garcia was admitted to Cook County

22   Hospital, he had over $89 in cash on him, as well as

23   numerous necklaces and rings and other items of jewelry.

24           You are also going to hear and it will be

15

Plaintiff Jakes 030883

1   stipulated, that is agreed, between the parties that

2   Rafael Garcia died as a result of 4 gunshot wounds.  A

3   gunshot wound to his hip, his thigh, his hand, and in his

4   back.  And you will learn that those injuries were the

5   result of him losing his life.

6           You are also going to hear from a Detective by

7   the name of Detective Boudreau.

8           Detective Boudreau will tell you that the

9   afternoon hours of September 16th of 1991 he was assigned

10  to Area 3 Violent Crimes which is located at 39th and

11  California.  He'll tell you that he was assigned to the

12  investigation of the homicide of Rafael Garcia.

13          He'll tell you that a person by the name of

14  Anthony Jakes was at the police station upon his arrival

15  there.  He'll tell you that after staying at the station

16  for a short time, he and his partner, Detective Michael

17  Kill, proceeded to the area of 1206 West 51st Street and

18  the adjacent areas around there, speaking with witnesses

19  trying to determine what had happened.

20          You will hear that later that evening,

21  Detective Kill and Detective Boudreau went back to Area 3

22  Violent Crimes and they had a conversation with Anthony

23  Jakes.

24          You will learn that after that conversation

Plaintiff Jakes 030884

1    with Anthony Jakes, a short time later, Detective

2    Boudreau and Detective Kill went out and looked for

3    Arnold Day.  You will hear of the numerous attempts they

4    made by going out to areas where they knew Arnold Day

5    frequented on the South Side of the City of Chicago

6    looking for him to question him about the homicide of

7    Rafael Garcia.

8         And you will hear that they were unable to

9    locate him.  You will hear that they went to his last

10   known address at 5023 South Damen and they spoke with

11   family members of Arnold Day.  He will tell you that they

12   left business cards there and instructed them when Arnold

13   Day comes home have him call us, we want to speak with

14   him.

15        Detective Boudreau will tell you between

16   September 17th of 1991 and February 4th of 1992, on the

17   average 2 to 3 times a week they continued to look over

18   the South Side of the City of Chicago for Arnold Day, but

19   he was nowhere to be found.

20        They will tell you that they continued to make

21   efforts to locate him by going to his residence and

22   leaving cards and messages with his family members, have

23   him contacts us.

24        And Detective Boudreau will tell you from

Plaintiff Jakes 030885

1    September 17th until February 4th, Arnold Day never

2    contacted them.

3         You are going to hear from a Chicago Police

4    Officer by the name of Officer Evans who's assigned to

5    the Gang Crimes South unit of the Chicago Police

6    Department.

7         Officer Evans will tell you that on the morning

8    of February 4th of 1992, along with 2 fellow Officers

9    from his unit and Detective Foley of the Chicago Police

10   Department, information was gathered that Arnold Day

11   could be found at 5234 South Sangamon.

12        Officer Evans will tell you that the 4 of them

13   went to that location, they knocked on the front door and

14   it was answered by an individual who identified himself

15   as Quainmay Tate.

16        He'll tell you that they advised Quainmay Tate

17   why it was they were there, that they were looking for

18   Arnold Day, and asked his permission to search his house

19   for Arnold Day.

20        They will tell you that they obtained a written

21   consent by Quainmay Tate to search his home to look for

22   Arnold Day.

23        Officer Evans will tell you that he proceeded

24   to search the house along with the other Officers that

Plaintiff Jakes 030886

1    were there looking for Arnold Day. He'll tell you that

2    once they got inside that house they were calling out for

3    Arnold Day, "if you are here come out." But they got no

4    response.

5          They will tell you that when they went to the

6    basement area at that address, there was a bed in that

7    basement and they will tell you that after calling Arnold

8    Day's name out numerous times and getting no response

9    they lifted up the mattress that was on that bed and

10    found Arnold Day hiding underneath the bed.

11          They will tell you that at that time Arnold Day

12    was placed under arrest and was taken to Area 3 Violent

13    Crimes.

14          And you will hear that Detective Boudreau had

15    conversations with Arnold Day concerning the homicide of

16    Rafael Garcia. You will hear that after Detective

17    Boudreau had those conversations, with Arnold Day, he

18    contacted a State's Attorney from the Felony Review Unit

19    of the State's Attorney's office.

20          And you are going to hear from a State's

21    Attorney by the name of Jason Donielian.

22          He'll tell you what the duties are of Assistant

23    State's Attorneys assigned to Felony Review but he'll

24    tell you that he came out on February 4th of 1992 and he

Plaintiff Jakes 030887

1    spoke with Arnold Day.

2            And he'll tell you that Arnold Day admitted to

3    him that he had in fact attempted to rob Rafael Garcia,

4    and when Rafael Garcia resisted his overtures of a

5    robbery, that he shot him to death.

6            You will hear that after he told that to

7    Assistant State's Attorney Donielian, Assistant State's

8    Attorney Donielian asked him if he would be willing to

9    have his statement reduced to writing.

10           State's Attorney Donielian will explain to you

11   that the 2 types of statements that are taken by a felony

12   review assistant are either a Court Reported or a

13   handwritten statement.

14           You will hear that Arnold Day chose to have a

15   handwritten statement, which is a statement written up by

16   the State's Attorney in summary fashion of what Arnold

17   Day told him.

18           In that handwritten statement, you will hear

19   that back on September 15 of 1991, Arnold Day went to the

20   Queen's Submarine Shop which is located at 1206 West 51st

21   Street.

22           You will hear that when he went into that

23   restaurant Rafael Garcia was also in that restaurant

24   ordering food.

Plaintiff Jakes 030888

1    You will hear that as Rafael Garcia pulled out

2    a wad of money to order his food, Arnold Day told the

3    Assistant State's Attorney that he noticed that the guy

4    had a lot of jewelry on, he had a big wad of money, and

5    being the opportunistic person that he is, ladies and

6    gentlemen, the evidence will show you that he then

7    proceeded to leave out the Queen's Submarine Shop and get

8    what he told the State's Attorney and referred to as a

9    Nation gun, a gun that is owned by the the Blackstone

10   Street Gang, of which the defendant admitted to be a

11   member.

12   You will hear that after he went and got the

13   Nation gun he proceeded back to 1206 West 51st Street and

14   lay in wait, waiting for Rafael Garcia when he came out

15   with his food so he could rob him and take his money and

16   his jewelry.

17   You will hear that as Rafael Garcia came out of

18   the Queen's Submarine Shop, Arnold Day told him, "stick

19   up."

20   And you will hear that unfortunately Rafael

21   Garcia resisted his overtures and attempted to get into

22   his car to drive away from the scene.

23   You will hear from State's Attorney Donielian

24   that Arnold Day then proceeded to shoot him to death when

21

Plaintiff Jakes 030889

1    he refused to give up his valuables.

2          And I submit, ladies and gentlemen, that when

3    you hear that evidence in this case, you look at what the

4    law is in the State of Illinois, and just as importantly,

5    you use your common sense, that you too will find Arnold

6    Day is guilty of the Attempted Armed Robbery and the

7    murder of Rafael Garcia.

8          Thank you.

9       THE COURT:  Mr. Day going to make an opening?

10      MR. KATZ:  Yes, Your Honor.

11      THE COURT:  You may proceed.

12

13               OPENING STATEMENT

14

15               BY

16

17               MR. KATZ:

18      Morning, ladies and gentlemen.  Once again my name

19   is Stewart Katz and I represent Arnold Day.

20          Ladies and gentlemen on September 15 of '91,

21   Rafael Garcia did in fact leave the Queen's Submarine

22   Shop at 51st and Racine.

23          And after he left that shop, somebody did

24   accost him and somebody did shoot him.

Plaintiff Jakes 030890

1    You are going to hear that the police responded

2  to the scene fairly quickly and they came out.  A number

3  of police officers arrived, the paramedics arrived and

4  the police officers canvassed the scene in order to find

5  witnesses.

6    And during the course of their investigation

7  they talked to quite a number of people.

8    And you are not going to hear one single person

9  come to this Courtroom and say, "I saw Arnold Day over by

10  the Queen Submarine Shop."

11    And you are not going to hear one single person

12  say, "I saw Arnold Day with a gun."

13    And nobody is going to tell you that Arnold Day

14  shot Rafael Garcia, because there are no witnesses to say

15  that he did any such thing.

16    In fact the police continued their

17  investigation and at some point they decided to go arrest

18  Arnold Day and he was at a friend's house at that time.

19    And you are going to hear that when he was

20  arrested they got him, found him in the basement.  He was

21  under or beside a bed, and that Officers kicked him in

22  the head, dragged him upstairs where he was handcuffed

23  and the other Officers were there and they took him to

24  the police station.

Plaintiff Jakes 030891

1    Now he was kept at the police station for quite

2    a number of hours. And during that time he was kept

3    handcuffed to a wall. He was kept in a small interview

4    room. He had no attorney present. He had no family

5    members present.

6    And during that time the police officers kept

7    trying to get him to admit to the shooting of Rafael

8    Garcia and he did not do so.

9    And after awhile they kept telling him that

10   they knew what happened; they told him that if he didn't

11   confess to this he was going to be charged anyway. That

12   he was going to be charged with another, a number of

13   other crimes which they knew he had not committed, and

14   they threatened him in a number of manners.

15   —   Sometime later that afternoon an Assistant

16   State's Attorney came in to take a statement from him.

17   That is ASA Donielian who you are going to hear from

18   later.

19   And after they went in there and first told Mr.

20   Donielian that he did not commit this offense and he

21   didn't know anything about it. And the Assistant State's

22   Attorney left the room.

23   And you are going to hear that Detective Foley,

24   one of the Detectives on this case, came back into that

24

1 room with Mr. Day. The ASA, the Assistant State's

2 Attorney, was not present at that time.

3   And Arnold Day was slammed up against the wall,

4 and he was threatened to be thrown out a window and he

5 was intimidated to the point where he was going to agree

6 to say or do whatever they wanted to.

7   And at that point he agreed to give a statement

8 that they wanted.

9   You are also going to hear that the statement

10 that they are going to show you, this written statement,

11 it is not his words and not his handwriting. It's the

12 Assistant State's Attorney's handwriting who wrote down

13 what he wanted to put down.

14   And the only thing Arnold Day ever did was sign

15 it and initial it. But he was never given the

16 opportunity to write it out in his own words. It was not

17 videotaped.

18   The only words that you are going to hear are

19 those of the Assistant State's Attorney. And the only

20 thing that you are going to see, an acknowledgement from

21 Arnold Day it's his signature on the bottom of those

22 pages where he was told to sign it.

23   You are also going to hear from some defense

24 witnesses in this case who are going to tell you that on

25

Plaintiff Jakes 030893

1    September 15, shortly before midnight, when the shooting

2    occurred, Arnold Day was at the address of 5147 South

3    Aberdeen.

4          He has some close friends that live over there,

5    the Robinson family, and he was in and out of their house

6    during the course of the day.

7          Shortly before this incident occurred around

8    10:30 he was out on the front porch with eleven-year-old

9    Dorothea Robinson, who's the daughter of the woman who

10   lives in that house.

11         He, he and Dorothea had been out on the porch

12   talking and Dorothea came into the house and asked her

13   mother if she and Arnold could go down to the store

14   around the corner, not too far from where this shooting

15   occurred. And Elenor said fine.

16         This is around 11:00, 11:30 at night.

17         Arnold and Dorothea went to the store, Dorothea

18   bought a bag of chips, they came back, they were together

19   the entire time. They come back to the house, they are

20   out on the front porch. There is a couple of other

21   people there. Carl Murray is one of them.

22         You are going to hear from Carl also and Carl

23   is going to tell you that while they were out there on

24   the porch he heard some gunshots down the street from the

1    direction of the Queen's Submarine Shop.

2          And that while they were sitting out there

3    somebody came by on a bike and said a guy just got shot

4    down the street there.

5          **And** from the time that this took place you are

6    going to know that the person that got shot was Rafael

7    Garcia.

8          But Arnold Day wasn't there.  Arnold Day was at

9    5147 South Aberdeen with his friends, at the time of the

10   shooting.  And at least 3 people are going to come in

11   here and tell you that.

12         One of them is an eleven-year-old girl who was

13   with him the entire time.

14         Ladies and gentlemen, I am going to ask a

15   couple of things while you sit here and serve as jurors.

16         First of all keep an open mind.  The way that

17   our Court system works is the State gets to go first,

18   they get to present all of their witnesses.

19         You are not going to hear from the defense

20   witnesses until towards the end of this case.

21         So I am going to ask that you keep an open mind

22   while you are sitting here.

23         And remember that as Mr. Day sits there he

24   doesn't have to prove anything.  He is not guilty.  He is

Plaintiff Jakes 030895

1    presumed innocent and he remains innocent until such time

2    as you have heard all of the evidence and you are

3    convinced beyond a reasonable doubt that he is guilty of

4    the offenses with which he is charged.

5           So with that, I simply ask you to sit, listen

6    to everything.

7           I believe when we are through you are not going

8    to be convinced beyond a reasonable doubt and you will

9    find him not guilty.

10          Thank you.

11      THE COURT:  Mr. Goodfriend and Mr. Dillon, if you

12   will take your table and move it approximately 2 feet to

13   the East, take that lecturn and move it towards me, and

14   if you'd assist me by moving 3 of those chairs.

15      ──  The jury is going to be heading out that door

16   and so simply by moving the chairs so that the jury can

17   get by in an unobstructed fashion.

18          Thank you.

19          What we are going to do now is you have your

20   opening statement for the other jury.  You haven't heard

21   any evidence but of course remember my admonition that

22   you can't discuss the evidence.

23          Opening statements are not evidence and any

24   statement made by the the attorneys which turns out not

28

Plaintiff Jakes 030896

1    to be borne out by the evidence is to be disregarded.

2           Sheriff, you will take the jury, take them out

3    the front door and then walk them around to the side then

4    we will have the other jury in.

5           (Whereupon Defendant Jakes and

6           his jury then entered the

7           Courtroom with proceedings

8           as follows:)

9

10     THE COURT: All right. Ladies and gentlemen, I want

11    to explain to you something of the logistics involved

12    when we have 2 jurys.

13           In this case as I mentioned to you yesterday,

14    the purpose of this is to make sure that the trials would

15    be as fair as possible.

16           From this point forward you will not have any

17    contact with the other jury. And that is for a very good

18    reason.

19           Actually I was taking a roll on the first jury.

20    Since the roll worked out, I don't have to take roll

21    because I know that you are the correct jury today.

22           But I told them a story. I'd asked the clerk

23    for the cards and there had been a mix up so I was handed

24    a wrong set of cards.

Plaintiff Jakes 030897

1    And that is to point out exactly the reason for

2  the separation that I am talking about.  I told them a

3  story about a case that was heard a few years ago in the

4  building where a Judge had a 2 jury situation going and

5  the case took about 2 weeks.  It was much longer than

6  this one will be.

7    And when the first jury reached their verdict

8  the Judge is required to do what's called a jury poll, he

9  got out the cards and proceeded to poll the jury and

10  there were 11 members from one jury and one member from

11  the other jury.

12    They had been mixed up because of the fact that

13  they had been intermingled during the week and that meant

14  that 2 weeks of work by the Court, by all the witnesses

15  and most importantly 2 weeks of work by 2 separate jurys

16  went for naught because the judgment in this case had to

17  be vacated.

18    So in order to prevent that from happening, you

19  will be kept separated from the other jury.

20    One of you in the morning when you report, will

21  report to a different Courtroom.  You will of course be

22  told what Courtroom that is.  For most of the day, except

23  for when you return from lunch, it won't be necessary

24  because when only one jury is in the Courtroom, we will

Plaintiff Jakes 030898

1    have the other jury leave by the front door, walk down

2    that corridor so we can use the jury room alternately

3    throughout most of the trial.  So that will occur

4    relatively infrequently.

5        You have to go to a different room in the

6    morning to report and you have to go to a different room

7    after lunch but after that we will just double use this

8    jury room, the current jury room most of the time.

9        You were sworn yesterday to tell the truth, now

10   you are going to be sworn as a jury for the first time.

11   So I ask all of you to stand and raise your right hand

12   and be sworn.

13            (Whereupon Jakes Jury was sworn.)

14       THE COURT:  After the the opening statement, we will

15   be proceeding with evidence.

16       Both jurys will presumably be present until

17   lunch time.  At lunch time you will get that rarest of

18   treats, you will get some of your own tax dollars back by

19   way of a free lunch and we will take you over to the

20   gourmet dining facility next door and after lunch we will

21   come back and continue with the evidence.

22       I want this to be as pleasant and comfortable

23   an experience for you as possible.  If you have some

24   needs just bring them to my attention by raising your

1    hand.  I will do my best to accomodate you.

2          We are about to have opening statements.

3          I instruct that you opening statements are made

4    by the attorneys to acquaint you with the facts they

5    expect to prove.

6          However, opening statements are not evidence.

7    I repeat, they are not evidence.  And any statement made

8    by the attorneys which turns out not to be borne out by

9    the evidence is of course to be disregarded.

10         Are the People going to make an opening

11   statement?

12     MR. GOODFRIEND:  Yes, Your Honor.

13     THE COURT:  You may proceed.

14     MR. GOODFRIEND:  Thank you.

15

16             OPENING STATEMENT

17

18             BY

19

20          MR. GOODFRIEND:

21          Ladies and gentlemen of the jury, on the late

22    evening hours of September 15, 1991, Rafael Garcia

23    stopped on his way home to get dinner.  He stopped at a

24    shop, a Submarine Shop at 51st and Racine.

Plaintiff Jakes 030900

1    3 individuals saw him as an easy mark. They

2    waited outside, they watched for the police.

3    When he left that restaurant or shop, he was

4    confronted. He tried to flee to his car but he was shot

5    3 times, 4 times. He got out of his car, tried to escape

6    further and lay in the street bleeding from wounds.

7    3 individuals participated in that offense and

8    one of the individuals who participated in that offense

9    is here today; his name is Anthony Jakes.

10    And for the acts that Anthony Jakes committed

11    and participated in, we will be asking that you find him

12    guilty of First Degree Murder and Attempt Armed Robbery.

13    Back in September of 1991, Rafael Garcia was 48

14    years of age. He lived at 5109 South Aberdeen. He had

15    his own store, Garcia's Grocery store on the North side

16    of Chicago.

17    It was at about 11:45 that he made a stop at

18    Queen's Submarine Shop at 51st and Racine. Mr. Garcia

19    went in there to buy dinner or a snack at night.

20    When he went in there, he had jewelry on him

21    and he had money to purchase the food that he was going

22    to eat. There was several individuals out there, several

23    individuals who saw what was happening, several

24    individuals who decided that Rafael Garcia was somebody

Plaintiff Jakes 030901

1    they wanted to rob.

2           One of them was Anthony Jakes, the second one

3    was his friend, Little A, Arnold Day, and the third

4    individual a man by the name of Darnell.

5           Arnold Day, Little A, had seen Rafael in the

6    shop, knew that he had jewelry and money and decided they

7    were going to commit a robbery.

8           But he needed help.  He needed somebody to look

9    out.  And this is one of the individuals he recruited,

10    Anthony Jakes, as the look out.

11           Anthony Jakes agreed to act as a look out to

12    watch for the police.  He was on his home turf a few

13    doors from his house.  He agreed to go to 51st and Racine

14    to watch out for the police.

15      — But he decided to ask for help.  He went up to

16    an individual by the name of Snake, Gus Robinson, and

17    asked Snake, "would you help me look out while we do this

18    robbery?"  Snake refused.  Snake left.

19           Anthony Jakes was the look out.  Anthony Jakes

20    looked at 51st and Racine and said to Arnold Day, Little

21    A, and Darren, it's all right, the coast was clear.

22           And at that point in time Rafael Garcia had

23    purchased his dinner, he walked out to a car which he had

24    driven there, his station wagon, and he was confronted.

34

Plaintiff Jakes 030902

1          Anthony Jakes knew Arnold Day was armed.  He

2   knew he was armed with his .380 that he had seen him with

3   before, knew it to be a loaded weapon.

4          And at that point in time, Rafael Garcia tried

5   to flee.  He dove into his car and tried to drive the car

6   out of that parking space.  He put it in reverse, backed

7   out, but Little A, his partner in crime, shot through the

8   window and kept shooting again and again.

9          Rafael Garcia got shot in the hip, a femur was

10  fractured.  He got shot in the back, his intestines were

11  shot out, he tried to get out of the way of the bullets

12  and dove outside the driver's door and lay in the street

13  bleeding from the gunshot wounds.

14         The defendant and Arnold Day, Little A and this

15  individual Darrin, fled and left.  He ran home.

16         The police came by, the ambulance came by, and

17  they took Rafael Garcia to Cook County Hospital.  But the

18  wounds caused by him and his partner were too severe and

19  it was in the morning of September 16th, 1991, that

20  Rafael Garcia died at Cook County Hospital.

21         Later that day, around noon, Officer Pack, a

22  Chicago Police Officer, and his partner received a phone

23  call from a female.

24         Pursuant to that phone call, they went looking

35

Plaintiff Jakes 030903

1   for Anthony Jakes because they thought he might have

2   information regarding this case.

3           Anthony Jakes came down to the police station

4   with Officer Pack, they went down to Area 3 Violent

5   Crimes which is located at 39th and California.

6           Officer Pack left the defendant there to talk

7   with some of the Detectives from Area 3 Violent Crimes.

8           You will hear from the Detective Kill who was

9   working that day with his partner, Detective Boudreau,

10  and they talked with Anthony Jakes around 4:15 and he

11  gave them some names to check out, some people who might

12  know about this, and they went out on the street.

13          They went back to the vacinity of 51st and

14  Racine, talking with the people that he had named.

15      -- But in talking with those people, and in

16  touring the area for about 4 or 5 hours, they found

17  Snake.

18          They found Snake, the man that he had tried to

19  recruit to assist him in the Armed Robbery.  And they

20  brought Snake back to the station, and they talked with

21  Gus Robinson.

22          And after talking with Gus Robinson, and

23  several other people, they went and talked with Anthony

24  Jakes.  That was at 10:45 that night.  They advised him

36

Plaintiff Jakes 030904

1   of his rights.  You have heard them on tv, I believe.

2   His Miranda rights.

3        And they said to him your story doesn't check

4   out.  And it was at that point in time that the defendant

5   admitted, admitted to the police officers what had

6   happened that night and that he had participated and was

7   going to help out in the Armed Robbery of Rafael Garcia.

8        The Detectives then called for a Youth Officer

9   because the defendant was a younger individual and they

10  also contacted the Felony Review Unit of the State's

11  Attorney's office.

12       Took awhile for the Youth Officer to get there

13  but the Youth Officer came at 3:45 in the morning, he

14  talked with the defendant.

15       --- And then about 4:00 o'clock a.m. State's

16  Attorney Brian Grossman sat down with the Youth Officer

17  and Detective Caesar, who was another Detective on the

18  case, and had a conversation with Anthony Jakes regarding

19  his participation in the Attempt Armed Robbery and murder

20  of Rafael Garcia.

21       The defendant again admitted to him his acts

22  and State's Attorney Grossman asked him if he'd be

23  willing to put that statement in writing.  And he gave

24  them a choice between a handwritten statement which they

37

Plaintiff Jakes 030905

1    write out right there or calling a Court Reporter in.

2            The defendant chose a handwritten statement.

3            The State's Attorney Brian Grossman took a

4    handwritten statement from the defendant, a piece of

5    evidence which you will have, which you will be able to

6    read in which the defendant admits conspiring with and

7    participating in this violent and vicious crime.

8            Ladies and gentlemen, once again my name is

9    Neal Goodfriend. This is my partner John Dillon. We

10   represent the People of the State of Illinois in this

11   case.

12           At this time what I ask of you is that you

13   listen closely to the evidence. At the conclusion of

14   this case, we will be returning to you and we will be

15   asking that you find the defendant Anthony Jakes guilty

16   of Attempt Armed Robbery and guilty of First Degree

17   Murder.

18       THE COURT: Is the defense going to make an opening

19   statement?

20       MR. MADEA: Thank you, Your Honor.

21

22

23

24

P38

Plaintiff Jakes 030906

```
1                    OPENING STATEMENT

2

3               BY

4

5          MR. MADEA:

6               May it please the Court, Ladies and gentlemen

7     of the jury, my name is Frank Madea, my partner Cheryl

8     Bormann and we represent Anthony Jakes, young man 15

9     years old charged with First Degree Murder and Attempt

10    Armed Robbery.

11               In life as probably you all know, there is a

12    lot of dichotomies, controversies.

13               You have heard what the State has told you they

14    expect the evidence to prove.

15          —— However we expect the evidence to prove

16    something entirely different.

17               In a way we do agree with a lot of things Mr.

18    Goodfriend just told you.  It is a tragedy.

19               Mr. Garcia was shot and killed on 51st and

20    Racine on September 15, 1991.  Anthony Jakes, as you

21    heard, lived 2 doors down from where this happened.  I

22    believe it's 1212 West 51st Street.

23               And on that day, Anthony or you will hear

24    evidence that Anthony was involved in a little skirmish
```

Plaintiff Jakes 030907

1 between a group of youths who busted a window and him,

2 Anthony and a cousin went and chased these fellows.

3   When they got back he saw an ambulance and that

4 was the ambulance that carted Mr. Garcia away to the

5 hospital.

6   Now, the State has indicated that you are going

7 to hear a statement from Gus Robinson.

8   Well, as the Judge told you and will tell you

9 again, it is up to you to decide the believability of all

10 the evidence and from all the witnesses that you hear.

11 And that comes from that box right up there, when the

12 witnesses get up and testify before you, and I ask you

13 all to do that.

14   You all raised your hand, gave an oath and said

15 that you would wait --

16   MR. GOODFRIEND:  Objection, statement of law.

17   THE COURT:  I did not hear the statement, to be

18 honest, so would you repeat it?

19   MR. MADEA:  All I am saying is you all raised your

20 hand, took an oath saying that you would wait to hear all

21 the evidence before you made the decision.

22   THE COURT:  Is that what you are talking about?

23   Sustained.

24   MR. MADEA:  That's all I am asking to you do.  Just

Plaintiff Jakes 030908

1   wait until you hear all the evidence.

2         Again that dichotomy, you are going to hear the

3   State's case, you are going to hear cross-examination

4   from the defense.  That is the way the system works; it's

5   an adversarial type system.

6         You are also going to hear that Anthony Jakes

7   told the police when, the next day, on September 16th,

8   the early, I believe he was, he went down to the police

9   station because as Mr. Goodfriend told you someone called

10   the police and said he might know something.  He lived 2

11   doors down.  Kind of makes sense.

12         So he went down to the police station around

13   noon or so on the 16th of September, 1991, and he talked

14   to a number of police officers.

15      --- He talked to Detectives Duckhorn and O'Reilly

16   and he told the story which I just related to you about

17   chasing some fellows who busted a window.

18         And he sat there pretty much all of that day,

19   on the 16th, and eventually he told that statement again

20   to Detective Kill --

21     MR. GOODFRIEND:  I am going to object to hearsay,

22   Judge.

23     MR. MADEA:  It's his statement.

24     THE COURT:  Objection is overruled.

1       MR. MADEA:  And then, then the other dichotomy

2  occurred.

3       Detective Kill whomped on my client, basically.

4  He beat a confession out of him.  He made him, a

5  fifteen-year-old boy, tell him a statement which he

6  wanted to hear.

7       Now, as the State has told you the Detectives

8  went out and looked for certain witnesses who Anthony

9  Jakes said may or may not be able to help.

10       They got those witnesses; they found a guy by

11  the name of Gus Robinson.

12       He is a known felon, ladies and gentlemen, he

13  is a liar and you are going to see him testify and you

14  are going to hear what he is going to say and you are

15  going to hear the opposite.

16       Think of what the State told you.  Will you

17  help me look out for a robbery?

18       Doesn't make sense, ladies and gentlemen, but

19  that is the statement that Detective Kill obtained from

20  the defendant.

21       Now, like I said, it's a dichotomy.  You heard,

22  you are going to hear one story from Mr. Jakes, you are

23  going to hear another story allegedly from his mouth but

24  we expect the evidence to show that that statement was

42

Plaintiff Jakes 030910

1   coerced.

2        And when you hear all evidence I want you to

3   use your common sense, I want you to think about it, I

4   want you to decide and I think after you do, you are

5   going to find Anthony Jakes not guilty of First Degree

6   Murder and Attempt Armed Robbery.

7        Thanks.

8     THE COURT:  Mr. Katz is back conferring with his

9   client.  If you would ask the 2 of them to come out?

10    MR. GOODFRIEND:  Judge, can I approach the Bench?

11    THE COURT:  Sure.

12       (Whereupon there were proceedings

13         had off the record per order of

14         the Judge in the above-entitled

15       cause.)

16     THE COURT:  Let the record reflect that both

17   Defendants are present personally and by counsel.

18        Both jurys are present.

19        State, please call your first witness.

20    MR. GOODFRIEND:  Marco Garcia.

21

22

23

24

44

Plaintiff Jakes 030911

```
 1                              (Witness sworn.)

 2                    MARCO GARCIA,

 3    called as a witness in the above-entitled cause, having

 4    been first duly sworn, was examined and testified as

 5    follows:

 6

 7                  DIRECT EXAMINATION

 8

 9                    BY

10

11                  MR. GOODFRIEND:

12        THE COURT:  Please be seated, make yourself

13    comfortable, once you are comfortable, state your full

14    name?

15        A --- My name is Mark Garcia.

16        THE COURT:  You may proceed.

17        MR. GOODFRIEND:  Thank you, Judge.

18    BY MR. GOODFRIEND:

19        Q    Mr. Garcia, how old are you?

20        A    I am 21 years old.

21        Q    What City do you live in?

22        A    I live in Chicago.

23        Q    Who do you live with?

24        A    I live with my mother, my uncle, my girlfriend
```

Plaintiff Jakes 030912

1    and my daughter.

2       Q    Do you work?

3       A    Yes, I do.

4       Q    Where do you work at?

5       A    I work in my father's grocery store.

6       Q    What's the name of that grocery store where you

7    work at?

8       A    Garcia's Grocery.

9       Q    What side of town is that located on?

10      A    It's on the North side.

11      Q    How long have you worked at that grocery store?

12      A    Since my father passed away.

13      Q    And I direct your attention to September of

14   1991, was your father living at that time?

15      A    Yes, he was.

16      Q    What was his name?

17      A    Rafael Garcia.

18      Q    How old was your father back in September of

19   1991?

20      A    He was 48.

21      Q    Where did he live at?

22      A    He lived on 5109 South Aberdeen.

23      Q    Where did he work at?

24      A    At Garcia's Grocery.

Plaintiff Jakes 030913

```
 1        Q     How long had he worked at Garcia's Grocery?

 2        A     8 months.

 3        Q     Was that his store?

 4        A     Yes.  It was.

 5        Q     Now, was your father one to wear any type of

 6   jewelry or rings?

 7        A     Yes, he did.

 8        Q     What kind of jewelry and rings did he wear?

 9        A     He wear gold chains and gold rings.

10        Q     I am going to direct your attention to the

11   beginning of September of 1991, do you remember seeing

12   your Dad in that month?

13        A     Yes, I did.

14        Q     What time of day did you see him at?

15        A     It was at night.

16        Q     Where did you see him at?

17        A     51st and Campbell.

18        Q     Was he in good health at that time?

19        A     Yes, he was.

20        Q     Did you talk to him on that date?

21        A     Yes, I did.

22        Q     Now I am going to direct your attention to

23   September 16th, 1991, at approximately 10:30 in the

24   morning.
```

46

Plaintiff Jakes 030914

1    Do you recall where you were at?

2    A    I was at a friend's house.

3    Q    Did you leave your friend's house?

4    A    Yes, I did.

5    Q    Where did you go to?

6    A    I went home.

7    Q    Where was home at that time?

8    A    47th and Wood.

9    Q    When you got home did you see any other

10   relatives of your's?

11   A    Yes, I seen my mother and my brother coming out

12   of the house.

13   Q    Did you have a conversation with them?

14   A    Yes, I did.

15   Q    At that time did you learn what had happened to

16   your Dad?

17   A    Yes.

18   Q    What did you learn?

19   A    That my father got shot.

20   Q    After you learned that your father got shot,

21   did you go anywhere?

22   A    I went to the hospital.

23   Q    What hospital did you go to?

24   A    Cook County Hospital.

Plaintiff Jakes 030915

1      Q    After you arrived at Cook County Hospital, was

2  your father alive or was he deceased?

3      A    He was dead.

4      Q    Did you get any property belonging to your

5  father back from the hospital?

6      A    Yes, I did.

7      Q    What property did you get back from the

8  hospital?

9      A    I got his gold chain, gold ring and his money.

10      Q    How much money did you get back?

11      A    $89.

12      Q    When you father worked at his store, what would

13  he do, what would he do with the money when he closed the

14  store?

15      A —— He used to take it home so he could buy

16  groceries the next day.

17      Q    Additionally, Mr. Garcia, what kind of car did

18  your father drive?

19      A    He had a station wagon.

20      MR. GOODFRIEND:  Judge, may I approach the witness?

21      THE COURT:  You may.

22  BY MR. GOODFRIEND:

23      Q    Mr. Garcia, I am going to show you what's been

24  marked for identification as People's Exhibit No. 1.

Plaintiff Jakes 030916

1           Would you please tell the ladies and gentlemen

2    of the jury what that is?

3        A    That is my father's driver's license.

4        Q    It has a picture of him on it?

5        A    Yes.

6        Q    And does that picture truly and accurately

7    portray your father as he was back in September of 1991?

8        A    Yes.

9        Q    Now, I am going to show you what's been marked

10   for identification as People's Exhibit No. 14.  You have

11   seen that photo before, is that correct?

12       A    Yes.

13       Q    Do you see a white and brown station wagon in

14   that photo?

15       A --- Yes.

16       Q    Do you recognize that car?

17       A    Yes.  That is my father's.

18       MR. GOODFRIEND:  Judge, there will be a stipulation

19   at this time regarding the photograph.

20       THE COURT:  All right.

21           Ladies and gentlemen, during the course of

22   trial you may often hear, I have no way of predicting how

23   often, but you may often hear the term stipulation.

24           A stipulation is either an agreement between

BO 49

Plaintiff Jakes 030917

1  the parties, that is to the State and the defense, that

2  either a fact is not in dispute, they agree that it's

3  true, or an agreement that if a witness were called to

4  testify, the witness would testify in a certain manner.

5  It's a way of saving time to be perfectly

6  honest with you.

7  So this stipulation that the parties have

8  apparently agreed to, I assume, will be self-explanatory.

9  You may proceed.

10  MR. GOODFRIEND:  Thank you, Judge.

11  There would be a stipulation between the People

12  and the defense that if this witness, Mr. Garcia, were

13  shown People's Exhibit Number 2, he would identify that

14  as a photograph of his father, Rafael Garcia, at the time

15  of his death.

16  So stipulated?

17  MR. KATZ:  So stipulated.

18  MR. MADEA:  So stipulated.

19  MR. GOODFRIEND:  Judge, I have no further questions.

20  THE COURT:  Mr. Day may inquire.

21  MR. KATZ:  I have no questions, Your Honor.

22  THE COURT:  Mr. Jakes may inquire.

23  MS. BORMANN:  Just briefly, Your Honor.

24

Plaintiff Jakes 030918

1                    CROSS EXAMINATION

2

3                    BY

4

5                    MS. BORMANN:

6        Q    Mr. Garcia, you recovered your father's

7    property from that, from September 15, is that correct?

8        A    Yes.

9        Q    In that there were 4 gold chains, correct?

10       A    Yes.

11       Q    All right.  And a couple of different gold

12   rings, right?

13       A    Yes.

14       Q    One of those gold rings had a stone set in it?

15       A    Yes.

16       Q    Those were recovered as well, correct?

17       A    Yes.

18       Q    And in that wallet was his driver's license

19       A    Yes.

20       Q    And also the $89.24?

21       A    It was a check, there was a check.

22       Q    It was a check for $89.24?

23       A    Yes.

24       Q    Mr. Garcia, is your family of Mexican origin?

2. 51

Plaintiff Jakes 030919

1      A    No, we Puerto Rican.

2      MS. BORMANN:  I have nothing further.

3      THE COURT:  Any redirect?

4      MR. GOODFRIEND:  No, Judge.

5      THE COURT:  You may step down, sir.  Thank you very

6      much.  Call your next witness.

7      MR. GOODFRIEND:  Call Officer Doss.

8      Judge, I am sorry, I did have one more

9      question.

10      THE COURT:  Mr. Garcia?

11

12                    REDIRECT EXAMINATION

13

14                         BY

15

16                    MR. GOODFRIEND:

17      Q    Mr. Garcia, the $89 that you got back was a

18      check cut by the hospital, is that correct?

19      A    Yes, it was.

20      Q    It was for the cash that your father had

21      brought to the hospital?

22      A    Yes.

23      THE COURT:  Okay.

24      MR. GOODFRIEND:  Okay.  Thank you, Judge.

Plaintiff Jakes 030920

1          THE COURT:  Any recross based on that additional

2     question from either side?

3          MS. BORMANN:  No, Your Honor.

4          THE COURT:  You may step down, sir.

5                                    (Witness excused.)

6          THE COURT:  Call your next witness.

7                                    (Witness sworn.)

8                    OFFICER DARREN DOSS,

9     called as a witness in the above-entitled cause, having

10    been first duly sworn, was examined and testified as

11    follows:

12

13                    DIRECT EXAMINATION

14

15          ———        BY

16

17                    MR. DILLON:

18         THE COURT:  Please be seated, make yourself

19    comfortable, once you are comfortable, state your name.

20         A     Officer Darren Doss.

21         THE COURT:  How do you spell Darren?

22         A     D-a-r-r-e-n.

23         THE COURT:  Proceed.

24    BY MR. DILLON:

Plaintiff Jakes 030921

1     Q     Officer, could you tell us by whom are you

2  employed?

3     A     The City of Chicago, Chicago Police Department.

4     Q     Would you tell us how long you have been a

5  Chicago Police Officer?

6     A     Little over 3 years.

7     Q     Can you tell me currently where are you

8  assigned within the police department?

9     A     To the 9th District.

10    Q     Now, I'd like to direct your attention back to

11 September of 1991, specifically the date of September 15

12 of 1991. Were you working on that date?

13    A     Yes.

14    Q     Were you working by yourself or with a partner?

15    A     With a partner.

16    Q     And what was your partner's name on that date?

17    A     Patrick Donovan.

18    Q     And on that particular date, were you still

19 assigned to the 9th District?

20    A     Yes.

21    Q     Could you please tell us what the boundaries

22 are within the 9th District?

23    A     Bounded by the Dan Ryan on the East, Kedzie on

24 the West, Garfield Boulevard on the South end and the

Plaintiff Jakes 030922

1    Chicago River on the North end.

2        Q    Officer, on the date of September 15 of 1991,

3    do you recall what your hours were that you were working?

4        A    11:00 p.m. to 7:00 a.m.

5        Q    Now, on that particular date, Officer, were you

6    wearing a uniform similar to the one you are wearing here

7    today in Court?

8        A    Yes.

9        Q    Were you assigned to an automobile?

10       A    Yes.

11       Q    Is that a marked or unmarked car that you were

12   assigned to?

13       A    Marked squadcar.

14       Q    I'd like to direct your attention to shortly

15   after midnight on what would now be September 16th of

16   1991.

17           Do you recall where you were at that time?

18       A    Yes.

19       Q    Where were you?

20       A    I was traveling northbound on Racine

21   approaching 51st Street.

22       Q    Could you tell me as you were driving down

23   Racine approaching 51st Street if anything unusual

24   occurred?

Plaintiff Jakes 030923

1      A    Okay.  When we got to 51st Street we made a

2  left turn which would be westbound to 51st.  At that

3  point we noticed a vehicle which we thought had been

4  involved in an auto accident.

5      Q    Could you tell me what type of vehicle this was

6  that you observed?

7      A    It was a Chevy station wagon.

8      Q    Did you approach that Chevrolet station wagon?

9      A    Yes.

10     Q    Now you indicated that it appeared it had been

11 in an accident.  Can you describe the car itself?

12     A    It was resting against another vehicle which

13 was parked against a curb.  The driver's side door was

14 open.

15     Q --- Now, as you approached that vehicle, did you

16 observe anything else as you approached that vehicle?

17     A    Yes, we also saw a body laying on the, in the

18 street about 4 feet in front of the station wagon.

19     Q    And when you made the observation of that body

20 4 feet in front of the station wagon, what did you do?

21     A    We approached the body which was in a pool of

22 blood at which point we called for an ambulance and for

23 assist units.

24     Q    Did you yourself actually go up to the body?

Plaintiff Jakes 030924

1      A      Yes.

2      Q      Did you subsequently learn the identity of that

3  body laying in the street as being one Rafael Garcia?

4      A      Yes.

5      Q      Now, at the time that you approached Mr. Garcia

6  as he was laying in the street, was he conscious?

7      A      No.

8      Q      He was unconscious?

9      A      Yes.

10     Q      Did you observe any injuries on him?

11     A      Yes.  He looked to be bleeding from several

12  areas of his body which I thought was his head.  Major

13  injury.

14     Q      Now, when you made those observations did you

15  notify anybody?

16     A      Yes, I called for an ambulance.

17     Q      And after you called for an ambulance, did you

18  contact anyone else?

19     A      Yes, I called for other units to come and help

20  secure the area.

21     Q      Now, when you observed Mr. Garcia lying on the

22  street, did he have any jewelry on?

23     A      Yes.

24     Q      Do you recall what items of jewelry you saw?

Plaintiff Jakes 030925

1    A    He had on several rings and I believe he had

2    several gold chains around his neck.

3    Q    Now, after you called for an ambulance and for

4    assisting units, did you have an occasion to examine that

5    automobile that you observed that had appeared to have

6    been in an accident?

7    A    Yes.

8    Q    Did you notice anything unusual about that

9    automobile as you observed it?

10   A    Okay.  It was, the engine was still running, it

11   was still in gear.  There were, the passenger side

12   window, front passenger side window was broken and there

13   was a couple of shell casings on the front seat and an

14   order of chicken.

15   Q -- Now, subsequent to that, did an ambulance

16   arrive?

17   A    Yes.

18   Q    And what happened when the ambulance arrived?

19   A    Well, they rendered aid to the victim, and at

20   which point they put him in the ambulance and took him to

21   the hospital.

22   Q    Do you know what hospital he was taken to?

23   A    Cook County.

24   Q    Did, subsequent to the ambulance taking Mr.

Plaintiff Jakes 030926

1    Garcia away, did other members of the Chicago Police

2    Department arrive at that scene?

3         A    Yes.

4         Q    Officer, I'd like to show you what's been

5    previously marked as People's Exhibit No. 13 for

6    identification and ask if you recognize what's shown in

7    that photograph?

8         A    Yes, I do.

9         Q    What do you recognize that photograph to be?

10        A    The area of 51st just West of Racine in front

11   of the Queen's Submarine Shop where we noticed the

12   vehicle involved in the accident.

13        Q    Does People's Exhibit No. 13 depict the vehicle

14   that you observed that appeared to have been in an

15   accident?

16        A    Yes.

17        Q    Now I'd like to show you what's been marked

18   previously as People's Exhibit No. 14 for identification.

19   Do you recognize what's depicted in that photograph?

20        A    Yes.

21        Q    What do you recognize to be depicted in that

22   photograph?

23        A    It's a different angle of the same vehicle

24   which we assumed had been involved in an accident.

Plaintiff Jakes 030927

1  Q. Showing you People's Exhibit No. 15 which

2 previously has been marked, what's depicted in People's

3 Exhibit No. 15?

4  A Same thing, the same vehicle resting against

5 that parked car.

6  Q People's Exhibit No. 16 for identification,

7 what's depicted in that?

8  A Same vehicle frontal view with the vehicle

9 involved in an accident, also with a flat tire.

10  Q When you first arrived on the scene was the

11 tire to that car flat?

12  A Yes.

13  Q Also showing you People's Exhibit No. 17 which

14 has previously been marked, do you recognize what's

15 depicted in that photograph?

16  A Yes, I do.

17  Q And what do you recognize that to be?

18  A Same vehicle, different angle of the flat tire.

19  Q Do People's Exhibits Numbers 13 through 17, do

20 they truly and accurately depict how that area, the

21 automobile you observed, appeared back on September 15 of

22 1991?

23  A Yes, except for the driver's side door being

24 closed, yes.

Plaintiff Jakes 030928

1       THE COURT:  Just to clarify, by that you mean when

2   you came on the scene the door was open?

3       A    Yes.

4       THE COURT:  Thank you.

5       MR. DILLON:  Thank you, Officer Doss.

6           I have no further questions.

7       THE COURT:  Mr. Day may inquire.

8       MR. KATZ:  Thank you.

9

10                  CROSS EXAMINATION

11

12                  BY

13

14                  MR. KATZ:

15      Q    Officer Doss, as you were driving down the

16  street, isn't it true that you were actually flagged down

17  by somebody?

18      A    Simultaneously as we made that left turn

19  someone did wave to my partner.

20      Q    And indicated to you that something had gone on

21  at that location?

22      A    Well, at that point I didn't stop.  I saw, I

23  thought that the same thing he was flagging us for is

24  what I saw and I pulled up to the scene.

Plaintiff Jakes 030929

1      Q   And you got out of the car and you went over to

2  see what had gone on before you called for an ambulance

3  or for any back up, is that correct?

4      A   Yes.

5      Q   And at the time could you tell that Mr. Garcia

6  was still alive?

7      A   Yes.

8      Q   Okay.  And then you went back and called for

9  the ambulance or called for the back up at the same time,

10  is that correct?

11      A   Yes.

12      Q   And approximately how long was it before an

13  ambulance or other police officers arrived?

14      A   Another squad car arrived within I'd say a

15  minute. And ambulance came within 5 minutes.

16      Q   So the squad car came first.

17         How many Officers were in that squadcar?

18      A   2.

19      Q   And what did those Officers do?

20      A   They helped me as far as keeping people away

21  from the scene.

22      Q   So when you say secure the scene what you mean

23  is you don't want people coming in moving the evidence,

24  disturb the scene so that you can take photographs or

Plaintiff Jakes 030930

1    whatever, is that correct?

2        A    Exactly.

3        Q    Protect the scene for technicians, other

4    Officers, investigators?

5        A    Yes.

6        Q    Okay.  Were those 2 Officers that came in that

7    car the only other Officers that arrived at the scene?

8        A    No.

9        Q    Total of how many Officers ended up at that

10   scene that evening?

11       A    Approximately, I believe, 5.

12       Q    And were they all uniformed Officers?

13       A    Yes.

14       Q    Did you also have any evidence technicians come

15   out?

16       A    Well, we called for the Crime Lab.

17       Q    And somebody from the Crime Lab came out?

18       A    Yes.

19       Q    Somebody from the Crime Lab, were you there

20   while they were doing their jobs?

21       A    No, I wasn't.

22       Q    Okay.  Were you there when the Crime Lab

23   arrived?

24       A    No, I wasn't.

1        Q     You had left the scene?

2        A     Yes.

3        Q     And where did you go?

4        A     I went to Cook County Hospital with the victim.

5        Q     Were you the person that called for the Crime

6  Lab Officers?

7        A     Yes, I was.

8        Q     And the purpose of bringing them out there is

9  to photograph the scene, isn't that right?

10       A     Yes.

11       Q     And also to take any fingerprints if they can

12  find fingerprints on any, anything relevant to the case,

13  is that correct?

14       A     Yes.

15       Q — But you weren't there when they did that part

16  of the job, isn't that right?

17       A     No, I was not.

18       Q     While you were there did any of the Officers,

19  did you or any of the other Officers canvass the area for

20  witnesses?

21       A     Yes.

22       Q     Did you do that or did other Officers?

23       A     I did it and other Officers also participated.

24       Q     How long were you on the scene total?

1     A    I'd say about 15, 20, 20 minutes.

2     Q    And can you tell us how many people you talked

3  to?

4     A    Personally 2.

5     Q    You talked to 2 people?

6     A    Yes.

7     Q    And the other Officers, do you have any idea

8  how many people they talked to?

9     A    No, I did not.

10     Q    Was there a group of people around the crowd?

11  Did anybody gather?

12     A    No.

13     Q    Do you remember how many civilians you saw in

14  the area?

15     A    Maybe 4 or 5.

16     Q    And did the Officers talk to those people?

17     A    I have no idea.

18    MR. KATZ:  I have no further questions.

19    THE COURT:  Mr. Jakes may inquire.

20    MS. BORMANN:  Your Honor, so that we may save time I

21  would ask to adopt the cross-examine of Mr. Katz.

22     I have a few questions of my own, though.

23

24

Plaintiff Jakes 030934

CROSS EXAMINATION


BY


MS. BORMANN:

Q    Officer Doss, as the first Officer on the scene you were the first person to approach the body lying 4 feet in front of the vehicle, correct?

A    Yes.

Q    Okay. When you approached him was he face up or face down?

A    He was basically on his side.

Q    And you noticed at that time he was wearing some gold jewelry?

A    Well, I noticed it when the ambulance attendants came and they rolled him over.

Q    And there were several chains that he had on?

A    Yes.

Q    And several gold rings?

A    Yes.

Q    Okay. They were noticeable?

A    Yes.

Q    Okay. Did you check his personal belongings at that time?

Plaintiff Jakes 030935

1  A  I went in his back pocket and pulled out his

2 wallet.

3  Q  And in his wallet he had some cash?

4  A  Yes.

5  Q  $89.24, correct?

6  A  Well, I didn't inventory it, I don't know the

7 exact amount.

8  Q  And his driver's license was in there?

9  A  Yes.

10  Q  Officer, when you went to Cook County Hospital,

11 did your partner, Officer Donlan, stay on the scene?

12  A  No, he accompanied me.

13  Q  So the remaining, how many Officers were

14 remaining on the scene when you left?

15  A  About 5.

16  Q  And during the time that you were there, did

17 you, you canvass the area for witnesses, the 15 minutes

18 that you were there?

19  A  Yes.

20  Q  And you spoke with a couple, correct?

21  A  Yes.

22  MS. BORMANN: I have nothing else.

23  THE COURT: Redirect?

24  MR. DILLON: No redirect, Judge.

Plaintiff Jakes 030936

1       THE COURT:  You may step down, sir.

2                               (Witness excused.)

3       THE COURT:  Call your next witness.

4       MR. DILLON:  Officer McKeough.

5                               (Witness sworn.)

6                       OFFICER MC KEOUGH,

7   called as a witness in the above-entitled cause, having

8   been first duly sworn, was examined and testified as

9   follows:

10

11                   DIRECT EXAMINATION

12

13                       BY

14

15               MR. DILLON:

16      THE COURT:  Make yourself comfortable.  Once you are

17  comfortable state your name and spell your last name.

18      A     McKeough.  M-c-K-e-o-u-g-h.

19  BY MR. DILLON:

20      Q     Sir, could you tell us by whom are you

21  employed?

22      A     I am employed by the Chicago Police Department

23  as a forensic investigator.

24      Q     And could you tell me briefly what exactly a

Plaintiff Jakes 030937

1    forensic investigator does?

2        A    Primarily we go to scenes of homicides and

3    serious aggravated batteries where we photograph the

4    scene and collect physical evidence and transport it to

5    the crime laboratory.

6        Q    Are you also referred to as an evidence

7    technician?

8        A    Yes, I am.

9        Q    How long have you been a Chicago Police

10   Officer?

11       A    Approximately 28 years.

12       Q    How long have you been a forensic investigator

13   or evidence technician?

14       A    25 years.

15       Q    Now, I'd like to direct your attention to the

16   date of September 16th of 1991.

17            Were you working on that date?

18       A    Yes, I was.

19       Q    Do you recall what your hours were on that

20   date?

21       A    I was working midnights from 12:00 o'clock to

22   8:00 o'clock.

23       Q    From 12:00 o'clock in the morning to 8:00

24   o'clock in the morning?

1     A    12:00 midnight to 8:00 in the morning.

2     Q    On that particular date, September 16th of

3  1991, were you working with a partner?

4     A    Yes, I was.

5     Q    And could you tell me who your partner was on

6  that date?

7     A    Thomas Clinton.  C-l-i-n-t-o-n.

8     Q    I'd like to direct your attention to

9  approximately 12:35, of the morning of September 16th of

10  1991.

11         Did you and your partner receive assignments?

12     A    Yes, we did.

13     Q    Could you tell me what the assignment was that

14  you received?

15     A — — A shooting at 1208 West 51st Street.

16     Q    Did you and your partner proceed to this

17  location after receiving that assignment?

18     A    Yes, we did.

19     Q    Can you tell me what you observed upon your

20  arrival at 1208 West 51st Street?

21     A    There was several police officers there.  We

22  spoke to one of the police officers at the scene, gave us

23  a brief summary of what he knew about the incident, and

24  we observed a vehicle that was involved in an accident, a

Plaintiff Jakes 030939

1    station wagon.  There was blood on the street.

2        Q    Now, after you made those observations, can you

3    tell me what it is you proceeded do then?

4        A    We photographed the scene, photographed the

5    vehicle and collected physical evidence.

6        Q    Could you tell me how it is you go about

7    collecting physical evidence at that crime scene?

8        A    After photographing it we will pick it up and

9    put it in an envelope, mark that envelope and seal it.

10       Q    Now, specifically after you photographed the

11   scene, could you tell me what you did by the way of

12   looking or collecting any evidence?

13       A    We noticed there was 2 cartridge cases on the

14   street, or on the sidewalk, one on the sidewalk and one

15   on the street near the curb.

16            And we also recovered a fired bullet from the

17   curb and, in front of 1210.

18            We observed some glass on the sidewalk and on

19   the street at 1210 and we searched the vehicle for any

20   physical evidence and we recovered 2 cartridge cases from

21   the vehicle.

22       Q    When you say you searched the vehicle, that

23   would be the station wagon that you had observed that

24   appeared to be in a accident?

71

Plaintiff Jakes 030940

1    A    Yes.

2    Q    Now, in addition to recovering the shell

3    casings that you mentioned and the fired bullets and

4    observing the broken glass, was there anything else in

5    the interior of the car besides the shell casings?

6    A    There was a bag of food.

7    Q    And where was that located?

8    A    It was approximately in the center of the front

9    seat.

10    Q    Now, could you tell me after you recovered the

11    shell casings and the fired bullet what it is that you do

12    with those items when you recover them?

13    A    We put them in a sealed envelope, label that

14    envelope and they are transported to the crime laboratory

15    for further examination.

16    Q    And is there any information that is marked on

17    the packaging that you put these items into?

18    A    The inventory number is inventory we use for

19    the evidence, the RD number or case number, and the date

20    and location where found.

21    MR. DILLON:  Your Honor, may the record reflect that

22    I have 2 sets of identical photographs to show to the

23    Officer?

24    THE COURT:  All right.

Plaintiff Jakes 030941

1    BY MR. DILLON:

2        Q    Officer, I'd like to show you what's been

3    marked as People's Exhibit No. 18 for identification, do

4    you recognize what's depicted in that photograph?

5        A    Yes.   This is a photograph of the station

6    wagon, '73 Chevy station wagon, and just in front of the

7    station wagon on the street there is a pool of blood.

8        Q    At the time that you arrived at the scene, was

9    any victim there?

10       A    No.   The victim had been removed to the

11   hospital.

12       Q    I'd like to show you what's been marked

13   previously as People's Exhibit No. 19 for identification.

14            Do you recognize what's depicted in that

15   photograph?

16       A    Again this is a photograph of the station wagon

17   and it's an overall photo where it shows the station

18   wagon, the blood on the street and the sidewalk.

19       Q    I'd like to show you what's previously been

20   marked as People's Exhibit No. 20 for identification.

21            Do you recognize what's depicted in that

22   photograph?

23       A    This is a photograph of the broken right

24   passenger front door window and also you can see the bag

73

Plaintiff Jakes 030942

1   of food that was in the front seat.

2       Q   Now, I'd like to show you 2 photographs, the

3   same photograph, People's Exhibit Number 21 for

4   identification.

5       Do you recognize what's depicted in that

6   photograph?

7       A   Yes.  This is a photograph of the front seat of

8   the vehicle and there is broken glass and you can also

9   see one cartridge case that we recovered from the front

10   seat in the passenger side.

11       Q   Sir, could you please use my pen and circle the

12   cartridge cases in both photographs to show where you

13   recovered that?

14       Okay.  And for the record he's placed a circle

15   on both copies of People's Exhibit Number 21 for

16   identification.

17       Now, I'd like to show you 2 copies of People's

18   Exhibit Number 22 for identification, and ask if you

19   recognize what's depicted in that photograph?

20       A   Again, this is a photograph of the front seat

21   of the vehicle with a cartridge case.

22       This cartridge case was not visible in the

23   other photo because it was under the center arm rest.

24   When we picked up the arm rest we discovered the other

Plaintiff Jakes 030943

1  cartridge case.

2      Q    Would you please on People's Exhibit Number 22

3  place a circle around the cartridge casing that you

4  recovered?

5          Showing you what I have marked as People's

6  Exhibit No. 23 for identification, again 2 photographs,

7  do you recognize what's depicted in that photograph?

8      A    This is an overall of the front of 1210, 1210

9  West 51st Street which shows the front of the building,

10  the sidewalk and part of the street.

11         And you can see glass on the sidewalk and the

12  street at the curb.

13     Q    Okay.  Officer, using my pen could you please

14  circle the glass on the street and sidewalk that you

15  observed back on that date?

16         Showing you what's previously been marked as

17  People's Exhibit No. 24 for identification, again showing

18  you duplicate photos, do you recognize what's depicted in

19  that Exhibit?

20     A    This is a photograph of the cartridge case we

21  recovered from the sidewalk in front of 1210 West 51st

22  Street.

23     Q    And Officer, with this pen could you please

24  circle the cartridge casing as it appears on the

75

1    sidewalk?

2         Officer, I'd like now to show you what's

3    previously been marked as People's Exhibit No. 25 for

4    identification, and ask you if you recognize what's

5    depicted in that photograph?

6    A    This is a photograph of a fired bullet

7    recovered from the street near the curb at 1210 West 51st

8    Street.

9    Q    And using the pen, Officer, could you please

10   circle the recovered bullet that you recovered from that

11   area?

12        Showing you what's previously been marked as

13   People's Exhibit No. 26 for identification, do you

14   recognize what's depicted in this photograph?

15   A  - This is an overall photograph showing the

16   relationship to the building.

17        The other photograph of the fired bullet was a

18   close up.

19        This is an overall showing the fired bullet

20   and, in relation to the building.

21   Q    And, sir, could you please place a circle

22   around the fired bullet that you observed on the street

23   and recovered?

24        Showing you what's been marked as People's

Plaintiff Jakes 030945

1    Exhibit No. 27 for identification, again double

2    photographs, could you please indicate what this picture

3    depicts?

4         A    This is a photograph again on the sidewalk and

5    a portion of the street in front of 1210 West 51st Street

6    showing 2 cartridge cases.

7         Q    And with this pen could you please place a

8    circle around the 2 cartridge casings as they appeared on

9    that date?

10             Finally showing you what's been previously

11   marked as People's Exhibit No. 28 for identification,

12   could you --

13             Do you recognize what's depicted in that

14   photograph?

15        A -- Yes.

16        Q    And what is that a photograph of?

17        A    This is a photograph of a portion of the street

18   and the sidewalk in front of 1210 West 51st Street and it

19   shows glass on the street and on the sidewalk.

20        Q    Do People's Exhibits 18 through 28, do all of

21   those photographs truly and accurately depict how that

22   area appeared back on September 16th of 1991 at the time

23   you processed this crime scene?

24        A    Yes, they do.

1       Q   Sir, I am now showing you what's previously

2    been marked as People's Exhibit No. 30 for

3    identification.

4        Do you recognize what that envelope is?

5       A   Yes, it is.  This is the envelope I put the

6    fired bullet in that I recovered at 1210 West 51st

7    Street.

8       Q   And does that envelope, could you examine the

9    contents of that envelope and see if that fired bullet is

10   in there?

11      A   Yes.

12      Q   And does that envelope contain markings on it

13   that you placed back on September 16th of 1991 as to

14   where it was recovered from?

15      A -- Yes, it does.

16      Q   Does People's Exhibit No. 30, the fired bullet,

17   does that appear to be in the same or substantially the

18   same condition now as back when you recovered it back on

19   16th of September, 1991?

20      A   Yes.  With the exception it was opened,

21   probably from -- or by the firearms and initialed.

22        And I opened it earlier this morning.

23      Q   Now, showing you what I have marked as People's

24   Group Exhibit No. 29 A and B, I ask that you examine that

Plaintiff Jakes 030947

1    envelope.

2            Do you recognize that envelope?

3        A    Yes, I do.  This is the envelope I put the 2

4    .380 cartridge cases I recovered from the street and

5    sidewalk.

6        Q    Could you examine that envelope and see if

7    those cartridge cases are in there still, please?

8        A    Yes, they are.

9        Q    Do People's Group Exhibits 29A and 29B, do they

10   appear to be in the same or substantially the same

11   condition now as when they were recovered on September

12   16th of 1991?

13       A    Yes, except for the exception as I made with

14   the other one, that it had been sealed and I had opened

15   it earlier this morning.

16       Q    Now I'd like to show you what's previously been

17   marked as People's Group Exhibit 31A and 31B, for

18   identification.

19           Do you recognize what's depicted, what this is?

20       A    This is the envelope I put two .380 cartridge

21   cases recovered from the front passenger seat of the '73

22   station wagon.

23       Q    And are both of those in there?

24       A    Yes, they are.

1    Q    Do they appear to be in the same or

2    substantially the same condition now as when they were

3    recovered back on September 16th of 1991?

4    A    Yes.

5    MR. DILLON:  If I could, if I could have a moment,

6    please, Judge?

7         Your Honor, I'd ask that the Officer be allowed

8    THE COURT:  Counsel, feel free to move wherever you

9    can see.

10   MR. DILLON:  That the Officer be allowed to step

11   down into the well.

12   THE COURT:  Sure.  Step down please?

13   BY MR. DILLON:

14   Q    Sir, I'd like to show you what's been marked as

15   People's Exhibit No. 12 for identification.  Do you

16   recognize what this is a diagram of?

17   A    Yes, I do.

18   Q    And what is it a diagram of?

19   A    This is a diagram of the scene.

20   Q    That would be 51st and Racine?

21   A    Yes.

22   Q    Does this diagram truly and accurately depict

23   how that area appeared back on September 16th of 1991

24   when you were there?

Plaintiff Jakes 030949

1       A       Yes.    It does.

2       Q       Would this aid you in your testimony to the

3    jury?

4       A       Yes.

5       Q       Could you please indicate, using this pen, and

6    make a square as to where that Chevrolet station wagon

7    was when you observed it at the time it appeared to have

8    been in an accident?

9       A       This is the sidewalk, this is the street, front

10   of the vehicle like this and there was a parked vehicle

11   right here.

12      Q       Thank you.  You can return to the witness stand

13   now.

14              Officer, you indicated that you recovered these

15   items from the car, the station wagon.  Where were those

16   items sent to?

17      A       They were sent to the firearms section of the

18   crime laboratory.

19      Q       Did you do anything to those prior to sending

20   them to the firearms section?

21      A       They were examined for ridge impressions with

22   negative results.

23      Q       When you say examined for ridge impressions

24   would it be fair to say you look for fingerprints on

1    them?

2         A    Yes.

3         Q    And you indicated that there were none?

4         A    There were none.

5         Q    Is that common in your experience as an

6    evidence technician to be able to obtain ridged

7    impressions off of shell casings?

8         A    Very seldom is it ever done as far as getting

9    positive results on cartridge case.

10        Q    Now, did you have an occasion to examine that

11   automobile for any ridged impressions?

12        A    Yes, we examined the right side of the vehicle,

13   the passenger side of the vehicle.  And there was no

14   ridged impressions, just a few smudges.

15        MR. DILLON:  Thank you, Officer.

16             I have no further questions.

17        THE COURT:  Mr. Day may inquire.

18        MR. KATZ:  Thank you.

19

20

21

22

23

24

Plaintiff Jakes 030951

CROSS EXAMINATION

BY

MR. KATZ:

Q   Officer McKeough, just to clarify a couple of things, you went to the scene for the purpose of processing it for physical evidence and for taking photographs, is that correct?

A   Yes.

Q   And when you got there you talked to the other Officers who were already on the scene?

A   Yes.

Q   And they had already secured the scene at that point, is that correct?

A   Yes.

Q   So presumably when you go to look for the physical evidence it has not been touched or tampered with in any way, right?

A   No.

Q   So you said you found a couple of cartridges on the ground, is that correct?

A   Yes.

Q   Now when we say cartridges, what we are talking

Plaintiff Jakes 030952

1   about, the casing that a fired bullet would have cast

2   out?

3        A    A fired bullet, yes.

4        Q    And the bullet had already been fired and the

5   empty cartridge is on the ground, is that correct?

6        A    Yes.

7        Q    When you talk about a cartridge of this type

8   it's from an automatic or semiautomatic type of weapon,

9   is that correct?

10       A    Yes.

11       Q    And those bullets have to be loaded into a

12  cartridge and placed in a gun, is that correct?

13       A    They have to be loaded into a magazine.

14       Q    A magazine?

15       A  - And placed in a weapon, yes.

16       Q    And that is usually done by hand, is that

17  correct?

18       A    Yes, they are.

19       Q    So those cartridges are handled by whoever it

20  was that loaded the magazine?

21       A    Yes.

22       Q    And it is possible for fingerprints to be left

23  on those cartridges, is that correct?

24       A    It's possible but very rare do we ever get any.

84

Plaintiff Jakes 030953

1       Q     Well, in this case you did not find

2   fingerprints?

3       A     No, we did not.

4       Q     But you did check for them?

5       A     Yes, we did.

6       Q     And you had found 2 cartridges on the ground,

7   you found 2 more in the car, is that correct?

8       A     Yes, we did.

9       Q     So out of a total of 4 cartridges you weren't

10  able to find any kind of fingerprints, isn't that right?

11      A     Yes.

12      Q     And you also processed the car, you said, for

13  fingerprints?

14      A     Just the passenger side of the vehicle.

15      Q     You didn't check the driver's side?

16      A     No, we didn't.

17      Q     You said that there was glass on the sidewalk.

18  That glass, did that appear to have come from the car?

19      A     Yes, it did.

20      Q     And it was one of the car windows that had been

21  shot out, is that correct?

22      A     It appeared to be, yes.

23      Q     And which window was it of the car that was

24  shot out?

Plaintiff Jakes 030954

1    A    It was right front passenger door.

2    Q    And that glass had landed mostly on the

3  sidewalk?

4    A    On the sidewalk and some of it was in the

5  vehicle.

6    Q    Did you check any of that glass for

7  fingerprints?

8    A    The glass was very minute.  It was broken into

9  small pieces.  It's a shattered type glass.  There

10  weren't any pieces big enough to check.

11    Q    And to the best of your knowledge nobody

12  handled those cartridges or moved the glass or anything

13  like that prior to your arrival on the scene, isn't that

14  right?

15    A - No.

16    MR. KATZ:  I have no further questions.

17    THE COURT:  Mr. Jakes may inquire

18    MS. BORMANN:  Thank you, Judge.  Again we'd ask to

19  adopt the stunning cross-examination of Mr. Katz.

20        Just have a few questions.

21

22

23

24

Plaintiff Jakes 030955

                    CROSS EXAMINATION

1

2

3                       BY

4

5                   MS. BORMANN:

6        Q    Officer McKeough, when you arrived on the crime

7   scene as Mr. Katz had asked you, it had already been

8   secured?

9        A    Yes.

10       Q    And when you first noticed the car what was the

11  position of the passenger door?

12       A    Passenger door was closed.

13       Q    And the driver's side door?

14       A    Was open.

15       Q  - It's the passenger window that was broken out?

16       A    Yes.  It was.

17       Q    Now the 2 sets of shell casings you, you found,

18  you found 2 shell casings inside the car?

19       A    Yes.

20       Q    And 2 shell casings on the sidewalk?

21       A    Yes.

22       Q    You were able to determine that they both came

23  from a .380, correct?

24       A    They were .380 cartridge cases.

Plaintiff Jakes 030956

```
 1        Q     Okay.   They were the same type of cartridge

 2   cases?

 3        A     Yes.

 4        MS. BORMANN:   I have nothing else.

 5        THE COURT:   Redirect?

 6        MR. DILLON:   No further questions.   Thank you.

 7        THE COURT:   You may step down.

 8                                    (Witness excused.)

 9        MR. GOODFRIEND:   Detective Caesar.

10                                    (Witness sworn.)

11                      DET. LOUIS CAESAR,

12   called as a witness in the above-entitled cause, having

13   been first duly sworn, was examined and testified as

14   follows:

15

16                   DIRECT EXAMINATION

17

18                   BY

19

20              MR. GOODFRIEND:

21        THE COURT:   Please be seated make yourself

22   comfortable.   Once you are comfortable, state your full

23   name.

24        A     Detective Louis Caesar.
```

1          THE COURT:  Spell Louis.

2          A    L-o-u-i-s.

3          THE COURT:  You may proceed.

4   BY MR. GOODFRIEND:

5          Q    Detective Caesar, where are you employed at?

6          A    Area 2 Violent Crimes, Chicago Police

7   Department at the present time.

8          Q    How long have you been a Chicago Police

9   Officer?

10         A    Little over 18 years.

11         Q    Back in September of 1991, what unit were you

12  assigned to?

13         A    I was assigned to Area 3 Violent Crimes at that

14  time.

15         Q    Where was that located at?

16         A    3900 South California.

17         Q    I am going to direct your attention to the

18  early morning hours of September 16th, 1991.  Were you

19  working?

20         A    Yes, I was.

21         Q    What hours were you working?

22         A    I was working a midnight shift beginning at

23  12:30 until 8:30 or 9:00 in the morning.

24         Q    Were you working with a partner?

Plaintiff Jakes 030958

1        A      Yes, I was.

2        Q      What was the name of your partner?

3        A      Detective Jack McCann.

4        Q      Shortly after you arrived at 39th and

5    California did you receive an assignment?

6        A      Yes, we did.

7        Q      What was the nature of that assignment?

8        A      Man shot at 51st Street, 1206.

9        Q      Did that involve the shooting of one Rafael

10   Garcia?

11       A      Yes, sir.

12       Q      Did you and your partner Detective McCann go to

13   the scene of 51st and Racine?

14       A      Yes, we did.

15       Q - - When you arrived there were there other police

16   officers present?

17       A      Yes, sir.

18       Q      What other Officers were present?

19       A      Officer Doss was there who was doing the paper

20   on the incident and there was another car, assisting him.

21   I don't recall exactly the individuals on that car.

22       Q      Approximately how long did you stay at the

23   scene?

24       A      We were there for probably about 45 minutes.

70

Plaintiff Jakes 030959

1      Q    Did the evidence technicians arrive during the

2  time period that you were there?

3      A    Yes, they did.

4      Q    And at that scene when you arrived was the

5  victim present?

6      A    No.  He wasn't.  He had been removed by the

7  fire ambulance to the County Hospital.

8      Q    Did you notice any cars at the vacinity of the

9  crime scene?

10     A    Yes, we did.  We observed what we were told or

11  what was speculated was the victim's car, station wagon,

12  and we saw another Dodge that had been banged into by the

13  station wagon.

14     Q    Now, was there certain damage done to the

15  station wagon?

16     A    Yes.  There was.

17     Q    What was the nature of the damage done to the

18  station wagon?

19     A    There was a dent in the rear where it had hit

20  the Dodge, a small dent, and there was a shattered window

21  on the passenger right front side.

22     Q    Now in the front of that vehicle, were there

23  any packages?

24     A    Yes, there was.

Plaintiff Jakes 030960

1        Q        What kind of package was it?

2        A        It was a folded up package like you get from a

3     fast food place.

4        Q        Where was it located?

5        A        On the front seat.

6        Q        Did you feel that package?

7        A        Yes, I did.

8        Q        And what did you notice when you felt the

9     package?

10       A        It was still slightly warm.

11       Q        Detective Caesar, I show you what's been marked

12    for identification as People's Exhibit No. 20 and can you

13    please tell the ladies and gentlemen what's shown in that

14    picture?

15       A -- Brown paper bag, folded up, as I described.

16    Maybe you would get from a fast food place.

17       Q        Is that the package that you felt for warmth?

18       A        Yes.

19       Q        And you stated it was still slightly warm, is

20    that correct?

21       A        Yes.

22       Q        Now, after you were at the scene, what location

23    did you go to next?

24       A        We went to the County Hospital.

93

1     Q    What part of the hospital did you go to?

2     A    We went to a Ward 32 to the trauma unit where

3  they normally take gunshots or seriously injured

4  individuals.

5     Q    What was the purpose of your going to the

6  trauma unit at Cook County Hospital?

7     A    Try to see the condition of our victim and

8  determine how he had been injured.

9     Q    Were you able to interview him?

10    A    No.  I was not.

11    Q    Why was that?

12    A    He had already been removed for surgery,

13  emergency surgery.

14    Q    Were you able to check out the belongings that

15  he came with to the hospital?

16    A    What was available at trauma unit, yes, and

17  what had been inventoried by the hospital.

18    Q    And what belongings had he brought to the

19  hospital?

20    A    He had arrived at the hospital with his wallet,

21  his identification, some keys, about $90 in cash.  He had

22  jewelry that included, I believe, 3 or 4 gold chains and

23  2 or 3 rings.

24    Q    Where did you go to next after you went to Cook

Plaintiff Jakes 030962

1    County Hospital?

2        A    We went to try to locate any next of kin or --

3             He was still alive at that time.  We tried to

4    locate any relatives at his listed address.

5        Q    And what address did you go to?

6        A    5109 South Aberdeen.

7        Q    Were you able to locate any relatives that

8    morning?

9        A    No, we were not.

10       Q    Later that day did you learn that the victim

11   Rafael Garcia had died at Cook County Hospital?

12       A    Yes, sir, I did.

13       Q    Detective Caesar, I am going to direct your

14   attention to the next morning, September 19, 1991.  Were

15   you on duty that morning?

16       A    I came back on duty, yes, about 12:30.

17       Q    Approximately what time was it -- strike it.

18            After you came on duty at 12:30 did you resume

19   your involvement in the investigation of this case?

20       A    Yes, I did.

21       Q    Did you speak with any other Detectives

22   regarding the investigation?

23       A    Yes, I did.

24       Q    Who did you speak with?

Plaintiff Jakes 030963

1      A     I spoke with Detective Kill and Detective

2   Boudreau.

3      Q     Was there an individual in custody in the

4   morning of September 17, 1991, regarding this

5   investigation?

6      A     Yes.   There was.

7      Q     What was the name of that individual?

8      A     Anthony Jakes.

9      Q     Do you see him in Court today?

10      A     Yes, I do.

11      Q     Please point to him and describe what he's

12   wearing?

13      A     Individual seated at the left side of the table

14   with the white long sleeve shirt on.

15      MR. GOODFRIEND:   Judge, could the record reflect the

16   in-Court identification of the defendant, Anthony Jakes?

17      THE COURT:   Counsel for Mr. Jakes agree?

18      MR. MADEA:   Yes.

19      THE COURT:   It may.

20   BY MR. GOODFRIEND:

21      Q     In regards to this investigation, did any

22   state's attorneys arrive at Area 3 Violent Crimes?

23      A     Yes, sir, they did.

24      Q     What was the name of the State's Attorney that

Plaintiff Jakes 030964

1       arrived at Area 3 Violent Crimes?

2           A    State's Attorney Brian Grossman.

3           Q    Did any other police officers from any other

4       units arrive regarding this investigation that morning?

5           A    Yes, sir.

6           Q    Who was that?

7           A    Youth was requested and Youth Officer Kenneth

8       Burke came to Area 3.

9           Q    Why was a Youth Officer requested?

10          A    Because Anthony was a juvenile and a Youth

11      Officer --

12          Q    Approximately what time was it that the Youth

13      Officer arrived?

14          A    About little bit about 4:00, about quarter to

15      4:00, I'd say.

16          Q    When Mr. Youth Officer Burke arrived did you

17      have a conversation with him?

18          A    Yes, I did.

19          Q    Approximately how long did you speak with Youth

20      Officer Burke?

21          A    Approximately about 5 minutes.

22          Q    After Youth Officer Burke spoke with you, did

23      he go anywhere?

24          A    Yes, he did.

Plaintiff Jakes 030965

1    Q    Where did he go?

2    A    Went into the room with Anthony Jakes.

3    Q    Was he in the room alone with the defendant

4  Jakes?

5    A    Yes, he was.

6    Q    Approximately how long was he in the room?

7    A    About 5 minutes.

8    Q    Now approximately 4:00 a.m. were you present

9  for a conversation with the defendant, Anthony Jakes?

10   A    Yes, I was.

11   Q    Who else was present at the beginning of that

12 conversation?

13   A    During the conversation Detective Kill was

14 there, State's Attorney Brian Grossman, Youth Officer

15 Burke and myself were there.

16   Q    Did someone introduce you to the defendant?

17   A    Detective Kill, who had been working on the

18 case since early in the evening, introduced each of us to

19 Anthony.

20   Q    Now, after Detective Kill made the

21 introductions, did he stay or leave?

22   A    He left the room.

23   Q    And at that time did you observe and sit

24 through an interview between State's Attorney Brian

Plaintiff Jakes 030966

1   Grossman and the defendant?

2      A   Yes, I did.

3      Q   Was Youth Officer Burke present for that

4   interview?

5      A   Yes, he was.

6      Q   Approximately how long did the initial

7   conversation last?

8      A   About half hour.

9      Q   Did you remain in the room with the State's

10   Attorney and the defendant and Youth Officer Burke?

11      A   Yes, I did.

12      Q   Was a handwritten statement taken from

13   defendant Anthony Jakes?

14      A   Yes.  It was.

15      Q   Approximately how long did that take?

16      A   Probably about another 45 minutes.

17      Q   At the conclusion of the taking of that

18   statement did the defendant have an opportunity to review

19   the statement?

20      A   Yes, he did.

21      Q   And did he sign that statement?

22      A   Yes, he did.

23      Q   Detective Caesar I am going to show you what's

24   been marked for identification as People's Exhibit No.

Plaintiff Jakes 030967

1    32.   Can you please take a look at that 4 page document?

2          Okay.  Is that the statement taken from Anthony

3    Jakes in the morning of September 17, 1991?

4          A    Yes, sir.  Yes, sir.

5          MR. GOODFRIEND:   Judge, I have no further questions

6    at this time.

7          THE COURT:  Mr. Day may inquire.

8          MR. KATZ:   Thank you, Your Honor.

9

10                   CROSS EXAMINATION

11

12                   BY

13

14                   MR. KATZ:

15         Q    Detective Caesar, when you first arrived at the

16    scene at 51st and Racine there were other Officers

17    present?

18         A    There were uniformed Officers, yes, sir.

19         Q    Do you remember how many uniform Officers were

20    there at the time?

21         A    At least 4.

22         Q    And they had secured the scene, is that

23    correct?

24         A    That is correct.

Plaintiff Jakes 030968

1   Q And when you got there did you canvass the area

2 for witnesses?

3   A Yes, sir, I did.

4   Q And did you talk to any people?

5   A We were unable to locate anybody that actually

6 could assist in the investigation.

7   Q You didn't talk to any people at that scene?

8   MR. GOODFRIEND: Objection, asked and answered.

9   THE COURT: Overruled.

10   Question wasn't if you ever located, but did

11 you talk to anybody, sir?

12   A We did talk to individuals, yes.

13 BY MR. KATZ:

14   Q Didn't you or one of your partners talk to the

15 owner of the Submarine Shop?

16   A No, sir.

17   Q Well, let me show you a police report.  I'd

18 like to mark this as Defendant's Exhibit No. 1.

19   Detective, do you recognize this?

20   A Yes, sir.

21   Q And is that a report that you prepared relating

22 to the investigation of this incident?

23   A Yes.  It is.

24   Q And your name is on that third page, is that

Plaintiff Jakes 030969

1    correct?

2        A    That is correct.

3        Q    Doesn't it in fact on page 2 state, if I may,

4    Your Honor?

5            I am sorry, on page 3 state that you had

6    learned from the operator of the Sub Shop --

7        MR. GOODFRIEND:  Objection, hearsay.

8    BY MR. KATZ:

9        Q    All right.  Doesn't it in fact relate the fact

10   that you or one of your partners spoke with the owner of

11   the Sub Shop?

12       A    Me or my partner did not speak with the owner

13   of the Sub Shop.

14       Q    Do you know who did?

15       A    One of the original responding Officers had

16   spoken with the owner.

17       Q    But you included that in your report, is that

18   correct?

19       A    Yes, sir.

20       Q    To the best of your knowledge did the, did any

21   other Officer relate that in any of their reports?

22       MR. GOODFRIEND:  Objection.

23       THE COURT:  Sustained.  Relevancy.

24   BY MR. KATZ:

Plaintiff Jakes 030970

1    Q    So you didn't speak to anybody who had seen

2  what had happened, is that correct?

3         MR. GOODFRIEND:  Objection, hearsay.

4         THE COURT:  Overruled.

5         MR. GOODFRIEND:  And objection, asked and answered.

6         THE COURT:  You may answer that question, sir.

7         A    I did not interview an eye witness, no.

8  BY MR. KATZ:

9         Q    To the best of your knowledge did anybody that

10  night identify my client, Arnold Day, as having been at

11  that scene?

12        MR. GOODFRIEND:  Objection.

13        THE COURT:  Sustained.

14        MR. KATZ:  I have nothing further.

15        THE COURT:  Mr. Jakes may inquire.

16        MR. GOODFRIEND:  Judge, can we approach the Bench?

17        THE COURT:  Sure.

18              (Whereupon there were proceedings

19                had out of the presence of the

20                Official Reporter in the above-entitled

21                cause.)

22        THE COURT:  Insofar as Mr. Day is concerned, does

23  the state have any redirect?

24        MR. GOODFRIEND:  No, Your Honor.

Plaintiff Jakes 030971

1       MR. DILLON:  No, sir.

2       THE COURT:  All right.  Then the jury for Mr. Day,

3   sheriff, if you'd be kind enough to take them out the

4   front door, around the corner and have them rest in the

5   jury room back there.

6                   (Whereupon the jury for Defendant

7                   Day was removed from the Courtroom

8                   and the following proceedings were

9                   then had.)

10      THE COURT:  All right.  The record will reflect that

11  the jury for Mr. Day has been excused.

12              Mr. Day and Mr. Katz are present.  You may

13  proceed with your cross-examination, counsel, for Mr.

14  Jakes.

15      MR. MADEA:  Thank you.

16

17                  CROSS EXAMINATION

18

19                  BY

20

21                  MR. MADEA:

22      Q    Detective Caesar, I believe you testified on

23  direct examination that you began work on the 16th of

24  September, 1991, about 12:00, 12:30?

Plaintiff Jakes 030972

```
 1        A     12:30, yes, sir.

 2        Q     And you were working with a partner on that

 3    day?

 4        A     Yes, I was.

 5        Q     And who was that?

 6        A     Detective McCann.  Jack McCann.

 7        Q     And did you happen to notice Anthony Jakes in

 8    Area 3 when you came on duty?

 9        A     On the 17th?

10        Q     Yes?

11        A     No, I did not.

12        Q     Okay.  When did you first see Anthony Jakes on

13    the 17th of September?

14        A     About, I saw him in the building but I didn't

15    talk to him until about -- later in the morning.

16        Q     All right.  Do you know what time that was?

17        A     When I --

18        Q     When you spoke to him?

19        A     About 4:00 o'clock.  Quarter to 4:00 I saw him.

20        Q     About 4:00 o'clock, quarter to 4:00?

21        THE COURT:  A.m. or p.m., sir?

22        A     A.m.

23        MR. MADEA:  I am sorry?  Okay, a.m., fine.

24    BY MR. MADEA:
```

Plaintiff Jakes 030973

1     Q    Now, where did you see him?

2     A    In the Sergeant's, what was the Sergeant's room

3  at Area 3.

4     Q    Okay. And that is a fairly big room compared

5  to the interview rooms at Area 3, correct?

6     A    It's a bigger room, yes, sir.

7     Q    And I believe you testified that Detective Kill

8  was present?

9     A    Yes, sir.

10     Q    And State's Attorney Grossman?

11     A    Yes, sir.

12     Q    And a Youth Officer Burke, correct?

13     A    Yes, sir.

14     Q    All right. And you said, I believe you

15  testified earlier that Youth Officer Burke had spoke to

16  Mr. Jakes privately, isn't that right?

17     A    Yes, sir.

18     Q    And about how much prior to this gathering in

19  this bigger room did that occur?

20     A    Youth Officer Burke got there about quarter to

21  4:00. He spoke with him for about 5 minutes and then

22  about 4:00 o'clock we all went back in the room and we

23  interviewed Mr. Jakes.

24     Q    Okay. Now, at 4:00 o'clock when you are all in

105

1    in bigger Sergeant's room, would it be fair to say

2    State's Attorney Grossman conducted the interview,

3    correct?

4        A    Correct.

5        Q    And you were basically there to witness any

6    statement, correct?

7        A    Yes, sir, and my familiarity with the scene.

8        Q    All right.  And Youth Officer Burke was called

9    because he was a Youth Officer, right?

10       A    Correct.

11       Q    And Detective Kill was there originally or

12   initially, correct?

13       A    Yes, sir.

14       Q    And Detective Kill left after he introduced you

15   and the interview began, correct?

16       A    Correct.

17       Q    And the State's Attorney conducted the

18   interview with Mr. Jakes, correct?

19       A    Correct.

20       Q    And then he asked Mr. Jakes if he was going to,

21   if he wanted a handwritten statement or a Court Reported

22   statement, right?

23       A    Correct.

24       Q    All right.  Now, a handwritten statement is one

106

Plaintiff Jakes 030975

1   in which the State's Attorney writes it out and then it's

2   reviewed by the defendant, right?

3       A    Correct.

4       Q    And a Court Reported statement would be one

5   where the State's Attorney asked the questions and a

6   person similar to the Court Reporter up there would take

7   down verbatim what the person said, correct?

8       A    That is correct.

9       Q    All right.  And then of course it would have

10  been typed up and reviewed again, correct?

11      A    Yes, sir.

12      Q    All right.  Now, Mr. Jakes had a handwritten

13  statement, correct?

14      A    That is correct.

15      Q    And that was written out by the State's

16  Attorney Grossman, correct?

17      A    Correct.

18      Q    And then it was reviewed by or read aloud by

19  the State's Attorney, is that correct?

20      A    In conjunction with Anthony, yes, sir.

21      Q    All right.  Did you have a copy also or was it

22  read like around the table or --

23      A    It was written and read right there at the

24  table.

107

1  Q Written and read at the same time?

2  A It was written and they were sitting there

3 writing it together and then when it was done they read

4 it over.

5  Q Okay.  And each page was initialed by everyone

6 present, correct?

7  A Yes, sir.

8  Q And it was eventually signed; in fact there was

9 corrections made on the document?

10  A Yes, sir.

11  Q And it was initialed where the corrections were

12 made?

13  A Yes, sir.

14  Q And it was signed at the end, correct?

15  A On each page and the end, yes, sir.

16  Q And your signature does appear on that

17 document, correct?

18  A Yes, sir.

19  Q All right.  Now, what time did that interview

20 end?

21  A About 5:00 o'clock, 5:15.

22  Q And that is in the morning again on the 17th,

23 1991?

24  A Correct.

Plaintiff Jakes 030977

1          MR. MADEA:   If I may have just a moment, Your Honor?

2          THE COURT:   You may.

3     BY MR. MADEA:

4          Q     Detective, when you said the statement was

5     being written and -- strike that.

6                When you said the statement was reviewed after

7     it had been written out, was it read aloud by the State's

8     Attorney?

9          A     In majority, yes, sir.

10         Q     Okay.  Can you explain what you mean by the

11    majority?

12         A     I believe Anthony read part of the beginning of

13    the statement.

14         Q     And then the State's Attorney read the rest?

15         A     Correct.

16         MR. MADEA:   Okay, I don't have anything further.

17         THE COURT:   Redirect?

18         MR. GOODFRIEND:   Thank you, Judge.

19

20

21

22

23

24

Plaintiff Jakes 030978

1                         REDIRECT EXAMINATION

2

3                         BY

4

5                         MR. GOODFRIEND:

6        Q    Detective Caesar, you -- the State's Attorney

7   gave the defendant Anthony Jakes a choice between whether

8   he wanted a handwritten or Court Reported statement, is

9   that correct?

10       A    That is correct.

11       Q    Did he explain the difference of those 2 to the

12  defendant?

13       A    Yes, he did.

14       Q    Which one did the defendant choose?

15       A    He chose a handwritten statement.

16       Q    You stated also that the defendant read part of

17  the statement, is that correct?

18       A    That is correct.

19       Q    Is that so you can ensure that the defendant

20  knows how to read?

21       A    That is correct.

22       Q    Was he able to read?

23       A    Yes.  He was.

24       Q    Was he sitting next to State's Attorney

Plaintiff Jakes 030979

1    Grossman while State's Attorney Grossman read the rest of

2    the statement?

3        A    That is correct.

4        Q    Did he follow along the page as State's

5    Attorney Grossman read it to him?

6        A    Yes, sir, and corrections were made.

7        MR. GOODFRIEND:  Judge, I have no further questions.

8        THE COURT:  Any recross?

9        MR. MADEA:  Yes, just briefly.

10

11            RECROSS EXAMINATION

12

13                BY

14

15             MR. MADEA:

16        Q    Detective Caesar, there was no Court Reporter

17    present in Area 3 at the time Mr. Jakes made his choice,

18    was there?

19        A    No, there was not.

20        Q    And Mr. Jakes, was he made known of that fact,

21    that there was not a Court Reporter present?

22        A    He was told one would have to come if he wanted

23    a Court Reporter statement.

24        MR. MADEA:  Thank you.  Nothing further.

1    THE COURT: All right. I am going to ask, this

2  sounds like there is some great big secret going on but I

3  am going to ask the gentlemen to come up and make lunch

4  arrangements.

5         We have about 5 minutes worth of work left so I

6  am going to ask the attorneys to come up.

7         You can bring out the other jury.

8      Front door, around the corner and into the back?

9              (Whereupon the jury for Mr. Day's

10                case was then escorted into the

11                Courtroom and the following

12                proceedings were had.)

13    THE COURT: All right. Record should reflect that

14  both Defendants are present personally and by counsel.

15  Both jurys are present.

16         I am informed by the parties that they have a

17  stipulation to some evidence. After that point, we are

18  going to break and send you to lunch.

19         So the State, would you proceed if you have

20  that stipulation?

21    MR. GOODFRIEND: Thank you, Judge.

22         The stipulation for both Defendants is marked

23  as People's Exhibit No. 11. It is hereby stipulated and

24  agreed by and between the parties, Jack O'Malley, State's

112

Plaintiff Jakes 030981

1   Attorney of Cook County through his assistants, John

2   Dillon and Neal Goodfriend, and defense attorneys Stewart

3   Katz and Frank Madea that if called to testify, Yuksel

4   Konacki, Y-u-k-s-e-l, K-o-n-a-c-k-i, would testify as

5   follows:

6           One, Dr. Konacki is a medical Doctor licensed

7   to practice medicine in the State of Illinois.

8           He was employed as a deputy medical examiner

9   for the Cook County Medical Examiner's Office and was so

10  employed in September of 1991.

11          That he is an expert in the field of Anatomic

12  and Forensic Pathology which involves the study of death

13  and its causes.

14          That he has performed over 500 autopsies.

15          On September 17th, 1991, he examined the

16  remains of Rafael Garcia, under medical examiner's case

17  number 296 of September, 1991.

18          That he performed an external and internal

19  examination on the remains of Mr. Rafael Garcia.

20          Dr. Konacki would identify People's Exhibit

21  Number 2 as a picture of Rafael Garcia prior to autopsy.

22          That the post-mortem examination of Rafael

23  Garcia revealed the following evidence of injury:

24          Gunshot Wound No. 1 on the dorsal and medial

Plaintiff Jakes 030982

1   aspect of the right hand 35 and a quarter inches below

2   the top of the head there is a gunshot wound of entrance.

3   It is round and measures 0.5 by 0.5 centimeters and it is

4   surrounded by a margin of abrasion measuring 0.1

5   centimeters in width.

6         Adjacent to its medical aspect there is a

7   recent, sutured, vertical incision measuring 4.5

8   centimeters in length.

9         The entry wound is depicted in People's Exhibit

10  No. 3.

11        On the base and inner aspect of the thumb of

12  the right hand, 36 inches below the top of the head,

13  gunshot wound No. 1 has exited.  The exit wound is

14  irregular and elongated and measures 1.0 by 0.7

15  centimeters.

16        The bullet traveled inside the right hand

17  through and through.  The exit wound is shown in People's

18  Exhibit No. 4.

19        Gunshot Wound No. 2:  On the anterior lower

20  aspect of the right thigh, 44 and a half inches below the

21  top of the head, there is a gunshot wound of entrance.

22  It is round and measures 0.8 by 0.8 centimeters and it is

23  surrounded with a margin of abrasion measuring 0.1

24  centimeters in width.

114

Plaintiff Jakes 030983

1    Above the entrance wound there are 3 small

2    round lacerations measuring 0.2 by 0.3 centimeters in

3    diameter.

4    Below and lateral to the entrance wound there

5    is a small round laceration measuring 0.2 centimeters in

6    diameter. Above them on the anterior aspect of the right

7    thigh there is a small round ecchymosis measuring 0.5 by

8    0.6 centimeters and 2 smaller round ecchymosis measuring

9    0.2 centimeters each.

10    On the upper anterior aspect of the right knee

11    there is a small hole measuring 0.6 centimeters in

12    association, with depression of this area. The entrance

13    wound to the thigh is shown in People's Exhibit No. 5.

14    On the lower inner aspect of the right thigh,

15    46 and a half inches below the top of the head, there are

16    2 lacerations which are 0.5 centimeters apart and

17    measuring 1.5 by 1.5 centimeters and 1.5 by 0.4

18    centimeters. The exit wound to the thigh is shown in

19    People's Exhibit No. 6.

20    Gunshot Wound No. 2 traveled inside the right

21    thigh, from anterior to the inner aspect fracturing the

22    right femur through and through. The bullet and

23    fragments of bullet or bone exited through the 2

24    lacerations described.

116

Plaintiff Jakes 030984

1    Gunshot wound No. 3:  On the right lower back
2    at the lateral aspect, 28 and a half inches below the top
3    of the head, and 3 and a half inches right of the
4    midline, there is a gunshot wound of entrance.  It is
5    round and measures 0.6 by 0.5 centimeters and it is
6    surrounded by a margin of abrasion measuring 0.1
7    centimeters in width.  The entrance wound is the upper
8    bullet wound in People's Exhibit No. 7.

9    On the left anterior mid abdomen, 29 and a half
10   inches below the top of the head and one-half inch left
11   of the midline gunshot wound No. 3 exited.  The exit
12   wound is oval and rather irregular and measures 1.2 by
13   0.7 centimeters.  It is surrounded with an abrasion which
14   is wider in the lower aspect measuring 0.7 centimeters in
15   width and measuring 0.2 to 0.1 centimeters in width in
16   the other aspects.

17   The exit wound is depicted in People's Exhibit
18   No. 8.

19   Gunshot wound No. 3 entered the abdomen from
20   the right posterior abdominal wall.  It traveled from
21   right to left and posterior anterior.  The right common
22   iliac artery was lacerated and exhibits surgical repair.

23   There are marked hemorrhages around the right
24   kidney.  The mesentery and small intestine were lacerated

Plaintiff Jakes 030985

1    and exhibit surgical repair sites.  The bullet followed a

2    through and through course.

3         Gunshot wound Number 4:  On the posterolateral

4    aspect of the right hip, 31 and a half inches below the

5    top of the head and 5 inches right of the midline there

6    is a gunshot wound of entrance.  It is round and measured

7    1.2 by 0.8 centimeters and it is surrounded with a margin

8    of abrasion measuring 0.1 centimeters in width.  Lateral

9    to the entrance wound there is a large area of

10   ecchymosis.  The entry wound is depicted in People's

11   Exhibit No. 7.

12        The bullet traveled inside the right hip and

13   thigh and posterior anterior.  It is lodged in the

14   anterior upper aspect of the right thigh in the

15   subcutaneous soft tissue.  This area exhibits marked

16   ecchymosis.

17        The bullet is medium size, yellow and fully

18   jacketed and it is not disfigured.  There are marked

19   hemorrhages in the course of the bullet.  People's

20   Exhibit No. 9 is the picture of the bullet that was

21   recovered.

22        External evidence of injury:  On the lateral

23   aspect of the left thigh there is an ecchymotic area.

24        2:  On the anterior aspect of the left knee

117

1  there is an abrasion measuring 1.5 by 0.6 centimeters.

2  Below it on the upper anterior aspect of the left leg

3  there are 3 abrasions measuring 1 to 2 centimeters.

4          It is the opinion that the deceased Rafael

5  Garcia died as a result of multiple gunshot wounds.

6          Dr. Konacki would identify People's Exhibit

7  Numbers 2, 3, 4, 5, 6, 7 and 8, as truly and accurately

8  depicting Rafael Garcia and the injuries he observed when

9  he conducted his post-mortem examination on September

10  17th, 1991.

11          Dr. Konacki would identify People's Exhibit No.

12  9 as truly and accurately depicting the bullet that he

13  recovered from Rafael Garcia.

14          Dr. Konacki would identify People's Exhibit No.

15  10 as the bullet he recovered from the remains of Rafael

16  Garcia and that it is in the same or substantially the

17  same condition now as when he recovered it on September

18  17th, 1991.

19          It is also stipulated that there was a properly

20  maintained chain of custody for People's Exhibit No. 10.

21          So stipulated?

22      MR. KATZ:  So stipulated.

23      MR. MADEA:  (Nodding head.)

24      MR. GOODFRIEND:  Thank you, Judge.

118

Plaintiff Jakes 030987

1      THE COURT:  All right.  We are going to conclude for

2    lunch now, ladies and gentlemen.  I would ask one of the

3    sheriffs to take the Day jury and proceed --

4      Let me explain what we are going to do.  We

5    will go and have lunch as I mentioned over in the

6    facility next door.  When you are done which should be

7    approximately one hour, we will come back and we will

8    proceed again this afternoon.

9      I intend as much as possible to try and avoid

10   taking the one jury to the other Courtroom on the other

11   floor only because of the fact that it takes so much

12   time, so therefore for a few moments, and I will make

13   sure it will be the shortest period of time, one of the

14   jurys may be asked to stand out in the corridor outside

15   the Courtroom the same way you have been going around.

16     Enjoy your lunch.  Remember you can't discuss

17   the case even now or until the conclusion of it.

18     Sheriff, please proceed out the front door with

19   the Day Jury.

20      (Whereupon both jurys were removed

21        from the Courtroom and the following

22        proceedings were had outside the

23        presence of the jurys.)

24     THE COURT:  If the attorneys would approach the

119

Plaintiff Jakes 030988

1    Bench so I don't have to speak loudly.

2                    (Whereupon there were proceedings

3                     had off the record per order of

4                     the Judge in the above-entitled

5                     cause.)

6        THE COURT:   This Court is in recess until 10 minutes

7    to 2:00.

8                    (Whereupon there was a short

9                     recess had for the lunch hour

10                    after which the following

11                    proceedings were had.)

12

13

14

15

16

17

18

19

20

21

22

23

24

120

Plaintiff Jakes 030989

1    THE COURT:  Court's back in session, please remain

2    seated.

3    MR. KATZ:  Your Honor, I have one motion before the

4    jurys come out.

5    THE COURT:  Go ahead.

6    MR. KATZ:  Your Honor, the State indicated they

7    intend to call Detective Pack as to both Defendants.

8    Detective Pack's testimony relates only to the

9    arrest of Mr. Jakes.

10    It's not relevant in any way to the case

11    against Mr. Day and I would object to my jury being

12    present for that testimony.

13    THE COURT:  Okay.  Your objection is noted.  I

14    suggest you object at that time.  I have no idea what he

15    is going to testify to.  Obviously one of the state's

16    theories is accountability here.

17    MR. KATZ:  Not towards Mr. Day it isn't.

18    MR. MADEA:  Judge, just as long as there is some

19    time here, I am going to ask as I indicated yesterday to

20    have defendant Day's statement put in our case.

21    We'd like, we'd like our jury, Jakes jury to

22    hear the State's Attorney publish and testify as to that

23    statement.

24    THE COURT:  We will talk about it in a side bar at

121

Plaintiff Jakes 030990

1    the appropriate time.

2           Bring out the jurys, both, please.

3       THE COURT:   The State and Mr. Day, while we have a

4    moment, perhaps we can discuss the matter that Mr. Madea

5    raised in a sidebar off the record.

6               (Whereupon there were proceedings

7                   had off the record per order of

8                   the Judge in the above-entitled

9                   cause.)

10      THE COURT:   Both Defendants are present personally

11   and by counsel, both jurys have reassembled.

12           Please proceed with your next witness.

13      MR. GOODFRIEND:   We call Richard Fournier.

14                      (Witness sworn.)

15

16

17

18

19

20

21

22

23

24

Plaintiff Jakes 030991

1         RICHARD FOURNIER,

2    called as a witness in the above-entitled cause, having

3    been first duly sworn, was examined and testified as

4    follows:

5

6              DIRECT EXAMINATION

7

8                   BY

9

10                MR. GOODFRIEND:

11        THE COURT:  Please be seated, make yourself

12   comfortable, and once you are comfortable, state your

13   full name.

14        A    Richard J.  Fournier.  F-o-u-r-n-i-e-r.

15        THE COURT:  Proceed, state.

16   BY MR. GOODFRIEND:

17        Q    Mr. Fournier, what's your occupation?

18        A    I am presently employed as a firearms examiner

19   for the Chicago Police Department.

20        Q    How long have you been so employed?

21        A    13 years.

22        Q    What are your duties at the Crime Lab?

23        A    My basic duties are to test for all firearms

24   and all fired evidence recovered by the Chicago Police

123

Plaintiff Jakes 030992

1    Department.

2           Where applicable I will fire tests from suspect

3    firearms and compare those tests against any evidence to

4    determine if a particular piece of evidence was fired in

5    a, a particular firearm.

6       Q    What's your educational background?

7       A    I received a degree in biology from Louis

8    College in 1969.

9           In 1970 and 1971 I attended Roosevelt

10   University where I completed 8 hours of graduate courses

11   in physics.  In 19789 and 1980, I attended the University

12   of Illinois at Circle where I completed 8 hours of

13   graduate credit in criminalistics.

14      Q    What's your experience relative to the field of

15   firearms?

16      A    I studied for approximately 2 years at the

17   Chicago Police Department under recognized experts in the

18   field of firearms identification.

19          During that time I examined many thousands of

20   firearms and many thousands of pieces of evidence.  I

21   fired tests from those firearms and compared those tests

22   against evidence that was submitted in cases.

23          I have attended a number of seminars put on by

24   the Federal government and State of Illinois dealing with

124

Plaintiff Jakes 030993

1       the principals of firearms identification.

2              I have attended a number of armor schools which

3       are schools put on by the major weapons manufacturers

4       where I will attend the school, learn how to build the

5       weapons, tour the factories and see how the weapons are

6       made and at each step in the manufacturing process.

7              I have toured ammunition plants and observed

8       the manufacture of ammunition from the initial stages to

9       the finished product.

10             Some of the armor schools I attended were Smith

11      & Wesson, Remington, Block, Berretta and Colt.  I have

12      attended the FBI Academy on 2 occasions and I completed a

13      course in gunshot distance determination and in other,

14      another course in specialized techniques in firearms

15      identification.

16             In addition to my regular duties, part of my

17      duties at the Crime Lab include being in charge of the

18      firearms reference collection which is a collection of

19      approximately 1500 firearms that is maintained by the

20      Chicago Police Department.

21      Q      Have you published or written any papers in the

22      area?

23      A      Yes, I have published 5 papers, dealing with

24      firearms and firearms identification in the Journal of

125

Plaintiff Jakes 030994

1    Firearms And Tool Marks Examiner's.

2        Q    Do you read any publications to keep abreast of

3    changes that are made in the field?

4        A    Yes, I real all the current publications.

5             Generally those are found in the Journal of

6    Firearms and Tool Box Examiners.

7        Q    Have you testified in Court as an expert in

8    firearms identification?

9        A    Yes.

10       Q    Approximately how many times have you testified

11   as an expert?

12       A    I have been qualified in both State and Federal

13   Court in excess of 100 times.

14       MR. GOODFRIEND:  Judge, at this time I would tender

15   the witness to the defendant.

16       THE COURT:  Either Defendant wish to voir dire the

17   witness?

18       MR. KATZ:  No, Your Honor.

19       MS. BORMANN:  No, Your Honor.

20       THE COURT:  Either of the Defendants wish to be

21   heard as to whether or not the witness is an expert?

22       MS. BORMANN:  No, Your Honor.

23       MR. KATZ:  No, Your Honor.

24       THE COURT:  Ladies and Gentlemen, what we have done

126

Plaintiff Jakes 030995

1     is just gone through a qualification.

2              Ordinarily witnesses are not permitted to give

3     opinions except for those opinions that we all have

4     everyday.  Those kind of opinions witnesses can give.

5              But other that that they can't give opinions.

6              There is a classification of witness, however,

7     called an expert witness, that can give opinions within

8     the scope of their expertise.

9              Detective, excuse me, Mr.Fournier is an expert

10    witness in the field of firearms identification and so is

11    therefore allowed to give opinions within the scope of

12    that expertise.

13             You may proceed.

14        MR. GOODFRIEND:  Thank you, Judge.

15    BY MR. GOODFRIEND:

16        Q    Mr. Fournier, what is the basis of firearms

17    identification?

18        A    The basis for firearms identification is the

19    reproduction of class and individual characteristics from

20    test to test and from test to evidence.

21        Q    Explain please class and individual

22    characteristics?

23        A    During the manufacturing process of a weapon,

24    if you have ever seen on television or looked down the

127

1    barrel of a firearm, you will generally see rifling

2    grooves, you will see revised areas and recessed areas,

3    and it will have a spiral twist either to the left or to

4    the right.

5         The gun or the barrel of a firearm when it's

6    first ever manufactured shorts out to a solid piece of

7    metal.  Tools are passed through first to bore it out to

8    whatever caliber it's designated to be and then next the

9    tools are passed through it to either cut or impress

10   these rifling grooves.  And as the cuts are made they are

11   given a direction of twist either to the left or to the

12   right.

13        The, the finished product could have anywhere

14   from 2 to 20 rifling grooves.

15        Any bullet that is fired down that barrel,

16   because the bullet is made of a material softer than the

17   gun barrel, and because it's pressed very tightly up

18   against that interior surface with that, those rifle

19   grooves, engraved grooves, engraved on, right on the

20   surface of a bullet.

21        So if you recover a bullet after you fire it

22   you can look at the surface that was in contact with the

23   barrel and count the rifling grooves or the number of

24   lands and grooves as a character check.

128

Plaintiff Jakes 030997

1    Each manufacturer produces weapons that have
2    different numbers of lands and grooves, some of them are
3    very unique, some of them very common.

4    Individual characteristics would be those
5    characteristics which will enable me to identify a
6    particular bullet back to the firearm that it was fired
7    from, to the exclusion of all other firearms.

8    These individual characteristics are placed in
9    the weapon at the same time that the rifling grooves and
10   finishing of the barrel are performed.  Those same tools
11   that cut or impress the rifling grooving and bore out and
12   polish the finished product, because the metals that the
13   gun barrel are made out of are made out of an alloy, they
14   are very inconsistent from place to place and hardness
15   and softness.

16   So as the tool passes over these harder and
17   softer areas, in addition to the rifle grooves, they will
18   also leave a series of microscopic scratches and gouges,
19   and when I said a bullet passes down a gun barrel,
20   because it's made of a material softer than the gun
21   barrel and because it's pressed tightly up against that
22   interior, scratches not only with the rifle grooves being
23   engraved, but there is this microscopic scratches and
24   gouges.

1          And because the bullet is traveling as it

2     passes, passes over this, they pass a series of lines or

3     striations.

4          Now these scratches and gouges are placed in

5     the weapon in the -- in completely random fasion by the

6     tool.  No two gun barrels, even consecutively

7     manufactured gun barrels, will have the same striation

8     pattern.

9          So when I fire a test through a weapon, and

10    look at it under a microscope, I see a striation pattern.

11         If I take a piece of evidence and place that on

12    the microscope as well, we have a device called a

13    comparison microscope which allows us to look at 2 pieces

14    of evidence at the same time.

15         I will look for a reapproximation of that

16    striation pattern.  If I see it on the test and I see

17    that same pattern on the evidence all across the surface

18    of the bullet, I can say that this particular bullet was

19    fired from this particular firearm to the exclusion of

20    all other firearms based upon this individual

21    characteristic, the striation patterns.

22         Once again no 2 weapons have the same set of

23    patterns, each weapon is a different pattern.

24         There is another piece of evidence that is

Plaintiff Jakes 030999

1  often found in crime scenes and that is the cartridge

2  case.

3        And a semiautomatic weapon or a rifle, in

4  addition to the bullet being found at the crime scene,

5  often times the cartridge cases will be found as well

6  because when the weapon is fired not only is the bullet

7  fired but the cartridge case is automatically extracted

8  and ejected from the weapon and it's found at the scene.

9        These can be identified back to the gun using a

10  similar process.

11        The part of the weapon that holds the cartridge

12  case, the chamber part of the barrel and then the rear

13  portion of the weapon called the breach face, that is the

14  part that, where the firing pin will come through, when

15  the weapon is fired there is a great deal of pressure

16  produced by the decomposing gun powder.

17        That pressure from the expanding gas from the

18  decomposing gun powder is what is used to propel the

19  bullet out of the barrel, also forces the cartridge case

20  backwards and to the sides with the same amount of force.

21        Any markings or scratches and gouges or any

22  finishing markings or tool markings that are present not

23  only in the gun barrel for the bullet but also on the

24  chamber or, or the breach face of the weapon or the

Plaintiff Jakes 031000

1    firing pin of the weapon will also be engraved right into

2    the cartridge case.

3            Once again the cartridge case is made of a

4    material softer than the gun barrel and it's being

5    slammed up against that breach face and pushed against

6    the chamber with a great deal of force. It will pick up

7    any markings that are there.

8            The tools that shape the breach face of the

9    chamber, the tools that manufacture the firing pin, once

10   again they perform that function to produce a finished

11   product because they are working on an alloyed metal.

12           In addition to that finished product it --

13   there will be a lot of microscopic scratches and gouges

14   present placed in a random fashion by the tool during the

15   manufacturing process.

16           Each cartridge case that is fired from the

17   weapon will have a distinct and unique set of individual

18   characteristics impressed upon it as well as the class

19   characteristics.

20           So if I get a cartridge case and a suspect's

21   weapon I will test fire the weapon and I will recover the

22   test cartridge cases, place those on the microscope, look

23   at the test cartridge case against the evidence cartridge

24   case and if I see that agreement and reapproximation of

132

1   the -- both the class and the individual characteristics,

2   then I can say a particular cartridge case was fired from

3   a particular weapon to the exclusion of all other

4   weapons.

5      Q   Mr. Fournier, if you did not have a weapon,

6   could you take 2 fired bullets to determine whether they

7   were fired from the same gun?

8      A   Yes.  Using exactly the same processes I would

9   take the 2 bullets, place them on the comparison

10   microscope and look for that reproduction of individual

11   characteristics.

12      If I see it, then I can say that the 2 bullets

13   were fired from the same gun even if I never received the

14   gun.

15      I can't say what gun they were fired in, but I

16   can say they were fired from the same gun based upon that

17   reproduction of individual characteristics.

18      And I can do the same with cartridge cases.

19      Q   I am going to direct your attention to a case

20   where the victim was one Rafael Garcia under police RD

21   number PA44A4289.

22      Did you have an opportunity to analyze certain

23   evidence in this case?

24      A   Yes.

133

Plaintiff Jakes 031002

1      MR. GOODFRIEND: Your Honor, I am going to show

2  People's Exhibits 10 and 30 first.

3  BY MR. GOODFRIEND:

4     Q   Mr. Fournier, first I offer --

5      Show you what's been marked for identification

6  as People's Exhibit No. 30. Would you please tell --

7      I am sorry. People's Exhibit No. 10. Would

8  you please tell the ladies and gentlemen of the jury what

9  that envelope is and what's inside the envelope?

10    A   This is a medical examiner's bullet envelope.

11  On the outside of it is the laboratory number 911864

12  which is the number it was, case we assigned to the

13  evidence in this envelope.

14      And inside it is a .380 auto caliber fired

15  bullet with 7 lands and 7 grooves inclined to the right.

16  Okay?

17      That would be the class characteristics of the

18  weapon.

19    Q   And that is the bullets recovered from the

20  victim in this case, is that correct?

21    A   Yes.

22    Q   In fact his name is on the front of the

23  envelope?

24    A   Yes. Rafael Garcia.

134

1  Q Now, you also had People's Exhibit No. 30 to

2 analyze, is that correct?

3  A Yes.

4  Q And that was a bullet recovered from the scene

5 of this offense?

6  A Yes. This bullet on the outside of the

7 envelope number 911847, which is the laboratory number

8 assigned to this bullet and the date I opened it the 2nd

9 of October, 1991.

10    Inside is what I identified as a .380 auto

11 caliber fired bullet and it also has 7 lands and 7

12 grooves inclined to the right.

13  Q Now, did you compare the bullet recovered from

14 the Medical Examiner's Office with the bullet recovered

15 at the scene?

16  A Yes.

17  Q And what did your, what finding did you make

18 based upon your examination?

19  A I placed both, each of the bullets on the

20 comparison microscopes so I look at them both at the same

21 time.

22    I lined them up so that the striation patterns

23 on one bullet lined up with the striation patterns on the

24 other to see if they would, and in fact in this one they

135

Plaintiff Jakes 031004

1    did, the class characteristics are the same.

2            They are both 7 right and the individual

3    characteristics on both what I marked as 911847 and

4    911864, the individual characteristics on them lined up

5    exactly.

6        Q    So it's your opinion that these 2 bullets were

7    fired from the same gun?

8        A    Based upon the reproduction of class and

9    individual characteristics, these 2 bullets were fired

10   from the same weapon to the exclusion of all other

11   weapons.

12           These 2 bullets could have only been fired from

13   one weapon.

14       Q    You never received a weapon in this case, is

15   that correct?

16       A    No.   Never received one.

17       Q    Are you able to determine, based upon your

18   looking at these 2 bullets, what type of gun it came

19   from?   In terms of manufacturer?

20       A    Yes.

21       Q    And what kind type of gun is that?

22       A    Based upon my review of the records, the FBI

23   each year publishes a file of the rifling characteristics

24   of all known manufactured weapons.   There is only one

136

1    weapon that has 7 lands and grooves inclined to the right

2    and is also .380 autocaliber.  That is a Remington Model

3    51 semiautomatic pistol.

4        Q   Now, in, in this case did you also have some

5    cartridge casings to look at?

6        A   Yes.

7        Q   First I am going to show you People's Exhibit

8    No. 29A and B., would you please tell the ladies and

9    gentlemen of the jury what that envelope is and what's

10   inside the envelope?

11       A   It's a evidence envelope.  On the outside I

12   have marked number 911847.  And inside are what I have

13   identified as 2 .380 autocaliber discharge cartridge

14   cases.

15       One, the brass colored one, is of IMI

16   Manufacturing, which is Israeli Military Industries, and

17   the second one has an aluminum bodied case.  This is

18   produced by Cascade Cartridge Company.

19       Q   And where were those 2 cartridge cases

20   recovered from according to the envelope?

21       A   According to the envelope they were recovered

22   from the sidewalk at 1210 West 51st Street.

23       Q   Now, you also have People's Exhibits 31A and

24   31B, is that correct?

Plaintiff Jakes 031006

1     A    Yes.

2     Q    Could you please tell the ladies and gentlemen

3   of the jury what that envelope is and what's contained

4   inside of it?

5     A    An evidence envelope.  Once again the number

6   911847 is written on the outside.  That is the laboratory

7   case number I assigned to this case.

8          And inside are also two .380 autocaliber

9   discharge cartridge cases.

10         Once again the brass one is also of Israeli

11  Military Industries manufacture and the aluminum colored

12  one is of Cascade Cartridge Company manufacture.

13    Q    And based on the writing on the envelope those

14  were covered from the front passenger seat, is that

15  correct?

16    A    Yes.  Also at 1208 West 51st Street from

17  passenger seat of '73 Chevy wagon.

18    Q    Did you compare these 4 cartridge cases to

19  determine if they were fired from the same weapon?

20    A    Yes, I placed each of the 4 on the comparison

21  microscope, 2 at a time, exchanging one and placing

22  another one on there and once again looking for that, the

23  individual characteristics that might be present on the

24  breach face and on the case body of the cartridges.

138

1          And after my examination it was my opinion that
2     all 4 of these cartridge cases were fired from the same
3     weapon.
4          Q    Mr. Fournier, when you received this evidence
5     from the Crime Lab it was in a sealed condition?
6          A    Yes.
7          Q    And in terms of the evidence that I have shown
8     you today, is it in the, substantially in the same
9     condition as it was when you looked at it?
10         A    Yes.
11         MR. GOODFRIEND:   Judge, could I have a minute
12    please?
13         THE COURT:   You may.
14         MR. GOODFRIEND:   Judge, I have no further questions.
15         THE COURT:   Mr. Day may inquire.
16         MR. KATZ:   Thank you, Your Honor.
17
18                    CROSS EXAMINATION
19
20                    BY
21
22                    MR. KATZ:
23         Q    Mr. Fournier, over your last 13 years of
24    working as a firearms expert have you had prior occasions

139

1    to see cartridges or bullets from .380 automatics?

2        A    Yes, sir.

3        Q    Can you tell us about how many times you have

4    seen these, that particular caliber?

5        A    Just .380 caliber?  Thousands of times.

6        Q    What about in the last year, how many times

7    have you seen 380s?  380s?

8        A    Thousands.  That is a very common caliber.

9        Q    This is not a rare type of caliber, rare type

10    of gun, the Remington that you said it came from?

11        A    Well, do you mean in terms of rifling

12    characteristics?

13        Q    No, in terms of just that particular type of

14    weapon or caliber?

15        A   The caliber is very common, yes.

16        Q    It's very common.  There is a lot of those out

17    in the street and you have seen those all here in

18    Chicago, is that correct?

19        A    Yes, sir.

20        MR. KATZ:  I have nothing further.

21        THE COURT:  Mr. Jakes may inquire.

22        MS. BORMANN:  Judge, we had just simply ask to adopt

23    Mr. Katz' cross-examination?

24        THE COURT:  All right.  Redirect?

Plaintiff Jakes 031009

1      MR. GOODFRIEND:  No, Your Honor.

2      THE COURT:  Thank you, sir, you may step down.

3                              (Witness excused.)

4      THE COURT:  Call your next witness.

5      MR. KATZ:  Your Honor, I believe at this time Mr.

6   Day's jury should be excused.

7      THE COURT:  Who's the next witness?

8      MR. GOODFRIEND:  Yes, Judge, it will be a witness

9   for Defendant Jakes.

10     THE COURT:  All right.

11         Ladies and Gentlemen, during the course of

12   trial as I mentioned to you earlier, there may be times

13   when evidence will be admissible against one defendant

14   and not against another.  That is a determination the

15   Court has to make.

16         The jurys are, both jurys are instructed not to

17   speculate or draw any inferences from that, but that will

18   occur so that the jury for Mr. Day will now be taken in

19   the back just to relax.  I suspect it will probably be at

20   least a half hour.  You can't discuss the evidence.

21         Just please retire out through the front door.

22   I guess there is no reason you can't go through this door

23   now.  All right.

24         Follow the sheriff and we will see you a little

Plaintiff Jakes 031010

1    later.

2              (Defendant Day Jury removed.)

3         THE COURT:  All right.  The record should reflect

4    that the jury for Mr. Jakes and counsel for Mr. Jakes are

5    present.

6              The other jury is back in the jury room.

7    please call your --

8         MR. GOODFRIEND:  Officer Pack.

9                             (Witness sworn.)

10                   OFFICER THOMAS PACK,

11   called as a witness in the above-entitled cause, having

12   been first duly sworn, was examined and testified as

13   follows:

14

15                   DIRECT EXAMINATION

16

17                   BY

18

19              MR. GOODFRIEND:

20        THE COURT:  Make yourself comfortable.  Once you are

21   comfortable, state your full name?

22        A     Name is Thomas Pack.  That is P-a-c-k, Star

23   2877.  Assigned to the 9th District Tactical unit.

24   Chicago Police Department.

142

Plaintiff Jakes 031011

BY MR. GOODFRIEND:

    Q    Officer Pack, how long have you been a Chicago Police Officer?

    A    22 years.

    Q    How long have you been assigned to the 9th District Tactical office?

    A    13 years.

    Q    I am going to direct your attention to September 16th, 1991. Were you working?

    A    Yes, sir, I was.

    Q    What hours were you working on that date?

    A    From 9:00 o'clock in the morning until 5:30 at night.

    Q    What unit were you assigned to?

    A    962 David which is a Tactical plainclothes car.

    Q    Were you working with a partner?

    A    Yes, sir, I was.

    Q    And what was name of your partner?

    A    Officer Michael Delaski.

    Q    When you came on duty that date did you learn of the homicide investigation of one Rafael Garcia?

    A    Yes, sir, I did.

    Q    And I am going to direct your attention to approximately noon on that date.

Plaintiff Jakes 031012

1          Did you or your partner receive a phone call?

2     A    Yes, sir, we did.

3     Q    And who was that phone call from?

4     A    Anonymous female.  She didn't want to give her

5     name but it was a female on the phone.

6     Q    Do you remember who it was that talked to that

7     female?

8     A    I believe it was myself.

9     Q    After you spoke with that individual, did you

10    go looking for anyone in regards to this investigation?

11    A    Yes, sir, I did.

12    Q    Who did you go looking for?

13    A    A subject known as Anthony Jakes.

14    Q    Where did you go looking for Anthony Jakes?

15    A    At 1212 West 51st Street in the rear house.

16    Q    Approximately what time was it that you arrived

17    at that rear house?

18    A    About 12:30 that afternoon, p.m.

19    Q    Who did you go there with?

20    A    Myself, Officer Delaski.

21         When I arrived on the scene we met an Officer

22    Posey, an Officer Patterson.

23    Q    Would you please describe that rear house to

24    the ladies and gentlemen of the jury?

149

1   A It's a, it's in back of a brick two-flat.  The

2 building is raised up approximately 3 to 4 feet.

3     To get to the front door you have to go up a

4 series of steps and then turn to your right, I believe.

5 It's where the front door is at.  It's not ground level.

6 It's up one level.

7   Q Did you go to the front door or back door?

8   A I went to the front door of the rear house.

9   Q And did you knock on the door?

10   A Yes, I did.

11   Q Who was with you at the time you knocked on the

12 door?

13   A My partner, Officer Delaski, Officer Patterson

14 and Officer Posey.

15   Q Did anyone answer the door?

16   A A female black answered the door, yes.

17   Q Did you later learn her identity?

18   A Yes.

19   Q And what was her name?

20   A Jessie Mae Jones, that she told me that she

21 resided at that address and was the guardian of Anthony

22 Jakes.

23   Q Did you have a conversation with her after she

24 opened the door?

Plaintiff Jakes 031014

1  A Yes, I did.

2  Q Did you identify yourself to her?

3  A I identified myself and I explained to her the

4 reason that I was there.

5  Q What did you tell Mrs. Jones the reason that

6 you were there?

7  A I told Mrs. Jones that we had received

8 information on Anthony Jakes, could be helpful in

9 homicide investigation from later that early morning

10 hours out in front of her place due to the fact that he

11 lived in the neighborhood and that he knew most of the

12 kids in that area by nicknames.

13  Q What happened after you made that request?

14  A She said that I could take him into the area.

15  She invited me in, I went into a kitchen area,

16 at that time she called upstairs to the second floor,

17 where Mr. Jakes was at.

18  Q Did he, did Anthony Jakes come down from the

19 second floor?

20  A After she called him down he came down. He

21 came approximately half way down the staircase.

22  Q Do you see him in Court today?

23  A Yes, sir, I do.

24  Q Could you please point to him and describe what

146

1    he is wearing?

2        A   He is sitting at the counsel table between the

3    counsels wearing a long sleeve, I believe it's a white

4    shirt, from here.  No hat.

5        THE COURT:  Has your client been identified?

6        MR. MADEA:  Yes, Your Honor.

7        THE COURT:  Okay.

8    BY MR. GOODFRIEND:

9        Q   What happened after the defendant came half way

10   down the stairs?

11       A   Miss Jones explained to him that he was going

12   to go with myself and my partner, and that for him to get

13   dressed.

14        At that time he came down he was only wearing

15   shorts and I believe it was a tee shirt.  He wasn't

16   dressed to go outside.

17       Q   Did the defendant get dressed to go with you?

18       A   Yes, he did.

19       Q   Before you left with the defendant, did you

20   have any further conversations with his aunt?

21       A   Yes, I did.  I told Mrs. Jones that I wouldn't

22   be taking him to the 9th District, that I would be taking

23   him to Area 3 Violent Crimes which is -- at that time was

24   located at 39th and California.

Plaintiff Jakes 031016

1       I gave her my business card and I believe I

2   wrote the phone number of Area 3 Violent Crimes to where

3   I was taking him on the back of it.

4       Q      What happened after you gave his aunt your

5   card?

6       A      We left that location.

7       Q      Where did you go next?

8       A      To the 3rd floor of 39th and California which

9   is the headquarters of Area 3 Violent Crimes.

10      Q      Once you arrived at the 3rd floor did you

11  inform the Sergeant at Area 3 Violent Crimes that Anthony

12  Jakes was there?

13      A      Yes, I did.

14      Q      Were any of the Detectives who were working on

15  the case present at the police station at that time?

16      A      They weren't in the station.

17          He told me that he would have to call them from

18  on the street.  Call them in, and to place Mr. Jakes in

19  an interview room.

20      MR. GOODFRIEND:  Judge, I have no further questions.

21      THE COURT:  You may inquire.

22      MR. MADEA:  Thank you, Your Honor.

23

24

Plaintiff Jakes 031017

1                          CROSS EXAMINATION

2

3                               BY

4

5                          MR. MADEA:

6        Q    It's Officer Pack, isn't that right?

7        A    That is correct.

8        Q    Officer Pack, when you went to -- strike that.

9             You indicated that you received a phone call

10   from some female, correct?

11       A    That is correct.

12       Q    That was you personally?

13       A    Yes, sir, it was.

14       Q    And do you remember what time that was?

15       A    Around noon of the 16th.

16       Q    And did you have to ask permission or get

17   orders to go and pick up Anthony Jakes?

18       A    No, sir, I did not.

19       Q    So you got your partner and you notified 2

20   other Officers to meet you over there?

21       A    I didn't notify them.  It just happened that

22   when I pulled up in front of 1212 West 51st, they were

23   there.  They were up on another assignment.

24       Q    Were they tac team, too?

149

Plaintiff Jakes 031018

1      A      Yes, sir, they were.

2      Q      So that, just for the members of jury, a tac

3    team are plainclothes police officers that drive a plain,

4    unmarked squadcar?

5      A      That is correct.

6      Q      All right.  And when you arrived you said you

7    went to 1212 West 51st Street, correct?

8      A      That is correct.

9      Q      And you said that Mr. Jakes lived in the rear

10   house, isn't that right?

11     A      Correct.

12     Q      Is there a house on the front of the lot and a

13   separate house on the back of the lot?

14     A      Yes.  There is.

15     Q      Okay.  And if you recall were the -- strike

16   that.

17            How far was that rear house from where the

18   homicide of Rafael Garcia occurred?

19     A      In distance from the rear house where I went

20   to?

21     Q      In houses or --

22     A      Well, it was a couple of houses to the West and

23   then three quarters of the way back in the lot.

24     Q      Okay.  And you told the ladies and gentlemen of

Plaintiff Jakes 031019

1    the jury that you spoke with Mr. Jakes' guardian, right?

2        A    Yes, I did.

3        Q    And you told her that you wanted him to come

4    down to the police station to assist in the investigation

5    of this homicide, is that correct?

6        A    That's right.

7        Q    And one of the reasons was because Mr. Jakes

8    knew most of the kids by their nicknames in the

9    neighborhood, right?

10       A    That is true.

11       Q    And she called down to Anthony Jakes and he

12   came down, isn't that right?

13       A    Right.  He came down from the second floor.

14       Q    Now, you said you arrived there about 12:30 on

15   the 16th of September, 1991, isn't that right?

16       A    Right.

17       Q    All right.  And you said Mr. Jakes was allowed

18   to go by his guardian, his aunt, right?

19       A    Right.  She gave her permission because due to

20   the fact that he is a juvenile to where I was taking him,

21   she okayed it.

22       Q    And you left her with a card that he would be

23   at Area 3 homicide, right?

24       A    That is true.

151

1      Q    And at that time Area 3 homicide was on 39th

2   and California, right?

3      A    Yes, sir.

4      Q    Do you remember about how long it took to you

5   get from Mr. Jakes' home to 39th and California?

6      A    I don't.

7      Q    You would have been there about 1:00 o'clock,

8   is that probably right?

9      A    Probably a little before, maybe.  Right around

10  there.

11     Q    Little before?  Okay.

12          MR. MADEA:  Nothing further.

13          THE COURT:  Redirect?

14          MR. GOODFRIEND:  No redirect.

15          THE COURT:  You may step down.

16                              (Witness excused.)

17          THE COURT:  Am I to understand that you have a

18  witness that will relate only to Mr. Jakes?

19          MR. GOODFRIEND:  Yes, sir, if you proceed to call

20  that witness.

21          THE COURT:  Okay.

22          MR. GOODFRIEND:  Gus Robinson.

23                              (Witness sworn.)

24

152

Plaintiff Jakes 031021

1                 GUS ROBINSON,

2 called as a witness in the above-entitled cause, having

3 been first duly sworn, was examined and testified as

4 follows:

5

6               DIRECT EXAMINATION

7

8                   BY

9

10              MR. GOODFRIEND:

11     THE COURT: Please be seated, make yourself

12 comfortable. Once you are comfortable state your full

13 name.

14       A    Gus Robinson.

15     THE COURT: How do you spell --

16       A    R-o-b-i-n-s-o-n.

17     THE COURT: Proceed.

18 BY MR. GOODFRIEND:

19       Q    Mr. Robinson, how old are you?

20       A    21.

21       Q    What's the City you live in?

22       A    Chicago.

23       Q    Who do you live with?

24       A    My mother.

Plaintiff Jakes 031022

1    Q    Do you have a nickname?

2    A    Yes.

3    Q    What's your nickname?

4    A    Snake.

5    Q    Back in 1990, Mr. Robinson, were you convicted

6    of the offense of Aggravated Assault?

7    A    Yes.

8    Q    What sentence did you receive?

9    A    A year and a half probation.

10   Q    Were you also sentenced to 6 months in the

11   County Jail?

12   A    Yes, sir.

13   Q    In 1992, were you convicted of the offense of

14   Possession of a Stolen Motor Vehicle?

15   A    Yes.

16   Q    Were you again sentenced to probation?

17   A    Yes.

18   Q    How long is your probation period this time?

19   A    3 years probation and 6 months home

20   confinement.

21   Q    I am going to direct your attention to

22   September of 1991. Where were you living at that time?

23   A    1449 West 52nd Street.

24   Q    Who were you living with?

Plaintiff Jakes 031023

```
 1        A     My mother.

 2        Q     Were you working?

 3        A     Yes.

 4        Q     Where were you working at?

 5        A     For the Chicago Park District.

 6        Q     What type of job did you have with the Chicago

 7   Park District?

 8        A     Landscaping.

 9        Q     Back in September of 1991, did you know an

10   individual by the name of Anthony Jakes?

11        A     Yes.

12        Q     What name did you known him by?

13        A     Shaun.

14        Q     How long had you known --

15        THE COURT:   I am sorry, what name?

16        A     Shaun.

17        THE COURT:   Shaun?

18        A     Yes.

19        THE COURT:   Do you know how to spell that?

20        A     S-h-a-u-n.

21        THE COURT:   Okay.

22   BY MR. GOODFRIEND:

23        Q     How long have you known Shaun?

24        A     About 6 months.
```

155

Plaintiff Jakes 031024

1     Q    Where did you see Anthony Jakes or Shaun at?

2  Where would you see him at?

3     A    Around the neighborhood.

4     Q    What neighborhood was that?

5     A    About 51st and Racine.

6     Q    How often would you see him around 51st and

7  Racine?

8     A    Maybe once or twice a week.

9     Q    Do you see him in Court today?

10     A    Yes, sir.

11     Q    Could you please point to him and describe what

12  he is wearing?

13     A    He is wearing a white shirt, sitting over

14  there.

15    MR. GOODFRIEND:  Judge, could the record reflect the

16  in-Court identification of the defendant, Anthony Jakes?

17    THE COURT:  Counsel agree?

18    MR. MADEA:  Yes.

19  BY MR. GOODFRIEND:

20     Q    Back in September of 1991, did you know a guy

21  by the name of Little A?

22     A    Yes.

23     Q    Where did you know him from?  What area of the

24  City?

156

1    A    51st.

2    Q    How many times had you seen him?

3    A    Maybe once or twice.

4    Q    I am going to direct your attention to

5    September 15, 1991, at about 6:00 o'clock in the evening.

6         Do you recall where you were at?

7    A    Yes.

8    Q    Where were you at?

9    A    In Sherman Park.

10   Q    Where is Sherman Park located?

11   A    On 52nd and Racine.

12   Q    Who were you with?  Strike that.

13        How you did you get to Sherman Park?

14   A    In my car.

15   Q    What kind of car did you have at that time?

16   A    Malibu station wagon.

17   Q    Who did you go to the park with?

18   A    My daughter.

19   Q    And what was your, what's your daughter's name?

20   A    Yolanda.

21   Q    How old was she back in September of 1991?

22   A    2.

23   Q    What kind of car was it that you drove there?

24   A    A Malibu station wagon.

Plaintiff Jakes 031026

1    Q    Were you still in the park at about 11:45?

2    A    Yes.

3    Q    At approximately 11:45 did you leave the park?

4    A    Yes.

5    Q    Who did you leave the park with?

6    A    My daughter.

7    Q    When you left the park, did you leave on foot

8    or in a automobile?

9    A    In my car.

10   Q    Where did you drive your car to?

11   A    To 51st and Racine.

12   Q    When you got to 51st and Racine, what did you

13   do with your car?

14   A    I parked it in the parking lot of Oliver's

15   Chicken Shack.

16   Q    Is that right at the corner of 51st and Racine?

17   A    Yes.

18   Q    When you parked the car in the lot what was the

19   next thing that you did?

20   A    I used the phone.

21   Q    Why were you using the phone?

22   A    Because somebody paged me.

23   Q    Where is the phone located?

24   A    On the corner of 51st and Racine.

158

Plaintiff Jakes 031027

1      Q    While you were on the phone did anyone come up

2  to you?

3      A    Yes.

4      Q    Who came up to you?

5      A    Shaun.

6      Q    The defendant?

7      A    Yes.

8      Q    Did you have a conversation or did he speak to

9  you?

10     A    Yes.

11     Q    Was there anybody else present when he spoke to

12  you?

13     A    No.

14     Q    What did the defendant say to you while you

15  were on the phone?

16     A    He asked me would I stand point with him and

17  watch out for the police while Little A and them was

18  robbing this white guy.

19     Q    What is stand point?

20     A    Watch out for the police.

21     Q    He said he was going to do what?

22     A    Stand point.

23     Q    I didn't hear you?

24     A    He asked me to stand point with him.

159

Plaintiff Jakes 031028

1    Q    What was the defendant going to do?

2    A    They was going to rob a white guy.

3    Q    Who was going to rob the white guy?

4    A    He said Little A and some other guys.

5    Q    What did you do after the defendant asked you

6  to stand point with him?

7    A    I walked to the window of the restaurant and I

8  looked in and I seen the white guy standing at the

9  counter.

10    Q    What restaurant was it that you walked up to?

11    A    The Submarine Shop on 51st.

12    Q    Did anyone walk up to the window with you?

13    A    Yes.

14    Q    Who walked up to the window with you?

15    A    Shaun.

16    Q    The defendant?

17    A    Yes.

18    Q    Where was the white guy within the restaurant

19  or the store?

20    A    Standing at the counter.

21    Q    What did you do after you observed him inside

22  the store?

23    A    I turned around and told him I wasn't with it

24  and I left.

Plaintiff Jakes 031029

1     Q    Who did you tell you wasn't with it?

2     A    Shaun.

3     Q    The defendant?

4     A    Yes.

5     Q    What did you do after you told the defendant

6  that you weren't with him?

7     A    I got in my car and I drove around to Elizabeth

8  Street. 50th and Elizabeth.

9     Q    Where did you go after you went to 50th and

10  Elizabeth?

11     A    I was standing outside talking to a few

12  friends.

13     Q    Did you hear anything when were you at 50th and

14  Elizabeth?

15     A    Not at that moment.

16     Q    Did you hear anything a few moments later?

17     A    Yes.

18     Q    What did you hear?

19     A    Some shots.

20     Q    Where were they coming from?

21     A    Sounded like off 51st.

22     Q    I am going to direct your attention to the

23  evening of September 16th, 1991.

24         Did you see the police that evening?

Plaintiff Jakes 031030

1      A      Yes.

2      Q      Did you go anywhere with the police?

3      A      Yes.

4      Q      Where did you go?

5      A      39th and California.

6      Q      Once you got to 39th and California, did you

7      speak with the police regarding the events of the night

8      before?

9      A      Yes.

10     Q      Did you also talk with a State's Attorney?

11     A      Yes.

12     Q      On the following day did you testify before a

13     Grand Jury regarding this matter?

14     A      Yes.

15     Q      Mr. Robinson, I am going to show you what's

16     been marked for identification as People's Exhibit Number

17     2.

18            The person that you see in this photo, did you

19     see him on the evening of September 16th, 19 -- or the

20     evening of September 15, 1991?

21     A      Yes.

22     Q      Where did you see him at?

23     A      In the Submarine Shop at the counter.

24     Q      Is that the person that you saw when you went

162

1    to the window?

2        A    Yes.

3        Q    I am show you what's been marked for

4    identification as People's Exhibit No. 34.

5            Do you recognize what's in that photo?

6        A    Yes.

7        Q    What's in that photo?

8        A    The Submarine Shop, paper stand, the telephone

9    on the corner.

10       Q    Is that, in that picture did you see the

11   telephone you were at when the defendant approached you?

12       A    Yes.

13       Q    Ask you to circle that with this pen.

14           Show you People's Exhibit No. 36.  Is that a

15   picture of the same intersection?

16       A    Yes.

17       Q    And do you see the phone in that picture as

18   well?

19       A    Yes.

20       Q    Would you please circle that, please?

21           How far did you park your car from where the

22   phone was?

23       A    Almost right up on it.

24       Q    Within several feet?

Plaintiff Jakes 031032

1      A    Yes.

2      Q    And also going to show you People's Exhibit 35.

3  What's in that picture?

4      A    The telephone and Oliver's.

5      Q    And Oliver's at that time was a restaurant or

6  chicken store?

7      A    Yes.

8      Q    Was it open at the time?

9      A    Yes.

10     Q    And once again circle the phone in that

11  picture?

12          These pictures truly and accurately portray the

13  intersection of 51st and Racine as it was back in

14  September, is that correct?

15     A _ Yes.

16    MR. GOODFRIEND:  Judge, may the witness leave the

17  stand to use the chart?

18    THE COURT:  Sure.

19         You may step down, sir.

20         Again, counsel, feel free to move wherever you

21  wish.

22  BY MR. GOODFRIEND:

23     Q    Mr. Robinson, please stand to that side for a

24  second.  Do you recognize what's shown in People's

Plaintiff Jakes 031033

1      Exhibit No. 12?

2          A     Yes.

3          Q     And that is -- what is that?

4          A     That is 51st and Racine.

5          Q     Okay.  Now I am going to ask you to put your

6      initials at where you were on the phone when you made the

7      call and when the defendant approached you?

8                Okay.  And now you said you looked through a

9      window at Queen's Submarine, is that correct?

10         A     Yes.

11         Q     Okay.  Draw an arrow where the window was that

12     you looked through.

13               Okay.  You can resume the stand.

14               Once again I am going to show you what's been

15     marked for identification as People's Exhibit No. 36.

16     Now in People's Exhibit No. 36, is there a news stand?

17         A     Yes.

18         Q     Okay.  And what's behind the news stand?

19         A     The window.

20         Q     That is the window that you looked at?

21         A     Yes.

22         Q     Looked through?

23         A     Yes.

24         Q     And you cannot see the window in that picture,

Plaintiff Jakes 031034

1    is that correct?

2         A    That is correct.

3         Q    The window is located right behind the news

4    stand?

5         A    Yes.

6         MR. GOODFRIEND:  Excuse me one second, Judge.

7             Judge, I have no further questions.

8         THE COURT:  You may inquire.

9         MR. MADEA:  Thank you.

10

11                   CROSS EXAMINATION

12

13                   BY

14

15                   MR. MADEA:

16        Q    Mr. Robinson, you testified that you have a

17   nickname of Snake, right?

18        A    Yes.

19        Q    And you testified that in September of 1991,

20   you were living, well, where were you living?

21        A    1449 West 52nd Street.

22        Q    And how far is that from 51st and Racine?

23        A    About 6 blocks.

24        Q    Okay.  And I believe you testified that you

Plaintiff Jakes 031035

1    worked at Sherman Park, right?

2        A    Yes.

3        Q    And you said that you went to Sherman Park on

4    the 16th of September, with your daughter, correct?

5        A    Yes.

6        Q    And she is, she was 18 months old at the time?

7        A    Yes.

8        Q    And what time did you get to the park?

9        A    I'd say about 6:00 that night.

10       Q    6:00 p.m.?

11       A    Yes.

12       Q    And were you consuming any alcoholic beverages

13   that night?

14       A    No.

15       Q    How about any narcotics?

16       A    No.

17       Q    Playing on the swings with your daughter?

18       A    Yes.

19       Q    From 6:00 a.m. to 11:45, right?

20       A    Yes.

21       MR. GOODFRIEND:   Objection.

22       THE COURT:   6:00 a.m.

23   BY MR. MADEA:

24       Q    I am sorry, 6:00 p.m. to 11:45, is that

1    correct?

2         A    Yes.

3         Q    Now, you said that you knew Anthony Jakes as

4    Shaun, right?

5         A    Yes.

6         Q    And you knew him from the neighborhood, right?

7         A    Yes.

8         Q    Did you hang around with Anthony Jakes?

9         A    No.  I shot ball with him a few times.  That

10   was about it.

11        Q    Played basketball with him?

12        A    Yes.

13        Q    You didn't go out with his sister, did you?

14        A    With his sister?

15        Q    Yes?

16        A    No, sir.

17        Q    Never?

18        A    (Nodding head.)

19        Q    Is that a no?

20        A    Yes, sir.

21        Q    And you said you knew Little A, right?

22        A    Yes.

23        Q    And what's is Little A's name?

24        A    Arnold Day.

168

Plaintiff Jakes 031037

1      Q      Arnold Day.

2             Now, I believe you testified on September 17th

3      that you were at Area 3, correct?

4      A      Yes.

5             MR. GOODFRIEND:  Objection, Judge.  That wasn't his

6      testimony.  Wrong date.

7      BY MR. MADEA:

8      Q      September 16th you were at Area 3?

9      A      Yes.

10     Q      What time did you get there?

11     A      I don't remember.

12     Q      Well, was it in the morning?

13     A      No.  It was at night.

14     Q      In the afternoon or in the night?

15     A      In the night.

16     Q      And how did you get to Area 3?

17     A      The police took me there.

18     Q      Do you remember which police officers?

19     A      Officer Boudreau and Officer Kill.

20     Q      Okay, they are Detectives, correct?

21     A      Yes.

22     Q      Did you go down there voluntarily?

23     A      Yes.

24     Q      When you went down to the police station with

Plaintiff Jakes 031038

1    Detective Kill and Detective Boudreau, did they tell you

2    you were going to be a witness?

3        A    No.

4        Q    Pardon me?

5        A    No.

6        Q    They wanted to know what you knew about the

7    homicide that occurred on 51st and Racine, right?

8        A    Right.

9        Q    Okay.  Now, did you tell them about Anthony

10   Jakes?

11       A    Yes.

12       Q    When they asked you?

13       A    Yes.

14       Q    Now, you spent sometime at the police station

15   that evening, right?

16       A    Yes.

17       Q    Do you recall about how many hours you stayed

18   down there?

19       A    About 8.

20       Q    About 8 hours?

21       A    Yes.

22       Q    And you eventually made a written statement

23   with the State's Attorney, right?

24       A    Yes.

Plaintiff Jakes 031039

```
 1        Q     And Detective Kill, right?

 2        A     Yes.

 3        Q     Okay.  You spent a lot of time with Detective

 4   Kill that day, right?

 5        A     Yes.

 6        Q     Could you tell the ladies and gentlemen of the

 7   jury about how much time you spent with Detective Kill?

 8        A     About 8 hours in the station.

 9        Q     And he wasn't with you the entire time, was he?

10        A     No.

11        Q     About how much of those 8 hours was he there?

12        A     I'd say he spent about 20 minutes, you know.

13        Q     20 minutes out of those 8 hours?

14        A     Yes.  Questioning me.

15        Q     Questioning you?

16        A     Yes.

17        Q     And then he was present when the State's

18   Attorney questioned you, right?

19        A     Yes.

20        Q     And that statement was handwritten, right?

21        A     Yes.

22        Q     By the State's Attorney, right?

23        A     Yes.

24        Q     And were you allowed to read it?
```

1     A    Yes.

2     Q    And you signed it, right?

3     A    Yes.

4     Q    And it was true facts that or it was a true

5 statement of the facts which you say happened on

6 September 15 at 1206 West 51st Street about 11:55 p.m.,

7 right?

8     A    Yes.  Yes.

9     Q    And in fact you signed that, right?

10    A    Yes.

11    Q    And then you testified before the Grand Jury

12 just as to those facts, right?

13    A    Yes.

14    Q    Or as to those facts, correct?

15    A    Yes.

16    Q    And you were under oath as to testify to those

17 facts, right?

18    A    Yes.

19    Q    Have you seen your written statement today?

20    A    No.

21    MR. MADEA:  May I approach, Your Honor?

22    THE COURT:  Of course.

23    MR. MADEA:  I will mark this as Defendant's Jakes

24 Exhibit 1 for identification, if I might.

172

Plaintiff Jakes 031041

BY MR. MADEA:

Q    Take a look at that?

A    Yes, I know what it is.

Q    You remember that statement?

A    Yes.

Q    Does it contain in that statement anywhere the fact that you and Anthony Jakes walked up to the window of the Submarine Shop and looked in there?

A    Yes.

Q    It is?  Would you mind showing me?

A    No, it's not in this statement.

Q    It's not in that statement.

Did you ever tell Detective Kill or Detective Boudreau that you walked up to that window with Anthony Jakes and looked at the white dude?

A    No, I said I did.

Q    You said you did?

A    Yes, sir.

Q    Okay.  This statement doesn't say that you did that though, either, does it?

MR. GOODFRIEND:  Objection, asked and answered.

THE COURT:  Sustained.

BY MR. MADEA:

Q    Now, you said on the 15th --

173

Plaintiff Jakes 031042

1          I am sorry, you said on the 15th of September,

2    1991, that Anthony Jakes came up to you around 51st and

3    Racine, right?

4          A     Yes.

5          Q     And you were on the telephone, right?

6          A     Yes.

7          Q     And he said something about Little A is fixing

8    to rob somebody and he wanted you to stand point with

9    him, isn't that right?

10         A     Yes.

11         Q     And your testimony was that then you walked

12   over to look in the window to see the white guy, right?

13         A     Yes.

14         Q     And you then, you told him you weren't going to

15   do that, right?

16         A     Right.

17         Q     You got in your car and you went home or you

18   went down to Elizabeth, right?

19         A     Yes.

20         Q     That is a few blocks away from Racine?

21         A     The next block.

22         Q     And you said you heard gunshots, right?

23         A     Yes.

24         Q     When you left, you don't know what Anthony

1    Jakes did, do you?

2        A   No.

3        Q   Now, the other day -- strike that.

4          The State has promised you that they would not

5    proceed with the contempt case against you if you

6    testified here today, correct?

7        A   Correct.

8        MR. MADEA:  If I may have a moment, Your Honor?

9        THE COURT:  Sure.

10   BY MR. MADEA:

11        Q   Now, when the State indicated that to you, it

12   was after you'd been arrested for contempt, right?

13        A   Yes.

14        Q   And that was because you didn't come to Court

15   pursuant to a subpoena in this case, right?

16        A   Yes.

17        Q   And Detective Kill brought you down here,

18   right?

19        A   Yes.

20        Q   And you spent a lot of time with him yesterday,

21   didn't you?

22        A   Yes.

23        MR. MADEA:  Nothing further.

24        THE COURT:  Redirect?

175

1    Q      Verbatim.

2    A      Verbatim.

3           Gus Robinson stated that he is also known as

4    Snake.  Gus has known, known Jakes for about 6 months,

5    just stated that on September 15, 1991, at about 11:50 he

6    was approached by Anthony Jakes in the parking lot of

7    Queen's Sub Shop and Harold's Chicken, just had, just

8    pulled up to the parking lot and was using the phone when

9    Jakes came up to Gus and Anthony Jakes told Gus that

10   there was this white dude in the Submarine Shop and that

11   Little A and his homies were scoping his money.

12          Jakes, Little A and Little A's homies were

13   fixing to rob the white dude in the Submarine Shop.

14          Jakes asked Gus if Gus wanted to stand point

15   with him while they were fixing to rob, while they was

16   fixing to come out.  Gus took this to mean that Jakes

17   wanted Gus to be a look out with him during the robbery.

18          Gus said no and Gus left the parking lot, Gus

19   drove home with his 18 month old daughter, Yolanda.

20          Gus drove around the block on Elizabeth and

21   went up to Throop.  Gus was telling his homies that he

22   was fixing to go home.  Gus then heard about 3 gunshots

23   from the area near the Submarine Shop.  Gus then drove

24   directly home.

Plaintiff Jakes 031045

1          Gus Robinson stated that he has been treated

2     well by the police and the Assistant State's Attorney.

3          Gus was not promised anything in return for his

4     statement, nor was he threatened in any way.

5          Q    That is your signatures on the bottom of that

6     page one and page 2, is that correct?

7          A    Yes.  It is.

8          MR. GOODFRIEND:  Judge, I have no further --

9          THE COURT:  For the record People, the Court would

10    cite People versus Powell, 53 Il 2d 465, 4 Jones on

11    Evidence, Section 960, and 801d1b of the Federal Rules of

12    Evidence.

13          You may inquire.

14          MR. MADEA:  Thank you.

15          ...

16               RECROSS EXAMINATION

17

18               BY

19

20               MR. MADEA:

21          Q    Mr. Robinson, Mr. Goodfriend just asked you if

22    you knew a warrant existed for your arrest on the day

23    before yesterday, right?

24          A    Yes.

180

Plaintiff Jakes 031046

1       Q    All right.  How did you know that there was a

2  warrant?

3       A    I didn't, until the police came to my new

4  address.

5       Q    That would be Detective Kill?

6       A    Boudreau.

7       Q    Okay.  Now what time was that statement which

8  you just read given to the, to Mr. Grossman?

9       A    I don't know.

10      Q    Well, if I told you it would be 3:58 in the

11  morning on September 17th, would that be about correct?

12      A    Yes.  It would be.

13      Q    And did you get to go home after you gave that

14  statement?

15      A    No, I went to the Grand Jury the next day.

16      Q    So you spent the night in the police station?

17      A    Yes.

18      Q    And did they, were you handcuffed at all or

19  anything like that?

20      A    Yes.

21      Q    Yes?

22      A    Yes.

23      Q    And when the statement, when you read the

24  statement and indicated that you weren't promised or

181

Plaintiff Jakes 031047

1      Q    All right.  How did you know that there was a

2  warrant?

3      A    I didn't, until the police came to my new

4  address.

5      Q    That would be Detective Kill?

6      A    Boudreau.

7      Q    Okay.  Now what time was that statement which

8  you just read given to the, to Mr. Grossman?

9      A    I don't know.

10     Q    Well, if I told you it would be 3:58 in the

11  morning on September 17th, would that be about correct?

12     A    Yes.  It would be.

13     Q    And did you get to go home after you gave that

14  statement?

15     A    No, I went to the Grand Jury the next day.

16     Q    So you spent the night in the police station?

17     A    Yes.

18     Q    And did they, were you handcuffed at all or

19  anything like that?

20     A    Yes.

21     Q    Yes?

22     A    Yes.

23     Q    And when the statement, when you read the

24  statement and indicated that you weren't promised or

|81|

1    threatened anything by the police and treated well by the

2    police, was that correct?

3        A    Yes.

4        Q    All right.  They treated well?

5             When they brought you down to the police

6    station, did they, they told you that you were going to

7    be a witness, right?

8        A    No.

9    MR. GOODFRIEND:  Objection, Judge.  It's already

10   been asked and answered.

11   THE COURT:  Sustained.

12            Well, I take that back, I am not sure that was

13   asked by counsel.  It may have been asked by you.

14   MR. GOODFRIEND:  It's beyond the scope, Judge.

15   THE COURT:  You can answer that question.

16            Did they tell you you were going to be a

17   witness?

18       A    No.

19   BY MR. MADEA:

20       Q    All right.  But they wanted to know what you

21   knew about this case, right?

22       A    Yes.

23       Q    And did they indicate to you that they would

24   help you with any legal problems that you had?

Plaintiff Jakes 031049

1  A  No.

2  Q  Not at all?

3  A  No.

4  MR. GOODFRIEND: Objection, asked and answered.

5  THE COURT: Sustained.

6  MR. MADEA: I don't have anything further.

7  THE COURT: You may step down, sir.

8           (Witness excused.)

9  THE COURT: Is the next witness related to Mr. Jakes

10 or --

11  MR. GOODFRIEND: Yes, Judge.

12  THE COURT: All right. Please call your next

13 witness?

14  MR. GOODFRIEND: Detective Kill, please.

15          (Witness sworn.)

16

17

18

19

20

21

22

23

24

1          DET. MICHAEL KILL,

2    called as a witness in the above-entitled cause, having

3    been first duly sworn, was examined and testified as

4    follows:

5

6                 DIRECT EXAMINATION

7

8                      BY

9

10               MR. GOODFRIEND:

11       THE COURT:  Make yourself comfortable.  Once you are

12   comfortable state your full name.

13       A    Michael Kill, K-i-l-l.

14       THE COURT:  Proceed.

15   BY MR. GOODFRIEND:

16       Q    Detective Kill, where are you employed at?

17       A    City of Chicago Department of Police, Area 2

18   Violent Crimes, 727 East 111th Street.

19       Q    How long have you been a Chicago Police

20   Officer?

21       A    I have been a Chicago Police Officer since the

22   30th of September, 1968.

23       Q    How long have you been a Detective?

24       A    I have been a Detective since May of 1978.

Plaintiff Jakes 031051

1       Q       I am going to direct your attention to

2    September 16th, 1991.  Were you working that day?

3       A       Yes, I was.

4       Q       What were your hours?

5       A       My hours were from 4:30 p.m. to 1:00 a.m on the

6    17th.

7       Q       Who was your partner that day?

8       A       My partner on that date was Detective Kenneth

9    Boudreau, B-o-u -- B-o-u-d-r-e-a-u.

10      Q       After arriving at work that day were you

11   assigned to the investigation of a homicide of one Rafael

12   Garcia?

13      A       Yes.

14      Q       And approximately what time was it that you

15   actually arrived at work on September 16th, 1991?

16      A       Approximately 4:00 o'clock p.m.

17      Q       Once arriving at work did you talk to any other

18   police Detectives regarding this investigation?

19      A       Yes.  At that time I talked to Detectives

20   Duckhorn, O'Reilly of Area 3 Violent Crimes.

21      Q       Was there a witness available at Area 3 Violent

22   Crimes regarding the investigation?

23      A       Yes.

24      Q       What witness was that?

185

1     A    That was Anthony, excuse me, Jakes.

2     Q    And when you first saw Mr. Jakes, where was he?

3     A    He was seated on a, on a bench in the main

4   squad bay area outside an interview room.

5     Q    Area 3 Violent Crimes, that was at 39th and

6   California, right?

7     A    Right.  3900 South California and that would be

8   on the 3rd floor.

9     Q    Now, the Defendant Anthony Jakes, do you see

10   him in Court today?

11     A    Yes, I do.

12     Q    And could you please point to him and describe

13   what he is wearing?

14     A    He is sitting there wearing light colored

15   shirt, dark pants.  He's got his finger alongside of his

16   left eye.  Sitting between the 2 defense counsels.

17     THE COURT:  Has your client been identified?

18     MR. MADEA:  Yes.

19  BY MR. GOODFRIEND:

20     Q    After speaking with Detectives Duckhorn and

21   O'Reilly, did you have a conversation with the defendant,

22   Anthony Jakes?

23     A    Yes, I did.

24     Q    Where did that conversation take place?

Plaintiff Jakes 031053

1     A    After speaking to Detectives Duckhorn and

2    O'Reilly, I asked Mr. Jakes to come with me into an

3    interview room.  We went into the interview room and he

4    was seated and I was seated and in that interview room

5    it's about 20 foot by 6 foot long.

6    Q    Was Detective Boudreau also present with you?

7    A    Yes.  He was.

8    Q    Did you have a conversation with the defendant,

9    Anthony Jakes, regarding the events of late evening

10    hours, September 15, 1991?

11    A    Yes.

12    Q    By the way did you identify yourself to the

13    defendant?

14    A    I did.

15    Q  - How did you do that?

16    A    I told him who I was and I showed him

17    identification.

18    Q    When you were seated there in the interview

19    room, what did the defendant tell you about the evening

20    of September 15, 1991?

21    A    The defendant told me that it was about, I

22    asked him where he was at that time.  He said that he was

23    in front of 1212 West 51st Street.  He was out in front

24    of the house with an Annette Harris, and Nikita Little

1      and Denise Harris.  He was also with 2 of his cousins on

2      his father's side, an individual known as Quarter Pounder

3      and another individual known as Tweety.

4          Q    What did the defendant tell you happened at

5      that time?

6          A    He said they were out in front of the house and

7      it was around 11:30 p.m., or shortly thereafter, and a

8      car came down the street with an unknown number of white

9      males in the car.  There was a Mexican flag protruding

10     from one of the windows.

11              As they passed 1212 West 51st Street one of the

12     occupants of the car threw a bottle and the bottle went

13     through the second floor front window at 1212 West 51st

14     Street.

15         Q  - What did the defendant tell you happened next

16     after the window broke?

17         A    He said that after the window broke and the car

18     continued West out of sight on 51st Street, and the

19     individuals he was in front of the house with, that would

20     be the other 5 people and himself, went up to the second

21     floor and they cleaned the glass up that, that had been

22     broken by the thrown bottle.

23         Q    What did the defendant tell you happened after

24     he cleaned the glass up?

Plaintiff Jakes 031055

1      A      The defendant said that himself, the individual

2      known as Quarter Pounder and Tweety then took the debris

3      from the broken glass out to the rear garbage can and

4      placed the garbage in the can.

5              While they were out there, disposing of refuse,

6      3 individuals that they had a fight with earlier in the

7      day approached them.

8      Q      What did the defendant tell you happened after

9      the 3 individuals approached him, Quarter Pounder and

10     Tweety?

11     A      He and his 2 cousins ran westbound to Throop

12     Street with the 3 other males in pursuit.  They outran

13     the 3 individuals.

14             Upon reaching Throop Street came back around on

15     51st Street and as they came back down 51st Street back

16     East towards the 1212 West 51st Street residence they

17     noticed a Chicago fire ambulance out in front of that, in

18     that vacinity in, in front of his house.

19     Q      Did the defendant tell you what nationality the

20     3 males were that chased him that he had been fighting

21     with earlier?

22     A      They were Afro-American males.

23     Q      What did the defendant tell you happened?

24             The Chicago fire ambulance, he noticed a

Plaintiff Jakes 031056

1       Chicago fire ambulance?

2       A    After he noticed a Chicago fire ambulance he

3       went up onto the front porch at 1212 West 51st which is

4       even with the first floor, and there was a young

5       individual, young male on that porch, which he got into a

6       fight with.

7           At that time his aunt slapped him across the

8       face, told him to behave himself and sent him upstairs.

9       Q    Now, after, after the defendant related this

10      information to you, did he have any suggestions?

11      A    Yes.  He suggested that we go and talk to

12      Quarter Pounder.  He said that Quarter Pounder was with

13      him earlier in the day when he had the fight with the 3

14      individuals and that Quarter Pounder might have some

15      knowledge of who the 3 individuals who chased them from

16      the vacinity in the rear of his house.

17      Q    Now, did you ask the defendant if he could go

18      out with you to find Quarter Pounder?

19      A    Right.  We had no idea who, who Quarter Pounder

20      was or what he looked like and he, it was just a

21      nickname.

22          And we wanted Mr. Jakes to come with us and if

23      he was out on the street for Mr. Jakes to point him out

24      because he felt that between the 2 of them maybe they

190

1    could give us some information as to who the offenders

2    who had shot Mr. Garcia might be.

3           He told us that he didn't want to go with us

4    because he didn't want to be seen driving around the

5    neighborhood in a police car.

6       Q    What did you do then?

7       A    Well, at that time we said, "well, would you

8    stay here?"

9       Q    What did the defendant say?

10      A    He said that he would and told us, you know, to

11   go to 1212, the people there would know Quarter Pounder

12   and be able to tell us where we could find him.

13      Q    What did you and Detective Boudreau do at that

14   time?

15      A - At that time Detective Boudreau left him in the

16   area, in the interview room.  He was seated in the

17   interview room and we went out in the police car.  We

18   went to the vacinity of 51st and Racine which is 1200

19   West 51st.

20      Q    And what's the first location you went to when

21   you went to the scene?

22      A    The first location was the sandwich shop which

23   is at 1206 West 51st Street.  We went there to see if we

24   could locate the individual that was there the night

Plaintiff Jakes 031058

1    before during the shooting, because when the original

2    Detectives arrived on the scene they told us that when

3    they got there the sandwich shop was closed.  Those

4    people were gone.

5         We wanted to see if they might have seen who

6    the offenders were through the front window.

7         Q    Did you have a conversation with anyone at the

8    sandwich shop?

9         A    Right.  We talked to the proprietor of the

10   sandwich shop.

11        Q    How long did you talk to the proprietor for?

12        A    That was probably 15 to 20 minutes but, we

13   talked to him but he could give us no information.

14        Q    What was next thing you did after you talked to

15   the proprietor?

16        A    Okay.  After talking to the proprietor, I went

17   to the rear of the sandwich shop and the rear of 1212.

18   There was a gangway, as you come out of the sandwich shop

19   and go to your right, there is a gangway that leads to

20   the alley in the back where Mr. Jakes said he was chased

21   by the 3 individuals with Quarter Pounder and was a

22   possible avenue of flight for the offenders from Mr.

23   Garcia.

24        Q    What did you do when you got back there?

192

1       A    Well, first there were a number of young men

2    playing basketball.  Young children.  I asked to see if

3    any of them were Quarter Pounder or where he was.  None

4    of them ever heard of him.

5            I asked them if they knew about a fight the day

6    before in the alley.  Nobody could give me any

7    information on that at all.

8            And then I began to search the area from the

9    alley back towards the front.  Since the incident with

10   Mr. Garcia happened at night, and has limited visibility

11   to see if there was any weapon, there might be a

12   discarded weapon in the bushes, in the --

13           I went through a hole.

14      Q    What did Detective Boudreau do?

15      A  - When I was going to the rear Detective Boudreau

16   went to the front door at 1212 West 51st.

17      Q    How long were you in the back talking to people

18   and looking for evidence?

19      A    I'd say 20 minutes to a half hour.

20      Q    Then what did you do?

21      A    Then I came back around the front and went to

22   1212 West 51st Street also.

23      Q    Was Detective Boudreau still there?

24      A    Yes.  He was there with the 3 young ladies that

193

1      I mentioned before.

2          Q      That would be Denise Harris, Annette Harris and

3      Nikita Little?

4          A      Correct.

5          Q      Did he complete his conversation with those 3

6      young ladies?

7          A      Right.

8          Q      What did you and Detective Boudreau do next

9      after you finished talking with the 3 women?

10         A      Well, after talking to them we then got back in

11     the police vehicle and we went to the, to 5109 South

12     Aberdeen where the victim lived to talk to his family.

13             We went up on the second floor at that address

14     and spoke to the people that were there that were

15     related. -

16             I think it was his older son and a, and his

17     wife.  His wife didn't speak English.

18         Q      Now, how long did you stay at the house there?

19         A      We were there about an hour.

20         Q      What did you do while you were at the victim's

21     house?

22         A      We went through, with the family's cooperation,

23     we went through his personal effects to see if there was

24     any information we could gleen from those effects which

194

1    might lead us to the offender, to who the offender might

2    be and the actual circumstances immediately preceding his

3    arrival at the scene of the incident where he was shot.

4        Q    Approximately what time was it when you left

5    the victim's house at 5109 South Aberdeen?

6        A    I would say close to 8:00. Little after 8:00

7    o'clock.

8        Q    Where did you go next with Detective Boudreau?

9        A    Then we began to go through the area again,

10   mentioned within the scope of the report. We went to

11   1102, 1102 West 51st Street.

12       Q    Did you talk with anybody there?

13       A    Yes, we did.

14       Q    Male or female?

15       A    - Male.

16       Q    After you talked with that individual, what was

17   the next thing you did?

18       A    At that time, at that point we went and again a

19   tour of the area looking for an individual known as Snake

20   which was, we knew as Gus Robinson.

21       Q    What areas did you go for looking for Gus

22   Robinson?

23       A    We went from the area from 50, from 1100 West

24   to approximately 1400 West, and from 50th Street through

195

Plaintiff Jakes 031062

1 54th Street.

2  Q Sometime around 9:00 o'clock did you locate Gus

3 Robinson?

4  A Yes. We located Gus Robinson and other

5 individuals in the, with some people that he was with, at

6 5031 South Elizabeth.

7  Q How far was that from the scene of the crime?

8  A It's right around the corner. I would say in,

9 100 yards, 200 yards, 100 yards West and 100 yards North.

10  Q Do you remember the names or at least the last

11 names of the other individuals that Gus Robinson was

12 with?

13  A I believe that was Mr. Sloan and Mr. Green, Mr.

14 Samson, Mr. Pitts and Gus Robinson.

15  Q - Did you make any requests of these 5

16 individuals?

17  A Yes. We told them we'd, rather than interview

18 them on the street, we'd like to go in, see if they would

19 help us out, we'd go into Area 3 Violent Crimes so we

20 could interview them in detail about their activities the

21 previous night and who they saw in the neighborhood

22 either running around or strange persons or just what was

23 going on.

24  Q Did they agree to come with you?

Plaintiff Jakes 031063

1      A     They did.

2      Q     And once again did you take these people in

3  your police car?

4      A     Yes.

5      Q     And went back to Area 3?

6      A     Correct.

7      Q     3rd floor?

8      A     Yes.

9      Q     Did you begin interviewing the 5 individuals

10  that you just spoke with?

11     A     We did.

12     Q     That you just talked about?

13     A     Right.

14     Q     Who was the last person that you spoke with?

15     A  -  The last person we spoke to was Gus Robinson.

16     Q     What time was it that you spoke to Gus

17  Robinson?

18     A     I would say that would have to be around

19  between 10:15 and 10:45.

20     Q     By the way, was Detective Boudreau present when

21  you spoke with Gus Robinson?

22     A     Yes.  He was.

23     Q     After speaking with Gus Robinson, what did you

24  do next?

Plaintiff Jakes 031064

1      A      At approximately 10:45, Detective Boudreau and

2      I then went back into the room where Anthony Jakes was

3      waiting.

4      Q      When you went back into the interview room

5      where the defendant was waiting, did you sit down?

6      A      Yes.

7      Q      Did you advise him of anything at that time?

8      A      At that time I advised him of his Miranda

9      warnings from page 79 of the 1991 FOP book.

10     Q      Do you have that 1991 FOP book with you?

11     A      I do.

12     Q      And I am also going to show you what's been

13     marked for identification as People's Exhibit No. 37.

14            Is People's Exhibit No. 37 a copy of page 79,

15     same rights?

16     A      Yes, they appear to be exactly the same.

17     Q      Now, you indicated that you read his Miranda

18     rights to him.  You read that from page 79 of your 1991

19     FOP book?

20     A      Right.  This book right here.

21     Q      Could you please read the rights that you read

22     to the defendant and the responses that he gave to you

23     that day?

24     A      First I asked him if he understood the rights

198

1  to answer yes.  And I read this to him:  "do you

2  understand that you have right to remain silent?"  And

3  Mr. Jakes responded by saying yes.  I then read to him,

4  "do you understand that anything you say can and may be

5  used against you in Court or other proceedings?"  I asked

6  him if he understood and again Mr. Jakes answered yes.

7          I then read to him, "do you understand that you

8  have the right to talk to a lawyer before we ask you any

9  questions and to have him with you during questioning?"

10  I asked Mr. Jakes if he understood that and again he

11  answered yes.

12          I then read to him, "if you cannot afford or

13  otherwise obtain a lawyer and you want one, a lawyer will

14  be appointed for you and we will not ask any questions

15  until he-has been appointed."

16          I asked him if he understood that and again Mr.

17  Jakes answered yes.  I then read to him, "if you decide

18  to answer now with or without a lawyer you still have the

19  right to stop the questioning at any time or to stop the

20  questioning for the purpose of consulting a lawyer."

21          Again I asked Mr. Jakes if he understood that

22  and again he answered yes.

23          I then read to him, "you may waive the right to

24  advice of counsel and your right to, you may waive the

Plaintiff Jakes 031066

1 right to counsel and your right to remain silent and you

2 may answer questions or make a statement without

3 consulting if you so desire."

4    I asked him if he understood and he again

5 answered yes, then I asked him if he understood what all

6 the rights meant and again he said that he did.

7    And then I advised him that he was juvenile,

8 and although he was a juvenile, what the offense was and

9 the reasons we were questioning him about that particular

10 offense, that he could be tried as an adult. And if he

11 was tried as an adult, and he was convicted as an adult,

12 he would be punished as an adult.

13    I asked him if he understood that and again he

14 answered yes.

15  Q - Did you then ask the defendant if he was

16 willing to talk to you at that time?

17  A Yes, I did.

18  Q And what did he say?

19  A He said that he would.

20  Q At that point in the conversation did you

21 advise the defendant, Anthony Jakes, of anything

22 regarding the investigation?

23  A Yes, I did.

24  Q What did you tell the defendant Anthony Jakes?

Plaintiff Jakes 031067

1    A    Well, I told him that we went over to 1212 West

2    51st Street.  I told him we talked to Annette Harris and

3    Denise Harris and Nikita Little.  They said --

4         MR. MADEA:  Object to what they said.

5         THE COURT:  Well, objection overruled.  It's not for

6    hearsay purposes.

7              You may answer.

8              Ladies and gentlemen, I am going to give you

9    instructions on this particular testimony, however.

10             It is not to be taken for the truth of what is

11   said but rather to explain the relationship between what

12   the defendant told and what the Officer told the

13   defendant and what the defendant responded.

14             Not to assume that what these women told the

15   Officer is, in fact, true, however.

16             You may proceed.

17   BY MR. GOODFRIEND:

18        Q    What did the defendant -- Did you tell the

19   Defendant what these women said?

20        A    I told him that we talked to the 3 women and

21   that the 3 of them said that they were not with him when

22   he said they were with him at the time of the shooting

23   and immediately prior to that.

24        Q    Did you tell him anything else regarding your

201

Plaintiff Jakes 031068

1    investigation?

2        A    I then told him that we asked around the

3    neighborhood and at 1212 West 51st Street, there, the

4    whereabouts of any subject, a cousin of his, the 2

5    cousins of his, Quarter Pounder and Tweety.

6             Nobody had heard of Quarter Pounder.  No one

7    had heard of Tweety in that area.

8        Q    Did you advise the defendant of anything else

9    regarding your investigation?

10       A    Yes.  I told him that we had talked to Gus

11   Robinson, about his conversation with Mr. Jakes the night

12   before.

13       Q    What was the next thing that you said or the

14   defendant said?

15       A  - I told him that based on what we had found out

16   from what he had said earlier that we wanted to, if he'd

17   tell us what happened, we wanted to know the truth about

18   what happened the night before.

19       Q    What did the defendant then tell you or say?

20       A    He said that it was, said that he would tell us

21   what really happened.

22       Q    What did the defendant proceed to tell you

23   then?

24       A    He said it was about 11:45, 11:50 the night

202

1    before, on the 15th. And he said that he was at about

2    1212, 1202, in front of the general area of the sandwich

3    shop at 1206. And at that time he was approached by a

4    subject known as Little A and a friend of his who he only

5    knew by the first name as Carrick.

6        Q    What did the defendant tell you next?

7        A    He said that Little A told him there was a

8    white man inside of the sandwich shop and that Little A

9    thought he had a lot of money.

10        Little A then went into the sandwich shop and

11    came back out and told him that he did have a lot of

12    money and they were going to stick him up.

13        Q    What did the defendant tell you happened next?

14        A    The defendant said Little A told him to go down

15    to the corner at 51st and Racine which is just East of

16    where the sandwich shop is, and see if any police were

17    coming and to make sure that the coast was clear for him.

18        At that time Little A lifted his shirt in the

19    waistband in front. Mr. Jakes said he saw the .380

20    automatic that Little A always carried with him at night

21    and always carried fully loaded.

22        Q    What did the defendant tell you happened after

23    he saw the weapon?

24        A    He said that he walked East on 51st Street, to

1    about 1202 West 51st which is just off the corner of 51st

2    and Racine where he met Gus Robinson.

3    Q    What name did he use for Gus Robinson?

4    A    Snake.

5    Q    What did the defendant tell you happened after

6    he met Snake?

7    A    He said that after he met Snake, he told Snake

8    what was going to happen and asked Snake to be a look out

9    for the police.  Snake declined to do so.  Snake went

10    back to his car, and drove away.

11    Q    What did the defendant tell you he did after

12    Snake drove away?

13    A    After Snake drove away, he walked to the corner

14    of, it would be the northwest corner of 53rd, 51st and

15    Racine and looked both ways down 51st and down Racine.

16    He then turned to where Little A or Arnold Day

17    was at and yelled out to him that it was all right.  As -

18    Q    What did the defendant tell you happened after

19    he yelled to Little A it was all right?

20    A    After he yelled it was all right he began

21    walking back towards the sandwich shop.  At that time the

22    subject, the white male exited the store and Little A or

23    Arnold Day produced the .380 blue steel automatic

24    handgun, announced a stick up.

Plaintiff Jakes 031071

1  Q    What did the defendant Anthony Jakes tell you

2  happened after Little A announced the stick up?

3     A    That the intended, that the man walked over to

4  his car on the driver's side and got in and started to

5  back up.

6        He said that Little A walked over to the

7  window.  While he was walking over to the window, Mr.

8  Jakes went to the corner on the South East side of the,

9  the South East corner of the sandwich shop.  There is

10 windows looking East and South.  That is a blind side.

11       He said that he walked there because he didn't

12 want to be seen in the window by the people that were

13 running the sandwich shop because he only lived 2 doors

14 away.

15    Q - What did he say happened next?

16    A    He said the man got into his car and started to

17 back up.  As Mr. Garcia, well, the victim started to back

18 up, Arnold Day opened fire.

19       He said he believed he fired 4 shots and as he

20 was finishing firing the last of those 4 shots, Mr. Jakes

21 ran northbound through the Oliver's chicken lot to the

22 alley, then westbound in the alley and into the backyard

23 at 1212 where he went up to his, up to the apartment on

24 the second floor.

205

Plaintiff Jakes 031072

1      Q    What did the defendant tell you he did once he

2  got back to the apartment?

3      A    Well, as he was running he stated that he heard

4  additional shots.

5        He got to the second floor, went to the front

6  window and looked down on the victim's station wagon, Mr.

7  Garcia's station wagon.

8        He could see Mr. Garcia rolling on the ground

9  and rolling around and then Mr. Garcia became still.

10       As Mr. Garcia became still, that is when the

11  ambulance arrived.  He then went and went to bed.

12     Q    Approximately what time was it that this

13  conversation with the defendant concluded?

14     A    About 11:45 p.m.

15     Q   Now, did you and Detective Boudreau then leave

16  the interview room where the defendant was at?

17     A    Yes.

18     Q    Did you make any notifications at some point in

19  time after you left the interview room?

20     A    Yes, I went right down the hall to the Area 3

21  Youth Office which is in the rear of the 3rd floor at

22  3900 South California to get a Youth Officer from the 3rd

23  watch, and Detective Boudreau went to the telephone to

24  notify the office of the State's Attorney Felony Review

Plaintiff Jakes 031073

1    Unit.

2         Q     Now, when you say the 3rd watch, what time is

3    the 3rd watch?

4         A     In the Youth Division it ends at midnight.  It

5    runs from the 8 hours from 4:00 o'clock p.m. --

6              Well actually 3:30 p.m. when they have roll

7    call until midnight.

8         Q     What was the reason that you were going to the

9    Youth Officer?

10        A     To get a Youth Officer so that when the Youth

11   Officer and the State's Attorney and either myself or

12   Detective Boudreau talked to them that the Youth Officer

13   would be present.

14        Q     Now, was there a problem at that point in time

15   with obtaining a Youth Officer?

16        A     Yes.

17        Q     And why was that?

18        A     It was a change of shifts.

19        Q     What did you have to do since it was the change

20   of shifts?

21        A     Well, the Area 3 Youth first were on their way

22   home and they told us to notify the midnight crew which

23   is down at Central Youth at 1121 South State.

24        Q     Did you notify 1121 South State?

Plaintiff Jakes 031074

1  A  Yes. Well, I came out of their office, came

2 back down the hall, told Detective Boudreau not to call

3 the State's Attorney up right away because the Youth --

4    First we'd have to notify them, they'd have to

5 drive all the way from 1121 South State, depending on

6 where our call fell into a general pool for the 3rd night

7 watch.

8  Q  Now, eventually did a State's Attorney arrive

9 at Area 3 Violent Crimes?

10  A  Yes.

11  Q  And what was the name of that State's Attorney?

12  A  (No audible response.)

13  Q  Mr. Grossman?

14  A  Mr. Grossman. Brian Grossman.

15  Q - And did a Youth Officer eventually arrive at

16 Area 3 Violent Crimes?

17  A  Yes. Youth Officer from the Central Youth

18 office did arrive. Officer Bertram? Burke.

19  Q  Do you know the name of that Officer?

20  A  Yes. Youth Officer Burke.

21  Q  Now, I am going to direct your attention to

22 approximately 4 a.m.

23    Was Anthony Jakes still there?

24  A  He was.

208

Plaintiff Jakes 031075

1    Q    And you had not spoken with him since you had

2    left him at about 11:45, is that correct?

3    A    No, I had not.

4    Q    Did you go anywhere into another room to bring

5    other parties to talk with Anthony Jakes?

6    A    Yes.  I directed Mr. Grossman, Youth Officer

7    Burke and at that time Detective Louise Caesar who had

8    handled the original scene and was working a midnight

9    watch was there.  Those 3 were sitting in the front of --

10   in a front office of Area 3 Violent Crimes, in a victims

11   area.

12          At that time I went to Mr. Jakes, told him I

13   was going to have him talk to a State's Attorney, took

14   him from that room, walked across the squad bay from that

15   room to another room and then I introduced him to the

16   Assistant State's Attorney, Detective Louis Caesar and

17   Youth Officer Burke.

18   Q    Now, how did you introduce State's Attorney

19   Grossman?

20   A    I told him it was the State's Attorney, that --

21          I told him that he would, if he would, he would

22   repeat his statement to him.  What he had told us

23   earlier.

24          And Detective Caesar I just introduced as

209

1    Detective Caesar.

2            I believe Youth Officer Burke had spoken to him

3    previous to my going to get him out of that room when I

4    was taking another statement from another individual.

5        Q    After you introduced Anthony Jakes to these

6    individuals, did you stay or leave?

7        A    I left.

8        Q    Now, what was it that you and Detective

9    Boudreau then tried to do?

10       A    Well, we were, tried to get information.

11           Detective Boudreau knew who Little A was,

12   Arnold Day.  And he knew his name.  But what we were

13   trying to do assimilate information from department

14   records to find out where he was staying, who he was

15   staying with and where he was.

16           We tried to get all those addresses together

17   and then we were, in fact, while, as far as I know while

18   those individuals were still there talking to Mr. Jakes,

19   we left the building and went out to see if if we could

20   apprehend Arnold Day and try and recover the weapon that

21   he used.

22       Q    Did you ever go into the Sergeant's room again

23   before you left the station?

24       A    Yes, I believe I did go into the Sergeant's

Plaintiff Jakes 031077

1    rooms because some of the files that we needed to get and

2    locate Arnold Day were in a cabinet in another room

3    which, and you have to walk through where they were doing

4    the interview to get to those records.

5         Q    Now, that morning, did you go and try to locate

6    Arnold Day?

7         A    Yes, we did.

8         MR. MADEA:  Judge, I am going to object.  It's

9    beyond the scope of Mr. Jakes --

10        THE COURT:  Sustained.

11        MR. GOODFRIEND:  Judge, can I have a moment, please?

12        THE COURT:  Sure.

13   BY MR. GOODFRIEND:

14        Q    Detective Kill, the location by the Queen's

15   Submarine Shop at Racine and 51st Street, that is in

16   Chicago, Cook County, Illinois, is that correct?

17        A    It is.

18        MR. GOODFRIEND:  Judge, I have no further questions.

19        THE COURT:  Cross-examination?

20

21

22

23

24

Plaintiff Jakes 031078

1                    CROSS EXAMINATION

2

3                    BY

4

5                    MR. MADEA:

6        Q      Detective Kill, you indicated that at some

7   point you notified a Youth Officer, is that correct?

8        A      That's right.

9        Q      All right.  And the reason you got a Youth

10  Officer is because the law requires you to do so, is that

11  not correct?

12       MR. GOODFRIEND:  Objection.

13       THE COURT:  Overruled.

14  BY MR. MADEA:

15       Q    - Is that not correct?

16       A      We get a Youth Officer and the Youth Officer is

17  there to assist the juvenile.  We are required --

18       Q      And that is pursuant to Illinois statute,

19  right?

20       A      When he is under arrest.

21       Q      Right.  In fact that statute is 705?

22       THE COURT:  The Court recognizes the statute and

23  it's totally irrelevant to these proceedings.

24              Please ask your next question.

Plaintiff Jakes 031079

1     MR. MADEA:  Okay.

2     BY MR. MADEA:

3         Q    Now, you first spoke, strike that.

4              What time did you first speak with Mr. Jakes if

5     you recall?

6         A    Oh, I'd say pretty close to 4:30 p.m. on the

7     16th of September, 1991.

8         Q    Okay.  And had you spoke to Gus Robinson up to

9     that point?

10        A    No.

11        Q    Okay.  And you indicated that Mr. Jakes, well

12    strike that.

13             Who was present for that interview?

14        A    Detective Boudreau was present for that

15    interview.  I did the talking and Detective Boudreau was

16    there.

17        Q    Now, you had talked to Detectives Duckhorn and

18    O'Reilly prior to speaking with Mr. Jakes, right?

19        A    That is correct, sir.

20        Q    And had you reviewed any police reports or

21    progress reports before speaking with Mr. Jakes?

22        A    I believe Detective Caesar and McCann had just

23    left the area with those reports.  Those reports were

24    over, went to Sergeant and I have had a cursory review of

Plaintiff Jakes 031080

1    those reports.

2         I didn't go over them in detail because when we

3    were assigned the case by the Sergeant he told us to

4    speak to Duckhorn or O'Reilly because they could give us

5    the most recent developments in the case.

6         Q    So you didn't look in the reports before you

7    spoke with Mr. Jakes?

8         A    As I say, I might have looked at them to get

9    the address.  The victim --

10        We had to do that because we went to 5109 on

11   Aberdeen and I'd have to know the victim lived there.  I

12   just couldn't pull it out of air.

13        Q    Okay.  How long did that conversation with Mr.

14   Jakes last?

15        A    Oh, I'd say it lasted -- the first one it was

16   pretty quick, about 25 minutes to a half hour.

17        Q    And this was in an interview room at Area 3,

18   39th and California at the time?

19        A    Yes.  As I had testified to, it's, the bench

20   where he was sitting was out in the main squad bay.

21   There is work --

22        Q    Is that on the 3rd floor?

23        A    It's on the 3rd floor.

24        Q    So then you took him into an interview room,

214

1    right?

2        A    It's an interview room just adjacent to the

3    area.

4        Q    And you had a 25 minute conversation in which

5    he told you that there was a problem with some guys with

6    a flag on the car had broke some window in their house,

7    right?

8        A    It was Mexican Independence Day so we know what

9    he was talking about when he said these individuals were

10   coming westbound on 51st Street with the Mexican flag and

11   throwing bottles.

12       Q    Okay.  You then said that pursuant to that

13   information, or he also told you about the Harrises and a

14   Miss Little, right?

15       A    That is correct.

16       Q    Okay.  And you said that they could be helpful

17   in the investigation or --

18       A    He said that they were out there when he was

19   out there.

20       Q    When these fellows drove by?

21       A    When the fellows drove by and until the time

22   that they all went upstairs and cleaned up the refuse

23   that went from the bottle through the second floor

24   window.

215

1      Q      And so eventually you made your way out to 51st

2    and Racine, right?

3      A      That is correct.

4      Q      And you said you spent about 20 minutes in the

5    back talking to people, looking for evidence, various

6    other things, right?

7      A      Right.  20 minutes with the proprietor, 25

8    minutes to a half hour in the back and probably another

9    20, 25 minutes in the, with the, with Miss Little and the

10   Harris girls.

11     Q      All right.  And then you went to find Gus

12   Robinson and his, and some other people that you

13   mentioned, right?

14     A      No.

15     Q     _ Well, what exactly --

16            Where exactly did you go?

17     A      I went to 5109 Aberdeen and I spent an hour

18   there with the family of the victim trying to ask,

19   ascertain what might have happened.

20            Because after we talked to the Harrises, and

21   Miss Little, and the other people and they completely --

22            The people that we were looking for to assist

23   Mr. Jakes as a witness to find out who those people were

24   that he saw in the alley weren't telling us anything near

2|b

Plaintiff Jakes 031083

1    what he was telling us.

2            As far as we knew we were now at square one, so

3    we started at square one and talked with the victim's

4    family, to go from there.

5        Q    All right.  In your experience as a Detective,

6    you have experienced witnesses who or people who are

7    alleged witnesses who weren't cooperative for whatever

8    reason, correct?

9        MR. GOODFRIEND:  Objection, Judge.

10       THE COURT:  Sustained.

11   BY MR. MADEA:

12       Q    Well, this is the first time that witnesses

13   weren't cooperative, right?

14       MR. GOODFRIEND:  Objection, Judge.

15       THE COURT:  Sustained.

16   BY MR. MADEA:

17       Q    Well, after you left 5109 South Aberdeen it's

18   then that you went and found Gus Robinson and his

19   friends, is that, or people with --

20       A    No.

21       Q    No?

22       A    No.  My previous testimony went to 1102 which

23   is 51st and Aberdeen, probably 40 feet from the victim's

24   house.  We went there because in the report that --

1  Q Okay, Detective, Detective, please?

2  A -- That person told us about, Mr. Robinson.

3 Then we went --

4  Q Okay. Then you went to find Mr. Robinson,

5 right?

6  A That is correct.

7  Q What time was that, do you remember?

8  A When we found Mr. Robinson? About 9:15.

9  Q Okay. And about 9:15 you advised Mr. Robinson

10 to come down to the police station to help you out in

11 this investigation, correct?

12  A Well, he and the other individuals.

13  Q Is that correct?

14  A Yes.

15  Q - And he went down there voluntarily, isn't that

16 right?

17  A That is correct.

18  Q Okay. And when you got him down to the police

19 station did you put him in an interview room similar to

20 what Mr. Jakes was in?

21  A Yes.

22  Q Was he handcuffed in a room?

23  A No. Neither. He was never handcuffed.

24  Neither was Mr. Robinson.

Plaintiff Jakes 031085

1      Q   I am just talking about Mr. Robinson?

2      A   Okay.

3      Q   Okay. All right. Now, you spoke to Mr.

4  Robinson.

5         Who was present?

6      A   Difficult Boudreau and myself.

7      Q   And just Mr. Robinson?

8      A   And Mr. Robinson, that was it.

9      Q   I am sorry?

10     A   When we were in the area, during the

11  transportation everybody was there in the area.

12         Our policy did to put each individual in a

13  different room, so we can get their independent

14  recollection of what happened that night uninfluenced by

15  somebody else.

16     Q   All right. You spoke to Mr. Robinson last

17  after all those other individuals, correct?

18     A   That is correct.

19     Q   Okay. And you didn't advise him of his rights

20  or anything like that, correct?

21     A   No.

22     Q   And he was not under arrest? He blabbed

23  voluntarily, correct?

24       MR. GOODFRIEND: Objection.

Plaintiff Jakes 031086

1      THE COURT:  Asked and answered.  Sustained.

2   BY MR. MADEA:

3      Q     And it was at that time he told you about

4   speaking with the Anthony Jakes on 9/15/91, about

5   midnight, correct?

6      A     Yes.

7      Q     All right.  And he told you that Anthony Jakes

8   asked him to stand point, I believe is the testimony,

9   correct?

10     A     Be the look out.

11     Q     Be the look out.  And was that his words or is

12  that your words?

13     A     No, those are his words, to be the look out.

14     Q     Look out is his words?

15     A  - Right.

16     Q     Okay.  And I believe you testified that

17  Robinson then said that, that Robinson told him no and

18  got in his car and left, right?

19     A     Right.  Robinson, when he was approached by Mr.

20  Jakes, was on the telephone.

21     Q     Right?

22     A     Okay.  Mr. Jakes he knows.

23           Mr. Jakes came up to him, made the proposition,

24  he declined it, got back in his car and drove away.

Plaintiff Jakes 031087

1    Q    All right.  Mr. Robinson never indicated to you

2  that he went to look in the window of the Submarine Shop

3  at the white guy that they are proposing to drop, is that

4  correct?

5    A    Well, you really don't have to look because you

6  can turn from the phone and there it is, 20 feet away.

7  There is the window.  There is the victim.

8    Q    20 feet away.  But he never indicated to you

9  that he went up to the window and looked into it, is that

10  correct?

11    A    I don't recall whether he said he saw the guy

12  or whether he walked up to the window.

13    Q    Well, if he had that would be a pretty

14  important piece of evidence, right?

15    MR. GOODFRIEND:  Objection, Judge.

16    THE COURT:  Overruled.

17  BY MR. MADEA:

18    Q    If he had told you that, that would be a pretty

19  important piece of evidence, right?

20    A    That you see the victim?  No.  Because he

21  leaves before the crime takes place.

22    MR. GOODFRIEND:  Judge, I would ask that the witness

23  be allowed to --

24    THE COURT:  Well, you are asking for a question that

221

1    calls for an opinion under interest, bias and motive.

2          I am reluctantly allowing the witness to answer

3    the question.  When you ask for an opinion, you've got to

4    give him time to give his opinion.

5        MR. MADEA:  Judge, I will withdraw the question.

6        THE COURT:  Next question.

7    BY MR. MADEA:

8        Q    Detective Kill, you prepared a report in this

9    case, right?

10        A    Yes, I did.

11        Q    And would it be fair to say that you would

12    include all the important facts in your police report?

13    Isn't that right?

14        A    It's a summary of all the important facts and

15    the events as I recall them.

16        Q    So that when the trial comes along you will be

17    able to testify and remind yourself about the pertinent

18    facts, correct?

19        A    That is correct.

20        Q    Now, I will show you what I will mark as

21    Defendant's 2 for identification and ask you to take a

22    look at page 5, if I may Your Honor?

23        THE COURT:  While he is doing that, would Ms.

24    Bormann and one of the Assistant State's Attorneys

Plaintiff Jakes 031089

1   approach me in a side bar for a moment?

2           (Whereupon there were proceedings

3            had off the record per order of

4            the Judge in the above-entitled

5            cause.)

6   THE COURT:  Again to let you know what happened at

7   this side bar, which is good news for you, I just asked

8   the State whether or not, since I don't want the other

9   jury sitting back there doing nothing, whether or not if

10  I sent you home after this witness there would be enough

11  evidence to close out the day for the other defendant.

12          Happily for you the answer is yes, so you are

13  going to get an early break in a few minutes.

14          And you may proceed.

15  BY MR. MADEA:

16  Q    Would you identify Defendant's Exhibit 2 for

17  identification?

18  A    Yes.  That is the report I submitted, my

19  conclusion of my part of the investigation.

20  Q    Does it anywhere contain any information that

21  Mr. Robinson looked in the window of the Submarine Shop

22  at the white dude that they were fixing to rob?

23  A    In the paragraph that you indicated to me and

24  as far as I recall in the rest of the report, sir, no.

223

1      Q      Thank you.

2             Detective Kill, did you know Gus Robinson prior

3      to your experience with him on September 15, 1991?

4      A      September what, sir?

5      Q      September 16th, 1991?

6      A      September 16th?  No.

7      Q      Did your partner know him?

8      A      Yes, my partner was a 9th District Tactical

9      Officer and he worked that area and I'd heard the name

10     but I had never made contact with Mr. Robinson.

11     Q      Now, after you spoke with Mr. Robinson, you

12     went and spoke with Mr. Jakes eventually, correct?

13     A      Within minutes.

14     Q      Okay.  And I believe you said you advised him

15     of his Miranda warnings, correct?

16     A      Yes, I did.

17     Q      And you said that he understood, he stated to

18     you that he understood those Miranda warnings, correct?

19     A      Right.  He answered yes to each right that I

20     had read and I told him prior to reading him his rights

21     that if he understood them to answer with yes and he did.

22     Q      All right.  At that conversation, it was just

23     you, who else was present?  Just you?

24     A      Detective Boudreau.

Plaintiff Jakes 031091

1   Q   And there was no Youth Officer, at this point,

2   correct?

3   A   No.  Well, he wasn't under arrest and we didn't

4   know what he was going to say.

5   Q   Well, you did read him his Miranda warnings?

6   A   That is, when the question and answer is

7   unknown quantities, you always read Miranda warnings and

8   give them their rights preclusive of what the defendant

9   is going to say.

10  Q   Now, you never coerced a confession out of Mr.

11  Jakes, did you?

12  A   No, I simply stated what we knew and asked him

13  what he knew.

14  Q   You didn't kick or punch or slap or try to burn

15  him with a cigarette or anything?

16  A   No.

17  Q   Now, you know that coercing a confession is

18  against the law, right?

19  MR. GOODFRIEND:  Objection.

20  THE COURT:  Sustained.

21  MR. MADEA:  If I might, Your Honor, if I may

22  approach?

23  THE COURT:  You may.

24  BY MR. MADEA:

225

Plaintiff Jakes 031092

1   Q I'd like to show you what I will mark as

2 Defendant's Group Exhibit 3A through G and ask you to

3 take a look at these photographs, if you might.

4    Now, calling your attention, Detective, to 3A,

5 the first one, is that, could you tell the ladies and

6 gentlemen of the jury what that is?

7   A 3A right here? That's a picture of the

8 defendant.

9   Q Right. And does that accurately and truly

10 depict the way he looked, except without a shirt, of

11 course, or with his shirt on September 16th, 1991?

12   A Well, he -- he had a shirt on so --

13   Q Okay. Okay.

14   A So that is the same.

15   Q Now, now, B, do you recognize B?

16   A It's a picture of somebody's back.

17   Q Okay. And C?

18   A Picture of somebody's back and it looks like

19 something, a healed injury to the back on both of them.

20   Q Okay. And D?

21   A It's a picture of somebody's back and I can

22 barely make out the -- same thing as on the other

23 picture.

24   Q All right. And E?

Plaintiff Jakes 031093

1    Q    I'd like to show you what I will mark as

2    Defendant's Group Exhibit 3A through G and ask you to

3    take a look at these photographs, if you might.

4         Now, calling your attention, Detective, to 3A,

5    the first one, is that, could you tell the ladies and

6    gentlemen of the jury what that is?

7    A    3A right here?  That's a picture of the

8    defendant.

9    Q    Right.  And does that accurately and truly

10   depict the way he looked, except without a shirt, of

11   course, or with his shirt on September 16th, 1991?

12   A    Well, he -- he had a shirt on so --

13   Q    Okay.  Okay.

14   A    So that is the same.

15   Q    Now, now, B, do you recognize B?

16   A    It's a picture of somebody's back.

17   Q    Okay.  And C?

18   A    Picture of somebody's back and it looks like

19   something, a healed injury to the back on both of them.

20   Q    Okay.  And D?

21   A    It's a picture of somebody's back and I can

22   barely make out the -- same thing as on the other

23   picture.

24   Q    All right.  And E?

1      A     E is the picture of somebody's chest, both

2  arms.

3      Q     All right.  And F?

4      A     Picture of somebody's elbow but it might be

5  somebody else because they are dressed different.

6            They weren't taken at the same time.

7      Q     Okay.  And G?

8      A     That is a picture of somebody's knee and again

9  that is a different time and place because they are

10  wearing different clothes.

11            There is 3 different people in there as far as

12  I know.

13      Q     All right.  Great.

14      MR. MADEA:  Your Honor, if I may have a moment,

15  please?  -

16      THE COURT:  Sure.

17  BY MR. MADEA:

18      Q     Detective Kill, you had occasion to pick up Gus

19  Robinson yesterday, correct?

20      A     Yes, I did.

21      Q     Okay.  And you spent pretty much of the day

22  with him, right?

23      A     No, I did not.

24      Q     Well, some of the day anyway, correct?

227

Plaintiff Jakes 031095

1    A    Well, I spent the part of the day where it

2    takes me to bring him from where he was to where he is

3    here.

4    Q    And then in the back here too?

5    A    No.  Because I went out to the washroom

6    facilities on the 4th floor and when I did the other jury

7    was coming in and I was trapped on the other side.

8    Q    Thank you.  Detective Kill --

9         Strike that.

10   MR. MADEA:  Judge, I don't have anything further.

11   THE COURT:  Redirect?

12

13                   REDIRECT EXAMINATION

14

15                   BY

16

17                   MR. GOODFRIEND:

18   Q    Detective Kill, the times that you spoke with

19   the defendant, Anthony Jakes, was he coherent?

20   A    Oh yes, perfectly.

21   Q    Was he ever falling asleep during the time that

22   you were talking to him?

23   A    No, he was wide awake.  Wide awake, alert.

24   Q    Was he allowed to use the bathroom?

Plaintiff Jakes 031096

1  A  Yes.

2  Q  Was he offered food and something to drink?

3  A  He was. And I believe he, when he used a wash

4 room, when we were there, he may have used a wash room

5 when we were gone because he had, outside of the locker

6 room, he had the run of the 3rd floor when we were gone

7 for those, from like 6:00 until 9:15, 9:30, when we got

8 back.

9  So 3 and a half hours, he used the washroom,

10 got water, whatever and I was there and he used the

11 washroom and we offered him food. He declined.

12  Q  Did anybody in your presence threaten him in

13 any way?

14  A  No. Nobody had to threaten him at all. In

15 fact he was very cooperative.

16  Q  Did anybody make him any promises?

17  A  No.

18  Q  Did he have any complaints about anybody

19 mistreating him?

20  A  No. He never made any complaints about anybody

21 mistreating him to myself. No.

22  Q  The defendant did indicate to you in your

23 conversation that he had a fight with 3 individuals the

24 day before, right?

Plaintiff Jakes 031097

1      A    He had a fight with 3 individuals the day

2    before and, on the 15th.  He had a skirmish with them

3    when he was taking the guys, where he and Quarter Pounder

4    and Tweety ran towards Throop Street and got away.

5          And then he had a, I wouldn't say it was a

6    fight.  I'd say it was a disciplinary action performed on

7    him by his aunt for fighting the other guy.

8      MR. GOODFRIEND:  Judge, I have no further questions.

9      THE COURT:  Recross?

10

11                RECROSS EXAMINATION

12

13                BY

14

15            MR. MADEA:

16      Q    Detective, you indicated that Anthony Jakes had

17    the run of the 3rd floor pretty much, is that correct?

18    You did testify to that?

19      A    Yes.  Except for the viewing room area.  There

20    is certain areas that are not sensitive.  That is the

21    area he was allowed in.

22      Q    Okay.  Just to get your attention, did Gus

23    Robinson have the same run of the 3rd floor that Mr.

24    Jakes was afforded?

230

Plaintiff Jakes 031098

1    MR. GOODFRIEND:  Objection, irrelevant.

2    THE COURT:  Sustained.

3    MR. MADEA:  Judge, may I be heard?

4    THE COURT:  Later on.

5    MR. MADEA:  Okay.  Well, I am through then.

6    THE COURT:  All right.  You may step down, sir.

7                              (Witness excused.)

8    MR. MADEA:  Judge, I do have a caveat.  Could I

9    approach?

10    THE COURT:  Yes.

11            (Whereupon there were proceedings

12             had off the record per order of

13             the Judge in the above-entitled

14             cause.)

15    THE COURT:  All right.  You are going to get

16    relieved for the evening.

17            What we are going to do is take you out the

18    front door and take you around.  Do you have any personal

19    possessions?  You have them all with you.  All right.

20            Tomorrow you will be going to 602.  Believe it

21    or not we are still on a schedule for possible completion

22    of this case tomorrow.  That is still my expectation.

23    But I truly need your cooperation.

24            Because of the double jury we lose some time in

231

Plaintiff Jakes 031099

1   logistics to transfer so tomorrow you will be in 602.

2           For example it takes us 5, 10, 15 minutes to

3   get you all out here together.  You can see that the

4   washroom facilities are insufficient for 28 people so it

5   takes a little longer and all of these minutes add up to

6   some point where they may rob us of completion tomorrow.

7           If that happens and it is necessary for a fair

8   trial, fine.  But I still believe we can complete this

9   tomorrow and I think that is a realistic expectation.

10  But in order to do that I need your cooperation.

11          If you would please be in room 602 at 10:30

12  sharp, go directly to 602, be there on time and we can

13  get started and that will certainly assist us in making

14  sure you don't have to spend that extra day.

15          - Remember you can't discuss the case with anyone

16  and if you happen to see anything on television, in the

17  radio or newspapers, you are of course to disregard it.

18          The sheriff will escort you.  Nobody has any

19  items in the jury room?  Very portable jury.  See you

20  tomorrow.

21                  (Whereupon the jury for Defendant

22                  Jakes was escorted out of the

23                  Courtroom and the following proceedings

24                  were had with Defendant Day and his jury.)

132

Plaintiff Jakes 031100

1          THE COURT:  Your comment was passed along to me and

2   I want you to know something, I know Judge Wapner I told

3   you I would always explain to you the reason for the

4   delay.

5          In the case of what we call a double jury,

6   which in this building is not infrequent, by any means,

7   it's certainly not common yet not uncommon at all.

8          It may be that elements of evidence may apply

9   to one defendant that may not apply to the other.  You

10  may, are not to speculate nor draw any inference from

11  that.  It's just to ensure that we have a fair trial.

12         The record should reflect that Mr. Day's jury

13  is present, Mr. Day is present personally and by counsel.

14         Neither the other defendant or the other jury

15  is present.

16         Please call your next witness.

17     MR. DILLON:  Officer Evans.

18

19

20

21

22

23

24

238

Plaintiff Jakes 031101

1          (Witness sworn.)

2              OFFICER JUDE EVANS,

3    called as a witness in the above-entitled cause, having

4    been first duly sworn, was examined and testified as

5    follows:

6

7              DIRECT EXAMINATION

8

9                  BY

10

11             MR. DILLON:

12       THE COURT:  Please be seated and make yourself

13   comfortable and once you are, please state your full

14   name?

15       A   Jude Evans.

16       THE COURT:  You may proceed.

17       MR. DILLON:  Thank you.

18   BY MR. DILLON:

19       Q    Sir, would you please tell us by whom you are

20   employed?

21       A    Chicago Police Department.

22       Q    Can you tell me how long you have been a

23   Chicago Police Officer?

24       A    Over 23 years.

Plaintiff Jakes 031102

1     Q   Could you tell me where you are currently

2  assigned within the Chicago Police Department?

3     A   I am assigned to the gang investigation unit on

4  Maxwell Street.

5     Q   Officer, I'd like to direct your attention to

6  the date of February the 4th of 1992.  Where were you

7  assigned within the police department at that time?

8     A   I was assigned as a Gang Crimes specialist to

9  Gang Crimes South at 51st and Wentworth.

10     Q   On February the 4th of 1992, were you working

11  on that date?

12     A   Yes, I was, sir.

13     Q   Were you working with a partner?

14     A   I was working with 2 partners that day.

15     Q  - Could you tell me the names of your partners

16  that you worked with on February 4th of 1992?

17     A   Officer John Blore and Officer Robert

18  Schaeffer.

19     Q   On that particular date that you worked do you

20  recall what hours you worked?

21     A   Worked from 9:00 in the morning until 5:30 in

22  the afternoon.

23     Q   And Officer, as you were working were you

24  wearing civilian dress similar to what you are wearing

Plaintiff Jakes 031103

```
 1   today or were you in a uniform?

 2        A    Civilian dress.

 3        Q    Were you assigned an automobile?

 4        A    Yes, sir.

 5        Q    Was that marked or unmarked vehicle?

 6        A    Unmarked vehicle.

 7        Q    Officer, I'd like to direct your attention to

 8   approximately 9:30 on the morning of the 4th of February,

 9   1992.  Did you have occasion to receive an assignment?

10        A    Yes, I did.

11        Q    Could you please tell me what the nature --

12        A    To meet Detective Foley at the area of 51st and

13   Sangamon.

14        Q    Did you proceed to that area?

15        A    Yes, sir.

16        Q    Did your partners, Officer Blore and Officer

17   Schaeffer, go along with you?

18        A    Yes, sir.

19        Q    Would you tell me what happened when you

20   arrived at the vacinity of 51st and Sangamon?

21        A    We met with Detective Foley and we went to an

22   address given to us by Detective Foley and -- concerning

23   of a man named Arnold Day wanted for questioning for a

24   murder.
```

Plaintiff Jakes 031104

1     Q   And with, would that address be 5234 South

2  Sangamon?

3     A   Yes.  It was, sir.

4     Q   Could you tell me when you got to that

5  location, what is it you did?

6     A   Went to the front door of the residence,

7  knocked on the door and the door was answered by a Mr.

8  Tate.

9     Q   Would that individual's first name be Quainmay

10  Tate?  (Phonetic)

11     A   Yes, sir.

12     Q   Now when you say you went to the front door,

13  who went to the front door?

14     A   Myself, Detective Foley and I believe Schaeffer

15  did also, sir.

16     Q   Now, after you knocked on the front door, Mr.

17  Tate answered the door.  Could you tell me what you did

18  at that time?

19     A   Identified ourselves as police officers,

20  explained to Mr. Tate we were looking for Arnold Day, and

21  asked Mr. Tate if we could search his house.

22     Q   When you requested Mr. Tate if you could search

23  his house, did he indicate whether or not he was willing

24  to allow you to search his home?

237

Plaintiff Jakes 031105

1          A     Yes, he was.

2          Q     Now, after he indicated to you that he would

3     allow you to search his home, what did you do at that

4     time?

5          A     Detective Foley and ourselves entered the

6     house, and gave Mr. Tate a consent to search form for his

7     residence and which he signed.

8          Q     And after that consent to search form was

9     signed did you then have an occasion to search 5234 South

10    Sangamon?

11         A     Yes, I did, sir.

12         Q     Can you please briefly describe the building

13    that is located at 5234 South Sangamon?

14         A     It's a single family residence located at that

15    address. -

16         Q     Now, could you tell me once you went into the

17    house and proceeded to search it, could you tell me where

18    you began your search?

19         A     We began our search on the first floor of that

20    residence.

21         Q     And when you conducted your search, did you

22    find Arnold Day on the first floor of that residence?

23         A     No, I did not.

24         Q     Now, after searching the first floor area of

138

1   5234 South Sangamon, can you tell me where you proceeded

2   to at that point?

3        A    I proceeded to the basement area along with

4   Officer Schaeffer, Detective, Officer Schaeffer, Officer

5   Blore and myself.

6        Q    And when you went to the basement area, were

7   you calling out anyone's name upon your arrival in the

8   basement?

9        A    Yes, sir.

10       Q    And whose name were you calling out?

11       A    Calling out Mr. Day's name and identifying

12   ourselves as police officers.

13       Q    When you were calling out Mr. Day's name, did

14   you get any responses?

15       A    No, I did not.

16       Q    Could you tell me then after you received no

17   response what you did?

18       A    We searched the basement area.

19       Q    Could you tell me what happened as you were

20   searching the basement area?

21       A    We lifted the bed in the front of the basement

22   and that gentleman there, Mr. Day, was laying under the

23   bed in the basement area, front part of the house.

24       Q    The person that you pointed to, could you

239

Plaintiff Jakes 031107

1    describe something he is wearing today in Court?

2         THE COURT:  Has your client been identified, Mr.

3    Katz?

4         MR. KATZ:  Yes, Your Honor.

5         MR. DILLON:  Thank you.

6    BY MR. DILLON:

7         Q    When you observed the defendant hiding

8    underneath the bed, what did you do at that time?

9         A    Told him to come out from underneath the bed.

10        Q    Did he come out?

11        A    He came out.  I believer Officer Schaeffer

12   handcuffed him and I observed a 9 milimeter bullet laying

13   underneath him on the floor.

14        Q    And what did you do with that bullet?

15        A  . The bullet was picked up and inventoried.

16        Q    Now, after the defendant was placed under

17   arrest and handcuffed, where did you proceed to?

18        A    Proceeded upstairs to my vehicle and brought

19   him into 39th and California Area 3 Violent Crimes and

20   placed him in the holding cell there.

21        Q    After you took the defendant to Area 3 Violent

22   Crimes and placed him in the holding cell, did you have

23   any further contact with Arnold Day?

24        A    No, I did not, sir.

Plaintiff Jakes 031108

1      MR. DILLON: If I could have one moment, please?

2      THE COURT: Of course.

3    BY MR. DILLON:

4      Q    Officer, what time was it that you arrived at

5    that location, 5234 South Sangamon?

6      A    Approximately 10:00 o'clock a.m. in the

7    morning, sir.

8      Q    And approximately what time was it that you

9    arrived at Area 3 Violent Crimes with Mr. Day?

10     A    I'd say 10:30. 10:40 is the latest.

11     MR. DILLON: Thank you, I have no further questions.

12     THE COURT: Cross-examination?

13

14              CROSS EXAMINATION

15

16              BY

17

18              MR. KATZ:

19     Q    Detective Evans, you said that when you went to

20   that address, Mr. Day was wanted for questioning, is that

21   correct?

22          That is how you phrased it when Mr. Dillon was

23   talking to you?

24     A    Yes, sir, I said questioning.

Plaintiff Jakes 031109

1    Q    At the time that you went there you had no

2  warrant for his arrest, is that correct?

3    A    I personally did not but there was a warrant

4  for his arrest.

5    Q    Not for this offense, is that correct?

6    A    Not for that offense, No, sir.

7    Q    And when you got to the address you knocked on

8  the door and Mr. Tate answered the door, is that correct?

9    A    Yes, sir.

10   Q    You announced that you were police officers at

11 that time, is that correct?

12   A    Yes, sir.

13   Q    All 3 of you, all 4 you, I should say, were in

14 plainclothes?

15   A  - Yes, sir.

16   Q    And when you entered the residence you actually

17 had your gun drawn, isn't that correct?

18   A    Yes, I did, sir.

19   Q    And the other officers, did they also have

20 their guns drawn?

21   A    I don't recall if they all did.  I believe one

22 other Officer did, sir.

23   Q    But when you entered the residence you did not

24 see Mr. Day, is that correct?

242

Plaintiff Jakes 031110

1      Q   At the time that you went there you had no

2  warrant for his arrest, is that correct?

3      A   I personally did not but there was a warrant

4  for his arrest.

5      Q   Not for this offense, is that correct?

6      A   Not for that offense, No, sir.

7      Q   And when you got to the address you knocked on

8  the door and Mr. Tate answered the door, is that correct?

9      A   Yes, sir.

10      Q   You announced that you were police officers at

11  that time, is that correct?

12      A   Yes, sir.

13      Q   All 3 of you, all 4 you, I should say, were in

14  plainclothes?

15      A  - Yes, sir.

16      Q   And when you entered the residence you actually

17  had your gun drawn, isn't that correct?

18      A   Yes, I did, sir.

19      Q   And the other officers, did they also have

20  their guns drawn?

21      A   I don't recall if they all did.  I believe one

22  other Officer did, sir.

23      Q   But when you entered the residence you did not

24  see Mr. Day, is that correct?

242

Plaintiff Jakes 031111

1       A    No, I did not, sir.

2       Q    And you did not find him on the first floor, is

3   that correct?

4       A    Correct, sir.

5       Q    And when you went down to the basement you said

6   he was under a bed, is that correct?

7       A    Yes, sir.

8       Q    And at that time you got him out from under the

9   bed?

10      A    Yes, sir.

11      Q    He was handcuffed?

12      A    Yes, sir.

13      Q    And he had no gun in his possession?

14      A    Correct, sir.

15      Q    And the bullet that you said you found was not

16  in his hand, it wasn't on his person, not in his clothes;

17  it was lying on the floor, is that correct?

18      A    Under him, yes, sir.

19      Q    And that was a 9 milimeter bullet you said?

20      A    Yes, sir.

21      Q    And at that time he didn't say anything to you,

22  did he?

23      A    No, he did not, sir.

24      Q    He did not make any statements of any kind, is

Plaintiff Jakes 031112

1   that correct?

2       A   Correct, sir.

3       Q   Are you --

4       Now, you said that he was wanted for

5   questioning but you put him under arrest at that moment,

6   didn't you?

7       You handcuffed him and put him under arrest

8   when you took him out from under that bed, is that

9   correct?

10      A   I believe I, he was under arrest, yes, sir, for

11   the warrant.

12      Q   And you took him to the police station in

13   custody?

14      A   Yes, sir.

15      Q   And when he came out from under the bed he

16   didn't struggle with you in any way, is that correct?

17      A   Correct, sir.

18      Q   He didn't try to run?

19      A   No, sir.

20      Q   He didn't fight with any of the Officers?

21      A   No, sir.

22      Q   Isn't it true that yourself and one of the

23   Officers, as he was being brought out from under the bed,

24   kicked him as he was lying on the floor?

Plaintiff Jakes 031113

1     A   No, sir.

2     Q   And he was -- but he was immediately

3 handcuffed, is that correct?

4     A   When?

5     Q   As soon as he got out from under the bed?

6     A   He was first searched, sir, then handcuffed.

7     Q   There was nothing found on his person, is that

8 correct?

9     A   Yes, sir.

10     Q   And he was handcuffed and then taken to the

11 station?

12     A   Yes, sir.

13     Q   How long were you in the house, Officer?

14     A   Probably a total of 15 minutes, sir.

15     Q  - And did you transport him down to the

16 headquarters of the police station?

17     A   Yes, I did.

18     Q   In your car?

19     A   Yes, sir.

20     Q   And you put, where did you take him once you

21 got down to the police station?

22     A   I took him to the third floor, Violent Crimes

23 unit, and there is an outside holding area.  I placed him

24 in there.

Plaintiff Jakes 031114

1      Q    So you didn't take him into an interview room.

2  You placed him in a holding cell, is that correct?

3      A    Yes, sir.

4      Q    And is that the last contact you had with him?

5      A    Yes. It is, sir.

6      MR. KATZ:  I have no further questions.

7      THE COURT:  Redirect?

8      MR. DILLON:  No further questions.

9      THE COURT:  You may step down, sir.

10                          (Witness excused.)

11      THE COURT:  Call your next witness.

12      MR. DILLON:  Detective Boudreau.

13                        (Witness sworn.)

14               DETECTIVE KENNETH J. BOUDREAU,

15  called as a witness in the above-entitled cause, having

16  been first duly sworn, was examined and testified as

17  follows:

18

19             DIRECT EXAMINATION

20

21             BY

22

23             MR. DILLON:

24      THE COURT:  State your full name and spell your last

Plaintiff Jakes 031115

1    name?

2        A    Kenneth J.  Boudreau, B-o-u-d-r-e-a-u.

3        THE COURT:  You may proceed.

4        MR. DILLON:  Thank you.

5    BY MR. DILLON:

6        Q    By whom are you employed?

7        A    Chicago Police Department, sir.

8        Q    How long have you been a Chicago Police

9    Officer?

10       A    Been a Chicago Police Officer for 7 years.

11       Q    And can you tell me what rank you currently

12    hold within the police department?

13       A    I am currently a Detective assigned to Area 1

14    Violent Crimes.

15       Q   How long have you been a Detective with the

16    Chicago Police Department?

17       A    3 years.

18       Q    Detective, I'd like to direct your attention

19    back to the date of September 16th of 1991.  On that

20    particular date, Detective, where were you assigned?

21       A    At that time I was assigned to Area 3 Violent

22    Crimes.

23       Q    And Detective, could you tell me where Area 3

24    Violent Crimes is located?

Plaintiff Jakes 031116

1    A    Area 3 Violent Crimes, the office is located at

2    3900 South California and at that time covered the 7th,

3    8th and 9th police districts.

4        Q    And Detective, do you recall on September 16th

5    of 1991, what your hours of work were?

6        A    On that day, sir, I was employed from 16:30

7    which was 4:30 in the afternoon up until 01:00 or 1:00

8    a.m. in the morning.

9        Q    On that date, Detective, were you assigned to a

10   partner?

11       A    Yes, I was.

12       Q    And could you tell the name of your partner

13   that you were working with on that date?

14       A    Detective Michael Kill, K-i-1-1.

15       Q    And Detective, were you assigned upon your

16   arrival at work to a homicide investigation involving a

17   victim by the name of Rafael Garcia?

18       A    Yes, sir, I was.

19       Q    Now, when you arrived at the area, was there a

20   person by the name of Anthony Jakes there?

21       A    Yes, sir, there was.

22       Q    Were there conversations with Mr. Jakes?

23       A    Yes, sir, there was.

24       Q    Now, after these conversations with Mr. Jakes,

Plaintiff Jakes 031117

1    did you remain at the area or did you go anywhere?

2       A    No, sir, we left the area and proceeded back to

3    the scene of the murder in search of trying to find

4    people that Mr. Jakes told us.

5       Q    That would be in the vacinity of 51st and

6    Racine?

7       A    Yes, sir.

8       Q    Now, when you went to that location, Detective,

9    did you have occasion to speak with witnesses?

10       A    Yes, I did.

11       Q    Approximately how long were you out in the

12    vacinity of 51st and Racine speaking with witnesses?

13       A    Approximately an hour.

14       Q    Now, did you have an occasion after speaking

15    with witnesses at that location to go to any other

16    locations in that immediate proximity?

17       A    Yes, sir, we did.

18       Q    Did you have an occasion to speak with other

19    people?

20       A    Yes, sir, we did.

21       Q    Now, at some point did you have an occasion to

22    return back to Area 3 Violent Crimes?

23       A    Yes, sir, I did.

24       Q    Do you recall approximately what time it was

Plaintiff Jakes 031118

1    that you arrived back at Area 3?

2        A    It was approximately 9:30.

3        Q    Now, Detective, I'd like to direct your

4    attention to approximately 10:45 on the evening of

5    September 16th of 1991.

6             Were you present for a conversation with

7    Anthony Jakes?

8        A    Yes, I was.

9        Q    Approximately how long did that conversation

10   last?

11       A    Approximately --

12       MR. KATZ:   I am going to object to the relevance.

13       THE COURT:   Sustained as to how long it lasted.

14   BY MR. DILLON:

15       Q    After you had this conversation with Anthony

16   Jakes, did you remain at the area?

17       A    Yes, sir, I did.

18       Q    At some point in time was an Assistant State's

19   Attorney notified?

20       A    Yes, sir, there was.  Along with, I tried to

21   contact a Youth Officer from Youth Division.

22       Q    At some point in time did an Assistant State's

23   Attorney arrive?

24       MR. KATZ:   Objection to the relevance.

Plaintiff Jakes 031119

1       THE COURT: Overruled.

2       A   Yes, sir.

3  BY MR. DILLON:

4       Q   Do you know the name of the state's attorney

5  that arrived at Area 3?

6       A   That was Assistant State's Attorney, I believe,

7  Brian Grossman.

8       Q   Did a Youth Officer subsequently come to Area

9  3?

10       A   Yes, sir.

11       Q   And was a handwritten statement taken from

12  Anthony Jakes?

13       A   Yes, sir.

14       Q   Were you present for that statement?

15       A   No, sir.

16       Q   Now, after that handwritten statement was taken

17  from Anthony Jakes, did you remain in the area or did you

18  go anywhere?

19       A   No, sir, I left the area.

20       Q   And what was your purpose in leaving the area?

21       A   I was looking for the defendant, Mr. Arnold

22  Day.

23       Q   Now, the person you referred to as the

24  defendant Arnold Day, can you please identify him please?

Plaintiff Jakes 031120

1      A     Yes.   Sitting at the defense table with the

2   suit on.

3      THE COURT:   Has your client been identified, Mr.

4   Katz?

5      MR. KATZ:   Yes, Your Honor.

6      MR. DILLON:   Thank you.

7   BY MR. DILLON:

8      Q     Now, after you went to go look for Arnold Day,

9   could you tell us where it is you went to look for Arnold

10  Day?

11     A     We went to an area at 5038 South Damen, the

12  rear cottage house.

13     Q     Approximately what time would this have been,

14  Detective?

15     A   _ Be approximately 5:30 in the morning.

16     Q     This would be now on the morning of September

17  17 of 1991?

18     A     Yes, sir.

19     Q     Now, when you went to 5038 South Damen, could

20  you tell me did you go there by yourself or with anyone

21  else?

22     A     No.   No, sir.   I went there with my partner,

23  Detective Kill.

24     Q     Could you tell me what happened upon your

Plaintiff Jakes 031121

1    arrival at that location?

2        A    We knocked on the door.  It was subsequently

3    answered by a female subject who identified herself as

4    Mr. Day's grandmother and a male subject who identified

5    himself as Mr. Day's uncle.

6        Q    Did you have a conversation with those people?

7        A    Yes, sir, we did.

8        Q    Could you tell me what it is you said to them?

9        A    We informed them of our identity, presented

10   them with business cards and we told the grandmother that

11   we wished to interview her grandson concerning a murder

12   investigation.

13       Q    And were you able to ascertain whether or not

14   Arnold Day was there?

15       A    No, sir.  She informed me that he returned home

16   at 3:00 a.m. and he subsequently left and she doesn't

17   know where he is at.

18       Q    Did you make any request of this grandmother

19   when you determined that he was not there?

20       A    Yes, we did.  With the business card provided

21   we asked her if he came home or she knew of his

22   whereabouts to please contact us.

23       Q    Now, after you went to 5038 South Damen to

24   attempt to locate Arnold Day and were unsucessful, what

Plaintiff Jakes 031122

1    did you do at that point?

2        A    I drove around to various locations at which,

3    at which I know that the subject Mr. Arnold Day would be

4    at.

5        Q    And do you recall those locations that you

6    went?

7        A    Yes, sir, I do.

8        Q    Could you please tell us where it was you went

9    to, looking for Arnold Day?

10       A    Went to an area located 53rd Street and

11   Aberdeen.  Went to an area located at 50th and Elizabeth.

12   Went to an area at 50th and Throop.  Went to an area at

13   54th and May.  I went back to the area where the murder

14   occurred at 51st and Racine.

15       Q    At all those locations that you went to, were

16   you able to find Arnold Day?

17       A    No, sir.

18       Q    Now, from September 17 of 1991, until February

19   of 1992, did you continue to look for Arnold Day?

20       A    Yes, sir, we did.

21       Q    Could you tell me how often you would spend

22   looking for Arnold Day?

23       A    I would say that on an average between 3 and 4

24   times each week.

Plaintiff Jakes 031123

1      Q   And could you tell me how it is during those 3

2   or 4 times on the average a week that you looked for him,

3   where you would go?

4      A   I would go to the same areas that I previously

5   mentioned, the areas that Mr. Day was known to hang out

6   in.

7      Q   And during the period of time since you went to

8   locations from September 17 of 1991, to February of 1992,

9   did you ever find Arnold Day?

10     A   No, sir, I did not.

11     Q   From the period of September 17 of 1991, to

12   February of 1992, did Arnold Day ever contact you or any

13   other member of the Chicago Police Department?

14     A   Not to my knowledge, sir.

15     Q  - Now, Detective, I'd like to direct your

16   attention to the date of February 4th of 1992.

17          Were you working at that time?

18     A   Yes, sir, I was.

19     Q   Were you still assigned to Area 3 Violent

20   Crimes?

21     A   Yes, sir, I was.

22     Q   On that particular day, Detective, were you

23   working by yourself or with a partner?

24     A   On that day I was working with a Detective

Plaintiff Jakes 031124

1    William Foley, F-o-l-e-y.

2        Q    Detective, do you recall what hours you were

3    working on February 4th, 1992?

4        A    Yes, I do.  It was from 08:30, or 8:30 a.m.

5    until 16:30 or 4:30 p.m.

6        Q    Detective I'd like to direct your attention to

7    approximately 10:30 to 10:40 in the morning of February

8    the 4th of 1992.

9            Do you recall where you were at that time?

10       A    Yes, sir.  I was in the offices of Area 3

11   Violent Crimes.

12       Q    At that time, Detective, were you made aware as

13   to whether or not anybody was in custody in regards to

14   the homicide investigation of Rafael Garcia?

15       A   - Yes, I was.

16       Q    And who was that that you were made aware of

17   was in custody?

18       A    Arnold Day.

19       Q    Detective, I'd like to direct your attention to

20   approximately 11:00 o'clock on the morning of February

21   4th of 1992.

22           Did you have occasion to have a conversation

23   with Arnold Day?

24       A    Yes, sir, I did.

256

1    Q    Could you tell me who else was present for that

2    conversation with the defendant?

3    A    Detective Bill Foley.

4    Q    Did you have a conversation with the defendant?

5    A    Yes, I did.

6    Q    And the conversation took place where?

7    A    In the interview room located on the third

8    floor of 3900 South California.

9    Q    At the conclusion of that interview, Detective,

10   could you tell me what it is that you did?

11   A    Prior to my interview with Mr. Day, I informed

12   him of his Miranda warnings and at the conclusion of that

13   interview, I contacted, made a request for the Cook

14   County State's Attorney Felony Review Unit to respond to

15   my office.

16   Q    Now, you indicated that, that prior to your

17   first questioning the defendant, you advised him of his

18   Constitutional rights.

19        Could you tell me how it is that you did that?

20   A    I did that from a page in our Fraternal Order

21   of Police handbook.  At that time it was listed on page

22   79.

23   Q    Do you have an FOP book with you here today?

24   A    Yes, sir, I do.

257

1     Q    And what year FOP book do you have here today?

2     A    1993.

3     Q    Are the rights in the 1993 book the same rights

4 that were present in the book that you used back on

5 February 4th of 1992?

6     A    Yes, sir, they are.

7     Q    Could you please tell us what rights you

8 advised the defendant of prior to speaking with him?

9     A    I informed Mr. Day do you understand that you

10 have right to remain silent at which time he indicated

11 yes.

12     Do you understand anything you say can and may

13 be used against you in a Court or other proceedings?

14 Again he responded yes.

15     Do you understand that you have the right to

16 talk to a lawyer before we ask you any questions and have

17 him with you during your questioning?  Again he responded

18 yes.

19     If you cannot afford or otherwise obtain a

20 lawyer and you want one, a lawyer will be appointed for

21 you and we will not ask any questions until he has been

22 appointed and asked him if he understood that.  He said

23 yes.

24     I said if you decide to answer now with or

Plaintiff Jakes 031127

1    without a lawyer you still have the right to stop the

2    questioning at any time or to stop the questioning for

3    the purpose of consulting a lawyer and I asked him if he

4    understood that and he said yes.

5             I said you have the right to advice of counsel

6    and your right to remain silent but you may answer

7    questions or make a statement without consulting a lawyer

8    if you so desire. He also indicated that he understood

9    that.

10            And then I asked him do you understand each of

11   these rights I have explained to you. He said yes.

12            And I said do you wish to answer my questions

13   at this time at which time he said yes.

14   Q     And that is when you and Detective Foley had a

15   conversation with him, is that correct?

16   A     That is correct.

17   Q     Now, you indicated at the conclusion of that

18   conversation you contacted the State's Attorney?

19   A     That is correct, sir.

20   Q     Did the State's Attorney subsequently come to

21   Area 3 Violent Crimes after you called the State's

22   Attorney's office?

23   A     Yes, sir.

24   Q     Can you tell me the name of the State's --

259

Plaintiff Jakes 031128

1    A    It was Assistant State's Attorney Jason

2    Doneilian.

3    Q    Do you recall what time it was approximately

4    that State's Attorney Doneilian arrived?

5    A    He arrived there approximately 15:00 or 3:00

6    p.m.

7    Q    Now, at the time State's Attorney Doneilian

8    arrived, did you have occasion to brief him in regards to

9    your investigation?

10   A    Yes, sir, I did.

11   Q    Detective, I'd like to direct your attention to

12   approximately 4:30 on the afternoon of February 4th,

13   1992.

14        Did you have another conversation with the

15   defendant Arnold Day?

16   A    Yes, I did.

17   Q    Could you tell me who was present for that

18   conversation?

19   A    At that time it was of course Mr. Day, myself

20   and Assistant State's Attorney Doneilian, ASA Doneilian.

21   Q    At the time that you and Assistant State's

22   Attorney Doneilian and the defendant had this

23   conversation did the State's Attorney identify himself

24   upon meeting Mr. Day?

260

Plaintiff Jakes 031129

1    A   Yes, he did.

2    Q   Do you recall how he introduced himself?

3    A   Yes, sir.  Previously I told Mr. Day that an

4 Assistant State's Attorney would be responding to the

5 area.

6        When we entered the room I informed Mr. Day

7 this was the Assistant State's Attorney I was talking

8 about.  Mr. Donielian just then identified himself by

9 name, and informed him that he was a lawyer, he was a

10 prosecutor that was working with the police and that he

11 was not Mr. Day's lawyer.

12    Q   Did Mr. Day indicate in your presence that he

13 understood that?

14    A   Yes, sir, he did.

15    Q   After Mr. Donielian had introduced himself to

16 Mr. Day, did he advise him of anything at that time?

17    A   Yes, sir, he did.

18    Q   And what is it that he advised him of?

19    A   Mr. Donielian advised him of his Miranda

20 warnings from his memory.

21    Q   And, as Mr. Donielian advised him of those

22 rights, did Arnold Day indicate he understood those

23 rights?

24    A   Yes, sir, he did.

Plaintiff Jakes 031130

1     Q    After State's Attorney Doneilian had advised

2  him of his rights did State's Attorney Doneilian ask the

3  defendant if he was willing to speak with him?

4     A    Yes, he did.

5     Q    And what was the Defendant's response?

6     A    Yes, he would.

7     Q    At that time were you present for a

8  conversation between Assistant State's Attorney Doneilian

9  and the defendant?

10     A    Yes, sir, I was.

11     Q    At the conclusion of that statement between

12  Assistant State's Attorney Doneilian and the defendant

13  for which you were present, did the State's Attorney

14  Doneilian make any request of the defendant?

15     A  - Yes, sir, he did.

16     Q    And what was the nature of that request?

17     A    He asked Mr. Day if he would submit to a

18  written statement and Mr.Donielian then informed Mr. Day

19  that there was 2 types of written statement.

20         One would be a Court Reported statement that is

21  similar to the Court Reporter that we have here in the

22  building today.

23         Or the other one would be handwritten statement

24  in which ASA Doneilian would write down his responses on

262

Plaintiff Jakes 031131

1      a piece of paper.

2          Q     Did the defendant indicate whether or not he

3      would be willing to give a statement?

4          A     Yes, he did.

5          Q     And what did he indicate he would give?

6          A     He indicated that he'd prefer a handwritten

7      statement.

8          Q     Now, after the defendant indicated that he was

9      willing to give a handwritten statement, could you tell

10     me what happened at that time?

11         A     At that time, myself and ASA Doneilian left the

12     room, the interview room in which Mr. Day was seated.

13         Short time later Mr.Donielian went back into

14     the room by himself with Mr. Day.

15         Q     Detective, I'd like to direct your attention to

16     approximately 6:00 o'clock on the evening of February 4th

17     of 1992.

18         Were you present for the handwritten statement

19     of the defendant, Arnold Day?

20         A     Yes, I was.

21         Q     And who was present for that handwritten

22     statement?

23         A     Arnold Day and ASA Doneilian and myself.

24         Q     Could you briefly explain to me how that

Plaintiff Jakes 031132

1  handwritten statement was taken?

2      A    Mr.Donielian would have a piece of paper in

3  front of him and a pen.  He asked Mr. Day some questions

4  at which time he would write his responses out.  He'd ask

5  a series of questions and then would write in summary

6  what Mr. Day had told him.

7      Q    And was this done during the entire course of

8  the statement?

9      A    Yes, sir.  It was.

10     Q    After that was done, during the statement could

11 you tell me what happened at that time?

12     A    ASA Doneilian then had Mr. Day read the

13 preprinted portion of the statement which were his

14 Miranda warnings to have Mr. Day demonstrate that he can

15 read English, and then ASA Doneilian also had him read

16 the first portion of the handwritten statement which ASA

17 Doneilian wrote out to demonstrate that to Mr.Donielian.

18     Q    Was defendant able to do so?

19     A    Yes, he was.

20     Q    Could you tell me after the defendant read out

21 the Miranda warnings as well as the first few lines, what

22 was done at that time?

23     A    At that time ASA Doneilian sat close to Mr. Day

24 and he ran his finger along the statement and he read the

264

Plaintiff Jakes 031133

1    statement out loud to Mr. Day where they could both read

2    it off the piece of paper.

3         Also during that time, if there was any

4    corrections or mistakes in that statement, Mr. Day was

5    afforded the opportunity to correct that.

6    Q    And was that done through each and every page

7    of that statement?

8    A    It was done throughout the entire statement,

9    sir.

10   Q    Now after the statement was read over and the

11   corrections were made, would you tell me what if anything

12   was done when a correction was made?

13   A    At the time a correction was made there was a

14   line drawn through that word or that phrase, and Mr. Day

15   would place his initials next to that line, I would place

16   my initials next to that line and so would ASA Doneilian.

17   Q    And was this done throughout the entire course

18   of the statement?

19   A    Yes, sir, it was.

20   Q    After the statement had been read and all the

21   corrections had been made what happened at that time?

22   A    At that time Mr. Day was requested to affix his

23   signature to the line directly below his preprinted, the

24   preprinted warnings and then on each and every page.

Plaintiff Jakes 031134

1      Q      Detective, did you yourself sign that

2   statement?

3      A      Yes, sir.  After Mr. Day would sign, ASA

4   Doneilian would sign and I would sign also.

5      Q      Detective, I'd like to show you what's been

6   previously marked as People's Exhibit No. 38 for

7   identification.

8             Do you recognize what that is?

9      A      Yes, sir.

10     Q      And what is that?

11     A      That is a page out of the Fraternal Order Of

12  Police handbook; that is the Miranda warnings to be given

13  prior to an interview with a suspect.

14     Q      And are those in fact the same rights that you

15  read to Arnold Day prior to your questioning of him?

16     A      Yes, sir.

17     Q      Now I'd like to show you what's been marked as

18  People's Exhibit No. 33 for identification and ask you to

19  look at that document.

20     A      Okay, sir.

21     Q      Can you tell me what you recognize that to be?

22     A      Yes, sir.  This is a handwritten statement that

23  Arnold Day gave to ASA Doneilian and myself.  It's the

24  original.

1    Q    Does People's Exhibit No. 33, does that appear
2    to be in the same or substantially the same condition now
3    as it was when it was taken back on February 4th of 1992?
4    A    Yes, sir.
5    Q    Thank you.
6         Detective, these events that you testified to
7    today occurred in Chicago, Cook County, Illinois?
8    A    Yes, they did.
9    MR. DILLON:  Thank you, I have no further questions.
10   THE COURT:  You may inquire.
11
12              CROSS EXAMINATION
13
14              BY
15
16              MR. KATZ:
17   Q    Detective Boudreau, going back to September 16,
18   you initially got to the scene at 51st and Racine, you
19   remember around what time?
20   A    I did not respond to the homicide scene, sir,
21   that evening, if that is the scene you are referring to.
22   Q    Didn't you say that you, I thought you --
23        Maybe I misunderstood.  When you first were
24   assigned to the case on the 16th, you were working with

267

Plaintiff Jakes 031136

1     Detective Kill, correct?

2          A     Yes, sir.

3          Q     Didn't you state that after you spoke with Mr.

4     Jakes you went back to the scene?

5          A     Yes, sir.

6          Q     And that was at 51st and Racine?

7          A     Yes, I thought you meant homicide.  The scene

8     itself.

9          Q     No, I am just talking at the scene of 51st and

10    Racine.

11               And you said you spoke with a number of

12    witnesses for approximately an hour, is that correct?

13         A     That is correct.

14         Q     Do you remember how many witnesses you spoke to

15    at that time?

16         A     Initially when I first got there I spoke to 3

17    people.  It was 3 girls.

18         Q     And did Detective Kill talk to any other people

19    besides those 3?

20         A     No, I talked to the 3 girls.  It was Nikita

21    Little and Annette Harris and Denise Harris.

22               While I was conducting those interviews

23    Detective Kill was in the alley behind the location.  He

24    was conducting other field interviews with other people.

168

1    Q    So he did talk to some other people while you

2    were talking to these 3?

3    A    Yes, sir.

4    Q    And then you left that location; you went to a

5    second location, is that correct?

6    A    That is correct, sir.

7    Q    Do you remember what location that was at?

8    A    Yes.  I went to the victim's residence at 5109

9    South Aberdeen, if I am not mistaken on the address.

10   Q    And you spoke with family members then, is that

11   what you were doing at that point?

12   A    That is correct, sir.

13   Q    Then you went back to 51st and Racine, is that

14   correct?

15   A    I believe after that we went to an address at

16   1102 West 51st Street.

17   Q    I am sorry.  You testified on direct that you

18   went back to the scene.  You went back to, where is this?

19   A    It's within half a block of the scene, sir.

20   Q    And what is it that you were doing there at

21   that time?

22   A    Again we were conducting, trying to locate

23   additional witnesses.

24   Q    And did you talk to additional people at that

Plaintiff Jakes 031138

1    point?

2         A    Yes, sir.

3         Q    And do you remember how many additional people

4    you talked to at that point?

5         A    At that time I believe we only spoke to 2

6    people.

7         Q    So you talked to 5 people total that were in,

8    at or around the scene and Detective Kill talked to some

9    additional number of people, is that correct?

10        A    That is correct, sir.

11        Q    All right.

12             You mentioned on direct that you went to Arnold

13   Day's residence on a number of occasions 3 to 4 times a

14   week, is that correct?

15        A    That is correct.

16        Q    Could we back up a little bit?  When you

17   initially talked to all these people on the scene on the

18   16th you initially wrote up a report, is that correct?

19        A    That is correct.

20        Q    You memorialized all your efforts, is that

21   correct?

22        A    That is correct.

23        Q    During the course of time from September 16th

24   through February of 1992, you made a number of attempts,

Plaintiff Jakes 031139

1   you said, to locate Mr. Day, isn't that right?

2       A   That is correct.

3       Q   You didn't make out any reports memorializing

4   those attempts, did you?

5       A   No, sir.  I would have volumes of reports to

6   write.

7       Q   But the answer is no, you have nothing down to

8   show that you made all those attempts to locate Mr. Day,

9   isn't that right?

10      A   No, sir.

11      Q   And then when you did see him it was at the

12  headquarters on -- I am sorry, the date in February of

13  '92, is that correct?

14      A   That is correct, sir.

15      Q   - Do you know what time --

16          Were you there when he was brought to the

17  police station?

18      A   I was there.  I believe he entered, came in the

19  police station around 10:30 in the morning.

20      Q   And do you know where, where did you initially

21  see him at the police station?

22      A   I believe I saw his back as he was being walked

23  to an interview room.

24      Q   So you didn't see him when he was initially

Plaintiff Jakes 031140

1    placed in a holding cell, is that correct?

2         A     There are no holding cells in Area 3, sir.

3         Q     There is no holding cells there?

4         A     No, sir.

5         Q     So he was taken directly to an interview room?

6         A     That is correct, sir.

7         Q     The interview room that he was taken to, would

8    you describe it for us please?

9         A     An interview room is located on the third

10   floor, be facing the North side -- be on the North side

11   of the building.  I would guess that the dimensions would

12   be maybe 8 feet by 5 feet in which there was a chair, a

13   table there with 4 chairs.

14        Q     I am sorry, 8 feet by 5 feet?

15        A     I would guess, sir.

16        Q     Approximately?

17        A     Yes, sir.

18        Q     And there is a window in the room?

19        A     Yes, sir.

20        Q     There is also a ring attached to one of the

21   walls, is that correct?

22        A     Yes, sir, there is a ring attached to a wall.

23        Q     And the purpose of that link is if you

24   handcuff, if you need to handcuff somebody to the wall,

Plaintiff Jakes 031141

1    that is how you do it, is that correct?

2         A    That is correct, sir.

3         Q    When Mr. Day was brought in he was in

4    handcuffs, is that correct?

5         A    I believe he was, sir, yes.

6         Q    And when he was brought in there he was

7    handcuffed to the wall, right?

8         A    No, sir, he was not.

9         Q    He was not handcuffed to the wall?

10        A    When I entered the room he was not handcuffed,

11   to speak to him, sir.

12        Q    So when you were speaking to him and Officer

13   Foley was present you are saying he was not handcuffed at

14   that time?

15        A    That is correct, sir.

16        Q    And you say you gave him his Miranda rights, is

17   that correct?

18        A    That is correct, sir.

19        Q    You did not have an attorney present while you

20   were talking to him?

21        A    No, sir.

22        Q    And it was just you and Officer Foley at that

23   time?

24        A    Yes, sir.

233

Plaintiff Jakes 031142

1    Q    And during the course of your conversation no

2    other officers came in, isn't that right?

3    A    No, sir.

4    Q    No attorneys came in for Mr. Day?

5    A    No, sir.

6    Q    No attorneys came in on behalf of the State.

7    No prosecutors, Assistant State's Attorneys came in,

8    isn't that right?

9    A    That is correct.

10   Q    How long was your initial conversation with

11   him?

12   A    My initial conversation with him was between

13   approximately 11:00 and 1:45 which was 11:00 o'clock a.m.

14   to 1:45 p.m.

15   Q    So he was in there for about half an hour

16   before you started to talk to him, isn't that right?

17   A    Yes, sir.

18   Q    And then you spoke to him for, I am sorry, you

19   said 11 to 1:45?

20   A    That is correct, sir.

21   Q    So for close to 3 hours?

22   A    Yes, sir.

23   Q    And during the course of that 3 hours --

24   scratch that.

Plaintiff Jakes 031143

1     After the initial conversation you left him

2 alone again for awhile, isn't that right?

3   A  That is correct, sir.

4   Q  And he was alone for approximately an hour and

5 a half, isn't that right?

6   A  He was alone until approximately the State's

7 Attorney arrived, yes, sir.

8   Q  Which would have been around 3:00 p.m.?

9   A  Yes, sir.

10   Q  And during that time, he didn't call anybody,

11 isn't that right?

12   A  No, sir. He didn't want to.

13   Q  Nobody else came in to talk to him during the

14 course of that period, isn't that right?

15   A - No, sir.

16   Q  And the Assistant State's Attorney came and you

17 said that he identified himself as an Assistant State's

18 Attorney, right?

19   A  That is correct, sir.

20   Q  And you say they had a conversation, the two of

21 you were present, Officer Foley left at that time, is

22 that correct?

23   A  Yes, sir.

24   Q  And after this conversation -- well, the

275

Plaintiff Jakes 031144

1    conversation with the Assistant State's Attorney lasted

2    for how long?

3         A    Approximately an hour.

4         Q    So now we are up to about 4:00 p.m., isn't that

5    right?

6         A    Actually ASA Doneilian started interviewing him

7    at 16:30 until 17:30.

8         Q    Is it correct when ASA Doneilian first arrived

9    he spoke with you?

10        A    That is correct.

11        Q    For close to an hour, isn't that right?

12        A    He spoke with me for awhile then he had a lot

13   of reports to read concerning the incident.

14        Q    So before he ever went in to talk to Mr. Day he

15   had been given quite a bit of information concerning this

16   case, is that correct?

17        A    Oh, absolutely, sir.

18        Q    And then he went and had the conversation with

19   Mr. Day?

20        A    Yes, sir.

21        Q    And you say at that point he was given the

22   opportunity to reduce the statement to writing, is that

23   correct?

24        A    That is correct.

Plaintiff Jakes 031145

1     Q   And the 2 options that he was given was Court

2  Reported statement or handwritten statement?

3     A   That is correct.

4     Q   That he was never given the opportunity to

5  write it out in his own words, isn't that right?

6     A   No, sir.

7     Q   Nobody ever offered him pen and paper and said,

8  "here. You know how to write. Put it down in your own

9  words?"

10     A   No, sir.

11     Q   He wasn't given the opportunity to put it down

12  on video tape, isn't that right?

13     A   We don't have any videotape capabilities, sir.

14  No, sir.

15     Q   It was not actually a Court Reporter present at

16  the time, was there?

17     A   No, sir. What they would do is they would

18  contact one and one would respond.

19     Q   Mr. Day was told there was no reporter present

20  at that time, isn't that right?

21     A   I don't believe he was informed of that, sir,

22  no.

23     Q   But in any event they would have had to wait to

24  have it be a Court Reported statement?

277

Plaintiff Jakes 031146

1     A   Yes, we'd have to wait for one to come to the

2  office.

3     Q   When ASA Doneilian sat down with the pen and

4  paper you said he wrote it down as he was talking to Mr.

5  Day, is that correct?

6     A   Yes, sir.

7     Q   Mr. Day didn't make corrections as they were

8  going, is that correct?  He waited until Mr.Donielian,

9  waited until he was finishing writing the whole thing

10  out?

11     A   That is correct.

12     Q   And the statement is in Mr.Donielian's

13  handwriting, is that correct?

14     A   Yes, sir.

15     Q   And it was not taken down word for word, is

16  that correct?

17     A   No, it's a summary.

18     Q   It's a summary.  Well, it's a summary of all

19  the relevant facts, isn't it?

20     MR. GOODFRIEND:  Objection, characterization.

21     THE COURT:  Sustained.

22  BY MR. KATZ:

23     Q   After he wrote the whole thing out that is when

24  he reviewed it with Mr. Day, is that correct?

Plaintiff Jakes 031147

1    A    That is correct.

2    Q    And what Mr. Day was told he could do at that

3    point is to go through it and correct any mistakes, isn't

4    that right?

5    A    He can go through and make any additions, he

6    could delete anything in the statement.  He could take

7    whatever he wants out of the statement and add whatever

8    he'd like into the statement.

9    Q    And he was asked to sign the bottom of each

10   page, is that correct?

11   A    That is correct.

12   Q    And that is what he did?

13   A    Yes, sir.

14   Q    After they had gone through the statement,

15   isn't that right?

16   A    That is correct.

17   Q    And he never actually read it out loud, is that

18   correct?

19   A    He read, as I testified earlier, he read the

20   preprinted portion, read the first few lines of ASA

21   Doneilian, his writing, so he could read.

22   Q    But he did not read the rest of the statement

23   out loud?

24   A    No, sir.  ASA Doneilian read it out loud and

1    took his finger and went through it line by line with Mr.

2    Day reading along with him.

3         MR. KATZ:  I have no further questions.

4         THE COURT:  Redirect?

5         MR. GOODFRIEND:  Judge, may we have a side bar?

6         THE COURT:  Sure.

7              (Whereupon there were proceedings

8              had out of the presence of the

9              Official Reporter in the above-entitled

10             cause.)

11        THE COURT:  You may proceed, State.

12        MR. DILLON:  Thank you, Judge.

13

14                  REDIRECT EXAMINATION

15

16                  BY

17

18                  MR. DILLON:

19        Q    Detective, you indicated that there are no

20   holding cells at Area 3, is that correct?

21        A    That is correct, sir.

22        Q    Detective, if a prisoner is not in an interview

23   room area at Area 3 on the third floor, is there any

24   other place where they are held?

Plaintiff Jakes 031149

1   A  Well, he could take them to district lock up

2 where it's a regular jail cell.

3   Q  Is there a cage up on the third floor?

4   A  Yes, sir, there is.

5   Q  And what is that cage used for?

6   A  That cage is primarily used, it's a cyclone

7 fence cage.  It's like built into the floor and it's

8 usually put there, usually place people there that have

9 already been charged and they are awaiting transport.

10   Q  So prisoners can be held in that cage, is that

11 correct?

12   A  Yes, sir.

13   Q  Now, Detective, counsel asked you whether or

14 not the defendant had an attorney present for any of the

15 questioning, is that correct?

16   A  That is correct.

17   Q  Did Arnold Day ever say, "I want an attorney

18 before I talk to you"?

19   A  No, sir.

20   Q  Did Arnold Day at any time during the time that

21 you or the State's Attorney spoke to him say, "I want to

22 stop the questioning, I want an attorney"?

23   A  No, sir.

24   Q  Now, you were also asked that you were -- first

281

Plaintiff Jakes 031150

1    spoke with the defendant from approximately 11:00 o'clock

2    until 1:45 in the afternoon, is that correct?

3         A    That is correct.

4         Q    This wasn't the only thing that you were

5    speaking to him about was the homicide investigation of

6    Rafael Garcia; you were speaking with him about other

7    matters, too, is that correct?

8         A    That is correct, sir.

9         Q    Now, you also indicated that no one offered Mr.

10   Day any pen or paper in order to write his statement, is

11   that correct?

12        A    That is correct.

13        Q    Did Mr. Day at any time ask the State's

14   Attorney or yourself, "may I have a piece of paper and a

15   pen so I can write this out myself"?

16        A    No, he did not.

17        Q    Now, you were also asked whether or not this

18   was videotaped.  Is there any videotaping facility up

19   there?

20        A    No, sir.

21        Q    Since you have been a Detective with the

22   Chicago Police Department, have you ever had a State's

23   Attorney from Felony Review take a statement with a video

24   camera?

Plaintiff Jakes 031151

1     A   Sir, currently it's not policy nor was it at

2    that time of the Chicago Police Department to videotape

3    confessions. No, sir.

4     Q   Now, you were also asked questions about

5    portions, when State's Attorney Doneilian read portions

6    of the statement out loud, is that correct?

7     A   That is correct, sir.

8     Q   Could you tell me what you observed Arnold Day

9    doing as the State's Attorney was reading the statement

10   out loud and running his finger along the lines?

11    A   During the statement occasionally Arnold Day

12   would see something in the statement that he did not want

13   in the statement and he'd ask ASA Doneilian to strike

14   that word or add another word at which time it was done.

15    Q   Did the defendant appear to be reading the

16   statement along with Assistant State's Attorney

17   Doneilian?

18    A   Yes, sir. He was asked to read along with him

19   at which time he said that he would.

20    MR. DILLON: I have no further questions.

21        Thank you, Detective.

22    THE COURT: Recross?

23    MR. KATZ: Thank you, Your Honor.

24

Plaintiff Jakes 031152

1                    RECROSS EXAMINATION

2

3                    BY

4

5                    MR. KATZ:

6        Q    Detective, you said that you have never seen an

7   Assistant State's Attorney take a videotaped statement,

8   is that correct?

9        A    That is correct.

10       Q    You have also never seen an Assistant State's

11  Attorney take a statement where a defendant or a person

12  in custody was given paper and pencil and allowed to

13  write out his own statement, have you?

14       A    Seen them write out diagrams but not

15  statements, sir.

16       MR. KATZ:   Thank you.  Nothing further.

17       THE COURT:  You may step down, sir.

18                              (Witness excused.)

19       THE COURT:  Who's your next witness available?

20       MR. DILLON:  State's Attorney Doneilian.

21       THE COURT:  I hate to impose upon you ladies and

22  gentlemen but the next, I suspect that that next witness,

23  if that be the case, and it being an Assistant State's

24  Attorney, we may have difficulty getting the Assistant

284

Plaintiff Jakes 031153

1    State's Attorney back.

2           So I am going to ask you to, because they have

3    a regular assignment, I am going to ask you to bear with

4    us.

5           If there is anybody that wants the sheriff to

6    make a phone call, you can tell them that you are going

7    to be a little later than expected.  The sheriff will be

8    happy to do that.

9                              (Witness sworn.)

10                  ASA JASON DONIELIAN,

11   called as a witness in the above-entitled cause, having

12   been first duly sworn, was examined and testified as

13   follows:

14

15                  DIRECT EXAMINATION

16

17                  BY

18

19             MR. DILLON:

20        THE COURT:  Please be seated and make yourself

21   comfortable and when you are, please state your full

22   name.

23        A    My name is Jason Donielian.  Last name

24   D-o-n-i-e-l-i-a-n.

285.

Plaintiff Jakes 031154

1          THE COURT:  You may proceed.

2          MR. DILLON:  Thank you.

3    BY MR. DILLON:

4          Q    Mr. Donielian, could you please tell me where

5    you are currently employed?

6          A    I am employed as Assistant State's Attorney for

7    the Cook County State's Attorney office.

8          Q    How long have you been employed by the State's

9    Attorney office of Cook County?

10         A    Over 4 and a half years.

11         Q    And are you an attorney who's licensed to

12   practice law in the State of Illinois?

13         A    Yes, I am.

14         Q    Mr. Donielian, I'd like to direct your

15   attention to the month of February of 1992.  Where were

16   you assigned in the State's Attorney office at that time?

17         A    I was assigned to the Felony Review Unit.

18         Q    And could you please explain what the duties

19   are of an Assistant State's Attorney working in Felony

20   Review?

21         A    Felony Review Assistant State's Attorney is

22   assigned to either work a.m. shift or p.m. shift.  A.m.

23   shift is from 7:00 in the morning until 7:00 in the

24   evening.  P.m. shift would be from 7:00 in the evening

1    until 7:00 in the morning.

2          Each assistant is assigned to handle a

3    different area responding to the 6 areas of the Chicago

4    Police Department.  They are on call to respond to

5    requests from police officers and Detectives to offer

6    legal advice, to interview potential witnesses and

7    victims of crime and where appropriate to take statements

8    from persons being held in custody for crimes.

9          Q    Now, I'd like to direct your attention to

10   specifically to the date of February 4th of 1992.  Were

11   you working on that date?

12         A    Yes, I was.

13         Q    Do you recall what hours you were working?

14         A    I was working the a.m. shift from 7:00 in the

15   morning until 7:00 in the evening.

16         Q    And what area was it that you were assigned to

17   work?

18         A    I was assigned to Area 3.

19         Q    And Area 3 is located at 39th and California?

20         A    That is correct.

21         Q    Now, I'd like to direct your attention

22   specifically to 2:30 on the afternoon of February 4th,

23   1992.

24         Did you have an occasion to receive an

1     assignment at that time?

2          A     Yes, I did.

3          Q     Could you tell me what the nature of the

4     assignment was that you received?

5          A     Yes.  I was dispatched to Area 3 Violent

6     Crimes; I was told that there was a person present there

7     who had knowledge of a homicide that had taken place and

8     I was referred to a Detective Boudreau.

9          Q     Did you subsequently go to 39th and California

10    and Area 3?

11         A     Yes, I did.

12         Q     Do you recall approximately what time it was

13    that you arrived at Area 3 Violent Crimes?

14         A     It was about 3:00 o'clock.

15         Q   - Could you tell me upon your arrival at Area 3

16    Violent Crimes, did you have occasion to meet with

17    Detective Boudreau?

18         A     Yes, I did.

19         Q     Could you tell me what happened once you met

20    with Detective Boudreau?

21         A     I met with Detective Boudreau in his office, I

22    was briefed as to the facts of the case, I was given all

23    the reports that had been generated with that particular

24    case, and I spoke with the Detective Boudreau at length

Plaintiff Jakes 031157

1    about the particular case.

2        Q    Now, were you aware that the offender was in

3    custody for the homicide of Rafael Garcia?

4        A    Yes, I was.

5        Q    I'd like to direct your attention to

6    approximately 4:30 on the afternoon of February 4th of

7    1992.

8            Did you have an occasion to speak with the

9    offender who was in custody?

10       A    Yes, I did.

11       Q    Do you see that same person that you spoke with

12   on February 4th of 1992 at Area 3 Violent Crimes here in

13   the Courtroom today?

14       A    Yes, I do.

15       Q    Could you identify him by something he is

16   wearing today in Court?

17       A    Yes.  He is the gentleman to the left of

18   counsel wearing a green jacket, white shirt and tie.

19       THE COURT:  Has your client been identified?

20       MR. KATZ:  Yes, Your Honor.

21       MR. DILLON:  Thank you.

22   BY MR. DILLON:

23       Q    Now, when you first had occasion to meet with

24   the defendant could you tell me where it was you met with

F-299

Plaintiff Jakes 031158

1    him at?

2         A    I met with him in the interview room on the

3    North side of the building at Area 3.

4         Q    When you first met the defendant would you tell

5    me who else was present besides yourself and the

6    defendant?

7         A    Detective Boundreau was present.

8         Q    When you first met the defendant would you tell

9    me what you did?

10        A    I introduced myself to him.

11        Q    And could you tell how it is that you

12   introduced yourself to him?

13        A    I told him my name.  I told him my name was

14   Jason Donielian, that I was an Assistant State's

15   Attorney, that I was a prosecutor working with the police

16   and that I was not his particular personal attorney.

17        Q    Did you ask him if he understood that?

18        A    Yes, I did.

19        Q    And what was his response?

20        A    He indicated that he understood who I was and

21   what my function was.

22        Q    Now, after you introduced yourself to him and

23   told him who you were did you then advise him of anything

24   else?

Plaintiff Jakes 031159

1    A    Yes, I did.

2    Q    What did you advise him of?

3    A    Of his Miranda rights.

4    Q    And did you do that from memory or a preprinted

5    source?

6    A    From memory.

7    Q    And could you tell me what it is that you

8    advised him of at that time?

9    A    Well, first I advised him that he had the right

10   to remain silent and I asked him if he understood that

11   and he indicated that he did.

12          I then advised him that if he chose not to

13   remain silent that anything he said to me could and would

14   be used against him in a Court of law. I asked him if he

15   understood that and he indicated that he did.

16          I then told him that he had a right to an

17   attorney and he had a right to that attorney to be

18   present with him before he answered any questions or

19   during any questioning or before he would choose to speak

20   with me. I asked him if he understood that. He

21   indicated that he did.

22          And finally I advised him that he if wished to

23   have an attorney present with him, but he felt as though

24   he could not afford an attorney, that the Court would

291

1    appoint an attorney to represent him and that person is

2    commonly referred to as the Public Defender. I asked him

3    if he understood that and he indicated that he did.

4    Q    After you advised him, the defendant, of his

5    rights and he indicated he understood his rights, did you

6    then have an opportunity to speak with the defendant?

7    A    Yes, I did.

8    Q    Prior to your speaking with him did you ask him

9    if he'd be willing to talk to you?

10    A    Yes, I did.

11    Q    And what is it that he indicated?

12    A    He indicated that he would be willing to speak

13    with me.

14    Q    Did you then have a conversation with him?

15    A    Yes, I did.

16    Q    Approximately how long did that conversation

17    take place that you had with him?

18    A    Well, for about an hour.

19    Q    Now, was Detective Boudreau present for this

20    conversation?

21    A    Yes, he was.

22    Q    Now, at the conclusion of your first

23    conversation with him did you make any requests after you

24    had that first conversation?

292.

Plaintiff Jakes 031161

1      A    Yes, I did.

2      Q    And could you tell me what it is that you

3  requested of the defendant?

4      A    I asked Mr. Day if he'd be willing to give a

5  written statement regarding the conversation that we had

6  just had.

7      Q    And what was Mr. Day's response?

8      A    He indicated that he would be willing to do so.

9      Q    Now after Mr. Day indicated that he would be

10  willing to have a statement reduced to writing, what did

11  you do then?

12     A    I explained to him the 2 types of written

13  statement that he could make.

14     Q    And could you please explain for us what it is

15  you told him?

16     A    Well, first time I explained to him that the

17  first type of statement is a Court Reported statement

18  where I would ask questions and he would give answers and

19  it would be transcribed by a Court Reporter similar to

20  the one in Court today, word for word, after which he'd

21  have an opportunity to review that transcript and make

22  any additions or corrections he wanted.

23     Q    What was the other type of statement you told

24  him he could make?

Plaintiff Jakes 031162

1      A     The other type of statement would be a

2   handwritten statement which I explained to Mr. Day is one

3   by which I would write in a summary form the gist of the

4   conversation that we had in my own writing, handwritten,

5   after which he would have an opportunity with me to

6   review the statement, make any additions or corrections

7   which would be penciled in and I asked him which of the 2

8   he preferred.

9      Q     After you asked him which of the 2 he

10  preferred, what did Mr. Day indicate to you?

11     A     He indicated that he wished to give a

12  handwritten statement and not a Court Reported type

13  statement.

14     Q     At that time, Mr. Donielian, did you stay in

15  the interview room or did you leave?

16     A     At that time I left the interview room.

17     Q     And Detective Boudreau, what did he do?

18     A     He left with me.

19     Q     Now after you left the interview room can you

20  tell us what you did?

21     A     At that point I went and got the forms that we

22  used to generate a handwritten statement and I returned

23  to the room shortly thereafter.

24     Q     Now when you returned to the room, would that

Plaintiff Jakes 031163

1    be the interview room that Mr. Day was in?

2        A    Yes.

3        Q    When you went into the interview room at that

4    time, did you go in by yourself or with anyone else?

5        A    By myself.

6        Q    Could you tell me what happened when you were

7    in the interview room by yourself with Mr. Day?

8        A    I had a short conversation with Mr. Day.

9        Q    Could you tell me what that conversation was

10   about?

11       A    Well, I asked him how he had been treated by

12   the police, I asked him if he had had the opportunity to

13   have anything to eat, to drink, if he had been allowed to

14   use the washroom.  I asked him how he was feeling.  I had

15   a little, you know, small talk with him.

16            And then I showed him the forms that we'd be

17   using for the handwritten statement.

18       Q    When you asked Mr. Day at that time that you

19   were alone with him how he had been treated, what did he

20   respond to you?

21       A    He said he had been treated fine.

22       Q    Now, when you asked Mr. Day if he had been

23   given anything to eat did he indicate that he had been

24   given something to eat?

1      A      Yes, he did.

2      Q      Did Mr. Day indicate to you if he had been

3    allowed to use the bathroom whenever he wanted?

4      A      Yes, he did.

5      Q      And did Mr. Day indicate to you whether or not

6    he had any complaints about his treatment since he had

7    been at the police station?

8      A      He indicated he had no complaints.

9      Q      Now, after you had this conversation with Mr.

10   Day by yourself, could you tell me what happened at that

11   point?

12     A      At that point as I began to prepare the

13   handwritten statement, Detective Boudreau came back in

14   the room and that is when we prepared the statement.

15     Q      Could you tell me how it is you actually took

16   this statement?

17     A      Well, I filled out the top caption points which

18   just basically states the name, the subject and where the

19   statement is being taken.

20            After writing a few lines, I would engage in a

21   series of questions with Mr. Day and he would give a

22   series of answers and then I'd reduce that to writing and

23   move onto the next section and ask a series of questions

24   followed by a series of answers and that would be reduced

r      296

Plaintiff Jakes 031165

1    to writing.

2    Q    So you were writing this down as he was

3    relating it to you, is that correct?

4    A    That is correct.

5    Q    Now, did you proceed to do that during the

6    entire course of the statement that you had with Mr. Day?

7    A    Yes.

8    Q    Now, after you concluded writing up a summary

9    of what Mr. Day had told you, could you tell me what you

10    did at that time?

11    A    After I completed, we completed the statement,

12    I struck diagonal lines through the unused portion of the

13    last page, after which I asked Mr. Day if he wished to

14    review the statement and he indicated that he did.

15    I first had him read the preprinted portion of

16    the statement which contains the Miranda warnings so as

17    to indicate whether or not he could in fact read English,

18    and he said he could.

19    I then had him read a portion of the

20    handwritten statement that I had written so as to be sure

21    that he could read my penmanship and he did so aloud and

22    was able to do so, after which we went through the entire

23    statement.

24    I read the statement aloud following along with

Plaintiff Jakes 031166

1   my finger on each word and each line and where necessary

2   Mr. Day chose to make some corrections, changes, and a

3   few deletions, I believe, and which were initialed by

4   myself, Detective Boudreau and Mr. Day.

5       Q   You did this throughout the entire course of

6   the statement, is that correct?

7       A   That is correct.

8       Q   Now after you had read the statement and you

9   had the defendant read a portion of it out loud, was the

10  defendant able to read a portion of it out loud?

11      A   Yes, he was.

12      Q   And was he able to read your handwriting?

13      A   Yes, he was.

14      Q   And after you went through the entire statement

15  and all necessary corrections that were pointed out by

16  the defendant were made, what was done at that time?

17      A   At that point I asked Mr. Day if he would be

18  willing to sign the statement.

19      Q   And what was his response?

20      A   He said he would be willing to do so.

21      Q   Now after the defendant indicated that he would

22  sign the statement, what was done?

23      A   He first signed the line immediately following

24  the preprinted Miranda warnings after which he signed

Plaintiff Jakes 031167

1    each page of the statement.

2        Q    After the defendant signed under the preprinted

3    Miranda warnings portion of the statement, and each page,

4    did anyone else affix their signatures as witnesses to

5    that statement?

6        A    Yes.

7        Q    And who was that?

8        A    Me and Detective Boudreau.

9        Q    Mr. Donielian, I'd now like to show you what's

10   previously been marked as People's Exhibit No. 33 for

11   identification.

12            Do you recognize what that document is?

13       A    Yes, I do.

14       Q    And what do you recognize that document to be?

15       A    This is the original handwritten statement that

16   I referred to.

17       Q    Does that appear to be in the same or

18   substantially the same condition now as it was when it

19   was taken back on February the 4th of 1992?

20       A    Yes.

21       MR. DILLON:  Your Honor, at this time I'd ask leave

22   to allow Mr. Donielian to publish the handwritten

23   statement to the jury?

24       THE COURT:  You may proceed.

1      A    Statement of Arnold Day taken 4, February, 92,

2    at 16:30 hours at 3900 South California, Area 3.  Present

3    ASA Donielian, Detective Boudreau, this statement taken

4    regarding the shooting death of Rafael Garcia which

5    occurred 15, September, 91, at 1208 West 51st Street at

6    about 11:30 p.m.

7         I understand that I have the right to remain

8    silent and that anything I say can be used against me in

9    a Court of law.  I understand that I have the right to

10    talk to a lawyer and have him present with me during

11    questioning.  And if I cannot afford a to hire a lawyer

12    one will be appointed by the Court to represent me before

13    any questioning.  I understand, understanding these

14    rights I wish to give a statement.  Signed Arnold Day.

15        - After being introduced to ASA Donielian and

16    after being told that ASA Donielian is an attorney

17    working with the police and not his personal attorney,

18    Arnold Day was advised of his Constitutional rights as

19    per Miranda after which he acknowledges hearing those

20    rights and understanding those rights.

21        Thereafter Arnold Day agreed to give a

22    statement of his knowledge of and involvement in the

23    shooting death of Rafael Garcia.

24        ASA Donielian explained to Arnold Day the

Plaintiff Jakes 031169

1    definition of and difference between a Court Reported

2    statement and a handwritten statement.  Arnold Day wishes

3    to give a handwritten and not Court Reported statement

4    which is a summary and not word for word.

5           Arnold Day states that he is 18 years old, that

6    he completed the 10th year of school at Tilden High

7    School.  Arnold Day states that he can speak, read and

8    write English.

9           Arnold states that he is a member of the

10   Blackstone Gang and has been for 3 years.  He holds the

11   rank of Officer which he explains is the second highest

12   rank.

13          Arnold Day states that on 15, September, 91, he

14   was selling drugs on Aberdeen Street from 6:00 p.m. to

15   12:00 p.m., but he decided to leave early to get

16   something to eat.

17          At around 11:30 p.m. he went into the Queen's

18   Submarine Shop at 1206 West 51st Street.  Before he had a

19   chance to order, he saw the Mexican guy who he now knows

20   as Rafael Garcia pull up in a station wagon and come into

21   the Sub Shop and ordered his food.

22          Arnold states that the Mexican guy was flashy

23   which Arnold has explained means he had a lot of jewelry

24   and he had a quote "nutroll" which Arnold explained means

F- 301

Plaintiff Jakes 031170

1   he had a lot of money.

2           Arnold states that he decided to rob the

3   Mexican guy of his money and jewelry.

4           Arnold states that he went outside the Sub Shop

5   and got the nation gun.  Arnold has explained that the

6   nation gun is a gun which belongs to the gang and is used

7   for gang activity.  Arnold further explained that the gun

8   was a .380 caliber.

9           Arnold states that when the Mexican guy exited

10  the Sub Shop he pulled out his .380 caliber and told the

11  Mexican guy, "stick up."

12          The Mexican guy walked back to his station

13  wagon and got in on the passenger side.  Arnold states

14  that when the Mexican guy got into the car, Arnold shot

15  him 2 or 3 times and fled.

16          Arnold states that he was treated well by the

17  Detectives and was given pop, oranges and Oreo cookies.

18  He was given cigarettes to smoke and was allowed to use

19  the washroom when he needed to.  He was treated well by

20  ASA Donielian.

21          Arnold states that he has not been threatened

22  or abused in any way by the Detectives or ASA Donielian.

23          Arnold states that no promises or deals have

24  been made in exchange for the statement.

1          Arnold has read this statement and has made any

2     corrections or additions that he wished.

3          Arnold states that this is a true and accurate

4     summary of what he's told the Assistant State's Attorney

5     and that he's given this statement freely and

6     voluntarily.

7          MR. DILLON:  Thank you, Mr. Donielian.  I have no

8     further questions.

9          THE COURT:  Cross-examination?

10         MR. KATZ:  Thank you, Your Honor.

11

12                    CROSS EXAMINATION

13

14                    BY

15

16                    MR. KATZ:

17    Q     Mr. Donielian, you are an Assistant State's

18    Attorney for Cook County, is that correct?

19    A     Yes, that is correct.

20    Q     In other words your job is to prosecute

21    criminal cases, right?

22    A     That is correct.

23    Q     And your current assignment, are you in the

24    Felony Trial Unit now?

1          A     No, I am not.

2          Q     Where are you now?

3          A     I am assigned to the 6th Municipal District in

4     Markham.

5          Q     You work out of the same office as Mr.

6     Goodfriend and Mr. Dillon here, isn't that right?

7          A     Yes.

8          Q     I mean you work for the same office; you do the

9     same -- basically the same type of job, is that correct?

10         A     That is correct.

11         Q     Your job is to prosecute --

12               Well, what you are doing now is misdemeanors,

13    isn't that right?

14         A     No.

15         Q     You are doing --

16         A     I am assigned to the preliminary hearing

17    Courtroom.

18         Q     Preliminary hearings?

19               At the time you were doing Felony Review,

20    right?  At the time that you took this statement you were

21    on Felony Review?

22         A     That is correct.

23         Q     Which meant that as part of your assignment for

24    the Cook County State's Attorney's office you would go

Plaintiff Jakes 031173

1    around to the police stations, give approval for felony

2    charges and take statements from witnesses, right?

3         A    That is correct.

4         Q    On this particular day, on February 4th of '92,

5    when you went to Area 3, the first thing you did was you

6    met with Detective Boudreau, isn't that right?

7         A    Yes.

8         Q    And Detective Boudreau filled you in on all the

9    facts of the case as far as he could, isn't that right?

10        A    That is correct.

11        Q    And then you reviewed all the police reports?

12        A    Yes, I did.

13        Q    And this took you at least an hour, isn't that

14    right?

15        A    Yes.

16        Q    And you did all that before you ever stepped in

17    the room and talked to Arnold Day, isn't that right?

18        A    That is correct.

19        Q    So you had a pretty good concept of what this

20    case was about before you ever talked to Arnold Day,

21    isn't that right?

22        MR. GOODFRIEND:  Objection, calls for conclusion.

23        THE COURT:  He may answer.

24        A    Yes.

Plaintiff Jakes 031174

1    BY MR. KATZ:

2        Q    And when you went in there and talked with him

3    initially, Officer Boudreau went in with you, that's

4    right?

5        A    That is correct.

6        Q    And initially didn't he tell you that he knew

7    nothing about this situation?

8        A    That is correct.

9        Q    And you didn't write that down in the

10   statement, isn't that right?

11       A    No, I didn't.

12       Q    It wasn't until later --

13            Well, actually after he told you this you left

14   the room, isn't that right?

15       A    No.   That's not right.

16       Q    You stayed there until he did tell you that he

17   knew something about it?

18       A    Yes.

19       Q    And was Officer Boudreau with you the whole

20   time?

21       A    Yes, he was.

22       Q    And later on you say he made the statement and

23   then you left the room again, isn't that right?

24       A    Yes.

1      Q   And the conversation you had with him, the

2  initial conversation lasted how long?

3      A   The initial --

4      Q   The initial conversation with Officer Boudreau,

5  how long did that last?

6      A   About an hour.

7      Q   And during that course of time, you didn't see

8  him eat or drink anything while you were there, did you?

9      A   No, I didn't.

10     Q   And during that course of time he had no

11  attorney present, isn't that right?

12     A   That is correct.

13     Q   And then you left the room for a short while

14  and you came back in and you spoke with him, isn't that

15  right?

16     A   That is correct.

17     Q   Now, when you first went in there you told him

18  that you were an Assistant State's Attorney, correct?

19     A   Yes, I did.

20     Q   And you told him that you were working with the

21  police, correct?

22     A   That is correct.

23     Q   And that he was not your attorney, right?  You

24  were not his attorney?

Plaintiff Jakes 031176

1      A      That is correct.

2      Q      He was fully informed of all this before he

3   ever spoke one word to you?

4      A      That is correct.

5      Q      And then when you went back and you had the

6   conversation, you left the room, you came back in, you

7   had the paper and pencil with you.  You had the paper

8   with you and your pen, isn't that right?

9      A      That is correct.

10     Q      And that is when you took the handwritten

11  statement.

12          Now, the procedure by which you did this, he

13  didn't just sit there and give you a narrative and you

14  wrote it down, is that right?  You asked him questions?

15     A    `  Well, questions to confirm what he had told me

16  before so that I had it correct when I reduced it to

17  writing.

18     Q      Well, you actually asked him questions that you

19  wanted put in the statement; it wasn't anything that he

20  was volunteering concerning the shooting of Rafael

21  Garcia, is that correct?

22          You asked him questions that you initially

23  wanted to put down in the statement?

24     A      Well, when I say I asked him a series of

1    questions followed by a series of answers, it was to

2    confirm my understanding of the conversation that we had

3    so as to make sure that the statement reflected

4    accurately what he had told me.

5        Q    Okay.  He didn't sit there and volunteer to you

6    that he had completed the 10th grade at Tilden High

7    School, is that correct?  You asked him that question?

8        A    That is correct.

9        Q    You wrote it down.

10        He didn't volunteer that to you that he was in

11    the Blackstone Gang; you asked him that.  You wrote it

12    down, though, correct?

13        A    That is correct.

14        Q    So this was all in response --

15        · This wasn't his narrative; it was response to a

16    series of questions that you asked?

17        A    Those particular questions.

18        Q    Well, then as you went through you continued in

19    the same procedure, correct?

20        A   Correct.

21        Q    And what you wrote down was not a first person

22    narrative, you didn't take down --

23        I mean he didn't sit there and say, "Arnold Day

24    did this.  Arnold Day did that", correct?  You wrote it

1    down in third person as opposed to first person?

2         A    That is correct.

3         Q    So it's your form of the words as opposed to

4    Arnold Day's form of the words, isn't that right?

5         A    It was a summary of what he told me.

6         Q    In your words?

7         A    In my words.

8         Q    And in fact you made mistakes as you were going

9    through it, correct?

10        A    I am sorry?

11        Q    You made some mistakes as you were writing it

12   down, isn't that right?

13        A    Yes.

14        Q    And he certainly didn't tell you that he was 20

15   years old, other than the fact that he was 18, is that

16   correct?

17        A    I subtracted from the time of the incident to

18   get his age as opposed to the time, the time frame that

19   we were in.

20        Q    But you told us that you were writing it down

21   as he was relating it to you.

22             So if you asked him how old he was, he didn't

23   say, "I was 20", did he?

24        A    I believe that I indicated that after writing

Plaintiff Jakes 031179

1    down a few paragraphs, then I began the question and

2    answer format.

3        Q    So there were mistakes in here, though?

4        A    Oh yes.

5        Q    And some of them or maybe all of them were

6    corrected, is that correct?

7        A    That is correct.

8        Q    Now, you say you offered him 2 ways in order to

9    reduce this statement to writing.  One was a Court

10    Reported statement and the other was a handwritten

11    statement, is that correct?

12        A    Yes.

13        Q    Those were the only 2 options he was given,

14    wasn't it?

15        A   Of, for reducing the statement to written form,

16    that is correct.

17        Q    He was never given the option of being given

18    pen and paper and writing it out in his own words, was

19    he?

20        A    No.

21        Q    You took the statement at 4:30 in the

22    afternoon?

23        A    That is what time I began interviewing him.

24        Q    What time did you start writing this down?

1      A      The statement probably started about 6:00

2    o'clock.

3      Q      And you remember what time you finished?

4      A      With this particular statement I finished about

5    maybe a half hour later.  Maybe a little longer.

6      Q      So that would have been around --

7      A      6:30.  Quarter to 7:00.

8      Q      All right.  And you stated that he told you

9    that he had been given something to eat during the course

10   of the day?

11     A      Yes.

12     Q      Did he tell you what he had been given to eat?

13     A      Yes.

14     Q      And that was Oreo cookies and an orange and

15   some pop, is that correct?

16     A      That's right.  The rinds from the orange peels

17   were in the trash can in the room.

18     Q      But he had not been given any kind of a full

19   meal during the course of that day, right?

20     A      I don't, I am not sure.  I don't believe so.

21     Q      He didn't say anything about it?

22     A      No.

23     Q      You have no information otherwise, is that

24   correct?

1      A    No.

2      MR. KATZ:   I have no further questions.

3      THE COURT:   Redirect?

4      MR. DILLON:   Could we have one moment, please,

5  Judge?

6

7                    REDIRECT EXAMINATION

8

9                    BY

10

11                   MR. DILLON:

12     Q    Now, Mr. Donielian, you were asked questions

13  about whether or not the defendant had an attorney

14  present.

15          Did the defendant ever request of you to get an

16  attorney for him?

17     A    No.

18     Q    Did he ever say, "I want an attorney before I

19  answer any questions"?

20     A    No.

21     Q    At any time during your speaking with him, did

22  he indicate that he wanted an attorney present?

23     A    No.

24     Q    Did the defendant ever say to you, "I don't

Plaintiff Jakes 031182

1    want to speak with you, I want to remain silent"?

2         A    No.

3         Q    Now, in addition to this you were speaking with

4    him in regards to other matters, as well, is that

5    correct?

6         A    That is correct.

7         Q    Now, you also indicated that the statements

8    that were taken from Felony Review were handwritten and

9    Court Reported, is that correct?

10        A    That is correct.

11        Q    Now, did the defendant ever ask to use the pen

12   and paper so he could write it out himself?

13        A    No, he didn't.

14        Q    Did he ever complain about the facts in which

15   you wrote up his statement?

16        A    No, he did not.

17        Q    As a matter of fact he signed his signature to

18   that statement as acknowledging that this was the summary

19   of what it is he told you, is that correct?

20        A    That is correct.

21        Q    And he also made corrections on it, as well, is

22   that correct?

23        A    That is correct.

24        MR. DILLON:   I have no further questions, thank you.

Plaintiff Jakes 031183

1       THE COURT:  Any recross?

2

3              RECROSS EXAMINATION

4

5              BY

6

7            MR. KATZ:

8     Q   Mr. Donielian, you did not offer him the

9  opportunity to write it out in his own handwriting, isn't

10  that right?

11     MR. GOODFRIEND:  Objection.  Asked and answered.

12     THE COURT:  Sustained.  That was his testimony.

13  BY MR. KATZ:

14     Q   In fact if he had asked that, you wouldn't have

15  allowed him to do it, would you?

16     MR. GOODFRIEND:  Objection, speculation.

17     THE COURT:  Sustained.  You may answer however, sir.

18     A   Could you repeat the question?

19     THE COURT:  If he asked to write the statement out

20  in his own handwriting, would you let him do it?

21     A   No.

22     MR. KATZ:  Nothing further.

23     THE COURT:  You may step down.

24     A   Thank you.

Plaintiff Jakes 031184

1          (Witness excused.)

2

3     THE COURT: Ladies and gentlemen I was right. It

4  was almost exactly a half hour. We will be starting at

5  10:30 sharp tomorrow.

6          Now the other jury is going to be reporting to

7  602. And you will be reporting here. This is room 500

8  and you come directly here. You know the procedure

9  already.

10          Now, one of the additional reasons --

11          Ask Assistant State's Attorney Donielian to

12  stay around please?

13          One of the additional reasons that I wanted

14  this extra half hour is because believe it or not we are

15  still on track to conclude this case tomorrow. In fact I

16  expect to conclude this case tomorrow. And since that

17  evidence that the Assistant State's Attorney related to

18  you, not to the other jury, I thought we'd get that out

19  of the way. In order to do that I need your help. And

20  that means that you must be here on time or we lose time

21  in gathering you all together.

22          If we can get together and start, fine. If

23  not, that means that we will be here Monday, if that

24  what's it takes to have a fair trial. I am more than

Plaintiff Jakes 031185

1    willing to do it. I am paid to be here everyday. But I
2    confess that I make little more than you do. So it hurts
3    me a little less to be here more than you. Try to
4    cooperate.
5         Remember you can't discuss the case with
6    anyone. If you happen to see something in the
7    newspapers, on television, or on the radio you are to
8    ignore it and we will see you here tomorrow at 10:30
9    sharp. Please follow the sheriff.
10        (Whereupon there were proceedings
11             had outside the presence of the
12             jury in the above-entitled
13             cause.)
14   THE COURT: There are several matters I want to take
15   care of. -
16        The first, counsel, you wanted to make a record
17   on me permitting the State to ask the question of
18   Boudreau to which you objected and to Donielian to which
19   you did not object.
20        But we will assume that for the sake of
21   argument you would have, if you hadn't had that adverse
22   ruling concerning the question that you were speaking
23   with him about other matters.
24   MR. KATZ: True. And I would like to state for the

1    record that I would have made the objection. I knew

2    obviously what your ruling was going to be.

3           I do object to the State being allowed to put

4    into, to notify the jury, in fact, that the defendant had

5    other matters pending, that the police and the Assistant

6    State's Attorney were questioning him.

7           That allows the jury information that they are

8    not allowed to know, that they had no reason to know, and

9    could prejudice the defendant without giving any real

10    probative value to the State's case.

11         THE COURT: All right.

12         State, do you wish to respond to that?

13         MR. DILLON: Yes, Judge.

14         I believe counsel has indicated in his opening

15    statements that the statement that he ultimately gave to

16    the Assistant State's Attorney was a coerced statement.

17         I also believe that counsel intimated that

18    because Detective Boudreau spoke with the defendant from

19    approximately 11:00 until 1:45 in the afternoon, he was

20    attempting to raise the suspicions of the jurors that

21    Detective Boudreau leaned on the defendant for a 3 hour

22    period in order to get him to give a statement.

23         I certainly think it's, if that is what counsel

24    is attempting to do, is to show that this statement was

Plaintiff Jakes 031187

1    involuntarily given, I think the jury certainly should

2    have the right to have it placed in its proper context,

3    which was that the defendant was in custody on another

4    matter and was being questioned in regards to that

5    matter, as well.

6           And I believe it was proper.

7       THE COURT: All right.

8           I didn't permit the State that. I probably

9    could have, but I didn't permit the State to go quite

10   that far.

11          We did have a side bar. Counsel did indicate

12   his objection at the time and the Court did say that we'd

13   have this hearing later on. So that the objection could

14   be spread of record.

15          In fact the State was quite restrained and the

16   question was, "were you speaking to him about other

17   matters?"

18          The other matters doesn't necessarily raise

19   inference that he was in custody on some other grounds,

20   although that was brought out by the defense earlier in

21   that the question concerning the warrants brought out

22   evidence that, in fact, there had been a warrant for some

23   other offenses.

24          However, the State is correct. There is in

Plaintiff Jakes 031188

1    fact an inference sought by the defense and properly so,

2    that is their job, to suggest that the 3 hours of time

3    involved leaning on and coercing the defendant into

4    giving a statement.

5          So the State was permitted in the rebuttal of

6    that to raise the circumstances in the manner indicated.

7    It was, in fact, a restrained question.

8          The objection is overruled.

9          Throughout all of this, counsel for Mr. Jakes

10    has been present because he wanted to hear the testimony

11    of Mr. Donielian.  He has heard that.  It is his desire

12    to have Mr. Donielian testify.

13          Do you have any information from any source

14    whatsoever, that in fact Mr. Day made, made a statement

15    to Assistant State's Attorney Donielian exculpating your

16    client?

17      MR. MADEA:  No.  The statement I seek is the one in

18    which you just heard him testify about.

19          And as long as I am being heard, --

20      THE COURT:  You are.

21      MR. MADEA:  -- I'd cite to the Court the case of

22    People versus Kokoraleis, K-o-k-o-r-a-l-e-i-s, I found at

23    149 Il Ap. 3rd, 1000 and also 501 N.E 2nd, 207.

24          It's a 1986 2nd District case been cited quite

Plaintiff Jakes 031189

1   a few times.

2      THE COURT: And does the Kokoraleis case say that

3   when a statement does not inculpate a co-defendant, it

4   may be admitted into evidence?

5      MR. MADEA: What it says, Judge, is that extra-

6   judicial statements made by third parties and,

7   implicating themselves but not defendant in homicides

8   which, with which all were charged, were admissible as

9   statements against penal interest and go to statements

10   that were made to the police long after homicides

11   occurred.

12      And where statements were corroborated by

13   physical evidence, the Defendant's own confession was

14   virtually the only evidence of guilt.

15      So my answer would be yes.

16      THE COURT: All right. Well, show me in there where

17   it says it.

18      MR. MADEA: No, what I am saying is that is the

19   whole --

20      THE COURT: It sounds like I read ahead. Read me in

21   that case where it says that the defendant, the statement

22   may be admitted where with it makes no mention --

23      MR. MADEA: Well, that is exactly the statement in

24   Kokoraleis. Now, by analogy --

Plaintiff Jakes 031190

1    THE COURT:  Well, what's the statement?

2    MR. GOODFRIEND:  Judge, when you get a chance I have

3    one point to make in the arguments on this matter.

4    THE COURT:  Well, you want to make your point while

5    Counsel is looking for --

6    MR. GOODFRIEND:  Judge, besides the case law I know

7    Your Honor is well aware of, Mr. Day made the Court

8    Reported statement about 6 months after the crime.

9    Later testified before this Court regarding the

10   voluntariness of the statement and is now claiming that

11   the statement isn't reliable because he was threatened

12   and coerced and had his, had Detective Foley come up to

13   him and grab him by the collar and push him up against

14   the wall.

15   - I mean I have a transcript here regarding his

16   allegations but I think that also --

17   THE COURT:  Well, I don't think that goes to phase

18   2.

19   See, I have probably in front of me, I have

20   probably the most pro-defense case on the matter that has

21   been, come down the pike.

22   And that is Angelo Rivera versus the Director

23   of the Department of Corrections of the State of

24   Illinois, reported at 915 Federal Reporters 2nd, 280, and

1   that case of course cited the Seminole case of Chambers

2   versus Mississippi, at 93 Supreme Court 1038.

3           In that particular case, with which I am

4   acutely familiar, because the case came back, in Rivera's

5   case came back here for trial based upon the granting of

6   the habeus corpus after he had been tried and convicted

7   up in Skokie.  And so I got the chance to hear and listen

8   to the reliability.

9           But the reliability is level 2.  I don't think

10  reliability, although we will certainly make a record on

11  that, but I don't think reliability needs to be

12  considered in this case because it is the Court's opinion

13  that --

14          I am also not going to base this upon the

15  availability of the witness.  I suppose there's been no

16  attempt at this point to subpoena the co-defendant to

17  testify.  Who knows?  It may happen.

18          But again I am not basing it on reliability.

19          Did you find anything in Kokoraleis, by the

20  way, counsel?

21      MR. MADEA:  I am still looking, Your Honor.

22      THE COURT:  I will give you a moment to do that.

23      MR. GOODFRIEND:  You mean you are not basing

24  anything on availability?  I think you just said

1   reliability.

2        THE COURT:  If I said reliability, I misspoke.  I

3   mean availability.

4             And, at this time at least, we are not

5   discussing reliability yet.

6        MR. MADEA:  Your Honor, page 218 of that opinion at

7   the N.E. 2nd cite says defendant -- that Kokoraleis next

8   argues that the trial Court erred in excluding the

9   statement made by Andy and Spritzer, I guess they are

10  co-defendants, to the police when they were arrested

11  several days prior to Defendant's arrest in November of

12  '82.  Neither Spritzer nor Andy mentioned Defendant in

13  any of these connections, and neither was asked police

14  officers conducting the questioning whether defendant was

15  involved in the abduction of Sutton and Barowski.

16            So I guess my answer would be in the

17  affirmative and I will give you a copy if you want to

18  look at it.

19       THE COURT:  Uh-huh, I do.

20       MR. MADEA:  It is my own copy.

21       THE COURT:  Then I will give it back to you.

22       MR. MADEA:  Fine.

23            Just for Your Honor's information, I talked

24  with Mr. Donielian and he said if you ordered him he'd be

324

Plaintiff Jakes 031193

1    back here tomorrow.

2        THE COURT:  Well, I have an order in back but that

3    is the easier thing to do.  He doesn't have to hang

4    around.

5            Mr. Donielian, you will have to be back here at

6    10:30 tomorrow.  Let's go off the record for a second.

7                (Whereupon there were proceedings

8                    had off the record per order of

9                    the Judge in the above-entitled

10                   cause.)

11       THE COURT:  Back on the record.  You will have to

12   come back at 10:30 tomorrow morning so somebody will have

13   to do the prelims out there.

14       A    That is fine.

15       THE COURT:  Who still doing it?  107?

16       A    102.

17       THE COURT:  Who's doing them now?

18       A    It has been Judge Girack, but the last few days

19   he's been on vacation.

20       THE COURT:  My old stomping ground out there.  You

21   say hello to everybody out there.

22            But you won't tomorrow because you will be here

23   tomorrow.

24       A    I will.  Thank you, Judge.

Plaintiff Jakes 031194

1        THE COURT:  May I see the statement of --

2        MR. MADEA:  Mr. Day?

3        THE COURT:  -- Mr. Day?

4        MR. GOODFRIEND:  The statement or the transcript,

5  Judge?  Statement itself?

6        THE COURT:  Statement itself.

7        MR. GOODFRIEND:  This is a copy, Judge.

8        THE COURT:  All right.

9        Yes, this is a much more difficult question

10  that I anticipated it would be.

11        I am going to give you some test cases and we

12  will have further arguments on it tomorrow.  Mr.

13  Donielian will be available.

14        It may very well be that the defendant will be

15  entitled to have this statement admitted but we won't

16  make that decision today.

17        People versus Rhodes.  If not don't worry about

18  Rhodes.

19        MR. MADEA:  Judge, I have a cite on here.  Be glad

20  to give you this back.

21        THE COURT:  All right.  Give me the official cite on

22  Kokoraleis.

23        MR. MADEA:  149 Il Ap.  3rd, 1000.

24        THE COURT:  All right.  People versus Sanchez, 131

Plaintiff Jakes 031195

1    Il 2nd 417.  People versus William Nally, N-a-l-l-y, 134

2    Il Ap.  3rd, 865.  Rivera versus Illinois, 915 Fed 2nd,

3    280.  Chambers versus Mississippi, 98, Supreme Court

4    1038, an Illinois Supreme Court case which I think is

5    going to be decided by People versus Howse, so whatever

6    you do make sure you look at that one, 141 Illinois 2nd

7    323.

8         The section relating to the extrajudicial

9    admissions is at page 389 and 90.

10        I am giving the State back their copy.

11    MR. GOODFRIEND:  Judge, do you want the transcript

12    of Arnold Day?

13    THE COURT:  You should have it available because I

14    think you could concede, I think for all practical

15    purposes rather than have to go through the charade, we

16    can concede unavailability, correct?

17    MR. GOODFRIEND:  Yes, Judge.

18    THE COURT:  So that gets us to whether or not a

19    neutral, and that is a statement that is, that, at best

20    inferentially inculpatory, the only thing that you can

21    say is that it doesn't mention the defendant.  Whether or

22    not that is admissible.

23        And then the second category being whether or

24    not the question of reliability ought to be considered at

327

1    this stage.

2          And of course the third question being whether

3    or not, assuming a statement is admissible, if the

4    contrary statement of the defendant decrying the

5    statement would be admissible in rebuttal, or, of the

6    defendant making the statement.

7      MR. GOODFRIEND:  See, Judge, I guess our first

8    argument, of course, that it's not admissible.  But then

9    I mean under the, if we go by the 4 step analysis.

10         But then in terms of the determining the

11    reliability of it before you even admit it, I think what

12    happened in Rivera in this Courtroom was that the

13    declarant --

14      THE COURT:  What happened in Rivera in this

15    Courtroom is totally irrelevant to the case in Rivera.

16      MR. GOODFRIEND:  Right.  But what I am saying is

17    that the factual situation in Rivera was the declarant

18    made a confession to the police.  He later gave testimony

19    contrary to that confession.

20      THE COURT:  But that was not known to the 7th

21    Circuit Court of Appeals so it can have nothing do with

22    the 7th Circuit Court of Appeals opinion.

23      MR. GOODFRIEND:  Right.  I am just saying that you,

24    when we retried Rivera, denied them the use of the Court

Plaintiff Jakes 031197

1    Reported statement.

2        THE COURT:  That doesn't mean I was right.  And the

3    problem was solved and the, and he testified.

4        MR. GOODFRIEND:  Right.  But all I am saying that

5    Arnold Day, in pretrial motions, has said that the

6    handwritten statement that he gave was coerced, the

7    subject of coercion, and I think the --

8        THE COURT:  Let me tell you what the 7th Circuit

9    Court of Appeals, one of the differences is the 7th

10   Circuit Court of Appeals spent more time criticizing your

11   office in the handling --

12       MR. GOODFRIEND:  That is the Attorney General's

13   office, Judge.

14       THE COURT:  I am sorry.  You are absolutely correct.

15       MR. GOODFRIEND:  And, Judge, if I was on the case,

16   the outcome may have been different.  We never know.

17       THE COURT:  Listen to what they said on that very

18   point.  The Supreme Court does not sit to decide cases

19   that are old; only cases that have identical facts.

20           Confession was reliable enough to be used to

21   put Norman away for the rest of his life, and no reason

22   is suggested why, if only it had been made to a close

23   friend but not otherwise, it would be reliable evidence

24   of Rivera's innocence, as well.

Plaintiff Jakes 031198

1          The State here intimates short-sightedly and

2     optimistic as it seems to us that the confession was

3     unreliable because it was involuntary, Norman having been

4     under the influence of drugs and alcohol when he was

5     interrogated.

6          If his confession was involuntary Norman is

7     entitled to a new trial at which the confession would be

8     inadmissible.  We are certain the State did not mean to

9     concede as much.

10         And of course we are on the horns of the same

11    dilemma.  The same statement you are telling me is

12    unreliable for one defendant you are using against the

13    other defendant in the hopes of sending him away for the

14    rest of his life, so --

15    MR. GOODFRIEND:  I guess the biggest thing is --

16         Well, I guess we will decide tomorrow, is that

17    there is some of the other factors taken into account.

18    THE COURT:  We will have the whole hearing tomorrow.

19    It doesn't have to be done until after lunch or until the

20    conclusion of the case.

21         If you want I will hold this since it's, rather

22    than have to go to the library --

23    MR. GOODFRIEND:  We have Feds upstairs.

24    MR. MADEA:  We have Feds upstairs.

1    THE COURT:  All right.  Save some Lexus time.  And

2    you are ready to go at 10:30 sharp?

3    MR. DILLON:  In regards to Mr. Robinson, Judge, we

4    still have him down here.

5         How do you prefer to deal with Mr. Robinson?

6    THE COURT:  Well, keep him available at least until

7    the jurys go out in case somebody else wants to call him.

8         You mean he is still here today?

9    MR. DILLON:  He is still here today.

10   THE COURT:  Okay.  He gets another free night at the

11   County.

12         (Whereupon this was all the proceedings

13          had at the hearing of the above-entitled

14          cause of action on said date.)

15

16

17

18

19

20

21

22

23

24

1    STATE OF ILLINOIS    )
                            ) SS:

2    COUNTY OF COOK    )

3           I, MARY CATHERINE REDMON, CSR, OFFICIAL

4    SHORTHAND REPORTER OF THE CIRCUIT COURT OF COOK COUNTY,

5    ILLINOIS, DO HEREBY CERTIFY THAT I REPORTED IN SHORTHAND

6    THE PROCEEDINGS HAD AT THE HEARING OF THE ABOVE-ENTITLED

7    MATTER, AND THAT THE FOREGOING IS A TRUE AND CORRECT

8    REPORT OF PROCEEDINGS HAD AT SAID CAUSE.

9

10

11    OFFICIAL SHORTHAND REPORTER
           CIRCUIT COURT OF COOK COUNTY

12    COUNTY DEPARTMENT-CRIMINAL DIVISION
           Lic #08384121

13

14

15

16

17

18

19

20

21

22

23

24

Plaintiff Jakes 031201

**(Rev. 4/2 /92) CCCR 0056**

STATE OF ILLINOIS )
COOK COUNTY ) ss.

I, AURELIA PUCINSKI, Clerk of the Circuit Court of Cook County, in said County and State and Keeper of the Records and Seal thereof, do hereby certify the above and foregoing to be a true and complete copy of ...... VOLUME TWO (2) OF THREE CONSISTING OF THE REPORT OF PROCEEDINGS, ONLY. NO DESIGNATION OF RECORD HAVING BEEN FILED PURSUANT TO THE NOTICE OF APPEAL FILED:

ILLINOIS APPELLATE COURT NO. 93-4471

in a certain cause. ........ LATELY .......................... pending in said Court, between

The people of the State of Illinois ............... WERE ..................., Plaintiff and

ANTHONY JAKES .......................... WAS ......... Defendant .....



Witness, AURELIA PUCINSKI, Clerk of the Court and the Seal thereof, at Chicago,. In said

County,......- JULY 13TH., ................, 19. 94.





Plaintiff Jakes 031203



CCCR-31(

# Transcript of Record
## Appeal
## to

APPELLATE ——————— **Court of Illinois**

FIRST **District**

**93-4471**

**Circuit Court No.** _____ 92-CR-5673

**Trial Judge** _____ THOMAS P. DURKIN

**Reviewing Court No.** _____ 93-4471

THE PEOPLE OF THE STATE OF ILLINOIS

**vs.**

ANTHONY JAKES

GILBERT S. MARCHMAN
CLERK OF COURT

'95 JAN 23 9:52

FILED APPELLATE COURT
1st DIST.

## from
# CIRCUIT COURT
## of
# COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CRIMINAL DIVISION

**AURELIA PUCINSKI**

**Clerk of Court**

**Per** _____ AP/1p

**Deputy**

VOLUME TWO (2)

REPORT OF PROCEEDINGS, ONLY

(VOLUME 3 OF 3)

Plaintiff Jakes 031204

IN THE CIRCUIT COURT OF THE COOK JUDICIAL CIRCUIT
COUNTY-DEPARTMENT, CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS

   vs.

ANTHONY JAKES,

   Defendant.

**FILED**

MAR 22 1994

AURELIA PUCINSKI
CLERK OF THE CIRCUIT COURT
CRIMINAL DIVISION

----------------------------------------

JUDGE:...THOMAS DURKIN
HEARD:...09-10-93
SS:......
NUMBER:..91-CR-23873

JURY TRIAL

REPORT OF PROCEEDINGS, had at the hearing of

the above-entitled cause, coming to be heard on the

10th day of SEPTEMBER, 1993, before the HONORABLE

THOMAS DURKIN, judge of said court.


A P P E A R A N C E S :

   HON. JACK O'MALLEY,
   State's Attorney of Cook County by;
   MR. JOHN DILLON & NEIL GOODFRIEND,
    Asst. State's Attorneys
    On behalf of the State of Illinois;

   MS. RITA FRY,
   Public Defender of Cook County by;
   MR. RONALD KATZ & CHERYL BORMANN,
    Asst. Public Defender
    On behalf of the Defendant


JAMIE MITCHELL, CSR
CRIMINAL DIVISION
891-3373

    G-1

Plaintiff Jakes 031205

# I N D E X

DATE:..... 09-10-93
HON:...... THOMAS DURKIN
CHARGE:....FIRST DEGREE MURDER & ARMED ROBBERY
PAGES......1-200


G-2

Plaintiff Jakes 031206

```
1                      I   N   D   E   X

2    Date of Hearing:  October 27, 1993

3    Page numbers: H1 through H18

4

5    Sentencing hearing

6                              DX        CX

7    Witness in aggravation:

8    Ofr. Frank Entress          H4        H7

9    Aggravation          H10

10   Mitigation           H11

11   Sentence             H15

12

13

14

15

16

17

18

19

20

21

22

23

24
                         H2
```

Plaintiff Jakes 031207

1       Good morning, Ladies and Gentlemen. The record

2       should reflect that the jury is present. Just to

3       be absolutely certain, although I think that we

4       have managed to avoid any mentioning, but I will

5       take role again.  Is George Jondell (phonetic)

6       present?

7           MR. JONDELL: Yes.

8           THE COURT: Melanie Zingle (phonetic.)

9           MS. ZINGLE: Yes.

10          THE COURT: Verna Jay (phonetic.)

11          MS. JAY: Yes.

12          THE COURT: Paul Penfold (phonetic.)

13          MR. PENFOLD: Yes.

14          THE COURT: Quincy?

15          MR. QUINCY: Yes.

16          THE COURT: Levy.

17          MR. LEVY: Yes.

18          THE COURT: O'Rourke.

19          MR. O'ROURKE: Yes.

20          THE COURT: Owens.

21          MR. OWENS: Yes.

22          THE COURT: Simon.

23          MR. SIMON: Yes.

24          THE COURT: Williams.

25                      G-3

Plaintiff Jakes 031208

```
 1          MR. WILLIAMS:  Yes.

 2          THE COURT:  Jillaqula.

 3          MR. JILLAQULA:  Yes.

 4          THE COURT:  Sanota.

 5          MR. SANOTA:  Yes.

 6          THE COURT:  All jurors are here.  State, call

 7    your next witness.

 8          MR. DILLON:  Brian Grossman.

 9              (Witness was sworn.)

10              MR. BRIAN GROSSMAN,

11    called as a witness on behalf of the State of

12    Illinois, was first duly sworn, examined and

13    testified as follows:

14              DIRECT EXAMINATION

15                  BY

16    MR. DILLON:

17          Q    State your name for the record?

18          A    Brian Grossman.

19          Q    Mr. Grossman, where are you employed at?

20          A    Cook County State's Attorney's Office.

21          Q    What is your position with the Cook

22    County State's Attorney's Office?

23          A    I'm an Assistant State's Attorney.

24          Q    Are you a lawyer licensed to practice law

25                  G-4
```

1           in the State of Illinois?

2               A    Yes.

3               Q    Where are you currently assigned?

4               A    Currently assigned in this building to

5           the courtroom of Ronald Himel.

6               Q    And directing your attention to September

7           of 1991, what unit were you assigned to at that

8           time in the State's Attorney's Office?

9               A    Felony Review Unit.

10              Q    Could you please explain to the Ladies

11          and Gentlemen of the Jury what the Felony Review

12          Unit is?

13              A    Yes.   We assist the police in their

14          investigation when they have somebody in custody.

15          We'll go out and interview the witnesses and the

16          person who is in custody.

17              Q    Now, I will direct your attention to the

18          evening of September 16th and the morning of

19          September 17th, 1991, were you working?

20              A    Yes.

21              Q    What hours were you working?

22              A    It was either 6:00 at night to 6:00 in

23          the morning or 7:00 at night to 7:00 in the

24          morning.

25                              G-5

Plaintiff Jakes 031210

1         Q  What area of the city were you covering?

2         A  West side.

3         Q  I will direct your attention to

4  approximately 1:30 a.m., on September 17, 1991, did

5  you receive an assignment?

6         A  Yes, sir.

7         Q  Where did that assignment take you to?

8         A  It took me to what was in Area 3 Violent

9  Crimes.

10        Q  Where was that location at?

11        A  I believe it was at 39th and California.

12        Q  When you arrived at Area 3 Violent

13  Crimes, did you speak with any detectives?

14        A  Yes, sir.

15        Q  What detectives did you speak with?

16        A  Detective Kill, Detective Caesar, I

17  believe Boudreau was there also.

18        Q  Did you become involved in the

19  investigation of a homicide of Raphael Garcia?

20        A  Yes.

21        Q  Did you read the police reports that were

22  available?

23        A  Yes, sir.

24        Q  Did you talk to certain witnesses?

25                  G-6

Plaintiff Jakes 031211

1          A    Yes, sir.

2          Q    Was there an individual in custody for

3     that offense at Area 3 at that time?

4          A    Yes, sir.

5          Q    What was the name of that individual?

6          A    Anthony Jakes.

7          Q    Do you see Mr. Jakes in court today?

8          A    Yes, sir.

9          Q    Could you please point to him and

10    describe what he's wearing?

11         A    He's seated at counsel table, actually,

12    an attractive woman.   He's wearing the white

13    button-down shirt.

14         MR. DILLON:  Judge, can the record reflect in-

15    court identification of the defendant, Antonio

16    Jakes.

17         THE COURT: Is there any dispute?

18         MR. KATZ:  No.

19         MR. DILLON:

20         Q    Mr. Grossman, at 4:00 a.m., were you

21    present in the sergeant's office for a conversation

22    with the defendant?

23         A    Yes.

24         Q    Who else went into the sergeant's office

25                         G-7

1     with you to speak with the defendant?

2         A   Myself, Detective Caesar, Youth Officer

3     Burke and Detective Kill.

4         Q   When you arrived in the sergeant's office

5     with the 3 officers and the defendant, did

6     Detective Kill introduce you to anyone?

7         A   Yes, he introduced me to the defendant.

8         Q   How did he introduce you to the

9     defendant?

10        A   He explained that I was a State's

11     Attorney and that I wanted to ask him some

12     questions.

13        Q   Did Detective Kill leave or stay at that

14     time?

15        A   After he introduced me, he left the room.

16        Q   Did Detective Caesar stay?

17        A   Yes.

18        Q   Youth Officer Burke stay?

19        A   Yes.

20        Q   At the beginning of the conversation that

21     you had with the defendant, did you explain to the

22     defendant who you were and what your position was?

23        A   Yes.

4        Q   Please tell the Ladies and Gentlemen how

25        G-8

Plaintiff Jakes 031213

1       you did that?

2           A    I explained to the defendant that -- I

3       introduced myself as Brian Grossman.  I explained

4       that I was an Assistant State's Attorney and not

5       his attorney, but an attorney working with the

6       police.

7           Q    Did you ask him if he understood that?

8           A    Yes.

9           Q    What did the defendant say?

10          A    He said, "yes."

11          Q    What was the next thing that you advised

12      the defendant of?

13          A    I advised the defendant what are commonly

14      known as miranda warnings.

15          Q    Did you do that by memory or preprinted

16      form?

17          A    Memory.

18          Q    Tell the Ladies and Gentlemen of the Jury

19      what rights you advised him of and what were his

20      responses to your advise?

21          A    I asked the defendant if he understood

22      that he had the right to remain silent.  He said,

23      "yes."  I asked the defendant if he understood that

4       anything he told me could be used in a court of

25                          G-9

Plaintiff Jakes 031214

1      law. He said, "yes." I asked the defendant if he

2      understood that if he could not afford a lawyer,

3      one would be appointed for him. He said, "yes." I

4      asked the defendant if he understood these rights.

5      He said, "yes." I asked the defendant knowing

6      these rights, if he wished to talk to me and he

7      said, "yes."

8         Q   Did you also advise the defendant that he

9      had a right to have an attorney present during

10     questioning?

11        A   Yes, I'm sorry. I advised him of that

12     before I advised him. I said, do you understand

13     that you have a right to an attorney being here

14     right now. He said, "yes." That's when I advised

15     him that if he could not afford an attorney, one

16     would be appointed by the Court for him, and he

17     said he understood that.

18        Q   Did you ask the defendant if he was

19     willing to talk to you regarding facts -- regarding

20     the homicide of Raphael Garcia?

21        A   Yes.

22        Q   What did he say?

23        A   He said, "yes."

24        Q   Approximately how long did your initial

25                  G-10

Plaintiff Jakes 031215

1      conversation with the defendant last?

2          A    About 30 minutes.

3          Q    At the end of that 30-minute period, did

4      you ask the defendant anything else?

5          A    Yes.  I explained to the defendant that I

6      wished to take his statement; we can either leave

7      it as it was or I said what I wanted to do was

8      either reduce it to writing or have a court

9      reporter come out.  I told him that if we reduced

10     it to writing, I will summarize his statement and

11     show it to him and we'll go over it together and he

12     would have a chance to make any corrections or

13     changes that he wanted to.  I explained to him that

14     a court reporter would come out and type out the

15     statement instead of me writing it out, but it

16     would take a little while for the court reporter to

17     get there.

18         Q    Did the defendant tell you whether he

19     would do either of those types of statements?

20         A    Yes.  He stated his preference for the

21     handwritten statement.

22         Q    Did you have any forms with you to

23     prepare that statement?

24         A    Yes.  It's a preprinted for that we use

25                              G-11

Plaintiff Jakes 031216

1       in the Felony Review Unit which stated the miranda

2       rights in a type-written form, which is blank lines

3       for us to write out the summary.

4           Q   Did you begin to prepare a summary of

5       what the defendant told you?

6           A   Yes, sir.

7           Q   Did Detective Caesar and Youth Officer

8       Burke stay in the room with you while you did that?

9           A   Yes.   We were all seated.   It's a

10      sergeant's office and we were all seated at a round

11      table in the sergeant's office.

12          Q   Did  you  go  about  preparing  the

13      handwritten statement?

14          A   Yes.  I -- the defendant once again went

15      through his version of what happened.  As he went

16      through his version of what happened, again, I

17      summarized at various points, stopping him so I

18      could catch up.

19          Q   At the conclusion of your writing the

20      statement, did you do anything with the defendant

21      regarding the process of reading the statement?

22          A   Yes.  I explained to the defendant that

23      we were going to read over the statement together

24      and that he could make any corrections or changes

25                      G-12

Plaintiff Jakes 031217

1      that he wanted.  I then read out loud to him again,

2      which was printed on the page of the type-written

3      miranda warnings, and I told him to sign right

4      below that, and then, I had him read the first few

5      lines, maybe the first paragraph of my summary out

6      loud because I wanted to make sure that he

7      understood.  He said he knew how to read English,

8      but I wanted to make sure he could read my writing,

9      so I had him to read that, and after that, I read

10     the statement to the defendant sitting next with

11     the defendant and I pointed to the word and he

12     stopped me at various points to make corrections.

13         Q    Was the defendant able to read your

14     writing?

15         A    Oh, yes.

16         Q    And as you went through the statement

17     line by line, did he read it with you?

18         A    Yes.

19         Q    At the conclusion of reading the

20     statement and making corrections, what did you do

21     with the statement?

22         A    Well, at each correction, we all

23     initialed each correction as we went along, and

4      then, I had him sign the bottom of each page as we

25                       G-13

1      went along and he also signed at the end of the

2      statement.

3           Q   Did anybody else sign the statement?

4           A   Yes. All people present for the statement

5      which would be myself, Detective Caesar, Youth

6      Officer Burke and defendant.

7           Q   During the time period that you were with

8      the defendant, was he coherent?

9           A   Yes.

10          Q   Was he ever falling asleep?

11          A   No.

12          Q   Was he offered to use the bathroom?

13          A   Yes.

14          Q   Was he offered food and something to

15      drink?

16          A   Yes.

17          Q   Did you ask him how he had been treated

18      by the police?

19          A   Yes.

20          Q   What did he tell you?

21          A   He said, "very well."

22          Q   Did anyone threaten him in your presence?

23          A   No.

4          Q   Anybody make any promises to him in your

25                G-14

Plaintiff Jakes 031219

1    presence?

2         A    No.

3         Q    Did he complain of any threats or

4    mistreating of him?

5         A    No.

6         Q    Mr. Grossman, I show you what's marked

7    for identification as People's Exhibit Number 32.

8    Would you please tell the Ladies and Gentlemen of

9    the Jury what that exhibit is?

10        A    This is the original four-page statement

11   of the defendant which was taken on September 17th,

12   1991 at 4:30 a.m.

13        MR. DILLON:  Judge, at this time, I would ask

14   that the statement be published.

15        THE COURT:  You want to be heard on that,

16   Counsel?

17        MR. KATZ:  Nothing other than what was said

18   before.

19        THE COURT:  You may proceed, Sir.

20        THE WITNESS:  Statement of Anthony Jakes,

21   taken September the 17th, 1991 at 4:30 a.m., at

22   Area 3 Violent Crimes.  Present Assistant State's

23   Attorney Brian Grossman, Detective Louis Caesar,

24   star number 7208, Youth Officer Ken Burke, star

25                           G-15

Plaintiff Jakes 031220

1    number 3037. This statement taken regarding the

2    fatal shooting of Raphael Garcia which occurred on

3    September 15th, 1991 at 1206 West 51st Street at

4    about 11:55 p.m.

5         I understand that I have the right to

6    remain silent and that anything I say can be used

7    against me in a court of law. I understand that I

8    have the right to talk to a lawyer and have him

9    present with me during questioning, and if I cannot

10   afford a lawyer, one will be appointed by the Court

11   to represent me before any questioning.

12   Understanding these rights, I wish to give a

13   statement. Signed Anthony Jakes. After being

14   advised of his constitutional rights and stating he

15   understood each of these rights and stating that he

16   understood that Brian Grossman is an Assistant

17   State's Attorney, a lawyer working with the police

18   and not his lawyer, Anthony Jakes agreed to give

19   the following statement in summary and not

20   verbatim.

21        Anthony Jakes stated he's 15 years old.

22   Anthony is a freshman at Tilden High School in

23   Chicago Illinois. Anthony reads and writes and

24   understands English.

25                    G-16

Plaintiff Jakes 031221

1       Anthony Jakes states that on September

2   15th 1991, he was standing just outside Queen's

3   Submarine Shop at 1206 West 51st Street at about

4   11:35 p.m. or 11:40 p.m.   Anthony was standing

5   with his friends, Little A and Darren.  Anthony has

6   known Little A for about a year and a half.

7   Anthony has known Darren for about one year.

8       Little A came out of the submarine shop

9   and said, quote, the Mexican dude has got a lot of

10   money, we're going to stick him up, end of quote.

11   Little A then showed Anthony the gun which was

12   sticking out of his waistband.  Anthony recognizes

13   the gun to be Little A's .380 caliber handgun,

14   which Little A usually carries on him a night.

15   Anthony knew that Little A's .380 held between 7

16   and 8 shells. Anthony knew Little A sometimes kept

17   the clip of the gun fully loaded with bullets and

18   at other times the gun was half loaded with

19   bullets.   Anthony told Little A -- I'm sorry,

20   Little A told Anthony to, quote get to the corner,

21   end of quote. Anthony understood this to mean that

22   he would be the look out.  Anthony's job was to

23   watch for any police that were coming and to let

4   Little A and Darren know that police were coming.

25                   G-17

1    After Little A told Anthony to get to the corner,

2    Anthony said, quote all right, end of quote.

3    Anthony then walked toward the corner of 51st and

4    Racine.  As Anthony walked towards the corner of

5    51st and Racine, he ran into his friend Smack in

6    the Harold's Chicken, now known as Ollie's Chicken

7    Parking Lot.  Anthony went up to Smack and said

8    that they was fittin to rob this man.  Anthony

9    asked Smack if he was fittin to help, but Smack

10   said, "no." Anthony -- I'm sorry, Smack then drove

11   away from the parking lot. When Anthony got to the

12   corner of 51st and Racine, Anthony stood there for

13   a little bit and looked both ways.  Anthony didn't

14   see any police coming from any direction.  Anthony

15   then stayed by the newspaper stand which was on the

16   side of the Queen's Submarine Shop.  Anthony told

17   Little A and Darren, quote it's all right, end of

18   quote.  Anthony meant that he didn't see any

19   police.   Anthony kept looking both ways. The

20   Mexican dude then came out of Queen's Submarine

21   Shop.  Little A went up to the Mexican dude and

22   pointed his .380 caliber gun at the Mexican dude

23   and Little A said, quote this is a stick up, end of

24   quote. Darren was standing right next to Little A.

25                          G-18

Plaintiff Jakes 031223

1   The Mexican dude mumbled something Anthony couldn't

2   hear.   The Mexican dude ran to his car parked in

3   front of Queen's Submarine Shop on the street.   The

4   Mexican dude started his car and backed up his car.

5   The Mexican dude's car then hit another car.

6   Little A then went right up to the passenger window

7   of the Mexican's dude's car.  Little A pointed the

8   gun at the Mexican dude and Little A started

9   shooting at the Mexican dude.  Anthony was next to

10  the newspaper stand about 10 feet away from Little

11  A.   Darren was a couple of feet away from Little

12  A.  Anthony didn't want to stand in front of the

13  submarine shop because Anthony lived only a few

14  houses from the submarine shop and he didn't want

15  anybody in the submarine shop to recognize him.

16  Anthony saw Little A fire 4 shots at the Mexican

17  dude.   Anthony then turned and started to run.

18  Anthony heard about 3 more shots after he turned

19  and started to run.  Anthony ran because he didn't

20  want anybody to see him.   He got scared. Anthony

21  ran home to 1212 West 51st Street.  Anthony figured

22  that him, Little A and Darren would split the money

23  they were going to take from the Mexican dude.

24  Anthony didn't stick around to get his share

25                          G-19

Plaintiff Jakes 031224

1    because he didn't want anybody to see him and he

2    got scared.

3            After Anthony had been home for a few

4    minutes, he looked out onto 51st Street towards the

5    submarine shop and he saw the Mexican dude moving

6    around on the ground for a minute.

7            Anthony Jakes states that he has been

8    treated well by the police and the Assistant

9    State's Attorney. Anthony has been allowed to use

10   the washroom when he needs to.

11           Anthony states he is not hungry or

12   thirsty at that time, and he was asked by the

13   police if he wanted anything.

14           Anthony states that he was not promised

15   anything in return for his statement, nor was he

16   threatened in anyway. Anthony is not, nor does he

17   appear to be under the influence of drugs or

18   alcohol. It's signed by Anthony Jakes, Assistant

19   State's Attorney, Brian Grossmen, Youth Officer

20   Burke and Detective Louis Caesar.

21       MR. DILLON: I have nothing further.

22       THE COURT: Cross.

23               CROSS EXAMINATION

24                    BY

25                   G-20

Plaintiff Jakes 031225

```
 1          MS. BORMANN:  Thank you for the compliment, Mr.

 2    Grossman.

 3          THE WITNESS:  You're welcome.

 4          MS. BORMANN:

 5          Q    You've been an attorney since 1988?

 6          A    Yes, November.

 7          Q    A little less than 5 years?

 8          A    Correct.

 9          Q    You started with the State's Attorney's

10    Office after being sworn in?

11          A    Yes, December of 1988.

12          Q    And where did you start in the State's

13    Attorney's Office at that time?

14          A    The Appellate Division.

15          Q    Okay.  You worked in the Appellate

16    Division for how long?

17          A    Until the end of May.

18          Q    Now, just to make this clear, Mr.

19    Grossman, you're employed by the same office that

20    employs Mr. Goodfriend and Mr. Dillon?

21          A    Yes.

22          Q    You're currently assigned to a courtroom

23    at 26th Street?

 4          A    Yes.

25                          G-21
```

Plaintiff Jakes 031226

1    Q    Your current assignment is second chair

2    for that courtroom?

3    A    Yes.

4    Q    Mr. Goodfriend is the first chair for

5    this courtroom?

6    MR. GOODFRIEND: Objection, relevance.

7    THE COURT: Overruled.

8    THE WITNESS: I think so.

9    MS. BORMANN:

10   Q    And Mr. Dillon is not assigned to

11   this courtroom, but would be considered equivalent

12   to a first chair?

13   A    That I don't know.

14   Q    Now, the hierarchy in the State's

15   Attorney's Office in a particular courtroom is that

16   the first chair make decisions regarding cases and

17.  then the second chair follows those decisions,

18   that's basically the way it works, correct?

19   MR. DILLON; Objection, relevance.

20   THE COURT: Overruled. It may turn out to be,

21   is that correct?

22   THE WITNESS: I wouldn't phrase it like that.

23   MS. BORMANN:

4    Q    How would you phrase it?

25                   G-22

Plaintiff Jakes 031227

1      A    I believe the first chair would be

2    responsible for what goes on in the courtroom, but

3    there is a first, second and third chair that acts

4    as partners.

5      Q    Okay. And the first chair is responsible

6    for actions of the second chair and third chair,

7    correct?

8      A    Ultimately, yes.

9      Q    Kind of like in a supervisory role?

10     A    I don't think they get supervisory

11   salary.

12     Q    I'm sure that they don't.   You're

13   currently a second chair?

14     A    Yes.

15     Q    Now, we are going to go all the way back

16   to September 17th, 1991, 2 years ago. At that time,

17   you were not assigned to felony courtroom, correct?

18     A    Yes.

19     Q    Okay.  It was part of your training to

20   even get into a felony courtroom, Assistant State's

21   Attorneys have to go through something called

22   felony review, correct?

23     A    Yes.

24     Q    And felony review assignments last from 6

25                        G-23

Plaintiff Jakes 031228

1       months to a year to 18 months, correct?

2              A    Correct for most people.

3              Q    For most people.  And that lead generally

4       into an assignment here at 26th Street?

5              A    That leads to preliminary hearings.

6              Q    And that's generally through here, 26th

7       Street?

8              A    That's usually out in the branch courts,

9       actually.

10             Q    Then after branch court, you end up here

11      if you successfully complete all those rotations?

12             A    Yes.

13             Q    Okay.  Now, on that day you were a

14      relatively new State's Attorney on September of

15      1992.

16             MR. DILLON: Objection.

17             THE COURT: Assumes facts not in evidence.

18      Sustained.

19             MS. BORMANN:

20             Q    Okay. On that day, September 1 7 ,

21      1991, you were working with the police, correct?

22             A    Yes.

23             Q    And you informed Mr. Jakes of that?

4              A    Yes.

25                          G-24

1     Q   You weren't looking out for his best

2     interest?

3     MR. DILLON:  Objection.

4     THE COURT: Overruled. You may answer.

5     THE WITNESS: I believe I was looking out for

6     everybody's best interest.

7     MS. BORMANN;

8     Q   But, Sir, you were a prosecutor,

9     right?

10    A   Yes.

11    Q   You worked with the police?

12    A   Yes.

13    Q   You prosecute people?

14    MR. DILLON: Objection.

15    THE COURT: Counsel, a prosecutor prosecutes

16    people. Anybody on this jury unaware that a

17    prosecutor prosecutes people?  That question has

18    been asked and answered by the way. Don't ask it

19    again. Next question.

20    MS. BORMANN:

21    Q   The -- when you arrived at the

22    police district, Area 3, that day, you went

23    directly to the police station?

4     A   Yes.

25                    G-25

```
 1            Q   You spoke with the detectives?

 2            A   Correct.

 3            Q   That's Detective Caesar?

 4            A   Yes.

 5            Q   Detective Kill?

 6            A   Yes.

 7            Q   Detective Boudreau?

 8            A   Yes.

 9            Q   Now, that's normal procedure when you

10       respond to a call for felony review Assistant,

11       correct?

12            A   In this type of case, yes.

13            Q   And you read over the reports that

14       existed at that time?

15            A   Yes.

16            Q   Your job as a felony review Assistant is

17       to assess evidence?

18            A   I do it, yes, that's part of it.

19            Q   Okay. And it's to take statements?

20            A   It's part of it, yes.

21            Q   And it's to process charges?

22       MR. DILLON:  Objection, relevance.

23       THE COURT:  Overruled.

 4       THE WITNESS:  That's part of it.

25                      G-26
```

1    MS. BORMANN:

2        Q    In this case, you assessed evidence?

3    A    Yes.

4    Q    You took statements?

5    A    Yes.

6    Q    And then you processed charges?

7    A    Yes.

8    Q    Now, during the months you were in felony

9    review, you met many police officers, right?

10   A    Yes.

11   Q    Detective Kill, Detective Boudreau, and

12   Detective Caesar?

13   A    Correct.

14   Q    You knew them prior to responding to Area

15   3 on the night of or the morning of September 17,

16   1991, correct?

17   MR GOODFRIEND:  I will object.

18   THE COURT:  Overruled.  Did you know them

19   before that as far as you know?

20   THE WITNESS:  Yeah.  I knew who they were.

21   MS. BORMANN:

22       Q    Okay.  You had met them before?

23   A    Yes.

24   Q    Now, as an Assistant State's Attorney,

25                         G-27

Plaintiff Jakes 031232

1          it's important you build relationships with the

2          police officers that you work with, correct?

3                MR. GOODFRIEND: Objection.

4                THE COURT: Sustained.

5                MS. BORMANN:

6                Q    After you read the reports and you

7          spoke with all of the detectives that evening, you

8          took a couple of statements, correct?

9                A    Yes.

10               Q    You took a statement from a Gus Robinson,

11         who was also at Area 3 that evening?

12               A    Yes.

13               Q    The statement you took from Mr. Robinson,

14         you took at approximately 3:50 a.m., is that

15         correct?

16               A    Yes.

17               Q    And the statement that you took from Mr.

18         Jakes was at about 4:30 in the morning, correct?

19               A    Correct.

20               Q    Now, when you discussed with the

21         detectives, Mr. Jakes, you obviously learned that

22         he had been in custody since about noon the day

23         before, correct?

24               MR. DILLON: Objection, assumes facts not in

25                                    G-28

1          evidence.

2                 THE COURT: Hearsay. Sustained.

3                 MS. BORMANN:

4                     Q   Did you ask Mr. Jakes how long he

5          had been in custody?

6                 MR. DILLON: Objection.

7                 THE COURT: Overruled.

8                 THE WITNESS: No.

9                 MS. BORMANN:

10                    Q   Did you ask him had he slept at all?

11                    A   I don't recall.

12                    Q   And did you ask him whether he had

13         anything to eat?

14                    A   Yes.

15                    Q   He hadn't, had he?

16                    A   He said he had been offered things to eat

17         and  drinks by the detectives, but he said he

18         wasn't hungry or thirsty.  I offered him a can of

19         pop. He said he wasn't thirsty.

20                    Q   None of his family was present?

21                    A   No.

22                    Q   Now, when you went through this statement

23         with Mr. Jakes the first time, and also the second,

24         it was series of questions and answers, wasn't it?

25                                    G-29

Plaintiff Jakes 031234

1        A    If you want to call it that.

2        Q    Well, Mr. Jakes didn't blurt out

3   everything in one long narrative, did he?

4        A    No.

5        Q    You asked him how old he was?

6        A    Yes.

7        Q    He said 15?

8        A    Yes.

9        Q    You asked him what year in school he was?

10       A    He said Freshman, yes.

11       Q    You asked him what school he went to?

12       A    Right, Tilden, I think.

13       Q    And then, you wrote down, in your words,

14   your understanding of his statement, correct?

15       MR. DILLON:  Objection.

16       THE COURT:  Overruled.

17       THE WITNESS:  I summarized his words, but I

18   also incorporated his words.

19       MS. BORMANN;

20       Q    In other words, the words on the

21   written paper, People's Exhibit Number 32, are your

22   words?

23       MR GOODFRIEND: Objection, asked and answered.

24       THE COURT: Sustained.

25                        G-30

1        MS. BORMANN:

2            Q    You never offered this preprinted

3        form to Mr. Jakes, did you?

4            A    I don't understand the question.

5            Q    Before the form was written up, you never

6        said, "Mr. Jakes, here's a form.  Write down what

7        it is that happened that evening?"

8            A    No, I would write it out myself because

9        my handwriting is usually a lot neater.

10           Q    Well, Mr. Grossmen, you were able to

11       determine that Mr. Jakes spoke English, right?

12           A    I asked him.

13           Q    Understand English?

14           A    Yes.

15           Q    And wrote English, right?

16           A    Yes.

17           Q    As you were going through this interview

18       -- let me understand, there were, at the very

19       beginning, 2 detectives present, Detective Caesar

20       and Detective Kill, correct?

21           A    No.

22           Q    Okay. Well, when you first arrived in the

23       interview room with Mr. Jakes, Detective Kill was

24       present, correct?

25                              G-31

Plaintiff Jakes 031236

1       A   No, I walked into the interview room with

2      Detective Kill and Detective Caesar, and I believe

3      the defendant and the Youth Officer Burke walked in

4      right before us.

5       Q   So, Detective Kill was present when you

6      were first in the interview room with Mr. Jakes?

7       A   He introduced us and then left the

8      interview room.

9       Q   And he left the interview room after a

10     minute or 2, correct?

11      A   No, he just introduced us and left the

12     interview room.  I don't know if it was a long --

13      Q   Could have been a minute, 2 minutes, 3

14     minutes, 30 seconds?

15      A   Right.

16      Q   Detective Kill entered that room on a

17     couple of other occasions during the interview

18     process, correct?

19      A   He might have come in once or twice to

20     get some files. There is a file cabinet in the

21     back, but he never approached the table.

22      Q   And when he walked into the interview

23     room, he had to walk past the table where Mr. Jakes

4     was standing, correct?

25                  G-32

1       A    No, I don't recall that.

2       Q    He had to walk around the table?

3       A    No.

4       Q    There are files in the office, correct?

5       A    Yes.

6       Q    And there is a file cabinet?

7       A    Yes.

8       Q    Where is that in relation to the table

9   where you were sitting?

10      A    They were back towards the door, if I

11  recall.

12      Q    And so, when the detective walked in, he

13  had to open the door?

14      A    I wasn't paying attention.

15      Q    All right.  And you usually had to walk

16  into the room?

17      A    That's how he got in the room, yes.

18      Q    It's a fair summary, Mr. Grossmen, to say

19  that you were never alone with Mr. Jakes at any

20  time, correct?

21      A    That's correct. Youth Officer Burke was

22  always present.

23      Q    And Detective Caesar was always present,

24  correct?

25                          G-33

1    A    Yes.

2    Q    And Detective Kill popped in a couple of

3    times, in and out?

4        MR. DILLON: Objection, asked and answered.

5        THE COURT: Sustained.

6        MS. BORMANN: We have nothing further.

7        THE COURT: Redirect.

8                REDIRECT EXAMINATION

9                      BY

10   MR. GOODFRIEND:

11       Q    Mr. Grossmen, on felony review,

12   counsel asked you whether you approve cases,

13   correct?

14   A    Yes.

15   Q    Okay. You also reject cases?

16   A    Absolutely.

17   Q    You reject a number of cases during your

18   tour on felony review, correct?

19   A    Yes.

20   Q    One of your responsibilities as a

21   Assistant State's Attorney is to ensure that

22   defendant's are treated fairly, correct?

23   A    Yes.

24   Q    Counsel asked you some questions about

25                      G-34

Plaintiff Jakes 031239

1          where I'm assigned and what my position is.  Mr.

2          Dillon is assigned to a different unit in this

3          office, is that correct?

4              A    Gangs Crime Unit.

5              Q    Now, directing your attention to the

6          taking of the statement, you indicated that you

7          arrived at 2:00 a.m., correct?

8              A    Yes.

9              Q    You did not interview the defendant until

10         a youth officer arrived, is that correct?

11             A    Yes.

12             Q    Before you interviewed the  defendant,

13         you indicated that you did have time to talk to Mr.

14         Robinson?

15             A    Yes.

16             Q    And you began his written summary at

17         approximately 3:50 that morning, is that correct?

18             A    Yes.

19             Q    And took you about 10 minutes to finish

20         that short statement?

21             A    Yes, more or less.

22             Q    Detective Kill did not participate in any

23         way in the preparation of the statement, the

4          handwritten statement?

25                              G-35

1        A    No.

2        Q    Did the defendant ever ask for a family

3   member?

4        A    You talkin about Jakes?

5        Q    I'm talking about Jakes?

6        A    No.

7        Q    If he had asked for a family member,

8   would you have allowed him to get one?

9        A    Yes.

10       Q    If defendant had asked to write out his

11   own statement, would you have allowed him to write

12   it out?

13       A    Yes.

14       MR. GOODFRIEND: Nothing further.

15       THE COURT: Cross.

16       MS. BORMANN: No cross.

17       THE COURT: You're excused.

18            (The witness was excused.)

19       THE COURT: Call your next witness.

20       MR. GOODFRIEND:  As to the case against

21   Anthony Jakes, the People would request that their

22   exhibits be admitted and we would rest.

23       THE  COURT:  Exhibits  have  already  been

24   discussed, so the State rest.  Counsel for each

25                    G-36A

Plaintiff Jakes 031241

1  side, approach the bench.

2   (Discussion was held outside presence of the jury.)

3    THE COURT: Defense, please proceed.  Call your

4  first witness, if any.

5    MR. KATZ:  If I can have a moment.  Your

6  Honor, we call Anthony Jakes.

7    THE COURT: Please walk up here, Sir.

8     (Witness was sworn.)

9     MR. ANTHONY JAKES,

10  called as a witness on his own behalf, was first

11  duly sworn, examined and testified as follows:

12     DIRECT EXAMINATION

13      BY

14  MR. KATZ:

15    Q State your name?

16    A Anthony Jakes.

17    Q Mr. Jakes, how old are you?

18    A 17.

19    Q Now, back on September of 1991, how old

20  were you?

21    A 15.

22    Q And were you attending school?

23    A Yes.

24    Q Where did you go to school?

25     G-36β

Plaintiff Jakes 031242

```
 1            A    Tilden High.

 2            Q    And what grade had you achieved?

 3            A    Freshman.

 4            Q    Now, back in September of 1991, where did

 5       you live at?

 6            A    1212 West 51st Street.

 7            Q    And this is in Chicago?

 8            A    Yes.

 9            Q    That's around 51st and Racine, correct?

10            A    Yes.

11            Q    Now, on September the 15th of 1991, do

12       you remember the evening -- do you remember where

13       you were at?

14            A    At my auntie's house.

15            Q    Okay.  And that's at 1212 West 51st

16       Street?

17            A    Yes.

18            Q    And around 10:00 o'clock or so, did

19       anything unusual happen?

20            A    Police came to my house.

21            Q    No, on the 15th?

22            A    Okay. The 15th?

23            Q    Yes.

24            A    Uh-huh.

25                           G-37
```

1          Q   Did you have an altercation with some

2       individuals or fight with some people?

3       MR. GOODFRIEND: Objection, leading.

4       THE COURT: Sustained. Let the witness

5       testify.

6       MR. KATZ:

7          Q   Did anything happen?

8       A   I got into an argument with some people.

9          Q   Can you tell the Ladies and Gentlemen,

10      what happened?

11       A   I believe it was Mexicans, Indians, and

12      one of them drove past and threw a bottle through

13      my auntie's window, so me and me and my cousin went

14      upstairs and cleared the glass up and took the

15      glass out to the garbage. We seen them in the

16      alley and we had a few words and that was it.

17       Q   And when you had a few words with them,

18      what occurred after that? What was after that?

19       A   They kind of chased us cause it was like

20      some more of them was comin.

21       Q   And after they chased you, where did you

22      go?

23       A   I ran -- like my house is between Racine

24      and Elizabeth in the middle of Racine, so I ran to

25                G-38

Plaintiff Jakes 031244

1          Elizabeth -- from East Elizabeth to Troop.

2              Q    And did you eventually get back to your

3          home?

4              A    Yes.

5              Q    All right.  Did you notice anything

6          unusual outside?

7              A    I seen an ambulance in front of my house.

8              Q    And were people around when the ambulance

9          was there?

10             A    Yes.

11             Q    All right.  And what else did you see as

12         far as the ambulance?

13             A    Well, when the police was out there, when

14         I walked up to the porch, I had said something to

15         somebody that was standing on the porch and my --

16         then we got into a argument and my auntie, she

17         slapped me across the face and sent me in the

18         house.

19             Q    Did she draw blood or anything when she

20         slapped you in the face?

21             A    Un-un.

22             Q    Is that a no?

23             A    Yeah.

24             Q    Now, did you ever see Gus Robinson on

25                          G-39

Plaintiff Jakes 031245

1    September 15, 1991?

2         A    No.

3         Q    Do you know Gus Robinson?

4         A    Yeah.

5         Q    And how do you know Gus Robinson?

6         A    I sent him in the neighborhood.

7         Q    Did you ever look out for Little A or

8    Arnold Day on September 15th, 1991?

9         A    No.

10        Q    Before you got home or -- strike that.

11   Before you saw the ambulance, had you ever seen

12   Raphael Garcia, the man on the ground before?

13        A    Nope.

14        Q    All right.  Now, I want to bring your

15   attention to the next day, September the 16th,

16   1991, did you -- what if anything unusual happened?

17        A    Well, I was gettin ready for juvenile

18   court and the police just busted in.

19        Q    All right.  Did they take you down to the

20   police station?

21        A    Yeah.

22        Q    All right.  And did you have a

23   conversation with certain detectives?

24        A    Yes.

25                         G-40

1          Q    And do you remember the detective's name

2     that you first spoke to?

3          A    I think it was Duckhorn.   I can't

4     remember their name.

5          Q    And did you tell them -- did you tell

6     that detective the same information that you told

7     the Ladies and Gentlemen of the jury?

8          MR. GOODFRIEND:  Objection, hearsay.

9          THE COURT:  Overruled.

10         THE WITNESS:  Yes.

11         MR. KATZ:

12         Q    Now, did you have an occasion to

13    speak to other detectives?

14         A    Yes.

15         Q    And do you remember their name?

16         A    I remember Detective Kill and Caesar.

17         Q    Do you remember, Mr. Jakes, what time you

18    first got to the police station?

19         A    About 12:00, 12:30 somewhere around

20    there, 12:40.

21         Q    And do you remember what time you spoke

22    to Detective Kill and Detective Caesar?

23         A    It was at night.

24         Q    Now, when you spoke to Detective Kill,

25                      G-41

1     what if anything happened?

2         A   First he came in there, he asked me my

3     name and stuff.

4         Q   All right. Let me stop you for a minute.

5     When you say he came in there, where are you

6     talking?

7         A   I think I was in a room, room with some

8     table and lockers.

9         Q   That was 39th and California?

10        A   Yes.

11       Q   So, Detective Kill came in.  What if

12     anything happened?

13      MR. GOODFRIEND:  Objection, no foundation.

14      THE COURT:  It was 39th and California.. He

15     was in a small room.  Objection overruled.

16      MR. KATZ:

17        Q   Tell the Ladies and Gentlemen, what

18     happened?

19         A   Well, he came and asked me my name, then

20     he walked back out of the room for like a minute or

21     so, then he came back in and he had 2 pictures with

22     him.  He said "I was the one in the picture -- in

23     the pictures of the person who was lookin out. I

24     said -- then he turned it around.  I was -- I still

25                   G-42

Plaintiff Jakes 031248

1  told him what I told the Duck one, I don't know

2  what you talkin about.  The second picture, he

3  told me, he said this was the trigger man.  He

4  turned it around and Arnold Day was on there and I

5  said I still don't know what you talkin about and

6  he slapped me.

7      Q  Where did he slap you at?

8      A  In the face.

9      Q  And what if anything happened after he

10  slapped you in the face?

11      A  Well, he was telling me how my family

12  would be killed by the Latin Kings.  He said  he

13  would push me out this window, and they tried to

14  burn me with a cigarette.

15      Q  What occurred then?

16      A  Then, he hit me with his fist.  I fell to

17  the floor, rolled up by one of the lockers.

18      Q  I didn't hear you.

19      A  Then, he hit me with his fist.  I fell on

20  the floor, rolled up by one of the lockers, you

21  know, balled up and he started kickin me in my

22  side.

23      Q  And after he did that, what if anything

24  happened?

25                 G-43

Plaintiff Jakes 031249

```
 1        A   I think I kind of cut my back on the
 2    locker or something, something steel.  I cut my
 3    back on --
 4        Q   And what if anything did Detective Kill
 5    say to you then?
 6        A   He said after he went back around the
 7    table like that, he said -- and put the chair up,
 8    he told me to get in the chair, so I pulled the
 9    chair back in the table and he said this is what
10    you gone tell the State's Attorney Grossmen, then
11    he started telling me this and that, you know, and
12    I just went along with it because I didn't want to
13    get beat no more.
14        Q   Did he use the word State's Attorney
15    Grossmen?
16        A   (Shaking head.)
17        Q   I'm sorry.
18        A   Un-un, he said this what you gone tell
19    the man when he come.
20        Q   Now, did that -- how long did that
21    conversation last, 30 minutes, 35 minutes,
22    somewhere between that.
23        A   (No response.)
 4        Q   When did you next see Detective Kill or
25                        G-44
```

Plaintiff Jakes 031250

1       -- strike that.  Do you remember how long it was

2       before you next spoke to someone?

3              A    Nope.

4              Q    Where were you staying before you next

5       spoke to someone?

6              A    I think I was in the sergeant room again,

7       in the same room.

8              MR. GOODFRIEND;   Objection, Judge, to the

9       leading.

10             THE COURT:  Overruled.

11             THE WITNESS:  It was one of them sergeants or

12      the other room

13             THE COURT:  All right.  When you were in the

14      sergeant's room who was present with you.

15             THE WITNESS:  The detective.

16             MR. KATZ:

17                 Q    Which detective?

18             A    I think Caesar and the State's Attorney.

19             Q    That's the fella that just testified?

20             A    Yes.  Kill was in there and I don't know

21      the other dude that was -- I don't know his name.

22             Q    Would that be Youth Officer Burke?

23             MR. GOODFRIEND: Objection, Judge.

24             THE WITNESS; Yes.

25                              G-45

Plaintiff Jakes 031251

1    THE COURT: Answer may stand. Please don't

2    lead the witness, Counsel.

3    MR. KATZ:

4        Q   Now, when you're in that room, what

5    if anything happened?

6        A   Well, Detective Kill, he just -- he

7    looked at me real hard, like -- cause right before

8    the State's Attorney got there or whoever he was

9    got there, he stated, "if you don't tell him what I

10   want to hear, you gone get some more of what I just

11   gave you." When he leaves, he looked at me real

12   hard.

13       Q   How did that make you feel?

14       A   Feel like he threatened me and I didn't

15   want to get beat up no more.

16       Q   Now, Mr. Jakes, you eventually gave a

17   statement to the State's Attorney, right?

18       A   Yes.

19       Q   And after that, you gave a handwritten

20   statement, is that right?

21       A   Right.

22       Q   Now, I want to show you what I have

23   previously marked as Defendant's Group Exhibit

24   Number 3 (A) through (G). If I may approach.

25                    G-46

1    I ask you to take a look at that

2    individually, each one.

3    Now, just bringing your attention to

4    Defendant's 3 (A), can you tell the Ladies and

5    Gentlemen of the Jury what that's a photograph of?

6    A   Of me.

7    Q   And what does it depict in that

8    photograph? What does it show?

9    A   My chest and stuff.

10   Q   Are there any marks or anything

11   distinguishing on that photograph?

12   A   My side where you can see a -- like a

13   little --

14   THE COURT:  Keep your voice up, Sir.

15   THE WITNESS:  It's like my side where you can

16   see a little bruise.

17   MR. KATZ:

18   Q   All right. And does that photograph

19   truly and accurately show how you looked on

20   September 16th, 1991?

21   MR. DILLON:  Objection.

22   THE COURT:  I'm sorry.

23   MR. DILLON:  There is no time established.

24   It's several dates.

25                        G-47

Plaintiff Jakes 031253

```
 1              THE  COURT:    That  goes  to  the  weight.

 2    Overruled.

 3              THE WITNESS:  Yes.

 4    MR. KATZ:

 5          Q    I'm going to show you (B) and ask

 6    you first of all, do you recognize that photograph?

 7          A    Yes.

 8          Q    What is that?  Do you recognize that

 9    photograph?

10          A    A picture of my back.

11          Q    And do you remember when that photograph

12    was taken?

13          A    I think it was taken the first day I went

14    to court.

15          Q    And do you remember what day that was?

16    Would it have been the day after you were in the

17    police station?

18              MR. DILLON: Objection.

19              THE  COURT:    Sustained.    Don't  lead  the

20    witness.  You don't remember what day it was?

21              THE WITNESS:  I think it was either a Monday

22    or a Tuesday.

23    MR. KATZ:

24          Q    Of 1991?

25                          G-48
```

Plaintiff Jakes 031254

1        A   Yes.

2        Q   And do you remember who took those

3   photographs?

4        A   I don't remember his name, but it was a

5   short Mexican dude.

6        Q   And when he took the photograph, was

7   there anyone else present besides yourself and him?

8        A   Nope.

9        Q   All right.  And when he took the

10   photograph, how did he go about taking this

11   photograph?

12        A   He told me to show him where I was hurtin

13   at, so he got a picture of it and he had just

14   turned me to the side, like this, and took a

15   picture then turned me around and take another

16   picture.

17        Q   Now, that's (B), and that shows a picture

18   of your back, is that correct?

19        A   Yes.

20        Q   I would show you (C) and ask you to tell

21   the Ladies and Gentlemen what is shown in there?

22        A   It's my back again, but a gooder look.

23        Q   Better look?

4        A   Yes.

25                  G-49

Plaintiff Jakes 031255

1         Q   It shows any injuries or anything?

2         MR. DILLON:  Objection.

3         THE COURT:  Overruled.

4         THE WITNESS:  It's a scar on there.

5         MR. KATZ:

6         Q   Now, I would show you (D) and ask

7    you if you can identify that --

8         A   It's like --

9         Q   Can you identify that?

10        A   Yeah, it's my back.

11        Q   And what does that photograph depict?

12        A   It's like the upper part of my back, up

13    here, a better look at that.

14        Q   I will show you (E) and ask you if you

15    can identify that?

16        A   It's the side.

17        Q   Of?

18        A   My body.

19        Q   And does that show or depict anything?

20        A   Up above my ribs and stuff.

21        Q   I will show you (F) and ask you to

22    identify that?

23        A   First of all, do you know who that is?

4        A   That's me.

25         G-50

1      Q   And what does that show?

2      A   My elbow.

3      Q   And I will show you (G) and I will ask

4   you to identify that? First of all, do you know

5   who that is?

6      A   Me, and it's a picture of my leg.

7      Q   Do all those photographs, Mr. Jakes,

8   truly and accurately depict how you looked after

9   September 16th or 17th, 1991?

10      A   Yes.

11      Q   Now, you testified, Anthony, that you

12   were in a fight with some fellas?

13      A   Yes.

14      Q   Could you tell the Ladies and Gentlemen

15   if you were taken anywhere that night?

16      A   Nope.

17      Q   And could you tell them why that was?

18      A   Well, it wasn't really no fight, but out

19   there on the streets, they say a fight is when you,

20   you know, argue. They call that a fight, but a

21   fight is really when you fist fight, you get

22   contact, but we didn't fist fight or contact, we

23   just had a argument, controversial.

          MR. KATZ: Nothing further.

25               G-51

Plaintiff Jakes 031257

1      THE COURT: Cross.

2                    CROSS EXAMINATION

3                         BY

4      MR. GOODFRIEND:

5           Q    Mr. Jakes, you said that on 16th of

6      September, 1991, you were going to juvenile court?

7           A    Yes.

8           Q    What were you going to juvenile court

9      for?

10     MR. KATZ:  Objection.

11     THE COURT:  Let's have a side bar.

12              (A sidebar was held.)

13     THE COURT:  Objection sustained.

14     MR. GOODFRIEND:

15          Q    Mr. Jakes, what is your middle name?

16          A    Sean.

17          Q    Do a lot of people call you Sean?

18          A    Most people.

19          Q    The person, Arnold Day, what name do you

20     know him by?

21          A    Little A.

22          Q    How long have you known Little A?

23          A    I have known him about a year.

24          Q    A year before this happened?

25                         G-52

Plaintiff Jakes 031258

1          A    Yes.

2          Q    Was Little A, Arnold Day, a member of a

3      street gang?

4          MR. KATZ:  Objection.

5          THE COURT:  Overruled.

6          MR. GOODFRIEND:

7          Q    Was Little A a member of a street

8      gang?

9          A    I don't know.

10         Q    The person by -- you know him by the name

11     of Darren, how long had you known him?

12         MR. KATZ:   Objection, assumes fact not in

13     evidence.

14         THE COURT: The way the question is phrased.

15     Sustained.

16         MR. GOODFRIEND:

17         Q    Do you know an individual by the

18     name of Darren?

19         A    Yes.

20         Q    Who is Darren?

21         A    Just a friend in the neighborhood, just

22     like everybody else.

23         Q    How long had you known Darren?

24         A    About 6 months.

25                          G-53

Plaintiff Jakes 031259

1    Q    Before this happened?

2    A    Yeah.

3    Q    Where did Darren live?

4    A    I couldn't even tell you that.

5    Q    What did you do with Darren?

6    A    I didn't do nothing with him.

7    Q    Did you see him in the neighborhood?

8    A    Yeah, I see him in the neighborhood.

9    Q    You know what block he lived on?

10   A    Nope.

11   Q    How many times in your life had you seen

12   Darren before this happened?

13   A    I couldn't tell you.

14   MR. KATZ:  Objection.

15   THE COURT:  Overruled.

16   THE WITNESS:  I couldn't tell you.

17   MR. GOODFRIEND:

18       Q    More than 10?

19   A    You see a lot of people these days.

20   Q    The question is, did you see Darren more

21   than 10 times before this happened?

22   A    And I couldn't tell you.

23   Q    You know Gus Robinson?

24   A    Yes.

25                              G-54

1        Q    Where did you know him from?

2        A    I know him from the neighborhood.

3        Q    How long had you known Gus Robinson

4    before this incident?

5        A    Five, six months, somewhere up in there.

6        Q    Now, you indicated that when you were

7    taken to the police station, you were somewhat

8    scared and intimidated?

9        A    Could you repeat the question?

10       Q    Were you scared of the police on

11   September 16, 1991?

12       A    Yes.

13       Q    Were you -- did you fell intimidated by

14   the police?

15       A    Yes.

16       Q    Before September 16, 1991, you had talked

17   with the police, is that correct?

18       A    Yes, I guess so.

19       Q    Approximately how many times before

20   September 16th of 1991, had you spoken with police

21   officers?

22       MR KATZ: Objection to the relevance.

23       THE COURT: Overruled.

24       THE WITNESS: I couldn't even tell you that.

25                    G-55

Plaintiff Jakes 031261

1          MR. GOODFRIEND:

2              Q    Well, would it be approximately 13

3      times?

4              A    I couldn't tell you.

5              Q    Well, you remember testifying in this

6      courtroom back on December the 3rd, 1992, don't

7      you?

8              A    Yeah, I remember.

9              Q    There was a hearing held in this

10     courtroom?

11             A    Yes.

12             Q    It was before Judge Durkin?

13             A    Yes.

14             Q    And your attorney was here?

15             A    Yes.

16             Q    You were put under oath?

17             A    Yeah.

18             Q    Page 74.  You remember being questioned

19     by an Assistant State's Attorney by the name of

20     David O'Connor?

21             A    Oh, yeah.

22             Q    Do you remember being asked this question

23     and giving this answer.  Question by Mr. O'Connor,

24     "would it be fair to say that you had contact with

25                             G-56

Plaintiff Jakes 031262

1        Chicago police officers prior to this day,

2        approximately 13 times?" Answer, "yeah."

3            Do you remember that question being asked

4        and you giving that answer?

5        A   I remember that question being asked, but

6        I don't remember giving that answer. That's his

7        answer.

8        Q   Sir, are you -- are you familiar with

9        your miranda warnings?

10       A   Nope.

11       Q   Once again, you remember testifying

12       before Judge Durkin back on December 3rd, 1991?

13       A   Yes.

14       Q   Page 51. Do you remember being asked

15       these questions and giving these answers?

16       Question, "prior to that date, had you ever heard

17       of your rights before?" Answer, "yeah."

18            MR. KATZ: Objection. That's not impeachment.

19       It's not the same question.

20            THE COURT: Rephrase your question.

21            MR. GOODFRIEND:

22       Q   "Before September 16th 1991, had you

23       ever heard of your miranda rights?"

24       A   It's a difference between miranda rights

25                G-57

Plaintiff Jakes 031263

1 and rights. I heard of rights, but I ain't heard

2 of no miranda rights, whatever you said.

3  Q Have you ever heard of your rights before

4 September 16, 1991?

5  MR. KATZ: Objection, asked and answered.

6  THE COURT: If it has been, I'm not aware.

7 Overruled.

8  MR. GOODFRIEND:

9  Q Sir, had you heard of your rights

10 before September 16, 1991?

11  A I guess so.

12  Q Pardon.

13  A I guess so.

14  Q Did you understand those rights?

15  A Nope.

16  Q Once again, Page 51. Do you remember

17 being asked these questions and giving these

18 answers? Question, "prior to that date, have you

19 ever heard of your rights before?" Answer, "Yeah."

20 "Did you understand those rights on a prior date?"

21 Answer, "Yeah."

22  Do you remember being asked those

23 questions and giving those answers?

24  A I don't remember asking the questions,

25        G-58

1       but I didn't give no answer.  I probably said yeah.

2       He was the one asking the questions and asking them

3       too fast.

4            Q    Do you remember giving those answers?

5            A    My memory is short.

6            Q    Is your answer you don't remember?

7            A    I don't remember.

8            Q    Before -- Before September 16th, 1991,

9       had you been given your miranda warnings by police

10      officers on 3 occasions?

11           A    I can't remember.

12           Q    Once again, bottom of Page 47 onto Page

13      75. Do you remember being asked these questions and

14      giving these answers.  Question, "during those 13

15      times that you had contact with the police

16      officers, did they provide miranda warnings?"

17      Answer, "Not everytime." Question, "how many times

18      would you estimate?"  Answer, "About 3 times."

19           Do you remember being asked those

20      questions and giving those answers?

21           A    Yes.

22           Q    Did you, on December 16, 1991, understand

23      what your rights were?

24           A    Not really.

25                          G-59

1          Q   You remember being asked this question

2       and giving this answer. Question, "you understood

3       those warnings each and everytime?" Answer,

4       "Yeah."

5          Do you remember being ask that question

6       and giving that answer?

7          A   I remember asking the question, but I

8       don't remember giving that answer. Whatever his

9       name is, he gave the answers.

10         Q   Did you understand on September 16, 1991,

11      that you had a right to remain silent?

12        A   Nope.

13        Q   Page 75 at the bottom. Do you remember

14      being asked this question and giving these answers.

15      Question, "Did you understand that you had a right

16      to remain silent?" Answer, "Yes."

17         Do you remember being asked that question

18      and giving that answer?

19        A   Yes.

20        Q   Do you understand that you had a right to

21      an attorney?

22        A   I guess so, yeah.

23        Q   Did you understand that an attorney could

24      be appointed for you?

25                            G-60

1      A   One was not ever appointed.

2      Q   Sir, the question is, did you understand

3  that an attorney could be appointed for you?

4      A   I don't know.

5      Q   Page 76. Do you remember being asked this

6  question and giving this answer. Question, "Do you

7  understand that if you don't have an attorney, one

8  would be appointed for you?" And your answer was,

9  "yeah."

10      You remember being asked that question

11  and giving that answer?

12      A   Yeah.  I remember that now.

13      Q   Pardon.

14      Q   I remember that now.

15      Q   You did understand that an attorney could

16  be appointed for you, is that correct?

17      A   Like I say, didn't one never come.

18      Q   Sir, you did understand that you could

19  have a lawyer and have one appointed for you, is

20  that correct?

21      A   I guess you could say that.

22      Q   Now, today, in court, you claimed that

23  you were hit in the face by Detective Kill, is that

4  correct?

25               G-61

Plaintiff Jakes 031267

1    A    Yes.

2    Q    That you were kicked and knocked on the

3    floor?

4    A    Yes.

5    Q    That you were stomped in the back?

6    A    Yes.

7    Q    That he threatened to push you out a

8    window?

9    A    Yes.

10    Q    Do you remember on the morning of

11    September 17, 1991, talking to Youth Officer Ken

12    Burke at about 3:45 in the morning?

13    A    I can remember talking to him, but I

14    don't know what we talked about.

15    Q    Do you remember talking to a youth

16    officer?

17    A    Yeah.

18    Q    It was just you and him, is that correct?

19    A    It was somebody kept poppin in and out.

20    Q    You do remember talking to a youth

21    officer, though?

22    A    Yes.

23    Q    Did you ever tell that youth officer that

24    Detective Kill had hit you in the face?

25                          G-62

Plaintiff Jakes 031268

1    A    Nope.

2        Q    Did you ever tell that youth officer that

3    Detective Kill had kicked and knocked you to the

4    floor?

5        A    Nope.

6        Q    Did you ever tell that youth officer that

7    he had stomped on your back?

8        A    No.

9        Q    Did you ever tell that youth officer that

10   he threatened to push you out a window?

11       A    No.

12       Q    Now, you indicated that you do remember

13   talking to State's Attorney Grossman, is that

14   correct?

15       A    Yes.

16       Q    He just testified a few minutes ago, is

17   that correct?

18       A    Yes.

19       Q    When you talked to State's Attorney

20   Grossman, Detective Kill wasn't in the room all the

21   time, was he?

22       A    He kept poppin in and out.

23       Q    There were times when you were with the

24   State's Attorney and Detective Kill, wasn't there,

25                    G-63

Plaintiff Jakes 031269

1       is that correct?

2            A    Correct.

3            Q    Did you ever complain to the State's

4       Attorney that you had been kicked or struck by

5       Detective Kill?

6            A    Nope.

7            Q    The State's Attorney asked you how you

8       had been treated by the police, is that correct?

9            A    Yeah.

10           Q    And you told him that you were treated

11      good?

12           A    I told him that because I was scared and

13      afraid.

14           MR. GOODFRIEND;   I ask that that part be

15      stricken and witness be instructed.

16           THE COURT:  Non-responsive.  Just answer the

17      question.  The question is, did you ever tell him?

18           THE WITNESS:  Nope.

19           MR. GOODFRIEND:

20           Q    Now, Mr. Jakes, after you were

21      charged with the murder and attempted armed robbery

22      of Raphael Garcia, you went over to the juvenile

23      court detention facility, is that right?

24           A    I went to 12th and Roosevelt.

25                              G-64

Plaintiff Jakes 031270

1       Q   The audy home?

2       A   Right.

3       Q   And at the audy home, you were examined

4   by a doctor, is that correct?

5       A   A couple of days later, yeah.

6       Q   Do you remember his name as Dr. Lujan?

7       A   Nope.

8       Q   Did the doctor look at your body and ask

9   you questions?

10      A   He just asked me was anything wrong with

11   me.

12      Q   Detective Kill wasn't there when you were

13   with the doctor, was he?

14      A   Cause wasn't nothing wrong with me at the

15   time.

16      THE COURT: That's not the question that was

17   asked of you. Repeat your question, please.

18      MR. GOODFRIEND:

19      Q   Was Detective Kill with you when the

20   doctor examined you?

21      A   Nope.

22      Q   Did you tell Dr. Lujan that you had been

23   beaten and struck by Detective Kill?

24      A   Nope.

25                   G-65

Plaintiff Jakes 031271

1       Q  Did you tell Dr. Lujan that Detective

2   Kill had threatened to toss you out a window?

3       A  Nope.

4       Q  Did you tell Dr. Lujan that he had tried

5   to burn you with a cigarette?

6       A  Nope.

7       Q  Did you tell Dr. Lujan that you had been

8   pushed to the floor and stomped on?

9       A  Nope.

10      Q  Did you tell Dr. Lujan something about

11   that injury to your back?

12      A  I can't remember.

13      Q  Didn't you tell Dr. Lujan that the

14   injuries to your back occurred one week before?

15      A  Haw.  Could you repeat that question

16   again.

17      Q  Didn't you tell Dr. Lujan on September

18   the 20th, 1991, that the injury to your back

19   occurred one week before?

20      A  I can't remember.

21      Q  Mr. Jakes, in regards to this alleged

22   beating that you suffered, did you make a complaint

23   to the Chicago Police Department Internal Affairs

4   Division?

25                  G-66

Plaintiff Jakes 031272

1  A No.

2  Q Did you call up any agency of the federal

3 government and make a complaint against Detective

4 Kill?

5  A Nope.

6  Q Did you file a lawsuit seeking money

7 damages for this --

8  MR. KATZ:  Objection to the relevance.

9  THE COURT:  Overruled.  Did you file a money

10 suit alleging damages done to you by Detective

11 Kill?

12  THE WITNESS:  No.

13  MR. GOODFRIEND:

14  Q The pictures, Defendant's Exhibits 3

15 (A) through (G), what day were they taken?

16  A I can't remember.  The day I went to

17 court.

18  Q What was the name of the person?

19  A I don't know.

20  Q You say he was a Mexican dude, is that

21 correct?

22  A You said what name, not race.

23  Q You testified earlier, Sir, that it was a

24 Mexican dude, is that correct?

25        G-67

Plaintiff Jakes 031273

1        A   Name and race is 2 different things.

2        THE COURT: That isn't the question, Sir.  The

3        question is, did you testify earlier that it was a

4        Mexican dude?

5        THE WITNESS: Yeah.

6        MR GOODFRIEND:

7        Q   Those are your words, is that

8        correct?

9        A   Yes.

10       Q   You're familiar with your four-page

11       handwritten statement, is that correct?

12       A   Yes.

13       Q   I'm going to ask you to turn to Page 3.

14       You see Page 3?

15       A   Yes.

16       Q   And on that page, is the victim in this

17       case referred to as the Mexican dude?

18       A   Yeah.

19       Q   Those are your words that you told the

20       State's Attorney Grossman, is that correct?

21       A   Well, if you want to -- if you want me to

22       tell you the truth, that was they words.  He said

23       Mexican dude.  I just followed up.

24       Q   Who did you say used the word "Mexican

25                   G-68

Plaintiff Jakes 031274

1          "dude" back on September 16, 1991?

2          A   Detective Kill.

3          Q   Who used the word "Mexican dude" today?

4          A   You asked me about the photograph,

5      Officer, you didn't ask me nothing about him.

6          Q   Mr. Jakes, the question is, who used the

7      word "Mexican dude," in this courtroom today?

8          A   Me.

9          Q   Mr. Jakes, before the pictures were taken

10     of you, did you look at your back anywhere?

11         A   No, I -- I ain't got eyes in the back of

12     my head.

13         Q   So, you don't know what your back looked

14     like back in September of 1991, do you?

15         A   Nope.

16         Q   Do you play basketball?

17         A   No.

18         MR. KATZ:  Objection, relevance.

19         THE COURT:  Answer may stand.

20         MR. GOODFRIEND:

21         Q   You play any sports?

22         A   I play football.

23         Q   During the summer?

24         A   Winter.

25             G-69

1       Q    Before the murder of Rapheal Garcia, were

2   you involved in an altercation or fight with 3

3   other individuals?

4       A    Yeah.

5       Q    Where did that incident take place?

6       A    On 51st.

7       Q    Where on 51st Street?

8       A    In front of my auntie's house.

9       Q    Were these individuals males or females?

10      A    You talkin about the first time or the

11  second time?

12      Q    First time?

13      A    Well, could you rephrase the question

14  because the first time it happened, they -- they --

15  the Mexican bust the window.

16      Q    When you went with the glass to the back

17  yard, you did go -- you took the glass to the back

18  yard, is that correct?

19      A    Yes.

20      Q    Did 3 gentlemen come into the alley and

21  chase you?

22      A    Yes.

23      Q    What nationality were these 3 gentlemen?

24      A    They was white.

25                  G-70

Plaintiff Jakes 031276

1    Q   Do you remember talking to Detective

2    Duckhorn and Riley at about 4:15 in the afternoon

3    on September 16th, 1991?

4        A   Yes, I remember talking to them.

5        Q   Do you remember telling them at that time

6    that it was 3 male blacks who chased you in the

7    alley?

8        A   I can't remember.

9        Q   This fight that occurred, did it involve

10   fists?

11       A   No, it was just an argument.

12       Q   Did anybody throw any knocks at each

13   other?

14       A   No.

15       Q   They came back again, is that correct,

16   and chased you out in the alley?

17       MR. KATZ: Objection to what time, your Honor.

18       THE COURT: Rephrase the question.

19       MR. GOODFRIEND:

20       Q   When you were cleaning up the glass,

21   did they come back at you in the alley?

22       A   Well, all I know, when we took the glass

23   out to the alley, they was there.

24       Q   Did you run?

25                     G-71

```
 1              A   After we had a few words, yes.

 2              Q   Who else was with you in the alley?

 3              A   Cousin.

 4              Q   What is you cousin's name?

 5              A   Walter Pound.

 6              Q   What is his real name?

 7              A   He's on my father's side.  I don't keep

 8          up with their names.

 9              Q   Where did he live?

10              A   He stay in 1210.  I don't know where he

11          lives now.

12              Q   You say that you also had an altercation

13          with somebody on your porch that night, is that

14          correct?

15              A   Yeah, some females.

16              Q   Did they strike you?

17              A   Nope, my auntie struck me.

18              Q   Where did she hit you?

19              A   In the face.

20              Q   Now, before you say that the car with the

21          Mexican dudes came down the street and threw a

22          bottle, were you in front of your house?

23              A   In front of my auntie's house.

24              Q   1212 West 51st Street?

25                          G-72
```

Plaintiff Jakes 031278

1        A   1210.

2        Q   Was Dennis Harris there?

3        A   I don't know. I wasn't lookin for him.

4        Q   Did you tell Detective Duckhorn at 4:14,

5   that Dennis Harris was there?

6        A   I can't remember. I might have.

7        Q   Did you tell Detective Kill in your first

8   conversation with him that you were out in front of

9   your house at 11:30 and Dennis was there?

10       A   I can't remember.

11       Q   Who is Dennis Harris?

12       A   He stay upstairs from us.

13       Q   Did you talk to Detective Duckhorn or

14   Detective Kill about Nakeia Little?

15       A   I can't remember.

16       Q   Did you see her out there that night?

17       A   That was 2 years ago. I can't remember.

18       Q   Anything else you forgot that happened on

19   that day?

20   MR. KATZ: Objection.

21   THE COURT: Sustained, form of the question.

22   MR. GOODFRIEND:

23       Q   Did you tell the detectives that

24   Annette Harris was out there that night?

25                     G-73

Plaintiff Jakes 031279

1      A    I can't remember.  It was about 2 years.

2           Q    Did you tell Detective Kill in your first

3      conversation with him that Wheaty was out there?

4      A    I can't remember.

5           Q    Who is Wheaty?

6      A    Walter Pound's sister.

7           Q    Who is Nakeia Little?

8      A    I guess she related to the people who

9      stay upstairs.

10          Q    Who is Annette Harris?

11     A    Dennis Harris' sister.

12          Q    Did they live at 1212?

13     A    Yes.

14          Q    When you spoke with Detective Duckhorn at

15     2:15, did you tell him that -- strike that.

16               When you spoke with Detective Kill at

17     approximately 4:30, was Detective Boudreau there?

18     A    I can't remember.

19          Q    Was there a second detective there?

20     A    I don't know.

21          Q    Did you tell Detective Kill that Walter

22     Pound knew the people that chased you down the

23     alley?

24     A    I can't remember.

25                              G-74

Plaintiff Jakes 031280

1       Q   Well, you were attempting to help them at

2      that time, weren't you?

3       A   Haw.

4       Q   You were attempting to help these

5      officers in the investigation, weren't you?

6       A   I was attempting to help them.

7       Q   The question is, were you attempting to

8      help Detective Kill solve this homicide?

9       A   To tell you the truth, I can't remember

10     none of the questions he asked me.

11      Q   Were you on drugs at that time?

12    MR. KATZ:  Objection.

13    THE COURT:  Sustained.

14    MR. GOODFRIEND:

15      Q   You have People's Exhibit Number 32

16    in your hand, don't you?

17      A   Yeah.

18      Q   That statement was written in your

19    presence, wasn't it?

20      A   Yes.

21      Q   You signed it, didn't you?

22      A   Yes.

23      Q   You read it, didn't you?

24      A   Yes.

25             G-75

Plaintiff Jakes 031281

1   Q Detective Kill, did he tell you what to

2 say?

3   A To be honest, he told me to say this and

4 that. He put it in a way to say that I had

5 something to do with it, and if I didn't tell them

6 what they wanted to hear --

7   Q Did Detective Kill tell you what to say?

8   A I say half and half.

9   Q Bottom of Page 80, going onto Page 81.

10 Remember testifying once again, on December 3rd,

11 1992, in front of Judge Durkin?

12   A Haw.

13   Q Remember testifying on December 3rd, 1992

14 in front of Judge Durkin?

15   A Yes.

16   Q You were once again under oath at that

17 time, weren't you?

18   A Yes, I guess so.

19   Q Do you understand what an oath is?

20   A Nope.

21   Q When Judge Durkin swore you in, did you

22 raise your right hand?

23   A Yes.

24   Q Did you understand that you were under

25         G-76

Plaintiff Jakes 031282

```
 1              obligation to tell the truth?

 2         A    Yes.

 3         Q    The whole truth?

 4         A    Yes.

 5         Q    And nothing but the truth?

 6         A    Yes.

 7         Q    When you said, "yes," did you understand

 8    what that meant?

 9         A    Yes, to tell the truth.

10         Q    Well, weren't you under the same oath

11    back in December of 1992?

12         A    I guess so.

13         Q    Do you understand what it is to tell the

14    truth?

15         A    Yes.

16         MR. KATZ:  Objection.

17         THE COURT:  Answer may stand.

18         MR. GOODFRIEND:

19         Q    Were you asked these questions by

20    Assistant State's Attorney O'Connor and did you

21    give these answers.  Page 8.  Question, "did

22    Detective Kill tell you what to say and you said it

23    to the State's Attorney, correct?"  Answer, "He

24    just told me to tell them what they wanted to

25                        G-77
```

1    hear."

2         MR. KATZ: Objection.

3         MR. GOODFRIEND:

4         Q    "Did he tell you what to say?"

5    Answer, "no."

6         Do you remember being asked those

7    questions and giving those answers?

8         A    I can't think back years ago.  I don't

9    remember.

10        Q    Now, you still -- could you look at Page

11   1 of the statement?

12        A    (Complying.)

13        Q    You see in that statement, the miranda

14   rights in the middle of Page 1, is that correct?

15        A    Yes, I see them.

16        Q    Mr. Grossmen read those rights to you,

17   didn't he?

18        A    Read them?

19        Q    You signed them and put your name under

20   that, is that correct?

21        A    Yes.

22        Q    You understood at the time that Mr.

23   Grossmen was a State's Attorney, a lawyer with the

24   police and not your lawyer, is that correct?

25                        G-78

Plaintiff Jakes 031284

1    A    I guess so.

2    Q    Now, I'm going to direct your attention

3    to the second paragraph.  It states, "Anthony

4    states he's 15 years old."  You told that to

5    State's Attorney Grossmen, is that correct?

6    A    Yes.

7    Q    Detective Kill didn't tell you to say

8    that, did he?

9    A    Naw.

10   Q    States "Anthony is a freshman at Tilden

11   High School.  Anthony reads and writes and

12   understands English," is that the truth?

13   A    Yeah.

14   Q    Anthony states "he was standing just

15   outside of Queen's Submarine Shop at about 11:35 or

16   11:45 p.m.," was that the truth?

17   A    Well, to be honest, he told me to say I

18   was standing out there somewhere.

19   Q    Who told you that?

20   A    Detective Kill.

21   Q    How soon before you spoke with State's

22   Attorney Grossmen, did you say Detective Kill gives

23   you these things to say?

24   A    I can't remember.

25                      G-79

1    Q    Were you able to remember everything he

2    said?

3    A    Not really.  It was a lot of people

4    poppin in and out.

5    Q    "Anthony was standing with his friends

6    Little A and Darren."  You see that?  It starts at

7    the bottom of Page 1 and finishing on Page 2?

8    A    I see it.

9    Q    Did Detective Kill give you the name of

10   Little A?

11   A    Yeah, he gave me the name.

12   Q    He knew who Little A was?

13   A    His partner knew who he was.

14   Q    Who came up with the name Darren?

15   A    I don't know.

16   Q    It got on the statement, didn't it?

17   A    Well, why don't you go ask him then.  I

18   don't know.

19   Q    I'm asking you right now?

20   A    I don't know.

21   Q    Darren's your friend, right?

22   A    He ain't my friend.  He's a neighbor.

23   Q    You knew him?

24   A    I knew him, but he ain't my friend.  He's

25                       G-80

```
 1              a neighbor.

 2                   Q    Did you, when you spoke with the State's

 3              Attorney, mention the name Darren?

 4                   A    I don't remember.

 5                   Q    Did you read this before you signed it?

 6                   A    Probably glanced at it.

 7                   Q    Do you remember I just questioned you

 8              about that approximately 12 or 20 minutes ago.  You

 9              remember that?

10                   A    Yeah.

11                   Q    And I asked you if you read the statement

12              and you said you did, right?

13                   A    We glanced through it.  I didn't read it.

14              He read it.

15                   Q    Did you read along with him?

16                   A    All I remember, man, I read the first, I

17              think, paragraph or something like that.  The rest,

18              I just glanced through.

19                   Q    Page 57, you remember giving this answer

20              -- and giving this answer.  "You read that

21              statement?"  Answer, "yeah."

22                        Remember being asked that question and

23              giving that answer?

24                   MR. KATZ:  Objection, it's not impeaching.

25                                G-81
```

Plaintiff Jakes 031287

THE COURT:  Overruled.

MR. GOODFRIEND:

3            Q    Do you remember being asked that

4    question and giving that answer back in December of

5    1992?

6            A    I guess so.

7            Q    The next sentence on Page 2, could you

8    please look at the statement.  "Anthony has known

9    Little A for about a year and a half.   Anthony has

10    known Darren for about a year."    Are those

11    accurate?

12            A    No.

13            Q    Well, did you tell State's Attorney

14    Grossmen that you knew Little A for approximately a

15    year and a half?

16            A    I told him I seen them.  I don't know

17    him.  I see him in the neighborhood.

18            Q    Well, it states, "known," you see the

19    word known?

20            A    Yeah, I see it.

21            Q    You knew you could make corrections on

22    this statement, didn't you?

23            A    Yes.

24            Q    Did you ask State's Attorney Grossmen to

25                            G-82

```
1          change the word, "known?"

2              A   Nope.

3              Q   It says, "Anthony has known Darren for

4          about one year," is that true?

5              A   Like I said before, I seen them in the

6          neighborhood.

7              Q   Well, you knew Darren, is that correct?

8              A   I don't know of him.  I seen him.

9              Q   Did you ask State's Attorney Grossmen to

10         change the word known in sentence 3?

11             A   Nope.

12             Q   "Little A came out of the submarine shop

13         and said, 'the Mexican dude has got a lot of money.

14         we're going to stick him up.' "  You see that

15         sentence?

16             A   Yes.

17             Q   Those were the words you used when you

18         spoke to State's Attorney Grossmen?

19             A   Yes.

20             Q   "Little A then showed Anthony the gun

21         which was stickin out of the waistband. Anthony

22         recognized the gun to be Little A's .380 caliber

23         handgun.  Little A carries it on him at night."

24         You had seen Little A with a .380 handgun before,

25                              G-83
```

Plaintiff Jakes 031289

1        change the word, "known?"

2           A   Nope.

3           Q   It says, "Anthony has known Darren for

4        about one year," is that true?

5           A   Like I said before, I seen them in the

6        neighborhood.

7           Q   Well, you knew Darren, is that correct?

8           A   I don't know of him.  I seen him.

9           Q   Did you ask State's Attorney Grossmen to

10       change the word known in sentence 3?

11          A   Nope.

12          Q   "Little A came out of the submarine shop

13       and said, 'the Mexican dude has got a lot of money.

14       we're going to stick him up.' "  You see that

15       sentence?

16          A   Yes.

17          Q   Those were the words you used when you

18       spoke to State's Attorney Grossmen?

19          A   Yes.

20          Q   "Little A then showed Anthony the gun

21       which was stickin out of the waistband. Anthony

22       recognized the gun to be Little A's .380 caliber

23       handgun.  Little A carries it on him at night."

24       You had seen Little A with a .380 handgun before,

25                   G-83

Plaintiff Jakes 031290

1     hadn't you?

2        A   No.

3        Q   You told that to the State's Attorney

4     Grossmen, is that correct?

5        A   That's what Kill said.  He said he got

6     shot with .380.

7        Q   Sir, the question is, not that but, did

8     you tell the State's Attorney that you saw Little A

9     with a .380?

10       A   Yeah.

11       Q   You read that sentence before you signed

12     it, didn't you?

13       A   I don't remember.

14       Q   Did you ask the State's Attorney Grossmen

15     to change any of that?

16       A   I wasn't thinking at the time.

17       Q   Is it that you weren't thinking but you

18     had participated in the crime?

19     MR. KATZ:  Objection.

20     THE COURT:  Overruled.

21     THE WITNESS: Could you repeat the question

22     again?

23     MR. GOODFRIEND:

24       Q   Are you saying that you weren't

25                 G-84

1      thinking at the time because you had participated

2      in the crime of Little A and Darren?

3          A   I didn't participate in no crime.

4          Q   "Anthony knew that Little A's .380 held

5      between 7 and 8 shells.  Little A knew Darren kept

6      the bullets?"

7          A   Yes, I told him.

8          Q   Did you tell him because you knew that

9      Anthony -- that Little A sometimes carries the gun

10     loaded?

11         A   Like I said before, I don't know what gun

12     he carried, how he carried it or where he carried

13     it.  Detective Kill said .380.

14         Q   Well, did Detective Kill give you all

15     other details about how many bullets would be in

16     the gun and how he carried it?

17         A   I can't remember.

18         Q   Still, Little A said, "get the corner."

19     This means look out. Do you understand the word,

20     "get in the corner?"

21         A   Yes.

22         Q   What does that mean?

23         A   It means stand on the corner.

24         Q   And do what?

25               G-85

Plaintiff Jakes 031292

1        A   I guess look out.

2        Q   Pardon me.

3        A   I guess look out.

4        Q   Another term for it is a look out?

5        A   If you want to say so.

6        Q   Sir, the question is another term for it

7 is to be a look out. I'm asking the questions?

8        A   If you want to say so.

9        Q   Have you acted as a look out before?

10      MR. KATZ: Objection.

11      THE COURT: Sustained.

12      MR. GOODFRIEND:

13        Q   You know what a look out is, don't

14 you?

15        A   Nope.

16        Q   Isn't a look out to watch for the police?

17        A   I guess.

18        Q   Did you tell the State's Attorney that

19 your job was to watch for any police that were

20 coming to let Little A and Darren know that the

21 police were coming?

22        A   Yeah, I told them that.

23        Q   Did you tell the State's Attorney

24 Grossmen that you went to the corner and saw a

25              G-86

Plaintiff Jakes 031293

1    Smack?

2        A    Yes.

3        Q    You never had any problems with Smack

4    before, had you?

5        A    Naw.

6        Q    You never had any arguments or fights

7    with him, did you?

8        A    I got -- probably had an argument here

9    and there.

10       Q    Do you remember that argument or are you

11   guessing?

12       A    I don't remember.

13       Q    Did you tell the State's Attorney that

14   you walked to the corner and saw Smack?  Did you

15   tell them that?

16       A    I told him that.

17       Q    Did you tell the State's Attorney that

18   you went up to Smack and you were fittin to rob

19   this man?

20       A    Yes, I told him that too.

21       Q    Did you tell the State's Attorney that

22   Smack said, "no?"

23       A    Yes.

24       Q    Did you tell the State's Attorney that

25                         G-87

Plaintiff Jakes 031294

1          Smack drove away?

2              A    Yeah.

3              Q    Did you tell the State's Attorney that

4          you got to the corner of 51st and Racine and you

5          stood for a little bit and looked -- and looked

6          both ways?

7              A    Yeah.

8              Q    Did you tell the State's Attorney that

9          you didn't see any police coming from any

10         direction?

11             A    Yeah.

12             Q    Did you tell the State's Attorney that

13         Anthony then stood -- that you stood by the

14         newspaper stand which was on the side of the

15         submarine shop?

16             A    Yeah.

17             Q    Did you tell the State's Attorney that

18         you told Little A and Darren it's all right?

19             A    Nope.

20             Q    You see the line that Little A said that?

21             A    Kill told me to say that.

22             Q    Sir, do you see that sentence?

23             A    Yes.

24             Q    Did you ask the State's Attorney to

25                          G-88

1    change that?

2     A No.

3     Q You read that before you signed it,

4   didn't you?

5     A I probably did.

6     Q Did  you put your corrections on that

7   very line?  Is that your very signature?

8     A Yes.

9     Q Did you tell the State's Attorney that

10   you didn't see any police and that you kept lookin

11   both ways?

12     A Yes.

13     Q Did you tell the State's Attorney that

14   the Mexican dude came out of Queen's Submarine

15   Shop?

16     A Yes, It told him that.

17     Q Did you tell them that Little A came up

18   to the Mexican dude and pointed his .380 caliber

19   gun at the Mexican dude and Little A said this was

20   a stick up?

21     A Well, if you want me to be honest, Kill

22   told me to tell him that.

23     Q Sir, that's not the question.

24     A Yes, I told him.

25         G-89

Plaintiff Jakes 031296

1        Q   Did you tell that to the State's

2    Attorney?

3        A   Yeah, I told him that.

4        Q   And once again, in that line, the word

5    "Mexican dude," those are your words, aren't they?

6        MR. KATZ: Objection, asked and answered.

7        THE COURT: Sustained.

8        MR. GOODFRIEND:

9        Q   Did you tell the State's Attorney

10   that Little A pointed the gun at the Mexican dude

11   and Little A started shootin at the Mexican dude

12   and Little A started shooting at the Mexican dude?

13       A   I told him that.

14       Q   Did you tell the State's Attorney that

15   you were at the newspaper stand about 10 feet away?

16   You gave the State's Attorney that distance, is

17   that correct?

18       A   He gave hisself the distance.

19       Q   Are you saying that the State's Attorney

20   said you were 10 feet away?

21       A   That's what Detective Kill said.

22       Q   Who. Did Detective Kill tell you to tell

23   the State's Attorney that you were 10 feet away?

24       A   Before the State's Attorney got there.

25                 G-90

1    Q    You remember that 10 feet?

2    A    Yes.

3    Q    Did you tell the State's Attorney that

4    you didn't want to stand in front of the submarine

5    shop because you only live a few houses away from

6    the submarine shop and you didn't want anyone to

7    recognize you?

8    A    Well --

9    Q    Did you tell that to the State's

10   Attorney?

11   A    I told it to him.

12   Q    Did you tell the State's Attorney that

13   you saw Little A fire 4 shots?

14   A    Yes.

15   Q    Did you tell the State's Attorney that

16   you ran?

17   A    Yes, I told him I ran.

18   Q    Did you tell the State's Attorney that

19   you ran because you didn't want anybody to see you

20   and you got scared?

21   A    Yes.

22   Q    Did you tell State's Attorney that you

23   ran home and you figured that you, Little A and

24   Darren would split money you were going to get from

25                          G-91

Plaintiff Jakes 031298

1      the Mexican dude?

2          A   Yes, I told him that.

3          Q   When you came to that part about the

4      money, you used the name Darren with the State's

5      Attorney, is that correct?

6          A   Darren name was already used in the

7      statement.

8          Q   As to this part on Page 4, you used the

9      name Darren before splitting the proceeds?

10         A   Yes.

11         Q   Detective Kill didn't tell you to use the

12      name Darren?

13         A   He told me to use it in the statement.

14         Q   I will ask you to direct your attention

15      to -- strike that.  You told the State's Attorney

16      you were treated well by the police, didn't you?

17         A   Yes.

18         Q   When you told that to the State's

19      Attorney, Detective Kill wasn't anywhere in the

20      room, was he?

21         A   Nope.

22         Q   You were allowed to use the washroom

23      there, weren't you?

24         A   Yes.

25                       G-92

Plaintiff Jakes 031299

```
 1           Q   They offered you food, didn't they?

 2           A   I don't remember.

 3           Q   You see the statement in front of you?

 4           A   Yeah.

 5           Q   You see the part where it says, "Anthony

 6       says he was not hungry or thirsty." Do you see that

 7       statement?

 8           A   Yes.

 9           Q   Does that refresh your memory as to

10       whether the police offered you something to eat?

11           A   He saw me ,they didn't.

12           Q   Did the police offer you something to

13       drink?

14           A   I don't remember.

15           Q   You read the last paragraph regarding the

16       treatment before you signed it?

17           A   I probably looked through it.

18       MR. GOODFRIEND:  Nothing further.

19       THE COURT: Redirect.

20                    REDIRECT EXAMINATION

21                         BY

22       MR. KATZ:

23           Q   Mr. Jakes, do you remember how long

24       you had been at the police station at Area 3 before

25                        G-93
```

1          you first saw Youth Officer Burke?

2              A    I guess about -- I can't say how many

3          hours.  I know it was hours.

4              Q    And how long did you talk with Youth

5          Office Burke?

6              A    10, 20 minutes.

7              Q    Would it be after you spoke with him?

8              A    That's when you gave the written

9          statement which Mr. Goodfriend gave you, right?

10             A    Right.

11             Q    And prior to speaking to Youth Officer

12         Burke, you had spoke to Detective Kill, right?

13             A    Right.

14             Q    And you testified earlier that he put you

15         in a chair and spoke to you about your speaking to

16         the State's Attorney?

17             A    Yes.

18             Q    All right.  Is it then, or tell the

19         Ladies and Gentlemen what it was that Detective

20         Kill told you at that time?

21             A    He told me like little parts to say.  He

22         said that we would label Little A the trigger man

23         and put me on the corner to keep me from being the

24         trigger man; we would label me running after I had

25                            G-94

Plaintiff Jakes 031301

1     shot, so I said nobody -- so I could say --

2     couldn't nobody see me.

3         Q   Now, you lived around 51st and Racine.

4     In fact, you lived a few doors down from this?

5         A   Three doors down.

6         Q   And you know that there is a newspaper

7     stand next to the submarine shop, right?

8         A   Right.

9         Q   And you probably -- or you go by there

10    everyday?

11        A   Right.

12        Q   Now, the State's Attorney asked you if

13    you told the State's Attorney Grossmen or the Youth

14    Officer that this statement, that is People's

15    Exhibit Number 32, was incorrect?

16        A   Could you repeat that.

17        Q   Why didn't you tell the State's Attorney

18    that this statement was incorrect?

19        A   Cause I was scared.

20        Q   And who were you scared of?

21        A   Kill.

22        Q   Why were you scared of him?

23        MR. GOODFRIEND:   Objection, asked and

24    answered.

25                    G-95

1        THE COURT:  Sustained.

2        MR. KATZ:

3            Q   Now, you went -- you testified that

4   you went to the audy home the next day, right.

5   Strike that.

6        Do you remember when you went to the audy

7   home?

8        A   Like after they got my written statement.

9        Q   And do you remember being examined by a

10   doctor?

11        A   Not to like I came from after court.

12        Q   All right.  And after court, do you

13   remember being examined by a doctor?

14        A   Yes.

15        Q   Did you tell that doctor anything?

16        A   (Shaking head.)

17        MR. GOODFRIEND: He just shook his head.

18        MR. KATZ:  I'm trying --

19        THE COURT:  Did he shake his head in a no

20   fashion?

21        MR. KATZ: He did judge.

22        THE COURT: Next question.

23        MR. KATZ:

24            Q   Could I have that question repeated?

25                 G-96

Plaintiff Jakes 031303

1    THE COURT: Did you tell the doctor anything.

2    MR. KATZ: Thank you.

3    THE WITNESS: Oh me, I didn't tell him nothin.

4    MR. KATZ: Nothing further.

5    THE COURT: You may step down.

6         (Witness was excused.)

7    THE COURT: Before I do that, does anyone need

8    a bathroom break? We'll take a brief recess.

9    Remember you can't discuss the case. Just go right

10   back there.

11        (A brief recess was taken.)

12        (Jury was present.)

13   THE COURT: Record should reflect the jury is

14   present for Mr. Jakes. Mr. Jakes is present with

15   counsel.

16        Ladies and Gentlemen, the defense has not

17   rested; however, we are going to do something for

18   the convenience of a witness. The State has a

19   doctor who has been here all morning. He's got an

20   office full of patients this afternoon, and we are

21   going to call him as a rebuttal witness, so we will

22   call him out of turn. After the doctor testifies,

23   we'll break for lunch and at some point this

24   afternoon, I'm informed that you will hear

25                            G-97

Plaintiff Jakes 031304

1    additional evidence in the case of Mr. Jakes, so

2    the defense has not rested in that case.  Please

3    call your rebuttal witness.

4          MR GOODFRIEND:  Dr. Lujan.

5                (Witness was sworn.)

6                DR. ENRIXUER LUJAN,

7    called as a witness on behalf of the State of

8    Illinois, in Rebuttal, was first duly sworn,

9    examined and testified as follows:

10               DIRECT EXAMINATION

11                    BY

12   MR. GOODFRIEND;

13         Q    State your full name?

14         A    Enrixuer Lujan, E-n-r-i-x-u-e-r, L-u-j-a-

15   n.

16         Q    Dr, what is your profession?

17         A    Physician.

18         Q    Where did you go to medical school?

19         A    In Boliva.

20         Q    What school is that?

21         A    Sawsemon (phonetic.)

22         Q    When did you graduate medical school?

23         A    1964.

24         Q    Did you do an internship?

25                    G-98

Plaintiff Jakes 031305

1       A   Yes.

2       Q   Where did you do that internship at?

3       A   St Francis Hospital in Evanston.

4       Q   What year was that?

5       A   1966.

6       Q   After you completed your internship at

7 St. Francis Hospital in Evanston, what is the next

8 thing you did in your medical career?

9       A   I trained for the pediatric specialty.

10      Q   Where did you train for your pediatric

11 specialty?

12      A   Cook County Hospital, and University of

13 Illinois Hospital.

14      Q   When did you finish your residency in

15 pediatric?

16      A   1970.

17      Q   After you completed your residency, what

18 was the next thing you did in terms of your medical

19 profession?

20      A   I was an assistant professor at the

21 University of Illinois since 1970 to 1977 at the

22 University of Illinois.

23      Q   After you completed that job as a

24 professor assistant, what did you do next in your

25                 G-99

Plaintiff Jakes 031306

1        medical career?

2        A   I started full medical private practice.

3        Q   What area did you specialize in?

4        A   Pediatric.

5        Q   You still have a private practice in

6        pediatric?

7        A   Yes.

8        Q   Do you also have a second job?

9        A   Yes.

10       Q   What is your second job?

11       A   I'm a pediatrician of the Temporary

12       Juvenile Detention Center in Chicago.

13       Q   Where is the Temporary Juvenile Detention

14       Center located at?

15       A   1100 South Hamilton.

16       Q   How long have you been employed there?

17       A   I have been a pediatrician there for at

18       least 25 years.

19       Q   What were your responsibilities at the

20       Juvenile Detention Center?

21       A   To take care of the health and welfare of

22       the children who are admitted there.

23       Q   Are you board certified?

24       A   Yes, I am.

25                G-100

Plaintiff Jakes 031307

```
 1              Q    What area are you board certified in?

 2              A    I'm board certified in the specialty of

 3      pediatric.

 4              Q    Do you teach anywhere currently?

 5              A    Yes.  I'm a preceptor of pediatric at the

 6      Family Practice Residency Program at St. Elizabeth

 7      Hospital, and my title is Clinical Assistant

 8      Pediatrician at the University of Illinois.

 9              Q    Do you belong to any profession

10      organizations or associations?

11              A    Yes, to the American Medical Association,

12      the Illinois Medical Association, the Chicago

13      Medical Association.

14              Q    Are you licensed to practice medicine?

15              A    Yes.

16              Q    What state?

17              A    Illinois and some other states.

18              Q    What is the next program or what is the

19      next?

20              A    Next is a -- is an examination that

21      permits me to practice and give me the perplexity

22      of other states.

23              Q    Do you lecture too?

24              A    Yes.

25                             G-101
```

Plaintiff Jakes 031308

1      A    When a boy that has been arrested by the

2    police is brought to the juvenile detention center,

3    they go first to the intake office where they are

4    seen and they are asked several questions regarding

5    their health, which will include history of

6    injuries any problems -- usage of alcohol or drugs,

7    et cetera.

8      Q    If a person comes to that screening with

9    certain injuries, is he sent anywhere?

10      A    If the patient is found to have injuries,

11    he's seen to -- first before being admitted, he's

12    sent to Cook County Hospital.

13      Q    Now, after somebody is screened, do you

14    conduct an intake examination?

15      A    Yes.

16      Q    What does an intake examination consist

17    of?

18      A    An intake examination consist in a -- in

19    a history in which you ask if there is any problem,

20    any illness, any recent illness and any recent

21    injuries. If it's the first time we see them, we

22    ask them past illnesses, past injuries, surgeries,

23    et cetera. We then proceed with a physical

24    examination and we note only the important parts of

25                  G-103

Plaintiff Jakes 031309

1       the physical examination.

2              Q    Now, when a screening is conducted, is a

3       card or document produced?

4              A    Yes.

5              Q    When you conducted an intake examination,

6       do you prepare a report or fill out a page or

7       paperwork?

8              A    The child comes with the card, the card

9       is handed to me either by him or by the nurse who

10      usually is there present and I do the physical

11      examination and write down immediately all the

12      notes in that card, in the intake card.

13             Q    The screening and intake cards, they are

14      made in the ordinary course of business of the

15      medical facility at the Juvenile Detention Center

16             A    Yes.

17             Q    And they were true and accurate and

18      correct at the time they are made?

19             A    Yes.

20             Q    They  were prepared at the time the

21      examinations are conducted, is that correct?

22             A    Yes.

23             Q    Now, before coming to court today, did

24      you review the medical file of one Anthony Jakes?

25                              G-104

1      A   Yes, I did.

2      Q   Do you have that medical file in front of

3   you?

4      A   Yes.

5      Q   Would that assist you in your testimony?

6      A   Yes, it would.

7      MR. GOODFRIEND:  Judge, I would ask that be

8   marked as People's Exhibit Number 39, please.

9      Q   Was  Anthony  Jakes  examined  --

10   admitted rather to the Juvenile Detention Center on

11   September 18, 1991?

12      A   Yes, he was.

13      Q   Was  he  initially  screened  by  the

14   detention center?

15      A   Yes.

16      Q   When he was screened, were there --  you

17   used  that  screening card  in conducting your

18   examination, is that correct?

19      A   Yes, I used it.

20      Q   When he was screened, were there any

21   injuries or illnesses or any complaints noted?

22      A   There were none noted here.

23      Q   If this -- if Anthony Jakes had an injury

24   or a illness, or a complaint, would it have been

25                 G-105

Plaintiff Jakes 031311

1    noted on the screening card?

2        A   Yes.

3        Q   And if he was injured, would he have been

4    sent to Cook County Hospital?

5        A   Yes.

6        Q   Now, you examined him on September 20th,

7    1991, is that correct?

8        A   That's correct.

9        Q   Did your examination consist of asking

10    him questions as well as performing a physical

11    examination?

12        A   Yes.

13        Q   What did you find when you examined

14    Anthony Jakes on September 20th, 1991?

15        A   First of all, I asked about recent

16    injuries and there were -- he said he didn't have

17    any. He said he was hit in the back one week prior

18    to being examined by me, and I found a superficial

19    scar in the back and no signs of serious injuries.

20        Q   One week before would have been September

21    13th, 1991, is that correct?

22        A   Yes.

23        Q   The injury that you observed, the old

24    superficial scar on the back, would that be

25                  G-106

Plaintiff Jakes 031312

1    sufficient with a scar of one week?

2         A    Yes.

3         Q    Did you see any other injuries whatsoever

4    on the body of Anthony Jakes?

5         A    No, I didn't.

6         Q    Did he make any complaints about his

7    face?

8         A    No, not about the face.

9         Q    Did he make any complaints about his

10   body?

11        A    No.

12        Q    Did he make any complaints about being

13   mistreated by the police?

14        A    No.

15        MR. GOODFRIEND:  Nothing further.

16        THE COURT:  Cross.

17             CROSS EXAMINATION

18                  BY

19   MR. KATZ:

20        Q    Dr. Lujan, do you understand who

21   Anthony Jakes is?

22        A    He is -- I know he's a patient.  I saw

23   him that day.

24        Q    Would you say that this individual is

25                       G-107

1   that same patient that's sitting next to me, the

2   defendant?  Could you say that again?

3       A    Well, I do not remember well.  The face

4   -- it's too long ago.

5       Q    And would it be fair to say your duty as

6   a doctor at the juvenile detention center that you

7   examined thousands of individuals perhaps in a

8   month or in a year?

9       A    Yes.

10      Q    About -- just for the benefit of the

11  Ladies and Gentlemen of the Jury, about how many

12  would you say you would do in one day?

13      A    That varies.  If it's a holiday where I'm

14  alone, I will see up to 15 or  20, usually I see

15  about 12.

16      Q    And since September 20th, 1991, you have

17  seen literally hundreds of individuals at the audy

18  home, is that correct?

19      A    Yes.

20      Q    And you're testifying based upon your

21  medical records, is that right?

22      A    Yes.

23      Q    And you don't have any independent

24  recollection of the examination of a person named

25                          G-108

Plaintiff Jakes 031314

1        Mr. Jakes, right?

2            A    Well, I have some.

3            Q    Okay. When you stated that there was a

4        old injury and a superficial scar, do you recall if

5        that was from conversations with Mr. Jakes or your

6        own personal observations?

7            MR. GOODFRIEND:    Objection, misstatement of

8        the evidence.

9            MR. KATZ:  Let me rephrase it then.

10           Q    Do you recall, Dr., the examination

11       of Mr. Jakes wherein he indicated there was an

12       injury to his back?

13           A    Not exactly, but what I have in my notes

14       --

15           Q    Just from your notes, and your notes

16       indicate, do they not, that Mr. Jakes was allegedly

17       hit in the back about a week ago, old superficial

18       scars in the back?

19           A    That's a physical examination, that's an

20       objective based on what I see.

21           Q    So,  that  wasn't  based  upon  a

22       conversation?

23           A    No.

24           Q    Okay. Now, you also testified that part

25                        G-109

1   of your examination during part of -- strike that.

2   You also testified that you used a screening card

3   which was done by a nurse as part of your

4   examination?

5       A   It's by the nurse or another person in

6   intake when they were brought by the police or when

7   they come to the audy home.

8       Q   And that Mr. Jakes was brought in on

9   September 18th, admitted, is that correct?

10      A   That's what it says.

11      Q   And you saw him on September 20th, right?

12      A   That's right.

13      Q   And that would have been in the afternoon

14  probably, is that right, or do you recall?

15      A   I usually work in the morning.

16      Q   All right.  I want to show you what has

17  been previously marked as Defense Exhibit Number 3,

18  Group Exhibit 3 (A) through (G).  I would ask you

19  to look at them, please.

20      Q   Calling your attention, Dr., to Defense

21  Exhibit 3 (C), does that appear to be the injuries

22  that you observed, if you recall back in September

23  20th, 1991?

24      A   Yes.

25                      G-110

Plaintiff Jakes 031316

1        Q   And did you notice any other injuries

2      back on September 20th, 1991?

3        A   No, I did not.

4        Q   Okay.  Now, showing you 3 (F) and 3 (G),

5      if you could tell the Ladies and Gentlemen of the

6      Jury what is depicted in there?

7        A   Here at first we have an body which shows

8      some old superficial scars and some depigmentation

9      of the skin which could be dermatitis.  The knee

10     shows some of the pigmentation, looks clear, the

11     whole knee compared to the rest of the skin and

12     also 3 small superficial like scratches or skin

13     abrasion which are healing.

14       Q   Now, you didn't note those injuries --

15     those observations in any reports of the elbow and

16     the knee, is that right?

17       A   Right.  I didn't write anything about

18     that.

19       Q   And would those individuals, if you know,

20     be consistent or about the same as the one which

21     you depicted on the back?

22       A   I could not say with the pictures there.

23       Q   The injury on the back it was crusted?

24       A   Crusted.

25               G-111

1     Q    And it's your testimony that they were

2     allegedly made about a week prior to your

3     examination?

4     A    Yes.

5     Q    Could it have been, Dr., 4 days or more?

6     A    Yes.

7     Q    Could it have been less than 4 days?

8     A    Very unlikely the way they looked. I

9     wrote it was an old superficial scar which means

10    that it wasn't recent within the first 4 hours so

11    more than that.

12    Q    Within the first 4 hours?

13    A    It wouldn't have been done, probably more

14    than 4 days is more accurate.

15    Q    But, it could have been within 4 days.

16    MR. GOODFRIEND:    Objection, asked and

17    answered.

18    THE COURT: Sustained.

19    MR. KATZ: Nothing further.

20    THE COURT: You may step down.

21    MR. GOODFRIEND; I'm sorry, I had a redirect

22    question.

23    THE COURT: Go ahead.

24                      G-112

Plaintiff Jakes 031318

1                        REDIRECT EXAMINATION

2                                BY

3          MR. GOODFRIEND:

4               Q    Dr., Counsel read to you from your

5          summary, he didn't read the first 3 words that you

6          noted though, did he?

7               THE COURT:  Just do me a favor, tell him what

8          he didn't do. Ask a question, if you're going to

9          ask it.

10              MR. GOODFRIEND:

11              Q    That notation that you made, the

12         full  notation  states,  "no  recent  injuries,

13         allegedly  was  hit  in  back  one  week  ago,  old

14         superficial  scar  on  back,  no  signs  of  serious

15         injury," is that correct?

16              A    Yes, it is correct.

17              Q    In terms of Defendant's document (F),

18         there is no face of elbow with that, is it?

19              A    No.

20              Q    Do you know whose elbow this is?

21              A    No.

22              Q    The feet in People's Exhibit Number (G),

23         do you know whose knee that is?

4               A    No.

25                             G-113

1        MR. GOODFRIEND: Nothing further.

2        THE COURT: Any recross.

3        MR. KATZ: No.

4        THE COURT: You may step down, Sir. Thank you.

5            (The witness was excused.)

6        THE COURT: Ladies and Gentlemen, we are going

7    to break for lunch. The sheriff's ready to take

8    you. Be back here by 2:00 o'clock. There will be

9    some common evidence between the jury and the other

10   jury at that point. Remember, you can't discuss

11   the case. Enjoy your lunch. We will see you in

12   45 minutes.

13           (A lunch recess was had.)

14       MS BORMANN: We would like to call Mr. Day.

15       THE COURT: Based on the direct, there is a

16   sufficient basis. You can ask some questions as

17   to firm it up.

18       MS. BORMANN: What we want to do is put in

19   basic foundation to allow the statement to be

20   published. I think that's already in.

21       MR. MAJUID: Not in our jury.

22       THE COURT: There is no question. It's based

23   on it. The record should reflect that the jury in

4    the case of Anthony Jakes is present and the jury

25                      G-114

Plaintiff Jakes 031320

1        in the case of Arnold Day is not present.

2              Mr. Jakes is present personally and by

3        counsel.  Mr Majuid, (phonetic) you had some

4        questions?

5              MR. MAJUID:  Co-counsel.

6                  (Witness was sworn.)

7                  MR. ARNOLD DAY,

8        called as a witness on behalf of the Defense, was

9        first duly sworn, examined and testified as

10       follows:

11                  DIRECT EXAMINATION

12                      BY

13       MS. BORMANN:

14             Q   Mr. Day,  on February the 4th of

15       1992, at 4:30 in the afternoon, you were at Area 3,

16       correct, Violent Crimes?

17            A   Yes.

18            THE COURT:  Keep your voice up, Sir.

19            MS. BORMANN:

20             Q   You were being interviewed at that

21       time by an Assistant State's Attorney by the name

22       of Danielle Lynn?

23            A   Yes.

24             Q   And Detective Boudreau, correct?

25                      G-115

1          A    Yes.

2          Q    You gave an interview at that time,

3    correct?

4          A    Yes.

5          Q    And the Assistant State's Attorney

6    Danielle Lynn wrote the notes from that interview

7    down, correct?

8          A    Yes.

9          Q    I'm going to show you what I have already

10   marked as Defendant's Exhibit Number 4 for

11   identification.  If I may approach.

12         THE COURT: You may.

13         MS. BORMANN:

14         Q    Can you tell us what that is,

15   please?

16         A    It's a handwritten statement.

17         Q    Is that your handwritten statement

18   from February 4th, 1992?

19         A    Yes.

20         Q    And did you sign that statement?

21         A    Yes.

22         MS. BORMANN:  Your Honor, I would like to

23   publish this statement to the jury.

24         THE COURT:  You may do so.

25                         G-116

Plaintiff Jakes 031322

1        MS. BORMANN: Thank you. Ladies and Gentlemen

2     of the Jury, the statement of Arnold Day, taken 4th

3     February 1992 at 1830 hours, 3900 South California,

4     Area 3. Assistant State's Attorney Danielle Lynn,

5     Detective Boudreau. This statement taken regarding

6     the shooting death of Rapheal Garcia which occurred

7     on the 15th September of 1991 at 1208 West 51st

8     Street at about 11:30 p.m.

9        "I understand that I have a right to

10    remain silent and that anything I say can be used

11    against me in a court of law. I understand that I

12    have a right to talk to a lawyer and have him with

13    me during questioning. If I cannot afford to hire

14    a lawyer, one will be appointed to represent me

15    before any questioning. Understanding these

16    rights, I wish to give a statement. That's signed

17    by Arnold Day, after being introduced to the

18    Assistant State's Attorney Danielle Lynn and being

19    told that Assistant State's Attorney, Danielle Lynn

20    is an attorney working with the police and not his

21    personal attorney; Arnold Day has known his rights

22    and after hearing those rights and understanding

23    those rights, thereafter, Arnold Day agreed to give

4     a statement of his knowledge of his involvement in

25                        G-117

Plaintiff Jakes 031323

1    the shooting death of Rapheal Garcia.

2         Assistant State's Attorney Danielle Lynn

3    explained to Arnold Day the definition of and

4    difference between a court reported statement and a

5    handwritten statement.  Arnold Day wishes to give

6    a handwritten statement and not court reported

7    statement, which is a summary and not word for

8    word.

9         Arnold Day states that he is 18 years

10   old; that he completed the 10th year of school at

11   Tilden High School.

12        Arnold Day states that he could speak,

13   read and write English.

14        Arnold Day states that he is a member of

15   the Black Stone Gang and has been for 3 years.  He

16   holds the rank of officer which he explains is the

17   second highest rank.

18        Arnold Day states that on the 15th of

19   September, 1991, he was selling drugs on Aberdeen

20   Street from 6:00 p.m., to 12 :00 a.m., but he

21   decided to leave early to get something to eat.  At

22   around 11:30 p.m., he went into the Queen's

23   Submarine Shop at 1208 West 51st Street.  Before he

24   had a chance to order, he saw quote, the Mexican

25                        G-118

1   guy unquote, who he now knows as Rapheal Garcia

2   pull up in a station wagon and come into the

3   submarine shop and order his food.

4   Arnold Day states that the, quote Mexican

5   guy was flashin, unquote, which Arnold Day has

6   explained means he had on a lot of jewelry and had

7   a, quote nut roll, unquote, which Arnold Day

8   explains means a lot of money.

9   Arnold Day states that he decided to rob

10  the Mexican Guy of his money and jewelry.

11  Arnold Day states that he went outside of

12  the submarine shop and got the, quote Nation gun,

13  unquote.

14  Arnold Day has explained that the Nation

15  gun is a gun which belongs to the gang and is used

16  for gang activity.

17  Arnold further explained that the gun was

18  a .380 caliber.

19  Arnold states that when the Mexican guy,

20  quote exited the submarine shop, he pulled out his

21  .380 caliber and told, quote the Mexican guy

22  quote stick up, unquote. The Mexican guy walked

23  back to his station wagon and got in on the

24  passenger side.

25  G-119

Plaintiff Jakes 031325

1               Arnold Day states when the Mexican guy

2      got into the car, Arnold shot him 2 or 3 times and

3      fled.

4               Arnold Day states that he has been

5      treated well by the detectives and was given

6      oranges and oreo cookies. He was given cigarettes

7      to smoke and was allowed to use the washroom when

8      he needed to. He was treated well by the Assistant

9      State's Attorney Danielle Lynn.

10            Arnold states he has not been threatened

11     or abused in any way, by the detective or Assistant

12     State's Attorney Danielle.

13          Arnold states that no promises or threats

14     had been made in exchange for this statement.

15          Arnold had read this statement and made

16     any corrections or additions that he wished.

17          Arnold states that this is a true and

18     accurate summary of what he has told the Assistant

19     State's Attorney and that he has given the

20     statement freely and voluntarily.

21         Nothing further.

22        THE COURT: Cross examination.

23                G-120

Plaintiff Jakes 031326

1          CROSS EXAMINATION

2                BY

3     MR. GOODFRIEND:

4          Q    Mr. Day, I'm going to direct your

5     attention to September 25th, 1990, you were found

6     guilty on that date of the offense, of robbery?

7          A    Yes, I was.

8          Q    What kind of sentence did you get for

9     your offense of robbery?

10         A    Four years.

11         Q    Four years where?

12         A    In D.O.C.

13         Q    On September of this year, were you

14    convicted of another offense in this courtroom and

15    sentenced?

16         A    Yes, I was.

17         Q    What offense were you convicted for

18    before Judge Durkin on September 8th and sentenced

19    for?

20         A    A drug case.

21         Q    What was the charge?

22         A    Delivery, I believe.

23         Q    Delivery of what?

24         A    Controlled substance.

25                        G-121

Plaintiff Jakes 031327

1          Q   And what sentence did Judge Durkin give

2   you several days ago?

3          A   Seven years.

4          Q   Seven years where?

5          A   I.D.O.C.

6          Q   Sir, are you still a member of the Black

7   Stone Gang?

8          A   No, I'm not.

9          Q   Well, when did you resign from that gang?

10         A   Before I got out of the penitentiary in

11   '91.

12         A   You have tattoos on your body?

13         A   Yes.

14         Q   What kind of tattoos do you have on your

15   body?

16         A   I have a five-point star, my mother's

17   name.

18         Q   How many five-point stars do you have?

19         A   Two.

20         Q   What side of your body are they on?

21         A   The left side of my body.

22         Q   Now, there is 2 facts common of street

23   gangs in the City, People and Folks, correct?

4         A   Yes.

25                    G-122

Plaintiff Jakes 031328

1       Q    Black Stone --

2       MR. KATZ: Objection to the relevance.

3       THE COURT: Overruled.

4       MR. GOODFRIEND:

5          Q    Black Stones have People, correct?

6          A    The Area of 51st and Racine, that's a

7    Black Stone Gang Territory, that's correct.

8       MS. BORMANN; Objection.

9       THE COURT: Overruled.

10       MR. GOODFRIEND:

11          Q    Does a gang have certain rules?

12          A    Like what?

13          Q    What's a violation?

14          A    Violation can mean anything.

15          Q    To rat on a fellow gang member, is that a

16    violation?

17          A    Is that a violation?

18          Q    Yes.

19          A    I don't know.

20          Q    You were in the gang for 3 years and you

21    don't know whether it's a violation to rat on a

22    fellow gang member?

23       MR. MAJUID: Objection, argumentative.

24       THE COURT: Asked and answered. Sustained.

25                        G-123

1          His testimony is he doesn't know.

2          MR. GOODFRIEND:

3            Q  You went to the police station and

4      were in the police station for-- on February 4th

5      of 1992?

6          A  Yes.

7          Q  You've known the individual, Anthony

8      Jakes for some time, is that correct?

9          A  I didn't know him personally. As far as

10     having conversations with him when we were on the

11     streets, but I have seen him from time to time.

12         Q  Do you know whether he belongs to the

13     Black Stone Street --

14         MR. KATZ: Objection, hearsay.

15         THE COURT: Who's objections?

16         MR. KATZ: I'm sorry.

17         THE WITNESS: I don't know.

18         THE COURT: Overruled. He may answer, if he

19     knows. His answer is he didn't know so it's -- so

20     it's a mute point anyway. Answer to stand.

21         MR. GOODFRIEND:

22          Q  Now, this offense that you were

23     arrested for, occurred on the evening of September

4      the 15th of 1991, is that correct?

25               G-124

Plaintiff Jakes 031330

1     A   Yes.

2     Q   You learned the next day that the police

3   were looking for you in regards to the shooting,

4   didn't you?

5     A   Yes.

6     Q   Who told you that the police were

7   looking for you?

8     A   My grandmother.

9     Q   Did you go the police station after the

10   police -- after your grandmother told you?

11     A   No, I did not.

12     Q   How many times did your grandmother tell

13   you that the police were looking for you?

14     A   She told me she -- it doesn't matter how

15   many times she told me, she told me, though.

16     Q   How many times did your grandmother tell

17   you that the police were looking for you in regards

18   to the shooting?

19     A   I don't know.

20     Q   Would it be more than 5?

21     A   Yes.

22     Q   Would it be more than 10?

23     A   I don't know.

4     Q   In the month of September, did you go to

25              G-125

Plaintiff Jakes 031331

1        the police station in regards to their wanting to

2        question you?

3            A    On what day?

4            Q    In front of September of '91, did you go

5        to the police station?

6            A    No, I didn't.

7            Q    In the month of October of 1991, did you

8        go to the police station to tell them what you

9        knew?

10           A    No, I didn't.

11           Q    Any time in 1991, did you go to the

12       police station?

13           A    No, I didn't.

14           Q    Any time in '92, did you go to the police

15       station?

16           A    Yeah, February.

17           Q    You didn't go voluntarily, did you?

18           A    No.

19           Q    They took you there?

20           A    Right.

21           Q    Now, you said in direct testimony that

22       when the police came to the house on February the

23       4th, 1991, you were scared, is that correct?

24           A    Yes, I was.

25                         G-126

1        Q   Well, that wasn't the first time, was

2    that?

3        A   Correct.

4        Q   At no time while they took the statement,

5    was Detective Evans there, was he?

6        A   He was there at the station.  He wasn't

7    in the room when the statement was taken.

8        Q   He wasn't in the room when the State's

9    Attorney talked to you, was he?

10        A   He came in back and forth.

11        Q   When the handwritten statement was taken,

12    Detective Evans wasn't present, was he?

13        A   Nope.

14        Q   When the handwritten statement was taken,

15    Detective Foley wasn't present, was he?

16        A   Nope.

17        Q   Do you remember having a conversation

18    with State's Attorney Jason Delgado (phonetic) with

19    no other officers being present?

20        A   Yes, I did.

21        Q   And State's Attorney Delgado asked you at

22    that time how you were treated by the police, is

23    that correct?

24        A   Well, you know --

25                   G-127

Plaintiff Jakes 031333

1   Q Sir, did State's Attorney Delgado ask

2 you how you were treated by the police?

3   A No, he did not.

4   Q You don't remember telling him that the

5 police treated you fine?

6   A No, I did not. That's something he wrote

7 hisself.

8   Q You knew you could make changes on that

9 statement, didn't you?

10   A So they say.

11   Q Well, you made some changes, didn't ya?

12   A About my age.

13   Q Did you ask him to change that part of

14 the statement where you said you had been treated

15 fine by the police?

16   A No, I did not.

17   MR. GOODFRIEND: Nothing further.

18   MR. KATZ: No.

19   MS BORMANN: No.

20   THE COURT: You may step down, Sir. Please

21 return to the table. Does Mr. Jakes have any

22 additional testimony?

23   MR. KATZ: No testimony.

24   THE COURT: Defense rest?

25        G-128

Plaintiff Jakes 031334

1          MR. KATZ:  We would like to admit our

2     exhibits.

3          THE COURT:  They have been received.

4          MR. KATZ:  We have the photographs we would

5     like to --

6          THE COURT:  We would like a record on them a

7     little later.  You are resting.

8          MR. KATZ:  Yes.

9          THE COURT:  State, do you have any rebuttal?

10         MR. GOODFRIEND:  Yes, we do.

11         MR. MAJUID:  You want me and Mr. Day here for

12    this?

13              (Witness was sworn.)

14              MR. PATRICK DANAHER,

15    called as a witness on behalf of the State of

16    Illinois, in Rebuttal, was first duly sworn,

17    examined and testified as follows:

18              DIRECT EXAMINATION

19                   BY

20    MR. GOODFRIEND:

21         Q    State your name for the record?

22         A    Patrick Danaher, D-a-n-a-h-e-r.

23         Q    Officer Danaher, where are you employed

24    at?

25                   G-129

Plaintiff Jakes 031335

1    A Area 2 Youth Division.

2    Q Where were you employed back in September

3 of 1991?

4    A Area 3 Youth Division.

5    Q How long had you been with the Chicago

6 Police Department?

7    A Twenty-five years.

8    Q I want to direct your attention to mid

9 afternoon around 3:30 p.m., were you present at

10 Area 3 in the youth office?

11    A Yes, I was.

12    Q And was there an individual present there

3 by the name of Anthony Jakes?

14    A Not in the youth office, in the Violent

15 Crimes Office when I was called over.

16    Q And do you see that person in court

17 today?

18    A Yes, I do.

19    Q Would you point to him and describe

20 something he's wearing?

21    A The black gentleman sitting at the table

22 over there without the tie.

23    THE COURT: Your client has been identified.

24    MR. KATZ: Yes.

25        G-130

1        MR. GOODFRIEND:

2            Q    Mr Jakes was there to talk to some

3        detectives from Area 3 Violent Crimes, is that

4        correct?

5            A    Yes, sir.

6            Q    Were officers present at the station at

7        that time?

8            A    No.

9            Q    Did you make a call to any family member

10       of and Anthony Jakes?

11           A    Yes, I did.

12           Q    Who did you call?

13           A    Ms. Jones, Jennie Jones, his aunt.

14           Q    And did you tell her that the defendant

15       was still at the police station?

16           A    Yes.

17           Q    Now, after you spoke with her, did you

18       give the defendant an option of whether of what to

19       do at that time?

20           A    Yes, I did.

21           Q    What option did you give him?

22           A    He had the option of going home or

23       waiting for the detectives to talk to him.

24           Q    And the detectives were on the street?

25                             G-131

```
 1          A    They were on the street at that time.

 2          Q    What did the defendant choose to do?

 3          A    He choose to stay there.

 4          Q    Where did you place him within the Area 3

 5    Violent Crimes?

 6          A    There was a bench outside an office.

 7    When I last saw him, he was sitting at.

 8          Q    Would it be approximately 3:30 in the

 9    afternoon that you last saw the defendant?

10          A    3:30 when I first saw him.

11          Q    And when approximately was the last time?

12          A    No more than 4:30.

13    MR. GOODFRIEND: Nothing further.

14    THE COURT: Cross.

15              CROSS EXAMINATION

16                  BY

17    MR. KATZ:

18          Q    Yes. Officer, were you present when

19    the detectives did speak with Mr. Jakes?

20          A    No, I wasn't.

21          Q    But, do you know -- you said that you

22    first saw him around 3:30, correct?

23          A    Yes.

24          Q    What time did you last see him, if you

25                        G-132
```

1   recall?

2     A Approximately between 4:00 and 4:30.

3     Q But, you're not sure exactly?

4     A No.

5     MR. KATZ: Nothing further.

6     THE COURT: Redirect?

7     MR. GOODFRIEND: No, your Honor.

8     THE COURT: Who is your next witness.

9      (Witness was excused.)

10    MR. DILLON: Officer Burke.

11     (Witness was sworn.)

12     OFFICER KENNETH BURKE,

13  called as a witness on behalf of the State of

14  Illinois, in Rebuttal, was first duly sworn,

15  examined and testified as follows:

16     DIRECT EXAMINATION

17      BY

18  MR. DILLON:

19     Q State your name?

20     A Youth Officer Kenneth Burke, 3037,

21  Chicago Police Department, Area 2 Youth.

22     Q You're employed by the Chicago Police

23  Department?

24     A Yes.

25      G-133

Plaintiff Jakes 031339

1              Q    How long have you been a Chicago Police

2   Officer?

3              A    Eleven years.

4              Q    You called -- you're a youth officer?

5              A    Yes.

6              Q    How long have you been a youth officer?

7              A    Six years.

8              Q    Will you basically tell us what the

9   duties are?

10            A    We process any juvenile offenders that's

11   charged with a crime.  We also sit in on any

12   statements and process any juvenile victims of

13   abuse.

14            Q    Juvenile offenders are people under the

15   age of 17 years, is that correct?

16            A    Correct.

17            Q    Now, where are you currently assigned

18   within the police department?

19            A    Area 2 Youth.

20            Q    I would like to direct your attention to

21   September 17, 1991, were you working at that time?

22            A    Yes, I was working the first midnight

23   shift.

24            Q    What were the hours?

25                             G-134

Plaintiff Jakes 031340

1       A    Midnight to 8:00 in the morning.

2       Q    Were you working at a particular location

3    on that morning?

4       A    Yeah. We worked midnight shift and youth

5    division works out of downtown out of 1121 South

6    State.

7       Q    Particular youth areas in each area of

8    the city, are those open during the midnight shift?

9       A    No, they are not.

10      Q    Only location is central youth?

11      A    Yes.

12      Q    Now, I would like to direct your

13    attention to the early morning hours of September

14    17, 1991, did you receive an assignment?

15      A    Yes.

16      Q    Can you tell me what that assignment was?

17      A    I received an assignment to go into Area

18    3 Violent Crimes.

19      Q    Was that in regards to an offender in

20    custody for the homicide of Raphael Garcia?

21      A    Yes.

22      Q    Do you remember what time it was that you

23    received that assignment?

24      A    I initially received it at 3:30 in the

25                        G-135

Plaintiff Jakes 031341

1      morning.

2           Q   Did you proceed to Area 3 Violent Crimes?

3           A   Yes.

4           Q   What time did you arrive there?

5           A   Approximately 3:45 in the morning.

6           Q   Did you have an occasion to speak with

7      any detectives upon your arrival there?

8           A   Yes, initially, I spoke with Detective

9      Caesar. He more or less apprised me of what they

10     had there.

11          Q   3:55 on the morning of September 17,

12     1991, did you have occasion to speak with the in-

'3     custody offender?

14          A   Yes.

15          Q   What was his name?

16          A   Anthony Jakes.

17          Q   Do you see him here in court today?

18          A   Yes, I do.

19          Q   Identify him by something he's wearing,

20     please.

21          A   The young man in the white stripe shirt.

22     THE COURT: Your client has been identified.

23     MR. KATZ: Yes.

24     MR. DILLON:

25                    G-136

Plaintiff Jakes 031342

1      Q   When you first encountered the

2   defendant, where did you encounter him at?

3      A   In an interview room in Area 3 Violent

4   Crimes.

5      Q   When you first met the defendant, can you

6   tell me how you introduced yourself to him?

7      A   I introduced him -- I introduced myself.

8   I said I was a youth officer from the Chicago

9   Police Department.  I asked him how he was treated,

10  if he was treated all right.  He responded that he

11  was.

12     Q   When you had this conversation with him,

13  was that just yourself and the defendant or was

14  anyone else present?

15     A   That was just myself and the defendant.

16     Q   After you introduced yourself to him,

17  did you advise him of anything?

18     A   Yes.  I advised him of his rights.

19     Q   And how did you do that?

20     A   From a preprinted form, an FOP book.

21     Q   Do you have an FOP book with you today?

22     A   Yes, I do.

23     Q   Can you take it out?  What year is the

24  FOP book that you have in your hand now?

25                        G-137

Plaintiff Jakes 031343

1       A   This is a 1993 FOP book.

2       Q   Are the rights that are in that '93 FOP

3   book the same rights in the FOP book that you had

4   when you advised the defendant of his rights back

5   in September of 1991?

6       A   Yes.

7       Q   Would you turn to the rights page and

8   tell us what it is you advised him of?

9       A   Before I ask you any questions, it is our

10   duty to advise you of your rights. Do you

11   understand that you have a right to remain silent.

12   Do you understand that anything you say can and

13   maybe used against you in court or other

14   proceedings. Do you understand that you have the

15   right to talk to a lawyer before we ask you any

16   questions and to have him with you during

17   questioning? If you cannot afford a lawyer and you

18   want one, a lawyer will be appointed to you and we

19   will not ask you any questions until he has been

20   appointed. If you decide to answer questions now

21   with or without a lawyer, you still have a right to

22   stop questioning at anytime or to stop the

23   questioning for purposes of consulting a lawyer.

24   You may waive the right to advise of counsel and

25                  G-138

Plaintiff Jakes 031344

1       your right to remain silent and you may answer

2       questions or make a statement without consulting a

3       lawyer, if you desire. Do you understand each of

4       these rights? Do you wish to answer the questions

5       at this time.

6          Q   Did he indicate that he understood those

7       rights?

8          A   Yes.

9          Q   Did he indicate whether he is willing to

10      speak with you?

11         A   Yes, he did indicate that.

12         Q   Did you also advise him that even though

13      he is a juvenile, he would be tried as an adult?

14         A   Yes.

15         Q   After you advised the defendant of his

16      rights, did you ask him any questions regarding his

17      treatment?

18         A   Yes. I asked him if he was treated okay,

19      if he was all right. He said, "yes." I asked him

20      if his mother knew that he was here. At that

21      point, he said he lived with his aunt and that his

22      aunt was his guardian. I asked him if his aunt

23      knew that he was here. He said that she did. I

24      asked him did you want your aunt. He said, "no,

25                     G-139

Plaintiff Jakes 031345

1       that's not necessary."

2          Q   Now, after the defendant told you this,

3       did you remain in the room with the defendant or

4       did you leave?

5          A   I left the room.

6          Q   I would like to direct your attention to

7       5 minutes later on September 17, 1991, were you

8       present for another conversation with the

9       defendant?

10          A   Yes, I was.

11          Q   And can you tell us where that

12       conversation took place?

13          A   What was known as the sergeant's room at

14       Area 3 Violent Crimes.

15          Q   Can you tell me who was present for that

16       conversation?

17          A   It was the Detective Caesar, State's

18       Attorney Grossmen, the defendant and myself.

19          Q   Did the State's Attorney introduce

20       himself to the defendant?

21          A   Yes.

22          Q   Prior to the State's Attorney introducing

23       himself, did anyone else introduce the people that

24       had come into the room?

25                       G-140

Plaintiff Jakes 031346

1         A    Detective Kill entered the room and

2     introduced the State's Attorney and Detective

3     Caesar.

4         Q    Detective Kill remained in the room?

5         A    No, he left.

6         Q    Now, you indicated that the State's

7     Attorney introduced himself? How did he do that?

8         A    He told the defendant that he was an

9     attorney and that he was not his attorney; that he

10     was an attorney that was working with the police

11     department, and the defendant said he understood?

12         Q    Did State's Attorney advise him of

13     anything?

14         A    Yes. He advised him of his rights.

15         Q    Did he do that from memory or preprinted

16     form?

17         A    Memory.

18         Q    Did the defendant indicate in your

19     presence that he understood his rights?

20         A    Yes.

21         Q    Were conversations then taken with the

22     defendant?

23         A    I'm sorry.

24         Q    Was there a conversation then between the

25                        G-141

Plaintiff Jakes 031347

1    State's Attorney and defendant?

2    A Yes.

3    Q At the conclusion of that conversation,

4  did you ask any questions of the defendant?

5    A Yes, the State's Attorney asked the -- if

6  he would want to either make a court reported

7  statement or a written statement as to the

8  statement he made.

9    Q Did the defendant indicate he was willing

10  to make a statement?

11    A Yes.

12    Q Which type of statement did the defendant

13  say he was willing to make?

14    A Handwritten.

15    Q Were you present for the taking of the

16  handwritten statement?

17    A Yes.

18    Q At the conclusion of that handwritten

19  statement, can you tell me what happened?

20    A At the conclusion of the statement, the

21  statement was read, the rights from the front page

22  and he asked the defendant to sign it, then he

23  asked him to start reading the statement and he

24  read, I believe about the first paragraph.

25         G-142

Plaintiff Jakes 031348

1       Q     Was the defendant able to read the first

2   paragraph out loud?

3       A     Yes, he was.

4       Q     After the first paragraph of the

5   statement that was read then, what happened?

6       A     Then Assistant State's Attorney Grossmen

7   read the statement to -- the statement to the

8   defendant pointing out as they went along.

9       Q     This was done during the course of the

10  entire statement?

11      A     Yes.

12      Q     Were corrections made?

13      A     Yes.

14      Q     As each correction was made, can you tell

15  me what was done?

16      A     After a correction was made, it was

17  corrected and then we all initialed the correction.

18      Q     After the statement was read and

19  correction made, what happened then?

20      A     Then after the statement was read and it

21  was the bottom of each statement, the bottom of

22  each page was signed by each of us and the end of

23  the statement was also signed by each of us.

24      MR. DILLON:  Nothing further.

25                    G-143

Plaintiff Jakes 031349

1    THE COURT:  Cross.

2              CROSS EXAMINATION

3                    BY

4    MS. BORMANN:

5         Q    Officer Burke, how long have you

6    been a youth officer with the Chicago Police

7    Department?

8         A    Six years.

9         Q    And you testified earlier that part of

10   your job is to sit in during the time that the

11   statements are taken, correct?

12        A    That's correct.

13        Q    And the youth officer is anyone defined

14   by law under the age of 17?

15        A    Correct.

16        Q    At the time that Mr. Jakes was arrested,

17   he was 15 years old?

18        A    Yes.

19        Q    So, that day you sat in while a written

20   statement was taken, correct?

21        A    Correct.

22        Q    And that would be proper Chicago Police

23   Procedure?

24        A    Yes.

25                    G-144

Plaintiff Jakes 031350

1        Q   Now, you weren't there when any prior

2       statements were taken from Mr. Jakes that day, were

3       you?

4       A   No.

5       Q   When you arrived at the police station

6       that day, you were informed that prior statements

7       had been taken, weren't you?

8       MR DILLON: Objection, hearsay.

9       THE COURT: Sustained.

10      MR. KATZ:

11      Q   At the beginning of the interview

12      with Mr. Jakes, Detective Kill was present in the

13      interview room, correct?

14      A   No, not on the first interview, no.

15      Q   Well, not the first one. At the time of

16      the interview where the Assistant State's Attorney

17      was present, Detective Caesar, yourself, the

18      beginning of that interview, Detective Kill was

19      present, correct?

20      A   We all walked into the room together and

21      then Detective Kill left the room before the

22      interview really started.

23      Q   So, at the beginning, he was present?

24      A   When we originally walked into the room,

25                  G-145

Plaintiff Jakes 031351

1    yes.

2        Q    He made the introduction?

3        A    Yes.

4        Q    Okay.  He was present?

5        A    Right.

6        Q    Thank you.  During the course of that

7    statement, Detective Kill popped in a couple of

8    times, correct?

9        A    I believe he might have walked into the

10   room.  He never really approached the table.  He

11   seemed like he was getting files or something from

12   the cabinet.

13       Q    Now, during the time that you were at the

14   station which was from approximately 3:30 in the

15   morning until when?

16       A    I really don't recall the time I left.

17       Q    Would it have been sometime after 4:30?

18       A    Yes.

19       Q    During that time, you never saw Mr Jakes

20   with Detective Kill alone?

21       A    No.

22       Q    The first time you had been in Area 3

23   that day was at 3:30 in the morning on September

4    17th?

25                        G-146

1     A  About 3:45.

2     MR. KATZ: Nothing further.

3     THE COURT: Redirect.

4     MR. DILLON: Nothing.

5     THE COURT: Who is your next witness.

6        (Witness was excused.)

7     MR. DILLON: Detective Boudreau.

8        (Witness was sworn.)

9       DETECTIVE KENNETH BOUDREAU,

10  called as a witness on behalf of the State of

11  Illinois, in Rebuttal, was first duly sworn,

12  examined and testified as follows:

13       DIRECT EXAMINATION

14        BY

15  MR. DILLON:

16     Q  State your name?

17     A  Detective Kenneth Boudreau, B-o-u-d-r-e-

18  a-u.

19     Q  You're a Chicago Police Detective?

20     A  Yes.

21     Q  How long have you been with the Chicago

22  Police Department?

23     A  For seven years.

4     Q  Where are you currently assigned to the

25        G-147

1          Chicago Police Department?

2          A     Assigned to Area 1 Violent Crime.

3          Q     And I would like to direct your attention

4    back to September of '91, where were you assigned

5    within the Chicago Police Department at that time?

6          A     I was assigned to Area 3 Violent Crimes

7    which covers the 7, 8, 9, police districts.

8          Q     I would like to specifically direct your

9    attention to the date of September 16, 1991, were

10   you working on that date?

11         A     Yes.

12         Q     On that particular date, did you have a

13   partner?

14         A     Yes.

15         Q     Can you tell me what the name of the

16   partner was?

17         A     It was Detective Michael Kill.

18         Q     On September of 1991, when time did you

19   start work?

20         A     Approximately 1600 or 4:00 p.m.

21         Q     What time were you scheduled to get off?

22         A     0100 or 1:00 o'clock in the morning.

23         Q     Now, upon your arrival at work, did you

24   have occasion to become involved in the

25                          G-148

Plaintiff Jakes 031354

1    investigation, of a work investigation of a

2    homicide of Raphael Garcia?

3        A    Yes.

4        Q    Did you learn that Anthony was in

5    custody?

6        A    He was not in custody at that time. He

7    was a witness.

8        Q    At some point and time, did you have a

9    conversation with Anthony Jakes?

10       A    Yes.

11       Q    And do you see Anthony Jakes in court

12   today?

13       A    Yes.

14       Q    Identify something he's wearing?

15       A    Gentleman sitting at the defense table

16   with the white striped dress shirt on with long

17   colors.

18       THE COURT: Any dispute?

19       MR. KATZ: No.

20       MR. DILLON:

21       Q    At that time, did you have occasion

22   to be present for a conversation with Anthony

23   Jakes?

24       A    Yes.

25                    G-149

Plaintiff Jakes 031355

1  Q   Did Anthony Jakes admit whether or not he

2  belonged to a gang?

3  A   Yes.

4  Q   What gang did he admit he belonged to?

5  A   He admitted he was a member of the Black

6  Stone Street Gang.

7  Q   Were you present for any other

8  conversations with Anthony Jakes that day?

9  A   Yes.

10  Q   That would be later on in the evening

11  hours?

12  A   Yes.

13  Q   Approximately 10:45, correct?

14  A   Correct.

15  Q   During the period of time that you had

16  conversations with Anthony Jakes, was Detective

17  Kill present with you on those occasions?

18  A   Yes.

19  Q   Did you ever see Detective Kill strike

20  or abuse Anthony Jakes in any way?

21  A   No.

22  Q   During the period of time that you were

23  at Area 3 on September 16, 1991, in the early

24  morning hours of September 17, 1991, did you ever

25                              G-150

Plaintiff Jakes 031356

1    see any Chicago Police Officer abuse Anthony Jakes

2    in any way?

3        A    Absolutely not.

4        MR. DILLON:  Nothing further.

5                    CROSS EXAMINATION

6                         BY

7    MR. KATZ:

8        Q    Detective Boudreau, I believe you

9    testified for one conversation with Anthony Jakes,

10   Detective Kill and yourself was present, is that

11   correct?

12       A    You say one conversation.  One

13   conversation.

14       Q    When was the first conversation?

15       A    First conversation was approximately 4:30

16   in the afternoon.

17       Q    And I take it that you and Detective Kill

18   attended to police business and came back and spoke

19   to Mr. Jakes again?

20       A    Later on that evening, that's correct.

21       Q    And do you know if Detective Kill spoke

22   to the defendant -- I'm sorry Anthony Jakes without

23   you being present?

4        A    No.

25                      G-151

Plaintiff Jakes 031357

1       will be heard in this matter and it would be

2       approximately 5:00 o'clock at that point, I'm

3       actually prepared to proceed today but I want you

4       to fully be advised as to what the law is in the

5       State of Illinois so you can help me make that

6       decision. I told you you have a 85 percent chance

7       of receiving the case today. I'm required by law

8       to give the attorneys an opportunity to comment on

9       the instructions of law that I give to the jury.

10      Those are experienced professional counsel. I

11      would suspect that would take no longer than a half

12      hour so you can figure somewhere in the 5:30 or

13      6:00 o'clock. We can come out and have closing

14      argument. Closing argument will take probably in

15      the vicinity of an hour or a bit more. You will be

16      instructed for 10 minutes so you will probably go

17      back to deliberate at about 7:15. While you were

18      back deliberating, then we would proceed with

19      instructing the jury. Under the law in the State

20      of Illinois, once a jury begins their

21      deliberations, they may not be separated. In other

22      words, unlike the federal court, where a jury can

23      go home, that can't happen in the State of Illinois

4       court, so once you begin your deliberations you

25                   G-153

Plaintiff Jakes 031358

1        cannot be separated, so in the event going out at

2        that hour, you're unable to reach a verdict at some

3        point, we would terminate the deliberations and you

4        will be taken to a motel and then we would come

5        back again tomorrow morning. The alternative is we

6        would hold it over until Monday. That's

7        essentially the situation. We would do this by

8        your vote. We would do it by a majority vote. If

9        I sent you home and you come back Monday, we will

10       leave now, but you will be required to come back

11       Monday. How many people want to go ahead and

12       finish today raise your hand.

13               (Complying.)

14           THE COURT: Have you reached your stipulation.

15           MR. DILLON: Yes. It's stipulated that if a

16       court reporter, Helen Hackney were called to

17       testify, she would testify that she is a certified

18       court reporter; that she took notes of a hearing

19       conducted in this courtroom on December the 3rd,

20       1992. During the testimony of the witness, Anthony

21       Jakes, the defendant, Assistant State's Attorney

22       Dave O'Connor, were asking the questions and the

23       defendant, Anthony Jakes was giving the answers.

24       Page 57, Question, "And at the conclusion of that

25                   G-154

Plaintiff Jakes 031359

1    statement, he signed that statement, correct?"

2    Answer, "yes."   Question, "you read that

3    statement, correct?"  Answer, "Yeah." Page 74,

4    "would it be fair to say that you had contact with

5    the Chicago Police prior to the statement

6    approximately 13 times?" Answer, "yes." Page 80

7    Question, "by the State's Attorney Dave O'Connor?"

8    The defendant's answered. "Did Detective Kill tell

9    you what to say, you said it to the State's

10    Attorney, correct?" "He just told me to come back

11    with what they wanted to hear." Question, "Did he

12    tell you what to say?" Answer, "no." So

13    stipulated.

14        MR. KATZ; So stipulated.

15        THE COURT:  Any further rebuttal from the

16    State?

17        MR. DILLON: No.

18        THE COURT: Any surrebuttal?

19        MR. KATZ: No.

20        MS. BORMANN: No.

21        THE COURT: That concludes all the evidence in

22    this case.  You would be going back to the jury

23    room while we complete the case for the other

24    defendant. Even though you heard all the evidence,

25                   G-155

Plaintiff Jakes 031360

1    you may not discuss the evidence.   If you're

2    tired, manage how I feel.  I guess we don't have a

3    sheriff to take you, but you know the way.  If you

4    would be kind enough to walk out of the front door

5    and they will let you back in the jury room.

6              (A recess was taken.)

7         MR. KATZ:  Number 4 has already been received.

8    That's Arnold Day's statement which has been

9    published.  Number 1 is Gus Robinson's statement.

10        MR. GOODFRIEND:  I would ask that they be

11   admitted.

12        THE COURT:  His testimony is already in the

13   record.

14        MR. GOODFRIEND:  Mr. Jakes' statement is going

15   back.  Arnold Day's statement is going back and I

16   would be asking that Gus Robinson's statement go

17   back under the theory that it was allowed to come

18   in.

19        THE COURT:  It has been identified.  He's not

20   offered it.  If you want to re-offer it as an

21   exhibit, I would consider that, but he is not

22   offering that.  You can't offer his exhibits now.

23   He's not offering one.  What is 2?

24        MR. KATZ:  Police report.  Three is my

25                      G-156

1     photographs and I'm offering them.

2     THE COURT: Any objection to the photographs.

3     MR. GOODFRIEND: Yes. Photographs of the

4     back. Defendant didn't know what his back looked

5     like, so how would he know.

6     THE COURT: I will do you a favor, Mr.

7     Goodfriend, I will deny your objection because if I

8     didn't send those photographs back those injuries

9     -- they're extremely weak. The defendant talked

10    about the fact that he moved in certain ways and

11    photographs were taken and they are polaroids. The

12    State would be able to argue the weight. I think

13    the jury's entitled to hear a more strenuous --

14    State's objection is overruled and they would be

15    received. Any other exhibits for you?

16    MR. KATZ: No.

17    THE COURT: 1.01 as People's One. Do you have

18    any objection?

19    MR. KATZ: No objection.

20    THE COURT: 1.02 is People's 2. No objection.

21    1.03, any objection?

22    MR. KATZ: No objection.

23    THE COURT: 2.01 is People's 4. You have any

24    objection?

25                G-157

Plaintiff Jakes 031362

1          photographs and I'm offering them.

2                THE COURT: Any objection to the photographs.

3                MR. GOODFRIEND: Yes. Photographs of the

4          back. Defendant didn't know what his back looked

5          like, so how would he know.

6                THE COURT: I will do you a favor, Mr.

7          Goodfriend, I will deny your objection because if I

8          didn't send those photographs back those injuries

9          -- they're extremely weak. The defendant talked

10         about the fact that he moved in certain ways and

11         photographs were taken and they are polaroids. The

12         State would be able to argue the weight. I think

13         the jury's entitled to hear a more strenuous --

14         State's objection is overruled and they would be

15         received. Any other exhibits for you?

16               MR. KATZ: No.

17               THE COURT: 1.01 as People's One. Do you have

18         any objection?

19               MR. KATZ: No objection.

20               THE COURT: 1.02 is People's 2. No objection.

21         1.03, any objection?

22               MR. KATZ: No objection.

23               THE COURT: 2.01 is People's 4. You have any

24         objection?

25                              G-157

Plaintiff Jakes 031363

1          MR. KATZ: No objection.

2          THE COURT: 2.02 People's 5. Do you have any

3     objection?

4          MR. KATZ: No objection.

5          THE COURT: 2.03 People's 6. Do you have any

6     objection?

7          MR. KATZ: No objection.

8          THE COURT:  3.02 is People's 7.  Any

9     objection?

10         MR. KATZ: No.

11         THE COURT: 3.2 People's A. Any objection?

12         MR KATZ: No.

13         THE COURT: 4.05 People's 10. Any objection?

14         MR. KATZ: No objection.

15         THE COURT: 6.05 People's 11. Any objection?

16         MR. KATZ: No objection.

17         THE COURT: 6.07 People's 12. Any objection?

18         MR. KATZ: No objection.

19         THE COURT:  7.01 A People's 13.  Any

20    objection?

21         MR. KATZ: No objection.

22         THE COURT: 7.02 A. Any objection?

23         MR. KATZ: No objection.

`4         THE COURT: 26.01 People's 15. Any objection?

25                        G-158

1        MR. KATZ: No objection.

2        THE COURT:  Rest of them are verdicts.  Any

3    objection to verdict forms?

4        MR. KATZ: 16, 17, 18, and 19.

5        THE  COURT:  State  have  any  additional

6    instructions to offer?

7        MR. GOODFRIEND:  No.

8        THE COURT:  Mr. Jakes.

9        MR. KATZ:  Judge, I just ask leave to go to

10   the office and check.  I don't believe so, but I

11   want to check.

12       THE COURT:  Make sure you bring it to my

13   attention.

14       MR. GOODFRIEND: The only evidentiary thing is

15   we are asking that Gus Robinson's statement be --

16   whether it be renumbered or relabeled, we ask that

17   that go back.

18       THE COURT:  That's 40.

19       MR. GOODFRIEND:  Yes.

20       MR. KATZ:  Over our objection.

21       THE COURT: That would be admitted as People's

22   40 over objection.

23       Please  bring  the  jury  out.  Let  the

24   record reflect that Mr. Jakes is present personally

25                        G-159

Plaintiff Jakes 031365

1     and the attorney.

2          (Jury was present.)

3          THE COURT: We have come to a point where the

4     State and the Defense will get an opportunity to

5     give their closing arguments. Before that is done,

6     I would like to give you instructions concerning

7     that. Opening statements are made by the attorneys

8     to acquaint you with the facts they expect to

9     prove. Closing arguments are made by the attorneys

10    to discuss the facts and circumstances in the case

11    and should be confined to the evidence and to

12    reasonable inferences to be drawn from the

13    evidence.

14        Neither opening statements nor closing

15    arguments are evidence. Any statements or

16    arguments made by the attorney which is not based

17    on the evidence should be disregarded. There is one

18    other thing I want to do which is not in the

19    instructions. I want to read the oath that the

20    sheriffs are going to take in your presence to you

21    because I want you to be aware of it before you

22    begin your deliberations. The sheriff will be in

23    charge of you. They will be sworn as each and ever

24    one of you will be sworn by the ever living God

25              G-160

Plaintiff Jakes 031366

1          that you will take the jury by a safe and protected

2          place by the Sheriff of Cook County and keep them

3          together and permit no person to speak to them nor

4          speak to them yourselves about this case. And when

5          they have agreed upon their verdict, you will

6          return them to open court.

7               I beg you to make sure that you allow the

8          sheriff to do what they are sworn to do both as

9          their jobs and what they are sworn to do,

10         specifically in this case, and do not, do not

11         discuss the case with them.

12               Is the State going to make opening

13         remarks?

14         MR. DILLON:

15               Yes. This Mexican dude he's got a

16         lot of money. He's got a lot of jewelry. You take

17         the corner, you take the point.

18               I submit, Ladies and Gentlemen, when

19         those words were spoken, that this defendant stated

20         all right, a partnership was formed, an agreement,

21         a partnership. Whose sole purpose was it to rob

22         Raphael Garcia? A partnership.

23               I submit that when this defendant told

24         you in his confession that that's what his partner

25                              G-161

Plaintiff Jakes 031367

1    in crime, Arnold Day said, and he agreed to do it,

2    he is responsible not only for his own actions but

3    for his partner's actions as well.

4         Now, Ladies and Gentlemen, after we are

5    done with closing arguments, the judge is going to

6    instruct you on what the law is in the State of

7    Illinois. As the judge told you, you're going to

8    determine what the evidence is in this case. It

9    would be your duty as jurors to apply the law that

10   he gives you to the evidence.

11        Now, I believe the judge is going to

12   tell you that a person is legally responsible for

13   the conduct of another person when either before or

14   during the commission of an offense and with the

15   intent to promote or facilitate the commission of

16   an offense, he knowingly solicits, aids, abets,

17   agrees to aid, or attempts to aid the other person

18   in the  planning or commission of the offense.

19   That is the law of accountability. It's a law that

20   the judge is going to tell you about after you have

21   heard all the closing arguments.  The law of

22   accountability is nothing more than the law of

23   responsibility.  If 2 people get together and

24   decide to go out and commit a criminal act, each is

25                      G-162

Plaintiff Jakes 031368

1     responsible not only for their own actions, but for

2     the actions of the other as well.

3          Anthony Jakes has told you in his

4     confession that he was Arnold Day's partner back on

5     September the 15th, 1991. You will have an

6     opportunity to take this statement with you, and

7     when you take the statement back with you, look and

8     see where the partnership was formed. He tells

9     you that back on September 15, 1991, Arnold Day

10    went into that store. He told you that Arnold Day

11    came back out, told him the Mexican Dude got a lot

12    of money, the Mexican dude got a lot of jewelry.

13    We are going to stick him up. You take the point.

14    You be the look out. And in his own confession,

15    you will hear that he said all right.

16          I submit, Ladies and Gentlemen that under

17    the law of accountability, he's responsibility not

18    only for his own actions, but for Arnold Day's

19    actions as well. The defendant told you how he

20    aided and abetted, how he made it possible for

21    Arnold Day to do what it was he had to do back on

22    September the 15th of '91. He explained during his

23    confession how he went down to the corner of 51st

24    and Racine, and on the corner of 51st and Racine,

25                              G-163

Plaintiff Jakes 031369

1       he looked up and down to make sure that the coast

2       was clear, and when the coast was clear, he gave

3       the signal to his partner, all right, it's okay.

4       You know from his confession when he gave that okay

5       signal that's when Raphael Garcia came out of that

6       restaurant, that's when Raphael Garcia was

7       viciously and violently executed, and if you look

8       at that statement, you will see that while Rapheal

9       Garcia is being shot to death, he's still standing

10      on the corner acting as a look out. He's still

11      aiding and abetting. He's making it possible for

12      Arnold Day to do what he did under the law of

13      responsibility. He's responsible for the attempted

14      armed robbery. He's responsible for the murder of

15      Raphael Garcia under the law in the State of

16      Illinois. Not only is he responsible for that

17      attempted robbery, he's responsible for the murder.

18      As he tells you in his confession when and Arnold

19      Day told him about the stick up, he pulled up his

20      shirt and he showed him his .380, and as the

21      defendant told you in his own words, he knew that

22      Arnold Day always carries that .380 with him and he

23      knew that Arnold Day carried that .380 with him.

4      It was either half loaded or fully loaded. This

25                    G-164

Plaintiff Jakes 031370

1        defendant knew full well what the purpose of that

2        gun was.  The purpose of that gun wasn't to scare

3        Mr. Garcia, the purpose was if he was going to use

4        it he was going to use it and he went right along

5        with the man --

6           MR. KATZ:  Objection

7           THE COURT:  The objection is overruled.

8           MR. DILLON:  He was right in on the plan from

9        the very beginning to the very end, part and

10       partial of it.  He's a team player and the team was

11       Arnold Day and Anthony Jakes, and each one is

12       responsible for the other's actions.  He's told you

13       in his confession how that crime was committed.

14       During the entire course of that crime, he stood on

15       the corner acting as a look out, allowing Arnold

16       Day to try and rob Raphael Garcia, allowing Arnold

17       Day to shoot Raphael Garcia to death.

18          During the course of the instructions

19       that the judge is going to give to you, you're

20       going to see the words one for whose conduct he's

21       legally responsible, you're going to see those

22       words time and time again throughout these

23       instructions.  When you see those words for one

24       whose conduct he's legally responsible, that is

25                  G-165

Plaintiff Jakes 031371

1     referring to the law of responsibility, and when

2     you see those words, those mean the actions of

3     Arnold Day, on the night of September 15, 1991.

4     When you see those words, it means Arnold Day.

5          Now, the judge is going to tell you that

6     to sustain the charge of attempted robbery, the

7     State has to prove the following propositions.

8     First that the defendant for one whose conduct he's

9     legally responsible or for an act which constituted

10    a substantial step towards the commission of the

11    offense of armed robbery, and second that the

12    defendant or one for whose conduct he's legally

13    responsible, did show with the intent to commit the

14    offense of armed robbery. What does that mean?

15    Well, what it means, Ladies and Gentlemen and as

16    the defendant has told you in his confession, was

17    a substantial step taken towards committing an

18    armed robbery. The defendant's own statement is

19    that as he stood on that corner acting as a look

20    out and as Raphael Garcia came out of that store,

21    Arnold Day said, "stick up" and he pointed his

22    .380 caliber handgun at him. That certainly is a

23    substantial step towards the commission of the

24    offense of armed robbery.

25               G-166

Plaintiff Jakes 031372

1   If you take a gun and point it at someone

2   and you say, "stick up," you're armed and you're

3   trying to take property.

4   I submit, under the evidence that you

5   have heard in this case, the defendant's own

6   confession, he has been proven guilty of attempted

7   robbery. The defendant is also charged with the

8   offense of first degree murder.

9   I believe the judge is going to tell you

10   that in order for the State to prove the defendant

11   guilty of first degree murder, the State has to

12   prove the following propositions. First that the

13   defendant or for whose conduct he's legally

14   responsible, performed the acts which caused the

15   death of Raphael Garcia, and second that when the

16   defendant or one for whose conduct he's legally

17   responsible, did so, he intended to kill or do

18   great bodily harm to Raphael Garcia or he knew that

19   his actions would cause death to Raphael Garcia or

20   he knew that his actions created a strong

21   probability of death or great bodily harm to

22   Raphael Garcia or he was attempting to commit the

23   offense of armed robbery.

24   When you get back and you look at that

25   G-167

Plaintiff Jakes 031373

1    instruction, there is something important that

2    needs to be noted. First of all, the first step

3    that has to be shown the defendant or one for whose

4    conduct he's legally responsible, Arnold Day,

5    conduct or the actions which caused the death of

6    Raphael Garcia. Well the defendant told you in his

7    confession that Arnold Day shot Raphael Garcia in

8    his car as he attempted to flea from the area where

9    Arnold Day and Anthony Jakes were trying to rob

10   him. It's been stipulated, been agreed by the

11   attorneys for Anthony Jakes that those 4 guns shot

12   wounds that Arnold Day put into the body of Raphael

13   Garcia were the acts which caused his death. So

14   the first degree murder has been proven. The

15   second element is one of either 4 alternatives. It

16   doesn't have to be all 4, it could be any one of

17   the 4, but I submit, under the evidence in this

18   case, all 4 are evidence, when the defendant

19   performs an act or one for whose conduct he's

20   legally responsible did so intended to kill or do

21   great bodily harm to Rapheal Garcia. Use your

22   common sense, Ladies and Gentlemen. When you take

23   a gun and you shot somebody, you're intending to

24   kill them and you know from the law of responsible,

25                              G-168

Plaintiff Jakes 031374

1      he's responsible for Arnold Day's actions. When

2      you take the gun and you point at something at

3      point blank range, you shoot them 4 times, your

4      actions speak louder than your words. It shows

5      intent to kill, and under the law of

6      responsibility, he's responsible for Arnold Day's

7      actions.

8      The second alternative, he knew that his

9      actions would cause death to Raphael Garcia. He

10      shot him 4 times. You know that your actions

11      would cause death.

12      The third possibility, he knew that he

13      had a strong probability of death to Raphael

14      Garcia, shooting someone 4 times at point blank

15      range. You certainly know at the very least that

16      your actions are creating a strong probably of

17      death and great bodily harm to Raphael Garcia.

18      The fourth alternative is that when the

19      acts were performed which caused the death of

20      Raphael Garcia, he was attempting to commit the

21      offense of armed robbery.

22      In his confession, he tells you that's

23      exactly what was going on when he tried to get that

24      money and that jewelry from Raphael Garcia. That's

25      G-169

Plaintiff Jakes 031375

1     when he was shot to death. He was shot during the

2     commission of an attempted armed robbery, and it

3     didn't matter whether he intended for that to

4     happen or not, it didn't matter. All he intended

5     to happen was to stick him up because under the

6     law, he's responsible for what Arnold Day did, and

7     it was done during the commission of an attempted

8     armed robbery. It doesn't matter whether he

9     intended Arnold Day to shoot him to death. It

10    doesn't matter if he intended for him to put that

11    gun out. He's in on attempted armed robbery. A

12    person dies. He's guilty. That's the law of the

13    State of Illinois. In his own words, in his

14    confession, he has admitted to you that he's guilty

15    of that attempted robbery, and he's guilty of first

16    degree murder of Raphael Garcia.

17        Now when you get a chance to look at his

18    statement, it's going to become very evidentiary to

19    you that a lot of what he said in this statement is

20    shown to be true by the evidence that exists in

21    this case. Keep in mind that he gives his

22    statement at 4:30 in the morning on September the

23    17th, a little bit over 2 days after this happened.

24        Now, he says back on September 15, 1991,

25                 G-170

Plaintiff Jakes 031376

1        he says that both himself, a person named Darren

2        and Arnold Day matched this plan to rob Raphael

3        Garcia. How do you know that's true? Gus Robinson

4        came in and told you that he was out on that corner

5        using the telephone when he was approached by this

6        defendant and he wanted this defendant, Gus

7        Robinson, to be in on a plan and Gus would have no

8        part of it. They want to be believe that Gus

9        Robinson isn't telling the truth; that Gus Robinson

10       made this all up, but Ladies and Gentlemen, Gus

11       Robinson gave a statement to the State's Attorney

12       on September 17th 1991. Gus Robinson testified in

13       front of the grand jury on September of '91. Gus

14       Robinson consistently said the same thing on

15       September 15th of '91, this defendant, Anthony

16       Jakes approached him and asked him to be a part of

17       this participation, to be in on the plan and he

18       refused to do so. Gus Robinson has absolutely no

19       bias or motive to get on that witness stand and lie

20       against this defendant.

21       His testimony shows you that what Anthony

22       Jakes says in his statement isn't -- is the truth,

23       but there is more, Ladies nd Gentlemen. The

24       defendant says in his statement that as Raphael

25                       G-171

Plaintiff Jakes 031377

1        Garcia comes out of the restaurant, Arnold Day

2         pulls out the gun and points and says, "stick up."

3        He said in his confession that Arnold Day came out

4        and said that the victim had a lot of jewelry on,

5        a lot of money.  What was the testimony in this

6        case?  The testimony in this case was that when

7        Raphael Garcia was taken to Cook County Hospital,

8        he had over $89.00 in cash on him, he had 4 gold

9        chains, he had 3 rings, he had a watch, a lot of

10       jewelry, a lot of money.  Again, evidence would

11       show what he says in his statement is true, but

12       there is more than that.  When Raphael Garcia comes

'3       out and gets into is car, after he rejects the

14       advances of Arnold Day, his partner, and gets into

15       the car, he gets in on the passenger side and the

16       defendant in his confession, says Arnold Day

17       proceeded to move into the passenger side of the

18       car.

19            You will have an opportunity to take this

20       back with you when you begin your deliberations,

21       but you can see the passenger side window of the

22       car broken out.  You can see the warm food sitting

23       inside the car.  More importantly than that, Ladies

.4       and Gentlemen, Mr. Jakes' attorney agreed that

25                              G-172

Plaintiff Jakes 031378

1      Raphael Garcia died as result of 4 gunshot wounds.

2      And where were those guns shots wounds? His right

3      hand, his right hip, his right thigh, his right

4      lower back.   If Raphael Garcia is seated in the

5      driver seat of that car trying to get away,

6      somebody -- somebody shooting through the passenger

7      door window, where are the guns shot wounds going

8      to be on his body? On the right side of his body.

9      Again, evidence which has no bias.  Evidence which

10      has no motive.  Evidence which shows what he says

11      in his confession is the truth.  But there is more

12      than that, Ladies and Gentlemen.  The defendant

13      says in his confession that Arnold Day used a .380

14      caliber handgun.   The autopsy on Raphael Garcia

15      isn't even performed in time on September 17. Now

16      he gives a statement at 4:30 in the morning on

17      September 17th and low and behold, when they take

18      the bullet out of -- the bullet out of Raphael

19      Garcia, what kind of bullet is it?  It's a .380

20      caliber bullet.  What kind of shell casings are

21      found inside of Raphael Garcia's car?  What kind of

22      shell casings are found on the seat?  What about

23      the fired bullets that's found on the street.  All

24      .380 caliber.  All physical evidence which shows

25                        G-173

Plaintiff Jakes 031379

1       that he says his statement is true evidence which

2       cannot lie. Evidence which has no bias or motive.

3       The physical evidence in this case shows you what

4       he says in his statement is the truth. Only a

5       person who is involved in this participation would

6       show that kind of detail, that exactly after the

7       murder has happened, and when you think about the

8       police investigation, the police got information

9       that he might know something about the murder. The

10      police came in and talked to him. After they tried

11      to verify his story, they went out and they checked

12      it out and it didn't match. Then they went out and

13      talked with Gus Robinson and Gus Robinson blew the

14      whistle on this defendant and this defendant was

15      confronted with Gus Robinson, with the statement.

16      "You were out there. You asked him to be a look

17      out in on this." That's when he confessed, and I

18      ask you to use your common sense, Ladies and

19      Gentlemen. He's confronted by Robinson who saw him

20      out there in on the plan and he then tells the

21      truth. The police officers, then realizing that he

22      is now confessing to a murder, attempted armed

23      robbery, contacts a youth officer and they have no

.4      contact with him, physically. The youth officer

25                              G-174

Plaintiff Jakes 031380

1       comes, and the youth officer has gotten on the

2       witness stand and tells you how he spoke with him

3       about his treatment.

4           And when you go back and you begin your

5       deliberations ask yourself if anybody has a reason

6       not to tell the truth. Do the police want to let

7       the real killer of Rapheal Garcia continue to roam

8       the streets of the City of Chicago. Have you heard

9       about any bias or motive, anything that they have

10      against Anthony Jakes that would make everyone of

11      them come out on this witness stand and lie. Have

12      you heard anything, from any evidence in this case

13      that Assistant State's Attorney Brian Grossmen

14      would get on this witness stand and lie and put an

15      innocent man in jail.

16          Ladies and Gentlemen, if the physical

17      evidence in this case shows you what's in this

18      confession is true, the law in the State of

19      Illinois is that he's responsible not only for his

20      actions, but for Arnold Days' actions. He is part

21      and partial of this plan and this plan resulted in

22      Raphael Garcia being shot to death in cold-blood,

23      and I'm asking you now to make him face his

4       responsibility for what he did. You can do that by

25                          G-175

Plaintiff Jakes 031381

1          finding him guilty of attempted armed robbery and

2          first degree murder because that's what the

3          evidence in this case has shown and that's what the

4          law is in the State of illinois, and I ask that

5          after you've heard the rest of the arguments, you

6          go back and you find him guilty of those offenses.

7          Thank you.

8               MR. KATZ:

9               May it please the Court, Ladies and

10         Gentlemen of the Jury, you have a right to remain

11         silent. You have a right to an attorney. You have

12         a right to remain silent and anything you say could

13         and will be used against you in a court of law.

14         You have Gus Robinson saying and pointing. You

15         have Arnold Day's confession to shooting Raphael

16         Garcia, to looking at him in the submarine shop,

17         the checking out of his jewelry, the checking out

18         of his nut roll, the showing and talking about the

19         shooting him with a .380 and shooting him visually

20         on the street. You have Anthony Jakes' testimony

21         and physical evidence that he was beaten by the

22         police, by Detective Kill and given a confession.

23         I told you a few days ago that there is a lot of

24         dichotomy in this case and indeed, I think you have

25                        G-176

Plaintiff Jakes 031382

1          seen there is a lot of dichotomy in this case.

2                 You heard the State talk about certain

3          propositions of law. I will tell you a little bit

4          about the proposition of law which I believe the

5          judge is going to instruct you. The other day,

6          when you were voir dired by the judge, he asked

7          that you would hold the State to its burden beyond

8          a reasonable doubt that the evidence would have to

9          convince you beyond a reasonable doubt, that

10         Anthony Jakes either committed attempt robbery and

11         murder or participated in attempt robbery or murder

12         beyond a reasonable doubt. Well, you heard

13         evidence that money was found on Mr. Garcia. That

14         should at least put some doubt in your mind as to

15         whether Anthony Jakes is guilty of attempted

16         murder, I'm sorry, attempted robbery and murder

17         beyond a reasonable doubt. Reasonable doubt,

18         Ladies and Gentlemen, is not defined. Whatever you

19         consider to be reasonable --

20             MR. GOODFRIEND: Objection.

21             THE COURT: Don't define reasonable doubt.

22         Sustained.

23             MR. KATZ:

24                 It is not defined. Again, the burden

25                           G-177

1       stays with the State throughout the proceedings

2       until you are convinced beyond a reasonable doubt.

3       If you think there is holes in their case, which I

4       expect you will he speaking about in a few moments,

5       you must find Anthony Jakes not guilty of attempted

6       murder -- I'm sorry, attempted robbery and murder.

7       No one can go behind your verdict. What you decide

8       is what it is.

9            Now, Mr. Dillon talked about the evidence

10      and he talked about the instructions. I would like

11      to talk a little bit about each of those matters

12      too. I will point out what I think are some of the

13      doubts.   You heard a number of witnesses.  You

14      heard Detective Kill testify that he picked up or

15      -- strike that.   That Anthony Jakes was at the

16      police station at 3900 South California and he was

17      a witness.  The reason they wanted him there was

18      because he's a young man, 15 years old and he knows

19      people, specifically nicknames which is how people

20      go on in the area of 51st and Racine.  And they

21      figured that he would have information or at least

22      maybe lead them to some information that could help

23      them and assist them in the investigation of this

4       homicide. Kill tells you that he first sees him

25                              G-178

Plaintiff Jakes 031384

1   around 4:30 and he talks to him. He's not

2   arrested. He's not under arrest. He's a witness.

3   Then, Kill goes out and looks for certain people.

4   He spent a little bit of time and you heard the

5   story that Detective Kill told you that Anthony

6   Jakes testified to. On the night of September 15,

7   1991, there was an altercation between some Mexican

8   guys and a window was broken. Do you remember when

9   Detective Kill told you that he went out there and

10  he checked around for at least 20 minutes talkin to

11  people in the back, lookin around. Well, he said

12  he didn't see no broken window. He never

'3  testified as to that. It's pretty good police

14  work. He's been a detective for many years. If

15  there wasn't a broken window there that he would

16  have noticed, I'm sure he would have pointed that

17  out to you at some point. Again, something I

18  consider a doubt, something you should consider a

19  doubt. The Judge told you earlier that you are not

20  to judge the credibility by people's demeanor nor

21  from the witness stand. Mr. Dillon pointed out

22  certain facts and that is that physical evidence

23  don't lie.

24          Well, I submit to you, Ladies and

25                      G-179

1    Gentlemen you're going to be allowed to take back

2    physical evidence showing certain injuries that

3    Anthony Jakes testified occurred to him. Now these

4    are polaroid photographs. You know you can look at

5    them and judge for yourself whether or not he's

6    telling the truth or not. But again, this really

7    physical evidence. This does not lie. You heard

8    Dr. Lujan, the intake physical from the juvenile

9    detention center. Dr. Lujan examined numerous

10   people. He said 12 to 20 per day. He told you he

11   couldn't remember Anthony Jakes. He said he just

12   remembered what was on his on -- his screening

13   card. He did note that there was injuries there.

14   He claimed that they were made a week ago. He said

15   they were superficial or superficial. He said

16   there were no serious injuries, but you remember

17   when I asked him, I said, "could it have been 4

18   days," and he said, "yes," except on the 16th,

19   Anthony Jakes was at 3900 South California.

20   September 20th he's examined. That's 4 days. It

21   should be at least some corroboration that Anthony

22   Jakes was telling the truth about what happened to

23   him in the police station.

     Now, if you think about Gus Robinson's

4

25                        G-180

Plaintiff Jakes 031386

1      statement, will you stand point with me, and for

2      the first time, that I have heard the case that he

3      goes and looks in the window at the Mexican dude in

4      the Queen's Submarine Shop, that's the first time

5      he even told you that he told the State's Attorney

6      that "yes," when he read his statement, which you

7      will see, it wasn't in there. Well, you know, if

8      you lie once maybe you're going to lie about

9      something.

10      I think in this particular case, Mr

11      Robinson has it a little bit mixed up. Remember

12      what he said? First of all he admitted to being a

13      felon. He admitted to having convictions and he

14      admitted that he had been at the police station for

15      a long period of time. He admitted that he is

16      handcuffed although Detective Kill said he had the

17      run of the third floor much like Anthony Jakes did.

18      Well, you can't have it every which way. It's one

19      way or the other. Certainly I don't think Gus

20      Robinson, Smack is the most credible person that

21      testified before you. He has his kid out from 6:00

22      o'clock in the evening to midnight at the park,

23      Sherman Park playing on the swings. If you recall

24      my cross examination of him, I don't think we can

25                        G-181

Plaintiff Jakes 031387

1        put a lot of credence in Gus Robinson.  He was

2        promised by the State for his testimony that they

3        would not recommend a sentence on the contempt

4        charge.  Think about the statement itself.  "Will

5        you help me look out for me during a robbery?"

6        Well, gee, let me check it out, let me look in this

7        window, let me look in this window here in the

8        Queen's Submarine Shop, let me see if I want to rob

9        this guy.  Well, why wouldn't he, if he's going to

10       go ahead and bother and look in there.  The guy had

11       jewelry and a bunch of money.  Why would he had to

12       go and look and decided first.  He's was down there

13       for a reason.  He was down there because he was a

14       witness much like Anthony Jakes.  Another question

15       enters my mind and that is, why would Anthony Jakes

16       want anyone to help him look out.  I mean, look at

17       this corner.  You got Racine Avenue going this way

18       and this 51st Street is a busy street.  Anybody

19       committing an armed robbery, they can look down

20       51st street themselves, they don't need anybody to

21       help them.  The statement just does not make since,

22       Ladies and Gentlemen, but we talked about

23       dichotomy.  You got the statement of Arnold Day

24       which you will have to you.  It is a statement.

25                        G-182

Plaintiff Jakes 031388

1    You heard testimony from him that it was

2    involuntary coerced from him, but also no physical

3    evidence to corroborate that.    He says that he

4    signed it.

5    it was published to you by Ms. Bormann.  I want you

6    to take a look at it, Gus Robinson's statement as

7    well as Anthony Jakes' statement when you're

8    deciding this case and see if it all fits together,

9    see if it's proved to you beyond a reasonable doubt

10    that a 15 year old committed attempted robbery with

11    a 20 year old Arnold Day on september 15th 1991.

12    Think about Arnold Day's statement, Ladies and

13    Gentlemen.   State is going -- Judge is going to

14    read you some instructions both on attempt robbery

15    which includes attempt armed robbery, first degree

16    murder, and if I might, I would like to just read

17    them for a second to sustain the charges of

18    attempted robbery.   The State must prove the

19    following propositions; that the defendant or one

20    for whose conduct he's legally responsible for acts

21    constituted a substantial step towards the

22    commission of the offense, armed robbery.  Second,

23    that the defendant or one for whose conduct he's

24    legally responsible, did so with intent to commit

25                        G-183

1 the offense of armed robbery. That's partial

2 reading, and then to sustain the charge of first

3 degree murder, the State must prove the following

4 propositions; first that defendant or one for whose

5 conduct he's legally responsible, performed the

6 acts which caused the defendant, Raphael Garcia

7 harm. Second, that when the defendant or one for

8 whose conduct he's legally responsible did so, he

9 intended to kill or do great bodily harm to Raphael

10 Garcia or he knew his actions would cause death to

11 Raphael Garcia or he knew that his actions created

12 a strong probability of death or great bodily harm

13 to Raphael Garcia or he was to commit the offense

14 of armed robbery.

15  Now, Arnold Day's statement does not mix

16 Anthony Jakes. That's the reason why we wanted you

17 to hear about it. Arnold Day says he did this.

18 Arnold Day went in. Arnold Day looks at the

19 jewelry. Arnold saw the Mexican dude. Arnold Day

20 did this. Arnold shot the man. Think about this,

21 Ladies and Gentlemen. Anthony Jakes was arrested

22 for this crime in September of 1991. The statement

23 of Arnold Day is taken in February of '92. The

24 State asked on cross examination if he knew the

25      G-184

1      police were looking for him. I don't think it

2      would be -- he said that he did and the knew it for

3      the whole period of time. If he's arrested, if

4      he's arrested and he knows someone was arrested,

5      wouldn't he want to pin it on him too. I mean, if

6      he's going to take the weight, wouldn't he want to

7      also tell about it. I ask you to use your common

8      sense, much like the State did make sense. Arnold

9      Day confessed. Arnold Day's statement makes sense.

10     It matches together. Anthony Jakes does not make

11     sense, Ladies and Gentlemen. I think that is a

12     doubt that you all must consider.

13         Remember Mr. Dillon indicated, physical

14     evidence doesn't lie. Well, there is a photograph

15     showing the passenger window of Mr. Garcia's car

16     shuddered, and that makes since. Physical evidence

17     does not lie. I mean the window was shattered.

18     There is no testimony that I recall saying that the

19     man went in the passenger door, but one thing you

20     do remember, is that the police officer on the

21     stand testified that the car was in drive --

22         MR. DILLON: Objection.

23         THE COURT: Jury has heard the testimony.

24     They will decide. Overruled.

25                 G-185

1     MR. KATZ;

2          He took it out of gear and he shut the

3     door because Mr. Garcia was on the ground, Ladies

4     and Gentlemen, he got -- he was in the -- he was in

5     the driver's seat.  It was clear when he was shot,

6     he was shot through the back window.  The physical

7     evidence is not lying, but it does not corroborate

8     Anthony Jakes' statement.  You remember again when

9     the police testified, the Detectives testified why

10    they wanted Anthony Jakes there.  He was a young

11    kid who knows people in the neighborhood by their

12    nickname.  He knew Arnold Day.  Everyone in the

13    neighborhood knew Arnold Day.   You heard why

14    everyone in the neighborhood knows Arnold Day and

15    if you know Arnold, you know what kind of weapon

16    Arnold Day carries.  He says he's a drug dealer.

17    He's selling drugs.  He's an animal.  He has a

18    .380.  If you live in the neighborhood, you know

19    that too, and that's why the police grabbed Anthony

20    Jakes and brought him down there, and that's why he

21    was there.  That's why you have the confession that

22    Anthony Jakes allegedly made, and Ladies and

23    Gentlemen that physical evidence, that physical

24    evidence which the State is telling you is being

25                        G-186

Plaintiff Jakes 031392

1    corroborated, is not corroborated. I think -- use

2    your common sense. The State is going to be able

3    to come back. They get to have the last word and

4    all this, they are going to tell you, "I believe

5    that Arnold Day is a gang member and Anthony Jakes

6    is a gang member and when a gang boss tells a gang

7    person to go do something, they better do it."

8    Well, use your common sense on that too. There is

9    something that was testified to and that was Arnold

10    Day's testimony that in September of 91, he wasn't

11    a member of a gang.

12        Ladies and Gentlemen, I began this case a

13    few days ago by saying there is dichotomy and all

14    the evidence and all the things that the State is

15    going to try to present to you, and again, I

16    believe -- I don't know if there -- I believe that

17    we have shown that Arnold Day is the bad guy in

18    this case. I believe we have shown that Anthony

19    Jakes had the confession coerced out of him.

20        I would like to thank you all for your

21    time. I know you all have your busy lives and

22    schedules to attend to. I would like to thank you

23    on behalf of Anthony Jakes. I would also like to

24    ask that each of you take a look at all the

25                  G-187

Plaintiff Jakes 031393

1       evidence, consider it, hash it out between. You

2       decide.  The State has the power.  If they have

3       not, which I believe they have not, please find

4       Anthony Jakes not guilty.  Thank you.

5           THE COURT:  Is the State going to respond?

6           MR. GOODFRIEND:

7               Yes.  Ladies and Gentlemen, before I get

8       started, there is a thanks that we owe to somebody

9       out there who we would never know.  Who is it?  And

10      in our society, in the big city, there is a lot of

11      people who are reluctant to come forward and say

12      that somebody committed a crime or they witnessed a

13      crime, specifically when it's someone from your own

14      neighborhood, but some woman called the police

15      station on the afternoon of September 16 and talked

16      to an Officer Pat and gave Officer Pat the name of

17      Anthony  Jakes.     That's  what  started  this

18      investigation  in  the  right  direction,  and  that

19      woman at least had the courage to make that phone

20      call.

21              Now, in terms of evaluating the evidence

22      in this case, one of the things that popped out on

23      the witness stand are words and statements, and

24      it's so important when you actually see it.  It's

25                          G-188

1    not t.v. but there is those little things that come

2    out from certain witnesses and it's amazing what

3    comes out of a defendant's mouth. We would hear

4    him today say how Detective Kill somehow coerced

5    this confession, and the police have a hard job,

6    not only on the streets, but they have to come into

7    court and face these allegations that everything

8    that's done in the police station is wrong too, but

9    he said that Detective Kill fed him the word like

10   Mexican dude. Well, it's amazing what pops out of

11   his mouth today when he was asked "well, who took

12   the pictures of you? Who took these pictures of

13   the alledged body?" What pops out of his mouth?

14   Mexican dude. I mean did Detective Kill feed those

15   words today too? Just amazing what pops out on the

16   stand sometimes. What's amazing also is our

17   society, that you can go up to the Sears Tower and

18   view the City and you see the cars and people going

19   about their lives, going to work. You can go top

20   of a mountain and you see beautiful things, cars

21   going down the highways, but what's unfortunate is

22   the violence that makes our society far known in

23   safety, where there are vultures out there

4    operating on the weak, operating on an unknown

25                              G-189

Plaintiff Jakes 031395

1      prey, on the hardworking citizen. So whether it be

2      somebody who stops at a rest stop for a nap,

3      whether they be a visitor to the city or to the

4      county --

5      MR. KATZ; I object to the line of questions.

6      It's not relevant.

7      THE COURT: Arguments you mean. Counsel, made

8      comment on crime, so you may proceed. Overruled.

9      MR. GOODFRIEND:

10      Whether it be a working man who

11      stops at a late night restaurant to grab a bite to

12      eat. There were vultures out there that night.

13      There were 3 vultures out there that night. Arnold

14      Day, a person by the name of Darren and the

15      defendant, Anthony Jakes. Those vultures

16      operated on Mr. Garcia. They attempted to rob him

17      and they left him to die in the middle of the

18      street with 4 guns shot wounds. For his actions

19      and for him participating, the defendant is guilty

20      of both offense, attempted armed robbery as well as

21      first degree murder.

22      In terms of evaluating the testimony, you

23      either believe they beat him or you don't believe

24      it, but the police, do they want the wrong man

25      G-190

Plaintiff Jakes 031396

1       charged?  You see what happens when the vultures

2       get caught?  They get caught.  What happened was --

3       what they tried to do is get out of it.

4           MR. KATZ:  Objection.

5           THE COURT:  Overruled.

6           MR. GOODFRIEND:

7               The vulture got caught and when he

8       realized he got caught,  he was confronted by

9       Detective Kill, and Detective Kill told him, "you

10      know, we talked to Little A, another woman and we

11      talked to Gus Robinson and your story doesn't make

12      sense.  Gus says you were out there asking him to

13      help you out.  So what did he do?  What did the

14      defendant do?  He was confronted.  He was trapped

15      and at that point and time that he said I did it,

16      he did it, and hears how it went down.  Now it's 2

17      years later.  You see, vultures don't like to be

18      held responsible because that means they are in

19      trouble.  This vulture didn't want to be held on --

20          MR. KATZ:  Objection to referring to my client

21      as a vulture.

22          THE COURT: Certainly the jury realizes  your

23      client is not actually a vulture.  It' a figure of

24      speech.  Counsel may do that by way of analogy.

25                      G-191

Plaintiff Jakes 031397

1       Overruled.

2          MR. GOODFRIEND:

3             This defendant realizes now that he's

4       made several mistakes.  He made the mistake of

5       telling the Detective Kill and Detective Boudreau a

6       lie because they caught him in the lie and they --

7       when he was caught in the lie, he made a second

8       mistake by admitting to them that he was involved.

9             Now how is he going to get out of this?

10      Two years later, he's on the stand "you know, I got

11      beat.    They beat me.    They fed me that

12      information," that's so I can get out of it if I

13      can convince that jury that they coerce me and they

14      fed me the words.  It's amazing want people do to

15      try and get out of that responsibility, people like

16      the defendant, Anthony Jakes or the defendant

17      Arnold Day; what they would say on the stand to try

18      and escape their responsibilities.  No remorse, no

19      feelings of responsibility, no guilt.

20            The right to testify is not a license to

21      lie and the defendant, he has memory problems.  You

22      saw on the stand today.  What he's trying to tell

23      you is that Detective Kill fed him this story and

24                          G-192

Plaintiff Jakes 031398

1     he remembered enough of it, all of it to put that

2     in that written statement and tell the State's

3     Attorney without Detective Kill even being there,

4     but you see court reporters are present in court.

5     Court reporters was present also in December when

6     he testified. He's a street smart person. He's

7     been around before and he's had contact with the

8     police. He's been mirandized, given his rights at

9     least 3 times, but he tries to come with I'm 15,

10     I'm scared of these guys, they overwhelm me, but

11     remember when I asked him "well how many times have

12     you had contact with the police?" He didn't really

13     know, but you see the court reporters remember.

14     They write this down. He was asked this question

15     back in December. "Would it be fair to say that

16     you had contact with the Chicago Police officers

17     prior to this day approximately 13 times?" Answer,

18     "yes." He is know by in the hood. Then the

19     pictures, the pictures. Well, we don't know who

20     took the -- we didn't know when they were taken.

21     MR. KATZ: Objection.

22     THE COURT: Overruled.

23     MR. GOODFRIEND:

24     In one he's got white, on the

25     G-193

Plaintiff Jakes 031399

```
 1          bottom, in another, he's got blue jeans.  There is

 2          different back grounds.  He didn't see his back or

 3          how would he know what his back looks like, I mean

 4          we didn't even see the injury, that's why Dr Lujan

 5          was called because he's the doctor, he's there,

 6          he's at the juvenile home, that's his job to treat

 7          the juvenile offenders when they come into the audy

 8          home.  Detective Kill wasn't there.  He could have

 9          told Dr. Lujan, "hey, the police beat me, they beat

10          me, they arrested me."  He didn't change.

11              MR. KATZ:  Objection.

12              THE COURT:  Please don't characterize the

13          evidence, merely state your grounds.  What are your

14          grounds?

15              MR. KATZ:  Objection.

16              THE COURT:  Jury has heard the evidence.

17          Overruled.

18              MR. GOODFRIEND:

19              He has that opportunity.  It's Dr Lujan,

20          and him, no police officers.  He's being examined.

21          Don't you think if the police had beat him, he

22          would have siad something to Dr. Lujan that my back

23          injuries was caused by a police beating and I got

24          that when I was arrested.   What did Dr. Lujan

25                              G-194
```

Plaintiff Jakes 031400

1        write on the -- in his report? No recent injuries,

2        allegedly was hit in the back one week ago, old

3        superficial scar on back, no signs of serious

4        injury. That is on September 20th 1991. One week

5        ago would be September 13th.

6                Additionally, no complaints were even

7        made when he entered the audy home on September

8        1991. Did he complain to anybody else, Youth

9        Officer Burke? That's youth officer assigned to

10       handle juvenile offenders, assigned to protect the

11       defendant. Youth officer Burke came into that

12       interview room by himself. "How are you? Are you

13       okay?" "Yeah." "Are you being treated fine?"

14       "Yes." "You want me to call your aunt?" "No."

15       Why? Because he didn't want his aunt to know what

16       he had done the night before.

17            MR. KATZ: Objection.

18            THE COURT: Jury will decide whether that's

19       reasonable effort to draw from the evidence. That's

20       not up to me. Overruled.

21            MR. GOODFRIEND:

22                Did he complain to the Assistant State's

23       Attorney Grossmen when the Detective Kill wasn't

24       around? No. Did he complain to Detective Caesar

25                              G-195

Plaintiff Jakes 031401

1    who was last in the interview?  No.  Did he

2    complain or file any lawsuits?  No.

3         Now his story is that he was with Walter

4    Pounder when the car with the Mexicans drove by and

5    broke the window.  They cleaned up the glass, take

6    it out to the back and then were chased by -- well

7    one day it's 3 blacks individuals, next day it's 3

8    white individuals, and he came around the corner,

9    had a discussion with somebody on the front porch

10   and his aunt slapped him on the face. Now, remember

11   Walter Pounder is a cousin on his father's side and

12   don't you think that if that had actually happened

13   --

14        MR. KATZ:  Objection.

15        THE COURT:  You may proceed.

16        MR. GOODFRIEND:

17        Don't you think that if he was actually

18   with  Walter Pounder that evening, we would have

19   heard from Walter Pounder? Do you think that he's

20   actually slapped by his aunt right at the time of

21   the murder, right after the murder, that we would

22   have heard from his aunt, that she was on the porch

23   the night of the murder, and that the defendant

24   came running up there and got in an argument and

25                      G-196

Plaintiff Jakes 031402

1       that she slapped him and sent him home.  Do you

2       think those events really happened?  We would have

3       heard from his relatives.

4              MR. KATZ:  Objection.

5              THE COURT:  I have instructed the jury.  The

6       defendant in any criminal case has no requirement

7       to prove is innocents, however, the defendant has

8       no obligation to present witnesses.  Either side in

9       any criminal case has subpoena power to compel the

10      production of the witnesses.

11             MR. GOODFRIEND:

12             In criminal cases there is always going

'3      to be unanswered questions.  Reasonable doubts are

14      standard in all cases and we have to prove

15      elements. now was there a broken window or not?

16      Who knows. Does it matter? Does it prove no one --

17      I mean, he would have brought somebody in from his

18      family to talk about that broken window.  He could

19      have brought Walter Pounder in.  I mean the

20      questions that are thrown out, why recruit Smack.

21      Well, remember in his statement he said, well he

22      didn't want to be recognized.  He wanted to be

23      fulfilled with the money from Mr. Garcia, but he

24      didn't want to be recognized.  He would had rather

25                          G-197

Plaintiff Jakes 031403

1  look out than have somebody help him and that's why

2  he recruited Smack. So, sometimes there is

3  answers.

4         Counsel statements are not supported by

5  the physical evidence. Well what about Smack?

6  What about Gus Robinson. I mean did Gus come in

7  willingly? Not exactly. He didn't show up on

8  Tuesday. We had to issue a warrant and he's here.

9  He was there to testify, but he didn't hide from

10  the police and he went to the police station back

11  in September and he told you what happened. I mean

12  you'll get to have his statement and his statement

13  basically says the same thing that Anthony Jakes

14  told the police. "I recruited Smack. Gus Robinson,

15  he made a decision and Smack made a good decision.

16  He decided not to it. Did he take a look in and

17  decided, no, I'm out of here. Smack came close,

18  but he made a decision that this defendant didn't

19  make. The defendant did make that decision. He

20  had choices that day, but you see, he was recruited

21  by an officer of the gang. Remember just today

22  Detective Boudreau asked the defendant about his

23  gang affiliation. His answer was, "yes." He says

24  he was a Black Stone. Answer you look in Arnold

25                         G-198

Plaintiff Jakes 031404

1        Day's statement. Arnold Day was an officer, still

2        is an officer and when an officer orders a fellow

3        gang member to do a, job you think he's going to

4        refuse his officer, specifically when he get

5        benefits from it.

6            I think Mr. Dillon, in his opening

7        remarks talked about the .380 caliber. The victim

8        went to the shop. There was warm food still on the

9        seat. Detective Caesar testified to that

10       yesterday. Possessions still on the victim that's

11       because they attempted it do it, but didn't

12       complete it. Did they take the substantial steps?

13       Yes. Took a lot of substantial steps.

14          Now counsel in his argument just a few

15       minutes ago talked about how Day's statement don't

16       mix with Anthony Jakes', but I want to tell you,

17       you, those statements, they go like this. They

18       talk about the same event, but remember Arnold Day

19       is a little older. It was 6 months, and can you

20       imagine the trouble one gets in when he's in his

21       gang, when he rats on a fellow gang member. He was

22       a younger guy. He didn't do the shooting. He

23       figured I could tell him, I could point the trigger

24       man out on another gang member. Arnold Day

25                G-199

Plaintiff Jakes 031405

1    thought he wasn't going to be violated. He wasn't

2    going to commit a violation by ratting on a fellow

3    gang member. He was caught, but he didn't rat on

4    anybody else, but when you take a look at the 2

5    statements and compare various parts, and I will

6    point out a few to you, I mean this is Jakes'

7    statements, "Little A came out of the submarine

8    shop and said a Mexican dude got a lot of money.

9    We are going to stick him up." Then, you see

10    Arnold Day's statement, he saw the Mexican dude

11    pull up in a station wagon. Arnold Day states that

12    the Mexican guy was flashin, which Arnold

13    explained to me he had a lot of jewelry and a nut

14    roll, which means Arnold Day explained he had a lot

15    of money, then they talked about the gun. Well

16    here's Anthony Jakes, "Little A then showed

17    Anthony the gun which was sticking out of his

18    waistband."

19    Now Arnold Day went outside of the

20    submarine shop and got the nation gun. Arnold

21    states that nation gun is a gun which belongs to

22    the gang and used for gang activity. Arnold Day

23    further explains that the gun was a .380 caliber.

24    Anthony Jakes, again "the mexican dude then came

25                 G-200

Plaintiff Jakes 031406

1        out of the Queen's Submarine Shop. Little A went up

2        to the Mexican dude, pointed his gun and Little A

3        says this is a stick up." Now Little A, Arnold Day

4        stated when the Mexican dude existed the shop, he

5        pulled out his caliber gun and told the Mexican

6        dude, 'stick up.'"

7                Ladies and gentleman, there is only one

8        verdict in this case and that is to find the

9        defendant, Anthony Jakes guilty of attempted armed

10       robbery and guilty of first degree murder.

11               THE COURT:    Members of the jury, the

12       believability of a witness that on some former

13       occasion, he made statements that was not

14       consistent with his testimony in this case,

15       ordinarily maybe considered by you only for the

16       limited purpose of deciding the weight to be given

17       to the testimony. You heard from the witnesses in

18       this courtroom.   You may consider a witnesses'

19       earlier consistent statements without limitation

20       when the statement was made under oath, at a trial,

21       or if the statement explained an event or condition

22       and the witness had personal knowledge of, and the

23       statement was written or signed by the witness or

24       the witness acknowledged, under oath that he made

25                          G-201

Plaintiff Jakes 031407

1    the statement.  It's up to you to determine what

2    weight should be given in  determining the weight

3    to be given to an earlier statement.  You should

4    consider all of the circumstances under which it

5    was made.

6         A person commits the offense of armed

7    robbery when he, while carrying on or about his

8    person or while otherwise armed with a dangerous

9    weapon, knowingly takes the property from a person

10   by the use of force or by threatening imminent use

11   of force.  Whether he, with intent to commit a

12   theft or armed robbery, which does the act or

13   constitutes a  substantial  step  towards  the

14   commission of the offense of armed robbery, the

15   offense of attempted robbery need not have been

16   committed.

17         To sustain the charges of attempted

18   robbery, the State must prove the following

19   propositions. First that the defendant or one for

20   whose conduct he's legally responsible, performed

21   and act which constituted a substantial step

22   towards the commission of the offense of armed

23   robbery and that the defendant or one for whose

24   conduct he's legally responsible, did so with

25                    G-202

Plaintiff Jakes 031408

1     intent to commit the offense of armed robbery.

2          If you find from your consideration of

3     all the evidence that each one of these

4     propositions has been proved beyond a reasonable

5     doubt, you should find the defendant guilty.

6          If you find from your considerations of

7     all the evidence that any one of these propositions

8     has not been proved beyond a reasonable doubt, then

9     you should find the defendant not guilty.

10          A person commits the offense of first

11     degree murder when he, while carrying on or about

12     his person, or while armed with dangerous weapon,

3     he intends to kill or do great bodily harm to that

14     individual or he knew that such acts would cause

15     death to that individual or he knew that such acts

16     would create a strong probability of death or great

17     bodily harm to that individual, or he is attempting

18     to commit the offense of the armed robbery.

19          To sustain the charge of first degree

20     murder, the State must prove by the following

21     propositions, first that the defendant or one for

22     whose conduct he is legally responsible for,

23     performs the acts which caused the death of Raphael

24     Garcia, and second that the defendant or one for

25                     G-203

Plaintiff Jakes 031409

1    whose conduct he's legally responsible, did so with

2    intent to kill or to do great bodily harm to

3    Raphael Garcia or he knew that his actions created

4    a strong probability of death or great bodily harm

5    to Raphael Garcia.

6         If you find from your consideration of

7    all the evidence that each one of these

8    propositions are true, you should find the

9    defendant guilty.

10        If you find from your consideration of

11   all the evidence that any one of these propositions

12   has not been proved beyond a reasonable doubt, you

13   should find the defendant not guilty.  When you

14   retired to the jury room, you will first elect one

15   of your members as your foreperson. He or she will

16   reside during your deliberations upon your verdict.

17   Your verdict must be unanimous.  Your verdict must

18   be in writing and signed by all of you including

19   your foreman.

20        Sheriff would you give the copy of the

21   instructions back with you, please.

22        Swear in the sheriffs.

23        (Sheriffs were sworn.)

24   THE COURT: Please retire and begin your

25                    G-204

Plaintiff Jakes 031410

1    deliberations.    Mr. Williams and Macula your

2    services in this case has now ended.  We have these

3    certificates of service from the Circuit Court of

4    Cook County and we appreciate your services.  You

5    will notice on the back, the clerk has put the

6    phone number here.  I'm sure you're curious as to

7    what would happen on the case, and if you call

8    Monday, they will tell you the results.  You can

9    talk to anybody you want about the case.  You don't

10    have to say a word.  If you want to go home and get

11    this out of your mind,  you're free to do so.

12    Pleasure meeting both of you.

13            (The jury was sent to deliberate.)

14        THE COURT:  Let the record reflect that it's

15    now 8:33 and the courtroom clock -- I have been

16    advised from by the sheriff that the jury reached a

17    verdict.  Defendant is present.  You are the

18    foreperson, sir?

19        FOREPERSON:  Yes.

20        THE COURT:  Have you reached a verdict in this

21    case?

22        JUROR:  Yes.

23        THE COURT:  Give the forms to the sheriff,

4    please.

25                    G-205

Plaintiff Jakes 031411

1          The verdict is in proper form signed, and

2     the verdict reads as follows:  We the jury find the

3     defendant, Anthony Jakes guilty of first degree

4     murder.  We, the jury find the defendant Anthony

5     Jakes guilty of attempt armed robbery.

6          Ladies and Gentlemen, we are going to

7     conduct what is called a jury poll.  A jury poll

8     consist of the following questions.  Were those

9     then, means at the time that you signed them and

10    are those now meaning at this time, your verdict.

11    So, the question is were those then and are those

12    now your verdicts.  Anyone who does not understand

13    that question, raise your hand.

14         Let the record reflect no hands have been

15    raised.

16         Mr. Jondell, were those then and are

17    those now your verdict?

18    MR. JONDELL:  Yes.

19    THE COURT:  Ms. Zingle, were those then and

20    are those now your verdicts?

21    MS. ZINGLE:  Yes.

22    THE COURT:  Ms. Jay, were those then and are

23    those now your verdicts?

24    MS. JAY:  Yes.

25                    G-206

Plaintiff Jakes 031412

1          THE COURT: Mr. Penfold, were these then and

2     are these now your verdicts?

3          MR. PENFOLD: Yes.

4          THE COURT: Ms. Jillaqula, were those then and

5     are those now your verdicts?

6          MS. JILLAQULA: Yes.

7          THE COURT: Mr. Quincy, were these then and

8     are those now your verdicts?

9          MR. QUINCY: Yes.

10          THE COURT: Ms. Sanota, were those then and

11     are those now your verdicts?

12          MS. SANOTA: Yes.

13          THE COURT: Mr Levy, were those then and are

14     those now your verdicts?

15          MR. LEVY: Yes.

16          THE COURT: Ms. O'Rourke, were those then and

17     are those now your verdicts?

18          MS. O'ROURKE: Yes.

19          THE COURT: Mr. Owens, were those then and are

20     those now your verdicts?

21          MR. OWENS: Yes.

22          THE COURT: Mr. Simon, were those then and are

23     those now your verdicts?

24          MR. SIMON: Yes.

25                         G-207

Plaintiff Jakes 031413

1        THE COURT:   Ladies and Gentlemen, I'm not

2        going to take any more of your time.  I want to

3        thank you for your services in this case. We have

4        certificates of service for you with a check

5        attached.  The sheriff will walk you to the parking

6        lot as a group.  It has been a pleasure meeting all

7        of you.  Good.  You have a good evening.

8            (Which were all the proceedings had that day.)

9                 *          *          *

10                         G-208

Plaintiff Jakes 031414

IN THE CIRCUIT COURT OF THE COOK JUDICIAL CIRCUIT
COOK COUNTY, ILLINOIS,

I, JAMIE MITCHELL, an Official Court

Reporter, for the Circuit Court of Cook County, Cook

Judicial Circuit of Illinois, do hereby certify that

I reported in shorthand the proceedings had on the

hearing of the above-entitled cause; that I thereafter

caused the foregoing to be transcribed into

typewriting, which I hereby certify to be a true and

accurate transcript of the proceedings had before the

HONORABLE THOMAS DURKIN, Judge of said court.

_____

JAMIE MITCHELL, CSR
Official Court Reporter
Circuit Court of Cook County
# 084-003450

Dated this _____ day
of _____ A.D. 1994.

G-

Plaintiff Jakes 031415

```
 1   STATE OF ILLINOIS   )
                         )   SS:
 2   COUNTY OF C O O K   )

 3
            IN THE CIRCUIT COURT OF THE COOK JUDICIAL CIRCUIT
 4                        COOK COUNTY, ILLINOIS

 5
     THE PEOPLE OF THE        )
 6   STATE OF ILLINOIS        )
                             )   Case No. 92-CR-5073
 7       vs.                  )
                             )   Charge:  Murder
 8   ANTHONY JAKES            )

 9

10           REPORT OF PROCEEDINGS had before

11   the HONORABLE THOMAS P. DURKIN, Judge of said court,

12   on the 27th day of October, 1993.

13

14      APPEARANCES:

15           HONORABLE JACK O'MALLEY,
                  State's Attorney of Cook County, by:
16           MR. JOHN DILLON,
                  Assistant State's Attorney,
17                appeared on behalf of the People;

18           MS. RITA A. FRY,
                  Public Defender of Cook County, by:
19           MR. FRANK MEDEA,
                  Assistant Public Defender,
20                appeared on behalf of the Defendant.

21

22   Mary M. Flagg, CSR
23   Official Court Reporter
     2650 South California Avenue
24   Chicago, Illinois  60608
```

H1

Plaintiff Jakes 031416

```
 1        THE CLERK:  Anthony Jakes.

 2        MR. DILLON:  Judge, tender the victim impact

 3   statement.

 4        MR. MEDEA:  Your Honor, approaching the bench is

 5   Anthony James represented by Frank M-e-d-e-a,

 6   assistant public defender.  Your Honor, I have filed

 7   today and tendered to the State a copy of my motion

 8   for new trial.  I don't have anything additional to

 9   add or argue.  I believe it is all the objections I

10   made during the trial, and I would ask Your Honor to

11   rule on the motion.

12        THE COURT:  All right, State, do you wish to

13   comment on the motion for new trial at all.

14        MR. DILLON:  Judge, we would rely on the arguments

15   made during the course of the trial.

16        THE COURT:  All right.  The motion for new trial

17   is heard and denied.

18        MR. MEDEA:  Judge, I understand the --  I would

19   answer ready for sentencing.  I understand the State

20   has a live witness.

21        THE COURT:  Are you ready now?

22        MR. DILLON:  Yes, Judge.  I'm ready now.

23        THE COURT:  Call your witness.  I've been tendered

24   a juvenile record and a victim impact statement.
```

H3

Plaintiff Jakes 031417

```
 1    Please raise your right hand to being sworn.
 2                     JAMES ENTRESS,
 3    a witness called on behalf of the People of the State
 4    of Illinois, in aggravation, having been first duly
 5    sworn, was examined and testified as follows:
 6        THE COURT:  Please be seated, make yourself
 7    comfortable.  Once you are comfortable state your full
 8    name.
 9        A    Name is James Entress, E-n-t-r-e-s-s.  My
10    star is 8114, 9th District.
11        THE COURT:  Proceed.
12        MR. DILLON:  Thank you.
13                     DIRECT EXAMINATION
14                     BY MR. DILLON:
15        Q    Officer Entress, where are you currently
16    assigned within the police department?
17        A    The 9th District.
18        Q    And how long have you been with the Chicago
19    Police Department?
20        A    21 years.
21        Q    Officer, I'd like to direct your attention to
22    the date of February 2 of 1990, were you working and
23    assigned within the 9th District at that time?
24        A    Yes, sir, I was.
```

                              H4

Plaintiff Jakes 031418

1    Q    Were you assigned to the 9th District

2  tactical unit?

3    A    Yes, sir.

4    Q    I'd like to direct your attention to that

5  date, February 2 of 1990 at approximately 3:50 in the

6  afternoon, did you have an occasion to be in the

7  vicinity of 5043 South Throop Street in Chicago, Cook

8  County, Illinois?

9    A    Yes, sir I was.

10   Q    Were you working by yourself or with a

11 partner on that day?

12   A    I was working with officer Glenn Lewellen,

13 L-e-w-e-l-l-e-n.  Star is 4163.

14   Q    Were you in civilian dress or in a Chicago

15 Police Department uniform?

16   A    Civilian dress.

17   Q    Were you assigned a car?

18   A    Yes.  Unmarked.

19   Q    Marked or unmarked?

20   A    Unmarked.

21   Q    At approximately 3:50 in the afternoon did

22 anything unusual occur at that location?

23   A    We were southbound on Throop.  I observed a

24 group of teenaged black youths exiting the alley

H5

Plaintiff Jakes 031419

1    westbound on to Throop Street.  Upon seeing us I

2    observed one of the boys drop a handgun on to the

3    grass.

4         Q    The person that you observed drop that

5    handgun on to the grass back on that day, do you see

6    that same person in the courtroom here today?

7         A    The gentleman at the table over there.

8         Q    Would you please identify him by something

9    he's wearing?

10        A    D.O.C. clothes.  He's Anthony Jakes.

11        MR. DILLON:  Your Honor, may the record reflect

12   the in-court identification of the defendant.

13        THE COURT:  Do you agree.

14        MR. MEDEA:  Yes, Your Honor.

15   BY MR. DILLON:

16        Q    After you made that observation of him

17   dropping this gun to the ground did you subsequently

18   place him under arrest?

19        A    Yes, I did.

20        Q    Did you subsequently recover the gun?

21        A    Yes, sir.

22        Q    Could you tell the Court what type of gun it

23   was that you recovered?

24        A    It's a homemade gun, a .32 caliber zipgun.

H6

Plaintiff Jakes 031420

1    It was metal taped with black tape and it had a firing

2    pin with a nail hammer -- a nail and a rubber band.

3         Q    At the time that you recovered that gun was

4    that gun loaded or unloaded?

5         A    It was unloaded.

6         Q    Did you subsequently recover that gun and

7    inventory it and send it to the crime lab?

8         A    Yes, sir, I did.

9         MR. DILLON:  I have no further questions.  Thank

10   you, Officer.

11        THE COURT:  Cross.

12                      CROSS EXAMINATION

13                   BY MR. MEDEA:

14        Q    Officer Entress, were you a driver or

15   passenger in that unmarked vehicle?

16        A    I was the driver.

17        Q    You were the driver.  And did you know Mr.

18   Jakes before you placed him under arrest that day?

19        A    I've stopped him before.  I've seen him

20   before.  I never arrested him before.

21        Q    You indicate you saw a number of people

22   coming out of the alley on Throop Street?

23        A    That's correct.

24        Q    And you said that you saw one of them drop

H7

1    what you called a zipgun, is that correct?

2        A    That's correct.

3        Q    And I believe you testified it was unloaded

4    at the time?

5        A    That's correct.

6        Q    And this was at four p.m. in February 2, is

7    that correct, of 1990?

8        A    It was about ten minutes to four, yes, sir.

9        Q    And it was rather dark -- getting dark at the

10   time?

11       A    No, sir.

12       Q    It was a sunny or cloudy day, if you recall?

13       A    I remember it was still daylight.  I don't

14   remember if it was cloudy.  I know it was clear.  It

15   wasn't raining.

16       Q    And you indicate that he was with a group of

17   other people, is that right?

18       A    Approximately four or five other teenaged

19   boys.

20       MR. MEDEA:  Okay.  No further questions.

21       THE COURT:  Redirect.

22       MR. DILLON:  I have nothing further.  Thank you,

23   Officer.

24       THE COURT:  Thank you very much, sir.  You're free

Plaintiff Jakes 031422

1    to go.

2                              (Witness excused.)

3        THE COURT:  Any additional witnesses for the

4    State?

5        MR. DILLON:  No further witnesses by live

6    testimony, no, Judge.

7        THE COURT:  Any witnesses for the defense.

8        MR. MEDEA:  No, Your Honor.

9        THE COURT:  All right, State.  Do you wish to make

10   an argument in aggravation?

11       MR. DILLON:  Yes, Judge.

12       MR. MEDEA:  Judge, before the State proceeds you

13   indicated the victim impact statement is in evidence.

14   I'm going to object formally for the record.

15       THE COURT:  What's the basis?

16       MR. MEDEA:  My basis is case called Mooth versus

17   Maryland (phonetically) which has been overruled and

18   I'm not sure that the statute under which the State is

19   allowed to put in this victim impact statement is

20   Constitutional and based upon that that's my

21   objection.

22       THE COURT:  Okay.  Well you can see that the law

23   is against you and you're correct in that.

24       MR. MEDEA:  Well you never know, Judge.

                              H9

Plaintiff Jakes 031423

1    THE COURT:  I agree with you, you never know.  In
2    fact, I suppose if --  This is probably the least
3    accusatory I suppose would be the statement.  It's
4    amazing with somebody having suffered the loss would
5    be as benign about it as the family is.  I would say
6    that it's hardly strident by any means.  Your
7    objection is overruled.  It is received.  It will be
8    made part of the court file.
9    MR. MEDEA:  Thank you.
10   THE COURT:  Argument.
11   MR. DILLON:  Thank you, Judge.  Judge, by way of
12   aggravation I'd ask the Court to consider the
13   testimony of Officer Entress as to the recovery of the
14   gun by this defendant.
15        I'd also ask the Court to take into
16   consideration his previous conviction for criminal
17   sexual assault in 1992 for which he was sentenced to
18   probation as a juvenile.
19        I'd also ask the Court to take into
20   consideration as part of aggravation the circumstances
21   of the case itself.  This crime was one of
22   opportunity.  I believe the defendant along with
23   Arnold Day basically, Your Honor, scoped out this
24   victim, watched him as he attempted to order food,

H10

Plaintiff Jakes 031424

 1   displayed money and observed jewelry.  And I believe,

 2   Your Honor, that but for the defendant's action this

 3   crime may not have taken place.

 4        I'd ask the Court to take into consideration

 5   that although the defendant is only seventeen years of

 6   age, his young life has resulted in serious personal

 7   harm.  Not only to Mr. Garcia, as he was shot four

 8   times during the course of this attempted armed

 9   robbery which took his life, but also his actions in

10   the criminal sexual assault.

11        I believe, Your Honor, that the law dictates

12   a sentence of imprisonment is mandatory.  I believe

13   Your Honor that given this defendant's background and

14   the facts of this case they speak for more than just

15   the minimum.  And I would ask the Court to sentence

16   the defendant to the appropriate period of time in the

17   penitentiary commensurate with this offense and his

18   prior criminal background.  Thank you.

19        MR. MEDEA:  Your Honor, I point out certain

20   information contained in the presentence report.  One

21   is the defendant's age at the time of this.  He was 15

22   years old.  He was never proven to be anything more

23   than a lookout.  In fact if Your Honor recalls --

24        THE COURT:  Oh, no question about it.

                              H11

Plaintiff Jakes 031425

1    MR. MEDEA:  If Your Honor recalls the testimony of

2    Gus Robinson during the trial when Mr. Jakes

3    supposedly talked to him about being a lookout also

4    Robinson walks over and looks in the store and says

5    no.  Robinson was much older than Anthony Jakes at the

6    time, as was the alleged or reputed shooter Arnold

7    Day.

8         I think it's Arnold Day's conduct which led

9    Anthony Jakes to do anything in this particular case.

10   It was a youthful mistake.

11        Your Honor will also notice that Mr. Jakes

12   graduated grammar school.  This event occurred in

13   between his eighth grade and freshman year at Tilden

14   high school.  He had had a job part time job working

15   at a grocery store.  This was an on and off type job.

16   He basically enjoyed sports as a --  in his leisure

17   time and lived with his aunt, who I think you --  Miss

18   Jones, that you met during the events of this trial.

19        Mr. Jakes' mother is in a halfway house in

20   Milwaukee.  He is under the care of his aunt, who has

21   other children as you heard.

22        He's a young man, Judge.  He's charged and

23   convicted of a very serious crime.  The law says that

24   you can sentence him between twenty and 60 years for

H12

Plaintiff Jakes 031426

1    this. We ask you to consider the other matters
2    contained in the presentence report and ask Your Honor
3    to consider something closer to the minimum than the
4    maximum. Thank you.

5        THE COURT: Mr. Jakes, do you want to say anything
6    before sentence is imposed?

7        THE DEFENDANT: No, sir.

8        THE COURT: Well he was a lookout. The old poem
9    says for want of a nail a shoe is lost. For want of a
10   shoe a horse was lost, et cetera, and it's quite
11   probable if it weren't for the lookout this might not
12   have happened.

13       There is a strong, in this Court's opinion,
14   very strong mandate that there be an element of
15   general deterrence that's involved as well as specific
16   deterrence. If I give this defendant the maximum
17   he'll still be out of jail before he reaches the age I
18   am today. It is a compelling thought, but in any
19   event he will be out before his 50 birthday. Mr.
20   Garcia will never been out. He's going to be -- his
21   body will be buried anyway for the rest of his earthly
22   existence, and the defendant certainly contributed in
23   large measure to that, so there's no way that any
24   sentence can bring back any type of parity between the

H13

Plaintiff Jakes 031427

1   two.

2        It's a shame because Mr. Garcia was a

3   hard-working man who was at the end of his day trying

4   to stop and get some food on the way home, trying to

5   better himself and he happened to come up against some

6   individuals who had exactly the opposite point of

7   view, who were vultures I think is the word that the

8   State used or jackals probably is a very appropriate

9   word, as well, waiting to set upon him as he happened

10   by.

11        This defendant in spite of his age has prior

12   conviction in juvenile court for a very serious

13   offense. And according to the testimony today he's

14   been involved with weapons before.

15        It's not at all unusual that he comes from a

16   dysfunctional family and I take that into

17   consideration. It's sad to say that all too many

18   young men that we see in cases like this don't care

19   anything about themselves, so it's no surprise that

20   they care little about anyone else, but our society

21   demands that something be done.

22        The Garcias point out in their comments in

23   fact they're afraid to go outside. Probably every

24   person in the city of Chicago is afraid to go out.

H14

Plaintiff Jakes 031428

1   We're all afraid that we're going to be set upon.

2   We're all afraid of this kind of random violence can

3   affect us at any point, and so in addition to the

4   individual deterrence the Court feels that that strong

5   message for general deterrence is necessary.

6           Forty years.  It's the judgment of the Court

7   the defendant shall be sentenced to 40 years in the

8   Illinois Department of Corrections.  I'm entering this

9   judgment on Count 3.  Ordinarily pursuant to People

10  versus Black I would enter the judgment on the

11  specific intent.  As a result of People versus

12  Cardonas, which is itself on appeal in the Illinois

13  Supreme Court, the Court is going to enter judgment on

14  Count 3, the felony murder count and there will be a

15  judgment.  No sentence on Count 1 and 2.

16          On Count 4, the attempt armed robbery,

17  defendant will be sentenced to a concurrent period of

18  15 years in the Illinois Department of Corrections.

19          The murder case will be followed by three

20  years mandatory supervised release.  The attempt armed

21  robbery, 15 years.

22          You have the right, Mr. Jakes, to appeal the

23  judgment of this court and I have no doubt that you

24  want to do that, within the next 30 days.  Counsel

H15

Plaintiff Jakes 031429

1    will file a written notice of appeal for you which has

2    to be done.  If you have no funds to hire an attorney

3    or to pay for transcripts an attorney will be provided

4    at no cost to you.  I assume that you don't have any

5    funds, is that correct?

6        THE DEFENDANT:  No.

7        THE COURT:  Raise your right hand to be sworn.

8                        (Defendant sworn.)

9        THE COURT:  State your name.

10       THE DEFENDANT:  Anthony Jakes?

11       THE COURT:  Do you have any money to hire your own

12   lawyer?

13       THE DEFENDANT:  No, sir.

14       THE COURT:  All right.  Court finds the defendant

15   is indigent.  And that note will be made on the file.

16   The defendant is entitled to some time credit.

17       MR. MEDEA:  Seven hundred and 71 days.

18       THE COURT:  Do you agree, State?

19       MR. DILLON:  Yes, Judge.

20       THE COURT:  Defendant is remanded to the custody

21   of the sheriff.  Other case motion State nolle prosse?

22       MR. DILLON:  Yes, sir.

23       MR. MEDEA:  That's the '91 indictment, correct?

24       THE COURT:  Correct.  Defendant demands trial?

H16

Plaintiff Jakes 031430

1     MR. MEDEA:   We demand trial.  Thank you, Your

2   Honor.

3     THE COURT:  Good luck, Mr. Jakes.

4                     (Which were all the proceedings had

5                      in the above entitled cause.)

6                        *  *  *  *  *

H17

Plaintiff Jakes 031431

```
 1   STATE OF ILLINOIS )
                       )   SS.
 2   COUNTY OF C O O K )

 3

 4

 5          I, Mary M. Flagg, C.S.R., an Official Court

 6   Reporter for the Circuit Court of Cook County, County

 7   Department, Criminal Division, do hereby certify that

 8   I reported in shorthand the proceedings had at the

 9   hearing of the above-entitled cause; that I thereafter

10   caused the foregoing to be transcribed into

11   typewriting, which I hereby certify to be a true and

12   accurate transcript of the proceedings had before the

13   Honorable THOMAS P. DURKIN, Judge of said court.

14

15

16

17

18   _____
              Official Court Reporter
19

20

21

22

23   Dated this 1st day

24   of February, 1994.
```

H18

Plaintiff Jakes 031432

# Exhibit 15



OFFICE OF THE MEDICAL EXAMINER
COUNTY OF COOK, ILLINOIS

## REPORT OF POSTMORTEM EXAMINATION

NAME  Rafael I. Garcia                    CASE NO.    296-September-1991

AGE   48   RACE White  SEX Male      DATE OF DEATH September 16, 1991

ADDRESS OF DECEDENT 5109 S. Aberdeen St DATE EXAMINED   September 17, 1991

CITY & STATE Chicago, Illinois         EXAMINED BY Yuksel Konakci, M.D.


Length 70 1/2 inches; weight 202 pounds.  Hair black; irides brown.

EXTERNAL EXAMINATION:

The body is that of a well developed, well nourished, middle aged, white male, which appears to be the stated age of 48.  It is received unclothed in the Forensic Institute and cold to the touch.  There is well formed rigor mortis, on the face, on the upper and lower extremities.  There is livor mortis, on the posterior aspects of the body and extremities.  The length is 70 1/2 inches and the weight is 202 pounds.

The hair is black.  The irides are brown, the sclerae are white, the corneae are clear, and the pupils are dilated.  The teeth are natural.  The fingernails are short and clean.  The external genitalia are normal male and not circumcised.  The face, upper extremities and upper chest are markedly edematous.  Both eyelids are markedly edematous.

BULLET #1 ENTRANCE WOUND:

1.  On the dorsal and medial aspect of the right hand, 35 1/4 inches below the top of the head.  It is round and measures 0.5 by 0.5 cm., and it is surrounded, by a margin of abrasion, measuring 0.1 cm. in width. Adjacent to its medial aspect, there is a recent, sutured, vertical incision, measuring 4.5 cm. in length.

BULLET #1 EXIT WOUND:

1.  On the base and inner aspect of the thumb of the right hand, 36 inches below the top of the head.  It is irregular and elongated and measures 1.0 by 0.7 cm.

GARCIA, RAFAEL I.                                    Page 2
296-September-1991

COURSE OF THE BULLET:

    1.   It traveled inside the right hand, and through and
        through.

BULLET #2 ENTRANCE WOUND:

    1.   On the anterior, lower aspect of the right thigh, 44
        1/2 inches below the top of the head.  It is round and
        measures 0.8 by 0.8 cm., and it is surrounded, with a
        margin of abrasion, measuring 0.1 cm. in width.  Above
        the entrance wound, there are three small, round lace-
        rations, measuring 0.2-0.3 cm. in diameter.  Below and
        lateral to the entrance wound, there is a small, round
        laceration, measuring 0.2 cm. in diameter.  Above them,
        on the anterior aspect of the right thigh, there is a
        small, round ecchymosis, measuring 0.5 by 0.6 cm., and
        two smaller, round ecchymoses, measuring 0.2 cm. each.
        On the upper anterior aspect of the right knee, there
        is a small hole, measuring 0.6 cm., in association,
        with depression of this area. (Apparent fistula
        opening.)

BULLET #2 EXIT WOUND:

    1.   On the lower, inner aspect of the right thigh, 46 1/2
        inches below the top of the head, there are two lacera-
        tions, which are 0.5 cm. apart and measuring 1.5 by
        1.5 cm., and 1.5 by 0.4 cm.

COURSE OF THE BULLET:

    1.   It traveled inside the right thigh, from anterior to
        the inner aspect, fracturing the right femur, and
        through and through.  The bullet and fragments of
        bullet or bone exited through the two lacerations
        described.

BULLET #3 ENTRANCE WOUND:

    1.   On the right lower back, at the lateral aspect, 28 1/2
        inches below the top of the head, and 3 1/2 inches
        right of the midline.  It is round and measures 0.6 by
        0.5 cm., and it is surrounded with a margin of abra-
        sion, measuring 0.1 cm. in width.

BULLET #3 EXIT WOUND:

    1.   On the left anterior, mid abdomen, 29 1/2 inches below
        the top of the head and 1/2 inch left of the midline.

GARCIA, RAFAEL I.                                    Page 3
296-September-1991

BULLET #3 EXIT WOUND:    (Continued)

    It is oval and rather irregular and measures 1.2 by
0.7 cm.  It is surrounded with an abrasion, which is
wider in the lower aspect, measuring 0.7 cm. in width,
and measuring 0.2-0.1 cm. in width in the other
aspects.

COURSE OF THE BULLET:

   1.   It entered the abdomen from the right, posterior
abdominal wall.  It traveled from right to left and
posterior anterior.  The right common iliac artery was
lacerated and exhibits surgical repair.  There are
marked hemorrhages around the right kidney.  The
mesentery and small intestine were lacerated and
exhibit surgical repair sites.  The bullet followed a
through and through course.

BULLET #4 ENTRANCE WOUND:

   1.   On the posterolateral aspect of the right hip, 31 1/2
inches below the top of the head, and 5 inches right of
the midline.  It is round and measures 1.2 by 0.8 cm.,
and it is surrounded with a margin of abrasion,
measuring 0.1 cm. in width.  Lateral to the entrance
wound, there is a large area of ecchymosis.

COURSE OF THE BULLET:

   1.   It traveled inside the right hip and thigh and poste-
rior anterior.  It lodged in the anterior, upper aspect
of the right thigh, in the subcutaneous soft tissue.
This area exhibits marked ecchymosis.

   2.   The bullet is medium size, yellow and full jacketed,
and it is not disfigured.  There are marked hemorrhages
in the course of the bullet.

OTHER EXTERNAL MARKS:

   I.   ECCHYMOSIS:

      1.   On the lateral aspect of the left thigh, there is
an ecchymotic area.

CITY_JAKES 00793

GARCIA, RAFAEL I.                                          Page 4
296-September-1991

OTHER EXTERNAL MARKS:    (Continued)

    II.   ABRASIONS:

        1.   On the anterior aspect of the left knee, there is an abrasion, measuring 1.5 by 0.6 cm.  Below it, on the upper anterior aspect of the left leg, there are three abrasions, measuring 1-2 cm.

    III.  OTHER SURGICAL INCISIONS:

        1.   On the abdomen, on the midline, extending from upper to the lower aspects, there is a recent, sutured, vertical incision, measuring 36 cm. in length.

        2.   On the upper, anterior, inner aspect of the left thigh, there is a recent, sutured, vertical incision, measuring 14 cm. in length.

        3.   On the inner aspect of the left ankle, there is a recent, sutured, horizontal incision, measuring 5 cm. in length.

    IV.   NEEDLE PUNCTURE SITES:

        1.   There are multiple recent needle puncture sites, on the upper, anterior chest, on both sides, and on the inner aspects of both forearms, on the antecubital fossa.

OTHER AUTOPSY FINDINGS:

HEAD:

The scalp is incised and reflected and does not show hemorrhage. No skull fractures are seen.  The brain is soft and the meningeal surfaces and the cut sections do not show hemorrhages.

NECK:

The muscles of the neck are dissected layerwise and do not show hemorrhage.  The hyoid bone and the laryngeal cartilage and mucosa and the trachea are intact.

CHEST:

RESPIRATORY SYSTEM:

Both lungs are markedly congested.

CITY_JAKES 00794

GARCIA, RAFAEL I.                                    Page 5
296-September-1991

OTHER AUTOPSY FINDINGS:   (Continued)

ABDOMEN:

GASTROINTESTINAL SYSTEM:

The esophagus is not remarkable.  The stomach contains a small
amount of green fluid material.  The gastric mucosa is intact.
The mesentery and small intestine were lacerated and surgically
repaired and with hemorrhage.  The appendix is present.  The
pancreas is pinkish, soft and lobular.

HEPATOBILIARY SYSTEM:

The liver is brownish-red, firm and with sharp margins.  The
gallbladder contains dark green bile.

SPLEEN:

It has a bluish-red and smooth capsule.  The cut sections are
dark red and soft.

GENITOURINARY SYSTEM:

There are marked hemorrhages in the right perirenal region.  Both
kidneys have smooth external surfaces.  On the cut sections, the
collecting system is not dilated.

ENDOCRINE SYSTEM:

The thyroid gland and adrenal glands are not remarkable.

ORGAN WEIGHTS:

| | | | |
|---|---|---|---|
| LUNGS: | 1612 | SPLEEN: | 174 |
| HEART: | 414 | KIDNEYS: | 543 |
| LIVER: | 1564 | BRAIN: | 1151 |

The bullet which is recovered and a sample of blood are submitted
to the Chicago Police Department Crime Laboratory.

Samples blood and bile are submitted for toxicologic studies.

AUTOPSY SUMMARY:

1.   BULLET #1 ENTRANCE WOUND:  On the dorsal and medial
     aspect of the right hand.

2.   BULLET #1 EXIT WOUND:  On the base and inner aspect of
     the thumb on the right hand.  The bullet traveled
     inside the right hand and through and through.

CITY_JAKES 00795

GARCIA, RAFAEL I.                                          Page 6
296-September-1991

AUTOPSY SUMMARY:   (Continued)

3.   BULLET #2 ENTRANCE WOUND:  On the anterior, lower
     aspect of the right thigh.  Around it, four small,
     round lacerations.  About them, three small, round
     ecchymotic areas.

4.   BULLET #2 EXIT WOUND:  On the lower, inner aspect of
     the right thigh, two lacerations.

     The bullet traveled inside the right thigh, from
     anterior to inner aspect, and through and through and
     fracturing the right femur.  The bullet and fragments
     of bullet or bone exited through two lacerations
     described.

5.   BULLET #3 ENTRANCE WOUND:  On the right lower back, at
     the lateral aspect.

6.   BULLET #3 EXIT WOUND:  On the left anterior, mid
     abdomen.  The bullet entered the abdomen from the right
     posterior aspect, and traveled from right to left and
     posterior anterior.

     The right common iliac artery was lacerated and
     surgically repaired.  The mesentery and small intestine
     were lacerated and surgically repaired.  There are
     marked hemorrhages in the right perirenal region.  The
     bullet followed a through and through course.

7.   BULLET #4 ENTRANCE WOUND:  On the posterolateral aspect
     of the right hip.  The bullet traveled inside the right
     hip and thigh, and posteroanterior.  It lodged in the
     anterior, upper aspect of the right thigh, in the
     subcutaneous soft tissue.  This area exhibits marked
     ecchymosis.  The bullet is medium size, yellow and full
     jacketed, and it is not disfigured.  Marked hemorrhages
     in the course of the bullet.

8.   Several abrasions and ecchymotic areas.

9.   Marked edema.

10.  Marked congestion of the lungs.

CAUSE OF DEATH:

Multiple gunshot wounds.                _Yuksel Konakci, MS_

YK/tw                                   YUKSEL KONAKCI, M.D.
10/3/91                                 Deputy Medical Examiner
                                        10-4-1551

CITY_JAKES 00796

# Exhibit 16

# CRIME LABORATORY REPORT
CRIME LABORATORY DIVISION/CHICAGO POLICE

| INCIDENT/ OFFENSE CLASSIFICATION | I-UCR OFF. CODE | RD NO. |
|---|---|---|
| BATTERY / AGGRAVATED | 0440 | P454289 |

| VICTIM'S NAME | DISTRICT | AREA | DATE OF THIS REPORT |
|---|---|---|---|
| GARCIA, RAFAEL | 177 | | 03-10-91 |

| DEFENDANT'S NAME | LABORATORY UNIT |
|---|---|
| | FIREARMS |

### SUMMARY FINDINGS – FIREARMS EVIDENCE

The following fired evidence was submitted to the Crime Laboratory for examination, classification and evaluation relative to RD P454289:

| INVENTORY NUMBER | DATE RECEIVED | CLASS CHARACTERISTICS | SUITABLE FOR COMPARISON | PLACED IN OPEN CASES |
|---|---|---|---|---|
| 956712 | 16-09-91 | 380A 7R | Yes | Yes |
| | | 380A 00 | Yes | Yes |
| 956713 | 16-09-91 | 380A 00 | Yes | Yes |

All evidence that has not been placed in the open case file has been forwarded to the Evidence and Recovered Property Unit.

PAGE 1 OF 1 PAGES

| EXTRA COPIES REQUIRED (NO. & RECIPIENT) | REPORTING MEMBER (PRINT NAME) | Richard J. Fournier |
|---|---|---|
| 1 TO A/3 VC | SIGNATURE | R Fournier |

CPD-33.110 (9/89)



**CRIME LABORATORY REPORT**
CRIME LABORATORY DIVISION/CHICAGO POLICE

| INCIDENT/OFFENSE CLASSIFICATION | I-UCR OFF. CODE | RD NO. |
|---|---|---|
| HOMICIDE / MURDER | 0110 | P454389 |

| VICTIM'S NAME | DISTRICT AREA | DATE OF THIS REPORT |
|---|---|---|
| GARCIA, RAFAEL | 177 | 19-09-91 |

| DEFENDANT'S NAME | LABORATORY UNIT |
|---|---|
| | FIREARMS |

SUMMARY FINDINGS  -  FIREARMS EVIDENCE

The following fired evidence was submitted to the Crime Laboratory for examination, classification and evaluation relative to RD P454389:

| INVENTORY NUMBER | DATE RECEIVED | CLASS CHARACTERISTICS | SUITABLE FOR COMPARISON | PLACED IN OPEN CASES |
|---|---|---|---|---|
| 946146 | 18-09-91 | 380A 7R | Yes | Yes |

All evidence that has not been placed in the open case file has been forwarded to the Evidence and Recovered Property Unit.

PAGE 1 OF 1 PAGES

| EXTRA COPIES REQUIRED (NO. & RECIPIENT) | REPORTING MEMBER (PRINT NAME) James J. Treacy |
|---|---|
| 1 TO A3 V/C | SIGNATURE |

CPD-33.110 (9/89)

CITY_JAKES 00801

# Exhibit 17

# FILED UNDER SEAL

# Exhibit 18

# FILED UNDER SEAL

# Exhibit 19

The Deposition of DARREN DOSS, taken on September 13, 2021

1

IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF ILLINOIS, EASTERN DISTRICT

CASE NO. 19-CV-02204

HONORABLE MANISH S. SHAH

HONORABLE SHEILA M. FINNEGAN

ANTHONY JAKES,

Plaintiff

V.

KENNETH BOUDREAU, ET AL.,

Defendants

DEPONENT:  DARREN DOSS

DATE:      SEPTEMBER 13, 2021

REPORTER:  ARIA EDWARDS

The Deposition of DARREN DOSS, taken on September 13, 2021

2

1          APPEARANCES

2

3    ON BEHALF OF THE PLAINTIFF, ANTHONY JAKES:

4    Renee Spence

5    Loevy & Loevy

6    311 North Aberdeen Street

7    Chicago, Illinois 60607

8    Telephone No.: (312) 243-5900

9    E-mail: spence@loevy.com

10   (Appeared via videoconference)

11

12   ON BEHALF OF THE DEFENDANTS, CITY OF CHICAGO:

13   George Yamin

14   The Sotos Law Firm, P.C.

15   141 West Jackson Boulevard

16   Suite 1240A

17   Chicago, Illinois 60604

18   Telephone No.: (630) 735-3300

19   Facsimile No.: (630) 773-0980

20   E-mail: gyamin@jsotoslaw.com

21   (Appeared via videoconference)

22

23

24

25

---

4

1                INDEX

2                         Page

3    PROCEEDINGS                    6

4    DIRECT EXAMINATION BY MS. SPENCE          7

5    CROSS EXAMINATION BY MR. YAMIN           87

6

7               EXHIBITS

8    Exhibit                  Page

9    1 - Bates Stamp City_Jakes 00491-00523      44

10   2 - Bates Stamp RFC_Jakes 16814-16829       46

11   3 - Bates Stamp City_Jakes 60-61        63

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

3

1        APPEARANCES (CONTINUED)

2

3    ON BEHALF OF THE DEFENDANTS, KENNETH BOUDREAU, LOUIS

4    CAESAR, MICHAEL DELACY, KEN BURKE, FRED BONKE:

5    Brittany Johnson

6    Rock Fusco & Connelly, LLC

7    321 North Clark Street

8    Suite 2200

9    Chicago, Illinois 60654

10   Telephone No.: (312) 494-1000

11   E-mail: bjohnson@rfclaw.com

12   (Appeared via videoconference)

13

14

15

16

17

18

19

20

21

22

23

24

25

---

5

1              STIPULATION

2

3    The video deposition of DARREN DOSS was taken at

4    KENTUCKIANA REPORTERS LLC, 730 WEST MAIN STREET, SUITE

5    101, LOUISVILLE, KENTUCKY, 40202, via videoconference in

6    which all participants attended remotely, on MONDAY the

7    13th day of SEPTEMBER 2021, at 10:06 a.m. CST; said

8    deposition was taken pursuant to the FEDERAL Rules of

9    Civil Procedure. The oath in this matter was sworn

10   remotely pursuant to FRCP 30.

11

12   It is agreed that ARIA EDWARDS, being a Notary Public

13   and Court Reporter for the State of INDIANA, may swear

14   the witness and that the reading and signing of the

15   completed transcript by the witness is not waived.

16

17

18

19

20

21

22

23

24

25

The Deposition of DARREN DOSS, taken on September 13, 2021

6

1            PROCEEDINGS
2
3        COURT REPORTER:  We are on record.  My name is
4    Aria Edwards.  I'm the video technician and court
5    reporter today.  Today is the 13th day of September
6    2021.  The time is 10:06 a.m.  We are convened by
7    videoconference to take deposition of Darren Doss in
8    the matter of Anthony Jakes versus Kenneth Boudreau,
9    et al., pending in the United States District Court
10   for the Northern District of Illinois, Eastern
11   Division, case number 19-CV-02204.  Will everybody,
12   but the witness, please state your appearance, how
13   you're attending, and the location you're attending
14   from, starting with the plaintiff's counsel?
15       MS. SPENCE:  My name is Renee Spence.  I am
16   here on behalf of plaintiff, and I am attending
17   remotely.
18       MR. YAMIN:  George Yamin --
19       MS. JOHNSON:  Go ahead, George.
20       MR. YAMIN:  George Yamin, City of Chicago. I'm
21   attending from the law office of James Sotos --
22   Sotos Law Firm.
23       MS. JOHNSON:  Brittany Johnson on behalf of the
24   defendant officers, attending from my office, 321
25   North Clark.

7

1        COURT REPORTER:  Okay.  Mr. Doss, will you
2    please state your name for the record.
3        THE WITNESS:  Darren Doss and I'm attending
4    from the Sotos office.
5        COURT REPORTER:  Okay.  Do all parties agree
6    the witness is, in fact, Mr. Doss?
7        MS. SPENCE:  Yes.
8        MS. JOHNSON:  Yes.
9        MR. YAMIN:  I didn't hear the question.
10       COURT REPORTER:  Do all parties agree that the
11   witness is, in fact, Mr. Doss?
12       MR. YAMIN:  I'll agree with that.
13       COURT REPORTER:  Mr. Doss, will you please
14   raise your right hand?  Do you solemnly swear or
15   affirm that the testimony you are about to give will
16   be the truth, the whole truth, and nothing but the
17   truth?
18       THE WITNESS:  Yes.  I do.
19       COURT REPORTER:  Thank you.  You may begin.
20           DIRECT EXAMINATION
21   BY MS. SPENCE:
22       Q    Good morning, Mr. Doss.  You are currently an
23   active police officer with the Chicago Police
24   Department; is that correct?
25       A    No.

8

1        Q    You no longer work with the Chicago Police
2    Department?
3        A    No.  I -- I'm retired.
4        Q    Oh, I see.  Okay.  Then, how would you like to
5    me -- for me to refer to you?  As Mr. Doss -- or I was
6    referring to you by rank earlier, so please just let me
7    know what your preference is.
8        A    Mr. Doss is fine.
9        Q    Okay.  Thank you.  So, Mr. Doss, as I stated
10   earlier, my name is Renee Spence and I represent the
11   plaintiff in this case, Mr. Anthony Jakes.  I just want
12   to go over some ground rules to get us started with this
13   deposition so that we can have a smooth and efficient
14   deposition.  Have you ever done a deposition before?
15       A    Yes.
16       Q    Okay.  When's the last time you sat for -- or
17   you sat for a deposition?
18       A    I don't -- I don't recall.  In the course of
19   my career, maybe once, and I don't recall when it was.
20       Q    Okay.  Great.  So I'll go ahead and just
21   remind you of kind of the parameters of the deposition.
22   The first one that's most important, I think, that this
23   has come up before we got on the record is that we want
24   to make sure that we're speaking one at a time.  And
25   because we are appearing by video, you want to give an

9

1    opportunity -- you want to pause before you answer, and
2    I will try to pause before I ask questions because
3    there's sometimes a bit of a delay, okay?  Similarly,
4    Counsel may object to a question, and -- so we want to
5    make sure that each person is pausing to allow time for
6    objections before responding or going forth with the
7    next question.  It's really important that we take our
8    time so that the transcript can accurately reflect what
9    was said today.  Furthermore, if I ask you a question
10   that you do not understand, please feel free to ask me
11   to clarify its meaning or rephrase the question, or to
12   tell me that you don't understand the question. However,
13   if you do answer the question, the presumption will be
14   that you understood the question that was being asked.
15   Do you agree to that?
16       A    Yes.
17       Q    Because this deposition is also being
18   transcribed, it's very important for you to use words as
19   opposed to gestures or sounds to communicate your
20   answer.  Typically, people will respond with a nodding
21   of the head or "uh-huh" or "uh-uh".  And this is a
22   perfectly natural response, but it's not accurately
23   captured on the record.  And -- so if you do that, I may
24   prompt you and say, "is that a yes" or "is that a no".
25   And it's not to reprimand you in any way.  It's just to

The Deposition of DARREN DOSS, taken on September 13, 2021

10

1   remind you to use your words, okay?
2       A    Yes.
3       Q    All right.  At any time during this
4   deposition, you can take a break.  You just simply have
5   to ask for one.  However, I would ask that if a question
6   is pending, that you answer the question before we take
7   the break.  Do you agree to that?
8       A    Yes.
9       Q    Okay.  Because we are remote, I can't see what
10  is in front of you, and -- so I ask if you are referring
11  to any documents or looking at documents in front of
12  you, that you let me know that you're looking at a
13  document, okay?
14      A    Yes.
15      Q    And at this time, do you have any documents in
16  front of you?
17      A    No.
18      Q    At any -- do you have any medical conditions
19  that impact your memory?
20      A    No.
21      Q    Is there any reason why you can't give a
22  complete and accurate deposition today?
23      A    No.
24      Q    Okay.  All right.  So, Mr. Doss, you said that
25  you're currently retired?

11

1       A    Yes.
2       Q    Are you working?
3       A    No.
4       Q    When did you retire from Chicago Police
5   Department?
6       A    November 26 of 2020.
7       Q    When did you start working at Chicago Police
8   Department?
9       A    30 July of 1990.
10      Q    Prior to working in the Chicago Police
11  Department, had you been working in law enforcement?
12      A    No.
13      Q    Would it be fair to say that Chicago Police
14  Department is your first law enforcement job?
15      A    Yes.
16      Q    Okay.  When you started at the Chicago Police
17  Department in 1990, what was your rank?
18      A    Recruit.
19      Q    Recruit.  Right.  And after recruit, did you
20  move to patrol?
21      A    Yes.
22      Q    And when you were in patrol, for how long were
23  you assigned to patrol?
24      A    'Til December of 2003.
25      Q    So from 1990 to the end of 2003?

12

1       A    Yes.
2       Q    When you were working in patrol, were you
3   assigned to a particular area?
4       A    Initially, from -- once I finished my time as
5   a recruit in the academy, I was assigned to the 9th
6   District for the -- 'til 1994, I believe -- August of
7   1994.
8       Q    And after August of 1994, where did you go?
9       A    The unit called Special Operations.
10      Q    For how long were you in Special Operations?
11      A    From 1994 to December of 2003.
12      Q    Special Operations -- did that -- so was that
13  a citywide assignment or was it restricted to particular
14  districts or areas?
15      A    Citywide.
16      Q    Did this -- when you were assigned to Special
17  Operations, did you work out of a particular police
18  department -- I mean, police station?
19      A    Initially, we were in Area Four which was
20  Harrison and Kedzie.  Then we moved to Homan Square.
21      Q    Spell the square -- human -- Homan square?  Can
22  you spell that?
23      A    I'm sorry, can you repeat that again?
24      Q    Yes.  You said that then you guys moved to a
25  place that began with an H square, and I'm just

13

1   wondering what that first -- can you spell that first
2   word?
3       A    Sure.  H-O-M-A-N.  Homan.
4       Q    After you left Special Ops in December 2003,
5   where did you go?
6       A    I was promoted to sergeant, and I was assigned
7   to the 21st District which was located at 29th and
8   Prairie.
9       Q    Sorry, the 21st District was located at 20?
10      A    9th and Prairie.
11      Q    Can you spell that street?
12      A    P-R-A-I-R-I-E.
13      Q    Okay.  Prairie.  Got it.  Okay.  Just one
14  moment.  I believe Plaintiff -- Mr. Jakes is joining.
15  Okay.  And -- so for -- when you were a sergeant, which
16  -- I asked which unit did you oversee as a sergeant?
17      A    Initially, I was assigned to the 21st
18  District, which encompasses Hyde Park and areas in --
19  University of Chicago -- that area all the way down to
20  Chinatown.
21      Q    And did you -- in your entire time as a
22  sergeant, did you supervise the 21st District or did you
23  move to another district?
24      A    In 2007, I moved to the training academy.
25      Q    For how long were you at the training academy?

The Deposition of DARREN DOSS, taken on September 13, 2021

14

1   A   Until 2014.
2   Q   Just to clarify, when you say that you oversee
3 the 21st District, that would be the patrol officers?
4   A   From my watch. Yes. I was a watch sergeant.
5 So I believe -- and then, for a while, I was a tactical
6 sergeant. So yes. I had officers under my command but
7 not the entire district.
8   Q   Okay. So between 2003 and 2007, you were a
9 watch sergeant and a tactical sergeant?
10   A   Correct.
11   Q   What's the difference between a watch sergeant
12 and a tactical sergeant?
13   A   The watch sergeant is basically I reported at
14 certain designated time. Normally, it was the third
15 watch during the afternoon. The tactical sergeant -- it
16 was a rotating watch and officers could be there in
17 uniform or plain clothes.
18   Q   For how long did you -- I'm sorry. After the
19 2014, where were -- where did you go?
20   A   I went to the 3rd District which is located at
21 71st in Cottage Grove.
22   Q   In what capacity did you go to the 3rd
23 District?
24   A   I was promoted to lieutenant, and I was a
25 watch operations lieutenant for midnights.

15

1   Q   What is the difference between a watch
2 operations lieutenant and a watch sergeant?
3   A   Well, the watch operations lieutenant is --
4 supervises the watch sergeants. It's also -- formerly
5 was known as a watch commander, but they changed the --
6 the vernacular and call the watch operations lieutenant
7 instead of watch commander.
8   Q   For how long did you hold the position of a
9 lieutenant watch operations -- I guess, the lieutenant
10 of watch operations?
11   A   Yeah. Watch operations lieutenant. For about
12 a year, and then I was -- then, I was given the tact
13 teams. I was made the tactical lieutenant.
14   Q   Okay. So you were made tactical lieutenant in
15 2016 or 2015?
16   A   Actually, it's 2015. I'm trying to get the
17 dates right. I think it was December of 2014. But it
18 was just at 2015.
19   Q   So around 2015 would be correct? Okay.
20   A   Correct.
21   Q   For how long did you hold the position of the
22 lieutenant for the tactical team?
23   A   Left in six months, and then I was made
24 commander of the 3rd District at 71st Cottage Grove.
25   Q   For how long were you the commander of the

16

1 3rd District?
2   A   Until October of 2017.
3   Q   And after you finished becoming -- sorry,
4 being the commander of the 3rd District, where did you
5 go?
6   A   I was transferred to what's called special
7 functions. I was the executive officer/commander of the
8 special functions until 2019. October 2019.
9   Q   What does the commander or the executive
10 officer or commander of special functions do?
11   A   It's kind of long. I was -- coordinated
12 different units. Starting with slot, mass transit, K9,
13 the horses, airports, dignitary protection, the
14 helicopter unit, Lakeshore Drive traffic, all parades,
15 and details of that nature. I'm sure I'm leaving
16 something out. But all of that.
17   Q   Okay. And you're the person who's overseeing
18 the logistics for that? Is that what it -- what is --
19 you're saying?
20   A   Basically, I was a conduit for all the
21 commanding officers for those units and -- and then
22 coordinator of, like I said, when the president will
23 come to town or something of that nature, or we had,
24 like, the Pride Parade or the Chicago Marathon. I would
25 be the coordinator involved in that for the police side.

17

1   Q   After October 2019, where did you go?
2   A   I went on -- I was actually -- was returned to
3 my rank of lieutenant and I spent the last year -- I was
4 out on medical leave.
5   Q   The lieutenant of the 3rd District or any
6 specific district?
7   A   No. I was still lieutenant of -- I was
8 assigned to special functions, but I would've been
9 detailed to the 12th District if I would've been at
10 work. But, like I said, I was out the entire year --
11 out, sick.
12   Q   Okay. And when you were working in patrol
13 from 1990 to about 2003, did you have any partners?
14   A   Yes.
15   Q   Who were your partners?
16   A   Initially, when I started, it was the luck of
17 the draw. I was assigned to a different person. Other
18 than my field training officer, I was as -- assigned to
19 many different partners. Eventually, I partnered up
20 with a -- an officer named Roger Freeman. We were
21 partners for several months, then he went to narcotics.
22 Then I partnered up with another officer. His name was
23 Preston Saddler. We were partners all the way through
24 al -- almost through 2003 when we went to special
25 functions together.

The Deposition of DARREN DOSS, taken on September 13, 2021

18

1    Q    Okay.  And when did you start working with
2  Officer Freeman?
3    A    That would have been in the latter part of
4  1992.
5    Q    Would it be fair to say that in September of
6  1991, you were in patrol, right?
7    A    Yes.
8    Q    In the 9th District?
9    A    Yes.
10    Q    And in September of 1991, would you have had
11  rotating partners or just various partners?
12    A    Yes.
13    Q    At any time during your career, did you work
14  with Detective Boudreau, Detective Kenneth --
15    A    No.
16    Q    -- Boudreau?
17    MR. YAMIN:  Objection to the form.
18    Q    You may answer.
19    A    No.
20    Q    Okay.  Do you have a relationship with
21  Detective Kenneth Boudreau?
22    MR. YAMIN:  Objection to form.
23    A    No.
24    MR. YAMIN:  And foundation.
25    Q    Okay.  Do you know Kenneth Boudreau?

19

1    A    Personally, no.
2    Q    Do you know -- and I'm going to ask you about
3  the defendants so -- just so you know where these names
4  are coming from.  Do you know -- did you know a officer
5  by the name of Michael Kill -- Detective Michael Kill?
6    A    No.
7    Q    Would it be fair to say that you've never
8  worked with Detective Michael Kill?
9    MR. YAMIN:  Objection, form.
10    A    I've never partnered with him.
11    Q    Have you -- did you ever give reports to
12  Detective Michael Kill or communicate information that
13  you learned about a case to Detective Michael Kill?
14    MR. YAMIN:  Objection.  Form.  Foundation.
15    A    Not that I can recall.  No.
16    Q    Do you know an officer who went by the name of
17  Louis Caesar or who goes by the name of Louis Caesar?
18    MR. YAMIN:  That actually is his name, too.
19    MS. SPENCE:  Right.  Yes.
20    THE WITNESS:  No.
21    MR. YAMIN:  It's not a pseudonym.
22    MS. SPENCE:  Right.  Do you have any
23  recollection of working on a case involving Officer
24  Louis Caesar or providing information to Officer
25  Louis Caesar?

20

1    MR. YAMIN:  Objection.  Form.
2    A    Not that I can recall.  No.
3  BY MS. SPENCE:
4    Q    Did you know a officer named Thomas Pack?
5    A    Not that I can reca -- recall.  No.
6    Q    Do you recall any kind of interactions with
7  Thomas Pack in the form of providing him information
8  about a case or about an investigation?
9    MR. YAMIN:  Objection to form.
10    A    Not -- not that I can recall.  No.
11    Q    Do you know an officer named Michael Delacy?
12    A    No.
13    Q    Do you have any memory of providing any
14  information or -- about a case or an investigation to
15  Officer Delacy?
16    MR. YAMIN:  Objection.  Form.
17    A    No.
18    Q    Do you know an officer named Ken Burke?
19    A    Not that I can recall.  No.
20    Q    Okay.  And I'll leave -- for much of his
21  career, he was a youth office -- in the youth division
22  or the youth officer division.  Does that help?
23    A    No.  I don't know the gentleman.
24    Q    Okay.  And do you have any recollection or
25  memories of providing information about an investigation

21

1  to Officer Kenneth Burke?
2    MR. YAMIN:  Objection.  Form.
3    A    Not that I can recall.  No.
4    Q    Do you know a officer named Fred Bonke?
5  B-O-N-K-E?
6    A    That name sounds familiar but I -- no.
7    Q    Do you have any specific memories of providing
8  any information about a case to Fred Bonke?
9    MR. YAMIN:  Objection.  Form.
10    A    No.
11    Q    And would it be fair to say that you stopped
12  working with the Chicago Police Department right -- you
13  said that you retired, and you were on medical leave
14  during your final year?
15    A    Yes.
16    Q    Have you ever been in the armed services?
17    A    No.
18    Q    At any point during your career with the
19  Chicago Police Department, have you ever been
20  disciplined?
21    MR. YAMIN:  Objection, form.  Foundation.
22    A    Yes.
23    Q    Okay.  Have any of the basis for being
24  disciplined been based on suppressing evidence?
25    MR. YAMIN:  Objection, form.

The Deposition of DARREN DOSS, taken on September 13, 2021

22

1    A    No.
2    Q    Has it ever been for fabricating evidence?
3    MR. YAMIN:  Same objection.
4    A    No.
5    Q    And has it been for coercing witnesses?
6    MR. YAMIN:  Same objection.
7    A    No.
8    Q    Has it been for coercing suspects?
9    MR. YAMIN:  Form.  Objection.
10    A    No.
11    Q    Have you ever been fired?
12    A    From the CPD?
13    Q    Yes.
14    A    No.
15    Q    Have you ever been the defendant in a lawsuit?
16    A    Yes.
17    Q    How many lawsuits?
18    A    Only one comes to mind.  One.
19    Q    Do you remember the name of the plaintiff in
20    that lawsuit?
21    A    His last name was -- I believe it was Chung.
22    Q    Would the name -- does the name Jung sound
23    familiar?  J-U-N-G?
24    A    Yeah.  That's -- I -- I pronounce it, Chung.
25    But yeah.  Same -- same case.

23

1    Q    Okay.  And it very well may be pronounced
2    Chung.  I -- just the spelling -- does that sound
3    familiar?
4    A    Yes.
5    Q    Okay.  Are you familiar -- do you remember a
6    lawsuit where the plaintiff's last name was Foggey,
7    F-O-G-G-E-Y?
8    A    Yes.
9    Q    Okay.  Other than those -- and you were a
10    named defendant in that lawsuit, correct?
11    MR. YAMIN:  In which one?  The second one?
12    Q    The Foggey.  Yes.  The F-O-G-G-E-Y lawsuit?
13    A    I believe so.  Yes.
14    Q    All right.  Other than those two lawsuits, the
15    J-U-N-G, the Jung lawsuit and the Foggey lawsuit, do you
16    have -- have you ever been involved in any other
17    lawsuits?
18    MR. YAMIN:  Objection.  Form.
19    A    Not that I can recall.
20    Q    Oh, I'm sorry.  Let me specify.  Have you ever
21    been a named defendant in any other lawsuits other than
22    the two that I've named?
23    A    Not that I can recall.
24    Q    Okay.  Now, Mr. Doss, I want to focus on the
25    time period of September 1991.  Okay.  And I want to

24

1    talk about -- in your capacity as a patrol officer back
2    in 1991, did you respond to the scene on multiple cases?
3    Did you have an opportunity to do that?
4    A    Yes.
5    Q    When you responded to the scene, how did you
6    typically arrive at the scene?
7    MR. YAMIN:  Objection to form.
8    MS. JOHNSON:  Join.
9    Q    Was it, like, on foot?  Are you in a patrol
10    car?
11    A    Ordinarily, I was in a car.
12    Q    And the car that you would be driving, was
13    that typically a marked patrol car?
14    MR. YAMIN:  Objection to form.
15    A    Yes.
16    Q    And around this time period when you were on
17    patrol, what kind of attire did you have to wear when
18    you were on duty?
19    A    A full uniform.
20    Q    When you talk about -- when you refer to a
21    full uniform, is it the kind of uniform that has a badge
22    and it identifies you as a Chicago Police Department
23    officer?
24    A    Yes.
25    Q    Would you be armed?

25

1    A    Yes.
2    Q    And -- so when you're responding to a scene
3    back in -- during this time period in September of 1991,
4    how did you typically get the information to respond to
5    a scene?
6    MR. YAMIN:  Objection, form.
7    MS. JOHNSON:  Join.
8    MR. YAMIN:  And foundation.
9    A    In numerous ways.  It could be dispatched from
10    OEMC, a hand waver, citizen reports that, you know,
11    information reports we would get at roll call --
12    anything of that nature.
13    BY MS. SPENCE:
14    Q    You said dispatch from -- and can -- I think
15    you referred to an acronym.  Can you spell the acronym?
16    A    OEMC, Office of Emergency Management
17    Communication.
18    Q    Okay.  And you also said a hand waver?
19    A    Yes.
20    Q    Is that a person --
21    A    That's a --
22    Q    -- who's waved their hand?
23    A    Yes.  That's it.  Yes.
24    Q    Okay.  And you mentioned citizen reports as
25    well?

The Deposition of DARREN DOSS, taken on September 13, 2021

26

1    A    Yeah.  So our information that we received
2  during roll call briefing, you know, about crime
3  patterns or anything that's happening on a beat that we
4  were assigned to.
5    Q    Okay.  And -- so when you are -- respond to a
6  scene, was there -- did you bring any materials with you
7  when you responded to a scene, like a notebook?
8        MR. YAMIN:  Objection.  Form.
9    A    Yes.  In 1991, we -- ev -- everything was
10  handwritten, paper-generated.
11    Q    So would you have -- was it your practice in
12  September of 1991 to carry a notebook with you when you
13  responded to a scene?
14    A    Actually, I carried a -- a metal case that
15  contained case reports and --pens and whiteout and such.
16    Q    In your capacity as a patrol officer back in
17  September 1991, did you have the duties of preserving
18  a scene when you arrived at a crime scene?
19    A    It depended on what -- how -- what order I
20  responded in and what my supervisor deemed for me to do
21  when I arrived.
22    Q    Did you ever have the experience of having to
23  preserve a scene back in that time period?
24        MR. YAMIN:  Objection to form.
25    A    I would say yes.  But I -- specifically, a --

27

1  a specific scene, I can't recall.  But I'm sure that I
2  -- that was part of my duties.
3    Q    Okay.  In your capacity as a patrol officer in
4  September of 1991, did you have an opportunity to speak
5  to and interview witnesses?
6    A    Yes.
7    Q    Did you have an opportunity to interview
8  witnesses on the scene during that time period?
9    A    Yes.
10        MR. YAMIN:  Object to form.
11    A    Yes.
12    Q    Okay.  What was your practice when you would
13  interview a witness on the scene?  How would you go
14  about doing so?
15        MR. YAMIN:  Objection, form.  Foundation --
16  just form.
17    A    Back in 1991, if I were the first arriving
18  officer.  I -- I would ask some -- whoever I saw around
19  what happened, do they know it, did they see it.  That
20  would be the interaction I would have with them upon my
21  arrival at the scene.
22    Q    When you ask the individual what happened,
23  would you ask for that individual's name?
24    A    I would attempt to document it and -- and for
25  -- and -- and write it down.  Yes.

28

1    Q    Okay.  And would did you also obtain -- would
2  it be your practice to obtain that individual's contact
3  information, like their phone number and address?
4    A    If they were willing to give it to me.  Yes.
5    Q    Would it have been your practice to ask?
6    A    Yes.
7    Q    Okay.  And would it have been your practice
8  also to document whatever information that they gave
9  you?
10    A    According to my training.  Yes.
11    Q    And when you documented this information about
12  contact information as well as their statements, where
13  did you document -- where would you typically document
14  that information?
15    A    On a case report.
16    Q    And the -- are these the case reports that you
17  would typically have in the metal case?
18    A    Yes.
19    Q    So you -- when you filled out case reports,
20  would you fill them out at the scene, or would you fill
21  them out at a later time?  This is back in September of
22  1991.
23    A    They would be done at the scene, but -- or
24  they -- depending on what the incident was, they can be
25  completed at -- at the scene, or if it was something

29

1  else or if it was more involved or more drawn out, it
2  can -- can be completed somewhere else depending on what
3  the case report was for.
4    Q    What kind of circumstances would require you
5  to -- or would lend to you filling out a case report
6  away from the scene?
7    A    If it was something where there was a victim
8  or if I had to relocate to a hospital or to -- back
9  then, we called it the Audy Home, the youth -- the youth
10  center, or if we had to go to a detective division -- or
11  something of that nature, then that's when we would
12  leave the scene and complete it elsewhere.
13    Q    You referred to something called the Audy
14  Home.  Is it spelled A-U-D-Y?
15    A    You know, that's a good question.  I never had
16  to write it down.  So I would say A-U-D-I-E but --
17    Q    Okay.  I think we can -- we'll do -- it's my
18  understanding, it may have been spelled A-U-D-Y.  And --
19  so just for the purpose of just the transcription, does
20  anyone have any objections to that being the spelling
21  for the deposition transcript?
22        MR. YAMIN:  We'll stipulate that Audy is
23  spelled A-U-D-Y.
24        MS. SPENCE:  Oh, thank you.
25  BY MS. SPENCE:

The Deposition of DARREN DOSS, taken on September 13, 2021

30

1    Q   Okay.  After you filled out the reports --
2  after you completed reports, and this is still during
3  September of 1991, what would happen to the completed
4  report?  What would you do next?
5    A   I would --
6      MR. YAMIN:  Excuse me.  Objection to the form.
7      MS. JOHNSON:  Join.
8      THE WITNESS:  Okay.  Depending on what it was,
9  if I saw my sergeant --
10     MR. YAMIN:  Excuse me -- and calls for
11  speculation.
12   A   I would call -- I would meet my sergeant on
13  the street and turn it over to my sergeant.  Or I would
14  either take it into the station, and we had a box at the
15  time for reports.  And I will put it in the box, and the
16  sergeant would retrieve it from there to review it and
17  approve it.
18  BY MS. SPENCE:
19   Q   Did you ever receive a copy of your report
20  after it had been approved?
21   A   Which report?  Ordinarily?  No.
22   Q   Okay.  And when you say, "which report", I'm
23  referring to the case report.  If you filled out a case
24  report and you gave it to the sergeant, would you ever
25  receive a copy of the case report?

31

1    A   If I didn't make it -- make a copy of it and
2  retain it myself, no.
3    Q   Would it -- was it your practice back in
4  September of 1991 to make copies of your case reports?
5    A   No.  There was a file cab -- file records
6  kept.  One copy was forwarded, and one copy was always
7  kept at the station.  And if I felt I needed to review a
8  copy of the case report, I could go in and look in the
9  file cabinet in the -- we call it the review office.  And
10  I'll pull it and make a copy and review it at that time.
11  There was no need to make copies of every report that I
12  generated.
13   Q   Okay.  So with the case report, there are two
14  places the co -- a case report might be.  One would be
15  forwarded.  There would be a version of the case report
16  that is forwarded to the sergeant; is that right?
17     MR. YAMIN:  Object to the form.
18   A   Back then, we used carbons.  There were two
19  copies of the case report.  The sergeant would sign both
20  of them.  One would be forwarded on to whatever
21  investigator wing it would go to or to the detective
22  division, and back then one copy was white, and one copy
23  was pink.  The pink copy would be re -- retained for the
24  records in the station.
25   Q   When the case report -- when the copy of the

32

1  case report was forwarded to a detective division, were
2  you involved in the forwarding process, or would that
3  happen with your sergeant?
4    A   I -- I had no involvement in it, and as far as
5  I know, the sergeant just approved them and put them
6  back in the box, and the clerk took them.  I -- I -- but
7  I can't attest to that.  I don't know where it went
8  after it left the box.
9    Q   And when you -- okay.  So, Mr. Doss, did you
10  prepare for today's deposition?
11   A   Yes.
12   Q   What did you -- did you review any documents
13  in preparation for today's deposition?
14   A   Yes.
15   Q   Which documents did you review?
16   A   My case report and the court transcript.
17   Q   When you refer to a court transcript, would
18  this be the -- a transcript of your trial testimony?
19   A   Yes.
20   Q   Did you review any photographs?
21   A   Yes.
22   Q   What were they photographs of?
23   A   Of the scene of a shooting and the victim and
24  -- yes.
25   Q   Did you meet with any attorneys in preparation

33

1  for your deposition?
2    A   Yes.
3    Q   Okay.  How many times did you meet with an
4  attorney?  And this could be in-person or over the
5  phone.
6      MR. YAMIN:  Object to the form of -- the form.
7    A   In-person, once.  And we had a couple of phone
8  calls to set up the in-person meeting.  But no
9  discussion of the case or anything.
10   Q   Okay.  So without going into the content of
11  anything that you've discussed with your attorney, when
12  did the in-person meeting occur?
13   A   I want to say September 9th of this year.
14   Q   For how long was that meeting?
15   A   About three hours.
16   Q   Other than your attorneys, were -- was -- were
17  there any other people present for that meeting?
18   A   Yes.
19   Q   Who was present?
20   A   Detective Patrick Donovan.
21   Q   Other than your attorneys and Detective
22  Donovan -- Patrick Donovan, was anyone else present for
23  the in-person meeting?
24   A   No.
25   Q   And the phone calls -- how many phone calls

The Deposition of DARREN DOSS, taken on September 13, 2021

34

1    did you have with your attorney in preparation for the
2    deposition?
3        MR. YAMIN: Objection. That mischaracterizes
4    his testimony. You can answer.
5        A    We've talked -- he called once to find me. We
6    had never touched base as I responded to a letter I
7    received at home. And then, we talked about possibly
8    meeting. And then, we set up the date to meet on the
9    9th.
10       Q    Okay.
11       A    So that -- that would be a total of three
12   times, I believe.
13       Q    Now, when you said that you reviewed your
14   court transcript in preparation for today's deposition,
15   did you read the entire transcript?
16       A    No.
17       MR. YAMIN: (Inaudible) testimony you're asking
18   or -- so for clarification.
19       MS. SPENCE: I didn't hear your question,
20   George. I'm sorry.
21       MR. YAMIN: Would you define the entire
22   transcript?
23   BY MS. SPENCE:
24       Q    So I -- you indicated that in preparation for
25   today's deposition, you read your trial testimony; is

35

1    that right?
2        A    I reviewed what I personally said in court.
3    Yes.
4        Q    Okay. Other than what you personally you said
5    in court that's captured on the transcript, did you
6    review any other trial testimony?
7        A    No.
8        Q    Okay. When you reviewed your statements that
9    were made at trial, did you review all -- your -- the
10   entirety of the statements that you made at trial?
11       A    I glossed over it. I don't think I read it
12   stem to stern or page 1 to -- to the end. But I looked
13   at -- I reviewed it.
14       Q    Other than the trial testimony that you gave
15   at the -- sorry. Other than your trial testimony, did
16   you give any other sworn testimony in connection with
17   the 1991 Garc -- Rafael Garcia murder investigation?
18       MR. YAMIN: Objection, form.
19       A    No.
20       Q    Prior to appearing for today's deposition,
21   have you had any contact with the defendants in this
22   case about your role in the -- maintaining one Garcia
23   Homicide Investigation?
24       MR. YAMIN: Objection, form.
25       A    No.

36

1        Q    Okay. So I'm going to go ahead and just read
2    the defendants' names and you can tell me if you had any
3    contact with them. Kenneth Boudreau?
4        A    No.
5        Q    Michael -- well. Michael Kill is deceased,
6    but I don't -- you know, at any point did you talk to
7    him? Well, I'll withdraw. Louis Caesar?
8        A    No.
9        Q    Michael Delacy?
10       A    No.
11       Q    Ken Burke?
12       A    No.
13       Q    Fred Bonke?
14       A    No.
15       Q    Prior to today's deposition, did you read the
16   civil complaint in this case?
17       A    No.
18       Q    So, Mr. Doss, turning to your -- to the
19   investigation that happened in September of 1991, right,
20   what shift were you working on September 16, 1991?
21       A    I believe midnight.
22       Q    And midnight -- what's the time frame for
23   midnights?
24       A    We'd have started at 10:00, or we started at
25   11:00, or we started at midnight, and you went eight

37

1    hours. So I don't recall what shift I was working --
2    what specific time I started that night.
3        Q    Okay.
4        MR. YAMIN: Have we established the -- a date?
5        MS. SPENCE: Yes. I did. I said September
6    16th of 1991.
7        MR. YAMIN: Okay.
8    BY MS. SPENCE:
9        Q    And then, just to clarify, Mr. Doss, did you
10   understand that to be September 16th of 1991?
11       A    Yes.
12       Q    Okay. And you were still working -- you were
13   working patrol at that time, right?
14       A    Yes.
15       Q    In the 9th District, correct?
16       A    Yes.
17       Q    And on that date, September 16, 1991, was your
18   -- during that shift, were you riding with Officer
19   Patrick Donovan?
20       A    Yes.
21       Q    And would this have been in a marked patrol
22   car? Sorry. Go ahead.
23       A    For some reason, I'm -- I'm -- that date
24   doesn't sound -- your -- you're saying September 16?
25       Q    Yes.

The Deposition of DARREN DOSS, taken on September 13, 2021

38

1    A   If it was -- if it's to respond to that scene
2  of the case that we're talking about, yes.  I was
3  working with Patrick Donovan.
4    Q   Okay.  Sorry.  Did you say something else,
5  Mr. Doss?
6    A   No.  I said that that's fair.  That's -- I was
7  working with Patrick Donovan when I responded to that --
8  the scene.
9    Q   And at that time, would you have been in a
10  marked patrol car if you were driving a police vehicle?
11    A   Yes.
12    Q   And during your shift, would you have been
13  wearing your uniform?
14    A   Yes.
15    Q   On the night of September 16, do you remember
16  responding to a crime scene in which a man had been
17  shot?
18    A   Yes.
19    Q   Okay.  How did you come to arrive at that
20  crime scene?
21    A   I was on routine patrol from what I can --
22  what I can recall.  We came upon a car that we thought
23  had been involved -- involved in an accident.  And that
24  was the scene.
25    Q   And how did you come across a car that had

39

1  been involved in an accident?
2    A   Like I said, we were on routine patrol.
3    Q   Do you remember being flagged by -- flagged
4  down by anyone?
5    A   I remember somebody -- well, I don't -- I
6  don't know how to put this.  Briefly recall that being
7  the -- what happened.  I remember driving down the
8  street, seeing a car involved in accident.
9    Q   All right.  And which street were you driving
10  on?
11    A   Racine.
12    Q   In which direction on Racine?
13    A   I believe northbound.
14    Q   Would it be fair to be -- would it be fair to
15  say that you were approaching 51st Street?
16    A   Yes.
17    Q   Do you remember interacting with someone who
18  -- a hand waver as you may have referred to them?
19      MR. YAMIN:  Objection to form.
20    A   I remember a hand waver being present.  Yes.
21    Q   Can you tell me at what point do you remember
22  -- as you were approaching the scene, at what point did
23  you notice a hand waver?
24    A   At the same time I saw the accident, you know.
25  So, of course, being a police officer, part of our

40

1  training is to render aid.  So if I saw someone hurt and
2  I saw a hand waver, I'd go to the person that's hurt.
3  That's our -- you know, that's the person that needs me
4  the most.
5    Q   When you -- were you the person driving that
6  night?
7    A   I believe I was the passenger.
8    Q   And other than Officer Donavan, were there any
9  other officers with you that night in your car?
10    A   No.
11    Q   Once you spotted the accident, what did you
12  do?
13    A   Pulled up to the scene and got out to render
14  aid to anybody involved in the accident.
15    Q   When you pulled up to the scene, what did you
16  see?  Like, when you refer to an accident, what do you
17  -- what did you see?
18    A   One -- one car resting against another car and
19  in a precarious manner.
20    Q   Do you see any -- other than the hand waver,
21  were there any other individuals at the scene?
22      MR. YAMIN:  Objection to form.
23    A   Yes.
24    Q   How many individuals were on the scene?  Sorry.
25  Were any of these individuals police officers at that

41

1  time?  The -- I'm focusing on when you first got there.
2    A   When we first got there, we were the only
3  police officers at the scene.
4    Q   Oh.  So how many other -- how many civilians
5  did you see on the scene when you first arrived?
6      MR. YAMIN:  Objection, foundation.
7    A   To the best of my recollection, two.
8    Q   All right.  And you said that when you saw the
9  accident, your goal was to render aid.  So once you saw
10  the accident, you approached the scene.  I assume you
11  parked your car; is that correct?  Or the car was
12  parked --
13    A   Yes.
14    Q   -- the patrol car was parked.  And you got --
15  you and Officer Donovan got out of the car; is that
16  right?
17    A   Yeah.
18    Q   And when you got out of the car, what did you
19  do?
20      MR. YAMIN:  Excuse me.  Before -- I began to
21  interject before that question was asked.  We're
22  going to take a slight break, please.  Because of
23  the phone thing, we're going to step out of the
24  room.
25      MS. SPENCE:  Okay.

The Deposition of DARREN DOSS, taken on September 13, 2021

42

1    MR. YAMIN:  Could you stop your video?
2        (OFF THE RECORD)
3        COURT REPORTER:  We are back on record at
4    11:00 a.m.
5    BY MS. SPENCE:
6    Q   All right.  So, Mr. Doss, you were saying that
7    we -- when we had taken the break, you were talking
8    about you had gotten out of the car, and you're now --
9    and you were at the crime scene, okay?
10   A   Yes.
11   Q   So when you got out of the car, did Officer
12   Donovan get out of the car with you?
13   A   He -- he got out of the car, eventually.  I
14   don't want to say that we both exited at the same time.
15   I don't recall the sequence.
16   Q   When you got out of the car, where did you go?
17   A   I walked up to the vehicles that were involved
18   in the accident.
19   Q   Mr. Doss, in preparation for today's
20   deposition, you should have received a packet of
21   photographs.
22       MS. SPENCE:  Do you have that --
23       MR. YAMIN:  We got it.
24       MS. SPENCE:  -- printed out, George?  Okay.
25       MR. YAMIN:  We do.  Yeah.

43

1        MS. SPENCE:  Okay.  Let me --
2        MR. YAMIN:  Should I hand those to the witness?
3        MS. SPENCE:  Yes.  Can you please just -- do
4    you have it as a packet or are they one by one?
5        MR. YAMIN:  One by one.  Well, --
6        MS. SPENCE:  Okay.  Can you hand --
7        MR. YAMIN:  Go ahead.
8        MS. SPENCE:  Can you -- you can hand the entire
9    packet to the witness, and I'm just going to go
10   ahead and just mark it for the record.
11       MR. YAMIN:  Oh, okay.
12   BY MS. SPENCE:
13   Q   So, Mr. Doss, you've been handed a packet of
14   photographs.  Can you confirm for me that you have
15   photographs that at the bottom, the first photograph has
16   a Bates stamp that says, "City_Jakes 491"?
17   A   Yes.
18   Q   And can you confirm that the last page in that
19   packet has a Bates stamp that says, "City_Jakes 523"?
20   A   Yes.
21   Q   Can you take a minute to just make sure that
22   the intervening photographs consecutively go from 491
23   to 523?  I just want to make sure we're all working with
24   the same set of photos.
25   A   Yes.

44

1    Q   Okay.  And earlier, I asked you, in
2    preparation for this deposition, if you had reviewed any
3    photographs, and you said yes.  Are the photographs --
4    sorry.  Let's -- let me back up.
5        MS. SPENCE:  Can we mark City_Jakes 491 through
6    523 as Exhibit 1, please?
7        (EXHIBIT 1 MARKED FOR IDENTIFICATION)
8    BY MS. SPENCE:
9    Q   Earlier in the deposition, I asked about your
10   preparation, and you indicated that you had looked at
11   photos of the crime scene and of the victim.  Are the
12   photos in Exhibit 1 the photos that you reviewed in
13   preparation for your deposition?
14   A   Yes.
15   Q   Are there any photos that are not included in
16   Exhibit 1 that you reviewed in preparation for today's
17   deposition?
18   A   Not that I can see.  No.
19   Q   Okay.  Turning to City_Jakes 518 of
20   Exhibit 1 --
21       MR. YAMIN:  Could you give me a second?  We
22   only have that one copy.  I want to get on them.
23       MS. SPENCE:  I can share my screen if that
24   would offset (Inaudible) --
25       MR. YAMIN:  Sure.

45

1        MS. SPENCE:  -- this.  Okay.
2        MR. YAMIN:  That would help.  Yes.
3        MS. SPENCE:  All right.  One moment.  Okay.
4    BY MR. SPENCE:
5    Q   All right.  I am also sharing my screen and
6    showing what's marked City_Jakes 518.  Do you have that
7    in front of you, Mr. Doss?
8    A   Yes.
9    Q   When you arrived on the scene, is this how the
10   car appeared?  The station wagon appeared?
11   A   Yes.
12   Q   With the driver's side door open?
13   A   I don't recall.
14   Q   Okay.  Mr. Doss -- sorry.
15       MS. SPENCE:  George, do you have Mr. Doss'
16   trial transcripts?
17       MR. YAMIN:  Yes.
18       MS. SPENCE:  His trial testimony?
19       MR. YAMIN:  Do I have a hard copy of it?
20       MS. SPENCE:  Yes.  Do you have a hard copy of
21   it?
22       MR. YAMIN:  Yes.
23       MS. SPENCE:  Okay.  Can you pass that to
24   Mr. Doss?
25       MR. YAMIN:  Sure.

The Deposition of DARREN DOSS, taken on September 13, 2021

46

1  BY MS. SPENCE:
2      Q    Okay.  So, Mr. Doss, can you affirm for me
3  that you have a transcript that starts with the Bates
4  stamp RFC_Jakes 18 -- sorry, 16814 on the first page?
5      A    16814.  Yes.
6      Q    Yeah.  And then, can you turn to the last page
7  and confirm that at the last page, it -- and -- it's a
8  Bates stamp that says RFC_Jakes 16829?
9      A    Yes.
10     Q    And can you confirm that you have all the
11 intervening pages?  Should be a total of 16.
12     A    Yes.
13         MS. SPENCE:  Okay.  Why don't we go ahead and
14 mark this trial transcript, RFC 16814 through RFC
15 Jakes 16829 as Exhibit 2?  I'm going to share my
16 screen because, George, I imagine you only have one
17 copy, right?
18        (EXHIBIT 2 MARKED FOR IDENTIFICATION)
19         MR. YAMIN:  We only have one.  Yes.
20         MS. SPENCE:  Okay.  That's good.
21 BY MS. SPENCE:
22     Q    All right.  Mr. Doss, referring to Exhibit 2
23 on page -- I mean, page 62 at the bottom, you'll see
24 that there are small numbers on page 62.  Sorry.
25 Actually, page 60.  Looking at line 19 of page 60.

47

1      A    I'm sorry.  What line am I looking -- are you
2  asking me to look at again?
3      Q    19.  It says, "Question, do you -- People's
4  Exhibits numbers 13 through 17, do they truly and
5  accurately depict how that area, the automobile you
6  observed, appeared back on September 15th of 1991?"
7      A    Yes.
8      Q    And I apologize.  I referred to the date
9  September 16th and I meant September 15, the day that
10 you responded to the crime scene.  Okay.
11         MR. YAMIN:  (Inaudible).
12         MS. SPENCE:  Okay.  So I'm going to the next
13 -- to the answer to the question and you put --
14         MR. YAMIN:  One second.  Excuse me, Ms. Spence.
15 That mischaracterizes the record.  You can proceed.
16         MS. SPENCE:  I didn't hear what you said.
17         MR. YAMIN:  Mischaracterizes the record.
18         MS. SPENCE:  Did I misread it?
19         MR. YAMIN:  No.  The -- I'll be specific in my
20 objection.  To clarify, it's the record does not
21 show that Mr. Doss arrived at the crime scene on
22 September 15 of 1991.
23         MS. SPENCE:  Okay.  I'm just reading the
24 question.  Okay.
25         MR. YAMIN:  Maybe I thought I heard you add

48

1  something into your -- in your question.
2          MS. SPENCE:  Yeah.  Sorry.  Okay.
3          THE WITNESS:  Can we have -- can we have just a
4  moment before you ask that question?  Can we have
5  just a moment?
6          MS. SPENCE:  To speak to your attorney, you
7  mean?
8          THE WITNESS:  Yes.
9          MS. SPENCE:  Yeah.  Sure.  We can go off the
10 record.
11         MR. YAMIN:  Okay.  Just a second.
12         MS. SPENCE:  Yeah.  Sure.
13         COURT REPORTER:  Is everyone okay with me going
14 off the record?
15         MS. SPENCE:  Yes.
16        (OFF THE RECORD)
17         COURT REPORTER:  We are on record at 11:12 a.m.
18         MR. YAMIN:  Ms. Spence, I'm just saying this to
19 help the process.  The record shows that the
20 incident that led Mr. Garcia to be where he was is
21 documented as having occurred on September 15.  The
22 record also shows that Mr. Doss and Mr. Donovan
23 arrived on the scene on September 16.  And as you
24 know, that that's -- this incident occurred around
25 midnight.  Some things occurred on one day and the

49

1  other -- other things occurred on the -- on another
2  day.  I don't want to testify, but I wanted you to -
3  - I think that's helpful to clarify so the record is
4  clear.  You know what I'm talking about?
5          MS. SPENCE:  I do know what you're talking
6  about.  I see that in the report.  And -- so that's
7  totally fine.  I can clarify that.  I think that's
8  fair.
9          MR. YAMIN:  Okay.
10         MS. SPENCE:  Yeah.  I don't want anyone to be
11 confused and I don't want the record to be muddied.
12 Great.
13 BY MS. SPENCE:
14     Q    So we -- I was correct initially when I was
15 saying that you were talking about events that took
16 place that you witnessed on September 16th and it was, I
17 think, according to your report, which we'll get to in a
18 second.  It appears that you arrived at, like,
19 12:01 a.m.  And -- so -- but going back to the crime
20 scene photo and the appearance of the car and referring
21 to Exhibit 2, page 60, line 19, I just want to direct
22 your attention there.
23     A    Yes.
24     Q    Sorry, one second.  Okay.  It says, the
25 question is: "Do People's Exhibits Number 13 through 17

The Deposition of DARREN DOSS, taken on September 13, 2021

50

1   -- do they truly and accurately depict that area, the
2   automobile you observed, appeared back on September 15th
3   of 1991?" And your answer was, "Yes. Except for the
4   driver's side door being closed. Yes." And on the next
5   page, starting at line 1, the Court says, "Just to
6   clarify, by that, you mean when you came to the scene,
7   the door was open?" And your answer is, "Yes." Do you
8   see that?
9       A   Yes.
10      Q   Okay. Does that jog your memory as to whether
11  or not when you arrived on the scene the door was open?
12      A   Yes.
13      Q   Okay. And -- so going back to Exhibit 1 -- to
14  the photograph that's Bates stamp City_ Jakes 518 -- and
15  I'm showing you on the screen. I don't know if you can
16  see it, Mr. Doss, the way that your screen is pointed.
17      A   Yes.
18      Q   Okay. Does this photograph on City_Jakes 518
19  depict the vehicle, the station wagon, as you saw it
20  when you arrived on the scene?
21      A   Yes. According to my sworn testimony. Yes.
22      Q   Okay. And according to your memory, is that
23  -- does that also comport with your memory?
24      A   When referring to my sworn testimony, it
25  conforms to my sworn testimony at the time. I can't say

51

1   100 percent I remember at this moment, but reading what
2   I wrote and reading what I testified to, yes.
3       Q   Okay. And I'm not trying to trick you or
4   anything. Those are two separate questions because I do
5   want to know what you -- it appears that you do have
6   actual memory of this event, and so I just want to be
7   able to separate what you remember versus what you
8   affirm based on you reading your testimony when you rely
9   on the document, okay?
10      A   Yes.
11      Q   I also want -- and referring to Exhibit 1,
12  City Jakes 508 -- I'm also sharing it on the screen.
13          MR. YAMIN: Mr. Doss, if you can see that --
14          THE WITNESS: I can see it all in front of me.
15          MR. YAMIN: Yeah. If you --
16          THE WITNESS: Don't worry about it.
17          MR. YAMIN: You're not to look at the paper
18      copies yet.
19  BY MS. SPENCE:
20      Q   Okay. Does City Jakes 508 accurately depict
21  the car accident as you -- sorry, the positions of the
22  cars as you observed them when you arrived on the scene
23  on September 16th?
24      A   Yes.
25      Q   Okay. Is it your recollection that there was

52

1   no car parked behind the red vehicle on the night that
2   you arrived on the crime scene?
3       A   Cor -- correct. That's where we pulled in
4   behind the scene. In my -- in my squad car.
5       Q   There is an officer -- zooming in. Let me see
6   if my computer will cooperate. There is an officer on
7   the right-hand side of this photograph. Do you
8   recognize that person?
9           MR. YAMIN: I can't see -- see --
10          THE WITNESS: Can't see him.
11          MR. YAMIN: -- see him -- I can't see him
12      anymore. Yeah. You zoomed in instead of out or
13      vice versa.
14          THE WITNESS: Our pictures are on that side of
15      the screen. I can -- I can't see it.
16          MR. YAMIN: Oh, you might not know that Spence.
17  BY MS. SPENCE:
18      Q   Okay. Can you see it now?
19      A   No.
20      Q   Okay. Can you look at the version that you
21  have in front of you and see -- do you know who that
22  officer is on -- depicted in 508?
23      A   No. I can't -- I -- I can't tell. No.
24      Q   Based on the photograph, you can't tell. Okay.
25  All right. And -- so when you arrived on the scene, you

53

1   said you walked up to the vehicle. When you walked up
2   to the vehicle, were you -- was the engine still
3   running?
4       A   I don't recall.
5       Q   Okay. Let me look at your trial testimony on
6   page 58.
7       A   Okay.
8       Q   All right. So I'm referring to page 58
9   starting at line 8, and said, "Did you notice anything
10  unusual about that automobile as you observed it?" And
11  the answer is, "Okay. It was -- the engine was still
12  running, it was still in gear. There were at the
13  passenger side window, front -- passenger side window
14  was broken and there was a couple of shell casings on
15  the front seat and an order of chicken." Do you see
16  that?
17      A   Yes.
18      Q   Okay. Do you remember the -- whether or not
19  the engine was running?
20      A   Based on my testimony, yes.
21      Q   Do you have a memory of it, or you have no
22  reason to dispute your testimony?
23      A   I have no reason to dispute my testimony. The
24  only thing I can freely remember was the order of
25  chicken for some reason so --

The Deposition of DARREN DOSS, taken on September 13, 2021

54

1    Q   Okay.  Then it's okay.  And -- so we were just
2    referring to Exhibit 1.  Going back to Exhibit 2 -- and
3    I'm going to show this on the screen, Mr. Doss.  I'm
4    referring to City Jakes 509 in Exhibit 2.  Can you see
5    this picture, Mr. Doss?
6    A   Yes.
7    Q   In this picture there -- it's a photograph of
8    the right-hand passenger side of the station wagon; is
9    that correct?
10   A   Yes.
11   Q   And the front passenger side window appears to
12   be shattered; is that right?
13   A   Yes.
14   Q   Or broken.  And there appears to be a brown
15   paper bag on the center console in the front seat; do
16   you see that?
17   A   Yes.
18   Q   Okay.  And then, that brown paper bag, do you
19   remember what the contents of that brown paper bag were
20   -- was?
21   A   Yes.
22   Q   What were the contents?
23   A   It was an order of chicken.
24   Q   Okay.  Is that the chicken you're referring to
25   in your trial testimony?

55

1    A   Yes.
2    Q   Okay.  And does this City Jakes 509 accurately
3    depict the right-hand side of the station wagon on the
4    night you arrived at the crime scene?
5    A   Yes.
6    Q   And when you arrived at the crime scene, did
7    you encounter a -- the body of Rafael Garcia?
8        MR. YAMIN:  Objection.  Foundation.
9    Q   Well, at the time -- at the time that you
10   arrived on the crime scene, you didn't know the name of
11   the individual that was on the -- sorry.  Actually, you
12   encountered a body; is that correct?  When you were at
13   the crime scene?
14   A   Yes.
15   Q   Where was the body located?
16   A   Aft -- after having my memory refreshed, it
17   was out -- it was on the street.
18   Q   On the street.  And did you learn the identity
19   of the person who was -- who's body was laying on the
20   street?
21   A   Eventually.  Yes.
22   Q   What was the identity of -- what's the name of
23   that individual?
24   A   I'd have to refer to the -- my paperwork to be
25   able to tell you that.

56

1    Q   Does the name Rafael Garcia sound familiar?
2    A   No.
3    Q   If I represent to you -- I'm going to
4    represent to you that the name of the individual who was
5    on the -- laying on the street that night was Rafael
6    Garcia.  Then -- we -- I will -- it'll be reflected in
7    your report as we can go through that later, okay?
8    A   Okay.
9    Q   All right.  Can you describe the state of the
10   body that you saw on the street?
11       MR. YAMIN:  Objection to form.
12       MS. JOHNSON:  Join.
13   A   The state of the body?
14   Q   Yeah.  Was it moving, or was the person
15   conscious?
16   A   It was a per --
17       MR. YAMIN:  Objection to form and calls for
18   speculation.
19   Q   Go ahead.
20   A   To the best of my recollection, it was a
21   person who had received several injuries and was in need
22   of medical attention.
23   Q   Okay.  And that -- there was blood on -- by
24   the individual?
25   A   Yes.

57

1    Q   All right.  Would it be fair to describe it as
2    a pool of blood?
3    A   On my independent relax -- recollection, I
4    just remember blood.  You know, pool of blood is the
5    characterization.  I don't -- I -- I -- he -- he was in
6    blood.  I don't -- you know, if I look at my reports, I
7    might have written a pool of blood.  I'm not sure.
8    Q   Yeah.  We can -- we'll just go to Exhibit 2.
9    Let's look at your trial testimony, Exhibit 2.  I'll
10   pull it up on the screen.  One second.  So I'm referring
11   to page 56, line 15.  Starting at line 15 where it says,
12   "Now, as you approached that vehicle -- did you observe
13   anything else as you approached that vehicle?"  And the
14   answer is, "Yes.  We also saw a body laying on the -- in
15   the street about four feet in front of the station
16   wagon."  The question is, "And when you made the
17   observation of that body four feet in front of the
18   station wagon, what did you do?"  And you say, "We
19   approached the body, which was in a pool of blood, at
20   which point we called for an ambulance and for the
21   assist units."  Do you see that?
22   A   Yes.
23   Q   Okay.  Does that refresh your memory as to
24   whether or not the body was in a pool of blood?
25   A   Yes.

The Deposition of DARREN DOSS, taken on September 13, 2021

58

1    Q   Okay.  And I want to show you Exhibit 2 and
2  I'll pull it up on the screen.  What's been Bates
3  stamped City Jakes 518.  And about a number of feet in
4  front of the vehicle, there appears to be some staining
5  on the pavement.  I don't know if you can see it on the
6  screen or if it'd be better to look at it on the -- in
7  the -- on the exhibit in person.  But do you see that
8  staining on the ground?
9    A   Yes.
10   Q   Okay.  Is that where the body was located when
11  you saw it when you arrived on the scene?
12   A   Yes.
13   Q   Okay.  And the staining on the ground -- was
14  that the blood that you were referring to in your trial
15  testimony?
16   A   I believe so.
17   Q   All right.  Do you remember whether or not
18  Mr. Garcia was conscious when you arrived?  When you saw
19  him?
20   A   He wasn't.  He was unconscious.
21   Q   Okay.  And, Mr. Garcia -- would it be fair to
22  say that when you encountered his body on the street
23  that he was wearing clothing?
24   A   Yes.
25   Q   And when you -- and you approached

59

1  Mr. Garcia's body; is that correct?
2    A   Yes.
3    Q   When you approached Mr. Garcia's body, did you
4  have an opportunity to observe whether or not he was
5  wearing any jewelry?
6        MR. YAMIN:  Objection to the form.
7    A   I independently don't recall.  I don't recall.
8    Q   Okay.  Let's look at Exhibit 1 - sorry,
9  Exhibit 2.  So the trial transcript, going to be page 57
10  and I'll bring it up on the screen as well.  And
11  starting at line 21, where it says, "Now when you
12  observed Mr. Garcia laying on the street -- lying on the
13  street, did he have any jewelry on?"  And your response
14  is, "Yes."  And the question goes, "Do you recall what
15  items of jewelry you saw?"  And your response was,
16  "He had on several rings, and I believe he had several
17  gold chains around his neck."  Do you see that?
18   A   Yes.
19   Q   Does that refresh your recollection as to
20  whether or not Mr. Garcia had rings and chains on his --
21  or if he was wearing jewelry that night?
22   A   According to my sworn testimony, he had rings
23  on, and I believe he had on several gold chains.  I
24  believed that then and I got to believe it now.
25   Q   Okay.  And do -- you have no reason to dispute

60

1  it; is that correct?  Your trial testimony, right?
2    A   Correct.
3    Q   And -- but you don't -- it sounds as though
4  you don't independently recollect that visual; is that
5  correct?
6    A   That's correct.
7    Q   Okay.  And -- did you have an opportunity to
8  check whether -- on the crime scene, did you have an
9  opportunity to check whether or not Mr. Garcia still had
10  custody of his wallet?
11   A   Yes.
12   Q   And did you find a wallet on Mr. Garcia?
13   A   Yes.
14   Q   All right.  And in that wallet was there any
15  cash?
16   A   I believe so.  I -- I -- I believe so.
17   Q   Okay.  Let's go to your trial transcript in
18  Exhibit 2, page 66.  All right.  The question --
19  starting at line 23, it says, "Okay," -- do yo -- and
20  I'm showing it on the screen if you prefer to look there
21  as well.  It says, "Okay.  Did you check his personal
22  belongings at that time?"  And the answer on page 67,
23  starting at line 1 is, "I went in his back pocket and
24  pulled out a wallet."  And the question is, "And in his
25  wallet, he had some cash?"  And your answer was, "Yes."

61

1  Do you remember giving that testimony?
2    A   Yes.  I'm -- yes.
3    Q   And do you remember --
4    A   I remember --
5    Q   -- do you have any recollection -- do you have
6  an independent recollection of finding cash in the
7  wallet?
8    A   I don't have an independent recollection of
9  the amount or how mu -- exactly how much he had on him.
10  I do re -- recall getting his ID.  That's how I put it
11  on -- how I was able to identify him for the case
12  report.  I don't remember the money.
13   Q   The ID that you found, was that a driver's
14  license?
15   A   Yes.
16   Q   Okay.  While you were on the scene, you called
17  the ambulance; is that correct?
18   A   Yes.
19   Q   And did you notify any other officers?
20   A   Yes.
21   Q   Who did you notify?
22   A   To the best of my recollection.  I would've
23  called for a supervisor and other assist units to help
24  contain the crime scene.  That would be based on my
25  training at the time, That's --

The Deposition of DARREN DOSS, taken on September 13, 2021

62

1    Q    Okay.
2    A    -- that's the only thing I can re --
3         MS. SPENCE:  George, do you have the case
4    report in this case?
5         MR. YAMIN:  Yes.
6         MS. SPENCE:  Can you pass that to officer --
7    sorry, to Mr. Doss, please?
8         MR. YAMIN:  Yes.
9         THE WITNESS:  Thanks.  I have it.
10        MS. SPENCE:  Mr. Doss, can you confirm that you
11   have two pages in front of you that are Bates stamp
12   City Jakes 60 City -- and City Jakes 61?
13        THE WITNESS:  Yes.
14        MS. SPENCE:  Okay.  Why don't we --
15        MR. YAMIN:  Can you hold up one second?
16        MS. SPENCE:  -- go ahead and discuss it.
17        MR. YAMIN:  Can you hold for just for a second?
18   Mr. Doss has got some of the pieces of paper here, I
19   just want to let him have some room to be able to do
20   some --
21        MS. SPENCE:  Sure.
22        MR. YAMIN:  -- testify.  They're here if you
23   need -- if you're going to ask him about anything
24   else from the Exhibits 1 or 2, I just want to --
25   just a little clutter.  Okay.

63

1    BY MS. SPENCE:
2    Q    Right.  And, Mr. Doss, given the number of
3    pieces of paper that you're dealing with, the trial
4    transcript, and the photographs, if it would be easier
5    for me to just pull it up, just let me know and I can
6    pull it up on your screen.  I think this might be less
7    unwieldy because it's only two pages, okay?
8    A    Yes.
9         MS. SPENCE:  Why don't we go ahead and mark
10   City Jakes 60 through 61 as Exhibit 3?
11        (EXHIBIT 3 MARKED FOR IDENTIFICATION)
12   BY MS. SPENCE:
13   Q    Mr. Doss, do you recognize Exhibit 3?
14   A    Yes.
15   Q    What do you recognize Exhibit 3 to be?
16   A    My handwritten case report of the events of
17   that night.
18   Q    Okay.  And it's your handwriting that appears
19   on that case report?
20   A    Yes.
21   Q    And I'm directing your attention to the bottom
22   row in box 92 where it says, "D. Doss".  And if you
23   move over a little, it says, "Sergeant White, Number
24   1721".
25   A    Yes.

64

1    Q    Do you see that there's a box that has an x on
2    it that says notify?
3    A    Yes.
4    Q    Who is Sergeant White in relation to you on
5    September 16, 1991?
6    A    Next to his name, it says Area 3BC, which
7    would be the Area 3 Violent Crimes.  That's a phone
8    notification and that's what we would call in.  At the
9    time it was located at 39th in California.
10   Q    Got it.  Was Sergeant White your supervisor?
11   A    No.
12   Q    Got it.  Can you turn to page 2 of Exhibit 3?
13   A    Yes.
14   Q    Looking on the right-hand side of that report
15   where it says, "Notifications", do you see that section?
16   A    Yes.
17   Q    Okay.  It indicates Sergeant White, as you
18   mentioned before -- and that -- and it has a time that
19   says, "00:55 hour", Do you see that?
20   A    Yes.
21   Q    And would that be the time that you would have
22   notified Sergeant White?
23   A    Yes.
24   Q    And how would -- so why did you notify
25   Sergeant White?

65

1    A    At the time, you would call a detective
2    division, and Sergeant White was the lucky soul that
3    answered the phone.
4    Q    Got it.  And was it -- would you call the
5    detective division because it was a shooting?
6    A    Yes.
7    Q    And below that it says, "PO Russell".  Do you
8    see that?
9    A    Yes.
10   Q    It says, "009 district desk."
11   A    Yes.
12   Q    Who is -- who -- I assume PO stands for police
13   officer, right?
14   A    Yes.
15   Q    Who's Police Officer Russell?
16   A    That would be Angie Russell and she was
17   working the desk that night.  And she was the one that
18   answered the phone when I called the station to make the
19   notification.
20   Q    Okay.  And why did you -- sorry.  Why would
21   you need to call PO Russell in addition to Sergeant
22   White?
23   A    That was part of our training at the time and
24   what we were told to do.  The 9th District is loc -- at
25   the time was located at 35th and Lowe.  That was our

The Deposition of DARREN DOSS, taken on September 13, 2021

---

66

1   district of assignment.  The area detective division is
2   the area -- that area of the city, which is more
3   encompassing than the 9th District.  So you call the
4   detectives in their location, and where they're housed.
5   And then, also, we notify our own station so the watch
6   commander can be notified and, you know, it's a -- a
7   news-worthy or a -- a notable event.
8       Q    Going down one more line where it says, "First
9   Deputy Police Officer Lanners", L-A-N-N-E-R-S.  Do you
10  see that?
11      A    Yes.
12      Q    All right.  And who is Police Officer Lanners
13  back in September 16, 1991?
14      A    That was another notification we had to make,
15  and it was to headquarters, and it was pre deputy desk
16  first deputy's office located at headquarters.  And,
17  like I said, another person who was working the desk and
18  headquarters at the first deputy's office who we were
19  required to make a notification to.
20      Q    Got it.  Now, going down a line where it says,
21  "Zone 13, Zeiger", I want to say --
22      A    Yes.
23      Q    -- or Zeiger.  It spells Z-E-I-G-E-R.  Who is
24  that?
25      A    That would be today's equiv -- equivalent to

---

67

1   OEMC, Office of Emergency Management and Communication,
2   making a notification to them as well.
3       Q    And going down one more line where it says,
4   "Beat 930 at scene".  Do you see that?
5       A    Yes.
6       Q    Who was on beat 930 on September 16, 1981?  Do
7   you remember?
8       A    No.  I don't.
9       Q    Okay.  And that was not your beat; is that
10  correct?
11      A    That's correct.
12      Q    Was your beat 933?
13      A    No.
14      Q    I'm referring to you -- the first page of
15  Exhibit 3 in box 7.
16      A    No.  I would be box 8, unit assigned.
17      Q    All right.  So your beat was 936A?
18      A    Yeah.
19      Q    And the place that the shooting occurred --
20  that was beat 933?
21      A    Correct.
22      Q    Got it.  And then, going back to page 2 of
23  Exhibit 3 where it says, "8/3 VC beat 5316 at scene", do
24  you see that line?
25      A    Yes.

---

68

1       Q    Is it the same for Area Three violent crimes?
2       A    Yes.
3       Q    Do you know to which individuals that beat
4   refers?
5       A    No.  At the time that they would've arrived, I
6   wasn't at the scene.  So that's why they're noted at the
7   -- at -- as that because I don't know who they are.
8       Q    How did you know that they arrived if you
9   weren't at the scene?
10      A    Other officers at the -- from the scene
11  might've communicated that to me -- to me via radio, but
12  I wasn't at the scene upon their arrival.
13      Q    Going up a number of lines where it says,
14  "On-scene: Call-in".  Do you see that section on the
15  right-hand side of page 2 of Exhibit 3?
16      A    Yes.
17      Q    Where it says, "Crime lab".  And then -- it's
18  a little bit illegible.  Was crime lab on the scene
19  while you were there?
20      A    I -- I don't recall.  I -- I -- I -- I -- I
21  would say I don't believe they were because for
22  procedure and training, if the victim was loaded up into
23  the ambulance, I pro -- I'll accompany the ambulance to
24  the hospital.
25      Q    Okay.  And then, below that it says, "Ceasar",

---

69

1   C-E-A-S-A-R, "number 7208".  Is that a detective or an
2   -- a detec -- an officer?
3       A    Based on the star number, I would considered
4   to be an officer.
5       Q    Okay.  And the star number is the 7208, and
6   that's what you're referring to as star number.
7       A    Yes.
8       Q    Was Officer Ceasar on the scene when you were
9   there?
10      A    As I said before, I don't believe so.
11      Q    Okay.  And what about -- going over just one
12  name where it says, "McCann", M-C -- little C --
13  C-A-N-N, "number 8137."  Was Officer McCann on the scene
14  when you were there?
15      A    To my recollection, no.
16      Q    Okay.  While you were on the scene, did any
17  officers arrive?
18      A    Yes.
19      Q    Do you know who -- which officers arrived?
20      A    I'm sure numerous officers showed up for some
21  reason.  The only two that pop into my mind are
22  Officer Thomas Hawkins and Sebastian Weaver (phonetic).
23      Q    And that's Hawkins, H-A-W-K-I-N-S?
24      A    Yes.  Hawkins.  Yes.
25      Q    And Weaver, common spelling?

The Deposition of DARREN DOSS, taken on September 13, 2021

70

1    A   Yes.
2    Q   And after you -- did -- you notified the
3  ambulance, I think we covered that.  Did you secure the
4  scene while you were there?
5    A   I secured it until the other officers arrived
6  and I went to the hospital with the victim.
7    Q   When you say that you "secured it until other
8  officers arrived," what did that entail securing the
9  scene?
10    A   Basically, making sure nobody approached it.
11  It might've been putting up crime -- crime scene tape,
12  and making sure the area was roped off and nobody was
13  able to enter into that immediate area.
14    Q   And why -- and was -- is it important to
15  secure a crime scene?
16    A   Yes.  In order to preserve the evidence -- or
17  possible evidence that might be there.
18    Q   Right.  And is to make sure that nothing is
19  moved or discarded accidentally?
20    A   And properly documented, correct.
21    Q   The photographs that are in Exhibit 1 -- are
22  those the photographs that crime scene took?
23    MR. YAMIN:  Objection to the foundation.
24    MS. SPENCE:  Sorry.  The crime lab.
25    MR. YAMIN:  Same objection.

71

1    A   To my knowledge.  Yes.
2  BY MS. SPENCE:
3    Q   Okay.  And you didn't take those photographs?
4    A   No.
5    Q   Okay.  While you were on the crime scene, did
6  you canvass for any witnesses?
7    A   I spoke to -- based on my case report, I -- I
8  spoke to two people.
9    Q   Okay.  And who were the two people that you
10  spoke to based, on your case report?
11    A   The initial one would be the hand waiver who
12  was directing us to what had happened, and the other one
13  was the -- I want to say he was the owner of the
14  restaurant that this scene happened in front of.
15    Q   And just to clarify, when we were talking
16  about Exhibit 3 in your case report, did you list the
17  exhib -- the witnesses that you encountered in box 31?
18    A   Yes.
19    Q   Okay.  So I want to just take each of them in
20  turn starting with the hand waiver.  When you spoke to
21  the hand waiver, was Officer Donovan with you?
22    A   Yes.
23    MR. YAMIN:  Excuse me a second.  Would you
24  restate that question?  I didn't catch the verb of
25  the question.

72

1    Q   When you spoke to the hand waiver, was
2  Officer Donovan with you?
3    MR. YAMIN:  Yeah.  Objection, foundation.
4    A   Was he standing next to me?  I don't -- I
5  don't recall, but I know he was in the -- in the
6  immediate area.
7    Q   When you spoke to the hand waiver, did you --
8  what information did you receive from the hand waiver?
9    A   Basically, I asked him what happened, and he
10  just told me somebody got shot, and that -- that's the
11  best of my recollection.
12    Q   And you indicate in your report that he didn't
13  -- he refused to provide any identifying information?
14    A   Correct.
15    Q   Okay.  And when you spoke to -- in box 31,
16  there's a person named Gurgid Singh, do you see --
17  G-U-R-G-I-D, Singh, S-I-N-G-H.  Do you see that?
18    A   Yes.
19    Q   Okay.  Is that the owner of the restaurant
20  that you're referring to?
21    A   I -- I believe he was the owner.
22    Q   Okay.  When you spoke to Mr. Singh, was
23  Officer Donovan present for that conversation?
24    A   Like I said, I don't know if he was standing
25  next to me, but I know he -- he was in the immediate

73

1  vicinity.
2    Q   Okay.  So just looking in Exhibit 3, box 32 of
3  Exhibit 3, it says, "1206 West 51st Street", Do you see
4  that?
5    A   Yes.
6    Q   Would that have been Mr. Singh's address?
7    A   That is -- at the time there was a restaurant.
8  So that -- the -- the address that he gives -- whatever
9  address someone gives you, is the address that you list.
10    Q   Right.  And that's the address that Mr. Singh
11  gave you?
12    A   Correct.
13    Q   And where it says, "Box 33", it says, "M", and
14  that stands for male, right?
15    A   Yes.
16    Q   Six.  Does that mean Asian Pacific Islander?
17    A   According to the ledger on the codes to the
18  right of that.  Yes.
19    Q   And it says, "20".  Is that -- would that have
20  been Mr. Singh's age?
21    A   Yes.
22    Q   Did he provide you with information about his
23  age?
24    A   That's the number he gave me.  That's the
25  number I wrote down.

The Deposition of DARREN DOSS, taken on September 13, 2021

74

1    Q    Got it.  And for box 34, it has a series of
2  seven digits.  Is that the phone number?
3    A    Yes.
4    Q    Okay.  In box 35, there is another series of
5  -- I can't tell if it's a different set of seven digits.
6    A    It's the same number.
7    Q    Okay.  And what -- why are there two -- oh,
8  one's a home phone and one's a business phone number.
9    A    Correct.
10    Q    And you got that from Mr. Singh, right?
11    A    Yes.
12    Q    Got it.  And what did Mr. Singh tell you when
13  you spoke to him?
14    A    Well, according to -- if you look back at
15  box 31, he witnessed it and he reported the offense.
16    Q    And when he reported the event, did he give
17  you any details?
18    A    I have to review my case in de -- my case
19  report in detail and try to see what he said.
20    Q    Okay.  Why why don't you just take a moment to
21  look at it and see if that refreshes your memory.
22    A    Okay.  Pretty quick.  Yes.  I -- I can see
23  where I spoke with him.
24    Q    Okay.  And do you have any independent
25  recollection of what Mr. Singh told you?

75

1    A    No.
2    Q    Okay.  Is your knowledge of what Mr. Singh
3  told you based on what you wrote in Exhibit 3?
4    A    Yes.
5    Q    Okay.  And -- so in Exhibit 3 you wrote that
6  Witness 1 stated that he heard five shots and then
7  called the police.
8    A    Yes.
9    Q    Okay.  And Witness 1 refers to Mr. Singh,
10  correct?
11    A    Correct.
12    Q    All right.  Other than the two people listed
13  in your report, did you speak to any other witnesses on
14  the crime scene?
15    A    I'm sorry, can you repeat that?
16    Q    Yes.  Other than the two witnesses that you
17  list on your report, did you speak to any other
18  witnesses at the crime scene that night?
19    A    To my recollection, no.
20    Q    If you had spoken to other witnesses, would
21  you have reflected it on your police report?  Would that
22  have been your habit?
23    A    Yes.
24    Q    Okay.  At some point the ambulance came to the
25  crime scene, correct?

76

1    A    I'm sorry, can you --
2    Q    Yes.  Sorry, I was speaking quickly.  At some
3  point the ambulance came to the crime scene?
4    A    Correct.
5    Q    And did you go with the victim to the
6  hospital?
7    A    Yes.
8    Q    Did Officer Donovan go with you to the
9  hospital?
10    A    Yes.
11    Q    Okay.  And what happened when you got to the
12  hospital?
13    A    We would determine via the doctor at the
14  hospital, based on our training, the doctor would've
15  examined him and basically gave us his diagnosis and
16  what his condition is so we can continue the
17  investigation.
18    Q    And did the doctor give you any kind of
19  diagnosis?
20    A    According to my case report at the time we
21  were there, his condition was critical.
22    Q    Other than learning that the condition was
23  critical, did you learn any other information from the
24  doctor?
25    A    No.  They would have been do -- I would've --

77

1  by my training I would have documented it on my case
2  report if I have been told more.
3    Q    Did you speak to any officers at the hospital?
4    A    My recollection, no.
5    Q    You don't recollect whether or not you spoke
6  to any officers at the hospital?
7    A    No.  I don't.
8    Q    Okay.  Did you ever take custody of any
9  property -- any of Mr. Garcia's property?
10    A    To my recollection, no.
11    Q    Did you speak to any of Mr. Garcia's family
12  members?
13    A    To my recollection, no.
14    Q    Okay.  Other than speaking to the doctor at
15  the hospital, did you do anything else at the hospital
16  in relation to this investigation?
17    A    So you -- I -- I missed a couple of words
18  there.  Could you repeat that, please?
19    Q    Other than speaking to the doctor at the
20  hospital, did you do anything else at the hospital that
21  was related to this investigation?
22    A    I believe while I was at the hospital, I might
23  have used the phone to make notifications.  Other than
24  that, no.
25    Q    Okay.  So after you left the hospital, what

The Deposition of DARREN DOSS, taken on September 13, 2021

78

1    did happen next?
2         MR. YAMIN:  Objection to Form.
3         A    Okay.  I would've -- after -- after I left the
4    hospital, my portion of the investigation would've been
5    completed.  I would've taken my completed case report
6    and returned to the station or met up with my sergeant
7    to -- to give it to him.  So then, that completes my
8    part of the investigation.
9         Q    Okay.  When you completed your case report,
10   did officer Donovan have an opportunity to review the
11   case report?
12        A    Yeah.
13        Q    And did you both review it for accuracy?
14        MR. YAMIN:  Objection.  Foundation.
15        Q    Go ahead.
16        A    Well, according to our training and what we
17   were taught at the time, we were supposed to both review
18   it for accuracy.  I know I reviewed it for accuracy, and
19   at which point I applied my signature.
20        Q    Do you have any reason to believe that
21   Officer Donovan did not review for accuracy before
22   signing the document -- before signing Exhibit 3?
23        MS. JOHNSON:  Objection.  Foundation.
24        Q    Sorry.  Go ahead.
25        A    I was going to say I -- I know I don't have

79

1    any reason to think that he wasn't.
2         Q    And just looking at Exhibit 3 box 86 -- sorry
3    box 95, is that your signature in the officer's
4    signature section?
5         A    Yes.
6         Q    And looking right below that where it says
7    P. Donovan, does that appear to be officer Donovan's
8    signature?
9         MS. JOHNSON:  Objection.  Foundation.
10        A    Actually, where are we at?
11        Q    Just the bottom of Exhibit 3, box 96.
12        A    Okay.  Did say P. Donovan?
13        Q    It says P. Donovan.
14        A    That's where I'm not seeing.  All the way at
15   the bottom.  Okay.  I guess I got confused
16   characterizing of that signature.
17        Q    No.  So looking to the right of where it says
18   P. Donovan, Mr. Doss, does that have -- have you seen
19   Mr. Donovan?  Sorry, George, you're saying things?
20        MR. YAMIN:  I just -- proceed.  I just --
21        Q    Okay.  So Mr. Doss, have you seen
22   Officer Donovan's signature before?
23        A    I -- I couldn't tell you yes or no.  I -- I
24   don't -- I wouldn't know what it looked like.
25        Q    Got it.  So after you -- just looking at

80

1    box 97 where it says supervising approve -- supervisor
2    approval -- so there's still the bottom rows.
3         A    Yes.
4         Q    Do you know why that the supervisor approval
5    instruction is blank?
6         MS. JOHNSON:  Objection.  Foundation.
7         MS. SPENCE:  Sorry.
8         MS. JOHNSON:  You know we're just --
9         THE WITNESS:  No.  I wouldn't know.
10        MS. JOHNSON:  -- we're going to stipulate --
11   can we stipulate that like all of the defense's
12   objections comfortable, so I don't have to keep
13   talking over George or vice versa.
14        MS. SPENCE:  Sure.
15        MS. JOHNSON:  Okay.  Cool.  All right George
16   you can continue.
17        MR. YAMIN:  Well, we -- I think we both made a
18   foundation.  Defendants made a foundation objection.
19        MS. SPENCE:  Okay.
20        MR. YAMIN:  The witness may have answered but
21   it's not right.
22        THE WITNESS:  I -- if I did not know.  I don't
23   know why it's blank.
24   BY MS. SPENCE:
25        Q    Right.  And typically -- and you submitted

81

1    Exhibit 3 -- is that your recollection you submitted it
2    to your supervisor?
3         A    Yes.
4         Q    And typically, when your supervisor approves
5    your report, the supervisor's signature would appear in
6    box 97 on the case report; is that correct?
7         MS. JOHNSON:  Objection to Foundation.
8         Q    Go ahead.
9         A    That's correct.
10        Q    All right.  And looking at page 2 of
11   Exhibit 3, looking towards the middle right-hand side
12   where it says, "I have reviewed this case report and my
13   signature indicates that it's acceptable."  Supervisor
14   signature.  Do you see those fields?
15        A    Yes.
16        Q    Do you know why the fields are blank?
17        MS. JOHNSON:  Objection, foundation.
18        Q    Go ahead.
19        A    No.
20        Q    All right.  Do you have any reason to believe
21   that your case report in this case, was not approved by
22   a supervisor?
23        MS. JOHNSON:  Objection, foundation.
24        A    No.
25        Q    Okay.  Like, at no point did someone return

The Deposition of DARREN DOSS, taken on September 13, 2021

---

82

1  your case report and tell you that they were -- there
2  needs to be corrections or changes made to your case
3  report; is that right?
4      A    From my recollection.  No.
5      Q    Okay.  Looking at page 2 of Exhibit 3, where
6  I'm looking at the left-hand side -- the last two lines
7  where it says, "Car accident report made, RD number
8  P868871."  Do you see that?
9      A    Yes.
10     Q    Okay.  Who filled out the car accident report?
11     A    I don't recall.
12     Q    Would you have been the officer who had filled
13  out a car accident report?
14         MR. YAMIN:  Objection, foundation.
15     A    I don't recall and -- and it could be
16  possible, but I don't recall completely.
17     Q    Okay.  In September 1991, had you -- did you
18  ever have any experience of filling out a car accident
19  report?
20     A    Yes.
21     Q    When you filled out a car accident report
22  where did you go?  Like, after you had filled it out,
23  what did you do with the report?
24     A    It would -- just like this report, it would be
25  turned in at the state desk in the 9th District for

---

83

1  approval.
2      Q    Right.  So this submission process for a car
3  accident report in September 1991 was the same as the
4  submission process for a case report?
5      A    Correct.
6      Q    Do you remember if you spoke to any detectives
7  about what you witnessed and learned at the crime scene?
8  Sorry, let me restate the question.  Do you -- did you
9  speak to any detectives about what you witnessed and
10  learned at the crime scene?
11     A    Based on my report, I know that I talked to
12  Sergeant White in the Area 3 Violent Crimes that's a
13  detective division.
14     Q    Okay.  Do you have any recollection of
15  speaking to Officer Caesar about what you learned at the
16  crime scene?
17     A    No.
18     Q    And just to be clear, I'm not talking about
19  when you spoke to -- if you spoke to them at the crime
20  scene.  It's just -- did you convey to them at any
21  point.  Did you convey to Officer Caesar at any point
22  the information that you gleaned from your time at the
23  crime scene?
24     A    Not to my recollection.  No.  I don't recall.
25     Q    And what about Officer McCann?  Did you convey

---

84

1  any information to Officer McCann about what you learned
2  about -- what the events of the crime scene?
3      A    Not that I can recall.
4      Q    Other than -- is there any involvement in this
5  case that we have not discussed?
6         MR. YAMIN:  Objection to Form --
7         MS. SPENCE:  All right.
8         MR. YAMIN:  -- and foundation.  Maybe you
9  weren't done with the question.
10         MS. SPENCE:  It -- well, it was not a good
11  question.  I think that's why there was that pause.
12  Other than your activity at the crime scene and the
13  hospital and the fact that you testified at the
14  trial, did you have any other involvement in this
15  case?  In that Garcia Homicide Investigation?
16         MR. YAMIN:  Objection to form.
17     A    No.
18  BY MS. SPENCE:
19     Q    Do you know a person named Arnold Day?
20     A    Sorry, can you say that name again?
21     Q    Do you know a person named Arnold Day?
22     A    Not that I know of.
23     Q    Do you know the plaintiff in this case,
24  Mr. Anthony Jakes?
25     A    Not that I know of.

---

85

1      Q    Have you ever met Mr. Jakes?
2      A    Not that I know of.
3      Q    Have you ever met Mr. Day?
4      A    Not that I know of.
5      Q    Did you ever encounter in your -- during your
6  time working on the Garcia Homicide Investigation, did
7  you ever encounter a witness named Snake, who also went
8  by the name of Gus Robinson?
9      A    Sorry, in my role, I was a preliminary
10  investigator.  I never conducted an investigation.  I
11  wasn't a detective.
12     Q    Right.  So in your role as a preliminary
13  investigator, did you ever encounter a person who went
14  by the name Snake or Gus Robinson?
15         MR. YAMIN:  Objection to Form.
16     A    No.  That would've been documented in my case
17  report.  But no.
18     Q    Okay.  So I'm going to go through the series
19  of names that followed the same general thought.  In
20  your role as a preliminary investigator, did you
21  encounter a person named Quarter Pound or Quarter
22  Pounder or Cleotha Chairse?  This is all the same
23  person.
24     A    No.
25     Q    Just for the record, Cleotha spells

The Deposition of DARREN DOSS, taken on September 13, 2021

86

1  C-L-E-O-T-H-A, Chairse spells, C-H-A-I-R-S-E.  In your
2  role as a preliminary investigator, did you encounter a
3  person by the named Naikia Little?
4      A   No.
5      Q   Did you encounter a person named Denise
6  Harris?
7      A   No.
8      Q   Did you encounter person named Annette Harris?
9      A   No.
10     Q   One more name --
11     MR. YAMIN:  Just a sec -- just one second,
12  please.  I want to -- objection 1.  And I'd like
13  that to be retroactive to the series of questions
14  that began when you were asking Mr. Doss if he had
15  encountered various individuals, I object to the
16  question.
17  BY MS. SPENCE:
18     Q   In your role as a preliminary investigator,
19  did you encounter a person by the name of Trey Walker?
20     A   No.
21     Q   And I -- if you had encountered any of these
22  people and learned their names would they have -- would
23  those encounters been reflected on your report?
24     MR. YAMIN:  Objection.  Calls for speculation.
25     THE WITNESS:  Based on my training, I would

87

1  have to documented this on this case report on what
2  we call a supplemental report, and I would've been
3  obligated to complete it.
4      MS. SPENCE:  All right.  I don't have any
5  further questions.
6      MR. YAMIN:  Want to take a brief break?
7      MS. SPENCE:  Okay.
8      (OFF THE RECORD)
9      COURT REPORTER:  We're on record at 12:03 p.m.
10         CROSS EXAMINATION
11  BY MR. YAMIN:
12     Q   I know you know who I am Mr. Doss, but to
13  remind you -- attorney for this defendant, City of
14  Chicago.  I have just a few questions for you.  The
15  offense that you investigated that you've been
16  questioned about extensively in the deposition and that
17  are reflected in Exhibit 3 of your case report that you
18  prepared, they occurred in 1991, correct?
19     A   Correct.
20     Q   And you're testifying today.  Today's date is
21  September 13, 2021, correct?
22     A   Correct.
23     Q   Is your memory of the events that occurred
24  that -- were you involved in the investigation that
25  you've been asked about at the deposition -- is your

88

1  memory of -- the events that you investigated in 1991--
2  was it better?  In 1991 in the years at -- a few years
3  later than it is today?
4      MS. JOHNSON:  Objection to form.
5      A   My recollection of events in 1991 would have
6  been closer -- better -- closer to 1991 as we sit here
7  30 years later.  But, you know, a few years after 1991,
8  you know life happens, career happens, and more things
9  get piled on on top of your memory.  So I would say my
10 memory of 1991 was better in 1991.
11     Q   Okay.  You also were questioned about
12  testimony you provided at the criminal trial of the
13  plaintiff, Mr. Jakes, represented to you that that
14  criminal occurred in 1994 I believe -- 1993 or 1994.
15  Again, today is the year 2021.  Is your memory of events
16  -- these events or the memory of the topics that you
17  testified about -- was it better at the time of the
18  trial testimony than it is today, almost 30 years later?
19     A   My memory of my sworn testimony at trial time
20  would definitely be better than it is in 2021 -- I mean
21  in 2021.  That's a long -- a long time afterward.  Like
22  I said before, you know, it's a lot memories pile on top
23  of what wasn't there in 1994.
24     Q   And is it correct that your testimony -- your
25  answers to questions that Plaintiff's counsel posed to

89

1  you with regards to your trial -- to the trial testimony
2  were based on what were provided after you were shown
3  portions of that trial testimony during your deposition?
4      A   Yes.
5      MS. JOHNSON:  Objection to Form.
6      Q   Is it also correct that your testimony about
7  -- at least some of the events that were related to the
8  investigation of this particular incident in 1991 --
9  strike that.  Is it correct that your review of the case
10 report that you prepared in 1991 stronger for having had
11 the chance to review the case report?
12     MS. JOHNSON:  Objection.  Form.
13     THE WITNESS:  Yes.  I reviewed my case report
14  to help provide testimony today.
15     MR. YAMIN:  No further questions so you can
16  proceed.
17     MS. SPENCE:  Okay.  Are you reserving
18  signature, George?
19     MR. YAMIN:  Yes.
20     COURT REPORTER:  All right.
21     MS. SPENCE:  Thank you Mr. --
22     (DEPOSITION CONCLUDED AT 1:08 P.M)
23
24
25

The Deposition of DARREN DOSS, taken on September 13, 2021

90

1          CERTIFICATE OF REPORTER
2              STATE OF INDIANA
3
4    I do hereby certify that the witness in the foregoing
5    transcript was taken on the date, and at the time and
6    place set out on the Title page hereof by me after first
7    being duly sworn to testify the truth, the whole truth,
8    and nothing but the truth; and that the said matter was
9    recorded by me and then reduced to typewritten form
10   under my direction, and constitutes a true record of the
11   transcript as taken, all to the best of my skills and
12   ability. I certify that I am not a relative or employee
13   of either counsel, and that I am in no way interested
14   financially, directly or indirectly, in this action.
15
16
17
18
19
20
21
22   ARIA EDWARDS,
23   COURT REPORTER / NOTARY
24   COMMISSION EXPIRES ON: 03/23/2029
25   SUBMITTED ON:  09/22/2021

The Deposition of DARREN DOSS, taken on September 13, 2021

**A**

A-U-D-I-E 29:16
A-U-D-Y 29:14,18,23
a.m 5:7 6:6 42:4 48:17 49:19
Aberdeen 2:6
ability 90:12
able 51:7 55:25 61:11 62:19 70:13
academy 12:5 13:24,25
acceptable 81:13
accident 38:23 39:1,8,24 40:11,14,16
41:9,10 42:18 51:21 82:7,10,13,18,21
83:3
accidentally 70:19
accompany 68:23
accuracy 78:13,18,18,21
accurate 10:22
accurately 9:8,22 47:5 50:1 51:20 55:2
acronym 25:15,15
action 90:14
active 7:23
activity 84:12
actual 51:6
add 47:25
addition 65:21
address 28:3 73:6,8,9,9,10
affirm 7:15 46:2 51:8
Aft 55:16
afternoon 14:15
afterward 88:21
age 73:20,23
agree 7:5,10,12 9:15 10:7
agreed 5:12
ahead 6:19 8:20 36:1 37:22 43:7,10
46:13 56:19 62:16 63:9 78:15,24
81:8,18
aid 40:1,14 41:9
airports 16:13
al 1:12 6:9 17:24
allow 9:5
ambulance 57:20 61:17 68:23,23 70:3
75:24 76:3
amount 61:9
Angie 65:16
Annette 86:8
answer 9:1,13,20 10:6 18:18 34:4
47:13 50:3,7 53:11 57:14 60:22,25
answered 65:3,18 80:20
answers 88:25
Anthony 1:7 2:3 6:8 8:11 84:24
anybody 40:14
anymore 52:12
apologize 47:8
appear 79:7 81:5
appearance 6:12 49:20
APPEARANCES 2:1 3:1
appeared 2:10,21 3:12 45:10,10 47:6
50:2
appearing 8:25 35:20
appears 49:18 51:5 54:11,14 58:4
63:18
applied 78:19
approached 41:10 57:12,13,19 58:25
59:3 70:10
approaching 39:15,22
approval 80:2,4 83:1
approve 30:17 80:1
approved 30:20 32:5 81:21
approves 81:4

**B**

B-O-N-K-E 21:5
back 24:1 25:3 26:16,23 27:17 28:21
29:8 31:3,18,22 32:6 42:3 44:4 47:6
49:19 50:2,13 54:2 60:23 66:13
67:22 74:14
badge 24:21
bag 54:15,18,19
base 34:6
based 21:24 51:8 52:24 53:20 61:24
69:3 71:7,10 75:3 76:14 83:11 86:25
89:2
basically 14:13 16:20 70:10 72:9 76:15
basis 21:23
Bates 4:9,10,11 43:16,19 46:3,8 50:14
58:2 62:11
beat 26:3 67:4,6,9,12,17,20,23 68:3
becoming 16:3
began 12:25 41:20 86:14
behalf 2:3,12 3:3 6:16,23
believe 12:6 13:14 14:5 22:21 23:13
34:12 36:21 39:13 40:7 58:16 59:16
59:23,24 60:16,16 68:21 69:10 72:21
77:22 78:20 81:20 88:14
believed 59:24
belongings 60:22
best 41:7 56:20 61:22 72:11 90:11
better 58:6 88:2,6,10,17,20
bit 9:3 68:18
bjohnson@rfclaw.com 3:11
blank 80:5,23 81:16
blood 56:23 57:2,4,4,6,7,19,24 58:14
body 55:7,12,15,19 56:10,13 57:14,17
57:19,24 58:10,22 59:1,3
Bonke 3:4 21:4,8 36:13

**C**

C 69:12
C-A-N-N 69:13
C-E-A-S-A-R 69:1
C-H-A-I-R-S-E 86:1
C-L-E-O-T-H-A 86:1
cab 31:5
cabinet 31:9
Caesar 3:4 19:17,17,24,25 36:7 83:15
83:21
California 64:9
call 15:6 25:11 26:2 30:12 31:9 64:8
65:1,4,21 66:3 87:2
Call-in 68:14
called 12:9 16:6 29:9,13 34:5 57:20
61:16,23 65:18 75:7
calls 30:10 33:8,25,25 56:17 86:24
canvass 71:6
capacity 14:22 24:1 26:16 27:3
captured 9:23 35:5
car 24:10,11,12,13 37:22 38:10,22,25
39:8 40:9,18,18 41:11,11,14,15,18
42:8,11,12,13,16 45:10 49:20 51:21
52:1,4 82:7,10,13,18,21 83:2
carbons 31:18
career 8:19 18:13 20:21 21:18 88:8
carried 26:14
carry 26:12
cars 51:22
case 1:3 6:11 8:11 19:13,23 20:8,14
21:8 22:25 26:14,15 28:15,16,17,19
29:3,5 30:23,23,25 31:4,8,13,14,15
31:19,25 32:1,16 33:9 35:22 36:16
38:2 61:11 62:3,4 63:16,19 71:7,10
71:16 74:18,18 76:20 77:1 78:5,9,11
81:6,12,21,21 82:1,2 83:4 84:5,15,23
85:16 87:1,17 89:9,11,13
cases 24:2
cash 60:15,25 61:6
casings 53:14
catch 71:24
Ceasar 68:25 69:8
center 29:10 54:15
certain 14:14
CERTIFICATE 90:1
certify 90:4,12
chains 59:17,20,23
Chairse 85:22 86:1
chance 89:11

area 12:3,19 13:19 47:5 50:1 64:6,7
66:1,2,2 68:1 70:12,13 72:6 83:12
areas 12:14 13:18
Aria 1:25 5:12 6:4 90:22
armed 21:16 24:25
Arnold 84:19,21
arrival 27:21 68:12
arrive 24:6 38:19 69:17
arrived 26:18,21 41:5 45:9 47:21 48:23
49:18 50:11,20 51:22 52:2,25 55:4,6
55:10 58:11,18 68:5,8 69:19 70:5,8
arriving 27:17
Asian 73:16
asked 9:14 13:16 41:21 44:1,9 72:9
87:25
asking 34:17 47:2 86:14
assigned 11:23 12:3,5,16 13:6,17 17:8
17:17,18 26:4 67:16
assignment 12:13 66:1
assist 57:21 61:23
assume 41:10 65:12
attempt 27:24
attended 5:6
attending 13:13,16,21,24 7:3
attention 49:22 56:22 63:21
attest 32:7
attire 24:17
attorney 33:4,11 34:1 48:6 87:13
attorneys 32:25 33:16,21
Audy 29:9,13,22
August 12:6,8
automobile 47:5 50:2 53:10

bottom 43:15 46:23 63:21 79:11,15
80:2
Boudreau 1:12 3:3 6:8 18:14,16,21,25
36:3
Boulevard 2:15
box 30:14,15 32:6,8 63:22 64:1 67:15
67:16 71:17 72:15 73:2,13 74:1,4,15
79:2,3,11 80:1 81:6
break 10:4,7 41:22 42:7 87:6
brief 87:6
briefing 26:2
Briefly 39:6
bring 26:6 59:10
Brittany 3:5 6:23
broken 53:14 54:14
brown 54:14,18,19
Burke 3:4 20:18 21:1 36:11
business 74:8

The Deposition of DARREN DOSS, taken on September 13, 2021

changed 15:5
changes 82:2
characterization 57:5
characterizing 79:16
check 60:8,9,21
Chicago 2:7,12,17 3:9 6:20 7:23 8:1
  11:4,7,10,13,16 13:19 16:24 21:12,19
  24:22 87:14
chicken 53:15,25 54:23,24
Chinatown 13:20
Chung 22:21,24 23:2
circumstances 29:4
citizen 25:10,24
city 2:12 6:20 50:14 51:12,20 54:4 55:2
  58:3 62:12,12,12 63:10 66:2 87:13
City_Jakes 4:9,11 43:16,19 44:5,19
  45:6 50:18
citywide 12:13,15
civil 5:9 36:16
civilians 41:4
clarification 34:18
clarify 9:11 14:2 37:9 47:20 49:3,7
  50:6 71:15
Clark 3:7 6:25
clear 49:4 83:18
Cleotha 85:22,25
clerk 32:6
closed 50:4
closer 88:6,6
clothes 14:17
clothing 58:23
clutter 62:25
codes 73:17
coercing 22:5,8
come 8:23 16:23 38:19,25
comes 22:18
comfortable 80:12
coming 19:4
command 14:6
commander 15:5,7,24,25 16:4,9,10
  66:6
commanding 16:21
COMMISSION 90:24
common 69:25
communicate 9:19 19:12
communicated 68:11
Communication 25:17 67:1
complaint 36:16
complete 10:22 29:12 87:3
completed 5:15 28:25 29:2 30:2,3 78:5
  78:5,9
completely 82:16
completes 78:7
comport 50:23
computer 52:6
CONCLUDED 89:22
condition 76:16,21,22
conditions 10:18
conducted 85:10
conduit 16:20
confirm 43:14,18 46:7,10 62:10
conforms 50:25
confused 49:11 79:15
connection 35:16
Connelly 3:6
conscious 56:15 58:18
consecutively 43:22
considered 69:3

console 54:15
constitutes 90:10
contact 28:2,12 35:21 36:3
contain 61:24
contained 26:15
content 33:10
contents 54:19,22
continue 76:16 80:16
CONTINUED 3:1
convened 6:6
conversation 12:23
convey 83:20,21,25
Cool 80:15
cooperate 52:6
coordinated 16:11
coordinator 16:22,25
copies 31:4,11,19 51:18
copy 30:19,25 31:1,6,6,8,10,22,22,23
  31:25 44:22 45:19,20 46:17
Cor 52:3
correct 7:24 14:10 15:19,20 23:10
  37:15 41:11 49:14 52:3 54:9 55:12
  59:1 60:1,2,5,6 61:17 67:10,11,21
  70:20 72:14 73:12 74:9 75:10,11,25
  76:4 81:6,9 83:5 87:18,19,21,22
  88:24 89:6,9
corrections 82:2
Cottage 14:21 15:24
counsel 6:14 9:4 88:25 90:13
couple 33:7 53:14 77:17
course 8:18 39:25
court 1:1 5:13 6:3,4,9 7:1,5,10,13,19
  32:16,17 34:14 35:2,5 42:3 48:13,17
  50:5 87:9 89:20 90:23
covered 70:3
CPD 22:12
crime 26:2,18 38:16,20 42:9 44:11
  47:10,21 49:19 52:2 55:4,6,10,13
  60:8 61:24 68:17,18 70:11,11,15,22
  70:24 71:5 75:14,18,25 76:3 83:7,10
  83:16,19,23 84:2,12
crimes 64:7 68:1 83:12
criminal 88:12,14
critical 76:21,23
CROSS 4:5 87:10
CST 5:7
currently 7:22 10:25
custody 60:10 77:8

D

D 63:22
Darren 1:23 5:3 6:7 7:3
date 1:24 34:8 37:4,17,23 47:8 87:20
  90:5
dates 15:17
day 5:7 6:5 47:9 48:25 49:2 84:19,21
  85:3
de 74:18
dealing 63:3
deceased 36:5
December 11:24 12:11 13:4 15:17
deemed 26:20
defendant 6:24 22:15 23:10,21 87:13
defendants 1:13 2:12 3:3 19:3 35:21
  80:18
defendants' 36:2
defense's 80:11
define 34:21

definitely 88:20
Delacy 3:4 20:11,15 36:9
delay 9:3
Denise 86:5
department 7:24 8:2 11:5,8,11,14,17
  12:18 21:12,19 24:22
depended 26:19
depending 28:24 29:2 30:8
depict 47:5 50:1,19 51:20 55:3
depicted 52:22
DEPONENT 1:23
deposition 5:3,8 6:7 8:13,14,14,17,21
  9:17 10:4,22 29:21 32:10,13 33:1
  34:2,14,25 35:20 36:15 42:20 44:2,9
  44:13,17 87:16,25 89:3,22
deputy 66:9,15
deputy's 66:16,18
describe 56:9 57:1
designated 14:14
desk 65:10,17 66:15,17 82:25
detail 74:19
detailed 17:9
details 16:15 74:17
detec 69:2
detective 18:14,14,21 19:5,8,12,13
  29:10 31:21 32:1 33:20,21 65:1,5
  66:1 69:1 83:13 85:11
detectives 66:4 83:6,9
determine 76:13
diagnosis 76:15,19
difference 14:11 15:1
different 16:12 17:17,19 74:5
digits 74:2,5
dignitary 16:13
direct 4:4 7:20 49:21
directing 63:21 71:12
direction 39:12 90:10
directly 90:14
discarded 70:19
disciplined 21:20,24
discuss 62:16
discussed 33:11 84:5
discussion 33:9
dispatch 25:14
dispatched 25:9
dispute 53:22,23 59:25
district 1:1,2,2 6:9,10 12:6 13:7,9,18
  13:22,23 14:3,7,20,23 15:24 16:1,4
  17:5,6,9 18:8 37:15 65:10,24 66:1,3
  82:25
districts 12:14
division 6:11 20:21,22 29:10 31:22
  32:1 65:2,5 66:1 83:13
doctor 76:13,14,18,24 77:14,19
document 10:13 27:24 28:8,13,13 51:9
  78:22
documented 28:11 48:21 70:20 77:1
  85:16 87:1
documents 10:11,11,15 32:12,15
doing 27:14
Donavan 40:8
Donovan 33:20,22,22 37:19 38:3,7
  41:15 42:12 48:22 71:21 72:2,23
  76:8 78:10,21 79:7,12,13,18,19
Donovan's 79:7,22
door 45:12 50:4,7,11
Doss 1:23 5:3 6:7 7:1,3,6,11,13,22 8:5
  8:8,9 10:24 23:24 32:9 36:18 37:9

The Deposition of DARREN DOSS, taken on September 13, 2021

38:5 42:6,19 43:13 45:7,14,24 46:2
46:22 47:21 48:22 50:16 51:13 54:3
54:5 62:7,10,18 63:2,13,22 79:18,21
86:14 87:12
**Doss'** 45:15
**draw** 17:17
**drawn** 29:1
**Drive** 16:14
**driver's** 45:12 50:4 61:13
**driving** 24:12 38:10 39:7,9 40:5
**duly** 90:7
**duties** 26:17 27:2
**duty** 24:18

**E**

**E-mail** 2:9,20 3:11
**earlier** 8:6,10 44:1,9
**easier** 63:4
**Eastern** 1:2 6:10
**Edwards** 1:25 5:12 6:4 90:22
**efficient** 8:13
**eight** 36:25
**either** 30:14 90:13
**Emergency** 25:16 67:1
**employee** 90:12
**encompasses** 13:18
**encompassing** 66:3
**encounter** 55:7 85:5,7,13,21 86:2,5,8
86:19
**encountered** 55:12 58:22 71:17 86:15
86:21
**encounters** 86:23
**enforcement** 11:11,14
**engine** 53:2,11,19
**entail** 70:8
**enter** 70:13
**entire** 13:21 14:7 17:10 34:15,21 43:8
**entirety** 35:10
**equiv** 66:25
**equivalent** 66:25
**established** 37:4
**et** 1:12 6:9
**ev** 26:9
**event** 51:6 66:7 74:16
**events** 49:15 63:16 84:2 87:23 88:1,5
88:15,16 89:7
**eventually** 17:19 42:13 55:21
**everybody** 6:1
**evidence** 21:24 22:2 70:16,17
**exactly** 61:9
**EXAMINATION** 4:4,5 7:20 87:10
**examined** 76:15
**Excuse** 30:6,10 41:20 47:14 71:23
**executive** 16:7,9
**exhib** 71:17
**exhibit** 4:8 44:6,7,12,16,20 46:15,18,22
49:21 50:13 51:11 54:2,2,4 57:8,9
58:1,7 59:8,9 60:18 63:10,11,13,15
64:12 67:15,23 68:15 70:21 71:16
73:2,3 75:3,5 78:22 79:2,11 81:1,11
82:5 87:17
**Exhibits** 4:7 47:4 49:25 62:24
**exited** 42:14
**experience** 26:22 82:18
**EXPIRES** 90:24
**extensively** 87:16

**F**

**F-O-G-G-E-Y** 23:7,12
**fabricating** 22:2
**Facsimile** 2:19
**fact** 7:6,11 84:13
**fair** 11:13 18:5 19:7 21:11 38:6 39:14
39:14 49:8 57:1 58:21
**familiar** 21:6 22:23 23:3,5 56:1
**family** 77:11
**far** 32:4
**FEDERAL** 5:8
**feel** 9:10
**feet** 57:15,17 58:3
**felt** 31:7
**field** 17:18
**fields** 81:14,16
**file** 31:5,5,9
**fill** 28:20,20
**filled** 28:19 30:1,23 82:10,12,21,22
**filling** 29:5 82:18
**final** 21:14
**financially** 90:14
**find** 34:5 60:12
**finding** 61:6
**fine** 8:8 49:7
**finished** 12:4 16:3
**FINNEGAN** 1:5
**Firm** 2:14 6:22
**first** 8:22 11:14 13:1,1 27:17 41:1,2,5
43:15 46:4 66:8,16,18 67:14 90:6
**five** 75:6
**flagged** 39:3,3
**focus** 23:24
**focusing** 41:1
**Foggey** 23:6,12,15
**followed** 85:19
**foot** 24:9
**foregoing** 90:4
**form** 18:17,22 19:9,14 20:1,7,9,16 21:2
21:9,21,25 22:9 23:18 24:7,14 25:6
26:8,24 27:10,15,16 30:6 31:17 33:6
33:6 35:18,24 39:19 40:22 56:11,17
59:6 78:2 84:6,16 85:15 88:4 89:5,12
90:9
**formerly** 15:4
**forth** 9:6
**forwarded** 31:6,15,16,20 32:1
**forwarding** 32:2
**found** 61:13
**foundation** 18:24 19:14 21:21 25:8
27:15 41:6 55:8 70:23 72:3 78:14,23
79:9 80:6,18,18 81:7,17,23 82:14
84:8
**four** 12:19 57:15,17
**frame** 36:22
**FRCP** 5:10
**Fred** 3:4 21:4,8 36:13
**free** 9:10
**freely** 53:24
**Freeman** 17:20 18:2
**front** 10:10,11,16 45:7 51:14 52:21
53:13,15 54:11,15 57:15,17 58:4
62:11 71:14
**full** 24:19,21
**functions** 16:7,8,10 17:8,25
**further** 87:5 89:15
**Furthermore** 9:9
**Fusco** 3:6

**G**

**G-U-R-G-I-D** 72:17
**Garc** 35:17
**Garcia** 35:17,22 48:20 55:7 56:1,6
58:18,21 59:12,20 60:9,12 84:15 85:6
**Garcia's** 59:1,3 77:9,11
**gear** 53:12
**general** 85:19
**generated** 31:12
**gentleman** 20:23
**George** 2:13 6:18,19,20 34:20 42:24
45:15 46:16 62:3 79:19 80:13,15
89:18
**gestures** 9:19
**getting** 61:10
**give** 7:15 8:25 10:21 19:11 28:4 35:16
44:21 74:16 76:18 78:7
**given** 15:12 63:2
**gives** 73:8,9
**giving** 61:10
**gleaned** 83:22
**glossed** 35:11
**go** 6:19 8:12,20 12:8 13:5 14:19,22
16:5 17:1 27:13 29:10 31:8,21 36:1
37:22 40:2 42:16 43:7,9,22 46:13
48:9 56:7,19 57:8 60:17 62:16 63:9
76:5,8 78:15,24 81:8,18 82:22 85:18
**goal** 41:9
**goes** 19:17 59:14
**going** 9:6 19:2 33:10 36:1 41:22,23
43:9 46:15 47:12 48:13 49:19 50:13
54:2,3 56:3 59:9 62:23 66:8,20 67:3
67:22 68:13 69:11 78:25 80:10 85:18
**gold** 59:17,23
**good** 7:22 29:15 46:20 84:10
**gotten** 42:8
**Great** 8:20 49:12
**ground** 8:12 58:8,13
**Grove** 14:21 15:24
**guess** 15:9 79:15
**Gurgid** 72:16
**Gus** 85:8,14
**guys** 12:24
**gyamin@jsotoslaw.com** 2:20

**H**

**H** 12:25
**H-A-W-K-I-N-S** 69:23
**H-O-M-A-N** 13:3
**habit** 75:22
**hand** 7:14 25:10,18,22 39:18,20,23
40:2,20 43:2,6,8 71:11,20,21 72:1,7,8
**handed** 43:13
**handwriting** 63:18
**handwritten** 26:10 63:16
**happen** 30:3 32:3 78:1
**happened** 27:19,22 36:19 39:7 71:12
71:14 72:9 76:11
**happening** 26:3
**happens** 88:8,8
**hard** 45:19,20
**Harris** 86:6,8
**Harrison** 12:20
**Hawkins** 69:22,23,24
**head** 9:21
**headquarters** 66:15,16,18
**hear** 7:9 34:19 47:16
**heard** 47:25 75:6

The Deposition of DARREN DOSS, taken on September 13, 2021

helicopter 16:14
help 20:22 45:2 48:19 61:23 89:14
helpful 49:3
hereof 90:6
hold 15:8,21 62:15,17
Homan 12:20,21 13:3
home 29:9,14 34:7 74:8
Homicide 35:23 84:15 85:6
HONORABLE 1:4,5
horses 16:13
hospital 29:8 68:24 70:6 76:6,9,12,14
77:3,6,15,15,20,20,22,25 78:4 84:13
hour 64:19
hours 33:15 37:1
housed 66:4
human 12:21
hurt 40:1,2
Hyde 13:18

I

ID 61:10,13
IDENTIFICATION 44:7 46:18 63:11
identifies 24:22
identify 61:11
identifying 72:13
identity 55:18,22
illegible 68:18
Illinois 1:2 2:7,17 3:9 6:10
imagine 46:16
immediate 70:13 72:6,25
impact 10:19
important 8:22 9:7,18 70:14
in-person 33:4,7,8,12,23
Inaudible 34:17 44:24 47:11
incident 28:24 48:20,24 89:8
included 44:15
independent 57:3 61:6,8 74:24
independently 59:7 60:4
INDEX 4:1
INDIANA 5:13 90:2
indicate 72:12
indicated 34:24 44:10
indicates 64:17 81:13
indirectly 90:14
individual 27:22 55:11,23 56:4,24
individual's 27:23 28:2
individuals 40:21,24,25 68:3 86:15
information 19:12,24 20:7,14,25 21:8
25:4,11 26:1 28:3,8,11,12,14 72:8,13
73:22 76:23 83:22 84:1
initial 71:11
initially 12:4,19 13:17 17:16 49:14
injuries 56:21
instruction 80:5
interacting 39:17
interaction 27:20
interactions 20:6
interested 90:13
interject 41:21
intervening 43:22 46:11
interview 27:5,7,13
investigated 87:15 88:1
investigation 20:8,14,25 35:17,23
36:19 76:17 77:16,21 78:4,8 84:15
85:6,10 87:24 89:8
investigator 31:21 85:10,13,20 86:2,18
involved 16:25 23:16 29:1 32:2 38:23
38:23 39:1,8 40:14 42:17 87:24

involvement 32:4 84:4,14
involving 19:23
Islander 73:16
it'd 58:6
it'll 56:6
items 59:15

J

J-U-N-G 22:23 23:15
Jackson 2:15
Jakes 1:7 2:3 6:8 8:11 13:14 46:15
50:14 51:12,20 54:4 55:2 58:3 62:12
62:12 63:10 84:24 85:1 88:13
James 6:21
jewelry 59:5,13,15,21
Job 11:14
jog 50:10
Johnson 3:5 6:19,23,23 7:8 24:8 25:7
30:7 56:12 78:23 79:9 80:6,8,10,15
81:7,17,23 88:4 89:5,12
Join 24:8 25:7 30:7 56:12
joining 13:14
July 11:9
Jung 22:22 23:15

K

K9 16:12
Kedzie 12:20
keep 80:12
Ken 3:4 20:18 36:11
Kenneth 1:12 3:3 6:8 18:14,21,25 21:1
36:3
KENTUCKIANA 5:4
KENTUCKY 5:5
kept 31:6,7
Kill 19:5,5,8,12,13 36:5
kind 8:21 16:11 20:6 24:17,21 29:4
76:18
know 8:7 10:12 18:25 19:2,3,4,4,16
20:4,11,18,23 21:4 25:10 26:2 27:19
29:15 32:5,7 36:6 39:6,24 40:3 48:24
49:4,5 50:15 51:5 52:16,21 55:10
57:4,6 58:5 63:5 66:6 68:3,7,8 69:19
72:5,24,25 78:18,25 79:24 80:4,8,9
80:22,23 81:16 83:11 84:19,21,22,23
84:25 85:2,4 87:12,12 88:7,8,22
knowledge 71:1 75:2
known 15:5

L

L-A-N-N-E-R-S 66:9
lab 68:17,18 70:24
Lakeshore 16:14
Lanners 66:9,12
law 2:14 6:21,22 11:11,14
lawsuit 22:15,20 23:6,10,12,15,15
lawsuits 22:17 23:14,17,21
laying 55:19 56:5 57:14 59:12
learn 55:18 76:23
learned 19:13 83:7,10,15 84:1 86:22
learning 76:22
leave 17:4 20:20 21:13 29:12
leaving 16:15
led 48:20
ledger 73:17
left 13:4 15:23 32:8 77:25 78:3
left-hand 82:6
lend 29:5

Let's 44:4 57:9 59:8 60:17
letter 34:6
license 61:14
lieutenant 14:24,25 15:2,3,6,9,9,11,13
15:14,22 17:3,5,7
life 88:8
line 46:25 47:1 49:21 50:5 53:9 57:11
57:11 59:11 60:19,23 66:8,20 67:3,24
lines 68:13 82:6
list 71:16 73:9 75:17
listed 75:12
little 62:25 63:23 68:18 69:12 86:3
LLC 3:6 5:4
loaded 68:22
loc 65:24
located 13:7,9 14:20 55:15 58:10 64:9
65:25 66:16
location 6:13 66:4
Loevy 2:5,5
logistics 16:18
long 11:22 12:10 13:25 14:18 15:8,21
15:25 16:11 33:14 88:21,21
longer 8:1
look 31:8 47:2 51:17 52:20 53:5 57:6,9
58:6 59:8 60:20 74:14,21
looked 35:12 44:10 79:24
looking 10:11,12 46:25 47:1 64:14
73:2 79:2,6,17,25 81:10,11 82:5,6
lot 88:22
Louis 3:3 19:17,17,24,25 36:7
LOUISVILLE 5:5
Lowe 65:25
luck 17:16
lucky 65:2
lying 59:12

M

M 1:5 73:13
M-C 69:12
MAIN 5:4
maintaining 35:22
making 67:2 70:10,12
male 73:14
man 38:16
Management 25:16 67:1
MANISH 1:4
manner 40:19
Marathon 16:24
mark 43:10 44:5 46:14 63:9
marked 24:13 37:21 38:10 44:7 45:6
46:18 63:11
mass 16:12
materials 26:6
matter 5:9 6:8 90:8
McCann 69:12,13 83:25 84:1
mean 12:18 46:23 48:7 50:6 73:16
88:20
meaning 9:11
meant 47:9
medical 10:18 17:4 21:13 56:22
meet 30:12 32:25 33:3 34:8
meeting 33:8,12,14,17,23 34:8
members 77:12
memories 20:25 21:7 88:22
memory 10:19 20:13 50:10,22,23 51:6
53:21 55:16 57:23 74:21 87:23 88:1
88:9,10,15,16,19
mentioned 25:24 64:18

The Deposition of DARREN DOSS, taken on September 13, 2021

met 78:6 85:1,3
metal 26:14 28:17
Michael 3:4 19:5,5,8,12,13 20:11 36:5
    36:5,9
middle 81:11
midnight 36:21,22,25 48:25
midnights 14:25 36:23
might've 68:11 70:11
mind 22:18 69:21
minute 43:21
mischaracterizes 34:3 47:15,17
misread 47:18
missed 77:17
moment 13:14 45:3 48:4,5 51:1 74:20
MONDAY 5:6
money 61:12
months 15:23 17:21
morning 7:22
move 11:20 13:23 63:23
moved 12:20,24 13:24 70:19
moving 56:14
mu 61:9
muddied 49:11
multiple 24:2
murder 35:17

**N**

Naikia 86:3
name 6:3,15 7:2 8:10 17:22 19:5,16,17
    19:18 21:6 22:19,21,22,22 23:6 27:23
    55:10,22 56:1,4 64:6 69:12 84:20
    85:8,14 86:10,19
named 17:20 20:4,11,18 21:4 23:10,21
    23:22 72:16 84:19,21 85:7,21 86:3,5
    86:8
names 19:3 36:2 85:19 86:22
narcotics 17:21
natural 9:22
nature 16:15,23 25:12 29:11
neck 59:17
need 31:11 56:21 62:23 65:21
needed 31:7
needs 40:3 82:2
never 19:7,10 29:15 34:6 85:10
news-worthy 66:7
night 37:2 38:15 40:6,9 52:1 55:4 56:5
    59:21 63:17 65:17 75:18
nodding 9:20
Normally 14:14
North 2:6 3:7 6:25
northbound 39:13
Northern 1:2 6:10
notable 66:7
Notary 5:12 90:23
notebook 26:7,12
noted 68:6
notice 39:23 53:9
notification 64:8 65:19 66:14,19 67:2
notifications 64:15 77:23
notified 64:22 66:6 70:2
notify 61:19,21 64:2,24 66:5
November 11:6
number 6:11 28:3 49:25 58:3 63:2,23
    68:13 69:1,3,5,6,13 73:24,25 74:2,6,8
    82:7
numbers 46:24 47:4
numerous 25:9 69:20

**O**

oath 5:9
object 9:4 27:10 31:17 33:6 86:15
objection 18:17,22 19:9,14 20:1,9,16
    21:2,9,21,25 22:3,6,9 23:18 24:7,14
    25:6 26:8,24 27:15 30:6 34:3 35:18
    35:24 39:19 40:22 41:6 47:20 55:8
    56:11,17 59:6 70:23,25 72:3 78:2,14
    78:23 79:9 80:6,18 81:7,17,23 82:14
    84:6,16 85:15 86:12,24 88:4 89:5,12
objections 9:6 29:20 80:12
obligated 87:3
observation 57:17
observe 57:12 59:4
observed 47:6 50:2 51:22 53:10 59:12
obtain 28:1,2
occur 33:12
occurred 48:21,24,25 49:1 67:19 87:18
    87:23 88:14
October 16:2,8 17:1
OEMC 25:10,16 67:1
offense 74:15 87:15
office 6:21,24 7:4 20:21 25:16 31:9
    66:16,18 67:1
officer 7:23 16:10 17:18,20,22 18:2
    19:4,16,23,24 20:4,11,15,18,22 21:1
    21:4 24:1,23 26:16 27:3,18 37:18
    39:25 40:8 41:15 42:11 52:5,6,22
    62:6 65:13,15 66:9,12 69:2,4,8,13,22
    71:21 72:2,23 76:8 78:10,21 79:7,22
    82:12 83:15,21,25 84:1
officer's 79:3
officer/commander 16:7
officers 6:24 14:3,6,16 16:21 40:9,25
    41:3 61:19 68:10 69:17,19,20 70:5,8
    77:3,6
offset 44:24
oh 8:4 23:20 29:24 41:4 43:11 52:16
    74:7
okay 7:1,5 8:4,9,16,20 9:3 10:1,9,13,24
    11:16 13:13,13,15 14:8 15:14,19
    16:17 17:12 18:1,20,25 20:20,24
    21:23 23:1,5,9,24,25 25:18,24 26:5
    27:3,12 28:1,7 29:17 30:1,8,22 31:13
    32:9 33:3,10 34:10 35:4,8 36:1 37:3
    37:7,12 38:4,19 41:25 42:9,24 43:1,6
    43:11 44:1,19 45:1,3,14,23 46:2,13
    46:20 47:10,12,23,24 48:2,11,13 49:9
    49:24 50:10,13,18,22 51:3,9,20,25
    52:18,20,24 53:5,7,11,18 54:1,1,18
    54:24 55:2 56:7,8,23 57:23 58:1,10
    58:13,21 59:8,25 60:7,17,19,21 61:16
    62:1,14,25 63:7,18 64:17 65:20 67:9
    68:25 69:5,11,16 71:3,5,9,19 72:15
    72:19,22 73:2 74:4,7,20,22,24 75:2,5
    75:9,24 76:11 77:8,14,25 78:3,9
    79:12,15,21 80:15,19 81:25 82:5,10
    82:17 83:14 85:18 87:7 88:11 89:17
On-scene 68:14
once 8:19 12:4 33:7 34:5 40:11 41:9
one's 74:8,8
open 45:12 50:7,11
operations 12:9,10,12,17 14:25 15:2,3
    15:6,9,10,11
opportunity 9:1 24:3 27:4,7 59:4 60:7
    60:9 78:10
opposed 9:19
Ops 13:4

order 26:19 53:15,24 54:23 70:16
Ordinarily 24:11 30:21
oversee 13:16 14:2
overseeing 16:17
owner 71:13 72:19,21

**P**

P 79:7,12,13,18
P-R-A-I-R-I-E 13:12
P.C 2:14
p.m 87:9 89:22
P868871 82:8
Pacific 73:16
Pack 20:4,7
packet 42:20 43:4,9,13,19
page 4:2,8 35:12 43:18 46:4,6,7,23,23
    46:24,25,25 49:21 50:5 53:6,8 57:11
    59:9 60:18,22 64:12 67:14,22 68:15
    81:10 82:5 90:6
pages 46:11 62:11 63:7
paper 51:17 54:15,18,19 62:18 63:3
paper-generated 26:10
paperwork 55:24
Parade 16:24
parades 16:14
parameters 8:21
Park 13:18
parked 41:11,12,14 52:1
part 18:3 27:2 39:25 65:23 78:8
participants 5:6
particular 12:3,13,17 89:8
parties 7:5,10
partnered 17:19,22 19:10
partners 17:13,15,19,21,23 18:11,11
pass 45:23 62:6
passenger 40:7 53:13,13 54:8,11
Patrick 33:20,22 37:19 38:3,7
patrol 11:20,22,23 12:2 14:3 17:12
    18:6 24:1,9,13,17 26:16 27:3 37:13
    37:21 38:10,21 39:2 41:14
patterns 26:3
pause 9:1,2 84:11
pausing 9:5
pavement 58:5
pending 6:9 10:6
pens 26:15
people 9:20 33:17 71:8,9 75:12 86:22
People's 47:3 49:25
percent 51:1
perfectly 9:22
period 23:25 24:16 25:3 26:23 27:8
person 9:5 16:17 17:17 25:20 40:2,3,5
    52:8 55:19 56:14,21 58:7 66:17
    72:16 84:19,21 85:13,21,23 86:3,5,8
    86:19
personal 60:21
personally 19:1 35:2,4
phone 28:3 33:5,7,25,25 41:23 64:7
    65:3,18 74:2,8,8 77:23
phonetic 69:22
photo 49:20
photograph 43:15 50:14,18 52:7,24
    54:7
photographs 32:20,22 42:21 43:14,15
    43:22 44:3,3 63:4 70:21,22 71:3
photos 43:24 44:11,12,12,15
picture 54:5,7
pictures 52:14

The Deposition of DARREN DOSS, taken on September 13, 2021

**pieces** 62:18 63:3
**pile** 88:22
**piled** 88:9
**pink** 31:23,23
**place** 12:25 49:16 67:19 90:6
**places** 31:14
**plain** 14:17
**plaintiff** 1:8 2:3 6:16 8:11 13:14 22:19
  84:23 88:13
**plaintiff's** 6:14 23:6 88:25
**please** 6:12 7:2,13 8:6 9:10 41:22 43:3
  44:6 62:7 77:18 86:12
**PO** 65:7,12,21
**pocket** 60:23
**point** 21:18 36:6 39:21,22 57:20 75:24
  76:3 78:19 81:25 83:21,21
**pointed** 50:16
**police** 7:23,23 8:1 11:4,7,10,13,16
  12:17,18 16:25 21:12,19 24:22 38:10
  39:25 40:25 41:3 65:12,15 66:9,12
  75:7,21
**pool** 57:2,4,7,19,24
**pop** 69:21
**portion** 78:4
**portions** 89:3
**posed** 88:25
**position** 15:8,21
**positions** 51:21
**possible** 70:17 82:16
**possibly** 34:7
**Pound** 85:21
**Pounder** 85:22
**practice** 26:11 27:12 28:2,5,7 31:3
**Prairie** 13:8,10,13
**pre** 66:15
**precarious** 40:19
**prefer** 60:20
**preference** 8:7
**preliminary** 85:9,12,20 86:2,18
**preparation** 32:13,25 34:1,14,24 42:19
  44:2,10,13,16
**prepare** 32:10
**prepared** 87:18 89:10
**present** 33:17,19,22 39:20 72:23
**preserve** 26:23 70:16
**preserving** 26:17
**president** 16:22
**Preston** 17:23
**presumption** 9:13
**Pretty** 74:22
**Pride** 16:24
**printed** 42:24
**Prior** 11:10 35:20 36:15
**pro** 68:23
**procedure** 5:9 68:22
**proceed** 47:15 79:20 89:16
**PROCEEDINGS** 4:3 6:1
**process** 32:2 48:19 83:2,4
**promoted** 13:6 14:24
**prompt** 9:24
**pronounce** 22:24
**pronounced** 23:1
**properly** 70:20
**property** 77:9,9
**protection** 16:13
**provide** 72:13 73:22 89:14
**provided** 88:12 89:2
**providing** 19:24 20:7,13,25 21:7

**pseudonym** 19:21
**Public** 5:12
**pull** 31:10 57:10 58:2 63:5,6
**pulled** 40:13,15 52:3 60:24
**purpose** 29:19
**pursuant** 5:8,10
**put** 30:15 32:5 39:6 47:13 61:10
**putting** 70:11

---

**Q**

**Quarter** 85:21,21
**question** 7:9 9:4,7,9,11,12,13,14 10:5
  10:6 29:15 34:19 41:21 47:3,13,24
  48:1,4 49:25 57:16 59:14 60:18,24
  71:24,25 83:8 84:9,11 86:16
**questioned** 87:16 88:11
**questions** 9:2 51:4 86:13 87:5,14
  88:25 89:15
**quick** 74:22
**quickly** 76:2

---

**R**

**Racine** 39:11,12
**radio** 68:11
**Rafael** 35:17 55:7 56:1,5
**raise** 7:14
**rank** 8:6 11:17 17:3
**RD** 82:7
**read** 34:15,25 35:11 36:1,15
**reading** 5:14 47:23 51:1,2,8
**really** 9:7
**reason** 10:21 37:23 53:22,23,25 59:25
  69:21 78:20 79:1 81:20
**reca** 20:5
**recall** 8:18,19 19:15 20:2,5,6,10,19
  21:3 23:19,23 27:1 37:1 38:22 39:6
  42:15 45:13 53:4 59:7,7,14 61:10
  68:20 72:5 82:11,15,16 83:24 84:3
**receive** 30:19,25 72:8
**received** 26:1 34:7 42:20 56:21
**recognize** 52:8 63:13,15
**recollect** 60:4 77:5
**recollection** 19:23 20:24 41:7 51:25
  56:20 57:3 59:19 61:5,6,8,22 69:15
  72:11 74:25 75:19 77:4,10,13 81:1
  82:4 83:14,24 88:5
**record** 6:3 7:2 8:23 9:23 42:2,3 43:10
  47:15,17,20 48:10,14,16,17,19,22
  49:3,11 85:25 87:8,9 90:10
**recorded** 90:9
**records** 31:5,24
**recruit** 11:18,19,19 12:5
**red** 52:1
**reduced** 90:9
**refer** 8:5 24:20 32:17 40:16 55:24
**referred** 25:15 29:13 39:18 47:8
**referring** 8:6 10:10 30:23 46:22 49:20
  50:24 51:11 53:8 54:2,4,24 57:10
  58:14 67:14 69:6 72:20
**refers** 68:4 75:9
**reflect** 9:8
**reflected** 56:6 75:21 86:23 87:17
**refresh** 57:23 59:19
**refreshed** 55:16
**refreshes** 74:21
**refused** 72:13
**regards** 89:1
**related** 77:21 89:7

**relation** 64:4 77:16
**relationship** 18:20
**relative** 90:12
**relax** 57:3
**relocate** 29:8
**rely** 51:8
**remember** 22:19 23:5 38:15 39:3,5,7
  39:17,20,21 51:1,7 53:18,24 54:19
  57:4 58:17 61:1,3,4,12 67:7 83:6
**remind** 8:21 10:1 87:13
**remote** 10:9
**remotely** 5:6,10 6:17
**render** 40:1,13 41:9
**Renee** 2:4 6:15 8:10
**repeat** 12:23 75:15 77:18
**rephrase** 9:11
**report** 28:15 29:3,5 30:4,19,21,22,23
  30:24,25 31:8,11,13,14,15,19,25 32:1
  32:16 49:6,17 56:7 61:12 62:4 63:16
  63:19 64:14 71:7,10,16 72:12 74:19
  75:13,17,21 76:20 77:2 78:5,9,11
  81:5,6,12,21 82:1,3,7,10,13,19,21,23
  82:24 83:3,4,11 85:17 86:23 87:1,2
  87:17 89:10,11,13
**reported** 14:13 74:15,16
**reporter** 1:25 5:13 6:3,5 7:1,5,10,13,19
  42:3 48:13,17 87:9 89:20 90:1,23
**REPORTERS** 5:4
**reports** 19:11 25:10,11,24 26:15 28:16
  28:19 30:1,2,15 31:4 57:6
**represent** 8:10 56:3,4
**represented** 88:13
**reprimand** 9:25
**require** 29:4
**required** 66:19
**reserving** 89:17
**respond** 9:20 24:2 25:4 26:5 38:1
**responded** 24:5 26:7,13,20 34:6 38:7
  47:10
**responding** 9:6 25:2 38:16
**response** 9:22 59:13,15
**restate** 71:24 83:8
**restaurant** 71:14 72:19 73:7
**resting** 40:18
**restricted** 12:13
**retain** 31:2
**retained** 31:23
**retire** 11:4
**retired** 8:3 10:25 21:13
**retrieve** 30:16
**retroactive** 86:13
**return** 81:25
**returned** 17:2 78:6
**review** 30:16 31:7,9,10 32:12,15,20
  35:6,9 74:18 78:10,13,17,21 89:9,11
**reviewed** 34:13 35:2,8,13 44:2,12,16
  78:18 81:12 89:13
**RFC** 46:14,14
**RFC_Jakes** 4:10 46:4,8
**riding** 37:18
**right** 7:14 10:3,24 11:19 15:17 18:6
  19:19,22 21:12 23:14 31:16 35:1
  36:19 37:13 39:9 41:8,16 42:6 45:3,5
  46:17,22 52:25 53:8 54:12 56:9 57:1
  58:17 60:1,14,18 63:2 65:13 66:12
  67:17 70:18 73:10,14,18 74:10 75:12
  79:6,17 80:15,21,25 81:10,20 82:3
  83:2 84:7 85:12 87:4 89:20

The Deposition of DARREN DOSS, taken on September 13, 2021

right-hand 52:7 54:8 55:3 64:14 68:15
  81:11
rings 59:16,20,22
Robinson 85:8,14
Rock 3:6
Roger 17:20
role 35:22 85:9,12,20 86:2,18
roll 25:11 26:2
room 41:24 62:19
roped 70:12
rotating 14:16 18:11
routine 38:21 39:2
row 63:22
rows 80:2
rules 5:8 8:12
running 53:3,12,19
Russell 65:7,15,16,21

_____ S _____

S 1:4
S-I-N-G-H 72:17
Saddler 17:23
sat 8:16,17
saw 27:18 30:9 39:24 40:1,2 41:8,9
  50:19 56:10 57:14 58:11,18 59:15
saying 16:19 37:24 42:6 48:18 49:15
  79:19
says 43:16,19 46:8 47:3 49:24 50:5
  57:11 59:11 60:19,21 63:22,23 64:2,6
  64:15,19 65:7,10 66:8,20 67:3,23
  68:13,17,25 69:12 73:3,13,13,19 79:6
  79:13,17 80:1 81:12 82:7
scene 24:2,5,6 25:2,5 26:6,7,13,18,18
  26:23 27:1,8,13,21 28:20,23,25 29:6
  29:12 32:23 38:1,8,16,20,24 39:22
  40:13,15,21,24 41:3,5,10 42:9 44:11
  45:9 47:10,21 48:23 49:20 50:6,11,20
  51:22 52:2,4,25 55:4,6,10,13 58:11
  60:8 61:16,24 67:4,23 68:6,9,10,12
  68:18 69:8,13,16 70:4,9,11,15,22
  71:5,14 75:14,18,25 76:3 83:7,10,16
  83:20,23 84:2,12
screen 44:23 45:5 46:16 50:15,16
  51:12 52:15 54:3 57:10 58:2,6 59:10
  60:20 63:6
seat 53:15 54:15
Sebastian 69:22
sec 86:11
second 23:11 44:21 47:14 48:11 49:18
  49:24 57:10 62:15,17 71:23 86:11
section 64:15 68:14 79:4
secure 70:3,15
secured 70:5,7
securing 70:8
see 8:4 10:9 27:19 40:16,17,20 41:5
  44:18 46:23 49:6 50:8,16 51:13,14
  52:5,9,9,10,11,11,15,18,21 53:15
  54:4,16 57:21 58:5,7 59:17 64:1,15
  64:19 65:8 66:10 67:4,24 68:14
  72:16,17 73:3 74:19,21,22 81:14 82:8
seeing 39:8 79:14
seen 79:18,21
separate 51:4,7
September 1:24 5:7 6:5 18:5,10 23:25
  25:3 26:12,17 27:4 28:21 30:3 31:4
  33:13 36:19,20 37:5,10,17,24 38:15
  47:6,9,9,22 48:21,23 49:16 50:2
  51:23 64:5 66:13 67:6 82:17 83:3

87:21
sequence 42:15
sergeant 13:6,15,16,22 14:4,6,9,9,11
  14:12,13,15 15:2 30:9,12,13,16,24
  31:16,19 32:3,5 63:23 64:4,10,17,22
  64:25 65:2,21 78:6 83:12
sergeants 15:4
series 74:1,4 85:18 86:13
services 11:16
set 33:8 34:8 43:24 74:5 90:6
seven 74:2,5
SHAH 1:4
share 44:23 46:15
sharing 45:5 51:12
shattered 54:12
SHEILA 1:5
shell 53:14
shift 36:20 37:1,18 38:12
shooting 32:23 65:5 67:19
shot 38:17 72:10
shots 75:6
show 47:21 54:3 58:1
showed 69:20
showing 45:6 50:15 60:20
shown 89:2
shows 48:19,22
sick 17:11
side 16:25 45:12 50:4 52:7,14 53:13,13
  54:8,11 55:3 64:14 68:15 81:11 82:6
sign 31:19
signature 78:19 79:3,4,8,16,22 81:5,13
  81:14 89:18
signing 5:14 78:22,22
Similarly 9:3
simply 10:4
Singh 72:16,17,22 73:10 74:10,12,25
  75:2,9
Singh's 73:6,20
sit 88:6
six 15:23 73:16
skills 90:11
slight 41:22
slot 16:12
small 46:24
smooth 8:13
Snake 85:7,14
solemnly 7:14
somebody 39:5 72:10
sorry 12:23 13:9 14:18 16:3 23:20
  34:20 35:15 37:22 38:4 40:24 44:4
  45:14 46:4,24 47:1 48:2 49:24 51:21
  55:11 59:8 62:7 65:20 70:24 75:15
  76:1,2 78:24 79:2,19 80:7 83:8 84:20
  85:9
Sotos 2:14 6:21,22 7:4
soul 65:2
sound 22:22 23:2 37:24 56:1
sounds 9:19 21:6 60:3
speak 27:4 48:6 75:13,17 77:3,11 83:9
speaking 8:24 76:2 77:14,19 83:15
special 12:9,10,12,16 13:4 16:6,8,10
  17:8,24
specific 17:6 21:7 27:1 37:2 47:19
specifically 26:25
specify 23:20
speculation 30:11 56:18 86:24
spell 12:21,22 13:1,11 25:15
spelled 29:14,18,23

spelling 23:2 29:20 69:25
spells 66:23 85:25 86:1
Spence 2:4 4:4 6:15,15 7:7,21 8:10
  19:19,22 20:3 25:13 29:24,25 30:18
  34:19,23 37:5,8 41:25 42:5,22,24
  43:1,3,6,8,12 44:5,8,23 45:1,3,4,15
  45:18,20,23 46:1,13,20,21 47:12,14
  47:16,18,23 48:2,6,9,12,15,18 49:5
  49:10,13 51:19 52:16,17 62:3,6,10,14
  62:16,21 63:1,9,12 70:24 71:2 80:7
  80:14,19,24 84:7,10,18 86:17 87:4,7
  89:17,21
spence@loevy.com 2:9
spent 17:3
spoke 71:7,8,10,20 72:1,7,15,22 74:13
  74:23 77:5 83:6,19,19
spoken 75:20
spotted 40:11
squad 52:4
square 12:20,21,21,25
staining 58:4,8,13
stamp 4:9,10,11 43:16,19 46:4,8 50:14
  62:11
stamped 58:3
standing 72:4,24
stands 65:12 73:14
star 69:3,5,6
start 11:7 18:1
started 8:12 11:16 17:16 36:24,24,25
  37:2
starting 6:14 16:12 50:5 53:9 57:11
  59:11 60:19,23 71:20
starts 46:3
state 5:13 6:12 7:2 56:9,13 82:25 90:2
stated 8:9 75:6
statements 28:12 35:8,10
States 1:1 6:9
station 12:18 30:14 31:7,24 45:10
  50:19 54:8 55:3 57:15,18 65:18 66:5
  78:6
stem 35:12
step 41:23
stern 35:12
stipulate 29:22 80:10,11
STIPULATION 5:1
stop 42:1
stopped 21:11
street 2:6 3:7 5:4 13:11 30:13 39:8,9
  39:15 55:17,18,20 56:5,10 57:15
  58:22 59:12,13 73:3
strike 89:9
stronger 89:10
submission 83:2,4
submitted 80:25 81:1 90:25
Suite 2:16 3:8 5:4
supervise 13:22
supervises 15:4
supervising 80:1
supervisor 26:20 61:23 64:10 80:1,4
  81:2,4,13,22
supervisor's 81:5
supplemental 87:2
supposed 78:17
suppressing 21:24
sure 8:24 9:5 13:3 16:15 27:1 43:21,23
  44:25 45:25 48:9,12 57:7 62:21
  69:20 70:10,12,18 80:14
suspects 22:8

The Deposition of DARREN DOSS, taken on September 13, 2021

**swear** 5:13 7:14
**sworn** 5:9 35:16 50:21,24,25 59:22 88:19 90:7

**T**

**tact** 15:12
**tactical** 14:5,9,12,15 15:13,14,22
**take** 6:7 9:7 10:4,6 30:14 41:22 43:21 71:3,19 74:20 77:8 87:6
**taken** 5:3,8 42:7 78:5 90:5,11
**talk** 24:1,20 36:6
**talked** 34:5,7 83:11
**talking** 38:2 42:7 49:4,5,15 71:15 80:13 83:18
**tape** 70:11
**taught** 78:17
**team** 15:22
**teams** 15:13
**technician** 6:4
**Telephone** 2:8,18 3:10
**tell** 9:12 36:2 39:21 52:23,24 55:25 74:5,12 79:23 82:1
**testified** 51:2 84:13 88:17
**testify** 49:2 62:22 90:7
**testifying** 87:20
**testimony** 7:15 32:18 34:4,17,25 35:6 35:14,15,16 45:18 50:21,24,25 51:8 53:5,20,22,23 54:25 57:9 58:15 59:22 60:1 61:1 88:12,18,19,24 89:1,3,6,14
**thank** 7:19 8:9 29:24 89:21
**Thanks** 62:9
**thing** 41:23 53:24 62:2
**things** 48:25 49:1 79:19 88:8
**think** 8:22 15:17 25:14 29:17 35:11 49:3,7,17 63:6 70:3 79:1 80:17 84:11
**third** 14:14
**Thomas** 20:4,7 69:22
**thought** 38:22 47:25 85:19
**three** 33:15 34:11 68:1
**time** 6:6 8:16,24 9:5,8 10:3,15 12:4 13:21 14:14 18:13 23:25 24:16 25:3 26:23 27:8 28:21 30:15 31:10 36:22 37:2,13 38:9 39:24 41:1 42:14 50:25 55:9,9 60:22 61:25 64:9,18,21 65:1 65:23,25 68:5 73:7 76:20 78:17 83:22 85:6 88:17,19,21 90:5
**times** 33:3 34:12
**Title** 90:6
**today** 6:5,5 9:9 10:22 87:20 88:3,15,18 89:14
**today's** 32:10,13 34:14,25 35:20 36:15 42:19 44:16 66:25 87:20
**told** 65:24 72:10 74:25 75:3 77:2
**top** 88:9,22
**topics** 88:16
**total** 34:11 46:11
**totally** 49:7
**touched** 34:6
**town** 16:23
**traffic** 16:14
**training** 13:24,25 17:18 28:10 40:1 61:25 65:23 68:22 76:14 77:1 78:16 86:25
**transcribed** 9:18
**transcript** 5:15 9:8 29:21 32:16,17,18 34:14,15,22 35:5 46:3,14 59:9 60:17 63:4 90:5,11
**transcription** 29:19

**transcripts** 45:16
**transferred** 16:6
**transit** 16:12
**Trey** 86:19
**trial** 32:18 34:25 35:6,9,10,14,15 45:16 45:18 46:14 53:5 54:25 57:9 58:14 59:9 60:1,17 63:3 84:14 88:12,18,19 89:1,1,3
**trick** 51:3
**true** 90:10
**truly** 47:4 50:1
**truth** 7:16,16,17 90:7,7,8
**try** 9:2 74:19
**trying** 15:16 51:3
**turn** 30:13 46:6 64:12 71:20
**turned** 82:25
**turning** 36:18 44:19
**two** 23:14,22 31:13,18 41:7 51:4 62:11 63:7 69:21 71:8,9 74:7 75:12,16 82:6
**typewritten** 90:9
**typically** 9:20 24:6,13 25:4 28:13,17 80:25 81:4

**U**

**uh-huh** 9:21
**uh-uh** 9:21
**unconscious** 58:20
**understand** 9:10,12 37:10
**understanding** 29:18
**understood** 9:14
**uniform** 14:17 24:19,21,21 38:13
**unit** 12:9 13:16 16:14 67:16
**United** 1:1 6:9
**units** 16:12,21 57:21 61:23
**University** 13:19
**unusual** 53:10
**unwieldy** 63:7
**use** 9:18 10:1

**V**

**V** 1:10
**various** 18:11 86:15
**VC** 67:23
**vehicle** 38:10 50:19 52:1 53:1,2 57:12 57:13 58:4
**vehicles** 42:17
**verb** 71:24
**vernacular** 15:6
**versa** 52:13 80:13
**version** 31:15 52:20
**versus** 6:8 51:7
**vice** 52:13 80:13
**vicinity** 73:1
**victim** 29:7 32:23 44:11 68:22 70:6 76:5
**video** 5:3 6:4 8:25 42:1
**videoconference** 2:10,21 3:12 5:5 6:7
**violent** 64:7 68:1 83:12
**visual** 60:4

**W**

**wagon** 45:10 50:19 54:8 55:3 57:16,18
**waived** 5:15
**waiver** 71:11,20,21 72:1,7,8
**walked** 42:17 53:1,1
**Walker** 86:19
**wallet** 60:10,12,14,24,25 61:7
**want** 8:11,23,25 9:1,4 23:24,25 33:13

42:14 43:23 44:22 49:2,10,11,21 51:5 51:6,11 58:1 62:19,24 66:21 71:13,19 86:12 87:6
**wanted** 49:2
**wasn't** 58:20 68:6,12 79:1 85:11 88:23
**watch** 14:4,4,9,11,13,15,16,25 15:1,2,3 15:4,5,6,7,9,10,11 66:5
**waved** 25:22
**waver** 25:10,18 39:18,20,23 40:2,20
**way** 9:25 13:19 17:23 50:16 79:14 90:13
**ways** 25:9
**we'll** 29:17,22 49:17 57:8
**we're** 8:24 38:2 41:21,23 43:23 80:8,10 87:9
**We've** 34:5
**wear** 24:17
**wearing** 38:13 58:23 59:5,21
**Weaver** 69:22,25
**went** 14:20 17:2,2,24 19:16 32:7 36:25 60:23 70:6 85:7,13
**weren't** 68:9 84:9
**West** 2:15 5:4 73:3
**When's** 8:16
**white** 31:22 63:23 64:4,10,17,22,25 65:2,22 83:12
**whiteout** 26:15
**willing** 28:4
**window** 53:13,13 54:11
**wing** 31:21
**withdraw** 36:7
**witness** 5:14,15 6:12 7:3,6,11,18 19:20 27:13 30:8 43:2,9 48:3,8 51:14,16 52:10,14 62:9,13 75:6,9 80:9,20,22 85:7 86:25 89:13 90:4
**witnessed** 49:16 74:15 83:7,9
**witnesses** 22:5 27:5,8 71:6,17 75:13 75:16,18,20
**wondering** 13:1
**word** 13:2
**words** 9:18 10:1 77:17
**work** 8:1 12:17 17:10 18:13
**worked** 19:8
**working** 11:2,7,10,11 12:2 17:12 18:1 19:23 21:12 36:20 37:1,12,13 38:3,7 43:23 65:17 66:17 85:6
**worry** 51:16
**would've** 17:8,9 61:22 68:5 76:14,25 78:3,4,5 85:16 87:2
**wouldn't** 79:24 80:9
**write** 27:25 29:16
**written** 57:7
**wrote** 51:2 73:25 75:3,5

**X**

**x** 64:1

**Y**

**Yamin** 2:13 4:5 6:18,18,20,20 7:9,12 18:17,22,24 19:9,14,18,21 20:1,9,16 21:2,9,21,25 22:3,6,9 23:11,18 24:7 24:14 25:6,8 26:8,24 27:10,15 29:22 30:6,10 31:17 33:6 34:3,17,21 35:18 35:24 37:4,7 39:19 40:22 41:6,20 42:1,23,25 43:2,5,7,11 44:21,25 45:2 45:17,19,22,25 46:19 47:11,14,17,19 47:25 48:11,18 49:9 51:13,15,17 52:9 52:11,16 55:8 56:11,17 59:6 62:5,8

The Deposition of DARREN DOSS, taken on September 13, 2021

62:15,17,22 70:23,25 71:23 72:3 78:2
78:14 79:20 80:17,20 82:14 84:6,8,16
85:15 86:11,24 87:6,11 89:15,19
**yeah** 15:11 22:24,25 26:1 41:17 42:25
46:6 48:2,9,12 49:10 51:15 52:12
56:14 57:8 67:18 72:3 78:12
**year** 15:12 17:3,10 21:14 33:13 88:15
**years** 88:2,2,7,7,18
**yo** 60:19
**youth** 20:21,21,22 29:9,9

---
**Z**

**Z-E-I-G-E-R** 66:23
**Zeiger** 66:21,23
**Zone** 66:21
**zoomed** 52:12
**zooming** 52:5

---
**0**

**00:55** 64:19
**00491-00523** 4:9
**009** 65:10
**03/23/2029** 90:24
**09/22/2021** 90:25

---
**1**

**1** 4:9 35:12 44:6,7,12,16,20 50:5,13
51:11 54:2 59:8 60:23 62:24 70:21
75:6,9 86:12
**1:08** 89:22
**10:00** 36:24
**10:06** 5:7 6:6
**100** 51:1
**101** 5:5
**11:00** 36:25 42:4
**11:12** 48:17
**12:01** 49:19
**12:03** 87:9
**1206** 73:3
**1240A** 2:16
**12th** 17:9
**13** 1:24 47:4 49:25 66:21 87:21
**13th** 5:7 6:5
**141** 2:15
**15** 47:9,22 48:21 57:11,11
**15th** 47:6 50:2
**16** 36:20 37:17,24 38:15 46:11 48:23
64:5 66:13 67:6
**16814** 46:4,5,14
**16814-16829** 4:10
**16829** 46:8,15
**16th** 37:6,10 47:9 49:16 51:23
**17** 47:4 49:25
**1721** 63:24
**18** 46:4
**19** 46:25 47:3 49:21
**19-CV-02204** 1:3 6:11
**1981** 67:6
**1990** 11:9,17,25 17:13
**1991** 18:6,10 23:25 24:2 25:3 26:9,12
26:17 27:4,17 28:22 30:3 31:4 35:17
36:19,20 37:6,10,17 47:6,22 50:3
64:5 66:13 82:17 83:3 87:18 88:2,5,6
88:7,10,10 89:8,10
**1991--** 88:1
**1992** 18:4
**1993** 88:14
**1994** 12:6,7,8,11 88:14,14,23

---
**2**

**2** 4:10 46:15,18,22 49:21 54:2,4 57:8,9
58:1 59:9 60:18 62:24 64:12 67:22
68:15 81:10 82:5
**20** 13:9 73:19
**2003** 11:24,25 12:11 13:4 14:8 17:13
17:24
**2007** 13:24 14:8
**2014** 14:1,19 15:17
**2015** 15:15,16,18,19
**2016** 15:15
**2017** 16:2
**2019** 16:8,8 17:1
**2020** 11:6
**2021** 1:24 5:7 6:6 87:21 88:15,20,21
**21** 59:11
**21st** 13:7,9,17,22 14:3
**2200** 3:8
**23** 60:19
**243-5900** 2:8
**26** 11:6
**29th** 13:7

---
**3**

**3** 4:11 63:10,11,13,15 64:7,12 67:15,23
68:15 71:16 73:2,3 75:3,5 78:22 79:2
79:11 81:1,11 82:5 83:12 87:17
**30** 5:10 11:9 88:7,18
**31** 71:17 72:15 74:15
**311** 2:6
**312** 2:8 3:10
**32** 73:2
**321** 3:7 6:24
**33** 73:13
**34** 74:1
**35** 74:4
**35th** 65:25
**39th** 64:9
**3BC** 64:6
**3rd** 14:20,22 15:24 16:1,4 17:5

---
**4**

**40202** 5:5
**44** 4:9
**46** 4:10
**491** 43:16,22 44:5
**494-1000** 3:10

---
**5**

**508** 51:12,20 52:22
**509** 54:4 55:2
**518** 44:19 45:6 50:14,18 58:3
**51st** 39:15 73:3
**523** 43:19,23 44:6
**5316** 67:23
**56** 57:11
**57** 59:9
**58** 53:6,8

---
**6**

**6** 4:3
**60** 46:25,25 49:21 62:12 63:10
**60-61** 4:11
**60604** 2:17
**60607** 2:7
**60654** 3:9
**61** 62:12 63:10

---
**62** 46:23,24
**63** 4:11
**630** 2:18,19
**66** 60:18
**67** 60:22

---
**7**

**7** 4:4 67:15
**71st** 14:21 15:24
**7208** 69:1,5
**730** 5:4
**735-3300** 2:18
**773-0980** 2:19

---
**8**

**8** 53:9 67:16
**8/3** 67:23
**8137** 69:13
**86** 79:2
**87** 4:5

---
**9**

**92** 63:22
**930** 67:4,6
**933** 67:12,20
**936A** 67:17
**95** 79:3
**96** 79:11
**97** 80:1 81:6
**9th** 12:5 13:10 18:8 33:13 34:9 37:15
65:24 66:3 82:25

Exhibit 20

AGO POLICE    1 BATTERY    P·4·4·6·08·2702    M-454089

| 4 ADDRESS OF OCCURRENCE | | | APT. NO. | 5 FIRE RELATED | 6 DATE OF OCCURRENCE - TIME | 7 BEAT OF OCCUR | 8 BEAT/UNIT ASSIGN |
|---|---|---|---|---|---|---|---|
| NO. 1,2,0,6 | DIR. W | STREET 51ST ST | | ☐1 YES ☒2 NO | DAY 15 MO SEP 91 2355 | 933 | 936A |

| 9 TYPE OF LOCATION OR PREMISE WHERE OFFENSE OCCURRED (GIVE NAME OF LOCATION IF APPLICABLE) | 10 LOCATION CODE | DATE/D ARRIVED - TIME | 12 ASSIGNED BY | 13 ON VIEW | 14 SUPERVISOR |
|---|---|---|---|---|---|
| STREET | 3,0,4 | 16 SEP 91 0001 | | ☒ | ☐ Cos ☐ |

All information, descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

| 21 NAME (LAST—FIRST M.I.) | IDENTITY VERIFIED | 22 HOME ADDRESS (NO. DIR., STREET, APT. NO.) | 23 SEX—RACE—AGE CODE | 24 HOME PHONE | 25 BUSINESS PHONE | 26 TIME AVAIL | 27 OCCUPATION | 28 INJURED YES NO | 29 VICTIM REL CODE |
|---|---|---|---|---|---|---|---|---|---|
| GARCIA, RAFAEL T | ☐ | 5109 S. ABERDEEN | M 4 48 4-NK | UNK | UNK | UNK | | X | 024 |
| | ☐ | | | | | | | | |
| | ☐ | | | | | | | | |
| PARENT/GUARDIAN, IF JUVENILE | ● | | | | | | | | |

| 31 ☐ DISCOVERED ☒ WITNESSED ☐ REPORTED OFFENSE | 32. | 33. | 34. | 35. | RACE CODES |
|---|---|---|---|---|---|
| SINGH, GURGID REFUSED | 1206 W. 51ST ST REFUSED | M 6 38 | 536 3900 | 536 3900 | 1-BLACK 3-BLACK HISPANIC 5-AMER. IND./ALASK. NAT. 2-WHITE 4-WHITE HISPANIC 6-ASIAN/PACIFIC ISLANDER OFFENDER/VICTIM RELATIONSHIP CODES (Use for Member of the Same Family or Household) |
| | | M 1 18 | REFUSED | REFUSED | 01-WIFE 17-BROTHER-IN-LAW 02-HUSBAND 10-SISTER 18-SISTER-IN-LAW 03-FORMER WIFE 11-AUNT 19-OTHER RELATIVE 04-FORMER HUSBAND 12-UNCLE 20-GIRL FRIEND 05-MOTHER 13-MOTHER-IN-LAW 21-BOYFRIEND 06-FATHER 14-FATHER-IN-LAW 22-FRIEND/ACQUAINTANCE 07-SON 15-SON-IN-LAW 23-OTHER—SPECIFY 08-DAUGHTER 16-DAUGHTER-IN-LAW 24-NO RELATIONSHIP |

| 41 OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.) | 42 HOME ADDRESS | 43 SEX—RACE—AGE | HEIGHT | WEIGHT | EYES | HAIR | COMPL. | MARKS, SCARS, ETC | 44 C.B./I.R NO | 45 OFFENDER REL CODE |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | A1 |

| 51 OBJECT/WEAPON ☒1 USED ☐2 DISPLAYED ☐3 UNK | 52 FIREARM FEATURES | 53 POINT/ENTRY | 54 POINT/EXIT | 55 BURGLAR ALARM | 56 SAFE BURGLARY METHOD | 57 IF RESIDENCE, WHERE WERE OCCUPANTS |
|---|---|---|---|---|---|---|
| ☒01 HAND GUN ☐08 EXPLOSIVE | ☐08 CHROME/NICKEL | ☐01 FRONT DOOR | ☐01 FRONT DOOR | ☒NONE | ☐01 PUNCH ☐06 PEEL | ☐01 WORK ☐06 OTHER |
| ☐02 SHOTGUN ☐09 LIQUID/GAS | ☐02 BLUE STEEL | ☐02 REAR DOOR | ☐02 REAR DOOR | ON PREMISE | ☐02 TORCH ☐07 OPEN | ☐02 VISITING ☐07 UNKNOWN |
| ☐03 RIFLE ☐10 BOTTLE/GLASS | ☐03 SHORT BARREL | ☐03 WINDOW | ☐03 WINDOW | ☐1 YES ☐2 NO | ☐03 EXPLOSIVE ☐08 UNKNOWN | ☐03 VACATION ☒08 DNA |
| ☐04 KNIFE ☐11 RAZOR | ☐04 LONG BARREL | ☐04 ROOF | ☐04 ROOF | ALARM CIRCUMVENTED | ☐04 DRILL | ☐04 WEDDING |
| ☐05 VEHICLE ☐12 PRY TOOL | ☐05 SAWED OFF | ☐05 FLOOR | ☐05 FLOOR | ☐1 YES ☐2 NO | ☐05 REMOVED | ☐05 FUNERAL/WAKE |
| ☐06 BLUNT INSTRUMENT ☐13 HAND, FEET | ☐06 OTHER | ☐06 SIDE DOOR | ☐06 SIDE DOOR | | | |
| ☐07 THROWN OBJECT ☐14 OTHER | ☒07 UNKNOWN | ☐07 UNKNOWN | ☐07 UNKNOWN | 58 UNUSUAL CHARACTERISTICS OF OFFENSE | | 60 GANG RELATED - AFFILIATION |
| ☐15 DNA | ☐08 DNA | ☒08 DNA | ☒08 DNA | | | ☒VICTIM U-N-K |
| | | | | | | ☐OFFENDER U-N-K |

| 71 DESCRIBE PROPERTY IN NARRATIVE | | | | T = TAKEN, R = RECOVERED | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 MONEY | 2 JEWELRY | 3 FURS | 4 CLOTHING | 5 OFFICE EQUIPMT. | 6 TV, RADIO, STEREO | 7 HOUSEHOLD GOODS | 8 CONSUM. GOODS | 9 FIREARMS | A Narc./Dang. Drugs | B OTHER | C NONE |
| ☐T $ | ☐T $ | ☐T $ | ☐T $ | ☐T $ | ☐T $ | ☐T $ | ☐T $ | ☐T $ | ☐T $ | ☐T $ | ☐T |
| ☐R | ☐R | ☐R | ☐R | ☐R | ☐R | ☐R | ☐R | ☐R | ☐H | ☐R | ☐R |

| 72 VEHICLE/TRAILER | YEAR | MAKE | BODY STYLE | COLOR | V.I.N. | STATE LICENSE NO. | STATE | EXPIR MO/YR | 73 PROPERTY INVENTORY NO(S) | 74 VEH INVENTORY NO. FOUND |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 STOLEN 2 THEFT FROM UN BUICK 4DR UNK U — N — K | | | | | | U — N — K | | | O — N — | N |
| FINDER'S | | | | | | | | | | |

75 NARRATIVE (Do not duplicate or repeat information — for explanation or additional information only)

IN SUMMARY, R/O'S WHILE ON ROUTINE PATROL WERE FLAGGED DOWN BY WITNESS #2 WHO REFUSED TO IDENTIFY HIMSELF. R/O'S OBSERVED VICTIM LYING FACE DOWN IN POOL OF BLOOD WITH HIS HEAD FACING SE AND FEET FACING N/W. VICTIM IN FRONT OF 79 CHEVY STATION WAGON VIN 1N3569J335917 PLATE RF8509 IL WHICH...

| 80 SOBRIETY OF VICTIM | ☐1 SOBER ☒ ☐3 IMPD |
|---|---|

| 81 EXTRA COPIES REQUIRED ☒ NORMAL N/A VC | CONT'D OTHER SIDE ☒ R.O. | 92 OFFICER NOTIFYING FOLLOW-UP INVESTIG. UNIT D. DOSS | UNIT NOTIFIED 1A/3 JC | PERSON NOTIFIED ☒ SGT WHITE #1721 | ☐ ARRIVED | DATE (DAY MO YR) 16 SEP 91 | TIME 0055 |
|---|---|---|---|---|---|---|---|
| 93 FIRST OFFICER AT SCENE D. DOSS | | 94 OFFICER NOTIFYING DET D/S ☐ET ☐M.E. D. DOSS | | PERSON NOTIFIED RANNERS #13623 | ☐ ARRIVED | DATE (DAY MO YR) 16 SEP 91 | TIME 0057 |
| 95 REPORTING OFFICER'S NAME (PRINT) D. DOSS | STAR NO. 15529 | OFFICER'S SIGNATURE [signature] | | DATE INVEST. COMPLETED—TIME 16 SEP 91 0250 | 97 SUPERVISOR APPROVING (PRINT NAME) | | STAR NO |
| 96 REPORTING OFFICER'S NAME (PRINT) P. DONOVAN | STAR NO. 16246 | OFFICER'S SIGNATURE [signature] | | | APPROVAL SIGNATURE | | DATE APPROVED | TIME |

380 (REV 8/83)

CITY_JAKES 00060

HAD ITS DR DOOR'S SLIDE DOOR OPEN AND
BROKEN PASSENGER SIDE WINDOW. CHECK OF
PLATE THROUGH COS REVEALED VEHICLE
OWNED BY VICTIM. R/O'S CANVASSED THE
AREA AND TALKED TO ABOVE WITNESS #1
WHO STATED THAT HE HEARD FIVE SHOTS
AND THEN CALLED POLICE. VICTIM
TRANSPORTED TO COOK COUNTY HOSPITAL
BY CFD AMB #1, CONDITION CRITICAL PER
DR. JAZAUERI. TOW ORDERED ON VEHICLE
VICTIM'S VEHICLE ALSO STRUCK PARKED
CAR. ACCIDENT REPORT MADE RD# P868871.
TOW ORDERED ON VEHICLE. VICTIM HAS ONE

HEAD WOUND AND THREE LEG WOUNDS P. 454289
ON SCENE: CRIME LAB OFFICERS
        CEASAR # 7208   McCANN #8137
NOTIFICATIONS: A/3 VC SGT WHITE #1721 0055 HR
        009 DIST DESK PO RUSSEL #14690 0045HR
      - I" DEPUTY: PO LANNERS #13623 0057HAS
        ZONE 13  ZEIGER #117 0050HRS
        BEAT 930 AT SCENE
A/3 VC BEAT 5316 AT SCENE

| | | |
|---|---|---|
| I HAVE REVIEWED THIS REPORT AND BY MY SIGNATURE INDICATE THAT IT IS ACCEPTABLE. | SUPERVISOR'S SIGNATURE | DATE (DAY-MO-YR) |

FOR USE BY BUREAU OF INVESTIGATIVE SERVICES ONLY

| I-UCR OFFENSE CODE | REV. CODE | I-UCR METHOD CODE | METHOD ASSIGNED □ 1 FIELD □ 2 ADMIN. | UNIT NO. | OFFICER ASSIGNED STAR NO. | DATE ASSIGNED | SUPV. STAR NO. | INVESTIGATIVE FILE | REASSIGNED |
|---|---|---|---|---|---|---|---|---|---|
| □ 1 CORRECT □ 2 REVISED | | | □ 3 SUMMARY | | | | | □ 1 YES □ 2 NO | □ 2 |
| OFFICER REASSIGNED STAR NO. | DATE | STATUS □ 3 CLEARED CLOSED □ 6 EXC. CLEARED OPEN | □ 0 PROGRESS □ 4 CLEARED OPEN | □ 1 SUSPENDED □ 5 EXC. CLRD. CLOSED | □ 2 UNFOUNDED □ 7 CLOSED–NON-CRIMINAL | IF CASE IS CLEARED, HOW CLEARED (USE THIS BOX FOR SINGLE CLEAR UP OR FIRST CLEAR UP OF MULTIPLE CLEAR UP LIST) □ 1 ARREST & PROSECUTION □ 2 DIRECTED TO FAMILY COURT □ 3 COMPL. REFUSED TO PROSECUTE | □ 4 COMMUNITY ADJUSTMENT | □ 5 OTHER EXCEPTIONAL | |
| VICTIM IDENTIFIERS □ 1 CORRECT □ 2 REVISED | VICTIM NO. | REVISED NAME | | | | REVISED ADDRESS | | | |
| | | | | | | | | REVISED PHONE NO. □ HOME □ BUSINESS | |
| VALUE OF PROPERTY TAKEN/RECOVERED □ 1 DNA □ 2 VERIFIED □ 3 CORRECTED | | | | | FILL IN THE FULL AMOUNT OF ONLY THOSE VALUES WHICH EITHER DIFFER FROM OR WERE NOT REPORTED ON THE REVERSE, THE NARRATIVE OR A SUPPLEMENTARY REPORT | | | | |
| MONEY □ T $ □ R | □ 2 JEWELRY □ T $ □ R | □ 3 FURS □ T $ □ R | □ 4 CLOTHING □ T $ □ R | □ 5 OFFICE EQUIPMT. □ T $ □ R | □ 6 TV, RADIO, STEREO □ T $ □ R | □ 7 HOUSEHOLD GOODS □ T $ □ R | □ 8 CONSUM. GOODS □ T $ □ R | □ 9 FIREARMS □ T $ □ R | □ A NARC/DANG DRUGS □ T $ □ R | □ B OTHER □ T $ □ R |
| SERIAL NOS. OR IDENTIFICATION NOS. | □ 1 DNA □ 2 VERIFIED □ 3 CORRECTED | | | | LIST ALL CORRECTIONS & NEW OR ADDITIONAL NOS OBTAINED | | | | |

REMARKS (PERTINENT INFORMATION NOT ON ORIGINAL REPORT)

| PREPARED BY – SIGNATURE | STAR NO. | DATE (DAY-MO-YR) | APPROVED BY – SIGNATURE | STAR NO. | DATE (DAY-MO-YR) |
|---|---|---|---|---|---|

CITY_JAKES 00061

# Exhibit 21

GENERAL PROGRESS REPORT
DETECTIVE DIVISION/CHICAGO POLICE

| DATE OF ORIG. CASE REPORT | | | DATE OF THIS REPORT | | | |
|---|---|---|---|---|---|---|
| DAY | MONTH | YEAR | DAY | MONTH | YEAR | WATCH |
| 15 | Sept | 91 | 16 Sept 91 | | | |

OFFENSE CLASSIFICATION—LAST PREVIOUS REPORT | VICTIM'S NAME AS SHOWN ON CASE REPORT
GARCIA, Rafael

BEAT/UNIT ASSIGNED
5316

This form is designed for recording handwritten notes and memoranda which are made during the conduct of investigations, including: inter-watch memoranda (handwritten or typewritten), witness and suspect interview notes, on-scene canvas notes, and any handwritten personal notes made by detectives during the field investigation of violent crimes which are used to prepare official Department case reports.

15 Sept 91   2355 hrs

GARCIA, RAFAEL I.   ▮▮▮▮▮

5109 S. ABERDEEN   5'9"  185

SS# ▮▮▮▮▮   DLN ▮▮▮▮▮

P. DONOVAN   #16246   BT. 936A
D. DOSS   #15529

DR. ALLEN   GUNSHOTS TO RIGHT LEG & MIDDLE ABDOMAN

BLK SHOES / 2 GREY & GREEN SOCKS
GREEN PLAID BOXER SHORTS
TAN PANTS WITH BLK LEATHER BELT

COUNTY INV
$89.24   4 YELLOW COLOR NECK CHAINS
5 CHAINS, 2 YELLOW RINGS, 1 RING WITH STONES
WATCH, 2 KEYS ON RING
1 BRN WALLET

SURGERY #633-6162   DISCONNECTED
5109 S. ABERDEEN   JOSE CARASQUINI 373-8153
(FROM PHONE   JESUS MERCADO   373-6668
LISTINGS)   BAD#

R.D. NO.  P451284

REPORTING OFFICER'S SIGNATURE—STAR NO. | RECEIVED BY SUPERVISOR'S SIGNATURE—STAR NO. | DAY—MO.—YR.  TIME

CPD 23.122 (Rev. 2/83)

GENERAL PROGRESS REPORT
DETECTIVE DIVISION/CHICAGO POLICE

| | DATE OF ORIG. CASE REPORT | DATE OF THIS REPORT |
|---|---|---|
| | DAY MONTH YEAR | DAY MONTH YEAR WATCH |

| OFFENSE CLASSIFICATION—LAST PREVIOUS REPORT | VICTIM'S NAME AS SHOWN ON CASE REPORT | BEAT/UNIT ASSIGNED |
|---|---|---|

This form is designed for recording handwritten notes and memoranda which are made during the conduct of investigations, including: inter-watch memoranda (handwritten or typewritten), witness and suspect interview notes, on-scene canvas notes, and any handwritten personal notes made by detectives during the field investigation of violent crimes which are used to prepare official Department case reports.

1210ᵗʰ  2 Cases  from  sidewalk        2 Shirt Buttons
           1 Bullet
           2 Cases from car (passenger side)
1206  CASES  2  HAIR BRUSH
      RF 8509  Chevy Wagon
      P 4PT 325  91-92 Sticker

      1208
      ST 8603
      T. CLINTON  12077
      T. McKeough  7668

| REPORTING OFFICER'S SIGNATURE—STAR NO. | RECEIVED BY SUPERVISOR'S SIGNATURE—STAR NO. | DAY—MO.—YR. TIME |
|---|---|---|
| | Brenter 2,08 | |

CPD-23.122 (Rev. 2/83)

R.D. NO. P 457289

RFC_Jakes 000500

Exhibit 22

H = Home;  C = Clothing Room  (Use H or C to indicate disposition of patient's clothing.)

| Article | No. | Description | H-C | Article | No. | Description | H-C | Article | No. | Description | H-C |
|---------|-----|-------------|-----|---------|-----|-------------|-----|---------|-----|-------------|-----|
| Blouse / Shirt | | Cut | | Slip | | | | Pants | 1 pr cut | | |
| Brassiere | | | | Shoes | | 1 pr Blk | | | | | |
| Cap / hat | | | | Slippers | | | | | | | |
| Coat | | | | Sweater | | | | | | | |
| Dress | | | | Panties | | | | | | | |
| Hose / socks | | | | T-shirt | | | | | | | |
| Jacket | | | | Undershorts | | 1 pr Cut | | | | | |

Condition of Clothes:          Good          Fair          Soiled          Vermin          Check by: _____
                                                                                                          (Classification)
The above list is correct.    Patient Signature  X unable to sign
Clothes taken to Clothes Room    Yes    No    By _____

_____

I consent to have the clothes and property which are checked H (Home) to be taken by:

Name: _____          Relationship: _____
Address: _____          Telephone: _____
Patient Signature: _____          Witness: _____
                                                                    (Classification)

_____

I accept responsibility for keeping the following property at my bedside:

| | | | |
|---|---|---|---|
| Shoes / slippers | Watch | Dentures - Partial | Radio |
| Keys | Wallet | Upper - Lower - Lower | T.V. |
| Eye-glasses | Ring | Make-up bag | |
| Purse | Chain | Money | |

Patient Signature: _____          Witness: _____
                                                                    (Classification)

_____

Ward Storage

Date: _____
Money: _____
Valuables: _____

_____

I understand that the valuables listed below have been given to Cook County Hospital for safekeeping and that the Hospital is not responsible for items not specifically listed below, valuables not picked up within one (1) year after discharge of patient from Cook County Hospital will be disposed of. Eighty nine dollars 29/100  4 Yellow color

List and Description of Valuables: Neck Chain 5 Charms 1 Yellow Color wrist Watch & Arm Band 20 Keys on ring  Brn wallet & Personnal Papers + I D's 2 yellow ring 1 yellow ring & Purple Stone 1 Yellow & Clear Stone

Patient Signature: X unable to sign          Witness X Barbara Silvay          (Classification)
                                                     Lee          Natalie Wray__

Withdrawals: _____

                                                                    1654301

(Imprint)    Garcia 54 Rafael
             9-10-49
             ...52  ABERCEEN
             ...  0156398   TRA

                                         Admission Number: _____

                                         (CH)  Cook County Hospital
                                               1835 W. Harrison St., Chicago, Illinois 60612     #1174
                                                                                                (5-1-84)

Plaintiff Jakes 017601

## COOK COUNTY HOSPITAL, CHICAGO, ILLINOIS

1. Admitted    Date _____    ☐ Walking      ☐ Stretcher
   Hour _____    ☐ Wheelchair   ☐ Carried

2. Doctor _____ notified    Hour _on arrival_ M____

3. Accompanied by   ☐ Attendant   ☐ Relative   ☐ Friend   ☐ Other
   ☐ Police Officer Bagde No. _____
   Name _____    Telephone Number _____
   Address _____

4. Accompanying information (Attach to first page of History.)
   ☐ Referral Slip (Form 244)          ☐ History of Sick or Injured Person (Form 153)
   ☐ Referral note or letter from _____

5. Clothes checked and bath given          ☐ in Admitting Department          ☐ on ward

6. Property and/or valuables checked  _UNABLE_    ☐ in Admitting Department      ☐ on ward

7. Next of kin (living) _____    Relation-ship _____
   Address _____    Telephone Number _____

8. Urine specimen collected   ☐ Yes   ☐ No

9. Indentification bracelet applied by _____

10. Clergy notified:   Hour _____ M by _____

11. Serious notice sent:   Hour _____ M by _____        Signature of Clergy

12. Placed in bed number _____

13. ☐ Side rails up          ☐ Full leather restraints      ☐ Partial leather restraints
    ☐ Canvas restraint       ☐ Sheet restraint

14. Describe patient's apparent condition:

_____
_____
_____
_____
_____
_____
_____
_____
_____

Signature of Nurse _____

(Imprint Plate Below)

```
        1554301
GARCIA, RAFAEL I
5109 S ABERDEEN
                    M
09/16/91    0159398   TRA
```

**ADMISSION RECORD SHEET**

Plaintiff Jakes 017602

# Exhibit 23

**CHICAGO FIRE DEPARTMENT — E.M.S.**
**MOBILE INTENSIVE CARE UNIT REPORT**
121 N. LaSalle St. Room 105 Chicago, Il 60602

| | 2A. I.R. # | | 5. TRANSPORT | | | 7. TIME INFORMATION |
|---|---|---|---|---|---|---|
| CFD UNIT # 00017 | | | 6. NON-TRANSPORT | | | 01 Dispatched |
| RUN # 241 | 3. A.L.S. | 4. B.L.S. | | | | 02 Arrived Scene |

2C Miles / 2E Hosp. / 2F Street No. / Street Name — RESPONDED FROM

8. License/Plate No. 9870079

03 Depart Scene 0030
04 Arrived Hospital 0041
05 Depart Hospital / Available 0116
06 In Quarters 
Total Time 0070

9. Date of Alarm: 9/6/91
9. Street No. 5400 Dir. 50 Street Name: RACINE

10. Type of Emer. Resp. Per Dispatch: 07

AREA
01 Residential  04 Industrial
02 Institutional 05 Hwy.
03 Commercial  06 Other

12. Road Conditions
01 Fog  03 Ice  05 Rain
02 Snow  04 Wet  06 Dry

15. Treatment Prior To Arrival — YES / NO
16. Seat Belts

17. Patient Last Name: GARCIA
First Name: RAFAEL
18. Age: 40  19. Race: H  20. Sex: M
21. Area Code / Phone No.: N/A
22. Date of Birth: N/A

23. Patient Address Street No. 5900  Dir. Street Name: ABERDEEN
24. City/Town: CHICAGO
25. State: IL  26. Zip Code

27. Chief Complaint/Duration of Complaint: MULTIPLE GSW's
28. Weight: 180 lbs.

29. Glasgow (Responsiveness)
Eyes-Opening: 4 (3) 2 1 (Spont) (Verb) (Pain) (None)
Motor-Response: 6 5 4 (3) 2 1 (Obeys) (Local) (Widrw) (Flex) (Ext) (None)
Verbal-Response: 5 4 3 2 (1) (Orient) (Confu) (Inapp) (Incomp) (None)
Capillary Refill: 2 (1) (Normal) (Delayed) (Absent)
Respiratory Effort: 3 2 (1) 0 (Normal) (Shallow) (Labored) (Or Absent)

30. Trauma SCORE
30A. Trauma BY-PASS

31. Medications Patient Taking: NONE KNOWN

32. Allergies: NKA

33. Pupils
R  L
Reactive
02 Equal
03 Dilated
04 Constricted
05 Other

34. Skin Moisture
05 Dry
06 Moist
07 Diaphoretic

35. Skin Color
01 Normal
02 Pale
03 Flush
04 Cyanotic

36. Skin Temperature
08 Normal
09 Hot
10 Cool

37. Lung Sounds
R  L
01 Clear
02 Absent
03 Wheezes
04 Rales
05 Diminished
06 Stridor
07 Rhonchi

27A. Patient History/Comments: 40 y/o M unconscious on street prone. Pool of blood around head. bloody pants leg (R) side. Pt according to witnesses in auto stepped out & collapsed. Pt has multiple GSW. Possible to back of head. Numerous shots to LEG & Femur Fx. NOTED. 1 small wound to Umbilicus - Abdomen

29. Blood Sugar Level: OiL
29. Oxygen Or Respiratory Treatment: 21
40. Respiratory Treatment: 04

27B. SUPPLEMENTAL REPORT

| 41. Time | 42. Blood Pres. | 43. Pulse | 44. Resp. | 45. Time | 45A. Cardiac Code | 45B. DEFIB W/S RHYTHM | 46. Time | 46A. Drug Code | 46B. DRUG/SOLUTIONS | 46C. Dose | 46D. Route/Site |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | unable | 112 | 8 | | 302 | TACHYCARDIA | | 225 | LRYZ | WO | LEG |
| | 80/Plp. | 116 | 28 | | | | | | | | |

slightly distended noted some bruising color to (R) FLANK AREA + umbilicus area (R) HAND HAS GSW ALSO

47. Body Part Affected
01 Head  06 L Arm
02 Neck  07 R Arm
03 Back  08 L Leg
04 Chest  09 R Leg
05 Abdomen  10 L Hand
11 R Hand
12 L Foot
13 R Foot
14 Eyes
15 Multiple

Additional Findings
F Fracture  B Burn
T Tenderness  P Pain
L Laceration  S Swelling
C Contusion  H Hemorrhage
A Abrasion  D Dislocation

(R) (L)  (R) (L)

48. Medical Onsite Assessment
49. Trauma Onsite Assessment
50. Patient Care Procedures
51. Hospital Contacted

52. Receiving Hospital

53. Telemetry Record — Tape # / Log # 45865  01
54. Outcome of Run

55. 01 Yes / 02 No
56. POD / PFP
57. Followed S.M.O.s only 01 Yes / 02 No

58. Additional EMS Units Requested: 01 AMB / 02 FS&R
59. Supervisor Called: 01 Yes / 02 No

60. CME PROCEDURES — APPROVED / DISAPPROVED
61. M.D. Give Orders: Bailey

M.D. / R.N.

File Number
62. 16374
63. 16797
Paramedic Officer: Rochwager / Bedard

Patient Care Procedures
65. / 66.

69. MEDICAID (PUB ASSIS.) Recept No.
70. DIAGNOSIS CODE
71. INS. CODE

72. MEDICARE NO.
73. WORK RELATED 01 YES / 02 NO
74. INSURANCE CO. NAME

NOTICE: THE CHARGE FOR THIS SERVICE IS $125 FOR BLS AND $195 FOR ALS. THERE WILL BE AN ADDITIONAL CHARGE OF $8.00 WHEN OXYGEN IS ADMINISTERED. RESPONSIBILITY IS HEREBY ACCEPTED AND AGREED THAT SAID PRICE BE PAID IN FULL. I AUTHORIZE ANY HOLDER OF MEDICAL OR OTHER INFORMATION ABOUT ME TO RELEASE TO THE SOCIAL SECURITY ADMINISTRATION OR ITS INTERMEDIARIES OR CARRIERS OR TO THE CITY OF CHICAGO AND ITS BILLING CONTRACTORS ANY INFORMATION NEEDED FOR THIS OR A RELATED MEDICARE CLAIM. I PERMIT A COPY OF THIS AUTHORIZATION TO BE USED IN PLACE OF THE ORIGINAL AND REQUEST PAYMENT OF MEDICAL INSURANCE BENEFITS EITHER TO MYSELF OR TO THE PARTY WHO ACCEPTS ASSIGNMENT. I FURTHER AGREE TO THE RELEASE OF ANY MEDICAL OR ITS BILLING CONTRACTORS. I UNDERSTAND AND HAVE READ THE AFOREMENTIONED AND ALSO UNDERSTAND THAT THIS IS A FEE FOR SERVICE.

75. INSURANCE POLICY NO.
76. PATIENT HOSPITAL CHART NO.
77. GROUP NO.
78. SOCIAL SECURITY NO.
SUSPECT B/BF CONTACT
80. PARTY RESPONSIBLE FOR PAYMENT (LAST NAME)
81. FIRST NAME  82. MI  83. RELATIONSHIP: Self

68. SIGNATURE: Unable

*For statistical purposes only.

CFD 41.101 (REV. 1/89)

01 Dispatched
02 Arrived Scene
03 Depart Scene
04 Arrived Hospital
05 Depart Hospital

COPY RECORDS

Plaintiff Jakes 017604

Exhibit 24

Cook County Hospital

**ADMISSION RECORD**

806

| PATCOM* | ADM. DATE & TIME | | TYPE | WARD | ROOM | DISCHARGE DATE & TIME | LAST HOSP. DISCH. DATE | MR# |
|---|---|---|---|---|---|---|---|---|
| 0159398 | 09/16/91 00:34 | | 1 | 32 | M9932 | 9-16-91 | | 1654301 |

| HANDICAP | ADM. BY | INT. BY: | ENT. BY. | LANG CODE | SERV. CODE | ADM. PHY. | ADM. DIAGNOSIS | | |
|---|---|---|---|---|---|---|---|---|---|
| | CM | | | | TRA M BARRETT JDH | | GUNSHOT WOUND TO HEAD | | |

| ADM. SOURCE | IN CUSTODY OF | BROUGHT TO CCH FROM | ACCIDENT | ACCIDENT DATE | COUNTY CODE | BORN AT CCH |
|---|---|---|---|---|---|---|
| 07 | | | | 8 75.8 | 01 | |

| DATE OF BIRTH | AGE | SEX | RACE | MAR. STAT. | REL. | STATE BORN IN | SOCIAL SECURITY NUMBER | INFO. OBTAINED FROM: (RELATIONSHIP) |
|---|---|---|---|---|---|---|---|---|
| | 048 | M | 3 | | | | 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 | |

| PATIENT NAME (LAST, FIRST, INITIAL) | | PATIENT AKA | | HOSP. DISCH. FROM |
|---|---|---|---|---|
| GARCIA     RAFAEL    I | | | | |

| PATIENT PERMANENT ADDRESS | ZIP/CITY/STATE | |
|---|---|---|
| 5109 S ABERDEEN | 60609 CHICAGO | IL |

| PATIENT LOCAL ADDRESS | CITY/STATE/ZIP |
|---|---|
| 5109 S ABERDEEN | CHICAGO |

| HOME PHONE # | PARENT/GUARDIAN NAME (LAST, FIRST, INITIAL) | MOTHERS MAIDEN NAME |
|---|---|---|
| 000 000-0000 | | |

| SPOUSE 2ND PARENT NAME (LAST, FIRST, INITIAL) | BUSINESS PHONE # | HOME PHONE # |
|---|---|---|
| | | |

| SPOUSE 2ND PARENT ADDRESS | CITY/STATE/ZIP |
|---|---|
| | CHICAGO |

| NEXT OF KIN NAME (LAST, FIRST, INITIAL) | RELATIONSHIP TO PATIENT | HOME PHONE # |
|---|---|---|
| 5109 S ABERDEEN | | |

| NEXT OF KIN ADDRESS | CITY/STATE/ZIP | |
|---|---|---|
| 5109 S ABERDEEN | CHICAGO | IL 60609 |

| EMPLOYER NAME | OCCUPATION | HOW LONG EMPLOYED | SALARY |
|---|---|---|---|
| | | | |

| EMPLOYER ADDRESS | CITY/STATE/ZIP |
|---|---|
| | |

## FOR MEDICAL INFORMATION SERVICES ONLY

**PRINCIPLE DIAGNOSIS**
(The condition after study that occasioned the admission to the hospital)

ICD-9-CM CODE(S)

Multiple Gun Shot Wound Injury — 853.0

**SECONDARY DIAGNOSIS(ES)**

Head Abdomen Right Common Iliac — 21.11, 863.1

Artery Liver and Small Bowel — 447.5

Cardiac Arrest — 902.89, 97.4, E165.

**PRINCIPLE PROCEDURE**          DATE    CODE(S)

Exploratory Laparotomy Ligation Right — 9-16-91 — 38.06

**SECONDARY PROCEDURE(S)**

Radial Artery Common Iliac artery. — 39.58

Resection With Hole of Prox Integrate — 45.62

Resection Small Bowel

| CHART PROCESSING (INITIAL & DATE) | | |
|---|---|---|
| RECEIVING | CODING | AC 10-4-91 |
| ASSEMBLY | ABSTRACTING | 10-4-91 |
| DATA ENTRY | PERM FILE | FINANCIAL CLASS |
| ANALYSIS | App | FINANCIAL INFOW |

FORM 5 (10-85)

Plaintiff Jakes 017605

Exhibit 25

R
COOK COUNTY HOSPITAL

Chicago,............................................19........

# REPORT OF DEATH

## To the Coroner of Cook County:

Name......Garcia  Rafael................................

Address......5709  S. Aberdeen................................

Name and Address Relative or Friend......847-1980  Rafael Garcia Jr.................

Age......48......Civil State......S / male......Occupation......................

Admitted......................hr 00 m 34 Ward No. 32

Died......9-16-91......hr 10 m 32

Brought to Hospital by......C+D #1................................

Name of Officer......................Precinct No.......................

How Injured......................................................

Where Injured......................................................

Diagnosis......Gun shot wound To Head................

Doctors......Patrick Keogh................

Splich

......................................, Warden

Per......Shirley Hazor.......

DCS 851      (FORM 41)

Plaintiff Jakes 017608