**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

ANTHONY JAKES,

               Plaintiff,

      v.

KENNETH BOUDREAU *et al*.,

             Defendants.

Case No. 19-cv-02204

Hon. Manish S. Shah

Hon. Beth W. Jantz

# EXHIBIT 15



## Planet Depos®
### We Make It *Happen*™

**CONTAINS CONFIDENTIAL INFORMATION**

# Transcript of Louis Caesar

**Date:** December 16, 2020
**Case:** Jakes -v- Boudreau, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

**Page 1**

1      IN THE UNITED STATES DISTRICT COURT FOR THE
2      NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION
3    - - - - - - - - - - - - x
4  ANTHONY JAKES,          :
5        Plaintiff,        :
6      v.            :   Civil Action No.
7  KENNETH BOUDREAU,       :   19-cv-02204
8  et al.,            :
9        Defendants.      :
10   - - - - - - - - - - - - x
11
12          CONTAINS CONFIDENTIAL INFORMATION
13
14          Deposition of LOUIS CAESAR
15            Conducted Virtually
16          Wednesday, December 16, 2020
17              10:13 a.m. CT
18
19
20
21
22   Job No.: 340616
23   Pages: 1 - 285
24   Reported By: Courtney Petros, RPR, CSR

**Page 2**

1      Deposition of LOUIS CAESAR, conducted
2  virtually:
3
4
5
6
7
8
9      Pursuant to notice, before Courtney Petros, a
10  Certified Shorthand Reporter, Registered
11  Professional Reporter, and a Notary Public in and
12  for the State of Illinois.
13
14
15
16
17
18
19
20
21
22
23
24

**Page 3**

1          A P P E A R A N C E S
2
3    ON BEHALF OF THE PLAINTIFF:
4        HEATHER LEWIS DONNELL, ESQUIRE
5        LOEVY & LOEVY
6        311 North Aberdeen Street
7        3rd Floor
8        Chicago, IL 60607
9        (312) 243-5900
10
11    ON BEHALF OF THE DEFENDANTS, THE INDIVIDUAL
12  POLICE OFFICERS:
13        ANDREW GRILL, ESQUIRE
14        BRITTANY D. JOHNSON, ESQUIRE
15        ROCK FUSCO & CONNELLY
16        321 North Clark Street
17        Suite 2200
18        Chicago, IL 60654
19        (312) 494-1000
20
21
22
23
24

**Page 4**

1      A P P E A R A N C E S   C O N T I N U E D
2
3    ON BEHALF OF THE DEFENDANT, THE CITY OF
4  CHICAGO:
5        GEORGE J. YAMIN, JR., ESQUIRE
6        THE SOTOS LAW FIRM, P.C.
7        141 West Jackson
8        Suite 1240A
9        Chicago, IL 60604
10        (630) 735-3313
11
12    ALSO PRESENT:
13        RICK KOSBERG, VIDEOGRAPHER
14
15
16
17
18
19
20
21
22
23
24

5

1                C O N T E N T S
2    EXAMINATION OF LOUIS CAESAR              PAGE
3    BY MS. DONNELL                             8
4    BY MR. GRILL                             273
5
6                E X H I B I T S
7              (Attached to transcript.)
8
9    CAESAR DEPOSITION EXHIBITS               PAGE
10

11   Exhibit 6     September 16 Supp Report     91
12   Exhibit 14    GPRs                         96
13   Exhibit 13    Property Inventory Reports  122
14   Exhibit 4     Major Crime Worksheet       127
15   Exhibit 5     September 15 Supp Report     131
16   Exhibit 1     MTS Testimony               179
17   Exhibit 10    Jakes Statement             193
18   Exhibit 7     Arrest Report               198
19   Exhibit 11    JV Arrest Report            200
20   Exhibit 2     Trial Testimony             206
21   Exhibit 3     PC Testimony                212
22   Exhibit 17    CR 185626                   227
23   Exhibit 16    CR 201798                   241
24   Exhibit 15    Answers to Interrogatories  262

6

1          E X H I B I T S   C O N T I N U E D
2              (Retained by counsel.)
3
4    CAESAR DEPOSITION EXHIBITS               PAGE
5

6    Exhibit 19    Drawing                      76
7    Exhibit 20    Evidence Report             149
8    Exhibit 21    City Jakes 642 - 643        154
9    Exhibit 23    City Jakes 922 to 926       171
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

7

1                P R O C E E D I N G S
2         THE VIDEOGRAPHER:  This is the remote Zoom
3    video deposition of Louis Caesar taken by Loevy &
4    Loevy in the matter of Anthony Jakes v. Kenneth
5    Boudreau, et al.  Case 19-cv-02204.  Today is
6    December 16th, 2020.  The time is 10:13.
7         The court reporter is Court Petros of
8    Planet Depos.  I am the Zoom host videographer,
9    Rick Kosberg.  If counsel could now introduce
10   themselves and then Court is free to administer
11   the oath.
12        MS. DONNELL:  Good morning.  Heather Lewis
13   Donnell on behalf of the plaintiff, Anthony Jakes.
14        MR. YAMIN:  George Yamin on behalf of
15   defendant, City of Chicago.
16        MS. DONNELL:  Can the individual officers'
17   counsel introduce themselves for the record,
18   please?
19        MR. GRILL:  Andrew Grill, G-R-I-L-L, on
20   behalf of the individual officers and the
21   deponent, Mr. Caesar.
22        MS. DONNELL:  And Brittany Johnson is also
23   on the record too for the individual officers.
24        MS. JOHNSON:  Oh, yeah.  Sorry.  The audio

8

1    went out for a second.
2         MS. DONNELL:  No problem.  Okay.  Court,
3    go ahead.
4         THE REPORTER:  Will counsel please
5    stipulate that in lieu of formally swearing in the
6    witness, the reporter will instead ask the witness
7    to acknowledge that their testimony will be true
8    under the penalties of perjury, that counsel will
9    not object to the admissibility of the transcript
10   based on proceeding in this way, and that the
11   witness has verified that he is, in fact, Louis
12   Caesar.  Counsel.
13        MS. DONNELL:  And that includes the
14   official video as well, correct?
15        THE REPORTER:  Correct.
16        MS. DONNELL:  Okay.  Yes.  Plaintiff's
17   counsel stipulates.
18        MR. GRILL:  Defendants' counsel stipulates
19   -- or officer defendants' counsel stipulates as
20   well.
21        MR. YAMIN:  Same with the City.
22             LOUIS CAESAR,
23   having been duly sworn, testified as follows:
24        EXAMINATION BY COUNSEL FOR THE PLAINTIFF

9

1 BY MS. DONNELL:
2    Q  Good morning, Mr. Caesar.  Thank you for
3 your patience in all that we had to do to get your
4 deposition arranged so that everyone can hear both
5 of us.  And like we said in the beginning, we're
6 here and we're socially distanced and we're
7 wearing masks, so if you can't hear me or you
8 don't understand a question, perfectly fine, just
9 let me know.  I'm more than happy to repeat
10 myself.  Okay?
11    A  Okay.
12    Q  And if you answer one of my questions, I'm
13 going to assume that you understood it and heard
14 it.  Okay?
15    A  Yes, ma'am.
16    Q  Also, if you need a break, let me know.
17 We can take breaks, especially if you need a break
18 with the mask.  So just let me know.  I'm happy to
19 accommodate that.  I just ask that you answer any
20 pending questions.  Okay?
21    A  Yes, ma'am.
22    Q  And I think that's all.  You've been
23 deposed before, at least on one occasion, in the
24 Hill matter; is that right?

10

1    A  That's correct.
2    Q  Have you ever been deposed in any other
3 matters?
4    A  The only one I recall is a civil suit
5 against my wife for a car accident.
6       THE REPORTER:  I'm sorry.  This is the
7 court reporter here.  It's very faint.
8       MS. DONNELL:  For which one of us?
9       THE REPORTER:  Mr. Caesar.
10       MS. DONNELL:  Okay.
11    Q  Mr. Caesar, I'm going to ask that you just
12 increase your volume so that Court, our court
13 reporter, can hear your answers.  Okay?
14    A  Okay.
15    Q  We're going to just move it a little
16 closer and see if that helps.  Okay.  All right.
17       So in terms of your prior depositions with
18 regard to your work as a Chicago police officer,
19 there's only the one deposition in the Harold Hill
20 case, correct?
21    A  Correct.
22    Q  And then you've been deposed in a civil
23 matter related to a car accident your wife was in,
24 correct?

11

1    A  Correct.
2    Q  Okay.  And in the Gibson lawsuit that
3 you've been named as a defendant, it's accurate to
4 say that you have not yet been deposed, correct?
5    A  To the best of my knowledge, yes.
6    Q  Okay.  Do you know if you have a
7 deposition scheduled in that case?
8    A  I recall being notified about a year ago
9 that it was being looked into, but I don't have
10 any definite date.
11    Q  And you've obviously testified on a number
12 of occasions in court, correct?
13    A  Correct.
14    Q  Okay.  So I want to ask you about your
15 relationship with some of the other named
16 defendants in this case and also ask about the
17 last time you've spoken with them.  And so I'm
18 going to run through those individuals.  Okay?
19    A  Yes, ma'am.
20    Q  Okay.  And in the -- to be clear, if you
21 had any meetings with the defendants and your
22 attorneys, I'm not asking about any of those
23 privileged communications.  Okay?
24    A  Okay.

12

1    Q  Okay.  And so let's start with Kenneth
2 Boudreau.  Do you know Kenneth Boudreau?
3    A  Yes, ma'am.
4    Q  Okay.  So when's the last time you saw Ken
5 Boudreau?
6    A  I'm guessing, but it had to be maybe five
7 years ago at an Area 2 annual gathering.
8    Q  And what's the Area 2 annual gathering?
9 Is it a holiday gathering or some other kind of
10 gathering?
11    A  Actually, it's a south side detectives
12 gathering that's usually held at Bourbon Street
13 out south.
14    Q  And, for the record, what's Bourbon
15 Street?
16    A  It's a tavern venue restaurant location on
17 111th Street.
18    Q  And are there -- sometimes separate south
19 side detectives would hold an annual celebration?
20    A  Yes, ma'am.
21    Q  And when was it -- is that still going on,
22 the south side detectives' celebration?
23    A  It's usually in the late summer, but it
24 wasn't -- it didn't occur this year because of

---

**Page 13**

1 COVID.

2    Q  Okay. And is it an FOP -- formal FOP

3 gathering?

4    A  No. It's just all the guys that used to

5 work on the south side as detectives informally

6 get together.

7    Q  Okay. And so, to the best of your

8 recollection, the last time you spoke to Ken

9 Boudreau -- well, let me -- did you speak to Ken

10 Boudreau about five years ago at Bourbon Street at

11 the south side detectives gathering?

12    A  I just remember seeing him there. I

13 didn't really talk to him.

14    Q  How about the last time before that, do

15 you remember the last time you saw Ken Boudreau?

16    A  I know -- well, I don't know for a fact,

17 but I believe it was right before I went to Iraq

18 or Afghanistan, because I would have talked to Ken

19 about that. So that was before 2007.

20    Q  So -- and I was going to ask you about

21 that later, but I know both of you -- both Ken

22 Boudreau and you both went back into the military

23 -- or you were with a contractor -- but went and

24 served overseas. So do you remember talking to

---

**Page 14**

1 Ken Boudreau when you went with -- back to

2 Afghanistan -- or not back to Afghanistan -- when

3 you went to Afghanistan?

4    A  I never got a chance to talk to him about

5 it, but when people found out I had gone, they

6 mentioned that Ken had been overseas as a military

7 officer.

8    Q  Okay. But you never had a chance to talk

9 to him about that?

10    A  No, ma'am.

11    Q  Would you consider yourself social friends

12 with Ken Boudreau?

13    A  We may have been in a bar together a

14 couple times, but not really go over to each

15 other's house or anything like that.

16    Q  How about your former partner, Detective

17 McCann?

18    A  I was fairly close with Jack. Small

19 vacations together. Knew each other's families.

20    Q  And you have to remind me, how long ago

21 did he pass away?

22    A  I'm bad with that, but it's got to be four

23 years now, I believe, three or four years.

24    Q  And were you still in contact with Jack

---

**Page 15**

1 prior to when he passed away?

2    A  Yes, ma'am.

3    Q  How regular contact were you in with Jack

4 McCann? Did you go --

5    A  Probably a couple times a year. But I did

6 go visit him when he got sick out in

7 (indiscernible).

8       THE REPORTER: Out in what area? Sorry.

9       THE WITNESS: He was out at Lake Carroll,

10 I believe it was, out towards Galena. I know he

11 was in a nursing home, and I went and visited him

12 before he came home to hospice.

13    Q  Did you and Jack ever discuss the Garcia

14 homicide investigation or Mr. Jakes's civil case?

15    A  No.

16    Q  How about Detective Kill? Do you know

17 Detective Kill?

18    A  Yes, ma'am.

19    Q  And describe your relationship with

20 Detective Kill.

21    A  Mainly through being a detective in the

22 same Area, plus, he was from my parish, but we

23 didn't really socialize. We did meet a few times

24 as his son and my son were Boy Scouts together.

---

**Page 16**

1    Q  And what parish is that?

2    A  St. Denis.

3    Q  Denis?

4    A  Denis. D-E-N-I-S.

5    Q  And where is St. Denis located?

6    A  The church is at 82nd and St. Louis.

7    Q  How about Sergeant Bonke? Do you know

8 Sergeant Bonke?

9    A  Yes, ma'am.

10    Q  And describe your relationship with

11 Sergeant Bonke.

12    A  Truly as a supervising sergeant at Area 3.

13       MR. GRILL: I would just object to

14 foundation and form and the time frame you're

15 talking about.

16    Q  Well, you knew Sergeant Bonke because he

17 was your supervisor; is that right?

18    A  Yes, ma'am.

19    Q  And that's when you were assigned to

20 Area 3 detective unit?

21    A  Yes, ma'am.

22    Q  And how about Defendant Burke? He's a

23 youth officer. Do you know Defendant Burke?

24    A  I remember sitting behind the

---

**Page 17**

1  courtroom.  And I didn't even know it, but he was
2  from my same parish, I believe, and I just knew
3  him as a youth officer.
4     Q  And when you're saying you're sitting
5  behind him in court, when are you referring to?
6     A  I'm not sure if it was the Harold Hill --
7  or the situation in front of Judge Hooks or it was
8  another court date.  I can't remember.
9     Q  And you're saying Defendant Burke also
10 attended St. Denis or does attend?
11    A  I remember sitting in the back of a
12 courtroom and talking to him and it was a surprise
13 to me that he was from my parish.
14    Q  Did you have any discussions with
15 Defendant Burke about Mr. Jakes's case or the
16 Garcia homicide investigation?
17    A  No.
18    Q  How about Defendant Delacy?  Do you know
19 who that is?
20    A  I know who he is, yes, ma'am.
21    Q  What's your relationship with -- or how
22 would you describe your relationship with --
23    A  I wouldn't recognize him if I saw him.  I
24 know he's a tac officer from reading the reports.

---

**Page 18**

1        THE REPORTER:  A what officer?
2        THE WITNESS:  I knew he was a tactical
3  officer from reading the reports.
4     Q  How about Defendant Pack, who is now
5  deceased, do you know --
6     A  Same situation as Delacy.
7     Q  Okay.  Have you had any meetings with any
8  of the defendants for this lawsuit with your
9  counsel?  And, again, I'm not asking about what
10 was discussed.  Just did you ever meet with
11 counsel with any of the other defendants in this
12 case?
13    A  Delacy was here at Andrew's office with us
14 a while back.  I can't remember the date.
15    Q  It was just you and Delacy and Mr. Grill?
16    A  Yes, ma'am.  Brittany may have been here
17 also.
18    Q  And, again, I'm not asking about the
19 substance of the meeting, but when was that
20 meeting, to the best of your recollection?
21    A  I'm bad with dates.  Within the last year.
22    Q  Within COVID time?  Were you wearing a
23 mask?
24    A  No.  Before COVID, I believe.

---

**Page 19**

1     Q  Okay.  And that was here at the Rock Fusco
2  office?
3     A  Yes, ma'am.
4     Q  How long was that meeting?
5     A  We were out by noon, I believe, so a
6  couple hours.
7     Q  Have you had any meetings where Detective
8  Boudreau was here with you?
9     A  Never.
10    Q  Okay.  Let's talk about what you did to
11 prepare for your deposition.  And, again, I'm not
12 asking about your privileged communications.
13       Did you look at documents to prepare for
14 your deposition today?
15    A  Yes, ma'am.
16    Q  What documents did you look at to prepare?
17    A  I'm not -- there was case reports, there
18 was supplementary reports, there was testimony
19 from trial, and I believe there was a -- my prior
20 deposition in the other case.  There may have been
21 other reports, but I don't know what -- it was
22 probably a dozen reports.
23    Q  And did you spend time reading those
24 documents?

---

**Page 20**

1     A  Yes, ma'am.
2     Q  Okay.  Did you read them before you met
3  with your counsel?
4     A  Some I did and some I didn't.  Some was
5  sent to me just recently via e-mail.
6     Q  Okay.  So it sounds like you read case
7  reports, supplementary reports, your trial
8  testimony back from the criminal trial for
9  Mr. Jakes; is that right?
10    A  Yes, ma'am.
11    Q  And then you also reviewed your deposition
12 in the Hill v. -- Harold Hill lawsuit?
13    A  Yes, ma'am.
14    Q  And did you review your whole deposition
15 or just portions of it?
16    A  The whole thing.  There was also
17 complaints or court orders that were involved that
18 got very legalese to me.
19    Q  Complaints or -- you mean like a civil
20 complaint?
21    A  Allegations again me or against us.
22    Q  Okay.  So you think you probably read the
23 complaint -- the civil complaint and it had a
24 number of paragraphs?

---

**21**

1  A  Yes, ma'am.

2  Q  Okay.  And then you said you read some

3  court orders?

4  A  Well, I'm not sure if they're considered

5  court orders, but summonses or notifications to

6  appear before Judge Hooks and things like that.

7  Q  Okay.  Did you review your testimony from

8  2016, June 2016, for your testimony in this -- the

9  postconviction proceeding for Mr. Anthony Jakes?

10  A  Was that the testimony before Judge Hooks?

11  Q  Right.

12  A  Yes, I did.

13  Q  Okay.  Anything else you recall reviewing

14  other than the things you've already testified to?

15  A  No, ma'am.

16  Q  Did you review your interrogatory

17  responses?  Do you know what I mean when I'm

18  referring to interrogatory responses?

19  A  I think that's what I just reviewed again

20  today and I was sent recently, and, yes, it got

21  very legalese to me, but I did read it.

22  Q  Okay.  Did you have any meetings with your

23  attorneys to prepare for today, whether they were

24  in person or on Zoom or telephone call?

---

**22**

1  A  Just Monday I was here the offices.

2  Q  Okay.  And who did you meet with here at

3  Rock Fusco?

4  A  Andrew Grill and Brittany Johnson.

5  Q  And how long did -- and it was just the

6  three of you?

7  A  Yes, ma'am.

8  Q  How long was that meeting?

9  A  Most of the day, I'd say, 10:00 to 2:30 or

10  so.

11  Q  Okay.  I'm going to switch gears now and

12  ask you some questions about your history --

13  education and employment history.  Okay?

14  A  Yes, ma'am.

15  Q  Can you describe for us your educational

16  background?

17  A  Graduated from high school on the south

18  side.  Originally went to the U of I Circle

19  Campus.  Didn't do too well.  Joined the Marine

20  Corps.  Got out and I finally got serious and went

21  back to Chicago State University when I was on the

22  job in the 10th District.  And I got my bachelor's

23  and master's in criminal justice from Chicago

24  State in the mid '80s.

---

**23**

1  Q  I'm going to go back.  Thank you.  I'm

2  going to go back and just ask a few follow-up

3  questions.

4  What high school did you graduate from on

5  the south side of Chicago?

6  A  Leo, 79th and Sangamon.

7  Q  You said 79th and Sangamon?

8  A  Yes, ma'am.

9  Q  What year did you graduate from Leo High

10  School?

11  A  1968.

12  Q  And Leo is a CPS school?

13  A  No.  It's a private Catholic high school.

14  Q  Private Catholic.  Okay.  Did you attend

15  parochial schools in Chicago through -- grade

16  school through high school?

17  A  Yes, ma'am.

18  Q  In 1968, did you enroll at the U of I

19  Circle Campus as a freshman?

20  A  Yes, ma'am.

21  Q  And what were you studying or had you --

22  A  Engineering until I took calculus.  Boy.

23  Q  How long did you attend the U of I Circle

24  Campus?

---

**24**

1  A  I believe three semesters.

2  Q  And it sounds like, at that point, school

3  was -- you weren't ready for focusing on your

4  education; is that right?

5  A  Not in engineering at U of I.

6  Q  Not in engineering.  Fair enough.  So you

7  enlisted in the Marine Corps; is that right?

8  A  Well, actually, the draft was present

9  then.  My numbers were high, and I joined the

10  Marine Reserves --

11  Q  Okay.

12  A  -- while attending junior college.

13  Q  Did you join the Marine Corps -- Reserve

14  Corps in 1970?

15  A  June of '70 I started boot camp.  I know

16  that.  I may have joined a little bit earlier.

17  Q  I understand you mostly served on the

18  stateside while you were in the Marines; is that

19  right?

20  A  It's kind of a weird situation.  I was in

21  the Reserves for about a year and a half.  That

22  wasn't working out.  I decided to go active and

23  get my service over with.  So I activated myself

24  for the remainder of a two-year enlistment.

---

**25**

1    Q  Why wasn't the Reserves working out?

2    A  School wasn't working out, I wasn't doing
3 that well, and I wanted to get the Reserves out of
4 the way.

5    Q  You wanted to get the Reserves out of the
6 way?  I don't understand.

7    A  The six-year commitment out of the way.

8    Q  I see.  And if you go two years active,
9 you accelerate that six years?

10    A  Correct.

11    Q  I see.  So when you went active in the
12 Marines, is that when you were a radio operator?

13    A  Yes, ma'am.

14    Q  And you did an overseas tour once active
15 with the Marine Corps?

16    A  I went back to Camp Lejeune for six
17 months, and then we were deployed to the
18 Mediterranean within '80 for six months, and then
19 I came back and I did another six months at Camp
20 Lejeune.  One of the main reasons I went back too
21 was also for the GI Bill.  I knew the Reserves
22 didn't get it.

23    Q  Okay.  And when did you complete your
24 service with the Marine Corps?

---

**26**

1    A  May of '73 -- no.  December of '73.
2 December of '73.  1973.

3    Q  Okay.  What did you do after you -- what
4 was your discharge from the Marines?

5    A  Honorable.

6    Q  What did you do after you were discharged
7 from the Marines?

8    A  I went back to junior college while
9 working for the railroad and various other jobs.

10    Q  Where did you attend junior college?

11    A  Daley Southwest.  It had a few different
12 names over the years.

13    Q  What were you studying at Daley College?

14    A  Mainly general AA type classes.  No real
15 specific --

16    Q  So general education classes?

17    A  General education classes.

18    Q  Okay.  And what railroad were you working
19 for?

20    A  Norfolk and Southern.

21    Q  What did you do for Norfolk and Southern?

22    A  Switchman.

23    Q  Was that a full-time job?

24    A  Yes, ma'am.

---

**27**

1    Q  Was it a union job?

2    A  I'm not sure if it was union, because they
3 had different rules.  But it paid well back then,
4 and I was an extra.  I believe it was union, yes.

5    Q  Okay.  Do you remember what union it was?

6    A  No, I don't.

7    Q  When did you -- well, at some point, you
8 applied for the Chicago Police Department, right?

9    A  Well, when I got out of the -- I was
10 actually called for the police department while I
11 was on the Marine Corps.

12    Q  When did you first make application to the
13 police department -- the Chicago Police
14 Department?

15    A  I took two or three tests, but I think the
16 one I made it off was sometime in the early '70s,
17 maybe 19 -- right before I went active, I believe.

18    Q  Do you remember the years you took the
19 test to be a Chicago police officer?

20    A  I don't remember the year, no.  It was --

21    Q  But you said you took it two or three
22 times?

23    A  I was first called in February of '72, but
24 I was in the Marine Corps.  That's when I was

---

**28**

1 called off the list I made it off of.  I notified
2 the City that I was on active duty, and I was put
3 -- I was told that when I got out of the Marine
4 Corps, I would be able to get back on the list.

5    Q  And did you put yourself back on the list
6 when you got out of the Marines?

7    A  Yes, ma'am.

8    Q  And so you were just waiting for a call
9 once you got back -- once you were discharged from
10 active duty?

11    A  When I was discharged, there was a hiring
12 freeze in the Chicago Police Department; and my
13 class in 1975 was the first class after the hiring
14 freeze, so I was put back on the top of the list.

15    Q  Do you -- hold on one second.  Do you know
16 how long the hiring freeze had been in place prior
17 to 1975?

18    A  Not exactly.  I know I was called in
19 February, so it wasn't on in -- when I got out in
20 December of '73, it was on.  So I'm not sure.

21    Q  So as far as you know, the hiring freeze
22 was at least from -- I'm sorry -- you said
23 December 1973?

24    A  From at least February -- I know there was

29

1  a class in February of '73 that I should have been
2  in.  And then when I got out in December, the
3  hiring freeze was on, and I didn't get on until
4  May of '75.  So at least from December of '73
5  until May of '75 it was on, around May of '75.
6      Q  Thank you.  Okay.  So then you joined the
7  Chicago -- or you were called off the list and
8  went to the academy in May 1975; is that right?
9      A  Yes, ma'am.
10     Q  Okay.  And then you served -- or were
11 employed by the Chicago Police Department until
12 your retirement in 2004; is that right?
13     A  Correct.
14     Q  And what was your date of retirement?
15     A  I believe it was mid October of '74.
16     Q  Of --
17     A  -- of '04.  I'm sorry.
18     Q  I almost wrote down 1974.  I was like, no,
19 that can't be right.  Okay.
20         I'm going to ask you some questions about
21 your various assignments while you were employed
22 with the Chicago Police Department.  Okay?
23     A  Yes, ma'am.
24     Q  Oh, but before I do, did you make any

30

1  other applications to other law enforcement
2  agencies other than the Chicago Police Department?
3      A  No.  I was trying for the fire department
4  hard.
5      Q  Oh, you also applied to the fire
6  department?
7      A  Yes, ma'am.
8      Q  Did you ever get called by them?
9      A  No, ma'am.
10     Q  Was that your preference?
11     A  At the time, yes.
12     Q  Okay.  Why was that?
13     A  It was more outdoorsy.
14     Q  Did you have any family members who were
15 police officers or fire department?
16     A  Never.
17     Q  Were you born and raised in Chicago?
18     A  Yes, ma'am.
19     Q  On the south side?
20     A  Yes.
21     Q  Okay.  What neighborhood?
22     A  I was born in the area where some of these
23 murders occurred, 56th and Racine, and then I
24 lived at St. Thomas More, 8500, on -- around

31

1  California the rest of my life.
2      Q  Okay.  Are you still in the city now, sir?
3      A  Yes, ma'am.  I'm not really embarrassed by
4  it, but I've probably only moved maybe three miles
5  in the last 50 years.
6      Q  I get that.  I get that.  Okay.  I know a
7  lot of your colleagues or former colleagues are
8  snowbirds these days and down in Florida for at
9  least part of the year.  Are you here full time
10 and go through the whole winter and everything?
11     A  Yes, ma'am.
12     Q  Okay.  Good for you.  Okay.  Let's -- so
13 you've never -- so other than the Chicago Fire
14 Department, you didn't apply to any other law
15 enforcement agencies, correct?
16     A  No, ma'am.
17     Q  Okay.  How long was the academy back in
18 1975?
19     A  It was really strange then, because it was
20 a new class.  I know we were in and out for over a
21 year.  I don't think we ever spent more than 16 --
22 maybe four months at a stretch we'd go out for --
23 originally, it was -- I'm guessing -- four or five
24 months and then out on the street and then back

32

1  for a short period of time.
2      Q  Were you considered being in the academy
3  for a full year?
4      A  We were on probation for a full year, but
5  we were out on the street probably over half of
6  that time.
7      Q  Where did you -- so it sounds like the
8  initial four or possibly five months was in the
9  academy in the classroom; is that right?
10     A  Yes, ma'am.
11     Q  And then you received an assignment as a
12 probationary officer out in the field?
13     A  Yes, ma'am.
14     Q  And then, occasionally, they'd bring you
15 back to the academy from some additional classroom
16 work; is that what I'm hearing you say?
17     A  I don't recall all the details, but I
18 remember going back to the academy, and I believe
19 they were teaching us basically city of college
20 [sic] classes.
21     Q  On what subjects?
22     A  Report -- not report writing, but general
23 grammar, English, all that kind of stuff.  General
24 education classes and some law -- some corrections

Page 33

1  classes.
2      Q  I'm sorry.  I didn't mean to interrupt
3  you.  Did you complete your answer?
4      A  Corrections classes.  Corrections-type
5  classes.
6      Q  Did you have an instructor -- I think it
7  was Instructor Forney who taught report writing
8  back in 1975?
9      A  I remember the name, but I can't picture
10 him.
11     Q  So you think you had him for report
12 writing?
13     A  Yes, ma'am.
14     Q  Do you remember anything about what -- I
15 don't know if it was Sergeant Forney or his first
16 name; do you remember his first name?
17     A  No, I don't.
18     Q  Do you remember anything he taught you
19 about report writing?
20     A  I remember he was -- the class was very
21 thorough and detailed and kind of repetitious.
22     Q  (Indiscernible.)
23        THE REPORTER:  Sorry.  I can't hear you.
24 Can you repeat that?

Page 34

1        MS. DONNELL:  Oh, sorry, Court.  Yeah.
2  Sure.  Thanks for letting me know.
3      Q  I have heard testimony before from other
4  folks who were educated by him in the academy that
5  he had the five -- who, what, when, where, how?
6      A  Now that you mention it, I do vaguely
7  remember that.  Yeah.
8      Q  Okay.  Do you remember any of the other
9  subjects you were taught other than report writing
10 and grammar and corrections while you were in the
11 academy, the formal part of the academy?
12     A  Basic police procedures, how to search,
13 self defense, defensive tactics, law.
14     Q  Were you instructed on Miranda Warnings
15 back in the academy in 1975?
16     A  Yes, ma'am.
17     Q  Were you given any training on how to
18 conduct witness interviews or suspect
19 interrogations?
20     A  Briefly, I believe.
21     Q  What do you recall about being taught
22 interview or interrogation techniques in the
23 academy as a new recruit?
24     A  Basically, I remember is not to take any

Page 35

1  preconceived notions into the interviews and be
2  fair.
3      Q  What did that mean or what were you taught
4  about being fair?
5      A  Let the person being interviewed tell you
6  what happened and document it as he's telling you.
7      Q  Were you instructed to take notes as the
8  person being questioned was providing responses?
9  You were saying -- I think you just said, let the
10 person tell you what happened and then take notes
11 or document it?
12     A  To document --
13        MR. GRILL:  Hang on.  Hang on.  Objection.
14 Form.  Compound.  Misstates his testimony.
15        MS. DONNELL:  I'll just ask it -- thank
16 you, Andrew.  I'll just ask a different question.
17     Q  Can you explain to me what you meant -- or
18 what you just said about how you were trained in
19 the academy about interview and interrogation
20 techniques?
21     A  We were told to listen to what the
22 individual was telling me, figure out if there was
23 a crime involved that should be documented, and
24 how to document that on the proper report.

Page 36

1      Q  And how were you trained to document what
2  someone told you on a proper report?
3        MR. GRILL:  Objection.  Foundation.
4        MS. DONNELL:  He just told -- I don't
5  think there's a foundation problem.
6      Q  We were talking about your training in the
7  academy -- the recruit academy, right?
8        MR. GRILL:  Okay.  If that's what --
9  because the way you phrased it --
10        MS. DONNELL:  Yeah.  No.  I'm sorry.
11 These questions about --
12     Q  Just to be clear, we're -- I'm having you
13 tell me what you remember about your training back
14 in the recruit academy, right?
15     A  All I remember is the instructors telling
16 us that based on the law we had learned and the
17 elements of certain crimes, listen to the
18 individual you talked to and document what they
19 were saying and make sure that fit the crime that
20 we were trying to document on the proper case
21 report.
22     Q  Okay.  Anything else that you recall about
23 how you were trained to conduct interviews and
24 interrogations?

