**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

ANTHONY JAKES,

               Plaintiff,

       v.

KENNETH BOUDREAU *et al.*,

            Defendants.

Case No. 19-cv-02204

Hon. Manish S. Shah

Hon. Beth W. Jantz

# EXHIBIT 19



# Transcript of Michael DeLacy

**Date:** January 15, 2021
**Case:** Jakes -v- Boudreau, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

Transcript of Michael DeLacy
Conducted on January 15, 2021

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
-------------------------------------------------------

Anthony Jakes,

     Plaintiff,

vs.          Case No. 19-CV-02204

Kenneth Boudreau, et al.,

     Defendants.

-------------------------------------------------------

     *   *   *   *   *

VIDEOTAPED DEPOSITION OF MICHAEL DELACY
CONDUCTED VIRTUALLY
Taken on the 15th day of January, 2021
10:00 A.M. CST

     *   *   *   *   *

Job No.: 346380

Pages: 1 - 266

Taken before Ann Marie Holland, CSR

**Page 2**

APPEARANCES:

     HEATHER LEWIS DONNELL, ESQ., of the firm of
LOEVY & LOEVY, 311 N. Aberdeen Street, Third Floor,
Chicago, Illinois 60607, phone: (312) 243-5900,
email: heather@loevy.com, appeared remotely representing
the Plaintiff.

     BRITTANY JOHNSON, ESQ. and ANDREW GRILL, ESQ.,
of the firm of ROCK FUSCO CONNELLY, LLC, 321 N. Clark
Street, Chicago, Illinois 60654, phone: (312) 494-1000,
appeared remotely representing the Defendant Michael
DeLacy and Defendant Individual Officers.

     GEORGE YAMIN, ESQ., of the SOTOS LAW FIRM,
141 West Jackson Boulevard, Suite 1240A, Chicago,
Illinois 60604, email: gyamin@jsotoslaw.com, appeared
remotely representing the Defendant City of Chicago.

Also Present:

     Rick Kosberg/Video Host/Videographer/Planet Depos

**Page 3**

I N D E X

EXAMINATION               PAGE
of: MICHAEL DELACY

Examination by Ms. Donnell................Page 6

Examination by Ms. Johnson................Page 246

Re-Examination by Ms. Donnell.............Page 248

E X H I B I T S

Exhibit No.    Description       Page
Exhibit 1     Arrest Report      168
Exhibit 2     Two-page CR report   186
Exhibit 3     Chicago Police
              Department's
              Supplementary report 198
Exhibit 4     Nine-page document
              comprising photographs 212
Exhibit 5     Document        264
Exhibit 6     Document        264
Exhibit 7     Document        264
Exhibit 8     CR file         221
Exhibit 9     Delany deposition  253
Exhibit 10    Document        264
Exhibit 11    Document        264
Exhibit 12    Document        264
Exhibit 13    CR file         241

*All Exhibits Marked Electronically By Attorney Donnell
*All Exhibits Marked/Retained By Attorney Donnell

**Page 4**

VIDEO HOST: This is the remote Zoom video deposition of Michael DeLacy taken by Loevy & Loevy in the Matter of Anthony Jakes vs. Kenneth Boudreau, et al., Case No. 19-CV-02204. Today is January 15th, 2021. The time is 10:23. The Court Reporter is Ann Holland of Planet Depos. I am the Zoom host/videographer, Rick Kosberg.

     Counsel can now introduce themselves, and then Ann is free to administer the oath.

     MS. DONNELL: Good morning. My name is Heather Lewis Donnell, and I represent the Plaintiff, Anthony Jakes in this matter.

     MS. JOHNSON: Good morning. My name is Brittany Johnson, and I represent Defendant, DeLacy, in this matter.

     MR. GRILL: My name is Andrew Grill, and I also represent the individual officers and Mike DeLacy in this deposition.

     MR. YAMIN: And George Yamin on behalf of the Defendant City of Chicago.

     (Off the record.)

     COURT REPORTER: Will counsel please stipulate that in lieu of formally swearing in the witness, the reporter will instead ask the witness

Transcript of Michael DeLacy
Conducted on January 15, 2021

**Page 5**

1 to acknowledge that their testimony will be true
2 under the penalties of perjury, that counsel will not
3 object to the admissibility of the transcript based
4 on proceeding in this way, and that the witness has
5 verified that he is, in fact, Michael DeLacy?  Do you
6 all agree?
7         ALL COUNSEL:  Agreed.
8         MS. DONNELL:  Plaintiff's counsel
9 agrees.  And also I would like a stipulation that the
10 parties agree that the video is also an official video
11 of the deposition as well.
12         MS. JOHNSON:  The Defendant officers
13 agree.
14         MR. YAMIN:  The same for the city.
15         COURT REPORTER:  Okay.  And then, I'm
16 sorry, Mr. DeLacy, if you would like to raise your right
17 hand, I will swear you in.
18         THE WITNESS:  Okay.
19         (Whereupon, the witness was sworn in.)
20
21
22
23
24 (Continued on next page...)

**Page 6**

1         MICHAEL DELACY,
2         the Witness in the above-entitled
3         matter after having been first duly
4         sworn deposes and says as follows:
5
6         EXAMINATION
7 BY MS. DONNELL:
8     Q.   Good morning.  Can you please state your
9 name for the record.  Your full name, sir.
10    A.   Michael DeLacy.
11    Q.   Okay.  And before we get started, we spoke
12 briefly before we went on the official record, but I
13 just want to, for the record, say we are taking this
14 video-- we are taking this deposition via
15 videoconference, so I'm not physically present with you
16 at the Rock Fusco office.  And so because of that, and
17 you are going to have to let me know if you hear my
18 questions.  And if not, I am going to assume that you
19 let me know so that I can state them again for you.  Is
20 that fair?
21    A.   Yes.
22    Q.   And I understand from your counsel's
23 representation earlier today that you have some impaired
24 hearing and are wearing hearing aids today; is that

**Page 7**

1 true?
2    A.   That's correct.  Yes.
3    Q.   And is that on both of your ears, sir?
4    A.   Yep.
5    Q.   Okay.  So, I understand from time to time
6 you may need to get your phone which you can adjust your
7 volume for your hearing aids.  Is that right?
8    A.   Yes, ma'am.
9    Q.   Okay.  If you are going to need to do that,
10 please let me know, and I am happy to accommodate that
11 so that you can hear my questions.  Okay?
12    A.   Okay.  Thank you.
13    Q.   And I understand right now your phone is
14 not present with you in the room however; is that true?
15    A.   That's correct.
16    Q.   Okay.  So you will let me know if you will
17 need to do that, and we can accommodate that request.
18 Does that sound fair?
19    A.   Thank you.
20    Q.   Okay.  And then can you describe for me,
21 sir, who is present with you in the room right now?
22    A.   Andrew Grill and Brittany Johnson.
23    Q.   Okay.  And like I said, I'm not there, so
24 we are going to do our best to communicate effectively.

**Page 8**

1 But I am going to make just the request and the
2 representation that counsel will abide by the same
3 practice as we would if I was present in the room with
4 everybody.
5         MS. DONNELL Brittany, you guys have agreed
6 to that; is that right?
7         MS. JOHNSON:  Yes.  Agreed.
8         MS. DONNELL:  Okay.
9 BY MS. DONNELL:
10    Q.   Well, let's get started then.
11         Mr. DeLacy, do you remember the date you
12 became a sworn member of the Chicago Police Department?
13    A.   March of 1969.
14    Q.   Okay.  And do you recall the date of your
15 retirement from the Chicago Police Department?
16    A.   I believe it was November of '98, I
17 believe.
18    Q.   Okay.  When you became a sworn officer of
19 the Chicago Police Department in 1969, did you then
20 attend the police academy?
21    A.   Yes.
22    Q.   How long was the police academy back in
23 1969?
24    A.   It was either six or seven months.

Transcript of Michael DeLacy
Conducted on January 15, 2021

3 (9 to 12)

9

1    Q.   Was that six or seven months of classroom
2 instruction, or six or seven months of both at academy
3 and out in the field?
4    A.   Both.  Yes.
5    Q.   Okay.  And you started as a probationary
6 officer, is that right, once you completed the academy?
7    A.   Yes.
8    Q.   And then you became a patrol officer; is
9 that right?
10    A.   Yes.
11    Q.   Can you describe for me just briefly the
12 ranks that you had as you -- from your date of becoming
13 a sworn officer in March 1969 until your retirement in
14 1998?
15    A.   Patrolman.
16    Q.   Did you ever take a test to become a
17 detective or youth officer or any other promotion?
18    A.   Yes.
19    Q.   Okay.  But it's fair to say you never were
20 promoted; is that right?
21    A.   That's correct.
22    Q.   Okay.  Well, what tests did you take while
23 you were a Chicago police officer?
24    A.   I believe I took the detective test, and I

10

1 may have taken a sergeant's test.
2    Q.   Okay.  How many times did you take the
3 detective test?
4    A.   I think twice.
5    Q.   How many times did you take the sergeant
6 test?
7    A.   I believe once.
8    Q.   Do you remember the first time you took the
9 detective test, what year or approximate year?
10    A.   No, I don't.
11    Q.   How about the second time you took the
12 detective test, do you remember when that was?
13    A.   No, I don't recall.
14    Q.   And how about the sergeant test?
15    A.   I don't recall that either.
16    Q.   Okay.  What districts did you work out of
17 throughout your career, if you could go in order?
18    A.   The 5th District, the 9th District.  I was
19 detailed Area One and detailed to detached services.
20    Q.   Can you repeat that last sentence?
21 Detailed to what services?
22    A.   Detached services.
23    Q.   Detached services.  Thank you.
24        And were you assigned to -- detailed to

11

1 detached services when you retired in November of 1998?
2    A.   Yes.
3    Q.   I'm going to go back now and I want to talk
4 to you about what you did to prepare for your deposition
5 today.  I'm not asking you to disclose any of your
6 communications with your counsel.  Understood?
7    A.   Yes.
8    Q.   Okay.  Did you review any documents to
9 prepare for your deposition today?
10    A.   Yes.
11    Q.   What documents did you review to prepare
12 for your deposition today, sir?
13    A.   The case report and arrest report.
14    Q.   Just to be sure the record is clear, did
15 you say you remembered reviewing the case report and an
16 arrest report?
17    A.   Yes.
18    Q.   And is that for the arrest of Mr. Anthony
19 Jakes in September of 1991?
20    A.   Yes.
21    Q.   Okay.  And the case report also is from
22 September 16th, 1991; is that right?
23    A.   Yes.
24    Q.   And, sir, it looks like you are looking at

12

1 some documents; is that right?
2    A.   I'm sorry?
3    Q.   Are there some documents in front of you
4 right now?
5    A.   Yes, there are.
6    Q.   Okay.  I am going to ask that you not look
7 at any of the documents.
8        MS. DONNELL:  And, Brittany, maybe you
9 could move the exhibits, because I haven't shown the
10 witness any exhibits at this point.  Could you please
11 move them so they're not in front of the witness.
12        MR. GRILL:  For the record, they
13 weren't in front of the witness; they were on the table.
14        MS. DONNELL:  That's fine.  Thanks.
15 I'm just asking, it looks like he was looking at them --
16 maybe -- it's hard for me -- as you know, we're all
17 trying to do this -- I'm accommodating the request that
18 I'm not there, which is fine.  It's hard for me to know
19 what's going on.  So, and I can't see the -- I only see
20 the witness from basically his shoulders up.  I can't
21 see what is on the table in front of him.
22        Maybe we could just make it clear that
23 right now is it accurate to say that the exhibits are by
24 counsel, and they are not in front of the witness?

Transcript of Michael DeLacy
Conducted on January 15, 2021

4 (13 to 16)

---

13

1    MR. GRILL: They are on the table.
2 They are not in front of him.
3    MS. DONNELL: I'm just asking if he can
4 read them. Are they in a place where he can read them,
5 or you can't?
6    MR. GRILL: No, he cannot read them.
7    MS. DONNELL: Okay. Thank you.
8 BY MS. DONNELL:
9    Q.  Mr. DeLacy, thanks for accommodating. We
10 are all trying to adjust for the pandemic and making
11 things work safely and also continue to do our job. So
12 I appreciate your patience with our format, okay?
13   **A.  Yes.**
14   Q.  Do you remember reviewing an arrest report
15 for Anthony Jakes back in September 1991 to prepare for
16 today; is that right?
17   **A.  A report was made out, yes.**
18   Q.  And you reviewed that to prepare for today,
19 correct?
20   **A.  Yes.**
21   Q.  And you reviewed a case report related to
22 the arrest of Anthony Jakes back in September of 1991 as
23 well?
24   **A.  Yes.**

---

14

1    Q.  Any other documents that you reviewed to
2 prepare for your deposition today?
3    **A.  I believe the transcript from Officer Pack.**
4    Q.  Did you read one transcript from Officer
5 Pack or more than one transcript of Officer Pack's
6 testimony?  And this would be in -- well, first of all,
7 the transcript that you reviewed, was that in Anthony
8 Jakes' criminal proceeding relating to the Garcia
9 murder?
10   **A.  Yes.**
11   Q.  Did you read a pretrial transcript?
12   **A.  I believe there were two.**
13   Q.  Okay.  Did you review both of the
14 transcripts you were provided for Mr. Pack's testimony
15 and Mr. Jakes' criminal proceeding to prepare for today?
16   **A.  Yes.**
17   Q.  Okay.  Other than the case report, arrest
18 report and two transcripts of Officer Pack's testimony
19 in Mr. Jakes' criminal proceeding, any other documents
20 that you reviewed to prepare for today, sir?
21   **A.  I don't believe so.**
22   Q.  Did you review a supplementary report
23 related to the arrest of Mr. Anthony Jakes in the Garcia
24 investigation?

---

15

1    **A.  I don't remember.**
2    Q.  Okay.  And for the record, Mr. DeLacy, do
3 you know who Officer Pack is?
4    **A.  Yes.**
5    Q.  Okay.  Who is he?
6    **A.  He's my partner.**
7    Q.  How long were you and Officer Pack partners
8 while you worked at the Chicago Police Department?
9    **A.  Probably 20 years.**
10   Q.  Did you and Officer Pack attend the police
11 academy together?
12   **A.  No.**
13   Q.  When did you first come to know Officer
14 Pack?
15   **A.  During the fire strike.  I believe it was
16 1979.**
17   Q.  I'm sorry, how did you describe the strike?
18   **A.  It was a fire strike.  Fire department was
19 on strike.**
20   Q.  So this would have been about ten years
21 after you joined the department?
22   **A.  Yes.**
23   Q.  And do you remember the situation or
24 circumstances of your first meeting Officer Pack during

---

16

1 the fire strike in 1979?
2    **A.  No.**
3    Q.  You just recall that that was the time that
4 you met him?
5    **A.  Yes.**
6    Q.  Did you meet him out on a picket line?
7    **A.  No.**
8    Q.  Where did you meet him?
9    **A.  At the 9th District.**
10   Q.  Did you meet him -- were you assigned
11 formally as partners when you met him in the 9th
12 District, or did you work with him for some
13 time and then request to become partners?
14   **A.  No, it was -- I believe I met him, and we
15 were going to be partners at that time.**
16   Q.  I guess can you clarify for me whether you
17 requested to be partners with Officer Pack or whether
18 you were just initially assigned to be partners and then
19 you stated you stayed working together for 20 years?
20   **A.  I think we were -- we were put together.**
21   Q.  Did you work with Officer Pack as your
22 partner until you retired from the department in 1998?
23   **A.  No.  He -- he retired before.  I think he
24 retired before that.**

---

Transcript of Michael DeLacy

5 (17 to 20)

Conducted on January 15, 2021

---

17

1      Q.   Okay.  Do you remember when Officer Pack
2   retired?
3      **A.   No.  I don't.**
4      Q.   Do you remember how many years after his
5   retirement you worked with the Chicago Police Department
6   before your retirement in November of 1998?
7      **A.   No, I don't.**
8      Q.   Did you work -- when you worked at the 5th
9   District as a patrol officer, that was before you worked
10  with Officer Pack as a partner; is that right?
11     **A.   Yes.**
12     Q.   And then in the 9th District, that's when
13  you and Officer Pack became partners?
14     **A.   Yes.**
15     Q.   Did Officer Pack move with you when you
16  were detailed in area one?
17     **A.   No.**
18     Q.   Okay.  Were you and Officer Pack only
19  assigned to work together as partners while you were at
20  the 9th District?  In other words, was there any other
21  assignment you had with Officer Pack other than as
22  patrol officers in the 9th District?
23     **A.   In the police department.  Could you repeat**
24  **your question?**

---

18

1      Q.   Sure.  Yes, absolutely.  Thanks for letting
2   me know.  If there is anything I can do to help you hear
3   better, let me know, too.
4           So, what I was asking is when you were
5   partners with Officer Pack --
6      **A.   Yes.**
7      Q.   -- were you ever assigned to a different
8   assignment other than as partners at the 9th District
9   together?
10     **A.   While we were at the 9th District, we were**
11  **partners together.**
12     Q.   Did Officer Pack -- did you and Officer
13  Pack work as partners together anywhere other than at
14  the 9th District?
15     **A.   Well, while with the Chicago Police**
16  **Department?**
17     Q.   Yes.
18     **A.   No.**
19     Q.   Have you worked with Officer Pack in
20  another capacity after your retirement from the Chicago
21  Police Department?
22     **A.   Yes.**
23     Q.   Okay.  So, thank you for clarifying.
24          So, in terms of you working with Officer

---

19

1   Pack together with the Chicago Police Department, that
2   was always as patrol officers in the 9th District; is
3   that accurate?
4      **A.   Yes.**
5      Q.   Okay.  And then after your retirement, you
6   and Officer Pack have also worked together; is that
7   accurate?
8      **A.   Yes.**
9      Q.   Okay.  I am going to get to that, your post
10  retirement in just a little bit.  But for now, I want to
11  go back to when you were at the 9th District.
12          Did you have any other partners other than
13  Officer Pack when you were assigned as a patrol officer
14  in the 9th District?
15     **A.   Yes.**
16     Q.   Do you remember their names?
17     **A.   No.**
18     Q.   Do you remember the approximate years you
19  are assigned as a patrol officer in the 9th District?
20     **A.   Early seventies, mid-nineties, I believe.**
21     Q.   Where was the 9th District physically
22  located when you were assigned to work there?
23     **A.   3501 South Lowe Avenue.**
24     Q.   I'm sorry, I didn't catch the last part of

---

20

1   what you said.
2      **A.   3501 South Lowe Avenue.**
3      Q.   Lowe Avenue?
4      **A.   Yes, ma'am.**
5      Q.   And was Area Three, detective Area Three
6   located in the same building?
7      **A.   No, Area Three is located at 3900 South**
8   **California.**
9      Q.   Okay.  Is there a district that is also
10  located at 3900 South California back in the early
11  nineties?
12          MS. JOHNSON:  Objection; foundation.
13  BY MS. DONNELL:
14     Q.   When Area Three was at 3900 South
15  California, was there also a patrol district at that
16  same location?
17          MS. JOHNSON:  You can answer.
18          THE WITNESS:  No.
19  BY MS. DONNELL:
20     Q.   But is it fair to say that the 9th District
21  was part of Area Three detective division while you were
22  assigned to the 9th District?
23          MS. JOHNSON:  Object to foundation.
24          You can answer, if you know.

---

Transcript of Michael DeLacy
Conducted on January 15, 2021

6 (21 to 24)

---

21

1    A.  Could you repeat the question?
2  BY MS. DONNELL:
3    Q.  Well, I'm sorry, let's do this.  Maybe I
4  will be more specific.
5       In 1991, the timeframe that I'm going to be
6  asking you about today, what detective area was the 9th
7  District part of?
8    A.  They were within Area Three.
9    Q.  Okay.  In the time that you were assigned
10 to the 9th District from the 1970s to the mid -- early
11 1970s to the mid-1990s, did the Chicago Police
12 Department have different ways that it arranged the
13 detective division?
14      MS. JOHNSON:  Object to foundation.
15 BY MS. DONNELL:
16   Q.  If you know.
17      MS. JOHNSON:  And form.
18   A.  The -- are you -- could you repeat the
19 question again?  I don't understand what you are asking.
20 BY MS. DONNELL:
21   Q.  Sure.  Sure.  Well, let me just clarify.
22      In September 1991, the 9th District patrol
23 division was part of Area Three detective division,
24 correct?

---

22

1    A.  The 9th District was under the area that
2  was for Area Three.  The detectives in Area Three had a
3  number of districts underneath them at that time, the
4  way the city was divided, and the 9th District was one
5  of those districts that was under Area Three.
6    Q.  Thank you for clarifying that.
7       My question was just over the time span
8  that you were assigned to the 9th District, is it fair
9  to say that it wasn't always one of the districts under
10 Area Three that CPD had different ways of organizing its
11 detective division over those two decades?
12      MS. JOHNSON:  Object to form and
13 foundation.
14   A.  I don't believe that was changed until
15 later.
16 BY MS. DONNELL:
17   Q.  Okay.  Do you remember when Area Three was
18 closed?
19   A.  I don't remember what year.
20   Q.  Okay.  Do you remember the latter part of
21 the time that you were assigned to a patrol officer in
22 District 9 that you were associated with a different
23 area, detective area other than Area Three?
24      MS. JOHNSON:  Object to form.

---

23

1       THE WITNESS:  I was detailed from the
2  9th District to Area One, I believe, in '94, I believe.
3  BY MS. DONNELL:
4    Q.  Okay.  And what does that mean, as being a
5  patrol officer detailed to Area One?  Can you describe
6  what that meant for you in terms of your job
7  responsibilities?
8       MS. JOHNSON:  Object to form.
9    A.  Area One had organized a mission team that
10 was made up of two members from each district, and the
11 team was formed and worked out of Area One.
12   Q.  And what was the mission team?  What was
13 the mission?
14   A.  It was to work on felonies that occurred in
15 the districts of Area One.
16   Q.  And were you and Officer Pack the two
17 members from the 9th District that were detailed to Area
18 One?
19   A.  No.
20   Q.  Do you remember who was assigned along with
21 you from the 9th District to when you got detailed to
22 Area One?
23      MS. JOHNSON:  Object to form.
24   A.  I had a number of different partners while

---

24

1  I was there.
2  BY MS. DONNELL:
3    Q.  Do you remember who they were?
4    A.  I remember an officer named Vito Balice and
5  an Officer Pat Seidler.  I don't remember anybody else.
6    Q.  How long did you work as the 9th District,
7  one of the 9th District officers detailed to Area One
8  for the investigation of felonies?
9    A.  Could you repeat the question?
10   Q.  How long were you detailed to Area One,
11 sir?
12   A.  Um, a little bit over a year, I believe.
13 Maybe a year-and-a-half.  I'm not positive.
14   Q.  Okay.  And then after that detail, you were
15 detailed to detached service; is that right?
16   A.  Yes, ma'am.
17   Q.  And you worked there until your retirement
18 in 1998?
19   A.  Yes, ma'am.
20   Q.  And for the record, what is detached
21 services?  What kind of services does that unit provide?
22   A.  It provides details outside the police
23 department.
24   Q.  Does that include services to other law

---

Transcript of Michael DeLacy
Conducted on January 15, 2021

25

1 enforcement agencies?
2　　A.　Yes.
3　　Q.　Like the FBI or federal law enforcement
4 agencies?
5　　A.　Yes.
6　　Q.　And other local municipal law enforcement
7 agencies in the suburbs?
8　　A.　Yes.
9　　Q.　As well as details to perhaps Cook County
10 or other surrounding counties?
11　　A.　Yes.
12　　Q.　And was there a particular law enforcement
13 agency that you worked with when you were assigned to
14 detached service?
15　　A.　Yes.
16　　Q.　Which was that?
17　　A.　Cook County State's Attorney's Office.
18　　Q.　Okay.　How long did you work with the Cook
19 County State's Attorney's Office when you were detailed
20 to detached services for the CPD?
21　　A.　I believe it was two years.　Right in the
22 area of two years.
23　　Q.　And what did you do?　Did you have a
24 particular assignment or unit that you were working on

26

1 with the Cook County State's Attorney's Office when you
2 were part of detached services?
3　　　　MS. JOHNSON:　Object to form.
4 BY MS. DONNELL:
5　　Q.　I'm sorry, what was your answer, sir?
6　　A.　Yes.
7　　Q.　Can you describe what you were assigned to
8 do for the Cook County State's Attorney's Office when
9 you were part of detached service?
10　　A.　I was assigned to the gang unit,
11 investigation unit.
12　　Q.　And can you describe what the gang unit,
13 investigation unit at the Cook County State's Attorney's
14 Office was when you were assigned there from
15 approximately maybe 1996 to 1998?
16　　A.　I don't understand the question.
17　　Q.　What did you do when you were assigned to
18 the gang unit as part of the Cook County State's
19 Attorney's Office?
20　　A.　We did a number of things.　We served
21 subpoenas.　We interviewed defense and state witnesses.
22 We transported witnesses, victims, evidence.　We
23 conducted swabs.　We did measurements.　We took photos.
24　　Q.　Were you assisting the Cook County State's

27

1 Attorney's Office in their criminal prosecutions?
2　　A.　Yes.
3　　Q.　Okay.　Did you request to be transferred to
4 the detached services unit?
5　　A.　Yes.
6　　Q.　Why did you ask to be detailed to the
7 detached services unit?
8　　A.　I was apprised of a vacancy that was at the
9 State's Attorney's Office.
10　　Q.　And why did you want to apply for that
11 vacancy?
12　　A.　Because my partner had retired.
13　　Q.　Are you referring to Officer Pack?
14　　A.　Yes.
15　　Q.　Okay.　And what was it about Officer Pack's
16 retirement that made you want to apply for the vacancy
17 at the gang unit at the Cook County State's Attorney's
18 Office?
19　　A.　Well, we had worked together for a long
20 time and I -- I liked the way that we worked together.
21 And the other partners that I had after him, we didn't
22 have the same relationship, so I wanted to branch out
23 into a new area.
24　　Q.　It makes sense.　Okay.

28

1　　　　And is it fair to say you were part of
2 detached services at the gang unit of the Cook County
3 State's Attorney's Office for approximately the last two
4 years of your career at the Chicago Police Department?
5　　A.　Yes, ma'am.
6　　Q.　Okay.　Did you have any other assignments
7 when you were part of the detached services, or did you
8 only have that one with the gang unit at the Cook County
9 State's Attorney's Office?
10　　A.　At that time I was just assigned to the
11 gang unit.
12　　Q.　Okay.　Were you part of a tactical unit
13 when you were at the 9th District?
14　　A.　Yes.
15　　Q.　Were you ever part of a tactical unit when
16 you were assigned to the 5th District?
17　　A.　No.
18　　Q.　Okay.　So, how long were you assigned to
19 the tactical unit at the 9th District?
20　　A.　20-some years.
21　　Q.　So the entire time at the 9th District, you
22 and Officer Pack were part of the tactical unit?　Is
23 that accurate?
24　　A.　Not -- well, not during the whole time, no.

Transcript of Michael DeLacy
Conducted on January 15, 2021

---

29

1 I was on the tact team before I met Officer Pack.
2    Q.  Okay.  When you moved from the 5th District
3 to the 9th District, was that a move to become a
4 tactical officer, or did you spend some time as just a
5 regular patrol in the 9th District before you joined the
6 9th District tactical team?
7    A.  I don't recall.
8    Q.  Okay.  Do you recall how many years you
9 were in the 5th District before you moved to the 9th
10 District?
11    A.  Some time.  I'm not sure.
12    Q.  Was your 5th District your first assignment
13 after you were no longer a probationary officer?
14    A.  I believe I was still on probation at the
15 5th District.
16    Q.  Okay.  That's where you started.
17    Did you do your field training at the 5th
18 District?
19    A.  My field training was -- I don't believe
20 they had field training back then.
21    Q.  Okay.  Fair enough.
22    So, is it accurate to say that your first
23 assignment as a probationary officer was at the 5th
24 District coming out of the academy?

---

30

1    A.  Yes.
2    Q.  I believe you said you don't remember how
3 long you were at the 5th District.
4    Are you able to estimate whether it was a
5 year, or more than one year?
6    A.  It may have been a year.
7    Q.  Okay.  And when you moved to the 9th
8 District, it's your testimony that you don't remember if
9 you spent some time as just a regular uniformed patrol
10 officer before becoming a tactical officer; is that
11 accurate?
12    A.  Yes.
13    Q.  Okay.  So to the best of your ability, as
14 you sit here today, you can't remember it, right?
15    MS. JOHNSON:  Objection; asked and
16 answered.
17 BY MS. DONNELL:
18    Q.  You can answer, sir.
19    A.  I don't recall.
20    Q.  Okay.  Is it fair to say that the majority
21 of those 20 years you were at the 9th District you were
22 working as a tactical officer; is that accurate?
23    A.  Yes.
24    Q.  And for at least approximately 20 of those

---

31

1 years, you were partners with Officer Pack on the
2 tactical unit, right?
3    A.  Yes.
4    Q.  Were you working as a tactical officer in
5 the seventies and eighties?
6    A.  I believe so.
7    Q.  Do you remember how long before September
8 1991 you had been a tactical officer?
9    A.  I would have to speculate on that.
10    Q.  Okay.  You can go ahead and guess.
11    A.  I would rather not guess.
12    Q.  Well, you were about seven years before
13 your retirement, so you would have been a tactical
14 officer for quite some time, right?
15    MS. JOHNSON:  Objection; form,
16 foundation.
17 BY MS. DONNELL:
18    Q.  You can answer.
19    A.  Yes.
20    Q.  Okay.  So, if you joined the CPD in March
21 of 1969, went to the academy, spent a short time at 5th
22 District, other than -- you were at the 9th District for
23 the remainder of your career until you were detailed to
24 Area One, right?

---

32

1    A.  Yes.
2    Q.  So the majority of your career was really
3 spent at the 9th District, right?
4    A.  Yes.
5    Q.  And the bulk or really the vast majority of
6 those years were spent as a tactical officer, correct?
7    A.  Yes.
8    Q.  Okay.  So, it's fair to say that you were
9 definitely a tactical officer by the 1980s; is that
10 right?
11    A.  Yes.
12    Q.  Okay.  So, probably you were a tactical
13 officer sometime in the 1970s, working backwards, right?
14    MS. JOHNSON:  Object to form and
15 foundation.
16    A.  Yes.
17 BY MS. DONNELL:
18    Q.  Okay.  Can you please describe in July,
19 August, September of 1991 what it meant to be a tactical
20 officer in the 9th District?
21    MS. JOHNSON:  Object to form and
22 foundation.
23    A.  I don't understand the question.
24 BY MS. DONNELL:

---

Transcript of Michael DeLacy
Conducted on January 15, 2021

---

33

1    Q.  Sure.  Well, what is a tactical officer?
2        MS. JOHNSON:  Object to form.
3  BY MS. DONNELL:
4    Q.  Sir, do you know what a technical officer
5  is?
6    **A.  It's a -- it's a group.  A sergeant and**
7  **eight men assigned to each shift that augments the**
8  **patrol officers in the district.**
9    Q.  Okay.  When you were a tactical officer in
10 the 9th District in 1991, did you wear uniforms or did
11 you not wear uniforms?
12   **A.  We wore both.**
13   Q.  Okay.  When would you wear a uniform, and
14 when would you not wear uniform?
15   **A.  When we would be detailed out of the**
16 **district, or for special events we would be in uniform.**
17   Q.  But on your regular shift as a tactical
18 officer, you would not be in uniform; is that correct?
19       MS. JOHNSON:  Object to form.
20   **A.  Predominantly.**
21 **BY MS. DONNELL:**
22   Q.  Okay.  When you worked as a tactical
23 officer in the 9th District, did you respond to radio
24 dispatch calls, or did you work on other assignments?

---

34

1    **A.  Both.**
2        MS. JOHNSON:  Object to form.
3  BY MS. DONNELL:
4    Q.  Okay.  Did you have, when you were a
5  tactical officer with the 9th District, did you use
6  marked or unmarked cars, or both?
7    **A.  Normally unmarked cars.**
8    Q.  When you worked as a tactical officer in
9  the 9th District in the 1990s, the time of this-- Mr.
10 Jakes' arrest, what shift were you working?
11   **A.  Days.**
12   Q.  And at that time, what were the hours for
13 days, the dayshift?
14   **A.  I believe it was 9:00 to 5:00 or 5:30.**
15   Q.  Was there a tactical unit for every shift,
16 for all three shifts back in the 1990s?
17       MS. JOHNSON:  Object to foundation.
18       MS. DONNELL:  I will strike that.
19 BY MS. DONNELL:
20   Q.  Do you know if there was a tactical unit
21 for the 9th District on duty for all three shifts in the
22 1990s?
23   **A.  I don't believe three shifts.  I believe --**
24 **I don't believe the midnight had a tact team.**

---

35

1    Q.  Okay.
2    **A.  I believe the days and afternoons did.**
3    Q.  Okay.  Did the tactical unit at the 9th
4  District perform search warrants?  Is that one of the
5  jobs they did?
6        MS. JOHNSON:  Object to form and
7  foundation.
8    **A.  Yes.**
9  **BY MS. DONNELL:**
10   Q.  Or execute search warrants?  Did the
11 tactical unit in the 9th District, when you were
12 assigned there in the 1990s, ever respond to homicide
13 scenes?
14       MS. JOHNSON:  Object to form and
15 foundation.
16   **A.  Yes.**
17 **BY MS. DONNELL:**
18   Q.  As tactical unit officer, did you conduct
19 witness interviews?
20   **A.  Do you want to clarify that question?**
21   Q.  Sure.  Did you as a tactical unit officer
22 ever go out to interview witnesses for criminal
23 investigations, felony criminal investigations?
24       MS. JOHNSON:  Object to form,

---

36

1  foundation.
2        Heather, I'm sorry, I couldn't hear it.
3  It keeps cutting out.  Are you asking if he did, or if
4  they did at that unit in general?
5        MS. DONNELL:  I am asking if at that
6  unit they did.
7        MS. JOHNSON:  Oh, okay.  Object to form
8  and foundation.
9    **A.  Sometimes.**
10 **BY MS. DONNELL:**
11   Q.  What was a typical shift like for a
12 tactical unit in the 1990s?  What were your typical
13 assignments?
14       MS. JOHNSON:  Object to form and
15 foundation.
16 BY MS. DONNELL:
17   Q.  Well, sir, you recall your work as a
18 tactical officer in the 9th District, right?  You have
19 some memory of that?
20   **A.  Yes.**
21   Q.  Okay.  And can you describe, generally, the
22 kinds of assignments that your unit had as the tactical
23 unit?
24       MS. JOHNSON:  Object to form and

---

37

1 foundation.
2      A.  If we weren't detailed out of the district,
3  we would normally handle problems that the district
4  commander had.  Citizens' complaints regarding drug
5  dealing, crime patterns involving burglaries and
6  robberies, things of that nature.
7  BY MS. DONNELL:
8      Q.  What was the geographic boundaries of the
9  9th District in September 1991?  The
10 north/south/east/west boundaries?
11     A.  The north boundary on the east end was, I
12 believe, 26th Street.  The east boundary was the Dan
13 Ryan Expressway.  South boundary was 55th Street.  And
14 west boundary was Kedzie Avenue.
15     Q.  And in the 1990s, were there any housing
16 projects that were in that 9th District in 1991?
17     A.  Yes.
18     Q.  Which ones?
19     A.  Wentworth Gardens.
20     Q.  You said Wentworth Gardens?
21     A.  Yes, ma'am.
22     Q.  Were those low-rises?
23     A.  Yes.
24     Q.  And do you remember the geographic location

38

1  of the Wentworth Gardens?
2      A.  I believe it was Wentworth on the east,
3  Princeton on the west, 37th Street to 39th Street.
4      Q.  Okay.  What kind of crimes did the tactical
5  unit typically investigate or be involved with --
6          MS. JOHNSON:  Object to form.
7  BY MS. DONNELL:
8      Q.  The early 1990s -- sorry.
9          MS. DONNELL:  I will strike that.  It
10 was a convoluted question.
11 BY MS. DONNELL:
12     Q.  Were there certain types of crimes that the
13 tactical unit was generally involved in investigating in
14 the 1990s?
15         MS. JOHNSON:  Object to form,
16 foundation.
17     A.  No.
18 BY MS. DONNELL:
19     Q.  You investigated all sorts of crimes?
20     A.  Yes.
21     Q.  Okay.  Can you describe some of the crimes
22 that you investigated as a tactical officer in the
23 1990s?
24     A.  Burglaries, robberies, thefts, drugs.

39

1      Q.  How about -- I'm sorry.  Go ahead.
2      A.  Drugs.
3      Q.  Drugs.  When you were assigned to the 9th
4  District tactical unit in the early 1990s, did that unit
5  also work with any gang officers or narcotic officers?
6          MS. JOHNSON:  Object to form,
7  foundation.
8      A.  There was a separate gang unit that was
9  also assigned to the 9th District.
10 BY MS. DONNELL:
11     Q.  Okay.  In 1991, do you remember the
12 separate gang unit or any of its members that were
13 assigned to the 9th District?
14     A.  No.
15     Q.  Was there a separate narcotics unit at that
16 time that was also assigned to work in the area?
17     A.  No.
18     Q.  Okay.  I want to talk about your work
19 post-retirement from the Chicago Police Department now.
20 Okay?
21     A.  Sure.
22     Q.  Did you, when you retired in November 1998,
23 did you go work in another capacity, or did you take
24 some time off?

40

1      A.  No, I worked in another capacity.
2      Q.  Okay.  Did you have one job or more than
3  one job since your retirement in 1998?
4      A.  One job.
5      Q.  Okay.  What job was that?
6      A.  Investigator for the State's Attorney's
7  Office.
8      Q.  Okay.  And how long did you work as an
9  investigator for the State's Attorney's Office since
10 your retirement from the Chicago Police Department?
11     A.  Nineteen years.
12     Q.  Are you currently employed by them?
13     A.  No.
14     Q.  When did you retire from the Cook County
15 State's Attorney's Office as an investigator?
16     A.  December of 2017.
17     Q.  Well, what units did you work with as an
18 investigator at the Cook County State's Attorney's
19 Office over those nineteen years?
20     A.  I worked in the trial, the trial division,
21 and I also worked in the gang unit.
22     Q.  Okay.  And did Officer Pack work as an
23 investigator at the Cook County State's Attorney's
24 Office during some portion of those nineteen years that

Transcript of Michael DeLacy
Conducted on January 15, 2021

41

1 you were there?
2          MS. JOHNSON:  Objection; foundation and
3 form.
4     A.  Yes.
5 BY MS. DONNELL:
6     Q.  Were you and Officer Pack assigned to the
7 same divisions when you were both investigators at the
8 Cook County State's Attorney's Office?
9     A.  At some point, yes.
10     Q.  So when you first got there, you were not
11 together in the same unit.  But at some point you were
12 both assigned together to the same unit?
13     A.  I believe so.
14     Q.  What unit did you and Officer Pack work in
15 together at the Cook County State's Attorney's Office?
16     A.  In the gang unit.
17     Q.  How long did you and Officer Pack work
18 together in the gang unit at the Cook County State's
19 Attorney's Office?
20     A.  Around eleven years.
21     Q.  Do you have a pension from the Cook County
22 State's Attorney's Office?
23     A.  Yes.
24     Q.  And do you also have a -- is that a full

42

1 pension from the Cook County State's Attorney's Office?
2     A.  Do you want to clarify that?
3     Q.  Well, you worked there for nineteen years?
4     A.  Yes.
5     Q.  And does that qualify you for -- were you
6 working full-time for the Cook County State's Attorney's
7 Office?
8     A.  Yes.
9     Q.  For those nineteen years?
10     A.  Yes.
11     Q.  And did that level of service qualify you
12 for a full pension?
13     A.  No.
14     Q.  Okay.  What did it qualify you for for your
15 pension?
16     A.  A percentage.
17     Q.  What percentage?
18          MS. JOHNSON:  Objection.
19          You are not going to answer any other
20 questions about financial obligations right now.
21          I direct him not to answer any
22 questions about his percentage of his pension or any
23 dollar amount, or anything like that, Heather.
24          MS. DONNELL:  Why?

43

1          MS. JOHNSON:  We have already been over
2 this one, Heather.  We haven't even decided whether or
3 not this was going to be an issue, and we have been
4 disputing whether or not this is even relevant.  So
5 let's just keep it moving.
6          If you're having a question about --
7          MS. DONNELL:  Well, if you -- go ahead,
8 Brittany.
9          MS. JOHNSON:  If you have any questions
10 about his pension, you can ask him on the record, and I
11 am going to direct him not to answer from hereon out.
12 He noted that he has a pension, and that's that.
13          MS. DONNELL:  Okay.  The parties are
14 in dispute whether the punitive damages discovery is
15 discoverable at this point, and it is something that we
16 are in the process of negotiating.
17          So, pursuant to the parties, you know,
18 meet and confer, I will -- maybe what I will do is I
19 will not ask further questions related to amounts.  I am
20 just going to ask about the existence of a pension with
21 CPD, and then we can defer that to the party's
22 resolution of it, or to the Court's resolution of it.
23 BY MS. DONNELL:
24     Q.  So, Mr. DeLacy, do you have a pension with

44

1 the Chicago Police Department?
2          MR. GRILL:  He has already answered the
3 question.
4          MS. DONNELL:  No, I haven't asked that.
5 No.
6          MS. JOHNSON:  She asked to the State's
7 Attorney's Office.
8          Go ahead.
9          MS. DONNELL:  And, also, per our
10 agreement, there is just one person who is defending
11 the witness.  So, I expect that Ms. Johnson is going
12 to be doing the objecting.
13          MR. GRILL:  Well, I also expect you to
14 not ask questions that you know you are not supposed to
15 be asking at this point.
16          MS. DONNELL:  I'm not.
17          MR. GRILL:  Well, no, with that said,
18 he said, "Yes."  Now let's move on from the topic.
19          MS. DONNELL:  I don't know the answer
20 to that.  And I think you interrupted him, or I didn't
21 hear it if he did.
22 BY MS. DONNELL:
23     Q.  Mr. DeLacy, do you have a pension with the
24 Chicago Police Department?

Transcript of Michael DeLacy
Conducted on January 15, 2021

12 (45 to 48)

45

1    A.   Yes.
2    Q.   Is that a full pension?
3         MR. GRILL:  No, we are not answering
4  anymore questions.
5         MS. JOHNSON:  Just keep moving.  Okay.
6  You know he has a pension with CPD.  Okay.
7  Don't answer that question.
8         MR. GRILL:  We're not answering any
9  more questions on that.
10        MS. DONNELL:  Okay.  Let's pause here
11 for a second and say:  This witness, I have agreed to
12 take this deposition remotely per the Defendant's
13 request.  At this time --
14        MR. GRILL:  No, that's actually a
15 mistake.
16        MS. DONNELL:  I recall --
17        MR. GRILL:  Hang on.
18        MS. DONNELL:  Hold on.  Please, don't
19 interrupt me.  Please, don't interrupt me.  You can
20 speak when I am done.  But I would ask, just like with
21 Mr. Caesar, that you don't interrupt, because it starts
22 to get unnecessarily heated.  So, let me make my record,
23 and then you guys can do yours.  And I'm trying not to
24 interrupt you guys as well.

46

1         MR. GRILL:  Go ahead.
2         MS. DONNELL:  Thank you.
3         I made a request at the beginning of
4  the deposition that there wouldn't be a tag-team defense
5  of this witness.  And I am going to repeat that request
6  right now, that there should be one lawyer defending
7  this deposition.  And it was represented to me that
8  that would be Ms. Johnson.  So, I am going to request
9  that the Defendants abide by that agreement as we
10 proceed through the rest of the deposition.
11        Now, if some -- if the Defendants would
12 like to speak, you may.
13        MR. GRILL:  Okay.  I'm going to speak.
14        MS. DONNELL:  No, hang on, Andrew.
15        MR. GRILL:  No, no, I'm going to speak.
16 You can -- you can choose not to listen to me, but I am
17 definitely going to handle this.
18        A couple of things here, Heather.
19 On the pension issue, and on his anything related to
20 punitive damages, you know full well that that is a
21 currently -- that is a dispute that is currently being
22 negotiated and argued between our firms.  So, you know
23 full well that going into this deposition that that
24 topic is off limits.  He has answered that question.

47

1  He is not answering anything more about that.
2         Second of all, when it comes to your
3  characterization as to why you are not physically
4  present here, that was something, and our e-mail
5  correspondence bears this out, so if you want to make
6  an issue about it, feel free to.  But you offered, and
7  I appreciated it, but I did not ever request or say
8  anything along the lines of that you cannot be here.
9  I asked you what the status was regarding your COVID
10 test, and you didn't answer that.  Instead, you just
11 offered to not be here, and I took that offer.  I never
12 said that you can't be here.  That was your offer.
13 I accepted it.  So, let's be clear that this is not
14 a situation where I told you that you could not come.
15        Okay.  With that, I am going to move
16 on.  I'm not -- I have not made any objections to
17 anything at this point.  I don't intend to.  This is
18 Brittany's deposition.  But in light of what you raised
19 there, I feel like I had to speak up.  So, with that,
20 I'm done.  Let's move on.
21        MS. DONNELL:  Andrew, I will just then
22 say for the record, I don't think that your questions
23 to me were appropriate.  I don't think we should be
24 discussing it on the record here.  Just like I am not

48

1  discussing your personal medical that you raised in
2  your e-mail --
3         MR. GRILL:  I just --
4         MS. DONNELL:  Well, let me finish.
5  No, no, no.
6         MR. GRILL:  I will have the witness
7  step out of the room, because I will -- I do want to
8  talk to you about this.
9         So, Mr. DeLacy, please go out.
10        (Whereupon, the witness departs the
11 room.)
12        MS. DONNELL:  Then we are going off
13 the record.  This is not on the record, Andrew.  This is
14 not appropriate nor is it necessary, and it's a really
15 big distraction.  I'm just asking that you don't have
16 a tag-team defense, and then we can move on.  I have
17 already agreed not to go further into the punitive
18 damages.  So, I am going to request that you bring
19 the witness back and we proceed.  This is a big waste
20 of time.
21        MR. GRILL:  Okay, Heather.  There is --
22        MS. DONNELL:  Let's go off the record.
23 It is not appropriate to be on the record, Andrew.
24        MR. GRILL:  I -- I would actually

Transcript of Michael DeLacy
Conducted on January 15, 2021

13 (49 to 52)

49

1  prefer to stay on the record. So, here is the deal,
2  Heather. The record itself bears it out that this has
3  not been a tag-team deposition by any stretch. Okay?
4  So, you can characterize it that way, but you are wrong.
5        Second of all, I'm not going to discuss
6  the contents of our communications regarding -- that led
7  up to your offer to not appear in person here today.
8  Okay? But I would ask tread very carefully here with
9  this, because what occurred and what led up to this, I
10 am very upset about it. And I'm happy to have a
11 conversation with you privately about that, but I
12 just ask just let's move on. And maybe at some point
13 in the future you and I can have a personal conversation
14 about how your decisions at the last deposition impacted
15 me and my family. With that said, let's move on. I am
16 going to call the witness back in here.
17        MS. DONNELL: Before you call the
18 witness, I get to speak, Andrew.
19        MR. GRILL: Go ahead.
20        MS. DONNELL: Andrew, I have conducted
21 myself professionally.
22        MR. GRILL: You haven't.
23        MS. DONNELL: Professionally and then
24 respectfully. And I do not think, and you and I

50

1  can have a conversation off the record, because I do
2  not think it is appropriate at all, but I will tell you
3  that I, for the record, since you are making certain
4  representations, that I will represent that I think I
5  have been extremely professional and courteous. And I
6  have -- so any way, let's move on. Because you and I
7  can speak off the record, because I think what is
8  happening here is really inappropriate. So let's move
9  on.
10        (Whereupon, the witness re-enters the
11 room.)
12        MR. GRILL: Ready to go when you are.
13        MS. DONNELL: Andrew, if you are going
14 to be speaking, you should have your video on.
15        MR. GRILL: We are ready to go.
16 I'm not intending on saying anything else. Let's go.
17 And as far as I know, I should not be the one being
18 video recorded.
19        MS. DONNELL: None of us are, Andrew;
20 the witness is.
21        MR. GRILL: Okay. Let's go.
22 BY MS. DONNELL:
23    Q. Mr. DeLacy, I'm sorry for that
24 interruption. Let's get back to the matters at hand.

51

1        So, Mr. DeLacy, before we -- well, you were
2  telling me about your work with the Chicago or the Cook
3  County State's Attorney's Office. I believe you told
4  me this, but just if you could clarify, have you had
5  any other employment other than since your work with
6  the Chicago Police Department, other than the Cook
7  County State's Attorney's Office?
8     A. No.
9     Q. Okay. Mr. DeLacy, do you have an
10 independent recollection of any of the events related
11 to your interaction with my client, Anthony Jakes, in
12 September of 1991?
13    A. Could you repeat that question?
14    Q. Sure. Of course. Do you have a memory of
15 your interactions with my client, Anthony Jakes, in
16 September of 1991, independent from any of the documents
17 or the reports that you reviewed?
18    A. No.
19    Q. Earlier today you testified that you
20 reviewed a number of documents, the case report, the
21 arrest report, and your partner, Officer Pack's
22 testimony, and Mr. Jakes' criminal proceeding. Do you
23 remember that testimony?
24    A. Yes.

52

1     Q. After reviewing those documents to prepare
2  for your deposition today, did that refresh your
3  recollection in any way of your interactions with
4  Anthony Jakes in September 1991?
5     A. Yes.
6     Q. It did?
7     A. Yes.
8     Q. Okay. So, do you now have a memory, an
9  independent memory of your interactions with Anthony
10 Jakes in September of 1991?
11    A. Yes.
12    Q. Okay. So, just so I'm clear, prior to your
13 review of the documents, meaning the case report, arrest
14 report and Pack's testimony and Mr. Jakes' criminal
15 proceeding, you did not have a memory at all, correct?
16    A. Correct.
17    Q. And after reviewing the documents you
18 testified to earlier today, you now have a refreshed
19 memory; is that true?
20    A. Yes.
21    Q. Okay. So now as you are sitting here
22 today, and I am asking you questions, is your memory
23 limited to what you reviewed in the documents, or do you
24 have a memory of interactions, either what was said or

Transcript of Michael DeLacy
Conducted on January 15, 2021

14 (53 to 56)

53

1 done, beyond what is reported in the documents you read?
2     **A. Limited.**
3     Q. Meaning, you do have a limited memory of
4 occurrences, either what was said or done, that is
5 outside or beyond what you reviewed?
6     **A. Yes.**
7     Q. Okay. Do you have -- with, first of all,
8 when is the first time that you reviewed any reports,
9 the case report, arrest report, or testimony in this
10 case? How long ago was the first time you read those
11 documents?
12     **A. I read the testimony Tuesday afternoon.**
13     Q. Tuesday of this week?
14     **A. Yes.**
15     Q. Had you read Officer Pack's testimony any
16 time before Tuesday of this week?
17     **A. No.**
18     Q. How about the case report? When did you
19 first remember reading the case report that you are
20 provided for your deposition?
21     **A. Probably a year ago.**
22     Q. Did your memory get refreshed a year ago
23 when you read the case report?
24     **A. No.**

54

1     Q. Okay. When is the first time you remember
2 reading the arrest report for Anthony Jakes from
3 September of 1991?
4     **A. About the same time. About a year ago.**
5     Q. Okay. And when you read the arrest report
6 for Anthony Jakes from September of 1991, did that
7 refresh your recollection of the events and your
8 involvement with Mr. Jakes?
9     **A. Somewhat.**
10     Q. Okay. So, is it accurate to say that your
11 memory as to the incident and your involvement with
12 Anthony Jakes in September of 1991 was first refreshed
13 about a year ago when you were provided the case report
14 and the arrest report?
15     MS. JOHNSON: Object to form.
16     **A. Yes.**
17 **BY MS. DONNELL:**
18     Q. And then you were provided the Pack's
19 testimony earlier this week; is that right?
20     **A. Yes.**
21     Q. And then that refreshed -- is it accurate
22 to say that that refreshed your recollection in
23 additional ways?
24     **A. Yes.**

55

1     Q. Okay. Now earlier you testified that now
2 that your memory is refreshed, you have a memory of some
3 interactions was Mr. Jakes that are not found in either
4 the case report, arrest report or Officer Pack's
5 testimony? Did I understand this correctly?
6     **A. I don't understand the question.**
7     MS. JOHNSON: Objection.
8 Mischaracterizes the testimony.
9 BY MS. DONNELL:
10     Q. Okay. I'm just trying to make sure. Let
11 me clarify this.
12     Do you have a memory of anything that
13 happened between your involvement with Mr. Jakes back in
14 September of 1991 that is not in the case report, arrest
15 report, or Officer Pack's testimony?
16     **A. No.**
17     Q. Okay. So it is fair to say that your
18 memory of your interactions with Anthony Jakes is
19 limited to what you have reviewed in the case report,
20 arrest report or Officer Pack's testimony; is that
21 right?
22     **A. Yes.**
23     Q. Okay. Were you provided any other
24 witnesses' testimony other than Officer Pack's

56

1 testimony?
2     **A. Yes.**
3     Q. What witness were you provided?
4     **A. I think the testimony of Anthony Jakes.**
5     Q. Do you remember what testimony? Were you
6 provided just one transcript or more than one transcript
7 of Anthony Jakes?
8     **A. I don't recall.**
9     Q. Any other witnesses other than Officer Pack
10 and Anthony Jakes?
11     **A. No.**
12     Q. Were you provided the pretrial testimony of
13 Jessie Mae Jones?
14     **A. No.**
15     Q. Do you know who Jessie Mae Jones is?
16     **A. Yes.**
17     Q. Who is that?
18     **A. The guardian of Anthony Jakes.**
19     Q. I want to talk to you about September 16th,
20 1991, okay?
21     **A. Okay.**
22     Q. You were working the dayshift at that time?
23     **A. Yes.**
24     Q. And so do you remember reporting for duty

Transcript of Michael DeLacy
Conducted on January 15, 2021

15 (57 to 60)

57

1  on September 16th, 1991?
2      A.  No, I don't remember reporting for duty,
3  but I was working that day.
4      Q.  And you know you were working because you
5  have seen the case report and arrest report, right?
6      A.  Yes.
7      Q.  Okay.  But it is fair to say, or tell me if
8  I'm wrong, you don't remember anything about September
9  16th, 1991 in terms of what happened that morning before
10 you reported for duty?  Do you remember anything about
11 that day?
12     A.  No.
13     Q.  And you don't actually remember reporting
14 for duty, correct?
15     A.  Correct.
16     Q.  Do you remember any assignments you had
17 before 12:00 p.m. on September 16th, 1991?
18     A.  No.
19     Q.  Okay.  Now, you were working with Officer
20 Pack that day, right?
21     A.  Yes.
22     Q.  And you don't remember that, but you just
23 know that from the case report and the arrest report; is
24 that fair?

58

1      A.  Yes.
2      Q.  Okay.  Did you or Officer Pack get a call
3  to inform you that Anthony Jakes might have information
4  about a homicide investigation?
5      A.  Officer Pack received a call.
6      Q.  How do you know that Officer Pack received
7  the call?
8      A.  Because he told me.
9      Q.  Do you remember Officer Pack having that
10 conversation with you?
11     A.  Yes.
12     Q.  Okay.  Where were you when Officer Pack
13 received the phone call?
14     A.  At the 9th District.
15     Q.  Where in the 9th District?
16     A.  I don't recall.
17     Q.  What telephone did that call come in on?
18         MS. JOHNSON:  Object to foundation.
19     A.  I don't know.
20     Q.  Do you have an actual memory of this phone
21 call?
22     A.  No.
23     Q.  Sir, what you are testifying to is from
24 what you just reviewed in the report; is that right?

59

1          MS. JOHNSON:  Objection.  That
2  mischaracterizes testimony.
3  BY MS. DONNELL:
4      Q.  Were you with Officer Pack when he received
5  the phone call?
6      A.  No.
7      Q.  Okay.  Do you remember Officer Pack
8  relaying to you that he had received a phone call?
9      A.  Yes.
10     Q.  Is that something that you have an actual
11 memory of?
12     A.  Yes.
13     Q.  Okay.  What do you remember about what
14 Officer Pack told you?
15     A.  He told me it's time to go, we have a — we
16 got some information from an anonymous source, and that
17 a person by the name of Anthony Jakes may have some
18 information regarding a homicide.
19     Q.  Okay.  And what you just testified to, is
20 that something that you actually remember, or is that
21 what you are relaying because you reviewed it in the
22 report?
23         MS. JOHNSON:  Objection; asked and
24 answered.

60

1  BY MS. DONNELL:
2      Q.  Go ahead, you can answer it again, sir.
3      A.  I'm not sure.
4      Q.  You are not sure if you actually remember
5  Officer Pack telling this to you, right?
6      A.  Yes.
7      Q.  Okay.  Did Officer Pack tell you who the
8  person was?
9      A.  Yes.
10     Q.  I'm sorry, did he tell you who the person
11 that called him was?
12     A.  No.
13     Q.  Okay.
14     A.  He said it was anonymous.
15     Q.  Do you remember if you asked Officer Pack
16 any questions about who the anonymous tip was from --
17 hold on.
18         MS. DONNELL:  Just pause one second.
19 I need to go.
20         (Off the record.)
21 BY MS. DONNELL:
22     Q.  You don't remember asking any questions
23 about the person who provided the anonymous tip; is that
24 correct?

Transcript of Michael DeLacy
Conducted on January 15, 2021

16 (61 to 64)

61

1    A.   That's correct.

2    Q.   So as you sit here today, you don't have

3 any memory of any information that Officer Pack provided

4 to you; is that right?

5         MS. JOHNSON:  Object.  That

6 mischaracterizes his testimony.

7         MS. DONNELL:  Sorry.  I can rephrase

8 the question.

9 BY MS. DONNELL:

10   Q.   You don't remember asking Officer Pack

11 anything about the identity of the person who provided

12 the anonymous tip, correct?

13   A.   Correct.

14   Q.   Okay.  Did Officer Pack, do you now know

15 from reading any of the reports that Officer Pack

16 provided you information about the identity of the

17 person who called him?

18        MS. JOHNSON:  Object to form,

19 foundation.

20 BY MS. DONNELL:

21   Q.   You can answer.

22   A.   He told me it was anonymous.

23   Q.   Anything else other than it was anonymous?

24   A.   Female.

62

1    Q.   Anything else other than it was an

2 anonymous female?

3    A.   Not that I can recall.

4    Q.   Were you with Officer Pack before he

5 received this phone call?

6    A.   No.

7    Q.   Do you know how long after Officer Pack

8 received the phone call that he came and got you?

9    A.   No.

10   Q.   Okay.  Did you have any knowledge of the

11 Garcia homicide prior to your starting the shift on

12 September 16th, 1991?

13   A.   No.

14   Q.   Was your assignment to go with Officer Pack

15 to talk to Anthony Jakes the first you knew of the

16 Garcia homicide?

17   A.   No.

18   Q.   How did you first find out about the Garcia

19 homicide?

20   A.   When we were apprised of it when we started

21 work.

22   Q.   When?

23   A.   At 9:00.

24   Q.   So, earlier you testified you didn't

63

1 remember anything about reporting for duty on September

2 16th, 1991.  Are you now testifying that you remember

3 learning about the Garcia homicide when you started your

4 shift on September 16th, 1991?

5         MS. JOHNSON:  Object to form.

6    A.   You had asked me if I knew anything before

7 I started for duty, and I said no.

8 BY MS. DONNELL:

9    Q.   I see.  I thought I had asked you, or maybe

10 I am mistaken, or maybe you misheard me, but I thought I

11 asked do you remember anything about what happened prior

12 to 12:00 on September 16th, 1991, and I thought you

13 testified you had no memory.  Maybe I was mistaken.

14        Do you remember anything about your shift

15 after you reported for duty on September 16th, 1991?

16        MS. JOHNSON:  Object to form.

17 BY MS. DONNELL:

18   Q.   You can answer.  Sir, your lawyer is going

19 to be objecting from time to time.  She is making her

20 record.  But unless she instructs you not to answer, you

21 can go ahead and answer after she has objected.  Sorry

22 if that wasn't clear.

23   A.   Yes, we were notified after we started for

24 duty that there was a homicide.

64

1    Q.   And you have an independent recollection of

2 that morning, September 16th, 1991?

3         MS. JOHNSON:  Object to form, Heather.

4    A.   I don't know.

5         MS. JOHNSON:  What are you asking him?

6 Did he have an independent memory of the morning?

7         MS. DONNELL:  Yes, I am asking --

8 yes, I think my questions have been quite clear.  I will

9 try to be more clear on this.

10        I will tell you -- ask you again.

11 BY MS. DONNELL:

12   Q.   What do you remember about your work with

13 the Chicago Police Department on September 16th, 1991,

14 prior to 12:00 p.m.?

15        MS. JOHNSON:  Object to form.

16   A.   We started work and we were apprised of the

17 incidents that happened in the district.

18 BY MS. DONNELL:

19   Q.   Okay.  What incidents were you apprised of

20 when you reported for duty on the morning of September

21 16th, 1991?

22   A.   The homicide that you're referring to.

23   Q.   Anything else?

24   A.   No.

Transcript of Michael DeLacy
Conducted on January 15, 2021

65

1    Q.  Was that the only thing that occurred in
2  the district at that time?
3         MS. JOHNSON:  Object to form and
4  foundation.
5    **A.  It was significant, that's why we were**
6  **apprised of it.**
7  **BY MS. DONNELL:**
8    Q.  Okay.  Anything else that was significant
9  that happened in the district that you were apprised of
10  on the morning of September 16th, 1991 other than the
11  Garcia homicide?
12         MS. JOHNSON:  Object to form and
13  foundation.
14    **A.  I don't recall.**
15  **BY MS. DONNELL:**
16    Q.  Okay.  I just want to be clear.
17         Do you actually remember being told about
18  the Garcia homicide on September 16th, 1991 when you
19  reported for duty?
20         MS. JOHNSON:  Objection; asked and
21  answered.
22         MS. DONNELL:  Well, I think I'm getting
23  different answers, so I am asking again.
24    Q.  So you can answer, sir?

66

1         MS. JOHNSON:  You are not getting
2  different answers.  He said the same answer.  I'm going
3  to object to make my record.  Asked and answered.
4         You can go ahead and answer that again
5  if you know.
6    **A.  Can you repeat it again?**
7  **BY MS. DONNELL:**
8    Q.  Sure.  Do you have an actual memory of
9  being told about the Garcia homicide on the morning of
10  September 16, 1991 when you reported for duty, or if you
11  are assuming you were apprised of it based on what you
12  read?
13         MS. JOHNSON:  Object to form.
14         Heather, now you are getting
15  argumentative.
16         MS. DONNELL:  That's not true.
17  Brittany, that's not true.  I'm actually trying to make
18  sure that the witness understands my question.  And I
19  want to know if he is assuming he was provided
20  information about it, or he has an actual memory if he
21  was being informed about the Garcia homicide that
22  morning.  And I'm just trying to get clarity.
23         MS. JOHNSON:  Well, I'm objecting to
24  the form of the question, and I am objecting that you

67

1  already asked that.
2         Go ahead and answer it.
3  BY MS. DONNELL:
4    Q.  I'm sorry, Mr. DeLacy, I don't understand
5  your prior answer.  I just want to make sure that you
6  actually remember being told about the Garcia homicide
7  that morning or not.
8         MS. JOHNSON:  Again.  Objection.  I am
9  going to make my objection.
10         You can answer it.  But just again
11  asked and answered, and form.
12         Go ahead.
13    **A.  I believe we were told that morning that**
14  **this was a homicide.**
15  **BY MS. DONNELL:**
16    Q.  When you say you believe you were told that
17  morning, is that because you remember being told about
18  it, or you are assuming you were told about it based on
19  what you reviewed?
20         MS. JOHNSON:  Objection; asked and
21  answered.
22  BY MS. DONNELL:
23    Q.  You can go ahead and answer, Mr. DeLacy.
24    **A.  I don't recall.**

68

1    Q.  Okay.  And your testimony that you don't
2  recall means that you don't recall reporting for duty
3  and being told about the Garcia homicide; is that
4  correct?
5         MS. JOHNSON:  Objection.  That
6  mischaracterizes the testimony.
7  BY MS. DONNELL:
8    Q.  Well, can you clarify for me what you don't
9  recall means, you testimony that you don't recall means?
10  Can you clarify it for me so that the record is clear?
11         MS. JOHNSON:  Object to form.
12    **A.  Before we started for work that day, I did**
13  **not know about the homicide.  We were apprised after I**
14  **started work that a homicide had occurred.**
15  **BY MS. DONNELL:**
16    Q.  Okay.  And I'm sorry, Mr. DeLacy, because
17  it's not entirely clear whether you are saying that you
18  were apprised, whether you remembered reporting for duty
19  and being told about the Garcia homicide, or you are
20  assuming that that is what happened based on what you
21  reviewed to prepare for your deposition.  Would you
22  please just make that clear for me?
23         MS. JOHNSON:  Okay.  I am going to
24  object again as asked and answered.

Transcript of Michael DeLacy
Conducted on January 15, 2021

18 (69 to 72)

---

69

1          Go ahead and answer it.
2      A.  I recall it.
3  BY MS. DONNELL:
4      Q.  Okay.  What do you recall about what you
5  were told about the Garcia homicide when you reported
6  for duty on September 16th, 1991?
7      A.  That this was a homicide that occurred in
8  the area of 51st and Racine?
9      Q.  Anything else other than you were told a
10 homicide occurred at 51st and Racine?
11     A.  Not that I recall.
12     Q.  Sir, did you review any of the homicide
13 supplementary reports or major incident reports to
14 prepare for your deposition here today or at any point?
15     A.  Possibly.
16     Q.  Okay.  Have you seen any photographs from
17 the homicide investigation to prepare for your
18 deposition?
19     A.  No, I don't believe so.
20     Q.  Okay.  Have you told me everything that you
21 remember being told about the Garcia homicide when you
22 reported for duty?
23         MS. JOHNSON:  Object to form.
24     A.  Yes.

---

70

1  BY MS. DONNELL:
2      Q.  What was your first assignment on your tour
3  of duty that day, on September 16th, 1991?
4          MS. JOHNSON:  Object to foundation.
5      A.  I don't recall.
6  BY MS. DONNELL:
7      Q.  You can answer, sir.
8      A.  I don't recall.
9      Q.  Do you remember anything that you did on
10 September 16, 1991 while you were on duty other than
11 going out to meet Mr. Anthony Jakes and bringing him
12 back to Area Three?
13         MS. JOHNSON:  Object to form.
14     A.  No.
15 BY MS. DONNELL:
16     Q.  Is this the only assignment that you
17 remember that you did on September 16, 1991?
18     A.  Yes.
19     Q.  Were you working September 17th, 1991?
20     A.  I don't recall.
21     Q.  Were you working September 15th, 1991?
22     A.  I don't recall.
23     Q.  Do you remember any other days that you
24 worked in September of 1991?

---

71

1          MS. JOHNSON:  Object to form.
2      A.  I don't recall.
3  BY MS. DONNELL:
4      Q.  Do you know who told Officer Pack he had a
5  phone call?
6          MS. JOHNSON:  Object to form and
7  foundation.
8      A.  No.
9  BY MS. DONNELL:
10     Q.  I will step back.
11         Do you remember Officer Pack being told
12 there was a phone call?
13     A.  No.
14     Q.  Do you remember officer -- well, did
15 Officer Pack relate to you who had given you guys the
16 assignment to go out and talk to Anthony Jakes?
17     A.  No.
18     Q.  Do you remember any officers that went with
19 you other than Officer Pack?
20         MS. JOHNSON:  Object to form,
21 foundation.
22     A.  No other officers went with us.
23     Q.  You and Officer Pack went alone?
24     A.  Yes.

---

72

1  BY MS. DONNELL:
2      Q.  Okay.  Were there any other officers
3  present with you at Mr. Jakes' home?
4      A.  When we arrived at Mr. Jakes' home, there
5  were two other officers.  There were on location, we
6  believe, on a previous assignment.
7      Q.  Who were those officers?
8      A.  Officer Patterson and Officer Posey.
9      Q.  Did you know Officer Patterson and Posey?
10     A.  Yes.
11     Q.  Were they part of the tactical unit at the
12 9th District at that time?
13     A.  Yes.
14     Q.  Okay.  Where did you guys drive to in -- do
15 you remember where you drove?
16     A.  Who drove the car?
17     Q.  I'm saying where did you drive?  Do you
18 remember where you went?
19         MS. JOHNSON:  Object to form.
20     A.  I don't understand the question.
21 BY MS. DONNELL:
22     Q.  Okay.  I will go back.
23         Who drove; you or Officer Pack?
24         MS. JOHNSON:  Object to form.

---

Transcript of Michael DeLacy

19 (73 to 76)

Conducted on January 15, 2021

73

1    A.  **Officer Pack.**
2 BY MS. DONNELL:
3    Q.  How do you know it was Officer Pack that
4 drove to Mr. Jakes' home?
5    A.  **He always drove.**
6    Q.  Okay.  Is there a reason why Officer Pack
7 always drove?
8    A.  **Because he was a better driver.**
9    Q.  Okay.  People don't usually admit that.
10 Okay.
11       So do you remember what kind of car you
12 guys had that day?
13    A.  **No, I don't.**
14    Q.  Was it marked or unmarked?
15    A.  **Unmarked.**
16       MS. JOHNSON:  Objection; foundation.
17 BY MS. DONNELL:
18    Q.  So you and Officer Pack drove over to Mr.
19 Jakes' home correct?
20    A.  **Yes.**
21    Q.  How did you know where Mr. Jakes lived?
22    A.  **It was supplied in the phone call.**
23    Q.  Do you remember where you drove to, or
24 would you have to see a report to know Mr. Jakes'

74

1 address that you drove to?
2       MS. JOHNSON:  Object to form.
3    A.  **1212 West 51st Street rear house.**
4 BY MS. DONNELL:
5    Q.  I'm sorry, rear house?  Can you say that
6 again?  Well, where did the anonymous tip tell you that
7 Mr. Jakes lived?
8    A.  **1212 West 51st Street rear house.**
9    Q.  And do you remember Mr. Jakes' home as you
10 sit here today?  Do you have a mental image of it?
11    A.  **No.**
12    Q.  Okay.  But it's fair to say it was the rear
13 house?
14    A.  **Yes.**
15    Q.  Were there two homes on a single lot?
16    A.  **I believe so.**
17       MS. JOHNSON:  Object to foundation.
18 BY MS. DONNELL:
19    Q.  Go ahead, sir, you can answer.
20    A.  **Yes.**
21    Q.  Okay.  And that's why it was described as
22 the rear house in your report?
23       MS. JOHNSON:  Object to form and
24 foundation.

75

1    A.  **Yes.**
2 BY MS. DONNELL:
3    Q.  Sir, you reported to 1212 West 51st Street.
4 Do you remember where Officer Pack parked the car?
5    A.  **No.**
6    Q.  When you went to 1212 West 51st Street to
7 the rear house on September 16th, 1991, did you know the
8 location of the homicide that was being investigated?
9       MS. JOHNSON:  Object to form.
10    A.  **Yes.**
11 BY MS. DONNELL:
12    Q.  I'm sorry, sir; I didn't hear your answer.
13    A.  **Yes.**
14    Q.  You did have that information?
15    A.  **Yes.**
16    Q.  Okay.  Had you reviewed any homicide
17 investigative reports on the Garcia homicide before you
18 went to 1212 West 51st Street to talk to Mr. Jakes?
19    A.  **No.**
20    Q.  You haven't reviewed any of the Jakes'
21 homicide reports; is that correct?
22    A.  **Correct.**
23    Q.  Had Officer Pack, to your knowledge?
24    A.  **No.**

76

1       MS. JOHNSON:  Object to foundation,
2 form.
3 BY MS. DONNELL:
4    Q.  What was your understanding of your
5 assignment that you and Officer Pack were supposed to do
6 when you were still at the 9th District before you went
7 to talk to Mr. Anthony Jakes?
8       MS. JOHNSON:  Object to form and
9 foundation.
10    A.  **To talk to Anthony Jakes.**
11 BY MS. DONNELL:
12    Q.  And did Officer Pack tell you that your
13 assignment was to talk to Anthony Jakes?
14    A.  **He related the information that he had**
15 **received from the phone.**
16    Q.  According to your testimony, the first time
17 you learned of the Garcia homicide was when you reported
18 for duty on the morning of September 16, 1991; is that
19 right?
20    A.  **Yes.**
21    Q.  And it's also your testimony that you did
22 not read any police reports or homicide reports,
23 supplemental reports, or major crime reports prior to
24 going to talk to Mr. Anthony Jakes at 1212 West 51st

Transcript of Michael DeLacy
Conducted on January 15, 2021

20  (77 to 80)

77

1 Street at the rear home; is that true?
2     A.  True.
3     Q.  And to your knowledge, your partner,
4 Officer Pack, had not reviewed any reports, correct?
5     A.  Correct.
6         MS. JOHNSON:  Object to foundation.
7 BY MS. DONNELL:
8     Q.  Had you had any communications with any of
9 your supervisors when you and Officer Pack went to 1212
10 West 51st Street to the rear house about what
11 information you were supposed to obtain?
12         MS. JOHNSON:  Object to form.
13     A.  I don't recall.
14 BY MS. DONNELL:
15     Q.  Okay.  It means you might have talked to
16 one of your supervisors.  You can't just recall one way
17 or another as you sit here today; is that right?
18         MS. JOHNSON:  Object to form and
19 foundation.
20     A.  Yes.
21 BY MS. DONNELL:
22     Q.  Tell me everything you remember Officer
23 Pack telling you about what the anonymous tip said to
24 him.

78

1         MS. JOHNSON:  Objection; asked and
2 answered.
3     A.  Indicated that he got an anonymous phone
4 call from a female caller who indicated that a man by
5 the name of Anthony Jakes who resided at 1212 West 51st
6 Street, in the rear house, had information pertaining to
7 the homicide.
8 BY MS. DONNELL:
9     Q.  And what was your understanding of what you
10 and Officer Pack were going to do with respect to that
11 information?
12     A.  We were going to go to Anthony Jakes'
13 house.
14     Q.  To do what?
15     A.  To talk to Anthony.
16         MS. JOHNSON:  Object to form.
17     A.  To talk to Anthony Jakes.
18 BY MS. DONNELL:
19     Q.  And what were you going to talk to Anthony
20 Jakes about?
21         MS. JOHNSON:  Object to form.
22     A.  About bringing him to Area Three.
23 BY MS. DONNELL:
24     Q.  And why were you going to bring him to Area

79

1 Three?
2     A.  Because they were conducting an
3 investigation of that homicide.
4     Q.  Were you and Officer Pack going to talk to
5 Anthony Jakes about what he knew or may know about the
6 homicide, or were you just supposed to go pick him up
7 and transport him to Area Three so that the detectives
8 could talk to him about what he knew?
9     A.  We were just going to pick him up and take
10 him to the area.
11     Q.  Did you have any conversations with any
12 Area Three detectives before you went to 1212 West 51st
13 Street, to the rear house, to pick up Anthony Jakes and
14 bring him to Area Three?
15     A.  No.
16     Q.  To your knowledge, did your partner,
17 Officer Pack, have any communications with any Area
18 Three homicide detectives before you and he went to 1212
19 West 51st Street to the rear house to pick up Anthony
20 Jakes?
21         MS. JOHNSON:  Object to form and
22 foundation.
23     A.  No.
24 BY MS. DONNELL:

80

1     Q.  So to the best of your knowledge, neither
2 one of you had talked to any Area Three detectives; is
3 that right?
4         MS. JOHNSON:  Objection; form,
5 foundation.
6     A.  Correct.
7 BY MS. DONNELL:
8     Q.  And back in September of 1991, did you and
9 Officer Pack work together and collaborate together as
10 partners?
11         MS. JOHNSON:  Object to form.
12     A.  Could you clarify your question?
13 BY MS. DONNELL:
14     Q.  Sure.  Did you and Officer Pack work well
15 together back in September of 1991?
16     A.  Yes.
17         MS. JOHNSON:  Object to form.
18 BY MS. DONNELL:
19     Q.  Is that accurate to say that you guys
20 shared information with each other while you were
21 working on assignments?
22         MS. JOHNSON:  Object to form and
23 foundation.
24         MS. DONNELL:  You can answer, sir.

Transcript of Michael DeLacy
Conducted on January 15, 2021

**Page 81**

1     A.  Yes.
2  BY MS. DONNELL:
3     Q.  If Officer Pack had information relevant to
4  one of your assignments, would he share that information
5  with you?
6     A.  Probably.
7     Q.  And how about you, if you had information
8  relevant to one of your assignments, would you share
9  that information with Officer Pack?
10    A.  Yes.
11        MS. JOHNSON:  Object to form.
12  BY MS. DONNELL:
13    Q.  I'm sorry, what was your answer?
14    A.  Yes.
15    Q.  And so, is it your -- if Officer Pack had
16  spoken to one of the Area Three homicide detectives who
17  was working at the Garcia homicide before you and he
18  went to pick up Anthony Jakes, would he have shared that
19  information with you?
20        MS. JOHNSON:  Object to form and
21  foundation.
22    A.  Yes.
23  BY MS. DONNELL:
24    Q.  Because if he had something relevant about

**Page 82**

1  an assignment you and he were doing together, you were
2  the kind of partners that would share that information,
3  right?
4        MS. JOHNSON:  Objection; form,
5  foundation.
6     A.  Yes.
7  BY MS. DONNELL:
8     Q.  Okay.  And the same is true for you; if you
9  had talked to one of the Area Three homicide detectives
10  and got information relevant to your assignment with
11  Anthony Jakes, you would have shared that with Officer
12  Pack, right?
13        MS. JOHNSON:  Objection; form and
14  foundation.
15    A.  Yes.
16  BY MS. DONNELL:
17    Q.  Okay.  Do you have any other information
18  relevant to your assignment to pick up Mr. Jakes and
19  bring him to Area Three?
20        MS. JOHNSON:  Object to form.
21  BY MS. DONNELL:
22    Q.  Other than the -- sorry.
23        MS. JOHNSON:  I apologize.
24        MS. DONNELL:  I'm sorry, I just paused.

**Page 83**

1  I will try again.  Sometimes it is hard when I pause and
2  we are virtual.
3  BY MS. DONNELL:
4     Q.  Anyways, Mr. DeLacy, other than the
5  information that you have already testified to that you
6  received about the Garcia homicide when you reported to
7  duty, before you went to 1212 West 51st Street at the
8  rear house, had you found any additional information
9  about the Garcia homicide?
10    A.  No.
11    Q.  Okay.  And to your knowledge, do you know
12  whether your partner, Officer Pack, had gotten any
13  additional knowledge about the Garcia homicide before
14  you guys went over to 1212 West 51st Street to the rear
15  house to get Anthony Jakes?
16        MS. JOHNSON:  Object to form and
17  foundation.
18    A.  No.
19  BY MS. DONNELL:
20    Q.  Was Anthony Jakes considered a possible
21  witness to the Garcia homicide when you went to go get
22  him on the afternoon of September 16, 1991?
23        MS. JOHNSON:  Object to foundation.
24    A.  Yes.

**Page 84**

1  BY MS. DONNELL:
2     Q.  Why did you consider Anthony Jakes a
3  possible witness to the Garcia homicide?  What was your
4  reason for that belief?
5        MS. JOHNSON:  Object to form and
6  foundation.  That mischaracterizes what his testimony
7  was.
8     A.  Based on the phone call.
9  BY MS. DONNELL:
10    Q.  Okay.  Anything else?
11    A.  No.
12    Q.  Okay.  Was Anthony Jakes considered a
13  suspect in the Garcia homicide when you went over to get
14  him on September 16, 1991?
15        MS. JOHNSON:  Object to foundation.
16    A.  No.
17  BY MS. DONNELL:
18    Q.  And why did you not consider Anthony Jakes
19  a suspect in the Garcia homicide when you went to go
20  pick him up at his home?
21        MS. JOHNSON:  Object to form,
22  foundation.  Mischaracterizes his previous testimony.
23    A.  The phone call indicated that he had
24  information.

Transcript of Michael DeLacy
Conducted on January 15, 2021

22 (85 to 88)

85

1 BY MS. DONNELL:
2      Q.  Okay.  So, sir, is it accurate, and I don't
3 want to mischaracterize your testimony, but is it
4 accurate to say that when you went to go get Mr. Jakes,
5 you considered him to be a possible witness based on the
6 anonymous tip your partner had received?  Is that
7 accurate?
8      **A.  Can you repeat that again, please?**
9      Q.  Sure.  Is it accurate to say that when you
10 went to go pick up Anthony Jakes from his home and bring
11 him to Area Three, it was your understanding that he was
12 a possible witness to the Garcia homicide; is that
13 accurate?
14     **A.  Yes.**
15     Q.  Okay.  And is it fair to say that when you
16 went to go get Anthony Jakes and bring him to Area
17 Three, you did not believe he was a possible suspect in
18 the Garcia homicide?
19     **A.  Correct.**
20     Q.  Do you know whether the Area Three
21 detectives knew that you and Officer Pack were going to
22 go get Anthony Jakes and bring him in for questioning?
23     **A.  I don't know.**
24     Q.  Did you have any communications with

86

1 Detective Kill before you went to get Anthony Jakes?
2      **A.  No.**
3      Q.  How about Detective Boudreau?
4      **A.  No.**
5      Q.  Do you know Detective Kill?
6      **A.  Yes.**
7      Q.  And how about Kenneth Boudreau?
8      **A.  Yes.**
9      Q.  How long had you known Detective Kill prior
10 to September of 1991?
11     **A.  I don't recall.**
12     Q.  Was this the first case that you had any
13 involvement with him?
14     **A.  No.**
15     Q.  Okay.  Had you worked a number of cases
16 that -- along with Detective Kill prior to September of
17 1991?
18     **A.  No.**
19            MS. JOHNSON:  I am going to object.
20 That assumes facts not in evidence, so object to form.
21 BY MS. DONNELL:
22     Q.  Is it fair to say that you had encountered
23 Detective Kill in other investigations prior to this one
24 on the Garcia homicide?  Is that accurate?

87

1      **A.  Yes.**
2            MS. JOHNSON:  Object to form.
3 BY MS. DONNELL:
4      Q.  And how about Kenneth Boudreau, do you know
5 how long before September of 1991 that you knew Kenneth
6 Boudreau?
7            MS. JOHNSON:  Object to form.
8      **A.  I don't recall.**
9 BY MS. DONNELL:
10     Q.  Had you worked with Kenneth Boudreau prior
11 to this case?
12     **A.  Not personally.  But he was assigned to the**
13 **9th District, I believe, before he made detective.**
14     Q.  Okay.  So is it fair to say that you knew
15 Kenneth Boudreau when he was assigned to the 9th
16 District before he was promoted to detective?
17     **A.  Yes.**
18     Q.  Did you ever work with him, or were you
19 assigned with him in a car ever?
20     **A.  No.**
21     Q.  Okay.  Was Kenneth Boudreau-- I can't
22 remember, was he part of the 9th District tactical unit
23 before he became a detective?
24            MS. JOHNSON:  Object to foundation.

88

1      **A.  I don't recall that.**
2 BY MS. DONNELL:
3      Q.  Do you recall him being a patrol, a
4 uniformed patrol officer in the 9th District?
5      **A.  I believe he was.**
6      Q.  Okay.  Do you remember working on any case
7 that involved Kenneth Boudreau after he became a
8 detective assigned to Area Three prior to this one?
9      **A.  Not specifically.**
10     Q.  Okay.  How about any cases after this one?
11 Do you remember any cases that you worked with Kenneth
12 Boudreau after Mr. Jakes' case and the Garcia homicide?
13     **A.  I don't recall.**
14     Q.  How about Detective Kill, do you remember
15 ever working with Detective Kill?
16     **A.  No, I don't recall.**
17     Q.  Were you ever social friends outside of
18 work with Detective Kill?
19     **A.  I'm sorry?**
20     Q.  Were you ever social friends with Detective
21 Kill outside of work?
22     **A.  I had seen him outside of work, but I**
23 **wasn't a social friend of his.**
24     Q.  Okay.  In what capacity had you seen

Transcript of Michael DeLacy
Conducted on January 15, 2021

89

1  Detective Kill at work?
2      A.  At parties.
3      Q.  Were those parties for other CPD members?
4  Like retirement parties and things like that?
5      A.  Yes.
6      Q.  Okay.  And how about Ken Boudreau, were you
7  ever social friends with Ken Boudreau and see him
8  outside of your work assignments?
9      A.  Not that I recall.
10     Q.  Okay.  So, I want to go back to now you and
11 Officer Pack drove over to Anthony Jakes' home with the
12 goal of getting him and bringing him to Area Three for
13 questioning.  Is that true?
14     A.  Yes.
15     Q.  And did you have the intention to question
16 Mr. Jakes at all, or were you just going to transport
17 him?
18     A.  No, we were just going to transport him.
19     Q.  Okay.  And when you got to Mr. Jakes' home,
20 you have a memory that there were two of your other
21 fellow tactical officers who were already in the area on
22 a different assignment?
23     A.  Yes.
24     Q.  Okay.  And that was Officer Patterson and

90

1  Posey?
2      A.  Yes.
3      Q.  And those were other fellow 9th District
4  tactical officers that you were quite familiar with,
5  right?
6      A.  Yes.
7      Q.  Okay.  Where did you encounter them; at Mr.
8  Jakes' home or somewhere around his home?
9      A.  On 51st Street.
10     Q.  Okay.  Where were Officer Patterson and
11 Posey on 51st Street?
12     A.  I don't recall exactly, but it was fairly
13 close to the address of the homicide.
14     Q.  What were they doing, Officer Patterson and
15 Posey, if you recall, when you first encountered them?
16     A.  They were out standing on the street.
17     Q.  Were they speaking to any civilians?
18     A.  I don't recall.
19     Q.  What do you remember?  Do you remember
20 anything about your interactions with Officer Patterson
21 and Posey before you went to Mr. Jakes home?
22     A.  No.
23     Q.  Did Officer Patterson and Posey come with
24 you to Mr. Jakes' home?

91

1      A.  Yes.
2      Q.  How did that come about?
3          MS. JOHNSON:  Object to form.
4  BY MS. DONNELL:
5      Q.  If you recall.
6      A.  I don't recall.
7      Q.  Okay.  But is it fair to say that all four
8  of you went to Mr. Jakes' home?
9      A.  Yes.
10     Q.  Was there a reason why you needed Officer
11 Patterson and Posey to pick up Mr. Anthony Jakes just as
12 sort of a witness and transport him to Area Three?
13         MS. JOHNSON:  Object to form and
14 foundation.
15     A.  No.
16 BY MS. DONNELL:
17     Q.  Did you guys clear it with any supervising
18 officers that Officer Patterson and Posey should come
19 with you to Mr. Jakes' home?
20     A.  No.
21     Q.  Why not?
22         MS. JOHNSON:  Object to form, and
23 foundation.
24     A.  It wasn't-- we didn't call them to come

92

1  with us at his home.  We met them at that location.
2  They were at that location.
3  BY MS. DONNELL:
4      Q.  They were already at Mr. Jakes' home?
5      A.  Not at his home, no.  They were on 51st
6  Street.
7      Q.  Was it your understanding that Officer
8  Patterson and Posey had also been assigned to pick up
9  Mr. Anthony Jakes?
10     A.  No.
11     Q.  So I take it to mean that you guys just saw
12 them on the street at 51st Street and they just decided
13 to come along with you for some reason; is that right?
14         MS. JOHNSON:  Object to form.
15     A.  Yes.
16 BY MS. DONNELL:
17     Q.  So I was just asking, and maybe you don't
18 recall, why is it that you had Patterson and Posey come
19 with you to get Mr. Jakes?
20         MS. JOHNSON:  Object to form.
21 Mischaracterizes his testimony.
22     A.  They came with us.
23 BY MS. DONNELL:
24     Q.  Well, you guys must have told them what you

Transcript of Michael DeLacy
Conducted on January 15, 2021

24 (93 to 96)

93

1 were doing, right?
2          MS. JOHNSON: Object to for.
3      **A. I'm assuming we did.**
4 **BY MS. DONNELL:**
5      Q. You don't remember it, but you just assume
6 you did, right?
7      **A. Yes.**
8      Q. Okay. And you don't remember whether it
9 was you or Officer Pack telling them: Hey, we are going
10 to go get this kid at 1212 West 51st Street; do you want
11 to come with us?
12          MS. JOHNSON: Object to form.
13 Mischaracterizes the testimony it.
14     **A. I don't recall.**
15 **BY MS. DONNELL:**
16     Q. Okay. Were there any other officers with
17 you before you went to Mr. Jakes' home other than you,
18 Officer Pack, Mr. Officer Patterson and Officer Posey?
19     **A. No.**
20     Q. Okay. And did you have a belief that you
21 needed additional support to go get Mr. Jakes?
22          MS. JOHNSON: Object to form,
23 foundation. It mischaracterizes the testimony.
24     **A. No.**

94

1 **BY MS. DONNELL:**
2      Q. All right. Do you remember, so you were
3 parked on 51st Street and you had to walk back to the
4 rear house; is that right?
5          MS. JOHNSON: Object to form,
6 foundation. It mischaracterizes his testimony.
7 BY MS. DONNELL:
8      Q. First of all, did I mischaracterize your
9 testimony? You testified that you parked on 51st
10 Street, right?
11          MS. JOHNSON: No, he testified that he
12 didn't recall where the car was parked.
13 BY MS. DONNELL:
14     Q. Let's clarify. So we clarify it for the
15 record so it is your testimony and not your counsel's.
16          Do you remember where Officer Pack parked
17 the car?
18     **A. No, I don't.**
19     Q. Okay. Sorry. I misunderstood.
20          So you don't know if he parked on 51st or
21 some other street?
22     **A. Correct.**
23          MS. JOHNSON: Objection; asked and
24 answered.

95

1 **BY MS. DONNELL:**
2      Q. I'm sorry, sir. You can go ahead and
3 answer.
4      **A. Correct.**
5      Q. Do you remember -- what we are about to
6 talk about now is what happened at Mr. Jakes' house.
7          Do you now have an independent recollection
8 of anything that happened at Mr. Jakes' house, or are
9 you going off of Officer Pack's testimony and the
10 reports that you read?
11          MS. JOHNSON: Object to form.
12     **A. No, I recall.**
13 **BY MS. DONNELL:**
14     Q. Okay. What do you independently recall?
15 Well, first of all, you didn't have an independent
16 recollection, then you read the reports and testimony
17 and now you do have an independent recollection; is that
18 correct?
19          MS. JOHNSON: Object to form.
20     **A. I recall that we knocked on the door of the**
21 **house.**
22 **BY MS. DONNELL:**
23     Q. Okay. But can you just answer my question?
24 Before reading any of the documents in this case, Pack's

96

1 testimony and the report, is it accurate to say that you
2 didn't have an independent recollection of knocking on
3 Mr. Anthony Jakes' door, correct?
4          MS. JOHNSON: Object to form.
5      **A. No.**
6 **BY MS. DONNELL:**
7      Q. And now you do, right?
8      **A. Yes.**
9          MS. JOHNSON: Object to form.
10          MS. DONNELL: You know, Brittany, you
11 are objecting to every question, and I am not sure that
12 that is necessary. You certainly are welcome to make
13 all your record.
14          MS. JOHNSON: Let me make my record and
15 let me object. Keep going.
16 BY MS. DONNELL:
17     Q. Officer DeLacy, so you now have a refreshed
18 recollection of knocking on Mr. Jakes' home door; is
19 that right?
20     **A. Yes.**
21     Q. Describe for me what you remember about
22 that.
23     **A. We knocked on the door and the door was**
24 **answered by a lady that identified herself as Jessie Mae**

Transcript of Michael DeLacy
Conducted on January 15, 2021

25 (97 to 100)

---

97

1 Jones.
2     Q.  Okay.  Anything else that you have an
3 independent recollection of, other than knocking on the
4 door and Jessie Mae Jones answering the door and
5 identifying herself?
6     A.  We asked her if Anthony Jakes lived at that
7 location, and she indicated that he did and that he
8 lived with her and that she was the guardian for Anthony
9 Jakes.
10     Q.  Okay.  So, this anonymous tip had told you
11 that Mr. Jakes lived at 1212 West 51st Street in that
12 rear house, right?
13     A.  Yes.
14     Q.  And you went to that address, right?
15     A.  Yes.
16     Q.  And it's your testimony that Miss Jessie
17 Mae Jones answered the door, right?
18     A.  Yes.
19     Q.  You asked if Mr. Jakes lived there, right?
20     A.  Yes.
21     Q.  And she said yes, he did, right?
22     A.  Yes.
23     Q.  And then she said:  I'm also his guardian,
24 right?

---

98

1     A.  Yes.
2     Q.  Anything else that your testimony that Ms.
3 Jones conveyed to you at that interaction?
4     A.  Well, we had explained to her that we had
5 received some information from a telephone call that
6 Anthony Jakes may have some information pertaining to
7 the homicide.
8     Q.  Were you talking or was Officer Pack
9 talking to Ms. Jones?
10     A.  I believe Officer Pack was talking to her.
11     Q.  Okay.  Why do you believe it was Officer
12 Pack talking to her?
13     A.  Because he was in front of me.
14     Q.  Where was Officer Pack standing and where
15 were you standing?
16     A.  I believe I was behind him.  I don't
17 remember exactly where.  I think he was up on the porch.
18     Q.  And when you say you were behind him, where
19 were you behind him?
20     A.  From the stairs, I believe.
21     Q.  Where was Officer Posey?
22     A.  I don't recall.
23     Q.  Where was Officer Patterson?
24     A.  I don't recall.

---

99

1     Q.  Were they with you right by the front door,
2 somewhere in that vicinity?
3         MS. JOHNSON:  Objection; foundation.
4     A.  I don't recall.
5 BY MS. DONNELL:
6     Q.  Did Officer Patterson and Posey approach
7 that front door with you, or did they stay out on the
8 street?
9     A.  No, I believe they were with us.
10     Q.  Okay.  During the course of your time that
11 you were at Mr. Jakes' home and Ms. Jones' home, did any
12 other officers show up at any point in time, or was it
13 just the four of you?
14     A.  I believe just the four of us.
15     Q.  Okay.  So, it's your recollection that
16 Officer Pack knocked on the door and spoke to Ms. Jones,
17 right?
18     A.  Yes.
19     Q.  And it's your testimony today that you --
20 that she identified herself that she lived at 1212 West
21 51st and that Anthony Jakes lived there with her, right?
22     A.  Yes.
23     Q.  Did she say anything about her relationship
24 with Anthony Jakes at that time other than that she was

---

100

1 his legal guardian?
2     A.  Not that I recall.
3     Q.  Okay.  And then it's your testimony that
4 Officer Pack conveyed to her that he had received a
5 phone call that Mr. Jakes might have information related
6 to a homicide, right?
7     A.  Yes.
8     Q.  Did Officer Pack tell her what homicide he
9 might have information related to?
10     A.  I think he said the homicide that happened
11 last night.
12     Q.  Okay.  Anything else that you remember
13 Officer Pack conveying to Ms. Jones in that initial
14 interaction?
15     A.  I believe he asked her if he was home.
16     Q.  Okay.  Are you testifying from your memory
17 now or what?
18         MS. JOHNSON:  Object to form.
19     A.  Yes.
20 BY MS. DONNELL:
21     Q.  So, you remember this conversation that
22 Officer Pack had with Ms. Jones at the door of their
23 home, right?
24     A.  Yes.

---

Transcript of Michael DeLacy
Conducted on January 15, 2021

26 (101 to 104)

---

101

1    Q.   Okay.  What else do you remember?
2    **A.   I remember --**
3        MS. JOHNSON:  Object to form.
4    **A.   I remember she invited us in.**
5    **BY MS. DONNELL:**
6    Q.   How did Miss Jones invite you in?
7    **A.   To come into the house.**
8    Q.   What did she say?
9    **A.   I don't recall.**
10   Q.   Is it your testimony that you were invited
11 into Ms. Jones' home?
12   **A.   Yes.**
13   Q.   Okay.  But you don't remember how she
14 invited you in?
15   **A.   I believe she held the door open and said**
16 **"come in."**
17   Q.   Okay.  What happened next?
18       MS. JOHNSON:  Object to form.
19   **A.   Officer Posey and Officer Pack went inside**
20 **the house.**
21   **BY MS. DONNELL:**
22   Q.   How about you?
23   **A.   I don't recall.**
24   Q.   You don't remember where you were?

---

102

1    **A.   I don't recall if I was inside the house or**
2    **outside the house.**
3    Q.   Do you remember ever going inside Ms.
4    Jones' home and Mr. Jakes' home?
5    **A.   I don't recall.  I may have, but I don't**
6    **recall.**
7    Q.   Okay.  You don't remember that, but you do
8    remember that Officer Posey and Patterson went inside
9    the house.
10   **A.   No, Officer Posey and Pack.**
11   Q.   Oh, Officer Posey and Pack.  I'm sorry,
12 thank you for clarifying.  So it is your testimony that
13 Officer Posey and Officer Pack went inside Mr. Jakes'
14 home, and you just don't recall one way or another
15 whether you did or not?
16   **A.   Yes.**
17   Q.   Are you able to testify about anything that
18 occurred inside the home of Mr. Jakes and Ms. Jones
19 based on your own memory?
20       MS. JOHNSON:  Object to form.
21   **A.   No.**
22       MS. JOHNSON:  Do we have a lot more to
23 go, or can we start to take a break for lunch soon?
24       MS. DONNELL:  I would like to go a

---

103

1    little bit longer on this interaction.  But we can take
2    a lunch break coming up.  So let me keep going for a
3    little bit, if that's okay.
4        MS. JOHNSON:  I just have to go to the
5    bathroom then, so I need to take a five.
6        MS. DONNELL:  Okay.  So let's take a
7    five-minute bathroom break, and then we can come back.
8        MS. JOHNSON:  Thank you.
9        VIDEO HOST:  Off the record at 12:09.
10       (Off the record.)
11       VIDEO HOST:  Back on the record at
12 12:21.
13 BY MS. DONNELL:
14   Q.   Okay.  Mr. DeLacy, right before counsel
15 requested a break, we were talking about your memory of
16 what happened when you were at Mr. Jakes' home and Ms.
17 Jones' home on September 16th.  Do you remember that?
18   **A.   Yes.**
19   Q.   Okay.  And I believe I want to step back.
20 But right before we took a break, you were telling me
21 about how Officer Pack had knocked on the door, Ms.
22 Jones had answered the door, and there had been some
23 communications, and then she invited officers in.  And
24 then it was your testimony that Officer Pack and Officer

---

104

1    Posey went into the home.  And your testimony was that
2    you don't recall whether or not you went into the home
3    or not; is that fair?
4    **A.   Yes.**
5    Q.   Okay.  So after reviewing Officer Pack's
6    testimony and Mr. Jakes' pretrial hearing in his
7    criminal trial, that did not refresh your recollection
8    in any way whether you were physically present inside
9    Mr. Jakes' home on September 16, 1991; is that fair?
10   **A.   That's fair.**
11   Q.   Okay.  And after reviewing your arrest
12 report, nothing in that refreshed your recollection one
13 way or the other whether you went inside the home or
14 outside the home, right?
15   **A.   Correct.**
16   Q.   Okay.  So, it is your testimony here today
17 that you have no ability to testify from your own memory
18 what happened inside Mr. Jakes' home; is that correct?
19   **A.   Correct.**
20   Q.   And nothing that you have read thus far has
21 refreshed your recollection in any way; is that right?
22   **A.   Correct.**
23   Q.   Is there anything else that you can think
24 of that would refresh your recollection as to whether

---

Transcript of Michael DeLacy
Conducted on January 15, 2021

27 (105 to 108)

---

105

1  you came inside Mr. Jakes' home or stayed outside on
2  September 16th, 1991?
3        MS. JOHNSON:  Object to form.
4     A.  No.
5  BY MS. DONNELL:
6     Q.  Okay.  So, you have reviewed Officer Pack's
7  testimony about what he testified to occurring inside
8  Mr. Jakes' home, right?
9     A.  Yes.
10    Q.  But you don't know one way or the other
11 whether that's what happened, because you can't remember
12 it yourself, right?
13       MS. JOHNSON:  Objection; asked and
14 answered, Heather.
15 BY MS. DONNELL:
16    Q.  Is that true?
17    A.  Yes.
18    Q.  Okay.  Do you have a memory of anybody else
19 being present inside the home other than Ms. Jones and
20 Mr. Jakes?
21    A.  I don't recall.
22    Q.  Okay.  Do you have a memory of whether
23 Officer Patterson eventually went into Mr. Jakes' home?
24    A.  I don't recall.

---

106

1     Q.  Do you know what officers went -- do you
2  know if any officers went upstairs in Mr. Jakes' home
3  when they were inside?
4     A.  According to the transcript that I read, it
5  was Officer Pack and Officer Posey at some point in time
6  went up the stairs.
7     Q.  Okay.  But you don't remember observing
8  that or being present for that, correct?
9     A.  No.
10    Q.  Okay.  When you were outside, standing on
11 the stairs outside of Mr. Jakes' home, could you see
12 inside the home?
13    A.  Not that I can recall.
14    Q.  Do you remember seeing Mr. Jakes inside his
15 home that day?
16    A.  No.
17    Q.  Okay.  Do you remember seeing Mr. Jakes on
18 September 16, 1991?  Do you remember what he looks like?
19    A.  No, I don't recall what he looks like.
20    Q.  Do you remember how old he was?
21    A.  He was a juvenile, but I don't know how
22 old.
23    Q.  Do you know how old he was as you sit here
24 now, because you have reviewed the reports?

---

107

1     A.  No, I don't know how old he was.
2     Q.  So you have a memory of him being a
3  juvenile and you knowing that on September 16, 1991, but
4  you don't remember how old he was?
5     A.  Correct.
6     Q.  Okay.  I will represent to you that he had
7  just turned 15 years old in September of 1991.  Okay?
8     A.  Okay.
9     Q.  Does that sound about what you remember him
10 being?  About a 15-year-old boy?
11    A.  That sounds about right.
12       MS. JOHNSON:  Object to form and
13 foundation.
14    A.  Yes.
15 BY MS. DONNELL:
16    Q.  Okay.  Do you remember, as you sit here
17 personally, what Mr. Jakes was wearing when you first
18 saw him on September 16th, 1991?
19    A.  No.
20    Q.  Okay.  And I think you said you were unable
21 to describe him.  Can you describe what you remember
22 about Mr. Jakes and his appearance on September 16th,
23 1991?
24    A.  No.

---

108

1     Q.  Okay.  Do you remember what he was wearing?
2     A.  No, I don't.
3     Q.  Do you remember his race?
4     A.  I'm sorry?
5     Q.  Do you remember his race?
6     A.  His race?
7     Q.  Yes.
8     A.  Male, black.
9     Q.  Okay.  Do you remember his height?
10    A.  No, I don't.
11    Q.  Do you remember his weight?
12    A.  No.
13    Q.  Do you remember if he had any injuries that
14 you could see on his face?
15    A.  I don't recall.
16    Q.  And you don't remember documenting any in
17 the reports that you reviewed; is that correct?
18    A.  I don't recall.
19    Q.  Okay.  Other than what you have testified
20 to already, do you remember any other communications
21 that you or your partner, Officer Pack, had with Mrs.
22 Jones on September 16th, 1991?
23    A.  Other communications?
24    Q.  Yes.  Anything else that you said to her or

---

Transcript of Michael DeLacy
Conducted on January 15, 2021

28 (109 to 112)

---

109

1 Officer Pack said to her?

2     **A. I believe at some time, at some point in**

3 **time that Officer Pack explained to Mrs. Jones that he**

4 **was going to take her to Area Three at 39th and**

5 **California, and gave her his business card.**

6     Q. Do you know that from reviewing the

7 testimony, or is that something you have a memory of it

8 yourself?

9     **A. No, I have a memory of it myself because I**

10 **also gave her my business card.**

11     Q. You have a memory of also giving Ms. Jones

12 your business card as well?

13     **A. Yes.**

14     Q. Did you say anything to her when you gave

15 her your business card?

16     **A. Not that I can recall.**

17     Q. Where? When was that -- did you and

18 Officer Pack give Ms. Jones your business cards at the

19 same time?

20     **A. No, I don't believe so.**

21     Q. So you think you had two separate

22 interactions? Like Officer Pack had an interaction with

23 Ms. Jones; he gave her his business card. And then you

24 separately had an interaction with Ms. Jones and gave

---

110

1 her your business card.

2     **A. Yes.**

3     Q. Okay. Tell me about what you remember when

4 you gave Ms. Jones your business card; what you said to

5 her and what she said to you.

6     **A. I gave her my business card when she came**

7 **out of the house.**

8     Q. When did she come out of the house?

9     **A. When everybody came out of the house.**

10     Q. And who is "everybody"?

11     **A. Officer Pack, Officer Posey and Anthony**

12 **Jakes.**

13     Q. How long was Officer Pack and Officer Posey

14 inside Mr. Jakes' home before they came back out?

15     **A. It wasn't a real long time. I don't --**

16 **specifically, I couldn't say.**

17     Q. Was that less than ten minutes?

18     **A. I would -- I would have to speculate on**

19 **that. My guess would be probably less than ten minutes.**

20     Q. It was less than 15 minutes?

21     **A. I don't recall.**

22     Q. Can you say it was definitely less than 20

23 minutes?

24     **A. Yes.**

---

111

1     Q. Okay. Do you think it was probably more

2 than five minutes?

3     MS. JOHNSON: Object to form and

4 foundation.

5     **A. I would say probably between maybe five and**

6 **ten minutes.**

7 **BY MS. DONNELL:**

8     Q. Okay. You already testified that when

9 Mr. -- so, as far as I understand, you have a memory of

10 being on the step and Officer Pack knocking on the door,

11 and Ms. Jones coming to the door, and then Pack and

12 Posey going inside the home. You don't have a memory of

13 whether you went into the home or not. But you do have

14 a memory when everybody -- when Mr. Jakes was coming out

15 of the home with Officer Pack and Officer Posey, you

16 have a memory of giving Ms. Jones your business card; is

17 that fair?

18     **A. Yes.**

19     Q. Okay. I'm sorry, I may have interrupted

20 you. Do you have a recollection of anything you may

21 have said to Ms. Jones when you handed her your business

22 card?

23     **A. I think I told her that we were going to**

24 **39th Street at Area Three.**

---

112

1     Q. Did you tell her why you were going to 39th

2 Street in Area Three?

3     **A. We had told her earlier that we were going**

4 **to take her there because we had received information**

5 **that he had information relative to the homicide.**

6     Q. Was Mr. Jakes in handcuffs when you

7 observed him coming out of his home?

8     **A. No.**

9     Q. If Ms. Jones testified that Anthony Jakes

10 was in handcuffs, would she be not telling the truth?

11     **A. Yes.**

12     Q. You have a specific recollection that Mr.

13 Jakes was not handcuffed when he came out of his home?

14     **A. Yes.**

15     Q. Is there anything else? Did Miss Jones say

16 anything to you when you told her that you were taking

17 Mr. Jakes in for questioning on a homicide and you gave

18 her your business card, did she ask any questions?

19     MS. JOHNSON: Objection; form.

20 Mischaracterizes the testimony.

21     **A. I'm sorry, could you repeat it?**

22 **BY MS. DONNELL:**

23     Q. Did she ask you anything? You testified

24 that you gave her your business card and told her that

---

Transcript of Michael DeLacy
Conducted on January 15, 2021

29 (113 to 116)

113

1  you were taking Mr. Jakes to 39th and Area Three for
2  questioning about the homicide investigation. Did she
3  ask any questions of you?
4          MS. JOHNSON: Object to form.
5  Mischaracterizes the testimony.
6      **A. Not that I can recall.**
7  **BY MS. DONNELL:**
8      Q. Did you convey to Ms. Jones that she could
9  come with you and she could go with Anthony-- Mr. Jakes
10 to Area Three?
11     **A. I believe we did.**
12     Q. You think you offered that to her?
13     **A. Yes, I do.**
14     Q. Okay. How did you offer it to her that Ms.
15 Jones could come with you?
16     **A. We asked her if she wanted to.**
17     Q. Who asked her if she wanted to come?
18     **A. I believe we both did.**
19     Q. When you say "we both did," who are you
20 referring to?
21     **A. Officer Pack and myself.**
22     Q. Did you both ask her if she wanted to come
23 to Area Three, did you do that at the same time?
24     **A. I believe so.**

114

1      Q. Okay. When was that in your interaction
2  with Ms. Jones?
3      **A. When they came outside.**
4      Q. Okay. So who asked if she wanted to come
5  with you first; you or Officer Pack?
6      **A. I don't recall.**
7      Q. But it is your testimony today that you
8  both made that offer to her that she could come with you
9  guys to Area Three, with Mr. Jakes?
10     **A. Yes.**
11     Q. And what did she say when you made that
12 offer?
13     **A. She said she couldn't come. I think she**
14 **referred to some other responsibility that she had.**
15     Q. Do you remember what other responsibility
16 she said she had?
17     **A. No, I don't recall.**
18     Q. I'm sorry, maybe you already said this.
19 Did you tell me whether you offered Ms. Jones that she
20 could come with you and Mr. Jakes first, or did Officer
21 Pack make that offer first?
22     **A. I don't recall.**
23         MS. JOHNSON: Objection; asked and
24 answered.

115

1          MS. DONNELL: Sorry, I think you are
2  right. I did ask it; and you did answer you don't
3  recall.
4  BY MS. DONNELL:
5      Q. Do you recall what Ms. Jones said the time
6  that Officer Pack's offered for her to come with you and
7  Mr. Jakes to Area Three?
8      **A. It was the same response. I think we said**
9  **it at about the same time.**
10     Q. Why did you offer to Ms. Jones that she
11 could come with you and Mr. Jakes to Area Three?
12     **A. Because he was a juvenile.**
13     Q. And what was it about Mr. Jakes being a
14 juvenile that made you want to offer to Ms. Jones that
15 she could come with you to Area Three?
16     **A. Because she was his guardian.**
17     Q. Okay. Why? Had you been trained in any
18 way about how juveniles were to be handled if they were
19 going to be questioned as a witness in a homicide
20 investigation?
21     **A. If they were going to be questioned, a**
22 **parent should be -- a parent or guardian should be**
23 **there.**
24     Q. Okay. When did you receive that training?

116

1      **A. Probably in the academy.**
2      Q. Okay. And so was that why you made that
3  offer to Ms. Jones that she could come with Mr. Jakes
4  and yourself and Officer Pack to Area Three because you
5  knew he was a juvenile at that time, and you knew she
6  was his legal guardian. So if Mr. Jakes was going to be
7  questioned, that she could be present for that
8  questioning?
9      **A. Probably that and moral support.**
10     Q. Why moral support?
11     **A. Because he was a juvenile.**
12     Q. Okay. Did you feel like that was the
13 most-- that was what you had been trained to do in the
14 academy, that if a juvenile was being brought in for a
15 homicide investigation, that a parent or guardian should
16 accompany the juvenile for that questioning?
17         MS. JOHNSON: Object to form,
18 foundation.
19     **A. If possible.**
20 BY MS. DONNELL:
21     Q. You are saying it's possible you were
22 trained on that?
23     **A. If possible.**
24     Q. If possible. I'm sorry. Thank you.

Transcript of Michael DeLacy
Conducted on January 15, 2021

117

1     And here, was it possible for Ms. Jones to
2 come with you?
3     MS. JOHNSON: Object to form and
4 foundation.
5     **A. When we asked her, she said she couldn't**
6 **come.**
7 **BY MS. DONNELL:**
8     Q. And it is your testimony that when you
9 asked her, she said she couldn't come because she had
10 some other obligation or responsibility?
11    **A. Yes.**
12    Q. Did she identify to you what that other
13 responsibility or obligation was?
14    MS. JOHNSON: Objection; asked and
15 answered.
16    **A. I don't recall.**
17 **BY MS. DONNELL:**
18    Q. Okay. Were you present when Anthony Jakes
19 put on clothes to come with you to Area Three? Were you
20 present in his room when he did that?
21    **A. No.**
22    Q. Okay. And you have a specific recollection
23 that you weren't present for that; is that right?
24    **A. Yes.**

118

1     Q. Okay. Did you have any communications with
2 Mr. Jakes at his home?
3     **A. No.**
4     Q. Did you have any communications with Mr.
5 Jakes when you and officer -- well, first, did you and
6 Officer Pack transport Mr. Jakes to Area Three?
7     **A. Yes.**
8     Q. Okay. Was it just the three of you in your
9 car?
10    **A. Yes.**
11    Q. And where were you seated, and where was
12 Officer Pack seated, and where was Mr. Jakes seated?
13    **A. Officer Pack was driving. I was in the**
14 **passenger seat, and Mr. Jakes was in the backseat.**
15    Q. Did you or Officer Pack perform a
16 protective pat-down search before Mr. Jakes got into
17 your vehicle?
18    **A. No.**
19    Q. Did you have any conversations with Mr.
20 Jakes when you transported him to Area Three?
21    **A. Not that I can recall.**
22    Q. How about Officer Pack? Do you remember
23 anything he and Mr. Jakes talked about?
24    **A. I don't recall any.**

119

1     Q. Do you know for certain that you did not
2 talk about the Garcia homicide?
3     **A. Yes.**
4     Q. And why is that? Why do you know for
5 certain that you had no communications about the Garcia
6 homicide?
7     **A. I don't think there was any conversation.**
8     Q. Oh, you don't think you had any
9 conversation, even small-talk with Mr. Jakes?
10    **A. Yes.**
11    Q. Was Mr. Jakes handcuffed when he was in the
12 backseat of your officer's vehicle?
13    **A. No.**
14    Q. Why not?
15    **A. He was a witness.**
16    Q. Okay. At that time when you were at Mr.
17 Jakes' home on September 16th, 1991 did you have any
18 information that led you to believe that he was a
19 suspect in the Garcia homicide?
20    **A. No.**
21    Q. If Ms. Jones testified that she did not
22 give you or Pack, Officer Pack or Officer Posey
23 permission to come into her home, would that be untrue?
24    **A. Yes.**

120

1     Q. Okay. If Ms. Jones testified that a
2 different individual, Darnell Louis, answered the door
3 on September 16, 1991, would that also be untrue?
4     **A. I don't recall.**
5     Q. Okay. Did you hear Ms. Jones give Officer
6 Pack or Officer Posey permission to go upstairs in her
7 home?
8     **A. No.**
9     Q. Okay. Is it your testimony that Mr. Jakes
10 was willing to come with you voluntarily to Area Three
11 on September 16, 1991?
12    **A. Yes.**
13    Q. If Mr. Jakes was willing to come with you
14 and Officer Pack to Area Three on September 16, 1991,
15 why did Officer Pack or Posey need to go inside Ms.
16 Jones or Mr. Jakes' home that day?
17    MS. JOHNSON: Object to form.
18 Foundation, speculation.
19    **A. I don't recall.**
20 **BY MS. DONNELL:**
21    Q. Well, you know from Officer Pack's
22 testimony that he went inside. He testified that he
23 went inside the home, right?
24    **A. Yes.**

Transcript of Michael DeLacy
Conducted on January 15, 2021

121

1    Q.   And you know that he testified that he went
2  upstairs to Mr. Jakes' bedroom and observed him getting
3  dressed, right?
4    A.   Yes.
5    Q.   And so do you know -- well, did you have
6  any conversations with Officer Pack that he was going to
7  go inside in the home of Mr. Jakes to observe where
8  getting dress to come with you to Area Three before you
9  guys got to his home?
10       MS. JOHNSON:  Object to form,
11  foundation speculation.
12    A.   No.
13  BY MS. DONNELL:
14    Q.   Did you and Officer Pack have any
15  discussion about what you were going to do when you got
16  to Mr. Jakes' home before you arrived there?
17    A.   No.
18    Q.   Do you know what you and Officer Pack
19  talked about when you drove over from the 9th District
20  to Jakes' home?  Do you have any memory of anything you
21  talked about?
22    A.   No.
23    Q.   Did you have any communications with
24  Officer Posey and Patterson when you encountered them on

122

1  the street before you went to Mr. Jakes' home discussing
2  that some of you would go inside Mr. Jakes' home to make
3  sure that he would come with you?
4    A.   No.
5    Q.   Can you identify any reason why Officer
6  Pack and Posey went into Mr. Jakes' home if he was
7  willing to come with you voluntarily as witness?
8       MS. JOHNSON:  Objection; form and
9  foundation.  That calls for speculation.
10    A.   Miss Jones invited him into the house.
11  BY MS. DONNELL:
12    Q.   Other than Ms. Jones' invitation, is there
13  any other reason why officers went into the home to take
14  Mr. Jakes with they did, with you guys to Area Three?
15       MS. DONNELL:  Strike that.  That was a
16  bad question.  Sorry.
17  BY MS. DONNELL:
18    Q.   Do you have any explanation why Officer
19  Pack and Posey went upstairs to Mr. Jakes' bedroom to
20  observe him getting dressed?
21       MS. JOHNSON:  Object to form and
22  foundation.
23    A.   No.
24  BY MS. DONNELL:

123

1    Q.   Do you have an opinion about whether that
2  was proper or not?
3       MS. JOHNSON:  Object to form.
4    A.   No.
5  BY MS. DONNELL:
6    Q.   Was that something you and Officer Pack
7  typically did when you were picking up witnesses that
8  were volunteering to come in for questioning, whether
9  you would go up to their bedrooms to observe them
10  getting dressed before you took them to an area for
11  questioning?
12       MS. JOHNSON:  Object to form.
13    A.   No.
14  BY MS. DONNELL:
15    Q.   Had you ever done that on any other
16  occasion that you can think of where you and Officer
17  Pack went into a witness' home and then into their
18  bedroom, if they were voluntarily coming to the area for
19  questioning?
20       MS. JOHNSON:  Object to form.
21    A.   Not that I recall.
22  BY MS. DONNELL:
23    Q.   This is the only time that you can think of
24  that happening that you can recall?

124

1       MS. JOHNSON:  Object to form.
2    A.   Yes.
3  BY MS. DONNELL:
4    Q.   Okay.  So, how long is the drive from 1212
5  West 51st Street to Area Three?
6    A.   I don't know.
7    Q.   Okay.  Do you know whether you went
8  straight from Mr. Jakes' home to Area Three, or if you
9  made a stop along the way?
10    A.   I believe we went straight to Area Three.
11    Q.   Did you observe Mr. Jakes have anything to
12  eat in your presence on September 16, 1991?
13    A.   I'm sorry.  Did you say did we observe him
14  have anything to eat?
15    Q.   Yes.  In your presence at any point on
16  September 16, 1991.
17    A.   I don't recall that.
18    Q.   Okay.  How about-- you don't recall
19  providing him any food, correct?
20    A.   No.
21    Q.   How about anything to drink?  Did you
22  observe Mr. Jakes have anything to drink in your
23  presence on September 16, 1991?
24    A.   Not that I recall.

Transcript of Michael DeLacy
Conducted on January 15, 2021

32 (125 to 128)

125

1    Q.   Okay.  Do you remember either independently
2  or based on your reports what time you went to Mr.
3  Jakes' home?
4    **A.   What time we went there?**
5    Q.   Yes.
6    **A.   I think the call was somewhere around --**
7  **the call that Officer Pack had received I believe was**
8  **around noontime.  So, we had gone to Mr. Jakes' house**
9  **sometime after noon, let's say before 12:30, somewhere**
10 **in that area.**
11   Q.   And then you testified you were at Mr.
12 Jakes' home from somewhere between approximately five to
13 ten minutes, you don't have a specific recollection, but
14 in that range, right?
15   **A.   Yes.**
16   Q.   And do you remember what time you got to
17 Area Three with Mr. Jakes?
18   **A.   No, I don't.**
19   Q.   Do you remember arriving at Area Three with
20 Mr. Jakes where you parked-- or where Officer Pack
21 parked?
22   **A.   I believe in the parking lot.**
23   Q.   Okay.  And do you remember anything about--
24 I want to make it clear.  You don't remember anything

126

1  about the conversation you and Officer Pack had with Mr.
2  Jakes while you were transporting him to Area Three,
3  correct?
4        MS. JOHNSON:  Object to form.  It
5  mischaracterizes the testimony.
6    **A.   I don't believe there was conversation.**
7  **BY MS. DONNELL:**
8    Q.   So you don't think you and Officer Pack
9  talked to Mr. Jakes at all?  It was just silent?
10   **A.   I don't recall.**
11   Q.   Okay.  So you may have spoken, but you just
12 don't remember.
13       MS. JOHNSON:  Object to form.  It
14 mischaracterizes the testimony.
15   **A.   Yes.**
16 **BY MS. DONNELL:**
17   Q.   Why don't you just tell us in your own
18 words what happened in the car while you were
19 transporting Mr. Jakes to Area Three.
20   **A.   We put him in the car.  We drove to Area**
21 **Three, and we took him up to the third floor.**
22   Q.   Okay.  For the portion in which you were in
23 the car with Mr. Jakes, do you have any memory of
24 anything you said, Mr. Jakes said, or Officer Pack said?

127

1    **A.   No.**
2    Q.   Do you know whether you and Officer Pack
3  had any conversations, just the two of you?
4    **A.   No.**
5    Q.   You just don't remember one way or the
6  other, right?
7    **A.   Right.**
8    Q.   And nothing that you have read has
9  refreshed your recollection of anything you may have
10 said to Mr. Jakes or he said to you, right?
11   **A.   Yes.**
12   Q.   So when you get to Area Three, Officer Pack
13 parked in the parking lot and you walked Mr. Jakes up to
14 the third floor; is that right?
15   **A.   Yes.**
16   Q.   Do you have a memory or independent memory
17 of what happened once you got to Area Three with Mr.
18 Jakes?
19   **A.   No.**
20   Q.   Is your memory what happened in Area Three
21 limited to what you read in either your reports or
22 Officer Pack's testimony?
23   **A.   Yes.**
24   Q.   Okay.  So this is different from what

128

1  happened at Mr. Jakes' home; is that right?
2    **A.   I don't understand the question.**
3    Q.   Well, it sounded like at Mr. Jakes' home
4  you have some independent recollection of what happened,
5  right?  Like you remember giving him a business card
6  and you remember standing out front?
7    **A.   Yes.**
8    Q.   But with regard to what happened at Area
9  Three, it sounds like nothing refreshed your
10 recollection.  You really don't have an independent
11 memory of what transpired at Area Three; is that
12 accurate?
13   **A.   Yes.**
14   Q.   Okay.  So, nothing that you have read so
15 far in Mr. Pack's testimony or your report has refreshed
16 your recollection of what happened in Area Three,
17 correct?
18   **A.   Correct.**
19   Q.   Okay.  So, your testimony of what happened
20 in Area Three is limited to what you reviewed in the
21 reports or Officer Pack's testimony?
22   **A.   Yes.**
23   Q.   Okay.  Was Mr. Jakes handcuffed when he got
24 to Area Three?

129

1     A.  No.
2     Q.  Did you guys handcuff him at Area Three?
3     A.  No.
4     Q.  Okay.  Do you remember having any
5 communications with Detective Kill in Area Three related
6 to Anthony Jakes and the Garcia homicide?
7     A.  No.
8     Q.  Do you recall of any communications with
9 Detective Boudreau in Area Three?
10     A.  No.
11     Q.  Were you present for the pat-down that
12 Officer Pack performed on Mr. Jakes?
13     A.  Yes.
14     Q.  Where did that pat-down occur?
15     A.  On the third floor.
16     Q.  Where on the third floor?
17     A.  I don't recall.
18         MS. DONNELL:  I'm sorry, I apologize.
19 My internet froze or you guys froze.  We are going to
20 have to go back to the question before.
21         (Off the record.)
22         (Whereupon the requested portion of
23 the record was read aloud by the Court Reporter.)
24 BY MS. DONNELL:

130

1     Q.  Did Officer Pack perform a pat-down on the
2 third floor of Mr. Jakes, if you know?
3         MS. JOHNSON:  Objection; form,
4 foundation.  Calls for speculation.
5     A.  For his own protection.
6 BY MS. DONNELL:
7     Q.  Why was it for officer -- you are talking
8 about for Officer Pack's own protection?
9     A.  Yes.
10     Q.  Why was it for Officer Pack's protection?
11         MS. JOHNSON:  Objection to form and
12 foundation.  Calls for speculation.
13     A.  He was told to put Anthony Jakes into a --
14 BY MS. DONNELL:
15     Q.  I'm sorry, Mr. DeLacy.  You are going to
16 have to repeat your answer because I think I froze
17 again.
18     A.  He was told to put Anthony Jakes into an
19 interview room.
20     Q.  Who told Officer Pack to put Anthony Jakes
21 in an interview room?
22     A.  The sergeants.
23     Q.  What sergeant?
24     A.  I don't recall.

131

1     Q.  Were you present when the sergeant, whoever
2 it was, told Officer Pack to put Anthony Jakes in the
3 interview room?
4     A.  I don't recall.
5     Q.  So you are testifying based on what you
6 read in the testimony of Officer Pack?
7     A.  Yes.
8     Q.  Okay.  Was Officer Pack going to be
9 interviewing Mr. Jakes in that interview room?
10     A.  No.
11     Q.  So, you said it was for Officer Pack's
12 safety.  Is that -- why was it for Officer Pack's safety
13 if Mr. Pack wasn't going to be in the room with Mr.
14 Jakes?
15     A.  It's for his safety and for everybody
16 else's that was on the floor.
17     Q.  Why didn't you -- you already testified
18 that you and Officer Pack did not do a protective
19 pat-down before you put Mr. Jakes into your vehicle to
20 transport him to Area Three, correct?
21     A.  Yes.
22     Q.  Why didn't you have that for your own
23 safety and Officer Pack's safety to perform a pat-down
24 of Mr. Jakes before you put him in your vehicle?

132

1         MS. JOHNSON:  Objection to form.  It
2 mischaracterizes the testimony.
3     A.  He was a witness.
4 BY MS. DONNELL:
5     Q.  So, had something changed with regard to
6 the status of Mr. Jakes between when you transported
7 him as a witness to Area Three and when he was being
8 put in an interrogation room on the third floor of Area
9 Three?  Did something happen or had some information
10 been provided to you?
11         MS. JOHNSON:  Object to form.
12     A.  He was told to put him into the interview
13 room by the sergeant, which was a secure area.  He
14 wanted to make sure that he didn't have any weapons on
15 him.
16 BY MS. DONNELL:
17     Q.  Who wanted to make sure that he didn't have
18 any weapons on him; the sergeant or Officer Pack?
19     A.  Both of them.
20     Q.  Did the sergeant ask you or Officer Pack
21 if you had already done a pat-down of Mr. Jakes before
22 you transported him to Area Three?
23     A.  No.
24     Q.  Okay.  So, was Mr. Jakes still a witness

Transcript of Michael DeLacy
Conducted on January 15, 2021

34 (133 to 136)

133

1 in your mind when he was -- the sergeant told you to
2 put him in an interview room in Area Three on the third
3 floor?
4     A.  Yes.
5     Q.  Okay.  So, it wasn't the status of the
6 witness had changed, it was just that he was being
7 put into an interrogation room?
8              MS. JOHNSON: Object to form.
9 Mischaracterizes the testimony and assumes facts not
10 in evidence.
11     A.  An interview room.
12 BY MS. DONNELL:
13     Q.  So, you are uncomfortable with
14 interrogations in interview rooms, what they were moved
15 to?
16              MS. JOHNSON:  Object to form.  That's
17 argumentative.
18 BY MS. DONNELL:
19     Q.  For the rooms on the third floor, you
20 considered those interview rooms; is that right,
21 Mr. DeLacy?
22     A.  I believe they are both.
23     Q.  They could be used for both interviews
24 and interrogations; is that what you are saying?

134

1     A.  Yes.
2     Q.  And that was a "yes," correct?
3     A.  I'm sorry.
4     Q.  That was a "yes," correct?
5     A.  Yes.  Both.
6     Q.  Okay.  How long were you and Officer Pack
7 at Area Three with Mr. Jakes?
8     A.  A short time.
9     Q.  How short?
10     A.  I don't know.  I would be guessing.
11     Q.  Okay.  I don't believe I asked you this
12 question.  There was no outstanding search warrant for
13 Mr. Jakes when you went to his home, correct?
14     A.  As far as I know, no.
15     Q.  Okay.  Did you tell Ms. Jones that there
16 was outstanding warrants for Mr. Jakes when you were at
17 her home?
18     A.  No.
19              MS. JOHNSON: Object to form.
20 BY MS. DONNELL:
21     Q.  Did you hear Officer Pack convey to Miss
22 Jones that Anthony had an outstanding warrant and you
23 were picking him up on a warrant?
24     A.  No.

135

1     Q.  Did you hear Officer Posey say anything to
2 that effect?
3     A.  No.
4     Q.  Officer Patterson?
5     A.  No.
6     Q.  Okay.  I am going back to Area Three.  When
7 you were in Area Three, you testified that when you were
8 present, Officer Pack performed a protective pat-down
9 before putting Anthony in one of the rooms on the third
10 floor of Area Three, right?
11     A.  Yes.
12     Q.  But you don't have an actual memory of
13 that, right?
14     A.  I believe I remember.
15     Q.  Okay.  What do you remember about the
16 pat-down?
17     A.  That he patted him down and he found a
18 tinfoil packet containing a white substance in his right
19 front pants pocket.
20     Q.  Do you remember all of this, or this was a
21 combination of what you reviewed and then Officer Pack's
22 testimony?
23     A.  I believe it was a combination.
24     Q.  Okay.  Where did the pat-down occur in

136

1 Area Three?  Was it in the room or somewhere in the
2 general area?
3     A.  I don't recall.
4     Q.  Okay.  Was anybody else present other than
5 you and Officer Pack?  Was the sergeant present or any
6 of the Area Three detectives?
7     A.  I don't recall.
8     Q.  Okay.  Do you actually remember that
9 Officer Pack found the tinfoil packet in Anthony Jakes'
10 right front pocket, or was that from Mr. Pack's
11 testimony?
12     A.  I believe I can remember that.
13     Q.  And what was Mr. Jakes wearing?  What kind
14 of pants was he wearing?
15     A.  I don't recall.
16     Q.  How about his shirt?
17     A.  I don't recall.
18     Q.  Did he have a jacket on?
19     A.  I don't recall.
20     Q.  Do you remember his shoes?
21     A.  I don't recall.
22     Q.  Okay.  But you remember that Officer Pack
23 pulled a tinfoil packet from Anthony Jakes' right front
24 pocket, correct?

Transcript of Michael DeLacy
Conducted on January 15, 2021

35 (137 to 140)

137

1     A.   Yes.
2     Q.   Okay.  Describe the packet.
3     A.   A tinfoil packet.
4     Q.   Okay.  How big was the tinfoil packet?
5     A.   Not very big.
6     Q.   What do you mean?  Describe the approximate
7  dimension.
8     A.   I would say maybe the size of a dime.
9  Nickel or a dime.
10     Q.   So the size of a nickel or a dime tinfoil
11  packet, so quite tiny?
12          MS. JOHNSON:  Object to form.
13     A.   I'm sorry, Counsel, could you repeat it?
14  BY MS. DONNELL:
15     Q.   Sure.  You said the tinfoil packet was the
16  size of either a nickel or a dime; is that right?
17     A.   Yes.
18     Q.   And do you have a memory of what you
19  observed Officer Pack do with the tinfoil packet?
20     A.   I believe he put it in his pocket.
21     Q.   Officer Pack put the tinfoil packet in his
22  pocket?
23     A.   I believe so.
24     Q.   Did he unwrap it?

138

1     A.   Yes.
2     Q.   Did he unwrap it there in front of Mr.
3  Jakes?
4     A.   Yes.
5     Q.   Okay.  And did you observe the packet being
6  opened?
7     A.   Yes.
8     Q.   And what did you observe?
9     A.   It contained a white substance.
10     Q.   How much?
11     A.   I don't recall.
12     Q.   Can you describe the white substance that
13  was inside the tinfoil packet that you observed Officer
14  Pack opening?
15     A.   I believe it was a white powder type
16  substance.
17     Q.   Okay.  Well, do you have a memory of what
18  happened next, or is it limited to what you reviewed in
19  Officer Pack's testimony?
20     A.   I don't recall.
21     Q.   Do you have a memory of anything else that
22  happened in Area Three?
23     A.   The -- I believe a case report was made out
24  in Area Three.

139

1     Q.   Did you make out the case report or did
2  Officer Pack?
3     A.   I'm not sure.  I don't recall.
4     Q.   Okay.  Where would you make out a case
5  report in Area Three as a tactical officer from the 9th
6  District.
7     A.   Probably at one of the available desks.
8     Q.   One of the detective desks that were
9  available?
10     A.   Yes.
11     Q.   Were those sort of in the main open area of
12  Area Three?  Those weren't in like little offices,
13  right?
14     A.   I don't remember the actual layout of Area
15  Three anymore.
16     Q.   Okay.  Do you remember taking Mr. Jakes
17  anywhere for processing?
18     A.   My memory is that he was put into an
19  interview room.
20     Q.   Okay.  So, after the pat-down, do you
21  remember you and Officer Pack putting him into an
22  interview room in Area Three?
23     A.   That's what my memory is.
24     Q.   Okay.  Tell me everything you remember

140

1  about that.  Like how long after the pat-down did you
2  put Mr. Jakes into an interview room?
3     A.   I don't recall.
4     Q.   It was a short time after the pat-down or a
5  long time after the pat-down?
6          MS. JOHNSON:  Object to form and
7  foundation.
8     A.   I don't recall.
9  BY MS. DONNELL:
10     Q.   Did you or Officer Pack ask any questions
11  of Mr. Jakes about the tinfoil packet?
12     A.   No.
13     Q.   Did either one of you convey to Mr. Jakes
14  that he was under arrest?
15     A.   Yes.
16     Q.   Okay.
17          MS. DONNELL:  Hold on one second.
18          (Off the record.)
19          MS. DONNELL:  Sorry, I'm back.
20          MS. JOHNSON:  Real quick.  It is 1:00.
21  Can we brick for lunch?
22          MS. DONNELL:  Can I just finish for
23  five minutes, and then we can break for lunch?  Just
24  this line of questioning.

Transcript of Michael DeLacy
Conducted on January 15, 2021

36 (141 to 144)

**141**

1      MS. JOHNSON: Sure.
2      (Off the record.)
3  BY MS. DONNELL:
4      Q.  Did you tell Mr. Jakes he was under arrest
5  after the foil packet was obtained?
6      **A.  I don't recall.**
7      Q.  So it is either you or Officer Pack, one of
8  the two of you?
9      **A.  Yes.**
10     Q.  Okay.  Did one of you advise Mr. Jakes of
11 his rights?
12     **A.  Yes.**
13     Q.  Who did?
14     **A.  I believe I did.**
15     Q.  Okay.  Why do you believe you advised Mr.
16 Jakes of his rights?
17     **A.  Because we had arrested him.**
18     Q.  But why do you think it was you and not
19 Officer Pack that advised Mr. Jakes?
20     **A.  I'm not sure.**
21     Q.  It could have been either one of the two
22 of you?
23     **A.  It could have been either one of us.**
24     Q.  Okay.  But you testified you thought it was

**142**

1  probably you, right?
2      **A.  I thought it was probably me.**
3      Q.  And I'm just asking why you believe it was
4  probably you that advised Anthony Jakes of his rights
5  after he was put under arrest for the tinfoil packet?
6      MS. JOHNSON: Object to foundation, and
7  asked and answered.
8  BY MS. DONNELL:
9      Q.  You can go ahead and answer.
10     **A.  Could you repeat the question?**
11     Q.  Sure.  I said you testified that you
12 believed it was probably you that gave Anthony Jakes
13 his Miranda warning after he was arrested for the
14 tinfoil packet that Officer Pack found on him.  And I
15 was just asking why you believe it was probably you.
16     MS. JOHNSON: Same objection.
17     **A.  I think I had the FOP Handbook with me.**
18 BY MS. DONNELL:
19     Q.  I'm sorry, I couldn't hear your answer.
20     **A.  I think I had the FOP Handbook with me.**
21     Q.  Okay.  And so you think because you had the
22 FOP Handbook with you, you read from the handbook?
23     **A.  I believe so.**
24     Q.  Okay.  Were there any youth officers

**143**

1  present at that time?
2      MS. JOHNSON: Object to form and
3  foundation.
4      **A.  On the third floor?**
5  BY MS. DONNELL:
6      Q.  When you were advising Mr. Jakes of his
7  rights?
8      MS. JOHNSON: The same objections.
9      **A.  I don't -- I don't understand your**
10 **question.**
11 BY MS. DONNELL:
12     Q.  Was it just you and Officer Pack present
13 with Mr. Jakes when you were advising him of his rights,
14 that he was under arrest?
15     **A.  Yes.**
16     Q.  And I am asking, was there also a youth
17 officer present at that time?
18     **A.  No.**
19     Q.  Okay.
20     MS. DONNELL: I think -- let's go off
21 the record.  I think this is a good time for a break.
22 We can pause right now.
23     VIDEO HOST: Off the record at 1:04.
24     (Off the record.)

**144**

1      (Whereupon, a lunch recess was taken.)
2      VIDEO HOST: Back on the record at
3  1:56.
4  BY MS. DONNELL:
5      Q.  Good afternoon, Mr. DeLacy.  Did you get a
6  chance to eat something on the break?
7      **A.  Yes, we did.  Thank you.**
8      Q.  Okay.  Great.  The same rules apply, if you
9  can't hear my question, just let me know and I will be
10 happy to repeat it for you.  Okay?
11     **A.  Thank you.**
12     Q.  Okay.  And has it been working for you so
13 far?  Do you feel like you are able to hear me?
14     **A.  Yes, it has.  Thank you.**
15     Q.  Okay.  Great.  We left off with some
16 questions related to when you were in Area Three with
17 Mr. Jakes and when your partner, Officer Pack, patted
18 him down.  Do you remember that?
19     **A.  Yes.**
20     Q.  Okay.  I want to go back to that part of
21 the events.  Okay?
22     **A.  Okay.**
23     Q.  I think I was asking you whether or not
24 there was a youth officer present at the time when the

Transcript of Michael DeLacy
Conducted on January 15, 2021

145

1 search was performed of Mr. Jakes, the protective
2 search. Do you recall whether there was youth officer
3 present with you and Officer Pack and Mr. Jakes at that
4 time?
5     A. No.
6     Q. Okay. So, there definitely wasn't a youth
7 officer present at that time?
8     A. No.
9     Q. Okay. Had you or Officer Pack made any
10 efforts to contact a youth officer prior to the
11 protective pat-down?
12     A. No.
13     Q. Okay. Is it fair to say if one of the
14 Area Three detectives was going to interrogate
15 Mr. Jakes, that you were relying on those investigating
16 officers to contact Mr. Jakes' legal guardian or other
17 adult to be present for the interrogation?
18         MS. JOHNSON: Object to form. It
19 mischaracterizes the testimony.
20         MS. DONNELL: He can answer.
21     A. I don't think he was going to be
22 interrogated at this time. I believe he was going to be
23 interviewed.
24 BY MS. DONNELL:

146

1     Q. Okay. But my question is a little bit
2 different. If one of the Area Three homicide detectives
3 was going to interview or interrogate Mr. Jakes because
4 they believed him to be a suspect in the Garcia
5 homicide, is it fair to say that you were relying on
6 those investigating officers to comply with the Chicago
7 Police Department's policy with respect to interrogating
8 juveniles?
9         MS. JOHNSON: Object to form and
10 foundation, and an incomplete hypothetical. Calls for
11 speculation.
12         MS. DONNELL: You can go ahead and
13 answer, sir.
14     A. No.
15 BY MS. DONNELL:
16     Q. You weren't relying on the investigating
17 officers to do that?
18         MS. JOHNSON: Same objection.
19     A. No.
20 BY MS. DONNELL:
21     Q. Why not?
22         MS. JOHNSON: Same objection.
23     A. Could you repeat the question again,
24 please?

147

1 BY MS. DONNELL:
2     Q. Sure. Sure. My question to you is when
3 you turned over Mr. Jakes to the Area Three detectives
4 for them to question Mr. Jakes, were you relying on
5 those detectives to comply with the Chicago Police
6 Department's policies with respect to how juveniles
7 were supposed to be questioned?
8         MS. JOHNSON: Object to form and
9 foundation, speculation and incomplete hypothetical.
10     A. No, the only thing we did as far as the
11 juvenile officer was concerned is we notified him that
12 we had brought Mr. Jakes into the area to be
13 interviewed, and that he was subsequently found to have
14 a controlled substance, a tinfoil packet that was
15 recovered with a white powdered suspect controlled
16 substance.
17 BY MS. DONNELL:
18     Q. Okay. I understand that. My question is a
19 little bit different. I am going to ask you about that.
20 Maybe I will just ask you now.
21         When did you inform the youth officer that
22 you had Mr. Jakes present at Area Three? Was that
23 before or after the protective pat-down Officer Pack
24 performed?

148

1     A. We notified him after.
2     Q. Okay. So it's after you say you got to
3 Area Three you parked in the parking lot and walked up
4 to Area Three, and then the sergeant said, "Put him in
5 one of those rooms," but up until that point you had not
6 notified the youth officer that you had Mr. Jakes in
7 Area Three, correct?
8     A. Correct.
9     Q. And so it was only after the protective
10 pat-down when you uncovered the tinfoil packet that you
11 and your partner, Officer Pack, notified the youth
12 officer about Mr. Jakes, correct?
13     A. Yes.
14     Q. Okay. And then why did you do that? Why
15 did you or Officer Pack notify the youth officer at that
16 time?
17     A. To let him know that he was under arrest.
18     Q. Okay. And why did you let the youth
19 officer know that Mr. Jakes was under arrest?
20     A. Because he would be processing him.
21     Q. Who would be processing him?
22     A. The youth officer.
23     Q. Do you remember who the youth officer was
24 that processed Mr. Jakes?

Transcript of Michael DeLacy
Conducted on January 15, 2021

38 (149 to 152)

149

1    A. No. I don't.
2    Q. Okay. But it's accurate to say that once
3 you uncovered what you believed to be a controlled
4 substance, you turned over Mr. Jakes to the youth
5 officer to do the processing?
6    A. Yes.
7    Q. Did you wait while the youth officer did
8 that, or did you and Officer Pack leave Area Three?
9    A. No, we left Area Three.
10    Q. Okay. So once you turned over Mr. Jakes to
11 the youth officer for processing related to the
12 controlled substance, you left Area Three?
13    A. Yes.
14    Q. Were you at Area Three when Mr. Jakes was
15 brought back up to Area Three to one of the interview
16 rooms?
17    A. I don't understand the question.
18    Q. Were you at Area Three when Mr. Jakes said
19 the youth officer had completed the processing of his
20 arrest for the controlled substance? Were you still at
21 Area Three?
22    A. No.
23    Q. So, you weren't at Area Three when he was
24 brought back up to the area to be interviewed, correct?

150

1    A. Correct.
2    Q. And you weren't present for any of
3 Detective Kill's questioning of Mr. Jakes; is that
4 correct?
5    A. Correct.
6    Q. And you weren't present for any of the
7 questioning that Kenneth Boudreau performed that day
8 either, correct?
9    A. Correct.
10    Q. So it is fair to say that you didn't have
11 any communications with Detective Kill with respect to
12 Anthony Jakes on September 16th, 1991?
13    A. Correct.
14    Q. And you didn't have any communications with
15 Kenneth Boudreau about Anthony Jakes on the September
16 16, 1991, true?
17    A. Correct.
18    Q. And you have no ability to testify about
19 what happened during the Kenneth Boudreau and Detective
20 Kill's interrogation of Anthony Jakes for the Garcia
21 homicide, correct?
22    A. Correct.
23    Q. Did Kenneth Boudreau ever talk to you about
24 his interrogation of Anthony Jakes at any point in time?

151

1    A. No.
2    Q. How about Detective Kill? Have you ever
3 had a conversation with Detective Kill about his
4 interrogation of Anthony Jakes?
5    A. No.
6    Q. Were you present at any of the
7 postconviction hearings in Mr. Jakes' case?
8    A. No.
9    Q. Were you present for his criminal trial?
10    A. No.
11    Q. Okay. Do you remember having any
12 conversations with your partner, Officer Pack, around
13 the time of Anthony Jakes' pretrial proceedings, when he
14 testified?
15    A. No.
16    Q. Did you have any conversations with your
17 partner, Officer Pack, before he testified in Anthony's
18 criminal trial on November 18th, 1992?
19    A. No.
20    Q. I'm sorry, that was the date -- I'm sorry,
21 that was the date of his testimony in the motion to
22 quash. I'm sorry. I will rephrase that so that the
23 record is accurate.
24        Did you have any conversations with your

152

1 partner, Officer Pack, before he testified in Anthony's
2 motion to quash arrest motion to suppress evidence on
3 November 18th, 1992?
4    A. No.
5    Q. Okay.
6        MS. JOHNSON: For the record,
7 Heather, when you are asking him whether he had any
8 conversations, are you talking about conversations in
9 general, or specifically about the Garcia homicide?
10        MS. DONNELL: That's fine. I will
11 restate it.
12 BY MS. DONNELL:
13    Q. Did you have any conversations with your
14 partner Thomas -- did you call him Tom?
15    A. Tom is fine, sure.
16    Q. Did you have any conversations with Tom
17 Pack prior to his testimony in Anthony Jakes' pretrial
18 proceeding in November of 1992 about your interactions
19 was Mr. Jakes on September 16, 1991?
20    A. No.
21    Q. Okay. And the same question, did you have
22 any communications with your partner, Tom Pack, before
23 he testified in Mr. Jakes' criminal trial proceeding in
24 September of 1993 about your interactions with Mr.

Transcript of Michael DeLacy
Conducted on January 15, 2021

---

153

1 Jakes?
2   A. No.
3   Q. Okay. How about after this -- at any other
4 time have you had any conversations with your partner,
5 Tom Pack, about Mr. Jakes' case or any of the facts
6 related to Mr. Jakes' case?
7       MS. JOHNSON: Object to form.
8   A. No.
9 BY MS. DONNELL:
10   Q. Okay. Have you ever, and again, I'm not
11 asking about what was communicated. But have you ever
12 had a meeting with your attorneys in which any of the
13 other Defendants who have been named in this lawsuit
14 were also present?
15   A. I don't recall.
16   Q. Do you know if you have ever been in a
17 meeting with Kenneth Boudreau about Mr. Jakes' lawsuit?
18   A. No. I haven't been.
19   Q. Okay. I'm sorry, when did your partner and
20 friend -- Tom Pack was your friend as well; is that
21 right?
22   A. Yes, he's my friend. Yes.
23   Q. And when did he pass away?
24   A. I believe it was in February of 2010?

---

154

1   Q. So, did you have any conversations, as you
2 can recall, with Mr. Tom Pack about Mr. Jakes' case?
3       MS. JOHNSON: Objection; asked and
4 answered.
5   A. No.
6 BY MS. DONNELL:
7   Q. Okay. Did I ask you if you have done any
8 meetings with Detective Kill about this case?
9   A. I believe you did. But no, I didn't have
10 any meetings with him.
11   Q. You didn't have any meetings with Detective
12 Kill?
13   A. No.
14       MS. JOHNSON: Kill is deceased.
15       MS. DONNELL: I know. But before he
16 was.
17 BY MS. DONNELL:
18   Q. Before Defendant Kill was deceased, did you
19 have any conversations with him about this case?
20   A. No, I didn't.
21   Q. Okay. Do you know Sergeant Bonke?
22   A. Yes.
23   Q. Okay. How do you know Sergeant Bonke?
24   A. I know him from Area Three.

---

155

1   Q. Have you and Sergeant Bonke had any
2 communications about Mr. Jakes' case?
3   A. No.
4   Q. Do you know Defendant Burke? Officer
5 Burke?
6   A. No, I don't.
7   Q. How about Defendant Caesar? Do you know
8 him, Defendant Caesar?
9   A. Yes.
10   Q. How do you know Officer Caesar?
11   A. From Area Three.
12   Q. Have you and Officer Caesar had any
13 communications about Mr. Jakes' case?
14   A. No.
15   Q. Are you and Officer Caesar friends? Do you
16 see him out socially?
17   A. No.
18   Q. How about Officer Bonke, do you see him
19 outside, or are you social friends with him?
20   A. No, I don't.
21   Q. Okay. You indicated or you testified
22 earlier today that you personally offered to Ms. Jones
23 that she could come with you and Mr. Jakes to Area
24 Three. Do you remember that testimony?

---

156

1   A. Yes.
2   Q. Did you provide Ms. Jones information to
3 any of the Area Three detectives?
4       MS. JOHNSON: Objection; asked and
5 answered.
6   A. Did I provide any of her information?
7 BY MS. DONNELL:
8   Q. Yes. To the Area Three detectives? Did
9 you let them know that Mr. Jakes had a legal guardian
10 at home and residing at 1212 West 51st Street in the
11 rear residence?
12   A. I believe it was in our report.
13   Q. Okay. Do you remember telling, orally
14 telling anybody at Area Three, like the sergeant, desk
15 sergeant or anybody?
16   A. I don't recall.
17   Q. Do you remember telling the youth officer
18 that was going to process Mr. Jakes for the arrest
19 for the controlled substance you believed that you had
20 obtained from him, that they had a legal guardian, Ms.
21 Jones, present at the address of 1212 West 51st Street,
22 in the rear residence?
23       MS. JOHNSON: Object to foundation.
24   A. Could you repeat the question, Counsel?

Transcript of Michael DeLacy
Conducted on January 15, 2021

40 (157 to 160)

157

1     Q.   Did you let the youth officer know that
2  you turned Mr. Jakes over for processing after the
3  protective pat-down that he had a legal guardian at
4  home, Ms. Jessie Mae Jones?
5          MS. JOHNSON:  Object to foundation.
6     A.   Not verbally.
7  BY MS. DONNELL:
8     Q.   So just in your report?
9     A.   Yes.
10    Q.   Okay.  Do you expect that any of the
11 detectives that were going to interrogate Mr. Jakes
12 about-- if they were going to interrogate him, that they
13 would comply with the CPD policy with respect to
14 custodial interrogations of juveniles?
15         MS. JOHNSON:  Objection; form,
16 foundation, incomplete hypothetical, and assumes facts
17 not in evidence.
18 BY MS. DONNELL:
19    Q.   You can answer.
20    A.   The problem was that you broke up for the
21 first part of the question.
22    Q.   Oh, I'm sorry, sorry.  Let me try again.
23         Is it accurate that you relied on the
24 investigating officers at Area Three to comply with any

158

1  Chicago Police Department policies regarding how Mr.
2  Jakes as a juvenile was to be interrogated if they
3  conducted a custodial interrogation?
4          MS. JOHNSON:  Object to form,
5  foundation, incomplete hypothetical, and cause for
6  speculation.
7  BY MS. DONNELL:
8     Q.   You can answer.
9     A.   I would speculate yes.
10    Q.   Okay.  In other words, you weren't part of
11 his interrogation or interview in Area Three, correct?
12    A.   Correct.
13    Q.   So, you relied on your fellow colleagues,
14 the investigating officers to do their jobs in
15 compliance with the CPD policies, right?
16         MS. JOHNSON:  Objection to form,
17 speculation, incomplete hypothetical, and calls for
18 speculation.
19 BY MS. DONNELL:
20    Q.   You can answer.
21    A.   I wouldn't want to speculate on that.
22    Q.   Well, you had been trained on how juveniles
23 were supposed to be treated if they were in custody,
24 correct?

159

1     A.   If they were in custody, yes.
2     Q.   Okay.  How about if they were just being
3  interviewed as a witness?  Was it your practice -- well,
4  did you interview juveniles?
5     A.   Not normally.
6     Q.   Not normally.  Okay.  That wasn't really
7  part of your job as a tactical officer, mostly speaking;
8  is that right?
9     A.   Yes.
10    Q.   You testifed earlier that in the academy
11 you were trained about the policy related to
12 interrogating juveniles, if it was a custodial
13 interrogation, correct?
14    A.   Yes.
15    Q.   Are you familiar with general order 87-7?
16    A.   I don't remember it.
17    Q.   Did you review any general orders before
18 your deposition today?
19    A.   No.
20    Q.   Okay.  Is it accurate to say that in
21 September of 1991 you knew that it was the Chicago
22 Police Department's policy that if there was a custodial
23 interrogation conducted of a juvenile, that a legal
24 guardian parent or other adult should be present?

160

1          MS. JOHNSON:  Objection; form,
2  foundation.
3          Are you reading off the general order,
4  Heather?
5          MS. DONNELL:  I am asking my question.
6          MS. JOHNSON:  Well, I understand that
7  you are asking the question.
8          MS. DONNELL:  I asked the question.
9  The witness can answer the question.
10 BY MS. DONNELL:
11    Q.   Go ahead, sir.
12    A.   Can you repeat it again, please.
13    Q.   Sure.  Why don't you tell us in your own
14 words, what was your understanding in September of 1991
15 about the policy of the Chicago Police Department with
16 respect to interrogations of juvenile suspects.
17    A.   As far as interrogation, I believe that a
18 youth officer had to be present and a parent or
19 guardian.
20    Q.   Okay.  How about for juveniles that are
21 being interviewed as witnesses.  What was your
22 understanding of the Chicago police department's policy
23 as of September of 1991?
24    A.   I don't recall that.

Transcript of Michael DeLacy
Conducted on January 15, 2021

161

1    Q.   Okay.  Thank you.
2         Were you trained on the Chicago Police
3  Department policy with respect to custodial
4  interrogation of juveniles when you were in the academy?
5    A.   I don't recall.
6    Q.   Okay.  Do you remember if you received any
7  in-service training on that?
8    A.   I don't recall.
9    Q.   Let's see here.  Were you present when the
10  youth officer processed Mr. Jakes for the arrest of a
11  controlled substance on September 16th, 1991?
12         MS. JOHNSON:  Objection; asked and
13  answered.
14    A.   No.
15  BY MS. DONNELL:
16    Q.   Did you have any knowledge of the factual
17  basis that was formed probable cause to arrest Mr. Jakes
18  for the Garcia homicide?
19         MS. JOHNSON:  Object to form.
20    A.   I'm sorry, could you repeat that?
21  BY MS. DONNELL:
22    Q.   Do you have any knowledge of the factual
23  basis that formed probable cause to charge Mr. Jakes for
24  the Garcia homicide?

162

1    A.   No, I don't have any knowledge.
2    Q.   Do you know or have any knowledge of the
3  evidence that the investigating officers developed in
4  the Garcia investigation?
5    A.   No, I don't.
6    Q.   Do you have any knowledge if there is any
7  physical evidence linking Mr. Jakes to the Garcia
8  homicide?
9    A.   No, I don't.
10    Q.   And you weren't involved in any way in the
11  processing of the scene of the Garcia homicide, correct?
12    A.   Correct.
13    Q.   Were you even on duty that night?
14    A.   No.
15    Q.   Because you work days, right?
16    A.   Yes.
17    Q.   Okay.  Do you know what you and your
18  partner, Officer Pack, did after you left Area Three on
19  September 16th, 1991?
20    A.   We went to 11th and State.
21    Q.   Why did you go to 11th and State?
22    A.   To drop off the narcotics.
23    Q.   And why did you go to 11th and State to
24  drop off the narcotics?

163

1    A.   Because there was no narcotic vault in Area
2  Three.
3    Q.   Did you know at that time that the
4  substance, the white substance that you were dropping
5  off was a narcotic?
6    A.   It was a suspected narcotic.
7    Q.   Okay.  So you were dropping it off at 11th
8  and State for testing or for processing?
9    A.   For forensics, yes.
10    Q.   Did you take the tinfoil and the white
11  substance of the whole packet?
12    A.   The whole packet together, yes.
13    Q.   Okay.  Had you already inventoried it at
14  Area Three?
15    A.   I believe it was there at the inventory
16  area in Area Three, but I'm not sure.
17         (Off the record.)
18  BY MS. DONNELL:
19    Q.   Maybe I asked this and you already answered
20  it, but let me make sure.
21         Did you inventory the white substance and
22  packet at Area Three?
23    A.   I believe we did, but I'm not positive.
24    Q.   Okay.  But do you have a memory of bringing

164

1  the substance to 11th and State for forensic testing?
2    A.   No.
3    Q.   You just know that you did that based on
4  the reports and the testimony?
5    A.   Yes.
6    Q.   Okay.  Did you receive the results back of
7  any forensic testing?
8    A.   I did not.
9    Q.   Okay.  Do you know who did?
10    A.   I -- I don't know.  I did not.
11    Q.   Did you observe anyone strike, hit, punch
12  or do anything to Mr. Jakes at Area Three?
13    A.   No.
14    Q.   Did you have any physical contact with Mr.
15  Jakes?
16    A.   No.
17    Q.   How about Officer Pack, did you observe him
18  strike, hit, punch or have any contact with Mr. Jakes?
19    A.   No.
20    Q.   Did you observe any injuries on Mr. Jakes
21  in Area Three before you turned him over to youth
22  officer?
23    A.   No.
24    Q.   Have you seen Mr. Jakes on any occasion

Transcript of Michael DeLacy
Conducted on January 15, 2021

42 (165 to 168)

---

165

1 after September 16th, 1991, that you are aware of?

2     **A. Not that I'm aware of.**

3     Q. Have you read any newspaper articles or

4 seen any in regards to Mr. Jakes' case?

5     **A. You froze again.**

6     Q. Oh, I'm sorry. Am I back?

7     **A. You are back.**

8     Q. Have you read any newspaper articles about

9 Mr. Jakes' case?

10     **A. Possibly.**

11     Q. Well, when you say "possibly," what are you

12 referring to?

13     **A. I believe there was an article in the paper**

14 **a number of months ago. I don't remember how long.**

15     Q. Do you remember what paper you read?

16     **A. No, I don't.**

17     Q. Do you get one of the Chicago newspapers?

18     **A. I get the Chicago Tribune.**

19     Q. Okay. Do you still get a physical copy, or

20 do you get an electronic copy?

21     **A. No, I get a physical copy.**

22     Q. Okay. Great. So you think you read about

23 Mr. Jakes' case in the Sun Times?

24     **A. I -- I don't remember what paper I read it**

---

166

1 in.

2     Q. Okay. Have you seen any TV news broadcasts

3 about Mr. Jakes' case?

4     **A. Not that I recall.**

5     Q. Have you read any media about Detective

6 Boudreau in the newspaper or seen it on TV?

7     **A. No.**

8     Q. After dropping off what was a suspected

9 narcotics at 11th and State on the afternoon of

10 September 16, 1991, did you have any other involvement

11 in Mr. Jakes' case?

12     **A. No.**

13     Q. I want to go back and ask you a few

14 questions. Before I move forward, I want to ask you a

15 few questions back when you were at Mr. Jakes' and Ms.

16 Jones' home. Okay?

17     **A. Yes.**

18     Q. Okay. I want to go back for just a second.

19     I think I had already gone over whether you

20 or any officer had indicated to Ms. Jones that you had

21 an arrest warrant for Mr. Jakes. So I'm not going to

22 ask you that. But I am going to ask you another

23 question. Did any of you covey -- you or any other

24 officer convey to Ms. Jones that you had a warrant to

---

167

1 search her home?

2     MS. JOHNSON: Object to form and

3 foundation.

4     **A. No.**

5 **BY MS. DONNELL:**

6     Q. Is it your testimony that that did not

7 happen?

8     MS. JOHNSON: Object to form,

9 foundation calls for speculation.

10     **A. Yes.**

11 **BY MS. DONNELL:**

12     Q. Did you tell Ms. Jones at any point while

13 you were at her home on September 16, 1991 that you were

14 looking for a murder weapon?

15     **A. No.**

16     Q. Did you hear Officer Pack tell Ms. Jones

17 that you were looking, you collectively were looking for

18 a murder weapon?

19     **A. No.**

20     Q. Did you ever hear Officer Posey indicate to

21 Ms. Jones that you were looking for a murder weapon?

22     **A. No.**

23     Q. How about Officer Patterson, did he say

24 anything to that effect?

---

168

1     **A. No.**

2     Q. Okay. Was there an Officer Malone or

3 Maloney present with you at 1212 West 51st Street on

4 September 16, 1991?

5     **A. No.**

6     Q. Do you know who that is, M. Malone

7 M-A-L-O-N-E?

8     **A. I think he's an officer in the 9th**

9 **District.**

10     Q. But he wasn't with you at Ms. Jones and Mr.

11 Jakes' home?

12     **A. No.**

13     Q. Okay. I'm going to have you look at some

14 documents now. Can you -- and I will look on my copy

15 and you look on your copy. I have designated an arrest

16 report as Exhibit No. 1 to your deposition. Can you get

17 that in front of you?

18     **A. Okay.**

19     Q. And do you have Exhibit 1 in front of you

20 now?

21     (Arrest report Deposition Exhibit 1

22 marked for identification.)

23     **A. Yes.**

24     Q. And for the record, Exhibit 1 is a one-page

---

Transcript of Michael DeLacy
Conducted on January 15, 2021

---

169

1  document that has the Bates stamped CITY JAKES 000097.
2      Do you recognize Exhibit 1, Mr. DeLacy?
3      **A. Yes.**
4      Q. Can you describe what Exhibit 1 is, please?
5      **A. It is an arrest report of Anthony Jakes.**
6      Q. And do you -- what is the date of this
7  arrest report?
8      **A. 16 September, 1991.**
9      Q. And what is the time of this arrest report?
10     **A. 1305.**
11     Q. Okay. And do you know if you or your
12  partner, Thomas Pack, prepared this report?
13     **A. I don't recall.**
14     Q. Do you recognize Thomas Pack's signature on
15  Exhibit 1?
16     **A. Yes.**
17     Q. And do you know that to be your partner's
18  signature because you worked with him for 20 years and
19  you saw his signature on many reports that you guys
20  prepared together; is that right?
21     **A. Yes.**
22     Q. And is this the report that you testified
23  to earlier that you think was prepared at Area Three or
24  was that just the case report?

---

170

1      **A. No, I believe both were prepared in Area**
2  **Three.**
3      Q. And is it fair to say that Exhibit 1, the
4  arrest report of Mr. Jakes', was actually typed on a
5  typewriter? That's what it looks like to me.
6      **A. Yes.**
7      Q. Okay. And are you able to say one way or
8  the other whether it's your report -- I'm sorry, are you
9  able to say one way or another whether you typed it or
10  Officer Pack typed it based on the fact that it is
11  Officer Pack's signature on it?
12     **A. I don't know. I couldn't say.**
13     Q. And was it through your practice with
14  Officer Pack that one or the two of you might type up
15  the report and one of you sign it, but it was both of
16  your reports?
17         MS. JOHNSON: Object to form.
18     **A. Yes.**
19  BY MS. DONNELL:
20     Q. Okay. And then you see the number here as
21  second arresting officer's signature, down towards the
22  bottom of the arrest report?
23     **A. I don't see a signature. I don't see that.**
24     Q. Well, it says, "Second arresting officer's

---

171

1  signature," in the box and then your name is typewritten
2  underneath that; is that right?
3      **A. Yes.**
4      Q. Okay. And that says that your star number
5  was 14120?
6      **A. Yes.**
7      Q. And you guys were working Beat No. 962D, as
8  in dog?
9      **A. Yes.**
10     Q. And your unit was --
11         COURT REPORTER: Hold on.
12         (Off the record.)
13  BY MS. DONNELL:
14     Q. And your Beat number was 962D, as in dog;
15  is that correct, Mr. DeLacy?
16     **A. Yes, it is.**
17     Q. And then the unit number was 9, for the 9th
18  District, correct?
19     **A. Yes.**
20     Q. And then up at the top at the narrative --
21  well, up at the top it indicates that Mr. -- you have it
22  written down that Mr. Jakes' height was 5'9"; is that
23  right?
24     **A. (Reviewing.) It looks to be 5'9." It's**

---

172

1  hard to read.
2      Q. And his weight is 130 pounds; is that
3  right?
4      **A. Yes.**
5      Q. And then up at the very, very top right it
6  indicates that Anthony Jakes' birthday was July 30th,
7  1976, right?
8      **A. Yes.**
9      Q. And did you get the birth date from Mr.
10  Jakes?
11     **A. I don't recall.**
12     Q. Okay. Now I want to look at the narrative
13  section of the report. Okay?
14     **A. Okay.**
15     Q. That first line says-- it looks like
16  something didn't get copied in what was produced to us.
17  But it looks like that was meaning to be 9th District
18  Tactical Incident No. 91-10-24; is that right?
19     **A. Yes, I see it. Yes.**
20     Q. And do you think that probably was supposed
21  to say, "9th District (phonetic)"?
22     **A. Yes, I think it did.**
23     Q. Okay. And what is a tactical number? What
24  is that referring to?

---

Transcript of Michael DeLacy
Conducted on January 15, 2021

44 (173 to 176)

173

1    A.  You know, I'm not really sure.  I think it
2  has something to do with maybe the year and the month,
3  maybe -- I'm not sure.
4    Q.  This was occurring in September of '91,
5  right?
6    A.  Yes, but I don't know what those numbers
7  signify.
8    Q.  Okay.  Would you have known back in 1991?
9    A.  I don't know.
10    Q.  Okay.  But either you or Officer Pack typed
11  that into the narrative of this report, correct?
12    A.  Yes.
13    Q.  Okay.  And this report is dated September
14  16, 1991, correct?
15    A.  Yes.
16    Q.  Do you know the next line down in the
17  narrative section it looks like it should say 9th
18  District raid number N, as in Nancy, 9-91-771.  Do you
19  see that?
20    A.  I do.
21    Q.  What does the 9th District raid number
22  refer to?  What is included in the narrative section of
23  the arrest report for Anthony Jakes?
24    A.  I'm not sure.

174

1    Q.  Was there, to your knowledge, a raid
2  associated with you going to Mr. Jakes' home to collect
3  him?
4        MS. JOHNSON:  Object to form,
5  foundation.
6    A.  No.
7  BY MS. DONNELL:
8    Q.  Do you know why there's a raid number
9  included on the narrative section of your and Officer
10  Pack's arrest report for Anthony Jakes?
11        MS. JOHNSON:  Objection; form,
12  foundation.
13    A.  I don't recall.
14  BY MS. DONNELL:
15    Q.  Your arrest report includes on the second
16  line, in the narrative section, district raid number,
17  correct?
18    A.  Yes.
19    Q.  Do you know why a district raid number was
20  included, a 9th District raid number was included on
21  Anthony Jakes' arrest report?
22        MS. JOHNSON:  Objection; foundation.
23    A.  I don't recall.
24  BY MS. DONNELL:

175

1    Q.  And to the best of your ability as you sit
2  here today, do you know if there was a raid associated
3  with going to get Mr. Jakes on September 16th, 1991?
4        MS. JOHNSON:  Objection; form.
5    A.  No, there was no raid.
6  BY MS. DONNELL:
7    Q.  So, you have no idea.  You can't tell me
8  why that was included on your arrest report?
9        MS. JOHNSON:  Objection; form.
10    A.  No, I don't recall.
11  BY MS. DONNELL:
12    Q.  But it is fair to say that you or your
13  partner, Officer Pack, put that on this report, correct?
14        MS. JOHNSON:  Objection; form,
15  foundation, and it also mischaracterizes his testimony.
16    A.  I don't know.
17  BY MS. DONNELL:
18    Q.  But you agree with me that that is included
19  and typed onto the narrative section of your arrest
20  report, right?
21    A.  Yes.
22        MS. JOHNSON:  Objection to form.
23  BY MS. DONNELL:
24    Q.  And either you or your partner, Officer

176

1  Pack, put this on that report, correct?
2    A.  Yes.
3    Q.  The next line down says the ROs received
4  information that an MB, meaning male, black subject by
5  the name of Anthony Jakes, and that's probably 15 years,
6  right?
7    A.  Yes.
8    Q.  Not five years.  Of 1212 West 51st Street
9  rear house was wanted for questioning by Area Three.
10  Right?
11    A.  Yes.
12    Q.  Now, here it indicate that is Area Three
13  wanted Mr. Jakes for questioning, right?
14    A.  I don't know.
15    Q.  Well, that's what is written, right?
16    A.  That what is on the report, yes.
17    Q.  It's written in your report because back on
18  September 16th, 1991, Area Three wanted Mr. Jakes for
19  questioning, right?
20    A.  I don't know where that came from.
21    Q.  Well, it had to come from you or Officer
22  Pack, right?
23        MS. JOHNSON:  Objection to form and
24  foundation.

Transcript of Michael DeLacy
Conducted on January 15, 2021

45 (177 to 180)

177

1    A.  I don't recall.
2  BY MS. DONNELL:
3    Q.  Well, you and Officer Pack prepared your
4  arrest report, right?
5    A.  Yes.
6    Q.  And if somebody else assisted you in
7  preparing it, their name would be included on this
8  report, right?
9    A.  Yes.
10    MS. JOHNSON:  Object to form and
11  foundation.
12  BY MS. DONNELL:
13    Q.  So it is accurate to say that you and
14  Officer Pack prepared Exhibit 1 and signed off on it and
15  submitted it as an official Chicago Police Department
16  arrest report, correct?
17    A.  Yes.
18    Q.  So nobody else helped you prepare it other
19  than the two of you, right?
20    A.  Correct.
21    Q.  And so you and Officer Pack, back in
22  September 16th, 1991, indicated that you went to Mr.
23  Jakes because he was wanted for questioning because Area
24  Three -- by Area Three, right?  That's what it says in

178

1  the report.  And the reason it says that is because
2  that's what happened, right?  You were documenting an
3  official arrest report based on the information that you
4  had at that time, correct?
5    MS. JOHNSON:  Objection to form,
6  foundation.  Calls for speculation.
7    A.  I don't recall.
8  BY MS. DONNELL:
9    Q.  I know you don't recall, sir.  But my
10  question is a little bit different.  You put that in
11  your arrest report because that's what was true, and you
12  were accurately documenting in your official police
13  report why you went to Mr. Jakes' home to get him for
14  questioning, correct?
15    MS. JOHNSON:  Same objection, Heather.
16  You asked him this question three times now.  He said he
17  doesn't remember.
18    MS. DONNELL:  I'm asking a different
19  question.
20  BY MS. DONNELL:
21    Q.  Sir, you were trained to put detailed,
22  factual accurate information in your arrest reports,
23  correct?
24    MS. JOHNSON:  Object to form.

179

1    A.  Yes.
2  BY MS. DONNELL:
3    Q.  And if Area Three requested for you to go
4  get Mr. Jakes for questioning, then you would convey
5  that in your arrest report, right?
6    MS. JOHNSON:  Object to form.
7    MS. DONNELL:  I will strike that.
8  That's a bad one.  I will strike it.
9  BY MS. DONNELL:
10    Q.  I guess another way of saying that,
11  Mr. DeLacy, is you would not have said that Area Three
12  wanted Mr. Jakes for questioning if they had not asked
13  that in an official arrest report, correct?
14    MS. JOHNSON:  Object to form and
15  foundation.
16    A.  I don't recall.
17  BY MS. DONNELL:
18    Q.  And my question is a little different.  I
19  know you don't recall why that information is in here,
20  and I understand that.  But what I am asking you is a
21  different question.  You would not have put that in an
22  official arrest report if it wasn't true, correct?
23    MS. JOHNSON:  Object to form and
24  foundation.  Again, calls for speculation.  And this is

180

1  asked and answered now like four times.
2    MS. DONNELL:  Well, I haven't gotten an
3  answer.
4    MS. JOHNSON:  Well, he doesn't know.
5  If his answer is he doesn't know, he does not know.
6    MS. DONNELL:  Which is why I am asking
7  him a different question.
8  BY MS. DONNELL:
9    Q.  You wouldn't put that in the report if it
10  wasn't true, correct?
11    MS. JOHNSON:  Object again.  The same
12  objection.  Heather, move on from this question.
13  His answer is he does not recall.  If we want to read it
14  back four, five or six times, I will let you ask this
15  question for the rest of this dep, but he's going to
16  give you the same answer.
17    MS. DONNELL:  Again, I would like him
18  to answer the question that has been posed.
19    MS. JOHNSON:  He said, once again, that
20  he does not recall, so objection.
21    MS. DONNELL:  And I am going to let the
22  witness testify.
23  BY MS. DONNELL:
24    Q.  Mr. DeLacy, in your arrest report it says

Transcript of Michael DeLacy
Conducted on January 15, 2021

46 (181 to 184)

---

181

1 Mr. Anthony Jakes was brought -- strike that.
2       Isn't it true, Mr. DeLacy, that it is
3 indicated in your arrest report Mr. Jakes was wanted for
4 questioning by Area Three because that is accurate, and
5 so you included it in your arrest report?
6       MS. JOHNSON: Same objection. And you
7 can answer it if you understand or if you remember.
8   **A. I don't recall.**
9 **BY MS. DONNELL:**
10   Q. Okay. Is it your testimony that if it
11 wasn't true, you would have included it in your arrest
12 report? You would have just made that up?
13       MS. JOHNSON: Object to form and
14 argumentative. Heather, you are arguing with him now.
15       Go ahead and answer her question.
16   **A. No.**
17 **BY MS. DONNELL:**
18   Q. Okay. What were you trained to include in
19 your arrest reports?
20   **A. The facts of the arrest.**
21   Q. Okay. And were you trained to be accurate
22 when included the facts of the arrest in your arrest
23 report?
24   **A. As accurate as possible.**

---

182

1   Q. Okay. Thank you. Your report indicates
2 that you proceeded to 1212 West 51st Street to the rear
3 house and spoke to Jessie Mae Jones, and then you
4 included her date of birth, right?
5   **A. Yes.**
6   Q. Did you ask for her date of birth when you
7 were at her home?
8   **A. I believe I did.**
9   Q. Okay. Were you taking notes when you were
10 at her home?
11   **A. I don't recall any notes.**
12   Q. Sir, do you know if Officer Pack was taking
13 any notes?
14   **A. I don't recall.**
15   Q. It also indicates in the arrest report that
16 Ms. Jones was the aunt of Anthony Jakes. Do you see
17 that in Exhibit 1?
18   **A. Yes, I do.**
19   Q. Did you ask Ms. Jones her relationship to
20 Anthony Jakes? I know you said earlier she testified
21 she was his legal guardian. But do you recall her
22 conveying her familial relationship to him?
23   **A. I don't recall that.**
24   Q. What was your practice in September of 1991

---

183

1 with respect to taking notes? Did you have like a steno
2 pad or a type of way that you took notes when you were
3 out in the field?
4       MS. JOHNSON: Object to form;
5 foundation.
6   **A. No, not usually.**
7 **BY MS. DONNELL:**
8   Q. So, if you obtained information from
9 witnesses like their name or date of birth or location,
10 how would you typically remember that information before
11 you prepared an official report?
12       MS. JOHNSON: Object to form.
13   **A. I don't recall.**
14 **BY MS. DONNELL:**
15   Q. Did Officer Pack have a practice with
16 respect to taking notes when he was out in the field?
17       MS. JOHNSON: Object to form,
18 foundation.
19   **A. I don't recall.**
20 **BY MS. DONNELL:**
21   Q. Did you keep a GPR pad when you were a
22 tactical officer in the 9th District in 1991?
23   **A. No.**
24   Q. Had you been trained on the use of GPRs, or

---

184

1 no?
2   **A. No.**
3   Q. And so the best of your ability, your
4 testimony is you have no recollection if you had a
5 practice with respect to taking notes when you were out
6 in the field, you just don't remember, or do you think
7 you probably didn't keep a note pad?
8   **A. I don't think we kept a note pad.**
9   Q. Okay. The report of Exhibit 1 includes an
10 individual by the name of Sergeant Risley; did I get
11 that right?
12   **A. Yes.**
13   Q. Do you know who Sergeant Risley is?
14   **A. He is a tactical sergeant.**
15   Q. And then Sergeant Risley, why was he
16 included on the report? Was he present for any of the
17 events?
18   **A. I don't believe so.**
19   Q. Okay. Was he just included because he was
20 your supervising officer of that shift?
21   **A. Yes.**
22   Q. Was he your regular supervising officer in
23 1991?
24   **A. Yes.**

Transcript of Michael DeLacy
Conducted on January 15, 2021

47 (185 to 188)

---

185

1    Q.   Was he like the dayshift tactical
2 supervising officer?
3    A.   Yes.
4    Q.   And so you earlier described that a
5 tactical unit was usually a sergeant and eight officers,
6 right?
7    A.   Yes.
8    Q.   And so your unit -- well, do you remember
9 in September 1991 who the officers were that were
10 included in your unit under Sergeant Risley?
11    A.   No, I don't.
12    Q.   What is Sergeant Risley's first name, if
13 you recall?
14    A.   John, I believe.
15    Q.   Okay.  And do you remember Sergeant
16 Patterson's first name?
17    A.   Sergeant Patterson?
18    Q.   J. Patterson?  You can look at your report.
19 It says, "J. Patterson"?
20        MS. JOHNSON:  Did you mean, "Sergeant
21 Patterson," Heather, or "Officer"?
22 BY MS. DONNELL:
23    Q.   I'm sorry.  My apologies.  Officer
24 Patterson.

---

186

1        MS. DONNELL:  Thank you, Brittany.
2    A.   Joe, I think it is.
3    Q.   Okay.  How about Posey?  What was Posey's
4 first name, if you remember?  Officer Posey?
5    A.   Charles.
6    Q.   Okay.  And how about, is it Malone?
7 Officer M. Malone, do you remember his first name?
8    A.   No, I don't.
9    Q.   Do you remember Officer Malone being
10 present at the home of Mr. Jakes?
11    A.   No.
12    Q.   How about at Area Three?
13    A.   No.
14    Q.   As you sit here today, do you know why he
15 is included on your arrest report?
16    A.   No, I don't.
17    Q.   Okay.  I'm going to have you look at
18 Exhibit 2 now.  Exhibit 2 should be in front of you.  It
19 is a two-page document.
20        (Two-page CR Deposition Exhibit 2
21 marked for identification.)
22    A.   Okay.
23        MS. DONNELL:  For the record, Exhibit 2
24 is a two-page document that was produced by the city

---

187

1 CITY JAKES 0052 and 53.
2    Q.   Do you recognize Exhibit 2, Mr. DeLacy?
3    A.   Yes.
4    Q.   Can you describe Exhibit 2?
5    A.   It's a case report.
6    Q.   What is a case report?
7    A.   It's a narrative of an incident that
8 happened.
9    Q.   And this is a narrative of an incident --
10 this is a case report that you and Officer Pack filled
11 out on September 16, 1991; is that right?
12    A.   Yes.
13    Q.   And this relates to your arrest of Mr.
14 Jakes on that date, right?
15    A.   Yes.
16    Q.   And that was for possession of a controlled
17 substance?
18    A.   Yes.
19    Q.   And do you recognize your signature at the
20 bottom of the first page of Exhibit 2?
21    A.   Yes.
22    Q.   And do you recognize Officer Pack's
23 signature as well?
24    A.   Yes.

---

188

1    Q.   And then do you recognize the signature of
2 Sergeant John Risley as well?
3    A.   Yes.
4    Q.   And what is the date of your case report?
5    A.   16 September '91.
6    Q.   And what time?
7    A.   1500.
8    Q.   Your report was at 1500.  Where do you see
9 that?  I thought it was at 1330.
10    A.   At the bottom, down there.
11    Q.   The date the investigation was completed
12 was at 1500.  I see that.  That's in box No. 95, right?
13    A.   Yes.
14    Q.   But what is the, up above, when it says,
15 "Person notified, Detective Reed," do you see that?
16    A.   I believe that's the officer that was at
17 O.C.D.
18    Q.   And what is "O.C.D.," for the record?
19    A.   Organized Crime Division.
20    Q.   And was that at 11th and State?
21    A.   Yes.
22    Q.   Okay.  Was that the time that -- and do you
23 see up at the top, when it says the date and hours
24 arrived, do you see that?  "September 16, 1991 at 1305"?

---

Transcript of Michael DeLacy
Conducted on January 15, 2021

48 (189 to 192)

189

1  Do you see that?
2      A.  I do.
3      Q.  What time does that refer to?  Is that
4  1:05?
5      A.  1:05 in the afternoon.
6      Q.  What is that?  Arrival where?
7      A.  I'm sorry?
8      Q.  What is that time referring to?
9      A.  The time when the narcotics was found.
10     Q.  At Area Three?
11     A.  Yes.
12     Q.  Okay.  So, you had already been to Mr.
13 Jakes' home and transported him to Area Three, and then
14 by 1:05 is when you and Officer Pack conducted the
15 pat-down?
16     A.  Yes.
17     Q.  Okay.  And 1500 hours, that's when your
18 investigation was complete and you were already downtown
19 and had delivered the substance to be tested?
20     A.  Yes.
21     Q.  Okay.  Okay.  I'm going to have you turn
22 your attention to Page 2 of Exhibit 2.
23         MS. JOHNSON:  Jakes 53?
24         MS. DONNELL:  What's that?

190

1          MS. JOHNSON:  Jakes 53, right, Heather?
2  That's the one?  Page 2?
3          MS. DONNELL:  Yes, this is Page 2 of
4  Exhibit 2.
5          MS. JOHNSON:  Okay.
6  BY MS. DONNELL:
7      Q.  And to who did you provide notification of
8  your arrest of Mr. Jakes?
9      A.  It says, "Lieutenant Reagan/Watch
10 Commander.  Sergeant Risley/Tactical Unit.  Sergeant
11 Palmer/Area 3.  Detective Reed/OCD."
12     Q.  Do you remember, is Detective Reagan the
13 Watch Commander of the 9th District?  Where was he the
14 Watch Commander?
15         MS. JOHNSON:  Object to form.
16     A.  I don't recall.
17 BY MS. DONNELL:
18     Q.  Okay.  Do you remember telling or notifying
19 Sergeant Risley, your sergeant on the tactical unit, of
20 Mr. Jakes' arrest?
21     A.  Yes.
22     Q.  How did you notify Sergeant Risley of
23 Mr. Jakes' arrest?
24     A.  I don't recall.

191

1      Q.  How about Sergeant Palmer of the Area Three
2  Violent Crimes Unit?  Do you remember notifying Sergeant
3  Palmer?
4      A.  I don't remember.
5      Q.  How did you notify Sergeant Palmer, if you
6  recall?
7          MS. JOHNSON:  Object to foundation.
8      A.  I don't recall.
9  BY MS. DONNELL:
10     Q.  Detective Reed, do you remember notifying
11 Detective Reed of Mr. Jakes' arrest?
12     A.  I don't remember, no.
13     Q.  Okay.  Do you see here the arresting
14 officers, who have you listed as arresting officers?
15     A.  It's got Pack, myself, Patterson, Posey,
16 Malone, Duckhorn and Reilly.
17     Q.  Do you know why Officer Malone is included
18 here on your arrest report for Mr. Jakes?
19     A.  No, I don't.
20     Q.  Do you know why officer -- who is Officer
21 Duckhorn, do you know?
22     A.  I think he is a detective at Area Three.
23     Q.  And how about Officer Reilly?
24     A.  I believe he is a detective also.

192

1      Q.  Okay.  Do you remember having any
2  communications with Detective Duckhorn or Detective
3  Reilly?
4      A.  No.
5      Q.  Do you know why they are included on your
6  case report?
7      A.  No, I don't.
8      Q.  Okay.  And do you see over in the
9  narrative-- do you know, can you tell this case report
10 whether you or your partner typed it up?
11     A.  No, I don't.
12     Q.  And your testimony earlier today is both
13 Exhibit 1 and Exhibit 2 were typed up in Area Three?
14     A.  I believe so.
15     Q.  Were they typed up in Area Three before you
16 went down to the 11th and State?
17     A.  I believe so.
18     Q.  How did you know that you were going to be
19 working with Detective Reed?
20     A.  I don't really know.  I think that -- I'm
21 not sure.  I don't remember.  But I would -- I'm not
22 sure.
23     Q.  All right.  Do you think you typed these up
24 at the 9th District after you went down to 11th and

Transcript of Michael DeLacy
Conducted on January 15, 2021

**193**

1 State?

2 **A. I don't think so.**

3 Q. Why don't you think so?

4 MS. JOHNSON: Object to form.

5 **A. The reports would have to be made out so**

6 **that the youth officer could process it.**

7 **BY MS. DONNELL:**

8 Q. Okay. Over in the narrative section, it

9 says typed up in the history and manner of arrest. Do

10 you see that?

11 **A. Yes.**

12 Q. Okay. And here it also indicates about

13 midway down that the ROs, meaning reporting officers,

14 proceeded to 1212 West 51st Street, rear house and spoke

15 to Jessie Mae Jones at female black 42-years-old, right?

16 Do you see that?

17 **A. I'm sorry, what does it -- could you repeat**

18 **it?**

19 Q. Sure. I will repeat it.

20 Your report indicates that -- let me back

21 up.

22 Your report indicates that the ROs received

23 information that an M/B subject by the name of Anthony

24 Jakes MB 15 years at 1212 West 51st Street rear house

**194**

1 was wanted for questioning by Area Three violent crimes

2 pertaining to a homicide investigation recorded under

3 RDP 454289. Did I read your report correctly.

4 **A. Yes.**

5 Q. And so you also included in your case

6 report that you went to get Mr. Jakes for questioning

7 because Area Three violent crimes wanted him for

8 questioning; do you see that?

9 MS. JOHNSON: Object to form.

10 **A. Can I see it?**

11 **BY MS. DONNELL:**

12 Q. Okay. There is nothing in the case report

13 as to the anonymous tip as to why you went to go get

14 him, right?

15 **A. (Reviewing.) Correct.**

16 Q. And the reason that it is included in the

17 history and manner of arrest, the details that you and

18 Officer Pack included was that he was wanted for

19 questioning by Area Three, correct?

20 MS. JOHNSON: Object to form.

21 **A. I don't recall.**

22 **BY MS. DONNELL:**

23 Q. Is that correct?

24 **A. I don't recall.**

**195**

1 Q. So I'm not asking your recollection. I am

2 asking that's what was put on the narrative section of

3 your case report, right?

4 **A. Could you repeat the question again?**

5 Q. Sure. I would be happy to.

6 You and Officer Pack included in your case

7 report the reason you went to get Mr. Jakes for

8 questioning is that he was wanted by Area Three violent

9 crimes, correct?

10 MS. JOHNSON: Object to form.

11 **A. That's what it says in the report.**

12 **BY MS. DONNELL:**

13 Q. Okay. So that's why you and Officer Pack

14 included as the important detail for the history and

15 manner of arrest of Mr. Jakes, correct?

16 MS. JOHNSON: Object to form and

17 foundation.

18 BY MS. DONNELL:

19 Q. Sir, that's true, correct?

20 MS. JOHNSON: Same objections.

21 BY MS. DONNELL:

22 Q. Is that true?

23 MS. JOHNSON: Same objection.

24 **A. I don't recall.**

**196**

1 **BY MS. DONNELL:**

2 Q. I know you don't recall, but you are

3 reading your report right now in front of you, right?

4 Can you see Exhibit 2, sir?

5 **A. I'm looking at it.**

6 Q. Okay. And Exhibit 2, isn't it true that it

7 says that the detail included in the narrative section

8 of the case report is that Mr. Jakes was wanted by

9 questioning by Area Three violent crimes, true?

10 **A. That's what it says.**

11 Q. Objection. And only you or Officer Pack

12 prepared Exhibit 2, nobody else, right?

13 **A. Yes.**

14 Q. And we know that because you guys signed

15 off on this report with your signatures?

16 **A. Yes.**

17 Q. And then you submitted it for approval to

18 your sergeants, correct?

19 MS. JOHNSON: Object to form.

20 **A. Yes.**

21 **BY MS. DONNELL:**

22 Q. Okay. And you prepared your report on the

23 day of these events, September 16, 1991?

24 MS. JOHNSON: Object to form.

Transcript of Michael DeLacy
Conducted on January 15, 2021

50 (197 to 200)

197

1    A.   Yes.
2         MS. JOHNSON:  Let me make that
3    objection.  Go ahead.  Go ahead, Heather.
4    BY MS. DONNELL:
5    Q.   Sure.  Okay.  Do you remember taking Mr.
6    Jakes to the youth division after the protective
7    pat-down in Area Three?
8    A.   I don't recall.
9    Q.   Do you remember where the youth division
10   was at Area Three?
11   A.   No, I don't.
12   Q.   But there were youth officers present at
13   Area Three on September 16, 1991, right?
14   A.   I believe there were.
15   Q.   Do you remember being present for the
16   processing of Mr. Jakes and he was told that he could
17   return home by the violent crimes, that he could be
18   returned home and be interviewed by violent crime
19   detectives later or that he could go down the hall to
20   violent crimes and he could be interviewed before going
21   home in were you present for that?
22        MS. JOHNSON:  Objection; form,
23   foundation.  Assumes facts not in evidence.
24   A.   No.

198

1    BY MS. DONNELL:
2    Q.   You weren't present for that communication?
3    A.   No.
4         MS. JOHNSON:  Objection.
5    BY MS. DONNELL:
6    Q.   Okay.  So were you present when Mr. Jakes
7    allegedly related that he didn't want to go home and he
8    wanted or wished to be interviewed before going home?
9    Were you present for that if Mr. Jakes said that to
10   somebody in Area Three?
11        MS. JOHNSON:  Object to form,
12   foundation.  Assumes facts not in evidence.
13   A.   No.
14   BY MS. DONNELL:
15   Q.   Okay.  I am going to show you, do you have
16   Exhibit 3 in front of you?  I want to show you Exhibit 3
17   and see if it refreshes your recollection with respect
18   to this questioning.  Okay.
19   A.   Okay.
20        (Chicago Police Department's
21   Supplementary Report Deposition Exhibit 3 marked for
22   identification.)
23   Q.   Do you have Exhibit 3 in front of you?
24   A.   I do.

199

1    Q.   Exhibit 3 for the record is produced by the
2    city in this case, it is CITY JAKES 11 through 16.  Do
3    you see that?
4    A.   11 --
5         MS. JOHNSON:  He doesn't know where to
6    look.
7    BY MS. DONNELL:
8    Q.   Does it have Exhibit 3 on it for you?
9    A.   It does.  It does.  Yes.
10   Q.   Okay.  Do you recognize Exhibit 3 as a
11   Chicago Police Department's supplementary report?
12   A.   Yes.
13   Q.   And this is for the Garcia homicide.  And
14   this report is dated September 17, 1991.  Have you ever
15   seen this report before?
16   A.   (Reviewing.)  Yes.
17   Q.   Okay.  And this is a supplementary report
18   by Detective Mike Kill and Lieutenant Kenneth Boudreau,
19   correct?
20   A.   Yes.
21   Q.   I am going to draw your attention to Page 3
22   of Exhibit 3.
23        MS. JOHNSON:  Jakes 13.
24        MS. DONNELL:  You got it.

200

1    BY MS. DONNELL:
2    Q.   And do you see up at top it says "RD had a
3    conversation with P.O. T. Pack of the 9th District
4    tactical team and the following information was learned
5    from this office."  Do you see that?
6    A.   Yes.
7    Q.   Okay.  I want you to -- I am going to call
8    your attention to the last two sentences of that
9    paragraph.  I will begin at the sentence "at Area Three
10   youth."  Do you see that?
11   A.   Yes.
12   Q.   Can you read those two sentences, and then
13   I will ask you some questions if it refreshes your
14   recollection.  Okay?
15   A.   Okay.
16   Q.   Go ahead and read it to yourself, and then
17   let me know when you are done.
18   A.   You want me to read it to myself?
19   Q.   Yes.  Read it to yourself, please.
20   A.   (Reviewing.)
21   Q.   Okay.  Are you ready?
22   A.   Yes.
23   Q.   After you have had an opportunity to review
24   that part of Exhibit 3, does that refresh your

Transcript of Michael DeLacy
Conducted on January 15, 2021

---

**201**

1  recollection that you and Officer Pack were present at
2  Area Three youth when Mr. Jakes was processed by Area
3  Three youth?
4       MS. JOHNSON:  Object to form and
5  foundation.  That mischaracterizes the document.
6      **A.  We weren't there at that time.**
7  **BY MS. DONNELL:**
8      Q.  Okay.  This part of the section of the
9  report starts by saying Pack Thomas, and then it says
10 "in summary but not verbatim, he related the following."
11 Do you see that?
12     **A.  I do.**
13     Q.  And do you see that it includes information
14 about when Mr. Jakes was being processed by the youth
15 officers, right?  Those two sentences I had you read,
16 right?
17     **A.  You are talking about down at the bottom?**
18     Q.  Yes.  That I just had you read.  The last
19 two sentences of that paragraph, under, "What
20 information was learned from Thomas Pack?"
21     MS. JOHNSON:  Can you re-ask the
22 question, Heather?  I'm not even sure what the question
23 was.
24     MS. DONNELL:  Sure.

**202**

1  BY MS. DONNELL:
2      Q.  So, I gave you an opportunity to review
3  Exhibit 3.  This is Detective Kill's and Detective
4  Boudreau's Supplementary Report from the Garcia house;
5  is that right?
6      **A.  Yes.**
7      Q.  And this is a document that you have
8  already had a chance to review before your deposition
9  here today, right?
10     **A.  Yes.**
11     Q.  Correct?
12     **A.  Yes.**
13     Q.  Okay.  Thank you.  Sorry, I didn't hear
14 your answer, if you answered.
15     And this includes a section that Detectives
16 Kill and Boudreau said that they obtained from a
17 conversation with your partner, Pack, correct?
18     **A.  Yes.**
19     Q.  Okay.  And part of that includes the
20 information that at Area Three youth, Mr. Jakes was
21 processed and referred to juvenile court.  Do you see
22 that?
23     **A.  I do.**
24     Q.  And then it indicates that Detective

**203**

1  Boudreau and Detective Kill learned from Officer Pack,
2  your partner, that upon completion of this processing,
3  that subject Jakes was told that he could be returned
4  home and be interviewed by Violent Crimes later, or he
5  could go down the hall to the Violent Crimes office and
6  tell the sergeant that he wished to be interviewed
7  before going home?  Do you see that?
8      MS. JOHNSON:  Objection; form.
9  Misstates the document.
10 BY MS. DONNELL:
11     Q.  Did I read the document wrong, sir?
12     **A.  No, I believe you read it correctly.**
13     Q.  Do you know if Officer Pack had that
14 information?
15     MS. JOHNSON:  Object to form and
16 foundation.
17     **A.  I don't know how.  I have no idea.**
18 **BY MS. DONNELL:**
19     Q.  Okay.  But it's fair to say that this
20 report indicates that Detective Kill and Boudreau got
21 this information from your partner, right?
22     **A.  I don't know.**
23     Q.  It's under the section that says that they
24 got this information in a conversation with Police

**204**

1  Officer T. Pack, star number 2877 of the 9th District
2  Tactical Team, right?
3      MS. JOHNSON:  Object to form and
4  foundation.
5      **A.  I don't know.**
6  **BY MS. DONNELL:**
7      Q.  Do you have any idea how -- let me make
8  sure I get this clear.
9      Is it your testimony that you and Officer
10 Pack were not present when Mr. Jakes was told that he
11 could go home or be interviewed by violent crimes now --
12 strike that.  Let me state it again.
13     Were you and your partner present when Mr.
14 Jakes was given the choice that he could go home and
15 come back and talk to Area Three detectives later, or he
16 could go down the hall and talk to them now and then go
17 home?  Were you or your partner present for that?
18     MS. JOHNSON:  Objection; form,
19 foundation, and assumes facts not in evidence.
20     **A.  No, we were not.**
21 **BY MS. DONNELL:**
22     Q.  Okay.  So if that's included in this
23 supplementary report, the detective did not get that
24 information from you, correct?

Transcript of Michael DeLacy
Conducted on January 15, 2021

52 (205 to 208)

205

1        MS. JOHNSON:  Objecting to form,
2 foundation and calls for speculation.
3     A.  Not from me.
4 BY MS. DONNELL:
5     Q.  And to the best of your ability, Officer
6 Pack was with you for the remainder of your tour of duty
7 on September 16, 1991.  He went with you to 11th and
8 State with the controlled substance to be processed and
9 tested by forensics, correct?
10    A.  Yes.
11    Q.  And Officer Pack drove the vehicle and you
12 rode in it, right?
13    A.  Correct.
14    Q.  Okay.  So it is not the case that Officer
15 Pack stayed at Area Three and you went to State and 11th
16 by yourself; that didn't happen, did it?
17    A.  No.
18    Q.  Do you recall having any other telephonic
19 or other communications with the youth officers that
20 processed Mr. Jakes?
21    A.  I don't recall.
22    Q.  Then you don't recall a youth officer
23 calling you and giving you this information that he gave
24 Mr. Jakes a choice about whether he could go home or

206

1 talk to Area Three detectives now.  You don't remember
2 getting that information from any youth officer, do you?
3     A.  No.
4     Q.  And that didn't happen; did it?
5        MS. JOHNSON:  Object to form.
6     A.  I don't know.
7 BY MS. DONNELL:
8     Q.  You think that could have happened, you
9 could have gotten a call?
10       MS. JOHNSON:  Object to form.
11    A.  I don't want to speculate on it.
12 BY MS. DONNELL:
13    Q.  Okay.  Do you know or have any personal
14 knowledge if Officer Pack got a phone call?
15       MS. JOHNSON:  Object to form.
16 BY MS. DONNELL:
17    Q.  Or the officers that told him that he gave
18 Mr. Jakes a choice.
19       MS. JOHNSON:  Object to foundation.
20    A.  No.
21 BY MS. DONNELL:
22    Q.  Do you have any personal knowledge as you
23 sit here today of Officer Pack receiving a phone call
24 from the youth officer that processed Mr. Jakes to let

207

1 Officer Pack know that Mr. Jakes was given this choice
2 whether to go home or to talk to Area Three at that
3 time?
4     A.  No.
5        MS. JOHNSON:  Object to form and
6 foundation.
7 BY MS. DONNELL:
8     Q.  Were you present when Detective Duckhorn
9 and O'Riley were summoned from Violent Crimes and
10 Mr. Jakes went to the waiting area to wait for his
11 interview by Detective Kill and Detective Boudreau?
12       MS. JOHNSON:  Object to form and
13 foundation.  Assumes facts not in evidence.
14    A.  No.
15 BY MS. DONNELL:
16    Q.  Okay.  And it is your testimony that you
17 weren't present for that, when Mr. Jakes' went back to
18 Area Three Violent Crimes, right?
19       MS. JOHNSON:  Object to form and
20 foundation.
21    A.  Correct.
22 BY MS. DONNELL:
23    Q.  The last time you saw Mr. Jakes was when he
24 was with the youth officer at the youth division of

208

1 Area Three, right?
2        MS. JOHNSON:  Object to form,
3 foundation and that mischaracterizes his testimony.
4        MS. DONNELL:  You can answer.
5     A.  The last time we seen him was when we left
6 the building.
7 BY MS. DONNELL:
8     Q.  And where was Mr. Jakes when you left the
9 building?
10    A.  I don't you recall.  I believe he was in an
11 interview room.
12    Q.  So you think he was in an interview room in
13 what division of Area Three?  In violent crimes, or in
14 the youth division?
15    A.  I don't recall.
16    Q.  Did you and your partner take Mr. Jakes to
17 the youth division for processing?
18    A.  I don't recall.
19    Q.  Well, I'm going to refer you to the
20 supplementary report, just a little bit up where it
21 says-- and see if that refreshes your recollection okay?
22    A.  Okay.
23    Q.  Do you see the sentence that begins "this
24 pat-down search"?  It is just a few sentences above

Transcript of Michael DeLacy
Conducted on January 15, 2021

53 (209 to 212)

209

1 where we were last looking, Mr. DeLacy.
2    A. (Reviewing.)
3    Q. Are you reviewing it?
4    A. I am. I am.
5    Q. Okay. You just let me know--
6    A. Yes.
7    Q. -- when you have had a chance to review it.
8    A. Okay.
9    Q. Did you get a chance -- oh, sorry. Go
10 ahead.
11    A. (Reviewing.) Okay. So he was taken down
12 to third floor hallway of Area Three.
13    Q. Does that refresh your recollection that
14 you and Officer Pack took Mr. Jakes to Area Three youth?
15    A. I don't recall.
16    Q. Okay. Thank you.
17       Do you have any information or personal
18 knowledge about Mr. Jakes' interview with the felony
19 review attorney?
20    A. No.
21    Q. You weren't present for that at all,
22 correct?
23    A. No.
24    Q. Do you know who Arnold Day is?

210

1    A. I believe he's the second Defendant in this
2 case.
3    Q. Did you have any interactions with Mr. Day?
4    A. No.
5    Q. Did you have any involvement in a murder
6 from February, the Irving murder?
7    A. No.
8    Q. Do you know who Commander John Bogue is?
9    A. Yes.
10    Q. Did you ever have any work with him?
11    A. No.
12    Q. Did you of have any involvement with him
13 when he was commander of Area Three?
14    A. No.
15    Q. I want to show you some photographs.
16    A. Okay.
17    Q. And I think they are printed out for you.
18 I don't know if they are in color or not. But if you
19 can see it on my screen, I will share my screen and show
20 it to you.
21       Is that okay with you?
22       MS. DONNELL: How about for you,
23 Brittany?
24       MS. JOHNSON: They are printed in

211

1 color, so I see them. Do you see it?
2       MS. DONNELL: I do. I do. Well, we
3 can try it that way, too. I can try and split my
4 screen, we can do it that way and see how that works.
5 Or I can put it up on my screen.
6 BY MS. DONNELL:
7    Q. Mr. DeLacy, do you have a preference as to
8 whether you see it in a hard copy or up on the screen?
9 I will be happy to do whatever.
10    A. Either way.
11    Q. Okay.
12       MS. DONNELL: Brittany, do you have all
13 of the photographs, are they stapled together?
14       MS. JOHNSON: They are stapled
15 together. I have Jakes 5080 to Jakes --
16       MS. DONNELL: It is not consecutive, so
17 as long as you have them.
18       MS. JOHNSON: Okay. I have four. Hold
19 on, let me count them. I have got nine. Is that right?
20       MS. DONNELL: Yes, that's right.
21 BY MS. DONNELL:
22    Q. Okay. Mr. DeLacy, do you have Exhibit 9 in
23 front of you, sir?
24    A. Exhibit 9?

212

1    Q. Yes, it is the photographs. Brittany can
2 give them to you.
3       MS. JOHNSON: I have it as Exhibit 4.
4       MS. DONNELL: I'm sorry. Exhibit 4.
5 You are absolutely right. Thank you.
6       (Nine-page document consisting of color
7 photographs Deposition Exhibit 4 marked for
8 identification.)
9 BY MS. DONNELL:
10    Q. I am showing the witness what has been
11 designated at as Exhibit 4. It is a nine-page document
12 consisting of color photographs, and they are not
13 consecutively Bates so we can identify the Bates number
14 as we look at it.
15       So are you looking at DeLacy Exhibit 4?
16    A. Yes.
17    Q. Thank you. I'm sorry for the confusion.
18       I'm going to have you first look at, I
19 thinks it the fourth photograph and it should say PT 108
20 or Plaintiff Jakes 5089 at the very bottom.
21    A. Okay.
22    Q. Do you recognize what is depicted in this
23 photograph?
24    A. No, I don't.

Transcript of Michael DeLacy
Conducted on January 15, 2021

54 (213 to 216)

213

1    Q.   Do you recognize this as Mr. Jakes' home,
2  the rear residence at 1212 West 51st Street?
3         MS. JOHNSON:  Object to form.
4    A.   No, I don't.
5  BY MS. DONNELL:
6    Q.   Okay.  I am going to go back to -- can you
7  go to the second photograph in Exhibit 4?
8    A.   Okay.
9    Q.   This is PT 103 or Plaintiff Jakes 5081.  Do
10 you recognize what is depicted here?
11   A.   No, I don't.
12   Q.   You don't recognize this as looking out
13 from the -- looking at the rear house of 1212 West 51st
14 Street, looking towards Racine?
15        MS. JOHNSON:  Objection; foundation.
16   A.   No.
17 BY MS. DONNELL:
18   Q.   Okay.  How about the first photograph in
19 Exhibit 4, PT 102, Plaintiff Jakes 5080.  Do you
20 recognize what is depicted here?
21   A.   No.
22   Q.   How about the third photograph PT 105
23 Plaintiff Jakes 5083.  Have you ever seen this
24 photograph before?

214

1    A.   No.
2    Q.   Do you recognize this as the corner of 51st
3  and Racine?
4    A.   It could be.
5    Q.   Were you familiar with that area, 51st and
6  Racine back in 1991?
7    A.   Yes.
8    Q.   Do you remember this clean submarine shop?
9  It says Italian beef, corned beef and ice cream.  Do you
10 remember that corner shop?
11   A.   I believe so.
12   Q.   Do you remember the newsstand that was
13 there?
14   A.   That, I don't remember.
15   Q.   Okay.  And do you remember, does this
16 refresh your recollection in any way where you and
17 Officer Pack parked when you went to Mr. Jakes' house?
18   A.   No.
19   Q.   Okay.  I am going to call your attention to
20 Page 6 of Exhibit 4, the photograph there.
21   A.   What number would that be?
22   Q.   It has PT 124 Plaintiff Jakes 5300.
23   A.   It says "Racine Avenue."
24   Q.   Yeah, do you recognize this to be a view

215

1  looking westward down 51st Street at the intersection of
2  Racine and 51st in 1991?
3         MS. JOHNSON:  Object to foundation.
4    A.   I'm not sure.
5  BY MS. DONNELL:
6    Q.   Does this refresh your recollection in any
7  way of what 51st and Racine looked like in September of
8  1991?
9         MS. JOHNSON:  Objection; foundation.
10 BY MS. DONNELL:
11   Q.   I'm sorry.  Did you answer?
12   A.   I don't -- I don't know.
13   Q.   Okay.  And it doesn't refresh your
14 recollection seeing this photograph?
15   A.   No.
16   Q.   Okay.  I'm going to have you look at the
17 Page 8 of Exhibit 4.  It has PT Exhibit 126.  Plaintiff
18 Jakes 5302.  Do you see the photograph that is depicted
19 on Page 8 of Exhibit 4?
20   A.   5302, yes.
21   Q.   Do you recognize what is depicted in 5302?
22   A.   It looks to be Racine Avenue.
23   Q.   And 51st?
24   A.   I'm not sure.

216

1    Q.   Okay.  Well, it sounds like the photographs
2  depicted in Exhibit 4 hasn't refreshed your recollection
3  in any way; is that right?
4    A.   Yes.
5    Q.   Meaning yes, it does not refresh your
6  recollection; is that right?
7    A.   Yes.  Right.
8    Q.   Do you have a memory of what Mr. Jakes'
9  house looked like at 1212 West 51st, the rear residence?
10 Can you describe what it looked like?
11   A.   I don't recall.
12   Q.   But you remember standing on steps that
13 walked up to the -- led up to the front door?
14   A.   Yes.
15   Q.   Anything else you remember, other than what
16 you have testified to earlier today about what that rear
17 home looked like?
18   A.   No.
19   Q.   Do you remember how many stories it was?
20   A.   No.
21   Q.   Do you have any knowledge of what was
22 included in Mr. Jakes' statement provided in the Garcia
23 homicide?
24        MS. JOHNSON:  Object to form and

Transcript of Michael DeLacy
Conducted on January 15, 2021

55 (217 to 220)

---

217

1 foundation.
2     **A. No.**
3 **BY MS. DONNELL:**
4     Q. Do you have any knowledge of statements
5 were given to the detectives and prosecutors from the
6 Garcia homicide?
7     **A. You broke up on the first part.**
8     Q. Sorry. Do you have any knowledge of what
9 information was provided to anyone investigating the
10 Garcia homicide?
11     MS. JOHNSON: Object to form and
12 foundation.
13     **A. No.**
14 **BY MS. DONNELL:**
15     Q. Do you know who Gus Robinson is?
16     **A. No.**
17     Q. Did you know an individual back in
18 September 1991 that went by the nickname "Snake"?
19     **A. No.**
20     Q. Had you had any involvement or interactions
21 with Mr. Jakes prior to your interactions with him on
22 September 16, 1991?
23     **A. Not that I can recall.**
24     Q. You have not seen any reports indicating

---

218

1 that you had interactions was Mr. Jakes prior to
2 September 16, 1991; is that true?
3     **A. Yes.**
4     Q. Okay. Have you ever done any work as an
5 independent contractor for Detective Boudreau's security
6 or investigative company?
7     **A. I don't believe so.**
8     Q. Do you know if officer, your partner, Tom
9 Pack, did before he passed away?
10     **A. I don't believe so.**
11     Q. Do you have information or knowledge about
12 that company? Do you know it exists?
13     **A. I don't know.**
14     Q. Okay.
15     MS. DONNELL: I actually need just like
16 a five-minute break. Just quick bathroom break. Can we
17 take just a short break? We are going to be done soon,
18 but I think I have a little bit more. It would be
19 helpful if we just took a short break and then come
20 back.
21     (Off the record.)
22     VIDEO HOST: Off the record at 3:17.
23     (Off the record.)
24     VIDEO HOST: Back on the record at

---

219

1 3:28.
2     MS. JOHNSON: Can you just state the
3 run time for the record, please.
4     VIDEO HOST: 3:51.
5     MS. JOHNSON: Thanks.
6     VIDEO HOST: You are welcome.
7 **BY MS. DONNELL:**
8     Q. Mr. DeLacy, I wanted to let you know --
9     **A. I lost her.**
10     Q. Can you hear me?
11     **A. Hold on. Hold on moment. Her picture.**
12     MR. GRILL: What did you lose?
13     THE WITNESS: Her picture.
14     MR. GRILL: She's over here.
15     THE WITNESS: She's over here, sorry.
16     MS. DONNELL: You didn't realize that I
17 am trying to trick you. I'm moving around on your
18 screen. I actually have no control over that. So I'm
19 not sure where I appear to you. But can you see me
20 okay? Because now you're looking a little off to the
21 distance where you used to be.
22     THE WITNESS: I can see you.
23 **BY MS. DONNELL:**
24     Q. Is there anything that you remember about

---

220

1 your involvement with Anthony Jakes that you remember
2 that you haven't testified to today already?
3     MS. JOHNSON: Object to form.
4     **A. No.**
5 **BY MS. DONNELL:**
6     Q. Do you remember anything that Anthony Jakes
7 said to you at any of your time with him?
8     **A. No.**
9     Q. Okay. I am going to switch gears now and
10 talk a little bit about your -- any disciplinary history
11 you with the Chicago Police Department.
12     Were you ever disciplined for any
13 infractions, uniform infractions, or anything?
14     **A. Not that I recall.**
15     Q. Okay. Do you have any personal knowledge
16 of any of the citizen complaints or the complaint
17 register file that were filed against you as you sit
18 here today?
19     **A. I looked at one.**
20     Q. Okay. What one did you look at? Do you
21 remember what it was about?
22     **A. I think it had to do with 50 bags of a**
23 **controlled substance.**
24     Q. Was this CR211723 for the arrest of Howard

---

Transcript of Michael DeLacy
Conducted on January 15, 2021

56 (221 to 224)

221

1  Robinson?
2      A.  I believe it was.
3      Q.  Okay.  I think in front of you you have
4  Exhibit 8.
5          MS. DONNELL:  Brittany, I don't think I
6  am going to need to use Exhibit 8B, so if you want to
7  just shred it or do whatever with it.
8          And for the Court Reporter, if you got
9  sent links to the exhibits, we're not going to use
10 Exhibit 8B, so you can just delete that.  We are just
11 going to use what I've designated as Exhibit 8.  Okay.
12         (CR file Deposition Exhibit 8 marked for
13 identification.)
14 BY MS. DONNELL:
15     Q.  Do you have Exhibit 8 in front of you?
16     A.  Yes.
17     Q.  Mr. DeLacy?
18     A.  Yes.  Yes, I do.  Yes.
19     Q.  Okay.  Is that the CR that you were
20 referring to that you had seen previously?
21     A.  Yes, I believe it is.
22     Q.  Okay.  And this is -- sorry.  One second.
23 This has the CR No. 211723 at the top of it?
24     A.  Yes, it does.

222

1      Q.  Okay.  Did you review this CR before you
2  prepared for your deposition?
3      A.  I'm sorry, did I what?
4      Q.  Have you looked at this CR before; the
5  file?
6      A.  I looked at it briefly.  I haven't read the
7  whole file.
8      Q.  Okay.  Does looking at Exhibit 8, the CR
9  file, refresh your recollection of your interactions
10 with Mr. Robinson on August 30th of 1984?
11     A.  No.
12     Q.  Okay.  Do you have any memory of these
13 events at all?
14     A.  No.
15     Q.  Do you have any memory of receiving
16 notification of the allegations and the charges against
17 you that are being investigated?
18     A.  No.
19     Q.  And it's fair to say that these were not
20 sustained against you, right?
21     A.  Yes.
22     Q.  Okay.  Do you remember the "to/from," did
23 you review your to/from report that you submitted in
24 this CR investigation?

223

1      A.  No, I did not.
2      Q.  Okay.  And did you read the allegations
3  that during the arrest of Mr. Robinson that he was hit
4  in the face and the legs and thrown to the ground in the
5  process of an arrest?  Did you read those allegations?
6      A.  I did.
7      Q.  But you have no memory of this particular
8  arrest, right?
9      A.  Correct.
10     Q.  Did you review the allegations that racial
11 slurs were said to Mr. Robinson and his family members
12 that were observing?
13         MS. JOHNSON:  Object to the form.  That
14 mischaracterizes the document.
15 BY MS. DONNELL:
16     Q.  Did you review the narrative of the CR
17 complaint that included that certain statements were
18 made to Mr. Robinson during the course of his arrest
19 that included derogatory racial terms?
20         MS. JOHNSON:  Object to form once
21 again.  That mischaracterizes the document.
22     A.  Yes.
23 BY MS. DONNELL:
24     Q.  You did read that, right?

224

1      A.  Yes.
2      Q.  And if you need to refresh your
3  recollection, you can look at Page 3 of --
4          MR. GRILL:  Just say the Bates stamp
5  number.
6          MS. DONNELL:  Sure.  The Bates stamp
7  is 21180, but it's Page 3 of Exhibit 8.
8      A.  Okay.
9  BY MS. DONNELL:
10     Q.  And do you see the second paragraph where
11 Ms. Buchanan, the complainant -- the complainant for
12 this is Barbara Buchanan, right?
13     A.  She is listed on here.
14     Q.  Yes.  And she is listed as the complainant,
15 correct?
16     A.  I believe so.
17     Q.  And the victim was her nephew, Mr. Howard
18 Robertson or Robinson?  Howard Robertson?
19     A.  Yes.
20     Q.  Robertson?
21     A.  Yes.  Uh-huh.
22     Q.  Okay.  And, so, the complainant alleged
23 that when she inquired about what the officers were
24 doing with her nephew, that one of them told her to

Transcript of Michael DeLacy
Conducted on January 15, 2021

57 (225 to 228)

---

225

1  back off and then used a racial derogatory term, right?
2      A.  Yes.
3      Q.  Okay.  And did you read any of Mr.
4  Robertson's complaints or allegations that he stated
5  in his interview of what happened to him?
6      A.  Yes.
7      Q.  So, then you are referring to Page 8, which
8  is a summary of the interview of victim Howard
9  Robertson?
10      A.  Page 8?
11      Q.  Of Exhibit 8?
12      A.  Is that on the same page?
13      Q.  No.  It's Page 8 of Exhibit 8.
14          MS. JOHNSON: Give him the Bates range,
15  Heather.
16          MS. DONNELL: Sure.  The bates number
17  is 21185.
18          MS. JOHNSON: Okay.  I apologize.  Ask
19  your question again for him now that he is on the right
20  page.
21          MS. DONNELL: Okay.  Sorry.
22          THE WITNESS: Wait a minute, which is
23  the right page?
24          MS. JOHNSON: 21185.  They are front

---

226

1  and back because there is a bunch of them.
2          THE WITNESS: Oh, I see, front and
3  back.  Okay.  Yes.
4          MS. JOHNSON: Yes.
5          (Off the record.)
6  BY MS. DONNELL:
7      Q.  And have you read the allegations of
8  physical abuse?
9      A.  No, I haven't read this page.
10      Q.  Okay.  Do you want to read that page?
11      A.  Sure.  (Reviewing.)
12      Q.  Did you get a chance to review it?
13      A.  I'm reading it.
14      Q.  Okay.  Let me know when you are ready.
15      A.  Okay.
16      Q.  Do you see where Mr. Robertson alleged that
17  he was -- that he was punched and kicked by several
18  officers and thrown to the ground during his arrest
19  on August 30th, 1984?
20      A.  Yes.
21      Q.  Did you hit Mr. Robertson when you arrested
22  him, in his face or legs?
23          MS. JOHNSON: Objection to form and
24  foundation.  It assumes facts not in evidence.

---

227

1      A.  No.
2  BY MS. DONNELL:
3      Q.  Did you observe any officers that were
4  present doing that during his arrest?
5      A.  No.
6      Q.  Okay.  I'm going to have you turn to Page
7  47 of Exhibit 8.  Okay?
8          MR. GRILL: Do you have a Bates stamp
9  number, Heather?
10          MS. DONNELL: Sure.  It's Bates stamp
11  21224.
12  BY MS. DONNELL:
13      Q.  Are you there, Mr. DeLacy?
14      A.  Not yet.  Yes, I am.  Okay.
15      Q.  Okay.  Have you seen this to/from memo
16  from --
17      A.  No, I haven't read it.
18      Q.  Okay.  Would you like the opportunity to
19  read this?
20      A.  Yes, I would.
21      Q.  Okay.  You get a chance to read it and let
22  me know when you are ready.
23      A.  Okay.  (Reviewing.)
24          Okay.

---

228

1      Q.  Did you get a chance to look at Page 47 of
2  Exhibit 8?
3          MS. JOHNSON: It's CITY JAKES 21224.
4      A.  That's the one I'm looking at, yes.
5  BY MS. DONNELL:
6      Q.  And do you recognize your signature on
7  Page 47 of Exhibit 8?
8      A.  Yes.
9      Q.  Okay.  And so this was the to/from that you
10  submitted for the complaint register investigation
11  211723, correct?
12      A.  Yes.
13      Q.  Do you remember writing this?
14      A.  I don't remember, no.
15      Q.  Did you or your attorney do it, or do you
16  remember?
17      A.  I don't recall.
18      Q.  Okay.  Does it refresh your recollection
19  in any way of the arrest of Mr. Robertson, the arrest
20  of Mr. Robinson of August 30th, 1994?
21          MS. JOHNSON: Did you mean "Robertson"?
22          MS. DONNELL: I do, but in Mr. Delacy's
23  memo it says, "Robinson," so I'm reading it.
24          MS. JOHNSON: Okay.  I got it.

Transcript of Michael DeLacy
Conducted on January 15, 2021

58 (229 to 232)

229

1    A.  I don't remember.
2 BY MS. DONNELL:
3    Q.  Okay.  And I might have -- let me make sure
4 that I am making the right record.  I was saying "1984,"
5 but I think I should have been saying "1994."  Let's
6 correct that.  I am sorry.  I apologize.  It was "1994."
7        Okay.  Sir, you don't have any memory of
8 this, but it is your testimony that you know for sure
9 that you didn't strike or hit Mr. Robertson, correct?
10    A.  Correct.
11    Q.  And what is your basis for that?
12        MS. JOHNSON:  Object to form.
13        MR. GRILL:  What was the question?  I
14 didn't get the question.
15        MS. JOHNSON:  What was his basis for
16 that?
17 BY MS. DONNELL:
18    Q.  What is your basis?  I'm saying you don't
19 have any memory of this incident, correct?
20    A.  Correct.
21    Q.  But your testimony is that you did not
22 hit or strike nor view any officers hit or strike Mr.
23 Robertson while arresting him, correct?
24        MS. JOHNSON:  Objection; argumentative.

230

1 BY MS. DONNELL:
2    Q.  Is that what you testified to today?
3    A.  That's what's in the report.
4    Q.  Okay.  But you have no memory of this
5 incident?
6    A.  Correct.
7        MS. JOHNSON:  Object to form.
8        MR. GRILL:  Heather, this is -- I've
9 got to speak up at this point.  I've been quiet to this
10 extent, but this is getting to be harassing.  And you
11 are arguing with him, and you are accusing him of saying
12 things that are in the report.  So unless you have got
13 something relevant to ask him here, I'm about to suggest
14 that this witness stop answering these questions.
15        Go ahead.  It's really rude.
16        MS. DONNELL:  I -- I -- I respectfully,
17 Andrew, I take issue with you jumping in.  I think
18 your colleague is doing a sufficiently good job in
19 representing your client --
20        MR. GRILL:  I agree.
21        MS. DONNELL:  -- and I don't think
22 you need to jump in.  All right?  She can adequately
23 represent your client.
24        MR. GRILL:  And --

231

1        MS. DONNELL:  I'm sorry, you are
2 interrupting me and I didn't interrupt.
3        MR. GRILL:  So let's move on, so we
4 stop wasting this witness's time here.
5        MS. DONNELL:  Okay, well, I am just
6 going to make my record because you have a certain
7 characterization of the questions that I am asking.
8 And I disagree with your characterization.  And maybe
9 there's something being lost.  But I'm sorry, Andrew,
10 it seems like you want to interrupt again; is that true?
11        MS. JOHNSON:  No, let's just keep
12 going.  Let's go.
13        MS. DONNELL:  No, I want to make my
14 record because Andrew has had the opportunity to
15 interrupt and characterize my questioning, and I wanted
16 to note for the record that I am really trying to get
17 through this and just finish the deposition.  And
18 maybe I'm mishearing Mr. DeLacy when he is answering
19 the questions.  But I'm not trying to be argumentative.
20 I am just asking-- he said he didn't remember it.  But
21 then he testified that that didn't happen.  So I am just
22 asking for the basis of that testimony.  It's an
23 appropriate question to ask.
24        MR. GRILL:  Okay.  So then now I will

232

1 speak.
2        You are saying that he doesn't remember
3 it, but then you are rephrasing what he has told you
4 in a way to suggest that he actually did what was,
5 you know, what he said in these reports that he didn't
6 do and what an investigation by the CPD determined that
7 he also did not do.  So that's the part that is
8 inappropriate, and it's harassing.
9        So, that's why, just so it's perfectly
10 clear why I'm saying it.  With that, I'm done.  I'm not
11 going to say anything else, unless it continues along
12 this line.  But go ahead and continue to ask your
13 questions.
14        MS. DONNELL:  Okay.  Well, I just
15 want to make it clear what I intended to do, so that
16 the record is clear, I was asking Mr. DeLacy if he
17 had a memory.  He said he had no memory.  I asked him
18 if he remembered it happening, and he said no.  And I
19 started asking him for the basis that he said no, it
20 didn't happen because he had no memory.  And I think
21 that was an appropriate line of questioning.
22        But regardless, let's just move on so
23 that we can finish, and Mr. DeLacy and all of us can go
24 on with our day.  Okay?

233

1        MR. GRILL: Okay.  Got it.
2  BY MS. DONNELL:
3      Q.  Okay.  Mr. DeLacy, did you look at any
4  other disciplinary files or investigation before your
5  deposition today, other than CR211723?
6      A.  No.
7      Q.  Before your deposition today.  Sorry, I
8  should have been clear on that.  Before your deposition
9  today.  Okay.
10     A.  No.
11     Q.  At a break did you have an opportunity to
12 look at any?
13     A.  No.
14     Q.  Okay.  So, there were two additional CRs
15 that I wanted to ask you about.  And I think that I have
16 produced what I previously designated as Exhibit 9.  And
17 maybe we can us that.  But then subsequently my
18 paralegal produced the ones that the city produced in
19 this case.  And so maybe those would be easier to use?
20     MS. DONNELL: Brittany, do you have
21 those, or would you like me to use Exhibit 9?  I think
22 either one would work.
23     MS. JOHNSON: I have -- hold on.  Give
24 me a second.  I have an 8B.

234

1        MS. DONNELL: We are not going to use
2  8B.  This is an Exhibit 9.
3        MS. JOHNSON: I don't have a 9.
4        MS. DONNELL: You don't have 9.
5        MS. JOHNSON: I have 8, 8B and a 10.
6  Do you remember what 9 was?
7        MS. DONNELL: So 9 should be the CRs
8  that were produced this morning.  But I think that she
9  produced --
10       MS. JOHNSON: The only thing that I
11 have -- I don't have -- oh, I get it.  So the 9 was
12 produced independently of the Hightail link; is that
13 what you are saying?
14       MS. DONNELL: I thought it was in the
15 Hightail link.  I thought it came through on my Hightail
16 link, but I could be wrong.  How about I do this.  How
17 about if I share my screen here.  There is a Hightail
18 link for Exhibits 12 and 13.  It was sent to you during
19 the deposition.  These are the ones that Jeff said are
20 produced as Pack CRs, but also include DeLacy.  If you
21 have them, I can just share my screen.
22       MS. JOHNSON: I have exhibits from it
23 looks like Pack, and then all I have is this.  It just
24 says DeLacy deposition at the top, and it looks like to

235

1  be a packet of redacted CRs.
2        MS. DONNELL: So do you mind then if I
3  use just the ones that the city previously produced and
4  you have a Hightail link for Exhibit 12 and 13?
5        MS. JOHNSON: I would prefer to have it
6  in front of him.  So if you can give me a second, I can
7  go and print it out and make sure that I've got what you
8  got.
9        MS. DONNELL: Sure.  Do you want to go
10 off the record and you can print the Hightail link,
11 Exhibit 12 and 13?  It is going to be pretty quick.  But
12 if you would prefer to print it and take the time,
13 that's fine, I'll wait.
14       MS. JOHNSON: I'm printing those
15 because those are two different CRs.  And the CRs that
16 we have never seen before like in the production that
17 you gave to us this morning right before the dep was
18 180056, and it looks like there is some contention of
19 that specific one having never been produced or located
20 before this dep, an hour before.
21       MS. DONNELL: That's fine.  I am going
22 to state that the city has failed to produced that CR in
23 litigation to the state as well.  So it is true that we
24 have inadvertently not produced the response.  So when

236

1  it came to our attention, we produced it as soon as we
2  were made aware of that.  But the CR that was requested
3  by the Plaintiff from the city has not yet been produced
4  apparently.
5        So let's do this.  Should we go off the
6  record, and you want to produce Exhibits 12 and 13 as
7  the city produced those CRs?
8        MS. JOHNSON: Okay.  Give me a second
9  and I will produce that.
10       MS. DONNELL: Okay.  I am just going to
11 wait.  So let's go off the record and you can just bring
12 them back.
13       VIDEO HOST:  Off the record at 3:47.
14       (Off the record.)
15       VIDEO HOST:  Back on the record at
16 3:54.
17 BY MS. DONNELL:
18     Q.  Mr. DeLacy, do you have what I have marked
19 as Exhibit 12 in front of you, please.
20     A.  Yes.
21     Q.  Okay.  Exhibit 12 is CR 183645; is that
22 right?
23     A.  Yes.
24     Q.  And let's see, for the record, that is

Transcript of Michael DeLacy
Conducted on January 15, 2021

60 (237 to 240)

237

1  Bates stamped CITY JAKES 22030 consecutive through
2  22073.
3      You have never seen Exhibit 12 before; is
4  that right?
5      A.  Correct.
6      Q.  Do you have any memory of the CR allegation
7  made against you by James Fayhill who says-- who
8  reported that on March 31st, 1991 at about 10:00 at 5550
9  West 43rd Street inside the 550s Lounge that you and
10 DeLacy and Sergeant Risley pushed him after he was
11 handcuffed causing him to fall on the floor, and
12 handcuffed him too tight and dragged him to the police
13 car?  Do you remember?  Does this refresh your
14 recollection of that arrest at all?
15     A.  I haven't had a chance to read it.  But I
16 don't remember it there, okay.
17     Q.  Do you want to look at the summary report,
18 the digest report of the complaint register which starts
19 on Page 2 of Exhibit 12?
20     A.  Yes, can I take a quick look?
21     Q.  Of course you can, sure.  Just let me know
22 when you are ready.
23     A.  (Reviewing.)  Okay.
24     Q.  Thank you.  So you had a chance to look at,

238

1  not all of, but some portion of Exhibit 12, which is the
2  MCR 183645, which made allegations against you and
3  Officer Pack and Sergeant Risley; is that right?
4      A.  Yes.
5      Q.  Does that refresh your recollection of the
6  arrest and complaint of James Fayhill on March 31st,
7  1991?
8      A.  I don't remember.
9      Q.  My apologies.  I am going to have you turn
10 to page 39, which is -- I'll get you the Bates stamp
11 number.  It's your to/from report to see if that
12 refreshes your recollection.  It is Bates stamped 22068.
13 It is really towards the end of the packet.  It's
14 like fifth to the last page.  Are you there with me?  It
15 says CITY JAKES 22068.
16     A.  Yes, I am.
17     Q.  Okay.  Do you recognize that to be your
18 to/from memo submitted to the O.P.S., Office of
19 Professional Standards on May 10th, 1991?  I'm sorry,
20 that you submitted to your district commander of the 9th
21 District, I'm sorry?
22     A.  Yes, yes.
23     Q.  And your district commander signed it.  Who
24 was that?

239

1      A.  Frank Radke.
2      Q.  He was the commander of Area Nine in 1991?
3      A.  Yes, 9th District commander.
4      Q.  Was he also the 9th District commander in
5  September of 1991?
6      A.  I don't know.
7      Q.  Okay.  Do you want to review your to/from
8  memo?  If you haven't had a chance to see that.
9      A.  Yes, thank you.
10     Q.  Okay.  Go ahead.
11     A.  (Reviewing.)  Okay.
12     Q.  Does reading the to/from memo in Exhibit 12
13 refresh your recollection of any of the involvement you
14 had with the complainant of James Fayhill on March 31st,
15 1991?
16     A.  I don't remember it.
17     Q.  Okay.  And that doesn't refresh your
18 recollection in any way?
19     A.  No.
20     Q.  Does it refresh your recollection that the
21 complainant crunched your partner Officer Pack?
22     A.  No.
23     Q.  Do you have any memory of Sergeant Risley
24 pushing Mr. Fayhill after he was handcuffed causing him

240

1  to fall to the ground?
2      A.  No.
3          MS. JOHNSON:  Object to form.
4  BY MS. DONNELL:
5      Q.  And do you have any memory of how Mr.
6  Fayhill was handcuffed?
7      A.  No.
8      Q.  And do you deny any of the allegations you
9  have read that the complainant made, Mr. Fayhill?
10         MS. JOHNSON:  Object to form.
11     A.  Do I deny?
12 BY MS. DONNELL:
13     Q.  Any of his conduct, yes, you or your
14 partner?
15         MS. JOHNSON:  Same objection.
16     A.  No misconduct.
17 BY MS. DONNELL:
18     Q.  So, you deny misconduct, right?
19         MS. JOHNSON:  Same objection.
20         MS. DONNELL:  He can answer.
21         MS. JOHNSON:  He answered it already.
22 Did you not hear it?
23 BY MS. DONNELL:
24     Q.  You can answer it again.  You denied his

Transcript of Michael DeLacy
Conducted on January 15, 2021

61 (241 to 244)

241

1 misconduct, right?
2 **A. Yes.**
3 MS. JOHNSON: Asked and answered.
4 MS. DONNELL: I didn't hear the answer.
5 Q. Look at Exhibit 13 for me. This is CR
6 185222 produced by the city.
7 MS. DONNELL: And for the record, this
8 document, Exhibit 13, has the Bates stamped CITY 22120
9 consecutive through 22159.
10 (CR File Deposition Exhibit 13 marked
11 for identification.)
12 Q. Mr. DeLacy, have you seen the complaint
13 review file for 185222 from July 1991?
14 **A. No.**
15 Q. Okay. I am going to give you a chance to
16 look at the allegations then. You might want to look at
17 the third page, which starts the summary digest report
18 of the CR file.
19 **A. Okay.**
20 Q. Okay. Do you want to take time to review
21 the allegations --
22 **A. Yes.**
23 Q. -- and find things?
24 **A. Yes.**

242

1 Q. Sure. You let me know when you are ready,
2 okay?
3 **A. Thank you. Okay (Reviewing.) Okay.**
4 Q. Does reviewing that portion of Exhibit 3
5 that you looked at refresh your recollection as to you
6 and Officer Pack assisting in an arrest on June 28th,
7 1991 of a Mr. Simmons?
8 **A. I don't remember it.**
9 Q. Okay. And you see here that the allegation
10 is that the police entered the complainant's home and
11 searched it without a search warrant and ransacked it;
12 did you see that? Did you read that?
13 **A. Um -- yes. Up on top.**
14 Q. Yes. And this was at 5639 South Seeley?
15 **A. Yes.**
16 Q. Do you have any memory of the incidents
17 alleged in this CR?
18 **A. No, I don't.**
19 Q. Okay. Do you see the findings that the
20 police officers, the O.P.S. finding was that the
21 officers stated the incident was Officer Sutter entered
22 the home with the permission and went directly to a
23 weapon and they denied searching it or ransacked it?
24 Did you see that?

243

1 **A. Yes.**
2 Q. Do you know who Detective Stanley Kroll
3 (phonetic) is?
4 **A. No, I don't.**
5 Q. Do you -- you don't remember any incidents
6 with him?
7 **A. No, I don't.**
8 Q. Okay. Do you deny that you committed any
9 misconduct in the context of this, like an unlawful
10 search and ransacking of a home?
11 MS. JOHNSON: Object to form.
12 **A. Yes.**
13 **BY MS. DONNELL:**
14 Q. Okay. Have you seen your -- do you
15 remember submitting a to/from in this memo or in this
16 CR?
17 **A. No, I don't.**
18 Q. I am going to call your attention to
19 Page 32. It has the bates stamp CITY JAKES 22149.
20 **A. Okay.**
21 Q. Do you recognize this as your to/from memo
22 dated July 29th, 1991 submitted to the district
23 commander of Area 7 or District 7?
24 **A. Yes.**

244

1 Q. But do you want to review your to/from
2 memo?
3 **A. Yes, I would. Thank you.**
4 Q. Okay. Before you do, that's your
5 signature, right?
6 **A. Yes.**
7 Q. Okay.
8 **A. Okay.**
9 Q. Does that refresh your recollection in any
10 way of your assistance of Detective Stanley Kroll on
11 June 26, 1991?
12 **A. I don't recall it.**
13 Q. Okay. But you in your to/from memo denied
14 any wrongdoing; is that right?
15 **A. Yes.**
16 Q. Can you go back a few pages and look at the
17 to/from memo from your partner Thomas Pack on Page
18 22145.
19 **A. 221, okay.**
20 Q. Do you recognize Tom Pack's signature on
21 Page 22145?
22 **A. I do.**
23 Q. Do you want to look at his to/from memo
24 that he submitted in this CR, and then I will ask you

Transcript of Michael DeLacy
Conducted on January 15, 2021

245

1 some questions.
2    **A. Okay.**
3    Q. Would you agree that his to/from memo is
4 identical to your partner Tom Pack's?
5         MS. JOHNSON: Objection; form,
6 foundation.
7         COURT REPORTER: I didn't hear the
8 question.
9         (Off the record.)
10        MS. DONNELL: Oh, I'm sorry. I just
11 asked if he would agree that his to/from memo is
12 identical to your partner Tom Pack's.
13        MS. JOHNSON: Object to form and
14 foundation.
15        MS. DONNELL: You can answer.
16    **A. They look the same.**
17 **BY MS. DONNELL:**
18    Q. Do you ever recall going into O.P.S. for an
19 interview for a CR investigation, or do you only
20 remember having to submit to/from memos?
21    **A. I don't remember going to O.P.S.**
22        MS. DONNELL: I'm -- I think I have
23 completed my questioning. I don't know if Mr. Yamin or
24 your attorneys have questions for you. But I really

246

1 appreciate your time today, and thank you for working
2 with the remote and the technology. So, at this time I
3 don't have any further questions.
4         THE WITNESS: Thank you.
5         MS. DONNELL: Thank you.
6         MS. JOHNSON: George, do you have any?
7         MR. YAMIN: No from the city.
8         MS. JOHNSON: All right. I have got
9 just a few.
10        MS. DONNELL: Okay, go ahead.
11        EXAMINATION
12 BY MS. JOHNSON:
13    Q. Mr. DeLacy, previously you were asked
14 questions about going to Mr. Jakes' house and
15 transporting him to Area Three; is that correct?
16    **A. Yes.**
17    Q. And you testified earlier that Jakes agreed
18 to go with you to Area Three, correct?
19    **A. Yes.**
20    Q. Okay. What would you have done had he
21 refused to go with you?
22    **A. I --**
23        MS. DONNELL: Sorry. Let me object.
24 Objection. Calls for speculation; incomplete

247

1 hypothetical.
2         But you can go ahead and answer.
3 BY MS. JOHNSON:
4    Q. You can answer.
5    **A. I'm sorry?**
6    Q. You can answer the question.
7         I asked you what would you have done had
8 Mr. Jakes refused to go with you that day when you
9 picked him up?
10        MS. DONNELL: And, again, I'm going to
11 reiterate my same objection, Mr. DeLacy. I will put my
12 hand up, so that you can see when I am going to object,
13 if that would help you.
14 BY MS. JOHNSON:
15    Q. Say that again. What would you have done?
16    **A. We would have left.**
17    Q. Okay. Why would you have left?
18        MS. DONNELL: Objection; calls for
19 speculation, incomplete hypothetical, and assumes facts
20 not in evidence.
21 BY MS. JOHNSON:
22    Q. You can answer.
23    **A. He wasn't wanted for anything.**
24    Q. Okay. Let's see. Give me a second.

248

1         Do you remember being asked about details
2 that were contained in your case report?
3    **A. Yes.**
4    Q. And you remember being asked whether or not
5 you had any conversations with Mr. Jakes while he was
6 being transported to Area Three, correct?
7    **A. Yes.**
8    Q. Okay. If you had had any conversations
9 with Mr. Jakes about the Garcia homicide, would you have
10 documented that in the case report?
11    **A. Yes, I would have.**
12        MS. JOHNSON: That's all I have.
13        MS. DONNELL: Okay, I just have one
14 follow-up question.
15        RE-EXAMINATION
16 BY MS. DONNELL:
17    Q. Mr. DeLacy you just testified that if Mr.
18 Jakes didn't want to go with you or wouldn't agree to go
19 with you, you would have left his home; is that what you
20 just testified to?
21    **A. Yes.**
22    Q. What would you have told the Area Three
23 violent crimes detectives that wanted to talk to him if
24 he wouldn't agree to go with you?

Transcript of Michael DeLacy
Conducted on January 15, 2021

63 (249 to 252)

---

**249**

1    **A. I don't know that we would have told him**
2 **anything.**
3    Q. Okay. If Mr. Jakes was willing to agree to
4 go with you on that day, why did officers go into his
5 home and into his bedroom?
6    MS. JOHNSON: Object to form and
7 foundation. And that was already asked and answered
8 previously. And that's speculation. He has already
9 answered that question, and that is not even remotely
10 related to what I just asked.
11    MS. DONNELL: I'm sorry, Brittany, I am
12 doing rebuttal to your question if he had refused to
13 come that he would have just left his home. So it is in
14 response to the questioning you just opened.
15    MS. JOHNSON: You asked him why he went
16 upstairs. That's not in rebuttal to the question I
17 asked.
18    MS. DONNELL: No, I didn't say why he
19 did. I asked why the officers went upstairs.
20    MS. JOHNSON: Again, that's not
21 rebuttal to the question I asked.
22 BY MS. DONNELL:
23    Q. That's fine. You can go ahead and answer,
24 Mr. DeLacy.

---

**250**

1    **A. I don't know.**
2    Q. And you testified earlier today that this
3 is the only time you can remember that Officer Pack,
4 your partner, went into a witness' home when you went to
5 pick them up for questioning, right; you can't think of
6 any other occasions?
7    MS. JOHNSON: Object to form and
8 foundation, and calls for speculation. And that's asked
9 and answered. And it mischaracterizes the previous
10 testimony; and this is once again, not rebuttal.
11 BY MS. DONNELL:
12    Q. You can answer, Mr. DeLacy.
13    **A. I don't recall.**
14    Q. You mean you don't recall any other time
15 when you or Officer Pack went into an individual's home
16 of a witness who was voluntarily coming with you for
17 questioning, right?
18    MS. JOHNSON: Objection; asked and
19 answered. Mischaracterizes the testimony. Again, asked
20 and answered.
21 BY MS. DONNELL:
22    Q. You can answer.
23    **A. I don't recall.**
24    Q. What do you mean by saying you don't

---

**251**

1 recall? You don't recall any other time when that
2 occurred, correct?
3    MS. JOHNSON: Objection; form,
4 foundation. Again, asked and answered.
5 BY MS. DONNELL:
6    Q. You can go ahead and answer.
7    **A. Yes.**
8    Q. Okay.
9    MS. DONNELL: I don't have any further
10 questions.
11    THE WITNESS: Thank you.
12    MS. JOHNSON: Okay.
13    MS. DONNELL: Mr. DeLacy, I'm sure --
14 are you guys going to waive?
15    MS. JOHNSON: No, we will reserve.
16    MS. DONNELL: Okay. The witness is
17 going to reserve it. I will just put on the record that
18 no questions-- I did not ask any questions about the CR
19 that was produced earlier today by our office in
20 response to a FOIA request that has not yet been
21 produced by the city pursuant to counsel's prior
22 communications before the deposition started. So, I
23 will just note that. And also --
24    MS. JOHNSON: Let me add, in that

---

**252**

1 respect, we do have an IFOIA (phonetic) redacted copy
2 of that CR, and if you intend to ask questions, I would
3 ask that you would do it on that, with the IFOIA
4 (phonetic) redacted copy, so that we're not bringing
5 him back.
6    MS. DONNELL: Oh, okay. So, I thought
7 you weren't going to permit him to answer questions
8 based on your representations earlier today.
9    MS. JOHNSON: No, I just wanted to
10 review it before you asked any questions.
11    MS. DONNELL: I see. I misunderstood.
12 Okay.
13    MS. JOHNSON: On that IFOIA (phonetic)
14 copy, then I'm fine. I just don't want to bring him
15 back.
16    MS. DONNELL: Okay. So, let's go back
17 and do that then so we don't have to bring him back.
18 I misunderstood your earlier position with me. I'm
19 sorry.
20    Sorry, Mr. DeLacy, but we've got to
21 keep you a little bit longer. Sorry.
22    MS. JOHNSON: Okay.
23    CONTINUED EXAMINATION
24 BY MS. DONNELL:

---

Transcript of Michael DeLacy
Conducted on January 15, 2021

64 (253 to 256)

253

1    Q.   So, we are still on the record.  Why don't
2  you look at Exhibit 9.  It is printed for you there, I
3  think.
4           (Delacy Deposition Exhibit 9 marked for
5  identification.)
6           MS. JOHNSON:  This one just says,
7  "DeLacy deposition."  Is that the one you are talking
8  about, Heather?
9           MS. DONNELL:  Yes, it should say,
10 "DeLacy deposition," Exhibit 9.  It must have been an
11 error, But I think that you've got it, right there.
12          MS. JOHNSON:  Okay.  So, for the
13 record, that starts, Exhibit 9 starts with PLAINTIFF
14 JAKES 095339?
15          MS. DONNELL:  Yes.  That's right.
16 And it's a large document, I think.  It's PLAINTIFF
17 JAKES 95339, and I think that full exhibit goes
18 consecutive through 95535, but we won't need that for
19 the record.
20 BY MS. DONNELL:
21    Q.   Okay.  So, do you see the first page of
22 what I have designated as Exhibit 9 to your deposition,
23 Mr. DeLacy?
24    A.   I don't have it yet.

254

1           MS. JOHNSON:  He doesn't have it yet.
2  Give me a second.  I am going to pull -- I am going to
3  try and figure out --
4           MS. DONNELL:  I can share my screen.
5  Would that work for you guys?
6           MS. JOHNSON:  Hold on.  I think I've
7  got it.
8           So for the record, Heather, I'm going
9  to hand him what looks to being CR 180056.  It is
10 Plaintiffs Jakes 95339, and it continues consecutively
11 until what I believe is 95389.  Is that the end that you
12 have?
13          MS. DONNELL:  Well, I just designated
14 the whole Exhibit that was previously produced.  So it
15 sounds like you are just lapping off just CR on that, is
16 what you are doing.
17          MS. JOHNSON:  Right, I'm just giving
18 him the CR that you are going to question him about.
19          MS. DONNELL:  So we have to make the
20 record clear on what Exhibit 9 is going to be.  Because
21 why don't you say -- because we have already produced
22 the digital file that had all of them ready so.
23          MS. JOHNSON:  Exhibit 9 now, since we
24 will go back and question is CR 180056.  It looks like

255

1  Exhibit 9 will start with Plaintiff Jakes 95339, which
2  is the complaint register history, and then it goes all
3  the way to 95389.
4  BY MS. DONNELL:
5     Q.   Okay.  Do you have that in front of you,
6  Mr. DeLacy?
7     A.   Yes, ma'am.
8     Q.   Okay.  Do you see that first page of what
9  we are designated as Exhibit 9 here, and it says a
10 pre-2000 mainframe printout of complaint register
11 histories?  Do you see that?
12    A.   Would that be -- that's on page --
13    Q.   It has the Bates stamp of --
14    A.   12 August?
15    Q.   It says 95339 at the bottom.  Do you see
16 that?
17    A.   Yes.  I have it.
18    Q.   Okay.  And it lists four CRs there.  Do you
19 see that?
20    A.   I do.
21    Q.   Okay.  Do you have a memory of any
22 additional CRs other than the four that are listed here,
23 do you know?
24    A.   No.

256

1     Q.   Okay.  Do you know how many CRs you had
2  over your career with the Chicago Police Department?
3           MS. JOHNSON:  Object to foundation.
4     A.   No.
5  BY MS. DONNELL:
6     Q.   And then if you turn to Page 2 of Exhibit
7  9, you will see there is a summary report digest of
8  complaint register 180056 that was reported on November
9  6, 1990.  Do you see that?
10    A.   Are you on back of Page 1?
11    Q.   I think it's the back of Page 1.  It will
12 say 95340 at the bottom.
13    A.   Okay.
14    Q.   Are you with me?
15    A.   Yes, I am.
16    Q.   Okay.  And you see here that here this is a
17 copy produced pursuant to Illinois Freedom of
18 Information Act.  So there is more redactions, and we
19 don't have the copy from the city.  So I don't know the
20 complainant's name.
21           But it says -- the allegation is that the
22 complainant alleges that is casually dressed or
23 non-uniformed officers tried to force their way into a
24 house without a search warrant and without permission?

Transcript of Michael DeLacy
Conducted on January 15, 2021

65 (257 to 260)

257

1      Do you see that allegation?
2      A.   Yes.
3      Q.   Okay.  And do you see that you, and along
4  with your sergeant from the 9th District tactical unit,
5  were the two initially accused officers?
6      A.   Yes.
7      Q.   Okay.  And then if you scroll down, not
8  scroll down, but if you turn your pages, you will get to
9  the additional accused officers includes your partner
10 Thomas Pack, Thomas Hennigan, James Volpi, Paul Jackson,
11 Richard Dowling, and Michael Malone?  That should be on
12 the fourth page.
13     MS. JOHNSON:  For the record, that's
14 Plaintiff's 95342.
15     MS. DONNELL:  Thanks, Brittany, you got
16 it.
17     A.   I see it, yes.
18 BY MS. DONNELL:
19     Q.   Were those the other officers in your 9th
20 District tactical unit as of that time in 1990, in
21 November of 1990?
22     A.   These appear to be officers from different
23 tactical teams.
24     Q.   Okay.  I got it.  Why are you saying from

258

1  different tact teams?  It look like it's all from the
2  9th.  But you think it is different tact teams from
3  within the 9th?
4      A.   I'm not sure.
5      Q.   If you look at the top of the fourth page
6  which has the Bates stamp 95342, do you see it there?
7      A.   On the bottom?
8      Q.   Top, where it says Thomas Pack, Thomas
9  Hennigan, and after the redaction it says 009 for the
10 9th District?
11     A.   I do see that, yes.
12     Q.   Okay.  Does that indicate to you that those
13 are all 9th District tactical units?
14     A.   Yes, and district personnel.
15     Q.   Okay.  Does it refresh your recollection
16 about the incident from where there is an allegation
17 that there was an unlawful search?
18     MS. JOHNSON:  Object to form.
19     A.   No.
20 BY MS. DONNELL:
21     Q.   No?  Okay.  I am going to call your
22 attention -- let's see.  Hold on one second.
23     I am going to call your attention to Page
24 37 of that packet, and it will have the Bates stamp

259

1  95375.
2      A.   I have it.
3      Q.   Do you recognize that as your to/from that
4  you submitted in CR 180056 dated November 4, 1990?
5      A.   Yes.
6      Q.   Would you like time to review it, sir?
7      A.   Yes.  It's very light.  It is very hard to
8  see.
9      Q.   Yes, it's light for me, too.  If you would
10 like me to try to share my screen, I can maybe darken it
11 for you.
12     A.   Let me see.
13     Q.   I'm happy to do that if you think that
14 would help you.
15     A.   (Reviewing.)  I'm having a hard time
16 reading this.
17     Q.   You are?  Okay.  Do you want me to try to
18 share my screen to see if I can -- if that helps you?
19     A.   Do you think yours is any -- is yours
20 printed darker than this one?
21     Q.   No, it's just -- not really.
22     A.   All right.  Let me try wiping my glass.
23 Maybe I can see it a little better.
24     MS. JOHNSON:  It is very light.

260

1      THE WITNESS:  I am having a very
2  difficult time reading it.
3  BY MS. DONNELL:
4      Q.   Okay.
5      MS. JOHNSON:  Can you try and show it
6  to him on your screen.
7      MS. DONNELL:  Yes, I am going to try to
8  see if that does any better.  Let me try.  Just a
9  second.
10     (Off the record.)
11 BY MS. DONNELL:
12     Q.   Okay.  It is on my screen right now.  I
13 don't know if this is any better or I'm going to have
14 the ability to make it better for you, but let me see if
15 I can in any way.  And I'm open to suggestions.
16     MR. GRILL:  Heather, I can make it out
17 on the computer.  If you want to just read it, I will
18 follow along to just to make sure it is accurate not
19 saying that you wouldn't read it accurately.
20     MS. DONNELL:  Okay.  Sounds good.
21 BY MS. DONNELL:
22     Q.   Thanks.  So, sir, I am going to, per your
23 counsel's instruction, are you able to read the to/from
24 to see the to/from on this memo is from you, Patrolman

Transcript of Michael DeLacy
Conducted on January 15, 2021

66 (261 to 264)

---

261

1 Michael DeLacy?

2     **A. I can read that, yes.**

3     Q. Okay. Great. If you have a two-paragraph

4 to/from memo here, and I will read the portions that are

5 not redacted. And it says: "The reporting officer on

6 the 26th October 1990 was working tactical Beat No. 96

7 2D, as in dog, on the third watch from 1730 to 02 hours

8 with his partner Officer Pack 2877. The reporting

9 officer on 27 October 1990 at approximately 0045 HRS

10 responded to a call of a disturbance loud party at

11 redaction. Said location is the source of numerous

12 complaints from area residents regarding gang activity,

13 minors drinking, and loud and boisterous behavior

14 during the early morning hours by members of the Latin

15 Kings street gang that frequent said location. The

16 reporting officer upon arrival observed a group of

17 youthful-appearing male Hispanics drinking beer in the

18 gangway at, and then the location is redacted, and

19 further heard loud music and voices coming from the

20 address of, and the address is redacted. Upon observing

21 the reporting officers, dropped their beer and fled the

22 westbound through the gangway into the west alley of

23 Richmond Avenue with the reporting officers in pursuit.

24 Two of the suspects were apprehended after a foot chase

---

262

1 and were led -- and were placed, I'm sorry, and were

2 placed under arrest for minor drinking. Reference RD,

3 and then the RD number is redacted. The reporting

4 officer returned to the gangway, and the location is

5 redacted, and recovered a quantity of Budweiser beer

6 which is inventoried at the 9th District. The reporting

7 officer at this location overheard loud and profane

8 language coming from the occupants of the house. Said

9 profanity directed at the reporting officers and other

10 reporting 9th District personnel. When said officers

11 told the occupant that they had a complaint about music

12 and boisterous behavior, the occupants told the

13 reporting officers in profane language that they were

14 not opening the door and to get a warrant."

15     Paragraph two: "At no time did the

16 undersigned officer or his partner Thomas Pack 2877 try

17 to force their way into the home at redacted location or

18 break a glass in the front door of same or first open

19 the garage by breaking the lock at said location. At

20 said location. And further, the reporting officer did

21 not observe any other officer engaged in the

22 aforementioned actions." (Reading.)

23     Were you able to hear me, Mr. DeLacy?

24     **A. I heard you.**

---

263

1 **BY MS. DONNELL:**

2     Q. Does that refresh your recollection of your

3 involvement and reporting to a sound disturbance? We

4 don't know the location. But on October 27th, 1990?

5     **A. I don't recall it.**

6     Q. Okay. But according to your to/from, you

7 denied going and having an unlawful entry into the

8 premises, wherever that was; is that right?

9     **A. Yes.**

10     MS. DONNELL: All right. I think we

11 can conclude. The only other thing I am going to put on

12 the record is that your counsel and I have agreed not to

13 go further into any of your discovery of your financial.

14 That is pursuant to the party's current dispute over the

15 punitive damages-related to discovery. So I will just

16 put that on the record. And I think now we have

17 completed, unless your counsel has any further

18 questions.

19     MS. JOHNSON: Nothing further for me.

20     MS. DONNELL: Okay. And I think we

21 have already established that the witness would like to

22 reserve signature.

23     MS. JOHNSON: Yes.

24     MS. DONNELL: Okay.

---

264

1     THE WITNESS: We are done.

2     BY MS. DONNELL: Have a nice weekend,

3 everybody.

4     VIDEO HOST: This completes the remote

5 video deposition of Michael DeLacy. The time is 4:35.

6     MS. DONNELL: Thank you, everybody.

7     (Off the record.)

8     MS. JOHNSON: Quick question. Heather,

9 are you ordering?

10     MS. DONNELL: I'm not ordering at this

11 time.

12     MS. JOHNSON: Okay.

13     (Deposition Exhibits 5, 6, 7, 10, 11

14 and 12 were marked for identification.)

15

16     (Whereupon, the deposition was

17 concluded at 4:35 p.m.)

18

19

20

21

22

23

24

---

265

1    ERRATA SHEET FOR THE TRANSCRIPT OF:
2  Case Name:    Anthony Jakes vs. Boudreau, et al.
   Dep. Date:    January 15, 2021
3  Deponent:     Michael DeLacy
4      CORRECTIONS:
5  Pg. Ln. Now Reads    Should Read    Reason

6  _____
   _____
7  _____
   _____
8  _____
   _____
9  _____
   _____
10 _____
   _____
11 _____
   _____
12 _____
   _____
13 _____
   _____
14 _____
15
16
17    _____
18      Signature of Deponent
19 SUBSCRIBED AND SWORN BEFORE ME
20 THIS___DAY OF_____, 2020.
21
22 _____
23 (Notary Public)
   MY COMMISSION EXPIRES:_____
24

266

1        STATE OF MINNESOTA
   COUNTY OF WASHINGTON            CERTIFICATE
2
3
       I, Ann Marie Holland, hereby certify that I
4  reported remotely the deposition of MICHAEL DELACY,
   conducted virtually, on the 15th day of January 2021,
5  and that the witness was by me first duly sworn to tell
   the truth and nothing but the truth concerning the
6  matter in controversy aforesaid;
7        That I was then and there a Notary Public in
   and for the County of Washington, State of Minnesota,
8  and that by virtue thereof, I was duly authorized to
   administer an oath;
9
        That the foregoing transcript is a true and
10 correct transcript of my stenographic notes in said
   matter, transcribed under my direction and control
11 to the best of my ability;
12       That the cost of the original has been charged
   to the party who noticed the deposition and that all
13 parties who ordered copies have been charged at the
   same rate for such copies;
14
        That the reading and signing of the deposition
15 was not waived;
16       That I am not related to any of the parties
   hereto,   nor interested in the outcome of the action
17 and have no contract with any parties, attorneys or
   persons with an interest in the action that has a
18 substantial tendency to affect my impartiality;
19       WITNESS MY HAND AND SEAL this 16th day of
   February, 2021.
20
21
22  _____
23
24      Ann M. Holland, CSR
        Notary Public

Transcript of Michael DeLacy
Conducted on January 15, 2021                                    68

| A | | | |
|---|---|---|---|

**aberdeen**
2:4
**abide**
8:2, 46:9
**ability**
30:13, 104:17,
150:18, 175:1,
184:3, 205:5,
260:14, 266:19
**able**
30:4, 102:17,
144:13, 170:7,
170:9, 260:23,
262:23
**about-**
124:18, 125:23,
157:12
**above**
188:14, 208:24
**above-entitled**
6:2
**absolutely**
18:1, 212:5
**abuse**
226:8
**academy**
8:20, 8:22,
9:2, 9:6, 15:11,
29:24, 31:21,
116:1, 116:14,
159:10, 161:4
**accepted**
47:13
**accommodate**
7:10, 7:17
**accommodating**
12:17, 13:9
**accompany**
116:16
**according**
76:16, 106:4,
263:6
**accurate**
12:23, 19:3,
19:7, 28:23,
29:22, 30:11,

30:22, 54:10,
54:21, 80:19,
85:2, 85:4,
85:7, 85:9,
85:13, 86:24,
96:1, 128:12,
149:2, 151:23,
157:23, 159:20,
177:13, 178:22,
181:4, 181:21,
181:24, 260:18
**accurately**
178:12, 260:19
**accused**
257:5, 257:9
**accusing**
230:11
**acknowledge**
5:1
**act**
256:18
**action**
266:28, 266:30
**actions**
262:22
**activity**
261:12
**actual**
58:20, 59:10,
66:8, 66:20,
135:12, 139:14
**actually**
45:14, 48:24,
57:13, 59:20,
60:4, 65:17,
66:17, 67:6,
136:8, 170:4,
218:15, 219:18,
232:4
**add**
251:24
**additional**
54:23, 83:8,
83:13, 93:21,
233:14, 255:22,
257:9
**address**
74:1, 90:13,

97:14, 156:21,
261:20
**adequately**
230:22
**adjust**
7:6, 13:10
**administer**
4:9, 266:14
**admissibility**
5:3
**admit**
73:9
**adult**
145:17, 159:24
**advise**
141:10
**advised**
141:15, 141:19,
142:4
**advising**
143:6, 143:13
**affect**
266:31
**aforementioned**
262:22
**aforesaid**
266:10
**after**
6:3, 15:21,
17:4, 18:20,
19:5, 24:14,
27:21, 29:13,
52:1, 52:17,
62:7, 63:15,
63:21, 63:23,
68:13, 88:7,
88:10, 88:12,
104:5, 104:11,
125:9, 139:20,
140:1, 140:4,
140:5, 141:5,
142:5, 142:13,
147:23, 148:1,
148:2, 148:9,
153:3, 157:2,
162:18, 165:1,
166:8, 192:24,
197:6, 200:23,

237:10, 239:24,
258:9, 261:24
**afternoon**
53:12, 83:22,
144:5, 166:9,
189:5
**afternoons**
35:2
**again**
6:19, 21:19,
60:2, 64:10,
65:23, 66:4,
66:6, 67:8,
67:10, 68:24,
74:6, 83:1,
85:8, 130:17,
146:23, 153:10,
157:22, 160:12,
165:5, 179:24,
180:11, 180:17,
180:19, 195:4,
204:12, 223:21,
225:19, 231:10,
240:24, 247:10,
247:15, 249:20,
250:10, 250:19,
251:4
**against**
220:17, 222:16,
222:20, 237:7,
238:2
**agencies**
25:1, 25:4,
25:7
**agency**
25:13
**ago**
53:10, 53:21,
53:22, 54:4,
54:13, 165:14
**agree**
5:6, 5:10,
5:13, 175:18,
230:20, 245:3,
245:11, 248:18,
248:24, 249:3
**agreed**
5:7, 8:5, 8:7,

Transcript of Michael DeLacy
Conducted on January 15, 2021                                    69

| | | | |
|---|---|---|---|
| 45:11, 48:17, 246:17, 263:12 | **allegation** 237:6, 242:9, 256:21, 257:1, 258:16 | 40:21, 41:24, 44:9, 44:13, 76:21, 92:8, 97:23, 109:10, 109:11, 120:3, 143:16, 153:14, 175:15, 182:15, 191:24, 193:12, 194:5, 232:7, 234:20, 239:4, 251:23 | 47:10, 60:2, 61:21, 63:18, 63:20, 63:21, 65:24, 66:2, 66:4, 67:2, 67:5, 67:10, 67:23, 69:1, 70:7, 74:19, 75:12, 80:24, 81:13, 95:3, 95:23, 115:2, 130:16, 142:9, 142:19, 145:20, 146:13, 157:19, 158:8, 158:20, 160:9, 180:3, 180:5, 180:13, 180:16, 180:18, 181:7, 181:15, 202:14, 208:4, 215:11, 240:20, 240:24, 241:4, 245:15, 247:2, 247:4, 247:6, 247:22, 249:23, 250:12, 250:22, 251:6, 252:7 |
| **agreement** 44:10, 46:9 | | | |
| **agrees** 5:9 | **allegations** 222:16, 223:2, 223:5, 223:10, 225:4, 226:7, 238:2, 240:8, 241:16, 241:21 | | |
| **ahead** 31:10, 39:1, 43:7, 44:8, 46:1, 49:19, 60:2, 63:21, 66:4, 67:2, 67:12, 67:23, 69:1, 74:19, 95:2, 142:9, 146:12, 160:11, 181:15, 197:3, 200:16, 209:10, 230:15, 232:12, 239:10, 246:10, 247:2, 249:23, 251:6 | **alleged** 224:22, 226:16, 242:17 | **always** 19:2, 22:9, 73:5, 73:7 | |
| | **allegedly** 198:7 | | |
| | **alleges** 256:22 | **amount** 42:23 | |
| | **alley** 261:22 | **amounts** 43:19 | |
| | **alone** 71:23 | **andrew** 2:9, 4:16, 7:22, 46:14, 47:21, 48:13, 48:23, 49:18, 49:20, 50:13, 50:19, 230:17, 231:9, 231:14 | |
| | **along** 23:20, 47:8, 86:16, 92:13, 124:9, 232:11, 257:3, 260:18 | | |
| **aids** 6:24, 7:7 | **aloud** 129:23 | **ann** 1:29, 4:5, 4:9, 266:5, 266:38 | |
| **al** 1:10, 4:4, 265:2 | **already** 43:1, 44:2, 48:17, 67:1, 83:5, 89:21, 92:4, 108:20, 111:8, 114:18, 131:17, 132:21, 163:13, 163:19, 166:19, 189:12, 189:18, 202:8, 220:2, 240:21, 249:7, 249:8, 254:21, 263:21 | **anonymous** 59:16, 60:14, 60:16, 60:23, 61:12, 61:22, 61:23, 62:2, 74:6, 77:23, 78:3, 85:6, 97:10, 194:13 | **answered** 30:16, 44:2, 46:24, 59:24, 65:21, 66:3, 67:11, 67:21, 68:24, 78:2, 94:24, 96:24, 97:17, 103:22, 105:14, 114:24, 117:15, 120:2, 142:7, 154:4, 156:5, 161:13, 163:19, 180:1, 202:14, 240:21, 241:3, 249:7, 249:9, 250:9, 250:19, 250:20, 251:4 |
| **all** 3:32, 3:33, 5:6, 5:7, 12:16, 13:10, 14:6, 34:16, 34:21, 38:19, 47:2, 49:5, 50:2, 52:15, 53:7, 89:16, 91:7, 94:2, 94:8, 95:15, 96:13, 126:9, 135:20, 192:23, 209:21, 211:12, 222:13, 230:22, 232:23, 234:23, 237:14, 238:1, 246:8, 248:12, 254:22, 255:2, 258:1, 258:13, 259:22, 263:10, 266:21 | | **another** 18:20, 39:23, 40:1, 77:17, 102:14, 166:22, 170:9, 179:10 | |
| | **also** 2:22, 4:17, 5:9, 5:10, 11:21, 13:11, 19:6, 20:9, 20:15, 39:5, 39:9, 39:16, | **answer** 20:17, 20:24, 26:5, 30:18, 31:18, 42:19, 42:21, 43:11, 44:19, 45:7, | **answering** 45:3, 45:8, 47:1, 97:4, |

230:14, 231:18
**answers**
65:23, 66:2
**anthony**
1:5, 4:3, 4:12,
11:18, 13:15,
13:22, 14:7,
14:23, 51:11,
51:15, 52:4,
52:9, 54:2,
54:6, 54:12,
55:18, 56:4,
56:7, 56:10,
56:18, 58:3,
59:17, 62:15,
70:11, 71:16,
76:7, 76:10,
76:13, 76:24,
78:5, 78:12,
78:15, 78:17,
78:19, 79:5,
79:13, 79:19,
81:18, 82:11,
83:15, 83:20,
84:2, 84:12,
84:18, 85:10,
85:16, 85:22,
86:1, 89:11,
91:11, 92:9,
96:3, 97:6,
97:8, 98:6,
99:21, 99:24,
110:11, 112:9,
117:18, 129:6,
130:13, 130:18,
130:20, 131:2,
134:22, 135:9,
136:9, 136:23,
142:4, 142:12,
150:12, 150:15,
150:20, 150:24,
151:4, 151:13,
152:17, 169:5,
172:6, 173:23,
174:10, 174:21,
176:5, 181:1,
182:16, 182:20,
193:23, 220:1,

220:6, 265:2
**anthony's**
151:17, 152:1
**anthony-**
113:9
**anybody**
24:5, 105:18,
136:4, 156:14,
156:15
**anymore**
45:4, 139:15
**anyone**
164:11, 217:9
**anything**
18:2, 42:23,
46:19, 47:1,
47:8, 47:17,
50:16, 55:12,
57:8, 57:10,
61:11, 61:23,
62:1, 63:1,
63:6, 63:11,
63:14, 64:23,
65:8, 69:9,
70:9, 84:10,
90:20, 95:8,
97:2, 98:2,
99:23, 100:12,
102:17, 104:23,
108:24, 109:14,
111:20, 112:15,
112:16, 112:23,
118:23, 121:20,
124:11, 124:14,
124:21, 124:22,
125:23, 125:24,
126:24, 127:9,
135:1, 138:21,
164:12, 167:24,
216:15, 219:24,
220:6, 220:13,
232:11, 247:23,
249:2
**anyways**
83:4
**anywhere**
18:13, 139:17
**apologies**
185:23, 238:9

**apologize**
82:23, 129:18,
225:18, 229:6
**apparently**
236:4
**appear**
49:7, 219:19,
257:22
**appearance**
107:22
**appearances**
2:1
**appeared**
2:6, 2:12, 2:17
**apply**
27:10, 27:16,
144:8
**appreciate**
13:12, 246:1
**appreciated**
47:7
**apprehended**
261:24
**apprised**
27:8, 62:20,
64:16, 64:19,
65:6, 65:9,
66:11, 68:13,
68:18
**approach**
99:6
**appropriate**
47:23, 48:14,
48:23, 50:2,
231:23, 232:21
**approval**
196:17
**approximate**
10:9, 19:18,
137:6
**approximately**
26:15, 28:3,
30:24, 125:12,
261:9
**argued**
46:22
**arguing**
181:14, 230:11

**argumentative**
66:15, 133:17,
181:14, 229:24,
231:19
**arnold**
209:24
**around**
41:20, 90:8,
125:6, 125:8,
151:12, 219:17
**arranged**
21:12
**arrest**
3:14, 11:13,
11:16, 11:18,
13:14, 13:22,
14:17, 14:23,
34:10, 51:21,
52:13, 53:9,
54:2, 54:5,
54:14, 55:4,
55:14, 55:20,
57:5, 57:23,
104:11, 140:14,
141:4, 142:5,
143:14, 148:17,
148:19, 149:20,
152:2, 156:18,
161:10, 161:17,
166:21, 168:15,
168:21, 169:5,
169:7, 169:9,
170:4, 170:22,
173:23, 174:10,
174:15, 174:21,
175:8, 175:19,
177:4, 177:16,
178:3, 178:11,
178:22, 179:5,
179:13, 179:22,
180:24, 181:3,
181:5, 181:11,
181:19, 181:20,
181:22, 182:15,
186:15, 187:13,
190:8, 190:20,
190:23, 191:11,
191:18, 193:9,

194:17, 195:15,
220:24, 223:3,
223:5, 223:8,
223:18, 226:18,
227:4, 228:19,
237:14, 238:6,
242:6, 262:2
**arrested**
141:17, 142:13,
226:21
**arresting**
170:21, 170:24,
191:13, 191:14,
229:23
**arrival**
189:6, 261:16
**arrived**
72:4, 121:16,
188:24
**arriving**
125:19
**article**
165:13
**articles**
165:3, 165:8
**asked**
30:15, 44:4,
44:6, 47:9,
59:23, 60:15,
63:6, 63:9,
63:11, 65:20,
66:3, 67:1,
67:11, 67:20,
68:24, 78:1,
94:23, 97:6,
97:19, 100:15,
105:13, 113:16,
113:17, 114:4,
114:23, 117:5,
117:9, 117:14,
134:11, 142:7,
154:3, 156:4,
160:8, 161:12,
163:19, 178:16,
179:12, 180:1,
232:17, 241:3,
245:11, 246:13,
247:7, 248:1,

248:4, 249:7,
249:10, 249:15,
249:17, 249:19,
249:21, 250:8,
250:18, 250:19,
251:4, 252:10
**asking**
11:5, 12:15,
13:3, 18:4,
21:6, 21:19,
36:3, 36:5,
44:15, 48:15,
52:22, 60:22,
61:10, 64:5,
64:7, 65:23,
92:17, 142:3,
142:15, 143:16,
144:23, 152:7,
153:11, 160:5,
160:7, 178:18,
179:20, 180:6,
195:1, 195:2,
231:7, 231:22,
232:16, 232:19
**asking-**
231:20
**assigned**
10:24, 16:10,
16:18, 17:19,
18:7, 19:13,
19:19, 19:22,
20:22, 21:9,
22:8, 22:21,
23:20, 25:13,
26:7, 26:10,
26:14, 26:17,
28:10, 28:16,
28:18, 33:7,
35:12, 39:3,
39:9, 39:13,
39:16, 41:6,
41:12, 87:12,
87:15, 87:19,
88:8, 92:8
**assignment**
17:21, 18:8,
25:24, 29:12,
29:23, 62:14,

70:2, 70:16,
71:16, 72:6,
76:5, 76:13,
82:1, 82:10,
82:18, 89:22
**assignments**
28:6, 33:24,
36:13, 36:22,
57:16, 80:21,
81:4, 81:8, 89:8
**assistance**
244:10
**assisted**
177:6
**assisting**
26:24, 242:6
**associated**
22:22, 174:2,
175:2
**assume**
6:18, 93:5
**assumes**
86:20, 133:9,
157:16, 197:23,
198:12, 204:19,
207:13, 226:24,
247:19
**assuming**
66:11, 66:19,
67:18, 68:20,
93:3
**attend**
8:20, 15:10
**attention**
189:22, 199:21,
200:8, 214:19,
236:1, 243:18,
258:22, 258:23
**attorney**
3:32, 3:33,
209:19, 228:15
**attorney's**
25:17, 25:19,
26:1, 26:8,
26:13, 26:19,
27:1, 27:9,
27:17, 28:3,
28:9, 40:6,

40:9, 40:15,
40:18, 40:23,
41:8, 41:15,
41:19, 41:22,
42:1, 42:6,
44:7, 51:3, 51:7
**attorneys**
153:12, 245:24,
266:29
**augments**
33:7
**august**
32:19, 222:10,
226:19, 228:20,
255:14
**aunt**
182:16
**authorized**
266:13
**available**
139:7, 139:9
**avenue**
19:23, 20:2,
20:3, 37:14,
214:23, 215:22,
261:23
**aware**
165:1, 165:2,
236:2
**away**
153:23, 218:9

---
**B**
---

**back**
8:22, 11:3,
13:15, 13:22,
19:11, 20:10,
29:20, 34:16,
48:19, 49:16,
50:24, 55:13,
70:12, 71:10,
72:22, 80:8,
80:15, 89:10,
94:3, 103:7,
103:11, 103:19,
110:14, 129:20,
135:6, 140:19,
144:2, 144:20,

Transcript of Michael DeLacy
Conducted on January 15, 2021                                72

149:15, 149:24,
164:6, 165:6,
165:7, 166:13,
166:15, 166:18,
173:8, 176:17,
177:21, 180:14,
193:20, 204:15,
207:17, 213:6,
214:6, 217:17,
218:20, 218:24,
225:1, 226:1,
226:3, 236:12,
236:15, 244:16,
252:5, 252:15,
252:16, 252:17,
254:24, 256:10,
256:11
**backseat**
118:14, 119:12
**backwards**
32:13
**bad**
122:16, 179:8
**bags**
220:22
**balice**
24:4
**barbara**
224:12
**based**
5:3, 66:11,
67:18, 68:20,
84:8, 85:5,
102:19, 125:2,
131:5, 164:3,
170:10, 178:3,
252:8
**basically**
12:20
**basis**
161:17, 161:23,
229:11, 229:15,
229:18, 231:22,
232:19
**bates**
169:1, 212:13,
224:4, 224:6,
225:14, 225:16,

227:8, 227:10,
237:1, 238:10,
238:12, 241:8,
243:19, 255:13,
258:6, 258:24
**bathroom**
103:5, 103:7,
218:16
**bears**
47:5, 49:2
**beat**
171:7, 171:14,
261:6
**became**
8:12, 8:18,
9:8, 17:13,
87:23, 88:7
**because**
6:16, 12:9,
27:12, 45:21,
48:7, 49:9,
50:1, 50:6,
50:7, 57:4,
58:8, 59:21,
67:17, 68:16,
73:8, 79:2,
81:24, 98:13,
105:11, 106:24,
109:9, 112:4,
115:12, 115:16,
116:4, 116:11,
117:9, 130:16,
141:17, 142:21,
146:3, 148:20,
162:15, 163:1,
169:18, 176:17,
177:23, 178:1,
178:11, 181:4,
184:19, 194:7,
196:14, 219:20,
226:1, 231:6,
231:14, 232:20,
235:15, 254:20,
254:21
**become**
9:16, 16:13,
29:3
**becoming**
9:12, 30:10

**bedroom**
121:2, 122:19,
123:18, 249:5
**bedrooms**
123:9
**beef**
214:9
**been**
6:3, 15:20,
30:6, 31:8,
31:13, 43:1,
43:3, 49:3,
50:5, 64:8,
92:8, 103:22,
115:17, 116:13,
132:10, 141:21,
141:23, 144:12,
153:13, 153:16,
153:18, 158:22,
180:18, 183:24,
189:12, 212:10,
229:5, 230:9,
233:8, 235:19,
236:3, 251:20,
253:10, 266:20,
266:22
**beer**
261:17, 261:21,
262:5
**before**
1:29, 6:11,
6:12, 16:23,
16:24, 17:6,
17:9, 29:1,
29:5, 29:9,
30:10, 31:7,
31:12, 49:17,
51:1, 53:16,
57:9, 57:17,
62:4, 63:6,
68:12, 75:17,
76:6, 79:12,
79:18, 81:17,
83:7, 83:13,
86:1, 87:5,
87:13, 87:16,
87:23, 90:21,
93:17, 95:24,

103:14, 103:20,
110:14, 118:16,
121:8, 121:16,
122:1, 123:10,
125:9, 129:20,
131:19, 131:24,
132:21, 135:9,
147:23, 151:17,
152:1, 152:22,
154:15, 154:18,
159:17, 164:21,
166:14, 183:10,
192:15, 197:20,
198:8, 199:15,
202:8, 203:7,
213:24, 218:9,
222:1, 222:4,
233:4, 233:7,
233:8, 235:16,
235:17, 235:20,
237:3, 244:4,
251:22, 252:10,
265:29
**begin**
200:9
**beginning**
46:3
**begins**
208:23
**behalf**
4:19
**behavior**
261:13, 262:12
**behind**
98:16, 98:18,
98:19
**being**
23:4, 46:21,
50:17, 65:17,
66:9, 66:21,
67:6, 67:17,
68:3, 68:19,
69:21, 71:11,
75:8, 88:3,
105:19, 106:8,
107:2, 107:10,
111:10, 115:13,
116:14, 132:7,

133:6, 138:5,
159:2, 160:21,
186:9, 197:15,
201:14, 222:17,
231:9, 248:1,
248:4, 248:6,
254:9
**belief**
84:4, 93:20
**believe**
8:16, 8:17,
9:24, 10:7,
14:3, 14:12,
14:21, 15:15,
16:14, 19:20,
22:14, 23:2,
24:12, 25:21,
29:14, 29:19,
30:2, 31:6,
34:14, 34:23,
34:24, 35:2,
37:12, 38:2,
41:13, 51:3,
67:13, 67:16,
69:19, 72:6,
74:16, 85:17,
87:13, 88:5,
98:10, 98:11,
98:16, 98:20,
99:9, 99:14,
100:15, 101:15,
103:19, 109:2,
109:20, 113:11,
113:18, 113:24,
119:18, 124:10,
125:7, 125:22,
126:6, 133:22,
134:11, 135:14,
135:23, 136:12,
137:20, 137:23,
138:15, 138:23,
141:14, 141:15,
142:3, 142:15,
142:23, 145:22,
153:24, 154:9,
156:12, 160:17,
163:15, 163:23,
165:13, 170:1,

182:8, 184:18,
185:14, 188:16,
191:24, 192:14,
192:17, 197:14,
203:12, 208:10,
210:1, 214:11,
218:7, 218:10,
221:2, 221:21,
224:16, 254:11
**believed**
142:12, 146:4,
149:3, 156:19
**best**
7:24, 30:13,
80:1, 175:1,
184:3, 205:5,
266:19
**better**
18:3, 73:8,
259:23, 260:8,
260:13, 260:14
**between**
46:22, 55:13,
111:5, 125:12,
132:6
**beyond**
53:1, 53:5
**big**
48:15, 48:19,
137:4, 137:5
**birth**
172:9, 182:4,
182:6, 183:9
**birthday**
172:6
**bit**
19:10, 24:12,
103:1, 103:3,
146:1, 147:19,
178:10, 208:20,
218:18, 220:10,
252:21
**black**
108:8, 176:4,
193:15
**bogue**
210:8
**boisterous**
261:13, 262:12

**bonke**
154:21, 154:23,
155:1, 155:18
**both**
7:3, 9:2, 9:4,
14:13, 33:12,
34:1, 34:6,
41:7, 41:12,
113:18, 113:19,
113:22, 114:8,
132:19, 133:22,
133:23, 134:5,
170:1, 170:15,
192:12
**bottom**
170:22, 187:20,
188:10, 201:17,
212:20, 255:15,
256:12, 258:7
**boudreau**
1:10, 4:3,
86:3, 86:7,
87:4, 87:6,
87:10, 87:15,
88:7, 88:12,
89:6, 89:7,
129:9, 150:7,
150:15, 150:19,
150:23, 153:17,
166:6, 199:18,
202:16, 203:1,
203:20, 207:11,
265:2
**boudreau's**
202:4, 218:5
**boudreau-**
87:21
**boulevard**
2:16
**boundaries**
37:8, 37:10
**boundary**
37:11, 37:12,
37:13, 37:14
**box**
171:1, 188:12
**boy**
107:10

**branch**
27:22
**break**
102:23, 103:2,
103:7, 103:15,
103:20, 140:23,
143:21, 144:6,
218:16, 218:17,
218:19, 233:11,
262:18
**breaking**
262:19
**brick**
140:21
**briefly**
6:12, 9:11,
222:6
**bring**
48:18, 78:24,
79:14, 82:19,
85:10, 85:16,
85:22, 236:11,
252:14, 252:17
**bringing**
70:11, 78:22,
89:12, 163:24,
252:4
**brittany**
2:9, 4:14,
7:22, 8:5, 12:8,
43:8, 66:17,
96:10, 186:1,
210:23, 211:12,
212:1, 221:5,
233:20, 249:11,
257:15
**brittany's**
47:18
**broadcasts**
166:2
**broke**
157:20, 217:7
**brought**
116:14, 147:12,
149:15, 149:24,
181:1
**buchanan**
224:11, 224:12

Transcript of Michael DeLacy
Conducted on January 15, 2021

74

| | | | |
|---|---|---|---|
| **budweiser**<br>262:5<br>**building**<br>20:6, 208:6,<br>208:9<br>**bulk**<br>32:5<br>**bunch**<br>226:1<br>**burglaries**<br>37:5, 38:24<br>**burke**<br>155:4, 155:5<br>**business**<br>109:5, 109:10,<br>109:12, 109:15,<br>109:18, 109:23,<br>110:1, 110:4,<br>110:6, 111:16,<br>111:21, 112:18,<br>112:24, 128:5<br><br>**C**<br><br>**caesar**<br>45:21, 155:7,<br>155:8, 155:10,<br>155:12, 155:15<br>**california**<br>20:8, 20:10,<br>20:15, 109:5<br>**call**<br>49:16, 49:17,<br>58:2, 58:5,<br>58:7, 58:13,<br>58:17, 58:21,<br>59:5, 59:8,<br>62:5, 62:8,<br>71:5, 71:12,<br>73:22, 78:4,<br>84:8, 84:23,<br>91:24, 98:5,<br>100:5, 125:6,<br>125:7, 152:14,<br>200:7, 206:9,<br>206:14, 206:23,<br>214:19, 243:18,<br>258:21, 258:23,<br>261:10 | **called**<br>60:11, 61:17<br>**caller**<br>78:4<br>**calling**<br>205:23<br>**calls**<br>33:24, 122:9,<br>130:4, 130:12,<br>146:10, 158:17,<br>167:9, 178:6,<br>179:24, 205:2,<br>246:24, 247:18,<br>250:8<br>**came**<br>62:8, 92:22,<br>105:1, 110:6,<br>110:9, 110:14,<br>112:13, 114:3,<br>176:20, 234:15,<br>236:1<br>**can't**<br>12:19, 12:20,<br>13:5, 30:14,<br>47:12, 77:16,<br>87:21, 105:11,<br>144:9, 175:7,<br>250:5<br>**cannot**<br>13:6, 47:8<br>**capacity**<br>18:20, 39:23,<br>40:1, 88:24<br>**car**<br>72:16, 73:11,<br>75:4, 87:19,<br>94:12, 94:17,<br>118:9, 126:18,<br>126:20, 126:23,<br>237:13<br>**card**<br>109:5, 109:10,<br>109:12, 109:15,<br>109:23, 110:1,<br>110:4, 110:6,<br>111:16, 111:22,<br>112:18, 112:24,<br>128:5 | **cards**<br>109:18<br>**career**<br>10:17, 28:4,<br>31:23, 32:2,<br>256:2<br>**carefully**<br>49:8<br>**cars**<br>34:6, 34:7<br>**case**<br>1:8, 4:4,<br>11:13, 11:15,<br>11:21, 13:21,<br>14:17, 51:20,<br>52:13, 53:9,<br>53:10, 53:18,<br>53:19, 53:23,<br>54:13, 55:4,<br>55:14, 55:19,<br>57:5, 57:23,<br>86:12, 87:11,<br>88:6, 88:12,<br>95:24, 138:23,<br>139:1, 139:4,<br>151:7, 153:5,<br>153:6, 154:2,<br>154:8, 154:19,<br>155:2, 155:13,<br>165:4, 165:9,<br>165:23, 166:3,<br>166:11, 169:24,<br>187:5, 187:6,<br>187:10, 188:4,<br>192:6, 192:9,<br>194:5, 194:12,<br>195:3, 195:6,<br>196:8, 199:2,<br>205:14, 210:2,<br>233:19, 248:2,<br>248:10, 265:2<br>**cases**<br>86:15, 88:10,<br>88:11<br>**casually**<br>256:22<br>**catch**<br>19:24 | **cause**<br>158:5, 161:17,<br>161:23<br>**causing**<br>237:11, 239:24<br>**certain**<br>38:12, 50:3,<br>119:1, 119:5,<br>223:17, 231:6<br>**certainly**<br>96:12<br>**certificate**<br>266:2<br>**certify**<br>266:5<br>**chance**<br>144:6, 202:8,<br>209:7, 209:9,<br>226:12, 227:21,<br>228:1, 237:15,<br>237:24, 239:8,<br>241:15<br>**changed**<br>22:14, 132:5,<br>133:6<br>**characterization**<br>47:3, 231:7,<br>231:8<br>**characterize**<br>49:4, 231:15<br>**charge**<br>161:23<br>**charged**<br>266:20, 266:22<br>**charges**<br>222:16<br>**charles**<br>186:5<br>**chase**<br>261:24<br>**chicago**<br>2:5, 2:11,<br>2:16, 2:18,<br>3:16, 4:20,<br>8:12, 8:15,<br>8:19, 9:23,<br>15:8, 17:5,<br>18:15, 18:20, |

Transcript of Michael DeLacy
Conducted on January 15, 2021                75

19:1, 21:11,
28:4, 39:19,
40:10, 44:1,
44:24, 51:2,
51:6, 64:13,
146:6, 147:5,
158:1, 159:21,
160:15, 160:22,
161:2, 165:17,
165:18, 177:15,
198:20, 199:11,
220:11, 256:2
**choice**
204:14, 205:24,
206:18, 207:1
**choose**
46:16
**circumstances**
15:24
**citizen**
220:16
**citizens**
37:4
**city**
2:18, 4:20,
5:14, 22:4,
169:1, 186:24,
187:1, 199:2,
228:3, 233:18,
235:3, 235:22,
236:3, 236:7,
237:1, 238:15,
241:6, 241:8,
243:19, 246:7,
251:21, 256:19
**civilians**
90:17
**clarify**
16:16, 21:21,
35:20, 42:2,
51:4, 55:11,
68:8, 68:10,
80:12, 94:14
**clarifying**
18:23, 22:6,
102:12
**clarity**
66:22

**clark**
2:10
**classroom**
9:1
**clean**
214:8
**clear**
11:14, 12:22,
47:13, 52:12,
63:22, 64:8,
64:9, 65:16,
68:10, 68:17,
68:22, 91:17,
125:24, 204:8,
232:10, 232:15,
232:16, 233:8,
254:20
**client**
51:11, 51:15,
230:19, 230:23
**close**
90:13
**closed**
22:18
**clothes**
117:19
**collaborate**
80:9
**colleague**
230:18
**colleagues**
158:13
**collect**
174:2
**collectively**
167:17
**color**
210:18, 211:1,
212:6, 212:12
**com**
2:6, 2:17
**combination**
135:21, 135:23
**come**
15:13, 47:14,
58:17, 90:23,
91:2, 91:18,
91:24, 92:13,

92:18, 93:11,
101:7, 101:16,
103:7, 110:8,
113:9, 113:15,
113:17, 113:22,
114:4, 114:8,
114:13, 114:20,
115:6, 115:11,
115:15, 116:3,
117:2, 117:6,
117:9, 117:19,
119:23, 120:10,
120:13, 121:8,
122:3, 122:7,
123:8, 155:23,
176:21, 204:15,
218:19, 249:13
**comes**
47:2
**coming**
29:24, 103:2,
111:11, 111:14,
112:7, 123:18,
250:16, 261:19,
262:8
**commander**
37:4, 190:10,
190:13, 190:14,
210:8, 210:13,
238:20, 238:23,
239:2, 239:3,
239:4, 243:23
**commission**
265:34
**committed**
243:8
**communicate**
7:24
**communicated**
153:11
**communication**
198:2
**communications**
11:6, 49:6,
77:8, 79:17,
85:24, 103:23,
108:20, 108:23,
118:1, 118:4,

119:5, 121:23,
129:5, 129:8,
150:11, 150:14,
152:22, 155:2,
155:13, 192:2,
205:19, 251:22
**company**
218:6, 218:12
**complainant**
224:11, 224:14,
224:22, 239:14,
239:21, 240:9,
256:22
**complainant's**
242:10, 256:20
**complaint**
220:16, 223:17,
228:10, 237:18,
238:6, 241:12,
255:2, 255:10,
256:8, 262:11
**complaints**
37:4, 220:16,
225:4, 261:12
**complete**
189:18
**completed**
9:6, 149:19,
188:11, 245:23,
263:17
**completes**
264:4
**completion**
203:2
**compliance**
158:15
**comply**
146:6, 147:5,
157:13, 157:24
**comprising**
3:20
**computer**
260:17
**concerned**
147:11
**concerning**
266:9
**conclude**
263:11

Transcript of Michael DeLacy
Conducted on January 15, 2021                                    76

```
concluded              contract               40:18, 40:23,          195:4, 197:16,
264:17                 266:29                 41:8, 41:15,           197:17, 197:19,
conduct                contractor             41:18, 41:21,          197:20, 203:3,
35:18, 240:13          218:5                  42:1, 42:6,            203:5, 204:11,
conducted              control                51:2, 51:6            204:14, 204:16,
1:18, 26:23,           219:18, 266:18         copied                 205:24, 206:8,
49:20, 158:3,          controlled             172:16                 206:9, 214:4,
159:23, 189:14,        147:14, 147:15,        copies                 234:16
266:7                  149:3, 149:12,         266:22, 266:23         couldn't
conducting             149:20, 156:19,        copy                   36:2, 110:16,
79:2                   161:11, 187:16,        165:19, 165:20,        114:13, 117:5,
confer                 205:8, 220:23          165:21, 168:14,        117:9, 142:19,
43:18                  controversy            168:15, 211:8,         170:12
confusion              266:10                 252:1, 252:4,          counsel
212:17                 conversation           252:14, 256:17,        4:8, 4:22, 5:2,
connelly               49:11, 49:13,          256:19                 5:7, 5:8, 8:2,
2:10                   50:1, 58:10,           corned                 11:6, 12:24,
consecutive            100:21, 119:7,         214:9                  103:14, 137:13,
211:16, 237:1,         119:9, 126:1,          corner                 156:24, 263:12,
241:9, 253:18          126:6, 151:3,          214:2, 214:10          263:17
consecutively          200:3, 202:17,         corrections           counsel's
212:13, 254:10         203:24                 265:5                  6:22, 94:15,
consider               conversations          correctly             251:21, 260:23
84:2, 84:18            79:11, 118:19,         55:5, 194:3,           count
considered             121:6, 127:3,          203:12                 211:19
83:20, 84:12,          151:12, 151:16,        correspondence        counties
85:5, 133:20           151:24, 152:8,         47:5                   25:10
consisting             152:13, 152:16,        cost                   county
212:6, 212:12          153:4, 154:1,          266:20                 25:9, 25:17,
contact                154:19, 248:5,         could                  25:19, 26:1,
145:10, 145:16,        248:8                   10:17, 12:9,          26:8, 26:13,
164:14, 164:18         convey                 12:10, 12:22,          26:18, 26:24,
contained              113:8, 134:21,         17:23, 21:1,           27:17, 28:2,
138:9, 248:2           140:13, 166:24,        21:18, 24:9,           28:8, 40:14,
containing             179:4                  47:14, 51:4,           40:18, 40:23,
135:18                 conveyed               51:13, 79:8,           41:8, 41:15,
contention             98:3, 100:4            80:12, 106:11,         41:18, 41:21,
235:18                 conveying              108:14, 112:21,        42:1, 42:6,
contents               100:13, 182:22        113:8, 113:9,          51:3, 51:7,
49:6                   convoluted             113:15, 114:8,         266:2, 266:12
context                38:10                  114:20, 115:11,        couple
243:9                  cook                   115:15, 116:3,         46:18
continue               25:9, 25:17,           116:7, 133:23,        course
13:11, 232:12          25:18, 26:1,           137:13, 141:21,        51:14, 99:10,
continued              26:8, 26:13,           141:23, 142:10,        223:18, 237:21
5:24, 252:23           26:18, 26:24,          146:23, 155:23,        court
continues              27:17, 28:2,           156:24, 161:20,        1:1, 4:5, 4:22,
232:11, 254:10         28:8, 40:14,           193:6, 193:17,         5:15, 129:23,
```

Transcript of Michael DeLacy
Conducted on January 15, 2021

171:11, 202:21,
221:8, 245:7
**court's**
43:22
**courteous**
50:5
**covey**
166:23
**covid**
47:9
**cpd**
22:10, 25:20,
31:20, 43:21,
45:6, 89:3,
157:13, 158:15,
232:6
**cr**
3:15, 3:24,
3:29, 186:20,
220:24, 221:12,
221:19, 221:23,
222:1, 222:4,
222:8, 222:24,
223:16, 233:5,
235:22, 236:2,
236:21, 237:6,
241:5, 241:10,
241:18, 242:17,
243:16, 244:24,
245:19, 251:18,
252:2, 254:9,
254:15, 254:18,
254:24, 259:4
**cream**
214:9
**crime**
37:5, 76:23,
188:19, 197:18
**crimes**
38:4, 38:12,
38:19, 38:21,
191:2, 194:1,
194:7, 195:9,
196:9, 197:17,
197:20, 203:4,
203:5, 204:11,
207:9, 207:18,
208:13, 248:23

**criminal**
14:8, 14:15,
14:19, 27:1,
35:22, 35:23,
51:22, 52:14,
104:7, 151:9,
151:18, 152:23
**crs**
233:14, 234:7,
234:20, 235:1,
235:15, 236:7,
255:18, 255:22,
256:1
**crunched**
239:21
**csr**
1:29, 266:38
**cst**
1:20
**current**
263:14
**currently**
40:12, 46:21
**custodial**
157:14, 158:3,
159:12, 159:22,
161:3
**custody**
158:23, 159:1
**cutting**
36:3
**cv**
1:8, 4:4

**D**

**damages**
43:14, 46:20,
48:18
**damages-related**
263:15
**dan**
37:12
**darken**
259:10
**darker**
259:20
**darnell**
120:2

**date**
8:11, 8:14,
9:12, 151:20,
151:21, 169:6,
172:9, 182:4,
182:6, 183:9,
187:14, 188:4,
188:11, 188:23,
265:3
**dated**
173:13, 199:14,
243:22, 259:4
**day**
1:19, 57:3,
57:11, 57:20,
68:12, 70:3,
73:12, 106:15,
120:16, 150:7,
196:23, 209:24,
210:3, 232:24,
247:8, 249:4,
266:7, 266:32
**days**
34:11, 34:13,
35:2, 70:23,
162:15
**dayshift**
34:13, 56:22,
185:1
**deal**
49:1
**dealing**
37:5
**decades**
22:11
**deceased**
154:14, 154:18
**december**
40:16
**decided**
43:2, 92:12
**decisions**
49:14
**defendant**
2:12, 2:13,
2:18, 4:14,
4:20, 5:12,
154:18, 155:4,

155:7, 155:8,
210:1
**defendant's**
45:12
**defendants**
1:11, 46:9,
46:11, 153:13
**defending**
44:10, 46:6
**defense**
26:21, 46:4,
48:16
**defer**
43:21
**definitely**
32:9, 46:17,
110:22, 145:6
**delacy**
1:17, 2:13,
3:6, 4:2, 4:14,
4:18, 5:5, 5:16,
6:1, 6:10, 8:11,
13:9, 15:2,
43:24, 44:23,
48:9, 50:23,
51:1, 51:9,
67:4, 67:23,
68:16, 83:4,
96:17, 103:14,
130:15, 133:21,
144:5, 169:2,
171:15, 179:11,
180:24, 181:2,
187:2, 209:1,
211:7, 211:22,
212:15, 219:8,
221:17, 227:13,
231:18, 232:16,
232:23, 233:3,
234:20, 234:24,
236:18, 237:10,
241:12, 246:13,
247:11, 248:17,
249:24, 250:12,
251:13, 252:20,
253:4, 253:7,
253:10, 253:23,
255:6, 261:1,

Transcript of Michael DeLacy
Conducted on January 15, 2021

78

262:23, 264:5,
265:4, 266:6
**delacy's**
228:22
**delany**
3:25
**delete**
221:10
**delivered**
189:19
**denied**
240:24, 242:23,
244:13, 263:7
**deny**
240:8, 240:11,
240:18, 243:8
**dep**
180:15, 235:17,
235:20, 265:3
**department**
8:12, 8:15,
8:19, 15:8,
15:18, 15:21,
16:22, 17:5,
17:23, 18:16,
18:21, 19:1,
21:12, 24:23,
28:4, 39:19,
40:10, 44:1,
44:24, 51:6,
64:13, 158:1,
160:15, 161:3,
177:15, 220:11,
256:2
**department's**
3:17, 146:7,
147:6, 159:22,
160:22, 198:20,
199:11
**departs**
48:10
**depicted**
212:22, 213:10,
213:20, 215:18,
215:21, 216:2
**deponent**
265:4, 265:28
**depos**
2:24, 4:6

**deposes**
6:4
**deposition**
1:17, 3:25,
4:2, 4:18, 5:11,
6:14, 11:4,
11:9, 11:12,
14:2, 45:12,
46:4, 46:7,
46:10, 46:23,
47:18, 49:3,
49:14, 52:2,
53:20, 68:21,
69:14, 69:18,
159:18, 168:16,
168:21, 186:20,
198:21, 202:8,
212:7, 221:12,
222:2, 231:17,
233:5, 233:7,
233:8, 234:19,
234:24, 241:10,
251:22, 253:4,
253:7, 253:10,
253:22, 264:5,
264:13, 264:16,
266:6, 266:21,
266:25
**derogatory**
223:19, 225:1
**describe**
7:20, 9:11,
15:17, 23:5,
26:7, 26:12,
32:18, 36:21,
38:21, 96:21,
107:21, 137:2,
137:6, 138:12,
169:4, 187:4,
216:10
**described**
74:21, 185:4
**description**
3:13
**designated**
168:15, 212:11,
221:11, 233:16,
253:22, 254:13,

**deposition**
255:9
**desk**
156:14
**desks**
139:7, 139:8
**detached**
10:19, 10:22,
10:23, 11:1,
24:15, 24:20,
25:14, 25:20,
26:2, 26:9,
27:4, 27:7,
28:2, 28:7
**detail**
24:14, 195:14,
196:7
**detailed**
10:19, 10:21,
10:24, 17:16,
23:1, 23:5,
23:17, 23:21,
24:7, 24:10,
24:15, 25:19,
27:6, 31:23,
33:15, 37:2,
178:21
**details**
24:22, 25:9,
194:17, 248:1
**detective**
9:17, 9:24,
10:3, 10:9,
10:12, 20:5,
20:21, 21:6,
21:13, 21:23,
22:11, 22:23,
86:1, 86:3,
86:5, 86:9,
86:16, 86:23,
87:13, 87:16,
87:23, 88:8,
88:14, 88:15,
88:18, 88:20,
89:1, 129:5,
129:9, 139:8,
150:3, 150:11,
150:19, 151:2,
151:3, 154:8,

**detective**
154:11, 166:5,
188:15, 190:11,
190:12, 191:10,
191:11, 191:22,
191:24, 192:2,
192:19, 199:18,
202:3, 202:24,
203:1, 203:20,
204:23, 207:8,
207:11, 218:5,
243:2, 244:10
**detectives**
22:2, 79:7,
79:12, 79:18,
80:2, 81:16,
82:9, 85:21,
136:6, 145:14,
146:2, 147:3,
147:5, 156:3,
156:8, 157:11,
197:19, 202:15,
204:15, 206:1,
217:5, 248:23
**determined**
232:6
**developed**
162:3
**different**
18:7, 21:12,
22:10, 22:22,
23:24, 65:23,
66:2, 89:22,
120:2, 127:24,
146:2, 147:19,
178:10, 178:18,
179:18, 179:21,
180:7, 235:15,
257:22, 258:1,
258:2
**difficult**
260:2
**digest**
237:18, 241:17,
256:7
**digital**
254:22
**dime**
137:8, 137:9,

Transcript of Michael DeLacy
Conducted on January 15, 2021                                    79

137:10, 137:16
**dimension**
137:7
**direct**
42:21, 43:11
**directed**
262:9
**direction**
266:18
**directly**
242:22
**disagree**
231:8
**disciplinary**
220:10, 233:4
**disciplined**
220:12
**disclose**
11:5
**discoverable**
43:15
**discovery**
43:14, 263:13,
263:15
**discuss**
49:5
**discussing**
47:24, 48:1,
122:1
**discussion**
121:15
**dispatch**
33:24
**dispute**
43:14, 46:21,
263:14
**disputing**
43:4
**distance**
219:21
**distraction**
48:15
**districts**
10:16, 22:3,
22:5, 22:9,
23:15
**disturbance**
261:10, 263:3

**divided**
22:4
**division**
1:3, 20:21,
21:13, 21:23,
22:11, 40:20,
188:19, 197:6,
197:9, 207:24,
208:13, 208:14,
208:17
**divisions**
41:7
**document**
3:19, 3:21,
3:22, 3:23,
3:26, 3:27,
3:28, 169:1,
186:19, 186:24,
201:5, 202:7,
203:9, 203:11,
212:6, 212:11,
223:14, 223:21,
241:8, 253:16
**documented**
248:10
**documenting**
108:16, 178:2,
178:12
**documents**
11:8, 11:11,
12:1, 12:3,
12:7, 14:1,
14:19, 51:16,
51:20, 52:1,
52:13, 52:17,
52:23, 53:1,
53:11, 95:24,
168:14
**dog**
171:8, 171:14,
261:7
**doing**
44:12, 82:1,
90:14, 93:1,
224:24, 227:4,
230:18, 249:12,
254:16
**dollar**
42:23

**done**
45:20, 47:20,
53:1, 53:4,
123:15, 132:21,
154:7, 200:17,
218:4, 218:17,
232:10, 246:20,
247:7, 247:15,
264:1
**door**
95:20, 96:3,
96:18, 96:23,
97:4, 97:17,
99:1, 99:7,
99:16, 100:22,
101:15, 103:21,
103:22, 111:10,
111:11, 120:2,
216:13, 262:14,
262:18
**dowling**
257:11
**down**
135:17, 144:18,
170:21, 171:22,
173:16, 176:3,
188:10, 192:16,
192:24, 193:13,
197:19, 201:17,
203:5, 204:16,
209:11, 215:1,
257:7, 257:8
**downtown**
189:18
**dragged**
237:12
**draw**
199:21
**dress**
121:8
**dressed**
121:3, 122:20,
123:10, 256:22
**drink**
124:21, 124:22
**drinking**
261:13, 261:17,
262:2

**drive**
72:14, 72:17,
124:4
**driver**
73:8
**driving**
118:13
**drop**
162:22, 162:24
**dropped**
261:21
**dropping**
163:4, 163:7,
166:8
**drove**
72:15, 72:16,
72:23, 73:4,
73:5, 73:7,
73:18, 73:23,
74:1, 89:11,
121:19, 126:20,
205:11
**drug**
37:4
**drugs**
38:24, 39:2,
39:3
**duckhorn**
191:16, 191:21,
192:2, 207:8
**duly**
6:3, 266:8,
266:13
**during**
15:15, 15:24,
28:24, 40:24,
99:10, 150:19,
223:3, 223:18,
226:18, 227:4,
234:18, 261:14
**duty**
34:21, 56:24,
57:2, 57:10,
57:14, 63:1,
63:7, 63:15,
63:24, 64:20,
65:19, 66:10,
68:2, 68:18,

**E**

**e-mail**
47:4, 48:2
**each**
23:10, 33:7,
80:20
**earlier**
6:23, 51:19,
52:18, 54:19,
55:1, 62:24,
112:3, 155:22,
159:10, 169:23,
182:20, 185:4,
192:12, 216:16,
246:17, 250:2,
251:19, 252:8,
252:18
**early**
19:20, 20:10,
21:10, 38:8,
39:4, 261:14
**ears**
7:3
**easier**
233:19
**east**
37:10, 37:11,
37:12, 38:2
**eastern**
1:3
**eat**
124:12, 124:14,
144:6
**effect**
135:2, 167:24
**effectively**
7:24
**efforts**
145:10
**eight**
33:7, 185:5
**eighties**
31:5

**either**
8:24, 10:15,
52:24, 53:4,
55:3, 125:1,
127:21, 137:16,
140:13, 141:7,
141:21, 141:23,
150:8, 173:10,
175:24, 211:10,
233:22
**electronic**
165:20
**electronically**
3:32
**eleven**
41:20
**else**
24:5, 50:16,
61:23, 62:1,
64:23, 65:8,
69:9, 84:10,
97:2, 98:2,
100:12, 101:1,
104:23, 105:18,
108:24, 112:15,
136:4, 138:21,
177:6, 177:18,
196:12, 216:15,
232:11
**else's**
131:16
**email**
2:6, 2:17
**employed**
40:12
**employment**
51:5
**encounter**
90:7
**encountered**
86:22, 90:15,
121:24
**end**
37:11, 238:13,
254:11
**enforcement**
25:1, 25:3,
25:6, 25:12

**engaged**
262:21
**enough**
29:21
**entered**
242:10, 242:21
**entire**
28:21
**entirely**
68:17
**entry**
263:7
**errata**
265:1
**error**
253:11
**esq**
2:3, 2:9, 2:15
**established**
263:21
**estimate**
30:4
**et**
1:10, 4:3,
265:2
**even**
43:2, 43:4,
119:9, 162:13,
201:22, 249:9
**events**
33:16, 51:10,
54:7, 144:21,
184:17, 196:23,
222:13
**eventually**
105:23
**ever**
9:16, 18:7,
28:15, 35:12,
35:22, 47:7,
87:18, 87:19,
88:15, 88:17,
88:20, 89:7,
102:3, 123:15,
150:23, 151:2,
153:10, 153:11,
153:16, 167:20,
199:14, 210:10,

**every**
34:15, 96:11
**everybody**
8:4, 110:9,
110:10, 111:14,
131:15, 264:3,
264:6
**everything**
69:20, 77:22,
139:24
**evidence**
26:22, 86:20,
133:10, 152:2,
157:17, 162:3,
162:7, 197:23,
198:12, 204:19,
207:13, 226:24,
247:20
**exactly**
90:12, 98:17
**examination**
3:5, 3:7, 3:8,
6:6, 246:11,
252:23
**execute**
35:10
**exhibit**
3:13, 3:14,
3:15, 3:16,
3:19, 3:21,
3:22, 3:23,
3:24, 3:25,
3:26, 3:27,
3:28, 3:29,
168:16, 168:19,
168:21, 168:24,
169:2, 169:4,
169:15, 170:3,
177:14, 182:17,
184:9, 186:18,
186:20, 186:23,
187:2, 187:4,
187:20, 189:22,
190:4, 192:13,
196:4, 196:6,
196:12, 198:16,

Index (continued from previous column):
69:6, 69:22,
70:3, 70:10,
76:18, 83:7,
162:13, 205:6

Transcript of Michael DeLacy
Conducted on January 15, 2021

81

198:21, 198:23,
199:1, 199:8,
199:10, 199:22,
200:24, 202:3,
211:22, 211:24,
212:3, 212:4,
212:7, 212:11,
212:15, 213:7,
213:19, 214:20,
215:17, 215:19,
216:2, 221:4,
221:6, 221:10,
221:11, 221:12,
221:15, 222:8,
224:7, 225:11,
225:13, 227:7,
228:2, 228:7,
233:16, 233:21,
234:2, 235:4,
235:11, 236:19,
236:21, 237:3,
237:19, 238:1,
239:12, 241:5,
241:8, 241:10,
242:4, 253:2,
253:4, 253:10,
253:13, 253:17,
253:22, 254:14,
254:20, 254:23,
255:1, 255:9,
256:6

**exhibits**
3:32, 3:33,
12:9, 12:10,
12:23, 221:9,
234:18, 234:22,
236:6, 264:13
**existence**
43:20
**exists**
218:12
**expect**
44:11, 44:13,
157:10
**expires:__**
265:34
**explained**
98:4, 109:3

**explanation**
122:18
**expressway**
37:13
**extent**
230:10
**extremely**
50:5

**F**

**face**
108:14, 223:4,
226:22
**fact**
5:5, 170:10
**facts**
86:20, 133:9,
153:5, 157:16,
181:20, 181:22,
197:23, 198:12,
204:19, 207:13,
226:24, 247:19
**factual**
161:16, 161:22,
178:22
**failed**
235:22
**fair**
6:20, 7:18,
9:19, 20:20,
22:8, 28:1,
29:21, 30:20,
32:8, 55:17,
57:7, 57:24,
74:12, 85:15,
86:22, 87:14,
91:7, 104:3,
104:9, 104:10,
111:17, 145:13,
146:5, 150:10,
170:3, 175:12,
203:19, 222:19
**fairly**
90:12
**fall**
237:11, 240:1
**familial**
182:22

**familiar**
90:4, 159:15,
214:5
**family**
49:15, 223:11
**far**
50:17, 104:20,
111:9, 128:15,
134:14, 144:13,
147:10, 160:17
**fayhill**
237:7, 238:6,
239:14, 239:24,
240:6, 240:9
**fbi**
25:3
**february**
153:24, 210:6,
266:33
**federal**
25:3
**feel**
47:6, 47:19,
116:12, 144:13
**fellow**
89:21, 90:3,
158:13
**felonies**
23:14, 24:8
**felony**
35:23, 209:18
**female**
61:24, 62:2,
78:4, 193:15
**few**
166:13, 166:15,
208:24, 244:16,
246:9
**field**
9:3, 29:17,
29:19, 29:20,
183:3, 183:16,
184:6
**fifth**
238:14
**figure**
254:3
**file**
3:24, 3:29,

**familiar**
220:17, 221:12,
222:5, 222:7,
222:9, 241:10,
241:13, 241:18,
254:22
**filed**
220:17
**files**
233:4
**filled**
187:10
**financial**
42:20, 263:13
**find**
62:18, 241:23
**finding**
242:20
**findings**
242:19
**fine**
12:14, 12:18,
152:10, 152:15,
235:13, 235:21,
249:23, 252:14
**finish**
48:4, 140:22,
231:17, 232:23
**fire**
15:15, 15:18,
16:1
**firm**
2:3, 2:10, 2:15
**firms**
46:22
**first**
6:3, 10:8,
14:6, 15:13,
15:24, 29:12,
29:22, 41:10,
53:7, 53:8,
53:10, 53:19,
54:1, 54:12,
62:15, 62:18,
70:2, 76:16,
86:12, 90:15,
94:8, 95:15,
107:17, 114:5,
114:20, 114:21,

Transcript of Michael DeLacy
Conducted on January 15, 2021                                    82

118:5, 157:21,
172:15, 185:12,
185:16, 186:4,
186:7, 187:20,
212:18, 213:18,
217:7, 253:21,
255:8, 262:18,
266:8
**five**
103:5, 111:2,
111:5, 125:12,
140:23, 176:8,
180:14
**five-minute**
103:7, 218:16
**fled**
261:21
**floor**
2:4, 126:21,
127:14, 129:15,
129:16, 130:2,
131:16, 132:8,
133:3, 133:19,
135:10, 143:4,
209:12, 237:11
**foia**
251:20
**foil**
141:5
**follow**
260:18
**follow-up**
248:14
**following**
200:4, 201:10
**follows**
6:4
**food**
124:19
**foot**
261:24
**fop**
142:17, 142:20,
142:22
**force**
256:23, 262:17
**foregoing**
266:16

**forensic**
164:1, 164:7
**forensics**
163:9, 205:9
**formally**
4:23, 16:11
**format**
13:12
**formed**
23:11, 161:17,
161:23
**forward**
166:14
**found**
55:3, 83:8,
135:17, 136:9,
142:14, 147:13,
189:9
**four**
91:7, 99:13,
99:14, 180:1,
180:14, 211:18,
255:18, 255:22
**fourth**
212:19, 257:12,
258:5
**frank**
239:1
**free**
4:9, 47:6
**freedom**
256:17
**frequent**
261:15
**friend**
88:23, 153:20,
153:22
**friends**
88:17, 88:20,
89:7, 155:15,
155:19
**front**
12:3, 12:11,
12:13, 12:21,
12:24, 13:2,
98:13, 99:1,
99:7, 128:6,
135:19, 136:10,

136:23, 138:2,
168:17, 168:19,
186:18, 196:3,
198:16, 198:23,
211:23, 216:13,
221:3, 221:15,
225:24, 226:2,
235:6, 236:19,
255:5, 262:18
**froze**
129:19, 130:16,
165:5
**full**
6:9, 41:24,
42:12, 45:2,
46:20, 46:23,
253:17
**full-time**
42:6
**further**
43:19, 48:17,
246:3, 251:9,
261:19, 262:20,
263:13, 263:17,
263:19
**fusco**
2:10, 6:16
**future**
49:13

-----------G-----------

**gang**
26:10, 26:12,
26:18, 27:17,
28:2, 28:8,
28:11, 39:5,
39:8, 39:12,
40:21, 41:16,
41:18, 261:12,
261:15
**gangway**
261:18, 261:22,
262:4
**garage**
262:19
**garcia**
14:8, 14:23,
62:11, 62:16,

62:18, 63:3,
65:11, 65:18,
66:9, 66:21,
67:6, 68:3,
68:19, 69:5,
69:21, 75:17,
76:17, 81:17,
83:6, 83:9,
83:13, 83:21,
84:3, 84:13,
84:19, 85:12,
85:18, 86:24,
88:12, 119:2,
119:5, 119:19,
129:6, 146:4,
150:20, 152:9,
161:18, 161:24,
162:4, 162:7,
162:11, 199:13,
202:4, 216:22,
217:6, 217:10,
248:9
**gardens**
37:19, 37:20,
38:1
**gave**
109:5, 109:10,
109:14, 109:23,
109:24, 110:4,
110:6, 112:17,
112:24, 142:12,
202:2, 205:23,
206:17, 235:17
**gears**
220:9
**general**
36:4, 136:2,
152:9, 159:15,
159:17, 160:3
**generally**
36:21, 38:13
**geographic**
37:8, 37:24
**george**
2:15, 4:19,
246:6
**getting**
65:22, 66:1,

Transcript of Michael DeLacy
Conducted on January 15, 2021                              83

66:14, 89:12,
121:2, 121:8,
122:20, 123:10,
206:2, 230:10
**give**
109:18, 119:22,
120:5, 180:16,
212:2, 225:14,
233:23, 235:6,
236:8, 241:15,
247:24, 254:2
**given**
71:15, 204:14,
207:1, 217:5
**giving**
109:11, 111:16,
128:5, 205:23,
254:17
**glass**
259:22, 262:18
**goal**
89:12
**goes**
253:17, 255:2
**gone**
125:8, 166:19
**good**
4:10, 4:13,
6:8, 143:21,
144:5, 230:18,
260:20
**gotten**
83:12, 180:2,
206:9
**gpr**
183:21
**gprs**
183:24
**great**
144:8, 144:15,
165:22, 261:3
**grill**
2:9, 4:16,
7:22, 12:12,
13:1, 13:6,
44:2, 44:13,
44:17, 45:3,
45:8, 45:14,

45:17, 46:1,
46:13, 46:15,
48:3, 48:6,
48:21, 48:24,
49:19, 49:22,
50:12, 50:15,
50:21, 219:12,
219:14, 224:4,
227:8, 229:13,
230:8, 230:20,
230:24, 231:3,
231:24, 233:1,
260:16
**ground**
223:4, 226:18,
240:1
**group**
33:6, 261:16
**guardian**
56:18, 97:8,
97:23, 100:1,
115:16, 115:22,
116:6, 116:15,
145:16, 156:9,
156:20, 157:3,
159:24, 160:19,
182:21
**guess**
16:16, 31:10,
31:11, 110:19,
179:10
**guessing**
134:10
**gus**
217:15
**guys**
8:5, 45:23,
45:24, 71:15,
72:14, 73:12,
80:19, 83:14,
91:17, 92:11,
92:24, 114:9,
121:9, 122:14,
129:2, 129:19,
169:19, 171:7,
196:14, 251:14,
254:5
**gyamin@jsotoslaw**
2:17

### H

**hall**
197:19, 203:5,
204:16
**hallway**
209:12
**hand**
5:17, 50:24,
247:12, 254:9,
266:32
**handbook**
142:17, 142:20,
142:22
**handcuff**
129:2
**handcuffed**
112:13, 119:11,
128:23, 237:11,
237:12, 239:24,
240:6
**handcuffs**
112:6, 112:10
**handed**
111:21
**handle**
37:3, 46:17
**handled**
115:18
**hang**
45:17, 46:14
**happen**
132:9, 167:7,
205:16, 206:4,
231:21, 232:20
**happened**
55:13, 57:9,
63:11, 64:17,
65:9, 68:20,
95:6, 95:8,
100:10, 101:17,
103:16, 104:18,
105:11, 126:18,
127:17, 127:20,
128:1, 128:4,
128:8, 128:16,
128:19, 138:18,
138:22, 150:19,

178:2, 187:8,
206:8, 225:5
**happening**
50:8, 123:24,
232:18
**happy**
7:10, 49:10,
144:10, 195:5,
211:9, 259:13
**harassing**
230:10, 232:8
**hard**
12:16, 12:18,
83:1, 172:1,
211:8, 259:7,
259:15
**hear**
6:17, 7:11,
18:2, 36:2,
44:21, 75:12,
120:5, 134:21,
135:1, 142:19,
144:9, 144:13,
167:16, 167:20,
202:13, 219:10,
240:22, 241:4,
245:7, 262:23
**heard**
261:19, 262:24
**hearing**
6:24, 7:7,
104:6
**hearings**
151:7
**heated**
45:22
**heather**
2:3, 4:11,
36:2, 42:23,
43:2, 46:18,
48:21, 49:2,
64:3, 66:14,
105:14, 152:7,
160:4, 178:15,
180:12, 181:14,
185:21, 190:1,
197:3, 201:22,
225:15, 227:9,

Transcript of Michael DeLacy
Conducted on January 15, 2021

84

230:8, 253:8,
254:8, 260:16,
264:8
**heather@loevy**
2:6
**height**
108:9, 171:22
**held**
101:15
**help**
18:2, 247:13,
259:14
**helped**
177:18
**helpful**
218:19
**helps**
259:18
**hennigan**
257:10, 258:9
**here**
30:14, 45:10,
46:18, 47:4,
47:8, 47:11,
47:12, 47:24,
49:1, 49:7,
49:8, 49:16,
50:8, 52:21,
61:2, 69:14,
74:10, 77:17,
104:16, 106:23,
107:16, 117:1,
161:9, 170:20,
175:2, 176:12,
179:19, 186:14,
191:13, 191:18,
193:12, 202:9,
206:23, 213:10,
213:20, 219:14,
219:15, 220:18,
224:13, 230:13,
231:4, 234:17,
242:9, 255:9,
255:22, 256:16,
261:4
**hereby**
266:5
**hereon**
43:11

**hereto**
266:28
**herself**
96:24, 97:5,
99:20
**hey**
93:9
**hightail**
234:12, 234:15,
234:17, 235:4,
235:10
**hispanics**
261:17
**histories**
255:11
**history**
193:9, 194:17,
195:14, 220:10,
255:2
**hit**
164:11, 164:18,
223:3, 226:21,
229:9, 229:22
**hold**
45:18, 60:17,
140:17, 171:11,
211:18, 219:11,
233:23, 254:6,
258:22
**holland**
1:29, 4:5,
266:5, 266:38
**homes**
74:15
**homicide**
35:12, 58:4,
59:18, 62:11,
62:16, 62:19,
63:3, 63:24,
64:22, 65:11,
65:18, 66:9,
66:21, 67:6,
67:14, 68:3,
68:13, 68:14,
68:19, 69:5,
69:7, 69:10,
69:12, 69:17,
69:21, 75:8,

75:16, 75:17,
75:21, 76:17,
76:22, 78:7,
79:3, 79:6,
79:18, 81:16,
81:17, 82:9,
83:6, 83:9,
83:13, 83:21,
84:3, 84:13,
84:19, 85:12,
85:18, 86:24,
88:12, 90:13,
98:7, 100:6,
100:8, 100:10,
112:5, 112:17,
113:2, 115:19,
116:15, 119:2,
119:6, 119:19,
129:6, 146:2,
146:5, 150:21,
152:9, 161:18,
161:24, 162:8,
162:11, 194:2,
199:13, 216:23,
217:6, 217:10,
248:9
**host**
2:24, 4:1, 4:6,
103:9, 103:11,
143:23, 144:2,
218:22, 218:24,
219:4, 219:6,
236:13, 236:15,
264:4
**hour**
235:20
**hours**
34:12, 188:23,
189:17, 261:7,
261:14
**house**
74:3, 74:5,
74:8, 74:13,
74:22, 75:7,
77:10, 78:6,
78:13, 79:13,
79:19, 83:8,
83:15, 94:4,

95:6, 95:8,
95:21, 97:12,
101:7, 101:20,
102:1, 102:2,
102:9, 110:7,
110:8, 110:9,
122:10, 125:8,
176:9, 182:3,
193:14, 193:24,
202:4, 213:13,
214:17, 216:9,
246:14, 256:24,
262:8
**housing**
37:15
**howard**
220:24, 224:17,
224:18, 225:8
**however**
7:14
**hrs**
261:9
**hypothetical**
146:10, 147:9,
157:16, 158:5,
158:17, 247:1,
247:19

**I**

**ice**
214:9
**idea**
175:7, 203:17,
204:7
**identical**
245:4, 245:12
**identification**
168:22, 186:21,
198:22, 212:8,
221:13, 241:11,
253:5, 264:14
**identified**
96:24, 99:20
**identify**
117:12, 122:5,
212:13
**identifying**
97:5

Transcript of Michael DeLacy
Conducted on January 15, 2021                    85

| | | | |
|---|---|---|---|
| **identity**<br>61:11, 61:16<br>**ifoia**<br>252:1, 252:3,<br>252:13<br>**illinois**<br>1:2, 2:5, 2:11,<br>2:17, 256:17<br>**image**<br>74:10<br>**impacted**<br>49:14<br>**impaired**<br>6:23<br>**impartiality**<br>266:31<br>**important**<br>195:14<br>**in-service**<br>161:7<br>**inadvertently**<br>235:24<br>**inappropriate**<br>50:8, 232:8<br>**incident**<br>54:11, 69:13,<br>172:18, 187:7,<br>187:9, 229:19,<br>230:5, 242:21,<br>258:16<br>**incidents**<br>64:17, 64:19,<br>242:16, 243:5<br>**include**<br>24:24, 181:18,<br>234:20<br>**included**<br>173:22, 174:9,<br>174:20, 175:8,<br>175:18, 177:7,<br>181:5, 181:11,<br>181:22, 182:4,<br>184:16, 184:19,<br>185:10, 186:15,<br>191:17, 192:5,<br>194:5, 194:16,<br>194:18, 195:6,<br>195:14, 196:7, | 204:22, 216:22,<br>223:17, 223:19<br>**includes**<br>174:15, 184:9,<br>201:13, 202:15,<br>202:19, 257:9<br>**incomplete**<br>146:10, 147:9,<br>157:16, 158:5,<br>158:17, 246:24,<br>247:19<br>**independent**<br>51:10, 51:16,<br>52:9, 64:1,<br>64:6, 95:7,<br>95:15, 95:17,<br>96:2, 97:3,<br>127:16, 128:4,<br>128:10, 218:5<br>**independently**<br>95:14, 125:1,<br>234:12<br>**indicate**<br>167:20, 176:12,<br>258:12<br>**indicated**<br>78:3, 78:4,<br>84:23, 97:7,<br>155:21, 166:20,<br>177:22, 181:3<br>**indicates**<br>171:21, 172:6,<br>182:1, 182:15,<br>193:12, 193:20,<br>193:22, 202:24,<br>203:20<br>**indicating**<br>217:24<br>**individual**<br>2:13, 4:17,<br>120:2, 184:10,<br>217:17<br>**individual's**<br>250:15<br>**inform**<br>58:3, 147:21<br>**information**<br>58:3, 59:16, | 59:18, 61:3,<br>61:16, 66:20,<br>75:14, 76:14,<br>77:11, 78:6,<br>78:11, 80:20,<br>81:3, 81:4,<br>81:7, 81:9,<br>81:19, 82:2,<br>82:10, 82:17,<br>83:5, 83:8,<br>84:24, 98:5,<br>98:6, 100:5,<br>100:9, 112:4,<br>112:5, 119:18,<br>132:9, 156:2,<br>156:6, 176:4,<br>178:3, 178:22,<br>179:19, 183:8,<br>183:10, 193:23,<br>200:4, 201:13,<br>201:20, 202:20,<br>203:14, 203:21,<br>203:24, 204:24,<br>205:23, 206:2,<br>209:17, 217:9,<br>218:11, 256:18<br>**informed**<br>66:21<br>**infractions**<br>220:13<br>**initial**<br>100:13<br>**initially**<br>16:18, 257:5<br>**injuries**<br>108:13, 164:20<br>**inquired**<br>224:23<br>**inside**<br>101:19, 102:1,<br>102:3, 102:8,<br>102:13, 102:18,<br>104:8, 104:13,<br>104:18, 105:1,<br>105:7, 105:19,<br>106:3, 106:12,<br>106:14, 110:14,<br>111:12, 120:15, | 120:22, 120:23,<br>121:7, 122:2,<br>138:13, 237:9<br>**instead**<br>4:24, 47:10<br>**instruction**<br>9:2, 260:23<br>**instructs**<br>63:20<br>**intend**<br>47:17, 252:2<br>**intended**<br>232:15<br>**intending**<br>50:16<br>**intention**<br>89:15<br>**interaction**<br>51:11, 98:3,<br>100:14, 103:1,<br>109:22, 109:24,<br>114:1<br>**interactions**<br>51:15, 52:3,<br>52:9, 52:24,<br>55:3, 55:18,<br>90:20, 109:22,<br>152:18, 152:24,<br>210:3, 217:20,<br>217:21, 218:1,<br>222:9<br>**interest**<br>266:30<br>**interested**<br>266:28<br>**internet**<br>129:19<br>**interrogate**<br>145:14, 146:3,<br>157:11, 157:12<br>**interrogated**<br>145:22, 158:2<br>**interrogating**<br>146:7, 159:12<br>**interrogation**<br>132:8, 133:7,<br>145:17, 150:20,<br>150:24, 151:4, |

Transcript of Michael DeLacy
Conducted on January 15, 2021

86

158:3, 158:11,
159:13, 159:23,
160:17, 161:4
**interrogations**
133:14, 133:24,
157:14, 160:16
**interrupt**
45:19, 45:21,
45:24, 231:2,
231:10, 231:15
**interrupted**
44:20, 111:19
**interrupting**
231:2
**interruption**
50:24
**intersection**
215:1
**interview**
35:22, 130:19,
130:21, 131:3,
131:9, 132:12,
133:2, 133:11,
133:14, 133:20,
139:19, 139:22,
140:2, 146:3,
149:15, 158:11,
159:4, 207:11,
208:11, 208:12,
209:18, 225:5,
225:8, 245:19
**interviewed**
26:21, 145:23,
147:13, 149:24,
159:3, 160:21,
197:18, 197:20,
198:8, 203:4,
203:6, 204:11
**interviewing**
131:9
**interviews**
35:19, 133:23
**introduce**
4:8
**inventoried**
163:13, 262:6
**inventory**
163:15, 163:21

**investigate**
38:5
**investigated**
38:19, 38:22,
75:8, 222:17
**investigating**
38:13, 145:15,
146:6, 146:16,
157:24, 158:14,
162:3, 217:9
**investigation**
14:24, 24:8,
26:11, 26:13,
58:4, 69:17,
79:3, 113:2,
115:20, 116:15,
162:4, 188:11,
189:18, 194:2,
222:24, 228:10,
232:6, 233:4,
245:19
**investigations**
35:23, 86:23
**investigative**
75:17, 218:6
**investigator**
40:6, 40:9,
40:15, 40:18,
40:23
**investigators**
41:7
**invitation**
122:12
**invite**
101:6
**invited**
101:4, 101:10,
101:14, 103:23,
122:10
**involved**
38:5, 38:13,
88:7, 162:10
**involvement**
54:8, 54:11,
55:13, 86:13,
166:10, 210:5,
210:12, 217:20,
220:1, 239:13,

263:3
**involving**
37:5
**irving**
210:6
**issue**
43:3, 46:19,
47:6, 230:17
**italian**
214:9
**itself**
49:2

---
**J**
---

**j**
185:19
**jacket**
136:18
**jackson**
2:16, 257:10
**james**
237:7, 238:6,
239:14, 257:10
**january**
1:19, 4:4,
265:3, 266:7
**jeff**
234:19
**jessie**
56:13, 56:15,
96:24, 97:4,
97:16, 157:4,
182:3, 193:15
**job**
1:27, 13:11,
23:6, 40:2,
40:3, 40:4,
40:5, 159:7,
230:18
**jobs**
35:5, 158:14
**joe**
186:2
**john**
185:14, 188:2,
210:8
**joined**
15:21, 29:5,

31:20
**jones**
56:13, 56:15,
97:1, 97:4,
97:17, 98:3,
98:9, 99:11,
99:16, 100:13,
100:22, 101:6,
101:11, 102:4,
102:18, 103:17,
103:22, 105:19,
108:22, 109:3,
109:11, 109:18,
109:23, 109:24,
110:4, 111:11,
111:16, 111:21,
112:9, 112:15,
113:8, 113:15,
114:2, 114:19,
115:5, 115:10,
115:14, 116:3,
117:1, 119:21,
120:1, 120:5,
120:16, 122:10,
122:12, 134:15,
134:22, 155:22,
156:2, 156:21,
157:4, 166:16,
166:20, 166:24,
167:12, 167:16,
167:21, 168:10,
182:3, 182:16,
182:19, 193:15
**july**
32:18, 172:6,
241:13, 243:22
**jump**
230:22
**jumping**
230:17
**june**
242:6, 244:11
**juvenile**
106:21, 107:3,
115:12, 115:14,
116:5, 116:11,
116:14, 116:16,
147:11, 158:2,

159:23, 160:16,
202:21
**juveniles**
115:18, 146:8,
147:6, 157:14,
158:22, 159:4,
159:12, 160:20,
161:4

**K**

**kedzie**
37:14
**keep**
43:5, 45:5,
96:15, 103:2,
183:21, 184:7,
231:11, 252:21
**keeps**
36:3
**ken**
89:6, 89:7
**kenneth**
1:10, 4:3,
86:7, 87:4,
87:5, 87:10,
87:15, 87:21,
88:7, 88:11,
150:7, 150:15,
150:19, 150:23,
153:17, 199:18
**kept**
184:8
**kicked**
226:17
**kid**
93:10
**kill**
86:1, 86:5,
86:9, 86:16,
86:23, 88:14,
88:15, 88:18,
88:21, 89:1,
129:5, 150:11,
151:2, 151:3,
154:8, 154:12,
154:14, 154:18,
199:18, 202:16,
203:1, 203:20,

207:11
**kill's**
150:3, 150:20,
202:3
**kind**
24:21, 38:4,
73:11, 82:2,
136:13
**kinds**
36:22
**kings**
261:15
**knew**
62:15, 63:6,
79:5, 79:8,
85:21, 87:5,
87:14, 116:5,
159:21
**knocked**
95:20, 96:23,
99:16, 103:21
**knocking**
96:2, 96:18,
97:3, 111:10
**know-**
209:5
**knowing**
107:3
**knowledge**
62:10, 75:23,
77:3, 79:16,
80:1, 83:11,
83:13, 161:16,
161:22, 162:1,
162:2, 162:6,
174:1, 206:14,
206:22, 209:18,
216:21, 217:4,
217:8, 218:11,
220:15
**known**
86:9, 173:8
**kosberg**
2:24, 4:7
**kroll**
243:2, 244:10

**L**

**lady**
96:24

**language**
262:8, 262:13
**lapping**
254:15
**large**
253:16
**last**
10:20, 19:24,
28:3, 49:14,
100:11, 200:8,
201:18, 207:23,
208:5, 209:1,
238:14
**later**
22:15, 197:19,
203:4, 204:15
**latin**
261:14
**latter**
22:20
**law**
2:15, 24:24,
25:3, 25:6,
25:12
**lawsuit**
153:13, 153:17
**lawyer**
46:6, 63:18
**layout**
139:14
**learned**
76:17, 200:4,
201:20, 203:1
**learning**
63:3
**least**
30:24
**leave**
149:8
**led**
49:6, 49:9,
119:18, 216:13,
262:1
**left**
144:15, 149:9,
149:12, 162:18,
208:5, 208:8,
247:16, 247:17,

**language**
248:19, 249:13
**legal**
100:1, 116:6,
145:16, 156:9,
156:20, 157:3,
159:23, 182:21
**legs**
223:4, 226:22
**less**
110:17, 110:19,
110:20, 110:22
**let's**
8:10, 21:3,
43:5, 44:18,
45:10, 47:13,
47:20, 48:22,
49:12, 49:15,
50:6, 50:8,
50:16, 50:21,
50:24, 94:14,
103:6, 125:9,
143:20, 161:9,
229:5, 231:3,
231:11, 231:12,
232:22, 236:5,
236:11, 236:24,
247:24, 252:16,
258:22
**letting**
18:1
**level**
42:11
**lewis**
2:3, 4:11
**lieu**
4:23
**lieutenant**
190:9, 199:18
**light**
47:18, 259:7,
259:9, 259:24
**liked**
27:20
**limited**
52:23, 53:2,
53:3, 55:19,
127:21, 128:20,
138:18

Transcript of Michael DeLacy
Conducted on January 15, 2021                                          88

**limits**
46:24
**line**
16:6, 140:24,
172:15, 173:16,
174:16, 176:3,
232:12, 232:21
**lines**
47:8
**link**
234:12, 234:15,
234:16, 234:18,
235:4, 235:10
**linking**
162:7
**links**
221:9
**listed**
191:14, 224:13,
224:14, 255:22
**listen**
46:16
**lists**
255:18
**litigation**
235:23
**little**
19:10, 24:12,
103:1, 103:3,
139:12, 146:1,
147:19, 178:10,
179:18, 208:20,
218:18, 219:20,
220:10, 252:21,
259:23
**lived**
73:21, 74:7,
97:6, 97:8,
97:11, 97:19,
99:20, 99:21
**llc**
2:10
**ln**
265:6
**local**
25:6
**located**
19:22, 20:6,

20:7, 20:10,
235:19
**location**
20:16, 37:24,
72:5, 75:8,
92:1, 92:2,
97:7, 183:9,
261:11, 261:15,
261:18, 262:4,
262:7, 262:17,
262:19, 262:20,
263:4
**lock**
262:19
**loevy**
2:4, 4:2
**long**
8:22, 15:7,
24:6, 24:10,
25:18, 27:19,
28:18, 30:3,
31:7, 40:8,
41:17, 53:10,
62:7, 86:9,
87:5, 110:13,
110:15, 124:4,
134:6, 140:1,
140:5, 165:14,
211:17
**longer**
29:13, 103:1,
252:21
**look**
12:6, 168:13,
168:14, 168:15,
172:12, 185:18,
186:17, 199:6,
212:14, 212:18,
215:16, 220:20,
224:3, 228:1,
233:3, 233:12,
237:17, 237:20,
237:24, 241:5,
241:16, 244:16,
244:23, 245:16,
253:2, 258:1,
258:5
**looked**
215:7, 216:9,

216:10, 216:17,
220:19, 222:4,
222:6, 242:5
**looking**
11:24, 12:15,
167:14, 167:17,
167:21, 196:5,
209:1, 212:15,
213:12, 213:13,
213:14, 215:1,
219:20, 222:8,
228:4
**looks**
11:24, 12:15,
106:18, 106:19,
170:5, 171:24,
172:15, 172:17,
173:17, 215:22,
234:23, 234:24,
235:18, 254:9,
254:24
**lose**
219:12
**lost**
219:9, 231:9
**lot**
74:15, 102:22,
125:22, 127:13,
148:3
**loud**
261:10, 261:13,
261:19, 262:7
**louis**
120:2
**lounge**
237:9
**low-rises**
37:22
**lowe**
19:23, 20:2,
20:3
**lunch**
102:23, 103:2,
140:21, 140:23,
144:1

**M**

**m-a-l-o-n-e**
168:7

**ma'am**
7:8, 20:4,
24:16, 24:19,
28:5, 37:21,
255:7
**made**
13:17, 23:10,
27:16, 46:3,
47:16, 87:13,
114:8, 114:11,
115:14, 116:2,
124:9, 138:23,
145:9, 181:12,
193:5, 223:18,
236:2, 237:7,
238:2, 240:9
**mae**
56:13, 56:15,
96:24, 97:4,
97:17, 157:4,
182:3, 193:15
**main**
139:11
**mainframe**
255:10
**major**
69:13, 76:23
**majority**
30:20, 32:2,
32:5
**make**
8:1, 12:22,
45:22, 47:5,
55:10, 66:3,
66:17, 67:5,
67:9, 68:22,
96:12, 96:14,
114:21, 122:2,
125:24, 132:14,
132:17, 139:1,
139:4, 163:20,
197:2, 204:7,
229:3, 231:6,
231:13, 232:15,
235:7, 254:19,
260:14, 260:16,
260:18
**makes**
27:24

Transcript of Michael DeLacy
Conducted on January 15, 2021                                    89

making
13:10, 50:3,
63:19, 229:4
male
108:8, 176:4,
261:17
malone
168:2, 168:6,
186:6, 186:7,
186:9, 191:16,
191:17, 257:11
maloney
168:3
man
78:4
manner
193:9, 194:17,
195:15
many
10:2, 10:5,
17:4, 29:8,
169:19, 216:19,
256:1
march
8:13, 9:13,
31:20, 237:8,
238:6, 239:14
marie
1:29, 266:5
marked
3:32, 3:33,
34:6, 73:14,
168:22, 186:21,
198:21, 212:7,
221:12, 236:18,
241:10, 253:4,
264:14
matter
4:3, 4:12,
4:15, 6:3,
266:10, 266:18
matters
50:24
maybe
12:8, 12:16,
12:22, 21:3,
24:13, 26:15,
43:18, 49:12,

63:9, 63:10,
63:13, 92:17,
111:5, 114:18,
137:8, 147:20,
163:19, 173:2,
173:3, 231:8,
231:18, 233:17,
233:19, 259:10,
259:23
mb
176:4, 193:24
mcr
238:2
mean
23:4, 92:11,
137:6, 185:20,
228:21, 250:14,
250:24
meaning
52:13, 53:3,
172:17, 176:4,
193:13, 216:5
means
68:2, 68:9,
77:15
meant
23:6, 32:19
measurements
26:23
media
166:5
medical
48:1
meet
16:6, 16:8,
16:10, 43:18,
70:11
meeting
15:24, 153:12,
153:17
meetings
154:8, 154:10,
154:11
member
8:12
members
23:10, 23:17,
39:12, 89:3,

223:11, 261:14
memo
227:15, 228:23,
238:18, 239:8,
239:12, 243:15,
243:21, 244:2,
244:13, 244:17,
244:23, 245:3,
245:11, 260:24,
261:4
memory
36:19, 51:14,
52:8, 52:9,
52:15, 52:19,
52:22, 52:24,
53:3, 53:22,
54:11, 55:2,
55:12, 55:18,
58:20, 59:11,
61:3, 63:13,
64:6, 66:8,
66:20, 89:20,
100:16, 102:19,
103:15, 104:17,
105:18, 105:22,
107:2, 109:7,
109:9, 109:11,
111:9, 111:12,
111:14, 111:16,
121:20, 126:23,
127:16, 127:20,
128:11, 135:12,
137:18, 138:17,
138:21, 139:18,
139:23, 163:24,
216:8, 222:12,
222:15, 223:7,
229:7, 229:19,
230:4, 232:17,
232:20, 237:6,
239:23, 240:5,
242:16, 255:21
memos
245:20
men
33:7
mental
74:10

met
16:4, 16:11,
16:14, 29:1,
92:1
michael
1:17, 2:12,
3:6, 4:2, 5:5,
6:1, 6:10,
257:11, 261:1,
264:5, 265:4,
266:6
mid
21:10
mid-nineties
19:20
mid-s
21:11
midnight
34:24
midway
193:13
might
58:3, 77:15,
100:5, 100:9,
170:14, 229:3,
241:16
mike
4:17, 199:18
mind
133:1, 235:2
minnesota
266:1, 266:12
minor
262:2
minors
261:13
minute
225:22
minutes
110:17, 110:19,
110:20, 110:23,
111:2, 111:6,
125:13, 140:23
miranda
142:13
mischaracterize
85:3, 94:8
mischaracterizes
55:8, 59:2,

Transcript of Michael DeLacy
Conducted on January 15, 2021

90

61:6, 68:6,
84:6, 84:22,
92:21, 93:13,
93:23, 94:6,
112:20, 113:5,
126:5, 126:14,
132:2, 133:9,
145:19, 175:15,
201:5, 208:3,
223:14, 223:21,
250:9, 250:19
**misconduct**
240:16, 240:18,
241:1, 243:9
**misheard**
63:10
**mishearing**
231:18
**miss**
97:16, 101:6,
112:15, 122:10,
134:21
**mission**
23:9, 23:12,
23:13
**misstates**
203:9
**mistake**
45:15
**mistaken**
63:10, 63:13
**misunderstood**
94:19, 252:11,
252:18
**moment**
219:11
**month**
173:2
**months**
8:24, 9:1, 9:2,
165:14
**moral**
116:9, 116:10
**more**
14:5, 21:4,
30:5, 40:2,
45:9, 47:1,
56:6, 64:9,

102:22, 111:1,
218:18, 256:18
**morning**
4:10, 4:13,
6:8, 57:9, 64:2,
64:6, 64:20,
65:10, 66:9,
66:22, 67:7,
67:13, 67:17,
76:18, 234:8,
235:17, 261:14
**most-**
116:13
**mostly**
159:7
**motion**
151:21, 152:2
**move**
12:9, 12:11,
17:15, 29:3,
44:18, 47:15,
47:20, 48:16,
49:12, 49:15,
50:6, 50:8,
166:14, 180:12,
231:3, 232:22
**moved**
29:2, 29:9,
30:7, 133:14
**moving**
43:5, 45:5,
219:17
**much**
138:10
**municipal**
25:6
**murder**
14:9, 167:14,
167:18, 167:21,
210:5, 210:6
**music**
261:19, 262:11
**must**
92:24, 253:10
**myself**
49:21, 109:9,
113:21, 191:15,
200:18

## N

**name**
4:10, 4:13,
4:16, 6:9,
59:17, 78:5,
171:1, 176:5,
177:7, 183:9,
184:10, 185:12,
185:16, 186:4,
186:7, 193:23,
256:20, 265:2
**named**
24:4, 153:13
**names**
19:16
**nancy**
173:18
**narcotic**
39:5, 163:1,
163:5, 163:6
**narcotics**
39:15, 162:22,
162:24, 166:9,
189:9
**narrative**
171:20, 172:12,
173:11, 173:17,
173:22, 174:9,
174:16, 175:19,
187:7, 187:9,
193:8, 195:2,
196:7, 223:16
**narrative-**
192:9
**nature**
37:6
**necessary**
48:14, 96:12
**need**
7:6, 7:9, 7:17,
60:19, 103:5,
120:15, 218:15,
221:6, 224:2,
230:22, 253:18
**needed**
91:10, 93:21
**negotiated**
46:22

**negotiating**
43:16
**neither**
80:1
**nephew**
224:17, 224:24
**never**
9:19, 47:11,
235:16, 235:19,
237:3
**new**
27:23
**news**
166:2
**newspaper**
165:3, 165:8,
166:6
**newspapers**
165:17
**newsstand**
214:12
**next**
5:24, 101:17,
138:18, 173:16,
176:3
**nice**
264:2
**nickel**
137:9, 137:10,
137:16
**nickname**
217:18
**night**
100:11, 162:13
**nine**
211:19, 239:2
**nine-page**
3:19, 212:6,
212:11
**nineteen**
40:11, 40:19,
40:24, 42:3,
42:9
**nineties**
20:11
**nobody**
177:18, 196:12
**non-uniformed**
256:23

Transcript of Michael DeLacy
Conducted on January 15, 2021

91

none
50:19
noon
125:9
noontime
125:8
normally
34:7, 37:3,
159:5, 159:6
north
37:10, 37:11
northern
1:2
notary
265:33, 266:11,
266:39
note
184:7, 184:8,
231:16, 251:23
noted
43:12
notes
182:9, 182:11,
182:13, 183:1,
183:2, 183:16,
184:5, 266:17
nothing
104:12, 104:20,
127:8, 128:9,
128:14, 194:12,
263:19, 266:9
noticed
266:21
notification
190:7, 222:16
notified
63:23, 147:11,
148:1, 148:6,
148:11, 188:15
notify
148:15, 190:22,
191:5
notifying
190:18, 191:2,
191:10
november
8:16, 11:1,
17:6, 39:22,

151:18, 152:3,
152:18, 256:8,
257:21, 259:4
number
22:3, 23:24,
26:20, 51:20,
86:15, 165:14,
170:20, 171:4,
171:14, 171:17,
172:23, 173:18,
173:21, 174:8,
174:16, 174:19,
174:20, 204:1,
212:13, 214:21,
224:5, 225:16,
227:9, 238:11,
262:3
numbers
173:6
numerous
261:11

—————— O ——————

o
188:18
o'riley
207:9
oath
4:9, 266:14
objected
63:21
objecting
44:12, 63:19,
66:23, 66:24,
96:11, 205:1
objection
20:12, 30:15,
31:15, 41:2,
42:18, 55:7,
59:1, 59:23,
65:20, 67:8,
67:9, 67:20,
68:5, 73:16,
78:1, 80:4,
82:4, 82:13,
94:23, 99:3,
105:13, 112:19,
114:23, 117:14,

122:8, 130:3,
130:11, 132:1,
142:16, 146:18,
146:22, 154:3,
156:4, 157:15,
158:16, 160:1,
161:12, 174:11,
174:22, 175:4,
175:9, 175:14,
175:22, 176:23,
178:5, 178:15,
180:12, 180:20,
181:6, 195:23,
196:11, 197:3,
197:22, 198:4,
203:8, 204:18,
213:15, 215:9,
226:23, 229:24,
240:15, 240:19,
245:5, 246:24,
247:11, 247:18,
250:18, 251:3
objections
47:16, 143:8,
195:20
obligation
117:10, 117:13
obligations
42:20
observe
121:7, 122:20,
123:9, 124:11,
124:13, 124:22,
138:5, 138:8,
164:11, 164:17,
164:20, 227:3,
262:21
observed
112:7, 121:2,
137:19, 138:13,
261:16
observing
106:7, 223:12,
261:20
obtain
77:11
obtained
141:5, 156:20,

183:8, 202:16
occasion
123:16, 164:24
occasions
250:6
occupant
262:11
occupants
262:8, 262:12
occur
129:14, 135:24
occurred
23:14, 49:9,
65:1, 68:14,
69:7, 69:10,
102:18, 251:2
occurrences
53:4
occurring
105:7, 173:4
ocd
190:11
october
261:6, 261:9,
263:4
of
265:30
offer
47:11, 47:12,
49:7, 113:14,
114:8, 114:12,
114:21, 115:10,
115:14, 116:3
offered
47:6, 47:11,
113:12, 114:19,
115:6, 155:22
office
6:16, 25:17,
25:19, 26:1,
26:8, 26:14,
26:19, 27:1,
27:9, 27:18,
28:3, 28:9,
40:7, 40:9,
40:15, 40:19,
40:24, 41:8,
41:15, 41:19,

41:22, 42:1,
42:7, 44:7,
51:3, 51:7,
200:5, 203:5,
238:18, 251:19
**officer's**
119:12, 170:21,
170:24
**officers**
2:13, 4:17,
5:12, 17:22,
19:2, 24:7,
33:8, 39:5,
71:18, 71:22,
72:2, 72:5,
72:7, 89:21,
90:4, 91:18,
93:16, 99:12,
103:23, 106:1,
106:2, 122:13,
142:24, 145:16,
146:6, 146:17,
157:24, 158:14,
162:3, 185:5,
185:9, 191:14,
193:13, 197:12,
201:15, 205:19,
206:17, 224:23,
226:18, 227:3,
229:22, 242:20,
242:21, 249:4,
249:19, 256:23,
257:5, 257:9,
257:19, 257:22,
261:21, 261:23,
262:9, 262:10,
262:13
**offices**
139:12
**official**
5:10, 6:12,
177:15, 178:3,
178:12, 179:13,
179:22, 183:11
**oh**
36:7, 102:11,
119:8, 157:22,
165:6, 209:9,

226:2, 234:11,
245:10, 252:6
**old**
106:20, 106:22,
106:23, 107:1,
107:4, 107:7
**once**
9:6, 10:7,
127:17, 149:2,
149:10, 180:19,
223:20, 250:10
**one**
10:19, 14:4,
14:5, 17:16,
22:4, 22:9,
23:2, 23:5,
23:9, 23:11,
23:15, 23:18,
23:22, 24:7,
24:10, 28:8,
30:5, 31:24,
35:4, 40:2,
40:3, 40:4,
43:2, 44:10,
46:6, 50:17,
56:6, 60:18,
77:16, 80:2,
81:4, 81:8,
81:16, 82:9,
86:23, 88:8,
88:10, 102:14,
104:12, 105:10,
127:5, 135:9,
139:7, 139:8,
140:13, 140:17,
141:7, 141:10,
141:21, 141:23,
145:13, 146:2,
148:5, 149:15,
165:17, 170:7,
170:9, 170:14,
170:15, 179:8,
190:2, 220:19,
220:20, 221:22,
224:24, 228:4,
233:22, 235:19,
248:13, 253:6,
253:7, 258:22,

259:20
**one-page**
168:24
**ones**
37:18, 233:18,
234:19, 235:3
**only**
12:19, 17:18,
28:8, 65:1,
70:16, 123:23,
147:10, 148:9,
196:11, 234:10,
245:19, 250:3,
263:11
**open**
101:15, 139:11,
260:15, 262:18
**opened**
138:6, 249:14
**opening**
138:14, 262:14
**opinion**
123:1
**opportunity**
200:23, 202:2,
227:18, 231:14,
233:11
**orally**
156:13
**order**
10:17, 159:15,
160:3
**ordered**
266:22
**ordering**
264:9, 264:10
**orders**
159:17
**organized**
23:9, 188:19
**organizing**
22:10
**original**
266:20
**other**
9:17, 14:1,
14:17, 14:19,
17:20, 17:21,

18:8, 18:13,
19:12, 22:23,
24:24, 25:6,
25:10, 27:21,
28:6, 31:22,
33:24, 42:19,
51:5, 51:6,
55:23, 55:24,
56:9, 61:23,
62:1, 65:10,
69:9, 70:10,
70:23, 71:19,
71:22, 72:2,
72:5, 80:20,
82:17, 82:22,
83:4, 86:23,
89:3, 89:20,
90:3, 93:16,
93:17, 94:21,
97:3, 99:12,
99:24, 104:13,
105:10, 105:19,
108:19, 108:20,
108:23, 114:14,
114:15, 117:10,
117:12, 122:12,
122:13, 123:15,
127:6, 136:4,
145:16, 153:3,
153:13, 158:10,
159:24, 166:10,
166:23, 170:8,
177:18, 205:18,
205:19, 216:15,
233:4, 233:5,
250:6, 250:14,
251:1, 255:22,
257:19, 262:9,
262:21, 263:11
**out**
9:3, 10:16,
13:17, 16:6,
23:11, 27:22,
29:24, 33:15,
35:22, 36:3,
37:2, 43:11,
47:5, 48:7,
48:9, 49:2,

Transcript of Michael DeLacy
Conducted on January 15, 2021

93

62:18, 70:11,
71:16, 90:16,
99:7, 110:7,
110:8, 110:9,
110:14, 111:14,
112:7, 112:13,
128:6, 138:23,
139:1, 139:4,
155:16, 183:3,
183:16, 184:5,
187:11, 193:5,
210:17, 213:12,
235:7, 254:3,
260:16
**outcome**
266:28
**outside**
24:22, 53:5,
88:17, 88:21,
88:22, 89:8,
102:2, 104:14,
105:1, 106:10,
106:11, 114:3,
155:19
**outstanding**
134:12, 134:16,
134:22
**over**
22:7, 22:11,
24:12, 40:19,
43:1, 73:18,
83:14, 84:13,
89:11, 121:19,
147:3, 149:4,
149:10, 157:2,
164:21, 166:19,
192:8, 193:8,
219:14, 219:15,
219:18, 256:2,
263:14
**overheard**
262:7
**own**
102:19, 104:17,
126:17, 130:5,
130:8, 131:22,
160:13

**P**

**pack's**
14:5, 14:14,

14:18, 27:15,
51:21, 52:14,
53:15, 54:18,
55:4, 55:15,
55:20, 55:24,
95:9, 95:24,
104:5, 105:6,
115:6, 120:21,
127:22, 128:15,
128:21, 130:8,
130:10, 131:11,
131:12, 131:23,
135:21, 136:10,
138:19, 169:14,
170:11, 174:10,
187:22, 244:20,
245:4, 245:12
**packet**
135:18, 136:9,
136:23, 137:2,
137:3, 137:4,
137:11, 137:15,
137:19, 137:21,
138:5, 138:13,
140:11, 141:5,
142:5, 142:14,
147:14, 148:10,
163:11, 163:12,
163:22, 235:1,
238:13, 258:24
**pad**
183:2, 183:21,
184:7, 184:8
**page**
3:5, 3:7, 3:8,
3:9, 3:13, 5:24,
187:20, 189:22,
190:2, 190:3,
199:21, 214:20,
215:17, 215:19,
224:3, 224:7,
225:7, 225:10,
225:12, 225:13,
225:20, 225:23,
226:9, 226:10,
227:6, 228:1,
228:7, 237:19,
238:10, 238:14,

241:17, 243:19,
244:17, 244:21,
253:21, 255:8,
255:12, 256:6,
256:10, 256:11,
257:12, 258:5,
258:23
**pages**
1:28, 244:16,
257:8
**palmer**
190:11, 191:1,
191:3, 191:5
**pandemic**
13:10
**pants**
135:19, 136:14
**paper**
165:13, 165:15,
165:24
**paragraph**
200:9, 201:19,
224:10, 262:15
**paralegal**
233:18
**parent**
115:22, 116:15,
159:24, 160:18
**parked**
75:4, 94:3,
94:9, 94:12,
94:16, 94:20,
125:21, 127:13,
148:3, 214:17
**parked-**
125:20
**parking**
125:22, 127:13,
148:3
**part**
19:24, 20:21,
21:7, 21:23,
22:20, 26:2,
26:9, 26:18,
28:1, 28:7,
28:12, 28:15,
28:22, 72:11,
87:22, 144:20,

157:21, 158:10,
159:7, 200:24,
201:8, 202:19,
217:7, 232:7
**particular**
25:12, 25:24,
223:7
**parties**
5:10, 43:13,
43:17, 89:2,
89:3, 89:4,
266:22, 266:27,
266:29
**partner**
15:6, 16:22,
17:10, 27:12,
51:21, 77:3,
79:16, 83:12,
85:6, 108:21,
144:17, 148:11,
151:12, 151:17,
152:1, 152:14,
152:22, 153:4,
153:19, 162:18,
169:12, 175:13,
175:24, 192:10,
202:17, 203:2,
203:21, 204:13,
204:17, 208:16,
218:8, 239:21,
240:14, 244:17,
245:4, 245:12,
250:4, 257:9,
261:8, 262:16
**partner's**
169:17
**partners**
15:7, 16:11,
16:13, 16:15,
16:17, 16:18,
17:13, 17:19,
18:5, 18:8,
18:11, 18:13,
19:12, 23:24,
27:21, 31:1,
80:10, 82:2
**party**
261:10, 266:21

Transcript of Michael DeLacy
Conducted on January 15, 2021

94

party's
43:21, 263:14
pass
153:23
passed
218:9
passenger
118:14
pat
24:5
pat-down
118:16, 129:11,
129:14, 130:1,
131:19, 131:23,
132:21, 135:8,
135:16, 135:24,
139:20, 140:1,
140:4, 140:5,
145:11, 147:23,
148:10, 157:3,
189:15, 197:7,
208:24
patience
13:12
patrol
9:8, 17:9,
17:22, 19:2,
19:13, 19:19,
20:15, 21:22,
22:21, 23:5,
29:5, 30:9,
33:8, 88:3, 88:4
patrolman
9:15, 260:24
patted
135:17, 144:17
patterns
37:5
patterson
72:8, 72:9,
89:24, 90:10,
90:14, 90:20,
90:23, 91:11,
91:18, 92:8,
92:18, 93:18,
98:23, 99:6,
102:8, 105:23,
121:24, 135:4,

167:23, 185:17,
185:18, 185:19,
185:21, 185:24,
191:15
patterson's
185:16
paul
257:10
pause
45:10, 60:18,
83:1, 143:22
paused
82:24
penalties
5:2
pension
41:21, 42:1,
42:12, 42:15,
42:22, 43:10,
43:12, 43:20,
43:24, 44:23,
45:2, 45:6,
46:19
people
73:9
percentage
42:16, 42:17,
42:22
perfectly
232:9
perform
35:4, 118:15,
130:1, 131:23
performed
129:12, 135:8,
145:1, 147:24,
150:7
perhaps
25:9
perjury
5:2
permission
119:23, 120:6,
242:22, 256:24
permit
252:7
person
44:10, 49:7,

59:17, 60:8,
60:10, 60:23,
61:11, 61:17,
188:15
personal
48:1, 49:13,
206:13, 206:22,
209:17, 220:15
personally
87:12, 107:17,
155:22
personnel
258:14, 262:10
persons
266:30
pertaining
78:6, 98:6,
194:2
pg
265:6
phone
2:5, 2:11, 7:6,
7:13, 58:13,
58:20, 59:5,
59:8, 62:5,
62:8, 71:5,
71:12, 73:22,
76:15, 78:3,
84:8, 84:23,
100:5, 206:14,
206:23
phonetic
172:21, 243:3,
252:1, 252:4,
252:13
photograph
212:19, 212:23,
213:7, 213:18,
213:22, 213:24,
214:20, 215:14,
215:18
photographs
3:20, 69:16,
210:15, 211:13,
212:1, 212:7,
212:12, 216:1
photos
26:23

physical
162:7, 164:14,
165:19, 165:21,
226:8
physically
6:15, 19:21,
47:3, 104:8
pick
79:6, 79:9,
79:13, 79:19,
81:18, 82:18,
84:20, 85:10,
91:11, 92:8,
250:5
picked
247:9
picket
16:6
picking
123:7, 134:23
picture
219:11, 219:13
place
13:4
placed
262:1, 262:2
plaintiff
1:6, 2:7, 4:11,
212:20, 213:9,
213:19, 213:23,
214:22, 215:17,
236:3, 253:13,
253:16, 255:1
plaintiff's
5:8, 257:14
plaintiffs
254:10
planet
2:24, 4:6
please
4:22, 6:8,
7:10, 12:10,
32:18, 45:18,
45:19, 48:9,
68:22, 85:8,
146:24, 160:12,
169:4, 200:19,
219:3, 236:19

Transcript of Michael DeLacy
Conducted on January 15, 2021

95

| | | | |
|---|---|---|---|
| **pocket** 135:19, 136:10, 136:24, 137:20, 137:22 **point** 12:10, 41:9, 41:11, 43:15, 44:15, 47:17, 49:12, 69:14, 99:12, 106:5, 109:2, 124:15, 148:5, 150:24, 167:12, 230:9 **police** 3:16, 8:12, 8:15, 8:19, 8:20, 8:22, 9:23, 15:8, 15:10, 17:5, 17:23, 18:15, 18:21, 19:1, 21:11, 24:22, 28:4, 39:19, 40:10, 44:1, 44:24, 51:6, 64:13, 76:22, 146:7, 147:5, 158:1, 159:22, 160:15, 160:22, 161:2, 177:15, 178:12, 198:20, 199:11, 203:24, 220:11, 237:12, 242:10, 242:20, 256:2 **policies** 147:6, 158:1, 158:15 **policy** 146:7, 157:13, 159:11, 159:22, 160:15, 160:22, 161:3 **porch** 98:17 **portion** 40:24, 126:22, 129:22, 238:1, | 242:4 **portions** 261:4 **posed** 180:18 **posey** 72:8, 72:9, 90:1, 90:11, 90:15, 90:21, 90:23, 91:11, 91:18, 92:8, 92:18, 93:18, 98:21, 99:6, 101:19, 102:8, 102:10, 102:11, 102:13, 104:1, 106:5, 110:11, 110:13, 111:12, 111:15, 119:22, 120:6, 120:15, 121:24, 122:6, 122:19, 135:1, 167:20, 186:3, 186:4, 191:15 **posey's** 186:3 **position** 252:18 **positive** 24:13, 163:23 **possession** 187:16 **possible** 83:20, 84:3, 85:5, 85:12, 85:17, 116:19, 116:21, 116:23, 116:24, 117:1, 181:24 **possibly** 69:15, 165:10, 165:11 **post** 19:9 **post-retirement** 39:19 **postconviction** 151:7 | **pounds** 172:2 **powder** 138:15 **powdered** 147:15 **practice** 8:3, 159:3, 170:13, 182:24, 183:15, 184:5 **pre** 255:10 **predominantly** 33:20 **prefer** 49:1, 235:5, 235:12 **preference** 211:7 **premises** 263:8 **prepare** 11:4, 11:9, 11:11, 13:15, 13:18, 14:2, 14:15, 14:20, 52:1, 68:21, 69:14, 69:17, 177:18 **prepared** 169:12, 169:20, 169:23, 170:1, 177:3, 177:14, 183:11, 196:12, 196:22, 222:2 **preparing** 177:7 **presence** 124:12, 124:15, 124:23 **present** 2:22, 6:15, 7:14, 7:21, 8:3, 47:4, 72:3, 104:8, 105:19, 106:8, 116:7, 117:18, 117:20, 117:23, 129:11, | 131:1, 135:8, 136:4, 136:5, 143:1, 143:12, 143:17, 144:24, 145:3, 145:7, 145:17, 147:22, 150:2, 150:6, 151:6, 151:9, 153:14, 156:21, 159:24, 160:18, 161:9, 168:3, 184:16, 186:10, 197:12, 197:15, 197:21, 198:2, 198:6, 198:9, 201:1, 204:10, 204:13, 204:17, 207:8, 207:17, 209:21, 227:4 **pretrial** 14:11, 56:12, 104:6, 151:13, 152:17 **pretty** 235:11 **previous** 72:6, 84:22, 250:9 **previously** 221:20, 233:16, 235:3, 246:13, 249:8, 254:14 **princeton** 38:3 **print** 235:7, 235:10, 235:12 **printed** 210:17, 210:24, 253:2, 259:20 **printing** 235:14 **printout** 255:10 **prior** 52:12, 62:11, 63:11, 64:14, 67:5, 76:23, |

86:9, 86:16,
86:23, 87:10,
88:8, 145:10,
152:17, 217:21,
218:1, 251:21
**privately**
49:11
**probable**
161:17, 161:23
**probably**
15:9, 32:12,
53:21, 81:6,
110:19, 111:1,
111:5, 116:1,
116:9, 139:7,
142:1, 142:2,
142:4, 142:12,
142:15, 172:20,
176:5, 184:7
**probation**
29:14
**probationary**
9:5, 29:13,
29:23
**problem**
157:20
**problems**
37:3
**proceed**
46:10, 48:19
**proceeded**
182:2, 193:14
**proceeding**
5:4, 14:8,
14:15, 14:19,
51:22, 52:15,
152:18, 152:23
**proceedings**
151:13
**process**
43:16, 156:18,
193:6, 223:5
**processed**
148:24, 161:10,
201:2, 201:14,
202:21, 205:8,
205:20, 206:24
**processing**
139:17, 148:20,

148:21, 149:5,
149:11, 149:19,
157:2, 162:11,
163:8, 197:16,
203:2, 208:17
**produce**
236:6, 236:9
**produced**
172:16, 186:24,
199:1, 233:16,
233:18, 234:8,
234:9, 234:12,
234:20, 235:3,
235:19, 235:22,
235:24, 236:1,
236:3, 236:7,
241:6, 251:19,
251:21, 254:14,
254:21, 256:17
**production**
235:16
**profane**
262:7, 262:13
**profanity**
262:9
**professional**
50:5, 238:19
**professionally**
49:21, 49:23
**projects**
37:16
**promoted**
9:20, 87:16
**promotion**
9:17
**proper**
123:2
**prosecutions**
27:1
**prosecutors**
217:5
**protection**
130:5, 130:8,
130:10
**protective**
118:16, 131:18,
135:8, 145:1,
145:11, 147:23,

148:9, 157:3,
197:6
**provide**
24:21, 156:2,
156:6, 190:7
**provided**
14:14, 53:20,
54:13, 54:18,
55:23, 56:3,
56:6, 56:12,
60:23, 61:3,
61:11, 61:16,
66:19, 132:10,
216:22, 217:9
**provides**
24:22
**providing**
124:19
**pt**
212:19, 213:9,
213:19, 213:22,
214:22, 215:17
**public**
265:33, 266:11,
266:39
**pull**
254:2
**pulled**
136:23
**punch**
164:11, 164:18
**punched**
226:17
**punitive**
43:14, 46:20,
48:17, 263:15
**pursuant**
43:17, 251:21,
256:17, 263:14
**pursuit**
261:23
**pushed**
237:10
**pushing**
239:24
**put**
16:20, 117:19,
126:20, 130:13,

130:18, 130:20,
131:2, 131:19,
131:24, 132:8,
132:12, 133:2,
133:7, 137:20,
137:21, 139:18,
140:2, 142:5,
148:4, 175:13,
176:1, 178:10,
178:21, 179:21,
180:9, 195:2,
211:5, 247:11,
251:17, 263:11,
263:16
**putting**
135:9, 139:21

---

**Q**

**qualify**
42:5, 42:11,
42:14
**quantity**
262:5
**quash**
151:22, 152:2
**question**
17:24, 21:1,
21:19, 22:7,
24:9, 26:16,
32:23, 35:20,
38:10, 43:6,
44:3, 45:7,
46:24, 51:13,
55:6, 61:8,
66:18, 66:24,
72:20, 80:12,
89:15, 95:23,
96:11, 122:16,
128:2, 129:20,
134:12, 142:10,
143:10, 144:9,
146:1, 146:23,
147:2, 147:4,
147:18, 149:17,
152:21, 156:24,
157:21, 160:5,
160:7, 160:8,
160:9, 166:23,

Transcript of Michael DeLacy
Conducted on January 15, 2021                                    97

| | | | |
|---|---|---|---|
| 178:10, 178:16,<br>178:19, 179:18,<br>179:21, 180:7,<br>180:12, 180:15,<br>180:18, 181:15,<br>195:4, 201:22,<br>225:19, 229:13,<br>229:14, 231:23,<br>245:8, 247:6,<br>248:14, 249:9,<br>249:12, 249:16,<br>249:21, 254:18,<br>254:24, 264:8<br>**questioned**<br>115:19, 115:21,<br>116:7, 147:7<br>**questioning**<br>85:22, 89:13,<br>112:17, 113:2,<br>116:8, 116:16,<br>123:8, 123:11,<br>123:19, 140:24,<br>150:3, 150:7,<br>176:9, 176:13,<br>176:19, 177:23,<br>178:14, 179:4,<br>179:12, 181:4,<br>194:1, 194:6,<br>194:8, 194:19,<br>195:8, 196:9,<br>198:18, 231:15,<br>232:21, 245:23,<br>249:14, 250:5,<br>250:17<br>**questions**<br>6:18, 7:11,<br>42:20, 42:22,<br>43:9, 43:19,<br>44:14, 45:4,<br>45:9, 47:22,<br>52:22, 60:16,<br>60:22, 64:8,<br>112:18, 113:3,<br>140:10, 144:16,<br>166:14, 166:15,<br>200:13, 230:14,<br>231:7, 231:19,<br>232:13, 245:1, | 245:24, 246:3,<br>246:14, 251:10,<br>251:18, 252:2,<br>252:7, 252:10,<br>263:18<br>**questions-**<br>251:18<br>**quick**<br>140:20, 218:16,<br>235:11, 237:20,<br>264:8<br>**quiet**<br>230:9<br>**quite**<br>31:14, 64:8,<br>90:4, 137:11<br><br>**R**<br>**race**<br>108:3, 108:5,<br>108:6<br>**racial**<br>223:10, 223:19,<br>225:1<br>**racine**<br>69:8, 69:10,<br>213:14, 214:3,<br>214:6, 214:23,<br>215:2, 215:7,<br>215:22<br>**radio**<br>33:23<br>**radke**<br>239:1<br>**raid**<br>173:18, 173:21,<br>174:1, 174:8,<br>174:16, 174:19,<br>174:20, 175:2,<br>175:5<br>**raise**<br>5:16<br>**raised**<br>47:18, 48:1<br>**range**<br>125:14, 225:14<br>**ranks**<br>9:12 | **ransacked**<br>242:11<br>**ransacking**<br>242:23, 243:10<br>**rate**<br>266:23<br>**rather**<br>31:11<br>**rd**<br>200:2, 237:9,<br>262:2, 262:3<br>**rdp**<br>194:3<br>**re-ask**<br>201:21<br>**re-enters**<br>50:10<br>**re-examination**<br>3:9, 248:15<br>**read**<br>13:4, 13:6,<br>14:4, 14:11,<br>53:1, 53:10,<br>53:12, 53:15,<br>53:23, 54:5,<br>66:12, 76:22,<br>95:10, 95:16,<br>104:20, 106:4,<br>127:8, 127:21,<br>128:14, 129:23,<br>131:6, 142:22,<br>165:3, 165:8,<br>165:15, 165:22,<br>165:24, 166:5,<br>172:1, 180:13,<br>194:3, 200:12,<br>200:16, 200:18,<br>200:19, 201:15,<br>201:18, 203:11,<br>203:12, 222:6,<br>223:2, 223:5,<br>223:24, 225:3,<br>226:7, 226:9,<br>226:10, 227:17,<br>227:19, 227:21,<br>237:15, 240:9,<br>242:12, 260:17,<br>260:19, 260:23, | 261:2, 261:4,<br>265:6<br>**reading**<br>53:19, 54:2,<br>61:15, 95:24,<br>160:3, 196:3,<br>226:13, 228:23,<br>239:12, 259:16,<br>260:2, 262:22,<br>266:25<br>**reads**<br>265:6<br>**ready**<br>50:12, 50:15,<br>200:21, 226:14,<br>227:22, 237:22,<br>242:1, 254:22<br>**reagan**<br>190:9, 190:12<br>**real**<br>110:15, 140:20<br>**realize**<br>219:16<br>**really**<br>32:2, 32:5,<br>48:14, 50:8,<br>128:10, 159:6,<br>173:1, 192:20,<br>230:15, 231:16,<br>238:13, 245:24,<br>259:21<br>**rear**<br>74:3, 74:5,<br>74:8, 74:12,<br>74:22, 75:7,<br>77:1, 77:10,<br>78:6, 79:13,<br>79:19, 83:8,<br>83:14, 94:4,<br>97:12, 156:11,<br>156:22, 176:9,<br>182:2, 193:14,<br>193:24, 213:2,<br>213:13, 216:9,<br>216:16<br>**reason**<br>73:6, 84:4,<br>91:10, 92:13, |

Transcript of Michael DeLacy
Conducted on January 15, 2021                    98

122:5, 122:13,
178:1, 194:16,
195:7, 265:6
**rebuttal**
249:12, 249:16,
249:21, 250:10
**receive**
115:24, 164:6
**received**
58:5, 58:6,
58:13, 59:4,
59:8, 62:5,
62:8, 76:15,
83:6, 85:6,
98:5, 100:4,
112:4, 125:7,
161:6, 176:3,
193:22
**receiving**
206:23, 222:15
**recess**
144:1
**recognize**
169:2, 169:14,
187:2, 187:19,
187:22, 188:1,
199:10, 212:22,
213:1, 213:10,
213:12, 213:20,
214:2, 214:24,
215:21, 228:6,
238:17, 243:21,
244:20, 259:3
**recollection**
51:10, 52:3,
54:7, 54:22,
64:1, 95:7,
95:16, 95:17,
96:2, 96:18,
97:3, 99:15,
104:7, 104:12,
104:21, 104:24,
111:20, 112:12,
117:22, 125:13,
127:9, 128:4,
128:10, 128:16,
184:4, 195:1,
198:17, 200:14,

201:1, 208:21,
209:13, 214:16,
215:6, 215:14,
216:2, 216:6,
222:9, 224:3,
228:18, 237:14,
238:5, 238:12,
239:13, 239:18,
239:20, 242:5,
244:9, 258:15,
263:2
**record**
4:21, 6:9,
6:12, 6:13,
11:14, 12:12,
15:2, 24:20,
43:10, 45:22,
47:22, 47:24,
48:13, 48:22,
48:23, 49:1,
49:2, 50:1,
50:3, 50:7,
60:20, 63:20,
66:3, 68:10,
94:15, 96:13,
96:14, 103:9,
103:10, 103:11,
129:21, 129:23,
140:18, 141:2,
143:21, 143:23,
143:24, 144:2,
151:23, 152:6,
163:17, 168:24,
171:12, 186:23,
188:18, 199:1,
218:21, 218:22,
218:23, 218:24,
219:3, 226:5,
229:4, 231:6,
231:14, 231:16,
232:16, 235:10,
236:6, 236:11,
236:13, 236:14,
236:15, 236:24,
241:7, 245:9,
251:17, 253:1,
253:13, 253:19,
254:8, 254:20,

257:13, 260:10,
263:12, 263:16,
264:7
**recorded**
50:18, 194:2
**recovered**
147:15, 262:5
**redacted**
235:1, 252:1,
252:4, 261:5,
261:18, 261:20,
262:3, 262:5,
262:17
**redaction**
258:9, 261:11
**redactions**
256:18
**reed**
188:15, 190:11,
191:10, 191:11,
192:19
**refer**
173:22, 189:3,
208:19
**reference**
262:2
**referred**
114:14, 202:21
**referring**
27:13, 64:22,
113:20, 165:12,
172:24, 189:8,
221:20, 225:7
**refresh**
52:2, 54:7,
104:7, 104:24,
200:24, 209:13,
214:16, 215:6,
215:13, 216:5,
222:9, 224:2,
228:18, 237:13,
238:5, 239:13,
239:17, 239:20,
242:5, 244:9,
258:15, 263:2
**refreshed**
52:18, 53:22,
54:12, 54:21,

54:22, 55:2,
96:17, 104:12,
104:21, 127:9,
128:9, 128:15,
216:2
**refreshes**
198:17, 200:13,
208:21, 238:12
**refused**
246:21, 247:8,
249:12
**regard**
128:8, 132:5
**regarding**
37:4, 47:9,
49:6, 59:18,
158:1, 261:12
**regardless**
232:22
**regards**
165:4
**register**
220:17, 228:10,
237:18, 255:2,
255:10, 256:8
**regular**
29:5, 30:9,
33:17, 184:22
**reilly**
191:16, 191:23,
192:3
**reiterate**
247:11
**relate**
71:15
**related**
13:21, 14:23,
43:19, 46:19,
51:10, 76:14,
100:5, 100:9,
129:5, 144:16,
149:11, 153:6,
159:11, 198:7,
201:10, 249:10,
266:27
**relates**
187:13
**relating**
14:8

Transcript of Michael DeLacy
Conducted on January 15, 2021

99

relationship
27:22, 99:23,
182:19, 182:22
relative
112:5
relaying
59:8, 59:21
relevant
43:4, 81:3,
81:8, 81:24,
82:10, 82:18,
230:13
relied
157:23, 158:13
relying
145:15, 146:5,
146:16, 147:4
remainder
31:23, 205:6
remembered
11:15, 68:18,
232:18
remote
4:1, 246:2,
264:4
remotely
2:6, 2:12,
2:18, 45:12,
249:9, 266:6
repeat
10:20, 17:23,
21:1, 21:18,
24:9, 46:5,
51:13, 66:6,
85:8, 112:21,
130:16, 137:13,
142:10, 144:10,
146:23, 156:24,
160:12, 161:20,
193:17, 193:19,
195:4
rephrase
61:7, 151:22
rephrasing
232:3
reported
53:1, 57:10,
63:15, 64:20,

65:19, 66:10,
69:5, 69:22,
75:3, 76:17,
83:6, 237:8,
256:8, 266:6
reporter
4:5, 4:22,
4:24, 5:15,
129:23, 171:11,
221:8, 245:7
reporting
56:24, 57:2,
57:13, 63:1,
68:2, 68:18,
193:13, 261:5,
261:8, 261:16,
261:21, 261:23,
262:3, 262:6,
262:9, 262:10,
262:13, 262:20,
263:3
reports
51:17, 53:8,
61:15, 69:13,
75:17, 75:21,
76:22, 76:23,
77:4, 95:10,
95:16, 106:24,
108:17, 125:2,
127:21, 128:21,
164:4, 169:19,
170:16, 178:22,
181:19, 193:5,
217:24, 232:5
represent
4:11, 4:14,
4:17, 50:4,
107:6, 230:23
representation
6:23, 8:2
representations
50:4, 252:8
represented
46:7
representing
2:6, 2:12,
2:18, 230:19
request
7:17, 8:1,

12:17, 16:13,
27:3, 45:13,
46:3, 46:5,
46:8, 47:7,
48:18, 251:20
requested
16:17, 103:15,
129:22, 179:3,
236:2
reserve
251:15, 251:17,
263:22
resided
78:5
residence
156:11, 156:22,
213:2, 216:9
residents
261:12
residing
156:10
resolution
43:22
respect
78:10, 146:7,
147:6, 150:11,
157:13, 160:16,
161:3, 183:1,
183:16, 184:5,
198:17, 252:1
respectfully
49:24, 230:16
respond
33:23, 35:12
responded
261:10
response
115:8, 235:24,
249:14, 251:20
responsibilities
23:7
responsibility
114:14, 114:15,
117:10, 117:13
rest
46:10, 180:15
restate
152:11

results
164:6
retained
3:33
retire
40:14
retired
11:1, 16:22,
16:23, 16:24,
17:2, 27:12,
39:22
retirement
8:15, 9:13,
17:5, 17:6,
18:20, 19:5,
19:10, 24:17,
27:16, 31:13,
40:3, 40:10,
89:4
return
197:17
returned
197:18, 203:3,
262:4
review
11:8, 11:11,
14:13, 14:22,
52:13, 69:12,
159:17, 200:23,
202:2, 202:8,
209:7, 209:19,
222:1, 222:23,
223:10, 223:16,
226:12, 239:7,
241:13, 241:20,
244:1, 252:10,
259:6
reviewed
13:18, 13:21,
14:1, 14:7,
14:20, 51:17,
51:20, 52:23,
53:5, 53:8,
55:19, 58:24,
59:21, 67:19,
68:21, 75:16,
75:20, 77:4,
105:6, 106:24,

108:17, 128:20,
135:21, 138:18
**reviewing**
11:15, 13:14,
52:1, 52:17,
104:5, 104:11,
109:6, 171:24,
194:15, 199:16,
200:20, 209:2,
209:3, 209:11,
226:11, 227:23,
237:23, 239:11,
242:3, 242:4,
259:15
**richard**
257:11
**richmond**
261:23
**rick**
2:24, 4:6
**rights**
141:11, 141:16,
142:4, 143:7,
143:13
**risley**
184:10, 184:13,
184:15, 185:10,
188:2, 190:10,
190:19, 190:22,
237:10, 238:3,
239:23
**risley's**
185:12
**robberies**
37:6, 38:24
**robertson**
224:18, 224:20,
225:9, 226:16,
226:21, 228:19,
228:21, 229:9,
229:23
**robertson's**
225:4
**robinson**
217:15, 221:1,
222:10, 223:3,
223:11, 223:18,
224:18, 228:20,

228:23
**rock**
2:10, 6:16
**rode**
205:12
**room**
7:14, 7:21,
8:3, 48:7,
48:11, 50:11,
117:20, 130:19,
130:21, 131:3,
131:9, 131:13,
132:8, 132:13,
133:2, 133:7,
133:11, 136:1,
139:19, 139:22,
140:2, 208:11,
208:12
**rooms**
133:14, 133:19,
133:20, 135:9,
148:5, 149:16
**ros**
176:3, 193:13,
193:22
**rude**
230:15
**rules**
144:8
**run**
219:3
**ryan**
37:13

---S---

**s**
32:9
**safely**
13:11
**safety**
131:12, 131:15,
131:23
**said**
7:23, 20:1,
30:2, 37:20,
44:17, 44:18,
47:12, 49:15,
52:24, 53:4,

60:14, 63:7,
66:2, 77:23,
97:21, 97:23,
100:10, 101:15,
107:20, 108:24,
109:1, 110:4,
110:5, 111:21,
114:13, 114:16,
114:18, 115:5,
115:8, 117:5,
117:9, 126:24,
127:10, 131:11,
137:15, 142:11,
148:4, 149:18,
178:16, 179:11,
180:19, 182:20,
198:9, 202:16,
220:7, 223:11,
231:20, 232:5,
232:17, 232:18,
232:19, 234:19,
261:11, 261:15,
262:8, 262:10,
262:19, 262:20,
266:17
**same**
5:14, 8:2,
20:6, 20:16,
27:22, 41:7,
41:11, 41:12,
54:4, 66:2,
82:8, 109:19,
113:23, 115:8,
115:9, 142:16,
143:8, 144:8,
146:18, 146:22,
152:21, 178:15,
180:11, 180:16,
181:6, 195:20,
195:23, 225:12,
240:15, 240:19,
245:16, 247:11,
262:18, 266:23
**saw**
92:11, 107:18,
169:19, 207:23
**say**
6:13, 9:19,

11:15, 12:23,
20:20, 22:9,
28:1, 29:22,
30:20, 32:8,
45:11, 47:7,
47:22, 54:10,
54:22, 55:17,
57:7, 67:16,
74:5, 74:12,
80:19, 85:4,
85:9, 85:15,
86:22, 87:14,
91:7, 96:1,
98:18, 99:23,
101:8, 109:14,
110:16, 110:22,
111:5, 112:15,
113:19, 114:11,
124:13, 125:9,
135:1, 137:8,
145:13, 146:5,
148:2, 149:2,
150:10, 159:20,
165:11, 167:23,
170:3, 170:7,
170:9, 170:12,
172:21, 173:17,
175:12, 177:13,
203:19, 212:19,
222:19, 224:4,
232:11, 247:15,
249:18, 253:9,
254:21, 256:12
**saying**
50:16, 68:17,
72:17, 116:21,
133:24, 179:10,
201:9, 229:4,
229:5, 229:18,
230:11, 232:2,
232:10, 234:13,
250:24, 257:24,
260:19
**says**
6:4, 170:24,
171:4, 176:3,
177:24, 178:1,
180:24, 185:19,

188:14, 188:23,
190:9, 193:9,
195:11, 196:7,
196:10, 200:2,
201:9, 203:23,
214:9, 214:23,
228:23, 234:24,
238:15, 253:6,
255:9, 255:15,
256:21, 258:8,
258:9, 261:5
**says-**
172:15, 208:21,
237:7
**scene**
162:11
**scenes**
35:13
**screen**
210:19, 211:4,
211:5, 211:8,
219:18, 234:17,
234:21, 254:4,
259:10, 259:18,
260:6, 260:12
**scroll**
257:7, 257:8
**seal**
266:32
**search**
35:4, 35:10,
118:16, 134:12,
145:1, 145:2,
167:1, 208:24,
242:11, 243:10,
256:24, 258:17
**searched**
242:11
**searching**
242:23
**seat**
118:14
**seated**
118:11, 118:12
**second**
10:11, 45:11,
47:2, 49:5,
60:18, 140:17,

166:18, 170:21,
170:24, 174:15,
210:1, 213:7,
221:22, 224:10,
233:24, 235:6,
236:8, 247:24,
254:2, 258:22,
260:9
**section**
172:13, 173:17,
173:22, 174:9,
174:16, 175:19,
193:8, 195:2,
196:7, 201:8,
202:15, 203:23
**secure**
132:13
**security**
218:5
**see**
12:19, 12:21,
63:9, 73:24,
89:7, 106:11,
108:14, 155:16,
155:18, 161:9,
170:20, 170:23,
172:19, 173:19,
182:16, 188:8,
188:12, 188:15,
188:23, 188:24,
189:1, 191:13,
192:8, 193:10,
193:16, 194:8,
194:10, 196:4,
198:17, 199:3,
200:2, 200:5,
200:10, 201:11,
201:13, 202:21,
203:7, 208:21,
208:23, 210:19,
211:1, 211:4,
211:8, 215:18,
219:19, 219:22,
224:10, 226:2,
226:16, 236:24,
238:11, 239:8,
242:9, 242:12,
242:19, 242:24,

247:12, 247:24,
252:11, 253:21,
255:8, 255:11,
255:15, 255:19,
256:7, 256:9,
256:16, 257:1,
257:3, 257:17,
258:6, 258:11,
258:22, 259:8,
259:12, 259:18,
259:23, 260:8,
260:14, 260:24
**seeing**
106:14, 106:17,
215:14
**seeley**
242:14
**seems**
231:10
**seen**
57:5, 69:16,
88:22, 88:24,
164:24, 165:4,
166:2, 166:6,
199:15, 208:5,
213:23, 217:24,
221:20, 227:15,
235:16, 237:3,
241:12, 243:14
**seidler**
24:5
**sense**
27:24
**sent**
221:9, 234:18
**sentence**
10:20, 200:9,
208:23
**sentences**
200:8, 200:12,
201:15, 201:19,
208:24
**separate**
39:8, 39:12,
39:15, 109:21
**separately**
109:24
**september**
11:19, 11:22,

13:15, 13:22,
21:22, 31:7,
32:19, 37:9,
51:12, 51:16,
52:4, 52:10,
54:3, 54:6,
54:12, 55:14,
56:19, 57:1,
57:8, 57:17,
62:12, 63:1,
63:4, 63:12,
63:15, 64:2,
64:13, 64:20,
65:10, 65:18,
66:10, 69:6,
70:3, 70:10,
70:17, 70:19,
70:21, 70:24,
75:7, 76:18,
80:8, 80:15,
83:22, 84:14,
86:10, 86:16,
87:5, 103:17,
104:9, 105:2,
106:18, 107:3,
107:7, 107:18,
107:22, 108:22,
119:17, 120:3,
120:11, 120:14,
124:12, 124:16,
124:23, 150:12,
150:15, 152:19,
152:24, 159:21,
160:14, 160:23,
161:11, 162:19,
165:1, 166:10,
167:13, 168:4,
169:8, 173:4,
173:13, 175:3,
176:18, 177:22,
182:24, 185:9,
187:11, 188:5,
188:24, 196:23,
197:13, 199:14,
205:7, 215:7,
217:18, 217:22,
218:2, 239:5
**sergeant**
10:5, 10:14,

Transcript of Michael DeLacy
Conducted on January 15, 2021

102

33:6, 130:23,
131:1, 132:13,
132:18, 132:20,
133:1, 136:5,
148:4, 154:21,
154:23, 155:1,
156:14, 156:15,
184:10, 184:13,
184:14, 184:15,
185:5, 185:10,
185:12, 185:15,
185:17, 185:20,
188:2, 190:10,
190:19, 190:22,
191:1, 191:2,
191:5, 203:6,
237:10, 238:3,
239:23, 257:4
**sergeant's**
10:1
**sergeants**
130:22, 196:18
**served**
26:20
**service**
24:15, 25:14,
26:9, 42:11
**services**
10:19, 10:21,
10:22, 10:23,
11:1, 24:21,
24:24, 25:20,
26:2, 27:4,
27:7, 28:2, 28:7
**seven**
8:24, 9:1, 9:2,
31:12
**seventies**
19:20, 31:5
**several**
226:17
**share**
81:4, 81:8,
82:2, 210:19,
234:17, 234:21,
254:4, 259:10,
259:18
**shared**
80:20, 81:18,

82:11
**sheet**
265:1
**shift**
33:7, 33:17,
34:10, 34:15,
36:11, 62:11,
63:4, 63:14,
184:20
**shifts**
34:16, 34:21,
34:23
**shirt**
136:16
**shoes**
136:20
**shop**
214:8, 214:10
**short**
31:21, 134:8,
134:9, 140:4,
218:17, 218:19
**should**
46:6, 47:23,
50:14, 50:17,
91:18, 115:22,
116:15, 159:24,
173:17, 186:18,
212:19, 229:5,
233:8, 234:7,
236:5, 253:9,
257:11, 265:6
**shoulders**
12:20
**show**
99:12, 198:15,
198:16, 210:15,
210:19, 260:5
**showing**
212:10
**shown**
12:9
**shred**
221:7
**sign**
170:15
**signature**
169:14, 169:18,

169:19, 170:11,
170:21, 170:23,
171:1, 187:19,
187:23, 188:1,
228:6, 244:5,
244:20, 263:22,
265:28
**signature-p1kal**
266:36
**signatures**
196:15
**signed**
177:14, 196:14,
238:23
**significant**
65:5, 65:8
**signify**
173:7
**signing**
266:25
**silent**
126:9
**simmons**
242:7
**since**
40:3, 40:9,
50:3, 51:5,
254:23
**single**
74:15
**sir**
6:9, 7:3, 7:21,
11:12, 11:24,
14:20, 24:11,
26:5, 30:18,
33:4, 36:17,
58:23, 60:2,
63:18, 65:24,
69:12, 70:7,
74:19, 75:3,
75:12, 80:24,
85:2, 95:2,
146:13, 160:11,
178:9, 178:21,
182:12, 195:19,
196:4, 203:11,
211:23, 229:7,
259:6, 260:22

**sit**
30:14, 61:2,
74:10, 77:17,
106:23, 107:16,
175:1, 186:14,
206:23, 220:17
**sitting**
52:21
**situation**
15:23, 47:14
**six**
8:24, 9:1, 9:2,
180:14
**size**
137:8, 137:10,
137:16
**slurs**
223:11
**small-talk**
119:9
**snake**
217:18
**social**
88:17, 88:20,
88:23, 89:7,
155:19
**socially**
155:16
**some**
6:23, 12:1,
12:3, 16:12,
28:20, 29:4,
29:11, 30:9,
31:14, 36:19,
38:21, 39:24,
40:24, 41:9,
41:11, 46:11,
49:12, 55:2,
59:16, 59:17,
92:13, 94:21,
98:5, 98:6,
103:22, 106:5,
109:2, 114:14,
117:10, 122:2,
128:4, 132:9,
144:15, 168:13,
200:13, 210:15,
235:18, 238:1,

245:1
**somebody**
177:6, 198:10
**something**
43:15, 47:4,
59:10, 59:20,
81:24, 109:7,
123:6, 132:5,
132:9, 144:6,
172:16, 173:2,
230:13, 231:9
**sometime**
32:13, 125:9
**sometimes**
36:9, 83:1
**somewhat**
54:9
**somewhere**
90:8, 99:2,
125:6, 125:9,
125:12, 136:1
**soon**
102:23, 218:17,
236:1
**sorry**
5:16, 12:2,
15:17, 19:24,
21:3, 26:5,
36:2, 38:8,
39:1, 50:23,
60:10, 61:7,
63:21, 67:4,
68:16, 74:5,
75:12, 81:13,
82:22, 82:24,
88:19, 94:19,
95:2, 102:11,
108:4, 111:19,
112:21, 114:18,
115:1, 116:24,
122:16, 124:13,
129:18, 130:15,
134:3, 137:13,
140:19, 142:19,
151:20, 151:22,
153:19, 157:22,
161:20, 165:6,
170:8, 185:23,

189:7, 193:17,
202:13, 209:9,
212:4, 212:17,
215:11, 217:8,
219:15, 221:22,
222:3, 225:21,
229:6, 231:1,
231:9, 233:7,
238:19, 238:21,
245:10, 246:23,
247:5, 249:11,
252:19, 252:20,
252:21, 262:1
**sort**
91:12, 139:11
**sorts**
38:19
**sotos**
2:15
**sound**
7:18, 107:9,
263:3
**sounded**
128:3
**sounds**
107:11, 128:9,
216:1, 254:15,
260:20
**source**
59:16, 261:11
**south**
19:23, 20:2,
20:7, 20:10,
20:14, 37:10,
37:13, 242:14
**span**
22:7
**speak**
45:20, 46:12,
46:13, 46:15,
47:19, 49:18,
50:7, 230:9,
232:1
**speaking**
50:14, 90:17,
159:7
**special**
33:16

**specific**
21:4, 112:12,
117:22, 125:13,
235:19
**specifically**
88:9, 110:16,
152:9
**speculate**
31:9, 110:18,
158:9, 158:21,
206:11
**speculation**
120:18, 121:11,
122:9, 130:4,
130:12, 146:11,
147:9, 158:6,
158:17, 158:18,
167:9, 178:6,
179:24, 205:2,
246:24, 247:19,
249:8, 250:8
**spend**
29:4
**spent**
30:9, 31:21,
32:3, 32:6
**split**
211:3
**spoke**
6:11, 99:16,
182:3, 193:14
**spoken**
81:16, 126:11
**st**
69:8, 69:10,
74:3, 74:8,
75:3, 75:6,
75:18, 76:24,
77:10, 78:5,
79:12, 79:19,
83:7, 83:14,
90:9, 90:11,
92:5, 92:12,
93:10, 94:3,
94:9, 94:20,
97:11, 99:21,
124:5, 156:10,
156:21, 168:3,

176:8, 182:2,
193:14, 193:24,
213:2, 213:13,
214:2, 214:5,
215:1, 215:2,
215:7, 215:23,
216:9, 237:8,
238:6, 239:14
**stairs**
98:20, 106:6,
106:11
**stamp**
224:4, 224:6,
227:8, 227:10,
238:10, 243:19,
255:13, 258:6,
258:24
**stamped**
169:1, 237:1,
238:12, 241:8
**standards**
238:19
**standing**
90:16, 98:14,
98:15, 106:10,
128:6, 216:12
**stanley**
243:2, 244:10
**stapled**
211:13, 211:14
**star**
171:4, 204:1
**start**
102:23, 255:1
**started**
6:11, 8:10,
9:5, 29:16,
62:20, 63:3,
63:7, 63:23,
64:16, 68:12,
68:14, 232:19,
251:22
**starting**
62:11
**starts**
45:21, 201:9,
237:18, 241:17,
253:13

Transcript of Michael DeLacy
Conducted on January 15, 2021

104

**state**
6:8, 6:19,
26:21, 162:20,
162:21, 162:23,
163:8, 164:1,
166:9, 188:20,
192:16, 193:1,
204:12, 205:8,
205:15, 219:2,
235:22, 235:23,
266:1, 266:12
**state's**
25:17, 25:19,
26:1, 26:8,
26:13, 26:18,
26:24, 27:9,
27:17, 28:3,
28:9, 40:6,
40:9, 40:15,
40:18, 40:23,
41:8, 41:15,
41:18, 41:22,
42:1, 42:6,
44:6, 51:3, 51:7
**stated**
16:19, 225:4,
242:21
**statement**
216:22
**statements**
217:4, 223:17
**states**
1:1
**status**
47:9, 132:6,
133:5
**stay**
49:1, 99:7
**stayed**
16:19, 105:1,
205:15
**steno**
183:1
**stenographic**
266:17
**step**
48:7, 71:10,
103:19, 111:10

**steps**
216:12
**still**
29:14, 76:6,
132:24, 149:20,
165:19, 253:1
**stipulate**
4:23
**stipulation**
5:9
**stop**
124:9, 230:14,
231:4
**stories**
216:19
**straight**
124:8, 124:10
**street**
2:4, 2:11,
37:12, 37:13,
38:3, 74:3,
74:8, 75:3,
75:6, 75:18,
77:1, 77:10,
78:6, 79:13,
79:19, 83:7,
83:14, 90:9,
90:11, 90:16,
92:6, 92:12,
93:10, 94:3,
94:10, 94:21,
97:11, 99:8,
111:24, 112:2,
122:1, 124:5,
156:10, 156:21,
168:3, 176:8,
182:2, 193:14,
193:24, 213:2,
213:14, 215:1,
237:9, 261:15
**stretch**
49:3
**strike**
15:15, 15:17,
15:18, 15:19,
16:1, 34:18,
38:9, 122:15,
164:11, 164:18,

179:7, 179:8,
181:1, 204:12,
229:9, 229:22
**subject**
176:4, 193:23,
203:3
**submarine**
214:8
**submit**
245:20
**submitted**
177:15, 196:17,
222:23, 228:10,
238:18, 238:20,
243:22, 244:24,
259:4
**submitting**
243:15
**subpoenas**
26:21
**subscribed**
265:29
**subsequently**
147:13, 233:17
**substance**
135:18, 138:9,
138:12, 138:16,
147:14, 147:16,
149:4, 149:12,
149:20, 156:19,
161:11, 163:4,
163:11, 163:21,
164:1, 187:17,
189:19, 205:8,
220:23
**substantial**
266:31
**suburbs**
25:7
**sufficiently**
230:18
**suggest**
230:13, 232:4
**suggestions**
260:15
**suite**
2:16
**summary**
201:10, 225:8,

237:17, 241:17,
256:7
**summonsed**
207:9
**sun**
165:23
**supervising**
91:17, 184:20,
184:22, 185:2
**supervisors**
77:9, 77:16
**supplemental**
76:23
**supplementary**
3:18, 14:22,
69:13, 198:21,
199:11, 199:17,
202:4, 204:23,
208:20
**supplied**
73:22
**support**
93:21, 116:9,
116:10
**supposed**
44:14, 76:5,
77:11, 79:6,
147:7, 158:23,
172:20
**suppress**
152:2
**sure**
11:14, 18:1,
21:21, 29:11,
33:1, 35:21,
39:21, 51:14,
55:10, 60:3,
60:4, 66:8,
66:18, 67:5,
80:14, 85:9,
96:11, 122:3,
132:14, 132:17,
137:15, 139:3,
141:1, 141:20,
142:11, 147:2,
152:15, 160:13,
163:16, 163:20,
173:1, 173:3,

Transcript of Michael DeLacy
Conducted on January 15, 2021

105

173:24, 192:21,
192:22, 193:19,
195:5, 197:5,
201:22, 201:24,
204:8, 215:4,
215:24, 219:19,
224:6, 225:16,
226:11, 227:10,
229:3, 229:8,
235:7, 235:9,
237:21, 242:1,
251:13, 258:4,
260:18
**surrounding**
25:10
**suspect**
84:13, 84:19,
85:17, 119:19,
146:4, 147:15
**suspected**
163:6, 166:8
**suspects**
160:16, 261:24
**sustained**
222:20
**sutter**
242:21
**swabs**
26:23
**swear**
5:17
**swearing**
4:23
**switch**
220:9
**sworn**
5:19, 6:4,
8:12, 8:18,
9:13, 265:29,
266:8

**T**

**table**
12:13, 12:21,
13:1
**tact**
29:1, 34:24,
258:1, 258:2

**tactical**
28:12, 28:15,
28:19, 28:22,
29:4, 29:6,
30:10, 30:22,
31:2, 31:4,
31:8, 31:13,
32:6, 32:9,
32:12, 32:19,
33:1, 33:9,
33:17, 33:22,
34:5, 34:8,
34:15, 34:20,
35:3, 35:11,
35:18, 35:21,
36:12, 36:18,
36:22, 38:4,
38:13, 38:22,
39:4, 72:11,
87:22, 89:21,
90:4, 139:5,
159:7, 172:18,
172:23, 183:22,
184:14, 185:1,
185:5, 190:10,
190:19, 200:4,
204:2, 257:4,
257:20, 257:23,
258:13, 261:6
**tag-team**
46:4, 48:16,
49:3
**take**
9:16, 9:22,
10:2, 10:5,
39:23, 45:12,
79:9, 92:11,
102:23, 103:1,
103:5, 103:6,
109:4, 112:4,
122:13, 163:10,
208:16, 218:17,
230:17, 235:12,
237:20, 241:20
**taken**
1:19, 1:29,
4:2, 10:1,
144:1, 209:11

**taking**
6:13, 6:14,
112:16, 113:1,
139:16, 182:9,
182:12, 183:1,
183:16, 184:5,
197:5
**talk**
11:3, 39:18,
48:8, 56:19,
62:15, 71:16,
75:18, 76:7,
76:10, 76:13,
76:24, 78:15,
78:17, 78:19,
79:4, 79:8,
95:6, 119:2,
150:23, 204:15,
204:16, 206:1,
207:2, 220:10,
248:23
**talked**
77:15, 80:2,
82:9, 118:23,
121:19, 121:21,
126:9
**talking**
98:8, 98:9,
98:10, 98:12,
103:15, 130:7,
152:8, 201:17,
253:7
**team**
23:9, 23:11,
23:12, 29:1,
29:6, 34:24,
200:4, 204:2
**teams**
257:23, 258:1,
258:2
**technical**
33:4
**technology**
246:2
**telephone**
58:17, 98:5
**telephonic**
205:18

**tell**
50:2, 57:7,
60:7, 60:10,
64:10, 74:6,
76:12, 77:22,
100:8, 110:3,
112:1, 114:19,
126:17, 134:15,
139:24, 141:4,
160:13, 167:12,
167:16, 175:7,
192:9, 203:6,
266:8
**telling**
51:2, 60:5,
77:23, 93:9,
103:20, 112:10,
156:13, 156:14,
156:17, 190:18
**ten**
15:20, 110:17,
110:19, 111:6,
125:13
**tendency**
266:31
**term**
225:1
**terms**
18:24, 23:6,
57:9, 223:19
**test**
9:16, 9:24,
10:1, 10:3,
10:6, 10:9,
10:12, 10:14,
47:10
**tested**
189:19, 205:9
**testified**
51:19, 52:18,
55:1, 59:19,
62:24, 63:13,
83:5, 94:9,
94:11, 105:7,
108:19, 111:8,
112:9, 112:23,
119:21, 120:1,
120:22, 121:1,

Transcript of Michael DeLacy
Conducted on January 15, 2021

125:11, 131:17,
135:7, 141:24,
142:11, 151:14,
151:17, 152:1,
152:23, 155:21,
159:10, 169:22,
182:20, 216:16,
220:2, 230:2,
231:21, 246:17,
248:17, 248:20,
250:2
**testify**
102:17, 104:17,
150:18, 180:22
**testifying**
58:23, 63:2,
100:16, 131:5
**testimony**
5:1, 14:6,
14:14, 14:18,
30:8, 51:22,
51:23, 52:14,
53:9, 53:12,
53:15, 54:19,
55:5, 55:8,
55:15, 55:20,
55:24, 56:1,
56:4, 56:5,
56:12, 59:2,
61:6, 68:1,
68:6, 68:9,
76:16, 76:21,
84:6, 84:22,
85:3, 92:21,
93:13, 93:23,
94:6, 94:9,
94:15, 95:9,
95:16, 96:1,
97:16, 98:2,
99:19, 100:3,
101:10, 102:12,
103:24, 104:1,
104:6, 104:16,
105:7, 109:7,
112:20, 113:5,
114:7, 117:8,
120:9, 120:22,
126:5, 126:14,

127:22, 128:15,
128:19, 128:21,
131:6, 132:2,
133:9, 135:22,
136:11, 138:19,
145:19, 151:21,
152:17, 155:24,
164:4, 167:6,
175:15, 181:10,
184:4, 192:12,
204:9, 207:16,
208:3, 229:8,
229:21, 231:22,
250:10, 250:19
**testing**
163:8, 164:1,
164:7
**tests**
9:22
**th**
1:19, 4:4,
11:22, 37:12,
37:13, 38:3,
56:19, 57:1,
57:9, 57:17,
62:12, 63:2,
63:4, 63:12,
63:15, 64:2,
64:13, 64:21,
65:10, 65:18,
69:6, 70:3,
70:19, 70:21,
75:7, 103:17,
105:2, 107:18,
107:22, 108:22,
109:4, 111:24,
112:1, 113:1,
119:17, 150:12,
151:18, 152:3,
161:11, 162:19,
162:20, 162:21,
162:23, 163:7,
164:1, 165:1,
166:9, 172:6,
175:3, 176:18,
177:22, 188:20,
192:16, 192:24,
205:7, 205:15,

222:10, 226:19,
228:20, 238:19,
242:6, 243:22,
261:6, 263:4,
266:7, 266:32
**thank**
7:12, 7:19,
10:23, 13:7,
18:23, 22:6,
46:2, 102:12,
103:8, 116:24,
144:7, 144:11,
144:14, 161:1,
182:1, 186:1,
202:13, 209:16,
212:5, 212:17,
237:24, 239:9,
242:3, 244:3,
246:1, 246:4,
246:5, 251:11,
264:6
**thanks**
12:14, 13:9,
18:1, 219:5,
257:15, 260:22
**thefts**
38:24
**themselves**
4:8
**thereof**
266:13
**thing**
65:1, 147:10,
234:10, 263:11
**things**
13:11, 26:20,
37:6, 46:18,
89:4, 230:12,
241:23
**think**
10:4, 16:20,
16:23, 44:20,
47:22, 47:23,
49:24, 50:2,
50:4, 50:7,
56:4, 64:8,
65:22, 98:17,
100:10, 104:23,

107:20, 109:21,
111:1, 111:23,
113:12, 114:13,
115:1, 115:8,
119:7, 119:8,
123:16, 123:23,
125:6, 126:8,
130:16, 141:18,
142:17, 142:20,
142:21, 143:20,
143:21, 144:23,
145:21, 165:22,
166:19, 168:8,
169:23, 172:20,
172:22, 173:1,
184:6, 184:8,
186:2, 191:22,
192:20, 192:23,
193:2, 193:3,
206:8, 208:12,
210:17, 218:18,
220:22, 221:3,
221:5, 229:5,
230:17, 230:21,
232:20, 233:15,
233:21, 234:8,
245:22, 250:5,
253:3, 253:11,
253:16, 253:17,
254:6, 256:11,
258:2, 259:13,
259:19, 263:10,
263:16, 263:20
**thinks**
212:19
**third**
2:4, 126:21,
127:14, 129:15,
129:16, 130:2,
132:8, 133:2,
133:19, 135:9,
143:4, 209:12,
213:22, 241:17,
261:7
**this-**
34:9
**this___day**
265:30

**thomas**
152:14, 169:12, 169:14, 201:9, 201:20, 244:17, 257:10, 258:8, 262:16

**thought**
63:9, 63:10, 63:12, 141:24, 142:2, 188:9, 234:14, 234:15, 252:6

**through**
46:10, 170:13, 199:2, 231:17, 234:15, 237:1, 241:9, 253:18, 261:22

**throughout**
10:17

**thrown**
223:4, 226:18

**tight**
237:12

**time**
4:5, 7:5, 10:8, 10:11, 16:3, 16:13, 16:15, 21:9, 22:3, 22:7, 22:21, 27:20, 28:10, 28:21, 28:24, 29:4, 29:11, 30:9, 31:14, 31:21, 34:9, 34:12, 39:16, 39:24, 45:13, 48:20, 53:8, 53:10, 53:16, 54:1, 54:4, 56:22, 59:15, 63:19, 65:2, 72:12, 76:16, 99:10, 99:12, 99:24, 106:5, 109:2, 109:3, 109:19, 110:15, 113:23, 115:5,

115:9, 116:5, 119:16, 123:23, 125:2, 125:4, 125:16, 134:8, 140:4, 140:5, 143:1, 143:17, 143:21, 144:24, 145:4, 145:7, 145:22, 148:16, 150:24, 151:13, 153:4, 163:3, 169:9, 178:4, 188:6, 188:22, 189:3, 189:8, 189:9, 201:6, 207:3, 207:23, 208:5, 219:3, 220:7, 231:4, 235:12, 241:20, 246:1, 246:2, 250:3, 250:14, 251:1, 257:20, 259:6, 259:15, 260:2, 262:15, 264:5, 264:11

**timeframe**
21:5

**times**
10:2, 10:5, 165:23, 178:16, 180:1, 180:14

**tinfoil**
135:18, 136:9, 136:23, 137:3, 137:4, 137:10, 137:15, 137:19, 137:21, 138:13, 140:11, 142:5, 142:14, 147:14, 148:10, 163:10

**tiny**
137:11

**tip**
60:16, 60:23, 61:12, 74:6, 77:23, 85:6, 97:10, 194:13

**today**
4:4, 6:23,

6:24, 11:5, 11:9, 11:12, 13:16, 13:18, 14:2, 14:15, 14:20, 21:6, 30:14, 49:7, 51:19, 52:2, 52:18, 52:22, 61:2, 69:14, 74:10, 77:17, 99:19, 104:16, 114:7, 155:22, 159:18, 175:2, 186:14, 192:12, 202:9, 206:23, 216:16, 220:2, 220:18, 230:2, 233:5, 233:7, 233:9, 246:1, 250:2, 251:19, 252:8

**together**
15:11, 16:12, 16:19, 16:20, 17:19, 18:9, 18:11, 18:13, 19:1, 19:6, 27:19, 27:20, 41:11, 41:12, 41:15, 41:18, 80:9, 80:15, 82:1, 163:12, 169:20, 211:13, 211:15

**told**
47:14, 51:3, 58:8, 59:14, 59:15, 61:22, 65:17, 66:9, 67:6, 67:13, 67:16, 67:17, 67:18, 68:3, 68:19, 69:5, 69:9, 69:20, 69:21, 71:4, 71:11, 92:24, 97:10, 111:23, 112:3, 112:16,

112:24, 130:13, 130:18, 130:20, 131:2, 132:12, 133:1, 197:16, 203:3, 204:10, 206:17, 224:24, 232:3, 248:22, 249:1, 262:11, 262:12

**tom**
152:14, 152:15, 152:16, 152:22, 153:5, 153:20, 154:2, 218:8, 244:20, 245:4, 245:12

**took**
9:24, 10:8, 10:11, 26:23, 47:11, 103:20, 123:10, 126:21, 183:2, 209:14, 218:19

**top**
171:20, 171:21, 172:5, 188:23, 200:2, 221:23, 234:24, 242:13, 258:5, 258:8

**topic**
44:18, 46:24

**tour**
70:2, 205:6

**towards**
170:21, 213:14, 238:13

**trained**
115:17, 116:13, 116:22, 158:22, 159:11, 161:2, 178:21, 181:18, 181:21, 183:24

**training**
29:17, 29:19, 29:20, 115:24, 161:7

**transcribed**
266:18

Transcript of Michael DeLacy
Conducted on January 15, 2021

108

transcript
5:3, 14:3,
14:4, 14:5,
14:7, 14:11,
56:6, 106:4,
265:1, 266:16,
266:17
transcripts
14:14, 14:18
transferred
27:3
transpired
128:11
transport
79:7, 89:16,
89:18, 91:12,
118:6, 131:20
transported
26:22, 118:20,
132:6, 132:22,
189:13, 248:6
transporting
126:2, 126:19,
246:15
tread
49:8
treated
158:23
trial
40:20, 104:7,
151:9, 151:18,
152:23
tribune
165:18
trick
219:17
tried
256:23
true
5:1, 7:1, 7:14,
52:19, 66:16,
66:17, 77:1,
77:2, 82:8,
89:13, 105:16,
150:16, 178:11,
179:22, 180:10,
181:2, 181:11,
195:19, 195:22,

196:6, 196:9,
218:2, 231:10,
235:23, 266:16
truth
112:10, 266:9
try
64:9, 83:1,
157:22, 211:3,
254:3, 259:10,
259:17, 259:22,
260:5, 260:7,
260:8, 262:16
trying
12:17, 13:10,
45:23, 55:10,
66:17, 66:22,
219:17, 231:16,
231:19
tuesday
53:12, 53:13,
53:16
turn
189:21, 227:6,
238:9, 256:6,
257:8
turned
107:7, 147:3,
149:4, 149:10,
157:2, 164:21
tv
166:2, 166:6
twice
10:4
two
14:12, 14:18,
22:11, 23:10,
23:16, 25:21,
25:22, 28:3,
72:5, 74:15,
89:20, 109:21,
127:3, 141:8,
141:21, 170:14,
177:19, 200:8,
200:12, 201:15,
201:19, 233:14,
235:15, 257:5,
261:24, 262:15
two-page
3:15, 186:19,

186:20, 186:24
two-paragraph
261:3
type
138:15, 170:14,
183:2
typed
170:4, 170:9,
170:10, 173:10,
175:19, 192:10,
192:13, 192:15,
192:23, 193:9
types
38:12
typewriter
170:5
typewritten
171:1
typical
36:11, 36:12
typically
38:5, 123:7,
183:10

---

**U**

uh-huh
224:21
um
24:12, 242:13
unable
107:20
uncomfortable
133:13
uncovered
148:10, 149:3
under
5:2, 22:1,
22:5, 22:9,
140:14, 141:4,
142:5, 143:14,
148:17, 148:19,
185:10, 194:2,
201:19, 203:23,
262:2, 266:18
underneath
22:3, 171:2
undersigned
262:16

understand
6:22, 7:5,
7:13, 21:19,
26:16, 32:23,
55:5, 55:6,
67:4, 72:20,
111:9, 128:2,
143:9, 147:18,
149:17, 160:6,
179:20, 181:7
understanding
76:4, 78:9,
85:11, 92:7,
160:14, 160:22
understands
66:18
understood
11:6
uniform
33:13, 33:14,
33:16, 33:18,
220:13
uniformed
30:9, 88:4
uniforms
33:10, 33:11
unit
24:21, 25:24,
26:10, 26:11,
26:12, 26:13,
26:18, 27:4,
27:7, 27:17,
28:2, 28:8,
28:11, 28:12,
28:15, 28:19,
28:22, 31:2,
34:15, 34:20,
35:3, 35:11,
35:18, 35:21,
36:4, 36:6,
36:12, 36:22,
36:23, 38:5,
38:13, 39:4,
39:8, 39:12,
39:15, 40:21,
41:11, 41:12,
41:14, 41:16,
41:18, 72:11,

Transcript of Michael DeLacy
Conducted on January 15, 2021

109

87:22, 171:10,
171:17, 185:5,
185:8, 185:10,
190:10, 190:19,
191:2, 257:4,
257:20
**united**
1:1
**units**
40:17, 258:13
**unlawful**
243:9, 258:17,
263:7
**unless**
63:20, 230:12,
232:11, 263:17
**unmarked**
34:6, 34:7,
73:14, 73:15
**unnecessarily**
45:22
**until**
9:13, 16:22,
22:14, 24:17,
31:23, 148:5,
254:11
**untrue**
119:23, 120:3
**unwrap**
137:24, 138:2
**upset**
49:10
**upstairs**
106:2, 120:6,
121:2, 122:19,
249:16, 249:19
**use**
34:5, 183:24,
221:6, 221:9,
221:11, 233:19,
233:21, 234:1,
235:3
**usually**
73:9, 183:6,
185:5

---
**V**
---

**vacancy**
27:8, 27:11,

27:16
**vast**
32:5
**vault**
163:1
**vehicle**
118:17, 119:12,
131:19, 131:24,
205:11
**verbally**
157:6
**verbatim**
201:10
**verified**
5:5
**via**
6:14
**vicinity**
99:2
**victim**
224:17, 225:8
**victims**
26:22
**video**
2:24, 4:1,
5:10, 50:14,
50:18, 103:9,
103:11, 143:23,
144:2, 218:22,
218:24, 219:4,
219:6, 236:13,
236:15, 264:4,
264:5
**video-**
6:14
**videoconference**
6:15
**videographer**
2:24, 4:6
**videotaped**
1:17
**view**
214:24, 229:22
**violent**
191:2, 194:1,
194:7, 195:8,
196:9, 197:17,
197:18, 197:20,

203:4, 203:5,
204:11, 207:9,
207:18, 208:13,
248:23
**virtual**
83:2
**virtually**
1:18, 266:7
**virtue**
266:13
**vito**
24:4
**voices**
261:19
**volpi**
257:10
**volume**
7:7
**voluntarily**
120:10, 122:7,
123:18, 250:16
**volunteering**
123:8
**vs**
1:8, 4:3, 265:2

---
**W**
---

**wait**
149:7, 207:10,
225:22, 235:13,
236:11
**waiting**
207:10
**waive**
251:14
**waived**
266:26
**walk**
94:3
**walked**
127:13, 148:3,
216:13
**want**
6:13, 11:3,
19:10, 27:10,
27:16, 35:20,
39:18, 42:2,
47:5, 48:7,

56:19, 65:16,
66:19, 67:5,
85:3, 89:10,
93:10, 103:19,
115:14, 125:24,
144:20, 158:21,
166:13, 166:14,
166:18, 172:12,
180:13, 198:7,
198:16, 200:7,
200:18, 206:11,
210:15, 221:6,
226:10, 231:10,
231:13, 232:15,
235:9, 236:6,
237:17, 239:7,
241:16, 241:20,
244:1, 244:23,
248:18, 252:14,
259:17, 260:17
**wanted**
27:22, 113:16,
113:17, 113:22,
114:4, 132:14,
132:17, 176:9,
176:13, 176:18,
177:23, 179:12,
181:3, 194:1,
194:7, 194:18,
195:8, 196:8,
198:8, 219:8,
231:15, 233:15,
247:23, 248:23,
252:9
**warning**
142:13
**warrant**
134:12, 134:22,
134:23, 166:21,
166:24, 242:11,
256:24, 262:14
**warrants**
35:4, 35:10,
134:16
**washington**
266:2, 266:12
**wasn't-**
91:24

Transcript of Michael DeLacy
Conducted on January 15, 2021

110

waste
48:19
wasting
231:4
watch
190:9, 190:13,
190:14, 261:7
way
5:4, 22:4,
27:20, 49:4,
50:6, 52:3,
77:16, 102:14,
104:8, 104:13,
104:21, 105:10,
115:18, 124:9,
127:5, 162:10,
170:7, 170:9,
179:10, 183:2,
211:3, 211:4,
211:10, 214:16,
215:7, 216:3,
228:19, 232:4,
239:18, 244:10,
255:3, 256:23,
260:15, 262:17
ways
21:12, 22:10,
54:23
we're
12:16, 45:8,
221:9, 252:4
we've
252:20
weapon
167:14, 167:18,
167:21, 242:23
weapons
132:14, 132:18
wear
33:10, 33:11,
33:13, 33:14
wearing
6:24, 107:17,
108:1, 136:13,
136:14
week
53:13, 53:16,
54:19

weekend
264:2
weight
108:11, 172:2
welcome
96:12, 219:6
went
6:12, 31:21,
71:18, 71:22,
71:23, 72:18,
75:6, 75:18,
76:6, 77:9,
79:12, 79:18,
81:18, 83:7,
83:14, 83:21,
84:13, 84:19,
85:4, 85:10,
85:16, 86:1,
90:21, 91:8,
93:17, 97:14,
101:19, 102:8,
102:13, 104:1,
104:2, 104:13,
105:23, 106:1,
106:2, 106:6,
111:13, 120:22,
120:23, 121:1,
122:1, 122:6,
122:13, 122:19,
123:17, 124:7,
124:10, 125:2,
125:4, 134:13,
162:20, 177:22,
178:13, 192:16,
192:24, 194:6,
194:13, 195:7,
205:7, 205:15,
207:10, 207:17,
214:17, 217:18,
242:22, 249:15,
249:19, 250:4,
250:15
wentworth
37:19, 37:20,
38:1, 38:2
weren't
12:13, 37:2,
117:23, 139:12,

146:16, 149:23,
150:2, 150:6,
158:10, 162:10,
198:2, 201:6,
207:17, 209:21,
252:7
west
2:16, 37:10,
37:14, 38:3,
74:3, 74:8,
75:3, 75:6,
75:18, 76:24,
77:10, 78:5,
79:12, 79:19,
83:7, 83:14,
93:10, 97:11,
99:20, 124:5,
156:10, 156:21,
168:3, 176:8,
182:2, 193:14,
193:24, 213:2,
213:13, 216:9,
237:9, 261:22
westbound
261:22
westward
215:1
whatever
211:9, 221:7
whereupon
5:19, 48:10,
50:10, 129:22,
144:1, 264:16
wherever
263:8
whether
16:16, 16:17,
30:4, 43:2,
43:4, 43:14,
68:17, 68:18,
83:12, 85:20,
93:8, 102:15,
104:2, 104:8,
104:13, 104:24,
105:11, 105:22,
111:13, 114:19,
123:1, 123:8,
124:7, 127:2,

144:23, 145:2,
152:7, 166:19,
170:8, 170:9,
192:10, 205:24,
207:2, 211:8,
248:4
white
135:18, 138:9,
138:12, 138:15,
147:15, 163:4,
163:10, 163:21
whoever
131:1
whole
28:24, 163:11,
163:12, 222:7,
254:14
willing
120:10, 120:13,
122:7, 249:3
wiping
259:22
wished
198:8, 203:6
within
21:8, 258:3
without
242:11, 256:24
witness
4:24, 5:4,
5:18, 5:19, 6:2,
12:10, 12:11,
12:13, 12:20,
12:24, 20:18,
23:1, 35:19,
44:11, 45:11,
46:5, 48:6,
48:10, 48:19,
49:16, 49:18,
50:10, 50:20,
56:3, 66:18,
83:21, 84:3,
85:5, 85:12,
91:12, 115:19,
119:15, 122:7,
123:17, 132:3,
132:7, 132:24,
133:6, 159:3,

Transcript of Michael DeLacy
Conducted on January 15, 2021

111

160:9, 180:22,
212:10, 219:13,
219:15, 219:22,
225:22, 226:2,
230:14, 246:4,
250:4, 250:16,
251:11, 251:16,
260:1, 263:21,
264:1, 266:8,
266:32
**witness's**
231:4
**witnesses**
26:21, 26:22,
35:22, 55:24,
56:9, 123:7,
160:21, 183:9
**words**
17:20, 126:18,
158:10, 160:14
**wore**
33:12
**work**
10:16, 13:11,
16:12, 16:21,
17:8, 17:19,
18:13, 19:22,
23:14, 24:6,
25:18, 33:24,
36:17, 39:5,
39:16, 39:18,
39:23, 40:8,
40:17, 40:22,
41:14, 41:17,
51:2, 51:5,
62:21, 64:12,
64:16, 68:12,
68:14, 80:9,
80:14, 87:18,
88:18, 88:21,
88:22, 89:1,
89:8, 162:15,
210:10, 218:4,
233:22, 254:5
**worked**
15:8, 17:5,
17:8, 17:9,
18:19, 19:6,

23:11, 24:17,
25:13, 27:19,
27:20, 33:22,
34:8, 40:1,
40:20, 40:21,
42:3, 70:24,
86:15, 87:10,
88:11, 169:18
**working**
16:19, 18:24,
25:24, 30:22,
31:4, 32:13,
34:10, 42:6,
56:22, 57:3,
57:4, 57:19,
70:19, 70:21,
80:21, 81:17,
88:6, 88:15,
144:12, 171:7,
192:19, 246:1,
261:6
**works**
211:4
**wouldn't**
46:4, 158:21,
180:9, 248:18,
248:24, 260:19
**writing**
228:13
**written**
171:22, 176:15,
176:17
**wrong**
49:4, 57:8,
203:11, 234:16
**wrongdoing**
244:14

**Y**

**yamin**
2:15, 4:19,
5:14, 245:23,
246:7
**yeah**
214:24
**year**
10:9, 22:19,
24:12, 30:5,

30:6, 53:21,
53:22, 54:4,
54:13, 173:2
**year-and-a-half**
24:13
**year-old**
107:10
**years**
15:9, 15:20,
16:19, 17:4,
19:18, 25:21,
25:22, 28:4,
28:20, 29:8,
30:21, 31:1,
31:12, 32:6,
40:11, 40:19,
40:24, 41:20,
42:3, 42:9,
107:7, 169:18,
176:5, 176:8,
193:24
**years-old**
193:15
**yep**
7:4
**yourself**
105:12, 109:8,
116:4, 200:16,
200:19, 205:16
**youth**
9:17, 142:24,
143:16, 144:24,
145:2, 145:6,
145:10, 147:21,
148:6, 148:11,
148:15, 148:18,
148:22, 148:23,
149:4, 149:7,
149:11, 149:19,
156:17, 157:1,
160:18, 161:10,
164:21, 193:6,
197:6, 197:9,
197:12, 200:10,
201:2, 201:3,
201:14, 202:20,
205:19, 205:22,
206:2, 206:24,

207:24, 208:14,
208:17, 209:14
**youthful-appeari-
ng**
261:17

**Z**

**zoom**
4:1, 4:6

**0**

**00**
1:20, 34:14,
57:17, 62:23,
63:12, 64:14,
140:20, 237:8
**000097**
169:1
**0045**
261:9
**0052**
187:1
**009**
258:9
**02**
261:7
**02204**
1:8, 4:4
**04**
143:23
**05**
189:4, 189:5,
189:14
**09**
103:9
**095339**
253:14

**1**

**1**
140:20, 143:23,
144:3, 189:4,
189:5, 189:14
**10**
1:20, 3:26,
4:5, 172:18,
234:5, 237:8,
238:19, 264:13

Transcript of Michael DeLacy
Conducted on January 15, 2021

112

**1000**
2:11
**102**
213:19
**103**
213:9
**105**
213:22
**108**
212:19
**11**
3:27, 162:20,
162:21, 162:23,
163:7, 164:1,
166:9, 188:20,
192:16, 192:24,
199:2, 199:4,
205:7, 205:15,
264:13
**12**
3:28, 57:17,
63:12, 64:14,
103:9, 103:12,
125:9, 234:18,
235:4, 235:11,
236:6, 236:19,
236:21, 237:3,
237:19, 238:1,
239:12, 255:14,
264:14
**1212**
74:3, 74:8,
75:3, 75:6,
75:18, 76:24,
77:9, 78:5,
79:12, 79:18,
83:7, 83:14,
93:10, 97:11,
99:20, 124:4,
156:10, 156:21,
168:3, 176:8,
182:2, 193:14,
193:24, 213:2,
213:13, 216:9
**124**
214:22
**1240**
2:16

**126**
215:17
**13**
3:29, 199:23,
234:18, 235:4,
235:11, 236:6,
241:5, 241:8,
241:10
**130**
172:2
**1305**
169:10, 188:24
**1330**
188:9
**141**
2:16
**14120**
171:5
**15**
1:19, 4:4,
70:21, 107:7,
107:10, 110:20,
176:5, 193:24,
265:3, 266:7
**1500**
188:7, 188:8,
188:12, 189:17
**16**
11:22, 56:19,
57:1, 57:9,
57:17, 62:12,
63:2, 63:4,
63:12, 63:15,
64:2, 64:13,
64:21, 65:10,
65:18, 66:10,
69:6, 70:3,
70:10, 70:17,
75:7, 76:18,
83:22, 84:14,
103:17, 104:9,
105:2, 106:18,
107:3, 107:18,
107:22, 108:22,
119:17, 120:3,
120:11, 120:14,
124:12, 124:16,
124:23, 150:12,

150:16, 152:19,
161:11, 162:19,
165:1, 166:10,
167:13, 168:4,
169:8, 173:14,
175:3, 176:18,
177:22, 187:11,
188:5, 188:24,
196:23, 197:13,
199:2, 205:7,
217:22, 218:2,
266:32
**168**
3:14
**17**
70:19, 199:14,
218:22
**1730**
261:7
**18**
151:18, 152:3
**180056**
235:18, 254:9,
254:24, 256:8,
259:4
**183645**
236:21, 238:2
**185222**
241:6, 241:13
**186**
3:15
**19**
1:8, 4:4
**1969**
8:13, 8:19,
8:23, 9:13,
31:21
**1970**
21:10, 21:11,
32:13
**1976**
172:7
**1979**
15:16, 16:1
**198**
3:18
**1980**
32:9

**1984**
222:10, 226:19,
229:4
**1990**
21:11, 34:9,
34:16, 34:22,
35:12, 36:12,
37:15, 38:8,
38:14, 38:23,
39:4, 256:9,
257:20, 257:21,
259:4, 261:6,
261:9, 263:4
**1992**
151:18, 152:3,
152:18
**1993**
152:24
**1994**
228:20, 229:5,
229:6
**1996**
26:15
**1998**
9:14, 11:1,
16:22, 17:6,
24:18, 26:15,
39:22, 40:3

**2**

**20**
15:9, 16:19,
28:20, 30:21,
30:24, 110:22,
169:18
**2000**
255:10
**2010**
153:24
**2017**
40:16
**2020**
265:30
**2021**
1:19, 4:4,
265:3, 266:7,
266:33
**21**
103:12

211723
220:24, 221:23,
228:11, 233:5
21180
224:7
21185
225:17, 225:24
212
3:20
21224
227:11, 228:3
22030
237:1
22068
238:12, 238:15
22073
237:2
221
3:24, 244:19
22120
241:8
22145
244:18, 244:21
22149
243:19
22159
241:9
23
4:5
24
172:18
241
3:29
243
2:5
246
3:8
248
3:9
253
3:25
26
37:12, 244:11,
261:6
264
3:21, 3:22,
3:23, 3:26,
3:27, 3:28

266
1:28
27
261:9, 263:4
28
219:1, 242:6
2877
204:1, 261:8,
262:16
29
243:22
2d
261:7

**3**

3
218:22, 219:1,
219:4, 236:13,
236:16
30
34:14, 125:9,
172:6, 222:10,
226:19, 228:20
31
237:8, 238:6,
239:14
311
2:4
312
2:5, 2:11
32
243:19
321
2:10
346380
1:27
35
264:5, 264:17
3501
19:23, 20:2
37
38:3, 258:24
39
38:3, 109:4,
111:24, 112:1,
113:1, 238:10
3900
20:7, 20:10,

20:14

**4**

4
264:5, 264:17
42
193:15
43
237:9
454289
194:3
47
227:7, 228:1,
228:7, 236:13
494
2:11

**5**

5
34:14
5'9
171:24
5'9"
171:22
50
220:22
5080
211:15, 213:19
5081
213:9
5083
213:23
5089
212:20
51
69:8, 69:10,
74:3, 74:8,
75:3, 75:6,
75:18, 76:24,
77:10, 78:5,
79:12, 79:19,
83:7, 83:14,
90:9, 90:11,
92:5, 92:12,
93:10, 94:3,
94:9, 94:20,
97:11, 99:21,
124:5, 156:10,

156:21, 168:3,
176:8, 182:2,
193:14, 193:24,
213:2, 213:13,
214:2, 214:5,
215:1, 215:2,
215:7, 215:23,
216:9, 219:4
53
187:1, 189:23,
190:1
5300
214:22
5302
215:18, 215:20,
215:21
54
236:16
55
37:13
550
237:9
5550
237:8
56
144:3
5639
242:14
5900
2:5
5th
10:18, 17:8,
28:16, 29:2,
29:9, 29:12,
29:15, 29:17,
29:23, 30:3,
31:21

**6**

60604
2:17
60607
2:5
60654
2:11

**7**

7
159:15

Transcript of Michael DeLacy
Conducted on January 15, 2021                                    114

**771**
173:18

**8**

**87**
159:15
**8b**
221:6, 221:10,
233:24, 234:2,
234:5

**9**

**9**
34:14, 62:23
**9-**
173:18
**91**
172:18, 173:4,
173:18, 188:5
**94**
23:2
**95**
188:12
**95339**
253:17, 254:10,
255:1, 255:15
**95340**
256:12
**95342**
257:14, 258:6
**95375**
259:1
**95389**
254:11, 255:3
**95535**
253:18
**96**
261:6
**962**
171:7, 171:14
**98**
8:16
**9th**
10:18, 16:9,
16:11, 17:12,
17:20, 17:22,
18:8, 18:10,
18:14, 19:2,

19:11, 19:14,
19:19, 19:21,
20:20, 20:22,
21:6, 21:10,
21:22, 22:1,
22:4, 22:8,
23:2, 23:17,
23:21, 24:6,
24:7, 28:13,
28:19, 28:21,
29:3, 29:5,
29:6, 29:9,
30:7, 30:21,
31:22, 32:3,
32:20, 33:10,
33:23, 34:5,
34:9, 34:21,
35:3, 35:11,
36:18, 37:9,
37:16, 39:3,
39:9, 39:13,
58:14, 58:15,
72:12, 76:6,
87:13, 87:15,
87:22, 88:4,
90:3, 121:19,
139:5, 168:8,
171:17, 172:17,
172:21, 173:17,
173:21, 174:20,
183:22, 190:13,
192:24, 200:3,
204:1, 238:20,
239:3, 239:4,
257:4, 257:19,
258:2, 258:3,
258:10, 258:13,
262:6, 262:10