**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| ANTHONY JAKES, | |
| Plaintiff, | Case No. 19-cv-02204 |
| v. | Hon. Manish S. Shah |
| KENNETH BOUDREAU *et al.*, | Hon. Beth W. Jantz |
| Defendants. | |

# EXHIBIT 35

LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA



# KENTUCKIANA
## — COURT REPORTERS —

**CASE NO. 19-CV-02204**

# ANTHONY JAKES

V.

# KENNETH BOUDREAU, ET AL.

**DEPONENT:**

**OFFICER KEN BURKE**

**DATE:**

**July 8, 2021**



a courtroom
**powerhouse**

✉ schedule@kentuckianareporters.com

☎ 877.808.5856 | 502.589.2273

www.kentuckianareporters.com

1      IN THE UNITED STATES DISTRICT COURT FOR THE

2     NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

3            HON. MANISH S. SHAH

4             HON. BETH W. JANTZ

5            CASE NO. 19-CV-02204

6

7             ANTHONY JAKES,

8               Plaintiff

9

10               V.

11

12          KENNETH BOUDREAU, ET AL.,

13             Defendants

14

15

16

17

18

19

20

21

22

23   DEPONENT:  OFFICER KEN BURKE

24   DATE:      JULY 8, 2021

25   REPORTER:  SUSAN L. HARRILL (BELL)

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 4 of 93 PageID #:9375
The Deposition of OFFICER KEN BURKE, taken on July 08, 2021

2..5

Page 2

```
1                    APPEARANCES
2
3   ON BEHALF OF THE PLAINTIFF, ANTHONY JAKES:
4     Renee Spence
5     Loevy & Loevy
6     311 North Aberdeen Street
7     Third Floor
8     Chicago, Illinois 60607
9     Telephone No.: (312) 243-5900
10    E-mail: spence@loevy.com
11    (Appeared via videoconference)
12
13  ON BEHALF OF THE DEFENDANT, CITY OF CHICAGO:
14    George J. Yamin Jr.
15    The Sotos Law Firm, P.C.
16    141 West Jackson Boulevard
17    Suite 1240A
18    Chicago, Illinois 60604
19    Telephone No.: (630) 735-3300
20    E-mail: gyamin@jsotoslaw.com
21    (Appeared via videoconference)
22
23
24
25
```

Page 4

```
1                      INDEX
2                                          Page
3   PROCEEDINGS                             6
4   DIRECT EXAMINATION BY MS. SPENCE        7
5   CROSS EXAMINATION BY MR. GRILL          245
6   REDIRECT EXAMINATION BY MS. SPENCE      253
7
8
9                    EXHIBITS
10  Exhibit                                 Page
11  1 - CITY_JAKES 922-925                  61
12  2 - CITY_JAKES 1252-1254                91
13  3 - CITY_JAKES 1121                     98
14  4 - CITY_JAKES 1102-1103                129
15  5 - PLAINTIFF_JAKES 95186, 95254-95296  131
16  6 - PLAINTIFF_JAKES 31205, 31342-31353  154
17  7 - CITY_JAKES 1255-1261                181
18  8 - CITY_JAKES 90-93                    199
19  9 - Answers To Interrogatories          231
20  10 - CITY_JAKES 26314-26319             239
21
22
23
24
25
```

Page 3

```
1              APPEARANCES, CONTINUED
2
3   ON BEHALF OF DEFENDANTS, KENNETH BOUDREAU, LOUISVILLE
4   CAESAR, THE ESTATE OF MICHAEL KILL, MICHAEL DELACY, KEN
5   BURKE, AND FRED BONKE:
6     Andrew J. Grill
7     Rock Fusco & Connelly, LLC
8     312 North Clark Street
9     Suite 2200
10    Chicago, Illinois 60654
11    Telephone No.: (312) 494-1000
12    E-mail: agrill@rfclaw.com
13    (Appeared via videoconference)
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1                    STIPULATION
2
3   The VIDEO deposition of OFFICER KEN BURKE was taken at
4   KENTUCKIANA COURT REPORTERS, 30 SOUTH WACKER DRIVE, 22nd
5   FLOOR, CHICAGO, ILLINOIS 60606, via videoconference in
6   which all participants attended remotely, on THURSDAY,
7   the 8th day of JULY 2021, at approximately 10:13 a.m.;
8   said VIDEO deposition was taken pursuant to the FEDERAL
9   Rules of Civil Procedure. The oath in this matter was
10  sworn remotely pursuant to FRCP 30.
11
12  It is agreed that SUSAN L. HARRILL (BELL), being a
13  Notary Public and Court Reporter for the State of
14  KENTUCKY, may swear the witness and that the reading and
15  signing of the completed transcript by the witness is
16  not waived.
17
18
19
20
21
22
23
24
25
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 6

PROCEEDINGS

1
2       COURT REPORTER:  My name is Lauren Harrill.  I
3    am the video technician and court reporter today.
4    Today is the 8th day of July 2021.  The time is
5    10:14 a.m.  We are convened by videoconference to
6    take the deposition of Officer Kenneth Burke -- Ken
7    Burke, in the matter of Anthony Jakes versus Kenneth
8    Boudreau, et al., pending in the District Court of
9    Northern Illinois, Eastern Division, Case number
10   19-CV-02204.  Will counsel please state your
11   appearance, who you are representing, and the
12   location you are attending from starting with the
13   plaintiff's counsel?
14       MS. SPENCE:  Renee Spence on behalf of
15   plaintiff, Anthony Jakes, appearing remotely.
16       MR. GRILL:  Andrew Grill, G-R-I-L-L, on behalf
17   of the individual defendant officers and deponent,
18   Officer Ken Burke.
19       MR. YAMIN:  And George Yamin, Y-A-M-I-N.  I
20   represent defendant City of Chicago.  I am appearing
21   remotely as well.
22       COURT REPORTER:  Thank you.  And Officer Burke,
23   will you please state your full name for the record?
24       THE WITNESS:  Yes.  Kenneth Burke, B-U-R-K-E.
25       COURT REPORTER:  Thank you.  And do all parties

Page 7

1    present stipulate that they are in agreement that
2    the witness is, in fact, Officer Burke?
3        MS. SPENCE:  Yes.
4        MR. GRILL:  Yep.
5        COURT REPORTER:  All right.  Thank you.  Sir,
6    will you please raise your right hand?
7        MS. SPENCE:  Sorry, Lauren.  Before you begin,
8    is Mr. Burke spotlighted?
9        COURT REPORTER:  He is on my screen.  Would you
10   like for him to be spotlighted on yours as well?
11       MS. SPENCE:  No.  That's fine.
12       COURT REPORTER:  Okay.  Perfect.  Sir, will you
13   please raise your right hand?  Thank you.  Do you
14   solemnly swear or affirm that the testimony you're
15   about to give will be the truth, the whole truth,
16   and nothing but the truth?
17       THE WITNESS:  Yes, I do.
18       COURT REPORTER:  Thank you.  You may begin.
19              DIRECT EXAMINATION
20   BY MS. SPENCE:
21       Q    Good morning, Mr. Burke.  How are you?
22       A    Good morning.
23       Q    My name is Renee Spence.  As I previously
24   stated, I represent the plaintiff in this case, Anthony
25   Jakes.  And is it okay for me to refer to you as

Page 8

1    Mr. Burke?
2        A    Sure.
3        Q    Have you ever sat for a deposition before,
4    Mr. Burke?
5        A    Yes, I have.
6        Q    Okay.  How many times have you sat for a
7    deposition?
8        A    Two or three.  I don't really recall the
9    number.
10       Q    Do you remember the last time, the most recent
11   time you sat for a dep?
12       A    I don't recall it, no.  I don't --
13       Q    Okay.
14       A    -- recall a date.
15       Q    So in that case, let's go over the rules for
16   this deposition.  I just want us to have a common
17   understanding of how this is going to proceed.
18       A    Sure.
19       Q    Because this is being recorded by stenography,
20   in order for us to have an accurate transcript, it's
21   important for us to speak one at a time.  And so I ask
22   that you let me finish my question before you answer,
23   and I will try to do the same.  Because we're doing this
24   remotely on Zoom, there tends to be a bit of a delay
25   sometimes in hearing someone finish and sometimes you

Page 9

1    can talk over each other.  And so I just ask that you
2    pause between hearing the question and your answer, and
3    I will certainly try to do the same thing.  Your
4    attorney or other attorneys may object, and so the pause
5    is also helpful to give the attorneys an opportunity to
6    object so that we're not talking over one another; is
7    that fair?
8        A    Yes.
9        Q    All right.  Also, because this is being taken
10   down by sonography it is important for you to use your
11   words to communicate as opposed to gestures.  Typically
12   people will nod, or they'll shake their head when they
13   mean yes, or they mean no.  It's natural, but it's -- it
14   can't be accurately recorded.  And so if I see you do
15   that or if I see you hear -- or if I hear you make a
16   sound like "uh-huh" or "uh-uh" which again, those are
17   ambiguous sounds and so they don't quite translate
18   accurately in the transcript, I'll remind you and I'll
19   say, "Is that a yes, is that a no?"  It's not to
20   reprimand you or anything.  That is just to remind you
21   to use your words, okay?
22       A    Understood.  Yes.
23       Q    To the best of my ability, I'm going to try to
24   ask questions that are clear to you, but if I ask you a
25   question that is unclear, please feel free to ask me to

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 6 of 93 PageID #:9377
The Deposition of ROBERT RIALMO, taken on July 08, 2020
10..13

Page 10

1  rephrase it or let me know that you don't understand,
2  and I'll try my best to make it clear.  But if you
3  answer the question, the presumption will be that you
4  understood the question that was being asked; is that
5  fair?
6      A    Yes.
7      Q    All right.  At any time during this deposition
8  you are allowed to take breaks.  The only -- my only
9  request is that if there is a question pending that you
10  answer the question before taking a break.  Do you
11  agree?
12      A    Yes.  I do.
13      Q    All right.  Do you have any medical condition
14  that would impact your memory -- that impacts your
15  memory?
16      A    No.
17      Q    All right.  Are you on any kind of medication
18  that has any impact on your memory?
19      A    No.
20      Q    Sir, any reason why you can't give a complete
21  and accurate deposition today?
22      A    No.
23      Q    Because we're appearing in -- remotely, I'm
24  not in front of you.  I know that your counselor has
25  printed a number -- I'm sorry -- your counsel has

Page 11

1  printed a number of exhibits, but I'd ask that you put
2  those exhibits to the side.  So if you have any
3  documents, I'd ask that you put them to the side and if
4  you are looking at documents, I ask that you agree to
5  tell me in advance that you're looking at documents.  Do
6  you agree?
7      A    Yes.  I do.
8      Q    Do you have any exhibits in front of you or do
9  you have any documents in front of you right now?
10      A    No.  They're off to the side.
11      Q    Okay.  Are there any documents on your screen
12  right now?
13      A    No.
14      Q    Okay.  So the same thing goes for the screen.
15  If you're pulling up any documents on the screen, I'd
16  just ask that you let me know that you're looking at a
17  document and let me know which -- what document you're
18  looking at.  Do you agree with that?
19      A    Yes.  I do.
20      Q    Mr. Burke, have you ever been a plaintiff in a
21  civil lawsuit?
22      A    Yes.
23      Q    Okay.  How many times have you been a
24  plaintiff in a civil lawsuit?
25      A    I believe twice.

Page 12

1      Q    And were those filed in federal court or civil
2  court-- I'm sorry -- a federal court or a state court?
3      A    Federal court.
4      Q    What were the issues in those lawsuits?
5      A    Well, one of them was -- it was excessive
6  force, I believe and --
7          MR. GRILL:  Plaintiff.
8      A    Oh.  No.  No.  No.  I've never been a
9  plaintiff.  No.
10      Q    Okay.  So --
11      A    Sorry.  I misunderstood you.
12      Q    That's okay.  So you've never been the party
13  who's filing the lawsuit or filing the complaint?
14      A    No, ma'am.
15      Q    Okay.  Now, okay, so let's switch to the other
16  side of that versus, the defendant's side.  It sounds as
17  though you've been a defendant in two civil lawsuits
18  before?
19      A    That's correct.
20      Q    And one of them you said was for excessive
21  force?
22      A    Actually, both of them were for excessive
23  force.
24      Q    In what years were those lawsuits filed?
25      A    I don't recall.  It would've been the '80s.

Page 13

1      Q    And were you --
2      A    Both of them would've been in the '80s.
3      Q    Both of them would've been in the '80s?
4      A    Yes, ma'am.
5      Q    All right.  Do you -- when you were sued, were
6  you serving in your capacity as a Chicago police
7  officer?
8      A    Could you repeat that?  I'm sorry.
9      Q    Sure.  When you were sued, were you sued in
10  your capacity as a Chicago police officer?
11      A    Yes.
12      Q    And so the first case, how did that case
13  resolve?
14      A    It was resolved at jury selection.  It was the
15  cooperation counsel actually played the -- paid the --
16  agreed to pay the plaintiff an amount of money and they
17  agreed to stop the trial.
18      Q    Okay.  So it sounds like the first case
19  settled?
20      A    Yes.
21      Q    What happened to the second -- and at the time
22  -- sorry.  Before the case settled were you still a
23  defendant in the case?
24      A    Yes.
25      Q    Do you know the name of the plaintiff in that



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 7 of 93 PageID #:9378
The Deposition of ROBERT KEN BURKE, taken on July 08, 2021

14..17

Page 14

1  case?
2      A    I don't recall.
3      Q    Aside from being accused -- sorry.  Were the
4  allegations that you used excessive force against the
5  plaintiff?
6      A    Yes.  I don't remember -- I don't remember the
7  exact charges, but it would fall under the parameters of
8  --
9          MR. GRILL:  Can you give me one second.  Sorry.
10         MS. SPENCE:  Is there someone --
11         MR. GRILL:  George, you're not muted, FYI.  We
12  can hear you.
13         MR. YAMIN:  Okay.  Give me just one second.
14         MS. SPENCE:  Okay.  Thanks.  Thanks Andrew.
15  BY MS. SPENCE:
16     Q    Other than an excessive force allegation, do
17  you remember any other allegations that were part of
18  that first civil suit?
19     A    No.  I don't.
20     Q    Okay.  And the second civil suit, you said
21  that that civil suit was also suing you in your capacity
22  as a Chicago police officer, right?
23     A    Yes.
24     Q    Okay.  And the allegations, they were also
25  excessive force?

Page 15

1      A    I believe so, yeah.
2      Q    Okay.  And what happened to that case?
3      A    That was also settled.  It was settled
4  sometime prior to jury selection.  It never went to
5  trial.  It was settled prior to trial.
6      Q    And were you still a defendant at the time
7  that the case settled?
8      A    Yes.
9      Q    Before the case settled were you consulted
10  about whether or not the case was going to be settled?
11     A    I don't recall.
12     Q    And in the first case before that case
13  settled, were you consulted before that case settled?
14     A    I don't know what you mean by consulted.
15     Q    Did anyone reach out to you to say, "Hey,
16  Mr. Burke, do you want us to settle this case, or would
17  you like to go to trial on it?"
18     A    I don't recall.  It's -- I mean, we were set
19  to go to trial because it was during jury selection that
20  it was settled.
21     Q    Right.  And so I'm asking before it settled
22  while you were right before jury selection, did someone
23  reach out to you to say, "Do you want this case to
24  settle?  Do you agree to settle this case?"
25     A    No.

Page 16

1      Q    Okay.
2      A    Not that I remember, no.
3      Q    In either case were you consulted or asked,
4  "Do you want to settle this case, do you agree to settle
5  this case?"
6      A    I don't -- no.  I don't think so.
7      Q    Okay.  For the first case, do you know for how
8  much it settled?
9      A    It was -- no.  I can't remember exactly.
10     Q    And what about the second case.  Do you
11  remember for how much it settled?
12     A    I do not.
13     Q    Other than those two cases have you ever been
14  -- have you been a defendant in any other civil suit?
15     A    Not that I recall, no.
16     Q    You said that you've been -- you've sat for a
17  deposition on multiple occasions, correct?
18     A    No.  I said it was two or three maybe.
19     Q    Right.  So more than one?
20     A    Yes.
21     Q    And when you sat for a deposition were you a
22  defendant or a witness in those instances?
23     A    To be honest, I don't recall.
24     Q    Okay.  In your civil suits, did you sit for
25  deposition in your civil suits?

Page 17

1      A    I believe so, but I don't recall.  It's well
2  over 30 years ago.
3      Q    When those cases settled did it have any
4  impact on your job as a Chicago police officer?
5      A    No.
6      Q    Was there any kind of internal affairs
7  investigation related to those cases, those two civil
8  suits?
9      A    I -- I really don't know.
10     Q    Have you ever -- Mr. Burke, have you ever
11  testified in a criminal court, like in state criminal
12  court?
13     A    Oh, yeah.
14     Q    At any time when you testified in state
15  criminal court did a judge ever find that you testified
16  falsely?
17     A    No.
18     Q    Has a judge ever found that you misled the
19  Court?
20     A    No.
21     Q    Okay.  Mr. Burke, did you prepare for today's
22  deposition?
23     A    Yes.
24     Q    What did you do to prepare?
25     A    Well, I met with Mr. Grill, and I looked over

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 8 of 93 PageID #:9379
The Deposition of ROBERT KENNETH BONKE, taken on July 08, 2021
18..21

Page 18

1  some of the documents pertaining to the case.
2      Q      And when did you meet with Mr. Grill?
3      A      I met with him yesterday.
4      Q      For how long?
5      A      About four hours.
6      Q      Other than your meeting yesterday, did you
7  have any other meeting with your counsel about your
8  deposition in this case?
9      A      Yes. I met with him on Tuesday as well.
10     Q      For how long did you meet on Tuesday?
11     A      That one was a little longer. Maybe six
12  hours, seven hours.
13     Q      So other than the Tuesday meeting and the
14  Wednesday meeting did you have -- did you meet with any
15  of your counsel in preparation for this deposition?
16     A      Yeah, I did. I met last year at one point. I
17  don't know what date it was, but I believe the
18  deposition was cancelled after meeting once.
19     Q      Do you remember how long that meeting was?
20     A      Six hours I would guess.
21     Q      Other than -- in yesterday's meeting other
22  than Mr. Grill was anyone else present for your meeting
23  with Mr. Grill?
24     A      No.
25     Q      What about on Thursday, your Thursday meeting

Page 19

1  -- sorry -- your Tuesday meeting with Mr. Grill, was
2  anyone else present?
3      A      No.
4      Q      What about in that meeting last year, was
5  anyone else present aside from your counsel?
6      A      Not that I recall, no.
7      Q      You said you looked over some documents. Can
8  you describe the documents you looked at in preparation
9  for today's deposition?
10     A      Yes. Some of the police reports, some of the
11  transcripts, some of my previous transcripts, the
12  written statement by the defendant, various reports.
13     Q      Did you author any reports -- sorry. Did you
14  read any reports that you authored?
15     A      I did not author any reports.
16     Q      Okay. So that's a no, you didn't read any
17  reports that you authored at all?
18     A      That's correct.
19     Q      Okay. When you said that you reviewed police
20  reports, who authored the police reports that you read?
21     A      The investigating detectives, State's
22  Attorney, arresting officer. That was about it.
23     Q      Okay. The transcripts that you read, you said
24  that you read your testimony?
25     A      That is correct.

Page 20

1      Q      At which hearings did you read the testimony?
2  Sorry. For which hearings did you read the testimony?
3      A      For the hearing to quash the arrest, for the
4  actual trial, and I believe there was a third one. I'm
5  not quite sure.
6      Q      Would that have been the postconviction
7  hearing?
8      A      Yes. It would've been. Correct.
9      Q      Did you read anyone else's testimony?
10     A      Yes. I did.
11     Q      Whose testimony did you read?
12     A      I read Mr. Jakes'. I read Detective Kill. I
13  -- I believe that was it. Oh, and Fred Bonke's
14  testimony. I think that was it.
15     Q      When you say you read Mr. Jakes' testimony, at
16  which -- for which hearing did that testimony take
17  place?
18     A      I'm not sure.
19     Q      All right. Was it for the motion of quash or
20  the trial or postconviction?
21     A      I couldn't say for sure.
22     Q      All right. And what about Detective Kill, do
23  you know when that testimony took place?
24     A      No.
25     Q      You said you read Fred Bonke's -- and

Page 21

1  B-O-N-K-E. You read his testimony?
2      A      Yes.
3      Q      Would that be his deposition testimony?
4      A      That is correct.
5      Q      All right. When you read these transcripts,
6  did you read them carefully?
7          MR. GRILL: Objection. Form.
8          MR. YAMIN: Objection.
9      Q      Go ahead. You can answer.
10     A      I really don't know what you mean by
11  carefully. I --
12     Q      Okay.
13     A      Some of them --
14     Q      Did you read the entire transcript?
15     A      Which entire transcript are you referring to?
16         MR. GRILL: Objection. Form.
17     Q      All right. So why don't we take them one by
18  one. Your testimony that you gave at the motion to
19  quash, also I think it was a hybrid motion, so the
20  motion to quash and the motion to suppress. Did you
21  read your entire testimony that you gave during that
22  hearing?
23     A      I believe I did, yeah.
24     Q      Okay. Your testimony that you gave at the
25  trial, did you read the entire testimony you gave at the



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 22

1    trial?
2        A    I believe so, yes.
3        Q    The testimony that you gave at the
4    postconviction hearing, did you read the entire
5    testimony?
6        A    Yes.
7        Q    All right.  When you looked at Mr. Jakes'
8    testimony, did you read everything he testified to in
9    that transcript?
10           MR. GRILL:  Objection.  Form.  Go ahead.
11       A    I don't recall.  I don't know if I read the
12   whole one or not.  I don't recall.
13       Q    All right.  Did you read Mr. -- I'm sorry,
14   Detective Kill's testimony, the entire testimony?
15       A    Yes.
16       Q    All right.  Did you read all of Mr. Bonke's
17   deposition testimony?
18       A    No.  I did not.  I kind of skimmed through it.
19       Q    And what was your purpose for reading
20   Mr. Bonke's deposition testimony?
21       A    Well, to try to familiarize myself with the
22   procedure.
23       Q    What procedure?
24       A    The deposition.
25       Q    Sorry.  What -- you read Mr. Bonke's

Page 23

1    deposition transcript in order to familiarize yourself
2    with how a deposition might take place?
3            MR. GRILL:  Asked and answered.
4        Q    Go ahead.
5        A    Yes.  I would say so, yeah.
6        Q    Okay.  Did you have any other purpose for
7    reading other than trying to determine the procedure for
8    a deposition?
9        A    No.  I don't think so.
10       Q    Okay.  Did you keep a personal file of any
11   documents relating to the homicide investigation for
12   Rafael Garcia?
13       A    No.
14           MR. YAMIN:  Objection.  Form.
15       Q    Just to make sure we're on the same page,
16   whenever I refer to the Garcia homicide investigation or
17   the homicide investigation, I'm referring to the
18   investigation that took place in 1991 and part of 1992
19   into Rafael Garcia's death.  Do you understand that?
20       A    Yes.
21       Q    Okay.  Outside of speaking to your attorneys
22   have you talked to anyone else about this lawsuit?
23       A    Yes.
24       Q    Who have you talked to?
25       A    My wife.

Page 24

1        Q    Anyone else?
2        A    I mentioned to some people that I have this
3    deposition going on this week.
4        Q    Who are those people that you mentioned it to?
5        A    People that I normally golf with on Tuesday
6    and couldn't golf because I had to be here.
7        Q    Do any of those people work for the Chicago
8    Police Department?
9        A    They're all retired.
10       Q    Okay.  They're not current employees of the
11   Chicago Police Department?
12       A    No.
13       Q    When you spoke to your wife about the lawsuit
14   was anyone else present for your conversation with your
15   wife?
16       A    No.
17       Q    Have you spoken to Kenneth Boudreau about this
18   lawsuit?
19       A    I mentioned to him that I was involved, yes.
20       Q    When did you talk to Mr. Boudreau about being
21   involved in the lawsuit?
22       A    That would've been last year at some time when
23   I -- when our paths crossed.
24       Q    And how did you talk to him?  Was it on the
25   phone, was it in person, via e-mail?

Page 25

1        A    It was in person.
2        Q    Where did you see him?
3        A    It was at the -- it was around Halloween time.
4    It was at a Halloween festival that I ran across him.
5        Q    And when you ran across Kenneth Boudreau at
6    the Halloween festival, how did the lawsuit come up?
7        A    I mentioned it.  I said we -- we both see each
8    other, said "hello," and I said -- I told him, I said,
9    "Hey, I'm involved in a -- in a suit that you're
10   involved in also," and you know, it was the extent of
11   it.
12       Q    What did he say when you said, "Hey, I'm
13   involved in a suit that you're involved in?"
14       A    He said, "which one?"
15       Q    Did you clarify?  Did you answer that
16   question?
17       A    Yes.
18       Q    All right.  And when you said -- and what case
19   did you say you were involved in?  Was it the Jakes
20   case?
21       A    Correct.
22       Q    So when you said, "I'm involved in the Jakes
23   case," what was his response?
24       A    I -- I don't recall.  It was nothing
25   significant.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 10 of 93 PageID #:9381
The Deposition of OFFICER KEN BURKE, taken on July 30, 2021
26..29

Page 26

1    Q    All right.  Did you say, this case is
2  ridiculous to him, or I don't even understand what's
3  going on?
4       MR. YAMIN: Objection. Form.
5    Q    Go ahead.
6    A    No.  I might have said that I don't know why I
7  was involved.
8    Q    All right.
9    A    I never --
10    Q    Go ahead.
11    A    I never said it was ridiculous, no.
12    Q    Other than saying, you know, that you're
13  involved in the same suit as Mr. Boudreau and you don't
14  know why you're involved and it's the Jakes case, did
15  you make any other comments to Mr. Boudreau about the
16  suit?
17    A    No.
18    Q    All right.  When you mentioned to your golfing
19  friends that you were sitting for a deposition, what
20  information did you give them about the deposition?
21    A    I said it was ridiculous because it's like 30
22  years old.
23    Q    And did they respond?  Did they say, "You're
24  right, it is ridiculous?"
25    A    Yes.  They did.

Page 27

1    Q    All right.  What else did you discuss with
2  your friends about the deposition?
3    A    Nothing other than it was the -- that he was
4  -- Mr. Jakes was awarded a certificate of innocence and
5  I tried to explain the little bit I knew what exactly it
6  was about.  These are all -- these are retired police
7  officers I golf with.  I golf with the police league.
8  There's 150 retired or active police officers in this
9  league that golf on Tuesday, and I couldn't be there
10  this last Tuesday because of coming down here.  So I
11  just happened to mention to the captain on my team and
12  other -- other golfers about this case.
13    Q    All right.  Did you let them know that this
14  was a homicide case?
15    A    Yes.
16    Q    Did you tell them what the allegations were?
17       MR. GRILL: Objection. Form.
18    A    The allegations?  I don't understand.
19    Q    Well, have you read the complaint in this
20  case?
21    A    No.  I don't think I have.
22    Q    Okay.  Did you give -- other than mentioning
23  that this is a homicide case from 30 years ago and
24  Mr. Jakes got a certificate of innocence, did you
25  mention any other facts about the case to your golfing

Page 28

1  friends and teammates?
2    A    No.
3    Q    Okay.  How did you communicate about this case
4  with them?  Was it over e-mail?
5       MR. GRILL: Objection. Asked and answered.
6    Form.
7    A    It was in person.
8    Q    When did this conversation take place?
9    A    Probably the first time it took place was a
10  year ago when I was first contacted to come down for the
11  deposition.
12    Q    Did it take place again most recently when you
13  have to come -- when you had to come for this
14  deposition?
15    A    I'm sorry.  Could you repeat that?
16    Q    I said, did the conversation take place again
17  more recently when you had to come down for this
18  deposition?
19    A    Yes.  Yeah.  I had -- I had said, "I have to
20  go to that deposition again that was cancelled last
21  year," and, you know, it was -- yeah.  Most recently it
22  was probably last week.
23    Q    Okay.  Have you spoken to Louis Caesar about
24  this case?
25    A    When we were at, I believe it was the

Page 29

1  postconviction hearing, or at one of the hearings we
2  were together at the -- at 26th and Cal in the jury
3  room.  It was -- I don't remember which it was.  We were
4  together and I spoke with him then.
5    Q    What did you guys discuss when you were in the
6  jury room together?
7    A    Absolutely nothing about this case.  We knew
8  each other from the neighborhood we grew up.  We talked
9  about we worked together in the Tenth District.  We
10  talked about a lot of things other than -- and nothing
11  really about this case.
12    Q    Since the lawsuit was filed, have you talked
13  to Mr. Caesar about the lawsuit?
14    A    No.
15    Q    Okay.  What about Michael Delacy, have you had
16  any conversation with Michael Delacy about this lawsuit?
17    A    No.  I have not.
18    Q    What about Fred Bonke, have you had any
19  conversation with Fred Bonke about this lawsuit?
20    A    No.  I have not.
21    Q    Are you -- how would you describe your
22  relationship with Mr. Boudreau?  Are you friends with
23  Mr. Boudreau?
24    A    No.  I met -- he's just -- I know him from the
25  police department.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 11 of 93 PageID #:9382
The Deposition of OFFICER KENNETH BURKE, taken on July 30, 2021

30..33

Page 30

1    Q    Okay.  Since being retired, other than the
2 run-in at the Halloween festival have you had contact
3 with Mr. Boudreau?
4    A    No.  That was the only time I had contact with
5 him in many years.
6    Q    You mentioned that you grew up with
7 Mr. Caesar; is that correct?
8    A    Same neighborhood.  Yes.  He's a -- he's a
9 couple of years older than me.
10   Q    Did you know him growing up?
11   A    I -- I -- yeah.  A little -- a little bit.
12 He's -- he was one of the kids in the neighborhood.  I
13 don't -- I never really hung around or associated with
14 him, but I knew him.
15   Q    And after the -- since your retirement from
16 the police department, have you kept in touch with
17 Mr. Caesar?
18   A    No.
19   Q    Okay.  Were you friends while you were working
20 at the Chicago Police Department?
21        MR. GRILL:  Objection.  Form.
22   A    No.  We were both assigned to the Tenth
23 District at one time, but I wouldn't say we were
24 friends.  We've never associated together socially at
25 all.

Page 31

1    Q    Since this lawsuit was filed, have you talked
2 to any prosecutors about the lawsuit?
3        MR. YAMIN:  Objection.  Form.
4    A    No.
5    Q    Have you spoken to an Assistant State Attorney
6 by the name of John Dillon about this lawsuit?
7    A    No.
8    Q    Have you spoken to an Assistant State Attorney
9 named David O'Conner about this lawsuit?
10   A    No.
11   Q    Have you spoken to an Assistant State Attorney
12 named Neal Goodfriend about this lawsuit?
13   A    No.
14   Q    Have you spoken to an Assistant State Attorney
15 named Andrew Levine about this lawsuit?
16   A    No.
17   Q    And that would be Levine, L-E-V-I-N-E.  Have
18 you spoken to an Assistant State Attorney named Brian
19 Stefanich?  So S-T-E-F-A-N-I-C-H?
20   A    No.
21   Q    And I'm using the term "Assistant State
22 Attorney," and they may have been special prosecutors,
23 but anyone from -- anyone representing the state or the
24 people of Illinois in regard to prosecuting Mr. Jakes.
25 Have you spoken to them about this lawsuit?

Page 32

1    A    No.
2    Q    Okay.
3    A    No.
4    Q    Have you sent any e-mails about the Garcia
5 homicide investigation?
6        MR. GRILL:  Objection.  Form.
7        MR. YAMIN:  Objection.  Form.
8    A    No.
9    Q    And you said that Mr. Jakes got a certificate
10 of innocence, right?
11   A    That's what I was told, yeah.
12   Q    Yeah.  How did you find out that Mr. Jakes got
13 a certificate of innocence?
14        MR. GRILL:  And so -- if you know that from any
15 source other than me, you can answer the question.
16 Otherwise, I'll tell you not to answer it.
17   A    No.
18 BY MS. SPENCE:
19   Q    Okay.  So other than -- so barring any
20 communications with your attorney, did you learn outside
21 of any communication with your attorneys about
22 Mr. Jakes' certificate of innocence?
23   A    No.
24   Q    Okay.  Mr. Burke, prior to working with the
25 Chicago Police Department, did you work for any other

Page 33

1 law enforcement agencies?
2    A    Yes.
3    Q    Who did you work for?
4    A    I worked for the Illinois Secretary of State
5 Police prior to coming down to Chicago police.
6    Q    For how long did you work for the Illinois
7 Secretary of State Police?
8    A    Three-and-a-half years.
9    Q    What -- in what capacity?
10   A    As an investigator.
11   Q    What kind of cases did you investigate?
12   A    There's various, anything -- anything to do
13 with the Illinois Vehicle Code, basically.
14   Q    So would these be traffic cases?
15   A    Traffic cases, truck cases, stolen auto cases,
16 stolen title, bad -- bad title.  Anything to do with --
17 Illinois Secretary of State Police are supposed to be
18 experts at the Illinois Vehicle Code.  Suburban
19 departments would call us to ask about different things
20 with the Illinois Vehicle Code.  So that's basically
21 what -- the training was going through the Illinois
22 Vehicle Code page by page and trying to memorize the
23 whole thing.
24   Q    Did you do any homicide work while there?
25   A    No.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 12 of 93 PageID #:9383
The Deposition of PETER KENNISON, taken on July 30, 2021
34..37

Page 34

1    Q    Did you work with any -- did you investigate
2  any cases involving children while there?
3    A    No.
4    Q    Okay.  And what -- for which years did you
5  work with the Illinois Secretary of State Police?
6    A    From 1978 until when I was hired in the
7  Chicago police in 1982.
8    Q    All right.  Why did you leave the Illinois
9  Secretary of State Police?
10   A    Because the Chicago Police paid better.
11   Q    Got it.  You say you started at Chicago Police
12 in 1982?
13   A    That's correct.
14   Q    And when you started, you were placed in
15 patrol.  Were you assigned a patrol rank?
16   A    Yes.  I was.  Yes.
17   Q    All right.  Where did you work as a patrol
18 officer?
19   A    I started out in Ninth District.
20   Q    And would this also be in 1982?
21   A    Yes.
22   Q    For how long were you a patrol officer?
23   A    Until 1989.
24   Q    Between 1982 and 1989 were you in the Ninth
25 District the entire time?

Page 35

1    A    No.
2    Q    Where else did you work as a patrol officer?
3    A    I worked in the Second District and in the
4  Tenth District.
5    Q    The Tenth District -- you said that Mr. Caesar
6  worked with you in the Tenth District; is that correct?
7    A    We both worked in the Tenth District at the
8  same time, yes.
9    Q    This time period when you were a patrol
10 officer in the 10th District was Mr. Caesar there as
11 well?
12   A    Yes.
13   Q    Did you guys work together?
14   A    No.
15   Q    Was he a patrol officer then as well?
16   A    Yes.  He was.
17   Q    While you were a patrol officer, did you ever
18 work with Kenneth Boudreau?
19   A    No.
20   Q    Did you ever work with Michael Kill?
21   A    No.
22   Q    Did you ever work with Fred Bonke?
23   A    No.
24   Q    Did you ever work with Michael Delacy?
25   A    No.

Page 36

1    Q    Did you ever work with Thomas Pack?
2    A    No.
3    Q    Okay.  After you left -- sorry.  You said that
4  you stopped working as a patrol officer in 1989.  Where
5  did you go after that?
6    A    In 1989 I was promoted to a youth officer, and
7  I went to the Area Two Youth.
8    Q    Did you have to apply to become a youth
9  officer?
10   A    Yes.
11   Q    Did you have to do any testing to become a
12 youth officer back then?
13   A    Yes.
14   Q    Did you get to choose which area you'd be
15 assigned?
16   A    No.
17   Q    Once you became a youth officer in Area Two,
18 for how long did you keep that position?
19   A    Until 1990.  Well, I -- yeah.  Until 1999.
20   Q    In 1999 where did you go?
21   A    I was promoted to sergeant and I -- my first
22 assignment as a sergeant was the 8th District in patrol.
23   Q    When you were in the youth -- when you were a
24 youth officer for Area Two did you have partners?
25   A    Yes.

Page 37

1    Q    Okay.  And were those partners people who
2  worked in the youth division, or could they work in a
3  separate division?
4    A    No.  They -- they -- they worked in the youth
5  division, my same unit, yes.
6    Q    When you were in patrol for the Eighth
7  District in 1999 for how long did you keep that
8  position?
9    A    In the Eighth District, one year.
10   Q    And why did you leave that position?
11   A    I was -- I -- I was given a position back at
12 Area Two Youth as a supervisor.
13   Q    For how long did you stay as an Area Two Youth
14 supervisor?
15   A    I believe five or six years.
16   Q    So would it be fair to say that from about
17 2000 to 2006 you were a supervisor in Area Two?
18   A    Yeah.  I think it was 2004 is when I left Area
19 Two.
20   Q    So 2000-2004 you were an Area Two supervisor
21 for the Youth Division?
22   A    That's correct.
23   Q    Okay.  After 2004, where did you go?
24   A    I went down to Youth Headquarters at the
25 police headquarters building.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 13 of 93 PageID #:9384
The Deposition of OFFICER KENNETH BOYLE, taken on July 28, 2021
38..41

Page 38

```
 1      Q    For how long did you -- sorry.  What was your
 2  position at the Youth Headquarters?
 3      A    I was the third watch sergeant/watch commander
 4  for -- for that unit.
 5      Q    For how long did you keep that position?
 6      A    Until I retired.
 7      Q    When did you retire?
 8      A    2011.
 9      Q    After you retired in 2011 did you get another
10  job?
11      A    Part time jobs here and there.
12      Q    What kind of part time jobs did you get?
13      A    Security.
14      Q    And did you work for any -- did you work for
15  the same security company each time?
16      A    No.  No.  I -- I worked for different --
17  different security company.  I worked for White Sox
18  Park, security there and I also worked in Florida.  I
19  worked at a golf course.
20      Q    In Florida you said?
21      A    Yes.
22      Q    You worked as security in the golf course, or
23  you had another type of job?
24      A    I'm sorry.  I'm sorry.  That was not a
25  security job on the golf course.
```

Page 39

```
 1      Q    When you worked security -- so just focusing
 2  on your security jobs, you said the White Sox Park.  Did
 3  you work for any other -- can you tell me the names of
 4  the other security companies for which you worked?
 5      A    Yes.  Embassy Security.
 6      Q    Uh-huh.
 7      A    That's it.
 8      Q    Oh, okay.  Do you work now?
 9      A    Yes.
10      Q    Where do you work now?
11      A    White Sox Park and also in the winter, I work
12  at the golf course.  I spend my winters in Florida.
13      Q    That is very sensible.  That makes sense to
14  me.  Prior to the Garcia homicide investigation, did you
15  have an opportunity to work with Mr. Boudreau?
16      A    No.
17      Q    Did you work with Detective Kill before the
18  Garcia homicide investigation?
19           MR. GRILL:  Well, hang on.  I'm going to
20      actually apply to the last question -- to object to
21      the form of the question on this question and the
22      one before specifically to the phrase "worked with."
23           MS. SPENCE:  Okay.
24  BY MS. SPENCE:
25      Q    Before the Garcia homicide investigation, did
```

Page 40

```
 1  you work on any cases with Detective Caesar?
 2      A    No.
 3      Q    Did you work on any cases with Detective -- or
 4  Officer Delacy?
 5      A    No.  Not that I recall.  When I was in the
 6  Ninth District, Pack and Delacy were also on a tech team
 7  in nine and I might have been involved in some arrest
 8  cases with them.  I don't recall, but I never personally
 9  worked with them.
10      Q    When you say, "them," you said Delacy and
11  which other officer?
12      A    Pack.
13      Q    Oh, Thomas Pack?
14      A    Yes.
15      Q    Okay.  Outside of possibly being on a case
16  with Thomas Pack when you were in the Ninth District did
17  you work on any other cases with Thomas Pack?
18      A    No.
19      Q    And it's your belief that outside of the Ninth
20  District that you did not work on any cases with Officer
21  Delacy?
22      A    That's correct.
23      Q    And the Ninth District time is when you were a
24  patrol officer; is that correct?
25      A    That is correct.
```

Page 41

```
 1      Q    When you became a youth officer did you have
 2  to get any special certifications?
 3      A    Yes.  Yeah.  You're certified by the State of
 4  Illinois as a juvenile officer, yes.
 5      Q    Would -- and was that true in 1989 when you
 6  became a youth officer?
 7      A    Yes.
 8      Q    Did you have to get recertified when you
 9  became a youth officer -- do you have to get recertified
10  at any point?
11      A    No.  Not that I recall, no.
12      Q    What do you have to do in order to be
13  certified as a youth officer in the State of Illinois?
14      A    It's part of the training.  We had to go
15  through a training and at the conclusion of the
16  training, you're -- there might have been a test
17  involved.  I don't recall.  But you are certified, yes.
18      Q    Do you have any continuing training that you
19  have to do as a youth officer while you were at the
20  Chicago Police Department?
21      A    I don't recall.  There's -- there's always
22  been inservice training the whole 30 years I was on the
23  police department.  I mean, there's always in-service
24  training for all kinds of reasons.  I don't particularly
25  recall any specific youth-type training.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 14 of 93 PageID #:9385
The Deposition of OFFICER KEN BURKE, taken on July 30, 2021
42..45

Page 42

1    Q    Right. And you don't recall any specific
2  requirement that a youth officer had to do specific
3  youth training throughout their time in that division?
4    A    No.
5    Q    And you said that the -- you have to go to
6  training as a juvenile officer. For how long is that
7  training?
8    A    I don't recall --
9    Q    And I'm referring to the initial training for
10  certification.
11    A    I think it might have been six weeks.
12    Q    Who puts on that training?
13    A    Chicago Police Academy.
14    Q    Okay. What subjects are you taught at that
15  training?
16    A    Well, the Juvenile Court Act, the Chicago
17  Police General Orders, and Special Orders pertaining to
18  juveniles. How to process juveniles. Just basically
19  the training -- the job of being a juvenile officer.
20    Q    All right. And why is it that you went to the
21  Youth Division in 1989?
22    MR. GRILL: Objection. Form of the question.
23    A    I took the test, passed the test, and was
24  promoted. It's a promotion.
25    Q    When you took the test, are you taking a test

Page 43

1  specifically to be in the Youth Division?
2    A    Yes.
3    Q    All right. And what was it about the --
4  that's what I'm trying to figure out. What is it about
5  the Youth Division? Why did you specifically want to be
6  in the Youth Division?
7    MR. GRILL: Objection. Asked and answered. You
8  can answer the question.
9    A    There's -- it wasn't that I specifically
10  wanted to be in the Youth Division. That was the very
11  first promotional test that came up while -- since I
12  came in the job at '82. I believe the test was in maybe
13  '88, or '87. I don't remember. But that was the first
14  promotional test that I was eligible to take and so I
15  took it, and I passed, and I was promoted.
16    Q    When you -- in 2000 when you returned to the
17  Youth Division, did you choose to go back to the Youth
18  Division?
19    A    Yes.
20    MR. GRILL: Objection to form.
21    Q    Why did you choose to go back to the Youth
22  Division in the 2000s?
23    A    Because the commander asked me to come back.
24    Q    Did he tell you why he wanted you to come back
25  to the Youth Division?

Page 44

1    A    No. She --
2    Q    I'm sorry. I apologize. Thank you for
3  correcting me.
4    A    She -- I imagine she thought I was a good
5  youth officer the ten years I was there and -- and was
6  knowledgeable about the youth proceedings, I imagine. I
7  mean, I don't know why else she would ask me. She asked
8  me if I wanted to come back. And, you know, you
9  wouldn't want to turn something like that down. You
10  know, to get out of patrol is kind of like a promotion.
11    Q    All right. Going back to your time in the
12  Youth Division in 1989, what were your duties in the
13  Youth Division at that time? Can we actually just
14  pause. Can you remind me what your rank was when you
15  went to the Youth Division in 1989?
16    A    Youth officer.
17    Q    Okay. And you said that that's kind -- that
18  was a promotion?
19    A    Yes. It was, yeah. It's also a pay increase.
20    Q    So this is higher than being a patrol officer?
21    A    Correct.
22    Q    Is it on par with being a detective?
23    A    The same --
24    MR. YAMIN: Objection to the form.
25    A    -- pay scale.

Page 45

1    Q    Okay. So when you were a youth officer in
2  1989, what were your duties?
3    A    Well, I was a youth officer for ten years and
4  when I started out in '89, basically my duties were
5  processing juveniles that were under arrest in the
6  station. As time went on, I moved up to what is
7  considered a crime car --
8    Q    Crime what?
9    A    -- and the crime car is -- crime car --
10    Q    Okay.
11    A    -- is what -- and basically what the officers
12  in the crime car do is, they handle child abuse hotlines
13  and all offenses -- either sexual or physical offenses
14  against children. So basically what you're doing --
15  you're very similar to a detective because you're
16  dealing with adult offenders as opposed to juvenile
17  offenders, because the adult offenders are victimizing
18  children. And that's what I did. Mostly that's what I
19  liked to do more than processing juveniles. And I did
20  that up until the time I was promoted.
21    Q    When you -- and other than child abuse cases
22  and child sex cases and physical offenses against
23  children, did the Youth Division in 1989 handle any
24  other cases involving children?
25    A    Yes. Missing persons. Missing persons



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 15 of 93 PageID #:9386
The Deposition of OFFICER KENNETH BURKE, taken on July 30, 2021
46..49

Page 46

1  investigations are done by the Youth Division.
2      Q    And did the youth officers assist in
3  investigations that did not fall under the umbrella of
4  child abuse or where the child is the victim or a
5  missing person?
6      A    Not that I recall, no.  I -- I really don't --
7  no.
8      Q    Okay.  So if a child is arrested for theft --
9  for stealing or a petty theft, would a youth officer be
10 involved in that process?
11     A    Yes.  Yes.  He would.
12     Q    Is a youth officer involved in every police
13 process that involved a child?
14         MR. GRILL:  Objection.  Form.
15         MR. YAMIN:  Objection.  Form.
16     A    Yes.
17     Q    And for the purposes of a youth officer, a
18 child is anyone who is under 17 years old, correct?
19     A    In 1989 it was under 17.  Now, it's under 18.
20 It's been changed.
21     Q    So between 1989 and 1999, so focusing on your
22 first tour in the Youth Division, a child was defined as
23 someone who's under 17 years old back then; is that
24 correct?
25     A    A juvenile would be someone under the age of

Page 47

1  17, yes.
2      Q    Right.
3      A    A 17-year-old -- a 17-year-old would be an
4  adult, but that is not the case today.
5      Q    A 17-year-old would be -- oh, so it's under
6  the age of 17 you would be a child for the purposes of
7  the Youth Division?
8      A    Correct.
9      Q    Okay.  Under 17.  In the 2000s when you go
10 back to the Youth Division, what were your duties?
11     A    I was the third watch supervisor/watch
12 commander at Area Two Youth.
13     Q    What does the third watch supervisor/watch
14 commander do?
15     A    Well, you manage -- I had probably on the
16 third watch there might have been 30 youth officers and
17 there was -- I -- there was two sergeants.  So typically
18 if there's two sergeants, one's going to be the watch
19 commander and then one's like a field sarge.  But
20 typically the days off are split out so a lot -- most of
21 the time there's only one sergeant there so you're the
22 watch commander.  And being the watch commander you
23 would manage the youth officers, you would do the AMA
24 sheets, you'd sign reports, just supervisory duties.
25     Q    The AMA sheets are the attendance and

Page 48

1  assignment sheets?
2      A    That's correct.
3      Q    Going back to 1989, between 1989 and 1999 when
4  you were in Area Two, how many youth officers worked in
5  Area Two during that time --
6      A    I --
7      Q    -- at one time?
8      A    I -- I -- I can -- I don't know.
9      Q    Would there be multiple youth officers
10 assigned to an area?
11     A    Yes.
12     Q    Okay.
13     A    Oh, yeah.  There's, I would say, maybe close
14 to 50.
15     Q    50?
16     A    Yes.
17     Q    Per area?
18     A    Yes.
19     Q    Okay.  And was this true for all the areas in
20 Chicago, Area One, Area Two, Area Three?
21     A    I would say, yeah.
22     Q    Okay.  And there was also a Central Division
23 or Central Headquarters as well?
24     A    There was Youth Headquarters, yes.  At that
25 time was at 11th and State, and that's where missing

Page 49

1  persons was housed there -- you know, located there and
2  that's where the child abuse hotlines came in from DCFS.
3  Yeah.  There's -- yeah, in 1989 there were six areas
4  plus Youth Headquarters.  So there was, like, seven
5  different units, I think in the Youth Division.  But
6  actually eight, because there was a Special
7  Investigations Unit.  So there would be eight different
8  units within the Youth Division.
9      Q    All right.  So you answered my next question.
10 So there were six areas in the 1989, 1999 time period,
11 right?
12     A    No.  Not quite.
13     Q    Well, I'll focus you on one year then.  So in
14 1991, how many areas were there?
15     A    At some point in the early '90s -- well, it
16 had to be after this case because Area Three was -- was
17 no longer in existence, but it was during this, so it
18 had to be sometime after this -- after '91, Area Three
19 was disbanded and there were five areas.  And then
20 sometime later I believe it went down to four areas.  It
21 was all that --
22     Q    So before Area Three got -- sorry.
23     A    -- disbanded, yes.
24     Q    Before Area Three was disbanded, there were
25 six areas?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 16 of 93 PageID #:9387
The Deposition of OFFICER KEN BURKE, taken on JULY 30, 2021

50..53

Page 50

1    A    That's correct.
2    Q    And it was your understanding that every area
3  there were about 50 youth officers assigned to that
4  area?
5    A    I -- you know, yeah.  There might have been
6  anywhere from 30 to 50 I would say.
7    Q    All right.  30 to 50.
8    A    Area Two -- Area Two where I worked was a
9  larger area and there was probably -- there might have
10  been more in Area Two than, like, say Area Three which
11  was a smaller area.  But I would say -- I -- I believe
12  there was, like, 250 youth officers in the police
13  department so that was spread out over the seven units
14  that I just mentioned so whatever that averages out to.
15    Q    Did the officers -- focusing in that 1991 time
16  period, so before Area Three closed --
17    A    Yes.
18    Q    -- did the youth officers work 24/7?  Like was
19  there always a youth officer on the areas -- at the
20  area locations?
21         MR. GRILL:  Objection.  Form.  Foundation.
22         MR. YAMIN:  Join.  Form.
23    A    Basically the youth division only worked the
24  second and third watch in the area because the majority
25  of the youth work is processing juveniles, okay?  So on

Page 51

1  midnights, because there isn't as much to do, they have
2  a skeleton crew that works out of Central Youth downtown
3  and they handle jobs all over the city.
4    Q    So would -- and then you say what will be
5  second watch?
6    A    Days.  Actually, 8:00 in the morning to 4:00
7  p.m.
8    Q    And then third watch would be what?
9    A    4:00 to midnight.
10    Q    The first watch is midnight to 8:00.
11    Q    When you do your training -- going to the
12  about six weeks that you're doing training for the Youth
13  Division, when you do that training are you taught about
14  -- are you taught that there are different rules that
15  apply to juveniles versus the way that you handle adults
16  when you're processing these individuals?
17         MR. GRILL:  Objection.  Form.
18         MR. YAMIN:  Objection.  Form.
19         MR. GRILL:  If you understand that question, go
20    ahead and answer.
21    A    Yes.  Sure.  There's different procedures,
22  yes.
23  BY MS. SPENCE:
24    Q    And what is the different way that you have to
25  process -- sorry.

Page 52

1         MR. GRILL:  It sounds like you're moving to a
2  different topic, and I wanted to take a quick break,
3  so maybe this would be a good spot.
4         MS. SPENCE:  That's fine.  How long do you want
5  to break?
6         MR. GRILL:  I've just got to go to the bathroom
7  for like --
8         MS. SPENCE:  Okay.  Let's take, like, five
9  minutes.
10         MR. GRILL:  Sure.
11         COURT REPORTER:  Okay.  We are off the record.
12  The time is 11:17.
13         (OFF THE RECORD)
14         COURT REPORTER:  We are back on the record.  The
15  time is 11:28.
16  BY MS. SPENCE:
17    Q    So Mr. Burke, can you tell me what was the --
18  back in 1991, what was the function of a youth officer?
19         MR. GRILL:  Objection.  Form.
20         MR. YAMIN:  Join.
21    A    Well, it would be the same functions I already
22  spoke of in 1989.  The functions haven't changed in two
23  years.
24    Q    But what was the purpose?  Why -- what is a
25  youth officer supposed to do?

Page 53

1         MR. YAMIN:  Objection.  Form.  Asked and
2    answered.
3         MR. GRILL:  Join.
4    A    I don't understand what you're -- what do you
5  mean?  What is a youth officer supposed -- in what --
6  what particular circumstance?
7  BY MS. SPENCE:
8    Q    Fair.  So in your time as a youth officer
9  between 1989 and 1999, right during that time period,
10  you had occasion where you assisted in investigations,
11  right, as a youth officer?
12         MR. GRILL:  Objection.  Form.
13    A    Yes.
14    Q    All right.  And sometimes did that assistance
15  in investigation take the form of observing
16  interrogations?
17         MR. YAMIN:  Objection to form.
18    A    No.
19    Q    Did it ever entail observing statements being
20  -- written statements by youth?
21    A    Yes.
22         MR. YAMIN:  Form.  Objection.
23    Q    Okay.  And when you are a youth officer and
24  you're observing a statement being taken from a youth,
25  what is the role of the youth officer in that

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 17 of 93 PageID #:9388
The Deposition of OFFICER KEN BURKE, taken on July 30, 2021
54..57

Page 54

1  circumstance?
2          MR. YAMIN:  Objection.  Form.
3          MR. GRILL:  Yes.  Join.
4      A   Basically, I'm a mere -- or a youth officer
5  would be an observer and he would be there to make sure
6  that the juvenile's rights are not violated, and they
7  are upheld and that he voluntarily waived his rights --
8  knowingly and voluntarily waived them.  And that he's,
9  you know, treated fairly.
10     Q   Well, when you say you're there to make sure
11  that the rights -- that the youth's rights are not
12  violated, which rights are you referring to?
13     A   His civil rights, specifically the Fifth and
14  Sixth Amendment.
15     Q   And when you say, "the Fifth and Sixth
16  Amendment," the Fifth Amendment embodying which right?
17  Which right are you referring to in the Fifth Amendment?
18     A   Well, the right that he doesn't incriminate
19  himself.
20     Q   And for the Sixth, are any of the rights in
21  the Fifth Amendment that you're referring to?
22         MR. GRILL:  Objection to form.
23     A   Could you repeat that?  I'm sorry.
24     Q   Other than the right not to incriminate
25  himself, were there any other rights that you're

Page 55

1  referring to when you said that you're talking about the
2  Fifth Amendment right that the youth might have?
3      A   Well, not specifically.  It'd be just his --
4  his rights in general.  His civil rights in general.
5  That he understood them and that he voluntarily -- and
6  knowingly and voluntarily waived his rights.
7      Q   Okay.  So I'm just trying -- I'm trying to
8  discern when you say, "civil rights in general," which
9  rights are you referring to when you use that term?
10         MR. GRILL:  Asked and answered.
11     Q   Go ahead.
12     A   Just, you know, the rights that are enumerated
13  in the Miranda warnings.
14     Q   Got it.  Other than the rights listed in the
15  Miranda warnings, are you referring to any other rights?
16         MR. GRILL:  Asked and answered.
17     A   Yeah.  I don't -- not that I'm aware of.  I
18  don't know.
19     Q   Okay.  You also mentioned the Sixth Amendment
20  as rights that, you know, we were talking about in
21  parts.  So just thinking about the Sixth Amendment that
22  you had mentioned as rights that you are making sure are
23  not violated, which right in the Sixth Amendment are you
24  referring to?
25     A   I don't specifically know about --

Page 56

1          MR. GRILL:  Asked and answered.  He's answered
2      that question.
3      Q   Okay.  And you said that your job in the
4  situation where you're the youth officer observing a
5  youth giving a statement that you're also making sure
6  that the child is knowingly and voluntarily waiving
7  their rights; is that correct?
8      A   That's correct.
9          MR. GRILL:  Mischaracterizes his testimony but
10     go ahead.
11         MS. SPENCE:  Okay.
12  BY MS. SPENCE:
13     Q   Did I mischaracterize your testimony?  Is that
14  --
15         MR. GRILL:  That's not a question, really.
16         MS. SPENCE:  Well, I can ask him that.
17         MR. GRILL:  The question itself
18     mischaracterizes his testimony when you ask him that
19     question.
20         MS. SPENCE:  Wait.  But I can ask him.
21  BY MS. SPENCE:
22     Q   Did I mischaracterize what you said?
23         MR. GRILL:  Then form objection.  Okay.  So...
24         MS. SPENCE:  Okay.
25     Q   Did I mischaracterize what you said,

Page 57

1  Mr. Burke?
2          MR. GRILL:  Same objection.
3      Q   You can answer.
4          MR. GRILL:  If you understand the question or
5      remember it, go ahead.  If you don't remember, you
6      can ask her to repeat the question.
7      A   Could you -- I'm sorry.  Could you repeat the
8  question?
9  BY MS. SPENCE:
10     Q   Sure.  I was saying that when you were talking
11  about circumstances where you were the youth officer and
12  a youth is giving a statement and you're observing, one
13  of the other duties that you had was to make sure that
14  the youth did not -- sorry, the youth was knowingly
15  involuntarily waiving their rights; is that correct?
16     A   That's correct.
17     Q   Okay.  And you also said that you were also
18  looking to make sure that the youth was not mistreated;
19  is that correct?
20     A   That's correct.
21     Q   Okay.  And when you say, "knowing and
22  voluntary waiver of the rights," are you referring to
23  the Miranda rights?
24     A   Yes.
25     Q   Are there any other rights that you're



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 18 of 93 PageID #:9389
The Deposition of OFFICER KENNEY, taken on July 30, 2021
58..61

Page 58

1  referring to when you refer to a knowing and voluntary
2  waiver of rights?
3       A    No.  That would pretty much cover it all, I
4  believe.
5       Q    And back in 1991 was a youth officer required
6  to be -- sorry -- in what -- in which circumstances was
7  a youth officer required to be present when a youth was
8  in custody?
9       A    When a parent was not available.
10      Q    And would that also include a guardian -- a
11  parent or a guardian not available?
12      A    A parent, guardian, yes.  Same -- yes.
13  Correct.
14      Q    Did that also include a lawyer not being
15  available?  If a parent, guardian, or lawyer was not
16  available?
17      A    Right.  Right.  If there was a lawyer
18  available, there would definitely not be a reason to
19  have a youth officer there.
20      Q    And was the expectation that officers who were
21  investigating the case involving a juvenile would reach
22  out to the parent or guardian to see if they were
23  available?
24      MR. YAMIN:  Objection to the form of the
25  question.

Page 59

1       MR. GRILL:  Yeah.  Form and foundation.
2       MR. YAMIN:  And foundation.
3       MR. GRILL:  Are you talking about
4  interrogations or any type -- any type of arrest?
5  You haven't made that clear.
6       MS. SPENCE:  I'm talking -- okay.  So I'll go
7  back.
8  BY MS. SPENCE:
9       Q    So we -- I initially asked you in what
10  circumstances did a youth officer need to be involved
11  and you said whenever a parent, guardian, or a lawyer
12  was not available for, you know, when the police are
13  dealing with a child; is that right?
14      A    No.
15      MR. GRILL:  Right.  That's the foundation
16  problem that was there.
17      MS. SPENCE:  Okay.  Great.
18  BY MS. SPENCE:
19      Q    So let's --
20      MR. GRILL:  Go ahead.
21      Q    So let's go back.  When did youth officers
22  need to be involved at the police station?
23      MR. YAMIN:  Objection to the form "involved."
24      MR. GRILL:  Form and foundation.
25      Q    Okay.  Go ahead.

Page 60

1       A    A youth officer would only need to be involved
2  for a -- during the written statement that a youth --
3  that a youth is giving when a parent or guardian or
4  attorney could not be located or refused to come in or
5  whatever.  Then a youth officer would be the last person
6  to sit in.
7       Q    Okay.  And in the circumstance where a youth
8  was giving some kind of statement, is the expectation
9  that a parent, guardian -- or guardian would be
10  contacted prior to that youth giving the statement?
11      MR. YAMIN:  Objection.  Form.  Foundation.
12      MR. GRILL:  Join.
13      Q    Go ahead.
14      A    Yes.
15      MR. GRILL:  Repeat the question.
16      A    Could you repeat the question?  I'm sorry.
17      MS. SPENCE:  Lauren, could you read back the
18  question, please.
19      COURT REPORTER:  Yes.  Give me one second to
20  pull that up.
21      (REPORTER READS BACK REQUESTED TESTIMONY)
22      A    My answer to that would be, only during an
23  official written or court reported statement.
24  BY MS. SPENCE:
25      Q    Okay.

Page 61

1       A    The youth officer need to be there only if a
2  parent, guardian, attorney, or other relative was not
3  available.
4       Q    You refer to an official written statement.
5  What is an official written statement?  What does that
6  term mean?
7       A    I'm sorry.  Please repeat that.
8       Q    Sure.  In your answer you mentioned an
9  official written statement and so I would like to know
10  when you refer to an official written statement, what
11  are you referring to?
12      A    Well, that would be when the State's Attorney
13  is present and taking a written statement from the
14  defendant.
15      Q    So I would like to refer you to the general
16  order 87-7 so I think it's --
17      MS. SPENCE:  I don't know if you printed it in
18  color.  Andrew, I think it was blue.
19      MR. GRILL:  Yes.  Sure.  We've got it.  He's
20  got it in front of him.
21      THE WITNESS:  I have it.
22      MS. SPENCE:  Okay.  Great.  So just before we
23  start.  So the Bates stamp on this document, let's
24  mark it Exhibit 1.  The Bates stamps are City_Jakes
25  922 through 925.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 19 of 93 PageID #:9390
The Deposition of OFFICER KENNETH BURKE, Taken on July 23, 2021
62..65

Page 62

1        (EXHIBIT 1 MARKED FOR IDENTIFICATION)
2  BY MS. SPENCE:
3      Q    Mr. Burke, can you make sure that you have all
4  four pages?  It's at the bottom it should state 922
5  through 925.
6           MR. GRILL:  The exhibit goes through 926.
7           MS. SPENCE:  Oh, I don't have 926 but if you
8  have 926, it's fine.
9      A    I have from 922 to 926.
10 BY MS. SPENCE:
11     Q    Got it.  And the top of Exhibit 1, do you see
12 where it says, "General Order"?
13     A    Yes.
14     Q    All right.  And it says underneath General
15 Order, "Subject Interrogation Field and Custodial"; is
16 that right?
17     A    Yes.
18     Q    Okay.  And as a youth officer between 1989 and
19 1999 you would've been trained on the General Order,
20 correct?
21     A    Sure.  Yes.
22     Q    You would've received it, right?
23     A    Yes.
24     Q    And you would have read it, correct?
25     A    Yes.  Correct.

Page 63

1      Q    So turning your attention to the second page
2  Bates stamped 923 to subsection 9, right where it says,
3  "Custodial interrogation," underneath the -- it's
4  towards the bottom.  Do you see that?
5      A    Yes.
6      Q    Right.  And it starts with, "Before the
7  interrogation of an individual who is in custody
8  anywhere or who is in any way being deprived of his
9  freedom of movement and action the person must be
10 expressly warned of his constitutional rights in clear
11 and unequivocal words."  Do you see that paragraph?
12     A    Yes.  I do.  Yeah.
13     Q    And do you see how it used the term, "in
14 custody"?  Do you see that term?
15     A    Yes.
16     Q    And you would agree that the term, "in
17 custody" means that person is not free to leave,
18 correct?
19     A    That's correct.
20     Q    And below that paragraph there are five --
21 there's a numerated list, one through five.  Do you see
22 that?
23     A    Yes.
24     Q    Okay.  And are these the Miranda rights that
25 you were referring to?

Page 64

1      A    Yes.  They are.
2      Q    Okay.  I ask you to turn the page.  Looking at
3  subsection F at the top of the page.  Do you see it
4  starts with, "In addition to the above warnings"?  Do
5  you see that paragraph?
6      A    Yes.
7      Q    All right.  And looking towards the bottom of
8  the paragraph where it says, "A juvenile should be
9  warned and questioned only in the presence of an adult,
10 parent or other" -- sorry -- "parent, other relative,
11 friend, if such an adult can be located."  Do you see
12 that sentence?
13          MR. GRILL:  Do you want to direct him to it?
14     A    Okay.  Under F, right?
15     Q    Yes.  We're in subsection F towards the
16 bottom.  It's the last sentence of subsection F.  Do you
17 see that sentence?  It says, "A juvenile should be
18 warned and questioned only in the presence of an adult,"
19 and then in parentheses it says, "(parent, other
20 relative, friend) if such an adult can be located."  Do
21 you see that's in all caps?
22     A    Yes.  I do.  Yeah.
23     Q    Right.  And that sentence says that when
24 dealing with a juvenile or a youth if they are going to
25 be questioned the parent should be present, right, if

Page 65

1  they can be located?
2      A    Yes.
3          MR. YAMIN:  That doesn't read the entirety of
4      that statement, but objection on that basis.
5          MR. GRILL:  I'd like to point that out as well.
6          MS. SPENCE:  Okay.
7  BY MS. SPENCE:
8      Q    And if a parent, other relative, or friend
9  cannot be present right before -- when the child is
10 being questioned, is the expectation that a youth
11 officer would be called in or should be called in?
12     A    I don't see that.  Where do you see that?
13     Q    I'm not pointing to anything.  I'm asking you
14 based on your training.  Right?  If the provision says
15 that a juvenile should be warned and questioned only in
16 the presence of an adult if such an adult can be
17 located, I'm now asking you, in the event an adult could
18 not be located was the expectation -- or was your
19 training -- sorry, was the training that a youth officer
20 should be contacted at that point?
21     A    No.
22     Q    What was -- what should've happened if an
23 adult could not be located before the child is
24 questioned, what was supposed to happen?
25          MR. YAMIN:  Objection to form.



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 20 of 93 PageID #:9391
The Deposition of OFFICER KEN BURKEY, taken on July 09, 2021
66..69

Page 66

1          MR. GRILL:  Join.
2     A    Well, it's not enumerated anywhere in the
3  order.  It's just -- it says, "if," you know.  It
4  doesn't say "if you can't," so I don't know.
5     Q    Right.  But you worked as a youth officer
6  between 1989 to 1999, right?
7     A    Yes.
8     Q    Okay.  So where this policy -- what was the
9  practice if a child -- if a child is going to be
10 questioned and the adults could not be located, what was
11 the practice?
12         MR. YAMIN:  Objection.  Foundation and form.
13         MR. GRILL:  Join.
14    Q    Go ahead.
15    A    I --
16         MR. GRILL:  Do you understand the question?
17         THE WITNESS:  No.  I don't.
18         MR. GRILL:  There you go.
19         MS. SPENCE:  Okay.
20         MR. GRILL:  Ask her to clarify it.
21    A    Yeah.  Could you clarify the question, please?
22 BY MS. SPENCE:
23    Q    Sure.  So during your time between 1989 and
24 1991 when you were a youth officer, did you ever
25 encounter a circumstance where a child needed to be

Page 67

1  questioned and the parent or guardian could not be
2  located?
3          MR. YAMIN:  Objection to form.
4     A    Yes.  That would be on a daily basis.  I mean,
5  I had many -- as a youth officer in the youth office,
6  when the arresting officers would bring a juvenile in
7  there under arrest, never was a parent with them -- or
8  hardly ever and, you know, we would talk to him without
9  a parent and call -- we would call the parents and have
10 them come in, but we couldn't talk to them without the
11 parent.
12    Q    As youth officers you could talk to the child
13 without the parent when the child was --
14    A    Sure.
15    Q    -- in custody; is that correct?
16    A    It was part of the processing.  Yes.
17    Q    I didn't hear that first part.  It's harder to
18 process?  I'm sorry.  What did you say?
19    A    It's part of the processing.  When you -- one
20 of the main jobs of a youth officer is processing
21 juveniles under arrest.  Okay.  You know -- you know, an
22 arresting officer would bring a juvenile into the
23 station and it's actually his job to contact a parent or
24 make an attempt to contact a parent, okay?  Oftentimes
25 it's not done.  We will try to make an attempt to

Page 68

1  contact the parent via telephone.  If that doesn't work,
2  we can send a beat car to the address, but it doesn't
3  preclude us from talking to the juvenile.
4          MR. GRILL:  So I think part of the problem
5  here, Spence, is that you chose to not read or use
6  the entirety of subsection F --
7          MS. SPENCE:  So I don't -- I'm not having
8  problems.
9          MR. GRILL:  -- and I think it's --
10         MS. SPENCE:  No.  I don't think we're talking -
11 - I understand where he's going.  I don't see a
12 problem, so I'm going to keep going.
13         MR. GRILL:  I think there -- do you want an
14 accurate record, or not?
15         MS. SPENCE:  The way that you're objecting --
16 hold on one second, Andrew.  I think the way that
17 you're objecting is --
18         MR. GRILL:  Okay.
19         MS. SPENCE:  -- appears somewhat coaching.
20         MR. GRILL:  I'm going to ask him to step out of
21 the room and I'm going explain where I'm coming
22 from.
23         MS. SPENCE:  Okay.
24         MR. GRILL:  Ken, why don't you out for a
25 minute, okay?

Page 69

1          THE WITNESS:  Here?
2          MR. GRILL:  Yeah.  Okay.  He's out of the room
3  so he can't hear me.  So here's the problem.  You
4  focused in on one of three sentences that are in
5  subsection F.  The sentence that you specifically
6  focused in on was that a juvenile should be warned
7  and questioned only in the presence of an adult if
8  such -- you know, and the sentence, if such an adult
9  can be located.  So he's answering your questions
10 from the standpoint of any type of communication
11 when subsection -- with a juvenile, when subsection
12 F specifically only applies to admissions or
13 statements of a juvenile like the statement to the
14 ASA in this case.  So that's the problem, which is
15 why George and I both objected that this -- you --
16 this is incomplete.  So what you're presenting him
17 with and what -- the questions you're asking him are
18 based on an incomplete reading of subsection F.  So
19 if you are interested in an accurate record and
20 actually getting answers from him about this, I
21 would start over and use all of F,
22 because he can answer these questions.  He knows the
23 rules here.  But what you're asking him, because
24 you've only used part of this, is confusing.  So
25 I've made my record.  You can continue to do what

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 21 of 93 PageID #:9392
The Deposition of OFFICER KEN BURKE, taken on July 30, 2021

70..73

Page 70

1  you want.  I'm not so sure the answers you're
2  getting, though, are going to be real useful to you
3  because of how you set this up.  That's all.
4      MS. SPENCE:  So I don't interpret subsection F
5  to read the way that you're reading it.  So I
6  understand your perspective, but I'm not -- I don't
7  read it that way.
8      MR. GRILL:  Well, it's pretty plain what
9  subsection F says, and I don't think it's ambiguous
10 whatsoever.  But it is when you only use the last --
11 when you only read the last -- have him read the
12 last sentence of it.
13     MS. SPENCE:  So, I mean, I don't have any
14 problem with him reading subsection F and that's why
15 we have it.
16     MR. GRILL:  No, I just mean --
17     MS. SPENCE:  So it's kind of --
18     MR. GRILL:  I just mean if he wants to -- go
19 ahead.
20     MS. SPENCE:  I mean, I don't have any objection
21 to him reading the entire paragraph.  It doesn't --
22 my questions are not dependent on your
23 interpretation that you've put on the record -- the
24 interpretation that you've put on the record on
25 subsection F.  So that's fine.

Page 71

1      MR. GRILL:  And my point is that there's
2  nothing to interpret.  I'm saying you're misleading
3  him and it's not -- I don't think it's appropriate
4  and I don't think that the record you're attempting
5  to make is legitimate and I'm offering you a way to
6  actually get testimony that maybe you can use, but
7  if you don't want it, okay.  That's fine.  I'm fine
8  with that.
9      MS. SPENCE:  Great.  And all I'm saying is I
10 don't agree with your interpretation of what's
11 happening, but in the interest of just -- it's not -
12 - it's not a hill worth dying on to me.  I'm fine if
13 he comes in and he reads subsection F.  That's all
14 I'm saying.
15     MR. YAMIN:  The question is not --
16     MR. GRILL:  You're trying to make this one of
17 the most important things you want this witness for
18 but that's your call.  Okay.
19     MS. SPENCE:  Yeah.  Sure.  Sorry, George, were
20 you going to say something?
21     Q    MR. GRILL:  Right.  I don't think the question
22 is the issue was what Mr. Burke is reading, it's --
23 the issue is what the question is being based on.
24     MR. GRILL:  Right.  Exactly.
25     MS. SPENCE:  Yeah.  We're on a -- I understand

Page 72

1  what you guys are saying.  I don't agree, but I
2  understand -- I understand the argument.  Again, I
3  think it can all be resolved when he comes in and
4  you say -- I say, let's read subsection F.  I
5  honestly don't think we have -- I don't think we're
6  apart in terms of procedure about how to proceed
7  about this right now.
8      MR. GRILL:  I just think that the question
9  needs to be if we're talking about subsection F,
10 what his understanding of when a youth officer needs
11 to be present when a statement or a confession of
12 the juvenile is being taken, not just when there's a
13 conversation with the juvenile, which is clearly
14 what Officer Burke is talking about because you only
15 asked him questions based on the last sentence of
16 subsection F, so...
17     MS. SPENCE:  Right.  But subsection F also
18 doesn't even talk about a youth officer.  I was
19 going to go in and clarify because I understood that
20 he was talking about any conversation.
21     MR. GRILL:  But you're asking him -- but he's
22 pointed out -- you are literally directly asking him
23 about how the youth officer plays into this, so
24 that's why.  It's your question and he's reacting to
25 what you're asking and you're only using part of

Page 73

1  this.  So continue to ask what you -- continue to do
2  that or move on.
3      MS. SPENCE:  Okay.  Again, I think it's fine
4  that we read subsection F.
5      MR. GRILL:  You do whatever you want.
6      MS. SPENCE:  It's totally fine.  You can bring
7  him back in.  That's totally fine.
8      MR. GRILL:  Okay.  He's coming.  He's in the
9  bathroom.
10     MS. SPENCE:  Okay.
11     MR. GRILL:  So we'll just wait a few minutes
12 for him to get back and we'll go from there.
13         (OFF THE RECORD)
14     MR. GRILL:  All right.  We're back.  Can you
15 hear me?
16     MS. SPENCE:  Yes.  Are we back on the record? I
17 was waiting for Lauren.
18     COURT REPORTER:  Yes.  We're back on the
19 record.
20 BY MS. SPENCE:
21     Q    So Mr. Burke, do you have Exhibit 1 in front
22 of you?  This is the General Order that we were
23 referring to?
24     A    Yes.  I do.
25     Q    Okay.  And I want you to turn to the page

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 74

1 that's Bates stamped City_Jakes 924.

2     A    Okay.

3     Q    Okay.  Looking at subsection F.  Sorry.  This
4 is the top -- the F at the top of the page, not the one
5 at the bottom.

6     A    Okay.  I got that one.

7     Q    Why don't you take a minute and read the
8 paragraph that's subsection F.  It starts with, "In
9 addition to the above warnings."  Can you take a minute
10 to read that to yourself?

11     A    Okay.

12     Q    Did you finish paragraph F at the top of the
13 page?

14     A    Paragraph F, yes.

15     Q    Okay.  Great.  And you see the last line of
16 paragraph F that says, "A juvenile should be warned and
17 questioned only in the presence of an adult (parent,
18 other relative, friend) if such an adult can be
19 located."  Do you see that sentence?

20     A    Yes.  I do.

21     Q    Okay.  And based on that sentence and your
22 reading, is it fair to say that the policy was that if
23 the juvenile was going to be questioned that the
24 questioning needs to happen in the presence of an adult
25 if an adult could be located?

Page 75

1          MR. GRILL:  Objection.  Mischaracterizes the
2     exhibit and foundation.

3     Q    Go ahead.

4     A    Okay.  Well, this is during the statement,
5 correct?

6     Q    I don't know.  I'm asking you based on your
7 reading of your -- based on your training and your
8 reading of subsection F that that last sentence says --
9 or that last sentence means that if a juvenile is being
10 questioned that that questioning needs to happen in the
11 presence of an adult if such an adult could be located?

12          MR. GRILL:  Objection for all the reasons that
13     I just went through off the -- well, on the record
14     but outside of Officer Burke's presence.  Form.
15     Foundation. Mischaracterizes the exhibit.

16 BY MS. SPENCE:

17     Q    Go ahead.

18     A    Okay.  I read that, and it's "if such an adult
19 can be located."

20     Q    Right.  So if an adult can be located, is --
21 was it your training that if an adult could be located
22 then that adult needed to be present before a juvenile
23 was questioned?

24          MR. GRILL:  Objection again.  This is really
25     getting ridiculous and harassing because I've made

Page 76

1 it clear outside of Officer Burke's presence what
2 the problem is with this misleading and
3 inappropriate line of questioning.  You've got to --

4          MS. SPENCE:  You'll have an opportunity to ask
5     as well.  Go ahead.

6          MR. GRILL:  I'm just telling you.  I've given
7     you a lot of opportunities to correct it.  So you
8     keep it up, this isn't going to be worth the paper
9     it's written on for anybody.

10          MS. SPENCE:  Okay.

11          MR. GRILL:  So rephrase your question.  Form.

12          MR. YAMIN:  Join.

13          MS. SPENCE:  All right.  I'm not rephrasing it
14     because I think it is proper so go ahead, Mr. Burke.

15          MR. GRILL:  It's not --

16          MS. SPENCE:  I understand --

17          MR. GRILL:  -- but go ahead.

18          MS. SPENCE:  -- you have said that Andrew and I
19     do hear you.

20          MR. GRILL:  Go ahead.  Go ahead.  I love it.  I
21     love it.

22          MS. SPENCE:  We just disagree.  We -- I mean,
23     we obviously disagree Andrew.  I don't have to
24     convince you that we are apart on this issue.  We
25     disagree and you --

Page 77

1          MR. GRILL:  Go ahead.

2          MS. SPENCE:  -- are allowed to ask your
3     questions at the end of this deposition.  You can
4     ask questions if you want to.  You're allowed to
5     make your objections.  You're allowed to -- you can
6     do what you need to do.  You've laid your record.
7     I'm asking the question.

8          MR. GRILL:  Go ahead.

9 BY MS. SPENCE:

10     Q    Go ahead, Mr. Burke.

11          MR. GRILL:  Maybe ask the question again or
12     have it read back.  I'm probably -- that was
13     probably too much for the witness to remember.

14     A    Yeah.  I'm sorry.  Could you repeat it?

15 BY MS. SPENCE:

16     Q    I can and in the time that Mr. Grill and I
17 were conversing about the objection, I saw that you were
18 reading through the exhibit; is that correct?

19     A    Yes.  I read paragraph F and, you know, I read
20 what it says.  A juvenile should be warned, should be
21 warned and questioned only in the presence of an adult,
22 parent, or other guardian or friend if such a adult can
23 be located.

24     Q    Right.  So my question to you is based on your
25 reading of all of subparagraph F, right, based on your



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 23 of 93 PageID #:9394
The Deposition of OFFICER KEN BURKEY, taken on July 30, 2021
78..81

Page 78

1  reading of that entire subparagraph, was it your
2  training that when a juvenile was questioned that it
3  needed to be done in the presence of an adult if the
4  adult could be located?
5       MR. GRILL:  Same objection.
6   Q   Go ahead.
7       MR. GRILL:  And I'm going to ask -- direct the
8  witness -- I -- the question --
9       MS. SPENCE:  Ask him to just answer the
10  question.
11      MR. GRILL:  -- read the whole -- read all of
12  F.
13      MS. SPENCE:  But he said that he read all of F
14  Andrew.
15      MR. GRILL:  Read all of F and then see if he
16  can answer the question in light of that.
17   A   "In addition -- in addition to the above
18  warnings" which are Miranda warnings, "before accepting
19  any admission or statement of a juvenile" -- okay.  It's
20  a statement.  "The juvenile will be advised that his
21  case might be transferred to a criminal court where he
22  will be prosecuted as an adult.  An express statement by
23  the juvenile that he understands the meaning of this
24  advice is required.  A juvenile should be warned and
25  questioned only in the presence of an adult, parent,

Page 79

1  other relative, friend, if -- if such an adult can be
2  located."
3  BY MS. SPENCE:
4   Q   Great.
5   A   Okay.  So that --
6   Q   So you've read subparagraph F out loud.
7   A   Right.
8   Q   And now I'm asking you, what --
9   A   So --
10   Q   -- let me ask the question.  Let me ask the
11  question.
12      MR. GRILL:  Let him try to answer the question.
13  He's not done answering the question.
14      MS. SPENCE:  Oh, okay.
15  BY MS. SPENCE:
16   Q   Go ahead.
17      MR. GRILL:  Okay.
18   A   Okay.  The way I read it is if it's a
19  statement, any admission or statement, okay.  So you
20  don't need the parent present if he's not giving a
21  statement.
22   Q   That's the way that you're reading it?
23   A   Yes.
24   Q   And this is the way you're reading it now
25  after you've read it multiple times before.  This is now

Page 80

1  the reading that you have; is that correct?
2       MR. GRILL:  No.  No.  No.  Hang on.
3       MR. YAMIN:  Objection.
4       MR. GRILL:  Objection.  That's argumentative.
5       MR. YAMIN:  Exactly.
6       MR. GRILL:  Object to form.
7  BY MS. SPENCE:
8   Q   You can answer it.  Go ahead.
9       MR. GRILL:  That's not a question.  So I'm
10  going to --
11      MS. SPENCE:  It is a question.  It's definitely
12  a question.
13      MR. GRILL:  Don't answer that question.  Ask
14  another question.
15  BY MS. SPENCE:
16   Q   Mr. Burke --
17      MR. GRILL:  You don't need to do that, okay?
18  Ask a question.
19   Q   Mr. Burke, what is the difference -- looking
20  at subparagraph F, that first line, what is the
21  difference between an admission -- sorry.  What does the
22  word "admission," mean in that sentence --
23      MR. GRILL:  Objection.
24   Q   -- based on your training?
25      MR. GRILL:  Okay.  Go ahead and answer it.

Page 81

1   A   An admission is admitting to -- to whatever
2  you're being accused of, I guess.
3   Q   Okay.  And what is a statement in that --
4  looking at that same sentence, the term statement.  Based
5  on your training, what does the word "statement" mean?
6   A   Well, a statement would be a written
7  statement.
8   Q   Okay.  And you would agree that nowhere in --
9  sorry.  Go ahead.
10   A   Or a court reported statement.
11   Q   And you would agree that nowhere in
12  subparagraph F does it say written statement?
13   A   I would agree to that, yes.
14   Q   All right.  And you would agree that nowhere
15  in subparagraph F does it say court reported statement,
16  correct?
17   A   That's correct.
18   Q   Okay.  And at the beginning of this
19  subsection, so this is subsection 9, right.  It started
20  on page 923 and goes to 924, right.  We're in subsection
21  9.  The title is "Custodial Interrogation, Advising the
22  Individual of his Rights."  Do you see that?
23   A   Yes.  I do.
24   Q   Okay.  Great.  Do you have to -- based on your
25  training, you have to advise -- sorry.  When do you have

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 82

1  to advise an individual of their rights based on your
2  training -- on their Miranda rights?
3      A    For any individual or a juvenile?
4      Q    Sure.  A juvenile.  Sure.  A youth.
5          MS. SPENCE:  You guys dropped off the sound.
6          COURT REPORTER:  Would you like to go off the
7  record while we resolve this?
8          MS. SPENCE:  Yes, please.
9          COURT REPORTER:  Okay.  We are off the record.
10 The time is 12:06.
11         (OFF THE RECORD)
12         COURT REPORTER:  All right.  We are back on the
13 record.  The time is 12:07.
14 BY MS. SPENCE:
15     Q    Mr. Burke, can you turn to page Bates stamp
16 923 of Exhibit 1?  So it's just one -- looking at
17 subsection 9?
18     A    Okay.
19     Q    Right.  Looking at -- under subsection 9 where
20 it says, "Subpart A.  Before the interrogation of an
21 individual who is in custody anywhere or is in any way
22 being deprived of his freedom of movement and action,
23 that person must be expressly warned of his
24 constitutional rights in clear and unequivocal words as
25 follows."  Do you see that?

Page 83

1      A    Yes.
2      Q    Okay.  Based on your training, what does the
3  word "interrogation" mean?
4      A    Well, it's somebody that's in custody.
5      Q    Is it a portion of the time they're in custody
6  when the officer is questioning that individual?
7      A    No.  Not necessarily.
8      Q    What is happening in interrogation?
9      A    What's happening in an interrogation?
10     Q    Yes.  What happens in an interrogation based
11 on your training and experience?  What happens in
12 interrogation?  We can restrict this to juveniles, to
13 youth.
14     A    Okay.  Well, it would be questioning -- he
15 would have to be in custody though.  He'd have to be a
16 suspect in custody.
17     Q    Right.  So once the child is a suspect and is
18 in custody, what happens in the course of interrogation
19 based on your training and experience?
20     A    Well, then he needs to be -- he should be read
21 his rights prior to an interrogation.
22     Q    And after the rights are read, what happens
23 then?
24     A    Well, he's asked if he understands them.
25     Q    And if the child indicates that he does

Page 84

1  understand them and wants to waive the rights, what
2  happens?
3      A    Well, then the interrogation can continue.
4      Q    Okay.
5      A    The questioning can continue.
6      Q    So at that point if the rights have been
7  waived then you're telling me that at that point the
8  officer would ask questions of the child suspect; is
9  that correct?
10     A    Yes.
11     Q    Right.  The child would be questioned, right?
12     A    Yes.
13     Q    And would be questioned about typically the
14 incident or what, you know, the basis of this child
15 being in custody, correct?
16         MR. GRILL:  Objection to the form, the use of
17 the word "child."
18     Q    The youth being in custody, correct?
19     A    Correct.
20     Q    Okay.  So looking at subsection F on the next
21 page, 924.
22         MR. GRILL:  F.  Yeah.  924.
23     A    Yes.
24     Q    Are you back on F?
25     A    Yes.  I am.

Page 85

1      Q    Okay.  When it says, "In addition to the above
2  warnings before accepting an admission or statement of
3  the juvenile, the juvenile would be advised that his
4  case might be transferred to criminal court where he
5  might -- where he will be prosecuted as an adult."  Do
6  you see that first paragraph -- sorry -- that first
7  sentence?
8      A    Yes.  I do.
9      Q    Right.  When it refers to an admission, this
10 is an -- this is an admission of committing the crime
11 that -- sorry.  This is -- sorry.  Let me back up.  When
12 it refers to an admission, this is a statement that
13 stems from the interrogation, correct?
14         MR. YAMIN:  Objection.  Form.
15     A    Yes.
16     Q    Right.  It's after the child has been
17 questioned, this is a -- during the course of
18 questioning the child may have made a confession of
19 sorts, right?
20         MR. YAMIN:  Objection to form.  I still -- I
21 also object to the use of the word "child."  I mean,
22 we're talking, if you want to stay consistent with
23 the terms of art here and the directive, how about
24 just saying juvenile?
25         MS. SPENCE:  I'll use the term "youth."  That's



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 25 of 93 PageID #:9396
The Deposition of OFFICER KEN BURKE, taken on JULY 30, 2021
86..89

Page 86

1  a term that we've all been using and understand,
2  Youth Division, youth.
3           MR. YAMIN:  Well, I still --
4           MS. SPENCE:  We've also defined the word
5  "child," earlier as someone who is under the age of
6  17.
7           MR. GRILL:  That mischaracterizes his
8  testimony.
9           MS. SPENCE:  Okay.
10 BY MS. SPENCE:
11      Q   Mr. Burke, do you understand the term,
12 "child," to mean --
13      A   No.
14      Q   Okay.
15          MR. GRILL:  It calls for speculation, and he's
16 --
17          MS. SPENCE:  Okay.
18      Q   So back to subsection F, right, where it says,
19 "admission," right.  This is a result of questioning the
20 juvenile, right?
21      A   Yes.
22      Q   Okay.  And getting a statement from the
23 juvenile, that would be the result of the questioning
24 that happened previous to the statement being obtained,
25 correct?

Page 87

1           MR. GRILL:  Object.  Form.
2      Q   Now, looking at that last sentence where it
3  says, "A juvenile should be warned and questioned only
4  in the presence of an adult if such an adult can be
5  located," what does the word "questioned" mean to you in
6  that statement based on your training and experience?
7      A   Well, I -- questioned means, you know, to see
8  if there was a statement made is what I'm -- the way I
9  interpret it.  I don't know.
10     Q   Right.  But you were saying that the statement
11 is a result of questioning that happens during the
12 course of the invest -- sorry -- the interrogation,
13 right?
14     A   I'm sorry.  Say that again?
15     Q   Earlier you stated that the statement is the
16 result of the questions that are asked during the course
17 of the interrogation, right?
18     A   Well, I interpret statement as being a written
19 statement.
20     Q   All right.  And in order to obtain a written
21 statement from the juvenile there would be a questioning
22 period, correct?
23     A   Yes.
24     Q   Right.  And so when it says that the juvenile
25 should be warned and questioned only in the presence of

Page 88

1  an adult if such an adult can be located, that is the
2  interrogation portion, the questioning portion, correct?
3           MR. GRILL:  Objection to the form.
4      A   I don't interpret it that way.
5      Q   What do you interpret questioning to mean in
6  that sentence?
7      A   It would be the questioning during a
8  statement.
9      Q   Okay.  Then what does "questioning" mean if it
10 refers to an admission?
11     A   Well, I -- I think it would be the same -- the
12 same thing.  I think it's -- I interpret that whole
13 paragraph as meaning the official court reported
14 statement.
15     Q   I mean, that's the way my training -- it's the
16 way we've always sent a youth officer out only if there
17 is going to be a admission in a court report or written
18 statement.
19     Q   Right.
20     A   Should he be warned of his Miranda rights
21 prior to that, sure, but that is not the job of the
22 Youth Division.  That's the job of the investigating
23 officer or the arresting officer.
24     Q   But putting aside the youth officer, because
25 we're focusing on the presence of an adult.  So putting

Page 89

1  that -- the youth officer part aside, right?  I'm asking
2  based on your training of subsection F you -- you're --
3  you keep talking about a statement, that it's a written
4  statement or a court reported statement --
5      A   Right.
6      Q   -- but would you agree that an admission in
7  subsection F, an admission is different from a
8  statement?
9           MR. GRILL:  Form.  Foundation.  Asked and
10 answered.
11     A   Yeah.  I -- I -- I interpret it as being the
12 same.
13     Q   You believe that admission and statement in
14 that first sentence are -- they mean the exact same
15 thing?  They mean court reported or written statement?
16     A   Yes.
17     Q   Got it.  All right.  So --
18     A   You know, I believe it's enumerated somewhere
19 and in the Juvenile Court Act as well.  Now, this is an
20 old order, and this is interrogation sealed and
21 custodial.  Of course, this one sub -- this one section
22 is -- pertains to juveniles, but there's -- there's
23 other orders out there that I think make it a little
24 clearer.  I don't know them off the top of my head.
25     Q   All right.  So you can't name which specific

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 90

1  order makes it --
2     A    No.  I've been retired for ten years, and I
3  have no idea.
4     Q    Okay.  When you were getting training as a
5  youth officer, did you have to attend presentations?
6     A    Have to attend what?
7     Q    Presentations.  Did they -- during the
8  training were there presentations about certain subject
9  matters?
10        MR. GRILL:  Form.
11    A    I -- I don't recall.  I don't know.
12    Q    Well, was the training just you reading books
13 or did -- was there someone who gave a lecture about,
14 you know, what you were supposed to learn?
15        MR. YAMIN:  Form.  Foundation.
16    Q    Go ahead.
17        MR. GRILL:  If you understand, go ahead.
18    A    It was a six-week course in the Chicago Police
19 Academy, eight hours a day in a classroom.  There is --
20 I'm sure there was some presentations.  I'm sure there
21 was some reading in the book of the orders.
22    Q    Okay.
23    A    It was a long time ago.  It was -- and I don't
24 recall the -- anything specific.
25    Q    You said that during the course of the

Page 91

1  training you were trained on how to process youth,
2  right?
3     A    That's correct.
4     Q    Okay.  And in your training and experience as
5  a youth officer during 1989 and 1991, were you aware
6  that there were circumstances where a juvenile could be
7  charged as an adult?
8     A    Yes.
9     Q    Okay.
10    A    With our automated transfers.
11    Q    All right.  And if a juvenile was going to be
12 charged with murder, is that the kind of case that where
13 a juvenile could be charged as an adult?
14    A    Yes.  Murder is an automatic transfer for a
15 15- or 16-year-old and it could go for a 13- or
16 14-year-old but it would have to -- it'd be up to the
17 judge in the juvenile court, but a 15- and 16-year-old
18 is an automatic transfer.  It definitely goes right to -
19 - I'm sorry -- to criminal court.
20    Q    Referring to the exhibit where the first page
21 is City_Jakes 1252, it looks like a table.
22        MR. GRILL:  Hang on.  1252 on the bottom
23     right-hand corner there.  Have you got it?
24        THE WITNESS:  Yes.  1252.  Okay.
25        MS. SPENCE:  Go ahead and mark that as Exhibit

Page 92

1  2.
2         (EXHIBIT 2 MARKED FOR IDENTIFICATION)
3  BY MS. SPENCE:
4     Q    And Mr. Burke can you verify for me that you
5  have pages that are Bates stamped City_Jakes 1252
6  through 1254?
7     A    Yes.  I have -- yes.  Yes.
8     Q    All right.  I want to direct your attention to
9  the first page, 1252 where it's enumerated number 2,
10 "Assistance With Detective Personnel."  Do you see that
11 that section?
12    A    Yes.
13    Q    All right.  And where it says, "A.  With the
14 arrest of a juvenile offender who may be charged as an
15 adult, detectives will contact youth officers to be
16 present during interrogation."  Do you see that
17 sentence?
18    A    Yes.
19    Q    Okay.  And did you receive that training when
20 you were a youth officer from 1989 to 1991?
21        MR. GRILL:  I'm going to object to foundation.
22     Form.  Are you asking him generally or are you
23     saying on this specific document because you just --
24 BY MS. SPENCE:
25    Q    On this specific document did you receive the

Page 93

1  training?  So the information I'm -- I'm referring to
2  the information on the document, right, where it says,
3  "With the arrest of a youth offender who may be charged
4  as an adult, detectives will contact youth officers to
5  be present during interrogation."
6         MR. GRILL:  Right.  Okay.
7     Q    Do you see that sentence?
8         MR. GRILL:  Yeah.  So hang on.  So my objection
9     is still foundation because there's a difference
10    between you asking him, "have you ever received
11    training like that" versus using this exhibit, which
12    suggests did you receive the --
13        MS. SPENCE:  I understand.
14        MR. GRILL:  -- specific training.  And if
15    that's the question, you haven't laid a foundation
16    for it.
17        MS. SPENCE:  Great.  I appreciate it if you
18    just give the basis of the objection, not the
19    speaking objection.  I appreciate that.
20        MR. GRILL:  Okay.  Well, you know --
21        MS. SPENCE:  I understand that you're looking
22    out for my best interest, Andrew, and I'm just
23    really --
24        MR. GRILL:  For everybody, because it's not
25    proper.  It's not -- you put an exhibit in front of

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 27 of 93 PageID #:9398
The Deposition of OFFICER KENNETH BURKE, taken on July 30, 2021

94..97

Page 94

1    the witness that you haven't laid a -- that there's
2    no foundation for to question -- for the way that
3    you're asking the question to him.  There's ability
4    to do it, but I'm going to object.
5         MS. SPENCE:  And you're free to object.
6         MR. GRILL:  Yeah.  Object to the foundation.
7         MS. SPENCE:  Thank you.
8         MR. GRILL:  Form.
9         MS. SPENCE:  Got it.
10        MR. GRILL:  Did you understand the question?
11        THE WITNESS:  No.
12        MR. GRILL:  Okay.
13        MS. SPENCE:  Why don't we repeat the -- let me
14   repeat the question.
15   BY MS. SPENCE:
16        Q    Right.  That sentence where it says, "With the
17   arrest of a juvenile offender who may be charged as an
18   adult, detectives will contact youth officers to be
19   present during interrogation."  Do you see that
20   sentence?
21        MR. GRILL:  Same objections.
22        MS. SPENCE:  Okay.
23        A    Yes.  I see that.
24        Q    And -- all right.  During your training in
25   1989 to 1991 were you trained on that procedure that a

Page 95

1    juvenile offender who may be charged as an adult the
2    detectives are supposed to contact the youth officers to
3    be present for the interrogation?
4         A    I don't recall.
5         Q    Okay.  Do you -- have you ever seen this
6    document before, Exhibit 2?
7         A    No.  I have no idea what this document is.
8         Q    Okay.  Do you --
9         A    It is not a --
10        Q    When you were in --
11        A    -- a police department --
12        Q    -- training during your six-week training, did
13   you receive documents as part of your training?
14        A    I'm sure I did.
15        Q    All right.  Do you remember what those
16   documents looked like?
17        A    No.
18        Q    Okay.  So you can't say whether you received
19   Exhibit 2 during your six-week training; is that
20   correct?
21        A    That's correct.
22        Q    You can't say if you got it or if you didn't
23   get it, correct?
24        A    That's right.
25        Q    Okay.  And at this -- okay.  Back in 1991,

Page 96

1    Mr. Burke, did youth officers wear a uniform?
2         A    No.
3         Q    How were you dressed as a youth officer back
4    in 1991?
5         A    In business attire.
6         Q    All right.  So would it be fair to
7    characterize it as plain clothes?
8         A    Sure.
9         Q    Okay.  Did you wear any kind of badge?
10        A    You could.  You didn't have to.
11        Q    Did you -- back in 1991, did you wear any kind
12   of badge?
13        A    I usually -- yes.  I usually had it on my
14   belt.
15        Q    And is this badge the kind of badge that says
16   Chicago Police Department?
17        A    Yes.
18        Q    All right.  Were you armed back then?
19        A    Yes.
20        Q    Okay.  Did you have any kind of insignia that
21   you wore, like a vest over your suit -- or sorry -- your
22   business clothes?
23        A    No.
24        Q    Okay.  And would it be fair to say that your
25   attire was similar to the way detectives would dress in

Page 97

1    plain clothes?
2         A    Yes.
3         Q    Based on your training in 1991 when youth were
4    processed, as part of that process were they
5    fingerprinted?
6         A    That depends.  I don't recall the exact
7    statute, but I believe there was a certain age.  I think
8    it was 12.  If they were processed for certain crimes
9    and they were over 12, they were fingerprinted.  And if
10   they were under 12, you had to get the watch commander's
11   permission to fingerprint them.  And --
12        Q    All right.
13        A    -- like I said, I don't -- I don't know 12 --
14   if it was 12 or ten.  I forget, to be honest with you.
15   But juveniles were fingerprinted, yes.  Not all of them.
16        Q    When you were a youth officer between 1989 and
17   1991 did you receive a manual, like a Youth Division
18   manual procedure?
19        A    Yes.
20        Q    Okay.  And did you read that manual?
21        A    Yes.  I did.
22        Q    Were you trained on that manual?
23        A    Yes.  I was.
24        Q    Okay.  Can you look at -- Andrew can you -- or
25   Mr. Burke, can you pull up the document that looks like



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 28 of 93 PageID #:9399
The Deposition of OFFICER KENNETH BURKE, taken on July 30, 2021
98..101

Page 98

1   this one in front.  It says, "Chicago Police Youth
2   Division Manual Procedure."  I looks -- I think now you
3   can see it on the screen.
4       A    Okay.  I got it.
5       Q    Perfect.
6            MS. SPENCE:  So let's mark that Exhibit 3.
7            MR. GRILL:  Can we agree that this is not the
8       whole manual, right?
9            MS. SPENCE:  Yes.  And I was actually just
10      going to put that on the record.  Let's not mark
11      that as Exhibit 3.  What I actually want to do is
12      direct your attention in that packet.  It's a packet
13      of multiple pages.  It's not the entire manual and
14      it's not consecutively paginated.
15  BY MS. SPENCE:
16      Q    I want you to turn to a page that is Bates
17  stamped City_Jakes 1121.
18           MR. GRILL:  The last page.
19           MS. SPENCE:  It's the last page.  And why don't
20      we mark that as Exhibit 3.
21           (EXHIBIT 3 MARKED FOR IDENTIFICATION)
22  BY MS. SPENCE:
23      Q    Mr. Burke, I'm directing your attention to --
24  I'm representing to you this is a page from the 1991
25  manual procedure, okay?

Page 99

1       A    Yes.
2       Q    All right.  Now, looking at subsection 4 where
3   it says -- sorry, subsection 3 where it says,
4   "Fingerprints."  Do you see that section?
5       A    Yes.
6       Q    Okay.
7       A    Yes.  I do.
8       Q    Can you read that paragraph A to yourself?
9       A    Okay.
10      Q    All right.  Now, paragraph A indicates that if
11  the juvenile arrestee -- if there are reasonable grounds
12  to believe that the offender had committed a felony that
13  that juvenile arrestee could be fingerprinted, correct?
14  Sorry.  Upon authorization of the watch commander,
15  right?
16      A    That's correct.
17      Q    And the other person who could give
18  authorization would be -- sorry -- the watch commander
19  of the patrol detective or Youth Division, correct?
20      A    That's correct.
21      Q    Actually -- one second.  Right.  Okay.  And
22  would you agree in 1991 that being found in possession
23  of a controlled substance, that would be a felony?
24      A    Okay.  The way --
25           MR. GRILL:  Objection.

Page 100

1       A    The way I read this is you need the watch
2   commander to approve when the age of the arrestee cannot
3   be established.
4       Q    Or right, it continues, right?  So Mr. Burke,
5   we can break this up into two parts.  Let's take a step
6   back, okay?
7       A    Okay.
8       Q    There are two circumstances in subsection A
9   where the watch commander can authorize for a juvenile
10  arrestee to be fingerprinted, correct?
11      A    Correct.
12      Q    One of them is when the age of the arrestee
13  cannot be established, right?
14      A    Right.
15      Q    Or where the juvenile arrestee has -- where
16  there's reasonable grounds to believe that the juvenile
17  arrestee has committed a felony, right?
18      A    Okay.  Yes.
19      Q    And there's actually a third circumstance, or
20  the enumerated offenses, right, use -- unlawful use of a
21  weapon, deceptive practices, and sex offenses other than
22  prostitution, correct?
23      A    Correct.
24      Q    So I'm just asking you, in 1991, would a
25  juvenile being found in possession of a controlled

Page 101

1   substance, would that qualify as a felony back in 1991?
2       A    Yes.  It would.
3       Q    Okay.  And so if the watch commander
4   authorized it, then a youth who is found in possession
5   of a controlled substance could be fingerprinted,
6   correct?
7       A    Well, once again, it's up to interpretation.  I
8   mean -- I mean, you know, the way I read it is the watch
9   commander needs approval if you believe you have in your
10  youth office a suspect that's stating he's 16 and you
11  believe he's much older, that he's lying about his age,
12  I believe that's when you need the watch commander.  Or
13  if he's being charged with a felony, you can have him
14  printed.
15      Q    So you're saying in the second circumstance
16  where the child is not -- when the youth is not being
17  charged -- sorry.  Let me start over.  In the second
18  circumstance where you believe that the youth has
19  committed a felony, you don't need authorization to
20  fingerprint him, you can just get him fingerprinted?  Is
21  that what you're saying?
22      A    That's correct.  That's correct.
23      Q    Got it.  I see.  All right.  Now, going to
24  subsection 4, can you read subsection A to yourself?
25           MR. GRILL:  Why don't we -- sorry.  Might I



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 29 of 93 PageID #:9400
The Deposition of OFFICER KEN BURKE, taken on July 09, 2021
102..105

Page 102

1    suggest he read it out loud, so we have a record, so
2    we don't have to --
3        A   Yeah.  Okay.  "A juvenile offender will be
4    photographed only when there are reasonable grounds to
5    believe that the offender committed an offense listed in
6    item 3A above and then only with the approval of the
7    watch commander, patrol detective, or Youth Division.
8    When photographing a juvenile, the YD number will be
9    shown on the -- on the date board."  If -- for
10   photographing, I do remember, I do know you needed the
11   watch commander, but not specifically for
12   fingerprinting.  I mean, I -- when I processed -- I
13   processed a lot of juveniles for felonies and you take
14   them right to the lockup and get them printed.  Never
15   had to get watch commander to approve it, but for photos
16   you did.  Photographing juvenile, you would have to, and
17   that's -- you know, I mean the way I interpret is the
18   way I've done it, and it's the way I was trained.
19       Q   Right.  And I'm not disputing anything.  I'm
20   just asking.  So my question actually just is: If a
21   child is -- sorry.  If a youth is being -- sorry.  If a
22   youth is suspected of committing a felony offense and
23   you have approval from the watch commander, at that time
24   could the youth be photographed?
25       A   Yes.

Page 103

1        Q   Okay.  And if that child is photographed --
2            MR. GRILL:  Objection.  Go ahead.
3            MS. SPENCE:  Huh?  Sorry.
4            MR. GRILL:  Go ahead.  Sorry.  I just --
5    BY MS. SPENCE:
6        Q   If a youth is photographed, where would that
7    photograph go?
8            MR. GRILL:  Objection.  Foundation.
9            MR. YAMIN:  And to form.
10           MR. GRILL:  Form.  Yes.
11   BY MS. SPENCE:
12       Q   Go ahead.
13       A   I don't know where it would go.  I don't know.
14       Q   Did you ever have a circumstance where you
15   processed a youth who was photographed?
16       A   No.  The -- I've never had a watch commander
17   approve photographing a juvenile.
18       Q   Okay.  Now, after in 1991 when a youth is
19   being processed at the end of the process, is it true
20   that the youth officer could then make the decision
21   about whether or not the youth is going to be detained
22   or if the youth is just going to get, you know,
23   information to appear in court at a later date and then
24   released?
25           MR. GRILL:  Objection to form.

Page 104

1        A   You -- you said after 1991?
2        Q   In 1991.
3        A   In 1991.  Yes.  I believe -- I believe in 1991
4    the youth officer had the authority to detain or release
5    a juvenile with a detention -- or with a referral to
6    court.  There was some point in the '90s and I don't
7    know exactly when, when that authorization was taken
8    away from the youth officer and you had to call
9    screening.  There was a screening unit that was formed
10   that was comprised of attorneys and you would call them
11   and give them the facts of the case and they would make
12   the decision on whether the juvenile would be detailed
13   at the Audy Home.  And -- basically, that was due to the
14   fact that there was no room in the Audy Home.
15       Q   Okay.
16       A   So I don't know if that answers your question
17   but --
18       Q   So but it's your recollection that back in
19   1991 at least the youth officer had the authority to
20   determine if the youth was going to be detained or would
21   be released with a court referral, right?
22       A   I believe so.  I don't -- like I said, it was
23   early in the '90s when it was changed, and I don't know
24   when.  It was --
25       Q   Okay.  In the -- sorry.  Go ahead.  I

Page 105

1    apologize.
2        A   I said it was right around that time.  Sometime
3    in '91, '92, something like that is when it was changed.
4        Q   Right.  So in the circumstance where a youth
5    officer determined that the child could be released, was
6    there any requirement for the youth officer to transport
7    that child back to their home?
8        A   No.
9        Q   Okay.  Based on your training and experience
10   in 1991 once a child is released with a -- or it's
11   decided that a child's going to be released with the
12   court referral slip, what was supposed to happen to the
13   child?
14       A   Well, he needs to be released to a parent or
15   guardian, or responsible adult.
16       Q   Okay.  And would it be on the youth officer to
17   contact that child's parent, guardian or responsible
18   adult?
19       A   Actually, it would be the arresting officer.
20   But oftentimes that didn't happen, so then it does fall
21   on the youth officer.
22       Q   In this circumstance -- and so earlier you
23   mentioned that there are a number of ways that a youth
24   officer would try to contact a parent or a guardian or
25   responsible adult and one of that is calling on the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 30 of 93 PageID #:9401
The Deposition of OFFICER KENNETH BURKE, taken on July 99, 2021

106..109

Page 106

1  phone, correct?
2      A    That's correct.
3      Q    And sometimes you would call multiple times to
4  try to reach the parent or adult -- responsible adult,
5  correct?
6      A    That's correct.
7      Q    And that sometimes maybe you would send a beat
8  car out, you said?
9      A    That's correct.
10     Q    All right.  And these are all efforts to make
11  sure the adult could come and get the child, right?
12     A    That's correct.
13     Q    And was the expectation that the youth officer
14  would take those steps if the arresting officer had not
15  done so, take those steps to make sure that the adult
16  knew that the child could be released?
17     A    Yeah.  Well, it falls upon the youth officer
18  to somehow make sure this child is released to a
19  responsible adult, yes.
20     Q    Now, would it be proper for a youth officer to
21  just say, "Here's your paper, now you can just go"?
22     A    No.
23     Q    And part of your training back in 1991 is
24  whenever a youth was taken into custody, right, whenever
25  the youth was not allowed to leave, that the arresting

Page 107

1  officer was supposed to immediately contact the parent
2  or adult or guardian, right?
3      A    That's correct.
4      Q    And was the practice that the -- or sorry.  Was
5  the expectation that the arresting officer would make
6  multiple attempts to try to contact that parent, adult,
7  or guardian?
8          MR. YAMIN:  Objection to form.
9          MR. GRILL:  Join.
10     Q    No.  What was the expectation?
11         MR. GRILL:  Objection.  Form.
12     A    Well, the expectation is that they would
13  attempt to contact.
14     Q    All right.  Would that attempt also -- would
15  the expectation also include leaving a message if there
16  was an answering machine?
17     A    Yes.
18     Q    And providing the parent, guardian, or
19  responsible adult information about where the youth was
20  being held?
21     A    Yes.
22     Q    Okay.  Did it also include an expectation that
23  the message would include information about what the
24  charge was that the youth was facing?
25     A    Not specifically, no.

Page 108

1      Q    All right.  Based on your training and
2  experience, do you believe that was important
3  information, though, that should be conveyed to a parent
4  or adult what charge the youth is facing?
5          MR. GRILL:  Objection to form.
6      A    Not necessarily, no.
7      Q    Why not?  When you say, "not necessarily,"
8  what do you mean?
9      A    Well, it's not a requirement to tell the
10  parent what he's being charged with.  All -- we need the
11  parent in there to take him home and they'll get the
12  papers telling them what he's charged with.
13     Q    Right.  But I'm referring to the beginning
14  process where when a child is brought into custody, you
15  said that it is the responsibility of the arresting
16  officer to call that parent immediately to let them know
17  that their child is in custody; is that correct?
18     A    Yes.
19         MR. GRILL:  Hang on.  Objection to the
20  continued use of the word, "child."
21     Q    And I'm saying in that initial contact with
22  the arresting officer, was it the expectation that the
23  arresting officer would provide information about what
24  charges the youth may be facing?
25     A    No.

Page 109

1      Q    Okay.  Oh, earlier you spoke about Miranda
2  warnings that you were trained that you had to give
3  Miranda warnings to youth when they were in custody; is
4  that right?
5          MR. GRILL:  Objection.  Mischaracterizes his
6  testimony.
7      A    Yeah.  No.  I -- we -- are we talking about a
8  written statement or are we talking about processing a
9  juvenile for shoplifting?
10     Q    So based on -- let me ask you this, based on
11  your training and experience back in 1991 when did you
12  have to give Miranda warnings to a youth?
13     A    Once again, if you're talking about processing
14  a juvenile that's in your office for shoplifting, or
15  battery, or something -- battery at school or something
16  like that, or are we talking about a murder case where
17  you're giving a statement?  I don't know what you're
18  referring to.
19     Q    Well, let me ask you this, if you're
20  processing a youth for battery or theft, do you have to
21  give a Miranda warning?
22     A    No.
23     Q    Right.  So that's what I'm asking, when did
24  you have to give Miranda warnings based on your training
25  and experience in 1991?  When were you required to give



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 110

1   a Miranda warning to a youth who was in custody?

2        MR. GRILL: Objection. Form. Foundation and

3   assumes facts -- assumes actually a lot of facts

4   that are not in evidence. If you want, I can

5   explain the difference. I can ask him --

6        MS. SPENCE: I'm okay. Thank you.

7   BY MS. SPENCE:

8      Q   Go ahead.

9        MR. GRILL: Okay. I'm giving you the chance.

10   Go ahead if you can answer that.

11      A   You're going to have to repeat it again.

12   Sorry.

13      Q   When a youth is brought into custody, right,

14   as a youth officer --

15      A   Yeah.

16      Q   -- when were you required to give that youth

17   Miranda warnings?

18        MR. GRILL: Same objection. And specific --

19   I'll give you a hint. The use of the word, "you,"

20   is part of the problem. So with that, go ahead.

21      A   I'm not required to if I'm processing a

22   juvenile that's in there for a minor misdemeanor. I

23   mean, that's the arresting officer's job. I'm

24   processing -- I'm doing paper -- the youth officer is

25   doing paperwork for either a J-number or to go to court.

Page 111

1   Okay. I very seldom go ask him about the facts of the

2   case.

3   BY MS. SPENCE:

4      Q   Got it. So in your -- in 1991 -- so from 1989

5   to 1991, was there ever a circumstance where you as the

6   youth officer gave a youth Miranda warnings?

7        MR. GRILL: Form. Foundation.

8      A   I -- I don't recall.

9      Q   Okay. One moment. Going back to Exhibit 1.

10      A   That's the General Order?

11      Q   Yeah.

12        MR. GRILL: Exhibit 1. Oh, right. Yes. The

13   General Order.

14      A   Okay.

15      Q   And going back to that subsection F when it

16   says, "In addition to the above warnings before

17   accepting any admission or statement of a juvenile, the

18   juvenile will be advised that his case might be

19   transferred to criminal court where he will be

20   prosecuted as an adult." Do you see that sentence?

21      A   Yes.

22      Q   Why was that the policy? Why did you have to

23   -- why were officers required to tell a juvenile before

24   giving an admission or statement that they could be

25   transferred to criminal court where they could be

Page 112

1   prosecuted as an adult?

2        MR. GRILL: Okay. Foundation. Form.

3      Q   Go ahead.

4      A   Why was that a requirement?

5      Q   Yes.

6      A   Was that the question?

7        MR. GRILL: Same objection. Foundation. Form.

8   Calls for speculation. Go ahead.

9      A   To -- to make sure that he's aware of his

10   rights.

11      Q   What right is -- what right are you referring

12   to when you're telling a youth that they could be

13   transferred to and prosecuted as an adult?

14        MR. GRILL: Form. Foundation.

15      A   It's -- it's all part of -- it's an extension

16   of the Miranda rights for a juvenile. I mean, I always

17   -- whenever I gave the Miranda rights to any juvenile, I

18   always added that on, even if he was 10 years old which

19   I knew he wouldn't be charged as an adult, but I still

20   advised him of those rights.

21      Q   All right. So would it be fair to say that

22   you provided that advice about the potential of being

23   prosecuted as an adult as just part of your routine --

24      A   Right.

25      Q   -- procedure of giving Miranda warnings?

Page 113

1      A   Right. I would rather, you know, err in

2   caution so to speak.

3      Q   Then going to subsection 11C. So this is on

4   the same page 924, and then we're just in subsection 11C

5   under interrogation procedure towards the bottom of the

6   page.

7        MR. GRILL: You're talking about C as in --

8   like cat, right?

9        MS. SPENCE: C as in cat, yes.

10        MR. GRILL: Okay.

11   BY MS. SPENCE:

12      Q   Okay. Why don't you just take a moment to

13   read the paragraph to yourself.

14      A   Okay.

15      Q   All right. So the first sentence says, "The

16   person to be questioned will be informed if at any time

17   a lawyer appears (or a parent appears in cases involving

18   a juvenile) and requests to see him regardless of the

19   fact that rights have been waived. In addition, the

20   person to be questioned shall have an opportunity to

21   have the lawyer or parent present during any subsequent

22   questioning if he so desires." Do you see that?

23      A   Yes. I do.

24      Q   Okay. And were you trained on that

25   requirement in subsection C?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 32 of 93 PageID #:9403
The Deposition of OFFICER KENNETH BERKNER, taken July 30, 2021
114..117

Page 114

1    A    Yes. I was.
2    Q    All right. And was it your practice in 1991
3 to inform youth that if a parent appears that they --
4 and requests to see them, that the parent could, in
5 fact, see the youth?
6         MR. GRILL: Hold on. That totally
7    mischaracterizes what you just read, so form.
8    Q    Go ahead.
9         MR. GRILL: That's legally not what it says. Go
10   ahead.
11   A    Okay. Once again, if this is a minor case and
12 a parent -- I, as a youth officer, in a youth -- in the
13 youth office, there could be times when I have eight to
14 ten kids in there and I definitely want a parent there
15 because I want to release this kid to a parent. So
16 there's no way in the world I would keep a parent away.
17 I don't know if that answers your question or not.
18   Q    Right. So I'm asking --
19   A    I never had -- never had a lawyer show up.
20 I've had parents come. I mean, it's -- I don't know if
21 that answers your question.
22   Q    So subsection 11 is about interrogation
23 procedures, right?
24   A    Okay.
25   Q    Is that correct? We're reading the same

Page 115

1 thing? This is a subsection about interrogation
2 procedure, right?
3    A    That's what I'm reading, yes.
4    Q    Yes?
5    A    Yes. Yes.
6    Q    An so in the context of an interrogation
7 procedure, we're looking at subsection C, right, where
8 it says, "The person to be questioned will be informed
9 if at any time a lawyer appears, or a parent appears in
10 cases involving a juvenile and requests to see him
11 regardless of the fact that the rights have been
12 waived." That's the first sentence. Okay. Now, is it
13 your interpretation of the first sentence that if a
14 parent appears that the child has to be told that the
15 parent is there?
16   A    Yes. Well, yeah. Sure.
17        MS. SPENCE: Okay. And I'll give you that one,
18   Andrew. I had misread it and misinterpreted it.
19        MR. GRILL: Okay. Got it.
20 BY MS. SPENCE:
21   Q    And that second sentence that says, "In
22 addition, the person to be questioned shall have an
23 opportunity to have the lawyer or parent present during
24 any subsequent question if he so desires"; is that
25 correct? Do you see that?

Page 116

1    A    Yes. I do.
2    Q    Right. And was it your training that if you
3 are questioning a youth that if the -- that the youth
4 would have an opportunity to have the parent present for
5 questioning if the child wanted them -- the parent
6 there?
7         MR. GRILL: Form.
8    A    Yes.
9         MR. GRILL: Okay. Yeah. Go ahead.
10   A    Yes.
11   Q    Is that a "yes"?
12   A    Yes. I said, "yes."
13   Q    And so was that your practice to let the youth
14 know that that was an option?
15   A    Well, okay. Once again, this is interrogation
16 procedures. Okay. I interrogated very few people, all
17 right, as a youth officer. When I got the juvenile in
18 the youth office, he was already interrogated, charged,
19 and given to me to be processed. I was like the lockup
20 keeper for a juvenile.
21        MR. GRILL: Just answer the question.
22        THE WITNESS: Okay.
23   Q    Okay. So in the few circumstances where you
24 did interrogate a youth, did you give them that
25 information, that if their parent appeared that they had

Page 117

1 the right to have the parent present for subsequent
2 questioning? Was that your --
3    A    Yes.
4    Q    Yes?
5    A    Yes.
6    Q    All right. Now, as a youth officer in 1991,
7 you were trained on how to write reports, correct?
8    A    Yes.
9    Q    And you were trained on the importance of
10 documenting your activities, right?
11   A    Yes.
12   Q    And did you follow that training in 1991?
13   A    Yes. I did.
14   Q    Okay. And when you were assisting, you were
15 trained that even when you were assisting in an
16 investigation that you had to -- that you were supposed
17 to record your observations, correct?
18   A    It depends.
19        MR. GRILL: Form.
20   Q    What does it depend on?
21   A    I don't know what you mean by, "assist."
22   Q    Got it. Okay. Can you take out the packet
23 that's labeled, "Chicago Police Youth Division," please?
24   A    The Youth Manual?
25   Q    Yep. The one that has a cover that says,



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 33 of 93 PageID #:9404
The Deposition of OFFICER KENNEDY, taken on July 09, 2021

118..121

Page 118

1    "Youth Manual."
2        A    Okay.
3        Q    And can you turn to the page that's Bates
4    stamped City_Jakes 1102?
5        A    Okay.
6        Q    Okay.  And I'm going to represent to you that
7    this is a page from the 1991 --
8        A    Okay.
9        Q    -- manual procedure for the Chicago Police
10   Youth Division, okay?  Do you see at the top of the
11   page, it says, subsection III -- or section III
12   "Responsibilities and Procedure"?  Do you see that?
13       A    Yes.  I do.
14       Q    All right.  And then I want to direct your
15   attention down to subsection C where it says, "Youth
16   Officers Will:"  Do you see that?
17       A    Yes.
18       Q    And I want you to turn the page to number 6 on
19   the enumerated list.
20       A    Okay.
21       Q    It says, "Youth Officers will record and
22   forward any information about a case which is not
23   assigned to them to the assigned youth officer who will
24   investigate and include it in the file."  Do you see
25   that?

Page 119

1        A    Yes.  I do.
2        Q    Okay.  And so when you were working -- did you
3    have circumstances where you've worked on cases that you
4    were not assigned?
5        A    Yes.
6        Q    Okay.  And when you read this subsection when
7    it says, "Not assigned," is that -- do you interpret
8    that to mean that you're not the lead officer?
9        A    That could be, yeah.
10       Q    All right.  So is it -- do you interpret that
11   to mean that you're assisting on a case or you're
12   helping?
13       A    It could, yes.
14       Q    All right.  And is it your understanding that
15   you are required to record and report any information
16   about a case to the assigned youth officer?
17            MR. GRILL:  Okay.  Foundation.  Form.
18       Q    Go ahead.
19       A    Once again, could you repeat the last one?
20       Q    Sure.
21            MS. SPENCE:  Lauren, could you read back the
22   question, please?
23            COURT REPORTER:  Sure.  Give me one second to
24   pull it up.
25            (REPORTER READS BACK REQUESTED TESTIMONY)

Page 120

1            COURT REPORTER:  Do you want me to go back
2    further from that question?
3            MS. SPENCE:  I think --
4            COURT REPORTER:  Sorry.  Go ahead.
5            MS. SPENCE:  I think the question -- there was
6    another -- there was a question after that.
7            COURT REPORTER:  Yeah.  There wasn't one after,
8    but there was one before.
9            MS. SPENCE:  Okay.  Then I'll just re-ask the
10   question.  Okay.
11   BY MS. SPENCE:
12       Q    When you read subsection number 6 on your
13   subsection C about what the responsibilities and duties
14   are for -- sorry -- what the responsibilities and
15   procedures are for youth officers, right?  When you read
16   number 6, do you interpret that to mean that you were
17   also required to report and forward any information on
18   cases where you were assisting a youth officer in their
19   investigation?
20            MR. GRILL:  Form.  Foundation.  You're missing
21   -- lots of pages in this manual and you're missing a
22   whole bunch of foundation for these questions.
23   BY MS. SPENCE:
24       Q    Go ahead.
25            MR. GRILL:  If you can answer that, go ahead.

Page 121

1    This is -- I know what you're trying to do, and this
2    is really, really bordering on inappropriate.  It's
3    misleading.  Big time misleading.
4        A    This was basically written for missing persons
5    investigations.  Those are the only type of
6    investigations that a youth officer would help another
7    youth officer with, and I believe that's -- you know, I
8    mean, it's -- if I had information about a case another
9    youth officer had, I would have to do a sup for the RD
10   number that he's assigned to, and it would go into his
11   file.  and that's basically what I believe they're
12   trying to say here.
13   BY MS. SPENCE:
14       Q    Got it.  So if you're assisting -- if you're
15   observing on a case that is being led by detectives,
16   right, so not youth officers, did you understand that
17   you were required to document your observations?
18            MR. GRILL:  Okay.  Hold on.  That is completely
19   an incomplete hypothetical.  It calls for
20   speculation.  Lack of foundation.  Form problem with
21   it.
22   BY MS. SPENCE:
23       Q    Okay.  Go ahead.
24            MR. GRILL:  If you can possibly answer that as
25   asked, give it your best shot.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 34 of 93 PageID #:9405
The Deposition of OFFICER KENNETH BURKE, taken on July 08, 2021

122..125

Page 122

```
 1      A    Okay.  Actually, the commander of the Youth
 2  Division put out a memo stating that we are not to
 3  initiate any report on a written statement and that our
 4  job -- our -- our function is to be a mere observer.  And
 5  there is somewhere out there a memo from Roberta Bartik,
 6  the Commander of Youth stating that.  So it's --
 7      MR. GRILL:  Okay.  And with that, we're taking
 8  a break.  I'll be back in five minutes.
 9      COURT REPORTER:  Would you like to go off the
10  record?
11      MS. SPENCE:  Sure.
12      COURT REPORTER:  Okay.  The time is 1:02 and
13  we're off the record.
14         (OFF THE RECORD)
15      COURT REPORTER:  We are back on the record.  The
16  time is 1:15.
17      MR. YAMIN:  Yes.  I am here.  I've been here
18  all along in case --
19      MS. SPENCE:  Yeah.  I didn't want us to start
20  without you.
21      MR. YAMIN:  No.  Thanks.
22      MS. SPENCE:  I just wanted to verify, that's
23  all.
24      MR. YAMIN:  Thank you.
25  BY MS. SPENCE:
```

Page 123

```
 1      Q    All right.  Now, Mr. Burke, did you -- from
 2  1989 to 1991 did you have occasion where you had to
 3  observe a written statement in a homicide case?
 4      A    I don't recall.
 5      Q    You don't recall.  Okay.  Were you ever
 6  trained on how to act as an observer for a written
 7  statement involving a juvenile on a homicide case?
 8      A    I don't recall that either.
 9      Q    You don't recall any kind of training on that
10  specific subject, is that what you're saying?
11      A    I don't recall, right.
12      Q    Okay.  Prior to our break, you indicated that
13  there was a memo that you received from the watch
14  commander that said that you were not allowed to write
15  any reports; is that correct?
16      MR. GRILL:  Mischaracterizes his testimony.  Go
17  ahead.
18      A    From the Youth Commander, yes.
19      Q    The Youth Commander.  And can you spell her
20  name?
21      A    Roberta Bartik, B-A-R-T-I-K.
22      Q    And the memo that you received, what did it
23  say?
24      A    Well, I can't -- I don't -- I can't state it
25  verbatim, but it -- it did state that our role in
```

Page 124

```
 1  sitting in on a statement is that we are mere observers.
 2  I remember that exact word in there, and that we are not
 3  to initiate any paperwork.
 4      Q    Okay.  And were you given any explanation as
 5  to why that was the policy?
 6      MR. GRILL:  Objection.  Form.
 7      A    No.
 8      Q    Okay.  Were you trained on that memo?
 9      MR. GRILL:  Objection to form.
10      A    No.
11      Q    All right.  How did you receive that memo?
12      A    It came from the commander.  It was issued to
13  all youth officers from the Commander of the Youth
14  Division.
15      Q    Right.  But was it sent via e-mail, or paper
16  on your desk, how did you get it?
17      A    I don't recall.  It's probably handed out at
18  roll call.  I don't recall.
19      Q    All right.  And what year would you receive
20  that -- would you have received that memo?
21      A    That was before e-mails by the way, so --
22      Q    Fair.
23      A    -- it was sometime in the early '90s.  You
24  know, I don't recall.
25      Q    Was this before 1991?
```

Page 125

```
 1      A    I don't -- it might have been.  I don't
 2  recall.
 3      Q    Aside from -- so you can't say either way if
 4  this memo was given to you before October of 1991?
 5      A    No.  I can't.
 6      Q    Aside from this memo, were you given any kind
 7  of training that said you were not allowed to document
 8  what you observe when you were acting as an observer for
 9  a written statement involving a youth?
10      A    I -- I believe that might have been touched on
11  in our training.
12      Q    Okay.  And when -- which training are you
13  referring to?
14      A    The youth officer training in 1989.
15      Q    All right.  Were you given any materials that
16  memorialize that training?
17      A    Not that I can remember right now.
18      Q    All right.  Were you given any explanation as
19  to why that would be the training?
20      MR. GRILL:  Objection.  Form.
21      A    No.
22      Q    All right.  And you said that you believe that
23  that was the training that you were given in 1989.  Is
24  that -- does that mean that you're not sure that that
25  was the training that you were given in 1989?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 35 of 93 PageID #:9406
The Deposition of OFFICER KEN BURKE, Taken on July 09, 2021
126..129

Page 126

1    MR. GRILL:  Object to form.
2    A    I don't recall exactly when I first heard
3  that.  I don't know if it was when I was in youth school
4  or if it was maybe afterwards.  And I don't know the
5  reasoning behind it, but I do know that they did not
6  want the youth officer to initiate any reports or sups
7  for them.
8    Q    You said that you've testified in criminal
9  court before, right?
10    A    Yes.
11    Q    And when you testified in criminal court were
12  they on cases for which you had written reports down?
13    A    Yes.
14    Q    All right.  And in the course of you
15  testifying, did you ever -- in your preparation for the
16  testimony, did you ever review those reports?
17    A    Yes.
18    Q    And did it help refresh your recollection as
19  to what happened at that particular memorialized event?
20    A    Sure.  Yeah.
21    Q    Okay.  Did you ever turn those reports over to
22  a prosecutor?
23    MR. GRILL:  Objection.  Foundation.  Form.  Go
24  ahead.
25    A    I don't recall.

Page 127

1    Q    Okay.  If a prosecutor asked for those
2  reports, would you have given them to the prosecutor?
3    MR. GRILL:  Incomplete hypothetical.  Calls for
4  speculation.  Form.  Foundation.
5    Q    Go ahead.
6    A    Yes.
7    Q    All right.  But would it be fair to say
8  primarily you used your reports when you -- before you
9  testified to help you refresh your memory, right?
10    A    That's correct.
11    Q    Okay.  And reports are helpful because
12  sometimes you have to testify months or years after the
13  event actually took place, right?
14    A    That's correct.
15    Q    Did you also take notes in your capacity as a
16  youth officer between 1990 -- sorry -- 1989 and 1991?
17    MR. GRILL:  Form.
18    Q    Go ahead.
19    MR. GRILL:  Foundation.
20    A    I don't understand what you mean by "notes."
21  Can you rephrase that, or
22    A    Sure.  You refer to reports, right?  You were
23  talking about reports?
24    A    Yes.
25    Q    All right.  And were there ever occasions when

Page 128

1  you were a youth officer between 1989 and 1991 where you
2  jotted down information on like a piece of paper?
3    A    Sure.  Yes.
4    Q    Or on like a notepad?
5    A    Sure.
6    Q    All right.
7    A    Yes.
8    Q    So let's refer to documentation that's not in
9  a report form, let's call those notes, okay?
10    A    Sure.
11    Q    Okay.  And when you testified at a hearing
12  would you ever look back at those notes to help refresh
13  your recollection?
14    A    I might have.  I don't -- yeah.  Yes.
15    Q    Were there occasions that you used those
16  notes to help write the reports?
17    A    Yes.
18    Q    Because the information in the notes did it
19  help you just remember what happened at the event?
20    A    Yes.
21    Q    Okay.  Do you believe it would've been helpful
22  when you were acting as an observer in a case where the
23  youth is giving a written statement for you to have been
24  able to take notes?
25    MR. GRILL:  Objection.  Form.  Foundation.

Page 129

1  Calls for speculation.  Assumes facts not in
2  evidence.
3    A    Not necessarily.
4    Q    What do you mean by not necessarily?
5    A    Well, if I'm ordered not to take notes or make
6  a report then I wouldn't.
7    Q    Right.  But I'm asking if you think it
8  would've been helpful to you -- if you're -- if you
9  have to -- sorry.  Do you think it would be helpful to
10  you if you have to testify at a later date about an
11  event for you to have been able to take notes when you
12  were acting as an observer?
13    MR. GRILL:  Objection.  Form.  Foundation and
14  incomplete hypothetical.
15    A    No.
16    MS. SPENCE:  All right.  Actually, before we
17  move on.  When you referred to City -- a document
18  that was Bates stamped City_Jakes 1102 through 1103
19  earlier. Let's mark that as Exhibit 4.  It wasn't
20  marked.
21    (EXHIBIT 4 MARKED FOR IDENTIFICATION)
22    MR. GRILL:  I thought you marked that as
23  Exhibit 3 before.
24    MS. SPENCE:  No.  Exhibit 3 was City_Jakes
25  1121.



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 36 of 93 PageID #:9407
The Deposition of OFFICER KENNETH BURKE, taken on July 30, 2021
130..133

Page 130

1    MR. GRILL:  Oh.  Just that page was?
2    MS. SPENCE:  Yes.  Just that page -- you know,
3  there were multiple documents in the packet.
4    MR. GRILL:  Yeah.
5    MS. SPENCE:  I just want it to be clear which
6  specific pages we're talking about so that just in
7  case the packet gets lost we know what we're talking
8  about.
9    MR. GRILL:  Okay.  Just so I'm clear, Exhibit
10  3, so City_Jakes 1121 is a page, correct --
11    MS. SPENCE:  One page.
12    MR. GRILL:  -- from CPDBIF manual procedure for
13  the Youth Division, right?
14    MS. SPENCE:  Right.
15    MR. GRILL:  And that is one of the pages that
16  you're -- that you culled out from the manual
17  procedure for the Youth Division, right, that you're
18  using here, but you just want to mark 1121 as a
19  separate exhibit?
20    MS. SPENCE:  Correct.
21    MR. GRILL:  Okay.  Got it.
22    MS. SPENCE:  Okay.
23    MR. GRILL:  And then are the remaining pages
24  going to be Exhibit 4 or is it just a specific page?
25    MS. SPENCE:  Specific pages 1102 through 1103.

Page 131

1    MR. GRILL:  Okay.
2    MS. SPENCE:  Okay.
3  BY MS. SPENCE:
4    Q    Now, Mr. Burke, can you use -- can you pull
5  your testimony packet from June 1, 2016.
6    MR. GRILL:  Second one.  Right on top.  Yeah.
7    A    Okay.  I have it.
8    Q    Do you have it in front of you?
9    A    Yes.  I do.
10    Q    Okay.
11    MS. SPENCE:  Let's go ahead and mark that as
12  Exhibit 5.
13    (EXHIBIT 5 MARKED FOR IDENTIFICATION)
14    Q    And Mr. Burke, you said that you reviewed your
15  testimony from the postconviction hearing, correct?
16    A    Yes.
17    Q    All right.  And that happened on in 2016 on
18  June 1st, right?
19    A    Yes.
20    Q    Okay.  And turning your attention to page 91.
21  The Bates stamp is 09 -- sorry.  It's Plaintiff Jakes
22  095276.
23    A    Okay.
24    Q    All right.  Starting at line -- are you there?
25    A    Yes.  What page?

Page 132

1    Q    All right.  Starting at line -- on the bottom
2  it says, "91," the Bates stamp is Plaintiff Jakes 95276.
3    A    Okay.
4    Q    All right.  Starting at line 10.
5    MR. GRILL:  So are we -- is this his testimony
6  or is this somebody else's testimony?
7    MS. SPENCE:  This is Mr. Burke's testimony.
8    MR. GRILL:  Okay.
9  BY MS. SPENCE:
10    Q    And so Mr. Burke, just so we're clear, if you
11  turn to the second page of Exhibit 5.
12    A    The second page?
13    Q    Yeah.  Where it says, "69."
14    A    Yes.
15    Q    Right.  You see it says, "Mr. Kenneth Burke
16  called as a witness on behalf of People of the State of
17  Illinois after first being duly -- after being first
18  duly sworn was examined and testified as follows."  Do
19  you see that?
20    A    Yes.
21    Q    All right.  So this is your testimony?
22    A    Yes.
23    Q    So going back to page number 91.  Page 91 on
24  the transcript Bates stamp --
25    A    Okay.

Page 133

1    Q    -- 95276 starting at line 10 where your answer
2  is, "But the Chicago Police Department does not require
3  a youth officer sitting in a statements to make any
4  documentation."  And the question is, "You don't make a
5  documentation about what you observed, right?"  And the
6  answer is, "Right."  The question is, "It's not
7  required, and your practice was even if it's required
8  I'm not going to do it?"  Your answer is, "Well, right.
9  I think maybe it should be done, but it's -- I was told
10  that we're not supposed to."  And the question is, "All
11  right.  What do you think -- why do you think it should
12  be done?"  And your answer is, "Well, so I can have
13  something 25 years later to look at what happened or in
14  a lot of cases maybe just a year later or something."  Do
15  you see that?
16    A    Yes.  I do.
17    Q    All right.  And is that still your answer that
18  you think it would've been helpful for you to be able to
19  document what you observed when you were sitting in on a
20  statement as a youth officer?
21    MR. GRILL:  Form.
22    A    Yeah.
23    MR. GRILL:  Foundation.
24    A    I don't know what I would've documented.  I
25  mean, everything is documented.  I have a copy of the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 37 of 93 PageID #:9408
The Deposition of OFFICER KEN BURKE, Taken on July 09, 2021
134..137

Page 134

1  transcript.  That was -- and my signature and initials
2  are on it.  I don't know what else I could've
3  documented.
4      Q    Okay.  Now, I want to clearly define the time
5  period that you were involved in the Garcia homicide
6  investigation.  So when did your participation --
7          MR. GRILL:  I'm going -- hang on, hang on.  I'm
8      going to just object because to form what you just
9      said and foundation for it but go ahead.
10         MS. SPENCE:  Okay.
11 BY MS. SPENCE:
12     Q    When did your participation in the Garcia
13 homicide investigation begin?
14         MR. GRILL:  Same objection.
15     A    It began at 3:45 a.m. on the date in question.
16     Q    Okay.  Would it be September 17, 1991?  Does
17 that sound right?
18     A    Yes.
19     Q    Okay.  And when did it end?
20     A    About an hour-and-a-half later.
21     Q    All right.  So sometime after 5:00 in the
22 morning?
23     A    Yeah.  From basically 3:45 to -- yeah, 5:00 I
24 guess.  Yeah.  5:15, something like that.
25     Q    And how did you become involved in the Garcia

Page 135

1  homicide investigation?
2          MR. GRILL:  Objection.  Form.
3      A    I was given an assignment from my -- from
4  Youth Headquarters, Central Youth I should say.
5      Q    And you were -- were you assigned to Area Two
6  at this time?
7      A    Yes.  I was.
8      Q    I understood earlier that people -- sorry --
9  youth officers that are assigned to an area stopped
10 working after midnight; is that incorrect?
11     A    No.  That's correct.  The areas shut down at
12 midnight.
13     Q    So how did you as a youth officer, how are you
14 getting assignments after midnight?
15     A    Because it was my, so to speak, turn in the
16 barrel to work midnights that month.
17     Q    Got it.  So your -- you received an assignment
18 from Central Youth to work on the Garcia homicide
19 investigation; is that right?
20     A    My assignment was to report to Area Three
21 Violent Crimes.
22     Q    And what -- which -- sorry.  What task did you
23 perform in the Garcia homicide investigation?
24     A    I sat in on the statement.
25     Q    Other than sitting in on the statement, did

Page 136

1  you do anything else?
2      A    No.
3      Q    All right.  Do you independently remember
4  sitting in on the statement?
5      A    Yeah.  I do.
6      Q    Okay.  Tell me what you remember.
7      A    I remember sitting there with Detective
8  Caesar, the defendant, and the State's Attorney, and the
9  State's Attorney taking a handwritten statement from the
10 defendant, and we all signed it and initialed any
11 change.
12     Q    Where do you remember this statement being
13 taken, like, physically location -- the physical
14 location.
15     A    Area Three Violent Crimes in that --
16     Q    Where in Area Three?
17     A    Pardon me.
18     Q    Where in Area Three Violent Crimes?
19     A    In what I believe might have been the
20 sergeant's office.
21     Q    Do you independently remember that as in the
22 sergeant office, or are you basing that on something
23 you've read?
24     A    No.  I don't -- it was in an office that had a
25 desk or a table.  I subsequently have learned since then

Page 137

1  that that was the sergeant's office.
2      Q    Okay.  And do you remember how you got to Area
3  Three?
4      A    Yeah.  I drove my car.
5      Q    Where were you when you got the assignment?
6      A    I don't recall.
7      Q    What were you wearing that morning?
8      A    Shirt and tie, sport coat.
9      Q    Okay.  Did you have your badge on you that
10 day?
11     A    I don't recall.  Most likely, yeah.
12     Q    Were you armed?
13     A    Most definitely, yeah.
14     Q    All right.  Do you independently remember what
15 you were wearing that day or just -- that's just --
16 you're relying on what you usually wore?
17     A    Well, I usually wore a shirt, tie, and a sport
18 coat.  Which shirt, tie, and sport coat?  No.  I don't
19 remember the colors or anything else, no.
20     Q    Before sitting in the statement, do you
21 remember what occurred when you got to the station?
22     A    I don't understand the question.
23     Q    All right.  At some point you're in your car
24 and you get to Area Three, correct?
25     A    Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

138..141

Page 138

1    Q    How long did it take you to get to Area Three?
2    A    Probably 15 minutes, 20 minutes.
3    Q    When you say, "probably," are you guessing, or
4 do you know?
5    A    Well, I'm surmising it.  I don't know where I
6 was, but I'm surmising I was somewhere south because
7 that's where I usually worked, and they normally try to
8 keep you in close to your area.  I mean, so I was
9 somewhere south.  It was my turn for an assignment, and
10 I got this assignment.
11    Q    Okay.  So Mr. Burke, I'm just trying to figure
12 out what you actually remember and what you just know
13 based on documents.  That's what I'm trying to do in
14 this -- right now.  And so when I ask you, you know, how
15 long it took you to get there, do you actually remember
16 how long it took you to get there or are you just
17 guessing based on habit?
18    A    Well, I don't know know long it took me to get
19 there.
20    Q    When you got to the station, where did -- do
21 you remember where you went?
22    A    I went upstairs to Area Three Violent Crimes
23 where I was told to go.
24    Q    Okay.  And do you independently remember that
25 or are you basing that on documents or inferences?

Page 139

1         MR. GRILL:  Form.  Go ahead.
2    A    I believe I remembered it, but you know.
3    Q    Well, I'm asking you just pause and think in
4 this moment do you independently remember going up to
5 Violent Crimes when you got to area -- or going -- not
6 up, I don't -- but going to Violent Crimes when you to
7 Area Three?
8    A    I don't actually remember walking up the
9 stairs, no.  But I did get up to the third floor somehow
10 from the parking lot.  I don't know.  I don't remember
11 exactly, but I did.
12    Q    And so when you get to the Violent Crimes
13 Unit, what do you remember happening once you got to
14 Violent Crimes?  What's the first thing you remember
15 happening?
16    A    The first thing I did as soon as I walked in
17 the door is I seen Detective Louis Caesar.  I basically
18 probably said something like, "What do you got?"
19    Q    All right.  Where was Mr. -- sorry --
20 Detective Caesar in the Violent Crimes area?  Where was
21 he?
22    A    I don't recall.  Standing somewhere inside the
23 doorway when I walked in.
24    Q    What was he wearing?
25    A    I don't recall.

Page 140

1    Q    And you said that you -- you're guessing, you
2 said something like, "What do you got?"
3    A    Well, I -- yeah, that would -- that would
4 probably be something like what I would say.  Or, you
5 know, "What do you need me for?"
6    Q    And just backing up a little.  When you get
7 assigned -- when you get an assignment from Central
8 Youth, what information are you given?
9    A    Very limited.  The only information I was
10 given -- at that time that was before cell phones we had
11 pagers.  And I was -- I got a page to call the office,
12 Central Youth.  I called.  They said they needed Area
13 Three Violent to sit in on a statement, period.  I said,
14 "Okay," and I drove there.
15    Q    Were you given information about what type of
16 case it was?
17    A    No.  I don't recall.  They might have said a
18 murder case, I don't -- I don't recall.
19    Q    Were you given information on which detectives
20 were working the case?
21    A    No.  I had no idea.
22    Q    All right.  So when you get there, you
23 remember talking to Detective Caesar and what
24 information does Detective Caesar give you, do you
25 remember?

Page 141

1    A    Not particularly, no.  (Phone ringing.)  I'm
2 sorry.
3    Q    That's okay.
4    A    Okay.  Sorry.
5    Q    So what's the next thing that you remember?
6    A    I don't really remember anything to be honest
7 with you.  I can only assume what the next step was.
8    Q    Right.  I don't want you to assume.  I only
9 want you to tell me what you remember.
10    A    I remember nothing.  I don't remember
11 anything.
12    Q    Okay.  So earlier you said that you remember
13 taking a statement with the ASA and Detective Caesar in
14 a room.  Do you remember that, or you were basing that
15 on what you read?
16    A    Well, I do remember asking Caesar where the
17 juvenile was and he pointed to a room and I said, "Can I
18 talk to him," and he said, "Yes," and I went in, and I
19 talked to him.
20    Q    All right.  And was anyone else present for
21 this conversation with Detective Caesar?
22    A    No.
23    Q    You asked Detective Caesar where the juvenile
24 was, right?
25    A    Sorry.  State that again.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 39 of 93 PageID #:9410
The Deposition of OFFICER KENNETH BURKE, Taken on July 30, 2021
142..145

Page 142

1    Q    Yes.  Your memory is that you asked Detective
2  Caesar where the juvenile was, correct?
3    A    Yeah.  That's correct.
4    Q    And you said that Detective Caesar then
5  pointed to a room; is that right?
6    A    Right.  He pointed to a closed door.
7    Q    Okay.  And then you asked, "Can I talk to
8  him?"
9    A    That's correct.
10    Q    Why did you ask if you could talk to him?
11    A    Well, because that's his prisoner.  You know,
12  I -- I can't just go in there.
13    Q    And if Detective Caesar had said, "No, you
14  can't talk to him," would you have to just accept that?
15    A    No.
16    Q    Sorry?
17    A    The answer is no.  I wouldn't accept it.
18    Q    Then why did you ask?
19        MR. GRILL:  Okay.  It's argumentative.  Form.
20    Go ahead and answer this.
21    A    I guess to be polite.
22    Q    Other than being polite, is there any other
23  reason why you asked if you could talk to the youth?
24    A    No.
25    Q    Okay.  And it's your memory that he said,

Page 143

1  "Yes, you can talk to him," right?
2    A    Yes.
3    Q    At which point you said that you then talked
4  to the person in the room, right?
5    A    That's correct.
6    Q    Right.  Do you independently remember going to
7  that room?
8    A    Yeah.  I do.
9    Q    What do you remember -- so when you go into
10  the room, what did the room look like?
11    A    I don't really recall what the room looked
12  like.
13    Q    Okay.  The door, was there any window on the
14  door?
15    A    No.
16    Q    Is this a wood door or a metal door?
17    A    I believe it was wood.  It's an old building.
18    Q    When you went into the room was there any
19  furniture in the room?
20    A    Mr. Jakes was sitting on something, a chair, a
21  bench, or some form of furniture, yeah.
22    Q    And can you describe Mr. Jakes?
23    A    Well, he was a young teenaged black juvenile.
24    Q    Do you independently remember what he looks
25  like?

Page 144

1    A    No.
2    Q    Okay.  So when you say, "He was a young,
3  teenaged, black juvenile," you're basing that on
4  documents?
5    A    Well, yeah.
6    Q    Okay.
7    A    Yes.
8    Q    All right.  It's really important that you
9  tell me what you can remember.  And what you're just
10  saying is just based on documents that you've read,
11  okay, Mr. Burke?
12    A    All right.
13    Q    All right.  So you walk in and do you
14  independently --
15        MR. GRILL:  Hang on.
16        MS. SPENCE:  Sorry.
17        MR. GRILL:  You need to ask the question, you
18    know, meaning you can't conduct a deposition by
19    putting an order out there and then you -- if he
20    doesn't follow it the way you want him to, you're
21    able to drop some inference about what he might have
22    meant.  So I'm going to ask that and direct the
23    witness to simply answer the questions that you're
24    asking.  She asked you, "Is this something you
25    remember or not?"  You can answer that question.

Page 145

1    But otherwise just answer the questions that she's
2    asking of you.
3        THE WITNESS:  All right.
4        MR. GRILL:  Okay.
5        MS. SPENCE:  Okay.  So Andrew, throughout this
6    deposition on many occasions you're making speaking
7    objections.
8        MR. GRILL:  Okay.  Yep.  You want to --
9        MS. SPENCE:  And so I ask that you just object
10    --
11        MR. GRILL:  -- you want to take it up with the
12    Court, you are absolutely free to.  So I'm well
13    aware that it's being recorded and that there's a
14    record.  So keep going.
15  BY MS. SPENCE:
16    Q    So Mr. Burke, you said that you saw Mr. Jakes
17  sitting on a chair or bench; is that right?
18    A    Yes.
19    Q    So you independently recollect that, or is
20  that based on documents that you read?
21    A    I do not independently recollect this, no.
22    Q    Do you remember what Mr. Jakes was wearing?
23    A    No.
24    Q    All right.  So when you get in the room, what
25  do you remember doing?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 40 of 93 PageID #:9411
The Deposition of OFFICER KEN BURKEY, taken July 09, 2021
146..149

Page 146

1    A    I -- first thing I did is I advised him of his
2    Miranda rights.
3    Q    And do you independently remember advising him
4    of the Miranda rights?
5    A    Yes.
6    Q    Okay.  And how did you administer the Miranda
7    warnings?
8    A    From preprinted form from my FOP book.
9    Q    Why did you advise him of his Miranda rights
10   when you went into the room?
11   A    Because I wanted to make sure he was aware of
12   his rights.
13   Q    Did you have any intention of interrogating
14   him at that time?
15   A    No.
16   Q    Did you have any intention of asking him
17   questions about the crime of which he was accused of
18   committing?
19   A    No.
20   Q    All right.  Did you have any -- sorry.  Before
21   you went into the room did you know what Mr. Jakes had
22   been accused of doing?
23   A    Yes.
24   Q    Do you independently remember being told what
25   Mr. Jakes was being accused of doing?

Page 147

1    A    No.
2    Q    Who told you what Mr. Jakes was accused of
3    doing?
4    A    Probably Detective Caesar.
5    Q    Do you remember that, or are you just basing
6    that on documents?
7    A    No.  I don't remember.  No.
8    Q    So let's just back up a little bit.  When you
9    speak to Detective Caesar, does he tell you what time
10   Mr. Jakes got to the station?
11   A    No.
12   Q    Did you ask?
13   A    No.
14   Q    Why not?
15   A    It wasn't necessary.
16   Q    What do you mean it wasn't necessary?
17   A    It's not my investigation.  I'm not -- that's
18   not why I'm there.
19   Q    And what was your understanding of why you
20   were there?
21   A    To sit in on the statement.
22   Q    And did you also understand your role to
23   determine -- to be to determine whether or not Mr. Jakes
24   had been mistreated?
25   A    I did ask him that.

Page 148

1    Q    Did you understand that that was your role to
2    determine whether or not he had been mistreated?
3    A    Yes.
4    Q    Did you also believe that your role at that
5    time was also to determine whether or not his rights had
6    been violated?
7    A    Yes.
8    Q    Back in 1991 was there some kind of rule that
9    said that youth could not be held in custody for more
10   than 24 hours?
11        MR. GRILL:  Objection.  Form.  Foundation.
12   A    I don't recall.  It's been changed so many
13   times, I don't recall.
14   Q    All right.  Did you review any reports before
15   you spoke to Mr. Jakes in the room?
16   A    Did I -- say that again.
17   Q    Did you review any reports before you walked
18   into the room after your conversation with Detective
19   Caesar?
20   A    No.
21   Q    All right.  And let me ask it in a clearer
22   way.  After you talked to Detective Caesar, but before
23   you walked in the room to speak to Mr. Jakes, did you
24   review any reports?
25   A    No.  I -- no.

Page 149

1    Q    Did you know that he was potentially going to
2    be charged with a homicide?
3    A    Yes.
4    Q    Okay.  And by "he" in that sentence, I mean
5    Mr. Jakes.  Do you understand that?
6    A    Yes.
7    Q    Did you review any arrest forms before you
8    spoke to Mr. Jakes?
9    A    Not that I recall, no.
10   Q    Okay.  Did you speak to Detective Boudreau
11   before speaking to Mr. Jakes?
12   A    No.
13   Q    Did you speak to Detective Kill before
14   speaking to Mr. Jakes?
15   A    No.
16   Q    Did you speak to any other police officer
17   before speaking to Mr. Jakes?
18   A    No.  Other than Caesar.
19   Q    Right.  Other than Caesar?
20   A    No.
21   Q    Sorry.  Was that -- did you say something?
22   A    No.  Caesar was the only one I spoke to.
23   Q    Okay.  And when you went into speak to
24   Mr. Jakes, was it your understanding that he had already
25   been interrogated?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 41 of 93 PageID #:9412
The Deposition of OFFICER KENNETH BURKE, taken July 30, 2021
150..153

Page 150

1          MR. GRILL:  Objection.  Form.  Foundation.
2      A    I -- I would say yes.
3      Q    Okay.  And why would you say yes?
4      A    Because they wouldn't be calling a youth
5  officer in unless they were ready to take a statement.
6      Q    And were -- before you spoke to Mr. Jakes, did
7  you know if his parent was at the station?
8      A    No.
9      Q    Did you know if his parent had been contacted?
10     A    Before I spoke with Jakes?
11     Q    Yes.  Before you spoke to Mr. Jakes, did you
12 know if his parents --
13     A    I don't recall.
14     Q    -- sorry.  Let me ask the question.
15     A    I don't recall.
16     Q    Let me get the question out.  Before you spoke
17 to Mr. Jakes did you know whether or not a parent or
18 guardian -- his parent or guardian had been contacted?
19     A    I don't recall.
20     Q    Before you spoke to Mr. Jakes, did you know if
21 a youth officer had been present for Mr. Jakes'
22 interrogation?
23         MR. GRILL:  Objection.  Assumes facts not in
24     evidence.  Form.  Foundation.
25     A    I don't recall.

Page 151

1      Q    Okay.  Did you ask anyone to see if a youth
2  officer was present for Mr. Jakes' interrogation?
3          MR. GRILL:  Same objections.
4      A    I don't recall.
5      Q    Prior to September 17, 1991 when you got to
6  the Area Three, had you worked on any cases with
7  Detective Caesar?
8      A    No.
9      Q    Had you worked on any cases with Detective
10 Boudreau?
11     A    No.
12     Q    Had you worked on any cases with Detective
13 Kill?
14     A    No.
15     Q    When you walked into the room, what was
16 Mr. Jakes' demeanor?
17     A    I don't recall.
18     Q    All right.  Was he handcuffed?
19     A    I don't recall.
20     Q    What time was it when you went in to speak
21 with Mr. Jakes?
22     A    Approximately 4:00 a.m.
23     Q    You said that you got the assignment at 3:45
24 a.m., right?
25     A    I believe I said I arrived at 3:45.

Page 152

1      Q    Okay.  So between 3:45 when you arrived and
2  4:00 a.m., what were you doing?
3      A    Well, I spoke with Detective Caesar, and I
4  went in and talked with Jakes.  And all of that probably
5  took about 15 minutes.
6      Q    When you -- did you bring anything in the room
7  with you when you went to speak to Mr. Jakes?
8      A    No.
9      Q    And when you went into the room to speak to
10 Mr. Jakes were you going there to find out whether or
11 not his rights had been violated?
12     A    Yes.  I asked him -- I asked him that.
13     Q    Did you introduce yourself when you went into
14 the room?
15     A    Yes.  I did.
16     Q    What did you say?
17     A    I said, "I'm Youth Officer Burke.  I'm with
18 the Chicago Police Department," and I advised him then
19 of his rights, told him that he will be charged as an
20 adult, and I asked him if he was treated okay.  He
21 responded he was, and I asked him if his mother knows
22 he's there and he told me he lives with his aunt.  And I
23 said, "Do you need -- do you want your aunt here," and
24 he said, "That's not necessary, no."
25     Q    Okay.  When you were introducing yourself and

Page 153

1  you said that you were the youth officer and you work
2  with the Chicago Police Department, did you give him any
3  other information about yourself?
4      A    No.
5      Q    Did you explain what a youth officer does?
6      A    Well, no, but I think he knows.  He's been
7  arrested enough times.
8      Q    At the time that you spoke to Mr. Jakes, did
9  you know about his criminal history?
10     A    No.
11     Q    Okay.  Did he -- did you ask him if he knew
12 what a youth officer was?
13     A    No.
14     Q    And did you know whether or not he knew what
15 your role was as a youth officer when you spoke to him?
16     A    Do I know if he knew?  I -- no.  I don't know
17 what he knew.
18     Q    Is that because you didn't ask him what he
19 knew?
20         MR. GRILL:  Objection.  Argumentative.  Form.
21     Q    Go ahead.
22     A    No.
23     Q    Mr. Burke, can you grab the transcript packet
24 that has a stamp on it that says, "Filed March 22,
25 1994."

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 42 of 93 PageID #:9413
The Deposition of OFFICER KENNETH BURKE, taken on July 30, 2021
154..157

Page 154

1    A    Okay.
2    Q    It says, "Jury trial."
3    A    Yes.
4         MR. GRILL:  I have two actually that say --
5    that have that stamp on it.  Can you state the
6    numbers.
7         MS. SPENCE:  The Bates stamp number is -- at
8    the bottom says, "Plaintiff's Jakes 31205," and the
9    date on that page should be September 10, 1993.
10   A    Okay.  Got it.
11   BY MS. SPENCE:
12   Q    All right.
13        MS. SPENCE:  Why don't we go ahead and mark
14   that Exhibit 6?
15        (EXHIBIT 6 MARKED FOR IDENTIFICATION)
16        MR. GRILL:  If I might jump in here, too.  I
17   presume you've got a little ways to go so if you do
18   want to break for lunch, it's 2:00.  So maybe this
19   would be a good spot to do that.
20        MS. SPENCE:  Sure.
21        MR. GRILL:  Well, maybe a good question --
22   maybe a better question is how much more do you
23   think you have?  If it's a lot, then let's take
24   lunch.  If not, then we can break then.
25        MS. SPENCE:  I have a little bit more than an

Page 155

1    hour.
2         MR. GRILL:  You have a little more than an
3    hour?
4         MS. SPENCE:  I think, yeah.  I think it's most
5    likely an hour, hour-and-a-half.
6         MR. GRILL:  Do you want to break for lunch, or
7    do you want to keep going through?  Your call.
8         THE WITNESS:  I'll break for lunch.
9         MR. GRILL:  Okay.  Let's break for lunch.
10        MS. SPENCE:  Can it be like 30 minutes?
11        MR. GRILL:  Yeah.  That'd be perfect.
12        COURT REPORTER:  Okay.  We are off the record.
13   The time is 2:01.
14        (OFF THE RECORD)
15        COURT REPORTER:  We are back on the record. The
16   time is 2:45.
17   BY MS. SPENCE:
18   Q    All right.  Mr. Burke, when you gave Mr. Jakes
19   his Miranda warnings you wanted to make sure that
20   Mr. Jakes understood the Miranda warnings, correct?
21   A    Yes.
22   Q    All right.  It's important that if he waived
23   his right that he did so knowingly, right?
24   A    That's correct.
25   Q    And he did so intelligently, right?

Page 156

1    A    Correct.  Yeah.
2    Q    And he did so voluntarily, correct?
3    A    Yes.
4    Q    And so it was a priority to make sure that he
5    understood what you were telling him, right?
6    A    Yes.
7    Q    Okay.  Do you remember the Miranda rights off
8    of the top of your head?
9    A    No.
10   Q    Okay.  I anticipated that you might not, so
11   can you look at what we -- sorry, during the break did
12   you review any documents?
13   A    Yeah.  I did take a look at a few things,
14   here.
15   Q    What did you look at during the break?
16   A    I looked at this -- the one that's Jakes
17   31205.
18   Q    Okay.  All right.  So let's go to what was
19   marked as Exhibit 6.  It's Bates stamped Plaintiff's
20   Jakes 31205 like you just referred to.
21   A    Uh-huh.
22   Q    And the second page is Plaintiff's Jakes
23   31339.  Do you see that?
24   A    Yes.
25   Q    Okay.  And do you see where it says, starting

Page 157

1    at line 18 -- sorry -- starting at line 12, "Officer
2    Kenneth Burke called as a witness on behalf of the State
3    of Illinois in rebuttal and was first duly sworn,
4    examined, and testified as follows."  Do you see that?
5    A    Yes.
6    Q    And you said during the break you had an
7    opportunity to look at Exhibit 6, correct?
8    A    Yes.
9    Q    And it was your testimony, right?
10   A    Yes.
11   Q    Okay.  So directing your attention to G138,
12   the page number.  It's also Bates stamped Plaintiff's
13   Jakes 31344.
14   A    Yes.
15   Q    Are you on that page?
16   A    Yes.  I am.
17   Q    Okay.  Great.  And so the question on line 2
18   is, "Are the rights that are in the 93 FOP book the same
19   rights in the FOP book that you had when you advised the
20   defendant of his rights back in February of 1991."  Do
21   you see that that question?
22   A    Yes.
23   Q    And what does FOP stand for?
24   A    Fraternal Order of Police.
25   Q    Right.  Okay.  Then your answer is, "Yes."  And



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 43 of 93 PageID #:9414
The Deposition of OFFICER KENNUKEY, taken on July 08, 2021
158..161

Page 158

1  the question is, "Would you turn to the rights page and
2  tell us what it is you advised of him."  Do you see that
3  that question?
4      A    Yes.  I do.
5      Q    Right.  And then you proceed to read the page
6  with the Miranda rights, correct?
7      A    That's correct.
8      Q    All right.  So let's go through this together.
9  You said to Mr. Jakes, according to your testimony,
10  "Before I ask you any questions, it is our duty to
11  advise you of your rights.  Do you understand that you
12  have a right to remain silent," right?  Did you read
13  that to him?
14      A    Yes.  I did.
15      Q    Okay.  And when you read the question, "Do you
16  understand that you have a right to remain silent," did
17  you explain what that right meant?
18          MR. GRILL:  Objection.  Form.
19      A    I -- no.  I didn't.  I thought it was pretty
20  simple.
21      Q    Okay.  Did you clarify whether or not he
22  understood the work "right" to mean that he was entitled
23  to remain silent as opposed to interpreting the word
24  "right" being right versus wrong?
25          MR. GRILL:  Objection.  Form.

Page 159

1      Q    Go ahead.
2      A    No.  I did not.
3      Q    All right.  Did you ask him specifically, do
4  you understand what this right means?
5          MR. GRILL:  Objection.  Form.  Foundation.
6      A    No.
7      Q    Okay.  And when you read the Miranda rights,
8  did you read them all at one time and then ask him if he
9  was willing to waive his rights at the end?
10          MR. GRILL:  Objection.  Form.
11      Q    Go ahead.
12      A    I don't recall, but I -- I do know as a
13  practice I used to ask them in a question form and want
14  an answer after each question.  I can't recall if I did
15  that or not in this particular case.
16      Q    All right.  And can you not recall because you
17  never wrote anything down?
18          MR. GRILL:  Objection.  Form.
19      Q    Go ahead.
20          MR. GRILL:  Argumentative.
21      A    Possibly but I don't know if I would've wrote
22  down the rights every question anyhow.
23      Q    But the fact is you did not write down what he
24  said after each question, correct?
25      A    No.  I didn't.  No.

Page 160

1      Q    And you didn't write down exactly how you
2  administered the rights, correct?
3      A    No.
4      Q    Okay.  Then the next line is, "Do you
5  understand that anything you say can and may be used
6  against you" -- sorry.  Let me -- I misread that.  Line
7  12 says, "Do you understand that anything you say can
8  and may be used against you in a court or other
9  proceeding."  Is that one of the questions you asked?
10      A    Yes.
11      Q    Okay.  Did you ask him if he understood what
12  other proceeding meant?
13          MR. GRILL:  Objection to form.
14      A    No.
15      Q    Did you ask him any follow-up question to that
16  specific right -- about that specific right?
17      A    No.
18      Q    Okay.  Why didn't you ask him any -- why
19  didn't you ask him any follow-up questions about that
20  specific right?
21          MR. GRILL:  Objection.  Form.
22      A    Because I figured he understood.  It was
23  pretty simple.  It was a simple question.
24      Q    When you were administering him his rights,
25  when you were reading the Miranda rights waiver, did you

Page 161

1  know what grade he was in?
2      A    No.  I don't --
3      Q    Did you know -- sorry?
4      A    I don't think so.  I don't recall.
5      Q    Did you know whether or not he was in special
6  education?
7      A    No.
8      Q    Did you know he had an Individual Education
9  Plan?
10      A    No.
11      Q    Did you know if he had a learning disability?
12      A    No.
13      Q    Did you know whether or not he had any kind of
14  processing issues?
15          MR. GRILL:  Objection.  Form.  Foundation.
16      A    No.
17      Q    Did you know whether or not he had difficulty
18  understanding material when it was read to him?
19          MR. GRILL:  Objection.  Form.  Foundation.
20  Calls for speculation.
21      A    No.
22      Q    Did you know whether or not he had any kind of
23  intellectual delays that would have prevented him from
24  understanding what you were reading to him?
25          MR. GRILL:  Objection.  Form.  Foundation.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 44 of 93 PageID #:9415
The Deposition of OFFICER KENNETH KUNCE, taken on July 30, 2021
162..165

Page 162

1  Calls for speculation.
2    A   No.  He answered every question like he
3  understood and I just -- I thought if he didn't
4  understand he would have said something.
5    Q   Right.  But is it fair to say that you did not
6  inquire past reading these rights out loud about whether
7  or not he truly understood what the rights were?
8      MR. GRILL:  Objection.  Form.
9    A   No.
10   Q   Okay.  The next question is on line 14, "Do
11  you understand that you have the right to talk to a
12  lawyer before we ask you any questions, and to have him
13  be -- and to have him with you during questioning?"
14   A   Yes.
15   Q   Okay.  When you asked that question, did you
16  ask him to explain to you what he understood that right
17  to mean?
18      MR. GRILL:  Objection.  Form.
19   A   No.
20   Q   Did you ask him whether or not he knew that
21  the word "right" meant that he was entitled to ask for a
22  lawyer?
23      MR. GRILL:  Objection.  Form.
24   A   No.
25   Q   Did he -- did you ask him whether or not he

Page 163

1  understood that he could ask for a lawyer even if others
2  did not want him to ask for a lawyer?
3      MR. GRILL:  Objection.
4    A   No.
5      MR. GRILL:  Form.  Argumentative.
6    Q   Okay.  Go ahead.
7    A   No.
8    Q   Did you ask him any follow-up questions about
9  this specific right, the right to an attorney?
10      MR. GRILL:  Objection.  Form.
11   A   No.
12   Q   Line 17, "If you cannot afford a lawyer and
13  you want one, a lawyer will be appointed to you, and we
14  will not ask you any questions until he has been
15  appointed."  Did you read that sentence to him?
16   A   Yes.  I did.
17   Q   Okay.  And as you're reading this -- these
18  rights to him does he have -- did you give him a copy to
19  read for himself?
20   A   No.
21   Q   Are these just being administered orally?
22   A   Yes.
23   Q   Okay.  And did you ask him if he understood
24  what the word "appointed" meant?
25   A   No.

Page 164

1    Q   Did you ask him if he understood how a lawyer
2  could get appointed to him?
3    A   No.
4    Q   Did you ask him whether or not he understood
5  that it was feasible for a lawyer to be appointed to
6  him?
7    A   No.
8    Q   Did you ask him any follow-up questions about
9  his understanding about this specific right?
10   A   No.
11   Q   Line 20, "If you decide to answer questions
12  now with or without a lawyer, you still have a right to
13  stop questioning at any time or to stop the questioning
14  for purposes of consulting a lawyer."  Did you read that
15  right to him?
16   A   Yes.  I did.
17   Q   And did you ask him if he understood that he
18  had a -- that when a sentence used the word "right" that
19  it meant that he was entitled to be able to stop
20  questioning at any time?
21      MR. GRILL:  Objection.  Form.
22   A   No.
23   Q   Did you ask him if he understood what the word
24  "consulting" meant?
25   A   Nope.

Page 165

1    Q   Did you explain to him the process by which he
2  would be able to consult with a lawyer?
3    A   No.
4    Q   Did you explain to him that if he wanted to
5  stop the questioning that it was his choice even if
6  maybe someone else wanted him to answer questions?
7      MR. GRILL:  Objection.  Form.
8    A   No.
9    Q   Did you ask him any follow-up questions about
10  his understanding about this specific right?
11   A   No.
12      MR. GRILL:  Objection.  Form.
13   Q   Line 24, "You may waive the right to advice of
14  counsel and your right to remain silent and you may
15  answer questions or make a statement without consulting
16  a lawyer if you desire."  Did you read that statement to
17  him?
18   A   Yes.
19   Q   Did you explain what the word "counsel" meant?
20   A   No.
21   Q   Did you ask him if he understood that that
22  word meant -- was synonymous with the word "lawyer"?
23   A   No.
24   Q   Okay.  Do you know if he understood what the
25  word "counsel" meant?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 45 of 93 PageID #:9416
The Deposition of OFFICER KEN PURKEY, taken on July 30, 2021
166..169

Page 166

1    A    No.

2    Q    Okay.  Did you spell the word "waive" for him?

3    A    No.

4    Q    Did you explain to him that the word "waive"
5  was different from W-A-V-E as in to wave your hand?

6    A    No.

7    Q    Did you ask him if he understood how the word
8  "waive" was being used in that sentence?

9    A    No.

10   Q    Did you ask him what the -- if he understood
11 that the word "right" in that sentence meant that he was
12 entitled to these things and advice of counsel or to
13 remain silent?

14   A    No.

15   Q    This is on page G-139 starting at line 3, "Do
16 you understand each of these rights?  Do you wish to
17 answer the questions at this time?"  Did you ask those
18 questions?

19   A    Yes.

20   Q    Okay.  And what was his response?

21   A    It was, "Yes," to both.

22   Q    Do you independently remember that he said,
23 "Yes"?

24   A    Yes.

25   Q    And is it your testimony that that was the

Page 167

1  exact language that he used, he said, "Yes"?

2    A    No.  I don't recall his exact language.

3    Q    Would it be fair to say that you just presumed
4  that he understood what you had read to him based on the
5  fact that he said, "Yes"?

6    A    Yes.  Well, he answered in the affirmative at
7  every question, and he answered --

8    Q    Go ahead.

9    A    -- in the affirmative when I asked him if he
10 understood all of them, and he answered in the
11 affirmative that he would -- do you wish to answer
12 questions at this time.  I don't recall if he said, yes,
13 yeah, or yep or whatever.  I don't remember the exact
14 terminology, but it was in the affirmative.

15   Q    So outside of him saying, "Yes," was that your
16 only indication that he was -- sorry.  Was the "yes" the
17 only indication you had that he understood what you were
18 saying?

19        MR. GRILL:  Objection.  Form.

20   A    Yeah.  Yes.

21   Q    Did you -- do you think it's a -- did you
22 think in 1991 that it was important for Mr. Jakes to
23 understand his Miranda rights?

24   A    Sure.  Yes.

25   Q    Do you think it was important for him to

Page 168

1  understand that he had -- that he was waiving them?

2    A    Say that again.

3    Q    Do you think it was important that Mr. Jakes
4  understood he was waiving his Miranda rights?

5    A    Yeah.  Yes.

6    Q    Okay.  Why do you think that that was
7  important?

8    A    Well, because if he didn't waive them,
9  everything would be stopped.

10   Q    And you would agree that Miranda rights are a
11 way of informing a suspect that they don't have to give
12 a statement, right?

13   A    Right.  Yes.

14   Q    And that they're allowed to have a lawyer with
15 them if they are going to give a statement, correct?

16   A    That's correct.

17   Q    And they're allowed to be advised by a lawyer
18 before they're giving a statement, correct?

19   A    Yes.

20   Q    And this is -- and Mr. Jakes did not have a
21 lawyer in that room, right?

22   A    No.

23   Q    He didn't have anyone giving him advice about
24 whether or not he should give a statement?

25   A    No.

Page 169

1    Q    Okay.  And then why did you -- if you thought
2  that these were important rights for him to understand,
3  why didn't you explain what each and every right meant
4  to him?

5        MR. GRILL:  Objection.  Form and foundation.
6        Assumes facts not in evidence and mischaracterizes
7        several of the exhibits that have been presented to
8        him already today.

9    A    Because I believe he answered each question
10 and it appeared he understood every question.  I gave
11 him time to state if he had a problem understanding
12 anything.  I didn't think I had to explain every word.  I
13 never had done that.

14 BY MS. SPENCE:

15   Q    After you read him the Miranda warnings, you
16 told him that he could be charged as an adult, right?

17   A    Yes.

18   Q    When you told him that he could be charged as
19 an adult, did you go through any penalties that he could
20 be facing?

21   A    No.

22        MR. GRILL:  Objection.  Form.  Foundation.
23        Assumes facts not in evidence.

24   Q    Did you explain to him what being charged as
25 an adult would mean?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 170

1    A    I don't recall.
2    Q    Do you know if he understood what it meant to
3    be potentially charged as an adult?
4    A    It appeared that he understood.
5    Q    When you say, "it appeared he understood,"
6    what was your indication that he understood?
7    A    Because he -- like I said, he answered
8    everything in the affirmative and he never asked any
9    questions.  If he would've asked the question, I
10   would've answered it.  He never did.
11   Q    Well, looking back at Exhibit 6, and this is
12   on page G-139 Bates stamp Plaintiff's Jakes 031345, are
13   you on that page?
14   A    Yes.  I am.
15   Q    Okay.  Looking at line 12, it said, "Did you
16   also advise him that even though he's a juvenile he
17   would be tried as an adult," and your answer was, "Yes,"
18   right?
19   A    Yes.
20   Q    At no point do you say, "And then I went on to
21   explain to him what that would mean," correct?
22        MR. GRILL:  Objection.  Form.
23   A    Right.  Well -- right.  No.  I never -- I
24   never -- I didn't think there was a need to.
25   Q    You don't think there was a need to do what?

Page 171

1    A    To explain to him what adult meant.
2    Q    No.  I'm not asking it's to explain to him
3    what adult meant, I'm asking did you explain to him what
4    it meant to be tried as an adult?
5    A    Well, okay.  I didn't think I needed to
6    explain to him what "tried" meant.
7    Q    Okay.
8    A    Tried as an adult.  I --
9    Q    And you would agree the word "tried" in that
10   sentence means a criminal trial, a prosecution of an
11   adult, correct?
12   A    Yes.
13   Q    It doesn't mean an effort, to make an effort
14   to try to do something?
15   A    No.
16        MR. GRILL:  Objection.  Form.
17   Q    And you don't know if he understood if the
18   word "tried" meant to be prosecuted, correct?
19        MR. GRILL:  Objection.  Calls for speculation.
20   A    I don't know what he -- you know, he never --
21   he never asked or never said that he didn't understand
22   anything, and I read it all very slow and meticulous at
23   the time.
24   Q    But you never asked him any follow-up
25   questions about whether or not he understood what it

Page 172

1    meant to be potentially tried as an adult?
2    A    No.  I did not.
3    Q    Okay.  And did you tell him that he was facing
4    a potential murder charge?
5    A    I don't recall.
6    Q    Did you tell him he was facing a potential
7    armed robbery charge?
8    A    I don't recall.
9    Q    Did you go over any charges that he would --
10   that he was potentially facing if he gave a statement?
11   A    No.  I didn't discuss the case at all.
12   Q    Why did you not go through with him what he
13   was potentially facing from a charging standpoint if he
14   were tried as an adult?
15        MR. GRILL:  Objection.  Foundation.  Asked and
16   answered.
17   A    Because I had met the arresting officer.  I --
18   I don't know basically, you know, it's not my -- it's
19   not up to me to tell him what he's being charged with.
20   Q    Now, after you told him that he could -- he
21   would be tried as an adult and you read him his Miranda
22   warnings, you also asked him about how he was treated;
23   is that right?
24   A    Yes.  Yes.
25   Q    Why did you want to know how he was treated?

Page 173

1    A    Well, I wanted to make sure that he wasn't
2    being, you know, mistreated or coerced or anything like
3    that.
4    Q    And when you say, you wanted to make sure he
5    wasn't being mistreated or coerced, you mean before like
6    in the processes that happened before you arrived,
7    correct?
8    A    That's correct.
9    Q    And at the time it was your understanding that
10   he had already been interrogated, right?
11        MR. GRILL:  Objection.  Form.  Foundation.
12   A    Yeah.  He was interviewed.  I don't know if
13   was an interrogation or not.  I don't know.
14   Q    What's the difference between an interrogation
15   and interview?
16        MR. GRILL:  Asked and answered hours ago.  Go
17   ahead.
18   A    Well, interrogation is a suspect that's
19   charged.  An interview could be a witness.
20   Q    And was your understanding when you got there
21   that he was a suspect in a murder?
22   A    At that time, yes.  It was --
23   Q    And was it your understanding -- sorry.
24   A    Go ahead.  I'm sorry.  Go ahead.
25   Q    Was it your understanding that he was not free



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 47 of 93 PageID #:9418
The Deposition of OFFICER KEN BURKE, taken July 30, 2021
174..177

Page 174

1   to leave?
2       A    Yes.
3       Q    So it was your understanding that he was in
4   custody, correct?
5       A    Correct.
6       Q    And at the time he was placed in custody that
7   -- withdraw that question.  Right.  And so circling back
8   to what I was asking you, at the time that you were
9   speaking to Mr. Jakes, it was your understanding that he
10  had already been interrogated?
11          MR. GRILL:  Objection.  Asked and answered.
12      Mischaracterizes his testimony.
13      A    He had already been interviewed, yes.
14      Q    All right.  You're telling me that an
15  interview is with a witness and interrogation is with a
16  suspect, correct?
17      A    Yeah.  Well, yes.
18      Q    And it was your understanding that Mr. Jakes
19  was a suspect, correct?
20      A    At this time, he's a suspect.  I don't know if
21  he was being questioned prior to him being a suspect or
22  not.
23      Q    And one of the things that you're asking --
24  one of the reasons why you asked about treatment is it
25  may affect whether or not the statement Mr. Jakes gives

Page 175

1   is voluntary, right?
2           MR. GRILL:  Hold on.  Form.  Foundation.
3       A    I don't understand the question.
4       Q    You said that one of the -- part of your
5   purpose for asking Mr. Jakes -- for talking to Mr. Jakes
6   is that you wanted to make sure that any statement he
7   gave was voluntary, right?
8       A    Yes.
9       Q    And you agree that if Mr. Jakes was coerced
10  before you met him that that may render his subsequent
11  statements involuntary, right?
12          MR. GRILL:  Well, that assumes facts not in
13      evidence, so form.
14      Q    Go ahead.
15          MR. GRILL:  And it's a complete hypothetical,
16      so go ahead.
17      Q    Go ahead.
18      A    Yeah.  I don't -- I don't really know how to
19  answer that.
20      Q    Well, answer this, if you were to learn that
21  before you spoke to Mr. Jakes that he had been
22  threatened by an officer into giving a statement, what
23  would you have done?
24          MR. GRILL:  Hang on.  Form.  Incomplete
25      hypothetical.  Calls for speculation again.

Page 176

1       A    I'm not going to speculate on what might have
2   happened.
3       Q    Well, you're asking about -- you asked him
4   about treatment, correct?
5       A    Yes.
6       Q    All right.  And the purpose of asking about
7   treatment is to figure out whether or not his rights had
8   been violated, correct?
9       A    That's correct.
10      Q    And if he had been threatened by an officer
11  before you had met with him, would that have violated
12  his rights?
13          MR. GRILL:  Objection.  Incomplete
14      hypothetical.  Calls for speculation.  Form.
15      A    If he told me he was threatened, yes.
16      Q    And if you learned that his rights had been
17  violated what was your duty as the youth officer at that
18  point?
19      A    Probably to make a supervisor aware.
20      Q    If Mr. Jakes had told you that before you had
21  come that an officer had kicked him, would that have
22  violated his rights?
23      A    Yes.
24      Q    And as the youth officer and you had been
25  informed of that, what would your -- what would you have

Page 177

1   been required to do?
2       A    I would've notified a supervisor.
3       Q    If Mr. Jakes had told you that prior to your
4   arrival that an officer had slapped him in the face,
5   would that have violated his rights?
6           MR. GRILL:  Objection.  Form.  Incomplete
7       hypothetical.  Calls for speculation.
8       A    I would assume, yes.  Yeah.
9       Q    Well, based on your training and experience,
10  is that the kind of behavior that would have violated
11  the policy for the way that juveniles were supposed to
12  be handled during police interactions?
13      A    Yes.
14      Q    And based on your training and experience
15  would slapping a juvenile while you were questioning
16  them, would that qualify as violating his rights?
17      A    Yes.
18      Q    And if Mr. Jakes had told you that that's how
19  he had been treated before you arrived, what would your
20  role as a youth officer require you to do?
21      A    Notify a supervisor.
22      Q    Well, if Mr. Jakes had told you that an
23  officer threatened to have his family jumped by a gang
24  unless he did what the officer was asking him to do, is
25  that the kind of information that would have made you



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 48 of 93 PageID #:9419
The Deposition of PETER KEVIN BURKE, taken on July 30, 2021
178..181

Page 178

1  believe that his rights had been violated?
2        MR. GRILL:  Objection.  Form.  Foundation.
3  Incomplete hypothetical.  Calls for speculation.
4        A    Yes.  It would.
5        Q    And if Mr. Jakes had told you that, what would
6  your duty have been as a youth officer?
7        A    Once again, to notify a supervisor.
8        Q    Why would it have been your duty to notify a
9  supervisor about something that happened before you got
10 there?
11       A    Well first of all, I don't know if it would be
12 my duty, but it would be in my conscience to notify a
13 higher up.
14       Q    Okay.  When you say, you're not sure if it
15 would be your duty, what does that mean?
16       A    I have never read in any order, or any
17 memorandum, or anything of what my duty would be in that
18 particular situation.
19       Q    Did you receive any training on if you -- on
20 what to do if you learn that a juvenile suspect had been
21 mistreated prior to your arrival what you were supposed
22 to do?
23       A    Not that I recall.
24       Q    Were you given any policy about what to do if
25 a juvenile tells you that they had been mistreated prior

Page 179

1  to your arrival?
2        A    Not that I recall.
3        Q    Okay.
4        Q    So is it fair to say that if you did nothing
5  that that would've also been fine?
6        A    No.  Not at all.
7        Q    Why wouldn't it have been okay?
8        A    Well, it would've been against my conscience
9  and my -- I -- it wouldn't have been right.  I -- I -- I
10 think I would've had to intervene.
11       Q    So outside of your moral compunction, like,
12 your feelings of what is the right thing to do, is there
13 any training or policy that you are aware of that
14 would've required you to report Mr. Jakes mistreatment
15 had he told you any of those -- had he told you that any
16 of those actions had been taken against him?
17       MR. GRILL:  Asked and answered.
18       A    Not that I'm aware of.  And it's all
19 speculation because that's never happened so I don't
20 know.
21       Q    What's never happened?
22       A    I've never had a juvenile or anyone tell me
23 that they were mistreated.
24       Q    How many times would you say in the course of
25 your career have you asked a juvenile whether or not

Page 180

1  they've been mistreated?
2        A    I have no idea.
3        Q    Okay.  Is it more than ten youth?
4        A    Probably, yeah.
5        Q    More than 20 youth?
6        A    Probably.
7        Q    More than 30 youth?
8        A    Yeah.  It might have been in the ten years I
9  was a youth officer and all the times I read statements
10 to youth is probably about a, you know, 100 times.  I
11 don't know.  I really don't know.
12       Q    And you say about -- and then this is an
13 estimate.  Of about those 100 times you're telling me
14 that none of those youth ever said they'd been
15 mistreated by the police?
16       A    No.  I -- no.  I -- I've never had them tell
17 me they were mistreated after I read my rights to --
18 their rights to them.  I, as a youth officer processing
19 juveniles, I've had them say that they were mistreated,
20 yes.
21       Q    And in the instances where you're processing a
22 youth and they said that they had been mistreated, what
23 did you do?
24       A    I would notify probably the desk sergeant or
25 the -- or the arresting officer supervisor.

Page 181

1        Q    Can you remember any occasion where you
2  actually did that?
3        A    Not offhand, no.
4        Q    Okay.  Now, can you pick up the packet that at
5  the bottom of the packet it says, "City_Jakes 1255."
6        A    1255.
7        Q    Yeah.  It looks like a table and at the very
8  top it says, "Hour one of investigative techniques."
9        A    Okay.  I've got it.
10       Q    And can you verify --
11       MR. GRILL:  Hold on 1255.
12       MS. SPENCE:  Yes, please.
13       MR. GRILL:  I got it.  Okay.  Is this 7 again?
14       MS. SPENCE:  This is Exhibit 7, yes.
15       (EXHIBIT 7 MARKED FOR IDENTIFICATION)
16 BY MS. SPENCE:
17       Q    Can you verify for me, Mr. Burke, that you
18 have pages 1255 through 1261?
19       A    Yes.  I do.
20       Q    Now, Mr. Burke, you would agree that you were
21 trained on how to take statements from juveniles, right?
22       A    I don't understand the question.  Take
23 statements from the juveniles?
24       Q    Yes.
25       A    You mean to interview him or to take a written



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 49 of 93 PageID #:9420
The Deposition of OFFICER KENN BURKEY, taken on July 06, 2021
182..185

Page 182

1  statements, or...?
2      Q    You were trained on what to do when you're
3  observing a written statement being taken from a
4  juvenile, right?
5      A    Yes.
6      Q    Okay.  And you were trained on the importance
7  of that statement being voluntary, correct?
8      A    Yes.
9      Q    All right.  And looking at City_Jakes 1259, at
10  the top it says, "Page 4."  That may help.
11      A    Okay.
12      Q    All right.  Do you see subsection 7 talks
13  about interrogations, correct?
14      A    Yes.
15      Q    And then you see subsection B talks about
16  legal -- is labeled "legal issues," right?
17      A    Yes.
18      Q    And to the right you see in the instructors
19  notes it says, "General Order 87-7," correct?
20      A    Yes.
21      Q    And you were trained on general order 87-7,
22  right?
23      A    Yes.
24      Q    So turning the page to number 3.  Sorry.
25  Number 2, it says, "Juveniles must also be informed that

Page 183

1  they may be tried as an adult if the charge so
2  warrants."  Do you see that sentence?
3      A    Yes.
4      Q    You were trained on the importance of making
5  sure that you tell a juvenile that, right?
6      A    Correct.
7      Q    All right.  And paragraph 3 says, "The
8  statement must be voluntarily and must be shown to be
9  voluntary."  Do you see that?
10      A    Yes.
11      Q    And you were trained that statements,
12  handwritten statements, or written statements that a
13  juvenile gives must be voluntary, right?
14      A    Yes.
15      Q    And you should be able to show that the
16  statement is in fact voluntary, correct?
17      A    No.
18      Q    You weren't trained --
19      A    What do you mean by "show"?
20      Q    Well, in that sentence it says, "It must be
21  shown that it's voluntary."  So part of the way that you
22  show that is showing -- is being able to say that the
23  Miranda rights were read, correct?
24      A    Okay.  First of all, I believe these are --
25  this is from detective school which I -- which I never

Page 184

1  went to, so --
2      Q    What --
3      A    -- it is for detectives.
4      Q    What makes you think this is from detective
5  school?
6      A    Well, I don't know.  It's --
7      MR. GRILL:  I was going to let you keep that
8  for the record.  Let you go a little further with
9  it.
10      MS. SPENCE:  Are you objecting, Andrew, or what
11  are you doing?  Are you just speaking?
12      MR. GRILL:  I'm speaking for this entire
13  exhibit.
14      MS. SPENCE:  Okay.  Why don't we just do the
15  objection and not do the speaking part, please.
16      MR. GRILL:  Well, the speaking part is just --
17  I'm not saying anything other than that you haven't
18  laid a foundation for this document.  You're reading
19  from it.  I don't know what it is.  You haven't
20  identified it at all except for the Bates stamp and
21  you put an Exhibit number on it, so...
22      MS. SPENCE:  Okay.  So the objection is
23  foundation; is that correct?
24      MR. GRILL:  Yeah.  Yeah.
25      MS. SPENCE:  Okay.

Page 185

1      MR. GRILL:  For now, it's foundation but, you
2  know --
3      MS. SPENCE:  So I'm going to reiterate my
4  request that you don't continue to make these
5  speaking objections.  If you do need to make them,
6  you can send Mr. Burke out of the room, but this is
7  a very consistent practice that you're doing
8  throughout the deposition.  So I'm going to
9  reiterate, please, just make the objection.
10      MR. GRILL:  I disagree and -- and I could point
11  out that the way you are approaching these exhibits
12  and the way you're characterizing them and forming
13  your questions is inappropriate and against the
14  rules, so --
15      MS. SPENCE:  Which rule?
16      MR. GRILL:  Okay.  I'll send the witness out.
17  I'll tell you.  You want to step out of the room?
18      MS. SPENCE:  No.  I don't -- no.  You've made
19  your objection.  No, I don't want to --
20      MR. GRILL:  I'm going to give you the
21  opportunity.  You've asked for me to explain and I
22  will, but I'll give you --
23      MS. SPENCE:  I withdraw my question.  I don't
24  want to -- I don't want you to explain it.
25      MR. GRILL:  Okay.  Then keep going and --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 50 of 93 PageID #:9421
The Deposition of OFFICER KEN BURKE, taken on July 30, 2021
186..189

Page 186

1    MS. SPENCE: Thank you.
2    MR. GRILL: -- with these pieces of paper that
3  we don't know what they are --
4    MS. SPENCE: Absolutely.
5    MR. GRILL: -- what they even pertain to youth
6  officers, or detectives, or patrol officers, or what
7  have you. So go ahead.
8    MS. SPENCE: Thank you.
9  BY MS. SPENCE:
10   Q   So Mr. Burke, were you trained that reading
11  the Miranda waivers was a way of demonstrating that the
12  statement was voluntary?
13   A   If -- if the subject answers in the
14  affirmative, yes.
15   Q   Right. And were you trained that if the
16  subject is allowed to go to the bathroom that that is a
17  helpful indicator that the statement was voluntary?
18   A   Okay. If he's allowed bathroom privileges,
19  yes.
20   Q   Would you agree that --
21   MR. GRILL: Continuing objection to foundation
22  to this entire line of questioning. Go ahead, and
23  I'll be quiet.
24   A   Would you agree that -- and when I'm talking
25  about a subject, I'm talking about a youth. Do you

Page 187

1  understand that?
2  BY MS. SPENCE:
3    Q   Okay. And would you agree that a youth being
4  able to eat, have access to food while they're in
5  custody is another way of showing that the statement
6  that they ultimately give is voluntary?
7    A   I -- I just -- I don't understand that at all.
8  I don't understand.
9    Q   What is it that you don't understand?
10   A   Well, you're asking me if he's allowed to eat
11  and go to the bathroom that that means his statement is
12  voluntary?
13   Q   That that is an indicator that the statement
14  is voluntary.
15   MR. GRILL: According to this document or
16  according in his opinion?
17   MS. SPENCE: I'm just asking the question. I'm
18  not -- we talked about Exhibit 6. I'm asking the
19  question of whether -- about his training. That's
20  what I asked if he was trained that that's an
21  indicator.
22   A   I've never --
23   MR. GRILL: Hang on. Then it's form and
24  foundation. If you understand the question, go
25  ahead and answer it.

Page 188

1    A   No. I don't. I don't understand it. I've
2  never seen -- I've never seen this document before. I
3  don't even know where it comes from.
4  BY MS. SPENCE:
5    Q   All right. Mr. Burke, putting Exhibit 7 to
6  the side.
7    A   Okay.
8    Q   My question to you is, when you were trained
9  about getting statements from juveniles, were you
10  trained that their ability to have access to food while
11  they're in custody is an indicator that the statement
12  that they ultimately gave was voluntary?
13   MR. GRILL: Foundation and --
14   A   No.
15   MR. GRILL: -- mischaracterizes his testimony.
16   Q   Does it matter to you as a youth officer who's
17  going to --
18   MR. GRILL: Are you withdrawing the last
19  question? Are you withdrawing the last question,
20  then? Because I objected and then you asked another
21  question.
22   MS. SPENCE: Well, he answered. He said, "No."
23   MR. GRILL: Well, I didn't hear that. And --
24   MS. SPENCE: He answered the question.
25   MR. GRILL: -- I know we are. Go ahead.

Page 189

1  BY MS. SPENCE:
2    Q   So Mr. Burke, when you're asking -- sorry --
3  when you're speaking to a youth who's about to give a
4  written statement, do you ask whether or not they've had
5  something to eat?
6    A   First of all, I don't -- when I'm sitting in
7  on a statement, I have never said a word after I was
8  done with initially talking to him by myself, giving him
9  his rights, and asking him if he's been treated well.
10  When I sit in on a statement it is with the detective,
11  and a State's Attorney, and the only thing I do is sign
12  the paper and initial any changes. I don't feel it's my
13  time -- it's my position to even speak. It's not my
14  investigation. I'm not going to speak in front of the
15  State's Attorney. So that's the only time I would sit
16  in on a statement or there would be a statement is when
17  I sit in on one like that.
18   Q   Right. But I'm talking about the conversation
19  you have with the youth before they give the statement.
20   A   Okay. When I'm giving him his rights and
21  asking him how he's -- how he's been treated. If he
22  asks me then that he wants something to eat, I will see
23  to it. If he needs to go to the bathroom, I will see to
24  it. I don't know, you know --
25   Q   In your initial conversation with a youth

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 51 of 93 PageID #:9422
The Deposition of OFFICER KENNBURKE, taken on July 30, 2021
190..193

Page 190

1  before they give a written statement, do you ask whether
2  or not they've had anything to eat while they've been in
3  custody?
4      MR. GRILL: Objection. Calls for speculation.
5  Incomplete --
6      Q   Was that your practice?
7      A   I don't know at the --
8      MR. GRILL: Foundation. Incomplete
9  hypothetical. Calls for speculation. Go ahead.
10     A   I don't recall.
11     Q   Now, when you spoke to Mr. Jakes, did you ask
12 him how long he had been at the station?
13     A   No.
14     Q   If you knew that he was at the station from
15 12:00 p.m. to 4:00 a.m. would that have concerned you?
16     A   No.
17     Q   Why not?
18     A   Well, it's -- from what I remember, he's got
19 24 hours on a homicide case.
20     Q   All right.
21     A   I mean, I'm trying to remember the orders back
22 from 30 years ago, too. But to the best of my
23 recollection he had 12 hours, and if it's a homicide
24 case, 24 hours from what I remember.
25     Q   All right. And do you think that -- all

Page 191

1  right. Let's back up a little bit. When you spoke to
2  Mr. Jakes you asked him how -- whether or not -- how he
3  had been treated, correct?
4      A   Yes.
5      Q   All right. And it's your response -- sorry.
6  It's your testimony that he responded that he had been
7  treated okay; is that correct?
8      A   Yes. It is.
9      Q   Did you ask him any follow-up questions?
10     A   I asked him if his mother knew where he was
11 at.
12     Q   Did you ask him any follow-up questions about
13 his treatment?
14     MR. GRILL: Objection. Form.
15     A   No. I -- I don't under -- I don't know what
16 kind of follow-up question I would ask. I asked him if
17 he was treated okay. He says, "Yes." He was.
18     Q   All right.
19     A   I don't know --
20     Q   When you --
21     A   -- if he would've said, "No," then I would've
22 had a follow-up question.
23     Q   When you spoke to Mr. Jakes, you knew that he
24 was 15 years old, right?
25     A   Yes. I did.

Page 192

1      Q   All right. And you knew that he had just
2  turned 15 years old like a month prior, correct?
3      A   I guess. I don't remember -- yeah. Okay.
4      Q   Yes, right?
5      A   I knew he was 15.
6      Q   Right. And you worked with -- you said that
7  when you were a youth officer in 1989 you did some
8  child abuse cases, correct?
9      A   That's correct.
10     Q   And you did cases where children had been
11 victimized by adults, right?
12     A   That's correct.
13     Q   And in those cases, you had to question the
14 children to find out what happened, correct?
15     A   Yes.
16     Q   And did there ever come a time where you
17 questioned a child about what happened, and the child
18 was reluctant to tell you?
19     A   Well, most of those tender-aged children were
20 interviewed in what's called a victim-sensitive
21 interview. It's done at a hospital.
22     Q   Did there ever come a time where a child was
23 reluctant to tell you what had happened?
24     MR. GRILL: Asked and answered.
25     A   Yes.

Page 193

1      Q   You said, "Yes"?
2      A   Yes.
3      Q   And you're aware that sometimes children are
4  afraid if they tell an adult that they could get in
5  trouble, correct?
6      MR. GRILL: Objection. Incomplete
7  hypothetical. Calls for speculation.
8      A   (NO VERBAL RESPONSE)
9      Q   And in your experience, you're aware that if
10 children sometimes are worried that if they tell an
11 adult that the adult may follow through on a threat that
12 may have been made to the child, correct?
13     MR. GRILL: Same objections. Incomplete
14 hypothetical. Calls for speculation.
15     Q   Go ahead.
16     A   Yes. It could be, yeah.
17     Q   All right. And so what methods did you use to
18 overcome those fears when you were working on those kind
19 of cases?
20     A   Well, like I said, when we had interviewed
21 tender-aged children it was done at a hospital setting
22 in a victim-sensitive interview. And the interviewee
23 was a social worker, and on the other side of a two-way
24 mirror would be myself, a State's Attorney, and anyone
25 else who was interested in watching the interview. And



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 52 of 93 PageID #:9423
The Deposition of OFFICER KEN BURKE, taken on July 30, 2021
194..197

Page 194

1  that's the way the interview went and when these
2  children were reluctant.  It was the state -- I'm sorry
3  -- the social worker who worked with them to try to get
4  them to talk, and it often worked very well.
5      Q    And in those instances, you were able to
6  observe what the social worker did with the kids in
7  order to get them to feel comfortable talking?
8      A    Yes.
9      Q    Okay.  When you refer to tender-aged children,
10 how old are those children?
11     A    Toddlers and up to, I'd say, 10 or 11 years
12 old.  I think -- I think the cutoff was 12 for a VSI.
13     Q    Okay.  And did you ever interview children who
14 were teenagers who were reluctant to tell you what
15 happened?
16     A    Yes.
17     Q    All right.  And how did you overcome their
18 reluctance?
19     A    Well --
20          MR. GRILL:  Objection.  Form.
21     A    There's -- you know, I can't recall any
22 particular cases right now.  I -- you know, I can't
23 recall.
24     Q    But were there strategies that you would
25 employ?

Page 195

1      A    I -- I don't recall.  I really don't.  Most of
2  our victims were younger.  And the older ones, the ones
3  that were 13, 14, 15, they weren't quite as reluctant as
4  the young ones.
5      Q    When you asked Mr. Jakes if he'd been treated
6  okay and he said, "Yeah, I was treated okay," did it
7  occur to you that he may have been reluctant to tell you
8  the truth?
9          MR. GRILL:  Objection.  Calls for speculation.
10     Incomplete hypothetical.  Form.  Foundation.
11     A    Well, sure.  I guess it could be.
12     Q    Right.
13     A    I don't know.  It's speculation.
14     Q    And when you were asking Mr. Jakes if he had
15 been mistreated, you're referring to whether or not the
16 adult officers had mistreated him, correct?
17     A    Anyone.
18     Q    All right.  And in this case when you say,
19 "anyone," these would be adults, correct?
20     A    Yes.
21     Q    Right.  And did you employ any of the
22 strategies that you had seen used to help reluctant
23 children talk about being victimized by adults when you
24 were speaking to Mr. Jakes?
25          MR. GRILL:  Objection.  Form.  Foundation.

Page 196

1      A    No.
2      Q    Did you use the same care that was used with
3  victims who had been victimized by adults with Mr. Jakes
4  in your interview with him?
5      A    Probably not.
6      Q    Why not?
7      A    Because it's not my case.
8      Q    And if it's not your case, what does that
9  mean?
10     A    I'm not the investigating officer.  You know,
11 it's --
12     Q    But you are there to find out if he's been
13 mistreated, correct?
14     A    Right.  And I asked that and he answered.
15 And I felt no reason to dive into it any further.
16     Q    All right.  You only asked him that question
17 the one time, right?  You didn't ask him more than once
18 whether or not he'd been mistreated, right?
19     A    I asked him, yeah, if he was mistreated at all
20 by anyone, and he said, "No."
21     Q    And my question is, you only asked the
22 question one time, correct?
23          MR. GRILL:  I'm going to make an objection.
24     A    As far as I can remember, yeah.
25     Q    And you never explained to him that you --

Page 197

1  what could happen if he told you he had been mistreated,
2  right?
3          MR. GRILL:  Calls for speculation.  Form.
4     Foundation.  Incomplete hypothetical.
5      A    No.  I did not.
6      Q    You never said if he had been mistreated that
7  you would help him if he told you that information,
8  correct?
9      A    No.  I didn't tell him.
10          MR. GRILL:  Same objection.
11     Q    You never asked Mr. Jakes how long he had been
12 at the station, correct?
13          MR. GRILL:  Asked and answered.
14     A    I did not.
15     Q    And part of the reason why you didn't ask him
16 was because you didn't want to know how long he'd been
17 at the station, correct?
18          MR. GRILL:  Okay.  Okay.  It's argumentative.
19          MS. SPENCE:  It's not argumentative.
20          MR. GRILL:  It is.
21 BY MS. SPENCE:
22     Q    Go ahead and answer the question.
23          MR. GRILL:  You asked him the question -- it
24 is.  And if you want to debate it, I will, but I
25 don't think you want to.  But you've asked and

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 53 of 93 PageID #:9424
The Deposition of OFFICER KEN BURKE, taken on July 30, 2021

198..201

Page 198

1    answered.  He's asked and answered that question and
2    now you're arguing with him about it, so...
3        MS. SPENCE:  No.  I'm asking him about a
4    statement he made, so I'm asking him the question
5    -the reason --
6        MR. GRILL:  You're arguing with him.
7    BY MS. SPENCE:
8        Q    The reason --
9        MS. SPENCE:  Sorry.
10       MR. GRILL:  You're arguing with him.
11       MS. SPENCE:  No.
12       MR. GRILL:  You asked the question.
13       MS. SPENCE:  Andrew, you need to stop.  Make
14   your objection and then let me ask the question.
15   Unless the matter is privileged, you do not get to
16   do that, so stop.
17       MR. GRILL:  I'm not telling him not to answer
18   the question, Renee.
19       MS. SPENCE:  Then make your objection and --
20       MR. GRILL:  I'm telling him that --
21       MS. SPENCE:  -- stop talking over me.
22       MR. GRILL:  I'm making an objection that it's
23   argumentative and you're --
24       MS. SPENCE:  Andrew, I'm not deposing you and
25   you are taking up a ton of time in the record.

Page 199

1        MR. GRILL:  I'm not.
2    BY MS. SPENCE:
3        Q    Mr. Burke --
4        MR. GRILL:  Ask a better question.
5        Q    -- the reason why you did not ask Mr. Jakes
6    how long he had been at the station is because you did
7    not want to know; is that correct?
8        MR. GRILL:  Argumentative.
9        A    No.  It's not correct.
10       Q    Okay.  All right.  Looking at, I think it's
11   Exhibit 7, sorry.  Actually, no.  Exhibit 8.  This is
12   the postconviction hearing testimony.
13       MR. GRILL:  So that is --
14       MS. SPENCE:  What did we mark that as?  Is that
15   Exhibit 5?  Sorry.  That's Exhibit 5.  Looking at
16   Exhibit 5.
17       MR. GRILL:  It's the thick one.  2016.
18       A    All right.
19   BY MS. SPENCE:
20       Q    All right.  Turning to page 94 Bates stamped
21   Plaintiff Jakes 95279.
22       A    Right.
23       Q    Starting at line 13.  "Did you want to know
24   how long Anthony had been at the police station?"
25   Answer, "Do I want to know now?"  Question, "Did you

Page 200

1    want to know then when you met with him at 3:55 a.m.?"
2    Answer, "No.  Not really."  Question, "Why didn't you
3    want to know how long he had been at the station?"
4    Answer, "I don't know.  Because I didn't want to know."
5    Was that your answer?
6        MR. GRILL:  Why don't you keep reading onto the
7    next page, so we have a complete --
8        MS. SPENCE:  No.  Why don't you do that on your
9    turn?  Go ahead, Mr. --
10       MR. GRILL:  Okay.  Then that's where the
11   problem is, Renee.  Because you're -- you're --
12       MS. SPENCE:  No.  Stop.  Andrew stop.  I'm not
13   here to have discussions with you.  I'm really not.
14       MR. GRILL:  I have my record.  Go to lines 24
15   and then lines 1 through 5 on the next page.  Okay.
16       MS. SPENCE:  You need to stop.  I don't know
17   how many times I have to ask you to stop doing this.
18   You're not a professor.  You're not teaching me how
19   to do a deposition.  Make your objection.  Lay your
20   record, and keep it moving.
21       MR. GRILL:  You don't get to mischaracterize
22   testimony --
23       MS. SPENCE:  Right.  So you can do that on your
24   turn.
25       MR. GRILL:  -- you're just trying to stretch

Page 201

1    the --
2    BY MS. SPENCE:
3        Q    Mr. Burke, was that your answer?
4        MR. GRILL:  -- by intentionally threatening the
5    witness.  And I'm going to defend my client's rights
6    when attorneys try to do that but go ahead.
7        MS. SPENCE:  There's a proper way to do it,
8    Andrew.
9        MR. GRILL:  You're misleading question.
10       MS. SPENCE:  No.  There's a proper way to do it
11   and what you're doing is absolutely improper.
12   You're mischaracterizing what I'm doing.  You're
13   making tons of speaking objections.  You're looking
14   to your client --
15       MR. GRILL:  I have to, because there's not --
16   it's in the record.  Go ahead.  Stop arguing and go
17   ahead and --
18       MS. SPENCE:  Okay.
19       MR. GRILL:  -- and ask the witness the
20   question.
21   BY MS. SPENCE:
22       Q    Mr. Burke, was that your answer.
23       MR. GRILL:  I don't know what his answer was.
24       A    I didn't answer.  What was the question?
25       Q    What do you mean you didn't answer?  I read to

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 54 of 93 PageID #:9425
The Deposition of OFFICER KEN BURKE, taken on July 30, 2021
202..205

Page 202

1  you a portion --
2      A    What was your question?
3      Q    So I read to you a portion of your testimony
4  where you were asked, "Why didn't you want to know how
5  long he had been at the station," and your answer was,
6  "I don't know because I didn't want to know."  That's
7  what you said, correct?
8      A    I guess, but --
9           MR. GRILL:  Objection.  It's incomplete.  It
10     mischaracterizes the testimony, and you are refusing
11     to under the completeness factor and read on the
12     rest of what he testified to and that's --
13          MS. SPENCE:  The rule of completeness does not
14     apply in a deposition.
15          MR. GRILL:  Well, you know --
16  BY MS. SPENCE:
17     Q    That was your answer, right, Mr. Burke?
18     A    Yes.  I didn't --
19     Q    My question to you --
20     A    -- care to know these things because I knew he
21  wasn't there past the limit of 24 hours.
22          MR. GRILL:  Thank you.
23     Q    That's why you didn't -- yeah.
24          MR. GRILL:  Which is in the transcript on the
25     part that you refused to read.

Page 203

1      Q    Oh, so you're referring to the question that
2  says, "Might" -- on page 94 where it says, "Might create
3  problems if Anthony Jakes is at the police station too
4  long."  Is that the question?  Do you see that question?
5      A    Yes.
6      Q    And your answer was, "No.  No.  You got 24
7  hours according to the order.  I'm sure he wasn't there
8  for over 24 hours."  Is that -- was that your response?
9      A    Yes.
10     Q    Okay.  How did you know he had not been there
11  for over 24 hours?
12     A    Because I knew he was brought in that evening
13  or that afternoon.
14     Q    Do you remember your previous testimony today
15  when you said, "I did not know what time he got there"?
16     A    I didn't know but I knew it wasn't 24 hours.
17     Q    How did you know that if you did not know what
18  time he got there?
19     A    Because I knew he got there that day.  I
20  didn't know what time that day.
21     Q    So it's your understanding that he got there
22  on the 17th?
23     A    The 16th.
24     Q    Okay.  So that was a different day, right,
25  because you get to the station on the 17th, correct?

Page 204

1      A    Yes.
2      Q    So you don't know if he'd been there from 4:00
3  a.m. on the 16th, correct?
4      A    I guess you're right, yeah.  I -- I -- you
5  know.
6      Q    Right.
7      A    You know, I don't recall.  I might have looked
8  at the arrest report and I probably did.  But now I'm
9  just speculating again for the time of arrest.  I don't
10  recall.
11     Q    Right.  And do you remember when I asked you
12  earlier if you had looked at your reports and you said,
13  "No," you had not looked at any reports before speaking
14  to Mr. Jakes?
15          MR. GRILL:  Objection.  Mischaracterizes his
16     testimony.
17     Q    Do you recall that?
18     A    Pardon me.
19     Q    Do you recall when I asked you earlier if
20  before you talked to Mr. Jakes, whether or not you read
21  the reports and your answer was, "No," you did not look
22  at any reports?
23          MR. GRILL:  Right.  Now, that's a different
24     question.  It mischaracterizes the testimony as
25     well.

Page 205

1      Q    Go ahead.
2      A    Yes.  I remember saying that, yes.
3      Q    Okay.  Right.  So isn't it true that you did
4  not want to know what time Mr. Jakes got to the station?
5          MR. GRILL:  This has got to stop.  It's asked
6     and answered.
7          MS. SPENCE:  Okay.  Then make your objection.
8          MR. GRILL:  The record speaks for itself.  It's
9     -- this is harassing at this point and, in fact, I'm
10     going to tell him don't even bother answering that
11     question at this point.  Move on, Counsel.
12  BY MS. SPENCE:
13     Q    Mr. Burke?
14     A    Yes.
15     Q    You never asked Mr. Jakes if in the time that
16  he'd been at the station if he had any opportunity to
17  sleep, correct?
18     A    Opportunity to sleep?
19     Q    Yes.
20     A    I don't recall asking him that.  I don't know.
21     Q    Right.  And you're speaking to this
22  15-year-old at 4:00 a.m., correct?
23     A    Yes.
24     Q    Right.  You didn't ask him -- and you would
25  agree that if a youth has been deprived of sleep that



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

---

Page 206

1  that may affect their decision making, correct?

2      A    I don't think he was deprived of sleep.

3      Q    Do you know if he slept while he was at the

4  station?

5      A    No.  I don't, but he had all --

6      Q    Do you know how long he'd been at the --

7      A    -- he'd had all the opportunity in the world

8  to sleep if he wanted to.

9      Q    How do you know that he had all the

10  opportunity in the world to sleep?

11     A    Well, I guess I'm -- I guess I don't know.

12     Q    Right.

13     A    But he was in the room.  He could've been

14  sleeping if he wanted to.

15     Q    But you didn't know whether or not he had

16  slept, correct?

17     A    No.  I didn't.  Correct.

18     Q    And you didn't ask whether or not he had an

19  opportunity to sleep, correct?

20     A    You're right.  I didn't.

21     Q    Why didn't you ask?

22     A    I didn't think it was important.

23     Q    Do you think it is important then, when

24  children are in custody or youth are in custody for many

25  hours that they have an opportunity to sleep?

---

Page 207

1          MR. GRILL:  Objection.  Form.  Compound, and

2      it's also an incomplete hypothetical and calls for

3      speculation.

4      A    Yeah.  I -- I -- right.  That's -- I'm not

5  going speculate.

6      Q    But you were a youth officer there to

7  determine whether or not he had been treated well,

8  correct?

9      A    Yes.

10     Q    And failing to give a child an opportunity to

11  sleep when they had been there for 16 hours, that would

12  not be good treatment, correct?

13         MR. GRILL:  Wait.  Stop.  Hold on.  Incomplete

14     hypothetical.  Stop calling him a child.  He's not a

15     child.  Form.  Foundation.  Go ahead and answer the

16     question.

17     A    I -- he was not deprived from sleeping.  If

18  they made him stand, I would say yes.  He was in a room.

19  There was a bench, or a chair, or something in there.

20  Nobody was depriving him from sleeping.

21  BY MS. SPENCE:

22     Q    How do you know that?

23     A    I -- I -- I guess I don't know it --

24     Q    Okay.  And in 1991 --

25     A    -- but how do you know he was deprived?

---

Page 208

1      Q    Sorry?

2      A    How do you know he was being deprived?

3      Q    Would it have -- did -- and you never asked

4  Mr. Jakes if he had an opportunity to eat in all the

5  time that he had been at the station, correct?

6      A    I asked him if he was treated well, and he

7  said he was.  Now, if they weren't allowing him to eat

8  or to sleep or to use a bathroom, that would be the time

9  to say something, and he never did.

10     Q    So my question to you is, you never asked him

11  if he had had anything to eat in all of the time he had

12  been at the station?

13     A    I asked him if he was treated well.

14     Q    So that's a no, you did not ask him if he had

15  anything to eat?  You didn't ask that specific question,

16  correct?

17     A    No.  I did not ask that specific question.  No.

18     Q    And you did not specifically ask him if he had

19  anything to drink in all the time that he had been at

20  the station?

21     A    I don't -- I don't recall.

22     Q    All right.  You didn't specifically ask him if

23  he had been allowed to go to the bathroom in all the

24  time that he had been at the station, correct?

25     A    I don't recall.

---

Page 209

1      Q    Did you just assume that he was allowed to do

2  those things while he was at the station?

3      A    Well, I can't imagine if he wanted to go to

4  the bathroom that they would've not let him go.  I mean,

5  of course, that's speculation, too, so I don't know.

6  You're right.  I wasn't there and I don't know.

7      Q    Would it have been fair to say that you assumed that

8  if Mr. Jakes had wanted to go to the bathroom that the

9  detectives would've allowed him to go to the bathroom?

10     A    Absolutely.

11     Q    Would it have been fair to say that you assume that

12  if Mr. Jakes had wanted to eat something that the

13  detectives would have given him food?

14     A    Absolutely.

15     Q    Would it have been fair to say that if Mr. Jakes had

16  asked the detective for water that the detectives would

17  have given him water, that that was your assumption?

18     A    Yes.

19     Q    Okay.  You asked Mr. Jakes if his mother knew

20  whether or not he was there and he clarified that he --

21  his aunt was his guardian, correct?

22     A    That's correct.

23     Q    And then you asked Mr. Jakes if his aunt knew

24  whether or not he was there, right?

25     A    Yes.

---



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 56 of 93 PageID #:9427
The Deposition of OFFICER KENNETH KUHN, taken on July 30, 2021

210..213

Page 210

1    Q    And he -- according to you, Mr. Jakes told you
2  that his aunt knew that he was at the station, right?
3    A    That's correct.
4    Q    And you never asked him how he knew that, and
5  how he knew that his aunt knew he was at the station,
6  correct?
7    A    Did I ask Jakes that?  No.  I -- I did not.
8    Q    You didn't ask him if he had an opportunity to
9  speak to his aunt that day, correct, or while he was at
10  the station?
11   A    To speak -- no.  I -- I asked him if -- if he
12  wanted her there.
13   Q    Right.  I'm asking, did you ask Mr. Jakes if
14  he had an opportunity to speak to his aunt while he was
15  at the station?
16       MR. GRILL:  Asked and answered.
17   A    Yeah.  I don't -- once again, I asked him if
18  he wanted her there, he could speak to her.  That he
19  could -- she could do -- you know, he could do whatever
20  he wants, and he says, "No."
21   Q    All right.
22   A    That would've been the ball in court to say,
23  "I'd like to talk to her on the phone," and he didn't.
24   Q    Right.  I'm asking you if you asked Mr. Jakes
25  prior to your arrival whether or not Mr. Jakes had an

Page 211

1  opportunity to speak to his aunt while he was at the
2  station?  Did you ask that question of Mr. Jakes?
3    A    No.  No.
4    Q    Now, did you ever ask the detectives whether
5  or not they had contacted his aunt about Mr. Jakes being
6  in custody on a murder case?
7    A    I -- I can't recall but I would think I
8  probably did.
9    Q    Did -- and that's not documented anywhere that
10  you asked that question, correct?
11   A    No.  No.  It's not.
12   Q    All right.  You asked Mr. Jakes whether or not
13  he wanted his aunt to be present, correct?
14   A    Yes.  I did.
15   Q    And it's your testimony that Mr. Jakes told
16  you that his response was, "No.  That's not necessary,"
17  right?
18   A    That is correct.
19   Q    Okay.  And did you ever explain to Mr. Jakes
20  that -- why it may be helpful for him to have his aunt
21  present?
22       MR. GRILL:  Objection.  Form.  Foundation.
23  Incomplete hypothetical.
24   A    No.
25   Q    Did you ever ask Mr. Jakes why he thought it

Page 212

1  wasn't necessary for his aunt to be present before he
2  gave a statement on a murder case?
3    A    No.  But I had an assumption as to why.
4    Q    Did you think independently that it was
5  important for you to reach out to the aunt to say, "Hey,
6  your nephew is here on a murder case and he's about to
7  give a statement, do you want to come down?"
8       MR. GRILL:  Objection.  Form.  Foundation.
9    A    No.
10   Q    Why did you not think it was important for you
11  to reach out as the youth officer to his guardian?
12   A    Other police officers had already reached out
13  to her.
14   Q    How did you know that other police officers
15  had reached out to her?
16   A    It was --
17   Q    About the murder case?
18   A    -- brought to my attention.
19   Q    Sorry.
20   A    It was brought to my attention when -- I think
21  when I was talking to Caesar.
22   Q    It's your testimony that Detective Caesar told
23  you that he had reached out to Mr. Jakes' aunt about
24  Mr. Jakes being in custody on a murder charge?
25   A    I would say yes.  Yeah.  That would've been

Page 213

1  one of the questions I would ask the detective as soon
2  as I arrived --
3    Q    And prior to --
4    A    -- because I would like to have a mother there
5  just as much as Jakes would because then I wouldn't need
6  to be there.
7    Q    All right.  Turning to Exhibit 5, the
8  postconviction hearing testimony on page 93.  Plaintiff
9  Jakes 095278.
10   A    Okay.
11   Q    All right.  Starting at line 11, question,
12  "How do you know that detectives already knew that
13  Anthony Jakes did not want his aunt to be present?"
14  Answer, "Because they according to the General Order
15  attempted to contact a guardian and had already gone
16  through that already asked Anthony Jakes if he wanted
17  someone there and he told them, 'No.'"  Question, "So
18  under your understanding of how things were supposed to
19  work there was no reason for you to be at the area to
20  observe the statement being taken unless a parent or
21  guardian could not have been located, right?"
22   A    Absolutely.
23   Q    Answer, "That's correct."  Question, "So you
24  expected that the detectives investigating the case
25  would've taken steps to try and locate and speak with a



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 57 of 93 PageID #:9428
The Deposition of OFFICER KEN PURKEY, taken on July 08, 2021
214..217

Page 214

1  guardian and find out of a guardian was able to come
2  down to the station, right?"  Answer, "Either detectives
3  or arresting officer, someone before me, yes."  All
4  right.  There -- during that line of questioning would
5  it be fair to say that you assumed that the detectives
6  had reached out to Mr. Jakes' aunt?
7       MR. GRILL:  Form.  Mischaracterizes the
8       testimony.  Incomplete hypothetical.  Calls for
9       speculation.  Foundation.  Go ahead.
10      A   No.  I didn't assume.  I -- I'm sure I asked
11  Caesar when I arrived.  Because like I said before, I
12  would want the parent there just as much as Jakes --
13  well, more than Jakes.  Jakes didn't want the parent
14  there.  If the parent was there, there would be no
15  reason for me to be there and I wouldn't be here today.
16      Q   And it's your memory that Detective Caesar
17  told you, "Yes, we've contacted Mr. Jakes' aunt to let
18  her know that he's in custody on a murder charge"; is
19  that right?
20      MR. GRILL:  Hang on.  Mischaracterizes his
21      testimony.  Form.
22      MS. SPENCE:  Go ahead.
23      MR. GRILL:  Go ahead.
24      A   Could you repeat the question?  I'm sorry.
25  BY MS. SPENCE:

Page 215

1       Q   Yes.  Is it your testimony that Detective
2  Caesar told you that they had contacted Mr. Jakes' aunt
3  to let him -- let her know that Mr. Jakes was in custody
4  on a potential murder charge?
5       MR. GRILL:  Mischaracterizes his testimony.
6       Form.
7       A   It's an assumption.  I -- I can't say for
8  sure, no.
9       Q   Okay.  So that's what I'm trying to
10  understand.  When you said that you definitely asked
11  Mr. -- sorry, Detective Caesar if they had contacted the
12  aunt, what is your memory of Detective Caesar's answer?
13      MR. GRILL:  Okay.  So from my recollection,
14      that is not what he testified to, so it
15      mischaracterizes his testimony.  Form.  But go ahead
16      and answer the question.
17      A   So it's 30 years ago.  I don't remember the
18  exact conversation I had with Caesar, but all I can say
19  is from my past experiences and practices that would've
20  been one of the first things that I would ask when I
21  arrived.  Where's the parent?  Are they on the way?  Have
22  they been notified?  And I don't see why this would've
23  been any different.  But then again, I don't recollect
24  it -- recall it because it's been over 30 years ago, and
25  I didn't make any report, and it's not in the

Page 216

1  detective's report, so I don't know.
2  BY MS. SPENCE:
3       Q   Based on your training and experience in 1991,
4  it was -- it's your expectation that one of those
5  officers would have contacted the aunt to let her know
6  that her nephew was in custody on a potential murder
7  charge, correct?
8       A   Yes.
9       Q   That would be consistent with the Chicago
10  Police Department Policy, right?
11      A   Correct.
12      Q   Before you ended your conversation with
13  Mr. Jakes, that initial conversation, did you tell him
14  what was going to happen next in the proceedings?
15      MR. GRILL:  Objection.  Form.
16      A   No.
17      Q   Did you know that a handwritten statement --
18  sorry.  Did you know that the Assistant State Attorney
19  was going to come to the station?
20      A   Yes.
21      Q   Was it your expectation that the Assistant
22  State Attorney was going to interview Mr. Jakes?
23      A   Yes.
24      Q   And that the Assistant State Attorney would
25  maybe ask Mr. Jakes for a written statement?

Page 217

1       A   Yes.
2       Q   Okay.  Did you inform Mr. Jakes that the
3  Assistant State Attorney was going to come?
4       A   No.
5       Q   Did you let him know that someone might ask
6  him to write a statement?
7       A   No.
8       Q   At any point did you tell Mr. Jakes that he
9  didn't have to agree to write a statement if someone
10  asked him?
11      A   No.
12      Q   How long was your initial conversation with
13  Mr. Jakes?
14      A   No more than ten minutes if that long.
15      Q   In your time as a youth officer when you've
16  witnessed, when you've talked to a youth before they
17  gave a written statement did you ever advise that
18  individual not to give a statement?
19      MR. GRILL:  Objection.  Form.  Foundation.
20      Incomplete hypothetical.  Calls for speculation.
21      A   No.
22      Q   Did you ever tell that individual, "Hey, you
23  should ask for your parent to come down here or your
24  guardian to come down here"?
25      MR. GRILL:  Objection.  Form.  Foundation,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 58 of 93 PageID #:9429
The Deposition of OFFICER KEN BURKE, taken on July 09, 2021

218..221

Page 218

```
1    incomplete hypothetical.  Calls for speculation.
2       A    I don't recall.  I don't recall.
3       Q    In your time speaking to a youth prior to them
4   giving a written statement did you ever tell them you
5   should ask for a lawyer?
6            MR. GRILL:  Same objection.
7       A    I don't recall.
8       Q    All right.
9            MS. SPENCE:  Looking at the document that's
10  marked "Statement of Anthony Jakes." Let's go ahead
11  and mark that as Exhibit 8.
12           (EXHIBIT 8 MARKED FOR IDENTIFICATION)
13  BY MS. SPENCE:
14      Q    Mr. Burke, can you verify the Bates stamp is
15  City_Jakes 90 through 93.  Can you verify that you have
16  all those pages, please?
17           MR. GRILL:  Hold on.
18           MS. SPENCE:  Yeah.  Take your time.
19           MR. GRILL:  Here.
20      A    Okay.  Yes.  90 to 93, got it.
21  BY MS. SPENCE:
22      Q    Now, you were -- after you spoke to Mr. Jakes
23  in the initial interview, it was just the two of you,
24  correct?
25      A    That's correct.
```

Page 219

```
1       Q    All right.  And after you spoke to him, you
2   went back out -- you left the room, right?
3       A    Yes.
4       Q    And then at some point you came back into the
5   room, right?
6       A    Yes.
7       Q    And at that point --
8       A    No.
9       Q    Sorry.
10      A    No.  No.  No.  It's not right.  No.  When I
11  left the initial room, I never went back in there.
12      Q    Great.  After you left the room, you had an
13  occasion where you saw Mr. Jakes again, though, correct?
14      A    That's correct.
15      Q    And this was only a few minutes after you had
16  finished interviewing him in that separate room, right?
17           MR. GRILL:  That mischaracterizes -- really
18  mischaracterizes his testimony.  Appreciate you not
19  doing that, so...
20  BY MS. SPENCE:
21      Q    Go ahead.
22      A    To a separate room.
23      Q    Right.  How long between the -- you're ending
24  the initial conversation with Mr. Jakes and you seeing
25  Mr. Jakes again?  How much time passed?
```

Page 220

```
1            MR. GRILL:  That mischaracterizes his testimony
2   also.
3            MS. SPENCE:  What is the mischaracterization?
4            MR. GRILL:  He never testified that he
5   interviewed Mr. Jakes.  He read him his rights and
6   then
7   --
8            MS. SPENCE:  Oh, okay.  That's fine.
9            MR. GRILL:  -- made sure --
10           MS. SPENCE:  Sure.  I will rephrase that.
11           MR. GRILL:  It's a really big distinction,
12  so...
13           MS. SPENCE:  Okay.  Okay.  Let's just bring
14  down the temperature a little bit.
15  BY MS. SPENCE:
16      Q    Mr. Burke, after you finished speaking to
17  Mr. Jakes in the room by yourself, how much time passed
18  between when you saw -- between leaving that room and
19  seeing Mr. Jakes again?
20      A    Ten, maybe 15 minutes.
21      Q    Okay.  Could it have been as short as five
22  minutes?
23      A    Pardon me?
24      Q    Could it have been as short as five minutes?
25      A    It could've been, yes.  It could've been.
```

Page 221

```
1       Q    Okay.  The next time you saw Mr. Jakes were
2   with the Assistant State Attorney, Brian Grossman?
3       A    Yes.
4       Q    And were you with Detective Caesar?
5       A    Yes.
6       Q    And is it in that setting that Mr. Jakes
7   provided a written statement for the Assistant State
8   Attorney?
9       A    That's correct.
10      Q    All right.  And prior to providing the written
11  statement did the Assistant State Attorney interview
12  Mr. Jakes?
13      A    Yes.
14      Q    Were you present for that entire interview?
15      A    Yes.
16      Q    And were you present when Mr. Jakes -- sorry
17  -- when the handwritten statement was done with
18  Mr. Jakes?
19      A    Yes.
20      Q    Okay.  Were you present with Mr. Jakes was
21  signing the handwritten statement?
22      A    Yes.
23      Q    Okay.  And the handwritten statement that you
24  witnessed that's the statement that's memorialized in
25  Exhibit 8, correct?
```



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 59 of 93 PageID #:9430
The Deposition of OFFICER KENNETH BURKE, taken on 09/09/2021
222..225

Page 222

1    A    Yes.
2    Q    And do you recognize that statement?
3    A    Yes.
4    Q    Okay.  Now, when you -- on September 17, 1991
5  it was your understanding that Mr. Jakes' first name was
6  Anthony; is that correct?
7    A    Yes.  It is.  Yeah.
8    Q    Okay.  And when you signed this statement, you
9  were able to see his signature, correct?
10    A    Yes.
11    Q    And you also signed the statement, right?
12    A    Yes.
13    Q    All right.  And I'm directing your attention
14  to City_Jakes 93, the last page.  Do you see your
15  signature on City_Jakes 93?
16    A    Yes it is.  Yes I do.
17    Q    Is it in the left-hand side?
18    A    Yes.
19    Q    And does -- it was your, I guess it's a star
20  number 3037?
21    A    Yes.  That's correct.
22    Q    Okay.  And do you see Mr. Jakes' signature?
23    A    Yes.  I do.
24    Q    All right.  And looking at his first name,
25  Anthony.  Do you see after the O in Anthony that he

Page 223

1  wrote an M, the letter M?
2        MR. GRILL:  Form.  Foundation.  Calls for
3    speculation.  It mischaracterizes the exhibit.  Go
4    ahead.
5    A    It could be an M.  It could be an N.  I don't
6  know.  You'd have to ask Anthony how he signs his name.
7  BY MS. SPENCE:
8    Q    When you look at it, that looks like an M to
9  you, correct?
10        MR. GRILL:  Objection.  Asked and answered and
11    it's argumentative.
12    A    No.  It looks like an N.
13    Q    It looks like an N -- like, you're saying the
14  word -- the letter N as in Nancy, correct?
15    A    That's correct.
16    Q    All right.  Looking at page City_Jakes 90 on
17  page 1 of the statement -- sorry -- page 91.
18    A    Uh-huh.
19    Q    Do you see Anthony Jakes' name at the bottom
20  of page 91?
21    A    Well, on the copy I have it's cut off, but I'm
22  sure it's there.
23    Q    On the bottom of page 91 it's cut off?
24    A    Yes.
25        MR. GRILL:  On 90 or 91?  You said 90.

Page 224

1    A    Oh, 90 -- 91.  Yeah.  I see it.  Yeah.
2    Q    Okay.  And in that version of his signature,
3  does it appear that he's spelling his name with the
4  letter M?
5        MR. GRILL:  Same objection.
6    A    It might be the way he makes an N.  I'm sure
7  he knows how to spell his name.
8    Q    Well, I'm asking you what it appears like to
9  you.  Does it look like he's -- he appears to be writing
10  the letter M when you look at it?
11        MR. GRILL:  Objection.  Form.  Calls for
12    speculation.
13    A    When I look at the word it looks like Anthony
14  to me because I know his name is Anthony.
15    Q    Okay.
16    A    So I -- you know, could that be an M?  Yes.
17  Could it be an N?  Yes.
18    Q    All right.
19    A    I mean, every other -- every other signature
20  on there, it's hard other than Louis Caesar is pretty
21  clear.  My own signature you can't see the letters so, I
22  -- you know...
23    Q    So Mr. Burke, looking at Exhibit 5, the
24  postconviction hearing testimony.
25        MR. GRILL:  The thick one.

Page 225

1    A    Okay.  Got it.
2    Q    All right.  Turning to page 108, the Bates
3  stamp is Plaintiff Jakes 95293.
4    A    Okay.
5    Q    All right.  Starting at line 4, I'm going to
6  represent to you that this is the Judge who is asking
7  you this question.  Line 4, "Well, if you look at the
8  rest of Anthony Jakes' signature, two on the front page,
9  and on the bottom of each of the other pages, do you
10  notice that he spelled his own first name wrong in each
11  case?  It's not an N in his first name, it's an M and
12  he's consistent with his spelling his own name."  And
13  your answer was, "Well, it does appear to be an M."  Did
14  I read that correctly?
15    A    Yes.
16        MR. GRILL:  Objection.  Form.  Foundation.
17    Incomplete hypothetical.  It calls for speculation.
18    Q    All right.  That's the answer that you gave to
19  the judge when he asked you that whether or not it
20  looked like an M; is that correct?
21    A    Yes.
22        MR. GRILL:  Hearsay.
23    Q    All right.  And did it trouble you when you
24  were looking -- when you were watching Anthony sign this
25  statement that he was misspelling his name?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 60 of 93 PageID #:9431
The Deposition of OFFICER KENNETH BURKE, taken on July 30, 2021

226..229

Page 226

1    A    No.
2         MR. GRILL: Objection. Form.
3    Q    No.  Why not?
4    A    Because I didn't notice it.  I didn't notice
5    it until I read it in this transcript.
6         MR. GRILL: Objection. It mischaracterizes the
7    exhibit.  Lacks foundation.
8    Q    So Mr. Burke, when you were witnessing this
9    statement, you -- did you witness Mr. Jakes being able
10   to make corrections to the statement?
11   A    Yes.
12   Q    Do you remember how those corrections were
13   made?
14   A    Yeah.  They were --
15   Q    Do you independently remember how it was made?
16   A    They were crossed out and everyone present
17   initialed.
18   Q    Okay.  Looking on page City_Jakes 90, the
19   fourth line from the bottom do you see -- sorry.  Are
20   you there on Exhibit 8?
21   A    Yes.
22   Q    Okay.  Fourth line from the bottom, do you see
23   where it says, "Anthony Jakes stated that," and then
24   there's something crossed out, and then the next word
25   is, "on?"  Do you see that?

Page 227

1    A    Yes.  I do.
2    Q    Okay.  Who decided to cross that phrase -- the
3    -- those -- that writing out?
4    A    I don't recall.
5    Q    Turn to page 2 of 4 of City_Jakes 91.  Going
6    to the second line at the top of the page, do you see
7    how the word "little" is crossed out?
8    A    Yes.
9    Q    Who decided to cross out the word "little"?
10   A    I don't recall.
11   Q    Going to a few lines down do you see there's a
12   crossed out -- crossed out writing right after the word
13   "be," B-E, and before "Little A's"?
14   A    Yes.
15   Q    Okay.  Whose decision was it to cross out that
16   writing?
17   A    I have -- I don't know.
18   Q    Going two lines down do you see that there's
19   another piece of writing crossed out between the word
20   "that" and "Little A's"?
21   A    Yes.  I see it.
22   Q    All right.  Whose decision was it to cross out
23   that writing?
24   A    I don't know.
25   Q    All right.  Going to about 11 lines down, do

Page 228

1    you see how the word, "alright" is crossed out?
2    A    Yes.
3    Q    Okay.  Whose decision was it to cross out
4    "alright"?
5    A    I don't recall.
6    Q    Whose decision was it to write the word, "all
7    right" in two words above the crossed-out portion?
8    A    I don't recall.
9    Q    Okay.  Going down five lines onto the
10   left-hand side, do you see how there is initialing in
11   front of the word "Harold's"?
12   A    Yes.  I see it.
13   Q    Okay.  What is that section correcting?
14   A    (NO VERBAL RESPONSE)
15   Q    I saw you shrug your shoulders.  Are you
16   saying you don't know?
17   A    Yeah.  I -- I -- yeah.  I don't know.
18   Q    Okay.  Going one line down, do you see the
19   word, "snake"?
20   A    Yep.  Yes.  I do.
21   Q    And do you see a carat, that's C-A-R-A-T, that
22   says, "and said"?
23   A    Yes.
24   Q    Okay.  Whose decision was it to add the words,
25   "and said"?

Page 229

1    A    I don't recall.
2    Q    Going to the next page, City_Jakes 92.  Do you
3    see toward the top where there's writing crossed out
4    between the word "it's" and the name Anthony?
5    A    Yes.  I do.
6    Q    Okay.  Whose decision was it to cross out
7    those -- that writing?
8    A    I -- I don't know.
9    Q    And do you see above the cross outs there are
10   two words that say, "all right."
11   A    Correct.
12   Q    Whose decision was it to write those words?
13   A    I don't know.
14   Q    All right.  Going down eight lines to the
15   left-hand side, do you see the words, "the parking
16   lot" is crossed out?
17   A    Yes.  I do.
18   Q    Okay.  And it seems -- it's a little unclear.
19   Are your initials above that crossed out?
20   A    Yes.  It would be above the P.
21   Q    Okay.  Whose decision was it to cross out the
22   phrase, "the parking lot"?
23   A    I -- I don't know.
24   Q    Mr. Burke, why did you sign the bottom of each
25   of the pages on Exhibit 8, the statement?



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 61 of 93 PageID #:9432
The Deposition of OFFICER KEN BURKE, taken on July 30, 2021
230..233

Page 230

1    A    To show that I was there for the entire
2  statement.
3    Q    All right.  Is there any reason other than
4  showing that you were there for the entire statement? Is
5  there any other reason why you signed the bottom of
6  Anthony Jakes' handwritten statement?
7    A    Not that I can recall.
8    Q    After Anthony signed the handwritten
9  statement, you had signed it, ASA Grossman signed it,
10  and Detective Caesar signed it, what did you do?
11    A    What did I do?
12    Q    Yeah.  What did you do next?
13    A    I was probably getting ready to leave.
14    Q    Okay.  And after the statement did you speak
15  to any of the officers in the case?
16    A    Not that I recall.
17    Q    Did you review any reports?
18    A    I didn't have any reports.
19    Q    Mr. Burke, you testified in the motion to
20  quash -- sorry -- the hybrid motion to quash, motion to
21  suppress hearing, right?
22    A    Yes.  I did.
23    Q    All right.  And before that hearing, did you
24  speak to any of the detectives in the case?
25    A    I don't recall.

Page 231

1    Q    All right.  You testified at Mr. Jakes' trial,
2  right?
3    A    Yes.
4    Q    Before you testified at the trial did you
5  speak to any detectives in the case?
6    A    I don't recall.
7    Q    Okay.  You testified at the probable cause
8  hearing, correct?
9    A    Yes.
10    Q    Before the probable cause hearing did you
11  speak to any of the detectives?
12    A    No.  I don't recall.
13    Q    And it's your testimony that when you spoke to
14  Detective Caesar during, you know, on the same day of
15  the probable cause hearing, that you did not speak about
16  the actual proceedings, correct?
17    A    That's correct.
18    Q    All right.  Now, Mr. Burke, can you put in
19  front of your interrogatory responses?  It's a document
20  that says, "Defendant Ken Burke's Answers To Plaintiff's
21  First Set of Interrogatories."
22    A    Yes.  I have it.
23    Q    All right.
24        MS. SPENCE:  Let's go ahead and mark that
25  Exhibit 9.

Page 232

1        (EXHIBIT 9 MARKED FOR IDENTIFICATION)
2    A    Okay.
3    Q    All right.  Mr. Burke, I want you to look at
4  the last page.  Actually, have you -- can you look at
5  the first page, please?
6    A    Okay.
7    Q    All right.  And do you see how it says -- in
8  the first line of the first paragraph says, "Defendant
9  Chicago Police Officer, Ken Burke, through his
10  undersigned attorneys and for his Answers to Plaintiff's
11  First Set of Interrogatories, states as follows," do you
12  see that line?
13    A    Yes.  I do.
14    Q    All right.  Have you seen this document
15  before?
16    A    Yeah.  I have.
17    Q    Okay.  Can you go to the last page of the
18  interrogatories?
19    A    Okay.
20    Q    And does it -- do you see the last page it
21  says, "verification"?
22    A    Yes.
23    Q    And it says, "I, Kenneth Burke, under
24  penalties of perjury, depose and say that I have read
25  the foregoing answers to plaintiff's first set of

Page 233

1  interrogatories and that they are true and accurate to
2  the best of my knowledge."  Do you see that paragraph?
3    A    Yes.  I do.
4    Q    And then there's a signature under that
5  paragraph.  Do you see that?
6    A    Yes.  That's my signature, yeah.
7    Q    All right.  That's your signature, Kenneth
8  Burke?
9    A    Yes.
10    Q    Okay.  Mr. Burke, I want to direct your
11  attention to page --
12    Q    Page what?
13    Q    These aren't numbered, but it's the fourth
14  page -- I want to direct your attention to interrogatory
15  number 5.  So it's towards the beginning on the fourth
16  page.
17        COURT REPORTER:  And if -- when you're holding
18        the exhibit, if you could make sure that it doesn't
19        cover up your face on the camera screen, I would
20        appreciate it just for the sake of the video.
21        THE WITNESS:  Sorry.
22        COURT REPORTER:  You're fine.
23  BY MS. SPENCE:
24    Q    Are you -- do you see interrogatory number 5,
25  Mr. Burke?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 62 of 93 PageID #:9433
The Deposition of OFFICER KEN BURKE, taken on 04/29/2021
234..237

Page 234

1    A    Yes.  I do.

2    Q    All right.  Number 5 it says, "Do you contend
3  that plaintiff Anthony Jakes committed the Garcia
4  murder?  If so, please provide the complete factual
5  basis for your contention."  Do you see that?

6    A    Yes.

7    Q    All right.  And it says, "Answer, defendant
8  objects to this interrogatory on the grounds that it is
9  premature.  Subject to and without waiving this
10 objection, Defendant was not present when Mr. Garcia was
11 murdered, and thus does not have any personal knowledge
12 regarding the identity of the persons who committed the
13 murder.  However, evidence that Anthony Jakes murdered
14 and/or took part in some manner in the murder includes,
15 but is not limited to, Jakes's confession, statements
16 given to police and prosecutors, third-party statements,
17 police reports, witness testimony, and documents
18 produced in this case.  Investigation continues."  Do
19 you see that answer?

20   A    Yes.

21   Q    All right.  Have you reviewed any witness
22 testimony -- sorry -- any third-party statements in this
23 case?

24   A    Not that I recall.

25   Q    Okay.  When you refer to witness testimony,

Page 235

1  whose witness testimony are you referring to in that
2  sentence?

3         MR. GRILL:  Okay.  Hang on a second.  To the
4         extent any of this touches on attorney-client
5         communications, you do not answer the question.  If
6         the source of any of the information in this
7         interrogatory that states other things you've
8         reviewed, conversations you've had with other people
9         other than your lawyers, go for it and answer
10        whatever you want to say.

11        MR. YAMIN:  Same.

12        MR. GRILL:  Go ahead.

13 BY MS. SPENCE:

14   Q    Whose witness testimony did you review?

15   A    I --

16        MR. GRILL:  Hang on.  Also, that question
17        mischaracterizes the document as it assumes facts
18        not in evidence.

19        MS. SPENCE:  Okay.

20 BY MS. SPENCE:

21   Q    Did you review any witness testimony in
22 preparation --

23   A    No.

24   Q    -- for this response in interrogatory number
25 5?

Page 236

1         MR. GRILL:  Form.

2    Q    Go ahead.

3    A    No.

4    Q    When you were answering interrogatory number
5  5, did you review any statements that were -- other than
6  Mr. Jakes' statements, did you review any statements
7  that were given to the police?

8         MR. GRILL:  Form.

9    A    Not that I recall.

10   Q    Did you -- when you were preparing your answer
11 for interrogatory number 5, did you review any
12 statements that were given to prosecutors?

13        MR. GRILL:  Asked and answered.

14   A    Not that I recall.

15   Q    Okay.  So in this response when you say,
16 "evidence that Anthony Jakes murdered and/or took part
17 in some manner in the murder" -- sorry -- when you
18 respond, "However, evidence that Anthony Jakes murdered
19 and/or took part in some manner in the murder," what
20 evidence are you referring to in that response?

21        MR. GRILL:  The document speaks for itself.
22        Asked and answered.  You can answer that question to
23        the extent it doesn't, you know, touch on any
24        conversations you have had with me or any of your
25        other lawyers.  Go ahead and take a shot at it.

Page 237

1    A    Yeah.  That would be attorney-client
2  privilege, right?  I mean --

3         MR. GRILL:  If that's where you get it from.

4    Q    So your answer is based on what you learned
5  from your attorney, is that what you're saying?

6    A    Yes.

7  BY MS. SPENCE:

8    Q    Okay.  You said that you're aware that
9  Mr. Jakes got a certificate of innocence; is that
10 correct?

11   A    Yes.

12   Q    All right.  And based on your knowledge that
13 Mr. Jakes was awarded a certificate of innocence, does
14 that lead you to believe that Mr. Jakes is innocent of
15 the Garcia homicide?

16   A    No.

17   Q    Why not?

18   A    I think -- I don't know.  I -- I don't know
19 how to answer that.

20   Q    Do you think that Mr. Jakes is guilty?

21   A    I have no idea.  I don't know.

22   Q    All right.  So you can't say either way
23 whether or not he is guilty or innocent, right?

24   A    Right.

25   Q    Okay.  Mr. Burke, can you look at the document

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 63 of 93 PageID #:9434
The Deposition of OFFICER KENT BURKE, taken on July 30, 2021
238..241

Page 238

1  that -- I'm going to just hold it up so you can see it
2  because I'm not quite sure how to describe it.  Oh, the
3  Bates stamp number at the bottom is City_Jakes 26314.
4      A    What's the number on it?
5      Q    City_Jakes 26314.  It looks like this is --
6  this is helpful to you.
7          MR. GRILL:  It's a portion of his CPD
8  application.  Also incomplete but that's okay.  Just
9  for the record --
10         MS. SPENCE:  What are you saying, Andrew?
11         MR. GRILL:  This is a portion, if I understand
12  -- if I'm remembering correctly, this is a portion
13  of his personnel file and it's not -- it's again
14  just an excerpt of his entire personnel file.
15         MS. SPENCE:  Correct.
16         MR. GRILL:  This is the standing problem I have
17  with the exhibits that you're only using pieces of
18  them.
19         MS. SPENCE:  Got it.
20         MR. GRILL:  Yeah.
21  BY MS. SPENCE:
22      Q    Mr. Burke, do you have City_Jakes 26314 --
23         MR. GRILL:  He's still looking for it.
24      A    I'm looking -- I'm looking for it.
25         MR. GRILL:  It's one past the one that's --

Page 239

1  there it is.
2      A    Oh, okay.
3      Q    Okay.
4      A    All right.  I'm sorry.  I have it.
5      Q    No.  You're fine.  Can you verify that you
6  have City_Jakes 26314, 26315, 26317, 26318, and 26319 in
7  front of you?
8      A    Yes.  I do.
9      Q    All right.
10         MS. SPENCE:  Let's go ahead and mark that as
11  Exhibit 9 [sic].
12         (EXHIBIT 10 MARKED FOR IDENTIFICATION)
13      A    Okay.
14      Q    Mr. Burke, I'm directing your attention to
15  section 8 on City_Jakes 26314.  Can you -- sorry.  The
16  exhibit is blocking your face, Mr. Burke.
17      A    Oh, I'm sorry.
18      Q    You're okay.  Can you see section 8 and -- on
19  City_Jakes 26314?
20      A    Yes.
21      Q    And do you see that's labeled, "Criminal
22  history"?
23      A    Yes.
24      Q    Can you take a moment and just --
25         MR. GRILL:  There's been --

Page 240

1          MS. SPENCE:  What are you saying, Andrew?
2          MR. GRILL:  For the record, there's been no
3  question about what this is.  You're just referring
4  to it by Bates stamp and section 8.
5          MS. SPENCE:  We had originally said that this
6  is part of his personnel file.
7          MR. GRILL:  I said it.  Okay.  If you want,
8  take that as --
9          MS. SPENCE:  And I agreed with you.  I said,
10  "Yes."
11         MR. GRILL:  You asked him if he agrees, but --
12  okay.  I wasn't sure if you were taking my
13  representation for it.  Okay.
14         MS. SPENCE:  Yeah.  I said, "Yes.  This is part
15  of his personnel file."
16  BY MS. SPENCE:
17      Q    Mr. Burke, I'm representing to you this is
18  part of your personnel file, okay?
19      A    Okay.
20      Q    Can you take a comment to read section 8 to
21  yourself, please?
22      A    Okay.
23      Q    All right.  By now, you know that the
24  defendants in the civil suit are Detective Kill,
25  Detective Boudreau, Detective Pack, Officer Delacy, Fred

Page 241

1  Bonke, and Detective Caesar, right?
2      A    That's correct.
3      Q    Okay.  In the cases listed in section 8, the
4  criminal history section, were any of the defendants
5  involved in any of those cases?
6      A    No.
7      Q    Okay.  Turning to the second page.  Can you
8  take a moment to review, actually pages City_Jakes 26316
9  through 26319.  Am I -- I'm just going to frame a few of
10  my questions the same, if any of the defendants were
11  involved in any of the cases that are listed on those
12  pages.
13      A    No.
14      Q    Just take a moment to look at the pages,
15  Mr. Burke, and then please answer the question after you
16  look at them.
17      A    No.  None of them were involved in any of
18  this.
19         MR. GRILL:  Object to the form.  What do you
20  mean by involved, but...
21      A    This was long before I was on the job, and I
22  don't even -- never knew any of them.  I did know
23  Caesar, but he -- he was not involved, no.
24         MS. SPENCE:  Okay.  All right.  Can we take a
25  five-minute break, please?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 64 of 93 PageID #:9435
The Deposition of OFFICER KENNETH BURKE, taken on 04/13/98, 2021
242..245

Page 242

1      MS. SPENCE:  Yep.  Sure.
2      COURT REPORTER:  All right.  We are off the
3  record.  The time is 4:33.
4      (OFF THE RECORD)
5      COURT REPORTER:  Okay.  We are back on the
6  record.  The time is 4:38.
7  BY MS. SPENCE:
8      Q    Mr. Burke, do you have any recollection of
9  speaking to any prosecutors about the -- Mr. Jakes'
10  prosecution for the Garcia homicide?
11      MR. GRILL:  Foundation.
12      A    No.
13      Q    Okay.  Did you ever meet with any prosecutors
14  prior to your testimony at the motion to quash/motion to
15  suppress?
16      A    Not that I recall.
17      Q    Okay.  Did you meet with any prosecutors prior
18  to your testimony at the trial for Mr. Jakes?
19      A    Are you saying at the time of the trial?
20      Q    Yes.  Like prior to the trial, leading up to
21  the trial, and during the trial, did you meet --
22      A    The day of the trial.  You mean the day of the
23  trial?
24      Q    Prior to the trial and during the trial, did
25  you meet with any prosecutors about Mr. Jakes'

Page 243

1  prosecution and your testimony?
2      A    I don't recall.  I probably did.  I don't
3  know.  I don't -- I don't recall.
4      Q    Do you have any recollection of any
5  conversations that you had with any prosecutors about
6  Mr. Jakes' prosecution around the time of the trial?
7      A    No.  I do not.
8      Q    Okay.  And so just to orient you for the
9  motion to suppress and the motion to quash.  In the time
10  leading up to the motion to quash and the motion to
11  suppress and during that hearing, did you have any
12  conversations with any of the prosecutors?
13      A    Not that I can recall.
14      Q    Okay.  In the time leading up to the
15  postconviction hearing in Mr. Jakes's case, did you have
16  any conversations with the prosecutors?
17      A    I -- I don't recall.
18      Q    In the time during the postconviction hearing
19  did you have any conversation with the prosecutors?
20      A    I don't recall.
21      Q    Okay.  Earlier we had talked about you not
22  documenting what you observed and learned during the
23  Garcia homicide investigation.  Do you remember that?
24      MR. GRILL:  Form.
25      A    During the investigation or during the

Page 244

1  statement?
2      Q    Okay.  When you spoke to Mr. Jakes, you did
3  not write down that he agreed to waive his rights,
4  correct?
5      A    Correct.
6      Q    Okay.  When you spoke to Mr. Jakes, you didn't
7  write down that he said that he had been treated okay,
8  right?
9      A    That's right.
10      Q    When you spoke to Mr. Jakes, you didn't write
11  down that he said that it was not necessary to call his
12  aunt, right?
13      MR. GRILL:  Asked and answered.
14      A    Correct.
15      Q    When you spoke to Mr. Jakes, you didn't write
16  down that he said that his aunt had already been
17  contacted?
18      A    Correct.
19      MR. GRILL:  Asked and answered.
20      Q    Okay.  You made no documentation about
21  Mr. Jakes's demeanor when you spoke to Mr. Jakes, right?
22      A    That's correct.
23      Q    You didn't make any documentations about any
24  specific language that Mr. Jakes used when you were
25  speaking to him, right?

Page 245

1      A    Correct.
2      MS. SPENCE:  I don't have any further
3  questions.
4      MR. GRILL:  I've got a few in follow-up.  Court
5  reporter, can you hear me all right?
6      COURT REPORTER:  If there's any way that you
7  can move a little bit closer to the phone, that
8  would be great just to make sure you're clear.
9      MR. GRILL:  Okay.  Is that a little better?
10      COURT REPORTER:  That's better.  Thank you.
11      CROSS EXAMINATION
12  BY MR. GRILL:
13      Q    All right.  Mr. Burke, the night that -- or
14  the morning I should say, September 17, 1991, when you
15  responded to Area Three, had you ever been to Area Three
16  prior to September 17, 1991 to the best of your
17  recollection?
18      A    I don't -- I don't recall.
19      Q    Okay.  Was that the area that you typically
20  worked out of at that time in 1991?
21      A    No.
22      Q    You testified you were assigned to Area Two,
23  right?
24      A    That's correct.
25      Q    And when did Area Three close down?



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 65 of 93 PageID #:9436
The Deposition of OFFICER KEN BURKE, taken on 05/19/99, 2021
246..249

Page 246

1    A    Early '90s, '92, '93 maybe.  I'm not quite
2  sure.
3        Q    So between this event on September 17, 1991
4  and when Area Three closed down, did you ever -- were
5  you ever assigned to Area Three at any point?
6        A    No.  I was not.
7        Q    Okay.  Was that an area that you typically
8  worked out of, to your recollection, at any point in
9  your career as a youth officer?
10       A    I did not.
11       Q    Okay.  And prior to this incident this night
12  on September 17, 1991 did you ever work with Detective
13  Boudreau?
14       A    No.
15       Q    What about Detective Kill?
16       A    No.
17       Q    All right.  Now, did you know when you got to
18  Area Three at about 3:45 in the morning and briefly
19  spoke with Detective Caesar, did you know after speaking
20  with Detective Caesar if any other officer or detective
21  had spoken to Mr. Jakes before you arrived at Area Three
22  at 3:45 in the morning?
23       MS. SPENCE:  Objection.  Form.
24       A    Did I know?  No.
25       Q    Yes.  Did you know if there was any, like,

Page 247

1  interviews or interrogations that had been conducted
2  with Mr. Jakes by any police personnel prior to your
3  arrival?
4        A    No.
5        Q    Was it your job or responsibility as the youth
6  officer on the morning of September 17, 1991 to actually
7  conduct the interview or interrogation of Mr. Jakes in
8  this case?
9        A    No.
10       Q    Whose job was it?
11       A    The investigating detectives.
12       Q    And as far as you knew at that point when you
13  were at Area Three that morning, who was the
14  investigating detective that had that responsibility?
15       A    It would've been Caesar, Boudreau, and Kill.
16       Q    Okay.  Was it your -- I want to go to, I think
17  it's Exhibit 8, the statement of Mr. Jakes.
18       A    Okay.
19       Q    You were asked -- do you have it in front of
20  you there?  Or here, you can just use mine.  So you were
21  asked a number of questions about whether you knew who
22  made the decision or who it was that crossed out certain
23  words or phrases on the various pages of this exhibit.
24  Do you remember being asked some questions about that?
25       A    Yes.

Page 248

1        Q    Do you know whether, though, it was you who
2  made the decision to cross out any of those words or
3  phrases on Exhibit 8?
4        A    It was not.
5        Q    How do you know that?
6        A    Because I didn't.  I wasn't -- it wasn't -- it
7  wasn't anything that I made a mistake on.
8        Q    Okay.  Was it your responsibility to walk
9  Mr. Jakes through what was written in this statement
10  after it was written out?
11       A    No.  It was not.
12       Q    Whose job, to your recollection, was it to do
13  that?
14       A    State's Attorney.  Assistant State's Attorney.
15       Q    Okay.  Can you say or do you know whether you
16  were the one though that physically crossed out any of
17  these words or phrases on --
18       A    I did not.
19       Q    -- on Exhibit 8?  Okay.  Back at the very
20  beginning of your deposition you were asked some
21  questions regarding a lawsuit where you were a defendant
22  being sued in your capacity as a police officer for
23  excessive force and you were talking about that case
24  having been settled.
25       A    Yes.

Page 249

1        Q    And I think you said at the point of jury
2  selection.
3        A    Correct.
4        Q    Do you remember that?
5        A    Yes.
6        Q    Okay.  Do you remember what the name of the
7  plaintiff was in that case?
8        A    I do not.
9        Q    Do you remember how many years ago or what
10  year this trial was that settled during jury selection?
11       MR. GRILL:  Objection.  Mischaracterization of
12       the testimony.  There was no trial.
13       A    It was the late '90 -- '80s.
14       Q    Late '80s?
15       A    Yes.
16       Q    Okay.  And did you want the corporation
17  counsel or the attorney from the City that was
18  representing you in this case to settle this excessive
19  force claim?
20       A    No.  I did not.
21       Q    Did you ever communicate that at the desire as
22  being you did not want to settle to the attorney
23  representing you at this -- in this case?
24       A    Yes.  I did.
25       Q    What did you say to this person?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 66 of 93 PageID #:9437
The Deposition of OFFICER KEN BURKE, taken on July 30, 2021
250..253

Page 250

1    A    The attorney came out of the Judge's chambers
2  and said, "We're over.  It's done.  They settled."  And
3  I said, "What do you mean?"  And I don't remember the
4  dollar amount, but they settled for a very small dollar
5  amount, and I was upset because in my mind that seemed
6  like it was guilt, like -- and I said I wanted to go
7  through with the trial.  I said, "We shouldn't settle
8  for anything like this," and the corporation counsel
9  advised me, he said, "The way the City looks at it is
10 it's going to cost us more to go through trial than what
11 we just gave them."  So that was the way they settled.
12   Q    How did it make you feel when they didn't hear
13 you?
14   A    Well, I mean, I can understand -- I can
15 understand his reasoning I guess, but I -- I still to
16 this day think that it makes -- it puts a guilt upon me,
17 because the City's settling on something that shouldn't
18 have been settled.
19   Q    And you were prepared to go to trial?
20   A    Yes.  I was.
21   Q    And testify in your own defense?
22   A    Yes.
23   Q    And did you want to testify in your own
24 defense in that case?
25   A    Yes.  I did.

Page 251

1    Q    And was it your intention to do so?
2    A    Yes.
3    Q    Were there any other officers or police
4  personnel also sued other than yourself in that matter?
5    A    No.  I was -- I was the lone one on that one.
6    Q    Okay.  I want to go to, I guess it's Exhibit 1
7  which is the General Order 87.7.
8    A    Yes.
9    Q    Okay.  And turn to City_Jakes 923, I guess, to
10 the second page.
11   A    Yes.
12   Q    Okay.  So you were asked a lot of questions
13 today about subsection 9, and subsection 9, what's the
14 title?  Can you read that for me, please, into the
15 record?
16   A    "Custodial Interrogation-Advising The
17 Individual Of His Rights."
18   Q    Okay.  And when does the custodial
19 interrogation take place?
20   A    When a person becomes a suspect.
21   Q    Okay.  And so what does it mean to be a
22 suspect versus, I guess, a witness?
23   A    Well when he's in custody --
24   Q    Okay.
25   A    -- he's now a suspect.

Page 252

1    Q    And does that mean that there may be probable
2  cause to actually charge him or her with something?
3    A    That's correct.
4    Q    Now, when somebody's in custody you have to
5  read them their Miranda rights, correct?
6    A    That's correct.
7    Q    And the reason for that is because there's a
8  chance that the officer knows or the person doing that
9  interrogation knows that that person may say something
10 that may incriminate them, right?
11       MR. GRILL:  Objection.  Form.  Calls for
12 speculation.
13   Q    And furthermore, you know that because the
14 person's a suspect meaning they're suspected of having
15 committed the crime that they're being questioned about,
16 right?
17   A    Yes.
18   Q    I want to flip over to the next page,
19 City_Jakes 924 and you were asked a lot of questions
20 about subsection F today, right?
21   A    Yes.
22   Q    Right.  So this subsection F, right, applies
23 in the context of a custodial interrogation or a witness
24 interview?
25   A    Custodial.

Page 253

1    Q    Does it apply in the context if you're just
2  talking to a witness that's a juvenile that isn't
3  suspected of a crime?
4    A    No.
5        MR. GRILL:  All right.  I've got nothing else.
6  If anybody has any follow-up on that, go for it.
7        MR. YAMIN:  Not from the City.
8        MS. SPENCE:  I have a very quick follow-up.
9            REDIRECT EXAMINATION
10 BY MS. SPENCE:
11   Q    Mr. Burke, when we began this deposition, we
12 talked about the two lawsuits that took place in the
13 1980s; is that correct?
14       MR. GRILL:  I can't -- go ahead.
15       MS. SPENCE:  Sorry.
16 BY MS. SPENCE:
17   Q    When we began this deposition, do you remember
18 that we spoke about your two lawsuits from the 1980s?
19   A    Yes.  In the '80s, yes.
20   Q    And you said that that was -- those are
21 federal lawsuits, right?
22   A    Correct.
23   Q    And they took place -- were they in the
24 Northern District of Illinois?
25   A    Yes.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 67 of 93 PageID #:9438
The Deposition of OFFICER KEN BURKE, taken on July 08, 2021

254..255

Page 254

1    Q    Okay.  And I asked you if anyone talked to
2  about the settlement, about settling the case.  Do you
3  remember that question?
4         MR. GRILL:  It mischaracterizes the testimony
5  today.
6    A    No.  I don't.
7         MS. SPENCE:  Okay.  I don't have anything
8  further.
9         COURT REPORTER:  Okay.
10        MR. GRILL:  Sorry.
11        MS. SPENCE:  I don't have anything further.
12        MR. GRILL:  Oh, sorry.  Okay.  George, you got
13  anything?
14        MR. YAMIN:  No.  No.  I do not.
15        MR. GRILL:  Okay.  We will reserve signature
16  and we are done.
17        COURT REPORTER:  Okay.  All right.  This
18  concludes the deposition of Kenneth Burke.  The time
19  is 4:53, and we are off the record.
20        (DEPOSITION CONCLUDED AT 4:53 P.M.)
21
22
23
24
25

Page 255

1              CERTIFICATE OF REPORTER
2          COMMONWEALTH OF KENTUCKY AT LARGE
3
4  I do hereby certify that the witness in the foregoing
5  transcript was taken on the date, and at the time and
6  place set out on the Title page hereof, by me after
7  first being duly sworn to testify the truth, the whole
8  truth, and nothing but the truth; and that the said
9  matter was recorded by me and then reduced to
10  typewritten form under my direction, and constitutes a
11  true record of the transcript as taken, all to the
12  best of my skill and ability. I certify that I am not a
13  relative or employee of either counsel and that I am
14  in no way interested financially, directly or
15  indirectly, in this action.
16
17
18
19  Susan Bell
20
21
22  SUSAN L. HARRILL (BELL),
23  COURT REPORTER / NOTARY
24  MY COMMISSION EXPIRES: 10/02/2024
25  SUBMITTED ON: 07/13/2021

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 68 of 93 PageID #:9439
The Deposition of OFFICER KEN BURKE, taken on July 08, 2021
256

**Exhibits**

**Exhibit 1_ BURKE** 61:24 62:1,11 73:21 82:16 111:9,12 251:6

**Exhibit 2_ BURKE** 91:25 92:1,2 95:6,19

**Exhibit 3_ BURKE** 98:6, 11,20,21 129:23,24 130:9,10

**Exhibit 4_ BURKE** 129:19,21 130:24

**Exhibit 5_ BURKE** 131:12,13 132:11 199:15, 16 213:7 224:23

**Exhibit 6_ BURKE** 154:14,15 156:19 157:7 170:11 187:18

**Exhibit 7_ BURKE** 181:14,15 188:5 199:11

**Exhibit 8_ BURKE** 199:11 218:11,12 221:25 226:20 229:25 247:17 248:3,19

**Exhibit 9_ BURKE** 231:25 232:1 239:11

**Exhibit 10_ BURKE** 239:12

**-**

**-the** 198:5

**0**

**031345** 170:12

**09** 131:21

**095276** 131:22

**095278** 213:9

**1**

**1** 61:24 62:1,11 73:21 82:16 111:9,12 131:5 200:15 223:17 251:6

**10** 112:18 132:4 133:1 154:9 194:11 239:12

**100** 180:10,13

**108** 225:2

**10:14** 6:5

**10th** 35:10

**11** 114:22 194:11 213:11 227:25

**1102** 118:4 129:18 130:25

**1103** 129:18 130:25

**1121** 98:17 129:25 130:10, 18

**11:17** 52:12

**11:28** 52:15

**11C** 113:3,4

**11th** 48:25

**12** 97:8,9,10,13, 14 157:1 160:7 170:15 190:23 194:12

**1252** 91:21,22, 24 92:5,9

**1254** 92:6

**1255** 181:5,6, 11,18

**1259** 182:9

**1261** 181:18

**12:00** 190:15

**12:06** 82:10

**12:07** 82:13

**13** 195:3 199:23

**13-** 91:15

**14** 162:10 195:3

**14-year-old** 91:16

**15** 138:2 152:5 191:24 192:2,5 195:3 220:20

**15-** 91:15,17

**15-year-old** 205:22

**150** 27:8

**16** 101:10 207:11

**16-year-old** 91:15,17

**16th** 203:23 204:3

**17** 46:18,19,23 47:1,6,9 86:6 134:16 151:5 163:12 222:4 245:14,16 246:3,12 247:6

**17-year-old** 47:3,5

**17th** 203:22,25

**18** 46:19 157:1

**19-CV-02204** 6:10

**1978** 34:6

**1980s** 253:13, 18

**1982** 34:7,12, 20,24

**1989** 34:23,24 36:4,6 41:5 42:21 44:12,15 45:2,23 46:19, 21 48:3 49:3,10 52:22 53:9 62:18 66:6,23 91:5 92:20 94:25 97:16 111:4 123:2 125:14,23,25 127:16 128:1 192:7

**1990** 36:19 127:16

**1991** 23:18 49:14 50:15 52:18 58:5 66:24 91:5 92:20 94:25 95:25 96:4,11 97:3,17 98:24 99:22 100:24 101:1 103:18 104:1,2,3,19 105:10 106:23 109:11,25 111:4,5 114:2 117:6,12 118:7 123:2 124:25 125:4 127:16 128:1 134:16 148:8 151:5 157:20 167:22 207:24 216:3 222:4 245:14, 16,20 246:3,12 247:6

**1992** 23:18

**1993** 154:9

**1994** 153:25

**1999** 36:19,20 37:7 46:21 48:3 49:10 53:9 62:19 66:6

**1:02** 122:12

**1:15** 122:16

**1st** 131:18

**2**

**2** 92:1,2,9 95:6, 19 157:17 182:25 227:5

**20** 138:2 164:11 180:5

**2000** 37:17 43:16

**2000-2004** 37:20

**2000s** 43:22 47:9

**2004** 37:18,23

**2006** 37:17

**2011** 38:8,9

**2016** 131:5,17 199:17

**2021** 6:4

**22** 153:24

**24** 148:10 165:13 190:19, 24 200:14 202:21 203:6,8, 11,16

**24/7** 50:18

**25** 133:13

**250** 50:12

**26314** 238:3,5, 22 239:6,15,19

**26315** 239:6

**26316** 241:8

**26317** 239:6

**26318** 239:6

**26319** 239:6 241:9

**26th** 29:2

**2:00** 154:18

**2:01** 155:13

**2:45** 155:16



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 69 of 93 PageID #:9440
The Deposition of OFFICER KEN BURKE, taken on July 08, 2021
257

**3**

**3** 98:6,11,20,21
99:3 129:23,24
130:10 166:15
182:24 183:7

**30** 17:2 26:21
27:23 41:22
47:16 50:6,7
155:10 180:7
190:22 215:17,
24

**3037** 222:20

**31205** 154:8
156:17,20

**31339** 156:23

**31344** 157:13

**3:45** 134:15,23
151:23,25
152:1 246:18,
22

**3:55** 200:1

**3A** 102:6

**4**

**4** 99:2 101:24
129:19,21
130:24 182:10
225:5,7 227:5

**4:00** 51:6,9
151:22 152:2
190:15 204:2
205:22

**4:33** 242:3

**4:38** 242:6

**4:53** 254:19,20

**5**

**5** 131:12,13
132:11 199:15,
16 200:15
213:7 224:23
233:15,24
234:2 235:25
236:5,11

**50** 48:14,15
50:3,6,7

**5:00** 134:21,23

**5:15** 134:24

**6**

**6** 118:18
120:12,16
154:14,15
156:19 157:7
170:11 187:18

**69** 132:13

**7**

**7** 181:13,14,15
182:12 188:5
199:11

**8**

**8** 199:11
218:11,12
221:25 226:20
229:25 239:15,
18 240:4,20
241:3 247:17
248:3,19

**80s** 12:25 13:2,
3 249:13,14
253:19

**82** 43:12

**87** 43:13

**87-7** 61:16
182:19,21

**87.7** 251:7

**88** 43:13

**89** 45:4

**8:00** 51:6,10

**8th** 6:4 36:22

**9**

**9** 63:2 81:19,21
82:17,19

231:25 232:1
239:11 251:13

**90** 218:15,20
223:16,25
224:1 226:18
249:13

**90s** 49:15
104:6,23
124:23 246:1

**91** 49:18 105:3
131:20 132:2,
23 223:17,20,
23,25 224:1
227:5

**92** 105:3 229:2
246:1

**922** 61:25 62:4,
9

**923** 63:2 81:20
82:16 251:9

**924** 74:1 81:20
84:21,22 113:4
252:19

**925** 61:25 62:5

**926** 62:6,7,8,9

**93** 157:18 213:8
218:15,20
222:14,15
246:1

**94** 199:20 203:2

**95276** 132:2
133:1

**95279** 199:21

**95293** 225:3

**A**

**A's** 227:13,20

**a.m** 200:1

**a.m.** 6:5 134:15
151:22,24
152:2 190:15
204:3 205:22

**ability** 9:23
94:3 188:10

**absolutely**
29:7 145:12
186:4 201:11
209:10,14
213:22

**abuse** 45:12,21
46:4 49:2 192:8

**Academy**
42:13 90:19

**accept** 142:14,
17

**accepting**
78:18 85:2
111:17

**access** 187:4
188:10

**accurate** 8:20
10:21 68:14
69:19 233:1

**accurately**
9:14,18

**accused** 14:3
81:2 146:17,22,
25 147:2

**act** 42:16 89:19
123:6

**acting** 125:8
128:22 129:12

**action** 63:9
82:22

**actions** 179:16

**active** 27:8

**activities**
117:10

**actual** 20:4
231:16

**add** 228:24

**added** 112:18

**addition** 64:4
74:9 78:17 85:1
111:16 113:19
115:22

**address** 68:2

**administer**
146:6

**administered**
160:2 163:21

**administering**
160:24

**admission**
78:19 79:19
80:21,22 81:1
85:2,9,10,12
86:19 88:10,17
89:6,7,13
111:17,24

**admissions**
69:12

**admitting** 81:1

**adult** 45:16,17
47:4 64:9,11,
18,20 65:16,17,
23 69:7,8
74:17,18,24,25
75:11,18,20,21,
22 77:21,22
78:3,4,22,25
79:1 85:5 87:4
88:1,25 91:7,13
92:15 93:4
94:18 95:1
105:15,18,25
106:4,11,15,19
107:2,6,19
108:4 111:20
112:1,13,19,23
152:20 169:16,
19,25 170:3,17
171:1,3,4,8,11
172:1,14,21
183:1 193:4,11
195:16

**adults** 51:15
66:10 192:11
195:19,23
196:3

**advance** 11:5

**advice** 78:24
112:22 165:13
166:12 168:23

**advise** 81:25
82:1 146:9
158:11 170:16
217:17

**advised** 78:20

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 70 of 93 PageID #:9441
The Deposition of OFFICER KEN BURKIE, taken on July 09, 2021

258

85:3 111:18
112:20 146:1
152:18 157:19
158:2 168:17
250:9

**advising** 81:21
146:3

**affairs** 17:6

**affect** 174:25
206:1

**affirm** 7:14

**affirmative**
167:6,9,11,14
170:8 186:14

**afford** 163:12

**afraid** 193:4

**afternoon**
203:13

**age** 46:25 47:6
86:5 97:7
100:2,12
101:11

**agencies** 33:1

**agree** 10:11
11:4,6,18 15:24
16:4 63:16
71:10 72:1
81:8,11,13,14
89:6 98:7 99:22
168:10 171:9
175:9 181:20
186:20,24
187:3 205:25
217:9

**agreed** 13:16,
17 240:9 244:3

**agreement** 7:1

**agrees** 240:11

**ahead** 21:9
22:10 23:4
26:5,10 51:20
55:11 56:10
57:5 59:20,25
60:13 66:14
70:19 75:3,17
76:5,14,17,20
77:1,8,10 78:6
79:16 80:8,25

81:9 90:16,17
91:25 103:2,4,
12 104:25
110:8,10,20
112:3,8 114:8,
10 116:9
119:18 120:4,
24,25 121:23
123:17 126:24
127:5,18
131:11 134:9
139:1 142:20
153:21 154:13
159:1,11,19
163:6 167:8
173:17,24
175:14,16,17
186:7,22
187:25 188:25
190:9 193:15
197:22 200:9
201:6,16,17
205:1 207:15
214:9,22,23
215:15 218:10
219:21 223:4
231:24 235:12
236:2,25
239:10 253:14

**allegation**
14:16

**allegations**
14:4,17,24
27:16,18

**allowed** 10:8
77:2,4,5 106:25
123:14 125:7
168:14,17
186:16,18
187:10 208:23
209:1,9

**allowing** 208:7

**alright** 228:1,4

**AMA** 47:23,25

**ambiguous**
9:17 70:9

**Amendment**
54:14,16,17,21
55:2,19,21,23

**amount** 13:16
250:4,5

**and/or** 234:14
236:16,19

**Andrew** 6:16
14:14 31:15
61:18 68:16
76:18,23 78:14
93:22 97:24
115:18 145:5
184:10 198:13,
24 200:12
201:8 238:10
240:1

**answering**
69:9 79:13
107:16 205:10
236:4

**answers** 69:20
70:1 104:16
114:17,21
186:13 231:20
232:10,25

**Anthony** 6:7,
15 7:24 199:24
203:3 213:13,
16 218:10
222:6,25 223:6,
19 224:13,14
225:8,24
226:23 229:4
230:6,8 234:3,
13 236:16,18

**anticipated**
156:10

**apologize** 44:2
105:1

**appearance**
6:11

**appeared**
116:25 169:10
170:4,5

**appearing**
6:15,20 10:23

**appears** 68:19
113:17 114:3
115:9,14 224:8,
9

**application**
238:8

**applies** 69:12

252:22

**apply** 36:8
39:20 51:15
202:14 253:1

**appointed**
163:13,15,24
164:2,5

**approaching**
185:11

**approval**
101:9 102:6,23

**approve** 100:2
102:15 103:17

**Approximately**
151:22

**area** 36:7,14,
17,24 37:12,13,
17,18,20 47:12
48:4,5,10,17,20
49:16,18,22,24
50:2,4,8,9,10,
11,16,20,24
135:5,9,20
136:15,16,18
137:2,24 138:1,
8,22 139:5,7,20
140:12 151:6
213:19 245:15,
19,22,25 246:4,
5,7,18,21
247:13

**areas** 48:19
49:3,10,14,19,
20,25 50:19
135:11

**arguing** 198:2,
6,10 201:16

**argument** 72:2

**argumentative**
80:4 142:19
153:20 159:20
163:5 197:18,
19 198:23
199:8 223:11

**armed** 96:18
137:12 172:7

**arrest** 20:3
40:7 45:5 59:4
67:7,21 92:14

93:3 94:17
149:7 204:8,9

**arrested** 46:8
153:7

**arrestee** 99:11,
13 100:2,10,12,
15,17

**arresting**
19:22 67:6,22
88:23 105:19
106:14,25
107:5 108:15,
22,23 110:23
172:17 180:25
214:3

**arrival** 177:4
178:21 179:1
210:25 247:3

**arrived** 151:25
152:1 173:6
177:19 213:2
214:11 215:21
246:21

**art** 85:23

**ASA** 69:14
141:13 230:9

**asks** 189:22

**assigned**
30:22 34:15
36:15 48:10
50:3 118:23
119:4,7,16
121:10 135:5,9
140:7 245:22
246:5

**assignment**
36:22 48:1
135:3,17,20
137:5 138:9,10
140:7 151:23

**assignments**
135:14

**assist** 46:2
117:21

**assistance**
53:14 92:10

**Assistant**
31:5,8,11,14,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0110 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 71 of 93 PageID #:9442
The Deposition of OFFICER KEN BURKE, taken on July 06, 2021
259

18,21 216:18,
21,24 217:3
221:2,7,11
248:14

**assisted** 53:10

**assisting**
117:14,15
119:11 120:18
121:14

**assume** 141:7,
8 177:8 209:1,
11 214:10

**assumed**
209:7 214:5

**assumes**
110:3 129:1
150:23 169:6,
23 175:12
235:17

**assumption**
209:17 212:3
215:7

**attempt** 67:24,
25 107:13,14

**attempted**
213:15

**attempting**
71:4

**attempts** 107:6

**attend** 90:5,6

**attendance**
47:25

**attending** 6:12

**attention** 63:1
92:8 98:12,23
118:15 131:20
157:11 212:18,
20 222:13
233:11,14
239:14

**attire** 96:5,25

**attorney** 9:4
19:22 31:5,8,
11,14,18,22
32:20 60:4
61:2,12 136:8,9
163:9 189:11,

15 193:24
216:18,22,24
217:3 221:2,8,
11 237:5
248:14 249:17,
22 250:1

**attorney-client**
235:4 237:1

**attorneys** 9:4,
5 23:21 32:21
104:10 201:6
232:10

**Audy** 104:13,
14

**aunt** 152:22,23
209:21,23
210:2,5,9,14
211:1,5,13,20
212:1,5,23
213:13 214:6,
17 215:2,12
216:5 244:12,
16

**author** 19:13,
15

**authored**
19:14,17,20

**authority**
104:4,19

**authorization**
99:14,18
101:19 104:7

**authorize**
100:9

**authorized**
101:4

**auto** 33:15

**automated**
91:10

**automatic**
91:14,18

**averages**
50:14

**awarded** 27:4
237:13

**aware** 55:17
91:5 112:9

145:13 146:11
176:19 179:13,
18 193:3,9
237:8

---

## B

**B-A-R-T-I-K**
123:21

**B-E** 227:13

**B-O-N-K-E**
21:1

**B-U-R-K-E**
6:24

**back** 36:12
37:11 43:17,21,
23,24 44:8,11
46:23 47:10
48:3 52:14,18
58:5 59:7,21
60:17,21 73:7,
12,14,16,18
77:12 82:12
84:24 85:11
86:18 95:25
96:3,11,18
100:6 101:1
104:18 105:7
106:23 109:11
111:9,15
119:21,25
120:1 122:8,15
128:12 132:23
147:8 148:8
155:15 157:20
170:11 174:7
190:21 191:1
219:2,4,11
242:5 248:19

**backing** 140:6

**bad** 33:16

**badge** 96:9,12,
15 137:9

**ball** 210:22

**barrel** 135:16

**barring** 32:19

**Bartik** 122:5
123:21

**based** 65:14
69:18 71:23
72:15 74:21
75:6,7 77:24,25
80:24 81:4,24
82:1 83:2,10,19
87:6 89:2 97:3
105:9 108:1
109:10,24
138:13,17
144:10 145:20
167:4 177:9,14
216:3 237:4,12

**basically**
33:13,20 42:18
45:4,11,14
50:23 54:4
104:13 121:4,
11 134:23
139:17 172:18

**basing** 136:22
138:25 141:14
144:3 147:5

**basis** 65:4 67:4
84:14 93:18
234:5

**Bates** 61:23,24
63:2 74:1 82:15
92:5 98:16
118:3 129:18
131:21 132:2,
24 154:7
156:19 157:12
170:12 184:20
199:20 218:14
225:2 238:3
240:4

**bathroom** 52:6
73:9 186:16,18
187:11 189:23
208:8,23 209:4,
8,9

**battery** 109:15,
20

**beat** 68:2 106:7

**began** 134:15
253:11,17

**begin** 7:7,18
134:13

**beginning**

81:18 108:13
233:15 248:20

**behalf** 6:14,16
132:16 157:2

**behavior**
177:10

**belief** 40:19

**belt** 96:14

**bench** 143:21
145:17 207:19

**big** 121:3
220:11

**bit** 8:24 27:5
30:11 147:8
154:25 191:1
220:14 245:7

**black** 143:23
144:3

**blocking**
239:16

**blue** 61:18

**board** 102:9

**Bonke** 29:18,
19 35:22 241:1

**Bonke's** 20:13,
25 22:16,20,25

**book** 90:21
146:8 157:18,
19

**books** 90:12

**bordering**
121:2

**bother** 205:10

**bottom** 62:4
63:4 64:7,16
74:5 91:22
113:5 132:1
154:8 181:5
223:19,23
225:9 226:19,
22 229:24
230:5 238:3

**Boudreau** 6:8
24:17,20 25:5
26:13,15 29:22,
23 30:3 35:18

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 72 of 93 PageID #:9443
The Deposition of OFFICER KEN BURKE, taken on July 06, 2021
260

39:15 149:10
151:10 240:25
246:13 247:15

**break** 10:10
52:2,5 100:5
122:8 123:12
154:18,24
155:6,8,9
156:11,15
157:6 241:25

**breaks** 10:8

**Brian** 31:18
221:2

**briefly** 246:18

**bring** 67:6,22
73:6 152:6
220:13

**brought**
108:14 110:13
203:12 212:18,
20

**building** 37:25
143:17

**bunch** 120:22

**Burke** 6:6,7,18,
22,24 7:2,8,21
8:1,4 11:20
15:16 17:10,21
32:24 52:17
57:1 62:3 71:22
72:14 73:21
76:14 77:10
80:16,19 82:15
86:11 92:4 96:1
97:25 98:23
100:4 123:1
131:4,14
132:10,15
138:11 144:11
145:16 152:17
157:2 181:17,
20 185:6
186:10 188:5
189:2 199:3
201:3,22
202:17 205:13
218:14 220:16
224:23 226:8
229:24 230:19
231:18 232:3,9,

23 233:8,10,25
237:25 238:22
239:14,16
240:17 241:15
242:8 245:13
253:11 254:18

**Burke's** 75:14
76:1 132:7
231:20

**business** 96:5,
22

---

## C

**C-A-R-A-T**
228:21

**Caesar** 28:23
29:13 30:7,17
35:5,10 40:1
136:8 139:17,
20 140:23,24
141:13,16,21,
23 142:2,4,13
147:4,9 148:19,
22 149:18,19,
22 151:7 152:3
212:21,22
214:11,16
215:2,11,18
221:4 224:20
230:10 231:14
241:1,23
246:19,20
247:15

**Caesar's**
215:12

**Cal** 29:2

**call** 33:19 67:9
71:18 104:8,10
106:3 108:16
124:18 128:9
140:11 155:7
244:11

**called** 65:11
132:16 140:12
157:2 192:20

**calling** 105:25
150:4 207:14

**calls** 86:15
112:8 121:19

127:3 129:1
161:20 162:1
171:19 175:25
176:14 177:7
178:3 190:4,9
193:7,14 195:9
197:3 207:2
214:8 217:20
218:1 223:2
224:11 225:17
252:11

**camera** 233:19

**cancelled**
18:18 28:20

**capacity** 13:6,
10 14:21 33:9
127:15 248:22

**caps** 64:21

**captain** 27:11

**car** 45:7,9,12
68:2 106:8
137:4,23

**carat** 228:21

**care** 196:2
202:20

**career** 179:25
246:9

**carefully** 21:6,
11

**case** 6:9 7:24
8:15 13:12,18,
22,23 14:1
15:2,7,9,10,12,
13,16,23,24
16:3,4,5,7,10
18:1,8 25:18,
20,23 26:1,14
27:12,14,20,23,
25 28:3,24
29:7,11 40:15
47:4 49:16
58:21 69:14
78:21 85:4
91:12 104:11
109:16 111:2,
18 114:11
118:22 119:11,
16 121:8,15
122:18 123:3,7
128:22 130:7

140:16,18,20
159:15 172:11
190:19,24
195:18 196:7,8
211:6 212:2,6,
17 213:24
225:11 230:15,
24 231:5
234:18,23
243:15 247:8
248:23 249:7,
18,23 250:24
254:2

**cases** 16:13
17:3,7 33:11,
14,15 34:2
40:1,3,8,17,20
45:21,22,24
113:17 115:10
119:3 120:18
126:12 133:14
151:6,9,12
192:8,10,13
193:19 194:22
241:3,5,11

**cat** 113:8,9

**caution** 113:2

**cell** 140:10

**Central** 48:22,
23 51:2 135:4,
18 140:7,12

**certificate**
27:4,24 32:9,
13,22 237:9,13

**certification**
42:10

**certifications**
41:2

**certified** 41:3,
13,17

**chair** 143:20
145:17 207:19

**chambers**
250:1

**chance** 110:9
252:8

**change** 136:11

**changed** 46:20

52:22 104:23
105:3 148:12

**characterize**
96:7

**characterizing**
185:12

**charge** 107:24
108:4 172:4,7
183:1 212:24
214:18 215:4
216:7 252:2

**charged** 91:7,
12,13 92:14
93:3 94:17 95:1
101:13,17
108:10,12
112:19 116:18
149:2 152:19
169:16,18,24
170:3 172:19
173:19

**charges** 14:7
108:24 172:9

**charging**
172:13

**Chicago** 6:20
13:6,10 14:22
17:4 24:7,11
30:20 32:25
33:5 34:7,10,11
41:20 42:13,16
48:20 90:18
96:16 98:1
117:23 118:9
133:2 152:18
153:2 216:9
232:9

**child** 45:12,21,
22 46:4,8,13,
18,22 47:6 49:2
56:6 59:13
65:9,23 66:9,25
67:12,13 83:17,
25 84:8,11,14,
17 85:16,18,21
86:5,12 101:16
102:21 103:1
105:5,7,10,13
106:11,16,18
108:14,17,20
115:14 116:5
192:8,17,22

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 73 of 93 PageID #:9444
The Deposition of OFFICER KEN BURKE, taken on July 06, 2021
261

193:12 207:10, 14,15

**child's** 105:11, 17

**children** 34:2 45:14,18,23,24 192:10,14,19 193:3,10,21 194:2,9,10,13 195:23 206:24

**choice** 165:5

**choose** 36:14 43:17,21

**chose** 68:5

**circling** 174:7

**circumstance** 53:6 54:1 60:7 66:25 100:19 101:15,18 103:14 105:4, 22 111:5

**circumstances** 57:11 58:6 59:10 91:6 100:8 116:23 119:3

**city** 6:20 51:3 129:17 249:17 250:9 253:7

**City's** 250:17

**City_jakes** 61:24 74:1 91:21 92:5 98:17 118:4 129:18,24 130:10 181:5 182:9 218:15 222:14,15 223:16 226:18 227:5 229:2 238:3,5,22 239:6,15,19 241:8 251:9 252:19

**civil** 11:21,24 12:1,17 14:18, 20,21 16:14,24, 25 17:7 54:13 55:4,8 240:24

**claim** 249:19

**clarified** 209:20

**clarify** 25:15 66:20,21 72:19 158:21

**classroom** 90:19

**clear** 9:24 10:2 59:5 63:10 76:1 82:24 130:5,9 132:10 224:21 245:8

**clearer** 89:24 148:21

**client** 201:14

**client's** 201:5

**close** 48:13 138:8 245:25

**closed** 50:16 142:6 246:4

**closer** 245:7

**clothes** 96:7, 22 97:1

**coaching** 68:19

**coat** 137:8,18

**Code** 33:13,18, 20,22

**coerced** 173:2, 5 175:9

**color** 61:18

**colors** 137:19

**comfortable** 194:7

**commander** 38:3 43:23 47:12,14,19,22 99:14,18 100:2, 9 101:3,9,12 102:7,11,15,23 103:16 122:1,6 123:14,18,19 124:12,13

**commander's**

97:10

**comment** 240:20

**comments** 26:15

**committed** 99:12 100:17 101:19 102:5 234:3,12 252:15

**committing** 85:10 102:22 146:18

**common** 8:16

**communicate** 9:11 28:3 249:21

**communication** 32:21 69:10

**communications** 32:20 235:5

**companies** 39:4

**company** 38:15,17

**complaint** 12:13 27:19

**complete** 10:20 175:15 200:7 234:4

**completely** 121:18

**completeness** 202:11,13

**Compound** 207:1

**comprised** 104:10

**compunction** 179:11

**concerned** 190:15

**CONCLUDED** 254:20

**concludes**

254:18

**conclusion** 41:15

**condition** 10:13

**conduct** 144:18 247:7

**conducted** 247:1

**confession** 72:11 85:18 234:15

**confusing** 69:24

**conscience** 178:12 179:8

**consecutively** 98:14

**considered** 45:7

**consistent** 85:22 185:7 216:9 225:12

**constitutional** 63:10 82:24

**consult** 165:2

**consulted** 15:9,13,14 16:3

**consulting** 164:14,24 165:15

**contact** 30:2,4 67:23,24 68:1 92:15 93:4 94:18 95:2 105:17,24 107:1,6,13 108:21 213:15

**contacted** 28:10 60:10 65:20 150:9,18 211:5 214:17 215:2,11 216:5 244:17

**contend** 234:2

**contention**

234:5

**context** 115:6 252:23 253:1

**continue** 69:25 73:1 84:3,5 185:4

**continued** 108:20

**continues** 100:4 234:18

**continuing** 41:18 186:21

**controlled** 99:23 100:25 101:5

**convened** 6:5

**conversation** 24:14 28:8,16 29:16,19 72:13, 20 141:21 148:18 189:18, 25 215:18 216:12,13 217:12 219:24 243:19

**conversations** 235:8 236:24 243:5,12,16

**conversing** 77:17

**conveyed** 108:3

**convince** 76:24

**cooperation** 13:15

**copy** 133:25 163:18 223:21

**corner** 91:23

**corporation** 249:16 250:8

**correct** 12:19 16:17 19:18,25 20:8 21:4 25:21 30:7 34:13 35:6 37:22 40:22,24, 25 44:21 46:18,



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 74 of 93 PageID #:9445
The Deposition of OFFICER KEN BURKE, taken on July 08, 2021

262

24 47:8 48:2
50:1 56:7,8
57:15,16,19,20
58:13 62:20,24,
25 63:18,19
67:15 75:5 76:7
77:18 80:1
81:16,17 84:9,
15,18,19 85:13
86:25 87:22
88:2 91:3
95:20,21,23
99:13,16,19,20
100:10,11,22,
23 101:6,22
106:1,2,5,6,9,
12 107:3
108:17 114:25
115:25 117:7,
17 123:15
127:10,14
130:10,20
131:15 135:11
137:24 142:2,3,
9 143:5 155:20,
24 156:1,2
157:7 158:6,7
159:24 160:2
168:15,16,18
170:21 171:11,
18 173:7,8
174:4,5,16,19
176:4,8,9
182:7,13,19
183:6,16,23
184:23 191:3,7
192:2,8,9,12,14
193:5,12
195:16,19
196:13,22
197:8,12,17
199:7,9 202:7
203:25 204:3
205:17,22
206:1,16,17,19
207:8,12 208:5,
16,24 209:21,
22 210:3,6,9
211:10,13,18
213:23 216:7,
11 218:24,25
219:13,14
221:9,25 222:6,
9,21 223:9,14,
15 225:20
229:11 231:8,

16,17 237:10
238:15 241:2
244:4,5,14,18,
22 245:1,24
249:3 252:3,5,6
253:13,22

**correcting**
44:3 228:13

**corrections**
226:10,12

**correctly**
225:14 238:12

**cost** 250:10

**could've** 134:2
206:13 220:25

**counsel** 6:10,
13 10:25 13:15
18:7,15 19:5
165:14,19,25
166:12 205:11
249:17 250:8

**counselor**
10:24

**couple** 30:9

**court** 6:2,3,8,
22,25 7:5,9,12,
18 12:1,2,3
17:11,12,15,19
42:16 52:11,14
60:19,23 73:18
78:21 81:10,15
82:6,9,12 85:4
88:13,17 89:4,
15,19 91:17,19
103:23 104:6,
21 105:12
110:25 111:19,
25 119:23
120:1,4,7
122:9,12,15
126:9,11
145:12 155:12,
15 160:8
210:22 233:17,
22 242:2,5
245:4,6,10
254:9,17

**court--** 12:2

**cover** 58:3
117:25 233:19

**CPD** 238:7

**CPDBIF**
130:12

**create** 203:2

**crew** 51:2

**crime** 45:7,8,9,
12 85:10
146:17 252:15
253:3

**crimes** 97:8
135:21 136:15,
18 138:22
139:5,6,12,14,
20

**criminal** 17:11,
15 78:21 85:4
91:19 111:19,
25 126:8,11
153:9 171:10
239:21 241:4

**cross** 227:2,9,
15,22 228:3
229:6,9,21
245:11 248:2

**crossed** 24:23
226:16,24
227:7,12,19
228:1 229:3,16,
19 247:22
248:16

**crossed-out**
228:7

**culled** 130:16

**current** 24:10

**custodial**
62:15 63:3
81:21 89:21
251:16,18
252:23,25

**custody** 58:8
63:7,14,17
67:15 82:21
83:4,5,15,16,18
84:15,18
106:24 108:14,
17 109:3 110:1,
13 148:9 174:4,
6 187:5 188:11
190:3 206:24

211:6 212:24
214:18 215:3
216:6 251:23
252:4

**cut** 223:21,23

**cutoff** 194:12

_____

**D**

_____

**daily** 67:4

**date** 8:14 18:17
102:9 103:23
129:10 134:15
154:9

**David** 31:9

**day** 6:4 90:19
137:10,15
203:19,20,24
210:9 231:14
242:22 250:16

**days** 47:20
51:6

**DCFS** 49:2

**dealing** 45:16
59:13 64:24

**death** 23:19

**debate** 197:24

**deceptive**
100:21

**decide** 164:11

**decided**
105:11 227:2,9

**decision**
103:20 104:12
206:1 227:15,
22 228:3,6,24
229:6,12,21
247:22 248:2

**defend** 201:5

**defendant**
6:17,20 12:17
13:23 15:6
16:14,22 19:12
61:14 136:8,10
157:20 231:20
232:8 234:7,10
248:21

**defendant's**
12:16

**defendants**
240:24 241:4,
10

**defense**
250:21,24

**define** 134:4

**defined** 46:22
86:4

**Delacy** 29:15,
16 35:24 40:4,
6,10,21 240:25

**delay** 8:24

**delays** 161:23

**demeanor**
151:16 244:21

**demonstrating**
186:11

**dep** 8:11

**department**
24:8,11 29:25
30:16,20 32:25
41:20,23 50:13
95:11 96:16
133:2 152:18
153:2 216:10

**departments**
33:19

**depend** 117:20

**dependent**
70:22

**depends** 97:6
117:18

**deponent** 6:17

**depose** 232:24

**deposing**
198:24

**deposition** 6:6
8:3,7,16 10:7,
21 16:17,21,25
17:22 18:8,15,
18 19:9 21:3
22:17,20,24
23:1,2,8 24:3
26:19,20 27:2

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 75 of 93 PageID #:9446
The Deposition of OFFICER KEN BURKES, taken on July 08, 2021
263

28:11,14,18,20
77:3 144:18
145:6 185:8
200:19 202:14
248:20 253:11,
17 254:18,20

**deprived** 63:8
82:22 205:25
206:2 207:17,
25 208:2

**depriving**
207:20

**describe** 19:8
29:21 143:22
238:2

**desire** 165:16
249:21

**desires** 113:22
115:24

**desk** 124:16
136:25 180:24

**detailed**
104:12

**detain** 104:4

**detained**
103:21 104:20

**detective**
20:12,22 22:14
39:17 40:1,3
44:22 45:15
92:10 99:19
102:7 136:7
139:17,20
140:23,24
141:13,21,23
142:1,4,13
147:4,9 148:18,
22 149:10,13
151:7,9,12
152:3 183:25
184:4 189:10
209:16 212:22
213:1 214:16
215:1,11,12
221:4 230:10
231:14 240:24,
25 241:1
246:12,15,19,
20 247:14

**detective's**
216:1

**detectives**
19:21 92:15
93:4 94:18 95:2
96:25 121:15
140:19 184:3
186:6 209:9,13,
16 211:4
213:12,24
214:2,5 230:24
231:5,11
247:11

**detention**
104:5

**determine**
23:7 104:20
147:23 148:2,5
207:7

**determined**
105:5

**difference**
80:19,21 93:9
110:5 173:14

**difficulty**
161:17

**Dillon** 31:6

**direct** 7:19
64:13 78:7 92:8
98:12 118:14
144:22 233:10,
14

**directing**
98:23 157:11
222:13 239:14

**directive** 85:23

**directly** 72:22

**disability**
161:11

**disagree**
76:22,23,25
185:10

**disbanded**
49:19,23,24

**discern** 55:8

**discuss** 27:1
29:5 172:11

**discussions**
200:13

**disputing**
102:19

**distinction**
220:11

**District** 6:8
29:9 30:23
34:19,25 35:3,
4,5,6,7,10
36:22 37:7,9
40:6,16,20,23
253:24

**dive** 196:15

**division** 6:9
37:2,3,5,21
42:3,21 43:1,5,
6,10,17,18,22,
25 44:12,13,15
45:23 46:1,22
47:7,10 48:22
49:5,8 50:23
51:13 86:2
88:22 97:17
98:2 99:19
102:7 117:23
118:10 122:2
124:14 130:13,
17

**document**
11:17 61:23
92:23,25 93:2
95:6,7 97:25
121:17 125:7
129:17 133:19
184:18 187:15
188:2 218:9
231:19 232:14
235:17 236:21
237:25

**documentatio
n** 128:8 133:4,5
244:20

**documentatio
ns** 244:23

**documented**
133:24,25
134:3 211:9

**documenting**
117:10 243:22

**documents**
11:3,4,5,9,11,
15 18:1 19:7,8
23:11 95:13,16
130:3 138:13,
25 144:4,10
145:20 147:6
156:12 234:17

**dollar** 250:4

**door** 139:17
142:6 143:13,
14,16

**doorway**
139:23

**downtown**
51:2

**dress** 96:25

**dressed** 96:3

**drink** 208:19

**drop** 144:21

**dropped** 82:5

**drove** 137:4
140:14

**due** 104:13

**duly** 132:17,18
157:3

**duties** 44:12
45:2,4 47:10,24
57:13 120:13

**duty** 158:10
176:17 178:6,8,
12,15,17

**dying** 71:12

———

**E**

———

**e-mail** 24:25
28:4 124:15

**e-mails** 32:4
124:21

**earlier** 86:5
87:15 105:22
109:1 129:19
135:8 141:12
204:12,19
243:21

**early** 49:15
104:23 124:23
246:1

**Eastern** 6:9

**eat** 187:4,10
189:5,22 190:2
208:4,7,11,15
209:12

**education**
161:6,8

**effort** 171:13

**efforts** 106:10

**Eighth** 37:6,9

**eligible** 43:14

**else's** 20:9
132:6

**Embassy** 39:5

**embodying**
54:16

**employ** 194:25
195:21

**employees**
24:10

**encounter**
66:25

**end** 77:3
103:19 134:19
159:9

**ended** 216:12

**ending** 219:23

**enforcement**
33:1

**entail** 53:19

**entire** 21:14,
15,21,25 22:4,
14 34:25 70:21
78:1 98:13
184:12 186:22
221:14 230:1,4
238:14

**entirety** 65:3
68:6

**entitled** 158:22
162:21 164:19
166:12



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page: 76 of 93 PageID #:9447
The Deposition of OFFICER KEN BURKE, taken on July 06, 2021

264

enumerated 55:12 66:2 89:18 92:9 100:20 118:19

err 113:1

established 100:3,13

estimate 180:13

et al 6:8

evening 203:12

event 65:17 126:19 127:13 128:19 129:11 246:3

evidence 110:4 129:2 150:24 169:6, 23 175:13 234:13 235:18 236:16,18,20

exact 14:7 89:14 97:6 124:2 167:1,2, 13 215:18

EXAMINATIO N 7:19 245:11 253:9

examined 132:18 157:4

excerpt 238:14

excessive 12:5,20,22 14:4,16,25 248:23 249:18

exhibit 61:24 62:1,6,11 73:21 75:2,15 77:18 82:16 91:20,25 92:2 93:11,25 95:6,19 98:6, 11,20,21 111:9, 12 129:19,21, 23,24 130:9,19, 24 131:12,13 132:11 154:14, 15 156:19 157:7 170:11

181:14,15 184:13,21 187:18 188:5 199:11,15,16 213:7 218:11, 12 221:25 223:3 224:23 226:7,20 229:25 231:25 232:1 233:18 239:11,12,16 247:17,23 248:3,19 251:6

exhibits 11:1, 2,8 169:7 185:11 238:17

existence 49:17

expectation 58:20 60:8 65:10,18 106:13 107:5, 10,12,15,22 108:22 216:4, 21

expected 213:24

experience 83:11,19 87:6 91:4 105:9 108:2 109:11, 25 177:9,14 193:9 216:3

experiences 215:19

experts 33:18

explain 27:5 68:21 110:5 153:5 158:17 162:16 165:1,4, 19 166:4 169:3, 12,24 170:21 171:1,2,3,6 185:21,24 211:19

explained 196:25

explanation 124:4 125:18

express 78:22

expressly 63:10 82:23

extension 112:15

extent 25:10 235:4 236:23

—————

F

face 177:4 233:19 239:16

facing 107:24 108:4,24 169:20 172:3,6, 10,13

fact 7:2 104:14 113:19 114:5 115:11 159:23 167:5 183:16 205:9

factor 202:11

facts 27:25 104:11 110:3 111:1 129:1 150:23 169:6, 23 175:12 235:17

factual 234:4

failing 207:10

fair 9:7 10:5 37:16 53:8 74:22 96:6,24 112:21 124:22 127:7 162:5 167:3 179:4 209:7,11,15 214:5

fairly 54:9

fall 14:7 46:3 105:20

falls 106:17

falsely 17:16

familiarize 22:21 23:1

family 177:23

fears 193:18

feasible 164:5

February 157:20

federal 12:1,2, 3 253:21

feel 9:25 189:12 194:7 250:12

feelings 179:12

felonies 102:13

felony 99:12, 23 100:17 101:1,13,19 102:22

felt 196:15

festival 25:4,6 30:2

field 47:19 62:15

figure 43:4 138:11 176:7

figured 160:22

file 23:10 118:24 121:11 238:13,14 240:6,15,18

filed 12:1,24 29:12 31:1 153:24

filing 12:13

find 17:15 32:12 152:10 192:14 196:12 214:1

fine 7:11 52:4 62:8 70:25 71:7,12 73:3,6, 7 179:5 220:8 233:22 239:5

fingerprint 97:11 101:20

fingerprinted 97:5,9,15 99:13

100:10 101:5, 20

fingerprinting 102:12

Fingerprints 99:4

finish 8:22,25 74:12

finished 219:16 220:16

five-minute 241:25

flip 252:18

floor 139:9

Florida 38:18, 20 39:12

focus 49:13

focused 69:4,6

focusing 39:1 46:21 50:15 88:25

follow 117:12 144:20 193:11

follow-up 160:15,19 163:8 164:8 165:9 171:24 191:9,12,16,22 245:4 253:6,8

food 187:4 188:10 209:13

FOP 146:8 157:18,19,23

force 12:6,21, 23 14:4,16,25 248:23 249:19

foregoing 232:25

forget 97:14

form 21:7,16 22:10 23:14 26:4 27:17 28:6 30:21 31:3 32:6,7 39:21 42:22 43:20 44:24 46:14,15

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 77 of 93 PageID #:9448
The Deposition of OFFICER KEN BURRIS, taken on July 07, 2021
265

50:21,22 51:17,
18 52:19 53:1,
12,15,17,22
54:2,22 56:23
58:24 59:1,23,
24 60:11 65:25
66:12 67:3
75:14 76:11
80:6 84:16
85:14,20 87:1
88:3 89:9
90:10,15 92:22
94:8 103:9,10,
25 107:8,11
108:5 110:2
111:7 112:2,7,
14 114:7 116:7
117:19 119:17
120:20 121:20
124:6,9 125:20
126:1,23 127:4,
17 128:9,25
129:13 133:21
134:8 135:2
139:1 142:19
143:21 146:8
148:11 150:1,
24 153:20
158:18,25
159:5,10,13,18
160:13,21
161:15,19,25
162:8,18,23
163:5,10
164:21 165:7,
12 167:19
169:5,22
170:22 171:16
173:11 175:2,
13,24 176:14
177:6 178:2
187:23 191:14
194:20 195:10,
25 197:3 207:1,
15 211:22
212:8 214:7,21
215:6,15
216:15 217:19,
25 223:2
224:11 225:16
226:2 236:1,8
241:19 243:24
246:23 252:11

**formed** 104:9

**forming**
185:12

**forms** 149:7

**forward** 118:22
120:17

**found** 17:18
99:22 100:25
101:4

**foundation**
50:21 59:1,2,
15,24 60:11
66:12 75:2,15
89:9 90:15
92:21 93:9,15
94:2,6 103:8
110:2 111:7
112:2,7,14
119:17 120:20,
22 121:20
126:23 127:4,
19 128:25
129:13 133:23
134:9 148:11
150:1,24 159:5
161:15,19,25
169:5,22
172:15 173:11
175:2 178:2
184:18,23
185:1 186:21
187:24 188:13
190:8 195:10,
25 197:4
207:15 211:22
212:8 214:9
217:19,25
223:2 225:16
226:7 242:11

**fourth** 226:19,
22 233:13,15

**frame** 241:9

**Fraternal**
157:24

**Fred** 20:13,25
29:18,19 35:22
240:25

**free** 9:25 63:17
94:5 145:12
173:25

**freedom** 63:9

82:22

**friend** 64:11,20
65:8 74:18
77:22 79:1

**friends** 26:19
27:2 28:1 29:22
30:19,24

**front** 10:24
11:8,9 61:20
73:21 93:25
98:1 131:8
189:14 225:8
228:11 231:19
239:7 247:19

**full** 6:23

**function** 52:18
122:4

**functions**
52:21,22

**furniture**
143:19,21

**FYI** 14:11

_____

**G**

_____

**G-139** 166:15
170:12

**G-R-I-L-L** 6:16

**G138** 157:11

**gang** 177:23

**Garcia** 23:12,
16 32:4 39:14,
18,25 134:5,12,
25 135:18,23
234:3,10
237:15 242:10
243:23

**Garcia's** 23:19

**gave** 21:18,21,
24,25 22:3
90:13 111:6
112:17 155:18
169:10 172:10
175:7 188:12
212:2 217:17
225:18 250:11

**general** 42:17

55:4,8 61:15
62:12,14,19
73:22 111:10,
13 182:19,21
213:14 251:7

**generally**
92:22

**George** 6:19
14:11 69:15
71:19 254:12

**gestures** 9:11

**give** 7:15 9:5
10:20 14:9,13
26:20 27:22
60:19 93:18
99:17 104:11
109:2,12,21,24,
25 110:16,19
115:17 116:24
119:23 121:25
140:24 153:2
163:18 168:11,
15,24 185:20,
22 187:6 189:3,
19 190:1
207:10 212:7
217:18

**giving** 56:5
57:12 60:3,8,10
79:20 109:17
110:9 111:24
112:25 128:23
168:18,23
175:22 189:8,
20 218:4

**golf** 24:5,6
27:7,9 38:19,
22,25 39:12

**golfers** 27:12

**golfing** 26:18
27:25

**good** 7:21,22
44:4 52:3
154:19,21
207:12

**Goodfriend**
31:12

**grab** 153:23

**grade** 161:1

**great** 59:17
61:22 71:9
74:15 79:4
81:24 93:17
157:17 219:12
245:8

**grew** 29:8 30:6

**Grill** 6:16 7:4
12:7 14:9,11
17:25 18:2,22,
23 19:1 21:7,16
22:10 23:3
27:17 28:5
30:21 32:6,14
39:19 42:22
43:7,20 46:14
50:21 51:17,19
52:1,6,10,19
53:3,12 54:3,22
55:10,16 56:1,
9,15,17,23
57:2,4 59:1,3,
15,20,24 60:12,
15 61:19 62:6
64:13 65:5
66:1,13,16,18,
20 68:4,9,13,
18,20,24 69:2
70:8,16,18
71:1,16,24
72:8,21 73:5,8,
11,14 75:1,12,
24 76:6,11,15,
17,20 77:1,8,
11,16 78:5,7,
11,15 79:12,17
80:2,4,6,9,13,
17,23,25 84:16,
22 86:7,15 87:1
88:3 89:9
90:10,17 91:22
92:21 93:6,8,
14,20,24 94:6,
8,10,12,21
98:7,18 99:25
101:25 103:2,4,
8,10,25 107:9,
11 108:5,19
109:5 110:2,9,
18 111:7,12
112:2,7,14
113:7,10 114:6,
9 115:19 116:7,
9,21 117:19
119:17 120:20,

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 78 of 93 PageID #:9449
The Deposition of OFFICER KEN BURRIS, taken on July 08, 2021
266

25 121:18,24
122:7 123:16
124:6,9 125:20
126:1,23 127:3,
17,19 128:25
129:13,22
130:1,4,9,12,
15,21,23 131:1,
6 132:5,8
133:21,23
134:7,14 135:2
139:1 142:19
144:15,17
145:4,8,11
148:11 150:1,
23 151:3
153:20 154:4,
16,21 155:2,6,
9,11 158:18,25
159:5,10,18,20
160:13,21
161:15,19,25
162:8,18,23
163:3,5,10
164:21 165:7,
12 167:19
169:5,22
170:22 171:16,
19 172:15
173:11,16
174:11 175:2,
12,15,24
176:13 177:6
178:2 179:17
181:11,13
184:7,12,16,24
185:1,10,16,20,
25 186:2,5,21
187:15,23
188:13,15,18,
23,25 190:4,8
191:14 192:24
193:6,13
194:20 195:9,
25 196:23
197:3,10,13,18,
20,23 198:6,10,
12,17,20,22
199:1,4,8,13,17
200:6,10,14,21,
25 201:4,9,15,
19,23 202:9,15,
22,24 204:15,
23 205:5,8
207:1,13
210:16 211:22

212:8 214:7,20,
23 215:5,13
216:15 217:19,
25 218:6,17,19
219:17 220:1,4,
9,11 223:2,10,
25 224:5,11,25
225:16,22
226:2,6 235:3,
12,16 236:1,8,
13,21 237:3
238:7,11,16,20,
23,25 239:25
240:2,7,11
241:19 242:11
243:24 244:13,
19 245:4,9,12
249:11 252:11
253:5,14 254:4,
10,12,15

**Grossman**
221:2 230:9

**grounds** 99:11
100:16 102:4
234:8

**growing** 30:10

**guardian**
58:10,11,12,15,
22 59:11 60:3,9
61:2 67:1 77:22
105:15,17,24
107:2,7,18
150:18 209:21
212:11 213:15,
21 214:1
217:24

**guess** 18:20
81:2 134:24
142:21 192:3
195:11 202:8
204:4 206:11
207:23 222:19
250:15 251:6,9,
22

**guessing**
138:3,17 140:1

**guilt** 250:6,16

**guilty** 237:20,
23

**guys** 29:5
35:13 72:1 82:5

## H

**habit** 138:17

**Halloween**
25:3,4,6 30:2

**hand** 7:6,13
166:5

**handcuffed**
151:18

**handed** 124:17

**handle** 45:12,
23 51:3,15

**handled**
177:12

**handwritten**
136:9 183:12
216:17 221:17,
21,23 230:6,8

**hang** 39:19
80:2 91:22 93:8
108:19 134:7
144:15 175:24
187:23 214:20
235:3,16

**happen** 65:24
74:24 75:10
105:12,20
197:1 216:14

**happened**
13:21 15:2
27:11 65:22
86:24 126:19
128:19 131:17
133:13 173:6
176:2 178:9
179:19,21
192:14,17,23
194:15

**happening**
71:11 83:8,9
139:13,15

**harassing**
75:25 205:9

**hard** 224:20

**harder** 67:17

**Harold's**
228:11

**Harrill** 6:2

**head** 9:12
89:24 156:8

**headquarters**
37:24,25 38:2
48:23,24 49:4
135:4

**hear** 9:15 14:12
67:17 69:3
73:15 76:19
188:23 245:5
250:12

**heard** 126:2

**hearing** 8:25
9:2 20:3,7,16
21:22 22:4 29:1
128:11 131:15
199:12 213:8
224:24 230:21,
23 231:8,10,15
243:11,15,18

**hearings** 20:1,
2 29:1

**Hearsay**
225:22

**held** 107:20
148:9

**helpful** 9:5
127:11 128:21
129:8,9 133:18
186:17 211:20
238:6

**helping** 119:12

**Hey** 15:15 25:9,
12 212:5
217:22

**higher** 44:20
178:13

**hill** 71:12

**hint** 110:19

**hired** 34:6

**history** 153:9
239:22 241:4

**hold** 68:16
114:6 121:18
175:2 181:11
207:13 218:17

238:1

**holding** 233:17

**home** 104:13,
14 105:7
108:11

**homicide**
23:11,16,17
27:14,23 32:5
33:24 39:14,18,
25 123:3,7
134:5,13 135:1,
18,23 149:2
190:19,23
237:15 242:10
243:23

**honest** 16:23
97:14 141:6

**honestly** 72:5

**hospital**
192:21 193:21

**hotlines** 45:12
49:2

**hour** 155:1,3,5
181:8

**hour-and-a-
half** 134:20
155:5

**hours** 18:5,12,
20 90:19
148:10 173:16
190:19,23,24
202:21 203:7,8,
11,16 206:25
207:11

**housed** 49:1

**hung** 30:13

**hybrid** 21:19
230:20

**hypothetical**
121:19 127:3
129:14 175:15,
25 176:14
177:7 178:3
190:9 193:7,14
195:10 197:4
207:2,14
211:23 214:8
217:20 218:1



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 79 of 93 PageID #:9450
The Deposition of OFFICER KEN BURRIS, taken on July 09, 2021
267

225:17

**I**

**idea** 90:3 95:7
140:21 180:2
237:21

**IDENTIFICATI
ON** 62:1 92:2
98:21 129:21
131:13 154:15
181:15 218:12
232:1 239:12

**identified**
184:20

**identity** 234:12

**III** 118:11

**Illinois** 6:9
31:24 33:4,6,
13,17,18,20,21
34:5,8 41:4,13
132:17 157:3
253:24

**imagine** 44:4,6
209:3

**immediately**
107:1 108:16

**impact** 10:14,
18 17:4

**impacts** 10:14

**importance**
117:9 182:6
183:4

**important** 8:21
9:10 71:17
108:2 144:8
155:22 167:22,
25 168:3,7
169:2 206:22,
23 212:5,10

**improper**
201:11

**in-service**
41:23

**inappropriate**
76:3 121:2
185:13

**incident** 84:14
246:11

**include** 58:10,
14 107:15,22,
23 118:24

**includes**
234:14

**incomplete**
69:16,18
121:19 127:3
129:14 175:24
176:13 177:6
178:3 190:5,8
193:6,13
195:10 197:4
202:9 207:2,13
211:23 214:8
217:20 218:1
225:17 238:8

**incorrect**
135:10

**increase** 44:19

**incriminate**
54:18,24
252:10

**independently**
136:3,21
137:14 138:24
139:4 143:6,24
144:14 145:19,
21 146:3,24
166:22 212:4
226:15

**indication**
167:16,17
170:6

**indicator**
186:17 187:13,
21 188:11

**individual** 6:17
63:7 81:22
82:1,3,21 83:6
161:8 217:18,
22 251:17

**individuals**
51:16

**inference**
144:21

**inferences**
138:25

**inform** 114:3
217:2

**information**
26:20 93:1,2
103:23 107:19,
23 108:3,23
116:25 118:22
119:15 120:17
121:8 128:2,18
140:8,9,15,19,
24 153:3
177:25 197:7
235:6

**informed**
113:16 115:8
176:25 182:25

**informing**
168:11

**initial** 42:9
108:21 189:12,
25 216:13
217:12 218:23
219:11,24

**initialed**
136:10 226:17

**initialing**
228:10

**initially** 59:9
189:8

**initials** 134:1
229:19

**initiate** 122:3
124:3 126:6

**innocence**
27:4,24 32:10,
13,22 237:9,13

**innocent**
237:14,23

**inquire** 162:6

**inservice**
41:22

**inside** 139:22

**insignia** 96:20

**instances**
16:22 180:21

194:5

**instructors**
182:18

**intellectual**
161:23

**intelligently**
155:25

**intention**
146:13,16
251:1

**intentionally**
201:4

**interactions**
177:12

**interest** 71:11
93:22

**interested**
69:19 193:25

**internal** 17:6

**interpret** 70:4
71:2 87:9,18
88:4,5,12 89:11
102:17 119:7,
10 120:16

**interpretation**
70:23,24 71:10
101:7 115:13

**interpreting**
158:23

**interrogate**
116:24

**interrogated**
116:16,18
149:25 173:10
174:10

**interrogating**
146:13

**interrogation**
62:15 63:3,7
81:21 82:20
83:3,8,9,10,12,
18,21 84:3
85:13 87:12,17
88:2 89:20
92:16 93:5
94:19 95:3
113:5 114:22

115:1,6 116:15
150:22 151:2
173:13,14,18
174:15 247:7
251:19 252:9,
23

**Interrogation-
advising**
251:16

**interrogations**
53:16 59:4
182:13 247:1

**interrogatorie
s** 231:21
232:11,18
233:1

**interrogatory**
231:19 233:14,
24 234:8 235:7,
24 236:4,11

**intervene**
179:10

**interview**
173:15,19
174:15 181:25
192:21 193:22,
25 194:1,13
196:4 216:22
218:23 221:11,
14 247:7
252:24

**interviewed**
173:12 174:13
192:20 193:20
220:5

**interviewee**
193:22

**interviewing**
219:16

**interviews**
247:1

**introduce**
152:13

**introducing**
152:25

**invest** 87:12

**investigate**
33:11 34:1

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 80 of 93 PageID #:9451
The Deposition of OFFICER KEN BURKE, taken on July 08, 2021
268

118:24

**investigating**
19:21 58:21
88:22 196:10
213:24 247:11,
14

**investigation**
17:7 23:11,16,
17,18 32:5
39:14,18,25
53:15 117:16
120:19 134:6,
13 135:1,19,23
147:17 189:14
234:18 243:23,
25

**investigations**
46:1,3 49:7
53:10 121:5,6

**investigative**
181:8

**investigator**
33:10

**involuntarily**
57:15

**involuntary**
175:11

**involved**
24:19,21 25:9,
10,13,19,22
26:7,13,14 40:7
41:17 46:10,12,
13 59:10,22,23
60:1 134:5,25
241:5,11,17,20,
23

**involving** 34:2
45:24 58:21
113:17 115:10
123:7 125:9

**issue** 71:22,23
76:24

**issued** 124:12

**issues** 12:4
161:14 182:16

**item** 102:6

---

**J**

**J-NUMBER**
110:25

**Jakes** 6:7,15
7:25 25:19,22
26:14 27:4,24
31:24 32:9,12
131:21 132:2
143:20,22
145:16,22
146:21,25
147:2,10,23
148:15,23
149:5,8,11,14,
17,24 150:6,10,
11,17,20
151:21 152:4,7,
10 153:8 154:8
155:18,20
156:16,20,22
157:13 158:9
167:22 168:3,
20 170:12
174:9,18,25
175:5,9,21
176:20 177:3,
18,22 178:5
179:14 190:11
191:2,23 195:5,
14,24 196:3
197:11 199:5,
21 203:3
204:14,20
205:4,15 208:4
209:8,12,15,19,
23 210:1,7,13,
24,25 211:2,5,
12,15,19,25
212:24 213:5,9,
13,16 214:12,
13 215:3
216:13,22,25
217:2,8,13
218:10,22
219:13,24,25
220:5,17,19
221:1,6,12,16,
18,20 225:3
226:9,23 234:3,
13 236:16,18
237:9,13,14,20
242:18 244:2,6,
10,15,21,24

246:21 247:2,7,
17 248:9

**Jakes'** 20:12,
15 22:7 32:22
150:21 151:2,
16 212:23
214:6,17 215:2
222:5,22
223:19 225:8
230:6 231:1
236:6 242:9,25
243:6

**Jakes's** 234:15
243:15 244:21

**job** 17:4 38:10,
23,25 42:19
43:12 56:3
67:23 88:21,22
110:23 122:4
241:21 247:5,
10 248:12

**jobs** 38:11,12
39:2 51:3 67:20

**John** 31:6

**Join** 50:22
52:20 53:3 54:3
60:12 66:1,13
76:12 107:9

**jotted** 128:2

**judge** 17:15,18
91:17 225:6,19

**Judge's** 250:1

**July** 6:4

**jump** 154:16

**jumped** 177:23

**June** 131:5,18

**jury** 13:14 15:4,
19,22 29:2,6
154:2 249:1,10

**juvenile** 41:4
42:6,16,19
45:16 46:25
58:21 64:8,17,
24 65:15 67:6,
22 68:3 69:6,
11,13 72:12,13
74:16,23 75:9,
22 77:20 78:2,

19,20,23,24
82:3,4 85:3,24
86:20,23 87:3,
21,24 89:19
91:6,11,13,17
92:14 94:17
95:1 99:11,13
100:9,15,16,25
102:3,8,16
103:17 104:5,
12 109:9,14
110:22 111:17,
18,23 112:16,
17 113:18
115:10 116:17,
20 123:7
141:17,23
142:2 143:23
144:3 170:16
177:15 178:20,
25 179:22,25
182:4 183:5,13
253:2

**juvenile's** 54:6

**juveniles**
42:18 45:5,19
50:25 51:15
67:21 83:12
89:22 97:15
102:13 177:11
180:19 181:21,
23 182:25
188:9

---

**K**

**keeper** 116:20

**Ken** 6:6,18
68:24 231:20
232:9

**Kenneth** 6:6,7,
24 24:17 25:5
35:18 132:15
157:2 232:23
233:7 254:18

**kicked** 176:21

**kid** 114:15

**kids** 30:12
114:14 194:6

**Kill** 20:12,22
35:20 39:17

149:13 151:13
240:24 246:15
247:15

**Kill's** 22:14

**kind** 10:17 17:6
22:18 33:11
38:12 44:10,17
60:8 70:17
91:12 96:9,11,
15,20 123:9
125:6 148:8
161:13,22
177:10,25
191:16 193:18

**kinds** 41:24

**knew** 27:5 29:7
30:14 106:16
112:19 153:11,
14,16,17,19
162:20 190:14
191:10,23
192:1,5 202:20
203:12,16,19
209:19,23
210:2,4,5
213:12 241:22
247:12,21

**knowing** 57:21
58:1

**knowingly**
54:8 55:6 56:6
57:14 155:23

**knowledge**
233:2 234:11
237:12

**knowledgeabl
e** 44:6

---

**L**

**L-E-V-I-N-E**
31:17

**labeled** 117:23
182:16 239:21

**Lack** 121:20

**Lacks** 226:7

**laid** 77:6 93:15
94:1 184:18

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 81 of 93 PageID #:9452
The Deposition of OFFICER KEN BURKE, taken on July 08, 2021

269

language
167:1,2 244:24

larger 50:9

late 249:13,14

Lauren 6:2 7:7
60:17 73:17
119:21

law 33:1

lawsuit 11:21,
24 12:13 23:22
24:13,18,21
25:6 29:12,13,
16,19 31:1,2,6,
9,12,15,25
248:21

lawsuits 12:4,
17,24 253:12,
18,21

lawyer 58:14,
15,17 59:11
113:17,21
114:19 115:9,
23 162:12,22
163:1,2,12,13
164:1,5,12,14
165:2,16,22
168:14,17,21
218:5

lawyers 235:9
236:25

Lay 200:19

lead 119:8
237:14

leading 242:20
243:10,14

league 27:7,9

learn 32:20
90:14 175:20
178:20

learned 136:25
176:16 237:4
243:22

learning
161:11

leave 34:8
37:10 63:17
106:25 174:1

230:13

leaving 107:15
220:18

lecture 90:13

led 121:15

left 36:3 37:18
219:2,11,12

left-hand
222:17 228:10
229:15

legal 182:16

legally 114:9

legitimate 71:5

letter 223:1,14
224:4,10

letters 224:21

Levine 31:15,
17

light 78:16

limit 202:21

limited 140:9
234:15

lines 200:14,15
227:11,18,25
228:9 229:14

list 63:21
118:19

listed 55:14
102:5 241:3,11

literally 72:22

lives 152:22

locate 213:25

located 49:1
60:4 64:11,20
65:1,17,18,23
66:10 67:2 69:9
74:19,25 75:11,
19,20,21 77:23
78:4 79:2 87:5
88:1 213:21

location 6:12
136:13,14

locations
50:20

lockup 102:14
116:19

lone 251:5

long 18:4,10,19
33:6 34:22
36:18 37:7,13
38:1,5 42:6
52:4 90:23
138:1,15,16,18
190:12 197:11,
16 199:6,24
200:3 202:5
203:4 206:6
217:12,14
219:23 241:21

longer 18:11
49:17

looked 17:25
19:7,8 22:7
95:16 143:11
156:16 204:7,
12,13 225:20

lost 130:7

lot 29:10 47:20
76:7 102:13
110:3 133:14
139:10 154:23
229:16,22
251:12 252:19

lots 120:21

loud 79:6 102:1
162:6

Louis 28:23
139:17 224:20

love 76:20,21

lunch 154:18,
24 155:6,8,9

lying 101:11

———————

M

machine
107:16

made 59:5
69:25 75:25
85:18 87:8
177:25 185:18
193:12 198:4

207:18 220:9
226:13,15
244:20 247:22
248:2,7

main 67:20

majority 50:24

make 9:15 10:2
23:15 26:15
54:5,10 57:13,
18 62:3 67:24,
25 71:5,16 77:5
89:23 103:20
104:11 106:10,
15,18 107:5
112:9 129:5
133:3,4 146:11
155:19 156:4
165:15 171:13
173:1,4 175:6
176:19 185:4,5,
9 196:23
198:13,19
200:19 205:7
215:25 226:10
233:18 244:23
245:8 250:12

makes 39:13
90:1 184:4
224:6 250:16

making 55:22
56:5 145:6
183:4 198:22
201:13 206:1

manage 47:15,
23

manner 234:14
236:17,19

manual 97:17,
18,20,22 98:2,
8,13,25 117:24
118:1,9 120:21
130:12,16

March 153:24

mark 61:24
91:25 98:6,10,
20 129:19
130:18 131:11
154:13 199:14
218:11 231:24
239:10

marked 62:1
92:2 98:21
129:20,21,22
131:13 154:15
156:19 181:15
218:10,12
232:1 239:12

material
161:18

materials
125:15

matter 6:7
188:16 198:15
251:4

matters 90:9

meaning 78:23
88:13 144:18
252:14

means 63:17
75:9 87:7 159:4
171:10 187:11

meant 144:22
158:17 160:12
162:21 163:24
164:19,24
165:19,22,25
166:11 169:3
170:2 171:1,3,
4,6,18 172:1

medical 10:13

medication
10:17

meet 18:2,10,
14 242:13,17,
21,25

meeting 18:6,
7,13,14,18,19,
21,22,25 19:1,4

memo 122:2,5
123:13,22
124:8,11,20
125:4,6

memorandum
178:17

memorialize
125:16

memorialized
126:19 221:24

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 82 of 93 PageID #:9453
The Deposition of OFFICER KEN BURKE, taken on July 09, 2021
270

memorize 33:22

memory 10:14, 15,18 127:9 142:1,25 214:16 215:12

mention 27:11, 25

mentioned 24:2,4,19 25:7 26:18 30:6 50:14 55:19,22 61:8 105:23

mentioning 27:22

mere 54:4 122:4 124:1

message 107:15,23

met 17:25 18:3, 9,16 29:24 172:17 175:10 176:11 200:1

metal 143:16

methods 193:17

meticulous 171:22

Michael 29:15, 16 35:20,24

midnight 51:9, 10 135:10,12, 14

midnights 51:1 135:16

mind 250:5

mine 247:20

minor 110:22 114:11

minute 68:25 74:7,9

minutes 52:9 73:11 122:8 138:2 152:5 155:10 217:14 219:15 220:20,

22,24

Miranda 55:13, 15 57:23 63:24 78:18 82:2 88:20 109:1,3, 12,21,24 110:1, 17 111:6 112:16,17,25 146:2,4,6,9 155:19,20 156:7 158:6 159:7 160:25 167:23 168:4, 10 169:15 172:21 183:23 186:11 252:5

mirror 193:24

mischaracteri zation 220:3 249:11

mischaracteri ze 56:13,22,25 200:21

mischaracteri zes 56:9,18 75:1,15 86:7 109:5 114:7 123:16 169:6 174:12 188:15 202:10 204:15, 24 214:7,20 215:5,15 219:17,18 220:1 223:3 226:6 235:17 254:4

mischaracteri zing 201:12

misdemeanor 110:22

misinterpreted 115:18

misleading 71:2 76:2 121:3 201:9

misled 17:18

misread 115:18 160:6

missing 45:25

46:5 48:25 120:20,21 121:4

misspelling 225:25

mistake 248:7

mistreated 57:18 147:24 148:2 173:2,5 178:21,25 179:23 180:1, 15,17,19,22 195:15,16 196:13,18,19 197:1,6

mistreatment 179:14

misunderstoo d 12:11

moment 111:9 113:12 139:4 239:24 241:8, 14

money 13:16

month 135:16 192:2

months 127:12

moral 179:11

morning 7:21, 22 51:6 134:22 137:7 245:14 246:18,22 247:6,13

mother 152:21 191:10 209:19 213:4

motion 20:19 21:18,19,20 230:19,20 242:14 243:9, 10

move 73:2 129:17 205:11 245:7

moved 45:6

movement 63:9 82:22

moving 52:1 200:20

multiple 16:17 48:9 79:25 98:13 106:3 107:6 130:3

murder 91:12, 14 109:16 140:18 172:4 173:21 211:6 212:2,6,17,24 214:18 215:4 216:6 234:4,13, 14 236:17,19

murdered 234:11,13 236:16,18

muted 14:11

___

N

named 31:9, 12,15,18

names 39:3

Nancy 223:14

natural 9:13

Neal 31:12

necessarily 83:7 108:6,7 129:3,4

needed 66:25 75:22 78:3 102:10 140:12 171:5

neighborhood 29:8 30:8,12

nephew 212:6 216:6

night 245:13 246:11

Ninth 34:19,24 40:6,16,19,23

No.' 213:17

nod 9:12

Northern 6:9 253:24

notepad 128:4

notes 127:15, 20 128:9,12,16, 18,24 129:5,11 182:19

notice 225:10 226:4

notified 177:2 215:22

notify 177:21 178:7,8,12 180:24

number 6:9 8:9 10:25 11:1 92:9 102:8 105:23 118:18 120:12, 16 121:10 132:23 154:7 157:12 182:24, 25 184:21 222:20 233:15, 24 234:2 235:24 236:4, 11 238:3,4 247:21

numbered 233:13

numbers 154:6

numerated 63:21

___

O

O'CONNER 31:9

object 9:4,6 39:20 80:6 85:21 87:1 92:21 94:4,5,6 126:1 134:8 145:9 241:19

objected 69:15 188:20

objecting 68:15,17 184:10

objection 21:7,8,16 22:10

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 83 of 93 PageID #:9454
The Deposition of OFFICER KEN BURRIS, taken on July 08, 2021

271

23:14 26:4
27:17 28:5
30:21 31:3
32:6,7 42:22
43:7,20 44:24
46:14,15 50:21
51:17,18 52:19
53:1,12,17,22
54:2,22 56:23
57:2 58:24
59:23 60:11
65:4,25 66:12
67:3 70:20
75:1,12,24
77:17 78:5
80:3,4,23 84:16
85:14,20 88:3
93:8,18,19
99:25 103:2,8,
25 107:8,11
108:5,19 109:5
110:2,18 112:7
124:6,9 125:20
126:23 128:25
129:13 134:14
135:2 148:11
150:1,23
153:20 158:18,
25 159:5,10,18
160:13,21
161:15,19,25
162:8,18,23
163:3,10
164:21 165:7,
12 167:19
169:5,22
170:22 171:16,
19 172:15
173:11 174:11
176:13 177:6
178:2 184:15,
22 185:9,19
186:21 190:4
191:14 193:6
194:20 195:9,
25 196:23
197:10 198:14,
19,22 200:19
202:9 204:15
205:7 207:1
211:22 212:8
216:15 217:19,
25 218:6
223:10 224:5,
11 225:16
226:2,6 234:10

246:23 249:11
252:11

**objections**
77:5 94:21
145:7 151:3
185:5 193:13
201:13

**objects**  234:8

**observations**
117:17 121:17

**observe**  123:3
125:8 194:6
213:20

**observed**
133:5,19
243:22

**observer**  54:5
122:4 123:6
125:8 128:22
129:12

**observers**
124:1

**observing**
53:15,19,24
56:4 57:12
121:15 182:3

**obtain**  87:20

**obtained**  86:24

**occasion**
53:10 123:2
181:1 219:13

**occasions**
16:17 127:25
128:15 145:6

**occur**  195:7

**occurred**
137:21

**October**  125:4

**offender**  92:14
93:3 94:17 95:1
99:12 102:3,5

**offenders**
45:16,17

**offense**  102:5,
22

**offenses**
45:13,22
100:20,21

**offering**  71:5

**offhand**  181:3

**office**  67:5
101:10 109:14
114:13 116:18
136:20,22,24
137:1 140:11

**officer**  6:6,18,
22 7:2 13:7,10
14:22 17:4
19:22 34:18,22
35:2,10,15,17
36:4,6,9,12,17,
24 40:4,11,20,
24 41:1,4,6,9,
13,19 42:2,6,19
44:5,16,20
45:1,3 46:9,12,
17 50:19 52:18,
25 53:5,8,11,
23,25 54:4 56:4
57:11 58:5,7,19
59:10 60:1,5
61:1 62:18
65:11,19 66:5,
24 67:5,20,22
72:10,14,18,23
75:14 76:1 83:6
84:8 88:16,23,
24 89:1 90:5
91:5 92:20 96:3
97:16 103:20
104:4,8,19
105:5,6,16,19,
21,24 106:13,
14,17,20 107:1,
5 108:16,22,23
110:14,24
111:6 114:12
116:17 117:6
118:23 119:8,
16 120:18
121:6,7,9
125:14 126:6
127:16 128:1
133:3,20
135:13 149:16
150:5,21 151:2
152:17 153:1,5,
12,15 157:1
172:17 175:22

176:10,17,21,
24 177:4,20,23,
24 178:6 180:9,
18,25 188:16
192:7 196:10
207:6 212:11
214:3 217:15
232:9 240:25
246:9,20 247:6
248:22 252:8

**officer's**
110:23

**officers**  6:17
27:7,8 45:11
46:2 47:16,23
48:4,9 50:3,12,
15,18 58:20
59:21 67:6,12
92:15 93:4
94:18 95:2 96:1
111:23 118:16,
21 120:15
121:16 124:13
135:9 186:6
195:16 212:12,
14 216:5
230:15 251:3

**official**  60:23
61:4,5,9,10
88:13

**oftentimes**
67:24 105:20

**older**  30:9
101:11 195:2

**one's**  47:18,19

**opinion**  187:16

**opportunities**
76:7

**opportunity**
9:5 39:15 76:4
113:20 115:23
116:4 157:7
185:21 205:16,
18 206:7,10,19,
25 207:10
208:4 210:8,14
211:1

**opposed**  9:11
45:16 158:23

**option**  116:14

**orally**  163:21

**order**  8:20 23:1
41:12 61:16
62:12,15,19
66:3 73:22
87:20 89:20
90:1 111:10,13
144:19 157:24
178:16 182:19,
21 194:7 203:7
213:14 251:7

**ordered**  129:5

**orders**  42:17
89:23 90:21
190:21

**orient**  243:8

**originally**
240:5

**outs**  229:9

**overcome**
193:18 194:17

---

P

---

**p.m.**  51:7
190:15 254:20

**Pack**  36:1 40:6,
12,13,16,17
240:25

**packet**  98:12
117:22 130:3,7
131:5 153:23
181:4,5

**pagers**  140:11

**pages**  62:4
92:5 98:13
120:21 130:6,
15,23,25
181:18 218:16
225:9 229:25
241:8,12,14
247:23

**paginated**
98:14

**paid**  13:15
34:10



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 84 of 93 PageID #:9455
The Deposition of OFFICER KEN BURKE, taken on July 08, 2021
272

paper 76:8
106:21 110:24
124:15 128:2
186:2 189:12

papers 108:12

paperwork
110:25 124:3

par 44:22

paragraph
63:11,20 64:5,8
70:21 74:8,12,
14,16 77:19
85:6 88:13
99:8,10 113:13
183:7 232:8
233:2,5

parameters
14:7

Pardon 136:17
204:18 220:23

parent 58:9,11,
12,15,22 59:11
60:3,9 61:2
64:10,19,25
65:8 67:1,7,9,
11,13,23,24
68:1 74:17
77:22 78:25
79:20 105:14,
17,24 106:4
107:1,6,18
108:3,10,11,16
113:17,21
114:3,4,12,14,
15,16 115:9,14,
15,23 116:4,5,
25 117:1 150:7,
9,17,18 213:20
214:12,13,14
215:21 217:23

parentheses
64:19

parents 67:9
114:20 150:12

Park 38:18
39:2,11

parking 139:10
229:15,22

part 14:17

23:18 38:11,12
41:14 67:16,17,
19 68:4 69:24
72:25 89:1
95:13 97:4
106:23 110:20
112:15,23
175:4 183:21
184:15,16
197:15 202:25
234:14 236:16,
19 240:6,14,18

participation
134:6,12

parties 6:25

partners 36:24
37:1

parts 55:21
100:5

party 12:12

passed 42:23
43:15 219:25
220:17

past 162:6
202:21 215:19
238:25

paths 24:23

patrol 34:15,
17,22 35:2,9,
15,17 36:4,22
37:6 40:24
44:10,20 99:19
102:7 186:6

pause 9:2,4
44:14 139:3

pay 13:16
44:19,25

penalties
169:19 232:24

pending 6:8
10:9

people 9:12
24:2,4,5,7
31:24 37:1
116:16 132:16
135:8 235:8

perfect 7:12
98:5 155:11

perform
135:23

period 35:9
49:10 50:16
53:9 87:22
134:5 140:13

perjury 232:24

permission
97:11

person 24:25
25:1 28:7 46:5
60:5 63:9,17
82:23 99:17
113:16,20
115:8,22 143:4
249:25 251:20
252:8,9

person's
252:14

personal
23:10 234:11

personally
40:8

personnel
92:10 238:13,
14 240:6,15,18
247:2 251:4

persons 45:25
49:1 121:4
234:12

perspective
70:6

pertain 186:5

pertaining
18:1 42:17

pertains 89:22

petty 46:9

phone 24:25
106:1 141:1
210:23 245:7

phones 140:10

photograph
103:7

photographed
102:4,24 103:1,
6,15

photographin
g 102:8,10,16
103:17

photos 102:15

phrase 39:22
227:2 229:22

phrases
247:23 248:3,
17

physical
45:13,22
136:13

physically
136:13 248:16

pick 181:4

piece 128:2
227:19

pieces 186:2
238:17

place 20:17,23
23:2,18 28:8,9,
12,16 127:13
251:19 253:12,
23

plain 70:8 96:7
97:1

plaintiff 6:15
7:24 11:20,24
12:7,9 13:16,25
14:5 131:21
132:2 199:21
213:8 225:3
234:3 249:7

plaintiff's 6:13
154:8 156:19,
22 157:12
170:12 231:20
232:10,25

Plan 161:9

played 13:15

plays 72:23

point 18:16
41:10 49:15
65:5,20 71:1
84:6,7 104:6
137:23 143:3
170:20 176:18

185:10 205:9,
11 217:8 219:4,
7 246:5,8
247:12 249:1

pointed 72:22
141:17 142:5,6

pointing 65:13

police 13:6,10
14:22 17:4
19:10,19,20
24:8,11 27:6,7,
8 29:25 30:16,
20 32:25 33:5,
7,17 34:5,7,9,
10,11 37:25
41:20,23 42:13,
17 46:12 50:12
59:12,22 90:18
95:11 96:16
98:1 117:23
118:9 133:2
149:16 152:18
153:2 157:24
177:12 180:15
199:24 203:3
212:12,14
216:10 232:9
234:16,17
236:7 247:2
248:22 251:3

policy 66:8
74:22 111:22
124:5 177:11
178:24 179:13
216:10

polite 142:21,
22

portion 83:5
88:2 202:1,3
228:7 238:7,11,
12

position 36:18
37:8,10,11
38:2,5 189:13

possession
99:22 100:25
101:4

possibly 40:15
121:24 159:21



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 85 of 93 PageID #:9456
The Deposition of OFFICER KEN BURRIS, taken on July 08, 2021
273

postconviction 20:6,20 22:4 29:1 131:15 199:12 213:8 224:24 243:15,18

potential 112:22 172:4,6 215:4 216:6

potentially 149:1 170:3 172:1,10,13

practice 66:9,11 107:4 114:2 116:13 133:7 159:13 185:7 190:6

practices 100:21 215:19

preclude 68:3

premature 234:9

preparation 18:15 19:8 126:15 235:22

prepare 17:21,24

prepared 250:19

preparing 236:10

preprinted 146:8

presence 64:9,18 65:16 69:7 74:17,24 75:11,14 76:1 77:21 78:3,25 87:4,25 88:25

present 7:1 18:22 19:2,5 24:14 58:7 61:13 64:25 65:9 72:11 75:22 79:20 92:16 93:5 94:19 95:3 113:21 115:23 116:4 117:1

141:20 150:21 151:2 211:13,21 212:1 213:13 221:14,16,20 226:16 234:10

presentations 90:5,7,8,20

presented 169:7

presenting 69:16

presume 154:17

presumed 167:3

presumption 10:3

pretty 58:3 70:8 158:19 160:23 224:20

prevented 161:23

previous 19:11 86:24 203:14

previously 7:23

primarily 127:8

printed 10:25 11:1 61:17 101:14 102:14

prior 15:4,5 32:24 33:5 39:14 60:10 83:21 88:21 123:12 151:5 174:21 177:3 178:21,25 192:2 210:25 213:3 218:3 221:10 242:14,17,20,24 245:16 246:11 247:2

priority 156:4

prisoner 142:11

privilege 237:2

privileged 198:15

privileges 186:18

probable 231:7,10,15 252:1

problem 59:16 68:4,12 69:3,14 70:14 76:2 110:20 121:20 169:11 200:11 238:16

problems 68:8 203:3

procedure 22:22,23 23:7 72:6 94:25 97:18 98:2,25 112:25 113:5 115:2,7 118:9,12 130:12,17

procedures 51:21 114:23 116:16 120:15

proceed 8:17 72:6 158:5

proceeding 160:9,12

proceedings 6:1 44:6 216:14 231:16

process 42:18 46:10,13 51:25 67:18 91:1 97:4 103:19 108:14 165:1

processed 97:4,8 102:12,13 103:15,19 116:19

processes 173:6

processing 45:5,19 50:25

51:16 67:16,19,20 109:8,13,20 110:21,24 161:14 180:18,21

produced 234:18

professor 200:18

promoted 36:6,21 42:24 43:15 45:20

promotion 42:24 44:10,18

promotional 43:11,14

proper 76:14 93:25 106:20 201:7,10

prosecuted 78:22 85:5 111:20 112:1,13,23 171:18

prosecuting 31:24

prosecution 171:10 242:10 243:1,6

prosecutor 126:22 127:1,2

prosecutors 31:2,22 234:16 236:12 242:9,13,17,25 243:5,12,16,19

prostitution 100:22

provide 108:23 234:4

provided 112:22 221:7

providing 107:18 221:10

provision 65:14

pull 60:20 97:25 119:24

131:4

pulling 11:15

purpose 22:19 23:6 52:24 175:5 176:6

purposes 46:17 47:6 164:14

put 11:1,3 70:23,24 93:25 98:10 122:2 184:21 231:18

puts 42:12 250:16

putting 88:24,25 144:19 188:5

———

Q

qualify 101:1 177:16

quash 20:3,19 21:19,20 230:20 243:9,10

quash/motion 242:14

question 8:22 9:2,25 10:3,4,9,10 25:16 32:15 39:20,21 42:22 43:8 49:9 51:19 56:2,15,17,19 57:4,6,8 58:25 60:15,16,18 66:16,21 71:15,21,23 72:8,24 76:11 77:7,11,24 78:8,10,16 79:10,11,12,13 80:9,11,12,13,14,18 93:15 94:2,3,10,14 102:20 104:16 112:6 114:17,21 115:24 116:21 119:22 120:2,5,6,10 133:4,6,10

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 86 of 93 PageID #:9457
The Deposition of OFFICER KEN BURKE, taken on July 08, 2021
274

134:15 137:22
144:17,25
150:14,16
154:21,22
157:17,21
158:1,3,15
159:13,14,22,
24 160:15,23
162:2,10,15
167:7 169:9,10
170:9 174:7
175:3 181:22
185:23 187:17,
19,24 188:8,19,
21,24 191:16,
22 192:13
196:16,21,22
197:22,23
198:1,4,12,14,
18 199:4,25
200:2 201:9,20,
24 202:2,19
203:1,4 204:24
205:11 207:16
208:10,15,17
211:2,10
213:11,17,23
214:24 215:16
225:7 235:5,16
236:22 240:3
241:15 254:3

**questioned**
64:9,18,25
65:10,15,24
66:10 67:1 69:7
74:17,23 75:10,
23 77:21 78:2,
25 84:11,13
85:17 87:3,5,7,
25 113:16,20
115:8,22
174:21 192:17
252:15

**questioning**
74:24 75:10
76:3 83:6,14
84:5 85:18
86:19,23 87:11,
21 88:2,5,7,9
113:22 116:3,5
117:2 162:13
164:13,20
165:5 177:15
186:22 214:4

**questions**
9:24 69:9,17,22
70:22 72:15
77:3,4 84:8
87:16 120:22
144:23 145:1
146:17 158:10
160:9,19
162:12 163:8,
14 164:8,11
165:6,9,15
166:17,18
167:12 170:9
171:25 185:13
191:9,12 213:1
241:10 245:3
247:21,24
248:21 251:12
252:19

**quick** 52:2
253:8

**quiet** 186:23

---

**R**

**Rafael** 23:12,
19

**raise** 7:6,13

**ran** 25:4,5

**rank** 34:15
44:14

**re-ask** 120:9

**reach** 15:15,23
58:21 106:4
212:5,11

**reached**
212:12,15,23
214:6

**reacting** 72:24

**read** 19:14,16,
20,23,24 20:1,
2,9,11,12,15,25
21:1,5,6,14,21,
25 22:4,8,11,
13,16,25 27:19
60:17 62:24
65:3 68:5 70:5,
7,11 72:4 73:4
74:7,10 75:18
77:12,19 78:11,

13,15 79:6,18,
25 83:20,22
97:20 99:8
100:1 101:8,24
102:1 113:13
114:7 119:6,21
120:12,15
136:23 141:15
144:10 145:20
158:5,12,15
159:7,8 161:18
163:15,19
164:14 165:16
167:4 169:15
171:22 172:21
178:16 180:9,
17 183:23
201:25 202:3,
11,25 204:20
220:5 225:14
226:5 232:24
240:20 251:14
252:5

**reading** 22:19
23:7 69:18
70:5,14,21
71:22 74:22
75:7,8 77:18,25
78:1 79:22,24
80:1 90:12,21
114:25 115:3
160:25 161:24
162:6 163:17
184:18 186:10
200:6

**reads** 60:21
71:13 119:25

**ready** 150:5
230:13

**real** 70:2

**reason** 10:20
58:18 142:23
196:15 197:15
198:5,8 199:5
213:19 214:15
230:3,5 252:7

**reasonable**
99:11 100:16
102:4

**reasoning**
126:5 250:15

**reasons** 41:24
75:12 174:24

**rebuttal** 157:3

**recall** 8:8,12,14
12:25 14:2
15:11,18 16:15,
23 17:1 19:6
22:11,12 25:24
40:5,8 41:11,
17,21,25 42:1,8
46:6 90:11,24
95:4 97:6 111:8
123:4,5,8,9,11
124:17,18,24
125:2 126:2,25
137:6,11
139:22,25
140:17,18
143:11 148:12,
13 149:9
150:13,15,19,
25 151:4,17,19
159:12,14,16
161:4 167:2,12
170:1 172:5,8
178:23 179:2
190:10 194:21,
23 195:1 204:7,
10,17,19
205:20 208:21,
25 211:7
215:24 218:2,7
227:4,10 228:5,
8 229:1 230:7,
16,25 231:6,12
234:24 236:9,
14 242:16
243:2,3,13,17,
20 245:18

**receive** 92:19,
25 93:12 95:13
97:17 124:11,
19 178:19

**received** 62:22
93:10 95:18
123:13,22
124:20 135:17

**recent** 8:10

**recently** 28:12,
17,21

**recertified**
41:8,9

**recognize**
222:2

**recollect**
145:19,21
215:23

**recollection**
104:18 126:18
128:13 190:23
215:13 242:8
243:4 245:17
246:8 248:12

**record** 6:23
52:11,13,14
68:14 69:19,25
70:23,24 71:4
73:13,16,19
75:13 77:6
82:7,9,11,13
98:10 102:1
117:17 118:21
119:15 122:10,
13,14,15
145:14 155:12,
14,15 184:8
198:25 200:14,
20 201:16
205:8 238:9
240:2 242:3,4,6
251:15 254:19

**recorded** 8:19
9:14 145:13

**REDIRECT**
253:9

**refer** 7:25
23:16 58:1
61:4,10,15
127:22 128:8
194:9 234:25

**referral** 104:5,
21 105:12

**referred**
129:17 156:20

**referring** 21:15
23:17 42:9
54:12,17,21
55:1,9,15,24
57:22 58:1
61:11 63:25
73:23 91:20
93:1 108:13
109:18 112:11


Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 87 of 93 PageID #:9458
The Deposition of OFFICER KEN BURKE, taken on July 08, 2021

275

125:13 195:15
203:1 235:1
236:20 240:3

**refers** 85:9,12
88:10

**refresh** 126:18
127:9 128:12

**refused** 60:4
202:25

**refusing**
202:10

**regard** 31:24

**reiterate**
185:3,9

**related** 17:7

**relating** 23:11

**relationship**
29:22

**relative** 61:2
64:10,20 65:8
74:18 79:1

**release** 104:4
114:15

**released**
103:24 104:21
105:5,10,11,14
106:16,18

**reluctance**
194:18

**reluctant**
192:18,23
194:2,14 195:3,
7,22

**relying** 137:16

**remain** 158:12,
16,23 165:14
166:13

**remaining**
130:23

**remember**
8:10 14:6,17
16:2,9,11 18:19
29:3 43:13 57:5
77:13 95:15
102:10 124:2
125:17 128:19

136:3,6,7,12,21
137:2,14,19,21
138:12,15,21,
24 139:4,8,10,
13,14 140:23,
25 141:5,6,9,
10,12,14,16
143:6,9,24
144:9,25
145:22,25
146:3,24 147:5,
7 156:7 166:22
167:13 181:1
190:18,21,24
192:3 196:24
203:14 204:11
205:2 215:17
226:12,15
243:23 247:24
249:4,6,9 250:3
253:17 254:3

**remembered**
139:2

**remembering**
238:12

**remind** 9:18,20
44:14

**remotely** 6:15,
21 8:24 10:23

**render** 175:10

**Renee** 6:14
7:23 198:18
200:11

**repeat** 13:8
28:15 54:23
57:6,7 60:15,16
61:7 77:14
94:13,14
110:11 119:19
214:24

**rephrase** 10:1
76:11 127:21
220:10

**rephrasing**
76:13

**report** 88:17
119:15 120:17
122:3 128:9
129:6 135:20
179:14 204:8

215:25 216:1

**reported** 60:23
81:10,15 88:13
89:4,15

**reporter** 6:2,3,
22,25 7:5,9,12,
18 52:11,14
60:19,21 73:18
82:6,9,12
119:23,25
120:1,4,7
122:9,12,15
155:12,15
233:17,22
242:2,5 245:5,
6,10 254:9,17

**reports** 19:10,
12,13,14,15,17,
20 47:24 117:7
123:15 126:6,
12,16,21 127:2,
8,11,22,23
128:16 148:14,
17,24 204:12,
13,21,22
230:17,18
234:17

**represent** 6:20
7:24 118:6
225:6

**representation**
240:13

**representing**
6:11 31:23
98:24 240:17
249:18,23

**reprimand**
9:20

**request** 10:9
185:4

**REQUESTED**
60:21 119:25

**requests**
113:18 114:4
115:10

**require** 133:2
177:20

**required** 58:5,
7 78:24 109:25

110:16,21
111:23 119:15
120:17 121:17
133:7 177:1
179:14

**requirement**
42:2 105:6
108:9 112:4
113:25

**reserve** 254:15

**resolve** 13:13
82:7

**resolved** 13:14
72:3

**respond** 26:23
236:18

**responded**
152:21 191:6
245:15

**response**
25:23 166:20
191:5 193:8
203:8 211:16
228:14 235:24
236:15,20

**responses**
231:19

**responsibilitie
s** 118:12
120:13,14

**responsibility**
108:15 247:5,
14 248:8

**responsible**
105:15,17,25
106:4,19
107:19

**rest** 202:12
225:8

**restrict** 83:12

**result** 86:19,23
87:11,16

**retire** 38:7

**retired** 24:9
27:6,8 30:1
38:6,9 90:2

**retirement**
30:15

**returned** 43:16

**review** 126:16
148:14,17,24
149:7 156:12
230:17 235:14,
21 236:5,6,11
241:8

**reviewed**
19:19 131:14
234:21 235:8

**ridiculous**
26:2,11,21,24
75:25

**right-hand**
91:23

**rights** 54:6,7,
11,12,13,20,25
55:4,6,8,9,12,
14,15,20,22
56:7 57:15,22,
23,25 58:2
63:10,24 81:22
82:1,2,24
83:21,22 84:1,6
88:20 112:10,
16,17,20
113:19 115:11
146:2,4,9,12
148:5 152:11,
19 156:7
157:18,19,20
158:1,6,11
159:7,9,22
160:2,24,25
162:6,7 163:18
166:16 167:23
168:4,10 169:2
176:7,12,16,22
177:5,16 178:1
180:17,18
183:23 189:9,
20 201:5 220:5
244:3 251:17
252:5

**ringing** 141:1

**robbery** 172:7

**Roberta** 122:5
123:21

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 88 of 93 PageID #:9459
The Deposition of OFFICER KEN BURRIS, taken on July 08, 2021
276

**role** 53:25
123:25 147:22
148:1,4 153:15
177:20

**roll** 124:18

**room** 29:3,6
68:21 69:2
104:14 141:14,
17 142:5 143:4,
7,10,11,18,19
145:24 146:10,
21 148:15,18,
23 151:15
152:6,9,14
168:21 185:6,
17 206:13
207:18 219:2,5,
11,12,16,22
220:17,18

**routine** 112:23

**rule** 148:8
185:15 202:13

**rules** 8:15
51:14 69:23
185:14

**run-in** 30:2

———————

**S**

**S-T-E-F-A-N-I-
C-H** 31:19

**sake** 233:20

**sarge** 47:19

**sat** 8:3,6,11
16:16,21
135:24

**scale** 44:25

**school** 109:15
126:3 183:25
184:5

**screen** 7:9
11:11,14,15
98:3 233:19

**screening**
104:9

**sealed** 89:20

**Secretary**

33:4,7,17 34:5,
9

**section** 89:21
92:11 99:4
118:11 228:13
239:15,18
240:4,20 241:3,
4

**security** 38:13,
15,17,18,22,25
39:1,2,4,5

**seldom** 111:1

**selection**
13:14 15:4,19,
22 249:2,10

**send** 68:2
106:7 185:6,16

**sense** 39:13

**sentence**
64:12,16,17,23
69:5,8 70:12
72:15 74:19,21
75:8,9 80:22
81:4 85:7 87:2
88:6 89:14
92:17 93:7
94:16,20
111:20 113:15
115:12,13,21
149:4 163:15
164:18 166:8,
11 171:10
183:2,20 235:2

**sentences**
69:4

**separate** 37:3
130:19 219:16,
22

**September**
134:16 151:5
154:9 222:4
245:14,16
246:3,12 247:6

**sergeant**
36:21,22 47:21
136:22 180:24

**sergeant's**
136:20 137:1

**sergeant/
watch** 38:3

**sergeants**
47:17,18

**serving** 13:6

**set** 15:18 70:3
231:21 232:11,
25

**setting** 193:21
221:6

**settle** 15:16,24
16:4 249:18,22
250:7

**settled** 13:19,
22 15:3,5,7,9,
10,13,20,21
16:8,11 17:3
248:24 249:10
250:2,4,11,18

**settlement**
254:2

**settling** 250:17
254:2

**sex** 45:22
100:21

**sexual** 45:13

**shake** 9:12

**sheets** 47:24,
25 48:1

**shirt** 137:8,17,
18

**shoplifting**
109:9,14

**short** 220:21,
24

**shot** 121:25
236:25

**should've**
65:22

**shoulders**
228:15

**show** 114:19
183:15,19,22
230:1

**showing**

183:22 187:5
230:4

**shown** 102:9
183:8,21

**shrug** 228:15

**shut** 135:11

**sic** 239:11

**side** 11:2,3,10
12:16 188:6
193:23 222:17
228:10 229:15

**sign** 47:24
189:11 225:24
229:24

**signature**
134:1 222:9,15,
22 224:2,19,21
225:8 233:4,6,7
254:15

**signed** 136:10
222:8,11 230:5,
8,9,10

**significant**
25:25

**signing** 221:21

**signs** 223:6

**silent** 158:12,
16,23 165:14
166:13

**similar** 45:15
96:25

**simple** 158:20
160:23

**simply** 144:23

**Sir** 7:5,12 10:20

**sit** 16:24 60:6
140:13 147:21
189:10,15,17

**sitting** 26:19
124:1 133:3,19
135:25 136:4,7
137:20 143:20
145:17 189:6

**situation** 56:4
178:18

**six-week**
90:18 95:12,19

**Sixth** 54:14,15,
20 55:19,21,23

**skeleton** 51:2

**skimmed**
22:18

**slapped** 177:4

**slapping**
177:15

**sleep** 205:17,
18,25 206:2,8,
10,19,25
207:11 208:8

**sleeping**
206:14 207:17,
20

**slept** 206:3,16

**slip** 105:12

**slow** 171:22

**small** 250:4

**smaller** 50:11

**snake** 228:19

**social** 193:23
194:3,6

**socially** 30:24

**solemnly** 7:14

**somebody's**
252:4

**sonography**
9:10

**sorts** 85:19

**sound** 9:16
82:5 134:17

**sounds** 9:17
12:16 13:18
52:1

**source** 32:15
235:6

**south** 138:6,9

**Sox** 38:17 39:2,
11



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 89 of 93 PageID #:9460
The Deposition of OFFICER KEN BURKIE, taken on July 08, 2021
277

speak 8:21
113:2 135:15
147:9 148:23
149:10,13,16,
23 151:20
152:7,9 189:13,
14 210:9,11,14,
18 211:1
213:25 230:14,
24 231:5,11,15

speaking
23:21 93:19
145:6 149:11,
14,17 174:9
184:11,12,15,
16 185:5 189:3
195:24 201:13
204:13 205:21
218:3 220:16
242:9 244:25
246:19

speaks 205:8
236:21

special 31:22
41:2 42:17 49:6
161:5

specific 41:25
42:1,2 89:25
90:24 92:23,25
93:14 110:18
123:10 130:6,
24,25 160:16,
20 163:9 164:9
165:10 208:15,
17 244:24

specifically
39:22 43:1,5,9
54:13 55:3,25
69:5,12 102:11
107:25 159:3
208:18,22

speculate
176:1 207:5

speculating
204:9

speculation
86:15 112:8
121:20 127:4
129:1 161:20
162:1 171:19
175:25 176:14
177:7 178:3

179:19 190:4,9
193:7,14 195:9,
13 197:3 207:3
209:5 214:9
217:20 218:1
223:3 224:12
225:17 252:12

spell 123:19
166:2 224:7

spelled 225:10

spelling 224:3
225:12

Spence 6:14
7:3,7,11,20,23
14:10,14,15
32:18 39:23,24
51:23 52:4,8,16
53:7 56:11,12,
16,20,21,24
57:9 59:6,8,17,
18 60:17,24
61:17,22 62:2,
7,10 65:6,7
66:19,22 68:5,
7,10,15,19,23
70:4,13,17,20
71:9,19,25
72:17 73:3,6,
10,16,20 75:16
76:4,10,13,16,
18,22 77:2,9,15
78:9,13 79:3,
14,15 80:7,11,
15 82:5,8,14
85:25 86:4,9,
10,17 91:25
92:3,24 93:13,
17,21 94:5,7,9,
13,15,22 98:6,
9,15,19,22
103:3,5,11
110:6,7 111:3
113:9,11
115:17,20
119:21 120:3,5,
9,11,23 121:13,
22 122:11,19,
22,25 129:16,
24 130:2,5,11,
14,20,22,25
131:2,3,11
132:7,9 134:10,
11 144:16
145:5,9,15

154:7,11,13,20,
25 155:4,10,17
169:14 181:12,
14,16 184:10,
14,22,25 185:3,
15,18,23 186:1,
4,8,9 187:2,17
188:4,22,24
189:1 197:19,
21 198:3,7,9,
11,13,19,21,24
199:2,14,19
200:8,12,16,23
201:2,7,10,18,
21 202:13,16
205:7,12
207:21 214:22,
25 216:2 218:9,
13,18,21
219:20 220:3,8,
10,13,15 223:7
231:24 233:23
235:13,19,20
237:7 238:10,
15,19,21
239:10 240:1,5,
9,14,16 241:24
242:1,7 245:2
246:23 253:8,
10,15,16 254:7,
11

spend 39:12

split 47:20

spoke 24:13
29:4 52:22
109:1 148:15
149:8,22 150:6,
10,11,16,20
152:3 153:8,15
175:21 190:11
191:1,23
218:22 219:1
231:13 244:2,6,
10,15,21
246:19 253:18

spoken 24:17
28:23 31:5,8,
11,14,18,25
246:21

sport 137:8,17,
18

spot 52:3
154:19

spotlighted
7:8,10

spread 50:13

stairs 139:9

stamp 61:23
82:15 131:21
132:2,24
153:24 154:5,7
170:12 184:20
218:14 225:3
238:3 240:4

stamped 63:2
74:1 92:5 98:17
118:4 129:18
156:19 157:12
199:20

stamps 61:24

stand 157:23
207:18

standing
139:22 238:16

standpoint
69:10 172:13

star 222:19

start 61:23
69:21 101:17
122:19

started 34:11,
14,19 45:4
81:19

starting 6:12
131:24 132:1,4
133:1 156:25
157:1 166:15
199:23 213:11
225:5

starts 63:6
64:4 74:8

state 6:10,23
12:2 17:11,14
31:5,8,11,14,
18,21,23 33:4,
7,17 34:5,9
41:3,13 48:25
62:4 123:24,25
132:16 141:25
154:5 157:2
169:11 194:2

216:18,22,24
217:3 221:2,7,
11

State's 19:21
61:12 136:8,9
189:11,15
193:24 248:14

stated 7:24
87:15 226:23

statement
19:12 53:24
56:5 57:12
60:2,8,10,23
61:4,5,9,10,13
65:4 69:13
72:11 75:4
78:19,20,22
79:19,21 81:3,
4,5,6,7,10,12,
15 85:2,12
86:22,24 87:6,
8,10,15,18,19,
21 88:8,14,18
89:3,4,8,13,15
109:8,17
111:17,24
122:3 123:3,7
124:1 125:9
128:23 133:20
135:24,25
136:4,9,12
137:20 140:13
141:13 147:21
150:5 165:15,
16 168:12,15,
18,24 172:10
174:25 175:6,
22 182:3,7
183:8,16
186:12,17
187:5,11,13
188:11 189:4,7,
10,16,19 190:1
198:4 212:2,7
213:20 216:17,
25 217:6,9,17,
18 218:4,10
221:7,11,17,21,
23,24 222:2,8,
11 223:17
225:25 226:9,
10 229:25
230:2,4,6,9,14
244:1 247:17

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 90 of 93 PageID #:9461
The Deposition of OFFICER KEN BURKIS, taken on July 09, 2021
278

248:9

**statements**
53:19,20 69:13
133:3 175:11
180:9 181:21,
23 182:1
183:11,12
188:9 234:15,
16,22 236:5,6,
12

**states** 232:11
235:7

**stating** 101:10
122:2,6

**station** 45:6
59:22 67:23
137:21 138:20
147:10 150:7
190:12,14
197:12,17
199:6,24 200:3
202:5 203:3,25
205:4,16 206:4
208:5,12,20,24
209:2 210:2,5,
10,15 211:2
214:2 216:19

**statute** 97:7

**stay** 37:13
85:22

**stealing** 46:9

**Stefanich**
31:19

**stems** 85:13

**stenography**
8:19

**step** 68:20
100:5 141:7
185:17

**steps** 106:14,
15 213:25

**stipulate** 7:1

**stolen** 33:15,
16

**stop** 13:17
164:13,19
165:5 198:13,
16,21 200:12,

16,17 201:16
205:5 207:13,
14

**stopped** 36:4
135:9 168:9

**strategies**
194:24 195:22

**stretch** 200:25

**subject** 62:15
90:8 123:10
186:13,16,25
234:9

**subjects** 42:14

**subparagraph**
77:25 78:1 79:6
80:20 81:12,15

**Subpart** 82:20

**subsection**
63:2 64:3,15,16
68:6 69:5,11,18
70:4,9,14,25
71:13 72:4,9,
16,17 73:4
74:3,8 75:8
81:19,20 82:17,
19 84:20 86:18
89:2,7 99:2,3
100:8 101:24
111:15 113:3,4,
25 114:22
115:1,7 118:11,
15 119:6
120:12,13
182:12,15
251:13 252:20,
22

**subsequent**
113:21 115:24
117:1 175:10

**subsequently**
136:25

**substance**
99:23 101:1,5

**Suburban**
33:18

**sued** 13:5,9
248:22 251:4

**suggest** 102:1

**suggests**
93:12

**suing** 14:21

**suit** 14:18,20,
21 16:14 25:9,
13 26:13,16
96:21 240:24

**suits** 16:24,25
17:8

**supervisor**
37:12,14,17,20
176:19 177:2,
21 178:7,9
180:25

**supervisor/**
**watch** 47:11,13

**supervisory**
47:24

**supposed**
33:17 52:25
53:5 65:24
90:14 95:2
105:12 107:1
117:16 133:10
177:11 178:21
213:18

**suppress**
21:20 230:21
242:15 243:9,
11

**sups** 126:6

**surmising**
138:5,6

**suspect** 83:16,
17 84:8 101:10
168:11 173:18,
21 174:16,19,
20,21 178:20
251:20,22,25
252:14

**suspected**
102:22 252:14
253:3

**swear** 7:14

**switch** 12:15

**sworn** 132:18
157:3

**synonymous**
165:22

———

**T**

**table** 91:21
136:25 181:7

**taking** 10:10
42:25 61:13
122:7 136:9
141:13 198:25
240:12

**talk** 9:1 24:20,
24 67:8,10,12
72:18 141:18
142:7,10,14,23
143:1 162:11
194:4 195:23
210:23

**talked** 23:22,24
29:8,10,12 31:1
141:19 143:3
148:22 152:4
187:18 204:20
217:16 243:21
253:12 254:1

**talking** 9:6
55:1,20 57:10
59:3,6 68:3,10
72:9,14,20
85:22 89:3
109:7,8,13,16
113:7 127:23
130:6,7 140:23
175:5 186:24,
25 189:8,18
194:7 198:21
212:21 248:23
253:2

**talks** 182:12,15

**task** 135:22

**taught** 42:14
51:13,14

**teaching**
200:18

**team** 27:11
40:6

**teammates**
28:1

**tech** 40:6

**technician** 6:3

**techniques**
181:8

**teenaged**
143:23 144:3

**teenagers**
194:14

**telephone**
68:1

**telling** 76:6
84:7 108:12
112:12 156:5
174:14 180:13
198:17,20

**tells** 178:25

**temperature**
220:14

**ten** 44:5 45:3
90:2 97:14
114:14 180:3,8
217:14 220:20

**tender-aged**
192:19 193:21
194:9

**Tenth** 29:9
30:22 35:4,5,6,
7

**term** 31:21
55:9 61:6
63:13,14,16
81:4 85:25
86:1,11

**terminology**
167:14

**terms** 72:6
85:23

**test** 41:16
42:23,25 43:11,
12,14

**testified** 17:11,
14,15 22:8
126:8,11 127:9
128:11 132:18
157:4 202:12
215:14 220:4
230:19 231:1,4,



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 91 of 93 PageID #:9462
The Deposition of OFFICER KEN BURKE, taken on July 08, 2021
279

7 245:22

**testify** 127:12
129:10 250:21,
23

**testifying**
126:15

**testimony**
7:14 19:24
20:1,2,9,11,14,
15,16,23 21:1,
3,18,21,24,25
22:3,5,8,14,17,
20 56:9,13,18
60:21 71:6 86:8
109:6 119:25
123:16 126:16
131:5,15 132:5,
6,7,21 157:9
158:9 166:25
174:12 188:15
191:6 199:12
200:22 202:3,
10 203:14
204:16,24
211:15 212:22
213:8 214:8,21
215:1,5,15
219:18 220:1
224:24 231:13
234:17,22,25
235:1,14,21
242:14,18
243:1 249:12
254:4

**testing** 36:11

**That'd** 155:11

**theft** 46:8,9
109:20

**thick** 199:17
224:25

**thing** 9:3 11:14
33:23 88:12
89:15 115:1
139:14,16
141:5 146:1
179:12 189:11

**things** 29:10
33:19 71:17
156:13 166:12
174:23 202:20
209:2 213:18

215:20 235:7

**thinking** 55:21

**third-party**
234:16,22

**Thomas** 36:1
40:13,16,17

**thought** 44:4
129:22 158:19
162:3 169:1
211:25

**threat** 193:11

**threatened**
175:22 176:10,
15 177:23

**threatening**
201:4

**Three-and-a-
half** 33:8

**Thursday**
18:25

**tie** 137:8,17,18

**time** 6:4 8:10,
11,21 10:7
13:21 15:6
17:14 24:22
25:3 28:9 30:4,
23 34:25 35:8,9
38:11,12,15
40:23 42:3
44:11,13 45:6,
20 47:21 48:5,
7,25 49:10
50:15 52:12,15
53:8,9 66:23
77:16 82:10,13
83:5 90:23
102:23 105:2
113:16 115:9
121:3 122:12,
16 134:4 135:6
140:10 146:14
147:9 148:5
151:20 153:8
155:13,16
159:8 164:13,
20 166:17
167:12 169:11
171:23 173:9,
22 174:6,8,20
189:13,15

192:16,22
196:17,22
198:25 203:15,
18,20 204:9
205:4,15 208:5,
8,11,19,24
217:15 218:3,
18 219:25
220:17 221:1
242:3,6,19
243:6,9,14,18
245:20 254:18

**times** 8:6 11:23
79:25 106:3
114:13 148:13
153:7 179:24
180:9,10,13
200:17

**title** 33:16
81:21 251:14

**today** 6:3,4
10:21 47:4
169:8 203:14
214:15 251:13
252:20 254:5

**today's** 17:21
19:9

**Toddlers**
194:11

**told** 25:8 32:11
115:14 133:9
138:23 146:24
147:2 152:19,
22 169:16,18
172:20 176:15,
20 177:3,18,22
178:5 179:15
197:1,7 210:1
211:15 212:22
213:17 214:17
215:2

**ton** 198:25

**tons** 201:13

**top** 62:11 64:3
74:4,12 89:24
118:10 131:6
156:8 181:8
182:10 227:6
229:3

**topic** 52:2

**totally** 73:6,7
114:6

**touch** 30:16
236:23

**touched**
125:10

**touches** 235:4

**tour** 46:22

**traffic** 33:14,15

**trained** 62:19
91:1 94:25
97:22 102:18
109:2 113:24
117:7,9,15
123:6 124:8
181:21 182:2,6,
21 183:4,11,18
186:10,15
187:20 188:8,
10

**training** 33:21
41:14,15,16,18,
22,24,25 42:3,
6,7,9,12,15,19
51:11,12,13
65:14,19 75:7,
21 78:2 80:24
81:5,25 82:2
83:2,11,19 87:6
88:15 89:2
90:4,8,12 91:1,
4 92:19 93:1,
11,14 94:24
95:12,13,19
97:3 105:9
106:23 108:1
109:11,24
116:2 117:12
123:9 125:7,11,
12,14,16,19,23,
25 177:9,14
178:19 179:13
187:19 216:3

**transcript** 8:20
9:18 21:14,15
22:9 23:1
132:24 134:1
153:23 202:24
226:5

**transcripts**
19:11,23 21:5

**transfer** 91:14,
18

**transferred**
78:21 85:4
111:19,25
112:13

**transfers**
91:10

**translate** 9:17

**transport**
105:6

**treated** 54:9
152:20 172:22,
25 177:19
189:9,21 191:3,
7,17 195:5,6
207:7 208:6,13
244:7

**treatment**
174:24 176:4,7
191:13 207:12

**trial** 13:17 15:5,
17,19 20:4,20
21:25 22:1
154:2 171:10
231:1,4 242:18,
19,20,21,22,23,
24 243:6
249:10,12
250:7,10,19

**trouble** 193:5
225:23

**truck** 33:15

**true** 41:5 48:19
103:19 205:3
233:1

**truth** 7:15,16
195:8

**Tuesday** 18:9,
10,13 19:1 24:5
27:9,10

**turn** 44:9 64:2
73:25 82:15
98:16 118:3,18
126:21 132:11
135:15 138:9
158:1 200:9,24
227:5 251:9



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 92 of 93 PageID #:9463
The Deposition of OFFICER KEN BURRIS, taken on July 08, 2021
280

turned 192:2

turning 63:1
131:20 182:24
199:20 213:7
225:2 241:7

two-way
193:23

type 38:23 59:4
69:10 121:5
140:15

typically 9:11
47:17,20 84:13
245:19 246:7

___

**U**

uh-huh 9:16
39:6 156:21
223:18

uh-uh 9:16

ultimately
187:6 188:12

umbrella 46:3

unclear 9:25
229:18

underneath
62:14 63:3

undersigned
232:10

understand
10:1 23:19 26:2
27:18 51:19
53:4 57:4 66:16
68:11 70:6
71:25 72:2
76:16 84:1
86:1,11 90:17
93:13,21 94:10
121:16 127:20
137:22 147:22
148:1 149:5
158:11,16
159:4 160:5,7
162:4,11
166:16 167:23
168:1 169:2
171:21 175:3
181:22 187:1,7,
8,9,24 188:1

215:10 238:11
250:14,15

understanding
8:17 50:2 72:10
119:14 147:19
149:24 161:18,
24 164:9
165:10 169:11
173:9,20,23,25
174:3,9,18
203:21 213:18
222:5

understands
78:23 83:24

understood
9:22 10:4 55:5
72:19 135:8
155:20 156:5
158:22 160:11,
22 162:3,7,16
163:1,23 164:1,
4,17,23 165:21,
24 166:7,10
167:4,10,17
168:4 169:10
170:2,4,5,6
171:17,25

unequivocal
63:11 82:24

uniform 96:1

unit 37:5 38:4
49:7 104:9
139:13

units 49:5,8
50:13

unlawful
100:20

upheld 54:7

upset 250:5

upstairs
138:22

___

**V**

Vehicle 33:13,
18,20,22

VERBAL 193:8
228:14

verbatim
123:25

verification
232:21

verify 92:4
122:22 181:10,
17 218:14,15
239:5

version 224:2

versus 6:7
12:16 51:15
93:11 158:24
251:22

vest 96:21

victim 46:4

victim-
sensitive
192:20 193:22

victimized
192:11 195:23
196:3

victimizing
45:17

victims 195:2
196:3

video 6:3
233:20

videoconferen
ce 6:5

violated 54:6,
12 55:23 148:6
152:11 176:8,
11,17,22 177:5,
10 178:1

violating
177:16

Violent 135:21
136:15,18
138:22 139:5,6,
12,14,20
140:13

voluntarily
54:7,8 55:5,6
56:6 156:2
183:8

voluntary
57:22 58:1

175:1,7 182:7
183:9,13,16,21
186:12,17
187:6,12,14
188:12

VSI 194:12

___

**W**

W-A-V-E 166:5

wait 56:20
73:11 207:13

waiting 73:17

waive 84:1
159:9 165:13
166:2,4,8 168:8
244:3

waived 54:7,8
55:6 84:7
113:19 115:12
155:22

waiver 57:22
58:2 160:25

waivers
186:11

waiving 56:6
57:15 168:1,4
234:9

walk 144:13
248:8

walked 139:16,
23 148:17,23
151:15

walking 139:8

wanted 43:10,
24 44:8 52:2
116:5 122:22
146:11 155:19
165:4,6 173:1,4
175:6 206:8,14
209:3,8,12
210:12,18
211:13 213:16
250:6

warned 63:10
64:9,18 65:15
69:6 74:16
77:20,21 78:24

82:23 87:3,25
88:20

warning
109:21 110:1

warnings
55:13,15 64:4
74:9 78:18 85:2
109:2,3,12,24
110:17 111:6,
16 112:25
146:7 155:19,
20 169:15
172:22

warrants
183:2

watch 38:3
47:11,13,16,18,
22 50:24 51:5,
8,10 97:10
99:14,18 100:1,
9 101:3,8,12
102:7,11,15,23
103:16 123:13

watching
193:25 225:24

water 209:16,
17

wave 166:5

ways 105:23
154:17

weapon
100:21

wear 96:1,9,11

wearing 137:7,
15 139:24
145:22

Wednesday
18:14

week 24:3
28:22

weeks 42:11
51:12

whatsoever
70:10

White 38:17
39:2,11



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-35 Filed: 11/04/22 Page 93 of 93 PageID #:9464
The Deposition of OFFICER KEN BURKIE, taken on July 08, 2021

281

**wife** 23:25
24:13,15

**window** 143:13

**winter** 39:11

**winters** 39:12

**withdraw**
174:7 185:23

**withdrawing**
188:18,19

**witnessed**
217:16 221:24

**witnessing**
226:8

**wood** 143:16,
17

**word** 80:22
81:5 83:3 84:17
85:21 86:4 87:5
108:20 110:19
124:2 158:23
162:21 163:24
164:18,23
165:19,22,25
166:2,4,7,11
169:12 171:9,
18 189:7
223:14 224:13
226:24 227:7,9,
12,19 228:1,6,
11,19 229:4

**words** 9:11,21
63:11 82:24
228:7,24
229:10,12,15
247:23 248:2,
17

**wore** 96:21
137:16,17

**work** 24:7
32:25 33:3,6,24
34:1,5,17 35:2,
13,18,20,22,24
36:1 37:2 38:14
39:3,8,10,11,
15,17 40:1,3,
17,20 50:18,25
68:1 135:16,18
153:1 158:22
213:19 246:12

**worked** 29:9
33:4 35:3,6,7
37:2,4 38:16,
17,18,19,22
39:1,4,22 40:9
48:4 50:8,23
66:5 119:3
138:7 151:6,9,
12 192:6 194:3,
4 245:20 246:8

**worker** 193:23
194:3,6

**working** 30:19
32:24 36:4
119:2 135:10
140:20 193:18

**works** 51:2

**world** 114:16
206:7,10

**worried** 193:10

**worth** 71:12
76:8

**would've**
12:25 13:2,3
20:8 24:22
62:19,22
128:21 129:8
133:18,24
159:21 170:9,
10 177:2 179:5,
8,10,14 191:21
209:4,9 210:22
212:25 213:25
215:19,22
247:15

**write** 117:7
123:14 128:16
159:23 160:1
217:6,9 228:6
229:12 244:3,7,
10,15

**writing** 224:9
227:3,12,16,19,
23 229:3,7

**written** 19:12
53:20 60:2,23
61:4,5,9,10,13
76:9 81:6,12
87:18,20 88:17
89:3,15 109:8

121:4 122:3
123:3,6 125:9
126:12 128:23
181:25 182:3
183:12 189:4
190:1 216:25
217:17 218:4
221:7,10 248:9,
10

**wrong** 158:24
225:10

**wrote** 159:17,
21 223:1

---

**Y**

**Y-A-M-I-N** 6:19

**Yamin** 6:19
14:13 21:8
23:14 26:4 31:3
32:7 44:24
46:15 50:22
51:18 52:20
53:1,17,22 54:2
58:24 59:2,23
60:11 65:3,25
66:12 67:3
71:15,21 76:12
80:3,5 85:14,20
86:3 90:15
103:9 107:8
122:17,21,24
235:11 253:7
254:14

**YD** 102:8

**year** 18:16 19:4
24:22 28:10,21
37:9 49:13
124:19 133:14
249:10

**years** 12:24
17:2 26:22
27:23 30:5,9
33:8 34:4 37:15
41:22 44:5 45:3
46:18,23 52:23
90:2 112:18
127:12 133:13
180:8 190:22
191:24 192:2
194:11 215:17,
24 249:9

**yesterday**
18:3,6

**yesterday's**
18:21

**young** 143:23
144:2 195:4

**younger** 195:2

**youth** 36:6,7,8,
12,17,23,24
37:2,4,12,13,
21,24 38:2
41:1,6,9,13,19
42:2,3,21 43:1,
5,6,10,17,21,25
44:5,6,12,13,
15,16 45:1,3,23
46:1,2,9,12,17,
22 47:7,10,12,
16,23 48:4,9,24
49:4,5,8 50:3,
12,18,19,23,25
51:2,12 52:18,
25 53:5,8,11,
20,23,24,25
54:4 55:2 56:4,
5 57:11,12,14,
18 58:5,7,19
59:10,21 60:1,
2,3,5,7,10 61:1
62:18 64:24
65:10,19 66:5,
24 67:5,12,20
72:10,18,23
82:4 83:13
84:18 85:25
86:2 88:16,22,
24 89:1 90:5
91:1,5 92:15,20
93:3,4 94:18
95:2 96:1,3
97:3,16,17 98:1
99:19 101:4,10,
16,18 102:7,21,
22,24 103:6,15,
18,20,21,22
104:4,8,19,20
105:4,6,16,21,
23 106:13,17,
20,24,25
107:19,24
108:4,24 109:3,
12,20 110:1,13,
14,16,24 111:6
112:12 114:3,5,

12,13 116:3,13,
17,18,24 117:6,
23,24 118:1,10,
15,21,23
119:16 120:15,
18 121:6,7,9,16
122:1,6 123:18,
19 124:13
125:9,14 126:3,
6 127:16 128:1,
23 130:13,17
133:3,20 135:4,
9,13,18 140:8,
12 142:23
148:9 150:4,21
151:1 152:17
153:1,5,12,15
176:17,24
177:20 178:6
180:3,5,7,9,10,
14,18,22 186:5,
25 187:3
188:16 189:3,
19,25 192:7
205:25 206:24
207:6 212:11
217:15,16
218:3 246:9
247:5

**youth's** 54:11

**youth-type**
41:25

---

**Z**

**Zoom** 8:24

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com