**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

ANTHONY JAKES,

               Plaintiff,

      v.

KENNETH BOUDREAU *et al.*,

               Defendants.

Case No. 19-cv-02204

Hon. Manish S. Shah

Hon. Beth W. Jantz

# EXHIBIT 36

LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA



# KENTUCKIANA
## — COURT REPORTERS —

## CASE NO. 19-cv-02204
## ANTHONY JAKES

VS

## KENNETH BOUDREAU, ET AL.

## DEPONENT:
## BRIAN GROSSMAN

## DATE:
## September 17, 2021



✉ schedule@kentuckianareporters.com

☎ 877.808.5856 | 502.589.2273

www.kentuckianareporters.com

1       IN THE UNITED STATES DISTRICT COURT FOR THE

2     NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

3            Case No.: 19-cv-02204

4             Hon. Manish S. Shah

5          Hon. Sheila M. Finnegan

6

7            ANTHONY JAKES,

8              Plaintiff

9

10               VS.

11

12       KENNETH BOUDREAU, ET AL.,

13            Defendants

14

15

16

17

18

19

20

21

22

23  DEPONENT:  BRIAN GROSSMAN

24  DATE:       SEPTEMBER 17, 2021

25  REPORTER:  KORTNEY CHASE



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 2

```
 1                    APPEARANCES
 2
 3   ON BEHALF OF THE PLAINTIFF, ANTHONY JAKES:
 4   Russell Ainsworth
 5   Loevy & Loevy
 6   311 North Aberdeen Street
 7   Third Floor
 8   Chicago, Illinois 60607
 9   Telephone No.: (312) 243-5900
10   E-mail: russell@loevy.com
11   (Appeared via videoconference)
12
13   ON BEHALF OF THE DEFENDANT, THE CITY OF CHICAGO:
14   George Yamin
15   The Sotos Law Firm, PC
16   141 West Jackson Boulevard
17   Suite 1240A
18   Chicago, Illinois 60604
19   Telephone No.: (630) 735-3322
20   Facsimile No.: (630) 773-0980
21   E-mail: gyamin@sotoslaw.com
22   (Appeared via videoconference)
23
24
25
```

Page 3

```
 1             APPEARANCES (CONTINUED)
 2
 3   ON BEHALF OF THE DEFENDANTS, KENNETH BOUDREAU, FRED
 4   BONKE, LOUIS CAESAR, MICHAEL DELACY, KEN BURKE:
 5   Andrew Grill
 6   Rock Fusco & Connelly, LLC
 7   321 North Clark Street
 8   Chicago, Illinois 60654
 9   Telephone No.: (312) 494-1000
10   Facsimile No.: (312) 494-1001
11   E-mail: agrill@rfclaw.com
12   (Appeared via videoconference)
13
14   ON BEHALF OF THE WITNESS, BRIAN GROSSMAN:
15   Alvin Portis
16   John Coyne
17   Cook County State's Attorney Office
18   69 West Washington Street
19   Chicago, Illinois 60602
20   Telephone No.: (312) 603-1880
21   E-mail: alvin.portisjr@cookcountyil.gov
22   john.coyne@cookcountyil.gov
23   (Appeared via videoconference)
24
25   Also Present: Anthony Jakes, Plaintiff
```

Page 4

```
 1                        INDEX
 2                                              Page
 3   PROCEEDINGS                                   6
 4   DIRECT EXAMINATION BY MR. AINSWORTH           8
 5   CROSS EXAMINATION BY MR. GRILL              125
 6   REDIRECT EXAMINATION BY MR. AINSWORTH       169
 7
 8                      EXHIBITS
 9   Exhibit                                     Page
10   *1 - Gus Robinson Statement - CITY JAKES 94-95   70
11   *2 - Photograph - CITY JAKES 506             92
12   *3 - Anthony Jakes Statement - CITY JAKES 90-93  103
13   *4 - Arrest Report of Anthony Jakes         113
14   *5 - The Written Statement of Anthony Jakes  116
15   *6 - Felony Minute Sheet                     120
16
17              *Will forward upon receipt
18
19
20
21
22
23
24
25
```

Page 5

```
 1                     STIPULATION
 2
 3   The VIDEO deposition of BRIAN GROSSMAN was taken at
 4   KENTUCKIANA REPORTERS, LLC, 730 WEST MAIN STREET, SUITE
 5   101, LOUISVILLE, KENTUCKY 40202, via videoconference in
 6   which all participants attended remotely, on FRIDAY the
 7   17TH day of SEPTEMBER 2021 at 1:01 p.m.; said deposition
 8   was taken pursuant to the FEDERAL Rules of Civil
 9   Procedure. The oath in this matter was sworn remotely
10   pursuant to FRCP 30.
11
12   It is agreed that KORTNEY CHASE, being a Notary Public
13   and Court Reporter for the State of INDIANA, may swear
14   the witness.
15
16
17
18
19
20
21
22
23
24
25
```



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 6

PROCEEDINGS

1      PROCEEDINGS
2          COURT REPORTER:  We are now on the record.  My
3  name is Kortney Chase, I'm the video technician and
4  court reporter today.  Today's the 17th day of
5  September 2021, the time is 1:02 p.m.  We are
6  convened by video conference to take the deposition
7  of Brian Grossman in the matter of Anthony Jakes
8  versus Kenneth Woodrow, et al., pending in the
9  United States District Court for the Northern
10  District of Illinois Eastern Division, case number
11  19CV02204.  Will everyone, but the witness, please
12  state your appearance, how you are attending, and
13  the location you are attending from, starting with
14  plaintiff's counsel?
15          MR. AINSWORTH:  This is Russell Ainsworth,
16  appearing on behalf of the plaintiff, and I'm
17  appearing remotely from Illinois.
18          MR. GRILL:  Andrew Grill, G-R-I-L-L, on behalf
19  of the officer defendants.  I'm also appearing
20  remotely from Illinois.
21          MR. YAMIN:  George Yamin, I'm appearing on
22  behalf of the defendants, City of Chicago,
23  remotely.
24          MR. PORTIS:  Assistant State's Attorney, Alvin
25  Portis, appearing via Zoom remotely in Illinois on

Page 7

1  behalf of the third-party proponent, Brian
2  Grossman. And joining me today is my colleague ASA
3  Johnny Coyne, who's also appearing remotely from
4  Illinois on behalf of the deponent, Brian Grossman.
5          MR. COYNE:  That's correct, thank you Alvin.
6          COURT REPORTER:  All right, and Mr. Grossman,
7  will you please state your full name for the
8  record?
9          THE WITNESS:  Yes, Kortney.  Brian, B-R-I-A-N.
10  Last name is Grossman, G-R-O-S-S-M-A-N.
11          COURT REPORTER:  All right.  And do all
12  parties agree that the witness is, in fact, Brian
13  Grossman?
14          MR. AINSWORTH:  Yes.
15          MR. YAMIN:    Yes.
16          COURT REPORTER:  Okay.  Mr. Grossman --
17          MR. PORTIS:  Yes.
18          MR. GRILL:  Yep.
19          COURT REPORTER:  Okay.  Mr. Grossman, will you
20  please raise your right hand?  Do you solemnly
21  swear or affirm that the testimony you are about to
22  give will be the truth, the whole truth, and
23  nothing but the truth?
24          THE WITNESS:  I do.
25          COURT REPORTER:  Thank you. You may begin.

Page 8

DIRECT EXAMINATION

1      DIRECT EXAMINATION
2  BY MR. AINSWORTH:
3      Q      Would you please state and spell your name for
4  the record, sir?
5      A      Sure.  Brian Grossman, B-R-I-A-N.  Last name
6  is G-R-O-S-S-M-A-N.
7      Q      All right.  Sir, if you don't understand any
8  of my questions during this deposition, would you please
9  ask me to rephrase the question, re-ask the question, or
10  indicate to me that you don't understand my question?
11      A      Yes, sir.
12      Q      And the flip side of that is that if you
13  answer my questions, I'll assume that you've understood
14  my question as I've posed them; is that fair?
15      A      Understood.
16      Q      If you need a break at any time, just let us
17  know.  All that I ask is that you answer any question
18  that's pending before taking a break.
19      A      Understood.  Thank you.
20      Q      And are you on any medication, or do you have
21  any health condition, or medical condition that would
22  affect your ability to testify truthfully and accurately
23  here today?
24      A      No, sir.
25      Q      I just want to talk about your background for

Page 9

1  a little bit.  What year did you graduate high school?
2      A      1981.
3      Q      And where'd you graduate high school from?
4      A      Niles North.
5      Q      Where'd you go to college?
6      A      University of Illinois, in Urbana.
7      Q      When'd you graduate from there?
8      A      1985.
9      Q      And then where'd you go to law school?
10      A      Loyola University of Chicago.
11      Q      And when did you graduate from law school?
12      A      1988.
13      Q      Did you grad -- did you attend any other law
14  school other than Loyola?
15      A      No, sir.
16      Q      While you were in law school, did you clerk at
17  either the -- a States Attorney, or District Attorney's
18  office?
19      A      Not while I was in law school.
20      Q      Did you ever clerk at any public defender's
21  office?
22      A      No, sir.
23      Q      When did you join the Cook County State's
24  Attorney's office?
25      A      September of 1988 as a law clerk.  And I was

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 10

1  sworn in as an Assistant State's Attorney in December of
2  1988.
3     Q    Why didn't you want to be a member of the Cook
4  County State's Attorney's office?
5     A    I wanted to be a trial attorney.
6     Q    And so why'd you go to the Cook County State's
7  Attorney's office, as opposed to the public defender's
8  office to be a trial attorney?
9     A    I think I had a better chance of getting into
10 the States Attorney's office.
11    Q    Why'd you feel you had a better chance of
12 getting into the State's Attorney's office?
13    A    It was a gut feeling.
14    Q    And did you apply to be -- did you apply to
15 work for any other employer, other than the Cook County
16 State's Attorney's office --
17    A    Yes, sir.
18    Q    -- back in '88?  Where else did you apply?
19    A    Illinois State Attorney General's office.
20    Q    How long did you work for the Cook County
21 State's Attorney's office?
22    A    18 years.
23    Q    All right.  Can you trace for us your
24 progression through the Cook -- the various positions
25 you held during the Cook County State's Attorney's

Page 11

1  office?  And so when you were clerking, where were you
2  assigned?
3     A    Criminal appeals.
4     Q    And how about when you became a sworn
5  Assistant State's Attorney in December of '88?
6     A    I remained in the criminal appeals unit.
7     Q    And so when did you leave the appeals?
8     A    Approximately June of '89.
9     Q    And then you went to juvenile?
10    A    Yes, sir.
11    Q    And how long did you spend in juvenile?
12    A    A little under two years.
13    Q    And so then in 1991, where did you go?
14    A    In the spring of '91 I went into the felony
15 review unit.
16    Q    How long did you spend in felony review?
17    A    Six months.
18    Q    Where'd you go after six months in felony
19 review?
20    A    The preliminary hearings unit.
21    Q    Where were you assigned for prelims?
22    A    Mostly the branch courts.  And then, I think,
23 last Branch 66 at 26th street.
24    Q    And that's the murders, right?
25    A    Correct, and sex related cases.

Page 12

1     Q    And where did you go -- and how long do you
2  spend in prelims?
3     A    I don't recall, to be honest with you.
4     Q    Do you know if it was more or less than a
5  year?
6     A    It would have been less than a year.
7     Q    Okay.  Where'd You go after prelims?
8     A    Night narcotics.
9     Q    Where was that located?
10    A    26 and California.
11    Q    Were there more than one chair in the night
12 narcotics courtroom?
13    A    Yes, sir.
14    Q    How many chairs were there?
15    A    Three.
16    Q    Did you start off as a third chair?
17    A    Correct.
18    Q    And how long were you in night narcotics?
19    A    I don't remember exactly.  It was less than a
20 year.
21    Q    How -- did you move up to second chair in the
22 time you were there?
23    A    No.
24    Q    Where'd you go after night narcotics?
25    A    I was assigned to a felony courtroom at 26 and

Page 13

1  California.
2     Q    And as a third chair?
3     A    Yes, sir.
4     Q    So when did you get a felony courtroom?  Do
5  you remember about when that was?
6     A    I think it was 1992.
7     Q    All right.  And how long did you remain as an
8  Assistant State's Attorney in felony courtroom?  I know
9  you went back and forth, you know, to different
10 positions, but what was the total amount of time that
11 you were in a felony courtroom?  Excluding the time in
12 felony review.
13    A    Well, I was -- excluding the time I went back
14 to felony review, I left at the end of 1988 -- I'm
15 sorry.  The end of 1998.
16    Q    Okay, where did you go at the end of 1998?
17    A    The civil actions bureau.  So, I went -- just
18 to be clear, I went there at the beginning of 19 -- I --
19 I'm sorry.  I -- I then would have gone there in January
20 of 1999.  So I was -- I was in criminal through the end
21 of '98, and then went to civil.
22    Q    Okay.  When you're in a felony courtroom, how
23 far did you advance?  Did you advance to the second
24 chair?
25    A    Yes, sir.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

Page 14

```
1    Q    Did you advance to first chair?
2    A    Yes, sir.
3    Q    All right.  How long were you a first chair in
4  a felony courtroom?
5    A    A year and a half, two years.  I -- I'm not
6  positive.
7    Q    Okay.  Why'd you leave the felony courtroom as
8  a first chair to go to civil actions?
9    A    It was -- it was time to go.
10   Q    Why was it time to go?  Why did you feel it
11 was time to go?
12   A    A lot of my friends had left the office, I had
13 accomplished what I wanted to accomplish, and I wanted
14 to get some experience on the civil side.
15   Q    Were you looking to leave the Cook County
16 State's Attorney's office?
17   A    I thought about it, yes.
18   Q    All right.  How long did you remain in the
19 civil side?
20   A    Until I left the office, which would have been
21 September of 2006.
22   Q    When you left the office in September of 2006,
23 where'd you go?
24   A    To a property tax law firm.
25   Q    Which one?
```

Page 15

```
1    A    Worsek & Vihon. W-O-R-S-E-K, and Vihon is
2  V-I-H-O-N.
3    Q    And how long did you remain at that firm?
4    A    11 years.
5    Q    And why did you leave Worsek?
6    A    A disagreement over the future of the firm.
7    Q    Were you asked to leave?
8    A    No, sir.
9    Q    And so, like, briefly stated, why'd you leave?
10 Or a little less briefly stated, but still briefly.
11        MR. GRILL:  Asked and answered.
12        MR. PORTIS:  You can answer the question.
13   Q    You can ans --
14   A    I've -- I think everything at a small firm is
15 related to money.
16        MR. AINSWORTH:  All right.  And just one
17 second.  Kortney, Mr. Jakes, I think, is trying to
18 log in.  He's been fighting.  All right.
19        COURT REPORTER:  All right.
20        MR. AINSWORTH:  So, let the record reflect
21 that Mr. Jakes has joined the deposition.
22 BY MR. AINSWORTH:
23   Q    And then where'd you go after Worsek?
24   A    To Walgreens.
25   Q    Were you in-house counsel?
```

Page 16

```
1    A    I -- yeah, I'm not in the legal department,
2  I'm in the tax department.
3    Q    Okay.  How long have you been there?
4    A    Three and a ha -- over three and a half years,
5  coming on four.
6    Q    And is your work in Chicago, in a Chicago
7  office?
8    A    The corporate headquarters is in Deerfield. We
9  do have a Chicago office, which I work out of a couple
10 times a week.
11   Q    Do you maintain your law license?
12   A    Yes.
13        MR. GRILL:  Hey Russell?
14        MR. AINSWORTH:  Yes?
15        MR. GRILL:  Sorry to interrupt you.  I think
16 it would be -- when you get a minute, you don't
17 have to do it now, but we should have Mr. Jakes
18 tell everybody on the record where he's at, and
19 whether anybody's with him.
20        MR. AINSWORTH:  We'll deal with that later.
21 Okay.  So-
22        MR. GRILL:  I mean, is that a no?
23        MR. AINSWORTH:  I said we'll deal with that
24 later.
25        MR. GRILL:  Okay.
```

