**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

ANTHONY JAKES,

                Plaintiff,

       v.

KENNETH BOUDREAU *et al.*,

                Defendants.

Case No. 19-cv-02204

Hon. Manish S. Shah

Hon. Beth W. Jantz

# EXHIBIT 47

LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA



# KENTUCKIANA
## — COURT REPORTERS —

# CASE NO. 19-CV-02204

# ANTHONY JAKES

# V.

# KENNETH BOUDREAU, ET AL.

## DEPONENT:

## YO PATRICK DANAHER

## DATE:

## October 20, 2021



a courtroom
**powerhouse**

✉ schedule@kentuckianareporters.com

☎ 877.808.5856 | 502.589.2273

www.kentuckianareporters.com

1   IN THE UNITED STATES DISTRICT COURT FOR THE

2  NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

3     CASE NO. 19-CV-02204

4     HON. MANISH S. SHAH

5     HON. BETH W. JANTZ

6

7      ANTHONY JAKES,

8       Plaintiff

9

10       V.

11

12    KENNETH BOUDREAU, ET AL.,

13      Defendants

14

15

16

17

18

19

20

21

22

23 DEPONENT: YO PATRICK DANAHER

24 DATE:   OCTOBER 20, 2021

25 REPORTER: KORTNEY CHASE



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Page 2**

```
1                    APPEARANCES
2
3   ON BEHALF OF THE PLAINTIFF, ANTHONY JAKES:
4   Renee Spence
5   Loevy & Loevy
6   311 North Aberdeen Street
7   3rd Floor
8   Chicago, Illinois 60607
9   Telephone No.: (312) 243-5900
10  E-mail: spence@loevy.com
11  (Appeared via videoconference)
12
13  ON BEHALF OF THE DEFENDANT, CITY OF CHICAGO:
14  George Yamin
15  The Sotos Law Firm, P.C.
16  141 West Jackson Boulevard
17  Suite 1240A
18  Chicago, Illinois 60604
19  Telephone No.: (630) 735-3322
20  Facsimile No.: (630) 773-0980
21  E-mail: gyamin@jsotoslaw.com
22  (Appeared via videoconference)
23
24
25
```

**Page 3**

```
1              APPEARANCES (CONTINUED)
2
3   ON BEHALF OF THE DEFENDANTS, KENNETH BOUDREAU, ESTATE OF
4   MICHAEL KILL, FRED BONKE, LOUIS CAESAR, MICHAEL DELACY,
5   KEN BURKE, AND THOMAS PACK:
6   Philip Andrews
7   Rock Fusco & Connelly, LLC
8   321 North Clark Street
9   Chicago, Illinois 60654
10  Telephone No.: (312) 494-1000
11  Facsimile No.: (312) 494-1001
12  E-mail: pandrews@rfclaw.com
13  (Appeared via videoconference)
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1                      INDEX
2                                             Page
3   PROCEEDINGS                                 6
4   DIRECT EXAMINATION BY MS. SPENCE            7
5   CROSS EXAMINATION BY MR. YAMIN            117
6   EXAMINATION BY MR. ANDREWS               118
7
8
9                    EXHIBITS
10  Exhibit                                   Page
11  1 - Youth Division Manual of Procedure in
12      1991 - CITY_JAKES 01009,
13      CITY_JAKES 01121                       43
14  2 - Blank Juvenile Minute Sheet -
15      CITY_JAKES 01147-01148                 60
16  3 - Juvenile Minute Sheet -
17      CITY_JAKES 26333 (CONFIDENTIAL)        81
18  4 - Patrick Danaher Motion to Suppress
19      Testimony - Plaintiff Jakes
20      030575-030584                         101
21  5 - Patrick Danaher Trial Testimony -
22      Plaintiff Jakes 031205, Plaintiff
23      Jakes 031335-031339                   111
24
25
```

**Page 5**

```
1                    STIPULATION
2
3   The video deposition of YO PATRICK DANAHER was taken at
4   KENTUCKIANA REPORTERS, 30 SOUTH WACKER DRIVE, 22ND
5   FLOOR CHICAGO, ILLINOIS 60606, via videoconference in
6   which all participants attended remotely, on WEDNESDAY
7   the 20TH day of OCTOBER, 2021 at 11:03 a.m.; said video
8   deposition was taken pursuant to the FEDERAL Rules of
9   Civil Procedure. The oath in this matter was sworn
10  remotely pursuant to FRCP 30.
11
12  It is agreed that KORTNEY CHASE, being a Notary Public
13  and Court Reporter for the State of ILLINOIS, may swear
14  the witness and that the reading and signing of the
15  completed transcript by the witness is not waived.
16
17
18
19
20
21
22
23
24
25
```



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 6

```
1                  PROCEEDINGS
2
3           COURT REPORTER:  We are now on the record.  My
4    name is Kortney Chase.  I'm the video technician and
5    court reporter today.  Today is the 20th day of
6    October 2021.  The time is 11:03 a.m.  We are
7    convened by videoconference to take the deposition
8    of Patrick Danaher in the matter of Anthony Jakes v.
9    Kenneth Boudreau, et al., pending in the United
10   States District Court for the Northern District of
11   Illinois, Eastern Division, case number 19-CV-02204.
12   Will everyone but the witness please state your
13   appearance, how you are attending, and location you
14   are attending from, starting with plaintiff's
15   counsel?
16           MS. SPENCE:  Renee Spence on behalf of
17   plaintiff Sean Jakes -- I'm sorry, Anthony Jakes.
18   Appearing remotely.
19           MR. YAMIN:  George Yamin.  I represent the
20   defendant, City of Chicago.  I am appearing remotely
21   at the home of the witness.
22           MR. ANDREWS:  Philip Andrews representing the
23   individual officer defendants.  I am appearing
24   remotely from the law office of Rock Fusco &
25   Connelly.
```

Page 7

```
1           COURT REPORTER:  Okay.  And Mr. Danaher, will
2    you please state your name for the record?
3           THE WITNESS:  My name is Patrick Danaher.
4           COURT REPORTER:  Okay.  And do all parties
5    agree that the witness is, in fact, Patrick Danaher?
6           THE WITNESS:  Is that me?
7           MS. SPENCE:  Yes.
8           MR. YAMIN:  No.  She's asking us that question.
9           THE WITNESS:  Oh.
10          MR. YAMIN:  Yeah.  Yes.
11          MR. ANDREWS:  Yep.
12          MR. YAMIN:  That he does.
13          COURT REPORTER:  Okay.  Mr. Danaher, will you
14   please raise your right hand?  Do you solemnly swear
15   or affirm that the testimony you are about to give
16   will be the truth, the whole truth, and nothing but
17   the truth?
18          THE WITNESS:  I do.
19          COURT REPORTER:  Thank you.  You may begin.
20                  DIRECT EXAMINATION
21   BY MS. SPENCE:
22      Q    Good morning, Mr. Danaher.  My name is Renee
23   Spence.  I represent the plaintiff in this case, Mr.
24   Anthony Jakes.  Can you please spell your first name and
25   last name for the record, please?
```

Page 8

```
1       A    First name is Patrick, P-A-T-R-I-C-K.  Last
2    name is Danaher, D-A-N-A-H-E-R.
3       Q    All right.  And Mr. Danaher, have you sat for
4    a deposition before?
5       A    Not like this.
6       Q    When you say, "not like this," do you mean via
7    Zoom or --
8       A    No --
9       Q    -- recording?
10      A    -- no, I haven't.  No, I haven't.
11      Q    Okay.  So I'm going to just review the rules
12   for the deposition so that we can proceed efficiently
13   and as clearly as possible.
14      A    I've been retired since 2001.
15          MR. YAMIN:  Mr. Danaher --
16      Q    Got it.  Okay.
17          MR. YAMIN:  Excuse me.  This is new --
18      Q    So --
19          MR. YAMIN:  Excuse me, Spence.  This is new to
20   Mr. Danaher, just -- you just need to answer.
21          THE WITNESS:  Yes or --
22          MR. YAMIN:  Don't --
23          THE WITNESS:  -- no.
24          MR. YAMIN:  -- speak unless -- no.  Just answer
25   que -- wait until you have been asked a question to
```

