## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

ANTHONY JAKES,

      Plaintiff,

    v.

KENNETH BOUDREAU, et al.,

      Defendants.

No. 19 CV 2204

Judge Manish S. Shah

### MEMORANDUM OPINION AND ORDER

Rafael Garcia was murdered on Chicago's South Side in 1991. Chicago police officers learned that plaintiff Anthony Jakes (who was fifteen years old at the time) had information about the killing. Officers went to Jakes's house and brought him to a police station, where they allegedly planted drugs on him and coerced his confession. Jakes was tried and convicted for Garcia's murder. In 2018, that conviction was vacated. Jakes brings claims against police officers for (among other things) coercion and fabrication in violation of the Fifth and Fourteenth Amendments. Defendants move for partial summary judgment under Federal Rule of Civil Procedure 56. For the reasons discussed below, the motion is granted in part.

## I. Legal Standards

Summary judgment is appropriate when there is no genuine dispute about any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Bunn v. Khoury*

*Enterprises, Inc.*, 753 F.3d 676, 681–82 (7th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). I construe all facts and reasonable inferences in favor of Jakes, the nonmoving party. *Robertson v. Dep't of Health Services*, 949 F.3d 371, 377–78 (7th Cir. 2020) (citation omitted). Defendants bear the burden of establishing that the summary judgment standard is met, but Jakes must put forward enough evidence to establish the essential elements of his claims and show that he can carry his burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## II.    Background

Jakes is no longer pursing claims against defendants Fred Bonke and Thomas Pack, and is also abandoning Count Three of his complaint. *See* [269] at 11 n.1; [268] ¶ 4.[1] At issue then, are claims against defendants Michael DeLacy, Louis Caesar, and Ken Burke, and one theory of liability against Kenneth Boudreau. *See* [1] ¶¶ 117–186. I omit facts that relate only to Bonke, Pack, and claims no longer at issue.

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are largely taken from defendant's response to plaintiff's Local Rule 56.1 statement, [285], and plaintiff's response to defendant's statement, [268], where both the asserted fact and the opponent's response are in one document. Any fact not properly controverted is admitted. N.D. Ill. Local R. 56.1(e)(3); *see, e.g.*, [268] ¶¶ 16, 23, 29, 54; [285] ¶ 19. I ignore legal arguments in the statements of facts and additional facts included in response to an asserted fact that do not controvert the asserted fact. N.D. Ill. Local R. 56.1(d)(4), (e)(2); *see, e.g.*, [268] ¶¶ 13–14, 16–17, 22–24, 26–30, 35, 41, 60, 62, 68, 70, 83, 97, 107; [285] ¶¶ 4, 13–14, 16, 19, 24–27, 32–33, 43, 48. Both parties object to statements of facts because they are immaterial to the motion at issue, but an objection to materiality doesn't controvert the fact asserted. Unsupported assertions are disregarded. *See* N.D. Ill. Local R. 56.1(d)(2)–(3); Fed. R. Civ. P. 56(c)(1)(A); *see, e.g.*, [268] ¶ 106; [285] ¶¶ 10, 26, 34. I also consider "other materials in the record" as appropriate. Fed. R. Civ. P. 56(c)(3).

## A.    Garcia's Murder and Initial Investigation

Shortly after midnight on September 16, 1991, Rafael Garcia was shot on the South Side of Chicago. *See* [268] ¶¶ 5, 12.[2] Garcia exited a restaurant near the intersection of Fifty-First Street and South Racine Avenue and entered his car. *See id.* ¶¶ 5–6, 9. Someone shot him. *See id.* ¶ 9. A few minutes later, two Chicago police officers arrived. *See id.* ¶ 5. They found Garcia lying in the street in a pool of blood close to his car. *See id.* ¶¶ 5–6. The passenger side window of the vehicle was broken, and shell casings and an order of chicken were on the front seat. *Id.* ¶ 6. The owner of the restaurant said that he heard five gunshots and then called police. *Id.* ¶ 7.

Detectives Louis Caesar and Jack McCann responded to the scene of the shooting. [268] ¶ 9.[3] Garcia, who was unconscious, was taken from the scene at approximately 12:30 a.m. and admitted to Cook County Hospital. *Id.* ¶ 8. Caesar and McCann went to the hospital but were unable to interview Garcia, who was in surgery. *Id.* ¶ 11. At 10:32 a.m. on September 16, Garcia died. *See id.* ¶ 12. An autopsy concluded that Garcia had died from multiple gunshot wounds. *Id.*

Early in the morning on September 16, the Office of Emergency Management Communications received a tip about the Garcia killing. [268] ¶ 13; *see* [285] ¶ 12. Two Chicago police officers followed up on the call, and spoke to an employee at a liquor store near the scene of the shooting. *See* [268] ¶ 13; [285] ¶ 12. The employee

---

[2] Plaintiff spelled Garcia's name "Raphael." *See* [285] ¶ 2; [269] at 15. But court and medical records use "Rafael." *See* [253-3] at 3; [253-11] at 58.

[3] Detectives Kenneth Boudreau, Louis Caesar, and Michael Kill, along with Officers Michael DeLacy and Ken Burke were employed by the City of Chicago during the Garcia murder investigation. [268] ¶ 3.

said that the shooting had been meant for a man named Snake, who had been a passenger in Garcia's car. *See* [268] ¶ 13; [285] ¶ 12. The employee also said that a Black man named Thomas had been the shooter, that Thomas had been sent by a man named Troy, and gave a description of both men. *See* [285] ¶ 12.

The tip about Snake was passed on to Detectives Caesar and McCann. *See* [268] ¶ 14; [285] ¶ 13. Neither detective spoke to the liquor store employee, *see* [285] ¶ 13, and Caesar and McCann tried and failed to find the owner of the restaurant. *See* [268] ¶ 14. Caesar and McCann wrote reports and left work at noon on September 16. *Id.* ¶ 15. They did not speak with any of the detectives beginning work on the next shift because Caesar and McCann believed that none of the day-shift detectives were assigned to the Garcia investigation. *Id.*

At noon on September 16, Officers Thomas Pack and Michael DeLacy received a call from a woman who said that Anthony Jakes might know something about the Garcia homicide. *See* [268] ¶ 16; [253-3] at 12.[4] The woman said that Jakes lived at the rear house at 1212 West Fifty First Street, three doors down from where Garcia was shot. *See* [268] ¶ 16.

---

[4] Pack and DeLacy's report said that the officers received information that Jakes "was wanted for questioning by [Area 3] Violent Crimes" relating to "a homicide investigation," [266-2] at 3, but that doesn't controvert the fact asserted: that these officers received a tip that Jakes had information about the murder. *See* [268] ¶ 16. Plaintiff also cites to a supplemental report filed by Detectives Caesar and McCann, *see* [266-14], and a report by Detectives Boudreau and Kill, *see* [266-24] at 3, but those reports don't show that Pack and DeLacy falsified the anonymous tip about Jakes or that Pack and DeLacy brought Jakes in for questioning at the direction of Area 3 detectives. *See* [268] ¶ 16; [285] ¶ 26; [266-24] at 3.

4

### B. Jakes's Activities on the Night of September 15

Anthony Jakes was fifteen years old in September 1991. *See* [268] ¶ 2; [285] ¶ 1. Jakes's aunt was his guardian, and owned two buildings—a front and rear house—located at 1212 West 51st Street. *See* [268] ¶ 17.[5] Jakes was living in Chicago at the time of the shooting, *see id.* ¶ 18, but there's a dispute as to whether he was living in the front or rear house at 1212 West 51st Street, and (relatedly) whether the first-floor apartment in the front house was vacant. *See id.* ¶¶ 18–19; [285] ¶ 4; [253-1] at 12, Dep. at 41–42; [253-2] at 5, Dep. at 12.[6]

At some point on the night of September 15, Jakes was in front of 1210 West 51st Street with his cousin, Cleotha Chairse. [285] ¶ 5. There's a dispute as to what happened next. According to Jakes, a car pulled up and someone tossed a bottle through a window of the house at 1210 West 51st Street. *See id.* Jakes then helped his cousin clean up the glass. *See id.* ¶ 6. While in the alley, Jakes and his cousin were approached by three men who wanted to fight. *See id.* ¶¶ 6–7. Jakes ran through the alley towards Throop street. *See id.* ¶ 7.