37

1      A   No.
2          MR. GRILL:  In the police academy?
3          MS. DONNELL:  Yes.  All these questions
4   are in the police academy.  Right.
5      Q   I'm going to talk to you later about when
6   you get promoted to detective.  So, right now,
7   these questions, just so the record is clear, the
8   time frame is the police academy.  Okay.
9          Were you given any training in the police
10  academy about interrogations or interviews of
11  juveniles that you recall as you sit here today?
12     A   I don't recall.
13     Q   Okay.  Where were you assigned as a
14  probationary officer once you completed your time
15  at the formal academy?
16     A   I was assigned to the 10th District which
17  used to be located at 23rd and Damen on the --
18     Q   That's on the west side of Chicago?
19     A   -- west side of Chicago.
20     Q   So you were there as a probationary
21  officer; is that right?
22     A   Yes, ma'am.
23     Q   And then when you completed your one-year
24  probationary period, were you also then --

38

1   received your first assignment as a sworn police
2   officer at the 10th District on patrol?
3      A   Yes, ma'am.
4      Q   And did you do that -- were you in that
5   position for about -- well, how long were you in
6   the 10th District as a patrol officer before your
7   next --
8      A   I was there until I made detective around
9   '87 --
10     Q   Okay.
11     A   -- 1987.
12     Q   Is it fair to say for the first portion
13  you were a patrol, and then you eventually became
14  a field training officer?
15     A   Yes, ma'am.  About halfway through my time
16  in the 10th District, I became a field training
17  officer.
18     Q   So is it fair to say from 1976 to 1987 you
19  were at the 10th District as patrol and then as a
20  field training officer?
21     A   Yes, ma'am.
22     Q   And that time was about 50/50, right?
23     A   Yes.
24     Q   Okay.  Meaning, you spent about four or

39

1   five years on patrol and four or five years as a
2   field training officer at the 10th District?
3      A   Yes.
4      Q   Okay.  Did you work -- what shifts did you
5   work at the 10th District?
6      A   Normally, I worked afternoons, but when I
7   was going to school, I would flip-flop or change
8   my shift depending on what was -- my classes
9   consisted of.
10     Q   Okay.  And back in that time frame, 1976
11  to 1987, when you worked the afternoon shift, what
12  was that shift?
13     A   Normally 4:00 to midnight.
14     Q   Okay.  You were promoted to detective in
15  1987; is that right?
16     A   Yes, ma'am.
17     Q   Do you remember the month?
18     A   No.  I believe late in '87, but I'm not
19  sure of the month.
20     Q   Did you take a test to become a detective
21  with the Chicago Police Department?
22     A   Yes, ma'am.
23     Q   And so you were promoted off the test?
24     A   Yes, ma'am.

40

1      Q   Do you know what rank you -- well, first
2   of all, what year did you take the detective test?
3      A   I'm not sure.  I took a youth officer
4   test, and I took two detective tests over my
5   career, but I don't recall the year I took that
6   test.
7      Q   What year did you -- do you remember the
8   year you took the youth officer test?
9      A   No, ma'am.
10     Q   Do you remember if it was before or after
11  you took -- the first time you took the test to be
12  a detective?
13     A   I'm not sure.
14     Q   And you said you took the detective test
15  twice?
16     A   I believe so.  Yes.
17     Q   Okay.  Do you remember the first time you
18  took the detective test?
19     A   Not really.  I remember going to Lane
20  Tech, but I don't remember.
21     Q   Do you remember back then how long you had
22  to be on patrol before you were eligible to take
23  the detective test?
24     A   I don't recall, no.

41

```
1      Q  There was a certain amount of time you had
2   to serve on patrol before you were even eligible,
3   right?
4      A  Yes, but I believe it was short.  I don't
5   believe it was more than a couple years.
6      Q  Oh, really?  Okay.  Do you remember -- so
7   what happened the first time you took the
8   detective test?
9      A  I didn't score well enough or I wasn't
10  qualified.
11     Q  Okay.  Do you remember what rank you had
12  the first time you took the test?
13     A  I want to say in the 500s, but I'm not
14  sure.
15     Q  Do you remember how many people took it
16  with you the first time you took the detective
17  test?
18     A  No, ma'am.
19     Q  And when you're saying in the 500s, you
20  mean the -- you know, you're ranked number 500 out
21  of the people who had taken it?
22     A  Yes, ma'am.
23     Q  Okay.  How about the youth officer test?
24  I know you said you don't recall when you took
```

42

```
1   that one, correct?
2      A  I don't recall, no.
3      Q  Were you in patrol at the 10th District
4   when you took the youth officer test?
5      A  Yes, ma'am.
6      Q  And is it -- what happened -- do you know
7   what happened with that test?
8      A  To the best of my recollection, I believe
9   I was called to be a detective right around the
10  same time I was going to be called to become a
11  youth officer, so I took detective.
12     Q  Why did you decide to take the youth
13  officer test, if you remember?
14     A  I took every promotional test that was
15  available while I was on the job.
16     Q  And was taking the youth officer test
17  considered a promotion?
18     A  It was a DII position like as an FTO, but
19  it was a better career line.
20     Q  And what does that mean?  Help us -- what
21  is a DII position?
22     A  Better pay grade, second pay grade over
23  patrolman.
24     Q  And you're saying it has a better
```

43

```
1   trajection; is that right?
2      A  You work in a smaller unit, and you're not
3   on the street constantly as a patrolman.
4      Q  Okay.  And then the second time you took
5   the detective test, you don't remember when that
6   was either?
7      A  No, ma'am.
8      Q  And that's the one you got promoted off
9   of?
10     A  I believe it was the second one, yes.
11     Q  Okay.  And do you remember how long before
12  you actually became a detective in 1987, was it
13  shortly before or -- if you have any memory?
14     A  No, I believe the test was out there a
15  while.  A couple years at least.  I'm not sure how
16  many years, though.
17     Q  Do you remember what rank you had the
18  second time you took the test for the detectives?
19     A  I believe I was an FTO at the time which
20  was a DII position, but it was still patrol on the
21  street.
22     Q  I'm sorry.  Do you remember what rank you
23  had in the test?
24     A  Oh, no, ma'am.
```

44

```
1      Q  Okay.  So you were promoted to detective
2   in 1987.  To the best of your ability, you think
3   it was later in the year in 1987, right?
4      A  Yes, ma'am.
5      Q  And then did you attend the detective
6   academy once you received that promotion?
7      A  Yes, ma'am.
8      Q  And that was in 1987?
9      A  Yes.
10     Q  How long was the detective -- was it --
11  did they call it detective academy or what did
12  they call it back then?
13     A  They just said dick school.  And I believe
14  it was -- I can't even remember if it was one week
15  or two weeks.  It wasn't very long.
16     Q  How many new detectives attended the
17  detective school in 1987 with you?
18     A  I'm thinking of the class picture, and I
19  would guess between 80 and 100, maybe.
20     Q  Was Jack McCann in your detective academy
21  class or detective school class?
22     A  No.  No, ma'am.
23     Q  Were any of the -- let's see.  It was '87.
24  That was before Detective Boudreau went to the
```

45

1 detective school, correct?
2    **A  Yes, ma'am.**
3    Q  And that was before -- let's see.  Were
4 you in the academy -- the detective school with
5 any of the defendants in this case?  With Kill?
6    **A  Not in this case.  I did go to the academy**
7 **with Vic Rusca and Jerry Ruznik who were also at**
8 **Area 3.  Other than that, I don't --**
9       MR. GRILL:  Sorry, Heather.  In like --
10 when you find a spot, I need to take a two-second
11 break.
12       THE REPORTER:  Mr. Grill, I can't hear
13 you.
14       MR. GRILL:  Sorry.  I was saying -- asking
15 Heather when she finds a spot that's convenient
16 for her if we could just take a two-minute break.
17       MS. DONNELL:  Sure.  We can do it right
18 now.  We're going to go off the record right now
19 for just, let's say, five minutes.  Rick, do you
20 want to get us off the record?
21       THE VIDEOGRAPHER:  Off the record 10:54.
22       (A recess was taken.)
23       THE VIDEOGRAPHER:  Back on the record
24 11:00.

46

1 BY MS. DONNELL:
2    Q  Okay.  Where we left off, we were talking
3 about when you attended the detective school back
4 in 1987, right?
5    **A  Right.**
6    Q  Oh, I should ask, did you attend in '87 or
7 '88?  Was it enough at the end of the year that
8 the school was actually into the following year,
9 if you recall?
10    **A  I know it was in '87.  It was before**
11 **Christmas, I believe.**
12    Q  Okay.  Do you have a memory of any of the
13 subjects you were taught at the detective school
14 back in 1987?
15    **A  Not specifically, no.**
16    Q  How about in general or --
17    **A  I know we learned more law and we -- we**
18 **learned more case reporting, supplementary-type**
19 **case reporting.**
20    Q  Do you remember anything you were taught
21 about how to prepare a supplementary case report
22 since those were sort of the main reports
23 detectives prepared?
24    **A  We were explained the whole report,**

47

1    **basically, how to fill out whether it was a**
2    **progress report, it was a closing report, whether**
3    **it was an in-progress report or a cleared report**
4    **or an open report.  Basically, how to check the**
5    **boxes on the supplementary report and justify what**
6    **type of report you're writing.**
7    Q  And, just for the record, what's your --
8    how were you taught the difference between a
9    progress report, a supplementary report, a closing
10   report, a cleared report, or a cleared-open
11   report?
12    **A  They kind of by definition define**
13   **themselves, but if you were closing a case out, it**
14   **would be one report.  If it was a continuing**
15   **investigation, it would be another box on the**
16   **report.  If it was a cleared but still work to be**
17   **done open case, it would be another box on the**
18   **report.**
19    Q  And back in 1987, was there one form for
20   supplementary reports, or did different parts of
21   the detective unit, like vice, have different
22   kinds of reports?
23    **A  I really don't recall.  I believe there**
24   **was a couple different ones.  I think auto theft**

48

1    **still had their own.  But when I went to violent**
2    **crimes, it was all on one supplementary report,**
3    **the way I remember it.**
4    Q  Okay.  Were you provided any training on
5    interview techniques at the detective academy?
6    **A  I don't recall any.  I don't recall any,**
7    **but I'm sure we did.**
8    Q  Were you given any training on how to
9    conduct interviews, either pre- or post-polygraph
10   examination?
11    **A  Not at all.  No.**
12    Q  Or use of polygraph in the context of
13   investigations?  Were you trained at all on
14   polygraphs?
15    **A  I don't recall it, no.**
16    Q  How about on conducting and preparing
17   lineups?  Were you given any training on lineups?
18    **A  Yes, ma'am.**
19    Q  Okay.  In the detective academy?
20    **A  Yes.**
21    Q  Do you remember anything about the
22   training you were provided on lineups in the
23   detective academy?
24    **A  I just remember the vague stuff about make**

---

49

1  sure that the suspects or the individual are
2  similar height, weight, race, ethnicity, and all
3  that, but I don't remember any real procedures
4  taught.
5      Q  How about were you given any special
6  training on how to -- or policies and procedures
7  around interviewing juveniles?
8      A  I'm sure we were, but I don't remember any
9  specifics other than youth was to be notified in
10 certain circumstances.
11     Q  When you're saying, youth, either youth
12 division or youth officer?
13     A  Yes, ma'am.
14     Q  Do you remember the circumstances in which
15 the youth officers were supposed to be notified?
16     A  Not really.  Not from the academy, no.
17     Q  Okay.  Any other areas of training you
18 remember receiving?
19     A  No.
20     Q  Where was your -- was there a time where
21 you were a probationary detective, or did you just
22 go right to detective?
23     A  I went right to Area 3 as a detective.
24 Area -- yes.  Area 3.

---

50

1      Q  When did you first get to Area 3 as a
2  detective?
3      A  Very end of '87 or the beginning of '89.
4  I think it was the end of '87.
5      Q  Okay.  And, now, that was the old Area 7,
6  right?  It eventually got closed down?
7      A  The old Area 3.
8      Q  I'm sorry.  The old Area 3.  I misspoke.
9  Thanks for correcting me.  That's the old Area 3,
10 right?
11     A  Right.
12     Q  And that was -- what was that, 11th and
13 California?
14     A  No.  39th and California.
15     Q  39th and California.  Sorry.  And did you
16 remain assigned as a detective to Area 3 until
17 Area 3 was closed down?
18     A  Yes, ma'am.
19     Q  Okay.  Do you remember the date they
20 closed Area 3 -- the city closed Area 3?
21     A  I don't remember the date, but it was
22 October of '92.
23     Q  And were you assigned to violent crimes
24 that whole time?

---

51

1      A  Yes, ma'am.
2      Q  And what kind of cases did you investigate
3  as a detective at Area 3 in the violent crime
4  unit?
5      A  Violent crimes at the time encompassed
6  robberies, sexual assault cases, aggravated
7  batteries, murders, and anything --
8  violently-related crimes.  Death investigations.
9      Q  Death investigations.  Okay.  Did you have
10 a regular partner you were assigned to work with
11 when you were at Area 3?
12     A  Eventually --
13     Q  Who was that?
14     A  -- after a couple years.
15     Q  So for the first couple years you kind of
16 rotated?
17     A  Yes, ma'am.
18     Q  And then who was your regular partner?
19     A  I teamed up with Jack McCann.
20     Q  Did you request to work with Jack McCann?
21     A  Yes, ma'am.
22     Q  What year did you and Jack McCann become
23 regular partners?
24     A  I think I was there a little over two

---

52

1  years, so I would guess around '91 or '92,
2  beginning of '92.
3      Q  Is it fair to say by the time you were
4  doing this investigation in September 1991 you
5  guys were regular partners?
6      A  Yes, ma'am.
7      Q  So it was some time prior to September
8  1991?
9      A  Right.  Two years.  From end of '89 or
10 beginning of '90 maybe we teamed up --
11     Q  Okay.
12     A  -- I'm not sure.
13     Q  But at some time prior to September 1991?
14     A  Yes, ma'am.
15     Q  Okay.  What shift -- did you work the same
16 shift the whole time you were at Area 3 from '87
17 to when they closed it in October '92?
18     A  Normally, we flip-flopped.  We worked a
19 period of afternoons and a period of days every
20 month.  Periodically, when they were shorthanded,
21 we would be assigned to midnight.  Very rarely.
22     Q  So it was usually afternoons or days?
23     A  Yes, ma'am.
24     Q  And what were those two shifts back in

53

1 this time frame?

2 **A Normally, we worked either the 8:00 till**
3 **4:30 shift or the 4:00 till 12:30 at night shift.**

4 Q And then there was another set of
5 detectives which is the midnight shift?

6 **A Normally, there was a crew, but during**
7 **summers or furloughs, we'd have to fill in**
8 **sometimes.**

9 Q Okay. After -- when they closed Area 2,
10 did you get to request where you wanted to go or
11 did they just move you?

12 **A Pretty much, you could request. So --**
13 **yeah.**

14 Q Did you request to go to Area 2?

15 **A Yes, ma'am.**

16 Q And did you and Jack go together?

17 **A Yes, ma'am.**

18 Q When you went to Area 3 in 1987, who was
19 the commanding officer of Area 3?

20 **A I want to say it was Commander Stibich,**
21 **but I'm not positive, because I believe my 10th**
22 **District commander at the time, Commander Robles,**
23 **helped me get there with a call, but I'm not sure.**
24 **I didn't ask for any help. I was told later on**

54

1 **that he called and said I was desirable.**

2 THE REPORTER: Can you keep your voice up,
3 Mr. Caesar?

4 THE WITNESS: I'm sorry.

5 THE REPORTER: That's okay.

6 MS. DONNELL: Did you get it, Court, or do
7 you need him to repeat anything?

8 THE REPORTER: No. I got it. We can keep
9 going.

10 Q Okay. So you think when you went to
11 Area 3 in 1987 that the commanding officer was
12 Commander Stibich?

13 **A Yes, ma'am.**

14 Q Okay. And then were you -- did you also
15 serve at Area 3 under Commander Jon Burge for a
16 portion of time, too?

17 **A I don't recall when he was there, but I**
18 **know he was the unit commander -- or the area**
19 **commander while I was there. I always worked**
20 **under my violent crimes unit supervisor, Jack**
21 **Ridges -- Jack Regan. Regan. Jack Regan.**

22 Q So Jack Regan was the unit lead on the
23 violent crimes unit?

24 **A Yes, ma'am.**

55

1 Q Okay. And was he a sergeant or a
2 lieutenant?

3 **A A lieutenant at the time.**

4 Q So your immediate report was Jack Regan
5 who was the lieutenant for the violent crimes
6 detectives?

7 **A Correct.**

8 Q And then for a portion of time, the Area 3
9 commanding officer was Commander Stibich, and then
10 for a portion of time, it was Jon Burge?

11 **A Yes, ma'am.**

12 Q Okay. Do you know Jon -- or did you know
13 Jon Burge?

14 **A Just by name. I knew him as a commander,**
15 **but just as seeing him around the building.**

16 Q Did you have investigations in which he
17 was involved --

18 **A No, ma'am.**

19 Q -- at Area 3?

20 **A No.**

21 Q Okay. How long were you at Area 2 as a
22 detective?

23 **A From 19 -- from October of '92 until I**
24 **made sergeant in '98.**

56

1 Q About six years?

2 **A Yes, ma'am.**

3 Q What shift did you work -- did you work
4 the same shift that whole time?

5 **A We normally worked afternoons, but we were**
6 **also allowed to flip flop when we were out there.**

7 Q And were you there with -- were you and
8 Jack McCann partners that whole time from '92 to
9 '98?

10 **A Yes, ma'am.**

11 Q And were you in violent crimes?

12 **A Yes, ma'am.**

13 Q Same kinds of cases or were you --
14 different cases?

15 **A No, same kind. Same type of cases.**

16 Q Eventually, did sexual assaults move into
17 a different unit?

18 **A I'm not sure if they were a separate unit**
19 **or if there was just specialists that normally**
20 **handed them cases.**

21 Q Okay. Who was the commanding officer at
22 Area 2?

23 **A The whole Area, I'm not sure. I believe**
24 **we worked originally for Lieutenant Beavers, I**

---

**57**

1 believe it was.

2     Q   Was he the lieutenant for the violent
3 crimes unit?

4     **A   Yes. Yes, ma'am.**

5     Q   Do you remember who was over the whole
6 Area?

7     **A   If I heard the name, I would, but I can't**
8 **recall right now.**

9     Q   Okay. When did you first take the test to
10 be promoted to sergeant?

11     **A   I know that list was up for a long time**
12 **with a lot of lawsuits against it, so I would**
13 **guess over three or four years.**

14     Q   And the lawsuits were related to racial
15 discrimination --

16     **A   Yes, ma'am.**

17     Q   -- on the test -- or on the promotion?

18     **A   And the test itself, I guess, you could**
19 **say.**

20     Q   Were you -- you were promoted to sergeant
21 in September of 1998; is that correct?

22     **A   I'm not sure if it was September, but it**
23 **was 1998. Yeah.**

24     Q   And you were promoted off the test?

---

**58**

1     **A   Yes, ma'am. My -- I was recommended by my**
2 **unit at Area 2 which helped me move up the list.**

3     Q   So it wasn't just your test score, it was
4 your test plus the recommendation?

5     **A   Yes, ma'am.**

6     Q   Is that true for any of the other tests
7 you took, that it was test plus recommendation
8 that got you -- moved you up the list?

9     **A   I don't think that was in effect until the**
10 **sergeant situation.**

11     Q   When you made sergeant, did you go to
12 sergeant school?

13     **A   Yes, ma'am.**

14     Q   How long was sergeant school in 1998?

15     **A   I have no -- no real recollection, but I**
16 **would guess only two weeks.**

17     Q   Do you have a memory of any of the things
18 you were taught in sergeant school in 1998?

19     **A   Nothing specific, no.**

20     Q   And then when you were assigned -- well, where
21 were you assigned once you made sergeant?

22     **A   I went to the 22nd District, Morgan Park**
23 **area.**

24     Q   And that was back on patrol?

---

**59**

1     **A   I got stuck on the desk a lot, but it was**
2 **as a patrol sergeant. Yes.**

3     Q   What does that mean to get stuck on the
4 desk a lot?

5     **A   It was an inside position where you manned**
6 **the desk and oversaw the activities within the**
7 **station.**

8     Q   And was there a different sergeant role at
9 the 22nd that somebody else -- other sergeant was
10 fulfilling?

11     MR. GRILL: Objection. Form.

12     Q   Sorry. Let me try to understand that
13 better. Were you the -- were there -- when you're
14 saying you got stuck at the desk --

15     **A   Normally, I was on the street as a patrol**
16 **sergeant --**

17     Q   I see.

18     **A   -- sometimes when certain other sergeants**
19 **had days off that normally worked the desk, I**
20 **would have to work the desk.**

21     Q   Got it. And then how long did you serve
22 as a patrol sergeant at the 22nd District?

23     **A   It was less than three years before I went**
24 **to vice. So I'm not sure what --**

---

**60**

1     Q   And where -- you went to vice -- let's
2 see. Was that around 2001?

3     **A   2000, 2001, I would guess.**

4     Q   And where was vice located?

5     **A   Homan Square. Flournoy and --**

6     Q   And, for the record, what kind of crimes
7 did vice investigate when you were there as a
8 sergeant in 2000, 2001?

9     **A   I was basically assigned to the gambling**
10 **unit.**

11     Q   How big was the gambling unit then?

12     **A   Probably 15 guys.**

13     Q   And were you -- were they detectives and
14 you were the sergeant?

15     **A   Some were patrolmen, some were detectives,**
16 **and I was one of the sergeants.**

17     Q   And you remained at vice at Homan Square
18 investigating gambling crimes until your
19 retirement in 2004?

20     **A   Yes, ma'am.**

21     Q   Okay. You served -- is it 30 years?

22     **A   Just under. With some military time I**
23 **bought back, it was over 30 years.**

24     Q   So you have a full pension?

61

1    A  Yes, ma'am.

2    Q  Okay.  Did you have any -- in the course

3  of your career with the Chicago Police Department,

4  were you ever disciplined for any misconduct?

5    A  I took a one-day suspension for losing my

6  hat as a patrolman, the only discipline I've

7  received as a police officer.

8    Q  Okay.  I want to talk about now your --

9  are you doing okay?  Do you need a break?

10    A  No.  I'm good.

11    Q  Okay.  I want to talk about your post

12  Chicago Police Department employment.  So I

13  understand you worked with -- is it DynCorp?

14  D-Y-N-C-O-R-P.

15    A  Yes, ma'am.

16    Q  And you were an independent contractor

17  with DynCorp?

18    A  Yes, ma'am.

19    Q  How long were you an independent

20  contractor with DynCorp?

21    A  My first contract was for one year, and my

22  second contract was also for one year.

23    Q  And, for the record, DynCorp is a --

24  essentially a military contractor that provides

62

1  services to the U.S. Government; is that right?

2    A  Department of State, I believe,

3  technically.  I'm not sure, but I believe it's --

4  Department of State contracts them.

5    Q  And you worked on a contract that DynCorp

6  had with the State Department to provide training

7  to the Afghan Police?

8    A  Iraqi Police, originally.

9    Q  I see.  The first contract was for the

10  Iraqi Police?

11    A  Yes, ma'am.

12    Q  And the second contract you worked with

13  DynCorp on was for the Afghanistan Police?

14    A  Yes, ma'am.

15    Q  And so for the first contract with DynCorp

16  that you worked as an independent contractor, were

17  you in Iraq?

18    A  Yes, ma'am.

19    Q  And that was for a 12-month period?

20    A  Yes, ma'am.

21    Q  What year was that?

22    A  I retired in, I believe it was, October,

23  and I was already in training in Virginia and in

24  Iraq by the first of the year, 2005.

63

1    Q  So that was '05 to '06?

2    A  Yes, ma'am.

3    Q  Oh, and I should be clear.  You didn't

4  spend any time or receive any training as military

5  police when you were in the Marine Corps, correct?

6    A  No, ma'am.

7    Q  Okay.  Did DynCorp train you on how to

8  train Iraqi police officers?

9    A  They tried to, yes.

10    Q  What do you mean they tried to?

11    A  In order to fulfill the position, you have

12  to have -- you had to have experience as a patrol

13  officer.  So they kind of just showed us what we

14  already knew about police procedures.

15    Q  Was the DynCorp police procedure training

16  different than the one you had received at the

17  academy back in 1975?  Had things advanced or

18  changed in any way?

19    A  The main difference I saw was the DynCorp

20  training was much more weapons oriented and safety

21  and defensive training, convoy-type situations,

22  and things like that.

23    Q  Okay.  And then where were you working in

24  Iraq?

64

1    A  I was originally in Fallujah, Iraq.  Then

2  I ended up in Al Asad Airbase after about six

3  months.  But the majority of the time I was in the

4  Fallujah area.

5    Q  And you were training Iraqi police

6  officers or patrol officers?

7    A  At the time, things were pretty hot and

8  heavy there, and the Marines were unable to really

9  secure anyplace.  But we would go out and we'd try

10  to find locations that may be potentially good

11  police facilities in the future.

12    Q  Did you do any training of Iraqi police

13  officers on that first contract or was it just to

14  find stable --

15    A  We did more recruiting-type situations

16  where people would be notified that they were

17  recruiting Iraqi Police, and we would go with the

18  Marines, and we would vet them or see if they had

19  any records through the Iraqi records and things

20  like that.  So we were vetting people to become

21  police.

22    Q  Rather than training police?

23    A  Right.

24    Q  Okay.  And then how about on that second

---

65

1 contract with DynCorp when you went to
2 Afghanistan, what year was that? Was that right
3 -- the next year?
4    A It was pretty much -- no. I came home for
5 over 13 months because my mom was sick. And I
6 went back, I think it was, January of '07,
7 beginning of '07.
8    Q Did you have any employment when you were
9 back in the states for 13 months?
10    A No, ma'am.
11    Q And then you went back in January of '07
12 for -- was it a 12-month period?
13    A Yes, ma'am.
14    Q So '08, and that was -- where were you
15 located in Afghanistan?
16    A Mainly Kabul.
17    Q And what were you doing in Kabul with
18 DynCorp?
19    A I was assigned to the internal affairs
20 division at the ministry of the interior,
21 basically, mentoring the upper echelon of some of
22 the Iraqi Police officials.
23    Q And what did you do to mentor the upper
24 echelon of the Iraqi Police officials?

---

66

1    A Basically, just tried to see if they were
2 doing their jobs.
3    Q What were their jobs?
4    A Various. There was different commanders
5 in the unit. Some were inspectional-type
6 commanders that were supposed to be inspecting
7 their troops. There was a human rights division
8 where there was a commander that was supposed to
9 be ensuring that none of the Iraqi Police were
10 mistreating their prisoners or things like that.
11    Q You mean the Afghanistan Police?
12    A Afghanistan Police. Yes.
13    Q Okay.
14    A Human rights. There was three commanders.
15 Inspections division, I think, was the other one.
16 Inspections where they -- we mentored how they
17 inspected their troops or how they kept their
18 facility proper.
19    Q Have you had any -- other than those two
20 contracts, have you had any other work as an
21 independent contractor with DynCorp?
22    A No.
23    Q Have you had any other employment, whether
24 as an independent contractor or otherwise, since

---

67

1 you retired from the Chicago Police Department
2 other than your two stints with DynCorp?
3    A No. I worked three days at one of the
4 hotels, I remember, a couple years ago when there
5 was threats of damage on Michigan Avenue, but it
6 was a private thing.
7    Q What company did you work for?
8    A I don't remember. It was -- somebody
9 referred me to it, and I got a check, a two-day
10 thing.
11    Q Do you know if you've ever worked for Ken
12 Boudreau's security company? Was it through that?
13    A No.
14    Q Okay. I'm going to talk to you about the
15 Garcia investigation now. Okay?
16    A Okay.
17    Q Do you need a break? Do you want to keep
18 going?
19    A No, I'm good.
20    Q Okay. Do you have your own independent
21 memory of some of your work on the Rafael Garcia
22 homicide investigation?
23    MR. GRILL: Objection. Form.
24    Q You can answer.

---

68

1    A Very little personal memory.
2    Q Yeah. So you understand what I'm asking,
3 I'm just asking, as you sit here today, apart from
4 what's on the reports or the records or in your
5 transcript, I'm wondering, as you sit here today,
6 if you have an independent memory of any of your
7 activities, investigatory activities, from the
8 Garcia investigation. And your answer is, it
9 sounds like, very little?
10    A Very little.
11    MR. GRILL: Form, asked and answered, and
12 it mischaracterizes his testimony.
13    Q Am I mischaracterizing your testimony?
14    MR. GRILL: That's argumentative.
15    MS. DONNELL: No, it's not. I'm asking
16 him a question. I want to just clarify.
17    A I remember bits and pieces, especially
18 after reading reports, that's the best way I can
19 explain.
20    Q Okay. Thank you. And can you identify
21 for me the bits and pieces that you do have a
22 memory of?
23    MR. GRILL: Objection. Form. Foundation.
24    A I remember vaguely the scene. I couldn't

---

69

1  tell you the color of the cars or anything.  And I
2  remember talking to Mike Kill on the night that we
3  interviewed Mr. Jakes.
4      Q   Okay.  Thank you.  I should step back.  Do
5  you have a ballpark -- strike that.
6          Do you know how many homicides you
7  investigated over your career with the Chicago
8  Police Department?
9      A   I tried to consider that in my mind, and I
10 would just guesstimate one week, so probably 50
11 a year for probably nine years.  So I'm not --
12 that's just a guess, though.
13     Q   And you're saying nine years because
14 that's how long you were a detective?
15     A   Approximately, yes.
16     Q   Okay.  So it's somewhere in the 4 to 500
17 range?
18     A   Truly a guess.  I'm not sure.
19     Q   Okay.  Okay.  You have somewhat of a -- or
20 a vague recollection of the scene, right?
21     A   Yes, ma'am.
22     Q   Okay.  And so it's fair to say that you
23 were one of the -- you were one of the scene
24 detectives called out the night of the murder,

70

1  right?
2      A   Correct.
3      Q   Okay.  And when you -- do you -- what do
4  you remember?  Your vague recollection of the
5  scene, could you describe that for me?
6      A   I just remember a car partially blocking
7  the street with a shot-out window and blood on the
8  street.
9      Q   Do you remember how long you stayed at the
10 scene?
11     A   It wasn't very long.  I would guess maybe
12 a little over an hour.
13     Q   And fair to say you were there when the
14 scene technicians came out to process the scene,
15 right?
16     A   I believe we were there for the beginning
17 of it, but I don't really recall exactly.
18     Q   Okay.  And then after the scene, you went
19 to the hospital; is that right?
20     A   That's why I believe we only spent such a
21 short time at the scene.  We wanted to try to
22 interview the individual who was shot.
23     Q   And that -- you came to find out the
24 victim was Rafael Garcia, right?

71

1      A   Yes, ma'am.  We never were able to see
2  him.
3      Q   And you were never able to interview
4  Mr. Garcia, correct?
5      A   No.  Correct.
6      Q   And you know from reviewing your reports
7  in this case that when you and Detective McCann
8  got to the hospital that the victim was already
9  taken for surgery; is that right?
10     A   That's what I recall from my report, yes.
11     Q   And then Mr. Garcia expired sometime
12 either during or after the surgery?
13     A   I believe the office was called later on
14 after we had left.
15     Q   And when you were at the hospital, you did
16 some inquiry of the medical workers there who had
17 treated Mr. Garcia to see if he had made any
18 statements or provided any information about what
19 happened to him, right?
20     A   I don't recall that -- doing that, but I'm
21 sure we did.
22     Q   Okay.  But it's accurate to say that there
23 was no information ever obtained from Mr. Garcia
24 about what happened, what he observed, right?

72

1      A   No.
2      Q   Okay.  Did you ever interview any
3  eyewitnesses to the crime?
4      A   No.
5      Q   Were any ever found and interviewed by any
6  of the other investigating officers?
7          MR. GRILL:  Objection.  Foundation.  I'd
8  also just point out to watch the leading.  I know
9  some of this stuff is foundational, but --
10         MS. DONNELL:  Sure.
11     A   I believe there was other individuals.  I
12 know Gus Robinson gave the statements.
13     Q   Let's talk about Gus Robinson.  He -- do
14 you know what his nickname or his other -- what he
15 went by?
16     A   Yes, ma'am.
17     Q   And what was that?
18     A   Snake.
19     Q   And did you know Snake or Gus Robinson
20 prior to September 15th, 1991?
21     A   I never knew him before or after.
22     Q   Oh, really?  Okay.  You had never
23 encountered him in any of your prior
24 investigations?

73

1      A  No, ma'am.
2      Q  Okay.  The other part of the
3  investigation, the Garcia homicide investigation,
4  that you testified you have a vague or very little
5  recollection of is your conversation with
6  Detective Kill prior to meeting Mr. Jakes; is that
7  right?
8      **A  Yes, ma'am.**
9      Q  Okay.  Can you tell me what you remember
10 about that conversation with Detective Kill, what
11 you have an independent recollection of?
12     **A  I remember coming to work and being**
13 **surprised that there was somebody in custody,**
14 **because we had very little the night before, and**
15 **Mike says that we have a witness, and Mr. Jakes is**
16 **telling us what happened.**
17     Q  Anything else that Mike Kill said to you,
18 other than what you've just testified to that you
19 remember independently?
20     **A  He said, do you want to go in on the**
21 **statement.  And I said, it's your case now, Mike,**
22 **it's up to you.**
23     Q  And what did Mike Kill say back to you
24 when you said, it's your case now, what do you

74

1  understand to do?
2      **A  He said something to the effect of, well,**
3  **you were on the scene and you did the papers, so**
4  **if you want to, go ahead.**
5      Q  And what did you respond?
6      **A  I said, okay, because he appeared very**
7  **tired and busy.**
8      Q  How did -- you said Mike Kill seemed tired
9  and busy.  What did you observe that made you
10 think he was tired?
11     **A  Just the fact that he had been there that**
12 **long and he just looked tired.**
13     Q  And how about the busy observation?  What
14 did you observe that made you conclude that he
15 appeared busy?
16     **A  Mike kind of always looked busy, but he**
17 **was kind of fidgety, and he would -- he was**
18 **dealing with the state's attorney and everybody,**
19 **coordinating everything for the statement that I**
20 **sat in on.**
21     Q  Do you know how long Mike Kill had been --
22 well, strike that.
23        Do you remember when you came on duty?
24 This would have been the early morning hours of

75

1  the -- of the 16th; is that right?
2      **A  17th.**
3      Q  17th.  I'm sorry.  The 17th.
4      **A  Do I remember what?**
5      Q  Yeah.  You came on at midnight; is that
6  right?
7      **A  Yes.  Correct.**
8      Q  And when did you speak to Mike Kill?  How
9  long after you came on duty?
10     **A  As soon as I came upstairs.  I would guess**
11 **12:15 or 12:30.**
12     Q  And that's because Area 3 was on the
13 second floor?
14     **A  Third floor.**
15     Q  The detective unit is on the third floor.
16 Thank you.
17        Where did you and Mike Kill have the
18 conversation that you just described?  You said on
19 the third floor?
20     **A  Yes, ma'am.**
21     Q  Do you remember where in Area 3 you and
22 Mike Kill had the conversation?
23        MR. GRILL:  Objection to form.
24     Q  You can answer.