Page 17

```
1         MR. AINSWORTH:  Is anyone with you, Mr. Grill?
2         MR. GRILL:  No, Russell, nobody is with me,
3  but we've had this issue come up in other cases, as
4  you know, where it seems like he's been with
5  people, but I think it's prudent to make that a
6  record.  If you're refusing to, I mean, I can't
7  make you.  I'm not going to stop the dep over it,
8  but it's your call.
9         MR. AINSWORTH:  All right. Anyway --
10        MR. YAMIN:  City joins that request.
11        MR. AINSWORTH:  Is anyone with you, George?
12        MR. YAMIN:  Not in my immediate presence, no.
13        MR. AINSWORTH:  Well, how far away?
14        MR. YAMIN:  Several rooms.
15        MR. AINSWORTH:  Okay.  Thank you.
16        MR. GRILL:  We might -- what about you,
17 Russell?  Anybody with you?
18        MR. YAMIN:    Right now, where all the
19 questions have been def --
20        MR. GRILL:  -- that we've --
21        MR. YAMIN:  So this is really --
22        MR. PORTIS:  Guys.  Guys.  Guys.  Guys, please
23 --
24        MR. YAMIN: I think it's extremely for Mr.
25 Ainsworth to answer our question.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 18

1    MR. GRILL: Yeah.
2    MR. PORTIS: Okay. But, guys, please, can
3 you, out of respect for Mr. Grossman here, can you
4 resolve this either off the record at some other
5 point, please? I just ask that as a courtesy.
6    MR. GRILL: Of course, and --
7    MR. YAMIN: Well, there's a history to this,
8 Mr. Portis, that I don't want to go into now.
9    MR. PORTIS: I understand. I just want to be
10 respectful of Mr. Grossman's time, that's all.
11 That's my only interjection.
12    MR. YAMIN: Same with us.
13    MR. GRILL: Same with us, absolutely.
14    MR. AINSWORTH: I'm alone. Okay.
15 BY MR. AINSWORTH:
16    Q    So, when you went back to felony review, you
17 went back, is that two times?
18    A    Three times.
19    Q    Three times? So you were in felony review how
20 many times total?
21    A    Three times.
22    Q    All right. So, you went back twice right?
23 After you made a felony courtroom?
24    A    Yes.
25    Q    All right. When you went back the first time

Page 19

1 after you made a felony courtroom, were you a
2 supervisor?
3    A    No.
4    Q    All right. How long after you -- what chair
5 were you in, in the felony courtrooms when you went back
6 to felony review?
7    A    The -- the first time I went back, I was a
8 second chair. And then the second time I went back, I
9 was a first chair, I think.
10    Q    Okay. So when you went back as a second
11 chair, how long were you in felony review?
12    A    Hold on, Mr. Ainsworth, I -- I don't remember
13 if I was a first or second chair the second time I went
14 back.
15    Q    I appreciate that clarification, but let's
16 just call it the first time you went back --
17    A    I'm sorry.
18    Q    -- after you gained a felony courtroom, how
19 long did you go back to felony review for?
20    A    It was either four or six months. I think
21 four months.
22    Q    Okay. Why'd you go back to felony review?
23    A    Because they told me to.
24    Q    Okay. How about the second time you went back
25 to felony review? How long were --

Page 20

1    A    Again, they told me to.
2    Q    They told you to. And did -- the second time
3 you went back to felony review after you made the felony
4 courtroom, did you go back as a supervisor?
5    A    Yes.
6    Q    And how long did you go to felony review as a
7 supervisor?
8    A    I think it was four months.
9    Q    When you were in juvenile, what kind of cases
10 did you handle?
11    A    Both abuse and neglect in delinquency.
12    Q    And for the delinquency side, did you handle
13 all kinds of delinquency cases, or were there a certain
14 subset of delinquencies that you would handle?
15    A    All kinds.
16    Q    All right. When you're in juvenile court,
17 did it come up -- when you're assigned to juvenile
18 court, did it come up that some juveniles, there's a
19 question about whether a parent or guardian had been
20 present during their interrogation?
21    A    I don't recall.
22    MR. GRILL: Objection. Form.
23    Q    Was it your understanding, during your time
24 when you were in juvenile, that either a parent, or
25 guardian, or a youth officer had to be present for a

Page 21

1 juvenile to be questioned in the city of Chicago about a
2 felony crime?
3    A    Yes.
4    MR. GRILL: Objection, to the extent that
5 mischaracterizes the law and what was required.
6    MR. YAMIN: Join.
7    MR. AINSWORTH: Well, Andrew, let's not do
8 speaking objections. We could just say, "Object to
9 the form." Okay? Thank you.
10    MR. GRILL: It's not a speaking objection what
11 I made, Russell. So let's not argue about it.
12 Okay? If you think it's improper, I welcome you to
13 raise that with the court. So let's move on.
14    MR. AINSWORTH: Okay. So we're -- but we're
15 not going to do this during the deposition.
16    MR. GRILL: Well, I'm going to make my
17 objections. So let's go.
18 BY MR. AINSWORTH:
19    Q    While you were assigned to juvenile, did you
20 prosecute murder cases, or cases involving death --
21    A    Yes.
22    Q    -- or murder?
23    A    Yes.
24    Q    When you went to felony review the first time,
25 did you have one supervisor the whole time, or did your

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 22

1  supervisors change?
2      A   They changed.
3      Q   How long was Steve Goebell your supervisor,
4      A   Steve Goebell and Catherine Sanders were
5  co-supervisors of the team.  And I do not -- I thought
6  about this, I do not recall if they were supervisors in
7  September or not, September of 1991.  At some point they
8  were replaced by Darren O'Brian, and Mary Beth Kinnerk.
9      Q   Would your murder memo indicate who is your
10 supervisor at the time?
11     A   If you're -- Mr. Ainsworth, I -- I don't know
12 what you're referring to as a "murder memo."  If you're
13 referring to my felony review folder, yes, it -- it
14 would.  My felony review folder would state who I called
15 in this particular case.
16     Q   What about --
17     A   I have not seen my felony review folder since
18 I turned it in the morning of September 17th, 1991.
19     Q   Would you create a memo regarding a confession
20 in a murder case after you received a confession while
21 you were in felony review back in 1991?
22     A   No, sir.
23     Q   Did you know other Assistant State's Attorneys
24 in felony review to do that?
25         MR. GRILL:  Objection.  Form.

Page 23

1      A   I don't remember that, sir.
2      Q   Do you remember the -- hearing the term
3  "murder memo" to a memo that memorializes the
4  circumstances surrounding the taking of a confession in
5  a murder case by an Assistant State's Attorney?
6      A   No.  That's why I was puzzled when you just
7  said, "murder memo."  Because I -- I didn't know exactly
8  what you're talking about.
9      Q   Okay.  What did you review to prepare for your
10 deposition?
11     A   I reviewed the statement that -- the
12 handwritten statement that I took from a witness, I
13 forgot his name, but his -- he's referred to as Snake
14 (phonetic).  I refer -- I -- I reviewed the handwritten
15 statement that was signed by Mr. Jakes.  I reviewed my
16 prior testimony, which included my testimony at the
17 motion to suppress, my testimony at the jury trial, and
18 my testimony five years ago before Judge Hooks.  And
19 then I briefly reviewed the testimony before Judge Hooks
20 involving defendant Antho -- or, George Anderson.  I did
21 that this morning.
22     Q   Did you review any photographs?
23     A   No.
24     Q   Did you review any audio or video recordings?
25     A   No, sir.

Page 24

1      Q   Did you review any pleadings?
2      A   I'm sorry, I didn't hear that.
3      Q   Did you review any pleadings, like legal
4  briefs, or --
5      A   No.
6      Q   All right.
7      A   No.
8      Q   Did you review the complaint in this case?
9      A   No.
10     Q   Did you review the transcripts of any other
11 witness, any witness other than yourself?
12     A   No, sir.
13     Q   Did you talk to anyone in preparation for this
14 deposition?
15     A   Yes, sir.
16     Q   All right.  With whom did you speak?
17     A   Mr. Portis, and Mr. Coyne.
18     Q   All right.  I don't want to hear about your
19 conversations with them, but tell me when, and for how
20 long you met with them?
21     A   We met a couple days ago.  I think that -- and
22 I wasn't keeping time, I'm -- I'm guessing that meeting
23 lasted no more than 15 minutes.  And we met once
24 previously several weeks ago, and I think that meeting
25 lasted about ten minutes.

Page 25

1      Q   Apart from the approximately 15-minute
2  meeting, and the approximate ten-minute meeting, have
3  you met with your attorneys on any other time in regard
4  to this deposition?
5      A   No, not in regard to this deposition.
6      Q   Did you have the opportunity to review
7  everything that you wish to review?
8      A   Wait, let me correct that Mr. Ainsworth.  Yes,
9  there was communication about the -- the time of this
10 deposition that took place last night and this morning.
11     Q   I appreciate that clarification.  Were there
12 any documents that you wanted to review to prepare for
13 this deposition, but didn't have an opportunity to
14 review?
15     A   No.  The -- the -- the only thing that would -
16 - the only thing I think that would help me is seeing my
17 felony review folder.
18     Q   Did you make any attempts to obtain that
19 felony review folder?
20     A   No.
21     Q   Have you ever tried to obtain that felony
22 review folder?
23     A   No.
24     Q   Do you know where it should be?
25     A   No.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

Page 26

1    Q    And I guess I should ask, do you know why it's
2  not in the trial file maintained by the Cook County
3  State's Attorney's office?
4    A    No.
5    Q    What'd you do with that felony review folder
6  after you completed it?
7    A    I turned it in at 26 and California that
8  morning.
9    Q    And I appreciate you answering the question,
10 but I'm talking about the one you filled out after
11 speaking with Mr. Jakes on the 17th.  And so, where do
12 you -- can you tell us where exactly you turned it in?
13   A    At the felony review office at 26 and
14 California.
15   Q    Was there a box for the felony review folders?
16   A    Yes, a bin, if I recall.
17   Q    All right.  And was it the same place you
18 turned in all of your other felony review folders?
19   A    I don't -- I don't remember.
20   Q    Did you turn it in some place other than the
21 place where you turned in your -- the rest of your
22 felony review folders?
23   A    Good question.  That's what I was trying to
24 remember.  I don't remember.
25        MR. PORTIS:  Hey Russel, ASA Fangman, I think

Page 27

1  he has an update on this issue, tangentially.  And
2  so at some point when you're done with this, maybe
3  we can take a short break, I won't count it against
4  your time.  He'd like to be let in the Zoom room,
5  and I think he has a -- he's been texting me.  He's
6  found something, I think.  So he would -- he had
7  just wanted to address, so -- you know, because
8  we've been trying to find --
9        MR. AINSWORTH:  Of course.
10       MR. PORTIS:  -- to locate it.  So, I think he's
11 in the waiting room now, Kortney, I don't know if
12 you want to just stop here and do that Russell, or
13 if you want to --
14       MR. AINSWORTH:  Why don't we, so -- because
15 that will, you know, if we have it, that'd be good.
16       MR. PORTIS:  Okay.
17       MR. AINSWORTH:  Let's go off the record.
18       COURT REPORTER:  Okay.  One moment.  Okay.  We
19 are off the record.
20            (OFF THE RECORD)
21       COURT REPORTER:  We're now on the record.
22       MR. AINSWORTH:  And my client is home alone.
23 He's communicated to me, and I can represent that
24 to you.
25       MR. GRILL:  Thanks, guys.

Page 28

1  BY MR. AINSWORTH:
2    Q    All right.  When you worked in felony review
3  the first time around, did you take statements from
4  juveniles?
5    A    Yes.
6    Q    When you worked in felony review the first
7  time around, so back in 1991, where you only assigned to
8  work Chicago, or did you work outlying suburbs as well?
9    A    Only in Chicago.
10   Q    And was there a particular part of Chicago
11 that you're assigned to?
12   A    Not specifically.  You either get assigned --
13 and, again, I don't know how they do it now.  Back then,
14 in 1991, you were -- for each particular shift you were
15 either assigned the north side, the west side, or the
16 south side.
17   Q    All right.  And you work the 12-hour shifts;
18 is that right?
19   A    Correct.
20   Q    And what -- am I correct that it would be a --
21 you would do a stint of three to four weeks on evenings,
22 and then -- starting in the evening, and then you'd get
23 some time off, and then shift to starting in the
24 morning?  How'd it work?
25   A    You're correct, but I don't remember getting

Page 29

1  time off.
2    Q    All right.  So, it would just -- when your
3  turn was up, you would then go to the night shift?
4    A    Correct.
5    Q    Okay.  And when you would work a 12-hour
6  shift, you would either start at 6:00 a.m. or 7:00 a.m.,
7  or 6:00 p.m. or 7:00 p.m., and go for 12 hours; is that
8  right?
9    A    Correct.  Yes, sir.
10   Q    And you would hope you would not pick up a
11 case at 5:00 a.m. if you were getting off at 6:00?
12   A    It wasn't preferred, but it happened.
13   Q    Okay.  You received on-the-job training in
14 felony review; is that right?
15   A    No, sir.
16   Q    Didn't review -- receive any training at all
17 at felony review?
18   A    Felony review was no different than any other
19 unit in the office in that you learn from your peers on
20 the job.
21   Q    That's what I meant.  Did you receive
22 on-the-job training when you're in felony review from
23 your peers?
24   A    From my peers?  Yes.
25   Q    And how did your peers train you?  Like, how

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 30

1  did you have an opportunity to observe what your peers
2  were doing?
3      A   You would -- being a newbie, you would
4  accompany them on your -- on -- for a shift or two to
5  see how they did things.
6      Q   And so, was part of your job at felony review
7  to memorialize statements by suspects in felony cases?
8      A   Yes.
9      Q   And it was part of your job at felony review
10 to memorialize statements from witnesses in felony
11 cases?
12     A   Yes.
13     Q   And when you wanted to memorialize the
14 statements by either a witness or suspect, were you
15 looking for information that would corroborate -- or
16 that would -- I'll strike that.  You were trying to
17 ensure that witnesses were providing you with truthful
18 information; is that right?
19         MR. GRILL:  Objection.  Form.  Foundation.
20     A   I -- I don't -- Mr. Ainsworth, I don't
21 understand the question.
22     Q   Okay.  Part of your job at felony review was
23 to determine whether there's sufficient evidence to
24 justify bringing charges against a particular person; is
25 that right?

Page 31

1      A   Yes.
2      Q   And so you wanted to ensure that the
3  information that you're relying upon was credible; is
4  that right?
5          MR. GRILL:  Form.  Foundation.
6      A   Can -- again, I don't understand the question.
7      Q   Which part of the question don't you
8  understand?
9      A   What do you mean by credible?
10     Q   By credible, I mean truthful, reliable.
11         MR. GRILL:  Same objections.
12     A   I don't know.
13     Q   Did you know, back in 1991, what credible
14 evidence was?
15         MR. GRILL:  Objection.  Form.
16     A   I don't remember.
17     Q   Would you sometimes show witnesses photographs
18 of people, such as the victim of a crime, to ensure that
19 they were -- you knew who they were talking about?
20         MR. YAMIN:  Objection  Form.
21     A   I don't recall.
22     Q   Was that something you could have done back in
23 felony review?  Show a witness a photograph so that you
24 could document that they were talking about the suspect
25 in your case as being the person who they saw shoot the

Page 32

1  victim in a murder case, for example?
2          MR. GRILL:  Form.
3          MR. YAMIN:  Same objection.
4          MR. GRILL:  Foundation.  Form and foundation.
5          MR. YAMIN:  Same objection.
6      A   Well, each -- each case was different, and it
7  wou -- it would depend if there was -- if there were
8  photographs to show people.  They're always not
9  available.
10 BY MR. AINSWORTH:
11     Q   Okay.  That's a fair delineation.  But in
12 situations where you did have photographs of people to
13 show witnesses, was that something that you could do in
14 felony review, that is, to show a witness a photograph
15 of a suspect so that they could identify the suspect as
16 being the person who they saw shoot the victim?
17     A   Yes.
18         MR. GRILL:  Form.  Foundation.  Incomplete
19 hypothetical.
20     Q   And conversely, could you show a witness a
21 photograph of the victim to corroborate that they were,
22 in fact, at the scene, and were able to identify the
23 victim as being present at the scene of the crime?
24         MR. GRILL:  Same objections.
25     A   Yes.  All -- all this is hypothetical, and

Page 33

1  hypothetically speaking, yes.
2      Q   Okay.  When you were in felony review in 1991,
3  if you were questioning a juvenile about a felony
4  offense where they were a suspect, would you have either
5  a parent, a guardian, or a youth officer present for
6  that interview?
7      A   Yes.
8      Q   Why would you have a parent, a guardian, or a
9  youth officer present for an interview with the
10 juvenile?
11     A   That was the law back in -- that was my
12 understanding of the law back in 1991.
13     Q   Would you proceed with an interview of a
14 juvenile if no parent, guardian, or youth officer had
15 arrived yet?
16     A   No.
17     Q   So you would wait for either a parent or
18 guardian to be contacted, or a youth officer to present;
19 is that right?
20     A   Correct.
21     Q   When you were in felony review in 1991, did
22 you have a preference as to whether it would be a youth
23 officer, or a parent, or guardian who is with the
24 juvenile when you questioned them, where the juvenile
25 was a suspect in a felony offense?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-36 Filed: 11/04/22 Page 12 of 68 PageID #:9467
The Deposition of BRIAN GROSSMAN, taken on September 27, 2021

34..37

Page 34

1  A   I don't recall.
2  Q   Okay.
3  Q   What was your understanding of the youth
4  officer's role in being present with a juvenile, when
5  the juvenile was being questioned about a felony crime
6  that they were suspected of committing?
7  A   My understanding was the youth officer was --
8  was there in -- in place of a parent to ha -- and -- and
9  the youth officer was not involved in the investigation
10  of the crime itself.
11  Q   When -- and so did you question juveniles back
12  in 1991 where a youth officer was present?
13  A   Yes.
14  Q   In the times that you questioned juveniles in
15  the presence of a youth officer, did the youth officer
16  take any kind of role, like, saying or doing anything
17  during the interview?
18       MR. GRILL:  Objection.  Form.
19  A   I don't remember.
20  Q   On any occasion when you were in felony review
21  in 1991, did a youth officer ever say anything during an
22  interview that you were conducting of a juvenile who is
23  a suspect in a felony crime?
24       MR. GRILL:  Objection.  Form.  Foundation.
25       MR. YAMIN:  Objection. Join.

Page 35

1  A   I don't remember.
2  Q   Did it ever happen that a youth officer in
3  your presence told either a detective or yourself to
4  stop questioning a juvenile who was being questioned?
5       MR. YAMIN:      Objection.
6  A   I don't remember.
7  Q   Was it your understanding, back in 1991 when
8  you were in felony review, that a parent, a guardian, or
9  a youth officer had to be present if a detective was
10  questioning a juvenile who is suspected of committing a
11  felony crime?
12       MR. YAMIN:  Objection. Foundation. Form.
13  A   I don't remember.
14  Q   Was it your understanding, back in 1991, if a
15  juvenile was suspected of murder, that a detective could
16  question the juvenile alone, but for you to question the
17  juvenile, a youth officer, or a parent, or guardian had
18  to be present?
19       MR. GRILL:  Objection.  Form.  Calls for
20       speculation.  Foundation.
21       MR. YAMIN:  Join.
22  A   I don't recall.
23  BY MR. AINSWORTH:
24  Q   And so when you refer to -- I'll strike that.
25  It was your understanding that somebody who is accused

Page 36

1  of a crime could later challenge their statement being
2  admitted against them in court; is that right?
3       MR. GRILL:  Form.
4  A   Well, everybody has the opportunity to -- to
5  challenge that.
6  Q   All right.  And so, part of what you did in
7  felony review back in 1991 was to try to establish that
8  statements that were provided to you were done
9  voluntarily, and without coercion; is that right?
10       MR. GRILL:  Form.  Leading.
11       MR. YAMIN:    Join.
12       MR. AINSWORTH:  Did you say leading?
13       MR. GRILL:  Yeah, it is.  But, go ahead.
14  A   Mr. Ainsworth, can you repeat the question?
15  BY MR. AINSWORTH:
16  Q   Sure.  Can you please read it back?
17       COURT REPORTER:  Yes. Give me one moment.
18       (REPORTER READS BACK REQUESTED
19       TESTIMONY)
20       MR. GRILL:  Leading.
21       MR. YAMIN:  And form. Otherwise --
22  A   I don't understand the question
23  BY MR. AINSWORTH:
24  Q   Okay.  You wanted to take statements, and --
25  you wanted to only take statements that were voluntary;

Page 37

1  is that right?
2       MR. GRILL:  Leading. Form.  Go ahead.
3  A   Yes.
4  Q   And you wanted to take statements that were
5  free of coercion, right?
6  A   Yes.
7  Q   And so one thing you did to determine whether
8  statements were voluntarily and free of coercion was to
9  question suspects outside the presence of the police,
10  right?
11       MR. GRILL:  Form.  Leading.  These are all
12       leading, and I'll just have a standing objection --
13       MR. YAMIN:  Talking about --
14       MR. GRILL:  -- to leading questions.
15       MR. YAMIN:    Join.
16  A   Yes.
17  BY MR. AINSWORTH:
18  Q   In 1991 when you were in felony review, did
19  you meet with juveniles separately from the police?
20  A   There -- if I recall, I never met with a
21  juvenile without a parent, guardian, or youth officer
22  present.
23  Q   Why didn't you meet with a juven -- if the
24  juvenile had a youth officer there instead of a parent
25  or guardian, why didn't you meet with the juvenile in

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRIAN GROSSMAN, taken on September 07, 2021

---

Page 38

1  the absence of the youth officer?

2      A    If I recall, there was case law back then

3  which talked about that being a factor of a juvenile's

4  statement.

5      Q    Okay.  So one of the factors in determining

6  whether a statement by a juvenile was voluntary, was

7  whether a youth officer, or parent, or guardian was

8  present for the questioning, right?

9      A    So you're changing it from questioning to

10  statement.  I'm talking about statement.

11      Q    Okay.

12      A    And that is -- from my recollection, that was

13  a factor that the courts looked at.  Now, the -- the

14  Juvenile Court Act was amended several times since 1991,

15  so I'm just going back -- I'm going by what I remember

16  in 1991.

17      Q    What distinction are you drawing between a

18  statement and questioning?  How are those different in

19  your mind?

20      A    If I recall, the -- the case law talked about

21  statements.

22      Q    And so what is a statement?

23      A    A statement would be, in my mind, something

24  written, or something that a -- that a court reporter

25  has taken down, or something that somebody has told me

---

Page 39

1  that I have memorialized to writing.

2      Q    All right, Mr. Grossman, I just want to make

3  sure I've got this clear.  Your understanding is that

4  the case law regarding the factor that considers whether

5  a parent, guardian, or youth officer is present applies

6  only to the obtaining of a written or court reported

7  statement, and not to questioning of the juvenile in

8  1991; is that right?

9          MR. GRILL:  Objection.  It mischaracterizes

10      his testimony.  Go ahead.

11      A    It's a factor.  You said, "the factor."  It's

12  a factor, from what I recall.

13      Q    And that's what I'm trying to just find out.

14  It's a factor in question -- well, let me state it all

15  in one go.  Whether a parent, guardian, or youth officer

16  is present for the taking of an either handwritten

17  statement, or a court reported statement is a factor in

18  determining the voluntariness of that statement, but it

19  is not a factor in determining the voluntariness of an

20  oral statement obtained by a detective; is that correct?

21          MR. GRILL:  Hold on.  Objection.  That calls

22      for speculation.  form.  And foundation.  And it

23      mischaracterizes his testimony.

24      A    You're asking me what I remember of the case

25  law back in 1991, and that's what I remember of the case

---

Page 40

1  law back in 1991.

2  BY MR. AINSWORTH:

3      Q    What do you remember?  Can you answer the

4  question?

5          MR. GRILL:  Argumentative.  Form.

6          MR. YAMIN:  Join.

7      A    I remember that there were several factors

8  that the -- that the courts looked at.  What exactly

9  those factors included, I don't remember.

10      Q    All right.  I'm just talking about the one

11  factor that you've mentioned here today, and that's the

12  factor regarding the -- whether a parent, a guardian, or

13  a youth officer is present.  And are you saying, sir, on

14  the record here today, that that factor only applied to

15  handwritten statements -- for the voluntariness of

16  handwritten statements, and court reported statements,

17  but did not apply -- that factor was not germane to oral

18  statements provided to a Chicago police detective?

19          MR. GRILL:  Mischaracterizes his testimony.  It

20      calls for speculation.  And it lacks foundation.

21      A    I don't remember.

22      Q    All right.  Did it concern you at all, back in

23  1991, whether a parent, a guardian, or a youth officer

24  was present when a police detective questioned a

25  juvenile suspected of committing murder?

---

Page 41

1      A    I don't recall.

2      Q    Okay.  What did you want to know about when a

3  juvenile was being questioned by police to determine

4  whether the juvenile's statement was voluntary?

5          MR. PORTIS:  Objection.  My objection here,

6      I'm asserting is that I think that that calls for a

7      specific mental impression to your question.  To

8      the extent that he might be able to answer it

9      without doing that, so be it, but that's my

10      objection as to that specific question.

11          MR. YAMIN:      Go ahead and answer the

12      question.

13      A    Can you repeat the question?

14  BY MR. AINSWORTH:

15      Q    Yeah.  What were you concerned about in terms

16  of the voluntariness of a juvenile's -- what did you

17  want to know regarding the circumstances of a juvenile's

18  questioning back in 1991, where the juvenile was

19  suspected of murder?

20          MR. GRILL:  Form.

21      Q    What facts did you want to know?

22          MR. GRILL:  Form.

23      A    I don't recall that thought process from 1991.

24      Q    Okay.  Well, let me ask you, did you want to

25  know if the juvenile had adequate sleep?

---



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 42

1        MR. YAMIN:  Objection.  Form.
2      A    Again, you're -- you're asking me in general,
3  and each case is different.  So, I don't -- it depends
4  on the case.
5      Q    All right.  Were there some cases where you
6  didn't care if the juvenile -- if the kid, had slept or
7  not?
8        MR. YAMIN:  Objection.
9        MR. GRILL:  I'm going throw --
10        MR. YAMIN:  Excuse me, I wasn't sure if
11      Russell was done.  Form, and argumentative.
12        MR. GRILL:  Yeah, and I also want to add that
13      this mischaracterizes the law.
14  BY MR. AINSWORTH:
15      Q    Go ahead and answer, sir.
16      A    I don't recall.
17      Q    All right.  Did you want to know if a juvenile
18  who was being accused of murder had been provided with
19  food or water?
20      A    Are you talking in general --
21      Q    Yeah.
22      A    -- or this specific case?
23      Q    Back in 1991.
24      A    Again, each case is different.  I --
25      Q    Right, so some cases you wanted to know

Page 43

1  whether the juvenile had been provided with food and
2  water, and in some cases you didn't -- it didn't concern
3  you whether the juvenile been provided food and water,
4  is that fair to say?
5        MR. GRILL:  Argumentative.  And form.
6        MR. YAMIN:  Mischaracterizes his testimony.
7      A    That's not fair to say.
8      Q    What would be fair to say?  How is it not
9  fair?
10        MR. GRILL:  Argumentative.  Form.
11      A    You're ask -- you phrased it that I didn't
12  care.  Again, each case is different.
13      Q    Okay.  Would you document, when you took
14  statements, whether a person had been provided food or
15  water?
16      A    If -- if a -- if somebody in custody had given
17  me a statement, I would document that in the statement.
18      Q    Okay.  Why would you document whether they've
19  been provided with food and water in the statement?
20        MR. PORTIS:  Objection.  Hear my objection,
21      Brian.  Objection, as to if the response to that
22      question requires an attorney mental impression.
23      To the extent that you may actually -- factually,
24      you may.
25      A    That would require a mental impression.

Page 44

1        MR. PORTIS:  And based upon the answer, I
2      would instruct my client on the basis of attorney
3      mental impression, not to answer that question.
4  BY MR. AINSWORTH:
5      Q    Were you concerned about -- well, strike that.
6  Did you want to know how long a person had been in
7  custody before they had provided a statement to you in a
8  felony case?
9        MR. YAMIN:  Objection.  Form.
10      A    If you -- if you're talking in general, in
11  general, I would know how long they were in custody.
12      Q    How would you know how long they're in
13  custody?
14      A    Usually I would be provided with police
15  reports that would document that.
16      Q    Before you talk to witnesses or suspects at a
17  police station, would you want to meet with the
18  investigating detectives to learn about the
19  investigation to date?
20      A    I always talked to the detectives when I would
21  arrive.
22      Q    And that was true in 1991 when you were in
23  felony review; is that right?
24      A    Correct.
25      Q    And would you want to look at all available

Page 45

1  police reports regarding the investigation?
2      A    Yes, with the caveat that some cases had more
3  reports available than others.
4      Q    So sometimes if there's, you know, a hundred
5  pages of police reports, you might not be able to review
6  all of them, is that what you're saying?
7        MR. GRILL:  Mischaracterizes his testimony.
8        MR. YAMIN:  Join.
9      A    No, that -- that's not what I'm saying.  There
10  were occasions where either I didn't have access to the
11  arrest report, or certain documents because they weren't
12  finished.
13      Q    Got it.  And if there were crime scene photos
14  available, would you want to see the crime scene photos?
15        MR. GRILL:  Form.  Hypothetical.
16      A    Hypothetically speaking, yes.
17      Q    Why would you want to see the crime scene
18  photos?
19      A    It would help my understanding of the case.
20      Q    And so why would you want to know about, you
21  know, facts from the investigating detective's review,
22  the police reports, and review of the crime scene photos
23  before you spoke to suspects and witnesses?
24      A    Well, it just makes sense to know why you're
25  there.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-02204 Document #: 266-36 Filed: 11/04/22 Page 15 of 68 PageID #:9479
The Deposition of BRIAN GROSSMAN, taken on September 17, 2021
46..49

Page 46

1    Q    Okay.  Did you also want to know facts about
2  the investigation, so that if witnesses or suspects were
3  telling you things that were inconsistent with what you
4  knew to be true about the crime scene, you could follow
5  up on those discrepancies?
6         MR. GRILL:  Objection.
7         MR. PORTIS:  I'm going to object as to the
8         extent that the answer may require an attorney
9         mental impression.  To the extent that you can
10        answer the question outside of that scope, then
11        please feel free to answer.
12        MR. YAMIN:  Objection.  Form.  Foundation.
13   A    That would re -- require an attorney mental
14 impression.
15        MR. PORTIS:  Based upon the representation, I
16        would instruct my client not to answer.
17        MR. AINSWORTH:  Let's take a break so we can
18        review the transcript -- or the memo that was just
19        circulated.  So let's go off the record, please.
20        (OFF THE RECORD)
21        COURT REPORTER:  We're on the record.
22 BY MR. AINSWORTH:
23   Q    When you were in felony review back in 1991,
24 was there anything that prevented you from asking a
25 suspect to write out a statement in their own hand?

Page 47

1    A    No.
2    Q    All right.
3    Q    So, do you recall anything you did on
4  September 16, 1991, the day before you were called out
5  to Area 3, in the early morning hours?
6         MR. YAMIN:  Objection.  Form.  I thought you
7         had more to the question than that, that's why I
8         paused.
9    A    I was likely asleep.
10 BY MR. AINSWORTH:
11   Q    Well, how about in the beginning of your shift
12 when you were working?  Were you sleeping then?
13   A    No.  Mr. Ainsworth, you asked me about the
14 early morning hours.  I was on the night shift, and so I
15 was likely sleeping.
16   Q    Sorry, wou -- I wasn't asking about the early
17 morning hours.  I was like -- I was, like -- I was trying
18 to ask you anything you did on the 16th, the day before
19 you were called out the early morning hours of the 17th.
20 So what'd you do on the 16th?  Do you remember?
21        MR. GRILL:  Form.
22        MR. YAMIN:  Same.
23   A    Well, on the 16th, I started work at either
24 6:00 p.m., or 7:00 p.m.
25   Q    Okay.  Did you receive any calls between the

Page 48

1  time that you arrived at work, and the time that you
2  were called out to Area 3 at about 1:30 in the morning
3  on the 17th?
4    A    I don't specifically remember that.
5    Q    Do you know if you had any calls at all before
6  receiving the call to go out to Area 3 at about 1:30 in
7  the morning?
8    A    I don't specifically remember that.
9    Q    Do you remember, generally anything about what
10 you'd done, or whether you had calls before the calls
11 where you met Mr. Jakes?
12   A    Generally, this would not have been my only
13 case of the night.
14   Q    Just based on how busy you were at the time?
15   A    Correct.
16   Q    Where did you come from when you responded to
17 the call regarding the Garcia homicide on the 17th?
18   A    I don't recall if I was at 26th street, or if
19 I was coming from another police station.
20   Q    Does that jive with your memory that you
21 received a call about the Garcia homicide at about 1:30
22 in the morning on September 17th?
23   A    Does what jive?
24   Q    That it -- that you received the call at about
25 1:30 in the morning.

Page 49

1         MR. YAMIN:  Objection.  For --
2    Q    Does that sound right?
3         MR. YAMIN:     Objection.  Form.
4    A    It -- it does sound about right.
5    Q    Okay.  What did you learn about the Garcia
6  homicide investigation when you were first notified over
7  the phone?
8    A    Well, the dis -- the felony review dispatcher
9  would have assigned me the case, so I don't recall if I
10 was told that it was a homicide investigation, or I just
11 had a case at Area Three.
12   Q    You had worked with Detective Kill before; is
13 that right?
14   A    Yes.
15   Q    How'd you know Detective Kill?
16   A    I had prior cases that he was involved with.  I
17 handled pri -- prior cases that he was involved with.
18   Q    From felony review?
19   A    Yes.
20   Q    How many prior cases did you have with Mike
21 Kill?
22   A    I don't recall.
23   Q    When was the last time you saw Mike Kill?
24   A    I don't recall.
25   Q    Did you stay in touch with Mike Kill after he

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 50

1  retired?
2          MR. YAMIN: Objection. Form.
3      A  No.
4      Q  Did you work with Detective Kill after he left
5  -- after you left felony review the first time?
6          MR. YAMIN: Objection. Form.
7      A  I don't recall if he testified in a -- in a
8  case in my courtroom -- in one of my courtrooms later
9  on. I -- I -- he could have, I don't recall.
10     Q  How about Ken Boudreau? You worked with Ken
11  Boudreau before this case involved in the Garcia
12  homicide, right?
13     A  Yes.
14     Q  And in those prior cases with -- how many
15  prior cases did he have with Ken Boudreau?
16     A  I don't recall.
17     Q  Did you work with Ken Boudreau outside of the
18  time you're in felony review in 1991?
19         MR. YAMIN: Objection. Form.
20     A  Again, he may have testified in my courtroom -
21  - or one of the courtrooms that I was assigned to later,
22  but I -- I don't -- I don't recall.
23     Q  Did Ken Boudreau ever talk to you about this
24  case after your felony -- after your time in felony
25  review in 1991?

Page 51

1          MR. YAMIN: Objection. Form.
2      A  I -- I don't think so. I -- I don't recall
3  that convers -- a conversation about this case.
4      Q  Did he call you at the time that the case was
5  going to a motion to suppress?
6          MR. YAMIN: Objection Foundation.
7      A  I don't remember that.
8      Q  Did Ken Boudreau call you at the time the case
9  was in post-conviction litigation?
10         MR. YAMIN: Foundation, and form.
11         MR. GRILL: Join.
12     A  No.
13     Q  When was the last time you spoke to Ken
14  Boudreau?
15     A  As far as I can remember, it was -- it was
16  back in the 1990s.
17     Q  All right About what time did you arrive at
18  Area 3, after receiving the call?
19     A  About 2:00.
20     Q  And so if you received the call around 1:30,
21  and arrived at 2:00 p.m., does that indicate to you that
22  you came from 26th and Cal, or does it indicate you came
23  from somewhere other than 26th and Cal?
24     A  It do -- it doesn't indicate it either way to
25  me.

Page 52

1      Q  Okay. What'd you do when you arrived at Area
2  3?
3      A  I talked to Detective Kill, Detective Caesar,
4  and I think Detective Boudreau, about the case.
5      Q  Did you ever socialize with either Detectives
6  Kill, Boudreau, or Caesar?
7          MR. YAMIN: Objection. Form.
8      A  Not to the best of my recollection.
9      Q  Do you know John Burge from Area 3?
10     A  I do not know John Burge from Area 3.
11     Q  And did you ever meet John Burge?
12     A  Never.
13     Q  When -- how long did you speak with Detectives
14  Kill, Boudreau, and Caesar after you arrived at
15  approximately 2:00 a.m.?
16     A  I don't recall exactly.
17     Q  Approximately, how long did you speak with
18  Detectives Kill, Boudreau, and Caesar?
19     A  I don't recall. It -- it had to be before
20  3:30-ish because that's when I -- if I recall, that's
21  when I spoke to -- I think his name is Gus Robinson, the
22  one that they refer to as Snake.
23     Q  Okay. Did those detectives provide you with
24  their police file?
25     A  No.

Page 53

1      Q  Did those detectives, Kill, Boudreau, and
2  Caesar, provide you with any documents?
3      A  Yes.
4      Q  What documents did they provide you with?
5      A  I don't recall.
6      Q  What types of documents did they provide you
7  with?
8      A  Police reports.
9      Q  Did they provide you with crime scene photos?
10     A  I don't recall.
11     Q  All right. So this was over 24 hours after
12  the murder had been committed. If police -- if crime
13  scene photos were available, would you have reviewed
14  them?
15         MR. YAMIN: Objection. Calls for speculation.
16         MR. GRILL: Yeah. I'm going to try and get off
17  mute.
18     A  Hypothetically speaking, yes.
19  BY MR. AINSWORTH:
20     Q  And in this case, the Garcia homicide
21  investigation, if crime scene photos have been available
22  for your review, would you have reviewed them?
23         MR. YAMIN: I'll object --
24         MR. GRILL: Same objection.
25         MR. YAMIN: -- form.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 54

1    A    Again, hypothetically speaking, yes.
2  BY MR. AINSWORTH:
3    Q    If it was over 24 hours since the time the
4  crime had been committed, would you expect that crime
5  scene photos would be available for your review?
6         MR. GRILL:  Form. Foundation.
7    A    So remember Mr. Ainsworth, we're talking about
8  1991, so there were -- to -- to the best of my
9  knowledge, there were no such things as digital photos.
10 So to -- we're -- we're talking about film development,
11 and I -- I don't remember how long it took in 1991 for
12 the police to develop film, and -- and have it in -- in
13 the hands of the detectives back then.
14   Q    Did you talk to Detectives Kill, Boudreau, and
15 Caesar about who their suspect was?
16   A    Of course.
17   Q    All right. Did you talk to Detectives Kill,
18 Boudreau, and Caesar about the course of the
19 investigation?
20        MR. GRILL:  Form.
21        MR. YAMIN:  Objection, form -- join.
22   A    I don't know what you mean by, "course of the
23 investigation."
24   Q    The steps that they had taken in the
25 investigation, you know, thus far, up until 2:00 a.m. on

Page 55

1  the 17th.
2    A    I don't have any independent recollection of
3  that.
4    Q    Did they alert you that the suspect, Anthony
5  Jakes, was 15 years old?
6    A    Yes. Although I -- I'm -- I'm trying to
7  remember if they said he was a juvenile, or if they said
8  he was 15. I -- I don't -- I don't recall.
9    Q    Okay. Did you ask how long the juvenile, or
10 15-year-old, Jakes, had been in police custody?
11        MR. YAMIN:  Objection. Form.
12   A    I don't recall.
13   Q    Did you want to know how long Jakes had been
14 at the police station when you arrived and were talking
15 to the police at 2:00 a.m. on the 17th?
16   A    Again, you're talking about my mental process.
17 I would assume that I knew, but do I have an independent
18 recollection of that?  I don't.
19   Q    Why do you assume that you knew?
20   A    I would assume that would come up in the
21 discussions, or in the police reports.
22   Q    Why would you assume it would come up in the
23 discussions or the police reports?
24   A    Well, hypothetically speaking, I would want to
25 know how this -- how this person, and I'm talking in

Page 56

1  general, was arrested. Why was he arrested? How did
2  they know -- what led them to arrest him?
3    Q    Okay. And did you learn why Jakes was
4  arrested, and what led them to arrest him?
5    A    I don't recall. I'm sure I did at the time.
6  Do I remember it now?  No.
7    Q    Okay. But you wanted to know the chain of
8  events that led to Jakes having contact with the Chicago
9  Police Department, in regards to this murder, right?
10   A    In --
11        MR. YAMIN:  Objection. Form.
12   A    In general, yes. However, I don't have an
13 independent recollection of that in this specific case.
14        MR. GRILL:  Sorry. I was a little late to the
15        punch here getting off mute on the last question.
16        Objection. Form. Assumes facts not in evidence.
17        Foundation. Specifically on the arrest.
18        MR. AINSWORTH:  Rule: Just make your
19        objections, no speaking objections. It's real
20        simple. Thank you. All right.
21 BY MR. AINSWORTH:
22   Q    So, when you were talking to Kill, Boudreau,
23 and Caesar, did they tell you that at, you know,
24 approximately 2:00 a.m., did they tell you that a youth
25 officer had not yet arrived for Jakes?

Page 57

1    A    I don't recall.
2         MR. PORTIS:  Hey, Russell? Before we go any
3         further, I think someone dropped off. Are we okay?
4         Or is everyone still here?
5         COURT REPORTER:  It was mister --
6         MR. AINSWORTH:  I think it was Jakes.
7         COURT REPORTER:  Yeah.
8         MR. PORTIS:  Okay. I just wanted to make the
9         observation.
10        MR. AINSWORTH:  Thank you.
11 BY MR. AINSWORTH:
12   Q    And I'm sorry, I can't remember your answer.
13   A    I do not recall. Do you --
14   Q    Okay. Then. Did you ask Kill, Boudreau,
15 and Caesar about Jakes' interrogation?
16        MR. YAMIN:  Objection. Form. Foundation.
17   A    I don't have an independent recollection of
18 that.
19   Q    Did Kill, Boudreau, or Caesar tell you whether
20 a youth officer, a parent, or a guardian was present for
21 Jakes' interrogation?
22   A    Again, I don't have an independent
23 recollection of that
24   Q    If Kill, or Boudreau, or Caesar had told you
25 that Jakes had been interrogated as a 15-year-old



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 58

1  without a parent, a guardian, or a youth officer
2  present, would you have wanted to follow up with Jakes
3  to make sure that he was okay with them questioning him
4  in the absence of a parent, a guardian, or a youth
5  officer?
6          MR. GRILL:  Objection --
7          MR. YAMIN:    Objection.  Go ahead, Andrew.
8          MR. GRILL:  Foundation.  Mischaracterizes the
9  evidence.  Assumes facts not in evidence.
10         MR. YAMIN:  Also form.  And calls for
11 speculation.
12         MR. PORTIS:  I will object on the basis of --
13 to the extent that your answer may require your
14 specific attorney mental impression.  I would
15 instruct you not to answer.  To the extent that you
16 can answer the question, you may, with that
17 parameter.
18      A    That would require me to talk about my
19 attorney mental impression.
20         MR. PORTIS:  Based upon the representation, I
21 would instruct my client not to answer.
22         MR. AINSWORTH:  And so, what's the basis for
23 the objection, Alvin?
24         MR. PORTIS:  The basis is the extent that this
25 -- if that question calls for him to divulge his

Page 59

1  attorney mental impressions about the specifics of
2  the case, as it related to what he was formulating
3  as an attorney, as the prosecute -- as the felony
4  review assistant on the case.
5          MR. AINSWORTH:  But what's the privilege?
6          MR. PORTIS:  Well, the privilege is his
7  deliberative process as an attorney mental
8  impression, that he does not have to divulge his
9  attorney mental impressions about this specific
10 case.
11         MR. AINSWORTH:  As a prosecutor in a case
12 that's been concluded, and the case has been -- the
13 conviction's been vacated, you think the
14 deliberative process applies?
15         MR. PORTIS:  Well, I -- more so to the point,
16 I do believe that he does not have to divulge his
17 specific attorney mental impressions about this
18 case.  In terms of the why he did certain things or
19 aspects, or if it calls for his impressions as an
20 attorney, I don't think that he has to divulge
21 that.
22         MR. AINSWORTH:  Well, then we're -- you know,
23 we'll file a motion, and we'll come back because I
24 don't think the deliberative process applies to
25 this witness' testimony.

Page 60

1          MR. PORTIS:  You don't believe that his
2  attorney mental impressions are protected?
3          MR. AINSWORTH:  That's right.
4          MR. PORTIS:  Okay.
5          MR. AINSWORTH:  All right. Mr. Jakes has
6  rejoined the deposition.
7  BY MR. AINSWORTH:
8      Q    Did you speak with Jakes about whether he had
9  a parent, a guardian, or a youth officer present?
10     A    When I spoke to him, there was a youth officer
11 there.
12     Q    Sorry.  You're right. Bad question.  Did you
13 speak to 15-year-old Anthony Jakes about whether he had
14 a youth officer, a parent, or a guardian present when he
15 was questioned by two Chicago police detectives about a
16 murder?
17     A    I don't recall.
18     Q    If you had talked to Jakes about whether he
19 was questioned in the presence of a parent, a guardian,
20 or a youth officer, or absent their presence, when he
21 was being interrogated about a murder by two Chicago
22 police detectives, would you have documented that fact?
23         MR. YAMIN:  Objection.  Calls for speculation.
24     A    I don't know.
25         MR. YAMIN:  And form.

Page 61

1      A    I don't know.
2      Q    Based on your understanding of the law back in
3  1991, when you were in felony review, was it permissible
4  for Detectives Kill or Boudreau to interrogate Jakes
5  about a murder in the absence of parent, a guardian, or
6  a youth officer?
7          MR. GRILL:  Incomplete hypothetical.  form.
8          MR. YAMIN:  Join.
9      A    I don't -- I don't remember.
10     Q    All right.  Had you been involved in any
11 interrogation as a -- or strike that.  Back in 1991 in
12 felony review, had you been involved in any felony
13 investigation where a juvenile had been questioned about
14 a murder by detectives in the absence of either a youth
15 officer, a parent, or a guardian?
16         MR. GRILL:  Form.
17         MR. YAMIN:    Objection.  Form.
18         MR. GRILL:    Incomplete hypothetical.
19     A    Wait, can -- Mr. Ainsworth, can you repeat the
20 question?
21 BY MR. AINSWORTH:
22     Q    Sure.  Back in 1991, when you were in felony
23 review, had you been involved in any investigation where
24 Chicago police detectives had questioned a juvenile in
25 the absence of a parent, or guardian, or youth officer

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-36 Filed: 11/04/22 Page 19 of 68 PageID #:9483
The Deposition of BRIAN GROSSMAN, taken on September 07, 2021

62..65

Page 62

1   about a murder, where the juvenile was the suspect in
2   the murder?
3            MR. YAMIN:  Same objection.
4            MR. GRILL:  Objection.
5   A    I don't recall.
6            MR. YAMIN:     Form.
7   A    My ---
8            MR. YAMIN:      I mean -- yeah, form.
9   A    My answer is, I don't recall.
10  BY MR. AINSWORTH:
11       Q    Did you talk with Detectives Kill, Boudreau,
12  and Hal -- or, Kill, Boudreau, and Caesar about their
13  efforts to locate a parent or guardian for Jakes?
14       A    I don't recall.
15           MR. YAMIN:  Objection.  Form.
16       Q    Did Boudreau, Kill, and Caesar tell you that
17  none of them had made any effort to contact Jakes'
18  parent or guardian to alert them that he was being
19  questioned for murder?
20           MR. GRILL:  Objection.  Form.  Foundation.
21       Incomplete hypothetical.  And mischaracterizes the
22       evidence.
23           MR. AINSWORTH:  What does it mischaracterize,
24       Mr. Grill?
25           MR. GRILL: Do you want to --

Page 63

1            MR. AINSWORTH: I'm sorry --
2            MR. GRILL:     We can argue about it.  Yeah,
3   I'm happy to ---
4            MR. AINSWORTH:  Yeah, what does it
5   mischaracterize?
6            MR. GRILL:  Okay.  So since you've invited me
7   to make a speaking objection, there's other
8   testimony and evidence in this case that
9   establishes that Jakes' family knew where he was,
10  and what was going on.  So we can argue about that,
11  but that's the evidence that's out there.  So we
12  can disagree about it, but you're mischaracterizing
13  -- your questions, really, actually don't -- from
14  my point of view, don't have a proper foundation,
15  and arguably they may not be being asked in good
16  faith because he was taken from his house in front
17  of his family, that's his story.  His mom knew
18  where he was.
19           MR. AINSWORTH:  Hey, Grill?
20           MR. GRILL:  Or his grandmother's.
21           MR. AINSWORTH:  Let me just -- okay.  So, I
22  asked what about a murder?  Nobody -- and so I'm not
23  mischaracterizing anything, and I think your
24  objection is wholly improper because nobody alerted
25  -- the testimony is unrebutted.  Nobody ever

Page 64

1   notified Jakes' parent or guardian that Jakes was
2   going to be questioned about a murder.  And that
3   was the question.  And so --
4            MR. GRILL:  Wait ---
5            MR. AINSWORTH:  -- if you want to talk -- if
6   you want to make allegations about bad faith, or
7   things like that, I'm saying that to say that that
8   mischaracterizes the evidence is -- that objection
9   is not taken in good faith, so please --
10           MR. GRILL: I -- well, we can go around about
11  this, but that's -- I totally disagree with what
12  you're saying, but go ahead and ask that.  I'm not
13  telling this witness not to answer.  I'm not
14  stopping the dep, or anything like that.  We've
15  made our positions clear.  So, fire away.
16           MR. AINSWORTH:  Yeah, yeah.  Grill, but I have
17  a problem repeatedly in depositions, with you in
18  particular, I don't have this problem with George.
19  I don't have this problem with other lawyers.  I
20  have it with you in particular, where there are
21  speaking objections, coaching objections, and
22  things are being done that at some point there
23  needs to be a stop.
24           MR. GRILL:  Russell, I -- you know, I --
25  what's the word that I'd like to use here?  Your

Page 65

1   characterization of me is unwelcome, and it's
2   inaccurate, but it's one that I think you like to
3   throw around as a threat, and it is completely
4   lacking.  The questions that you ask a lot of times
5   in these depositions, Russell, are improper.
6   They're improperly formed, but I also don't sit
7   here and throw aspersions at you, or, you know,
8   take a confrontational position or tone like you're
9   taking here.  It's unnecessary, and it's
10  unprofessional, okay?  And if you've got that big
11  of a problem with me, why have you never brought
12  this up to the judge in any of these other cases
13  where this is apparently such a problem?  I don't
14  understand why you feel like you need to resort to
15  a personal attack when I'm just making my
16  objections here, and in this particular speaking
17  objection, you invited me to make. So, let's keep
18  the personal attacks out of it, and let's go on
19  with this deposition and not waste this witness'
20  time.
21  BY MR. AINSWORTH:
22       Q    Do you remember the question, sir?
23       A    I do.  I don't recall, is my answer.
24       Q    Did the detectives tell you anything about
25  whether Jakes' initial story had been corroborated, or

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 66

1 contradicted by their investigation?
2         MR. YAMIN: Objection. Form. Foundation.
3     A   I don't recall.
4     Q   Tell us everything you recall about that
5 conversation between you, Detective Boudreau, and
6 Detective Caesar at about 2:00 a.m. -- that started at
7 about 2:00 a.m. on the 17th.
8         MR. YAMIN:    Objection. Mischaracterizes
9     the evidence.
10    A   I -- I don't have any independent recollection
11 of exactly what the conversation was.
12    Q   Were you friendly with Detectives Kill,
13 Boudreau, and Caesar?
14        MR. YAMIN: Objection. Form.
15    A   What do you mean by "friendly"?
16    Q   I mean genial, that you liked their company.
17        MR. YAMIN: Same objection.
18    A   Well, out -- outside of these cases, I -- I
19 didn't have their company. They, along with other det -
20 - detectives -- there are times -- and I'm talking about
21 back in 1991, when things could be -- when -- when we
22 could have disagreed because of our different roles in
23 investigations.
24    Q   Did you have any disagreements with either
25 Detectives Kill, Boudreau, or Caesar?

Page 67

1     A   I don't remember exactly, with them.
2     Q   And do you remember any kind of disagreement
3 with Kill, Boudreau, or Caesar at any time?
4     A   Not that I can recall.
5     Q   Did you ever refuse to take a statement from a
6 suspect who was in police custody and willing to
7 confess?
8         MR. YAMIN: Objection. Form.
9     A   I don't recall.
10    Q   Did you ever report to any supervisor, or
11 person within the Cook County State's Attorney's office,
12 or to a person within the Chicago Police Department,
13 that a Chicago police officer had, you believed, commit
14 a misconduct?
15        MR. YAMIN: Objection. Form. Foundation.
16    A   No.
17    Q   Why did you talk to Gus Robinson before
18 Mr. Jakes?
19    A   I don't remember specifically, but I -- I, in
20 general, would talk to the witnesses before the suspect.
21    Q   Why was that?
22    A   To get as many facts as possible.
23    Q   Okay. And so when you spoke to Gus Robinson,
24 did you want to get as many facts as possible about what
25 he knew about the murder, and Jakes' involvement?

Page 68

1     A   Yes.
2     Q   And so who was present when you spoke to Gus?
3     A   I think that was Michael Kill who was with me.
4     Q   Did you speak to Gus outside Michael Kill's
5 presence?
6     A   I don't recall.
7     Q   Was it your practice to speak to witnesses
8 outside of a police officer's presence to find out how
9 they were treated? Or is that not your practice?
10    A   Again, it depends on the case. And I don't
11 recall if I did here.
12    Q   I'm about to show you Mr. Robinson's
13 statement, just so we can go over it.
14        MR. AINSWORTH: But everybody, I just need
15     about three minutes. I've got a sick kid
16     downstairs who's about to be picked up, and so I
17     just have to get her stuff together and send her
18     out the door.
19        MR. YAMIN: No problem.
20        MR. AINSWORTH: I'm still alone my room, but
21     she's downstairs. So give me -- let's go off the
22     record for about three minutes.
23        (OFF THE RECORD)
24        COURT REPORTER: We're on the record.
25    Q   All right. When you spoke to Gus Robinson,

Page 69

1 did you ask him open-ended questions?
2     A   What do you mean by "open-ended questions"?
3     Q   An open-ended question, I mean, a question
4 that does not suggest the answer.
5     A   Yes.
6     Q   What did Gus Robinson tell you, and what did
7 you say to him during that conversation?
8     A   Well, I don't remember the exact conversation,
9 but it's memorialized in his handwritten statement.
10    Q   Do you have any independent recollection of
11 your conversation with Mr. Robinson?
12    A   No.
13    Q   Do you recall what Mr. Robinson looked like?
14    A   No.
15    Q   Do you recall that he had a skin discoloration
16 on his face?
17    A   No.
18    Q   How did you introduce yourself to
19 Mr. Robinson?
20    A   I -- I said that I was an assistant state's
21 attorney, and a sur -- an attorney working with the
22 police, not his attorney, or Anthony Jakes' attorney.
23    Q   All right. Do you remember saying that to
24 him, or is that just what you would typically say to a
25 witness?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

Page 70

1    A   That's what I would typically say to a
2 witness.
3    Q   And you told him you were working with the
4 police, right?
5    A   Yes.
6    Q   How did you find -- how did -- what did you do
7 to determine how Mr. Robinson had been treated while he
8 was in police custody -- or with the -- at the police
9 station?
10    MR. YAMIN:  Objection.  Form.
11    I don't think -- I don't think Mr. Robinson
12 was in custody.
13    Q   That's -- and I -- let me rephrase the
14 question.  What did you do to find out how Mr. Robinson
15 had been treated by the police during the investigation?
16    MR. YAMIN:  Same objection.
17    A   I don't --
18    MR. YAMIN:  Same objections.
19    A   I don't -- I don't remember.
20    Q   Okay.  Let's take a look at what we'll mark as
21 Exhibit 1.  All right.  So you started talking to Gus
22 Robinson about 3:30; is that right?
23    (EXHIBIT 1 MARKED FOR IDENTIFICATION)
24    MR. YAMIN:  Objection.  Mischaracterizes the
25 statement.

Page 71

1    A   3:30-ish.  I don't know if it was before.  I -
2 - I don't -- there's something at the top that I didn't
3 put on there.  P-454289.  I don't know what that is.
4 That's not my handwriting.
5    Q   I think that's the RD number, but -- so, you
6 started your conversation with Gus Robinson around 3:30,
7 right?
8    A   3:30 --
9    MR. YAMIN:  Objection. Mischaracterize --
10 excuse me.  Mischaracterizes the document.  Doesn't
11 that say 3:50?
12    MR. AINSWORTH:  George, that's not the time
13 that the conversation started.
14    MR. YAMIN:  Okay, I'm --
15    MR. AINSWORTH:  And that's not what my
16 question is.
17    MR. YAMIN:  -- just going based on what I can
18 see of the document.  My apologies.
19    MR. AINSWORTH:  Well, then --
20    PART 3 OF 8 ENDS [01:36:04]
21    MR. GRILL:  It says "taken" at that time.
22    MR. YAMIN:  Guys --
23    MR. YAMIN:  I can't see --
24    MR. AINSWORTH:  -- just let the witness
25 testify.  He will explain it to you.  If you-

Page 72

1    MR. YAMIN:  I can't see the entire document of
2 Carla's (phonetic).
3    MR. AINSWORTH:  It -- that doesn't have
4 anything to --
5    MR. YAMIN:  Well, that I disagree with.
6    MR. AINSWORTH:  I'm just asking the witness
7 the question.  Let him testify. We'll ask --
8 BY MR. AINSWORTH:
9    Q   Mr. Grossman, and only Mr. Grossman, what time
10 did you start talking to Gus Robinson?
11    A   It was 3:30-ish.  It could've been a little
12 bit earlier.  I don't know.
13    Q   And then what time did you start recording Gus
14 Robinson's handwritten statement?
15    A   As it says on the statement, 3:50 a.m.
16    Q   So you had a conversation with Gus Robinson
17 before you took his statement, right?
18    A   Yes, sir.
19    Q   And then how long did it take you to
20 memorialize Gus Robinson's statement?
21    A   It -- it was very short, like, ten minutes.
22    Q   Why was it so short, like ten minutes?
23    A   Just --
24    MR. YAMIN:  Objection.  form.
25    A   It's a short statement.

Page 73

1    MR. YAMIN:  Calls for speculation.
2    Q   All right.  So -- this is your handwriting; is
3 that right?
4    A   Yeah.  So, there's a stamp at the bottom
5 that's not mine.  That's a City Jakes 00094.
6    Q   Right.  But you -- and actually I should do
7 that.  This document that we've marked as Exhibit 1 is
8 Bates numbered City Jakes 94 through City  Jakes 95. But
9 the handwriting on this document is yours; is that
10 correct?
11    A   Yes, sir.
12    Q   Apart from the signatures, right?
13    A   Yes, sir.
14    Q   Okay.  And so it says, "Gus Robinson stated
15 that he's also known as 'Snake.'  Gus has known Anthony
16 Jakes for about six months.  Gus stated that on
17 September 15, 1991 at about 11:50 p.m., he was
18 approached by Anthony Jakes in the parking lot of Queen
19 Submarine Shop, and Harold's Chicken.  Gus had just
20 pulled up to the parking lot and was using the phone
21 when Jakes came up to Gus."  Did I read that correctly?
22    A   Yes.
23    Q   Did Gus tell you that it was about 11:50 p.m.
24    that he was approached by Anthony Jakes in the
25 parking lot?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 74

1  A    Yes.
2  Q    Did he tell you how he knew it was 11:50 p.m.
3  -- about 11:50 p.m.?
4  A    I don't recall.
5  Q    Did he tell you there was a clock in the
6  parking lot of Queen Submarine Shop?
7  A    I don't recall.
8  Q    Did he tell you he was wearing a watch?
9  A    I don't recall.
10  Q    Did you just include, you know, that you knew
11  the murder occurred at about 11:55 p.m., and so you kind
12  of backwards that it was about 11:50 p.m.?
13       MR. GRILL: Form. Argumentative. Foundation.
14       MR. YAMIN: And it characterizes prior
15  testimony.
16  A    No. I would have gotten that from him.
17  BY MR. AINSWORTH:   Q    It says, "Anthony Jakes told
18  Gus that there was this white dude in the sub shop, and
19  that Little A and his homie were scoping his money.
20  Jakes, Little A, and Little A's homie were fitting to
21  rob the white dude in the sub shop. Jakes asked Gus if
22  Gus wanted to stand point with him while they fitting to
23  come out. Gus took this to mean that Jakes wanted Gus
24  to be a lookout with him during the robbery. Gus said,
25  'No,' and Gus left the parking lot. Gus drove home with

Page 75

1  his 18-month-old daughter, Yolanda." Did I read that
2  correctly?
3  A    Yes, sir.
4  Q    All right. So, who was Little A's homie that
5  was scoping out the money with Little A?
6       MR. YAMIN: Objection. Foundation.
7  A    If you're -- If you're asking me, I don't
8  remember.
9  Q    All right. Did you ask Gus Robinson who
10  Little A's homie was?
11  A    Yes, but I think that's how he described him.
12  Q    All right. So, when Gus was talking with you,
13  he didn't provide a name or a nickname for the person
14  who was with Little A when Little A was -- and the
15  person were scoping out the money; is that right?
16  A    Well, Gus referred to him as "Little A's
17  homie."
18  Q    I understand that, sir. And I read that
19  there. What I'm asking you is, Gus didn't refer to
20  Little A's homie by a name or a nickname; is that
21  correct?
22  A    Correct.
23  Q    All right. So at the time that you were
24  talking to Gus, Gus didn't know -- or at least Gus was
25  telling you that he didn't know the name or nickname of

Page 76

1  the person who was with Little A; is that fair?
2  A    I --I don't know what he knew or didn't know.
3  All I can do is tell you what he told me.
4  Q    And that's what I'm asking you. He told you
5  that he didn't know the name of Little A's friend who
6  was with them, right?
7       MR. YAMIN: Objection. mischaracterizes the
8  testimony. Foundation.
9  A    Correct.
10  Q    And then going on in the document, it says,
11  "Gus drove around the block on Elizabeth and went up to
12  Throop. Gus was telling his homies that he was fitting
13  to go home. Gus then heard about three gunshots from
14  the area near the sub shop. Gus then drove directly
15  home." Did I read that correctly?
16  A    Yes, sir.
17  Q    Did Gus tell you who it was that he went to go
18  see on Elizabeth?
19  A    He referred to them as his "homies."
20  Q    So, like, his friends?
21  A    I -- I don't know. That --
22       MR. GRILL: Objection. Form. And foundation.
23       -- tho -- that -- those are his words.
24  Q    Well, did you ask him what he meant by
25  "homies"?

Page 77

1  A    I don't recall.
2  Q    What did you understand it to mean when Gus
3  referred to his "homies"?
4  A    I don't recall.
5  Q    Do you now know what "homies" means?
6  A    If you're asking me what -- I know what
7  "homies" means as of September 17, 2021. Yes. I would
8  refer to that as -- it could mean somebody's friends. It
9  could mean somebody's fellow gang member. It could mean
10  somebody's buddies.
11  Q    What did you understand "homies" to mean back
12  in September of 1991?
13  A    Same answer. I don't recall.
14  Q    Okay.
15  Q    Did you ever write down information in a
16  handwritten statement without understanding what the
17  word, or the information meant?
18       MR. YAMIN: Objection. Form.
19  A    I don't recall.
20  Q    Well, when you wrote down the statement for
21  Gus Robinson, and you wrote down "homies", did you
22  understand what Gus meant by "homies"?
23       MR. YAMIN: Objection. Asked and answered, a
24  few times.
25  A    I'm sure I understood it back then, but if



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 78

1  you're asking me what my mental state was at that time,
2  I don't recall.
3      Q    All right.  The statement then goes on to say,
4  "Gus Robinson stated that he has been treated well by
5  the police and the assistant state's attorney.  Gus was
6  not promised anything in return for his statement, nor
7  was he threatened in any way."  Did I read that
8  correctly?
9      A    Yes, sir.
10     Q    Did Gus Robinson tell you he'd been provided
11  with food or drink while he was at the police station?
12     A    I don't recall.
13     Q    If Gus Robinson had told you that he'd been
14  provided with food or drink while he was at the police
15  station, would you have documented that in his statement
16  to demonstrate that he was treated well by the police?
17          MR. YAMIN:  Objection.  Calls for speculation.
18     A    I don't know.  Gus Robinson was not in
19  custody.  I -- I don't know what you're asking me to
20  speculate.  I -- I don't know.
21     Q    Gus Robinson did not tell you that he -- that
22  Jakes showed him who the victim was in the murder,
23  correct?
24          MR. GRILL:  Objection.  Form.
25     A    I -- I don't understand the question, Mr.

Page 79

1  Ainsworth.
2      Q    Sure.
3      Q    Jakes told you -- Oh.  Sorry.  Robinson told
4  you that Jakes wanted Gus to be a lookout with him
5  during the robbery, right?
6      A    Correct.
7      Q    Did Robinson tell you that Jakes took him over
8  to the sub shop, looked through the window into the sub
9  shop, and showed him who the victim was?
10          MR. YAMIN:  Objection.
11     A    I don't recall that --
12          MR. GRILL:  Form.
13          MR. YAMIN:  Excuse me.  Form of the question.
14  Compound.
15  BY MR. AINSWORTH:
16     Q    If Robinson had told you that Jakes had taken
17  him over to the sub shop, looked through the window with
18  him into the sub shop, and identified the victim for
19  him, would you have included that in your handwritten
20  statement?
21          MR. YAMIN:  Objection.  Form.  Calls for
22  speculation.
23     A    You're asking me a hypothetical, and
24  hypothetically speaking, yeah.  I could have included
25  that in the statement.

Page 80

1      Q    Well, if Gus had actually seen the victim, and
2  could identify the victim in this particular murder,
3  that would have been information that would have
4  corroborated the information he was providing to you
5  during your investigation, right?
6          MR. GRILL:  Form.  Foundation.  Calls for
7  speculation.
8          MR. YAMIN:  Join.
9      A    I don't understand the question.
10     Q    Sure.  If you had a photograph of the victim,
11  you could have shown the photograph of the victim to
12  Gus, and had him identify the victim as a means of
13  corroborating what Gus Robinson was telling you, right?
14          MR. GRILL:  This is -- hold on.  This is
15  speculation, and is a hypothetical.  Form.
16          MR. YAMIN:  Join.
17  BY MR. AINSWORTH:
18     Q    Go ahead and answer.
19     A    Hypothetically speaking, yes.
20     Q    All right.
21          And is there any reason why you wouldn't
22  include, in Gus Robinson's statement, if he had told you
23  that Jakes had shown him who the victim was, and they
24  looked through the sub window to see the victim, why you
25  wouldn't include that fact in your handwritten

Page 81

1  statement?
2          MR. YAMIN:  Objection.  Form.  Calls for
3  speculation.
4      A    Not that I can think of today.
5          MR. GRILL:  All right.  Is anybody else
6  getting a lot of feedback, or static?
7          MR. YAMIN:  Not I.
8          MR. GRILL:  Okay.
9          MR. AINSWORTH:  -- check --
10          MR. GRILL:  It's gone.  Right.  It's gone now,
11  but it was pretty loud for a second there.  Never
12  mind. But now it's back.
13          MR. PORTIS:  I do hear it a little bit as
14  well.
15          MR. AINSWORTH:  Let me mute just to see if
16  it's me.
17          MR. GRILL:  It's not -- if we can continue,
18  it's not to the point where it's going to -- I
19  don't think it's going to interfere, but it's
20  annoying.  Yeah.
21  BY MR. AINSWORTH:
22     Q    All right.  So, did you do anything between
23  the time that you talked to Gus, and the time that you
24  talked to Mr. Jakes?
25          MR. YAMIN:  Objection, form.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 82

1    A    If I recall correctly, I think I went in to
2  talk to Mr. Jakes immediately after talking to Mr.
3  Robinson.
4    Q    Did you ever talk to Bob Mylan about this
5  case?
6    A    Yes.
7         MR. YAMIN:  Objection, form.
8    Q    And how was that -- how long did you talk to
9  Mr. Mylan for?
10        MR. YAMIN:  Same objection.
11   A    A few minutes.
12   Q    What did you say to him?  What did he say to
13  you?
14   A    He called me to give me the heads up that, as
15  a special prosecutor, they were dismissing the case.
16   Q    And what did you say to Bob Mylan?
17   A    I told him that was his call.
18   Q    Did you have any problem with the -- with
19  Jakes' conviction being overturned?
20        MR. YAMIN:  Objection.  Form  Foundation.
21        MR. PORTIS:  Objection.  But also I'm going to
22        make my objection as to if he -- if that answer to
23        that question calls for your specific attorney
24        mental impressions, I would recommend you -- I
25        would -- I am representing to you not -- I'm

Page 83

1        instructing the witness not to answer, to the
2        extent that you may be able to answer it outside of
3        that concept, please feel free to do so.
4    A    It's -- it was not my call, Mr. Ainsworth.
5  BY MR. AINSWORTH:
6    Q    I understand it wasn't your call, but how did
7  you feel?  How did you feel when you learned that the --
8  that Jakes' conviction was overturned?
9         MR. YAMIN:  Same objections.  Form.
10        Foundation.
11   A    I don't think I had any feelings one way or
12  the other.  I, again, as I said before Judge Hooks, I'm
13  just here to tell the truth.
14   Q    Did you have any conversation with Anthony
15  Jakes about how his interrogation went?
16        MR. YAMIN:  Objection.  Form.
17   A    I said hello to Mr. Jakes, and he said hello
18  to me back on June 1st of 2016 when I walked in the
19  courtroom.  We didn't talk about the case.
20   Q    Sorry.  I mean, when you were -- back on
21  September 11, 1991, did you have any conversation with
22  Anthony Jakes about his interrogation by the Chicago
23  Police detectives?
24   A    You -- specific -- I -- I don't understand
25  your question.

Page 84

1    Q    Did you -- did he say anything to you about
2  how his interrogation went?
3         MR. YAMIN:  Objection.  Form.
4    A    I asked how he was treated by the police, and
5  he said, "very good," or -- or, "very well," something
6  to that effect.
7    Q    All right.  And you're with Officer Burke -- a
8  police officer was present when you asked him how he'd
9  been treated by the police, correct?
10   A    Yes.
11   Q    And was Detective Caesar also present?
12   A    I don't recall.
13   Q    All right.  So Detective Caesar may have been
14  present.  Was Detective Kill present when you asked
15  Anthony Jakes how he'd been treated by the police?
16   A    No, Detective Kill introduced me to Anthony
17  Jakes, and then left the room.
18   Q    Did you ask Detective Kill to introduce you?
19   A    No.
20   Q    Did you need Detective Kill to introduce you
21  to Anthony Jakes?
22   A    I don't understand.
23   Q    Well, was it -- did you feel awkward about
24  going in to speak to Mr. Jakes without Detective Kill
25  coming with you to introduce you?

Page 85

1         MR. YAMIN:  Objection.  Form.
2    A    Did I tell Detective Kill that I feel awkward
3  about going in to talk to Jakes by myself?  No.
4    Q    No, I didn't ask you if you told him that.  I'm
5  just saying, did you feel like you needed Detective Kill
6  to introduce you to Mr. Jakes?
7         MR. YAMIN:  Objection.  Form.
8    A    To be honest with you, I had no feelings about
9  it one way or the other.  It didn't -- it didn't faze
10  me.
11   Q    Did Detective Kill introduce you to Gus
12  Robinson?
13   A    I don't remember.
14   Q    You went in to see Mr. Jakes with Detective
15  Caesar as well, right?
16   A    Yes.
17   Q    Did Detective Kill introduce Detective Caesar?
18        MR. YAMIN:  Objection.  Form.
19   Q    To Mr. Jakes, sorry.
20   A    I don't think so.
21   Q    What did you say to Mr. Jakes, and what did
22  Mr. Jakes say to you?
23   A    I explained to Mr. Jakes that I was an
24  assistant state's attorney, an attorney working with the
25  police, and not his attorney.  And I told him that I

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 86