Page 9

```
1    speak.
2           THE WITNESS:  Okay.
3           MR. YAMIN:  Yeah.  Okay.
4    BY MS. SPENCE:
5       Q    So I'm just going to go over the rules, right?
6    So the first rule is that we want to make sure that
7    we're speaking one at a time so that the court reporter
8    can accurately transcribe what we're saying.  Because of
9    the video, sometimes there's a bit of a delay or
10   sometimes I may ask a question and your counsel may
11   object or counsel for the individual officers may
12   object.  And then we have to sort out the objection and
13   then you can answer.  So the general theme is to --
14   let's speak one at a time and also to just pause after a
15   question and I will pause after your answer, okay?
16      A    Fine.
17      Q    If there comes a point where you can't hear me
18   or that the sound becomes choppy, just let me know
19   because I want to make sure that you're hearing the
20   entire question, okay?
21      A    Fine.
22      Q    If I ask you a question that you don't
23   understand, please ask me to rephrase it or tell me that
24   you don't understand the question.  But the presumption
25   will be that if you answer the question that you did in
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 10

1  fact understand what was being asked, okay?

2       A    Yes, ma'am.

3       Q    At any point during the deposition, you're
4  permitted to take breaks.  I just ask that before we
5  take a break, if a question is pending, that you answer
6  the question and then we take the break; do you agree?

7       A    Yes, ma'am.

8       Q    Okay.  Are you on any kind of medication that
9  impacts your memory?

10      A    No.

11      Q    Is there any reason why you can't give a
12  complete and accurate deposition today?

13      A    No.

14      Q    Okay.  Because we're appearing remotely, I may
15  show you documents on the screen and I just ask that
16  when you are looking at a document, just let me know if
17  you can't read it.  I'll let you know in advance that
18  I'm showing you a document, okay?

19      A    Fine.

20      Q    Do you have any -- because we are appearing
21  remotely, I can't tell if you have any documents in
22  front of you.  Do you have any documents in front of
23  you?

24      A    No.

25      Q    If at any point in this deposition you have

Page 11

1  documents or you're referring to a document, I just ask
2  that you let me know that you're looking or referring to
3  a document, okay?

4       A    Yes, ma'am.

5       Q    All right.  Excellent.  Now, you told me
6  earlier that you retired in 2001?

7       A    Yes, ma'am.

8       Q    Are you currently employed anywhere?

9       A    No, ma'am.

10      Q    When you retired in 2001, were you referring
11  to the Chicago Police Department?

12      A    Was I what?

13      Q    When you retired in 2001, were you referring
14  to the Chicago Police Department?

15      A    I've -- we could stay friends with them, yeah.

16      Q    Sorry.  So which -- when you retired, you
17  retired from Chicago Police, right?

18      A    Yes.

19      Q    Okay.  And when did you begin working at the
20  Chicago Police Department?

21      A    19, four -- wow, 19 -- 1968.

22      Q    1968.  And did you work continuously at the
23  Chicago Police Department from 1968 to 2001?

24      A    Yes.

25      Q    At any point, were you ever fired, or did you

Page 12

1  leave the Chicago Police Department?

2       A    No.

3       Q    Was the Chicago Police Department your first
4  job in law enforcement?

5       A    Yes.

6       Q    All right.  In 1968 --

7       A    When was I in the academy, my 13th out of 14th
8  week in the academy was the '68 Democratic Convention.

9       Q    And did you work the '68 Democratic
10  Convention?

11      A    Unfortunately, yes.  I was at Michigan and
12  Balboa.

13      Q    And when you worked the '68 Democratic
14  Convention, were you working in your capacity as a
15  patrol officer?

16      A    I -- we were -- there was a group of us down
17  there at the Michigan and Balboa at the time, so it --
18  yes, as patrol -- as a acting pa -- as a patrol
19  officer.

20      Q    For how long did you work in patrol?

21      A    Until I retired -- until I became a youth
22  officer.

23      Q    When did you become a youth officer?

24      A    I couldn't tell you the exact date, but it's
25  been -- I couldn't tell you the exact date.  I didn't

Page 13

1  know that was going to be asked.  I would have found
2  out.

3       Q    Do you know the general decade in which you
4  became a youth officer?  Was it 1970s, '80s, '90s?

5       A    It was the '80s.

6       Q    And for how long did you remain a youth
7  officer?

8       A    Until I retired.

9       Q    When you were a patrol officer from 1968 until
10  the 1980s, in which areas did you work?

11      A    Primarily Area 2 or Area 4 -- in Area 4.  At
12  the time, there -- the -- the -- the -- the -- the --
13  their boundaries are changed now.

14      Q    And while you were on patrol, were you part of
15  any special teams, like, a tactical unit or a gang unit?

16      A    No.

17      Q    When you became a youth officer in the 1980s,
18  to which area were you assigned?

19      A    I was originally assigned Area 2 -- Area 2.

20      Q    And then did you work in any other areas?

21      A    I worked Area 4 for a long time.  I retired
22  from Area 4.  Because I'm -- at the time, it was the
23  west side.  And I worked in Area 3 for a while, but I
24  retired from Area 4.

25      Q    For how long did you work in Area 2?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 14

1    A    I couldn't tell you.
2    Q    Was it months or years?
3    A    Oh, no.  It was -- it was cou -- cou -- a
4  couple -- a year or two -- a year or two.
5    Q    It was a year or two?
6    A    Yeah.  Maybe a --
7    Q    And what would -- if you had to estimate,
8  what's the maximum amount of time would you say you
9  spent working at Area 2?  Was it, like, five years, ten
10  years?
11    A    About five years.
12    Q    No more than five?
13    A    No.  Not that -- that -- not that I remember.
14        MR. YAMIN:  Objection.  This calls for
15  speculation.
16    Q    And in the Area 2, was that the first area to
17  which you were assigned as youth officer?
18    A    Yes.
19    Q    What was the second area to which you were
20  assigned?
21    A    Area 3 for a short time.
22    Q    When you say, "a short time," about how long
23  would you say you were at Area 3?
24    A    About a year in assignment.
25    Q    Why were you -- why did you move from Area 2

Page 15

1  to Area 3?
2        MR. YAMIN:  Objection.  Speculate -- calls for
3    speculation.  Foundation.
4    Q    If you know.
5    A    I ju -- just to cha -- just to have a change
6  of districts and change of personnel.
7    Q    And did you request to move to Area 3?
8    A    Yeah.
9    Q    And you said that you stayed in Area 3 for
10  about a year?
11    A    But I -- I think -- I think so.  It's been so
12  long ago, I can't remember.
13    Q    Okay.  And after Area 3, did you go to Area 4?
14    A    I went to -- I was -- I went to Area 4, right.
15    Q    Did you go anywhere else between Area 3 and
16  Area 4?
17    A    Area 2 every so often.
18    Q    So after Area 3 -- so did you go back to Area
19  2 before you moved to Area 4?
20    A    Only if on assignment.  These questions are 30
21  year -- this is 30 years ago.
22    Q    Yeah.  I just ask for you to answer it to the
23  best of your ability.
24    A    Oh.  Well, good luck.
25    Q    So you said that you may have gone back to

Page 16

1  Area 2 for -- was it short assignments?
2    A    Right.
3    Q    And what would cause you to have to go back to
4  Area 2?
5    A    If they wanted personnel -- if they wanted
6  someone from that -- who was there before.
7    Q    Why did you leave Area 3?
8    A    I retired.
9    Q    Well, you said you retired from Area 4.  And
10  you said that you spent --
11    A    Well, I retired -- I -- I left Area 3 because
12  there was change in personnel and I went where -- and I
13  knew all the people in Area 4.  And I wanted to work in
14  Area 4 because at the time -- a couple of times while I
15  was in the youth -- youth division, the areas were
16  changed, and the boundaries were -- were -- were moved
17  in one area, so I didn't -- I wanted to stay with the
18  people I knew.  It was a long time ago though.
19    Q    When you were in Area 3, did you have a
20  partner?
21    A    Not to work.  They -- you know, on paper, yes.
22  In actuality, rarely.  Because of the -- the lack of
23  personnel.
24    Q    So when you say, "you had a partner on paper,"
25  what does that mean?

Page 17

1    A    If you looked at the sheets that came out,
2  that -- Danaher and someone else were assigned to a
3  certain area -- certain district.  But in actuality,
4  because of the lack of personnel, either I worked at
5  different district that day, or the next day, or that
6  week, or my -- the guy who was assigned as my partner
7  did.  Because of lack of personnel, we didn't work -- we
8  rarely, if ever, worked together.
9    Q    Who was your assigned partner on paper in
10  Area 3?
11    A    Oh, I couldn't tell you.  It was 30 years ago.
12  I'm surprised I'm remembering my name.
13    Q    Did you have to apply to become a youth
14  officer?
15    A    Yes.
16    Q    Why did you choose to apply to become a youth
17  officer?
18    A    Because I wanted to work with juveniles and I
19  -- I saw what the -- when I was in patrol and I brought
20  someone into the youth office, I enjoyed -- I liked what
21  they were doing, and I wanted to do it.
22    Q    What part of the youth officer position appeal
23  to you?
24    A    Working with juveniles.
25    Q    Anything specifically about working with kids?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-47 Filed: 11/04/22 Page 8 of 47 PageID #:9913
The Deposition of MS. PATRICK DILLARD, taken October 26, 2021
18..21

Page 18

1    A    No.  Just that I was working with kids.
2    Q    In your experience as a youth officer, did you
3  find that you treated -- so -- sorry.  Prior to -- I'll
4  restate the question.  Prior to becoming a youth
5  officer, did you interact with adults in your capacity
6  as a police officer?
7    A    Oh, yes.
8         MR. YAMIN:  Objection to form of the question.
9    Q    Did you arrest adults?
10   A    Yes.
11   Q    Did you have to interview suspects -- adult
12  suspects?
13   A    Yes.
14        MR. YAMIN:  Object to the form of the question.
15  You've got to give me just a second --
16        THE WITNESS:  Oh, okay.
17        MR. YAMIN:  -- to hear, please.
18  BY MS. SPENCE:
19   Q    Did you -- in your capacity as a patrol
20  officer before you became a youth officer, did you have
21  to process adult arrestees?
22        MR. YAMIN:  Objection.  Form.
23   A    Yes.  I did.
24   Q    Did you have to interview adult arrestees as
25  well or adult witnesses?

Page 19

1         MR. YAMIN:  Objection.  Form.
2    A    Yes.
3    Q    When you became a youth officer, did you -- in
4  your capacity as a youth officer, did you have occasion
5  where you arrested youths?
6    A    Yes.
7    Q    Did you have occasion where you -- sorry,
8  questioned youth arrestees?
9    A    Yes.
10   Q    Did you have occasion where you questioned
11  youth witnesses?
12   A    Yes.
13   Q    Did you have occasion where you processed
14  youth?
15   A    Yes.
16   Q    Okay.  And if you compare your experiences as
17  a patrol officer when you were dealing with adults
18  versus when you were a youth officer dealing with
19  juvenile arrestees, did you treat the juvenile arrestees
20  differently than adult arrestees?
21        MR. YAMIN:  Objection. Form of the question.
22   A    I -- I treated them as subjects.  I had -- had
23  some new juveniles.  I had to speak with different
24  language because of the terminology that they wouldn't
25  understand -- understand the adult language and vice-

Page 20

1  versa.
2    Q    It sounds like when you were dealing with kids
3  who had been arrested, you would speak -- you would
4  change your language to accommodate the fact that you
5  were talking to a child as opposed to an adult; is that
6  right?
7    A    Right.
8         MR. YAMIN:  All right.  This is -- I object to
9  the form.  And we went over this.  This was an issue
10  in one of our other depositions, Spence.  If you're
11  going to use the word child and kids, I'm going to
12  let us -- I'm going to reject every single time
13  because we have a term of art here.  And I would
14  appreciate it if you abided by it.  Kids, and youth,
15  and juveniles, and child -- children are not
16  interchangeable terms under the law.
17   Q    Okay.  So when you were dealing with youth as
18  a youth officer, it sounds like you changed your term --
19  you would adjust the terminology to accommodate the fact
20  that they were youths and not adults; is that right?
21   A    Yes.
22   Q    Okay.  In what -- so what kind of terminology
23  would you kind of -- would you shift when you were
24  dealing with a youth arrestee?
25   A    With a juvenile arrestee, I would have to

Page 21

1  change the terminology to something that they would
2  understand instead of using the legalized terminology
3  that an adult would -- would I -- that I would use with
4  an adult.  It all depends -- it all depends on the
5  situation at the time.
6    Q    Would you be careful to use a youth friendly
7  terminology when explaining their Miranda rights?
8         MR. YAMIN:  Objection to form.  Foundation.
9    Q    Go ahead.
10   A    Well I have -- I -- when I explain their
11  Miranda rights to them, I had -- had to tell them what
12  -- what they were.  I wanted to tell them what they were
13  so they wouldn't be confused or, you know, didn't know
14  what that goes going in.
15   Q    And when you decided -- when you adjusted your
16  terminology to accommodate the youth arrestee or you
17  adjusted the way that you administered Miranda to
18  accommodate the fact you are speaking to a youth, was
19  that -- had you been trained to do that?
20        MR. YAMIN:  Objection to form.  Go ahead.
21   Q    Go ahead.
22   A    It's -- it's -- if we were I don't remember if
23  we were because we went through the -- the academy a few
24  times.  But I know I did just common sense.
25   Q    What kind of terminology would you adjust to

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 22

1  help the youth understand?
2      A    I didn't use real long words and that was 30
3  years ago -- to 30-plus years ago.  So I -- I use
4  terminology that the juvenile -- it all depends on the
5  age of the juvenile would understand whether it is the
6  victim or offender.
7      Q    It seems like you were very focused on making
8  sure that the youth you were interacting with understood
9  what was happening during the interactions; is that
10  correct?
11     A    I had to.
12     Q    Why did you have to?
13     A    It -- it's common sense.  And I wanted make
14  sure that the juvenile knew why -- what -- why I was --
15  why a policeman was talking to him.
16     Q    Was it important to you as a youth officer --
17  sorry.  As a youth officer, did you believe it was
18  important that a juvenile also understood the rights
19  that they had when talking to a police officer?
20     A    Of course.
21     Q    Did you think it was important as youth
22  officer for the youth you were speaking to you to
23  understand what it meant to waive some of their rights,
24  like their Miranda rights, for example?
25     A    If they wanted to -- if, you know, I explained

Page 23

1  to them what was going on with at the time.  And if they
2  had any questions and then fine.  If they did not, then
3  we kept on going.
4      Q    But I was asking if it was it important to you
5  -- was it important as a youth officer to make sure that
6  the youth understood that they -- what rights they were
7  waiving?
8      A    Well, exactly.
9      Q    And how did you go about making sure that the
10  youth understood when they are waiving their Miranda
11  rights?
12     A    I explained it to them, and I asked them.  And
13  if I had to ask them the different ways and then I'd ask
14  them.  I asked them until they either said they
15  understood, or they just said yes, they understood
16  whether or not they understood or not because I'm --
17  we're doing -- dealing with juveniles.
18     Q    Am I correct to -- so it sounds that you would
19  ask them multiple ways to determine whether or not they
20  understood their Miranda rights?
21     A    Right.  If -- if they didn't understand and
22  begin with and I asked them -- I changed the terminology
23  -- change the wording a little bit so they be more
24  inclined for them to understand.
25     Q    Got it.  And other than changing terminology

Page 24

1  to accommodate the fact that you were dealing with the
2  youth arrestee, did you do anything differently when
3  handling a youth arrestee as compared to you how you
4  would handle an adult arrestee?
5          MR. YAMIN:  Object to the form of the question.
6      Q    Go ahead.
7      A    I handle a juvenile as a juvenile arrestee and
8  if I had an adult, I handle an adult as an adult
9  arrestee.
10     Q    When you were dealing with a youth who had
11  been arrested, did you ever reach out to that youth's,
12  like, parent or guardian?
13     A    I had to, every time.
14         MR. YAMIN:  Excuse me.  Objection to form.
15  Foundation.  You can answer now, please.
16         THE WITNESS:  Huh?
17         MR. YAMIN:  You can answer now, please.
18     A    I had to -- had to -- anytime I had a juvenile
19  in custody, I had to do my level best to get an adult --
20  a family member or an adult that was known to -- to the
21  family.
22  BY MS. SPENCE:
23     Q    When you say you had to, what made it so that
24  you had to?
25     A    That's what -- that was the -- what could I

Page 25

1  say?  That was the makeup of the youth division.  If we
2  had a juvenile in custody, we had to have an adult
3  companion or a relative because the juvenile wasn't --
4  we didn't have the -- you know, it was just a juvenile
5  and the arresting officer or -- and -- or me when we
6  needed someone from the juvenile's family.  That's just
7  the way it was.
8      Q    You mean someone --
9      A    That's just, you know, whether it was an order
10  or not I don't -- I don't know.  But that's way it was.
11     Q    So it sounds like that was the practice of the
12  Chicago Police Department Youth Division to make sure
13  that there was a parent or guardian involved --
14     A    Exactly.
15     Q    -- when you had a juvenile in custody?
16     A    Exactly.
17     Q    And did that practice officer require for the
18  parent or guardian to be present when you had the
19  juvenile in custody?
20     A    Yeah.
21     Q    Did you -- and do you know if it was the
22  policy of the Chicago Police Department to have a parent
23  or guardian present whenever a child was in custody --
24  sorry --
25     A    I'm going to assume it was --



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 26

1    MR. YAMIN:  Excuse me.  Excuse me.
2  Ms. Spence.  You need to let the attorney ask --
3  complete her question before you answer so there's
4  no -- so it's a clear record.
5    THE WITNESS:  Okay.
6    MR. YAMIN:  She'll get a chance to, you know,
7  complete her question and she'll give you a chance
8  to complete your answer.
9    THE WITNESS:  Okay.
10    MR. YAMIN:  I understand that you're -- got
11  things to say, but yeah.  Thanks.
12    THE WITNESS:  Okay.
13    MR. YAMIN:  Want to try that again?
14    MS. SPENCE:  Sure.
15    THE WITNESS:  Yeah.
16  BY MS. SPENCE:
17    Q    Was it the policy of the Chicago Police
18  Department to make sure that a parent or guardian was
19  present when a youth was in custody or had been
20  arrested?
21    A    Yes.  It was.
22    Q    All right.  When you were in Area 3 as a youth
23  officer, did you ever work on cases with a detective
24  named Kenneth Boudreau?
25    A    If I did, it was a long time ago and I don't,

Page 27

1  you know, the name doesn't ring a bell.  But then there
2  were a bunch of detectives in Area 3 and Area 4 and area
3  -- the areas that, you know, there -- there were more
4  detectives than youth officers because the detective had
5  different units.  And if -- if I worked with an
6  Investigator Boudreau, probably, but I have to, you
7  know, I don't rem -- the name doesn't ring a bell.  Not
8  saying that it -- that we -- we didn't work on the same
9  case.
10    Q    When you -- I just want to go back to the
11  management of a youth arrestee.  When you had a youth
12  arrestee or a youth who was in custody and you contacted
13  the parent, would you -- was it the practice to wait for
14  the parents to arrive before you continued to interact
15  with the youth?
16    MR. YAMIN:  Objection.  Form of the question.
17  Incomplete hypothetical.  Foundation.  You can
18  answer, please.
19    A    If I was questioning the juvenile, I'd have to
20  have a -- a -- an adult present that was either related
21  to him or knew him and I -- I couldn't, you know, if --
22  if anything else out of the side or off the side, any
23  conversation with the juvenile before an adult was there
24  -- if it happened, it happened.  That's, you know...
25    Q    I just want to follow up on that last part.

Page 28

1  You're saying if anything happened before the adult
2  came, then it was -- it just happened.  What does that
3  mean?
4    MR. YAMIN:  Objection.  Misstates the
5  testimony.
6    A    If I asked the subject what was going on and
7  he -- and he or she explained the whole thing to me
8  without an adult being there, then I'd have to ask him
9  -- ask the party again with an adult being there.
10    In an instance where you asked the youth what
11  happened before an adult arrived, or the parent or
12  guardian arrived, was that in keeping with the practice
13  of the Chicago Police Department?
14    A    No.  It was just --
15    MR. YAMIN:  Excuse me.  Objection to form of
16  the question.  Incomplete hypothetical and
17  foundation too.  You can answer, please.
18    A    And it'd be a response to if the arrestee or
19  the person that was there asked why they were there.
20  Then I'd explain because A and B equal, you know
21    Q    I don't know.  You're saying -- I don't
22  understand the response.  Can you explain?
23    A    Well, if they said why -- why am I here in a
24  police station, then I kind of explain to him why until
25  an adult got there.

Page 29

1    Q    All right.  Other than asking questions to
2  explain the presence of the youth, it was your practice
3  -- is it correct to believe that your practice was to
4  wait until a parent or guardian was present before
5  asking the youth questions about the incident for which
6  they had been arrested?
7    A    Well, exactly.
8    Q    Okay.  When you -- how would you get in
9  contact with the guardian or parent of a youth who had
10  been arrested?
11    MR. YAMIN:  Objection.  Objection, form.
12  Incomplete hypothetical.  Foundation.
13    A    How would I contact them?
14    Q    Yes.
15    A    Either by phone or send another call -- call
16  to city code.  They have a car -- police officer go over
17  there and tell them what's going on -- that I need
18  someone in my unit if I couldn't contact them.
19    Q    And what kind of -- if you contacted a parent
20  or guardian by phone, based on your practice, what kind
21  of information would you convey to the parent or
22  guardian?
23    MR. YAMIN:  Objection to form.  Incomplete
24  hypothetical.
25    A    I'd give them my name, my unit, and why that

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 30

1  the -- the person in custody is here -- is present with
2  me and I need someone because it's -- the person present
3  was a juvenile and I needed an adult to be present that
4  was a member of the family or knew -- knew the juvenile.
5      Q    Would you also provide the parent or guardian
6  with information about why the juvenile was being held
7  at the police station?
8      A    Over the phone?
9      Q    Yes.
10     MR. YAMIN:  Objection of form.  Foundation.
11  Calls for speculation.  Incomplete hypothetical.
12     A    No.  Because I -- I couldn't tell who I was
13  talking to.
14     MR. YAMIN:  Also incomplete hypothetical.
15     Q    Okay.  If you were able to verify -- or were
16  there occasions where you were able to verify who you
17  were speaking to on the phone when you tried to reach
18  out for a guardian or a parent?
19     MR. YAMIN:  Objection to form.  Foundation.
20     Q    Go ahead.
21     A    Every so often, you know, if they could answer
22  the questions in regarding juvenile's middle name, or
23  school, or what have you, then I'd explain a little bit,
24  but not a lot.  I'd - I'd rather have the person in --
25  in -- in view and not on the phone.

Page 31

1      Q    Okay.  When you reached out to a parent or
2  guardian for the youth, did you document your efforts
3  when you -- to reach out to the guardian or the parent?
4      MR. YAMIN:  Objection, form.  Incomplete
5  hypothetical.  Foundation.
6      A    Yes.
7      Q    How would you document that contact with the
8  parent?
9      A    I had -- I had the paperwork in front of me
10  and I just filled in the blanks.  You know, I just had a
11  notebook in front of me and I just, you know, talked to
12  so-and-so at such and such a time.
13     Q    And would you document what you told so-and-so
14  the parent or guardian?
15     A    Yeah.  I had -- I had to cover my job.  In
16  case they --
17     Q    Right.  Would you --
18     A    -- in case they --
19     Q    -- you want to --
20     A    -- in case they went to the court and the law
21  -- and the state's attorney or the public defender was
22  asking about it and I'd have proof that on such and such
23  a date I asked this question and I had it in front of
24  me.  It was a common sense problem -- situation that
25  were used.

Page 32

1      Q    Okay.  In addition to wanting to make sure
2  that you covered your job, did you also document that
3  you had contacted the parent or guardian to make sure
4  that there was evidence that you had followed the rules?
5      A    It's --
6      MR. YAMIN:  Objection to form of the question.
7      A    That's what I just said.  I would say on the
8  report who I talked to and what I -- what it -- was
9  questioned.
10     Q    When you were -- when you interacted with --
11  when you had an adult in custody, were you required to
12  reach out to that adult's family members to let them
13  know that the adult was in custody?
14     MR. YAMIN:  Objection to form of the question.
15     A    That -- that was common sense.  If we had
16  someone in custody, you had a juvenile or adult,
17  especially a juvenile.  But it was -- but if I had an
18  adult in custody, I called the -- if I -- if he get --
19  if he or she had a number to call out, I would call that
20  number, explain what's going on.  And if they wanted --
21  somebody wanted to come in, they came in.  If not, I
22  could care less.
23     Q    Got it.  You -- when you became a youth
24  officer, did you receive training before you became a
25  youth officer?

Page 33

1      A    In the -- in the police academy -- I don't
2  know.  I couldn't tell you how long it was, but yeah, we
3  did have some training.
4      Q    And once you became a youth officer, did you
5  get additional training?
6      A    Every so often.
7      Q    And what kind of topics would they cover in
8  your training as a youth officer?
9      A    Whatever.  It's basically everything under the
10  sun.
11     Q    Did the -- go on.
12     A    You know, handling -- handling the -- the --
13  the -- the -- the -- the -- the -- subject that -- why --
14  why the subject was in custody, what kind of case was
15  it, you know, is it
16     Q    And did your training cover the need -- the
17  requirement to contact a youth's parent or guardian when
18  they were in custody?
19     A    Well, of course.  That was -- that was just
20  common -- that was -- if I -- if there was a juvenile in
21  custody and the arresting officer did make the contact,
22  I would have to make the contact.
23     Q    You as the youth officer had to make the
24  contact?
25     A    Right.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 34

1    Q    And other than that being just the rule, was
2  there any other reason why it was important or required
3  for a youth to have a parent or a guardian contacted
4  when they were taken into custody?
5    A    Just common sense.  If you have a juvenile,
6  you have to have someone who can speak for him.
7    Q    Okay.  When you say speak for him, what do you
8  mean?
9    A    As an adult.  As a parent or mother, or father
10 -- as a parent or an adult that speaks for the child,
11 you know, if I could -- they have a juvenile in custody,
12 you want someone who can understand a little bit more
13 what's going on.
14   Q    All right.  So it sounds as though that the
15 parent could act as a safeguard for the child to make
16 sure that the child -- sorry.  It sounds as though the
17 parent could act as a safeguard for the youth to make
18 sure the youth understood what was happening?
19   A    Right.
20        MR. YAMIN:  Object -- excuse me.  Objection to
21   form.  Misstates prior testimony.
22   Q    Okay.  Are you familiar with a detective by
23 the name of Detective Kill -- Michael Kill?
24   A    I -- I've heard the name, but I -- that's as
25 far as it goes right now.  I've been away from the job

Page 35

1  for 30 years.
2    Q    I understand.  In this I'm going to ask you
3  about a few names and I'll -- to see if they -- if you
4  remember them and also if you worked with them.  So do
5  you have any memory of working with a detective by the
6  name of Michael Kill?
7    A    No.  That -- that's not saying that we didn't.
8  It's just that I don't have any re -- I don't recall.
9    Q    Understood.  And do you know of a detective --
10 a Chicago Police Department detective by the name of
11 Louis Caesar?
12   A    No.
13   Q    Do you know a Chicago Police officer named by
14 the name of Thomas Pack?
15   A    The name rings a bell, but that's about as far
16 as it goes.
17   Q    Did you work on any cases with Officer Pack?
18   A    Not that I know.  I couldn't tell you.  You're
19 asking someone whose memories leaves a lot to be
20 desired.
21   Q    You're doing pretty well, sir.  What about a
22 detect -- oh, sorry, an officer by the name of Michael
23 DeLacy.  Do you know that name?
24   A    DeLacy or Delucy [sic]?
25   Q    DeLacy.  D-E-L-A-C-Y, DeLacy.

Page 36

1    A    The name rings a bell, but I don't know why.
2  Probably because we worked at -- if he was a patrol man,
3  we worked together or he -- he had a couple of jobs at
4  -- where he brought them into the youth division, and I
5  handled them.
6    Q    Do you have any memory of working --
7    A    The name rings a bell.  Pardon me?
8    Q    Do you have any memory of working on a
9  specific -- on any cases with Officer DeLacy?
10   A    Oh, no.  No.  No.  No.
11   Q    Do you -- are you familiar with the name of a
12 Chicago Police youth officer by the name of Ken Burke?
13   A    Ken Burke?
14   Q    Yes.  Ken Burke.  B-U-R-K-E.
15   A    It rings a bell, but that's about as far as it
16 goes.  We probably worked together -- we were probably
17 in the same area together and what have you, but -- it
18 -- it rings a bell.  But that's as far as it goes.
19   Q    All right.  Do you remember working on any
20 cases with Youth Officer Ken Burke?
21   A    I -- I couldn't tell you.
22   Q    Do you -- are you familiar with the name of an
23 officer for -- officer called Fred Bonke, B-O-N-K-E?
24   A    No.  You asked me that before.  No.  I didn't
25 -- the name doesn't ring a bell.

Page 37

1    Q    Right, I haven't asked you about Fred Bonke.
2    A    Well, whatever.  But, that's -- no.  I -- the
3  name ring -- doesn't ring a bell.
4    Q    Okay.
5    A    I'm not saying that we didn't do anything
6  together but it's just that -- it does, you know, I've
7  been off 30 years and I'm, you know, a bunch of these
8  names I forgot.  I'm lucky I remember my own.
9    Q    When you retired in 2001, what was the reason
10 for your retirement?
11   A    Age.
12   Q    Age.
13   A    I already had the so -- so many years on the
14 job.
15   Q    So you were just ready to retire?
16   A    Right.
17   Q    Got it.  So I want to direct your attention to
18 September 1991.  I believe you were working in Area 3 in
19 September of 1991; is that correct?
20   A    I couldn't tell you.
21   Q    You're not sure?
22   A    Yeah.
23   Q    Were you -- but you were a youth officer in
24 the 1990s for sure though, right?
25   A    Right.  Right.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 38

1    Q    Okay.  Is the -- I want to focus on -- one of
2  the duties of the youth officer is to process youth who
3  had been arrested, right?
4    A    Right.
5    Q    And when you process a youth who has been
6  arrested, as the youth officer who is processing that
7  youth, do you fill out -- in 1991, would you fill out
8  arrest warrant for the youth?
9    A    No.  I fill -- there is a section with -- for
10  my name on it on the bottom that -- and I would indicate
11  something in the narrative.
12    Q    Okay.  And as the youth officer who is
13  processing the youth, what exactly were your duties as
14  the person doing the processing?  What were you required
15  to do?
16    A    To represent the juvenile as an adult -- as an
17  adult until when an adult got there.
18    Q    What do you mean represent?
19    A    That I'll be -- I be "his acting parent" until
20  the -- an actual parent or a guardian got there.
21    Q    What if a guardian or adult never gets there?
22  What happens?
23        MR. YAMIN: Objection.  Excuse me.  Form.
24    Foundation.  Calls for speculation.
25    A    We'd have to handle it accordingly.

Page 39

1    Q    Did you ever encounter a situation where you
2  were the youth officer who is processing a youth and the
3  adult or guardian did not appear?
4    A    Oh, yeah.
5    Q    All right.  In those situations where the
6  adult or guardian did not appear and you're the
7  processing youth officer, what steps did you take after
8  the adult or guardian didn't appear?
9    A    Well, we finish the -- the -- the -- the --
10  the -- the -- the job and if I -- if I could not get an
11  adult, then we sent the juvenile to a -- a home.  At the
12  time, there -- we had a -- a place that we could send
13  them to for temporarily.
14    Q    If a --
15    A    But we -- I don't know if they still do.
16    Q    Were there circumstances where you processed a
17  youth, and the youth wasn't going to be detained?
18        MR. YAMIN: Objection.  Form.  Foundation.
19    A    And the youth didn't want -- did not want to
20  be detained?
21    Q    Was not required to be detained.  That the
22  youth would be able to --
23    A    Oh, of course.  Of course.
24    Q    Okay.
25    A    I'd send the -- you know, that's when he goes

Page 40

1  home with either a card saying that he -- case closed or
2  with a card saying that he's got -- got a court date
3  coming up on juvenile court in such and such a date.
4    Q    So in a circumstance where a youth is not
5  going to be detained, you would send the youth home with
6  a card saying that the case was closed, right?  That's
7  one option.
8    A    Right.  Or that --
9    Q    Or you would --
10    A    That he will be called to court on such and
11  such a date.
12    Q    Or you would send the youth home.  Sorry.  You
13  would send the youth home with the information about the
14  court date?
15    A    Right.
16    Q    And how would -- in any situation where the
17  youth was not detained, and a parent or guardian did not
18  come to the station, how did the youth get back to his
19  or her home or their home?
20    A    Either I took them home or -- or an officer
21  took them home.  It be an officer took them home.  But
22  we'd have to have a phone call with someone there or a
23  neighbor saying that they be there -- that someone would
24  be there.  And we put that information on the case
25  report or the arrest slip.

Page 41

1    Q    So in a situation where the youth is not being
2  detained and a parent or guardian is not at the station,
3  either you or another officer would take the youth home;
4  is that right?
5        MR. YAMIN: Objection.  Asked and answered.
6    A    Yes.  It's -- I already answered that.
7    Q    And then in advance of you going there, you
8  would reach out to the parent or guardian to make sure
9  that a parent or guardian would be home to receive the
10  -- the youth?
11    A    Yes.
12        MR. YAMIN: Same objection.
13        THE WITNESS: Why did she ask the same question
14    all the time?
15        MS. SPENCE: I can hear you.
16        THE WITNESS: I know.
17        MS. SPENCE: Okay.  All right.  I just so -- I
18    just wanted to let you know.
19        MR. YAMIN: It's a fair question too.
20        MS. SPENCE: I understand that.
21  BY MS. SPENCE:
22    Q    Okay.  So when you processed a youth, were
23  there ever occasions where you took pictures of the
24  youth who had been arrested -- a photograph?
25        MR. YAMIN: Objection to foundation.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-02204 Document #: 266-47 Filed: 11/04/22 Page 14 of 47 PageID #:9919
The Deposition of ANTHONY DANAHER, taken October 20, 2021
42..45

Page 42

1     A   I don't think we could because the -- the fact
2 that he was a juvenile. I don't remember taking -- I
3 don't ever remember having pho -- photos taken of a
4 juvenile.
5     Q   Okay. Okay. All right.
6         THE WITNESS: Is she talking to someone?
7         MR. YAMIN: Whatever happens on the others --
8 with the other attendees here, this -- that's their
9 business.
10         THE WITNESS: Oh, okay.
11         MR. YAMIN: You only need to focus on the
12 question and do your best with your answers.
13         MS. SPENCE: All right. One moment.
14         MR. YAMIN: It's --
15         THE WITNESS: Sit back and relax.
16         MR. YAMIN: Exactly. It's -- we're all getting
17 used to the technology.
18         MS. SPENCE: Yeah. It's a little -- with my
19 connection, it's a little bit slow so just give me a
20 minute.
21 BY MS. SPENCE:
22     Q   All right. I'm going to show you a document,
23 Mr. Danaher. So it's going to show up on your screen.
24 I'm going to zoom out that so you can see this document.
25 Okay. And I'm referring to for the record, a document

Page 43

1 that's Bates stamped City_Jakes 1009. And then the
2 following page is a non-consecutive page it's Bates
3 stamped City_Jakes 1121. I'm going to mark this as
4 Exhibit 1.
5         (EXHIBIT 1 MARKED FOR IDENTIFICATION)
6         THE WITNESS: City_Jakes was a --
7         MR. YAMIN: That's the name of the case.
8         THE WITNESS: Oh.
9         MR. YAMIN: That's the way we designate
10 documents.
11         THE WITNESS: Oh, okay.
12         MR. YAMIN: It's like a --
13 BY MS. SPENCE:
14     Q   So Mr. Danaher, I'm showing you a cover page
15 on Exhibit 1 that says City Police Department Bureau of
16 Investigative Services, Manual of Procedure, Chicago
17 Police Youth Division. Do you see that?
18     A   Yes.
19     Q   And it says -- at the bottom do you see
20 revised 1991?
21     A   Okay. Yeah. I see it on the very bottom,
22 yeah.
23     Q   And as a youth officer working in 1991, you
24 would have received this manual, correct?
25     A   I would --

Page 44

1         MR. YAMIN: Objection to form. Foundation.
2 Hypothetical -- sorry, calls for speculation. You
3 can answer.
4     A   I would assume.
5     Q   Okay. And when you were a youth officer in
6 the 1990s, you were trained on the policies of the
7 Chicago Police Department Youth Division, right?
8     A   Yes.
9     Q   And you followed those policies, correct?
10     A   I would assume.
11     Q   All right. I'm showing you on the second page
12 of Exhibit 1. I'm showing you an excerpt from this
13 manual because the manual is hundreds of pages. So I'm
14 showing you an excerpt from the manual and I'm going to
15 zoom in because I'm referring to section 4 of the manual
16 that says photographs. Can you see section 4?
17         MR. YAMIN: I'm going to interpose an objection
18 here. But before you proceed, Spence, you did note
19 correctly that this is a multi-page document. And I
20 don't know if you're going to show the witness more
21 than this one page, but I'm objecting that a
22 document that's part of this youth division manual
23 is being shown that's out-of-context and is thereby
24 unfair to the witness. But you can ask Mr. Danaher
25 what do you want to ask and maybe I'll have further

Page 45

1 objections.
2     Q   All right. So I'm representing to you this is
3 a page from the Chicago Police Department manual
4 procedure for the youth division. I'm directing your
5 attention to section 4, photographs. Can you see that
6 section, Mr. Danaher?
7     A   Yes.
8     Q   Right. And were you able to read subsection A
9 of that section?
10     A   Yes.
11         MR. YAMIN: Excuse me. Did you ask him if he
12 has read it now?
13         MS. SPENCE: If he was able to read it, yes.
14 Currently. Yes. Because I --
15         MR. YAMIN: You haven't given -- you have not
16 even asked him to read it and he hasn't had a chance
17 to do so. Please read it and take your time.
18         THE WITNESS: Could you make it a little
19 bigger?
20 BY MS. SPENCE:
21     Q   Sure. Can you read subsection -- so
22 subsection 4 or subsection 8. Can you see it?
23     A   Oh, yeah. So subsection 4.
24         MR. YAMIN: A.
25         THE WITNESS: 4A. Right.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-47 Filed: 11/04/22 Page 15 of 47 PageID #:9920
The Deposition of TOM TANAHER, taken October 20, 2021
46..49

Page 46

1    Q   Right.  Read A and B.  They are two sub
2  paragraphs.  So can you read A and B please to yourself?
3    A   Okay.
4    Q   All right.
5        MR. YAMIN:  A couple of things.  We can't read
6  -- I can't see and I assume Mr. Danaher can't see
7  either subsection B.
8        MS. SPENCE:  You can't see subsection B?  I can
9  scroll up.
10       THE WITNESS:  Photographs of juveniles will be
11  --
12       MR. YAMIN:  Now we can.
13       MS. SPENCE:  Yeah.
14       MR. YAMIN:  Well, it was not -- we couldn't see
15  it.  We --
16       MS. SPENCE:  Okay.  I'm sorry.  I thought it
17  was visible.  That's fine.  Thank you for pointing
18  that out.
19       MR. YAMIN:  No.  And for the questions, I'll
20  object now in particular to this to the witness
21  being asked about section 4A, photographs.  It is --
22  there is a reference to another portion of the
23  manual -- Item 3 - - III-A above that is
24  incorporated in the section that I just mentioned
25  and that the witness is going to be asked about.  So

Page 47

1  to ask him about section on photographs without
2  showing him what's cross-referenced is -- I object
3  to that.
4       MS. SPENCE:  All right.  George, I was going to
5  do it.  I'm just trying to make sure everyone is
6  pacing.
7       MR. YAMIN:  Pardon me?
8       MS. SPENCE:  But I understand you have to lay
9  your records so that's fine.  It's totally fine, but
10  I was going to show it.  I do recognize that.
11  BY MS. SPENCE:
12    Q   So Mr. Danaher, did you get to read part B of
13  section 4?
14    A   "Photographs of juveniles will be maintained
15  at Youth Division Headquarters."
16    Q   Right.  And so as your counsel pointed out,
17  there is a part of section 4 that refers to 3A above.
18  And so I'm going to scroll up to 3A.  It's entitled
19  fingerprints and I'm going to zoom in so that you can
20  read that to yourself.
21       MR. YAMIN:  3A with the sub-parts?
22       MS. SPENCE:  Yeah.  3A, 1, 2, 3.  Yes.  There
23  are -- just the paragraph 3A and --
24       MR. YAMIN:  You see it?
25       THE WITNESS:  Uh-huh.

Page 48

1       MR. YAMIN:  Okay.
2       THE WITNESS:  I'm okay.
3  BY MS. SPENCE:
4    Q   All right.  Having read subsection 3A as well
5  as subsection 4A and B, does that jog your memory in any
6  way as to whether or not you processed juveniles who
7  were photographed?
8       MR. YAMIN:  Objection to form.
9    A   Oh, I'm sure I did.  I'm sure I did just to,
10  you know, because there were so -- so many juveniles
11  that were photographed.
12    Q   Right.  And so I'd stop sharing the screen.
13  And in -- when a -- and did you have occasion to process
14  youth who had been charged with felony offenses?
15    A   Yes.
16    Q   Okay.  In a occasion where a youth has been
17  charged with the felony offense and has been photograph,
18  where would that photograph be kept in the 1990s?
19       MR. YAMIN:  Objection to form.  Foundation.  If
20  you know, Mr. Danaher.
21    A   I would assume if it was a photograph, then it
22  had a YD -- a -- a YD number and will all be kept in the
23  same file with the -- as the YD number.  Youth division.
24    Q   YD you said stand -- stands for youth
25  division?

Page 49

1    A   Right.
2    Q   And the YD file that you referred to -- is
3  this a physical file or electronic file?
4       MR. YAMIN:  Objection, form.  Foundation.
5    A   At the time, physical.
6    Q   Where would the YD file in the 1990s, where
7  would the YD file be kept?
8       MR. YAMIN:  Same objection.
9    A   In the dis -- in the area that -- that it was
10  taken in.
11    Q   So where you worked at area 3, then the -- and
12  the youth was photograph at area 3 with his YD file be
13  at area 3 as well?
14    A   I'm --
15       MR. YAMIN:  Objection.  Calls for speculation.
16  Foundation.
17    A   Yeah.
18    Q   Is the YD file -- is that associated with a
19  specific case number or is it associated with the youth?
20    A   It's associated with the youth because if you
21  can have the Y -- we -- we only call them a Y number.
22  And you can have the Y number and a multiple charges
23  underneath from different cases.
24    Q   And --
25    A   All depends on the background -- all depends

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 50

1  on the background of the individual.
2      Q    So in a situation where the -- did you ever
3  encounter -- sorry.  Do you ever process a youth who had
4  been arrested previous to your encounter with them?
5      A    Of course.
6      Q    All right.  And did you ever have to pull a YD
7  file for a youth who had had previous charges or
8  interactions with the police?
9      A    When they -- when his record was being run,
10 the YD number would show up and then I'd have to -- then
11 we'd handled it accordingly.
12     Q    The YD file for a youth who had been arrested
13 before -- if that person had been photograph, would
14 those photographs be in there YD file?
15         MR. YAMIN:  Objection.  Foundation.  Form.
16     A    I don't -- in some cases, rarely would they
17 be, but other cases we'd have to call, and have it sent
18 from downtown from the Youth Division Headquarters where
19 everything is kept.
20     Q    When you say "rarely," they would be -- what
21 circumstance you're describing as rare?
22     A    Well, sometimes the photograph of the subject
23 would be, you know, two photographs were taken, one for
24 the main copy of the -- the file that went down to his
25 record downtown and if -- if necessary and who knows why

Page 51

1  it would be necessary, he'd be kept in the area that the
2  officer was working in at the time just to double-check,
3  make sure that he's -- that he's not using a different
4  name or uses somebody else's name.
5      Q    All right.  So I'm not clear --
6      A    Because sometimes the bad guys lie.
7      Q    Is the YD file kept at the area or is it kept
8  downtown?
9      A    Downtown.  Primarily downtown.
10     Q    Okay.  Was there a -- I mean --
11     A    This is -- this is 30 years ago; I don't know
12 what they do now.
13     Q    Sir, I'm only focused on the 1990s when you
14 were a youth officer.  In the 1990s, was the YD file
15 kept at the area or kept at the downtown area?
16     A    Usually kept at the area.
17     Q    Okay.  So focusing on the 1990s where the YD
18 file is kept at the area, if that youth had been
19 previously arrested and had photographs taken of him
20 during those previous arrests, were those photographs be
21 in the YD file?
22     A    They should be.
23         MR. YAMIN:  Objection -- excuse me.  Form and
24 foundation.  Calls for speculation.
25     A    They should be.

Page 52

1         MR. YAMIN:  Incomplete hypothetical.
2      Q    Okay.  We spoke earlier about when a youth is
3  detained, that there are circumstances where a youth
4  could be detained after charges, and sometimes a youth
5  is not detained after being charged.  Do you remember
6  that?
7         MR. YAMIN:  Objection.  Is the question:  Does
8  he remember being asked a question?
9         MS. SPENCE:  Yes.  Does he remember being asked
10 that?  Yeah.
11     A    Yeah.
12     Q    Okay.  How was the decision made to determine
13 whether or not a youth was going to be charged but
14 allowed to be released?
15         MR. YAMIN:  Excuse me.
16     A    No.  I think --
17         MR. YAMIN:  Excuse me.  Incomplete
18 hypothetical.  Form.  Foundation.
19     Q    Go ahead.
20     A    Depends on what the charge was -- what the
21 incident was.  It -- it - it -- it had -- it has to be
22 involved with the incident and the charge.
23     Q    All right.  So the decision about whether or
24 not youth was going to be detained was dependent on what
25 the youth had been charged with?

Page 53

1      A    And the incident.  Right.
2      Q    When you say, "and the incident," what does
3  that mean?
4      A    The crime.  Why he was -- why the subject was
5  in my -- in my -- in my presence.
6      Q    Was there anyone who had to approve the
7  decision to -- about whether or not the youth was going
8  to be charged in detained versus charged and released?
9         MR. YAMIN:  Objection, form.  Foundation.
10     A    We always asked our supervisor.
11     Q    Other than asking a supervisor, was there any
12 other approval needed?
13         MR. YAMIN:  Same objections.
14     A    No.  Not that -- not that -- to my knowledge.
15 That's -- but this was 30 years ago.
16     Q    When you processed a youth, what kind of
17 paperwork were you required to fill out?
18     A    We had a -- had a couple of things added to
19 the original arrest report.  And then we had a felony
20 101 and -- what -- some case, you know, some -- what was
21 it?  The 101?  You know, we had to do a narrative
22 section.  We had a narrative report.
23     Q    Did you have to fill a juvenile youth minutes
24 sheet?
25     A    Yes.  Yeah.  We did.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-47 Filed: 11/04/22 Page 17 of 47 PageID #:9922
The Deposition of TO PADRICK  TANNER , taken October 20, 2021
54..57

Page 54

1    Q    And you referred to a felony 101.  Is the
2  youth minute street and the felony 101 -- are those the
3  same or different documents?
4    A    Different documents, but sim -- quite similar.
5    Q    Okay.
6    A    Because of the -- because of the incident
7  involved and the -- the charge.
8    Q    For the felony 101 sheet, what information
9  goes at -- went into a felony 101 sheet?
10   A    Well, I have no idea.  It's -- it's 30 years
11  ago.  Name, address, telephone number, and charge I'm
12  assuming.
13   Q    And did the arresting officer had to fill that
14  out or is it the processing youth officer who fills out
15  the felony 101 sheet?
16   A    The processing youth officer, I would assume,
17  but the -- with the indication of the arresting
18  officer's name on it.
19   Q    And the juvenile minute sheet.  What was the
20  purpose of the juvenile minute sheet?
21   A    Just to make, you know, just get -- to -- to
22  my knowledge, which leaves a lot to be desired right
23  now, was just a cap, you know, just an explanation of
24  why youth officer was already arresting -- arresting was
25  there and what the case report was.  Was just a -- the

Page 55

1  youth officers terminology, you know, des -- description
2  of the case report and the -- deter -- and what
3  happened.
4    Q    After a juvenile minute sheet is filled out,
5  where did it go?  This is in the 1990s.  Where would you
6  place it?
7    A    I -- we put everything in a -- into a pile and
8  put it in a report and let the supervisor sign them. And
9  what they did with them beyond me.
10   Q    All right.
11   A    If they kept it there, fine.  If they could
12  send it downtown, fine.  I'm not -- I was never a
13  supervisor.
14   Q    So as the processing youth officer, you'd fill
15  out the juvenile minute sheet and then you would submit
16  it to the supervisor?
17   A    Right.
18   Q    And what about the felony 101 sheet?  Where
19  did it --
20   A    Same thing.
21   Q    -- go after it's filled out?  Same thing?
22   A    Yeah.
23   Q    Did the -- do you know if the youth minute
24  sheet was ever sent to the prosecutor?
25        MR. YAMIN:  Objection.  Calls for speculation.

Page 56

1  Foundation.  Form.
2    A    I have no idea.
3    Q    Do you know if the felony 101 sheet was sent
4  to the prosecutor?
5        MR. YAMIN:  Same objections.
6    A    I -- I would assume they got copies of it, but
7  I don't know.  It all depends on the -- the state's
8  attorneys and how they operated.  It all depends on how
9  they did it.  I -- I don't -- I'm -- you know, I was --
10  I was just a processing officer.  I wasn't the --
11   Q    So I want to follow up on actually that
12  statement where you're saying you're just the processing
13  officer.  As the processing officer, after you fill out
14  all the paperwork and you contact the guardian or
15  parent, are there any other duties that the processing
16  officer has?
17        MR. YAMIN:  Objection, form.  Calls for --
18  incomplete hypothetical.
19   A    Well, we had to make sure that the subject
20  stayed there until an adult came and pick them up, or we
21  brought -- if -- if push came to shove, then we take
22  them home if we knew there was someone at home that --
23  that would take them.
24   Q    Okay.  So other than completing the paperwork,
25  making sure that the subject was taken home or got home,

Page 57

1  and contacting the parent or guardian, were there any
2  other duties that the processing officer had?
3        MR. YAMIN:  The same objection.  Asked and
4  answered.
5    A    No.  It's already been answered.  I already
6  had told you about it.
7    Q    As the processing officer, did you have to
8  report back to the arresting officers about what
9  occurred during processing?
10        MR. YAMIN:  Objection to form.
11   A    Yeah.  If they -- if they weren't there.  But
12  you -- nine times -- usually they were there in the --
13  in -- in -- in the next room or in the same room.  It
14  all depends on the -- what was going on.
15   Q    What information would you report back to the
16  arresting officers?
17        MR. YAMIN:  Objection.  Foundation and form.
18   A    If there was a court date set, what the court
19  date was, and what -- you know, and that's about it.  If
20  not a court date then why, but you know.
21   Q    Okay.  So when you reported back to arresting
22  officers, you would tell them whether or not the court
23  date was set and when the court date was scheduled.
24   A    Right.
25   Q    Okay.  Did you have to give any other updates

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 58

1  about the processing of the youth to any other people
2  besides the arresting officers?
3            MR. YAMIN:  Objection, form.
4      A    Supervisor.
5      Q    Okay.  Other than your supervisor and the
6  arresting officers, did you provide updates as a
7  processing officer to any other police officers?
8            MR. YAMIN:  Objection.  Form that
9  mischaracterizes witness' testimony.
10     A    No.
11           THE WITNESS:  (Inaudible).
12           MR. YAMIN:  Spence, are you going to another
13  line of questioning?
14           MS. SPENCE:  I just want to show one document
15  and then I am going to shift to a different topic.
16           MR. YAMIN:  Okay.  After the document, I'd like
17  to take a break.
18           MS. SPENCE:  Sure.
19  BY MS. SPENCE:
20     Q    Mr. Danaher, I'm showing you a document.  It
21  is Bates stamped City_Jakes 1147 -- it's two pages --
22  through City_Jakes 1148.  I'm going to scroll -- I'm
23  going to zoom in so you can see it.  At the very top on
24  the left-hand corner, it says juvenile minutes sheet,
25  Youth Division/Chicago Police.  Do you see that?  Can

Page 59

1  you see that?
2      A    Yes.
3      Q    Okay.  And can you see the texts that's on
4  this document?  On City_Jakes 1147?
5            MR. YAMIN:  Can you read it okay?
6            THE WITNESS:  That -- that part right there?
7            MR. YAMIN:  Just in general you're asking,
8  right?
9            MS. SPENCE:  Can you to read the words?
10           MR. YAMIN:  In general?
11           THE WITNESS:  Those -- in gen --
12           MR. YAMIN:  Excuse me.  Mr. Danaher, since I'm
13  not sure I understand what you're asking.
14           MS. SPENCE:  Yeah.  I just wanted to make sure
15  it's legible.  Like, he doesn't have to read it out
16  loud or do anything specific.  He literally read the
17  words that are displayed on the screen.  That's what
18  I'm asking.
19           MR. YAMIN:  Can you see them?
20           THE WITNESS:  I can see them, but if you -- you
21  can make them bigger so I can read them.
22           MR. YAMIN:  Yeah.  That --
23  BY MS. SPENCE:
24     Q    Sure.  Is this a good enough size or do you
25  want it to be bigger?

Page 60

1      A    A little bit bigger.
2      Q    Absolutely.  I'm just going to zoom over and
3  come over here.  How's that?  And I'm going to tell you
4  the purpose of my question.  My question is: Do you
5  recognize -- I want to just know if you recognize this
6  document.  So I'm going to scroll to see if you
7  recognize it.
8      A    I recognize the juvenile minute sheets.  Yeah.
9      Q    Right.  Is the -- I'm going to -- so as close
10  to the bottom of City_Jakes 1147.  And why don't we just
11  go ahead and mark these two pages as Exhibit 2.  The
12  first page of Exhibit 2 -- does that appear to be the
13  juvenile minute sheets that you filled out in the 1990s?
14           (EXHIBIT 2 MARKED FOR IDENTIFICATION)
15           MR. YAMIN:  Objection, form.
16     A    I couldn't tell.  It -- it looks like it.
17     Q    Okay.  Does it look like a familiar -- when
18  you earlier were referring to the juvenile minute sheet,
19  is this the document that you were referring to?
20     A    Right.
21           MS. SPENCE:  Okay.  All right.  George, how
22  long do you want the break to be?
23           MR. YAMIN:  Do you mind if we take a five-minute
24  break?
25           THE WITNESS:  Whatever you want.

Page 61

1            MR. YAMIN:  Yeah.  Well, five minutes is fine.
2            MS. SPENCE:  Okay.  Sure.
3            MR. YAMIN:  Just a second.  Don't say anything,
4  Mr. Danaher.
5            THE WITNESS:  I'm not.
6            (OFF THE RECORD)
7            COURT REPORTER:  We're back on the record.
8  BY MS. SPENCE:
9      Q    Okay.  Mr. Danaher, did you prepare for
10  today's deposition?
11     A    No.  I had -- I was going to have lunch.
12           MR. YAMIN:  No.  I think she meant -- you
13  misunderstood.
14     A    No.  I didn't -- I didn't -- I just -- I read
15  the 101 yest -- yesterday or the day before and what
16  have you, but that's about the only thing I could do
17  because that's the only paperwork I had.
18     Q    All right.  One second.
19           THE WITNESS:  Do I have to do this one?
20     Q    Got it.  All right.
21           MR. YAMIN:  Just answer the questions.  Yes.
22     Q    You said you read the 101?  Sorry, did you say
23  something?
24     A    Pardon me?
25           MR. YAMIN:  I just asked the witness to answer



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 62

1    the questions.
2    Q    Okay.  George -- sorry.  Not George.
3    Mr. Danaher, you said you read the 101 sheet?
4    A    Yeah.  And I filled it out.  It was mine.  Well
5    -- well, it wasn't mine.  I added some stuff to it.  You
6    can tell my addition to everything with the dark type --
7    the dark type -- type-written words.  The dark printed -
8    -
9    Q    All right.  And what was the Bates stamp for
10   that 101 sheet?
11   A    Pardon me?
12   Q    What was the Bates stamp for the 101 sheet at
13   the bottom?
14   A    Oh, I couldn't tell you.
15   Q    Do you have that document near you?
16   A    No.
17   Q    You said that you typed on the 101 sheet?
18   A    30 years ago.
19   Q    Yes.  Not currently.  30 years ago you typed
20   on the 101 sheet?
21   A    Yeah.
22   Q    Okay.
23   A    I added --
24   Q    And --
25   A    I added some information.  They're just a

Page 63

1    couple of lines, nothing important.  No.  I -- I didn't
2    think it was currently important at the time but now.
3    You could tell by the fact that it's -- you know, the --
4    what I typed on there is out of place with the rest of
5    this stuff.  Because the typing is darker and -- we were
6    talking about the same form.
7        MS. SPENCE:  Right.  George, do you have the
8    Bates stamp for the 101 sheet?
9        MR. YAMIN:  That he's referring to?
10       MS. SPENCE:  Yes.  That he's referring to.
11       MR. YAMIN:  Let me see.
12       THE WITNESS:  (phone rings)  Hi, Anna
13   (phonetic).
14       MS. SPENCE:  Why don't we go off the record?
15       MR. YAMIN:  Yeah.  Let's go off the record.
16       COURT REPORTER:  Okay.
17           (OFF THE RECORD)
18       COURT REPORTER:  We're back on the record.
19       MR. YAMIN:  The Bates stamp number is
20   City_Jakes -- No, sorry.  Wait a minute.
21       THE WITNESS:  (Inaudible).
22       MR. YAMIN:  City_Jakes 26333, I believe is what
23   Mr. Danaher said.
24       MS. SPENCE:  26333?
25       MR. YAMIN:  Yes.

Page 64

1    BY MS. SPENCE:
2        Q    Okay.  Other than looking at the 101 sheet,
3    Mr. Danaher, did you review any other documents in
4    preparation for today's deposition?
5        A    For to -- for to -- no.
6            MR. YAMIN:  I just want to make sure this is
7        clear that I think -- this will be helpful.  We --
8        you did review some job transcripts.
9            THE WITNESS:  Oh, right.  We reviewed --
10           MR. YAMIN:  I don't know how much you
11       understood the question that Ms. Spence asked you,
12       so yes.
13           THE WITNESS:  I reviewed the -- the arrest slip
14       and the 101.
15           MR. YAMIN:  Right.
16   BY MS. SPENCE:
17       Q    Okay.  You said you reviewed the arrest
18   something?
19       A    The arrest slip and the 101.
20       Q    Arrest slip, the 101 sheet.  Did you review
21   any transcript testimony?
22       A    Didn't have any.
23       Q    Okay.  Did you review --
24           MR. YAMIN:  I'm sorry.  It's only going to
25       facilitate this.  I -- you review -- I want to

Page 65

1    remind you.  You reviewed testimony you gave at a
2    pretrial hearing and a criminal trial.  Remember
3    that?
4            THE WITNESS:  No.
5            MR. YAMIN:  I will attest that Mr. Danaher
6    reviewed his trial tran -- his pretrial -- sorry.
7    Pretrial motion hearing related to the --
8            THE WITNESS:  Is it --
9            MR. YAMIN:  -- arrest of Mr. Jakes and his
10   trial testimony.
11           THE WITNESS:  Is it there?
12           MR. YAMIN:  That's my stuff.
13           THE WITNESS:  Do you have a copy of it?
14           MS. SPENCE:  All right.
15           THE WITNESS:  Because I don't have any of that.
16           MR. YAMIN:  No.  That's not -- that was not for
17   you.
18           MS. SPENCE:  Okay.
19           THE WITNESS:  I don't have any of that stuff
20   because it's --
21           MS. SPENCE:  All right.  I'm going to -- I'm
22   just focusing on just documents you reviewed
23   previously and not anything that you may or may not
24   have in front of you right now.
25           THE WITNESS:  I have nothing in front of me



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-47 Filed: 11/04/22 Page 20 of 47 PageID #:9925
The Deposition of TONY PADRON DANAHER, taken on October 20, 2021
66..69

Page 66