---

[5] The portion of West 51st Street where Garcia's body was found was visible from both of the front houses at 1210 and 1212 West 51st Street. *See* [268] ¶ 22; [253-1] at 98, Dep. at 386–87. Plaintiff's objection, *see* [268] ¶ 22, is overruled. Jakes had personal knowledge of what could be seen from the front house at 1212 West 51st Street, and wasn't speculating as to the field of view from that location. *See id.*; [253-1] at 98, Dep. at 386–87.

[6] Plaintiff's objections are overruled. *See* [268] ¶¶ 17–19. Jakes's living arrangements in and around September 1991 are relevant to the circumstances of his detention and statements to police officers. *See id.* There's a dispute as to whether Jakes and his mother lived in the front house at some point before the shooting. *See id.* ¶ 18; [253-1] at 9–10, 14–15, 34–35, Dep. at 31–33, 52–53, 131–34. Jakes moved with his mother and siblings to Milwaukee for a time, but Jakes had returned to Chicago at the time of the shooting. *See* [268] ¶ 18; [253-1] at 12, Dep. at 41–42; [266-8] at 33–34. To access the rear house at 1212 51st Street from 51st Street, a person had to go through the gangway between the houses at 1212 and 1210 51st Street. [285] ¶ 4.

Chairse remembered a slightly different sequence. *See* [285] ¶¶ 5–7. Chairse testified that he and Jakes threw bottles at passing cars. *See id.* ¶ 6; [253-1] at 323–24, Dep. at 12, 16. One car stopped and approached Jakes and Chairse, at which point Jakes and Chairse ran. *See* [285] ¶ 6; [253-1] at 324, Dep. at 16. Chairse went into the house, and a bottle was thrown through the window. *See* [253-1] at 347, Dep. at 106–07. Chairse didn't remember Jakes helping clean up the broken glass. *See* [285] ¶¶ 5–6; [253-1] at 324–25, 347, Dep. at 16–21, 106–09.

There's a dispute as to whether Jakes served as the lookout for the murder, knew Garcia would be robbed or shot, or witnessed some portion of the crime. *See* [285] ¶ 9; [253-3] at 15; [253-6] at 259–62. Jakes walked back towards 51st Street, at which point he saw an ambulance outside the restaurant. *See* [285] ¶¶ 7–8, 11. Jakes then ran home. *See id.* ¶ 11.

### C.    Officers Seek Jakes for Questioning

Based on the tip they received on September 16, Officers Pack and DeLacy considered Jakes a possible witness to the crime. *See* [268] ¶ 24; [285] ¶ 14; [253-3] at 83.[7] Before looking for Jakes, the officers didn't review reports or talk to any Area 3 detectives. [268] ¶ 23. Along with two other officers, at about 12:30 p.m. Pack and DeLacy went to the rear house at 1212 West 51st Street. *See id.* ¶¶ 23, 25; [285] ¶¶ 14–15. Pack knocked and spoke with Jakes's aunt. [268] ¶ 26. Pack told her that

---

[7] That a report showed that Jakes was wanted for questioning by officers associated with Area 3 Violent Crimes, the officers looked for a weapon, and brought Jakes to Area 3 expecting that he would be questioned, doesn't controvert defendants' asserted fact: that DeLacy and Pack considered Jakes a possible witness. *See* [268] ¶ 24. The fact is admitted.

they were looking to speak with Jakes because officers had reason to believe Jakes knew something about the murder. *See* [268] ¶¶ 26–27.[8] There's a dispute as to whether the officers had permission to enter the house, and whether officers had their guns drawn. *See id.* ¶ 27; [285] ¶ 15; [266-21] at 9–10; [253-1] at 209, Dep. at 79–80; [266-20] at 7.

When the officers arrived, Jakes was upstairs ironing clothing. *See* [285] ¶ 15. Jakes heard the officers arrive, *see id.* ¶ 16, his aunt called for Jakes to come down, and Jakes came to the top of the stairs. *See* [268] ¶ 28. There's a dispute as to what happened next. According to Jakes, officers came up the stairs with guns drawn, slammed Jakes against the wall, and handcuffed him. *See id.*; [285] ¶ 17. Jakes asked what was going on and whether the officers had a search warrant. *See* [266-1] at 25. At Jakes's criminal trial, however, Officer Pack didn't remember any officers slamming Jakes into a wall. *See* [253-2] at 352.

Pack and another officer waited with Jakes while he got dressed. [266-22] at 8–9, 15; *see* [285] ¶ 17. The officers placed Jakes (who was handcuffed) in a police car. *See* [285] ¶ 19.[9] Jakes could not recall if officers read him *Miranda* warnings at the house or told him that he was under arrest. *See* [268] ¶ 30. Officers did not tell Jakes that he was involved in a murder. *See id.* There are disputes as to whether the officers searched the house for a gun, told Jakes's aunt where they were taking Jakes, and

---

[8] Jakes's aunt said that, as the officers were escorting Jakes out, they told her that they were "taking [Jakes] for a warrant" and "were looking for a murder weapon." *See* [268] ¶ 26; [285] ¶ 15; [266-20] at 8.

[9] Jakes's aunt didn't see police handcuff Jakes or strike him, and was unable to describe in detail the officers who entered her home. [268] ¶ 29.

whether she gave officers permission to take Jakes to the police station. *See* [268] ¶¶ 31, 33; [285] ¶¶ 18, 20, 25; [266-20] at 109; [266-6] at 403. No gun was found at Jakes's house, [285] ¶ 18, and officers told his aunt to call police if she found a gun or had any questions. *See* [268] ¶ 33.

Pack and DeLacy transported Jakes to the Area 3 police station. *See* [268] ¶ 34; [285] ¶ 21. They arrived by 12:40 p.m., and Jakes was taken to the third floor. *See* [268] ¶ 34. A sergeant told Pack that the detectives on the case weren't at the station, and that Pack should place Jakes in an interview room. *See* [268] ¶ 35; [285] ¶ 21. Despite the fact that there were no visible bulges in Jakes's clothing, Pack performed a pat-down search at 1:05 p.m., while DeLacy was also present. *See* [268] ¶ 36; [285] ¶ 22. There's a dispute as to whether Pack found a tin foil packet containing what appeared to be drugs in Jakes's pants, or whether Pack and DeLacy planted the packet. *See* [268] ¶¶ 36–37; [285] ¶ 23.

Pack arrested Jakes for possession of a controlled substance. *See* [268] ¶ 38; [285] ¶ 23. Pack read Jakes his rights,[10] and notified Area 3 Youth Division that detectives wanted to ask Jakes about a homicide. [268] ¶ 38. Jakes remained at Area 3, while Pack and DeLacy left the station for the crime lab, where they dropped off

---

[10] Jakes had been arrested several times between 1989 and September 1991, and arrest reports show that he had been given his *Miranda* warnings during those earlier arrests. [268] ¶¶ 2, 76. Plaintiff's hearsay objection is overruled. *See id.* Jakes's arrest records likely fall under the exception for records of a regularly conducted activity, or a record or statement of a public office. *See* Fed. R. Evid. 803(6), (8). Jakes later testified that on three previous occasions he had been given *Miranda* warnings and understood them. *See* [266-48] at 39–40. Jakes's experience with *Miranda* warnings before September 15 is relevant to the voluntariness of his subsequent confession. *See Jackson v. Curry*, 888 F.3d 259, 265 (7th Cir. 2018) ("The evaluation of whether a confession is coerced involves consideration of the totality of the circumstances.").

the suspected narcotics. [268] ¶¶ 38–39; [285] ¶ 24.[11] Neither Pack nor DeLacy asked Jakes about the Garcia homicide, and had no further part in the investigation of Garcia's murder. [268] ¶ 39.