76

1      **A  I remember talking to him in the main**
2  **squad bay, the big area out in the main squad bay.**
3      Q  I know, I think this will help me going
4  forward.  So if I take a piece of paper and I
5  sanitize and give you a pen, could you do, just to
6  the best of your ability, it doesn't have to be
7  scaled, just a diagram what the Area 3 -- would
8  this have been just the violent crimes --
9      **A  It was the violent crimes unit.  And I'm**
10 **not even sure if it was second or third floor.**
11     Q  Okay.  It doesn't matter second or third.
12 But I'm going to label this -- actually, let me
13 see.  Because everybody is on Zoom, I had to
14 prelabel exhibits.  So even though it's the first
15 one we are using, I'm going to identify it as
16 Exhibit 19.
17        (Caesar Deposition Exhibit 19 marked for
18 identification and was retained by counsel.)
19     Q  So Exhibit 19 is going to be Mr. Caesar's,
20 you know, diagram of what Area 3 looked like back
21 in 1991.  Do you have your own pen?  Otherwise,
22 I'll sanitize one of mine.
23     **A  No, I don't.**
24     Q  Okay.  Hold on.

77

1      MR. GRILL: Well, before you do this, I
2  would object on a foundational basis. You haven't
3  asked him or laid any foundation establishing what
4  his recollection even is --
5      Q  Do you remember --
6      MS. DONNELL: Sorry. Go ahead.
7      MR. GRILL: -- if he could -- if he could.
8  So before you do that, I'd ask that you lay a
9  foundation before you start having -- having him
10  draw a picture.
11      MS. DONNELL: Well, I think I have, but
12  I'm happy to do that.
13      Q  Mr. Caesar, you were assigned to Area 3
14  from when you first became a detective in 1987
15  through its closure in October '92, correct?
16      A  Yes, ma'am.
17      Q  And do you have a memory of what it looked
18  like, the various offices?
19      A  I have a vague memory, but I can't really
20  position all the interview rooms or the whole
21  situation.
22      Q  Okay. I'm just going to ask you to do it
23  to the best of your ability understanding that
24  it's not going to be perfect. I'm going to hand

78

1  you this after I've sanitized it. So I'll just
2  give you a moment to the best of your ability to
3  do the layout.
4      MR. GRILL: Okay. So before you start
5  drawing, the layout specifically of what? Because
6  he's already testified --
7      MS. DONNELL: Area 3.
8      MR. GRILL: Well, Area 3 is a huge
9  geographical area. Are you talking about
10  something different than that?
11      MS. DONNELL: We're talking about the
12  office. So we're talking about the upstairs
13  office, either the second or the third floor. We
14  don't -- he doesn't remember which floor it was
15  on, but the office area.
16      MR. GRILL: Right. Hang on. So I would
17  ask that you -- I would object to the question
18  still on a foundational basis, because I'm not
19  even clear about what specifically it is that
20  you're asking him to draw. He's testified that he
21  doesn't really recall the layout of the offices,
22  but you're talking about first the area, then the
23  second floor, then the third floor, it doesn't
24  really matter. So I would just ask that you be

79

1  very specific about what it is that you're asking
2  him to draw.
3      MS. DONNELL: Sure. That's fine. Okay.
4      Q  I'm asking you to draw, to the best of
5  your recollection, the memory of, you know, where
6  this main -- the main squad area was, the sergeant
7  office, any files, and interview or interrogation
8  rooms or holding, if you had a place where you
9  held folks too. So that's sort of -- basically,
10  the office layout. Sort of if I asked Mr. Grill
11  to do a layout of Rock Fusco, where his office is,
12  where the main lobby area is. That's what I'm --
13  do you understand what I'm asking?
14      A  Yes. But I'm not sure if I can do it.
15      Q  Can you do it to the best of your ability?
16      A  Yes, ma'am.
17      MR. GRILL: Okay. So I'm still objecting
18  on foundation, because you still haven't even
19  established whether any of the -- what floor we're
20  talking about or floors or whether any of the
21  things, for example, that you just rattled off
22  there are even on the same floor in that building.
23      MS. DONNELL: I'm going to -- that's fine.
24      Q  There was a main squad area, is that

80

1  right, where the detectives congregated in Area 3,
2  right?
3      A  There was a central area, yes.
4      Q  Okay. And in addition to the central
5  area, did the sergeant have its own office?
6      A  It was a -- yes, ma'am.
7      Q  Okay. And were there also interview rooms
8  located in Area 3 in the office area?
9      A  Yes, ma'am. But I can't really remember
10  exactly where they were.
11      Q  Okay. And you testified you thought it
12  could have been on the second or the third floor,
13  because below was one of the districts, right?
14      A  Below was the desk, and I believe we were
15  on the second floor.
16      Q  Okay. So, now, I'm just going to ask you
17  to the best of your ability to draw the layout as
18  you remember where the main squad area was, where
19  the sergeant's office was, and any of the
20  interview rooms, to the best of your ability.
21      MR. GRILL: Still foundation.
22      MS. DONNELL: Okay. Well, I'm going to
23  let him do it now so we don't waste more time.
24      MR. GRILL: No. Hang on. Let's have the

81

1 witness step out, and I'll explain maybe outside
2 of the presence of the witness what my problem is.
3 That might clear this up.
4        MS. DONNELL:  Okay.  We're going to stay
5 on the record.
6        MR. GRILL:  We'll stay on the record, but
7 if you could just step out for one second.
8        MS. DONNELL:  You can step out, Mr.
9 Caesar.  Thank you.
10        MR. GRILL:  I'm truly not trying to mess
11 with you.  I get it.  I do this too with having
12 witnesses draw stuff.  My concern here is that
13 he's testified that he doesn't really know, that
14 his memory is very vague.  And your questions are
15 not specific, from my point of view, about even
16 what floor we're talking about.  You're talking
17 sergeant's room, well, there would be a sergeant
18 room on the second floor potentially too or one on
19 the first floor.  We don't even know that.  So I
20 would just ask --
21        MS. DONNELL:  Okay.  Well, maybe if I said
22 the violent crime area of Area 3, would that help
23 you?
24        MR. GRILL:  Well, the question is whether

82

1 it's going to help the witness.
2        MS. DONNELL:  That's fine.  I think let's
3 just go ahead.  I think that he's already said
4 that he thinks it's the second floor or possibly
5 the third floor.  I don't think that really
6 matters, because I'm not asking him to do the
7 other floors.  I am just asking for the area --
8 and we can specify it's where the interrogation --
9        MR. GRILL:  Well, okay.  So --
10        MS. DONNELL:  -- happened with respect to
11 this.  I don't want to waste more time on it,
12 because this is just eating up time.  So let's
13 just get this done.  You can have objections.  You
14 can ask him questions about it.  You can object to
15 this part of the testimony coming in.  I'd just
16 like to proceed.
17        MR. GRILL:  Yeah.  I'm going to continue
18 to object.  But just to bring the point home
19 further for you in light of what you just said,
20 you've asked him to draw items or a floor or a
21 layout of some sort, and your question assumes,
22 for example, that certain things are even there.
23 You haven't even laid a foundation that those
24 certain types of rooms that you've mentioned even

83

1 existed on this floor.
2        MS. DONNELL:  He did say that.  Maybe you
3 didn't hear his testimony.  He said there is a
4 sergeant's office, there is interrogation and
5 interview rooms, and there was a main squad area.
6        MR. GRILL:  And you also talked about
7 holding cells and places where you hold prisoners.
8 And there's been no testimony if those things
9 existed on there.
10        MS. DONNELL:  Okay.
11        MR. GRILL:  So if you're going to ask him
12 to draw specific things, I think you need to lay a
13 foundation for it.
14        MS. DONNELL:  Okay.
15        MR. GRILL:  Okay.  And if you're not
16 concerned about this being admissible, then I
17 don't know why we're asking the questions.
18        MS. DONNELL:  Because I want to have --
19        THE VIDEOGRAPHER:  Excuse me.  Are we
20 still on record?
21        MR. GRILL:  Yeah, we are.
22        THE VIDEOGRAPHER:  Okay.  Thank you.
23 BY MS. DONNELL:
24     Q  Okay.  Mr. Caesar, you are going to go

84

1 ahead and proceed; and to the best of your
2 ability, can you describe -- or can you draw on
3 Exhibit 19, the area you worked at on -- where you
4 were at on September, you know, 16th into the
5 17th, 1991, when you had this conversation with
6 Mike Kill and then eventually took a statement
7 from my client, Mr. Jakes.  Okay?
8     A  Okay.
9     Q  All right.
10     A  This is really rough, but it's really the
11 best I can do.
12     Q  Okay.  Sure.  That's fine.  I'm going to
13 just take it back.  Oh, sorry.  Can you label it?
14     A  Review office.
15     Q  Okay.  And your -- for the record, you're
16 writing review office on Exhibit 19.  Can you
17 describe what the review office was?
18     A  It's just where -- there was a sergeant in
19 charge of keeping track of the reports that came
20 into the unit.  There's file cabinets and a desk
21 where he stayed.
22     Q  Do you remember where the file cabinets
23 were within the review office?
24     A  Not really, no.

---

85

1    Q  Do you remember how many file cabinets
2  there were?
3    A  No.
4    Q  Were the Area files kept in there?
5    A  The homicide files were normally kept in
6  the sergeant's office to my recollection.
7    Q  Okay.  Do you remember what was kept in --
8  do you know what was kept in the file cabinets in
9  the review office?
10    A  I think all the violent crimes and
11  robberies and batteries and everything over the
12  years were kept in there.
13    Q  Okay.  And then can you please identify
14  the sergeant's office on Exhibit 19?
15    A  Okay.
16    Q  And you said there was also file cabinets
17  in the sergeant's office or were there shelves
18  where the homicide files were kept?
19    A  I remember file cabinets on the back -- on
20  the front wall.
21    Q  Can you place the file cabinets or draw
22  the file cabinets on Exhibit 19 where you recall
23  them being on the back wall of the sergeant's
24  office?

---

86

1    A  I wrote files where I think they were.
2    Q  And you might have to keep your voice up.
3    A  Okay.  I'm sorry.
4    Q  That's okay.  To the best of your ability,
5  I think you testified that the homicide files were
6  kept in that sergeant's -- in the sergeant's
7  office?
8    A  Yes, ma'am.  The current ones.
9    Q  The current ones that were active and
10  being investigated?
11    A  Yes, ma'am.
12    Q  And were those considered the -- what were
13  those called, the Area files or the running files?
14    A  They were just the case files.
15    Q  And what would be in the case files that
16  were kept in the sergeant's office at Area 3?
17    A  The -- normally, all the reports that had
18  been generated on numerous homicides over the
19  years.
20    Q  Okay.  Okay.  Can you identify on
21  Exhibit 19 any of the interview rooms?
22    A  I remember two out of three.  I can't even
23  remember where the thirds one was.
24    Q  Do you remember there being three?

---

87

1    A  Yes, ma'am.
2    Q  Okay.  What were -- the two you remember,
3  can you identify where they were in Exhibit 19?
4    A  There was one near the front door and
5  there was one as you go in through the front door
6  to the left towards the washroom.
7    Q  Can you identify the washroom on
8  Exhibit 19?
9    A  I wrote a little thing here.
10    Q  You did write washroom?
11    A  No.  I can.
12    Q  That would be great.  Did you identify the
13  main squad area?
14    A  It's just the center of all this.
15    Q  Can you write down main squad area?  Is
16  that -- the main squad area, were there desks in
17  there or tables and chairs?
18    A  There was a -- there was a couple desks,
19  from what I remember.  It changed.  Mainly, it was
20  just wide open.
21    Q  Did you have a particular spot you could
22  keep your belongings?
23    A  I was trying to remember where the locker
24  room was; and I remember there was even a little

---

88

1  gym down the hall, but it was out of the Area 3
2  unit.
3    Q  Okay.  So the locker room and -- I should
4  clarify.  Was this just the violent crime part of
5  Area 3 that you're depicting here in Exhibit 19?
6    A  Yes, ma'am.
7    Q  Okay.  There were other parts of the Area
8  as well, right, but this part is just the violent
9  crime section of Area 3?
10    A  From what I remember, yeah.
11    Q  Okay.  So on Exhibit 19, you've put two of
12  the interview rooms, but you just can't remember
13  where the third one was, but you remember a third
14  one?
15    A  Yes, ma'am.  I believe there was a third
16  one.
17    Q  Okay.  And when -- before I had you start
18  doing the diagram on Exhibit 19, I think you told
19  me -- and, I'm sorry, you just have to remind
20  me -- the conversation you had with Mike Kill was
21  in that main squad area, correct?
22    A  Yes, ma'am.
23    Q  Okay.  And then after you talked to Mike
24  Kill, you and Mike went into the room where

89

1  Mr. Jakes was; is that right?  Or what did you do
2  after that?
3      A  No.  I just waited for the youth officer
4  to come.
5      Q  Okay.  Got it.  Okay.  Can I have
6  Exhibit 19?  I'm going to just show it to the
7  screen.
8      A  I don't know what you call this office
9  over here.  This is where we interviewed Jakes.
10     Q  Okay.  What are you -- can you --
11     A  It was just another office that was used
12  by whoever needed to be in there at the time.
13     Q  What was in that office?
14     A  I can't remember.
15        MR. GRILL:  Objection.  Form.
16     Q  Go ahead.
17        MR. GRILL:  Go ahead.  You can answer, if
18  you know.
19     A  Just that I remember a desk where a
20  sergeant could sit or a person could sit if he had
21  to do any paperwork or anything.
22     Q  Can you just identify the room -- you
23  don't remember it having a particular name; is
24  that right?

90

1      A  Correct.
2      Q  Okay.  Do you want to just label it other
3  office; is that a general description?
4      A  Yes, ma'am.
5      Q  But you're not sure if it was a sergeant
6  office, it was just an office?
7      A  It was next to the main sergeant's office.
8      Q  Okay.  And then you testified that what
9  you've just identified as office on Exhibit 19 is
10  where you and the youth officer and the felony
11  review attorney, Grossman, talked to Mr. Jakes; is
12  that right?
13     A  In that other office, yes.
14     Q  Which you've identified as just office on
15  Exhibit 19?
16     A  Yes, ma'am.
17     Q  Okay.  May I take Exhibit 19 now?  And, I
18  guess, if, over the course of the deposition, you
19  remember other things about it -- here.  I'm just
20  going to show it so you guys can see it.  Okay.
21        I'm going to go back now to the original
22  work that you did on the night of the murder, so
23  this would have been September 15th, 1991, and
24  your work at the scene and then the hospital and

91

1  follow-up investigation.  And I'm going to hand
2  you what I've already designated as Exhibit 6 to
3  your deposition.  Okay?
4      A  Okay.
5        MS. DONNELL:  So I'm handing the witness
6  what I've designated as Exhibit 6 to his
7  deposition.  You guys should have it as an
8  electronic file.  Let me just make sure -- this
9  seems a little -- okay.
10        (Caesar Deposition Exhibit 6 marked for
11  identification and attached to the transcript.)
12     Q  Mr. Caesar, I've handed you what was
13  produced by the City in this case.  It has the
14  Bates stamp City Jakes 55 consecutive through 68.
15  Do you recognize this as your supplementary report
16  dated -- let's see -- it's dated September 16th,
17  1991?
18     A  Yes, ma'am.
19     Q  Okay.  And this is the supplementary
20  report that you prepared after your work at the
21  scene for the Garcia homicide; is that right?
22     A  That's correct.
23     Q  Okay.  And we know it's your report,
24  because you appear -- your name appears first on

92

1  the back of his supplementary report; is that
2  right?
3      A  Not necessarily, no.
4      Q  Okay.  How do we know it's that you --
5  well, it's you and your partner, Detective McCann,
6  right?
7      A  Yes, ma'am.
8      Q  Did you and your partner have a practice
9  over who would -- that we could tell that you
10  typed this versus he typed this?
11     A  Not --
12        MR. GRILL:  Hang on.  Hang on.  Objection.
13  Form.  Go ahead and answer if you understand the
14  question.
15     A  We sometimes typed the whole report
16  ourselves.  Sometimes we took portions each other.
17  Sometimes I would or he would do the whole report.
18  I can't really tell on this, but I believe I typed
19  it.  I'm not sure.
20     Q  Okay.  But you didn't have a particular
21  practice that we'd be able to tell on the report
22  if your name was first on the back?
23     A  No.  No, ma'am.
24     Q  Okay.  And back in 1990 -- September 1991,

93

1  you actually were typing these on typewriters?
2  **A  I can't recall when we changed.  I was**
3  **trying to think of that the other day, and I'm not**
4  **sure.**
5  Q  When you changed over to the computer?
6  **A  Yes, ma'am.**
7  Q  Is there a way to tell on the report?
8  THE REPORTER:  Sorry.  Can you be careful
9  with the papers?  I can't hear when they are waved
10  over the speaker.
11  **A  My guess is there's not enough typos or**
12  **whiteouts on this, so I believe this may have been**
13  **on a computer --**
14  Q  Okay.
15  **A  -- I'm not sure.**
16  Q  But to the best of your ability, you
17  believe you're the one that prepared Exhibit 6,
18  this supplementary report?
19  **A  I believe I did.**
20  Q  Okay.  And what's your belief based on?
21  **A  The grammar and my run-on sentences and**
22  **some of the things, the way I write.**
23  Q  Okay.  Do you know when you started
24  preparing this report, Exhibit 6?  Would you have

94

1  started to prepare it on the 15th?
2  **A  On the 15th?**
3  MR. GRILL:  Hang on.  Objection.  Form, in
4  particular.  If you understand that question, you
5  can answer it.
6  **A  We were -- we didn't get to the scene till**
7  **the 16th --**
8  Q  I see.  Okay.
9  **A  -- so it was sometime in the early morning**
10  **hours or daylight on the 16th that we prepared the**
11  **report.**
12  Q  And the time on the report down at the box
13  No. 91, it says, date this report submitted, it
14  says, 16th September, '91, and it has the time
15  1200 hours?
16  **A  Yes, ma'am.**
17  Q  What does that mean?
18  **A  That means we were finishing this report**
19  **around noon on the 16th.**
20  Q  Okay.  And then this was submitted to your
21  -- your supervisor, Sergeant Bonke; is that right?
22  **A  We normally get a basket where we put our**
23  **reports in.**
24  Q  Okay.  And then for one of your

95

1  supervisors to review and approve, right?
2  **A  Yes, ma'am.**
3  Q  Did you take notes when you were out at
4  the scene on the early morning hours of September
5  16th, 1991?
6  **A  I apparently didn't, because I did**
7  **normally, but I don't see any in the reports I**
8  **reviewed.**
9  Q  Well, let's back up a minute.  Let's talk
10  about what you normally did.  What did you
11  normally do back in this time period when you were
12  a detective at Area 2 when you went out to a
13  homicide scene in terms of taking notes?  What was
14  your practice?
15  MR. GRILL:  Form.  If you can answer that,
16  go for it.
17  **A  I normally took notes more than my**
18  **partner.  In this case, I saw a couple GPRs that**
19  **my partner took notes from the scene, so I**
20  **apparently didn't.**
21  Q  I'm going to show you what I've designated
22  as Exhibit 14 to your deposition.  I'm just going
23  to put this back.
24

96

1  (Caesar Deposition Exhibit 14 marked for
2  identification and attached to the transcript.)
3  Q  And I'm handing the witness what I've
4  previously marked as Exhibit 14.  It's a two-page
5  document, and it has the Bates stamp City Jakes
6  125 and 126.  I'm handing -- it's two general
7  progress reports --
8  MR. GRILL:  Oh, it's double sided.  Sorry.
9  Q  -- do you see both of these general
10  progress reports?
11  **A  First time I've seen it.  Yes, ma'am.**
12  Q  So these aren't the ones you were
13  referring to, the --
14  **A  No.  These are my GPRs from that night,**
15  **because I didn't believe I didn't take any.**
16  Q  Okay.  This is your handwriting, right?
17  **A  Yes, ma'am.**
18  Q  Okay.  I thought it was.  Okay.  So you
19  did -- you think you took these notes out at the
20  scene?
21  **A  I know I did.  Now that I look at it,**
22  **yeah, that's my writing.**
23  Q  Okay.  It sounds like you didn't get a
24  chance to see these before your deposition, so I'm

97

1  going to give you a chance to look over them
2  before I ask you questions about it.  Okay?
3     **A  Yes, ma'am.  These are bringing back my**
4  **recollection.**
5     Q  Okay.  Are you -- did you get a chance to
6  look at your GPR?
7     **A  Yes, ma'am.**
8     Q  Okay.  Are you ready for some questions?
9     **A  Yes, ma'am.**
10    Q  Okay.  So you recognize your handwriting
11 on Exhibit 14 as your handwriting?
12    **A  Yes, ma'am.**
13    Q  Okay.  And these are GPRs that are dated
14 the 16th of September, 1991, right, the date of
15 this report up at the top right?
16    **A  Yes, ma'am.**
17    Q  Okay.  And the beat unit assigned, 5216,
18 that was you and Detective McCann?
19    **A  Correct.**
20    Q  Okay.  And then can you just read through
21 this for us, what you wrote?
22    **A  I have the victim's name, Rafael Garcia,**
23 **his birth date, his apparent address, his height,**
24 **his weight, a Social Security number, and a**

98

1  driver's license.
2     Q  And so you wrote down 5109 South Aberdeen
3  as his apparent address, right?
4     **A  Yes, ma'am.**
5     Q  His Social Security number, his height as
6  5'9", weight 105, date of birth, May -- the 5th of
7  June, 1943?
8     **A  Yes, ma'am.**
9     Q  Okay.  And then the next line down, can
10 you read what you wrote here?
11    **A  On the SS, Social Security number?**
12    Q  Oh, I'm sorry.  You can skip the Social
13 Security number.  The next line down we have,
14 P. Donovan.
15    **A  I believe that was the beat officers that**
16 **were assigned the original scene.**
17    Q  And you have beat 936A, right?
18    **A  Yes, ma'am.**
19    Q  And you have P. Donovan and D. -- is it
20 Boss?
21    **A  Doss, I think.**
22    Q  Doss.  And then their star numbers?
23    **A  Yes, ma'am.**
24    Q  Okay.  And you think those are the scene

99

1  patrol officers that you saw out on the scene,
2  right?
3     **A  From reading the original report, they are**
4  **the ones that created that.**
5     Q  Oh, I'm sorry.  Up at the very top right
6  of Exhibit 14, you have the time of the original
7  -- the original time of the incident as the 15th
8  of September, '91, at 2355 hours, right?
9     **A  Yes, ma'am.**
10    Q  And that matches up with Exhibit 6, your
11 supp report, that has the date of the original
12 occurrence?
13    **A  Yes, ma'am.**
14    Q  And then the next line down, does it say
15 -- can you read that for me, what you wrote?
16    **A  Under Doss?**
17    Q  Yes.
18    **A  Dr. Allen, gunshots to the right leg and**
19 **middle abdomen.**
20    Q  Do you know what that refers to?  Were you
21 speaking to Dr. Allen at the hospital?
22    **A  I believe so, but I don't remember that**
23 **conversation.**
24    Q  Okay.  What do you have down next?

100

1     **A  Black shoes, two gray and green socks,**
2  **green plaid boxer shorts, tan pants, with a black**
3  **leather belt.**
4     Q  And do you know from reading your
5  supplementary report what that refers to?
6     **A  I believe it refers to the clothing that**
7  **was at the hospital when we were there.**
8     Q  And you took that clothing into custody?
9     **A  No.  I believe it was inventoried by the**
10 **hospital.**
11    Q  Oh, by the hospital.  Sorry.  Okay.
12       And then what do you have below the
13 clothing that you observed at the hospital?
14    **A  I have written, County inventory, which is**
15 **confusing to me.  I believe the County Hospital**
16 **inventory --**
17    Q  Okay.
18    **A  -- and it has a dollar amount of $89.24,**
19 **four yellow color neck chains, five chains, two**
20 **yellow rings, a ring with stones, watch, two keys**
21 **on ring, and one brown wallet.**
22    Q  Okay.  And then what's down below?
23    **A  That's the number for surgery so we could,**
24 **I believe, contact as to his condition.**

---

101

1    Q  And then underneath you have the address
2  from above, 5109 South Aberdeen, and then from
3  phone listing, and then you have two individuals
4  with numbers; is that right?
5    A  I can only guess as to what they are, but
6  I believe they were me seeking individuals to
7  contact regarding his condition.
8    Q  Okay.  And then you have disconnected on
9  top of the first number and bad number below the
10 second number, right?
11   A  Yes, ma'am.
12   Q  Okay.  Can you read the back page of
13 Exhibit 14?
14   A  1210 West, which would be a part of the
15 address.  Two casings from the sidewalk, two shirt
16 buttons, one bullet, two casings from car
17 passenger side.
18   Q  And then what do you see?  Can you keep
19 reading for me?
20   A  1206, casings two, case two, hairbrush,
21 RF8509 Chevy Wagon P487325 91-92 sticker.
22   Q  And does that refer to the car -- a car?
23   A  Yes, ma'am.
24   Q  Okay.  And this is -- this page, page 2 of

---

102

1  Exhibit 14, this is actually from the scene when
2  you're out at the scene; is that right?
3    A  I believe this page was from the scene.
4  Yes, ma'am.
5    Q  Okay.  And that's because you were
6  documenting some of the evidence that was located
7  at the scene and putting the bullet casings,
8  right?
9    A  Yes, ma'am.
10   Q  Okay.  And one of the bullets.  Okay.  And
11 then what's written down below?
12   A  1208 -- 1208 beat 63 -- 9603, T. Clinton
13 12077, T. McKeough 7668.
14   Q  Okay.  And do you know what that refers
15 to?
16   A  89603 would you have the crime lab that
17 responded.
18   Q  Okay.  And does that refresh your
19 recollection that you were there with those crime
20 lab technicians on scene?
21   A  I don't recall talking to them.
22   Q  Okay.  So is it fair to say that then it
23 was your practice in this case that you took notes
24 at the scene on the GPR report form, that was your

---

103

1  practice?
2    A  Yes, ma'am.
3    Q  So you didn't typically take notes on a
4  separate legal pad or steno pad, you would take
5  notes on GPRs?
6    A  Yes, ma'am.
7    Q  Is that how you had been trained?
8    A  Yes, ma'am.
9    Q  And how had you been trained with respect
10 to GPRs back in -- did you get training on GPRs in
11 the academy in '87?
12      MR. GRILL:  Okay.  Form.  Yeah.
13   Q  Okay.  Well, do you remember getting
14 training on GPRs?
15      MR. GRILL:  Form.
16   A  Not specifically, no.
17   Q  Okay.  Do you remember being issued a GPR
18 pad?  Were those pads of paper back in the --
19      MR. GRILL:  Foundation.
20   A  In the academy, no, I don't remember that.
21   Q  How about when you became a detective at
22 Area 2, did you get issued a GPR pad?
23   A  It was always stacks of them that you
24 could take and put on your file.

---

104

1    Q  But were they single sheets or was it a
2  pad where you would rip them off?
3    A  I believe it was a pad.  Yeah.
4    Q  And you would carry the pad out on the
5  street with you when you were going to interview
6  witnesses or go out to a scene of a crime?
7    A  I clipped them to my clipboard.
8    Q  You'd clip the pad of GPRs to your
9  clipboard?
10   A  Right.
11      MR. GRILL:  Objection.  Assumes facts not
12 in evidence.  Foundation.
13   Q  Well, that was your practice back then
14 when you were a detective at Area 2 back in 1991
15 that you would keep a clipboard with a pad of GPRs
16 and you would go out and take that out with you to
17 the scene?
18      MR. GRILL:  Objection.  Form.  Leading.
19 I've already asked Counsel to be mindful of that.
20 I'd also say there's an objection to foundation
21 here as well.
22   Q  I think it was (indiscernible) but why
23 don't you just describe your practice for taking
24 notes on GPRs back when you were a detective at

105

1  Area 2.
2      **A  Normally, I would take a clipboard with a**
3  **pad of GPRs with me.**
4      Q  Okay.  And then you would take notes when
5  you were out at the scene, that was on your GPR
6  pad that was with your clipboard, right?
7      **A  Yes, ma'am.**
8      Q  And then what would you do with those
9  handwritten GPRs like we have in Exhibit 14?
10     **A  I would maintain them and use them to**
11  **write my report.**
12     Q  And then what would you do with them after
13  -- your GPRs that you filled out -- after you had
14  prepared your report?
15     **A  Submit them with the report.**
16     Q  Okay.  So the GPRs, like we have in
17  Exhibit 14, along with Exhibit 6, your
18  supplementary report, those would get submitted
19  into a basket at Area 2, right?
20     **A  Correct.**
21     Q  Okay.  Where was that basket in Area 2?
22     **A  I remember it was in a sergeant's office.**
23  **I believe it was on the desk, but I'm not sure if**
24  **it was on the desk or on top of the file cabinet.**

106

1      Q  Okay.  And would you submit them at the
2  end of each of your shifts?
3      **A  I would submit them whenever I completed**
4  **them.  Before we went home, I would submit those**
5  **reports.**
6      Q  Okay.  And --
7          MR. GRILL:  Foundation.  Sorry.  I'm a
8  little bit late on that objection, but I believe
9  -- for example, to clarify, I think you were
10  saying Area 2.
11         MS. DONNELL:  Oh, sorry.  I think I did
12  say Area 2, but I meant Area 3.  Thank you.
13  Thanks, Andrew.
14     Q  Just to be clear, when you were saying
15  that you submitted your GPRs and your
16  supplementary reports, when you completed them in
17  the sergeant's office -- I misspoke.  We're
18  talking about Area 3 at this time, right?
19     **A  Yes, ma'am.**
20     Q  Okay.  Thank you.
21         MR. GRILL:  And -- but I still also have a
22  foundation objection and a form objection to the
23  questioning.  Are you talking about in this case
24  or generally?  And I'm only speaking now because

107

1  you're looking at me as if you're confused about
2  my objection, so that's why.
3      Q  What you just testified to, your practice
4  of submitting your reports in the sergeant's
5  office at Area 3, that was true, generally, for
6  your practice that whole time you were assigned to
7  Area 3, correct?
8      **A  Yes, ma'am.**
9      Q  And that's also true for what occurred in
10  this case with respect to the reports you produced
11  in this case?
12     **A  Yes, ma'am.**
13     Q  Okay.  All right.  So, now, do you have a
14  recollection of taking notes -- any kind of notes
15  -- on a GPR pad or otherwise during the interview
16  -- your participation in the interview of
17  Mr. Jakes in this case?
18         MR. GRILL:  Hang on.  Form.  Assumes facts
19  not in evidence.  But go ahead and answer, if you
20  understand.
21     **A  No, I don't recall taking any notes.**
22     Q  Okay.
23         THE VIDEOGRAPHER:  Excuse me.  Andrew, I
24  think you need to speak louder.