```
 1   wanted to ask him a few questions about what happened
 2   the night before.  And then I proceeded to give
 3   Mr. Jakes his -- what are commonly referred to as his
 4   Miranda warnings.
 5        Q    And a youth officer was present at that time;
 6   is that right?
 7        A    Yes.
 8        Q    Were you alerted when the youth officer
 9   arrived?
10        A    I don't recall.
11        Q    Did the youth officer say anything during the
12   entire time that you were talking to Anthony Jakes?
13        A    I don't recall.
14        Q    And you told Mr. Jakes that you were working
15   with police, right?
16        A    Yes.
17        Q    Did he know he was 15 when you walked into
18   the room to talk to Anthony Jakes?
19        A    I don't recall.
20        Q    Did Detectives Kill, Boudreau, and Caesar tell
21   you what Jakes had told them before you went to speak to
22   Jakes?
23             MR. YAMIN:  Objection.  Form.
24        A    I don't remember exactly what they told me.
25        Q    But I'm not asking you for the substance of
```

Page 87

```
 1   what they told you.  Just -- my question is, did they
 2   tell you what Jakes told them before you spoke to Jakes?
 3        A    Again, I don't remember exactly what they told
 4   me.
 5        Q    I'm not asking you for what exactly what they
 6   told you.  I'm just wondering, do -- did they tell you
 7   what Jakes told them about the murder before you spoke
 8   to Jakes?
 9        A    I would assume so, but I don't have an
10   independent recollection of that.
11        Q    All right.  Why do you assume so?
12        A    Normally, I would know what the person in
13   custody was saying before going to talk to that person.
14        Q    Okay.  Did anything -- did Jakes tell you
15   anything in your conversation with him that was
16   different from what Kill, Boudreau, and Caesar had told
17   you Jakes had told them?
18             MR. GRILL:  Form.  foundation.
19             MR. YAMIN:  Join.
20        A    Again, I don't remember exactly what my
21   conversation was with the detectives prior to speaking
22   to Mr. Jakes.
23        Q    I'm just asking you whether you recall
24   anything that Jakes told you that was different from
25   what the detectives had told you Jakes had told them.
```

Page 88

```
 1        A    I understand your question.  Same answer.  I
 2   don't -- in order for me to -- you know, in order for me
 3   to answer that specifically, I have to remember what,
 4   specifically, what the detectives told me.  And I don't
 5   remember specifically what they told me.
 6        Q    So, fair to say, you don't remember anything
 7   that Jakes told you that was different from what Jakes
 8   had told the -- or the detectives had told you Jakes
 9   told them, right?
10             MR. YAMIN:  Objection.  [crosstalk
11   02:01:40]
12        A    That's not what I said.
13             MR. YAMIN:  It mischaracterizes his testimony.
14   BY MR. AINSWORTH:
15        Q    Well, do you remember -- so, tell me anything
16   that you remember Jakes saying to you that the
17   detectives hadn't already told you Jakes had told them.
18             MR. YAMIN:  Objection.  Mischaracter -- go
19   ahead, Andrew.
20             MR. GRILL:  Yeah.  Same objections.  Yep.
21             MR. YAMIN:  Yeah, but I'm going to add
22   harassing to mine.
23        A    Again, same answer, Mr. Ainsworth, because in
24   order to answer that specifically, I would have to have
25   an independent relloct -- recollection of what the
```

Page 89

```
 1   detectives told me,  and I don't.
 2   BY MR. AINSWORTH:
 3        Q    Do you have any independent recollection of
 4   what Jakes told you?
 5             MR. GRILL:  Asked and answered.
 6        A    I have -- Jakes' statement is memorialized.
 7   So, yes.
 8        Q    You mean you need to -- well, do you have an
 9   independent recollection, outside of the memorialization
10   of Jakes' statement, of what Jakes told you?  And can
11   you remember what he said to you?
12        A    Exactly?  No.
13        Q    Can you remember what he told you in general
14   terms?
15        A    Yes.
16        Q    What do you recall Jakes telling you, in
17   general terms?
18        A    What is in his handwritten statement.
19        Q    And do you recall anything that Jakes said
20   that's not in his handwritten statement?
21             MR. GRILL:  Foundation.
22        A    I don't -- I don't recall.
23        Q    What do you recall being in -- What do you
24   recall that Jakes told you?
25             MR. GRILL:  Same objection.  Foundation.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Page 90**

1    A    In general, the -- the facts which are
2    memorialized in his statement.
3    Q    Which facts?
4    A    All facts that are in his statement.
5    Q    What are they?  What are the facts?
6         MR. GRILL:  Okay. Form. Argumentative.
7         MR. YAMIN:  Join.
8    A    In general, he -- and I'm doing this by
9    memory. Little A, and I -- I think Darren, came up to
10   him and said there was a Mexican dude in the -- it was
11   either the sub shop, or the -- the chicken place, who
12   looked like he had some money.  They were thinking of
13   robbing him.  They asked Mr. Jakes to be a lookout.  He
14   said he would, he went to the corner to be a lookout. He
15   indicated to them that everything was okay.  And then he
16   saw, "he" being Mr. Jakes, saw them approach the car --
17   the victim's car.  The victim tried to drive off.  He
18   was shot, I believe, three times.  I think there were
19   four other shots.  Mr. Jakes, who lived down the street,
20   ran home, and didn't wait to split up the proceeds.
21   Q    And so are you recalling what's in the
22   handwritten statement, or are you recalling what Jakes -
23   - the words that Jakes said to you from 1991?  Or are
24   you unable to distinguish between the two?
25   A    I don't remember the -- if you're asking me if

**Page 91**

1    I remember his exact words from the entire conversation
2    from 30 years ago today, I don't.  I need the
3    handwritten statement.
4    Q    So Jakes told you that there was a Mexican
5    dude, right?
6    A    I believe that's what he said.
7    Q    And Gus told you that Jakes referred to the
8    victim as a "white dude," right?
9    A    Yes.
10   Q    Did you try and explore that with Mr. Jakes,
11   about why Gus said it was a white guy, and Jakes was
12   saying it was a Mexican guy?
13        MR. YAMIN:  Objection. Form.
14        MR. GRILL:  Join.
15   A    I don't recall.
16   Q    Did Jakes tell you that he took Gus Robinson
17   over to the window of the sub shop, and looked inside
18   the window, and actually saw the victim alongside Gus
19   Robinson, and showed the victim to Gus Robinson?
20        MR. YAMIN:  I think -- would you have that
21        question reread please?
22        COURT REPORTER:  The previous one he just
23        asked?
24        MR. YAMIN:  Yeah. I wasn't sure about the
25        subject of the sentence.

**Page 92**

1         COURT REPORTER:  Yep, of course.  Give me one
2         second.
3              (REPORTER READS BACK REQUESTED
4              TESTIMONY)
5         MR. YAMIN:  Thank you. Objection.  Form.
6    A    I don't recall him saying that.
7    BY MR. AINSWORTH:
8    Q    If Jakes had told you that he had pointed out
9    the victim to Gus Robinson, and seeing the victim inside
10   the sub shop, you would have included that in your
11   handwritten statement for Mr. Jakes, is that correct?
12        MR. YAMIN:  Objection. Form. Foundation.
13   A    You're ask -- you're asking me a hypothetical,
14   and hypothetically, yes.
15   Q    I'll show you what we'll mark as Exhibit
16   number 2.  Sorry, I have to click on it.  All right.
17   This is a set of photographs, and I'll mark the whole
18   thing as an exhibit, but I'm only going to show you some
19   of these.  So it starts at City Jakes 491.  I'm going to
20   start at -- on the City Jakes 506.  Did you recall
21   seeing photos from the crime scene of the -- where the
22   car came to rest?
23              (EXHIBIT 2 MARKED FOR IDENTIFICATION)
24   A    I do not.
25   Q    All right.  Do you know one way or the other

**Page 93**

1    if you saw crime scene photos before you spoke to
2    Anthony Jakes --
3    A    I don't --
4         MR. YAMIN:  Objection.  Asked and answered.
5    Q    And let me amend this.  I'm all-
6         MR. YAMIN:  And foundation, too.
7         MR. AINSWORTH:  I only need to show him this
8         one photograph, so I'll just make City Jakes 506
9         actually Exhibit number 2.
10   BY MR. AINSWORTH:
11   Q    What was Jakes' -- What size was Jakes when
12   you spoke to him?
13   A    Pardon me?
14   Q    How big, and how tall, what kind of stature
15   did Jakes have when you spoke to him?
16        MR. YAMIN:  Objection. Form.
17   A    I don't -- I don't specifically recall.
18   Q    Did he look 15, or did he look older than his
19   age, or younger than his age?
20        MR. YAMIN:  Objection. Form. Foundation.
21        MR. GRILL:  Join.
22        MR. YAMIN:  And calls for speculation.
23   A    He -- he weighed less than he did at the
24   hearing before Judge Hooks.  He -- of course, I probably
25   weigh -- in fact, I know I weigh more since that

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 94

1  hearing, so I'm trying to be nice about this.
2  BY MR. AINSWORTH:
3      Q    My question is, did he look like he was 15
4  years old?
5          MR. GRILL:  Form.
6          MR. YAMIN:  Objection.  Form.  Excuse me.
7      Form.  Calls for speculation.
8      A    I don't remember him looking like he was 15.
9  BY MR. AINSWORTH:
10     Q    Do you remember him looking older than 15, or
11 younger than 15?
12         MR. YAMIN:  Same objection.
13         MR. GRILL:  Join.
14     A    I remember him looking a little older than 15.
15     Q    Okay.  Let's take a look at the Jakes'
16 handwritten statement.  And so we've got the statement
17 of Anthony Jakes.  So you started talking to him at 4:00
18 a.m., right?  About 4:00 a.m.?
19     A    Yes.
20     Q    And you started writing down this statement at
21 4:30 in the morning, correct?
22     A    Correct.
23     Q    And you don't have Jakes' date of birth on
24 here?  Is that right?
25     A    Correct.

Page 95

1  Q    Is there a reason for that?
2          MR. GRILL:  Objection. It mischaracterize the
3  document.
4  A    No.
5          MR. AINSWORTH:  Okay.  How did I
6  mischaracterize the document?
7          MR. GRILL:  Well, to me it mischaracterize it
8  because the first line in the second paragraph
9  states "Anthony Jakes stated that he is 15 years
10 old."
11         MR. AINSWORTH:  So you're saying that I
12 mischaracterize the document by asking him why he -
13 - whether there was a reason he didn't put the date
14 of birth in the document?
15         MR. GRILL:  Yeah.  Yeah.  Then in light of
16 that, I also think that it's a harassing question.
17         MR. AINSWORTH:  Well, this is getting to be
18 kind of bonkers, but that's not a proper objection.
19         MR. GRILL:  Okay, well --
20         MR. AINSWORTH:  And I think your objections
21 are being made in bad faith.  So lets --
22         MR. GRILL:  I -- they're not, and, you know,
23 it would save everybody a lot of time if you stop
24 arguing with me.  I've just made my objection.  You
25 don't have to agree with it.  It's in the record.

Page 96

1          So stop.  Go on with your -- just ask your
2          questions, Russel.
3  BY MR. AINSWORTH:
4      Q    So Anthony Jakes had turned 15 just two months
5  before you spoke to him.  Do you recall that?
6      A    No.
7      Q    All right.  Does -- let's go up to the top or
8  up here.  You wrote "After being advised of his
9  constitutional rights, and stating he understood each of
10 these rights, and stating that he understood that Brian
11 Grossman is an assistant state's attorney, a lawyer
12 working with the police and not his lawyer, Anthony
13 Jakes agreed to give the following statement summary and
14 not verbatim."  Did I read that correctly?
15     A    Yes, sir.
16     Q    The statement then says, "Anthony Jakes stated
17 that he is 15 years old.  Anthony is a freshman at
18 Tilden High School in Chicago, Illinois.  Anthony reads,
19 writes, and understands English."  Do you see that?
20     A    Yes, sir.
21     Q    Did you test Anthony's reading and writing?
22     A    I did test his reading.  I did not test his
23 writing.
24     Q    How'd you test his reading?
25     A    If you go back up to the first paragraph, the

Page 97

1  handwritten part, I had him read the first few lines of
2  that.  I had asked him if he knew how to read and write
3  and he said, "Yes."  And I had him read the first few
4  lines of -- not the whole first paragraph out loud
5  because I wanted to make sure that he could read my
6  handwriting.  And he did.
7      Q    How proficient was he at reading?
8          MR. YAMIN:  Objection.  Calls for speculation
9  and form.
10     A    I don't know.
11     Q    Well, I mean, based on your observation, did
12 he have any trouble, you know, sounding out any of the
13 words in the first paragraph?
14         MR. YAMIN:  Same objections.
15     A    He was able to read.  I didn't sense any
16 trouble.
17     Q    Okay.  So you didn't -- he didn't have -- he
18 didn't, like, stop, and start, and have difficulty
19 trying to ascertain what the word was that's at parts,
20 or mispronounced things, or ask you what a particular
21 word was because he didn't know what it was?
22         MR. YAMIN:  Objection to form.  Foundation.
23     A    I don't recall that.
24     Q    It says Anthony Jakes stated that on September
25 15, 1991, he was standing just outside Queen's Submarine

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-36 Filed: 11/04/22 Page 28 of 68 PageID #:9492
The Deposition of BRIAN GROSSMAN, taken September 17, 2021
98..101

Page 98

1  shop at 1206 West 51st Street at about 11:35 p.m. or
2  11:40 p.m.  Anthony was -- I think standing.  Can you
3  tell?
4      A    Yeah, there's a stamp over that.  If I'm a --
5  I have a copy here.  If you guys let me look at it, I
6  can look at it to tell you exactly.
7      Q    Sure.
8      A    Yes.  Anthony was standing.
9      Q    He's standing with his friends, Little A and
10  Darren.  Anthony has known Little A for about a year and
11  one half, and then it has little crossed out.  And then
12  Anthony has known Darren for about one year.  Did I read
13  that correctly?
14      A    Yes, sir.
15      Q    And so who suggested the -- why is it that
16  little crossed out?
17      A    When we're going over the statement line by
18  line, word by word, I thought that Anthony Jakes had
19  told me that Little Anthony has known Darren for about a
20  year.  And he said, no, he has known Darren for about a
21  year.
22      Q    Okay.  And so then you crossed out little?
23      A    So -- yes.  I asked him to initial that along
24  with Detective Caesar and detective -- the youth officer
25  and my initials also appear next to it.

Page 99

1      Q    All right.  Did Jakes say that it was about
2  11:35 or 11:40 p.m.?
3      A    Again, I would have gotten that from him.
4      Q    Okay.  Did you ask him how he knew it was
5  11:35 or 11:40 p.m. when he was standing with his
6  friends, Little A and Darren?
7      A    I don't recall.
8      Q    Did you ask him if he was wearing a watch at
9  the time?
10      A    I don't recall.
11      Q    Did he tell you he was wearing a watch at the
12  time?
13      A    I don't recall.
14      Q    Did he tell you there is a clock just outside
15  Queen's Submarine shop?
16      A    I don't recall.
17      Q    Did Mr. Jakes tell you that the address, the
18  Queen's Submarine shop, was 1206 West 51st Street?
19      A    I don't recall.
20      Q    Would you include near the location of the
21  Queen's Submarine shop, so that the reader would know
22  what you're referring to?  Even if Jakes hadn't told you
23  the address?
24      A    I don't recall.
25      Q    So you might've done that?  You might not have

Page 100

1  done that?
2          MR. GRILL:  Objection, form.
3      A    I don't recall.
4      Q    Did you ask Jakes for the address?
5      A    I don't recall.
6      Q    Okay.  It then reads, "Little A came out of
7  the sub shop and said, 'The Mexican dude has got a lot
8  of money.  We're going to stick him up,'  Little A then
9  showed Anthony the gun which was sticking out of his
10  waistband.  Anthony recognized the gun to be Little A's
11  .380-caliber handgun, which Little A usually carries on
12  him at night.  Anthony knew that Little A's .380 held
13  between seven and eight shells.  Anthony knew Little A
14  sometimes kept the clip of the gun fully loaded with
15  bullets.  And at other times the gun was half loaded
16  with bullets."  Did I read that correctly?
17      A    Yes, sir.
18      Q    So Jakes did not tell you that Little A had to
19  go run to another location to get a gun to use in the
20  robbery; is that right?
21      A    I don't recall.
22      Q    If Jakes had told you that Little A had left
23  the area in order to go get a gun and then returned with
24  the gun, you would have included that in your
25  handwritten statement, correct?