```
 1    right now except the screen -- CT screen.
 2         MR. YAMIN:  Yeah.  I'm just trying to help out,
 3    so there's no confusion with the attorney.
 4         MS. SPENCE:  I understand.  I understand,
 5    George.  It's fine.
 6  BY MS. SPENCE:
 7    Q    So other than the transcripts of your sworn
 8    testimony in court, and the arrest slip, and the 101
 9    sheet, are there any other documents that you reviewed
10    in preparation for today's deposition?
11    A    Not that I know of.
12    Q    Okay.  Did you meet with any attorneys in
13    preparation for today's deposition?
14    A    No.  Unless --
15         MR. YAMIN:  I called.
16    A    I was just going to say my partner here is a
17    -- is an attorney.
18    Q    George?  Okay.  How many times did you meet
19    with George?
20         THE WITNESS:  Regarding this case once, twice?
21         MR. YAMIN:  You have to -- I can't help you.
22    You have to answer it from your own --
23    A    Once.  For this case, once or twice.  I don't
24    remember right.
25    Q    Once or twice?
```

Page 67

```
 1    A    I know it was once.
 2    Q    Okay.  And when were those meetings?  When did
 3    they take place?
 4    A    Two days ago.
 5    Q    For how long?
 6    A    The last one was two days ago.
 7    Q    When was the first one?
 8    A    About a week ago.
 9    Q    How long did the meeting from a week ago last?
10    A    About ten minutes.
11    Q    And how long did that meeting from two days
12    ago last?
13    A    About an hour.
14    Q    Okay.
15    A    Because we had to go over everything.
16    Q    Okay.
17         MR. YAMIN:  Just answer the question.
18    Q    Okay.  You testified at the motion to suppress
19    and at trial.  Other than testifying at the motion to
20    suppress and trial, have you given any others sworn
21    testimony about your role in the Garcia investigation?
22    A    No.
23         MR. YAMIN:  Objecting -- excuse me.
24         THE WITNESS:  No.  I'm sorry.
25         MR. YAMIN:  Objecting to the characterization
```

Page 68

```
 1    of Mr. Danaher's involvement in this litigation.
 2         MS. SPENCE:  Are you objecting to the term
 3    role?
 4         MR. YAMIN:  Role in the Garcia homicide
 5    investigation.
 6         MS. SPENCE:  Got it.  And I'll rephrase that.
 7  BY MS. SPENCE:
 8    Q    Other than the testimony that you gave at the
 9    motion to suppress and the trial, have you given any
10    other sworn testimony about your interactions with Mr.
11    Jakes?
12    A    No.
13    Q    Okay.
14    A    Because I haven't heard -- heard this stuff in
15    30 years until it was recently brought up and now it's
16    -- remembering most of it is kind of hard.
17         MR. YAMIN:  Just answer the question.
18    Q    Have you read the complaint filed in this
19    civil matter?
20         MR. YAMIN:  You may have to explain what that
21    means.
22         MS. SPENCE:  Yeah.  Sure.
23    Q    So I just -- Mr. Danaher, if you don't
24    understand a question, I just need you to tell me that.
25    I know that your counsel has been kind of facilitating a
```

Page 69

```
 1    bit, but I just need you to communicate with me about
 2    what you understand me asking, what you don't
 3    understand.  So you're here in a deposition in a civil
 4    case.  Do you understand that?
 5    A    No.  Because I don't understand what a civil
 6    case is.
 7    Q    Okay.
 8    A    I -- a criminal case?  Yes.  A civil case, I
 9    don't understand.
10    Q    So this is not a criminal case.  This is a
11    civil case that you're appearing in, okay?  I'm just
12    going to represent that to you.  Got it?
13    A    Fine.
14    Q    All right.  And other than the documents that
15    you read, have you read any document associated with
16    this case that describes what this case is about?
17    A    No.
18    Q    So have you read any document associated with
19    this case that describes who is being sued in the case?
20    A    No.
21    Q    Do you know who is being sued in this case?
22    A    Hopefully not me.
23    Q    Other than that belief that you are not being
24    sued, do you know about anybody being sued in this case?
25    Do you know who the individuals are?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-02204 Document #: 266-47 Filed: 11/04/22 Page 21 of 47 PageID #:9926
The Deposition of PATRICK DANAHER, taken October 20, 2021

70..73

Page 70

1    A    No.
2    Q    Okay.  Are you aware the city is being sued in
3  this case?
4    A    I wouldn't doubt it, but I did -- wasn't aware
5  of it.
6    Q    Got it.  All right.  When you reviewed the
7  minute sheet -- sorry, the 101 sheet, not the minute
8  sheet.  When you reviewed the 101 sheet, and your trial
9  testimony, and the motion to suppress testimony, and the
10  arrest form in preparation for this deposition, did you
11  have a memory in your mind about the events that are
12  described in those documents?
13    A    I did, but not total memory because it was so
14  damn -- darn long ago.  But I, you know, I knew what the
15  -- I recognized, you know, I did -- I did my addition to
16  the sheets and why I had to put the additions on there.
17    Q    Right.  Well --
18    A    Because I was a juvenile officer, and we had a
19  juvenile in the custody.
20    Q    Right.  What do you remember about the event?
21    A    About the event itself?  It's --
22    Q    Yes.
23    A    -- hardly anything.  If I don't have it in
24  front of me, I can't -- I -- I can't tell you anything.
25    Q    Right.  But just now you told me that after

Page 71

1  reviewing the documents that you vaguely remember what
2  happened.  You don't remember everything, but you
3  remember something.  So I'm trying to figure out what
4  the -- what are the somethings that you remember?
5    A    Just the stuff that I did with -- in the -- in
6  -- in the youth officers' room -- in the office -- my --
7  in my -- the room that I use as an -- my office in the
8  -- in the area -- used office room.  That he was there,
9  and I was there, and that was about it.
10    MR. YAMIN:  Excuse me.  We're going to take a
11  break, please.  Thanks.
12    MS. SPENCE:  Okay.  And sorry.  George, when
13  you take the break -- we can go off the record.
14    (OFF THE RECORD)
15    COURT REPORTER:  We're back on the record.
16  BY MS. SPENCE:
17    Q    All right.  So Mr. Danaher, before we took a
18  break, you were telling me that you remember some parts
19  of the interactions in the processing room.  And I'm
20  trying to sort out what it is that you remember about
21  the events.
22    A    And when he was first arrested?
23    Q    When did you first encounter Mr. Jakes?
24    A    The day he was arrested.  30 years ago.
25    Q    And how did you encounter him?