A youth officer processed Jakes for the drug charge at about 3:30 p.m. [268] ¶ 40.[12] Jakes didn't ask to call a lawyer or a family member. *See id.* ¶ 41. There's conflicting evidence as to whether the youth officer (or any other officer) called Jakes's aunt to tell her about Jakes's being at Area 3 and being charged with a drug offense. *See id.* ¶¶ 42–43; [285] ¶ 24. There's also a dispute as to whether the youth officer told Jakes he was no longer under arrest, that Jakes could choose whether to go home or stay for questioning about the homicide, and (relatedly) whether Jakes voluntarily agreed to stay for questioning. *See* [268] ¶¶ 44–45; [285] ¶ 24. Jakes wasn't in handcuffs at this point, and didn't tell the youth officer that he had been mistreated by police at his house or that officers had planted drugs on him. *See* [268] ¶ 46.

---

[11] The contents of the packet tested negative for any controlled substance. [268] ¶ 48. The State's Attorney dropped a possession charge before Jakes's criminal trial, and no evidence about the discovery of the packet was introduced at the trial. *See id.*

[12] There's a dispute as to the nature of this processing. The youth officer said he asked Jakes for information and learned that he had a guardian. *See* [268] ¶¶ 40–41. But Jakes testified during his post-conviction proceedings that the youth officer merely walked in, gave Jakes a piece of paper with a court date, and left. *See* [266-1] at 31–32.

### D.    Jakes's Initial Interviews and Further Investigation

Officers moved Jakes into an interview room. [268] ¶ 47. Two detectives interviewed Jakes at 4:15 p.m. *Id.* ¶ 49.[13] The detectives asked Jakes what he had been doing on September 15. *Id.* ¶ 50. The detectives didn't accuse Jakes of being involved in the murder or show Jakes any photos. *Id.* Jakes told the detectives that at 11:30 p.m. the previous night, Jakes had been in front of a house when a car drove by waving a Mexican flag. *Id.* ¶ 51. Someone threw a bottle from the car, and it hit a window at 1210 West 51st Street. *Id.* Jakes and others cleaned up the glass. *Id.* Jakes said that three men or boys that he had been fighting with arrived, and that Jakes and his cousin ran away. *Id.* Jakes then returned home and saw an ambulance in front of the house, got in an argument with another boy, and Jakes's aunt slapped him and sent him inside. *Id.* The detectives told Jakes that other detectives had more questions for Jakes, left him in the interview room, and had no further interaction with Jakes. *Id.* ¶ 52.

Detectives Kenneth Boudreau and Michael Kill arrived at the police station at about 4:00 or 4:30 p.m. on September 16, and took over the Garcia homicide

---

[13] Jakes couldn't remember which detectives interviewed him first. *See* [268] ¶¶ 50, 52. Officers were instructed that a juvenile giving admissions or statements should be warned that they could be prosecuted as an adult and that an express statement by the juvenile that he understood the meaning of that advice was required. *See* [285] ¶ 37; [266-31] at 4. A general order instructed officers that juveniles should be warned and questioned only in the presence of an adult (such as a parent, relative, or friend) if such an adult could be located. [285] ¶ 37; [266-31] at 4. Defendants' objection is overruled. *See* [285] ¶ 37. How the officers in this case were trained to handle juvenile detainees is relevant to the circumstances of Jakes's detention and subsequent confession. *See Jackson v. Curry*, 888 F.3d 259, 265 (7th Cir. 2018) ("The evaluation of whether a confession is coerced involves consideration of the totality of the circumstances.").

investigation. [268] ¶¶ 15, 53; [285] ¶ 28. Boudreau reviewed reports and learned about the anonymous call that Pack and DeLacy had received, tipping police that Jakes had information about the murder. *See* [268] ¶ 54; [285] ¶ 28. Boudreau also learned that Jakes had agreed to come to Area 3, that his guardian had allowed Jakes to come to the station, and that Jakes had been cited for possession of a suspected controlled substance. *See* [268] ¶ 54; [285] ¶ 28. Another report that Boudreau reviewed discussed the tip from the liquor store employee: that the shooting had been meant for a man named Snake, the passenger in Garcia's car, and that the shooter had been a man named Thomas, who had been sent by a drug dealer, Troy. *See* [268] ¶ 55; [285] ¶ 29; [253-5] at 30, Dep. at 113–14. Boudreau was familiar with Snake from earlier encounters in the neighborhood. [268] ¶ 60; [285] ¶ 35. Boudreau and Kill learned that other detectives had already conducted a short interview with Jakes. *See* [268] ¶ 56.

Kill and Boudreau spoke with Jakes at 4:45 p.m. *See* [268] ¶ 57; [285] ¶ 30. Before interviewing Jakes, Kill and Boudreau didn't try to contact Jakes's aunt or a youth officer at the police station. *See* [285] ¶ 39. In his interview with Kill and Boudreau, Jakes repeated approximately the same account of his activities on the night of September 15 as he had related to the other detectives. *See id.* ¶ 30; [268] ¶ 57. Jakes told the officers that they should speak with his cousins and a neighbor, because they might have more information about the murder. *See* [268] ¶¶ 58–59.[14]

---

[14] During a hearing leading up to his criminal trial, Jakes said that he told Boudreau and Kill that they should speak with his cousin, because she knew who committed the murder. [268] ¶ 58. But during his deposition, Jakes said that he told the officers to speak with his

Detectives Kill and Boudreau left Area 3 and traveled to the scene of the shooting. *See* [268] ¶ 60. Jakes remained in the interview room, which was locked and didn't have a telephone. *See* [285] ¶ 31; [266-1] at 32, 39.[15] No officer offered Jakes anything to eat or drink, to let Jakes leave, or to call a family member. *See* [285] ¶ 31; [266-1] at 39–40. There's a dispute as to whether Jakes wanted to remain at the police station, or wanted to go home because he felt scared and because of how he had been treated. *See* [285] ¶ 32; [266-1] at 38–39; [266-27] at 10.

Kill and Boudreau wanted to look for the individuals that Jakes had told them might have information and find Snake, the suspect identified by other officers. [268] ¶ 60. The detectives spoke to the owner of the sandwich shop near where Garcia was killed, but that person had no information about the murder. *See* [285] ¶¶ 33–34; [266-27] at 11. Boudreau spoke to a young woman who told him that she heard several shots coming from the direction of the restaurant, and that she had gone to the scene of the shooting and heard someone ask if Snake was all right. *See* [268] ¶ 62. Although the detectives wanted to speak to the liquor store employee who had earlier tipped officers, Boudreau and Kill didn't speak with that person or the owner of the liquor

---

cousins because he guessed that they may have had information that would be useful. *Id.* ¶ 59. There's a dispute as to when Jakes learned that his cousins might know something about the murder. *See id.*; [266-48] at 36.