108

1          MR. GRILL:  Sure.  Thanks for the tip.  My
2  objection was form and that was it, so go ahead.
3      Q  Okay.  Is it accurate to say that you
4  would have taken on the -- September 16th you took
5  notes, at least these two notes that we have in
6  Exhibit 14, and you used them to prepare
7  Exhibit 6?
8      **A  Yes, ma'am.  And the case report that we**
9  **had at the time --**
10     Q  Okay.
11     **A  -- the original case report.**
12     Q  The original case report.  Great.  Okay.
13  Let's go back to -- I want to go back to
14  Exhibit 6.  Okay.  Do you -- let's see.
15         Do you remember how you were assigned to
16  the Garcia homicide investigation?
17     **A  After reviewing the reports, I read**
18  **somewhere that the midnight coordinator assigned**
19  **us, but I don't recall who.**
20     Q  Okay.
21     **A  Sergeant White, I believe.**
22     Q  Yeah.  So if you're looking at the bottom
23  of page 2 of your September 16th supp report, you
24  wrote, R/D assigned to the man shot at 1206 West

---

**109**

1 51st Street by first watch coordinator, Sergeant
2 White --
3    **A**  **Yes, ma'am.**
4    Q  -- and responded to the scene; is that
5 what you're referring to?
6    **A**  **Yes, ma'am.**
7    Q  Okay. Do you remember -- it sounds like
8 you don't remember Sergeant White; is that right?
9    **A**  **He was a (indiscernible) sergeant that**
10 **would fill in at -- on nights, and, again,**
11 **guessing, we came into work and he says we got a**
12 **-- we got a shooting --**
13    Q  Do you know -- sorry. Go ahead.
14    **A**  **-- we've got a shooting, you guys are**
15 **assigned.**
16    Q  Okay. And do you know -- you were working
17 midnights this night, is that right, on September
18 16th?
19    **A**  **Yes, ma'am.**
20    Q  Okay. But that wasn't usual for you back
21 then?
22    **A**  **Very rare --**
23    Q  Do you know --
24    **A**  **-- for a month at a time, but very rare.**

**110**

1    Q  So this would have been the month of
2 September -- during this 30-day period, whenever
3 it stopped and started, you were working
4 midnights?
5    **A**  **Yes, ma'am.**
6    Q  Okay. And so for the entirety of the
7 Garcia homicide investigation, you were on
8 midnights?
9    **A**  **Yes, ma'am.**
10    Q  And, do you remember, were Ken Boudreau
11 and Mike Kill were they on days or were they also
12 on midnights with you?
13    **A**  **From reading the reports, they were on**
14 **afternoon.**
15    Q  They were on afternoon. Okay. And back
16 in September of 1991, if the homicide detective
17 went out to the scene, you were considered the
18 lead detectives since you've been to the scene; is
19 that right?
20    MR. GRILL: Objection. Form of the
21 question.
22    Q  You can answer.
23    **A**  **Yes, ma'am. Normally, if we went to a**
24 **scene, it was our case.**

**111**

1    Q  Okay. And what did it mean back in 1991
2 it was our case?
3    **A**  **Midnights was a little different, because**
4 **they handle a lot of scenes. But on afternoons or**
5 **days, we were assigned a case, we followed up on**
6 **it normally.**
7    Q  And you would be considered the lead
8 detective --
9    MR. GRILL: Objection. Foundation.
10    Q  -- is that right?
11    **A**  **I guess you could use the term lead. It**
12 **was more or less your case if you were following**
13 **up it on.**
14    Q  Okay. And when you had talked about the
15 conversation you had an independent recollection
16 between and Mike Kill, that's why he was saying --
17 he basically said to you, hey, it's your case, do
18 you want to be part of the statement, right,
19 because you had been out to the scene?
20    MR. GRILL: Objection. Calls for
21 speculation. Foundation. Go ahead, if you can
22 answer that. Or if you understand it, you can
23 answer it.
24    **A**  **Mike knew I was familiar with the scene,**

**112**

1 **and I believe he was busy with other chores, so he**
2 **asked me to do it.**
3    Q  Got it. Okay. When you got there to the
4 scene of the homicide at 1206 West 51st Street, it
5 was out in front of the Queens Submarine shop; is
6 that right?
7    **A**  **Yes, ma'am.**
8    Q  Did you talk to Gurgid Singh who was the
9 operator of the Queens Submarine shop at that
10 location?
11    **A**  **No.**
12    Q  Was he present on the scene when you got
13 there, if you recall?
14    **A**  **No, he wasn't.**
15    Q  So did the patrol officers who had spoken
16 -- had patrol officers spoken to him?
17    **A**  **I believe they had, because he was listed**
18 **in their report.**
19    Q  Okay. And they relayed to you what he had
20 conveyed to them, because their reports weren't
21 written up at that time, but they orally conveyed
22 it to you, correct?
23    **A**  **Yes, ma'am.**
24    Q  Okay. And then the patrol officers on

113

1  scene, they also informed you that the victim had
2  been taken to Cook County hospital?
3      **A  He left in an ambulance.  Yes.**
4      Q  Okay.  Okay.  And you were told -- who
5  told you -- do you remember was it patrol --
6  strike that.  Sorry.
7      On the top of page 3 of your report --
8      MR. GRILL:  This is Exhibit 6, right?
9      MS. DONNELL:  Exhibit 6.  Yeah.
10     Q  Okay.  In that first paragraph on the top
11 of 3, you document what the reporting detectives,
12 you and Detective McCann, were informed about the
13 victim being removed and taken to the hospital,
14 right?
15     **A  Yes, ma'am.**
16     Q  And then you also go on to say that you
17 learned that the victim had exited the Queens
18 Submarine shop seconds before shots were heard
19 from in front of the shop by its operator, Gurgid
20 Singh.  And they also learned that the victim
21 apparently attempted to back his auto from the
22 scene upon being shot and that the 1979 Chevrolet
23 station wagon he was driving had lost control and
24 struck a 1983 Plymouth at 1206 West 51st Street,

114

1  right?
2      **A  Yes, ma'am.**
3      Q  And does that sort of correspond with the
4  notes you took on your GPR on Exhibit 14, a lot of
5  that's not in here, right?
6      **A  No.  No.**
7      Q  So you just remember --
8      MR. GRILL:  Hang on.  Hang on.  Hang on.
9  Hang on.  That was a compound question, so I'm
10 going to object to form.  Go ahead.
11     Q  Okay.  Do you remember where you got that
12 information from?
13     **A  I believe from the original -- the**
14 **original case reporting officer, Doss, and their**
15 **report.**
16     MR. GRILL:  Are you talking about the
17 information in Exhibit 14 -- or in Exhibit 6?
18     MS. DONNELL:  Yes.
19     MR. GRILL:  Okay.  Not in the GPR?
20     MS. DONNELL:  Right.
21     MR. GRILL:  Okay.  Got it.
22     Q  So the information that we just read from
23 your supplementary report, you recall getting from
24 the patrol officers that were on the scene?

115

1      **A  Basically, I don't remember talking to**
2  **them, but I remember after reading the report that**
3  **it's in there that they talked to the store -- the**
4  **submarine shop owner.**
5      Q  But it's accurate to say that you would
6  have gotten that information contemporaneously
7  prior to reading the reports?  When you reported
8  to the scene, you would have talked to them?
9      **A  Yes, ma'am.**
10     Q  Yes.  Okay.  And -- okay.  And then you
11 documented that you actually observed the victim's
12 1979 Chevy blocking 51st Street with its passenger
13 side front door window shattered, right?  You
14 documented what you observed yourself?
15     **A  Yes, ma'am.**
16     MR. GRILL:  Form.
17     Q  Okay.  And then you also documented that
18 you observed a pool of blood in the middle of 51st
19 Street at 1210 West 51st Street, right?
20     MR. GRILL:  Hang on.  Form.  Foundation.
21     MS. DONNELL:  I'm going over his report --
22     MR. GRILL:  Okay.  But it's --
23     MS. DONNELL:  -- and I'm actually reading
24 from it.  I don't think --

116

1      MR. GRILL:  Right.  But you're saying you
2  documented --
3      MS. DONNELL:  He did.
4      MR. GRILL:  Right.  In this -- are you
5  saying that he documented in -- just in Exhibit 6?
6  Are you accusing him of -- or suggesting that he
7  documented it somewhere else?  Are you saying --
8      MS. DONNELL:  I'm talking about Exhibit 6
9  that's right in front of both of us, Andrew.
10 You're really --
11     MR. GRILL:  I --
12     THE REPORTER:  I can't hear when you talk
13 over each other.
14     MR. GRILL:  I'm just telling you --
15     MS. DONNELL:  If you're going to object to
16 form, just object to form.
17     MR. GRILL:  I am, but you keep doing it,
18 and it's really confusing.  So I don't think that
19 the question -- the way you're asking the
20 question, I understand now what you're going for,
21 but the way you're phrasing it, it's not at all
22 clear what you're saying.
23     MS. DONNELL:  Okay.  Well, I think --
24     MR. GRILL:  Documented has a -- that

117

1  suggests something.  So be careful the words you
2  use.
3       MS. DONNELL:  I want you to stop wasting
4  my time.  Just object with your one-word
5  objections, and the witness and I will continue to
6  go through Exhibit 6.
7       MR. GRILL:  Listen, Heather, I'm not
8  wasting anybody's time.  And if --
9       MS. DONNELL:  You are.
10      MR. GRILL:  -- if you have no interest in
11 making a clear record, that's fine.  So why don't
12 you just say so, then?  Say I don't care if this
13 is --
14      (Simultaneous crosstalk.)
15      MS. DONNELL:  I've never done a deposition
16 with you, so I don't know your habits or your
17 patterns, but I think that this could go a lot
18 smoother if you didn't have speaking objections.
19 And I appreciate you don't like my form or
20 technique, that's fine.  Just say that.  And then
21 we can proceed so he doesn't have to be here
22 forever.
23      MR. GRILL:  Heather, I would ask that you
24 ask this witness clear questions.  He has a right

118

1  to understand what the question is.  And we have
2  -- everybody has a right to a clear record here.
3  And you need to ask questions that are consistent
4  with the way the rules require you to ask
5  questions.
6       MS. DONNELL:  I think I am, Andrew.  And I
7  don't appreciate that.  But I think Mr. Caesar and
8  I were both having an understanding that we were
9  talking about the report that's in front of both
10 of our faces.  So I don't think there was a lot of
11 lack of clarity, but I'm just going to continue.
12 You object as you see fit.  You do your job.  I
13 don't want to prevent you from doing your job.
14 But I'm going to try and get through this
15 deposition sometime before, you know, the end of
16 the day.
17      MR. GRILL:  Well, Heather --
18      MS. DONNELL:  This is a waste of
19 everyone's time.
20      MR. GRILL:  Nope.  It's not.  It's not,
21 because I'm making my record now, because you're
22 also making accusations about whether what I'm
23 saying is even justified or not, so now I have an
24 obligation to explain myself.

119

1       MS. DONNELL:  No, you don't.  We're taking
2  a break.  No.  I'm taking a break.  You're not
3  spending more time explaining.  You've already
4  explained.
5       MR. GRILL:  I'm done.  Go ahead and ask
6  the question.
7  BY MS. DONNELL:
8    Q  Okay.  Let's go -- all right.  Mr. Caesar,
9  you still have -- I'm sorry for that squabble.
10 We're both just doing our jobs.
11      So here's Exhibit 6.  Do you have
12 Exhibit 6, it's your supplementary report?
13   A  Yes, ma'am.
14   Q  Okay.  And we were previously talking
15 about the information that you observed at the
16 scene that you put down in your supplementary
17 report, right --
18      MR. GRILL:  There we go.
19   Q  -- and that's because you don't have an
20 independent recollection anymore about the scene,
21 so I'm asking you about what you documented in
22 your supplementary report.  Okay?
23   A  Yes, ma'am.
24   Q  All right.  So since we're on the same

120

1  page now, you also documented that you observed
2  blood on 51st Street, right?
3    A  Yes, I did.
4    Q  Okay.  And then you also documented that
5  you observed that the lab technicians came out at
6  that time and they processed the scene, right?
7    A  Yes, ma'am.
8    Q  And they found two .380 caliber auto
9  cartridge casings -- bullet casings -- on the
10 sidewalk at 1210 West 51st Street?
11   A  That's what I documented.  Yes.
12   Q  And they also found a fired bullet in the
13 gutter of that same address?
14   A  Correct.
15   Q  And so then there were another two casings
16 also located, right?
17   A  Yes, ma'am.
18   Q  And those additional casings were
19 recovered from the front seat of the victim's
20 station wagon?
21   A  Correct.
22   Q  So there was a total of four casings and
23 one bullet recovered at the scene, right?
24   A  Correct.

121

1    Q  Okay.  And some buttons were also
2  recovered by the evidence technicians on the
3  street at 1210 West 51st Street?
4    **A  That's what I documented.  Yes.**
5    Q  And they also -- the technicians took a
6  blood standard from that pool of blood as well?
7    **A  Yes, ma'am.**
8    Q  Okay.  There was no blood found in the
9  victim's auto, right?
10   **A  That's what I have documented.  Yes.**
11   Q  Okay.  So -- and I have some questions.
12  It does not appear -- so I saw the evidence -- did
13  you see the property inventories for the casings
14  and the bullets in preparing for the deposition?
15   **A  No.**
16   Q  Okay.  I am going to show you what I have
17  previously marked as Exhibit 13.  Here you go,
18  Mr. Caesar.
19      MS. DONNELL:  Here you go, Andrew.
20      MR. GRILL:  Thanks.
21      MS. DONNELL:  Yep.
22   Q  Okay.  So you can take a look at
23  Exhibit 13.  It's Bates stamped City Jakes 121
24  consecutive through 124.  But it appears that they

122

1  might be -- let's see.  Okay.
2      (Caesar Deposition Exhibit 13 marked for
3  identification and attached to the transcript.)
4    Q  And these are the property inventories for
5  a sealed envelope with a marked bullet; is that
6  right?  And also the sealed envelope with a vial
7  of blood?
8    **A  Yes, but I didn't prepare that report.**
9    Q  Right.  You're just listed under hold for
10  investigation and/or evidence?
11   **A  Yes, ma'am.**
12      THE REPORTER:  Can you hold the papers a
13  little away from the speaker?  I don't know if
14  they're close, but -- thank you.
15      MS. DONNELL:  Sure.  I think that might be
16  Andrew.
17   Q  Okay.  I didn't see any evidence in the
18  investigative file that there was any attempt to
19  do any fingerprint lift from any of the bullets or
20  bullet casings; is that right?
21      MR. GRILL:  Hang on.  Form and calls for
22  speculation.  If you can answer what she saw or
23  didn't see, go for it.
24   **A  I'm not sure.  I believe in one of the**

123

1  **reports I read that no fingerprints were found.**
2  **We documented that somewhere, I believe.**
3    Q  Okay.  So you think that it was checked
4  from fingerprints?
5    **A  I think it was (indiscernible).**
6      THE REPORTER:  Sorry.  I couldn't hear
7  that answer.
8    **A  I believe the car was checked for**
9  **fingerprints.**
10   Q  I'm sorry.  That the car was checked for
11  prints.  But were the bullets and the casings
12  checked for prints?
13   **A  I have no idea.**
14   Q  Okay.  You don't remember that, do you?
15   **A  No.**
16   Q  And you haven't seen a report documenting
17  any attempts to take lifts from the bullet
18  casings?
19   **A  No.**
20   Q  And you don't remember ever requesting
21  that?
22   **A  No.**
23      MR. GRILL:  Objection.  Hang on.  Hang on
24  a second.  That calls -- I'm going to ask that

124

1  that be stricken, because that's attorney/client,
2  at least the way I understand your question to be
3  asked.  Are you asking if he requested from his
4  attorneys to see?
5      MS. DONNELL:  No.  I said, did he ever --
6  no.  I don't think Mr. Grill heard the question.
7      MR. GRILL:  No, I heard the question.
8      MS. DONNELL:  Did you ever --
9      MR. GRILL:  Did you -- your question was,
10  did you request to see reports like that?
11      MS. DONNELL:  No.  I --
12      (Simultaneous crosstalk.)
13      MR. GRILL:  And that came on the heels of
14  you asking, what reports did you review?
15      MS. DONNELL:  No, I didn't.  You didn't
16  hear the question.  I said do you -- sure.  Why
17  don't you --
18      MR. GRILL:  Just ask the question again.
19  Go ahead.
20      MS. DONNELL:  Okay.
21  BY MS. DONNELL:
22   Q  You don't remember ever requesting
23  fingerprints to be obtained from the casings,
24  correct?

125

1    **A  Correct.**
2    Q  And you don't remember ever requesting
3  fingerprints to be -- attempted to be lifted from
4  the bullets, correct?
5    **A  Correct.**
6    Q  Okay.  Thank you.
7        MS. DONNELL:  I think it would be helpful
8  if you listen to questions.
9        MR. GRILL:  Me or the witness?
10        MS. DONNELL:  You.  The witness is doing
11  fine.  Okay.
12        MR. GRILL:  I'm listening to the questions
13  fine.  I would ask that you just ask better
14  questions.
15        MS. DONNELL:  Okay.  We're going to take a
16  break, because it's getting -- I need to take a
17  break, because -- Mr. Grill, I'd like you to
18  listen to the questions being asked before you
19  object to them.
20        MR. GRILL:  I am.  And I don't appreciate
21  the tone that you're using.
22        MS. DONNELL:  I don't appreciate -- we're
23  going to go off the record.
24        THE VIDEOGRAPHER:  Off the record.  12:26.

126

1        (A recess was taken.)
2        THE VIDEOGRAPHER:  Back on the record.
3  1:06.
4        MS. DONNELL:  Okay.  It sounds like -- is
5  there reverberation or no?  Okay.
6        MR. GRILL:  I think we're good.
7        MS. DONNELL:  Okay.  We're good.
8  BY MS. DONNELL:
9    Q  Let's go -- do you still have your
10  Exhibit 6 in front of you.  I feel like -- can you
11  hear it?
12        MR. GRILL:  I'm not hearing any -- if
13  you're talking about feedback or something, I'm
14  not hearing anything.
15        MS. DONNELL:  Yeah.  You're not hearing
16  anything?
17        MR. GRILL:  Yeah.  No.
18        MS. DONNELL:  Okay.  Maybe --
19        MR. GRILL:  You are?
20        MS. DONNELL:  Maybe -- okay.
21        MR. GRILL:  Okay.  We're on Exhibit 6?
22        MS. DONNELL:  Yep.
23        MR. GRILL:  Got it.
24    Q  Okay.  I'm going to hand you what I've

127

1  previously designated as Exhibit 4 to your
2  deposition.
3        (Caesar Deposition Exhibit 4 marked for
4  identification and attached to the transcript.)
5    Q  And it has the Bates stamp City Jakes 77
6  and 78.  There you go.  Do you recognize
7  Exhibit 4, Mr. Caesar?
8    **A  Yes, ma'am.**
9    Q  And can you describe what Exhibit 4 is for
10  the record?
11    **A  It is a major crime worksheet completed by**
12  **myself and my partner.**
13    Q  And this is a major crime worksheet for
14  the Garcia homicide?
15    **A  Yes, ma'am.**
16    Q  Okay.  And your -- the detectives assigned
17  are down there at the bottom, Detective L. Caesar,
18  Star No. 7208 and J. McCann, Star No. 8137; is
19  that right?
20    **A  Yes, ma'am.**
21    Q  Okay.  And this is -- it's called the
22  major crime worksheet up at the top?
23    **A  Correct.**
24    Q  And this is one of the reports -- this is

128

1  what you were referring to earlier, the case
2  reports that you had filled out; is that right?
3    **A  No.  This is a major crime worksheet.**
4  **This is not an official -- this is a report that**
5  **we normally fill out in case we're not going to**
6  **get the case report done before we go home.**
7    Q  And what were you referring to as then the
8  case report?  Were you referring to Exhibit 6?
9    **A  Yes, ma'am.**
10    Q  I see.  So your supplementary report is
11  what you were referring to as your case report?
12    **A  Yes, ma'am.**
13    Q  Okay.  And then this is the major crime
14  worksheet that you also fill out when you go out
15  to the scene?
16    **A  Normally, we don't fill it out if we get**
17  **the report done on time, but this is left in the**
18  **office if we don't get to document what we did the**
19  **night of the scene.**
20    Q  I see.  So, in this case, which one would
21  you have done first then, Exhibit 4 or Exhibit 6?
22        MR. GRILL:  Form.
23    Q  Do you know which report you prepared
24  first during the investigation?

129

1    A  I don't know which one we did first.  Both
2  were done before we went home at noon.
3    Q  So when you were saying you fill out the
4  major crime scene when you're not sure you'll get
5  the supplementary or case report done, that
6  doesn't mean that you did the crime scene
7  worksheet report first?
8       MR. GRILL:  Hang on.  Form.  Go ahead.
9    A  We weren't sure if we were going to be
10  able to finish the report that day, so we filled
11  out a major crime worksheet.  In case something
12  happened, the office would have the information
13  necessary to follow up --
14    Q  Okay.
15    A  -- the information that we had gathered.
16    Q  I see.  But, in this case, we know you
17  filled out both of them on the 16th and submitted
18  both of them on the 16th; is that right?
19    A  Yes, ma'am.
20    Q  Okay.  So let's get back to either one,
21  but I'm going to be looking at Exhibit 6, you can
22  look at either one, about what else you did after
23  you were at the scene.  But then we had gone
24  through the evidence that you were there that was

130

1  collected, right?
2    A  Correct.
3    Q  Okay.  And then it also indicates that --
4  on Exhibit 4 that the patrol and the beat units
5  that were assigned to the investigation were beat
6  No. 976A, that was Police Officer D. Doss and
7  Police Officer P. Donovan; is that right?
8    A  Yes, ma'am.
9    Q  And then also the evidence tech unit was
10  unit 934 with L. White and R. Hargrove; is that
11  right?  On the bottom of the Exhibit 4 over in the
12  personnel.  I'm sorry.  Exhibit 4.  The bottom
13  left-hand corner of the first page.
14       MR. GRILL:  So you're on Jakes 77?
15       MS. DONNELL:  I'm sorry.
16    Q  Let me restate that.  I'm on Jakes 77,
17  Exhibit 4, the patrol beat unit were two units,
18  936A; is that right?
19    A  Yes, ma'am.
20    Q  And that was Doss and Donovan?
21    A  Yes, ma'am.
22    Q  And then also beat 934, right?
23    A  Yes, ma'am.
24    Q  And that was White and Hargrove?

131

1    A  Correct.
2    Q  And then over on the mobile crime unit was
3  9603, right?
4    A  Yes, ma'am.
5    Q  And that was Clinton and McKeough?
6    A  Yes.
7    Q  And then who is this other units notified,
8  933, with Harkins and Weaver?
9    A  I believe they protected the scene, but
10  I'm not sure --
11    Q  Okay.
12    A  -- and possibly ordered the
13  (indiscernible).
14    Q  Got it.
15       THE REPORTER:  And possibly what?
16       THE WITNESS:  Ordered the tow on the
17  vehicle.
18    Q  Okay.  I'm going to hand you what I've
19  previously marked as Exhibit 5 to your deposition,
20  and it has -- it's a one-page document and it has
21  the Bates stamp City Jakes 0003.  I'm handing you
22  now what I've previously designated as Exhibit 5.
23       (Caesar Deposition Exhibit 5 marked for
24  identification and attached to the transcript.)

132

1       MR. GRILL:  What exhibit?
2       MS. DONNELL:  Exhibit 5.
3    Q  And do you recognize Exhibit 5,
4  Mr. Caesar?
5    A  Yes, ma'am.  I've seen it this week.
6    Q  Okay.  And this is the supplementary
7  report prepared by two of those patrol officers on
8  the scene of the Garcia homicide, right?
9    A  I'm not sure if they were at the scene,
10  but we did talk to them that night.
11    Q  Okay.  This says, White and Hargrove?
12    A  Yes, ma'am.
13    Q  Okay.  And so you -- that night you
14  learned from them that they had responded to an
15  information call at 1102 West 51 Street; is that
16  right?
17    A  I believe so, yes.  I'm not sure of the
18  address.
19    Q  And then they were met by a male Arab --
20  who they described as a male Arab, an employee of
21  Star Foods & Liquors, right?
22    A  I'm going by the report.  Yes, ma'am.
23    Q  And he identified himself -- he refused to
24  identify who he was, right?

133

1    A   Yes, ma'am.
2    Q   But he told Officers White and Hargrove
3  that the shooting was meant for Snake, right?
4    **A   That's what the report says.  Yes, ma'am.**
5    Q   And this is information you received that
6  night as well, right?
7    **A   We reviewed this report and spoke to the**
8  **officers.**
9    Q   You reviewed -- do you remember reviewing
10 actually this supplementary report, Exhibit 5?
11   **A   Yes, ma'am.**
12   Q   And then also talking in person to White
13 and Hargrove?
14   **A   I don't remember the conversation with**
15 **them, but I remember the report was submitted.**
16   Q   Did you get it on the scene?
17   **A   I don't remember how we got it, but it was**
18 **there when we were doing our -- when we were**
19 **typing our reports.**
20   Q   Do you remember also talking to them,
21 the --
22   **A   Not really.**
23   Q   But you think you did based on what you've
24 written in your report?

134

1    **A   I think we did.**
2    Q   Okay.  But it's fair to say that September
3  16th, 1991, you had received information that the
4  shooting -- the Garcia shooting was meant for
5  Snake?
6    **A   Possibly.  Yes, ma'am.**
7    Q   But that's what this individual --
8  unidentified individual had said, right, to these
9  officers?
10   **A   Yes, ma'am.**
11   Q   Okay.  And then that -- who was a
12 passenger in the victim's car at the time of the
13 shooting, right?
14   **A   Yes, ma'am.**
15   Q   And that a black male with the last name
16 of Thomas had done the shooting, right?
17   **A   Correct.**
18   Q   And then this individual provided a
19 physical description of that shooter as 6',
20 skinny, dark complexion, and also that Thomas was
21 sent by a man named Troy, right?
22   **A   Correct.**
23   Q   Meaning that Troy had sent this man,
24 Thomas, to shoot Snake allegedly?  That's what's

135

1  documented in the report?
2       MR. GRILL:  Hang on.  Form.  Calls for
3  speculation.  The document speaks for itself.  Go
4  ahead.
5    **A   That's what the report says, yes.**
6    Q   And that Troy was given a physical
7  description of 5'7", 190 pounds, who drives an
8  IROC, and resides in the 50th block of Elizabeth,
9  right?
10   **A   Yes, ma'am.**
11   Q   And also said that Snake is a Cobra, a
12 gang affiliation with Cobra, right?
13   **A   That's what the report says.**
14   Q   And who were the Cobras?
15   **A   Just a gang that was prevalent in the**
16 **city.**
17   Q   Was it prevalent in the area that you
18 worked for Area 3?
19   **A   My dealings was mostly Gangster Disciples,**
20 **but there was also Cobras.**
21   Q   Okay.  And then you did some follow-up
22 work on this lead, right?
23   **A   On this lead?**
24   Q   Yes.

136

1    **A   No, ma'am.**
2    Q   You didn't do anything to follow up?
3    **A   We tried to locate the employee that gave**
4  this information and we were (indiscernible).
5       THE REPORTER:  Sorry.  You're really low.
6  Can you speak up a little bit?
7       THE WITNESS:  Yes, sir.
8       MR. GRILL:  Go ahead and repeat your
9  answer.
10   **A   We were unable to locate anybody to follow**
11 **up on that information.**
12   Q   But is it accurate to say you tried to
13 find this individual?
14   **A   We went by that store, yeah.**
15   Q   Okay.  And you just were unable to locate
16 the employee?
17   **A   I'm not sure.  But I think we even went as**
18 **far as to ask the night district if they had any**
19 **phone listings for that business.  I'm not sure of**
20 **that, though.**
21   Q   Anything else you recall that you did --
22 that you recall doing to follow up on the
23 information that Police Officers White and
24 Hargrove had documented in their supplementary

137

1 report about the Garcia murder?

2    **A No.**

3    Q Okay. And you included -- on page 3, you

4 included the information from Police Officers

5 White and Hargrove's report in your supplementary

6 report, right?

7    **A Yes, ma'am.**

8    Q And is there anything in your

9 supplementary report that refreshes your

10 recollection that you actually had a conversation

11 with them?

12    **A It says that we did.**

13    MR. GRILL: Go ahead.

14    Q Okay. Where is that? What indicates --

15 what part -- can you read me the part of Exhibit 6

16 that indicates you actually spoke to White and

17 Hargrove?

18    MR. GRILL: Okay. I'm sorry. I'll

19 withdraw in light of what just asked. Go ahead.

20    **A In the middle of the last page it says,**

21 **P.O. L. White and R. Hargrove, located and related**

22 **that they had, in fact, responded to 1102 West**

23 **51st Street regarding information and spoken with**

24 **the individual that related this information.**

138

1    Q Okay. And so the way you formulated that

2 sentence that you just read for us means that you

3 had some sort of communication either over the

4 telephone or in person with White and Hargrove?

5    **A From reading my report, it appears that**

6 **way.**

7    Q Okay. Great. Thank you. And then if you

8 go to page 4 on the back of your supplementary

9 report, Exhibit 6, it says, Efforts to locate and

10 interview this male Arab store owner made and R/Ds

11 learned that the individual to be interviewed may

12 be the owner's son, Jay. Do you see that?

13    **A Yes, ma'am.**

14    Q Does that refresh your recollection in any

15 way of the efforts you and your partner took to

16 locate this individual that White and Hargrove had

17 spoken to?

18    MR. GRILL: Object to the form of the

19 question. Go ahead.

20    **A Not really.**

21    Q It doesn't refresh your recollection?

22 Okay.

23    Do you remember taking any notes or GPRs

24 on this part of your investigation or is any of it

139

1 referred to here?

2    **A No. I don't see it anywhere.**

3    Q Okay. And then you indicated that you

4 were unable to locate the individual or personally

5 interview him regarding the information and where

6 he obtained it from, right?

7    **A Correct.**

8    Q And so -- and there's no additional report

9 -- well, strike that.

10    Do you remember any additional efforts you

11 made after September 16th to try and find the

12 individual that had provided the information about

13 this murder was intended for Snake and committed

14 by a man named Thomas and ordered by a man named

15 Troy? Did you do anything else?

16    **A On the 16th, all I recall was vaguely**

17 **finding out from the 9th District if they had a**

18 **home contact number for that business.**

19    Q And they didn't have anything?

20    **A We couldn't find anything.**

21    Q Okay. Even though that's not documented

22 here, you have a recollection of doing that?

23    **A Yes, ma'am.**

24    Q Okay. Anything else you have a

140

1 recollection of doing to follow up on this lead

2 regarding the murder being for Snake and committed

3 by a man named Thomas?

4    MR. GRILL: Asked and answered. Go ahead.

5    **A No.**

6    Q Okay. How about on September 17th, did

7 you take any investigatory steps to work on this

8 lead?

9    MR. GRILL: Form.

10    Q You can answer.

11    **A I was told by Mike when I got there that**

12 **Snake was there.**

13    Q And, Mike, you're saying --

14    **A Mike Kill.**

15    Q -- was it Mike Kill or Mike Rogers?

16    **A Michael Kill.**

17    Q Okay. And did you have any interactions

18 with Snake or Gus Robinson in the context of the

19 Garcia homicide?

20    **A No, ma'am.**

21    Q Did you ever speak to him?

22    **A No.**

23    Q But you knew he was at Area 3 when you

24 came on duty on September 16th?

141

1      MR. GRILL: Objection. Oh, no, actually,
2  no. Sorry. I'll withdraw it.
3      **A I was told he was there by Mike Kill.**
4      Q Okay. But you didn't ever see him, is
5  that right, that you're aware of?
6      **A I don't recall seeing him.**
7      Q Okay. In your report, you said that you
8  learned the individual could be the -- could be
9  the store's owner, Jay. Do you remember trying to
10 locate Jay?
11     MR. GRILL: Hang on. Form. That
12 mischaracterizes the exhibit. That's not what it
13 says. His son.
14     **A I don't know where we got that from.**
15     MS. DONNELL: I said, the owner's son,
16 Jay. I don't think I've misread that at all.
17     MR. GRILL: You said, owner Jay. You left
18 out --
19     MS. DONNELL: Owner's son, Jay. I'm
20 sorry. Thank you. I'm sorry. I thought I said
21 son.
22     Q Do you remember making any efforts to
23 locate Jay?
24     **A I don't recall where we even got the**

142

1  **information that it may be the son's owner [sic].**
2      Q Okay. And that's not listed here in your
3  report, is it?
4      **A No, ma'am.**
5      Q Okay. So after -- so I was asking if you
6  did anything to follow up, and you said you found
7  out that Snake was at Area 3 on the 16th, right?
8      MR. GRILL: Mischaracterizes his
9  testimony. Go ahead.
10     Q I'm sorry. The 17th.
11     **A On the 17th, when I came in.**
12     Q Great. Okay. Anything else you did on
13 September 17th or later to follow up on the lead
14 about Thomas being the shooter?
15     **A No.**
16     Q After -- strike that.
17     How about -- it says here in your
18 Exhibit 6 that there was efforts to locate the
19 operator of the Queens Submarine shop. Do you
20 remember reading that in your report?
21     **A Yes, ma'am.**
22     Q What efforts did you and your partner make
23 to locate the operator of the Queens Submarine
24 shop outside of which -- where the murder

143

1  occurred?
2      **A We -- we drove by again and saw that it**
3  **was closed. It was closed when we got there.**
4      Q When did you drive by? When was that?
5      **A Pardon?**
6      Q When did you drive by the Queens Submarine
7  shop?
8      **A We went -- when we were at the scene, it**
9  **was closed.**
10     Q You're saying when you reported -- this
11 was on September 16th, the early morning hours of
12 September 16th?
13     **A At the scene of the incident when we were**
14 **processing it.**
15     Q You're saying that the shop was closed
16 when you were on the scene, right?
17     **A Right.**
18     Q Did you make any other efforts other than
19 when you were on the scene?
20     **A Not that I recall.**
21     Q Did you ever go back to the Queens
22 Submarine shop any time on September 16th like
23 after you were at the hospital?
24     **A No.**

144

1      Q Did you go by on September 17th?
2      **A No.**
3      Q Any other time after September 17th?
4      **A No.**
5      Q Why not?
6      **A We had no need to. We had information --**
7  **statements.**
8      Q So you had no need to talk to the Queens
9  Submarine shop operator who may have witnessed the
10 murder because you had statements from Mr. Jakes
11 and Snake; is that right?
12     **A We didn't think that he could add anything that**
13 **we didn't already know.**
14     MR. GRILL: Hang on. I'm going to object
15 to form. I presume these questions that you're
16 asking about what he did not -- or he and his
17 partner, not we being all of the individuals
18 involved in this investigation.
19     MS. DONNELL: Yes. I'm talking about
20 Mr. Caesar and his partner.
21     MR. GRILL: Great. Thanks.
22     MS. DONNELL: Yep.
23     Q So -- well, it sounds like even before you
24 had this statement from Anthony Jakes or Gus

145

1  Robinson you had not gone back to try and talk to
2  the operator of the Queens Submarine shop, right?
3     A  I hadn't, no.
4     Q  Okay.  And you and your partner hadn't
5  obtained any information about who that individual
6  was, right?
7     A  The owner of the sub shop?
8     Q  Do you know who the name of that person
9  was?
10    A  Who the name of the sub shop owner was?
11    Q  The operator.  The one who was operating.
12    A  We didn't know his name -- or we knew his
13 name from the report.
14    Q  Okay.  But you didn't make any efforts to
15 locate him at his home or place of work other than
16 when you were out on the scene when you first
17 reported to the scene, right?
18    A  Correct.
19    Q  And then was there -- did you think it was
20 worth going to talk to the operator of the Queens
21 Submarine shop before -- in the investigation,
22 before these statements were obtained?
23       MR. GRILL:  Hang on.  Form.  Foundation.
24 And it's argumentative.