Page 101

1          MR. YAMIN:  Objection.  Calls for speculation.
2      A    You're asking a hypothetical question.
3  Hypothetically, yes.
4      Q    Did you ask Anthony how he knew that Little A
5  sometimes kept the gun half loaded with bullets?
6      A    I don't recall.
7      Q    Statement says, "Little A told Anthony to get
8  the corner and they understood this to mean he would be
9  the lookout.  Anthony's job was to watch for any police
10  that were coming and to let Little A and Darren know
11  that police were coming.  After Little A told Anthony to
12  get the corner, Anthony said, 'Alright.'  Anthony then
13  walked toward the corner of 51st and Racine."  Do you
14  see that?
15      A    Yes, sir.
16      Q    Right.  And the "alright" [sic] is crossed out
17  and then it's rewritten as two words, "all" and "right."
18  Do you see that?
19      A    Yes, sir.
20      Q    Who requested that change to be made?
21      A    I did.
22      Q    Why did you request that the change, that the
23  "alright" be changed from "alright" to "all right"?
24      A    I assume at the time I was thinking
25  grammatically that alright should be two words. Remember

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 102

1  this was -- this is 1991.  This is the days before we
2  can Google something on our cell phones.
3      Q    So you wanted to make sure the -- it was
4  accurate, right?
5      A    Well, grammatically.
6      Q    Did you want to make sure the rest of it was
7  accurate?
8      A    Yes.
9           MR. GRILL:  Objection, form.
10     Q    You want to make sure the whole thing was
11 accurate, right?
12          MR. YAMIN:  Objection, form.
13     A    Yes.  Accurate as to what he told me.
14     Q    Okay.  And it says, "As Anthony walked toward
15 the corner of 51st and Racine, he ran to his friend,
16 Snake, in Harold's Chicken, now known as Oliver's
17 Chicken parking lot.  Anthony went up to Snake and said
18 that 'They was fitting to rob this man.'  Anthony asked
19 Snake if he was fitting to help.  But Snake said 'No.'
20 Snake then drove away from the parking lot."  Did I read
21 that correctly?
22     A    Yes, sir.
23     Q    So again, there's nothing in this paragraph
24 about Jakes bringing Snake up to the window and viewing
25 the victim, correct?

Page 103

1      A    Not in that paragraph.
2      Q    All right.  And up to the paragraph, there's
3  no mention of Jakes actually seeing the victim, right?
4      A    Correct.
5      Q    Let's go down and onto the next page of
6  Exhibit number 3.  It says, "When Anthony got to the
7  corner of 51st and Racine, Anthony stood there for a
8  little bit and looked both ways.  Anthony didn't see any
9  police coming from any direction.  Anthony then stood by
10 the newspaper stand, which was on the side of Queen's
11 Submarine shop.  Anthony told Little A and Darren it's"
12 -- then can you tell what's crossed out?
13     A    "All right."
14     Q    And how's it spelled in the -- when it's
15 crossed out?
16     A    I can't tell.
17     Q    All right.  But to be consistent with the
18 other all right, you've now written all right in two
19 words, "all" and "right" here as well, correct?
20     A    Correct.
21     Q    And who made that change?
22     A    I did.
23     Q    And who suggested that change?
24     A    I did.
25     Q    The statement then reads, "Anthony meant that

Page 104

1  he didn't see any police around.  Anthony then kept
2  looking both ways."  Did I read that correctly?
3      A    Yes, sir.
4      Q    "The Mexican dude then came out of Queen's
5  submarine shop.  Little A went up to the Mexican dude
6  and pointed his .380-caliber gun at the Mexican dude and
7  Little A said, "This is a stick-up."  Darren was
8  standing right next to the Little A.  The Mexican dude
9  mumbled something that Anthony couldn't hear.  The
10 Mexican dude ran to his car parked in" -- let me read it
11 without the crossing out.  "The Mexican dude ran to his
12 car parked in the parking lot front of Queen's submarine
13 shop on the street.  The Mexican dude started his car
14 and backed up his car.  The Mexican dude's car then hit
15 another car."  Did I read that paragraph correctly
16 including the part that was crossed out?
17     A    No.
18     Q    And what did I read incorrectly?
19     A    I don't think you included the part that was
20 crossed out.
21     Q    Oh, I thought I had.  Maybe -- let me try
22 reading that sentence once more.  "The Mexican dude ran
23 to his car parked in the parking lot."  Oh, sorry.  "The
24 Mexican dude ran to his car parked in -- well, in the
25 parking lot front of Queen's Submarine shop on the

Page 105

1  street."  Did I read that sentence correctly with the
2  portion that's crossed out?
3      A    The portion that is crossed out is "the
4  parking lot."
5      Q    Okay.  And so -- can you just remind us of the
6  process that you went through to create this statement?
7  That you had a conversation with Jakes before you put
8  pen to paper, right?
9      A    Yes, sir.
10     Q    And then once Jakes agreed to give a
11 handwritten statement instead of a court reported
12 statement, you then started summarizing his statement;
13 is that right?
14     A    Yes, sir.
15     Q    And can you tell us when you were summarizing
16 Jakes' statement and memorializing it in writing, were
17 you just sitting there and writing while Jakes was
18 silent?  Or how did that process work?
19     A    It was again, a conversation between us and
20 there was back and forth with me asking questions.  And
21 most of my questions were "What happened next?"
22     Q    And you have an idea of what happened next
23 because he'd already told you, right?
24     A    Yes.
25     Q    And the detectives had already told you what

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 106

1  Jakes was going to say, correct?
2      A    Again, I have no independent recollection of
3  what the detectives told me.
4      Q    So you wrote, "The Mexican dude ran to his car
5  parked in the parking lot front of Queen's submarine
6  shop on the streets," right?
7      A    Yes.
8      Q    And you thought there was a parking lot and in
9  front of Queen's Submarine shop, right?
10     A    Correct.
11     Q    Why did you write initially, "The Mexican dude
12  ran to his car parked in the parking lot front of
13  Queen's submarine shop on the street"?
14     A    Because I thought that's what Mr. Jakes had
15  told me.
16     Q    Do you see that it doesn't make grammatical
17  sense?  "His car parked in the parking lot front of
18  Queen's submarine shop on the street"?
19     A    Yes.
20     Q    All right.  Why did you write a sentence that
21  didn't make grammatical sense?
22     A    Well, that's why we go over -- that's one of
23  the reasons we go over the statement at the end.  I'm
24  just trying my best to summarize what the -- what
25  Mr. Jakes was telling me.

Page 107

1      Q    Okay.  Why did it say, "ran to his car parked
2  in a front of Queen's Submarine shop on the street"?
3      A    I thought that's what he told me.
4      Q    He told you "it was parked in A-front."  What's
5  an "A-front"?  I'm questioning this "A" here.  Oh,
6  actually I think that's Anthony Jakes' initials.
7      A    It is.
8      Q    All right.  I missed that.  Thank you.  Why
9  did you call it "the parking lot on the street"?
10     A    I don't recall.
11     Q    Would you agree with me that doesn't make
12  sense?  That there'll be a parking lot on the street?
13         MR. YAMIN:  Objection, form.
14     A    Again, that's why we go over the statement.
15     Q    Well, I'm just asking, like, there are parts
16  of Chicago that become parking spots at about 5:00 on a
17  Friday.  But the phrase "parking lot on the street"
18  doesn't make any sense, right?
19         MR. YAMIN:  Objection, form.
20     A    Again, that's why we cross --
21     Q    I'm just asking you if it makes sense.
22         MR. GRILL:  And he's trying to answer your
23  question.
24         MR. YAMIN:  Yeah, he -- my bad.
25     A    The parking lot is crossed out.

Page 108

1      Q    I get that, and I get you're saying it was a
2  mistake and all that.  I just want to know:  Do you agree
3  that it doesn't make sense for the phrase, "the parking
4  lot on the street," doesn't make sense?
5         MR. YAMIN:  Objection, asked and answered.
6         MR. GRILL:  Joined.
7      A    Again.  That's -- that's why we go over the
8  statement.
9      Q    And you made the change where you crossed out
10  the parking lot at the end when you went through it.
11  After you'd written the entire statement up, right?
12     A    I believe so.
13     Q    You have any doubt in your mind about that?
14         MR. YAMIN:  Objection.
15         MR. GRILL:  Joined.  Form.  Argumentative.
16     A    No.
17     Q    And Jakes told you that he backed -- that the
18  victim backed his car up, correct?
19     A    Correct.
20     Q    And that after he backed his car into another
21  car then -- well, let me just read the next portion of
22  this statement.  It says, "Little A then went right up
23  to the passenger window of the Mexican dude's car.
24  Little A pointed the gun at the Mexican dude and Little
25  A started shooting at the Mexican dude.  Anthony was

Page 109

1  next to the news stand about 10 feet away from Little A.
2  Darren was a couple of feet away from Little A.  Anthony
3  didn't want to stand in front of the sub shop because
4  Anthony lived only a few houses away from the sub shop.
5  And he didn't want anybody in the sub shop to recognize
6  him."  Did I read that paragraph correctly?
7      A    Yes, sir.
8      Q    "Anthony saw Little" --
9      A    Sorry.  What happened there?
10     Q    My screen went out.  I'm sorry.  "Anthony saw
11  Little A fire four shots at the Mexican dude.  Anthony
12  then turned and started to run.  Anthony heard about
13  three more shots after he turned and started to run.
14  Anthony ran because he didn't want anybody to see him
15  and he got scared.  Anthony ran home to 1212 West 51st
16  Street.  Anthony figured that him, Little A, and Darren
17  would split the money they were going to take from the
18  Mexican dude.  Anthony didn't stick around to get his
19  share because he didn't want anybody to see him, and he
20  got scared.  After Anthony had been home for a few
21  minutes, he looked out onto 51st street toward the sub
22  shop and saw the Mexican dude moving around in the
23  ground for a minute."  Did I read that paragraph
24  accurately?
25     A    Yes, sir.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

Page 110

1  Q   And while you were at Area 3, nobody suggested
2  to you that because Anthony lived in a rear house at
3  1212 West 51st Street, there's no way he could have seen
4  the victim in the streets, right?
5  A   Right.
6       MR. GRILL: Objection, form. Calls for
7  speculation, foundation.
8       MR. YAMIN: Objection, form.
9  A   Nobody including Anthony mentioned that he
10 lived in the rear house.
11 Q   Okay. So when you were talking to Anthony,
12 you didn't know that he lived in the rear house at 1212
13 West 51st Street; is that correct?
14      MR. GRILL: Objection. Form, foundation.
15      MR. YAMIN: Joined.
16 A   Correct.
17 Q   All right. Then it reads, "Anthony Jakes
18 states that he has been treated well by the police and
19 the assistant state's attorney. Anthony has been
20 allowed to use the washroom when he needed to. Anthony
21 states he is not hungry or thirsty at the present time
22 and told the police that when he was asked 'if you
23 wanted anything.' Anthony states that he was not
24 promised anything in return for a statement nor was he
25 threatened in any way. Anthony is not nor does he

Page 111

1  appear to be under the influence of drugs or alcohol."
2  Did I read that paragraph correctly?
3  A   Yes, sir.
4  Q   All right. So when you talked to Anthony he
5  said that he wasn't hungry or thirsty, right?
6  A   Yes, sir.
7  Q   And he said he hadn't had anything to eat or
8  drink while he had been at the police station, right?
9  A   He -- he said that he wasn't hungry or thirsty
10 at the present time and told the police that -- when he
11 was asked if he wanted anything, he -- that's what he
12 told the police when they asked him if he wanted
13 anything.
14 Q   If Anthony had told you he had eaten something
15 or had something to drink while he was at the police
16 station, you would have documented that, correct?
17 A   Again, you're asking me a hypothetical.
18 Hypothetically speaking, yes.
19 Q   Did you review Anthony Jakes -- well, strike
20 that. Did the detectives tell you that Jakes got to the
21 police station about 1:00 p.m. in the afternoon on the
22 previous day and he'd been there ever since?
23      MR. GRILL: Asked and answered.
24 A   I don't recall.
25 Q   Did you review a police report documenting

Page 112

1  that Jakes had been arrested at 1:05 p.m. on the 16th?
2       MR. GRILL: Asked and answered.
3  A   I don't recall.
4  Q   If Jakes' arrest report had been among the
5  materials made available to you, would you have reviewed
6  that report to see what time he'd been, you know, taken
7  into custody?
8  A   You're asking --
9       MR. YAMIN: Objection. Mischaracterizes the
10      evidence.
11 A   You're asking me a hypothetical -
12 hypothetical. And hypothetically speaking, yes.
13 Q   Did anyone hide -- to your knowledge, did
14 anyone hide from you how long Jakes had been in custody
15 when you spoke to him at about 4:00 a.m. in the morning
16 on the 17th?
17      MR. YAMIN: Objection, form. foundation too.
18      Actually, it mischaracterizes --
19 A   I --
20      MR. YAMIN: Excuse me, sir. It
21      mischaracterizes the evidence.
22 A   I don't know how to answer that,
23 Mr. Ainsworth. It's not for me to say if somebody --
24 how would I know if somebody hid something from me?
25 Q   That's why I'm asking you, sir. I'm asking

Page 113

1  you did -- to your knowledge, did anyone hide it from
2  you?
3       MR. YAMIN: Same objections.
4  Q   Go ahead.
5  A   To the best of my knowledge, no.
6  Q   All right. Let me show you what we'll mark as
7  Exhibit number 4. This is a police report documenting
8  an arrest of Anthony Jakes at -- do you see this here?
9  1:05 p.m. on September 16, 1991.
10      (EXHIBIT 4 MARKED FOR IDENTIFICATION)
11 A   I see it. Yes, sir.
12 Q   If you had known that Jakes was in custody --
13 well, I'll strike that. If you had known that Jakes was
14 at the police station from 1:00 p.m. in the afternoon on
15 the 16th until, you know, 5:00 a.m. in the morning on
16 the 17th, would you have wanted to know why he wasn't
17 hungry and why he didn't eat any food?
18      MR. YAMIN: Objection. Calls for speculation,
19      foundation, and form.
20 A   Not necessarily.
21 Q   Why do you say, "not necessarily"?
22 A   It's not -- he wasn't there for a few days. He
23 was -- he wasn't even there -- he was there -- what? 14
24 hours? 12 hours?
25 Q   16 hours. But -- you know, there's three kind

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of BRIAN GROSSMAN, taken on September 17, 2021

Page 114

1  of lawyers: Ones who can do math and ones who can't.
2      A   I guess I fall in the latter category.
3      Q   The 16, so he's -- so Jakes is there for 16
4  hours.  Do you have any concern about the fact that
5  Jakes hadn't eaten anything or had anything to drink in
6  the 16 hours he'd been at the police station?
7          MR. GRILL:  Objection, form.
8          MR. YAMIN:  Also calls for speculation.
9      A   No, that didn't jump out at me.
10     Q   And Detective Caesar and Youth Officer Burke,
11 didn't say, "Oh no, you know, you forgot Mr. Jakes.  You
12 had some pizza two hours ago and we had some soda that
13 we gave you," right?
14         MR. YAMIN:  Objection, form.
15     A   I don't recall.
16     Q   If Caesar, or Burke, or Kill, or Boudreau had
17 told you that Jakes had consumed food or drink while he
18 was at the police station, you would have noted that
19 fact in the statement, correct?
20         MR. YAMIN:  Objection.  Calls for speculation.
21 Form.
22     A   Hypothetically -- hypothetically speaking --
23 because it's a hypothetical question, no.
24     Q   Why wouldn't you have included the fact that
25 one of the police officers said that they had fed Jakes

Page 115

1  in the statement documenting what Jakes had consumed
2  while he was at the police station?
3          MR. GRILL:  Objection.  Mischaracterizes his
4  testimony now.
5      A   This wasn't the police officer's statement.
6  That was Mr. Jakes' statement.
7      Q   So if there was a discrepancy between what
8  Jakes was saying and what the police officers were
9  saying, would you have noted that in the statement --
10     A   No.
11     Q   -- that you -- police --
12         MR. YAMIN:  Objection, form.
13     Q   Okay.  Would you have noted it in the memo
14 that you created the next day?
15     A   I have now read the memo.  I have no
16 independent recollection of writing this memo, although
17 that is my signature.  I recognize that to be my
18 signature at the bottom, but I don't -- I don't even
19 remember reviewing this memo before.  I definitely
20 didn't review it before I testified before Judge Hooks
21 five years ago.  And I don't remember reviewing it
22 before I testified at the motion to suppress or the jury
23 trial.
24     Q   That's not my question, sir.  My question is
25 simply: If there'd been a discrepancy about what Jakes

Page 116

1  had been fed or given to drink between what Mr. Jakes
2  was saying and what the police officers were saying,
3  would you have documented it in the memo that you
4  created documenting the circumstances surrounding
5  Mr. Jakes' confession?
6          MR. YAMIN:  Objection.  Calls for speculation.
7      A   Mr. Ainsworth.  I understand your question,
8  but I can't -- I can't answer it when I don't remember
9  the writing the memo.
10     Q   All right.  Well, we'll -- let's -- let me
11 show you that memo, sir, so that we can all look at the
12 same -- sorry I closed it.  I've opened it.  All right,
13 so looking at your memo dated September 18, 1991.  And
14 this is your signature on the second page of Exhibit 4
15 now, right?
16     A   Yes.
17         COURT REPORTER:  This would be Exhibit 5.
18     Q   5, my apologies.  And on the second page of
19         Exhibit 5, you wrote: "Anthony Jakes told me
20 that the police allowed him to use the washroom whenever
21 he needed to.  He said that the police asked him if he
22 wanted anything to eat or drink, but he told them he
23 wasn't hungry or thirsty."  Do you see that?
24     A   Yes.
25     Q   If the police said: "Anthony Jakes is full of

Page 117

1  hooey.  We gave him pizza, hamburgers, breakfast, and
2  all sorts of things, and he claimed we never fed him,"
3  would you have included that in this memo, sir?
4          MR. YAMIN:  Objection, form.
5      A   No.
6          MR. YAMIN:  Calls for speculation.
7      A   No.
8      Q   Why wouldn't you have included that in this
9  statement?
10     A   If you look at the top of the memo on top of
11 page 2, the title is "The written statement of Anthony
12 Jakes."  On page --
13     Q   Okay.
14     A   -- on the first page, it says: "The written
15 statement of Anthony Jakes concerning the fatal shooting
16 of Rafael Garcia, which occurred on September 15, 1991."
17     Q   So you only included in this memo things that
18 were contained in the written statement of Anthony
19 Jakes; is that right?
20     A   I think the memo is about the statement of
21 Anthony Jakes.  It's regarding --
22     Q   Right.  Okay.  So why does that mean that you
23 wouldn't include information from the police that
24 contradicted what Jakes was telling you?
25         MR. GRILL:  Asked and answered.



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 118

1    A   It's not Anthony Jakes' statement.

2    Q   Was it Anthony Jakes' statement that says at

3 the first sentence, "On September 17, 1991 at about 2:00

4 a.m., I was in area of three violent crimes.  And when I

5 was informed the police had a suspect to the murder of

6 Rafael Garcia" -- was that Jakes' statement?

7    A   It gave background to Jakes' statement.

8    Q   All right, so it gave background.  It provided

9 information about Jakes' statement, right?

10   A   Yes.

11   Q   Okay.  And so my question is: Was there

12 anything preventing you -- well, what was the purpose of

13 this memo?

14   A   I don't remember.

15   Q   Okay.  Was there anything preventing you from

16 documenting in your memorandum to your supervisor and

17 the felony review unit where you documented the

18 background and the statement of Anthony Jakes that

19 police officers were claiming that Jakes had actually

20 been fed and watered when Jakes was saying he hadn't

21 anything to eat or drink?

22       MR. GRILL:  Objection, form.

23   A   Again, same answer.  The title of this memo is

24 the written statement of Anthony Jakes not the

25 investigation.

Page 119

1    Q   And so -- because the title is "the written

2 statement of Anthony Jakes," you're saying you were

3 prevented from including the information, if it existed,

4 from police officers saying Jakes was actually fed and

5 watered even though that wasn't reflected in his

6 handwritten statement?

7       MR. GRILL:  Form, argumentative, calls for

8   speculation.

9   A   You can ask me the same question, Mr.

10     Ainsworth, ten more times.  I'm going to tell

11 you I don't have an independent recollection of writing

12 this memo.  That is my signature, but I'm looking at the

13 title.  It says: "The written statement of Anthony Jakes

14 concerning the fatal shooting of Rafael Garcia, which

15 occurred on September 15, 1991."  It doesn't say "The

16 investigation of the fatal shooting of Rafael Garcia,

17 which occurred on September 15, 1991."

18   Q   You didn't -- you approved charges against Mr.

19 Jakes, right?

20   A   Yes.

21   Q   You didn't approve those charges until you

22 spoke to Anthony Jakes, right?

23   A   Correct.

24   Q   It was after you spoke to Anthony Jakes that

25 you approved the charges, right?

Page 120

1    A   Yes.

2    Q   When did you approve the charges?  Do you

3 recall?

4    A   I would need my felony review folder.

5    Q   All right.

6    A   I -- I don't recall.

7    Q   Let me show you what we'll mark as Exhibit

8 number 6.  All right.  This is a document Bates number

9 City Jakes 99 and I'm going to -- do you recognize this

10 form with the felony minute sheet?

11      (EXHIBIT 6 MARKED FOR IDENTIFICATION)

12   A   No.

13   Q   Okay.  Do you see in the top right corner it

14 says: "Charges approved by ASA Grossman at 03" -- it's

15 hard to read.  Maybe 50 hours on September 18, 1991?

16   A   Oh, you're talking about the far top right?

17   Q   Yeah, up here.  Sorry.

18   A   Yes.

19   Q   All right.  Does that sound about right?

20 "Charges approved by ASA Grossman at 3-something hours

21 on September 18, 1991."

22   A   No.

23   Q   Why?  Why doesn't that sound right?

24   A   First of all, I didn't -- this form is not my

25 form.  I did not fill this out or type it.  And it's not

Page 121

1 correct because at 3:50, I was just taught -- I just

2 started the handwritten statement of Gus Robinson.

3    Q   Well, that was on the 17th.  This is on 18th,

4 September 1991.

5    A   Oh, I'm sorry.  That's incorrect.  I -- I

6 would've approved charges before I left the police

7 station on September 17, 1991.

8    Q   Do you know why this document says that

9 charges were approved at 3-something on the 18th?

10   A   No, I don't even know what this document is.

11   Q   All right.  And you didn't type this document;

12 is that right?

13   A   Correct.

14   Q   All right.  Did you give Anthony Jakes the

15 opportunity to write out his own statement?

16   A   No.

17   Q   Did you give Anthony Jakes the opportunity to

18 call his parent or guardian?

19   A   No.

20   Q   What was Anthony Jakes' demeanor like when you

21 spoke to him?

22   A   He was not combative.  He was cooperative.

23   Q   Did he appear anxious?

24      MR. YAMIN:  Objection to form.  Calls for

25   speculation.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 122

1    A    Not that I could see, but only he could say if
2  he was anxious or not.
3    Q    Okay, but he didn't appear anxious to you?
4    A    Not -- not to me --
5         MR. YAMIN:  Hey, there.  Excuse me.  Form.
6    A    -- but -- but again --
7         MR. YAMIN:  Objection.
8    Q    Was he smiling?
9    A    At what point?
10   Q    During the time that you're interacting with
11  him.
12   A    I don't recall.
13   Q    Have any of your other cases that you took
14  confessions in had the convictions reversed, or ended in
15  acquittal, or dismissal of charges?
16   A    Yeah.  But if you're asking me to name them, I
17  can't name them.
18   Q    How many?
19   A    I have no idea.
20   Q    How do you know that there are other cases
21  where -- that ended in acquittal, or overturned
22  conviction, or dismissal of charges?
23   A    I guess I'm speculating because I can't
24  believe in -- I handled many cases in six months on
25  felony review in 1991.  So I guess the answer should be

Page 123

1  I don't know.
2    Q    Okay.
3         MR. AINSWORTH:  I think I'm just about done.
4    Can we take just a couple minute break and then
5    I'll come on and tell you if I have any more
6    questions?
7         MR. GRILL:  Sure.
8         MR. YAMIN:  Sure.
9         COURT REPORTER:  Okay, we're off the record.
10        (OFF THE RECORD)
11        COURT REPORTER:  We're on record.
12  BY MR. AINSWORTH:
13   Q    So you ended your handwritten statement with
14  Anthony Jakes around 5:15 in the morning; is that right?
15   A    I don't recall exactly.
16   Q    How long did it take you to memorialize the
17  statement?
18   A    I don't recall exactly.
19   Q    Did Jakes ever feel -- ever appear fatigued to
20  you?
21   A    No.
22   Q    Did you ask him if he had the opportunity to
23  sleep?
24   A    I don't recall.
25   Q    Who did you prepare to testify with anybody

Page 124

1  before the motion to suppress hearing?
2    A    I don't understand your question.
3    Q    Do you remember who handled the prosecution in
4  this case?
5    A    Yes.
6    Q    Who handled the prosecution?
7    A    It was John Dillon and I think Neil
8  Goodfriend.
9    Q    Did you talk with either John Dillon or Neil
10  Goodfriend about this case?
11   A    Yes.
12   Q    What did you -- what conversation did you have
13  with either one of them?
14   A    I don't recall, but I think it had to do
15  logistically when I would be testifying.
16   Q    Do you talk with them about the substance of
17  your testimony?
18   A    I don't recall.
19   Q    Did you talk with the police about finding
20  Little A or Darren?
21   A    I don't recall.
22   Q    Did you want to speak to Little A or Darren
23  about this case?
24   A    I don't recall.
25   Q    I don't have any further questions at this

Page 125

1  time.  I may have some follow-up on Andrew's
2  questioning, but I appreciate your time.
3    A    Thank you, sir.
4         MR. GRILL:  Yeah.  I was almost done getting
5    my thoughts together.  If we could just have a
6    couple more minutes break and then I'll begin my
7    questions, which will not last as long as
8    Russell's, but I do have some questions.
9         MR. AINSWORTH:  Okay.
10        COURT REPORTER:  Okay.  We're off the record.
11        (OFF THE RECORD)
12        COURT REPORTER:  We are on the record.
13              CROSS EXAMINATION
14  BY MR. GRILL:
15   Q    All right, Mr. Grossman.  Just to remind you
16  because it's been a while, my name is Andrew Grill.  I'm
17  one of the attorneys that represents the individual
18  police officers that have been sued by Mr. Jakes in this
19  case.  You can hear me okay, correct?
20   A    Yes, sir.
21   Q    All right.  All the same rules apply.  And I
22  will try to get through this as quickly as I can.  You
23  said earlier today that you, I believe, were with the
24  (Inaudible) police office for about 18 years; is that
25  correct?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-02204 Document #: 266-36 Filed: 11/04/22 Page 35 of 68 PageID #:9499
The Deposition of BRIAN GROSSMAN, taken on September 07, 2022
126..129

Page 126

1    A    Yes, sir.

2    Q    Okay.  Can you just tell me in your own words
3  how you would define "probable cause"?  Not a trick
4  question.

5    A    No, I know.  Keep in mind, Mr. Grill, I
6  haven't done criminal law since 1998, so I don't
7  remember the -- I don't remember the exact definition.

8    Q    Okay.  Well, let me ask it to you this way.
9  What do you or what can you tell me about probable cause
10  as it pertains to your responsibilities as a felony
11  review assistant state's attorney?

12    MR. AINSWORTH:  Object to the form of the
13    question.

14    A    I think probable cause has more to do with an
15  arrest than it does have to do with my responsibilities
16  as a state's attorney.

17    Q    You make the decision -- and I believe you've
18  already testified to this, as to whether there is
19  sufficient evidence to charge, in this case, Mr. Jakes,
20  right?

21    A    Correct.

22    Q    And what is, I guess, the line that you'd need
23  to feel, personally, the evidence gets over for you to
24  make that determination and to charge Mr. Jakes in this
25  case with the murder?

Page 127

1    MR. PORTIS:  Okay, so before you answer, I'm
2    going to object to that question as it stands if
3    it's calling for his specific reasons for approving
4    charges in this case.  To the extent that you might
5    be able to answer generally or broadly.  If you're
6    able to without giving your attorney mental
7    impressions, you can.

8    A    I don't know if I can answer that without
9  giving my attorney mental impressions.

10    Q    Did you believe that based on the evidence
11  that you had reviewed, and after speaking with
12  Mr. Jakes, that there was sufficient evidence to charge
13  Mr. Jakes with murder?

14    A    Yes.

15    Q    Okay.  Now, when you -- how many cases do you
16  think throughout your career as a felony review
17  assistance -- I guess you were on there for six months.
18  How many cases do you think you reviewed in total?  Is
19  it over 1,000?

20    A    No.  No.

21    Q    Is it over 500?

22    A    I don't know.  And the reason I don't know,
23  Mr. Grill, is because the number would also include
24  phone cases -- what we called phone cases where they
25  were less serious offenses that we approved charges over

Page 128

1  the phone.

2    Q    Sure.  And I'm not being specific to murders.
3  I'm saying how many cases do you think, if you can
4  ballpark it for me, during the six months that you were
5  at -- working as a felony review assistant that -- how
6  many cases do you think you reviewed?

7    A    I can't ballpark it.  I'm going to guess,
8  which I'm not supposed to do according to my attorney,
9  but I'm going to guess it over a 100.

10    Q    Okay.

11    A    How much over 100?  I don't know.

12    Q    Okay.  Do you have to bring charges every time
13  you review a case?  Do you have to prove charges I
14  should say?

15    A    No, sir.

16    Q    All right.  Is it your job to make an
17  independent determination as to whether charges should
18  be brought in any given case?

19    A    Yes.

20    Q    And that would be also in the case of
21  Mr. Jakes, your -- one of your responsibilities that
22  night or that morning was to review the evidence, talk
23  to Mr. Jakes, and then come to your own independent
24  conclusion about whether charges should be brought, in
25  this case murder, against Mr. Jakes, correct?

Page 129

1    MR. AINSWORTH:  Objection, leading.

2    MR. PORTIS:  I'm going to object to the form
3    specifically as to the use of the phrase "brought."
4    And then just -- I just want to say this as
5    clarifying.  I'm not trying to take what he says,
6    but I want the record to be clear in terms of what
7    we do in terms of, like, I don't know if by
8    "brought" you mean approved or if you mean by
9    "brought," Andrew, like, actually brought, like,
10    specifically he should be charged with this.

11    MR. GRILL:  Approved.

12    MR. PORTIS:  Okay, so then could we just
13    please -- so the record is clear -- just as a
14    courtesy, could you use the word approve?

15    MR. GRILL:  Sure.

16    MR. PORTIS:  All right.  Thank you.

17    A    So Mr. Grill, can you repeat the question?

18  BY MR. GRILL:

19    Q    Yeah.  So one of your responsibilities in this
20  case -- in Mr. Jakes' case was to look at the evidence
21  and take that into consideration -- the evidence being
22  whatever the police had provided you up until that point
23  in combination with what Mr. Robinson and Mr. Jakes were
24  telling you, and then decide whether you should approve,
25  in this case, a murder charge against Mr. Jakes,



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

Page 130

1  correct?
2      A    Well, almost.  In this specific case, this was
3  a homicide investigation.  So I would've run it by my
4  trial supervisor who -- I don't know exact -- I don't
5  remember exactly who that was.
6      Q    Okay.  But with that caveat; am I correct?
7      A    Yes, yes.
8      Q    Okay.  So it was an option for you that
9  morning to not approve charges against Mr. Jakes,
10 correct?  That was the --
11          MR. AINSWORTH:  Objection.  Asked and
12     answered.
13     A    Yes.
14     Q    Okay.  Would you have approved charges against
15 Mr. Jakes for murder just based on what it was that the
16 police had told you about their investigation up until
17 that point?
18          MR. AINSWORTH:  Object to the form of the
19     question.
20          MR. PORTIS:  Objection. I believe that that'll
21     cause for his attorney mental impressions.  I would
22     assert that privilege and I would instruct my
23     client not to answer that question.
24     Q    Mr. Grossman?
25     A    On the advice of my attorney, I'm not going to

Page 131

1  answer that question.
2      Q    Have you ever approve charges -- or do you
3  have any recollection of ever approving a murder charge
4  -- well, actually we'll withdraw that question.  What is
5  -- or do you know -- or do you understand there being a
6  difference between a witness and a suspect?
7      A    Yes.
8      Q    Okay.  What would you say the difference
9  between those two are based on your experience in the
10 state's attorney's office?
11     A    Well, a suspect is somebody who may have done
12 the crime whereas a -- a witness is not a suspect.
13     Q    Right.  Somebody that you would not suspect of
14 having committed the crime, correct?
15          MR. AINSWORTH:  Object to the leading.
16     A    Yes.
17     Q    Okay.  Based on your 18 years of experience,
18 was it your understanding that a witness needed to be
19 read his or her Miranda rights before being -- before
20 the police would speak to him or could speak to him?
21          MR. AINSWORTH:  Object to the form of the
22     question.
23     A    Remember -- remember, Mr. Grill.  Back in
24 1991, I didn't have 18 years of experience.  I just was
25 sworn in and --

Page 132

1      Q    Yeah.  And I'm not talking about 1991.  I'm
2  talking about based on your 18 years of experience, do
3  you have an understanding, based on that experience,
4  whether a witness needs to be read his or her Miranda
5  rights before the police can speak to them?
6      A    A -- a witness?
7          A witness.  Somebody that is not suspected of
8  having committed a crime.
9      A    How -- I give you the caveat because I don't
10 know -- I have not kept up with the current case law,
11 but a witness did not have to be given his or her
12 Miranda rights before being spoken to.
13     Q    Okay.  Is it your experience, thinking back to
14 those 18 years of never having encountered a scenario
15 where a person starts out as a witness, or you find out
16 that the person started out as a witness, but then
17 something in that conversation changed and then that
18 person became a suspect?  Have you ever encountered
19 that?
20     A    Yes.
21     Q    Okay.  And would you agree then that at the
22 time that the person then in that conversation becomes a
23 suspect, he or she should be read their Miranda rights
24 at that point before continuing with the conversation;
25 is that fair?