Page 72

1    A    I was assigned to that district as a youth
2  officer, and they brought him in.  I'm assuming.
3    Q    And when you say you're assuming, do you
4  remember --
5    A    Not really.
6    Q    -- who brought him in?
7    A    I -- the only thing I can tell you is the
8  arresting officers are -- brought him in.
9    Q    And you said you're assigned to that district.
10  What district is that?
11    A    I couldn't tell you.  I -- I don't have
12  the paperwork in front of me.
13    Q    Okay.
14    A    If it's -- if -- if -- I think it was the 5th
15  District at 115th and whatever it was at the time.
16  That's --
17    Q    You said the arresting officers brought him
18  in?
19    A    Yes.
20    Q    When you say "in," where is in?
21    A    In is into my -- into the youth office.  Into
22  the district and the youth office.
23    Q    Where is the youth office located?
24    A    On the first floor.
25    Q    What was the address of the station?

Page 73

1    A    The old 5th District, I couldn't tell you.  I
2  -- 115th and Indiana, I think.
3    Q    And when the arresting officers brought
4  Mr. Jakes in, was Mr. Jakes handcuffed?
5    A    I couldn't tell you.
6    Q    What did Mr. Jakes look like?  Can you
7  describe Mr. Jakes?
8    A    Not really.
9    Q    When you say, "not really," what is it that
10  you remember?
11    A    It -- it just that I don't remember what he
12  looked like because there were so many people that I
13  handled in -- at that district and over the years that,
14  you know, what -- take a one -- particular one doesn't
15  not work with me.  Not 30 years later.
16    Q    All right.  So can you describe what race
17  Mr. Jakes was?  And I don't want you to guess.  I just
18  want you to tell me if you know.
19    A    Well, I -- I think he was Caucasian.
20    Q    Okay.
21    MR. YAMIN:  I'm going to take a break, please.
22    MS. SPENCE:  Okay.
23    (OFF THE RECORD)
24    COURT REPORTER:  We're back on the record.
25  BY MS. SPENCE:

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-47 Filed: 11/04/22 Page 22 of 47 PageID #:9927
The Deposition of JOHN DANAHER, taken October 20, 2021
74..77

Page 74

1    Q   All right.  Do you remember what height
2  Mr. Jakes -- how tall Mr. Jakes was?
3    A   Nope.
4    Q   Okay.  Who brought Mr. Jakes into the office
5  to talk to you?
6    A   I would assume the arresting officers and I --
7  I don't know why -- why anybody else would be in -- in
8  my office.
9    Q   Right.  Who were the arresting officers?
10   A   I have no idea.  This is 30 years ago.  We had
11 -- all this stuff is on the arrest report if you got
12 that.
13   Q   And when the arresting officers brought
14 Mr. Jakes into the room, was there anyone else in the
15 room with you?
16   A   Not to my knowledge.  I don't remember.
17   Q   Do you remember or are you saying no?  I'm not
18 sure which answer you're giving.
19   A   No.
20   Q   No one's in the room with you?
21   A   Pardon me?
22   Q   No one was in the room with you other than the
23 arresting officers and the person you believe is
24 Mr. Jakes, right?
25   A   Right.

Page 75

1    Q   And how many officers brought Mr. Jakes to the
2  room?
3    A   I couldn't tell you.
4    Q   Is it because you don't remember?
5    A   I don't remember.  I'm lucky I remember where
6  the district was.
7    Q   Can you describe Mr. Jakes' demeanor?
8    A   No.
9    Q   Had you ever seen the individual that the
10 arresting officers brought into the processing room?  Had
11 you ever seen that individual before?
12   A   Not to my knowledge.
13   Q   Did you know who the individual's name before
14 -- when that individual was brought to the processing
15 room?
16   A   No.  Not until I got the arrest slip.
17   Q   Okay.  So when the officers brought the
18 individual into the processing room, what happened after
19 they entered the room with the individual?
20   A   Sat down and tell -- should we -- I
21 interviewed him.
22   Q   Okay.  When you say, "sat down," who sat down?
23   A   I have all -- I -- I was sitting down and I --
24 when I have someone -- when a person is brought into my
25 office, I'd have them sit down in the -- in -- in front

Page 76

1  of me.
2    Q   All right.  So the individual who had been
3  brought in by the arresting officers sat in front of
4  you; is that correct?
5    A   Right.  Right.
6    Q   And then -- and was there a table?
7    A   It was a desk.
8    Q   It was a desk.  And --
9    A   There was a table in the office, but we were
10 at the desk.  I mean, we're at my desk.
11   Q   And your role in this interaction -- was it as
12 the processing youth officer?
13   A   Yeah.
14   Q   Okay.  Do you -- once the individual had been
15 seated at your desk, what happened next?
16   A   We, you know, if anything, I advised him of
17 his rights again because if -- if I don't do it -- if I
18 -- I advise every arrestee that comes into my office of
19 their rights just in case they weren't advised before.
20 So I advised him of his rights and then we discussed the
21 reason why he was there.  And do I remember what the
22 discussion was?  Of course not.
23      MS. SPENCE:  I see.  When you were --
24   Mr. Danaher, so you --
25      THE WITNESS:  (phone rings).  Hello.

Page 77

1      MS. SPENCE:  -- okay.  Why don't we go off the
2  record.
3      COURT REPORTER:  Okay.
4      (OFF THE RECORD)
5      COURT REPORTER:  We're back on the record.
6  BY MS. SPENCE:
7    Q   All right.  So Mr. Danaher, you said that the
8  individuals sat at your desk, and you advised the
9  individual of his rights, correct?
10   A   Right.  I do that every -- every time someone
11 is sent to -- comes in my office.  Any time an arrestee
12 comes into my office.  At the time --
13   Q   At the time -- sorry.
14      MR. YAMIN:  One -- I had a objection.
15 Mischaracterizes testimony to the prior question.
16   Q   Okay.  At the time that you advised the
17 individual of his rights, were the arresting officers
18 still in the room?
19   A   I couldn't tell you.  Was 30 years ago.
20   Q   I appreciate that, Mr. Danaher.  I'm just
21 asking.
22      MR. YAMIN:  But he is entitled to qualify his
23 answers any way he wants to.
24      MS. SPENCE:  I'm not restricting anything that
25 he's saying.  I was just saying I understood what he

Kentuckiana Reporters
30 North Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-02204 Document #: 266-47 Filed: 11/04/22 Page 23 of 47 PageID #:9928
The Deposition of TO PATRICK  DANAHER, taken on December 20, 2021
78..81

Page 78

1    was trying to communicate.
2         MR. YAMIN:  I'm going to be honest.  This is
3    editorial comment on his answers so
4         MS. SPENCE:  Pardon?
5         MR. YAMIN:  The editorial comment on his
6    answers.  That's not proper.
7    BY MS. SPENCE:
8         Q    Mr. Danaher, you said that you then discussed
9    the reason why the individual was there, right?
10        A    Yes, ma'am.  I have to.  That's part of my --
11   that's part of the process.
12        Q    And what was your understanding for the
13   individual -- for the basis of the individual who was
14   present in your office?
15        A    That the subject was brought in for an offense
16   that he allegedly committed and that -- and that's as
17   far as I can go right now.  It is 30 years ago.
18        Q    So it's your understanding that this person
19   had been arrested?
20        A    That's why he was in my office.  He was a
21   juvenile and he was brought into the youth office.
22        Q    Right.  And so you understood that he was
23   arrested?  He was under arrest at that time?
24        A    Yes.
25        Q    Okay.  And at this time, you do not remember

Page 79

1    the charge for which he was arrested --
2         A    No.
3         Q    -- is that correct?  Okay.  Great.  Do you
4    remember any of the responses that the individual gave
5    you during your discussion?
6         A    No.
7         Q    Do you remember the individual's demeanor?
8         A    No.
9         Q    And do you know if during your conversation
10   about the offense, whether or not there were any other
11   officers present for that conversation?
12        A    No.
13        Q    All right.  After you discussed the offense
14   with the individual, what did you do next?
15        A    I haven't the slightest idea.
16        Q    So just focusing on that interaction with the
17   individual, do you have any memory past discussing to
18   having a big discussion about the offense with the
19   individual?  Do you have any other memory about your
20   interactions with that individual?
21        A    That's about -- that'd be about it.  Just
22   talking about why he's -- who was in my office and why I
23   was -- and why he was there, and I was there.
24        MR. YAMIN:  Object to the form of that
25   question.  Pardon me for the belated objection.

Page 80

1         Q    Did you -- do you remember -- sorry.  Did you
2    -- after interacting with the individual, did you talk
3    to the arresting officers?
4         A    I don't remember.
5         Q    After interacting with the individual, did you
6    -- oh, sorry -- discussing the charge with the
7    individual, do you know where the individual was taken?
8         A    I would assume if everything went all right if
9    -- if -- then he went to either ju -- juvenile detention
10   or he was released to the -- a parent.  It should
11   indicate -- it should indicate it on your arrest slip.
12        Q    Right.  But do you specifically have a memory
13   of what --
14        A    Of course not.
15        Q    -- happens to the individual after the
16   conversation?
17        A    Of course not.
18        Q    Do you have a specific memory of filling out
19   the paperwork in this case?
20        A    Nope.  It's just another case.
21        Q    Okay.
22        THE WITNESS:  What's wrong?
23        MR. YAMIN:  It's just a delay.  We're waiting
24   for the next question, I think.
25        Q    Okay.  So Mr. Danaher, I'm going to show you

Page 81

1    the document that is Bates stamped City_Jakes 26333.
2    It's marked confidential.  I will note that the city has
3    produced two different documents of the same Bates
4    stamp, so we can clear that up afterwards, but just --
5    let's mark this as Exhibit 3.  And it's entitled at the
6    top juvenile minutes sheet.
7         (EXHIBIT 3 MARKED FOR IDENTIFICATION)
8         MR. YAMIN:  Can you see it okay Mr. Danaher?
9         THE WITNESS:  I do not have --
10        MS. SPENCE:  All right.  It's okay.  I'm
11   describing it for the record so once I can I'll zoom
12   in.
13        MR. YAMIN:  Okay.
14   BY MS. SPENCE:
15        Q    It's at the top of the juvenile minute sheet
16   and at the bottom -- it -- the bottom left corner it
17   says, "prepared by YO P.H. Danaher."  Mr. Danaher, I'm
18   going to zoom in so you can read this.  Based on this
19   magnification, can you read to yourself?  Is it legible
20   to you?  I'm trying to figure out if the words are
21   visible to you.
22        A    All right.  It's fine.
23        Q    Okay.
24        MR. YAMIN:  Can you just -- I can't see the
25   whole -- I'm sure you realize this.  And I

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-02204 Document #: 266-47 Filed: 11/04/22 Page 24 of 47 PageID #:9929
The Deposition of YO PATRICK DANAHER, taken October 20, 2021

82..85

Page 82

1 appreciate you're helping Mr. Danaher see or be able
2 to read, but we can't see the whole sheet.
3      THE WITNESS:  Which I see the top -- the top.
4      MR. YAMIN:  Well, I mean if you go left more
5 --
6      MS. SPENCE:  Right.  I'm going to scroll down,
7 but can you see the left and right margins of this
8 sheet?  Is that visible to you at least?
9      MR. YAMIN:  That's my point.  Yeah, that's what
10 I'm trying to see.
11      MS. SPENCE:  You can't see the left and right
12 margins?
13      MR. YAMIN:  We see the left.
14      MS. SPENCE:  And the right or not to the right?
15      THE WITNESS:  Basically, we can see the right
16 because there's nothing outstanding.
17      MR. YAMIN:  No.  That's not correct.  We can't
18 see the entire sheet left or right.  We can see the
19 left margin and what's under the column that has at
20 the top juvenile minute sheet.  There's a certain
21 point on the right that we can't see.  I -- because
22 I can't see it, I can't tell you what's not visible.
23      MS. SPENCE:  This is strange to me.  This is so
24 interesting.  Okay.  Can you guys pull it?  I don't
25 actually -- I mean, can we go off the record because

Page 83

1      this is just about a technological issue?
2           MR. YAMIN:  Yeah.
3           (OFF THE RECORD)
4      COURT REPORTER:  We're back on the record.
5 BY MS. SPENCE:
6      Q    All right.  So Mr. Danaher, at this
7 magnification, can you -- is the writing on the document
8 that's being shown to you, Exhibit 3 -- is that legible
9 to you, like, is it readable?
10      A    Yeah.
11      Q    Okay.  Great.  Can you just read it to
12 yourself?  I want to just make sure you recognize this
13 document.  That's the purpose of the question.
14      A    Anthony Jakes.  Male, Black --
15      Q    Just to yourself in your mind.
16      A    Oh, okay.
17      Q    I just wanted to make sure you can -- you're
18 familiar with this document.
19      A    Yeah.
20      Q    All right.  I'm going to scroll down so you
21 can see the rest.  And just let me know when you're
22 ready for me to scroll down to the bottom.
23      A    Okay.
24      Q    All right.  I'm scrolling down to --
25      A    Okay.

Page 84

1      Q    Uh-huh.
2      A    Okay.
3      Q    I'm going to go -- now I'm all the way at the
4 bottom.  Do you see in the bottom left-hand box where it
5 says prepared by YO P.H. --
6      A    Yeah.
7      Q    -- Danaher?  Is that your --
8      A    Yep.
9      Q    -- name and was that your --
10      A    That's me.
11      Q    Was that your star number?
12      A    At the time, yes.
13      Q    Okay.  And the handwritten signature that
14 appears on the bottom right-hand section, is that your
15 signature?
16      A    No.
17      Q    And do you know who signature that is?
18      A    It looks like a Sergeant Galloway (phonetic)
19 or something -- some Galloway or something, I have no
20 idea.
21      Q    Okay.  After reading this document, do you
22 have -- does it refresh your memory as to what happened
23 during your interactions with Mr. Jakes?
24      A    Just to -- what -- what's on -- on the -- the
25 papers is what I could -- can remember.

Page 85

1      Q    So I want to know if I were to take this paper
2 away, right?  And you cannot read anything on the paper.
3 Would you independently remember what happened or would
4 you need to rely on what the paper says to figure out
5 what happened?
6      A    I'd have to rely on what the papers says.  This
7 has happened 30 years ago.
8      Q    Got it.  And did you type all of the
9 information that appears on Exhibit 3, this minutes
10 sheet?
11           MR. YAMIN:  Do you need to see the whole minute
12      sheet again or --
13      A    I need to see the whole minute sheet, first of
14 all.
15      Q    All right.  So I'm going to scroll up and then
16 slowly scroll down.
17      A    Okay.  Scroll up a bit more.
18      Q    This is the very top, sir.
19      A    Oh, it's okay.  Scroll down.
20      Q    Okay.  Well, let's take in pieces.  The
21 section entitled minor respondents.  Did you type all of
22 the information in the minor respondents section?
23      A    Where is the minor respondent?
24      Q    It's at the very top right here (indicating).
25 I have highlighted in blue.  Can you see that?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 86

1    A    Oh, yeah.  Right.
2    Q    Right.  So this section that has the name, the
3  sex, the date, arrested charges, detained, court report,
4  YD number.  Did you type all of that information?
5    A    To my knowledge, yes.
6    Q    Okay.  I will also show you a section that
7  shows the date of the offense, time, and the location.
8  Did you type that information?
9    A    This whole -- this whole paper was typed by --
10  it was typed by me.
11    Q    Okay.  So you're saying everything that
12  appears on this paper was typed by you on Exhibit 3,
13  correct?
14    A    Right.
15    Q    Okay.  And on Exhibit 3, it says "the A/O's
16  were arresting another CPD" -- so I'm in the
17  investigation section -- the narrative section of
18  Exhibit 3.
19    A    Uh-huh.
20    Q    And it says the A/O's -- that stands for
21  arresting officers, correct?
22    A    Right.
23    Q    "The A/O's were assisting another CPD unit and
24  received permission from arrestee's guardian to
25  transport arrestee into unit number 632 for

Page 87

1  investigation."  Do you see that sentence?
2    A    Yes.
3    Q    Okay.  And in this case, the arresting
4  officers -- is that T. Pack and M. DeLacy?
5    A    Yes.
6    Q    Okay.  And I'm referring to the section above
7  it that says arresting officers.  Do you see that?
8    A    Right.  Yes.
9    Q    Okay.  And when it says, "unit number 632,"
10  what -- to what does that number refer?
11    A    That's their beat number.
12    Q    Is that your beat number or their beat number?
13    A    No.  It's theirs.
14    Q    Okay.  And what's a beat number?
15    A    What -- the -- the car that they were driving.
16  I think when -- oh, no their unit -- that's the unit
17  number.
18    Q    What's a unit number?
19    A    That's if -- whatever if it's youth division
20  or a robbery division, whatever the division they --
21  they're in and it's -- each one has a number.
22    Q    Do you know which division correlated to 632
23  at the time you wrote this report?
24    A    At the time, yeah.  But not now.
25    Q    Right.  I'm asking at the time you wrote the

Page 88

1  report what -- do you -- which division correlated to
2  number 632?
3    A    I couldn't tell you.
4    Q    Okay.  It continues and it says "once inside
5  the area number 3 headquarters" --
6    A    Area 3 headquarters.  That -- it was at 30 --
7  I think 39th and California.
8    Q    Okay.  So --
9    A    And that would be unit 632.
10    Q    Right.  So "once inside the Area 3
11  headquarters, the arresting officers made a protective
12  pat-down search and recovered from the arrestee's right-
13  hand pants pocket, a tin-foil packet containing a white
14  powdery substance."
15    A    Do you want to make this --
16    MR. YAMIN:  No.  You let her finish her
17  question.
18    THE WITNESS:  Okay.
19    MR. YAMIN:  Yeah.
20  BY MS. SPENCE:
21    Q    Do you see the sentence I read out loud?
22    MR. YAMIN:  There was -- could you re-read
23  that, please, Spence because --
24    MS. SPENCE:  Sure.
25    THE WITNESS:  Look at the point there.

Page 89

1  BY MS. SPENCE:
2    Q    Mr. Danaher, I'm going to zoom in to this
3  paragraph that we're referring to, okay?
4    MR. YAMIN:  Hold on.  Just a second.  Just a
5  second, please.  There's a technology issue here.
6  For some -- did you do something to the --
7    THE WITNESS:  I -- I touched it by -- by
8  mistake.
9    MR. YAMIN:  Okay.  We -- pardon me.
10    THE WITNESS:  I can move it back-and-forth.
11    MR. YAMIN:  Mr. Danaher no longer can see the
12  entire document at one time.  He can navigate
13  through the document with his finger.
14    MS. SPENCE:  Well, it's here because I'm
15  sharing the screen so he can actually touch it.
16    MR. YAMIN:  Well, he can't touch it, but he's
17  done something --
18    THE WITNESS:  I inadvertently touched it or
19  something.
20    MR. YAMIN:  He's --
21    MS. SPENCE:  Okay.
22    MR. YAMIN:  Yeah.  And I don't know how to --
23    MS. SPENCE:  Why don't we this.  Let me stop
24  sharing screen real quick so we can just reset.
25    MR. YAMIN:  Yeah.  I'll see --

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-02204 Document #: 266-47 Filed: 11/04/22 Page 26 of 47 PageID #:9931
The Deposition of JON BURGE, taken on December 20, 2021
90..93

Page 90

1   MS. SPENCE:  What do you see -- George, what do
2   you guys see now?
3       MR. YAMIN:  Nothing yet.  But we see the five
4   talking heads.
5       MS. SPENCE:  Okay.  Great.  So I'm going to go
6   back to sharing the screen and let's see what
7   happens then.
8       MR. YAMIN:  I think that's a good idea.  And
9   you got to be careful, Mr. Danaher --
10      THE WITNESS:  I know.
11      MR. YAMIN:  -- what you see, okay.  Because --
12      MS. SPENCE:  Does it -- can you see it now like
13  you used to?  Is about --
14      THE WITNESS:  Yeah.
15      MS. SPENCE:  Okay.  Perfect.
16      MR. YAMIN:  Excuse me, one second.  Can you
17  read it because now it's kind of small.
18      THE WITNESS:  I mean, I could -- could you just
19  --
20      MS. SPENCE:  Okay.  I'm going to zoom in and
21  I'm going to read.  Okay.  Hold on.
22      THE WITNESS:  Well, she made it larger.  So
23  don't touch.
24  BY MS. SPENCE:
25      Q   All right.  So here we are.  I am in -- I'm

Page 91

1   starting at the word once and I've highlighted it in
2   blue.  It's the second sentence of the paragraph in
3   the narrative portion.
4       A   Right.
5       Q   It says -- all right.  I'm going to read out
6   loud and then I'll ask you questions about the sentence.
7   Here we go.  "Once inside the area number 3
8   headquarters, the arresting" -- sorry -- "the A/O's made
9   a" --
10      A   The arresting officers.
11      Q   Yap.  "The arresting officers made a
12  protective pat-down search, and recovered from the
13  arrestee's right-hand pants pocket, a tin-foil packet
14  containing a white powdery substance."  Do you see that
15  sentence?
16      A   Yes.
17      Q   Great.  So is it correct to interpret that
18  this event was taking place at the Area 3 headquarters?
19      A   Yes.
20      MR. YAMIN:  Objection to form.
21      Q   And that you were, in fact, in Area 3?
22      A   Pardon me?
23      Q   And that you were at Area 3?
24      MR. YAMIN:  Excuse me.  Okay.  Never mind.
25  Object to the form.