[15] Defendants' objections are overruled, *see* [285] ¶¶ 31–32, because Jakes's earlier testimony is sufficient to create a dispute of material fact. *See United States v. Funds in Amount of $100,120.00*, 730 F.3d 711, 717 (7th Cir. 2013) (citations omitted) (noting that self-serving or unsubstantiated testimony can create a dispute of material fact); *McKinney v. Off. of Sheriff of Whitley Cnty.*, 866 F.3d 803, 814 (7th Cir. 2017) (citations omitted).

store, and instead went to look for Snake. *See* [268] ¶ 13; [285] ¶¶ 12, 33; [266-26] at 132–33.

Boudreau interviewed Annette Harris and Nikia Little. *See* [268] ¶ 63. There's a dispute as to whether Boudreau also talked to Jakes's neighbor, Denise Harris. *See id.* ¶¶ 63–64. Notes from the interviews show that Denise Harris was away from home at the time of the shooting, Little was asleep at home at the time, and that Annette Harris was not home at all that evening. *See* [266-24] at 5; [253-5] at 34, Dep. at 129–30. But at her deposition, Denise Harris said that she hadn't spoken to police about the shooting. *See* [268] ¶ 64.

Boudreau and Kill found Gus "Snake" Robinson, and he agreed to be interviewed at Area 3. *See* [268] ¶ 68; [285] ¶ 35. Kill and Boudreau returned to Area 3 around 9:30 p.m. on September 16, and interviewed Robinson. [268] ¶ 70; [285] ¶ 35. Robinson told the detectives that Jakes approached him at roughly 11:50 p.m. on September 15, and asked if Robinson would help rob someone in the sandwich shop, and if Robinson would act as a look out while Jakes, "Little A," and a friend robbed the man. [268] ¶ 70.[16]

---

[16] Robinson never said that Kill or Boudreau mistreated him, and repeatedly gave the same account of what happened on September 15. [268] ¶ 72. At his deposition, Robinson repeatedly invoked the Fifth Amendment and refused to answer numerous questions, including whether Robinson testified truthfully at Jakes's trial, whether Boudreau and Kill made promises or threats during his interview, whether Robinson made up his statement to detectives, whether Jakes asked him to be a look out, and whether he saw Jakes participate in the murder. *Id.*; [285] ¶ 36.

### E.    Jakes's Confessions and Pre-Trial Detention

Boudreau and Kill spoke to Jakes a second time at around 10:45 p.m. *See* [268] ¶¶ 71, 73, 75. No one else was in the room. *Id.* ¶ 75. Jakes wasn't handcuffed for the interview and agreed to speak with the detectives. *Id.* There's a dispute as to whether Boudreau and Kill read Jakes his *Miranda* rights. *See id.*; [266-48] at 15–16. The detectives asked Jakes questions about the Garcia murder. [268] ¶ 77. Kill presented a picture of Jakes, and told him that "the guy in the picture know[s] who committed this murder." *Id.* Jakes told the detectives that he didn't know what they were talking about. *See id.* ¶ 78; [285] ¶ 41.

There's a dispute as to how the interview proceeded. Boudreau says that neither he nor Kill threatened Jakes, made promises to him, or physically abused Jakes. *See* [268] ¶ 78. But according to Jakes, Kill slapped him repeatedly, threatened to push him out of a window, turn him and his family over to a gang, and burn him with a cigarette. *See id.*; [285] ¶ 40. Jakes also testified that Kill knocked Jakes to the floor, kicked him, and stomped on his back. [268] ¶ 78. Kill told Jakes that the state's attorney was coming, and that Jakes had "better tell [Kill] what [Kill] wants to hear, or [Kill] was going to give me some more of what I just had." *Id.* ¶ 79. Jakes didn't cry out or make any noise when he was being kicked by Kill, and couldn't remember bleeding after the beating. *See id.* ¶ 80.

Jakes made or repeated a statement. *See* [268] ¶ 81. According to Boudreau, Jakes confessed to being the lookout during the murder. *See id.* A police report shows that Jakes confessed to being a lookout for another man, "Little A." *See* [253-3] at 15.

But Jakes testified that he merely repeated a story that he was given by Kill and Boudreau, that the detectives said if he cooperated he might be able to go home, and that he understood he would be beaten if he didn't cooperate. *See id.*; [266-1] at 54–58.[17] Boudreau and Kill arrested Jakes, and prepared a report. *See* [268] ¶¶ 81, 84.

At 12:30 a.m. on September 17, Detective Louis Caesar began his shift at Area 3. [268] ¶ 86. Kill and Boudreau told Caesar that Jakes had implicated himself in the Garcia murder and was in custody. *See id.* Caesar didn't speak with Jakes and didn't know whether Jakes had been threatened or promised anything by other officers. *See id.*

Kill and Boudreau called Area 3's Youth Division and the Cook County Felony Review Unit at 1:30 a.m. [268] ¶ 87. Assistant State's Attorney Brian Grossman arrived at Area 3 at about 2 a.m., and Youth Officer Kenneth Burke arrived at 3:45 a.m. *Id.* Caesar told Burke about the status of the investigation. *Id.* There's conflicting evidence as to whether Burke spoke with Jakes. At the motion to suppress hearing, Jakes had no memory of the conversation with Burke. *See id.* ¶ 90. But Burke testified at his deposition that he spoke with Jakes for about five minutes at roughly 4:00 a.m. *Id.* ¶ 88. According to Burke, Jakes told Burke that he had been treated well by the officers, and that he didn't need his aunt to be present. *See id.*

---

[17] During a hearing on his motion to suppress, Jakes said that Kill told Jakes to tell officers what they wanted to hear, but didn't tell Jakes what to say. *See* [268] ¶ 95. Jakes wasn't abused in any other interview with police officers. *Id.* ¶ 83.

¶ 89.[18] Burke advised Jakes of his *Miranda* rights and told Jakes that he could be tried as an adult. *See id.* Jakes understood his rights and was willing to speak with Burke. *See id.*

Burke, Caesar, Kill, and Grossman entered the interview room at around 4:15 a.m. [268] ¶ 91. Kill introduced Grossman and left the room. *Id.* Grossman told Jakes that he was an assistant state's attorney (not Jakes's lawyer) and that he wanted to ask Jakes some questions. *Id.* ¶ 92. Grossman gave Jakes his *Miranda* warnings, and then interviewed Jakes for an hour. *See id.* Burke and Caesar were present, and there's a dispute as to whether Kill was also in the room for portions of the interview. *See id.* ¶ 91; [285] ¶ 43; [266-50] at 92.

Jakes told Grossman that officers had treated him well and that no one had threatened Jakes or made promises to him while Grossman was present. *See* [268] ¶ 94. Jakes confessed to the murder. *See* [266-37]. During the course of the interview, at times Grossman said "little stuff" that led Jakes "to finish the statement for [Grossman]." *See* [285] ¶ 44; [268] ¶ 96; [266-6] at 459–60. In other words, Grossman led Jakes, who followed his direction. *See* [266-6] at 463. For instance, Grossman led Jakes to say that one of the murderers told Jakes to "get the corner," and may have put those words in Jakes's mouth. *See id.* at 465. Along with other details that ultimately appeared in Jakes's confession, Jakes was led by Grossman to say that he acted as a lookout. *See id.* at 467; [285] ¶ 44; [266-37]. Jakes told Grossman that after

---

[18] Burke did not have any reason to suspect that Jakes had been mistreated before he arrived at Area 3. *See* [268] ¶ 90. Burke believed that Boudreau and Kill had already attempted to contact Jakes's guardian. *See* [285] ¶ 42; [266-34] at 93.

Garcia was shot, Jakes ran home to 1212 West 51st Street and saw Garcia's body from the window of Jakes's house. *See* [268] ¶ 93. Grossman made a written record of Jakes's statement, reviewed it line by line with Jakes, and Jakes initialed corrections to the statement and signed each page. *Id*. Burke and Caesar also signed the confession. *Id*. The interview was complete by about 5:00 a.m. on September 17. *Id*.[19] Grossman never told Jakes that Jakes could be charged as an adult or charged with murder. [285] ¶ 46.