146

1     Q  I'm trying to ask if you thought it was --
2  you, as one of the homicide detectives, thought it
3  was worth trying to talk to the individuals who
4  may have witnessed the murder prior to when the
5  statements were obtained.
6       MR. GRILL:  Okay.  So form, foundation.
7  It mischaracterizes the evidence in this case and
8  it assumes facts that are not in evidence.  If you
9  understand that question, you can try to answer
10 it.
11    A  I didn't have the opportunity to do it
12 that night or the availability, and that probably
13 would have been my first thing to do when I came
14 in the next day.
15    Q  Okay.  And why would that probably have
16 been the first thing to do in terms of the
17 investigation?
18    A  To gain more investigative leads and
19 conduct a proper one-on-one interview.
20    Q  And why would you have wanted to talk to
21 -- and I think his name was Gurgid Singh, right?
22    A  That's what I was told by the report.
23    Q  Okay.  So we can -- instead of saying the
24 operator, we can say Mr. Singh.

147

1       Why did you think when you were next going
2  to report on duty that you would want to talk to
3  Mr. Singh if he hadn't been talked to already as
4  part of the Garcia homicide investigation?  Why
5  was that important to you?
6       MR. GRILL:  Objection.  Form.
7     A  Just to verify what he said and if he knew
8  anything.
9     Q  Okay.  Okay.  I forgot to ask you.  You
10 also tried to locate the victim's friends or
11 family; is that right?
12    A  Yes, ma'am.  I believe we drove by his
13 house, but I don't recall actually knocking on
14 their door or anything.
15    Q  And it looks like you made some calls, the
16 numbers you had for that address?
17    A  I don't know where we got them.  I don't
18 know where we got them numbers, but we apparently
19 tried, yes.
20    Q  Okay.  But, ultimately, you were not able
21 to do that; is that right?
22    A  No, ma'am.
23    Q  Okay.  Do you remember how long -- sorry.
24 Strike that.

148

1       Do you remember if you worked beyond your
2  normal shift hours on the day of September 16th
3  because of this investigation?
4     A  Yes, ma'am.
5     Q  When did you go off duty?
6     A  We signed off -- we put 12:00 noon on the
7  report, so I imagine sometime around then.
8     Q  So you think you did a 12-hour shift?
9     A  At least, yes.
10    Q  Because your normal report would have been
11 12:00 a.m. starting your shift; is that right?
12    A  Yes, ma'am.
13    Q  Okay.  Do you recall overlapping with Ken
14 Boudreau and Mike Kill when they came on in the
15 morning --
16       MR. GRILL:  Objection.
17    Q  -- on September 16th, 1991?
18    A  They were on afternoons, and I was gone
19 when they came to work.  When I came to work that
20 night, they were there.
21    Q  So they would have started at 4:00 p.m.
22 based on your recollection of how the shift
23 worked?
24    A  Either 3:00 or 4:00.  I don't know.

149

1    Q  Did you talk to any of the dayshift
2 detectives that were coming on who were going to
3 start -- continue to work on the Garcia
4 investigation?
5    A  No, ma'am.
6    Q  You don't remember talking to anybody at
7 around noon or sometime before noon on September
8 16th, 1991?
9    A  No.  To my recollection, nobody was
10 assigned.  We were still completing
11 (indiscernible).
12    Q  I see.
13      THE REPORTER:  Sorry.  I didn't hear that
14 answer.
15    A  To my recollection, we were -- nobody was
16 assigned on the dayshift.  We were still
17 completing our reports.
18    Q  Okay.  I'm going to mark this as
19 Exhibit 20.
20      (Caesar Deposition Exhibit 20 marked for
21 identification and was retained by counsel.)
22      MS. DONNELL:  And I apologize for the -- I
23 think I didn't get this sent over to you guys, but
24 I'm marking as Exhibit 20, it's an evidence

150

1 report.  It's Jakes 119.  I think it's -- so if
2 that's okay, I'm going to proceed.  Andrew will
3 have a copy of Exhibit 20, but it's City Jakes
4 119.  Okay?
5    Q  Handing you Exhibit 20.  Mr. Caesar, do
6 you recognize Exhibit 20?
7    A  I recognize it as an evidence report that
8 the ETs -- the evidence technicians -- normally
9 fill out.  I haven't seen it before.
10    Q  You haven't seen it before today at least
11 or you don't remember seeing it?
12    A  I don't remember seeing it before today.
13    Q  But this would have been part of the
14 homicide investigation file?
15    A  Yes, ma'am.
16    Q  Okay.  And you see here that the
17 investigating officer's name is you, Caesar.  Star
18 No. 7208, right?
19    A  Yes, ma'am.
20    Q  And that the reporting officers are the
21 technicians Clinton and McKeough?
22    A  Correct.
23    Q  Okay.  And that this relates to the same
24 R/D number for the Garcia homicide?

151

1    A  Correct.
2    Q  And this indicates with the property
3 inventory numbers the evidence that was collected
4 in the case by the evidence technicians?
5    A  Correct.
6    Q  Okay.  And this also indicates that the
7 beat officer was Doss, right?
8    A  Yes, ma'am.
9    Q  Okay.  And so the evidence collected with
10 the inventory numbers was a glass vial of blood
11 from the street in front of 1210 West 51st?
12    A  I see that.
13    Q  And that corresponds with your
14 supplementary report from the scene observing the
15 blood getting collected, right?
16    A  Yes, ma'am.
17    Q  And then there was two pink colored
18 buttons in the street in front of 1210?
19    A  I see that.
20    Q  And then there was a bullet, one fired
21 bullet, in the gutter and two fired casings from a
22 .380 caliber automatic, right?
23    A  Correct.
24    Q  And then there was two additional fired

152

1 casings from a .380 automatic from the front seat
2 of the victim's car?
3    A  Correct.
4    Q  And there was never a gun recovered
5 associated with this crime, correct?
6    A  Correct.
7    Q  Was there any efforts made to locate the
8 weapon used?
9    A  I don't know.
10    Q  Did you make any efforts?
11    A  No.
12    Q  Was there any physical evidence that
13 linked Mr. Jakes to the Garcia homicide?
14    A  Not that I know of.
15    Q  What was the factual basis for Mr. Jakes's
16 arrest for the Garcia homicide?
17      MR. GRILL:  Form.  Foundation.  Calls for
18 speculation.
19    Q  You can answer.
20    A  From what I was told by Detective Kill,
21 one of the main things was the witness
22 identification by Mr. Robinson.
23    Q  By who?
24    A  Mr. Robinson.

153

1    Q  And what did Detective Kill tell you about
2  Mr. Robinson's identification of Mr. Jakes?
3    **A  From what I remember, and, basically, from**
4  **reading reports, Mr. Robinson said that Anthony**
5  **Jakes had asked him to be a lookout for the**
6  **incident.**
7    Q  Anything else Mr. Kill told you?
8    **A  Nothing specific.**
9    Q  And when did Mike Kill tell you that?
10   **A  When I came in at -- a little after**
11 **midnight.**
12   Q  Was that before talking to Anthony Jakes?
13   **A  Yes, ma'am.**
14   Q  Did you have any discussions with Mike
15 Kill at that time when you first came on duty
16 about whether Snake was the intended victim of
17 this murder?
18   **A  We hadn't discussed that.**
19   Q  Did you have any communications with Kill
20 about whether somebody named Thomas had been
21 involved?
22   **A  No.**
23      MS. DONNELL: For the record, I'm going to
24 mark as Exhibit 21 City Jakes 642 and 643.

154

1    Q  Here's Exhibit 21.
2      (Caesar Deposition Exhibit 21 marked for
3  identification and was retained by counsel.)
4      MR. GRILL: You wrote Exhibit 21. Did you
5  mean to do that?
6      MS. DONNELL: Yeah. For you. So that you
7  know. I'm just trying to keep things straight.
8      MR. GRILL: Yeah. That's fine.
9      MS. DONNELL: Did I say -- sorry --
10 Exhibit --
11     MR. GRILL: Exhibit 21.
12     MS. DONNELL: Exhibit 21. Did I say
13 Exhibit 21 on yours or Exhibit 22? Does it say
14 Exhibit 21?
15     THE WITNESS: Exhibit 21.
16 BY MS. DONNELL:
17   Q  Okay. I've handed you what I've
18 designated as Exhibit 21 to your deposition. It
19 has a Bates stamp 642 and 643. Do you recognize
20 Exhibit 21?
21   **A  Yes, ma'am.**
22   Q  And what is it?
23   **A  A case report prepared by the beat guys**
24 **regarding the aggravated battery of Rafael Garcia.**

155

1    Q  And did you see this case report back on
2  September 16th, 1991?
3    **A  Yes, ma'am.**
4    Q  Okay. And then you also talked to Doss
5  and Donovan at the scene, right?
6    **A  Correct. At the hospital. I'm not sure**
7  **if it was the scene or the hospital.**
8    Q  Well, these were the guys that were on the
9  scene, right? Based on -- you've seen the
10 evidence tech report and your supplementary
11 report?
12   **A  I personally don't remember talking to**
13 **him. But I believe it was either -- we gained**
14 **that information either at the hospital or at the**
15 **scene.**
16   Q  Okay. But you definitely -- they were
17 definitely on the scene when you got there, right?
18   **A  I don't recall.**
19   Q  Well, it's in your supplementary report,
20 right --
21      MR. GRILL: Objection. Form.
22   Q  -- right? When you -- let's see.
23      MR. GRILL: What exhibit are you looking
24 at?

156

1      MS. DONNELL: I'm looking at Exhibit 6.
2      MR. GRILL: Is there a part you want to
3  draw his attention to?
4      MS. DONNELL: Yeah. I'm going to see. So
5  let's see.
6    Q  Oh, so you're not sure whether 936A, Doss
7  and Donovan, were on the scene or just you talked
8  to them later; is that right?
9    **A  I'm not sure.**
10   Q  Let me see. Because you say when you
11 responded to the scene, you were met by beat 933,
12 right?
13     MR. GRILL: Okay. Form as to the part of
14 this report that you're reading from, because I
15 can't tell, or if you'd like to draw his attention
16 to it, I'd ask that you do that.
17     MS. DONNELL: Sure.
18     MR. GRILL: We're talking about Exhibit 6,
19 I think?
20   **A  In the middle paragraph on page 3, it**
21 says, (indiscernible.)
22   Q  I see. Okay.
23     THE REPORTER: It says what? I couldn't
24 hear.

157

1      THE WITNESS:  Beat 936A was located at the
2  hospital.
3      Q  Got it.  Okay.  And then it says that 936A
4  also related that they had spoken with the
5  operator of the Queens Submarine shop just prior
6  to coming to the hospital; do you see that?
7      A  That's what it says.
8      Q  So they had been on the scene?
9      A  They had definitely been on the scene.  I
10  don't recall talking to them at the scene.
11      Q  I see.  You recall talking to them
12  possibly at the hospital?
13      A  From my report, I wasn't sure where we
14  talked to them.
15      Q  Okay.  Thanks for clarifying.  I
16  appreciate that.  So you're not disagreeing that
17  they were at the scene, it's just that you don't
18  -- you remember talking to them at the hospital,
19  based on your report?
20      A  Correct.
21      Q  Thank you for clarifying.  Okay.  So back
22  to Exhibit 21.  This is the Doss and Donovan
23  report from their activities that night?
24      A  Yes, ma'am.

158

1      Q  They report what they observed when they
2  observed the victim lying facedown in a pool of
3  blood with his head facing southeast and feet
4  facing northwest, right?
5      A  That's what the report says.
6      Q  Okay.  And then they reported that they
7  canvassed the area about witnesses, right?  I'm
8  looking on page 2 of Exhibit 21.
9      MR. GRILL:  Is there specifically a spot
10  here?
11      Q  About the first line down, it says, R/Os
12  canvassed the area, right?
13      A  I see that where it says that.  Yes.
14      Q  And it says they talked to witness No. 1;
15  is that right?
16      A  Correct.
17      Q  And is witness No. 1 Gurgid Singh?
18      A  Yes, ma'am.
19      Q  Okay.  And that was the operator of the
20  Queens Submarine shop, right?
21      A  Correct.
22      Q  Okay.  And then it looks like --
23      MR. GRILL:  I'm going to object to the
24  extent that it mischaracterizes his testimony.  Go

159

1  ahead.
2      Q  And then it looks like they also talked to
3  a second witness who refused to be identified,
4  right?
5      A  I don't see that.
6      Q  Do you see -- do you see under 31,
7  witness, there's, Gurgid Singh, and then the next
8  line says, refused?
9      A  I see that now, yes.
10      Q  Do you know who -- do you have any idea
11  who that was?
12      A  I have no idea.
13      MR. GRILL:  Objection to the extent that
14  it assumes facts not in evidence and it calls for
15  speculation.
16      Q  That wasn't documented in your
17  supplementary report that there was a second
18  witness on the scene that patrol tried to talk to
19  that refused to identify themselves, correct?
20      A  I don't believe so.
21      Q  Okay.  Well, do you want to look at
22  Exhibit 6 and see if you can see that there?
23      A  I didn't document it, apparently.
24      Q  Okay.  And then do you see on -- over on

160

1  this -- over to the right on page 643 of
2  Exhibit 21 that it says, On scene:  Crime lab
3  officers, right?  Second line on the right column.
4      A  On this paper?
5      Q  Yeah.  Over here.  It says, On scene:
6  Crime lab officers, right?
7      A  Oh, yes.  Yes.
8      Q  And underneath that it says, Caesar and
9  McCann?
10      A  Yes, ma'am.
11      Q  So at least based on the report of Doss
12  and Donovan, they documented you being on scene
13  with them, right?
14      A  Correct.
15      Q  Okay.  But that's not included in your
16  supplementary report, Exhibit 6, that Doss and
17  Donovan were on scene with you when you were at
18  the scene of the murder, right?
19      MR. GRILL:  Objection.  Form and
20  foundation.  Mischaracterizes his testimony and
21  the evidence.  And it's leading.
22      A  I believe we documented that we met them
23  at the hospital.  I don't remember them from the
24  scene.

161

1    Q  And I'm just pointing out that they
2  documented being on scene with you based on their
3  report, right?
4        MR. GRILL:  Objection.  Calls for
5  speculation.  Foundation.  Mischaracterizes the
6  evidence.
7    Q  You can answer.
8    **A  That can be interpreted that we were**
9  **assigned to the scene.**
10    Q  I see.  Okay.  All right.  I want to go --
11  go back to now when you come back on duty to the
12  early morning hours of September 16th.  Okay?
13    **A  September 17th?**
14    Q  September 17th.  Thank you.  I appreciate
15  that.  I'm sorry.  September 17th.  And you've
16  already talked to me about, you know, you reported
17  to duty about 12:00 a.m.  You think you were
18  upstairs at about 12:15 a.m.
19        Oh, and I wanted to point out in your --
20  in your -- deposition in the Hill case when you
21  were talking about your interrogation of Peter
22  Williams in the Bishop murder, you said that you
23  just went up to the third floor and spoke with
24  Peter.  Does that -- that was what you testified

162

1  to back in 2008.
2        MR. GRILL:  Okay.  Time out.  Object.
3  Because I don't have a copy of the transcript in
4  front of me.  I have no idea if that's indeed what
5  it says.  It may.  I don't know.
6        MS. DONNELL:  That's fine.
7        MR. GRILL:  But if you're talking about
8  something specific, I would ask that you show it
9  to him.
10        (Simultaneous crosstalk.)
11        MS. DONNELL:  Yeah.  I can refresh him
12  with anything I want.  So --
13        MR. GRILL:  Right.  But you're not even
14  setting it up the right way.  That's the problem.
15  You're just telling him, he said this, you said
16  that, without showing him the testimony.  So why
17  don't we do it the right way so --
18        (Simultaneous crosstalk.)
19        MS. DONNELL:  I'm just asking him --
20    Q  If I represent to you that in 2008 on
21  page 18 at line 3 is where you testified, We just
22  went to up to the third floor and I spoke with
23  Peter --
24        MR. GRILL:  Just show it to him.

163

1    Q  -- if that refreshes your recollection --
2        MS. DONNELL:  Andrew, stop interrupting.
3    **A  Pretty much so, yes.**
4    Q  Okay.  Thank you.  All right.  So --
5        MR. GRILL:  What page is that on, so I can
6  check it?
7        MS. DONNELL:  Page 18, lines 3 and 4.
8        MR. GRILL:  Lines 3 and 4.
9        MS. DONNELL:  Okay.
10        MR. GRILL:  Page 18 of what you just
11  handed me?
12        MS. DONNELL:  Andrew, page 18 of --
13        MR. GRILL:  Okay.  I'm looking at page 18.
14  Do you see it?  Okay.  Lines 3 and 4.  Line 3
15  says, Conversation with the petitioner, did he
16  ever request that a family member be present?
17  Answer, no.  So where are you talking about?  And
18  so while we're at it --
19        MS. DONNELL:  Page 18, lines 3 and 4.
20        MR. GRILL:  I'm on -- see.  Look.  18.
21  I'm on it.
22        MS. DONNELL:  I gave you the wrong thing.
23  Okay.  Look at the electronic exhibit.  Line 18.
24        MR. GRILL:  Can I see it, please?  Thanks

164

1  for throwing it at me.  I appreciate it.  I'm glad
2  that was videotaped.  Okay.  So line 18.  So this
3  is not what you just showed me.
4        MS. DONNELL:  It's a small point, Andrew.
5  I'm not trying to trip him up.  It's just trying
6  to move through it.
7        MR. GRILL:  I'm just -- I don't know why
8  you're doing so difficult when it comes to just
9  showing the witness what was actually
10  (indiscernible).
11        (Simultaneous crosstalk.)
12        MS. DONNELL:  (Indiscernible) refresh his
13  recollections by representing his testimony.
14        MR. GRILL:  But you're not refreshing his
15  recollection.  You're telling him -- you're
16  setting it up by saying, you said this.  That's
17  not refreshing anything.  That's just
18  characterizing his testimony without showing the
19  witness the transcript or me.
20        MS. DONNELL:  Thank you.
21        MR. GRILL:  Thanks.
22        MS. DONNELL:  All right.  I'm sorry.
23  Mr. Caesar.  I'm sorry for the frustration.  And
24  I'm sorry to you, Andrew --

165

1     MR. GRILL:  Thank you.
2     MS. DONNELL:  -- I'll try and be more
3   professional with you.  I hope you'll do the same
4   with me.
5   BY MS. DONNELL:
6     Q   Okay.  So you got up there at about 12:15,
7   and that's when you had your conversation with
8   Mike Kill that you've already testified to, right?
9     A   On the 17th we're talking about?
10    Q   Yes.
11    A   Yes, ma'am.
12    Q   Okay.  And then did you do anything on the
13  Garcia investigation from the time that you talked
14  to Mike Kill up until the point in time when
15  you're about to go in and talk to Mr. Jakes?
16    A   No.
17    Q   Did you work on other (indiscernible).
18    A   No.
19        THE REPORTER:  I didn't hear that
20  question.  Can you repeat it?
21    Q   Did you work on other cases?
22    A   No.
23    Q   Do you know -- do you remember what you
24  did?

166

1     A   I believe it was a short period of time,
2   less than an hour.
3     Q   Okay.  And I believe you earlier
4   testified, but correct me if I'm wrong, that you
5   were waiting for a youth officer to arrive; is
6   that right?
7     A   I was told that a youth officer had been
8   contacted, and, yes, I waited.
9     Q   And who told you that a youth officer had
10  been contacted?
11    A   I don't recall.
12    Q   It's fair to say you didn't contact the
13  youth officer?
14    A   No.
15    Q   Okay.  And why were you waiting for the
16  youth officer to arrive?
17    A   Because Anthony Jakes was 15 years old.
18    Q   Okay.  And so you knew -- well, who told
19  you -- sorry.  Strike that.
20        You knew Anthony Jakes was 15 years old,
21  right?
22    A   Yes, ma'am.
23    Q   Did somebody tell you that?
24    A   I was aware of it from the arrest report,

167

1   and I was told, yeah.
2     Q   Who told you?
3     A   Basically, Mike Kill.
4     Q   Do you remember what Mike Kill told you?
5     A   No.  I believe he just said something -- I
6   don't recall.  He said something to the effect
7   that we have a juvenile, youth is on the way, this
8   is what's happening.
9     Q   Was it your understanding that there had
10  not been a youth officer present during Mike Kill
11  and Ken Boudreau's interview with Mr. Jakes?
12        MR. GRILL:  Objection.  Foundation.
13    A   I know that now, yes.
14    Q   Okay.  And did you and -- did you ask Mike
15  Kill whether any parent or guardian had been
16  present for Mr. Jakes's interview that they
17  conducted of him?
18    A   I didn't ask Mike.
19    Q   Why not?
20    A   Because I trusted his judgment, and I knew
21  he had been a detective for a long time.
22    Q   What did you trust Mike Kill's judgment
23  about?
24    A   He was a good detective.

168

1     Q   Did you trust Ken Boudreau?
2     A   Yes, ma'am.
3     Q   And did you trust -- you were trusting
4   that Ken Boudreau and Mike Kill would make good
5   judgment calls in the context of their
6   investigation?
7     A   Yes, ma'am.
8     Q   Were you trusting that they would follow
9   any policies and procedures required of them for
10  the interrogation of juveniles?
11    A   Yes, ma'am.
12    Q   And what's your understanding --
13        MR. GRILL:  Hang on.
14    Q   -- back in December 1991 --
15        MS. DONNELL:  Can I ask the question?
16        MR. GRILL:  Yeah.  And then I'll object.
17  Go ahead.
18    Q   What was your understanding of what was
19  required for interrogations of juveniles back in
20  September 1991?
21        MR. GRILL:  Okay.  So my --
22        MS. DONNELL:  Let me just say this.  I
23  don't think you should be instructing the witness,
24  and nor do I think you should be coaching him.  So you

---

169

1 can make your objection, but if it's going to be
2 anything along those lines, I'm going to ask the
3 witness to leave.
4      MR. GRILL:  Okay.  So just give me the
5 same favor that I just gave you which was don't
6 interrupt me.  My question -- my objection, a
7 little late.  It's not to the question you just
8 asked, the question before.  Your use of the word
9 interrogation, it assumes facts not in evidence
10 and calls for speculation to this witness.
11 Obviously, he's given his answer.  I want it on
12 the record.  Go ahead with the question that you
13 just asked.
14    **A   Could you repeat the question?**
15    Q   Sure.  What was your understanding back in
16 September 1991 of what was required for any
17 interviews of juveniles suspected of homicide?
18    **A   Once they became --**
19      MR. GRILL:  Object to the form of the
20 question, then.  And foundation.
21    **A   Once an investigation became interrogative**
22 **or accusatory of a juvenile, a parent, guardian,**
23 **or youth officer was required.**
24    Q   Now, where did you obtain that

---

170

1 understanding -- or how did you obtain that
2 understanding?
3    **A   I'm sure it was in an order somewhere, but**
4 **I just knew it from general practice and how**
5 **things were done.**
6    Q   Was that your personal practice that you
7 used?
8    **A   I personally did, yes, and detectives were**
9 **required to do that by law, I believe.**
10    Q   Do you know why that was?
11      MR. GRILL:  Objection.  Form.
12    **A   For protection of the juvenile.**
13    Q   Are you familiar with general order 87-7
14 on field and custodial interrogation?
15    **A   Not by number or by definition.**
16    Q   Fair to say you would have been familiar
17 with it back in the time frame when you were
18 conducting field and custodial interrogations?
19    **A   Yes, ma'am.**
20    Q   Okay.  And do you remember that in that
21 87-7 instruction, I think, 9F stated, A juvenile
22 should be warned and questioned only in the
23 presence of an adult (parent, other relative,
24 friend) if such an adult can be located?

---

171

1      MR. GRILL:  Time out.  Objection.  Form.
2 Foundation.  I'd ask if you're reading from
3 something to show the witness whatever it is that
4 you're reading.  So I'm going to object that it
5 mischaracterizes it until you show it to him.
6      MS. DONNELL:  I can show it to him, but
7 we're going to have to -- we can mark it, but I'm
8 going to have to show it to him from my computer.
9 Do you want me to -- I'm happy to show you
10 Exhibit 87-7.
11    **A   Could you reread it?**
12    Q   Sure.  But do you want to follow along?
13    **A   No.  That's okay.**
14    Q   Okay.  And we can mark this as an exhibit.
15 I think we're on Exhibit 23.
16      (Caesar Deposition Exhibit 23 marked for
17 identification and was retained by counsel.)
18      MR. GRILL:  What's the Bates stamp?
19      MS. DONNELL:  Sure.  The Bates stamp is
20 City Jakes 922 to 926.  And I can wait for you.
21 And the page that I'm reading from is -- let's see
22 -- it's City Jakes 924.
23      MR. GRILL:  Okay.  So just so we're clear,
24 this is the section dealing with interrogations,

---

172

1 right, not interviews?
2      MS. DONNELL:  That's fine.
3      MR. GRILL:  Okay.  Just so we're clear on
4 that.
5    Q   Can you see my screen okay?  Because I can
6 zoom it in.
7    **A   Yeah.**
8    Q   And I think -- I'm sorry.  I don't want to
9 get too close.  But I was reading from
10 paragraph F.
11    **A   Yes, ma'am.  I read it.**
12    Q   Okay.  Did you get a chance to read that
13 portion of Exhibit 23 which is general order 87-7?
14    **A   Yes.**
15    Q   And so you were able to read that section
16 that I had read to you that a juvenile should be
17 warned and questioned only in the presence of an
18 adult, meaning, a parent, relative, or friend?
19      MR. GRILL:  Okay.
20      MS. DONNELL:  I'm just asking if I read
21 that correctly.
22      MR. GRILL:  Right.  But, yes, if you're
23 only question is is that literally what this
24 little part says, then I've got no objection.

173

1    A  I also read the first section where it
2  refers to statements and (indiscernible).
3       THE REPORTER: Sorry.  I can't hear you.
4  Can you speak up?
5    A  I also read the first line of the section
6  that the attorney represented to me that says
7  something about for statements also.
8    Q  Meaning -- the part you read, I'll read it
9  and see if this is what you're referring to.  An
10 express statement by a juvenile that he
11 understands the meaning of this advice is
12 required.  That line?
13   A  No.  The first line of section F, I
14 believe, it is.
15   Q  In addition to the above warning, before
16 accepting any admission or statement of a
17 juvenile, the juvenile be advised that his case
18 might be transferred to criminal court where he'll
19 be prosecuted as an adult?
20   A  Yes, ma'am.
21   Q  Okay.  That's the part you were just
22 referring to?
23   A  I was referring to the whole thing going
24 back to the statements more so than interviews.

174

1    Q  Oh, and what were you trying to -- could
2  you clarify or help explain what you --
3    A  To my understanding, once an individual
4  juvenile became an investigative target, then a
5  juvenile's adult, parental guardian, or whoever
6  was needed.
7    Q  Do you -- what was your practice in terms
8  of when you considered a juvenile to be an
9  investigative target in one of your
10 investigations?
11      MR. GRILL: Objection.  Incomplete
12 hypothetical.  Calls for speculation.
13   A  Every case was different.
14   Q  Okay.  Are you not able to answer that as
15 a general practice?
16      MR. GRILL: Okay.  That's argumentative.
17      MS. DONNELL: I'm not argumentative.  I'm
18 just asking.
19      MR. GRILL: It's argumentative.  He just
20 answered the question, so it's asked and answered.
21 And -- it's asked and answered.
22   Q  Okay.  You can answer.
23   A  There's such a gray area.  You can't have
24 a youth officer for every individual juvenile we

175

1  interviewed.  And at what point does it become
2  interrogation?  There's a gray area.  Every case
3  is different.
4    Q  I see.  So was it your practice that if
5  you were just interviewing a juvenile about
6  whether they were involved in a murder or other
7  violent crime that you may not have a -- have a
8  parent or guardian or friend present?
9       MR. GRILL: Objection.  Form.  Incomplete
10 hypothetical.  Go ahead.
11   A  We would always try to have a parent
12 there, but if it was impractical or unavailable,
13 we would continue the interviews.
14   Q  Okay.  And was it also possible if you
15 couldn't have a parent or a guardian you could
16 then seek to have a youth officer present?
17      MR. GRILL: Form.
18   A  We would normally have a youth officer
19 there -- not a youth officer.  We actually usually
20 try to have a parent or a guardian or adult there
21 for the child during the interviews.  Once it
22 became an interrogation or there was an accusation
23 against that individual, we would try to -- harder
24 to get an adult there.  If we couldn't, then the

176

1  youth officer would be called.
2    Q  Okay.  And, in this case, you were not
3  present when Detective Kill and Detective Boudreau
4  were with Mr. Jakes, right?
5    A  Correct.
6    Q  Do you know whether -- well, you have no
7  idea whether it was accusatory or not or do you?
8    A  I have no idea.
9    Q  Okay.  So you don't know whether what they
10 conducted was what you would consider an
11 interrogation, correct?
12   A  Correct.
13   Q  But you do know that there was no adult,
14 guardian, or friend present with Mr. Jakes for
15 their time that they were questioning Mr. Jakes?
16      MR. GRILL: Objection.  Calls for
17 speculation.
18   A  Based on the reports I've read and these
19 proceedings, I understand there was not.
20   Q  Okay.  You also were aware back on
21 September 17th, 1991, that Mr. Jakes was arrested
22 from his -- where he lived with his aunt, right?
23   A  I learned that, yes.
24   Q  And you knew that from his arrest report?

177

1     A  Basically, yes.
2     Q  And so you knew that prior to the time
3  that you were with him for his statement, correct?
4     A  I knew he had been picked up at home, I
5  was told.
6     Q  And you know that his aunt -- did you know
7  that his aunt was present when he got arrested?
8     A  Yes, ma'am.
9     Q  Okay.  So you knew that there was an adult
10  in his life that was at least available at the
11  time of his arrest, right?
12     A  I know there was an adult there when he
13  was arrested is all I know.
14     Q  Were you relying on Detective Boudreau and
15  Kill to reach out to her for her to be present
16  with -- during their questioning of Mr. Jakes as
17  it became accusatorial?
18     A  Yes.
19     Q  And you relied on them to use their
20  judgment to follow what you knew to be the policy
21  of the Chicago Police Department with respect to
22  interrogations of juveniles, right?
23     A  Correct.
24     Q  Did you take any steps to assure yourself

178

1  that they had done that?
2        MR. GRILL:  Objection.  Incomplete
3  hypothetical.  Assumes facts not in evidence.
4  Foundation.
5        MS. DONNELL:  I can rephrase if it wasn't
6  a good question.
7     Q  Did you take any steps on September 17th,
8  1991, before you participated in taking a
9  statement from Anthony Jakes to assure yourself
10  that Detective Boudreau and Detective Kill had
11  followed what you understood to be the Chicago
12  Police Department's policy with respect to
13  interrogating juveniles?
14        MR. GRILL:  Okay.  Again, it assumes facts
15  not in evidence.  It calls -- asks this witness to
16  speculate.  And it's a hypothetical and it lacks
17  foundation.
18     A  I don't know.  I know a youth officer was
19  on his way, so I assume they couldn't get ahold of
20  anybody.
21     Q  And my question is, did you ask Detective
22  Kill any questions -- strike that.
23        Did you ask Detective Kill if he had
24  reached out to Anthony Jakes's parent or guardian

179

1  to be present for their questioning of him?
2        MR. GRILL:  Objection.  Same objections.
3  Go ahead.
4     A  No.
5     Q  And did he volunteer any information about
6  efforts he made to reach out to any parents?
7     A  Did Mike Kill?
8     Q  Yes.
9     A  No.  No, ma'am.
10     Q  Did you also talk to Detective Boudreau on
11  September 17th, 1991, before you participated in
12  Mr. Jakes's statement?
13     A  I don't even remember Kenny being around
14  that night.
15     Q  Okay.  I'm going to show you what I marked
16  -- previously marked as Exhibit 1 to your
17  deposition.  And this is your testimony on
18  December 2nd, 1992.  I'll hand it to you.
19        (Caesar Deposition Exhibit 1 marked for
20  identification and attached to the transcript.)
21        MR. GRILL:  This is from the motion to
22  suppress?
23        MS. DONNELL:  What's that?
24        MR. GRILL:  Motion to suppress?