Page 133

1      A    Yes.
2      Q    Okay.  Before you would go in and speak with a
3  -- a person that you might end up taking a statement
4  from, would you know whether that person was a suspect
5  or a witness according to the police before you went in
6  and spoke with them?
7      A    Yes.
8      Q    How would you find that out typically?
9      A    Typically from what the police told me or from
10 the police reports.
11     Q    Okay.  And if you knew that that person was a
12 suspect, according to those sources that you just
13 identified, when you went in to speak with that person,
14 would you always read them their Miranda rights as well?
15     A    Yes.
16     Q    Okay.  And you would read those rights to that
17 person before you ask them any questions, correct?
18     A    Correct.
19     Q    And you did that in this case -- or let me ask
20 you this.  Did you do that in this case with Mr. Jakes
21 when you entered that room and started talking with him?
22     A    Yes.
23     Q    And how do you know that you did that?
24          MR. AINSWORTH:  Object to the form of the
25     question.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-36 Filed: 11/04/22 Page 37 of 68 PageID #:9501
The Deposition of BRIAN GROSSMAN, taken on September 17, 2021
134..137

Page 134

1    Q    And I'm speaking particularly about the oral
2   conversation you had with Mr. Jakes before you started
3   memorializing it in the written statement that we've
4   talked about today.
5    A    It helps in this particular case -- this is
6   now the fourth time I'm testifying in this case so that
7   helps.  And it also helps to have a written statement of
8   Mr. Jakes to review.  And also that's how I conducted
9   myself on felony review --
10   Q    Okay.
11   A    -- back in 1991.
12   Q    So that was your practice to do that back in
13  1991?
14   A    Correct.
15   Q    Okay.  The cases in which you are going to
16  speak with somebody who's a suspect -- would you try to
17  determine whether the person was actually willing to
18  speak with you before, for example, before you go in and
19  talk with them?
20       MR. AINSWORTH:  Object to the form of the
21  question.
22   A    I don't understand the question, Mr. Grill.
23   Q    Would you ask, for example, before you went
24  into the room -- would you ask the police, "Does this
25  person -- do you think that this person is willing to

Page 135

1   talk to me?"  Would you ask any questions like that?
2    A    I don't recall.
3    Q    Once you went into the room and spoke with a
4   suspect after reading them -- that person their Miranda
5   rights, would you ask that person a question along the
6   lines of, "Are you willing to speak with me?"
7    A    Yes.
8    Q    Today would you ask that question?
9    A    To make sure that the statement or -- I think
10  it solidifies, in my mind, the Miranda warnings.
11   Q    That they -- that their conversation with you
12  is going to be voluntary?
13   A    Correct.
14   Q    That they're willing to speak with you?
15   A    Correct.
16   Q    That you're not pressuring them to talk with
17  you?
18   A    Correct.
19       MR. AINSWORTH:  Object to the leading.
20   Q    What would you do if the person -- or did you
21  ever -- well, strike that, actually.  Did you do that in
22  the case of Mr. Jakes?  When you went in and spoke with
23  him, after you read him his Miranda rights, did you ask
24  him a question along those lines, "Mr. Jakes, are you
25  willing to speak with me?"

Page 136

1    A    Yes.
2    Q    Okay.  And what did you --
3    A    Although I didn't --
4    Q    Go ahead.
5    A    I think I called him Anthony.  I didn't call
6   him Mr. Jakes back then.
7    Q    Fair enough.  What do you recall him telling
8   you?
9    A    Just like -- he responded to the Miranda
10  warnings.  He said, "Yeah."
11   Q    Okay.  Have you ever encountered a situation
12  where a suspect that you're going in to speak with tells
13  you, "I don't want to talk to you"?  Do you have any
14  recollection of that ever happening while you were
15  working in the state's attorney office?
16   A    I have a recollection of -- yes.  Somebody who
17  requested to speak to his or her attorney.  Their own
18  attorney.
19   Q    Okay.  And how would you document that or
20  memorialize that position, I guess, of a suspect?
21   A    I would write in my felony review folder that
22  the defendant chose to speak with his own attorney.  I
23  don't remember how I phrased it, but it was to that
24  effect.
25   Q    Right, but it would be documented, as you said

Page 137

1   --
2    A    Yes.
3    Q    -- in your felony review folder, correct?
4    A    Yes.
5    Q    All right.
6        MR. AINSWORTH:  Object to the -- leading.
7    Q    Would there be any -- okay, so you know how
8   earlier today you were shown the exhibit, which was
9   Mr. Jakes' estate.  I'm sure you remember seeing that
10  today, correct?
11   A    Yes.
12   Q    All right.  If somebody told you, "I don't
13  want" -- I'm sorry.  I have my kids next door.
14   A    Don't worry about it.
15   Q    Can you hear it?
16   A    I get it.  Yeah.
17   Q    Okay.
18       MR. GRILL:  Before we go on -- everybody, give
19  me one second and let me tell them all to can it.
20  One second.  We don't need to go off the record,
21  just wait one second.
22       MR. PORTIS:  I feel bad for the kids.
23       MR. GRILL:  They all just got back from school
24  a little bit ago.
25       THE WITNESS:  Okay.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 138

1     MR. GRILL: Sorry about that.
2  BY MR. GRILL:
3     Q    When -- so if somebody refused to -- well, let
4  me ask you this.  When you take that handwritten
5  statement, what do you do with it after you're done?
6  Where does it go after you're done?  After it's drafted
7  and everybody signed it?
8     A    Goes with my felony review folder to the bin.
9  Or in this specific case, the bin at 26th and
10 California.
11    Q    Uh-huh.
12    A    But if I -- if I recall, there was also a --
13 if I was, like, working in the north side, there was a
14 bin there to put your felony review folder and any
15 statements there, so you didn't have to go to 26th and
16 California at the end of your shift.
17    Q    If somebody refused to give a statement, would
18 there be no statement in your felony review folder?  Just
19 a notation that they didn't want to talk to some extent,
20 or would there be like a blank form that, you know, is
21 a, you know, the handwritten statement form, but with
22 just nothing written on it?
23    A    No, there would never be a blank form.  It
24 would be noted in my felony review folder, "Defendant
25 chose to speak with his own attorney."  Or something to

Page 139

1  that effect.
2     Q    Got it.  And so would -- is it accurate to say
3  that the fact that there's an actual handwritten
4  statement in this case is one indication that Mr. Jakes
5  voluntarily spoke with you, and wanted to talk with you,
6  or agreed to talk with you that morning; is that fair?
7     A    Yes.
8     Q    Okay.  In cases involving juvenile suspects in
9  1991 -- so stick with that time period for a minute
10 here.  Do you recall whose responsibility it was to
11 contact the youth's parent or guardian if it was going
12 to be a juvenile that was going to be, you know,
13 interviewed or interrogated?
14    A    I don't recall.
15    Q    Was it your responsibility back in 1991 to
16 make that phone call to the parent or guardian?
17    A    No, sir.
18    Q    How do you know that it was not your
19 responsibility to do that?  If you know.
20    A    I don't recall.
21    Q    Okay.  Do you have a recollection in this case
22 of seeing any police officer do anything in your
23 presence at any point during your interactions with
24 Mr. Jakes that you believe should have caused the youth
25 officer to intervene on behalf of Mr. Jakes?

Page 140

1     MR. AINSWORTH:  Object to the form of the
2  question.
3     A    No, sir.
4     Q    If you had, what would you have done?
5     A    Well, it depends what specifically happened.
6  You're asking me a hypothetical and hypothetically
7  speaking, I would call my trial supervisor.
8     Q    Okay.  Do you have any recollection of having
9  called your trial supervisor in this case to complain
10 about misconduct committed by any police officer or
11 youth officer against Mr. Jakes in your presence?
12    A    No, I do not in this case.
13    Q    Would you have noted something like that as
14 well?  If something like that occurred, would that have
15 also been noted on your felony review file?
16    A    Absolutely.
17    Q    Why would it be important to make note of
18 that?
19    A    Because the person in custody wouldn't be
20 giving a free and volunteer -- voluntary statement.
21    Q    If you would have encountered what you believe
22 to be, you know, coercion, say -- let's say physical
23 abuse, okay?  In the course of, you know, felony review
24 with respect to a suspect who is about to make a
25 statement, what would you do?

Page 141

1     A    Again, you're asking me a hypothetical
2  question.  And my hypothetical answer is I would call my
3  trial supervisor.
4     Q    Okay.  Do you have any recollection of ever
5  encountering a suspect during preliminary review that
6  was complaining to you that the police had physically
7  abused him or her?  Yeah, did that ever -- do you have
8  any recollection of any complaints like that being made
9  to you by a suspect?
10    A    I do not.
11    Q    Okay.  Do you have any recollection in this
12 case of Mr. Jakes making a complaint like that to you?
13    A    I do not.
14    Q    If he had, would you have documented that
15 somewhere?
16    A    Again, you're asking me a hypothetical.  And
17 my hypothetical answer would be -- I would document, but
18 I would also call my trial supervisor.
19    Q    Would you continue to try to take the
20 statement of somebody who was complaining to you that --
21 before you got there, the police had physically abused
22 him or her?
23    A    No, I would wait for a -- hypothetically, I
24 would wait for a response from my trial supervisor.
25    Q    Why would you not continue to take the



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 142

1  statement of somebody who's telling you that the police
2  were abusing them before you arrived?
3      A    Hypothetically -- again, it wouldn't be a free
4  and voluntary statement.
5      Q    It would be a statement then that was not
6  worth anything for prosecution, correct?
7          MR. AINSWORTH:  Object to the form of the
8  question, leading.
9          MR. PORTIS:  And I'm going to object on the
10  basis of -- as it was phrased that it calls for a
11  specific attorney mental impression in terms of the
12  decision to charge or not charge in this case.  And
13  I'm going to instruct my client not to answer.
14      Q    Are you going to follow your attorney's
15  advice, sir?
16      A    Yes, sir.
17      Q    Okay.  Did you ever receive any training as a
18  state's attorney on how to handle a situation like that
19  where you have a suspect that's complaining about being
20  mistreated or abused by police?
21      A    Not that I can recall, sir.
22      Q    Okay.  What about a situation where you
23  encounter what you would believe to be coercion by the
24  police intended to cause a suspect that you're speaking
25  with or are about to take a statement from to confess?

Page 143

1  What would you do in a situation like that
2  hypothetically?
3          MR. AINSWORTH:  Object to the form.
4      A    I'm sorry, can you repeat the question?
5      Q    What would you do if you encountered a suspect
6  who you believed had been coerced by the police in
7  whatever way to give a statement to you as a felony
8  review assistant?  What would you do in a situation like
9  that?
10      A    Again, you're asking me a hypothetical
11  question.  My hypothetical answer would be I would call
12  my trial supervisor immediately.
13      Q    And make note of it --
14      A    Yes.
15      Q    -- in your felony review file?
16      A    Yes.
17      Q    And if that's what you believed had occurred,
18  that the suspect had been coerced by the police to give
19  whatever statement you were about to take, would you
20  still continue to take the statement of that suspect?
21      A    Hypothetically speaking, no.  I would call my
22  trial supervisor.
23      Q    For the same reason as before because it would
24  impact the voluntariness, for example?
25      A    Yes.  Correct.

Page 144

1          MR. AINSWORTH:  Object to the leading.
2      Q    When you would enter that room, for example,
3  with Mr. Jakes, and you think back to that, would you
4  look for any evidence or indication, I should say, that
5  Mr. Jakes was being coerced by the police to speak with
6  you?
7      A    Yes.
8      Q    What would you look for?
9      A    As in the case of Mr. Jakes or anybody else,
10  appearance first of all.  And then secondly, what the
11  person in custody told me in response to my questions of
12  how he or she was treated.
13      Q    Okay.  So let's go with appearance.  What types
14  -- can you explain in a little bit more detail what you
15  mean by "appearance" and how it relates to your
16  assessment about whether Mr. Jakes have been coerced in
17  any way by the police to speak with you?
18      A    If you're talking in this specific case about
19  Mr. Jakes, he had no outward appearances of being
20  physically abused.
21      Q    In addition to physical abuse are -- and okay.
22  I need to unpack that real quick.  What do you mean by
23  "outward appearance" -- appearances of physical abuse?
24      A    He didn't appear to -- Mr. Jakes didn't appear
25  to be beaten up.  I saw no appearance -- outward

Page 145

1  appearance of any type of coercion.
2      Q    Was Mr. Jakes in handcuffs when you were
3  speaking with him?
4      A    No.
5      Q    You also said it would be based upon his
6  response to questions you would be asking him.  Can you
7  -- I think you testified a little bit to these before.
8  But if you could remind me, what were the types of
9  questions that you would ask?
10      A    I asked Mr. Jakes how he was treated by the
11  police, and he told me either very good or very well,
12  something to that effect.  And I asked him if they
13  offered him anything to eat or drink, and he said he
14  wasn't hungry or thirsty at that time.  I even offered
15  to get Mr. Jakes a can of soda pop.  He told me he
16  wasn't thirsty, and I asked him if anybody made any
17  threats or promises to him -- specifically, did the
18  police make any threats or promises to him, and he said,
19  "No."
20      Q    Okay.  Would you take any steps to determine
21  whether Mr. Jakes was potentially lying to you in any
22  way when he was giving the statement to you?  Let's just
23  start with the oral interview that you conducted before
24  you started writing stuff down.  During that portion of
25  your interview of him, would you take any steps to



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 146

1  determine whether anything that he was telling you was
2  untrue?
3      A   I don't recall.
4      Q   Okay.  Let's back it up a little broader then
5  to maybe what your practice might've been with suspect
6  interviews generally as a felony review assistant.  Do
7  you have a recollection of applying any type of protocol
8  of your own, steps, whatever you want to call it, in
9  order to test the truthfulness of what it was that a
10 suspect was telling you in one of those oral interviews
11 that would precede the handwritten or court report
12 statements that they might give?
13     A   I don't recall.
14     Q   Okay.  Do you take any steps after you get a
15 statement from a suspect to verify any of the
16 information that appears in the recorded statement
17 whether it's handwritten or court reported?
18     A   Again, each case is different.  So I don't
19 think I can make a general statement.
20     Q   Okay.  Was it your job to, as a felony review
21 assistant, to investigate the information that a suspect
22 would give you that might later appear in a handwritten
23 statement or a court reported statement?
24         MR. AINSWORTH:  Object to the form of the
25     question.

Page 147

1      A   My job was -- I don't believe to be an
2  investigator.  I was there to assist the police with
3  their investigation, to interview any witnesses, to
4  interview the person in custody, and then to make a
5  determination if there would be charges and what
6  specific charges would there be.
7      Q   Based on what the suspect was telling you and
8  what the evidence that you had available to up to that
9  point in your mind showed?
10     A   Correct.
11     Q   Okay.  When you would -- when you interviewed
12 Mr. Jakes, did you look to see if there was any signs
13 that he might be intoxicated or under the influence of
14 any type of drug?
15     A   He didn't appear to be.  And I asked him
16 specifically and he said he was not.
17     Q   Okay.  What about mental illness?  Do you ever
18 look for -- in Mr. Jakes' case, did you ever have a look
19 at him or kind of personally analyze him from your own
20 perspective to see if you thought maybe there was some
21 type of mental deficit that he was suffering from that
22 might impair his ability to speak with you honestly and
23 openly?
24     A   So I'm not an expert, however, and again, this
25 was back in 1991, he did not appear to me to have any

Page 148

1  type of mental illness.
2      Q   You don't recall whether -- do you recall
3  whether he was exhibiting or -- during your interactions
4  with him whether he exhibited any erratic behavior,
5  something that was unusual to you?
6      A   He did not.
7      Q   What about when he was answering the questions
8  that you were asking him in the conversation that you
9  were having with him?  Were the answers that he was
10 giving -- did they seem responsive to your questions in
11 a way that you would expect somebody that was in control
12 of their faculties to be responding to the form of the
13 question?
14         MR. AINSWORTH:  Object to the form of the
15     question.
16     A   Again, I'm not an expert.  I'm sorry,
17 Mr. Grill.  Can you repeat the question?
18     Q   In your conversation with him, do you have a -
19 - do you recall whether the answers that he was giving
20 to whatever questions you were asking him were ones that
21 were responsive to your questions?  They weren't, you
22 know -- he wasn't answering questions that you were
23 asking to him in a way that was suggesting to you that
24 he was not understanding, for example, what it was that
25 you're asking?

Page 149

1          MR. AINSWORTH:  Object to the form of the
2      question.
3      A   His answers were responsive.  And I said -- as
4  I stated earlier, he was cooperative.
5      Q   Okay.  And in fact, he even told you what
6  level of education he had obtained up until that point,
7  correct?
8          MR. AINSWORTH:  Objection, leading.
9      A   I don't recall about level of education.  He
10 told me when he was at Tilden High School, but I don't
11 recall a specific grade.
12     Q   Okay.  In your experience, do you have to be
13 able to read and write and understand English in order
14 to get into high school?
15     A   I would hope so.
16     Q   Fair enough.  Okay.  If you suspected that
17 Mr. Jakes was intoxicated or had mental illness, or was
18 somehow not competent to continue speaking with you,
19 would you have taken his -- in this case, handwritten
20 statement?
21     A   No, because then it wouldn't be a voluntary
22 statement.
23     Q   All right.  Do you recall whether, like, what
24 entity was responsible for maintaining your felony
25 reviews file?  I guess what I'm asking is:  Was it the



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-36 Filed: 11/04/22 Page 41 of 68 PageID #:9505
The Deposition of BRIAN GROSSMAN, taken on September 07, 2021
150..153

Page 150

1  state's attorney's office, or was it somebody else, some
2  other entity that was supposed to maintain that file? If
3  you know that.
4       A    I don't know.
5       Q    When you -- you said that at least in this
6  case, your felony review file would go into a bin
7  somewhere at -- correct?
8       A    Yes.
9       Q    And where was it exactly again was that bin
10  located?
11      A    In the felony review office at 26th and
12  California.
13      Q    Okay.  Was that office an office that was a
14  Cook County state's attorney's office?
15      A    Yes.
16      Q    Was it -- was the person -- do you know the
17  person that controlled that bin, like, was there
18  somebody that was always there that was watching that
19  bin?
20      A    That I don't know.
21      Q    Do you know if the Chicago Police Department
22  was responsible for maintaining that bin or that office
23  at 26th and Cal [sic]?
24      A    They were not.
25      Q    How do you know that?

Page 151

1       A    Because I don't think the Chicago Police
2  Department controls the state's attorney's office.
3       Q    Fair enough.  You were asked questions earlier
4  today by Mr. Ainsworth about the difference between
5  open-ended questions and leading questions.  Do you
6  remember being asked those questions?
7       A    Yes.
8       Q    Okay.  He asked you questions about --
9  Mr. Ainsworth asked you about the types of questions you
10  asked to Mr. Robinson.  Do you remember whether in your
11  discussions or interviews with Mr. Jakes, you were
12  asking him open-ended questions or leading questions?
13      A    They would have been more open-ended like
14  Mr. Robinson.  More along the lines of what happened
15  next.
16      Q    Okay.  And why would you -- in Mr. Jakes' --
17  in your interview with Mr. Jakes, why would you want to
18  ask him open-ended questions as opposed to leading
19  questions?
20      A    It's not my statement.  It's Mr. Jakes'
21  statement.
22      Q    Well, why would a leading question, I guess,
23  based on your answer, make it your statement instead of
24  Mr. Jakes' statement?
25           MR. AINSWORTH:  Object to the form of the

Page 152

1  question.
2       A    I didn't say that it would.
3       Q    Okay.  Well, can you explain to me then what
4  you mean by your statement that it's Mr. Jakes'
5  statement and not your statement if you were asking him
6  open-ended questions?
7       A    I want him to tell me what happened.  It's not
8  my place to tell him what happened.  I don't know.  I
9  wasn't there.
10      Q    So if you're asking him leading questions, is
11  that -- in your mind, is that -- would you then be
12  telling him what to say?
13           MR. AINSWORTH:  Objection, leading.
14      Q    I guess in a way -- just ask a question as an
15  example.
16      A    I cannot say that every single question I
17  asked was an open-ended question.  I don't remember.
18      Q    But it would be generally your practice to ask
19  open-ended questions like you just described along the
20  lines of what happened next, correct?
21      A    Yes, yes.
22      Q    All right.  And that was --
23           MR. AINSWORTH:  Objection, leading to that
24      last question.
25           MR. GRILL:  Apropos.

Page 153

1       Q    When you went in to speak with Mr. Jakes, you
2  testified earlier today that you had first gone in to
3  speak with Gus Robinson, right?
4       A    Correct.
5       Q    When you went in to speak with Anthony, did
6  you tell him that you had spoken to Snake?
7       A    I don't recall.
8       Q    Did you -- do you recall whether you told
9  Anthony that Snake was in the police station talking to
10  the police?
11      A    I don't recall.
12      Q    Okay.  In his handwritten statement, the name
13  Snake appears, correct?
14      A    Which -- which handwritten statement?
15      Q    Sorry.  In Anthony's handwritten statement.
16      A    Yes.
17      Q    All right.  And I believe it was your
18  testimony today that that information in that statement
19  came from Anthony?
20      A    Correct.
21      Q    And I understood you -- and you tell me if my
22  understanding is wrong -- to mean that all of those
23  things in that statement were things that Anthony said
24  to you in response to open-ended questions; is that
25  correct?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-02204 Document #: 266-36 Filed: 11/04/22 Page 42 of 68 PageID #:9506
Video Deposition of BRIAN GROSSMAN, taken on September 27, 2019
154..157

Page 154

```
1          MR. AINSWORTH:  Object to the form of
2    question.
3      A    Yeah.  Again, I don't know if every single one
4    of my questions was open-ended, but there were all
5    responses to my questions -- responses by Mr. Jakes.
6      Q    Did Mr. Jakes say the name Snake to you?  Or
7    did you have a recollection of whether you said that
8    name to Jakes first?
9      A    No, he said that to me.
10     Q    How do you know?
11     A    I wouldn't tell Mr. Jakes who -- what name to
12   use for somebody.  It's not my statement.  It's his
13   statement.
14     Q    If you became aware of a situation where you
15   thought that Mr. Jakes was repeating details in his
16   statement to you that were provided to him by the
17   police, what would you have done if you believed that
18   that was what was going on?
19     A    And you're asking me a hypothetical question.
20   And my hypothetical answer would be I would stop the
21   questioning and call my trial supervisor because --
22     Q    And make note of it in -- sorry.
23     A    And make note of it in my folder because that
24   would not be a voluntary statement.
25     Q    Okay.  We talked a little bit -- or Mr. Andrew
```

Page 155

```
1    talked a little bit about the fact that you wrote out
2    Mr. Jakes' -- that you wrote out Anthony's statement.
3    Was there -- is there some -- I wasn't clear though.  And
4    maybe I missed it and I apologize if I'm asking you this
5    question again, but it was not clear to me in your
6    answers about why you write out the statement or it was
7    your practice generally, I guess, to write out
8    handwritten statements as opposed to letting the
9    suspect, in this case, Mr. Jakes, write it out himself.
10   Was there a reason why you write it out versus Mr. Jakes
11   not writing it out?
12     A    Yes.
13     Q    What is the reason?
14     A    The reason being -- I kind of pride myself on
15   my handwritten material to be good enough for everyone
16   to read.  Now if you asked me to write it in cursive,
17   most people wouldn't be able to read my cursive
18   handwriting.  And so that's why I continue.  And to this
19   day, even taking notes, I take it in handwriting and not
20   cursive.
21     Q    Do you know if Mr. Jakes had -- so it sounds
22   to me like it's a clarity issue for you?
23     A    Yes.
24          MR. AINSWORTH:  Objection.  Leading.
25     Q    It's more that -- it's more clear if you write
```

Page 156

```
1    it out versus leaving it up to, like, literally like the
2    physical writing is more clear if you write it out
3    because you know how you write relative to letting
4    somebody else do it; is that correct?
5      A    Correct.
6      Q    All right.  So did you know whether Mr. Jakes
7    had good penmanship that night?
8      A    I could tell when he signed his name -- if you
9    look at his signature below the Miranda warnings, it is
10   -- I don't -- I don't believe it's as clear as my
11   handwriting.
12     Q    Okay.  Do you have any recollection of ever
13   giving a suspect the opportunity that his or herself to
14   write out their handwritten statement?
15     A    He didn't ask me to.
16     Q    No, I'm saying generally, did you ever let any
17   other suspect in any other case do that?
18     A    I don't recall ever being asked that, but I
19   have included statements that suspects wanted in the
20   statement.
21     Q    Got it.  Okay.  And did Mr. Jakes make any
22   requests like that to you in this case, if you remember,
23   where he wanted to write in his own section, addition,
24   what have you, into the handwritten statement?
25     A    No, we -- we signed the bottom of -- "we"
```