Page 92

1       Q   Sir, go ahead.
2       A   Well, what -- they brought him in the Area 3.
3   Whether or not I was there at the time, I couldn't tell
4   you.
5       Q   Okay.  And do you have any memory of speaking
6   to Mr. Jakes at the Area 3 headquarters?
7       A   Of course not.
8       Q   Okay.  The sentence refers to the resting out
9   of -- officers conducting a protective pat-down of
10  Mr. Jakes.  Were you present for the pat-down?
11      A   I don't remember.
12      Q   It also states that the arresting officers
13  recovered a tin-foil packet containing a white powdery
14  substance from Mr. Jakes' right-hand pants pocket.  Did
15  you witness the recovery of the tin foil packet?
16      A   No.  Not to -- not to my knowledge.
17      Q   Did you ever see the tin-foil packet that they
18  alleged was recovered from Mr. Jakes?
19      A   I would say yes, but I -- I can't verify it.
20      Q   So you say --
21      A   All I know is that I process -- I processed
22  the -- the arrestee -- I processed the arrestee as a
23  juvenile and we got his record.  And everything was from
24  the -- Area 3 computer.
25      Q   When you say, "everything was from the Area 3

Page 93

1   computer," what does that mean?
2       A   That means all the -- the background check.
3       Q   And can you access the Area 3 computer when
4   you're not at Area 3?
5       MR. YAMIN:  In 1991, right?
6       A   In 1991, yeah.
7       Q   You didn't have to be -- in 1991, you did not
8   have to be in the Area 3 to access the area --
9       A   No, all I was -- all I was needed was his
10  background, his name and -- name, and what they -- we
11  call a y-number and no matter what computer we were in -
12  - no matter what district we were in, we could get this
13  information.
14      Q   Got it.  Now, I want to clarify your answer
15  about the recovery.  Yes or no, were you present when
16  the tinfoil was allegedly recovered from Mr. Jakes'
17  pants pocket?
18      MR. YAMIN:  Objection.  Asked and answered.
19      Q   Go ahead.
20      A   I couldn't tell you because it says the
21  arresting officers made a protective pat down search and
22  we covered the arrestee's -- recovered the tinfoil
23  packet.  What -- whether or not they did it in front of
24  me, I couldn't tell you.
25      Q   All right.  And did you ever handle the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 94

```
 1  tinfoil packet?
 2       MR. YAMIN:  Objection to form.
 3       THE WITNESS:  Huh?
 4       MR. YAMIN:  No, go ahead.  I'm just --
 5   A   I -- I -- I would say no.
 6   Q   Okay.  Did you ever fill out any paperwork --
 7  other than this minute sheet, did you fill out any
 8  paperwork related to the recovery of a tinfoil packet
 9  containing a white powdery substance?
10   A   No.  Because the arresting officers --
11   Q   Go ahead.
12   A   You know, they -- they -- inventory did, not
13  me.
14   Q   All right.  It says, "subject advised of his
15  rights and admitted to substance being his."  Do you see
16  that sentence?
17   A   Yes.
18   Q   When you say that the subject was advised of
19  his rights, who advised the subject of his rights in
20  this particular sentence?  Who -- to whom --
21   A   The arresting officers.
22       MR. YAMIN:  Objection.  Form and foundation.
23   A   The arresting officer.  So this is not when
24  they -- you did the advisements of rights; is that
25  correct?
```

Page 95

```
 1   A   Right.
 2   Q   And when it says that the subject admitted to
 3  the substance being his, to whom was that admission
 4  made?
 5   A   The arresting officers.
 6   Q   Okay.
 7       MR. YAMIN:  Objection.  Calls for speculation.
 8  Form.  I mean, foundation.
 9   Q   So you -- did this subject ever admit to you
10  to being the owner of the tinfoil packet?
11       MR. YAMIN:  Objection.  Call.
12   A   I have no idea.
13   Q   Okay.  But when you read the sentence that
14  says that subject admitted to the substance being
15  his you're referring to the subject statement to the
16  arresting officers; is that correct?
17   A   Yes.
18   Q   And were you present when the subject made
19  that statement to the arresting officers?
20   A   I couldn't tell you.
21   Q   Okay.  Is that because you don't remember?
22   A   Exactly.
23   Q   Okay.  Then it says, "a court date set, and
24  all proper notifications made."  Do you see that
25  sentence?
```

Page 96

```
 1   A   Yes.
 2   Q   Okay.  And when you say, "proper
 3  notifications," what does that -- to what does that
 4  refer?
 5   A   Well, to the arresting officers but -- but
 6  then it's -- we'll assume and -- I don't know what time
 7  this was.  I could've been working overtime.  But to
 8  whoever it had to be notified, they -- they were
 9  notified.
10   Q   Okay.  The -- I'm at the top of the page, in
11  the column that says Y.D. NO., it appears to be for YD
12  number.  Do you see that column?  I've highlighted it in
13  blue.
14   A   Oh, yeah.  Right.
15   Q   Great.  Do you see the number beneath of this
16  has 239206?  I'm going to go ahead, and I'll highlight
17  but go ahead.  I'm going to highlight that in blue.  Do
18  you see the number of 239206 in the YD number column?
19   A   Oh yeah.  That's his y-number.
20   Q   All right.  The y-number, is that the number
21  that's part of the y-file that you referred to -- the YD
22  file that you referred to earlier?
23   A   Right.
24   Q   That's the youth division file?
25   A   That's it.
```