On the morning of September 18, Jakes was admitted to the Cook County Juvenile Detention Center. [268] ¶ 97. Jakes's intake records showed no complaints of injuries or illnesses when Jakes was admitted. *See id*. A pediatrician examined Jakes on September 20 by looking at Jakes's upper body and face, and asking Jakes if he was injured. *See id*. ¶ 98. Jakes didn't complain of any injury, or about being mistreated by police officers, *see id*. ¶ 99, but noted that he had been hit in the back a week before. *See id*. ¶ 98. The doctor found a nonrecent, superficial scar on Jakes's back that appeared to be more than two days old, and not caused by blunt-force trauma. *See id*.

### F.    Arnold Day, the Trial, and Jakes's Vacated Conviction

According to a police report, sometime after Jakes's confession to Boudreau and Kill, officers identified "Little A" as Arnold Day. *See* [253-3] at 15. Jakes and Day knew one another in 1991, and for at least a year before that. *See* [266-6] at 159–60;

---

[19] At his deposition, Jakes testified that parts of his confession were things that Kill told Jakes to say, things that Grossman led Jakes to say, or things that Jakes told Grossman to make the statement "look good so I could go home." [268] ¶ 96.

[266-42] at 134. Day would regularly sit on Jakes's porch, but the two weren't friends. *See* [266-42] at 134–37; [266-6] at 159–60. Day's nickname in 1991 was "Little A," *see* [266-42] at 87, and Jakes knew that Day went by that name. *See* [266-6] at 161.

Little A was first mentioned as having taken part in the murder by Gus Robinson during his interview with Boudreau and Kill. *See* [253-3] at 14. Police reports and Jakes's written confession show that Jakes similarly implicated Little A in the murder. *See id.* at 15; [266-37] at 3. According to Jakes, however, Detective Kill told him to implicate Little A. *See* [266-6] at 462.

On February 4, 1992, Detective Boudreau questioned Day about the Garcia homicide. [268] ¶ 100. A police report shows that Day confessed, and an assistant state's attorney documented Day's confession, which didn't mention Jakes or otherwise refer to a lookout. *See id*. Day later denied having confessed, [253-7] at 33–34, and testified during his criminal trial that another detective abused him in Boudreau's presence and that his confession was coerced through abuse by Boudreau and two other officers. [268] ¶ 100. Day said that the statement was false, made up by Boudreau. [285] ¶ 48; [266-42] at 312, 353, 380–81, 407–408.

Jakes was tried along with Day for the Garcia murder, before separate juries. *See* [285] ¶ 2; [253-2] at 208–10. The prosecution's theory of the offense was that Jakes served as a lookout while Day robbed and shot Garcia. *See* [253-2] at 703–07. Jakes testified, and denied seeing Robinson or serving as a lookout for Day. *See* [268] ¶ 102. Over the state's objection, the trial court admitted Day's written confession into evidence, and (at Jakes's request) allowed Day to read his confession to Jakes's

jury without mentioning that police allegedly coerced the statement. *See id.* ¶¶ 102–04. Jakes's attorney was aware during the trial that Day had claimed that his confession was coerced. *See* [253-2] at 527. The state cross-examined Day about Day's prior convictions, his relationship with Jakes, and his membership in a gang, including whether Day knew about a gang rule against implicating other gang members in crimes. *See id.* at 663–66.

In closing argument, Jakes's defense attorney argued that Day's confession was evidence of Jakes's innocence, because Day hadn't implicated Jakes in the murder. *See* [253-2] at 726–27. In rebuttal, the state argued that Day's confession was consistent with Jakes's confession—noting factual similarities—and also that Day hadn't implicated Jakes to comply with a gang prohibition against informing on fellow gang members. *See id.* at 741–43. Jakes was found guilty of the murder, and sentenced to forty years imprisonment. *See* [285] ¶ 2.

In 2004, Jakes filed a petition seeking to vacate his conviction. *See* [268] ¶ 105. Nine years later, Jakes obtained post-conviction review and an evidentiary hearing. *Id.* ¶ 106. In 2018, the Cook County State's Attorney withdrew the state's opposition to the petition, and the state court vacated Jakes's conviction. *See* [285] ¶ 3; [268] ¶ 106; [266-5] at 2. A year later, Jakes obtained (and the special prosecutor did not oppose) a certificate of innocence. *See* [268] ¶ 106; [285] ¶ 3.

### III. Analysis

#### A. Fabrication

An officer who "manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of [his] liberty in some way." *Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017) (quoting *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012) and citing *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)). Fabricated testimony is made up, always false, and known to be false by the officer. *See Fields v. Wharrie*, 740 F.3d 1107, 1110, 1112 (7th Cir. 2014) (distinguishing fabrication from coercion, when an officer coerces a witness "to say what may be true"); *Petty v. City of Chicago*, 754 F.3d 416, 422 (7th Cir. 2014) (citing *Whitlock*, 682 F.3d at 571–72). Fabricated evidence never helps a jury perform its truth-seeking function, which is why convictions "premised on deliberately falsified evidence will always violate the defendant's right to due process." *Avery*, 847 F.3d at 439.

To show individual liability for any constitutional violation under § 1983, a plaintiff needs to show that each defendant was personally involved in the unlawful conduct. *See Johnson v. Rimmer*, 936 F.3d 695, 710–11 (7th Cir. 2019) (quoting *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017)). Direct participation isn't required. *See Minix v. Canarecci*, 597 F.3d 824, 833–34 (7th Cir. 2010) (citation omitted). But to hold an officer individually responsible, Jakes must prove that the officer (1) participated directly in the alleged violation; (2) knew about the conduct;

20

(3) facilitated the conduct; or (4) approved, condoned, or turned a blind eye to it. *Rasho v. Elyea*, 856 F.3d 469, 478 (7th Cir. 2017) (citations omitted).

At issue here are Jakes's Fifth and Fourteenth Amendment due process claims against Officer Burke and Detective Caesar related to Jakes's interview with Assistant State's Attorney Grossman and claims against Detective Boudreau based on the fabrication of Arnold Day's statement. *See* [269] at 27–37; [250] at 8–9, 28–30, 32–33. Jakes is not pursuing any fabrication claim against Officer DeLacy, or theories of fabrication related to Gus Robinson's statement. *See* [269] at 35 nn. 9–10.

### 1. Detective Caesar and Officer Burke

Detective Caesar arrived at the police station at 12:30 a.m. on September 17, 1991, and knew that Jakes had implicated himself in the Garcia homicide. *See* [268] ¶ 86. Officer Burke arrived at 3:45 a.m. and was briefed on the status of the investigation. *See id.* ¶ 87. Both officers were present when Assistant State's Attorney Grossman interviewed Jakes. *See id.* ¶ 91. Grossman said "little stuff that led [Jakes] to finish the statement for [Grossman]." [266-6] at 459–60; *see* [285] ¶ 44. Jakes testified at his deposition that many of the details of his confession were things that Grossman led him to say. *See* [266-6] at 459–81. For instance, Jakes said that the statement that he had known one of the others involved in the shooting for a year and a half "probably came from me and Grossman," that he was "led to say" how many shells were in a gun involved in the crime, that an instruction from the shooter

21

"[sounded] like something Grossman probably told me – led me to say," and that Jakes was "always told by them to say I was the lookout." *Id.* at 462, 464–65, 467.

Jakes argues that Caesar and Burke fabricated the confession made to Grossman because they were present when Grossman fed Jakes details about the crime. *See* [269] at 24–26, 35–37. But on this record, no jury could conclude that defendants were personally involved in any fabrication.