180

1        MS. DONNELL:  Yeah.  I have a copy for
2  you.
3        MR. GRILL:  Thank you.
4     Q  Okay.  So I'm showing you Exhibit 1, and
5  I'm going to call your attention to page -- I
6  think it's pages 28 and 29 of your testimony to
7  see if it refreshes your recollection.
8        MR. GRILL:  About?
9        MS. DONNELL:  What I just asked him about.
10     Q  So -- okay.  So starting at the bottom of
11  page 28, you were asked -- could you read there to
12  yourself starting at line 23?
13        MR. GRILL:  Page 28.  Okay.
14     Q  And then following on to page 29 through
15  line 2.
16     A  Who explained what the status of the
17  investigation was.
18     Q  And then --
19     A  I spoke to Detective Kill and Detective
20  Boudreau about what was going on with the case.
21     Q  Okay.  And that was your testimony back on
22  December 2nd, 1992, which was obviously a lot
23  closer to the events in question, right?
24     A  Yes, ma'am.

181

1   Q  And so your memory -- is it true your
2  memory would have been much better back in
3  December 1992 than December 2020?
4   A  My memory was a lot better.
5   Q  Okay.  And so back on December 2nd, 1992,
6  when you were asked who had updated you on the
7  status of the Garcia investigation, you responded
8  it was both Detective Kill and Detective Boudreau.
9   A  That's what I said.
10   Q  Okay.  And you have no reason to doubt the
11 accuracy of that testimony from back in 1992,
12 right?
13   A  I can explain how I was thinking when I
14 said it.
15   Q  Oh, you can?
16   A  Yeah.
17   Q  Okay.
18   A  I was just saying that I spoke to the
19 detectives that were handling the case before I
20 went in with Mr. Jakes.  But I don't recall
21 talking to Detective Boudreau.
22   Q  Okay.  And this doesn't refresh your
23 recollection, what I've just pointed your
24 attention to?

182

1   A  No, ma'am.
2   Q  Okay.  Thank you.  Do you remember having
3  any conversations with Ken Boudreau about the
4  Garcia investigation back in 1991 -- in September
5  1991?
6   A  No, ma'am.
7   Q  Have you already told me everything that
8  Detective Kill relayed to you about his -- the
9  information he obtained from Anthony Jakes?
10   A  From Anthony Jakes, yes, ma'am.
11   Q  Before you got the statement.  Okay.  Is
12 that right?
13   A  Yes.
14   Q  Do you have a recollection of being
15 present for the statement of Anthony Jakes, or is
16 your recollection -- memory of those events
17 limited to what's in the statements or reports and
18 your prior testimony?
19   A  From the latter.
20   Q  It's just -- you don't have an actual
21 memory?
22   A  No, ma'am.  I don't remember sitting at
23 the table.
24   Q  Okay.  Do you remember what Anthony Jakes

183

1  looked like at that time on September 17th, 1991?
2   A  Not really, no.
3   Q  Do you remember anything?
4     MR. GRILL: Objection.  Form.
5   Q  I mean, do you remember anything about
6  what Anthony Jakes -- his appearance?
7   A  Not his appearance, no.
8   Q  Okay.  Do Remember how earlier today you
9  testified that Mike Kill looked tired to you?
10   A  Right.
11   Q  Do you have a memory of Anthony Jakes
12 appearing tired to you?
13   A  I don't recall Anthony's appearance that
14 night.
15   Q  So you really can't say one way or the
16 other; is that true?
17   A  Yes, ma'am.
18   Q  Okay.  Did you take any steps to assure
19 yourself that Mr. Jakes -- well, like me strike
20 that.
21     Did you know how long Mr. Jakes had been
22 at Area 3 prior to the time when you were present
23 for his statement?
24   A  I was aware of what time he was brought

184

1  in, yes.
2   Q  And what time was he brought in?
3   A  I believe it was early afternoon.  Maybe
4  2:00, I believe.
5   Q  And so you were aware that he had been at
6  Area 3 from 2:00 or 3:00 in the afternoon on
7  September 16th?
8   A  Yes, ma'am.
9   Q  And did you make any inquiry of Mike Kill
10 when you spoke to him of whether Anthony Jakes had
11 had any time to rest during that time frame?
12   A  I didn't ask.
13   Q  Okay.  And let's just be clear.  What time
14 was the statement taken?
15   A  I believe --
16     MR. GRILL:  Form.  The one that he sat in
17 on?
18     MS. DONNELL:  Yeah.
19     MR. GRILL:  Yeah.  Okay.
20   Q  What time -- I'm sorry.
21   A  The formal statement was around 4:00, I
22 believe, in the morning.
23   Q  So Mr. Jakes had been present at the
24 station for about 16 hours?

185

1    A  To my understanding, he came in at 2:00 in
2 the afternoon.
3    Q  And this is 4:00 a.m. when his written
4 statement was being taken, right?
5    A  Correct.
6    Q  You would agree that was about 16 hours at
7 least?
8    A  Yes, ma'am.
9    Q  And same question.  Did you take any steps
10 to determine whether Mr. Jakes had had any
11 opportunity to rest during that time period from
12 2:00 p.m. in the afternoon on the 16th to
13 4:00 a.m. on the 17th?
14    MR. GRILL:  Objection.  Form.
15    A  No, ma'am.
16    Q  How about with respect to whether
17 Mr. Jakes had been provided any food; did you make
18 any inquiry to Mike Kill whether he had been
19 provided any food?
20    A  No.
21    Q  How about any water or something to drink?
22    A  We didn't discuss that.
23    Q  Okay.  So I don't -- you don't have an
24 independent recollection, but based on your

186

1 review, tell us what happened -- strike that.
2    Who was present for Mr. Jakes's written
3 statement other than yourself?
4    A  State's Attorney Grossman.  And the reason
5 I even remember this statement at all, basically,
6 other than from reading the reports, it was the
7 only one I had with Ken Burke.
8    Q  And Ken Burke is the youth officer?
9    A  Yes, ma'am.
10    Q  Okay.  And then is it also accurate to say
11 that Mike Kill was present at least initially for
12 the statement?
13    A  Yes, ma'am.
14    Q  And why was Mike Kill present for the
15 first part of the written statement?
16    MR. GRILL:  Objection.  Form.  Calls for
17 speculation.
18    A  He introduced us to -- he introduced
19 Anthony to all the rest of us.
20    Q  Do you remember anything Mike Kill said to
21 introduce you to -- you and State's Attorney
22 Grossman and Officer Burke to Anthony?
23    A  Just from reading the reports, he said
24 something to the effect of these are the

187

1 detectives and the state's attorney that's going
2 to handle the statement.
3    Q  Okay.  And then was there some portion of
4 time that Mr. Burke met alone with Mr. Jakes?
5    A  Yes, ma'am.
6    Q  Okay.  And how long was that?
7    A  From my reports, I understand it was about
8 five minutes.
9    Q  And then you and -- did you and Mr. Burke
10 have any communications after he spoke to
11 Mr. Jakes for about five minutes?
12    A  Afterwards, no.
13    Q  What happened after -- oh, and this is all
14 -- I want to go back.  This is all happening in
15 that office, is that right, with Mr. Jakes already
16 in the office?
17    MR. GRILL:  Objection.  Form.  Foundation.
18    MS. DONNELL:  Andrew's, right.  Let me --
19    Q  Where was Mr. Jakes when you first had
20 Mike Kill introduce you and State's Attorney
21 Grossman and Youth Officer Burke to him?
22    A  He was in that office too (indiscernible).
23    THE REPORTER:  Can you repeat?  I couldn't
24 hear that.

188

1    MS. DONNELL:  Sure.
2    A  He was in the undetermined office on the
3 diagram next to the sergeant's office.
4    Q  The one that you labeled as exhibit -- as
5 office on Exhibit 19?
6    A  Right.
7    Q  Okay.  And -- thank you.  And where was
8 he?  Was he sitting or standing?
9    A  I don't recall.
10    Q  Was he handcuffed?
11    A  No.  From reading the reports, no.
12    Q  Okay.  And did you -- were there chairs in
13 there for everybody to sit down during the
14 statement?
15    A  To the best that I recall, there was a
16 desk in there and some chairs.  Yes, ma'am.
17    Q  Okay.  And to the best you recall, was
18 everybody sitting down during the statement?
19    A  Yes, ma'am.
20    Q  Okay.  And so after that -- so for the
21 first five minutes, Youth Officer Burke was alone
22 with Mr. Jakes?
23    A  Yes, ma'am.
24    Q  And then he came out -- did he come out of

189

1 the office and then you all went back in?
2   A  Yes, ma'am.
3   Q  Could you -- were there windows for that
4 office?  Could you see Youth Officer Burke and
5 Anthony Jakes from where you were positioned
6 outside the office?
7   A  Not unless the door was open.
8   Q  Okay.  Do you remember the door being open
9 or closed?
10  A  Open.
11  Q  So you could see Youth Officer Burke
12 talking to Mr. Jakes?
13  A  I didn't personally remember that.  But
14 you could if you were in the squad bay.
15  Q  Okay.  Do you know where you were when Mr.
16 Burke was talking to Mr. Jakes?
17  A  Not really.
18  Q  Were you able to overhear their
19 conversation?
20  A  No, ma'am.
21  Q  Did Officer Burke relay at any point his
22 conversation he had with Anthony Jakes outside of
23 your presence?
24  A  No.

190

1   Q  So do you have any idea what they talked
2 about?
3   A  No.
4   Q  Okay.  So then next you and Mike Kill and
5 Grossman and Burke all go into that office; is
6 that right?
7   A  Yes, ma'am.
8   Q  And Mike Kill introduced all of you?
9   A  Yes, ma'am.
10  Q  Did he say anything about what Anthony had
11 told him?
12  A  No.  Not that I read or I recall.
13  Q  Okay.  I want to go back.  Do you have --
14 did Mike Kill tell you anything that he or his
15 partner, Ken Boudreau, said to Anthony Jakes when
16 they were questioning him?
17  A  No.  They didn't tell me anything.  They
18 told me that there was a witness statement from
19 Gus Robinson.
20  Q  And did they tell what Gus had -- and they
21 told you what Gus had said?
22  A  Yes, ma'am.
23  Q  And did they tell you anything that they
24 had said to Gus Robinson?

191

1   A  No, ma'am.
2   Q  So do you have any knowledge if they make
3 any threats or promises to Gus Robinson?
4   A  I have no idea.
5   Q  Do you have any personal knowledge of any
6 threats or promises made to Anthony Jakes?
7   A  No.
8   Q  And do you have any personal knowledge of
9 whether they used any physical force with
10 Mr. Jakes --
11  A  I have no idea.
12  Q  -- or any threats of physical force?
13  A  I don't know.
14  Q  Did Mr. Jakes say -- tell you anything
15 about his interactions with Mr. Boudreau -- with
16 Detective Boudreau or Kill?
17  A  No.
18  Q  Okay.  How long did it take to take
19 Mr. Jakes's written statement on September 17th,
20 1991?
21  A  From reading the reports, I think it was
22 something like a half hour, maybe, conversation
23 with the state's attorney and then maybe another
24 20 minutes, half hour writing it up.  From the

192

1 reports.  I don't recall.
2   Q  I'm going to hand you what I've previously
3 marked as Exhibit 10.  Here you go.  Actually,
4 before I do that, let me ask you a couple
5 questions.
6       You have no memory of the statement that
7 -- the written statement Mr. Jakes -- of Mr. Jakes
8 -- strike that.
9       You have no memory of Mr. Jakes's written
10 statement other than what's in the papers and the
11 reports, right?
12  A  No.  I remember sitting in the room with
13 Ken Burke and State's Attorney Grossman, because
14 that was the only time I was on a statement with
15 them two individuals.  I don't recall the content
16 or the individual that was being interviewed as
17 being Anthony Jakes --
18  Q  Okay.
19  A  -- I remember being in the room with Ken
20 Burke.  I remember Brian Grossman, because that
21 was the only case I had with Ken, and I don't
22 think I ever dealt with Brian Grossman as a felony
23 review assistant in that case.
24  Q  Okay.  And I was actually going to ask you

193

1  that question. So you think this is the only case
2  you worked with Brian Grossman as a felony review
3  attorney?
4      A  I'm pretty sure. Yeah.
5      Q  Okay. Now, I'm handing you what I've
6  designated as Exhibit 10 to your deposition. Do
7  you recognize Exhibit 10?
8          (Caesar Deposition Exhibit 10 marked for
9  identification and attached to the transcript.)
10     A  Yes, ma'am.
11     Q  Okay. What is Exhibit 10?
12     A  It's a statement taken from Anthony Jakes
13 on the night of the 17th -- or the morning of the
14 17th of September.
15     Q  And is that your -- up at the top where it
16 says, Statement of Anthony Jakes, and it says it's
17 taken September 17th, 1991, at 4:30 a.m.; is that
18 right?
19     A  Yes, ma'am.
20     Q  Is that sort of what you just testified to
21 that you met with -- you, Grossman, and Burke met
22 with Mr. Jakes from about 4:00 to 4:30, and then
23 the statement was written down?
24     A  That's the way I recall looking at the

194

1  report.
2      Q  Okay. Okay. And where it says, Present,
3  it says, ASA Brian Grossman and then it says
4  Detective Louis Caesar with Star No. 72; is that
5  your handwriting?
6      A  No.
7      Q  Okay. I think this might be a bad copy,
8  but is that -- did you -- I don't think it
9  captured it on the first page. But on the second
10 page of Exhibit 10, is that your signature?
11     A  Yes, ma'am.
12     Q  And also on -- it probably -- it should be
13 also on Exhibit 1, but I think it was cut off. Is
14 that also your signature on Exhibit 10, page 3 and
15 page 4?
16     A  Yes, ma'am.
17     Q  Okay. Do you have any memory of --
18 there's a couple, you know, corrections throughout
19 the cross outs and then initials for corrections
20 throughout the statement; do you see those?
21     A  Yes, ma'am.
22     Q  Do you have a memory of any of those
23 happening in real time?
24     A  No, ma'am.

195

1          MR. GRILL: Hang on. Can you read back
2  the question, please?
3          (Pending proceedings read.)
4          MR. GRILL: I'm going to object to form.
5      Q  Okay. Did you take any steps to
6  independently verify the accuracy of Mr. Jakes's
7  statement?
8          MR. GRILL: Objection. Form.
9      A  Could you repeat that?
10     Q  Did you take any steps to investigate the
11 accuracy of Mr. Jakes's statement after it was
12 provided?
13         MR. GRILL: Objection. Form.
14     A  I'm not sure what you mean. But I was
15 aware of what Gus was saying, and I was aware of
16 what he was saying, and they seemed to match up.
17     Q  And after those two statements were
18 provided from Mr. Robinson and Mr. Jakes, did you
19 take any further investigatory steps other than
20 those two statements -- strike that.
21         Did you take any investigatory steps on
22 the Garcia homicide investigation to investigate
23 the accuracy of Mr. Robinson's statement?
24         MR. GRILL: Objection. Form. Foundation.

196

1  Misstates also what his actual constitutional
2  obligations and responsibilities are, so it
3  assumes, I guess, facts that are not in evidence.
4          MS. DONNELL: I don't think that's a
5  proper objection and, certainly, questions don't
6  have to be geared toward constitutional rights.
7      Q  So I'm asking -- you can answer the
8  question. Did you take any investigatory steps to
9  verify that what Mr. Robinson had stated was
10 accurate?
11         MR. GRILL: Objection. Form. Foundation.
12     A  After the statements and the charging, we
13 continued to verify some of the things he said in
14 trying to locate Little A and Darren and things
15 like that. I don't know if that's what you're
16 saying.
17     Q  Okay. And did you have any communications
18 with any of those witnesses?
19     A  I didn't personally, no.
20     Q  Okay. Mr. Jakes in his statement says
21 that he was -- let's see. Okay. On page 2 of
22 Mr. Jakes's statement, it says -- he said that
23 Little A then showed Anthony the gun which was
24 sticking out of his waistband and the Anthony

197

1 recognized the gun to be Little A's .380 caliber
2 handgun. Did you make any efforts to locate that
3 handgun --
4        MR. GRILL: Objection. Asked and
5 answered.
6    Q -- that was allegedly used?
7        MR. GRILL: Asked and answered.
8 Mischaracterizes his testimony.
9    A I did not.
10   Q Did you ever -- well, back in 1991 or --
11 '91 and '92, did you ever review Anthony Jakes's
12 statement?
13   A No.
14   Q Have you ever seen it to this day?
15   A I don't believe so. No.
16   Q Did you ever make any investigation into
17 whether Mr. Jakes could have seen what he alleged
18 to have seen from his home about the victim on the
19 ground at 51st Street?
20       MR. GRILL: Objection. Form. Foundation.
21 Calls for speculation.
22   A Did I ever check into that?
23   Q Yeah.
24   A Back then, no.

198

1    Q Did you ever go out to Mr. Jakes's home --
2        MR. GRILL: Objection. Form. Foundation.
3    Q -- where he was living back in September
4 1991?
5    A No.
6    Q Okay. I'm going to show you what I've
7 previously marked as Exhibit 7. For the record,
8 Exhibit 7 is City Jakes 97.
9        (Caesar Deposition Exhibit 7 marked for
10 identification and attached to the transcript.)
11   Q Okay. Do you recognize Exhibit 7,
12 Mr. Caesar?
13   A This is the first time. I don't remember
14 seeing it.
15   Q Okay. You recognize this as a Chicago
16 Police Department arrest report?
17   A Yes, ma'am.
18   Q And this is -- the arresting officer's
19 signature is Thomas Pack, right?
20   A Yes, ma'am.
21   Q Do you know who that is?
22   A I know who (indiscernible).
23   Q Okay. And the second arresting officer is
24 Mike Delacy?

199

1    A Yes, ma'am.
2    Q Okay. And this is the arrest for -- an
3 arrest report for Anthony Jakes?
4    A Yes, ma'am.
5    Q Okay. And do you see here that the report
6 -- some of it is cut off, so I apologize for that
7 in the copying. But it says that -- the report
8 says, Received information that a male black
9 subject by the name of Anthony Jakes, 16 years, of
10 1212 West 51st Street, rear house, was wanted for
11 questioning by Area 3 pertaining to a homicide
12 investigation, right?
13   A I've read that, yes.
14   Q And that these reporting officers
15 proceeded to 1212 West 51st Street to the rear
16 house and spoke to Jessie Mae Jones who was a
17 female black of 42 years old?
18   A I can read that, yes.
19   Q And she was the aunt of Anthony Jakes,
20 right?
21       MR. GRILL: Objection. Foundation.
22   A It's reported that that's -- reportedly,
23 that's the aunt of Anthony Jakes?
24   A That's what the report says. Right.

200

1    Q And this was information you knew back on
2 September 17th, 1991, prior to being present for
3 Mr. Jakes's statement, correct?
4    A I knew he had been picked up at home, but
5 I don't recall seeing this report.
6    Q You don't. Okay.
7        THE REPORTER: Sorry. I can't hear you.
8        MS. DONNELL: Sorry. I had to plug in my
9 computer.
10   Q You recall seeing an arrest report prior
11 to Mr. Jakes's statement you just testified to,
12 right?
13       MR. GRILL: Objection. Asked and
14 answered.
15   A I recall seeing the report that Mike Kill
16 filled out for the first degree murder charge.
17   Q Okay. And I'm going to show you what I've
18 previously marked as Exhibit 11 which has the
19 Bates stamp Plaintiff Jakes 5318. Is this the
20 arrest report you're referring to?
21       (Caesar Deposition Exhibit 11 marked for
22 identification and attached to the transcript.)
23       MR. GRILL: This is Exhibit 11?
24       MS. DONNELL: Yeah.

---

201

1    MR. GRILL:  What was the -- what's this
2 one?
3    MS. DONNELL:  Exhibit 7.
4    Q  Do you recognize Exhibit 11, Mr. Caesar?
5    **A  Yes, I've seen that.**
6    Q  And this is a juvenile field arrest report
7 filled out by Detective Kill?
8    **A  Yes, ma'am.**
9    Q  Okay.  Is this what you were talking
10 about?
11   **A  This is the report I've seen regarding**
12 **this case, yes, the arrest report.**
13   Q  Okay.
14      THE REPORTER:  I just want to remind
15 everyone to keep their voices up.
16   Q  I forgot to ask you.  So after Mr. --
17 after Mr. Jakes provided his statement, ASA
18 Grossman approved charges; is that right?
19   **A  Yes, ma'am.**
20   Q  Does Mr. Jakes -- well, let's see.  Okay.
21      Was it your understanding that Mr. Jakes
22 was already under arrest and in custody at the
23 time his statement was being taken?
24   **A  Yes, ma'am.**

---

202

1    Q  And did you know when he was arrested?
2    **A  I assumed he was considered arrested after**
3 **he gave a statement to Mike Kill, oral statement.**
4    Q  And do you know that he had been
5 previously arrested earlier in the day and charged
6 with narcotics?
7    **A  I was told that, but I didn't know the**
8 **circumstances of that arrest.**
9    Q  Okay.  Who told you that?
10   **A  Mike.**
11   Q  When did Mike tell you that?
12   **A  When he explained to me how Anthony came**
13 **to be there.**
14   Q  What did Mike tell you about how Anthony
15 came to be at Area 3?
16   **A  He said that the tac officers picked him**
17 **up at his home, he had some narcotics on him, he**
18 **was referred to violent crimes, and then Mike and**
19 **Ken talked to him.**
20   Q  Did Mike explain to you how they had --
21 why Anthony Jakes had been picked up by tactical
22 officers?
23   **A  I just understood it was a phone call or**
24 **information that the tac officers received that**

---

203

1 led them to Anthony.
2    Q  And that was related to the -- being
3 wanted for questioning by Area 3 pertaining to a
4 homicide investigation, right?
5    **A  Yeah.**
6       MR. GRILL:  Objection to the form of the
7 question to the extent it mischaracterizes the
8 evidence.
9    Q  I mean, I guess to be clear, he wasn't
10 being arrested by the tac officers for a narcotics
11 investigation; it was for the homicide
12 investigation, that was your understanding, right?
13      MR. GRILL:  Okay.  Form.  Foundation to
14 that question.
15   **A  My understanding, he was looked for as a**
16 **witness or to be interviewed by the tac officers.**
17 **And during that processing, he was arrested for**
18 **narcotics.**
19   Q  And was it your understanding that he was
20 being looked for by the tac officers to be
21 questioned about possible knowledge about the
22 Garcia homicide, right?
23   **A  That's what I was told.  Yes.**
24   Q  Okay.  And that's what Mike Kill told you?

---

204

1    **A  Mike Kill told me that Delacy and Pack had**
2 **gotten -- or Delacy and Pack had gotten**
3 **information that he may be involved.**
4    Q  Do you know -- did you have an
5 understanding of how Delacy and Pack had gotten
6 that information?
7    **A  No, ma'am.**
8    Q  Were you updated on the -- on what had
9 happened over the course of the investigation when
10 you were off duty when you came back on on
11 September 17th, 1991, other than what Mike Kill
12 told you?
13   **A  No.**
14   Q  Do you remember reading any reports on
15 September 17th sometime between 12:00 a.m. and
16 4:00 a.m. on the Garcia homicide investigation?
17   **A  No.**
18   Q  As far as you remember, you didn't do
19 anything with regard to the Garcia investigation
20 between, you know, your conversation with Mike
21 Kill sometime around 12:15 and when you went into
22 the office to be part of the statement; is that
23 right?
24   **A  Correct.**

---

205

1    Q  Okay.  And so for the -- at least with
2  respect to your time on September 17th, 1991, it
3  was -- it was Mike Kill who gave you -- updated
4  you on what had transpired in the investigation,
5  right?
6    A  Correct.
7       MS. DONNELL:  I just need a quick
8  five-minute break.
9       MR. GRILL:  I was just going to ask for
10 one too.  Perfect.
11      MS. DONNELL:  We're going -- let's take a
12 seven-minute break.  We're going to come back in
13 seven minutes.
14      MR. GRILL:  Start the clock.
15      THE VIDEOGRAPHER:  Off the record.  2:36.
16      (A recess was taken.)
17      THE VIDEOGRAPHER:  Back on the record.
18 2:49.
19 BY MS. DONNELL:
20   Q  Okay.  Okay.  So fair to say Mr. -- with
21 respect to the criminal prosecution of Mr. Jakes,
22 there was no physical evidence tying him to the
23 Garcia homicide, true?
24   A  To my knowledge, yes.

---

206

1    Q  It was his statement, right?
2    A  His statement and witness statement.
3    Q  Okay.  You testified at Mr. Jakes's
4  suppression hearing -- sorry.  Hold on one second.
5  I apologize.  I have to update my parking.
6       So you testified at Mr. Jakes's
7  suppression hearing on December 2nd, 1992?  That
8  was Exhibit 1 that you just showed you.
9    A  Yes, ma'am.
10   Q  And I'm going to show you -- do you
11 remember testifying in his criminal trial?
12   A  Not really, no.
13   Q  Okay.  I'm going to show you what I've
14 designated previously as --
15      MS. DONNELL:  Sorry, Court.
16   Q  -- Exhibit 2 to your deposition.  And let
17 me hand you Exhibit 2.
18      (Caesar Deposition Exhibit 2 marked for
19 identification and attached to the transcript.)
20   Q  I'm showing you Exhibit 2 to your
21 deposition.  Have you seen this transcript before?
22 This is from September 9th, 1993, during
23 Mr. Jakes's criminal proceeding.
24   A  I don't recall ever seeing this, no.

---

207

1    Q  Okay.  And I'm going to just call your
2  attention -- so if you want to -- Exhibit 2 -- if
3  you want to, let's see, just turn to the first
4  page where it says, Detective Louis Caesar called
5  as a witness; do you see that?
6    A  Yes, ma'am.
7    Q  Okay.  Does looking at the first two pages
8  of Exhibit 2 refresh your recollection in any way
9  that you testified in Mr. Jakes's criminal trial
10 on September 9th, 1993?
11   A  Apparently, I did, if this is a
12 transcript.  Yes, ma'am.
13   Q  Okay.  And -- let's see.  And do you see
14 initially you were asked some questions by
15 Mr. Neal Godfried who was a state's attorney?
16   A  I see that, yes.
17   Q  Okay.  Do you know Neal Godfried?
18   A  I couldn't picture him, no, but I remember
19 the name.
20   Q  I'm sorry.  Goodfriend.  I'm
21 mispronouncing it.
22   A  Goodfriend.  Yeah.
23   Q  I'm mispronouncing it.  My apologies.  But
24 -- let's see.  If you want to -- do you want to

---

208

1  look over it so I can --
2    A  If I could.
3    Q  Sure.  Take your time.  It's not very
4  long.
5    A  I've read my testimony.
6    Q  Okay.  So I actually only have a few
7  questions, so -- but you've had a chance to review
8  Exhibit 2?
9    A  Yes, ma'am.
10   Q  Does reading Exhibit 2 which is your
11 testimony in Mr. Jakes's criminal proceedings --
12 or criminal trial; did that refresh your
13 recollection in any way as to testifying at his
14 trial?
15   A  I don't recall testifying, to be honest
16 with you.  It refreshes my memory of what
17 happened, but --
18   Q  Does it change your testimony in any way
19 to what you testified to earlier today?
20   A  No.
21   Q  Okay.  And you testified truthfully and to
22 the best of your ability back in September 1993?
23   A  Yes, ma'am.
24   Q  Okay.  Do you remember testifying -- oh,

209

1  sorry.  I had a question for you.  Sorry.  Almost
2  forgot.
3       I'm going to call your attention to pages
4  98 and 99, just at the end of your direct
5  examination.  And calling your attention to page
6  -- it will say 98, but it also looked like a 90.
7  But the Bates stamp is 30967.  Are you with me?
8    **A  I'm with you.**
9    Q  Okay.  Do you see at line 23 after being
10 asked some questions about Mr. Jakes's statement,
11 the prosecutor asked you to identify People's
12 Exhibit 32, right?
13   **A  I see that written.  Yes.**
14   Q  And that was the -- you were asked, Is
15 that the statement taken from Anthony Jakes in the
16 morning of September 17th, 1991, right?
17   **A  Yes, sir -- yes, ma'am.**
18   Q  And then you identified it as being such,
19 correct?
20   **A  Correct.**
21   Q  Okay.  And fair to say you testified about
22 some of your investigation at the scene at
23 Mr. Jakes's criminal trial, right?
24   **A  Yes, ma'am.**

210

1    Q  And then you also testified about being
2  present for his statement?
3    **A  Correct.**
4    Q  Do you remember testifying -- you do
5  remember testifying in Judge Hooks's courtroom,
6  right?
7    **A  Partially, yes.  I remember, yes.**
8    Q  Okay.  And that was in June -- or June 1st
9  -- June 1st, 2016, right?
10   **A  It was five or six years ago, so, yeah.**
11 **Four or five years ago.  '16 sounds right.**
12   Q  Okay.  Do you remember any of the
13 preparation you did to prepare for that hearing?
14   **A  Not really, no.**
15   Q  Did you meet with any of the other
16 detectives who were testifying at the -- in Judge
17 Hooks's courtroom?
18   **A  I'm confusing cases now.  I remember**
19 **sitting down with Detective Mosier somewhere.  I**
20 **don't know if he was on that case.**
21   Q  Okay.  Was Detective Mosier -- was he part
22 of the Harold Hill case?
23   **A  I believe he was part of the Gibson case.**
24 **I'm mixing up cases now.**

211

1    Q  Okay.  He might have been part of the
2  Gibson case.  Okay.  So you remember meeting and
3  talking to Detective Mosier at Judge Hooks's
4  courtroom somewhere at 26th and Cal?
5    **A  I don't remember where it was if it was at**
6  **26th Street or if it was at a law office.  I don't**
7  **remember.  I believe it was downtown.**
8    Q  Did you meet with Detective Mosier with
9  your counsel or outside of the presence of
10 counsel?
11   **A  With counsel --**
12   Q  Okay.
13   **A  -- I don't think --**
14   Q  Were any other detectives -- sorry.
15   **A  As a witness, I believe.  I'm not sure.**
16 **Not as a defendant.**
17      THE REPORTER:  Can you keep your voice up?
18      THE WITNESS:  I'm sorry.
19      MS. DONNELL:  Sorry.  We're getting tired
20 of talking.
21   Q  Do you remember meeting with any of the
22 detectives on the Garcia investigation pertaining
23 to Mr. Jakes's postconviction proceeding around
24 the time of the summer of 2016?

212

1    **A  No, I don't recall.**
2    Q  Okay.  But you remember seeing youth
3  officer Burke in the courtroom, right?
4    **A  Yes.**
5    Q  Okay.  And talking to him and realizing
6  you both went to the same parish?
7    **A  That was brought to my attention again by**
8  **rereading the transcripts from Judge Hooks's**
9  **hearing.**
10   Q  Okay.  And I'm going to hand you what I've
11 designated as Exhibit 3 to your deposition
12 previously.  And this includes testimony other
13 than just your own, actually, so we can -- I can
14 call your attention to that portion of the
15 transcript.  But did you review your testimony
16 from Judge Hooks's courtroom before your
17 deposition?
18      (Caesar Deposition Exhibit 3 marked for
19 identification and attached to the transcript.)
20   **A  Yes.**
21   Q  Okay.  And so -- your testimony starts on
22 page 112; is that right?
23   **A  Yes, ma'am.**
24   Q  Okay.  And so this part of your testimony

213

1  you've reviewed, right?
2      **A  Yes.**
3      Q  Okay.  And I'm going to call your
4  attention to page 122 of your testimony.  And if
5  you want to just review from line 18 to line 22.
6      MR. GRILL:  On page 122?
7      MS. DONNELL:  Yeah.
8      **A  18 to 22, I've read.**
9      Q  18 to 22.  Okay.  And that's your
10  testimony back from 2016.  Would you agree that's
11  consistent with your testimony today that you were
12  relying on Detectives Kill and Boudreau to contact
13  Mr. Jakes's parent or guardian?
14      **A  I didn't see anything in the section I**
15  **read, but --**
16      MR. GRILL:  You said lines 18 to 22, I
17  think.
18      MS. DONNELL:  Oh, 8 to 22.  I'm sorry.  I
19  apologize.  I'm sorry.
20      MR. GRILL:  So start at 8.
21      Q  I'm so sorry.  You can start at 1.  I'm
22  sorry.  You can start at 1.
23      **A  I've read that.**
24      Q  Would you agree that -- how would you

214

1  characterize that; is that consistent or
2  inconsistent with your testimony today?
3      MR. GRILL:  Hang on.  Form.  Go ahead and
4  answer.
5      **A  Consistent.**
6      Q  Okay.  Meaning, you were relying on them,
7  meaning, Kill and Boudreau, to reach out to a
8  parent or guardian?
9      **A  Yes, ma'am.**
10      Q  Okay.  Do you remember being asked about
11  whether -- at the hearing in 2016 in Judge Hooks's
12  courtroom -- whether you and any of the
13  investigating officers had discussed whether it
14  was possible for Mr. Jakes to see what he said he
15  saw when he could see the victim laying on 51st
16  Street from where he lived --
17      MR. GRILL:  Objection.  Form and
18  foundation.
19      Q  -- do you remember reviewing that part of
20  your transcript?
21      MR. GRILL:  From this?
22      MS. DONNELL:  Yeah.  Because he read it
23  before his deposition, so I'm just asking.
24      **A  I recall the discussion of it, but I don't**

215

1  **know if it was from this hearing or when it was.**
2      Q  Okay.  Sure.  So you can look at page 129.
3  And I guess you could read from line 4 down to 24.
4      **A  I've read that.**
5      Q  Okay.  And does that refresh your
6  recollection that back in 2016 you were asked if
7  you and your other officers investigating the
8  Garcia homicide had ever had any discussion about
9  whether Mr. Jakes could see what allegedly saw in
10  his statement, right?
11      MR. GRILL:  Objection.  Form.
12  Mischaracterizes his testimony.
13      Q  You were asked that question, right?
14      **A  What's the question again, please?**
15      Q  Sorry.  You were asked back in 2016 about
16  whether you and your fellow officers had ever had
17  any discussion or debate about whether Anthony was
18  able to see the victim lying in the street from
19  his home?
20      **A  I was asked that.  Correct.**
21      Q  And then you said there was no discussion,
22  that was never discussed?
23      **A  Correct.**
24      Q  Okay.  And that's still true today?