Page 157

```
1    being myself, the youth officer, and Detective Caesar
2    signed the bottom of each page as we were going through
3    that particular page.  And we went through it line by
4    line, word by word.  So Mr. Jakes did make some
5    corrections, which we talked about earlier.  But beyond
6    those corrections, he did not ask to make any specific
7    additions.
8      Q    Okay.  Was there an option available at that
9    time in 1991 for Mr. Jakes to do a court reported
10   statement instead of a handwritten statement?
11     A    Yes.
12     Q    All right.  And how is it decided that night
13   or morning, I guess with Mr. Jakes, you know, about
14   which one we're going to do -- handwritten versus court
15   reported?  How's that decision made that night?
16     A    That decision in this particular case was made
17   by Mr. Jakes.  I told him that after his oral statement
18   to me, we can leave it as is, or the second option would
19   be that we can put it in writing.  He would have the
20   opportunity to review it and make any changes that he
21   wishes.  Or the third option would be that we could get
22   a court reporter to come to the police station with the
23   caveat being that it would take the court reporter some
24   time to get there.  Mr. Jakes chose the second option,
25   which would be a handwritten statement that he got to
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-02204 Document #: 266-36 Filed: 11/04/22 Page 43 of 68 PageID #:9507
The Deposition of BRIAN GROSSMAN, taken on September 07, 2021
158..161

Page 158

1  review and make corrections.
2      Q    After you had completed your oral interview of
3  Mr. Jakes, had you decided at that point that you had
4  enough information to bring a charge of murder against
5  him?
6      A    No, sir.
7      Q    I'm sorry -- to approve a charge.  To use
8  Mr. Portis' preferred term -- to approve the charge of
9  murder against him?
10     A    No, sir.
11     Q    And you're telling me after you completed the
12 oral statement, you didn't believe that you had enough
13 information to approve a charge of murder at that point?
14     A    I didn't even --
15         MR. PORTIS:  Oh, my God.  Uh, hold on one
16     second.  Can the court reporter read the question
17     back?
18         MR. GRILL:  I can rephrase it.
19         MR. PORTIS:  Because I may have an objection,
20     or you can rephrase it.
21         MR. GRILL:  I'll just ask it again.
22         MR. PORTIS:  Okay.
23 BY MR. GRILL:
24     Q    Did you believe after you completed your oral
25 interview of Mr. Jakes, at that point, so before the

Page 159

1  handwritten statement, you know, starts up.  At that
2  point, did you believe that you had enough information
3  to approve a charge of murder against Mr. Jakes at that
4  point?
5          MR. PORTIS:  I'm going to object.  I believe
6      that that calls for an attorney mental impression
7      about the specific decision whether or not to
8      approve felony review charges, which are also
9      privileged and instruct my client not to answer.
10     Q    You're going to take your attorney's advice?
11     A    Yes, sir.
12     Q    Well, let me just ask you this then.  At the
13 conclusion of the oral part -- the interview -- the oral
14 interview that you had with Mr. Jakes, did you tell him
15 at that point that he was going to be charged or that
16 you were going to approve a charge of murder against
17 him?
18     A    No, sir.
19     Q    Okay.  Is there any reason why you didn't want
20 to communicate that information to him, or you that you
21 did not communicate that information to him at that
22 point?
23     A    I never said that he was going to be charged.
24     Q    At any point?
25     A    No.  You were talking about after his oral

Page 160

1  statement?
2      Q    Yeah.  I'm trying to clarify your answer
3  because you said, "I never told him."  I thought you
4  said that "I never told him he was going to be charged,"
5  so
6      A    But I was responding to your question about
7  after his oral statement.
8      Q    At -- well, let me ask you this then.  At any
9  point during your interactions with Mr. Jakes that
10 morning, did you tell him that he was going to be
11 charged with murder?
12     A    No, sir.
13     Q    Did at any point, did you tell him that you
14 were going to approve a charge of murder against --
15     A    No, sir.
16     Q    Was there any reason, if you can think back
17 all that time to 1991, that you recall having in your
18 mind, you know, for not telling Mr. Jakes that that's
19 what you were going to do?
20         MR. AINSWORTH:  Object to the form of the
21     question.
22     A    I don't recall.
23     Q    Okay.  Do you recall having a belief in your
24 mind at that time that Mr. Jakes understood that as a
25 result of the statement that he was giving to you that

Page 161

1  he was implicating himself in a murder?
2      A    That's a question for Mr. Jakes.  I don't
3  know.
4      Q    At any point during your interviewer
5  interaction with Mr. Jakes, did you make it clear to him
6  that he may be facing a murder charge as a result of the
7  police investigation or any of the things that he was
8  telling you?
9          MR. AINSWORTH:  Object to the form of the
10     question.
11     A    I don't believe so.
12     Q    Do you recall if any of the police officers in
13 that room with you while you were speaking with him
14 advised Mr. Jakes that is potentially what he's facing?
15     A    I don't recall that.
16     Q    Okay.  When you were interviewing Mr. Jakes,
17 did you know from any source other than what he was
18 telling you where it was that he lived at the time the
19 murder happened?
20     A    I don't understand your question.
21     Q    So Mr. Jakes, in his statement, says that he
22 lives at 1212 West 51st Street, right?
23     A    Yes.
24     Q    Great.  So other than -- and that's something
25 that he told you, right?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 162

1    A    Yes.

2    Q    Okay.  So other than that, did you know from

3  any other source where Mr. Jakes lived the night that

4  this murder happened?

5    A    I don't recall.

6    Q    Did you have an understanding or was it, I

7  mean, strike that.  We'll back up.  When you were

8  interviewing Mr. Jakes and up through the handwritten

9  statement that, you know, was made, do you recall it

10  being your belief that the 1212 West 51st Street

11  residence was a house actually on 51st Street, as

12  opposed to a house that was set somewhere back off of

13  51st Street behind another house?

14    A    Wait, can you -- can you say that again?

15    Q    Yeah.  Was it your understanding, based on

16  what Mr. Jakes was telling you, that 1212 West 51st

17  Street was a house actually on 51st Street?

18    A    Yes.

19        MR. AINSWORTH:  Object to the form of the

20  question.

21    Q    I'm sorry, what was your answer?

22    A    Yes.

23    Q    Okay.  And at that time, did you have any, you

24  know, personal experience, knowledge, anything like that

25  about what the businesses were that were on, you know,

Page 163

1  that intersection?  Basically -- whether on 51st Street

2  or on the scene, did you -- were you familiar with that

3  intersection personally?

4    A    At that time?  No.

5    Q    All right.  Do you know, like, that there was

6  a submarine or a chicken shop on 51st Street there?

7    A    Well, I know --

8    Q    Not from this case, like, did you have your

9  own understanding that that store was there?

10    A    Not prior to this case.

11    Q    Okay.  What about the newspaper stand that's

12  mentioned?  Did you know whether that thing was even

13  there?  If that was a real thing?

14    A    Again, not prior to this case.

15    Q    Okay.  Based on your review of the handwritten

16  statement that we've -- of Mr. Jakes that we've been

17  over so many times today, is there any information in it

18  about Mr. Jakes running to a house that was located

19  behind 1212 West 51st Street?

20    A    No, sir.

21    Q    Is it fair to say that Mr. Jakes did not give

22  you any indication that he ran to a house that was

23  behind 1212 51st Street?

24    A    Correct.

25    Q    Okay.  Do you -- is there any information in

Page 164

1  Mr. Jakes' statement that would suggest that the police

2  came into his house earlier that day with their guns

3  drawn?

4    A    No.

5    Q    If he had said anything like that to you,

6  would -- is that something that you would have

7  documented or made a note of somewhere in any of the

8  paperwork you generated?

9    A    You're asking me a hypothetical question.  I

10  don't know.  It would -- if he -- if Mr. Jakes insisted

11  that I put it into his statement, I would put it into

12  his statement.  If he didn't insist on putting it into a

13  statement, I don't know.  It's hypothetical.

14    Q    Do you have a recollection of Mr. Jakes

15  telling you that the police came into his house with

16  their guns drawn, and then slammed him up against the

17  wall of his bedroom, and handcuffed him earlier in the

18  day to bring him down to the area?

19    A    I do not.

20    Q    Is that something that you would've wanted to

21  know about if that had happened?

22    A    Again, you're asking me a hypothetical

23  question.  I'm not -- it never came up in my

24  conversation with Mr. Jakes.

25    Q    Did it ever come up in your conversations with

Page 165

1  Mr. Jakes that four to five police officers came into

2  his bedroom at his house?  And that they were all white

3  police officers with their guns drawn?  Did that ever

4  come up?  Did he ever say anything about that to you?

5    A    He did not.

6    Q    Did he tell you that once he was at the police

7  station, the police searched his pockets and found a

8  small packet of what they said was cocaine and that they

9  had planted it on him?  Did he ever say anything like

10  that?

11    A    He did not.

12    Q    If he had told you, "Mr. Grossman, the police

13  planted drugs on me."  Is that something that you would

14  have documented somewhere in any of the paperwork you

15  generated?  That this is a complaint that he's making to

16  you -- that he was framed for a drug charge earlier in

17  the day?

18    A    Again, that's a hypothetical.  My hypothetical

19  answer would be I would immediately call my trial

20  supervisor.  And --

21    Q    And not proceed?  Go ahead.

22    A    And not proceed with the statement.

23    Q    Did Mr. Jakes tell you that before you got

24  there, the police had put him into a "little cage" at

25  the police station before you spoke with him?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-36 Filed: 11/04/22 Page 45 of 68 PageID #:9509
The Deposition of BRIAN GROSSMAN, taken on September 17, 2021
166..169

Page 166

1    A    He did not.

2    Q    Did Mr. Jakes ever ask you if he could call
3 his mother or grandmother while he was speaking with
4 you?

5    A    He did not.

6    Q    Did he ever ask to call any family member when
7 he was speaking with you?

8    A    He did not.

9    Q    If he had asked you that, would you have let
10 him make that phone call?

11    A    Yes.

12    Q    Why?

13    A    Given his age, I think that would be
14 appropriate.

15    Q    And if he had made a request, like, this is a
16 hypothetical, but if he had made that request to you and
17 then the police said, "No, we're not going to let him,"
18 would you have been able to override the police and make
19 sure that he got that phone call?

20    A    Again, you're asking me a hypothetical. And
21 my hypothetical answer would be I would call my trial
22 supervisor immediately.

23    Q    Okay. And not proceed with the statement?

24    A    Correct.

25    Q    And I'm sure that if he had asked to speak

Page 167

1 with a lawyer while you were speaking with him, you
2 would have ended your conversation with him right away?

3    MR. AINSWORTH: Objection. Leading.

4    A    With that hypothetical, I wouldn't even need
5 to call my trial supervisor. The conversation would be
6 over.

7    Q    Did Mr. Jakes ever tell you that the police
8 did not read him his rights? Did he ever say anything
9 like that to you?

10    A    He did not.

11    Q    Did Mr. Jakes ever tell you in your
12 conversations with him, at any point, that he was
13 innocent, that he did not commit this murder? Did he
14 ever start out with that position denying it?

15    A    Well, the words you chose -- he was -- he was
16 not the shooter. He was the lookout. So --

17    Q    Correct, sorry. I see where your problem --
18 let me rephrase the question. Did Mr. Jakes -- that's a
19 very fair point. Did Mr. Jakes ever, if you recall,
20 tell you "I was not involved. I was not the lookout. I
21 was not connected at all with this shooting"? Did he
22 ever make a statement like that to you?

23    A    No, he did not.

24    Q    All right. Did Mr. Jakes ever tell you or
25 complain to you before -- strike that. Did Mr. Jakes

Page 168

1 ever complain to you or tell you during your
2 conversations with him that the police were holding him
3 at the police station before your arrival against his
4 will?

5    A    He did not.

6    Q    Did you know from any source -- actually,
7 never mind. This was asked already. I don't need to
8 ask again when answered. Based on -- I just want to
9 circle, shift gears over to Mr. Robinson, the Gus
10 Robinson statement. But let me -- strike that. I
11 walked that back, too. Let's keep on Mr. Jakes'
12 statement. Do you -- what is your understanding of a --
13 what it is to be a lookout for, you know, people that
14 are going to commit a crime, whatever the crime is? What
15 -- in your own words tell me what you understand that to
16 mean?

17    A    You're accountable for the actions of others
18 when you participate in a crime.

19    Q    Was it your understanding that Jakes was
20 asking Gus Robinson to participate in a robbery of
21 Mr. Garcia?

22    A    Yes.

23    Q    All right.

24    MR. GRILL: I think I might be done. Give me
25    two minutes. I'm going to commiserate with my co-

Page 169

1 counsel and make sure that there isn't some giant
2 burning question that I've forgotten to ask you. I
3 don't think there is. So just give me one minute
4 and I'll be right back, okay?

5    THE WITNESS: Okay.

6    COURT REPORTER: Okay. We're off the record.

7    (OFF THE RECORD)

8    COURT REPORTER: We're on the record.

9 BY MR. GRILL:

10    Q    I have no more burning questions for you,
11 Mr. Grossman. Thank you for your time. I don't know if
12 Russell has any other follow-up on whatever it was that
13 I asked, but I'm done.

14    A    Thank you, sir.

15    MR. AINSWORTH: Mine's very short.

16    REDIRECT EXAMINATION

17 BY MR. AINSWORTH:

18    Q    So when you prosecuted felony cases at 26th
19 and California, you prosecuted cases involving
20 statements taken by felony review assistants, right?

21    A    You're talking about after 1991 when I was in
22 the felony trial courts? Yes.

23    Q    And in some of those cases, the felony review
24 assistants would take photographs of the suspect and
25 eventual criminal defendant after they provided a

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 170

1  statement, correct?

2      A    I don't recall that.  I recall photographs

3  being taken by a court reporter, but I don't recall.  I

4  -- we didn't have cameras.

5      Q    Okay, sorry.  So court reporters would take

6  photographs of the defendants, is that correct?

7      A    Well, whether that happened in every case, I

8  don't know.  But I do remember a case where a court

9  reporter took a picture with a court reported statement.

10      Q    Okay.  Did you ask that the photograph be

11  taken of Mr. Jakes to depict his condition at the time

12  that he provided his statement?

13      A    No, sir.

14      Q    Did you examine any portions of Mr. Jakes'

15  body for bruising, or cuts, or injuries?

16      MR. GRILL:  Asked and answered.

17      A    I saw no bruising, cuts, or injuries from his

18  outward appearance.

19      Q    Did you lift up any portion of his clothing to

20  examine if he was injured?

21      A    No, sir.

22      Q    Now what was Mr. Jakes' skin tone?

23      MR. GRILL:  Form.

24      A    I don't recall.

25      Q    You never told Mr. Jakes that he could be

Page 171

1  charged as an adult for what he would tell you; is that

2  correct?

3      A    Correct.

4      Q    Why didn't you tell Mr. Jakes that he could be

5  charged as an adult for what he was telling you?

6      A    I don't recall.

7      Q    And you never told Mr. Jakes he could be

8  charged with murder, right?

9      A    Correct.

10      Q    Why didn't you tell Mr. Jakes he could be

11  charged with murder for what he was telling you?

12      A    Well, for one thing, charges weren't approved

13  at that time.  That's all -- that's all I can remember.

14      Q    The question is: Why didn't you tell Mr. Jakes

15  that he could be charged with murder for what he was

16  telling you?

17      A    I don't recall.

18      Q    Mr. Grill asked you a number of questions

19  about whether Mr. Jakes told you about being abused by

20  police officers who came into his home.  Did you ask

21  Mr. Jakes any questions about what happened between him

22  and the police officers who came into his home before

23  1:00 p.m. on the day before?

24      A    I don't recall.

25      Q    Did you have any reason to ask Mr. Jakes about

Page 172

1  his interactions with police officers before 1:00 p.m.

2      at his house the day before?

3      A    I don't recall.

4      Q    All right.

5      MR. AINSWORTH:  Those are all the questions

6  that I have.

7      MR. GRILL:  I've got nothing on that.  So I

8  think we're done.  Let's see, you want to talk to

9  them about signature?  Or I can, I don't care.

10      MR. AINSWORTH:  Well, or ask the court --

11      MR. PORTIS:  I will.  Yes, yes, yes.

12      MR. GRILL:  Well yeah, Fair point.  I guess I

13  assumed maybe wrongly there, but --

14      MR. PORTIS:  Yeah, yeah, yeah.  No, no, no,

15  no, no.  I don't have any -- not questions.  I will

16  talk to them about signature.  Brian, as you are

17  aware, you just took a deposition.  You have the

18  right to review, not for, like, you know, you

19  didn't say, but you know, for small errors, et

20  cetera, or you can just trust that Kortney has done

21  an excellent job and you can waive signature and

22  review of the transcript.

23      THE WITNESS:  Kortney looks very responsible

24  and I will trust Kort.

25      MR. PORTIS:  Okay.  So that means we will waive

Page 173

1  signature.

2      COURT REPORTER:  Okay, perfect.  Give me one

3  moment to get us off the record then will everyone

4  please stay on the line?  All right.

5      (EXHIBIT 3 MARKED FOR IDENTIFICATION)

6      (EXHIBIT 5 MARKED FOR IDENTIFICATION)

7      (DEPOSITION CONCLUDED AT 5:50 P.M.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 174

1              CERTIFICATE OF REPORTER

2                  STATE OF COLORADO

3

4      I do hereby certify that the witness in the foregoing

5      transcript was taken on the date, and at the time and

6      place set out on the Title page here of by me after

7      first being duly sworn to testify the truth, the whole

8      truth, and nothing but the truth; and that the said

9      matter was recorded stenographically and mechanically by

10     me and then reduced to typewritten form under my

11     direction, and constitutes a true record of the

12     transcript as taken, all to the best of my skill and

13     ability.  I certify that I am not a relative or employee

14     of either counsel, and that I am in no way interested

15     financially, directly or indirectly, in this action.

16

17

18

19

20

21

22     KORTNEY CHASE,

23     COURT REPORTER/NOTARY

24     COMMISSION EXPIRES:  08/03/2029

25     SUBMITTED ON:  09/30/2021

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-36 Filed: 11/04/22 Page 48 of 68 PageID #:9512
The Deposition of BRIAN GROSSMAN, taken on September 15, 2021

175

- -

**--I** 76:2

**0**

**00094** 73:5

**01:36:04** 71:20

**02:01:40** 88:11

**03** 120:14

**1**

**1** 70:21,23 73:7

**1,000** 127:19

**10** 109:1

**100** 128:9,11

**11** 15:4

**11:35** 98:1
99:2,5

**11:40** 98:2
99:2,5

**11:50** 73:17,23
74:2,3,12

**11:55** 74:11

**12** 29:7 113:24

**12-hour** 28:17
29:5

**1206** 98:1
99:18

**1212** 109:15
110:3,12
161:22 162:10,
16 163:19,23

**14** 113:23

**15** 24:23 55:5,8
73:17 86:17
93:18 94:3,8,
10,11,14 95:9
96:4,17 97:25
117:16 119:15,
17

**15-minute**
25:1

**15-year-old**
55:10 57:25
60:13

**16** 47:4 113:9,
25 114:3,6

**16th** 47:18,20,
23 112:1
113:15

**17** 77:7 83:21
118:3 121:7

**17th** 6:4 22:18
26:11 47:19
48:3,17,22
55:1,15 66:7
112:16 113:16
121:3

**18** 10:22 116:13
120:15,21
125:24 131:17,
24 132:2,14

**18-month-old**
75:1

**18th** 121:3,9

**19** 13:18

**1981** 9:2

**1985** 9:8

**1988** 9:12,25
10:2 13:14

**1990s** 51:16

**1991** 11:13
22:7,18,21
28:7,14 31:13
33:2,12,21
34:12,21 35:7,
14 36:7 37:18
38:14,16 39:8,
25 40:1,23
41:18,23 42:23
44:22 46:23
47:4 50:18,25
54:8,11 61:3,
11,22 66:21
73:17 77:12
83:21 90:23
97:25 102:1
113:9 116:13
117:16 118:3
119:15,17
120:15,21

**121:4,7** 122:25
131:24 132:1
134:11,13
139:9,15
147:25 157:9
160:17 169:21

**1992** 13:6

**1998** 13:15,16
126:6

**1999** 13:20

**19CV02204**
6:11

**1:00** 111:21
113:14 171:23
172:1

**1:02** 6:5

**1:05** 112:1
113:9

**1:30** 48:2,6,21,
25 51:20

**1st** 83:18

**2**

**2** 92:16,23 93:9
117:11

**2006** 14:21,22

**2016** 83:18

**2021** 6:5 77:7

**24** 53:11 54:3

**26** 12:10,25
26:7,13

**26th** 11:23
48:18 51:22,23
138:9,15
150:11,23
169:18

**2:00** 51:19,21
52:15 54:25
55:15 56:24
66:7 118:3

**3**

**3** 47:5 48:2,6
51:18 52:2,9,10

**71:20** 103:6
110:1 173:5

**3-something**
120:20 121:9

**30** 91:2

**380** 100:12

**380-caliber**
100:11 104:6

**3:30** 70:22
71:6,8

**3:30-ish** 52:20
71:1 72:11

**3:50** 71:11
72:15 121:1

**4**

**4** 113:7,10
116:14

**491** 92:19

**4:00** 94:17,18
112:15

**4:30** 94:21

**5**

**5** 116:17,18,19
173:6

**50** 120:15

**500** 127:21

**506** 92:20 93:8

**51st** 98:1 99:18
101:13 102:15
103:7 109:15,
21 110:3,13
161:22 162:10,
11,13,16,17
163:1,6,19,23

**5:00** 29:11
107:16 113:15

**5:15** 123:14

**5:50** 173:7

**6**

**6** 120:8,11

**66** 11:23

**6:00** 29:6,7,11
47:24

**7**

**7:00** 29:6,7
47:24

**8**

**8** 71:20

**88** 10:18 11:5

**89** 11:8

**9**

**91** 11:14

**94** 73:8

**95** 73:8

**98** 13:21

**99** 120:9

**A**

**A's** 74:20 75:4,
10,16,20 76:5
100:10,12

**A-FRONT**
107:4,5

**a.m.** 29:6,11
52:15 54:25
55:15 56:24
66:6,7 72:15
94:18 112:15
113:15 118:4

**ability** 8:22
147:22

**absence** 38:1
58:4 61:5,14,25

**absent** 60:20

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-36 Filed: 11/04/22 Page 49 of 68 PageID #:9513
The Deposition of BRIAN GROSSMAN, taken on September 15, 2021
176

**absolutely** 18:13 140:16

**abuse** 20:11 140:23 144:21, 23

**abused** 141:7, 21 142:20 144:20 171:19

**abusing** 142:2

**access** 45:10

**accompany** 30:4

**accomplish** 14:13

**accomplished** 14:13

**accountable** 168:17

**accurate** 102:4,7,11,13 139:2

**accurately** 8:22 109:24

**accused** 35:25 42:18

**acquittal** 122:15,21

**Act** 38:14

**actions** 13:17 14:8 168:17

**actual** 139:3

**add** 42:12 88:21

**addition** 144:21 156:23

**additions** 157:7

**address** 27:7 99:17,23 100:4

**adequate** 41:25

**admitted** 36:2

**adult** 171:1,5

**advance** 13:23 14:1

**advice** 130:25 142:15 159:10

**advised** 96:8 161:14

**affect** 8:22

**affirm** 7:21

**afternoon** 111:21 113:14

**age** 93:19 166:13

**agree** 7:12 95:25 107:11 108:2 132:21

**agreed** 96:13 105:10 139:6

**ahead** 36:13 37:2 39:10 41:11 42:15 58:7 64:12 80:18 88:19 113:4 136:4 165:21

**Ainsworth** 6:15 7:14 8:2 15:16,20,22 16:14,20,23 17:1,9,11,13, 15,25 18:14,15 19:12 21:7,14, 18 22:11 25:8 27:9,14,17,22 28:1 30:20 32:10 35:23 36:12,14,15,23 37:17 40:2 41:14 42:14 44:4 46:17,22 47:10,13 53:19 54:2,7 56:18,21 57:6,10,11 58:22 59:5,11, 22 60:3,5,7 61:19,21 62:10, 23 63:1,4,19,21 64:5,16 65:21 68:14,20 71:12, 15,19,22,24 72:3,6,8 74:17

79:1,15 80:17 81:9,15,21 83:4,5 88:14,23 89:2 92:7 93:7, 10 94:2,9 95:5, 11,17,20 96:3 112:23 116:7 119:10 123:3, 12 125:9 126:12 129:1 130:11,18 131:15,21 133:24 134:20 135:19 137:6 140:1 142:7 143:3 144:1 146:24 148:14 149:1,8 151:4, 9,25 152:13,23 154:1 155:24 160:20 161:9 162:19 167:3 169:15,17 172:5,10

**alcohol** 111:1

**alert** 55:4 62:18

**alerted** 63:24 86:8

**all-** 93:5

**allegations** 64:6

**allowed** 110:20 116:20

**alongside** 91:18

**alright** 101:12, 16,23,25

**Alvin** 6:24 7:5 58:23

**amend** 93:5

**amended** 38:14

**amount** 13:10

**analyze** 147:19

**Anderson** 23:20

**Andrew** 6:18 21:7 58:7 88:19

125:16 129:6 154:25

**Andrew's** 125:1

**annoying** 81:20

**ans** 15:13

**answering** 26:9 148:7,22

**answers** 148:9,19 149:3 155:6

**Antho** 23:20

**Anthony** 6:7 55:4 60:13 69:22 73:15,18, 24 74:17 83:14, 22 84:15,16,21 86:12,18 93:2 94:17 95:9 96:4,12,16,17, 18 97:24 98:2, 8,10,12,18,19 100:9,10,12,13 101:4,7,11,12 102:14,17,18 103:6,7,8,9,11, 25 104:1,9 107:6 108:25 109:2,4,8,10, 11,12,14,15,16, 18,20 110:2,9, 11,17,19,20,23, 25 111:4,14,19 113:8 116:19, 25 117:11,15, 18,21 118:1,2, 18,24 119:2,13, 22,24 121:14, 17,20 123:14 136:5 153:5,9, 19,23

**Anthony's** 96:21 101:9 153:15 155:2

**anxious** 121:23 122:2,3

**anybody's** 16:19

**anything.'** 110:23

**apologies** 71:18 116:18

**apologize** 155:4

**apparently** 65:13

**appeals** 11:3, 6,7

**appearance** 6:12 144:10,13, 15,23,25 145:1 170:18

**appearances** 144:19,23

**appearing** 6:16,17,19,21, 25 7:3

**appears** 146:16 153:13

**applied** 40:14

**applies** 39:5 59:14,24

**apply** 10:14,18 40:17 125:21

**applying** 146:7

**approach** 90:16

**approached** 73:18,24

**approve** 119:21 120:2 129:14,24 130:9 131:2 158:7,8,13 159:3,8,16 160:14

**approved** 119:18,25 120:14,20 121:6,9 127:25 129:8,11 130:14 171:12

**approving** 127:3 131:3



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-36 Filed: 11/04/22 Page 50 of 68 PageID #:9514
The Deposition of BRIAN GROSSMAN, taken on September 30, 2021

177

**approximate** 25:2

**approximately** 11:8 25:1 52:15,17 56:24

**Apropos** 152:25

**area** 47:5 48:2, 6 49:11 51:18 52:1,9,10 76:14 100:23 110:1 118:4 164:18

**arguably** 63:15

**argue** 21:11 63:2,10

**arguing** 95:24

**argumentative** 40:5 42:11 43:5,10 74:13 90:6 108:15 119:7

**arrest** 45:11 56:2,4,17 112:4 113:8 126:15

**arrested** 56:1, 4 112:1

**arrival** 168:3

**arrive** 44:21 51:17

**arrived** 33:15 48:1 51:21 52:1,14 55:14 56:25 86:9 142:2

**ASA** 7:2 26:25 120:14,20

**ascertain** 97:19

**asleep** 47:9

**aspects** 59:19

**aspersions** 65:7

**assert** 130:22

**asserting** 41:6

**assessment** 144:16

**assigned** 11:2, 21 12:25 20:17 21:19 28:7,11, 12,15 49:9 50:21

**assist** 147:2

**assistance** 127:17

**assistant** 6:24 10:1 11:5 13:8 22:23 23:5 59:4 69:20 78:5 85:24 96:11 110:19 126:11 128:5 143:8 146:6,21

**assistants** 169:20,24

**assume** 8:13 55:17,19,20,22 87:9,11 101:24

**assumed** 172:13

**Assumes** 56:16 58:9

**attack** 65:15

**attacks** 65:18

**attempts** 25:18

**attend** 9:13

**attending** 6:12,13

**attorney** 6:24 9:17 10:1,5,8, 19 11:5 13:8 23:5 43:22 44:2 46:8,13 58:14, 19 59:1,3,7,9, 17,20 60:2 69:21,22 78:5 82:23 85:24,25 96:11 110:19 126:11,16 127:6,9 128:8 130:21,25 136:15,17,18, 22 138:25

142:11,18 159:6

**attorney's** 9:17,24 10:4,7, 10,12,16,21,25 14:16 26:3 67:11 131:10 142:14 150:1, 14 151:2 159:10

**attorneys** 22:23 25:3 125:17

**audio** 23:24

**aware** 154:14 172:17

**awkward** 84:23 85:2

----

**B**

----

**B-R-I-A-N** 7:9 8:5

**back** 10:18 13:9,13 18:16, 17,22,25 19:5, 7,8,10,14,16, 19,22,24 20:3,4 22:21 28:7,13 31:13,22 33:11, 12 34:11 35:7, 14 36:7,16,18 38:2,15 39:25 40:1,22 41:18 42:23 46:23 51:16 54:13 59:23 61:2,11, 22 66:21 77:11, 25 81:12 83:18, 20 92:3 96:25 105:20 131:23 132:13 134:11, 12 136:6 137:23 139:15 144:3 146:4 147:25 158:17 160:16 162:7, 12 168:11 169:4

**backed** 104:14 108:17,18,20

**background** 8:25 118:7,8,18

**backwards** 74:12

**bad** 60:12 64:6 95:21 107:24 137:22

**ballpark** 128:4, 7

**based** 44:1 46:15 48:14 58:20 61:2 71:17 97:11 127:10 130:15 131:9,17 132:2, 3 145:5 147:7 151:23 162:15 163:15 168:8

**Basically** 163:1

**basis** 44:2 58:12,22,24 142:10

**Bates** 73:8 120:8

**beaten** 144:25

**bedroom** 164:17 165:2

**begin** 7:25 125:6

**beginning** 13:18 47:11

**behalf** 6:16,18, 22 7:1,4 139:25

**behavior** 148:4

**belief** 160:23 162:10

**believed** 67:13 143:6,17 154:17

**Beth** 22:8

**big** 65:10 93:14

**bin** 26:16 138:8,9,14 150:6,9,17,19,

22