Page 97

```
 1   Q   Okay.  It indicates on Exhibit 3 that there's
 2  a property inventory number.  I've highlighted that
 3  section in blue.  Do you see that?
 4   A   Yes.
 5   Q   All right.  How did you learn what the
 6  property inventory number was?
 7       MR. YAMIN:  Objection.  Form.
 8   A   The arresting officers.
 9   Q   Okay.  All right.  Did Mr. Jakes make any
10  statements to you about the offense?
11       MR. YAMIN:  Did you hear that question?
12       THE WITNESS:  I --
13       MR. YAMIN:  Will you say that again?  Repeat
14  that.
15       MS. SPENCE:  Sure.
16  BY MS. SPENCE:
17   Q   When you spoke to Mr. Jakes, when you were
18  processing him, did he make any statements to you about
19  the recovery of the tinfoil packet?
20       MR. YAMIN:  Objection to form.
21   A   I have no idea.
22   Q   And you --
23   A   And I was -- because he was processed by the
24  arresting officers -- he was arrested by the arresting
25  officers.  They made out the report and I made out the
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-02204 Document #: 266-47 Filed: 11/04/22 Page 28 of 47 PageID #:9933
The Deposition of PATRICK DANAHER, taken December 20, 2021

98..101

Page 98

1  juvenile report.

2      Q    When you make out the juvenile report, are you

3  just basing it on what's in the arrest form?

4      A    Primarily.  That's what's in the 101 form.

5      Q    All right.  So I want to clarify this.  The --

6  let me go back to Exhibit 3.  Okay.  So exhibit 3, it

7  says juvenile minute sheet.  Oh, my gosh.  Okay.  Right.

8  It says juvenile minute sheet.

9      A    Right.

10     Q    Is this different from the 101 sheet or are

11 they the same thing?

12     A    The same thing.

13     Q    Okay.  So there's no differences between the

14 juvenile minute sheet and the felony 101 sheet that you

15 were referring to earlier?

16     A    Not if -- not for a juvenile.

17     Q    Got it.

18     MR. YAMIN:  Excuse me.  I know we had some

19 intermittent breaks and technology things to deal

20 with.  It been about an hour since we had our last --

21 I'll call it -- well, we had our last break.  But

22 we're able to do the things when it usually does

23 fix.  Where are you at in the questionings Spence if

24 I may ask because we may want to --

25     MS. SPENCE:  I was hoping to finish this up and

Page 99

1  close it out.

2      MR. YAMIN:  I'm sorry, what?

3      MS. SPENCE:  I was hoping that we can finish up

4  and close it out.  Do you -- can we go for, like,

5  another 15 and see where we are?  Or do you want to

6  take a five-minute break now?  We can.

7      MR. YAMIN:  I need to -- yes.

8      MS. SPENCE:  Yeah.  Let's take a five-minute

9  break.

10     MR. YAMIN:  Okay.  Thanks.

11     (OFF THE RECORD)

12     COURT REPORTER:  We're back on the record.

13 BY MS. SPENCE:

14     Q    Okay.  So Mr. Danaher, when you were

15 interacting -- when you were processing Mr. Jakes, did

16 you reach out to his guardian?

17     A    That day, I -- I -- if he was there, I talked

18 to him.

19     Q    Right.

20     A    If he wasn't there, I don't know.  Was it a

21 guardian or a parent?

22     Q    All right.  So I'm going to show you --

23     A    You're going to show me something for 30 years

24 ago?

25     MR. YAMIN:  No.  Hold on now.

Page 100

1      Q    All right.  Sorry.  This is very slow today

2  for some reason.  All right.  I'm going to show you a

3  transcript.  It is Bates stamped -- there's a cover page

4  of Plaintiff's 3 -- Plaintiff Jakes 30575.  And then it

5  continues from 30577 through 30584.  The cover page

6  indicates that this is a motion to suppress statements

7  transcript from that hearing taken -- that took place on

8  December 2, 1992.  Mr. Danaher, I'm showing you a

9  portion of your -- I'm going to show it to you in a

10 second.  A portion of your trial -- I'm sorry, your

11 motion to suppress testimony.  Directing your attention

12 to Plaintiff Jakes 30579, lines 14 -- starting at line

13 14.  And it says, "did you conduct a" -- this is a

14 question.  "Did you conduct a preliminary interview with

15 the defendant with respect to his name and appearance

16 and address?"  Answer.  "Yes, sir.  I did."  Question.

17 "Did he proceed to provide you with any information with

18 respect to a relative that was acting as his guardian?"

19 Answer.  "Yes."  Question.  "Who was that?"  Answer.

20 "Jones.  Last name Jones, guardian."  Question.  "Is

21 that Jessie Mae?"  The continuous answer, "Jessie Mae

22 Jones."  Question.  "Did you have occasion pursuant to

23 the processing of Anthony Jakes to call her?"  "Yes,

24 sir.  I did."  Question.  "Did you notify her of Anthony

25 Jakes' location and why he was being held in Area number

Page 101

1  3 for at that particular time?"  Answer.  "I called her

2  and told her he was being referred to the court for a

3  narcotics violation; that he was at 39th in California

4  at the time."  Did you see those sentences I read, Mr.

5  Danaher?

6      (EXHIBIT 4 MARKED FOR IDENTIFICATION)

7      A    Yes.

8      Q    Does that refresh your memory?

9      MR. YAMIN:  Excuse me.  I want to interpose an

10 objection that Mr. Danaher was not given an

11 opportunity to review this context of the deposition

12 and is being shown some number of lines of testimony

13 from this excerpt from a lengthier -- well, as an

14 excerpt from the entirety of the testimony he

15 provided but subject to that are those objections.

16 Mr. Danaher can answer, but would -- I may have --

17 will you -- could you repeat the question, please?

18     MS. SPENCE:  Right.  I was in the middle of

19 asking of it.  I was saying: Did you -- does that

20 review of the transcript -- does that refresh your

21 recollection as to whether or not you called Mr.

22 Jakes' guardian?

23     A    No.  Not at all.  Because I don't remember

24 this dialogue.  I barely remember this case.

25     Q    Okay.  Do you have any reason to doubt that

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-02204 Document #: 266-47 Filed: 11/04/22 Page 29 of 47 PageID #:9934
The Deposition of Jerry Padnak - Daniher, taken September 20, 2021
102..105

Page 102

1  you -- doubt the accuracy of the testimony that you
2  provided at the motion to suppress with regard to
3  calling his guardian?
4      A   No.  I don't because that's routine.
5      Q   Right.  And in the testimony you indicated
6  that you called the guardian and told her that Mr. Jakes
7  was being referred to court for a narcotics violation
8  and that he was at 39th and California at the time.  Do
9  you remember me reading that out allowed?
10     A   I wouldn't doubt it, but I don't have that on
11 my screen anymore but -- but before I got -- okay.  Well,
12 you know what I have on my screen.
13     Q   Right.  I was saying: Do you remember me
14 reading that out loud just a few minutes ago or a few
15 seconds ago?
16     A   Oh, yeah.  I remember you reading it out loud.
17     Q   Yes.  And do you have any memory of the
18 conversation that you had with Mr. Jakes' aunt?
19     A   No.  None -- none whatsoever.
20     Q   Do you have any reason to doubt that the
21 testimony you gave at the motion to suppress -- do you
22 have any reason to believe that the testimony you gave
23 at the motion to suppress left out details regarding
24 your conversation with Ms. Jones?
25         MR. YAMIN:  Objection.  Form.

Page 103

1      A   No.  I have no idea.
2      Q   All right.
3          COURT REPORTER:  Ms. Spence, do you want to
4  mark that as Exhibit 4?
5          MS. SPENCE:  Yes.  Let's go ahead and mark it
6  Exhibit 4.  Thank you, Kortney.
7      Q   Do you -- and you have no memory of what
8  Ms. Jones said to you after you called her, correct?
9      A   None whatsoever.
10     Q   All righty.  When you were processing
11 Mr. Jakes, do you know at what point you called his
12 guardian?
13     A   Just during the process of it but, you know, I
14 don't -- I couldn't tell you.
15     Q   Was Mr. Jakes allowed to speak to his aunt?
16         MR. YAMIN:  Objection.  Form and foundation.
17 Calls for speculation.
18     A   Right.  If he wanted to, I'm sure he could if
19 --
20     Q   Okay.  Do you know if you let Mr. Jakes speak
21 to his aunt during your conversation with her?
22     A   I couldn't tell you.
23     Q   Okay.  And by his aunt, I'm referring to
24 Ms. Jones.  Do you know if Mister -- did you allow Mr.
25 Jakes an opportunity to speak to his aunt Ms. Jones --

Page 104

1      A   I don't --
2      Q   -- when you were speaking or after you had
3  spoke to her?
4      A   I -- I -- I couldn't tell you.
5      Q   Okay.  Is that because you don't remember?
6      A   Right.
7      Q   Okay.  After -- you indicated earlier -- you
8  testified earlier that you don't remember what happened
9  after you processed Mr. Jakes, right?
10     A   Right.
11     Q   Okay.  So going back to Exhibit 4.  Starting
12 at page 7 -- sorry.  It's marked B7, Bates stamped
13 Plaintiff Jakes 30580, line 20.
14         MR. YAMIN:  This is the pretrial.
15         MS. SPENCE:  This is the motion to suppress.
16         MR. YAMIN:  Okay.
17 BY MS. SPENCE:
18     Q   Okay.  It says, line 20, question.  "After you
19 completed the processing of Anthony Jakes, did you put
20 him in the lock up?"  Answer.  "No.  I put him on a
21 bench outside of an office on the third floor of violent
22 crimes."  Can you see the words that I'm reading out
23 loud, Mr. Danaher?
24     A   Yes.
25     Q   And are you following along as I read them?

Page 105

1      A   Yes.
2      Q   Okay.  All right.  It said "on the third floor
3  of violent crimes called the summary office.  There is a
4  bench there."  Then it says: Question.  "Was he under
5  arrest for that possession of a controlled substance
6  charge any longer after processing?"  And the answer is,
7  no.  "No, sir.  He wasn't."  Do you see that?
8      A   Yes.
9      Q   Okay.  And does that refresh your memory as to
10 what happened to Mr. Jakes after you finished processing
11 him?
12     A   Nope.
13     Q   Okay.  Do you have any memory of ever speaking
14 to the arresting officers after you finished processing
15 Mr. Jakes?
16     A   No.  I don't.
17     Q   Do you have a memory of speaking to any
18 detectives at Area 3 about Mr. Jakes?
19     A   No.  I don't.  This happened 30 years ago, and
20 this is, you know -- I'm lucky I can remember what
21 happened yesterday.
22     Q   And you keep saying that.  You're lucky if you
23 can remember what happened yesterday.  Do you have any
24 memory problems that have been diagnosed?
25     A   No.  I haven't been diagno -- diagnosed.  It's

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 106

1  just that I'm 100 -- you know, I'm getting older and
2  older.  And this happened 30 years ago, and I've had a
3  few cases in between since then.
4        Q    A few cases?  What do you mean a few cases?
5  Oh, as a youth officer?
6        A    Right.
7        Q    Got it.  All right.  I'm going to show you --
8  we're back on Exhibit 4.  I'm referring you to page 9,
9  line 1.  It's also marked Plaintiff Jakes 30582.  The
10  question is on line 1.  "After you placed Anthony Jakes
11  and indicated that information with respect to that
12  option was that the end of your contact with him?"
13        A    I was -- yeah.  If I put it --
14        MR. YAMIN:  Wait, wait, wait.  You should let
15  her read it.
16        Q    I'm going to scroll up a little just so you
17  have some context.  So just -- let's scroll up.  All
18  right.  I scrolled up to page 8.  Also, Plaintiff Jakes
19  30581, starting at line 8 -- starting at line 3.  "Was
20  he under arrest for the possession of a controlled
21  substance charge any longer after processing?"  Answer.
22  "No, sir.  He wasn't."  Question.  "Was he instructed of
23  that?"  Answer.  "At the time he could either -- he had
24  the option of going home or staying for questioning in
25  other matters that were" -- there's an interruption from

Page 107

1  the Court where the Court says, "how did that
2  information get imparted to him?"  And you respond,
3        "that he could go or stay?  Per me."  The
4  question is: "Having given him that option, were you
5  made aware that the detectives who were going to
6  interview Anthony Jakes were out on the street?"
7  Answer.  "I knew they weren't in the office at that
8  time."  Question.  "Were some measures taken by Area
9  number 3 personnel to contact them out on the street so
10 they could come in and interview him?"  Answer.  "Yes,
11 sir."  Question.  "After you place Anthony Jakes and
12 indicated that information with respect to that option,
13 was that the end of your contact with him?"  Answer.
14 "That was the end of my contact.  Once he was placed on
15 the bench, and the option was given to him, my dealings
16 with him were finished."  Did you see -- did you read
17 along as I read those lines out loud?
18        A    Yes.
19        Q    Okay.  So I'm just going to go through this
20 from the -- just want to focus on certain parts of this
21 testimony.  It indicates that there were detectives who
22 were going to interview Mr. Jakes at the station.  Do
23 you know who this detectives were?
24        A    I have no idea.
25        Q    How did you learn that there are detectives

Page 108

1  who were going to interview Mr. Jakes at the station?
2        A    I'm sure at the time, communication was made.
3        Q    Right.  And as you sit here right --
4        MR. YAMIN:  Objection.  Calls for speculation.
5        Q    As you sit here right now, do you know how you
6  learned that information?
7        A    I couldn't tell you.  It was 30 years ago.  I'm
8  assuming word of mouth.
9        Q    Do you know who told you that information?
10        A    Nope.
11        Q    Okay.  It stated that you answered the
12 question and indicated that the detectives who were
13 supposed to interview Mr. Jakes -- that they weren't in
14 the office at the time.  Do you know how you knew
15 whether or not they were at the office at the time as
16 you sit here today?
17        A    I would assume I called their unit and they --
18 they weren't there.
19        Q    All right.  And so you're guessing --
20        MR. YAMIN:  Objection.  Speculation.
21        Q    I just want to know what you remember,
22 Mr. Danaher.  Do you remember --
23        A    Not much.
24        Q    -- how you knew whether or not the detectives
25 were at the office at the time?

Page 109

1        A    I couldn't tell you.
2        Q    Okay.  And the question was: "Were some
3  measures taken by Area number 3 personnel to contact
4  them out on the street so they could come in and
5  interview him?"  And your answer was "yes, sir."
6        A    Yeah.
7        Q    As you sit here today, do you know what
8  measures were taken to contact the detectives who were
9  out on the street?
10        A    I'm assuming person down their division called
11 them.  And then you usually the -- either that -- if
12 they had a telephone or if they had a rad -- a radio.
13        Q    So I don't want you to assume.  I just want to
14 know what you remember.  So in this moment --
15        A    I didn't -- I don't -- I don't remember
16 anything.
17        Q    Right.  And reading this transcript, your
18 testimony from the motion to suppress does not refresh
19 your memory as to your knowledge about how they were
20 contacted?
21        A    None -- none whatsoever.
22        Q    Okay.  Do you have a specific memory
23 administering Miranda to Mr. Jakes?
24        A    Of course not.
25        Q    Okay.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-47 Filed: 11/04/22 Page 31 of 47 PageID #:9936
The Deposition of TERRY DANAHER, taken on October 20, 2021
110..113

Page 110

1    THE WITNESS:  It's a long 15 minutes.
2    Q    And do you know if detectives ever spoke to
3  Mr. Jakes?
4    A    No.
5    Q    Okay.  Is there any part of your interaction
6  with Mr. Jakes that we have not already discussed?
7    A    Not that --
8    MR. YAMIN:  Excuse me.  Are you -- is that the
9  question or did --
10    MS. SPENCE:  Yes.  Because --
11    MR. YAMIN:  Objection.  Form.
12    MS. SPENCE:  Go ahead.
13    MR. YAMIN:  Calls for speculation.  Foundation.
14  Do you need the question asked again?
15    THE WITNESS:  Uh-huh.
16    MR. YAMIN:  Yeah.  Please.
17  BY MS. SPENCE:
18    Q    Are there any parts of your interactions with
19  Mr. Jakes that we have not already discussed?
20    A    Not to my knowledge.  This happened 30 years
21  ago.
22    Q    Okay.  Mr. Danaher, I presume that you do not
23  remember what time you started interacting with
24  Mr. Jakes, correct?
25    A    Exactly.  I have the foggiest idea.

Page 111

1    Q    And you don't remember what time you finished
2  interacting with Mr. Jakes, right?
3    A    You got that right.
4    Q    All right.  Great.  So I'm going to show you a
5  transcript.  It is -- there's the cover page marked
6  Plaintiff Jakes 31205.  It indicates that it's a
7  transcript of the proceedings that took place on
8  September 10, 1993.  The second page of this document is
9    Bates stamped Plaintiff Jakes 31335 and it
10  continues through 31339.  And I represent to you, Mr.
11  Danaher, that this is your trial testimony.  All right.
12  I'm going to direct your attention to page G-132, also
13  marked Plaintiff's Jakes 31338.  All right.  Starting at
14  line 8, the question is "Would it be approximately 3:30
15  in the afternoon that you last saw the defendant?"  Your
16  answer is "3:30 when I first saw him."  Question.  "And
17  when approximately was the last time?"  Answer.  "No
18  more than 4:30."  Were you able to read that along as I
19  read that out loud?
20    (EXHIBIT 5 MARKED FOR IDENTIFICATION)
21    A    Yes.
22    Q    And I'm just going to scroll down a little
23  further.  I'm going to refer you to page G-133.  Stick
24  -- Bates stamped Plaintiff Jakes 31339 -- sorry.  It's
25  actually G-132 through G-133.  And you were asked again

Page 112

1  question -- this line 21 on G-132.  "But do you know --
2  you said that you first saw him around 3:30, correct?"
3  Answer.  "Yes."  "What time did you last see him, if you
4  recall?"  Answer.  "Approximately between 4:00 and
5  4:30."  Do you see that?
6    A    Uh-huh.
7    Q    And it says, "but you're not sure exactly?"
8  and the answer is "no," correct?
9    A    Right.
10    Q    All right.  Does that refresh your
11  recollection as to the start time and end time of your
12  interactions with Mr. Jakes?
13    A    Nope.  This happened --
14    Q    Do you have any reason to doubt the accuracy
15  of that testimony?
16    A    None whatsoever.  And I'm sure at the time it
17  was acc -- accurate, but right now I couldn't remember
18  30 years ago.
19    Q    All right.  Did you ever speak to an
20  individual named Detective Duckhorn about Mr. Jakes?
21    A    No.  Not to my --
22    Q    Did you ever speak -- did you ever speak to an
23  individual named Detective O'Reilly about Mr. Jakes?
24    A    Not to my knowledge.
25    Q    Did you ever speak to an individual named

Page 113

1  Detective Louis Caesar about Mr. Jakes?
2    A    Not to my knowledge.
3    Q    Did you ever speak to --
4    A    I probably did it at the time because I --
5  they were -- we were all working in the same building.
6  But right now, I couldn't tell you 30 years later.  I
7  don't even know if they're still alive.
8    Q    Okay.  Did you -- and did you discuss
9  Mr. Jakes with an individual named Detective McCann?
10    A    At the time, probably.  But I couldn't tell
11  you now.
12    Q    All right.  When you say, "at the time
13  probably," are these guesses or do you have an actual
14  memory of doing that?
15    A    Guesses.
16    Q    Okay.  And so I don't want you to guess.  I
17  want you to just focus on what you actually know.  Did
18  you speak to an individual named Detective Kill about
19  Mr. Jakes?
20    A    I don't know.
21    Q    All right.  Did you speak to a detective named
22  Kenneth Boudreau about Mr. Jakes?
23    A    I don't know.
24    Q    All right.  And did you ever speak to Officer
25  Pack about your interactions with Mr. Jakes?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 114

1    A    I don't know.
2    Q    Did you speak to. Officer DeLacy about your
3  interactions with Mr. Jakes?
4    A    I don't know.
5    Q    Okay. Did you ever provide updates about
6  Mr. Jakes' court date to Officer Pack?
7         MR. YAMIN: Objection. Form.
8    A    I don't know.
9    Q    Did you provide any updates or information
10 about Mr. Jakes' court date to Officer DeLacy?
11        MR. YAMIN: Objection. Form.
12   A    I don't know.
13   Q    Did you ever receive the lab report that was
14 generated in relation to the narcotics that were
15 submitted?
16        MR. YAMIN: Objection. Foundation.
17   A    I don't know.
18   Q    Okay. Do you remember any of your
19 interactions with the prosecutors in -- for the motion
20 to suppress?
21        MR. YAMIN: Objection. Foundation.
22   A    I -- I don't remember.
23   Q    Did you speak to any prosecutors in
24 preparation for your testimony at the motion to
25 suppress?

Page 115

1    A    I couldn't tell you. I don't know. I don't
2  know.
3    Q    Did you speak to any prosecutors in
4  preparation for your trial testimony?
5    A    I don't know.
6    Q    And reviewing your trial testimony and your
7  motion to suppress testimony, does that refresh your
8  recollection as to whether or not you spoke to the
9  prosecutors about -- before the motion to suppress or
10 the trial, correct?
11   A    Exactly.
12   Q    All right. And at any point, did you have any
13 involvement in the investigation of the murder of a man
14 named Rafael Garcia?
15   A    No. Not to my knowledge.
16   Q    So do you know a man by the name of Arnold
17 Day?
18   A    Arnold who?
19   Q    Day, D-A-Y?
20   A    No. I don't -- that name doesn't ring a bell.
21        MS. SPENCE: All right. I think, I'm finished.
22 If you give me one moment. Let's take a five-minute
23 break and then I can let you know.
24        MR. YAMIN: Okay. Thanks.
25        COURT REPORTER: Okay.

Page 116

1         (OFF THE RECORD)
2         COURT REPORTER: We're back on the record.
3  BY MS. SPENCE:
4    Q    Okay. Mr. Danaher, at -- when you spoke to
5  Ms. Jones, at any point, did you inform her that Mr.
6  Jakes would be remaining at the station pursuant to a
7  homicide investigation?
8    A    I don't remember. I would say no.
9    Q    All right. And did you -- if you had told her
10 that, would you have documented that somewhere?
11   A    I would assume.
12   Q    Okay. Would that have been your practice to
13 document that information?
14   A    Yes.
15   Q    And that would've been documented in the
16 juvenile minute sheet, correct?
17   A    I would assume.
18   Q    That was -- was that your practice to document
19 that kind of information in the juvenile minute sheet?
20   A    Yes.
21        MS. SPENCE: Okay. All right. I don't have
22 any further questions.
23        MR. YAMIN: Okay. The -- I just have a couple.
24        MS. SPENCE: Okay.
25        CROSS EXAMINATION

Page 117

1  BY MR. YAMIN:
2    Q    Mr. Danaher, you know that I must -- represent
3  the attorney for the City of Chicago in this litigation,
4  correct?
5    A    Yes.
6    Q    Now you've testified at the pretrial
7  suppression hearing related to Mr. Jakes, correct?
8    A    Yes.
9    Q    And before you gave that testimony, you took
10 an oath where you swore to tell the truth when you gave
11 that testimony, correct?
12   A    Yes.
13   Q    Did you tell the truth --
14   A    Yes.
15   Q    -- when you testified?
16   A    Yes.
17   Q    And you also testified at the criminal trial
18 of Mr. Jakes for homicide; is that correct?
19   A    Yes.
20   Q    And prior to giving your testimony up at that
21 proceeding, you took an oath where you swore to tell the
22 truth during your testimony, correct?
23   A    Yes.
24   Q    Did you tell the truth when you testified at
25 the criminal trial proceeding for Mr. Jakes?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 118

1    A   Yes.
2        MR. YAMIN:  That's all.
3        MS. SPENCE:  All right.  Philip, are you going
4    to ask any questions?
5        MR. ANDREWS:  Yes.  I'll just ask Mr. Danaher.
6            EXAMINATION
7   BY MR. ANDREWS:
8    Q   Hello, again Mr. Danaher.  My name is Philip
9   Andrews.  I represent the individual officers.
10   A   Right.
11   Q   Mr. Danaher, you were speaking with Ms. Spence
12  over the course of the last hour or so.  You were
13  answering questions about the juvenile minute sheet. You
14  remember that conversation from just a few minutes ago,
15  right?
16   A   Yeah.  Yes.
17   Q   Do you have any recollection of your
18  interaction with the plaintiff, Anthony Jakes, beyond
19  what you documented at the time?
20   A   No.
21   Q   So if -- for instance, on your -- on the
22  juvenile minute sheet that you discussed with Ms. Jakes [sic] saying "once inside Area
23  3 headquarters, the A/O's made a protective pat-down
24  search and recovered from the arrestees right-hand pants
25

Page 119

1   pocket a tin-foil packet containing a white powdery
2   substance."  So you as -- do you remember discussing
3   that with Ms. Spence just maybe 20 minutes ago or
4   whatever that may have been?
5        MS. SPENCE:  I'm just going to object --
6    Q   Right.
7        MS. SPENCE:  I'm going to object to the form.
8   Philip, when you first read the question, you said
9   that you discussed with Ms. Jakes and then you read
10  the answer.  Did you mean Spence or I just want to
11  clarify.
12       MR. ANDREWS:  Yes.  Yes.  Fair point.  I meant
13  Ms. Spence.
14       MS. SPENCE:  Uh-huh.
15  BY MR. ANDREWS:
16   Q   You remember discussing that portion of the
17  minute sheet, Mr. Danaher?
18   A   Oh.  A little bit, yes.
19   Q   Okay.  So you don't remember anything about
20  that?  You don't remember any -- and I apologize.  It's
21  somewhat of a compound question.  But Mr. Danaher, you
22  don't remember anything that specific beyond -- or
23  independent of this juvenile minute sheet, right?
24   A   Right.
25       MR. ANDREWS:  Okay.  Yeah.  That's all the

Page 120

1   questions I have for Mr. Danaher.
2        COURT REPORTER:  Okay.  Who want --
3        MR. ANDREWS:  Thank you, Mr. Danaher.
4        COURT REPORTER:  All right.
5        (DEPOSITION CONCLUDED AT 2:01 P.M.)

Page 121

1            CERTIFICATE OF REPORTER
2            STATE OF ILLINOIS
3
4   I do hereby certify that the witness in the foregoing
5   transcript was taken on the date, and at the time and
6   place set out on the Stipulation page hereof, by me
7   after first being duly sworn to testify the truth, the
8   whole truth, and nothing but the truth; and that the
9   said matter was recorded by me and then reduced to
10  typewritten form under my direction, and constitutes a
11  true record of the transcript as taken, all to the best
12  of my skill and ability. I certify that I am not a
13  relative or employee of either counsel and that I am in
14  no way interested financially, directly or indirectly,
15  in this action.
16
17
18
19
20
21
22  KORTNNEY CHASE
23  COURT REPORTER/NOTARY
24  MY COMMISSION EXPIRES: 09/24/2025
25  SUBMITTED ON: 10/29/2021

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

### Exhibits

**Exhibit 1_ Danaher** 43:4, 5,15 44:12

**Exhibit 2_ Danaher** 60:11,12,14

**Exhibit 3_ Danaher [ CONFIDENTIA L]** 81:5,7 83:8 85:9 86:12,15, 18 97:1 98:6

**Exhibit 4_ Danaher** 101:6 103:4,6 104:11 106:8

**Exhibit 5_ Danaher** 111:20

---

### 1

**1** 43:4,5,15 44:12 47:22 106:9,10

**10** 111:8

**100** 106:1

**1009** 43:1

**101** 53:20,21 54:1,2,8,9,15 55:18 56:3 61:15,22 62:3, 10,12,17,20 63:8 64:2,14, 19,20 66:8 70:7,8 98:4,10, 14

**1121** 43:3

**1147** 58:21 59:4 60:10

**1148** 58:22

**115th** 72:15 73:2

**11:03** 6:6

**13th** 12:7

**14** 100:12,13

**14th** 12:7

**15** 99:5 110:1

**19** 11:21

**19-CV-02204** 6:11

**1968** 11:21,22, 23 12:6 13:9

**1970s** 13:4

**1980s** 13:10,17

**1990s** 37:24 44:6 48:18 49:6 51:13,14,17 55:5 60:13

**1991** 37:18,19 38:7 43:20,23 93:5,6,7

**1992** 100:8

**1993** 111:8

---

### 2

**2** 13:11,19,25 14:9,16,25 15:17,19 16:1,4 47:22 60:11,12, 14 100:8

**20** 104:13,18 119:3

**2001** 8:14 11:6, 10,13,23 37:9

**2021** 6:6

**20th** 6:5

**21** 112:1

**239206** 96:16, 18

**26333** 63:22,24 81:1

**2:01** 120:5

---

### 3

**3** 13:23 14:21,

23 15:1,7,9,13, 15,18 16:7,11, 19 17:10 26:22 27:2 37:18 46:23 47:22 49:11,12,13 81:5,7 83:8 85:9 86:12,15, 18 88:5,6,10 91:7,18,21,23 92:2,6,24,25 93:3,4,8 97:1 98:6 100:4 101:1 105:18 106:19 107:9 109:3 118:24

**30** 15:20,21 17:11 22:2 35:1 37:7 51:11 53:15 54:10 62:18,19 68:15 71:24 73:15 74:10 77:19 78:17 85:7 88:6 99:23 105:19 106:2 108:7 110:20 112:18 113:6

**30-plus** 22:3

**30575** 100:4

**30577** 100:5

**30579** 100:12

**30580** 104:13

**30581** 106:19

**30582** 106:9

**30584** 100:5

**31205** 111:6

**31335** 111:9

**31338** 111:13

**31339** 111:10, 24

**39th** 88:7 101:3 102:8

**3:30** 111:14,16 112:2

**3A** 47:17,18,21, 22,23 48:4

---

### 4

**4** 13:11,21,22, 24 15:13,14,16, 19 16:9,13,14 27:2 44:15,16 45:5,22,23 47:13,17 101:6 103:4,6 104:11 106:8

**4:00** 112:4

**4:30** 111:18 112:5

**4A** 45:25 46:21 48:5

---

### 5

**5** 111:20

**5th** 72:14 73:1

---

### 6

**632** 86:25 87:9, 22 88:2,9

**68** 12:8,9,13

---

### 7

**7** 104:12

---

### 8

**8** 45:22 106:18, 19 111:14

**80s** 13:4,5

---

### 9

**9** 106:8

**90s** 13:4

---

### A

**a.m.** 6:6

**A/o's** 86:15,20, 23 91:8 118:24

**abided** 20:14

**ability** 15:23

**Absolutely** 60:2

**academy** 12:7, 8 21:23 33:1

**acc** 112:17

**access** 93:3,8

**accommodate** 20:4,19 21:16, 18 24:1

**accuracy** 102:1 112:14

**accurate** 10:12 112:17

**accurately** 9:8

**act** 34:15,17

**acting** 12:18 38:19 100:18

**actual** 38:20 113:13

**actuality** 16:22 17:3

**added** 53:18 62:5,23,25

**addition** 32:1 62:6 70:15

**additional** 33:5

**additions** 70:16

**address** 54:11 72:25 100:16

**adjust** 20:19 21:25

**adjusted** 21:15,17

**administered** 21:17

**administering** 109:23



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

admission 95:3

admit 95:9

admitted 94:15 95:2,14

adult 18:11,21, 24,25 19:20,25 20:5 21:3,4 24:4,8,19,20 25:2 27:20,23 28:1,8,9,11,25 30:3 32:11,13, 16,18 34:9,10 38:16,17,21 39:3,6,8,11 56:20

adult's 32:12

adults 18:5,9 19:17 20:20

advance 10:17 41:7

advise 76:18

advised 76:16, 19,20 77:8,16 94:14,18,19

advisements 94:24

affirm 7:15

afternoon 111:15

age 22:5 37:11, 12

agree 7:5 10:6

ahead 21:9,20, 21 24:6 30:20 52:19 60:11 92:1 93:19 94:4,11 96:16, 17 103:5 110:12

alive 113:7

alleged 92:18

allegedly 78:16 93:16

allowed 52:14 102:9 103:15

amount 14:8

Andrews 6:22 7:11 118:5,7,9 119:12,15,25 120:3

Anna 63:12

answering 118:13

answers 42:12 77:23 78:3,6

Anthony 6:8, 17 7:24 83:14 100:23,24 104:19 106:10 107:6,11 118:18

anymore 102:11

anytime 24:18

apologize 119:20

appeal 17:22

appearance 6:13 100:15

appearing 6:18,20,23 10:14,20 69:11

appears 84:14 85:9 86:12 96:11

apply 17:13,16

approval 53:12

approve 53:6

approximately 111:14,17 112:4

area 13:11,18, 19,21,22,23,24, 25 14:9,16,19, 21,23,25 15:1, 7,9,13,14,15, 16,17,18,19 16:1,4,7,9,11, 13,14,17,19 17:3,10 26:22 27:2 36:17

37:18 49:9,11, 12,13 51:1,7, 15,16,18 71:8 88:5,6,10 91:7, 18,21,23 92:2, 6,24,25 93:3,4, 8 100:25 105:18 107:8 109:3 118:23

areas 13:10,20 16:15 27:3

Arnold 115:16, 18

arrest 18:9 38:8 40:25 53:19 64:13,17, 19,20 65:9 66:8 70:10 74:11 75:16 78:23 80:11 98:3 105:5 106:20

arrested 19:5 20:3 24:11 26:20 29:6,10 38:3,6 41:24 50:4,12 51:19 71:22,24 78:19, 23 79:1 86:3 97:24

arrestee 20:24, 25 21:16 24:2, 3,4,7,9 27:11, 12 28:18 76:18 77:11 86:25 92:22

arrestee's 86:24 88:12 91:13 93:22

arrestees 18:21,24 19:8, 19,20 118:25

arresting 25:5 33:21 54:13,17, 24 57:8,16,21 58:2,6 72:8,17 73:3 74:6,9,13, 23 75:10 76:3 77:17 80:3 86:16,21 87:3,7 88:11 91:8,10, 11 92:12 93:21 94:10,21,23

95:5,16,19 96:5 97:8,24 105:14

arrests 51:20

arrive 27:14

arrived 28:11, 12

art 20:13

assigned 13:18,19 14:17, 20 17:2,6,9 72:1,9

assignment 14:24 15:20

assignments 16:1

assisting 86:23

assume 25:25 44:4,10 46:6 48:21 54:16 56:6 74:6 80:8 96:6 108:17 109:13 116:11, 17

assuming 54:12 72:2,3 108:8 109:10

attendees 42:8

attending 6:13,14

attention 37:17 45:5 100:11 111:12

attest 65:5

attorney 26:2 31:21 66:3,17 117:3

attorneys 56:8 66:12

aunt 102:18 103:15,21,23, 25

aware 70:2,4 107:5

_____

B

B-O-N-K-E 36:23

B-U-R-K-E 36:14

B7 104:12

back 15:18,25 16:3 27:10 40:18 42:15 57:8,15,21 61:7 63:18 71:15 73:24 77:5 83:4 90:6 98:6 99:12 104:11 106:8 116:2

back-and-forth 89:10

background 49:25 50:1 93:2,10

bad 51:6

Balboa 12:12, 17

barely 101:24

based 29:20 81:18

basically 33:9 82:15

basing 98:3

basis 78:13

Bates 43:1,2 58:21 62:9,12 63:8,19 81:1,3 100:3 104:12 111:9,24

beat 87:11,12, 14

begin 7:19 11:19 23:22

behalf 6:16

belated 79:25

belief 69:23

bell 27:1,7

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-47 Filed: 11/04/23 Page 36 of 47 PageID #:9941
The Deposition of PATRICK DURKIN, taken on October 20, 2021
124

35:15 36:1,7,
15,18,25 37:3
115:20

**bench** 104:21
105:4 107:15

**beneath** 96:15

**big** 79:18

**bigger** 45:19
59:21,25 60:1

**bit** 9:9 23:23
30:23 34:12
42:19 60:1 69:1
85:17 119:18

**Black** 83:14

**blanks** 31:10

**blue** 85:25 91:2
96:13,17 97:3

**Bonke** 36:23
37:1

**bottom** 38:10
43:19,21 60:10
62:13 81:16
83:22 84:4,14

**Boudreau** 6:9
26:24 27:6
113:22

**boundaries**
13:13 16:16

**box** 84:4

**break** 10:5,6
58:17 60:22,24
71:11,13,18
73:21 98:21
99:6,9 115:23

**breaks** 10:4
98:19

**brought** 17:19
36:4 56:21
68:15 72:2,6,8,
17 73:3 74:4,13
75:1,10,14,17,
24 76:3 78:15,
21 92:2

**building** 113:5

**bunch** 27:2
37:7

**Bureau** 43:15

**Burke** 36:12,
13,14,20

**business** 42:9

———————
**C**
———————

**Caesar** 35:11
113:1

**California** 88:7
101:3 102:8

**call** 29:15
32:19 40:22
49:21 50:17
93:11 95:11
98:21 100:23

**called** 32:18
36:23 40:10
66:15 101:1,21
102:6 103:8,11
105:3 108:17
109:10

**calling** 102:3

**calls** 14:14
15:2 30:11
38:24 44:2
49:15 51:24
55:25 56:17
95:7 103:17
108:4 110:13

**cap** 54:23

**capacity** 12:14
18:5,19 19:4

**car** 29:16 87:15

**card** 40:1,2,6

**care** 32:22

**careful** 21:6
90:9

**case** 6:11 7:23
27:9 31:16,18,
20 33:14 40:1,
6,24 43:7 49:19
53:20 54:25
55:2 66:20,23
69:4,6,8,10,11,
16,19,21,24
70:3 76:19
80:19,20 87:3

101:24

**cases** 26:23
35:17 36:9,20
49:23 50:16,17
106:3,4

**Caucasian**
73:19

**cha** 15:5

**chance** 26:6,7
45:16

**change** 15:5,6
16:12 20:4 21:1
23:23

**changed** 13:13
16:16 20:18
23:22

**changing**
23:25

**characterizati
on** 67:25

**charge** 52:20,
22 54:7,11 79:1
80:6 105:6
106:21

**charged** 48:14,
17 52:5,13,25
53:8

**charges** 49:22
50:7 52:4 86:3

**Chase** 6:4

**check** 93:2

**Chicago** 6:20
11:11,14,17,20,
23 12:1,3
25:12,22 26:17
28:13 35:10,13
36:12 43:16
44:7 45:3 117:3

**child** 20:5,11,
15 25:23 34:10,
15,16

**children** 20:15

**choose** 17:16

**choppy** 9:18

**circumstance**
40:4 50:21

**circumstance
s** 39:16 52:3

**city** 6:20 29:16
43:15 70:2 81:2
117:3

**City_jakes**
43:1,3,6 58:21,
22 59:4 60:10
63:20,22 81:1

**civil** 68:19
69:3,5,8,11

**clarify** 93:14
98:5 119:11

**clear** 26:4 51:5
64:7 81:4

**close** 60:9
99:1,4

**closed** 40:1,6

**code** 29:16

**column** 82:19
96:11,12,18

**comment**
78:3,5

**committed**
78:16

**common** 21:24
22:13 31:24
32:15 33:20
34:5

**communicate**
69:1 78:1

**communicatio
n** 108:2

**companion**
25:3

**compare**
19:16

**compared**
24:3

**complaint**
68:18

**complete**
10:12 26:3,7,8

**completed**
104:19

**completing**
56:24

**compound**
119:21

**computer**
92:24 93:1,3,11

**CONCLUDED**
120:5

**conduct**
100:13,14

**conducting**
92:9

**confidential**
81:2

**confused**
21:13

**confusion**
66:3

**connection**
42:19

**Connelly** 6:25

**contact** 29:9,
13,18 31:7
33:17,21,22,24
56:14 106:12
107:9,13,14
109:3,8

**contacted**
27:12 29:19
32:3 34:3
109:20

**contacting**
57:1

**context** 101:11
106:17

**continued**
27:14

**continues**
88:4 100:5
111:10

**continuous**
100:21

**continuously**
11:22

**controlled**
105:5 106:20



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

convened 6:7

Convention 12:8,10,14

conversation 27:23 79:9,11 80:16 102:18, 24 103:21 118:14

convey 29:21

copies 56:6

copy 50:24 65:13

corner 58:24 81:16

correct 22:10 23:18 29:3 37:19 43:24 44:9 76:4 77:9 79:3 82:17 86:13,21 91:17 94:25 95:16 103:8 110:24 112:2,8 115:10 116:16 117:4,7, 11,18,22

correctly 44:19

correlated 87:22 88:1

cou 14:3

could've 96:7

counsel 6:15 9:10,11 47:16 68:25

couple 14:4 16:14 36:3 46:5 53:18 63:1 116:23

court 6:3,5,10 7:1,4,13,19 9:7 31:20 40:2,3, 10,14 57:18,20, 22,23 61:7 63:16,18 66:8 71:15 73:24 77:3,5 83:4 86:3 95:23 99:12 101:2

102:7 103:3 107:1 114:6,10 115:25 116:2 120:2,4

cover 31:15 33:7,16 43:14 100:3,5 111:5

covered 32:2 93:22

CPD 86:16,23

crime 53:4

crimes 104:22 105:3

criminal 65:2 69:8,10 117:17, 25

CROSS 116:25

cross-referenced 47:2

CT 66:1

custody 24:19 25:2,15,19,23 26:19 27:12 30:1 32:11,13, 16,18 33:14,18, 21 34:4,11 70:19

────────

D

────────

D-A-N-A-H-E-R 8:2

D-A-Y 115:19

D-E-L-A-C-Y 35:25

damn 70:14

Danaher 6:8 7:1,3,5,13,22 8:2,3,15,20 17:2 42:23 43:14 44:24 45:6 46:6 47:12 48:20 58:20 59:12 61:4,9 62:3 63:23 64:3 65:5 68:23

71:17 76:24 77:7,20 78:8 80:25 81:8,17 82:1 83:6 84:7 89:2,11 90:9 99:14 100:8 101:5,10,16 104:23 108:22 110:22 111:11 116:4 117:2 118:5,8,11 119:17,21 120:1,3

Danaher's 68:1

dark 62:6,7

darker 63:5

darn 70:14

date 12:24,25 31:23 40:2,3, 11,14 57:18,19, 20,23 86:3,7 95:23 114:6,10

day 6:5 17:5 61:15 71:24 99:17 115:17, 19

days 67:4,6,11

deal 98:19

dealing 19:17, 18 20:2,17,24 23:17 24:1,10

dealings 107:15

decade 13:3

December 100:8

decided 21:15

decision 52:12,23 53:7

defendant 6:20 100:15 111:15

defendants 6:23

defender 31:21

Delacy 35:23, 24,25 36:9 87:4 114:2,10

delay 9:9 80:23

Delucy 35:24

demeanor 75:7 79:7

Democratic 12:8,9,13

Department 11:11,14,20,23 12:1,3 25:12,22 26:18 28:13 35:10 43:15 44:7 45:3

dependent 52:24

depends 21:4 22:4 49:25 52:20 56:7,8 57:14

deposition 6:7 8:4,12 10:3,12, 25 61:10 64:4 66:10,13 69:3 70:10 101:11 120:5

depositions 20:10

des 55:1

describe 73:7, 16 75:7

describes 69:16,19

describing 50:21 81:11

description 55:1

designate 43:9

desired 35:20 54:22

desk 76:7,8,10, 15 77:8

details 102:23

detained 39:17,20,21

40:5,17 41:2 52:3,4,5,24 53:8 86:3

detect 35:22

detective 26:23 27:4 34:22,23 35:5, 9,10 112:20,23 113:1,9,18,21

detectives 27:2,4 105:18 107:5,21,23,25 108:12,24 109:8 110:2

detention 80:9

deter 55:2

determine 23:19 52:12

diagno 105:25

diagnosed 105:24,25

dialogue 101:24

differences 98:13

differently 19:20 24:2

direct 7:20 37:17 111:12

directing 45:4 100:11

dis 49:9

discuss 113:8

discussed 76:20 78:8 79:13 110:6,19 118:23 119:9

discussing 79:17 80:6 119:2,16

discussion 76:22 79:5,18

displayed 59:17

district 6:10



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-47 Filed: 11/04/23 Page 38 of 47 PageID #:9943
The Deposition of JOHN PATRICK DONAHUE, taken on October 20, 2021

126

17:3,5 72:1,9,
10,15,22 73:1,
13 75:6 93:12

**districts** 15:6

**division** 6:11
16:15 25:1,12
36:4 43:17
44:7,22 45:4
47:15 48:23,25
50:18 87:19,20,
22 88:1 96:24
109:10

**Division/
chicago** 58:25

**document**
10:16,18 11:1,3
31:2,7,13 32:2
42:22,24,25
44:19,22 58:14,
16,20 59:4
60:6,19 62:15
69:15,18 81:1
83:7,13,18
84:21 89:12,13
111:8 116:13,
18

**documented**
116:10,15
118:19

**documents**
10:15,21,22
11:1 43:10
54:3,4 64:3
65:22 66:9
69:14 70:12
71:1 81:3

**double-check**
51:2

**doubt** 70:4
101:25 102:1,
10,20 112:14

**downtown**
50:18,25 51:8,
9,15 55:12

**driving** 87:15

**Duckhorn**
112:20

**duties** 38:2,13
56:15 57:2

---

**E**

**earlier** 11:6
52:2 60:18
96:22 98:15
104:7,8

**Eastern** 6:11

**editorial** 78:3,5

**efficiently** 8:12

**efforts** 31:2

**electronic**
49:3

**else's** 51:4

**employed** 11:8

**encounter**
39:1 50:3,4
71:23,25

**end** 106:12
107:13,14
112:11

**enforcement**
12:4

**enjoyed** 17:20

**entered** 75:19

**entire** 9:20
82:18 89:12

**entirety** 101:14

**entitled** 47:18
77:22 81:5
85:21

**equal** 28:20

**estimate** 14:7

**et al** 6:9

**event** 70:20,21
91:18

**events** 70:11
71:21

**evidence** 32:4

**exact** 12:24,25

**EXAMINATIO
N** 7:20 116:25
118:6

---

**Excellent** 11:5

**excerpt** 44:12,
14 101:13,14

**excuse** 8:17,19
24:14 26:1
28:15 34:20
38:23 45:11
51:23 52:15,17
59:12 67:23
71:10 90:16
91:24 98:18
101:9 110:8

**exhibit** 43:4,5,
15 44:12 60:11,
12,14 81:5,7
83:8 85:9
86:12,15,18
97:1 98:6 101:6
103:4,6 104:11
106:8 111:20

**experience**
18:2

**experiences**
19:16

**explain** 21:10
28:20,22,24
29:2 30:23
32:20 68:20

**explained**
22:25 23:12
28:7

**explaining**
21:7

**explanation**
54:23

---

**F**

**facilitate** 64:25

**facilitating**
68:25

**fact** 7:5 10:1
20:4,19 21:18
24:1 42:1 63:3
91:21

**fair** 41:19
119:12

**familiar** 34:22

---

36:11,22 60:17
83:18

**family** 24:20,21
25:6 30:4 32:12

**father** 34:9

**felony** 48:14,
17 53:19 54:1,
2,8,9,15 55:18
56:3 98:14

**figure** 71:3
81:20 85:4

**file** 48:23 49:2,
3,6,7,12,18
50:7,12,14,24
51:7,14,18,21
96:22,24

**filed** 68:18

**fill** 38:7,9
53:17,23 54:13
55:14 56:13
94:6,7

**filled** 31:10
55:4,21 60:13
62:4

**filling** 80:18

**fills** 54:14

**find** 18:3

**fine** 9:16,21
10:19 23:2
46:17 47:9
55:11,12 61:1
66:5 69:13
81:22

**finger** 89:13

**fingerprints**
47:19

**finish** 39:9
88:16 98:25
99:3

**finished**
105:10,14
107:16 111:1
115:21

**fired** 11:25

**five-minute**
60:23 99:6,8

---

115:22

**fix** 98:23

**floor** 72:24
104:21 105:2

**focus** 38:1
42:11 107:20
113:17

**focused** 22:7
51:13

**focusing** 51:17
65:22 79:16

**foggiest**
110:25

**foil** 92:15

**follow** 27:25
56:11

**forgot** 37:8

**form** 18:8,14,
22 19:1,21 20:9
21:8,20 24:5,14
27:16 28:15
29:11,23 30:10,
19 31:4 32:6,14
34:21 38:23
39:18 44:1
48:8,19 49:4
50:15 51:23
52:18 53:9
56:1,17 57:10,
17 58:3,8 60:15
63:6 70:10
79:24 91:20,25
94:2,22 95:8
97:7,20 98:3,4
102:25 103:16
110:11 114:7,
11 119:7

**found** 13:1

**foundation**
15:3 21:8 24:15
27:17 28:17
29:12 30:10,19
31:5 38:24
39:18 41:25
44:1 48:19
49:4,16 50:15
51:24 52:18
53:9 56:1 57:17
94:22 95:8

---



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-47 Filed: 11/04/23 Page 39 of 47 PageID #:9944
The Deposition of JOHN PATRICK DONAHUE, taken on October 20, 2021
127

103:16 110:13 114:16,21

**Fred** 36:23 37:1

**friendly** 21:6

**friends** 11:15

**front** 10:22 31:9,11,23 65:24,25 70:24 72:12 75:25 76:3 93:23

**Fusco** 6:24

———

**G**

———

**G-132** 111:12, 25 112:1

**G-133** 111:23, 25

**Galloway** 84:18,19

**gang** 13:15

**Garcia** 67:21 68:4 115:14

**gave** 65:1 68:8 79:4 102:21,22 117:9,10

**gen** 59:11

**general** 9:13 13:3 59:7,10

**generated** 114:14

**George** 6:19 47:4 60:21 62:2 63:7 66:5,18,19 71:12 90:1

**give** 7:15 10:11 18:15 26:7 29:25 42:19 57:25 115:22

**giving** 74:18 117:20

**good** 7:22 15:24 59:24 90:8

**gosh** 98:7

**Great** 79:3 83:11 90:5 91:17 96:15 111:4

**group** 12:16

**guardian** 24:12 25:13,18, 23 26:18 28:12 29:4,9,20,22 30:5,18 31:2,3, 14 32:3 33:17 34:3 38:20,21 39:3,6,8 40:17 41:2,8,9 56:14 57:1 86:24 99:16,21 100:18,20 101:22 102:3,6 103:12

**guess** 73:17 113:16

**guesses** 113:13,15

**guessing** 108:19

**guy** 17:6

**guys** 51:6 82:24 90:2

———

**H**

———

**hand** 7:14 88:13

**handcuffed** 73:4

**handle** 24:4,7, 8 38:25 93:25

**handled** 36:5 50:11 73:13

**handling** 24:3 33:12

**handwritten** 84:13

**happened** 27:24 28:1,2,11 55:3 71:2 75:18 76:15 84:22

85:3,5,7 104:8 105:10,19,21, 23 106:2 110:20 112:13

**happening** 22:9 34:18

**hard** 68:16

**headquarters** 47:15 50:18 88:5,6,11 91:8, 18 92:6 118:24

**heads** 90:4

**hear** 9:17 18:17 41:15 97:11

**heard** 34:24 68:14

**hearing** 9:19 65:2,7 100:7 117:7

**height** 74:1

**held** 30:6 100:25

**helpful** 64:7

**helping** 82:1

**highlight** 96:16,17

**highlighted** 85:25 91:1 96:12 97:2

**Hold** 89:4 90:21 99:25

**home** 6:21 39:11 40:1,5, 12,13,19,20,21 41:3,9 56:22,25 106:24

**homicide** 68:4 116:7 117:18

**honest** 78:2

**hoping** 98:25 99:3

**hour** 67:13 98:20 118:12

**How's** 60:3

**hundreds** 44:13

**hypothetical** 27:17 28:16 29:12,24 30:11, 14 31:5 44:2 52:1,18 56:18

———

**I**

———

**idea** 54:10 56:2 74:10 79:15 84:20 90:8 95:12 97:21 103:1 107:24 110:25

**IDENTIFICATI ON** 43:5 60:14 81:7 101:6 111:20

**III-A** 46:23

**Illinois** 6:11

**impacts** 10:9

**imparted** 107:2

**important** 22:16,18,21 23:4,5 34:2 63:1,2

**inadvertently** 89:18

**Inaudible** 58:11 63:21

**incident** 29:5 52:21,22 53:1,2 54:6

**inclined** 23:24

**incomplete** 27:17 28:16 29:12,23 30:11, 14 31:4 52:1,17 56:18

**incorporated** 46:24

**independent** 119:23

**independently**

85:3

**Indiana** 73:2

**indicating** 85:24

**indication** 54:17

**individual** 6:23 9:11 50:1 75:9, 11,14,18,19 76:2,14 77:9,17 78:9,13 79:4, 14,17,19,20 80:2,5,7,15 112:20,23,25 113:9,18 118:9

**individual's** 75:13 79:7

**individuals** 69:25 77:8

**inform** 116:5

**information** 29:21 30:6 40:13,24 54:8 57:15 62:25 85:9,22 86:4,8 93:13 100:17 106:11 107:2, 12 108:6,9 114:9 116:13, 19

**inside** 88:4,10 91:7 118:23

**instance** 28:10 118:21

**instructed** 106:22

**interact** 18:5 27:14

**interacted** 32:10

**interacting** 22:8 80:2,5 99:15 110:23 111:2

**interaction** 76:11 79:16 110:5 118:18


Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:19-cv-02204 Document #: 266-47 Filed: 11/04/23 Page 40 of 47 PageID #:9945
The Deposition of OFC. PATRICK DONAHUE, taken on October 20, 2021
128

**interactions**
22:9 50:8 68:10
71:19 79:20
84:23 110:18
112:12 113:25
114:3,19

**interchangeab**
**le** 20:16

**interesting**
82:24

**intermittent**
98:19

**interpose**
44:17 101:9

**interpret** 91:17

**interruption**
106:25

**interview**
18:11,24
100:14 107:6,
10,22 108:1,13
109:5

**interviewed**
75:21

**inventory**
94:12 97:2,6

**investigation**
67:21 68:5
86:17 87:1
115:13 116:7

**Investigative**
43:16

**Investigator**
27:6

**involved** 25:13
52:22 54:7

**involvement**
68:1 115:13

**issue** 20:9 83:1
89:5

**Item** 46:23

_____

**J**

**Jakes** 6:8,17
7:24 65:9 68:11

71:23 73:4,6,7,
17 74:2,4,14,24
75:1 83:14
84:23 92:6,10,
18 97:9,17
99:15 100:4,12,
23 102:6
103:11,15,20,
25 104:9,13,19
105:10,15,18
106:9,10,18
107:6,11,22
108:1,13