There's no evidence that Caesar and Burke made up Jakes's statement themselves, or that they gave Jakes any direction at all during the interview with Grossman. And these officers couldn't have known, facilitated, or turned a blind eye to any fabrication by Grossman, either. The evidence is that Grossman *led* Jakes to say things—not that Grossman made the confession up and then told Jakes to repeat it. That distinction matters. Asking leading questions is a sign of coercion (not fabrication). *See Dassey v. Dittmann*, 877 F.3d 297, 312 (7th Cir. 2017); *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991) (quoting *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960)) ("[C]oercion can be mental as well as physical."); *United States v. Preston*, 751 F.3d 1008, 1021–28 (9th Cir. 2014). Grossman suggested some details that Jakes adopted into his confession, but it's not reasonable to infer based only on that questioning that Caesar and Burke knew that Jakes's adopted statements were false. *See Anderson v. City of Rockford*, 932 F.3d 494, 510 (7th Cir. 2019) (quoting *Petty v. City of Chicago*, 754 F.3d 416, 423 (7th Cir. 2014)).

This case isn't like those when fabrication claims reached a jury. *Cf. Whitlock v. Brueggemann*, 682 F.3d 567, 576–87 (7th Cir. 2012) (affirming a district court's

denial of absolute and qualified immunity when a jury could have found that a prosecutor knowingly falsified evidence); *Patrick v. City of Chicago*, 213 F.Supp.3d 1033, 1050 (N.D. Ill. 2016) (holding that a jury could find fabrication based on evidence that officers fed plaintiffs "details about the murders and forced them to confess accordingly, all based on a prefabricated script concocted by Defendants"); *Phillips v. City of Chicago*, No. 14 C 9372, 2018 WL 1309881, at *26 (N.D. Ill. Mar. 13, 2018) (holding that a jury could find a due process violation when defendants provided plaintiffs "with pre-written stories, urged them to adopt the stories and promised them leniency if they did, and coached them as they tried to memorize the details of the stories"). In those cases, officers created confessions from thin air and fed them to witnesses. Here, by contrast, (crediting Jakes's account) Grossman *led* Jakes to certain details in his statement but didn't create those details or the confession as a whole from nothing. *See* [266-6] at 459–81. Burke and Caesar weren't aware of evidence that undercut Jakes's confession and couldn't have known that his statements were false. *See* [268] ¶¶ 86–94. These defendants were not personally involved in any fabrication.

Summary judgment is granted to defendants Caesar and Burke as to this theory of a due process violation.

2.    *Detective Boudreau*[20]

At the criminal trial, Day read his confession to the jury without mentioning that officers fabricated the statement. *See* [268] ¶¶ 102–04. While not contesting (for purposes of summary judgment) that Day's statement was fabricated or his own knowledge of the confession's falsity, Detective Boudreau argues that Day's statement was not used to deprive Jakes of liberty. *See* [250] at 28–30.

If Day's fabricated confession was used "in some way" to secure Jakes's conviction, that would be a violation of plaintiff's right to a fair trial. *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012); *see Petty v. City of Chicago*, 754 F.3d 416, 421–22 (7th Cir. 2014). But if the evidence wasn't used to secure a conviction, the officer responsible hasn't violated due process. *See Bianchi v. McQueen*, 818 F.3d 309, 319 (7th Cir. 2016). Jakes must prove that there's a reasonable likelihood that the fabricated evidence affected the judgment of the jury. *Patrick v. City of Chicago*, 974 F.3d 824, 835 (7th Cir. 2020) (citation omitted). If the fabricated evidence was immaterial, it did not cause an unconstitutional conviction. *Id.*

Plaintiff was convicted of Garcia's murder. *See* [285] ¶ 2. Jakes argues that his conviction was based on Day's false confession because its existence put Jakes between a rock and a hard place. *See* [269] at 32. The fabricated confession forced Jakes to choose between calling Day to testify about Jakes's innocence (testimony

---

[20] Defendant Boudreau is not seeking summary judgment as to the due process claims against him based on Jakes's own confession. *See* [250] at 8–9. Plaintiff made no argument that any officer except Boudreau fabricated Day's confession, *see* [269] at 28–35, and so waived this theory of liability as to the other defendants. *See Nichols v. Michigan City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) (citing *Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999)).

that likely would have also expressed Day's innocence, which would then have been impeached with the fabricated confession), or introducing into evidence the fabricated statement itself (which did not incriminate Jakes, so by inference corroborated Jakes's claim to innocence). *See id.* Plaintiff chose the latter course. *See* [268] ¶¶ 102–04. Jakes argues that things would have turned out differently had Day testified without the confession, because Day would have corroborated Jakes's testimony about the night of the murder. *See* [269] at 30.

Plaintiff's counterfactual boils down to the proposition that Day's unimpeached testimony would have undercut Jakes's own confession and bolstered Jakes's credibility at trial. But there's no evidence to support this theory. For one thing, Day's confession didn't mention Jakes, *see* [268] ¶ 100; [253-2] at 659–62, which means that Day's actual trial testimony—fabricated or not—already had exculpatory value. So there must be some evidence to suggest a different kind of exculpatory statement from Day would have affected the outcome, but Jakes points to none. For example, he argues that his attorney chose to forgo the risk of impeachment with Day's confession, *see* [269] at 32, but there's no evidence that Jakes's attorney actually made that choice. *See* [253-2] at 525–35. It's speculation, not a reasonable inference based on evidence, to argue that Day's hypothetical testimony (free from the taint of the confession) would have corroborated Jakes's trial testimony and undermined Jakes's confession in a better way than Day's confession as used by Jakes did. Day testified at his deposition that his confession was false and that he wasn't at the scene of the murder, *see* [285] ¶ 48; [266-42] at 407–08, but that doesn't show why his hypothetical

trial testimony would have further lined up with Jakes's, since Jakes testified about his own whereabouts, not Day's. *See* [253-2] at 582. No jury could conclude that the absence of Day's hypothetical, unimpeached testimony affected the outcome of Jakes's criminal trial.

Boudreau emphasizes that Day's confession was admitted by Jakes over the prosecution's objection, and argues that the prosecution did not use the fabricated evidence to obtain the conviction. *See* [250] at 28–30. But at Jakes's trial, the prosecutor used Day's confession against Jakes in two ways. First, to undermine the exculpatory value of Day's statement, the prosecutor suggested that Day's omission of Jakes from the statement could be chalked up to gang-member loyalty. *See* [253-2] at 665, 741–42. Second, the prosecutor argued that Day's statement incriminated Jakes by pointing out how Day's confession lined up with Jakes's confession. *See id.* at 741–43. The prosecution likely never intended to use Day's confession against Jakes (it would be improper for them to even try), but once Jakes put it in, the prosecution tried to spin it to its advantage. The jury convicted, and another jury could reasonably conclude that Day's confession influenced that verdict.[21]

---

[21] That Jakes had an opportunity to examine Day on the stand does not mean that Jakes's due process rights weren't violated. The rule that due process requires evidence to be tested by cross-examination and contrary proofs, *see Buie v. McAdory*, 341 F.3d 623, 625 (7th Cir. 2003); *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1029 (7th Cir. 2006), doesn't mean that the effects of fabricated evidence are necessarily cured in this way. *Starks v. City of Waukegan*, 123 F.Supp.3d 1036, 1049 (N.D. Ill. 2015), cited by Boudreau, applied the proposition that "[t]he Constitution does not require that police testify truthfully" to reject a due process claim based on alleged fabrications. But that maxim, applied in *Sornberger* to a *Brady* claim (one that requires a deprivation of evidence), does not provide the rule of decision for a fabricated evidence claim. *Whitlock, Patrick*, and *Avery* make clear that fabricated evidence never helps the jury perform its truth-seeking function. If fabricated evidence is used to secure a conviction, due process is violated, regardless of a defendant's opportunities

Summary judgment is granted to all defendants, except Boudreau, as to Jakes's due process claims based on Day's confession.