216

1      **A  Yes.**
2      MR. GRILL:  Objection.  Form.
3      Q  Now, earlier today -- and you can please
4  correct me if I'm wrong -- you were testifying
5  that it was your understanding that for
6  interviewing or interrogating a juvenile that it's
7  only when it became accusatory that a parent or
8  guardian needs to be present; is that what you
9  said?
10      MR. GRILL:  Objection.  Mischaracterizes
11  his testimony.
12      Q  You can clarify.  Why don't you just tell
13  me -- what was your understanding?
14      **A  My understanding was once the**
15  **investigation became accusatory or an**
16  **interrogation rather than an interview, the youth**
17  **officer or parent or guardian should -- had to be**
18  **there.**
19      Q  So it was your understanding that it
20  wasn't just when the juvenile became in custody,
21  it's when the interrogation became accusatory?
22      MR. GRILL:  Objection.  Mischaracterizes
23  his testimony.
24      **A  In custody would be accusatory, in my**

217

1  opinion.  So if he was being interviewed, no; if
2  he was being accused, yes.
3      Q  Okay.  What about if he's in custody but
4  being questioned in a nonaccusatorial fashion?
5      MR. GRILL:  Objection.  Mischaracterizes
6  his testimony --
7      MS. DONNELL:  I'm trying to understand
8  this.
9      MR. GRILL:  -- it's an incomplete
10  hypothetical.  Well, your -- yeah.  I won't jump
11  in further.
12     A  A parent or guardian or youth officer, if
13  available, could be there or can be there, but
14  it's not required.
15     Q  So when you bring a 13 or 14 year old into
16  custody, it's preferable to have -- your
17  understanding of the rule was that it's preferable
18  to have a parent or guardian there if they're
19  going to be questioned -- sorry, let me strike
20  that.
21     MS. DONNELL:  Because you're about to --
22     MR. GRILL:  Yep.  Go ahead.  Try it again.
23     Q  When you brought -- let's say you -- back
24  in the early '90s when you had a juvenile who you

218

1  wanted to bring in for questioning about possible
2  knowledge of a homicide, would you make an effort
3  to bring a parent or guardian or other adult with
4  that juvenile?
5      MR. GRILL:  Hang on.  Incomplete
6  hypothetical.  That calls for speculation.  Form.
7  Go ahead.
8      A  We would try, yes.
9      Q  And that's because when we looked at
10  Exhibit 23, general order 87-7, it was -- the
11  order says to have a parent or guardian present
12  when you're advising them of their warnings, the
13  Miranda Warnings, right?
14     A  Yes.
15     Q  You want to make sure that they fully
16  understand those warnings and waive them, right?
17     A  Yes, ma'am.
18     Q  And then if you're going to interrogate a
19  juvenile, you're supposed to have someone present
20  with them, right?
21     A  Interrogate, yes.  Not interview.
22     Q  So if you were going to just interview
23  juveniles about being a possible witness of a
24  homicide, you wouldn't necessarily have a parent

219

1  or guardian with them?
2      MR. GRILL:  Hang on.  That's a
3  hypothetical.  Calls for speculation.  Form.  Go
4  ahead.
5      A  We would try, but it was very rarely
6  practical.  Me and my partner would.
7      Q  What if you didn't know whether this
8  individual was just a witness or possibly
9  involved?
10     MR. GRILL:  Same objection.  Form.
11  Incomplete hypothetical.  Mischaracterizes --
12  foundation.  Calls for speculation.  Go ahead.
13     A  I'm not sure what the question was there.
14     Q  I can ask it again.
15     Well, if you're going to pick up a
16  juvenile to question them about their knowledge of
17  a homicide but you don't know at the time whether
18  they just witnessed it or had some involvement in
19  the homicide, would you err on the side of caution
20  and ask for a parent or guardian to come with you?
21     MR. GRILL:  All right.  So that's an
22  incomplete hypothetical.  That calls for
23  speculation.  Form.  Assumes facts not in
24  evidence.  Go ahead.

220

1      A  Whenever me and my partner would try to
2  interview possible suspects, juvenile suspects, we
3  tried to get an adult or a parent there.  It was
4  very often impractical.
5      Q  And why was it very often impractical?
6      A  Because many of the juveniles didn't have
7  that relationship with their parents or guardians
8  to contact them or get them there or there wasn't
9  availability or time to spend on waiting around
10  for parents and guardians for hours and hours.
11     Q  But for the individual juveniles that you
12  were interviewing in a homicide investigation
13  where you had a parent or guardian contact and
14  they had a relationship where it wasn't requiring
15  any additional, you know, delay, you would have
16  the parent or guardian come down with you?
17     MR. GRILL:  Form.  Foundation.  Calls for
18  speculation.  Incomplete hypothetical.
19     A  Sometimes.  Yes.
20     Q  Would you agree that was best practice?
21     MR. GRILL:  Objection -- same objections.
22     A  It was probably best practice, but it was
23  impractical in most cases, in my opinion,
24  impractical.  It took too much time and wasted

221

1  time.  Every interview would have to be done hours
2  and hours spent waiting for a parent.
3      Q  How about if the parent or guardian was at
4  the area and right there available to be part of
5  the interview, would you then include them in it?
6      MR. GRILL:  Hang on.  Incomplete
7  hypothetical.  Calls for speculation.
8  Mischaracterizes the evidence as well.
9      Q  You can answer.
10     A  Yes.  Definitely.  It's happened.
11     Q  What's that?
12     A  It's happened to me numerous times.
13     Q  What's happened numerous times?  Where the
14  parent or guardian is with the juvenile at the
15  Area?
16     A  Comes to the Area or gets notified and
17  shows up, yeah, we let them talk.
18     Q  Okay.  Can you think of any reason or --
19  why you wouldn't include a parent or guardian if
20  you're going to interrogate a juvenile in a
21  homicide investigation if they're present at the
22  Area?
23     MR. GRILL:  Incomplete hypothetical.
24  Calls for speculation.  Form.  Go ahead.

222

1      A  No.
2      Q  Okay.  Okay.  Do you recall your
3  involvement in a murder investigation also from
4  1991 of Hicks -- I can get you the first name --
5  in which you interrogated another juvenile,
6  Tyshawn Ross?
7      A  I remember the name, but I don't know the
8  circumstances of the --
9      MR. GRILL:  (Indiscernible.)
10     THE REPORTER:  I can't hear you guys.
11  Sorry.
12     MR. GRILL:  I had asked if this was the
13  Gibson case that she was referring to.  She said
14  no.
15     MS. DONNELL:  That's from '80.
16     Q  Okay.  So you remember the name Ross or
17  you remember the name Hicks?
18     A  I don't remember Wicks at all.  I remember
19  Tyshawn Ross.
20     Q  Okay.  What do you remember about Tyshawn
21  Ross?
22     A  Just the name.  If you gave me a location
23  or a victim's name, I might remember more.
24     Q  Sure.  I'll give you the victim's name.

223

1  Let's see.  It might be Shawn Ross.  Let's see.
2      A  Shawn Wicks.
3      Q  It was Hicks.  H-I-C-K-S.  Hold on one
4  second.  Wicks maybe.  Wicks.  Sorry.  W-I-C-K-S.
5  Shawn Wicks.
6      A  I vaguely remember some bits and pieces of
7  that case.
8      Q  Okay.  And it was a murder from June 1991,
9  I think June 3rd, 1991?
10     A  Right.  Well, I don't remember the dates,
11  but I remember Shawn Wicks was a white kid from
12  the suburbs that got shot.
13     Q  Yes.  That's right.  He was a student at
14  -- I forget which high school, but out in the
15  suburbs.
16     A  Hersey or something like that in Arlington
17  Heights, I believe.
18     Q  Yes.  That's right.  Okay.  That's the --
19  do you remember that homicide investigation?
20     A  Just -- I don't remember the names and
21  what each individual did, but I knew it was
22  something to do with he knew kids from the
23  neighborhood here in the city and they went out to
24  buy drugs and they flipped on one another and it

224

1  was a robbery gone bad.
2      MR. GRILL:  You've got copies, I think,
3  Heather.  So if I can get one --
4      MS. DONNELL:  Sure.
5      MR. GRILL:  -- that would be great.
6      MS. DONNELL:  You have them.  I've already
7  given you the exhibits, but that's fine.  I'm
8  going to show you Exhibit --
9      MR. GRILL:  No.  You've got four copies of
10  whatever you've got.
11     MS. DONNELL:  Of course.  And thank you.
12  I'm allowed to ask him what I know.
13     MR. GRILL:  I know.  You were telling me
14  as if I already have it.
15     MS. DONNELL:  You do.  You have all the
16  exhibits electronically.
17     MR. GRILL:  No.  I'm talking about the
18  hard copies sitting in front of you.  Gee-whiz.
19     MS. DONNELL:  This is going to be an
20  impossible case.
21     MR. GRILL:  It's not going to be because
22  of me, I can tell you that.
23     MS. DONNELL:  I'm not going to respond to
24  you.  It's not pleasant for Mr. Caesar to have our

225

1  squabbling.
2  BY MS. DONNELL:
3      Q  Okay.  So -- yes.  So it's a murder of a
4  kid, Wicks, from the suburbs.  Do you remember --
5  so you don't remember anything more about the
6  investigation?
7      MR. GRILL:  Hang on real quick.
8      MS. DONNELL:  Well, we're allowed to use
9  it in the deposition with the --
10     MR. GRILL:  I just don't remember.
11     MS. DONNELL:  If we can just pause for one
12  second.
13     MR. GRILL:  Yeah.  Let's just pause for
14  one second.
15     MS. DONNELL:  Let's -- we're going to go
16  off the record for a second.
17     MR. GRILL:  Yeah.  Can we go off the
18  record for one second, please?
19     THE VIDEOGRAPHER:  Are we going off the
20  record?
21     THE REPORTER:  Yes, Rick.  We're going
22  off.
23     THE VIDEOGRAPHER:  Off the record.  3:19.
24     (An off-the-record discussion was held.)

226

1      THE VIDEOGRAPHER:  Back on the record.
2  3:34.
3      MS. DONNELL:  Okay.  Per my discussion
4  with Counsel for defendants who's representing the
5  position of all defendants, both parties have
6  agreed we're going to proceed with Exhibit 17 as
7  it's been produced by the City.  When the City
8  reproduces -- or produces it in its redacted form,
9  Exhibit 17 will be substituted with the redacted
10  version of Exhibit 17.  And the version Exhibit 17
11  that we're using right now is already marked
12  confidential and so it's -- the protective order
13  is applicable to it anyway.
14     Okay.  We're going to proceed?
15     MR. GRILL:  Mm-hmm.
16     MS. DONNELL:  Okay.
17     MR. GRILL:  That's a yes.
18  BY MS. DONNELL:
19     Q  Do you have Exhibit 17 or did we take it
20  from you?
21     A  I don't think I ever got it.
22     MR. GRILL:  I just have mine.
23     Q  Okay.  I'm going to give you Exhibit 17.
24  Okay.  But -- okay.

227

1      (Caesar Deposition Exhibit 17 marked for
2  identification and attached to the transcript.)
3      Q  So I was asking you -- you had some --
4  well, I'm not going to have you read through the
5  whole CR.  What I've handed you, Exhibit 17, has
6  been produced by the City in this case.  It's
7  complaint register file 185626, and it's Bates
8  stamped City Jakes 19836 consecutive through
9  19935.
10     And I'm going to ask you some questions
11  and you can refer to this as we go.  But before we
12  talk about this, do you -- I was asking you about
13  the Wicks homicide investigation which was of a
14  young teenager from the suburbs who was killed in
15  a robbery gone bad after he was here trying to
16  allegedly purchase some drugs, right?
17     A  You want me to go into what I remember
18  from memory?
19     Q  Yeah.
20     A  I remember that it was a white kid that
21  had gone to school in Arlington Heights.  I want
22  to say it was Hersey High School, but I'm not sure
23  of the name.  And some of the black kids from the
24  neighborhood had gone to school out with there

228

1  with him, so they became friends.  He came into
2  the city, they set him up pretending to go buy
3  drugs, from what I remember, and he knew who shot
4  him, because it was one of my friends.  That's
5  vaguely what I remember.
6      Q  Okay.  Do you remember being present for
7  the questioning of Tyshawn Ross, one of the
8  individuals in that --
9      A  I remember the name, but I don't remember
10  the questioning.
11     Q  Okay.  And do you remember a CR being
12  filed against you and your partner, Jack McCann?
13     A  Now that I see it, yes.
14     Q  Okay.
15     THE REPORTER:  What was that answer?
16     THE WITNESS:  Now that I see it, yes.
17     Q  Okay.  So -- and, you know, I'll just --
18  so there's a complaint made against you and
19  Detective McCann by John M. Raba who was the
20  medical director of Cook County Hospital?
21     A  Correct.
22     Q  Okay.  Does that refresh your recollection
23  about this CR?
24     A  No, not really.

229

1    Q   Okay.  The allegation as to Detective
2  McCann is that he had used electrical shock on
3  Tyshawn Ross in the course of his interrogation;
4  do you remember that allegation?
5    A   Now that I read it, yes.
6    Q   Okay.  And the allegation against you is
7  that you had stomped on Mr. Ross's foot and
8  accused him of lying; do you remember that
9  allegation against you?
10   A   I remember that allegation against me and
11 my partner, yes.
12   Q   Okay.  And, in this case, there was
13 another complainant, Murline Ross, who was the
14 grandmother of Tyshawn Ross; do you remember that
15 the grandmother had complained as well?
16   A   I can see it here, yes --
17   Q   Okay.
18   A   -- I don't remember it.
19   Q   And she stated in her complaint that on
20 June 4th, 1991, around 10:00 p.m. that she had
21 come into Area 3 with her grandson, Mr. Ross; do
22 you see that?
23   A   Is that in some report or --
24   Q   Yeah.  I'm looking on page 2.

230

1    A   I don't remember, no.
2    Q   On page 2, there's a summary of the
3  allegation?
4    A   Yes.
5    Q   And in that second paragraph it says,
6  Complainant, Murline Ross, grandmother of the
7  victim stated that on 4 June '91 after 10:00 p.m.
8  she took her grandson to Area 3 Police Station
9  where two male white detectives questioned him in
10 her presence?
11   A   Yes.
12   Q   Do you remember that, having Mr. Ross, who
13 was 17 at the time, with his grandmother present
14 at Area 3 for questioning?
15   A   No, not really.  No, not at all.
16   Q   So the answer is not at all?
17   A   Yeah.
18   Q   Okay.  And that part of the -- the
19 complainant's allegations that you and Detective
20 McCann questioned her grandson in her presence is
21 consistent with what you understood the policy to
22 be at the time, right?
23   A   Yes, ma'am.
24   Q   Okay.  And then Murline Ross, the

231

1  grandmother, said during the questioning the tall
2  Detective punched her grandson in the side with a
3  baton; do you see that?
4    A   I see the allegation, yes.
5    Q   Did you witness -- and I'll represent to
6  you that -- well, I won't represent to you.  Was
7  Jack McCann taller than you?
8    A   Yes, ma'am.
9    Q   How much taller?
10   A   6'2".  I'm 5'9".  5'8", 5'9".
11   Q   So if the two of you are together
12 and somebody describes one as the taller and one
13 as the shorter, you would be the shorter one,
14 right?
15   A   Yes, ma'am.
16   Q   Okay.  And she said that -- well, do you
17 remember Jack McCann hitting a juvenile with a
18 baton?
19   A   Jack never hit anybody in my presence.
20   Q   So you deny that occurred?
21   A   Yes, ma'am.
22   Q   And then Mr. Murline Ross made the further
23 statement that the shorter detective kicked her
24 grandson on the foot and verbally was abusive to

232

1  him?
2    A   I see the allegation.
3    Q   And that allegation was against you,
4  right?
5    A   Yes, ma'am.
6    Q   And do you -- what's your position on that
7  allegation; did that happen?
8    A   I've never done that.
9    Q   So you deny kicking Mr. Ross in the foot?
10   A   Or anybody.
11   Q   Okay.  Mr. Tyshawn Ross alleges that his
12 grandmother went with him to Area 3 where he was
13 questioned in a room by two white male detectives
14 in his grandmother's presence; and he stated that
15 the shorter of the detectives said he was a damn
16 liar.  Do you see that allegation in paragraph 3?
17   A   Yes, ma'am.
18   Q   Did you call Mr. Ross a damn liar?
19   A   I don't believe so, no.
20   Q   Okay.  Is that something you could have
21 said?
22   A   No.  I could have said, I don't believe
23 you, but I wouldn't say damn liar.
24   Q   Have you ever used damn liar in the

233

1  context of an interrogation?
2  **A. No.**
3  Q  Okay.  Then the allegation was that the
4  taller detective took him to another room,
5  handcuffed him -- his wrist to the ring in the
6  wall, and informed him that the victim of the
7  crime, Ross, that he was being implemented in --
8  onto page 3 -- had identified him, Ross.  I'm
9  sorry.  This was that Wicks had identified Ross,
10 right?  And then Ross apparently --
11 **A. I'm lost.**
12 Q  We're on page 19839.
13 **A. Okay.**
14 Q  Then Ross said he didn't have any
15 information to tell you -- tell about the Wicks
16 murder, right?
17 **A. I see that, yes.**
18 Q  Do you have any -- does this refresh your
19 recollection at all of your interrogation of
20 Mr. Ross --
21 **A. No.**
22 Q  -- when you see this?  Okay.  If it does,
23 will you let me know?
24 **A. Sure.**

234

1  Q  And then Ross states that he heard the
2  detective tell his grandmother that she could
3  leave.  And that after his grandmother left, the
4  taller detective came back and informed him that
5  he was going to see the assistant state's
6  attorney, right?
7  **A. I see where it says that, yes.**
8  Q  And then the allegation is that he and the
9  taller detective were in the room with the female
10 black state's attorney.  She read a statement to
11 him that implicated him in the crime and he
12 refused to sign it; do you see that?
13 **A. I see that.  Yes.**
14 Q  Now, you're not alleged to have been
15 present for that.  But did your partner, Jack
16 McCann, ever tell you anything that would be
17 consistent with those facts?
18 **A. No.  I don't recall this at all, a refusal**
19 **to sign a statement.**
20    THE REPORTER:  Sorry.  You're getting very
21 faint again.
22    THE WITNESS:  I don't recall any refusal
23 to sign a statement at all.
24 Q  After it's stated that after he refused to

235

1  sign that statement, that it was already prepared,
2  that he was taken back to the room next to the
3  caged cell, handcuffed to the ring on the wall,
4  and that the same detective, meaning, the taller
5  detective, pulled down his pants, tore a hole in
6  the front of his underwear, and he was repeatedly
7  applied an object that gave off an electrical
8  shock to the upper part of his thigh.
9  **A. I read that.**
10 Q  And you deny that happened?
11 **A. Definitely.**
12 Q  Did you ever see an electrical black box
13 or an electric device at Area 3 when you were
14 there?
15 **A. No.**
16    MR. GRILL:  Objection.  Hang on.
17 Objection.  Form.  Foundation.
18 Q  And then Ross described that the pain was
19 so great that he signed the statement that
20 implicated himself in the crime, right?
21 **A. I see where it says that, yes.**
22 Q  And then he described the object that he
23 was shocked with being about ten inches long,
24 three inches wide, and about two inches thick?

236

1  **A. I see that, yes.**
2  Q  And that he also said that this detective
3  repeatedly referred to him with a racial slur,
4  right?
5  **A. I see that, yes.**
6  Q  Did you ever hear Detective McCann use a
7  racial slur with black suspects or witnesses?
8  **A. Not really.**
9     MR. GRILL:  Hang on.  Objection.  Form.
10 Foundation.  Calls for speculation.
11 Q  What do you mean by not really?
12 **A. I've never heard him use the term, no.**
13 Q  You were not -- the allegations against
14 you were not sustained, right?
15 **A. I believe so.  I don't recall exactly.**
16 Q  But you gave a statement with -- you had
17 to go give an actual statement in the CR
18 investigation, right?
19 **A. I -- probably, yes.**
20 Q  I'm going to call your attention to page
21 City Jakes 19920.
22 **A. 99?**
23 Q  19920.  Did you ever have that occur when
24 you worked with -- you and Jack McCann -- were

237

1 interrogating a juvenile, you have a parent or
2 guardian present, and you tell them to leave and
3 you keep going on with the interrogation after you
4 tell the parent or guardian to leave?
5    MR. GRILL: What page are we on?
6    MS. DONNELL: I'm not asking -- we're
7 going to go to 19920, but this is not on that
8 page.
9    MR. GRILL: Got it. Okay.
10   **A  Have we ever told a parent to leave?**
11   Q  Yeah. If you have the parent present.
12   **A  No.**
13   Q  Never did that?
14   **A  No.**
15   Q  And that would be improper, right?
16      MR. GRILL: Objection. Form. Foundation.
17 Calls for speculation.
18   **A  To tell them to leave?  Yes.**
19   Q  And then continue an interrogation?
20   **A  Yes.**
21   Q  So you deny doing that with respect to
22 Mr. Ross or anyone else?
23   **A  Correct.**
24   Q  So you were provided this statement in the

238

1 context of this complaint register file
2 investigation on September 27th, 1991; is that
3 right?
4    **A  Could you repeat that?**
5    Q  Sure. Do you -- you don't recall giving a
6 statement for this CR investigation, do you?
7    **A  No, I don't.**
8    Q  And I'm going to call your attention to
9 page City Jakes 19920; do you see that?
10   **A  Yes.**
11   Q  And up at the top it says, Office of
12 Professional Standards, right?
13   **A  Yes, ma'am.**
14   Q  And you see the date, 27 September '91?
15   **A  Correct.**
16   Q  And then you see, Statement of accused,
17 Detective Louis Caesar, with your star number?
18   **A  Yes.**
19   Q  And this is related to the complaint by
20 Murline Ross, Tyshawn Ross, right?
21   **A  Correct.**
22   Q  That you physically and verbally abused
23 him?  That's up at the top.
24   **A  Yes, ma'am.**

239

1    Q  And you were questioned by Investigator
2 Dennis Crosby?
3    **A  Apparently, yes.**
4    Q  And you had your lawyer present with you,
5 right?
6    **A  Yes, ma'am.**
7    Q  Okay. And that was your -- Arthur
8 Neville?
9    **A  I didn't know him personally, but it
10 appears to be an FOP attorney.**
11   Q  Okay. And that's your signature down at
12 the bottom of page 19920?
13   **A  Yes, it is.**
14   Q  And you can look at page 19921, the rest
15 of your -- this is sort of a typewritten, I guess,
16 summary of the back and forth, right?
17      MR. GRILL: Objection. Form.
18   Q  Strike that.
19      You didn't prepare this report, but you
20 signed it, right?
21   **A  Yes, ma'am.**
22   Q  And you signed both pages?
23   **A  Yes.**
24   Q  And you had an opportunity to review it

240

1 before you signed it?
2    **A  Apparently, yes.**
3    Q  Do you have any memory of these questions
4 being asked and the answers you gave?
5    **A  Not really, no.**
6    Q  Was this the only time you were
7 interviewed by OPS for a CR investigation?
8    **A  One of the few.  Maybe two or three.  I
9 don't remember going down.  I remember sometimes
10 doing it.**
11   Q  Like a to/from memo?
12   **A  To/from memo.  Yeah.**
13   Q  Yeah. You don't remember having to
14 actually get interviewed very often?
15   **A  No.**
16   Q  Okay. Do you see the next page of
17 Exhibit 17 is Mr. Tyshawn Ross's statement on June
18 5th, 1991, at 4:00 a.m. at Area 3 with ASA Michael
19 McDowell and Detective John McCann, right?
20   **A  Correct.**
21   Q  Okay. We can put that aside for now.
22 Okay. I'm going to ask you some questions about
23 another CR investigation. This is what was
24 previously marked as Exhibit 16. I don't think

241

1  this has the same issue.
2      (Caesar Deposition Exhibit 16 marked for
3  identification and attached to the transcript.)
4      MR. GRILL:  Yeah, it does.
5      MS. DONNELL:  It's the same thing?  I
6  don't know why where there's some redactions and
7  then it still has it.  It's not entirely clear to
8  me.
9      MR. GRILL:  So it will be the same
10 stipulation with this one too.
11     MS. DONNELL:  All right.  We'll have the
12 same stipulation.  Although, for the record, both
13 Exhibit 16 and Exhibit 17 do have redactions like
14 officers' date of birth or victim's date of birth.
15 There are some redactions.  And then there's two
16 pages marked AEO for whatever reason on the whole
17 document.  So --
18     MR. GRILL:  They are what they are.  And
19 they're marked the way they are.  So --
20     MS. DONNELL:  But, George, I think --
21     MR. GRILL:  This will be what, Exhibit 18?
22     MS. DONNELL:  I'm making -- no.  This was
23 previously marked as Exhibit 16.  George, we're
24 crossing what the City produced -- I think it was

242

1  supposed to already by the State, so, obviously,
2  we need them produced.  So --
3      MR. YAMIN:  Right.
4  BY MS. DONNELL:
5      Q  Okay.  Detective Caesar, do you remember
6  allegations by Greg Logan?  It was also a civil
7  suit against you 93C3386; do you remember either
8  the civil suit or the corresponding CR
9  investigation?
10     A  Not really -- no.  No.
11     Q  And this is an allegation that Mr. Logan
12 was asleep at his home at 6912 South Cornell and
13 he was arrested unlawfully and broken into his
14 home and that Detectives Caesar, Foley, and
15 O'Brien illegally searched his vehicle and tore
16 out the seats?
17     A  Can you read that?
18     Q  Does that refresh your recollection about
19 this allegation and the corresponding civil suit?
20     A  No.
21     Q  Were you deposed in this civil suit, do
22 you know?
23     A  Not that I recall.
24     Q  Okay.  Do you remember it being dismissed?

243

1      A  I don't recall it at all.
2      Q  Okay.  In this, Mr. Logan further
3  identifies that when he was interviewed at 3900
4  South California that Detective O'Brien beat him
5  with a bat?
6      A  I can see that.
7      Q  Okay.  With keys attached to it, right?
8      A  Yes.
9      Q  And that he was denied legal counsel and
10 that you and Detective McCann arrested him on
11 charges of three counts of aggravated battery and
12 one count of first degree murder?
13     A  That's what it says.
14     Q  Okay.  And this was arising out of a
15 homicide investigation of Ms. Kathryn Myles, and
16 the address was 6551 South Wolcott?
17     A  I don't recall that.
18     Q  Do you remember that murder from June 9th,
19 1991?  No?
20     A  No.
21     Q  It was in fairly close proximity to the
22 Wicks murder that we were just talking about; does
23 that refresh your recollection?
24     A  No.

244

1      Q  Okay.  For this investigation, I think you
2  just had to submit a CR -- I mean, a to/from
3  report.  Let me see.  If you call attention to --
4  if you look at page 20300, it's towards the back.
5  It's maybe the last 12 pages.  Mr. Logan also went
6  by Greg Reed; does that refresh your recollection
7  in any way?
8      A  The name Gregory Reed comes to mind.
9      Q  What does that -- do you remember Gregory
10 Reed?
11     A  Just that (indiscernible).
12     THE REPORTER:  I couldn't hear your
13 answer.
14     THE WITNESS:  Just that there was a CR
15 complaint by him.
16     Q  Okay.  And on page City Jakes 20300, do
17 you recognize that as the to/from you submitted
18 dated August 11th, 1993, to Commander Nevels?
19     A  Yes.
20     Q  And this was with regard to the OPS
21 investigation by Gregory Logan/Reed?
22     A  Yes.
23     Q  And it was one allegation of physical
24 abuse and the like for the arrest related to the

245

1  murder of 14-year-old Kathryn Myles?
2  **A  I see that, yes.**
3  Q  Okay.  Does that refresh your recollection
4  of this homicide investigation?
5  **A  No.**
6  Q  So it looks like that you appeared at OPS
7  on June -- July 27th, 1993, to make a statement,
8  but you didn't end up having to make a statement,
9  Investigator Deligio just said to do a to/from?
10  **A  I see it's written that, yes.**
11  Q  And this is what you wrote, right?
12  **A  Yes.**
13  Q  That's your signature at the bottom?
14  **A  I don't recall typing it, but it's got my**
15  **signature on it.**
16  Q  And it's -- it's a memo to Commander
17  Nevels from you, right?
18  **A  Correct.**
19  Q  And that was your commander once you got
20  transferred to Area 2?
21  **A  When I first got there, apparently,**
22  **because I don't remember Commander Nevels.**
23  Q  Okay.  And in this, you deny the
24  allegations of physical abuse made by

246

1  Mr. Logan/Reed, right?
2  **A  Let me read a little.**
3  Q  Sure.
4  **A  Question again, please.**
5  Q  You denied any -- committing any
6  misconduct with respect to Mr. Logan/Reed?
7  **A  Yes, ma'am.**
8  Q  Did you observe Mr. McCann hit Mr. Reed?
9  **A  I don't recall the incident.  I don't**
10  **recall dealing with Mr. Reed.**
11  Q  You don't have any memory one way or the
12  other?
13  **A  No.**
14  Q  Okay.  I'm going to ask you some questions
15  now about your interaction with Peter Williams.
16  Okay?
17  **A  Yes, ma'am.**
18  Q  And you know who I'm talking about?
19  **A  Yes.**
20  Q  Okay.  And you took a statement from Peter
21  Williams in the Terry Bishop homicide
22  investigation; is that right?
23  **A  Correct.**
24  Q  Okay.  And that was a homicide back in

247

1  January of 1992?
2  **A  I forget the date, but it was around then.**
3  Q  And this is when you were still at Area 3,
4  right?
5  **A  Yes, ma'am.**
6  Q  Okay.  And you read the deposition that
7  you gave in the Hill case, right?
8  **A  Yes, ma'am.**
9  Q  And that pertained to this investigation
10  and your involvement with Mr. Williams, right?
11  **A  Correct.**
12  Q  And, basically, I mean, I think you have a
13  memory, but do you have a memory of Mr. Williams
14  telling you when you were interviewing him in the
15  context of the Bishop homicide that he had just
16  provided a court-reported statement confessing to
17  involvement in the Morgan homicide in which he
18  realized he was incarcerated at the time of the
19  murder, right?
20  MR. GRILL: I'm going to object to the
21  extent that it mischaracterizes the evidence.
22  **A  I didn't know which homicide, but I**
23  **remember when I talked to him he said something to**
24  **the effect, I gave a statement and I think I was**

248

1  in custody then.
2  Q  Okay.  And what do you recall doing once
3  Mr. Williams told you that he just gave a
4  statement on a murder, not identifying which one,
5  and he thinks he might have been in custody --
6  MR. GRILL: Um --
7  Q  -- what did you do when Mr. Williams gave
8  you that information?
9  MR. GRILL: (Indiscernible.)
10  THE REPORTER: Mr. Grill, I'm sorry.  I
11  can't hear you.
12  MR. GRILL: Sorry.  My objection is to the
13  extent that these questions cross over into the
14  Gibson case.  So you can go ahead.  I'm just -- at
15  some point here --
16  MS. DONNELL: Well, let's do this.  Why
17  don't we just pause for a second, and let me find
18  out -- let's take a pause and go off the record,
19  and let me talk to Mr. Grill and find out what
20  we're doing, because I don't know what we're
21  doing.  So why don't we do that and that will help
22  me.
23  MR. GRILL: Sorry, Louis, if you wouldn't
24  mind stepping out.  I appreciate it.