**birth** 94:23 95:14

**bit** 9:1 72:12 81:13 103:8 137:24 144:14 145:7 154:25 155:1

**blank** 138:20, 23

**block** 76:11

**Bob** 82:4,16

**body** 170:15

**bonkers** 95:18

**bottom** 73:4 115:18 156:25 157:2

**Boudreau** 50:10,11,15,17, 23 51:8,14 52:4,6,14,18 53:1 54:14,18 56:22 57:14,19, 24 61:4 62:11, 12,16 66:5,13, 25 67:3 86:20 87:16 114:16

**box** 26:15

**branch** 11:22, 23

**break** 8:16,18 27:3 46:17 123:4 125:6

**breakfast** 117:1

**Brian** 6:7 7:1,4, 9,12 8:5 43:21 96:10 172:16

**briefly** 15:9,10 23:19

**briefs** 24:4

**bring** 128:12 158:4 164:18

**bringing** 30:24 102:24

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

broader 146:4

broadly 127:5

brought 65:11
128:18,24
129:3,8,9

bruising
170:15,17

buddies 77:10

bullets 100:15,
16 101:5

bureau 13:17

Burge 52:9,10,
11

Burke 84:7
114:10,16

burning 169:2,
10

businesses
162:25

busy 48:14

_____

_____

C

Caesar 52:3,6,
14,18 53:2
54:15,18 56:23
57:15,19,24
62:12,16 66:6,
13,25 67:3
84:11,13 85:15,
17 86:20 87:16
98:24 114:10,
16 157:1

cage 165:24

Cal 51:22,23
150:23

California
12:10 13:1
26:7,14 138:10,
16 150:10
169:19

call 17:8 19:16
48:6,17,21,24
51:4,8,18,20
82:17 83:4,6
107:9 121:18
136:5 139:16

140:7 141:2,18
143:11,21
146:8 154:21
165:19 166:2,6,
10,19,21 167:5

called 22:14
47:4,19 48:2
82:14 127:24
136:5 140:9

calling 127:3

calls 35:19
39:21 40:20
41:6 47:25
48:5,10 53:15
58:10,25 59:19
60:23 73:1
78:17 79:21
80:6 81:2 82:23
93:22 94:7 97:8
101:1 110:6
113:18 114:8,
20 116:6 117:6
119:7 121:24
142:10 159:6

cameras 170:4

car 90:16,17
92:22 104:10,
12,13,14,15,23,
24 106:4,12,17
107:1 108:18,
20,21,23

care 42:6 43:12
172:9

career 127:16

Carla's 72:2

carries 100:11

case 6:10
22:15,20 23:5
24:8 29:11
31:25 32:1,6
38:2,20 39:4,
24,25 42:3,4,
22,24 43:12
44:8 45:19
48:13 49:9,11
50:8,11,24
51:3,4,8 52:4
53:20 56:13
59:2,4,10,11,
12,18 63:8

68:10 82:5,15
83:19 124:4,10,
23 125:19
126:19,25
127:4 128:13,
18,20,25
129:20,25
130:2 132:10
133:19,20
134:5,6 135:22
138:9 139:4,21
140:9,12
141:12 142:12
144:9,18
146:18 147:18
149:19 150:6
155:9 156:17,
22 157:16
163:8,10,14
170:7,8

cases 11:25
17:3 20:9,13
21:20 30:7,11
42:5,25 43:2
45:2 49:16,17,
20 50:14,15
65:12 66:18
122:13,20,24
127:15,18,24
128:3,6 134:15
139:8 169:18,
19,23

category
114:2

Catherine 22:4

caused 139:24

caveat 45:2
130:6 132:9
157:23

cell 102:2

cetera 172:20

chain 56:7

chair 12:11,16,
21 13:2,24
14:1,3,8 19:4,8,
9,11,13

chairs 12:14

challenge
36:1,5

chance 10:9,
11

change 22:1
101:20,22
103:21,23
108:9

changed 22:2
101:23 132:17

changing 38:9

characterizati
on 65:1

characterizes
74:14

charge 126:19,
24 127:12
129:25 131:3
142:12 158:4,7,
8,13 159:3,16
160:14 161:6
165:16

charged
129:10 159:15,
23 160:4,11
171:1,5,8,11,15

charges 30:24
119:18,21,25
120:2,14,20
121:6,9 122:15,
22 127:4,25
128:12,13,17,
24 130:9,14
131:2 147:5,6
159:8 171:12

Chase 6:3

check 81:9

Chicago 6:22
9:10 16:6,9
21:1 28:8,9,10
40:18 56:8
60:15,21 61:24
67:12,13 83:22
96:18 107:16
150:21 151:1

chicken 73:19
90:11 102:16,
17 163:6

chose 136:22
138:25 157:24
167:15

circle 168:9

circulated
46:19

circumstance
s 23:4 41:17
116:4

city 6:22 17:10
21:1 73:5,8
92:19,20 93:8
120:9

civil 13:17,21
14:8,14,19

claimed 117:2

claiming
118:19

clarification
19:15 25:11

clarify 160:2

clarifying
129:5

clarity 155:22

clear 13:18
39:3 64:15
129:6,13 155:3,
5,25 156:2,10
161:5

clerk 9:16,20,
25

clerking 11:1

click 92:16

client 27:22
44:2 46:16
58:21 130:23
142:13 159:9

clip 100:14

clock 74:5
99:14

closed 116:12

clothing
170:19

co- 168:25

co-
supervisors
22:5

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-36 Filed: 11/04/22 Page 52 of 68 PageID #:9516
The Deposition of BRIAN GROSSMAN, taken on September 12, 2021

179

coaching 64:21

cocaine 165:8

coerced 143:6, 18 144:5,16

coercion 36:9 37:5,8 140:22 142:23 145:1

colleague 7:2

college 9:5

combative 121:22

combination 129:23

commiserate 168:25

commit 67:13 167:13 168:14

committed 53:12 54:4 131:14 132:8 140:10

committing 34:6 35:10 40:25

commonly 86:3

communicate 159:20,21

communicated 27:23

communication 25:9

company 66:16,19

competent 149:18

complain 140:9 167:25 168:1

complaining 141:6,20 142:19

complaint 24:8 141:12

165:15

complaints 141:8

completed 26:6 158:2,11, 24

completely 65:3

Compound 79:14

concept 83:3

concern 40:22 43:2 114:4

concerned 41:15 44:5

concluded 59:12 173:7

conclusion 128:24 159:13

condition 8:21 170:11

conducted 134:8 145:23

conducting 34:22

conference 6:6

confess 67:7 142:25

confession 22:19,20 23:4 116:5

confessions 122:14

confrontational 65:8

connected 167:21

consideration 129:21

considers 39:4

consistent 103:17

constitutional 96:9

consumed 114:17 115:1

contact 56:8 62:17 139:11

contacted 33:18

contained 117:18

continue 81:17 141:19,25 143:20 149:18 155:18

continuing 132:24

contradicted 66:1 117:24

control 148:11

controlled 150:17

controls 151:2

convened 6:6

convers 51:3

conversation 51:3 66:5,11 69:7,8,11 71:6, 13 72:16 83:14, 21 87:15,21 91:1 105:7,19 124:12 132:17, 22,24 134:2 135:11 148:8, 18 164:24 167:2,5

conversations 24:19 164:25 167:12 168:2

conversely 32:20

conviction 82:19 83:8 122:22

conviction's 59:13

convictions

122:14

Cook 9:23 10:3,6,15,20, 24,25 14:15 26:2 67:11 150:14

cooperative 121:22 149:4

copy 98:5

corner 90:14 101:8,12,13 102:15 103:7 120:13

corporate 16:8

correct 7:5 11:25 12:17 25:8 28:19,20, 25 29:4,9 33:20 39:20 44:24 48:15 73:10 75:21,22 76:9 78:23 79:6 84:9 92:11 94:21,22, 25 100:25 102:25 103:4, 19,20 106:1,10 108:18,19 110:13,16 111:16 114:19 119:23 121:1, 13 125:19,25 126:21 128:25 130:1,6,10 131:14 133:17, 18 134:14 135:13,15,18 137:3,10 142:6 143:25 147:10 149:7 150:7 152:20 153:4, 13,20,25 156:4, 5 163:24 166:24 167:17 170:1,6 171:2, 3,9

corrections 157:5,6 158:1

correctly 73:21 75:2 76:15 78:8 82:1 96:14 98:13 100:16 102:21

104:2,15 105:1 109:6 111:2

corroborate 30:15 32:21

corroborated 65:25 80:4

corroborating 80:13

could've 72:11

counsel 6:14 15:25 169:1

count 27:3

County 9:23 10:4,6,15,20,25 14:15 26:2 67:11 150:14

couple 16:9 24:21 109:2 123:4 125:6

court 6:2,4,9 7:6,11,16,19,25 15:19 20:16,18 21:13 27:18,21 36:2,17 38:14, 24 39:6,17 40:16 46:21 57:5,7 68:24 91:22 92:1 105:11 116:17 123:9,11 125:10,12 146:11,17,23 157:9,14,22,23 158:16 169:6,8 170:3,5,8,9 172:10 173:2

courtesy 18:5 129:14

courtroom 12:12,25 13:4, 8,11,22 14:4,7 18:23 19:1,18 20:4 50:8,20 83:19

courtrooms 19:5 50:8,21

courts 11:22 38:13 40:8 169:22

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-36 Filed: 11/04/22 Page 53 of 68 PageID #:9517
The Deposition of BRIAN GROSSMAN, taken on September 13, 2021
180

**Coyne** 7:3,5
24:17

**create** 22:19
105:6

**created** 115:14
116:4

**credible** 31:3,
9,10,13

**crime** 21:2
31:18 32:23
34:5,10,23
35:11 36:1
45:13,14,17,22
46:4 53:9,12,21
54:4 92:21 93:1
131:12,14
132:8 168:14,
18

**crimes** 118:4

**criminal** 11:3,6
13:20 126:6
169:25

**cross** 107:20
125:13

**crossed** 98:11,
16,22 101:16
103:12,15
104:16,20
105:2,3 107:25
108:9

**crossing**
104:11

**crosstalk**
88:10

**current** 132:10

**cursive**
155:16,17,20

**custody** 43:16
44:7,11,13
55:10 67:6
70:8,12 78:19
87:13 112:7,14
113:12 140:19
144:11 147:4

**cuts** 170:15,17

————————

**D**

**Darren** 22:8
90:9 98:10,12,
19,20 99:6
101:10 103:11
104:7 109:2,16
124:20,22

**date** 44:19
94:23 95:13

**dated** 116:13

**daughter** 75:1

**day** 6:4 47:4,18
111:22 115:14
155:19 164:2,
18 165:17
171:23 172:2

**days** 24:21
102:1 113:22

**deal** 16:20,23

**death** 21:20

**December**
10:1 11:5

**decide** 129:24

**decided**
157:12 158:3

**decision**
126:17 142:12
157:15,16
159:7

**Deerfield** 16:8

**def** 17:19

**defendant**
23:20 136:22
138:24 169:25

**defendants**
6:19,22 170:6

**defender's**
9:20 10:7

**deficit** 147:21

**define** 126:3

**definition**
126:7

**deliberative**

59:7,14,24

**delineation**
32:11

**delinquencies**
20:14

**delinquency**
20:11,12,13

**demeanor**
121:20

**demonstrate**
78:16

**denying**
167:14

**dep** 17:7 64:14

**department**
16:1,2 56:9
67:12 150:21
151:2

**depend** 32:7

**depends** 42:3
68:10 140:5

**depict** 170:11

**deponent** 7:4

**deposition** 6:6
8:8 15:21 21:15
23:10 24:14
25:4,5,10,13
60:6 65:19
172:17 173:7

**depositions**
64:17 65:5

**det** 66:19

**detail** 144:14

**details** 154:15

**detective** 35:3,
9,15 39:20
40:18,24 49:12,
15 50:4 52:3,4
66:5,6 84:11,
13,14,16,18,20,
24 85:2,5,11,
14,17 98:24
114:10 157:1

**detective's**
45:21

**detectives**
44:18,20 52:5,
13,18,23 53:1
54:13,14,17
60:15,22 61:4,
14,24 62:11
65:24 66:12,20,
25 83:23 86:20
87:21,25 88:4,
8,17 89:1
105:25 106:3
111:20

**determination**
126:24 128:17
147:5

**determine**
30:23 37:7 41:3
70:7 134:17
145:20 146:1

**determining**
38:5 39:18,19

**develop** 54:12

**development**
54:10

**difference**
131:6,8 151:4

**difficulty** 97:18

**digital** 54:9

**Dillon** 124:7,9

**DIRECT** 8:1

**direction**
103:9

**directly** 76:14

**dis** 49:8

**disagree** 63:12
64:11 72:5

**disagreed**
66:22

**disagreement**
15:6 67:2

**disagreements**
66:24

**discoloration**
69:15

**discrepancies**
46:5

**discrepancy**
115:7,25

**discussions**
55:21,23
151:11

**dismissal**
122:15,22

**dismissing**
82:15

**dispatcher**
49:8

**distinction**
38:17

**distinguish**
90:24

**District** 6:9,10
9:17

**Division** 6:10

**divulge** 58:25
59:8,16,20

**document**
31:24 43:13,17,
18 44:15 71:10,
18 72:1 73:7,9
76:10 95:3,6,
12,14 120:8
121:8,10,11
136:19 141:17

**documented**
60:22 78:15
111:16 116:3
118:17 136:25
141:14 164:7
165:14

**documenting**
111:25 113:7
115:1 116:4
118:16

**documents**
25:12 45:11
53:2,4,6

**door** 68:18
137:13

**doubt** 108:13

**downstairs**
68:16,21

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-36 Filed: 11/04/22 Page 54 of 68 PageID #:9518
The Deposition of BRIAN GROSSMAN, taken on September 14, 2021

181

drafted 138:6

drawing 38:17

drawn 164:3, 16 165:3

drink 78:11,14 111:8,15 114:5, 17 116:1,22 118:21 145:13

drive 90:17

dropped 57:3

drove 74:25 76:11,14 102:20

drug 147:14 165:16

drugs 111:1 165:13

dude 74:18,21 90:10 91:5,8 100:7 104:4,5, 6,8,10,11,13, 22,24 106:4,11 108:24,25 109:11,18,22

dude's 104:14 108:23

E

earlier 72:12 125:23 137:8 149:4 151:3 153:2 157:5 164:2,17 165:16

early 47:5,14, 16,19

Eastern 6:10

eat 111:7 113:17 116:22 118:21 145:13

eaten 111:14 114:5

education 149:6,9

effect 84:6 136:24 139:1

145:12

effort 62:17

efforts 62:13

Elizabeth 76:11,18

employer 10:15

encounter 142:23

encountered 132:14,18 136:11 140:21 143:5

encountering 141:5

end 13:14,15, 16,20 106:23 108:10 133:3 138:16

ended 122:14, 21 123:13 167:2

ENDS 71:20

English 96:19 149:13

ensure 30:17 31:2,18

enter 144:2

entered 133:21

entire 72:1 86:12 91:1 108:11

entity 149:24 150:2

erratic 148:4

errors 172:19

establish 36:7

establishes 63:9

estate 137:9

et al 6:8

evening 28:22

evenings

28:21

events 56:8

eventual 169:25

evidence 30:23 31:14 56:16 58:9 62:22 63:8,11 64:8 66:9 112:10,21 126:19,23 127:10,12 128:22 129:20, 21 144:4 147:8

exact 69:8 91:1 126:7 130:4

EXAMINATIO N 8:1 125:13 169:16

examine 170:14,20

excellent 172:21

excluding 13:11,13

excuse 42:10 71:10 79:13 94:6 112:20 122:5

exhibit 70:21, 23 73:7 92:15, 18,23 93:9 103:6 113:7,10 116:14,17,19 120:7,11 137:8 173:5,6

exhibited 148:4

exhibiting 148:3

existed 119:3

expect 54:4 148:11

experience 14:14 131:9,17, 24 132:2,3,13 149:12 162:24

expert 147:24 148:16

explain 71:25 144:14 152:3

explained 85:23

explore 91:10

extent 21:4 41:8 43:23 46:8,9 58:13, 15,24 83:2 127:4 138:19

extremely 17:24

F

face 69:16

facing 161:6, 14

fact 7:12 32:22 60:22 80:25 93:25 114:4,19, 24 139:3 149:5 155:1

factor 38:3,13 39:4,11,12,14, 17,19 40:11,12, 14,17

factors 38:5 40:7,9

facts 41:21 45:21 46:1 56:16 58:9 67:22,24 90:1, 3,4,5

factually 43:23

faculties 148:12

fair 8:14 32:11 43:4,7,8,9 76:1 88:6 132:25 136:7 139:6 149:16 151:3 163:21 167:19 172:12

faith 63:16 64:6,9 95:21

fall 114:2

familiar 163:2

family 63:9,17 166:6

Fangman 26:25

fatal 117:15 119:14,16

fatigued 123:19

faze 85:9

fed 114:25 116:1 117:2 118:20 119:4

feedback 81:6

feel 10:11 14:10 46:11 65:14 83:3,7 84:23 85:2,5 123:19 126:23 137:22

feeling 10:13

feelings 83:11 85:8

feet 109:1,2

fellow 77:9

felony 11:14, 16,18 12:25 13:4,8,11,12, 14,22 14:4,7 18:16,19,23 19:1,5,6,11,18, 19,22,25 20:3,6 21:2,24 22:13, 14,17,21,24 25:17,19,21 26:5,13,15,18, 22 28:2,6 29:14,17,18,22 30:6,7,9,10,22 31:23 32:14 33:2,3,21,25 34:5,20,23 35:8,11 36:7 37:18 44:8,23 46:23 49:8,18 50:5,18,24 59:3 61:3,12,22

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

118:17 120:4,
10 122:25
126:10 127:16
128:5 134:9
136:21 137:3
138:8,14,18,24
140:15,23
143:7,15 146:6,
20 149:24
150:6,11 159:8
169:18,20,22,
23

**fighting** 15:18

**figured** 109:16

**file** 26:2 52:24
59:23 140:15
143:15 149:25
150:2,6

**fill** 120:25

**filled** 26:10

**film** 54:10,12

**find** 27:8 39:13
68:8 70:6,14
132:15 133:8

**finding** 124:19

**finished** 45:12

**fire** 64:15
109:11

**firm** 14:24 15:3,
6,14

**fitting** 74:20,22
76:12 102:18,
19

**flip** 8:12

**folder** 22:13,
14,17 25:17,19,
22 26:5 120:4
136:21 137:3
138:8,14,18,24
154:23

**folders** 26:15,
18,22

**follow** 46:4
58:2 142:14

**follow-up**
125:1 169:12

**food** 42:19
43:1,3,14,19
78:11,14
113:17 114:17

**forgot** 23:13
114:11

**forgotten**
169:2

**form** 20:22
21:9 22:25
30:19 31:5,15,
20 32:2,4,18
34:18,24 35:12,
19 36:3,10,21
37:2,11 39:22
40:5 41:20,22
42:1,11 43:5,10
44:9 45:15
46:12 47:6,21
49:3 50:2,6,19
51:1,10 52:7
53:25 54:6,20,
21 55:11 56:11,
16 57:16 58:10
60:25 61:7,16,
17 62:6,8,15,20
66:2,14 67:8,15
70:10 72:24
74:13 76:22
77:18 78:24
79:12,13,21
80:6,15 81:2,25
82:7,20 83:9,16
84:3 85:1,7,18
86:23 87:18
90:6 91:13
92:5,12 93:16,
20 94:5,6,7
97:9,22 100:2
102:9,12
107:13,19
108:15 110:6,8,
14 112:17
113:19 114:7,
14,21 115:12
117:4 118:22
119:7 120:10,
24,25 121:24
122:5 126:12
129:2 130:18
131:21 133:24
134:20 138:20,
21,23 140:1
142:7 143:3

146:24 148:12,
14 149:1
151:25 154:1
160:20 161:9
162:19 170:23

**formed** 65:6

**formulating**
59:2

**found** 27:6
165:7

**foundation**
30:19 31:5
32:4,18 34:24
35:12,20 39:22
40:20 46:12
51:6,10 54:6
56:17 57:16
58:8 62:20
63:14 66:2
67:15 74:13
75:6 76:8,22
80:6 82:20
83:10 87:18
89:21,25 92:12
93:6,20 97:22
110:7,14
112:17 113:19

**fourth** 134:6

**framed** 165:16

**free** 37:5,8
46:11 83:3
140:20 142:3

**freshman**
96:17

**Friday** 107:17

**friend** 76:5
102:15

**friendly** 66:12,
15

**friends** 14:12
76:20 77:8 98:9
99:6

**front** 63:16
104:12,25
106:5,9,12,17
107:2 109:3

**full** 7:7 116:25

**fully** 100:14

**future** 15:6

———————

**G**

———————

**G-R-I-L-L** 6:18

**G-R-O-S-S-M-
A-N** 7:10 8:6

**gained** 19:18

**gang** 77:9

**Garcia** 48:17,
21 49:5 50:11
53:20 117:16
118:6 119:14,
16 168:21

**gave** 114:13
117:1 118:7,8

**gears** 168:9

**general** 42:2,
20 44:10,11
56:1,12 67:20
89:13,17 90:1,8
146:19

**General's**
10:19

**generally** 48:9,
12 127:5 146:6
152:18 155:7
156:16

**generated**
164:8 165:15

**genial** 66:16

**George** 6:21
17:11 23:20
64:18 71:12

**germane**
40:17

**giant** 169:1

**give** 7:22 36:17
68:21 82:14
86:2 92:1 96:13
105:10 121:14,
17 132:9
137:18 138:17
143:7,18
146:12,22

163:21 168:24
169:3 173:2

**giving** 127:6,9
140:20 145:22
148:10,19
156:13 160:25

**God** 158:15

**Goebell** 22:3,4

**good** 26:23
27:15 63:15
64:9 84:5
145:11 155:15
156:7

**Goodfriend**
124:8,10

**Google** 102:2

**grad** 9:13

**grade** 149:11

**graduate** 9:1,
3,7,11

**grammatical**
106:16,21

**grammatically**
101:25 102:5

**grandmother**
166:3

**grandmother'
s** 63:20

**Great** 161:24

**Grill** 6:18 7:18
15:11 16:13,15,
22,25 17:1,2,
16,20 18:1,6,13
20:22 21:4,10,
16 22:25 27:25
30:19 31:5,11,
15 32:2,4,18,24
34:18,24 35:19
36:3,10,13,20
37:2,11,14
39:9,21 40:5,19
41:20,22 42:9,
12 43:5,10
45:7,15 46:6
47:21 51:11
53:16,24 54:6,
20 56:14 58:6,8
61:7,16,18



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-36 Filed: 11/04/22 Page 56 of 68 PageID #:9520
The Deposition of BRIAN GROSSMAN, taken on September 16, 2021

183

62:4,20,24,25
63:2,6,19,20
64:4,10,16,24
71:21 74:13
76:22 78:24
79:12 80:6,14
81:5,8,10,17
87:18 88:20
89:5,21,25 90:6
91:14 93:21
94:5,13 95:2,7,
15,19,22 100:2
102:9 107:22
108:6,15 110:6,
14 111:23
112:2 114:7
115:3 117:25
118:22 119:7
123:7 125:4,14,
16 126:5
127:23 129:11,
15,17,18
131:23 134:22
137:18,23
138:1,2 148:17
152:25 158:18,
21,23 168:24
169:9 170:16,
23 171:18
172:7,12

**Grossman** 6:7
7:2,4,6,10,13,
16,19 8:5 18:3
39:2 72:9 96:11
120:14,20
125:15 130:24
165:12 169:11

**Grossman's**
18:10

**ground** 109:23

**guardian**
20:19,25 33:5,
8,14,18,23
35:8,17 37:21,
25 38:7 39:5,15
40:12,23 57:20
58:1,4 60:9,14,
19 61:5,15,25
62:13,18 64:1
121:18 139:11,
16

**guess** 26:1
114:2 122:23,

25 126:22
127:17 128:7,9
136:20 149:25
151:22 152:14
155:7 157:13
172:12

**guessing**
24:22

**gun** 100:9,10,
14,15,19,23,24
101:5 104:6
108:24

**guns** 164:2,16
165:3

**gunshots**
76:13

**Gus** 52:21
67:17,23 68:2,
4,25 69:6 70:21
71:6 72:10,13,
16,20 73:14,15,
16,19,21,23
74:18,21,22,23,
24,25 75:9,12,
16,19,24 76:11,
12,13,14,17
77:2,21,22
78:4,5,10,13,
18,21 79:4
80:1,12,13,22
81:23 85:11
91:7,11,16,18,
19 92:9 121:2
153:3 168:9,20

**gut** 10:13

**guy** 91:11,12

**guys** 17:22
18:2 27:25
71:22 98:5

_____

_____

**H**

**ha** 16:4 34:8

**Hal** 62:12

**half** 14:5 16:4
98:11 100:15
101:5

**hamburgers**
117:1

**hand** 7:20
46:25

**handcuffed**
164:17

**handcuffs**
145:2

**handgun**
100:11

**handle** 20:10,
12,14 142:18

**handled** 49:17
122:24 124:3,6

**hands** 54:13

**handwriting**
71:4 73:2,9
97:6 155:18,19
156:11

**handwritten**
23:12,14 39:16
40:15,16 69:9
72:14 77:16
79:19 80:25
89:18,20 90:22
91:3 92:11
94:16 97:1
100:25 105:11
119:6 121:2
123:13 138:4,
21 139:3
146:11,17,22
149:19 153:12,
14,15 155:8,15
156:14,24
157:10,14,25
159:1 162:8
163:15

**happen** 35:2

**happened**
29:12 86:1
105:21,22
109:9 140:5
151:14 152:7,8,
20 161:19
162:4 164:21
170:7 171:21

**happening**
136:14

**happy** 63:3

**harassing**
88:22 95:16

**hard** 120:15

**Harold's** 73:19
102:16

**headquarters**
16:8

**heads** 82:14

**health** 8:21

**hear** 24:2,18
43:20 81:13
104:9 125:19
137:15

**heard** 76:13
109:12

**hearing** 23:2
93:24 94:1
124:1

**hearings**
11:20

**held** 10:25
100:12

**helps** 134:5,7

**Hey** 16:13
26:25 57:2
63:19 122:5

**hid** 112:24

**hide** 112:13,14
113:1

**high** 9:1,3
96:18 149:10,
14

**history** 18:7

**hit** 104:14

**hold** 19:12
39:21 80:14
158:15

**holding** 168:2

**home** 27:22
74:25 76:13,15
90:20 109:15,
20 171:20,22

**homicide**
48:17,21 49:6,
10 50:12 53:20

130:3

**homie** 74:19,
20 75:4,10,17,
20

**homies** 76:12,
19,25 77:3,5,7,
11,21,22

**honest** 12:3
85:8

**honestly**
147:22

**hooey** 117:1

**Hooks** 23:18,
19 83:12 93:24
115:20

**hope** 29:10
149:15

**hours** 29:7
47:5,14,17,19
53:11 54:3
113:24,25
114:4,6,12
120:15,20

**house** 63:16
110:2,10,12
162:11,12,13,
17 163:18,22
164:2,15 165:2
172:2

**houses** 109:4

**How'd** 28:24
49:15 96:24

**how's** 103:14
157:15

**hundred** 45:4

**hungry** 110:21
111:5,9 113:17
116:23 145:14

**hypothetical**
32:19,25 45:15
61:7,18 62:21
79:23 80:15
92:13 101:2
111:17 112:11,
12 114:23
140:6 141:1,2,
16,17 143:10,
11 154:19,20



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-36 Filed: 11/04/22 Page 57 of 68 PageID #:9521
The Deposition of BRIAN GROSSMAN, taken on September 17, 2021

184

164:9,13,22
165:18 166:16,
20,21 167:4

**hypothetically**
33:1 45:16
53:18 54:1
55:24 79:24
80:19 92:14
101:3 111:18
112:12 114:22
140:6 141:23
142:3 143:2,21

**I**

**idea** 105:22
122:19

**IDENTIFICATI
ON** 70:23 92:23
113:10 120:11
173:5,6

**identified**
79:18 133:13

**identify** 32:15,
22 80:2,12

**Illinois** 6:10,
17,20,25 7:4
9:6 10:19 96:18

**illness** 147:17
148:1 149:17

**immediately**
82:2 143:12
165:19 166:22

**impact** 143:24

**impair** 147:22

**implicating**
161:1

**important**
140:17

**impression**
41:7 43:22,25
44:3 46:9,14
58:14,19 59:8
142:11 159:6

**impressions**
59:1,9,17,19
60:2 82:24
127:7,9 130:21

**improper**
21:12 63:24
65:5

**improperly**
65:6

**in-house** 15:25

**inaccurate**
65:2

**Inaudible**
125:24

**include** 74:10
80:22,25 99:20
117:23 127:23

**included** 23:16
40:9 79:19,24
92:10 100:24
104:19 114:24
117:3,8,17
156:19

**including**
104:16 110:9
119:3

**Incomplete**
32:18 61:7,18
62:21

**inconsistent**
46:3

**incorrect**
121:5

**incorrectly**
104:18

**independent**
55:2,17 56:13
57:17,22 66:10
69:10 87:10
88:25 89:3,9
106:2 115:16
119:11 128:17,
23

**indication**
139:4 144:4
163:22

**individual**
125:17

**influence**
111:1 147:13

**information**

30:15,18 31:3
77:15,17 80:3,4
117:23 118:9
119:3 146:16,
21 153:18
158:4,13 159:2,
20,21 163:17,
25

**informed**
118:5

**initial** 65:25
98:23

**initially** 106:11

**initials** 98:25
107:6

**injured** 170:20

**injuries**
170:15,17

**innocent**
167:13

**inside** 91:17
92:9

**insist** 164:12

**insisted**
164:10

**instruct** 44:2
46:16 58:15,21
130:22 142:13
159:9

**instructing**
83:1

**intended**
142:24

**interacting**
122:10

**interaction**
161:5

**interactions**
139:23 148:3
160:9 172:1

**interfere** 81:19

**interjection**
18:11

**interrogate**
61:4

**interrogated**
57:25 60:21
139:13

**interrogation**
20:20 57:15,21
61:11 83:15,22
84:2

**interrupt** 16:15

**intersection**
163:1,3

**intervene**
139:25

**interview** 33:6,
9,13 34:17,22
145:23,25
147:3,4 151:17
158:2,25
159:13,14

**interviewed**
139:13 147:11

**interviewer**
161:4

**interviewing**
161:16 162:8

**interviews**
146:6,10
151:11

**intoxicated**
147:13 149:17

**introduce**
69:18 84:18,20,
25 85:6,11,17

**introduced**
84:16

**investigate**
146:21

**investigating**
44:18 45:21

**investigation**
34:9 44:19 45:1
46:2 49:6,10
53:21 54:19,23,
25 61:13,23
66:1 70:15 80:5
118:25 119:16
130:3,16 147:3
161:7

**investigations**
66:23

**investigator**
147:2

**invited** 63:6
65:17

**involved** 34:9
49:16,17 50:11
61:10,12,23
167:20

**involvement**
67:25

**involving**
21:20 23:20
139:8 169:19

**issue** 17:3 27:1
155:22

**J**

**Jakes** 6:7
15:17,21 16:17
23:15 26:11
48:11 55:5,10,
13 56:3,8,25
57:6,25 58:2
60:5,8,13,18
61:4 62:13 64:1
67:18 73:5,8,
16,18,21,24
78:22 79:3,4,7,
16 80:23 81:24
82:2 83:15,17,
22 84:15,17,21,
24 85:3,6,14,
19,21,22,23
86:3,12,14,18,
21,22 87:2,7,8,
14,17,22,24,25
88:7,8,16,17
89:4,10,16,19,
24 90:13,16,19,
22,23 91:4,7,
10,11,16 92:8,
11,19,20 93:2,
8,11,15 94:17
95:9 96:4,13,16
97:24 98:18
99:1,17,22
100:4,18,22
102:24 103:3



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

105:7,10,17
106:1,14,25
108:17 110:17
111:19,20
112:1,14 113:8,
12,13 114:3,5,
11,17,25 115:1,
8,25 116:1,19,
25 117:12,15,
19,21,24
118:18,19,20,
24 119:2,4,13,
19,22,24 120:9
121:14,17
123:14,19
125:18 126:19,
24 127:12,13
128:21,23,25
129:23,25
130:9,15
133:20 134:2,8
135:22,24
136:6 139:4,24,
25 140:11
141:12 144:3,5,
9,16,19,24
145:2,10,15,21
147:12 149:17
151:11,17
153:1 154:5,6,
8,11,15 155:9,
10,21 156:6,21
157:4,9,13,17,
24 158:3,25
159:3,14 160:9,
18,24 161:2,5,
14,16,21 162:3,
8,16 163:16,18,
21 164:10,14,
24 165:1,23
166:2 167:7,11,
18,19,24,25
168:19 170:11,
25 171:4,7,10,
14,19,21,25

**Jakes'** 57:15,
21 62:17 63:9
64:1 65:25
67:25 69:22
82:19 83:8
89:6,10 93:11
94:15,23
105:16 107:6
112:4 115:6
116:5 118:1,2,

6,7,9 121:20
129:20 137:9
147:18 151:16,
20,24 152:4
155:2 164:1
168:11 170:14,
22

**January** 13:19
**jive** 48:20,23
**job** 29:20 30:6,
9,22 101:9
128:16 146:20
147:1 172:21
**John** 52:9,10,
11 124:7,9
**Johnny** 7:3
**join** 9:23 21:6
34:25 35:21
36:11 37:15
40:6 45:8 51:11
54:21 61:8
80:8,16 87:19
90:7 91:14
93:21 94:13
**joined** 15:21
108:6,15
110:15
**joining** 7:2
**joins** 17:10
**judge** 23:18,19
65:12 83:12
93:24 115:20
**jump** 114:9
**June** 11:8
83:18
**jury** 23:17
115:22
**justify** 30:24
**juven** 37:23
**juvenile** 11:9,
11 20:9,16,17,
24 21:1,19
33:3,10,14,24
34:4,5,22 35:4,
10,15,16,17
37:21,24,25
38:6,14 39:7

40:25 41:3,18,
25 42:6,17
43:1,3 55:7,19
61:13,24 62:1
139:8,12
**juvenile's** 38:3
41:4,16,17
**juveniles**
20:18 28:4
34:11,14 37:19

---

### K

**keeping** 24:22
**Ken** 50:10,15,
17,23 51:8,13
**Kenneth** 6:8
**kid** 42:6 68:15
**kids** 137:13,22
**Kill** 49:12,15,
21,23,25 50:4
52:3,6,14,18
53:1 54:14,17
56:22 57:14,19,
24 61:4 62:11,
12,16 66:12,25
67:3 68:3
84:14,16,18,20,
24 85:2,5,11,17
86:20 87:16
114:16
**Kill's** 68:4
**kind** 20:9 34:16
67:2 74:11
93:14 95:18
113:25 147:19
155:14
**kinds** 20:13,15
**Kinnerk** 22:8
**knew** 31:19
46:4 55:17,19
63:9,17 67:25
74:2,10 76:2
97:2 99:4
100:12,13
101:4 133:11
**knowledge**
54:9 112:13

113:1,5 162:24
**Kort** 172:24
**Kortney** 6:3
7:9 15:17 27:11
172:20,23

---

### L

**lacking** 65:4
**lacks** 40:20
**lasted** 24:23,25
**late** 56:14
**law** 9:9,11,13,
16,19,25 14:24
16:11 21:5
33:11,12 38:2,
20 39:4,25 40:1
42:13 61:2
126:6 132:10
**lawyer** 96:11,
12 167:1
**lawyers** 64:19
114:1
**leading** 36:10,
12,20 37:2,11,
12,14 129:1
131:15 135:19
137:6 142:8
144:1 149:8
151:5,12,18,22
152:10,13,23
155:24 167:3
**learn** 29:19
44:18 49:5 56:3
**learned** 83:7
**leave** 11:7
14:7,15 15:5,7,
9 157:18
**leaving** 156:1
**led** 56:2,4,8
**left** 13:14
14:12,20,22
50:4,5 74:25
84:17 100:22
121:6
**legal** 16:1 24:3

**lets** 95:21
**letting** 155:8
156:3
**level** 149:6,9
**license** 16:11
**lift** 170:19
**light** 95:15
**lines** 97:1,4
135:6,24
151:14 152:20
**literally** 156:1
**litigation** 51:9
**lived** 90:19
109:4 110:2,10,
12 161:18
162:3
**lives** 161:22
**loaded** 100:14,
15 101:5
**locate** 27:10
62:13
**located** 12:9
150:10 163:18
**location** 6:13
99:20 100:19
**log** 15:18
**logistically**
124:15
**long** 10:20
11:11,16 12:1,
18 13:7 14:3,18
15:3 16:3 19:4,
11,19,25 20:6
22:3 24:20
44:6,11,12
52:13,17 54:11
55:9,13 72:19
82:8 112:14
123:16 125:7
**looked** 38:13
40:8 69:13
79:8,17 80:24
90:12 91:17
103:8 109:21
**lookout** 74:24
79:4 90:13,14



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-36 Filed: 11/04/22 Page 59 of 68 PageID #:9523
The Deposition of BRIAN GROSSMAN, taken on September 19, 2021
186

101:9 167:16,
20 168:13

**lot** 14:12 65:4
73:18,20,25
74:6,25 81:6
95:23 100:7
102:17,20
104:12,23,25
105:4 106:5,8,
12,17 107:9,12,
17,25 108:4,10

**loud** 81:11 97:4

**Loyola** 9:10,14

**lying** 145:21

---

**M**

**made** 18:23
19:1 20:3 21:11
62:17 64:15
95:21,24
101:20 103:21
108:9 112:5
141:8 145:16
157:15,16
162:9 164:7
166:15,16

**maintain** 16:11
150:2

**maintained**
26:2

**maintaining**
149:24 150:22

**make** 17:5,7
21:16 25:18
39:2 56:18 57:8
58:3 63:7 64:6
65:17 82:22
93:8 97:5
102:3,6,10
106:16,21
107:11,18
108:3,4 126:17,
24 128:16
135:9 139:16
140:17,24
143:13 145:18
146:19 147:4
151:23 154:22,
23 156:21
157:4,6,20

158:1 161:5
166:10,18
167:22 169:1

**makes** 45:24
107:21

**making** 65:15
141:12 165:15

**man** 102:18

**mark** 70:20
92:15,17 113:6
120:7

**marked** 70:23
73:7 92:23
113:10 120:11
173:5,6

**Mary** 22:8

**material**
155:15

**materials**
112:5

**math** 114:1

**matter** 6:7

**means** 77:5,7
80:12 172:25

**meant** 29:21
76:24 77:17,22
103:25

**medical** 8:21

**medication**
8:20

**meet** 37:19,23,
25 44:17 52:11

**meeting** 24:22,
24 25:2

**member** 10:3
77:9 166:6

**memo** 22:9,12,
19 23:3,7 46:18
115:13,15,16,
19 116:3,9,11,
13 117:3,10,17,
20 118:13,23
119:12

**memorandum**
118:16

**memorializati
on** 89:9

**memorialize**
30:7,10,13
72:20 123:16
136:20

**memorialized**
39:1 69:9 89:6
90:2

**memorializes**
23:3

**memorializing**
105:16 134:3

**memory** 48:20
90:9

**mental** 41:7
43:22,25 44:3
46:9,13 55:16
58:14,19 59:1,
7,9,17 60:2
78:1 82:24
127:6,9 130:21
142:11 147:17,
21 148:1
149:17 159:6

**mention** 103:3

**mentioned**
40:11 110:9
163:12

**met** 24:20,21,
23 25:3 37:20
48:11

**Mexican** 90:10
91:4,12 100:7
104:4,5,6,8,10,
11,13,14,22,24
106:4,11
108:23,24,25
109:11,18,22

**Michael** 68:3,4

**might've** 99:25
146:5

**Mike** 49:20,23,
25

**mind** 38:19,23
81:12 108:13
126:5 135:10
147:9 152:11

160:18,24
168:7

**mine** 73:5
88:22

**Mine's** 169:15

**minute** 16:16
109:23 120:10
123:4 139:9
169:3

**minutes** 24:23,
25 68:15,22
72:21,22 82:11
109:21 125:6
168:25

**Miranda** 86:4
131:19 132:4,
12,23 133:14
135:4,10,23
136:9 156:9

**Mischaracter**
88:18

**mischaracteri
ze** 62:23 63:5
71:9 95:2,6,7,
12

**mischaracteri
zes** 21:5 39:9,
23 40:19 42:13
43:6 45:7 58:8
62:21 64:8 66:8
70:24 71:10
76:7 88:13
112:9,18,21
115:3

**mischaracteri
zing** 63:12,23

**misconduct**
67:14 140:10

**mispronounce
d** 97:20

**missed** 107:8
155:4

**mistake** 108:2

**mister** 57:5

**mistreated**
142:20

**mom** 63:17

**moment** 27:18
36:17 173:3

**money** 15:15
74:19 75:5,15
90:12 100:8
109:17

**months** 11:17,
18 19:20,21
20:8 73:16 96:4
122:24 127:17
128:4

**morning** 22:18
23:21 25:10
26:8 28:24
47:5,14,17,19
48:2,7,22,25
94:21 112:15
113:15 123:14
128:22 130:9
139:6 157:13
160:10

**mother** 166:3

**motion** 23:17
51:5 59:23
115:22 124:1

**move** 12:21
21:13

**moving** 109:22

**mumbled**
104:9

**murder** 21:20,
22 22:9,12,20
23:3,5,7 32:1
35:15 40:25
41:19 42:18
53:12 56:9
60:16,21 61:5,
14 62:1,2,19
63:22 64:2
67:25 74:11
78:22 80:2 87:7
118:5 126:25
127:13 128:25
129:25 130:15
131:3 158:4,9,
13 159:3,16
160:11,14
161:1,6,19
162:4 167:13



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-02204 Document #: 266-36 Filed: 11/04/22 Page 60 of 68 PageID #:9524
The Deposition of BRIAN GROSSMAN, taken on September 09, 2021
187

171:8,11,15

murders 11:24
128:2

mute 53:17
56:15 81:15

Mylan 82:4,9,
16

_____

N

_____

narcotics
12:8,12,18,24

necessarily
113:20,21

needed 85:5
110:20 116:21
131:18

neglect 20:11

Neil 124:7,9