109:23 110:3,6,
19,24 111:2,6,
9,13,24 112:12,
20,23 113:1,9,
19,22,25 114:3
116:6 117:7,18,
25 118:18,23
119:9

**Jakes'** 75:7
92:14 93:16
100:25 101:22
102:18 114:6,
10

**Jessie** 100:21

**job** 12:4 31:15
32:2 34:25
37:14 39:10
64:8

**jobs** 36:3

**jog** 48:5

**Jones** 100:20,
22 102:24
103:8,24,25
116:5

**ju** 15:5 80:9

**juvenile** 19:19
20:25 22:4,5,
14,18 24:7,18
25:2,3,4,15,19
27:19,23 30:3,
4,6 32:16,17
33:20 34:5,11
38:16 39:11
40:3 42:2,4
53:23 54:19,20
55:4,15 58:24
60:8,13,18
70:18,19 78:21
80:9 81:6,15

82:20 92:23
98:1,2,7,8,14,
16 116:16,19
118:13,22
119:23

**juvenile's** 25:6
30:22

**juveniles**
17:18,24 19:23
20:15 23:17
46:10 47:14
48:6,10

_____

**K**

**keeping** 28:12

**Ken** 36:12,13,
14,20

**Kenneth** 6:9
26:24 113:22

**kids** 17:25 18:1
20:2,11,14

**Kill** 34:23 35:6
113:18

**kind** 10:8
20:22,23 21:25
28:24 29:19,20
33:7,14 53:16
68:16,25 90:17
116:19

**knew** 16:13,18
22:14 27:21
30:4 56:22
70:14 107:7
108:14,24

**knowledge**
53:14 54:22
74:16 75:12
86:5 92:16
109:19 110:20
112:24 113:2
115:15

**Kortney** 6:4
103:6

_____

**L**

**lab** 114:13

**lack** 16:22
17:4,7

**language**
19:24,25 20:4

**larger** 90:22

**law** 6:24 12:4
20:16 31:20

**lay** 47:8

**learn** 97:5
107:25

**learned** 108:6

**leave** 12:1 16:7

**leaves** 35:19
54:22

**left** 16:11 81:16
82:4,7,11,13,
18,19 102:23

**left-hand**
58:24 84:4

**legalized** 21:2

**legible** 59:15
81:19 83:8

**lengthier**
101:13

**level** 24:19

**lie** 51:6

**lines** 63:1
100:12 101:12
107:17

**literally** 59:16

**litigation** 68:1
117:3

**located** 72:23

**location** 6:13
86:7 100:25

**lock** 104:20

**long** 12:20
13:6,21,25
14:22 15:12
16:18 22:2
26:25 33:2
60:22 67:5,9,11
70:14 110:1

**longer** 89:11
105:6 106:21

**looked** 17:1
73:12

**lot** 30:24 35:19
54:22

**loud** 59:16
88:21 91:6
102:14,16
104:23 107:17
111:19

**Louis** 35:11
113:1

**luck** 15:24

**lucky** 37:8 75:5
105:20,22

**lunch** 61:11

_____

**M**

**made** 24:23
52:12 88:11
90:22 91:8,11
93:21 95:4,18,
24 97:25 107:5
108:2 118:24

**Mae** 100:21

**magnification**
81:19 83:7

**main** 50:24

**maintained**
47:14

**make** 9:6,19
22:13 23:5
25:12 26:18
32:1,3 33:21,
22,23 34:15,17
41:8 45:18 47:5
51:3 54:21
56:19 59:14,21
64:6 83:12,17
88:15 97:9,18
98:2

**makeup** 25:1

**making** 22:7
23:9 56:25

**Male** 83:14



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

man 36:2
115:13,16

management
27:11

manual 43:16,
24 44:13,14,15,
22 45:3 46:23

margin 82:19

margins 82:7,
12

mark 43:3
60:11 81:5
103:4,5

marked 43:5
60:14 81:2,7
101:6 104:12
106:9 111:5,13,
20

matter 6:8
68:19 93:11,12

matters 106:25

maximum 14:8

Mccann 113:9

means 68:21
93:2

meant 22:23
61:12 119:12

measures
107:8 109:3,8

medication
10:8

meet 66:12,18

meeting 67:9,
11

meetings 67:2

member 24:20
30:4

members
32:12

memories
35:19

memory 10:9
35:5 36:6,8
48:5 70:11,13
79:17,19 80:12,

18 84:22 92:5
101:8 102:17
103:7 105:9,13,
17,24 109:19,
22 113:14

mentioned
46:24

Michael 34:23
35:6,22

Michigan
12:11,17

middle 30:22
101:18

mind 60:23
70:11 83:15
91:24

mine 62:4,5

minor 85:21,
22,23

minute 42:20
54:2,19,20
55:4,15,23
60:8,13,18
63:20 70:7
81:15 82:20
85:11,13 94:7
98:7,8,14
116:16,19
118:13,22
119:17,23

minutes 53:23
58:24 61:1
67:10 81:6 85:9
102:14 110:1
118:14 119:3

Miranda 21:7,
11,17 22:24
23:10,20
109:23

mischaracteri
zes 58:9 77:15

Misstates 28:4
34:21

mistake 89:8

Mister 103:24

misunderstoo
d 61:13

moment 42:13
109:14 115:22

months 14:2

morning 7:22

mother 34:9

motion 65:7
67:18,19 68:9
70:9 100:6,11
102:2,21,23
104:15 109:18
114:19,24
115:7,9

mouth 108:8

move 14:25
15:7 89:10

moved 15:19
16:16

multi-page
44:19

multiple 23:19
49:22

murder 115:13

—————

N

named 26:24
35:13 112:20,
23,25 113:9,18,
21 115:14

names 35:3
37:8

narcotics
101:3 102:7
114:14

narrative
38:11 53:21,22
86:17 91:3

navigate 89:12

needed 25:6
30:3 53:12 93:9

neighbor
40:23

non-
consecutive
43:2

Northern 6:10

note 44:18 81:2

notebook
31:11

notifications
95:24 96:3

notified 96:8,9

notify 100:24

number 6:11
32:19,20 48:22,
23 49:19,21,22
50:10 54:11
63:19 84:11
86:4,25 87:9,
10,11,12,14,17,
18,21 88:2,5
91:7 96:12,15,
18,20 97:2,6
100:25 101:12
107:9 109:3

—————

O

O'REILLY
112:23

oath 117:10,21

object 9:11,12
18:14 20:8 24:5
34:20 46:20
47:2 79:24
91:25 119:5,7

objecting
44:21 67:23,25
68:2

objection 9:12
14:14 15:2
18:8,22 19:1,21
21:8,20 24:14
27:16 28:4,15
29:11,23 30:10,
19 31:4 32:6,14
34:20 38:23
39:18 41:5,12,
25 44:1,17
48:8,19 49:4,8,
15 50:15 51:23
52:7 53:9 55:25
56:17 57:3,10,
17 58:3,8 60:15
77:14 79:25

91:20 93:18
94:2,22 95:7,11
97:7,20 101:10
102:25 103:16
108:4,20
110:11 114:7,
11,16,21

objections
45:1 53:13 56:5
101:15

occasion 19:4,
7,10,13 48:13,
16 100:22

occasions
30:16 41:23

occurred 57:9

October 6:6

offender 22:6

offense 48:17
78:15 79:10,13,
18 86:7 97:10

offenses 48:14

office 6:24
17:20 71:6,7,8
72:21,22,23
74:4,8 75:25
76:9,18 77:11,
12 78:14,20,21
79:22 104:21
105:3 107:7
108:14,15,25

officer 6:23
12:15,19,22,23
13:4,7,9,17
14:17 17:14,17,
22 18:2,5,6,20
19:3,4,17,18
20:18 22:16,17,
19,22 23:5
25:5,17 26:23
29:16 32:24,25
33:4,8,21,23
35:13,17,22
36:9,12,20,23
37:23 38:2,6,12
39:2,7 40:20,21
41:3 43:23 44:5
51:2,14 54:13,
14,16,24 55:14
56:10,13,16



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-47 Filed: 11/04/23 Page 42 of 47 PageID #:9947
The Deposition of OFC PATRICK BONAMIN, taken on October 20, 2021
130

57:2,7 58:7
70:18 72:2
76:12 94:23
106:5 113:24
114:2,6,10

**officer's** 54:18

**officers** 9:11
27:4 55:1 57:8,
16,22 58:2,6,7
72:8,17 73:3
74:6,9,13,23
75:1,10,17 76:3
77:17 79:11
80:3 86:21
87:4,7 88:11
91:10,11 92:9,
12 93:21 94:10,
21 95:5,16,19
96:5 97:8,24,25
105:14 118:9

**officers'** 71:6

**older** 106:1,2

**one's** 74:20

**operated** 56:8

**opportunity**
101:11 103:25

**opposed** 20:5

**option** 40:7
106:12,24
107:4,12,15

**order** 25:9

**original** 53:19

**originally**
13:19

**out-of-context**
44:23

**outstanding**
82:16

**overtime** 96:7

**owner** 95:10

---

**P**

---

**P-A-T-R-I-C-K**
8:1

**P.H.** 81:17 84:5

**P.M.** 120:5

**pa** 12:18

**pacing** 47:6

**Pack** 35:14,17
87:4 113:25
114:6

**packet** 88:13
91:13 92:13,15,
17 93:23 94:1,8
95:10 97:19
119:1

**pages** 44:13
58:21 60:11

**pants** 88:13
91:13 92:14
93:17 118:25

**paper** 16:21,24
17:9 85:1,2,4
86:9,12

**papers** 84:25
85:6

**paperwork**
31:9 53:17
56:14,24 61:17
72:12 80:19
94:6,8

**paragraph**
47:23 89:3 91:2

**paragraphs**
46:2

**pardon** 36:7
47:7 61:24
62:11 74:21
78:4 79:25 89:9
91:22

**parent** 24:12
25:13,18,22
26:18 27:13
28:11 29:4,9,
19,21 30:5,18
31:1,3,8,14
32:3 33:17
34:3,9,10,15,17
38:19,20 40:17
41:2,8,9 56:15
57:1 80:10
99:21

**parents** 27:14

**part** 13:14
17:22 27:25
44:22 47:12,17
59:6 78:10,11
96:21 110:5

**parties** 7:4

**partner** 16:20,
24 17:6,9 66:16

**parts** 71:18
107:20 110:18

**party** 28:9

**past** 79:17

**pat** 93:21

**pat-down**
88:12 91:12
92:9,10 118:24

**Patrick** 6:8 7:3,
5 8:1

**patrol** 12:15,
18,20 13:9,14
17:19 18:19
19:17 36:2

**pause** 9:14,15

**pending** 6:9
10:5

**people** 16:13,
18 58:1 73:12

**Perfect** 90:15

**permission**
86:24

**permitted** 10:4

**person** 28:19
30:1,2,24 38:14
50:13 74:23
75:24 78:18
109:10

**personnel**
15:6 16:5,12,23
17:4,7 107:9
109:3

**Philip** 6:22
118:3,8 119:8

**pho** 42:3

**phone** 29:15,
20 30:8,17,25

40:22 63:12
76:25

**phonetic** 63:13
84:18

**photograph**
41:24 48:17,18,
21 49:12 50:13,
22

**photographed**
48:7,11

**photographs**
44:16 45:5
46:10,21 47:1,
14 50:14,23
51:19,20

**photos** 42:3

**physical** 49:3,
5

**pick** 56:20

**pictures** 41:23

**pieces** 85:20

**pile** 55:7

**place** 39:12
55:6 63:4 67:3
91:18 100:7
107:11 111:7

**plaintiff** 6:17
7:23 100:4,12
104:13 106:9,
18 111:6,9,24
118:18

**plaintiff's** 6:14
100:4 111:13

**pocket** 88:13
91:13 92:14
93:17 119:1

**point** 9:17
10:3,25 11:25
82:9,21 88:25
103:11 115:12
116:5 119:12

**pointed** 47:16

**pointing** 46:17

**police** 11:11,
14,17,20,23
12:1,3 18:6

22:19 25:12,22
26:17 28:13,24
29:16 30:7 33:1
35:10,13 36:12
43:15,17 44:7
45:3 50:8 58:7,
25

**policeman**
22:15

**policies** 44:6,9

**policy** 25:22
26:17

**portion** 46:22
91:3 100:9,10
119:16

**position** 17:22

**possession**
105:5 106:20

**powdery** 88:14
91:14 92:13
94:9 119:1

**practice** 25:11,
17 27:13 28:12
29:2,3,20
116:12,18

**preliminary**
100:14

**preparation**
64:4 66:10,13
70:10 114:24
115:4

**prepare** 61:9

**prepared**
81:17 84:5

**presence** 29:2
53:5

**present** 25:18,
23 26:19 27:20
29:4 30:1,2,3
78:14 79:11
92:10 93:15
95:18

**presume**
110:22

**presumption**
9:24



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**pretrial** 65:2,6, 7 104:14 117:6

**pretty** 35:21

**previous** 50:4, 7 51:20

**previously** 51:19 65:23

**Primarily** 13:11 51:9 98:4

**printed** 62:7

**prior** 18:3,4 34:21 77:15 117:20

**problem** 31:24

**problems** 105:24

**procedure** 43:16 45:4

**proceed** 8:12 44:18 100:17

**proceeding** 117:21,25

**proceedings** 6:1 111:7

**process** 18:21 38:2,5 48:13 50:3 78:11 92:21 103:13

**processed** 19:13 39:16 41:22 48:6 53:16 92:21,22 97:23 104:9

**processing** 38:6,13,14 39:2,7 54:14,16 55:14 56:10,12, 13,15 57:2,7,9 58:1,7 71:19 75:10,14,18 76:12 97:18 99:15 100:23 103:10 104:19 105:6,10,14 106:21

**produced** 81:3

**proof** 31:22

**proper** 78:6 95:24 96:2

**property** 97:2, 6

**prosecutor** 55:24 56:4

**prosecutors** 114:19,23 115:3,9

**protective** 88:11 91:12 92:9 93:21 118:24

**provide** 30:5 58:6 100:17 114:5,9

**provided** 101:15 102:2

**public** 31:21

**pull** 50:6 82:24

**purpose** 54:20 60:4 83:13

**pursuant** 100:22 116:6

**push** 56:21

**put** 40:24 55:7, 8 70:16 104:19, 20 106:13

---

**Q**

**qualify** 77:22

**question** 7:8 8:25 9:10,15, 20,22,24,25 10:5,6 18:4,8, 14 19:21 24:5 26:3,7 27:16 28:16 31:23 32:6,14 41:13, 19 42:12 52:7,8 60:4 64:11 67:17 68:17,24 77:15 79:25 80:24 83:13 88:17 97:11 100:14,16,19, 20,22,24 101:17 104:18 105:4 106:10, 22 107:4,8,11 108:12 109:2 110:9,14 111:14,16 112:1 119:8,21

**questioned** 19:8,10 32:9

**questioning** 27:19 58:13 106:24

**questionings** 98:23

**questions** 15:20 23:2 29:1,5 30:22 46:19 61:21 62:1 91:6 116:22 118:4, 13 120:1

**quick** 89:24

---

**R**

**race** 73:16

**rad** 109:12

**radio** 109:12

**Rafael** 115:14

**raise** 7:14

**rare** 50:21

**rarely** 16:22 17:8 50:16,20

**re-read** 88:22

**reach** 24:11 30:17 31:3 32:12 41:8 99:16

**reached** 31:1

**read** 10:17 45:8,12,13,16, 17,21 46:1,2,5 47:12,20 48:4 59:5,9,15,16,21 61:14,22 62:3 68:18 69:15,18

**81**:18,19 82:2 83:11 85:2 88:21 90:17,21 91:5 95:13 101:4 104:25 106:15 107:16, 17 111:18,19 119:8,9

**readable** 83:9

**reading** 84:21 102:9,14,16 104:22 109:17

**ready** 37:15 83:22

**real** 22:2 89:24

**realize** 81:25

**reason** 10:11 34:2 37:9 76:21 78:9 100:2 101:25 102:20, 22 112:14

**recall** 35:8 112:4

**receive** 32:24 41:9 114:13

**received** 43:24 86:24

**recently** 68:15

**recognize** 47:10 60:5,7,8 83:12

**recognized** 70:15

**recollection** 101:21 112:11 115:8 118:17

**record** 6:3 7:2, 25 26:4 42:25 50:9,25 61:6,7 63:14,15,17,18 71:13,14,15 73:23,24 77:2, 4,5 81:11 82:25 83:3,4 92:23 99:11,12 116:1, 2

**recording** 8:9

**records** 47:9

**recovered** 88:12 91:12 92:13,18 93:16, 22 118:25

**recovery** 92:15 93:15 94:8 97:19

**refer** 87:10 96:4 111:23

**reference** 46:22

**referred** 49:2 54:1 96:21,22 101:2 102:7

**referring** 11:1, 2,10,13 42:25 44:15 60:18,19 63:9,10 87:6 89:3 95:15 98:15 103:23 106:8

**refers** 47:17 92:8

**refresh** 84:22 101:8,20 105:9 109:18 112:10 115:7

**regard** 102:2

**reject** 20:12

**related** 27:20 65:7 94:8 117:7

**relation** 114:14

**relative** 25:3 100:18

**relax** 42:15

**released** 52:14 53:8 80:10

**rely** 85:4,6

**rem** 27:7

**remain** 13:6

**remaining** 116:6

**remember** 14:13 15:12



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-47 Filed: 11/04/23 Page 44 of 47 PageID #:9949
The Deposition of OFC. PATRICK DONAHUE, taken on October 20, 2021
132

21:22 35:4
36:19 37:8
42:2,3 52:5,8,9
65:2 66:24
70:20 71:1,2,3,
4,18,20 72:4
73:10,11 74:1,
16,17 75:4,5
76:21 78:25
79:4,7 80:1,4
84:25 85:3
92:11 95:21
101:23,24
102:9,13,16
104:5,8 105:20,
23 108:21,22
109:14,15
110:23 111:1
112:17 114:18,
22 116:8
118:14 119:2,
16,19,20,22

**remembering**
17:12 68:16

**remind** 65:1

**remotely** 6:18,
20,24 10:14,21

**Renee** 6:16
7:22

**repeat** 97:13
101:17

**rephrase** 9:23
68:6

**report** 32:8
40:25 53:19,22
54:25 55:2,8
57:8,15 74:11
86:3 87:23 88:1
97:25 98:1,2
114:13

**reported** 57:21

**reporter** 6:3,5
7:1,4,13,19 9:7
61:7 63:16,18
71:15 73:24
77:3,5 83:4
99:12 103:3
115:25 116:2
120:2,4

**represent** 6:19

7:23 38:16,18
69:12 111:10
117:2 118:9

**representing**
6:22 45:2

**request** 15:7

**require** 25:17

**required** 32:11
34:2 38:14
39:21 53:17

**requirement**
33:17

**reset** 89:24

**respect**
100:15,18
106:11 107:12

**respond** 107:2

**respondent**
85:23

**respondents**
85:21,22

**response**
28:18,22

**responses**
79:4

**rest** 63:4 83:21

**restate** 18:4

**resting** 92:8

**restricting**
77:24

**retire** 37:15

**retired** 8:14
11:6,10,13,16,
17 12:21 13:8,
21,24 16:8,9,11
37:9

**retirement**
37:10

**review** 8:11
64:3,8,20,23,25
101:11,20

**reviewed** 64:9,
13,17 65:1,6,22
66:9 70:6,8

**reviewing** 71:1
115:6

**revised** 43:20

**right-** 88:12

**right-hand**
84:14 91:13
92:14 118:25

**rights** 21:7,11
22:18,23,24
23:6,11,20
76:17,19,20
77:9,17 94:15,
19,24

**righty** 103:10

**ring** 27:1,7
36:25 37:3
115:20

**rings** 35:15
36:1,7,15,18
63:12 76:25

**robbery** 87:20

**Rock** 6:24

**role** 67:21 68:3,
4 76:11

**room** 57:13
71:6,7,8,19
74:14,15,20,22
75:2,10,15,18,
19 77:18

**routine** 102:4

**rule** 9:6 34:1

**rules** 8:11 9:5
32:4

**run** 50:9

———
**S**
———

**safeguard**
34:15,17

**sat** 8:3 75:20,
22 76:3 77:8

**scheduled**
57:23

**school** 30:23

**screen** 10:15

42:23 48:12
59:17 66:1
89:15,24 90:6
102:11,12

**scroll** 46:9
47:18 58:22
60:6 82:6
83:20,22 85:15,
16,17,19
106:16,17
111:22

**scrolled**
106:18

**scrolling**
83:24

**Sean** 6:17

**search** 88:12
91:12 93:21
118:25

**seated** 76:15

**seconds**
102:15

**section** 38:9
44:15,16 45:5,
6,9 46:21,24
47:1,13,17
53:22 84:14
85:21,22 86:2,
6,17 87:6 97:3

**send** 29:15
39:12,25 40:5,
12,13 55:12

**sense** 21:24
22:13 31:24
32:15 34:5

**sentence** 87:1
88:21 91:2,6,15
92:8 94:16,20
95:13,25
118:22

**sentences**
101:4

**September**
37:18,19 111:8

**Sergeant**
84:18

**Services** 43:16

**set** 57:18,23
95:23

**sex** 86:3

**sharing** 48:12
89:15,24 90:6

**she'll** 26:6,7

**sheet** 53:24
54:8,9,15,19,20
55:4,15,18,24
56:3 58:24
60:18 62:3,10,
12,17,20 63:8
64:2,20 66:9
70:7,8 81:6,15
82:2,8,18,20
85:10,12,13
94:7 98:7,8,10,
14 116:16,19
118:13,22
119:17,23

**sheets** 17:1
60:8,13 70:16

**shift** 20:23
58:15

**short** 14:21,22
16:1

**shove** 56:21

**show** 10:15
42:22,23 44:20
47:10 50:10
58:14 80:25
86:6 99:22,23
100:2,9 106:7
111:4

**showing** 10:18
43:14 44:11,12,
14 47:2 58:20
100:8

**shown** 44:23
83:8 101:12

**shows** 86:7

**sic** 35:24
118:23

**side** 13:23
27:22

**sign** 55:8

**signature**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-47 Filed: 11/04/23 Page 45 of 47 PageID #:9950
The Deposition of OFC PATRICK DURANTE, taken on October 20, 2021
133

84:13,15,17

sim 54:4

similar 54:4

single 20:12

sir 35:21 51:13 85:18 92:1 100:16,24 105:7 106:22 107:11 109:5

sit 42:15 75:25 108:3,5,16 109:7

sitting 75:23

situation 21:5 31:24 39:1 40:16 41:1 50:2

situations 39:5

size 59:24

slightest 79:15

slip 40:25 64:13,19,20 66:8 75:16 80:11

slow 42:19 100:1

slowly 85:16

small 90:17

so-and-so 31:12,13

solemnly 7:14

somethings 71:4

sort 9:12 71:20

sound 9:18

sounds 20:2, 18 23:18 25:11 34:14,16

speak 8:24 9:1, 14 19:23 20:3 34:6,7 103:15, 20,25 112:19, 22,25 113:3,18, 21,24 114:2,23 115:3

speaking 9:7 21:18 22:22 30:17 92:5 104:2 105:13, 17 118:11

speaks 34:10

special 13:15

specific 36:9 49:19 59:16 80:18 109:22 119:22

specifically 17:25 80:12

Speculate 15:2

speculation 14:15 15:3 30:11 38:24 44:2 49:15 51:24 55:25 95:7 103:17 108:4,20 110:13

spell 7:24

Spence 6:16 7:7,21,23 8:19 9:4 18:18 20:10 24:22 26:2,14, 16 41:15,17,20, 21 42:13,18,21 43:13 44:18 45:13,20 46:8, 13,16 47:4,8, 11,22 48:3 52:9 58:12,14,18,19 59:9,14,23 60:21 61:2,8 63:7,10,14,24 64:1,11,16 65:14,18,21 66:4,6 68:2,6,7, 22 71:12,16 73:22,25 76:23 77:1,6,24 78:4, 7 81:10,14 82:6,11,14,23 83:5 88:20,23, 24 89:1,14,21, 23 90:1,5,12, 15,20,24 97:15, 16 98:23,25 99:3,8,13

101:18 103:3,5 104:15,17 110:10,12,17 115:21 116:3, 21,24 118:3,11 119:3,5,7,10, 13,14

spent 14:9 16:10

spoke 52:2 97:17 104:3 110:2 115:8 116:4

stamp 62:9,12 63:8,19 81:4

stamped 43:1, 3 58:21 81:1 100:3 104:12 111:9,24

stand 48:24

stands 48:24 86:20

star 84:11

start 112:11

started 110:23

starting 6:14 91:1 100:12 104:11 106:19 111:13

state 6:12 7:2

state's 31:21 56:7

stated 108:11

statement 56:12 95:15,19

statements 97:10,18 100:6

states 6:10 92:12

station 28:24 30:7 40:18 41:2 72:25 107:22 108:1 116:6

stay 11:15 16:17 107:3

stayed 15:9 56:20

staying 106:24

steps 39:7

Stick 111:23

stop 48:12 89:23

strange 82:23

street 54:2 107:6,9 109:4,9

stuff 62:5 63:5 65:12,19 68:14 71:5 74:11

sub-parts 47:21

subject 28:6 33:13,14 50:22 53:4 56:19,25 78:15 94:14,18, 19 95:2,9,14, 15,18 101:15

subjects 19:22

submit 55:15

submitted 114:15

subsection 45:8,21,22,23 46:7,8 48:4,5

substance 88:14 91:14 92:14 94:9,15 95:3,14 105:5 106:21 119:2

sued 69:19,21, 24 70:2

summary 105:3

sun 33:10

supervisor 53:10,11 55:8, 13,16 58:4,5

supposed 108:13

suppress 67:18,20 68:9

70:9 100:6,11 102:2,21,23 104:15 109:18 114:20,25 115:7,9

suppression 117:7

surprised 17:12

suspects 18:11,12

swear 7:14

swore 117:10, 21

sworn 66:7 67:20 68:10

———

T

table 76:6,9

tactical 13:15

taking 42:2 91:18

talk 74:5 80:2

talked 31:11 32:8 99:17

talking 20:5 22:15,19 30:13 42:6 63:6 79:22 90:4

tall 74:2

teams 13:15

technician 6:4

technological 83:1

technology 42:17 89:5 98:19

telephone 54:11 109:12

telling 71:18

temporarily 39:13

ten 14:9 67:10


Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**term** 20:13,18 68:2

**terminology** 19:24 20:19,22 21:1,2,7,16,25 22:4 23:22,25 55:1

**terms** 20:16

**testified** 67:18 104:8 117:6,15, 17,24

**testifying** 67:19

**testimony** 7:15 28:5 34:21 58:9 64:21 65:1,10 66:8 67:21 68:8,10 70:9 77:15 100:11 101:12, 14 102:1,5,21, 22 107:21 109:18 111:11 112:15 114:24 115:4,6,7 117:9,11,20,22

**texts** 59:3

**that'd** 79:21

**theme** 9:13

**thing** 28:7 55:20,21 61:16 72:7 98:11,12

**things** 26:11 46:5 53:18 98:19,22

**Thomas** 35:14

**thought** 46:16

**time** 6:6 9:7,14 12:17 13:12,21, 22 14:8,21,22 16:14,18 20:12 21:5 23:1 24:13 26:25 31:12 39:12 41:14 45:17 49:5 51:2 63:2 72:15 77:10,11,12,13, 16 78:23,25 84:12 86:7

87:23,24,25 89:12 92:3 96:6 101:1,4 102:8 106:23 107:8 108:2,14,15,25 110:23 111:1, 17 112:3,11,16 113:4,10,12 118:19

**times** 16:14 21:24 57:12 66:18

**tin** 92:15

**tin-foil** 88:13 91:13 92:13,17 119:1

**tinfoil** 93:16,22 94:1,8 95:10 97:19

**today** 6:5 10:12 100:1 108:16 109:7

**today's** 61:10 64:4 66:10,13

**told** 11:5 31:13 57:6 70:25 101:2 102:6 108:9 116:9

**top** 58:23 81:6, 15 82:3,20 85:18,24 96:10

**topic** 58:15

**topics** 33:7

**total** 70:13

**totally** 47:9

**touch** 89:15,16 90:23

**touched** 89:7, 18

**trained** 21:19 44:6

**training** 32:24 33:3,5,8,16

**tran** 65:6

**transcribe** 9:8

**transcript** 64:21 100:3,7 101:20 109:17 111:5,7

**transcripts** 64:8 66:7

**transport** 86:25

**treat** 19:19

**treated** 18:3 19:22

**trial** 65:2,6,10 67:19,20 68:9 70:8 100:10 111:11 115:4,6, 10 117:17,25

**truth** 7:16,17 117:10,13,22, 24

**type** 62:6,7 85:8,21 86:4,8

**type-written** 62:7

**typed** 62:17,19 63:4 86:9,10,12

**typing** 63:5

**U**

**Uh-huh** 47:25 84:1 86:19 110:15 112:6 119:14

**underneath** 49:23

**understand** 9:23,24 10:1 19:25 21:2 22:1,5,23 23:21,24 26:10 28:22 34:12 35:2 41:20 47:8 59:13 66:4 68:24 69:2,3,4, 5,9

**understanding** 78:12,18

**understood** 22:8,18 23:6, 10,15,16,20 34:18 35:9 64:11 77:25 78:22

**unfair** 44:24

**unit** 13:15 29:18,25 86:23, 25 87:9,16,18 88:9 108:17

**United** 6:9

**units** 27:5

**updates** 57:25 58:6 114:5,9

**V**

**vaguely** 71:1

**verify** 30:15,16 92:19

**versa** 20:1

**versus** 19:18 53:8

**vice-** 19:25

**victim** 22:6

**video** 6:4 9:9

**videoconferen ce** 6:7

**view** 30:25

**violation** 101:3 102:7

**violent** 104:21 105:3

**visible** 46:17 81:21 82:8,22

**W**

**wait** 8:25 27:13 29:4 63:20 106:14

**waiting** 80:23

**waive** 22:23

**waiving** 23:7, 10

**wanted** 16:5, 13,17 17:18,21 21:12 22:13,25 32:20,21 41:18 59:14 83:17 103:18

**wanting** 32:1

**warrant** 38:8

**ways** 23:13,19

**week** 12:8 17:6 67:8,9

**west** 13:23

**whatsoever** 102:19 103:9 109:21 112:16

**white** 88:13 91:14 92:13 94:9 119:1

**witness'** 58:9

**witnesses** 18:25 19:11

**word** 20:11 91:1 108:8

**wording** 23:23

**words** 22:2 59:9,17 62:7 81:20 104:22

**work** 11:22 12:9,20 13:10, 20,25 16:13,21 17:7,18 26:23 27:8 35:17 73:15

**worked** 12:13 13:21,23 17:4,8 27:5 35:4 36:2, 3,16 49:11

**working** 11:19 12:14 14:9 17:24,25 18:1 35:5 36:6,8,19 37:18 43:23 51:2 96:7 113:5

**would've** 116:15



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:19-cv-02204 Document #: 266-47 Filed: 11/04/23 Page 47 of 47 PageID #:9952
The Deposition of YO PATRICK DoNARD, taken on October 20, 2021

135

wow 11:21

writing 83:7

wrong 80:22

wrote 87:23,25

———————

**Y**

———————

y-file 96:21

y-number
93:11 96:19,20

Y.D. 96:11

Yamin 6:19
7:8,10,12 8:15,
17,19,22,24 9:3
14:14 15:2
18:8,14,17,22
19:1,21 20:8
21:8,20 24:5,
14,17 26:1,6,
10,13 27:16
28:4,15 29:11,
23 30:10,14,19
31:4 32:6,14
34:20 38:23
39:18 41:5,12,
19,25 42:7,11,
14,16 43:7,9,12
44:1,17 45:11,
15,24 46:5,12,
14,19 47:7,21,
24 48:1,8,19
49:4,8,15 50:15
51:23 52:1,7,
15,17 53:9,13
55:25 56:5,17
57:3,10,17
58:3,8,12,16
59:5,7,10,12,
19,22 60:15,23
61:1,3,12,21,25
63:9,11,15,19,
22,25 64:6,10,
15,24 65:5,9,
12,16 66:2,15,
21 67:17,23,25
68:4,17,20
71:10 73:21
77:14,22 78:2,5
79:24 80:23
81:8,13,24
82:4,9,13,17
83:2 85:11

88:16,19,22
89:4,9,11,16,
20,22,25 90:3,
8,11,16 91:20,
24 93:5,18
94:2,4,22 95:7,
11 97:7,11,13,
20 98:18 99:2,
7,10,25 101:9
102:25 103:16
104:14,16
106:14 108:4,
20 110:8,11,13,
16 114:7,11,16,
21 115:24
116:23 117:1
118:2

Yap 91:11

YD 48:22,23,24
49:2,6,7,12,18
50:6,10,12,14
51:7,14,17,21
86:4 96:11,18,
21

year 14:4,5,24
15:10,21

years 14:2,9,
10,11 15:21
17:11 22:3 35:1
37:7,13 51:11
53:15 54:10
62:18,19 68:15
71:24 73:13,15
74:10 77:19
78:17 85:7
99:23 105:19
106:2 108:7
110:20 112:18
113:6

yest 61:15

yesterday
61:15 105:21,
23

YO 81:17 84:5

youth 12:21,23
13:4,6,17 14:17
16:15 17:13,16,
20,22 18:2,4,20
19:3,4,8,11,14,
18 20:14,17,18,
24 21:6,16,18
22:1,8,16,17,

21,22 23:5,6,10
24:2,3,10 25:1,
12 26:19,22
27:4,11,12,15
28:10 29:2,5,9
31:2 32:23,25
33:4,8,23 34:3,
17,18 36:4,12,
20 37:23 38:2,
5,6,7,8,12,13
39:2,7,17,19,22
40:4,5,12,13,
17,18 41:1,3,
10,22,24 43:17,
23 44:5,7,22
45:4 47:15
48:14,16,23,24
49:12,19,20
50:3,7,12,18
51:14,18 52:2,
3,4,13,24,25
53:7,16,23
54:2,14,16,24
55:1,14,23
58:1,25 71:6
72:1,21,22,23
76:12 78:21
87:19 96:24
106:5

youth's 24:11
33:17

youths 19:5
20:20

———————

**Z**

———————

zoom 8:7 42:24
44:15 47:19
58:23 60:2
81:11,18 89:2
90:20



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com