## B. Coercion

Jakes brings coercive interrogation claims under the Fifth and Fourteenth Amendments against Officer DeLacy. *See* [1] ¶¶ 117–38.[22] Using a coerced confession against a defendant in a criminal proceeding violates the Fifth Amendment's protection against compelled self-incrimination. *See* U.S. Const. amend. V; *Miller v. Fenton*, 474 U.S. 104, 109–10 (1985); *Jackson v. Curry*, 888 F.3d 259, 265 (7th Cir. 2018). A confession based on abuse also violates the due process clause of the Fourteenth Amendment. *See* U.S. Const. amend. XIV, § 1; *Chavez v. Martinez*, 538 U.S. 760, 773 (2003) (plurality opinion); *United States v. Stadfeld*, 689 F.3d 705, 709 (7th Cir. 2012) (quoting *United States v. Huerta*, 239 F.3d 865, 871 (7th Cir. 2001)).

Coerced testimony happens when "a witness is forced by improper means to give" a statement, which may be true or false. *Fields v. Wharrie*, 740 F.3d 1107, 1110 (7th Cir. 2014). Jakes can show that his confession was coerced by proving, based on the totality of the circumstances, that his "will was overborne." *Arizona v.*

---

to challenge that evidence. *See Whitlock v. Brueggemann*, 682 F.3d 567, 580–83 (7th Cir. 2012); *Saunders-El v. Rohde*, 778 F.3d 556, 559–61 (7th Cir. 2015). In this case, considering how Day's confession was used by the prosecution at Jakes's trial, a jury could conclude that this evidence led to Jakes's conviction.

[22] Defendants also moved for summary judgment as to coercion claims against Detective Caesar and Officer Burke. *See* [250] at 20–23. Plaintiff failed to respond. Jakes's brief makes no argument as to how these defendants coerced his confession to the state's attorney, and instead argues only that they participated in fabrication (as discussed above at 21–23). *See* [269] at 24–26, 35–37. By failing to address defendants' argument about coercion (rather than fabrication), Jakes waived his coercion claims against Caesar and Burke. *See Nichols v. Michigan City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) (citing *Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999)).

*Fulminante*, 499 U.S. 279, 288 (1991). Courts assess the characteristics of the accused and the details of the interrogation, including the existence of physical and mental abuse. *See Dassey v. Dittmann*, 877 F.3d 297, 303–04 (7th Cir. 2017); *Jackson v. Curry*, 888 F.3d 259, 265 (7th Cir. 2018). Relevant are the suspect's age, intelligence, and mental state, the length of the detention, the nature of the interrogations, whether the suspect received *Miranda* warnings, whether physical coercion occurred, and the deprivation of food or sleep. *United States v. Brooks*, 125 F.3d 484, 492 (7th Cir. 1997). Coercion is determined from the perspective of a reasonable person in Jakes's position. *Hicks v. Hepp*, 871 F.3d 513, 527 (7th Cir. 2017) (citation omitted).

Jakes argues that DeLacy participated in the coercion of his confession to Boudreau and Kill. *See* [269] at 22–24. According to plaintiff, DeLacy falsely (and roughly) arrested Jakes and charged him with a drug crime, which loosened Jakes's lips in the subsequent interview with Boudreau and Kill. *See id.* Jakes also argues that DeLacy and Pack waited before searching Jakes so as to detain him until Kill and Boudreau could take over the investigation. *See id.*

On September 16, Officers DeLacy and Pack received a tip that Jakes might know something about the murder. *See* [268] ¶¶ 16, 24; [285] ¶ 14. DeLacy was one of four officers who went to Jakes's home, and it's reasonable to infer that he and other officers entered without permission, at some point had their guns drawn, slammed Jakes into a wall, handcuffed him, and transported Jakes to a police station. *See* [268] ¶¶ 27–28, 34; [285] ¶¶ 15, 17, 20–21. It's also reasonable to infer that DeLacy was present when Pack planted drugs on Jakes. *See* [268] ¶¶ 36–37; [285]

¶¶ 22–23. Pack and DeLacy arrested Jakes for possession of drugs, left the police station sometime shortly after 1:05 p.m., and had no further part in the investigation. *See* [285] ¶¶ 23–24; [268] ¶¶ 36, 38–39. DeLacy never questioned Jakes about his involvement in the homicide. *See* [268] ¶¶ 30, 39. Jakes wasn't interviewed by Detectives Boudreau and Kill until 4:15 p.m., and wasn't allegedly coerced into giving a confession until 10:45 p.m. *Id.* ¶¶ 49, 73.

Plaintiff is right that Officer DeLacy's conduct—along with the other circumstances leading up to Jakes's interview with Boudreau and Kill—is relevant to Jakes's coercion claims. *See Jackson*, 888 F.3d at 265; *Hicks*, 871 F.3d at 527 (citation omitted). But in addition to proving that coercion actually occurred, Jakes must show that DeLacy was personally involved in violating his rights. *See Wilson v. Warren Cnty., Ill.*, 830 F.3d 464, 469 (7th Cir. 2016) (citation omitted). Jakes can't overcome that hurdle.

It's reasonable to infer that DeLacy knew Jakes would be questioned by detectives at Area 3 about the Garcia homicide. *See* [268] ¶ 35. But there's no evidence that DeLacy knew *which* detectives would interview Jakes, or the detectives' schedules such that he and Pack could manipulate Jakes's detention so as to ensure that Jakes would be interviewed by certain officers. DeLacy wasn't working with Boudreau and Kill, wasn't present during their interviews with Jakes, and his alleged misconduct occurred many hours before the alleged coercion of Jakes's confession. DeLacy's misconduct is not, by itself, sufficient for a jury to conclude that Jakes's free will would necessarily be overcome by any subsequent interaction with police officers

29

who asked Jakes questions. And there's no evidence that DeLacy knew what techniques would be used against Jakes such that DeLacy's conduct could support an inference that DeLacy was involved in subsequent coercion. Based on the absence of evidence connecting DeLacy with the coercion by Boudreau and Kill, no jury could conclude that DeLacy knew about, approved, or otherwise was personally involved in coercing Jakes's confession.[23]

Summary judgment is granted to defendants DeLacy, Burke, and Caesar as to Counts I and II.

## C. Other Claims

Jakes hasn't shown that defendants DeLacy, Caesar, or Burke were personally involved in coercing or fabricating his confession. Plaintiffs' other claims against these defendants fail for similar reasons.

### 1. Unlawful Pretrial Detention and Malicious Prosecution

In Count Four, Jakes alleges that defendants detained him without probable cause in violation of the Fourth Amendment. *See* [1] ¶¶ 154–59. And in Count Seven, Jakes alleges that defendants maliciously prosecuted him. *See id.* ¶¶ 174–78.[24]

---

[23] This case isn't like *Wilson*, because there's no evidence that DeLacy was present when Jakes's confession was coerced or that DeLacy knew that Jakes was being coerced into confessing. *See Wilson v. City of Chicago*, 707 F.Supp. 379, 385 (N.D. Ill. 1989).

[24] Jakes isn't pursuing a Fourth Amendment claim based on his detention for drug possession, *see* [269] at 11 n.1, and instead argues that defendants unlawfully detained him for the Garcia killing. *See id.* Jakes wasn't prosecuted for drug possession, *see* [268] ¶ 48, and waived any argument that his malicious prosecution claim is based on proceedings related to the drug evidence. *See* [250] at 46; [269] at 45.