249

1    THE VIDEOGRAPHER: Off the record. 3:59.
2    (An off-the-record discussion was held.)
3    THE VIDEOGRAPHER: Back on the record.
4 4:02.
5 BY MS. DONNELL:
6    Q  Okay.  I'm going to just proceed to ask
7 you questions about the Terry Bishop and Morgan
8 homicide investigations.  Okay?
9    **A  (No verbal response.)**
10    Q  Okay.  So I think where we were at is you
11 were speaking with Mr. Pete Williams in the
12 context of your investigation of the Bishop
13 homicide, right?
14    **A  Correct.**
15    Q  And in the context of that interview or --
16 were you interrogating him, Mr. Williams?
17    **A  The second time I talked to him, yes.**
18    Q  Okay.  And when he told you that he may
19 have been incarcerated during the time of another
20 homicide he just provided a statement in, was that
21 the first or second time you talked to
22 Mr. Williams?
23    **A  I had talked to him on previous occasions.**
24    Q  Okay.  So this was your interrogation of

250

1 him, right?
2    **A  Yes.**
3    Q  Okay.  So you're interrogating him about
4 his participation in the Bishop homicide, right?
5    **A  Yes, ma'am.**
6    Q  And what did he convey to you?
7    **A  About the Terry Bishop homicide?**
8    Q  No.  I'm sorry.  The Morgan.
9    **A  All he said was -- I don't remember the**
10 **name Morgan.  I don't remember the details of the**
11 **murder.  But when I was asking him about the Terry**
12 **Bishop homicide, he interrupted me, and he asked**
13 **me if I could find out when the murder he had**
14 **previously confessed to occurred.**
15    Q  And did you already know that he had
16 previously confessed to another murder?
17    **A  I understood he had given a statement, and**
18 **I didn't know if he had been charged yet.  I was**
19 **waiting for that investigation to more or less**
20 **conclude that night so I could take over my**
21 **investigation.**
22    Q  Okay.  And you knew that Ken Boudreau was
23 on that other investigation, right?
24    **A  I probably did if he was, but I want to**

251

1 **say Jack Halloran -- I remember Mike Rogers,**
2 **basically, from my conversations after he told me**
3 **that.  I don't remember talking to detectives**
4 **about it.**
5    Q  And Mike Rogers was a state's attorney,
6 right?
7    **A  Yes, ma'am.**
8    Q  And he was a felony review attorney that
9 was out at Area 3?
10    **A  Correct.**
11    Q  Okay.  And was he the -- he was working
12 both homicides at that point, right?
13    **A  Yes, ma'am.**
14    Q  Okay.  And so you remember talking to Mike
15 Rogers about what Mr. Williams had told you?
16    **A  Yes, ma'am.**
17    Q  Do you remember talking to Ken Boudreau or
18 Jack Halloran?
19    **A  No.**
20    Q  Okay.  But what do you remember telling --
21 relaying to Mike Rogers?
22    **A  I remember going out, and I don't know if**
23 **I -- I remember telling Mike something to the**
24 **effect of, I don't know, you might want to look**

252

1 **into this, Pete's saying that he was in custody at**
2 **the time of the murder you just took his statement**
3 **in.**
4    Q  Did you know he had just provided a
5 court-reported statement?
6    **A  I didn't know if it was court-reported or**
7 **handwritten.  I was just told he gave a statement.**
8    Q  Okay.  Did you have concerns that Pete
9 Williams had just falsely confessed to a crime
10 that he wasn't -- couldn't possibly have committed
11 because he was in custody at the time?
12    MR. GRILL: Objection. Calls for
13 speculation.  Assumes facts not in evidence.  It
14 mischaracterizes the evidence.
15    **A  I initially figured out it's just another**
16 **bullshit alibi, but I felt it was serious enough**
17 **to tell somebody about.**
18    Q  Okay.  And you later learned that, in
19 fact, that was true, he had been in custody at the
20 time of the homicide, right?
21    MR. GRILL: Objection. Form. Foundation.
22 Go ahead.
23    **A  To this day, I'm not sure if that was, in**
24 **fact, a fact, but I believe he was, yes.**

253

1    Q  Okay.  Well, did you know that -- did you
2  have -- do you have any knowledge that later in
3  the investigation Ken Boudreau stated that he had
4  figured it out that he had been in custody at Cook
5  County at the time?
6        MR. GRILL: Object to form.  Go ahead.
7    **A  I never knew anything about that until I**
8  **read it in one of the reports the other day.**
9    Q  Is it fair to say that you took that
10  information -- sorry.  Strike that.
11       You just said that information was
12  significant enough to you that you relayed it to
13  least Mike Rogers, right?
14   **A  I know I told somebody in my office too.**
15  **I don't know if it was Sergeant Bonke or the**
16  **sergeant or if it was Ken or Jack Halloran, but I**
17  **know I told Mike Rogers.  I remember telling Mike**
18  **Rogers.**
19   Q  Yeah.  So you have an actual memory of
20  that.  Why was it again that you wanted to let
21  Mike Rogers know that?
22   **A  Because I understood he was possibly going**
23  **to handle my case.  That's what I was concerned**
24  **about.  I asked him when he came in, Mike, are you**

254

1  **going to be here to handle my murder and my**
2  **statement if I get one.**
3    Q  Because you didn't want him to get caught
4  up in the other one and not be there for yours?
5    **A  No.  I knew he was involved in that one**
6  **and it was the same defendant, he had just doubled**
7  **it, so I figured he would be handling it.  But he**
8  **didn't give me an answer when I first asked him**
9  **before I went in.  I says, Mike, should I call**
10  **another state's attorney or are you going to**
11  **handle this.**
12   Q  And he didn't tell you one way or the
13  other?
14   **A  No.  Not initially.**
15   Q  Not initially.  You were talking to Pete
16  Williams and he gives you this information about
17  he was possibly in custody at the time of this
18  other murder he just provided a statement in.  Did
19  you interrupt your questioning and go tell Mike
20  right away?
21       MR. GRILL: Objection.  Form.
22   **A  I talked to Pete.  Pete started running**
23  **down to me what happened on the Terry Bishop**
24  **murder.  He was pretty open about it.  Then he**

255

1  **interrupted me partially through it, not very**
2  **long, maybe a couple minutes.  And he says,**
3  **Detective Caesar, can you find out when that**
4  **murder just happened I confessed to.**
5        **I remember saying something to the effect**
6  **to him, well, you just gave a statement, don't you**
7  **know.  And he says, could you find out for me and**
8  **then I'll talk to you.  So I did leave there.  But**
9  **we had already conversed, and I felt he had**
10  **already told me enough that I needed a statement**
11  **from him on my murder.**
12   Q  Okay.  But you also were concerned enough
13  that he may not have actually done the other
14  murder that he had just confessed to?
15       MR. GRILL: Objection.  Form.  Foundation.
16   **A  Like I said before, I thought it was**
17  **important enough to tell somebody, but it kind of**
18  **-- in the back of my mind, I felt, that's**
19  **bullshit, he wasn't in custody.**
20   Q  Got it.  Did you find out that night that
21  he -- the date of that -- the other murder, the
22  Morgan murder, and give the information back to
23  Mr. Williams?
24   **A  No.**

256

1        MR. GRILL: Hang on.  Form.
2    Q  And then you went back in the room and
3  continued talking to Pete, right?
4    **A  Correct.**
5    Q  On the Bishop case?
6    **A  Yes.**
7    Q  Okay.  Do you remember anything Mike
8  Rogers told you when you told him, hey, Pete
9  Williams thinks he might have been in custody at
10  the time of the murder you just got a statement
11  from him on; do you remember what Mike said to
12  you?
13   **A  No.  He didn't really say much.  I just**
14  **says, you know, Mike, I got to tell you what he's**
15  **saying.  And I don't know -- and I remember people**
16  **after that starting to check into it.**
17   Q  Because that would be a concern if
18  somebody has given a full-on statement confessing
19  to a murder that -- and being charged for it if it
20  was impossible for them to have committed because
21  they were in actual custody, right?
22   **A  That's what my concern was.**
23   Q  It would be a false confession?
24   **A  Probably.**

257

1    Q  Well, how could it not be?
2       MR. GRILL:  Objection.  Form.
3       THE REPORTER:  Ms. Donnell, I'm having
4  trouble hearing you as well.
5       MR. GRILL:  I objected based on form.
6    **A  The question, please?**
7    Q  I'm just saying, it would be a false
8  confession if it was true that Pete Williams was,
9  in fact, at Cook County Jail at the exact time --
10 in custody -- in the County's custody -- at the
11 time a murder occurred outside of the jail.  Those
12 two things can't both be true?
13      MR. GRILL:  Hang on.  Incomplete
14 hypothetical.  Form.
15      MS. DONNELL:  It's not even -- I'm saying
16 --
17   Q  Okay.  In the Morgan case, Pete Williams,
18 if I represent to you that he was in custody at
19 Cook County Jail at the time of the Morgan
20 homicide, he could not -- his statement was false,
21 his confession was false, correct?
22   **A  If they were both true, both incidents --**
23 **if both occurrences were true.**
24   Q  Has that ever happened in any of your

258

1  cases that you've worked up where the individual
2  that provides an inculpatory statement or a
3  written statement saying they committed the murder
4  you find out later the fact that they were in
5  custody of a jail or police custody?
6    **A  No.  That's one of the many reasons I**
7  **remember this one, plus, all the litigation over**
8  **it.**
9    Q  Have you had other cases in which you've
10 obtained a confession from an individual and not
11 sought charges on that crime?
12   **A  Yes.**
13   Q  How many other cases has that happened --
14 how many cases has that happened?
15   **A  I don't know.  Not a lot.**
16   Q  And why?
17   **A  Because the other evidence didn't add up**
18 **to what they were telling me.**
19   Q  And what was -- and do you remember any of
20 those specific cases?
21   **A  No, not really.**
22   Q  You just know that it's happened where
23 somebody has confessed to doing something but the
24 other evidence you have, either physical or other

259

1  witness testimony -- statements -- doesn't match
2  up?
3    **A  Correct.**
4    Q  And so is it -- as a homicide detective,
5  was it always best for you when the physical
6  evidence corroborated the witness's or defendant's
7  statements --
8       MR. GRILL:  Objection.
9    Q  -- in other words, there was
10 corroboration -- some sort of corroboration?
11      MR. GRILL:  Objection.  Form.
12   **A  It was always best and usually required**
13 **that they coincide.**
14   Q  Over the course of your career, you had
15 other complaint registers filed against you.  I'm
16 just going to ask -- read some of the names, the
17 victim names and allegations, to see if it
18 refreshes your recollection.
19      The City produced in this case CR 238934,
20 the complainant was Leticia Childrith, and the
21 allegation was from August 4th, 1997, about an
22 unlawful entry and pointing guns at four black
23 males in her home including Lavell Childrith and
24 in Deshon Dishman; does that ring a bell?

260

1    **A  None of the names, no.**
2    Q  CR177144, allegations of racial slurs and
3  the individual lost his job from 1984 by a
4  complainant, Derwin Sellers?
5    **A  '84?**
6    Q  Yeah.
7    **A  No.**
8    Q  How about CR253973, the complainant was
9  Anthony Limberly from March 28th, 1997, of an
10 unlawful search and arrest?
11   **A  I don't recall the name or the incident.**
12   Q  How about CR256404 by a complainant Latoya
13 Garrett from November 4th, 1999, for battery and
14 use of -- or use of foul language during a battery
15 investigation.  It was an assault and battery
16 investigation, domestic that you went out.
17   **A  '91?**
18   Q  '99?
19   **A  I think I was a sergeant.  I vaguely**
20 **remember that name, but I don't remember the**
21 **circumstances.**
22   Q  How about CR222603 by Eddy Blackman.  It
23 was also a civil suit 95CD4924.  This was
24 initiated and -- the complaint register was

261

1 initiated on December 12th, 1995, for about you
2 and McCann at Area 2 where you denied medical
3 care. He was a diabetic and the denial of medical
4 care was back from March 1993. Do you remember
5 any of that or the lawsuit?
6    A No. No.
7    Q CR273331 from June 27th, 2001, filed by
8 Nikki Lewis, this would have been when you were in
9 vice, that there was money taken from a Memory --
10 I think it's Memory Tavern?
11    A I don't recall that at all.
12    Q That was a -- okay. How about CR250889,
13 this was from September 7th, 1999, and it involved
14 Lieutenant Sharon Balcitis --
15    A Balcitis.
16    Q -- Balcitis and a police aide, Janet
17 Nelson, of which you may have witnessed some
18 portion of their interactions?
19    A Yeah. I vaguely remember that one.
20    Q What do you remember about that one?
21    A Just that the police aide and the
22 lieutenant didn't get along, and I got in the
23 middle of it. I don't remember what the
24 allegation was.

262

1    Q Okay. I'm going to show you what I've
2 previously marked as Exhibit 15 to your
3 deposition. Do you recognize Exhibit 15,
4 Mr. Caesar?
5       (Caesar Deposition Exhibit 15 marked for
6 identification and attached to the transcript.)
7    A Yeah. I believe this was what Andrew sent
8 me a while back. (Indiscernible.)
9    Q You don't have to tell me anything about
10 your communications with Andrew.
11       THE REPORTER: I couldn't hear. Can you
12 ask your question again?
13       MS. DONNELL: I was just saying he doesn't
14 have to tell me anything about his communications
15 with Andrew. It wasn't a question.
16    Q Mr. Caesar, on the back page, do you see
17 this verification; is that your signature?
18    A Yes, ma'am.
19    Q And that means you reviewed these and
20 verified their truth and accuracy?
21    A Yes.
22    Q Okay. And I'm not sure why we don't have
23 these dated, but they were produced last year.
24 Last year? Yeah. I think so. In 2019. Okay.

263

1       I'm going to call your attention to your
2 response to interrogatory No. 2. So I'm going to
3 look on page 3 of Exhibit 15. This is asking for
4 you to identify any complaint which would include
5 CR register files -- CR files -- or civil suits.
6 Okay?
7    A Right.
8    Q And you answered -- at the very bottom of
9 your answer, there's some legal -- what you termed
10 legalese or whatever, and then you answered that
11 Defendant Caesar is also named as a defendant in
12 the pending lawsuit filed by James Gibson. Gibson
13 v. City of Chicago, et al., filed in the Northern
14 District of Illinois under case No. 19-CV-4152,
15 right?
16    A Yes. I see that.
17    Q And you're also named as a defendant in
18 Logan v. O'Brien under case No. 93-CV-3386.
19    A Apparently, yes. I don't recall that.
20    Q Do you remember that CR we looked at?
21    A Yeah. I remember now, but, yeah. I don't
22 remember it, but I saw that --
23    Q So if you look at Exhibit 16 which is
24 CR201798. All right. Do you remember that -- do

264

1 you have Exhibit 16?
2    A I don't know where they're numbered.
3    Q Do you have something at the top that
4 says, 201798?
5    A Oh, yeah.
6    Q You got it? Okay. If you turn about
7 maybe six pages into the document, do you see --
8    A Yeah. I remember reading this about James
9 O'Brien.
10    Q Yeah. And do you see that there's a civil
11 lawsuit, 93-CV-3386, there's a -- it's a City of
12 Chicago interoffice communication?
13    A I see that, yes.
14    Q Okay. And this CR was basically initiated
15 based on the lawsuit. Okay?
16    A Okay.
17    Q So those two are -- does that refresh your
18 recollection about the Logan v. O'Brien lawsuit
19 that you were in?
20    A No. I didn't know I was.
21    Q But you read your interrogatories before
22 you signed them, right?
23    A Yes, ma'am.
24    Q Okay. So you verified that you were a

265

1  defendant in that lawsuit. Okay. How about this
2  Golar v. City of Chicago under case
3  No. 16-CV-7387; do you see that?
4  **A  Yes, ma'am.**
5  Q  What's that lawsuit about?
6  **A  I don't recall.**
7  Q  Have you been deposed for that --
8  **A  Not that I know of.**
9  Q  -- or were deposed in that. The plaintiff
10  was Kevin Golar. He was convicted of a double
11  homicide. Does that refresh your recollection in
12  any way?
13  **A  No.**
14  Q  Okay. But you have no recollection of
15  having to sit for a deposition in that case,
16  correct?
17  **A  I don't recall it, no.**
18  Q  Okay.
19  **A  Double homicide?**
20  Q  Yeah. From January 1991. Maurice
21  Collier, Derrick Harris, and Vincent Carlton were
22  shot and killed in an abandoned building at 4462
23  South Wentworth, and Carlton lived and Collier and
24  Harris died.

266

1  **A  I don't recall it.**
2  Q  You don't recall that investigation?
3  **A  No.**
4  Q  Okay. Okay. So, Mr. Caesar, the next
5  thing we need to do -- I think I've finished all
6  my questions, so -- but we're going to just
7  adjourn your deposition. And we're going to put
8  on the record, I would like to ask you some
9  questions about your involvement in the Gibson
10  case. Okay? And your attorney has informed me
11  he's not going to permit you to answer any
12  questions about that.
13     MS. DONNELL: The plaintiff's position is
14  that defendants have known -- Mr. Caesar's
15  attorneys have known for a very long time that we
16  would ask questions about any complaint or other
17  allegations and misconduct, including the Gibson
18  v. City of Chicago case, 19-CV-4152, and we're
19  prepared to do so today; and that if Mr. Caesar's
20  attorneys wanted to prevent him from answering any
21  questions due to a pending lawsuit for which
22  there's no privilege that applies, they should
23  have filed for a protective order.
24     Otherwise, it's our position that we have

267

1  the right and opportunity to ask Defendant Caesar
2  about all of the Gibson-related incident just like
3  the defendants have taken the position that they
4  get to ask any 404(b) witnesses about the facts of
5  those cases, so -- repeatedly.
6     So just because Mr. Caesar is going to
7  have to sit for a deposition in the Gibson case
8  doesn't obviate our right to ask him questions
9  about the same allegations related to the Gibson
10  case in this case. So we think -- based on
11  there's no privilege and there's no protective
12  order in place -- that we should be able to ask
13  Mr. Caesar those questions today.
14     MR. GRILL: Well, just to be clear about
15  our position, and our position only pertains to
16  questions -- so we're clear here -- regarding the
17  Gibson case, Mr. Caesar is not going to answer --
18  it would be our recommendation to Mr. Caesar to
19  not answer questions about a pending lawsuit in
20  which he's a defendant and he's represented by
21  other attorneys that aren't present, and he hasn't
22  been deposed in that case yet.
23     So that's our position, and if we need to
24  file a motion, if necessary, we'll do so. But the

268

1  questioning about that case, for those reasons, we
2  believe it's improper to do that.
3     MS. DONNELL: And because this only came
4  up yesterday -- yesterday yesterday afternoon --
5  this request was being made, and because we didn't
6  want to cancel his deposition and because we're
7  officers of the court and we have to conduct
8  (indiscernible) we have agreed to do this.
9     But I am telling defendants, you have to
10  file a protective order, otherwise -- because we
11  don't think there's any basis to preclude us
12  questioning Mr. Caesar. And so we're going to
13  request that you come back and sit for those --
14  the deposition pertaining to the Gibson-related
15  facts. And so if you would like him not to do
16  that, you're going to have to file for a
17  protective order. Okay?
18     MR. GRILL: Okay. But our position, I
19  think, is clear. You didn't provide any notice
20  to --
21     MS. DONNELL: We don't have to provide
22  notice of what questions we're going to ask.
23     MR. GRILL: And we don't think it's fair
24  or appropriate to be asking Mr. Caesar questions

269

1  about a case where he's a defendant.
2      MS. DONNELL: And --
3      MR. GRILL: Hang on. When he hasn't even
4  been deposed and his attorneys aren't here. So
5  that's it. We're going to agree to disagree.
6      MS. DONNELL: That's fine. And then just
7  to be clear, there's no privilege assertion,
8  there's just -- about that question. It's just a
9  matter of that -- because he's a defendant in a
10 pending lawsuit.
11     MR. GRILL: I don't -- it's -- it's not a
12 privilege issue, but there are other bases out
13 there that would preclude this questioning, from
14 our point of view. And we also do not think it is
15 all similar to the 404(b) issue that you raised.
16 But I guess we can brief that out, what our
17 respective positions are, when, and if, motion
18 practice is necessary on this.
19     MS. DONNELL: Okay. And then we would
20 just request that the protective order -- the
21 motion for protective order gets filed promptly.
22 Obviously, it's a holiday, so shortly after the
23 holidays, maybe the first week of January, so that
24 we can get this scheduled. Because all of the

270

1  depositions have to be conducted, I think, by
2  March. We have to resolve it pretty quickly.
3      Okay. So we are not concluding your
4  deposition. We are just adjourning. You'll have
5  to come back now or later or sometime soon. We're
6  done for today.
7      MR. GRILL: That's plaintiff's position,
8  that's not necessarily one that we agree with.
9  But I understand why you're saying that.
10     MS. DONNELL: But we agree that the
11 deposition is adjourned, not concluded.
12     MR. GRILL: We agree that we're not going
13 to be asking any more questions of this witness on
14 this particular topic. If you other questions --
15     MS. DONNELL: I do, actually, I do. I
16 wanted to ask punitive damages related questions.
17 Are you also going to not permit him to answer
18 those questions?
19     MR. GRILL: Yeah. And I'm surprised
20 you're bringing that up, frankly, because we've
21 exchanged plenty of correspondence on this, and
22 you're well aware what our position is and what
23 the Court has ordered, for example, in the Serrano
24 case. So --

271

1      MS. DONNELL: Well, we don't have an order
2  in this case --
3      MR. GRILL: No. We don't, but --
4      MS. DONNELL: -- let me finish. Let me
5  finish. We don't have a position on this case.
6  We've made several offers to defer it until after
7  summary judgment. You've rejected those offers.
8  There's a proposal on the table, but you haven't
9  responded to us. And so at this point --
10     MR. GRILL: And so you're going to try to
11 go around our conversations and then put questions
12 to something that we're actively discussing to
13 this witness directly? Come on.
14     MS. DONNELL: No. I'm saying we can
15 either agree that that is also potential subject
16 matter for him to be brought back based on
17 whether we agree or --
18     MR. GRILL: Oh, absolutely not. Because I
19 think that a deposition on that topic would go
20 well bounds of what the Judge has ordered in
21 Serrano and other cases. So I totally disagree
22 with that. You can put whatever you would like on
23 the record. But to suggest that that is part of
24 this -- part of a reason to bring Mr. Caesar back

272

1  for a deposition, no, I totally disagree with
2  that.
3      MS. DONNELL: Well, are you going to
4  instruct him to answer any questions related to
5  his -- whether he's going assert an inability to
6  pay the defense or his net worth or either one of
7  those?
8      MR. GRILL: I'm not totally following your
9  question, but in light of the negotiations that on
10 going under Rule 37.2 between your office and my
11 office regarding punitive damages for Mr. Caesar,
12 given that he's the deponent today, yes, we're not
13 touching that topic today.
14     MS. DONNELL: Okay. So we're just going
15 to leave -- from our position, both of those areas
16 are open or pending, so, potentially, court
17 resolution. And I appreciate that you have an
18 order in another case that you think is -- has the
19 force of an order here. But --
20     (Simultaneous crosstalk.)
21     MR. GRILL: Heather. Come on. Stop
22 mischaracterizing my position.
23     MS. DONNELL: That is what you're saying.
24     MR. GRILL: No, no, no, no, no, no. That

273

1  is not. My position -- we've made it very clear.
2  And, at this point, a pretty significant time and
3  correspondence between our firms. So don't put
4  words in my mouth. Don't mischaracterize what I'm
5  saying. The bottom line here is that when it
6  comes to punitive damages, that is an open issue
7  between our firms, but I'm certainly not at all
8  agreeing that that provides any basis to bring
9  Mr. Caesar back at any point to be deposed.
10     MS. DONNELL: Okay. We're going to agree
11 to disagree on these issues, and we're going to
12 adjourn for today.
13     MR. GRILL: Okay. Well, I have questions.
14 Although you're done, I have some follow ups for
15 this witness.
16     EXAMINATION BY COUNSEL FOR THE DEFENDANTS,
17        THE INDIVIDUAL OFFICERS
18 BY MR. GRILL:
19    Q  So, Mr. Caesar, I just want to be clear,
20 I'm going to jump around a little bit here with my
21 questions. There aren't many of them, but they
22 kind of touch on different parts of your testimony
23 today, so if you're not following me, just let me
24 know.

274

1        At the very beginning of your deposition,
2  you were asked some questions about when it was
3  that you found out that Mr. Jakes was at Area 3.
4  Do you remember generally talking about that
5  topic?
6     A  Okay.
7     Q  You found out -- if I'm recalling your
8  testimony correctly -- that Mr. Jakes was at
9  Area 3 when you came back, you know, after you
10 left and did the scene, you went home and you came
11 back the second time, correct?
12    A  That's correct.
13    Q  All right. Now, can you tell me again
14 when did you -- when did you become aware --
15 strike that question.
16        Did you find out from either Detective
17 Kill or Detective Boudreau how it was that Jakes
18 got on the radar of the Chicago Police Department
19 as it pertained to the Garcia homicide
20 investigation?
21     MS. DONNELL: Objection. Form. You can
22 answer.
23    A  I learned that from Detective Kill when I
24 came in.

275

1     Q  And what exactly -- well, maybe not
2  exactly, but what do you recall Detective Kill
3  telling you about how Anthony Jakes came to the
4  attention of the Chicago Police Department as it
5  pertains to the Garcia homicide investigation?
6     A  He basically told me, I believe, that the
7  tac guys had some information -- anonymous
8  information, I believe, that Jakes was involved,
9  but -- and they went to talk to him.
10    Q  That Jakes was involved or that Jakes knew
11 something about the -- about the --
12     MS. DONNELL: Objection. Leading.
13    A  He knew something.
14    Q  Okay. When you had left the night before
15 after checking out the scene and going to the
16 hospital, at that point, Mr. Jakes was, at least
17 as far as you're concerned, was not known to you
18 as somebody that might know anything about this
19 investigation?
20    A  Correct.
21    Q  Okay.
22     THE REPORTER: Can you keep your voice up,
23 Mr. Grill? I got it.
24     MR. GRILL: Yeah. Sorry. I will. Did

276

1  you get all that, though? Do I need to go back
2  over anything I just said there?
3     THE REPORTER: I got it. I was just
4  waiting for a pause.
5     MR. GRILL: Sure. I appreciate it.
6     Q  Was there -- strike that question.
7        I want to look at -- can you pull out -- I
8  know you've got a lot of exhibits in front of you,
9  but it's Exhibit 14. It's the GPR that you wrote
10 regarding the scene and your investigation and
11 whatnot at the scene. This one. It's City Jakes
12 126 and City Jakes 125. Is it Exhibit 14? Yeah.
13 It's Exhibit 14.
14     (Simultaneous crosstalk.)
15    A  Okay.
16    Q  You got it? Can you flip over to the back
17 page, so City Jakes 126?
18    A  I see it.
19    Q  Okay. So you were asked some questions
20 about this, and I'm just kind of going to point to
21 you -- point it out to you here if you want to
22 look where I'm pointing here.
23        Down one, two, three, four lines. It says
24 -- this says 1206 case or casings two was your

277

1  testimony.  And then underneath it you got,
2  RF8509, P487325; those two numbers that you
3  testified were license plate numbers, right?
4     **A  Correct.**
5     Q  Okay.  So between the 1206 and the number
6  2, you said the word was case or casings.  Is that
7  -- is that correct that that's what it says, or
8  does it say something else?
9     **A  I believe it says cars.**
10     Q  Cars.  And two, meaning, cars, two cars,
11  and there's the license plates underneath?
12     **A  I believe the second number is a sticker**
13  **number on the Chevy --**
14     Q  Got it.
15     **A  -- the plate of the second car is noted.**
16     Q  So like a temporary plate on the car?
17     MS. DONNELL: Objection.  Leading.
18     **A  I think be may be the city sticker on the**
19  **windshield.**
20     Q  Got it.  Okay.  But in any event, it
21  doesn't say case or casings.  Cars?
22     **A  Cars.  Yes.**
23     Q  Cars.  Okay.  Let's look at Exhibit 4.
24  This is the major crimes worksheet.  If I can find

278

1  it.  This is City Jakes 77 and 78.  I just want to
2  make sure that the record is clear.
3     Does this document -- in particular,
4  what's cataloged in the narrative on the back
5  which is City Jakes 78, is this information that
6  you and McCann knew personally that night or does
7  this come from other sources as well?
8     **A  It's a combination of the whole**
9  **(indiscernible).**
10     THE REPORTER: I'm sorry.  Mr. Caesar, I
11  can't hear you.
12     **A  It included all the information we had**
13  **gathered up until the time we left.**
14     Q  And when you say we had gathered, who is
15  the we?
16     **A  Me and my partner, Detective McCann.**
17     Q  Okay.  So this is what you and McCann knew
18  up until the time you finished on that first
19  night?
20     **A  Yes, sir.**
21     Q  Okay.  Oh, one more thing.  On City Jakes
22  77, on the front of that exhibit that you have,
23  we're still on Exhibit 4.  If you see down here --
24  so you got, you know, this is on the witness -- in

279

1  the witness boxes?
2     **A  Yes, sir.**
3     Q  You were asked a couple questions, you
4  know, about Mr. Gurgid Singh is one of the
5  witnesses, right, and it says his age is -- or
6  date of birth is 28 years old, I gather?
7     **A  I see that, yeah.**
8     Q  And then in box 2, it says, unknown,
9  right?
10     **A  Yes, sir.**
11     Q  Okay.  But it has a sex/race, meaning, M
12  black, so I'm guessing that's male black, right?
13     **A  Yes, sir.**
14     Q  And then 18 years approximately, I guess,
15  in parenthesis next to that, right?
16     **A  Yes.**
17     Q  So what is -- what is this -- who is this
18  18 -- this other male black that's 18; do you have
19  a recollection as to what this is referring to?
20     **A  I believe it was just taken from the**
21  **original report.  It was written the same way.**
22     Q  Okay.  And this is another person that was
23  a witness or a suspect or do you know?
24     **A  I never -- I have no idea.**

280

1     Q  Okay.  So this is just information you're
2  getting from one of the other reports and plugging
3  into this major crime worksheet?
4     **A  The original responding officer's original**
5  **case report.  Yeah.**
6     Q  Okay.  I want to go to Exhibit 5.  Here it
7  is.  So that would be the supplementary report of
8  -- it's a handwritten one -- by White and
9  Hargrove, City Jakes 3.  This one.  You can just
10  use mine, because I know what the question is.
11  You'll see on the left margin written vertically
12  it looks like it says, Caesar?
13     **A  Yes, sir.**
14     Q  Okay.  Do you know why that -- why your
15  name is there on the side of that report?
16     **A  No.**
17     Q  Okay.  Is that your handwriting, Caesar?
18     **A  No.**
19     Q  Okay.  You testified today that you did
20  not make any -- or something along the lines of
21  that you did not make any efforts to locate a gun,
22  however -- do you recall offering testimony along
23  those lines today that a gun was not located?
24     MS. DONNELL: Objection to form.

281

1    A    Yeah.  I remember answering questions.
2  Yes.
3    Q    Okay.  So when you were on the scene, do
4  you recall whether you checked the scene for a
5  firearm?
6    A    We checked the scene for any evidence.
7    Q    Okay.  So -- and you didn't find a gun at
8  the scene?
9    A    No.
10    Q    And did you ever go back to the scene
11  after that night?
12    A    We drove by the scene, and we tried to
13  locate the sub shop owner and the convenience
14  store owner, but I don't think we ever stopped and
15  saw anybody.
16    Q    And on any of those occasions, you didn't
17  find a gun?
18    A    No.
19    Q    Okay.  To be clear, you were not present
20  when Kill or Boudreau were talking to Jakes before
21  you came back to the Area, correct?
22    A    Right.
23        MS. DONNELL:  Objection.  Asked and
24  answered.

282

1    Q    So do you know when it was that, from any
2  source during the investigation, when it was that
3  Kill and Boudreau interviewed Jakes
4  (indiscernible).
5        THE REPORTER:  I'm losing the end of your
6  question there.
7    Q    Do you know when it was from any source
8  during the investigation when Kill and Boudreau's
9  interview of Jakes turned accusatory?
10    A    I can guess, but I don't know.
11    Q    Do you know when during their conversation
12  or interview of Jakes that Jakes began to
13  implicate himself?  Do you know when that began to
14  happen?
15    A    No, I don't.
16    Q    Okay.  Of any of the CRs that you ever
17  received, do you know if any of them against you
18  were ever sustained?
19        MS. DONNELL:  Objection.  Asked and
20  answered.
21    A    I don't believe so.
22    Q    You don't believe any of them were?
23    A    Yeah.
24        MR. GRILL:  All right.  I've got nothing

283

1  else.  Those are the only points I wanted to hit.
2  Do you have anything on that, Heather?
3        MS. DONNELL:  No.  George, do you have any
4  questions?
5        MR. YAMIN:  No, I do not.
6        MS. DONNELL:  Okay.  I think we're going
7  to adjourn Mr. Caesar's deposition for the day.
8        THE VIDEOGRAPHER:  This concludes the
9  video deposition of Louis Caesar.  Time:  4:40.
10        (Off the record at 4:40 p.m.)

284

1        ACKNOWLEDGMENT OF DEPONENT
2        I, LOUIS CAESAR, do hereby acknowledge
3  that I have read and examined the foregoing
4  testimony and the same is a true, correct, and
5  complete transcription of the testimony given by
6  me and any corrections appear on the attached
7  errata sheet signed by me.
8
9  _____    _____
10    (SIGNATURE)            (DATE)

285

1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2

3        I, Courtney Petros, Registered

4    Professional Reporter, Certified Shorthand

5    Reporter and Notary Public, the officer before

6    whom the foregoing deposition was taken, do hereby

7    certify that the foregoing transcript is a true

8    and correct record of the testimony given; that

9    said testimony was taken by me and thereafter

10   reduced to typewriting under my direction; that

11   reading and signing was requested; and that I am

12   neither counsel for, related to, nor employed by

13   any of the parties to this case and have no

14   interest, financial or otherwise, in its outcome.

15       IN WITNESS WHEREOF, I have hereunto signed

16   this 16th day of December, 2020.

17   My commission expires May 6th, 2023.

18

19   _____

20   COURTNEY PETROS, RPR, CSR

21   NOTARY PUBLIC IN AND FOR THE

22   STATE OF ILLINOIS

23

24