newbie 30:3

news 109:1

newspaper
103:10 163:11

nice 94:1

nickname
75:13,20,25

night 12:8,11,
18,24 25:10
29:3 47:14
48:13 86:2
100:12 128:22
156:7 157:12,
15 162:3

Niles 9:4

north 9:4 28:15
138:13

Northern 6:9

notation
138:19

note 140:17
143:13 154:22,
23 164:7

noted 114:18
115:9,13
138:24 140:13,

15

notes 155:19

notified 49:6
64:1

number 6:10
71:5 92:16 93:9
103:6 113:7
120:8 127:23
171:18

numbered
73:8

_____

O

_____

O'BRIAN 22:8

object 21:8
46:7 53:23
58:12 126:12
127:2 129:2
130:18 131:15,
21 133:24
134:20 135:19
137:6 140:1
142:7,9 143:3
144:1 146:24
148:14 149:1
151:25 154:1
159:5 160:20
161:9 162:19

objection
20:22 21:4,10
22:25 30:19
31:15,20 32:3,5
34:18,24,25
35:5,12,19
37:12 39:9,21
41:5,10 42:1,8
43:20,21 44:9
46:6,12 47:6
49:1,3 50:2,6,
19 51:1,6 52:7
53:15,24 54:21
55:11 56:11,16
57:16 58:6,7,23
60:23 61:17
62:3,4,15,20
63:7,24 64:8
65:17 66:2,8,
14,17 67:8,15
70:10,16,24
71:9 72:24 75:6
76:7,22 77:18,

23 78:17,24
79:10,21 81:2,
25 82:7,10,20,
21,22 83:16
84:3 85:1,7,18
86:23 88:10,18
89:25 91:13
92:5,12 93:4,
16,20 94:6,12
95:2,18,24
97:8,22 100:2
101:1 102:9,12
107:13,19
108:5,14 110:6,
8,14 112:9,17
113:18 114:7,
14,20 115:3,12
116:6 117:4
118:22 121:24
122:7 129:1
130:11,20
149:8 152:13,
23 155:24
158:19 167:3

objections
21:8,17 31:11
32:24 56:19
64:21 65:16
70:18 83:9
88:20 95:20
97:14 113:3

observation
57:9 97:11

observe 30:1

obtain 25:18,
21

obtained 39:20
149:6

obtaining 39:6

occasion
34:20

occasions
45:10

occurred
74:11 117:16
119:15,17
140:14 143:17

offense 33:4,
25

offenses
127:25

offered 145:13,
14

office 9:18,21,
24 10:4,7,8,10,
12,16,19,21
11:1 14:12,16,
20,22 16:7,9
26:3,13 29:19
67:11 125:24
131:10 136:15
150:1,11,13,14,
22 151:2

officer 6:19
20:25 33:5,9,
14,18,23 34:7,
9,12,15,21
35:2,9,17
37:21,24 38:1,7
39:5,15 40:13,
23 56:25 57:20
58:1,5 60:9,10,
14,20 61:6,15,
25 67:13 84:7,8
86:5,8,11 98:24
114:10 139:22,
25 140:10,11
157:1

officer's 34:4
68:8 115:5

officers 114:25
115:8 116:2
118:19 119:4
125:18 161:12
165:1,3 171:20,
22 172:1

older 93:18
94:10,14

Oliver's
102:16

on-the-job
29:13,22

open-ended
69:1,2,3 151:5,
12,13,18 152:6,
17,19 153:24
154:4

opened 116:12

openly 147:23

opportunity
25:6,13 30:1
36:4 121:15,17
123:22 156:13
157:20

opposed 10:7
151:18 155:8
162:12

option 130:8
157:8,18,21,24

oral 39:20
40:17 134:1
145:23 146:10
157:17 158:2,
12,24 159:13,
25 160:7

order 88:2,24
100:23 146:9
149:13

outlying 28:8

outward
144:19,23,25
170:18

override
166:18

overturned
82:19 83:8
122:21

_____

P

_____

P-454289 71:3

p.m. 6:5 29:7
47:24 51:21
73:17,23 74:2,
3,11,12 98:1,2
99:2,5 111:21
112:1 113:9,11
171:23 172:1
173:7

packet 165:8

pages 45:5

paper 105:8

paperwork
164:8 165:14

paragraph



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-36 Filed: 11/04/22 Page 61 of 68 PageID #:9525
The Deposition of BRIAN GROSSMAN, taken on September 17, 2021

188

95:8 96:25
97:4,13 102:23
103:1,2 104:15
109:6,23 111:2

**parameter**
58:17

**Pardon** 93:13

**parent** 20:19,
24 33:5,8,14,
17,23 34:8
35:8,17 37:21,
24 38:7 39:5,15
40:12,23 57:20
58:1,4 60:9,14,
19 61:5,15,25
62:13,18 64:1
121:18 139:11,
16

**parked** 104:10,
12,23,24 106:5,
12,17 107:1,4

**parking** 73:18,
20,25 74:6,25
102:17,20
104:12,23,25
105:4 106:5,8,
12,17 107:9,12,
16,17,25 108:3,
10

**part** 28:10 30:6,
9,22 31:7 36:6
71:20 97:1
104:16,19
159:13

**participate**
168:18,20

**parties** 7:12

**parts** 97:19
107:15

**passenger**
108:23

**paused** 47:8

**peers** 29:19,
23,24,25 30:1

**pen** 105:8

**pending** 6:8
8:18

**penmanship**
156:7

**people** 17:5
31:18 32:8,12
155:17 168:13

**perfect** 173:2

**period** 139:9

**permissible**
61:3

**person** 30:24
31:25 32:16
43:14 44:6
55:25 67:11,12
75:13,15 76:1
87:12,13
132:15,16,18,
22 133:3,4,11,
13,17 134:17,
25 135:4,5,20
140:19 144:11
147:4 150:16,
17

**personal**
65:15,18
162:24

**personally**
126:23 147:19
163:3

**perspective**
147:20

**pertains**
126:10

**phone** 49:7
73:20 127:24
128:1 139:16
166:10,19

**phones** 102:2

**phonetic** 23:14
72:2

**photograph**
31:23 32:14,21
80:10,11 93:8
170:10

**photographs**
23:22 31:17
32:8,12 92:17
169:24 170:2,6

**photos** 45:13,
14,18,22 53:9,
13,21 54:5,9
92:21 93:1

**phrase** 107:17
108:3 129:3

**phrased** 43:11
136:23 142:10

**physical**
140:22 144:21,
23 156:2

**physically**
141:6,21
144:20

**pick** 29:10

**picked** 68:16

**picture** 170:9

**pizza** 114:12
117:1

**place** 25:10
26:17,20,21
34:8 90:11
152:8

**plaintiff** 6:16

**plaintiff's** 6:14

**planted** 165:9,
13

**pleadings**
24:1,3

**pockets** 165:7

**point** 18:5 22:7
27:2 59:15
63:14 64:22
74:22 81:18
122:9 129:22
130:17 132:24
139:23 147:9
149:6 158:3,13,
25 159:2,4,15,
22,24 160:9,13
161:4 167:12,
19 172:12

**pointed** 92:8
104:6 108:24

**police** 37:9,19
40:18,24 41:3
44:14,17 45:1,

5,22 48:19
52:24 53:8,12
54:12 55:10,14,
15,21,23 56:9
60:15,22 61:24
67:6,12,13 68:8
69:22 70:4,8,15
78:5,11,14,16
83:23 84:4,8,9,
15 85:25 86:15
96:12 101:9,11
103:9 104:1
110:18,22
111:8,10,12,15,
21,25 113:7,14
114:6,18,25
115:2,5,8,11
116:2,20,21,25
117:23 118:5,
19 119:4 121:6
124:19 125:18,
24 129:22
130:16 131:20
132:5 133:5,9,
10 134:24
139:22 140:10
141:6,21 142:1,
20,24 143:6,18
144:5,17
145:11,18
147:2 150:21
151:1 153:9,10
154:17 157:22
161:7,12 164:1,
15 165:1,3,6,7,
12,24,25
166:17,18
167:7 168:2,3
171:20,22
172:1

**pop** 145:15

**portion** 105:2,
3 108:21
145:24 170:19

**portions**
170:14

**Portis** 6:24,25
7:17 15:12
17:22 18:2,8,9
24:17 26:25
27:10,16 41:5
43:20 44:1
46:7,15 57:2,8
58:12,20,24

59:6,15 60:1,4
81:13 82:21
127:1 129:2,12,
16 130:20
137:22 142:9
158:15,19,22
159:5 172:11,
14,25

**Portis'** 158:8

**posed** 8:14

**position** 65:8
136:20 167:14

**positions**
10:24 13:10
64:15

**positive** 14:6

**post-
conviction**
51:9

**potentially**
145:21 161:14

**practice** 68:7,9
134:12 146:5
152:18 155:7

**precede**
146:11

**preference**
33:22

**preferred**
29:12 158:8

**preliminary**
11:20 141:5

**prelims** 11:21
12:2,7

**preparation**
24:13

**prepare** 23:9
25:12 123:25

**presence**
17:12 34:15
35:3 37:9
60:19,20 68:5,8
139:23 140:11

**present** 20:20,
25 32:23 33:5,
9,18 34:4,12
35:9,18 37:22



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-36 Filed: 11/04/22 Page 62 of 68 PageID #:9526
The Deposition of BRIAN GROSSMAN, taken on September 02, 2021

189

38:8 39:5,16
40:13,24 57:20
58:2 60:9,14
68:2 84:8,11,14
86:5 110:21
111:10

**pressuring**
135:16

**pretty** 81:11

**prevented**
46:24 119:3

**preventing**
118:12,15

**previous**
91:22 111:22

**previously**
24:24

**pri** 49:17

**pride** 155:14

**prior** 23:16
49:16,17,20
50:14,15 74:14
87:21 163:10,
14

**privilege** 59:5,
6 130:22

**privileged**
159:9

**probable**
126:3,9,14

**problem**
64:17,18,19
65:11,13 68:19
82:18 167:17

**proceed** 33:13
165:21,22
166:23

**proceeded**
86:2

**PROCEEDING
S** 6:1

**proceeds**
90:20

**process** 41:23
55:16 59:7,14,
24 105:6,18

**proficient** 97:7

**progression**
10:24

**promised** 78:6
110:24

**promises**
145:17,18

**proper** 63:14
95:18

**property** 14:24

**proponent** 7:1

**prosecute**
21:20 59:3

**prosecuted**
169:18,19

**prosecution**
124:3,6 142:6

**prosecutor**
59:11 82:15

**protected** 60:2

**protocol** 146:7

**prove** 128:13

**provide** 52:23
53:2,4,6,9
75:13

**provided** 36:8
40:18 42:18
43:1,3,14,19
44:7,14 78:10,
14 118:8
129:22 154:16
169:25 170:12

**providing**
30:17 80:4

**prudent** 17:5

**public** 9:20
10:7

**pulled** 73:20

**punch** 56:15

**purpose**
118:12

**put** 71:3 95:13
105:7 138:14
157:19 164:11

165:24

**putting** 164:12

**puzzled** 23:6

---

**Q**

**Queen** 73:18
74:6

**Queen's** 97:25
99:15,18,21
103:10 104:4,
12,25 106:5,9,
13,18 107:2

**question** 8:9,
10,14,17 15:12
17:25 20:19
26:9,23 30:21
31:6,7 34:11
35:16 36:14,22
37:9 39:14 40:4
41:7,10,12,13
43:22 44:3
46:10 47:7
56:15 58:16,25
60:12 61:20
64:3 65:22 69:3
70:14 71:16
72:7 78:25
79:13 80:9
82:23 83:25
87:1 88:1 91:21
94:3 95:16
101:2 107:23
114:23 115:24
116:7 118:11
119:9 124:2
126:4,13 127:2
129:17 130:19,
23 131:1,4,22
133:25 134:21,
22 135:5,8,24
140:2 141:2
142:8 143:4,11
146:25 148:13,
15,17 149:2
151:22 152:1,
14,16,17,24
154:2,19 155:5
158:16 160:6,
21 161:2,10,20
162:20 164:9,
23 167:18
169:2 171:14

**questioned**
21:1 33:24
34:5,14 35:4
40:24 41:3
60:15,19 61:13,
24 62:19 64:2

**questioning**
33:3 35:4,10
38:8,9,18 39:7
41:18 58:3
107:5 125:2
154:21

**questions** 8:8,
13 17:19 37:14
63:13 65:4
69:1,2 86:1
96:2 105:20,21
123:6 124:25
125:7,8 133:17
135:1 144:11
145:6,9 148:7,
10,20,21,22
151:3,5,6,8,9,
12,18,19 152:6,
10,19 153:24
154:4,5 169:10
171:18,21
172:5,15

**quick** 144:22

**quickly** 125:22

---

**R**

**Racine** 101:13
102:15 103:7

**Rafael** 117:16
118:6 119:14,
16

**raise** 7:20
21:13

**ran** 90:20
102:15 104:10,
11,22,24 106:4,
12 107:1
109:14,15
163:22

**re-ask** 8:9

**read** 36:16
73:21 75:1,18
76:15 78:7

96:14 97:1,2,3,
5,15 98:12
100:16 102:20
104:2,10,15,18
105:1 108:21
109:6,23 111:2
115:15 120:15
131:19 132:4,
23 133:14,16
135:23 149:13
155:16,17
158:16 167:8

**reader** 99:21

**reading** 96:21,
22,24 97:7
104:22 135:4

**reads** 36:18
92:3 96:18
100:6 103:25
110:17

**real** 56:19
144:22 163:13

**rear** 110:2,10,
12

**reason** 80:21
95:1,13 127:22
143:23 155:10,
13,14 159:19
160:16 171:25

**reasons**
106:23 127:3

**recall** 12:3
20:21 22:6
26:16 31:21
34:1 35:22
37:20 38:2,20
39:12 41:1,23
42:16 47:3
48:18 49:9,22,
24 50:7,9,16,22
51:2 52:16,19,
20 53:5,10
55:8,12 56:5
57:1,13 60:17
62:5,9,14 65:23
66:3,4 67:4,9
68:6,11 69:13,
15 74:4,7,9
77:1,4,13,19
78:2,12 79:11
82:1 84:12
86:10,13,19



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-36 Filed: 11/04/22 Page 63 of 68 PageID #:9527
The Deposition of BRIAN GROSSMAN, taken on September 03, 2021
190

87:23 89:16,19,
22,23,24 91:15
92:6,20 93:17
96:5 97:23
99:7,10,13,16,
19,24 100:3,5,
21 101:6
107:10 111:24
112:3 114:15
120:3,6 122:12
123:15,18,24
124:14,18,21,
24 135:2 136:7
138:12 139:10,
14,20 142:21
146:3,13 148:2,
19 149:9,11,23
153:7,8,11
156:18 160:17,
22,23 161:12,
15 162:5,9
167:19 170:2,3,
24 171:6,17,24
172:3

**recalling**
90:21,22

**receive** 29:16,
21 47:25
142:17

**received** 22:20
29:13 48:21,24
51:20

**receiving** 48:6
51:18

**recognize**
109:5 115:17
120:9

**recognized**
100:10

**recollection**
38:12 52:8
55:2,18 56:13
57:17,23 66:10
69:10 87:10
88:25 89:3,9
106:2 115:16
119:11 131:3
136:14,16
139:21 140:8
141:4,8,11
146:7 154:7
156:12 164:14

**recommend**
82:24

**record** 6:2 7:8
8:4 15:20 16:18
17:6 18:4
27:17,19,20,21
40:14 46:19,20,
21 68:22,23,24
95:25 123:9,10,
11 125:10,11,
12 129:6,13
137:20 169:6,7,
8 173:3

**recorded**
146:16

**recording**
72:13

**recordings**
23:24

**REDIRECT**
169:16

**refer** 23:14
35:24 52:22
75:19 77:8

**referred** 23:13
75:16 76:19
77:3 86:3 91:7

**referring**
22:12,13 99:22

**reflect** 15:20

**reflected**
119:5

**refuse** 67:5

**refused** 138:3,
17

**refusing** 17:6

**regard** 25:3,5

**rejoined** 60:6

**related** 11:25
15:15 59:2

**relates** 144:15

**relative** 156:3

**reliable** 31:10

**relloct** 88:25

**relying** 31:3

**remain** 13:7
14:18 15:3

**remained** 11:6

**remember**
12:19 13:5
19:12 23:1,2
26:19,24 28:25
31:16 34:19
35:1,6,13 38:15
39:24,25 40:3,
7,9,21 47:20
48:4,8,9 51:7,
15 54:7,11 55:7
56:6 57:12 61:9
65:22 67:1,2,19
69:8,23 70:19
75:8 85:13
86:24 87:3,20
88:3,5,6,15,16
89:11,13 90:25
91:1 94:8,10,14
101:25 115:19,
21 116:8
118:14 124:3
126:7 130:5
131:23 136:23
137:9 151:6,10
152:17 156:22
170:8 171:13

**remind** 105:5
125:15 145:8

**remotely** 6:17,
20,23,25 7:3

**repeat** 36:14
41:13 61:19
129:17 143:4
148:17

**repeatedly**
64:17

**repeating**
154:15

**rephrase** 8:9
70:13 158:18,
20 167:18

**replaced** 22:8

**report** 45:11
67:10 111:25
112:4,6 113:7
146:11

**reported** 39:6,
17 40:16
105:11 146:17,
23 157:9,15
170:9

**reporter** 6:2,4
7:6,11,16,19,25
15:19 27:18,21
36:17,18 38:24
46:21 57:5,7
68:24 91:22
92:1,3 116:17
123:9,11
125:10,12
157:22,23
158:16 169:6,8
170:3,9 173:2

**reporters**
170:5

**reports** 44:15
45:1,3,5,22
53:8 55:21,23
133:10

**represent**
27:23

**representation**
46:15 58:20

**representing**
82:25

**represents**
125:17

**request** 17:10
101:22 166:15,
16

**requested**
36:18 92:3
101:20 136:17

**requests**
156:22

**require** 43:25
46:8,13 58:13,
18

**required** 21:5

**requires** 43:22

**reread** 91:21

**residence**
162:11

**resolve** 18:4

**resort** 65:14

**respect** 18:3
140:24

**respectful**
18:10

**responded**
48:16 136:9

**responding**
148:12 160:6

**response**
43:21 141:24
144:11 145:6
153:24

**responses**
154:5

**responsibilitie
s** 126:10,15
128:21 129:19

**responsibility**
139:10,15,19

**responsible**
149:24 150:22
172:23

**responsive**
148:10,21
149:3

**rest** 26:21
92:22 102:6

**result** 160:25
161:6

**retired** 50:1

**return** 78:6
110:24

**returned**
100:23

**reversed**
122:14

**review** 11:15,
16,19 13:12,14
18:16,19 19:6,
11,19,22,25
20:3,6 21:24
22:13,14,17,21,
24 23:9,22,24
24:1,3,8,10



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-02204 Document #: 266-36 Filed: 11/04/22 Page 64 of 68 PageID #:9528
The Deposition of BRIAN GROSSMAN, taken on September 14, 2021
191

25:6,7,12,14,
17,19,22 26:5,
13,15,18,22
28:2,6 29:14,
16,17,18,22
30:6,9,22 31:23
32:14 33:2,21
34:20 35:8 36:7
37:18 44:23
45:5,21,22
46:18,23 49:8,
18 50:5,18,25
53:22 54:5 59:4
61:3,12,23
111:19,25
115:20 118:17
120:4 122:25
126:11 127:16
128:5,13,22
134:8,9 136:21
137:3 138:8,14,
18,24 140:15,
23 141:5 143:8,
15 146:6,20
150:6,11
157:20 158:1
159:8 163:15
169:20,23
172:18,22

**reviewed**
23:11,14,15,19
53:13,22 112:5
127:11,18
128:6

**reviewing**
115:19,21

**reviews**
149:25

**rewritten**
101:17

**rights** 96:9,10
131:19 132:5,
12,23 133:14,
16 135:5,23
167:8

**rob** 74:21
102:18

**robbery** 74:24
79:5 100:20
168:20

**robbing** 90:13

**Robinson**
52:21 67:17,23
68:25 69:6,11,
13,19 70:7,11,
14,22 71:6
72:10,16 73:14
75:9 77:21
78:4,10,13,18,
21 79:3,7,16
80:13 82:3
85:12 91:16,19
92:9 121:2
129:23 151:10,
14 153:3 168:9,
10,20

**Robinson's**
68:12 72:14,20
80:22

**role** 34:4,16

**roles** 66:22

**room** 27:4,11
68:20 84:17
86:18 133:21
134:24 135:3
144:2 161:13

**rooms** 17:14

**Rule** 56:18

**rules** 125:21

**run** 100:19
109:12,13
130:3

**running**
163:18

**Russel** 26:25
96:2

**Russell** 6:15
16:13 17:2,17
21:11 27:12
42:11 57:2
64:24 65:5
169:12

**Russell's**
125:8

———

**S**

**Sanders** 22:4

**save** 95:23

**scared** 109:15,
20

**scenario**
132:14

**scene** 32:22,23
45:13,14,17,22
46:4 53:9,13,21
54:5 92:21 93:1
163:2

**school** 9:1,3,9,
11,14,16,19
96:18 137:23
149:10,14

**scope** 46:10

**scoping** 74:19
75:5,15

**screen** 109:10

**searched**
165:7

**section** 156:23

**send** 68:17

**sense** 45:24
97:15 106:17,
21 107:12,18,
21 108:3,4

**sentence**
91:25 104:22
105:1 106:20
118:3

**separately**
37:19

**September** 6:5
9:25 14:21,22
22:7,18 47:4
48:22 73:17
77:7,12 83:21
97:24 113:9
116:13 117:16
118:3 119:15,
17 120:15,21
121:4,7

**set** 92:17
162:12

**sex** 11:25

**share** 109:19

**sheet** 120:10

**shells** 100:13

**shift** 28:14,23
29:3,6 30:4
47:11,14
138:16 168:9

**shifts** 28:17

**shoot** 31:25
32:16

**shooter** 167:16

**shooting**
108:25 117:15
119:14,16
167:21

**shop** 73:19
74:6,18,21
76:14 79:8,9,
17,18 90:11
91:17 92:10
98:1 99:15,18,
21 100:7
103:11 104:5,
13,25 106:6,9,
13,18 107:2
109:3,4,5,22
163:6

**short** 27:3
72:21,22,25
169:15

**shot** 90:18

**shots** 90:19
109:11,13

**show** 31:17,23
32:8,13,14,20
68:12 92:15,18
93:7 113:6
116:11 120:7

**showed** 78:22
79:9 91:19
100:9 147:9

**shown** 80:11,
23 137:8

**sic** 101:16
150:23

**sick** 68:15

**side** 8:12
14:14,19 20:12
28:15,16
103:10 138:13

**signature**
115:17,18
116:14 119:12
156:9 172:9,16,
21 173:1

**signatures**
73:12

**signed** 23:15
138:7 156:8,25
157:2

**signs** 147:12

**silent** 105:18

**simple** 56:20

**simply** 115:25

**single** 152:16
154:3

**sir** 8:4,7,11,24
9:15,22 10:17
11:10 12:13
13:3,25 14:2
15:8 22:22
23:1,25 24:12,
15 29:9,15
40:13 42:15
65:22 72:18
73:11,13 75:3,
18 76:16 78:9
96:15,20 98:14
100:17 101:15,
19 102:22
104:3 105:9,14
109:7,25 111:3,
6 112:20,25
113:11 115:24
116:11 117:3
125:3,20 126:1
128:15 139:17
140:3 142:15,
16,21 158:6,10
159:11,18
160:12,15
163:20 169:14
170:13,21

**sit** 65:6

**sitting** 105:17

**situation**
136:11 142:18,
22 143:1,8
154:14



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-36 Filed: 11/04/22 Page 65 of 68 PageID #:9529
The Deposition of BRIAN GROSSMAN, taken on September 15, 2021

192

**situations** 32:12

**size** 93:11

**skin** 69:15 170:22

**slammed** 164:16

**sleep** 41:25 123:23

**sleeping** 47:12,15

**slept** 42:6

**small** 15:14 165:8 172:19

**smiling** 122:8

**Snake** 23:13 52:22 73:15 102:16,17,19, 20,24 153:6,9, 13 154:6

**So-** 16:21

**socialize** 52:5

**soda** 114:12 145:15

**solemnly** 7:20

**solidifies** 135:10

**somebody's** 77:8,9,10

**sorts** 117:2

**sound** 49:2,4 120:19,23

**sounding** 97:12

**sounds** 155:21

**source** 161:17 162:3 168:6

**sources** 133:12

**south** 28:16

**speak** 24:16 52:13,17 60:8, 13 68:4,7 84:24 86:21 124:22

131:20 132:5 133:2,13 134:16,18 135:6,14,25 136:12,17,22 138:25 144:5, 17 147:22 153:1,3,5 166:25

**speaking** 21:8, 10 26:11 33:1 45:16 53:18 54:1 55:24 56:19 63:7 64:21 65:16 79:24 80:19 87:21 111:18 112:12 114:22 127:11 134:1 140:7 142:24 143:21 145:3 149:18 161:13 166:3,7 167:1

**special** 82:15

**specific** 41:7, 10 42:22 56:13 58:14 59:9,17 82:23 83:24 127:3 128:2 130:2 138:9 142:11 144:18 147:6 149:11 157:6 159:7

**specifically** 28:12 48:4,8 56:17 67:19 88:3,4,5,24 93:17 129:3,10 140:5 145:17 147:16

**specifics** 59:1

**speculate** 78:20

**speculating** 122:23

**speculation** 35:20 39:22 40:20 53:15 58:11 60:23 73:1 78:17 79:22 80:7,15 81:3 93:22 94:7

97:8 101:1 110:7 113:18 114:8,20 116:6 117:6 119:8 121:25

**spell** 8:3

**spelled** 103:14

**spend** 11:11, 16 12:2

**split** 90:20 109:17

**spoke** 45:23 51:13 52:21 60:10 67:23 68:2,25 87:2,7 93:1,12,15 96:5 112:15 119:22, 24 121:21 133:6 135:3,22 139:5 165:25

**spoken** 132:12 153:6

**spots** 107:16

**spring** 11:14

**stamp** 73:4 98:4

**stand** 74:22 103:10 109:1,3 163:11

**standing** 37:12 97:25 98:2,8,9 99:5 104:8

**stands** 127:2

**start** 12:16 29:6 72:10,13 92:20 97:18 145:23 167:14

**started** 47:23 66:6 70:21 71:6,13 94:17, 20 104:13 105:12 108:25 109:12,13 121:2 132:16 133:21 134:2 145:24

**starting** 6:13 28:22,23

**starts** 92:19 132:15 159:1

**state** 6:12 7:7 8:3 10:19 22:14 39:14 78:1

**state's** 6:24 9:23 10:1,4,6, 12,16,21,25 11:5 13:8 14:16 22:23 23:5 26:3 67:11 69:20 78:5 85:24 96:11 110:19 126:11,16 131:10 136:15 142:18 150:1, 14 151:2

**stated** 15:9,10 73:14,16 78:4 95:9 96:16 97:24 149:4

**statement** 23:11,12,15 36:1 38:4,6,10, 18,22,23 39:7, 17,18,20 41:4 43:17,19 44:7 46:25 67:5 68:13 69:9 70:25 72:14,15, 17,20,25 77:16, 20 78:3,6,15 79:20,25 80:22 81:1 89:6,10, 18,20 90:2,4,22 91:3 92:11 94:16,20 96:13, 16 98:17 100:25 101:7 103:25 105:6, 11,12,16 106:23 107:14 108:8,11,22 110:24 114:19 115:1,5,6,9 117:9,11,15,18, 20 118:1,2,6,7, 9,18,24 119:2, 6,13 121:2,15 123:13,17 133:3 134:3,7 135:9 138:5,17, 18,21 139:4 140:20,25

141:20 142:1,4, 5,25 143:7,19, 20 145:22 146:15,16,19, 23 149:20,22 151:20,21,23, 24 152:4,5 153:12,14,15, 18,23 154:12, 13,16,24 155:2, 6 156:14,20,24 157:10,17,25 158:12 159:1 160:1,7,25 161:21 162:9 163:16 164:1, 11,12,13 165:22 166:23 167:22 168:10, 12 170:1,9,12

**statements** 28:3 30:7,10,14 36:8,24,25 37:4,8 38:21 40:15,16,18 43:14 138:15 146:12 155:8 156:19 169:20

**states** 6:9 9:17 10:10 95:9 110:18,21,23

**static** 81:6

**stating** 96:9,10

**station** 44:17 48:19 55:14 70:9 78:11,15 111:8,16,21 113:14 114:6, 18 115:2 121:7 153:9 157:22 165:7,25 168:3

**stature** 93:14

**stay** 49:25 173:4

**steps** 54:24 145:20,25 146:8,14

**Steve** 22:3,4

**stick** 100:8 109:18 139:9



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-36 Filed: 11/04/22 Page 66 of 68 PageID #:9530
The Deposition of BRIAN GROSSMAN, taken on September 16, 2021
193

**stick-up** 104:7

**sticking** 100:9

**stint** 28:21

**stood** 103:7,9

**stop** 17:7 27:12 35:4 64:23 95:23 96:1 97:18 154:20

**stopping** 64:14

**store** 163:9

**story** 63:17 65:25

**street** 11:23 48:18 90:19 98:1 99:18 104:13 105:1 106:13,18 107:2,9,12,17 108:4 109:16, 21 110:3,13 161:22 162:10, 11,13,17 163:1, 6,19,23

**streets** 106:6 110:4

**strike** 30:16 35:24 44:5 61:11 111:19 113:13 135:21 162:7 167:25 168:10

**stuff** 68:17 145:24

**subject** 91:25

**submarine** 73:19 74:6 97:25 99:15,18, 21 103:11 104:5,12,25 106:5,9,13,18 107:2 163:6

**subset** 20:14

**substance** 86:25 124:16

**suburbs** 28:8

**sued** 125:18

**suffering** 147:21

**sufficient** 30:23 126:19 127:12

**suggest** 69:4 164:1

**suggested** 98:15 103:23 110:1

**suggesting** 148:23

**summarize** 106:24

**summarizing** 105:12,15

**summary** 96:13

**supervisor** 19:2 20:4,7 21:25 22:3,10 67:10 118:16 130:4 140:7,9 141:3,18,24 143:12,22 154:21 165:20 166:22 167:5

**supervisors** 22:1,6

**supposed** 128:8 150:2

**suppress** 23:17 51:5 115:22 124:1

**sur** 69:21

**surrounding** 23:4 116:4

**suspect** 30:14 31:24 32:15 33:4,25 34:23 46:25 54:15 55:4 62:1 67:6, 20 118:5 131:6, 11,12,13 132:18,23 133:4,12 134:16 135:4

136:12,20 140:24 141:5,9 142:19,24 143:5,18,20 146:5,10,15,21 147:7 155:9 156:13,17 169:24

**suspected** 34:6 35:10,15 40:25 41:19 132:7 149:16

**suspects** 30:7 37:9 44:16 45:23 46:2 139:8 156:19

**swear** 7:21

**sworn** 10:1 11:4 131:25

_____

**T**

_____

**taking** 8:18 23:4 39:16 65:9 133:3 155:19

**talk** 8:25 24:13 44:16 50:23 54:14,17 58:18 62:11 64:5 67:17,20 82:2, 4,8 83:19 85:3 86:18 87:13 124:9,16,19 128:22 134:19 135:1,16 136:13 138:19 139:5,6 172:8, 16

**talked** 38:3,20 44:20 52:3 60:18 81:23,24 111:4 134:4 154:25 155:1 157:5

**talking** 23:8 26:10 31:19,24 37:13 38:10 40:10 42:20 44:10 54:7,10 55:14,16,25 56:22 66:20

70:21 72:10 75:12,24 82:2 86:12 94:17 110:11 120:16 132:1,2 133:21 144:18 153:9 159:25 169:21

**tall** 93:14

**tangentially** 27:1

**taught** 121:1

**tax** 14:24 16:2

**team** 22:5

**technician** 6:3

**telling** 46:3 64:13 75:25 76:12 80:13 89:16 106:25 117:24 129:24 136:7 142:1 146:1,10 147:7 152:12 158:11 160:18 161:8, 18 162:16 164:15 171:5, 11,16

**tells** 136:12

**ten** 24:25 72:21,22 119:10

**ten-minute** 25:2

**term** 23:2 158:8

**terms** 41:15 59:18 89:14,17 129:6,7 142:11

**test** 96:21,22, 24 146:9

**testified** 50:7, 20 115:20,22 126:18 145:7 153:2

**testify** 8:22 71:25 72:7 123:25

**testifying**

124:15 134:6

**testimony** 7:21 23:16,17, 18,19 36:19 39:10,23 40:19 43:6 45:7 59:25 63:8,25 74:15 76:8 88:13 92:4 115:4 124:17 153:18

**texting** 27:5

**that'd** 27:15

**that'll** 130:20

**there'd** 115:25

**there'll** 107:12

**thing** 25:15,16 37:7 92:18 102:10 163:12, 13 171:12

**things** 30:5 46:3 54:9 59:18 64:7,22 66:21 97:20 117:2,17 153:23 161:7

**thinking** 90:12 101:24 132:13

**third-party** 7:1

**thirsty** 110:21 111:5,9 116:23 145:14,16

**tho** 76:23

**thought** 14:17 22:5 41:23 47:6 98:18 104:21 106:8,14 107:3 147:20 154:15 160:3

**thoughts** 125:5

**threat** 65:3

**threatened** 78:7 110:25

**threats** 145:17, 18

**Throop** 76:12



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-36 Filed: 11/04/22 Page 67 of 68 PageID #:9531
The Deposition of BRIAN GROSSMAN, taken on September 17, 2021
194

throw 42:9
65:3,7

Tilden 96:18
149:10

time 6:5 8:16
12:22 13:10,11,
13 14:9,10,11
18:10,25 19:7,
8,13,16,24
20:2,23 21:24,
25 22:10 24:22
25:3,9 27:4
28:3,7,23 29:1
48:1,14 49:23
50:5,18,24
51:4,8,13,17
54:3 56:5 65:20
67:3 71:12,21
72:9,13 75:23
78:1 81:23
86:5,12 95:23
99:9,12 101:24
110:21 111:10
112:6 122:10
125:1,2 128:12
132:22 134:6
139:9 145:14
157:9,24
160:17,24
161:18 162:23
163:4 169:11
170:11 171:13

times 16:10
18:17,18,19,20,
21 34:14 38:14
65:4 66:20
77:24 90:18
100:15 119:10
163:17

title 117:11
118:23 119:1,
13

today 6:4 7:2
8:23 40:11,14
81:4 91:2
125:23 134:4
137:8,10 151:4
153:2,18
163:17

Today's 6:4

told 19:23 20:1,
2 35:3 38:25

49:10 57:24
70:3 74:17
76:3,4 78:13
79:3,16 80:22
82:17 85:4,25
86:14,21,24
87:1,2,3,6,7,16,
17,24,25 88:4,
5,7,8,9,17 89:1,
4,10,13,24
91:4,7 92:8
98:19 99:22
100:22 101:7,
11 102:13
103:11 105:23,
25 106:3,15
107:3,4 108:17
110:22 111:10,
12,14 114:17
116:19,22
130:16 133:9
137:12 144:11
145:11,15
149:5,10 153:8
157:17 160:3,4
161:25 165:12
170:25 171:7,
19

tone 65:8
170:22

top 71:2 96:7
117:10 120:13,
16

total 13:10
18:20 127:18

totally 64:11

touch 49:25

trace 10:23

train 29:25

training 29:13,
16,22 142:17

transcript
46:18 172:22

transcripts
24:10

treated 68:9
70:7,15 78:4,16
84:4,9,15
110:18 144:12
145:10

trial 10:5,8
23:17 26:2
115:23 130:4
140:7,9 141:3,
18,24 143:12,
22 154:21
165:19 166:21
167:5 169:22

trick 126:3

trouble 97:12,
16

true 44:22 46:4

trust 172:20,24

truth 7:22,23
83:13

truthful 30:17
31:10

truthfully 8:22

truthfulness
146:9

turn 26:20 29:3

turned 22:18
26:7,12,18,21
96:4 109:12,13

type 120:25
121:11 145:1
146:7 147:14,
21 148:1

types 53:6
144:13 145:8
151:9

typically 69:24
70:1 133:8,9

_____

U

Uh-huh 138:11

unable 90:24

understand
8:7,10 18:9
30:21 31:6,8
36:22 65:14
75:18 77:2,11,
22 78:25 80:9
83:6,24 84:22
88:1 116:7
124:2 131:5

134:22 149:13
161:20 168:15

understanding
20:23 33:12
34:3,7 35:7,14,
25 39:3 45:19
61:2 77:16
131:18 132:3
148:24 153:22
162:6,15 163:9
168:12,19

understands
96:19

understood
8:13,15,19
77:25 96:9,10
101:8 153:21
160:24

unit 11:6,15,20
29:19 118:17

United 6:9

University 9:6,
10

unnecessary
65:9

unpack 144:22

unprofessiona
l 65:10

unrebutted
63:25

untrue 146:2

unusual 148:5

unwelcome
65:1

up,' 100:8

update 27:1

Urbana 9:6

_____

V

V-I-H-O-N 15:2

vacated 59:13

verbatim
96:14

verify 146:15

versus 6:8
155:10 156:1
157:14

victim 31:18
32:1,16,21,23
78:22 79:9,18
80:1,2,10,11,
12,23,24 90:17
91:8,18,19 92:9
102:25 103:3
108:18 110:4

victim's 90:17

video 6:3,6
23:24

view 63:14

viewing
102:24

Vihon 15:1

violent 118:4

voluntarily
36:9 37:8 139:5

voluntariness
39:18,19 40:15
41:16 143:24

voluntary
36:25 38:6 41:4
135:12 140:20
142:4 149:21
154:24

volunteer
140:20

_____

W

W-O-R-S-E-K
15:1

waistband
100:10

wait 25:8 33:17
61:19 64:4
90:20 137:21
141:23,24
162:14

waiting 27:11

waive 172:21,
25



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-36 Filed: 11/04/22 Page 68 of 68 PageID #:9532
The Deposition of BRIAN GROSSMAN, taken on September 08, 2021

195

**Walgreens** 15:24

**walked** 83:18 86:17 101:13 102:14 168:11

**wall** 164:17

**wanted** 10:5 14:13 25:12 27:7 30:13 31:2 36:24,25 37:4 42:25 56:7 57:8 58:2 74:22,23 79:4 86:1 97:5 102:3 110:23 111:11,12 113:16 116:22 139:5 156:19, 23 164:20

**warnings** 86:4 135:10 136:10 156:9

**washroom** 110:20 116:20

**waste** 65:19

**watch** 74:8 99:8,11 101:9

**watching** 150:18

**water** 42:19 43:2,3,15,19

**watered** 118:20 119:5

**ways** 103:8 104:2

**wearing** 74:8 99:8,11

**week** 16:10

**weeks** 24:24 28:21

**weigh** 93:25

**weighed** 93:23

**west** 28:15 98:1 99:18 109:15 110:3, 13 161:22 162:10,16 163:19

**what'd** 26:5 47:20 52:1

**When'd** 9:7

**where'd** 9:3,5, 9 11:18 12:7,24 14:23 15:23

**white** 74:18,21 91:8,11 165:2

**wholly** 63:24

**why'd** 10:6,11 14:7 15:9 19:22

**window** 79:8, 17 80:24 91:17, 18 102:24 108:23

**wishes** 157:21

**withdraw** 131:4

**witness'** 59:25 65:19

**witnesses** 30:10,17 31:17 32:13 44:16 45:23 46:2 67:20 68:7 147:3

**wondering** 87:6

**Woodrow** 6:8

**word** 64:25 77:17 97:19,21 98:18 129:14 157:4

**words** 76:23 90:23 91:1 97:13 101:17, 25 103:19 126:2 167:15 168:15

**work** 10:15,20 16:6,9 28:8,17, 24 29:5 47:23 48:1 50:4,17 105:18

**worked** 28:2,6 49:12 50:10

**working** 47:12 69:21 70:3 85:24 86:14 96:12 128:5 136:15 138:13

**worry** 137:14

**Worsek** 15:1,5, 23

**worth** 142:6

**wou** 32:7 47:16

**would've** 121:6 130:3 164:20

**write** 46:25 77:15 97:2 106:11,20 121:15 136:21 149:13 155:6,7, 9,10,16,25 156:2,3,14,23

**writes** 96:19

**writing** 39:1 94:20 96:21,23 105:16,17 115:16 116:9 119:11 145:24 155:11 156:2 157:19

**written** 38:24 39:6 103:18 108:11 117:11, 14,18 118:24 119:1,13 134:3, 7 138:22

**wrong** 153:22

**wrongly** 172:13

**wrote** 77:20,21 96:8 106:4 116:19 155:1,2

——————

**Y**

**Yamin** 6:21 7:15 17:10,12, 14,18,21,24 18:7,12 21:6 31:20 32:3,5 34:25 35:5,12,

21 36:11,21 37:13,15 40:6 41:11 42:1,8,10 43:6 44:9 45:8 46:12 47:6,22 49:1,3 50:2,6, 19 51:1,6,10 52:7 53:15,23, 25 54:21 55:11 56:11 57:16 58:7,10 60:23, 25 61:8,17 62:3,6,8,15 66:2,8,14,17 67:8,15 68:19 70:10,16,18,24 71:9,14,17,23 72:1,5,24 73:1 74:14 75:6 76:7 77:18,23 78:17 79:10,13,21 80:8,16 81:2,7, 25 82:7,10,20 83:9,16 84:3 85:1,7,18 86:23 87:19 88:10,13, 18,21 90:7 91:13,20,24 92:5,12 93:4,6, 16,20,22 94:6, 12 97:8,14,22 101:1 102:12 107:13,19,24 108:5,14 110:8, 15 112:9,17,20 113:3,18 114:8, 14,20 115:12 116:6 117:4,6 121:24 122:5,7 123:8

**year** 9:1 12:5,6, 20 14:5 98:10, 12,20,21

**years** 10:22 11:12 14:5 15:4 16:4 23:18 55:5 91:2 94:4 95:9 96:17 115:21 125:24 131:17, 24 132:2,14

**Yolanda** 75:1

**you-** 71:25

**younger** 93:19

94:11

**youth** 20:25 33:5,9,14,18,22 34:3,7,9,12,15, 21 35:2,9,17 37:21,24 38:1,7 39:5,15 40:13, 23 56:24 57:20 58:1,4 60:9,10, 14,20 61:6,14, 25 86:5,8,11 98:24 114:10 139:24 140:11 157:1

**youth's** 139:11

——————

**Z**

**Zoom** 6:25 27:4

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com