To succeed on his unlawful pretrial detention claim, Jakes must prove that defendants caused his detention and didn't have probable cause. *See Lewis v. City of Chicago*, 914 F.3d 472, 476–77 (7th Cir. 2019); *Mitchell v. City of Elgin*, 912 F.3d 1012, 1015 (7th Cir. 2019). Under Illinois law, malicious prosecution requires a showing that a defendant caused the commencement or continuance of a judicial proceeding against Jakes. *See Beaman v. Freesmeyer*, 2019 IL 122654, ¶¶ 43–46 (citations omitted) (holding that liability "extends to all persons who played a significant role in causing the prosecution of the plaintiff" and that the analysis should focus on whether the defendant's conduct is "both the cause in fact and a proximate cause of the commencement or continuation" of proceedings).

As discussed above, Officer DeLacy left the police station many hours before Jakes was arrested for murder, and never questioned Jakes. *See* [268] ¶¶ 39, 81. Detective Caesar and Officer Burke arrived at the station after Jakes had already been arrested by Detectives Boudreau and Kill, and were present in the room with the assistant state's attorney during a subsequent interview with Jakes. *See id.* ¶¶ 81, 86–87, 91–96. Because these officers weren't involved in the decision to detain Jakes or in developing the probable cause to support that detention, Jakes hasn't shown that DeLacy, Caesar, or Burke caused his detention or played any role in causing the commencement of criminal proceedings against him. *See Johnson v. Rimmer*, 936 F.3d 695, 710–11 (7th Cir. 2019) (citing *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017)); *Beaman*, 2019 IL 122654 ¶¶ 43–46.

These officers are granted summary judgment as to Counts Four and Seven.

### 2.    *Failure to Intervene*

An officer who is present and fails to prevent other law enforcement officers from infringing the constitutional rights of a citizen is liable under § 1983 if that officer had reason to know that a constitutional violation was being committed and a realistic opportunity to intervene. *Doxtator v. O'Brien*, 39 F.4th 852, 864–65 (7th Cir. 2022) (quoting *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994)).

In this case, defendants have conceded that a jury could find that Detectives Boudreau and Kill coerced and fabricated Jakes's confession and detained him without probable cause. *See* [250] at 8–9. Plaintiff hasn't shown that any other officers violated his rights by fabricating or coercing his confession made to the state's attorney, fabricating drug evidence, or falsely arresting him for drug possession. *See above* at 21–23, 27–30; [269] at 35 n.10 (plaintiff abandoned his fabrication claim related to the drug evidence); [269] at 11 n.1. (plaintiff isn't pursuing a Fourth Amendment claim based on false arrest for drug possession). Without showing these underlying violations, plaintiff can only base his failure to intervene claims on the alleged violations by Boudreau and Kill. *See Rosado v. Gonzalez*, 832 F.3d 714, 718 (7th Cir. 2016) (quoting *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005)).

Officer DeLacy left the station long before Boudreau and Kill arrived, and there's no evidence that DeLacy knew or should have known about any impending violations. *See* [268] ¶¶ 39, 73–75. Detective Caesar and Officer Burke came to the station after Boudreau and Kill had allegedly coerced or fabricated Jakes's confession, *see id.* ¶¶ 86–87, and had no reason to know that Jakes's had been fed a confession,

forced to make one, or that Jakes was arrested without probable cause. These defendants didn't have reason to know about any violation or a realistic opportunity to prevent the resulting harm. *See Stewardson v. Biggs*, 43 F.4th 732, 736 (7th Cir. 2022) (quoting *Yang*, 37 F.3d at 285) (noting that a realistic opportunity to intervene may exist "if an officer could have 'called for a backup, called for help, or at least cautioned [the officer] to stop'"). No jury could find that defendants failed to intervene to stop Boudreau and Kill from violating Jakes's rights.

These defendants are granted summary judgment as to Count Five.

### 3.    *Conspiracy*

Jakes brings both state-law and federal claims for conspiracy. *See* [1] ¶¶ 166–73, 182–86. An agreement involving the defendants is a requirement under either federal or Illinois law. *See Adcock v. Brakegate, Ltd.*, 164 Ill.2d 54, 62–64 (1994); *Turner v. Hirschbach Motor Lines*, 854 F.3d 926, 930 (7th Cir. 2017) (citations omitted) (applying Illinois law); *Daugherty v. Page*, 906 F.3d 606, 612 (7th Cir. 2018) (citing *Owens v. Evans*, 878 F.3d 559, 565 (7th Cir. 2017)) (applying the federal standard under § 1983).

Jakes argues that DeLacy agreed with Boudreau and Kill to frame Jakes. *See* [269] at 39–41. As evidence of their agreement, Jakes points to the allegedly wrongful seizure of Jakes at his home, the delay between when DeLacy and Pack arrived at the police station with Jakes and when Jakes was searched, and the alleged planting of narcotics. *See id.* But it's not reasonable to infer from this circumstantial evidence that DeLacy had an agreement with Detectives Boudreau and Kill. There's no

evidence that DeLacy was working with Boudreau and Kill, knew when they would arrive at Area 3, or ever communicated with them about Jakes or the Garcia homicide. DeLacy's actions may have created the conditions for Boudreau and Kill's subsequent conduct, but without some suggestion of contact between these officers, that's not evidence of an agreement. *See Turner*, 854 F.3d at 930 (quoting *Adcock*, 164 Ill.2d at 64); *Amundsen v. Chicago Park Dist.*, 218 F.3d 712, 718 (7th Cir. 2000).

Jakes's conspiracy claims against Caesar and Burke turn on the premise that these officers knew the state's attorney was fabricating Jakes's confession. *See* [269] at 41–42. As discussed above at 21–23, however, these officers couldn't have known that Jakes's confession was false or that the state's attorney was violating Jakes's rights. That Burke didn't call Jakes's guardian and the assistant state's attorney didn't warn Jakes that he could be charged with murder and tried as an adult, *see* [285] ¶¶ 42, 46, isn't evidence of an agreement, either. Burke believed that other officers had already attempted to contact Jakes's aunt, *see id.* ¶ 42; [266-34] at 93–94, and plaintiff hasn't shown that the assistant state's attorney was required to warn him about how his case might proceed, such that the absence of a warning would allow a jury to infer an agreement among defendants.

Plaintiff hasn't shown an agreement involving DeLacy, Caesar, and Burke.[25] These officers are granted summary judgment as to Counts Six and Nine.

---

[25] Because plaintiff hasn't presented evidence to show that defendants entered an agreement, I decline to reach the issue of qualified immunity on this claim. *See* [250] at 43–44; [269] at 43–44. Without deciding the question here, however, I don't agree that qualified immunity is an available defense to the doctrine of conspiracy liability under § 1983. *See Walker v. White*, No. 16 CV 7024, 2021 WL 1058096, at *16 n.16 (N.D. Ill. Mar. 19, 2021).

### 4. *Intentional Infliction of Emotional Distress*

The tort of intentional infliction of emotional distress requires a showing of "extreme and outrageous conduct" that causes "severe emotional distress." *Richards v. United States Steel*, 869 F.3d 557, 566 (7th Cir. 2017) (citing *Feltmeier v. Feltmeier*, 207 Ill.2d 263, 268–69 (2003)). Plaintiff's alleged emotional injuries all stem from his incarceration. *See* [269] at 44–45. But there's no evidence that Caesar, Burke, or DeLacy caused Jakes to be wrongfully imprisoned (leading to severe emotional distress).

These defendants are granted summary judgment as to Count Eight.

## IV. Conclusion

Defendants' motion for summary judgment, [246], is granted in part. The parties shall file a status report on June 5, 2023, with an update on remaining discovery issues and their availability for trial in 2024.

ENTER:

_____
Manish S. Shah
United States District Judge

Date: May 22, 2023

35